## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CIVIL NO. _____

| | | |
|---|---|---|
| **RICARDO SANCHEZ, Jr.,** | **:** | |
| | **:** | |
| **Movant** | **:** | **THIS IS A CAPITAL CASE** |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |

### RICARDO SANCHEZ'S MOTION TO
### VACATE, SET ASIDE, OR CORRECT
### SENTENCE PURSUANT TO 28 U.S.C. § 2255

**Matthew C. Lawry**
**Aren Adjoian**
Federal Community Defender Office
 for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 928-0520
Fax: (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

*Counsel for Ricardo Sanchez, Jr.*

Dated:  May 3, 2016

**TABLE OF CONTENTS**

Preliminary Statement.............................................................................................. 1

Procedural History .................................................................................................. 2

Grounds for Relief .................................................................................................. 4

I. Mr. Sanchez's Rights to Due Process, to an Impartial Jury, to be Free From Cruel and Unusual Punishment, And Under the Federal Death Penalty Act Were Violated Where Jurors Provided Dishonest, Inaccurate, and/or Incomplete Information in their Juror Questionnaires and During Voir Dire and Otherwise Committed Misconduct.............. 5

II. Mr. Sanchez's Murder Convictions and Resulting Death Sentences are Based on an Impermissibly Vague Statute, in Violation of Due Process and the Eighth Amendment........................................................................................................ 14

A. Carjacking Under § 2119 Does Not Categorically Qualify as a Crime of Violence Under the Force Clause................................................................................ 15

B. Section 924(c)'s Residual Clause is Unconstitutionally Vague..................................... 17

1. *Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a crime of violence. .................................................................. 17

2. *Johnson* renders § 924(c)(3)(B) unconstitutionally vague........................................... 18

C. Mr. Sanchez's Convictions and Death Sentences Are Invalid Because the Jury Was Given the Option of Convicting Him for Either a Drug Trafficking Offense or the Constitutionally Invalid Crime of Violence................................................................. 19

III. Mr. Sanchez is Ineligible for the Punishment of Death Pursuant to the Constitution of the United States and Other Federal Law. .................................................................. 20

A. Mr. Sanchez Exhibits Significant Intellectual Deficits, and his General Intellectual Functioning is and has been Significantly Limited Throughout his Childhood, Adolescence, and Adulthood. ....................................................................... 23

B. Throughout his Life, Mr. Sanchez has Demonstrated Deficits in Adaptive Functioning. ....................................................................................... 29

i

1. Beginning in childhood and continuing throughout his adulthood to the present day, Mr. Sanchez has exhibited significant deficits in conceptual skills............................ 29

2. Mr. Sanchez's practical adaptive skills are, and have been since his childhood, significantly limited. .................................................................................. 32

3. Mr. Sanchez has demonstrated significant limitations in skills in the social domain of adaptive functioning. .............................................................. 33

C. Experts Qualified to Assess Intellectual Disability Have Concluded that Mr. Sanchez is Intellectually Disabled.................................................................... 35

D. Mr. Sanchez Is Ineligible for the Death Penalty Because His Brain Dysfunction, Mental Disorders, and Mental Age Render the Penalty Unconstitutionally Excessive................................................................................................. 37

E. Conclusion.............................................................................................. 38

IV. Mr. Sanchez was Incompetent to Stand Trial, Trial Ccounsel was Ineffective for Failing to Investigate, Develop, and Present Evidence of His Incompetence, and the Court Did not Order an Assessment of or Hearing to Determine his Competence. ....... 38

A. Mr. Sanchez Has Significant Impairments in Intellectual Functioning, Neuropsychological Impairments, and Psychiatric Symptoms. ................................. 39

1. Impairments in intellectual functioning. ....................................... 39

2. Neuropsychological impairments. ............................................... 41

3. Mr. Sanchez suffered debilitating psychiatric symptoms at the time of the preparations for trial and during trial proceedings.................................... 42

B. As a Result of his Impairments and Psychiatric Symptoms, Mr. Sanchez was Incompetent to Stand Trial............................................................................ 43

1. Mr. Sanchez was unable rationally and properly to assist his counsel pretrial and at the capital trial............................................................... 43

2. Mr. Sanchez did not understand the nature and consequences of the proceedings leading up to his capital trial and during the capital trial itself................................. 45

C. Trial Counsel Failed to Investigate, Prepare, and Present Evidence of Mr. Sanchez's Incompetence. .......................................................................... 46

1. Prevailing professional standards. ............................................... 46

2. Deficient performance. .............................................................. 47

3. Prejudice. ............................................................................... 48

D. The Court Failed to Order an Assessment of Mr. Sanchez's Competence or Hold a Hearing to Determine Mr. Sanchez's Competence........................................ 49

E. Conclusion.............................................................................................. 50

V. The Prosecution's Presentation of Testimony of a Medical Examiner Who Did Not Conduct or Observe the Autopsies of the Victims Violated Mr. Sanchez's Rights Under the Fifth, Sixth, and Eighth Amendments; Trial Counsel were Ineffective for Failing to Object to the Substitution of the Medical Examiner.............................. 50

A. Mr. Sanchez's Rights Under the Fifth, Sixth, and Eighth Amendment Were Violated. 51

B. Counsel Were Ineffective for Failing to Object to Dr. Mittleman's Testimony. ........... 54

 1. Prevailing professional norms...................................................................... 54

 2. Deficient performance. ................................................................................. 54

 3. Prejudice. ..................................................................................................... 56

VI. The Government Violated its Obligations Pursuant to Brady v. Maryland by Failing to Disclose Exculpatory Information to the Defense that was Material to the Guilt and Penalty Phases of Trial................................................................................................ 58

A. The Government Failed to Disclose Material Exculpatory Information Regarding Danny Varela. ...................................................................................................... 59

B. The Government Failed to Disclose Material Exculpatory Information Regarding Potential Third Party Guilt, Including Information Regarding Yessica Escobedo's Cell Phone...................................................................................................................... 68

C. The Government Failed to Disclose Material Exculpatory Information Regarding the Alleged Drug Deal in Daytona Beach. ......................................................... 68

D. The Government Failed to Disclose Material Exculpatory Information From the Security Booth at the Briar Bay Neighborhood. .......................................... 69

E. The Government Failed to Disclose Material Exculpatory Information Regarding Benefits Provided to Cooperating Witness Kevin Vetere.............................. 71

F. The Government Failed to Disclose Material Exculpatory Information of Mr. Sanchez's Lessened Culpability for the Murders............................................ 72

G. The Cumulative Materiality of the Withheld Evidence Requires that Mr. Sanchez be Granted a New Trial and/or Penalty Hearing. ............................ 72

VII. Mr. Sanchez was Deprived of the Effective assistance of Counsel at the Guilt Phase of his capital trial. ................................................................................................ 73

A. Trial Counsel Unreasonably and Prejudicially Failed to Challenge the Composition and Selection of the Grand and Petit Jury Venires in Violation of the Fifth, Sixth, and Eighth Amendments................................................................................... 74

 1. Prevailing professional norms...................................................................... 74

 2. Deficient performance. ................................................................................. 74

 3. Prejudice. ..................................................................................................... 75

B. Trial Counsel Unreasonably and Prejudicially Failed to investigate and Properly Challenge the Government's Toolmark Evidence........................................... 81

 1. Prevailing professional norms...................................................................... 81

 2. Deficient performance. ................................................................................. 81

 3. Prejudice. ..................................................................................................... 84

C. Trial Counsel Rendered Ineffective Assistance by Failing to Investigate and Present the Testimony of a Qualified Expert in Cellular Forensics. ........................ 87

1. Prevailing professional norms.................................................................................. 87

2. Deficient performance. ........................................................................................... 87

3. Prejudice. ............................................................................................................... 91

D. Trial Counsel Unreasonably and Prejudicially Failed to Object to the Charges Contained in Counts 7 through 10, and to the Jury Instructions and Verdicts on those Counts. ....................................................................................................................... 91

1. Prevailing professional norms.................................................................................. 91

2. Deficient performance. ........................................................................................... 92

3. Prejudice. ............................................................................................................... 94

E. Trial Counsel Unreasonably and Prejudicially Failed to Object to the Prosecutor's Misconduct During the Guilt Phase Closing Arguments............................................... 95

1. Prevailing professional norms.................................................................................. 95

2. Deficient performance. ........................................................................................... 95

3. Prejudice. ............................................................................................................... 97

F. Counsel's Unreasonable Errors and Omissions Individually and Cumulatively Prejudiced the Defense at Mr. Sanchez's Capital Trial. ............................................... 98

VIII. Mr. Sanchez was Deprived of the Effective Assistance of Counsel at the Penalty Phase of his Capital Trial........................................................................................... 99

A. Trial Counsel Ineffectively Failed to Investigate and Present the Jury with Compelling Evidence of Mr. Sanchez's Personal Background and Psychological and Social Development and Functioning.................................................................................... 100

1. Prevailing professional norms................................................................................ 100

2. Deficient performance. ......................................................................................... 101

3. Prejudice. ............................................................................................................. 105

B. Trial Counsel Ineffectively Failed to Present Evidence of Mr. Sanchez's Significant Neuropsychological Impairments and the Effect Upon His Behavior of these Impairments. ........................................................................................................... 123

1. Prevailing professional norms................................................................................ 123

2. Deficient performance. ......................................................................................... 124

3. Prejudice. ............................................................................................................. 125

C. Trial Counsel Ineffectively Failed to Investigate, Develop and Present Expert Mental Health Testimony Regarding Mr. Sanchez's Psychiatric Disorders and the Effect of Such Disorders on Mr. Sanchez's Behavior and Functioning. ................................... 127

1. Prevailing professional norms................................................................................ 127

2. Deficient performance. ......................................................................................... 127

3. Prejudice. ............................................................................................................. 128

D.    Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Present to the Jury Compelling Evidence that Mr. Sanchez is Intellectually Disabled and the Effects of that Disability on his Behavior and Functioning. .................................................... 138

    1.    Prevailing professional norms.................................................................................. 138

    2.    Deficient performance. ............................................................................................ 139

    3.    Prejudice. ................................................................................................................. 140

E.    Trial Counsel Unreasonably and Prejudicially Failed to Investigate Mr. Sanchez's Competence to Stand Trial at the Penalty Phase, and to Present Evidence to the Court that Mr. Sanchez was Incompetent. ................................................................................ 141

    1.    Prevailing professional norms.................................................................................. 141

    2.    Deficient performance. ............................................................................................ 141

    3.    Prejudice. ................................................................................................................. 142

F.    Trial Counsel Rendered Ineffective Assistance to Mr. Sanchez by Their Errors and Omissions in Consultation with the Mental Health Experts Retained by the Defense.142

    1.    Prevailing professional norms.................................................................................. 142

    2.    Deficient performance. ............................................................................................ 142

    3.    Prejudice. ................................................................................................................. 146

G.    Trial Counsel Unreasonably and Prejudicially Failed to Identify and Present to the Jury Critical Information about Mr. Sanchez's Traumatic Background and Disabilities from Documentary Evidence in Counsel's Possession. ....................................................... 147

    1.    Prevailing professional norms.................................................................................. 147

    2.    Deficient performance. ............................................................................................ 148

    3.    Prejudice. ................................................................................................................. 149

H.    Trial Counsel Unreasonably and Prejudicially Failed to Impeach and Discredit the Testimony of Government Mental Health Expert Michael Brannon........................... 154

    1.    Prevailing professional norms.................................................................................. 154

    2.    Deficient performance. ............................................................................................ 154

    3.    Prejudice. ................................................................................................................. 156

I.    Trial Counsel Unreasonably and Prejudicially Failed to Investigate, Challenge, and Mitigate the Evidence Introduced in Aggravation by the Prosecution. ....................... 157

    1.    Prevailing professional norms.................................................................................. 158

    2.    Deficient performance. ............................................................................................ 158

    3.    Prejudice. ................................................................................................................. 161

J.    Mr. Sanchez's Trial Counsel Rendered Prejudicially Ineffective Assistance by Failing to Object to the Prosecution's Misconduct During the Penalty Phase. ........... 162

    1.    Prevailing professional norms.................................................................................. 162

    2.    Deficient performance. ............................................................................................ 162

　　　3.　　Prejudice. ................................................................................... 163

　K.　Mr. Sanchez's Trial Counsel Rendered Prejudicially Ineffective Assistance by
　　　Failing to Object to Penalty Phase Jury Instructions That Interfered With the
　　　Jurors' Ability to Consider Proffered Mitigating Factors. .......................................... 163

　　　1.　　Prevailing professional norms. ..................................................... 164

　　　2.　　Deficient performance. ................................................................ 164

　　　3.　　Prejudice. ................................................................................... 165

　L.　Counsel's Unreasonable Errors and Omissions Individually and Cumulatively
　　　Prejudiced the Defense at the Penalty Phase of Mr. Sanchez's Trial. ........................ 165

IX.　Mr. Sanchez's Death Sentence Violates the Eighth Amendment to the United States
　　　Constitution's Prohibition Against Cruel and Unusual Punishments. ......................... 165

　A.　The Death Penalty is a Disproportionate Sentence Even for the Gravest of  Offenses.
　　　........................................................................................................................... 167

　　　1.　　There is a national trend toward abolition. ................................... 167

　　　2.　　The death penalty is excessive. ................................................... 170

　　　3.　　The United States is out of step with the international community's consensus
　　　　　against the death penalty. ......................................................... 171

　B.　The Capital Punishment Schemes in the United States, Including the Federal Death
　　　Penalty Act, Are Unconstitutional Because They Fail to Ensure Reliability,
　　　Consistency, and Equal Protection of Law. ............................................................ 173

　　　1.　　Reliability. .................................................................................. 173

　　　2.　　Arbitrariness. .............................................................................. 173

　　　3.　　Racial discrimination. ................................................................. 175

　C.　The Conditions Under Which Mr. Sanchez Is Confined Under Sentence of Death, and
　　　the Length of Time Under Which He Will be Confined Prior to Execution, Constitute
　　　Conditions of Physical and Psychological Torture and Inhumane Treatment. ............. 177

　　　1.　　Physical conditions of confinement. ............................................ 177

　　　2.　　The psychologically torturous nature of the prolonged confinement under the
　　　　　conditions detailed above while under a sentence of death constitutes a violation of
　　　　　the Eighth Amendment ban on cruel and unusual punishment. ............... 180

　D.　Method of Execution. ......................................................................................... 181

　E.　Conclusion. ....................................................................................................... 182

X.　The Security Measures Used by the Court During Trial Denied Mr. Sanchez His
　　　Rights to a Jury Trial, to the Presumption of Innocence, To Due Process, To the
　　　Effective Assistance of Counsel, and to Be Free From Cruel and Unusual
　　　Punishment. ....................................................................................................... 183

XI.　Mr. Sanchez is Entitled to Relief Based Upon the Cumulative Impact of the
　　　Constitutional and Statutory Violations Described in this Motion. ............................ 185

**PRELIMINARY STATEMENT**

Ricardo Sanchez, Jr., a young man with multiple intellectual and psychiatric impairments, was capitally tried while incompetent before a jury that contained jurors partial against him, on charges that were unconstitutionally void for vagueness. His counsel at trial failed to present evidence to support their theory of guilt phase defense and to challenge evidence presented by the prosecution. Mr. Sanchez's lawyers also failed to investigate, develop, and introduce evidence of Mr. Sanchez's traumatic childhood and a lifelong history of being failed by individuals and institutions supposed to protect him. Mr. Sanchez's convictions and death sentences are invalid; relief should be granted.

Mr. Sanchez was convicted and sentenced to death in a case involving the murders of four members of the Escobedo family: Jose Luis Escobedo, his wife Yessica, and their sons, Luis Julian and Luis Damian.  Mr. Sanchez was sentenced to death in relation to the deaths of Julian and Damian Escobedo. This was a lengthy trial, joined with the trial of two non-capital defendants in a related drug conspiracy, and involving another capital defendant, Daniel Troya.

In this Motion, Mr. Sanchez demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

References to the consecutively numbered transcripts of the trial proceedings before this Court are cited as "Tr." followed by a page citation. Pre-trial and post-trial proceedings are cited as "Tr." followed by the date of the proceeding and page citation. All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

1

## PROCEDURAL HISTORY

1.      In October 2006, Danny Varela, Daniel Troya, Ricardo Sanchez, Jr., and Liana Lopez were arrested in connection with a narcotics conspiracy led by Mr. Varela. The government later indicted them for multiple narcotics and weapons offenses. Mr. Sanchez and Daniel Troya also faced charges for the murders of the Escobedo family.

2.      Mr. Sanchez was ultimately charged in this Court, by means of the Third Superseding Indictment, with: conspiring to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a) and 846 (Count 1); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2 (Counts 4 and 13); conspiring to carjack a motor vehicle, in violation of 18 U.S.C. §§ 371 and 2119(3) (Count 5); being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a), and 2 (Count 14); using a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 15); and five capital charges: carjacking resulting in the deaths of all four Escobedos, in violation of 18 U.S.C. § 2119(3) (Count 6); and use of a firearm in connection with a crime of violence or drug trafficking crime, causing the deaths of Damian, Julian, Yessica, and Jose Luis Escobedo, respectively, in violation of 18 U.S.C. § 924(j) and 18 U.S.C. § 1111 (Counts 7 through 10). *United States v. Varela et al.*, No. 06-CR-80171-DTKH (S.D. Fla.).

3.      Mr. Sanchez pled not guilty on all counts. Mr. Sanchez did not testify at trial or at sentencing.

4.      After a jury trial, Mr. Sanchez was convicted of all counts on March 5, 2009.

5.      Following a capital sentencing proceeding before the same jury, Mr. Sanchez was sentenced to death on Counts 7 and 8 (the charges relating to Damian and Julian Escobedo), and to consecutive life sentences on the other murder charges, on May 13, 2009. On that same date, the Court sentenced Mr. Sanchez to concurrent life terms on Counts 1 and 13, 480 months'

2

imprisonment on Count 4, 60 months' imprisonment on Counts 5 and 14, and a consecutive term of 60 months' imprisonment on Count 15.

6.      Mr. Sanchez appealed and on October 2, 2013, the Eleventh Circuit affirmed the judgment. *United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013).[1]

7.      Mr. Sanchez's petition for writ of certiorari was denied by the United States Supreme Court on May 4, 2015. *Sanchez v. United States*, 135 S. Ct. 2048 (2015). The certiorari petition raised three issues: (1) Whether the prosecution's use of an "examining" expert to rebut

---

[1] On direct appeal, Mr. Sanchez raised or adopted from Mr. Troya's brief the following issues: (1) The Court's failure to identify jurors who would automatically impose the death penalty resulted in a jury unqualified to sit in this capital case; (2) The Court erred in denying Mr. Sanchez's *Batson* challenge; (3) The Court abused its discretion by requiring the capital and noncapital defendants to unanimously exercise twenty peremptory challenges; (4) Evidence of Mr. Sanchez's involvement in several shooting and firearm incidents that were unrelated to the charged offenses was improperly admitted and exploited by the government; (5) Testimony of uncharged drug trafficking by Mr. Varela outside the time period of the drug trafficking conspiracy was improperly admitted; (6) Statements by Mr. Troya were admitted in violation of Mr. Sanchez's rights under *Bruton*; (7) Cumulative error at the guilt-phase trial; (8) The Court's evidentiary rulings and instructions to the jury regarding Mr. Sanchez's relationship with his son prevented the jury from giving effect to important mitigation about Mr. Sanchez's character; (9) The Court improperly permitted testimony based on Mr. Sanchez's compelled statements to a government psychologist; (10) Prosecutorial misconduct by the government at penalty phase closing argument, including falsely vouching to jurors that Daniel Varela, the kingpin of the drug operation and the apparent instigator of the murders, would continue to be investigated and would ultimately be capitally prosecuted; (11) The Court's instructions and the verdict sheet created the risk of a coerced, arbitrary death sentence; (12) The Court's instructions improperly invited jurors to find and weigh the non-statutory aggravating factor that Mr. Sanchez had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such act; (13) The Court erred in excluding critical, reliable expert testimony that Mr. Sanchez would make a positive adjustment to prison and could safely be managed if sentenced to life; (14) The jury's critical aggravation findings that Mr. Sanchez had substantially planned in advance the killings of the two child victims and done so to eliminate them as witnesses lacked legally sufficient supporting evidence; (15) The government failed to present legally sufficient evidence to support the statutory vulnerable-victim aggravating factor; (16) The jury wrongly weighed the aggravating factor of pecuniary-gain in sentencing Mr. Sanchez to die for the deaths of the two child victims; (17) The Court violated Mr. Sanchez's Sixth Amendment right to jury trial by refusing to instruct jurors that the aggravating factors needed to outweigh the mitigating ones "beyond a reasonable doubt" before they could vote for a death sentence; and (18) Cumulative error at penalty phase.

a defense "non-examining" expert violated the Fifth Amendment; (2) Whether the Eleventh Circuit's summary denial of numerous issues in a capital direct appeal was improper; and (3) Whether the Eleventh Circuit improperly dismissed as harmless the district court's exclusion of significant, non-cumulative mitigation at a capital-sentencing hearing.

8.     Other than the direct appeals listed above, Mr. Sanchez has not filed any other motions, petitions or applications concerning this judgment of conviction in any court.

9.     Mr. Sanchez seeks relief on the grounds set forth below, as to which he is being held in violation of the Constitution, laws, or treaties of the United States.

## GROUNDS FOR RELIEF

10.     Mr. Sanchez alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his rights to a fair trial, to be free of cruel and unusual punishment, and to due process of law.

11.     Mr. Sanchez moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Mr. Sanchez's claims are not cognizable under § 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241 as to any claim for which § 2255 proves to be ineffective or inadequate to test the legality of his detention and sentences.

I.    MR. SANCHEZ'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO
      BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT, AND UNDER THE
      FEDERAL DEATH PENALTY ACT WERE VIOLATED WHERE JURORS
      PROVIDED DISHONEST, INACCURATE, AND/OR INCOMPLETE
      INFORMATION IN THEIR JUROR QUESTIONNAIRES AND DURING VOIR
      DIRE AND OTHERWISE COMMITTED MISCONDUCT.

[This claim – paragraphs 12 through 51 -- is being filed separately under seal]

5

6

8

9

## II.  MR. SANCHEZ'S MURDER CONVICTIONS AND RESULTING DEATH SENTENCES ARE BASED ON AN IMPERMISSIBLY VAGUE STATUTE, IN VIOLATION OF DUE PROCESS AND THE EIGHTH AMENDMENT.

52.  The allegations included in other claims of this Motion are incorporated by this reference in support of this claim for relief.

53.  Mr. Sanchez was convicted of four counts and sentenced to death on two of those counts for using a firearm during and in relation to a federal crime of violence which resulted in a murder, in violation of 18 U.S.C. § 924(j) & (c)(1), and 18 U.S.C. § 1111.[2] The jury was instructed that it could find Mr. Sanchez guilty of a "crime of violence" based either on a drug trafficking crime or on carjacking in which a killing occurs, under 18 U.S.C. § 2119(3). Pursuant to *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015), however, carjacking fails to qualify categorically as a "crime of violence." Because the jury was given the option to convict Mr. Sanchez and sentence him to death based on an invalid "crime of violence," the murder convictions and death sentences should be vacated.

54.  Section 924(j) required the government to prove that Mr. Sanchez committed a crime of violence as defined under § 924(c). Section 924(c)(3) defines "crime of violence" in either of two ways. It must be a felony that:

> (A)  has an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B)  that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

---

[2] Mr. Sanchez was also convicted of carjacking that resulted in death, a violation of 18 U.S.C. § 2119(3), and was sentenced to life imprisonment without the possibility of parole.

55.     The first clause – § 924(c)(3)(A) – is commonly referred to as the force clause. The other – § 924(c)(3)(B) – is commonly referred to as the residual clause.

56.     As discussed in the next sections, carjacking categorically fails to qualify as a "crime of violence" under the residual clause because that clause is void for vagueness under *Johnson*. In *Johnson*, the Supreme Court struck down the Armed Career Criminal Act's (ACCA) residual clause (18 U.S.C. § 924(e)(2)(B)(ii)) as unconstitutionally vague. 135 S. Ct. at 2557. Under *Johnson*, § 924(c)'s materially indistinguishable residual clause (§ 924(c)(3)(B)) must similarly be stricken as unconstitutional.

57.     Carjacking as defined by 18 U.S.C. § 2119 does not constitute a crime of violence under § 924(c)(3)(A) (the "force clause") because it can be accomplished by "intimidation," which does not require violent physical force and does not require an intentional threat, and because the killing element need not be intentional and can be established by accident and happenstance.

58.     The predicate offense of carjacking in which a killing occurs, as defined by § 2119, which serves as the basis for Mr. Sanchez's § 924(j) conviction and death sentence for using a firearm during and in relation to a federal crime of violence which results in a murder, does not qualify as a "crime of violence" pursuant to *Johnson*.

### A.     Carjacking Under § 2119 Does Not Categorically Qualify as a Crime of Violence Under the Force Clause.

59.     To determine whether a predicate offense qualifies as a "crime of violence" under § 924(c), courts must use the categorical approach. This approach requires that courts look only to the elements of the offense and not to the particular facts underlying the offense in determining whether the offense qualifies as a crime of violence.

15

60.     Furthermore, the definition of "crime of violence" in § 924(c)(3)(A) requires an element of physical, violent force. *See Johnson v. United States*, 559 U.S. 133, 139-41 (2010) (construing a materially identical definition of "crime of violence" under § 924(e)(2)(B)(i) as requiring violent force).

61.     Accordingly, for carjacking under § 2119 to qualify as a "crime of violence" under § 924(c)(3)(A)'s force clause, the offense must necessarily include an element of physical, violent force. Carjacking in which a killing occurs, as defined by § 2119(3), does not meet this requirement because the carjacking itself can be accomplished merely by "intimidation," and because the killing can be purely accidental, neither of which require the use, attempted use or threatened use of "violent force."

62.     To satisfy the intimidation element of carjacking, the government need only prove that the defendant committed an act or made a statement "that would put a reasonable person of ordinary sensibilities in fear of bodily harm." Tr. 7534 (jury instructions). An act such as saying in a menacing voice, "Get out of the car," would satisfy the intimidation element of the statute, even though no violent force was involved and the defendant did not intend to put another in fear of injury.

63.     Moreover, even if the intimidation element is assumed to require a threat, it does not require a threat of violent physical force. A threat that puts someone in fear of bodily harm does not necessarily require a threat to use violent physical force, but could be a threat to take some other action.

64.     The death element of § 2119(3) does not qualify as a crime of violence under the force clause because it also does not require the use of "violent force." Rather, the death element

16

can be satisfied if the death is caused by recklessness, negligence, or accident, including accidents that occur during flight after the taking of the motor vehicle.

65.     Because neither violent force nor the intentional use of violent force are necessary to establish the death element under § 2119(3), it does not qualify under the force clause of § 924(c)(3)(A).

## B.     Section 924(c)'s Residual Clause is Unconstitutionally Vague.

66.     Because § 2119(3) fails to qualify as a "crime of violence" under § 924(c)(3)'s force clause, the validity of Mr. Sanchez's convictions depends on the validity of § 924(c)(3)(B)'s residual clause. Under *Johnson*, however, § 924(c)(3)(B) is void for vagueness.

67.     In *Johnson*, the Supreme Court analyzed the Armed Career Criminal Act's (ACCA) "residual clause," 18 U.S.C. § 924(e)(2)(B)(ii), which parallels § 924(c)(3)(B)'s residual clause in all material respects. As § 924(c)(3)(B) suffers from the identical flaws that compelled the Supreme Court to declare the ACCA residual clause unconstitutionally vague, the conclusion is inescapable that § 924(c)(3)(B) is unconstitutional as well.

### 1.     *Johnson* expressly overruled the "ordinary case" approach to determining whether a felony qualifies as a crime of violence.

68.     In *Johnson*, the Supreme Court held that the ACCA residual clause is unconstitutionally vague because the process by which courts categorize prior convictions as violent felonies is unacceptably "wide ranging" and "indeterminate." *Johnson*, 135 S. Ct. at 2557. As a result, the residual clause "both denies fair notice to defendants and invites arbitrary enforcement by judges." *Id.*

69.     The residual clause requires following the categorical approach to determine whether a particular statute qualifies as a violent felony. *Id.* at 2557. The Court concluded,

17

however, that the process of determining what is embodied in the "ordinary case" is fatally flawed, rendering it unconstitutionally vague. *Id.* at 2557-58.

70.     *Johnson* not only invalidated the ACCA residual clause; it also invalidated the "ordinary case" analysis previously relied on in upholding statutory provisions against vagueness challenges. Thus, while the only way to apply such a residual clause is through "ordinary case" analysis, it is impossible to apply the "ordinary case" analysis in a constitutional manner.

71.     The Court's decision in *Johnson* is a substantive rule that is retroactively applicable. *Welch v. United States*, No. 15-6418, __ U.S. __, slip op. at 9 (April 18, 2016).

### 2.     *Johnson* renders § 924(c)(3)(B) unconstitutionally vague.

72.     The residual clause in § 924(c) suffers the same defects as the ACCA residual clause.[3] Although the risk at issue in the ACCA is a risk of injury, and the risk at issue in § 924(c) is a risk that force will be used, this difference is immaterial to the due process problem and has no impact on *Johnson*'s rationale. The Court's holding did not turn on the type of risk but rather how courts assess and quantify the risk.

73.     The inquiry is the same under the ACCA and § 924(c). The residual clause in § 924(c) and the residual clause in the ACCA suffer from the same constitutional flaws; they both require an "ordinary case" analysis to assess the predicate offense, and also require the court to determine how risky that ordinary case is.

74.     Because this is the same defect that rendered the ACCA residual clause unconstitutional, the residual clause in § 924(c) is also unconstitutional. As a result, the residual

---

[3] ACCA's residual clause defines violent felony as an offense that "otherwise involves conduct that presents a serious potential risk of physical injury to another." § 924(e)(2)(B)(ii). Section 924(c)(3)(B)'s residual clause defines a crime of violence as one that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in committing the offense."

clause cannot be used to support a conviction under § 924(c). Thus, § 2119(3) fails to qualify as a "crime of violence" under § 924(c)'s "force" clause, and § 924(c)'s residual clause is unconstitutionally vague.

> **C.     Mr. Sanchez's Convictions and Death Sentences Are Invalid Because the Jury Was Given the Option of Convicting Him for Either a Drug Trafficking Offense or the Constitutionally Invalid Crime of Violence.**

75.     The Court instructed the jury that carjacking "is in fact classified under the law as a crime of violence" for purposes of 18 U.S.C. § 924(c). Tr. 7536. As set forth above, that instruction was erroneous under *Johnson*.

76.     The Court similarly instructed the jury that the drug conspiracy charge (of which Mr. Sanchez was convicted) was "as a matter of law ... classified as a drug trafficking crime" for purposes of 18 U.S.C. § 924(c). Tr. 7536.

77.     The Court then instructed the jury regarding the elements of Counts 7 through 10 (the murder with a firearms charges), as follows:

> Number one, that the Defendant committed the crime of violence which is set out in Count 6 [(carjacking)], or the drug trafficking crime charged in Count 1.
>
> And two, that during the commission of either or both of those offenses, that the Defendant knowingly carried or used a firearm during and in relation to the crime of violence and/or the drug trafficking crime.
>
> And three, that in the course of using the firearm, the Defendant caused the death of the person described in the particular count of the indictment.
>
> And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense or the killing resulted from the perpetration of or attempted perpetration of the crime of violence alleged in Count 6.

Tr. 7537.

78.     Not only did the Court instruct the jury that the carjacking counts were as a matter of law crimes of violence under § 924(c), the Court also gave the jurors the option of convicting

19

Mr. Sanchez if they found that he committed murder with a firearm "during the commission of" *either* carjacking *or* the drug conspiracy.

79.     Under *Stromberg v. California*, 283 U.S. 359 (1931), and its progeny, it violated due process to allow the jury to convict Mr. Sanchez of the murder charges on the basis of either the drug trafficking crime or the constitutionally invalid "crime of violence" under 18 U.S.C. § 924(c) & (j).

80.     Mr. Sanchez was prejudiced by the due process violation. The jury could have rejected the government's theory that the killings were carried out as part of the drug conspiracy orchestrated by codefendant Varela, while it was obvious that the decedents' automobile was taken from them. Thus, it is likely that one or more members of the jury convicted Mr. Sanchez of Counts 7 through 10 on the basis of the "crime of violence" option rather than the "drug trafficking crime" option. In these circumstances, the due process violation was not harmless.

81.     The violation also prejudiced Mr. Sanchez at capital sentencing. The jury imposed the death sentence only for the murders of the children. It is highly likely that one if not all of the jurors believed that the murders of the children were committed in the course of carjacking, not of a drug offense. But for the instruction on the invalid carjacking predicate offense, the jury likely would not have imposed the death sentence.

82.     Accordingly, this Court should vacate Mr. Sanchez's murder convictions in Counts 7 through 10, and his two death sentences.

**III.     MR. SANCHEZ IS INELIGIBLE FOR THE PUNISHMENT OF DEATH PURSUANT TO THE CONSTITUTION OF THE UNITED STATES AND OTHER FEDERAL LAW.**

83.     The allegations included in all other claims of this Motion are incorporated by reference in support of this claim for relief.

84.     Mr. Sanchez is intellectually disabled,[4] making him categorically ineligible for the punishment of death pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), *Hall v. Florida*, 134 S. Ct. 1986 (2014), *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), and 18 U.S.C. § 3596(c).

85.     Mr. Sanchez's intellectual disability has been manifest since his childhood when he demonstrated significantly limited intellectual functioning and adaptive functioning. His condition has profoundly compromised his ability to function throughout his life and persists to the present. Individuals who, like Mr. Sanchez, suffer from intellectual disability have limited capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. The law recognizes that although people who suffer from intellectual disability are not exempted altogether from criminal sanctions when they commit criminal acts, these deficiencies sufficiently diminish the personal culpability of those charged with or convicted of capital offenses to make them ineligible for the imposition of the sentence of death.

86.     The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) (DSM-5) of the American Psychiatric Association sets forth criteria for identifying intellectual disability. The DSM-5 diagnostic criteria for intellectual disability are: (a) deficits in intellectual

---

[4] In *Atkins*, the United States Supreme Court used the term "mental retardation," which was then in use in the clinical community to describe individuals who are now described as "intellectually disabled." The federal statute prohibiting the execution of these individuals also uses the term "mentally retarded." Following the Court's opinion in *Atkins* and the enactment of 18 U.S.C. § 3596(c), the American Association on Intellectual and Developmental Disabilities (AAIDD), formerly the American Association on Mental Retardation (AAMR), changed the terminology from "mental retardation" to "intellectual disability." *See AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support*, 11th Ed. (2010) at 3. The terms "intellectual disability" and "ID" cover the same population of individuals who were diagnosed previously with mental retardation. *Id*. at xvi. In *Hall v. Florida*, 134 S. Ct. 1986 (2014), the Court adopted the term "intellectual disability," noting that "[t]his change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders." *Id.* at 1990. This Motion will use "intellectual disability" or "ID" rather than "mental retardation" to reflect the terminology currently in use.

functioning, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing; (b) deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility in at least one or more activities of daily life such as communication, social participation, and independent living, across multiple environments; and (c) onset of intellectual and adaptive deficits during the developmental period. DSM-5 at 33.

87.     The AAIDD currently defines intellectual disability as characterized by "significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical skills," originating before age eighteen. AAIDD Ad Hoc Committee on Terminology and Classification, *Intellectual Disability: Definition, Classification, and System of Supports* (11th ed. 2010) (Green Book) at 5. Under the AAIDD standard, an individual must have significant limitations in one of the three domains – conceptual skills, social skills, and practical skills – to be diagnosed as intellectually disabled. Green Book at 47.

88.     Intellectual disability is a heterogeneous condition with multiple causes and may coexist in the presence of diagnosable mental illness. DSM-5 at 38. "Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (*e.g.*, mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population." DSM-5 at 40. Whether or not comorbid conditions are present, "[t]he diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met." DSM-5 at 39.

89.     Mr. Sanchez has been intellectually disabled throughout his life – from early childhood to the present day. His significant limitations in intellectual and adaptive functioning,

22

manifesting during the developmental period, satisfy all relevant definitions of intellectual disability.[5]

### A. Mr. Sanchez Exhibits Significant Intellectual Deficits, and his General Intellectual Functioning is and has been Significantly Limited Throughout his Childhood, Adolescence, and Adulthood.

90. The results of clinical assessment indicate that Mr. Sanchez has demonstrated deficits in intellectual functions including reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, throughout his life, beginning in early childhood and continuing into adulthood.

91. Qualified mental health professionals performing assessments including reviewing critical background documents, reviewing witness statements, and meeting with and administering standardized instruments to Mr. Sanchez have concluded that Mr. Sanchez has deficits in comprehension, working memory, perceptual reasoning, abstract thought, and cognitive efficacy.

