# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CIVIL NO. 9:16-CV-80693-RNS

| | | |
|---|---|---|
| **RICARDO SANCHEZ, JR.,** | **:** | |
| **Movant** | **:** | |
| | **:** | |
| **v.** | **:** | **THIS IS A CAPITAL CASE** |
| | **:** | |
| **UNITED STATES OF AMERICA,** | **:** | |
| **Respondent** | **:** | |

## RICARDO SANCHEZ'S MOTION
## FOR DISCOVERY AND CONSOLIDATED
## MEMORANDUM OF LAW

Matthew C. Lawry
Aren Adjoian
Federal Community Defender Office
 for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 928-0520
Fax: (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

Counsel for Ricardo Sanchez, Jr.

Dated:  September 12, 2016

Ricardo Sanchez hereby moves for discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the Due Process Clause of the Fifth Amendment, and the Eighth Amendment.  Mr. Sanchez previously sought discovery informally. *See* Letter from Aren Adjoian to Stephen Carlton (attached as Ex. A).  Respondent provided some discovery informally, but did not provide most of the requested discovery.  *See* Letter of Steve Carlton to Matthew Lawry (July 20, 2016) (attached as Ex. B); Letter of Steve Carlton to all counsel (August 31, 2016) (attached as Ex. C).  Mr. Sanchez requests that the government be ordered to turn over any and all responsive information in its actual or constructive possession.

In response to several of Mr. Sanchez's requests, Respondent indicated that the United States Attorney's Office ("USAO") does not have, or is still searching for, responsive documents.  *See, e.g.*, Ex. B at 2 (Dr. Brannon's records); *id.* at 3 (United States Marshal's Service records); *id.* at 14 (Bureau of Prisons records).  Mr. Sanchez includes herein some of these requests in order to formalize them and to seek permission to obtain such information in the possession of third parties, or should such information be discovered in the future.  As discussed below, Mr. Sanchez submits that Respondent has at least constructive possession of records maintained by other government agencies involved in the case, and should be ordered to provide such documents.  For documents determined not to be in Respondent's actual or constructive possession, Mr. Sanchez requests that third party discovery be ordered.

### Standards Governing Discovery

Mr. Sanchez's discovery requests are governed by Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts.  Rule 6 states: "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or

Civil Procedure, or in accordance with the practices and principles of law."  A post-conviction petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)); *Bowers v. United States Parole Comm'n, Warden*, 760 F.3d 1177, 1183 (11th Cir. 2014) ("'Good cause is demonstrated where specific allegations show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.'") (quoting *Arthur v. Allen*, 459 F.3d 1310, 1310-11 (11th Cir. 2006)).

When a petitioner establishes good cause, discovery must be allowed.  The United States Supreme Court has explained that "[t]he very nature of the writ [of habeas corpus] demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."  *Harris*, 394 U.S. at 291; *see Isaacs v. Head*, 300 F.3d 1232, 1248 (11th Cir. 2002) ("'it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry.'") (quoting *Bracy*, 520 U.S. at 909).[1] Since the purpose of post-conviction discovery "is to ensure that the facts underlying a [habeas] claim are adequately developed," a court must allow discovery whenever "a petitioner has

---

[1] *Accord Bowers*, 760 F.3d at 1184-85 (where petitioner presented allegations that "are more than 'mere speculation," he was entitled to discovery); *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996) (Rule 6's "history makes clear that its purpose is to ensure that the facts underlying a habeas corpus claim are adequately developed, and that it is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief."  Accordingly, "a court may not deny a habeas corpus petitioner's motion for leave to conduct discovery if there is a sound basis for concluding that the requested discovery might allow him to demonstrate that he has been confined illegally."); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim.").

provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." *Johnston*, 165 F.R.D. at 445.

Accordingly, a court may not deny a petitioner's discovery motion "if there is a sound basis for concluding that the requested discovery might allow him to demonstrate" his entitlement to relief. *Id.* This is never more so than in the context of a capital case, where the unique finality and irreversibility of the sentence require heightened procedural safeguards. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case").

Mr. Sanchez moves for discovery of all such materials in the actual or constructive possession of the United States Attorney's Office (USAO), which includes materials in the possession of both the USAO and any government agency, including correctional and law enforcement agencies, involved in this case. *See* Ex. A at 3. Such materials are properly the subject of a discovery request. *See Rice v. Black*, 112 F.R.D. 620, 625-26 (D. Neb. 1986) (granting discovery relating to FBI analysis of evidence); *cf. United States v. Scruggs*, 583 F.2d 238, 242 (5th Cir. 1978)[1] (requiring discovery under Rule 16(b) of the Federal Rules of Criminal Procedure of materials in possession of a governmental investigatory agency connected with the prosecutor); *United States v. Antone*, 603 F.2d 566, 569 (5th Cir. 1979) (declining "to draw a distinction between different agencies under the same government, focusing instead upon the 'prosecution team' which includes both investigative and prosecutorial personnel").

To the extent that this Court concludes that the USAO does not have actual or constructive possession of any of the materials requested herein, Mr. Sanchez requests that the

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

Court issue an order granting third party discovery.  *See, e.g.*, *Tracfone Wireless Inc. v. Adams*, 304 F.R.D. 672, 674 (S.D. Fla 2015) (granting plaintiff permission to serve subpoenas on third parties that it reasonably believes may have information relating to the case); *Jeld-Wen, Inc. v. Nebula Glasslam Intern., Inc.*, 248 F.R.D. 632, 635 (S.D. Fla. 2008) (indicating that the court had authorized formal and informal third-party discovery).

**Discovery Requests**

### 1. Documents pertaining to Claim I

Mr. Sanchez alleges that his constitutional and statutory rights were violated when jurors provided incomplete, inaccurate, and/or dishonest information in their questionnaires and during voir dire.  Claim I identifies five jurors who understated, misrepresented, and/or failed to disclose information regarding their family members' criminal histories, including drug and firearm offenses.  Pet'n, ECF No. 16-1, ¶¶ 23-39.  One of those jurors failed to disclose his son's pending prosecution on drug counts in Miami-Dade County.  *Id*. ¶¶ 23-27.  Another juror apparently failed to disclose her family member's former employment as a state prosecutor.  *Id*. ¶¶ 28-29.  An alternate juror misrepresented her own history as a convicted felon and cooperating prosecution witness.  *Id*. ¶¶ 35-36.  Claim I further alleges that, to the extent the prosecution suppressed evidence implicating the accuracy and completeness of the information provided by venire persons, the government violated due process.  *Id*. ¶ 50.

The government has unique access to and knowledge about the information at issue – criminal histories and prosecutorial employment.  *See United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) (federal prosecutor had knowledge, for purposes of disclosure requirements, of the criminal record of an adverse witness).  The trial transcript establishes that government agents ran driver's license searches, National Crime Information Center ("NCIC") searches,

4

and/or other background searches on members of the jury venire.[2]  *See* Tr. 1266-67.  In order to establish a complete and accurate record regarding the information that was sought from the jury venire, and to determine whether the government failed to disclose any such information, Mr. Sanchez requests the following discovery:

a. Records, reports, correspondence, notes, and/or information concerning or referencing the criminal history and driver's license history of any seated juror, alternate juror, or family member thereof;

b. Records, reports, correspondence, notes, and/or information concerning or referencing the former or current employment by a prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof;

c. Records, reports, correspondence, notes, and/or information concerning or referencing the witnessing of a crime by any seated juror, alternate juror, or family member thereof; and

d. Records, reports, correspondence, notes, and/or information concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the jury venire.

Mr. Sanchez further requests that the Court authorize the issuance of a subpoena to the following pre-trial diversionary program for records and documents from 2008 and 2009 stemming from the prosecution of David Andrew Sollenberger (the son of juror Mark Sollenberger), who participated in this diversionary program (during the trial in this case) following his arrest on multiple drug charges in December 2008:

> The Advocate Program, Central Office
> 1399 NW 17th Ave., 2nd Floor
> Miami, FL 33125.

### 2. Documents pertaining to Claim III

Claim III alleges that Mr. Sanchez is ineligible for the death penalty because he is intellectually disabled.  Pet'n, ¶¶ 83-131.  Materials relevant to this claim are likely to be in the

---

[2] Undersigned counsel has searched prior counsel's records but has been unable to find copies of any such records that the government may have been disclosed before or during trial.

actual or constructive possession of the government.  Mr. Sanchez was held in government custody during his incarceration both prior to and during his capital trial.  He was housed in both state and federal jail facilities and was in the custody of the United States Marshal's Service during the transport to and from and during court proceedings.  Materials generated by correctional and custodial officers, by prosecutors, and by experts consulting with the prosecution regarding Mr. Sanchez's cognitive, intellectual, and adaptive functioning while in custody and during trial proceedings are relevant to the allegations in the § 2255 motion that Mr. Sanchez has deficits in intellectual functioning; deficits in adaptive functioning; and onset of intellectual and adaptive deficits during the developmental period.  Mr. Sanchez requests the following discovery:

a. Documentation of statements made by Mr. Sanchez;

b. Documents relating to observations of Mr. Sanchez's cognitive, intellectual, and adaptive functioning;

c. Medical and/or mental health records relating to evaluation or treatment of Mr. Sanchez;

d. Records of psychological testing of Mr. Sanchez;

e. Employment records;

f. Educational records;

g. Correctional records; and

h. Records of surveillance or monitoring of Mr. Sanchez.

