Philadelphia, PA

Sandra Castro, Paralegal
Federal Community Defender Office
For The Eastern District of Pennsylvania
Capital Habeas Unit

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KATHLEEN KAIB, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 17, 2017

Sworn to and subscribed before me
this ⎵11⎵ day of ⎵Oct⎵ 20⎵16⎵.

A-000560

## AFFIDAVIT/DECLARATION OF SANDRA CASTRO

## PURSUANT TO 28 U.S.C. § 1746 AND 18 Pa. C.S. § 4904

I, Sandra Castro, hereby declare and verify as follows:

1.  My name is Sandra Castro. I am employed with the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania as a bilingual paralegal.

2.  In 1989, I received a Bachelor of Arts degree in Business-Spanish from Holy Family University.

3.  From 1989 to 2005, I was employed as the official Spanish Interpreter for the Defender Association of Philadelphia. My duties included serving as the Spanish interpreter for defense counsel in hundreds of criminal jury trials, bench trials, proffer sessions, guilty pleas and sentencings.

4.  I have served as a Spanish interpreter in civil arbitration hearings and have done translations for private counsel in both civil and criminal proceedings.

5.  I translated into English the attached Spanish-language affidavit of Maria De La Luz Betancourt Jimenez.

6.  I hereby certify that the attached English translation of the declaration of Maria De La Luz Betancourt Jimenez is a true and correct translation of the corresponding Spanish language declaration.

7.  I hereby certify that the facts set forth above are true and correct to the best of my knowledge and belief, subject to 28 U.S.C. § 1746 and 18 Pa. C.S. § 4904.

Philadelphia, PA

Sandra Castro, Paralegal
Federal Community Defender Office
For The Eastern District of Pennsylvania
Capital Habeas Unit

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KATHLEEN KAIB, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 17, 2017

Sworn to and subscribed before me
this 11 day of Oct 2016

## Declaración de Elsa Hernández
## Según 28 U.S.C. § 1746

Yo, ELSA HERNANDEZ, declaro lo siguiente:

1.     Soy la tía materna de Ricardo Sanchez Jr. Ricardo es el hijo de mi hermana mayor, Juanita Sanchez. Juanita y yo tuvimos cinco hermanos. En orden somos: Yolanda, Natividad, Gregoria, Juanita, yo, Juan Antonio, y Lucy. Nuestros padres eran Antonio Jimenez y Maria de la Luz Betancourt Jimenez.

2.     Ambos de mis padres vinieron a los Estados Unidos de Matamoros, Méjico. Todos mis hermanos y hermanas nacieron en Méjico excepto Juan Antonio y Lucy. Cuando vivíamos en Méjico, mi papá y yo íbamos y veníamos de Brownsville, Texas para trabajar. Mi mamá se quedaba en casa y cosía para ganar dinero extra para nosotros.

3.     Después que mi papá murió, mi mamá se mudó a San Antonio, Texas. Ella continuó cosiendo y trabajó en restaurantes para proveer para nosotros.  Mi papá era un borracho. Me acuerdo que mi mamá me decía que mi papá era un mal hombre. Cuando él tomaba él la trataba mal  y lo vi golpeándola y dándole puños  a mi mamá. Mi papá era un hombre bravo y tuvo muchas otras mujeres mientras estuvo casado con mi mamá.

4.     Mi papá, Antonio, golpeo a mis hermanos y hermanas y a mí también y a mi mamá.  Comencé a odiar a mi papá después que lo vi dándole patadas a mi hermana Juanita. Ella era tan pequeña. En ese  tiempo que vivimos en Méjico y Juanita había estado jugando con una niña chiquita en el vecindario. La niña chiquita había hecho algo malo y mi papá caminó derecho hacia la casa de la vecina y le dio patadas a Juanita como si fuera un perro.

Iniciales _E H_                                              Fecha: _4-7-2016_

A-000563

5. Mi mamá me dijo que mi abuelo paternal, Natividad Jimenez dejó a mi abuela, Sara, por una mujer más joven que limpiaba la casa. Natividad tuvo a su nueva familia y dejó a Sara para que se defendiera por ella misma y cuidar a todos sus hijos. Por consiguiente, la familia de mi papá dejó de ser acomodada dependiendo de otros para sobrevivir.

6. El alcohol por fin mató a mi papá en 1972. Mi mamá no pudo cuidar a todos sus hijos todavía viviendo en casa ella sola. Mi hermana mayor Gregoria se quedó con los padres de mi mamá en Méjico. El resto de nosotros nos mudamos a San Antonio donde mi mamá trabajó en restaurantes y continuó a cosiendo para proveer para nosotros. Nos mudamos bastante cuando estábamos creciendo porque mi mamá también trabajó como migrante en los campos. Mi mamá nos llevó a Ohio e Indiana dependiendo del tiempo durante el año.

7. Cuando tenía como nueve años, mi mamá mandó a Juanita y a mí a vivir con mi hermana mayor, Yolanda. Yolanda tenía como 24 años y casada con Amador Acevedo cuando Juanita y yo fuimos a vivir con ella. Juanita tenía 11 años. Yolanda trabajaba para una familia en San Antonio, Texas y tuvo 3 hijos suyos. Juanita y yo compartimos una alcoba en la casa de Yolanda.

8. Yolanda y su esposo eran muy severos con nosotras. Yolanda nos golpeaba cuando se sentía frustrada cuando nos tenía que cuidar. Ella no nos quería allí. Ella golpeaba nuestras cabezas contra las paredes. No teníamos el permiso de tocar las cajas de cereales u otra comida en la cocina. Solamente podíamos comer lo que Yolanda ponía enfrente de nosotras para comer. Cuando comíamos algo que no nos decía que podíamos comer, ella golpeaba Juanita y a mí.

Iniciales _E H_                                                                 Fecha:_____

9.    Una vez cuando tenía 10 años, Yolanda me arrancó mi blusa y me puso afuera de la casa en el frio para castigarme por un error pequeño que hice. Ella me dejó horas por fuera sin mi blusa puesta. Ella hizo lo mismo con Juanita también. Nos trataron como Cinderella en casa de Yolanda. Tuvimos muchos quehaceres y casi no fuimos a la escuela porque teníamos que cuidar a los niños de ella casi todo el tiempo.

10.    Amador no era un hombre simpático. Yolanda nos amenazaba de quitar la blusa a mí o la de Juanita y dejar que Amador mirara a nuestros pechos desnudos si no nos portábamos bien. El peor abuso vino de Amador. Juanita y yo fuimos abusadas sexualmente ~~y violadas~~ por (EH) Amador. No lo pudimos escapar. *El se BAJABA el pantalón y nos forzaBA A tocarlo, EL Nos tocaBA DesNUDAs.*

11.    Juanita era muy tímida. Ella no le hablaba a Yolanda o Amador. Me defendí contra ellos y peleé para proteger a las dos, aunque yo era dos años menor que Juanita.

12.    Cuando tenía como 11 años y Juanita tenía como 13 años, nos mudamos de la casa de Yolanda en San Antonio, Texas hasta West Palm Beach, Florida para vivir con mi mamá de nuevo. Éramos muy pobres. No teníamos carro, y tomábamos el autobús a todas partes. Trabajamos en las fincas recogiendo naranjas y vegetales donde mi mamá y hermana trabajaban. Nosotros vivimos en el vecindario con los migrantes de las fincas. Ricardo Sanchez vivía con su familia en el mismo vecindario cuando se mudó de Brownsville, Texas. Juanita conoció a Ricardo porque él vivía al frente de la calle nuestra.

13.    La hermana de mi mamá Paula y su familia vivían en West Palm Beach, Florida e hicieron trabajo de migrantes en los campos. Paula tuvo tres hijas: Beatriz, Graciela, y Minxerva. Beatriz es la mamá de Daniel Varela.

Iniciales: EH                                                                 Fecha: 4-7-2016

14.     No me gradué de bachillerato, ni tengo un GED. Trabajé en los campos recogiendo vegetales cuando era adolescente. Trabajé en vez de terminar la escuela para ayudar a mi mamá ganar suficiente dinero para darle comida a nuestra familia.

15.     Nadie en mi familia pensó que era buena idea que Juanita se casara con Ricardo Sanchez, Sr. Le dijimos que no se casara con él. Él era creído y no un hombre simpático. Pero Juanita no nos escuchaba. Ella se quería salir de su casa y ella vio a Ricardo Sr. Como manera para salirse. Ella se casó cuando Juanita tenía 17 y Ricardo Sr. tenía 20 años.

16.     Ricardo Sr. salía bastante y tomaba cantidades grandes de alcohol. Él llegaba a casa después de haber tomado toda la noche y empezaba argumentos con Juanita. El la golpeaba y le daba una paliza. Cuando ella tenía tres meses de estar embarazada con su hijo, Efraín, Ricardo Sr., le disparó en su cara en un ataque de furia causada por la bebida. Ricardo Sr. fue arrestado y Juanita tuvo que ir al hospital.

17.     Cuando le dieron a Juanita la salida, ella vino y se quedó con mi mamá y yo. Le rogamos con ella que no hablara ni volviera con Ricardo Sr. Ricardo mandó a su hermana, Nora que hablara con Juanita y le animara que volviera otra vez con Ricardo Sr. Juanita se quedó con nosotras por un tiempo y después se fue a Houston, Texas para quedarse con su hermana Gregoria después que nació Efraín. No la pudimos convencer que dejara a Ricardo Sr. Pensé que Juanita estaba loca por volver con Ricardo Sr. y quedarse con él por todos estos años.

18.     Después que nació Efraín, mi mamá, Juan Antonio, Lucy, y yo nos mudamos a San Antonio Texas. Tenía 17 años. Empecé a trabajar en una fábrica que se llamaba American Lantern donde hacía y asambleaba instalaciones de luces. Trabajé allí por mucho tiempo. He trabajado en fábricas desde ese tiempo. Todavía trabajo en una fábrica de harina de maíz.

Iniciales _E H_                                                              Fecha: _4-7-2016_

19. Me casé con Hector Hernández en 1984 en San Antonio. Juanita trajo a Efraín y Nydia a mi boda porque ella no la quería dejar sola con su papá. Mis hijos Hector, Alex, y Deyaneris, son mucho más jóvenes que los hijos de Juanita.

20. Ricardo era malo y enojado, controlador y manipulador. Juanita me dijo que Ricardo Sr. actuaba en a la casa como un general y ella y los hijos eran los soldados. Ricardo Sr. demandaba saber todo que pasaba cuando el no estuvo en la casa. Todo siempre era para Ricardo Sr. Él se gastaba casi todo el dinero para el mismo, dejando a Juanita y los pobre niños casi sin nada. Ricardo Sr. siempre tenía ropa buena, zapatos, mientras que los niños se vestían con ropa de andrajosa y vieja. Él se iba a las bares en la noche y casi siempre estaba con otras mujeres. Juanita me decía que a veces llegaba a casa con marcas en su cuello de otras mujeres besándolo. El casi no dejaba a Juanita y los niños salir de la casa.

21. Ricardo Sr. golpeaba a los niños igual que a Juanita. Ricardo Sr. golpeaba a su hija Nydia tan duro que ella tenía golpes por todo su cuerpo. Estaba caliente en Florida, pero ella se tenía que poner mangas largas para cubrir sus golpes.

22. Mi hermano Natividad, le dispararon y lo mataron en Mayo del 1989. Él siempre fue el hijo favorito de mi madre, y se le partió el corazón.

23. Cuando Ricardo Jr., o como dice nuestra familia, Ricardín, era un niño pequeño él fue a visitar a nuestra familia en San Antonio. Ricardín vino a quedarse con nosotros cuando era pequeño. Ricardín se cayó de un triciclo y se golpeó la cabeza cuando estuvo con nosotros. Mi hermano, Juan Antonio, lo llevó al hospital. Le tuvieron que poner varias grapas en su cabeza.

Iniciales *E H*            Fecha: _4-7-2016_

24.    Ricardín vino otra vez a visitarnos unos años después, esta vez con más de su familia. Ricardín era un niño muy callado. El casi no hablaba, él se sonreía bastante y era muy respetuoso. El parecía mentalmente más lento que sus hermanos y hermana. Él le seguía a sus hermanos y se quedó muy cerca de ellos. Ellos hacían planes y él los seguía.

25.    Ricardín era muy obediente. A él le tenían que decir todo, en cada etapa, pero el siempre trataba de hacer lo que le decían y no les contestaba. Él no se acordaba de las direcciones que le daban. Le repetíamos lo que tenía que hacer. Él se le olvidaba.

26.    Juanita y yo tenemos una relación unida. Hablamos por teléfono siempre y casi siempre se lo que está pasando con ella y sus hijos. Ella me dijo cuando Ricardín fue arrestado, que ella le dio terror por él y no lo podía creer. Definitivamente fue un choque para nosotros. Esto no parece algo en que Ricardín sería capaz.

27.    Antes que Ricardín fuera a juicio, Lisa McDermott, su investigador, y un hombre joven fueron a visitarme. Ellos me preguntaron cómo era Ricardín de niño. Ellos querían saber si él era un niño juicioso. Ellos no me preguntaron mucho más. Tuvimos una charla buena, pero no oí nada más de ellos. Quería testificar en el juicio, y no asistí al juicio. Si me hubieran preguntado. Hubiera testificado todo lo que he dicho aquí.

**Yo certifico que los datos arriba mencionados son verdaderos y correctos, bajo la pena de perjurio bajo 28 U.S.C. § 1746.**

Firmado en _Elsa H_

Nombre _EISA Hernandez_

Iniciales _E H_                                        Fecha: _4-7-2016_

## Declaration of Elsa Hernandez

### Pursuant to 28 U.S.C. §1746

I, ELSA HERNANDEZ, declare as follows:

1.      I am the maternal aunt of Ricardo Sanchez, Jr. Ricardo is the son of my older sister Juanita Sanchez. Juanita and I have five other siblings. In order, we are: Yolanda, Natividad, Gregoria, Juanita, me, Juan Antonio, and Lucy. Our parents were Antonio Jimenez and Maria de la Luz Betancourt Jimenez. Antonio passed away in 1972, when I was seven years old. My mother still lives near me in San Antonio, Texas.

2.      Both of my parents came to the United States from Matamoros, Mexico. All of my brothers and sisters were born in Mexico except for Juan Antonio and Lucy. When we lived in Mexico my father went back and forth to Brownsville, Texas for work. My mother stayed at home and took in sewing to make extra money for us.

3.      After my father died my mother moved us to San Antonio, Texas. She continued to take in sewing and worked in restaurants to provide for us. My father was a drunk. I remember my mother telling me that my father was a bad man. When he drank he was mean and I saw him slapping and punching my mother. My father was an angry man and he had many other women while he was married to my mother.

4.      My father, Antonio, beat my brothers and sisters and me as well as my mother. I started hating my father after I saw him kick my sister Juanita. She was so small. At the time, we lived in Mexico and Juanita had been playing with a little girl in the neighborhood. The little girl said that Juanita had done something bad and my father just walked straight over to the neighbor's house and kicked Juanita like she was a dog.

Initials: _____                                    Date: _____

A-000569

5. My mother told me that my paternal grandfather, Natividad Jimenez, left my grandmother, Sara, for a younger woman who cleaned his house. Natividad had his new family and left Sara to fend for herself and care for all of her children. As a result my father's family went from being well-off to depending on others to survive.

6. The alcohol finally killed my father in 1972. My mother could not afford to take care of all of the children still living at home on her own. My older sister Gregoria stayed with my mother's parents in Mexico. The rest of us moved to San Antonio where my mother worked in restaurants and continued to take in sewing to provide for us. We moved around quite a bit when we were growing up because my mother also worked as a migrant farmworker. My mother took us to Ohio and Indiana to work on farms. She cooked for the migrant workers and sometimes also worked in the fields picking vegetables. We moved often, following the crops. I went to school in Ohio and Indiana depending on the time of year.

7. When I was about nine years old, my mother sent Juanita, and me to live with our older sister, Yolanda. Yolanda was about 24 years old and married to Amador Acevedo when Juanita and I came to live with her. Juanita was 11years old. Yolanda worked for a family in San Antonio, Texas and had 3 children of her own. Juanita and I shared a bedroom in Yolanda's house.

8. Yolanda and her husband were both very tough on us. Yolanda beat us when she felt frustrated about having to care for us. She did not want us there. She slammed our heads against the walls. We were not allowed to touch the cereal boxes or other food in the kitchen. We could only eat what Yolanda put in front of us to eat. When we ate something she did not tell us we could eat, she beat Juanita and me.

Initials: _____                                    Date: _____

A-000570

9.      One time when I was 10 years old, Yolanda stripped off my shirt and put me outside the house in the cold to punish me for some small mistake I had made. She left me outside for hours without my shirt on.  She did this with Juanita too. We were treated like Cinderella in Yolanda's home. We had many chores to do and we rarely went to school because she made us babysit her children most of the time.

10.     Amador was not a nice man. Yolanda threatened to take my or Juanita's shirts off and let Amador stare at our bare chests if we did not behave. The worst abuse came from Amador. Juanita and I were both molested ~~and raped~~ by Amador. We could not escape it. *He would take down his pants + force us to touch him. He would touch us naked.*

11.     Juanita was a very shy and timid girl. She did not speak up against Yolanda or Amador. I stood up against them and fought to protect both of us, even though I was two years younger than Juanita.

12.     When I was about 11 years old and Juanita was about 13 years old, we moved from Yolanda's home in San Antonio, Texas to West Palm Beach, Florida to live with my mother again. We were very poor. We had no car and took the bus everywhere. We worked on the farms picking oranges and vegetables where my mother and her sister worked. We lived in a neighborhood of migrant farm workers.  Ricardo Sanchez, Sr. lived with his family in the same neighborhood, having moved there from Brownsville, Texas. Juanita met Ricardo because he lived across the street from us.

13.     My mother's sister Paula and her family lived in West Palm Beach, Florida and did migrant farm work. Paula had three daughters: Beatriz, Graciela, and Minerva. Beatriz is Daniel Varela's mother.

Initials: _____                                        Date: _____

14.     I did not graduate from high school, nor do I have my GED. I worked in the fields picking vegetables when I was a teenager. I worked instead of finishing school to help my mother earn enough money to feed our family.

15.     No one in my family thought it was a good idea for Juanita to marry Ricardo Sanchez, Sr. We told her not to marry him. He was very full of himself and not a kind man. But Juanita did not listen to us. She wanted to get out of our house and she saw Ricardo Sr. as the way out. They were married when Juanita was 17 and Ricardo Sr. was 20 years old.

16.     Ricardo Sr. went out often and drank large amounts of alcohol. He came home after drinking all night and started arguments with Juanita. He smacked her around and beat her. When she was three months pregnant with her first son, Efrain, Ricardo Sr. shot her in the face in a drunken rage. Ricardo Sr. was arrested and Juanita had to go to the hospital.

17.     When Juanita was discharged she came and stayed with my mother and me. We pleaded with her not to talk to Ricardo Sr. or go back to him. Ricardo sent his sister, Nora, to talk to Juanita and encourage her to go back to Ricardo Sr. Juanita stayed with us for a while and then went to Houston, Texas to stay with my sister Gregoria after Efrain was born. She called Ricardo Sr. and went back to him after Efrain's birth. We could not convince her to leave Ricardo Sr. I thought Juanita was crazy to go back to Ricardo Sr. and to stay with him for all these years.

18.     After Efrain was born, my mother, Juan Antonio, Lucy, and I moved back to San Antonio, Texas. I was 17 years old. I started working in a factory called American Lantern where I made and assembled light fixtures. I worked there for a long time. I have worked in factories since that time. I still work in a cornmeal factory.

Initials: _____          Date: _____

A-000572

19.    I married Hector Hernandez in 1984 in San Antonio. Juanita brought Efrain and Nydia to my wedding because she did not want to leave them alone with their father. My children, Hector, Alex, and Deyaneris, are all much younger than Juanita's children.

20.    Ricardo Sr. was mean and angry, controlling and manipulative. Juanita told me that Ricardo Sr. ran their house like a general and she and the children were soldiers. Ricardo Sr. demanded to know everything that went on when he was away from home. Everything was always for Ricardo Sr. He spent most of the money he earned on himself, leaving Juanita and the poor children with almost nothing. Ricardo Sr. always had nice clothes and shoes, while the children dressed in raggedy old clothes. He went out to bars at night and was often with other women. Juanita told me that sometimes he came home with marks on his neck from other women kissing him. He rarely let Juanita and the children leave the house.

21.    Ricardo Sr. beat the children as well as Juanita. Ricardo Sr. beat his daughter Nydia so hard she had bruises all over her body. It was hot in Florida, but she had to wear long sleeves to cover the bruises.

22.    My brother, Natividad, was shot and killed in May 1989. He had always been my mother's favorite child, and she was heartbroken.

23.    When Ricardo Jr., or as our family calls him, Ricardín, was a small boy, he came to visit our family in San Antonio. Ricardín came to stay with us when he was very little. Ricardín fell off a tricycle and hit his head while he was with us. My brother, Juan Antonio, took him to the hospital. He had to have many staples put into his head.

24.    Ricardín came again to visit us a few years later, this time with more of his family. Ricardín was a very quiet boy. He rarely spoke, but he smiled a lot and was very

Initials: _____               Date: _____

A-000573

respectful. He seemed mentally slower than his brothers and sister. He followed his siblings around and stayed close to them. They made the plans and he followed them.

25.     Ricardín was very obedient. He had to be told what to do every step of the way, but he always tried to do as he was told and did not talk back. He did not remember directions that were given to him. We told him repeatedly what to do. He was very forgetful.

26.     Juanita and I have a close relationship. We speak on the phone often and I usually know what is going on with her and the kids. She told me when Ricardín was arrested. She was terrified for him and could not believe it. It was definitely a shock to all of us. This does not seem like something Ricardín could be capable of doing.

27.     Before Ricardín went to trial, Lisa McDermott, his investigator, and a young man came to visit me. They asked me how Ricardin was as a child. They wanted to know if he was a good boy. They did not ask me much of anything else. We had a nice talk but I did not hear anything else from them. I was not asked to testify at trial, and I did not attend trial. If I had been asked, I would have testified to all I say here.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on** _____

**Name** _____

Initials: _____                                     Date: _____

A-000574

**Declaration of Ezequiel Sanchez**

**Pursuant to 28 U.S.C. §1746**

I, EZEQUIEL SANCHEZ, declare as follows:

1. I am Ricardo Sanchez, Jr.'s younger brother. I am the fourth child born to Ricardo Sanchez, Sr. and Juana Maria Jimenez Sanchez. I am almost two years younger than Ricardo. I have four siblings total. They are in order: Efrain, Nydia, Ricardo Jr. and Omar Diaz Sanchez. Omar was adopted by my parents when my father's younger sister Ana died in childbirth.

2. Growing up in my house was like a nightmare. My father drank all the time and came home drunk with marks on his shirt from messing around with other women. My mother became very angry and argued with my father. My father returned the favor by beating my mother, throwing things at her and screaming mean things at her. There were very few nights that my siblings and I did not run to our room crying, hoping we were not next to get a beating.

3. My father was a controlling man who expected us to always be on our best behavior. If he thought we were not, we could expect to be punched or slapped around. When I was growing up I only thought of my father as angry and mean. We lived in a run-down apartment project called Dyson Circle in West Palm Beach when we were young children. Our home was surrounded by drug dealers, drug addicts and the police. I have vivid memories of finding guns and needles discarded in the yard around our apartment. I remember watching guys fleeing the police only to be caught and wrangled to the ground. It was a bleak environment.

4. When I was about 9 years old we moved to the neighborhood where my parents still live on Coconut Road in West Palm Beach. Even though it was still a low income neighborhood, it was a step up from our old neighborhood which was a housing project called Dyson circle.

Initials:

1

A-000575

Date: 7/31/16

5.      I was not in the same classes with Ricardo when we were in school, but I recall that he had trouble reading and always needed help with his homework. I never saw Ricardo read anything for fun. He liked to play video games and watch movies. He played whatever everyone else was playing. Ricardo was not one to make a plan; he just followed along with what we were doing. Sometimes Ricardo would just sit in front of the television for a long time. He was not watching television. It seemed like he was lost or blank.

6.      Ricardo wanted to please my mother and father. He tried very hard. He tried to do what he was told, but my parents still got angry and Ricardo was whipped and beaten by both my parents.

7.      My older brother, Efrain, was born with what my mother called "problems." He was not smart. He had terrible seizures and acted out in bizarre ways. There were periods of time where he acted crazy. He spent time in the state mental hospital for setting a fire in our parent's home. He has trouble finding a job because of his problems.

8.      Ricardo and I had a turbulent relationship. We did not always get along. In high school there was a period of years when I did not talk to Ricardo even though we lived in the same house. I also was fed up with my parents arguing all the time. I ran away from home. I ended up staying with my Aunt Nora and her sons: Jose Antonio, Juan Carlos, and Miguel. I stayed there for a couple of years. It was better for me. I felt safe and calm. I did not make up with Ricardo until he found out Maria was pregnant with their son.

9.      I knew my mother's uncle Benito Rodriguez from family functions. He came to the house for barbecues or we went to his house for parties. I knew that he and my cousin Danny Varela had a close relationship. I knew what Danny's business was. He sold cocaine. I was upset when Ricardo started hanging around Danny and his friends. Ricardo wanted to have money like

Initials:

2

Date: 7/13/16

Danny did. Danny always had nice clothes, gold jewelry and plenty of cash. Danny even had a completely gold grill with diamonds on his teeth. Shortly after Ricardo started hanging around with Danny he started acting and dressing just like him. He copied everything that Danny did. He even started talking like Danny. Ricardo did anything that Danny asked him to do.

10. Ricardo had a hard time keeping a job. He only ever had simple, labor jobs. Most of the jobs he got from my father or Maria's father asking their friends if he could work for them. He worked caulking windows. He dug sewer ditches and did roofing for a while. Ricardo never kept a job for long because he is forgetful and showed up late or forgot something he was supposed to do and got fired.

11. I was very upset and scared for Ricardo when he was arrested. I could not believe that he got himself into such a mess by hanging out with Danny and his friends. I tried to do what I could to help. I met with Ricardo's investigator, Lisa, several times. She did not ask me to testify. I did not attend the trial because I had to work to support my daughters. But I would have testified to all I say here if they had asked me to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___July 31, 16___

Name _____

Initials: _____

3

A-000577

Date: _7/31/16_

## Declaración de Juana Maria Sanchez
## Según 28 U.S.C. § 1746

Yo, Juana Maria Sanchez, declaro lo siguiente:

1. Soy la mamá de Ricardo Sanchez, Jr. ~~Ricardo~~. Yo lo llamo Ricky. Ricky es el tercer hijo de mi esposo y yo. Tenemos cuatro hijos juntos: Efraín, Nydia, Ricardo Jr. Y Ezequiel. También adoptamos el hijo de la hermana de mi esposo quien tuvo un problema del corazón y murió dando luz. Su nombre es Omar Díaz Sanchez.

2. Yo nací en Matamoros, México en 1963. Mis padres eran Maria de La Luz Betancourt y Antonio Jimenez. Fui la cuarta hija de seis hermanos. Ellos son Yolanda, Natividad, Gregoria, Elsa, Juan Antonio y Lucy. Cuando era joven mi familia y yo vivíamos en Matamoros en una casa cerca de la ciudad. Mi papá trabajaba en un negocio que hacía muy poco dinero. Mi mamá cocía para ayudar a mi papá proveer para nosotros. Éramos pobres. Mis padres hicieron el esfuerzo de cuidar y dar comida a los siete niños. Mis hermanos mayores no pudieron terminar la escuela en Méjico porque tenían que pagar el costo para el bachillerato. Mis hermanas fueron a trabajar afuera de la casa con familia en los Estados Unidos cuando tenían como 15 años. Mi hermana Yolanda, nos traía botas y ropa de los Estados Unidos porque mi mamá no podía comprarlos en Méjico. Todos mis hermanos mayores les dieron dinero a mis padres para ayudar con la casa.

3. Mi papá era un alcohólico severo. Él golpeaba a mi mama con frecuencia. El golpeaba a nosotros, los niños también. Después que nací, mi mamá y papá se separaron por un tiempo porque el abuso de mi mamá siguió. Él también la estaba engañando con otras mujeres. Mi mamá botó a mi papá varias veces. El siempre volvía y continuó a tomando y golpeándola. Los últimos cuatro hijos de mis padres nacieron después que volvieron juntos. Mi mamá me decía que cuando nos mudamos a los Estados Unidos que la vida iba a ser mejor porque los

Iniciales J S

1

Fecha 8/4/16

A-000578

hombres no les golpeaban a las mujeres allá. Mi mamá y papá nos mudamos a San Antonio, Texas.

4. Cuando tenía nueve años, mi papá murió de una enfermedad del hígado. El dejó a mi mamá que cuidara siete niños sola. Ella empezó a trabajar afuera de la casa haciendo preparatorios para restaurantes y continuó cociendo. También empezamos a trabajar en las fincas recogiendo frutas. Empecé a trabajar a los *(12)(JS)* años recogiendo manzanas en Michigan. Mis hermanos mayores trabajaron y también le enviaban dinero a mi mamá para ayudarnos.

5. Cuando tenía *(10-11) (JS.)* años, mi me mamá mandó a mí y a mi hermana Elsa a vivir con mi hermana mayor, Yolanda. Yolanda, estaba enfadada de que ella nos tenía que cuidar. Ella no era buena con Elsa y yo. Ella le daba a sus niños lo que quería para comer y Elsa y yo tuvimos que comer lo que nos ponían en frente. Nos golpeaba y nos castigaba. Yolanda nos hacía hacer cosas raras como quitar nuestra ropa y pararnos afuera en el frío. A veces ni sabíamos por qué nos castigaban. Yolanda tiene problemas mentales.. Esto no lo sabíamos cómo niños, pensábamos que ella era loca y mala.

6. Después que murió mi papá, mi mamá tenía que trabajar afuera para ayudarnos. Viajamos a las fincas en Michigan para recoger manzanas. En Indiana, recogíamos fresas. Recogimos tomates en Ohio y en la Florida vegetales como pimientos y pepinos. Ella llevaba a sus menores con ella para que trabajaran en el campo. Trabajamos durante la semana después de la escuela donde íbamos. También trabajábamos el sábado y domingo si había trabajo. El ingreso iba a mi mamá para sobrevivir.

7. Ocasionalmente, podíamos ir a la escuela cuando estábamos en otros estados. Me acuerdo de haber ido a la escuela en Toledo, Ohio y Michigan. Eventualmente, mi mamá

Iniciales  J S

2

A-000579

Fecha  8/4/16

decidió quedarse en West Palm Beach, Florida. Trabajamos en los campos y estaba cerca de mi hermana, Paula Rodriguez y sus hijos.

8.     Mi mamá trajo a mi hermano Natividad, a mí, Elsa y Juan Antonio y Lucy con ella a West Palm Beach. Mi hermano mayor consiguió trabajo y se salió de la casa de mi mamá. Vivíamos en casa que nos proveyeron para los que trabajaban en los campos. Se llamaba Campo Verde. Había un grupo con edificios de dos pisos, como apartamentos. El nuestro tenía dos alcobas y un baño. Estaba deteriorado y en mal estado. Era el trabajo de Elsa y mio mantener el apartamento limpio. Yo limpiaba la parte de arriba y ella la parte abajo. No había teléfonos en los apartamentos. El campo tenía dos teléfonos de pago y uno tenía que caminar hacia ellos y esperar su turno para hacer una llamada. Yo trabajaba en fincas hasta que tuve 15 años. Los químicos que rociaban olían horrible y me dolían la nariz con su fuerte olor de químicos. Las plantas estaban cubiertas con polvo blanco y nos untábamos por todas las manos y ropa. No teníamos guantes ni mascaras.

9.     Éramos trabajadores de día en las fincas agriculturas. El hombre que nos pagó nos recogió del campo de vivienda en un bus grande. Olía a personas sucias y era terriblemente caliente. No había aire acondicionado y teníamos que montarnos 25 minutos cada viaje.

10.     Mi tía Paula tuvo cinco hijos. Son Armando, Beatriz, Benito, Graciela y Minerva. Estuvimos juntos cuando éramos niños en las reuniones de familia. Mi primo Benito Rodiguez se interesó en mi familia y trató de ayudarnos cuando podía. Él nos manejaba a la tienda para comprar comida. No teniamos carro. Mi prima Beatriz es la mamá de Danny Varela. A mi prima Minerva la mataron en un robo de casa en el 2001. Ella tenía dos hijos, Jesseina y Fermin y fueron a vivir con Paula cuando ella murió. Mi primo Armando fue deportado a Méjico. Él fue adicto y fumó la cocaína crack y se metió en problemas.

Iniciales J S

3

A-000580

Fecha 8/4/16


11.     Cerca del campo de trabajadores vivía la familia Sanchez. La familia Sanchez tenían varias cosas en común con nuestra familia. La familia vino de Matamoros, Méjico y vivían en Brownsville, Texas por un tiempo. Mi mamá los conocía antes de mudarnos a la Florida. También la familia Sanchez entera trabajó en las fincas de la Florida. Habían viajado dentro de muchos de los mismos estados como mi familia para trabajar en las fincas. La familia Sanchez también tuvieron varios niños que eran de la misma edad mía y las de mis hermanos. Así es que conocía a Ricardo Sr. Lo veía casi todos los días. Éramos amigos. El me molestaba, que yo era muy joven para hablar con él. Iba a los bailes en la comunidad y bailaba con Ricardo. *(J S)* ~~Aunque él tenía novia el siempre bailaba conmigo.~~ No estaba supuesta a bailar con Ricardo. Mi hermana Elsa, le chismoseaba a mi mamá cada vez que me veía bailar con él. Aunque mi familia me advirtió no hacerlo, me casé con Ricardo Sanchez, Sr., cuando tenía 16 y Ricardo Sr. Tenía 20 años. Mi familia no quería que me casara con Ricardo porque sabían que él tomaba demasiado. Pero sin embargo, no me dijeron antes de casarnos. Mi mamá me seguía diciendo que era muy joven para casarme y que esperara por otro hombre. No sabía cuánto tomaba Ricardo hasta después que nos casamos. *Me fuí De mi cASA Abr/17 mAyo 10, 1980 (JS)* y *nos CASAmos*

12.     Los padres de Ricardo eran Modesta García y Aurelio Sanchez. Ellos tuvieron siete hijos. Son Ricardo, Rolando, Martin, Ana, Nora, Ellian, Sergio y Aurelio Jr. Todos menos los dos menores de los niños nacieron en Matamoros, Méjico. Mi hermana Elsa y yo éramos buenas amigas con Nora y Ana. Ricardo y yo nos casamos el 10 de mayo de 1980. Nos *(SUS) (J.S.)* mudamos al apartamento de mis padres en el campo de los trabajadores.

13.     Poco después que Ricardo y yo nos casamos, descubrí que era alcohólico. Él tomaba al parecer todos los días. Salíamos juntos algunas veces cuando nos casamos al principio

Iniciales J.S.

**4**

A-000581

Fecha 8/4/16

pero poco después, él quería que me quedara en casa mientras que él salía.  Estaba segura que

estaba saliendo con otras mujeres.  Quedé embarazada con mi primer hijo en 1980.

