Page **8** of **30**

Edition (DSM-5): "Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." DSM-5, page 37.

17.     Mr. Sanchez's scores on the WAIS-IV (when not corrected for the Flynn Effect) placed him in the Low Average range of intellectual functioning overall. His scores on two of the four indices measured by the instrument, the Working Memory Index and the Processing Speed Index, fell more than one standard deviation below the mean of 100, at 80 (9th percentile) and 79 (8th percentile), respectively. His scores on the Verbal Comprehension Index and the Perceptual Reasoning Index were slightly higher: 87 (19th percentile) and 94 (34th percentile), respectively. His Full Scale IQ score measured at 82 (12th percentile), also more than one standard deviation below the mean.

18.     The Processing Speed Index of the WAIS-IV measures the individual's capacity to focus attention and quickly scan, discriminate between, and sequentially order visual information. The Working Memory Index measures the subject's ability to attend to information; hold that information briefly in the brain and process and manipulate it; and use it to form a response to a situation as it is occurring. Intact working memory is essential for the success of higher order thinking, cognitive flexibility, planning, and coherent and rational responses to events.

19.     The Verbal Comprehension Index measures general verbal skills, verbal concept formation, and verbal knowledge. The Perceptual Reasoning Index measures the subject's non-verbal and visual spatial problem-solving and reasoning skills.

20.     Mr. Sanchez's scores on four of the ten subtests of the WAIS-IV were measured below the average range. These were Vocabulary (score = 6), Arithmetic (score = 5), Symbol Search (score = 6), and Coding (score = 6),.

21.     Mr. Sanchez's full-scale IQ score on the WAIS-IV was 82. As described above, all neuropsychological test scores are associated with some degree of measurement error, the standard error of measurement (SEM). In addition, as the DSM-5 and the AAIDD user manual recognize, norms for intelligence tests, including the WAIS-IV, become obsolete with the passage of time, and average scores on intelligence tests increase. This phenomenon is often called the "Flynn effect," named for the psychologist, James Flynn, who documented it. The rise in IQ scores has been calculated at 3 points per decade, or approximately 0.3 points each year. The WAIS-IV was normed in 2007, and its norms were 9 years old at the time I administered the instrument to Mr. Sanchez. Taking into account norm obsolescence, Mr. Sanchez's score would calculate to 79 (which is consistent with the Borderline range of functioning according to the WAIS-IV). When also considering the SEM, Mr. Sanchez's true full scale IQ score, at the 95 percent confidence interval, falls between 75 and 83.

22.     Processing speed is a measure of cognitive efficiency and proficiency. It is the pace at which an individual takes in information, makes sense of it, and begins to respond to the information. Those with impairments in processing speed often demonstrate difficulty with tasks that can be more automatically performed by those without these impairments. Individuals with slow processing speed also may have difficulty with multi-step instructions, because they have difficulty absorbing and digesting the instructions in order to understand and complete the task.

23.     Working memory is the cognitive system responsible for temporarily storing and managing information required to carry out tasks including learning, reasoning, and comprehension. It is involved in retaining information for short periods of time and performing mental operations on and manipulating this information so as to understand environmental cues

and stimuli and solve problems. Working memory may be affected by difficulty sustaining attention.

24.     Individuals who demonstrate difficulty with both working memory and processing speed are at risk for poor decision-making and judgment because they are unable to absorb and process in an effective and timely manner the sensory input they receive from the world around them, and so are unable to respond appropriately to that input.

25.     Mr. Sanchez demonstrated impairments in both processing speed and working memory. As noted above, Mr. Sanchez's score on the Processing Speed Index of the WAIS-IV fell at the 8th percentile and his score on the Working Memory Index was in the 9th percentile.

26.     On other instruments that involve processing speed and working memory such as the Logical Memory I and II subtests of the Wechsler Memory Scale, Fourth Edition (WMS-IV), and the California Verbal Learning Test, Second Edition (CVLT-II), Mr. Sanchez performed poorly. The Logical Memory I subtest presents the individual with two short paragraphs read orally, one after the other, and requires the individual to repeat back the paragraphs, one at a time, recalling as many details as possible. Mr. Sanchez performed in the 2nd percentile on this subtest. His difficulty with this task is consistent with an inability to absorb and retain verbal information as provided and then make meaningful sense of it when asked to do so. The Logical Memory II subtest is one of delayed recall of the same two paragraphs. Mr. Sanchez performed slightly better on this subtest in the 5th percentile. This indicates that Mr. Sanchez is able to retain and produce the limited information that he is able to absorb.

27.     Mr. Sanchez also demonstrated difficulty on the CVLT-II, which assesses recall and recognition of two word lists over immediate and delayed memory trials. The first list, consisting of sixteen words, is presented through five trials to the subject, who is asked after each

presentation to recall and produce as many of the words as possible. A second list (an interference list) is then presented to the subject, followed by the presentation of the first list, after which the subject is required to recall words from the first list after short and long delays, and with and without cues. Although Mr. Sanchez was able to learn and recall some of the words on the lists provided, he was initially overwhelmed (producing 2 of 16 words on the first trial), produced many words that were not on the original lists, and had trouble distinguishing between words on versus off the list during recall. This pattern of results indicates difficulties with processing and learning new information.

28.    Mr. Sanchez's impairments in working memory and processing speed result in his having difficulty following and understanding verbal information provided to him because he is slow to process the information. Although he may appear to have a superficial understanding of verbal content (hence his higher score on the Verbal Comprehension Index), his difficulty processing information results in his thinking about information he has previously heard when new information is presented, so he is unable to keep up with and understand the new information because he is distracted by the information presented previously. He also has difficulty encoding the information presented to him, due to his impairments in working memory, and thus he cannot hold the information in his attention for enough time to use the information effectively.

29.    The cognitive processes referred to as "executive functions" are those that "act in a supervisory capacity in the overall hierarchy of brain processing." *A Compendium of Neuropsychological Tests: Administration, Norms, and Commentary, Third Edition*, Strauss, E., Sherman, E., Spreen, O. 2006, page 401. Executive functions control skill sets including problem-solving; abstract reasoning; learning from experience; applying previously acquired

Page **12** of **30**

knowledge to novel situations; organization; cognitive flexibility; planning; engaging in goal-directed thinking, speech, and behavior; controlling impulses and inhibiting behavior; and understanding and responding appropriately to social cues. Individuals with impairment in executive functioning have difficulty adapting behavior in response to information, such as by using environmental and interpersonal feedback to change unsuccessful strategies. Impaired executive functioning also typically leads to limited ability to perceive environmental stimuli accurately, respond adaptively, anticipate and reach toward future goals, consider potential consequences, and make use of hindsight and foresight. Deficits in executive functioning also can interfere with an individual's ability to have insight into his own behavior, thought-processes, and appearance to others. Research has demonstrated that low scores on executive functioning tasks may be a proxy for low intelligence.

30.      Mr. Sanchez's performance on tests of executive functioning was mixed. On instruments measuring visual scanning and switching, categorical processing, and ability to use feedback to guide problem solving, Mr. Sanchez performed in the average range. By contrast, on instruments measuring verbal productivity, inhibition of responses and mental flexibility, deductive reasoning and abstract thinking, and decision-making in the context of uncertain outcomes, Mr. Sanchez performed in the mildly impaired range. Mr. Sanchez's executive functioning performance profile was consistent with those of individuals who struggle to think abstractly and demonstrate difficulty making goal-directed decisions, particularly in circumstances that are stressful or present complex cognitive or emotional stimuli.

31.      I administered to Mr. Sanchez five tasks from the Delis-Kaplan Executive Function System (D-KEFS), a battery that is designed to assess different components of executive functioning. The Color-Word Interference Test of the D-KEFS requires the subject to

name color patches, read words that denote colors printed in black ink (e.g., say "red" for the word "red" printed in black ink), name the ink color in which names of colors are printed (e.g., say "red" for the word "green" printed in red ink), and switch back and forth between naming dissonant ink colors and conflicting words. In order to perform the task successfully, the subject must inhibit his or her immediate learned response and think flexibly to provide an accurate response. Mr. Sanchez demonstrated difficulty with this task. His performance on the Color Naming trial fell in the impaired range, below the 1st percentile. His performance on the Word Reading trial fell in the borderline impaired range (5th percentile). Mr. Sanchez's scores on the Inhibition and Inhibition/Switching trials, requiring him to inhibit an impulse and think flexibly were in the 9th percentile, the low average range.

32.     The Verbal Fluency Test from the D-KEFS requires the subject to produce as many words as possible that begin with a specific letter, that fall into a particular semantic category, and that alternate between two different semantic categories. It assesses the individual's verbal production fluency as well as the individual's ability to switch between tasks. On this test, as well, Mr. Sanchez's best performance was one standard deviation below the mean, and his lowest score was more than two standard deviations below the mean. He achieved scaled scores of 7 on the Letter Fluency and Category Fluency sections, a scaled score of 4 on the Category Switching correct responses section, and a scaled score of 3 on Total Switching Accuracy. His low scores on the switching tasks demonstrate Mr. Sanchez's lack of cognitive verbal flexibility and weak working memory and indicate that he has significant difficulty focusing on more than one verbal stimulus at a time.

33.     The Word Context Test on the D-KEFS measures the individual's skills in deductive reasoning, verbal abstract thinking, and hypothesis testing. It requires the individual to

A-000759

discover and provide the meaning of made-up words based upon cues in sentences. Mr. Sanchez obtained a scaled score of 5, which falls in the 5th percentile, nearly two standard deviations below the mean. His performance on this test demonstrated concrete thinking and inability to recognize and make use of contextual information to solve a problem, and is consistent with the performance of individuals who are literal thinkers and exhibit difficulty understanding subtext.

34.    Mr. Sanchez achieved somewhat higher scores on the Twenty Questions Test and the Trail Making Test from the D-KEFS. On the Twenty Questions Test, the individual must ask the fewest number of yes/no questions in order to identify the target item, which is one stimulus appearing on a page of 30. Mr. Sanchez achieved a total scaled score of 9 (37th percentile) on the Twenty Questions Test, derived from his scores of 10 (50th percentile) on initial abstraction and 11 (63rd percentile) on total questions asked. While his performance fell in the average range, qualitatively his performance was characterized by randomness and luck. For example, on Item 2, Mr. Sanchez's third guess was "utensil," a fairly random term, and he identified the target word "spoon" three guesses later.

35.    The Trail Making Test requires the subject to exercise skill in visual scanning, number and letter sequencing, number-letter switching, and motor and processing speed. Mr. Sanchez's achieved scores on the Trail Making Test primarily in the average range, although his Letter Sequencing score was in the borderline range of functioning. This performance is consistent with Mr. Sanchez's performance on other tests that demonstrates greater impairment in verbal skills than in math skills.

36.    The California Verbal Learning Test, Second Edition (CVLT-II), measures verbal learning and memory. This instrument is sensitive to the presence of executive functioning deficits because it assesses the subject's learning strategies (such as semantic and serial

clustering), degree of vulnerability to interference, and responses to cues. Although Mr. Sanchez's performance on several of the indices (Semantic Cluster, Primacy, Recency, and Repetitions) fell in the average range, his performance on the Total Intrusions Index (Free & Cued Recall) was very impaired – five standard deviations below the mean. Mr. Sanchez produced numerous words that appeared nowhere in the lists presented to him.

37. The Rey Osterrieth Complex Figure Test assesses visual-spatial constructional ability and visual memory, but it also provides information about the subject's organizational and planning skills and consolidation and storage of new memories. The subject is provided with a complex geometric figure and asked to copy it, to reproduce it from memory immediately and after a time delay, and to identify whether particular figures were part of the complex figure. Although Mr. Sanchez performed in the average range on this test measure, which was consistent with his relative strength in visual skills and ability to recall visual information, he exhibited no clear plan for copying the figure. He produced the figure in a haphazard, disorganized manner, focusing on individual details of the figure rather than on the figure as a whole.

38. The Iowa Gambling Task measures an individual's reasoning and problem-solving skills and also has an attentional component. The individual is presented with four decks of cards from which the individual can choose to draw; the examiner informs the individual that he or she will win money each time a card is drawn, but sometimes choosing a card results in losing money as well. Some decks are more advantageous than others and those that are disadvantageous lead to losses in the long run. Mr. Sanchez performed poorly on the Iowa Gambling Task, losing a total of $2745 and scoring in the 5th percentile overall, demonstrating impairments in reasoning in a novel situation.

39.     The Booklet Category Test provides the subject with sets of items, each of which is organized on the basis of a particular principle, including number of objects, spatial position, size, shape, and color. The test requires the subject to use feedback provided to him by the examiner in order to learn the underlying principle of categorization, adhere to that principle following consistent positive feedback from the examiner, and abandon the principle and learn a new one when the principle is no longer effective. Mr. Sanchez's performance on this test was in the average range. That he performed better on this measure than on other measures of executive functioning is consistent with his relative strengths in visual processing.

40.     On the Behavior Rating Inventory of Executive Function – Adult Version (BRIEF-A), an instrument on which the subject answers questions about his or her self-regulatory functioning, Mr. Sanchez's scores on the Metacognition Index and the Global Executive Composite were 67 and 66, respectively. Scores above 65 are clinically significant. Mr. Sanchez endorsed symptoms of executive functioning deficits that were consistent with the results of the other executive functioning instruments I administered to him, including difficulties with working memory, organization, and cognitive/behavioral flexibility.

41.     I administered several subtests of the Wide Range Achievement Test, Fourth Edition, Blue Test Form (WRAT4) to Mr. Sanchez. The WRAT4 measures the individual's academic achievement. Mr. Sanchez scored in the 13th percentile (at the 6.9 grade level) in his ability to read aloud individual words, in the 5th percentile (at the 4.7 grade level) in his ability to spell individual words, and in the 3rd percentile (at the 4.3 grade level) in his ability to perform math computations. Although Mr. Sanchez was able to read individual words at a sixth grade level, the instrument does not measure his ability to comprehend the words he read.

42.  Mr. Sanchez performed in the 88th percentile with his dominant right hand and in the 95th percentile with his left hand on the Grooved Pegboard test, a task of eye-hand coordination and motor speed. These results suggest that Mr. Sanchez does not have any deficits in coordination and motor skills that would explain his impaired performance on other tests.

## RISK FACTORS FOR IMPAIRMENT

43.  Mr. Sanchez has been exposed to multiple significant risk factors for brain impairment throughout his life. His mother received very limited prenatal care during her pregnancy with Mr. Sanchez. She suffered from infections, including several urinary tract infections, while she was pregnant with Mr. Sanchez for which she received, but failed to complete the course of, antibiotics.  Mr. Sanchez's birth was different than the births of his two older siblings; Mr. Sanchez's mother's water did not break, and she started bleeding when she went into labor.

44.  Mr. Sanchez has a genetic predisposition for mental and developmental disorder. Both of his parents have very limited cognitive functioning, as measured by tests of nonverbal intelligence: his mother achieved scores in the range of borderline intellectual functioning and his father achieved scores in the range of intellectual disability. Mr. Sanchez's father has exhibited extremely erratic behavior as an adult, including numerous episodes of violence, particularly when under the influence of alcohol.  He exhibited other bizarre behaviors during Mr. Sanchez's early childhood; for example, on one occasion during Mr. Sanchez's infancy his father placed a clean diaper over Mr. Sanchez's clothes and dirty diaper instead of changing the diaper, and on another, he unexpectedly handed Mr. Sanchez to his thirteen-year-old sister-in-law at the airport and instructed her to take Mr. Sanchez with her to her home in Texas.  Mr. Sanchez's eldest brother, Efrain, has been diagnosed with intellectual disability as well as a

severe seizure disorder that has been only poorly controlled with medication. Efrain also exhibited bizarre behavior. Mr. Sanchez's younger brother, Ezequiel, was diagnosed with a learning disability and received special education services throughout his school career, as did Mr. Sanchez himself.

45.   Mr. Sanchez was a sickly child. He had pneumonia on more than one occasion and also had allergic reactions that caused his mother to take him to the emergency room for medicine to remedy his breathing problems.

46.   As a child, Mr. Sanchez also suffered from head injuries and insults that can negatively affect neurodevelopment. When he was two years old, Mr. Sanchez ingested a large quantity of his brother's anti-seizure medication, after which he exhibited symptoms including lethargy and lack of coordination and was taken to the hospital by ambulance. His mother and sister indicated that he went into a coma and took some time to recover. When Mr. Sanchez was three or four years old, he fell off a tricycle and hit his head, requiring treatment with staples to his scalp. Mr. Sanchez sustained blows to the head on several other occasions when riding his bicycle; when he was about fourteen years old he tried to do a back flip on his bicycle and struck the back of his head on the ground when he landed. On another occasion he fell and struck his face on the ground. Mr. Sanchez's father regularly beat Mr. Sanchez, inflicting blows upon his head as well as on other places on his body.

## LIFETIME BEHAVIOR AND FUNCTIONING

47.   Mr. Sanchez exhibited developmental delays beginning in early childhood. Family members noted that he was a very quiet child; he rarely spoke but he smiled often. It was difficult to have a conversation with him. He appeared mentally slower than his brothers and sister. He was meek and timid and was not a curious child, asking only basic questions such as

where the family was going or what time it was.  Mr. Sanchez did not make decisions independently, but rather simply followed his brothers and sister around, doing what they did and trying to do what they told him to do.  He was clingy and affectionate and stayed close to his mother.

48.     Mr. Sanchez also had difficulty remembering instructions and "had to be told what to do every step of the way." He "at times seemed to be far away, absent, as if he didn't understand what was going on around him." He "sometimes seemed to be in another world" and "did not respond" to his mother unless she "called his name several times."  On one occasion, Mr. Sanchez went very close to the street while playing, without seeming to recognize the danger of passing cars or understand the verbal warnings his grandmother issued to him. He was not able to pay attention to his grandmother and move away from the road until she threw pebbles at him.

49.     People both within and outside the family who observed Mr. Sanchez when he was a child described him as shy and timid.  In preschool he spoke little and he stayed close to the people he knew well.  Over time, when he became more familiar in a particular context, he behaved like a "clown," "goofy," and "silly." He liked it when people laughed and wanted to please everyone.

50.     Very shortly after Mr. Sanchez entered public school, his teachers recognized that he had disabilities that required specialized attention. In October 1989, the fall of Mr. Sanchez's kindergarten year, his teacher observed that he had difficulty understanding and expressing himself in English and needed extra assistance to complete his work correctly; that he was distractible; and that he needed a quiet, isolated place to do his work. He was assigned to receive

services through the English for Speakers of Other Languages (ESOL) program, because his teacher perceived his struggles as due to the fact that his family spoke Spanish at home.

51.     Mr. Sanchez continued to exhibit academic difficulties in first grade. In November 1990, the fall of his first grade year, he was described as exhibiting "youngness in all areas of development." His teachers observed that he was distractible and unable to stay on task even for short periods of time, as most first graders are able to do; that he was unable to work independently; that he was incapable of following directions; and that he became frustrated easily. Mr. Sanchez performed poorly on academic and achievement testing during his first grade year and in the spring he was placed into services under a federal program entitled Chapter 1, which provided him with additional reading and math assistance.

52.     Mr. Sanchez's second grade teachers observed and reported additional academic and functional deficits. His ESOL teacher noted that the ESOL services did not ameliorate Mr. Sanchez's academic problems. In October 1991, Mr. Sanchez was described as unable to complete an assignment without one-to-one assistance and guidance through each individual step of the assignment. He could not learn vocabulary even after multiple drills. Mr. Sanchez was unable to comprehend information presented to him visually or orally; performed below grade level in reading; was distracted and impulsive; exhibited memory impairments; and could not understand and follow instructions. A second grade teacher described Mr. Sanchez as "very needy," and as a student who "could not take the initiative to attempt work on his own, and was not able to or did not feel capable of tackling assignments without individualized intervention."

53.     Mr. Sanchez's second grade teachers recommended him for evaluation for special education services. He received a psychological evaluation in July 1992, when he was eight years, nine months old, during which he was administered academic, intellectual functioning,

and achievement testing. The psychologist observed that Mr. Sanchez exhibited distractibility, problems with attention and concentration, processing deficits in immediate sequential, visual and auditory memory, and impaired academic achievement. The psychologist administered the Stanford-Binet Intelligence Scale, Fourth Edition (SB-4), and Mr. Sanchez obtained a Full Scale IQ score of 80. The psychologist apparently administered the SB-4 rather than the more commonly used Wechsler Intelligence Scale for Children, Revised (WISC-R), because the SB-4 generally produced a higher Full Scale IQ score than the WISC-R and he wanted to ensure that Mr. Sanchez was eligible for special education services as learning disabled, which required a differential of one standard deviation between the IQ score and the achievement score. Following the testing, in third grade, Mr. Sanchez was determined to be eligible for special education services under the category of specific learning disability.

54.     Mr. Sanchez continued to demonstrate significant academic and other impairments in school after he was placed in a special education program and received multiple interventions, despite the fact that he exerted a great deal of effort in his classes. Throughout elementary school, middle school, and high school, Mr. Sanchez exhibited difficulty with organization and self-direction. He was not able to work independently or stay on task without individual attention and guidance. Mr. Sanchez was unable to understand even simple directions and "[m]ultiple-step directions were impossible for him."

55.     Mr. Sanchez demonstrated difficulty with verbal and written skills throughout his school career. He was exempted from standardized testing in high school because "he had such significant conceptual and intellectual deficits."

Page **22** of **30**

56.    Although Mr. Sanchez received full time special education services from the middle of his third grade year through the time he left school in tenth grade when he was nearly twenty years old, he made very little academic progress. As one of his teachers described,

> The records indicate that when [Mr. Sanchez] was in the fifth grade, he was working at a fourth grade math level and a first grade level in reading. They further indicate five years later, when he was in tenth grade, he was still achieving at only a fourth grade level in math and was able to write only some information on a personal data sheet.

The teacher concluded from this data, and I agree, that "[t]his lack of progress is consistent with [Mr. Sanchez's] very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well."

57.    Mr. Sanchez repeated both ninth and tenth grade. He was promoted to tenth grade after his second year in ninth grade not because he had achieved the 2.0 grade point average required for promotion, but because the state of Florida determined in 2000 that students who had a certain number of credits should be promoted in order to take the tenth grade state test. The special education coordinator at Mr. Sanchez's high school reported:

> That policy applied even to those students who were not expected to take the regular state tenth grade examination. As a result, [Mr. Sanchez] was promoted in August 2000 to the tenth grade even though he had achieved a GPA of only 1.10 even in his special classes with accommodations and interventions and alternative curriculum.

58.    Special education providers working with Mr. Sanchez while he was in high school noted that he would not be able to obtain employment independently and would require assistance to find a job. They also reported that he required specialized instruction and curriculum and direct assistance for the majority of learning activities and weekly personal assistance, monitoring, and intervention in the area of independent functioning. He was "unable to plan and make realistic occupational training and job placement decisions." Although his

special education records indicate that Mr. Sanchez functioned independently in the community and was capable of living in an apartment on his own, his high school special education coordinator explained that these notations "did not mean that [Mr. Sanchez] was able to function without assistance in the community; they simply meant that the IEP team believed that he had support from family or others and that the school did not need to provide services to [Mr. Sanchez] for him to accomplish these goals." It appears that Mr. Sanchez never did live independently, even after he stopped attending school; he lived with his family and with the family of his girlfriends or with other friends.

59. During his adolescence, Mr. Sanchez continued to demonstrate deficits in and out of school in conceptual, practical, and social domains of adaptive skills. When he was approximately thirteen years old, he was unable to help his sister navigate their travel on buses from Florida to Texas to visit their grandmother. His sister described him as of "no help to [her]; he had no idea what to do."

60. Mr. Sanchez's sister and mother observed that Mr. Sanchez continued to have difficulty reading and his sister had to help him with his homework in order for him to complete any of it. He did not understand what was going on in classes, and in order to hide his confusion, when subjects and tasks were complicated he simply pretended he did not care about them. He was teased and bullied for being slow, and on at least one occasion a fellow student called him "retarded." On occasion his teachers pounded or slapped his desk when he "zoned out."

61. Mr. Sanchez's inattention and slowness were not limited to the school environment. His mother noted that he was slow and distracted at home. Although Mr. Sanchez was obedient at home, his mother had to ask him more than once to do something because he "seemed to forget what [she] had asked him to do and needed help to do it." His friends

observed that Mr. Sanchez did not appear to think much about things, did not come up with ideas of his own, and had trouble understanding and playing the simple video games that the rest of his friends played. One friend described him as "not the brightest crayon in the box." His friends noted that "he did not get things outside of school," and they often "had to explain what [they] meant or repeat what [they] said." Often he seemed to be in a dream world, absent from what was going on around him. In order for his friends to get his attention, they had to snap their fingers at him, poke him, or tap him on the arm and call his name loudly in order to rouse him.

62.     When he was between eighteen and twenty years old, Mr. Sanchez continued to behave in the manner of a person much younger than he was. He had difficulty comprehending and following even very simple directions, had to have instructions repeated multiple times, and had to be reminded of the steps he was supposed to take in order to perform basic tasks such as buying a soda for his girlfriend's mother. He was unable to remember appointments and had to be reminded where he needed to go and what he was supposed to do. His sister noted that she often "helped him do things he did not seem to know he should do."

63.     As a young adult, Mr. Sanchez did not know how to handle the money he earned working basic construction and other menial jobs. His sister took him to open his first bank account when he was twenty years old. While he and Maria, the mother of his child, were in a relationship, Maria handled his money: she took his paycheck, made sure that it was cashed, and provided money to her mother with whom they were living for rent and for the items her mother bought for their baby. He was unable to keep any job for long.

64.     Mr. Sanchez is universally described as a "follower." His family, friends, and teachers observed that Mr. Sanchez "did not have an original idea in his head," "always did whatever others wanted to do," and "took no initiative but simply followed the will of the

A-000770

group." He wanted to please other people. Although he had difficulty following rules, people did not perceive him as intentionally acting out but rather as unable to do what was expected. For example, a special education professional at Mr. Sanchez's high school reported:

> [Mr. Sanchez] did not intentionally misbehave, but although he wanted to please his teachers and do what he was supposed to do, he had some difficulty following rules. For example, I often found him in the hallway of the school during class time, and when I said, "Ricky, what are you doing here?" he smiled at me goofily and went immediately back to class without any complaints and without talking back.

65.    As a young adult, Mr. Sanchez was mistreated and taken advantage of by those with whom he spent time. He was "easy to influence because he did not know what was happening all the time."

66.    Mr. Sanchez's family members, romantic partners, and others described his gullibility. They noted that Mr. Sanchez regularly was taken advantage of by his cousin, Danny Varela. Danny Varela and others Mr. Sanchez spent time with made fun of him, thought he was stupid, did not respect him, yelled at him, and ordered him around.  Despite their treatment of him, Mr. Sanchez "did whatever Danny told him to." Family members perceived Mr. Sanchez as having no understanding that these individuals were taking advantage of him; rather, he believed everything they told him and believed that because Danny and others involved with him were family members, they were trustworthy.

## MEDICO-LEGAL CONCLUSIONS

67.    Based upon my neuropsychological evaluation of Mr. Sanchez and my review of background materials, I conclude to a reasonable degree of professional certainty that Mr. Sanchez exhibits mild to moderate neuropsychological impairment.

Page **26** of **30**

## Brain Impairment

68.     Mr. Sanchez's neuropsychological functioning is impaired in the domains of overall thinking and reasoning, as well in aspects of attention and executive functioning, including processing speed, working memory, cognitive flexibility, and organization. His deficits affect his cognitive functioning and behavior, making it difficult for him to attend to, absorb, and make use of information provided to him. This is especially true for novel or complex information, or information provided to him under conditions of stress. Because he is unable to process effectively information from his environment, he is unable to use this information immediately or at later times.

69.     It is my professional opinion, held to a reasonable degree of certainty, that Mr. Sanchez's impairments are long-standing in nature. Mr. Sanchez's available medical records, special education records, and employment records, and descriptions of his functioning by individuals who knew him well throughout his life, all confirm that Mr. Sanchez has exhibited significant impairments throughout his toddlerhood, childhood, adolescence, and adulthood. His prison records do not indicate that there have been any pronounced changes in his cognitive abilities or behavior due to a recent major medical event. Furthermore, the types of impairments he demonstrates, including in processing speed, working memory, and general thinking and reasoning, are neurodevelopmental in nature rather than likely to have been acquired through a particular head or brain injury. Thus, although Mr. Sanchez's impairments may have been exacerbated by his experiencing head injuries, including those from his tricycle and bicycles accidents and occurring as a result of his father's abuse, his impairments likely are not primarily due to those injuries.

Page **27** of **30**

### *Intellectual Disability*

70.    Mr. Sanchez meets the diagnostic criteria for intellectual disability set forth in the Diagnostic and Statistical Manual of Mental Disorder, Fifth Edition (DSM-5), published by the American Psychiatric Association, and the similar diagnostic criteria established by the American Association of Intellectual and Developmental Disabilities (AAIDD). Mr. Sanchez's limited intellectual functioning, and his significant limitations in adaptive functioning in the domains of cognitive, social, and practical skills, have been observed and documented through multiple and varied sources during the developmental period – well before his eighteenth birthday – and throughout his life.

71.    Mr. Sanchez's full-scale IQ scores on tests administered throughout his life, both during childhood and at the time of his trial, are consistent with intellectual disability.[2]

72.    As the DSM-5 explains, "[i]ndividual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." DSM-5 at page 37. As described in detail above, Mr. Sanchez's performance on a

---

[2] Mr. Sanchez's full scale IQ scores on tests of intelligence throughout his life are as follows: (1) Stanford-Binet administered in July 1992, when Mr. Sanchez was 8 years old – score = 80; with SEM and norm obsolescence accounted for, the score falls between 73 and 83; (2) Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), administered in March 2008 while Mr. Sanchez was awaiting trial – score = 76; with SEM and norm obsolescence applied, the true score falls between 67 and 77; (3) Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), administered in early December 2008 while Mr. Sanchez was awaiting trial – score = 77; with SEM and norm obsolescence applied, the true score falls between 72 and 82; (4) WAIS-III, administered in late December 2008 while Mr. Sanchez was awaiting trial – score = 89; with SEM and norm obsolescence applied, the true score falls between 80 and 90. Variability in an individual's scores on the same or a very similar test administered on successive occasions may be attributable to the effects of the individual's prior exposure to the test, or what is called "practice effect." Instruments that rely on novelty (they require the subject to perform a task that is different from any the subject has ever undertaken) and instruments that require deduction of a strategy frequently demonstrate practice effects; that is, a subject who is exposed to the test or a similar test more than once may perform better on subsequent administrations than he or she did the first time the test was administered. An individual may similarly achieve a higher score on an instrument that has not been administered on a prior occasion to that individual than the individual would had he or she not been administered a similar test or a test that required the individual to use similar strategies in the past. The score of 89 that Mr. Sanchez achieved on the WAIS-III in late December 2008, approximately three weeks after the administration of the WAIS-IV in December 2008, reflects a practice effect and is almost certainly an overestimation of Mr. Sanchez's true IQ.

Page **28** of **30**

number of the neuropsychological tests I administered fell significantly below the mean, and more than two standard deviations below the mean in critical areas of cognitive functioning, including working memory, processing speed, and other aspects of executive functioning.

73.    Furthermore, Mr. Sanchez's significant deficits in adaptive functioning, particularly in the domains of conceptual and practical skills, as documented in records contemporaneous with his development and in sworn declarations of educators, family members, and other individuals and described above, demonstrate that he functions in the range of an individual with intellectual disability. The DSM-5 provides:

> IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

DSM-5 at page 37.

### *Trial Competence*

74.    As described above, the results of current and prior neuropsychological testing indicate that Mr. Sanchez has profound difficulty attending to and processing information provided to him verbally. Had I been consulted by the court or counsel representing Mr. Sanchez at the time of his capital trial, I would have advised them that his deficits would render it difficult to understand trial proceedings and assist his counsel, and render it nearly impossible for him to comprehend complicated or technical testimony or evidence. I would have advised counsel and the court that Mr. Sanchez's significant reading limitations[3] would have made it very difficult for

---

[3] It is clear that Mr. Sanchez's vocabulary and reading skills have improved since he was tested just prior to his capital trial. The increase in his full scale IQ score between 2008 and 2016 is accounted for almost entirely by the

Page **29** of **30**

him to read law enforcement reports, let alone identify information that was important from those reports. I also would have advised counsel and the court that Mr. Sanchez would have had significant trouble following and participating meaningfully in the legal proceedings. His limitations in processing speed and working memory would prevent him from absorbing and following the testimony of a witness, particularly when the content of the testimony was complicated or technical. I would have advised counsel and the court that Mr. Sanchez's disabilities were likely to be exacerbated under the stress of a capital trial, especially one involving multiple defendants and attorneys, and thereby increasing distracting stimuli.

75. Although Mr. Sanchez's very low intellectual functioning would have interfered with his understanding of trial proceedings and participation in preparation of his defense under any circumstances, I would have informed counsel and the court that special accommodations could and must be made in order to maximize Mr. Sanchez's understanding of trial proceedings and his ability to assist counsel in his defense. I would have advised them that counsel must prepare Mr. Sanchez at the beginning of each court day by informing him what witnesses would testify that day, and provide him with an overview of the content of their testimony. I further would have advised them that a break should be taken between the presentation of the direct testimony and cross-examination of each witness so that Mr. Sanchez's lawyers would have an opportunity to review the testimony with Mr. Sanchez to maximize his understanding prior to the presentation of the next witness. In addition, I would have advised them that at the close of each court day, counsel should review the proceedings with Mr. Sanchez again. I would have informed counsel that it is common for individuals with impairments like Mr. Sanchez to fail to

improvement in his verbal skills. Mr. Sanchez has difficulty even now reading fairly simple material, and at the time of his trial his reading skills were significantly more limited.

ask questions when they do not understand what is going on around them. This can be due to a number of factors, including a desire to mask disability, a desire to please by being compliant, and/or an inability to articulate or frame questions about what is not understood.

### *Mitigation*

76.     I have reviewed the mitigating factors set forth in the federal death penalty statute, 18 U.S.C. section 3592. It is my professional opinion, held to a reasonable degree of certainty, that Mr. Sanchez's cognitive and intellectual impairments would have been relevant to the trial jury's consideration of several of the statutory mitigating circumstances. In particular, Mr. Sanchez's deficits rendered significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; his deficits, which are long-standing and existed at the time of the offenses for which he was charged, constituted severe mental disturbance; and his impairments are factors in his background, record, or character that mitigate against imposition of the death sentence.

77.     It is my professional opinion that at the time of Mr. Sanchez's capital trial, any qualified neuropsychologist with access to Mr. Sanchez's full history, considering Mr. Sanchez's history and his clinical profile, could and would have reached these same conclusions regarding Mr. Sanchez's neuropsychological, cognitive, and intellectual impairments and their effects on his understanding of and participation in trial proceedings.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

**Signed on**  8/31/16

**Name** _____



Institute for Applied Psychometrics

Kevin S. McGrew, Ph.D.
Educational Psychologist
Director
Institute for Applied Psychometrics

1313 Pondview Lane
St. Joseph, MN 56374
320-260-1309
iap@earthlink.net
www.themindhub.com

I, **Kevin S. McGrew**, declare as follows:

1. The Federal Community Defender Office for the Eastern District of Pennsylvania, Capital Habeas Unit, requested that I provide an expert opinion regarding the interpretation of Mr. Ricardo Sanchez, Jr.'s intelligence test scores from 1992 through 2008, and an expert opinion regarding the level of Mr. Sanchez's general intellectual functioning. This request is related to the question of whether Mr. Sanchez meets the first prong (deficit in general intellectual functioning) for a diagnosis of intellectual disability (ID).

2. I received my Bachelor's in psychology and my Master's in education (School Psychology) at Morehead State University in 1974 and 1975, respectively. I earned a doctorate in educational psychology at the University of Minnesota in 1989.

3. I am the Director of the Institute for Applied Psychometrics (IAP) and a Visiting Professor in Educational Psychology (School Psychology Program) at the University of Minnesota.

4. I have fourteen years of experience as a practicing school psychologist in the states of Iowa and Minnesota (1975 to 1989), primarily conducting psychological and educational assessments with special education populations. I subsequently was a Professor in Applied Psychology (teaching educational psychology courses) at St. Cloud State University, St. Cloud, MN (1990 to 2000). I have served as a measurement consultant to a number of psychological test publishers, national research studies and organizations.

5. I have extensive experience in the development and psychometric analysis of nationally standardized, norm-referenced psychological and educational assessment instruments. I am a coauthor of the Woodcock-Johnson Battery—Third Edition (WJ III; 2001) and the Woodcock-Johnson Battery—Fourth Edition (WJ IV; 2014), a widely used nationally standardized battery of intelligence, oral language, and achievement tests appropriate for use from preschool through late adulthood. The WJ test batteries have been highly praised by test reviewers for psychometric excellence, strong theoretical foundation, and innovation.

6. I have authored or coauthored over sixty professional journal articles and book chapters, four professional books on intelligence test interpretation, seven norm-referenced intelligence, oral language, achievement, and/or special purpose psychological test batteries, and over forty technical (grant) and special publications and reports. I have made over seventy presentations or workshops related to my stated areas of research interest at state, national and international conferences. I have served on the editorial board or as an ad hoc reviewer of manuscripts for a number of journals in psychology and developmental disabilities.

7.  Additional details regarding my qualifications, including a listing of all my publications, are included in the attached curriculum vitae.

8.  I have served as an expert witness at a trial or via written declaration for a number of *Atkins* death penalty cases since 2009.

9.  The following information was considered in the formation of my expert opinions:

    -   Review of copies of four intelligence test results from 1992 to 2008 (test records and psychological reports where available) and background information (school records) provided to me by counsel.

    -   Review of the scientific research and professional literature regarding: (a) the psychometric properties and measurement principles related to the scientific and professional interpretation of intelligence test scores, (b) measurement issues related to accuracy of individual intelligence test scores and consistency of intelligence test scores over time, and (c) professional standards, guidelines and codes of ethics related to interpretation of intelligence tests in the context of a possible diagnosis of ID.

    -   Review of the American Association on Intellectual and Developmental Disabilities (AAIDD) 2010 manual, *Intellectual Disability: Definition, Classification, and Systems of Supports*.

    -   Review of the American Association on Intellectual and Developmental Disabilities (AAIDD) 2015 publication, *The Death Penalty and Intellectual Disability*.

    -   Review of the American Educational Research Association (AERA), American Psychological Association (APA), and National Council on Measurement in Education (NCME) *Standards on Educational and Psychological Testing* (2014).

    -   Review of the American Psychiatric Association's (APA) *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (DSM-5)—sections dealing with the diagnosis of intellectual disability.

    -   Review of the Federal Judicial Center *Reference manual on scientific evidence—Third Edition* (2011). I reviewed chapters relevant to standards for evaluating error tolerance in the sciences.

2

A-000778

### Summary[1]

10. I have reviewed Mr. Sanchez's intelligence test results (4 tests spanning 16 years) in the context of accepted scientific principles, and reliable clinical and professional methods and standards. As a result of this process and the scientific information and professional principles outlined in this statement, the following statements reflect my expert opinion, which I provide with a reasonable degree of scientific certainty.

11. Three of Mr. Sanchez's reported IQ test scores between 1992 and 2008 significantly overestimate his general intellectual functioning (at the time the tests were administered) due to the scientifically recognized fact of norm obsolescence (the Flynn effect). The scientific and professional consensus is that IQ test norms "soften" over time, and need new, contemporary, "freshened", nationally representative norms approximately every 10 years. Three of four of his IQ test scores were based on national test norms that were from 7 to 13 years out-of-date when he was tested. These three reported IQ test scores need to be adjusted for norm obsolescence, as per accepted scientific evidence and professional guidelines. The scientific and professional basis for adjusting IQ scores due to norm obsolescence (Flynn effect) is described in detail later in this declaration.

12. The concept of error tolerance in measurement and experiments is recognized in most sciences, as well as the need to account for acceptable levels of error when presenting scientific data and evidence. IQ tests do not possess perfect reliability; there is a degree of known error in each IQ test score. As per scientific and professional standards, each of Mr. Sanchez's IQ test scores must be interpreted as a range of scores—bounded by a 95% confidence interval band ($\pm$ 5 IQ score points). The notion of an acceptable error tolerance of 5% (conversely, a 95% confidence interval) has a long history in the sciences, and is grounded in reasoned logic, mathematical and statistical theory, and statistically tractable mathematical quantification of the characteristics of the normal curve. The 95% confidence interval is also the professional consensus confidence interval recommended by professional guidelines promulgated for the evaluation of IQ test scores in the diagnosis of intellectual disability in high stakes settings (i.e., eligibility for social security benefits; *Atkins* death penalty cases). The scientific and professional basis for the 95% confidence interval (and standard error of measurement, or SEM) is explained in detail later in this declaration.

13. Mr. Sanchez was administered three adult Wechsler Adult Intelligence Scales (two WAIS-IIIs and one WAIS-IV) within the same year (2008). He was first administered the WAIS-III in March of 2008. Approximately 9 months later (December, 2008) he was administered the WAIS-IV and then (again) the WAIS-III, within the same month. Due to his repeated exposure to the adult Wechsler scales in such a short time period (within the same year), and within the same month for his last two exams, the last two intellectual assessments are positively upward biased estimates of intelligence due to the scientifically-based and professionally recognized testing issue of practice effects and progressive error practice effects. The test score bias due to practice effects and progressive error practice effects are not accounted for in the standard error of measurement (SEM; see #12 above). Mr. Sanchez's second 2008 WAIS-III score (third WAIS in 2008), in particular, is most likely a significant overestimate of his general intelligence due to cumulative progressive error practice effects from his two prior 2008 WAIS-III and WAIS-IV test administrations. It is my expert opinion that his third and last Wechsler Full Scale IQ test score is invalid and should not be considered when evaluating prong I for a possible diagnosis of

---

[1] It should be noted that some of the text included in this declaration may be identical, or may closely approximate, text included in two chapters (McGrew, 2015a, 2015b) in the AAIDD *The Death Penalty and Intellectual Disability* publication (Polloway, 2015). This occurs because I had written extensively about a variety of intelligence testing issues in a series of papers available at The MindHub™ (www.themindhub.com) prior to being asked to write two chapters for Polloway (2015). Where applicable, I have used some text from the original source document files.

intellectual disability.  Practice effects and progressive error practice effects are explained in detail later in this declaration.

14. When interpreted according to scientifically valid methods and accepted clinical and professional practices—including an adjustment for norm obsolescence (the Flynn effect), the appropriate use of the standard error of measurement (SEM: and the accepted 95% score confidence interval), and an appropriate accounting for practice effects/progressive error practice effects[2]--the majority of Mr. Sanchez's IQ valid test score confidence bands include ranges of possible scores that are within the two standard deviations below the mean IQ diagnostic score range (65-75; intellectual disability prong 1), such that a complete clinical evaluation, including consideration of adaptive behaviour, must be made to determine whether he meets the criteria for a diagnosis of intellectual disability.  The clinical determination of whether Mr. Sanchez is a person with intellectual disability cannot be made without a thorough evaluation of Mr. Sanchez's adaptive functioning combined with the clinical interpretation of his intelligence test scores as described in this declaration.

### Discussion

15. My scientific, professional, and expert opinion summarized above, which I render with a reasonable degree of scientific certainty, is based on the following scientific evidence and professional standards related to the measurement of general intelligence and the use of IQ test scores as one part (prong 1) of the definition and diagnostic criteria for intellectual disability.

16. Table 1 presents a summary of the results of Mr. Sanchez's four intelligence test full scale scores obtained prior to his trial in 2009.[3]  The table presents his age at the time of testing, the year of testing, the test name abbreviation, information regarding when each test was published and the middle year of norm data collected prior to publication, recommended calculations to adjust his IQ test scores for norm obsolescence (the Flynn effect), and the 95% confidence interval range for his adjusted Flynn effect IQ test scores.

---

[2] Each of these factors affecting the accuracy of Mr. Sanchez's IQ test scores are explained later in this declaration.

[3] The scores reported in Table 1 are taken from copies of the psychological test records, reports or score printouts provided to me by Mr. Sanchez's legal counsel.

**Table 1: Summary of Mr. Ricardo Sanchez's IQ test scores**

Summary of original and norm obsolescence (Flynn effect) adjusted IQ scores for Ricardo Sanchez
Prepared by Dr. Kevin S. McGrew, PhD.

| Age @ testing | Year tested | Name of IQ test [1] | Test pub. year | Test norm year [2] | Number years of norm obsolescence | FE adjusted per year (.3) [3] | Original IQ score | Amount of FE adjusted | FE adjusted IQ score (rounded) | FE adjusted IQ 95% CI range [5] | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | | | | B | C = (A-B) | D | E | F = (C x D) | G = (E – F) [4] | -2 SEM | | +2 SEM |
| 8 | 1992 | SB-IV | 1986 | 1985 | 7 | 0.3 | 80 | 2.1 | 78 | 73 | to | 83 |
| 25 | 2008 | WAIS-III | 1997 | 1995 | 13 | 0.3 | 76 | 3.9 | 72 | 67 | to | 77 |
| 25 | 2008 | WAIS-IV | 2008 | 2007 | 1 | 0.3 | 77 | 0.3 | 77 | 72 | to | 82 |
| 25 | 2008 | WAIS-III | 1997 | 1995 | 13 | 0.3 | 89 | 3.9 | 85 | 80 | to | 90 |

1. SB-IV=Stanford-Binet-Fourth Edition; WAIS-III=Wechsler Adult Intelligence Scale-Third Edition; WAIS-IV=Wechsler Adult Intelligence Scale-Fourth Edition
2. Middle year of test norm data collection (Watson, 2014; AAIDD Chapter 8 of *The death penalty and intellectual disability* (Polloway, 2015)
3. Per year Flynn effect recommended adjustment value (McGrew,2015; Watson, 2015; Chapter's 8 and 10 of
   AAIDD *The death penalty and intellectual disability* (Polloway, 2015)
4. Rounded recommended value (McGrew, 2015a, Chapter10 of AAIDD *The death penalty and intellectual disability* (Polloway, 2015)
5. 95% SEM of plus/minus 5 is most recommended confidence interval (CI) value (McGrew, 2015a; Watson, 2015; Chapters 8 and 10 of
   AAIDD *The death penalty and intellectual disability* ( Polloway, 2015)

17. It is important to understand that a person does not obtain a specific IQ score when tested: they obtain a range of possible IQ test scores with a certain degree of confidence (in this case, 95% confidence; Kaufman, 2009). The 95% confidence interval band values for the Flynn effect adjusted IQ scores that appear in Table 1, above, are plotted in Figure 1, below. When interpreting Mr. Sanchez's IQ test scores, professional standards and clinical accuracy requires utilizing the 95% confidence interval band from each assessment and not the point-specific IQ score obtained. Figure 1 provides a visual representation of the 95% confidence interval bands for each test administration.

**Figure 1:  Plot of Mr. Sanchez's Flynn effect adjusted IQ scores with 95% confidence intervals**



18. The confidence a psychologist can place in a diagnosis of intellectual disability increases if there is a "convergence of indicators."  That is, if IQ scores across different test administrations are reasonably similar, this can be thought of as a form of empirical triangulation or consistency of measured intelligence scores.  As suggested by Watson (2010), a reasonable degree of score convergence is present when the 95% confidence bands from the different IQ test scores "overlap or are not far apart" (p. 124).[4]  As can be seen in Figure 1, the three 95% confidence bands for Mr. Sanchez's 1992 SB-IV, first 2008 WAIS-III, and 2008 WAIS-IV all overlap—suggesting that these three IQ scores, obtained over a 16-year period, are providing the same approximate estimate of general intelligence for Mr. Sanchez.[5]

---

[4] This "overlapping" band rule-of-thumb is based on the psychometric characteristic of the reliability of difference scores (see McGrew, Werder & Woodcock, 1991; Woodcock, 1971).

[5] This score convergence evidence is important in evaluating the accuracy of Mr. Sanchez's first IQ test score while 8 years of age (SB-IV).  Post-publication research and independent reviews of the SB-IV highlighted a potpourri of technical issues (e.g., less than representative norm sample; different combinations of subtests to obtain IQ scores at different ages; complicated and error-prone scoring; evidence that individuals with ID, on average, obtain higher SB-IV scores than on other intelligence tests) (McGrew, 2012).  These different technical issues point in opposite directions in terms of any potential upward or downward IQ score bias.  For example, the higher education and SES norm sample would suggest a downward IQ score bias for a bilingual examinee from a lower SES background with lower educated parents.  Conversely, research with individuals with ID suggests the opposite possibility—such individuals may obtain higher scores than other IQ tests available at the time (WISC-III). An additional complicating factor is that the SB-IV was only published in an English form, yet the psychologist who administered the test reported that "this psycho-educational evaluation was completed in both English and

A review of Figure 1 shows that these three convergent IQ score ranges are in the range of IQ scores (65 to 75; gray shading in Figure 1) that may result in a diagnosis of mild intellectual disability as per recognized professional organizations and guidelines. The fourth score (second WAIS-III in 2008) is an inflated and invalid estimate of Mr. Sanchez's general intelligence due to progressive error practice effects (discussed in detail below) and should not be considered when making a determination of a possible diagnosis of intellectual disability for Mr. Sanchez.

19. Of the three convergent IQ scores with overlapping bands in Figure 1, it is my professional and expert opinion that the score with the least amount of score bias is the first 2008 WAIS-III (Flynn effect corrected score of 72; 67-77 95% confidence band). This was Mr. Sanchez's first encounter with the WAIS series of tests. Thus, this test administration was novel—which parallels the experience of all subjects in the WAIS-III norm sample. Responding to novel test materials is a basic assumption of standardized intelligence testing. The 2008 WAIS-III does not have any practice effect or progressive error practice effects (as described in detail later in this declaration). This first 2008 WAIS-III score does require an adjustment for norm obsolescence (Flynn effect). However, as described later in this declaration, there is an empirically and professionally recognized adjustment procedure that was applied to Mr. Sanchez's obtained IQ score. Although the 2008 WAIS-IV (his second WAIS) requires no similar norm obsolescence adjustment, it contains a much larger form of score bias due to practice effects—for which there is no recognized professional consensus adjustment procedure. Finally, as explained above (see footnote 5), the 1992 SB-IV test suffered from a number of significant technical issues which suggest, in my opinion, that it should be considered the least accurate of these three convergent IQ test scores.

20. It is well known in psychometrics, but not typically by the lay public, that the calculation of an arithmetic average IQ score (when more than one score is available) is inconsistent with accepted statistical and psychometric methods and principles (Watson, 2015). Instead, the most acceptable method for evaluating Mr. Sanchez's collection of IQ scores is to evaluate his complete set of 95% confidence band intervals individually and collectively using generally accepted methods of test interpretation and clinical judgment.[6]

21. Given that Mr. Sanchez's first three IQ score ranges include scores within the zone of scores that meet prong I of an intellectual disability diagnosis, it is my scientific and professional opinion that there is sufficient reasonable and reliable evidence that Mr. Sanchez is a person who has IQ scores that fall within the range of scores specified for prong 1 of an intellectual disability diagnosis. This conclusion is consistent with the "unanimous professional consensus that the diagnosis of intellectual disability requires comprehensive assessment and the application of clinical judgment" (Brief of *Amici Curiae* American Psychological Association, American Psychiatric Association, American Academy of Psychiatry and the Law, Florida Psychological Association, National Association of Social Workers, and National Association of Social Workers Florida Chapter, in Support of Petitioner; *Hall v. Florida*; S.Ct., No. 12-10882;

---

Spanish" (Francis X. Crosby report, p. 1). The psychologist described Mr. Sanchez as bilingual (but Spanish language dominant) and Spanish was the dominant language in his home. Based on available bilingual intelligence testing research (Sattler, 2001), the direction of a potential SB-IV score bias due to this non-standard administration (none, higher score, lower score), is unknown. Given these various issues, the fact that the SB-IV IQ score is generally convergent with his first two adult Wechsler tests provides some degree of confidence that the SB-IV IQ score was an adequate, yet imperfect, indicator of Mr. Sanchez's general intelligence between grades 2 and 3.

[6] IQ test scores do not possess the same measurement characteristics as do such physical quantities as length or weight. Although inches and pounds can be averaged, IQ scores cannot be arithmetically averaged (Tellegen, & Briggs, 1967; Watson, 2015). This was noted in the recent decision by the Supreme Court in *Hall v Florida*, 134 S. Ct. 1986, 1995 (2014).

2014; p. 8).[7] The application of clinical judgment in the evaluation of IQ scores in the diagnosis of intellectual disability includes consideration of the standard error of measurement of IQ scores and other factors that might influence the accuracy of an assessment of general intellectual ability (e.g., Flynn effect, practice effects, cultural factors, etc.).

**Norm obsolescence (Flynn effect) adjustment to reported IQ test scores**

22. Three of Mr. Sanchez's Wechsler IQ scores (1992 SB-IV; 2008 WAIS-IV and second WAIS-III) are overestimates of his general intellectual functioning due to the scientifically recognized fact of norm obsolescence (the Flynn effect). These three IQ test scores require Flynn effect adjustments as outlined in Table 1. The recognition of norm obsolescence and the need for Flynn effect adjustments for IQ scores based on out-of-date national test norms (a) is recognized as a scientific fact, (b) is considered best professional practice, and (c) standard procedural guidelines have been provided by AAIDD to adjust for norm obsolescence.

23. The *APA Dictionary of Psychology* (VandenBos, 2007) defines the Flynn effect as:

> a gradual rise of IQ level that has been observed since the time when records of IQ first were kept. Although the average IQ remains 100 due to periodic renorming of IQ tests, raw scores have been rising. These increases have been roughly 9 points per generation (i.e., 30 years). The gains have been unequally distributed across the different abilities, with fluid abilities showing substantially greater gains than crystallized abilities (p. 382).

In simple terms, psychologists and psychological measurement experts typically describe the Flynn effect as resulting from a "softening" of IQ tests norms with the passage of time. That is, individuals tested today on an IQ test normed many years earlier will obtain inflated IQ scores, as the older test norms [8] are obsolete for individuals in contemporary society. This is one of the primary reasons why authors and publishers of IQ tests must make every effort to provide "freshened" norms via the collection of new nationally representative sample data for intelligence test batteries approximately every 10 years (the generally accepted rule of thumb in the IQ testing industry; Weiss, 2010). As noted above, three of Mr. Sanchez's IQ test scores are based on comparisons to Wechsler test norms that are 0.7 to 1.3 times out-of-date as per the 10 year renorming rule-of-thumb.

24. The historical origins of the Flynn effect have been summarized by McGrew (2015a). The recognition of the impact of norm obsolescence has been documented as early as the 1980s. Flynn (1985) published an article ("*Wechsler intelligence tests: Do we really have criterion of mental retardation?*") in the then official journal of AAIDD. Flynn's 1985 article first demonstrated that the test norm obsolescence had a significant impact on the proportion of the population of individuals that would be identified as intellectually disabled and proposed a form of adjusting scores for the softening of tests norms. Fifteen years later Flynn (2000) again sounded the alarm regarding the implication of norm obsolescence related to the diagnosis and classification of mental retardation. Flynn stated:

> [I]t is certain that over the past 50 years, literally millions of Americans evaded the label of mentally retarded designed for them by the test manuals. Whether this was good or bad depends on what one thinks of the label. Some will say millions avoided stigma. Others will say

---

[7] This unanimous professional consensus represents the national mental health professional associations of the American Psychological Association, American Psychiatric Association, and American Academy of Psychiatry.

[8] As per the *APA Dictionary of Psychology* (VandenBos, 2007), a *norm* is "a standard range of values that represents the typical performance of a group or of an individual (of a certain age, for example) against which comparisons can be made" (p. 631).

that millions missed out on needed assistance and classroom teachers were left unaided to cope with pupils for whom aid was needed. (p. 197).

25. There is a scientific and professional consensus that the Flynn effect is a scientific fact (Gresham, 2009). As summarized by McGrew (2015a), *"the consensus of the relevant scientific community is that the Flynn effect is real* (Cunningham & Tassé, 2010; Fletcher, Stuebing & Hughes, 2010; Flynn, 2009; Greenspan, 2006, 2007; Gresham & Reschly, 2011; Kaufman, 2010a, 2010b; McGrew, 2010c; Rodgers, 1999; Trahan, Stuebing, Fletcher, & Hiscock 2014; Weiss, 2010; Zhou, Zhu, & Weiss, 2010)" (p. 158; italics in original). Key contemporary Flynn effect issues bearing on the diagnosis of intellectual disability in the *Atkins* context were covered in a special 2010 issue of the *Journal of Psychoeducational Assessment* (*JPA*). The consensus of almost all authors who contributed to the *JPA* Flynn effect issue (Fletcher et al., 2010; Flynn, 2010; Hagan, Drogin, & Guilmette, 2010; Kaufman, 2010a, 2010b; Kaufman & Weiss, 2010; McGrew, 2010c; Reynolds, Niland, Wright, & Rosenn, 2010; Sternberg, 2010; Weiss, 2010; Zhou et al. 2010) was that IQ test norm obsolescence (i.e., the Flynn effect) is an established scientific fact.

26. The AAIDD *Intellectual Disability: Definition, Classification, and Systems of Supports* (11th ed., Schalock, 2010) provides a written guideline supporting the use of the Flynn effect adjustment in the diagnosis of ID. As discussed in the *User's Guide* (Schalock et al., 2007) that accompanies the 10th edition of the AAIDD Manual, best practices require recognition of a potential Flynn effect when intelligence tests with out-of-date norms are used in the assessment or interpretation of an IQ score. (p. 37). In AAIDD's most recent *User's Guide to Intellectual Disability: Definition, Classification, and Systems of Supports* (Schalock, 2012), a corrected IQ score upward of 3 points per decade is recommended when test norms are obsolete (p. 23).

27. When current or historical IQ test scores are impacted by norm obsolescence (i.e., Flynn effect), and the scores are to be used as part of the diagnosis of intellectual disability in *Atkins* or other high stakes decisions, the global scores impacted by outdated norms should be adjusted downward by 3 points per decade (0.3 points per year) of norm obsolescence. The recommended adjustment is: *Date test administered – (minus) date test was normed) x 0.3.*[9] The resultant adjustment value should then be subtracted from the obtained IQ score. The final corrected IQ score should be rounded to the nearest whole integer value. Both the original and Flynn effect adjusted scores should be included in all reports or court related statements or declarations (McGrew, 2015a). These recommended norm obsolescence (Flynn effect) procedures were used to produce the summary of scores in Table 1 and the subsequent plotting of the 95% IQ score confidence bands in Figure 1.

28. The other professional set of guidelines used by mental health professionals for the diagnosis of mental and behavior disorders, including intellectual disability, is the American Psychiatric Association's (APA) *Diagnostic and Statistical Manual of Mental Disorders*, Fifth Edition, (DSM-5; APA, 2013). When describing the diagnostic features of reduced general intellectual functioning, the DSM-5 manual also recognizes the potential distorting impact of norm obsolescence. "Factors that affect test scores include practice effects and the 'Flynn effect' (i.e., overly high scores due to out-of-date test norms)." (p. 37).

**The standard error of measurement (SEM) and the 95% confidence interval band for Mr. Sanchez's IQ scores**

29. It is crucial to recognize "the reality that we don't earn a specific IQ—we actually earn a *range of IQs* that most likely includes our true IQ" (Kaufman, 2009; p. 143; italics in original). IQ tests are fallible measures. They cannot provide perfect or precise scores. However, the well-respected individually administered IQ test batteries (e.g., Wechslers; Stanford-Binet; Woodcock-Johnson) recommended for the diagnosis of

---

[9] The dates of publication of an IQ test do not accurately capture the time period when the test norm data were gathered (McGrew, 2015a). "The calculation of the years of norm obsolescence should be based on the difference between the year the test was administered to an individual and the best estimate of the year the IQ test was normed" (see table 8.4 in Watson, 2015).

intellectual disability (McGrew, 2015b) provide global composite IQ scores characterized by high score reliability. When the reliability of a global IQ score is known, a scientifically-based, professionally accepted, and mathematically tractable procedure is used to quantify the amount of potential error in any IQ score—the standard error of measurement (SEM). Clinical practice and professional standards require that any point-specific IQ score be presented with an estimate of the range of variation of observed scores due to the SEM (AAIDD, 2010; APA, 2013; McGrew, 2015b; Widaman, 2015; Watson, 2015). This range of scores is referred to as the confidence interval band.

30. Mr. Sanchez's IQ test scores are presented in Figure 1 in the form of 95% confidence interval score bands. Confidence interval bands are based on the statistical concepts of reliability[10] and the SEM. As per scientific and professional standards of practice, each of Mr. Sanchez's IQ scores must be interpreted within the context of SEM-derived confidence bands (AERA, APA, NCME, 2014; APA, 2013; AAIDD, 2010; Polloway, 2015). It is my expert opinion, which I provide with a reasonable degree of scientific certainty, that the 95% confidence bands should be used in the interpretation of each of Mr. Sanchez's IQ test scores.

**An explanation of standardized testing and the concepts of SEM and confidence intervals**

31. The quantification and objective comparison of different individuals in human performance situations is made possible via the use of standard sets of tasks and measurement procedures. For example, when measuring bowling performance, each "test" session (or sample of bowling behavior) is the same via the holding constant of the number of frames bowled, length and width of the bowling lanes, size and weight of the bowling pins, and the use of an objective scoring method. As a result, each bowling session is made as identical as possible to all other sessions to allow each person's bowling ability to be judged via an objective common yardstick. The key to precise, dependable, and consistent measurement in any human performance domain is standardization. So it is with standardized IQ testing.

32. A standardized test is a task or set of tasks administered under standard conditions and designed to assess some aspect of a person's knowledge, skill, behavior, or personality (Green, 1981). Individually administered standardized IQ tests are designed to reduce sources of error in assessment that may result from idiosyncratic or biased assessment methods used by any individual psychological examiner. This is achieved via the use of standard or uniform procedures for (a) test item content administered to examinees, (b) prescribed test administration procedures (e.g., wording of items and directions; time limits), and (c) objective scoring criteria (Sattler, 2001). As per the Joint Test Standards (AERA, APA, NCME, 2014), the use of standardized testing procedures insures "a constant testing environment and conducting the test according to detailed rules and specifications, so that testing conditions are the same for all test takers" (p. 182). Thus, the result of a standardized IQ test is an objective quantifiable score that is purged, to the maximum degree possible, of idiosyncratic characteristics of the person administering the test. The result is a fair, equitable and standard comparison of examinees measured via a common method or mental yardstick (Green, 1981).

33. Anyone who has regularly played a game or performed in a domain where performance is measured under standardized procedures with objective scoring criteria (e.g., bowling, bridge, chess, running marathons) is personally aware of the variability in his or her performance from day-to-day, game-to-game, or event-to-event. No one, not even the most accomplished expert or star within a performance

---

[10] According to *The Standards for Educational and Psychological Testing* (aka, the *Joint Test Standards*; AERA, APA, NCME, 2014), reliability is "the degree to which test scores for a group of test takers are consistent over repeated applications of a measurement procedure and hence are inferred to be dependable and consistent for an individual test taker; the degree to which scores are free of errors of measurement for a given group" (p. 223).

domain, operates at optimal level on all occasions. For example, on any given day an individual may suffer from internal fluctuations in levels of energy, mental concentration, and physical well-being, to mention but a few within-person variables. External factors beyond the individual's control (e.g., refurbishing the bowling alley lanes between tournaments; environmental temperature being uncharacteristically hot or cold) may also influence performance. However, over many different occasions (samples) a general consistent pattern of typical or average level of performance emerges (e.g., bowling average; golf handicap), together with a range of typical variability in performance for each individual. The same holds true for performance on individually administered IQ tests. The "quantification of the consistency and inconsistency in examinee performance constitutes the essence of reliability analysis" (Feldt & Brennan, 1989, p.105) and the important statistical estimate derived from a test's reliability—the standard error of measurement (SEM).

34. Just as perfectly standardized measurement conditions prove elusive in all human performance situations (e.g., despite a scoring system with near-perfect reliability, in a golf tournament one set of golfers starts early enough to enjoy perfect weather conditions while players starting later in the day may face more adverse weather conditions), standardized IQ tests are fallible or imperfect measures of an individual's level of general intellectual ability. However, thanks to the development of the psychological specialty of psychometrics, a scientifically-based, professionally accepted, and mathematically tractable statistic has been developed to quantify the amount of potential error in any IQ score—the standard error of measurement or SEM.

**Professional and scientific definitions of the standard error of measurement (SEM) and the use of the 95% confidence band interval[11]**

35. The following authoritative definitions and descriptions explain the SEM as "the error in estimating true scores from observed scores" (VandenBos, 2007; p. 889) and describe the use of the SEM to establish a 95% confidence interval band around a person's obtained IQ score.

- *The Standards for Educational and Psychological Testing* (aka, the Joint Test Standards; AERA, APA, NCME, 2014). The standard error of measurement is "The standard deviation of an individual's observed scores from repeated administrations of a test (or parallel forms of a test) under identical conditions. Because such data cannot generally be collected, the standard error of measurement is usually estimated from group data" (p. 182).

- *American Association on Intellectual and Developmental Disabilities*

    o "The variation around a hypothetical 'true score' for the person. The standard error of measurement applies only to scores obtained from a standardized test and can be estimated from the standard deviation of the test and a measure of the test's reliability. The standard error of measurement, which varies by test, subgroup, and age group, should be used to establish a statistical confidence interval within which the person's true score

---

[11] Historical note: Cowles and Davis (1982), in an article in the American Psychological Association's *American Psychologist* flagship journal, provide one of the best historical treatments of the issues of acceptable error tolerance (e.g., SEM) in their article *On the Origins of the .05 level of Statistical Significance.* As elucidated by Cowles and Davis, the notion of an acceptable error tolerance of 5% (conversely, a 95% confidence interval) has a long history involving prominent mathematicians, statisticians, and scientists from the physical, mathematical, and social sciences, and is built upon reasoned logic, mathematical and statistical theory, and statistically tractable mathematical quantification of the characteristics of the normal curve. It has been formally established (at least from the early to mid-1950's) as the consensus level of error tolerance in most sciences that recognize the known error present in measurement and experiments.

falls...Reporting the range within which the person's true score falls, rather than only a score, underlies both the appropriate use of intellectual and adaptive behavior assessment instruments and best diagnostic practices in the field of ID. Such reporting must be a part of any decision concerning the diagnosis of intellectual disability" (AAIDD, 2010; p. 224).

o   "The standard error of measurement is a characteristic of a theoretical distribution, representing the standard deviation of scores on a given dimension for an individual across an infinite number of times of testing. That is, assuming that one could assess an individual an infinite number of times with, for example, a test of intelligence, one would not assume that the person would obtain precisely the same score on each administration. Instead, one would expect a distribution of scores, presumably a normal distribution, centered on the person's true score for intelligence. The mean of this theoretical distribution is the best estimate of the person's true score, and the standard deviation of the distribution would be the standard error of measurement. Thus, the SEM indicates that standard deviation of errors when manifest IQ scores stand for true IQ scores" (Widaman, 2015, p. 68).[12]

- *The American Psychiatric Association (APA)*

o   The consensus of the American Psychiatric Association, as reflected in the *Diagnostic and Statistical Manual of Mental Disorders—Fifth Edition* (DSM-5; 2013), is to use the 95% confidence band when addressing the range of permissible IQ scores near the score of 70, two standard deviations below the mean. DSM-5 states: "Individuals with intellectual

---

[12] The ± 5 SEM rule-of-thumb is a conservative estimate of the amount of potential error in an individual IQ score. The reliabilities used to calculate this value come from IQ test technical manuals and are based on the homogeneity (split-half or internal consistency procedures) among the items within each subtest that then contribute to the total IQ score. This is a single-point-in-time estimate of test precision or reliability and is known to be an upward bound positively biased estimate of reliability (Widaman, 2015). Reliability methods that evaluate test scores across time (test-retest reliability) are typically lower, and reflect the known variability in IQ test scores due to actual change in abilities (actual trait changes or temporary state changes) and/or the passage of time. As explained by Widaman (2015), when test-retest reliability estimates are used, a typical 95% confidence band would be approximately ± 9 points—and thus, "an IQ score in the range from 71-79 or even 71-80 might be considered adequate for the diagnosis of ID, based on the standard error of estimate" (p. 69). Furthermore, a single reliability estimate (and, thus, a single average SEM value) is used across all levels of measured abilities. Modern test development methods have informed us that the reliability/precision (as reflected in the SEM) varies across the ability scale, and typically is smaller (more precise and reliable) in the middle ability ranges and larger at the lower and upper ends of the ability scale (Widaman, 2015). It is typically larger at the lower ends of the test or ability scale as examinees operating at the lower end typically complete fewer test items—tests have a "floor" (first item) which does not allow for fuller examination of an individual's lower abilities since lower items are not available. Conversely, at the top end of a test or ability scale, there is a "ceiling" (last item). High ability individuals often could perform higher if there would be more items beyond the artificial ceiling item. Thus, examinees at the top and bottom of a test or ability scale, on average, take a smaller number of items due to the artificial floor (first item) and ceiling (last item). Reliability decreases (and SEM increases) the smaller the number of items administered to a person. For a person in the middle of the test or ability scale, there are sufficient items above and below the person's ability estimate to allow for a more complete sampling of their abilities via more items—therefore resulting in a more precise ability score estimate (higher reliability and a lower SEM). Thus, the actual SEM at the score of 70 may be larger. In this context, Widaman (2015) states that "the expert might use clinical judgement to argue for a wider uncertainty range (e.g., 71-80 might be sufficient to support a diagnosis of ID)" (p.69). Both of these measurement facts suggest that the ± 5 SEM rule-of-thumb (for the 95% confidence interval) used in this declaration is a conservative estimate and clinical judgment and methods are needed to evaluate Mr. Sanchez's IQ test scores, both individually and collectively.

disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally ±5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of *65-75 (70 ± 5)*. Clinical training and judgment are required to interpret test results and assess intellectual performance" (APA, 2013, p. 37; italics added).

o   As indicated in the *Amici Curiae* brief in *Hall v Florida* (APA et al., 2013), the American Psychiatric Association's position is also consistent with that of other national mental health organizations, including the American Psychological Association and the American Academy of Psychiatry and the Law. As stated in this amicus brief, "The SEM, in turn, allows calculation of a range of scores (typically ± 5 points), or 'confidence interval,' within which clinicians can say that the person's true IQ score lies with 95% confidence" (p. 6).

- The Federal Judicial Center

    o   The *Reference Manual on Scientific Evidence* "has become the leading reference source for federal judges for difficult issues involving scientific testimony" (p. ix). The Reference Manual, which is the product of a joint effort of the Federal Judicial Center and the National Research Council's Committee on Science, Technology, and Law, provides guidance on the nature of engineering and the social and medical sciences and "the process by which science and technical information informs legal issues" (p. ix). Thus, information and guidance summarized in the Reference Manual is relevant to *Atkins* cases, as the Reference Manual "is formulated to provide the tools for judges to manage cases involving complex scientific and technical evidence" (p. xv).

    o   The information presented in the Reference Manual relevant to acceptable error rates in science supports the use of the SEM (and the 95% confidence interval bands) when reporting Mr. Sanchez's IQ scores. The use of 95% confidence as the common standard for evaluating tolerable error in statistical evidence is demonstrated in multiple expert chapters in the Reference Manual, across a variety of diverse sciences and technologies.

    o   In the chapter Reference Guide on DNA Identification Evidence, Kaye and Sensabaug (2011) state that when interpreting DNA test results, "In general, laboratories count the occurrences in the database and take the upper end of a 95% confidence interval around the corresponding proportion" (p. 178).

    o   In the chapter Reference Guide on Statistics, Kaye and Freedman (2011), indicate that statistical estimates from samples, much like the SEM-based confidence interval band around the possible distribution of a person's IQ test scores (if a person could be tested 100's of times), bracket the obtained metric with a standard error and a confidence band. According to Kaye and Freedman (2011), "increased confidence can be attained only by widening the interval. The 95% confidence level is the most popular, but some authors use 99%, and 90% is seen on occasion" (p.245). Furthermore, when evaluating scientific evidence, "The phrase 'margin of error' generally means twice the standard error" (p. 245)— i.e., 95% confidence interval.

    o   In the chapter Reference Guide on Survey Research (Diamond, 2011), it is noted that in survey research "Traditionally, scientists adopt the 95% level of confidence" (p. 381).

    o   In the chapter Reference Guide on Medical Testimony (Wong, Gostin & Cabrera, 2011), when discussing population screening testing, Wong et al. (2011) report that "Normal ranges for biochemical tests are often based on the 95% confidence intervals in a normal healthy population" (p. 717).

**The impact of practice effects and progressive error practice effects on Mr. Sanchez's last two 2008 WAIS IQ scores.**

36. An additional statistical distortion present in Mr. Sanchez's set of IQ test scores is the scientifically recognized fact of practice effects and progressive error practice effects.

37. According to the *APA Dictionary of Psychology* (VandenBos, 2007) the practice effect is "Any change or improvement that results from practice or repetition of task items or activities" (p. 719). According to AAIDD (2010), the practice effect "refers to gains in IQ scores on tests of intelligence that result from the person being retested on the same instrument" (p. 38). Greenspan and Olley (2015), McGrew (2015b) and Watson (2015) recognize and describe practice effects as a known cause of potential score inflation in IQ test scores. This score inflation is not accounted for by the 95% SEM confidence band reported for IQ test scores.

38. The research literature on the impact of progressive error practice effects on the various Wechsler batteries is large (Kaufman, 2009; Kaufman & Lichtenberger, 2006). Progressive error practice effect (which is sometimes called reactive or retest effects in longitudinal research studies) has a significant impact on the testing of major cognitive abilities up to two to four years later (Ferrer, Salthouse, Stewart & Schartz, 2004; Rabbitt, Diggle, Smith, Holland, & McInnes, 2001; Rabbitt, Lunn, Wong & Cobain, 2008; Salthouse, 2014a, 2014b), and has been reported up to 8 to 12 years later (Rabbitt et al., 2008). The progressive error practice, reactive, or retest effect research literature continues to show that this potential systematic source of bias is an empirical fact (in the direction of higher inflated scores due to the repeated testing with the same or similar test stimuli).

39. In 2008 Mr. Sanchez was administered one of the adult Wechsler tests (WAIS-III; WAIS-IV) three different times. This repeated testing within the same year, and within the same month (last two exams), is highly unusual and not in accordance with accepted professional practice. As recommended by AAIDD (Schalock et al., 2010), "...established critical practice is to avoid administering the same intelligence test within the same year to the same individual because it will often lead to an overestimate of the examinee's true intelligence" (p.38). Practice effects from the first and second administration of the adult Wechsler test have been found to be 6 to over 7 IQ score points in periods of time ranging from 2 weeks to 6 months—a minimum of 12 months is a recommended interval before retesting with another Wechsler battery (Watson, 2010). The time between Mr. Sanchez's first WAIS-III (March, 2008) and subsequent WAIS-IV (December, 2008) was approximately 9 months—less time than the recommended minimum 12 months. Even more problematic was the time between his WAIS-IV (December, 2008) and his second WAIS-III (December, 2008)—within the same month.

Clear practice effects are demonstrated in the plot of Mr. Sanchez's Flynn effect adjusted WAIS-III/WAIS-IV Full Scale IQ scores in Figure 2. His Full Scale IQ score increased +5 points from his first Wechsler (WAIS-III; 72) to second Wechsler (WAIS-IV; 77). It increased an additional +8 points from his second Wechsler (WAIS-III; 77) to his third Wechsler (WAIS-III; 85). His total IQ score increase from his first Wechsler (WAIS-IV; 72) to his third Wechsler (WAIS-III; 85) is +13 points—almost a one standard deviation increase.



**Figure 2:  Plot of Mr. Sanchez's three adult Wechsler Full Scale IQ scores from 2008**

40. When an individual has been administered some version of the adult Wechsler scales repeatedly (more than twice), an individual's scores are subject to what is known as progressive error practice effect (Kaufman, 2009).  Mr. Sanchez's Flynn effect adjusted 2008 adult Wechsler IQs (in sequential order) are 72, 77, and 85.  The +13 point IQ score gain from the first-to-third Wechsler tests is highly suggestive of a progressive error practice effect.  Dr. Alan Kaufman, the leading scholar regarding research on the various Wechsler batteries, based on a review of the extant practice effect research, concluded that at almost all ages, practice and progressive error practice effects are, on average, 5 to 8 IQ points on the Full Scale IQ score (Kaufman, 1994).[13]  Mr. Sanchez's Full Scale IQ score gain of +13 points within a 9-month test-retest time interval is very likely due to the progressive error practice effects.[14]

---

[13] Gains *twice* as large are common in the normal population (Matarazzo & Herman, 1984). Matarazzo, Carmody, and Jacobs (1980) suggested using the rule of thumb that a gain of at least 15 points is needed in a person's Full Scale IQ from one administration to the next to denote a "significant" improvement (*i.e.*, a gain that cannot be simply attributed to the known practice effect).

[14] Changes in test content between the WAIS-III and WAIS-IV should also be considered as possibly contributing to the +5 point Full Scale IQ score increase from the first to second adult Wechsler examinations (McGrew, 2010b).  However, this is not likely an important factor in this case. McGrew (2010b) reported that the primary cognitive ability domains (fluid reasoning, visual-spatial processing; processing speed, working memory and quantitative reasoning) "...were approximately the same in proportional contribution to the WAIS-IV Full Scale IQ as was in the WAIS-III (p. 96). This conclusion is supported by a WAIS-III/WAIS-IV Full Scale IQ correlation of .94 in the WAIS-IV technical manual (Wechsler, 2008). Drozdick, Wahlstrom, Zhu and Weiss (2012) concluded that "despite the changes made to the WAIS-IV, the correlations with the WAIS-III are high, suggesting that they measure closely related constructs" (p. 2012).

41. Additional support for the hypothesis that Mr. Sanchez's second 2008 WAIS-III IQ test score is likely an inflated estimate of his general intelligence is the scientific fact that practice effects and progressive error practice effects are greatest on the Wechsler nonverbal (Performance) subtests and smaller on the Wechsler Verbal subtests.[15] The Wechsler's intelligence scales are divided into two broad types of subtests: (a) the Verbal Scale (Verbal Comprehension Index on the WAIS-III and WAIS-IV), which comprises school-like tasks such as defining words, solving oral arithmetic problems, and answering factual questions (e.g., What is the capital of Spain? Who is Bill Gates?); and (b) the Performance (nonverbal) Scale, which uses blocks, puzzles, and a variety of pictures and designs to measure the ability to solve novel problems—the kind of skills that are not taught in school. The nonverbal tests are intended to measure the ability to solve new problems, but that novelty wears off fast. The second time a Wechsler test is administered, the tasks are no longer novel and, therefore, they are no longer measuring the kind of intelligence that Dr. Wechsler intended to measure with the Performance Scale.

42. This cumulative and differential (verbal vs nonverbal) increasing score bias is evident across Mr. Sanchez's three adult Wechsler examinations in 2008. As can be seen in Figure 2[16], Mr. Sanchez's Perceptual Organization/Reasoning Index (nonverbal) scores increased over the three examinations from 91 to 96 (+5), then from 96 to 107 (+11)—a total first-to-third administration increase of +16 points, which is a slightly-over one standard deviation positive change. His Processing Speed Index (nonverbal) scores increased over the three examinations from 71 to 74 (+3), then from 74 to 81 (+7)—a total first-to-third administration increase of +10 points—approximately 2/3 of a standard deviation positive change.

---

[15] Earlier editions of the adult Wechslers (WAIS, WAIS-R) had a standard Verbal/Performance (nonverbal) organizational score structure. This changed to a Verbal Comprehension, Perceptual Organization/Reasoning, Working Memory, and Processing Speed organizational structure in the WAIS-III and WAIS-IV. Although not a perfect match, the WAIS-III/IV Perceptual Organization/Reasoning and Processing Speed Index scores correspond to the old Performance IQ scale while the Verbal Comprehension Index and the Working Memory Index scores (especially the former) correspond to the earlier Verbal IQ scale (Drozdick et al., 2012; Flanagan, McGrew & Ortiz, 2000).

[16] When comparing and discussing the four Wechsler index scores, the obtained scores, and not Flynn effect adjusted scores, are used. The extant norm obsolescence research literature (McGrew, 2015a) does not support differential Flynn effect adjustments for the subordinate composite scores that comprise the Full Scale IQ. In these comparisons the important metric is the magnitude of the relative increase in index scores from one test administration to the other.



**Figure 2: Plot of Mr. Sanchez's three adult Wechsler Index scores from 2008**

43.  Dr. Alan Kaufman describes the progressive error practice effect on the Wechsler Performance scale (corresponding to Perceptual Organization/Reasoning and Processing Speed Indices in the WAIS-III/IV) tests as follows:

> It is well known that Wechsler's Performance IQ has a huge practice effect on children, adolescents, or adults who are tested twice. Administer the test a second time after a few months have gone by, and IQs will go up just from the practice of taking the test previously.  But the IQ gains are not equal for the Verbal and Performance Scales. On the old WAIS, for example, the average gains were 8 points in Performance IQ and 2 points in Verbal IQ (Matarazzo, Carmody, & Jacobs, 1980). The Performance Scale is designed to measure a person's ability to solve *novel* problems that are not taught in school. Administer the nonverbal subtests a second time and they stop being novel. Administer them 5 or 10 times, even over 20 years, and they are more like old friends than novel problems. In longitudinal research, this type of error is known as *progressive error* (Kaufman, 2009, p. 231; italics in original).

> Solving new problems *(Gf)*, processing information visually *(Gv)*, and handling information rapidly *(Gs)* are measured the 1st time people are tested, and maybe even the 2nd time if only a few years have elapsed.[17] But by the 3rd or 5th or 10th time, the Performance IQ is no longer measuring the abilities that Wechsler intended to measure when he developed his subtests (Kaufman, 2009, p. 232; italics in original).

---

[17] *Gf* (fluid reasoning), *Gv* (visual-spatial processing, and *Gs* (processing speed) italic notation references the nomenclature for the consensus human intelligence ability taxonomy of cognitive abilities (McGrew, 2010b; Watson, 2010).

Mr. Sanchez's successive nonverbal (Perceptual Organization/Reasoning [*Gf/Gv*] and Processing Speed [*Gs*]) index scores plotted in Figure 2 are consistent with the scientific evidence regarding the Wechsler test practice and progressive error practice effects.

On one of the Performance subtests (Picture Completion), Mr. Sanchez's scaled scores (average or mean = 10 with standard deviation of 3) jumped, from his first-to-third adult Wechsler examinations, from 5 to 12—2.4 times higher on the third than on the first examination. These Picture Completion score changes would be equivalent (when transformed to the Full Scale IQ score scale) to an increase in IQ scores from 75 to 110—an increase equivalent to 35 IQ points.

44. Additional support for the inflationary impact on IQ test scores due to the repeated testing of Mr. Sanchez with the adult Wechsler tests from 1992 to 2008 is a much smaller practice and progressive error practice effect on Mr. Sanchez's Verbal Comprehension Index scores. As reported in Figure 2, his Verbal Comprehension Index scores only increased from 70 to 72 (+2), then from 72 to 74 (+2)—a total increase from first-third adult Wechsler increase of +4 points—slightly less than 1/3 standard deviation. Substantially smaller Verbal Comprehension Index score changes (total of +4 points), compared to significantly larger Perceptual Organization/Reasoning (+16) and Processing Speed (+10) Index score changes is consistent with the extant practice effect research literature (Kaufman, 1994).

45. Collectively there is strong probability that the repeated testing of Mr. Sanchez with the WAIS-III and WAIS-IV within a time period of 9 months in 2008 introduced systematic practice effect and progressive error practice effect upward score bias in the two December 2008 IQ test administrations. Currently there is no scientific or professional based guideline for "adjusting" scores downward due to practice effects (as there is for the Flynn effect). One must consider the impact of these practice and progressive effects clinically in rendering a professional judgment regarding Mr. Sanchez's general intellectual ability.

46. A real +13 point Full Scale IQ score change (reflecting a real change in underlying general intelligence) over a 9-month period (first-to-third examinations) is inconsistent with the known stability of general intelligence over such a short period of time in adults. Mr. Sanchez's final WAIS-III test score (Flynn effect adjusted Full Scale IQ of 85; 80 to 90 range as per the 95 percentile confidence band) is an invalid score and should *not* be considered when formulating a clinical determination of whether Mr. Sanchez is, or is not, intellectual disabled.

## Conclusion

It is my expert opinion, which I provide with a reasonable degree of scientific certainty, that consistent with prevailing standards in the scientific and clinical communities, Mr. Sanchez's three most valid IQ test scores from 1992, March 2008, and early December 2008 (when bounded by a 95% confidence interval and when recognizing the impact of norm obsolescence and practice effects and progressive error practice effects on his IQ test scores) meet or approximate the two standard deviations below the mean IQ diagnostic score range for intellectual disability, such that a complete clinical evaluation, including consideration of adaptive behaviour, must be made in order to determine whether he meets criteria for a diagnosis of intellectual disability.

It is also my expert opinion that any reasonably competent psychologist familiar with psychological and IQ testing consulting with Mr. Sanchez's trial counsel could and would have reached these conclusions in 2009, at the time of Mr. Sanchez's capital trial.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of April, 2016.

Kevin S. McGrew, Ph.D.
Educational Psychologist
Director
Institute for Applied Psychometrics

19
A-000795

## References

American Association on Intellectual and Developmental Disabilities. (2010). *Intellectual disability: Definition, classification, and systems of supports—11th Edition.* Washington, DC:  Author.

American Educational Research Association, American Psychological Association, & National Council on Measurement in Education (2014). *Standards for Educational and Psychological Testing.*  Washington, DC:  Author.

American Psychiatric Association (2013). *Diagnostic and statistical manual of mental disorders—Fifth Edition.*  Washington D.C.:  Author.

Basso, M. R., Carona, F. D., Lowery,N. & Axelrod (2002).  Practice effects of the WAIS-III across 3- and 6-month intervals. *The Clinical Neuropsychologist, 16 (1)*, 57-63.

Cowles, M., & Davis, C. (1982). On the origins of the .05 level of statistical significance. *American Psychologist, 37(5),* 553.

Cunningham, M. D. & Tassé, M. J. (2010).  Looking to science rather than convention in adjusting IQ scores when death is at issue. *Professional Psychology: Research and Practice, 45 (5)*, 413-419.

Diamond, S. S. (2011).  Reference guide on survey research (p. 359-423), In the *Reference manual on scientific evidence—Third Edition.*  Federal Judicial Center and National Research Council of the National Academies.  Washington, DC:  National Academies Press.

Drozdick, L. W., Wahlstrom, D., Zhu, J., & Weiss, L. G. (2012). The Wechsler Adult Intelligence Scale–Fourth Edition and Wechsler Memory Scale—Fourth Edition.  In D. P. Flanagan & P. L. Harrison (Eds.), *Contemporary Intellectual Assessment: Theories, Tests and Issues—Third Edition* (pp. 197-223), New York, Guilford Press.

Federal Judicial Center (2011).  *Reference manual on scientific evidence—Third Edition.*  Federal Judicial Center and National Research Council of the National Academies.  Washington, DC:  National Academies Press.

Feldt, L. S. & Brennan, R. L. (1989).  Reliability.  In R. L. Linn (Ed.), *Educational measurement—Third edition.*  New York:  American Council on Education:  Macmillan Publishing Company.

Ferrer, E., Salthouse, T.A., Stewart, W., & Schwartz, B. 2004. Modeling age and retest processes in longitudinal studies of cognitive abilities. *Psychology and Aging, 19,* 243-259.

Fletcher, J., Stuebing, K., & Hughes, L. (2010).  IQ scores should be corrected for the Flynn effect in high stakes decisions. *Journal of Psychoeducational Assessment, 28*(5), 469-473.

Flanagan, D. P., McGrew, K. S., & Ortiz, S. O. (2000).  *The Wechsler Intelligence Scales and Gf-Gc theory.  A contemporary approach to interpretation.*  Boston.  Allyn & Bacon.

Flynn, J. R. (1985). Wechsler Intelligence Tests: Do we really have a criterion of mental retardation? *American Journal of Mental Deficiency, 90(3),* 236-244.

Flynn, J. R. (2000).  The hidden history of IQ and special education - Can the problems be solved? *Psychology Public Policy and Law, 6(1)* 191-198.

Flynn, J. R. (2009).  The WAIS-III and WAIS-IV: *Daubert* motions favor the certainly false over the approximately true. *Applied Neuropsychology, 16,* 98-104.

Flynn, J. R. (2010).  Problems with IQ gains: The huge Vocabulary gap.  *Journal of Psychoeducational Assessment,* *28 (5),* 412-433.

Green, B. F. (1981). In defense of measurement. *American Psychologist, 33,* 1001-1011.

Greenspan, S. (2006). Issues in the use of the "Flynn effect" to adjust IQ scores when diagnosing MR. *Psychology in* *Mental Retardation and Developmental Disabilities, 31*(3), 3-7.

Greenspan, S. (2007). Flynn-adjustment is a matter of basic fairness: Response to Roger B. Moore, Jr. *Psychology in* *Mental Retardation and Developmental Disabilities, 32*(3), 7-8.

Greenspan, S. & Olley, G. (2015).  Variability of IQ test scores, In Polloway, E. (Ed.), *The Death Penalty and* *Intellectual Disability (pp. 141-153).*  Washington, DC:  American Association on Intellectual and Developmental Disabilities.

Gresham, F. M. (2009). Interpretation of intelligence test scores in Atkins cases: Conceptual and psychometric issues, *Applied Neuropsychology, 16 (2),* 91-97

Gresham, F., & Reschly, D. J. (2011).  Standard of practice and Flynn effect testimony in death penalty cases. *Intellectual and Developmental Disabilities, 49*(3), 131-140.

Hagan, L., Drogin, E., & Guilmette, T. (2010). IQ scores should not be adjusted for the Flynn effect in capital punishment cases. *Journal of psychoeducational Assessment, 28*(5), 474-476.

Kaufman, A. S. (1990). *Assessing adolescent and adult intelligence.*  Boston:  Allyn & Bacon.

Kaufman, A. S. (1994).  Practice effects.  In R.J. Sternberg (Ed.), *Encyclopedia of Intelligence* (Vol. II) (pp. 828-833). New York:  Macmillan.

Kaufman, A. S. (2009). *IQ testing 101.* New York:  Springer Publishing.

Kaufman, A. (2010a).  "In what way are apples and oranges alike?":  A Critique of Flynn's interpretation of the Flynn Effect. *Journal of Psychoeducational Assessment, 28*(5), 382-398.

Kaufman, A. (2010b).  Looking through Flynn's rose-coloured scientific spectacles. *Journal of Psychoeducational* *Assessment, 28*(5), 494-505

Kaufman, A. S., & Lichtenberger, E. O. (2006). *Assessing adolescent and adult intelligence* (3rd  ed.).  New York: Wiley.

Kaufman, K., & Weiss, L. (2010).  Guest editor's Introduction to the special issue of JPA on the Flynn Effect. *Journal* *of Psychoeducational Assessment, 28(5), 379-381.*

Kaye, D. H. & Freedman, D. A. (2011).  Reference guide on statistics (p. 211-302), In the *Reference manual on* *scientific evidence—Third Edition.*  Federal Judicial Center and National Research Council of the National Academies. Washington, DC:  National Academies Press.

Kaye, D. H. & Sensabaugh, G. (2011).  Reference guide on DNA identification evidence (p. 129-210), In the *Reference manual on scientific evidence—Third Edition.*  Federal Judicial Center and National Research Council of the National Academies. Washington, DC:  National Academies Press.

Lynn, R. (2013).  Who discovered the Flynn Effect?  A review of early studies of the secular increase in intelligence. *Intelligence, 41*(6), 765-769.

Matarazzo, J. D., Carmody, T. D., & Jacobs, L. D. (1980). Test-retest reliability and stability of the WAIS: A literature review with implications for clinical practice. *Journal of Clinical Neuropsychology*, 2, 89-105.

Matarazzo, J. D., & Herman, D. O. (1984). Base rate data for the WAIS-R: test-retest stability and VIQ-PIQ differences. *Journal of Clinical Neuropsychology*, 6, 351-366.

McGrew, K. (2012). *Applied Psychometrics 101 #11: Problems with the 1960 and 1986 Stanford-Binet IQ scores in Atkins MR/ID death penalty cases.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2015a). Norm obsolescence: The Flynn effect. In Polloway, E. (Ed.), *The Death Penalty and Intellectual Disability* (pp. 155-169). Washington, DC: American Association on Intellectual and Developmental Disabilities.

McGrew, K. (2015b). Intellectual functioning. In Polloway, E. (Ed.), *Intellectual disability and the death penalty* (pp. 85-111). Washington, DC: American Association on Intellectual and Developmental Disabilities.

McGrew, K. (2010c). The Flynn effect and Its Critics: Rusty Linchpins and "Lookin' for *g* and Gf in Some of the Wrong Places." *Journal of Psychoeducational Assessment, 28 (5)*, 448-468.

Polloway, E. (2015). *The Death Penalty and Intellectual Disability*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Rabbitt, P., Diggle, P., Smith, D., Holland, F., & McInnes, L. (2001). Identifying and separating the effects of practice and of cognitive ageing during a large longitudinal study of elderly community residents. *Neuropsychologia, 39*, 532–543.

Rabbitt, P., Lunn, M., Wong, D., & Cobain, M. (2008). Age and ability affect practice gains in longitudinal studies of cognitive change. *Journal of Gerontology: Psychological Sciences, 63B* (4), 235–240.

Rodgers, J. L. (1999). A critique of the Flynn effect: Massive IQ gains, methodological artifacts, or both? *Intelligence, 26*(4), 337-356.

Reynolds, C., Niland, J., Wright, J., & Rosenn, M. (2010). Failure to apply the Flynn correction in death penalty litigation: Standard practice of today maybe, but certainly malpractice of tomorrow. *Journal of Psychoeducational Assessment, 28 (5)*, 477-481.

Salthouse, T. A. (2014a). Frequent Assessments May Obscure Cognitive Decline. *Psychological Assessment.* Advance online publication. http://dx.doi.org/10.1037/pas0000007

Salthouse, T. A. (2014b). Aging cognition unconfounded by prior test experience. *Journal of Gerontology: Psychological Sciences.* doi: 10.1093/geronb/gbu063

Sattler, J. (2001). *Assessment of Children: Cognitive Applications—Fourth Edition.* San Diego, CA: Jerome M. Sattler, Publisher.

Schalock, R. L., Buntinx, W. H. E., Borthwick-Duffy, S., Luckasson, R., Snell, M. E., Tassé, M. J., & Wehmeyer, M. L. (2007). *User's Guide Mental Retardation: Definition, Classification, and Systems of Support—10th Edition. Applications for Clinicians, Educators, Disability Program Managers, and Policy Makers*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Schalock, R. L., Luckasson, R., Bradley V., Buntinx, W., Lachapell, Y., Shogren, K. A., Snell, M. E., Thompson, J. R., Tassé, Verdugo-Alonso & Wehmeyer, M . L. (2012). *User's guide intellectual disability: Definition, classification, and systems of supports—11th Edition*. Washington, DC: American Association on Intellectual and Developmental Disabilities.

Sternberg, R. (2010). The Flynn effect: So What? *Journal of Psychoeducational Assessment, 28 (5),* 434-440.

Trahan, L. H., Stuebing, K. K., Fletcher, J. M., & Hiscock, M. (2014). The Flynn effect: A Meta-Analysis. *Psychological Bulletin.* Online First Publication, June 30. 2014. http://dx.doi.org/10.1037/a0037173.

Tellegen, A. , & Briggs, P. (1967). Old wine in new skins. Grouping Wechsler subtests into new scales. *Journal of Consulting Psychology, 31*, 499-506.

Vandenbos, G. (2007). *APA Dictionary of Psychology*. Washington, DC: American Psychological Association.

Watson, D. (2015). Intelligence testing. In Polloway, E. (Ed.), *The Death Penalty and Intellectual Disability* (pp. 113-140). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Wechsler, D. (1981). *WAIS-R Manual: Wechsler Adult Intelligence Scale—Revised.* San Antonio, TX: The Psychological Corporation.

Weiss, L. G. (2010). Considerations on the Flynn effect. *Journal of Psychoeducational Assessment, 28 (5),* 482-493.

Widaman, K. (2015). Concepts of measurement. In Polloway, E. (Ed.), *The Death Penalty and Intellectual Disability* (pp. 55-76). Washington, DC: American Association on Intellectual and Developmental Disabilities.

Wong, J. B., Gostin, L. W., & Cabrera, O. A. (2011). Reference guide on medical testimony (p. 687-745), In the *Reference manual on scientific evidence—Third Edition.* Federal Judicial Center and National Research Council of the National Academies. Washington, DC: National Academies Press.

Zhou, X., Zhu, J., & Weiss, L. (2010). Peeking inside the "blackbox" of the Flynn effect: Evidence from three Wechsler instruments. *Journal of Psychoeducational Assessment, 28 (5),* 399-411.

K. McGrew CV (07-28-15)                                                                                       p. 1

**Kevin S. McGrew, Ph.D.**

Educational Psychologist                          Phone:  320-363-8566
1313 Pondview Lane E                              Email:  iap@earthlink.net
St. Joseph, MN ´56374                            Web page:  www.themindhub.com

---

## CURRENT POSITIONS

**Director: The Institute for Applied Psychometrics (IAP).** IAP ₗₗc is a private research organization, founded by Kevin McGrew, devoted to the application of educational, psychological, measurement and statistical procedures to issues and problems in psychology, education, and human exceptionalities/disabilities. The goal of IAP is to provide a bridge between psychological, measurement, and statistical theory/methods and applied practice in psychology and education. IAP has particular research interests in: (a) theories and measurement of human intelligence, personal competence and adaptive behavior, (b) the application of psychological and educational measurement principles and techniques to the development and interpretation of psychological and educational assessment instruments, (c) the Cattell-Horn-Carroll (CHC) Theory of Cognitive Abilities, (d) narrowing the theory-practice gap in educational and psychological assessment, (c) the influence of non-cognitive (conative) characteristics on learning and human performance, (d) psychological assessment practices in the identification and classification of individuals with intellectual and learning disabilities and other exceptionalities, (e) the application of emerging neurotechnologies to learning and cognitive performance, and (f) psychometric issues related to the identification of individuals with intellectual disabilities in Atkins MR/ID death penalty cases. The *practical* application of *psychometrics* to educational, psychological and legal problems is a unique IAP focus. (1998 to present). Additional information can be found at http://www.themindhub.com

**Intelligence Theory and Test Development Consultant.** Dharma Bermakna Foundation, Indonesia. Serving as intelligence theory and testing consultant to Dharma Bermakna Foundation and Universatas Gadjah Mada (UGM) for the development of the Indonesian AJT Cognitive Assessment Development Project. Primary duties include (a) conducting training regarding the Cattell-Carroll-Horn (CHC) theory of intelligence with AJT project staff, (b) serving as member of the AJT Cognitive Assessment Quality Assurance Project Team, (c) serving as member of AJT project Independent Review Panel, and (d) introducing "best practices" in psycho-educational assessment to AJT project staff. 2014 (March) to present.

**Visiting Professor: University of Minnesota, Educational Psychology.** A guest lecturer and doctoral student advisor in the School Psychology graduate program. Measurement consultant to various federal grants operated by the National Center of Educational Outcomes (NCEO) and Institute on Community Integration (ICI). Currently providing statistical and measurement consultation to the National Center on Educational Outcomes (NCEO) and the National Accessible Reading Assessment Projects (NARAP). (Sept. 2000 to present).

**Research Director: The Woodcock—Muñoz Foundation (WMF).** Responsible for directing all internal and external research projects for WMF, a private, non-profit operating foundation that supports the advancement of contemporary cognitive assessment. The WMF engages in programs of instructional support to professional preparation programs, research concerning the abilities of individuals with diagnosed exceptionalities, and closely-related educational and research projects. (Spring 2005 to spring, 2015). Web page. http://www.woodcock-munoz-foundation.org/index.html

**Associate Director: Measurement Learning Consultants (MLC).** Provide statistical and measurement expertise assistance, as well as co-author test development duties (*Woodcock—Johnson Battery III*) related to development of applied psycho-educational assessment instruments produced by Dr. Richard Woodcock's private research test development corporation (MLC). (April, 2008 to spring, 2015).

K. McGrew CV (07-28-15)                                                                p. 2

**Director of Science and Research: Interactive Metronome.** External (non-staff) consultant position to Interactive Metronome, a neurotechnology company providing rehabilitation interventions for a variety of clinical neurological disorders. Web page: http://www.interactivemetronome.com/

## EDUCATION

**University of Minnesota**: Ph.D. - *Educational Psychology* (1989)
**Moorhead State University**: BA (cum laude) - *Psychology* (1974); MS.Ed. - *School Psychology* (1975)

## UNIVERSITY EXPERIENCE

**University of Minnesota**: Visiting Professor in Department of Educational Psychology, School Psychology program (Sept. 2000 to present). Affiliate Member of University of Minnesota Graduate School (Dec. 2008 to present)

**St. Cloud State University**: St. Cloud, MN. Professor in Department of Applied Psychology. Primarily taught educational psychology courses (Sept. 1990 to 2000).

## PROFESSIONAL EXPERIENCES *(select list)*

**Test Development/Validation Expert:** Invited participant /consultant for Workshop on Measuring Critical Analytic Thinking skills for Intelligence Analysts, Office of the Director of National Intelligence (ODNI), MITRE Corporation, McLean, Va. (December 5-5, 2012).

**Measurement Consultant/Expert Witness:** Have served as consulting expert, via declarations or testimony, to the courts regarding the measurement of intelligence and psychometric issues relevant to intellectual assessment in *Atkins* (Atkins v Virginia, 2001) death penalty cases (capital punishment cases involving individuals with intellectual disabilities). (2009-current).

**Measurement Consultant:** Completed all measurement and statistical work for the Children's Psychological Processing Scale, http://www.psychprocesses.com/ (2010-2011).

**Measurement Consultant:** Full-time measurement and statistical consultant to Dr. Richard Woodcock (Measurement Learning Consultants) and Riverside Publishing on the revision/renorming of the Woodcock-Johnson Psycho-Educational Battery-III (WJ-III). (1996-2000; while on four year leave from SCSU).

**Professor:** Department of Applied Psychology, St. Cloud State University, St. Cloud, MN (1990 to 2000). Primary duties included teaching educational psychology courses. Through a cooperative agreement with the University of Minnesota, 33%-66% release time devoted to serving as a Senior Researcher and Management team member with the National Center on Educational Outcomes (NCEO) and a Research Associate with the Institute on Community Integration from 1990 to 1996.

**School Psychologist/Research Associate:** 25% School Psychologist with St. Cloud Community Schools (ISD 742). 75% shared research/grant development position with St. Cloud Community Schools, University of Minnesota's Institute on Community Integration, and University of Minnesota's University Affiliated Program (1987 to 1990).

**Research Fellow/Assistant:** University of Minnesota, Minneapolis, MN (1985 to 1987).

**School Psychologist/Child Study Coordinator:** St. Cloud Community Schools (ISD 742), St. Cloud, MN. (1977 to 1985). On leave of absence from 1985 to 1987.

**School Psychologist:** Area Education Agency 12, Onawa Service Center, Onawa, Iowa (1975 to 1977).

A-000801

K. McGrew CV (07-28-15)                                                                                      p. 3

## PROFESSIONAL AFFILIAITONS/JOURNAL BOARDS

### Professional Affiliations

American Association on Intellectual and Developmental Disabilities (AAIDD)
- AAIDD Death Penalty Task Force (member)

American Psychological Association (APA)
- Division 5:  Division for Quantitative and Qualitative Methods (member)
- Division 16:  School Psychology (member)
- Division 33: Intellectual and Developmental Disabilities (member)
- Division 41: American Psychology-Law Society (member)

Association for Psychological Science (APS)
National Association of School Psychologists (NASP)
International Society of Intelligence Research (ISIR)

### Professional Journal Review and Board Activity

Applied Psychological Measurement:  Ad hoc reviewer (July-Aug, 2010).
American Journal on Intellectual and Development Disabilities:  Ad hoc reviewer (Dec, 2009)
Baltic Journal of Psychology:  Ad hoc reviewer (Sept, 2009)
Intelligence:  Ad hoc reviewer (February, 2009 to present)
Journal of Psychoeducational Assessment:  Editorial advisory board member (January, 1985 to 1998; Spring 2010 to current)
Learning and Individual Differences: Ad hoc reviewer (January-March, 2015)
Psychology in the Schools:  Co-guest editor, special issue on the Cattell-Horn-Carroll (CHC) theory and intellectual assessment (2008-2009)
School Psychology Quarterly:  Ad hoc reviewer (January, 1996 to 2004)
School Psychology Review:   Editorial advisory board member (January, 1988 to June, 1990); Ad hoc reviewer (January, 1996 to 2004).

## ADVISORY BOARDS/SPECIAL CONSULTATIONS *(select list)*

Member of AAIDD MR/ID Atkins Death Penalty Task Force.  (2010 to current).

Measurement consultant to University of Minnesota, Institute on Community Integration, federally funded National Longitudinal Transition Study (NLTS 2012).

Expert consultant or witness for nine state and federal circuit court cases regarding psychometric issues in the identification of individuals with mental retardation/intellectual disabilities related to federal Atkins MR/ID death penalty habeas corpus cases.  (2009 to present)

Measurement and research consultant with the National Center on Educational Outcomes (NCEO), University of Minnesota (2002 to present).

Test Development Expert consultant for National Accessible Reading Assessment Project (NARAP), University of Minnesota (U of M/IAP subcontract; Fall 2004 to 2010).

Independent reviewer of pre-publication draft of Mental retardation:  Determining eligibility for social security benefits.  National Academy of Science, National Research Council (2002).

Consultant to Riverside Publishing on the revision plans for the Standard-Binet Intelligence Scale (5th Edition) (1996 to 2000).

Consultant to the Psychological Corporation for special analyses of the Comprehensive Behavior Rating Scale for Children norm data (1988-1989).

Consultant to CTB/McGraw-Hill for the Tests of Cognitive Skills (2nd Edition).  Content review of items (1989).

K. McGrew CV (07-28-15)                                                                          p. 4

Consultant to <u>Dr. Richard Woodcock (Measurement Learning Consultants)</u> and <u>Developmental Learning Materials (DLM)</u> on the <u>revision of the Woodcock-Johnson Psycho-Educational Battery</u> (WJ-R, 1989). Calculated the norms, performed the majority of the statistical analyses, and coauthored the WJ-R technical manual. (1986-1991).

Consultant to <u>Dr. Richard Woodcock, (Measurement Learning Consultants)</u> for select data analyses for the <u>Woodcock Language Proficiency Batteries</u> (October 1983 to September 1984) and the <u>Woodcock Reading Mastery Test-Revised</u> (Summer, 1986).

Measurement and research consultant to the <u>Woodcock-Munoz Foundation</u> regarding grant proposals and measurement work on the <u>International Editions of the Woodcock-Johnson assessment instruments</u> (2002 to 2004).

Advisory Committee Member for the <u>National Center on Student Progress Monitoring</u> (NCSPM), American Institutes for Research (AIR). April, 2004 to November 2008.
Invited participant and presenter at <u>U. S. Department of Education, Office of Special Education Programs</u> (OSEP) meetings on <u>Assessment and Students with Disabilities</u> (January 21, 2003) and <u>Alternative Assessments and Alternate Achievement Standards</u>, Washington, DC (July 24, 2003).

Measurement consultant to <u>Stanford Research Institute</u> (SRI) for the U. S. Department of Education, Office of Special Education Programs (OSEP) <u>national Special Education Elementary Longitudinal Study</u> (SEELS) (1999 to 2007).  Member of SEELS Direct Assessment Work Group.

Member of the <u>Stanford Research Institute</u> (SRI) Technical Work Group and ongoing consultation for the U. S. Department of Education, Office of Special Education Programs (OSEP) <u>National Longitudinal Transition Study-2 (NLTS2)</u> (1999 to 2003).

Consultant and member of <u>Stanford Research Institute</u> (SRI) Resource Panel on Disability and Special Education for <u>NCES Early Childhood Longitudinal Study</u> (ECLS) (1997).

Consultant to the <u>National Academy of Education</u> (NAE) panel on the evaluation of the <u>National Assessment of Educational Assessment Program (NAEP) Trial State Assessment Project</u> regarding a special study on the exclusion of students with disabilities.  March 14, 1994 and May 26, 1995, Washington, D.C.

Educational research and measurement consultant to <u>Interactive Metronome</u> (IM), a privately held neurotechnology company.  IM is a proprietary based neurotechnology developed to help children with learning and developmental disorders as well as to treat adult neuro rehabilitation patients.  Served as external consultant from 2004 to 2007.  Became a member of the <u>IM Scientific Advisory Board</u> in 2007 (to present).

Evaluation consultant to <u>Sherburne and Northern Wright Special Education Cooperative</u>.  Program evaluator for three-year project to evaluate the effectiveness of special education services (1994 to 1997).

Measurement consultant to <u>Rum River Special Education Cooperative</u> (MN) for two-year federally sponsored study to develop reading and writing norms for the <u>Minnesota Braille Skills Inventory</u> (MBSI) (1995 - 1997).

Measurement consultant to the <u>Rum River Special Education Cooperative</u> for the analysis of the <u>Braille Assessment Inventory</u> (BAI) (1994).

Consultant to numerous school systems, special education cooperatives/units, and state and national organizations/agencies.  Have provided national and international workshops on special education assessment and decision-making practices and program evaluation.

## AWARDS/RECOGNITIONS

**Distinguished Alumni Award**.  Minnesota State University—Moorhead, <u>Psychology Department</u>, September 17, 2010.  First award presented by the MSUM Psychology department.

A-000803

**Outstanding Faculty Award.** St. Cloud State University, May, 1991.

**Lifetime Achievement Award** (2014-2015).  Minnesota Association of School Psychologists (MSPA).

**Lifetime Achievement Award** (2015).  KIDS, Inc. – School neuropsychology training and resources.

**Recognition as "top contributor" to school psychology literature (1987-1995).**  Ranked as the 17th top contributor to all school psychology literature from 1987-1995.  Tied for 2nd place for assessment-related articles. [Little, S. (1997).  Graduation education of the top contributors to the school psychology literature.  1987-1995. School Psychology International, 18, 15-27.]

## PROFESSIONAL BLOGS AND WEB PAGES

The MindHub[TM] – www.themindhub.com
The Institute for Applied Psychometrics (IAP) – www.iapsych.com
Intelligent Insights on Intelligence Theories and Tests (aka IQ's Corner) – www.iqscorner.com
Intellectual Competence and the Death Penalty (ICDP) – www.atkinsmrdeathpenalty.com
The Brain Clock – www.brainclock.net

## SCHOLARLY PRODUCTIVITY SUMMARY

### JOURNAL, BOOK AND BOOK CHAPTER PUBLICATIONS (organized by topics)

[Note.  * designates peer-reviewed journal article]

Intelligence Testing and Theories

McGrew, K. (2015b).  Norm obsolescence: The Flynn Effect.  In Polloway, E. (Ed.), *The death penalty and intellectual disability* (p. 155-169).  Washington, DC:  American Association on Intellectual and Developmental Disabilities.

*Taub, G., & McGrew, K.  (2014). The Woodcock–Johnson Tests of Cognitive Abilities III's Cognitive Performance Model: Empirical support for intermediate factors within CHC theory.  *Journal of Psychoeducational Assessment, 32* (3), 187-201.

McGrew, K. (2015a).  Intellectual functioning.  In Polloway, E. (Ed.), *The death penalty and intellectual disability* (p. 85-111), Washington, DC:  American Association on Intellectual and Developmental Disabilities.

*Cormier, D.C., McGrew, K.S., Ysseldyke, J.E. (2014). The influences of cultural loading and linguistic demand on cognitive test scores. Journal of Psychoeducational Assessment,  0, 0-0. DOI: 10.1177/073428291453601 2

McGrew, K. S. (2012, September). *Implications of 20 Years of CHC cognitive-achievement research: Back-to-the-future and beyond CHC.* Paper presented at the Richard Woodcock Institute, Tufts University, Medford, MA.

*Kaufman, S., Lui, X., Reynolds, M., McGrew, K., & Kaufman, A. (2012).  Are cognitive g and academic g one and the same g? An exploration across the life span on the Woodcock-Johnson and Kaufman tests. *Intelligence, 20,* 123-138.

*Cormier, D., McGrew, K., & Evans, J. (2011).  Quantifying the "degree of linguistic demand" in spoken intelligence test directions. *Journal of Psychoeducational Assessment, 29(6),* 515 –533.

Schneider, W. J., & McGrew, K. (2012).  The Cattell-Horn-Carroll model of intelligence. In, D. Flanagan & P. Harrison (Eds.), *Contemporary Intellectual Assessment: Theories, Tests, and Issues (3rd ed.)* (p. 99-144). New York: Guilford.

*McGrew, K. (2010).  The Flynn Effect and its critics: Rusty linchpins and—lookin' for g and *Gf* in some of the wrong places. *Journal of Psychoeducational Assessment, 28(5),*448–468

K. McGrew CV (07-28-15)                                                                          p. 6

*McGrew, K. & Wendling, B. (2010). CHC cognitive-achievement relations: What we have learned from the past 20 years of research. *Psychology in the Schools, 47(7)*, 651-675.

*Newton, J. & McGrew, K. (2010). Introduction to the special issue: Current research in Cattell-Horn-Carroll-based assessment. *Psychology in the Schools, 47(7)*, 621-634.

*Hale, J., Alfonso, V., Berninger, V., Bracken, B., Christo, C., Clark, E., Cohen, M., Davis, A., Decker, S., Denckla, M., Dumont, R., Elliott, C. Feifer, S., Fiorello, C., Flanagan, D., Fletcher-Janzen, E., Geary, D., Gerber, M., Gerner, M., Goldstein, S., Gregg, N., Hagin, R., Jaffe, L., Kaufman, A., Kaufman, N., Keith, T., Kline, F., Kochhar-Bryant, C., Lerner, J., Marshall, G., Mascolo, J., Mather, N., Mazzocco, M., McCloskey, G., **McGrew, K.,** Miller, D., Miller, J., Mostert, M., Naglieri, J., Ortiz, S., Phelps, L., Podhajski, B., Reddy, L., Reynolds, C., Riccio, C., Schrank, F., Schultz, E., Semrud-Clikeman, M., Shaywitz, S., Simon, J., Silver, L., Swanson, L., Urso, A., Wasserman, T., Willis, J., Wodrich, D., Wright, P., & Yalof, J. (2010). Critical Issues in response-to-intervention, comprehensive evaluation, and specific learning disabilities identification and intervention: An expert white paper consensus. *Learning Disability Quarterly*, 33, 223-236.

*Floyd, R. G., McGrew, K. S., Barry, A., Rafael, F. & Rogers, J. (2009). General and specific effects on Cattell–Horn–Carroll Broad Ability Composites. Analysis of the Woodcock–Johnson III Normative Update CHC factor clusters across development. *School Psychology Review*, 38 (2), 249-265

*Floyd, R. G., Shands, E. I., Rafael, F. A., Bergeron, R., & McGrew, K. S. (2009). The dependability of general-factor loadings. The effects of factor-extraction methods, test battery composition, test battery size, and their interactions. *Intelligence, 37,* 453-465.

*McGrew, K. (2009). Editorial. CHC theory and the human cognitive abilities project. Standing on the shoulders of the giants of psychometric intelligence research, *Intelligence, 37,* 1-10.

*Taub, G., Floyd, R. G., Keith, T. Z., & McGrew, K. S. (2008). Effects of general and broad cognitive abilities on mathematics. *School Psychology Quarterly, 23(2),* 187-198

*Floyd, R. G., McGrew, K. S., & Evans, J. J. (2008). The relative contributions of the Cattell-Horn-Carroll cognitive abilities in explaining writing achievement during childhood and adolescence. *Psychology in the Schools, 45(2),* 132-144.

*Floyd, R. G., Keith, T. Z., Taub, G. E., & McGrew, K. S. (2007). Cattell-Horn-Carroll cognitive abilities and their effects on reading decoding skills. *g* has indirect effects, more specific abilities have direct effects. *School Psychology Quarterly, 22(2),* 200-233.

McGrew, K. S. (2005). The Cattell-Horn-Carroll (CHC) theory of cognitive abilities. Past, present and future. In D. Flanagan, & Harrison (Eds.), *Contemporary intellectual assessment. Theories, tests, and issues* (p.136-202). New York. Guilford Press.

*Phelps, L., McGrew, K. S., Knopik, S. N., & Ford, L. (2005). The general (*g*), broad, and narrow CHC stratum characteristics of the WJ III and WISC-III tests. A confirmatory cross-battery investigation. *School Psychology Quarterly, 20(1),* 66-88.

*Taub, G. E., & McGrew, K. S. (2004). A confirmatory factor analysis of Cattell-Horn-Carroll theory and cross-age invariance of the Woodcock-Johnson Tests of Cognitive Abilities III. *School Psychology Quarterly, 19*(1), 72-87.

*Taub, G., McGrew, K, & Witta, E. (2004). A confirmatory analysis of the factor structure and cross-age invariance of the Wechsler Adult Intelligence Scale-Third Edition. *Psychological Assessment, 16*, 85-89.

Floyd, R. G., Shaver, R. B., & McGrew, K. S. (2003). Interpretation of the WJ III Tests of Cognitive Abilities. Acting on evidence. In F.A. Schrank & D.P. Flanagan (Eds.), *WJ III clinical use and interpretation* (pp. 1-46). San Diego. Academic Press.

Phelps, L., & McGrew, K. S. (2003). Using the Woodcock-Johnson III Tests of Achievement with the WISC-III and WAIS-III to determine a specific learning disability. In F.A. Schrank & D.P. Flanagan (Eds.), *WJ III clinical use and interpretation* (pp. 229-241). San Diego. Academic Press.

*Floyd, R. G., Evans, J. J., & McGrew, K. S. (2003). Relations between measures of Cattell-Horn-Carroll (CHC) cognitive abilities and mathematics achievement across the school-age years. *Psychology in the Schools, 40(2)*, 155-171.

*Evans, J., Floyd, R., McGrew, K. & Leforgee, M. (2002). The relations between measures of Cattell-Horn-Carroll (CHC) cognitive abilities and reading achievement during childhood and adolescence. *School Psychology Review, 31(2)*, 246-262.

*Vanderwood, M. L., McGrew, K. S., Flanagan, D. P., & Keith, T. Z. (2002). The contribution of general and specific cognitive abilities to reading achievement. *Learning and Individual Differences, 13*, 159-188.

Flanagan, D. P., McGrew, K. S., & Ortiz, S. O. (2000). *The Wechsler Intelligence Scales and Gf-Gc theory. A contemporary approach to interpretation*. Boston. Allyn & Bacon.

McGrew, K., & Flanagan, D. (1998). *The Intelligence Test Desk Reference (ITDR). Gf-Gc cross-battery assessment*. Boston. Allyn & Bacon.

*Flanagan, D. P., & McGrew, K. S. (1998). Interpreting intelligence tests from contemporary *Gf-Gc* theory. Joint confirmatory factor analyses of the WJ-R and KAIT in a non-white sample. *Journal of School Psychology, 36*, 151-182.

Flanagan, D., & McGrew, K. (1997). A cross-battery approach to assessing and interpreting cognitive abilities. Narrowing the gap between practice and science. In D.P. Flanagan, J.L. Genshaft, & P.L. Harrison (Eds). *Contemporary intellectual assessment. Theories, tests, and issues* (pp. 314-325). New York. Guilford.

McGrew, K. (1997). Analysis of the major intelligence batteries according to a proposed comprehensive Gf-Gc framework. In D.P. Flanagan, J.L. Genshaft, & P.L. Harrison (Eds). *Contemporary intellectual assessment. Theories, tests, and issues* (p. 151-180).. New York. Guilford.

*Cameron, L., Ittenbach, R. McGrew, K. & Harrison, P. (1997). Factor analysis of the K-ABC with gifted referrals. *Educational and Psychological Measurement, 57*, 823-849.

*Flanagan, D., & McGrew, K. (1997). Interpreting intelligence tests from modern *Gf-Gc* theory. Joint confirmatory factor analysis of the WJ-R and Kaufman Adolescent and Adult Intelligence Test in a non-white sample. *Journal of School Psychology, 36*, 151-182.

*Flanagan, D., McGrew, K., Abramowitz, E., Lehnar, L., Untiedt, S., Berger, D., & Armstrong, H. (1997). Improvement in academic screening instruments? A concurrent validity investigation of the K-FAST, MBA, and WRAT-3. *Journal of Psychoeducational Assessment, 15*, 99-112.

*McGrew, K. S., Flanagan, D. P., Keith, T. Z., & Vanderwood, M. (1997). Beyond *g*. The impact of *Gf-Gc* specific cognitive abilities research on the future use and interpretation of intelligence tests in the schools. *School Psychology Review, 26*, 177-189.

*McGrew, K., & Wrightson, W. (1997). The calculation of new and improved WISC-III subtest reliability, uniqueness, and general factor characteristic information through the use of data smoothing procedures. *Psychology in the Schools, 34*, 181-195.

*McGrew, K., & Knopik, S. (1996). The relationship between intra-cognitive scatter on the Woodcock-Johnson Psycho-Educational Battery-Revised and school achievement. *Journal of School Psychology, 34*, 351-364.

*McGrew, K., Untiedt, S.A., & Flanagan, D. (1996). General factor and uniqueness characteristics of the Kaufman Adolescent and Adult Intelligence Test (KAIT). *Journal of Psychoeducational Assessment, 14*, 208-219.

*McGrew, K., & Murphy, S. (1995). Uniqueness and general factor characteristics of the Woodcock-Johnson Tests of Cognitive Ability-Revised. *Journal of School Psychology, 33*, 235-245.

*McGrew, K., & Hessler, G. (1995). The relationship between the WJ-R *Gf-Gc* cognitive clusters and mathematics achievement across the lifespan. *Journal of Psychoeducational Assessment, 13*, 21-38.

McGrew, K. (1994). The Woodcock-Johnson Tests of Cognitive Ability - Revised. In R. Sternberg (Ed.), *The encyclopedia of intelligence* (pp. 1152-1158). New York. Macmillan.

K. McGrew CV (07-28-15)                                                                      p. 8

McGrew, K. (1994). *Clinical interpretation of the Woodcock-Johnson Tests of Cognitive Ability-Revised.* Boston. Allyn and Bacon.

*McGrew, K., Murphy, S., & Knutson, D. (1994). The development and investigation of a graphic scoring system for obtaining derived scores for the WJ-R and other tests. *Journal of Psychoeducational Assessment, 12*, 33-41.

*McGrew, K. (1993). The relationship between the Woodcock-Johnson Psycho-Educational Battery - Revised *Gf-Gc* cognitive clusters and reading achievement across the life-span. *Journal of Psychoeducational Assessment Monograph Series. WJ-R Monograph*, 39-53.

*McGrew, K. & Knopik, S. (1993). The relationship between the WJ-R *Gf-Gc* cognitive clusters and writing achievement across the life-span. *School Psychology Review, 22*, 687-695.

*McGrew, K., & Pehl, J. (1988). Prediction of future achievement by the Woodcock Johnson Psycho-Educational Battery and the WISC-R. *Journal of School Psychology, 26*, 275-281.

*McGrew, K. (1987). Exploratory factor analysis of the Woodcock-Johnson Tests of Cognitive Ability. *Journal of Psychoeducational Assessment, 3*, 200-216.

*McGrew, K. (1987). A multivariate analysis of the Wechsler/Woodcock-Johnson discrepancy controversy. *Journal of Psychoeducational Assessment, 5*, 49-60.

McGrew, K. (1986). *Clinical interpretation of the Woodcock-Johnson Tests of Cognitive Ability.* Boston. Allyn and Bacon.

*McGrew, K. (1986). A review of the differential predictive validity of the Woodcock-Johnson Scholastic Aptitude clusters. *Journal of Psychoeducational Assessment, 4*, 307-317.

*McGrew, K. (1985). Investigation of the verbal/nonverbal structure of the Woodcock-Johnson. Implications for subtest interpretation and comparisons with the Wechsler Scales. *Journal of Psychoeducational Assessment, 3*, 65-71.

*McGrew, K. (1984). An analysis of the influence of the Quantitative Concepts subtest in the Woodcock-Johnson Scholastic Aptitude clusters. *Journal of Psychoeducational Assessment, 2*, 325-332.

*McGrew, K. (1984). Normative-based guides for subtest profile interpretation of the Woodcock-Johnson Tests of Cognitive Ability. *Journal of Psychoeducational assessment, 2*, 141-148.

*McGrew, K. (1983). Comparison of the WISC-R and Woodcock-Johnson Tests of Cognitive Ability. *Journal of School Psychology, 21*, 271-276.

## Adaptive Behavior and Personal Competence Research

*Thompson, J. R., McGrew, K. S., & Bruininks, R. H. (2002). Pieces of the puzzle. Measuring the personal competence and support needs of persons with intellectual disabilities. *Peabody Journal of Education, 77(2)*, 23-29.

Thompson, J., McGrew, K. & Bruininks, R. (1999). Adaptive and maladaptive behavior. Functional and structural characteristics. In R. L. Schalock & D Braddock (Eds), *Adaptive behavior and its measurement: Implications for the field of mental retardation* (pp. 15-42). Washington, DC. American Association on Mental Retardation.

Widaman, K. & McGrew K., (1996). The structure of adaptive behavior. In J.W. Jacobson & J.A. Mulick (Eds.), *Manual of diagnosis and professional practice in mental retardation* (pp. 97-110). Washington, D.C. American Psychological Association.

*Greenspan, S., & McGrew, K. (1996). Response to Mathias and Nettlebeck on the structure of competence. Need for theory-based methods to test theory-based questions. *Research in Developmental* Disabilities, *17*, 145-152.

*McGrew, K., Bruininks, R., & Johnson, D. (1997). Confirmatory factor analysis investigation of Greenspan's model of personal competence. *American Journal on Mental Retardation, 100(5)* 533-545.

K. McGrew CV (07-28-15)                                                                                p. 9

*Bruininks, R., Chen, T., Lakin, C., & McGrew, K. (1992).  Components of personal competence and community integration for persons with mental retardation in small residential programs. *Research in Developmental Disabilities, 13*, 463-479.

*Ittenbach, R., Spiegel, A., McGrew, K., & Bruininks, R.  (1992). A confirmatory factor analysis of early childhood ability measures within a model of personal competence.  *Journal of School Psychology, 30*, 307-323.

*McGrew, K., Bruininks, R., & Thurlow, M. (1992). Relationship between measures of adaptive functioning and community adjustment for adults with mental retardation. *Exceptional Children, 58*, 517-529.

*McGrew, K., Ittenbach, R., Bruininks, R., & Hill, B. (1991). Factor structure of maladaptive behavior across the lifespan for persons with mental retardation. *Research in Developmental Disabilities, 12*, 181-199.

*McGrew, K., & Bruininks, R. (1990).  Defining adaptive and maladaptive behavior within a model of personal competence. *School Psychology Review, 19*, 53-73.

*McGrew, K., & Bruininks, R. (1989).  The factor structure of adaptive behavior. *School Psychology Review, 18*, 64-81.

*Bruininks, R., McGrew, K., & Maruyama, G. (1988).  Structure of adaptive behavior in samples with and without mental retardation. *American Journal on Mental Retardation, 93*, 265-272.

*Lewis, D., Bruininks, R., Thurlow, M., & McGrew, K. (1988).  Using benefit-cost analysis in special education. *Exceptional Children, 55*, 203-214.

## Disability Specific Research

*Thompson, J. R., McGrew, K. S., Johnson, D. R., & Bruininks, R. H. (2000). Refining a multidimensional model of community adjustment through an analysis of post-school follow-up data. *Exceptionality, 8(2)*, 73-99.

*McGrew, K., Johnson, D., & Bruininks, R. (1994).  Factor analysis of community adjustment outcome measures for young adults with mild to severe disabilities. *Journal of Psychoeducational Assessment, 12*, 55-66.

McGrew, K., & Bruininks, R. (1994). A multidimensional approach to the measurement of community adjustment.  In M.F. Hayden and B. Abery (Eds), *Challenges for a service system in transition. Ensuring quality community experiences for persons with developmental disabilities*. Baltimore, MD. Brookes Publishing.

*Evans, J., Carlson, R., & McGrew, K. (1993).  Classification of exceptional students with the Woodcock-Johnson Psycho-Educational Battery-Revised. *Journal of Psychoeducational Assessment Monograph Series. WJ-R Monograph*, 6-19.

*Ittenbach, R., Bruininks, R.H., Thurlow, M., & McGrew, K. (1993).  Community integration of young adults with mental retardation. A multivariate analysis of adjustment. *Research in Developmental Disabilities, 14*, 275-290.

*Mather, N., Vogel, S., Spodak, R., & McGrew, K.  (1992). Use of the Woodcock-Johnson Revised writing tests with students with learning disabilities. *Journal of Psychoeducational Assessment, 9*, 296-307.

*McGrew, K., Bruininks, R., Thurlow, M., & Lewis, D. (1992).  Empirical analysis of multidimensional measures of community adjustment for young adults with mental retardation. *American Journal on Mental Retardation, 96*, 475-487.

Bruininks, R., Thurlow, M., McGrew, K., & Lewis, D. (1990).  Dimensions of community adjustment among young adults with intellectual disabilities.  In W.I. Fraser (Ed.), *Key issues in mental retardation.  Proceedings of the Eighth Congress of the International Association for the Scientific Study of Mental Deficiency* (pp. 435-448).  New York. Routledge.

Lewis, D., Bruininks, R., Thurlow, M., & McGrew, K. (1990).  Assessing post-school effects of special education for youth with mental retardation through economic analysis. In W.I. Fraser (Ed.), *Key issues in mental retardation. Proceedings of the Eighth Congress of the International Association for the Scientific Study of Mental Deficiency* (pp. 426-434).  New York.  Routledge.

K. McGrew CV (07-28-15)                                                                                           p. 10

## National Data Collection Programs and Policy Research

\*Vanderwood, M. L., McGrew, K. S. & Ysseldyke, J. E. (1998). Why we can't say much about the status of students with disabilities during education reform. *Exceptional Children 64(3)*, 359-370.

\*McGrew, K., Algozzine, B., Ysseldyke, J., Thurlow, M., & Spiegel, A. (1995). The identification of individuals with disabilities in national databases. Creating a failure to communicate. *Journal of Special Education, 28*, 472-487.

\*McGrew, K. (1994). National outcome data collection programs. How they can be used at the local level. *Special Services in the Schools, 9*, 51-62.

\*McGrew, K., Thurlow, M., & Spiegel, A. (1993). An investigation of the exclusion of students with disabilities in national data collection programs. *Educational Evaluation and Policy Analysis, 15*, 339-352.

## Other Assessment and Measurement Research

\*McGrew, K., Gilman, C. & Johnson, S. (1992). A review of scales to assess family needs. *Journal of Psychoeducational Assessment, 10*, 4-25.

\*McGrew, K., Gilman, C. (1991). Measuring the perceived degree of parent empowerment in home-school relationships through a home-school survey. *Journal of Psychoeducational Assessment, 9*, 353-362.

McGrew, K. (1989). Review of the Test of Computational Processes. In J.C. Conoley & J.J. Kramer (Eds.), *The tenth mental measurements yearbook*. Lincoln, Nebraska. The Buros Institute of Mental Measurements, University of Nebraska-Lincoln.

\*Lewis, D., Bruininks, R., Thurlow, M., & McGrew, K. (1989). A note on the use of earning functions and human capitol theory in assessing special education. *Economics of Education Review, 8*, 285-290.

## Neurotechnology Intervention Research

\*Taub, G.. & McGrew, K., & Keith, T. (in press b). Improvements in interval time tracking and effects on mathematics achievement. *Journal of Research in Childhood Education*.

\*Taub, G., McGrew, K., & Keith, T. (2007). Improvements in interval time tracking and effects on reading achievement. *Psychology in the Schools, 44(8)*, 849-863.

## PSYCHOLOGICAL ASSESSMENT INSTRUMENTS AND TEST MANUAL PUBLICATIONS

Schrank, F.A., McGrew, K.S., & Mather, N. (2014a). *Woodcock-Johnson IV*. Rolling Meadows, IL: Riverside.

McGrew, K.S., LaForte, E.M., & Schrank, F.A. (2014). Technical Manual. *Woodcock-Johnson IV*. Rolling Meadows, IL: Riverside.

Schrank, F.A., Mather, N. & McGrew, K.S. (2014a). *Woodcock-Johnson IV Tests of Achievement*. Rolling Meadows, IL: Riverside.

Schrank, F.A., Mather, N. & McGrew, K.S. (2014b). *Woodcock-Johnson IV Tests of Oral Language*. Rolling Meadows, IL: Riverside.

Schrank, F.A., McGrew, K.S., & Mather, N. (2014). *Woodcock-Johnson IV Tests of Cognitive Abilities*. Rolling Meadows, IL: Riverside.

Schrank, F. , McGrew, K. & Dailey, D. (2010). *Technical Supplement*. Woodcock-Muñoz Language Survey—Revised Normative Update: Rolling Meadows, IL: Riverside Publishing.

Woodcock, R., McGrew, K., & Mather, N. (2008). *Woodcock-Johnson III—Australian Adaptation*. Jannali NSW, Australia. Psychological Assessments Australia,

K. McGrew CV (07-28-15)                                                                    p. 11

Woodcock, R., McGrew, K., Schrank, F, & Mather, N. (2001, 2007). *Woodcock-Johnson III Normative Update.* Rolling Meadows, IL. Riverside Publishing.

Muñoz-Sandoval, A. F., Woodcock, R. W., McGrew, K. S. & Mather, N. (2005). *Bateria III Woodcock-Muñoz.* Itasca, IL. Riverside Publishing.

McGrew, K. S. & Woodcock, R. W. (2005). Manual técnico (L. Wolfson, Trans.). *Woodcock-Johnson III.* Itasca, IL. Riverside Publishing. (La edición original fue publicada en 2001).

Muñoz-Sandoval, A. F., Woodcock, R. W., McGrew, K. S. & Mather, N. (2005). *Batería III Woodcock-Muñoz. Pruebas de aprovechamiento.* Itasca, IL. Riverside Publishing.

Schrank, F. A., McGrew, K. S., Ruef, M. L., Alvarado, C. G., Muñoz-Sandoval, A. F., & Woodcock, R. W. (2005). *Overview and technical supplement: Batería III Woodcock-Muñoz Assessment Service Bulletin* No. 1). Itasca, IL. Riverside Publishing.

Woodcock, R. W., Muñoz, A. S., McGrew, K., Mather, N., & Schrank, F. (2005). *Batería III pruebas de habilidades cognitivas.* Itasca, IL. Riverside Publishing.

Woodcock, R. W., McGrew, K. S., Mather, N., & Schrank, F. A. (2003). *Woodcock-Johnson III Diagnostic Supplement to the Tests of Cognitive Abilities.* Itasca, IL. Riverside Publishing.

Woodcock, R., McGrew, K., & Mather, N. (2001). *Woodcock-Johnson III.* Itasca, IL. Riverside.

McGrew, K., & Woodcock (2001). Technical Manual. *Woodcock-Johnson III.* Itasca, IL. Riverside.

Woodcock, R., McGrew, K., & Mather, N. (2001). *Woodcock-Johnson Battery III Tests of Achievement.* Itasca, IL. Riverside.

Woodcock, R., McGrew, K., & Mather, N. (2001). *Woodcock-Johnson Battery III Tests of Cognitive Abilities.* Itasca, IL. Riverside.

Sharpe, M., McNear, D., & McGrew, K. (1996). *Sharpe-McNear-McGrew Braille Assessment Inventory (BAI).* Hawthorne Publishing.

Woodcock, R., McGrew, K., & Werder, J. (1994). *Woodcock-McGrew-Werder Mini-Battery of Achievement (MBA).* Chicago, IL. Riverside.

McGrew, K., Werder, J., & Woodcock, R. (1991). *WJ-R technical manual.* Chicago, IL. Riverside.

McGrew, K., & Woodcock, R. (1985). *Subtest norms for the WJ-SIB Assessment System.* Chicago, IL. Riverside.


## TECHNICAL REPORTS & SPECIAL PUBLICATIONS (organized by topics)

### Intelligence Testing and Theories

McGrew, K. (2012). *Applied Psychometrics 101 #11: Problems with the 1960 and 1986 Stanford-Binet IQ scores in Atkins MR/ID death penalty cases.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K., & Foley, K. (2011). *Applied Psychometrics 101 #11: Time to stop executing the mentally retarded—The case for applying the standard error of measurement.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2011). *Applied Psychometrics 101 #12 CHC narrow ability assessment with the WJ III Battery.* St. Joseph, MN: Institute for Applied Psychometrics.

Ford, L., Swart, S., Negreiros, J., Lacroix, S., & McGrew, K. (2010). *Use of the Woodcock-Johnson III NU Tests of Cognitive Abilities and Tests of Achievement with Canadian Populations. (Woodcock-Johnson III Assessment Service Bulletin No. 12).* Rolling Meadows, IL: Riverside Publishing

K. McGrew CV (07-28-15)                                                                                    p. 12

McGrew, K., Moen, R., & Thurlow, M. (2010). *Cognitive and achievement differences between students with divergent reading and oral comprehension skills: Implications for accessible reading assessment research.* Minneapolis, MN: University of Minnesota, Partnership for Accessible Reading Assessment.

McGrew, K. (2010a). *Applied Psychometrics 101 #6: The Flynn Effect Series: What is the Flynn Effect.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2010b). *Applied Psychometrics 101 #7: The Flynn Effect Series: Is the Flynn Effect a scientifically accept fact?* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2010c). *Applied Psychometrics 101 #8: The Flynn Effect Series: A brief history of the Flynn Effect. It was NOT given birth by Atkins v Virginia (2002) SCOTUS decision.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2010d). *Applied Psychometrics 101 #9: The Flynn Effect Series: Is the Flynn Effect a scientifically accept fact?* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2009a). *Applied Psychometrics 101 #10: The Armed Services Vocational Aptitude Battery (ASVAB): Why it should not be used in the determination of a diagnosis of mental retardation/intellectual disability.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2009b). *Applied Psychometrics 101 #2: What does the WAIS-IV measure? CHC analysis and beyond.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2009c). *Applied Psychometrics 101 #3: MDS analysis of the CHC-based WJ III Battery: Implications for possible refinements and extensions of the CHC model of human intelligence.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2009d). *Applied Psychometrics 101 #4: Cluster analysis of the WJ III Battery: Implications for CHC test interpretation and possible CHC model extensions.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (2009e). *Applied Psychometrics 101 #5: The standard error of measurement (SEM): An explanation and facts for "fact finders" in Atkins MR/ID death penalty proceedings.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K., Dailey, D., & Schrank, F. (2007). *Woodcock-Johnson III/Woodcock-Johnson III Normative Update score differences. What the user can expect and why (Woodcock-Johnson III Assessment Service Bulletin No. 9).* Itasca, IL: Riverside Publishing.

Schrank, F. A., McGrew, K. S., Ruef, M. L., Alvarado, C. G., Muñoz-Sandoval, A. F., & Woodcock, R. W. (2005). *Overview and technical supplement: Batería III Woodcock-Muñoz Assessment Service Bulletin* No. 1). Itasca, IL: Riverside Publishing.

McGrew, K. S., & Evans, J. J. (2004). *Expectations for students with cognitive disabilities. Is the cup half empty or half full? Can the cup flow over? Synthesis Report 54.* Minneapolis, MN: University of Minnesota, National Center on Educational Outcomes.

McGrew, K. M., Johnson, D., Cosio, A., & Evans, J. J. (2004). *Increasing the chance of no child being left behind. Beyond cognitive and achievement abilities.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

Schrank, F., McGrew, K. & Woodcock, R. (2003). *Calculating discrepancies between the WJ III GIA-Std score and selected WJ III Tests of Cognitive Abilities clusters (Woodcock-Johnson III Assessment Service Bulletin No. 6).* Itasca, IL: Riverside Publishing

McGrew, K. S., & Evans, J. J. (2002). *IAP research report #7. Within-CHC domain comparisons of the WJ III cognitive and achievement test growth curves.* St. Cloud, MN: Institute for Applied Psychometrics.

McGrew, K. S., & Evans, J. J. (2002). *IAP research report #6. Cross-sectional growth curves for the individual tests for the WJ III cognitive and achievement batteries.* St. Cloud, MN: Institute for Applied Psychometrics.

Schrank, F., McGrew, K. & Woodcock, R. (2001). *Technical abstract (Woodcock-Johnson III Assessment Service Bulletin No. 2)*. Itasca, IL: Riverside Publishing.


## National Data Collection Programs and Policy Research

Thurlow, M., McGrew, K., Tindal, G., Thompson, S., Ysseldyke, J. & Elliott, J. (2000). *Assessment accommodations research. Considerations for design and analysis. Technical Report 26.* . Minneapolis, MN: University of Minnesota, National Center on Educational Outcomes.

Abery, B., McGrew, K. S., & Smith, J. (1995). *Self-determination skills, attitudes, and knowledge scale*. Minneapolis, MN: University of Minnesota, Institute on Community Integration.

McGrew, K. (1995). *Disability summary analysis of select national data collection programs*. Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

McGrew, K., Lin, Hung-Chih, Johnson, D., Bloomberg, L., & Bruininks, R. (1995). *The National Transition Study of Individuals with Severe Disabilities (NTSSD). Methodology and multivariate analysis report.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

Johnson, D., McGrew, K., Bloomberg, L., Lin, Hung-Chih, & Bruininks, R. (1995). *Descriptive findings of the National Transition Study of Individuals with Severe Disabilities leaving school.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

Johnson, D., Bloomberg, L., Lin, Hung-Chih, McGrew, K., & Bruininks, R. (1995). *A secondary analysis of the findings from the National Longitudinal Transition Study. An examination of the post-school outcomes of youth with severe disabilities.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

McGrew, K., Spiegel, A., Thurlow, M., Shriner, J., Ysseldyke, J. (1994). *Secondary analysis of state assessment data. Why we can't say much about students with disabilities.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

McGrew, K., Spiegel, A., Thurlow, M., Kim, D. (1994). *Matching information in national data collection programs to a model of school completion outcomes and indicators.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

Ysseldyke, J., Thurlow, M., McGrew, K., & Vanderwood, M. (1994). *Making decisions about the inclusion of students with disabilities in large-scale assessments.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

McGrew, K., Algozzine, B., Ysseldyke, J., Thurlow, M., & Spiegel, A. (1993). *The identification of people with disabilities in national data bases. A failure to communicate.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

McGrew, K., Spiegel, A., Thurlow, M., Ysseldyke, J., Bruininks, R., and Shriner, J. (1992). *Outcomes for children and youth with disabilities. Secondary analysis of national data collection programs.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

McGrew, K., Thurlow, M., Shriner, J. & Spiegel, A. (1992). *Inclusion of students with disabilities in national and state data collection systems.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

Ysseldyke, J., Thurlow, M., Bruininks, R., Gilman, C., Deno, S., McGrew, K., & Shriner, J. (1992). *An evolving conceptual model of educational outcomes for children and youth with disabilities.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

Bruininks, R., Deno, S., McGrew, K., Shriner, J., Thurlow, M., & Ysseldyke, J. (1991). *Assessing educational outcomes. State activity and literature integration.* University of Minnesota, National Center on Educational Outcomes, Minneapolis, MN:

McGrew, K., Spiegel, A., Thurlow, M., Ysseldyke, J., Bruininks, R., Deno, S., & Shriner, J. (1991). *Secondary data analysis. A review of major conceptual, measurement and technical issues.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

A-000812

K. McGrew CV (07-28-15)                                                                                p. 14

McGrew, K., Spiegel, A., Thurlow, M., Ysseldyke, J., Bruininks, R., Deno, S., & Shriner, J. (1991). *Plan for identifying state and national data bases by the National Center on Educational Outcomes.* Minneapolis, MN: National Center on Educational Outcomes, University of Minnesota.

Other Assessment and Measurement Research

McGrew, K. (2013). *MindHub™ Pub #1: The Motivation and Academic Competence (MACM) commitment pathway to learning model.* St. Joseph, MN: Institute for Applied Psychometrics.

McGrew, K. (1999). *The measurement of reading achievement by different individually administered standardized reading tests. Apples and apples, or apples and oranges?* (Research Report # 1). St. Cloud, MN: Institute for Applied Psychometrics. [Note. This was originally a commissioned paper written for the *National Research Council Committee on the Prevention of Reading Difficulties in Young Children,* 1998].

McGrew, K., & Gilman, C. (1991). *Family and professional partnerships. Analysis of pre/post home-school survey results in project FISC.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

McGrew, K. Gilman, C., Wise, M., Meyer, J. & Gunderson, D. (1991). *The FISC individualized family-centered planning process.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

McGrew, K., Gilman, C., Wise, M., Meyer, J., & Gunderson, D. (1991). *Project FISC pre/post family needs survey results.* Minneapolis, MN: Institute on Community Integration, University of Minnesota.

McGrew, K., Gilman, C., & Johnson, S. (1990*). Family Assessment Scales and Methods.* Unpublished manuscript. Minneapolis, MN: Institute on Community Integration, University of Minnesota.

Bruininks, R.H., Thurlow, M.T., McGrew, K.S., Johnson, D.R., & Sinclair, M. (1990), *Minimum Community Adjustment Data Protocol.* Minneapolis, MN: Institute on Community Integration.

McGrew, K., Gilman, C., & Johnson, S. (1989). *Family involvement and needs in serving young children with moderate and severe handicaps. Parent survey results.* Minneapolis, MN: University of Minnesota, Department of Educational Psychology. Institute on Community Integration.

Henning, J., & McGrew, K. (1989). *An evaluation of the effectiveness of a mainstream based mastery learning approach to servicing mildly handicapped learners. A report of first year pilot activities.* St. Cloud Community Schools, St. Cloud, MN: A grant report submitted to the Minnesota Department of Education, Unique Learner Needs Section.

Lewis, D., Bruininks, R., Thurlow, M., & McGrew, K. (1988). *Empirically testing the use of benefit-cost analysis in special education.* In Bruininks, R., Lewis, D., Thurlow, M. (Eds.). Assessing outcomes, costs, and benefits of special education programs. Minneapolis. MN: University of Minnesota, Department of Educational Psychology. University Affiliated Program on Developmental Disabilities

Bruininks, R. & McGrew, K. (1987). *Exploring the structure of adaptive behavior.* Minneapolis, MN: University of Minnesota, Department of Educational Psychology.

Neurotechnology Research

McGrew, K. (2013). *MindHub™ Pub #2: The science behind Interactive Metronome: An integration of brain clock, temporal processing, brain network and neurocognitive research and theory.* St. Joseph, MN: Institute for Applied Psychometrics.

## GRANTS

Measurement consultant to University of Minnesota, Institute on Community Integration, federally funded (Institute of Education Sciences, U. S. Dept. of Education; U of M ICI subcontractor to Mathematic Policy Research) National Longitudinal Transition Study (NLTS 2012). (April, 2011 to present)

K. McGrew CV (07-28-15)                                                                                       p. 15

Assisted in writing a proposal that resulted in the University of Minnesota being awarded the Rehabilitation and Research Training Center on Persons with Mental Retardation (RRTC) from NIDRR.  Through a cooperative agreement served as Research Associate for this five year grant (October, 1993 to October, 1998).

Assisted in the writing of a cooperative grant proposal that resulted in the University of Minnesota and St. Cloud State University being awarded a grant for Research on the Self-Determination of Individuals with Disabilities from OSERS (Department of Education).  Through a cooperative agreement served as Co-Principal Investigator for this two-year grant (October,1992 to October, 1994).

Assisted in the writing of a proposal that resulted in the University of Minnesota being awarded the National Transition Study on Individuals with Severe Disabilities (NTTSD) from OSERS/NIDRR.  Through a cooperative agreement with St. Cloud State University served as data analyst for this three-year grant (October 1991 to October 1994).

Assisted in the writing of the original proposal, and subsequent renewal proposal, that resulted in the University of Minnesota being awarded the National Center on Educational Outcomes (NCEO) for students and youth with disabilities from the Office of Special Education Programs, U.S. Department of Education.  Through a cooperative agreement with St. Cloud State University, served as a member of the NCEO Senior Research and Management (October, 1990 to 1996).

Primary author and Project Evaluation/Assessment Specialist for the Families Involved School and Children (FISC), a three year federal award (US Education Office of Special Education and Rehabilitative Services).  A joint research and demonstration project between the St. Cloud Community Schools and the University of Minnesota's Institute on Community Integration (October, 1988 to October, 1991).

Primary author, Project Director and Evaluator of A Cooperative and Coordinated Mainstream-based Service Delivery System for Mildly Handicapped Students - A one year (Fall, 1988 - Spring, 1989) Minnesota State Department of Education Effectiveness Grant awarded to the St. Cloud Community Schools.


## PRESENTATIONS/WORKSHOPS *(select list)*


Stough, C., Pase, M., Scholey A., & McGrew, K. (2015, May).  *Applying the Cattell-Horn Carroll (CHC) model across psychology, neuroscience and heath.*  Symposium at the Association  for Psychological Science, New York.

McGrew, K., Schrank, F., & Mather, N. (2014, Feb*.).  Contemporary CHC theory and assessment practice:  The Woodcock-Johnson IV.*  Workshop presented at the annual convention of the National Association of School Psychologists, Washington, DC.

McGrew, K. (2012, October).  *Implications of 20 years of cognitive-achievement research:  Back-to-the-Future and Beyond. Presentation made at the Inaugural Session of the Richard Woodcock Institute for Advancement of Contemporary Cognitive Assessment,* Tufts University, Medford, MA.

Sandman, C. & McGrew, K. (2012, August).  *All IQ tests are not created equal:  How psychometric principles can be applied in Atkins litigation to explain outlier IQ scores and other differences in IQ test scores over time.*  Presentation made at the Seventeenth Annual Federal Habeas Corpus Seminar, Washington, DC.

Cormier, D., McGrew, K., & Evans, J. (2012, February).  Quantifying the degree of linguistic demand in intelligence directions.  Poster presentation at the National Association of School Psychologists Annual Convention,  Philadelphia, PA.

McGrew, K. (2011, August).  *The Flynn Effect in Atkins death penalty MR/ID cases:  To adjust or not to adjust, that is the question.*  In J. Greg Olley (chair), Perspectives on intellectual disability and the death penalty—Toward more effective contributions of psychologists in Atkins cases.  Invite Symposium conducted at the annual American Psychological Association convention, Washington, DC.

McGrew, K. (2011, October).  *What we've learned from 20 years of CHC COG-ACH research:  Implications for SLD assessment.*  Presentation made at the New York Association of School Psychologists annual conference, Verona, NY

McGrew, K. (2011, April).  *Linking CHC processing to achievement:  Implications for intervention planning.*  Full day workshop at Georgia Association of School Psychologists annual conference, Atlanta, Georgia.

K. McGrew CV (07-28-15)                                                                                        p. 16

McGrew, K. (2011, April). *Contemporary Cattell-Horn-Carroll (CHC) cognitive-achievement relations research: Implications for assessment practice.* Half day workshop at Ohio Association of School Psychologists annual conference, Columbus, Ohio.

Kaufman, S.B., Liu, X., McGrew, K., & Kaufman, A.S. (2010, August). *What is the relation between cognitive g and academic achievement g?* Poster to be presented at the meeting of the American Psychological Association Annual Convention, San Diego, California.

McGrew, K. (2010, June). *Assessing intellectual functioning.* In M. Tasse (chair), Atkins v. Virgnia: Challenges and pitfalls in diagnosing ID in a forensic context. Symposium conducted at the American Association on Intellectual and Development Disabilities Annual Conference, Providence, RI.

McGrew, K. (2010, March). *Cattell-Horn-Carroll intelligence testing: What have we learned in 20 years?* In D. McIntosh and J. Newton (chairs). Symposium conducted at the National Association of School Psychologists Annual Convention, Chicago, IL

Hansen, A., Lim, B. & McGrew, K. (2010, March). *Cultural loading and linguistic demand on the WJ III Normative Update.* Poster presentation at the National Association of School Psychologists Annual Convention, Chicago, IL.

McGrew, K. (2010, Jan). *Intelligent insights on intelligence tests: What I've learned from 35 years of IQ testing, development and research.* Presentation at the Minnesota School Psychologists Association Annual Midwinter Conference, Minneapolis, MN.

McGrew, K. (2009, July). *The art and science of intelligence test development. Theory, tools, tips and troubles.* Four hour course presentation at IV Congresso Brasileiro de Avaliacao Psicologica, Campinas, Brazil.

McGrew, K. (2009, July). *CHC theory. Past, present and future.* Presentation at IV Congresso Brasileiro de Avaliacao Psicologica, Campinas, Brazil.

McGrew, K. (2009, Feb). *An overview of the Human Cognitive Abilities project.* Paper presentation at the 40th annual convention of the National Association of School Psychologists, Boston, MA.

McGrew, K. (2009, Feb). *CHC cognitive and achievement relations research synthesis. What we've learned from 20 years of research.* Mini-skills workshop presented at the 40th annual convention of the National Association of School Psychologists, Boston, MA.

McGrew, K. (2008, Dec). *The Human Cognitive Abilities Project. An overview and update.* Poster presentation at Ninth Annual International Society for Intelligence Research, Decatur, GA.

Floyd, R. G., Shands, E. I., Rafael, F. A., Bergeron, R., & McGrew, K. S (2008, Dec.). *The dependability of general factor loadings. A partial replication and extension of Thorndike's (1987) Stability of Factor Loadings.* Paper presentation at Ninth Annual International Society for Intelligence Research, Decatur, GA.

McGrew, K. (2008, Sept). *The Australian standardization of the Woodcock-Johnson III Cognitive and Achievement Battery.* In W. Howe (chair), Adaptation and norming of cognitive and achievement tests in other countries—issues and outcomes. Symposium conducted at the Forty-third Australian Psychological Society Conference, Hobart, Tasmania, Australia.

McGrew, K. (2008, July). *Advances in the prediction of academic achievement using WJ III subtests.* General Session at the Third National School Neuropsychology Conference, Grapevine, Texas.

McGrew, K., Wendling, B. & Read, B. (2008, Feb). *Using CHC theory to link assessment to intervention.* Workshop presented at the 39th annual convention of the National Association of School Psychologists, New Orleans, LA.

McGrew, K. (2007, July). *The brain clock. An overview of contemporary research and theory regarding the neuroscience of brain-based interval timing and its relevance to learning and rehabilitation.* Invited keynote presentation at the Interactive Metronome Professional Conference, Chicago, IL.

McGrew, K. (2006, Oct.). *The IM Effect. What is happening under the hood?* Invited presentation at the Interactive Metronome Professional Conference, Austin, TX.

A-000815

K. McGrew CV (07-28-15)                                                                                      p. 17

Taub, G. & McGrew, K. (2006). *Improving timing and rhythm and the effects on academic achievement*. National Association of School Psychologists Annual Convention, Anaheim, CA.

Taub, G. & McGrew, K. (2005, April). *Improvements in interval time tracking and the effect on academic achievement*. Paper presented at the Learning and the Brain Conference, Cambridge, MA.

McGrew, K. (2005, April). *How will neuro-technology change learning, intelligence and the treatment of learning disorders in the future*. Panel discussant at the Learning and the Brain Conference, Cambridge, MA.

McGrew, K. (2004, Sept). *NCLB and expectations for students with disabilities. Increasing the chance of No Child Being Left Behind. Beyond cognitive and achievement abilities*. Invited presentations at West Virginia Department of Education, Office of Special Education, Special Education Administrators Leadership Conference, Charleston, West Virginia.

Taub, G. E. & McGrew, K. S. (2003, April). *A confirmatory factor analysis of the Woodcock-Johnson Tests of Cognitive Ability III. Is there cross-age invariance?* National Association of School Psychologists Annual Convention, Toronto, Canada.

McGrew, K. (2003, Nov.). *"Intelligent" use and interpretation of the WJ III in the context of contemporary research and pending changes in IDEA*. Keynote address at the 28th Annual Hou-Met Texas Educational Diagnosticians Conference, Houston, TX.

McGrew, K. (2003, Oct). *Cognitive abilities/disabilities role in establishing academic expectations*. Invited presentation at Maryland Department of Education, Division of Special Education/Early Intervention Services, Leadership Conference, Ocean City, MD.

McGrew, K. (2003, Jan. & July). *A lesson from Forrest Gump regarding expectations for students with cognitive disabilities*. Invited presentation at U. S. Department of Education, Office of Special Education Programs (OSEP) meetings on *Assessment and Students with Disabilities* and *Alternative Assessments and Alternate Achievement Standards*, Washington, DC

McGrew, K. S. (2002, Feb). *Advanced interpretation of the Woodcock-Johnson III*. Workshop presented at the annual convention of the National Association of School Psychologists, Chicago, IL.

Schrank, F., Ford, L., & McGrew, K. (2001, Aug.). *Woodcock-Johnson III—Administration and scoring*. Continuing education workshop at the annual convention of the American Psychological Assocation, San Francisco, CA.

McGrew, K. (2001, May). *Innovations in intellectual assessment. Back to the future*. Invited keynote address at the New Jersey Association of School Psychologists Conference, Monroe, NJ.

McGrew, K. (2001, May). *Cattell-Horn-Carroll Intelligence Theory. Will you evolve or will you become extinct?* Workshop presented at the New Jersey Association of School Psychologists Conference, Monroe, NJ.

McGrew, K. (2000, Feb.). *An introduction and overview of the Woodcock-Johnson Battery--Third Edition (WJ III)*. Workshop presented at the annual convention of the Minnesota School Psychologists Association, Minneapolis, Mn.

Thompson, J. & McGrew, K. (1999, April). *The construct of adaptive behavior. Looking back and looking ahead.*. Paper presented at the annual convention of the Council for Exceptional Children, Charlotte, North Carolina.

Flanagan, D. P., & McGrew, K. S. (1998, April). *A Gf-Gc cross battery approach to assessing the cognitive capabilities of students with learning difficulties and/or culturally and linguistically diverse backgrounds*. Workshop presented at the annual convention of the National Association of School Psychologists, Orlando, FL.

McGrew, K. S., & Flanagan, D. P. (1997, Nov.). *A research-based cross-battery approach to intelligence test interpretation. Implications for individuals referred for reading problems*. Paper presented at the 48th Annual Conference of the Orton Dyslexia Society, Minneapolis, MN.

McGrew K. S., & Flanagan, D. P. (1997, Oct.). *A Gf-Gc cross-battery approach to the intellectual assessment of students with learning disabilities and/or culturally and linguistically diverse backgrounds*. Invited workshop presented at the Arizona State Psychological Association in conjunction with Phoenix Public Schools, Phoenix, AZ.

Flanagan, D. P., & McGrew, K. S. (1996, Aug.). *Interpreting WJ-R and KAIT joint factor analyses from Gf-Gc theory*. Paper presented at the annual convention of the American Psychological Association, Toronto, Canada

A-000816

K. McGrew CV (07-28-15)                                                                 p. 18

McGrew, K., Thurlow, M., & Vanderword, M. (1996, April) *Why we can't say much about students with disabilities during education reform.* Paper presented at the National Council on Measurement in Education Annual Meeting, New York.

McGrew, K. (1996, March). *An integration of theories of multiple intelligences within a model of personal competence. The big picture.* In J. Genshaft (chair), Theoretical models of multiple intelligences and personal competencies. Implications for research. Symposium conducted at the National Association of School Psychology Convention, Atlanta, GA.

McGrew, K. (1996, March). *Recent research on the structure of intelligence. Implications for intelligence testing.* In J. Genshaft (chair), Advancing the field of intellectual assessment. Technical, theoretical, and cultural considerations. Symposium conducted at the National Association of School Psychologists Convention. Atlanta, GA.

McGrew, K. S., & Flanagan, D. P. (1996, March). *A cross-battery approach to intelligence test interpretation.* Workshop presented at the twenty-eighth annual convention of the National Association of School Psychologists, Atlanta, Georgia.

Flanagan, D. P. & McGrew, K. S. (1996, Jan.). *A cross-battery approach to intelligence test interpretation.* Paper presented at an Advanced Symposium on Tests and Theories of Intelligence in co-sponsorship with Educational and Diagnostic Consulting Services and St. John's University, Jamaica, NY.

Woodcock, R., McGrew, K., & Flanagan, D. (1995, Aug.). *An overview of the WJ-R within the context of contemporary theory and research.* Day workshop for trainers of school psychologists at the American Psychological Association Annual Convention, New York.

McGrew, K. (1995, July). *Expanded clinical interpretation of the WJ-R Tests of Cognitive Ability using individual tests and supplemental groupings.* Presentation at the Second Annual Psychoeducational Assessment Summer Institute, Brattelboro, VT.

McGrew, K. (1995, June). *Confessions of a quantoid. What I have learned about adaptive behavior from eight years of factor analysis research.* In R. Schalock (chair), Adaptive behavior and its measurement. Symposium conducted at the annual meeting of the American Association on Mental Retardation, San Francisco, CA.

McGrew, K. (1995, May). *Recent advances in research on intelligence. Implication for assessment.* Presentation at the Minnesota Psychological Association Annual Meeting, Brainerd, MN.

McGrew, K. (1995, April). *The modern Gf-Gc theory of intelligence. Implications for assessment and comparing the Wechsler and the WJ-R cognitive batteries.* Two presentations made at advanced WJ-R symposium, Cromwell, CT.

McGrew, K. (1995, March). *Why we can't say much about students with disabilities during education reform.* Presentation at the Ninth Annual Conference on the Management of Federal/State Data Systems, Baltimore, MD.

McGrew, K. (1995, March). *Intelligence is a "many splendored" thing. Implications of theories of multiple intelligences.* Presentation at the National Association of School Psychologists Convention, Chicago, IL.

Flanagan, D., & McGrew, K. (1995, March). *Will you evolve or become extinct? Interpreting intelligence tests according to Gf-Gc theory.* Presentation at the National Association of School Psychologists Convention, Chicago, IL.

McGrew, K. (1994, March). *An introduction to the Gf-Gc theory of intelligence.* Mini-skills workshop at the National Association of School Psychologists Convention, Seattle, WA.

McGrew, K. (1994, April). *Comparison of the Wechsler and WJ-R Cognitive batteries; Best practices in aptitude/achievement discrepancies: Clinical interpretation of the WJ-R tests of cognitive ability.* Three presentations made at an advanced WJ-R seminar, Reston, VA.

Bruininks, R., & McGrew, K. (1993, July). *Adaptive behavior. Definition, uses, and issues.* Paper presented at the International Conference on Disabilities and Adaptive Behaviors, Bilbao, Spain.

McGrew, K. (1993, Oct.). *New research on intelligence. Implications for assessment.* Presentation made at the Child Guidance Center of Greater Winnipeg, Winnipeg, Canada.

McGrew, K. & Bruininks, R. (1993, July). *Dimensions of personal competence and adjustment in the community.* Paper presented at the International Conference on Disabilities and Adaptive Behaviors, Bilbao, Spain

A-000817

K. McGrew CV (07-28-15)                                                                                          p. 19

McGrew, K., Spiegel, A., & Thurlow, M. (1993, April). *Inclusion of students with disabilities in state and national assessments.* Paper presented at the Annual Council for Exceptional Children Convention, San Antonio, TX.

McGrew, K. & Woodcock, R. (1993, April). *New concepts about intelligence and their implications for school psychology.* Preconvention workshop at the National Association of School Psychologists Convention, Washington, D.C.

McGrew, K. (1992, March). *The Woodcock-Johnson-Revised Cognitive Tests. Promising measures for identifying aptitude-treatment interactions?* Paper presented at National Association of School Psychologists Convention, Nashville, TN.

McGrew, K. (1992, Oct.). *The FISC Individualized Family-Centered Assessment and Planning Process.* Presentation made at the Minnesota School Psychologists Fall Conference, Brooklyn Park, MN.

McGrew, K., Bruininks, R., Lewis, D., & Johnson, D. (1992, Aug.). *Perspectives on community adjustment. Multidimensional outcome measures on young adults with disabilities.* Paper presented at Ninth World Congress of the International Association for the Scientific Study of Mental Retardation, Brisbane, Australia.

McGrew, K., & Gilman, C. (1992, March). *An individualized family-centered approach to program planning.* Paper presented at National Association of School Psychologists convention, Nashville, TN.

McGrew, K., Thurlow, M., & Spiegel, A. (1992, April). *The sensitivity of the national educational data system to the assessment of outcomes for students with disabilities.* Paper presented at the annual National Council on Measurement in Education Meeting, San Francisco, CA.

Shriner, J., Thurlow, M., Bruininks, R., Deno, S., Ysseldyke, J., & McGrew, K. (1992, April*). National survey of state practices in assessment of educational outcomes for students with disabilities.* Paper presented at the American Education Research Association Annual Meeting, San Francisco, CA.

Ittenbach, R., Bruininks, R., Thurlow, M., & McGrew, K. (1991, April). *Community integration of young adults with mental retardation.* Paper presented at the American Educational Research Association annual meeting in Chicago, IL.

Krepel, T., McGrew, K., & Grady, M. (1991, Aug,). *The national goals for education. Challenges in policy, research and measurement.* Paper presented at the National Council of Professors of Education Administration, Fargo, ND.

McGrew, K. (1991, Feb.). *The WJ-R cognitive battery. No longer the Rodney Dangerfield of intelligence tests.* Presentation made at the Minnesota School Psychologists Midwinter Conference, Brainerd, MN.

McGrew, K. (1991, June). *A multidimensional approach to post-school outcome assessment.* Presentation at Secondary Transition Intervention Effectiveness Institute, Washington, D.C.

McGrew, K. (1991, Nov.). *The WJ-R cognitive battery. No longer the Rodney Dangerfield of intelligence tests.* Presentation made as part of the Woodcock-Johnson Advanced Symposium, Chicago.

McGrew, K., & Bruininks, R., (1991, April). *Dimensions of personal competence and adjustment in the community.* Paper presented at the Eighth World Congress of the International Association for the Scientific Study of Mental Deficiency, Hong Kong.

McGrew, K. (1990, Feb.). *Selecting and using informal and formal family assessment tools.* Presentation to the Family Matters Conference, St. Cloud, MN.

McGrew, K. (1990, April). *A comparison of major adaptive behavior scales.* Presentation at the Adaptive Behavior Conference, Minnesota Department of Education, St. Paul, MN.

McGrew, K. (1990, March). *Comparative Horn-Cattell Gf-Gc factor structure of five intelligence batteries.* Paper presented at the National Association of School Psychologists convention, San Francisco, CA.

McGrew, K. (1990, March). *Analysis of the new Woodcock-Johnson Battery.* Presentation made to the Trainers of School Psychologists at the annual convention of the National Association of School Psychologists convention, San Francisco, CA.

McGrew, K., & Johnson, S. (1990, March). *The development of individual family service plans. A demonstration project.* Paper presented at the National Association of School Psychologists convention, San Francisco, CA.

A-000818

K. McGrew CV (07-28-15)                                                      p. 20

McGrew, K. (1989, March). *Factor structure of the Woodcock-Johnson Psycho-Educational Battery. Confirmatory factor analysis from kindergarten to adulthood.* Paper presented at the National Association of School Psychologists convention, Boston, MA.

McGrew, K., & Bruininks, R. (1989, March). *Adaptive and maladaptive behavior. Testing models of personal competence.* Paper presented at the National Association of School Psychologists convention, Boston, MA.

Bruininks, R., McGrew, K., Thurlow, M., & Lewis, D. (1988, Aug.). *Dimensions of community adjustment among young adults with intellectual disabilities.* Paper presented at the Eighth World Congress of the International Association for the Scientific Study of Mental Deficiency, Dublin, Ireland.

McGrew, K. (1987, March). *Exploring the structure of adaptive behavior.* Paper presented at the National Association of School Psychologists convention, New Orleans, LA.

McGrew, K. (1986, May). *A multivariate analysis of the Woodcock-Johnson/Wechsler discrepancy controversy.* Paper presented at the Western Psychological Association convention, Seattle, Washington.

McGrew, K. (1986, May). *Exploring the structure of adaptive behavior in handicapped and nonhandicapped populations.* Research presentation at Phyllis K. Mirkin Lectureship Series in Special Education, University of Minnesota, Minneapolis, MN.

McGrew, K. (1986, August. 1987, March). *Interpretation of the Woodcock-Johnson Tests of Cognitive Ability.* Presentation made to the Trainers of School Psychologists at the annual convention of the American Psychological Association, Washington, D.C. Similar presentation repeated March, 1987 at National Association of School Psychologists convention, New Orleans, LA.

McGrew, K. (1984, April). *Subtest research with the Woodcock-Johnson Tests of Cognitive Ability.* Paper presented at the National Association of School Psychologists convention, Philadelphia, PA.

McGrew, K. (1982, March). *Comparison of the WISC-R and Woodcock-Johnson Tests of Cognitive Ability.* Paper presented at the National Association of School Psychologists convention, Toronto, Ontario, Canada.

## NEWSLETTER ARTICLES

Ortiz, S., Flanagan, D.P., & McGrew, K. S. (1999). Assessment in school psychology. Past, present, and future. *NASP Communiqué, 28 (2)*, 30-32.

McGrew, K. S., Flanagan, D. P., & Keith, T. Z. (1999). *Gf-Gc* theory and the organization of abilities. Response to Naglieri and Sullivan. *NASP Communiqué, 27 (6)*, 28-29.

McGrew, K., & Flanagan, D. (1996). The Wechsler Performance Scale debate. Fluid Intelligence (*Gf*) or Visual Processing (Gv)? *NASP Communiqué, 24(6)*.

Flanagan, D. & McGrew, K. (1995). The field of intellectual assessment. A current perspective. *The School Psychologist, 49(1)*.

McGrew, K., & Flanagan, D. (1995). A cross-battery approach to intelligence test interpretation. *NASP Communiqué, 24(4)*.

McGrew, K. (1994). The achievement content criticism of the WJ and WJ-R. A myth. *NASP Communiqué, 22 (8)*.

McGrew, K. (1994). School psychologists vs. school proceduralists. A response to Willis and Dumont. *NASP Communiqué, 22*.

McGrew, K. (1993) Intelligence testing and *Gf-Gc* theory. *NASP Communiqué, 21(5)*.

McGrew, K. (1990). An individualized family-centered approach to assessment and planning. NASP Communiqué, 19(2).

McGrew, K. (1989). A school psychologist as applied researcher. *NASP Communiqué, 18(3)*.

McGrew, K. (1988). A response to. Should a single criterion for learning disability eligibility be employed? *NASP Communiqué, 16(8)*.

K. McGrew CV (07-28-15)                                                                    p. 21

McGrew, K. (1987). School psychologists' acceptance of the Woodcock-Johnson Tests of Cognitive Ability. *Trainers' Forum. Newsletter of Trainers of School Psychologists, 7(2).*

A-000820

## Carlton, Stephen (USAFLS)

**From:** Patricia Kyle [patricia@kylecrimlaw.com]
**Sent:** Tuesday, May 27, 2008 3:00 PM
**To:** Carlton, Stephen (USAFLS)
**Subject:** RE: Daniel Troya, et al

Thank you. patty

*"Carlton, Stephen (USAFLS)" <Stephen.Carlton@usdoj.gov>* wrote:
We are actively reviewing your e-mails, and deciding what to do; will be in touch shortly.

---

**From:** Patricia Kyle [mailto:patricia@kylecrimlaw.com]
**Sent:** Tuesday, May 27, 2008 2:37 PM
**To:** Carlton, Stephen (USAFLS)
**Subject:** RE: Daniel Troya, et al

Steve:

I just spoke with Mario via telephone. Basically, here's some more background that may help you and John decide what you want to do about this information.

While Mario was cooperating with AUSA Todd Mestepey, Mario was debriefed by ATF Agent Eric Espinosa (305) 796-4786 and St. Lucie County detective Fred Wilson (772) 462-3259 regarding Troya et al. This was after Troya had been arrested and incarcerated in Miami FDC but while the State was deciding whether to charge them with the murders. Mario told Fred and Eric that Troya (and I believe Varela) had been part of a violent home invasion robbery group with guns. He also told them about what Troya had said about the murders. I believe that Eric has a great deal of information resulting from at least two debriefings of Mario. Mario knows a lot about Troya and the guns too.

Mario has advised me that he will be more than happy to meet with your agents (and I fully approve any meeting without me present), and to testify if you need him.

It is my understanding that Mario's attorney at the time, Glenn Kritzer of Miami, and AUSA Todd Mestepey did NOT present this information to the Judge as part of the basis for a 5K1.1 Motion at sentencing because (1) the information had not yet been vetted through you guys and (2) they decided to hold off on it to serve later as part of a request for a subsequent Rule 35.

My goal, and I want to be absolutely straight with you, is to get Mario OUT of prison ASAP. He will sign anything agreeing to testify/debrief/whatever, and I think that everyone who has met with Mario believes that he will live up to his agreements.

Please keep me posted. Thank you. patty

*"Carlton, Stephen (USAFLS)" <Stephen.Carlton@usdoj.gov>* wrote:

Should we send someone to go see this guy?

---

**From:** Patricia Kyle [mailto:patricia@kylecrimlaw.com]
**Sent:** Tuesday, May 27, 2008 11:52 AM

1
A-000821

Troya058605

**To:** Kastrenakes, John (USAFLS); Carlton, Stephen (USAFLS)
**Subject:** Re: Daniel Troya, et al

Hello John (and Steve, although I never have met Steve):

I have a client named Mario Davis who has been debriefed and testified in a major Miami case for Todd Mestepey. Mario is an INCREDIBLE witness who, not too long ago, was housed with Daniel Troya. Daniel Troya told Mario, face to face and in great detail, how he and Varela had murdered Jose Luis Escobedo, his wife and their sons on the turnpike a few years ago. Mario also has information regarding what Troya told him about drugs.

Right now, Mario is at Butner Medical Center. He is very ill with terminal kidney disease, and I am working with Bob Senior and Todd Mestepey to try to get Mario sprung so that he can get a kidney transplant. Both Bob and Todd are empathetic to Mario's situation, but it would be helpful to supporting a request for a Rule 35 Motion by Bob if Mario were to assist in another pending matter. Mario only has about 3 years left to serve -- or less.

I believe that I mentioned Mario's information to you a long time ago, but I don't believe he ever was debriefed by your agents. Please let me know if you are interested and, if so, give me a call or e-mail. Also, please feel free to contact Bob and/or Todd. Thank you. patty

Troya058606



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

_____

*500 Australian Ave.*
*West Palm Beach, FL 33401*
*(561)820-8711*

November 21, 2008

L. D. Murrell, P.A.
400 Executive Center Dr Ste 201
West Palm Beach, Florida 33401-2922

James L. Eisenberg
250 Australian Avenue South
West Palm Beach, FL 33401

Gershman & Goldstein
1675 Palm Beach Lakes Boulevard
Suite 700
West Palm Beach, FL 33401

Ruben Maurice Garcia
1209 SE 3rd Avenue
Fort Lauderdale, FL 33316-1905

Michael B. Cohen
6400 N Andrews Ave. Suite 460,
Ft. Lauderdale, FL 33309

Gregg Stuart Lerman
330 Clematis Street
West Palm Beach, FL 33401

Re: <u>United States v. Danny Varela, et al.,</u>
Case No. 06-80171-Cr-Hurley (s)(s)(s)

Dear Counsel:

In preparing for trial we discovered a photograph which for some reason was not included on the previously-supplied CD's; enclosed is a hard copy of that photograph. That photograph (file name: DSC00091.JPG) is included on a CD-ROM being provided to Mr. Eisenberg as lead counsel for discovery. The photograph depicts Damian Escobedo. We earlier sent out to you separate CDs of the autopsies of each victim, but the photograph on this CD-ROM was apparently not included on those. I will also send out this single file as an e-mail attachment to all defense attorneys.

<u>Opinion of medical examiner, Dr. Roger Mittleman.</u> Previously, you were supplied the protocols of the autopsies of the four victims in this case. The opinions of Dr. Diggs are adopted by Dr. Mittleman, except for a typographical error on the entrance wound location for the 3 year old victim, D███ E███████. Further, based on a review of the Medical Examiner files, Dr. Mittleman will also opine as follows:

> With regard to adult male victim, Jose Escobedo: The wound to his head was fired from close range, approximately 18-24 inches. That shot was immediately fatal. The other shots to the abdomen of the victim are consistent with him being shot while laying supine on the ground.

> With regard to the adult female victim, Jessica Escobedo: The numerous shots to her body, both front and rear are consistent with her moving and turning with her

covering her children. Those shots occurred prior to the 3 shots to her head which lodged in her brain, as those shots were instantly fatal. Further, her position on the ground when found is inconsistent with her being shot in portions of her body or head while in that position. Further there are 3 shots to her body which perforated her body and are consistent with some re-entry type wounds found on the children.

With regard to the 4 year old child, J█████ B█████████  There are some shots to his body which appear to be re-entry wounds. Further, the shots to his body preceded the instantly fatal shot to the head. Given, the position of this child on the ground, it is consistent with the fatal shot being fired while this child was on the ground, but some of the shots to his body are inconsistent with this position.

With regard to the 3 year old child, D████ B██████: The fatal shot was to his chest and is not a re-entry wound. This bullet perforated his body and is consistent that this bullet struck and perforated his arm. Unlike the other three victims, this child's mechanism of death was slower as he bled into his lungs and then was unable to breathe having "drowned in his own blood." Such a death typically would take from 30 seconds to over a minute.

Second, we have caused certain conversations and transcripts involving Malik Mullino and Danny Varela to be digitized and synchronized. Copies of the transcripts are enclosed, as well as a CD-ROM of the synchronization. Audio cassette tapes of these recordings were already provided earlier in discovery.

Third, in connection with the unopposed motion to substitute medical examiner, we are notifying each of you that the Medical Examiner's entire file on the four homicides at issue in this case is a public record available for your review on the campus of Indian River State College in Ft. Pierce at the Office of the Medical Examiner. We intend to introduce said file as a business record, however, we do not plan on publishing the majority of the file but only those documents and photographs that will aid the Medical Examiner in his opinions.

Fourth, previously-listed firearms examiner Mark Chapman recently provided a document that summarizes his computer search of possible .40 caliber weapons based on his examination of the recovered .40 caliber projectiles. That list is attached. I will also send out this single page as an e-mail attachment to all defense attorneys.

Please contact me if you have questions.

Sincerely,

/s Stephen Carlton

By:     Stephen Carlton
        Assistant U.S. Attorney

A-000824



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

---

*500 Australian Ave.*
*West Palm Beach, FL 33401*
*(561)820-8711*

January 13, 2009

L. D. Murrell, P.A.
400 Executive Center Dr Ste 201
West Palm Beach, Florida 33401-2922

James L. Eisenberg
250 Australian Avenue South
West Palm Beach, FL 33401

Gershman & Goldstein
1675 Palm Beach Lakes Boulevard
Suite 700
West Palm Beach, FL 33401

Ruben Maurice Garcia
1209 SE 3rd Avenue
Fort Lauderdale, FL 33316-1905

Michael B. Cohen
6400 N Andrews Ave. Suite 460,
Ft. Lauderdale, FL 33309

Gregg Stuart Lerman
330 Clematis Street
West Palm Beach, FL 33401

Re: United States v. Danny Varela, et al.,
Case No. 06-80171-Cr-Hurley (s)(s)(s)

Dear Counsel:

In reviewing our Rule 16 disclosure regarding the testimony of the medical examiner, we omitted a conclusion of his. With regard to the autopsy of L█████ D█████ Escobedo, the medical examiner noted a stippling pattern on the left side of his face and ear. This pattern is consistent with a firearm being discharged in relative close proximity to the left side of this child's face. There is no gunshot wound that the medical examiner can directly link to this stippling pattern.

Please contact me if you have questions.

Sincerely,

*/s Stephen Carlton*

By:   Stephen Carlton
Assistant U.S. Attorney

A-000825

OFFICE OF THE MEDICAL EXAMINER
DISTRICT NINETEEN, FLORIDA

CHAIN OF CUSTODY

RECEIVED FROM:  OFFICE OF THE MEDICAL EXAMINER
2500 SOUTH 35TH STREET
FORT PIERCE, FLORIDA 34981
(561) 464-7378

MEDICAL EXAMINER: _Dr Diggs_

NAME: _ESCOBEDO, L___ D____    CASE # 06-19-597_

ITEMS:

_1 PROJECTILE FRAGMENT (INNER RIGHT Thigh)_

AGENCY REPRESENTED: _SLSO_

RECEIVED BY: _D. Carmichael_

SIGNATURE: _____

DATE: _10/16/06_    TIME: _3:48 pm_

A-000826



**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L█ D█..........October 16, 2006...........3:00 p.m........Case No. 06-19-597

### CAUSE OF DEATH:

MULTIPLE GUNSHOT WOUNDS

### MANNER OF DEATH:

HOMICIDE

**Charles A. Diggs, M.D.**
Associate Medical Examiner

Date 10/20/06

CAD/ps

A-000827

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L██ D██████.........October 16, 2006...........3:00 p.m........Case No. 06-19-597

## EXTERNAL EXAMINATION:

The body is that of a 3 foot 2 inch, 38 pound Caucasian male child, who appears the stated age of 3 years. The hair is dark brown and is normally distributed. Both eyes have brown irides, which surround equally dilated pupils. The conjunctivae show no hemorrhages nor congestion. The nasal cavities are free of obstructions and the septum has no perforations. The mouth has natural dentition. The tongue and oral mucosa are free of lacerations and hemorrhages. The neck has a midline trachea. The chest is symmetrical and the abdomen is free of masses. The external genitalia are those of a normal male child. The rectum is unremarkable. Both right and left upper and lower extremities are symmetrical and free of congenital abnormalities. The back is unremarkable.

## TRAUMA:  EXTERNAL AND INTERNAL

## GUNSHOT WOUND OF RIGHT UPPER SHOULDER:

An entrance gunshot wound measuring 1/3 of an inch in diameter and showing no stippling nor blackening is present over the left upper shoulder 4 inches to the left of the midline of the chest and 30 inches above the sole of the feet. The wound track courses from left to right and slightly downward, passing through the right and left lungs and heart. The exit wound is located at the right armpit 5-1/2 inches to the right of the midline of the chest and 26-1/2 inches above the sole of the feet.

## GUNSHOT WOUNDS OF EXTREMITIES:

Through and through gunshot wounds are present over the posterior upper right arm and dorsal left wrist. These wounds measures 1/3 x 1/2 inches in their broadest diameter. An additional gunshot wound is located over the medial aspect of the right thigh. The projectile courses in the soft tissue and exits the body at the right inguinal line 4 inches to the right of the pelvic midline. A projectile was recovered in the exit wound.

## INTERNAL EXAMINATION:

**HEAD**:  The brain weighs 1275 grams. Both cerebral hemispheres are symmetrical and free of contusions and lacerations. The parenchymal surfaces of the cerebrum, cerebellum and medulla show no masses, hemorrhages, nor scars. The corpus callosum is intact and the cerebrospinal fluid is clear. No aneurysms, occlusions, nor ruptures are present in the cerebrovascular system. No subarachnoid, subdural, nor epidural hemorrhages are noted. No lacerations of the dura mater nor leptomeninges are present. The skull is free of fractures. The subcutaneous tissue of the scalp shows no contusions.

1

A-000828

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L██ D██..........October 16, 2006...........3:00 p.m........Case No. 06-19-597

**NECK**:   The cervical spine has no fractures nor dislocations.  The cervical spinal cord is free of contusions or hemorrhages.  The thyroid cartilage and hyoid bone are midline and free of fractures.  The epiglottis and vocal cords are free of inflammatory changes or edema.  The strap muscles and soft tissues of the neck show no hemorrhages nor contusions.

**BODY CAVITIES**:   The right and left thoracic cavities contain hemorrhage secondary to the gunshot wounds of the right and left thorax.

The diaphragm has no lacerations nor hemorrhages.

The abdominal organs are arranged in their proper locations and show no congenital deformities.  The abdominal cavity is lined by glistening and shiny peritoneum. No hemoperitoneum is present.  No retroperitoneal masses nor hemorrhages are noted.

**CARDIOVASCULAR SYSTEM**:  The heart weighs 100 grams.  A perforation through the heart has been previously described.  Otherwise, the heart is anatomically normal and shows no valvular nor congenital abnormalities.  The coronary arteries and myocardium are unremarkable.  The valves are competent.   The great vessels arise from their usual positions and are free of congenital deformities.

**LUNGS**:  The right lung weighs 125 grams.  The left lung weighs 100 grams.  Projectile perforation through both lungs with generalized hemorrhage is present.  The pulmonary arteries and branches are free of thrombi or emboli.  No obstructions are present in the bronchi, trachea, or larynx.

**LIVER AND GALLBLADDER**: The liver weighs 550 grams.  The capsule is smooth and glistening.  No lacerations are present.  The parenchymal surfaces are free of masses, hemorrhages, or scars.  The gallbladder lies in its normal bed and contains no bile.

**HEMIC AND LYMPHATICS**:   The spleen weighs 75 grams.  The capsule is gray and free of lacerations.  The parenchymal surfaces are free of masses, hemorrhages, or scars.  No enlarged lymph nodes are noted.  The bone marrow has no metastatic tumors.

**GENITOURINARY SYSTEM**:   The right kidney weighs 80 grams.  The left kidney weighs 80 grams.  The capsule was stripped with ease from the underlying red-brown cortical surfaces.  The cortical and medullary parenchymal surfaces are free of masses, hemorrhages, or cysts.  The renal pelves and ureters are free of obstructions and stones.  The bladder has no masses nor hemorrhages.  The prostate gland is free of nodules and is not enlarged.  The testes are properly descended and free of trauma.

2

A-000829

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L■ Da■..........October 16, 2006...........3:00 p.m........Case No. 06-19-597

**ENDOCRINE SYSTEM**: The thyroid gland has its normal bilobed appearance and is free of masses, hemorrhages, and cysts. The pancreas has its usual elongated shape and normal tan-brown appearance. The right and left adrenal glands are free of masses, hemorrhages, or cysts.

**DIGESTIVE SYSTEM**: The esophagus and stomach have normal mucosal surfaces, which are free of ulcerations or hemorrhages. The small and large intestines are free of obstructions, hemorrhages, masses, or ulcerations. The omentum and mesentery have no lacerations nor hemorrhages. The stomach is empty.

**MUSCULOSKELETAL SYSTEM**: The muscles of the torso and extremities are normally formed and free of atrophic changes. The right and left upper and lower extremities are symmetrical and free of fractures or deformities. The thoracic, lumbar, and sacral vertebral bodies and bones are free of fractures or dislocations. No fractures of the pelvis, sternum, rib cage, nor clavicles are noted.

**AUTOPSY DIAGNOSES**:

1. Gunshot wound of left upper shoulder with perforation of right and left lungs and heart.

2. Gunshot wound of right thigh.

3. Gunshot wound of right upper arm and left wrist.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

CAD/ps

3

A-000830

Child #2

Full body, male, anterior and posterior views (ventral and dorsal).

Name _Escobedo, _____ ▮▮▮ ▮▮▮▮▮_  Autopsy No. _06-19-597_

Age _3_     Race _W_     Sex _M_     Date _Oct 16, 2006_

A-000831

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L█ D█..........October 16, 2006...........3:00 p.m........Case No. 06-19-597

### MICROSCOPIC EXAMINATION

**LUNGS**:    Generalized hemorrhage in parenchymal surfaces.

**HEART**:   No significant histopathology.

**LIVER**:   No significant histopathology.

**KIDNEYS**:   No significant histopathology.

**BRAIN**:   No significant histopathology.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

October 27, 2006
CAD/ps

4

A-000832

```
RUN DATE: 11/14/06              WUESTHOFF REFERENCE LABORATORY                    PAGE 1
RUN TIME: 1426                       6800 Spyglass Court
                                    Melbourne,Fl 32940


PATIENT: MEDX06-597 ESCOBEDO,L▮▮ D▮▮ ACCT #: Q00988351    LOC:   MEDX     U #: 0001193908
SSN #:                          AGE/SX: 3Y 00M/M  STATUS:  REG REF   REG: 10/17/06
REG DR:  DIGGS,CHARLES A., M.D.                            DISCHARGE DATE:
```

| Test | Result | Cutoff conc mg/L |
|------|--------|------------------|
| **BLOOD DRUG SCREEN** | | |
| SPECIMEN TYPE | CHEST BLOOD | |
| GC/MS | NO DRUGS DETECTED | |
| *IMMUNOASSAY SCREEN* | | |
| AMPHETAMINES | NEGATIVE | 0.100 |
| BARBITURATES | NEGATIVE | 0.100 |
| BENZODIAZEPINES | NEGATIVE | 0.100 |
| CANNABINOIDS | NEGATIVE | 0.050 |
| COCAINE METAB | NEGATIVE | 0.100 |
| FENTANYL | NEGATIVE | 0.001 |
| METHADONE | NEGATIVE | 0.050 |
| OPIATES | NEGATIVE | 0.050 |
| TRICYCLICS | NEGATIVE | 0.100 |
| SALICYLATE | NEGATIVE | 10.0 |
| **VOLATILES** | | |
| SPECIMEN TYPE | CHEST BLOOD | |
| VOLATILES | NONE DETECTED | |

*Specimens were intact upon receipt.  Chain of custody,
specimen security and integrity has been maintained.
Testing has been performed as requested.*

Reviewed by: *Susan K Adams*     Date: 11-15-06

*FINAL REPORT - THIS COMPLETES REPORTING ON THIS CASE.*

\*\* END OF REPORT \*\*

**OFFICE OF THE MEDICAL EXAMINER**
**DISTRICT NINETEEN, FLORIDA**

## CHAIN OF CUSTODY

RECEIVED FROM:      OFFICE OF THE MEDICAL EXAMINER
                                 2500 SOUTH 35TH STREET
                                 FORT PIERCE, FLORIDA 34981
                                 (561) 464-7378

MEDICAL EXAMINER: _Dr. Diggs_

NAME: _Escobedo, Yessica_                     CASE # _06-19-595_

ITEMS:

1- Bullet Jacket

1- Bra

1- Hair Scrunchie

1- Pants

1- Shirt

1- Panties

1- Shoes

1- Watch.

2 Rings

1- pair earring

1- Bracelet

AGENCY REPRESENTED: _SLSO_

RECEIVED BY: _R. Graves_

SIGNATURE: _____

DATE: _10/13/06_                     TIME: _1651_

A-000834

OFFICE OF THE MEDICAL EXAMINER
DISTRICT NINETEEN, FLORIDA

CHAIN OF CUSTODY

RECEIVED FROM: OFFICE OF THE MEDICAL EXAMINER
2500 SOUTH 35TH STREET
FORT PIERCE, FLORIDA 34981
(561) 464-7378

MEDICAL EXAMINER: Dr. Diggs

NAME: ESCOBEDO, Yessica          CASE # 06-19-595

ITEMS:

1 - PROJECTILE     (Middle Left Head)
5 - PROJECTILE FRAGMENTS     (Head)
1 - PROJECTILE     (Left Chest)
1 - PROJECTILE     (Left Arm)
1 - PROJECTILE     (Left Neck)
1 - PROJECTILE     (Lower Left Head)
1 - FRAGMENT     (Shoulder)
1 - PROJECTILE     (Superior Left Head)

AGENCY REPRESENTED: SLSO
RECEIVED BY: D. Carmichael
SIGNATURE: N. _____
DATE: 10/10/06          TIME: 11:26 AM

- A-000835

OFFICE OF THE MEDICAL EXAMINER
DISTRICT NINETEEN, FLORIDA

CHAIN OF CUSTODY

RECEIVED FROM:       OFFICE OF THE MEDICAL EXAMINER
2500 SOUTH 35TH STREET
FORT PIERCE, FLORIDA 34981
(561) 464-7378

MEDICAL EXAMINER: _CADiggs_

NAME: _Escobedo, Yessica_          CASE # _06-19-595_

ITEMS:

_1 Projectile_

AGENCY REPRESENTED: _St Lucie S.O._

RECEIVED BY: _Sgt R. Gregg_

SIGNATURE: _[signature]_

DATE: _10/19/06_          TIME: _9:45 am_

A-000836

FCN-052
02/02

*ME06-19-595*

## ST. LUCIE COUNTY SHERIFF'S OFFICE
# Death Investigation Field Report

Agency Case # *1-06-013332*

Name *Yessica Guerrero Escobedo*   Race *H*   Sex *F*   DOB ▮▮▮-*81*   Age *25*

Address/Location ▮▮▮▮▮▮ *West Palm Beach FL 33413*

SS# ▮▮▮-*1183* Occupation _____   Employer _____

Place of death *149 mm Turn Pike SB*   County *St. Lucie County*

Date/Time death occurred *10-13-06*   Presences of _____

Date/Time found *10-13-06  7:45 AM*   by *Sean Michael Jacobus*

Date/Time last seen alive _____   by _____

Identified by *Driver's license thru DAVID*   Address *1730 spring lake, Orlando*

*outside of PR*  Position/Location of body *laying facedown Heading Facing North. w/ 2 Juv males Next to her*

Clothing description *yellow Polo shirt w/ pink, Blu, + white stripe, Blue Jeans 1 Flip flop*  (brown)

Are fold in clothing consistent with body location/position ☑ Yes   ☐ No

Lividity ☑ Yes   ☐ No        Rigor mortis ☐ None   ☐ Slight   ☑ Full        ☐ Body heat

Decomposition ☑ None   ☐ Slight   ☐ Advanced        Trauma ☑ Yes   ☐ No

Describe trauma *Gunshot Wound*

Were any rigor mortis joints broken by on scene personnel   ☐ Yes   ☑ No

Death violent ☑ Yes   ☐ No        ☑ Weapon used   Type weapon *HANDGUN*

Death pronounced by *FHP Chief lee #6*   Date/Time *10/14/06 @ 0752* EMS# _____

☑ M.E. Notified   Time _____   Notified by _____   ID# _____

Doctors (previous treatment) _____

☐ Doctor sign death certificate   Name _____   Phone _____

Medications to medical examiner _____

Next of kin _____   Relationship _____

Address _____   Notified ☐ Yes ☐ No   Date _____

Phone Number _____   Notified by _____   ID# _____

Funeral home requested   ☐ Yes   ☐ No   Name _____

Valuables/Disposition _____

Body transported by *Tri-County Mortuary*   Date/Time *10-13.06*

On scene officer *DIS Tuckert*   ID# *204*   Date/Time *10/14/06 @ 800An*

Investigator on scene   ☑ Yes   ☐ No   Name *Det. Fred Wilson, Det. David Ingram*

Investigator requests attendance at autopsy   ☑ Yes   ☐ No   PX# _____

Report submitted by *Det. Ingram*   ID# *117*   Date *10-13-06*

Please list any inconsistencies or comments _____

_____

_____

_____

DISTRIBUTION:   WHITE - RECORDS;   CANARY - INVESTIGATIONS;   PINK - OFFICER;   GOLD - MEDICAL EXAMINER

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

**CAUSE OF DEATH:**

MULTIPLE GUNSHOT WOUNDS

**MANNER OF DEATH:**

HOMICIDE

**Charles A. Diggs, M.D.**
Associate Medical Examiner

Date 10/20/06

CAD/ps

A-000838

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19

### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

## EXTERNAL EXAMINATION:

The body is that of a 5 foot 4 inch, 118 pound Caucasian female, who appears the stated age of 25 years. The hair is dark brown and is normally distributed. Both eyes have brown irides, which surround equally dilated pupils. The conjunctivae show no hemorrhages nor congestion. The nasal cavities are free of obstructions and the septum has no perforations. The mouth has natural dentition. The tongue and oral mucosa are free of lacerations or hemorrhages. The neck has a midline trachea. The chest is symmetrical and the breasts are free of masses. The abdomen is flat. The external genitalia are those of a normal female adult. No lacerations nor contusions are present in the vagina. The rectum is unremarkable. Both right and left upper and lower extremities are symmetrical and free of congenital abnormalities. The back has no rashes nor tattoos.

## TRAUMA: EXTERNAL AND INTERNAL

### MULTIPLE GUNSHOT WOUNDS OF HEAD:

A large irregular 1 x 1-1/2 inch gunshot wound is located over the posterior midline of the head at its base. This wound is located 59 inches above the sole of the feet. This wound courses from left to right and exits the head behind the right ear. No stippling nor blackening is noted around the periphery of the wound.

A gunshot wound which measures 1/3 of an inch in diameter and shows no stippling or blackening around the periphery is located on the posterior aspect of the head behind the left ear. This wound courses from back to front and lodges in the left side of the brain.

A gunshot wound is located over the left mandible, measuring 1/3 of an inch in diameter and shows no stippling or blackening around its periphery. This wound courses from front to back and slightly upward and lodges in the left side of the brain.

An entrance gunshot wound is located over the inferior aspect of the chin at the midline. No stippling nor blackening is noted around the periphery of the wound. This wound courses from front to back and slightly upward, lodging in the left hemisphere of the brain.

### GUNSHOT WOUNDS OF TORSO:

An entrance gunshot wound measuring 1/3 of an inch in diameter is located on the left anterior chest approximately 1 inch to the left of the midline of the chest and 52 inches above the sole of the left foot. No stippling or blackening is noted around the periphery. The direction of the wound track is from front to back and slightly upward. A projectile terminating at the end of this wound track is recovered at the base of the neck over its lateral aspect.

1

A-000839

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

A gunshot wound measuring 1/3 of an inch in diameter is located over the superior aspect of the left shoulder. This wound is located approximately 52 inches above the sole of the feet. No stippling nor blackening is present around the periphery of the wound. The wound track courses anatomically downward and lodges in the central aspect of the left upper arm. A projectile is recovered at the terminus of the wound track.

An entrance gunshot wound is located over the right anterolateral abdomen. This wound measures 1/3 of an inch in diameter and shows no stippling nor blackening around its periphery. The wound is located 49-1/2 inches above the sole of the feet and 4-1/2 inches to the right of the midline of the abdomen. The wound track courses from front to back and exits the back just to the right of the midline.

A gunshot wound which measures 1/3 of an inch in diameter and shows no stippling nor blackening around the periphery is located over the right anterolateral abdomen 4 inches to the right of the midline of the abdomen and 48 inches above the sole of the feet. This projectile travels from right to left, slightly back to front and downward, terminating in the soft tissue of the abdomen on the right side.

An entrance gunshot wound that measures 1/3 of an inch in diameter and shows no stippling nor blackening is noted over the upper posterior right shoulder. This wound is located 4 inches to the right of the midline of the back and 52 inches above the sole of the feet. The direction of the wound track is from back to front, fracturing the right clavicle. A projectile is recovered in an exit wound located over the superior aspect of the right shoulder.

An entrance gunshot wound is located over the right posterolateral aspect of the back. This wound measures 1/3 of an inch in diameter and shows no stippling nor blackening around the periphery. The wound is located 7 inches to the right of the midline of the back and 49-1/2 inches above the sole of the feet. The wound track courses from right to left, back to front and slightly downward and lodging in the soft tissue of the posterior diaphragm on the left side.

A gunshot wound is located over the right posterior aspect of the back. This wound measures 1/3 of an inch in diameter and shows no stippling nor blacking around its periphery. The wound is located 5-1/2 inches to the right of the midline of the back and 43-1/2 inches above the sole of the feet. The wound curses from back to front and horizontal and exits the right lower abdomen over its right anterior aspect.

### INTERNAL EXAMINATION:

**HEAD:** The brain weighs 1275 grams. Multiple hemorrhagic perforations secondary to multiple gunshot wounds are present. Generalized intracranial hemorrhage is also prominent. No masses nor scars are present in the parenchymal surfaces of the cerebrum, cerebellum, or medulla.

2

A-000840

( (

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

**NECK**: The cervical spine has no fractures nor dislocations. The cervical spinal cord is free of contusions or hemorrhages. The thyroid cartilage and hyoid bone are midline and free of fractures. The epiglottis and vocal cords are free of inflammatory changes or edema. The strap muscles and soft tissues of the neck show no hemorrhages nor contusions.

**BODY CAVITIES**: The right and left thoracic cavities show the presence of 500 ml. of hemorrhage in the left thorax and 450 ml. in the right thorax. Hemorrhage is present in the mediastinum.

The diaphragm shows a projectile perforation over its left aspect.

The abdominal organs are arranged in their proper locations and show no congenital deformities. The abdominal cavity shows generalized extravasated hemorrhage. No retroperitoneal masses are present.

**CARDIOVASCULAR SYSTEM**: The heart weighs 225 grams. It is located in a normal pericardial sac which is free of fluid or hemorrhages. The epicardium is glistening, smooth, and shiny. The myocardium is dark red-brown and shows no scars nor hemorrhages. The endocardial surfaces are smooth and glistening. The valves are competent and the valve leaflets are free of vegetations. The chordae tendineae show no shortening or fusions. The papillary muscles are normal. No atrial nor ventriculoseptal defects are noted. The right and left coronary arteries, circumflex, and diagonal branches are widely patent. Both coronary ostia are free of occlusions. The great vessels, including the aorta, superior and inferior vena cava, along with the pulmonary artery, arise from their usual positions and are free of congenital deformities.

**LUNGS**: The right lung weighs 200 grams. The left lung weighs 225 grams. Projectile perforations are present through both right and left lungs. No masses nor scars are present. The pulmonary arteries and branches are free of thrombi or emboli. No obstructions are present in the bronchi, trachea, or larynx.

**LIVER AND GALLBLADDER**: The liver weighs 1350 grams. The capsule is smooth and glistening. No lacerations are present. The parenchymal surfaces are free of masses, hemorrhages, or scars. The gallbladder lies in its normal bed and contains 5 ml. of green bile.

**HEMIC AND LYMPHATICS**: The spleen weighs 100 grams. The capsule is gray and free of lacerations. The parenchymal surfaces are free of masses, hemorrhages, or scars. No enlarged lymph nodes are noted. The bone marrow has no metastatic tumors.

**GENITOURINARY SYSTEM**: The right kidney weighs 100 grams. The left kidney weighs 100 grams. The capsule was stripped with ease from the underlying red-brown cortical surfaces. The cortical and medullary parenchymal surfaces are free of masses, hemorrhages, or cysts. The renal pelves and ureters are free of obstructions and stones. The bladder is unremarkable. The uterus is nonpregnant and contains an IUD.

3

A-000841

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

**ENDOCRINE SYSTEM**: The thyroid gland has its normal bilobed appearance and is free of masses, hemorrhages, or cysts. The pancreas has its usual elongated shape and normal tan-brown appearance. The right and left adrenal glands are free of masses, hemorrhages, or cysts.

**DIGESTIVE SYSTEM**: The esophagus and stomach have normal mucosal surfaces, which are free of ulcerations or hemorrhages. The stomach is empty. The small and large intestines are free of obstructions, hemorrhages, masses, or ulcerations. Extravasated hemorrhage is present in the omentum and mesentery secondary to the gunshot wounds.

**MUSCULOSKELETAL SYSTEM**: The muscles of the torso and extremities are normally formed and free of atrophic changes. The right and left upper and lower extremities are symmetrical and free of fractures or deformities. The thoracic, lumbar, and sacral vertebral bodies and bones are free of fractures or dislocations. No fractures of the pelvis, sternum, rib cage, nor clavicles are noted.

### AUTOPSY DIAGNOSES:

1.    Gunshot wounds (4) of head, with perforation of brain and skull.

2.    Gunshot wounds of chest, abdomen, back and extremities (7).

    A.    Perforation of right and left lungs.

    B.    Perforation of abdominal viscera.

    C.    Thoracic and abdominal hemorrhage.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

Date 10/20/06

CAD/ps

4

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Yessica.............October 16, 2006............8:30 a.m.........Case No. 06-19-595

## MICROSCOPIC EXAMINATION

**LUNGS:** Hemorrhage in pulmonary parenchymal surfaces.

**HEART:** No significant histopathology.

**LIVER:** No significant histopathology.

**KIDNEYS:** No significant histopathology.

**BRAIN:** Generalized hemorrhage in parenchymal surfaces.


**Charles A. Diggs, M.D.**
Associate Medical Examiner


October 27, 2006
CAD/ps

5

A-000843

FULL BODY, (FEMALE) ANTERIOR AND POSTERIOR VIEW

NAME _Escobedo, Yessica_  AUTOPSY NO. _06-19-595_

AGE _25_  RACE _W_  SEX _F_  DATE _10/16/06_



A-000844

```
RUN DATE: 11/08/06          WUESTHOFF REFERENCE LABORATORY              PAGE 1
RUN TIME: 1635                    6800 Spyglass Court
                                  Melbourne, Fl 32940


PATIENT: MEDX06-595 ESCOBEDO,YESSICA    ACCT #: Q00987945    LOC:    MEDX      U #: 0001193717
SSN #:                                  AGE/SX: 25/F         STATUS: REG REF   REG: 10/16/06
REG DR:  DIGGS,CHARLES A., M.D.                                      DISCHARGE DATE:
```

| Test | Result | Cutoff Conc mg/L |
|------|--------|------------------|
| **BLOOD DRUG SCREEN** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| GC/MS | CAFFEINE | |
| **IMMUNOASSAY SCREEN** | | |
| AMPHETAMINES | NEGATIVE | 0.100 |
| BARBITURATES | NEGATIVE | 0.100 |
| BENZODIAZEPINES | NEGATIVE | 0.100 |
| CANNABINOIDS | NEGATIVE | 0.050 |
| COCAINE METAB | NEGATIVE | 0.100 |
| FENTANYL | NEGATIVE | 0.001 |
| METHADONE | NEGATIVE | 0.050 |
| OPIATES | NEGATIVE | 0.050 |
| TRICYCLICS | NEGATIVE | 0.100 |
| SALICYLATE | NEGATIVE | 10.0 |
| **VOLATILES** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| VOLATILES | NONE DETECTED | |

*Specimens were intact upon receipt. Chain of custody, specimen security and integrity has been maintained. Testing has been performed as requested.*

Reviewed by: _____    Date: 11/8/06

*FINAL REPORT - THIS COMPLETES REPORTING ON THIS CASE.*

** END OF REPORT **
A-000845

OFFICE OF THE MEDICAL EXAMINER
DISTRICT NINETEEN, FLORIDA

CHAIN OF CUSTODY

RECEIVED FROM:     OFFICE OF THE MEDICAL EXAMINER
2500 SOUTH 35TH STREET
FORT PIERCE, FLORIDA 34981
(561) 464-7378

MEDICAL EXAMINER: _DR Diggs_____

NAME: _ESCOBEDO, L█ J█████_____     CASE # _06-19-596_

ITEMS:

_1 - Projectile         (Right Abdomen)_

_1 - Piece of Projectile Fragment_

AGENCY REPRESENTED: _SLSO_____

RECEIVED BY: _D. Carmichael_____

SIGNATURE: _N. _____

DATE: _10/14/16_____     TIME: _2:42 pm____

A-000846

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**

St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L█ J█.........October 16, 2006..........2:00 p.m........Case No. 06-19-596

COPY

**CAUSE OF DEATH:**

GUNSHOT WOUNDS OF HEAD AND ABDOMEN

**MANNER OF DEATH:**

HOMICIDE

**Charles A. Diggs, M.D.**
Associate Medical Examiner

Date 10/20/06

CAD/ps

A-000847

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L█ J█..........October 16, 2006..........2:00 p.m.......Case No. 06-19-596

## EXTERNAL EXAMINATION:

The body is that of a 3 foot 5 inch, 40 pound Caucasian male child, who appears the stated age of 4 years. The hair is dark brown and is normally distributed. Both eyes have brown irides, which surround equally dilated pupils. The conjunctivae show no hemorrhages nor congestion. The nasal cavities are free of obstructions and the septum has no perforations. The mouth has natural dentition. The tongue and oral mucosa are free of lacerations and hemorrhages. The neck has a midline trachea. The chest is symmetrical and the abdomen is free of masses. The external genitalia are those of a normal male child. The rectum is unremarkable. Both right and left upper and lower extremities are symmetrical and free of congenital abnormalities. The back is unremarkable.

## TRAUMA:  EXTERNAL AND INTERNAL

### GUNSHOT WOUND OF HEAD:

An entrance stellate gunshot wound is located over the left superior aspect of the head. The wound measures 1-1/2 x 1 inch and is located 41 inches above the sole of the feet. The direction of the projectile is slightly downward, slightly to the right and slightly posterior, passing through the left cerebral hemisphere, producing massive intracranial hemorrhage and necrosis of brain tissue. The exit wound is located over the left posterior aspect of the head approximately 39 inches above the sole of the feet.

### GUNSHOT WOUND OF LEFT LATERAL ABDOMEN:

An entrance gunshot wound is located over the left lateral abdomen. The wound measures 1/3 of an inch in diameter and shows no stippling nor blackening around the periphery. The would is located 24 inches above the sole of the feet and 5 inches to the left of the midline of the abdomen. The direction of the wound track is from left to right, terminating in the lateral aspect of the right abdomen at the right mid axillary line. A projectile is recovered at the terminus of the wound track.

### GUNSHOT WOUND OF ANTERIOR LEFT LOWER ABDOMEN:

An entrance gunshot wound which measures 1/3 of an inch in diameter and shows no stippling nor blackening around its periphery is located 2 inches to the left of the midline of the abdomen and 21 inches above the sole of the foot. The direction of the wound track is from left to right and very slightly upward, crossing the abdomen and exiting the body near the right anterior axillary line 24 inches above the sole of the feet.

### GUNSHOT WOUND OF LEFT LOWER EXTREMITY:

An entrance gunshot wound is located over the lateral aspect of the left thigh. The wound measures 1/3 of an inch in diameter and is located approximately 13 inches above the sole of the feet. The wound track courses from left to right and exits the medial aspect of the left thigh.

1

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**

St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L██ J██...........October 16, 2006..........2:00 p.m.......Case No. 06-19-596

A markedly deformed projectile is recovered in the soft tissue of the right wrist. A slap shot (graze shot) is located over the posterior left lower leg.

## INTERNAL EXAMINATION:

**HEAD**: The brain weighs 1250 grams. Extensive intracranial hemorrhage, along with fractures of the skull secondary to the gunshot wound of the head has been described. Otherwise, the parenchymal surfaces are free of masses or scars. The corpus callosum is lacerated and the cerebrospinal fluid is hemorrhagic. No aneurysms nor occlusions.

**NECK**: The cervical spine has no fractures nor dislocations. The cervical spinal cord is free of contusions or hemorrhages. The thyroid cartilage and hyoid bone are midline and free of fractures. The epiglottis and vocal cords are free of inflammatory changes or edema. The strap muscles and soft tissues of the neck show no hemorrhages nor contusions.

**BODY CAVITIES**: The right and left thoracic cavities are symmetrical and are separated by a midline mediastinum. The mediastinum contains no masses nor hemorrhages. No hemothorax nor pneumothorax is present.

The diaphragm has no lacerations nor hemorrhages.

The abdominal organs are arranged in their proper locations and show no congenital deformities. The abdominal cavity contains extravasated hemorrhage. No retroperitoneal masses are present.

**CARDIOVASCULAR SYSTEM**: The heart weighs 100 grams. It is located in a normal pericardial sac which is free of fluid and hemorrhages. The epicardium is glistening, smooth, and shiny. The myocardium is dark red/brown and shows no scars nor hemorrhages. The endocardial surfaces are smooth and glistening. The valves are competent and the valve leaflets are free of vegetations. The chordae tendineae show no shortening or fusions. The papillary muscles are normal. No atrial nor ventriculoseptal defects are noted. The right and left coronary arteries, circumflex, and diagonal branches are widely patent. Both coronary ostia are free of occlusions. The great vessels, including the aorta, superior and inferior vena cava, along with the pulmonary artery, arise from their usual positions and are free of congenital deformities.

**LUNGS**: The right lung weighs 175 grams. The left lung weighs 125 grams. The parenchymal surfaces are free of masses, hemorrhages, or scars. The pulmonary arteries and branches are free of thrombi or emboli. No obstructions are present in the bronchi, trachea, or larynx.

**LIVER AND GALLBLADDER**: The liver weighs 500 grams. The capsule is smooth and glistening. No lacerations are present. The parenchymal surfaces are free of masses, hemorrhages, or scars. The gallbladder lies in its normal bed and contains no bile.

2

A-000849

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L▮▮J▮▮..........October 16, 2006..........2:00 p.m.......Case No. 06-19-596

**HEMIC AND LYMPHATICS**:  The spleen weighs 100 grams.  The capsule is gray and free of lacerations.  The parenchymal surfaces are free of masses, hemorrhages, or scars.  No enlarged lymph nodes are noted.  The bone marrow has no metastatic tumors.

**GENITOURINARY SYSTEM**:  The right kidney weighs 75 grams.  The left kidney weighs 75 grams.  The capsule was stripped with ease from the underlying red-brown cortical surfaces.  The cortical and medullary parenchymal surfaces are free of masses, hemorrhages, or cysts.  The renal pelves and ureters are free of obstructions and stones.  The bladder has no masses nor hemorrhages.  The prostate gland is free of nodules and is not enlarged.  The testes are properly descended and free of trauma.

**ENDOCRINE SYSTEM**:  The thyroid gland has its normal bilobed appearance and is free of masses, hemorrhages, and cysts.  The pancreas has its usual elongated shape and normal tan-brown appearance.  The right and left adrenal glands are free of masses, hemorrhages, or cysts.

**DIGESTIVE SYSTEM**:  The esophagus and stomach have normal mucosal surfaces, which are free of ulcerations or hemorrhages.  The small and large intestines are free of obstructions, hemorrhages, masses, or ulcerations.  The omentum and mesentery show extravasated hemorrhage and projectile perforations.

**MUSCULOSKELETAL SYSTEM**:  The muscles of the torso and extremities are normally formed and free of atrophic changes.  The right and left upper and lower extremities are symmetrical and free of fractures or deformities.  The thoracic, lumbar, and sacral vertebral bodies and bones are free of fractures or dislocations.  No fractures of the pelvis, sternum, rib cage, nor clavicles are noted.

**AUTOPSY DIAGNOSES**:

1.    Gunshot wound of head.

    A.    Perforation of skull with intracranial fractures.

    B.    Perforation of brain.

    C.    Intracranial hemorrhage.

2.    Gunshot wounds (2) of abdomen, with extravasated hemoperitoneum.

3.    Gunshot wound (through and through) of left thigh.

4.    Gunshot wound of posterior left lower leg (graze shot).

3

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L███ J███ n...........October 16, 2006..........2:00 p.m.......Case No. 06-19-596

5.    Projectile perforation of right wrist.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

CAD/ps

4

A-000851

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, L█ J█.........October 16, 2006..........2:00 p.m.......Case No. 06-19-596

## MICROSCOPIC EXAMINATION

**LUNGS**:    No significant histopathology.

**HEART**:    No significant histopathology.

**LIVER**:    No significant histopathology.

**KIDNEYS**:    No significant histopathology.

**BRAIN**:    Hemorrhage in parenchymal surfaces.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

October 27, 2006
CAD/ps

5

A-000852

Child #1

**Full body, male, anterior and posterior views (ventral and dorsal).**

Name _Escobedo, _____   Autopsy No. _06-19596_

Age _4_      Race _W_      Sex _M_      Date _____

3'5"   40 lbs

A-000853

```
RUN DATE: 11/10/06          WUESTHOFF REFERENCE LABORATORY               PAGE 1
RUN TIME: 1153                6800 Spyglass Court
                             Melbourne,Fl 32940


PATIENT: MEDX06-596 ESCOBEDO,L█████ J█████ CCT #: Q00988346    LOC:  MEDX      U #: 0001193906
SSN #:                       AGE/SX: 99/M       STATUS:  REG REF    REG: 10/17/06
REG DR:  DIGGS,CHARLES A., M.D.                          DISCHARGE DATE:
```

| Test | Result | Cutoff Conc mg/L |
|------|--------|------------------|
| **BLOOD DRUG SCREEN** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| GC/MS | CAFFEINE | |
| *IMMUNOASSAY SCREEN* | | |
| AMPHETAMINES | NEGATIVE | 0.100 |
| BARBITURATES | NEGATIVE | 0.100 |
| BENZODIAZEPINES | NEGATIVE | 0.100 |
| CANNABINOIDS | NEGATIVE | 0.050 |
| COCAINE METAB | NEGATIVE | 0.100 |
| FENTANYL | NEGATIVE | 0.001 |
| METHADONE | NEGATIVE | 0.050 |
| OPIATES | NEGATIVE | 0.050 |
| TRICYCLICS | NEGATIVE | 0.100 |
| SALICYLATE | NEGATIVE | 10.0 |
| **VOLATILES** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| VOLATILES | NONE DETECTED | |

*Specimens were intact upon receipt. Chain of custody, specimen security and integrity has been maintained. Testing has been performed as requested.*

Reviewed by: _Susan R Adams_          Date: 11-13-06

*FINAL REPORT - THIS COMPLETES REPORTING ON THIS CASE.*

** END OF REPORT **

OFFICE OF THE MEDICAL EXAMINER
DISTRICT NINETEEN, FLORIDA

CHAIN OF CUSTODY

RECEIVED FROM:      OFFICE OF THE MEDICAL EXAMINER
2500 SOUTH 35TH STREET
FORT PIERCE, FLORIDA 34981
(561) 464-7378

MEDICAL EXAMINER:  DR Diggs

NAME:  ESCOBEDO, JOSE                          CASE #  06-19-594

ITEMS:

1- PROJECTile   (RT. Mid BACK)
1- PROJECTile   (RT Lower BACK)
1- PROJECTile   (LFT Mid BACK)

AGENCY REPRESENTED:  SLSO

RECEIVED BY:  D. Carmichael

SIGNATURE:

DATE:  10/16/14                   TIME:  12:09pm

A-000855

FCN 052
02/02

_ME0679-594_

## ST. LUCIE COUNTY SHERIFF'S OFFICE
# Death Investigation Field Report

Agency Case # _1-6-013332_

Name _Jose Luis Escobedo JR_   Race _H_   Sex _M_   DOB ███ _77_ Age

Address/Location _Turnpike South bound Mile Marker 149_ ███

SS# _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_ Occupation ___   Employer ___   _WPB-33413_

Place of death _Turnpike MM 149 SB_   County _St. Lucie_

Date/Time death occurred _10-13-06_   Presences of ___

Date/Time found _10-13-06   7:15pm_   by _SEAN Michael Jacobus_

Date/Time last seen alive ___   by ___

Identified by _Drivers licence thru D.A.V.I.D_ Address ___

Position/Location of body _laying on back Head Facing south, on side of RD_

Clothing description _Blk Jean shorts, whi tshirt Redsleeves (w) Red logo, Bk FlipFlop_

Are fold in clothing consistent with body location/position  ☑ Yes  ☐ No

Lividity ☑ Yes ☐ No       Rigor mortis ☑ None ☐ Slight ☐ Full       ☐ Body heat

Decomposition ☑ None ☐ Slight ☐ Advanced       Trauma ☑ Yes ☐ No

Describe trauma _Gunshot Wound_

Were any rigor mortis joints broken by on scene personnel  ☐ Yes ☑ No

Death violent ☑ Yes ☐ No       ☑ Weapon used  Type weapon _Handgun_

Death pronounced by _Trooper Lee #6_   Date/Time _10-13-06 0752_   EMS# ___

☑ M.E. Notified   Time ___   Notified by ___   ID# ___

Doctors (previous treatment) ___

☐ Doctor sign death certificate   Name ___   Phone ___

Medications to medical examiner ___

Next of kin ___   Relationship ___

Address ___   Notified ☐ Yes ☐ No  Date ___

Phone Number ___   Notified by ___   ID# ___

Funeral home requested  ☐ Yes ☐ No  Name ___

Valuables/Disposition ___

Body transported by _Tri County Mortuary_   Date/Time _10-13-06_

On scene officer _Dist. W Deifcept_   ID# _204_   Date/Time _10/13/06 @ 0800_

Investigator on scene ☑ Yes ☐ No  Name _Det Fred Wilson, Det. Ingram_

Investigator requests attendance at autopsy ☑ Yes ☐ No  PX# ___

Report submitted by _Det. Ingram_   ID# _412_   Date ___

Please list any inconsistencies or comments ___

00A856

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006............11:30 a.m...........Case No. 06-19-594

**CAUSE OF DEATH:**

GUNSHOT WOUNDS OF HEAD AND ABDOMEN

**MANNER OF DEATH:**

HOMICIDE

**Charles A. Diggs, M.D.**
Associate Medical Examiner

Date _10/20/06_

CAD/ps

A-000857

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006............11:30 a.m..........Case No. 06-19-594

## EXTERNAL EXAMINATION:

The body is that of a 5 foot 6 inch, 185 pound Caucasian Hispanic male, who appears the stated age of 28 years. The hair is brown and is normally distributed. Both eyes have brown irides, which surround equally dilated pupils. The conjunctivae show no hemorrhages nor congestion. The nasal cavities are free of obstructions and the septum has no perforations. The mouth has natural dentition. The tongue and oral mucosa are free of lacerations and hemorrhages. The neck has a midline trachea. The chest is symmetrical and the abdomen is free of masses. The external genitalia are those of a normal male adult. The rectum is unremarkable. Both right and left upper and lower extremities are symmetrical and free of congenital abnormalities. The back is unremarkable.

## TRAUMA: EXTERNAL AND INTERNAL

### GUNSHOT WOUND OF HEAD:

A 1-1/2 x 1/2 inch obliquely oriented gunshot wound is located over the central aspect of the lower forehead. A 3 x 5 pattern of stippling surrounds the gunshot wound. It is located at the central aspect of the lower forehead, 62 inches above the sole of the feet. The wound track courses from front to back and exits the back of the head 2 inches to the right of the posterior midline and 61 inches above the sole of the feet. Massive comminuted fractures of the skull, along with extensive hemorrhage and lacerations of the brain tissue is present.

### GUNSHOT WOUND OF LEFT MID ABDOMEN:

An entrance gunshot wound is located just to the left of the midline of the abdomen. This wound measures 1/3 of an inch in diameter and shows no stippling nor blackening around the periphery. The gunshot wound is located one inch to the left of the midline of the abdomen and 39 inches above the sole of the feet. The projectile courses from front to back and horizontal and terminates in the posterior wall of the stomach.

### GUNSHOT WOUND OF ANTERIOR PELVIS:

An entrance gunshot wound measuring 1/3 of an inch in diameter is located at the pelvic midline. This wound is located 34 inches above the sole of the feet. The wound track courses from front to back and lodges in the soft tissue of the back just to the right of the midline.

### GUNSHOT WOUND OF LOWER PELVIS:

An entrance gunshot wound is located through the shaft of the penis. This wound exits the penis and reenters the lower pelvis, coursing upward and lodging in the back on the right side 3 inches to the right of the midline of the back.

1

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006.............11:30 a.m...........Case No. 06-19-594

## GUNSHOT WOUND OF RIGHT LOWER LEG:

An entrance gunshot wound is located over the medial right lower leg. This wound measures 1/3 of an inch in diameter and shows no stippling or blacking around the periphery. The wound is located on the medial aspect of the leg 9 inches above the sole of the foot. The direction of the projectile is from left to right and very slightly upward. The projectile exits the lateral aspect of the right lower leg 11-1/2 inches above the sole of the foot.

## INTERNAL EXAMINATION:

**HEAD:** The brain weighs 1450 grams. It shows extensive lacerations and perforation of both right and left cerebral hemispheres secondary to the gunshot wound. The parenchymal surfaces of the cerebrum, cerebellum and medulla show no masses nor scars. The corpus callosum is lacerated and the cerebrospinal fluid is hemorrhagic. No aneurysms, occlusions, nor ruptures are present in the cerebrovascular system. Traumatic subarachnoid, subdural and epidural hemorrhage, along with multiple skull fractures secondary to the gunshot wound are present.

**NECK:** The cervical spine has no fractures nor dislocations. The cervical spinal cord is free of contusions or hemorrhages. The thyroid cartilage and hyoid bone are midline and free of fractures. The epiglottis and vocal cords are free of inflammatory changes or edema. The strap muscles and soft tissues of the neck show no hemorrhages nor contusions.

**BODY CAVITIES:** The right and left thoracic cavities are symmetrical and are separated by a midline mediastinum. No hemothorax nor pneumothorax is present. No hemorrhages nor masses are present in the mediastinum.

The diaphragm has no lacerations nor hemorrhages.

The abdominal organs are arranged in their proper locations and show no congenital deformities. The abdominal cavity contains one liter of clotted blood. Retroperitoneal hemorrhages is also present.

**CARDIOVASCULAR SYSTEM:** The heart weighs 375 grams. It is located in a normal pericardial sac which is free of fluid and hemorrhages. The epicardium is glistening, smooth, and shiny. The myocardium is dark red/brown and shows no scars nor hemorrhages. The endocardial surfaces are smooth and glistening. The valves are competent and the valve leaflets are free of vegetations. The chordae tendineae show no shortening or fusions. The papillary muscles are normal. No atrial nor ventriculoseptal defects are noted. The right and left coronary arteries, circumflex, and diagonal branches are widely patent. Both coronary ostia are free of occlusions. The great vessels, including the aorta, superior and inferior vena cava, along with the pulmonary artery, arise from their usual positions and are free of congenital deformities.

2

A-000859

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006............11:30 a.m...........Case No. 06-19-594

**LUNGS:** The right lung weighs 400 grams. The left lung weighs 350 grams. The parenchymal surfaces are free of masses, hemorrhages, or scars. The pulmonary arteries and branches are free of thrombi or emboli. No obstructions are present in the bronchi, trachea, or larynx.

**LIVER AND GALLBLADDER:** The liver weighs 2050 grams. The capsule is smooth and glistening. No lacerations are present. The parenchymal surfaces are free of masses, hemorrhages, or scars. The gallbladder lies in its normal bed and contains 7 milliliters of green bile.

**HEMIC AND LYMPHATICS:** The spleen weighs 175 grams. The capsule is gray and free of lacerations. The parenchymal surfaces are free of masses, hemorrhages, or scars. No enlarged lymph nodes are noted. The bone marrow has no metastatic tumors.

**GENITOURINARY SYSTEM:** The right kidney weighs 150 grams. The left kidney weighs 150 grams. The capsule was stripped with ease from the underlying red-brown cortical surfaces. The cortical and medullary parenchymal surfaces are free of masses, hemorrhages, or cysts. The renal pelves and ureters are free of obstructions and stones. The bladder has no masses nor hemorrhages. The prostate gland is free of nodules and is not enlarged. The testes are properly descended and free of trauma.

**ENDOCRINE SYSTEM:** The thyroid gland has its normal bilobed appearance and is free of masses, hemorrhages, and cysts. The pancreas has its usual elongated shape and normal tan-brown appearance. The right and left adrenal glands are free of masses, hemorrhages, or cysts.

**DIGESTIVE SYSTEM:** The esophagus and stomach have normal mucosal surfaces, which are free of ulcerations or hemorrhages. The stomach contains 7 mL. of brown mucoid liquid. The small and large intestines are free of obstructions, masses, or ulcerations. Several loops of bowel, along with omentum mesentery, show hemorrhage and projectile perforations.

**MUSCULOSKELETAL SYSTEM:** The muscles of the torso and extremities are normally formed and free of atrophic changes. The right and left upper and lower extremities are symmetrical and free of fractures or deformities. The thoracic, lumbar, and sacral vertebral bodies and bones are free of fractures or dislocations. No fractures of the pelvis, sternum, rib cage, nor clavicles are noted.

**AUTOPSY DIAGNOSES:**

1.     Gunshot wound of head.

    A.     Perforation and comminuted fractures of skull.

    B.     Perforation of brain.

3

A-000860

**MEDICAL EXAMINER DEPARTMENT - DISTRICT 19**
St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006............11:30 a.m...........Case No. 06-19-594

      C.      Intracranial hemorrhage.

2.     Gunshot wounds (4) of torso and extremities.

      A.      Perforation of intestines and omentum.

      B.      Perforation of stomach.

      C.      Abdominal hemorrhage.

      D.      Gunshot wound, medial aspect of right lower leg.

**Charles A. Diggs, M.D.**
Associate Medical Examiner

CAD/ps

4

A-000861

## MEDICAL EXAMINER DEPARTMENT - DISTRICT 19
### St. Lucie, Martin, Indian River, and Okeechobee Counties

Name....ESCOBEDO, Jose...............October 16, 2006............11:30 a.m...........Case No. 06-19-594

## MICROSCOPIC EXAMINATION

**LUNGS**:  Aspirated hemorrhage in parenchymal surfaces.

**HEART**: No significant histopathology.

**LIVER**:  Mild fatty changes in parenchymal surfaces.

**KIDNEYS**:  No significant histopathology.

**BRAIN**:  No significant histopathology.


**Charles A. Diggs, M.D.**
Associate Medical Examiner


October 27, 2006
CAD/ps

5

A-000862

```
RUN DATE: 11/08/06          WUESTHOFF REFERENCE LABORATORY              PAGE 1
RUN TIME: 1633                   6800 Spyglass Court
                                 Melbourne,Fl 32940


PATIENT: MEDX06-594 ESCOBEDO,JOSE       ACCT #: Q00987925   LOC:   MEDX      U #: 0001193712
SSN #:                                  AGE/SX: 38/M        STATUS: REG REF   REG: 10/16/06
REG DR:  DIGGS,CHARLES A., M.D.                             DISCHARGE DATE:
```

| Test | Result | Cutoff Conc mg/L |
|------|--------|-------------------|
| **BLOOD DRUG SCREEN** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| GC/MS | CAFFEINE | |
| **IMMUNOASSAY SCREEN** | | |
| AMPHETAMINES | NEGATIVE | 0.100 |
| BARBITURATES | NEGATIVE | 0.100 |
| BENZODIAZEPINES | NEGATIVE | 0.100 |
| CANNABINOIDS | NEGATIVE | 0.050 |
| COCAINE METAB | NEGATIVE | 0.100 |
| FENTANYL | NEGATIVE | 0.001 |
| METHADONE | NEGATIVE | 0.050 |
| OPIATES | NEGATIVE | 0.050 |
| TRICYCLICS | NEGATIVE | 0.100 |
| SALICYLATE | NEGATIVE | 10.0 |
| **VOLATILES** | | |
| SPECIMEN TYPE | HEART BLOOD | |
| VOLATILES | NONE DETECTED | |

*Specimens were intact upon receipt.  Chain of custody,
specimen security and integrity has been maintained.
Testing has been performed as requested.*

Reviewed by: _____     Date: 11/8/06

*FINAL REPORT - THIS COMPLETES REPORTING ON THIS CASE.*

** END OF REPORT **
A-000863

Full body, (male) anterior and posterior views (ventral and dorsal).

Name _Escobedo, Jose_

Age _88_          Race _W_          Sex _M_          Autopsy No. _06-19-594_          Date _10/16/06_



5'2" 185
Brown eyes
Blk hair
Not Dent.

Troya064843

1) P.B.S.O. EXECUTED A SEARCH WARRANT ON THIS PERSONS RESIDANCE EARLY 2006

2) GAVE STATEMENTS TO PBSO ABOUT DANNY VARELA POSSESSING GUNS AND BIG IN TRAFFICKING

%AO 12
(Rev. 03/07)

## REPORT ON
## OPERATION OF THE JURY SELECTION PLAN*
### COMPLETED PURSUANT TO 28 U.S.C. § 1863(a)

| DISTRICT | Southern District of Florida | |
|---|---|---|
| DIVISION | Miami | If Master Wheel is Maintained for District at Large, Check Here |
| DISTRICT NUMBER | 113C | DATE COMPLETED  02/15/2008 |

### PART I GENERAL INFORMATION:

1. This master jury wheel was last filled  | 09 | 07 | 07 |

2. The number of names then placed in the wheel was  | 2 | 5 | 0 | 0 | 0 | 0 |

3. Source of Names Was   a) Voter registration  | X |
   b) List of actual voters  | |
   c) Other (specify) _____

4. Supplied by:   Supervisor of Elections  Miami Dade County

5. No. of jury divisions established in district by Jury Selection Plan .................................................. | 5 |

### PART II SAMPLING OF RETURNED QUESTIONNAIRES:

A. (1) Date of drawing from master wheel | 09 | 25 | 07 |  (2) No. of names drawn | | 1 | 6 | 0 | 0 |

(3) Dates on which initial mailing completed | 09 | 27 | 07 |  (4) No. of forms mailed | | 1 | 6 | 0 | 0 |

B. (5) Date of sampling from returned forms | 02 | 04 | 08 |

Number of qualification forms thus far: { (6) Completed and returned | 8 | 4 | 8 |  (7) Returned undeliverable by P.O. | | 1 | 4 | 0 |  (8) Not yet returned | 6 | 1 | 2 |

(9) Analysis of sample of completed and returned questionnaire forms:

Total no. of forms in sample | | 8 | 4 | 8 |

| Race | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| White | 170 | 20.0 | 342 | 40.3 | | | 512 | 60.4 |
| Black or African American | 52 | 6.1 | 80 | 9.4 | | | 132 | 15.6 |
| American Indian or Alaska Native | 0 | 0.0 | 1 | 0.1 | | | 1 | 0.1 |
| Asian | 10 | 1.2 | 9 | 1.1 | | | 19 | 2.2 |
| Native Hawaiian/Pacific Islander | 1 | 0.1 | 0 | 0.0 | | | 1 | 0.1 |
| Other | 48 | 5.7 | 74 | 8.7 | | | 122 | 14.4 |
| Multi-Racial | 0 | 0.0 | 0 | 0.0 | | | 0 | 0.0 |
| Unknown | 29 | 3. | 32 | 3.8 | | | 61 | 7.2 |
| Total (by column) | 310 | 36.6 | 538 | 63.4 | | | 848 | 100% |

| Ethnicity | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| Hispanic or Latino | 133 | 15.7 | 324 | 38.2 | | | 457 | 53.9 |
| Non-Hispanic or Non-Latino | 148 | 17.5 | 190 | 22.4 | | | 338 | 39.9 |
| Unknown | 29 | 3.4 | 24 | 2.8 | | | 53 | 6.3 |
| Total (by column) | 310 | 36.6 | 538 | 63.4 | | | 848 | 100% |

### PART III SAMPLING OF QUALIFIED JURY WHEEL:
(If this part is reported because of a change in rules, attach an explanation of changes.)

(1) Date sample was taken | | | |

(2) Number of names in wheel | | | | | |

(3) Analysis of sample:

Total no. of names in sample | | 3 | 0 | 3 |

| Race | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| White | 77 | 25.4 | 88 | 29.0 | | | 165 | 54.5 |
| Black or African American | 28 | 9.2 | 36 | 11.9 | | | 64 | 21.1 |
| American Indian or Alaska Native | 0 | 0.0 | 1 | 0.3 | | | 1 | 0.3 |
| Asian | 8 | 2.6 | 2 | 0.7 | | | 10 | 3.3 |
| Native Hawaiian/Pacific Islander | 0 | 0.0 | 0 | 0.0 | | | 0 | 0.0 |
| Other | 22 | 7.3 | 28 | 9.2 | | | 50 | 16.5 |
| Multi-Racial | 0 | 0.0 | 0 | 0.0 | | | 0 | 0.0 |
| Unknown | 8 | 1.7 | 8 | 2.6 | | | 13 | 4.3 |
| Total (by column) | 140 | 46.2 | 163 | 53.8 | | | 303 | 100% |

| Ethnicity | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| Hispanic or Latino | 70 | 23.1 | 94 | 31.0 | | | 164 | 54.1 |
| Non-Hispanic or Non-Latino | 61 | 20.1 | 62 | 20.5 | | | 123 | 40.6 |
| Unknown | 9 | 3.1 | 7 | 2.3 | | | 16 | 5.3 |
| Total (by column) | 140 | 46.2 | 163 | 53.8 | | | 303 | 100% |

A-000866

AO 12 Page two
(Rev. 03/07)

## PART IV STATISTICAL COMPARISON OF JURY WHEEL SAMPLE AGAINST CITIZEN POPULATION DATA, AGE 18 OR OVER, BY RACIAL, ETHNIC, AND SEX CLASSIFICATIONS

| | This table reflects<br>(   ) persons returning questionnaires, or<br>( X ) persons qualified as jurors | Number in Wheel Sample | Percent of Sample | Percent this class is found in citizen population of the:<br>(   ) district<br>( X ) jury division |
|---|---|---|---|---|
| Racial | TOTAL | 303 | 100% | 100% |
| | White | 165 | 54.5 | 71..7 |
| | Black or African American | 64 | 21.1 | 20.6 |
| | American Indian or Alaska Native | 1 | 0.3 | 0.2 |
| | Asian | 10 | 3.3 | 1.2 |
| | Native Hawaiian or Pacific Islander | 0 | 0.0 | 0.0 |
| | Other | 50 | 16.5 | 3.2 |
| | Multi-Racial | 0 | 0.0 | 3.1 |
| | Unknown | 13 | 4.3 | |
| | Other racial or ethnic class (if specified by Court) | | | |
| | | | | |
| | | | | |
| | | | | |
| Ethnic | Hispanic or Latino | 164 | 54.1 | 50.5 |
| | Non-Hispanic or Non-Latino | 123 | 40.6 | 49.5 |
| | Unknown | 16 | 5.3 | 0.0 |
| Sex | Male | 140 | 46.2 | 46.0 |
| | Female | 163 | 53.8 | 54.0 |
| | Unknown | | | |

Prepared Pool # 1101Mia 1600

Prepared by: Steven M. Larimore

For the Court
A-000867

Clerk, United States District Court

- Home
- Compare Versions
- F.A.Q.
- Images
- Blog
- Contact
- Subscribe
- Log In

All States
>
Florida \ /
AlabamaAlaskaArizonaArkansasCaliforniaColoradoConnecticutDelawareDistrict of
ColumbiaFloridaGeorgiaHawaiiIdahoIllinoisIndianaIowaKansasKentuckyLouisianaMaineMarylandMassachusettsMichiganMinnesotaMississippiMissouriMontanaNebraska
HampshireNew JerseyNew MexicoNew YorkNorth CarolinaNorth DakotaOhioOklahomaOregonPennsylvaniaRhode IslandSouth CarolinaSouth
DakotaTennesseeTexasUtahVermontVirginiaWashingtonWest VirginiaWisconsinWyoming
>
Counties \ /
Cities
>
Palm Beach County, Florida

# Population of Palm Beach County, Florida:
# Census 2010 and 2000 Interactive Map, Demographics, Statistics, Graphs, Quick Facts



Compare population statistics about Palm Beach County, FL by race, age, gender, Latino/Hispanic origin etc. CensusViewer delivers detailed demographics and population statistics from the 2010 Census, 2000 Census, American Community Survey (ACS), registered voter files, commercial data sources and more.

Experience breakthrough technology for census data discovery, population analysis and visualization over Bing Maps. Visually "fly over" a state, viewing in great detail the census blocks, census tracts, cities, counties and various political districts in your selection or "zoom down" to the street level to get demographic statistics and information about the population in an individual census block or census tract.

Click on any map link to see our blazing-fast data visualization over Bing Maps in action. Read more about the unprecedented demographic insight and analytical power of CensusViewer interactive maps.

CensusViewer maps, data and statistics pages for all states, counties and cities.

| Palm Beach County, Florida - Overview | 2010 Census | | 2000 Census | | 2000-2010 Change | |
|---|---|---|---|---|---|---|
| | Counts | Percentages | Counts | Percentages | Change | Percentages |
| Total Population | | | | | | |
| Total Population | 1,320,134 | 100.00% | 1,131,186 | 100.00% | 188,948 | 16.70% |
| | | | | | | |
| Population by Race | | | | | | |
| American Indian and Alaska native alone | 6,043 | 0.46% | 2,466 | 0.22% | 3,577 | 145.05% |
| Asian alone | 31,100 | 2.36% | 17,127 | 1.51% | 13,973 | 81.58% |
| Black or African American alone | 228,690 | 17.32% | 156,055 | 13.80% | 72,635 | 46.54% |
| Native Hawaiian and Other Pacific native alone | 770 | 0.06% | 692 | 0.06% | 78 | 11.27% |
| Some other race alone | 53,138 | 4.03% | 33,709 | 2.98% | 19,429 | 57.64% |
| Two or more races | 30,272 | 2.29% | 26,928 | 2.38% | 3,344 | 12.42% |
| White alone | 970,121 | 73.49% | 894,209 | 79.05% | 75,912 | 8.49% |
| | | | | | | |
| Population by Hispanic or Latino Origin (of any race) | | | | | | |
| Persons Not of Hispanic or Latino Origin | 1,069,311 | 81.00% | 990,511 | 87.56% | 78,800 | 7.96% |
| Persons of Hispanic or Latino Origin | 250,823 | 19.00% | 140,675 | 12.44% | 110,148 | 78.30% |
| | | | | | | |
| Population by Gender | | | | | | |
| Female | 681,246 | 51.60% | 584,446 | 51.67% | 96,800 | 16.56% |
| Male | 638,888 | 48.40% | 546,740 | 48.33% | 92,148 | 16.85% |

Population by Age

A-000868

| | | | | | |
|---|---|---|---|---|---|
| Persons 0 to 4 years | 70,852 | 5.37% | 62,913 | 5.56% | 7,939 | 12.62% |
| Persons 5 to 17 years | 198,032 | 15.00% | 177,545 | 15.70% | 20,487 | 11.54% |
| Persons 18 to 64 years | 766,095 | 58.03% | 628,652 | 55.57% | 137,443 | 21.86% |
| Persons 65 years and over | 285,155 | 21.60% | 262,076 | 23.17% | 23,079 | 8.81% |

## Palm Beach County, Florida Registered Voters - Overview Statistics and Quick Facts

## CensusViewer - Graphs & Tables: Race by Age

| Population by Race, 2010 Census | Counts | Percentages | Color |
|---|---|---|---|
| American Indian and Alaska native alone | 6,043 | 0.46% | |
| Asian alone | 31,100 | 2.36% | |
| Black or African American alone | 228,690 | 17.32% | |
| Native Hawaiian and Other Pacific native alone | 770 | 0.06% | |
| Some other race alone | 53,138 | 4.03% | |
| Two or more races | 30,272 | 2.29% | |
| White alone | 970,121 | 73.49% | |

Graph: Population by Age and Race - Palm Beach County, Florida



| Population by Race, 2000 Census | Counts | Percentages | Color |
|---|---|---|---|
| American Indian and Alaska native alone | 2,466 | 0.22% | |
| Asian alone | 17,127 | 1.51% | |
| Black or African American alone | 156,055 | 13.80% | |
| Native Hawaiian and Other Pacific native alone | 692 | 0.06% | |
| Some other race alone | 33,709 | 2.98% | |
| Two or more races | 26,928 | 2.38% | |
| White alone | 894,209 | 79.05% | |

Graph: Population by Age and Race, 2000 Census - Palm Beach County, Florida



| Change in Population between 2000 and 2010, by Race - Palm Beach County, Florida | Change | Percentages | Color |
|---|---|---|---|
| American Indian and Alaska native alone | 3,577 | 145.05% | |
| Asian alone | 13,973 | 81.58% | |
| Black or African American alone | 72,635 | 46.54% | |
| Native Hawaiian and Other Pacific native alone | 78 | 11.27% | |
| Some other race alone | 19,429 | 57.64% | |
| Two or more races | 3,344 | 12.42% | |
| White alone | 75,912 | 8.49% | |

Graph: Change in Population between 2000 and 2010, by Age and Race - Palm Beach County, Florida

A-000869

Case 9:16-cv-80693-BB   Document 33-9   Entered on FLSD Docket 10/19/2016   Page 117 of
156
Population of Palm Beach County, FL - Census 2010 and 2000 Interactive Map, Demogra...   Page 3 of 4



## CensusViewer - Graphs & Tables: Hispanic/Latino Origin

X
Download Reports for Palm Beach County, Florida



Click here to download a sample Census 2010/2000 Race PDF.



Click here to download a sample Census 2010/2000 Latino PDF.

A-000870



Click here to download a sample Voter PDF.
**Here's what you get...**
PDF Reports for:

1. Census 2010/2000 Race for Palm Beach County, Florida [SAMPLE]
2. Census 2010/2000 Latino for Palm Beach County, Florida [SAMPLE]
3. Voter for Palm Beach County, Florida [SAMPLE]

CSV Files for:

1. Census 2010 Race for Palm Beach County, Florida
2. Census 2010 Latino for Palm Beach County, Florida
3. Census 2000 Race for Palm Beach County, Florida
4. Census 2000 Latino for Palm Beach County, Florida
5. Florida Voters for Palm Beach County, Florida

Privacy Policy | Terms of Use

Home | Compare Versions | F.A.Q. | Images | Blog | Contact | Subscribe | Log In
Copyright © 2011-2012 Moonshadow Mobile, Inc. All Rights Reserved

A-000871

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

THIS AFFIDAVIT MUST CONTAIN FACTS ** NOT CONCLUSIONS ** TO
SUBSTANTIATE THE OFFENSE FOR WHICH THE PERSON WAS ARRESTED.

THE OFFENSE OF: _____

OCCURRED AT: _____

ON: _____, IN PALM BEACH COUNTY, FLORIDA.

The undersigned swears that ____Ricardo Sanchez____

was arrested, based on the following probable cause: (Circle one
number and complete.)

1. Arrested person confessed to ____Detective Gary Hill____,
   admitting that he committed the acts listed in the narrative.

2. Arrested person was observed by _____,
   who then told _____ that he saw
   arrested person commit the acts listed in the narrative.

3. Arrested person committed the acts listed in the narrative
   in my presence.

4. Other way affiant knows arrested person committed acts
   listed in narrative.  (Tell in narrative how you know, ie:
   via past reliable confidential informant, etc.)

NARRATIVE OF FACTS WHICH CONSTITUTE PROBABLE CAUSE FOR THE ARREST:

On 1? September Det. Hill and Det. Perez picked up Ricardo Sanchez
and took him to Central Sub Station where he was advised of his Constit-
utional Rights.  He stated it was an accident, that the gun went off
while he was trying to place it under the mattress.  He denies shooting her
on purpose.

on 22 September 1980 Det. Hill and Det. Perez interviewed Dr. William
Hunt who is the victim's Doctor.  He stated the gunshot wound is a direct
contact and on a downward angle, indicating that Ricardo Sanchez was bending
over or laying next to her.

on 22 September 1980 Ricardo Sanchez was arrested by Det. Hill.  After
advising Ricardo Sanchez of his rights thru D/S Rios, Ricardo Sanchez
continued with fabercating the story.  After a while he finally broke
down and admitted she (his wife) was telling the truth.  He admitted on tape
that he came home drunk.  He found the bedroom door locked.  After he beat
on the door she opened it.  He started yelling at her and threating her.

RECOMMENDED BOND OF $ _____ BY ARRESTING OFFICER

SWORN TO AND SUBSCRIBED BEFORE ME

_____
Notary Public or Officer of Court

_____
Detective Gary Hill

Arresting Officer-Investigating Officer

9/22/80                           9228?
Date                              Date

Notary Public, State of Florida at Large
My Commission Expires July 19, 1983
Bonded by American Fire & Casualty Company

00872

80-5328 CFA99

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

THIS AFFIDAVIT MUST CONTAIN FACTS ** NOT CONCLUSIONS ** TO SUBSTANTIATE THE OFFENSE FOR WHICH THE PERSON WAS ARRESTED.

THE OFFENSE OF: Attempted Murder, Agg. Assault, Shooting in Dwelling

OCCURRED AT: ▓▓▓▓▓▓ West Palm Beach, FL.

ON: 18 September 1980 , IN PALM BEACH COUNTY, FLORIDA.

The undersigned swears that Ricardo Sanchez was arrested, based on the following probable cause: (Circle one number and complete.)

1. Arrested person confessed to Detective Gary Hill admitting that he committed the acts listed in the narrative.

2. Arrested person was observed by Juana Sanchez, who then told Det. Perez and Det. Hill that he saw arrested person commit the acts listed in the narrative.

3. Arrested person committed the acts listed in the narrative in my presence.

4. Other way affiant knows arrested person committed acts listed in narrative. (Tell in narrative how you know, ie: Via past reliable confidential informant, etc.)

NARRATIVE OF FACTS WHICH CONSTITUTE PROBABLE CAUSE FOR THE ARREST:

On 18 September 1980 the PBSO responded to ▓▓▓▓▓ involving a shooting. Found at the scene was victim Juana Sanchez with a bullet hole in the back of her neck. Exit of the bullet was thru the left cheek. Also present at the time of the shooting was the victim's husband, Ricardo Sanchez. The victim was found laying in the bed. Due to the fact that the victim and her husband speak very little English it was not until later at the hospital that she told, thru her mother, that Ricardo Sanchez had shot her on purpose and not an accident.

The Crime Scene sketches, recovery of bullet, pillow, height of bullet hole in the wall, all indicate that she was shot at close angle and on a downward motion.

On 19 September Det. Hill and Det. Perez taped the victim at the hospital. She stated that Ricardo Sanchez came home drunk and started slapping her around and accusing her of seeing someone else. He then put the gun to her head and pulled the trigger.

RECOMMENDED BOND OF $_____ BY ARRESTING OFFICER

SWORN TO AND SUBSCRIBED BEFORE ME

Notary, Witness or Officer of Court

9/22/80
Date

Detective Gary Hill

Arresting Officer-Investigating Officer

9-22-80
Date

Notary Public, State of Florida at Large
My Commission Expires July 19, 1983
Bonded by Associated Fire & Casualty Company

000873

## AFFIDAVIT IN SUPPORT OF PROBABLE CAUSE

THIS AFFIDAVIT MUST CONTAIN FACTS ** NOT CONCLUSIONS ** TO
SUBSTANTIATE THE OFFENSE FOR WHICH THE PERSON WAS ARRESTED.

THE OFFENSE OF: _____

OCCURRED AT: _____

ON: _____, IN PALM BEACH COUNTY, FLORIDA.

The undersigned swears that _____ Ricardo Sanchez _____

was arrested, based on the following probable cause: (Circle one
number and complete.)

1. Arrested person confessed to _____ *Detective Gary Hill* _____
   admitting that he committed the acts listed in the narrative.

2. Arrested person was observed by _____,
   who then told _____ that he saw
   arrested person commit the acts listed in the narrative.

3. Arrested person committed the acts listed in the narrative
   in my presence.

4. Other way affiant knows arrested person committed acts
   listed in narrative. (Tell in narrative how you know, ie:
   via past reliable confidential informant, etc.)

NARRATIVE OF FACTS WHICH CONSTITUTE PROBABLE CAUSE FOR THE ARREST:

As she lay back down he was still yelling at her, accusing her of

possibly fooling around behind his back. He then laid down beside her and

tried to get her to make love but she refused. He then pulled out the

38 Smith and Wesson gun which was in his waist band and struck her in the

back of the head twice. He then told her he was going to kill her and

then the gun went off.

Victim is still in the hospital but will have to hve surgery to re-

move ther rest of the bullet.

STATE OF FLORIDA • PALM BEACH COUNTY

I hereby certify that the
foregoing is a true copy
of the record in my office.

THIS __ DAY OF ____ __

___ O. BOCK
CLERK A COMPTROLLER

By _____
DEPUTY CLERK

RECOMMENDED BOND OF $ _____    BY ARRESTING OFFICER

SWORN TO AND SUBSCRIBED BEFORE ME

_____
Notary Public or Officer of Court

*Detective Gary Hill*

Arresting Officer-Investigating Office

9/22/80
Date

9/22/80
Date

Notary Public, State of Florida at Large
My Commission Expires July 19, 1981

PALM BEACH COUNTY SHERIFF'S OFFICE
CENTRAL RECORDS
FSS EXEMPTIONS/CONFIDENTIAL

☐ 119.071(2)(c) active criminal intelligence/active criminal investigative information

☐ 119.071(2)(d) Comprehensive policies or plans pertaining to the mobilization, deployment or tactical operations involved in responding to emergencies. (Deputies schedules)

☐ 119.071(2)(e) confessions

☐ 119.071(2)(f) confidential informants

☐ 119.071(5)(g) 1, Biometric Identification Information (Fingerprints, palm prints, and footprints)

☑ 365.171(15) identity of 911 caller or person requesting emergency service

☐ 119.071(4)(d)(1) home address, telephone, soc. security #, photos of active/former LE personnel, spouses and children

☐ 316.066(5)(a) crash reports are confidential for period of 60 days after the report is filed

☐ 119.071(2)(h)(1) I.d. of victim of sexual battery, lewd and lascivious offense upon person less than 16 years old, child abuse, sexual offense

☐ 119.071(2)(i) assets of crime victim

☐ 985.04(1) juvenile offender records

☐ 119.071(5)(a)(5) social security numbers held by agency

☑ 119.0712(2) personal information contained in a motor vehicle record

☐ 119.071(5)(b) bank account #, debit, charge, and credit card #s held by an agency

☐ 395.3025(7)(a) and/or 456.057(7)(a) medical information

☐ 394.4615(7) mental health information

☐ 119.071(2)(b) criminal intelligence/investigative information from a non-florida criminal justice agency

☐ 943.053/943.0525 NCIC/FCIC/FBI and in-state FDLE/DOC

☐ 119.071(4)(c) undercover personnel

☐ 119.07(4)(d) extra fee if request is voluminous or requires extensive personnel, technology

☐ OTHER: _____

☐ PawnBrokers Ticket # FSS 539.001

Case number: 06-110508 Clerk ID: #5978 Date: 12/2/08

A-000875

```
5978                          12/02/08                            EMCA
     PALM BEACH COUNTY SHERIFF'S OFFICE      PAGE   1
                    OFFENSE REPORT              CASE NO. 06110508

                                  DISPOSITION: INACTIVE
                                  DIVISION: ROAD PATROL

AGG BATTERY                        CODE: 130A  DATE: 09/11/06  MONDAY
ZONE: B13 GRID: 4B1    DEPUTY ID.: 7642 ASSIST:    TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND  DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300      BLK HAVERHILL          RD  APT. NO.:
            CITY: WPB                     STATE: FL     ZIP: 33415
NO. OFFENSES: 01  NO. OFFENDERS: UK  NO. VEH. STOLEN: 0  NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01  NO. ARRESTED: 0  FORCED ENTRY:  0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 045      CIS CODE 130A

VICTIM  NO. 001         ASIA D MATTHEWS              DOB:      /1979
                SEX: F RACE: B HT: 504 WT: 115 HR: BLACK    EYE: BROWN
RESIDENTIAL ADDRESS:                        W PALM BCH FL 33407
       HOME PHONE: 414 265-4667
BUSINESS NAME ADDRESS: 704 S MILITARY TRAIL, WPB, FL 33406
     BUSINESS PHONE: 561 255-1055
OTHER                   DAVID ALLAN                  DOB:      /1960
                SEX: M RACE: W HT: 509 WT: 185 HR: BROWN    EYE: GREEN
RESIDENTIAL ADDRESS:                        LAKE WORTH FL 0
       HOME PHONE: 561 502-5818
     BUSINESS PHONE: 561 000-0000
OTHER                   ANGELA ELVIR                 DOB:      /1971
                SEX: F RACE: W HT: 502 WT: 150 HR: BROWN    EYE: BROWN
RESIDENTIAL ADDRESS:                        LAKE WORTH FL 33460
       HOME PHONE: 561 856-5682
     BUSINESS PHONE: 561 585-5058
OTHER                   CLEVELAND PETTIS             DOB:      /1968
                SEX: M RACE: B HT: 600 WT: 155 HR: BLACK    EYE: BROWN
RESIDENTIAL ADDRESS:                        WEST PALM  FL 33401
       HOME PHONE: 561 294-6708
     BUSINESS PHONE: 561 000-0000


===========================================================================
STATUS  1 = STOLEN               2 = S/R DIFFERENT DAY
CODES   3 = S/R SAME DAY         4 = RECOVERED FOR OTHER JURISDICTION
(STA)   5 = LOST ITEMS  8 = EVIDENCE SEIZED   9 = OTHER (ARSON/VANDALISM)
===========================================================================
DATE  S T                        P R O P E R T Y
STLN/ T Y    BRAND   CALIBER  SERIAL/NUMBER  VALUE    VALUE     TELETYPE
RECOV A P    NAME    (GUN)    DESCRIPTION    STOLEN  RECOVERED  NUMBER
===========================================================================
091106 9 Z                   SEE NARRATIVE   500
```

A-000876

5978                          12/02/08                          EMCA
      P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E    PAGE    2
                      O F F E N S E   R E P O R T          CASE NO. 06110508

091106 8 Z                        CONSENT TO                    1
                                  SEARCH FROM
                                  SIGNED BY
                                  ASIA MATTHEWS


      OFFENSE INDICATOR: OFFENSE 1      VICTIM NUMBER: 1
VICTIM TYPE: ADULT
RESIDENCE TYPE: COUNTY       RESIDENCE STATUS: FULL YEAR
EXTENT OF INJURY: SERIOUS
INJURY TYPE(1): GUNSHOT
INJURY TYPE(2): NOT APPLICABLE
VICTIM TREAT TAKEN: JFK HOSPITAL
VICTIM RELATION: UNDETERMINED


VEH/VESS STATUS CODE: VICTIMS      VEH/VESS TYPE: AUTO
VALUE OF VEH/VESS: $ 5000
LICENSE TYPE: PASSENGER CAR
   VEH STATE LICENSE: FL    TAG YR: 2007    VEH YR: 1994
VEH LICENSE NO. ████        VEH LICENSE DECAL: ████████
VEH MAKE: BUIC    VEH STYLE: FOUR DOOR
VEH COLOR: GLD
VIN NUMBER: ████████████

      REPORT NUMBER: 1
FLORIDA VICTIM ? N
WEATHER: CLEAR
WITNESS TO CRIME KNOWN ?. N       SUSPECT NAME KNOWN ?....... N
CAN VICTIM I.D. SUSPECT ? N       SUSPECT LOCATION KNOWN ?... N
WILL VICTIM PROSECUTE ?.. Y       STOLEN PROPERTY TRACEABLE ? N
IS M.O. SIGNIFICANT ?.... Y       EVIDENCE LEFT AT SCENE ?... Y
            SUSPECT'S VEHICLE KNOWN ?.. Y
TAG NUMBER KNOWN ?....... N       PROPERTY DAMAGE ?......... Y
AMOUNT OF DAMAGE .......$ 500
VEHICLE TOWED BY ........ SISTERS TOWING
VEHICLE TOWED TO ........ PBSO IMPOUND


     ON MONDAY, 091106 AT ABOUT 0048 HRS., I WAS DISPATCHED TO A
DELAYED SHOOTING OF A FEMALE AT THE SUGAR DADDY'S NIGHTCLUB AT
704 S MILITARY TRAIL, IN UNINC. WESTPALM BEACH.
     UPON ARRIVAL, I OBSERVED A B/F VICTIM WHO IDENTIFIED HERSELF
VERBALLY AS ASIA D. MATTHEWS.  I SAW WHAT APPEARED TO BE A GUNSHOT
WOUND TO THE RIGHT MIDDLE AREA OF HER THIGH.  IT APPEARED THAT IT
WAS AN ENTRANCE/EXIT WOUND DIRECTLY THROUGH THE MUSCLE OF HER LEG
MOVING LEFT TO RIGHT.
     AFTER MAKING CONTACT WITH HER AND OBSERVING HER INJURY, SHE
TOLD ME THAT SHE WAS A DANCER AT THIS NIGHTCLUB AT 704 S MILITARY
TRAIL AND LEFT THIS AREA IN HER VEHICLE ('94 4 DOOR GOLD PARK AVENUE)
BEARING FL TAG ████ AND WAS SOUTHBOUND ON HAVERHILL ROAD BY THE
SUMMIT PINES BOULEVARD ENTRANCE.  SHE ADVISED THAT SHE HAD NOTICED
A BLUE NEWER MODEL VEHICLE FOLLOWING HER IN HER REARVIEW MIRROR.
SHE SAID UPON MOVING PAST THE SUMMIT PINES BOULEVARD EXIT HEADING
SOUTHBOUND ON HAVERHILL, THE VEHICLE PULLED UP TO HER ON THE DRIVER
SIDE PARALLEL TO HER AND SHOT NUMEROUS ROUNDS INTO HER VEHICLE.
ADVISING THAT ONE ROUND SHOT HER IN THE RIGHT THIGH.  SHE SAID WAS

A-000877

5978                          12/02/08                          EMCA
PALM BEACH COUNTY SHERIFF'S OFFICE       PAGE    3
OFFENSE REPORT              CASE NO. 06110508

ONLY ABLE TO DESCRIBE THE VEHICLE AS A NEWER BLUE 4 DOOR VEHICLE
WITH VERY DARK TINT.  SHE SAID SHE WAS UNABLE TO SEE WHAT KIND OF
WEAPON SHOT HER OR GET ANY SORT OF SUSPECT INFORMATION REFERENCE
THE ACTUAL SHOOTER.
     IT WAS AT THIS TIME THAT PALM BEACH FIRE RESCUE #33 ARRIVED ON
SCENE AND BEGAN RENDERING FIRST AID TO HER.  THEY ADVISED ME THAT
SHE WOULD BE TAKEN TO JFK MEDICAL CENTER TO TREAT HER GUNSHOT
WOUND.
     I RETAINED THE VICTIM'S VEHICLE VIA CRIME SCENE TAPE AND WAS
ADVISED BY MY SERGEANT THAT CRIME SCENE AND VIOLENT CRIMES
DETECTIVES WOULD BE RESPONDING REFERENCE THIS CASE.  MYSELF AND
D/S LUMBERT (7634) SECURED THE VEHICLE FOR EVIDENTIARY PURPOSES
WAITING FOR THE VIOLENT CRIME DETECTIVE AND CRIME SCENE TO
ARRIVE.
     AT ABOUT 0122 HRS., CRIME SCENE 20 ARRIVED.  TECHNICIAN
RODON (7430) ARRIVED TO CONDUCT CRIME SCENE STATISTICS FOR THE
VEHICLE.  IT SHOULD ALSO BE NOTED IT WAS AT THIS TIME THAT OTHER
UNITS AT THE SECONDARY CRIME SCENE AREA WHERE THE INITIAL SHOOTING
TOOK PLACE AT THE 1300 BLOCK OF HAVERHILL ROAD ADVISED ME THAT THEY
HAD FOUND 11 9MM WINCHESTER SHELL CASINGS IN THE SOUTHBOUND LANES
OF HAVERHILL ROAD.  IT WAS THEN THAT DET. KARPINSKI (6682) ARRIVED ON
SCENE AT SUGAR DADDY'S AT 704 S. MILITARY TRAIL. IT WAS AT THAT TIME
THAT I TRANSFERRED ALL OF MY IN CARD INFORMATION REFERENCE THIS
CASE OVER TO DET. KARPINSKI FOR THEIR INVESTIGATIVE PURPOSES. THIS
CASE AND ALL ITS INFORMATION WAS TRANSFERRED TO DET. KARPINSKI.
     AFTER TRANSFERRING ALL NECESSARY INFORMATION TO DET. KARPINSKI,
THE VEHICLE WAS SEALED BY CRIME SCENE BY EVIDENCE TAPE AND ALL WINDOWS
HAD PLASTIC FILM PLACED OVER IT TO PROTECT THE CONTENTS INSIDE.  IT
WAS AT THIS TIME THAT SISTERS TOWING WAS CALLED AND THEY RESPONDED
TO THE SCENE AT WHICH TIME AN INVESTIGATIVE TOW WAS COMPLETED ON THIS
VEHICLE AND I  FOLLOWED SISTERS TOWING BACK TO THE PALM BEACH COUNTY
SHERIFFS OFFICE IMPOUND YARD WHERE THE VEHICLE WAS PLACED IN OUR
IMPOUND YARD FOR SAFE KEEPING.  I GATHERED A COPY OF THE SISTERS
TOWING RECEIPT AND A COMPLETED COPY OF PBSO TOW SLIP.  IT SHOULD BE
NOTED THAT NO KEYS WERE WITH THE VEHICLE AT THIS TIME AND THE TOW
SLIP AND TOW RECEIPT WERE PLACED INTO THE IMPOUND YARD'S OFFICE
DOOR SLIP.
     THIS CONCLUDED MY INVOLVEMENT WITH THIS CASE.
D/S CUNNINGHAM, #7642; 091106 @ 0700 HRS.
TRANS:  091206////BWR

A-000878

5978                           12/02/08                          EMCA
        P A L M  B E A C H  C O U N T Y  S H E R I F F ' S  O F F I C E      PAGE     4
        SUPPLEMENT 1   O F F E N S E  R E P O R T           CASE NO. 06110508

                                    DISPOSITION: INACTIVE
                                    DIVISION: ROAD PATROL

AGG BATTERY                          CODE: 130A   DATE: 09/11/06   MONDAY
ZONE: B13 GRID: 4B1    DEPUTY ID.: 7642 ASSIST:     TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND   DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300       BLK HAVERHILL            RD   APT. NO.:
            CITY: WPB                       STATE: FL      ZIP: 33415
NO. OFFENSES: 01  NO. OFFENDERS: UK  NO. VEH. STOLEN: 0  NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01  NO. ARRESTED:  0  FORCED ENTRY:  0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 045     CIS CODE 130A

    IT SHOULD BE KNOWN THAT A LOG ENTRY WAS COMPLETED AND TURNED INTO
THE DISTRICT 1 LOG ENTRY BOARD PRIOR TO ME GOING HOME FROM MY SHIFT
ON 091106 AT 0500 HRS.
D/S CUNNINGHAM #7642; 091106 @ 0655 HRS.
TRANS: 091206////BWR

A-000879

5978                              12/02/08                          EMCA

P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E    PAGE   5
SUPPLEMENT 2   O F F E N S E   R E P O R T              CASE NO. 06110508

                              DISPOSITION: INACTIVE
                              DIVISION: DETECTIVE

AGG BATTERY                              CODE: 130A  DATE: 09/11/06  MONDAY
ZONE: B13 GRID: 4B1     DEPUTY ID.: 6938 ASSIST:    TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND   DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300       BLK HAVERHILL          RD  APT. NO.:
             CITY: WPB                     STATE: FL      ZIP: 33415
NO. OFFENSES: 01  NO. OFFENDERS: UK  NO. VEH. STOLEN: 0  NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01  NO. ARRESTED:  0  FORCED ENTRY:  0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 045      CIS CODE 130A

    ON MONDAY, SEPTEMBER 11, 2006, AT APPROXIMATELY 0100 HOURS, I WAS
DIRECTED TO RESPOND TO THE SUGAR DADDY'S NIGHTCLUB LOCATED AT 704 SOUTH
MILITARY TRAIL, UNINCORPORATED WEST PALM BEACH, REFERENCE A REPORT OF A
SHOOTING.  UPON ARRIVAL, I MET WITH THE LEAD INVESTIGATOR ON THIS CASE,
DET. CHRIS KARPINSKI IN ORDER TO ASSIST KARPINSKI.  I THEN TRAVELED OVER
TO THE INTERSECTION OF SUMMIT PINES BLVD. AND HAVERHILL ROAD IN UNINCORPORATED
WEST PALM BEACH, WHERE A SECONDARY CRIME SCENE HAD BEEN INITIATED.  UPON
ARRIVAL, I OBSERVED THAT YELLOW AND BLACK BARRIER TAPE HAD BEEN SET UP
BLOCKING SOUTHBOUND LANES OF TRAFFIC APPROXIMATELY 25 YARDS NORTH OF THE
INTERSECTION OF SUMMIT PINES BLVD. AND HAVERHILL TO APPROXIMATELY 80 YARDS
SOUTH OF THIS INTERSECTION.  I CAME IN CONTACT WITH D/S MALDONADO, WHO HAD
INITIATED THE CRIME SCENE.  D/S MALDONADO ADVISED ME THAT HE FIRST ARRIVED
TO SUGAR DADDY'S IN REFERENCE TO A REPORT THAT A WOMAN HAD ARRIVED, WHO HAD
BEEN SHOT MULTIPLE TIMES.  UPON ARRIVAL, MALDONADO STATES HE CAME INTO CONTACT
WITH ASIA D. MATTHEWS, A BLACK FEMALE.  MATTHEWS HAD A VISIBLE INJURY
TO HER RIGHT UPPER THIGH THAT WAS CONSISTENT WITH A PROJECTILE ENTERING AND
EXITING THROUGH HER THIGH.  MALDONADO STATED THAT HE DID NOT CONDUCT AN
INTERVIEW WITH THE SUBJECT, MATTHEWS, SINCE EMS HAD ARRIVED AND HAD BEGUN
TO TRANSPORT HER TO JFK HOSPITAL.
    MALDONADO THEN ARRIVED TO THE AREA IN WHICH THIS CRIME SCENE HAD BEEN
INITIATED AND ADVISED ME THAT APPROXIMATELY 8 TO 11 SHELL CASINGS HAD BEEN
DISCOVERED.  WHILE I WAS ON SCENE, I DID OBSERVE THAT SEVERAL FLARES HAD
BEEN SET WITHIN THE YELLOW AND BLACK BARRIER TAPE IN ORDER TO INDICATE
WHERE SHELL CASINGS HAD BEEN LOCATED.  I DID OBSERVE ON ONE OF THE SHELL
CASINGS, AND IT APPEARED TO ME BASED ON ITS SIZE, THAT IT ORIGINATED FROM A
9MM PROJECTILE.
    WHILE AT THIS CRIME SCENE, A CANVASS WAS CONDUCTED IN THE CAREFREE
MOBILE HOME PARK, WHICH IS LOCATED ON THE EAST SIDE OF THIS INTERSECTION.
AN ATTEMPT TO CONTACT THE RESIDENTS RESIDING AT 4970, 4976, AND 4982 CAREFREE
TRAIL PROVED UNSUCCESSFUL.  THERE WAS NO RESPONSE WHILE KNOCKING AT THESE
RESIDENCES.  THE RESIDENT AT 4964, WHO DID NOT WANT TO BE IDENTIFIED, STATED
THEY DID NOT HEAR ANYTHING.  THE RESIDENT, ██████████████████████
████████████ WAS PRESENT AT HER RESIDENCE LOCATED AT ████████████████
███████ STATED THAT SHE HAD CALLED "911" AFTER HEARING APPROXIMATELY TWO TO
FIVE "LOUD BANGS," IN HER OWN WORDS. ████████WAS UNABLE TO PROVIDE ANY
ADDITIONAL INFORMATION REFERENCE THIS INVESTIGATION.  THIS CONCLUDED THE
CANVASS.
    WHILE I WAS STILL ON SCENE WHERE THE SHOOTING OCCURRED OFF OF HAVERHILL,
I WAS DIRECTED TO RESPOND TO JFK HOSPITAL, IN ORDER TO MAKE CONTACT WITH
THE VICTIM, ASIA D. MATTHEWS.  UPON ARRIVAL TO JFK HOSPITAL, I ENCOUNTERED

                              A-000880

5978                          12/02/06

P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E     PAGE     6
SUPPLEMENT 2   O F F E N S E   R E P O R T             CASE NO. 06110508

D/S WEISS (ID 7237).  WEISS HAD FOLLOWED THE VICTIM TO THE HOSPITAL FROM
THE SUGAR DADDY'S ESTABLISHMENT.  WEISS ADVISED ME THAT WHILE HE WAS IN
CLOSE PROXIMITY TO THE VICTIM'S ROOM IN THE EMERGENCY ROOM, HE OVERHEARD
THE VICTIM STATE WHILE ON THE CELL PHONE, "TRICK I TURNED WENT BAD."  WEISS
STATED AT THIS POINT, HE DID NOT HEAR ANYTHING ADDITIONAL IN THE PHONE
CONVERSATION THAT MATTHEWS HAD.

    AFTER BEING ADVISED BY D/S WEISS OF HIS OBSERVATIONS, I THEN MADE
CONTACT WITH THE VICTIM, ASIA MATTHEWS.  AFTER IDENTIFYING MYSELF AS A
DETECTIVE WITH THE VIOLENT CRIMES DIVISION OF THE PALM BEACH COUNTY SHERIFF'S
OFFICE, I ASKED MATTHEWS IF SHE WOULD BE WILLING TO PARTICIPATE IN A
VOLUNTARY INTERVIEW.  MATTHEWS STATED SHE WOULD BE WILLING TO COOPERATE.
MATTHEWS STATED THAT SHE IS CURRENTLY EMPLOYED AS A DANCER AT SUGAR
DADDY'S ESTABLISHMENT LOCATED AT 704 SOUTH MILITARY TRAIL AND HAS BEEN
OFF AND ON FOR A FEW YEARS.  MATTHEWS STATED THAT SHE BEGAN WORKING ON
THE EVENING OF SEPTEMBER 10, 2006, AT APPROXIMATELY 2000 HOURS, AND AT
APPROXIMATELY 0030 HOURS ON MONDAY, THE 11TH, MATTHEWS DECIDED TO LEAVE.
MATTHEWS STATED THAT SHE TOLD HER MANAGER SHE WANTED TO LEAVE EARLY, AT
WHICH POINT HER MANAGER REQUESTED THAT SHE PAY HER STANDARD TIP OUT.
MATTHEWS EXPLAINED THAT SHE TOLD HER MANAGER THAT SHE DID NOT HAVE THE MONEY
AND WOULD BE ABLE TO PAY HIM THE NEXT TIME SHE REPORTED TO WORK.  MATTHEWS
STATED THAT THERE WAS NO ARGUMENT BETWEEN HER AND THE MANAGER, AND SHE DID
NOT HAVE ANY KIND OF ALTERCATION BECAUSE SHE COULD NOT PAY AT THIS TIME.
MATTHEWS THEN STATED THAT SHE WAS LEAVING TO GO PICK UP HER CHILDREN FROM
HER SISTERS.  MATTHEWS AS SHE PULLED OUT ONTO MILITARY TRAIL HEADING NORTH-
BOUND, CONDUCTED A U-TURN IN ORDER IN ORDER TO TURN SOUTHBOUND UNDER THE
TRAIL.  AS MATTHEWS CONDUCTED A U-TURN, UNKNOWN WHICH INTERSECTION, MATTHEWS
STATED SHE OBSERVED AN OLDER VEHICLE, POSSIBLY MIDNIGHT BLUE IN COLOR,
CONDUCT A U-TURN SHORTLY BEFORE SHE DID.  MATTHEWS STATED THAT SHE DID NOT
RECOGNIZE THE CAR FROM ANY PREVIOUS EXPERIENCES.  MATTHEWS STATED THAT
WHILE TRAVELING SOUTHBOUND ON HAVERHILL ROAD, SHE WAS SHOT AT SEVERAL TIMES,
AND WHILE BEING SHOT AT, MATTHEWS WAS UNABLE TO VIEW THE SUSPECTS THAT WERE
SHOOTING AT HER.  MATTHEWS ALSO STATED THAT SHE WAS UNABLE TO DESCRIBE THE
WEAPON THAT WAS USED.  MATTHEWS DENIED HAVING ANY ALTERCATIONS AT THE CLUB
PRIOR TO LEAVING THE SUGAR DADDY'S CLUB AND STATED THAT SHE DID NOT SUSPECT
ANYONE WANTING TO HARM HER AT THIS TIME.  MATTHEWS STATED THAT SHE WAS
TRAVELING SOUTHBOUND ON HAVERHILL IN ORDER TO GO TO HER RESIDENCE LOCATED
AT 1266 CAREFREE COVE.  MATHEWS STATED THAT SHE HAS BEEN STAYING THERE FOR
APPROXIMATELY A MONTH AND THAT A FRIEND OF HERS, WHOM SHE REFERRED TO AS
DAVID ALLEN, HAS ALLOWED HER TO STAY AT THIS TRAILER WITH HER CHILDREN.
MATTHEWS STATED THAT SHE HAS A VERBAL AGREEMENT WITH DAVID ALLEN TO PAY HIM
$500 PER MONTH FOR THE USE OF THE TRAILER.  MATTHEWS DID STATE THAT SHE HAS
NOT PAID ALLEN AND SHE DID HAVE A CONVERSATION WITH ALLEN ON SUNDAY, SEPTEMBER
10, IN REFERENCE TO HER NOT BEING ABLE TO PAY ALLEN.  MATTHEW STATED THAT
IT WAS NOT A VOLATILE CONVERSATION THOUGH SHE DID BELIEVE THAT ALLEN WAS A
BIT UPSET BECAUSE HE HAS NOT RECEIVED ANY COMPENSATION FOR THE USE OF HIS
TRAILER.

    AT THIS POINT IN THE INTERVIEW, IT APPEARED THAT MATTHEWS WAS UNABLE TO
PARTICIPATE ANY LONGER DUE TO THE MEDICATION THAT SHE HAD RECEIVED.  IT
APPEARED THAT MATTHEWS WAS BECOMING VERY LETHARGIC AND WAS HAVING TROUBLE
COMMUNICATING.  IT WAS ALSO AT THIS TIME THAT THE X-RAY TECHNICIAN HAD
ARRIVED TO TRANSPORT MATTHEWS TO HAVE AN X-RAY OF HER THIGH COMPLETED.  WHILE
I WAS IN THE EMERGENCY ROOM WITH MATTHEWS, I DID OBSERVE THAT SHE HAD AN
INJURY ON HER UPPER THIGH THAT WAS CONSISTENT WITH A PROJECTILE ENTERING AND
EXITING THROUGH HER UPPER THIGH.  THE WOUND LOOKED FRESH, IT WAS RED, AND
IT WAS MOIST.  MATTHEWS ALSO HAD WHAT APPEARED TO BE SLIGHT LACERATIONS ON

A-000881

5978                        12/02/06

P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E      PAGE      7
SUPPLEMENT 2    O F F E N S E   R E P O R T            CASE NO. 06110508

HER RIGHT AND LEFT FOREARMS.  THESE LACERATIONS WERE SIMILAR TO LACERATIONS
ONE WOULD RECEIVE IF GLASS HAD SHATTERED AND ENTERED INTO HER ARMS.  MATTHEWS
DID STATE DURING THE INTERVIEW THAT SHE DID BELIEVE THAT THESE INJURIES WERE
SUSTAINED WHEN SHE WAS SHOT AT.  THIS INTERVIEW CEASED ONCE THE X-RAY
TECHNICIAN ARRIVED TO TRANSPORT HER TO HAVE AN X-RAY.
        WHILE STILL ON SCENE AT THE HOSPITAL, DET. KARPINSKI ARRIVED.  SHORTLY
AFTER KARPINSKI ARRIVED IN THE EMERGENCY ROOM, MATTHEWS WAS THEN RETURNED TO
HER HOSPITAL ROOM.  KARPINSKI CONDUCTED A SWORN TAPED STATEMENT WITH
MATTHEWS AND DURING THIS TAPED STATEMENT, I WAS PRESENT.  WHILE PRESENT
DURING THIS INTERVIEW WITH MATTHEWS THAT WAS CONDUCTED BY DET. KARPINSKI, I
WITNESSED THE VICTIM MATTHEWS SIGN A CONSENT TO SEARCH FORM FOR HER VEHICLE.
I DID WITNESS KARPINSKI LEAVE A COPY OF THIS CONSENT TO SEARCH FORM WITH
THE VICTIM PRIOR TO THE INTERVIEW TERMINATING.  THIS INTERVIEW WITH MATTHEWS
THAT KARPINSKI CONDUCTED WAS DIGITALLY TAPED USING MY DIGITAL RECORDER.  I
ALSO RECORDED THE INTERVIEW I CONDUCTED WITH MATTHEWS.  THESE TAPED INTERVIEWS
WERE BURNED TO A DISC AND ENTERED INTO EVIDENCE BY ME.
        THIS CONCLUDES MY INVOLVEMENT IN THIS CASE.  THIS REPORT IS FOR SUPPLE-
MENTAL PURPOSES.
DET. OLIVER ID 6938/CJ TRANS. 09/20/2006
DICTATED: 09/11/2006

5978                         12/02/08                        EMCA
PALM BEACH COUNTY SHERIFF'S OFFICE   PAGE    8
SUPPLEMENT 3   OFFENSE REPORT              CASE NO. 06110508

DISPOSITION: INACTIVE
DIVISION: DETECTIVE

AGG BATTERY                    CODE: 130A   DATE: 09/21/06   MONDAY
ZONE: B13 GRID: 4B1    DEPUTY ID.: 7430 ASSIST:    TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND   DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300      BLK HAVERHILL        RD   APT. NO.:
           CITY: WPB                    STATE: FL     ZIP: 33415
NO. OFFENSES: 01  NO. OFFENDERS: UK  NO. VEH. STOLEN: 0  NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01  NO. ARRESTED: 0  FORCED ENTRY: 0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 045    CIS CODE 130A

     ON MONDAY, SEPTEMBER 11, 2006, AT APPROXIMATELY 0110 HRS, COMMU-
NICATIONS NOTIFIED CRIME SCENE INVESTIGATOR (CSI) RODON #7430 IN REF-
ERENCE TO A SHOOTING. CSI RODON WAS EN ROUTE TO SUGAR DADDY'S CABARET
AT 704 S. MILITARY TRAIL AT APPROXIMATELY 0120 HRS AND ARRIVED AT
APPROXIMATELY 0125 HRS. SGT. COVER #3837, D/S CUNNINGHAM #7642, AND
OTHER PALM BEACH COUNTY SHERIFF'S OFFICE (PBSO) PERSONNEL WERE PRE-
SENT AT THE SCENE. DET. KARPINSKI #6682 AND DET. OLIVER #6938 ARRIVED
ON SCENE AT APPROXIMATELY 0140 HRS.
     D/S CUNNINGHAM ADVISED THAT THE VICTIM, B/F ASIA DIVINE MATTHEWS
DOB 07/22/79, HAD BEEN DRIVING NEAR HAVERHILL ROAD AND SUMMIT ROAD
WHEN AN UNKNOWN SUSPECT IN A BLUE 4 DOOR CAR FIRED SEVERAL SHOTS AT
HER. THE VICTIM HAD AN APPARENT GUN SHOT WOUND TO HER LEG AND WENT
TO SUGAR DADDY'S CABARET TO GET HELP. SHE WAS TRANSPORTED TO JFK
HOSPITAL PRIOR TO MY ARRIVAL.
     IT WAS NIGHTTIME AND THE WEATHER CONDITIONS WERE WARM AND RAINY.
THE VICTIM'S VEHICLE, A BEIGE 4-DOOR 1994 BUICK PARK AVENUE WITH
FLORIDA TAG ████████ AND VIN#████████████████ WAS PARKED FACING NORTH
IN THE FOURTH PARKING SPACE ON THE SOUTH SIDE OF THE SUGAR DADDY'S
BUILDING. THE AREA AROUND THE VEHICLE WAS SECURED WITH CRIME SCENE
BARRIER TAPE. THE VEHICLE'S HEADLIGHTS WERE ON. ALL FOUR DOORS WERE
CLOSED. THE LEFT FRONT AND LEFT REAR WINDOWS WERE CLOSED. THE RIGHT
FRONT WINDOW WAS COMPLETELY OPEN AND THE RIGHT REAR WINDOW WAS PAR-
TIALLY OPEN. DEFECTS WERE PRESENT IN THE LEFT FRONT WINDOW, LEFT
FRONT DOOR, LEFT REAR DOOR, AND BOTH TAIL LIGHTS. THE GLASS OF THE
LEFT FRONT AND LEFT REAR WINDOWS WAS CRACKED BUT STILL IN PLACE IN
THE WINDOW FRAMES. THE LEFT REAR TIRE WAS FLAT. THROUGH THE OPEN
RIGHT FRONT WINDOW, CSI RODON OBSERVED THAT THE VEHICLE WAS IN PARK
AND THERE WERE BLOOD-LIKE STAINS ON THE LEFT FRONT SEAT.
     CSI RODON PHOTOGRAPHED THE EXTERIOR OF THE VEHICLE WITH A DE-
PARTMENT ISSUED NIKON D100 DIGITAL CAMERA, A NIKON 28-105 MM LENS,
A NIKON SB800 FLASH, AND A LEXAR DIGITAL FLASH CARD LABELED "A23".
     CSI RODON PLACED CLEAR COLLISION WRAP OVER THE OPEN AND DAMAGED
WINDOWS TO PROTECT THE INTERIOR OF THE VEHICLE. CSI RODON PLACED EVI-
DENCE SEALS ON THE FOUR DOORS.
     SISTER'S TOWING TRANSPORTED THE VEHICLE TO THE PALM BEACH COUNTY
SHERIFF'S OFFICE IMPOUND LOT AT APPROXIMATELY 0215 HRS. D/S CUNNINGHAM
ADVISED THAT HE WOULD FOLLOW THE VEHICLE AND SECURE IT IN LOT A.
     CSI RODON CLEARED AT APPROXIMATELY 0220 HRS AND RESPONDED TO THE
ORIGINAL INCIDENT LOCATION ON HAVERHILL ROAD BETWEEN SUMMIT ROAD AND
FOREST HILL BLVD. CSI RODON ARRIVED ON SCENE AT APPROXIMATELY 0225

A-000883

5978                                    12/02/06

P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E     PAGE    9
SUPPLEMENT 3   O F F E N S E   R E P O R T          CASE NO. 06110508

HRS AND MET WITH D/S MCDANIEL #7457.
        THE SCENE WAS LOCATED IN THE SOUTHBOUND LANE OF HAVERHILL ROAD
APPROXIMATELY IN FRONT OF THE ENTRANCE FOR THE SUMMIT PINES APARTMENT
COMPLEX. SEVERAL SPENT CARTRIDGE CASINGS WERE LYING IN THE ROADWAY.
CRIME SCENE BARRIER TAPE WAS SECURED AROUND THE PERIMETER OF THE
ROADWAY.
        CSI RODON PHOTOGRAPHED THE SCENE USING THE PREVIOUSLY DESCRIBED
CAMERA EQUIPMENT. CSI RODON PLACED NUMBER STANCHIONS NEXT TO THE
FOLLOWING ITEMS:
*ITEM #1:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 1)
*ITEM #2:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 2)
*ITEM #3:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 3)
*ITEM #4:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 4)
*ITEM #5:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 5)
*ITEM #6:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 6)
*ITEM #7:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 7)
*ITEM #8:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 8)
*ITEM #9:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 9)
*ITEM #10:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 10)
*ITEM #11:(1) WIN 9MM LUGER SPENT CARTRIDGE CASING(STANCHION 11)
        CSI RODON TOOK ADDITIONAL PHOTOGRAPHS WITH THE STANCHIONS IN
PLACE.
        USING A DEPARTMENT ISSUED TRAFFIC WHEEL, CSI RODON OBTAINED
THE FOLLOWING APPROXIMATE MEASUREMENTS FOR THE LOCATION OF EACH
STANCHION FROM FPL POLE #677194016 ON THE WEST SIDE OF HAVERHILL
ROAD:
*FPL POLE EAST TO STANCHION 1: 41'6"
 FPL POLE NORTH TO STANCHION 1: 90'11"
*FPL POLE EAST TO STANCHION 2: 22'8"
 FPL POLE NORTH TO STANCHION 2: 91'5"
*FPL POLE EAST TO STANCHION 3: 26'3"
 FPL POLE NORTH TO STANCHION 3: 62'4"
*FPL POLE EAST TO STANCHION 4: 37'8"
 FPL POLE NORTH TO STANCHION 4: 13'9"
*FPL POLE EAST TO STANCHION 5: 52'3"
 FPL POLE NORTH TO STANCHION 5: 10'9"
*FPL POLE EAST TO STANCHION 6: 56'10"
 FPL POLE SOUTH TO STANCHION 6: 3'6"
*FPL POLE EAST TO STANCHION 7: 20'3"
 FPL POLE SOUTH TO STANCHION 7: 51'8"
*FPL POLE EAST TO STANCHION 8: 51'6"
 FPL POLE SOUTH TO STANCHION 8: 61'11"
*FPL POLE EAST TO STANCHION 9: 39'8"
 FPL POLE SOUTH TO STANCHION 9: 80'11"
*FPL POLE EAST TO STANCHION 10: 46'2"
FPL POLE SOUTH TO STANCHION 10: 44'1"
*FPL POLE EAST TO STANCHION 11: 40'2"
 FPL POLE SOUTH TO STANCHION 11: 54'2"
        CSI RODON COLLECTED THE ITEMS MARKED BY STANCHIONS 1-11. THE
COLLECTED ITEMS WERE SECURED IN CSI RODON'S CRIME SCENE VEHICLE. CSI
RODON CLEARED THE SCENE AT APPROXIMATELY 0325 HRS AND RESPONDED TO
JFK HOSPITAL.
        CSI RODON ARRIVED AT JFK HOSPITAL AT APPROXIMATELY 0335 HRS AND
ENTERED THE EMERGENCY ROOM. MEDICAL STAFF DIRECTED ME TO ROOM #11.
DET. KARPINSKI AND DET. OLIVER WERE WAITING WITH THE VICTIM INSIDE

PALM BEACH COUNTY SHERIFF'S OFFICE      PAGE   10
SUPPLEMENT 3   OFFENSE REPORT              CASE NO. 06110508

THE ROOM. THE VICTIM WAS LYING FACE-UP ON A HOSPITAL BED. THE UPPER
PORTION OF THE BED WAS ELEVATED. THE VICTIM WAS CLOTHED IN A HOSPITAL
GOWN AND WAS COVERED UP TO HER WAIST WITH A WHITE BLANKET. A HOSPITAL
ID BRACELET WAS ON HER RIGHT WRIST AND AN IV WAS IN HER LEFT ARM. THE
VICTIM WAS CONSCIOUS AND ABLE TO POINT OUT HER INJURIES. THE FOLLOWING
WOUNDS WERE NOTED:
*SCRATCHES/ABRASIONS ON INNER RIGHT FOREARM
*SCRATCHES/ABRASIONS ON OUTER LEFT FOREARM
*CIRCULAR DEFECT ON OUTSIDE OF RIGHT THIGH
*CIRCULAR DEFECT ON INSIDE OF RIGHT THIGH
*ABRASION ON ANTERIOR SURFACE OF LEFT THIGH
        CSI RODON PHOTOGRAPHED THE VICTIM AND HER INJURIES WITH AND
WITHOUT A SCALE AND COLOR GUIDE. THE VICTIM'S CLOTHING HAD BEEN RE-
MOVED BY HOSPITAL STAFF PRIOR TO MY ARRIVAL AND PLACED ON TOP OF
THE COUNTER. CSI RODON COLLECTED THE CLOTHING PER DET. KARPINSKI'S
REQUEST.
        THE FLASH CARD AND CLOTHING WERE SECURED IN CSI RODON'S CRIME
SCENE VEHICLE. CSI RODON CLEARED THE HOSPITAL AT APPROXIMATELY 0405
HRS AND RETURNED TO PBSO HEADQUARTERS.
        UPON RETURNING TO HEADQUARTERS, CSI RODON TRANSPORTED THE FLASH
CARD, CASINGS, AND CLOTHING TO THE CRIME SCENE PROCESSING ROOM AND
SECURED THEM IN AN EVIDENCE LOCKER.
        ON MONDAY, SEPTEMBER 11, 2006, AT APPROXIMATELY 1830 HRS, CSI
RODON REMOVED THE ITEMS FROM THE LOCKER. CSI RODON PLACED THE SPENT
CASINGS (ITEMS #1-11) ON BROWN KRAFT PAPER AND PHOTOGRAPHED THEM
WITH THE PREVIOUSLY DESCRIBED CAMERA EQUIPMENT.
        THE VICTIM'S CLOTHING CONSISTED OF:
*ITEM #12: (1) GREEN & WHITE STRIPED "CHARLOTTE RUSSE" TANK TOP
SHIRT, SIZE S, WITH BLOOD-LIKE STAINS
*ITEM #13: (1) PAIR OF GREEN "REFUGE" SHORTS, SIZE 7, WITH BLOOD-
LIKE STAINS
        NO DEFECTS WERE OBSERVED IN THE CLOTHING. CSI RODON PLACED
THE CLOTHING ITEMS ON BROWN KRAFT PAPER AND PHOTOGRAPHED THEM.
        ALL PROCESSING AND PACKAGING OF EVIDENCE WAS COMPLETED BY CSI
RODON. THE CASINGS (ITEMS #1-11) WERE PROCESSED FOR LATENT PRINTS
WITH BLACK POWDER AND BRUSH. NO LATENT DEVELOPMENT WAS OBSERVED.
EACH CASING WAS WRAPPED IN TISSUE PAPER AND PACKAGED IN A SEPARATE
COIN ENVELOPE. THE CASINGS WERE SEALED IN AN EVIDENCE BAG AND SUB-
MITTED TO THE CRIME LAB EVIDENCE UNIT TO BE FORWARDED TO THE FIREARMS
UNIT. THE CLOTHING (ITEMS #12 & #13) WERE SEALED IN SEPARATE EVIDENCE
BAGS AND TURNED OVER TO THE EVIDENCE UNIT. THE DIGITAL FLASH CARD
LABELED "A23" (ITEM #14) WAS SEALED IN AN EVIDENCE BAG AND TURNED
OVER TO THE PHOTO LAB.
        THIS CONCLUDES CSI RODON'S INVOLVEMENT IN THIS CASE AT THIS
TIME.
INV. ELIZABETH RODON/ID #7430/9-19-06
COPY/PASTE/9-21-06/SS/ID #4656.

A-000885

5978                              12/02/08                              ЕМСА
    P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E     PAGE    11
    SUPPLEMENT 4    O F F E N S E   R E P O R T          CASE NO. 06110508

DISPOSITION: INACTIVE
DIVISION: DETECTIVE

AGG BATTERY                          CODE: 130A   DATE: 10/30/06   MONDAY
ZONE: B13 GRID: 4B1     DEPUTY ID.: 7430 ASSIST:     TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND   DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300        BLK HAVERHILL          RD   APT. NO.:
        CITY: WPB                          STATE: FL      ZIP: 33415
NO. OFFENSES: 01   NO. OFFENDERS: UK   NO. VEH. STOLEN: 0   NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01   NO. ARRESTED:  0   FORCED ENTRY:  0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1   FLORIDA STATE STATUTE:  784 045        CIS CODE 130A

        ON SUNDAY, SEPTEMBER 17, 2006, AT APPROXIMATELY 1830 HRS,
CRIME SCENE INVESTIGATOR (CSI) RODON #7430 RESPONDED TO THE PALM
BEACH COUNTY SHERIFF'S OFFICE (PBSO) IMPOUND LOT TO PROCESS THE
VICTIM'S VEHICLE FOR FIREARMS EVIDENCE AT THE REQUEST OF DET.
OLIVER #6938. DET. OLIVER ADVISED THAT A CONSENT TO SEARCH HAD
BEEN OBTAINED FROM THE REGISTERED OWNER, B/F ASIA DIVINE MATTHEWS
DOB 07/22/79.
        THE VEHICLE, A BEIGE 4-DOOR 1994 BUICK PARK AVENUE WITH
FLORIDA TAG ▓▓▓▓ AND VIN# ▓▓▓▓▓▓▓▓ WAS PARKED IN LOT A,
THE EVIDENCE SEALS ON THE DOORS AND THE COLLISION WRAP OVER THE
WINDOWS WERE INTACT. CSI RODON PHOTOGRAPHED THE EXTERIOR OF THE
VEHICLE WITH A DEPARTMENT ISSUED NIKON D100 DIGITAL CAMERA, A NIKON
28-200 MM LENS, A NIKON SB800 FLASH, AND A LEXAR DIGITAL FLASH
CARD LABELED "A23".
        CSI RODON PLACED LABELED ADHESIVE PHOTO SCALES BY DEFECTS ON
THE EXTERIOR, AS FOLLOWS:
*DEFECT A: LEFT FRONT WINDOW
*DEFECT B: LEFT FRONT DOOR NEAR SIDE MIRROR
*DEFECT C: LEFT FRONT DOOR, LEFT OF HANDLE
*DEFECT D: LEFT FRONT DOOR, RIGHT OF DEFECT C
*DEFECT E: LEFT REAR DOOR BELOW WINDOW
*DEFECT F: LEFT TAILLIGHT
*DEFECT G: RIGHT TAILLIGHT
        CSI RODON TOOK CLOSE-UP PHOTOGRAPHS OF EACH DEFECT WITH THE
SCALES IN PLACE.
        CSI RODON BROKE THE EVIDENCE SEALS AND OPENED THE DOORS TO
PHOTOGRAPH THE INTERIOR OF THE VEHICLE. THE LEFT FRONT AND REAR
DOORS COULD NOT BE OPENED ALL THE WAY BECAUSE ANOTHER VEHICLE WAS
PARKED TOO CLOSE TO THAT SIDE OF THE VEHICLE. THE INTERIOR OF THE
VEHICLE CONTAINED AN INFANT CAR SEAT ON THE RIGHT REAR SEAT, A
BLACK BACKPACK ON THE LEFT REAR SEAT, AND A WALLET ON THE RIGHT
FRONT SEAT. THE INTERIOR OF THE VEHICLE WAS LITTERED WITH DEBRIS.
BLOOD-LIKE STAINS WERE PRESENT ON THE LEFT FRONT SEAT.
        A DEFECT THAT APPEARED TO CORRESPOND WITH DEFECT A WAS OB-
SERVED ON THE INTERIOR OF THE LEFT FRONT WINDOW. AN ADHESIVE PHOTO
SCALE LABELED "DEFECT A INTERIOR" WAS PLACED BY THIS DEFECT AND WAS
PHOTOGRAPHED BY CSI RODON.
        CSI RODON CLEARED THE IMPOUND LOT AT APPROXIMATELY 2015 HRS.
UPON RETURNING TO PBSO HEADQUARTERS, CSI RODON SEALED THE FLASH CARD
LABELED "A23" (ITEM #15) IN AN EVIDENCE BAG AND TURNED IT OVER TO

A-000886

PALM BEACH COUNTY SHERIFF'S OFFICE PAGE 12
SUPPLEMENT 4 OFFENSE REPORT CASE NO. 06110508

THE PHOTO LAB. CSI RODON ADVISED DET. OLIVER OF THE PROCESSING RE-
SULTS AND INFORMED HIM THAT THE TWO LEFT DOORS COULD NOT BE OPENED
COMPLETELY.

ON TUESDAY, OCTOBER 3, 2006, AT APPROXIMATELY 1815 HRS, CSI RODON
RESPONDED TO THE PBSO IMPOUND LOT FOR ADDITIONAL PROCESSING OF THE
VICTIM'S VEHICLE. DET. KARPINSKI #6682 WAS PRESENT UPON MY ARRIVAL.

THE VEHICLE HAD BEEN MOVED SO THE LEFT SIDE WAS ACCESSIBLE. CSI
RODON TOOK ADDITIONAL PHOTOGRAPHS OF THE EXTERIOR AND INTERIOR OF
THE VEHICLE USING THE PREVIOUSLY DESCRIBED CAMERA EQUIPMENT AND A
LEXAR DIGITAL FLASH CARD LABELED "B5".

A DEFECT WAS OBSERVED ON THE INTERIOR OF THE LEFT FRONT DOOR
ABOVE THE ARMREST. CSI RODON PLACED AN ADHESIVE PHOTO SCALE LABELED
"DEFECT H" BY THIS DEFECT AND PHOTOGRAPHED IT.

DET. KARPINSKI REMOVED THE LEFT REAR INTERIOR DOOR PANEL TO
LOOK FOR ANY POSSIBLE FIREARMS EVIDENCE. NO ITEMS WERE RECOVERED
FROM INSIDE THE DOOR. DET. KARPINSKI AND CSI RODON SEARCHED THE
INTERIOR OF THE VEHICLE. ONE METAL FRAGMENT WAS LOCATED AND COL-
LECTED FROM THE RIGHT REAR FLOORBOARD. CSI RODON PHOTOGRAPHED THE
FRAGMENT PRIOR TO COLLECTION. NO OTHER EVIDENTIARY ITEMS WERE
COLLECTED.

CSI RODON CLEARED THE IMPOUND LOT AT APPROXIMATELY 2000 HRS.
UPON RETURNING TO PBSO HEADQUARTERS, CSI RODON TRANSPORTED THE
FLASH CARD AND METAL FRAGMENT TO THE CRIME SCENE PROCESSING ROOM
AND SECURED THEM IN AN EVIDENCE LOCKER.

ON THURSDAY, OCTOBER 5, 2006, CSI RODON PLACED THE METAL FRAG-
MENT ON BROWN KRAFT PAPER AND PHOTOGRAPHED IT. THE FRAGMENT WAS
WRAPPED IN TISSUE PAPER AND PACKAGED IN A LABELED COIN ENVELOPE.
THE METAL FRAGMENT (ITEM #17) WAS SEALED IN AN EVIDENCE BAG AND
SUBMITTED TO THE CRIME LAB EVIDENCE UNIT TO BE FORWARDED TO THE
FIREARMS UNIT. THE FLASH CARD LABELED "B5" (ITEM #16) WAS SEALED
N AN EVIDENCE BAG AND TURNED OVER TO THE PHOTO LAB.

THIS CONCLUDES CSI RODON'S INVOLVEMENT IN THIS CASE.
INV. E. RODON/ID #7430/10-29-06
COPY/PASTE/10-30-06/SS

A-000887

5978                          12/02/08                      EMCA
   P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E   PAGE   13
   SUPPLEMENT 5   O F F E N S E   R E P O R T          CASE NO. 06110508

                          DISPOSITION: INACTIVE
                          DIVISION: DETECTIVE

AGG BATTERY                         CODE: 130A  DATE: 02/25/08  MONDAY
ZONE: B13 GRID: 4B1    DEPUTY ID.: 6682 ASSIST:    TIME D 0047 A 0051 C 0114
OCCURRED BETWEEN DATE: 09/10/06 , 0048 HOURS AND  DATE: 09/10/06 , 0048 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 1300      BLK HAVERHILL        RD   APT. NO.:
           CITY: WPB                      STATE: FL    ZIP: 33415
NO. OFFENSES: 01  NO. OFFENDERS: UK  NO. VEH. STOLEN: 0  NO. PREM. ENTERED: 0
LOCATION: MOTOR VEHICLE
NO. VICTIMS: 01  NO. ARRESTED:  0  FORCED ENTRY:  0
WEAPON TYPE: HANDGUN
OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 045      CIS CODE 130A

      ON MONDAY, SEPTEMBER 11, 2006, AT ABOUT 0100 HOURS, I RECEIVED A
TELEPHONE CALL FROM PALM BEACH COUNTY SHERIFF'S OFFICE VIOLENT CRIME
DIVISION DETECTIVE SERGEANT RICHARD MCAFEE.  HE ASSIGNED ME A SHOOTING
INVESTIGATION.  HE TOLD ME THAT AN EMPLOYEE OF SUGAR DADDY'S ADULT
ENTERTAINMENT WAS SHOT WHILE DRIVING HER VEHICLE AFTER LEAVING WORK.  SHE
THEN DROVE BACK TO SUGAR DADDY'S WHERE 911 WAS CALLED.  SUGAR DADDY'S IS
LOCATED AT 704 SOUTH MILITARY TRAIL, UNINCORPORATED WEST PALM BEACH, PALM
BEACH COUNTY, FLORIDA.  THE FEMALE VICTIM WAS TRANSPORTED TO JFK MEDICAL
CENTER, IN ATLANTIS, FLORIDA, WITH A NON-LIFE THREATENING GUNSHOT INJURY
TO ONE OF HER LEGS.  I WAS TOLD THAT DETECTIVE SEAN OLIVER WOULD BE
RESPONDING TO ASSIST WITH THE INVESTIGATION.
      AT ABOUT 0140 HOURS, I ARRIVED AT SUGAR DADDY'S, WHICH IS LOCATED ON
THE NORTHEAST CORNER OF SOUTH MILITARY TRAIL AND SATURN DRIVE.
      I WAS IMMEDIATELY MET BY PALM BEACH COUNTY SHERIFF'S OFFICE CRIME
SCENE INVESTIGATOR ELIZABETH RODON, ID 7430.  SHE INFORMED ME THAT DISTRICT
1 ROAD PATROL UNITS LOCATED THE PRIMARY CRIME SCENE ON HAVERHILL ROAD,
BETWEEN SUMMIT BOULEVARD AND GUN CLUB ROAD.  NUMEROUS SHELL CASINGS WERE
DISCOVERED IN THE ROADWAY.
      AT ABOUT 0143 HOURS, I MET WITH DISTRICT 1 DEPUTY SHERIFF JEFFREY
CUNNINGHAM, ID 7642.  HE TOLD ME THE FOLLOWING:
      DISTRICT 1 DEPUTIES RESPONDED TO SUGAR DADDY'S AT ABOUT 0048 HOURS
IN REFERENCE TO A SHOOTING.  UPON ARRIVAL, THEY DISCOVERED THE VICTIM TO
BE ASIA DEVINE MATTHEWS.  MATTHEWS WAS TRANSPORTED TO JFK MEDICAL CENTER
BY PALM BEACH COUNTY FIRE RESCUE #33 WITH A NON-LIFE THREATENING GUNSHOT
INJURY TO ONE OF HER LEGS.  THERE WERE WHAT APPEARED TO BE AN ENTRY AND
AN EXIT WOUND ON THE UPPER PART OF ONE OF HER LEGS.  MATTHEWS' VEHICLE, A
GOLD 1994 BUICK, FOUR DOOR, BEARING FLORIDA LICENSE PLATE ▆▆▆▆ VIN #
▆▆▆▆▆▆▆▆▆▆▆ WAS DISCOVERED PARKED ON THE SOUTH SIDE OF SUGAR
DADDY'S.  THE VEHICLE HAS SEVERAL DEFECTS ON ITS DRIVER'S SIDE, APPARENTLY
CAUSED BY PROJECTILES.  PRIOR TO BEING TRANSPORTED TO JFK MEDICAL CENTER,
MATTHEWS TOLD DEPUTIES THAT SHE WAS FOLLOWED AFTER SHE LEFT SUGAR DADDY'S
BY UNKNOWN SUBJECT(S) WHO WERE DRIVING A BLUE, NEWER MODEL, FOUR DOOR
VEHICLE WITH TINTED WINDOWS AND AN OCCUPANT OF THE VEHICLE OPENED FIRE ON
HER VEHICLE ON HAVERHILL ROAD.  MATTHEWS RETURNED TO SUGAR DADDY'S AFTER
BEING SHOT.  DISTRICT 1 SHERIFF'S DEPUTIES DISCOVERED NUMEROUS SHELL CASINGS
ON THE ROADWAY OF HAVERHILL ROAD, BETWEEN SUMMIT BOULEVARD AND GUN CLUB
ROAD.  THAT SCENE WAS BEING SECURED BY DEPUTY SHERIFFS UNTIL DETECTIVES
AND CRIME SCENE PERSONNEL COULD RESPOND.  THERE WERE NO WITNESSES TO THE
SHOOTING AT THIS TIME AND NOBODY FROM THE CLUB HAD INFORMATION IN REFERENCE
TO POSSIBLE SUSPECTS.

                          A-000888

5978                            12/02/08                          EMCA
        P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E       PAGE   14
        SUPPLEMENT 5   O F F E N S E   R E P O R T            CASE NO. 06110508

        I EXAMINED THE VICTIM'S VEHICLE AT ABOUT 0150 HOURS AND NOTED THE
FOLLOWING:  THE VEHICLE WAS PARKED IN THE SECOND PARKING SPACE EAST OF
MILITARY TRAIL AND NORTH OF SATURN DRIVE.  THERE WERE WHAT APPEARED TO BE
A TOTAL OF FIVE PROJECTILE DEFECTS LOCATED ON THE DRIVER'S SIDE OF THE
VEHICLE.  TWO DEFECTS WERE CENTRALLY LOCATED ON THE DRIVER'S DOOR, ONE
WAS CENTRALLY LOCATED ON THE BOTTOM HALF OF THE WINDOW OF THE DRIVER'S DOOR,
ONE WAS LOCATED IN THE UPPER LEFT QUADRANT OF THE DRIVER'S SIDE REAR
PASSENGER DOOR AND ONE WAS LOCATED ON THE FRONT DRIVER'S SIDE SIDE PANEL.
THE WINDOW OF THE REAR DRIVER'S SIDE PASSENGER DOOR WAS COMPLETELY
FRACTURED BUT INTACT.  IT WAS VOID OF ANY APPARENT PROJECTILE DEFECTS.
BOTH REAR TAILLIGHTS ALSO HAD CIRCULAR DEFECTS, BUT IT WAS NOT IMMEDIATELY
APPARENT WHETHER THESE DEFECTS WERE CAUSED BY FIREARM PROJECTILES.
        I ALSO MADE THE FOLLOWING OBSERVATIONS OF THE VICTIM'S VEHICLE:  BOTH
OF THE DRIVER'S SIDE WINDOWS WERE IN THE UP POSITION.  ON THE PASSENGER
SIDE OF THE VEHICLE, THE FRONT WINDOW WAS COMPLETELY OPEN AND THE REAR
WINDOW WAS APPROXIMATELY HALFWAY DOWN.  THE HEADLIGHTS WERE ON AND THE
LEFT REAR TIRE WAS DEFLATED.
        BREAKING THE INSIDE OF THE VEHICLE INTO QUADRANTS, I OBSERVED THE
FOLLOWING:
     *  THE DRIVER'S SEAT HAD A BLOOD LIKE SUBSTANCE ON IT ON THE SEAT PORTION.
        THE DOOR LOCKING MECHANISM ON THE INTERIOR OF THE DRIVER'S DOOR WAS
        DAMAGED.
     *  THE FRONT PASSENGER SIDE HAD SEVERAL ITEMS LOCATED ON THE SEAT,
        INCLUDING A BROWN PAPER TOWEL OR NAPKIN, A POTATO CHIP BAG AND WHAT
        APPEARED TO BE A BROWN LEATHER WALLET OF SOME TYPE.
     *  THE REAR PASSENGER SEAT ON THE DRIVER'S SIDE HAD A BLUE TOWEL ON THE
        SEAT.
     *  THE REAR PASSENGER SEAT ON THE PASSENGER'S SIDE HAD A BABY SEAT
        CARRIER ON THE SEAT.
        UPON EXAMINING THE INTERIOR OF THE VICTIM'S VEHICLE THROUGH THE OPEN
WINDOWS ON THE PASSENGER SIDE, I DID NOT SEE ANY OTHER OBVIOUS EVIDENCE,
INCLUDING ANY FIREARM PROJECTILES.
        I MET WITH DETECTIVE OLIVER AT THE SCENE.  HE WAS ASSIGNED TO RESPOND
TO THE HAVERHILL ROAD CRIME SCENE TO EVALUATE THE SCENE.  HE WOULD THEN
RESPOND TO JFK MEDICAL CENTER TO INTERVIEW THE VICTIM.
        SHORTLY AFTER EXAMINING THE VICTIM'S VEHICLE, I MET WITH THOMAS P
DOHERTY, THE OWNER OF SUGAR DADDY'S AND ████████████████████████████████
████████████████████████████████████
        ACCORDING TO DOHERTY, THERE ARE NO SURVEILLANCE CAMERAS INSTALLED
AT HIS BUSINESS.  IN REFERENCE TO MATTHEWS, HE HAS KNOWN HER ON AND OFF
FOR 10 YEARS.  HE EXPLAINED THAT SHE WOULD WORK AT THE BUSINESS
PERIODICALLY, WHICH HE EXPLAINED IS NORMAL FOR ADULT ENTERTAINERS.  MATTHEWS
IS CURRENTLY WORKING AS A DANCER AT THE BUSINESS.  SHE RECENTLY HAD A BABY
AND HAS HAD SOME ISSUES WITH HER EX-BOYFRIEND.  SHE HAD DOMESTIC RELATED
ISSUES WITHIN THE PAST YEAR WITH HER EX-BOYFRIEND OVER A VEHICLE.  HE DID
NOT KNOW THE EX-BOYFRIEND'S NAME.  HE SAW HER JUST BEFORE SHE LEFT WORK AND
SHE APPEARED TO BE IN A GOOD MOOD.
        ACCORDING TO ████ MATTHEWS ARRIVED AT WORK TODAY AT ABOUT 2030 HOURS.
SHE LEFT WORK AT ABOUT 0037 HOURS.  HE DID NOT SEE ANYONE FOLLOW HER AS SHE
LEFT AND DID NOT SEE ANY VEHICLES PULL OUT BEHIND HER VEHICLE AS SHE LEFT.
SHE LEFT ALONE.  HER SHIFT WAS SUPPOSED TO END TODAY, BUT SHE TOLD HIM THAT
SHE HAD TO GO TO SCHOOL IN THE MORNING AND LEFT EARLY.  MATTHEWS RETURNED
TO SUGAR DADDY'S AT ABOUT 0047 HOURS.  HE KNEW THIS BECAUSE HE DIALED 911
AT ABOUT 0047 HOURS.  HE LOOKED ON HIS CELLUAR TELEPHONE TO ASCERTAIN THIS
TIME.  UPON RETURNING, MATTHEWS TOLD HIM THAT SOMEONE IN A BLUE VEHICLE

A-000889

5978                          12/02/08                          EMCA
       P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E      PAGE    15
       SUPPLEMENT 5    O F F E N S E   R E P O R T          CASE NO. 06110508

FOLLOWED HER.   HE SAW A BLUE SPORTS UTILITY VEHICLE, POSSIBLY A CHEVROLET WITH TINTED WINDOWS, PARKED IN A PARKING LOT ON THE SOUTH SIDE OF SATURN DRIVE EARLIER, BUT DID NOT NOTICE IT LEAVE.

███████ CHECKED MATTHEWS TIMECARD.   SHE SIGNED IN AT ABOUT 2010 HOURS AND DID NOT SIGN OUT, WHICH ACCORDING TO BOTH ████ AND DOHERTY, IS A STANDARD PRACTICE.

I ALSO SPOKE TO SEVERAL EMPLOYEES AND PATRONS, ALL OF WHOM STATED THEY DID NOT WITNESS ANY ALTERCATIONS INVOLVING MATTHEWS WHILE SHE WAS WORKING.

I PROVIDED DOHERTY WITH MY BUSINESS CARD AND CASE NUMBER AND REQUESTED THAT HE CONTACT ME IF HE SHOULD LEARN ANYTHING FURTHER ABOUT THE SHOOTING AND/OR MATTHEWS.

SISTERS TOWING ARRIVED AT SUGAR DADDY'S AND SUBSEQUENTLY TOWED THE VICTIM'S VEHICLE TO THE PALM BEACH COUNTY SHERIFF'S OFFICE SECURED IMPOUND LOT LOCATED AT 3228 GUN CLUB ROAD.   DEPUTY SHERIFF CUNNINGHAM WAS ASSIGNED TO MAINTAIN THE CHAIN OF CUSTODY FOR THE VEHICLE UNTIL IT WAS SECURE AT THE IMPOUND LOT.

PALM BEACH COUNTY SHERIFF'S OFFICE CRIME SCENE INVESTIGATOR RODON WAS ASSIGNED TO RESPOND TO THE HAVERHILL ROAD CRIME SCENE FOR CRIME SCENE DOCUMENTATION AND EVIDENCE COLLECTION.   SHE WAS INSTRUCTED TO MEET DETECTIVE OLIVER AND I AT JFK MEDICAL CENTER WHEN SHE COMPLETED HER ASSIGNMENT.

PRIOR TO LEAVING THE SCENE, I CANVASSED THE IMMEDIATE AREA OF SUGAR DADDY'S FOR ANY BUSINESSES WITH SURVEILLANCE CAMERAS, BUT DID NOT LOCATE ANY.

I LEFT SUGAR DADDY'S AT ABOUT 0235 HOURS AND RESPONDED TO JFK MEDICAL CENTER.

I ARRIVED AT JFK MEDICAL CENTER AT ABOUT 0245 HOURS.   I MET WITH DETECTIVE OLIVER AND DEPUTY SHERIFF TERRY WISE OUTSIDE ROOM 11 IN THE EMERGENCY ROOM, WHERE MATTHEWS WAS BEING TREATED.

ACCORDING TO DETECTIVE OLIVER, MATTHEWS TOLD HIM THAT SHE WORKED FROM ABOUT 2000 HOURS UNTIL ABOUT 0030 HOURS.   SHE SAID THERE WAS NO MONEY TO BE MADE AND TOLD JOHN (DOHERTY) SHE WAS LEAVING.   NOBODY WAS WITH HER WHEN SHE LEFT SUGAR DADDY'S OR RETURNED AFTER BEING SHOT.   SHE RESIDES AT 1266 CAREFREE COVE, NEAR WHERE THE SHOOTING OCCURRED.   MATTHEWS' SISTER MAY HAVE BEEN TALKING TO MATTHEWS ON THE TELEPHONE WHEN MATTHEWS WAS SHOT.

ACCORDING TO DEPUTY SHERIFF WISE, HE OVERHEARD MATTHEWS TELLING SOMEBODY ON THE PHONE THAT IT WAS "A TRICK THAT WENT BAD".

MATTHEWS WAS BEING TREATED AT THIS TIME AND WAS UNAVAILABLE FOR FURTHER QUESTIONING.

AFTER MATTHEWS HAD RETURNED TO ROOM 11 AFTER BEING X-RAYED, SHE AGREED TO PROVIDE AN ADDTIONAL SWORN STATEMENT.   AT ABOUT 0337 HOURS, MATTHEWS SIGNED A CONSENT TO SEARCH FORM, GRANTED THE PALM BEACH COUNTY SHERIFF'S OFFICE PERMISSION TO SEARCH HER VEHICLE FOR EVIDENCE.   AT ABOUT 0346 HOURS, DETECTIVE OLIVER AND I INTERVIEWED MATTHEWS.   DETECTIVE OLIVER DIGITALLY RECORDED THE INTERVIEW WHICH WAS OBTAINED IN ITS ENTIRETY IN ROOM 11. DURING HER SWORN STATEMENT, MATTHEWS PROVIDED THE FOLLOWING INFORMATION:

*   SHE ENTERTAINED ONE CUSTOMER DURING HER SHIFT AT SUGAR DADDY'S; A HISPANIC MALE, WHO SPOKE BOTH ENGLISH AND SPANISH, AND WAS WEARING A GRAY TEE SHIRT AND GRAY NYLON WORKOUT PANTS.   HE PAID HER A TOTAL OF $40-50, AT $10 A DANCE.   HE DID WANT TO HAVE SEX, BUT SHE REFUSED, INDICATING SHE WAS ON HER PERIOD.   HE WAS UPSET, BUT DID NOT GET IN A CONFRONTATION WITH HER.
*   WHEN SHE LEFT SUGAR DADDY'S IN HER VEHICLE, SHE DROVE NORTHBOUND ON MILITARY TRAIL.   SHE WAS GOING TO HER SISTER'S HOUSE OFF OF 45TH STREET. SHE WAS TALKING TO HER SISTER (MONICA) ON HER CELL PHONE WHILE DRIVING. SHE NOTICED A VEHICLE TRAVELING IN THE SAME DIRECTION BEHIND HERS.   HER

A-000890

PALM BEACH COUNTY SHERIFF'S OFFICE    PAGE  16
SUPPLEMENT 5  OFFENSE REPORT            CASE NO. 06110508

SISTER INVITED HER TO GO DANCING.  SHE MADE A U-TURN NEAR THE HESS GAS
STATION, NORTH OF SOUTHERN BOUELVARD, AND BEGAN DRIVING SOUTHBOUND ON
MILITARY TRAIL.  THE VEHICLE CONTINUED FOLLOWING HER.  SHE TURNED
RIGHT (WEST) ONTO GUN CLUB ROAD.  SHE SPED UP AND THE VEHICLE CONTINUED
TO FOLLOW HER.  SHE TURNED LEFT (SOUTH) ONTO HAVERHILL ROAD.  SHE SAW
A PALM BEACH COUNTY SHERIFF'S OFFICE PATROL VEHCILE TRAVELING NORTHBOUND
ON HAVERHILL ROAD.  SHE PASSED BY THE PATROL VEHICLE.  AS SHE APPROACHED
CAREFREE COVE, WHERE SHE RESIDES, SHE SLOWED AND TURNED RIGHT INSTEAD
OF LEFT TO SEE IF THE VEHICLE FOLLOWED HER.  THE SUSPECT VEHICLE,
SLOWED AND THE SHOOTING STARTED.  SHE DUCKED DOWN.  SHE SAW THE
VEHICLE DRIVE AWAY SOUTHBOUND ON HAVERHILL ROAD.  SHE DESCRIBED THE
SUSPECT VEHICLE AS A LITTLE, BLUE, OLDER MODEL, FOUR DOOR TOYOTA
COROLLA OR FORD WITH TINTED WINDOWS.  SHE COULD NOT PROVIDE A DESCRIPTION
OF THE PERSON(S) WHO SHOT AT HER.  AFTER DISCOVERING SHE WAS SHOT, SHE
MADE A U-TURN AND DROVE BACK NORTHBOUND ON HAVERHILL ROAD, THEN
EASTBOUND ON SUMMIT BOULEVARD AND BACK TO SUGAR DADDY'S.

*  A COUPLE OF DAYS AGO, SHE MADE A COMPLAINT TO DCF IN REFERENCE TO HER
   CHILD BEING LEFT UNATTENDED IN THE HOUSE OF HER DAY CARE.  SHE MADE THE
   COMPLAINT ON KIMBERLY ALLISON, OF FAMILY CENTRAL.  SHE DID NOT REMEMBER
   THE EXACT ADDRESS OF THE DAY CARE, BUT SAID IT'S LOCATED NEAR 26TH
   COURT AND AVENUE S IN RIVIERA BEACH, FLORIDA.  SHE INITIATED THE
   REPORT IN PERSON AT THE RIVIERA BEACH POLICE DEPARTMENT.

*  SHE RENTS A TRAILER AT 1266 CAREFREE COVE FROM A MALE NAMED DAVID
   ALLEN.  ALLEN LIVES AT ANOTHER RESIDENCE IN LAKE WORTH WITH HIS
   GIRLFRIEND ANGIE.  IN A RECENT INCIDENT, ANGIE RAMMED HER VEHICLE
   INTO DAVID'S VEHICLE WHILE SHE (MATTHEWS) WAS DRIVING AND DAVID WAS
   A PASSENGER.  ANGIE WAS UPSET BECAUSE OF HER (MATTHEWS) RELATIONSHIP
   WITH DAVID.  DAVID DID NOT WANT TO REPORT THE INCIDENT TO POLICE
   BECAUSE HE WAS INTOXICATED.  THE INTERVIEW WAS CONCLUDED AT ABOUT
   0430 HOURS.

PLEASE REVIEW DETECTIVE OLIVER'S SUPPLEMENT AND/OR THE RECORDING FOR
FURTHER DETAILS OF MATTHEWS' STATEMENT.

PALM BEACH COUNTY SHERIFF'S OFFICE CRIME SCENE INVESTIGATOR RODON
ARRIVED IN ROOM 11.  SHE PHOTOGRAPHED MATTHEWS' INJURY AND COLLECTED THE
CLOTHING MATTHEWS WAS WEARING WHEN SHE WAS SHOT AS EVIDENCE.  CRIME SCENE
IVNESTIGATOR RODON INFORMED ME THAT SHE COLLECTED 11 LUGER 9MM SHELL CASINGS
FROM THE HAVERHILL ROAD CRIME SCENE.

AT ABOUT 0435 HOURS, I SPOKE TO MONICAL HARRIS SMITH IN THE LOBBY OF
THE EMERGENCY ROOM.  HARRIS IDENTIFIED HERSELF AS MATTHEWS' SISTER.  SHE
SAID THAT SHE CALLED MATTHEWS AS MATTHEWS WAS LEAVING WORK.  SHE INVITED HER
TO A REGGAE CLUB IN RIVIERA BEACH.  MATTHEWS TOLD HER THAT SHE WAS GOING
HOME TO CHANGE CLOTHES AND SHE WOULD MEET HER AT THE CLUB.  AN UNKNOWN
PERSON CALLED HER FROM SUGAR DADDY'S AND INFORMED HER OF THE SHOOTING.
HARRIS INFORMED ME THAT THERE IS A CO-WORKER OF MATTHEWS NAMED "JUICY"
WHO DRIVES A CAR THAT LOOKS SIMILAR TO MATTHEWS VEHICLE.

I LEFT JFK MEDICAL CENTER AT ABOUT 0440 HOURS.

THE CONSENT TO SEARCH FORM THAT MATTHEWS SIGNED WAS PLACED INTO
EVIDENCE.

ON SUNDAY, SEPTEMBER 24, 2006, I CALLED THE PALM BEACH AUTO MALL AND
SPOKE TO MANAGER BARRY BOWMAN TO ASCERTAIN WHETHER THE BUSINESS HAD
SURVEILLANCE CAMERAS THAT CAPTURED MILITARY TRAIL.  BOWMAN TOLD ME THAT I
WOULD HAVE TO CALL ON MONDAY AND SPEAK WITH THE SECURITY MANAGER.

I E-MAILED MAURICE COOPER, OF THE PALM BEACH COUNTY SHERIFF'S OFFICE
FIREARMS SECTION, IN REFERENCE TO COMPARING AND ENTERING THE LUGER 9MM
SHELL CASINGS RECOVERED IN THIS CASE INTO NIBIN.

5976                              12/02/08                              EMCA
      P A L M   B E A C H   C O U N T Y   S H E R I F F' S   O F F I C E   PAGE   17
      SUPPLEMENT 5   O F F E N S E   R E P O R T          CASE NO. 06110508

        ON MONDAY, SEPTEMBER 25, 2006, AT ABOUT 1500 HOURS, I ARRIVED AT
PALM BEACH TOYOTA, 735 SOUTH MILITARY TRAIL, WHICH IS DIRECTLY ACROSS
MILITARY TRAIL FROM SUGAR DADDY'S.   I INQUIRED WITHIN REFERENCE TO THEIR
SURVEILLANCE CAMERAS.   I LEFT MY CONTACT INFORMATION AND WAS TOLD SECURITY
MANAGER KIM MCMANN WOULD CALL ME.
        AFTER LEAVING PALM BEACH TOYOTA, I DROVE THE EXACT ROUTE THAT ASIA
MATTHEWS STATED SHE TOOK AFTER LEAVING SUGAR DADDY'S ON SEPTEMBER 11, 2006.
I DID NOT LOCATE ANY BUSINESSES WHICH HAD SURVEILLANCE CAMERAS THAT
CAPTURED ANY OF THE ROADWAYS.
        AT ABOUT 1535 HOURS, I ARRIVED AT 4750 CAREFREE TRAIL, THE OFFICE OF
THE LONGLAKE VILLAGE MOBILE HOME PARK.   MATTHEWS RESIDED IN THIS COMMUNITY.
I MET WITH PARK MANAGER DALE HALL.   HALL PROVIDED ME WITH INFORMATION ON
DAVID ALLEN, SUCH AS HIS CURRENT ADDRESS, 343 DARTMOUTH DRIVE AND CELLULAR
TELEPHONE NUMBER, 561-502-5818.   SHE TOLD ME THAT DAVID ASSUMED THE PAYMENTS
(RENT) FOR 1266 CAREFREE COVE FROM AN ASSOCIATE NAMED DAVID GILCHRTIST, BUT
DID NOT RESIDE IN THE PARK.   HALL GAVE ME THE LAST KNOW ADDRESS, 5462
HAVERFORD WAY, LAKE WORTH, FLORIDA AND PHONE NUMBER 561-856-4545, FOR
GILCHRIST.
        AT ABOUT 1628 HOURS, I LEFT A MESSAGE ON DAVID ALLEN'S VOICEMAIL
ASKING HIM TO CALL ME.
        I REVIEWED PALM BEACH COUNTY SHERIFF'S OFFICE CASE NUMBER 06-018849,
A BATTERY CASE IN WHICH DAVID ALLEN IS LISTED AS A WITNESS.   I ALSO FOUND
A WITNESS NAMED ANGELA ELVIR, WHITE FEMALE, DATE OF BIRTH, 08-07-71, LISTED
IN THE NAME LIST OF THE REPORT.
        DETECTIVE OLIVER GAVE ME THE TELEPHONE NUMBER OF ASIA MATTHEWS'
EX-BOYFRIEND CLEVELAND, 561-310-5811.   I LEFT A MESSAGE FOR CLEVELAND TO
CALL ME WITH AN UNIDENTIFIED FEMALE.
        AT ABOUT 1750 HOURS, I RECEIVED A CALL FROM CLEVELAND PETTIS, MATTHEWS'
EX-BOYFRIEND.   HE TOLD ME THE FOLLOWING:   HE HAS A CHILD WITH MATTHEWS.   HE
BROKE UP WITH HER BECAUSE OF THE QUALITY OF PEOPLE SHE HUNG AROUND.   HE
LEARNED FROM HER THAT SHE USED TO "STIFF" NON-AFRICAN AMERICAN MALES FOR
MONEY, TELLING THEM THEY WOULD MEET FOR SEX, TAKE MONEY FROM THE MALES AND
NOT SHOW UP.   MATTHEWS DID HAVE A COUPLE OF ALTERCATIONS WITH THE WIFE OF
DAVID ALLEN, WHOM SHE USED TO RENT THE TRAILER IN LONGLAKE VILLAGE FROM.
THE GIRLFRIEND RAMMED HER VEHICLE INTO MATTHEWS' VEHICLE ONE NIGHT AND CAME
OVER TO THE TRAILER ABOUT 4 1/2 WEEKS AGO AND GOT INTO AN ARGUMENT WITH
MATTHEWS.   MATTHEWS WAS ALSO USING DAVID ALLEN FOR MONEY.   HE WOULD GIVE
HER MONEY AND SHE WOULD REFUSE TO HAVE SEX WITH HIM.   MATTHEWS DID CALL HIM
FROM JFK MEDICAL CENTER ON THE NIGHT SHE WAS SHOT BUT DID NOT MENTION A
"TRICK" THAT HAD GONE BAD.
        AT ABOUT 1745 HOURS, DETECTIVE OLIVER AND I MET WITH DAVID ALLEN AT
HIS RESIDENCE, 343 DARMOUTH DRIVE, IN LAKE WORTH, FLORIDA.   ALLEN INVITED
US INSIDE HIS RESIDENCE AND I PROCEEDED TO QUESTION HIM AS TO HIS RELATIONSHIP
WITH ASIA MATTHEWS.   ACCORDING TO ALLEN:   HE HAS KNOWN MATTHEWS FOR ABOUT
2 1/2 TO 3 YEARS.   HE MET HER AT SUGAR DADDY'S, WHERE SHE WAS A DANCER AND
HE WAS A PATRON.   ABOUT 6 WEEKS AGO, HE ALLOWED HER TO RENT HIS TRAILER FROM
HIM FOR $500 A MONTH RENT.   THEY DID HAVE A SEXUAL RELATIONSHIP, BUT HE
DID NOT PAY HER FOR SEX.   THEY WERE NOT IN LOVE EITHER.   HE IS CURRENTLY
DATING AND RESIDING WITH ANGIE VALDARES.   THEY HAVE KNOWN EACH OTHER AND BEEN
DATING FOR ABOUT 1 1/2 YEARS.   VALDARES FOUND OUT ABOUT HIS RELATIONSHIP
WITH MATTHEWS BECAUSE SHE IS INQUISITIVE.   ANGIE NEVER CAUGHT THEM HAVING
SEX AND HE HAS NOT TOLD HER THEY DID.   ANGIE WOULD CHECK HIS CELLULAR
TELEPHONE FREQUENTLY.   ANGIE HAS KNOWN ABOUT THE RELATIONSHIP FOR ABOUT 6
OR 7 WEEKS.
        I QUESTIONED ALLEN IF ANGIE EVER RAMMED HER CAR INTO HIS CAR WHILE

A-000892

P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E     PAGE   18
SUPPLEMENT 5   O F F E N S E   R E P O R T                CASE NO. 06110508

MATTHEWS WAS DRIVING.  HE TOLD ME THAT HE WAS WITH MATTHEWS ONE NIGHT, ABOUT 5 OR 6 WEEKS AGO, AT THE SANDBAR BAR ON FOREST HILL BOULEVARD.  WHEN THEY LEFT THE BAR, MATTHEWS WAS DRIVING HIS CADILLAC WHEN ANGIE RAMMED HER RED CHEVY VAN INTO THE REAR OF HIS CAR.  NOTHING HAPPENED AFTERWARDS.  HE AND MATTHEWS THEN WENT TO RED LOBSTER ON PALM BEACH LAKES BOUELVARD.  HE DID NOT KNOW WHERE ANGIE WENT.

I THEN QUESTIONED HIM ABOUT MATTHEWS' WHEREABOUTSS. ACCORDING TO ALLEN, MATTHEWS' LEFT ON A TRAIN TO MILWAUKEE LAST SATURDAY.  HE LEARNED DIRECTLY FROM MATTHEWS THAT SHE HAD BEEN SHOT AND SOMEONE WAS TRYING TO KILL HER. SHE TOLD HIM THAT IT HAPPENED ON HAVERHILL ROAD IN FRONT OF THE TRAILER PARK. SHE CALLED HIM AND REQUESTED THAT HE PICK HER UP.  HE PICKED HER UP AT HER SISTER'S HOUSE ON 45TH STREET AND BROUGHT HER BACK TO HER TRAILER.  A FRIEND OF HIS, ROB LINDSEY, DROPPED HER OFF AT THE TRAIN STATION LAST SATURDAY. LINDSEY NOW RESIDES IN THE TRAILER AT 1266 CAREFREE COVE DRIVE.  HE MOVED IN FOUR DAYS BEFORE MATTHEWS' LEFT.  HE WOULD LATER PROVIDE ME WITH MATTHEWS' SISTER'S TELEPHONE NUMBER IN MILWAUKEE WHICH HE HAD STORED IN HIS CELLULAR TELEPHONE.  HE DID HAVE A CONVERSATION WITH HER LAST FRIDAY OR SATURDAY, BEFORE THE SHOOTING, ABOUT HER NOT PAYING THE $500 RENT.  SHE TOLD HIM THAT SHE WAS NOT PAYING THE RENT AND HE TOLD HER THAT SHE WOULD HAVE TO LEAVE IF SHE DID NOT PAY HER RENT.  HE SAID THAT THE CONVERSATION WAS NOT CONFRONTATIONAL.

ALLEN SAID THAT EITHER HE OR ANGIE OWNS A GUN.

ALLEN THEN AGREED TO CONTACT ANGIE AND MEET ME AT PALM BEACH COUNTY SHERIFF'S OFFICE HEADQUARTERS AT ABOUT 2130 HOURS FOR A FORMAL INTERVIEW. WE LEFT ALLEN'S RESIDENCE AT ABOUT 1715 HOURS.  ALLEN AND HIS GIRLFRIEND ANGIE FAILED TO SHOW UP AT PALM BEACH COUNTY SHERIFF'S OFFICE HEADQUARTERS.

ON TUESDAY, OCTOBER 3, 2006, AT ABOUT 1815 HOURS, I MET CRIME SCENE INVESTIGATOR E RODON AT THE PALM BEACH COUNTY SHERIFF'S OFFICE SECURED IMPOUND LOT TO SEARCH MATTHEWS' 1994 BUICK FOR PROJECTILES.  AT ABOUT 1920 HOURS, I LOCATED A FRAGMENT FROM A PROJECTILE ON THE RIGHT REAR PASSENGER SIDE FLOORBOARD.  RODON PHOTOGRAPHED AND PACKAGED THE FRAGMENT AS EVIDENCE. THERE WERE NO OTHER PROJECTILES LOCATED IN THE VEHICLE.

ON SUNDAY, OCTOBER 22, 2006, I MET WITH DAVID ALLEN AT 343 DARTMOUTH DRIVE IN LAKE WORTH, FLORIDA.  DAVID INVITED ME INSIDE THE RESIDENCE.  I ASKED ALLEN WHY HE AND HIS GIRLFRIEND HAD NOT COME TO HEADQUARTERS ON SEPTEMBER 25, 2006, AFTER HE STATED HE WOULD.  ALLEN TOLD ME THAT HE FELT HE HAD COOPERATED ENOUGH.  AT MY REQUEST, ALLEN PROVIDED ME WITH THE CELLULAR TELEPHONE NUMBER OF HIS GIRLFRIEND, ANGELA ELVIR.  I TOLD HIM I WOULD WAIT FOR HER TO COME HOME OUTSIDE.  I THEN CALLED ELVIR.  SHE AGREED TO MEET ME AT HER RESIDENCE IN ABOUT 30 MINUTES.

A SHORT TIME LATER, AFTER I HAD LEFT THE COMPANY OF ALLEN AND HIS NEPHEW CHRISTOPHER, I SAW BOTH OF THEM LEAVE THE RESIDENCE ON FOOT AND TRAVEL SOUTH ON DIXIE HIGHWAY.  I MADE THESE OBSERVEATIONS FROM MY DEPARTMENT ISSUED UNMARKED VEHICLE ON THE NORTH SIDE OF DARTMOUTH DRIVE.

AT ABOUT 1935 HOURS, ANGELA ELVIR ARRIVED AT THE RESIDENCE IN A MAROON VAN.  I APPROACHED ELVIR AND INTRODUCED MYSELF.  I REQUESTED THAT SHE COME TO HEADQUARTERS FOR AN INTERVIEW.  SHE AGREED AND FOLLOWED ME TO HEADQUARTERS.  WE ARRIVED AT HEADQUARTERS AT ABOUT 1955 HOURS.  I ESCORTED ELVIR UPSTAIRS AND INTO INTERVIEW ROOM #1.  I THEN REQUESTED DETECTIVE SEAN OLIVER TO ASSIST ME WITH TRANSLATION, AS ELVIR SPOKE BROKEN ENGLISH AND SPANISH WAS HER NATIVE LANGUAGE.

AT ABOUT 2004 HOURS, I CONDUCTED A SWORN, DIGITALLY VIDEO RECORDED INTERVIEW OF ELVIR.  THE FOLLOWING IS A SUMMARY OF HER STATEMENT AND SHOULD NOT BE CONSIDERED A VERBATIM ACCOUNT OF HER STATEMENT.  FOR DETAILS OF HER STATEMENT, PLEASE REVIEW THE RECORDING AND/OR TRANSCRIPTS WHEN THEY ARE MADE

A-000893

5978                          12/02/08                              EMCA
P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E     PAGE    19
SUPPLEMENT 5   O F F E N S E   R E P O R T          CASE NO. 06110508

AVAILABLE.
ACCORDING TO ELVIR, SHE WAS NOT A LEGAL UNITED STATES CITIZEN.  SHE HAS
DATED ALLEN FOR ABOUT 3 YEARS.  DAVID TOLD HER THAT MATTHEWS HAD BEEN SHOT
AND SOMEONE WAS TRYING TO KILL HER ON WHAT SHE REMEMBERS TO BE A SUNDAY.
SHE ADMITTED TO HAVING MET MATTHEWS ON A COUPLE OF OCCASIONS AND APPEARED
TO HAVE KNOWLEDGE THAT ALLEN WAS HAVING A RELATIONSHIP WITH HER.  SHE
ADMITTED TO BUMPING INTO/COLLIDING WITH ALLEN'S VEHICLE NEAR FOREST HILL
BOUELVARD AND DIXIE HIGHWAY AFTER SHE DISCOVERED MATTHEWS WITH HIM.
ELVIR DENIED INVOLVEMENT IN MATTHEWS BEING SHOT AND STATED SHE HAD NO
KNOWLEDGE OF THE PERSON WHO SHOT HER.  SHE HAD NEVER POSSESSED OR OWNED A
FIREARM AND HAS NEVER SEEN ALLEN WITH A FIREARM.
THE INTERVIEW WAS CONCLUDED AT ABOUT 2041 HOURS.
ELVIR'S SWORN STATEMENT WAS COPIED ONTO A COMPACT DISC AND PLACED
INTO EVIDENCE.
ON MONDAY, OCTOBER 23, 2006, AT ABOUT 1703 HOURS, I RETRIEVED THE BLACK
LEATHER BIFOLD WALLET BELONGING TO ASIA MATTHEWS FROM HER VEHICLE, WHICH WAS
STORED IN LOT D OF THE PALM BEACH COUNTY SHERIFF'S OFFICE IMPOUND LOT.  INSIDE
THE WALLET WAS:
  *  6 MISCELLANEOUS BUSINESS CARDS
  *  A LIBRARY CARD IN THE NAME OF ASIA MATTHEWS
  *  2 BANK OF AMERICA DEBIT CARDS IN THE NAME OF ASIA MATTHEWS
  *  A COSTCO MEMBERSHIP CARD IN THE NAME OF ASIA MATTHEWS
  *  AN ACE EXPRESS MEMBERSHIP CARD
  *  WISCONSIN DRIVER'S LICENSE OF INGRID MARSHALL
THE PROPERTY WAS SUBMITTED INTO EVIDENCE TO BE RELEASED TO MONICA HARRIS,
WHOM MATTHEWS AUTHORIZED THE PROPERTY TO BE RELEASED TO.
I SPOKE TO MATTHEWS ON THE TELEPHONE.  SHE STATED THAT SHE WANTED ALL
PERSONAL PROPERTY FROM THE VEHICLE, INCLUDING A BABY SEAT, BILLS AND
PAPERWORK, AND A BLACK AND BLUE BAG CONTAINING BOOTS, COSTUMES AND A GOLD
NECKLACE.  I TOLD HER I WOULD RETRIEVE AND SUBMIT THE PROPERTY SHE REQUESTED
INTO EVIDENCE AND AUTHORIZE THE PROPERTY TO BE RELEASED TO MONICA HARRIS.
ON DECEMBER 15, 2006, I RECEIVED A FIREARMS REPORT FROM FORENSIC
FIREARMS EXAMINER JAY MULLINS OF THE PALM BEACH COUNTY SHERIFF'S OFFICE
TECHNICAL SERVICES DIVISION.  THE REPORT WAS DATED DECEMBER 14, 2006 AND
WAS SIGNED BY MULLINS.  I HAD REQUESTED THAT THE ELEVEN SPENT CARTRIDGE
CASINGS RECOVERED IN THIS CASE BE COMPARED AND ENTERED INTO NIBIN.  ALL
ELEVEN CASINGS WERE COMPARED AND IDENTIFIED AS BEING FIRED FROM THE SAME
FIREARM.  ONE CASING WAS ENTERED INTO THE NIBIN DATABASE.  THE FRAGMENT,
RECOVERED DURING A SEARCH OF THE VICTIM'S VEHICLE, SUBSEQUENT TO THE
SHOOTING INCIDENT, WAS EXAMINED AND IT WAS DETERMINED TO BE TYPICAL OF
A COPPER JACKETED MATERIAL FOUND ON JACKETED AMMUNITION.  THE FRAGMENT HAD
ONE GROOVE IMPRESSION AND TWO PARTIAL LAND IMPRESSIONS.  HE WAS UNABLE TO
DETERMINE THE DIRECTION OF THE TWIST.  THE FIREARMS REPORT WAS PLACED INTO
THE CASE FILE.
ON SUNDAY, APRIL 22, 2007, AT ABOUT 1620 HOURS, I CALLED ASIA MATTHEWS
IN RESPONSE TO A MESSAGE SHE LEFT WITH DETECTIVE OLIVER.  UPON SPEAKING WITH
MATTHEWS, SHE TOLD ME THAT RUMOR HAS IT THAT A DANCER WHO WAS WORKING AT
SUGAR DADDY'S DURING THE TIME SHE WAS SHOT HAD "SET HER UP".  MATTHEWS
HAD NO DIRECT KNOWLEDGE OF THIS AND FURTHER STATED THAT "WORD GETS AROUND
IN OUR COMMUNITY" (REFERRING TO DANCERS).  SHE ALSO TOLD ME THAT SHE DID
NOT KNOW ANY OF THE DANCER'S NAMES.  SHE ALSO TOLD ME THAT SHE WANTED ME
TO RELEASE HER VEHICLE TO THE FATHER OF HER CHILD, CLEVELAND PETTIS.  I
REQUESTED THAT SHE MAKE A FORMAL REQUEST FOR THE VEHICLE, HAVE THE REQUEST
NOTARIZED AND MAIL IT TO ME.  I TOLD HER THAT UPON RECEIPT OF HER REQUEST,
I WOULD COMPLETE A RELEASE FORM AND NOTIFY MR PETTIS SO HE COULD RETRIEVE

A-000894

5978                        12/02/08                        EMCA
      PALM BEACH COUNTY SHERIFF'S OFFICE           PAGE    20
      SUPPLEMENT 5   OFFENSE REPORT          CASE NO. 06110508

THE VEHICLE.
      ON MONDAY, APRIL 23, 2007, I RECEIVED A NOTARIZED LETTER FROM ASIA
MATTHEWS STATING THAT SHE WAS GIVING PERMISSION TO ME TO AUTHORIZE THE
RELEASE OF HER VEHICLE TO CLEVELAND PETTIS.   INCLUDED IN THE LETTER WAS A
CELL PHONE NUMBER FOR PETTIS (561-294-6708) AND THE KEYS TO HER VEHICLE.
I LATER MADE CONTACT WITH PETTIS AND PROVIDED HIM WITH CONTACT INFORMATION
FOR THE PALM BEACH COUNTY SHERIFF'S OFFICE IMPOUND LOT, SO THAT HE COULD
ARRANGE THE RETRIEVAL OF MATTHEWS' VEHICLE.   I ALSO COMPLETED AND SIGNED
AN IMPOUNDED VEHICLE RELEASE FORM AND TURNED IT OVER TO THE IMPOUND LOT
ALONG WITH THE KEYS TO MATTHEWS' VEHICLE.
      ON JUNE 21, 2007, I RECEIVED A COPY OF THE IMPOUNDED VEHICLE RELEASE
FORM WHICH I TURNED OVER TO THE IMPOUND LOT ON APRIL 23, 2007.   ACCORDING
TO THE FORM, MATTHEWS' VEHICLE WAS RELEASED TO CHRIS BERNARD, OF SISTERS
TOWING, ON JUNE 20, 2007 AT 1005 HOURS.   THE FORM WAS PLACED INTO THE CASE
FILE.
      ANY ADDITIONAL INFORMATION WILL BE INCLUDED IN FUTURE SUPPLEMENTAL
REPORTS.
DETECTIVE KARPINSKI ID 6682
TRANS 02-25-08 JOY

A-000895

Ricardo Sanchez SR

A-000896

Case 9:16-cv-80693-BB   Document 33-9   Entered on FLSD Docket 10/19/2016   Page 144 of 156



A-000897

Case 9:16-cv-80693-BB   Document 33-9   Entered on FLSD Docket 10/19/2016   Page 145 of 156



CENTRAL RECORD'S COPY          ARREST RECORD

| LAST NAME | FIRST NAME | MIDDLE NAME | SEX | RACE | DATE OF BIRTH |
| SANCHEZ | RICARDO | GARCIA | M | W | |

BOOKING NO 00285988

| HEIGHT | WEIGHT | HR COL | EYE COL | COMPLEXION | POB | SOCIAL SECURITY NUMBER | OCCUPATION | DATE OF ARREST | TIME |
| 506 | 165 | BLK | BRD | DARK | MX | | LABORER | 072884 | 0215 |

| ALIAS-LAST NAME | FIRST NAME | MIDDLE NAME | SCARS, MARKS, TATOOS | MARRIED | SINGLE | RELIGION |
| SANCHEZ | RICARDO | G | TL/ARM TEXAS | ☒ | ☐ | CATHOLIC |

| LOCAL-ST NO | STREET | ST PR | DIREC | TR/APT/LOT | CITY | STATE | ZIP | RES CODE |
| | | | | | M.P.R. | FL | 33405 | |
| | STREET | ST PR | DIREC | TR/APT/LOT | CITY | STATE | ZIP | RES CODE |

PLACE PHOTO HERE

| ARRESTED BY OFFICER | ID NO | AGCY | PLACE OF ARREST | TRANSPORTED BY OFFICER | ID NO | AGCY |
| TURNER | 270401 | | MERMAID BAR | | | |

| DETAINERS | POUCH | INCIDENT NO | CAPIAS WARRANT NO (S) | BOND |
| | | 0487244 | | |

| TIME OUT | COURT | DATE | TIME | DIV |
| | UK | 081684 | 0900 | R |

(Place Second Photo on Back)

| RELEASE DATE | RELEASED TO | BOND DATE | TYPE | RET DATE | BNDSMAN |
| | 0 | | UN | | |

| STATUTE | NCIC | ST | CHARGE | CIT/NOT # |
| 870.01 | 5303 | 01 | AFFRAY | |

SPECIAL INSTRUCTIONS

| | FP BY | PHOTO BY | ENTER BY |
| | | | VS |

| LAST NAME | FIRST NAME | MIDDLE NAME | ALIAS | CELL (1) | (2) | (3) | (4) |
| SANCHEZ | RICARDO | GARCIA | | H.C. | | | |

A-000898

Case 9:16-cv-80693-BB   Document 33-9   Entered on FLSD Docket 10/19/2016   Page 146 of 156



A-000899



# DEPARTMENT OF LAW ENFORCEMENT

I understand to federal regulations (vol. CFs 20) this record may be used only for the stated purpose for which it was submitted. Charges and dispositions are coded herein and of standardized uniform offense and disposition classifications for computerized criminal history records. More detailed and specific information may be obtained from the contributor. The department does not warrant that these records are comprehensive or accurate. This would certify as an indication on the subject that the department has received and is presently authorized to disclose on file.

POST OFFICE BOX 1489
TALLAHASSEE, FLA. 32302
PHONE 904-488-7880

65484

3484

11/17/80   PAGE   1

NAME=SANCHEZ, RICARDO GARSI.                    FBI NO.=1565747    FBI NO.=
DOB=              SEX=M   RACE=W   HGT=5'09   WGT=175   EYE=BRO   HAIR=BLK   SKN=          POB=MM
SOC.SEC.=                        MISC. NO.=                        SCR/MRK/TAT=
ADDRESS:                         OCCUP.=LABORER                    FPC=PI 56 04 PI 16
CTY/ST= N PALM BCH, FL                                            14 07 06 18 15

ARREST CONTRIBUTOR=FL0500000 PALM BEACH COUNTY SHERIFF'S OFFICE
  CHARGE 01 ARRESTED=09/22/80   CITATION=FL784-021
    OFFENSE=0912 HOMICIDE=WILFUL KILL=ATTEMPT TO COMMIT
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 02 ARRESTED=09/22/80   CITATION=FL784-03
    OFFENSE=1315 AGGRAV ASSLT=BATTERY
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 03 ARRESTED=09/22/80   CITATION=FL790-19
    OFFENSE=5213 FIRING=OCCUPIED BUILDING
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 04 ARRESTED=09/22/80   CITATION=FL812-014
    OFFENSE=2399 LARC=GRAND
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 05 ARRESTED=09/22/80   CITATION=FL812-031
    OFFENSE=2804 POSSESS STOLEN PROP
    OFFENSE DATE=              LOCAL CASE NO.=65484

ARREST CONTRIBUTOR=FL0500000 PALM BEACH COUNTY SHERIFF'S OFFICE
  CHARGE 01 ARRESTED=09/27/80   CITATION=FL810-02          COUNTS=2
    OFFENSE=7199 BREAKING AND ENTERING AUTO
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 02 ARRESTED=09/27/80   CITATION=FL812-031          COUNTS=2
    OFFENSE=2804 POSSESS STOLEN PROP
    OFFENSE DATE=              LOCAL CASE NO.=65484
  CHARGE 03 ARRESTED=09/27/80   CITATION=FL812-014
    OFFENSE=2399 LARC=GRAND
    OFFENSE DATE=              LOCAL CASE NO.=65484


  THIS CONTAINS FLORIDA RECORD ONLY=UNKNOWN AS TO NATIONAL RECORD STATUS
              ****END OF REPORT****

Case 9:16-cv-80693-BB  Document 33-9  Entered on FLSD Docket 10/19/2016  Page 148 of 156



A-000901

RELEASE DATE     ARREST RECORD   CELL       191676
BUREAU OF RECORDS     SOC. SEC. NO.

SANCHEZ   RICARDO   GARSIA      ALIASES     BOOKING OFF.
LAST NAME    FIRST NAME    MIDDLE NAME

WPB FLA        CATH
LOCAL ADDRESS       PERMANENT HOME ADDRESS     RELIGION

LABORER | M | W | 20 | 5-9 | 175 | BLK | BRN | MED | 1050.00
OCCUPATION | SEX | COLOR | AGE | HEIGHT | WEIGHT | HAIR | EYES | COMPLEXION

IN CUSTODY PBC JAIL      MEXICO
PLACE ARRESTED     DATE OF BIRTH    PLACE OF BIRTH    BOND

1135HRS   9/27/80   MW       PBSO    5203
TIME AND DATE OF ARREST    ARRESTING OFFICER    POLICE DEPARTMENT   ID CHECK

C.R. No. _____

CASE No. _____      1. AUTO BLE    810.02   602

CAPIAS No. _____     2. POSSESSION OF STOLEN PROPERTY   812.031   1307

WARRANT No. _____    3. GRAND LARCENY    812.021   606

B.____ _____ PET DATE _____   4.    PBSO CASE #80-76407
              CHARGES

SCARS-MARKS-DEFORMITIES-TATTOOS

DETAINERS

RETURNED FROM

SCARS CODE | PROPERTY NO | DRUNKOMETER BY    RELEASE TO     COURT DISPOSITIONS     DATE
                    OR
MARRIED   YES ___ NO ___ NTP ___ ATTORNEY   BONDED TO

Case 9:18-cv-80603-BB Document 33-9 Entered on FLSD Docket 10/19/2016 Page 149 of 156

50/60

PBSC #0083 R/99 | ARREST RECORD | **CENTRAL RECORD COPY**

| MAX RELEASE DATE | EARLY RELEASE DATE |
|---|---|

| BOOKING DATE | BOOKING TIME | ID NUMBER | DATE NUM | BOOKING NUMBER | ARREST DATE | ARREST TIME |
|---|---|---|---|---|---|---|
| 10/11/[illegible] | 18:15 | [illegible] | [illegible] | 2950554 | 10/1 [illegible] | 0207 |

| LAST NAME | FIRST NAME | MIDDLE NAME | SEX | RACE | BIRTH DATE |
|---|---|---|---|---|---|
| [illegible] | [illegible] | 65484 | M | W | ████ |

| HGT | WGT | HAIR | EYES | COMPLEXION | POB | SOCIAL SECURITY | OCCUPATION | MARRIED |
|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | BRN | MEDIUM | | | EQUIPMENT OPERATOR | [illegible] |

| ALIAS LAST NAME | ALIAS FIRST NAME | ALIAS MIDDLE NAME | SCARS / MARKS / TATTOOS |
|---|---|---|---|
| | | | [illegible] |

| LOCAL ST NO | STREET | SUFFIX | DIR | APT/LOT | CITY | STATE | ZIP CODE |
|---|---|---|---|---|---|---|---|
| ████████ | | | | | [illegible] | [illegible] | [illegible] |

| ARRESTING OFFICER | ID NO | AGCY | PLACE OF ARREST | TRANSPORT OFFICER | ID NO | AGCY |
|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | | | |

| DETAINERS | POUCH | INCIDENT | CAPIAS / WARRANT | BOND |
|---|---|---|---|---|
| | | [illegible] | | [illegible] |

| | COURT | RETURN DATE | TIME | GR |
|---|---|---|---|---|
| | | | | N |

| RELEASE DATE | RELEASE TIME | RELEASED TO | RELEASE TYPE (BONDSMAN) |
|---|---|---|---|
| | | | |

PLACE PHOTO HERE

(Place Second Photo on Back)

| | STATUTE | COUNTS | CHARGE DESCRIPTION |
|---|---|---|---|
| 1 | [illegible] | [illegible] | [illegible] RESIST OFFICER WITH VIOLENCE [illegible] |
| 2 | | [illegible] | |
| 3 | [illegible] | [illegible] | RESIST ARREST WITH VIOLENCE [illegible] |
| 4 | | [illegible] | DRIVE OFFICER |
| 5 | | | |

| PROPERTY REFERENCE | [illegible] |
|---|---|
| 9M05/029/484 | NO BOND ORDERED |

| CHG (1) | (2) | (3) | (4) | (5) | NCIC FCR | TP B | MBI | ENTER BY | PHOTO BY | F.P. BY |
|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | | | | | | DS | | [illegible] | | [illegible] |

Case 9:16-cv-80603-RLR Document 33-9 Entered on FLSD Docket 10/19/2016 Page 150 of 156

ARREST RECORD • CENTRAL RECORD COPY

| MAX RELEASE DATE | | BAIL RELEASE DATE |
|---|---|---|

PBSO #0086 (01/99)

| BOOKING DATE | BOOKING TIME | ID NUMBER | OBTS NUMBER | BOOKING NUMBER | ARREST DATE | ARREST TIME |
|---|---|---|---|---|---|---|
| 05/04/1999 | 0534 | ▮▮▮▮▮ | 0011412811 | 99118412 | 05/04/1999 | 0235 |

### IDENTITY

| LAST NAME | FIRST NAME | MIDDLE NAME | SEX | RACE | BIRTH DATE |
|---|---|---|---|---|---|
| SANCHEZ | RICARDO | GARCIA | M | W | ▮▮▮▮ 1960 |

| HGT | WGT | HAIR | EYES | COMPLEXION | POB | SOCIAL SECURITY | OCCUPATION | MARRIED |
|---|---|---|---|---|---|---|---|---|
| 507 | 220 | BLK | BRN | MEDIUM | | | | |

| ALIAS LAST NAME | ALIAS FIRST NAME | ALIAS MIDDLE NAME | SCARS MARKS TATTOOS |
|---|---|---|---|
| | | | TAT L ARM |

### ADDRESS

| LOCAL ST NO | STREET | SUFFIX | DIR | TRANS/DOT | CITY | STATE | ZIP | CODE |
|---|---|---|---|---|---|---|---|---|
| ▮▮▮▮ | ▮▮▮▮ | | | | WEST PALM B FL | 33415 | 2 | |

### ARREST

| ARRESTING OFFICER | ID NO | AGCY | PLACE OF ARREST | TRANSPORT OFFICER | ID NO | AGCY |
|---|---|---|---|---|---|---|
| ESSARY | 5428 | 01 | RESIDENCE | SAME | | |

| DETAINERS | POUCH | INCIDENT | CASH/BOND/WARRANT | | |
|---|---|---|---|---|---|
| | 1586 | 99067730 | | | 0.00 |

| | COURT | RETURN DATE | TIME | DIV |
|---|---|---|---|---|
| | | | | X |

| RELEASE DATE | RELEASE TIME | RELEASED TO | RELEASE TYPE | BONDSMAN |
|---|---|---|---|---|
| | | | | |

| | STATUTE | COUNTS | CHARGE DESCRIPTION |
|---|---|---|---|
| 1 | 784.07 | 1 | BATTERY ON LEO |
| 2 | 843.01 | 1 | RESIST ARREST WITH VIOLENCE |
| 3 | 784.07 | 1 | AGGRAV ASSAULT ON L E DEADLY WEAPON |
| 4 | | | |
| 5 | | | |

PROPERTY REFERENCE: NO BOND ALLOWED

| FCIC | (2) | (3) | (4) | (5) | NCIC / FCIC | IT BY | CASH | MFO | ENTER BY | PHOTO BY | 4TH BY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H.F. | | | | | | | | | 6304 | | |

Case 9:16-cv-80693-BB  Document 33-9  Entered on FLSD Docket 10/19/2016  Page 151 of 156

```
JJ1660R1                                    COUNTY/CIRCUIT COURT

                                           CRIMINAL HISTORY REPORT
   DATE 06 01 94                            HISTORY PURGE LIST                                               PG 17338

**************************************************************************************************************
------------ NAME ------------  SEX  RACE   DOB      CASE #      CIT #    ARREST  PARK TICKET *
   SANCHEZ,RICARDO,GARCIA          M    W     60   92004160MM A02 494410*  91042860         *  MISDEMEANOR OR NOT-FILED
      COMM                                                                                  **********************************

ADDRESS    STREET      STREET        SUF APT-                   ST
RECORDS    NUMBER  DIR NAME          FIX LOT  CITY              CD ZIPCODE  PROVINCE  COUNTRY AGCY UPDATE
                                     DR       WEST PALM BEACH   FL 00000                     CTA  092380
                                     DR       WPB               FL 00000                     CTA  073084
                                     CR       WPB               FL 33415                     CDC  032493


   JIFM  01 DIST-LOC=001   DATE 021292 OF CASE FILING  ST-ATTY=                    DEF-ATTY=PUBLIC DEFENDER

FEL-MISD  AGCY=06 92012256A ARRN-DATE=030592 COURT=KK TIME=0900



   JIFA    PRAECIPE-BY=              PRAECIPE-DT=       ARRN-DT=030592 JUDGE=BOLLINGER  COURT=KK DEF-ATTY=PUBLIC DEFENDER
ARRAIGN.   DEF-PRES=Y ADV-RTS=030592 ARRN-PASS-TO=     TIME=    COURT=   DEF-RLSE-DT=



JICH  02 COUNT=01 NARR=(PROB)  BATTERY                         STAT=784.03     NCIC=      NOLE-PROS-DTE=
CHARGE
        AMEN-DTE=         PLEA=NC ADJ=   ADJ-WH=Y SENT-DTE=033092 SUSP=  WHELD=Y TIME-SER=  MTHS=   DYS=   YRS=

        FINE=*******.00    SERVICE-FEE=*******.00  PROBATION  MTHS=06 DYS=   YRS=   VICTIM-CODE= 0



JICH  03 COUNT=02 NARR=BATTERY                                 STAT=784.03     NCIC=      NOLE-PROS-DTE=
CHARGE
        AMEN-DTE=        PLEA=G  ADJ=G  ADJ-WH=   SENT-DTE=033092 SUSP=  WHELD=  TIME-SER=  MTHS=   DYS=  YRS=

        FINE=*******.00    SERVICE-FEE=*******.00  PROBATION  MTHS=   DYS=   YRS=   VICTIM-CODE= 0



JICH     COUNT=03 NARR=ASSAULT ON A POLICE OFFICER            STAT=784.07     NCIC=      NOLE-PROS-DTE=033092
CHARGE
        AMEN-DTE=        PLEA=   ADJ=   ADJ-WH=   SENT-DTE=      SUSP=  WHELD=  TIME-SER=  MTHS=   DYS=  YRS=

        FINE=*******.00    SERVICE-FEE=*******.00  PROBATION  MTHS=   DYS=   YRS=   VICTIM-CODE= 0



JICH     COUNT=04 NARR=OBSTRUCT OFFICER WITHOUT VIOLENCE       STAT=843.02     NCIC=      NOLE-PROS-DTE=033092
CHARGE
        AMEN-DTE=        PLEA=   ADJ=   ADJ-WH=   SENT-DTE=      SUSP=  WHELD=  TIME-SER=  MTHS=   DYS=  YRS=

        FINE=*******.00    SERVICE-FEE=*******.00  PROBATION  MTHS=   DYS=   YRS=   VICTIM-CODE= 0

*** CONTINUED NEXT PAGE ***
                                             A-000904
```

Case 9:16-cv-80693-BB Document 33-9 Entered on FLSD Docket 10/19/2016 Page 152 of 156

JJI660R1

COUNTY/CIRCUIT COURT

CRIMINAL HISTORY REPORT
HISTORY PURGE LIST

DATE 06 01 94

PG 17339

****************************************************************************************************

| NAME | SEX | RACE | DOB | CASE # | CIT # | ARREST | PARK TICKET | * |

SANCHEZ,RICARDO,GARCIA    M    W    ████    92004160MM A02    494410*    91042860                * MISDEMEANOR OR NOT-FILED
COMM                                                                                     **********************************

JISN
SENT    DTE=033092 SUSP=    ADJ-WH=    SENT-WH=    JUDGE-COD=01 FINE=*******.00 CRT-COSTS=******5.00    SERVICE-FEES=*******.00

PAID=*****75.00 PAY-DUE-DTE=053092 PAID-DTE=050792 BOND-FORT=*******.00 INS-FUND=*******.00    VICTIM-AID=*******.00
SURCHARGE=****20.00 PROS-OV55=*******.00    REHAB=*******.00    HANDICAP=*******.00    DG=*******.00

LIC-REV/SUS=    DYS=    MTHS=    SUR=    SCHOOL-NAM=    CRS=    DTE=    TIME-SER=    MTHS=    DYS=    YRS=

PROBATION/MTHS=    DYS=    YRS=    PURGE-DTE=053194

OBTS    OBTS=0001936017 0002787199 0002453159 0002127081

-------------------------------------------------- COMMENTS --------------------------------------------------
01 INFO FILED;CHG.REDUCED TO MSD(DOWNFILED FROM 91-15396CF A99) 01 BOND O.R. DISCHARGED
02 PUCILLO--DFT PRES,W/CO. PROB W/PRIDE. 30 HRS COMM SERV.    02    RESTITUTION TO BE DETERMINED. GIVEN UNTIL 9/30/92 TO
02   PAY CRT COSTS.   PROB CONCUR W/EACH COUNT.            03 SEE CT 1.

A-000905

Case 9:16-cv-80693-BB  Document 33-9  Entered on FLSD Docket 10/19/2016  Page 153 of 156

```
         P A L M   B E A C H   C O U N T Y   S H E R I F F ' S   O F F I C E         PAGE    1
CASE NO. 99031320                    O F F E N S E   R E P O R T            CASE NO. 99031320
                                                               DISPOSITION: INACTIVE
                                                               DIVISION: ROAD PATROL

BATTERY                            *                  *                  *
SIGNAL CODE: 31     CRIME CODE: 1  NON CRIME CODE:      CODE: 130B  02/06/99     SATURDAY
ZONE: C01 GRID: 5A5    DEPUTY I.D.: 5577 NAME: ENGLEHARDT KEVI ASSIST:    TIME D 2341 A 2341 C 0017
OCCURRED BETWEEN DATE: 02/06/99 , 2345 HOURS AND  DATE:        , 0000 HOURS
EXCEPTION TYPE:
INCIDENT LOCATION: 6128       CONGRESS              AV  APT. NO.:
             CITY: LANTANA                    STATE: FL      ZIP: 33436


NO. OFFENSES: 01 NO. OFFENDERS: 01 NO. VEHICLES STOLEN:  0  NO. PREMISES ENTERED:   0
LOCATION: BAR / NIGHT CLUB
NO. VICTIMS: 01 NO. ARRESTED:  0  FORCED ENTRY: 0 WEAPON TYPE: HANDS / FISTS / FEET


OFFENSE NO. 1  FLORIDA STATE STATUTE:  784 03       CIS CODE 130B

NAME LIST:
     ROLE:
VICTIM  NO. 001         JOHN SEBEST               DOB:    ▮▮▮/1971
          SEX: M RACE: W HT: 601 WT: 190 HR: BROWN     EYE: BROWN
BUSINESS PHONE:      ▮▮▮▮▮▮▮
WITNESS                JEFFREY D ELLER            DOB:    ▮▮▮/1978
          SEX: M RACE: W HT: 600 WT: 190 HR: BLOND     EYE: BLUE
RESIDENTIAL  ADDRESS: ▮▮▮▮  ▮  ▮▮▮   POMPANO BH FL 33064   HOME PHONE: ▮▮▮▮▮▮▮
BUSINESS PHONE: ▮▮▮▮▮▮
SUSPECT                RICARDO G SANCHEZ          DOB:    ▮▮▮/1960
          SEX: M RACE: W HT: 509 WT: 235 HR: BLACK     EYE: BROWN
RESIDENTIAL  ADDRESS: ▮▮▮  ▮▮▮▮  ▮       WPB        FL 33413    HOME PHONE: ▮▮▮▮▮▮▮
PERMANENT ADDRESS:   ▮▮  ▮▮▮▮  ▮ APT.   WPB       FL
BUSINESS PHONE: 561 000-0000
```

| STATUS | 1 = STOLEN | 2 = S/R DIFFERENT DAY |
|---|---|---|
| CODE | 3 = S/R SAME DAY | 4 = RECOVERED FOR OTHER JURISDICTION |
| (STA) | 5 = LOST ITEMS    8 = EVIDENCE SEIZED | 9 = OTHER (ARSON/VANDALISM) |

| DATE STLN/ RECOV | S A | T Y P | BRAND NAME | CALIBER (GUN) | SERIAL/NUMBER DESCRIPTION | PROPERTY VALUE STOLEN | VALUE RECOVERED | TELETYPE NUMBER |
|---|---|---|---|---|---|---|---|---|
| 020699 | 8 | X | C-COCAINE | | GRAM PLASTIC BAGGIE | 20 | | |

Aq000906

Case 9:16-cv-80693-BB   Document 33-9   Entered on FLSD Docket 10/19/2016   Page 154 of 156

printed by Employee Id #: 4940   on   March 11, 2008 11:26:44AM



Oct-19-1999 10:14am 99—417011
ORB 11406 Pg 730
DOROTHY H. WILKEN, CLERK PB COUNTY, FL

IN THE CIRCUIT COURT IN AND FOR
PALM BEACH COUNTY, FLORIDA

CRIMINAL DIVISION

CASE NO. 99 4965 CFA02 X

STATE OF FLORIDA

vs                                **FILED**

Ricardo Sanchez         OCT 0 6 1999

DOROTHY H. WILKEN, CLERK
CIRCUIT & COUNTY COURTS
(CRIM. DIV.)

**JUDGMENT OF NOT GUILTY**

You, _Ricardo Sanchez_ , being now before the Court,
attended by your attorney, _Chris Kammerer_
(or knowing and understanding your right to an attorney , but having waived your right to be
represented by an attorney), and having been found NOT GUILTY of: _____

Ct 1. Aggravated Assault on a
Police officer

now therefore, I ADJUDGE YOU to be NOT GUILTY of the offense or offenses to which you were
found not guilty.

DONE AND ORDERED in Open Court, this _6th_ day of _October_

at West Palm Beach, Palm Beach, County, Florida

STATE OF FLORIDA • PALM BEACH COUNTY
I hereby certify that the
foregoing is a true copy
of the record in my office.
THIS _24_ DAY OF _Feb_ 20_08_
SHARON R. BOCK
CLERK & COMPTROLLER
By _____
DEPUTY CLERK

_____
Circuit Court Judge

A-000908

OFTEDAL
"X"

DC# 599265
Officer: 15-3

# JUDGMENT OF GUILT
# AND PLACING DEFENDANT ON PROBATION

STATE OF FLORIDA

    VS       Plaintiff

RICARDO SANCHEZ
        Defendant

In The Circuit Court

of Palm Beach County, Florida

Case No. 99-4965CFA02

This cause coming on this day to be heard before me, and you, the defendant RICARDO SANCHEZ, being now present before me, and you having:

FOUND GUILTY OF

the offense of COUNT 2 RESIST ARREST WITHOUT VIOLENCE (LESSER), COUNT 3 DISORDERLY CONDUCT (LESSER) the court hereby adjudges you to be guilty of said offense; and

It appearing to the satisfaction of the Court that you are not likely again to engage in a criminal course of conduct, and that the ends of justice and the welfare of society do not require that you should suffer the penalty authorized by law:

Now, therefore, it is ordered and adjudged that the imposition of sentence are hereby withheld, and that you are hereby placed on probation for a period of EIGHTEEN (18) MONTHS AS TO COUNTS 2 & 3 CONCURRENT EACH COUNT under the supervision of the Department of Corrections and its Officers, such supervision to be subject to the provisions of the laws of this State.

It is further ordered that you shall comply with the following conditions of probation:

(1) Not later than the fifth day of each month, you will make a full and truthful report to your Probation Officer on the form provided for that purpose.

(2) You will pay to the State of Florida the amount of **FIFTY DOLLARS ($50.00)** per month, plus a 4% surcharge, toward the cost of your supervision, unless otherwise exempted in compliance with Florida Statutes.

(3) You will not change your residence or employment or leave the county of your residence without first procuring the consent of your Probation Officer.

(4) You will neither possess, carry or own any weapons or firearm without first securing the consent of your Probation Officer.

(5) You will live and remain at liberty without violating any law. A conviction in a court of law shall not be necessary in order for such a violation to constitute a violation of your probation.

(6) You will submit to Urinalysis, Breathalyzer or Blood Tests, as directed by your Probation Officer or the Professional Staff of any treatment center where you may be receiving treatment, to determine the possible use of alcohol, drugs, or controlled substances.

(7) You will work diligently at a lawful occupation and support any dependents to the best of your ability as directed by your Probation Officer.

1
A-000909