92. The results of the administration of reliable intelligence, cognitive, and neuropsychological assessment instruments establish Mr. Sanchez's significantly limited general intellectual functioning.

93. Mr. Sanchez has achieved scores within the range of mild intellectual disability on instruments designed to measure intellectual functioning that were administered when he was a child and while he was pending capital trial.

94. Kevin McGrew, Ph.D., an expert in the development and psychometric analysis of standardized, norm-referenced psychological and educational instruments, reviewed the

---

[5] 18 U.S.C. § 3596(c) does not set forth a specific definition of intellectual disability. The United States Supreme Court has determined that under the Eighth Amendment, "[i]n determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions." *Hall v. Florida*, 134 S.Ct. at 1993.

results of the tests of intellectual functioning administered to Mr. Sanchez during childhood and pending his capital trial, and formed an expert opinion about their reliability, validity, and clinical significance in the context of scientific research and professional literature.

95.     Dr. McGrew has extensive experience as a practicing school psychologist conducting psychological and educational assessments with special education populations. He has served as a measurement consultant to psychological test publishers, national research studies, and organizations. He is the coauthor of the Woodcock-Johnson Battery Third Edition (WJ III, 2001) and the Woodcock-Johnson Battery Fourth Edition (WJ IV, 2014), a widely used, nationally standardized battery of intelligence, oral language, and achievement tests.

96.     Following his review of Mr. Sanchez's pretrial test results and special education records, Dr. McGrew rendered the expert opinions that follow regarding those test results and records.

97.     Mr. Sanchez was administered the Stanford-Binet Fourth Edition (SB-IV) in June 1992, when he was 8 years, 9 months old. He achieved a full scale intelligence quotient (IQ) score that was reported as 80 on this test. Mr. Sanchez's true IQ score on this instrument, when it is adjusted for norm obsolescence and standard error of measurement, falls between 73 and 83, approximately two standard deviations below the norm.[6]

98.     The psychologist who administered the SB-IV to Mr. Sanchez reported that students tended to achieve higher scores on this instrument than on the other instrument used regularly in 1992 to evaluate students' IQs, the Wechsler Intelligence Scale for Children, Revised Edition (WISC-R). He further reported that he administered the SB-IV rather than the

---

[6] When adjusted for norm obsolescence, the score itself is 78. However, psychological and psychometric consensus is that "a person does not obtain a specific IQ score when tested: they obtain a range of possible IQ test scores with a certain degree of confidence."

WISC-R to Mr. Sanchez purposely to ensure that Mr. Sanchez met the criteria for eligibility for special education services as learning disabled rather than as intellectually disabled, at the time considered a stigmatizing diagnosis better avoided. Psychological studies have demonstrated that the SB-IV has been observed to inflate the score for individuals with intellectual disability.

99.     Mr. Sanchez was administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) in March 2008, pending his capital trial. He achieved a full scale IQ score that was reported at 76. Mr. Sanchez's true IQ score on this instrument, when it is adjusted for norm obsolescence and standard error of measurement, falls between 67 and 77,[7] two standard deviations below the norm, and within the range of scores of mild intellectual disability. Of Mr. Sanchez's convergent IQ scores, Mr. Sanchez's score on the WAIS-III administered to him in March 2008 is the score with the least amount of score bias; that is, it is the score that is most accurate and reliable of the scores of tests administered to him prior to trial.

100.    Mr. Sanchez was administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) in December 2008, shortly before his capital trial. He obtained a full scale IQ score of 77. The range of scores within which Mr. Sanchez's IQ falls on this instrument to a 95 percent degree of confidence is 72-82. Scores in this range occur within the mildly intellectually disabled range.

101.    The scores that Mr. Sanchez achieved on these three instruments are convergent. "[A] reasonable degree of score convergence is present when the 95% confidence bands from the different IQ test scores 'overlap or are not far apart.'" This means that these three test scores,

---

[7] When adjusted for norm obsolescence, the score itself is 72. But, as noted in footnote 2 above, "When interpreting Mr. Sanchez's IQ test scores, professional standards and clinical accuracy requires utilizing the 95% confidence interval band from each assessment and not the point-specific IQ score obtained."

obtained over a 16-year period, provide the same approximate estimate of general intelligence for Mr. Sanchez, within the mildly intellectually disabled range.[8] As Dr. McGrew has found:

> Given that Mr. Sanchez's first three IQ score ranges include scores within the zone of scores that meet prong 1 of an intellectual disability diagnosis, it is my scientific and professional opinion that there is sufficient reasonable and reliable evidence that Mr. Sanchez is a person who has IQ scores that fall within the range of scores specified for prong 1 of an intellectual disability diagnosis. This conclusion is consistent with the "unanimous professional consensus that the diagnosis of intellectual disability requires comprehensive assessment and the application of clinical judgment." (Citation omitted).

102.    Mr. Sanchez was administered the WAIS-IV a second time, in January 2016. His full scale IQ score as measured on this occasion was 82. Mr. Sanchez's true IQ score on this instrument, when it is adjusted for norm obsolescence and standard error of measurement, falls between 75 and 83.[9]

103.    Mr. Sanchez's scores in January 2016 on tests of processing speed and working memory, as well as measures of executive functioning, including subtests on the WAIS-IV as well as additional instruments, were consistent with impairment. Persons with deficits in processing speed and working memory have difficulty following and understanding information provided to them because they are slow to process information. Research has demonstrated that low scores on executive functioning tasks may be a proxy for low intelligence.

104.    Congruent data from numerous sources establish and confirm Mr. Sanchez's significant limitations in intellectual functioning. Mr. Sanchez was described by family members

---

[8] Mr. Sanchez was also administered the WAIS-III a second time, late in December 2008, approximately three weeks following the administration of the WAIS-IV in December 2008. He obtained a reported full scale IQ score of 89 on this administration, which, taking into consideration norm obsolescence, is 85. As noted by Dr. McGrew, this score "is an inflated and invalid estimate of Mr. Sanchez's general intelligence due to progressive error practice effects ... and should not be considered when making a determination of a possible diagnosis of intellectual disability for Mr. Sanchez."

[9] When adjusted only for norm obsolescence, the score is 79.

as mentally slow. Mr. Sanchez's friends described him as sweet but low functioning, dopey, and unable to understand even basic games.

105. Mr. Sanchez was not able to understand even simple directions; multiple-step instructions were impossible for him to understand or follow. Very basic instructions had to be repeated to him several times before he understood them. He did not seem to understand when situations were risky or dangerous, and had difficulty understanding even when provided direct warnings about these dangers.

106. Mr. Sanchez's mother noted that Mr. Sanchez seemed to be the most intellectually slow of her children. Mr. Sanchez's mother described that he sometimes seemed to be in another world, did not respond immediately, and was often blank. School personnel suggested that his parents take him to a doctor to evaluate him for these problems, but they did not do so.

107. Educators noted that Mr. Sanchez "seemed to be intellectually disabled." Mr. Sanchez had extreme difficulty reading, and was reading at only a third grade level when he stopped attending high school prior to finishing tenth grade at the age of 19. Mr. Sanchez was identified as having problems learning when he was in kindergarten, and he was assessed and deemed eligible for special education when he was in third grade. Mr. Sanchez failed both ninth and tenth grades, and "made only very minimal progress in school" despite the fact that he was in full-time special education classes from the time he was in elementary school, and he did not graduate from high school. A special education coordinator at Mr. Sanchez's high school observed that Mr. Sanchez "did not have an original idea in his head."

108. Mr. Sanchez's genetic history includes factors associated with elevated risk for impairments in intellectual functioning. Underlying causes of intellectual disability are varied, but can include genetic abnormalities and genetic syndromes, environmental causes, and other

conditions. The fact that multiple individuals in Mr. Sanchez's family exhibited signs of intellectual disability and other developmental disabilities confirms that Mr. Sanchez was predisposed to intellectual impairment.

109.    Both of Mr. Sanchez's parents have very limited cognitive functioning, as measured by tests of nonverbal intelligence: his mother achieved scores in the range of borderline intellectual functioning and his father achieved scores in the range of intellectual disability. Mr. Sanchez's father has exhibited erratic behavior, including numerous episodes of violence, particularly when under the influence of alcohol. Mr. Sanchez's eldest brother, Efrain, has been diagnosed with intellectual disability as well as a severe seizure disorder that has been only poorly controlled with medication. Mr. Sanchez's younger brother, Ezequiel, was diagnosed with a learning disability and received special education services throughout his school career.

110.    Mr. Sanchez was exposed to environmental factors associated with elevated risk for impairments in intellectual functioning. He may have suffered from birth complications; his mother reported that unlike her labor with her other children, when she went into labor with Mr. Sanchez, her water did not break but she started to bleed. Mr. Sanchez was a sickly child who contracted pneumonia and suffered from allergies. He was exposed to neurotoxins in the form of pesticides from the farms on which he and his relatives worked and which were brought into the home on clothing following days in the fields.

111.    Mr. Sanchez suffered head injuries and insults as a child that can negatively affect neurodevelopment. When he was two years old, Mr. Sanchez ingested a large quantity of his brother's anti-seizure medication, after which he exhibited symptoms including lethargy and lack of coordination and was taken to the hospital by ambulance. His mother and sister indicated that he went into a coma and took some time to recover. When Mr. Sanchez was three or four years

old, he fell off a tricycle and hit his head, requiring treatment of staples to his scalp. Mr. Sanchez

sustained blows to the head on several other occasions when riding his bicycle: when he was

about fourteen years old he tried to do a back flip on his bicycle and struck the back of his head

on the ground when he landed. On another occasion he fell and struck his face on the ground.

Mr. Sanchez's father regularly beat Mr. Sanchez, inflicting blows upon his head as well as on

other places on his body.

**B.      Throughout his Life, Mr. Sanchez has Demonstrated Deficits in Adaptive Functioning.**

**1.      Beginning in childhood and continuing throughout his adulthood to the present day, Mr. Sanchez has exhibited significant deficits in conceptual skills.**

112.    Mr. Sanchez exhibited developmental delays beginning in early childhood.

Family members noted that he was a very quiet child; he rarely spoke but he smiled often. It was

difficult to have a conversation with him. He appeared mentally slower than his brothers and

sister, despite their own significant impairments. Mr. Sanchez did not make decisions

independently, but rather simply followed his brothers and sister around, doing what they did and

trying to do what they told him to do. He had difficulty remembering instructions and "had to be

told what to do every step of the way." He "sometimes seemed far away, as if he did not

understand what was going on around him." His school records indicate that he often seemed to

be in a daze. When Mr. Sanchez was a small child, about four years old, he went very close to

the street while playing without seeming to recognize the danger of passing cars or understand

the verbal warnings his grandmother issued to him. He was not able to pay attention to his

grandmother and move away from the road until she threw rocks at him.

113.    Mr. Sanchez's friends noted that he was not "capable of thinking too deeply about

anything" and "never really came up with thoughts of his own on any topic." They reported that

he "could not answer the simplest questions in math class," and did not have "in depth conversations." A friend observed that "He would usually agree and smile when people asked him something. Or when something was complicated, he would act like he didn't care about it."

114. Very shortly after Mr. Sanchez entered public school, his teachers recognized that he had disabilities that required specialized attention. In October 1989, the autumn of Mr. Sanchez's kindergarten year, his teacher observed that he had difficulty understanding and expressing himself in English and needed extra assistance to complete his work correctly; that he was distractible; and that he needed a quiet, isolated place to do his work. He was assigned to receive services through the English for Speakers of Other Languages (ESOL) program, because his teacher perceived his struggles as due to the fact that his family spoke Spanish at home.

115. Mr. Sanchez continued to exhibit academic difficulties in first grade. In November 1990, the fall of his first grade year, he was described as exhibiting "youngness in all areas of development." His teachers observed that he was distractible and unable to stay on task even for short periods of time, as most first graders are able to do; that he was unable to work independently; that he was incapable of following directions; and that he became frustrated easily. Mr. Sanchez performed poorly on academic and achievement testing during his first grade year and in the spring he was placed into services under a federal program entitled Chapter 1, which provided him with additional reading and math assistance.

116. Mr. Sanchez's second grade teachers observed and reported additional academic and functional deficits. His ESOL teacher noted that the ESOL services did not ameliorate Mr. Sanchez's academic problems. In October 1991, Mr. Sanchez was described as unable to complete an assignment without one-to-one assistance and guidance through each individual step of the assignment. He could not learn vocabulary even after multiple drills. Mr. Sanchez was

30

unable to comprehend information presented to him visually or orally; performed below grade level in reading; was distracted and impulsive; exhibited memory impairments; and could not understand and follow instructions. A second grade teacher described Mr. Sanchez as "very needy," and as a student who "could not take the initiative to attempt work on his own, and was not able to or did not feel capable of tackling assignments without individualized intervention."

117.    Mr. Sanchez's second grade teachers recommended him for evaluation for special education services. He received a psychological evaluation in July 1992, when he was eight years, nine months old, during which he was administered academic, intellectual functioning, and achievement testing. The psychologist observed that Mr. Sanchez exhibited distractibility, problems with attention and concentration, processing deficits in immediate sequential, visual and auditory memory, and impaired academic achievement.

118.    Mr. Sanchez demonstrated difficulty with verbal and written skills throughout his school career. He was exempted from standardized testing in high school because "he had such significant conceptual and intellectual deficits."

119.    Although Mr. Sanchez received full time special education services from the middle of his third grade year through the time he left school in tenth grade when he was nearly twenty years old, he made very little academic progress. As one of his teachers described,

> The records indicate that when [Mr. Sanchez] was in the fifth grade, he was working at a fourth grade math level and a first grade level in reading. They further indicate five years later, when he was in tenth grade, he was still achieving at only a fourth grade level in math and was able to write only some information on a personal data sheet.

The teacher concluded from this data that "[t]his lack of progress is consistent with [Mr. Sanchez's] very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well."

31

120. Mr. Sanchez repeated both ninth and tenth grade. He was promoted to tenth grade after his second year in ninth grade not because he had achieved the 2.0 grade point average required for promotion, but because the state of Florida determined in 2000 that students who had a certain number of credits should be promoted in order to take the tenth grade state test. The special education coordinator at Mr. Sanchez's high school reported:

> That policy applied even to those students who were not expected to take the regular state tenth grade examination. As a result, [Mr. Sanchez] was promoted in August 2000 to the tenth grade even though he had achieved a GPA of only 1.10 even in his special classes with accommodations and interventions and alternative curriculum.

### 2. Mr. Sanchez's practical adaptive skills are, and have been since his childhood, significantly limited.

121. From the time of Mr. Sanchez's adolescence, when individuals typically are able to perform many tasks independently and navigate their communities with some degree of self-sufficiency, Mr. Sanchez demonstrated great difficulty in these areas. For example, when Mr. Sanchez was approximately thirteen years old, he was unable to help his sister navigate their travel on buses from Florida to Texas to visit their grandmother.

122. Special education providers working with Mr. Sanchez while he was in high school noted that he would not be able to obtain employment independently and would require assistance to find a job. They also reported that he required specialized instruction and curriculum and direct assistance for the majority of learning activities and weekly personal assistance, monitoring, and intervention in the area of independent functioning. He was "unable to plan and make realistic occupational training and job placement decisions."

123. Mr. Sanchez never lived independently, even after he stopped attending school; he lived with his family and with the family of his girlfriends or with other friends.

124.    Even when Mr. Sanchez was between eighteen and twenty years old, he continued to behave in a manner of a person much younger than he was. He had difficulty comprehending and following even very simple directions, and had to have instructions repeated multiple times and had to be reminded of the steps he was supposed to take in order to perform basic tasks such as buying a soda for his girlfriend's mother at the store. He was unable to remember appointments and had to be reminded where he needed to go and what he was supposed to do. His sister noted that she often "helped him do things he did not seem to know he should do."

125.    As a young adult, Mr. Sanchez did not know how to handle the money he earned working basic construction and other menial jobs. His sister took him to open his first bank account when he was twenty years old. While he and Maria, the mother of his child, were in a relationship, Maria handled his money: she took his paycheck, made sure that it was cashed, and provided money to her mother with whom they were living for rent and for the items her mother bought for their baby.

### 3.    Mr. Sanchez has demonstrated significant limitations in skills in the social domain of adaptive functioning.

126.    People who observed Mr. Sanchez when he was a child described him as a "clown," "goofy," "dopey," and "silly." He liked it when people laughed and wanted to please everyone.

127.    Mr. Sanchez is universally described as a "follower." His family, friends, and teachers observed that Mr. Sanchez "did not have an original idea in his head," "always did whatever others wanted to do," "would go along with anything anyone told him to do and not really think about it," and "took no initiative but simply followed the will of the group." Although he had difficulty following rules, people did not perceive him as intentionally acting

out but rather as unable to do what was expected. For example, a special education professional

at Mr. Sanchez's high school reported:

> [Mr. Sanchez] did not intentionally misbehave, but although he wanted to please his teachers and do what he was supposed to do, he had some difficulty following rules. For example, I often found him in the hallway of the school during class time, and when I said, "Ricky, what are you doing here?" he smiled at me goofily and went immediately back to class without any complaints and without talking back.

128.     Although friends liked him and thought he was sweet, they noted that often he did

not engage actively with those around him. One friend described him as follows:

> Ricky reminded me of two cartoon characters – Eeyore and Mr. Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding contact.

129.     As a young adult, Mr. Sanchez was mistreated and taken advantage of by those

with whom he spent time. Mr. Sanchez's sister and friend described an occasion upon which

Maria, the mother of Mr. Sanchez's child accosted Mr. Sanchez at a restaurant when she came

upon him eating dinner with a new girlfriend. They explained that Mr. Sanchez stood passively,

without fighting back or walking away, while Maria pushed him, struck him, and yelled at him.

130.     Mr. Sanchez's family members, romantic partners, and others described his

gullibility in other situations as well. They note that Mr. Sanchez regularly was taken advantage

of by his cousin, Danny Varela. Mr. Varela and others Mr. Sanchez spent time with made fun of

him, thought he was stupid, did not respect him, yelled at him, and ordered him around. Despite

their treatment of him, Mr. Sanchez "did whatever Danny told him to." Family members

perceived Mr. Sanchez as having no understanding that these individuals were taking advantage

of him, and noted that he believed everything they told him and that he believed that because Mr.

Varela and others involved with him were family members, they were trustworthy.

34

**C.      Experts Qualified to Assess Intellectual Disability Have Concluded that Mr. Sanchez is Intellectually Disabled.**

131.   Kevin McGrew, Ph.D., an expert with extensive experience in the development and psychometric analysis of nationally standardized, norm-referenced psychological and education assessment instruments, has concluded that Mr. Sanchez's scores on tests of intellectual functioning over the course of his life satisfy the first criterion for the diagnosis of intellectual disability. Dr. McGrew has concluded:

> [C]onsistent with prevailing standards in the scientific and clinical communities, Mr. Sanchez's three most valid IQ test scores from 1992, March 2008, and early December 2008[10] (when bounded by a 95% confidence interval and when recognizing the impact of norm obsolescence and practice effects and progressive error practice effects on his IQ test scores) meet or approximate the two standard deviations below the mean IQ diagnostic score range for intellectual disability, such that a complete clinical evaluation, including consideration of adaptive behavior, must be made in order to determine whether he meets criteria for a diagnosis of intellectual disability.

132.   Dr. McGrew's conclusions are based upon his review of materials including but not limited to Mr. Sanchez's results on tests of intellectual functioning administered during his childhood and prior to his capital trial; clinical manuals establishing guidelines for the diagnosis of intellectual disability, including the AAIDD manual from 2010 and the DSM-5; and scientific research and professional literature regarding intellectual test instruments and interpretation of those instruments, including professional standards for interpreting test scores.

133.   Joette James, Ph.D., a neuropsychologist qualified to assess for and diagnose individuals with intellectual disability, has concluded that Mr. Sanchez's impairments in

---

[10] Dr. McGrew concluded that Mr. Sanchez's score on the WAIS-III test administered to him in December 2008 by Dr. Michael Brannon "is most likely a significant overestimate of his general intelligence due to cumulative progressive error practice effects from his two prior 2008 WAIS-III and WAIS-IV test administrations" and that therefore it "is invalid and should not be considered."

intellectual and adaptive functioning arising during the developmental period of his life meet the diagnostic criteria for intellectual disability.

134.   In arriving at her clinical conclusion, Dr. James considered the following sources of relevant information: a clinical interview and neuropsychological assessment of Mr. Sanchez performed over two days, over the course of approximately seven and a half hours; review of vital records, birth and medical records, education records, employment records, and criminal records pertaining to Mr. Sanchez and members of his family; reports, data, and testimony from evaluations of Mr. Sanchez by Drs. Daniel Grant, Katrina Hallmark, Thomas Reidy, and Michael Brannon; the sworn declaration of Dr. McGrew; and accounts from Mr. Sanchez's family members, teachers, friends, mitigation specialists, and others familiar with Mr. Sanchez's and his family's history.

135.   Dr. James' conclusion that Mr. Sanchez is intellectually disabled is based upon her findings that:

- Mr. Sanchez exhibits significant limitations in general intellectual functioning, including in the areas of verbal comprehension, working memory, processing, abstract thought, and cognitive efficiency. These limitations were illustrated by his performance on tests measuring intellectual functioning over the course of his life, including the SB-IV administered in 1992, the WAIS-III administered in March 2008, and the WAIS-IV administered in December 2008 and January 2016, and her conclusions that Mr. Sanchez's performance on these instruments is consistent with descriptions of her abilities and behavior provided by family members, friends, and others throughout his life.

- Mr. Sanchez exhibits limitations in adaptive functioning that manifest as limitations in conceptual, social, and practical skills.

- Mr. Sanchez's limitations in intellectual and adaptive functioning manifested during the developmental period.

**D.      Mr. Sanchez Is Ineligible for the Death Penalty Because His Brain Dysfunction, Mental Disorders, and Mental Age Render the Penalty Unconstitutionally Excessive.**

136.    Mr. Sanchez is an individual who suffers from brain dysfunction and psychiatric impairments, and his behavior and functioning throughout his life and at the time of the crime was that of a person significantly younger than his chronological age. His impairments and the fact that his mental age was comparable to that of an individual below the age of eighteen at the time of the crimes for which he was capitally charged render the death penalty grossly disproportionate to his culpability.

137.    Virtually every major mental health association in the United States has published a policy statement advocating either an outright ban on executing all mentally disordered offenders, or a moratorium until a more comprehensive evaluation system can be implemented. The organizations that take positions against the execution of mentally disordered offenders include, but are not limited to, the American Psychiatric Association, the American Psychological Association, the National Alliance for the Mentally Ill, and the National Mental Health Association.

138.    Under principles of international law, the prohibition against the imposition of the death penalty on mentally disordered individuals qualifies as an international norm or legally binding international law. The execution of persons suffering from mental illness has been condemned explicitly, inter alia, by the Parliamentary Assembly of the Council of Europe and the United Nations Commission on Human Rights as a violation of international law.

139.    At the time of the capital crimes, Mr. Sanchez lacked the maturity and responsibility that adults typically exhibit, and as such his "irresponsible conduct [was] not as morally reprehensible as that of an adult." *Roper v. Simmons*, 543 U.S. 551, 570 (2005) (internal quotations omitted). As set forth above, Mr. Sanchez did not achieve academically beyond an

elementary school level. During his trial, his reading level was so low that the government's mental health expert, Dr. Michael Brannon, was unable to administer to Mr. Sanchez the Minnesota Multiphasic Personality Inventory, an instrument that requires a sixth grade reading level.

140.    As set forth in greater detail above, Mr. Sanchez's behavior and functioning, even after his eighteenth birthday, was comparable to that of a minor. As a result, for the reasons articulated by the Supreme Court, the imposition of the death penalty upon Mr. Sanchez constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and must be set aside.

### E.    Conclusion.

141.    Because the Constitution of the United States and 18 U.S.C. § 3596 prohibit the execution of intellectually disabled individuals like Mr. Sanchez, the Court should vacate Mr. Sanchez's sentence of death.

## IV.    MR. SANCHEZ WAS INCOMPETENT TO STAND TRIAL, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF HIS INCOMPETENCE, AND THE COURT DID NOT ORDER AN ASSESSMENT OF OR HEARING TO DETERMINE HIS COMPETENCE.

142.    The allegations included in all other claims of this Motion are incorporated by this reference in support of this claim for relief.

143.    Mr. Sanchez was unable to understand the nature and consequences of the proceedings against him or rationally or properly assist counsel in the preparation and conduct of his defense leading up to and during his capital trial in 2009. At the time of his capital trial, his neuropsychological and intellectual impairments, and symptoms of psychiatric disorders significantly impaired his functioning and grossly limited his ability to attend to events occurring

around him, understand and engage in oral and written communication, and comprehend and follow directions.

144.    Although Mr. Sanchez's counsel had clear evidence of his incompetence, counsel failed to fully investigate it or request a hearing at which to present evidence of his incompetence. Because trial counsel failed to investigate and request a hearing to determine Mr. Sanchez's competence, and because the Court failed to conduct a hearing, Mr. Sanchez was unconstitutionally tried, convicted, and sentenced to death while incompetent.

145.    Mr. Sanchez's convictions and sentence of death were unlawfully and unconstitutionally imposed in violation of his rights to comprehend and participate in trial proceedings; not to be tried while incompetent; to a reliable determination by a tribunal of his competence to proceed to trial; to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to a trial free of materially false and misleading evidence; to an impartial and disinterested tribunal; to equal protection; and to due process of law. U.S. Const. amends. V, VI, VIII; *Dusky v. United States*, 362 U.S. 402 (1960); *Pate v. Robinson*, 383 U.S. 375 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975); 18 U.S.C. §§ 4241, 4247.

A.    **Mr. Sanchez Has Significant Impairments in Intellectual Functioning, Neuropsychological Impairments, and Psychiatric Symptoms.**

1.    **Impairments in intellectual functioning.**

146.    Mr. Sanchez exhibits significant limitations in intellectual functioning. Clinical assessment has shown that Mr. Sanchez has demonstrated deficits in intellectual functions including reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, throughout his life, beginning in early childhood and continuing into adulthood. The results of the administration of reliable intelligence and neuropsychological

assessment instruments establish Mr. Sanchez's significantly limited general intellectual functioning.

147.    Mr. Sanchez's significant limitations in intellectual functioning include deficits in comprehension, working memory, perceptual reasoning, abstract thought, and cognitive efficacy. People who have known Mr. Sanchez throughout his life, in a variety of contexts, observed that Mr. Sanchez was mentally slow, unable to understand or follow multistep directions, often seemed as though he were absent and did not understand what was going on around him, and was "not quite right."

148.    Mr. Sanchez demonstrates significant limitations in adaptive functioning in the domains of conceptual, social, and practical skills. His adaptive deficits, which have been demonstrated throughout his lifetime, include the following: inability to identify or appreciate risks; inability to think or work independently; difficulty communicating with adults and peers; poor comprehension of information provided to him orally or in writing; difficulty making use of information; inability to take standardized testing generally administered to students in school; academic failure, including retention in school and failure to graduate; inability to obtain employment independently; inability to find housing and live independently; difficulty using and managing money; and gullibility and vulnerability to being manipulated.

149.    Mr. Sanchez's limitations in intellectual and adaptive functioning manifested during the developmental period.

150.    As a result of Mr. Sanchez's intellectual impairments, he has "diminished capacit[y] to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," and he "often act[s] on impulse rather than pursuant to a premeditated plan,

40

and that in group settings [he is a] follower[] rather than leader[]." *Atkins v. Virginia*, 536 U.S. 304, 318 (2002); *see* Claim III.

### 2. Neuropsychological impairments.

151. Mr. Sanchez's performance on reliable tests of neuropsychological functioning demonstrated impairment in a number of domains, including processing speed, working memory, intellectual functioning, and executive functioning.

152. Mr. Sanchez's deficits in working memory and processing speed put him at risk for poor decision-making and judgment because they render him unable to absorb and process in an effective and timely manner the sensory input he receives from the world around him, making him unable to respond appropriately to that input. Although he may appear to have a superficial understanding of verbal content, his difficulty processing information results in his thinking about information he has just heard when new information is presented, so he is unable to keep up with and understand the new information because he is distracted by the information presented previously. He also has difficulty encoding the information presented to him, due to his impairments in working memory, and he cannot thus hold the information in his attention for enough time to use it effectively.

153. Mr. Sanchez's executive functioning impairments restrict his ability to adapt his behavior in response to information, such as by using environmental and interpersonal feedback to change unsuccessful strategies. They also limit his ability to perceive environmental stimuli accurately, respond adaptively, anticipate and reach toward future goals, consider potential consequences, and make use of hindsight and foresight. They further reduce his insight into his own behavior, thought-processes, and appearances to others. Mr. Sanchez's executive functioning performance profile is consistent with those of individuals who are unable to think

41

abstractly and demonstrate difficulty making goal-directed decisions, particularly in circumstances that are stressful or present complex cognitive or emotional stimuli.

154.   Mr. Sanchez's executive functioning impairments include a lack of cognitive verbal flexibility, causing him significant difficulty focusing on more than one verbal stimulus at a time. He also demonstrates concrete thinking and inability to recognize and make use of contextual information to solve a problem as well as difficulty understanding subtext.

155.   Mr. Sanchez's neurocognitive impairments prevent him from thinking efficiently and lead him to perform poorly under conditions that are stressful, novel, unfamiliar, and complex, like those of a capital trial.

### 3. Mr. Sanchez suffered debilitating psychiatric symptoms at the time of the preparations for trial and during trial proceedings.

156.   Mr. Sanchez has suffered symptoms of depression throughout his life. Mr. Sanchez has experienced disturbed sleep at least since adolescence, if not before. This sleep disturbance included nightmares and insomnia. Mr. Sanchez's sleep disturbance impaired his functioning during waking hours by leading to exhaustion, intensifying his difficulties with focus and concentration, and influencing his waking thought processes.

157.   Mr. Sanchez also has experienced suicidal ideation; difficulty concentrating and maintaining focus; and symptoms and behaviors consistent with dissociation, including a "dazed" appearance, staring off into space, and appearing "absent." Mr. Sanchez further suffered symptoms of hopelessness, helplessness, worthlessness, and low self-esteem. He experienced and exhibited agitation and irritability, common presentations of depression, particularly in adolescence.

158.   In addition to symptoms of depression, Mr. Sanchez has experienced and exhibited symptoms of anxiety, including sleep disturbance, agitation, and irritability.

159. Throughout his life, Mr. Sanchez has suffered symptoms of hyperactivity, hyperarousal, and inability to control impulses. During elementary school, he was over-active, in constant motion, and needed individual attention to complete tasks. He called out and acted out inappropriately, jumped on other children's backs while standing in line, and exhibited sudden changes in behavior. In middle school, he had difficulty starting tasks and maintaining work on the tasks. In middle school and high school, he needed assistance with behavior management, including assistance to self-regulate.

160. Behavioral outcomes of Mr. Sanchez's impulsivity and impaired judgment include unsafe behavior leading to serious injuries, including ingesting a large amount of his brother's seizure medication when he was a child and multiple bicycle accidents resulting in head injuries. Mr. Sanchez regularly acted without considering the consequences of his behavior.

161. Prior to and during trial, Mr. Sanchez appeared distressed, depressed, anxious, and confused.

**B.      As a Result of his Impairments and Psychiatric Symptoms, Mr. Sanchez was Incompetent to Stand Trial.**

**1.      Mr. Sanchez was unable rationally and properly to assist his counsel pretrial and at the capital trial.**

162. Mr. Sanchez did not understand the language and terminology the lawyers on the team used when communicating with him. He was not able to read with comprehension the law enforcement reports trial counsel brought to review with him. When members of the trial defense team visited him in jail prior to trial, they were not able to make Mr. Sanchez comprehend many of the investigative steps they planned to take or the legal arguments they planned to make.

163. When the mitigation investigator visited Mr. Sanchez along with the attorneys, she observed that Mr. Sanchez rarely spoke when the lawyers talked to him, and instead simply nodded as if in agreement with whatever they said. Although Mr. Sanchez attempted to mask his

43

confusion when the attorneys were present, when the mitigation specialist spoke with Mr. Sanchez alone, he admitted that he had understood very little, if any, of the information the attorneys provided to him. He repeatedly asked questions that he had already asked and to which he already had been given answers. On some occasions it was clear that he did not recall he had asked the same questions on prior occasions, and on others it was apparent that Mr. Sanchez did not understand the answers that had been provided to him, or that his understanding had been fleeting and he did not retain the information.

164.    Mr. Sanchez was unable to read with understanding critical documents related to the case, including law enforcement reports. During the mitigation specialist's early communications with Mr. Sanchez, when she provided him documents to review, he attempted to mask his disabilities by indicating he had read and understood them. Over time, based upon his questions and his obvious confusion, the mitigation specialist recognized that Mr. Sanchez had not read or comprehended the content of the reports. Following this realization, the mitigation specialist changed her approach, and read and paraphrased information she believed was important from the reports to Mr. Sanchez. Even this approach did not effectively and consistently ensure that Mr. Sanchez understood the information she provided him. Furthermore, because it was the mitigation specialist who selected the information to provide and explain to him, rather than Mr. Sanchez reviewing the reports himself, there was likely information in the reports that would have been significant to Mr. Sanchez and important to his defense had he read and understood them but that the mitigation specialist and the attorneys did not know to call to his attention.

165.    Mr. Sanchez's understanding of information presented to him by his trial team was maximized when the mitigation specialist drew diagrams and pictures and reviewed them in

great detail with Mr. Sanchez. Although he was better able to follow the information she provided him under such conditions, he continued to have difficulty retaining and recalling the information in future interviews. Furthermore, while this approach on occasion improved Mr. Sanchez's understanding of particular items of evidence or pieces of information, it did not improve his ability to put information together or understand the details in the context of the whole and thus to assist with the development of a theory of the defense or to understand the theory the trial team put forward.

166. Mr. Sanchez was unable to assist his attorneys by directing them to witnesses to interview, issues to investigate, or information gathered by law enforcement and the prosecution to challenge. He was unable to identify any issues or facts that could be helpful at trial or could lead his trial defense team to helpful, admissible information.

167. As a result of his inability to understand what was significant about the proceedings, respond in a meaningful and goal-directed way to questions his attorneys asked him, and identify important information for the attorneys to follow up on or to challenge, Mr. Sanchez was unable to properly and rationally assist his counsel in his defense, and therefore was incompetent to stand trial.

**2. Mr. Sanchez did not understand the nature and consequences of the proceedings leading up to his capital trial and during the capital trial itself.**

168. Mr. Sanchez did not understand and meaningfully follow the pretrial, guilt, or penalty phase proceedings. One of his attorneys reported that representing Mr. Sanchez during his capital proceedings was like representing a potted plant. Mr. Sanchez did not attend to the proceedings. He seldom engaged with his attorneys or others on the defense team during the proceedings, and rarely asked questions prior to, during, or after the court proceedings.

45

169.    Mr. Sanchez spent much of the time during the proceedings doodling or drawing pictures on a note pad. He did not appear to understand what was happening during the proceedings. Instead, he regularly looked to one of his codefendants, Daniel Troya, for cues about how to behave. He imitated Mr. Troya's behavior and actions in the courtroom, smiling after Mr. Troya smiled, snickering after Mr. Troya snickered, and posturing when Mr. Troya postured. When the death verdict was read, Mr. Troya stood up and threw a water bottle at one of the prosecutors. Mr. Sanchez stood up after Mr. Troya did and postured. As soon as the bailiffs removed the defendants from the courtroom, Mr. Sanchez dropped his pose and resumed his respectful behavior.

**C.    Trial Counsel Failed to Investigate, Prepare, and Present Evidence of Mr. Sanchez's Incompetence.**

**1.    Prevailing professional standards.**

170.    Reasonably effective counsel representing a capital defendant at the time of Mr. Sanchez's trial in 2009 looked for and attended to signs of the defendant's incompetence to stand trial, and when confronted with signs of incompetence alerted the judge and requested a formal judicial determination of competency to proceed, because it was and is a fundamental denial of due process to try and/or sentence an incompetent client. *ABA Standards for Criminal Justice Prosecution Function and Defense Function, Third Edition* (1993), Standard 4-3.1 and commentary thereto (1993 Standards); *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (2003 ed.) (2003 ABA Guidelines), Guideline 10.5 and commentary thereto; *see also* Guideline 10.7 and commentary thereto.

## 2.     Deficient performance.

171.     When there is an issue as to a defendant's competence, counsel has the obligation to fully investigate. Although counsel were or should have been aware of manifest signs of Mr. Sanchez's incompetence, counsel failed to conduct a reasonably effective investigation into his incompetence, request a competency evaluation, or request a hearing to determine his competence prior to the commencement of trial.