### 3. Documents pertaining to Claim IV

Claim IV alleges that Mr. Sanchez was incompetent to stand trial, as a result of his impairments in intellectual functioning, neuropsychological impairments, and psychiatric symptoms that he suffered at the time of trial.  Pet'n, ¶¶ 142-81.

Mr. Sanchez seeks materials in the government's actual or constructive possession that will enable him to develop the facts in support of the claim that he was incompetent to stand

trial.  Mr. Sanchez was held in government custody and control during his incarceration prior to his capital trial as well as during the trial itself, and he was observed by government and prosecutorial actors during court proceedings.  These individuals had the opportunity to observe Mr. Sanchez's behavior and his interactions with others while in custody, during transport to and from court, and while in the courtroom itself.  Custodial personnel were tasked with monitoring and recording Mr. Sanchez's behavior.  Prosecutors and/or personnel with the United States Marshal's Service may have present during court proceedings during which accommodations for Mr. Sanchez's disabilities were discussed.  Mr. Sanchez requests the following discovery:

a.    Documentation of observations by law enforcement, prosecutorial, custodial, and correctional officers about Mr. Sanchez's behavior, functioning, and understanding in the courtroom; and

b.    Information regarding discussions about or efforts made to provide accommodations to Mr. Sanchez in custodial settings and/or in the courtroom.

### 4.    Documents Pertaining to Claim VI

Mr. Sanchez has alleged in Claim VI that the government violated its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by failing to disclose favorable evidence to the defense that was material to the guilt and/or penalty phases of Mr. Sanchez's trial.  Mr. Sanchez has included several sub-sections in this claim.  First, Mr. Sanchez has alleged that the government failed to disclose material exculpatory information regarding Danny Varela.  Pet'n, ¶¶ 214-36.  At trial, the government repeatedly claimed that it did not prosecute Mr. Varela for the murders of the Escobedos because it could not secure enough evidence against him to do so.  *Id.*  This explanation is belied by Mr. Varela's clear co-conspirator liability as part of both the drug and carjacking conspiracies.  *Id.*  Information that some other consideration influenced the government's decision not to charge Mr. Varela with murder (let alone seek the death penalty against him) is potentially mitigating as to Mr. Sanchez.

7

As a result, Mr. Sanchez has demonstrated good cause for discovery establishing the strength of the government's evidence against Mr. Varela and any other motivation the government may have had for not charging Mr. Varela with murder.

Second, the government failed to disclose material exculpatory information regarding potential third party guilt, including information regarding Yessica Escobedo's cell phone. *Id.* at ¶¶ 237-39. As set forth in Claims VI and VII, it is unclear whether Yessica Escobedo's cell phone traveled to Texas at some point on the evening of October 12. To the extent this happened, it would potentially indicate third-party guilt, as Mr. Sanchez never traveled to Texas that evening. Mr. Sanchez has thus demonstrated good cause for discovery of any information the government may have suggesting that the phone traveled to Texas.

Third, the government failed to disclose material favorable information regarding the alleged drug deal in Daytona Beach. *Id.* at ¶¶ 240-43. While the government's trial theory was that the Escobedo family was murdered as part of a drug robbery that took place following a large-scale drug deal in Daytona Beach, little to no actual evidence of this deal was presented at trial. *Id.* As noted in Claim VI, either the deal did happen, in which case one or more people in Daytona Beach involved in large scale drug trafficking had the means, motive, and opportunity to attack the Escobedos, or it did not happen, in which case the government's trial theory would be undercut. Mr. Sanchez has demonstrated good cause for discovery of any information the government has regarding the drug deal.

Fourth, the government failed to disclose material exculpatory information regarding the security booth at the Briar Bay neighborhood. *Id.* at ¶¶ 244-48. Two key witnesses—Kevin Vetere and David Doran—testified that Mr. Sanchez and Mr. Troya returned to the Garden Court house shortly after the murders in Mr. Varela's van and the Escobedos' Jeep. *Id.* at ¶ 244.

8

Special Agent David Weeks testified that he viewed video footage from the Briar Bay security gate covering the time period during which Mr. Sanchez and Mr. Troya would have returned to the neighborhood, according to Vetere and Doran. *Id.* at ¶¶ 246. Agent Weeks testified that nothing on the video footage he reviewed was "relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th, 2006." Tr. 6975. But if the video footage shows the entry gate and neither the Jeep nor the van appeared in it, then the footage would most certainly be "relevant"; indeed, it would directly contradict Vetere's and Doran's testimony and be highly exculpatory. Mr. Sanchez has demonstrated good cause for discovery of this video footage.

Fifth, the government failed to disclose favorable information regarding benefits provided to witness Kevin Vetere. *Id.* at ¶¶ 249-52. As noted in Claim VI, Mr. Vetere received an extreme sentence reduction that resulted in a sentence for a fraction of the criminal conduct for which he could be charged. *Id.* at ¶ 251. Despite this, Vetere testified at trial that he had a mere "hope" of a sentence reduction for his substantial cooperation. *Id.* at ¶ 250. Mr. Vetere met extensively with the government and provided lengthy testimony. There is ample reason to believe that he had more than mere hope of favorable treatment. Mr. Sanchez has demonstrated good cause for discovery of any promises, agreements, or benefits provided to Vetere.

Sixth, the government failed to disclose material exculpatory information regarding Mr. Sanchez's lessened culpability for the murders. *Id.* at ¶ 253. The government provided one *Brady* notice at trial indicating that Juan Gutierrez stated that, while Mr. Sanchez was present when the killings occurred, Mr. Troya was responsible for all of the shooting. Ex. B at 6. Any such additional and/or corroborating evidence would, at a minimum, be mitigating as to Mr.

9

Sanchez. He has thus provided good cause for discovery of any further information the government possesses in this regard.

Because Mr. Sanchez has established good cause to conduct discovery with respect to the various aspects of his *Brady* claim, Mr. Sanchez requests that the government provide any of the following information that is in its actual or constructive possession:

a.   Documents that expand on or contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to: any cooperation agreement between Mr. Varela and the government; documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible;

b.   Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;

c.   Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;

d.   Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12th or 13th, 2006;

e.   Documents that reveal the identity of the individual or individuals with whom the Escobedos allegedly conducted a drug deal in the Daytona Beach area on the night/morning of October 12th/13th and documents that provide information as to the details, nature, and scope of this drug deal;

f.   Documents that contain or reference video footage of the area around the Briar Bay security booth;

g.   Documents that contain information that Kevin Vetere expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement; and

h.   Documents that contain information that Mr. Sanchez did not fire a weapon on October 13, 2006 and/or had a lesser role in the murders.

10

### 5. Documents Pertaining to Claim VII.A

Claim VII.A alleges that trial counsel failed to investigate, research or challenge the process whereby jury venires in the West Palm Beach Division of the Southern District of Florida underrepresented racial and ethnic minorities. Pet'n, ¶¶ 257-80. The West Palm Beach Division of the Southern District of Florida is comprised of a single county: Palm Beach County. Relying on the data reported by the district court clerk on the AO 12/JS 12 forms and census data for Palm Beach County, Mr. Sanchez alleges that Hispanics and African Americans were significantly underrepresented on the venires at the time the petit jury was drawn, and that such underrepresentation was systematic.

The claim specifically alleges that there was an absolute disparity of 4.74-11.3% and a comparative disparity of 38.10-59.47% between the jury wheel sample and the Hispanic population and that there was an absolute disparity of 1.4-4.9% and a comparative disparity of 10.1-28.4% between the jury wheel sample and the African-American population. *Id.* ¶¶ 272, 275. Mr. Sanchez also alleges that the population data on the AO 12/JS 12 forms consistently underreported the population of Hispanics and African Americans in Palm Beach County. *Id.* ¶¶ 270-71, 273-74, 278-79. In order to prove his entitlement to relief on this claim, Mr. Sanchez requests that the Court order the Clerk for the West Palm Beach Division of the United States District Court for the Southern District of Florida the following information regarding the West Palm Beach Division's practices and procedures for jury selection:

a. Documents concerning or referencing the jury selection process in this case;

b. A copy of the Plan for the Random Selection of Grand and Petit Jurors of the United States District Court for the Southern District of Florida approved on January 31, 1997, June 14, 2002, and January 31, 2007;

c. Documents concerning or referencing the manner in which the master jury wheel and summons database were generated, including the sources of the information contained in

the database, how often and when the wheel and database were updated, amended, or checked for completeness and accuracy from 2005 through 2010;

d.      Documents concerning or referencing the expansion of sources of information for the master jury wheel or summons database from 2005 through 2010;

e.      Documents concerning or referencing any policy for approved excuses in advance of a summons date and the excusal of prospective jurors on the day of service from 2005 through 2010;

f.      Documents concerning or referencing any policy or procedure regarding prospective jurors who failed to respond to the initial and/or subsequent summons or questionnaire from 2005 through 2010;

g.      Documents concerning or referencing any policy or procedure regarding summoned jurors who fail to appear for jury service from 2005 through 2010;

h.      Documents regarding racial, ethnic, or gender demographics within Palm Beach County from 2005 through 2010;

i.      Documents regarding the total number and racial, ethnic, or gender demographics of registered voters within Palm Beach County from 2005 through 2010.