      14.    Ricardo Sr. Se puso más violento en los meses antes y después de mi embarazo. *JS.*

*ESTABA celoso.*

En septiembre del 1980, Ricardo Sr., me disparó en la cara porque ~~dejé de tener sexo con él.~~

Tenía un mes de embarazo con Efraín. Tuve que ir al hospital y me trataron por la herida del

*a Ricardo lo arrestaron y estuvo preso 9 meses*

disparo.  Estuve en el hospital por dos meses. Después que me dejaron salir del hospital, no pude *(JS)*

volver a vivir con Ricardo Sr. porque tenía mucho miedo y estaba enojada. Fui a vivir con mi

mamá hasta que nació el bebé, después a Houston, Texas para quedarme con mi hermana

Gregoria.  La hermana de Ricardo, Nora me llamaba y me visitaba, pidiéndome que hablara con

Ricardo Sr. Ella quería que nos reconciliaramos.  No quería hablar con él.  Sin embargo,

después que nació Efraín, llamé a Ricardo Sr. y le pedí que me recogiera.  Quería que pagara por

sus errores y que nos diera apoyo a Efraín y a mí.  Volví a vivir con él y su comportamiento

controlador y violento continuó. *Yo regresé porque pensé que a Efraín le hacía falta tener un papá. (JS)*

      15.    La familia de Ricardo Sr, como la mía era violenta. Me gustaba el papá de

Ricardo Sr. pero él era un fuerte bebedor.  Él era más simpático que la mamá de Ricardo, pero

era violento con Modesta.  El papá de Ricardo iba detrás de Modesta con un machete y también

la golpeaba. Modesta me seguía e iba a mi casa a espiarme. Ella me quería coger haciendo algo

malo.  Yo la ví por la ventana en varias ocasiones solamente mirándome.  Ella pensó que me iba

coger engañando a Ricardo o haciendo algo que no iba aprobar.  El manejaba un camión por

largos tiempos y a menudo no estaba en casa por varios días.  Ella me vigilaba para él.  También

Ricardo Sr. no me permitía salir de la casa sola aún por algo simple.  El llamaba a su mamá para

que me vigilara para que ella le reportara.  Eso me ponía triste.  Aún hoy en día Ricardo Sr., no

Iniciales JS

**5**

A-000582

Fecha 8/4/16

me deja salir de la casa sola. Casi siempre él le dice a Efraín que vaya conmigo, aun si es para caminar o ir al parque.

16.   Efraín tiene problemas mentales, es lento en su inteligencia y ha sufrido de ataques epilépticos desde que era pequeño. Él ha estado tomando medicina para controlar los ataques por varios años. Pienso que cuando me dispararon al comienzo de mi embarazo con Efraín, esto causó problemas. Dentro de dos años nacieron Nydia y Ricky. No tuve casi ningún cuidado pre natal. Fui al doctor para una infección mientras que estaba embarazada con Ricky. El nacimiento de Ricky fue diferente que los otros dos anteriormente. En vez de que se rompiera mi agua, empecé a sangrar. Pensé que algo no estaba bien. Me apuré al hospital y tuve a Ricky. No supe porque eso pasó.

17.   Era bastante trabajo cuidar a tres niños pequeños. Ricardo Sr., salía casi todas las noches y me dejaba en casa cuidando a los niños mientras que él estaba tomando. Con frecuencia venía a la casa borracho y enojado. Ricardo vino a casa e inmediatamente empezó un argumento conmigo. Él decía cosas malas y degradantes sobre mi apariencia y como cocinaba. El tiraba platos de comida y jarras de limonada hacia mí. A veces el tiraba botellas de cerveza. El me golpeaba y me daba cuando estaba enojado.

18.   En abril del 1985, nació mi hijo más joven, Ezequiel. Mis otros tres niños estaban bajo la edad de 5 años. Estaba abrumada cuidándolos. Estuve sola. No pude depender de mi suegra porque uno de los vecinos decía que cada vez que dejaba a mis niños en casa de ella, ella les daba y los golpeaba. Mi esposo no tenía ni idea como cuidar a los niños. El no cambiaba un pañal ni les daba comida a los niños. Una noche dejé a Ricardo Sr., con Ricky cuando era bebé mientras que corría a la tienda para comprar leche. Llegué a casa y en vez de cambiar el pañal

Iniciales

6

A-000583

Fecha

del bebe, él tiró uno encima de la ropa del bebe y pañal sucia. No me pude imaginar lo que estaba pensando.

19. Mi esposo fue arrestado varias veces en los años que estuve embarazada con los niños. Teníamos muy poco dinero y vivíamos en los proyectos. El vecindario estaba lleno de drogas y peleas. Casi todo el tiempo, estaba sola en la casa cuidando a los niños. Mi mamá y mis hermanos excepto Natividad se mudaron a San Antonio, Texas como en el 1982. No tuve ninguna ayuda de ellos para que me cuidaran los niños. Cuando Ricardo Sr. vino a casa, el peleaba conmigo enfrente de los niños, y golpeaba a los niños. Odiaba verlo golpear a los niños. No quería que les causara daño. No me gustaba que nos viera peleando, pero no había manera de ocultarlo. Mis hijos le tenían miedo a su papá. Cuando él llegaba borracho, los niños se dispersarían y se escondían. Me acuerdo de haberlos oído llorar pero no podía ir a consolarlos porque eso ponía a Ricardo Sr., furioso. Traté de proteger a los niños calmando a mi esposo. Casi nunca trabajaba. Ricardo Sr., peleaba conmigo hasta que se iba a la cama.

20. Ricardo Sr., nunca tenía nada bueno que decir a nosotros. Mis niños le tenían terror de lo que pudiera hacerme su papá. Una vez, Ricardo Sr., me golpeó tan duro por la cara que me caí al piso. Nydia bajó a chequearme y decidió llamar a la policía. Hasta el tiempo que llegó la policía, Ricardo Sr., salió por la puerta de atrás y cruzo la calle y hacia el bosque. Él se quedó allí hasta que se fue la policía. Él estaba tan enojado con Nydia. El gritó y le tiró cosas a ellas.

21. Cuando Ricky tenía tres años, vivíamos en un apartamento en Dycon Circle en West Palm Beach. Un día mi esposo y yo nos dimos cuenta que Ricky se estaba quedando dormido. Estaba suelto y balanceándose de lado a lado. El apartamento tenía dos pisos y llevé a Ricky arriba para ponerlo en la cama. Me di cuenta de7 una botella abierta de pastillas de la

Iniciales

7

Fecha

Iniciales J S

medicina para los ataques de Efraín. Conté que había 18 pastillas que faltaban. Yo pedí a Ricardo Sr. que llamara una ambulancia y corrí a la farmacia para ver que le daba a Ricky. La ambulancia llevó a Ricky al hospital y él estuvo en coma por 12 horas. Tenía mucho miedo.

22. Ricky tuvo otro accidente cuando tenía menos de cinco años. Él estuvo visitando a mi mamá en San Antonio. Él estuvo allí como por un mes cuando mi mamá llamó y me dijo que Ricky estaba jugando y se cayó y se partió la cabeza. Mi hermano Juan Antonio corrió al hospital donde le tuvieron que poner varios puntos en su cabeza. Yo fui y lo traje a la casa después de eso.

23. Ricky parecía estar enfermo bastante cuando era niño. Él fue hospitalizado varias veces por la pulmonía. También él era alérgico de varias cosas cuando era niño. Si tocaba algo él tenia una reacción, como una erupción o problemas al respirar. Cuando él no podía respirar corría a la sala de emergencia en el hospital donde le daban la medicina.

24. Ricky a veces parecía estar en otro mundo. El no respondía a no ser que yo lo llamaba varias veces cuando esto pasaba. Él estaba en blanco y le tenía que poner la atención otra vez donde estuviera. Me acuerdo que la escuela mencionaba esto y sugirieron que lo llevara al doctor para que lo chequearan. No lleve a Ricky al doctor para esto. No entendí lo que estaba diciendo la escuela. Pensé que estaban diciendo que Ricky estaba distraído o no prestando atención a la maestra. Casi siempre estaba distraído en la casa y no pensé que era un problema severo. Mirando atrás, quisiera haber puesto más atención a esto.

25. Para mi Ricky parecía manso y tímido. Siempre estaba esperando para que algo malo pasara. El solamente hacía preguntas básicas como, adonde vamos, o que hora es. Él no era un niño curioso. Ricky era apegado y cariñoso. Siempre estaba apegado a mí cuando estaba

8

A-000585



pequeño. Él le gustaba verme en la cocina cocinando o me seguía cuando estaba limpiando la casa.

26. Los hombres de la familia de mi esposo eran machistas. Eran duros con las mujeres y se ponían ellos mismos de primero. Mi esposo era muy machista. El dinero que el hacía iba hacia él. Él se compraba ropa buena y salía con frecuencia. Solamente lo que sobraba iba hacia la familia. El tío de la mamá de Ricardo Sr. era Santos Garcia, era el modelo para imitar. Él era un hombre violento y mi esposo trataba a su familia de la misma manera que hizo Santos.

27. Mi esposo hacia cosas locas cuando estaba enojado. No solamente argumentaba y peleaba conmigo, pero a veces entraba a su camión grande y volteaba las llantas creando todo tipo de polvo y humo. El manejaba en círculos conmigo en la cabina del camión solamente porque estaba enojado. Me asustaba y no entendía su comportamiento. Pensé que todo su alcoholismo debio de haber causado daño a su cerebro para el portarse así.

28. Todos mis hijos asistieron al programa Head Start antes de que comenzaron la escuela. Ricky le gustaba ir y aprendió algunas cosas básicas antes de comenzar la escuela.

29. En 1989, Ricky empezó la escuela elemental de Berkshire en Palm Beach County. Efraín y Nydia estaban también asistiendo a la escuela. Hablaba en Español con mis hijos en casa, pero también aprendieron el inglés. Pusieron a Ricky en clases de inglés como un segundo idioma. Pensé que eran clases especiales para ayudar a Ricky en la escuela. Cuando Ricky estaba en el segundo grado, la escuela me dijo que examinaron a Ricky y que él tenía problemas en aprender. Ricky parecía el más lento en aprender de todos mis hijos. Ezequiel estaba en clases especiales también pero Ricky era más lento que Ezequiel. Ni yo ni mi esposo asistimos reuniones en la escuela para Ricky. Fui a algunas reuniones para conocer a los maestros cuando

Iniciales  J S

9

A-000586

Fecha 8/4/16

Ricky estaba en la escuela elemental, pero mi esposo generalmente estaba trabajando y yo estaba cuidando la casa.

30.     Ricky siempre necesitaba ayuda con su tarea. Generalmente, Nydia lo ayudaba. Estaban cerca de edad y a veces tenían trabajo similares. Ricky no era bueno para leer.  Le costaba trabajo estudiar para los exámenes.  Nydia trató de ayudarlo que memorizara números o palabras pero él no lo podía hacer. Era difícil para mí ayudar a Ricky. Solamente terminé el sexto grado y no leo el inglés.  Él era olvidadizo  y la información no se le quedaba en la cabeza no importa cuántas veces le decía.  *Ricky paró la esuela en Decimo (10) grado. ( )*

31.     Ricky era obediente en la casa y trataba de hacer lo que yo le decía.  Casi siempre le tenía que pedir a Ricky más de una vez de hacer algo. El como que se le olvidaba lo que le pedía hacer y necesitaba ayuda en hacerlo.

32.     En 1995, mi esposo y yo compramos una casa pequeña por el Southern Boulevard en West Palm Beach. Pudimos obtener a la casa porque ya iban a anular una hipoteca. El nuevo vecindario todavía era de bajos ingresos, pero el nuevo vecindario no estaba invadido de drogas o peleas.  La mayoría del vecindario eran Blancos y Latinos cuando nos mudamos.  Algunos de nuestros vecinos eran racistas. Decían cosas como ¡regresen de donde vinieron! Este problema siguió por un tiempo y tuvieron que llamar a la policía varias veces.

33.     También llamé a la policía después que supe que uno de los hombres que vivía por la calle molestó a Efraín. Efraín se montó en su bicicleta para visitar un amigo que vivía cerca del hombre.  Efraín me llamó desde la casa del hombre y dijo que necesitaba ayuda en arreglar su antena. El hombre pasó al teléfono y dijo que él estaba seguro y que Efraín llegaría pronto. Efraín si llegó a la casa y le dijo que tuvo un ataque en la casa del hombre.  Cuando el

salió de su ataque, el hombre bajó sus pantalones y le tocó su pene. Yo llamé a la policía y me dijeron que iban hablar con el hombre pero nunca oí más sobre eso.

34.     Cuando mis hijos eran mayores, la violencia en mi casa se puso peor. Mi esposo golpeaba a mis hijos. Él los regañaba y los golpeaba o pegaba si creía que no se estaban comportando bien. Parecía que cada vez mi esposo estaba pegando o golpeando a alguien en la casa. A Nydia le jalaba el pelo cuando Ricardo Sr. no le gustaba algo que ella hacía. Él le daba puñetazos y dejaba golpes o contusiones por todo el brazo. Yo le hacía poner blusas con mangas largas para esconder los golpes. Mi esposo no le gustaba que los niños salieran excepto para la escuela. Él era extremadamente controlador con todos nosotros. Unas pocas veces Ricky y Efraín trataron de protegerme del abuso de Ricardo Sr. Ricky se paraba contra Ricardo, pero eso solamente lo enojaba más.

35.     Yo si trabajé afuera de la casa entre 1996 hasta 2001 en el mercado de Publix. Me gustaba trabajar afuera de la casa, pero tuve que renunciar cuando Efraín entró a ~~bachillerato~~. *la escuela secunDARiA (JS)* Los ataques venían con más frecuencia y lo tenía que recoger en cualquier momento. Me sentí abrumada regularmente por mis responsabilidades con mi familia. Nada de lo que yo hacía era bueno para Ricardo Sr. Siempre me estaba humillando y sofocando. A veces ni sabía adonde estaba mi cabeza. Ricky tenía como 13 años y llevé a todos los niños a la tienda conmigo. Yo fui e hice mis compras y volví a casa donde encontré a Omar sentado en frente del pasto comiendo una naranja. Lo dejé allí. Él nunca llegó a entrar al carro con los otros niños. No podía creer que fue tan descuidada dejándolo atrás. *la escuela secun DARiA (High school) (JS)*

36.     Ricky estaba en ~~bachillerato~~ cuando conoció a Maria Lopez. Después que salieron por un tiempo, ella quedó embarazada con mi nieto, Ricardo Sanchez, III. La familia lo llama Three. Pensé que Ricky era muy joven para ser padre, pero parecía que quería estar envuelto.

 

Poco después de su cumpleaños de los 19 años, Ricky se mudó con Maria y su mamá, Rachel Ramos. Estuve triste cuando Ricky se fue de la casa. Ricky quería estar con su hijo, pero también estar alejado de su papá y todas las peleas en casa. *Traté de llevar a Ricky a coger su GED, pero nunca lo pudo hacer (JS)*

37. Ricky trató de buscar trabajo para poder mantener a María y Three. Él trabajaba en construcción. El papá de Maria le consiguió trabajo con un amigo que tenía un grupo de construcción. Él no se quedaba con un trabajo por largo tiempo. Ellos estaban luchando para vivir y se mudaron a Carolina del Norte para buscar mejor trabajo. Ricky venía a mi casa unas veces durante la semana. Generalmente eran los domingos.

38. Después que Ricky y Maria se dejaron, el no venía a mi casa mucho. El empezó a andar con el hijo de mi prima Beatriz, Danny Varela. No conocía a Danny muy bien, pero no me gustaba le influencia que tenía con Ricky. Ricky cambió. Él se vestía diferente y empezó a usar joyas como Danny. Él se comenzó a meterse en problemas con la policía y estaba muy preocupada por él. Sabía que Danny tenía problemas y tenía miedo que iba a meter a Ricky en muchos problemas. Le dije a Ricky lo que pensaba, pero él penaba que Danny era como familia y su amigo. Ricky le tenía confianza a Danny.

39. Cuando Ricky fue arrestado, estuve horrorizada. Tenía miedo y realmente no sabía lo que estaba pasando. Pusieron a Ricky en la cárcel y él tuvo abogados y un investigador. La investigadora, Lisa, vino hablar conmigo en varias ocasiones. Ella no hablaba Español, entonces dependí de mis hijos que me explicaran todo lo que estaba pasando.

40. Visité a Ricky en la prisión con frecuencia antes de su juicio. Ricky tenía miedo y estaba muy triste. Sé que le consoló de que lo visitara, pero parecía que estaba muy confundido de lo que estaba pasando en el caso. No pude calmar sus temores. Durante el juicio estaba

Iniciales _J S_

12

A-000589

Fecha _8/4/16_

sentada detrás de Ricky. No le podía ver la cara, pero él estaba callado y quieto. Él no hablaba mucho con los abogados.

41. Como no podía entender exactamente lo que estaba pasando, tenía miedo de tenerle confianza a los abogados de Ricky. Si hubiera entendido lo que estaba pasando, les hubiera dado más información.

*mi esposo ~~tuvimos un accidente~~ tuvo un accidente.*

*42. En 1991 mi esposo*

*Un Barril exploto y la tapa le Dió en la cara y*

Yo certifico que los datos arriba mencionados son verdaderos y correctos, bajo la pena de perjurio bajo 28 U.S.C. § 1746.

*la cabeza. El impacto lo tiró unos 14-20 pies.*
*El se puso mas violento despues de ese accidente.*
*(JS.)*

~~Firmado en~~ *8/4/16*

Nombre *Juana M. Sanchez.*

*Ricardo tiraba los platos y las Jamas cuando le servia la comida, Diciendo "A esto le falta sal." me humillaba y me tiraba las Jaras de Te frio enfrente de los muchachos. Ricky vio y olló todo esoy pasaba Frequentemente porque Ricardo llegaba tomado.*

Nombre *Juana M. Sanchez 8/4/16*

Testigo *Alba S. Johnson 8/4/16*

**Declaration of Juana Maria Sanchez**

**Pursuant to 28 U.S.C. §1746**

I, Juana Maria Jiménez Sanchez, declare as follows:

1.     I am Ricardo Sanchez, Jr.'s mother. I call him Ricky. Ricky is the third child born to my husband, Ricardo Sanchez, Sr. and me. We have four children together: Efrain, Nydia, Ricardo Jr. and Ezequiel. We also adopted the son of my husband's sister, who had a heart problem and died in childbirth. His name is Omar Diaz Sanchez.

2.     I was born in Matamoros, Mexico in 1963. My parents are Maria de la Luz Betancourt and Antonio Jiménez. I am the fourth child born and I have six siblings. They are Yolanda, Natividad, Gregoria, Elsa, Juan Antonio and Lucy. When I was young my family lived in Matamoros in a house near the city. My father worked in a business but made very little money. My mother took in other people's sewing to help my father provide for us. We were poor. My parents struggled to care for and feed seven children. My older siblings were not able to finish school in Mexico because you had to pay tuition for high school. My sisters went to work outside the house with families in the United States when they were about 15 years old. My sister, Yolanda, would bring us boots and clothing from the United States because my mother could not afford to buy them in Mexico. All of my older siblings gave my parent's money to help them keep the house.

3.     My father was a severe alcoholic. He beat my mother frequently. He beat us kids too. After I was born my mother and father separated for a time because of the abuse my mother endured. He was also cheating on her with other women. My mother threw my father out many times. He always came back and continued to drink and beat her. My parents' last four children were born after they got back together. My mother used to tell me that when we moved to the

1

United States life would be better because men did not beat women there. My mother and father moved us to San Antonio, Texas.

4.       When I was nine years old, my father died from liver disease. He left my mother to take care of seven children alone. She started working outside the home doing prep work in restaurants and she continued to take in sewing. We also started working on farms picking fruit. I began working around 12 years old picking apples in Michigan. My older siblings worked and also sent my mother money to help support us.

5.       When I was 10- 11 years old, my mother sent me and my sister Elsa to live with my older sister Yolanda. Yolanda was upset that she had to take care of us. She was not kind to Elsa and me. She gave her children whatever they wanted to eat and Elsa and I had to eat whatever was put in front of us. She hit us and punished us. Yolanda made us do strange things like take our clothes off and stand outside in the cold. Sometimes we did not even know what we were being punished for. Yolanda has mental health problems. We did not know this as children, we just thought she was very crazy and mean.

6.       After my father died, my mother had to work outside the home to support us. We traveled to farms in Michigan to pick apples. In Indiana, we picked strawberries. We picked tomatoes in Ohio and in Florida vegetables like peppers and cucumbers.  She took her younger children with her and we all worked in the fields. We worked during the week after school, when we went. We also worked on Saturday and Sunday if there was work. Our income went to my mother to help us survive.

7.       Occasionally, we were able to go to school when we were in those other states. I remember going to school in Toledo, Ohio and Michigan. Eventually, my mother decided to stay

2

in West Palm Beach, Florida. We worked in the fields there and it was close to her sister, Paula Rodriguez and her children.

8.    My mother brought my brother Natividad, me, Elsa, Juan Antonio and Lucy with her to West Palm Beach. My older brother got a job and moved out of my mother's home. We lived in housing provided for those who worked in the fields. It was called Campo Verde. There was a large group of two story buildings, like apartments. Ours had two bedrooms and a bathroom. It was rundown and in disrepair. It was Elsa's and my job to keep the apartment clean. I cleaned the upstairs and Elsa cleaned the downstairs. There was no telephone in the apartments. The camp had two pay phones and you had to walk to them and wait your turn to make a call. I worked on farms until I was 15 years old. The chemicals they sprayed on the plants smelled horrible and hurt my nose with the strong chemical smell. The plants were covered with white powder and we got it all over our hands and clothes. We did not get gloves or masks to wear.

9.    We were day laborers on agricultural farms. The man who paid us came to pick us up from the housing camp in a big bus. It smelled like dirty people and was terribly hot. There was no air conditioning and we had to ride 25 minutes each way.

10.    My aunt Paula had five children. They are Armando, Beatriz, Benito, Graciela and Minerva. We spent time with them when we were children at family gatherings. My cousin Benito Rodriguez took an interest in my family and tried to help us when he could. He used to drive us to the store to buy food. We did not have a car. My cousin Beatriz is Danny Varela's mother. My cousin Minerva was killed in a home invasion in 2001. She had two children, Jessenia and Fermin, who went to live with Paula when she died. My cousin Armando was deported back to Mexico. He was addicted to smoking crack cocaine and got into trouble.

3

A-000593

11.     Close to us in the camp for workers lived the Sanchez family. The Sanchez family had several things in common with my family. Their family came from Matamoros, Mexico and lived in Brownsville, Texas for a time. My mother knew them before we moved to Florida. Also, the entire Sanchez family worked on the farms in Florida. They had traveled around to many of the same states that my family did to work on farms. The Sanchez family also had several children who were around the same age as me and my younger brother and sisters. This is how I knew Ricardo Sr. I saw him nearly every day. We were friends. He teased me, telling me that I was too young for him to talk to. I went to dances in the community and danced with Ricardo.. I was not supposed to dance with Ricardo. My sister, Elsa, would tattle on me to my mother every time she saw me dance with him. Even though my family warned me not to, I married Ricardo Sanchez, Sr. when I was 16 and Ricardo Sr. was 20 years old. My family did not want me to marry Ricardo because they knew he drank heavily. However, they did not tell me this before we married. My mother kept telling me that I was too young to marry and to wait for a better man. I did not know how much Ricardo drank until after we were married. I left my house on April 17 and we got married on May 10, 1980.

12.     Ricardo Sr.'s parents were Modesta Garcia and Aurelio Sanchez. They had seven children. They are Ricardo, Rolando, Martin, Ana, Nora Ellian, Sergio, and Aurelio Jr. All but the youngest two children were born in Matamoros, Mexico. My sister Elsa and I were good friends with Nora and Ana. Ricardo and I married on May 10, 1980. We moved into his parents' apartment in the workers camp.

13.     Shortly after Ricardo and I married, I discovered he was an alcoholic. He drank what seemed like every day. We went out together sometimes when we were first married, but

4

soon he wanted me to stay home while he went out. I was sure that he was seeing other women. I became pregnant with our first son in 1980.

14.     Ricardo Sr. became increasingly violent in the months before and after I got pregnant. In September of 1980, Ricardo Sr. shot me in the face for because he was jealous. I was one month pregnant with Efrain. I had to go to the hospital and be treated for the gunshot wound. I was in the hospital for two months. They arrested Ricardo and he was in prison for 9 months.  After I was released from the hospital, I could not go back and live with Ricardo, Sr., because I was too scared and angry. I went to live with my mother until the baby was born, then to Houston, Texas to stay with my sister Gregoria. Ricardo Sr.'s sister Nora called and visited me, asking me to talk to Ricardo Sr. She wanted us to reunite. I did not want to speak to him. However, after Efrain was born, I called Ricardo Sr. and asked him to come get me. I wanted him to pay for his mistake and be made to support Efrain and me. I went back to live with him and his controlling and violent behavior continued. I came back because I thought Efrain needed to have his father.

15.     Ricardo Sr.'s family, like mine, had a violent history. I liked Ricardo Sr.'s father but he was a heavy drinker. He was nicer than Ricardo Sr.'s mother, but he was violent with Modesta. Ricardo's father went after Modesta with a machete and also hit her. Modesta followed me around and came to my house to spy on me. She wanted to catch me doing something wrong. I saw her through the window on many occasions just watching me. She thought she might catch me cheating on Ricardo or doing something he would not approve of. He was driving a truck on long hauls and was often not home for days at a time. She kept an eye on me for him. Also, Ricardo Sr. would not allow me to leave the house by myself even for the simplest errand. He would call his mother to come and chaperone me so that she could report back to him. It upsets

5

me. Even today Ricardo Sr. does not like me to leave the house by myself. He often makes Efrain go with me even if it is only for a walk around the park.

16.    Efrain has mental problems, is slow in intelligence and suffered from epileptic attacks since he was small. He has been on medicine to control the seizures for many years. I think that being shot so early in my pregnancy with Efrain caused these problems. Within two years of Efrain, Nydia and Ricky were born. I did not have much prenatal care. I went to the doctor for an infection while I was pregnant with Ricky. Ricky's birth was different than my previous two. Instead of my water breaking I started bleeding. I was afraid something was wrong. I rushed to the hospital and had Ricky. I did not know why that happened.

17.    It was a lot of work to take care of three small children. Ricardo Sr. went out almost every night and left me at home to take care of the kids while he was drinking. Often, he came home drunk and angry. Ricardo came home and immediately started an argument with me. He would say mean degrading things to me about my appearance or my cooking. He threw plates of food and pitchers of lemonade at me. Sometimes he threw beer bottles. He slapped and hit me when he was mad.

18.    In April of 1985, my youngest son Ezequiel was born. My other three children were under the age of 5 years old. I was overwhelmed with taking care of them. I was on my own. I could not depend on my mother in law because one of her neighbors told me that anytime I left the children at her house she hit and beat them. My husband had no idea how to care for children. He would not change a diaper or feed the children. One night I left Ricardo Sr. with Ricky when he was a baby while I ran to the store for milk. I came home and instead of changing the baby's diaper, he had just slapped another on top of the baby's clothes and dirty diaper. I could not imagine what he was thinking.

6

19.   My husband was arrested several times in the years that I was pregnant with the children. We had very little money and lived in the projects. The neighborhood was full of drugs and fighting. Most of the time, I was home alone taking care of the children. My mother and siblings except for Natividad moved back to San Antonio, Texas around 1982. I had no help from them to care for my children. When Ricardo Sr. came home, he fought with me in front of the children, and hit the children. I hated to see him hit the children. I did not want him to hurt them. I did not like for them to see us fight, but there was no way to hide it from them. My children were scared of their father. When he came home drunk the children would scatter and hide. I remember hearing them cry but I did not leave to comfort them because it would make Ricardo Sr. furious. I tried to protect the children by calming my husband down. It usually did not work. Ricardo Sr. fought with me until he went to bed.

20.   Ricardo Sr. never had anything nice to say to any of us. My children were terrified of what their father might do to me. One time, Ricardo Sr. hit me so hard across the face that I fell to the floor. Nydia bent down to check on me and decided to call the police. By the time the police came, Ricardo Sr. was out the backdoor and across the road into the woods. He stayed there until he was sure the police were gone. He was so angry at Nydia. He screamed and threw things at her.

21.   When Ricky was three years old, we lived in an apartment in Dyson Circle in West Palm Beach. One day my husband noticed that Ricky was falling asleep. He was wobbly and swaying from side to side. The apartment had two floors and I took Ricky upstairs to put him in bed. I noticed an open pill bottle of Efrain's seizure medication. I counted 18 pills missing. I made Ricardo Sr. call an ambulance and I ran to the pharmacy to see what I should give to

7

Ricky. The ambulance took Ricky to the hospital and he was in a coma for 12 hours. I was very scared.

22.     Ricky had another accident when he was less than five years old. He was visiting my mother in San Antonio. He was there for about a month when my mother called and told me that Ricky was playing and fell and split open his head. My brother Juan Antonio rushed him to the hospital where they had to put a bunch of stitches into his head. I went and brought him home after that.

23.     Ricky seemed to be sick a lot when he was a child. He was hospitalized for pneumonia a few times. He was also allergic to many things when he was a child. He would rub up against something and have an allergic reaction, like a rash or breathing problems. When he could not breathe I rushed him to the emergency room at the hospital where they gave him medicine.

24.     Ricky sometimes seemed to be in another world. He did not respond unless I called his name several times when this happened. He was blank and I had to bring his attention back to me from wherever he was. I recall the school mentioning this to me and suggesting that I take him to a doctor to have it checked out. I did not take Ricky to a doctor for this. I misunderstood what the school was saying. I thought they meant that Ricky was distracted or not paying attention to the teacher. He was often distracted at home and I did not think it was a severe problem. Looking back I wish I had paid more attention to this.

25.     To me, Ricky seemed meek and timid. He was always waiting for something bad to happen. He only asked basic questions like where we are going, or what time is it. He was not a curious child. Ricky was clingy and affectionate. He was always close to me when he was small. He liked to watch me cook in the kitchen or followed me when I cleaned the house.

A-000598

26. Men in my husband's family were machista. They were hard on women and put themselves first. My husband was very much machista. The money he made went to him. He bought nice clothes and went out often. Only whatever was left over came to his family. Ricardo Sr.'s mother's uncle, Santos Garcia, was Ricardo Sr.'s role model. He was a very violent man and my husband treated his family the same way Santos did.

27. My husband did some crazy things when he was mad. Not only did he argue and fight with me, but sometimes he would get in his big truck and spin the wheels creating all kinds of dust and smoke. He would drive around in circles with me in the cab of the truck just because he was mad. It scared me and I did not understand this behavior. I thought all the drinking must have damaged his brain for him to act this way.

28. All of my children attended the Head Start program before they started school. Ricky liked going and learned a few basic things before he started school.

29. In 1989, Ricky started school at Berkshire Elementary School in Palm Beach County. Efrain and Nydia were already attending school. I spoke Spanish to my children at home, but they all learned English too. They placed Ricky in classes for English as a second language. I thought these were special classes to help him in school. When Ricky was in second grade the school told me that they tested Ricky and he had problems learning. Ricky seemed like the slowest of my children intellectually. Ezequiel was in special classes too, but Ricky was slower than Ezequiel. Neither my husband nor I attended many meetings at school for Ricky. I went to a couple of meet the teacher meetings when Ricky was in elementary school, but my husband was usually working and I was taking care of the house.

30. Ricky always needed help with his homework. Usually, Nydia helped him. They were close in age and sometimes had similar work. Ricky was not a good reader. He had trouble

A-000599

studying for tests. Nydia tried to help him memorize numbers or words but he could not do it. It was hard for me to help Ricky. I only finished the sixth grade and I do not read English. He was forgetful and the information would not stick in his head no matter how many times you told him. Ricky stopped going to school in 10th grade.

31.    Ricky was obedient at home and tried to do what I asked him. I often had to ask Ricky more than once to do something, though. He seemed to forget what I had asked him to do and needed help to do it.

32.    In 1995, my husband and I bought a small house off Southern Boulevard in West Palm Beach. We were able to get the house because it was going to be foreclosed on. The new neighborhood was still low income, but the new neighborhood was not overrun with drugs and fighting. The majority of the neighborhood was White and Spanish when we moved in. Some of our neighbors were racist. They yelled things like, "go back where you came from!" This problem went on for some time and the police were called more than once.

33.    I also called the police after I found out that a man down the street from us had molested Efrain. Efrain rode his bike to visit a friend who lived near the man. Efrain called me from this man's house and said he needed help fixing his antennae. The man got on the phone and told me that he was safe and Efrain would be home soon. Efrain did come home and told her that he had a seizure at the man's house. When he came out of the seizure the man pulled his pants down and touched his penis. I called the police and they said they would talk to the man, but I never heard anything else about it.

34.    As my children got older, the violence in my house got worse. My husband hit the kids. He yelled at them and punched or slapped them if he thought they were not behaving. It seemed like all the time my husband was hitting or fighting with someone in our house. Nydia

10

had her hair yanked when Ricardo Sr. did not like something she did. He punched her and left bruises all down her arms. I made her wear long sleeve shirts to school to hide the bruises. My husband did not like for the children to go out of the house except for school. He was extremely controlling of us all. A few times Ricky or Efrain tried to protect me from Ricardo Sr's abuse. Ricky would stand up to Ricardo, but it only made him angrier.

35.     I did work out of the home from 1996 to 2001 at Publix grocery store. I enjoyed working out of the home, but I had to quit when Efrain was in high school. His seizures came more frequently and I had to be able to pick him up at a moment's notice. I regularly felt overwhelmed by my responsibilities to my family. Nothing I did was good enough for Ricardo Sr. He was always humiliating me and putting me down. Sometimes I did not know where my head was. Ricky was about 13 and I took all the kids to the store with me. I went and did my shopping and returned home to find Omar sitting on the front lawn eating an orange. I left him there. He never made it into the car with the rest of the kids. I could not believe that I was so careless to leave him behind.

36.     Ricky was in high school when he met Maria Lopez. After they dated for a while, she got pregnant with my grandson, Ricardo Sanchez, III. The family calls him Three. I thought Ricky was too young to be a father, but he seemed like he wanted to be very involved. Shortly after his 19th birthday, Ricky moved in with Maria and her mother, Rachel Ramos. I was sad to have Ricky leave the house. Ricky wanted to be with his son, but also to be away from his father and all of the fighting in the house. I tried to get Ricky to get his GED, but he could never do it.

37.     Ricky tried to find work so that he could support Maria and Three. He worked in construction. Maria's father got him a job with a friend that ran a construction crew. He did not keep any job for long. They were struggling to make ends meet and they moved to North

11

A-000601

Carolina for a while to look for better jobs. Ricky came by my house a couple times a week. Usually I saw him on Sundays.