172.     As set forth above, counsel were or reasonably should have been aware that Mr. Sanchez suffered from impairments that called into question his ability to understand the nature and consequences of the proceedings and rationally and properly to assist counsel. Counsel was or reasonably should have been aware, due to Mr. Sanchez's impairments in processing speed and working memory, as well as his limited intelligence, that as more information was presented to Mr. Sanchez, his comprehension would be significantly limited. They knew or reasonably should have known that Mr. Sanchez needed frequent confirmation that he understood the information provided, and that if he did not understand, the information needed to be repeated and/or translated into simpler language in order to maximize his understanding.

173.     Trial counsel also knew or reasonably should have known that Mr. Sanchez lacked competency because he was unable to grasp concepts, could not understand options, and lacked abilities in verbal comprehension that made it difficult for him to participate in his defense and understand the trial proceedings.

174.     Mr. Sanchez's trial defense team considered requesting accommodations for Mr. Sanchez under the Americans with Disabilities Act to maximize his understanding of the trial proceedings, including special measures during court proceedings to accommodate his disabilities. Nevertheless, Mr. Sanchez was not provided with adequate accommodations during trial.

47

### 3. Prejudice.

175. Because counsel did not investigate clear signs of Mr. Sanchez's incompetence or ask the trial court to order a mental health evaluation and competency hearing, Mr. Sanchez was tried and sentenced to death without any judicial determination that he was competent.

176. Had trial counsel met their obligations, Mr. Sanchez would have undergone a mental health examination to determine his competence, and information regarding his competence would have been presented to the Court, requiring a hearing on the competency question. The available but unpresented information includes but is not limited to the following:

- Mr. Sanchez's very low intellectual functioning, in the range of intellectual disability, interfered with his understanding of trial proceedings and participation in the preparation of his defense.

- Mr. Sanchez's significant limitations in reading made it difficult for him to read law enforcement reports and other case materials, and to identify information that was important and/or flawed in those reports.

- Mr. Sanchez had profound difficulty attending to and processing information provided to him verbally, rendering it difficult for him to understand trial proceedings and to assist his counsel. His processing deficits made it nearly impossible for him to comprehend complicated or technical testimony or evidence. Mr. Sanchez's deficits in processing speed and working memory impeded his ability to follow and participate meaningfully in pretrial and trial proceedings, because they prevented him from absorbing and following the testimony of witnesses. Mr. Sanchez's attentional deficits further impaired his ability to understand the proceedings in the context of a trial involving increased distracting stimuli such as multiple defendants and attorneys. His disabilities were exacerbated under the stress of the capital trial.

- It is common for individuals with the impairments that Mr. Sanchez possessed not to ask questions when they do not understand what is going on around them, due to factors including a desire to mask disability, a desire to please by being compliant, and an inability to articulate or frame questions about what they do not comprehend.

- Mr. Sanchez's psychiatric symptoms, in concert with his cognitive and intellectual impairments, undermined his ability to understand the trial proceedings and to assist his appointed trial counsel in a rational manner.

48

177.    Had all of this information been developed and presented to the Court, it is reasonably likely that a competency hearing would have been held and that Mr. Sanchez would have been found incompetent to stand trial, at least without significant accommodations for his impairments.

178.    Trial counsel unreasonably failed to take steps to maximize Mr. Sanchez's understanding of the nature and consequences of the capital proceedings and his rational and proper assistance of counsel. These steps included but were not limited to requesting accommodations from the Court, including breaks between the presentation of the direct and cross-examination of each witness so that the attorneys could review the witness's testimony with Mr. Sanchez prior to the presentation of the next witness's testimony. They also included preparing Mr. Sanchez at the beginning of each court day by informing him which witnesses would testify that day and providing him with an overview of the expected content of their testimony, and reviewing the day's proceedings with Mr. Sanchez at the close of each court session.

179.    Although Mr. Sanchez's psychiatric, neurocognitive, and intellectual impairments likely would have interfered with his understanding of trial proceedings and participation in the preparation of his defense under any circumstances, because counsel did not obtain adequate accommodations from the Court or otherwise work with Mr. Sanchez to maximize his understanding and participation, Mr. Sanchez proceeded to trial without being competent to do so.

**D.      The Court Failed to Order an Assessment of Mr. Sanchez's Competence or Hold a Hearing to Determine Mr. Sanchez's Competence.**

180.    Many of Mr. Sanchez's impairments may have been known to the Court. As set forth above, individuals present in the courtroom during pretrial and trial proceedings noted that

49

Mr. Sanchez did not attend to the proceedings, drew and doodled rather than conferring with counsel during proceedings, and rather than reacting organically and naturally to the proceedings imitated the reactions and behaviors of one of his codefendants. The Court also may have been presented with information that Mr. Sanchez required accommodations in order to understand the nature and consequences of the proceedings. Nevertheless, the Court did not order a competency evaluation or hold an evidentiary hearing. The Court denied Mr. Sanchez due process of law by failing to conduct a competency hearing in the face of information raising a bona fide doubt regarding Mr. Sanchez's competency to stand trial.

### E.     Conclusion.

181.    Mr. Sanchez was deprived of his right not to be tried while incompetent, and of his right to the effective assistance of counsel. These errors violated the Fifth, Sixth, and Eighth Amendments. This Court should grant relief with regard to his criminal convictions and death sentence, or at least hold an evidentiary hearing.

### V.     THE PROSECUTION'S PRESENTATION OF TESTIMONY OF A MEDICAL EXAMINER WHO DID NOT CONDUCT OR OBSERVE THE AUTOPSIES OF THE VICTIMS VIOLATED MR. SANCHEZ'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE SUBSTITUTION OF THE MEDICAL EXAMINER.

182.    The allegations included in all other claims of this Motion are incorporated by reference in support of this claim for relief.

183.    The autopsy of each victim in this case was conducted by Dr. Charles A. Diggs, an Associate Medical Examiner in the Office of the Medical Examiner for the Nineteenth District of Florida, which includes St. Lucie County. Dr. Diggs did not, however, testify to his findings and opinions. The government instead moved to offer a substitute medical examiner, Dr.

Roger E. Mittleman, who ultimately testified. *See* Dkt. 522 (government's motion to allow for substitution of medical examiner).

184.    Defense counsel did not object to the substitution. *See* Dkt. 531 (government's amended unopposed motion to allow for substitution of medical examiner); Tr. 3395-96. The Magistrate Court granted the motion in a one-word, handwritten order. Dkt. 538.

185.    The use of testimony by a substitute medical examiner regarding facts about the autopsies performed by a non-testifying medical examiner – including adoption of the opinions of the non-testifying doctor from the autopsy reports – violated Mr. Sanchez's rights to due process and confrontation under the Fifth and Sixth Amendments. *See Crawford v. Washington*, 541 U.S. 36 (2004). It also violated Mr. Sanchez's rights under the Eighth Amendment for failure to adhere to the heightened procedural safeguards required in capital cases. The failure to object to this clear constitutional violation violated Mr. Sanchez's right to the effective assistance of counsel under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.      Mr. Sanchez's Rights Under the Fifth, Sixth, and Eighth Amendment Were Violated.**

186.    Dr. Diggs performed the autopsies of all four victims in this case and authored all four autopsy reports. By the time of trial, however, Dr. Diggs had retired from practice. Tr. 3363. In its unopposed motion to permit substitution of the testifying medical examiner, the government represented that Dr. Diggs had moved to Tampa and that health concerns made travel for him "extremely difficult." Dkt. 531 at 1. The government did not allege that Dr. Diggs was unavailable for Confrontation Clause purposes, nor did the Court so find. Dkt. 522, 531, 538. And Dr. Diggs was not unavailable due to chronic health concerns, as he has testified by video deposition in at least one other trial subsequent to Mr. Sanchez's trial. Shelley Rossetter, *Tampa man stands trial for decades-old murder*, Tampa Bay Times, April 30, 2013, *available at*

51

http://www.tampabay.com/news/courts/criminal/tampa-man-stands-trial-for-decades-old-murder/2118253.

187. Dr. Mittleman was substituted without objection from the defense. Dr. Mittleman had not himself conducted the autopsies at issue. Tr. 3363. Dr. Mittleman's name does not appear on the autopsy reports, and there is no indication that Dr. Mittleman directly observed or participated in the autopsies in any way.

188. Dr. Mittleman was nonetheless permitted to testify to Dr. Diggs's findings and opinions without challenge. Not only was Dr. Mittleman permitted to testify to Dr. Diggs's findings and opinions, he was permitted to testify to additional conclusions that he came to on his own that were not reflected in any way in Dr. Diggs's autopsy reports.

189. The conclusions testified to by Dr. Mittleman are particularly problematic in light of the fact that numerous complaints of incompetence and unethical behavior have been leveled against him over the course of his career. *See*, *e.g.*, Dana Calvo, *Medical Examiner Setting Standards*, South Florida Sun-Sentinel, April 19, 1998, *available at* http://articles.sun-sentinel.com/1998-04-19/news/9804180177_1_medical-examiner-mittleman-families ("Inaccurate information or an inability to identify victims can be horrific for a grieving community, Mittleman said. 'I don't think we should be in the business of hurting people,' he said. State prosecutors are concerned he takes that philosophy too far. They are investigating charges he falsified public records."); Jose Luis Jimenez, *Quincy He Ain't*, Miami New Times, May 27, 1999, *available at* http://www.miaminewtimes.com/news/quincy-he-aint-6358651 (describing multiple allegations of mismanagement, incompetence, and unethical behavior).

190. Dr. Mittleman testified, for example, that the cause of Luis Damian Escobedo's death was "[h]emorrhage around the lungs, in the lungs, heart, blood in the air passageways,

altogether." Tr. 3465. Dr. Diggs's autopsy report lists Luis Damian Escobedo's cause of death simply as "multiple gunshot wounds."

191.    Even more problematically, Dr. Mittleman offered florid and gruesome details about Luis Damian Escobedo's mechanism of death that were not contained in Dr. Diggs's autopsy report nor reasonably deducible from the report or any of the other materials in Dr. Mittleman's possession. Specifically, he testified that the death of Luis Damian Escobedo was "a suffocating type of death," which he equated to "drowning in one's own blood." Tr. 3458.

192.    Dr. Mittleman likewise offered testimony regarding the death of Luis Julian Escobedo that is found nowhere in the autopsy report. For example, he opined that the gunshot wound to Luis Julian Escobedo's head was consistent with the shooter standing over him while he lay on the ground. Tr. 3451-52.

193.    While some of Dr. Mittleman's opinions went beyond the scope of the autopsy reports, all of his testimony was dependent on the work, findings, and opinions of Dr. Diggs, who was not present for cross-examination by the defense.

194.    Dr. Diggs's autopsy reports were unquestionably testimonial in nature, as they were prepared in anticipation of use at a criminal trial. Indeed, both an investigator from the medical examiner's office and Dr. Diggs himself traveled to the crime scene where they viewed the bodies on the side of the Florida Turnpike before they were transported. The investigator and Dr. Diggs did so because they were summoned to the scene by law enforcement officials. The autopsies were thus plainly conducted in the aid of a law enforcement investigation.

195.    In view of the defense's inability to cross-examine the medical examiner who actually performed the autopsies, as well as Dr. Mittleman's unsupported embellishments to Dr. Diggs's findings, Mr. Sanchez's Fifth Amendment due process right, his Sixth Amendment

53

Confrontation Clause right, and his Eighth Amendment right to be free from cruel and unusual punishment were violated.

**B.      Counsel Were Ineffective for Failing to Object to Dr. Mittleman's Testimony.**

**1.      Prevailing professional norms.**

196.     At the time of Mr. Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant were expected to consider all legal claims potentially available, thoroughly investigate and evaluate such claims, and preserve any and all conceivable errors. 2003 ABA Guidelines, Guidline 10.8.A and commentary.

**2.      Deficient performance.**

197.     Trial counsel were ineffective in failing to object to Dr. Mittleman's substituted testimony. The introduction of testimonial evidence that a criminal defendant has no opportunity to cross-examine violates the Confrontation Clause. This Confrontation Clause violation is plain and would have been evident to any attorney acting reasonably.

198.     Counsel's failure to object was unreasonable, particularly given that the government flagged the Confrontation Clause issue in its motion to substitute the medical examiner. *See* Dkt. 522, 531. It was additionally unreasonable for counsel to fail to object given that the government provided supplemental discovery with Dr. Mittleman's additional opinions that were not included in Dr. Diggs's autopsy reports well in advance of trial. Defense counsel had plenty of notice regarding the constitutionally problematic and inflammatory evidence the government ultimately introduced.

199.     Counsel appeared disengaged on this issue. Not only did they fail to object to the Confrontation Clause violation in advance of trial, but they performed no questioning of Dr. Mittleman at trial. They did not voir dire him on his qualifications, Tr. 3358, and they did not ask a single question on cross-examination. Tr. 3466. Nor did they engage the services of an

54

independent forensic pathologist – either to use as a witness or to consult with regarding the problems inherent in Dr. Mittleman's testimony.

200.    Counsel had no reasonable basis for failing to object to Dr. Mittleman's substitution, particularly given that the issue was raised significantly in advance of trial by way of written motion. Counsel had no legitimate reason for permitting the government to violate their client's Confrontation Clause rights.

201.    Counsel apparently failed to appreciate the meritorious Confrontation Clause objection that existed separate and apart from any issue of admissibility under the Federal Rules of Evidence. Indeed, during the middle of Dr. Mittleman's testimony, the Court *sua sponte* made a record that defense counsel were knowingly waiving objection to the substitution of the medical examiner because the autopsy reports were admissible under the Federal Rules of Evidence:

> The Court:    I just want the record to be very clear in this regard, and I know the lawyers are aware of this.
>
> Dr. Mittleman was not the Medical Examiner, and obviously the doctor in a sense is providing two different types of testimony. He is repeating for us and explaining to us the information contained in medical records, the examiner's autopsy reports, and obviously independent of all that he is giving us the benefit of his opinion testimony as a forensic pathologist.
>
> I just want to be very clear, the autopsy reports are in fact, of course, admissible. I am looking at the case of United States versus Rosa, R-O-S-A, 11 Federal 3rd, page 315, and I assume it is because of a recognition that those types [of] reports would be admissible under Federal Rule of Evidence 803.8, there has been no objection to the fact that the reports were in fact not introduced and the doctor is effectively giving testimony from a document not in evidence.
>
> I simply want the record to be clear, defense counsel are aware of that and that they are purposefully not objecting.

55

> Is that my understanding? Am I correct?

Mr. Cohen:  That is correct.

The Court:  I am not questioning it. I want the record to reflect that. Okay. That is perfectly fine.

Tr. 3395-96.

202.    But at no point did the Court or counsel make any reference to the Confrontation Clause. The Court and counsel each seemed to view the issue as purely an evidentiary matter.

### 3.    Prejudice.

203.    Mr. Sanchez was prejudiced by counsel's failure to object. Current counsel for Mr. Sanchez have engaged a well-qualified independent forensic pathologist, Dr. David Fowler, who explains that Dr. Diggs's autopsy reports were severely deficient and fell well below the standard of care for minimum competence in the field of forensic pathology. Dr. Diggs would have been ripe for cross-examination if he offered any opinion beyond the basic, straightforward facts that the Escobedos died of gunshot wounds and that their manner of death was homicide.

204.    Much of Dr. Mittleman's testimony was not only unsupported by Dr. Diggs's work, it was inaccurate. For example, Luis Damian Escobedo did not drown in his own blood; the gunshot wound to his chest caused his death within a matter of a few seconds. And Dr. Mittleman's conclusion that Luis Julian Escobedo was shot while lying on the ground with the shooter standing above him was purely speculative and lacking in reliable scientific foundation.

205.    Dr. Mittleman nonetheless was permitted to testify to these gruesome details about the deaths of each of the children that were unsupported and inaccurate without any challenge whatsoever.

206.    The government exploited Dr. Mittleman's testimony to inflame the passions of the jury. The prosecutor referenced the "drowning in blood" conclusion in his opening statement,

and twice more in his closing argument. Tr. 3043, 7161, 7164. And the prosecutor referenced Dr. Mittleman's testimony that the gunshots were consistent with the shooter standing directly over Luis Julian Escobedo and firing directly down into his head in order to describe the killing as a "cold blooded execution." Tr. 7170-71. The Eleventh Circuit specifically referenced this inflammatory information in its opinion denying relief on direct appeal, *United States v. Troya*, 733 F.3d 1125, 1136 (11th Cir. 2013), as did a juror when speaking to the press about why the jury voted to sentence Mr. Sanchez to death. Daphne Duret, *Juror cites killing of children as reason for death sentences*, Palm Beach Post, April 4, 2009 *available at* http://articles.sun-sentinel.com/2009-04-04/news/0904040002_1_jurors-daniel-troya-danny-varela (referencing speculative testimony that shooter stood over Luis Julian Escobedo while firing downwards).

207.    Defense counsel eventually recognized the prejudicial impact of this information. In advance of the penalty phase, counsel moved *in limine* to preclude further reference to the "drowning" comment because its prejudicial impact outweighed any probative value at the penalty phase. Tr. 7898. The government did not object. *Id.*

208.    But at that point, the damage was done. The jury had repeatedly heard the information. And press reports and the split sentencing verdict on the death penalty counts would ultimately make clear that it was the murders of the children that caused the jury to sentence Mr. Sanchez to death. There is a reasonable probability that, had counsel objected, excluded the testimony of Dr. Mittleman, and cross-examined Dr. Diggs, the jury would not have convicted Mr. Sanchez or, at a minimum, would not have sentenced Mr. Sanchez to death.

57

**VI.   THE GOVERNMENT VIOLATED ITS OBLIGATIONS PURSUANT TO *BRADY V. MARYLAND* BY FAILING TO DISCLOSE EXCULPATORY INFORMATION TO THE DEFENSE THAT WAS MATERIAL TO THE GUILT AND PENALTY PHASES OF TRIAL.**

209.   The allegations included in all other claims of this Motion are incorporated by reference in support of this claim for relief.

210.   The Due Process Clause requires the government to disclose material, exculpatory evidence to a criminal defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence impeaching the credibility of a government witness falls within the *Brady* doctrine. *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). As part of its *Brady* obligation, the government has a duty to learn of favorable evidence from others acting on its behalf, including the police. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The duty to enforce *Brady* "with painstaking care is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

211.   The government's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. If there is any reasonable likelihood that the non-disclosure could have affected the judgment of the jury, relief must be granted. The materiality of suppressed evidence must be considered collectively, not item-by-item. *Kyles*, 514 U.S. at 436.

212.   Due process is also violated when the government knowingly relies on false evidence. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

213.   Mr. Sanchez's due process rights were violated by the government's failure to disclose all defense favorable evidence in its possession and the government's knowing presentation of false evidence. Mr. Sanchez was prejudiced by the collective failure to disclose. Mr. Sanchez's Eighth Amendment rights were likewise violated in light of the heightened procedural requirements that attend capital prosecutions. To the extent trial counsel could or

should have uncovered and/or presented any of this evidence or objected to the government's tactics, they were ineffective. *Strickland v. Washington*, 466 U.S. 668 (1984).

A.     **The Government Failed to Disclose Material Exculpatory Information Regarding Danny Varela.**

214.    Danny Varela was not charged with the murders of the Escobedo family. This is true despite the fact that the government made clear from the beginning of trial that its theory of the case was that the Escobedos were murdered in furtherance of a drug conspiracy headed by Mr. Varela. The government asserted in its opening statement that:

> The evidence will reveal that each of them [the Escobedos], although four separate lives born on four separate dates in four separate years, random dates, had one thing in common, that their lives were snuffed out in an instant, a[n] instant that was not random, a[n] instant that was traced to the drug trafficking activities of this man right here, Danny Varela, a man who hooked up in a drug trafficking link with Jose Luis Escobedo for several months, a drug trafficking link that involved large scale drug trafficking in West Palm Beach, drugs in police seizures and drug deaths [sic, debts] that arose as a result of the seizures. Those deaths [sic, debts] caused a schism between supplier and buyer and formed the motive for the tragic murder of an entire family.

Tr. 3041-42.

215.    The government repeated the point throughout the course of trial:

| The Court: | Does the Government allege in the indictment that the murders on October 13 are an example of an overt act in furtherance of the conspiracy – of the drug conspiracy? Don't they do that? |
| --- | --- |
| Mr. Kastrenakes: | We do, 924J count – |
| The Court: | The answer is yes? |
| Mr. Kastrenakes: | The 924J count, the weapon carried displayed and used was done in furtherance of the narcotics conspiracy as well as in furtherance of the carjacking. So everything is linked back into Count 1, and logically, Your Honor, this was a drug rip, they stole 15 kilos from the car that Mr. Escobedo was driving and distributing those drugs. Factually that fits in also. |

59

Tr. 3277; *see also* Tr. 5508-10 (government explaining its theory of the case); Tr. 4714 (Court observing that "the Government is contending that all of the activities in the indictment are in fact interconnected. That is, that the murder of the Escobedo family is somehow involved in this larger drug distribution").

216.    The government's theory that Mr. Varela was the head of the drug organization was supported by numerous pieces of testimonial and documentary evidence. The government repeatedly used this evidence to cement its point in its guilt phase closing argument:

> If you lived in that house, you knew it was headquarters for drug trafficking operations of Danny Varela and there were guns available within short steps to confront any challenge to that ongoing narcotics activity.

Tr. 7093.

> [T]hey are members of a violent drug trafficking organization headed by Danny Varela who were willing to use weapons and reap violence when required to protect the ongoing activities of that group, and it didn't matter if they knew the person or if it was a stranger. If it threatened them, they were willing to carry guns, wear disguises and shoot, and they did that in this case.

Tr. 7180.

217.    In addition to arguing that the Escobedos were killed in furtherance of a drug conspiracy headed by Mr. Varela, the government also repeatedly argued that co-conspirator liability is exceedingly broad. It noted with respect to Mr. Varela's liability in Count 2 of the indictment, for example, that:

> [E]ven though Varela is not there, he was responsible, and he should be held liable on this.
>
> His Honor will tell you with regard to a concept called co-conspirator liability, that even though Varela was not there, if he joined in the overall conspiracy charged in Count 1, he can then be liable for this count as well, so long as the offense charged in Count 2 was committed by a co-conspirator, meaning Lopez, during the existence of the conspiracy. A conspiracy is May, October, 2006. This was in May that the Defendant Varela was a knowing and willful member of that same conspiracy, which he was, and that the commission of the offense by the co-conspirator Lopez in the May 10 stop was foreseeable to Varela.

60

That is easy, we have shown all of that.

Tr. 7105.

218.    The government repeated its point about the sweeping nature of co-conspirator

liability multiple times:

> If you find all four people are in the drug conspiracy, it matters not where the drugs were found. It doesn't matter if it was in Varela's bedroom and Troya didn't know about it. Doesn't matter if it was in the garage and Lopez didn't know about it. Doesn't matter under co-conspirator liability if the Government proves all four are members of the conspiracy and drugs possessed by just one person as part of that conspiracy with the intent to distribute, and it is foreseeable to everybody else, you are stuck with the result. That is the danger of the conspiracy. In for a dime, in for a dollar.

Tr. 7117.

> But don't confuse the individuality of their trials with the fact that evidence of conduct of other people that you are in a conspiracy with is admissible against you. In other words, Varela's trial in his trial, independent trial, evidence of the conduct of Liana Lopez, Sanchez, Troya, Flako, Vetere, all the people involved in this conspiracy is admissible against him. The drugs gathered in those seizures are admissible against him, because this is a joint venture.

> So even though his trial is independent, and Troya's trial is independent, Sanchez's and Lopez's trial are independent of each other, the evidence that you can consider, you can consider the conduct of jointly undertaken activity, and you can consider the conduct of all of these co-conspirators with respect to your verdict as to those individual Defendants.

Tr. 7413; *see also* Tr. 3277-78 (Court noting that "this is why conspiracy is such a dangerous

crime. If the Government is contending that Ms. Lopez is a member of the drug conspiracy, and

the purpose of the conspiracy is to go out and get drugs, I suppose normally you think that

conspirators do that by just buying drugs from somebody else, but if the Government is able to

put on evidence that the conspirators also decided here was a good place to steal drugs from

somebody, you know that concept of conspirator liability is so dangerous, it is so inclusive, and I

guess it gets into whether the act was foreseeable and that kind of thing.").

61

219.     In light of the government's evidence and argument (and the sweeping nature of co-conspirator liability), multiple defense counsel noted the peculiarity of the government's decision not to charge Mr. Varela with the murders in their guilt phase closing arguments. Tr. 7187 ("This is a surreal situation. How can the Government on one hand treat Sanchez and Troya worse than Varela when the Government's own theory is that Varela is the boss?") (counsel for Mr. Varela); Tr. 7189 ("The Government alleges Varela is the boss, calling the shots figuratively and literally. Government alleges Varela is the money man, houses, cars, telephones being passed out by him. When you see the third superseding indictment, you will see all the Defendants are charged in Count 1. Count 5, the conspiracy regarding the carjacking, is not all four Defendants, just Sanchez and Troya. Doesn't make sense on the one hand Sanchez and Troya are portrayed as Varela's grunts or gophers, go people making a weekly stipend, and on the other hand it is alleged that Sanchez and Troya independently on their own in Count 5, as if some rogue operatives have this plan, this plan to carjack and kill.") (counsel for Mr. Varela); Tr. 7342-43 ("That co-conspirator the Government alleged to be involved in these acts involving carjacking and murder is Danny Varela. We know he controlled that house, the one we are talking about, and we know he controlled these other matters. It is Danny Varela in case you are wondering. So it tells you, what did the Government really know about this case? Was Danny Varela indicted for murder? If he is the man who controlled this. Is he indicted for murder? Doesn't this tell you what the Government says about the case is a theory? They don't know what happened. If they can't come forward and indict the man who is in major part responsible for this, they are putting this together haphazardly, that has no meat, that should come to mind when you are reviewing these types of things.") (counsel for Mr. Sanchez).

220.    The government responded to these defense arguments in its rebuttal guilt phase closing argument by claiming that it did not prosecute Mr. Varela for murder because it could not produce enough evidence to do so:

Then Mr. Gershman put another question to you. Why isn't my client charged with murder, so to speak. I was asking why he asked a question like that. That answer comes because some evidence is not proof beyond a reasonable doubt, some evidence is not good enough in a courtroom in America.

Sure, there is evidence that Sanchez and Troya called Varela after the murders. Sure, there is evidence that Varela participated in unloading the booty. Sure, there is evidence that Varela participated in the division of that booty, in fact gave one of those kilograms to Malik Mullino. That is not enough.

What do we know from the evidence in this case? We know Varela was not on the Turnpike, we know that Varela did not make statements to other people, and we know that Varela was not pulling the trigger that killed an entire family.

Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and gather evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.

Tr. 7413-14.

221.    The government made a similar argument during its penalty phase closing argument in an attempt to refute the defense argument that Mr. Sanchez was under Mr. Varela's control:

There is no evidence whatsoever that Danny Varela was anywhere near that van. In fact, you will recall that the testimony of Agent Weeks, the telephone activity of Danny Varela's phone the entire night showed he was in West Palm Beach. He, Varela, was not forcing anybody to do anything. He is 50 miles away.

Tr. 9497 (initial government penalty phase closing argument).

222.    The defense yet again pointed to the tenuousness of that argument in light of the government's theory of the case:

Just a few minutes ago this prosecutor stood up and said Danny Varela was 50 miles away when this incident happened. What did they say during the trial? They

63

said Danny Varela – this murder, this whole thing was all about Danny Varela cancelling a drug debt, and now they want you to execute Ricardo Sanchez. They are providing Danny Varela as an alibi. Is that being fair about the evidence and what brought us here?

Tr. 9532 (Sanchez penalty phase closing argument).

223.    Counsel for Mr. Troya reprised the point in his penalty phase closing argument:

That was in the first part of the trial, the first phase, guilt, innocence phase, Danny Varela is the person the indictment says is the co-conspirator in the carjacking. And Judge Hurley instructed you a co-conspirator is responsible for the criminal acts of the other co-conspirators, in addition to being part of the conspiracy.

So where are we getting that Daniel Varela is not here for some reason because he was 50 miles away?

Tr. 9568-69 (Troya penalty phase closing argument); *id.* at 9570 ("Danny Varela didn't know what was going on? Danny Varela wasn't involved? Where were we for a month of trial?") (Troya penalty phase closing argument).

224.    The government did not relent in its penalty phase rebuttal closing argument. *See*, *e.g.*, Tr. 9616 ("Danny Varela was not on the Turnpike. We talked about this, remember, in the first phase of the argument. He is not following the family for eight hours. He is not shooting those family members on the Turnpike at 2:24 in the morning October 13th, 2006.") (rebuttal government penalty phase closing argument); Tr. 9636 ("Danny Varela is a convicted drug kingpin. You know he is not facing the death penalty because the Government didn't have the evidence to convict him. He is not the shooter, he is not on the Turnpike. He is not the one that pulls these people out of the car. He is not the one massacring this family.") (rebuttal government penalty phase closing argument); Tr. 9637-38 ("Danny Varela is not an equally culpable co-defendant not facing the death penalty. Have you heard any evidence that anybody from the Government's side of the table made some deal with Danny Varela? None, zero. There is no deal with Danny Varela. When the evidence is there, he will be prosecuted, and he will face another

64

jury of his peers. That doesn't excuse these two shooters for what they did the morning of October 13th.") (rebuttal government penalty phase closing argument).

225.    The government's argument regarding Mr. Varela's lack of liability for the murders because he was not present on the Turnpike contrasts markedly from its argument regarding his co-conspirator liability for Count 2 of the indictment. Tr. 7105 ("even though Varela is not there, he was responsible, and he should be held liable on this."). Indeed, these two arguments cannot be reconciled.

226.    The notion that the government did not charge Mr. Varela with murder (let alone seek the death penalty against him) because they could not produce the evidence to do so does not withstand scrutiny. The government's entire argument on this point speaks to why, in the government's estimation, it did not have enough evidence to charge Mr. Varela under a principal theory of liability. It does not remotely explain why it could not have charged him with the murders under a co-conspirator theory of liability as part of the drug conspiracy (Count 1).

227.    If, as the government alleged, 1) there was a drug conspiracy; and 2) the murders were committed by co-conspirators during and in furtherance of the drug conspiracy, it necessarily follows that the murders were reasonably foreseeable to the leader of the drug conspiracy. Mr. Varela is therefore liable for the murders as the leader of the drug conspiracy.

228.    If the government's theory of the case is correct, plenty of evidence also supports Mr. Varela's liability as a co-conspirator in the carjacking, as the government specifically alleged (without mentioning him by name) in the indictment. Dkt. 305 at 4-5 (Third Superseding Indict; Count 5, conspiracy to commit carjacking) (charging that Mr. Troya and Mr. Sanchez "did knowingly and willfully combine, conspire, confederate, and agree with each other, and with another individual known to the Grand Jury, to commit an offense against the United States,

65

that is, the carjacking of a motor vehicle and its contents"). The government presented evidence, for example, that Mr. Varela possessed a substantial number of guns in his bedroom, was in direct contact with Mr. Troya and Mr. Sanchez on the night of October 13, and took possession of fruits of the crime immediately following the killings.

229.   Indeed, during Mr. Varela's sentencing hearing, the Court stated that it was "absolutely certain" that Mr. Varela had foreknowledge of the murders:

> And I want to be very clear, and I say this with full consideration of the seriousness of what I am saying. I am absolutely certain that Mr. Varela, Mr. Sanchez, and Mr. Troya were fully knowledgeable about what was being done with respect to the murder of the Escobedo family. That Mr. Varela is every bit as culpable as the people who actually held the guns and shot the bullets.

Tr. 5/15/09 at 86 (sentencing of Mr. Varela).

230.   The Court sentenced Mr. Varela based on the evidence heard by the jury. If the Court was absolutely certain that Mr. Varela was guilty of the murders, the government could have proven his guilt beyond a reasonable doubt.

231.   Trial counsel raised the issue of the government not seeking murder convictions or the death penalty against Mr. Varela by way of pre-trial *Brady* motion. Dkt. 275 at 5-6. The government opposed the motion. Dkt. 282. The Magistrate Court denied the motion, ruling that "Defendant Sanchez simply speculates as to why the Government has not sought the death penalty as to Varela," and that "[m]ere speculation about what could have or might have occurred is not a legitimate basis for *Brady* material." Dkt. 307 at 16-17.

232.   The government's ostensible reason for not charging Mr. Varela with murder has now been explicitly stated. This justification – that the government could not prove his guilt beyond a reasonable doubt – collapses in light of the government's trial theory. This Court's own sentencing determination for Mr. Varela makes this clear. The government's argument was improper and violated Mr. Sanchez's due process rights.

66

233.     The government has also withheld information supporting Mr. Sanchez's defense that Mr. Varela exerted control over him, and that further demonstrates Mr. Varela's direct connection to (and thus, liability for) the murders. The government did not disclose information about cooperating witness Mario Davis's statement that Mr. Varela had direct involvement in the murders. The government also did not disclose information from Phillip Perez regarding Mr. Varela's large-scale drug trafficking and gun possession.

234.     The information in the possession of the government that explains why it did not charge Mr. Varela with the murders – whether or not the government characterizes it as a "deal" – is favorable to Mr. Sanchez. It is information that Mr. Sanchez could have used to challenge the thoroughness of the law enforcement investigation and strengthen his penalty phase argument in support of the statutory mitigating circumstance that an equally culpable co-defendant was not sentenced to death.

235.     The withholding of this exculpatory evidence was material as to both guilt and punishment, as made clear by a published media report following trial. Juror Rick DiCresce stated as follows:

> "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela wasn't sitting at that table, he said.
>
> Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that didn't happen, DiCresce said. Kastrenakes said authorities didn't have enough evidence to charge Varela, but were still investigating.

Daphne Duret, *Brutality to Children Left Juror No Doubts*, Palm Beach Post at A1A (Apr. 3, 2009).

236.     There is a reasonable probability that the jury would not have found Mr. Sanchez guilty or sentenced him to death had they been given the opportunity to hold the person they actually believed was most culpable – Mr. Varela – responsible. This is especially the case in

67

light of Mr. Sanchez's theme at the penalty phase – that he was under the sway and control of his cousin, Mr. Varela.

**B.      The Government Failed to Disclose Material Exculpatory Information Regarding Potential Third Party Guilt, Including Information Regarding Yessica Escobedo's Cell Phone.**

237.     As stated in Claim VII, it unclear whether Yessica Escobedo's cell phone traveled from Florida to Texas at some point on the evening of October 12, but defense counsel ineffectively failed to adequately investigate and gather additional records that may have enabled them to definitively establish this point. The government, without disclosing the full extent of the cellular records necessary to establish the point, improperly suggested to the jury and to the Court that the phone had not traveled to Texas.

238.     The fact that the phone may have traveled to Texas would have powerful implications for the government's theory of the case, as it would suggest the presence of some third party on the night of the crime.

239.     The phone plainly was not taken to Texas by Ms. Escobedo, Mr. Troya, or Mr. Sanchez. Evidence that a third party took Ms. Escobedo's phone to Texas immediately prior to her death would suggest that someone else may have been involved in the killings, and is thus exculpatory and material. The government's failure to turn over any information it possesses regarding third party guilt, including the whereabouts of Ms. Escobedo's phone, violated *Brady*.

**C.      The Government Failed to Disclose Material Exculpatory Information Regarding the Alleged Drug Deal in Daytona Beach.**

240.     The government's theory was that Mr. Troya and Mr. Sanchez killed the Escobedos, in part, to rob them of a substantial quantity of drugs. In support of this theory, the government claimed that the Escobedos traveled from West Palm Beach up the coast to the

68

Daytona Beach area immediately prior to the murders in order to consummate a large drug deal. *See*, *e.g.*, Tr. 7135 (government closing argument).

241.    But the evidence supporting the drug robbery motive was thin. It consisted primarily of brief statements allegedly made to cooperators and speculation that the purchase of a used Chevrolet and a necklace in the aftermath of the murders were made with proceeds from the robbery. *Id.* at 7135-36.

242.    And the evidence that a drug deal actually took place in Daytona Beach was essentially non-existent. No evidence was presented regarding the nature of the deal, the specific venue of the deal, or the other participants in the deal. Nor was any evidence presented of drugs or money that could be specifically traced to the deal.

243.    One of two things is true regarding the alleged deal: 1) the deal did happen, in which case one or more people in the Daytona Beach area involved in large scale drug trafficking knew that the Escobedos were traveling on October 13 with a large quantity of drugs or money, and thus had the means, motive, and opportunity to commit the killings; or 2) the deal did not happen, in which case the government's entire theory that the killings involved a drug robbery is undercut. In either event, any knowledge the government possesses about the alleged Daytona Beach drug deal constitutes *Brady* material.