### 6.      Documents pertaining to Claim VII.B

Mr. Sanchez alleges that the toolmark evidence presented at trial was unreliable.  Mr. Sanchez further alleges that trial counsel was ineffective for failing to challenge the government's evidence and to present the testimony of an independent expert. Pet'n,¶¶ 281-94. At trial, toolmark examiner Alison Quereau opined that the AK-47 firearm collected from 6548 Garden Court fired the projectiles and casings collected at 1901 Mercer Avenue and 1305 Suwanee Drive. *Id.* ¶ 284.  Mark Chapman, another toolmark examiner, compared and matched spent casings collected from the crime scene to live cartridges collected from the Garden Court residence. *Id.* ¶¶ 285-86.

Mr. Sanchez thus far has only been provided the conclusions of Ms. Quereau and Mr. Chapman; no underlying data has been supplied.  Mr. Sanchez has retained a toolmark expert to review the findings of Ms. Quereau and Mr. Chapman and thus seeks discovery of materials in the actual or constructive possession of the prosecution in order to perform a comprehensive

12

evaluation of the opinions presented at trial.  These include any interim or amended reports, correspondence concerning the examination of casings and projectiles collected, any bench notes, and access by defense experts to the physical evidence collected from Garden Court, Mercer Avenue, and Suwannee Drive.  Specifically, Mr. Sanchez requests:

a.     Any and all documents, including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court;

b.     Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;

c.     Documents containing internal written policies and standards for toolmark comparisons and guidelines for rendering an opinion;

d.     Any and all photomicrographs of the comparison subjects;

e.     Diagrams or photographs of subject evidence at all stages of collection and testing;

f.     Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;

g.     Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;

h.     Laboratory quality manuals (however named) in effect at the time the subject work was performed;

i.     Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;

j.     Internal and external audit reports generated or received by the laboratories;

k.     For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for toolmark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate);

l.      Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court.

### 7.      Discovery pertaining to Claim VII.C

At trial, the government claimed that cellular records showed the movements of the defendants and the Escobedos on October 12 and October 13, 2006.  Mr. Sanchez alleges that trial counsel was ineffective for failing to challenge the accuracy of these cellular records.  Mr. Sanchez also alleges, to the extent trial counsel intended to argue that the cellular phone belonging to Yessica Escobedo traveled from Florida to Texas, that counsel failed to investigate and obtain evidence to support these allegations.  Pet'n, ¶¶ 296-304.  The government subpoenaed cellular records from the network providers and has exclusive access to any undisclosed information generated during its investigation.  Mr. Sanchez specifically requests:

a.      Any and all notes, documents, manuals, memoranda, reports, or other information concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida;

b.      System information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006; and

c.      Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.

### 8.      Documents pertaining to Claim VIII

Claim VIII alleges that Mr. Sanchez was deprived of his right to the effective assistance of counsel at the penalty phase of his trial, because trial counsel failed to conduct an adequate investigation of Mr. Sanchez's personal and psychosocial history and background; develop and present evidence of his mental health impairments and the effects of those impairments on his behavior and functioning; and challenge the evidence presented against him in aggravation.  Pet'n, ¶¶ 330-551.

14

Mr. Sanchez seeks discovery of materials in the actual or constructive possession of the prosecution that are relevant to Mr. Sanchez's background and functioning and to the evidence of other crimes that was presented in aggravation, but that trial counsel failed to request at the time of trial.  Many of these documents were generated and maintained by law enforcement agencies, and were more readily available to the prosecution than to trial counsel.  These include documents pertaining to the arrests of Mr. Sanchez's father, Ricardo Sanchez, Sr., and to the investigation of the crimes for which he was arrested; documents relating to the law enforcement investigation of the sexual abuse of Mr. Sanchez's older brother Efrain by a neighbor; and records pertaining to the law enforcement investigation of criminal activity and hate crimes in Dyson Circle and Fruity Acres, the neighborhoods in which Mr. Sanchez spent his childhood.  In his § 2255 motion, Mr. Sanchez has made "specific allegations [that] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bowers*, 760 F.3d at 1183.  He has thus established good cause for discovery.  Mr. Sanchez requests the following discovery:

a.      Documents relating to any police contact with, or arrest, guilty pleas, trial, conviction, and sentence incurred by Ricardo Sanchez, Sr., Mr. Sanchez's father, between January 1980 and October 2006;

b.      Documents relating to the investigation of crimes occurring in Dyson Circle, West Palm Beach, between 1983 and 1994, when Mr. Sanchez lived there as a child;

c.      Documents relating to the investigation of charges of sexual abuse of Mr. Sanchez's brother Efrain Sanchez by a neighbor on Coconut Grove, West Palm Beach;

d.      Documents relating to investigations of racially motivated disturbances or hate crimes in the Fruity Acres neighborhood of West Palm Beach, between 1993 and 2003, when Mr. Sanchez was living there;

e.      Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.

15

### 9.    Documents pertaining to Claim IX

Claim IX alleges that Mr. Sanchez's death sentence was imposed in violation of the Eighth Amendment because it is inconsistent with evolving standards of decency, serves no valid penological purpose, and is torturous.  In particular, Claim IX alleges that the death sentence was obtained through an arbitrary process that failed to limit the death penalty to the worst offenders and promoted discrimination on the basis of race, and that the conditions under which he is confined are torturous and inhumane.  As set forth in the § 2255 motion, multiple studies have demonstrated that the death penalty is imposed overwhelmingly upon men of color, particularly in cases in which the victim is white.

The materials Mr. Sanchez seeks in discovery are exclusively within the control of the federal government, including materials setting forth the criteria used in determining which cases to prosecute capitally and whether or not to reject a settlement or to overrule an Assistant United States Attorney's recommendation not to seek the death penalty.  In this case, the recommendation of the Assistant United States Attorneys responsible for prosecuting Mr. Sanchez to agree to a life sentence rather than to pursue the death penalty, based at least in part upon the relative culpability of Mr. Sanchez in the crimes and his intellectual impairments, was rejected by the Attorney General of the United States.  There is therefore "a sound basis for concluding that the requested discovery might allow him to demonstrate" his entitlement to relief.  *Johnston*, 165 F.R.D. at 445.

Mr. Sanchez is housed on death row at the United States Penitentiary – Terre Haute.  As set forth in the § 2255 motion, the conditions on the Special Confinement Unit on which he is housed have been the subject of civil rights complaints and lawsuits.  Mr. Sanchez seeks information within the control of the federal government with regard to the conditions under

which he has lived and will continue to live during his confinement in order to adequately develop this claim for relief.  Mr. Sanchez requests the following discovery:

a.    Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;

b.    Documents relating to the United States Attorneys' agreement not to seek the death penalty against Mr. Sanchez and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him;

c.    Documents relating to the conditions of confinement on federal death row at United States Penitentiary – Terre Haute, including but not limited to interim and final reports of investigations into the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.

### 10.    Discovery pertaining to Claim X

Mr. Sanchez alleges that the Court put in place excessive security measures, including partial sequestration of the jury, and that these measures interfered with his right to counsel and to a full and fair trial.  Pet'n, ¶¶ 607-13.  The jurors assembled at offsite locations each day and were then transported to the courthouse together by the United States Marshal's Service under very tight security.  Tr. 12/17/08, 80-81.  In addition to the metal detector in the lobby, there was a second metal detector placed outside the courtroom, and persons coming into and out of the courtroom were required to sign in.  *Id.*.  Mr. Sanchez also alleges that the court put into place unwarranted security measures during the testimony of Kevin Vetere, directing two U.S. Marshals to accompany Mr. Vetere to and from the courtroom.  Tr. 5409.

These measures were instituted without the Court explaining the necessity for them or giving Mr. Sanchez an opportunity to challenge the bases for the Court's determination at a

17

hearing.  In order to prove his entitlement to relief on this claim, Mr. Sanchez requests from the West Palm Beach Division of the United States District Court for the Southern District of Florida and the United States Marshals Service, the following information regarding the security measures put in place:

a.      Records, reports, correspondence, notes, and/or information concerning or referencing the security measures put in place during Mr. Sanchez's trial; and

b.      Records, reports, correspondence, notes, and/or information concerning or referencing any policy or procedure from 2005 to 2010 identifying or describing the circumstances requiring the implementation of enhanced security measures.

Undersigned counsel hereby certify that they have conferred with counsel for Respondent in a good-faith attempt to resolve by agreement the issues presented in this motion.

WHEREFORE, for the foregoing reasons, Mr. Sanchez respectfully requests that the Court order Respondent to provide the discovery requested herein.  A proposed Order is attached.

Respectfully submitted,

/s/ Aren Adjoian
Matthew C. Lawry
Aren Adjoian
Federal Community Defender Office
    for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 928-0520
Fax: (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

Counsel for Ricardo Sanchez, Jr.