38.    After Ricky and Maria split up, he did not come around to my house much. He started hanging out with my Cousin Beatriz's son, Danny Varela. I did not know Danny very well, but I did not like the influence he had on Ricky. Ricky changed. He dressed differently and wore more jewelry like Danny. He started getting into trouble with the police and I was very worried for him. I knew that Danny was trouble and I was scared he would get Ricky into a bunch of trouble. I told Ricky what I thought, but he felt like Danny was family and his friend. Ricky trusted Danny.

39.    When Ricky was arrested, I was horrified. I was scared and I did not really understand what was going on. They put Ricky in jail and he had attorneys and an investigator. The investigator, Lisa, came to talk to me on many occasions. She did not speak Spanish, so I relied on my children to explain to me most of what was going on.

40.    I visited Ricky in the prison as often as I could before his trial. Ricky was scared and really sad. I know it comforted him for me to visit, but he seemed very confused about what was going on with his case. I was not able to calm his fears. During trial I was sitting behind Ricky. I could not see his face, but he was so quiet and still. He did not talk much to the attorneys.

41.    Because I did not exactly understand what was going on, I was afraid to trust Ricky's attorneys. If I had understood what was going on, I could have given them more information.

42.    In 1991 my husband had an accident. A barrel exploded and the lid hit his face and head. The impact sent him flying 14-20 feet. He became more violent after that accident.

12

A-000602

43.     Ricardo would throw plates and cups when I would serve him; food saying "this needs salt". He would humiliate me and throw the cups of ice tea in front of the children. Ricky saw and heard everything and that would happen frequently because Ricardo would come home drunk.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on** _____

**Name** _____

13

A-000603

Page **1** of **4**

## Declaration of Frances Lenore Wolfe

## Pursuant to 28 U.S.C. §1746

I, Frances Lenore Wolfe, declare as follows:

1.     I am a retired teacher. In late 1991 and in the winter and spring of 1992, Ricardo Sanchez, Jr. was in my second grade class at Berkshire Elementary School in West Palm Beach, Florida.

2.     I began teaching in 1966 in New York. I taught for 25 years in various schools in New York before moving to south Florida. I taught in primarily disadvantaged neighborhoods in New York and had a lot of experience teaching underprivileged students by the time I started teaching in Florida.

3.     I began teaching in the Palm Beach County School District in January 1990. The district assigned teachers to schools and classrooms based almost entirely on how many teachers were required by law to be present in a classroom with a certain number of students. If the number of students in a particular grade in a classroom or in a school exceeded or fell below a certain number, even if this changed in the middle of a grading period or school year, a teacher could be plucked from one school or classroom and reassigned elsewhere without any regard for the individual needs of the students or continuity of instruction. The lack of stability was disruptive to the students and their parents as well as the faculty and generated low morale. My first couple of years in the district I was moved around several times before finally settling at Berkshire in late 1991. I retired from the school district in 1999.

Initials: _Flw_                                                                                          Date: _03/14/2016_

A-000604

Page 2 of 4

4.      I started teaching at Berkshire in 1991 when Michelle Anthony Stark, who was teaching Ricardo's second grade class, went on maternity leave. I took over her class until she returned from leave, at which time she and I co-taught the class. Students at Berkshire at that time came from working class families. Their parents were generally of limited financial means.

5.      I recently have reviewed Ricardo's special education records. Ricardo was eight years old when he was in my class. At that time, kindergarten was mandatory in Florida, and children were not allowed to start kindergarten unless they were five years old on or before a date in late August of that year. Because Ricardo's birthday is in October, he was not able to start school until he was nearly six years old.

6.      Despite the fact that Ricardo was one of the older students in the class, my notes of his performance and functioning in the classroom indicate that he was developmentally behind many of the other, younger students in the class. He required one-on-one instruction in order to engage in and complete classwork. He was unable to work independently. Ricardo often appeared to be in a daze. He also behaved immaturely and impulsively, putting papers in other students' desks and jumping on other students' backs while standing in line.

7.      My observations about Ricardo's behavior describe a very needy child who frequently failed to comprehend instructions, could not take the initiative to attempt work on his own, and was not able to or did not feel capable of tackling assignments without individualized intervention. Furthermore, my observations about his impulsivity do not reflect aggression or serious behavioral problems but rather puerility and attention-seeking conduct.

8.      When I started teaching in Ricardo's class, Ricardo was already receiving some special services. He received services through our English for Speakers of Other Languages program (ESOL) due to the faculty's perception that his proficiency in English was limited. He

Initials: _~hw_                                                                                  Date: _03/14/2016_

Page **3** of **4**

also received Chapter 1 special instruction, pull-out assistance for students struggling with or below grade level in reading and math skills. Because these services were insufficient to address Ricardo's serious academic difficulties, in early 1992 we recommended him for evaluation for eligibility for special education services. He did not receive the evaluation for eligibility until the summer following second grade, when I was no longer his teacher.

9. Ricardo was evaluated by a psychologist in July 1992 who interviewed Ricardo and administered psychological and achievement tests to him. The psychologist concluded that Ricardo's intellectual ability fell into the low average range, and that he had significant processing deficits. The psychologist recommended that Ricardo be placed into a more individualized educational setting with multimodal and multisensorial instruction. The records indicate that in December 1992 Ricardo was deemed eligible for special education services.

10. Although his special education records indicate that Ricardo's mother consented to the evaluation and consented to his receiving special education services, after Ricardo was determined to be eligible for special education services she did not participate in the meetings to set up and revise an Individualized Education Plan (IEP) for Ricardo. I have reviewed Ricardo's special education records from throughout his education in the Palm Beach County School District, and it is clear from those records that Mrs. Sanchez did not attend future IEP meetings even though she was advised of those meetings and at times informed school staff that she intended to participate. Although it was common for parents of students in special education to miss an IEP meeting here or there, it was very uncommon for parents to be as uninvolved as Ricardo's parents were.

11. It also appears from Ricardo's special education records that he made only very minimal progress throughout his many years in the school district, despite the fact that he was

Initials: _FW_                                                          Date: _03/14/2016_

Page **4** of **4**

provided full-time special education services. The records indicate that when Ricardo was in fifth grade, he was working at a fourth grade math level and a first grade level in reading. They further indicate five years later, when he was in tenth grade, he was still achieving at only a fourth grade level in math and was able to write only some information on a personal data sheet. This lack of progress is consistent with Ricardo's very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well. It is consistent with Ricardo's parents' apparent lack of participation in his education and their failure or reluctance to demand that the district and teachers modify the services they provided Ricardo to yield better results.

12. I was not approached by anyone representing Ricardo at his capital trial. Had a member of the defense team representing Ricardo spoken with me, I willingly would have provided the information in this declaration, and I would have testified to the information herein if I had been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on _March 14, 2016_
Name _Frances Lenore Wolfe_

Initials: _FW_                                    Date: _03/14/2016_

**Declaration of Jamie M. Matos**

**Pursuant to 28 U.S.C. §1746**

I, JAMIE M. MATOS, , declare as follows:

1.      I am a childhood friend of Ricardo Sanchez, Jr. I went to elementary and middle school with him. I also lived down the street from his neighborhood. Ricardo lived in a neighborhood called Fruity Acres in West Palm Beach, Florida.

2.      I met Ricardo when he was about 10 years old. He and I were in several of the same special education classes at Melaleuca Elementary School. Ricardo had terrible trouble reading. I do not read well either, but I remember that Ricardo really struggled with reading and math. We continued to be in some of the same classes in middle school. We went to both Conniston and Okeeheelee Middle School together.

3.      Ricardo rarely came to school with his homework done. In the class before homework was due we copied each other's papers. It took both of us working together to get the homework done.

4.      Ricardo often did not understand things in the classroom. Simple directions were repeated or explained to him a couple of times before he got it, or said he got it. The teachers seemed to think it was because he spoke Spanish at home and English at school, but I knew that he did not get things outside of school. A lot of times when we were talking he said, 'huh?' I had to explain what I meant or repeat what I said. I often did this a couple of times before he said he understood.

Initials: _JM_                    A-000608                    Date: _5/12/14_

5. Conniston Middle School had two buildings. The special classes and regular classes were in one building and the Academy program was in another building. Ricardo and I spent most of the day in the building where the special classes were held. Some people gave Ricardo a hard time for being in special classes.

6. Ricardo was bullied about being in special classes. He did not usually argue or fight back, but I remember a guy in our class getting in Ricardo's face and yelling, 'you are retarded!' Ricardo stepped up to him and said, 'I am not retarded.' Ricardo did not fight much, but if he felt threatened, he fought back.

7. Ricardo had periods of time where he zoned out. He seemed to be somewhere else. In class, I had to poke him and call his name a couple of times to get him to come back. The teachers had to pound or slap on his desk several times before he came back. I noticed that he did this outside of school too. He seemed to go blank. We had to snap our fingers or tap him on the arm and call his name loudly to get him back.

8. Ricardo was a sweet and respectful boy. When I saw him he had a smile on his face and he loved to goof around with me. We were very close friends in middle school. We hung out and played in the neighborhood after school. Ricardo's father was very strict and he had to be home early. Ricardo worried about getting home so he did not get in trouble.

9. I was a tomboy when I was in middle school. I hung around with a bunch of guys from the neighborhood. We played a game called Manhunt. It was basically hide and seek. We spent a lot of time walking around and around the neighborhood. Ricardo played whatever the group wanted to play.

Initials: _____   A-000609   Date: 5/12/14

10.     There was a group of boys, including Ricardo, that wrestled on old mattresses in the neighborhood. They got together and copied what they saw wrestlers on television do. Ricardo brought one of the paper belts they made for the champion to school to show me one time. He was very proud of it.

11.     The guys also swam in the canal in the neighborhood. They jumped in from the road or swung out over the canal and dropped into the water. There was a tree on the bank that had a limb that hung over the canal. The boys tied a rope to the tree and used it to swing out over the canal. I do not know how deep the water was, but it was dirty and I was afraid there were water moccasin snakes in it.

12.     I knew Daniel Troya also. We went to the same middle school for a time. We dated for a while and I got to know his family. However, I lost touch with both Ricardo and Daniel Troya when I dropped out of school in 9th grade. I got pregnant and married and I did not see them regularly anymore.

13.     I saw Ricardo and Daniel together a few times after I left school. I saw them out at dance clubs and we said hello to each other. Then a few days before he was arrested I saw Daniel Troya at a doctor's office where I worked. He broke his hand and the doctor was putting a cast on it. We said hello and talked for a bit. Daniel told me he broke his hand in a fight at a bar. It was so strange to see him after so long. He was supposed to come back for a follow up four weeks later, but by that time he was arrested.

14.     I found out about Ricardo and Daniel being arrested from the television news. I could not believe Ricardo was involved in something so tragic, but Daniel was very different from Ricardo, ~~and I could see him being involved.~~ *gm*

Initials: _____

A-000610

Date: _5/12/16_

15.     I was not contacted by Ricardo's attorneys or anyone on his defense team before

trial. I would have answered any questions and testified to all I say here if I was asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on 5/12/16

Name _____

Initials: _____

A-000611

Date: 5/12/16

Page **1** of **8**

**Declaration of Janice Coe**

**Pursuant to 28 U.S.C. §1746**

I, Janice Coe, declare as follows:

1.      I was the Exceptional Student Education (ESE) coordinator at Palm Beach Lakes High School in the Palm Beach County School District when Ricardo Sanchez, Jr. was a student there between 1999 and 2002. The ESE coordinator at Palm Beach Lakes High School was responsible for coordinating special education services offered at the school, participating in individualized education planning (IEP) for students with disabilities, supporting ESE teachers to provide appropriate interventions and services for special education students, interacting with special education students and their parents or guardians, and completing paperwork. I replaced Jeffrey Silverman as the ESE coordinator at Palm Beach Lakes High School in August 1999, at which time he took a position as an Area Alternative Education Specialist, participating in and coordinating the placement of students with disabilities in alternative programs when they committed an infraction that resulted in removing them from their assigned school. Amy Fleming replaced me as the ESE coordinator at Palm Beach Lakes High School when I left in 2007. I currently am the ESE coordinator for Area 2 of the Palm Beach County School District. In this position, I support compliance and educational programing for 42 schools.

2.      I remember Ricardo well, for several reasons. Brian Coe, who later became my husband, was Ricardo's language arts teacher. I spent a lot of time in Brian's class, and saw

Initials: _QC_                                                    Date: _3-15-16_

A-000612

Page **2** of **8**

Ricardo regularly. Ricardo received special education services in all academic subjects; his need for services was extensive. He was a sweet, goofy kid who was polite and respectful and did not pose behavior problems. Ricardo was friendly; he almost always had a smile on his face. He often had a blank, or absent expression, as if he were not all there. Unlike some other students in the ESE program, he was never a ringleader for drama. Ricardo did not plan or initiate activity and instead he just followed other students around.

3. Ricardo's intellectual functioning was quite low. He had difficulty understanding, remembering, and following directions provided to him. When there was more than one step involved in a task or project, his teachers could not give him all of the steps at once because he was unable to follow them under those conditions. He needed to have tasks broken up into small pieces, with instructions given at the beginning of each piece, in order for him to make progress with the task.

4. I also remember Ricardo because his older brother, Efrain, had grand mal seizures on a regular basis at school. Ricardo's mother was very involved with Efrain; she came to school to meet with teachers and other staff about Efrain. Many times she came to school to pick Efrain up after he had a seizure. She did not, however, attend meetings related to Ricardo's special education services. It seemed that her attention and time was devoted almost entirely to Efrain.

5. I have reviewed Ricardo's special education school records from his time at Palm Beach Lakes High School, as well as his special education records from Okeeheelee Middle School when he was in eighth grade. Those records are attached at the end of this declaration. They indicate that Ricardo was designated as eligible for special education services due to a specific learning disability (SLD). I have also reviewed Ricardo's special education records from Berkshire and Melaleuca Elementary Schools and from Conniston Middle School.

Initials: _QC_                                                                                    Date: _3-15-16_

A-000613

Page **3** of **8**

6.     Ricardo's IEP dated March 19, 1998, when he was in eighth grade at Okeeheelee Middle School, indicates that Ricardo was exhibiting difficulty beginning assignments and staying on task, following directions, and being prepared for class. He also had trouble with written and oral expression. The IEP team established organizational and behavior-related instructional objectives for Ricardo including teaching him to bring necessary supplies to class, begin tasks within five minutes after the class bell, remain on task, and follow directions. The team also developed specific academic instructional objectives, including teaching him to understand and properly use vocabulary, spell, and read and write complete sentences with appropriate capitalization and punctuation. The need to set such elementary objectives with Ricardo when he was 14 years old and in eighth grade, shows that his impairments were significant at that time.

7.     Despite the severity of Ricardo's academic difficulties, the IEP team at Okeeheelee in March 1998 recommended that Ricardo receive a modified regular educational curriculum rather than the alternative ESE curriculum in the academic subjects of math, science, social studies, language arts, and reading. The team also determined that Ricardo should take statewide standardized testing with modifications, including flexible scheduling and having test items read to him orally.

8.     It appears that one of the participants on the IEP team perceived Ricardo to be more capable of academic achievement than at least one other member of the team. That member of the team described Ricardo as having "the ability to do his work, but choos[ing] to do as little as possible." This assessment is inconsistent with nearly all of the other comments by Ricardo's teachers in his special education records throughout his school career, both before and after, and is inconsistent with my experience with Ricardo. My own interactions with Ricardo and the

Initials: _____      Date: _3-15-16_

Page **4** of **8**

descriptions that his teachers gave to me regarding his functioning indicated that Ricardo's difficulties in school were not due to poor effort and that in fact he exerted a great deal of effort in his classes.

9. Ricardo attended Palm Beach Lakes from the fall 1998 through April 2002. Despite the fact that he was at Palm Beach Lakes for nearly four school years, he did not complete tenth grade during that time. He repeated both ninth and tenth grades. A student, even a student receiving ESE services, had to have a 2.0 grade point average in order to move up at the close of the school year. In 2000, the state of Florida determined that students who had a certain number of credits should be promoted from the ninth grade even if their GPAs were lower than 2.0, so that they could take the tenth grade state test that they were required to pass in order to graduate. That policy applied even to those students who were not expected to take the regular state tenth grade examination. As a result, Ricardo was promoted in August 2000 to the tenth grade even though he had achieved a GPA of only 1.10 even in his special classes with accommodations and interventions and alternative curriculum.

10. Ricardo's annual IEP in March 1999, his first IEP at Palm Beach Lakes High School, indicates that the team recommended that the least restrictive environment in which Ricardo's educational and academic needs could be met was full-time ESE curriculum rather than through a modified regular curriculum for all academic subjects. He was noted to be "hardworking, polite, and cooperative," but had difficulty with organization. The IEP team determined that he was not capable of working toward a regular high school diploma, and placed him on a track for a special ESE diploma, that at best would qualify him for vocational employment. The team also decided that Ricardo had such significant conceptual and intellectual deficits that he should be exempted from standardized testing, including the Comprehensive Test

Initials: _OC_                                                                 Date: _3-15-16_

Page **5** of **8**

of Basic Skills (CTBS) and the Florida Comprehensive Assessment Test (FCAT).[1] The team

noted that Ricardo expressed interest in finding work in construction, and noted that he would

not be able to obtain employment independently but instead would need assistance to find a job.

11. The March 1999 IEP also includes a Matrix of Services that had to be completed

in order to determine how much funding Palm Beach Lakes High School received from the

government to provide services to Ricardo. The Matrix was a relatively new requirement for the

IEP process in 1999, and we were still learning how to use it. The Matrix indicates that Ricardo

required a specialized instruction and curriculum and direct assistance for the majority of

learning activities; and weekly personal assistance, monitoring, and intervention in the area of

independent functioning. The Matrix notes that Ricardo did not require special services in the

areas of social/emotional behavior, health care, or communication. That notation does not mean

that Ricardo was independent in these areas; it simply means that because Ricardo came to

school appropriately groomed and dressed and appeared well-nourished, did not pose a

behavioral problem at school, and appeared to make himself understood, the school did not need

to provide services or interventions in these areas.

12. Ricardo's IEPs from March 2000, March 2001, and March 2002 report that he

continued to demonstrate the same cognitive and organizational difficulties throughout the rest of

his time at Palm Beach Lakes High School. He was described as "a pleasant young man" whose

"inability to stay focused prohibits his success." He was assigned to ESE classes for all academic

subjects as well as the elective of career preparation. Ricardo needed daily assistance for all

learning activities and direct specialized instruction and curriculum for the majority of learning

---

[1] An undated page of an IEP in Ricardo's school records indicates that at some point Ricardo was recommended to take the FCAT and the High School Competency Test (HSCT) with modifications. It is unclear when this recommendation was made, as he was exempted again in March 2000, March 2001, and March 2002.

Initials: _CR_                                                                 Date: _3-15-16_

Page **6** of **8**

activities. He continued to be exempted from standardized testing due to limited cognitive ability. His Matrices of Services indicate that he continued to require additional help with development of independent living skills as well as specialized instruction, and he also was deemed to need monthly counseling or guidance for behavior management for minor infractions.

13.     Ricardo's special education records indicate that in March 2001, when Ricardo was seventeen years old, and in tenth grade (for the first time), he was performing math at the fourth grade level. His math skills included being able to solve simple equations, tell time on an analog clock, identify coins and their values and count them, and make change using coins. Ricardo's reading level and reading comprehension was at the lower third grade level. He was able to write some information on a personal data sheet and address an envelope. This is clearly a very low level of achievement for a seventeen-year-old.

14.     Ricardo's March 2001 IEP indicates that although he was able to complete job applications and display appropriate job interview skills, he was "unable to plan and make realistic occupational training and job placement decisions" and he needed assistance to do so. Ricardo's IEP also indicates that he "function[s] independently in the community" and was "capable of living in an apartment on her [sic] own." His March 2002 IEP reflects the same observations. As noted above, these observations did not mean that Ricardo was able to function without assistance in the community; they simply meant that the IEP team believed that he had support from family or others and that the school did not need to provide services to Ricardo for him to accomplish these goals.

15.     In March 2002, when Ricardo was nineteen years old and in his second year of tenth grade, his IEP notes that he had "significant processing deficits which have resulted in his reading and performing mathematical tasks far below grade level." The IEP also reports that

Initials: _JC_                                                          Date: _3-15-16_

Page 7 of **8**

Ricardo did not demonstrate cognitive ability and adaptive behavior to allow him to complete statewide standardize testing, even with accommodations. The IEP team observed and reported that Ricardo demonstrated "difficulty displaying appropriate behavior across settings" and "following school rules" and that he needed to receive additional instruction in practicing self-control. Instructional objectives included demonstrating good decision making skills when presented with and developing strategies for resolving conflicts. The team recommended that Ricardo receive further academic assessment and be administered a functional behavior assessment to evaluate accurately the additional needs he displayed during this year of school and to determine what services he required to address them.

16.     Despite the fact that Ricardo demonstrated some behavioral dysregulation, he did not exhibit physical aggression or violence. In April 2002, before the recommended functional behavioral assessment was administered to Ricardo, he was arrested for having a butterfly knife in his backpack at school. Ricardo did not take the knife out of his backpack, but someone informed the police that he had it with him. Ricardo said that he had the knife because he had been threatened, and he felt safer having the knife with him. At that time, the principal had a zero tolerance policy; when a student came to school with something that could be used as a weapon, the student was moved to an alternative program for at least 45 days. As a result, even though the staff and Jeffrey Silverman, the Area Alternative Education Specialist, determined that the infraction was a manifestation of his disability, Ricardo was assigned to Roosevelt Full Service for 45 days.

17.     Ricardo did not return to Palm Beach Lakes High School following his assignment to Roosevelt Full Service. Because the mandatory 45-day period for his alternative placement expired during the summer, and because the principal felt strongly about the zero

Initials: _____                                                          Date: _3-15-16_

Page **8** of **8**

tolerance policy, the IEP team recommended that Ricardo continue at Roosevelt Full Service for an additional semester. According to the computer file attached to the end of this declaration, Ricardo did not continue in Roosevelt Full Service but instead enrolled in Adult Education services with the Palm Beach County School District in September 2002, when he was almost nineteen years old. Ricardo attended that program until August 2003. The Adult Education program was geared primarily to prepare an individual to take the GED, and the program was not appropriate for Ricardo because he did not have the cognitive ability or skills to pass the GED. His IEP did not follow him into the Adult Education program.

18.     I was not contacted before or during Ricardo's capital trial by anyone working on his behalf. If any member of the defense team representing Ricardo had approached me, I would have provided the information in this declaration, and I would have been willing and able to testify truthfully to the information herein if I had been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___3-15-16___
Name ___Janice R Coe___

Initials: _JC_                                                                                 Date: _3-15-16_

A-000619

**Declaration of Jason Vazquez**
**Pursuant to 28 U.S.C. §1746**

I, Jason Vazquez, declare as follows:

1.    I am a friend and former schoolmate of Ricardo Sanchez's. We attended middle school together as well as high school at Palm Beach Lakes High School. Ricardo was in my close circle of friends and I hung out with him regularly, both at school and at his family's house. I was also friends with Ricardo's younger brother, Ezequiel.

2.    It was clear to me, even as a kid, that Ricardo had a tough upbringing. Ricardo's family was dirt poor. Whenever I visited his house, I remember thinking that there were too many people living in such a small house. I also remember that Ricardo and his brother would never dress for gym class at school. Gym class uniforms cost money that his family did not have.

3.    Ricardo also had a really tough father. Ricardo's father was a drunk who was not a nice man. It was clear from talking to Ricardo and his brother that Ricardo would get beaten regularly.

4.    Our high school was also not an easy place to be. There were regular fights, and you always had to be on guard and hold your own. If you got beaten up once and did not stand up for yourself, you would end up with a reputation for being a wimp and the beatings would never stop. Pretty much everyone I knew brought a knife, brass knuckles, a chain, or some other weapon to school at some point or another for protection. You could get ganged up on by several kids at any time and having a weapon was just a matter of protecting yourself and surviving.

5.    Even in that environment, Ricardo was not a fighter. I got in way more fights than Ricardo did, and he was often the one trying to calm me down when I was upset.

1



6. Ricardo was never one to start trouble. I would describe him as a follower. He would go along with anything anyone told him to do and not really think about it.

7. I never got the sense that Ricardo was capable of thinking too deeply about anything. He was always so quiet growing up. Even though we were good friends, I never remember having a deep conversation with him. He was able to answer simple questions, but he never really came up with thoughts of his own on any topic. He was basically just kind of a dopey guy.

8. Sometimes I played video games with Ezequiel, but Ricardo did not participate much. When we were kids, we were just playing the simple games that were out at the time like Super Mario Brothers or Sonic the Hedgehog, but Ricardo did not really seem to be able to get the hang of them. I always had the sense that something was not quite right with Ricardo, but I could never put my finger on exactly what

9. Before Ricardo's current lawyers came and talked to me, I had never been contacted about his case. From 2006 to 2009, I was living in the West Palm Beach area, and I would have provided the above information if I had been asked to do so.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Jason Vazquez

Date: 4/7/16

2

A-000621

## Declaration of Juan Gutierrez

## Pursuant to 28 U.S.C. §1746

I, JUAN GUTIERREZ, declare as follows:

1. I am Ricardo Sanchez, Jr.'s first cousin. His father, Ricardo Sanchez, Sr., is my mother's older brother. I have known Ricardo Jr. and his family since I was a child. We were quite close friends as young children. We saw each other often at family gatherings and celebrations. We visited each other's homes and sometimes we stayed the night.

2. I played with Ricardo Jr. and his younger brother Ezequiel and sister Nydia. We were all close in age, but I am closest in age to Ezequiel. We played games and hung out. When I was at the Sanchez home, Ricardo's mother, Juanita, cooked for us.

3. Ricardo Jr.'s father was mean and angry. He was overbearing and extremely strict. There were times where he did not let me stay overnight at their house. Sometimes he did not allow Ricardo to come over to my house. It seemed random to me. Ricardo Sr. did not give reasons for his decisions. Ricardo Jr. did not like to stay at his own house. He told me that his father drank a lot, got angry and hit Ricardo Jr. and his siblings. He also told me that his mother and father yelled and hit each other often. Usually this was after his father had been drinking.

4. I was not in the same classes as Ricardo Jr. in school. He was older than me and was closer to my brother, Jose Anthony, or Tony, during school. We lost touch during our school years and did not see each other much until we were older.

5. Ricardo Jr. was a nice person. He liked to make jokes and laugh. He played anything the rest of us came up with. He stayed close to his family when he was young. He was a very loyal person and I enjoyed his company.

1





6.     My mother, Nora, and my father divorced when I was about 11 years old. My brother wanted to live with my father and my mother was upset. We were visiting Ricardo Sr.'s home and he became angry at my brother. As we were leaving, Ricardo Sr. leaned into the car and grabbed my brother. He smacked him violently and told him to have some respect for my mother. It was shocking to see and I lost respect for my uncle right then. I did not like to visit his home after that.

7.     Ricardo Jr. moved out of his father's house as soon as he could. He wanted to leave his family's home and get away from the fighting and his father's mean, angry outbursts. When his girlfriend, Maria, became pregnant, Ricardo Jr. wasted no time in moving in with her and her mother. He seemed happy to be away from his father.

8.     Ezequiel stayed with my family for months when he was about 15 years old. He was having a terrible time getting along with his father. He ran away from home and was staying here and there with friends. My mother reached out to him and told him that she wanted him to stay with us. He did, but Ricardo Sr. was enraged. He wanted Ezequiel to come home immediately. My mother told Ricardo Sr. that Ezequiel wanted to stay with us and that it was better for him to be with us than to be at his own house. It caused the relationship between my mother and Ricardo Sr. to be bad for a while.

9.     I was arrested for burglary with Ezequiel when I was 18 years old. It was not until after I was released from prison and on probation that I started hanging out with Ricardo Jr. again. Ricardo Jr. was hanging around his cousin on his mother's side, Danny Varela. He was also hanging around with Danny's friends, Daniel Troya and Kevin Vetere. They all lived in a house together and I started staying there just a couple of months before we were arrested. We mostly went out to dance clubs and strip clubs at night. Ricardo Jr. went out with them all the

2

JG

6-24-16

time. He seemed to do whatever Danny and Daniel wanted him to. They often sent him on errands that they did not want to do. Ricardo Jr. did not ask questions, he just did as he was told.

10.     I was arrested in 2007 with Ricardo Jr., Danny Varela, Daniel Troya, and Liana Lopez. I pleaded guilty instead of going to trial. No one from Ricardo's defense team came to speak to me before trial.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___6-24-16___

Name _____

3

A-000624

6-24-16

Page 1 of 4

## Declaration of Jeffrey Silverman

## Pursuant to 28 U.S.C. §1746

I, Jeffrey Silverman, declare as follows:

1. I have worked for the Palm Beach County School District for many years. I am currently the principal of Christa McAuliffe Middle School. I have worked in a number of different positions with the district, many of them connected with the Exceptional Student Education (ESE) program. I served as the ESE coordinator at Palm Beach Lakes High School and then as an Alternate Education Liaison in the district's ESE program. I was an Alternate Education Liaison when Ricardo Sanchez, Jr. was a student at Palm Beach Lakes High School. One of my roles in that position was to work with students receiving special education services, their parents, and members of the faculty and staff to determine appropriate alternate educational placements for students with special needs when they demonstrated impairments or manifestations of their impairments that required them to be moved from their assigned school. I was later the ESE coordinator for the entire Palm Beach County School District before becoming the principal at Christa McAuliffe.

2. In my position as Alternate Education Specialist, I spent a lot of time at Palm Beach Lakes High School and I got to know the students in special education there very well. I knew Ricardo, who I called Ricky, and his older brother Efrain, because they both received full-time special education services. Both Ricky and Efrain were very sweet, quiet, and slow. Although Efrain was the elder of the two, because he was even more intellectually impaired than Ricky, Ricky felt like he had to take care of Efrain and tried to keep track of where Efrain was and how he was doing.

Initials: _____  Date: 3/14/16

A-000625

Page 2 of 4

3.       Although Ricky's IQ was measured at 80, in the low average range, Ricky seemed to be intellectually disabled. He acted goofy and smiled shyly often, but there was a sadness and a seriousness about him, too. Several times he came up to me and asked me why he was not able to read. He said, "I want to learn how to read, but I can't. Why can't I learn how to read? Can you help?" Ricky was not able to understand even simple directions. Multiple-step instructions were impossible for him. His teachers had to break each task up into individual steps and go over those steps repeatedly with him one at a time in order for him to follow them. Ricky craved and sought attention from adults, and clearly enjoyed the attention when he received it. He was unable to focus his attention and required one-on-one instruction in order to begin, progress upon, and complete assignments. Ricky did not intentionally misbehave, but although he wanted to please his teachers and do what he was supposed to do, he had some difficulty following rules. For example, I often found him in the hallway of the school during class time, and when I said, "Ricky, what are you doing here?" he smiled at me goofily and went immediately back to class without any complaints and without talking back.

4.       Ricky did not have an original idea in his head. He had friends at school, and people who liked him, but he always did whatever others wanted to do. He took no initiative but simply followed the will of the group. He was not a leader in any way.

5.       Ricky made only very minimal progress in school despite the many interventions offered to him. This lack of progress is not surprising to me; children and teenagers with low intellectual functioning like Ricky rarely exhibited much academic improvement. It was obvious to me that Ricky wanted to perform well and generally tried his best, and that his inability to make progress was upsetting and frustrating to him.

Initials: _____                                                              Date: 3/14/16

Page 3 of 4

6.      I do not recall Ricky getting into serious trouble at school other than at the end of April 2002 when he brought a knife to school and was arrested when the police found the knife on him after receiving an "anonymous tip." Bringing a knife to school was extremely out of character for Ricky. To the best of my recollection, when he was asked about it, Ricky said that another student had threatened to hurt him so he put the knife in his backpack because he felt safer with it there. We did not get the impression that Ricky was planning to use the knife. Because Ricky received special education services, the district was required to hold a manifestation hearing to determine if this infraction was a manifestation of his disability. Ricky did not understand the seriousness of having the knife at school, and we determined that because no functional behavior assessment had been completed despite his having been disciplined previously for minor matters, his bringing the knife to school was a manifestation of his disability. Nevertheless, because the school district and the principal took possession of weapons very seriously, Ricky was disciplined for having the knife. The principal had the absolute authority to place Ricky at an interim alternative education setting for 45 days, and he did so the same day, enrolling him at Roosevelt Full Service Center.

7.      Following the manifestation hearing, the team recommended that Ricky be enrolled at Roosevelt Full Service Center. Ricky's interim 45-day alternative placement at Roosevelt Full Service ended after the school year was completed, so the team recommended that he stay there for the first semester of the 2002-2003 school year. Ricky enrolled in the program there but then withdrew almost immediately. Because Ricky was almost twenty years old at the time, he was eligible for Adult Education Services through the district and enrolled in that program in September 2002 and stayed in that program for a year. Once he enrolled in the

Initials: ____   Date: 3/14/16

Page **4** of **4**

Adult Education Services program, which was designed to assist students to prepare to take the GED test, he no longer received ESE services and so I did not have further contact with him.

8.    Ricky's parents did not participate in the manifestation hearing or any other Individualized Education Plan (IEP) meeting held at Palm Beach Lakes High School while I was there.  Although his mother advised the team that she would attend the meeting at which the alternative education placement was determined, she forgot to attend and was updated by phone at the conclusion of the meeting.  I did not meet Ricky's parents at all during the two years Ricky was at Palm Beach Lakes High School.  Their lack of involvement in his education, even when he was at risk of serious discipline, was atypical.

9.    When I learned that Ricky had been arrested for drug crimes and was being charged with having committed homicides, I was stunned. I felt that Ricky was not capable – neither functionally nor characterologically – of planning a crime like this. Ricky was a sweet, simple boy with very poor decision-making skills. He did not have the wherewithal to come up with a plan and put it into action.

10.    I was not contacted before or during Ricky's capital trial by anyone working on his behalf.  Had a member of the defense team representing Ricardo approached me, I willingly would have provided the information in this declaration, and I would have been willing and able to testify truthfully to the information herein had I been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on __3/14/16__

Name __Jeffrey Silverman__

Initials: __N__

Date: __3/14/16__

**Declaration of Juan Antonio Jimenez**

**Pursuant to 28 U.S.C. §1746**

I, JUAN ANTONIO JIMENEZ, declare as follows:

1. I am Ricardo Sanchez, Jr.'s maternal uncle. Ricardo is the son of my older sister Juanita Jimenez Sanchez. Juanita and I have five siblings. In order, we are: Yolanda, Natividad, Gregoria, Juanita, Elsa, me, and Lucy. Our parents were Antonio Jimenez and Maria de la Luz Betancourt Jimenez. My father Antonio passed away in 1972 when I was six years old.

2. I was born in ~~San Antonio~~ Brownsville (JJ), Texas. My family was very poor. After my father We lived in a house in Makamora where the bath-rooms were outside (JJ) died, my mother could not take care of all of the children and work too, so she sent Juanita and Elsa to stay with my sister, Yolanda. ~~I~~ We (JJ) traveled all over the country with my mother while she worked in the fields picking fruit or vegetables. Eventually we went to West Palm Beach, Florida near her sister.