**D.    The Government Failed to Disclose Material Exculpatory Information From the Security Booth at the Briar Bay Neighborhood.**

244.    The government presented evidence, principally through witnesses Kevin Vetere and David Doran, that shortly following the murders Mr. Sanchez and Mr. Troya returned to the Garden Court house. Tr. 3969-70 (testimony of David Doran that he observed the burgundy van and a dark-colored vehicle that may have been a Jeep SUV (owned by the Escobedos) returning to the Garden Court house between 4:30 and 5:00 a.m. on October 13, 2006); Tr. 5451

(testimony of Kevin Vetere that he observed Mr. Varela, Mr. Troya, Mr. Sanchez, and Mr. Gutierrez returning to the Garden Court house in the early morning hours of October 13, 2006, carrying bags); Tr. 5463 (testimony of Kevin Vetere that the bags being carried by these four individuals were of the type they typically used to transport kilos of cocaine).

245.    The Garden Court house was located in a gated community. *See*, *e.g.*, Tr. 5468. Thus, in order for the van (owned by Mr. Varela) and the Jeep to arrive at the Garden Court house, they would have needed to pass through the security gate. The government obtained, and provided in discovery, the security logs from that security gate on October 12 and 13, 2006. Tr. 6969-70. Those security logs did not indicate that Mr. Sanchez or Mr. Troya entered the security gate at the time indicated by Mr. Vetere and Mr. Doran. Tr. 6975. The government, upon cross-examination of the law enforcement witness who was involved in the investigation of the logs, Special Agent Jim Matthews, elicited that there was no way to know how accurate the logs were. Tr. 6983-84.

246.    But defense counsel also elicited through Special Agent David Weeks that there were surveillance cameras at the Briar Bay security gate. Tr. 6968. Upon cross-examination by the government, Agent Weeks acknowledged that he had viewed video footage from the Briar Bay surveillance cameras covering the time period from October 12 to October 14, 2006. Tr. 6974-75. Agent Weeks further testified that he did not deem anything he received from Briar Bay "relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th 2006." Tr. 6975.

247.    This video footage was not turned over to the defense. Video footage, unlike a security log, is not susceptible to a charge of inaccuracy due to human error. Given that the government did not introduce this video footage in its case, the only logical conclusion is that it

did not support Mr. Vetere's and Mr. Doran's testimony. This evidence is therefore exculpatory within the meaning of *Brady*.

248.    Failure to disclose the information was also material both as to guilt and punishment for Mr. Sanchez. The government's theory of the case was that the Escobedos were killed as part of a drug robbery. Mr. Vetere's testimony about the bags Mr. Varela, Mr. Troya, Mr. Sanchez, and Mr. Gutierrez were carrying in the middle of the night and his speculation about what those bags may have contained served as some of the only evidence that this was, in fact, a drug robbery. If the defense had been able to use this video footage to undercut Mr. Vetere's testimony, it would have dealt a severe blow to the government's case. There is a reasonable probability that, had the information been disclosed, Mr. Sanchez would not have been convicted and/or sentenced to death.

**E.    The Government Failed to Disclose Material Exculpatory Information Regarding Benefits Provided to Cooperating Witness Kevin Vetere.**

249.    Cooperating witness Kevin Vetere was one of the government's principal witnesses. Mr. Vetere was initially indicted as a co-defendant to Mr. Sanchez, but pleaded guilty to Count 1 of the Superseding Indictment (the drug conspiracy) prior to trial and was sentenced to 144 months imprisonment.  Dkt. 301.

250.    Mr. Vetere testified that no further promise of benefit was made to him, but that he hoped his sentence might be reduced as a result of his cooperation. Tr. 5426 (stating that a reduction in sentence was "[j]ust a hope right now."). Mr. Vetere testified on cross-examination that he had entered into a limited use immunity agreement for his testimony, that he hoped that his sentence might be reduced by 40 or 50 percent due to his cooperation, and that he was told he could be prosecuted on additional gun and drug charges. Tr. 5793-94; Tr. 5843-45.

71

251.     Following trial, Mr. Vetere's sentence was indeed reduced at a Rule 35 hearing. The government asked for a 40% reduction in Mr. Vetere's sentence, to 86 months. The Court went substantially further, however, and reduced Mr. Vetere's sentence to only 42 months, or three-and-a-half years. Dkt. 1058. The extreme reduction in sentence received by Mr. Vetere, on a fraction of the criminal conduct for which he could have been charged, suggests that he had more than a mere hope that his cooperation at trial might prove fruitful.

252.     The government had an obligation to disclose any discussions with Mr. Vetere or his attorney that made his hope for future benefit more than merely speculative and aspirational.

**F.     The Government Failed to Disclose Material Exculpatory Information of Mr. Sanchez's Lessened Culpability for the Murders.**

253.     The government did not provide the defense with material, exculpatory information in its possession that would have lessened Mr. Sanchez's role in the murders and would have therefore affected the jury's determination of his guilt and/or punishment. The government did not provide material exculpatory evidence in its possession that Mr. Sanchez did not fire a weapon on October 13, 2006.

**G.     The Cumulative Materiality of the Withheld Evidence Requires that Mr. Sanchez be Granted a New Trial and/or Penalty Hearing.**

254.     As discussed above, *Brady* materiality must be determined cumulatively, rather than item-by-item. The cumulative materiality of the government's non-disclosures prejudiced Mr. Sanchez.

## VII.   MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL.

255.   Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

256.   The government presented circumstantial evidence – including a palm print on a turnpike toll ticket, photographs of the van and the Jeep entering the turnpike together, and cellular phone records – that placed Mr. Sanchez on the turnpike at or near the scene of the murders. This evidence was consistent with the defense theory at trial that Mr. Sanchez was engaged in counter-surveillance to protect Jose Escobedo during a drug delivery and sale. Tr. 7291-92. The defense theory was undercut by trial counsel's unreasonable and prejudicial failure to conduct a timely or adequate investigation of the guilt phase issues, including failing to investigate and challenge the government's toolmark and cellphone evidence and failing to investigate and gather additional evidence that could have supported the claim that other unidentified persons may have been traveling with the Escobedos or met them along the way. Trial counsel unreasonably and prejudicially failed to object to the duplicitous charges contained in Counts 7 through 10, and to the jury instructions and verdicts on those counts. Trial counsel also unreasonably and prejudicially failed to object during guilt phase closing arguments when the government repeatedly vouched for the strength of its own investigation without any foundation or connection to the evidence. As a result of counsel's unreasonable and prejudicial failures, Mr. Sanchez's convictions were imposed in violation of his rights to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to due process of law; and to a reliable determination of penalty. U.S. Const. amends. V, VI, VIII; *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.** **Trial Counsel Unreasonably and Prejudicially Failed to Challenge the Composition and Selection of the Grand and Petit Jury Venires in Violation of the Fifth, Sixth, and Eighth Amendments.**

**1.** **Prevailing professional norms.**

257. Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. 2003 ABA Guidelines, Guideline 10.8 and commentary thereto ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." (quotations omitted)). Federal defense counsel were specifically required to raise before trial any objections to composition of the grand jury venire. Fed. R. Crim. P. 12(b)(3)(B)(v).

**2.** **Deficient performance.**

258. At the time of trial, the defense bar widely recognized the viability of challenges to the grand and petit jury venire selection processes, as such challenges had been available for decades. From 2006 through 2009, the composition and selection of Southern District of Florida jury venires raised serious concerns of which counsel was or reasonably should have been aware. Information and records reflecting the composition and selection process were reasonably available to trial counsel. Trial counsel nonetheless failed to investigate, research, or challenge the process whereby jury venires in the West Palm Beach Division of the Southern District of Florida underrepresented racial and ethnic minorities (including Hispanics and African Americans), and counsel thus failed to preserve and litigate a meritorious claim. Trial counsel's failure to challenge the grand and petit jury venires deprived Mr. Sanchez of effective assistance of counsel.

74

### 3.      Prejudice.

259.    Had counsel timely raised a challenge to the grand and petit jury venires, Mr. Sanchez could have established that his rights under the Fifth and Sixth Amendments were violated by the processes which brought about his indictment, convictions, and death sentence. The Sixth Amendment requires that the panels from which petit juries are selected be drawn from a fair cross section of the community. The fair cross section requirement applies to grand jury venires as well.

260.    Further, the Equal Protection Clause of the Fifth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results.

261.    Mr. Sanchez, a Hispanic man facing federal capital charges, had standing to mount these challenges.

262.    To establish a *prima facie* claim that the government violated the fair cross section requirement, a movant must show:

- that the group alleged to be excluded is a "distinctive" group in the community;

- that the representation of the group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and

- that this underrepresentation is due to systematic exclusion of the group in the jury selection process.

263.    A *prima facie* showing of discrimination under the Equal Protection Clause requires similar proof.  A claimant must show "the procedure employed resulted in substantial underrepresentation of his race or identifiable group," by demonstrating:

- the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied";

75

- underrepresentation of the group in the grand jury process *over a significant period of time*; and

- a selection procedure "that is susceptible of abuse *or* is not racially neutral."

264. Mr. Sanchez can demonstrate a *prima facie* case of discriminatory underrepresentation, under both the Fifth and Sixth Amendments, of Hispanics and African Americans on grand jury and petit jury panels in the West Palm Beach Division of the Southern District of Florida at the time of the trial proceedings in this case.

### a.  **Hispanics and African Americans are distinct classes in the community which merit constitutional protection.**

265. Hispanics and African Americans have long been recognized by the courts as "distinct classes," the exclusion of whom from possible jury service is constitutionally suspect.

### b.  **Underrepresentation.**

266. The West Palm Beach Division of the Southern District of Florida is comprised of a single county: Palm Beach County. Before trial, the total population of Palm Beach County was, according to the 2000 census, 1,131,186. The Hispanic population was 140,675 or 12.44% of the population. The African American population was 156,055 or 13.80% of the total population.

267. Hispanic and African American persons were unfairly and unreasonably underrepresented on the petit and grand jury venires in this case and for a significant period of time.

268. The petit jury was selected in late 2008 and January of 2009. The petit jury venire was likely drawn from the master wheel on September 7, 2007. The data concerning that wheel was reported by the district court clerk on form AO 12 on February 15, 2008. Section IV of the report contains the racial and ethnic breakdown of the jury wheel sample: the first column states the number of persons in the wheel sample, the second column states the percentage that this

76

group represents in the wheel sample, and the third column states the percentage that this group represents in population for the jury division (Palm Beach County). According to the AO 12 report, Hispanics made up 7.7% of the wheel, and 7.2% of the population:

| Ethnic | | | | |
|---|---|---|---|---|
| Hispanic or Latino ...................... | 26 | 7.7 | 7.2 | |
| Non-Hispanic or Non-Latino .............. | 282 | 83.2 | 92.8 | |
| Unknown ............................. | 31 | 9.1 | 0.0 | |

269.    According to the AO 12 report, the jury wheel sample has an over-representation of Hispanics as compared to the population in the jury division. However, the third column – the reported percentage of the group in the population – appears to be inaccurate.

270.    Census data for Palm Beach County for the years 2000 and 2010[11] establish that Hispanics made up 12.44% of the population in 2000, and 19% of the population in 2010:

| Palm Beach County, Florida - Overview | 2010 Census | | 2000 Census | | 2000-2010 Change | |
|---|---|---|---|---|---|---|
| | Counts | Percentages | Counts | Percentages | Change | Percentages |
| Total Population | 1,320,134 | 100.00% | 1,131,186 | 100.00% | 188,948 | 16.70% |
| | | | | | | |
| **Population by Race** | | | | | | |
| American Indian and Alaska native alone | 6,043 | 0.46% | 2,466 | 0.22% | 3,577 | 145.05% |
| Asian alone | 31,100 | 2.36% | 17,127 | 1.51% | 13,973 | 81.58% |
| Black or African American alone | 228,690 | 17.32% | 156,055 | 13.80% | 72,635 | 46.54% |
| Native Hawaiian and Other Pacific native alone | 770 | 0.06% | 692 | 0.06% | 78 | 11.27% |
| Some other race alone | 53,138 | 4.03% | 33,709 | 2.98% | 19,429 | 57.64% |
| Two or more races | 30,272 | 2.29% | 26,928 | 2.38% | 3,344 | 12.42% |
| White alone | 970,121 | 73.49% | 894,209 | 79.05% | 75,912 | 8.49% |
| | | | | | | |
| **Population by Hispanic or Latino Origin (of any race)** | | | | | | |
| Persons Not of Hispanic or Latino Origin | 1,069,311 | 81.00% | 990,511 | 87.56% | 78,800 | 7.96% |
| Persons of Hispanic or Latino Origin | 250,823 | 19.00% | 140,675 | 12.44% | 110,148 | 78.30% |

271.    In other words, at the time the petit jury venire was drawn, Hispanics did *not* make up 7.2% of the population of Palm Beach County, as was reported on AO 12 form. Rather, the Hispanic population was far larger: in 2000, Hispanics already made up 12.44% of the population, and between 2000 and 2010, Hispanics had grown to 19.00% of the population. It is

---

[11] This chart was obtained at the following URL: http://censusviewer.com/county/FL/Palm%20Beach.

extremely unlikely, then, that Hispanics only made up 7.2% of the population at the time the petit jury was drawn.

272.   Using the 2000 census data, there was an absolute disparity of 4.74%, and a comparative disparity of 38.10%. But given that the Hispanic population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparities were likely even greater. Assuming that at the time of trial in 2009 the Hispanic population in Palm Beach County was closer to 19.00% (per the 2010 census data), then the jury wheel sample (7.7%) represents a greater than 10% absolute disparity (11.3%), and a comparative disparity of 59.47%.[12]

273.   According to the same AO 12 report, African Americans made up 12.4% of the wheel, and 10% of the population:

| This table reflects ( ) persons returning questionnaires, or ( X ) persons qualified as jurors | Number in Wheel Sample | Percent of Sample | Percent this class is found in citizen population of the: ( ) district ( X ) jury division |
|---|---|---|---|
| TOTAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 339 | 100% | 100% |
| White . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 272 | 80.2 | 86.2 |
| Black or African American . . . . . . . . . . . . . . . | 42 | 12.4 | 10.0 |
| American Indian or Alaska Native . . . . . . . . . | 0 | 0.0 | 0.2 |
| Asian . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 2.9 | 0.9 |
| Native Hawaiian or Pacific Islander . . . . . . . . | 0 | 0.0 | 0.0 |
| Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 | 2.9 | 1.4 |
| Multi-Racial . . . . . . . . . . . . . . . . . . . . . . . . | 1 | 0.3 | 1.3 |
| Unknown . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 1.2 | 0.0 |

Racial

According to the AO 12 report, the jury wheel sample thus has an over-representation of African Americans as compared to the population in the jury division. However, the third column – the reported percentage of the group in the population – once again appears to be inaccurate.

_____

[12] On information and belief, the Administrative Office provides clerk's offices with current census estimates when an AO 12 report is to be completed. It does not appear that the clerk recorded those census estimates on the AO 12 form that was completed on February 15, 2008.

274. At the time the petit jury venire was drawn, African Americans did not make up 10% of the population of Palm Beach County, as was reported on AO 12 form. Rather, in 2000, African Americans made up 13.80% of the population, and between 2000 and 2010, that group had grown to 17.32% of the population. It is extremely unlikely, then, that African Americans only made up 10% of the population at the time the petit jury venire was drawn.

275. Using the 2000 census data, there was an absolute disparity of 1.4%, and a comparative disparity of 10.14%. But given that the African American population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparities were likely much larger. Assuming that at the time of trial in 2009 the African American population in Palm Beach County was closer to 17.32% (per the 2010 census data), then the jury wheel sample (7.7%) represents an absolute disparity of 4.92%, and a comparative disparity of 28.41%.

276. The relevant AO 12 report indicates that the wheel from which the petit jury was drawn was filled with names from the voter registration list. The wheel was filled on September 9, 2007, but it does not indicate the date of the voter registration list that was used. On information and belief, however, as well as based on the previously aforementioned analysis, the voter registration list that was used to fill the wheel for both the grand and petit jury venires in this case underrepresented Hispanics and African Americans in Palm Beach County.

277. Additionally, on information and belief, the voter registration list that was used to fill the wheel for both the grand and petit juries improperly excluded 18 to 21-year-olds who were eligible to serve. Significant numbers of Hispanic and African American persons were among these excluded persons.

79

### c.  This underrepresentation was the product of an unconstitutional selection process.

278.  The underrepresentation of Hispanics and African Americans was systemic in the process by which the petit and grand jury venires were selected. It appears that African Americans and Hispanics had been underrepresented in the wheels in the West Palm Beach Division for a number of years. In AO 12/JS 12 forms for the years 1998, 2002, 2003, 2004, 2008 and 2010, the citizen population data for Hispanics and African Americans – the number that is recorded in the third column of Section IV of the form – was incorrect:

- The population data for African Americans in the jury division was reported as 10% in 1998, 11.3% in 2002, then back to 10% in 2003 – *and then it stayed at precisely 10% in every subsequently filed report, up to and including the 2010 report*. Although the increase from 10% in 1998 to 11.3% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data – which suggests that the African American population declined to 10% in 2003 and stayed at that level through to 2010 – is clearly inaccurate.

- The population data for Hispanics in the jury division was reported as 6.8% in 1998, 11.1% in 2002, and then down to 7.2% in 2003 – *and then it stayed at precisely 7.2% in every subsequently filed report, up to and including the 2010 report*. Although the increase from 6.8% in 1998 to 11.1% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data – which suggests that the Hispanic population declined to 7.2% in 2003 and stayed at that level through 2010 – is clearly inaccurate.

279.  The consistently inaccurate reporting of population data on the AO 12/JS 12 forms made the process by which the grand and petit jury venires were selected subject to the systematic exclusion of proportionate numbers of minority groups; resulted in venire selection that was not racially neutral; and reflected a process that was susceptible to abuse. That is, the data reported in the AO 12/JS 12 forms as to the percentage of Hispanics and African Americans in the jury division was consistently reported as much smaller than what was actually reflected in the community; consequently, the jury wheel sample consistently appeared to slightly overrepresent Hispanics and African Americans, when in fact those persons were being

80

significantly underrepresented. And, as noted above, the underrepresentation was so stark that in some instances, it likely exceeded a 10% absolute disparity.

280.   These and related allegations, which Mr. Sanchez will seek to prove at an evidentiary hearing, demonstrate that counsel's failure to object to the selection and composition of the jury venires prejudiced Mr. Sanchez.

**B.      Trial Counsel Unreasonably and Prejudicially Failed to investigate and Properly Challenge the Government's Toolmark Evidence.**

### 1.      Prevailing professional norms.

281.   At the time of Mr. Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant were expected to "independently investigate the circumstances of the crime and all evidence – whether testimonial, forensic, or otherwise – purporting to inculpate the client" and to "subject[] all forensic evidence to rigorous independent scrutiny." Commentary to Guideline 1.1 of the 2003 ABA Guidelines; *see also* Guideline 5.1.B.2.e (capital counsel expected to demonstrate "skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence"); Guideline 8.1 and commentary thereto (capital counsel is expected to keep "abreast of the field" and "must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones").

### 2.      Deficient performance.

282.   Trial counsel were or reasonably should have been aware that it was necessary to conduct a comprehensive investigation of the firearms identification evidence in this case. The opinion testimony of the government's toolmark examiners – Allison Quereau and Mark Chapman – was the only forensic evidence that tied the weapons used during the murders and two uncharged shootings to the Garden Court residence where the government alleged Mr.

Sanchez stayed. Trial counsel also were or reasonably should have been aware that it was necessary to challenge before trial the admissibility of the firearms identification evidence pretrial under Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or risk waiver.

283.    Trial counsel, however, did not challenge the admissibility of the firearms identification evidence or request a *Daubert* hearing until the government offered the first of its two toolmark examiners as an expert at trial. At that time, counsel argued that toolmark examiners have no way to measure the accuracy or the error rates of their determinations and that the testimony should be inadmissible under *Daubert.* Tr. 6258. The government argued that defense counsel's *Daubert* motion should have been filed and heard pretrial. Tr. 6259. Defense counsel argued that there is no requirement to raise the issue pretrial and that *Daubert* requires the court to act as the gatekeeper for expert testimony. Tr. 6261. The Court denied the defense request, ruling that since the government had provided the expert reports pretrial, the *Daubert* motion objecting to testimony based on the reports had to be filed pretrial also. Tr. 6263-64.

284.    Testifying as an expert, Ms. Quereau opined that eight of 11 cartridge casings found at the Mercer Avenue residence on April 28, 2006, were fired by the AK-47 rifle (Govt. Ex. 202m) found at the Garden Court residence during the search on October 25, 2006. Tr. 6291. She also opined that one other casing cycled through the rifle. She noted that the two remaining casings had "class characteristics" consistent with having been fired by the rifle but she made no further identification. Tr. 6290-91. Regarding the Suwanee Drive shooting on April 28, 2006, Ms. Quereau testified that eight of 16 cartridge casings recovered from the scene were fired by the AK-47 rifle. In addition, six of the remaining casings cycled through the rifle at one time, and

the last two casings had class characteristics consistent with the rifle. Tr. 6344-46. Ms. Quereau testified that she was "100 percent sure" of her identifications. Tr. 6385.

285.    Mr. Chapman testified regarding the cartridge casings recovered from crime scene on October 13, 2006. Since no murder weapons were recovered, Mr. Chapman had no tools to which he could compare the recovered cartridge casings. Instead, he sought to match spent cartridge casings recovered from the scene to live cartridges found in the Garden Court residence. Mr. Chapman opined that six of seven spent 40 caliber cartridge casings found at the scene had markings that matched the markings on one of the live 40 caliber cartridges found in a magazine in the residence. Tr. 6644-45. Mr. Chapman gave similar testimony regarding the 9mm cartridge casings found at the scene of the murders. He testified that three of the four spent 9mm cartridge casings from the scene had toolmarks matching the marks on two live 9mm cartridges from a box of 9mm cartridges found at the Garden Court residence. Tr. 6653.

286.    Mr. Chapman testified that he could not identify the tools that had made the marks. As he stated, "without the tool I cannot tell you what the tool was." Tr. 6646. Although the marks were of "unknown origin," Mr. Chapman suggested two possibilities. One "possibility" was that they were made by a "magazine lip." *Id*. It was also "possible" that they were made by the chamber of a gun. *Id.* Nonetheless, he testified to "a reasonable degree of scientific certainty" that the spent and unspent cartridge cases had come in contact with the same tool. Tr. 6653, 6668. He defined the phrase "reasonable degree of scientific certainty" as meaning that it was a "practical impossibility" that more than one tool had made the marks. Tr. 6667.

287.    Trial counsel cross-examined each expert about the reliability of toolmark identifications and the methodology used to reach their opinions. Tr. 6373-77 (Quereau), 6667-

83

6686 (Chapman). However, this was no substitute for a *Daubert* hearing, which if successful, would have rendered inadmissible all or part of the government's toolmark evidence. Moreover, even if the toolmark evidence was admissible at trial, counsel would have been in position to effectively challenge the evidence by presenting an expert who could explain the inadequacies of the toolmark identifications in this case and by thoroughly cross-examining the government's experts on these grounds.

### 3.   Prejudice.

288.   As a result of trial counsel's unreasonable failure to file a pretrial objection under *Daubert*, and to present the testimony of an independent expert, Mr. Sanchez lost the opportunity to exclude the toolmark evidence. Had trial counsel timely sought a *Daubert* hearing, such a hearing likely would have been held, and the government would not have sustained its burden under *Daubert.*

289.   By the time of Mr. Sanchez's trial, the underlying assumptions of toolmark identification – that a tool leaves unique, identifiable, and reproducible toolmark(s) on an object – repeatedly had been called into question as not being validated. *See* National Research Council of the National Academies (NRC), *Ballistic Imaging, Committee to Assess the Feasibility, Accuracy, and Technical Capability of National Ballistics Database*, 80-81 (2008) ("The validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks has not yet been fully demonstrated."); *see also* NRC, *Strengthening Forensic Science in the United States: A Path Forward*, 155 (2009) ( "[T]he scientific knowledge base for toolmark and firearms analysis is fairly limited," and the studies that have been performed place a "heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability.").

84

290.     Constitutionally effective counsel, having undertaken an adequate investigation, would have developed and presented expert evidence challenging the reliability of toolmark identification testimony and the specific toolmark identifications made by Ms. Quereau and Mr. Chapman. Current counsel for Mr. Sanchez have engaged a well-qualified firearms and toolmark identification expert who explains that the methodology and conclusions reached by Ms. Quereau and Mr. Chapman departed from accepted practices in the field.

291.     The government's experts did not adequately document or explain their methodology or the tests that form the basis for their opinions. The government's experts also did not address "subclass characteristics," and made no attempt to rule out the possibility that the toolmarks were class or subclass characteristics rather than individual characteristics.[13] Indeed, Mr. Chapman did not explain how, without knowing what tool had left the marks, he could differentiate the class and subclass characteristics from the supposedly unique individual characteristics of the markings. Without the firearm or magazine, Mr. Chapman could not obtain exemplars or standards to determine if the toolmarks were reproducible and to determine if similar firearms or magazines made comparable marks.

292.     Moreover, had trial counsel not prevailed on the *Daubert* challenge, counsel would still have been in a position to cross-examine the government's experts on these grounds, present the testimony of an independent expert, and provide the jury with a compelling basis on which to reject the government experts' testimony. There was no professionally reasonable basis for counsel's failure to avail themselves of such evidence, either at the pretrial or trial stages of

---

[13] Class characteristics are intentional marks that all firearms of a given make and model will share. Subclass characteristics, which are created by the manufacturing of batch lots of tools, are matching microscopic characteristics that are distinguishable from toolmarks produced by other tools of the same type but are common to toolmarks produced by tools in the same batch. Individual characteristics are considered to be unintentional and incidental microscopic characteristics unique to the toolmarks produced by an individual firearm or other tool.

the case. Even if the toolmark evidence had been deemed admissible, prevailing professional norms still required that counsel seek to impeach the government's experts and/or present testimony from independent experts based on a thorough investigation of any available challenges to the forensic evidence about which testimony was expected. *See* Guideline 1.1 and commentary thereto ("Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination.").

293.    The combined effect of counsel's failures prejudiced Mr. Sanchez. Ms. Quereau's toolmark testimony regarding the Suwanee and Mercer shootings was the basis for introducing inflammatory evidence of shootings not connected to the offense. In closing argument, the government emphasized the other drug crimes and other shootings evidence in urging the jury to convict Mr. Sanchez for the Escobedo murders. The government displayed the AK-47 to jurors during closing argument and invited them to examine it during deliberations. Tr. 7119-21, 7594.[14] The government portrayed Mr. Sanchez as a "thug enforcer" for the Varela conspiracy, "willing to carry guns, wear disguises and shoot." Tr. 7180, 7437. Mr. Sanchez, the government argued, was the sort of person whom the jury should believe capable of killing the Escobedos. Tr. 7448-49.

294.    Mr. Chapman's toolmark testimony likewise was prejudicial, as it was the only forensic evidence purporting to tie Mr. Sanchez to the Escobedo murders. While other forensic evidence placed Mr. Sanchez on the turnpike, that evidence did not connect him to the murders themselves. As trial counsel made clear in closing, "[f]our bullets that Mark Chapman says connect [Ricardo] Sanchez to the murder scene. That's the Government's case. That's it." Tr.

---

[14] During several days of deliberations, the only evidence the jury asked to see was the AK-47 and one other firearm. Dkt. 789; Tr. 7594.

7290. The admission of the unreliable toolmark testimony linking Mr. Sanchez to the Suwanee and Mercer shootings and linking the murder weapons to the residence where Mr. Sanchez was alleged to have stayed, and the failure to pose an adequate challenge to the evidence that was introduced were thus prejudicial, and relief is required.

**C.    Trial Counsel Rendered Ineffective Assistance by Failing to Investigate and Present the Testimony of a Qualified Expert in Cellular Forensics.**

**1.    Prevailing professional norms.**

295.    At the time of Mr. Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant investigated all forensic evidence, and subjected the government's forensic evidence to independent scrutiny. *See* 2003 ABA Guidelines, Guideline 1.1. and commentary thereto; *see also* Guideline 10.7 and commentary thereto (qualified capital counsel "aggressively re-examine[d] all of the government's forensic evidence, and conduct[d] appropriate analyses of all other available forensic evidence").

**2.    Deficient performance.**

296.    Trial counsel unreasonably failed to present testimony of a qualified forensic cellphone examiner to challenge the government's cellphone evidence and failed to investigate and gather additional cellphone evidence to support the defense theory that a third party was involved in the conspiracy and murders.[15]

297.    During discovery, the government disclosed subscriber records, toll records, Call Detail Records (CDRs), and cellular site data for various cellular phones belonging to the defendants and the Escobedos. Trial counsel knew or reasonably should have known that the

---

[15] A third car – a silver sedan – entered and left the turnpike at the exact same locations about four minutes before the Jeep and the van, but police never identified it or its owner. Tr. 3349-50; Def. Ex. 3, 4.

87

government intended to present evidence that purported to map the movement of the defendants and the Escobedos on October 12 and October 13, 2006, through the use of cellular phones.

298.    At trial, the government presented the testimony of three records custodians from Verizon Wireless, T-Mobile, and MetroPCS. Relying on business records from these network providers, Special Agent David Weeks testified that cellular records established that Mr. Escobedo and Mr. Sanchez placed a series of short calls to each other from approximately 6:00 PM on the evening of October 12, 2006, until 2:21 AM on October 13, 2006. By mapping the cellular towers that processed these calls, the government argued that the cellular phone records showed that Mr. Sanchez and Mr. Escobedo traveled in tandem north from West Palm Beach to Daytona Beach, and then back south to Fort Pierce, where they got on the turnpike heading south to West Palm Beach. Govt. Ex. 760.1-15; Tr. 6750-821.

299.    No calls occurred between Mr. Sanchez's and Mr. Troya's phones during that time, which the government suggested indicated that the two were riding together in the same vehicle. Mr. Troya did make several other calls, which were processed by cellular towers in the same vicinity in which Mr. Sanchez and Mr. Escobedo were traveling. Govt. Ex. 760.4, 760.8; Tr. 6793-94. After 2:25 AM, the government argued that multiple calls between Mr. Sanchez and Mr. Troya indicated that they were traveling south back to West Palm Beach in separate vehicles. Govt. Ex. 760.6, 760.9; Tr. 6796-808.

300.    Trial counsel objected to this testimony, arguing that the government needed to present an expert in cellular forensics to establish the accuracy and reliability of cellular tower data and that the testimony could mislead the jury into believing that a person was in a specific location when a call was made. Tr. 6010-15, 6742-45. Counsel informed the court that counsel would "seek leave . . . to call an expert on this." Tr. 6019. Counsel, however, unreasonably failed

88

to present any expert testimony to strengthen the argument as to the unreliability and inaccuracy of cellular tower data.

301. Trial counsel had obtained the appointment of Jeffrey Fischbach as an expert in cellular forensics and submitted an expert disclosure in order to call him as a witness at trial. Dkt. 515-3. Trial counsel ultimately withdrew Mr. Fischbach as an expert witness because the government did not provide notice that it would present its own expert in cellular technology. Tr. 2747-49, 6014 ("My position was not having received any expert disclosure from the Government regarding cell site information, I was not in a position to go forward with my expert and I withdrew him.").

302. Counsel clearly wanted to challenge the accuracy of the cellular tower data. Counsel therefore had no reasonable basis for not presenting the testimony of an expert witness. Instead, counsel only cross-examined the government's witnesses on cellular tower range, operability, and maintenance, without presenting readily available expert testimony.

303. Counsel also had no reasonable strategic or tactical basis for failing to investigate and gather additional evidence to support the argument that Yessica Escobedo's cellular phone traveled to the vicinity of McAllen, Texas on October 12, 2006. Trial counsel introduced Ms. Escobedo's phone records into evidence but did not present any testimony regarding the records. Def. Ex. 32; Tr. 6979. Trial counsel also did not present any argument about the records in his initial closing argument. Counsel re-opened closing arguments to address the records, stating:

> You will see 10/12 of 2006 at 7:47 p.m., a call was made in Melbourne, Florida, was received with respect to that phone.
>
> You will see the next call, ladies and gentlemen, on 10/12, was at 11:58 p.m. That call was in McAllen, Texas.
>
> Likewise, you will see that on 10/13/06, 12 a.m., another call was received by Yessica Escobedo's phone in McAllen, Texas.

> And finally, ladies and gentleman, you will see that on 10/13 at 3:18 a.m., Yessica Escobedo the Government says is dead, another call is received on that phone in McAllen, Texas.
>
> There is a mystery here which was never answered.
>
> We know someone was traveling with the Escobedos that night, and the Government knew it, too, and they ignored it and they kept this evidence out of their presentation.
>
> The second phone Mr. Carlton said was missing and which he said was searched for in the dark was that night in Texas.
>
> We provided you this information in this case, Sanchez Exhibit 32, Yessica Escobedo's phone, moves from Melbourne, Florida, the same path the Escobedos took that night, to McAllen, Texas by 12 that night.
>
> Look at its path. When they stand up here and the Government closes on rebuttal, ask them why the Government kept that information from you.

Tr. 7351-52.

304.    Counsel clearly recognized that Ms. Escobedo's phone records contained critical information that would have provided additional support for the defense theory at trial that there were other people involved in the conspiracy and murders. But counsel failed to adequately investigate and gather additional records that would have enabled them to definitely establish this point. As a result of counsel's errors and omissions, the government could persuasively claim in its rebuttal closing that the records did not reflect that the phone traveled from Florida to Texas on October 12, 2006, but that the service area for three calls was in McAllen, Texas simply because the phone had a Texas number. Tr. 7453 ("I don't know where Mr. Cohen got the fact that Yessica's phone was in Texas. It has a Texas number.").[16]

---

[16] The government forcefully repeated this argument at the Rule 29 hearing, stating, "When you look back to the records, there is no evidence at all, not one scintilla of a cell tower that carried the Yessica Escobedo number. If you look at the records, it is not there. There was no cell tower identified by the phone company for that call. To argue it is in Texas is a phantom argument unsupported by the evidence." Tr. 7661.

### 3.     Prejudice.

305.     Due to trial counsel's errors and omissions, the jury heard incorrect information about the location accuracy of cellular tower data. Larry Smith, a records custodian for MetroPCS, testified incorrectly on direct examination that he could "narrow down [the location of a handset] to a specific area one and half to two miles where a call occurred from." Tr. 6011, 6114. The government relied on this erroneous testimony in its closing argument. Tr. 7140 ("He testified in an urban environment cell range for MetroPCS is one and a half to two miles . . . max is ten miles."). The jury did not learn that records produced at trial were materially insufficient to substantiate the whereabouts of an individual handset with this degree of accuracy and precision.

306.     Also due to counsel's failures, counsel did not learn that the records for Yessica Escobedo's phone were incomplete. Because counsel did not investigate, counsel did not obtain the additional records needed to definitely establish whether the handset traveled from Florida to the vicinity of McAllen, Texas on October 12, 2006. Evidence that Ms. Escobedo's phone traveled to Texas while she remained in Florida would have provided further support for the defense theory that others were involved in the conspiracy and murders, contradicted the government's argument in rebuttal and at the Rule 29 hearing that counsel had misrepresented the evidence, and made it reasonably likely that the jury would not have voted to convict and/or would not have sentenced Mr. Sanchez to death.

### D.     Trial Counsel Unreasonably and Prejudicially Failed to Object to the Charges Contained in Counts 7 through 10, and to the Jury Instructions and Verdicts on those Counts.

#### 1.     Prevailing professional norms.

307.     Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. 2003 ABA Guidelines, Guideline 10.8 and commentary thereto ("One

91

of the most fundamental duties of an attorney defending a capital case at trial is the preservation

of any and all conceivable errors for each stage of appellate and post-conviction review."

(quotations omitted)). Federal defense counsel were specifically required to raise before trial any

objections to duplicitous charges contained in the indictment. Fed. R. Crim. P. 12(b)(3)(B)(i).

### 2.    Deficient performance.

308.    Trial counsel were aware that Counts 7 through 10 of the Third Superseding

Indictment each alleged that Mr. Sanchez had committed multiple crimes, including murder as

defined in 18 U.S.C. § 1111:

> On or about October 13, 2006, in St. Lucie County, in the Southern District of
> Florida, [. . . Mr. Sanchez] did knowingly carry and use a firearm during, and in
> relation to, a crime of violence, and a drug trafficking crime, for which [he] may
> be prosecuted in a Court of the United States, that is, armed carjacking, in
> violation of Title 18, United States Code, Section 2119, as set forth in Count Six
> of this Third Superseding Indictment, and conspiracy to possess with intent to
> distribute one or more controlled substances, in violation of Title 21, United
> States Code, Sections 84l(a)(l) and 846, as set forth in Count One of this Third
> Superseding Indictment, respectively, . . .  in violation of Title 18, United States
> Code, Section 924(c)(l), and in the course of this violation caused the death of a
> person through the use of a firearm, which killing is a murder as defined in Title
> 18, United States Code, Section 1111, in that [Mr. Sanchez], with malice
> aforethought, did unlawfully kill [each victim] by shooting him [or her] with the
> firearm willfully, deliberately, and maliciously, and with premeditation, and in the
> perpetration of, and attempt to perpetrate, a robbery.