Dated: September 12, 2016

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served electronically by

the Court's CM/ECF service on this 12th day of September, 2016, on the following individuals:


Stephen Carlton
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 820-8711
Fax: (561) 659-4526
stephen.carlton@usdoj.gov
Counsel for the United States

Brandy Galler
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 820-8711
Fax: (561) 659-4526
brandy.galler@usdoj.gov
Counsel for the United States


/s/ Aren Adjoian
Aren Adjoian

# FEDERAL COMMUNITY DEFENDER OFFICE
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## *Capital Habeas Unit*

### FEDERAL COURT DIVISION - DEFENDER ASSOCIATION OF PHILADELPHIA

#### SUITE 545 WEST -- THE CURTIS CENTER
#### 601 WALNUT STREET
#### PHILADELPHIA, PA 19106

*LEIGH M. SKIPPER*
CHIEF FEDERAL DEFENDER

PHONE NUMBER   (215) 928-0520
FAX NUMBER      (215) 928-0826
FAX NUMBER      (215) 928-3508

*HELEN A. MARINO*
FIRST ASSISTANT FEDERAL DEFENDER

Stephen Carlton, Esquire
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401

Via Email: stephen.carlton@usdoj.gov

Re: *Sanchez v. United States*, No. 16-CV-80693-RNS

Dear Mr. Carlton:

We write, pursuant to our joint discovery plan, to request discovery in the above-captioned case. In making these requests, we note at the outset that any request for "documents" is intended to include, by way of illustration and not limitation: writings, files, transcripts, handwritten notes, bench notes, worksheets, chain of custody forms, memoranda, letters, reports (including investigative and interview reports), photographs, drawings, tests and test results, diagrams, maps, tape recordings, video recordings, e-mails and other electronic files and/or media, and any and all other information responsive to the below-listed requests in any format in which it may exist.

We further note that these requests are intended to apply not only to documents created, generated, gathered, possessed, or otherwise collected and/or maintained by the United States Attorney's Office, but also to documents created, generated, gathered, possessed, or otherwise collected and/or maintained by any government agency, including correctional and law enforcement agencies, involved in this case.

With these principles in mind, Mr. Sanchez respectfully makes the following discovery requests, which are organized by the claims in Mr. Sanchez's § 2255 petition to which they relate.

**Documents contained in the trial file of the United States Attorney's Office**

Page **1** of 7

Mr. Sanchez submits that the trial file of the United States Attorney's Office contains a substantial number of documents relevant to most, if not all, of Mr. Sanchez's claims, and that the most expeditious and comprehensive course of action would be the provision of the entire USAO file.

**Documents pertaining to Claim I (alleging that jurors provided incomplete, inaccurate, and/or dishonest information in their questionnaires and during voir dire)**

Mr. Sanchez has identified in Claim I five jurors who understated, misrepresented, and/or failed to disclose information regarding their family members' criminal histories, including drug and firearm offenses. Doc 16-1 ¶¶ 23-39. One of those five jurors also apparently failed to disclose her family member's former employment as a state prosecutor. *Id.* ¶¶ 28-29. The claim identified an additional alternate juror who misrepresented her own history as a convicted felon and cooperating prosecution witness. *Id.* ¶¶ 35-36. Claim I alleged that, to the extent the prosecution was aware of undisclosed information that implicated the accuracy and completeness of the information that venire persons provided, the government violated due process. *Id.* ¶ 50.

The government has unique access to and knowledge about the type of undisclosed information at issue – criminal histories and prosecutorial employment. Accordingly, in order to establish a complete and accurate record regarding the information that was sought from the jury venire, and in order to determine whether the government failed to disclose any such information, Mr. Sanchez requests the following:

- Documents concerning or referencing the criminal history of any seated juror, alternate juror, or family member thereof;

- Documents concerning or referencing the former or current employment by a prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof;

- Documents concerning or referencing the witnessing of a crime by any seated juror, alternate juror, or family member thereof; and

- Documents concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the jury venire.

**Documents pertaining to Claim III (alleging that Mr. Sanchez is ineligible for the punishment of death because he is intellectually disabled)**

Mr. Sanchez has alleged in Claim III that he is intellectually disabled, and thus ineligible for the death penalty. Intellectual disability includes deficits in intellectual functioning and adaptive functioning. Mr. Sanchez requests the following discovery with respect to allegations that he is intellectually disabled:

- Documents including statements by Mr. Sanchez and statements and documents about Mr. Sanchez relating to his cognitive, intellectual, and adaptive functioning; medical records relating to evaluation or treatment; mental health records relating to evaluation or treatment; records of psychological testing; disciplinary records; employment records; educational records; and records of any surveillance or monitoring of Mr. Sanchez, including placement on suicide watch.

**Documents pertaining to Claim IV (alleging that Mr. Sanchez was incompetent to stand trial)**

Mr. Sanchez has alleged in Claim IV that he was incompetent to stand trial. Mr. Sanchez requests the following discovery with respect to his claim that he was unable to understand the nature and consequences of the proceedings against him or rationally or properly assist counsel in the preparation and conduct of his defense:

- Documents relating to observations by law enforcement, prosecutorial, and custodial/correctional officers about Mr. Sanchez's behavior, functioning, and understanding in the courtroom; and discussions regarding or efforts made to provide accommodations to Mr. Sanchez in custodial settings and/or in the courtroom.

**Documents pertaining to Claim VI (alleging that the government violated its obligations pursuant to *Brady v. Maryland*, and its progeny)**

Mr. Sanchez has alleged in Claim VI that the government violated its obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny by failing to disclose favorable evidence to the defense that was material to the guilt and/or penalty phases of Mr. Sanchez's trial. Mr. Sanchez requests that the government provide the following information that he reasonably believes is in its possession:

- Documents that contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to: any cooperation agreement between Mr. Varela and the government; documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible;

- Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;

- Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;

- Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12th or 13th, 2006;

- Documents that reveal the identity of the individual or individuals with whom the Escobedos allegedly conducted a drug deal in the Daytona Beach area on the night/morning of October 12th/13[th] and documents that provide information as to the details, nature, and scope of this drug deal;

- Documents that contain video footage of the area around the Briar Bay security booth;

- Documents that contain information that Kevin Vetere expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement; and

- Documents that contain information that Mr. Sanchez did not fire a weapon on October 13, 2006 and/or had a lesser role in the murders.

**Documents pertaining to Claim VII (alleging that Mr. Sanchez was deprived of the effective assistance of counsel at the guilt phase of trial)**

### Discovery relating to toolmark evidence

Mr. Sanchez has alleged that the toolmark evidence presented at trial was unreliable and that counsel was ineffective for failing to challenge the evidence or present the testimony of an independent expert. Doc 16-1 ¶¶ 281-94. Alison Quereau, a toolmark examiner with the Palm Beach County Sheriff's Office, opined that the AK-47 collected from 6548 Garden Court fired projectiles and casings collected from 1901 Mercer Avenue and 1305 Suwanee. *Id.* ¶ 284. Mark Chapman, a toolmark examiner with the Indian River Crime Lab, compared and matched spent casings collected from the crime scene to live cartridges collected from the Garden Court residence. *Id.* ¶¶ 285-86.

Mr. Sanchez thus far has only been provided the conclusions of Ms. Quereau and Mr. Chapman; no underlying data has been supplied. Mr. Sanchez has retained a toolmark expert to review the findings of Ms. Quereau and Mr. Chapman and requests the following discovery in order to perform a comprehensive evaluation of the opinions presented at trial:

- Any and all documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court;

- Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;

- Documents containing internal written policies and standards for toolmark comparisons and guidelines for rendering an opinion;

- Any and all photomicrographs of the comparison subjects;

- Diagrams or photographs of subject evidence at all stages of collection and testing;

- Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;

- Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;

- Laboratory quality manuals (however named) in effect at the time the subject work was performed;

- Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;

- Internal and external audit reports generated or received by the laboratories;

- For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for toolmark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and

- Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court.

### Discovery relating to cellular forensics

At trial, the government used cellular records to map the movement of the defendants and the Escobedos on October 12 and October 13, 2006. Mr. Sanchez has alleged that trial counsel was ineffective for failing to challenge accuracy of these cellular records. Mr. Sanchez also alleged, to the extent trial counsel intended to argue that the cellular phone belonging to Yessica Escobedo traveled from Florida to Texas, counsel failed to investigate and obtain evidence to support these allegations. Doc. 16-1 ¶¶ 296-304. The government obtained the cellular records from the network providers and has exclusive access to any undisclosed information generated during its investigation. To establish a complete and accurate record of the cellular evidence in this case, Mr. Sanchez specifically requests:

- Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida;

- Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;

- Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.