3. We lived in Florida and worked on farms as migrant workers until I was in the ninth grade in school. I worked with my mother in the fields from the time I was six years old. I picked vegetables and oranges. I also worked after school and on the weekends to help support my mother after my father died. When I was 14 years old my mother, Lucy, and I moved back to San Antonio. Juanita married Ricardo Sanchez, Sr. and she stayed in Florida.

4. My sister's son Ricardo Sanchez, Jr. (we call him Ricardín) came to visit us in Texas. I remember spending time with him when he was a young teenager. He always said I was his favorite uncle. He also asked if he and his younger brother Ezequiel could stay with me. I did not think Juanita would approve so I said no.

Intials: _JJ_                                                    Date: _4-7-2016_

A-000629

5.      I think Ricardín wanted to stay with me because his father was mean to him and drank often. I saw him drink. I know that he could be mean and violent with Juanita. It was very upsetting to Ricardín to see his parents argue.

6.      When Ricardín was visiting my mother as a small child, he had an accident where he split his head open. I had to take him to the hospital where they stapled up his scalp.

7.      Ricardín was painfully shy. He was very quiet and timid. It was hard to have a conversation with him. He was slow and did not seem like a boy who played outside much. He did not know what to do with a soccer ball. His father did not spend much time with him. His father did not teach Ricardín about soccer or roller skating. It was sad.

8.      I am the only one in my family to finish high school. I set that as a goal. I got married and have three children. ~~I have worked as a~~ mechanic ~~for many years~~. Ricardín liked watching me work on my cars, ~~and motorcycles~~. work is a hobby of mune. ( ) It also liked to watch me exercise in my garage. He sometimes asked questions but did not seem to understand the answers. I had to repeat myself often. Ricardín liked to be anywhere I was. He would sit and watch me instead of being where the other adults ~~were~~ or children were. ( )

9.      I found out about Ricardín's arrest from Juanita. I was so sad for Juanita and Ricardín. I was contacted by Ricardín's attorneys and traveled to Florida to testify at his trial. I was not asked much about my life growing up or my family. I would have testified to all I say here if asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___4-7-2016___

Name _____

Intials: _____

Date: 4-7-2016

**Declaration of Kenny Velasquez**

**Pursuant to 28 U.S.C. §1746**

I, KENNY VELASQUEZ, declare as follows:

1.      I am a childhood friend of Ricardo Sanchez, Jr. I call him Rick. I grew up in the neighborhood called Fruity Acres in West Palm Beach, Florida. Rick lived with his family down the street.

2.      When we were boys we used to ride bikes, play basketball and build treehouses in the woods together. We were very active boys.

3.      There was a group of neighborhood boys, including Rick, who loved professional wrestling. We started our own neighborhood wrestling federation. We would scour the neighborhood for discarded mattress and take them to our friend Albert's house at a dead end road in the neighborhood. We arranged the mattresses next to each other so it created our own wrestling ring. All day at school we collected our school work papers and made them into championship wrestling belts.

4.      We tried to copy the moves of the wrestlers who we watched on television. The matches got really rough sometimes. Rick and I and the other kids were usually bruised and scraped up from wrestling. The matches became so popular that the number of wrestlers grew from only a few to more than a dozen kids. No parents or grownups were ever present. We did not wear safety gear and sometimes we got knocked around pretty good.

5.      When he was young Rick was always smiling. I used to call him "goof" because he was really goofy. You could say Rick was slow. It always took him a lot to catch on as a kid,

Initials: _KV_                                A-000631                                Date: _4·27·2016_

6.      We went to school together but Rick was a year or two older than me so we were not in the same classes. Rick was teased and bullied at school. Most of the time he would not react. He would try to avoid a fight. Some kids took his goofiness as a weakness. Sometimes Rick had to fight back when he was threatened but just as often he would run away. Rick did stand up for his older brother Efrain. He knew his brother was not the strongest in the head. So he was very protective of him even though he was younger than Efrain.

7.      Rick was easy to influence because he did not know what was happening all the time. He was not the brightest crayon in the box. In fact, during the time I knew Rick in school he could not read. I remember helping Rick with a movie club order. It was the kind of order form were you picked stamps of the movies you wanted, placed them in boxes on the form then sent the form in. He had me read all the titles of the movies on the stamps because he couldn't read them himself. I had to explain a few times how the form worked and what movies he was ordering before he finally understood.

8.      There were times, not every day but pretty often, when I noticed Rick just sat there looking like he was daydreaming, off in his own world. He seemed unfocused. I had to snap my fingers and say to him, 'Hey, Rick, snap out of it' to get him back.

9.      Rick and I went to different high schools but we were still friendly when we ran into each other. Later after high school, I ran into Rick at the clubs around town and saw him with Daniel Varela and Daniel Troya. Rick would always smile, shake my hand and talk to me about the old days. But I noticed a change in him when he was hanging out with those guys. He seemed depressed. It seemed to me he was trying to fit in and be as tough as Varela and Troya. The Rick I knew was never mean or disrespectful to anyone.

Initials: _KV_                          A-000632                          Date: _4·27·2016_

10. I was not contacted by Rick's attorneys or anyone on his defense team before trial. I would have answered any questions and testified to all I say here if I was asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on _4·27·2016_

Name _Denny Velasquez_

Initials: _D.V._

A-000633

Date: _4·27·2016_

**Declaration of Linda Velasquez**

**Pursuant to 28 U.S.C. §1746**

I, LINDA VELASQUEZ, declare as follows:

1.      Ricardo Sanchez, Jr. was my boyfriend in 2006. I cared for him very much. We dated for about a year before he was arrested in October 2006. I called him Rick.

2.      I met Rick when I was working at a jewelry store called Gina's Gold in a flea market in West Palm Beach, Florida in 2005. Rick came to the stall to look at the gold chains and necklaces we sold. Before he left, he asked me for my number. I was 16 years old when I started dating Rick. I lived with my mother, Maria Cordova, and my sister, Elizabeth Maldonado.

3.      Rick told me that he worked with his father driving semi-trucks. I thought that is where he went every day. He was gone for two or three days at a time and I thought he was working. I was still going to school and I worked two jobs so we saw each other at night mostly. He usually came over to my mother's house in the evening. When he came over before 10:00 pm, he could stay the night with me in my bedroom.

4.      Rick did not have a car of his own. I picked him up or one of his friends dropped him off at my mother's apartment. He hung around with Danny Varela, who was known as DV. He seemed to be with DV when he was not working or with me. I knew that DV was his cousin. DV dated my cousin, Rosalinda, when I was younger. I also knew Juan Gutierrez, known as Flaco, and his brother, Tony. I saw them with Rick sometimes. I also saw Daniel Troya, or Homer, drop him off a couple of times.

5.      Rick drank alcohol quite often. When he came over he smelled like booze. He and I smoked pot together sometimes. It just seemed to make Rick more laid back and more

Intials: _____        Date 04/12/16

A-000634

affectionate. He always smiled a lot, but he was more smiley when he smoked pot or was drunk. Rick treated me really well. He took me out to movies and to dinner. He bought me presents. He had a gold grill on his teeth and several gold chains just like DV. He seemed to always have money. I thought he made it working for his father.

6. Ricardo had a son with Maria Lopez. I had several run-ins with Maria. One time she showed up with her friend Myra Garcia at a restaurant where I was having dinner with Rick. She made a huge scene in the restaurant and followed us out to the parking lot. She started pushing, hitting, shaking, and shouting at Rick. He did not fight back. She also told her friend to beat me up, but Myra did not do it. I could tell that Rick was embarrassed and upset that she had acted that way towards me.

7. Another time, it was Rick's birthday and he was coming to my house and we were going to his mother's house for a birthday party. Maria followed him to my house and she took my license tag off my car and ran away. She ended up in the bathroom of my neighbor's house. Rick had to go and argue with her until she gave it back. I never saw Rick be violent with anyone, even when he was angry. I did not know him to carry a gun.

8. Rick seemed to be a do-boy for DV and his guys. They called him at all hours of the night and asked him to come hang with them at the clubs. They made fun of him wanting to spend time with me. They said things to Rick like, "you would rather make babies than hang with us." He was very loyal to them, even though they were not nice to him. He thought they were his friends but really they were just using him. He did anything they told him to do. I could tell they thought he was dumb. I could tell they did not respect Rick because DV hit on me a couple of times in front of him and did not seem to care that it upset Rick.

Intials: _____

Date: 04|12|16

A-000635

9. The night before the police raided the house on Garden Court Rick was staying with me. When I got home he was gone. When I called him, Liana Lopez answered and told me that I could not come over because the police were there. I was horrified and scared for Rick. I did not understand what was happening.

10. After Rick was arrested, people who were working for the government came to interview me, but they were not clear who they were and I was confused and thought they were supposed to be helping Rick. But at some point they told me not to talk to Rick's attorneys. They said that if I did they could arrest me. They also told me that Rick was still messing around with Maria while we were together. I did not want to believe it. It was not until I spoke to Lisa McDermott and she explained to me that I was testifying for the prosecution that I understood what I was doing.

11. I testified at Rick's trial and I kept in touch with him from the time he was arrested. I wrote to him every day for six months. Finally, I had to let go and move on. Rick wanted me to.

12. I was so young when I was with Rick. I understand now that I was naïve. I did not notice much of what was going on with him. He was good to me and I loved him. I am still shocked that all of this happened and I still care for Rick very much. My mother and sister still care about him too.

13. I don't recall Lisa or Rick's attorneys asking me questions about my relationship with Ricardo or his behaviors. I would have answered any questions and helped in any way I could have if they had asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.** Signed on 04/12/16

Name Linda Villasques.

Intials: _PRm_

Date: 04/12/16

## Declaration of Lucy Jimenez Sanchez

## Pursuant to 28 U.S.C. §1746

I, LUCY JIMENEZ SANCHEZ, declare as follows:

1.      I am the maternal aunt of Ricardo Sanchez Jr. Ricardo is the son of my older sister Juanita Jimenez Sanchez. I am the youngest of seven children. In order, we are: Yolanda, Natividad, Gregoria, Juanita, Elsa, Juan Antonio, and me. Our parents were Antonio Jimenez and Maria de la Luz Betancourt Jimenez. My father Antonio passed away in 1972 when I was two years old.

2.      I was born in San Antonio, Texas.  We were always very poor and my mother moved us around while she worked farms after my father died. We lived in Ohio, Michigan, and Florida. We finally settled in West Palm Beach, Florida, and stayed there until I was 11 years old. I did not finish high school or get my GED because I got pregnant when I was 15 and stopped going to school.

3.      My mother decided to move back to San Antonio, Texas and took us with her. Juanita did not come back with the rest of us because she had married to Ricardo Sanchez, Sr. and she needed to care for Ricardo Sr.'s mother, Modesta Garcia Sanchez,.who was ill with diabetes. She was blind and needed constant help.

4.      Juanita's husband Ricardo Sr. got away with many things. He went out and drank most nights. He was very self-centered and often angry. My family did not want Juanita to marry him. He beat Juanita. Ricardo Sr. shot Juanita in the face when she was pregnant with her first son, Efrain.

5.      When I was thirteen, I visited Juanita's family in Florida. Suddenly, just as I was leaving, Ricardo Sr. handed me Ricardo Jr. (we call him Ricardín), and told me to take him with



1

me back to Texas. Ricardín was only a baby and had no change of clothes, diapers, formula, or plane ticket. Ricardo Sr. just handed him to me and told me to take him. I did not know what to do, so I took Ricardín on the plane with my mother and we kept him for a few months until Juanita came to take him home.

6.      The next time we saw Ricardín he was about three years old. He came and stayed with my mother and me. I was 16 years old and had just had a baby when Ricardín came back. Ricardín fell off a tricycle while he was visiting us. He hit his head and it started bleeding. Juan Antonio took him to Baptist Hospital in San Antonio and he had to have staples in his scalp.

7.      Ricardín was a quiet child. He did not say much, but he was very sweet. We loved to have him visit. He always asked if he could stay. He never wanted to go home because his father hit him and was always angry.

8.      Some people came to speak to my mother and me before Ricardín's trial. However, I was not asked to testify and did not attend his trial. I would have testified to all I say here if asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


Signed on _4—7—16_
Name _Maria Gonzalez_


2

## <u>Declaración de Maria De La Luz Betancourt Jimenez</u>
## <u>Según 28 U.S.C. § 1746</u>

Yo, MARIA DE LA LUZ BETANCOURT JIMENEZ,  declaro lo siguiente:

1.    Soy la mamá de Juanita Jimenez Sanchez, Ricardo Sanchez es mi nieto.

2.    Tengo 87 años y so ciega.

3.    Nací en Padilla, cerca de la Ciudad Victoria, la capital de Tamaulipas, Méjico, en 1929. Soy una de cinco hijos.  Mis hermanas son Gregoria, Paula, y Oralia. Tengo un hermano, Abel. Crecimos en una finca donde mi papá, Abel Betancourt, cultivó maíz, frijoles y chile. Mi mamá era Maria Trujillo Jimenez. Fui a una escuela rural donde solamente fui hasta el sexto grado. Después de eso, mis padres tenían que pagar para mandarme a la escuela y no tenían los medios de mandarme o a mis hermanos a la escuela.  Trabajé en los campos ayudando a mis padres cuando no estaba en la escuela.

4.    A mi papá le gustaba tomar alcohol.  El me daba dinero y me mandaba a comprarle alcohol para que mi mamá no se diera cuenta.

5.    Mi hermana Gregoria se casó cuando tenía 15 años. Gregoria supo que su esposo la estaba engañando y ella lo confrontó.  Mantuvimos veneno de rata para matar los insectos para que no se comieran los cultivos.  Mi hermana cogió el veneno de rata y ella misma se mató a los 16 años.

6.    Me casé con Antonio Jimenez cuando tenía 15 años. Él era dos años mayor que yo. Tuvimos siete hijos juntos; Yolanda, Natividad, Gregoria, Juanita, Elsa, Juan Antonio, y Lucy.  Nos mudamos a San Antonio Texas cuando Elsa era un bebe.

7.    Mi vida con Antonio fue llena de violencia, alcohol, y otras mujeres. Antonio llegaba a la casa con su ropa interior al revés, entonces sabía que estaba con otras mujeres. Él

Iniciales: _____

Fecha: 4/7/16

A-000639

tomaba y me golpeaba diariamente hasta que murió en el 1972 en Matamoros, Méjico cuando era de la edad mediana de una enfermedad al hígado de tantos años por haber tomado.

8. Después que murió Antonio, nunca me casé de nuevo. Trabajé fuerte limpiando, cocinando, y cosiendo mientras que estuve criando a mis hijos. Tuve que sostener a mis hijos solos. Mandé a mi hija Gregoria que viviera con mis padres en Méjico. Mandé a Juanita, Elsa, y Juan Antonio a vivir con mi hija mayor, Yolanda. Ella era casada, trabajando, y tenía su casa propia. Yo cosía para la gente y trabaje en restaurantes en San Antonio. Me mude siguiendo las cosechas o cultivos y trabajé como cocinera para los trabajadores migrantes en los campos en Ohio, Michigan, y finalmente Florida. Mi hermana Paula estaba viviendo en West Palm Beach, Florida y lleve a mi hijo mayor, Natividad y que mi hija menor, Lucy que viviera conmigo mientras yo trabajaba recogiendo naranjas.

9. Juanita, Elsa, y Juan Antonio eventualmente se encontraron conmigo en Florida. Todos trabajaban en el campo también. Juanita conoció a Ricardo Sanchez, Sr. Donde sus padres trabajaban en el campo recogiendo naranjas conmigo y Paula. Vivíamos en un grupo de remolques que los jefes de los campos proveyeron a los trabajadores.

10. Nunca quise que Juanita se casara con Ricardo Sr. Él siempre era para el mismo. Él era como un pavo real; siempre se veía lindo y no le importaba la gente alrededor. Él era muy apegado a su mamá y necesitado.nunca tenía que levantar una mano. La mamá le hacia todo y le daba todo.

11. Cuando Juanita estaba embarazada con su primer hijo, Efrain, Ricardo Sr. Le disparó en su cara en una ebria rabia. Mi familia cree que por esto Efrain nació con epilepsia y problemas de salud mental. Después que le disparó, Juanita dejó a Ricardo Sr., y se quedó con nosotras como por seis meses. Aunque sus hermanas y yo le advertimos, ella volvió con Ricardo

Iniciales: _MJ_    Fecha: _4/7/16_

A-000640

sr. Poco después que Juanita volvió con Ricardo Sr., yo me mudé con Juan Antonio y Lucy otra vez a San Antonio.

12. La primera vez que el hijo de Juanita, Ricardo, que lo llamo Ricardín, vino a Texas a visitar, tenía siete meses de edad. Mi hija Lucy y yo estábamos visitando a la Florida mientras que regresamos a Texas, Ricardo Sr., le entregó a Ricardín a Lucy y le dijo que lo llevara. Lucy llevó a Ricardín en avión aunque no tenía ropa, pañales, formula, o un tiquete. Juanita vino meses después para llevarse a Ricardín a casa.

13. La segunda vez que vino Ricardín me visitó cuando tenía como 3 años. Él tuvo una caída terrible y se partió su cabeza, se abrió. Mi hijo lo llevó rápido al hospital donde tuvieron que poner puntos en su cabeza.

14. Cuando los hijos de Ricardín vinieron a visitarnos, se querían quedar y no volver a la casa. Dijeron que sus padres peleaban mucho en la casa. Ricardín le pidió a Juan Antonio si se podía quedar con él y Nydia le pidió a Elsa si se podía quedar con ella. Ambos Ricardín y Nydia dijeron que su papá los golpeaba y a su mamá todo el tiempo.

15. Ricardo Sr., tomaba bastante. El salía casi todas las noches a tomar y andar con sus amigos. Una vez vi a Ricardo Sr. Coger su cinturón de cuero grueso, y darle golpes a los niños con eso. Él iba detrás de Nydia y me sentí sin poder y sin tener fuerzas de hacer nada. Me fui corriendo como un conejo. Ricardo Sr. golpeaba a Juanita casi diariamente en frente de sus hijos. Yo lo llamaba El Monstruo.

16. Ricardín era un niño muy juicioso. Él siempre era simpático y cariñoso. Él no hablaba mucho y siempre quería hacer lo mismo que hacían los otros niños. Él parecía más lento que sus hermanos y hermanas. Él era bien respetuoso y siempre me quería complacer.

Ricardín a veces parecía que estuviera lejos, ausente, como que no entiendía lo que estaba pasando a su alrededor. Una vez, cuando visitaba,

Iniciales: MJ                                           Fecha: 4/7/16

en mi CASA, Ricardin se acerco mucho a la calle, Donde PASABAN carros, y no entendia mis ADvertencias, ASí le tiré piedrezitas para que me prestara Atencion. Loqué que se moviera. (MJ)

17. Ricardín visitó unas pocas veces cuando era niño. Fui a la Florida para ver a la familia en vacaciones. Nunca me gustaba quedarme con Juanita porque Ricardo Sr. y yo no hemos viajado a verlos en mucho tiempo. Se me hace difícil viajar porque tengo la enfermedad de Parkinson y artritis que me causa dolor severo en mis rodillas. Tengo que usar un paseante para poder caminar .

18. Estuve asombrada y se me partió el alma cuando supe que Ricardín fue arrestado.

19. Alba Johnson me leyó esta declaración y confirmo que es exacto.

**Yo certifico que los datos arriba mencionados son verdaderos y correctos, bajo la pena de perjurio bajo 28 U.S.C. § 1746 y 18 Pa. C.S. § 4904.**

Firmado en _Marias_   4/7/2014

Nombre _MARiA JimeNez_

Yo certifico que leí esta peclaracion entera a Maria de la Luz Betancourt Jimenez. Ella confirmó su exactitud y yo presencié su firma.

_Alba S. Johnson_

Iniciales: _MJ_                    Fecha: _4/7/16_

**Declaration of Maria de la Luz Betancourt Jimenez**

**Pursuant to 28 U.S.C. §1746**

I, MARIA DE LA LUZ BETANCOURT JIMENEZ, declare as follows:

1. I am Juanita Jimenez Sanchez's mother. Ricardo Sanchez, Jr. is my grandson.

2. I am 87 years old and I am blind.

3. I was born in Padilla, nearby Ciudad Victoria, the capital of Tamaulipas, Mexico, in 1929. I am one of five children. My sisters are Gregoria, Paula, and Oralia. I have one brother, Abel. We grew up on a farm on which my father, Abel Betancourt, farmed corn, beans, and chile. My mother was Maria Trujillo Jimenez. I went to a rural school that went only through the sixth grade. After that my parents had to pay to send me to school and they did not have the means to send me or my siblings to school. I worked in the fields helping my parents when I was not in school.

4. My father liked to drink alcohol. He gave me money and sent me to buy him alcohol so my mother would not know.

5. My sister Gregoria got married when she was 15 years old. Gregoria found out that her husband was cheating on her and she confronted him. We kept rat poison to kill the vermin so they would not eat the crops. My sister Gregoria took the rat poison and killed herself when she was only 16 years old.

6. I married Antonio Jimenez when I was 15 years old. He was two years older than me. We had seven children together; Yolanda, Natividad, Gregoria, Juanita, Elsa, Juan Antonio, and Lucy. We moved to San Antonio, Texas when Elsa was a baby.

7. My life with Antonio was filled with violence, alcohol, and other women. Antonio came home often with his underwear turned inside out, so I knew he had been with

Iniciales:_____          A-000643          Fecha:_____

other women. He drank and beat me on a daily basis until he died in 1972. Antonio died in Matamoros, Mexico when he was middle aged from liver disease brought on by his years of drinking.

8.      After Antonio died, I never remarried. I worked hard cleaning, cooking, and sewing while I was raising my children. I had to support the children on my own. I sent my daughter Gregoria to live with my parents in Mexico. I sent Juanita, Elsa, and Juan Antonio to live with my oldest daughter, Yolanda. She was married, working, and had a home of her own. I took in sewing for people and worked in restaurants in San Antonio. I moved around, following the crops, and worked as a cook for migrant workers on farms in Ohio, Michigan, and finally in Florida. My sister Paula was living in West Palm Beach, Florida and I took my eldest son, Natividad and my youngest daughter, Lucy to live with me there while I worked picking oranges.

9.      Juanita, Elsa, and Juan Antonio eventually came to join me in Florida. They all worked in the fields, too. Juanita met Ricardo Sanchez, Sr., whose parents worked in the fields picking oranges with Paula and me. We lived in a group of trailers that the field bosses provided for the workers.

10.      I never wanted Juanita to marry Ricardo Sr. He was always all about himself. He was like a peacock; he always looked beautiful and did not care about the others around him. He was clingy and needy ; he never had to lift a hand. His mother did everything for him and gave him everything.

11.      When Juanita was pregnant with her first child, Efrain, Ricardo Sr. shot her in the face in a drunken rage. My family believes that this is why Efrain was born with epilepsy and mental health problems. After he shot her, Juanita left Ricardo Sr. and stayed with us for about

Iniciales:_____            A-000644            Fecha:_____

six months. Although her sisters and I warned her not to, she returned to Ricardo Sr. Shortly after Juanita went back to Ricardo Sr., I moved with Juan Antonio and Lucy back to San Antonio, Texas.

12. The first time Juanita's son, Ricardo, whom I call Ricardín, came to Texas to visit he was seven months old. My daughter Lucy and I had been visiting in Florida and as we were returning to Texas, Ricardo Sr. handed Ricardín to Lucy and told her to take him. Lucy took Ricardín on the plane even though he had no clothes, diapers, formula, or plane ticket. Juanita came months later to take Ricardín home.

13. The second time Ricardín visited me he was about 3 years old. He had a terrible fall and split his scalp open. My son rushed him to the hospital where they had to put staples in his head.

14. When Juanita's children came to visit us, they wanted to stay and not to return home. They said their parents fought constantly in their home. Ricardín asked Juan Antonio if he could stay with him and Nydia asked Elsa if she could stay with her. Both Ricardín and Nydia said that their father hit them and their mother all the time.

15. Ricardo Sr. drank often. He went out almost every night to drink and hang out with his friends. I once saw Ricardo Sr. take off his thick, leather belt and beat the children with it. He went after Nydia and I felt powerless to do anything. I ran away like a rabbit. Ricardo Sr. hit Juanita almost daily in front of the children. I called him "The Monster."

16. Ricardín was a very good boy. He was always kind and affectionate. He did not talk much and always wanted to do everything the other children were doing. He seemed slower than his brothers and sisters. He was very respectful and always wanted to please me. Ricardín at times seemed to be far away, absent, as if he didn't understand what was going on around him. Once, when he was visiting at my house, Ricardín got too close to the street where cars were passing. He didn't understand my warnings so I threw little pebbles toward him to make him pay attention to

Iniciales:_____                    A-000645                    Fecha:_____

*I got him to move away.*

17.     Ricardín only visited a few times when he was a child. I went to Florida to see the family on occasion. I never liked to stay with Juanita because of Ricardo Sr. I have not traveled to see them in a long time. I find traveling difficult because I have Parkinson's disease and arthritis that causes severe pain in my knees. I have to use a walker to move around.

18.     I was shocked and heartbroken when I found out that Ricardín had been arrested. I do not recall anyone from his legal team coming to visit me before his trial. I did not attend his trial. I would have answered any questions and testified if asked.

19.     Alba Johnson read this declaration to me and I confirm that it is accurate.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


**Signed on** _____

**Name** _____


I certify that I read this declaration in full to Maria de la Luz Betancourt Jimenez. She confirmed it's accuracy and I witnessed his signature.

Alba Johnson

**Declaration of Martin Sanchez**

**Pursuant to 28 U.S.C. §1746**

I, MARTIN SANCHEZ, declare as follows:

1.      I am Ricardo Sanchez, Sr.'s younger brother. I am the third child born to Modesta Garcia and Aurelio Sanchez, Sr. I have six siblings. In order they are: Ricardo, Rolando, Nora, Aurelio Jr., Ana and Sergio. Most of my family was born in a small farming community about 25 minutes west of Matamoros, Mexico.

2.      ~~My family worked on the farms in Mexico.~~ When we lived in Mexico, my father went across the boarder to work on farms in Texas. We lived in a house that was not more than a shack. We were poor. Both of my parents worked endless hours to support us. My family left Mexico and moved to a small town about 45 miles from Brownsville, Texas named Pharr. I went to elementary school and Ricardo Sr. only finished the 6th grade in Texas.

3.      Our house in Pharr was not much different from the house in Mexico. It was a rundown shack in the middle of agriculture fields. I remember being fascinated by the crop duster planes flew so close to our house in Texas. They sprayed the fields and came so close to me that I could clearly see the pilot. I could feel the mists on my skin of chemicals that the planes were spreading. I did not think anything of it when I was a kid. We all played outside and had this experience. I thought it was an exciting experience. Now, as an adult, I think that those chemicals must have affected my health. I sometimes have problems with my memory.

4.      My family worked in the same fields ~~that the crop dusters sprayed~~ in Indiana, then we moved to Florida in 1974. My mother, father and older brothers, Ricardo and Rolando were in the fields all day and were ~~misted by~~ exposed to chemicals while they worked.

Initials: _____      Date: _5/16/16_

5.     My mother and father worked in the fields most of their lives. My mother usually worked two or three jobs at one time. We lived in Texas for a few years. When I was eight years old my parents took us and worked in fields in Indiana and Ohio. My older brothers Ricardo Sr. and Roland left school in the 6th grade to work in the fields. They helped to support our family. We continued to just scrape by and we lived in small houses or trailers for the workers.

6.     My family finally settled in West Palm Beach, Florida when I was about 11 years old. We lived in a community for farm workers called Campo Verde. There were small apartments for the families there. My family lived in a one level apartment at the end of a row of six apartments. The four apartments in the middle were two levels. Juana Sanchez and her family lived four doors down from us in a two level apartment. I remember Juana's sisters used to come and take our bicycles from our apartment and ride them. They never had bikes of their own. They brought them back with flat tires and bent spokes and then I fixed them. It made me so upset, but I liked Juana's family. I actually thought she was out of my league.

7.     Our apartment did not have a telephone. We used a neighborhood pay phone a couple of blocks away to call anyone. There were only two pay phones in the neighborhood. The buildings were cramped and rundown. We did not have air-conditioning. In my apartment, my sister and I were usually alone. My parents worked all day long. My mother for example got up at 3:00 am and started cooking breakfast and lunch for the men that worked in the fields. They gave my mother a few dollars and she cooked them breakfast and lunch to take with them in the fields. She then went to work in the fields all day, and then worked in the packing plant where the produced they picked

Initials: _____     Date: 5/16/16

during the day was packaged and shipped at night. She did not return home at night until close to midnight. Nora and I took care of the younger children and cooked for them since my mother was not there.

8.      I remember that my parents and brothers smelled like pesticides when they came home. They were covered in a yellow green powder that smelled like poison. The whole apartment reeked of this smell. The powder fell off all over the place. It was on their shoes and clothes. They tried to brush or beat it off their clothes before they came in, but it did not remove it all.

9.      Ricardo Sr. and Juana were friends. They knew each other because our families lived so close to each other and they went to the Mexican dances on the weekend. Both Juana and Ricardo had significant others but eventually they ended up together and married.

10.     My brother Ricardo Sr. had a wild streak. His temper was short and he drank heavily. When he went to the Mexican dances he often got in fights. He got angry and did stupid things like burning the rubber on the tires of his truck by spinning them in the dirt. It made a huge cloud of dust in front of our home.

11.     After Ricardo Sr. and Juana were married in 1980 they moved into my parent's apartment with us. It was a tight fit. They shared a bedroom together and then the rest of the boys stayed in a room all together. My brother and Juana worked in the fields and then went out dancing. Sometimes my brother left Juana home with us and went out for the night by himself.

12.     Ricardo Sr. shot Juana one night in my parent's apartment. We just found out that Juana was pregnant. I remember hearing a noise and her scream and the

Initials: _____                                    Date: 5/16/16

A-000649

ambulance come and take her away. It all happened so fast. Juana was taken to the hospital and stayed for months. She did not come back until after their son was born. Efrain was born with several problems. He was mentally slow and suffered from terrible seizures.

13. ~~I knew that my brother hurt Juana when he was drunk.~~ When he was drunk he was mean and angry. Juana stayed at home and took care of the children, cooked and cleaned, but it was never good enough for him.

14. Ricardo Sr. worked in the fields from the age of about 13 years old until he was in his early thirties. He picked vegetables like my parents. He was in the fields and exposed to the chemicals they used as pesticides. Like my parents he brought the residual chemicals into his house where he had four young children. He did not leave the fields to start driving a truck until 1985 when he was 40 years old. Even the truck he drove was for the packing company that transported the produce picked in the fields.

15. One time in 1983 ~~I went to a~~ My Brother Rolando and I went Rollerskating. I had a feeling that Ricardo Sr. was in trouble. He was at a Mexican Dance with Ricardo Sr. at the American Legion dance hall. As we arrived at the dance to check on Ricardo Sr., ~~We were having a good time when a fight~~ a fight broke out. I watched Ricardo Sr. get shot during the fight. It was so scary to watch. Ricardo Sr. did not want to go to the hospital because they had to report it to the police. Luckily the wound was just a graze across his side. He probably needed stiches but we just patched him up and went home.

16. I remember Ricardo Jr. as a small child. He was a timid and quiet child. He was very good and respectful. He seemed slow, like he did not always understand what I said to him. I felt bad that my brother was not a better role model. He worked hard, but he did not participate in the kids' ~~lives at all.~~ as he should have Ricardo Sr. did not encourage his

Initials: _____ Date: 3/16/16

A-000650

kids to play sports or be out of the house. Ricardo Sr. was very strict with his children and Juana. He liked things to be the way he wanted them.

17.   I moved to Salisbury, Maryland in 1992. I did not go back often to visit my family in Florida or Texas. I started my own family and took in my younger sister Ana's child. Jose Luis went originally to stay with my sister Nora, but I took him in when he was about 12 years old. Ricardo Sr. took in Jose's brother Omar, and raised him as his own.

18.   My sister Nora called and told me that Ricardo Jr. and her son Juan Gutierrez had been arrested. The boys as I remember them would not have been involved in a crime like this. I was not contacted by Ricardo Jr.'s attorneys or investigator before his trial. I would have answered any questions and testified if I had been asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on** _____5/18/16_____

**Name** _____

Initials:_____                    Date:_____

A-000651

**Declaration of Martin Sanchez**

**Pursuant to 28 U.S.C. §1746**

I, MARTIN SANCHEZ, declare as follows:

1.     I am Ricardo Sanchez, Sr.'s younger brother. I am the third child born to Modesta Garcia and Aurelio Sanchez, Sr. I have six siblings. In order they are: Ricardo, Rolando, Nora, Aurelio Jr., Ana and Sergio. Most of my family was born in a small farming community about 25 minutes west of Matamoros, Mexico.

2.     When we lived in Mexico, my father traveled across the border to work on farms in Texas. We lived in a house that was not more than a shack. We were poor. Both of my parents worked endless hours to support us. My family left Mexico and moved to a small town about 45 miles from Brownsville, Texas named Pharr. I went to elementary school and Ricardo Sr. only finished the 6th grade in Texas.

3.     Our house in Pharr was not much different from the house in Mexico. It was a rundown shack in the middle of agriculture fields. I remember being fascinated that the crop duster planes flew so close to our house in Texas. They sprayed nearby fields and came so close to me that I could clearly see the pilot. I could feel the mists on my skin of chemicals that the planes were spreading. My brothers, sister and I played outside and we all had this experience. I did not think anything of it when I was a kid. I thought it was an exciting experience. Now, as an adult, I think that those chemicals must have affected my health. I sometimes have problems with my memory.

4.     My family moved around and worked in fields in Indiana and Michigan. We finally moved to West Palm Beach, Florida in 1974. My mother, father and older

Initials: _____

1

A-000652

Date: 8/10/16

brothers, Ricardo and Rolando were in the fields all day and were exposed to chemicals while they worked.

5.      My mother and father worked in the fields most of their lives. My mother usually worked two or three jobs at one time. We lived in Texas for a few years. When I was eight years old my parents took us and worked in fields in Indiana and Ohio. My older brothers Ricardo Sr. and Roland went to work in the fields after Elementary school. They helped to support our family. We continued to just scrape by and we lived in small houses or trailers for the workers.

6.      My family settled in West Palm Beach, Florida when I was about 11 years old. We lived in a community for farm workers called Campo Verde. There were small apartments for the families there. My family lived in a small apartment at the end of a row of six apartments. . Juana Sanchez and her family lived four doors down from us.

7.      I remember Juana's sisters used to come and take bicycles from our apartment and ride them. They never had bikes of their own. They brought them back with flat tires and bent spokes and then I fixed them. It made me so upset, but I liked Juana's family. Our apartment did not have a telephone. We used a neighborhood pay phone a couple of blocks away to make calls. There were only two pay phones in the whole neighborhood. The buildings were cramped and rundown. We did not have air-conditioning.

8.      In my family's apartment, my sister and I were usually alone. My parents worked all day long. My mother for example got up at 3:00 am and started cooking breakfast and lunch for the men that worked in the fields. They gave my mother a few dollars and she cooked them breakfast and lunch to take with them in the fields. She then

Initials: _L S_

2

A-000653

Date: _8/10/11_

went to work in the fields all day, and then worked in the packing plant where the produced they picked during the day was packaged and shipped at night. She did not return home at night until close to midnight. Nora and I took care of the younger children and cooked for them since my mother was not there.