> In violation of Title 18, United States Code, Sections 924(j)(l) and 2.

Dkt. 305 at 8-11.

309.    Each of these four counts charged two different predicate offenses – drug

trafficking as set forth in Count 1 and armed carjacking as set forth in Count 6 – for a crime of

violence under 18 U.S.C. § 924(j)(1), and also alleged that the killing violated 18 U.S.C. § 1111.

*See id*. Further, the § 1111 charge itself alleged both premeditated murder and felony murder

committed during a robbery. *Id*.; *see also* Tr. 6832 (prosecutor stating that "the indictment

alleged premeditation and felony murder").

310.    Despite the allegations in Counts 7 to 10 that Mr. Sanchez "did unlawfully kill" each victim "in the perpetration of, and attempt to perpetrate, a robbery," pursuant to § 1111's felony murder clause, the Court did not instruct the jury on the elements of robbery. *See* Tr. 7521-76. Instead, the Court erroneously instructed the jury that it could find felony murder based on the carjacking charge. Tr. 7542-43.

311.    The Court also did not instruct the jury that it must unanimously find that each killing occurred in the course of the underlying drug offense, or that each killing occurred in the course of the carjacking. *See* Tr. 7537-44. In other words, although the Court instructed the jury to unanimously decide the underlying offense(s) for the second element of Counts 7 through 10, it did not require such unanimity as to the third and fourth elements. *See id.*

312.    The jury's verdicts on Counts 7 to 10 do not indicate whether Mr. Sanchez had been found guilty of premeditated murder and/or felony murder as defined by § 1111. Dkt. 796 at 3-5. Despite the alternative predicate offenses of drug trafficking and carjacking that were charged in the second element of each of the four counts, the verdicts also did not indicate whether the jury based its guilty verdicts on the drug conspiracy and/or the carjacking predicate(s). *Id*. The verdicts stated only that each killing occurred "in relation to a crime of violence and/or a drug trafficking crime." *Id*.; *see also* Tr. 7698-99. The jury did not reach a verdict on robbery or any other enumerated § 1111 offense upon which felony murder properly could be based. *See* Dkt. 796.

313.    Trial counsel were or reasonably should have been aware that carjacking and drug trafficking are not enumerated offenses for which § 1111 authorizes a charge of felony murder, and that under § 924(j)(1), one can only be convicted upon a finding of having committed murder as defined by § 1111. Counsel accordingly should have objected to the Court's

93

instructions on these counts, including its felony murder jury instruction, which improperly reduced the government's burden of proof, and should have objected to the jury's subsequent verdicts.

314. Counsel should have recognized that the charges in the indictment were duplicitous and at variance with the jury instructions, the jury verdicts, and § 924(j)(1). Trial counsel were or reasonably should have been aware that such duplicitous charges invited juror confusion and could violate Mr. Sanchez's rights to due process and to trial by jury, because a guilty verdict on such a duplicitous count invited uncertainty as to whether the jury unanimously agreed on the particular elements and/or crimes upon which the verdict was based.

315. Trial counsel also were or reasonably should have been aware that the government was required to prove to the jury, unanimously and beyond a reasonable doubt, each crime element contained in the indictment, and that it failed to do so here.

316. Trial counsel had no tactical or strategic reason for failing to move to dismiss or strike the indictment, to object to the duplicitous counts, to object to the jury instructions and the verdict sheets, or to object to the verdicts on Counts 7 to 10. Counsel's performance was deficient.

### 3. Prejudice.

317. Mr. Sanchez was prejudiced by trial counsel's failure to object and litigate the duplicitous charges, the Court's jury instructions, and the jury's verdicts on Counts 7 to 10.

318. Because the jury could not lawfully find unanimously all of the elements charged in Counts 7 through 10, Mr. Sanchez was prejudiced. There is a reasonable probability that counsel's objection to the indictment, instructions, and/or verdicts would have resulted in a different outcome at trial.

**E.**  **Trial Counsel Unreasonably and Prejudicially Failed to Object to the Prosecutor's Misconduct During the Guilt Phase Closing Arguments.**

**1.**  **Prevailing professional norms.**

319.  Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. 2003 ABA Guidelines, Guideline 10.8 and commentary thereto ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." (quotations omitted)).

**2.**  **Deficient performance.**

320.  The government's case against Mr. Sanchez was based almost entirely on circumstantial evidence. To compensate for the lack of any direct evidence implicating Mr. Sanchez in the killings, the government resorted to making improper arguments, including vouching for the strength of its own case and for the work of law enforcement officials. Most, if not all, of the government's vouching was completely divorced from any meaningful attempt to discuss the facts of the case. These tactics were improper and violated Mr. Sanchez's due process and Eighth Amendment rights.

321.  Despite the clearly impermissible nature of the government's commentary, trial counsel failed to object to the prosecutor's pervasive vouching and bolstering of its case, in violation of Mr. Sanchez's right to the effective assistance of counsel.

322.  In its initial closing, for example, the prosecutor suggested that the government had outside knowledge of Mr. Sanchez's guilt: "[t]he Government is alleging, *and we think we know*, we have proved that those murders occurred directly as a result of this carjacking." Tr. 7132. In rebuttal closing, the government argued to the jury: "Folks, the cases don't get better

95

than this." Tr. 7437. The government further described its prosecution of the defendants as "a case worthy of this great courtroom." Tr. 7457.

323.    The government went so far as to vouch for its own honesty in its presentation of the case in its rebuttal closing. The prosecutor stated that "[t]he United States in this case honestly put this evidence before you. I submit we didn't play hide the ball." Tr. 7427; *see also id.* ("We are not the enemy coming over the wall. This case was presented honestly by the United States. We didn't play hide the ball with you all.").

324.    The government also repeatedly vouched for the efforts of the government agent witnesses. The prosecution's rebuttal argument included each of the following improper comments:

- "This evidence was gathered by dedicated, hard working law enforcement." Tr. 7416.

- "Let's stop nitpicking and let's recognize the simple truth, that a number of law enforcement agencies together and independently did a fabulous job in solving this case." Tr. 7425.

- "[T]here are a lot of good people. Detective Fred Wilson, Ms. Carmichael, Detective Parow. What a fabulous job Detective Parow did."[17] Tr. 7426.

- "The Drug Enforcement Administration should be proud of the work they did in this case, not ashamed. Agent Weeks, Agent Birch, fabulous job." Tr. 7426.

- "[T]his is the kind of work that we expect and demand as a community from our law enforcement, to work together, to work incredibly long hours and solve horrible crimes like this." Tr. 7426.

- "Palm Beach Sheriff's Office, Sheriff Bradshaw has a good group of people working for him, Ms. Culpepper, Deputy Halloren, Piatchek, Detective Johnson. Alcohol, Tobacco, Firearms, Barborini, Barbercheck, all these people work together. West Palm Beach Police Department, can't leave them out. Chief Bush has a good department. Mr. McCall came from that department." Tr. 7426-27.

---

[17] *See also* Tr. 7148 (in initial closing argument, describing Detective Parow and Albeiro Munoz as "diligent"); Tr. 7426 (speaking about Parow's "dedication").

96

- "The effort and dedication, they deserve praise from this community, not criticism." Tr. 7427.

- "The heroes and stars of the case are the people that marshal that evidence like Weeks, Birch, Wilson." Tr. 7456.

325.    These remarks were improper personal comment by the prosecutor on the quality of the work, and thus the credibility, of the law enforcement agents involved in this case. By arguing that the law enforcement agents were good, hard working, dedicated people who had done a "fabulous job in solving this case," the government improperly invited jurors to judge their testimony based upon their character. Further, the argument impermissibly suggested that the prosecutor himself had a personal, extended familiarity with the agents involved in this case and that he was vouching for that work based on this familiarity. This tactic is impermissible, as prosecutorial bolstering based either on the government's reputation or on evidence not presented at trial is improper.

326.    Counsel had no reasonable basis for failing to object. Counsel emphasized throughout the case just how weak and circumstantial the government's evidence was. Counsel therefore had no reasonable basis for allowing the government to buttress its case with an improper appeal to the jury's views of the character, honesty, and diligence of individual law enforcement officers.

### 3.    Prejudice.

327.    Mr. Sanchez was prejudiced by counsel's failure to object. As noted above, the government's case was circumstantial. To find Mr. Sanchez guilty, the jury had to credit the testimony of a number of law enforcement witnesses and the physical evidence they described. Much of the government's improper vouching dealt with law enforcement agents who offered some of the most damaging (although flawed) circumstantial evidence against Mr. Sanchez – namely, the testimony that the toolmarks left on the cartridge casings at the scene matched

97

toolmarks left on ammunition found at the Garden Court residence and the testimony regarding cell phone evidence.

**F.      Counsel's Unreasonable Errors and Omissions Individually and Cumulatively Prejudiced the Defense at Mr. Sanchez's Capital Trial.**

328.    There was no forensic evidence, no confession to police, and no eyewitness testimony that Mr. Sanchez murdered the Escobedos. Nor was there evidence that the murders had been planned in advance. The best the government could do to link Mr. Varela's drug business to the murders was to suggest, through unreliable toolmark identification evidence, that shell casings found near the victims' bodies had toolmarks similar to those on unspent cartridge casings found at the Garden Court residence. It is clear that the jury wrestled with the verdict in this case, as evidenced by their extended deliberations. There is a reasonable probability that, had counsel conducted a constitutionally adequate investigation to develop and present readily available forensic evidence challenging the government's circumstantial case and objected to the government's improper vouching, the jury would have returned verdicts of acquittal.

329.    There also is a reasonable probability that trial counsel's errors and omissions affected Mr. Sanchez's penalty phase proceedings. While the jury sentenced Mr. Sanchez to death, they again did so only after extended deliberations. Jurors may well have had residual doubt about Mr. Sanchez's involvement in the murders because, for example, the government was unable to produce any direct evidence that Mr. Sanchez fired a gun at the crime scene. Trial counsel unreasonably and prejudicially failed to present evidence to undermine the weak circumstantial evidence that placed Mr. Sanchez near the crime scene and failed to object to the government's improper arguments that vouched for the strength of its case and the work of law enforcement officials. But for counsel's inactions, there is a reasonable probability that at least one juror would have voted to sentence Mr. Sanchez to life.

## VIII.   MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS CAPITAL TRIAL.

330.     Mr. Sanchez's trial counsel ineffectively failed to conduct a timely or adequate investigation of penalty phase issues, including Mr. Sanchez's social history and intellectual and psychiatric functioning; failed to investigate and present a challenge to the aggravating evidence presented by the prosecution; and failed to make informed, considered decisions regarding potentially meritorious defenses. Trial counsel's unreasonable and prejudicial failures, as set forth below, included (A) failing to investigate and present the jury with compelling evidence of Mr. Sanchez's personal background and psychological and social development and functioning; (B) failing to present evidence of Mr. Sanchez's significant neuropsychological impairments and the effect upon his behavior of these impairments; (C) failing to investigate, develop and present expert mental health testimony regarding Mr. Sanchez's psychiatric disorders and the effect of such disorders on Mr. Sanchez's behavior and functioning; (D) failing to investigate and present to the jury compelling evidence that Mr. Sanchez is intellectually disabled and the effects of that disability on his behavior and functioning; (E) failing to investigate Mr. Sanchez's competence to stand trial at the penalty phase, and to present evidence to the Court that Mr. Sanchez was incompetent: (F) failing to consult effectively with the mental health experts they retained; (G) failing to identify and present to the jury critical information about Mr. Sanchez's traumatic background and disabilities from documentary evidence in counsel's possession; (H) failing to impeach and discredit the testimony of government mental health expert Michael Brannon; (I) failing to investigate, challenge, and mitigate the evidence introduced in aggravation by the prosecution; and (J) failing to object to the prosecution's misconduct during the penalty phase. Reasonably effective counsel at the time of Mr. Sanchez's arrest in 2006 and his trial in 2009 would not have made these errors and omissions.

99

331.    As a result of trial counsel's unreasonable and prejudicial failures, Mr. Sanchez's sentence of death was imposed in violation of his rights to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to a trial free of materially false and misleading evidence; to a trial by a fair and impartial jury; to a reliable, fair, non-arbitrary, and non-capricious determination of penalty; to an impartial and disinterested tribunal; to equal protection; and to due process of law. U.S. Const. amends. V, VI, VIII; *Strickland v. Washington*, 466 U.S. 668 (1984); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor (Terry)*, 529 U.S. 362 (2000); International Covenant on Civil and Political Rights art. 14, Mar. 23, 1976, 999 U.N.T.S. 171.

**A.    Trial Counsel Ineffectively Failed to Investigate and Present the Jury with Compelling Evidence of Mr. Sanchez's Personal Background and Psychological and Social Development and Functioning.**

332.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

**1.    Prevailing professional norms.**

333.    Reasonably effective counsel representing a defendant in federal capital trial proceedings at the time of Mr. Sanchez's penalty phase trial in 2009 knew that it was necessary to conduct a thorough investigation of the defendant's life history, including gathering records and interviewing witnesses about the presence of mental illness and dysfunction, and the defendant's genetic history, including a familial history of trauma, exposure to neurotoxins, mental illness, and substance abuse. Reasonably effective counsel commenced investigation of penalty phase issues immediately upon appointment and pursued this investigation expeditiously. Reasonably effective counsel also guided the mitigation investigation, directed the investigator to relevant areas of mitigation, and adjusted the investigation continuously to account for new

100

information learned. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor (Terry)*, 529 U.S. 362 (2000); 2003 ABA Guidelines, Guideline 10.7 and commentary thereto.

### 2.     Deficient performance.

334.     Trial counsel were or reasonably should have been aware that it was necessary to conduct a comprehensive investigation of Mr. Sanchez's life history background, including gathering information about his parents' background and experiences; his mother's pregnancy with him and his birth; his infancy, toddlerhood, and achievement of or failure to achieve developmental milestones; and his experiences and functioning during his childhood, adolescence, and early adulthood leading up to the time of the crimes for which he was arrested and charged capitally.

335.     Trial counsel also were aware that preparations for and presentation of a capital penalty phase defense required skills different from and in addition to those required to prepare for a typical guilt-innocence criminal trial. One of the attorneys appointed to represent Mr. Sanchez had no capital defense experience, and the other had defended capital cases in state court in Florida, but had no prior experience representing individuals in federal capital proceedings. Trial counsel divided responsibility for the development and presentation of the guilt and penalty phases, assigning responsibility for the penalty phase to the attorney who had capital defense experience in state court.

336.     Trial counsel's proposed case budget filed with the Court shortly after the capital charges were added to the indictment cited and quoted the *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (1989 ed.)[18] in support of their requests for

---

[18] The ABA published a new edition of the *Guidelines* in 2003, and that edition, rather than the 1989 edition that counsel cited, was effective at the time of trial counsel's appointment and representation of Mr. Sanchez. Nevertheless, the 1989 and 2003 *Guidelines* were substantially similar on the points cited here.

funding for a mitigation investigator and other experts with whom to consult for penalty phase preparations. Dkt. 238; *see also* Dkt. 450 (Sealed). Specifically, counsel set forth in its entirety 1989 Guideline 11.8.6, which stated that capital counsel should consider presenting all evidence in mitigation at the penalty phase, including medical history, educational history, military service, employment and training history, and family and social history. Dkt. 238; *see also* Dkt. 450 (Sealed). Counsel's motion also cited language from the *Standards for the Performance of Counsel in Death Penalty Cases* adopted by the National Legal Aid and Defender Association, (NLADA) in amended form on November 16, 1988, that mitigation investigation must commence immediately upon appointment of counsel and comprise all reasonably available mitigating evidence. Dkt. 238; *see also* Dkt. 450 (Sealed).

337.    Trial counsel applied for the appointment of and funding for a mitigation specialist, and the Court granted this application. Dkt. 215; Dkt. 217. *See also* Dkt. 238 ("The mitigation specialist is a critically important member of the defense team who will work closely with counsel, the client, and social history witnesses throughout all phases of the case, including the trial of the penalty phase. Mitigation Specialist Lisa McDermott has already been appointed to aid counsel, pursuant to a prior Order of this Court."); *see also* Dkt. 450 (Sealed).

338.    Despite the fact that counsel applied for and was granted the services of a mitigation specialist, counsel failed to ensure that a professionally reasonable investigation into Mr. Sanchez's background and functioning was conducted. Counsel failed to provide the mitigation specialist adequate guidance about which witnesses she should contact, what subjects she should explore with these witnesses, and what themes and topics were critical to develop for presentation to the penalty phase jury.

339.    Counsel unreasonably failed to engage the services of a Spanish-speaking mitigation investigator to communicate with and interview members of Mr. Sanchez's family. Both Mr. Sanchez's mother and father, Juana and Ricardo Sanchez, Sr., while able to speak some English, are significantly more proficient in Spanish. In addition, many of Mr. Sanchez's other close relatives, including maternal and paternal grandparents, aunts, and uncles, are either monolingual Spanish speakers or speak only limited English. Although for some of these interviews the mitigation investigator employed the services of a Spanish-speaking interpreter, for most of the interviews in which the family member spoke only or primarily Spanish, the investigator asked another family member to interpret. Counsel and the investigator knew or reasonably should have known that engaging one family member to interpret an interview for another is likely to lead to the gathering of unreliable or incomplete evidence, both because it may inhibit the disclosure of information from the witness being interviewed and because it may result in the family interpreter's misinterpreting the information to comport with that family member's understanding of events.

340.    The mitigation investigator was unable to communicate in a meaningful fashion with the monolingual or primarily Spanish-speaking individuals, either to gather information about Mr. Sanchez's background and functioning or to provide information to family members about the progress of the investigation and capital prosecution. Thus, although counsel and the mitigation specialist spoke with some of these family members, significant obstacles to meaningful communication existed and were not overcome.

341.    Mr. Sanchez's trial counsel also failed to speak with numerous family members who were reasonably available and had compelling mitigation information about Mr. Sanchez's background, experiences, and functioning. These family members included but were not limited

103

to Mr. Sanchez's maternal grandmother, Maria de la Luz Betancourt, paternal uncle Martin Sanchez, and cousin José Antonio Gutierrez.

342. Trial counsel spoke with several other family members who had compelling mitigation information to provide to the jury, but failed to call these family members to testify. These family members included but were not limited to Mr. Sanchez's maternal aunts Lucy Jimenez Sanchez and Elsa Hernandez; his father Ricardo Sanchez, Sr.; his brother Ezequiel Sanchez; and his second cousin Benito Rodriguez.

343. Counsel failed to locate and interview friends of Mr. Sanchez's who had compelling mitigating information about Mr. Sanchez's background and functioning. These friends include but are not limited to Yolanda Vazquez, Jason Vazquez, Rosa Ponce, Myra Garcia, and Joel Romero.

344. Counsel also failed to locate and interview numerous teachers and educators who could and would have provided persuasive mitigating information about Mr. Sanchez's behavior and functioning in an academic setting. These included but were not limited to Frances Lenore Wolfe, Mr. Sanchez's second grade teacher; Patricia Replogle, his third grade teacher; Wanda Lee, one of his special education teachers when he was in sixth grade; and Jeffrey Silverman and Janice Coe, special education administrators who knew Mr. Sanchez when he attended Palm Beach Lakes High School.

345. Although counsel contacted Dr. Francis Crosby, the psychologist who performed an evaluation of Mr. Sanchez between Mr. Sanchez's second and third grade years to determine whether he had disabilities making him eligible for special education services, counsel failed to follow up with or interview him despite the fact that he was available and willing to talk to them and to testify at Mr. Sanchez's trial.

104

346.     Mr. Sanchez's trial counsel entirely failed to investigate and present evidence of Mr. Sanchez's adaptive functioning deficits beginning in childhood and continuing throughout his life. Although counsel were aware that Mr. Sanchez received full-time special education services beginning in third grade and continuing throughout the remainder of his schooling, *see, e.g.*, Defense Ex. 34, and also that Mr. Sanchez had difficulty obtaining and maintaining employment after he left school, counsel failed to investigate and present information about these deficits to the jury.

### 3.     Prejudice.

347.     As a result of their errors and omissions, Mr. Sanchez's trial counsel provided the jury with only a very limited, misleading picture of Mr. Sanchez's life history and functioning. Through the limited testimony of the few lay witnesses counsel presented at the penalty phase, including Mr. Sanchez's mother Juana, his sister Nydia, his maternal uncle Juan Antonio, his teacher Amy Fleming, the mother of his child, Maria Lopez, and his child's maternal grandmother Rachel Ramos, the jury learned that Mr. Sanchez's father was an alcoholic and physically abusive to his wife and children; that Mr. Sanchez received special education services in school; that Mr. Sanchez's parents did not attend meetings at school relating to his special education services and did not provide him with tutoring or other supportive services outside of school; that Mr. Sanchez did not graduate from high school; and that Mr. Sanchez was dedicated to being a good father to his child. Although this information was truthful, it did not provide the jury an accurate picture of the traumatic events Mr. Sanchez experienced, the symptoms he exhibited following these traumatic events, and the depth and breadth of his intellectual, cognitive, and adaptive functioning deficits.

### a.    Genetic background and life history.

348.    Constitutionally effective counsel, having undertaken an adequate investigation, would have discovered and presented the extensive, compelling mitigation information readily available from the witnesses the trial team interviewed as well as many the trial team did not. Had Mr. Sanchez's trial counsel discharged their obligation to investigate and present readily available evidence relating to his social history and psychological development, the jury's consideration of Mr. Sanchez's sentence would have been informed by the following compelling mitigating information provided by numerous individuals who knew Mr. Sanchez and his family.

349.    Mr. Sanchez's heritage on both sides of his family is Mexican. Both of his parents were born in or near Matamoros, Mexico, on the border of Mexico and Texas, and both immigrated to the United States when they were children.

350.    Mr. Sanchez's maternal grandmother, Maria de la Luz Betancourt Jimenez, was born in 1929 in Padilla, near Ciudad Victoria, the capital of the state of Tamaulipas, Mexico. Maria had three brothers and one sister. She and her siblings grew up in a rural community; her father was a farmer. Maria was educated only through sixth grade because her family did not have the financial resources to pay for further schooling or the luxury of having her attend school rather than work in the fields along with the rest of her family.

351.    Members of Maria's family suffered from mental illness and abused substances. Her father drank alcohol on the sly because Maria's mother did not approve of his drinking and spending the family's limited income on alcohol. Maria's sister Gregoria committed suicide at the age of 16 by ingesting rat poison when she learned that her husband had been unfaithful to her.

352.    Maria married Antonio Jimenez, Mr. Sanchez's maternal grandfather, when she was 15 years old and he was 17. Antonio had grown up in a home without a father, because his

106

father, Natividad, left his mother, Sara, for a younger woman. Sara was left alone to care for Antonio and his siblings, and went from being well-off to depending on others to survive.

353.    Antonio was an alcoholic. He was also abusive and a womanizer. Antonio drank and beat Maria nearly daily from the time they were married until he died of liver disease brought on by his years of drinking in 1972. Maria and Antonio separated a number of times, but each time Antonio returned to the home and continued to drink and beat Maria.

354.    Antonio not only slapped and punched Maria, but also he beat his children (Mr. Sanchez's mother Juana and her siblings). Mr. Sanchez's maternal aunt Elsa remembered one terrible incident when her father beat Mr. Sanchez's mother Juana, explaining that she started hating her father after she saw him kicking Juana "like a dog" when Juana was very small.

355.    Before Antonio died, he worked in a business in Matamoros where the family lived, but he made very little money. Maria also worked to supplement the family's income by taking in other people's sewing. The family was very poor; Maria struggled to feed her children. Juana's older siblings attended school for only a short time because they were required to work to assist the family. Juana's elder sisters moved to the United States when they were about 15 years old to live and work with families, and they sent the money they earned back to Maria and Antonio.

356.    Mr. Sanchez's mother Juana was born in Matamoros in 1963. Maria and Antonio moved the family to San Antonio, Texas, a few years later, after several of Juana's older siblings had already moved to the United States. Maria told Juana that life would be better in the United States because men did not beat women there. Juana's younger siblings Juan Antonio and Lucy were born in Texas. The family continued to travel between Matamoros and Texas.

107

357. After Antonio died, Maria was left to support herself and their seven children – Yolanda, Natividad, Gregoria, Juana, Elsa, Juan Antonio, and Lucy – on her own. Maria worked in restaurants in San Antonio, took in sewing, and also moved around a great deal to do migrant farm work in fields in many different places in the United States, including Ohio, Indiana, Michigan, and Florida. Juana and her siblings worked in the fields picking fruit and vegetables beginning when they were very young: Juana beginning when she was nine years old. They worked during the week after school (when they were able to enroll in school) and on weekends as well, and all of their earnings went to their mother to help them survive.

358. Because Maria was unable to work and take care of all the young children, she sent Juana and Elsa to live with their older sister, Yolanda; she sent Gregoria to stay with Maria's parents in Mexico; and Juan Antonio and Lucy stayed with Maria. Juana and Elsa went to live with Yolanda when Juana was about eleven and Elsa nine years old.

359. Living with Yolanda was a profoundly traumatic experience for both Juana and Elsa. Yolanda was unhappy to have her sisters descend upon her and her family, and was cruel to Juana and Elsa. She treated them very differently from her own children. She restricted their diets. She also punished them in cruel ways, beating them and making them stand outside in the cold unclothed or partially clothed. Elsa described their living situation as follows:

> Yolanda beat us when she felt frustrated about having to care for us. She did not want us there. She slammed our heads against the walls. We were not allowed to touch the cereal boxes or other food in the kitchen. We could only eat what Yolanda put in front of us to eat. When we ate something she did not tell us we could eat, she beat Juanita and me.
>
> One time when I was 10 years old, Yolanda stripped off my shirt and put me outside the house in the cold to punish me for some small mistake I had made. She left me outside for hours without my shirt on. She did this with Juanita too. We were treated like Cinderella in Yolanda's home. We had many chores to do and we rarely went to school because she made us babysit her children most of the time.

108

360.    Yolanda's husband, Amador Acevedo, physically abused Juana and Elsa, and also repeatedly sexually assaulted them. Elsa reported that Yolanda threatened to take her and Juanita's shirts off and let Amador stare at their bare chests if they did not behave. Elsa also reported that both she and Juana were molested by Amador, who touched their naked bodies and forced them to touch his genitals.

361.    Although Juana was the elder of the two girls, she was shy and timid and did not speak or stand up to Yolanda or Amador. Elsa fought to protect herself and her sister, but was unsuccessful in curbing the abuse.

362.    When Juana was about 13 and Elsa about 11 years old, they returned to live with their mother Maria. Maria had a sister, Paula, in West Palm Beach, Florida, and she settled there with her children Natividad, Juana, Elsa, Juan Antonio, and Lucy.

363.    Maria worked in the fields in and around West Palm Beach, picking oranges and vegetables, and Juana and her siblings joined her. The family lived in housing provided for those who worked in the fields, called Campo Verde, in a dilapidated apartment with two bedrooms. There were no telephones in the apartment and the family had to place calls on one of the two pay phones used by everyone in the camp. The family continued to be very poor. They did not have a vehicle and traveled on foot or by bus.

364.    Conditions for the day laborers where Juana and her family members worked were very poor. Workers were brought to the fields from the housing camp in a big bus.

365.    Juana and her family members also were exposed to neurotoxic chemicals while working in the fields in West Palm Beach. The pesticides sprayed on the crops were odorous and burned the workers' noses and eyes. The white pesticide residue stained their hands. The workers

109

were not provided with gloves, masks, or other protective gear and so were exposed to the pesticides through ingestion, respiration, and skin contact.

366.   Juana met Ricardo Sanchez, Sr., Mr. Sanchez's father, while living in Campo Verde. Ricardo Sr.'s family was also from Matamoros, Mexico, and had lived in Brownsville, Texas. Although Juana did not meet Ricardo Sr. prior to settling in West Palm Beach, her mother Maria had met Ricardo Sr. and his family in Texas and had spent time with them in other states in which both families worked migrant farming.

367.   Ricardo Sr.'s parents were Modesta Garcia and Aurelio Sanchez. Ricardo Sr. had six siblings: Rolando, Martin, Ana, Nora Ellian, Sergio, and Aurelio Jr. Both Aurelio and Modesta worked long and harsh hours in the fields, and the family was very poor. They lived in a shack in Mexico before moving to Pharr, near Brownsville, Texas, when Ricardo Sr. was of about middle school age.

368.   Life in Pharr was not significantly different for Ricardo Sr.'s family than living outside Matamoros had been. The family continued to work in the fields and live in impoverished conditions. The family lived very near the fields, and the children were showered by pesticides from the crop duster planes that flew overhead and could feel the mist on their skin.

369.   Ricardo Sr.'s father was a heavy drinker, and treated Modesta with violence, threatening her with machetes and hitting her.

370.   The Sanchezes moved to Campo Verde when Ricardo Sr. was a teenager. They lived under conditions similar to those under which Juana's family lived.

371.   Juana and Ricardo Sr. became friends before they began their courtship. They saw each other nearly every day. Ricardo Sr. flirted with Juana, even though he was three years older

than she and was dating others at the time. Juana danced with Ricardo Sr. at community dances, even though her mother had told her not to.

372.    Ricardo Sr. was short-tempered and he drank heavily. He often became involved in fights at dances. He became angry easily and acted on impulse, often burning the rubber on the tires of his truck by spinning them in the dirt and making a huge cloud of dust in front of his home.

373.    From early on in Juana's relationship with Ricardo Sr., her family advised her against dating and marrying him. Juana's family felt that Ricardo Sr. was self-involved, vain, and spoiled. Maria described him as "like a peacock; he always looked beautiful and did not care about the others around him. He was clingy and needy; he never had to lift a hand. His mother did everything for him and gave him everything." Juana's family members observed that Ricardo Sr. drank a great deal of alcohol. Juana's sister Elsa believed that Juana turned a blind eye to Ricardo Sr.'s faults and did not listen to her family's warnings about him because she wanted to leave the family home and she saw Ricardo Sr. as the way out.

374.    Juana and Ricardo Sr. were married on May 10, 1980, when she was 16 and he was 20 years old, and Juana moved into Ricardo Sr.'s family's apartment in Campo Verde. Ricardo Sr. continued to go out and drink to excess after they married, and Juana realized he was an alcoholic shortly after their wedding. Ricardo Sr. drank almost every day, and while he and Juana went out together at night when they were first married, this ended soon after and Ricardo Sr. ordered Juana to stay home while he went out.

375.    Ricardo Sr. regularly became violent with Juana after he drank. Early in Juana's pregnancy with their first child, Efrain, Ricardo Sr. shot Juana in the face in a drunken rage. Juana was hospitalized for a couple of months but did not lose the pregnancy. Ricardo Sr. was

111

arrested and ordered to pay Juana's hospital costs. When she was released from the hospital, Juana went to live with her mother Maria until Efrain was born in March 1981, and then she stayed with her sister Gregoria in Houston. Although she was afraid of Ricardo Sr., Juana took Efrain and returned to live with Ricardo Sr. in West Palm Beach.

376.    After Juana moved back in with Ricardo Sr., he continued to act in a controlling and violent manner toward her. In addition, Ricardo Sr.'s mother treated Juana poorly, spying on her and reporting her behavior back to Ricardo Sr. Ricardo Sr. restricted Juana's movements, prohibiting her from leaving the house by herself. Ricardo Sr. later subjected his children to similar treatment.

377.    Juana gave birth to more children after Efrain, in short order. Her second child, Nydia, was born in August 1982. Ricardo Jr. (Mr. Sanchez) was born on October 19, 1983. Mr. Sanchez's younger brother Ezequiel was born on April 17, 1985. Juana had very limited prenatal care while pregnant with Mr. Sanchez and Nydia. She suffered from a urinary tract infection while pregnant with Mr. Sanchez, for which she twice was prescribed antibiotics although she did not complete either course of the medication. Ricardo Sr. was working in the fields while Juana was pregnant with Nydia and Mr. Sanchez, and he tracked pesticides into the home at the end of each workday. As a result, Mr. Sanchez was exposed to neurotoxins in utero. When Juana went into labor with Mr. Sanchez, her water did not break and instead she began to bleed.

378.    Juana was overwhelmed with the burdens of parenting several small children. Many members of Juana's immediate family, including her mother Maria and her siblings Elsa, Juan Antonio, and Lucy, returned to Texas shortly after Efrain was born, and as a result Juana did not have support from her family to assist with caring for and raising the children. Juana did not feel that she could trust her mother-in-law to help her with the children because a neighbor

reported that Modesta beat the children when they were at her house without Juana. Ricardo Sr. did not have any skills taking care of small children, and he seemed uninterested in helping Juana care for them. Juana described one incident when she left Mr. Sanchez alone with Ricardo Sr. while she went to the store; instead of changing Mr. Sanchez's diaper, Ricardo Sr. put a new diaper on top of the baby's clothes and dirty diaper.

379.    Juana's eldest child, Efrain, suffered from severe seizures and demonstrated impaired intelligence from the time he was a small child, and he required a great deal of her attention, restricting the time and energy she had available to devote to Mr. Sanchez and his other siblings.

380.    The family lived in housing projects on Dyson Circle in West Palm Beach until Mr. Sanchez was approximately ten or eleven years old. The family was extremely poor. When Mr. Sanchez was young, Ricardo Sr. worked in the fields. He tracked pesticides into his home at the end of each work day. He smelled of pesticides, was covered in a yellow green powder that smelled like poison, and tracked the powder in on his clothes and shoes. Although he made efforts to brush or beat it off their clothes before he came in, he was unable to remove it all. Ricardo Sr. did not leave the fields to start driving a truck until 1985, when Mr. Sanchez was a toddler, but the truck he drove was for the packing company that transported the produce picked in the fields, and so he was still exposed to pesticides at that point as a result.

381.    Ricardo Sr. spent much of the money he earned going out to bars. Ricardo Sr. "spent most of the money he earned on himself, leaving Juanita and the poor children with almost nothing. Ricardo Sr. always had nice clothes and shoes, while the children dressed in raggedly old clothes."

382.    Dyson Circle and the neighborhood in which it was located were extremely dangerous places. The project was run-down and decrepit and Mr. Sanchez's home was surrounded by drug dealers and addicts and had a frightening police presence. The area was known for being overrun with drugs and violence. One of Mr. Sanchez's brothers reported having vivid memories of finding guns and needles discarded in the yard around the apartment and of watching men fleeing from the police only to be caught and wrestled to the ground.

383.    Mr. Sanchez and his siblings attended a Head Start program when he lived in Dyson Circle. The program helped children from homes where a language other than English was spoken. It also helped young children to socialize with other children and learn basic skills like shapes, colors and letters. Mr. Sanchez and the rest of his siblings were quiet, serious, and respectful, but Mr. Sanchez was the most timid and shyest of them all. He spoke rarely, but smiled a good deal. He stayed close to the people he knew well.

384.    When the family moved to Coconut Grove, when Mr. Sanchez was ten or eleven years old, the family considered it a "step up" even though it was still a low income neighborhood. Nevertheless, this neighborhood posed many dangers as well. Mr. Sanchez and his family members were victims of racism and bigotry in that neighborhood, on more than one occasion being threatened to "go back where [they] came from." The police were called on several occasions when this happened. In addition, Efrain was sexually abused by a neighbor who took advantage of his disabilities to convince him to enter his home and then touched Efrain's penis after the boy had a seizure. Although the police were contacted, they took no action.

385.    Mr. Sanchez was a sickly child. He suffered from pneumonia and exhibited allergic reactions, including rashes and respiratory problems.

114

386.    Mr. Sanchez also was accident prone. When he was two years old, he ingested Efrain's seizure medication. Juana and Ricardo Sr. noticed him reacting to the medication, becoming woozy and unstable. Mr. Sanchez was taken by ambulance to the hospital, where he was unresponsive for several hours. When Mr. Sanchez was about three or four years old, he fell off a tricycle and split his head while he was visiting his maternal family in Texas. His family rushed him to the emergency room and he had staples put in his head. Mr. Sanchez had other bicycle accidents during his adolescence; one occurred when he was riding a bike on ramps that his neighbor had built, tried to do a flip, fell off the bicycle and hit the back of his head against the ground.

387.    Mr. Sanchez's childhood was profoundly affected by his treatment by Ricardo Sr., who continued to exhibit violent and erratic behavior throughout Mr. Sanchez's life. On one occasion, when Mr. Sanchez was a baby, Ricardo Sr. handed him to his maternal aunt Lucy as she was preparing to board an airplane to return to Texas from West Palm Beach. Ricardo Sr. told Lucy to take Mr. Sanchez with her. Lucy was so stunned by this bizarre request that she did so, even though Mr. Sanchez had no clothes, diapers, formula, or plane ticket. Lucy and her mother cared for Mr. Sanchez in Texas until Juana came to retrieve him several months later.