**Documents pertaining to Claim VIII (claiming that Mr. Sanchez was deprived of the effective assistance of counsel at the penalty phase of his capital trial):**

Mr. Sanchez has alleged in Claim VII that he was deprived of the effective assistance of counsel at the penalty phase of his capital trial in a number of ways, including that trial counsel failed to investigate and present readily available mitigating evidence in support of a verdict less than death; that counsel failed to investigate and present mitigating evidence that Mr. Sanchez's father's criminal behavior and abuse of his family were traumatic events that adversely affected Mr. Sanchez's behavior and functioning; that trial counsel unreasonably and prejudicially failed to investigate and present mitigating evidence that the environment in which Mr. Sanchez grew up was riddled with violence; that his trial counsel was ineffective for failing to investigate and present mitigating evidence that Mr. Sanchez and his family members were exposed to traumatic experiences during his childhood; and that Mr. Sanchez was not involved in uncharged crimes offered in aggravation and that the aggravating evidence presented against him and considered by the jury was unreliable and invalid.  Mr. Sanchez requests the following discovery with respect to these allegations:

- Documents relating to Mr. Sanchez's character; economic, educational, and psychosocial background; mental health history; cognitive, intellectual, and adaptive functioning; and/or related to individuals involved in Mr. Sanchez's life and upbringing, that would tend to mitigate his convictions or lead to other mitigating evidence.   This information includes, but is not limited to, information about Mr. Sanchez's or his family members' substance abuse; physical, psychological, or sexual abuse; dysfunctional family patterns and dynamics; dysfunctional peer relationships; poverty and attendant economic disadvantages; poor educational or employment performance; racism; organic, neurological, or other medical problems; mental disorders; and developmental disabilities;

- Documents relating to any police contact with, or arrest, guilty plea, trial, conviction, and sentence incurred by Ricardo Sanchez, Sr., Mr. Sanchez's father, between January 1980 and October 2006;

- Documents relating to the investigation of homicides occurring in Dyson Circle, West Palm Beach, between 1983 and 1994, when Mr. Sanchez was living there as a child;

- Documents relating to the investigation of charges of sexual abuse of Mr. Sanchez's brother Efrain Sanchez by a neighbor on Coconut Grove, West Palm Beach;

- Documents relating to investigations of racially motivated disturbances or hate crimes in the Fruity Acres neighborhood of West Palm Beach, between 1993 and 2003, when Mr. Sanchez was living in that neighborhood; and

- Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach. Evidence relating to all three of these events was presented in the guilt phase against Mr. Sanchez as prior bad acts, and the jury argued that it supported aggravating factors argued at the penalty phase.

**Documents pertaining to Claim IX (alleging that Mr. Sanchez's death sentence violates the Eighth Amendment because it is inconsistent with evolving standards of decency, serves no valid penological purpose, and is torturous):**

- Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;

- Documents relating to the United States Attorneys' agreement to waive the seeking of the death penalty against Mr. Sanchez and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him;

- Documents relating to the conditions of confinement on federal death row at United States Penitentiary – Terre Haute, including but not limited to interim and final reports of investigations into the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.

Thank you very much for your attention to these requests.  We look forward to speaking with you further should you require any additional information or clarification.

Sincerely,

Aren Adjoian
Assistant Federal Defender



**U.S. Department of Justice**

United States Attorney
Southern District of Florida

---

*500 S. Australian Avenue, Suite 400*
*West Palm Beach, FL 33401*
*(561) 820-8711 - Telephone*
*(561) 820-8777 - Facsimile*

July 20, 2016

Matthew C. Lawry
Aren Adjoia
Federal Community Defender Office
Eastern District of Pennsylvania
Curtis Center, Suite 545-W
601 Walnut Street
Philadelphia, PA 19106

Re: <u>Ricardo Sanchez</u>

Gentlemen:

I write in response to your detailed requested discovery letter. This response is drafted in the spirit of providing  some limited information to you without waiving our official position that Ricardo Sanchez is not entitled to discovery –without Court order—at this stage of a 2255 proceeding. Having preserved our litigation position let me provide responses that match the organization of your requests:

### *Documents contained in the trial file of the United States Attorney's Office*

This request seeks every record in our possession; it is overly broad and beyond the scope of either this District's Standing Discovery Order, or Rule 16,  Fed. R. Crim. Proc. Basically you are seeking broader discovery than you are entitled to receive, without any stated basis, or established "good cause". So, at this juncture we are not willing to entertain this request.

### *Documents pertaining to Claim I (alleging that jurors provided incomplete, inaccurate, and/or dishonest information in their questionnaires and during voir dire)*

<u>**Request:**</u>

• Documents concerning or referencing the criminal history of any seated juror, alternate juror, or family member thereof;

• Documents concerning or referencing the former or current employment by a

prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof;

• Documents concerning or referencing the witnessing of a crime by any seated juror, alternate juror, or family member thereof; and

• Documents concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the Jury venire.

**Response:**

We have double-checked the retained files containing the jury selection notes, and the notes and records confirm my recollection:  we did not conduct the presumed research you have described. No such records exist.

> ***Documents pertaining to Claim III (alleging that Mr. Sanchez is ineligible for the punishment of death because he is intellectually disabled)***

**Request:**

Documents including statements by Mr. Sanchez and statements and documents about Mr. Sanchez relating to his cognitive, intellectual, and adaptive functioning; medical records relating to evaluation or treatment; mental health records relating to evaluation or treatment; records of psychological testing; disciplinary records; employment records; educational records; and records of any surveillance or monitoring of Mr. Sanchez, including placement on suicide watch.

**Response:**

This office does not possess any prison or jail disciplinary records, employment records, or records of surveillance or monitoring of Mr. Sanchez, including placement records.  This office did submit separation letters to the U.S. Marshal's Service, but that is it.  As to Mr. Sanchez's mental functioning, mental health records, etc., the only expert retained by the government at any stage of proceeding was Dr. Michael Brannon. We believe all of his records were turned over to defense counsel prefatory to his penalty phase testimony, but we will double check and provide what we have to you.

> ***Documents pertaining to Claim IV (alleging that Mr. Sanchez was incompetent to stand trial)***

**Request:**

Documents relating to observations by law enforcement, prosecutorial, and custodial/correctional officers about Mr. Sanchez's behavior, functioning, and

understanding in the courtroom; and discussions regarding or efforts made to provide accommodations to Mr. Sanchez in custodial settings and/or in the courtroom.

**Response:**

This office, (United States Attorney's Office for the Southern District of Florida, hereafter "USAO") does not have any documents consisting of the observations of law enforcement, prosecutorial, and custodial/correctional officers about Mr. Sanchez's behavior, functioning, and understanding in the courtroom.  Moreover, USAO does not have any documents concerning efforts made to provide accommodations to Mr. Sanchez in custodial settings or in the Courtroom.  On this latter issue, please note that courtroom security as to all of the trial defendants is a matter assigned exclusively to the United States Marshal's Service in consultation with the District Court in general, and the assigned trial judge specifically.

### Documents pertaining to Claim VI (alleging that the government violated its obligations pursuant to *Brady v. Maryland,* and its progeny)

**Request:**

Documents that contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him. Such documents include, but are not limited to:[1] any cooperation agreement between Mr. Varela and the government; [2] documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; [3] documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or [4] documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible; [note that bracketed numbers added by USAO].

**Response:**

[1] there was no cooperation agreement with Varela, ever.  To the contrary the government did not even debrief Varela, and in fact filed a sentencing information enhancement under 21 USC 851 mandating a life sentence if convicted of some of the charged crimes.

[2] there are no documents indicating that Varela provided information to the government; see response to [1] above.

[3] there are no documents indicating that prosecution of Varela would adversely affect any criminal investigation or prosecution.

[4]  there are no documents indicating that any law enforcement officer, state, local or federal, acted improperly so as to render the prosecution of Varela infeasible.  This is a

3

wildly inaccurate assumption on your part that has no good faith basis for the allegation; it did not happen.

**Request:**

Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy;

**Response:**

The government provided Jencks materials to trial counsel concerning government witnesses Melvin Fernandez and Kevin Vetere; the government also provided in discovery cellular telephone call records indicating cell tower activity on the night preceding, and the early-morning hours post-dating the homicides between Troya. See also USA Trial Exhs. 755 and 760.1 through 760.15.

**Request:**

**Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand;**

**Response:**

The government has no information that Varela participated in the murders; to the contrary, eyewitnesses placed Varela in West Palm Beach, FL at that time. See, e.g., Testimony of David Doran, trial transcript at p. 3963, (February 2, 2009). Moreover, the previously-disclosed cell phone tower records corroborated those witnesses' reports. See trial testimony of Kevin Vetere concerning Varela's actions after the murders.

We do not believe any records exist tending to establish that Mr. Varela intended to murder the Escobedos or knew that they would occur before hand.

**Request:**

Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12 or October 13, 2006 ;

**Response:**

USAO provided discovery of Yessica Escobedo's cell phone records [(956) 266-2004] and other persons' cell phone records at various stages of pre-trial preparation. See responses provided on the following dates: (i) 6th Supplemental SDO Response filed May 18, 2007, sections (e) and (f) of that response; 8th Supplemental SDO Response filed

4

August 6, 2007, section (vii) of that response; January 28, 2008, Supplemental Discovery response; November 17, 2008 Supplemental discovery letter from AUSA enclosing CD-ROM with T-Mobile cell site data; and November 25, 2008, supplemental discovery letter enclosing cell phone subscriber, tolls and cell sight records for Troya, and T-Mobile cell site data (Sanchez, 786-853-8416), all on CDR #1; see also supplemental letter response of December 22, 2008, enclosing a CD-ROM containing: two sets of T-Mobile business records recently received by the United States: (1) an Excel spreadsheet entitled VLR_List.xls  which contains a list of telephone switches;  and (2) an Excel spreadsheet entitled florida_041907(1) - T-Mobile Cell Site Locationsl.xls which contains a listing of cellular tower site locations;

Note also, albeit unrelated to Yessica Escobedo's cell phone, that in the same December 22, 2008 supplemental response additional disclosure was provided concerning Sanchez cell phone records: "another copy of the subscriber and cell site location records for (786) 853-8416. We sent these out earlier but one or more photocopies may have been blocked when copying due to a post-it pad not being removed."