9.      I remember that my parents and brothers smelled like pesticides when they came home. They were covered in a yellow green powder that smelled like poison. The whole apartment reeked of this smell. The powder fell off all over the place. It was on their shoes and clothes. They tried to brush or beat it off their clothes before they came in, but it did not remove it all.

10.      Ricardo Sr. and Juana were friends. They knew each other because our families lived so close to each other and they both went to the Mexican dances on the weekend. Both Juana and Ricardo had significant others but eventually they ended up together and married.

11.      My brother Ricardo Sr. had a wild streak. His temper was short and he drank heavily. When he went to the Mexican dances he often got in fights. He got angry and did stupid things like burning the rubber on the tires of his truck by spinning them in the dirt. It made a huge cloud of dust in front of our home.

12.      After Ricardo Sr. and Juana were married in 1980 they moved into my parent's apartment with us. It was a tight fit. They shared a bedroom together and then the rest of the boys stayed in a room all together. My brother and Juana worked in the fields and then went out dancing. Sometimes my brother left Juana home with us and went out for the night by himself.

Initials:

3

Date: 8/16/11

13. One time in 1983 my brother, Rolando and I went roller skating. I had a feeling that my brother Ricardo was in trouble. He was at a Mexican Dance at the American Legion dance hall. As we arrived at the dance to check on Ricardo a fight broke out. I watched Ricardo Sr. get shot during the fight. It was so scary to watch. Ricardo Sr. did not want to go to the hospital because they had to report it to the police. Luckily the wound was just a graze across his side. He probably needed stiches but we just patched him up and went home. Ricardo Sr. shot Juana one night in my parent's apartment. We just found out that Juana was pregnant. I remember hearing a noise and her scream and the ambulance come and take her away. It all happened so fast. Juana was taken to the hospital and stayed for months. She did not come back until after their son was born. Efrain was born with several problems. He was mentally slow and suffered from terrible seizures.

14. When my brother was drunk he was mean and angry. Juana stayed at home and took care of the children, cooked and cleaned, but it was never good enough for him.

15. Ricardo Sr. worked in the fields from the age of about 13 years old until he was in his early thirties. He picked vegetables like my parents. He was in the fields and exposed to the chemicals they used as pesticides. Like my parents he brought the residual chemicals into his house where he had four young children. He did not leave the fields to start driving a truck until 1985 when he was 40 years old. Even the truck he drove was for the packing company that transported the produce picked in the fields.

16. I remember Ricardo Jr. as a small child. He was a timid and quiet child. He was very good and respectful. He seemed slow, like he did not always understand

4

A-000655

Initials:

Date: 8/10/11

what I said to him. I felt bad that my brother was not a better role model. He worked hard, but he did not participate in the kids' the way he should have. Ricardo Sr. did not encourage his kids to play sports or be out of the house. Ricardo Sr. was very strict with his children and Juana. He liked things to be the way he wanted them.

17.    I moved to Salisbury, Maryland in 1992. I did not go back often to visit my family in Florida or Texas. I started my own family and took in my younger sister Ana's child. Jose Luis went originally to stay with my sister Nora, but I took him in when he was about seven years old. Ricardo Sr. took in Jose's brother Omar, and raised him as his own.

18.    My sister Nora called and told me that Ricardo Jr. and her son Juan Gutierrez had been arrested. The boys as I remember them would not have been involved in a crime like this. I was not contacted by Ricardo Jr.'s attorneys or investigator before his trial. I would have answered any questions and testified if I had been asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___8-/0-/6___

Name _____

5

A-000656

Initials _____    Date: _8/1·/1(_

**Declaration of Michelle Sembric**

**Pursuant to 28 U.S.C. §1746**

I, MICHELLE SEMBRIC, declare as follows:

1.     I was one of Ricardo Sanchez, Jr.'s teachers in the Head Start program in Palm Beach County during the years 1987-1989.

2.     I worked for the Head Start program in West Palm Beach for 25 years. I currently work as a Licensed Mental Health Counselor for the County of Palm Beach Employee Assistance Program.

3.     Ricardo started at the Head Start program when he was three years old. He stayed in the program until he went to kindergarten. The children that attended the Head Start program had to qualify based on their family's income. Only children from low income families were eligible for the Head Start program. They mostly came from the poorest areas of West Palm Beach. When Ricardo was in the program it was made up mostly of Hispanic and African American children.

4.     Ricardo's family lived in one of the worst areas of West Palm Beach. They lived on Dyson Circle which was a low income housing project. Dyson Circle was well known for violence and drugs. Murders often happened in the neighborhood and it was overrun with drugs. Ricardo found a gun in the grass near his house. He picked it up and gave it to his father. They have tried over the years to clean the neighborhood up, but it has not been successful.

5.     Ricardo and all of his siblings: Efrain, Nydia, Ezequiel, and many years later his adopted brother Omar, attended the Head Start program. We had a bus and driver that went to the different neighborhoods and picked up the children. Ricardo's mother, Juana, often came

Initials: _MS_                                                                Date: _5-26-16_

A-000657

with them on the bus to the program too. She helped my co-worker, Rosa Ponce, in the office while her children were in the program. Juana spoke mostly Spanish and Rosa was able to talk to her. She helped Rosa with office duties and they talked. Juana did not have an easy home life. Coming to the program gave Juana an opportunity to be away from home. Her husband was abusive towards her. He was an alcoholic and hit her frequently. He yelled at her and threw things at her. She came to the program dressed and with her bruises covered.

6.      The Head Start program at that time offered the children help learning some basics before they started school. It also provided two meals and a snack. Most of the kids in the program did not have enough to eat at home. We also took them to the dentist at the local dental school. They received exams and dental work that was needed. Head Start was also a good way to get the children ready to attend school and an opportunity to socialize with other children.

7.      Rosa and I made some home visits to the Sanchez house on Dyson Circle. While the home was clean, it was run down. The apartment had two stories but it was small and cramped for a family with four children. There was no space outside for the children to run around and play that was not dangerous because of the drug activity and violence in the neighborhood.

8.      Ricardo was a very quiet child. He was not a behavior problem. He was very different from his brother Efrain. Efrain was wild. One time Efrain had to use the bathroom and when we went in to check on him, he had taken off all of his clothing. We had to explain to him that there were other children around and he needed to leave his clothing on. We were also aware that Efrain had seizures from time to time. Nydia always had a smile on her face. The Sanchez children acted respectfully. They never spoke against their father or talked about what they saw

Initials: _MS_                                           Date: _5-26-16_

at home. They were rarely absent from the program. Juana and her children seemed to be relieved to be away from their home and their father.

9.      Juana told Rosa about how bad things were at home. Rosa asked me to try to help Juana leave her husband. We researched and found a program that would take Juana and her children and shelter them. We came up with a plan for Rosa to get Juana and the children away from her husband and to the shelter, but Juana was too afraid to leave him. She would not take the help we offered. I was upset that she did not take the help. I often wondered if anyone advocated for Juana and her kids after they left the Head Start program.

10.      I lost touch with Juana and her kids after Ezequiel finished the Head Start program. I do remember Omar participating many years later. I could not believe when I saw the news about the turnpike shootings that Ricardo would be involved in such a thing.

11.      I was not contacted before or during Ricardo's capital trial by anyone working on his behalf. Had a member of the defense team representing Ricardo approached me, I willingly would have provided the information in this declaration, and I would have been willing and able to testify truthfully to the information herein had I been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on** _May 26, 2016_

**Name** _Mildy Gonlier_

**Initials:** _MJ_                                    **Date:** _5-26-16_

## Declaration of Myra Garcia

### Pursuant to 28 U.S.C. §1746

I, Myra Garcia, declare as follows:

1.      Ricardo Sanchez, Jr. was my neighbor and close friend when I was a child. I knew his whole family. I went to school with Ricardo's sister, Nydia, and we spent a lot of time at each other's homes as children.

2.      My sister Erica and I were very close friends with Ricardo, his sister Nydia, and his brother Ezequiel. Ricardo was about 12 when they moved into our neighborhood. My family lived not very far away in the same neighborhood as their home on Coconut Road. Almost every day after school we went to Ricardo's house. Mrs. Sanchez cooked for us. She was a good cook and a kind woman.

3.      I remember Ricardo's personality lit up a room. He was like a clown most of the time. He was always doing goofy things to make us laugh. Ricardo was always talking about girls. He told us that this girl liked him and that girl talked to him. Ricardo wanted to know what we thought of these girls and if he should like them. He treated my sister and me like his own sister.

4.      Ricardo's father, Ricardo Sanchez, Sr., was a very strict man. He did not like for his children to leave the house very often. He told them he did not want them out running the streets. Mr. Sanchez wanted them at home. On a few occasions Mr. Sanchez let Ricardo, Nydia, and Ezequiel come to visit at my house. My parents were lucky enough to have a pool and they

Intials: M.G.                               A-000660                               Date: 5/26/16

out with a guy like that. Ricardo trusted him because he was family, even though it did not seem that Danny was looking out for Ricardo.

10.     Maria and Ricardo split up, but Ricardo stayed involved in his son's life. He started dating other women. Maria and Ricardo got into a physical fight in front of Linda Velasquez, his new girlfriend, when Maria saw them out together at a restaurant. Ricardo just stood there and let Maria push him and yell at him. He did not fight back.

11.     The last time I saw Ricardo before he was arrested was at the birthday party his mother gave for him in 2006. Mrs. Sanchez made Ricardo's favorite meal, posole. She made a birthday cake and invited most of the family to come over. Ricardo and I stayed up until 2:00 in the morning sitting on the back of a truck and talking. He was so kind to me. I had just broken off a relationship and Ricardo told me not to be sad. He said I was a pretty girl and that I would find someone else to love. I appreciated that very much.

12.     When Nydia told me that Ricardo had been arrested she was shocked and broken-hearted. She did not know what to do to help him. My family and I could not believe it either. We were all stunned and scared for Ricardo.

13.     I was still in contact with Nydia throughout Ricardo's trial. I was not contacted before Ricardo's trial by his attorney or investigator. I would have answered any questions and testified to all I say here if asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Intials: MC                    A-000661                    Date: 5/26/16

came over to swim. My parents enjoyed having the Sanchez children over and treated them like their own when they visited.

5.      My family went to many family gatherings and parties at Ricardo's home. I knew his uncle Rolando and his family. I knew his aunt Nora and her children. I considered Juan Gutierrez a friend and dated his older brother Tony for a while when we were teenagers.

6.      I was not in the same classes as Ricardo. I do not remember him ever fighting or getting into trouble at school.

7.      Nydia told me on several occasions that her father got mad and hit her and her siblings. She said that he drank alcohol and came home angry. He took his anger out on her and her mother. Mr. Sanchez also did not allow Nydia to date boys. When she was 19 years old, she had a boyfriend and wanted to be able to go out with him. Her father still did not approve and would not let her see her boyfriend. Nydia got into an argument with her father. She told him that she was an adult and not doing anything wrong. She left home that day.

8.      I knew Maria Lopez from Palm Beach Lakes High School. I remember when she and Ricardo started dating. Ricardo was happy when Maria became pregnant. He was scared to tell his father, but he wanted to be there for Maria and the baby.

9.      Maria complained to me when Ricardo started hanging out with his cousin, Danny Varela. She was upset because Ricardo did whatever Danny told him to do and it kept him away from her and their son. Ricardo stayed out all night with Danny and his crew. I had heard that Danny was selling drugs and I could not figure out why Ricardo would want to hang

Signed on 5/26/16

Signature _____

Intials: M.G.

A-000662

Date: 5/26/10

**Declaration of Nydia Sanchez**

**Pursuant to 28 U.S.C. §1746**

I, NYDIA SANCHEZ, declare as follows:

1.      I am Ricardo Sanchez, Jr.'s older sister. I am the second child born to Ricardo Sanchez, Sr. and Juana Maria Jimenez Sanchez. I am 14 months older than Ricardo, Jr. and we have an older brother, Efrain Sanchez, and a younger brother, Ezequiel Sanchez. My parents also took in and adopted my Aunt Ana's son, Omar Sanchez Diaz, after she passed away from complications of childbirth.

2.      Ricardo Jr. (I call him Ricky) and I have the closest relationship out of our siblings. We had the same friends and always tried to look out for each other. Our father was a very strict man. He did not like us to be far from home and he ruled our house like a general. Ricky and I supported each other through so many of my parents' fights. We relied on each other to deal with my father's drinking and abuse. My mother and all my siblings were victims of my father's punches, slaps, and hits over the years. When my father was drunk and started hitting on my mother and pulling her hair, my brothers and I ran to our rooms scared. We hid in the closet huddled together crying until it was over.

3.      Ricky got into my brother Efrain's seizure medication when he was about 3 years old. He took a handful of pills before I could stop him. My mother called an ambulance and rushed him to the hospital. He was in a coma and had to stay in the hospital for about a day.

4.      Ricky went to the hospital a lot when we were kids. He got sick easily, often with pneumonia. My mother took him to the emergency room to get treated and to get medicine.

5.      We lived in a low income apartment complex on Dyson Circle in West Palm Beach, Florida when we were small children. It was a dangerous neighborhood. There were

Intials: _N.A._                                    Date: _5/25/16_

A-000663

fights and a lot of drugs there. When I was 11 years old we moved to our house on Coconut Road. The house was nicer and the neighborhood was better, but we had some neighbors that said racist things after we moved in. One of our neighbors yelled things at my father and they got into an argument. My mother was scared and called the police.

6.  Ricky was always clowning around with me and other people he felt comfortable with. He was kind of goofy. He was very smiley and wanted to please everyone. He liked to make people laugh by acting silly. He liked the attention. Ricky did not like conflict and wanted everyone to be happy.

7.  When he was not goofing around, Ricky was very quiet. He did not talk much when my father was around and sometimes stared off into space. He tried to do whatever anyone asked him to. When I started arguments with him he did not fight back. He was the same with Ezequiel. Ricky did not talk about his feelings. Ricky was forgetful. I had to remind him of things I knew I told him several times before.

8.  When we were kids, it seemed like Ricky was attached to my hip. Where I went he went. When I was 14 years old, my mother gave me some money and put Ricky and me on a bus from Florida to Texas to visit my grandmother and her family. We had to change buses in a strange city and we almost got lost. I had to read all the signs and ask if we were on the right bus. Ricky was no help to me; he had no idea what to do. Eventually, we ended up on the right bus and made it to Texas. Taking care of Ricky was a big responsibility.

9.  Ricky fell several times while riding a bike. When he was about 14 years old, Ricky had a neighbor friend who he rode BMX bikes with. The neighbor's father built ramps in the front yard and Ricky rode around on them. Ricky was riding around in a wooded area one

Intials: NK    Date: 5/25/16

time and he tried to do a back flip on the bike off a dirt hill and he fell flat on the back of his head. He fell on his face one time too.

10.     School was hard for Ricky. He did not read well and had to have a lot of help with any homework he did. He was tested and told that he had learning disabilities and put in special classes. He read so slowly that homework took a long time and he got frustrated. Ricky was not good at anything in school. He struggled in all of his classes.

11.     My father was strict. He expected us to come home after school and stay there doing chores. My brothers usually had chores to do outside like yardwork or cleaning up. I stayed inside and helped my mother clean and cook. We did not participate in sports or clubs at school and we were rarely allowed to visit friends or go to social events that were not family gatherings. My father did not want us out on the streets. We did not have many friends outside our family.

12.     It was confusing that my father went out and drank almost every night but wanted us all to stay at home. He came home with marks on his shirt that looked like other women had been kissing him. My mother got mad and they fought and yelled at each other. Sometimes they ended up beating on each other too.

13.     My father punched, slapped, and hit us kids with his belt. He threw things like plates of food at us. The food would hit the wall and splatter all over the kitchen and my father would yell at my mother to clean it up. None of us escaped beatings from him. I had to wear long sleeves when I went to school even when it was hot to cover the bruises from whippings from my father's belt. One time I got in trouble for throwing small pebbles at a girl at my bus stop. Her mother came and told my father. He was beside himself. He yelled at me and yanked my

Intials: _NL_                                              Date: _5/25/16_

A-000665

hair almost out of my head. Then he beat me with his belt. That night I ran away from home. I went to my friend Mayra Garcia's house and stayed for what seemed like a week.

14.     My mother and Ricky tried to protect me from my father. Sometimes Ricky put himself between my father and me when he thought my father was going to hit me. Ricky got slapped across the face instead and usually my beating was worse when he interfered.

15.     When I was about 15 years old my father came home completely drunk and hit my mother so hard she fell to the floor. I was furious and tired of all the fighting. I leaned down to check on my mother. Ricky and my brothers were all there watching. I screamed at my father and then called the police. The police came to our house and pulled my father in the front yard and sprayed him with the hose to calm him down. After they left, my father slapped me hard across the face.

16.     My mother sometimes got frustrated with us, too. She would throw a shoe at us or hit us with a sandal.

17.     Ricky stepped in a couple of times when I was bullied in school. People picked fights with me and Ricky showed up and got in fights trying to protect me. Ricky protected me in fights with my brothers, too. I fought with Efrain and sometimes Ezequiel. They pushed or pulled on me. They hit me and Ricky put himself in between us and tried to separate us. He had to punch or hit them sometimes. The fights were usually over silly things.

18.     Ricky was loyal and family oriented, but it was terrible living with my father. The fighting seemed to happen every day and my father was so controlling. There was no way to please him. He did not have a kind word to say. Ricky, Ezequiel, and Omar all moved out of the house the first chance they had. My father did not allow me to date or even talk to boys. He smacked me for speaking to a boy on the telephone. I did not want to get married at a young age.

Intials: ___N____     Date: 5/25/16

I thought I would get married when I was 26 or older, but I could not stay in the house with my father. I got married at 19 years old and moved out with my husband.

19.     After he moved out of the house, I continued to look out for Ricky. I helped him do things he did not seem to know he should do. I took him to a bank to open his first account when he was about 20 years old. He complained that he was paying too much to cash the checks at check cashing stores, but he did not know what to do with his paychecks other than cash them. I also had to help Ricky fill out his job applications. His handwriting was so bad and he could not spell anything. I filled them out and he signed them.

20.     Even after he had moved out of my mother's house to live with Maria, Ricky came by most Sundays to see my mother and we all played Mexican bingo together. After he started hanging around with Danny Varela that changed. He stayed away from my parents' house and only came by once in a while.

21.     Ricky needed to be told what to do. He was a follower and did anything he was told. Danny took advantage of this. I was with Ricky when he took a phone call from Danny. He just stood there while Danny screamed at him over the phone. Danny was so mean to him, and I could not believe that Ricky just did whatever Danny told him to.

22.     Ricky started copying the things that Danny did. He wore designer clothes and had a gold grill on his teeth. He wore more jewelry. I told Ricky that I thought it was wrong that he was acting exactly like Danny. He was not being the Ricky that I knew. I did not like it. I told him he should get away from Danny. Ricky did not listen to me. Ricky seemed to think that because Danny was family he would not steer him wrong.

Intials: _____                                                    Date: 5/25/16

A-000667

23.     Ricky's friend, Liana Lopez, came to my mother's house around 1:00 in the morning to tell us that Ricky had been arrested. We were all heartbroken and scared for him. It is the only time in my entire life that I remember seeing my father cry.

24.     Before trial, we spent time with Ricardo's legal team answering questions and seeing doctors. It was extremely hard for my parents. My mother does not speak English well and she was very confused by everything that was going on. Lisa used me to interpret for my mother from English to Spanish most of the time. I tried to help explain things to my mother but the process was very complicated. If the legal team had asked about the things I have said in this declaration, I would have told them, and testified about these things at the trial.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___5/25/16___

Name ___Nydia Jamal___

Intials: ___N J___                                    Date: ___5/25/16___

Page 1 of 4

R PmL

**Declaration of Patricia Zeplogle**

**Pursuant to 28 U.S.C. §1746**

R PMR

I, Patricia Zeplogle, declare as follows:

1.       I taught at Berkshire Elementary School in the Palm Beach County School District from 1965, my first year as a teacher, until 1993, when I retired. Ricardo Sanchez, Jr. was in my third grade class in 1992-1993, my last year of teaching.

2.       I recently reviewed Ricardo's special education records from the Palm Beach County School District. Ricardo was identified by other school faculty and staff as having academic difficulties before he was assigned to my class in the fall of 1992. As early as the fall of his kindergarten year, in October 1989, his teacher observed that he had difficulty understanding and expressing himself in English and needed a great deal of help completing his work correctly. His kindergarten teacher also observed that Ricardo was distractible and needed a quiet, isolated place to do his work. Although most kindergarteners have some difficulty focusing in class for extended periods of time due to their youth and unfamiliarity with a classroom setting, the fact that Ricardo's teacher filled out an assessment observation form to describe Ricardo's behavior demonstrates that his difficulties were more extreme than those of a typical kindergartener. Ricardo began receiving services through the English for Speakers of Other Languages (ESOL) program due to the fact that his teacher perceived his struggles with the English language as stemming from the fact that his family spoke Spanish at home.

3.       Ricardo continued to demonstrate developmental delay, academic difficulty, and atypical behavior during his first grade year. In November 1990, his teachers observed that he exhibited "youngness in all areas of development"; that he was distractible and unable to stay on task even for short periods of time, as most first graders are able to do; and that he was incapable

Initials: *PMR*                                                                                            Date: *3-15-16*

A-000669

Page **2** of **4**

of working independently. They noted that he could not follow directions. He became frustrated and bent and tore his reading book. He was unable to be redirected by teachers about his disruptive behavior despite their multiple attempts, and the teachers eventually excused him from the group to avoid further distractions for the other students. In December 1990, Ricardo was administered the Peabody Picture Vocabulary Test and achieved a score of 67, more than two standard deviations below the norm of 100, and in the impaired range of functioning. In April 1991, Ricardo scored extremely poorly on the Comprehensive Test of Basic Skills, a standardized test administered to children throughout the United States, achieving stanine scores of 1 (out of a possible 9) on all subtests, including Reading Comprehension, Vocabulary, Total Reading, and Math Computation. Ricardo was placed into services under Chapter 1, which provided him with additional reading and math assistance.

4.      When he was in second grade, Ricardo's ESOL teacher reported that Ricardo continued to demonstrate the same academic problems he had exhibited in kindergarten and first grades, even though he was receiving ESOL services. Beginning in October 1991, his teacher described Ricardo as unable to complete any assignments without one-to-one assistance. He could not complete math problems unless a teacher, aide, or student worked with him individually and guided him through the steps. His ESOL teacher also noted that Ricardo was unable to learn vocabulary words even after multiple drills. She also observed that he was disruptive in small group settings. She reported, however, that he knew English "pretty well." Another one of Ricardo's teachers reported that he was unable to comprehend material presented to him visually or orally; was below grade level in reading; was distracted, overactive, and impulsive; and had memory difficulties. This teacher described Ricardo as having difficulty comprehending instructions.

Initials: *PmR*                                                                Date: *3-15-16*

Page **3** of **4**

5.      As a result, in early 1992, faculty referred Ricardo for assessment to determine whether he was eligible for special education services. Pre-referral conferences and meetings were held in the spring of 1992, and Ricardo was administered a psychological evaluation in July 1992 and a speech and language evaluation in September 1992.

6.      I participated in the SLD Multidisciplinary Evaluation Team meetings for Ricardo's eligibility for ESE services in December 1992, during which we determined that Ricardo's disabilities included low average intelligence (based on the Stanford Binet scores he achieved during his July 1992 psychological evaluation), poor short term memory, extreme difficulty concentrating, and below-grade level academic performance. We deemed Ricardo eligible for special education services through the district's Exceptional Student Education (ESE) program in the area of specific learning disabilities (SLD), and determined that he required special education instruction full-time in all academic areas with the exception of art, music, and physical education.

7.      Although Ricardo demonstrated some impulsivity and disruptiveness in class, neither the psychologist who evaluated him nor the team who deemed him eligible for special education felt that he exhibited aggression or demonstrated emotional disturbance that required a separate eligibility determination. We felt that Ricardo's behavior stemmed from his cognitive and academic difficulties and the frustration he experienced as a result of his academic failure. Had Ricardo been classified as eligible for special education due to emotional disturbance, he would have been transferred to a different elementary school because Berkshire did not have a program to serve emotionally disturbed children.

8.      Following Ricardo's placement in special education, Ricardo spent much less time in my classroom. Ricardo came to my classroom for attendance and lunch count every day,

Initials: *PmR*                                                                                           Date: *3-15-16*

A-000671

Page **4** of **4**

and joined my class for art, music, and physical education on the days when the class had these electives. Ricardo received the rest of his instruction outside my class from different teachers. Although there were several children in my class that received special education services, most students who were enrolled in special education only received those services for specific needs for part of the day and spent the rest of the day in my classroom. Only those few students with very significant needs, like Ricardo, spent the majority of the school day outside my classroom.

9. The student population at Berkshire changed dramatically between my first year there in 1965 and the time I retired in 1993. When I first started teaching at Berkshire, the student body was entirely white and middle class. At the time I retired, and during the time Ricardo was a student there, Berkshire was much more racially and ethnically diverse and the students came from families that were considerably less economically stable. One year I had students from nine different countries in my class, including Mexico, Guatemala, Lebanon, Afghanistan, and Switzerland. Many of my students qualified for the free or reduced lunch program. When Ricardo was in my class, much of the student body was African-American and Latino.

10. Nobody representing Ricardo at his capital trial called me or came to talk to me. Had a member of the defense team representing Ricardo approached me, I willingly would have provided the information in this declaration, and I would have testified to the information herein had I been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on *3-15-16*

Name *Patricia M. Leplafe*

Initials: *PML*                                                                                                  Date: *3-15-16*

A-000672

**Declaration of Rachel Ramos**

**Pursuant to 28 U.S.C. §1746**

I, RACHEL RAMOS, declare as follows:

1.      I am Maria Lopez's mother. Maria and Ricardo Sanchez, Jr. are the parents of my grandson, Ricardo Sanchez, III (we call him Three). Three was born on January 3, 2003. Ricardo Sanchez, Jr. lived with me and my daughter for about a year after Three was born.

2.      Ricardo was about 18 years old when he met and started dating Maria. They met at Palm Beach Lakes High School. Maria brought Ricardo to my house to introduce him to me a couple of weeks after they started seeing each other. Maria became pregnant about six months after they met and Ricardo came to live with me and my family a few months before his son was born. He seemed happy to be out of his father's home. He was excited about being a father and told me he was going to do anything he could to be a good father.

3.      I know that Ricardo's childhood was rough. His father, Ricardo Sanchez, Sr., abused alcohol. Ricardo told me that his father was mean and angry when he drank. He punched and smacked Ricardo around regularly. Maria told me that Ricardo's father hit his mother and his brothers and sister too. Maria told me that one time she and Ricardo took his mother, Juanita, to a store to do some shopping. Ricardo Sr. did not know that Juanita was with them or where they were. When they brought her back to the house to drop her off, Ricardo Sr. dragged her from the car and punched her right in front of them. He screamed at her to get into the house.

4.      Before Ricardo moved in with me and Maria, he felt trapped at his father's house. Ricardo's father was strict and did not like for his children to be away from home. Ricardo

Intials: RR

A-000673

Date: 5-10-16

frequently snuck out of his house to come see Maria. Sometimes Ricardo spent the day with me watching television and then went back home for dinner. He told me that he did not want to go to school. He said that people teased him for having classes in the building for special classes. They called him dumb and other names. I did not want him to be on the street so I let him stay with me.

5. Shortly after he turned 19, and a few months before Three was born, Ricardo moved into my house so that he could help Maria and be close to his son. He was a good house guest. He worked hard to do the chores I asked him to do. He had a job doing construction. Ricardo was totally devoted to Three.

6. Ricardo was slow. He behaved like someone much younger than he was. When Maria was in labor with Three at the hospital, he decided to leave the room and go sleep in the car for a few hours. He said that Maria was too loud and he could not sleep in the hospital room. It seemed so silly, like something a child would do. He was also forgetful and I had to remind him of things over and over. On several occasions I asked him to go to the store and buy me Coke, but when he got to the store he called me and asked, "what kind of soda do you want again?" I also had to remind him of important appointments or places he was supposed to be. When I asked him to do things for the baby or around the house, I had to give him instructions several times before understood what I was asking. One time Maria and I asked Ricardo if he could go to the store to get baby cereal for Three. He went to the store and came back with the small boxes of cheerios. He did not understand that babies eat rice cereal and not breakfast cereal in small boxes.

Intials: R R

A-000674

Date: 5-10-16

7.      Maria handled all of Ricardo's money. She took his paycheck and made sure it was cashed. Then she made sure I got money for rent and anything that I purchased for the baby. Ricardo did not seem to know what to do with his money. His sister took him to open his first bank account when he was about 20 years old. Ricardo did not plan for the future by saving his money. If he had money he would spend it on whatever caught his eye.

8.      Maria also helped Ricardo find and apply for jobs. He did not read well. Maria would read the classified ads to him. Maria filled out Ricardo's job applications. His handwriting was almost unreadable and his spelling was terrible. He misspelled even simple words. Maria and I helped Ricardo study for his driving test. I think he had to take the test more than twice before he passed. He had trouble reading the test. He read very slowly and did not understand what most of the words meant.

9.      My family loved Ricardo. After he moved out of my house he came back when he had Three he often brought him to my house so I could help take care of Three. He was always welcome at my house. When Three was a few months old, Maria and Ricardo moved to North Carolina, to live with Maria's father to find work. They left Three with me until they found jobs then came and took him back with them. They lived there for a few months but had to move back to West Palm Beach after Ricardo lost his job. He was fired when he did not show up for work. He took Maria and Three on a trip to visit relatives in another part of the state. It snowed while they were there and Ricardo could not get back for his job and was let go.

10.     After Maria and Ricardo returned, they lived in a trailer left to Maria by her father. Ricardo started hanging out all night with his cousin Danny Varela and his friends. He started not coming home at night and Maria was furious. She finally broke it off with him. Maria

Intials: RR                                   A-000675                                  Date: 5-10-16

moved on to other relationships, but let Ricardo see Three whenever he wanted to. Ricardo provided money for Maria and Three.

11.     Ricardo was a follower. He did whatever was he was told. Danny and his friends took advantage of Ricardo. He did whatever they wanted him to and he believed anything they told him. That was valuable to them. Ricardo thought that because they were his family, he could trust them. They took advantage of that trust.

12.     Ricardo would often bring Three to stay with me when he had him. He would leave him with me and then go off with his friends. Ricardo acted like a big shot. He talked differently and dressed differently. He wore nicer clothes and shoes. He wore gold on his teeth and many gold chains around his neck. I never saw Ricardo like this when he lived with me. It was only after he started hanging out with Danny and his friends.

13.     Three has had some trouble in school. He was diagnosed with learning disabilities when he was in elementary school. I think he inherited these learning disabilities from Ricardo. Sometimes when I am trying to explain homework to Three, it reminds me of working with Ricardo on his driving test. We have to go over and over the information just like I did with Ricardo. Three was held back in second grade because of these disabilities. Three has also been threatened and bullied in school like Ricardo was.

14.     I could not believe that Ricardo was arrested for this crime. The Ricardo I know is not capable of doing something like this. Maria and I were contacted by Lisa McDermott and Donnie Murell from Ricardo's legal team. They came to my home and Maria and I went to their office. We talked and answered questions that they had about Ricardo and his behaviors. We

Intials: RR

A-000676

Date: 5-10-16

would have told them the information in this declaration and testified about it, if they had asked us. Maria and I attended most of Ricardo's trial and testified during the penalty hearing.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on** 5-10-16

**Name** Raccul Ramco

Intials:_____         A-000677         Date:_____

## Declaration of Rosa A. Ponce

## Pursuant to 28 U.S.C. §1746

I, ROSA A. PONCE, declare as follows:

1. I am a good friend of Juana Sanchez. I have known her family for more than 30 years.

2. I first met Juana's family through her mother Maria Jimenez. I worked for an organization called Community Action. I was a Family Service Specialist. My job was to go into low income communities and help families apply for assistance they qualified for like food stamps. I also recruited and enrolled children into the Head Start Program. Both programs were under the same umbrella organization when I started working for them.

3. Maria was living in West Palm Beach, Florida at the time I met her. Juana was a teenager. Juana, her sisters Elsa and Lucy, and their brother Juan Antonio lived in a small apartment in the Tradewinds Apartment complex with Maria. The Spanish families that lived in the complex called it "Campo Verde." Maria worked in the fields picking fruit and vegetables.

4. Maria and her family were eligible for food stamps and I tried to help them. I made visits to their home a few times a month to check in with them. I enjoyed talking to Maria and we became friendly outside of my work with her family.

5. I also became familiar with the Sanchez family that lived a few doors down in the same neighborhood. Aurelio Sanchez, Sr. and his wife Modesta lived in a small ~~one~~ two *RAP* level

Initials: _RAP_          A-000678          Date: _5/11/16_

apartment with their children Ricardo, Rolando, Ana, Martin, Nora, Aurelio Jr., and Sergio. It was chaotic in that apartment. Aurelio ~~and Modesta~~ *RAP* worked in the fields all day and into the night. Ricardo and Rolando both worked in the fields too. I made home visits to their apartment through my work.

6. Juana and Ricardo Sanchez Sr. were married several years after I met the family. After they were married, Juana and Ricardo Sr. lived with Ricardo Sr.'s family in their tiny apartment. For a time, Juana, Ricardo Sr., his brother Rolando and his wife all lived in that apartment with Ricardo Sr.'s parents and Ricardo Sr.'s other brothers and sisters.

7. Ricardo Sr.'s family was not a family that embraced each other. There was very little affection in that home. Modesta was a mean woman. She was the kind of mother whose sons could do no wrong. She put her sons above everyone else. They were always right. Ricardo Sr. and Rolando were wild and Modesta let them do as they pleased. Sometimes Aurelio Sr. stood up for Juana. When he protected her or took her side, Modesta got angry and it caused a fight. Aurelio Sr. was a nice man, but he and Modesta brought out the worst in each other. They fought and Aurelio Sr. sometimes drank more alcohol than he should have.

8. Ricardo Sr.'s brother Rolando drank heavily and was abusive to his wife. He and his wife got into violent arguments in the apartment. One time Rolando hit her with a whip. This all happened while Juana and Ricardo Sr. lived in the same apartment.

9. When Juana was early in her pregnancy with her first son, Ricardo Sr. shot her. She told me he was drunk and playing Russian roulette on the bed while she was lying down. It was terrible. I went to visit her when she was in the hospital. We did not think she was going to make it. I was scared for her. She was in the hospital for months. When they released her from

Initials: *RAP*          A-000679          Date: 5/11/16

the hospital, her family sent her to Texas. Her mother Maria and her sister Elsa tried to break her and Ricardo Sr. apart. However, against all of our advice, she went back to him.

10.     Juana's oldest child Efrain has a seizure disorder and some mental problems. He was anxious and depressed as a child. Ricardo Sr. was not a good father figure. I know that he was mean and abusive to Juana, but I avoided talking to her about it.