388.    Ricardo Sr. also acted erratically on other occasions. Juana described him getting into his truck and spinning the wheels to stir up dust when he was angry, as well as forcing Juana to sit in the cab of the truck as he drove around and around in circles.

389.    Ricardo Sr. was arrested numerous times for violent behavior in the community. He got into fights in bars when he was drinking, and attacked people with his fists and with weapons.

115

390.    From the time they were small children, Ricardo Sr. beat his children as well as their mother; this happened regularly, multiple times a week. Ricardo Sr. beat Mr. Sanchez and his siblings with his fists and thick leather belts. He pulled the hair out of their heads. Although he hit them all over their bodies, he made an effort to hit them in places that would be covered by clothes so that school personnel and others outside the house would not see the physical evidence of his beatings.

391.    Mr. Sanchez and his mother and siblings tried to protect one another from Ricardo Sr.'s abuse, but their efforts generally enraged Ricardo Sr. further and resulted in their receiving harsher beatings. One occasion that many family members recall was a time when Mr. Sanchez was about 14 years old, when Ricardo Sr. came home staggeringly drunk and all of the children were home. Ricardo Sr. hit Juana so hard that she fell to the floor. Nydia was furious and afraid, and screamed at her father as she knelt to check on her mother. Nydia called the police. Following this incident, Ricardo Sr. slapped Nydia hard across the face and threw things at her.

392.    Other members of Mr. Sanchez's family, including his maternal grandmother, only watched in horror as Ricardo Sr. attacked them. Maria reported: "I once saw Ricardo Sr. take off his thick, leather belt and beat the children with it. He went after Nydia and I felt powerless to do anything. I ran away like a rabbit. Ricardo Sr. hit Juanita almost daily in front of the children. I called him 'The Monster.'"

393.    On some occasions Mr. Sanchez ran and hid, crying, when his father beat his mother. Juana did not go to comfort Mr. Sanchez on these occasions because it made Ricardo Sr. furious. She tried to protect the children by trying to calm Ricardo Sr. down, but this was generally a fruitless endeavor.

116

394. Ricardo Sr. emotionally as well as physically abused Juana. He said degrading things to her about her appearance and her cooking. In addition to hitting, slapping, and punching her, Ricardo Sr. threw plates of food, pitchers of lemonade, and beer bottles at Juana as well as at the children.

395. Not only did Ricardo Sr. physically and emotionally abuse his wife and children, but also he controlled almost every aspect of their lives. He "ran their house like a general and [Juana] and the children were soldiers." He did not like the children to leave the house except to go to school, and punished them when he learned that they had. He did not permit the children to participate in sports or clubs at school, or to visit friends or go to social events that were not family gatherings. Ricardo Sr.'s restrictions on his wife and children were frustrating and confusing for them given his own behavior of going out drinking almost every night. Through his draconian rules, Ricardo Sr. was able to isolate his family from those in the community who might have been able to offer them support.

396. Despite the fact that Ricardo Sr. kept his wife and children close to home, and apart from other resources in their community, he did not engage or interact with the children in a loving, fatherly way. Mr. Sanchez's uncle observed with regret that Ricardo Sr. did not spend much time with Mr. Sanchez and did not teach him about soccer or roller skating.

397. The abuse that Ricardo Sr. perpetrated on Mr. Sanchez and his family severely affected Mr. Sanchez's psychological, cognitive, and behavioral functioning. The effects of the trauma Mr. Sanchez suffered at the hands of his father were exacerbated by Juana's own victimization by Ricardo Sr. Mr. Sanchez was terrified of Ricardo Sr.; he was not only frightened by what Ricardo Sr. would do to Mr. Sanchez himself, but perhaps even more frightened by the harm and humiliation Ricardo Sr. would inflict on Juana and Mr. Sanchez's siblings.

117

398.    Ricardo Sr.'s abuse of Mr. Sanchez's family members had a further harmful effect on Mr. Sanchez's functioning because it made him feel powerless and unable to protect those he loved. Moreover, the abuse was confusing: because it came from a person who was supposed to take care of Mr. Sanchez, and whom he believed he should admire. Several times as a child, Mr. Sanchez asked if he could live with his maternal family members in Texas in order to escape his father's abuse and the ubiquitous violence in his home, but they turned him down.

399.    Ricardo Sr.'s abuse of and exercise of coercive control over Mr. Sanchez, his siblings, and his mother, continued throughout Mr. Sanchez's adolescence, until he left home just after his nineteenth birthday, to move in with his pregnant girlfriend, Maria Lopez.

400.    Juana, too, spent little time engaging with and assisting Mr. Sanchez, despite the fact that he exhibited significant disabilities in school that were identified when he was in kindergarten and for which he received special services throughout his schooling. In addition to her four biological children, Juana also raised Ricardo Sr.'s nephew Omar Diaz Sanchez, whose mother Ana died in childbirth. Juana had little time for any of her children individually, and the time she did have was primarily devoted to Efrain due to his serious seizure disorder. From 1996 to 2001, when Mr. Sanchez was in middle school and high school, Juana worked at Publix grocery store. Juana had to leave Publix because Efrain's seizures grew more frequent and severe when he was in high school. Juana attended very few of the meetings scheduled by the school district to design and implement an individualized education plan for Mr. Sanchez, despite the fact that she was advised in advance of these meetings.

401.    Mr. Sanchez's parents failed to recognize the severity of Mr. Sanchez's disabilities or take steps to ameliorate them. Although they were informed by school personnel that Mr. Sanchez frequently looked dazed in school, and were advised to have Mr. Sanchez

118

medically evaluated, they did not do so. Although Juana observed the same behavior and symptoms in Mr. Sanchez herself, she did not take any steps to have him assessed or treated.

402.     Both Mr. Sanchez's parents were intellectually and cognitively challenged, and their impairments contributed to their difficulty functioning competently as parents, and prevented them from ensuring that Mr. Sanchez developed appropriately. As Dr. Crosby, the psychologist who evaluated Mr. Sanchez in elementary school, explained:

> It is well established that an individual's intellectual and cognitive functioning are influenced by his or her genetic background and environment. Because an individual needs to have all of his senses stimulated in order for his brain to develop in a healthy manner, experiential deprivation can limit the individual's brain development and thus his cognitive and intellectual functioning. The intellectual functioning skills of a child's parents can have a tremendous impact on the child's own intellectual development apart from the genetic contribution; if the child's parents are intellectually low functioning, they are less likely than typically functioning parents to provide a home environment in which the child's brain is appropriately and safely stimulated. This can lead to atypical brain development.

403.     Although educational personnel recognized that Mr. Sanchez had disabilities that required attention and remediation when he was in kindergarten, it was not until between his second and third grade years that he was formally assessed for special education services, and not until the middle of his third grade year that he was determined to be eligible for special education services and placed in a full-time special education program. Despite the fact that Mr. Sanchez received full-time special education services from the middle of third grade until he left school before completing tenth grade, after failing both ninth and tenth grades, Mr. Sanchez made only very minimal progress in school, never achieving above the fourth grade level in math and the third grade level in reading. The systems in place to support him and help him to achieve failed to do so.

404.     In April 2002, when Mr. Sanchez was eighteen years old and still in the tenth grade (for the second time), he was arrested for having a butterfly knife in his backpack at

119

school. Although the educators who knew Mr. Sanchez felt that this was uncharacteristic behavior for him, did not believe that he posed any threat of harm, and believed that the possession of the knife was a manifestation of his disability, Mr. Sanchez was transferred to an alternative school placement. Mr. Sanchez's family did not participate in meetings with the school about this transfer.

405.    Mr. Sanchez enrolled in an adult education program that was designed to prepare students for the GED. But because Mr. Sanchez did not have the intellectual capability to take the GED, had been exempted from standardized testing for years due to his intellectual deficits, and had been preparing for a special, rather than a typical, diploma, he was unable to complete the adult education program and did not take the GED.

406.    Mr. Sanchez began dating Maria Lopez when they were both still in high school. Mr. Sanchez left his house just after his nineteenth birthday, and moved in with Maria, who was pregnant with his child, and her mother. Although Mr. Sanchez was very committed to parenting his son, Mr. Sanchez did not know the first thing about caring for an infant. When Maria was in labor with their son at the hospital, Mr. Sanchez left the hospital to sleep in the car, saying that Maria was too loud and he could not sleep in the hospital room. When Maria's mother Rachel Ramos asked Mr. Sanchez to do things for the baby or around the house, she had to give him instructions several times before he understood what she was asking. On one occasion, when Maria and Rachel asked Ricardo to go to the store to get baby cereal for the baby, who was an infant at the time, Mr. Sanchez came back from the store with small boxes of Cheerios, because he did not understand that babies eat soft rice cereal and not breakfast cereal in small boxes.

407.    While living with Maria, Mr. Sanchez obtained work through family members and friends. Most of the jobs he got through his family members or Maria's father asking their

120

friends if he could work for them. Maria also helped Mr. Sanchez find and apply for jobs by reading the classified ads to him and filling out his job applications. For a short time, Mr. Sanchez and Maria moved to North Carolina, where Maria's father knew of work, and they left their baby with Maria's mother. Mr. Sanchez had only simple, menial jobs, such as caulking windows, digging sewer ditches, and doing some roofing tasks. Mr. Sanchez kept no job for long because he was unable to meet even the very basic expectations of the positions he held.

408.   When his son was just a few years old, Mr. Sanchez became reacquainted with his cousin, Danny Varela, who had been in prison for some time. Mr. Sanchez began to spend more and more time with Mr. Varela, and he and Maria began to have problems and grew apart. Mr. Sanchez and Maria broke up, and Mr. Sanchez moved out, but he continued to visit and spend time with his child and to contribute financially to raising him.

409.   Mr. Sanchez had begun to use alcohol and drugs when he was in high school, but his alcohol and drug use increased dramatically when he was spending time with Mr. Varela. He often smelled of alcohol and smoked pot.

410.   Mr. Sanchez was wholly under Mr. Varela's thrall. Despite the fact that Mr. Varela and his friends did not treat Mr. Sanchez well, ridiculed him, thought he was stupid, and took advantage of him, Mr. Sanchez did whatever Mr. Varela asked him to do and naively trusted him.

### b.   Deficits in adaptive functioning.

411.   Counsel failed to investigate, develop, and present evidence of Mr. Sanchez's significant deficits in adaptive functioning. Professionally reasonable counsel, having undertaken an adequate investigation, would have discovered and presented compelling information about the difficulties Mr. Sanchez exhibited in daily functioning that were readily available from the witnesses the trial team interviewed as well as many the trial team did not. Because counsel did

not do so, the jury did not learn that Mr. Sanchez demonstrated impairments in functioning in the domains of conceptual, practical, and social skills. Had Mr. Sanchez's trial counsel discharged their obligation to investigate and present this evidence, the jury's consideration of Mr. Sanchez's sentence would have been guided by the information set forth in Claim III. The factual allegations and supporting documents and authority set forth in that claim are incorporated by this reference as though fully set forth herein.

> **c.**    **Counsel neither presented this social history information through lay witnesses, nor did they provide it to a qualified mental health expert to explain it to the jury.**

412.    Mr. Sanchez's trial counsel failed to consult with and present the testimony of an expert to put Mr. Sanchez's experiences, behavior, and deficits into mitigating context for the jury.

413.    Had Mr. Sanchez's trial counsel discharged their obligation provide an expert with all relevant information and sufficient access to Mr. Sanchez and his family members, and prepare the expert to testify, the jury's consideration of Mr. Sanchez's sentence would have been informed by the following compelling mitigating information:

- Mr. Sanchez was exposed to numerous factors that put him at risk for the development of intellectual, cognitive, and psychiatric impairment.

- Mr. Sanchez was genetically predisposed for cognitive impairments and mental health disorders prevalent in his paternal and maternal families. Mr. Sanchez's siblings exhibited symptoms of cognitive and intellectual impairment and psychiatric disorder.

- Mr. Sanchez's parents' cognitive and psychiatric disabilities prevented them from being effective parents.

- The physical and emotional abuse to which Mr. Sanchez was subjected and that he witnessed inflicted on his mother and his siblings profoundly and enduringly affected his psychological, cognitive, and behavioral functioning.

122

- Mr. Sanchez spent his childhood under conditions of deprivation that included severe poverty, isolation, and inability to access basic services.

- Mr. Sanchez demonstrated intellectual, cognitive, and psychiatric impairment throughout his childhood and adulthood, beginning when he was a small child.

- Despite his impairments, and the extraordinary abuse and trauma he suffered, witnesses available to the defense would have testified that Mr. Sanchez was a kind, gentle person with a sweet disposition.

- Mr. Sanchez turned to alcohol and drugs to mitigate his distressing psychiatric symptoms.

414. Mr. Sanchez was prejudiced by trial counsel's failures. Trial counsel's failure to conduct a thorough, culturally and linguistically competent investigation and/or to present the testimony of an expert to explain to the jury all available mitigating evidence resulted in an incomplete presentation of Mr. Sanchez's background to the jury that falsely suggested the information provided constituted the totality of Mr. Sanchez's redeeming qualities, human frailties, mental vulnerabilities, and difficult life experiences. The jury made its decision to sentence Mr. Sanchez to death unaware of Mr. Sanchez's unique life circumstances, disabilities, and traits. Had trial counsel presented the information above, there is a reasonable probability that at least one of the jurors would have voted for life without the possibility of parole instead of death.

**B.** **Trial Counsel Ineffectively Failed to Present Evidence of Mr. Sanchez's Significant Neuropsychological Impairments and the Effect Upon His Behavior of these Impairments.**

415. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

**1.** **Prevailing professional norms.**

416. Reasonably effective counsel at the time of Mr. Sanchez's 2009 capital trial engaged and presented the testimony of qualified and culturally competent experts "tailored

123

specifically to the needs of the case" who could "explain the . . . hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control." 2003 ABA Guidelines, Guideline 10.11 and commentary thereto; *see also* Guideline 10.7 and commentary thereto ("The circumstances of a particular case will often require specialized research and expert consultation.").

## 2. Deficient performance.

417. Trial counsel unreasonably and prejudicially failed to develop and present expert testimony that Mr. Sanchez suffers from organic brain impairments, and regarding the functional and behavioral consequences of these impairments.

418. Trial counsel was aware that Mr. Sanchez likely suffered from neuropsychological damage. Counsel was or reasonably should have been aware that Mr. Sanchez was at risk for brain injury in utero because of his father's violence toward his mother and because of exposure to toxins.

419. Counsel further was aware that Mr. Sanchez had suffered head injuries as a child that might have impaired his brain functioning, including a tricycle accident when he was three or four years old following which he received emergency treatment, including staples to his head. Mr. Sanchez's trial counsel also knew that as a toddler, Mr. Sanchez had ingested a large amount of his brother's seizure medication and had to be rushed to the hospital for treatment. *See, e.g.*, Tr. 8176.

420. Furthermore, counsel possessed information, including special education records, that indicated that from the time Mr. Sanchez was a small child, he demonstrated problems learning, focusing his attention, and controlling his impulses. Def. Ex. 34.

421.    Trial counsel obtained the appointment of Daniel Grant, Ed.D., a neuropsychologist, to perform an evaluation of Mr. Sanchez.[19] Counsel, however, failed to provide Dr. Grant critical and readily available information about Mr. Sanchez's behavior and functioning throughout his life, because counsel had not investigated and obtained this information. Dr. Grant's assessment of Mr. Sanchez therefore was artificially limited.

422.    Moreover, although Dr. Grant administered neuropsychological instruments to Mr. Sanchez, and obtained evidence from this testing of Mr. Sanchez's impaired functioning, counsel did not present much of this evidence at trial. Instead, counsel presented limited testimony from Dr. Grant that Mr. Sanchez was of borderline intelligence. As set forth more fully below and in Claim Three, this conclusion was inaccurate.

423.    Despite the numerous red flags listed above, trial counsel failed to develop and present readily available and compelling evidence about Mr. Sanchez's neuropsychological and brain impairment.

### 3.    Prejudice.

424.    Because of trial counsel's errors and omissions, the jury was unaware that Mr. Sanchez suffered significant brain dysfunction, and was unaware of the impact of his deficits on Mr. Sanchez's functioning.

425.    Had trial counsel conducted a constitutionally effective penalty phase investigation and preparation, and provided the results of a thorough investigation to a qualified neuropsychologist, trial counsel could have presented to the jury the testimony of a neuropsychologist that included but was not limited to the following:

---

[19] Counsel also consulted with Dr. Katrina Hallmark and Dr. Laurence Levine, both of whom administered some instruments to Mr. Sanchez. Of the three, counsel called only Dr. Grant to testify. The allegations set forth below apply to counsel's prejudicially deficient performance with regard to all three of these mental health experts.

426.     Mr. Sanchez was exposed to multiple significant risk factors for brain impairment, including but not limited to lack of prenatal care, genetic predisposition for mental and developmental disorder, and head injuries and insults.

427.     Mr. Sanchez's neuropsychological functioning is impaired in the domains of intellectual functioning, processing speed, working memory, and in some areas of executive functioning. His deficits affect his cognitive functioning and behavior, making it difficult for him to attend to, absorb, and make use of information provided to him. This is especially true for novel or complex information, or information provided to him under conditions of stress. Because he is unable to process effectively information from his environment, he is unable to use this information immediately or at later times.

428.     Mr. Sanchez's impairments are long-standing in nature. Mr. Sanchez's available medical records, special education records, and employment records, and descriptions of his functioning by individuals who knew him well throughout his life, all confirm that Mr. Sanchez has exhibited significant impairments throughout his toddlerhood, childhood, adolescence, and adulthood. Furthermore, many of the impairments he demonstrates, including in processing speed, working memory, and intellectual functioning, are neurodevelopmental in nature rather than likely to have been acquired through a particular head or brain injury, or through substance abuse.

429.     Mr. Sanchez has profound difficulty attending to and processing information provided to him verbally, and this difficulty is exacerbated under novel, unfamiliar conditions and stressful situations.

430.     Trial counsel's failure to investigate and present evidence to the jury of Mr. Sanchez's neuropsychological impairments prejudiced Mr. Sanchez because the jurors were

unable to take this mitigating evidence into consideration when they deliberated about his punishment. Evidence of his brain damage would have had great mitigating power because it provided an explanation for Mr. Sanchez's impaired behavior and functioning, and it likely would have made a difference to at least one juror determining the appropriate penalty for Mr. Sanchez.

> **C.**     **Trial Counsel Ineffectively Failed to Investigate, Develop and Present Expert Mental Health Testimony Regarding Mr. Sanchez's Psychiatric Disorders and the Effect of Such Disorders on Mr. Sanchez's Behavior and Functioning.**

431.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

### 1.     Prevailing professional norms.

432.    At the time of Mr. Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant engaged and presented the testimony of qualified and culturally competent experts "tailored specifically to the needs of the case" who could "explain the . . . hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control." 2003 ABA Guidelines, Guideline 10.11 and commentary thereto; *see also* Guideline 10.7 and commentary thereto ("The circumstances of a particular case will often require specialized research and expert consultation.").

### 2.     Deficient performance.

433.    Trial counsel was or reasonably should have been aware that Mr. Sanchez had suffered extreme trauma during his childhood and suffered from symptoms of psychiatric disorder. Counsel knew that Mr. Sanchez had been abused by his father, including harsh beatings, and that he had witnessed his father's violence toward on his mother and siblings throughout his childhood. Counsel also was aware that Mr. Sanchez lived in communities rife

127

with poverty and crime, and that Mr. Sanchez had been exposed to community violence from the time he was a small child. Tr. 8158-87, 8271-77. Counsel knew or reasonably should have known that exposure to trauma, especially the type of severe and chronic trauma that Mr. Sanchez experienced, often leads to debilitating symptoms, including anxiety, depression, hypervigilance, sleep disturbance, low self-esteem, and self-harmful behaviors. Tr. 8614-31.

434.    Trial counsel also knew or reasonably should have known that Mr. Sanchez suffered from symptoms of hyperactivity and inattentiveness, because these symptoms were well-documented in the school records that counsel possessed. Def. Ex. 34.

435.    Despite these red flags indicating the likelihood that Mr. Sanchez suffered from symptoms of psychiatric illness, trial counsel failed to further investigate these symptoms, consult with a mental health professional to assess Mr. Sanchez and explain the significance of his symptoms, and present information about these symptoms to the jury. Trial counsel had no strategic reason for failing to do so, and in fact, such an approach was wholly consistent with counsel's defense strategy at both the guilt and penalty phases of the trial: to present evidence of Mr. Sanchez's impairments.

### 3.    Prejudice.

436.    Had trial counsel discharged their obligation to investigate Mr. Sanchez's psychiatric symptoms, provide a mental health expert with all relevant information and sufficient access to Mr. Sanchez, and prepare the expert to testify, the jury's consideration of Mr. Sanchez's sentence would have been informed by the following compelling information.

### a.    Trauma, neglect, and other adverse childhood events.

437.    Trauma and traumatic events are stressful experiences that include exposure to events involving death or the threat of death, serious bodily injury, sexual abuse, and other serious threats to physical integrity. These may be experienced directly, witnessed, or

experienced by family members or other loved ones. The vulnerability of a child to the impact of trauma is affected by the age of the child and the chronicity of the exposure to trauma because traumatic experiences cause long-term changes in the biology of the brain that make children more vulnerable than adults to psychological disturbances. Exposure to adverse experiences at a young age effects changes in a child's stress-response system and increases the risk of negative outcomes following stressors later in life. The suffering of stressful events early in life causes a child to secrete increased amounts of cortisol, a hormone that can be neurotoxic to specific brain areas, including the hippocampus (which processes memory) and the pre-frontal cortex (which processes attention and executive function).

438.    Mr. Sanchez was exposed to severely traumatic events throughout his life, beginning when he was in utero and continuing throughout his infancy, childhood, adolescence, and adulthood. Research has demonstrated that fetal exposure to stress produces hormones that impact fetal brain development, and Mr. Sanchez's mother experienced a great deal of stress during her pregnancy. Mr. Sanchez's father routinely beat his mother. Mr. Sanchez's mother had two small children while pregnant with Mr. Sanchez, one of whom suffered from seizures and required a great deal of attention and care. Mr. Sanchez's mother also received little to no prenatal care while pregnant with Mr. Sanchez.

439.    Traumatic experiences involving interpersonal violence, and particularly those involving violence perpetrated by or toward caregivers, can have particularly adverse effects on a child. Children who witness violence inflicted upon a loved one can suffer negative psychological consequences that are even more detrimental that those arising from violence inflicted directly upon them. Domestic violence is damaging when the abuser and the victim are people upon whom the child directly depends for physical care, safety, and comfort. Not only

129

was Mr. Sanchez personally subjected to violent abuse by his father, but also he witnessed the abuse of his mother and siblings on a regular basis.

440.    Mr. Sanchez was regularly and severely physically abused by his father, Ricardo Sanchez, Sr. Mr. Sanchez's father was frequently violent with Mr. Sanchez's mother and his children. Mr. Sanchez received beatings at the hands of his father at least on a weekly basis, and sometimes more often. His father struck Mr. Sanchez with his fists and with belts, generally when he was intoxicated. Although his father hit him all over his body, including striking him in the head, his father made some effort to inflict the harshest of the blows in areas of Mr. Sanchez's body that were not visible when he was clothed, so that teachers and others outside the family would not be able to see the wounds and bruises he inflicted. Mr. Sanchez often intervened to try to protect his sister from their father's beatings, and when he did both children were attacked by their father.

441.    Mr. Sanchez experienced tremendous stress upon witnessing his father physically attack other members of his family. The impact upon him of watching and hearing his father beat his mother was particularly devastating, as it was confused by Mr. Sanchez's feelings of mixed loyalty. Mr. Sanchez experienced distress and confusion on the occasions when his father brutally beat his mother. Mr. Sanchez was terrified that his father would seriously injure his mother, and felt a strong urge to protect her, but because his siblings were all focused on taking care of their mother, he also felt that someone needed to stand up for his father. The uncertainty about what to do in these situations left him feeling even more hopeless, helpless, and confused.

442.    That Mr. Sanchez's father was the primary (and for much of his childhood, the only) breadwinner for the family caused Mr. Sanchez further distress and confusion. Although on several occasions other members of his family reported Mr. Sanchez's father's abuse to law

130

enforcement authorities, the family and Mr. Sanchez himself were concerned that if his father was arrested the family would not survive his absence. Mr. Sanchez deeply respected his father for his financial support of the family. Experiencing these contradictory emotions – feelings of admiration for as well as fear and anger toward his abuser – exacerbated the negative consequences of the abuse Mr. Sanchez suffered, because they impeded his ability to make sense of his experiences.

443.    Mr. Sanchez's mother beat him as well. Although Mr. Sanchez tried hard to meet his parents' expectations, he was not able to please his parents and they both whipped and beat him.

444.    Mr. Sanchez suffered neglect and isolation as well as abuse. Neglect is a type of trauma: it is maltreatment of a child characterized by the failure of caregivers to provide needed, age-appropriate care that includes both physical care and emotional and psychological care and stimulation. Neglect may have more damaging effects on the child than physical abuse, and some of the harmful effects include failure to thrive, physical illness, injury due to lack of supervision or guidance, low self-esteem, and cognitive and psychiatric impairment.

445.    Neither of Mr. Sanchez's parents attended to some of Mr. Sanchez's basic needs. The family suffered from poverty. Mr. Sanchez did not have access to basic necessities and supplies that other children in his community had, including uniforms for gym class, after school activities, and tutoring. Mr. Sanchez's parents did not attend to Mr. Sanchez's needs. Although he needed help with homework, they did not assist him. Although they were advised about and aware of regular meetings to develop and update individualized education plans (IEPs) for his special education placement, they did not attend these meetings. Mr. Sanchez's mother appeared to be consumed with the needs of Mr. Sanchez's elder brother, Efrain, who suffered from a

131

severe seizure disorder, and had no time or resources to devote to Mr. Sanchez's needs. Educators observed that the lack of parental involvement in and attention paid to Mr. Sanchez's significant educational needs were "uncommon" and "atypical."

446.    Mr. Sanchez's father was extremely controlling of his wife and children. His father did not like the children to leave the house except to go to school, and only rarely did he permit them to play with other children other than relatives either at their own house or outside the house. As a result, Mr. Sanchez was isolated and precluded from forming normal friendships and relationships with peers that are critical to healthy social development.

447.    Mr. Sanchez grew up in neighborhoods in West Palm Beach, Florida that were impoverished, segregated, and violent. Dyson Circle, the neighborhood in which he lived until he was about ten years old, was filled with drug dealers and addicts; guns and needles were discarded in the area around his apartment. When Mr. Sanchez was about ten years old, his family moved to a house on Coconut Road in a neighborhood only slightly better off than Dyson Circle; it was still a low-income community plagued by crime. The schools that Mr. Sanchez attended as a child had a student body that came primarily from socioeconomically deprived families. Particularly when he was in high school at Palm Beach Lakes High, school was a dangerous place to be.

448.    Mr. Sanchez experienced discrimination and racism when growing up in West Palm Beach. Racism has a strong negative influence on psychological and emotional well-being because it is inherently dehumanizing and degrading and causes emotions of fear, low self-esteem, frustration, hopelessness, and anger. Multiple mechanisms in which racism is manifest adversely affect psychological health and functioning. Institutional racism, that is, racism that limits their socio-economic status and excludes them from economic and employment

132

opportunities, often results in segregation of members of racial groups into certain neighborhoods in which risk factors for mental disorder such as poverty, instability, noise, crowding, crime, and violence are prevalent. The subjective experience of racial discrimination, whether overt or in the form of microaggressions, causes considerable psychiatric distress and can lead to symptoms of anxiety, hyperarousal, hypervigilance, and depression. The experience of racism and discrimination can also lead to internalized racism, in which members of marginalized racial populations accept or adopt the negative societal beliefs and stereotypes about themselves. Internalized racism causes profound stress and can lead to poor psychological outcomes.

449.    Particularly in the neighborhood in which he lived starting at approximately age ten, Mr. Sanchez encountered overt racism that had a profound effect on his sense of self. Neighbors were hostile to Mr. Sanchez and his family members and on more than one occasion told them to "go back where [they] came from."

450.    Mr. Sanchez experienced indifference from community institutions and resources that would have been expected to provide intervention and support. Although the police were called occasionally when Mr. Sanchez's father brutally attacked and beat his family members, and although Mr. Sanchez's father was arrested for some of these incidents, law enforcement and social services did not intervene in any meaningful way to prevent the abuse that occurred in the household on a regular basis. There is no evidence that any investigation was performed, or any action taken, by Child Protective Services or any other organization to ensure that Mr. Sanchez, his mother, and his siblings were safe.

451.    Additional institutional failure came in the context of Mr. Sanchez's schooling. Although Mr. Sanchez was psychologically evaluated and deemed eligible for special education

133

services when he was almost nine years old, Mr. Sanchez did not make meaningful progress in the ten years that followed that determination. The school district failed to modify Mr. Sanchez's interventions to achieve better outcomes. Mr. Sanchez failed ninth and tenth grades, and when he left school at age 19, without having passed tenth grade, he was performing math at a fourth grade level and reading at approximately a third grade level. Educators explained that they were not surprised by Mr. Sanchez's failure to progress because such was consistent with his very low intellectual functioning. His teachers reported that Mr. Sanchez exerted a great deal of effort in his classes and did not understand and became frustrated by his lack of progress.

452.    Mr. Sanchez's special education records indicate that both before he was formally identified with a disability and later in his school career, after years of continued inability to improve, Mr. Sanchez exhibited disruptive behaviors consistent with inability to focus, distractibility, hyperactivity, and frustration. Teachers and special education personnel also observed that Mr. Sanchez's disruptive behavior stemmed from his disabilities, and noted that although he was disruptive he was not aggressive or physical.

453.    Mr. Sanchez experienced significant frustration, hopelessness, and helplessness throughout his school career. He could not understand why he was unable to learn to read proficiently, despite great effort. As he fell farther and farther behind his same-aged peers, he felt stupid and terrible about himself. He had no sense of what he was going to be able to achieve in the future, and indeed felt that he had no hope of any success in employment. Particularly in high school, he suffered sleep disturbance, including insomnia and nightmares. He had thoughts of suicide. He responded with agitation and irritability to disappointments. Mr. Sanchez's experiences led him to believe that no one could help him, and this belief was devastating to him.

134

454.     The symptoms of anxiety and depression that Mr. Sanchez experienced, along with the symptoms of attentional deficits and hyperactivity that are clearly evident from descriptions in Mr. Sanchez's special education records, exacerbated Mr. Sanchez's processing dysfunction, leading to even poorer outcomes in school. These, in turn, perpetuated increasing frustration and hopelessness that contributed to Mr. Sanchez's leaving school before completing tenth grade.

455.     The lack of the presence of protective factors to ameliorate the effects of these adverse factors left Mr. Sanchez even more psychiatrically vulnerable. Protective factors that can reduce the damaging effect of trauma upon a child include competent caregivers or people outside the family who provide physical and emotional support. They also include other resources that can provide an emotional outlet, such as social activities, physical activities, and hobbies. Mr. Sanchez had limited or no access to protective factors and community supports to enable him to develop resilience to overcome or minimize the effects of the trauma he experienced.

### b.     Symptoms of psychiatric illness.

456.     Over the course of his life, Mr. Sanchez exhibited symptoms of psychiatric illness and brain disorder that left him unable to function in a healthy and typical manner. These symptoms included but were not limited to the following:

### i.     Depression.

457.     Mr. Sanchez suffered symptoms of depression, accompanied by somatic symptoms and cognitive disruption that affected his ability to function. His depressive symptoms included sleep disturbance, feelings of worthlessness, hopelessness or helplessness, diminished ability to think or concentrate, and thoughts about suicide. These symptoms impaired his functioning by preventing him from being able to attend to tasks during the day, appearing

135

distant and absent from events occurring around him, resulting in feelings of hopelessness and worthlessness that exacerbated his failure to achieve, and causing him to withdraw from the world around him.

### ii.       Anxiety.

458.    Mr. Sanchez also suffered from symptoms of anxiety, which is characterized by persistent anticipation of future threat that is excessive, out of proportion with reality. Mr. Sanchez's anxiety was manifest through agitation, irritability, sleep disturbance, and inability to concentrate his attention. These symptoms were debilitating, impairing his social, educational, and occupational functioning.

459.    Mr. Sanchez's sleep disturbance, including insomnia and nightmares, had serious effects on his daytime functioning, including causing fatigue, decreased energy, mood disturbances, deficits in concentration, and somatic symptoms.

### iii.      Hyperactivity, hyperarousal, and lack of impulse control.

460.    Mr. Sanchez also exhibited symptoms of hyperactivity, hyperarousal, and lack of impulse control throughout his life. Impulsivity is the inability to control impulses and is characterized by behavior that appears irrational and unconsidered and frequently demonstrates impaired judgment. Hyperactivity refers to excessive motor activity or extreme restlessness. Hyperarousal is characterized by being easily startled, feeling on edge, and having difficulty sleeping.

461.    During elementary school, Mr. Sanchez was over-active, in almost constant motion, and needed individual attention to complete tasks. He called out and acted inappropriately, jumped up on other children's backs while standing in line, and exhibited sudden changes in behavior. In middle school he had difficulty starting tasks and maintaining

work on the tasks. In both middle school and high school he was reported to need periodic assistance with behavior management, including in the area of self-regulation. *See, e.g.*, Def. Ex. 34.

462.    Mr. Sanchez exhibited impulsivity and impaired judgment from childhood into his adolescence and adulthood. He frequently was injured as a result of unsafe and impulsive behavior. He was seriously injured several times while riding a tricycle and bicycle; as a teenager, Mr. Sanchez fell several times and hit his head and face while riding a bicycle on ramps in a yard. As a very young child, Mr. Sanchez swallowed a number of his brother's seizure pills, requiring emergency hospitalization and treatment. In adulthood, Mr. Sanchez frequently acted without considering the consequences of his behavior.

### iv.    Intellectual impairment.

463.    Mr. Sanchez's intellectual functioning is extremely low and his cognition seriously impaired. Psychological and neuropsychological testing performed during Mr. Sanchez's school years and during his adulthood indicated that Mr. Sanchez has very significant impairments in processing information. Symptoms of anxiety, depression, and inattention, and hyperactivity can cause or aggravate processing difficulties.

### v.    Substance abuse.

464.    The use of alcohol and drugs frequently accompanies or follows exposure to traumatic stress and other adverse childhood events, particularly when the individual has not received mental health treatment, medication, or therapy following these events. Mr. Sanchez never received mental health treatment, and instead he attempted to self-medicate his emerging psychiatric conditions, including anxiety, depression, and trauma, through the use of alcohol and drugs and seek relief and dissociation with the use of those substances. The alcohol and drugs he used blunted the impact of his emotions and the effects of his trauma. Beginning in his late

137

adolescence, and increasing over the course of his young adulthood, Mr. Sanchez used a variety of substances to blunt unpleasant emotions and make him feel more comfortable in social settings that caused him anxiety. The substances he used included alcohol, marijuana, cocaine, and MDMA (Ecstasy). Mr. Sanchez mixed these drugs, using multiple substances at a time. While using these drugs, he felt more relaxed and confident. Mr. Sanchez did not seem to have insight into the fact that the use of these drugs further impaired his functioning and was dangerous to his health.

465. Mr. Sanchez was prejudiced by trial counsel's failure to retain a psychiatrist who would have explained to the jury his psychiatric symptoms and their effect on his behavior and functioning. There is a reasonable probability that at least one juror would have voted for a sentence of life in prison without the possibility of parole if the information provided above had been presented at Mr. Sanchez's capital trial.

**D. Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Present to the Jury Compelling Evidence that Mr. Sanchez is Intellectually Disabled and the Effects of that Disability on his Behavior and Functioning.**

466. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

**1. Prevailing professional norms.**

467. Reasonably effective counsel representing a capital defendant at the time of Mr. Sanchez's trial in 2009 investigated and presented evidence of the defendant's intellectual disability, both because a finding that the defendant was intellectual disabled precluded the imposition of the death penalty and because evidence of intellectual and adaptive functioning impairments, even if not meeting the legal definition of intellectual disability, could make the difference between a death sentence and a lesser sentence. Jurors at the time of Mr. Sanchez's trial were far less likely to sentence people with those impairments to death. 2003 ABA

138

Guidelines, Guideline 4.1 and commentary thereto ("The Constitution forbids the execution of persons with mental retardation, making this a necessary area of inquiry in every case. Further, the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase.").

### 2. Deficient performance.

468. Trial counsel was or reasonably should have been aware that Mr. Sanchez suffered from intellectual disability, but failed to conduct an investigation into Mr. Sanchez's adaptive functioning, ensure a complete professional evaluation of Mr. Sanchez's cognitive functioning, ensure that contemporaneous records existing at the time of Mr. Sanchez's trial were carefully reviewed for evidence supporting a diagnosis of intellectual disability, and present information about Mr. Sanchez's intellectual disability to the Court or to the jury.