**Request:**

- **Documents that reveal the identity of the individual or individuals with whom the  Escobedos allegedly conducted a drug deal in the Daytona Beach area on the  night/morning of October 12th/13th and documents that provide information as to  the details,  nature, and scope of this drug deal;**

**Response:**

Investigative leads were followed relating to the possible source of the drugs obtained by Escobedo in the Daytona area on the night of October 12-13, 2006, and the users of telephone numbers in contact with Escobedo during that time.  Subscriber records for (561) 891-1220 (Jose Escobedo's phone) were disclosed in the 8th Supplemental Response (8/6/2007).  Moreover, a large volume of cellular telephone records were disclosed in the 4th Supplemental SDO Response, the Fifth (4/24/07); the 6th (5/18/07); the 8th (8/06/07; and a letter to Mr. Murrell  dated 1/28/08. While the investigation failed to develop any information sufficient to charge anyone else or any information materially favorable to the defendants, copies of those investigative reports are enclosed. While the investigation failed to develop any information sufficient to charge anyone else or any information materially favorable to the defendants, copies of those investigative reports are enclosed.

**Request:**

- **Documents that contain video footage of the area around the Briar Bay security booth;**

5

**Response**:

See 8th Supplemental SDO Response, 8/6/2007:

A.   6 b. CD-ROM containing results of forensic examination of Briar Bay
Computer hard drive, N-232.

**Request**:

> **• Documents that contain information that Kevin Vetere expected or received
> any benefit of any type from the government, whether or not that benefit
> accrued as a   result of a formal deal or cooperation agreement; and**

**Response**:

*Giglio* information pertaining to Vetere was disclosed as follows:  (i) supplemental
discovery response sent December 22, 2008 with attachments.  In Court notice and
disclosure also provided prefatory to Vetere's testimony, see pp. 5402 through 5413, Vol.
21, February 11, 2009.

**Request**:

> **• Documents that contain information that Mr. Sanchez did not fire a weapon
> on  October 13, 2006 and/or had a lesser role in the murders.**

**Response**:

USAO provided a *Brady* notice concerning a statement made by Juan Gutierrez
allegedly.  See letter response dated June 2, 2008 indicating Gutierrez allegedly uttered a
statement that Sanchez  was present when the killings occurred but Troya was responsible
for the shootings.

**Documents pertaining to Claim VII (alleging that Mr. Sanchez was deprived of the
effective assistance of counsel at the guilt phase of trial)**

**Request**:

> **Discovery relating to tool mark evidence**
>
> **[1] Any and all documents including opinions, reports (including interim or amended
> reports), memoranda, testing results, bench notes, and correspondence concerning the
> examination of the casings and projectiles collected from the crime scene, the casings
> and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles
> collected from Garden Court, and the AK -4 7 rifle collected from Garden Court;**

6

**[2] Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;**

**[3] Documents containing internal written policies and standards for tool mark comparisons and guidelines for rendering an opinion;**

**[4] Any and all photomicrographs of the comparison subjects;**

**[5] Diagrams or photographs of subject evidence at all stages of collection and testing;**

**[6] Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;**

**[7] Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices;**

**[8] Laboratory quality manuals (however named) in effect at the time the subject work was performed;**

**[9] Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;**

**[10] Internal and external audit reports generated or received by the laboratories;**

**[11] For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for tool mark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and**

**[12] Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court**

<u>**Response**</u>**:**

[1] Discovery related to tool mark evidence was provided in pre-trial discovery as follows:

1st Discovery Response, [DE 39, Sanchez (11/20/2006); DE 58, Troya (11/27/2006)] included inventory of search warrant, items take from search of Garden Court residence on October 25, 2006;

5th Supplemental SDO Response, [DE #176, April 24, 2007]:

7

m. ATF reported dated February 7, 2007 concerning testing of certain firearms by ATF Special Agent Steve Barborini, (copy attached to defense counsel copy of this response);

n. additional ATF Exhibits as follows: Exhibits 7, 8, 11, 12, 13, 18, 19, 20, 21, 25, 26, 27 and 29, all of which relate to firearms and violations of federal firearms laws, (copies were attached to defense counsel copy of that response);

Please note that paragraphs "m" and "n" cited above relate to firearms  but are not believed to related to tool mark evidence, but only operability.

Paragraph A. 6. of this same supplemental response also included the following information:

a. firearms testing: see response listed under paragraph "A. 5 n", *supra*;

b. ballistics results: Indian River Crime Lab, ("IRCL"), two reports, (2), each dated October 25, 2006 from Mark A. Chapman, 4 pages and 1 page, respectively, (copies attached to defense counsel copy of this response);.

c. attached to defense counsel's copy of this response are the *curriculum vitae* of IRCL employees Mark A. Chapman and Earl Ritzline, PBSO employee Beth Rosenthal, chemist, ATF Special Agents Steve Barborini and Jeff Kunz. **[only Chapman testified about tool mark evidence]**

6th Supplemental SDO Response, [Docket Entry #, filed 5/18/2007: ]
k.   Chain of custody form for projectile recovery reports from St. Lucie County medical examiner**.**

lab results & CV's:

a.   amended ballistics report from Indian River Crime Lab, ("IRCL"),  Mark A. Chapman; (copy attached to defense counsel copy of that response);

8

March 7, 2008, letter noting additional evidence:

      a. 404(b) notice on Suwanee & Mercer Avenue shootings;
      b. PBSO ballistics analysis by Quereau linking weapons for Suwanee
        & ballistics analysis for Mercer Ave shootings [Quereau]
      c.  Haverhill shootings by Troya and Sanchez;

March 27, 2008 Fed. Exp. packets, Index, papers, CD's, photos, etc., [post-SLSO & DEA review]:
      a. packets mailed only to: Ruben Garcia **[Troya]** , Michael Cohen **[Sanchez],** Greg
      Lerman **[Lopez],** Robert Gershman **[Varela]**
      b. contents included:
          d.  CD which consists of photographs of loaded magazines from Garden
          Court firearms (SLSO CD#72);

April 24, 2008 letter enclosing the following:
      b.  CD labeled 06-110508 containing digital photos of Haverhill shooting;

May 8, 2008 letter enclosing the following:
      a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar
      Felix]

June 23, 2008 letter enclosing the following :
      IRCL ballistics report comparing homicide casings w/ Garden Ct. casings,
      [both .40 and 9 mm casings have consistent magazine markings]

June 26, 2008 letter enclosing the following:
      IRCL ballistics report comparing homicide casings with Garden Ct.
      casings, [both .40 and 9 mm casings have consistent magazine markings] &
      c.v. of Jimmie D. Thompson, IRCL adopting same report

August 12, 2008 letter with attachments:
      i. curriculum vitae of Omar Felix;
      iii. curriculum vitae of Alison Quereau

October 17, 2008 discovery letter with attachments:
      i. lab report of Jay Mullins, PBSO prelim. ballistics**; [note: not believed to
        be related to tool mark evidence]**

October 22, 2008 discovery letter with attachments:
      i. CD-ROM, Suwanee shooting photos;
      ii. CD-ROM, Mercer Ave., shooting photos;
      iii. CD-ROM w/ following attachments:
          a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
          (b) crime scene diagram of Mercer Avenue shooting scene;
          (c) curriculum vitae of Karin A. Crenshaw;

(d) curriculum vitae of Vonda Bray;

(e) photocopy of handwritten note intercepted on October 6, 2008 from Daniel Troya;

(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:

November 21, 2008 supplemental discovery letter with enclosures:

(c) Chapman chart on research on .40 caliber projectiles & potential weapons;

**Response:**

Items [2] through [12] as follows:

[2-11] USAO does not have this information; USAO does not have the personnel file of Indian River Crime Lab personnel; moreover there is no good faith basis, nor good cause for requesting this information.

[12]  Good cause has not been demonstrated to produce this information; moreover, USAO does not know if this evidence exists at this juncture.

### Discovery relating to cellular forensics

**Request:**

**[1] Documents concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida;**

**[2] Documents concerning or referencing system information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006;**

**[3] Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.**

**Response:**

[1] USAO doe not have this information; if it exists it could be obtained from the cell carriers via subpoena from any party.

[2-3] all records in the possession of the government relating to the evidence presented at trial was disclosed pre-trial in discovery; see our detailed response *supra*, wherein we described all evidence related to Yessica Escobedo's cell phone that we possessed.