11.     All four of Juana's children participated in the Head Start program where I worked. Many years later, her adopted son Omar came to the program when he was three years old. I was not a teacher at the program. I was a facilitator. I had a Bachelor's Degree in Organizational Management, but I am not a licensed Social Worker.  The program helped children from homes where a language other than English was spoken. It also helped young children aged three and four to socialize with other children and learn basic skills like identifying shapes, colors and letters. It was not mandatory for us to teach the kids to read when Ricardo Jr. was in Head Start. Now it is mandatory and they also are tested on their skills before they graduate to Kindergarten.

12.     Juana and her children were like family to me. I was Nydia's Godmother for her first Communion at church. I watched the children grow up and I stayed close to Juana.

13.     Juana and her children were quiet and serious. They did not speak easily about their home life or complain about their circumstances. The children were very respectful. Juana and I would talk sometimes when she came to pick her children up from Head Start. Even though it seemed hard for her to talk about these things, she occasionally vented to me about how controlling and mean Ricardo Sr. was to her. He did not like for her to be away from home by

Initials: _RAP_                          A-000680                          Date: _5/11/16_

herself. He often sent his mother to look in on what she was doing if he was away from home for any length of time. Ricardo Sr. drank alcohol heavily and was a womanizer.

14.     I saw Ricardo Jr. daily when he was in the Head Start program. He was a shy, timid boy. He was not a talker. After being in the program for a while he was more comfortable and friendly with me. He smiled when he saw me and talked to me in Spanish. Ricardo was different from his younger brother Ezequiel. Ezequiel was more active. He ran around with the other kids more than Ricardo did. Ricardo stayed close to the teachers and people he knew.

15.     Juana and her family first lived in a very small apartment on Suwanee Avenue in the Westgate community. Then they moved to an apartment on Dyson Circle. It was a low income housing project. The Head Start program was held in the Community Center for Westgate. The Head Start program I worked for separated from the umbrella organization about that time. I stayed working with Head Start until I retired four years ago.

16.     Dyson Circle was where very poor families lived. It was overrun with drugs and violence. The group called Guardian Angels came in and cleaned up the community after the Sanchez family left neighborhood.

17.     The Sanchez family moved to Coconut Road in Fruity Acres after the children finished elementary school. The area is named Fruity Acres because all the roads are named for fruit. The neighborhood is also low income, but was not a housing project. I had many children in Head Start from the Fruity Acres neighborhood. The area was historically a white neighborhood. When the Sanchezes moved there the white people were starting to move out and more Spanish families were moving in. It is now a diverse neighborhood.

Initials: _GAP_                                          A-000681                                          Date: _5/11/16_

18.     I only made a couple of visits to Juana at her Coconut Road home. Her children were older and I was raising my three sons. We sometimes saw them at events in the community like wedding parties and quinceñera parties. Juana's children knew my sons and many of the same people in the community.

19.     I learned that Ricardo Jr. was arrested from the newspaper. I told my co-workers at Head Start, who remembered little Ricardo Jr. None of us could believe it. He was such a sweet, respectful boy.

20.     I talked to Juana a few times about Ricardo Jr.'s arrest, but I did not go to his trial. She told me that someone working for Ricardo Jr.'s defense was going to call me but they never did. I wish they had. I would have answered any questions and testified if I was asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___5/11/16___

Name _____

Initials:_____

A-000682

Date:_____

Page **1** of **4**

### Declaration of Wanda Lee

### Pursuant to 28 U.S.C. §1746

I, Wanda Lee, declare as follows:

1.    I was one of Ricardo Sanchez, Jr.'s special education teachers when he was in sixth grade at Conniston Middle School in the Palm Beach County School District in 1995-1996. Ricardo was in my language arts and pre-vocational classes.

2.    I have worked as an employee of the Palm Beach County School District since 1993. I started teaching at Conniston Middle School in 1994 and taught there until 1999. I currently hold a position with the district in the Alternative to Suspension program, in which I teach classes to students who have been disciplined for having alcohol, tobacco, or drugs on campus about the risks of using these substances. Students who take my class are entitled to reduce the number of days of their out-of-school suspension so that they may return to school more quickly and reduce their loss of academic instruction.

3.    Conniston was a neighborhood middle school in which the student body was largely Hispanic at the time Ricardo attended. Many of the students came from families of lower socio-economic status, although there were some students from middle class families as well.

4.    I have recently reviewed Ricardo's special education records. When I was his teacher, Ricardo received special educational services full time through the Exceptional Student Education (ESE) program in the school district. All of Ricardo's academic subjects were taught through the support class/essential instruction model in which students with disabilities were taught in a special class separate from the typically performing students. The ESE curriculum

Initials: _WL_                                    Date: _3/16/16_

Page **2** of **4**

was an alternative to the regular curriculum, which meant that the subjects were adapted and designed to impart functional skills rather than academic skills.

5.      Students like Ricardo who were assigned to a full-time special education program had more intensive needs than those enrolled in part-time special education classes. Because the law required students to be taught in the least restrictive environment, students who received full-time special education services in a separate classroom, as Ricardo did, had significant academic needs that could not be addressed adequately in a less restrictive setting, such as in a regular classroom with additional services.

6.      Ricardo took six ESE classes: math, science, social studies, language arts, reading, and pre-vocational. All of these classes were taught with different and more basic objectives than those offered to the typically performing students. In my language arts class in which Ricardo was enrolled, I taught sentence structure and handwriting skills. In Ricardo's pre-vocational class, I taught social skills units in which I taught my students how to interact with others, and how to advocate for themselves and understand and draw upon their strengths. There were frequently visitors to my classes from within the school or the district, and I used the occasions when visitors came as opportunities to teach my students how to respond when they encountered an interruption or distraction while in the middle of a task and how to redirect themselves back to the task when the interruption had concluded.

7.      I have reviewed Ricardo's individualized education plan (IEP) records from the time that he was in my classes at Conniston. The records containing my notes and comments are attached to the end of this declaration. My comments reflect that Ricardo had significantly limited social skills and task-related and organization skills in addition to difficulties in academic skills. My comment that Ricardo "has trouble beginning tasks; staying on tasks; and completing

Initials: _____      Date: _3/16/16_

A-000684

Page 3 of 4

tasks" indicates that Ricardo had difficulty focusing on and understanding directions for class assignments, and was unable to exert control to attend to and complete assignments. I noted that Ricardo "frequently display[ed] little or no tact while communicating w/ peers and teachers alike, as well as using inappropriate statements about peers w/ no apparent concern of the damage it may cause him or others." These notes indicate that Ricardo was unable to understand that some of things he said were offensive or insulting, that he spoke impulsively without being able to exert control over his speech, and that he was unable to understand the consequences of saying hurtful things – both for himself and for others. The fact that I noted that Ricardo had difficulty inhibiting his inappropriate speech but that I did not note that Ricardo was physically inappropriate or aggressive indicates that he did not act out physically; if he had, I would have included that in my notes.

8.     I also noted that Ricardo had difficulty with organization and self-direction; I included as one of his instructional objectives that he needed to be taught to write down an assignment so that he would remember it and that the teacher needed to review it, that he needed to be taught to begin a task within 10 minutes of the teacher having reviewed it after he wrote it down, and that he needed to be taught to work independently and stay on task for a period of at least 15 minutes. These very basic but detailed instructional goals indicate significant impairments in goal-orientation.

9.     Ricardo also demonstrated difficulty with verbal and written skills that I observed in my language arts class. Ricardo had "poor sentence structure usage and handwriting skills that need[ed] to be developed through practice and/or drill." I developed instructional objectives to seek to ameliorate these impairments, including that he should use functional written expression skills in sentence writing and handwriting and "verbalize his thoughts to his teacher for

Initials: _WY_                                                                Date: _3/16/16_

A-000685

Page **4** of **4**

appropriateness to a given task prior to writing a response." This objective indicates that Ricardo was unable to recognize when he was on the wrong track, when he did not understand directions, or when his answers were incorrect, and that he needed to check in with his instructor before undertaking a task in order to ensure he was proceeding as directed.

10.   When I was his teacher, the IEP team, of whom I was a member, recommended that Ricardo be exempted from taking the Comprehensive Test of Basic Skills (CTBS), a standardized test typically administered to all students. Very few students who qualified for special education services as learning disabled were exempted from the standardized testing; only those whose intellectual and cognitive functioning was very low were exempted. Because *and those who would have experienced extreme frustration* Ricardo was not pursuing an academic track in school, he did not need CTBS scores for high school or college admissions, and his impaired math, language, and reading skills would have made taking the test unduly frustrating for him.

11.   I was not contacted before or during Ricardo's capital trial by anyone working on his behalf. Had a member of the defense team representing Ricardo approached me, I willingly would have provided the information in this declaration, and I would have been willing and able to testify truthfully to the information herein had I been asked to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on   3/16/16

Name   Wanda K. Lee

Initials: WL        Date: 3/16/16

A-000686

**Declaration of Yolanda Vazquez**
**Pursuant to 28 U.S.C. § 1746**

1.      I grew up and currently live in the West Palm Beach area.  In middle school and high school, I was friends with Ricardo Sanchez, who I know as Ricky.

2.      My maiden name is Sanchez.  Although Ricky and I shared the same last name, we are not related.  My background is Cuban, and his family came from Mexico.  In school, we were often seated next to each other because of our last names.  I can't count the number of times I was asked if I was Ricky and Ezequiel's sister.

3.      I was in the same math class as Ricky, and I was friends with him outside of class.  I was also friends with his brother Ezequiel and with Maria, the mother of his son.

4.      Ricky was a sweet boy but always seemed to be low functioning.  In math class, he could not answer the simplest questions.  He would play it off like he did not care about it.  I never saw Ricky act out in class or get angry.  He was always respectful of the teacher and nice to the other students.

5.      Ricky reminded me of two cartoon characters – Eeyore and Mr. Magoo.  Ricky was sweet and sad like Eeyore, always on the outside looking in.  And he looked off into the distance like Magoo.  I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space.  It was like he lived in a dream world, keeping quiet and avoiding eye contact.

6.      I do not remember Ricky having in depth conversations.  He would usually agree and smile when people asked him something.  Or when something was complicated, he would act like he didn't care about it.  I remember one time a school teacher was explaining to him why he didn't have enough credits to pass on to the next grade, and afterward he was like, whatever, that



1

A-000687

doesn't matter. But he looked confused to me.

7.     When I first knew him, he was sad most of the time, but after he and Maria started dating, he became so happy. He was really proud when she became pregnant, and I still remember the look on his face as he rubbed her pregnant belly.

8.     Before Ricky's current lawyers came and talked to me about him, I had never been contacted about his case. From 2006 to 2009, I was living in the West Palm Beach area, and I would have provided the above information if I had been asked to do so.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

Yolanda Sanchez Vazquez

Date: 4-7-16

2

A-000688

Page 1 of 25

## Declaration of Louis James Kraus, M.D.

## Pursuant to 28 U.S.C. §1746

I, Louis James Kraus, M.D., declare as follows:

1.     I am a psychiatrist, licensed to practice in the states of Illinois, Florida, and Arizona. I am Board Certified in General Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry by the American Board of Psychiatry and Neurology.

2.     I earned my Bachelor's degree from Syracuse University in 1983, and my medical degree from the University of Health Sciences, Chicago Medical School, in 1987. My postgraduate training included a surgery internship at Boston University from July 1987 through June 1988. I completed my residency in psychiatry at Northwestern University in Chicago between 1988 and 1992, and served as Chief Resident there from July through December 1991.

3.     I have extensive teaching experience and have held a number of academic appointments. I currently serve as Professor of Clinical Psychiatry and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, and have held that position since 2015. Between 2001 and 2002, I was a Visiting Associate Professor of Psychiatry at the University of Illinois in Chicago, and I also held a position as Assistant Professor of Psychiatry at Northwestern University. Between November 1997 and July 2001, I was a Clinical Instructor in the Department of Psychiatry at Northwestern University. From July 1994 to August 1997 I was an Assistant Professor in the Department of Psychiatry, and the Director of Child and Adolescent Forensic Psychiatry, at the University of Chicago. In these positions I supervised psychiatry residents and child psychiatry fellows; developed a forensic rotation for

Page 2 of 25

child and adolescent fellows; and developed and taught child and adolescent psychiatry, general psychiatry, and forensic psychiatry courses.

4. I am a member in good standing of the following professional organizations: the American Psychiatric Association (APA), the American Medical Association (AMA), the American Academy of Psychiatry and the Law (AAPL), the American Academy of Child and Adolescent Psychiatry (AACAP), the Illinois Society of Child and Adolescent Psychiatry, the Illinois State Medical Society, the Chicago Medical Society, and the Illinois Psychiatric Association.

5. I have served in a number of professional appointments in my field. From June 2014 to 2015, I served as the chair-elect of the American Medical Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair. From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, on which I had served for 18 years. From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

6. I have served as a professional consultant in the areas of general psychiatry, child and adolescent psychiatry, and forensic psychiatry. My consulting positions include three federal consent decree appointments to assess and restructure mental health programming for the Departments of Juvenile Justice in Arizona and Illinois and in Cook County, Illinois, from 2005 through the present; consultation with the ACLU with regard to deficiencies in the Illinois Department of Juvenile Justice from 2006 to the present; consultation with the United States Department of Juvenile Justice, Civil Rights Division, between 2003 and 2008; psychiatric consultant to the Illinois Youth Center in Joliet, Illinois, from 1990 to 1997; and consultant to the

Page 3 of 25

City of Chicago, South East Community Mental Health Center, from 1990 through 1992. I also served as the Director of Child and Adolescent Psychiatry at Evanston Hospital from June 1997 to February 2000, and as the Psychiatric Chairperson of the Physician Review Board for the City of Chicago Department of Mental Health in 1992.

7. I have held various administrative positions during my professional career. From 1999 through the present, I have been the Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools. I have served as the Chief of Child and Adolescent Psychiatry at Rush University Medical Center from 2002 through the present. Since 2006, I have served as the Director of Psychiatric Services for the Sonia Shankman Orthogenic School (a residential school), and have directed the clinical rotation for child and adolescent psychiatry fellows at Rush University. Beginning in 2011, and continuing to the present, I have developed the Autism Assessment, Research, Treatment and Services Center (AARTS) at Rush University Medical Center.

8. In addition to my teaching and consulting work, I maintain a clinical practice in which I assess, diagnose, and treat patients. I have done this work throughout my career. Between July 1994 and August 1997, I was the Assistant Inpatient Director of Child and Adolescent Inpatient Services at the University of Chicago. From May 1997 through June 1999 I was a Psychiatric Consult to Youth Campus, a Department of Child and Family Services contracting agency. I was the Division Head of Child/Adolescent Psychiatry at Evanston Northwestern Healthcare between August 1997 and February 2000, and between February 2000 and June 2001, I was the Director of Child and Adolescent Psychiatry at the University of Illinois at Chicago. From January 1999 to the present I have served as the Medical Director at the

Page 4 of 25

Chicago Metropolitan Easter Seals Therapeutic School. I have served as the Director of the AARTS program at Rush University Medical Center since 2012.

9.    I have authored or coauthored a number of books and chapters, including "Public Policy Implications of Research on Aggression and Antisocial Behavior," in *The Origins of Antisocial Behavior* (2012) and "Understanding the Relationship Between Children and Caregivers," in *The Scientific Basis of Child Custody Decisions* (1999). I also have authored or coauthored peer-reviewed articles and protocols, including a 2011 Practice Parameter for Child and Adolescent Forensic Evaluations in the *Journal of the American Academy of Child and Adolescent Psychiatry* (Dec. 2011); and "Treating the Mentally Ill Offender: The Challenge of Creating an Effective, Safe and Just System," in *The Journal of Criminal Law and Criminology*, Northwestern University School of Law 89 (1) (1998).

10.    I have presented at various conferences and seminars. My presentations include "Making Systems Work Across the Lifespan for Children with Special Needs" in Palos Hills, Illinois (2013); "The Complexity of Diagnosis and Behavior of Students Placed Residentially" for the Illinois State Board of Education (2013); "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health" and "DSM-5 Implications for Child and Adolescent Psychiatry" for the 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health (2013); "The Impact of Isolation Practices in Confinement Facilities," a National Webinar for the Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody (2013); "The Role of Child and Adolescent Psychiatry in Public and Private Special Education" for Abraxas Education Forums (2012); "Juvenile Competency to Stand Trial and Understand Miranda" for DePaul University College of Law (2009), the AAPL (2007), and the APA national meeting in San Diego (2007); "Child and

Page 5 of 25

Adolescent Psychiatric Diagnoses and Medications" for the Hephzibah Children's Association (2001); "Domestic Violence and How It Affects Children" for the Cook County Public Guardian's Office (2000); and "Delinquency, Etiology and Intervention" for Grand Rounds at the Columbus Hospital Department of Pediatrics (1994).

11.     I have been deemed qualified to testify in Illinois and Wisconsin as an expert in psychiatric evaluations, diagnosis, and treatment in juvenile courts, focusing on abuse, neglect, and delinquency, and in family courts, focusing on custody determinations.

## REFERRAL QUESTIONS AND SCOPE OF EVALUATION OF RICARDO SANCHEZ

12.     Counsel currently representing Ricardo Sanchez, Jr. have asked me to perform a psychiatric evaluation to determine whether Mr. Sanchez suffers symptoms of mental disease or defect, and if so, what effects his condition(s) may have had on his behavior and functioning before, during, and after the capital offenses for which he was arrested, tried, and convicted, including his functioning during the preparations for and the trial itself between 2006 and 2009. In order to perform this evaluation, I met with Mr. Sanchez at United States Penitentiary – Terre Haute (USP-Terre Haute) on March 25, 2016. I reviewed extensive background materials, including vital records, birth and medical records, education records, employment records, court records, law enforcement records, and records of psychological and neuropsychological evaluations of Mr. Sanchez and members of his family. I also reviewed testimony and statements of Mr. Sanchez's family members, teachers, other educators, and friends, and testimony and reports by mental health professionals who evaluated Mr. Sanchez for his capital trial proceedings and more recently. The evaluation I performed and the materials I reviewed constitute the type of information customarily relied upon by mental health professionals to perform a reliable evaluation of an individual's current and past mental state and functioning.

A-000693

Page 6 of 25

13.    Based on my interview of Mr. Sanchez, my observations of him during that interview, and my review of materials provided to me by Mr. Sanchez's current counsel, it is my opinion, which I hold to a reasonable degree of medical certainty, that Ricardo Sanchez suffers from mental disorders and brain impairment that restrict his ability to understand and process information; attend to stimuli and filter important from unimportant information in his environment; learn from experience; make reasoned decisions; and avoid manipulation by others. It is further my opinion, which I hold to a reasonable degree of medical certainty, that Mr. Sanchez suffers symptoms of mental illness including anxiety, depression, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, deficits in concentration, and substance abuse. Many of these symptoms are likely sequelae of chronic exposure to traumatic experiences.

14.    In my opinion, which I hold to a reasonable degree of medical certainty, Mr. Sanchez's mental disorders and brain impairment are of long-standing duration. Some of his impairments originated at or shortly after his birth, and his symptoms were exacerbated by events and environmental factors that affected him throughout his infancy, childhood, adolescence, and young adulthood. My conclusions are informed by and consistent with the results of the neuropsychological evaluation performed by Dr. Joette James, records prepared prior to the capital offenses, and accounts by individuals who have known Mr. Sanchez and witnessed his behavior over the course of his life.

## CLINICAL OBSERVATIONS

15.    Ricardo Sanchez presented as a Latino man who appeared physically younger than his chronological age of 32 years. His vocabulary, demeanor, and interests all appeared to be those of a much younger person; he gave the impression of an adolescent. Mr. Sanchez

Page 7 of 25

appeared well-nourished. He was polite and respectful during the clinical interview. He answered my questions and appeared to be forthcoming, but his description of most events lacked detail and his memory for dates was limited. His affect was blunted during much of the interview; although he described some profoundly difficult and disturbing events, including experiencing and witnessing regular beatings at the hands of his father, he displayed little emotion when describing these incidents. In contrast to this general presentation, Mr. Sanchez became teary-eyed and overcome with emotion while describing one occasion upon which his father beat his mother so severely that she fell to the floor and lay crying as Mr. Sanchez's sister knelt beside her, sobbing. Both these reactions—flat affect and emotional flooding—are symptoms that arise from exposure to chronic traumatic experiences.

## FAMILY HISTORY OF MENTAL ILLNESS, COGNITIVE IMPAIRMENT, AND SUBSTANCE ABUSE

16.    It is well known that some mental health disorders and cognitive impairment have a hereditary factor. A family history of psychiatric disorders or other brain dysfunction is a risk factor that may increase the likelihood that an individual developssuch a disorder. In addition, an individual whose caregivers are mentally ill or cognitively impaired, or who has siblings with mental illness or brain impairment, often suffers because the parents are ill-equipped or too overwhelmed to meet the physical and emotional needs of the developing child.

17.    Both of Mr. Sanchez's parents have demonstrated cognitive impairment, measuring within the range of intellectual disability on tests of intellectual functioning. From the time she was a young girl, Mr. Sanchez's mother was shy and timid and required protection by her younger sister. Mr. Sanchez's father had difficulty in school. Mr. Sanchez's father had a quick, hot temper beginning in childhood. He was aggressive and rebellious and did not get along with other children. As an adult, Mr. Sanchez's father engaged in violent behavior toward

Page 8 of 25

his family members and others in the community. He also exhibited odd, impulsive, and compulsive behaviors, including driving erratically in circles in front of his home. Mr. Sanchez's father's impairments may have been caused or exacerbated by his exposure as a child to physical contact from pesticides sprayed upon him by crop dusting planes that flew over fields near his home as well as his exposure to pesticides when he worked in the fields as an adolescent and young adult. His impairments may also have been intensified by a severe head injury he suffered in 1991, when Mr. Sanchez was eight years old. On that occasion, Mr. Sanchez's father was struck in the head with the top of a barrel that flew off when the barrel exploded; the impact drove Mr. Sanchez's father backward a number of feet. Following this accident, Mr. Sanchez's father's behavior became yet more violent.

18. Mr. Sanchez's older brother Efrain suffers from a severe seizure disorder that has afflicted him since birth. Efrain also has been diagnosed with intellectual disability. Efrain demonstrates bizarre behavior. Mr. Sanchez's maternal great-aunt Gregoria committed suicide when she was sixteen years old, and his maternal aunt Yolanda has been described as exhibiting symptoms of mental illness.

19. A number of members of Mr. Sanchez's maternal and paternal families abused alcohol, and several also abused drugs. Mr. Sanchez's paternal great-grandfather, paternal grandfather, and father drank alcohol excessively and were violent when drunk. Mr. Sanchez's maternal great-grandfather drank alcohol and hid his drinking from his wife. Mr. Sanchez's maternal grandfather also was a severe alcoholic who abused his wife and children when he was drunk, and he died from complications of liver disease when Mr. Sanchez's mother was nine years old.

Page 9 of 25

## TRAUMATIC EXPERIENCES AND OTHER RISK FACTORS

20. Trauma and traumatic events are stressful experiences that include exposure to events involving death or the threat of death, serious bodily injury, sexual abuse, and other very serious threats to physical integrity. These may be experienced directly, witnessed, or experienced by family members or other loved ones. Most individuals exposed to such events suffer immediate overwhelming psychological or physical symptoms. The extent to which a person suffers long term effects of the trauma depends upon factors including the chronicity and intensity of the experiences, the age at which they occur, and the presence or absence of other stressors or protective factors.

21. The vulnerability of a child to the impact of trauma is affected by the age of the child and the chronicity of the exposure to trauma because traumatic experiences cause long-term changes in the biology of the brain that make children more vulnerable than adults to psychological disturbances. Exposure to adverse experiences at a young age effects changes in a child's stress-response system and increases the risk of negative outcomes following stressors later in life. The suffering of stressful events early in life causes a child to secrete increased amounts of cortisol, a hormone that can be neurotoxic to specific brain areas, including the hippocampus (which processes memory) and the pre-frontal cortex (which processes attention and executive function).

22. Research has demonstrated that a mother's exposure to environmental trauma while pregnant can impair the development of the fetus, including the development of the fetal brain. Mr. Sanchez's mother suffered physical and emotional abuse at the hands of Mr. Sanchez's father during her pregnancies. Mr. Sanchez's mother also received little to no prenatal care during her pregnancy, and she suffered from infections while pregnant with Mr. Sanchez.

Page 10 of 25

She also was exposed to neurotoxins during her pregnancy with Mr. Sanchez; Mr. Sanchez's father, parents, and brothers came home from their work in the fields covered in "a yellow green powder that smelled like poison" and that fell off their clothing and shoes all over the small apartment in which the family lived. Mr. Sanchez's birth was unusual in that when his mother went into labor, instead of her water breaking, she began to bleed. Difficulties during delivery are correlated with increased risks for pathology in the child.

23. Mr. Sanchez was also exposed to neurotoxins himself during key developmental periods. As an infant and small child, Mr. Sanchez was exposed to the pesticides that his father and paternal uncles and aunts tracked into their home.

24. Traumatic experiences involving interpersonal violence, and particularly those involving violence perpetrated by or toward caregivers, can have particularly adverse effects on a child. Children and adults who witness violence inflicted upon a loved one can suffer negative psychological consequences that are even more detrimental than those arising from violence inflicted directly upon them. Domestic violence is damaging when the abuser and the victim are people upon whom the child directly depends for physical care, safety, and comfort. Not only was Mr. Sanchez personally subjected to violent abuse by his father, but also he witnessed the abuse of his mother and siblings on a regular basis.

25. Mr. Sanchez was regularly and severely physically abused by his father, Ricardo Sanchez, Sr. Mr. Sanchez's father was frequently violent with his wife (Mr. Sanchez's mother) and his children (Mr. Sanchez and his siblings). Mr. Sanchez told me during clinical interview that his father beat him at least on a weekly basis, and sometimes more often. This frequency was confirmed by members of his family. His father struck Mr. Sanchez with his fists and with belts, generally when he was intoxicated. Although his father hit him all over his body, including

A-000698

Page **11** of **25**

striking him in the head, his father made some effort to inflict the harshest of the blows in areas of Mr. Sanchez's body that were not visible when he was clothed, so that teachers and others outside the family would not be able to see the wounds and bruises he inflicted.

26.   Mr. Sanchez's description of this abuse is consistent with descriptions provided by other family members. His sister Nydia reported that their father punched and hit the children, and that she often had to wear long sleeves when she went to school in warm weather in order to hide the bruises she sustained. Nydia also reported that Mr. Sanchez often intervened to try to protect her from their father's beatings, and when he did both children were attacked by their father. Mr. Sanchez's maternal aunts and uncle also confirmed that Mr. Sanchez, Sr. beat Mr. Sanchez and his siblings. Mr. Sanchez's maternal grandmother observed his father beating the children with a thick leather belt.

27.   Mr. Sanchez experienced tremendous stress upon witnessing his father physically attack other members of his family. The impact upon him of witnessing his father beat his mother was particularly devastating, as it was confused by Mr. Sanchez's feelings of mixed loyalty. Mr. Sanchez described to me the distress and confusion he experienced on the occasions when his father brutally beat his mother. Mr. Sanchez was terrified that his father would seriously injury his mother, and felt a strong urge to protect her, but because his siblings were all focused on taking care of their mother—he described this as their all being "on her side"—he also felt that someone needed to stand up for his father. The uncertainty about what to do in these situations left him feeling even more hopeless, helpless, and mystified by the experience.

28.   That Mr. Sanchez's father was the primary (and for much of his childhood, the only) breadwinner for the family caused Mr. Sanchez further distress and confusion. Although on several occasions other members of his family reported Mr. Sanchez's father's abuse to law

A-000699

Page 12 of 25

enforcement authorities, the family and Mr. Sanchez himself were concerned that if his father was arrested the family would not survive his absence. Mr. Sanchez reported to me that he also deeply respected his father for his financial support of the family, and he continues to speak of his father with respect. Experiencing these contradictory emotions—feelings of admiration as well as fear and anger toward his abuser—exacerbated the negative consequences of the abuse Mr. Sanchez suffered, because they impeded his ability to make sense of his experiences. Complicated and contradictory feelings like these are difficult for anyone to process, and much more difficult to process for individuals like Mr. Sanchez whose intellectual functioning is quite limited.

29. Mr. Sanchez's mother beat him as well, when Mr. Sanchez was unable to meet his parents' expectations.

30. Neglect is a type of trauma: it is maltreatment of a child characterized by the failure of caregivers to provide needed, age-appropriate care that includes both physical care and emotional and psychological care and stimulation. Neglect may have more damaging effects on the child than physical abuse, and some of the harmful effects include failure to thrive, physical illness, injury due to lack of supervision or guidance, low self-esteem, and cognitive and psychiatric impairment.

31. Mr. Sanchez suffered from neglect. Mr. Sanchez's parents did not attend to Mr. Sanchez's needs. Although he needed help with homework, they did not assist him. Although they were advised about and aware of regular meetings to develop and update Individualized Education Plans (IEPs) for his special education placement, they did not attend these meetings. Family members and teachers observed that Mr. Sanchez's mother appeared to be consumed with the needs of Mr. Sanchez's elder brother, Efrain, who suffered from a severe seizure

Page 13 of 25

disorder, and those took precedence over Mr. Sanchez's needs. Educators observed that the lack of parental involvement in and attention paid to Mr. Sanchez's significant educational needs was "uncommon" and "atypical."

32.  Mr. Sanchez also suffered from social isolation. According to Mr. Sanchez's maternal aunt, "Ricardo Sr. ran their house like a general and [Mr. Sanchez's mother] and the children were soldiers." Others in the family also described Mr. Sanchez's father as a general. Mr. Sanchez's mother and sister reported that his father was extremely controlling of them all. His father did not like the children to leave the house except to go to school, and only rarely did he permit them to play with other children other than relatives either at their own house or outside the house. As a result, Mr. Sanchez was isolated and precluded from forming normal friendships and relationships with peers that are critical to healthy social development.

33.  The family suffered from poverty (one school mate of Mr. Sanchez described the family as "dirt poor"). Mr. Sanchez did not have access to basic necessities and supplies that other children in his community had, including uniforms for gym class, after school activities, and tutoring.

34.  Mr. Sanchez grew up in neighborhoods in West Palm Beach, Florida that were impoverished, segregated, and violent. Dyson Circle, the neighborhood in which he lived until he was about ten years old, was filled with drug dealers and addicts; guns and needles were discarded in the area around his apartment. There was a substantial police presence in the neighborhood and Mr. Sanchez and his siblings often saw people fleeing from, and being forcefully apprehended by, the police. Mr. Sanchez's family moved to a house on Coconut Road when he was about ten years old; although this neighborhood was slightly better off than Dyson Circle, it was still a low-income community plagued by crime.

Page 14 of 25

35. The schools that Mr. Sanchez attended as a child had a student body that came primarily from socioeconomically deprived families. Particularly when he was in high school at Palm Beach Lakes High, school was a dangerous place to be. As one of Mr. Sanchez's friends, Jason Vasquez, described it:

> There were regular fights, and you always had to be on guard and hold your own. If you got beaten up once and did not stand up for yourself, you would end up with a reputation for being a wimp and the beatings would never stop. Pretty much everyone I knew brought a knife, brass knuckles, a chain, or some other weapon to school at some point or another for protection. You could get ganged up on by several kids at any time and having a weapon was just a matter of protecting yourself and surviving.

36. Racism has a strong negative influence on psychological and emotional well-being. Racism is inherently dehumanizing and degrading and causes emotions of fear, low self-esteem, frustration, hopelessness, and anger. Multiple mechanisms in which racism is manifest adversely affect psychological health and functioning. Institutional racism, that is, racism that limits their socio-economic status and excludes them from economic and employment opportunities, often results in segregation of members of racial groups into certain neighborhoods in which risk factors for mental disorder such as poverty, instability, noise, crowding, crime, violence, and criminal profiling are prevalent. The subjective experience of racial discrimination causes considerable psychiatric distress and can lead to symptoms of anxiety, hyperarousal, hypervigilance, and depression. The experience of racism and discrimination can also lead to internalized racism, in which members of marginalized racial populations accept or adopt the negative societal beliefs and stereotypes about themselves. Internalized racism causes profound stress and can lead to poor psychological outcomes.

37. Mr. Sanchez experienced discrimination and racism in the communities in which he lived in West Palm Beach, Florida. Particularly in the neighborhood in which he lived starting

Page 15 of 25

at approximately age ten, Mr. Sanchez encountered overt racism that had a profound effect on his sense of self. Neighbors were hostile to Mr. Sanchez and his family members and on more than one occasion told them to "go back where they came from."

38. In addition to these traumatic exposures, Mr. Sanchez experienced indifference from community institutions and resources that would have been expected to provide intervention and support. Although the police were called on more than one occasion when Mr. Sanchez's father brutally attacked and beat his family members, and although Mr. Sanchez's father was arrested for some of these incidents, law enforcement and social services did not intervene in any meaningful way to prevent the abuse that occurred in the household on a regular basis. There is no evidence that any investigation was performed, or any action taken, by Child Protective Services or any other organization to ensure that Mr. Sanchez, his mother, and his siblings were safe.

39. Furthermore, although Mr. Sanchez was deemed eligible and received special education services throughout his schooling, the services provided were incomplete and insufficient to identify and treat Mr. Sanchez's significant impairments. Mr. Sanchez was psychologically evaluated only once during his school career, before he was nine years old. The psychologist who evaluated Mr. Sanchez, observing significant cognitive and intellectual deficits, went to great lengths to ensure that he received special education services while potentially depriving him of an accurate diagnosis—the psychologist reported that he did this in order to avoid having Mr. Sanchez diagnosed with intellectual disability, a label that carried stigma. The school district never ordered another psychological assessment for Mr. Sanchez despite the fact that his clinical profile suggested other disabilities for which he would have been

Page 16 of 25

eligible for services, including other health impairment (OHI) for his attention deficits and hyperactivity, and emotional disabilities.

40.     Although Mr. Sanchez did not make meaningful progress in the ten years that followed the determination that he was eligible for special education services, the school district failed to modify Mr. Sanchez's interventions to achieve better outcomes. Mr. Sanchez failed ninth and tenth grades and when he left school at age 19, without having passed tenth grade, he was performing math at a fourth grade level and reading at approximately a third grade level. Educators explained that they were not surprised by Mr. Sanchez's failure to progress because such was consistent with his very low intellectual functioning. His teachers reported that Mr. Sanchez exerted a great deal of effort in his classes and became frustrated by his lack of progress. Mr. Sanchez's educational difficulties were apparent to his classmates, as well. They observed that he often did not understand things in the classroom, had difficulty reading, and he often was unfocused and "zoned out" in class.