469. Counsel possessed Mr. Sanchez's special education records. Counsel recognized that information in these records was important, introduced them as evidence in the penalty phase of Mr. Sanchez's trial, and presented the testimony of one of his teachers, Amy Fleming, regarding some aspects of these records. Def. Ex. 34; Tr. 8208-70. But trial counsel unreasonably failed to recognize the significance of numerous entries in the records, including but not limited to many that described Mr. Sanchez as having "low cognitive ability" qualifying him for exemption from standardized testing, indicating that Mr. Sanchez's intellectual functioning fell within the range of mild intellectual disability.

470. Trial counsel also knew or reasonably should have known that Mr. Sanchez had achieved ranges of full scale IQ scores on multiple instruments throughout his life, beginning when he was eight years old, which fell within the range of scores for mild intellectual disability.

471. Nevertheless, trial counsel unreasonably failed to recognize the significance of these scores, to investigate their significance, and to consult with an expert in the field of

intellectual disability and standardized testing to explain the significance of the scores to the jury. Instead, counsel unreasonably determined that Mr. Sanchez did not meet the criteria for intellectual disability because his full scale IQ scores were higher than 70, and that therefore no further investigation or presentation should be undertaken.

472. Trial counsel also unreasonably failed to investigate and present readily available evidence of Mr. Sanchez's adaptive functioning deficits in the domains of conceptual, practical, and social skills. As set forth above, such an investigation was necessary and important regardless of the presence of intellectual functioning deficits, because evidence that Mr. Sanchez exhibited difficulties with everyday functioning was independently mitigating, reducing Mr. Sanchez's culpability. Moreover, the development and presentation of this evidence was entirely consistent with counsel's guilt and penalty phase strategy to "describe[e] Mr. Sanchez as a follower and as a person with low intelligence."

473. Trial counsel's failure to investigate and present evidence of Mr. Sanchez's adaptive deficits was unreasonable. The failure to investigate Mr. Sanchez's adaptive deficits, despite available evidence that his IQ scores fell in the range of two standard deviations below the norm, and thus that he was categorically ineligible for the death penalty, was likewise unreasonable.

### 3. Prejudice.

474. As a result of trial counsel's unreasonable errors and omissions, the Court and the jury were not presented with readily available evidence that Mr. Sanchez is mildly intellectually disabled and therefore categorically ineligible for the death penalty.

475. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim, particularly those in Claim III.

476.    But for counsel's errors and omissions, there is a reasonable probability that Mr. Sanchez would have been found ineligible for the death penalty. Even if Mr. Sanchez had not been found ineligible for the death penalty, the evidence of his adaptive deficits would have been profoundly mitigating and, taken together with the other readily available evidence described in this claim along with the evidence that was presented at trial, would likely have resulted in a life sentence for Mr. Sanchez.

**E.      Trial Counsel Unreasonably and Prejudicially Failed to Investigate Mr. Sanchez's Competence to Stand Trial at the Penalty Phase, and to Present Evidence to the Court that Mr. Sanchez was Incompetent.**

477.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim, particularly those in Claim IV.

**1.      Prevailing professional norms.**

478.    Reasonably effective counsel representing a capital defendant at the time of Mr. Sanchez's trial in 2009 looked for and attended to signs of the defendant's incompetence to stand trial, and when confronted with signs of incompetence alerted the judge and requested a formal judicial determination of competency to proceed, because it was and is a fundamental denial of due process to try or sentence an incompetent client. *ABA Standards for Criminal Justice Prosecution Function and Defense Function, Third Edition* (1993), Standard 4-3.1 and commentary thereto (1993 Standards); 2003 ABA Guidelines, Guideline 10.5 and commentary thereto; *see also* Guideline 10.7 and commentary thereto.

**2.      Deficient performance.**

479.    Trial counsel unreasonably failed to investigate and present to the Court readily available evidence of Mr. Sanchez's incompetence, despite the fact that trial counsel was or reasonably should have been aware that Mr. Sanchez did not understand the nature or consequences of the proceedings against him and could not properly and rationally assist counsel

141

in his penalty phase defense. The factual allegations and supporting authorities set forth in Claim IV, are hereby incorporated by this reference as though fully set forth herein.

### 3. Prejudice.

480. Because of trial counsel's unreasonable errors and omissions, Mr. Sanchez was deprived of his constitutional right to a judicial determination of competence and was capitally sentenced while incompetent. The factual allegations and supporting authorities set forth in Claim IV, are hereby incorporated by this reference as though fully set forth herein.

### F. Trial Counsel Rendered Ineffective Assistance to Mr. Sanchez by Their Errors and Omissions in Consultation with the Mental Health Experts Retained by the Defense.

481. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

### 1. Prevailing professional norms.

482. At the time of Mr. Sanchez's trial, reasonably effective counsel representing a capital defendant provided the mental health experts with whom they consulted all available supporting documentation and access to the defendant in order for those experts "to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s) . . . or otherwise support a sentence less than death." 2003 ABA Guidelines, Guideline 10.11. Reasonably effective counsel also properly prepared their experts to testify.

### 2. Deficient performance.

483. Multiple unreasonable errors and omissions with regard to their consultation with mental health experts rendered Mr. Sanchez's trial counsel's performance ineffective. Counsel failed to provide their experts with results of an adequate background investigation, including

142

compelling evidence of Mr. Sanchez's adaptive deficits; improperly delegated nearly full responsibility for selecting and communicating with the experts to the mitigation specialist; failed to provide their experts with clear and appropriate referral questions; failed to arrange for any of the psychologists they hired to perform a full mental health mitigation evaluation of Mr. Sanchez; permitted Mr. Sanchez to be administered psychological testing, including IQ testing, repeatedly within a period of months, resulting in the skewing of Mr. Sanchez's scores due to practice effects and progressive practice effects; failed to ensure that the experts examined Mr. Sanchez for symptoms of psychiatric disorder; and failed to prepare their experts to testify.

484.    As set forth in detail above, trial counsel failed to conduct a thorough, accurate, and culturally competent investigation into Mr. Sanchez's multi-generational history and life history, resulting in the failure to uncover readily available evidence of genetic risk factors and traumatic and adverse childhood events to which Mr. Sanchez was exposed. Just as importantly, counsel failed to conduct an assessment of Mr. Sanchez's behaviors and functioning throughout his life. To avoid unnecessary duplication, the facts alleged above are incorporated by this reference as though fully set forth herein. Because counsel failed to conduct such an investigation and develop this readily available information, they were unable to, and did not, provide it to the experts they consulted and whom they called to testify. As a result, the opinions their experts rendered were incomplete and misleading, and in critical respects, inaccurate.

485.    Trial counsel delegated responsibility for locating, selecting, and consulting with the mental health professionals to the mitigation specialist. They provided the mitigation specialist with little guidance about the type of mental health experts needed.

486.    Counsel failed to provide the neuropsychologist and psychologist they hired and called to testify with clear and appropriate referral questions. Counsel expected Dr. Daniel Grant,

143

a neuropsychologist who administered intelligence and some neuropsychological testing to Mr. Sanchez, to do a full psychological workup, but Dr. Grant testified he was not asked to assess Mr. Sanchez for symptoms of psychiatric disorder. Tr. 8488. As noted above, moreover, counsel failed to provide Dr. Grant with sufficient background information to perform a mental health mitigation evaluation. Moreover, counsel failed to direct Dr. Grant to perform a full assessment of Mr. Sanchez for intellectual disability, unreasonably and prejudicially determining that Mr. Sanchez's IQ score rendered the assessment of adaptive deficits irrelevant.

487.    Counsel unreasonably permitted Mr. Sanchez to be administered psychological testing, including IQ testing, repeatedly within a period of months, resulting in the skewing of Mr. Sanchez's scores due to practice effects and progressive practice effects. Counsel hired Dr. Katrina Hallmark to administer a WAIS-III to Mr. Sanchez in March 2008. Counsel subsequently hired Dr. Laurence Levine to administer testing to Mr. Sanchez in June 2008. In December 2008, counsel arranged for Dr. Grant to administer intelligence and neuropsychological testing to Mr. Sanchez. As explained by Dr. McGrew, "Due to his repeated exposure to the adult Wechsler scales in such a short time period (within the same year), and within the same month for his last two exams, the last two intellectual assessments are positively upward biased estimates of intelligence due to the scientifically-based and professionally recognized testing issue of practice effects and progressive error practice effects."

488.    Counsel failed to ensure that any mental health professional with whom they consulted performed an evaluation on Mr. Sanchez to determine whether he suffered from symptoms of psychiatric disorder. Dr. Grant testified that he "wasn't evaluating looking for a mental illness per se." Tr. 8488. The facts alleged earlier in this claim about the failure to engage an expert to assess Mr. Sanchez for psychiatric symptoms are incorporated by this reference as

144

though fully set forth here. Counsel had no reasonable strategic purpose for failing to do so, and would have presented information about Mr. Sanchez's psychiatric illness if counsel had had that information.

489.    Counsel asked Dr. Thomas Reidy to perform an assessment to identify "risk or protective factors [he] might find to determine what kind of influences there were on [Mr. Sanchez's] behavior as he was growing up and getting into the adult years to take a look at what type of pathway he took in life, and what factors influenced that path." Tr. 8520-21. That is, counsel asked Dr. Reidy to render opinions about the factors in Mr. Sanchez's background that caused him to engage in criminal behavior. Counsel did not ask Dr. Reidy to, and Dr. Reidy did not, assess how Mr. Sanchez's adverse childhood experiences affected his emotional, psychological, or psychiatric functioning. Moreover, counsel did not ask Dr. Reidy to meet or evaluate Mr. Sanchez, even though he was willing and able to do so; instead, they asked him simply to review some documents and listen to penalty phase testimony in order to form his opinions.

490.    This presentation was grossly inadequate as mitigation evidence. It focused the jury's attention on non-mitigating – indeed, on aggravating – factors, encouraging the jury to consider Mr. Sanchez's background as the explanation for violent behavior, and likely encouraged the jury to determine that Mr. Sanchez would continue to pose a risk of dangerous behavior while incarcerated. It wholly failed to explain the effect of Mr. Sanchez's experiences upon his cognition, mental health, and functioning, and to describe his significant impairments, all of which were mitigating.

491.    Dr. Grant's notes of his clinical interview with Mr. Sanchez contained notations that the government used to impeach and discredit Dr. Grant's testimony. Professionally

145

reasonable counsel would have reviewed the notes with Dr. Grant and then either (a) sought to obtain a new expert, or (b) prepared Dr. Grant for cross-examination regarding his notes. Trial counsel unreasonably failed to do either, with the result that the sole testifying defense mental health expert who had evaluated Mr. Sanchez was discredited.

### 3.     Prejudice.

492.    Due to trial counsel's unreasonable errors and omissions, the jury did not learn about Mr. Sanchez's intellectual impairments, his significant neuropsychological impairments, and his psychiatric symptoms, all of which profoundly affected his behavior and functioning throughout his life.

493.    Also due to counsel's failures, the jury heard incorrect and damaging information from Dr. Grant. Dr. Grant testified, incorrectly, on cross-examination, that in order to meet the criteria for diagnosis of mental retardation (intellectual disability), a person has to have an IQ "*three* standard deviations below [the mean] taking [into] consideration the standard error of measurement, adaptive behavior measured, that is–the guideline *three* standard deviations." Tr. 8484 (emphasis added). The jury did not learn that a diagnosis of intellectual disability requires only intellectual and adaptive functioning measured at *two* standard deviations below the mean.

494.    Also due to counsel's failure adequately to prepare Dr. Grant to testify, Dr. Grant was impeached and discredited on cross-examination about the contents of his notes of his clinical interview with Mr. Sanchez. The prosecution successfully impeached Dr. Grant by pointing out that Dr. Grant did not include information from his notes in his report that was disclosed to the prosecution prior to his testimony. Dr. Grant also was not prepared to explain a portion of his notes that stated, "Everyone has both light and dark inside. What is important is what we choose to act on." Tr. 8496-97. Caught unaware and confused, Dr. Grant testified, incredibly, that these notes "had nothing to do with this case [but] was something that I was

146

reading and thinking about at the time on the train back." Tr. 8497. Similarly, Dr. Grant testified

that the portion of his notes "lives in a prison with many doors" "had nothing to do with case.

I'm over, I should have deleted it. I had written it on the wrong page, which is why I included it."

Tr. 8498. When prodded further by the prosecutor, Dr. Grant testified, "I don't remember. It was

a long ride back. I don't remember why I happened to put it on this case." Tr. 8499. Dr. Grant

also testified that his note "[t]hings we lose have a way of coming back to us in the end" was

another thought that had nothing to do with Mr. Sanchez. Tr. 8499-500.

495. The failure to prepare Dr. Grant to testify permitted the prosecution to impeach

his credibility, rendering the mitigating information he did provide incredible to the jury.

**G.     Trial Counsel Unreasonably and Prejudicially Failed to Identify and Present to the Jury Critical Information about Mr. Sanchez's Traumatic Background and Disabilities from Documentary Evidence in Counsel's Possession.**

496. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support

of this claim.

### 1.     Prevailing professional norms.

497. Reasonably effective counsel representing a defendant on capital charges at the

time of Mr. Sanchez's trial collected, reviewed, and presented mitigating information and

materials from contemporaneous records documenting the defendant's history and background.

Reasonably effective counsel not only introduced the records and their contents as evidence, but

also consulted with lay witnesses and experts to interpret these background records, including

school records, medical and mental health records, and criminal records, and presented the

testimony of these witnesses to explain the records and put the mitigating information in

meaningful context before the jury. 2003 ABA Guidelines, Guideline 10.11 and commentary

thereto (counsel should consider presenting "[e]xpert and lay witnesses, along with supporting

147

documentation (e.g., school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)"); 2003 ABA Guidelines, Guideline 10.7 and commentary thereto ("Records–from courts, government agencies, the military, employers, etc.–can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness."); *see also id.* at n.215 ("Contemporaneous records are more credible than witnesses sharing previously undisclosed memories or experts offering opinions that were formed only after the client faced capital charges. Records may also document events that neither the client nor family members remember.").

### 2.      Deficient performance.

498.     Trial counsel had in their possession a number of documents recording mitigating information about Mr. Sanchez's family history, his own life history, and his deficits. With regard to some of these documents, trial counsel failed entirely to introduce them into evidence and/or to question witnesses about their content and significance. With regard to others, counsel introduced them into evidence but failed to ensure that the jury understood their significance.

499.     The documents that trial counsel had in their possession, but which they failed to present to the jury in any form, included but were not limited to the following: records from Mr. Sanchez's employment at Divosta Homes, records of Mr. Sanchez's birth, documentation that Mr. Sanchez was taken to the emergency room after ingesting large amounts of his brother's seizure medication when Mr. Sanchez was two years old, and records of Mr. Sanchez's father's criminal history.

500.     Documentary materials that trial counsel introduced into evidence and/or about which counsel questioned witnesses, but which contained additional compelling mitigating

information that counsel failed to elicit include but are not limited to Mr. Sanchez's special education records.

501. Counsel had no reasonable strategy for failing to introduce these documents or the entirety of their mitigating contents. The information contained therein that counsel failed to elicit before the jury was wholly consistent with counsel's defense strategy at the penalty phase– to demonstrate that Mr. Sanchez suffered traumatic events as a child and that he was low functioning and a follower.

### 3. Prejudice.

502. Counsel's failure to present and explain to the jury details of Mr. Sanchez's school records in counsel's possession left the jury with a misleading and inaccurate impression of Mr. Sanchez's childhood experiences and his functioning. Counsel's errors and omissions also left the testimony of Mr. Sanchez's mother and sister about the abuse that Mr. Sanchez's father inflicted upon him and other members of his family uncorroborated by official, contemporaneous law enforcement records.

503. As a result of counsel's errors and omissions with regard to the presentation of information in Mr. Sanchez's special education records through the testimony of one of his teachers, Amy Fleming, the jury was left with the following false impressions of Mr. Sanchez's functioning: that Mr. Sanchez's primary difficulty in school was a learning disability, that is, a discrepancy between his intelligence and his achievement; that Mr. Sanchez was capable of functioning independently in the community; that Mr. Sanchez did not always exercise effort in school; that Mr. Sanchez dropped out of school after tenth grade but did not fail any grades; and that Mr. Sanchez was dangerous because he brought a knife to school. Tr. 8208-70.

504. Had counsel conducted an adequate investigation, counsel could have presented the testimony of teachers who were more familiar with Mr. Sanchez's school records than the

149

single teacher counsel called to testify, of the psychologist who evaluated Mr. Sanchez when he was eight years old and who prepared the psychological report on the basis of which Mr. Sanchez was deemed eligible for special education services, and of other available witnesses. Had counsel done so, the jury would have learned compelling mitigation information including but not limited to the following:

505.    Despite the fact that Mr. Sanchez was one of the older children in his second grade class, he was developmentally behind many of the other, younger children in his class. He behaved immaturely and impulsively. He was a needy child who had difficulty comprehending instructions, was unable to take the initiative to attempt work on his own, and did not feel capable of tackling assignments without individualized attention.

506.    In elementary school, Mr. Sanchez performed very poorly on standardized testing, more than two standard deviations below the mean. In high school he was exempted from standardized testing not simply because he was diagnosed with a learning disability, but because he had "significant conceptual and intellectual deficits."

507.    Dr. Francis Crosby, the psychologist who assessed Mr. Sanchez at the request of the school district in July 1992 made specific decisions with regard to the evaluation that affected the results and his conclusions. Had trial counsel interviewed him and presented his testimony at trial, he could and would have explained his assessment as follows:

> I generally chose to administer the SB-4 to minority students [like Mr. Sanchez] because the SB-4 had more practice items on the subtests than the WISC-R did, and I wanted the students who were likely to have had less exposure to books or other academic materials to have an opportunity to practice the tasks the test required. Students tended to score higher on the SB-4 than on the WISC-R as a result of the practice items and other factors. In order to qualify for special education services as learning disabled, the student needed to have a discrepancy of at least 15 points (one standard deviation) between his or her full scale IQ score and his or her score on achievement tests. Because I was trying to ensure that students met the criteria for eligibility for special education services as learning

150

disabled, and I knew that a higher score on an IQ test, combined with a lower score on an achievement test, was more likely to achieve that goal, I preferred to administer the SB-4 rather than the WISC-R.

At the time I evaluated [Mr. Sanchez], it was very stigmatizing for a student, particularly a minority student, to be labeled as mentally retarded. It was important to avoid that label whenever possible, while still ensuring that the student was eligible for services. That is another reason why I administered the SB-4 to [Mr. Sanchez] rather than the WISC-R; his full-scale IQ score on the WISC-R was likely to be lower than it was on the SB-4.

The fact that [Mr. Sanchez] achieved a full scale IQ score that is typically considered above the mentally retarded range when he was 8 years, 9 months old does not preclude the possibility that he was and is mentally retarded (now termed intellectually disabled). As noted above, a younger child who is able to answer correctly the items that appear early in the instrument will achieve a higher IQ score than an older child, who is expected to be able to answer the more difficult questions that appear later in the instrument but who has not progressed and still is able to answer only the simpler questions toward the beginning of the instrument. In order to ensure that the IQ score accurately reflects an individual's intellectual functioning, it is important to retest the individual after several years, particularly when the first administration of an IQ instrument is completed before the age of 10, because an individual's intelligence profile may change from childhood into adolescence.

508.    Although he was impulsive, Mr. Sanchez's behavior "did not reflect aggression or serious behavioral problems but rather puerility and attention-seeking conduct." Even when he was arrested on campus when he was in high school for possessing a knife, educators did not believe that Mr. Sanchez posed a threat of harm. Mr. Sanchez did not remove the knife from his backpack, brandish it, or threaten anyone with it, and the staff believed that he had it in his possession because he felt at risk of being harmed himself.

509.    Mr. Sanchez made only minimal progress throughout his schooling, even though he received full-time special education services from the middle of his third grade year until he left school in tenth grade, after failing both ninth and tenth grades and not completing the requirements even to pass ninth grade. Mr. Sanchez's "lack of progress is consistent with [his]

151

very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well."

510.    Notes in Mr. Sanchez's special education records from high school indicating that he functioned independently in the community and was capable of living in an apartment on his own did not mean that Mr. Sanchez was in fact able to function without assistance in the community; "they simply meant that the IEP team believed that he had support from family or others and that the school did not need to provide services to [Mr. Sanchez] for him to accomplish these goals."

511.    Because trial counsel failed to introduce into evidence Mr. Sanchez's employment records, or call witnesses to testify about these records or Mr. Sanchez's employment history, the jury was left with the impression that Mr. Sanchez had "a series of vocations that could be available and followed by someone with a low I.Q.," Tr. 9515, and that nevertheless he "made [a] conscious choice[] in this case to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they injured," Tr. 9507-08, rather than pursuing a life of gainful employment. If trial counsel had presented the records and testimony about Mr. Sanchez's employment, the jury would have learned that Mr. Sanchez was unable to obtain employment without the assistance of family members and friends, he was unable to keep a job for very long, and he lost jobs because he was unable to meet the expectations required for employees in the position.

512.    Because trial counsel failed to introduce into evidence medical records of Ms. Sanchez's pregnancy with Mr. Sanchez and his birth, the jury was not informed that Mr. Sanchez's mother suffered infections during her pregnancy and, although she was prescribed antibiotics to treat these infections, she twice failed to complete the course of antibiotics. The

jury thus was not aware that there were medical complications while Mr. Sanchez was in utero and that Mr. Sanchez's mother failed to comply with medical advice to treat these complications.

513.    Counsel also failed to introduce records in their possession documenting Mr. Sanchez's ingestion of his brother's seizure medication when he was two years old. Although the jury heard testimony from Mr. Sanchez's mother about this incident, counsel failed to corroborate her testimony with the contemporaneous record of this incident.

514.    Because counsel failed to introduce into evidence records in their possession records documenting Mr. Sanchez's father's violence toward family members, as well as his arrests for other criminal acts, the jury was not provided with contemporaneous information regarding Ricardo Sr.'s physical abuse of his wife and children, of his alcohol abuse, and of his erratic and violent nature and acts that corroborated testimony by Mr. Sanchez's mother and sister. The jury thus was not aware of compelling mitigating information including but not limited to the following:

- Ricardo Sr. admitted to law enforcement officers that he shot Juana in the face after coming home drunk and threatening her in 1980. In June 1980, in a prosecution stemming from this incident, Ricardo Sr. was found guilty of two counts of grand theft, and ordered not to buy or possess a dangerous weapon, not to initiate contact with his wife or child, and to pay Juana's hospital bill.

- On Christmas Day 1991, when Mr. Sanchez was eight years old, Ricardo Sr. was arrested for battery and battery on a police officer following his punching another man in the mouth and hitting and kicking the officer who was attempting to detain him.

- In April 1993, when Mr. Sanchez was nine years old, his father hit a friend in the head with a pool cue while under the influence of alcohol, causing injuries that required medical attention. He was not arrested for this incident because he and the victim agreed that he would contribute to the payment of the victim's medical expenses.

- In February 1999, when Mr. Sanchez was 15 years old, Ricardo Sr. was arrested after striking a club owner in the mouth while under the influence of alcohol and possibly cocaine.

153

- In May 1999, when Mr. Sanchez was 15 years old, police were called to his home after Ricardo Sr. came home drunk, started a fight, threw a beer bottle, and then departed. While the police were present, Ricardo Sr. returned home, driving erratically, spinning tires and creating smoke. Ricardo Sr. threatened his family and the police officer, brandished a beer bottle at the officer, and then attacked the officer, poking him in the eyes and attempting to bite him. Ricardo Sr. was arrested for battery on a police officer, resisting arrest with violence, and aggravated assault on a law enforcement officer. He was convicted of resisting arrest without violence and disorderly conduct related to this event.

- Ricardo Sr. was arrested for possession of stolen property.

515.    Had counsel introduced these documents and their contents to the jury, the jury's verdict would have been informed by comprehensive, accurate information regarding Mr. Sanchez's experiences, abilities, and functioning, rather than incomplete, uncorroborated, and misleading information.

**H.      Trial Counsel Unreasonably and Prejudicially Failed to Impeach and Discredit the Testimony of Government Mental Health Expert Michael Brannon.**

516.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

**1.      Prevailing professional norms.**

517.    Reasonably effective counsel representing a capital defendant in 2009 "investigate[d] all sources of possible impeachment of defense and prosecution witnesses." 2003 ABA Guidelines, Guideline 10.7, and commentary thereto.

**2.      Deficient performance.**

518.    Dr. Michael Brannon testified for the government in rebuttal at the penalty phase of Mr. Sanchez's trial. Trial counsel were provided a copy of Dr. Brannon's report prior to trial, and were aware that the government intended to present his testimony to refute the anticipated defense mental health presentation. In particular, counsel were aware that Dr. Brannon had reported that Mr. Sanchez had achieved a full scale IQ score on the WAIS-III that Dr. Brannon

154

administered in late December 2008 of 89, significantly higher than his scores on any previous administration of an IQ test, and that this information could undermine their presentation regarding Mr. Sanchez's very low intellectual functioning. In addition, counsel knew that Dr. Brannon reported that Mr. Sanchez had denied having been the victim or witness of domestic violence, experiencing any traumatic events, or experiencing symptoms of mental illness, that he was unaware of any substance abuse or mental illness suffered by any members of his family, and that he had described his childhood to Dr. Brannon as "good."

519.    Counsel knew that the information Dr. Brannon would present could be damaging to the mitigation case, and moved the Court to limit Dr. Brannon's testimony. Counsel argued that because the defense had presented expert testimony only in the area of low intellectual functioning, Dr. Brannon's testimony should be limited to his testing of Mr. Sanchez's intellectual functioning. Tr. 9268-73. The Court denied counsel's motion and ruled that because counsel had presented testimony from Dr. Thomas Reidy that "we are all creatures of our environment," Tr. 9272-73, Dr. Brannon was permitted to testify about the content of his clinical interview of Mr. Sanchez.

520.    Despite the fact that trial counsel were or reasonably should have been aware that Dr. Brannon would provide testimony regarding Mr. Sanchez's intellectual functioning that was inconsistent with the presentation counsel had made to the jury, trial counsel failed to consult with an expert in IQ testing and to present testimony to challenge the validity of the full scale IQ score Dr. Brannon had obtained.

521.    When counsel's efforts to limit Dr. Brannon's testimony failed, counsel were or reasonably should have been aware that it was critical to impeach Dr. Brannon's adverse

155

testimony in order to minimize the impact of his rebuttal testimony on the jury. But counsel failed to impeach Dr. Brannon on critical issues.

522.    Furthermore, counsel entirely failed to elicit before the jury information that Dr. Brannon's assessment was limited by the dearth of information he had been provided about Mr. Sanchez's background and functioning. Dr. Brannon's report included an important disclaimer that called into serious question the reliability and validity of his conclusions:

> It should be noted that the following conclusions are limited to the information available at the time of this assessment. Additional information and documentation was requested by this examiner prior to the completion of this report. However, that information was not received as of the date of this report. Therefore, the following conclusions are subject to change or modification based upon the possible future receipt of additional relevant information including but not limited to medical records, academic records, mental health records, occupational records, and contact information for collateral sources of data such as relatives, friends, or treating professionals.

Counsel failed entirely to cross-examine Dr. Brannon about this disclaimer in order to call to the jurors' attention the fact that Dr. Brannon acknowledged that his evaluation was limited and that his conclusions might be different if he were provided with relevant background materials upon which mental health professionals' opinions must rely.

523.    As set forth above, counsel failed to investigate and present evidence of Mr. Sanchez's neuropsychological impairments and provide the experts hired with the results of a complete and accurate social history and adaptive functioning investigation that would have negated many of Dr. Brannon's ill-informed conclusions.

### 3.    Prejudice.

524.    Due to trial counsel's unreasonable errors and omissions, Dr. Brannon provided the following incorrect and misleading testimony that counsel failed to challenge:

- That he administered the WAIS-III to Mr. Sanchez rather than the WAIS-IV, in part because there was no "wealth of data" on how individuals who were incarcerated performed on the WAIS-IV test. Tr. 9289-90.

156

- That Mr. Sanchez could "plan out how events happen over time and anticipate what would happen" and that "[h]e did well in that." Tr. 9296. Mr. Sanchez's performance on the testing Dr. Brannon administered did not support those conclusions.

- That Mr. Sanchez "is also good at the kinds of things that require him to see something and then as a result of whatever he sees, make decisions about the right way to handle that task." Tr. 9296. Mr. Sanchez's performance on the testing Dr. Brannon administered did not lead to such conclusions.

- That the Comprehension subtest "give[s] us indices or includes whether or not a person can do things like understand what happens in the world when you do certain things or know the difference between right and wrong, or know how to behave in certain situations, how you are supposed to conduct your behavior, social behavior and problem solving." Tr. 9298-99. In fact, the Comprehension subtest was eliminated from the WAIS-IV, in part because of its heterogeneity in construct validity; research demonstrated that it was not clear what skills the Comprehension subtest meaningfully evaluated.

- That there is no statistical way to determine/quantify adverse outcomes for negative experiences. Tr. 9332-33. In fact, multiple studies stemming from the Adverse Childhood Events Study conducted by Kaiser Permanente in the 1990s concluded that the number of categories of adverse childhood exposures experienced by individuals showed a graded relationship to the presence of adult medical and mental health diseases later in life.

- That Mr. Sanchez's denials that he was exposed to physical abuse and that any family member suffered from mental illness or abused substances, and that Mr. Sanchez's statement that his childhood was "good" showed that Mr. Sanchez was not adversely affected by his childhood experiences.

525.    As a result of counsel's unreasonable errors and omissions, Dr. Brannon's misleading and inaccurate testimony was not adequately challenged and the jury likely relied on the misleading information Dr. Brannon provided in arriving at the death verdicts.

**I.      Trial Counsel Unreasonably and Prejudicially Failed to Investigate, Challenge, and Mitigate the Evidence Introduced in Aggravation by the Prosecution.**

526.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

157

### 1.     Prevailing professional norms.

527.    Reasonably effective counsel representing capitally charged defendants in federal court between 2006 and 2009 "investigate[d] prior convictions, adjudications, or unadjudicated offenses that could be used as aggravating circumstances or otherwise come into evidence" and looked for "extenuating circumstances that [could] be offered to lessen the weight of a conviction, adjudication, or unadjudicated offense." 2003 ABA Guidelines, Guideline 10.7 and commentary thereto. Effective counsel "carefully research[ed] applicable . . . federal law governing the admissibility of evidence in aggravation" and "[w]here possible, . . . move[d] to exclude aggravating evidence as inadmissible, and if that fail[ed], rebut[ted] the evidence or offer[ed] mitigating evidence that would blunt its impact." *Id.*, Guideline 10.11 and commentary thereto. Reasonably effective counsel "fully investigate[d] the circumstances of prior [unadjudicated criminal] conduct and determine[d] whether it is properly admissible at the penalty stage," and determined whether prior convictions could be attacked or invalidated. *Id.*

### 2.     Deficient performance.

528.    Mr. Sanchez's trial counsel were aware that the government intended to introduce evidence in aggravation at the penalty phase. On February 20, 2008, the government filed a notice of intent to seek the death penalty against Mr. Sanchez. Dkt. 312. The notice stated that the government intended to introduce evidence in support of statutory aggravating factors including pecuniary gain, substantial planning and premeditation, vulnerability of the child victims, and multiple killings. *Id.* at 3-4. The government also notified the defense that it planned to introduce evidence in support of the following non-statutory aggravating factors: future dangerousness; uncharged murders, attempted murders, and other serious acts of violence; contemporaneous convictions for multiple murders and other serious acts of violence; witness elimination; and victim impact. *Id.* at 4-5. With regard to the second non-aggravating factor—

158

uncharged murders, attempted murders, and other serious acts of violence–the government indicated that Mr. Sanchez "had been involved in other murders, attempted murders, and serious acts of violence which are not reflected in his criminal record." *Id*. at 5.

529.   Trial counsel knew that effective representation of Mr. Sanchez at the penalty phase required challenging the evidence to be presented in aggravation. Counsel filed motions in limine challenging the admissibility of evidence pertaining to some of the aggravating circumstances. In particular, on May 20, 2008, counsel filed a motion to exclude evidence intended to be introduced by the prosecution at the guilt phase under Federal Rule of Evidence 404(b). Dkt. 361. Counsel noted that the government, when providing discovery to Mr. Sanchez on March 7, 2008, informed the defense that it planned to introduce evidence of a shooting at 1305 Suwanee Drive, Apartment B, West Palm Beach, on April 28, 2006; a shooting at 1910 Mercer Avenue, West Palm Beach on April 28, 2006; and a shooting on the 1300 block of Haverhill Road in West Palm Beach on September 11, 2006. *Id*. at 3. Counsel argued that this evidence was inadmissible under Rule 404(b) at the guilt phase, and sought to exclude it. *Id*. This motion was denied. Tr. 7839.

530.   Counsel were aware that the prosecution intended to argue that these prior bad acts supported the aggravating factors to be argued at the penalty phase. The notice of intent to seek the death penalty against Mr. Sanchez indicated:

> The Government further gives notice that in support of imposition of the death penalty it intends to rely upon all the evidence admitted by the Court at the guilt phase of the trial and the offenses of conviction as described in the Third Superseding Indictment as they relate to the background and character of the defendant, Ricardo Sanchez, Jr., his moral culpability, and the natures and circumstances of the offense charged in the Third Superseding Indictment.

Dkt. 312 at 6.

159

531.     Although trial counsel were aware it was important to challenge the prosecution's evidence, counsel failed to investigate the circumstances surrounding the events presented in aggravation.

532.     The government linked Mr. Sanchez to the Haverhill, Suwanee, and Mercer shootings solely through its presentation of firearms evidence. The government presented evidence that the firearms evidence found at these crime scenes "matched" weapons found at the Garden Court residence or firearms evidence found at the scene of the charged crimes. As set forth in detail in Claim VII, counsel unreasonably failed adequately to challenge the firearms evidence introduced by the government. Had counsel challenged the firearms evidence, they could have made a strong argument that no evidence linked Mr. Sanchez to these other uncharged crimes.

533.     Moreover, although counsel collected police records on these incidents, counsel failed to investigate red flags in the records, particularly in the records of the Haverhill shooting, indicating either that Mr. Sanchez was not involved or that he was acting under the control of others if he were involved. These red flags included but were not limited to the following:

- The victim of the shooting on Haverhill Road on September 11, 2006, stated that she believed she was shot because "a trick [she] turned went bad."

- The victim of the Haverhill shooting also informed law enforcement officers that prior to the shooting she had had an argument with the person from whom she was renting her trailer because she was overdue on paying her rent. In addition, the person from whom the victim was renting a trailer had had an altercation with his girlfriend in which his girlfriend had rammed his car with hers because she was jealous of his relationship with the victim. The victim and he had a sexual relationship. The man who rented the victim his trailer, or his girlfriend, owned a gun.

- The victim of the Haverhill shooting made enemies by "stiffing" non-African American males for money, "telling them they would meet for sex, take money from the males, and not show up."

- The victim of the Haverhill Road shooting reported to the police that another dancer at her place of employment had set her up.

- There were no witnesses to the shooting of the victim on Haverhill Road.

- One of the victims of the Suwanee shooting informed police officers that he "had had a problem with two individuals he named as 'Shorty' and 'Dilbert' who belong with the MS gang." Neither of these names was ever associated with Mr. Sanchez or others with whom he affiliated.

534.    Trial counsel also failed to present evidence that because Mr. Sanchez's functioning is impaired in the domains of intellectual functioning, processing speed, working memory, and in some areas of executive functioning, those deficits affected his functioning and behavior, impeding him from coming up with and planning acts on his own, causing him to be taken advantage of by others and to simply follow the will of the group, and causing him to act without considering the consequences of his behavior.

535.    Trial counsel had no strategic reason not to present this evidence to the jury.

### 3.    Prejudice.

536.    Mr. Sanchez was prejudiced by trial counsel's failures and errors. Had trial counsel discharged their constitutional duty to investigate the circumstances surrounding these incidents, collect and review evidence of Mr. Sanchez's psychological and mental conditions, and direct further investigation as warranted by the circumstances of the evidence in aggravation, trial counsel would have obtained and presented evidence that there was reasonable doubt that Mr. Sanchez participated in the three uncharged shootings, at Haverhill, Suwanee, and Mercer.

537.    Had trial counsel presented this information, it would have been taken into consideration by the jurors in their assessment of whether and in what role Mr. Sanchez was involved in the criminal acts charged as well as those introduced under Rule 404(b). Had the jury

been provided with this information, there is a reasonable probability that at least one juror would have voted for life without the possibility of release.