10

**Documents pertaining to Claim VIII (claiming that Mr. Sanchez was deprived of the effective assistance of counsel at the penalty phase of his capital trial):**

**Request:**

**[1] Documents relating to Mr. Sanchez's character; economic, educational, and psychosocial background; mental health history; cognitive, intellectual, and adaptive functioning; and/or related to individuals involved in Mr. Sanchez's life and upbringing, that would tend to mitigate his convictions or lead to other mitigating evidence. This information includes, but is not limited to, information about Mr. Sanchez's or his family members' substance abuse; physical, psychological, or sexual abuse; dysfunctional family patterns and dynamics; dysfunctional peer relationships; poverty and attendant economic disadvantages; poor educational or employment performance; racism; organic, neurological, or other medical problems; mental disorders; and developmental disabilities;**

**Response [1]:**

USAO does not have any of these documents.  Note as stated earlier, Dr. Michael Brannon was the only mental health professional engaged by the United States. He is the only person who interacted with Ricardo Sanchez for the issues cited above. We disclosed all discoverable information on this issue prior to calling him as a witness in the penalty phase.

**[2] Documents relating to any police contact with, or arrest, guilty plea, trial, conviction, and sentence incurred by Ricardo Sanchez, Sr., Mr. Sanchez's father, between January 1980 and October 2006;**

**Response [2]:**

USAO does not have any of these documents.

**[3] Documents relating to the investigation of homicides occurring in Dyson Circle, West Palm Beach, between 1983 and 1994, when Mr. Sanchez was living there as a child;**

**Response [3]:**

USAO does not have any of these documents.

11

**[4]  Documents relating to the investigation of charges of sexual abuse of Mr. Sanchez's brother Efrain Sanchez by a neighbor on Coconut Grove, West Palm Beach;**

**Response [4]:**

USAO does not have any of these documents.

**[5] Documents relating to investigations of racially motivated disturbances or hate crimes in the Fruity Acres neighborhood of West Palm Beach, between 1993 and 2003, when Mr. Sanchez was living in that neighborhood;**

**Response [5]:**

USAO does not have any of these documents.

**[6] Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach. Evidence relating to all three of these events was presented in the guilt phase against Mr. Sanchez as prior bad acts, and the jury argued that it supported aggravating factors argued at the penalty phase.**

**Response [6]:**

Broken down separately as Suwanee, Mercer & Haverhill:

**Suwanee:**

3/07/2008 letter of additional evidence:
      a. 404(b) notice on Suwanee & Mercer Avenue shootings;
      b. PBSO ballistics analysis by Quereau linking weapons for Suwanee
        & ballistics analysis for Mercer Ave shootings [Quereau]

10/22/08 discovery letter w/ attachments:
      i. CD-ROM, Suwanee shooting photos;
      iii. CD-ROM w/ following attachments:
          a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];
            (c) curriculum vitae of Karin A. Crenshaw;

        (f) property receipts relating to various items of evidence [mostly spent bullets
          and casings] at each of the three separate shooting locations:

**Mercer Ave.:**

3/07/2008 letter of additional evidence:
      a. 404(b) notice on Mercer Avenue shooting;
      b. PBSO ballistics analysis by Quereau  for Mercer Ave shootings [Quereau]

10/22/08 discovery letter w/ attachments:
      ii. CD-ROM, Mercer Ave., shooting photos;
      iii. CD-ROM w/ following attachments:
            (b) crime scene diagram of Mercer Avenue shooting scene;
            (f) property receipts relating to various items of evidence [mostly spent
            bullets and casings] at each of the three separate shooting locations:

**Haverhill:**

3/07/2008 letter of additional evidence:

      c.   Haverhill shootings by Troya and Sanchez;

4/24/08 letter enclosing the following:
      b.  CD labeled 06-110508 containing digital photos of Haverhill shooting;

5/8/08 letter enclosing the following:
      a. PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

**Documents pertaining to Claim IX (alleging that Mr. Sanchez's death sentence violates the Eighth Amendment because it is inconsistent with evolving standards of decency, serves no valid penological purpose, and is torturous):**

**<u>Requests</u>:**

**[1] Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case;**

**<u>Response [1]</u>:**

USAO does not have this information.

**[2]  Documents relating to the United States Attorneys' agreement to waive the seeking of the death penalty against Mr. Sanchez and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him;**

<u>**Response [2]:**</u>

USAO possesses internal documents concerning the potential application of the death penalty to defendants Sanchez and Troya.  Deliberative process and attorney work product privileges apply to those documents.  The Department of Justice (Main) likely possesses similar documents, but likewise deliberative process and attorney work product privileges apply to those documents.


**[3] Documents relating to the conditions of confinement on federal death row at United States Penitentiary- Terre Haute, including but not limited to interim and final reports of investigations into the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.**

USAO does not have possession of, nor access to such documents. Such documents would be in the possession of the Bureau of Prisons.


Should you have any questions concerning any of the previously-provided discovery, please contact me to discuss.   In the meantime, we would like to formalize the joint filing required by Judge Scola and get it finished.  Please notify me by no later than 12 noon tomorrow, June 24, 2016 to discuss authorization of our filing the last draft of that joint submission.  Thank you.

Sincerely

By:   /s Steve Carlton

STEVE CARLTON
Assistant United States Attorney

14



**U.S. Department of Justice**

United States Attorney
Southern District of Florida

_500 S. Australian Avenue, Suite 400_
_West Palm Beach, FL 33401_
_(561) 820-8711 - Telephone_
_(561) 820-8777 - Facsimile_

August 31, 2016

Steven H. Malone                        D. Todd Doss
Steven H. Malone, P.A.                  Assistant Federal Defender
1217 South Flagler Drive                Federal Defender's Office,
West Palm Beach, FL 33401               Second Floor,
                                        201 South Orange Ave., Ste. 300
                                        Orlando, FL 32801

Matthew C. Lawry
Aren Adjoia
Federal Community Defender Office
Eastern District of Pennsylvania
Curtis Center, Suite 545-W
601 Walnut Street
Philadelphia, PA 19106

Re: <u>Daniel Troya & Ricardo Sanchez</u>

Gentlemen:

I write in supplemental response to your detailed requested discovery letters. You have raised allegations that dealt with the issue of Briar Bay and the security gate. In response to your allegations and 2255 discovery request, e.g., "[d]ocuments that contain video footage of the area around the Briar Bay security booth", we responded as follows: "_See 8th Supplemental SDO Response, 8/6/2007:  A. 6 b. CD-ROM containing results of forensic examination of Briar Bay Computer hard drive, N-232._"

Petitioner Sanchez also raised basically the same issue in his petition, concerning documentation relating to the Briar Bay security gate and any documentation of ingress or egress on the night of the murders (October 12-13, 2006).  See Sanchez petition, DE 16-1 at p. 77. Agent Weeks had testified at trial that he did not receive anything relevant to that time period relating to Briar Bray, See DE 765 at p. 6975.

In preparing the responses for these matters, I came across miscellaneous documents contained within a particular file folder relating to Briar Bay. I could not find these identical notes in the known discovery that I caused to be sent out.  I have caused those separate documents to be scanned and we are providing them now to defense counsel.   These

documents are not Brady, nor are they necessarily responsive to any request, but are being provided as a courtesy and in an abundance of caution.

The time period covered by these documents are well after the murders. The table-like document is believed to be a guest-type log created at the front gate; these documents were not introduced at trial. These were not authenticated by any Briar Bay records custodian. The second document contains handwritten notes, with a "post-it pad" comment that was affixed as an identifier for the notes. The "post-it" notes are my own wherein I identified the author of the handwritten notes as "Woodward" notes. Please note that Det. Woodward was a Deputy Sheriff with the Palm Beach County Sheriff's Office concerning an underlying state search warrant for 6458 Garden Court that was applied for on October 25, 2006. This underlying affidavit was disclosed in the original pre-trial discovery. Woodward's wife, Sue Woodward, was a deputy sheriff or detective with the St. Lucie County Sheriff's Office. She is believed to have performed some collateral duties concerning the murder investigation, although she was not the lead detective. Neither person testified at trial, and I do not recall which Woodward I was referring to in identifying the notes' author.

Should you have any questions please contact me to discuss. Thank you.