41.     Mr. Sanchez's special education records indicate that both before he was formally identified with a disability and later in his school career, after years of continued inability to improve, Mr. Sanchez exhibited disruptive behaviors consistent with an inability to focus, distractibility, hyperactivity, and frustration. The psychologist who evaluated him when he was eight years old believed that the behaviors were due to his cognitive and learning disabilities. Teachers and special education personnel also observed that Mr. Sanchez's disruptive behavior stemmed from his disabilities, and noted that although he was disruptive he was not aggressive or physical. Even when Mr. Sanchez was arrested at Palm Beach Lakes High School for possession of a knife, the special education staff reported that this behavior was "out of character" for Mr. Sanchez, that he had brought the knife because he felt threatened at school,

Page 17 of 25

and he did not take it out of his backpack, display it, or use it. He was transferred to an alternative placement program only because the principal of the high school had a zero tolerance policy with regard to possession of weapons. Mr. Sanchez's behavior in this situation appears to have been typical of students at the high school at that time; as noted above, one of Mr. Sanchez's fellow students explained that "having a weapon was just a matter of protecting yourself and surviving."

42.     During our clinical interview, Mr. Sanchez described to me the frustration, hopelessness, and helplessness he experienced throughout his school career. He could not understand why he was unable to learn to read proficiently, despite great effort. As he fell farther and farther behind his same-aged peers, he felt stupid and terrible about himself. He had no sense of what he was going to be able to achieve in the future, and indeed felt that he had no hope of any success in employment. Particularly in high school, he suffered sleep disturbance, including insomnia and nightmares. He had thoughts of suicide. He responded with agitation and irritability to disappointments. Mr. Sanchez also reported to me that his experiences led him to believe that no one could help him, and this belief was devastating to him.

43.     The symptoms of anxiety and depression that Mr. Sanchez reported, along with the symptoms of attentional deficits and hyperactivity that are clearly evident from descriptions in Mr. Sanchez's special education records, likely exacerbated Mr. Sanchez's processing dysfunction, leading to even poorer outcomes in school. These, in turn, perpetuated increasing frustration and hopelessness that contributed to Mr. Sanchez's leaving school before completing tenth grade.

44.     The lack of the presence of protective factors to ameliorate the effects of these adverse factors, including any treatment, left Mr. Sanchez even more psychiatrically vulnerable.

A-000705

Page 18 of 25

Protective factors that can reduce the damaging effect of trauma upon a child include competent caregivers or people outside the family who provide physical and emotional support. They also include other resources that can provide an emotional outlet, such as social activities, physical activities, hobbies, and appropriate psychiatric and other mental health interventions. Mr. Sanchez had limited or no access to protective factors and community supports to enable him to develop resilience to overcome or minimize the effects of the trauma he experienced.

## PSYCHIATRIC SYMPTOMS AND BRAIN DYSFUNCTION

45. Over the course of his childhood, adolescence, and adulthood, Mr. Sanchez exhibited and continues to exhibit debilitating symptoms commonly present in individuals who have chronically experienced serious trauma, including depression, anxiety, sleep disturbance, hypervigilance, hyperarousal, avoidance, difficulty concentrating, and negative alterations in cognition and mood. These symptoms exist comorbid with Mr. Sanchez's low IQ, and exacerbate his processing deficits and cognitive impairment.

### Depression

46. Depressive symptoms include the presence of a sad, empty, and sometimes agitated or irritable mood accompanied by somatic symptoms and cognitive disruption that affect the individual's ability to function. Symptoms can include diminished interest or pleasure in activities generally enjoyed, sleep disturbance, feelings of worthlessness, hopelessness or helplessness, diminished ability to think or concentrate, and thoughts about or attempts at suicide.

47. Mr. Sanchez suffers from many of these symptoms. Mr. Sanchez has suffered from disturbed sleep at least since adolescence. As noted above, he reported nightmares

A-000706

Page 19 of 25

(unpleasant or frightening dreams, the content of which is not always recalled upon awakening), and insomnia (inability to commence or maintain sleep).

48. Difficulty concentrating and maintaining focus are problems that have plagued Mr. Sanchez since early childhood and continue through the present day. School personnel, family members, and friends observed and reported this about Mr. Sanchez. His school records are replete with descriptions of Mr. Sanchez's inability to attend to tasks, and school personnel confirm these descriptions. The school records also document that Mr. Sanchez appeared "dazed." Family members, teachers, and friends confirm this, describing Mr. Sanchez as having "a blank, or absent expression, as if he were not all there," being "far away, absent, as if he didn't understand what was going on around him," "seem[ing] to go blank," and "seem[ing] unfocused." His friend Yolanda Sanchez described Mr. Sanchez in the following terms:

> Ricky reminded me of two cartoon characters — Eeyore and Mr. Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding eye contact.

49. Mr. Sanchez suffered feelings of helplessness and hopelessness throughout his life, increasing in middle and high school. He associated these feelings with his inability to achieve or progress in school, his inability to protect himself and his family from his father's abuse, and his inability to maintain employment. Mr. Sanchez expressed feelings of worthlessness and low self-esteem; given his failures in school, he felt discouraged about his future and life appeared bleak.

50. During adolescence and early adulthood, Mr. Sanchez experienced agitation and irritability, which are common presentations of depression in teenagers and young adults. Mr.

Page 20 of 25

Sanchez reported to me that small slights or disappointments caused him to become short-tempered and testy.

51.    Mr. Sanchez also reported suicidal ideation. Although he apparently never formed a concrete plan for suicide nor attempted suicide, he thought about harming or killing himself while in high school and after leaving high school.

## Anxiety

52.    Anxiety is characterized by persistent anticipation of future threat that is excessive and out of proportion with reality. Symptoms of anxiety include restlessness, feeling on edge, difficulty concentrating or mind going blank, irritability, muscle tension, sweatiness, heart pounding, and sleep disturbance. Pathological anxiety causes clinically significant distress and may impair social or occupational functioning.

53.    Mr. Sanchez's symptoms of irritability and difficulty concentrating are described above and his symptoms of sleep disturbance are referred to above and described in more detail below.

## Sleep Disturbance

54.    Sleep disturbance is often suffered by individuals exposed to stressors. Although it is often comorbid with other mental disorders, including depression, anxiety, and cognitive impairment, it can also be a primary disorder and is a risk factor for the development of mental illness. Sleep disturbance can have serious effects on an individual's daytime functioning, including causing fatigue, decreased energy, mood disturbances, deficits in concentration, and somatic symptoms.

55.    As stated above, Mr. Sanchez experienced sleep disturbances for much of his life. By the time he was in high school, Mr. Sanchez was suffering significant sleep difficulties,

A-000708

Page 21 of 25

including increased sleep latency and waking up at night, which intensified his difficulties with concentration and further impaired his functioning. He had nightmares that influenced his waking thought processes and his inability to fall asleep and maintain sleep led to exhaustion and the keeping of odd hours during the day.

### Hyperactivity, Hyperarousal, and Lack of Impulse Control

56. Impulsivity is the inability to control impulses and is characterized by behavior that appears irrational and unconsidered, and frequently demonstrates impaired judgment. Hyperactivity refers to excessive motor activity, extreme restlessness, and inability to attend to and regulate behavior, and includes fidgeting, blurting out answers before questions have been completed, having difficulty waiting one's turn, interrupting others, and running about or climbing inappropriately. Hyperarousal is characterized by symptoms such as being easily startled, feeling on edge, irritability, having difficulty with concentration, and having difficulty sleeping. Mr. Sanchez exhibited symptoms of impulsivity, hyperactivity, and hyperarousal throughout his life.

57. Mr. Sanchez's special education records demonstrate that Mr. Sanchez exhibited hyperactivity from the time he was in kindergarten until he left school when he was almost nineteen years old. During elementary school, he was described as over-active, in almost constant motion, and needing individual attention to complete tasks. He called out and acted inappropriately, jumped up on other children's backs while standing in line, and exhibited sudden changes in behavior. In middle school he had difficulty starting tasks and maintaining work on tasks. In both middle school and high school he was reported to need periodic assistance with behavior management, including in the area of self-regulation.

Page 22 of 25

58.     Mr. Sanchez exhibited impulsivity and impaired judgment from childhood into his adolescence and adulthood. He frequently was injured as a result of unsafe and impulsive behavior. He was seriously injured several times while riding a tricycle and bicycle; as a teenager, Mr. Sanchez fell several times and hit his head and face while riding a bicycle on ramps in a yard. As a very young child, Mr. Sanchez swallowed a number of his brother's seizure pills. In adulthood, Mr. Sanchez frequently acted without considering the consequences of his behavior. Although he did not initiate plans or activities, he "would go along with anything anyone told him to do and not really think about it."

59.     Mr. Sanchez's symptoms of irritability and sleep disturbance, consistent with hyperarousal, are described above. Mr. Sanchez also reported to me feelings of difficulty trusting certain other people that appeared severe enough to approach paranoia. He believed that most people wanted to harm him, very few wanted to help him, and he could turn only to a few people, primarily members of his family, for help.

### Cognitive and Intellectual Impairment

60.     It appears from Mr. Sanchez's school records, as well as from statements by family members, teachers, and friends who knew him over the course of his life, that Mr. Sanchez's intellectual functioning is extremely low and his cognition seriously impaired. These problems appear to have been present since Mr. Sanchez's birth or very shortly thereafter. Although Mr. Sanchez was deemed in childhood to be learning disabled, his exceedingly poor performance in school and his inability to progress beyond the fourth grade level despite multiple interventions cannot be explained by learning disability alone. Psychological and neuropsychological testing performed during Mr. Sanchez's school years and during his adulthood indicates that Mr. Sanchez has very significant impairments in processing information.

Page 23 of 25

Symptoms of anxiety, depression, inattention, and hyperactivity can cause or aggravate processing difficulties.

### Substance Abuse

61.     The use of alcohol and drugs as a teenager or adult frequently accompanies or follows exposure to traumatic stress and other adverse childhood events, particularly when the individual has not received mental health treatment, medication, or therapy following these events. Because Mr. Sanchez did not receive mental health treatment for his psychiatric conditions, including anxiety, depression, and trauma, he took the quite typical and predictable track of using alcohol and drugs to avoid his symptoms and dissociate from his experiences. The substances he used blunted the impact of the emotions and the effects of the trauma that affected him.

62.     Beginning in his late adolescence, and increasing over the course of his young adulthood, Mr. Sanchez used a variety of substances to dampen unpleasant emotions and make him feel more comfortable in social settings that caused him anxiety. The substances he used included alcohol, marijuana, cocaine, and MDMA (Ecstasy). Mr. Sanchez mixed these drugs, using multiple substances at a time. He reported to me that while taking these drugs, he felt more relaxed and confident. Mr. Sanchez did not seem to have insight into the fact that the use of these drugs likely further impaired his functioning and was dangerous to his health.

### MEDICOLEGAL CONCLUSIONS

63.     It is my professional opinion, which I hold to a reasonable degree of medical certainty, that Mr. Sanchez suffered and continues to suffer from symptoms of mental illness and brain dysfunction that impair his social, psychiatric, and cognitive functioning and behavior. These symptoms include depression, anxiety, sleep disturbance, hyperactivity, impulsivity,

Page **24** of **25**

hyperarousal, and cognitive disturbance and delays. It is further my professional opinion, which I hold to a reasonable degree of medical certainty, that Mr. Sanchez's psychiatric symptoms have contributed to his deficits in intellectual functioning, precluded his academic achievement, prohibited him from engaging in gainful employment, resulted in behavioral dysfunction, caused him to be vulnerable to being taken advantage of and manipulated by others, and otherwise interfered with healthy development and functioning throughout Mr. Sanchez's life.

64.     I have reviewed Dr. Joette James' declaration that describes her neuropsychological evaluation of Mr. Sanchez, including results of intelligence testing, and her assessment of documents, statements, and testimony that provide descriptions of risk factors affecting Mr. Sanchez as well as Mr. Sanchez's behavior. I also have reviewed personally the underlying materials upon which Dr. James' conclusions rely. I agree that the results of Dr. James' neuropsychological assessment of Mr. Sanchez support the conclusions that Mr. Sanchez meets diagnostic criteria set forth in the DSM-5 for intellectual disability and mild to moderate brain impairment.

65.     It is further my professional opinion, which I hold to a reasonable degree of medical certainty, that Mr. Sanchez's psychiatric symptoms, in concert with his cognitive and intellectual impairments, call into doubt his ability to understand the trial proceedings and to assist his appointed trial counsel in a rational manner. Mr. Sanchez would have had difficulty understanding the details of the legal process, processing the testimony and presentation of evidence in the courtroom, and comprehending his role in working meaningfully with his defense lawyers in the development and presentation of a defense.

66.     I have reviewed the mitigating factors set forth in the federal death penalty statute, 18 U.S.C. section 3592. I also have reviewed the list of additional mitigating factors that Mr.

Page 25 of 25

Sanchez's trial counsel prepared and submitted to the jury for consideration. It is my opinion that Mr. Sanchez's psychiatric symptoms and an explanation of the effect that these symptoms had on Mr. Sanchez's behavior would have been relevant to the trial jury's consideration of several of the statutory mitigating circumstances as well as non-statutory mitigating factors, both those presented to the jury by the trial defense lawyers and others that the defense team did not raise. In particular, with regard to statutory mitigating factors, Mr. Sanchez's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; his deficits, which are long-standing and existed at the time of the offenses for which he was charged, constituted severe mental disturbance; and his impairments are factors in his background, record, or character that mitigate against imposition of the death sentence.

67.     It is my medical opinion that at the time of Mr. Sanchez's capital trial, any qualified, competent psychiatrist, meeting with Mr. Sanchez and considering his history and his clinical profile, could and would have reached these same conclusions regarding Mr. Sanchez's psychiatric, cognitive, and intellectual impairments and their effects on his understanding of and participation in trial proceedings.

I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.

Signed on _10/11/2016_

Name _Lorin J. Kraus, MD_

A-000713

**Declaration of David R. Fowler, MB, Ch.B., M.Med. Path.**

**Pursuant to 28 U.S.C. §1746**

I, David R. Fowler, declare as follows:

1.      I am the Chief Medical Examiner in the Office of the Chief Medical Examiner for the State of Maryland. I have an active medical license in the State of Maryland. I have certifications in Anatomic and Forensic Pathology from the American Board of Pathology. I am a fellow of the National Association of Medical Examiners, the American Academy of Forensic Sciences, and the College of American Pathologists.

2.      I received my medical degree from the University of Cape Town in Cape Town, South Africa in 1983. I performed a one-year internship in general medicine and general surgery at Victoria Hospital in Cape Town in 1984. I performed a one-year residency in pediatric pathology at Red Cross Children's Hospital in Cape Town in 1985. I performed a five-year full-time pathology residency at the University of Cape Town, which culminated in my receiving a degree of Master of Medicine, in 1990, with a certification in forensic pathology. I next performed a two-year residency in anatomic pathology at the University of Maryland School of Medicine in Baltimore, followed by a two-year fellowship in Forensic Pathology with the Office of the Chief Medical Examiner for the State of Maryland.

3.      I have been employed since 1994 with the Office of the Chief Medical Examiner for the State of Maryland. From 1994 until 1998, I was an Assistant Medical Examiner; from 1998 until 1999, I was the Deputy Chief Medical Examiner for Autopsy Services; from 1999 until 2001, I was the Deputy Chief Medical Examiner for Statewide Services; from 2001 until 2002, I was the Acting Chief Medical Examiner; and from 2002 until the present I have been the Chief Medical Examiner.

Page 1 of 12

A-000714

4.     I have held numerous faculty positions over the course of my career.  Among them: I have served as a Lecturer in the Department of Forensic Pathology for the University of Cape Town; I have served as both a Clinical Instructor and a Clinical Assistant Professor in the Department of Pathology and Department of Pediatrics at the University of Maryland School of Medicine; I have served as a Visiting Professor with the Tonji Medical School and with Wuhan University, both located in Wuhan, China; and I have served on the faculty for the Armed Forces Institute of Pathology.

5.     I have served on the National Association of Medical Examiners' Accreditation Committee, Strategic Planning Committee, International Affairs Committee, Nominating Committee, and Executive Committee.  I have also served on the Editorial Board of the Journal of Forensic Radiology and Imaging and the American Journal of Forensic Medicine and Pathology.

6.     I have been invited to give lectures on various topics in forensic pathology for numerous law enforcement organizations, including the Bureau of Alcohol, Tobacco, and Firearms at the Federal Law Enforcement Training Center in Brunswick, Georgia; the Federal Bureau of Investigation at the FBI Academy in Quantico, Virginia; the New Jersey State Police; the St. Mary's County, Maryland State's Attorney's Office; and the Baltimore City, Maryland Police Department.

7.     I have been the author or co-author of numerous peer-reviewed journal articles and book chapters on various topics in anatomic and forensic pathology.  I have also made numerous presentations at various academic and professional conferences.  A copy of my *curriculum vitae* is attached to this declaration.

Page **2** of **12**

A-000715

## Referral Questions and Materials Reviewed

8.      I have been asked by current counsel for Ricardo Sanchez, Jr., to render an opinion as to the performance and documentation of the autopsies of Jose Luis Escobedo, Yessica Escobedo, Luis Julian Escobedo, and Luis Damian Escobedo, performed by Associate Medical Examiner Charles A. Diggs.  I have been further asked to render an opinion as to the propriety and accuracy of Chief Medical Examiner Roger E. Mittleman's testimony at Mr. Sanchez's capital trial in light of the fact that Dr. Mittleman did not personally perform the autopsies and in light of the documentation possessed by Dr. Mittleman.

9.      In order to render an opinion, I have reviewed the following documents relating to Mr. Sanchez's case:

- Crime scene photographs from the Florida Turnpike

- Autopsy photographs for each member of the Escobedo family

- The medical examiner file (including autopsy report) for each member of the Escobedo family

- Letters from Assistant United States Attorney Stephen Carlton dated November 21, 2008, and January 13, 2009, setting forth supplemental opinions of Dr. Mittleman

- Trial transcripts dated January 27, 2009 (opening statements), January 28, 2009 (testimony of Dr. Mittleman), and February 25-26, 2009 (closing arguments)

- Government trial exhibits 1, 2, and 3

- United States Court of Appeals opinions in United States v. Daniel Troya and Ricardo Sanchez and United States v. Liana Lopez and Danny Varela

- *Curriculum vitae* of Dr. Diggs and Dr. Mittleman

## Opinions and Conclusions

10.      Upon my review of the above materials, I have concluded to a reasonable degree of medical certainty that the autopsy reports are bereft of necessary detail as to preclude a

Page 3 of 12

A-000716

reliable determination of many critical facts regarding the cause and manner of death of the Escobedo family. The autopsy reports are far below the standard of care and do not comport with fundamental standards of the discipline of forensic pathology as they existed in 2006 (and today). I have further concluded, also to a reasonable degree of medical certainty, that Dr. Mittleman's opinion that Luis Damian Escobedo "drowned in his own blood" is not supported by the available evidence, given the lack of documentation in the autopsy reports and the fact that Dr. Mittleman did not personally perform the autopsies himself. To the contrary, the available evidence demonstrates that the gunshot wound to Luis Damian Escobedo's heart would have been very rapidly fatal, *i.e.* within a matter of a few seconds. Moreover, this is not a phrase that is typically used within the discipline of forensic pathology to describe the mechanism of death resulting from a gunshot wound to the heart. Lastly, I have concluded, also to a reasonable degree of medical certainty, that Dr. Mittleman's testimony regarding the relative positioning of the shooter and Luis Julian Escobedo is too speculative to be medically reliable, again given the lack of documentation in the autopsy reports and the fact that Dr. Mittleman did not personally perform the autopsies himself.

**The Standard of Care in Forensic Pathology**

11.     The field of pathology generally refers to the science of the causes and effects of disease. Forensic pathology is a branch of pathology that specifically deals with investigation into the cause and manner of death for individuals who die in unexpected, unnatural, or suspicious circumstances. The aim of forensic pathology is to investigate and provide answers to the question of how and why a person died, often in conjunction with the legal system.

12.     A critical component of any forensic investigation is the performance of a forensic autopsy. A forensic autopsy generally refers to the measurements, tests, examinations,

Page **4** of **12**

A-000717

and observations performed on a body in an effort to determine what medical conditions, injuries, or substances may have caused or contributed to an individual's death.

13.     The forensic death investigation begins at the place of a person's death, particularly when a death is clearly violent or suspicious. A medical examiner or medical examiner investigator will sometimes travel to the place of death to document pertinent details about the place and condition in which a body is found, including by taking photographs of the body and crime scene. The autopsy then continues at the medical examiner's office, where meticulous external and internal examinations of the body are conducted.

14.     The National Association of Medical Examiners has, since 2005, promulgated a guide entitled *Forensic Autopsy Performance Standards* that serves as the standard of care for forensic pathologists. The guide has undergone minor revisions and amendments since 2005, however the basic framework and content has remained largely unchanged since it was originally adopted. The principal objective of the *Performance Standards* is to provide a constructive framework that defines the fundamental services rendered by a professional forensic pathologist practicing his or her art. The guide sets forth minimal performance levels for competency in the profession, and deviation from the performance standards is expected only in unusual cases when justified by considered professional judgment. These minimal performance levels are described below.

15.     The *Performance Standards* dictate that medical examiners must investigate cooperatively with, but independent from, law enforcement and prosecutors and operate without any undue influence from law enforcement agencies and prosecutors.

Page **5** of **12**

A-000718

16.     Interpretations and opinions by the medical examiner must be formulated only after consideration of available information and only after all necessary information has been obtained.

17.     During the external examination of a body, minimum standards for obtaining information include: measuring and recording body length; measuring and recording body weight; examining external aspects of the body; photographing and describing the body; documenting and correlating clothing findings with injuries of the body in suspected criminal cases; identifying and collecting trace evidence in suspected criminal cases; and photographing or listing clothing and personal effects.

18.     The external examination also must include a documentation of identifying features, signs or absence of disease or trauma, and signs of death, including: apparent age; sex; apparent race or racial characteristics; description of hair; description of eyes; description of abnormal body features; description and location of prominent scars, tattoos, skin lesions, and amputations; description of teeth; inspection and description of the head, neck, thorax, abdomen, extremities, and hands; description of the posterior body surface and genitals; and documentation of evidence of prior medical or surgical intervention.  The medical examiner must also document postmortem changes, including rigor mortis, livor mortis, and any decomposition of the body.

19.     Meticulous, specific, detailed documentation of injuries is vital to any minimally competent forensic autopsy.  Observations and findings are documented to support or refute interpretations, to provide evidence for court, and to serve as a record.  Injuries must be described by type, location, size, shape, and pattern.  Documentation must be both photographic and written.

A-000719

20. Documentation of firearm wounds should include detail sufficient to provide meaningful information to users of the forensic autopsy report, and to permit another forensic pathologist to draw independent conclusions based on the documentation. The autopsy report must describe injuries, measure wound size, locate cutaneous wounds by measuring from either the top of the head or sole of the foot and from either the anterior or posterior midline; locate cutaneous wounds of the upper extremities by measuring from anatomic landmarks; descriptively locate cutaneous wounds in an anatomic region; describe the presence or absence of soot and stippling; and describe the presence of an abrasion ring, searing, muzzle imprints, or lacerations.

21. Internal body cavities must be examined both before and after organs are removed. Organs must be examined and described both before and after they are removed.

22. The medical examiner must also perform thorough internal examinations of the head and neck. Specific, detailed descriptions of the internal examinations of the head and neck must be documented. These include descriptions of the scalp, skull, and meninges; documentation of any epidural, subdural, or subarachnoid hemorrhage, descriptions of the brain prior to and after removal; description of the muscles and soft tissue of the neck; and description of neck organs and airways.

23. Documentation of penetrating injuries, including gunshot wounds, should include detail sufficient to provide meaningful information to users of the forensic autopsy report, and to permit another forensic pathologist to draw independent conclusions based on the documentation. Internal wound pathways shall be described according to organs and tissues and size of defects of these organs and tissues. The medical examiner must correlate internal to

Page 7 of 12

external injuries; describe and document the track of the wound; describe and document the direction of the wound; and describe and document recovered foreign bodies.

24.     Finally, the medical examiner must make use of supporting scientific tests and laboratory procedures. Medical examiners must X-ray all bodies in certain circumstances, including gunshot victims, and must preserve bodily fluids for purposes of further laboratory testing, including toxicological and DNA testing.

### The Autopsies of the Escobedo Family

25.     The autopsy reports prepared in this case are noteworthy for their brevity and for their lack of detail. They fall far short of the required standards necessary for minimal competence in the performance of the duties of a forensic pathologist. Critically, the autopsy reports do not sufficiently document the results of Dr. Diggs's examinations so as to permit subsequent forensic pathologists to draw reliable independent conclusions about the cause and manner of the Escobedos' deaths, except in the most rudimentary way.

26.     It is of course apparent that each of the Escobedos died as a result of gunshot wounds. What is not apparent – and is impossible to reconstruct after the fact – are the specific details regarding Dr. Diggs's examinations of the Escobedos. Dr. Diggs alone performed examinations; the majority of his observations remain solely with him due to his lack of documentation. Moreover, given the volume of autopsies that most medical examiners perform and the passage of time from autopsy to trial, even the medical examiner who performs a particular autopsy cannot reasonably be expected to retain all pertinent details of that examination in his or her memory. For this reason, it is absolutely crucial to meticulously and contemporaneously document each and every relevant finding and observation, both photographically and in writing. Dr. Diggs failed to do so, thus it is not possible for any other

Page **8** of **12**

forensic pathologist to come to reliable conclusions on anything but the most straightforward aspects of the Escobedos' deaths.

27. Dr. Diggs did not record in his autopsy reports numerous details that are necessary to the minimum performance standards in forensic pathology. With respect to Luis Damian Escobedo's fatal gunshot wound, for example, the autopsy report does not contain a description of which chamber of the heart the projectile entered, the size of the wound on any internal organs, how much fluid was present in the pericardial sac, how much fluid was present in the lungs, or what type of damage to the large blood vessels of the lungs was present. Regarding the external wounds, the autopsy report fails to document their shape, borders, or whether an abrasion ring is present. These descriptions are necessary for the determination of whether a wound is an entrance or an exit wound.

28. Regarding Luis Julian Escobedo's fatal head wound, significant pieces of information are missing, such as the presence or absence of an abrasion ring and the presence or absence of beveling of the skull. These details are again critical to the determination of whether a wound is an entrance or an exit wound.

29. Moreover, the photographic documentation of the bodies was rushed and incomplete. I note, for example, that there is no clear photograph of the fatal entrance wound to Luis Damian Escobedo's left upper shoulder. I further note that, according to the timestamps on the digital photographs taken during the autopsy, the photographing of Luis Damian Escobedo's body once his clothing had been removed lasted only 3 minutes (from 3:01 p.m. to 3:04 p.m.). Such a short amount of time does not permit the careful and thorough documentation of all external features and injuries necessary to an adequate autopsy examination.

A-000722

**Supplemental Opinions of Dr. Mittleman**

30.    All of the supplemental opinions reached by Dr. Mittleman and set forth in Assistant United States Attorney Carlton's letters of November 21, 2008, are speculative due to Dr. Diggs's lack of sufficiently detailed written and photographic documentation and Dr. Mittleman's lack of participation in the autopsies.

31.    Moreover, I note specifically that Dr. Mittleman's conclusion that Luis Damian Escobedo "drowned in his own blood" is not supported by the available evidence. First, as described above, the autopsy report fails to document with precision the location of the gunshot wound that passed through Luis Damian Escobedo's lungs and heart and the amounts of fluid located in the pericardial sac and lungs. There can be wide variability in the mechanism of death depending on where, precisely, the wound is located. For instance, it can make a substantial difference whether the projectile passes through the right or left ventricle of the heart. There can be tremendous difference in the amount of time an individual takes to die and/or remains conscious depending on the precise path of the projectile.

32.    Although the autopsy report itself lacks necessary detail, it is possible to determine from the crime scene and autopsy photos that – contrary to the supplemental disclosure and trial testimony – the gunshot wound to Luis Damian Escobedo's heart was very rapidly fatal. There is no scientific evidence to support the assertion that he drowned in his own blood.

33.    The surface of the lungs contains a material known as pulmonary surfactant. This material performs a variety of necessary functions, including in the regulation of the lungs' ability to collapse and expand. Given that the injury to Luis Damian Escobedo involved hemorrhaging of both lungs, pulmonary surfactant would have mixed with any blood in the

Page **10** of **12**

airways and come out of his mouth had he been alive and had more than one or two lung contractions following this gunshot wound. Pulmonary surfactant is visible as a soapy or frothy fluid, and is absent in any of the crime scene or autopsy photographs of Luis Damian Escobedo. Given the lack of evidence of pulmonary surfactant having been expelled from the mouth, Luis Damian Escobedo's death would have occurred in a matter of one or two breaths (*i.e.*, a few seconds) following the gunshot wound to the heart.

34.     There is no legitimate basis upon which Dr. Mittleman could have grounded his conclusion that Luis Damian Escobedo "drowned in his own blood," or his conclusion that Luis Damian Escobedo's death involved more suffering than a typical gunshot wound to the heart.

35.     Moreover, no forensic pathologist speaking objectively would describe a death involving a gunshot wound to the heart, with no evidence of substantial fluid buildup in the lungs, as one in which the victim "drowned in his own blood." While any violent crime against a child is unquestionably horrific, this unsupported conclusion comes across as an effort to make Luis Damian Escobedo's death seem even more horrific and torturous in order to aid the prosecution's case, rather than to dispassionately describe the cause and manner of death as an independent medical professional.

36.     Dr. Mittleman's further conclusion and testimony that the fatal head wound to Luis Julian Escobedo was consistent with a shooter standing above him and firing down as he lay on the ground was purely speculative. Given the lack of documentation in the autopsy reports and lack of other available information that would inform such a conclusion, there is no scientific basis upon which a reviewing pathologist could determine the position of the shooter at the time the shot was fired.

A-000724

## Conclusion

37.     The deficiencies and lack of documentation in the autopsy reports and the lack of

support for Dr. Mittleman's conclusions would be clear to any reasonable medical examiner who

examined the materials provided to me by counsel for Mr. Sanchez.  This is the case now and

would have been the case at the time of Mr. Sanchez's 2009 trial.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is**

**true and correct.**

**Signed on** ___10___/_11_/_____

**Name** _____

A-000725

Page 1 of 5

## Declaration of Jeff M. Fischbach

## Pursuant to 28 U.S.C. §1746

I, Jeff M. Fischbach, declare as follows:

1.     I am the founder and president of SecondWave Informations Systems, an information technology consulting firm. I am a board certified forensic examiner specializing in information, communication, stored data and electronic technologies.

2.     For the last twenty years, I have worked as an expert in the field of digitally-recorded evidence, consulting and testifying in numerous cases in federal and state court, including in California, Oregon, Utah, Alaska, Colorado, Michigan, Texas, Minnesota and Wisconsin. In addition, I have been hired by courts to act independently in the capacity and/or under the supervision of a special master. I also have given numerous lectures on cellular records and forensic analysis to attorneys, law enforcement and judges. A copy of my *curriculum vitae* is attached to this declaration.

3.     In January 2008, I was retained by counsel for Ricardo Sanchez to provide expert assistance in the area of cellular forensics. Although counsel provided me with all of the cellular records produced in discovery, I was asked to focus my attention on determining the location of a 911 call that counsel believed was placed by one of the victims. I was not asked to conduct a more general review and analysis of the cellular tower data that the government provided in discovery and intended to present at trial until close to the time of trial. By that time, I was operating under time constraints, and it was my understanding that I would not testify at trial.

Initials: _____     Date: _____

A-000726

Page 2 of 5

Counsel contacted me during the proceedings and asked that I review trial testimony presented by the government and provide an expert declaration. In the declaration I provided to counsel on February 22, 2009, I expressed only general opinions based on my experience in cellular forensics.

4.      I have been contacted by current counsel for Ricardo Sanchez and Daniel Troya, who have asked me to analyze the cellular records provided in pretrial discovery and to review the testimony at trial. The opinions below are expressed to a reasonable degree of professional certainty.

5.      In the most basic form, a cellular phone is essentially a two-way radio, consisting of a radio transmitter and a radio receiver. When a call is placed, the phone converts voice data into an electrical signal. It is then transmitted via radio waves to a switch center, which routes the signal to the nearest cellular tower in its line of sight with the best signal strength or quality. If the cellular tower is overloaded, offline, or the signal is obstructed, the signal will connect to the next best tower in its sightline. The cellular tower then relays the radio wave to the recipient cellular phone, which converts the wave to an electrical signal and then back to sound again.

6.      Once a phone call is terminated, the only location information that may be available is the location of the cellular tower that processed the call. Call Detail Records (CDRs) are historical records that can provide information detailing dialed and incoming numbers, call completion status, and contact frequency among numbers. They also contain cell site and switch center information which can be used to extrapolate the location of stationary cellular towers. This data is intended to allow technicians to diagnose dropped calls and other network problems; it is not designed or intended for the purpose of locating subscribers – historically or in real-time.

Initials: _____      Date: _____

Page 3 of 5

7.      In contrast, GPS is a form of real-time "triangulation" that measures the relative distances between at least two fixed points and one unknown point, in order to calculate the location of the unknown movable object.  Triangulation cannot be performed *ex post facto*. As a recent advance and in response to Federal Communications Commission (FCC) mandates, tower locations can be used in a similar fashion to GPS – but only in real-time. This requires the simultaneous use of multiple towers to triangulate a cellular device. Such use is now routinely triggered by dialing "911" on a mobile handset, which can generate a record of both the call and triangulation results.

8.      In this case, the testimony at trial suggested that the cellular tower data could narrow the origination point of a call to a specific area one and a half to two miles from the location of the cellular tower that processed the call. Based on my examination of the records, the discovery produced at trial was patently insufficient to substantiate the whereabouts of an individual handset on a given date and time with such accuracy or precision. The records are only sufficient to determine the location and engineered capabilities of the particular cellular tower that provided cellular service.

9.      The various factors that affect cellular tower range and coverage area – such as geography, cell site design and engineering, network integrity, obstructions, density, and congestion – are not predictable or constant. Though a tower may have been engineered to provide a certain range of coverage, there is no guarantee that the entire coverage area will receive the same quality of service or any service at all.

10.      Each major cellular network provider maintains standard business records that could substantiate the approximate range and operating conditions of their cellular towers, including records that describe the towers' operational behavior, engineered capabilities, tuning

Initials: _____      Date: 5-2-16

Page 4 of 5

and alignment, maintenance, and service history. Such records, which do not appear to have been provided in this case, dictate the actual range of service and would provide a more accurate estimation of an individual's location within the provider network.

11.     I also reviewed the toll records, CDRs, and subscriber information for (956) 266-2004. The number was assigned to Yessica Escobedo by T-Mobile in May 2006. The toll records state that the handset was in the McAllen, Texas when it placed three outgoing calls to (956) 742-9994 at 11:58 PM on October 12, 2006, 12:00 AM on October 13, 2006, and 3:18 AM on October 13, 2006. The CDRs, which provide the cell site and switch data needed to identify the specific cellular towers responsible for providing cellular service, are incomplete for these calls.

12.     The toll records, CDRs, and subscriber information provided by T-Mobile for (786) 853-8416, which the government alleged was used by Ricardo Sanchez, are similarly incomplete. There are calls in early October where the toll records show that the service area is Rio Grande, Texas or Houston, Texas. The CDRs provided by T-Mobile only cover October 12-14, 2006. As a result, the specific towers that processed those calls cannot be identified.