### J. Mr. Sanchez's Trial Counsel Rendered Prejudicially Ineffective Assistance by Failing to Object to the Prosecution's Misconduct During the Penalty Phase.

538. Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

#### 1. Prevailing professional norms.

539. Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. 2003 ABA Guidelines, Guideline 10.8 and commentary thereto ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (commentary, quoting Stephen B. Bright, *Preserving Error at Capital Trials*, The Champion, Apr. 1997, at 42-43).

#### 2. Deficient performance.

540. Trial counsel failed to object to the prosecutor's misconduct at the penalty phase, which included but was not limited to the following:

- Misrepresenting the facts and denigrating the defense by arguing that the trauma presented by the defense was "a figment of imagination they want you to adopt hook, line and sinker." Tr. 9515.

- Misrepresenting the law and the facts by insisting during closing argument that a sentence of life in prison for Mr. Sanchez would make this crime "just like any other murder, just drug dealers." Tr. 9522.

- Misrepresenting the law by stating that the jury must impose the death penalty against Mr. Sanchez "as the conscience of this community" and that in order to do so, the jurors "need[ed] to speak with one voice." Tr. 9606.

162

- Denigrating the defense and urging the jury to disregard evidence presented in mitigation by arguing, "It's really disgusting for them to put up a picture of a child in a videotape and beg and in a desperate fashion ask for your mercy when they know that [Mr. Sanchez] killed a child of exactly that same age." Tr. 9611.

- Misrepresenting the facts by minimizing the abuse that Ricardo Sr. inflicted on Mr. Sanchez and his other family members, insisting that Mr. Sanchez's father "did it the best he could." Tr. 9612.

- Misrepresenting the facts and the law by arguing to the jury that the government was not seeking the death penalty against Danny Varela "because the Government didn't have the evidence to convict him," claiming that "Varela is not an equally culpable co-defendant not facing the death penalty," and insisting that the government had made no deal with Varela. Tr. 9636-37.

541.    Counsel had no objectively reasonable basis for failing to object to the prosecutor's misconduct.

### 3.    Prejudice.

542.    Had trial counsel objected to the prosecutor's misconduct, the law required that his objections be sustained. Trial counsel's failures resulted in the violation of Mr. Sanchez's rights to due process; to a fair trial; to present a defense; to a fair and impartial jury; to a reliable, fair, non-arbitrary, and non-capricious determination of penalty; and to confrontation of witnesses against him. The failures permitted the jury and the Court inappropriately to consider inadmissible and improper factors. Trial counsel's omissions also resulted in the failure to preserve these issues for appellate review. Particularly when taken together with trial counsel's numerous other errors and omissions, trial counsel's failures to object prejudiced Mr. Sanchez.

**K.    Mr. Sanchez's Trial Counsel Rendered Prejudicially Ineffective Assistance by Failing to Object to Penalty Phase Jury Instructions That Interfered With the Jurors' Ability to Consider Proffered Mitigating Factors.**

543.    Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

163

### 1.      Prevailing professional norms.

544.    Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. 2003 ABA Guidelines, Guideline 10.8 and commentary thereto ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (commentary, quoting Stephen B. Bright, *Preserving Error at Capital Trials*, The Champion, Apr. 1997, at 42-43).

### 2.      Deficient performance.

545.    The Court instructed the jury, and the prosecutor repeatedly argued, that in considering nonstatutory mitigating factors, the jurors were required to follow a three-step process by which they first decided whether a proposed mitigating factor had been proven, then decided whether that factor was indeed mitigating, and finally decided what weight to give the factor if satisfied as to the first two steps. *See, e.g.*, Tr. 9728, 9735-37, 9742-44, 9747 (jury instructions); Tr. 9516-17, 9521, 9627-29 (prosecutor's argument).

546.    The instruction and argument improperly allowed the jury to make a legal decision as to whether a particular nonstatutory mitigating factor was indeed mitigating – a decision that the Court properly made for itself where the government had challenged the validity of proposed mitigating factors. *See* Tr. 9140, 9369-9458. Allowing the jurors to do that violated settled Eighth Amendment principles that preclude the sentence from refusing to consider any mitigating evidence relating to the defendant's background or upbringing.

547.    Counsel's failure to object was unreasonable. There was no reasonable basis for counsel's failure to raise this objection.

164

### 3.   Prejudice.

548.   Mr. Sanchez was prejudiced by counsel's deficient performance. There is a reasonable probability that the three-step process, as required by the jury instructions and the government's closing argument resulted in one or more jurors refusing to consider constitutionally relevant mitigating evidence.

549.   Trial counsel's omissions also resulted in the failure to preserve these issues for appellate review. Particularly when taken together with trial counsel's numerous other errors and omissions, trial counsel's failures to object prejudiced Mr. Sanchez.

### L.   Counsel's Unreasonable Errors and Omissions Individually and Cumulatively Prejudiced the Defense at the Penalty Phase of Mr. Sanchez's Trial.

550.   Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

551.   There is a reasonable probability that, but for counsel's failure to conduct a constitutionally adequate investigation and to develop and present readily available and compelling evidence in mitigation and to challenge the evidence presented by the government in aggravation, the jury would not have sentenced Mr. Sanchez to death.

## IX.   MR. SANCHEZ'S DEATH SENTENCE VIOLATES THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.

552.   Mr. Sanchez incorporates all facts set forth elsewhere in this pleading in support of this claim.

553.   Mr. Sanchez's death sentence is unconstitutional under the Eighth Amendment to the United States Constitution because the death penalty is inconsistent with evolving standards of decency, is arbitrary, serves no valid penological purpose, and is torturous.

165

554.    Mr. Sanchez's death sentence was obtained pursuant to an arbitrary process that failed to limit the death penalty to the worst offenders and instead operated by means of and promoted discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238 (1972). As a result, Mr. Sanchez's death sentence and continued confinement deprive him of his rights to due process; equal protection; and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; decisional law, and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law.

555.    Mr. Sanchez's sentence of death is further unconstitutional because Mr. Sanchez has been and will continue to be confined for a time that is unnecessarily lengthy, and under conditions that are torturous and inhumane.

556.    Justices of the Supreme Court have increasingly opined that the delay that will transpire between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of the current standards of decency because it subjects the prisoner, in addition to and in anticipation of the forfeiture of his life, to the endurance of many years living under sentence of death under extraordinary psychological duress, as well as extreme physical and social conditions and restrictions. *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of the petition for writ of certiorari); *Thompson v. McNeil*, 129 S. Ct. 1299 (2009) (Stevens, J., same); *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (Breyer, J., dissenting).

557.    It is well established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958). Moreover, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the

166

obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'"

*Gregg v. Georgia*, 428 U.S. 153, 171 (1976) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)).

### A.    The Death Penalty is a Disproportionate Sentence Even for the Gravest of Offenses.

558.    The steady and progressive abandonment of capital punishment throughout the nation demonstrates that the death penalty, under current standards of decency, is a disproportionate punishment even for the most serious of offenses.

### 1.    There is a national trend toward abolition.

559.    Jurisdictions throughout the country have increasingly repealed or abolished the death penalty, with greater frequency within the past few years, and thus the use of the penalty has become unusual within the meaning of the Eighth Amendment. New York's death penalty was declared unconstitutional in 2004, *People v. LaValle*, 3 N.Y. 3d 88 (2004), and no legislative or other attempt was made to reinstate it. New Jersey repealed the death penalty in 2007, and New Mexico repealed capital punishment in 2009. Following the commutation of all death sentences by the Illinois governor in 2003, the state abolished capital punishment in 2011. Connecticut repealed the death penalty in 2012, Maryland did so in 2013, and Nebraska did so in 2015.

560.    Numerous other United States jurisdictions, while retaining the death penalty on the books, either have not carried out any executions in recent years or have carried out only a handful. The federal government has not carried out any executions since 2003. The military capital punishment system has not executed anyone since 1961. Seven states that legally authorize the death penalty have not carried out an execution in the past ten years[20]: California,

---

[20] The years of consideration here are 2006 through 2016.

Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming. Seven additional states have carried out only a single execution in the last ten years; these are Arkansas, Kentucky, Louisiana, Nevada, Utah, Montana, and Washington. Of these seven states, those executed in Kentucky, Louisiana, Montana, and Nevada had abandoned their appeals.

561.   In only ten states have executions averaged more than one per year over the last ten years: Alabama, Arizona, Florida, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Texas, and Virginia. These ten states accounted for 92% of all executions (393/428) over this time period, with a single state, Texas, responsible for over 42% (181/428).[21]

562.   Even those states which still routinely employ the death penalty have seen a marked drop in executions, as reflected in a steady decline nationally. The high occurred in 1999, when 98 offenders were executed. The last ten years have shown a consistent decrease in executions (2006–53; 2007–42; 2008–37; 2009–56; 2010–46; 2011–43; 2012–43; 2013–39; 2014–35; 2015–28; 2016–10 to date).[22]

563.   The decline in new death sentences is clear and stark. In 1995, 311 people were sentenced to death nationwide. In 2004, the number was less than half that, at 138. In 2008, the number was nearly halved again, with a total of 73 people sentenced to death, the lowest total since the death penalty was reintroduced in 1976. Three states accounted for half of the new death sentences in 2014: Florida with 11, Texas with 11, and California with 14.

564.   A number of states that still authorize the death penalty have expressed reservations about its continued use. The legislatures in California, New Hampshire,

---

[21] http://www.deathpenaltyinfo.org/views-executions (last visited April 6, 2016).

[22] *Id*. (note that the spike in executions in 2009 reflects the end of the stays of execution issued pending *Baze v. Rees*, 553 U.S. 35 (2008).

Pennsylvania, and Tennessee have commissioned reports on their states' use of the death penalty, and Louisiana has established a Capital Punishment Fiscal Commission to investigate the cost of the death penalty. Four states that recently abolished capital punishment – New Jersey, Illinois, Connecticut, and Maryland – all commissioned reports before enacting legislation abolishing the death penalty.

565.   The executive branches of multiple states have demonstrated concerns about the fairness and appropriateness of the death penalty. Governors of Colorado, Oregon, Pennsylvania, and Washington have declared official moratoria on executions.

566.   The United States Supreme Court has examined actual practices rather than simply whether the death penalty was legislatively authorized when assessing the constitutionality of the death penalty for categories of offenders, as well as the constitutionality of other punishments. *See, e.g.*, *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) ("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989)]."); *Roper v. Simmons*, 543 U.S. 551, 564-65 (2005) (noting that although twenty states authorized capital punishment for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *see also Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, these sentences are most infrequent."); *Miller v. Alabama*, 132 S. Ct. 2455, 2549 (2012) ("[S]imply counting legislative enactments can present a distorted view").

567.    Capital punishment is infrequently practiced, other than in a very few states, and new death sentences are rapidly and consistently declining. The infrequency of the use of the death penalty, relative to the number of death eligible offenders, renders it "truly unusual" and it can now be concluded that a "national consensus has developed against it." *Atkins*, 536 U.S. at 316.

### 2.    The death penalty is excessive.

568.    The Eighth Amendment prohibits the imposition of excessive punishments. *Furman*, 408 U.S. at 325 (Marshall, J., concurring) (noting that the Court has concluded that "excessive punishments [are] as objectionable as those that [are] inherently cruel"). Punishments are excessive when, among other reasons, they "involve the unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173.

569.    The acceptable goals of punishment – deterrence, retribution, incapacitation, and rehabilitation – form the baseline for analyzing excessiveness. The death penalty fails to significantly further these goals over life imprisonment.

570.    Because the death penalty fails measurably to promote any of the permissible penological goals over life imprisonment, it is excessive. *Furman*, 408 U.S. at 279 (Brennan, J., concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive.") (internal citation omitted).

### 3. The United States is out of step with the international community's consensus against the death penalty.

571. The United States executed 35 people in 2014.[23] Only China, Iran, Saudi Arabia, and Iraq executed more.[24] With 73 new death sentences imposed in 2014, the United States ranked behind only China, Nigeria, Egypt, Pakistan, Bangladesh, Tanzania, and Iran.[25]

572. Since the 1970s, 82 countries have abolished the death penalty for all crimes, bringing the total number of abolitionist countries to 98. Thirty-five additional countries are abolitionist in practice because they have not carried out any executions during the last ten years and are understood to have an established policy or practice of not carrying out executions.[26] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[27]

573. Mr. Sanchez's prolonged confinement under sentence of death violates international human rights law. The European Court of Human Rights has held that the protracted postconviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an accused to face such a fate. *Soering*

---

[23] Amnesty International, Death Sentences and Executions 2014 at 62 (2015) available at https://www.amnesty.org.uk/sites/default/files/death_sentences_and_executions_2014_en.pdf.

[24] *Id*.

[25] *Id*. at 63.

[26] DPIC, Abolitionist and Retentionist Countries, http://www.deathpenaltyinfo.org/abolitionist-and-retentionist-countries?scid=30&did=140 (last visited April 6, 2015); Amnesty International, Death Sentences and Executions 2014 at 64 (2015) available at https://www.amnesty.org.uk/sites/default/files/death_sentences_and_executions_2014_en.pdf.

[27] G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2015), available at http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186.

171

*v. United Kingdom*, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989) (six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential capital defendant to that state). The Canadian Supreme Court cited such delays as a relevant consideration in deciding that extradition of a murder suspect to the United States without first obtaining assurances that the death penalty would not be imposed violated principles of fundamental justice. *United States v. Burns*, 1 S.C.R. 283, 353 (2001).

574.    Courts in other countries, even those assuming the lawfulness of a death sentence, have held that "lengthy delay in administering a *lawful* death penalty renders ultimate execution inhuman, degrading, or unusually cruel." *Knight v. Florida*, 120 S. Ct. 459, 462 (1999) (Breyer, J., dissenting from denial of certiorari). Relying in part on international treaties and human rights law, the India Supreme Court commuted fifteen death sentences on the ground that pre-execution delays in the resolution of mercy petitions ranging from five to twelve years[28] constituted cruel and degrading treatment and/or punishment and were inordinate, unreasonable, and amounted to torture. *Shatrughan Chauhan & Anr., v. Union of India & Ors.*, No. 55 of 2013 (India Supreme Court, filed Jan 21, 2014), slip. op. at 31-33, available at http://judis.nic.in/supremecourt/imgs1.

575.    The United States Supreme Court has routinely taken into account the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham v. Florida*, 560 U.S. at 80 (it is appropriate to look "beyond our nation's borders for support for [the] independent conclusion that a particular punishment is cruel and unusual"); *Roper*, 543 U.S. at 575 ("[F]rom the time of the Court's decision in *Trop* [*v. Dulles*], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'").

---

[28] At the time of the filing of this Motion, Mr. Sanchez has been on death row for nearly seven years.

172

**B.      The Capital Punishment Schemes in the United States, Including the Federal Death Penalty Act, Are Unconstitutional Because They Fail to Ensure Reliability, Consistency, and Equal Protection of Law.**

**1.      Reliability.**

576.     The risk of wrongful execution, that is, the execution of an innocent person, attends all death penalty schemes in the United States, including capital sentences imposed pursuant to the Federal Death Penalty Act. There is evidence of at least 156 exonerations in capital cases throughout the nation. Researchers have estimated that nearly one in twenty (4.1%) of those sentenced to death are actually innocent, an unacceptably high error rate given the consequences. Because due process of law protects the innocent, as long as there remains the possibility of exoneration, this right should not be foreclosed.

**2.      Arbitrariness.**

577.     The Eighth Amendment's requirement to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements may ultimately be irreconcilable.

**a.      Failure to narrow the class of eligible offenders.**

578.     The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Thus, to pass constitutional muster, a death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not, and suitably guide the sentencer's discretion. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972); *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

173

579.     In conflict with these clearly established United States Supreme Court mandates, many death penalty statutes, including the Federal Death Penalty Act, were designed to, and do, operate in the precise manner the Supreme Court found violated the Eighth Amendment in *Furman*. Death penalty statutes, including the Federal Death Penalty Act, fail to justify the imposition of a more severe sentence on defendants like Mr. Sanchez against whom the death penalty is sought compared to others found guilty of murder; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants such as Mr. Sanchez for capital prosecution without providing consistent guidelines to ensure reliability.

580.     The Federal Death Penalty Act sets forth sixteen statutory aggravating factors, some of which contain multiple parts. 18 U.S.C. § 3592(c). These include, but are not limited to, felony murder; previous violent felonies involving the use of a firearm; previous conviction of an offense for which a death sentence or life without parole was authorized; previous conviction of other serious offenses; grave risk of death to additional persons; heinous, cruel, or depraved manner of committing offense; financial gain from offense; conviction for two felony drug offenses; conviction for serious federal drug offenses; criminal enterprise involving drug sales to minors; offense against high public official; prior conviction for sexual assault or child molestation; and multiple killings or attempted killings. In addition to these sixteen statutory aggravating factors, the Federal Death Penalty Act permits the fact-finder to consider "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592. As a result of the extraordinary breadth of the statute, individual federal prosecutors are afforded virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness.

174

### 3.      Racial discrimination.

581.     One of the fundamental goals of our criminal system is to ensure that justice is meted out fairly, in accordance with the law, and not on the basis of improper concerns such as race. Applying the death penalty in a discriminatory manner constitutes functional and structural error. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The denial of equal protection is established where a defendant demonstrates that the prosecutorial authorities' selective enforcement decision is deliberately based upon an arbitrary classification, such as race, ethnicity, national origin, or gender. Furthermore, Congress enacted 21 U.S.C. § 848(o) in order to expressly grant capital defendants the "right . . . to justice without discrimination," requiring juries to certify that racial discrimination played no role in the imposition of the death penalty in specific cases.

582.     Statistical evidence shows disproportionate prosecution of people of color under the federal death penalty statute. The prosecution of and imposition of the death sentence against Mr. Sanchez violated his rights under 21 U.S.C. § 848 to "justice without discrimination," and also contributed to "the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

583.     Many studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies consistently reveal, even after accounting for legitimate non-racial case characteristics, that offenders who kill white people have a significantly higher chance of receiving a death sentence than offenders who kill people of other races. *See, e.g.*, U.S. General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990); David C. Baldus & George Woodworth, *Race Discrimination in*

175

*the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research*, 39 Crim. L. Bull, 194, 196, 207-08 (2003).

584.   Some states have invoked the persistence of discrimination as a basis for eliminating or restricting the use of the death penalty. Governor Martin O'Malley of Maryland, a state that repealed the death penalty, flatly declared that the death penalty "cannot be administered without racial bias."[29] Connecticut Governor Dannel P. Mallow, signing repeal legislation, observed that he saw discrimination in the administration of the death penalty.[30] Illinois Governor Pat Quinn, signing repeal legislation, similarly commented that it is impossible to design a death penalty system that is consistent and free from discrimination on the basis of race.[31] And New Mexico Governor Bill Richardson, on approving the abolition of capital punishment, stated, "It bothers me greatly that minorities are overrepresented in the prison population and on death row."[32]

585.   The governors of Colorado, Oregon, Washington, and Pennsylvania have declared moratoria on execution in their states, and each has cited concerns about racial discrimination and equal justice in support of the moratoria.[33]

---

[29] Ian Simpson, *Maryland Becomes Latest U.S. State to Abolish Death Penalty*, Reuters, May 2, 2013, available at http://mobile.reuters.com/article/idUSBRE9410TQ20130502.

[30] Governor Dannel P. Mallow, on Signing Bill to Repeal Capital Punishment (Apr. 25, 2012), available at http://portal.ct.gov/Gov-Malloy-on-Signing-bill-to-repeal-capital-punishment/.

[31] Press Release, Statement from Governor Pat Quinn on Seante Bill 3539 (Mar. 9, 2011), available at
http://www3.illinois.gov/PressReleases/ShowPressRelease.cfm?SubjectID=2&REcNum=9265.
[32] Press Release, Governor Bill Richardson Signs Repeal of the Death Penalty (Mar. 18 2009), available at http://www.eji.org/files/03.19.09%20NM%20Press%20Release.pdf.

[33] http:///www.deathpenaltyinfo.org/documents/COexecutiveorder.pdf; William Yardley, Oregon Governor Says He Will Block Executions, The New York Times, Nov. 22, 2011, http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-

**C.     The Conditions Under Which Mr. Sanchez Is Confined Under Sentence of Death, and the Length of Time Under Which He Will be Confined Prior to Execution, Constitute Conditions of Physical and Psychological Torture and Inhumane Treatment.**

**1.     Physical conditions of confinement.**

586.    The physical and psychological conditions of Mr. Sanchez's lengthy confinement are so dehumanizing, brutal, and severe as to constitute unconstitutional torture.

587.    Mr. Sanchez lives under conditions of extreme isolation in the Special Confinement Unit (SCU) at the United States Penitentiary – Terre Haute (USP-Terre Haute), where he and other federal death row inmates are confined. The amount of time Mr. Sanchez is permitted to be outside his cell is extremely limited, and when he is transported, he is handcuffed behind his back and escorted by guards. Mr. Sanchez is confined to his cell and allowed out of his cell only to go to a small exercise cage in which he exercises alone, use the computer to conduct legal research, and make telephone calls; attend medical appointments and visits, and for limited religious or educational programs. He is not permitted to work. Mr. Sanchez eats his meals in his cell.

588.    Mr. Sanchez is permitted to have only very limited personal property, including a limited number of legal materials, photographs, books, and magazines.

589.    Mr. Sanchez's access to legal resources is restricted. SCU prisoners do not have access to hard-bound legal books or legal treatises, and are able to access only limited legal authority online, and only for a short time each day.

---

kitzhaber.html; Governor Jay Inslee, Remarks Announcing a Capital Punishment Moratorium (Feb. 11, 2014), available at http://www.deathpenaltyinfo.org/documents/InsleeMoratoriumRemarks.pdf; Memorandum, available at https://www.scribd.com/doc/255669059/Governor-Tom-Wolf-Announces-a-Moratorium-on-the-Death-Penalty-in-Pa.

590. Human contact is generally restricted to brief interactions with corrections officers and occasional meetings with attorneys, family, and friends. Mr. Sanchez and other death row prisoners at USP-Terre Haute are shackled during their visits. Inside and outside of his cell, Mr. Sanchez is under the surveillance of correctional officers.

591. The deplorable and inhumane physical conditions under which Mr. Sanchez has been confined are so extreme as to have generated attention and litigation. In 2007 and 2008, the National Prison Project of the American Civil Liberties Union conducted an investigation into conditions of the SCU at USP-Terre Haute and concluded that the conditions "may violate the Eighth Amendment's proscription against cruel and unusual punishment." The National Prison Project's findings included but were not limited to the following:

592. Deficiencies in the medical and psychiatric treatment exacerbated the decrepit and chaotic physical conditions. The medical, dental, and mental health treatment of death row prisoners at USP-Terre Haute was characterized by deliberate indifference to the needs of prisoners, constitutionally inadequate mental health care, denial of access to timely and adequate dental care, and exposure to incessant noise, resulting in sleep deprivation and physiological and psychological distress.

593. The call buttons designed to alert staff to medical emergencies did not function properly, and when they did function, staff failed to respond to them in a timely manner. Prisoners suffering cardiac and diabetic emergencies were made to wait for hours after reporting symptoms to receive medical assistance. Prisoners in the SCU were provided no standardized way to make requests for medical care for acute conditions short of emergencies, and the requests they did make were frequently ignored. Prisoners who suffered serious injuries, including head injuries, were not properly assessed and the medical staff failed to comply with

178

follow-up treatment ordered by physicians at outside hospitals. Other prisoners with diagnosed serious medical conditions were made to endure months without treatment despite the medical staff's recognition that the conditions required immediate medical attention.

594. Preventive medical care was inadequate. Many prisoners were not administered flu shots and routine vaccinations, including measles/mumps/rubella, tetanus, and hepatitis A and B, contrary to Bureau of Prisons policy.

595. Prisoners on death row at USP-Terre Haute lacked access to minimally adequate mental health care. "Evaluations are cursory, programming is unavailable, and the Complex lacks an on-site psychiatrist. Treatment of mentally ill prisoners is minimal." Many prisoners who require psychotropic medications are not prescribed them, and those who are receive their prescriptions following teleconferences with an off-site psychiatrist, and their follow-up care in the same manner. Psychological staff members come to prisoners' cell fronts and ask them to engage in discussions about their mental health symptoms and conditions in the presence of all other staff and prisoners on the unit, so there is no confidentiality. Many prisoners are uncomfortable describing their symptoms under these circumstances.

596. Dental care at USP-Terre Haute was "grossly and dangerously deficient." Prisoners waited for more than 13 months for routine dental care. For those with dental problems, extraction of teeth was frequently the only treatment offered. The prison failed to provide dentures to individuals who lacked teeth or had teeth extracted and had difficulty eating.

597. The lack of adequate medical and mental care has resulted in several inmates abandoning their death penalty appeals.

598. A prisoner in the SCU sued medical and correctional staff at USP-Terre Haute, claiming that the staff demonstrated deliberate indifference to his medical needs when they failed

179

to approve surgery for pterygia, a condition that adversely affected the prisoner's vision, despite his repeated requests for the surgery, for a period of five years. Following denial of relief on summary judgment by the federal district court, the Court of Appeals for the Seventh Circuit ruled that the prisoner had demonstrated a genuine issue of material fact whether the doctor who had denied the surgery was deliberately indifferent to the prisoner's medical needs. *Ortiz v. Bezy*, 281 Fed.Appx. 594 (2008) (unpublished).

599.    Death row at USP-Terre Haute is also an intensely loud environment, a circumstance with adverse physiological and psychological consequences. The National Prison Project found that prisoners in the SCU at USP-Terre Haute were subjected to "extreme, unbearable noise at all hours of day and night." The noise emanated from prisoners in the Secure Housing Unit (SHU) located immediately below the SCU, who screamed, banged, and pounded on walls, as well as from frequent fire alarms, which were also accompanied by strobe lights.

> **2.    The psychologically torturous nature of the prolonged confinement under the conditions detailed above while under a sentence of death constitutes a violation of the Eighth Amendment ban on cruel and unusual punishment.**

600.    The effect on Mr. Sanchez caused by the medieval conditions of confinement experienced by those housed at USP-Terre Haute is profoundly heightened by years of uncertainty.

601.    The United States Supreme Court has in the past recognized the cruelty of a prolonged imprisonment under sentence of death and the torment suffered by those who must endure periods of uncertainty. *See In re Medley*, 134 U.S. 160, 172 (1890) (recognizing "terror" and "immense mental anxiety" of living under sentence of death as "a great increase of the offender's punishment"); *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari) (acknowledging that execution after prolonged incarceration implicates the

180

Eighth Amendment and questioning whether state interests in deterrence and retribution are properly satisfied by such execution). The stress associated with not knowing when a prisoner will be executed exacts an immeasurable toll on that prisoner's mental health.

### D.      Method of Execution.

602.      Eighth Amendment concerns about the method of execution employed by the federal government causing constitutionally unacceptable levels of suffering have prompted litigation that is still pending. In 2005, several federal death row prisoners filed a lawsuit against the federal government alleging that the federal government's lethal injection protocol violated the due process clause of the Fifth Amendment, the right to be free from cruel and unusual punishment under the Eighth Amendment, and provisions of the federal Administrative Procedure Act, 5 U.S.C. § 551 et seq. (APA). *Roane et al. v. Gonzales et al.*, Case No. 1:05-cv-02337-RWR-DAR. The case survived the defendants' motion for summary judgment and is still pending adjudication.

603.      The knowledge that the three drug protocol devised and actually implemented by the government to execute prisoners demonstrated a substantial risk of extreme pain has and will continue to be a direct and proximate cause of Mr. Sanchez's extreme distress, anxiety, and fear regarding an impending execution.

604.      Since the filing of the lethal injection lawsuit, at least one of the drugs designated to be used in the lethal injection cocktail has become unavailable, and the government has not yet completed the process of determining what drug combination will be used instead. *Roane et al. v. Leonhart et al.*, 741 F.3d 147, 150 (D.C. Cir. 2014) (noting that the government "has merely suspended executions using the three-drug cocktail called for by the current protocol and has not yet issued a new protocol"). This has been the status since 2011. As a result, Mr. Sanchez

181

has been confined under sentence of death for years without having any idea what method of execution will be imposed upon him in the event that he is actually executed.

605. Furthermore, Mr. Sanchez and the other prisoners under sentence of death following federal prosecutions have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the federal government will select. *See, e.g.*, The Capital Punishment Enforcement Act (to be codified as amended at Tenn. Code Ann. § 40-23-114 (May 22, 2014)) (Tennessee capital punishment statute recently amended to provide that if the correctional department commissioner certifies to the governor that "an essential ingredient" for lethal injection executions is unavailable, the mandatory method for carrying out the execution is by electrocution). Mr. Sanchez further is constantly exposed to the continuing, realistic fear that whichever method the government selects will not comport with constitutional requirements. *See, e.g.*, Mot. for TRO and TRO, *Taylor v. Apothecary Shoppe, LLC.*, No. 14-CV-063-TCK-TLW, (N.D. Ok. Feb. 11 and 12, 2014); ECF Nos. 3 and 8 (describing effect that uncertainty about whether drugs to be used in an execution are defective and therefore might cause significant pain and suffering upon administration has on the psychological state of a prisoner facing execution–and issuing temporary restraining order preventing delivery of compounded pentobarbital to department of corrections for use in execution).

### E.     Conclusion.

606. The arbitrariness, lack of valid penological purpose, delay, and torturous conditions of and under which Mr. Sanchez is serving a sentence of death render that sentence excessive under currently prevailing and evolving standards of decency under the federal Constitution, as well as international law. Accordingly, Mr. Sanchez's death sentence should be set aside.

**X. THE SECURITY MEASURES USED BY THE COURT DURING TRIAL DENIED MR. SANCHEZ HIS RIGHTS TO A JURY TRIAL, TO THE PRESUMPTION OF INNOCENCE, TO DUE PROCESS, TO THE EFFECTIVE ASSISTANCE OF COUNSEL, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.**

607. Mr. Sanchez incorporates all allegations set forth elsewhere in this pleading in support of this claim.

608. The Court put in place excessive security measures. These security measures interfered with Mr. Sanchez's right to counsel and to a full and fair trial. They also impacted the jury, who were led to believe that Mr. Sanchez was an extraordinarily dangerous person – without competent evidence of such and where Mr. Sanchez's alleged dangerousness was at the core of the issues the jury would resolve. This, in turn, tainted both the guilt and penalty verdicts. To the extent that counsel knew about some of these measures and failed to fully object and challenge the evidence, counsel were ineffective. Ultimately, Mr. Sanchez's right to fully confront this evidence was compromised.

609. The Court *sua sponte* set in place various security measures, including partial sequestration of the jury. The jurors assembled at offsite locations each day and were then transported to the courthouse together by the United States Marshal's Service under very tight security. Dkt. 584; Tr. 12/17/08, 80-81. Upon arrival at the courthouse, they were ushered inside -- also under very tight security -- and were able to see uniformed and armed law enforcement personnel in many areas in and around the courthouse. In addition to the metal detector in the lobby, there was a second metal detector placed outside the courtroom, and people coming into and out of the courtroom were required to sign in. Tr. 12/17/08, 80-81.

610. These unwarranted measures were put in place without the Court explaining the necessity for the additional security measures or giving Mr. Sanchez an opportunity to challenge the bases for the Court's determination at a hearing. Indeed, there were no specific allegations

183

that Mr. Sanchez, either personally or through third parties, had harmed or threatened to harm potential witnesses.

611. The Court also put in place unwarranted security measures during the testimony of Kevin Vetere. Prior to Mr. Vetere's testimony, the Court brought to counsel's attention that at least one additional marshal would accompany Mr. Vetere into the courtroom and questioned whether a break would be needed to prevent "any extraordinary show of force … [from] happen[ing] in front of the jury." Tr. 5279. During a subsequent sidebar, the Court advised counsel it had been told two marshals would accompany Mr. Vetere when he walked in and that the Court had been asked if the jury should be present. Tr. 5408.  The Court did not "think two Marshals walking in was such a big deal." *Id.* In addition to having at least two marshals accompany him, Mr. Vetere also wore a jacket that looked similar to a U.S. Marshal's jacket to cover a bulletproof vest he was provided. Counsel did not object to the additional security measures for this witness. Such security unreasonably heightened the perception Mr. Vetere was in danger from Mr. Sanchez and the other defendants because of his testimony and heightened the jurors' perception of Mr. Sanchez's dangerousness.

612. Such drastic security measures likely had a powerful effect on the jurors' view of Mr. Sanchez and their analysis of the evidence – particularly during the penalty phase. The Court's implementation of these enhanced security measures lent credence to the evidence and argument presented throughout the trial that Mr. Sanchez was a violent criminal. *See* Tr. 7437 (describing Mr. Sanchez as a "thug enforcer"); Tr. 7180 (stating that Mr. Sanchez was "willing to use weapons and reap violence"); Tr. 9507-08 (stating that Mr. Sanchez "made conscious choices . . . to pursue a life a crime, a life of violence, unrepentant violence"). The measures, including the daily segregated transport, also increased the likelihood for improper

184

communications and related misconduct by the members of the jury. Mr. Sanchez's Fifth, Sixth, and Eighth Amendment rights were violated.

613.    To the extent that trial counsel failed to object and fully litigate these issues, counsel were ineffective. Mr. Sanchez was prejudiced by counsel's deficient performance as there is a reasonable probability that the enhanced security measures had a profound impact on the jurors and affected their ability to fairly consider the evidence at guilt and penalty.

## XI.    MR. SANCHEZ IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL AND STATUTORY VIOLATIONS DESCRIBED IN THIS MOTION.

614.    Mr. Sanchez incorporates all allegations set forth elsewhere in this pleading in support of this claim.

615.    Each of the claims of constitutional and statutory error set forth above stands on its own and independently requires relief. Together, the errors set forth in this Motion committed by trial counsel, the jury, state actors, and the Court, combined with the errors set forth in Mr. Sanchez's direct appeal, rendered Mr. Sanchez's trial fundamentally unfair, the resulting guilt and penalty verdicts and judgment unreliable, and his death sentences unlawful. U.S. Const. amends V, VI, VIII, XIV.

616.    This Court is obliged under the federal constitution to conduct a cumulative error and cumulative prejudice analysis. Moreover, the Eighth Amendment requirement of heightened reliability in cases in which the penalty is death imposes a special duty on the Court to examine the complete record to determine whether a capitally charged defendant received a fair trial.

617.    The Court's obligation encompasses the consideration of individual errors that the Court may deem harmless (and therefore not reversible when considered alone), and to assess whether the cumulative effect of those errors on the outcome of the trial is such that collectively they can no longer be regarded as harmless.

618.    Because the errors presented to this Court in this Motion and in his direct appeal individually and cumulatively had a substantial and injurious effect on the jury's deliberations of guilt and penalty, and the verdicts rendered at Mr. Sanchez's trial, Mr. Sanchez is entitled to habeas corpus relief.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Sanchez prays that this Court:

619.    Permit him to file this motion and allow him reasonable time to file any appropriate amendments, an appendix with documents supporting his motion, and a memorandum of law in support of his motion;

620.    Permit the government to file an answer and allow Mr. Sanchez reasonable time to file a reply, to amend the motion, if warranted, and to file such legal memoranda and briefs as may be necessary to respond or reply to any defenses raised and/or motions filed by the government;

621.    Order such discovery as Mr. Sanchez may request by separate motion;

622.    Conduct an evidentiary hearing after the completion of discovery, as Mr. Sanchez will request by separate motion;

623.    Permit further amendment to and briefing of the motion if the fact-development procedures so warrant, and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments thereto, after discovery is complete and an evidentiary hearing is conducted;

624.    Vacate Mr. Sanchez's convictions and death sentences and order a new trial of the guilt-innocence and penalty phases, if permitted under the Eighth Amendment; and

186

625.    Grant such additional relief as may be necessary and to which Mr. Sanchez may

be entitled.

Respectfully submitted,


/s/ Matthew C. Lawry
**Matthew C. Lawry**
**Aren Adjoian**
Federal Community Defender Office
 for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone:  (215) 928-0520
Fax:  (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

*Counsel for Ricardo Sanchez, Jr.*

Dated:  May 3, 2016

187

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of May, 2016, I electronically filed the foregoing

Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, and served it on

the following individuals by first-class United States mail, postage prepaid.

Diana Margarita Acosta
United States Attorney's Office
101 South U.S. Hwy 1, Suite 3100
Fort Pierce, FL 34950
Phone: (772) 293-0981
Fax: (772) 466-1020
diana.acosta@usdoj.gov
Counsel for the United States


Stephen Carlton
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 820-8711
Fax: (561) 659-4526
stephen.carlton@usdoj.gov
Counsel for the United States


Evelio J. Yera
United States Attorney's Office
99 NE 4 Street
Miami, FL 33132
Phone: (561) 209-1052
Fax: (561) 536-7214
e.j.yera@usdoj.gov
Counsel for the United States


/s/ Matthew C. Lawry
Matthew C. Lawry

188