Sincerely,

By:   */s Steve Carlton*
STEVE CARLTON
Assistant United States Attorney

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL NO. 9:16-CV-80693-RNS**

| | | |
|---|---|---|
| **RICARDO SANCHEZ, JR.,** | **:** | |
| **Movant** | **:** | |
| | **:** | |
| **v.** | **:** | **THIS IS A CAPITAL CASE** |
| | **:** | |
| **UNITED STATES OF AMERICA** | **:** | |

**ORDER**

AND NOW, this ____ day of _____, 2016, upon consideration of Movant Ricardo Sanchez's motion for discovery, and for good cause shown, it is hereby ORDERED that the motion is GRANTED. This Court orders as follows:

1. The United States Attorney's Office shall produce the items listed in the Request for Production, attached hereto.

2. Counsel is authorized to serve a subpoena on the following entity for any and all records pertaining to David Andrew Sollenberger:

   The Advocate Program, Central Office
   1399 NW 17th Ave, 2nd Floor
   Miami, FL 33125

3. The Clerk for the West Palm Beach Division of the West Palm Beach Division of the United States District Court for the Southern District of Florida shall, within thirty (30) days of service of this Order, provide a copy of the following:

a. Documents concerning or referencing the jury selection process in this case.

b. A copy of the Plan for the Random Selection of Grand and Petit Jurors of the United States District Court for the Southern District of Florida approved on January 31, 1997, June 14, 2002, and January 31, 2007.

c. Documents concerning or referencing the manner in which the master jury wheel and summons database were generated, including the sources of the information contained in the database, how often and when the wheel and database were updated, amended, or checked for completeness and accuracy from 2005 through 2010.

d. Documents concerning or referencing the expansion of sources of information for the master jury wheel or summons database from 2005 through 2010.

e. Documents concerning or referencing any policy for approved excuses in advance of a summons date and the excusal of prospective jurors on the day of service from 2005 through 2010.

f. Documents concerning or referencing any policy or procedure regarding prospective jurors who failed to respond to the initial and/or subsequent summons or questionnaire from 2005 through 2010.

g. Documents concerning or referencing any policy or procedure regarding summoned jurors who fail to appear for jury service from 2005 through 2010.

h. Documents regarding racial, ethnic, or gender demographics within Palm Beach County from 2005 through 2010.

i. Documents regarding the total number and racial, ethnic, or gender demographics of registered voters within Palm Beach County from 2005 through 2010.

j. Records, reports, correspondence, notes, and/or information concerning or referencing the security measures put in place during Mr. Sanchez's trial.

k. Records, reports, correspondence, notes, and/or information concerning or referencing any policy or procedure from 2005 to 2010 identifying or describing the circumstances requiring the implementation of enhanced security measures.

4. The United States Marshals Service shall, within thirty (30) days of service of this

Order, provide a copy of the following:

   a. Documentation of observations by law enforcement, prosecutorial, custodial, and correctional officers about Mr. Sanchez's behavior, functioning, and understanding in the courtroom.

   b. Information regarding discussions about or efforts made to provide accommodations to Mr. Sanchez in custodial settings and/or in the courtroom.

   c. Records, reports, correspondence, notes, and/or information concerning or referencing the security measures put in place during Mr. Sanchez's trial.

   d. Records, reports, correspondence, notes, and/or information concerning or referencing any policy or procedure from 2005 to 2010 identifying or describing the circumstances requiring the implementation of enhanced security measures.

5. The Bureau of Prisons shall, within thirty (30) days of service of this Order,

provide a copy of the following:

   a. Documents relating to the conditions of confinement on federal death row at United States Penitentiary – Terre Haute, including but not limited to interim and final reports of investigations in to the provision of medical and mental health treatment to death row prisoners, and interim and final reports of investigations into the use of force by prison staff upon death row prisoners.

6. Counsel is authorized to serve a subpoena on the following entity for a) any and all notes, documents, manuals, memoranda, reports, or other information concerning or referring the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained in Florida; b) system information, cell site, and switch data for cellular towers in Florida and Texas for October 2006; and c) call detail reports for (786) 853-8416 and (956) 266-2004 for October 2006:

T-Mobile
Subpoena Compliance Department
4 Sylvan Way
Parsippany, NJ 07054

7.     Counsel is authorized to serve a subpoena on the following entities for any and all

notes, documents, manuals, memoranda, reports, or other information concerning

or referring the operational behavior, engineered capabilities, tuning and

alignment, maintenance, and service history for cellular towers maintained in

Florida:

Verizon
Attn: VSAT
180 Washington Valley Road
Bedminster, NJ 07921

MetroPCS
Attn: Custodian of Records
2250 Lakeside Boulevard
Richardson, TX 75782

BY THE COURT:

_____
Robert N. Scola, Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL NO. 9:16-CV-80693-RNS**


**RICARDO SANCHEZ, JR.,**              **:**

      **Movant**                          **:**

                       **:**

      **v.**                               **:**           **THIS IS A CAPITAL CASE**

                       **:**

**UNITED STATES OF AMERICA**          **:**


**REQUESTS FOR PRODUCTION**

Pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, the Due Process Clause of the Fifth Amendment, and the Eighth Amendment, Ricardo Sanchez submits the following request for production from the United States Attorney's Office.

1.     Records, reports, correspondence, notes, and/or information concerning or referencing the criminal history and driver's license history of any seated juror, alternate juror, or family member thereof.

2.     Records, reports, correspondence, notes, and/or information concerning or referencing the former or current employment by a prosecutorial or law enforcement agency of any seated juror, alternate juror, or family member thereof.

3.     Records, reports, correspondence, notes, and/or information concerning or referencing the witnessing of a crime by any seated juror, alternate juror, or family member thereof.

4.     Records, reports, correspondence, notes, and/or information concerning or referencing the prosecution's awareness of any undisclosed information relevant to the accuracy and completeness of the information provided by the jury venire.

5.     Documentation of statements made by Mr. Sanchez.

6.   Documents relating to observations of Mr. Sanchez's cognitive, intellectual, and adaptive functioning.

7.   Medical and/or mental health records relating to evaluation or treatment of Mr. Sanchez.

8.   Records of psychological testing of Mr. Sanchez.

9.   Employment records for Mr. Sanchez.

10.  Educational records for Mr. Sanchez.

11.  Correctional records for Mr. Sanchez.

12.  Records of surveillance or monitoring of Mr. Sanchez.

13.  Documents that expand on or contradict the government's stated reason for failing to charge Danny Varela with murder; namely, that the government purportedly did not have enough evidence to prosecute him.  Such documents include, but are not limited to: any cooperation agreement between Mr. Varela and the government; documents indicating that Mr. Varela provided information to the government, whether or not such information was provided as part of a formal cooperation agreement; documents indicating that prosecution of Mr. Varela would adversely affect any criminal investigation or prosecution; and/or documents indicating that any improper conduct on the part of law enforcement rendered prosecution of Mr. Varela infeasible.

14.  Documents that indicate that Mr. Varela was a co-conspirator in the carjacking conspiracy.

15.  Documents that indicate that Mr. Varela participated in the murder of the Escobedos in any way, including as an accomplice; that Mr. Varela intended to murder the Escobedos; or that Mr. Varela knew that the murders of the Escobedos would occur beforehand.

16.  Documents that indicate or suggest that Yessica Escobedo's cell phone traveled to Texas on October 12th or 13th, 2006.

17.  Documents that reveal the identity of the individual or individuals with whom the Escobedos allegedly conducted a drug deal in the Daytona Beach area on the night/morning of October $12^{th}/13^{th}$ and documents that provide information as to the details, nature, and scope of this drug deal.

18.  Documents that contain or reference video footage of the area around the Briar Bay security booth.

2

19.     Documents that contain information that Kevin Vetere expected or received any benefit of any type from the government, whether or not that benefit accrued as a result of a formal deal or cooperation agreement.

20.     Documents that contain information that Mr. Sanchez did not fire a weapon on October 13, 2006 and/or had a lesser role in the murders.

21.     Any and all documents, including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court.

22.     Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument.

23.     Documents containing internal written policies and standards for toolmark comparisons and guidelines for rendering an opinion.

24.     Any and all photomicrographs of the comparison subjects.

25.     Diagrams or photographs of subject evidence at all stages of collection and testing.

26.     Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects.

27.     Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for preparation, instrument analysis, instrument calibration, and all required quality control practices.

28.     Laboratory quality manuals (however named) in effect at the time the subject work was performed.

29.     Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed.

30.     Internal and external audit reports generated or received by the laboratories.

31.     For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for toolmark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate).

32.     Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the

projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court.

33. Any and all notes, documents, manuals, memoranda, reports, or other information concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida.

34. System information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006.

35. Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.

36. Documents relating to any police contact with, or arrest, guilty pleas, trial, conviction, and sentence incurred by Ricardo Sanchez, Sr., Mr. Sanchez's father, between January 1980 and October 2006.

37. Documents relating to the investigation of crimes occurring in Dyson Circle, West Palm Beach, between 1983 and 1994, when Mr. Sanchez lived there as a child.

38. Documents relating to the investigation of charges of sexual abuse of Mr. Sanchez's brother Efrain Sanchez by a neighbor on Coconut Grove, West Palm Beach.

39. Documents relating to investigations of racially motivated disturbances or hate crimes in the Fruity Acres neighborhood of West Palm Beach, between 1993 and 2003, when Mr. Sanchez was living there.

40. Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006, at 1910 Mercer Avenue, West Palm Beach. and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.

41. Documents relating to prosecutors' discretion under the Federal Death Penalty Act that leads to the selection of defendants to prosecute capitally, including data regarding the seeking of the death penalty by location and jurisdiction; the criteria used by United States Attorneys to determine whether or not to seek the death penalty; and the criteria used by the United States Attorney General to determine whether or not to authorize the death penalty and whether or not to reject a settlement or to overrule a United States Attorney's decision not to seek the death penalty in a particular case.

42. Documents relating to the United States Attorneys' agreement not to seek the death penalty against Mr. Sanchez and the United States Attorney General's decision to reject the proffered settlement and direct the United States Attorney's Office to seek the death penalty against him.

4