13.     Because these records are incomplete, it is not possible to definitively determine whether the (956) 266-2004 handset traveled to Texas at some point on October 12, 2006. In order to perform a more comprehensive forensic evaluation, I would need to review system information, cell site, and switch data for relevant T-Mobile cellular towers in Florida and Texas during October 2006. Because network providers continuously update their cell site and switch center data, the data provided from 2007 and 2008 is not historically accurate. Historically accurate data is particularly important in this case because T-Mobile acquired wireless spectrum from the FCC in September 2006 and was in the process of upgrading its equipment and network capabilities during this time. I also would need to review the CDRs for (786) 853-8416 and (956)

Initials: _____          Date: _____

A-000729

Page 5 of 5

266-2004 for the entire month of October 2006. As noted above, the CDRs for (786) 583-8416 only covered two days, and the CDRs produced by T-Mobile for (956) 266-2004 were generated by a third party subsidiary – Fraudbusters.

14.     Had trial counsel provided adequate notice of these issues then, I would have testified to the same information provided in this declaration.

I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.

Signed on _May 2, 2016_

Name _Jeff M. Fulbard_

Initials: _JF_                                                         Date: _5-2-16_

Page 1 of 8

## Declaration of Francis Crosby, Psy.D.

## Pursuant to 28 U.S.C. §1746

I, Francis Crosby, Psy.D., declare as follows:

1.       In June 1992, I conducted a psychological evaluation of Ricardo Sanchez, Jr., at the request of the Palm Beach County School District, to assist the school district in determining Ricardo's eligibility for special education services.

2.       I am a psychologist, licensed to practice in Florida. I speak French, Spanish, and English fluently. I have applied knowledge in developmental, forensic, and educational testing, diagnosis, and treatment.

3.       I received my Bachelor's degree in Social Psychology from Florida Atlantic University in 1981. In 1990, I earned a Master's in Counseling Psychology from Nova University in Florida. I continued my graduate studies at the Miami Institute of Psychology, earning a Master's in School Psychology in 1991, a Master's in Clinical Psychology in 1994, and a Doctor of Psychology degree in 1999.

4.       I have practiced in a number of different clinical settings over the course of my career, including in teaching hospitals, university research centers, a county sexual assault team and a child protective services team, inpatient and outpatient clinics, and in public school systems. Since 1996 I have maintained a private practice in Boca Raton, Florida. I have also consulted and provided psychological services through Multilingual and Legacy Centers in West Palm Beach, Florida since 2003.

Initials: _____        Date: 3/15/16

A-000731

Page **2** of **8**

5.     In September 1991, I was hired to a contract position with the Palm Beach County School District to conduct psychological assessments of students enrolled in the school district who were referred for evaluation for eligibility for special education services.

6.     Under the school district's imposed rules, psychologists who conducted assessments were authorized to describe a child as having an educational profile that would benefit from certain types of recommended services but not to provide a diagnosis.  For example, in Ricardo's case, I was not permitted to say that he had a specific learning disability, only that he had an educational or psychological profile that would benefit from services provided to those with learning disabilities.  My responsibility also was not to assess every disability the child had, but simply to describe impairments for which the district could provide services that would ensure that child access to an appropriate education.  This is one reason why in my report following my assessment of Ricardo I indicated that although Ricardo's behavioral disturbances might arise from a disability other than academic and learning difficulties, I recommended that the district address the academic and learning problems first before assessing him for other qualifying disabilities, such as emotional handicap.

7.     During my evaluation of Ricardo in June 1992 when he was 8 years, 9 months old, I administered the Stanford-Binet Fourth Edition (SB-4) intelligence test.  At the time I evaluated Ricardo, I typically administered either the SB-4 or the Wechsler Intelligence Scale for Children, Revised (WISC-R) to assess a child's IQ. The SB-4 was designed for administration to individuals ages 2 through 23, and the WISC-R for children ages 6 to 16.

8.     I generally chose to administer the SB-4 to minority students because the SB-4 had more practice items on the subtests than the WISC-R did, and I wanted the students who were likely to have had less exposure to books or other academic materials to have an

Initials: _____          Date: __3|15|16__

Page **3** of **8**

opportunity to practice the tasks the test required. Students tended to score higher on the SB-4 than on the WISC-R as a result of the practice items and other factors. In order to qualify for special education services as learning disabled, the student needed to have a discrepancy of at least 15 points (one standard deviation) between his or her full scale IQ score and his or her score on achievement tests. Because I was trying to ensure that students met the criteria for eligibility for special education services as learning disabled, and I knew that a higher score on an IQ test, combined with a lower score on an achievement test, was more likely to achieve that goal, I preferred to administer the SB-4 rather than the WISC-R.

9.      At the time I evaluated Ricardo, it was very stigmatizing for a student, particularly a minority student, to be labeled as mentally retarded. It was important to avoid that label whenever possible, while still ensuring that the student was eligible for services. That is another reason why I administered the SB-4 to Ricardo rather than the WISC-R; his full-scale IQ score on the WISC-R was likely to be lower than it was on the SB-4.

10.     Ricardo obtained a full scale IQ score of 80, a score that placed him in the low average range of intelligence. The score of 80 is more than one standard deviation below the mean score of 100. I also administered the Woodcock-Johnson Psycho-Educational Battery-Revised achievement test. Because Ricardo obtained scores on many of the subtests of the Woodcock-Johnson that were more than one standard deviation below the full scale IQ score he obtained on the Stanford-Binet, he qualified for special education services under the designation of specific learning disabled.

11.     Ricardo obtained low scores on many of the subtests of the Stanford-Binet. He exhibited particular difficulty with subtests that measure working memory. Working memory is the ability to take information into the mind and hold it in the mind for long enough to

Initials: ____      Date: _3/15/16_

Page 4 of 8

manipulate it and solve a problem. Those who demonstrate working memory impairments often have difficulty exercising good judgment and making reasoned decisions, because they are unable to hold information in their minds, manipulate it properly, or filter out extraneous information and focus on the relevant information.

12. Ricardo's highest subscale scores were on the quantitative reasoning and comprehension subtests, both of which included relatively simple questions. The SB-4 and other intelligence tests are designed so that simple questions appear at the beginning of the subtests; the difficulty of the questions increases later in the examination. The testing protocol requires that the administration of the subtest be discontinued after an individual fails to complete a certain number of items correctly.

13. A younger child thus may achieve an average score by completing the items early in the instrument even if the child is not able to complete (or never even reaches) the more complicated items later in the instrument, while an older child taking the same test and answering the same items would achieve a lower score.

14. The fact that Ricardo achieved a full scale IQ score that is typically considered above the mentally retarded range when he was 8 years, 9 months old does not preclude the possibility that he was and is mentally retarded (now termed intellectually disabled). As noted above, a younger child who is able to answer correctly the items that appear early in the instrument will achieve a higher IQ score than an older child, who is expected to be able to answer the more difficult questions that appear later in the instrument but who has not progressed and still is able to answer only the simpler questions toward the beginning of the instrument. In order to ensure that the IQ score accurately reflects an individual's intellectual functioning, it is important to retest the individual after several years, particularly when the first

Initials: _____                                                Date: _3|ˡ⁵|16_

Page **5** of **8**

administration of an IQ instrument is completed before the age of 10, because an individual's intelligence profile may change from childhood into adolescence.

15. In addition to the SB-4 and the Woodcock-Johnson, I administered to Ricardo the Beery Developmental Test of Visual-Motor Integration 3-R (Third Edition, Revised), and the Visual Aural Digit Span Test (VADS). The Beery is a test of graphomotor skills and hand-eye coordination and is a tertiary measure of intelligence. It requires the subject to copy designs, starting with a simple straight line and progressing to more complicated designs. The subject is not permitted to erase any errors. One of the primary purposes of the test is to assess whether difficulties the subject demonstrates on other psychological tests, including intelligence tests, stem from motor or other sensory impairment. Ricardo performed slightly below chronological age level on the Beery, achieving a standard score of 92, in the average range of performance. These results indicate that his motor skills are a relative personal strength for him, and that his impaired performance on the other instruments I administered was not due to motor impairment.

16. I have recently reviewed Ricardo's special education records from the Palm Beach County School District. Ricardo's significant intellectual impairment is clear from his performance on the Comprehensive Test of Basic Skills, administered in April 1991, prior to my assessment of him, upon which he received stanine scores of 1, the lowest possible score, in all domains (comprehension, vocabulary, math computation, and total reading). Stanine (short for Standard Nine) is a nine-point scale used for normalized test scores. Scores of 1-3 are below average, 4-6 are average, and 7-9 are above average. Ricardo's intellectual impairment is also reflected in his score on the Test of Language Development, a 67, more than two standard deviations below the mean and within the range of intellectual disability.

Initials:    Date: 3-15-16

Page **6** of **8**

17.     Ricardo's special education records indicate that no intelligence testing was administered to him during his school years after my initial assessment in 1992, although Ricardo failed to make meaningful progress in school even though he was receiving instruction full-time in a small classroom for learning disabled students. Given his minimal progress in the classroom setting designed to foster the achievement of learning disabled students, Ricardo's teachers and the special education staff should have ensured that Ricardo underwent psychological testing including IQ testing during his reevaluation three years following my initial assessment, when he was 11 or 12 years old. If he continued to fail to progress, he should have been assessed again three years later, when he was 15 years old.

18.     Ricardo's records demonstrate that he continued to have academic difficulty throughout his schooling despite the fact that he was enrolled in full-time special education and was provided numerous interventions. Ricardo's school records indicate that he was exempted from standardized testing in high school because of his low cognitive ability. This demonstrates that Ricardo had difficulties separate and apart from a learning disability; he had extremely limited cognitive capacity in the first instance. If the district had consulted with me about Ricardo's educational progress after my initial evaluation of Ricardo, I would have recommended that he undergo further psychological testing and IQ testing.

19.     Ricardo's school records also show that over time Ricardo exhibited some behavioral impairments, including inattention, disorganization, and disruption, but it appears that the school district did not intervene to address these problems, and failed even to conduct a behavioral assessment. It is likely that Ricardo's behavior resulted from his disabilities.

20.     I noted in my report of my evaluation of Ricardo that individuals described him as "dazed." This symptom/appearance is common in individuals like Ricardo with very low

Initials: _____                                                                 Date: 3·15·16

A-000736

Page 7 of **8**

cognitive abilities and intellectual functioning. It is also a very common symptom in individuals with mild seizure activity. Had I known that Ricardo's older brother suffered from tonic-clonic seizures (previously known as grand mal seizures) and from mental retardation, I would have recommended that Ricardo be evaluated by a neurologist and undergo neuropsychological testing to determine if he suffered from a seizure disorder or organic brain damage.

21. It is well established that an individual's intellectual and cognitive functioning are influenced by his or her genetic background and environment. Because an individual needs to have all of his senses stimulated in order for his brain to develop in a healthy manner, experiential deprivation can limit the individual's brain development and thus his cognitive and intellectual functioning. The intellectual functioning skills of a child's parents can have a tremendous impact on the child's own intellectual development apart from the genetic contribution; if the child's parents are intellectually low functioning, they are less likely than typically functioning parents to provide a home environment in which the child's brain is appropriately and safely stimulated. This can lead to atypical brain development.

22. Sometime in the second half of 2008, I was called by Lisa McDermott, who told me that she was working with the defense team representing Ricardo Sanchez on criminal charges. I spoke to Ms. McDermott briefly on the phone. She asked if I remembered Ricardo and if I would be available to speak with the defense team. I told her that I would be happy to do that but that she would need to provide me with my report of my psychological school evaluation of Ricardo so that I could review it and provide meaningful information to the team. Ms. McDermott told me that she would get back to me if the team needed me. She sounded harried and extremely busy. Ms. McDermott never called me back.

Initials: _____  Date: 3·15·16

Page **8** of **8**

23.     If Ms. McDermott had called me again and provided me with my report and Ricardo's special education records, I would have been willing and able to talk to her and would have provided her and the rest of the defense team all the information I have provided in this declaration. I also would have been willing and able to testify truthfully on Ricardo's behalf to the information included herein, had the defense team asked me to do so.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___MARCH  15th, 2016___

Name ___(signature)___

Initials _(initials)_                                       Date: ___3·15·16___

A-000738

Page **1** of **8**

## Declaration of James Gannalo

## Pursuant to 28 U.S.C. §1746

I, James Gannalo, declare as follows:

1.     I am the president of Stria Consulting Group, Inc. My area of expertise is in firearms, firearms operability and identification, and shooting scene investigation.

2.     My curriculum vita is attached to this declaration and details my training and employment history. In summary, I began my firearms training with the New York Police Department Ballistics Squad in 1989. In that capacity, I worked on a number of firearms related cases and assisted local, state and federal law enforcement agencies with investigations of firearms related incidents. Since my retirement in 1998, I have worked in a private capacity as a forensic investigator, instructor, and consultant in the field of forensic firearms identification. In addition, I am certified as an assessor of accredited laboratories by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB), which specializes in the accreditation of public and private crime laboratories, and have conducted a number of laboratory assessments in the United States and Canada for the Forensic Quality Services Corporation. I have over twenty-five years of training and experience working for law enforcement agencies and private clients, analyzing crime and accident scenes as it pertains to firearms identification and shooting incident reconstruction.

3.     I was contacted by the Federal Community Defender Office for the Eastern District of Pennsylvania and asked to examine the evidence in the case of *United States v.*

Initials: _____     Date: 5/3/16 _____

Page 2 of 8

*Ricardo Sanchez.* In connection with this case, I have reviewed the notes of testimony from the crime scene technicians and firearms and toolmark experts. I also have reviewed the trial exhibits and discovery that the government provided to trial counsel pertaining to firearms and toolmark identification, including crime scene photographs, autopsy reports, ballistics analysis, and other police paperwork. My opinions below are based solely on my analysis of all of the evidence and testimony reviewed thus far, drawing on my experience as a police and private forensics examiner. I reserve the right to amend any opinions or conclusions stated within this declaration should additional information be provided.

4.    In order to perform a comprehensive evaluation, and to reach reliable forensic conclusions about the firearms and toolmark evidence in this case, it is necessary to inspect the weapons, projectiles and cartridge casings at issue. It also is necessary as part of my evaluation review the correspondence, case files, photographic records, interim reports, and bench notes relating to the forensic evaluations conducted by law enforcement personnel in this case, as well as the laboratory accreditations, protocols, examiner proficiency results, and firearms identification manuals, including but not limited to the quality, training, and technical manuals, for the Indian River Crime Lab and the Palm Beach County Sherriff's Office from 2006 to present. I have not yet been provided access to all of the physical evidence and documentation listed in this paragraph.

5.    Firearms identification is part of the forensic science discipline of toolmark identification. An underlying premise of toolmark identification is that a tool, such as a firearm barrel, leaves a unique *and* reproducible mark on an object, such as a bullet. Firearms examiners compare toolmarks on ammunition components recovered from crime scenes with test toolmarks that they produce on other ammunition components by firing or otherwise using a particular

Initials: _____    Date: _5/3/16_

A-000740

Page 3 of **8**

firearm. Toolmarks are either "striated," meaning that they consist of patterns of scratches or striae and are produced by the twisted motion of tools against objects (e.g., marks made by firearm barrels on bullets), or "impression," meaning that they are produced by the impact of tools (e.g., firing pin impressions or breech face marks). Both types of toolmarks have class, subclass, and individual characteristics.

6. Class characteristics are intentional marks that all firearms of a given make and model will share. Subclass characteristics, which are created by the manufacturing of batch lots of tools, are matching microscopic characteristics that are distinguishable from toolmarks produced by other tools of the same type but are common to toolmarks produced by tools in the same batch. These subclass characteristics are shared by a smaller more restrictive group of firearms of the same make and model. Individual characteristics are considered to be unintentional and incidental microscopic characteristics unique to the toolmarks produced by an individual firearm or other tool. For example, the rifling impressions on bullets that are classified as class characteristics that reflect the number, width and direction of twist of the lands and grooves in the types of barrels that fired them. In contrast, individual characteristics are microscopic striations or lines within the rifling impressions that correspond to imperfections or irregularities on the tool surfaces of a particular firearm that are produced by the manufacturing process and/or subsequent use, wear, or damage.

7. If the same class characteristics are found on the evidence collected and test samples, a firearms and toolmark examiner uses a comparison microscope to determine whether that they share subclass and individual characteristics that are similar and unique. While wear and tear on some tools may cause the subclass characteristics to be completely replaced by

Initials: _____ Date: 5|3|16

Page 4 of 8

individual characteristics, in other tools, subclass and individual characteristics may exist alongside each other.

8.     In this case, Allison Quereau and Mark Chapman testified that they were able to identify toolmarks based on class and individual characteristics. Ms. Quereau testified, consistent with her February 20, 2008 report, that she examined casings and projectiles retrieved from the Mercer Avenue address and compared them to test firings from an AK-47 rifle retrieved from the Garden Court residence. She opined that eight of the eleven casings were fired from the rifle and one casing was cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle but she did not reach any further conclusions as to those casings. Ms. Quereau also testified that she examined casings and projectiles retrieved from Suwanee Drive and compared them to the test firings from the AK-47 rifle. She opined that eight out of the sixteen casings were fired from the rifle and six casings were cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle, but she did not reach any further conclusions as to those two casings. Ms. Quereau testified that she was "100 percent" sure of her identifications.

9.     Mr. Chapman also relied on class and individual characteristics to compare 9 mm and 40 caliber casings retrieved from the crime scene to live 9 mm and 40 caliber cartridges retrieved from the Garden Court residence. In his May 29, 2008 report, Mr. Chapman stated that six of the seven 40 caliber casings from the crime scene and one cartridge from Garden Court "were identified as having individual characteristics of an unknown origin but a common source typical of magazine lip marks or chamber marks." Mr. Chapman also stated in his report that three of the four 9 mm caliber casings from the crime scene and two cartridges out of a box of forty-one cartridges found at the Garden Court residence "were identified as having individual

Initials: _____     Date: 5|3|16

Page 5 of 8

characteristics of an unknown origin but a common source typical of magazine lip marks or chamber marks." Mr. Chapman provided slightly more detail in his testimony, stating that, based on a comparison viewing of two evenly spaced scratches that ran the length of the cartridge casings, the casings came in contact with the same tool at some time. Although he could not identify the tool used, he opined that the marks were consistent with the lip of a magazine and that it was "practically impossible" that a different tool made the marks.

10. In my opinion, some of the identifications made by Ms. Quereau and Mr. Chapman were reached through procedures that departed from accepted practices in the field. The discovery and testimony in this case do not indicate that Ms. Quereau or Mr. Chapman made any attempt to rule out the possibility of class or subclass characteristics. Drawing identification conclusions without considering class or subclass characteristics fails to comply with professional standards set forth by the Association of Firearm and Toolmark Examiners (AFTE) Theory of Identification, which states that examiners should exercise caution in distinguishing class or subclass characteristics from individual characteristics. There is little that documents or explains the processes and tests performed by Ms. Quereau and Mr. Chapman that form the basis for their opinions or the process of peer review and verification. The documents reviewed fail to provide any descriptions or diagrams of the resembling striations or any explanation of the standard of comparison used in making the identifications. The comparison exemplar photographs – for just two cartridge casings out of twenty-seven – attached to Ms. Quereau's case file are unreadable, and there are no comparison photographs for Mr. Chapman at all.

11. Mr. Chapman's identifications are further called into question by the fact that no firearm or magazine was recovered in this case and, consequently, no exemplars or standards could be obtained. Therefore, Mr. Chapman's opinions were all reached without being able to

Initials: _____   Date: _5\3\16_

Page 6 of 8

test the actual firearm or magazine used during the incident and without additional tests to determine shared class and/or subclass characteristics from similar firearms or magazines. According to his reports and testimony, Mr. Chapman could not determine if the toolmarks were made by a magazine or by a firearm chamber. Exemplars could have been examined to determine if the toolmarks were reproducible (a basic principal of firearms identification) and to determine if similar firearms or magazines made comparable marks. Although it might be the case that the spent cartridge casings and the unspent cartridge casings shared similar markings, in my opinion, it is not possible – and it was not possible in 2009 – to state within a reasonable degree of scientific certainty, let alone a "practical impossibility," that the casings came in contact with the "same" weapon based on the limited toolmarks alone.

12. Moreover, the discovery does not provide any information regarding the methodology Mr. Chapman used to reach his identifications. Magazines can be interchangeable between different makes and models of firearms. Mr. Chapman's report does not indicate that he made any attempt to determine the makes and models of firearms or magazines that the ammunition could have been worked through or fired. Therefore, he could not have used knowledge of how various types of firearms and magazines are manufactured to determine whether the marks were individual, class, or subclass characteristics. In my opinion, this leaves open the possibility that any markings assumed to be unique may in fact have been class or subclass characteristics.

13. To the extent that the unidentified tool was a magazine, the reliability of the magazine mark identification that Mr. Chapman made in the absence of the magazine is also called into question because of the limited information that magazines provide for evaluation. The edges of magazine lips are narrow and contain few characteristics to make striated markings.

Initials: _____        Date: _5\3\16_

Page 7 of **8**

Because magazine marks on cartridges have a limited quantity of striated markings for comparison, there is a greater likelihood of identification error. In my opinion, magazine mark identifications should not be made without directly examining the magazine lips under magnification, which Mr. Chapman could not do in this case. For that reason, Mr. Chapman's conclusion that spent 9 mm and 40 caliber cartridge casings from the crime scene and live 9 mm and 40 caliber rounds from the Garden Court address were run through the same unknown firearm in the same unknown magazine is patently unreliable and not consistent with accepted forensic standards in the field of firearm and toolmark identification currently and at the time of trial.

14.     The case records also do not indicate that either Ms. Quereau or Mr. Chapman took into account the differences in toolmarks that may result when a firearm fires different makes of ammunition. In order to account for these differences, the accepted practice of firearms and toolmarks examiners is to compare evidence toolmarks with test toolmarks made on the same brand of ammunition, whenever possible. In this case, Ms. Quereau's reports indicate that cartridge casings from the Suwanee shooting were Chinese-made, and the remaining cases are unidentified. Thus, in my opinion, there is no indication that Ms. Quereau adhered to acceptable practice by comparing evidence toolmarks with test toolmarks made on the same brand of ammunition whenever possible.

15.     In the May 2, 2007 Amended Report, Mr. Chapman indicates that the 40 caliber cartridge casings retrieved from the crime scene, where identifiable, were manufactured by several companies – Federal, Winchester, Remington, Companhia Brasileria de Cartuchos (CBC), Arms Corporation of the Philippines (ACP), and PMC. The report identifies the manufacturer of only one 9 mm cartridge casing and describes the 9 mm jackets as being made

Initials: _____     Date: _5/3/16_

Page **8** of **8**

of brass, copper, or nickel. The case records and testimony reviewed do not identify the manufacturer of the 40 caliber round, but the magazine from which it was retrieved contained rounds from seven different manufacturers. The 9 mm live rounds were manufactured by Winchester. The case records contain no explanation of why, despite the differences in the makes of the ammunition, Mr. Chapman concluded that the live rounds and the spent casings were cycled through the same magazine.

16. Based on the foregoing, it is my expert opinion that the procedures used by Ms. Quereau and Mr. Chapman to reach the identifications in this case were unreliable and did not conform to established standards within the field. If I had been called to testify at a pretrial *Daubert* hearing or at trial, I would have testified to the same regarding the unreliability of the toolmark identifications in this case.

17. In order to reach reliable forensic conclusions about the firearms and toolmark evidence in this case, I would need to inspect and review the items and records identified in paragraph 4, above.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___5/3/16___

Name ___

Initials: ___

Date: ___5/3/16___

A-000746

Page 1 of 30

## Declaration of Joette Deanna James, Ph.D.

### Pursuant to 28 U.S.C. §1746

I, Joette Deanna James, Ph.D., declare as follows:

1.  I am a clinical psychologist with a specialty in clinical neuropsychology. I am licensed to practice in the state of Maryland and in the District of Columbia. I am a member in good standing of the American Psychological Association (APA) and its subspecialties Division 40, Clinical Neuropsychology; Division 33, Intellectual and Developmental Disabilities; and Division 41, Psychology & the Law. I am also a member in good standing of the International Neuropsychological Society (INS), the National Academy of Neuropsychology (NAN), the American Academy of Clinical Neuropsychology (AACN), and the Brain Injury Association of Maryland (BIAMD). I am also an affiliate member in good standing of The District of Columbia Association for Special Education.

2.  I received my Bachelor of Arts degree in Honors Psychology with Distinction from Huron College at the University of Western Ontario in London, Ontario, Canada in 1995. Prior to attending graduate school in Clinical Psychology, I worked as a Psychology Extern at Lakeside Veterans Administration Hospital in Chicago, Illinois, from July 1996 to June 1997. Between September 2000 and August 2001, I served as a predoctoral intern and was trained in neuropsychological assessment of adults and children.

3.  I received my Doctorate in Clinical Psychology from Northwestern University Medical School in Chicago, Illinois, in 2003. I completed a predoctoral internship in neuropsychological assessment and neurodevelopmental assessment at Harvard Medical School in August 2001. From September 2001 to August 2002, I was an Advanced Fellow in Pediatric

Page **2** of **30**

Psychology at Children's Hospital in Boston, Massachusetts, conducting developmental assessments and administering treatment to children from birth to age six with emotional, behavioral, and developmental impairments. Between September 2002 and July 2003, I was an Advanced Fellow in Pediatric Psychology at Children's Hospital in Boston, conducting psychiatric diagnostic interviews with children aged eight to eleven and conducting psychoeducational assessments of school-aged children with learning difficulties. From January 2004 to August 2004 I served as a Postdoctoral Fellow in Pediatric Neuropsychology at Children's Evaluation Center in Newton, Massachusetts, conducting neurodevelopmental and neuropsychological assessments with children from birth to adolescence; and between September 2004 and August 2006 I was a Postdoctoral Fellow in Pediatric Neuropsychology at Children's National Medical Center in Washington, D.C.

4. Between 2006 and 2013, I served as an Assistant Professor in the Departments of Pediatrics and Psychiatry and Behavioral Sciences at the George Washington University Medical Center in Washington, D.C. From September 2006 to August 2010, I also served as a Pediatric Neuropsychologist at Children's National Medical Center in Washington, D.C. In this position, my duties included providing pediatric neuropsychological services to clinical programs including the Center for Autism Spectrum Disorders and the Inpatient Rehabilitation Unit of the Health Services for Children Pediatric Center; conducting research; and supervising predoctoral and postdoctoral trainees. Between August 2010 and December 2013, I was employed as the chief neuropsychologist at HSC Pediatric Center, a rehabilitation facility in Washington, D.C. I have been in private practice since January 2014, conducting both clinical and forensic neuropsychological evaluations.

Page **3** of **30**

5.     I have coauthored a number of peer-reviewed publications, including "Attention deficit/hyperactivity disorder moderates cognition and behavior in children with autism spectrum disorders" (2009) (in Autism Research, 10.1002/aur.103); "Sleep-Disordered Breathing" (2008) (in Castillo, C., ed., *Children with Complex Medical Issues in Schools: Neuropsychological Descriptions and Interventions*, pages 379-406); and "Functional connectivity of the inferior frontal cortex changes with age in children with autism spectrum disorders: Evidence from an fMRI study of response inhibition" (2008) (in *Cerebral Cortex*, 19, 1787-94, doi: 10.1093/cercor/bhn209).

6.     I have presented and co-presented papers and posters at several conferences, including the following: "Neuropsychology and the Executive Functions" (at the 34th International Congress on Law and Mental Health in Vienna, Austria, 2015); "The Many Uses of Neuropsychology" (at the Multi-Track Federal Criminal Defense Seminar in Buffalo, New York, 2013, and the 33rd International Congress on Law and Mental Health in Amsterdam, the Netherlands, 2013); "Educating Children with ADHD: Reconceptualization of ADHD as a Disorder of Executive Functioning" (at the District of Columbia Public Schools in Washington, D.C., 2011); "Intellectual Disabilities: What Every Defense Attorney Should Know" (Public Defender Service of the District of Columbia, Washington, D.C., 2010); "Social Attribution to 'Triangles Playing Tricks' Is Diminished and Does Not Improve with Age Among Children with High Functioning Autism Spectrum Disorders" (at Annual Social & Affective Neuroscience Conference in Boston, Massachusetts, 2008); "Executive functioning in children with autism spectrum disorders and elevated symptoms of ADHD" (at International Meeting for Autism Research in London, England, 2008); "Developmental trajectory of set-shifting in children with autism spectrum disorders" (at annual meeting of the Association for Psychological Science, in

Page **4** of **30**

Washington, D.C., 2007); "Executive functioning and weak central coherence: Exploring the relationship between theories that purport to underlie cognitive processing in children with autism" (at International Meeting for Autism Research, in Boston, Massachusetts, 2005).

## SCOPE OF NEUROPSYCHOLOGICAL EXAMINATION OF RICARDO SANCHEZ, JR.

7.     Counsel with the Federal Community Defender Office for the Eastern District of Pennsylvania currently representing Ricardo Sanchez, Jr., asked me to perform a neuropsychological evaluation of Mr. Sanchez to determine whether he exhibits cognitive or neuropsychological deficits and if so, to describe the nature and severity of those deficits and render an opinion about possible etiologies for those deficits. Counsel further asked me to render an opinion regarding whether and how any of his cognitive and/or neuropsychological impairments have affected his functioning throughout his life, including at the time of the charged offenses, during preparations for his capital trial, and throughout the capital trial itself.

8.     To perform these tasks, I conducted a clinical interview and neuropsychological assessment of Mr. Sanchez at United States Penitentiary – Terre Haute on January 18 and 19, 2016. My evaluation of Mr. Sanchez was conducted over a period of approximately seven and a half hours. During that evaluation, I administered the following neuropsychological instruments to Mr. Sanchez: several tests of the Delis-Kaplan Executive Function System (D-KEFS) battery, including the Verbal Fluency Test, the Color-Word Interference Test, the Twenty Questions Test, the Word Context Test, and the Trail-Making Test; the Behavior Rating Inventory of Executive Function-Adult Version (BRIEF); the California Verbal Learning Test, Second Edition (CVLT-II); the Booklet Category Test; the Iowa Gambling Test; the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV); several subtests of the Wechsler Memory Scale, Fourth Edition (WMS-IV); the Rey Osterrieth Complex Figure Test; several subtests of the Wide

Page **5** of **30**

Range Test of Achievement, Fourth Edition (WRAT-4); the Grooved Pegboard Test; the Test of Variables of Attention (TOVA); the Nonverbal Medical Symptom Validity Test (NV-MSVT); and the Dot Counting Test. The data obtained from the administration of these instruments, taken together, are the type customarily relied upon by competent neuropsychologists in evaluating an individual's neurocognitive functioning. These tests, or earlier versions thereof, were available to neuropsychologists at the time of Mr. Sanchez's capital trial in 2009.

9.     My assessment also included my review of numerous background documents related to Mr. Sanchez and his family members, including birth and medical records; education records; employment records; criminal records; reports and data from evaluations of Mr. Sanchez by Drs. Daniel Grant, Katrina Hallmark, Thomas Reidy, and Michael Brannon at the time of his capital trial; testimony from Mr. Sanchez's capital trial; and statements from Mr. Sanchez's family members, friends, teachers, and others familiar with Mr. Sanchez's and his family's history. When available, these types of materials are commonly reviewed by competent neuropsychologists as an important part of a thorough and reliable neuropsychological assessment.

## CLINICAL FINDINGS

### Behavioral Observations and Evaluation of Effort

10.     Mr. Sanchez presented as a 32-year-old, right-handed, Latino male. Although Mr. Sanchez was 32 years old at the time I saw him, he reported that he was 33. His date of birth is October 19, 1983, and he reported that because the date of the evaluation was in 2016, he was 33 years old. It required my explaining several times that he would not turn 33 until his birthday in October 2016 before he seemed to understand what I was telling him. Mr. Sanchez was alert and oriented during the evaluation and was cooperative throughout.

A-000751

Page **6** of **30**

11. Throughout the testing, Mr. Sanchez exhibited some difficulties with attention and concentration, as well as difficulties understanding the test instructions. He frequently asked me to repeat the instructions, sometimes more than once. My observations of Mr. Sanchez during the testing sessions were that he displayed good effort over the course of the two days of testing. These observations were confirmed both by the test instruments specifically designed to measure effort and by the overall congruence of his performance on the instruments as a group. Mr. Sanchez's scores on the three stand-alone measures of effort, the Word Choice Test, the NV-MSVT, and the Dot Counting Test, and his scores on the measures of effort embedded in other instruments, such as the TOVA, the CVLT-II Forced Choice scale, the Digit Span subtest of the WAIS-IV, and the Logical Memory Recognition and Visual Reproduction subtests of the WMS-IV that correlate with good effort demonstrated that he was motivated and compliant and not malingering. It is thus my opinion, held to a reasonable degree of psychological certainty, that the results of the evaluation indicate Mr. Sanchez's true neuropsychological abilities.

### Interpretation of Neuropsychological Evaluation

12. The results of my neuropsychological evaluation of Mr. Sanchez provide reliable evidence of Mr. Sanchez's neuropsychological impairment. Mr. Sanchez performed the most poorly on instruments measuring aspects of attention and executive functioning, including sustained attention, organized retrieval, processing speed, working memory, decision-making, and fluid reasoning. He also demonstrated significant academic deficits. He exhibited relative strengths in motor skills and visual memory. These results are consistent with significant cognitive deficits that are neurodevelopmental in nature (that is, they are more likely to have developed prenatally or early in life than to have been caused by a specific head injury). These

Page 7 of **30**

neurocognitive impairments prevent him from thinking efficiently and lead him to perform very poorly under conditions that are stressful, novel, unfamiliar, and complex.

13.     The frequency distributions of many psychological and neuropsychological attributes generally conform to a bell-shaped curve. Reliable neuropsychological tests generally are designed to conform to this normal curve such that proportionally more individuals score near the mean than farther from the mean. An individual's score on a neuropsychological instrument is compared to the mean score of the population upon which the test was standardized.

14.     The standard deviation is a measure of the variability of a distribution of test scores.[1] Scores that fall two standard deviations below the mean or more demonstrate significantly impaired performance that is consistent with real-life cognitive or functional deficits. Those scores that fall between one and two standard deviations below the mean are considered low average or borderline scores that also may correlate with cognitive or functional deficits.

15.     Test scores provide estimates of abilities and skills rather than precise measurements; all neuropsychological test scores are associated with some degree of measurement error, which is called the standard error of measurement.

16.     I assessed Mr. Sanchez's intellectual functioning through the administration of the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV), as well as through other neuropsychological instruments, as recommended by the Diagnostic and Statistical Manual, Fifth

---

[1] Scores are reported differently for different types of tests. For example, while scores for many neuropsychological tests are reported as scaled scores (the mean is 10), index scores and full scale scores for intelligence tests are reported as standard scores (the mean is 100), and scores for some other tests are reported as T scores (the mean is 50). One standard deviation for scaled scores is 3, one standard deviation for standard scores is 15, and one standard deviation for T scores is 10.

A-000753