<u>Step Three: Optional Skill-Building Workshop (Spanish language only)</u>

The six-day skill-building workshop gives participants one-on-one time with experienced faculty, as well as intensive practice in the three modes of interpreting. This is an optional workshop designed to assist participants in their preparation for the certification exam.

<u>Step Four: Certification Exam</u>

An individual may sit for the certification exam one time in a calendar year. The certification exam consists of an oral exam on simultaneous interpreting, consecutive interpreting, and sight translation. If a candidate passes all three sections with a 70 percent or higher, he or she becomes a certified court interpreter in the state of [state].

**Importance and Purpose of Certification**

Court interpreting is a highly specialized profession that requires the interpreter to render a complete and accurate interpretation or translation without altering, omitting, editing, or summarizing anything to what is stated or written, and without explanation. All words including slang, vulgarisms, and epithets are interpreted to convey the intended meaning. A full rendition of in-court proceedings can only be done if the interpreter is skilled in the three modes of interpreting—simultaneous interpreting, consecutive interpreting, and sight translation. Court interpreters must have an extensive vocabulary in both the English language and the foreign language.

Individuals who pass the certification exam have demonstrated a minimum level of competency necessary to interpret in the courtroom. Individuals who are unable to pass this exam do not yet possess the necessary skills to perform the important function of a court interpreter. Take for example an exam candidate who fails a section of the certification exam with a 45 percent. Is it acceptable for a court interpreter to only be able to accurately interpret 45 percent of what transpires in the courtroom?

The role of the court interpreter is to place the non-English speaker on equal footing with those that speak English. In doing so, the non-English speaker is provided with equal access to justice. Only through certification are court interpreters able to demonstrate whether or not they can perform the functions of this very important responsibility.

# 4. Determining Whether or Not A Court Interpreter Is Needed

[Excerpted from A Judge's Guide to Immigration Law in Criminal Proceedings.]

The responsibility for appointing an interpreter where a defendant is non- or limited-English speaking rests with the trial court. This is true even if the defendant or his counsel does not request an interpreter. The court must make the determination in the first instance as to whether an interpreter is necessary.

The Federal Court Interpreters Act, 28 USC § 1827(d)(1), and many state statutes and court rules provide that the presiding judicial officer shall appoint an interpreter, either *sue sponte* or by motion of a party, whenever the ability of a party or witness to speak and understand English fully is called into question. Even when the defendant or witness speaks some English, if put on notice either through the defense counsel or through direct communication with the defendant or witness, the court should evaluation whether an interpreter needs to be appointed in order for the defendant to be able to fully understand, communicate, and participate in the proceedings.

The appropriate way to determine whether to appoint an interpreter is to conduct an inquiry on the record, allowing the judge to determine whether the defendant or witness is able to understand the proceedings, communicate with counsel and effectively participate in his own defense.

In evaluating a defendant's or witness's English language competency, it is important to be mindful that a person with a limited ability to understand or speak English may be able to handle routine matters in English but may not be able to express complex, emotionally sensitive matters. This is particularly true in the stress-charged environment of a criminal trial. In addition, persons who are not native speakers of English develop an extensive listening vocabulary before acquiring a comparable spoken vocabulary, and generally are able to understand more than they can articulate. It is therefore recommended that the judge's *voir dire* includes active vernacular, and avoids "yes" or "no" questions, so as to be able to better evaluate the level of English-language comprehension and the ability to effectively communicate in English.

An interpreter should be appointed in a criminal case when the defendant: [Florida Bench Book]

    a.  Is unable to accurately describe persons, places, and events that affect his or her defense;
    b.  Is unable to tell the court Awhat happened@ over a period of time;
    c.  Is unable to request clarification when statements are vague or misleading, during cross-examination, to defend their position, or otherwise participate in his or her defense;
    d.  Is not on an equal footing with an English-speaking defendant with an equivalent education and background.

An interpreter should be appointed in a civil case when:

    a.  An indigent civil litigant is unable to understand the court proceedings because of the inability to speak or understand the English language;

b. A fundamental issue or interest is at stake, such as would be the case in matters involving parental rights, paternity rights, dissolution of marriage, civil commitment, etc.; and

c. The court cannot resolve the issues in dispute without the services of an interpreter.

***Suggested Voir Dire Questions to Determine English Proficiency and the Need for an Interpreter***

To make efficient and effective determinations about whether an interpreter is needed, ask at least one or two questions from each of the following categories:

(1) Identification, such as:
 * Please tell the court your name.
 * What is your address?
 * When is your birthday? or When were you born?
 * How old are you?
 * Where were you born?

(2) Active vocabulary in vernacular English, such as:
 * How long have you been speaking English?
 * How did you learn English?
 * How did you get to court today?
 * What kind of work do you do?
 * Did you go to school as a child?
 * Where did you go to school?
 * What is the highest grade you completed in school?
 * What have you eaten today?
 * How comfortable are you understanding and speaking English?

(3) Simple, direct questions requiring a response other than "yes" or "no."

[Citation from ABA publication - Adapted from Guadalupe Valdes and Phyllis Wilcox, The Use of Court Interpreters in New Mexico:  A Handbook for Judges, Attorneys and Interpreters ¶¶ 1.5-2, 1.5-3 (1986); Cal. R. Ct. appendix div. I § 18; *Model Voir Dire for Determining the Need for an Interpreter, in Judge's Guide to Standards for Interpreted Proceedings,* Figure 6.1 in Hewitt, Court Interpretation:  Model Guides for Policy and Practice in the State Courts (1995).]

# 5. Waiving the Right to an Interpreter

[Excerpted from A Judge's Guide to Immigration Law in Criminal Proceedings.]

## Waiver Must Be Knowing and Voluntary

Before permitting a defendant to waive the right to an interpreter, the judge should take precautions to ensure that the waiver is knowingly and voluntarily given. In many jurisdictions, a defendant's waiver of the right to an interpreter is only permitted by the court if the waiver is made expressly by the defendant on the record after having had an opportunity to consult with counsel, and after the court has explained, through an interpreter in the defendant's primary language, the nature and effect of the waiver.

A waiver need not be granted where the court has determined an interpreter is required. At least one circuit court has ruled that if the presiding judicial officer determines that the use of an interpreter is necessary to assure complete and accurate communication with a witness, the officer should not permit the witness to waive this right.

### *Suggestions for Ensuring that a Waiver of the Right to an Interpreter is Knowing and Voluntary*

1. Explain the waiver in the defendant's native language.
2. Provide the defendant with the opportunity to consult with counsel before waiving his or her right to an interpreter.
3. Provide a written waiver in English and in the defendant's native language, and ensure that the defendant, not counsel, signs the waiver.

## Waiver is Revocable at Any Time

The waiver of the right to an interpreter is revocable. If at any time during the proceedings a defendant who had previously waived the right to an interpreter indicates that he wishes to retract the waiver, the judge is thus put on notice of a defendant's English-comprehension limitations, and must conduct an inquiry to determine whether an interpreter should be appointed.

# 6. Appointment of A Court Interpreter

## When the Court is Required by Law to Appoint an Interpreter [Florida]

The following is the recommendation provided by the Judicial Management Council's Committee on Trial Court Performance and Accountability, Court Interpreter Workgroup, in a draft report dated May 2001.

| DIVISION Case type | COURT INTERPRETATION PROVIDED | COMMENTS |
|---|---|---|
| | | |
| **ALL DIVISIONS** | | |
| Criminal Contempt | Yes | Court Interpreter services required in all Criminal Contempt proceedings at state expense. |
| Jurors | No | Language interpreters are not allowed in jury deliberations. Therefore, interpretation should not be provided in earlier juror stages of the trial process. |
| **CIRCUIT CIVIL** | | |
| All | No | Court interpreter services are not required to be provided by the court. Parties may bring interpreters to court if needed. |
| **CIRCUIT CRIMINAL** | | |
| All | Yes | Court interpreter services required in all cases, including: every person who is a party to the case; every proceeding. |
| **DOMESTIC RELATIONS** | | |
| Dissolution | No | Court interpreter services are not required to be provided by the court. Parties may bring interpreters to court if needed; |

|  |  | *But:* |
|---|---|---|
| Custody | Yes | Court may appoint an interpreter and charge either party, but if both are indigent an interpreter should be provided. |
| Child Support Enforcement | No/Yes | A court should appoint an interpreter only in actions brought by the Dept. of Revenue where the respondent is indigent. |
| Domestic Violence (Injunctions, Extension Hearings) | Yes | A court should appoint an interpreter in all. |
| Repeat Violence | Yes | A court should appoint an interpreter in all. |
| Paternity | Yes/No | A court should appoint an interpreter in any action where the respondent is indigent, and in actions brought by an individual (not DOR) who is indigent. |
| Adoption | No | Court interpreter services are not required to be provided by the court. |
| Name Change | No | Court interpreter services are not required to be provided by the court. |
| **JUVENILE** |  |  |
| Delinquency, Dependency   CINS/FINS | Yes | Court interpreter services required in all cases, including: every person who is a party to the case (parents or caregivers); every proceeding |
| **PROBATE, GUARDIANSHIP, AND MENTAL HEALTH** |  |  |

13

A-001193

| Probate | No | Court interpreter services are not required to be provided by the court. Parties my bring interpreters to court if needed. |
|---|---|---|
| Guardianship/Property | No | Court interpreter services are not required to be provided by the court. Parties may bring interpreters to court if needed. |
| Guardianship/Person | No/Yes | Court interpreters may be appointed, with costs assessed, or at public expense if ward is indigent. |
| Mental Health | Yes | A court interpreter should be appointed in any proceeding in which a person may potentially lose the ability to control the decisions about his or her life, and extends to conferences between court-appointed counsel and clients, as there is no agency to provide this service. The requirement also extends to examinations ordered by the court. |
| Petition for Incapacity | Yes | Court interpreter services are required at public expense for conferences between court-appointed counsel and clients, at all proceedings and in all court-ordered examinations. |
| Baker Act | No/Yes | If a public defender has been appointed, then the public defenders= office is required to provide court interpreter services for conferences between the public defender and the client. |

14
A-001194

| | | |
|---|---|---|
| Marchman Act | Yes/No | Court interpreter services are required at public expense for the defendant, not the family members seeking court action. |
| **COUNTY CIVIL** | | |
| All | No | Court interpreter services are not required to be provided by the court. Parties may bring interpreters to court if needed. |
| **COUNTY CIVIL TRAFFIC** | | |
| All | No | Court interpreter services are not required to be provided by the court. Parties may bring interpreters to court if needed. |
| **COUNTY CRIMINAL** | | |
| All | Yes | Court interpreter services required in all cases, including: every person who is a party to the case; and every proceeding. |

[See also sections III and IV of Oregon's Bench Book and section 4 of the Minnesota Best Practices Manual.]

**Priority of Appointment** [insert state policy, if applicable]

Pursuant to I.C.A.R. 52(d)(1) an interpreter shall be appointed when an interpreter is requested or when the appointing authority determines that a principal party in interest or witness does not communicate in or understand the English language sufficiently to permit effective participation in a court proceeding. Section (d)(2) requires that the interpreter shall be appointed according to the following priority:

    (A) a certified interpreter,
    (B) a conditionally approved interpreter,
    (C) a qualified interpreter.

The appointing authority may appoint an interpreter of lower priority on the foregoing list only when good cause exists. Good cause includes, but is not limited to, a determination made prior to the proceeding by the appointing authority that:

> (i) Given the totality of the circumstances, including the nature of the proceeding and the potential penalty or consequences involved, the services of an interpreter of higher priority are not reasonably available to the appointing authority; or
> (ii) The current list of certified interpreters maintained by the Idaho Supreme Court does not include an interpreter certified in the language spoken by the non-English speaking person.

The court is not required to articulate such a determination in a court proceeding, unless the appointment of an interpreter is challenged by a party. If a party challenges the appointment of an interpreter, the court shall make a determination on the record as to whether the appointment of the interpreter conforms with the provisions of this rule.

## Determining an Interpreter's Qualifications

[Oregon and excerpts from A Judge's Guide to Immigration Law in Criminal Proceedings]

The court must take special care to appoint an interpreter who is uniquely qualified to interpret in the language used by the non-English-speaking person. It is critical for the protection of both the integrity of the judicial proceedings and the rights of the defendants that the court determines the competency of any interpreters before they are engaged in their duties.

The role and responsibilities of a court interpreter are highly specialized. Especially in the context of criminal proceedings where the stakes are generally high, it is critical that the court ensure that the interpretation provided is clear, accurate and delivered properly and in a manner fully consistent with the nature and tenor of the proceedings. Courts must, therefore, ensure that the individual is qualified to interpret. In addition, courts must consider whether the use of that individual as an interpreter creates a conflict of interest, a perception of impropriety, or inhibits that person from providing adequate interpretation. In particular, the employment of counsel or the judge as interpreter can interfere with the proper execution of the other duties these individuals have in the courtroom.

### *Foundation Questions for Certified and Noncertified Interpreters in Order to Qualify the Interpreter*

1. Suggested Questions to Ask Certified and Noncertified Interpreters:
   a. Do you hold the _____ Certified Court Interpreter credential issued by the Office of the State Court Administrator?
   b. Have you read and do you understand and agree to adhere to the Code of Professional Responsibility for Interpreters in _____ Courts?
   c. Having that code in mind, are you aware of any conflicts of interest you may have in this particular case?
   d. Have you had an opportunity to speak with the person in this case who needs an interpreter? Can you readily communicate with the non-English speaking person?

2. Suggested Foundation Questions to Ask Noncertified Interpreters:

16
A-001196

a.  Do you have any particular training or credentials as an interpreter?
b.  What is your native language?
c.  How did you learn English?
d.  How did you learn [the foreign language]?
e.  Can you read both languages? (Not for ASL interpreters.)
f.  What was the highest grade you completed in school?
g.  Have you spent any time in a foreign country?
h.  Have you spent any time in a country speaking the language of the person requiring interpretation?
i.  Did you formally study [English/foreign language] in school?  How much formal study in that language did you have?
j.  Have you ever interpreted in court before?  Where?  How often?
k.  Are you certified by any other state or the federal courts? (Not for ASL interpreters.)
l.  Do you hold one or more certifications from any national organizations? Please explain what was involved in obtaining this certification.
m.  Have you received any special training in court interpreting?
n.  Are you familiar with the Code of Professional Responsibility for Court Interpreters [where one exists]?  Please explain some of the main points.
o.  Are you a potential party in this case?
p.  Is there a possibility that you will be called to testify in this case?
q.  Do you know Mr. X?  Have you ever worked for Ms. Y?  Do you know the lawyer for Mr. T?
r.  Have you had an opportunity to speak with the non-English-speaking person informally?  Were there any particular communication problems?
s.  Are you familiar with the dialect spoken by Mr. B?
t.  Are you familiar with the accent of people from the region of the country where Ms. L is from?
u.  Describe the simultaneous and consecutive modes of interpretation and how they differ.
v.  Are you able to interpret simultaneously without omitting or changing anything that is said?
w.  Are you able to interpret consecutively?
x.  Do you ever summarize statements while interpreting? Do you understand that the law requires you to interpret everything said by all parties?

## Appointing Multiple Interpreters to a Proceeding [Oregon]

1.  Multiple Parties Needing Same Language Interpreter
    a.  Separate Interpreters - The court should afford each party a separate interpreter if needed to avoid a conflict of interest.
    b.  Preferred Procedure (if equipment available):
        1)  To ensure uniform interpretation, one interpreter interprets the proceeding through closed circuit electronic transmission system, and all parties needing an interpreter listen by means of individual headphones.
        2)  If interpreter for the proceeding provides interpretation to multiple parties, at least one other interpreter must be available to assist in communication between client and attorney during proceedings.

2.  Party and Witnesses Needing Interpreter

17
A-001197

Provide one interpreter for a party and a separate interpreter who can interpret for all witnesses (if a party's interpreter serves as an interpreter for a witness, the interpreter cannot assist in communications between the party and counsel).

3. Exception for Separate Interpreters

When separate interpreters are not available, for example in rural communities, then the potential conflict should be disclosed and any waiver put on the record.

**Resources to Locate Interpreters** [Washington]

The following resources are for courts to consider when a Washington State court certified interpreter is not available or the court needs an interpreter in a non-certifiable language. Some of these sources may provide names of interpreters with only marginal skills and no court experience. Judicial officers must exercise discretion to determine qualifications to serve as an interpreter in a particular court proceeding.

A.   **Other State Courts** (Consortium member states recommended above non-consortium states): Local court administrators (federal, superior, municipal, district), particularly courts in larger jurisdictions may have names of qualified interpreters for a particular language or dialect needed.

B.   **Non-Government Organizations**: Some schools, churches, and ethnic community organizations may be of assistance in locating an interpreter for rare languages or dialects. Exercise caution when using this alternative due to possible conflict of interest.

C.   **Language Line Services**: Appropriate to use for short hearings of approximately 15 minutes in duration (e.g., arraignment), "at the public counter" interpretations of non-legal matters between parties and court staff, or if the court is having difficulty determining what language the person speaks. It is not appropriate to use for long hearings or trials.

D.   **Colleges and Universities**: Foreign language departments and international student organizations of local colleges and universities can be a resource.

E.   **Medical Facilities**: Hospitals and clinics use interpreters. The Department of Social and Health Services offers certification in medical interpreting (360) 664-6035.

F.   **Private/Commercial**: Private language schools and commercial interpreting agencies are available but not endorsed or rated by the AOC.

[See also Section IX of Oregon Bench Book.]

# 7. Role of the Court Interpreter and Professional Code of Ethics

**Role of the Court Interpreter** [Minnesota]

The role of the court interpreter can be defined in the following ways:

- The duty of the Court Interpreter is to serve as a conduit between non-English speakers and English-speaking officials in legal forums. As they convert one language to another, interpreters play a critical role in the administration of justice and make it possible to ensure the rights of due process and participation in the court system for all those involved.
- The goal of a court interpreter is to enable the judge and jury to react in the same manner to a non-English-speaking witness as they do with one who speaks English. Also, the limited – or non-English-speaking defendant should be enabled to hear everything that an English speaker has the privilege to hear.
- The proper role of the interpreter is to place the non-English speaker, as closely as linguistically possible, in the same situation as an English speaker in a legal setting. In doing so the interpreter does not give any advantage or disadvantage to the non-English-speaking witness or defendant.
- The goal of a court interpreter is to produce a legal equivalent, a linguistically true and legally appropriate interpretation.

Court interpretation for foreign language speaking and deaf or hearing impaired individuals is a highly specialized form of interpreting that cannot be effectively performed without commensurate specialized training and skills. Being bilingual, even fluently so, is insufficient qualification for court interpreting. Interpreters must be able to interpret with exactitude while accurately reflecting a speaker's nuances and level of formality. The interpreter must interpret the original source material without editing, summarizing, deleting, or adding; while conserving the language level, style, tone, and intent of the speaker. The interpreter must render what may be termed the "legal equivalent" of the source message.

Interpreting requires the use of several cognitive and motor skills, including:

1. Listen
2. Comprehend
3. Abstract the message from the words and word order
4. Store ideas
5. Search for the conceptual and semantic matches
6. Reconstruct the message in the other language
7. WHILE . . . speaking and listening for the next chunk of language to process
8. WHILE . . . monitoring their own output.

Court interpreters must be able to use these skills in three different modes: simultaneous interpretation, consecutive interpretation, and sight interpretation of documents.

19

A-001199

[Oregon]

"Interpret" is the appropriate professional term for orally rendering the proceeding/statements. "Translate" is the professional term for converting written information from one language to another. Several references in ORS do not respect the professional terminology, probably because the drafter was not familiar with the profession, not because the drafter intended to differentiate.

[Washington]

The Proper Role of a Court Interpreter Should Be:

- A conduit/facilitator of communications.

- To interpret accurately all communications to and from English and the target language.

- To interpret thoroughly and precisely, adding or omitting nothing, giving consideration to grammar, syntax, and level of language.

Ethical Considerations:

- Should be considered an officer of the court.

- Abide by a code of professionalism expected of any court officer to promote confidence and impartially in the judicial process.

- The interpreter shall avoid any conflict of interest, financial or otherwise.
  - ➤ Shall not render services if a potential witness, associate, friend or relative of a party.
  - ➤ Shall not render services if he/she has a stake in the outcome.
  - ➤ Shall not render services where he/she has served as an investigator in a preparation of litigation.

- Shall not disclose any communication that is otherwise privileged without consent or court order.

- Shall not comment on a matter where he/she has served as an interpreter.

- Report any effort by another to solicit, entice, or induce the interpreter to violate any law or canon of conduct for interpreter.

- Shall not give legal advice and shall refrain from the unauthorized practice of law.

What You Should Expect From an Interpreter:

- He/she will request clarification if a phrase or word is not understood

20
A-001200

- He/she will interpret in the first person and should address the court in the third person, in order to keep a clear record.

- He/she will have paper and pencils available at all times and may have a dictionary or other reference material with him/her.

- He/she will be as unobtrusive and professional as possible.

- He/she will not converse with the defendant or party except to interpret everything that is said in the courtroom.

Red Flags to Watch For:

- Beware of the interpreter who does not carry a Washington State interpreter badge.

- Be clear to identify the interpreter's level of certification (Washington State, Federal, other state).

- Beware if the interpreter is not interpreting everything that is being said in the courtroom. Summary and paraphrase interpreting have no place in the courtroom, under any circumstances.
  - ➢ By observation, you can determine if the interpreter is simultaneously interpreting the testimony, both questions and answers of witnesses, the closing arguments of counsel, etc. The party is entitled to hear everything that is happening, as it is happening.

- Beware if you observe the interpreter engaging in conversation with the non-English speaking party or witness.

- Beware if the interpreter is coaching or encouraging a party to answer in a certain way (such as nodding or using facial expressions). The interpreter should simply interpret everything that is being said in the courtroom, with no personal input whatsoever.

Beware if the interpreter draws undue attention to himself/herself. A trained interpreter will be as unobtrusive as possible and professional in manner.

## Code of Professional Responsibility in the Judiciary [Minnesota and Oregon]

To clarify the role and govern the behavior of the interpreter in the state court system, the Code of Professional Responsibility was promulgated by the _____ Supreme Court in _____. (See Appendix A.) Judges should be familiar with the code and its canons.

## Reporting Policy Violations by Interpreters [New Jersey]

If a judge or staff person believes that an interpreter engaged in conduct that violates either the Code of Professional Responsibility or any other judiciary policy, he or she should so advise the
_____.

## 8. Conducting Court Proceedings Using Interpreters and Other Practical Considerations for Facilitating the Interpreter's Performance of Duties

**Interpreter Oath** [New Jersey]

All interpreters shall take the following written or oral oath: "Do you solemnly swear or affirm that you will interpret accurately and impartially, follow all guidelines for court interpreting that are binding on you, and discharge all of the solemn duties and obligations of an official interpreter?" An interpreter who has not taken this oath shall not be permitted to interpret.

This standard sets forth a uniform oath to be administered to all interpreters, something that does not presently exist. *New Jersey Rule of Evidence* 604 simply requires an interpreter to be "subject to all provisions" of the evidence rules that relate to witnesses and to "take an oath or make an affirmation or declaration to interpret accurately."

Under present practice, interpreters should be sworn before starting to interpret for each particular proceeding of record. This is time-consuming and adds one more task for the judge or hearing officer to perform. The practice of administering the oath has also been honored more in the breach than in the execution. A preferable approach is for interpreters to take the oath only at the beginning of their career as an interpreter for the New Jersey judiciary. Once so administered, the oath would be in effect throughout their careers, just as attorneys are bound by the oath they take when they are admitted to the New Jersey bar.

All staff interpreters should take the oath at the time they begin state employment, and a record of the oath at the time they begin state employment, and a cord of the oath should become a part of their permanent personnel file. Freelance interpreters may swear by affidavit at the time their names are entered into the official registry of interpreters maintained by the judiciary; those affidavits should be kept on file in the central office. As for interpreters from agencies, the central office should make arrangements with such interpreting agencies to use only interpreters who have taken the oath. In the highly unusual case in which an interpreter not listed in the registry must be used in a particular proceeding, the judge or hearing officer conducting that proceeding would have to administer the oath on the record.

**Preparation of the Court Interpreter**

[Excerpted from A Judge's Guide to Immigration Law in Criminal Proceedings.]

The following recommendations are designed to facilitate the job of the interpreter and to assure greater accuracy in the interpretation.

1. Allow interpreters to acquaint themselves with the individual.

In recognition of different accents, dialects and regionalisms, and to ensure accuracy of interpretation, courts should provide interpreters with an opportunity to speak with the defendant or witness to determine whether they can communicate effectively, and to allow them both to familiarize themselves with each other's language particularities. The judge may then establish on the record that the interpreter and the person requiring assistance have had an opportunity to speak, and that they are able to understand each other's respective accents and identify each other's dialects and regionalisms.

Many languages have different dialects, and there will be times even a federally certified or a professionally qualified interpreters cannot effectively communicate with the person requiring an interpreter. In those cases, it is important to employ an interpreter who understands and speaks the appropriate dialect.

If at any time during the course of proceedings it becomes apparent that the interpreter is unable to communicate effectively with the presiding judicial officers, attorneys in the case, a party in the case, or a witness, the presiding judicial officer must dismiss the interpreter and obtain the services of another interpreter.

2. All interpreters to review relevant documents.

Permitting the interpreter to review indictments or other pre-hearing or pre-trial court documents to familiarize themselves with the nature of the case and its particular vocabulary often leads to a greater understanding of the proceedings. This, in turn, can lead to the court proceedings running more smoothly and efficiently.

3. Advise interpreters of their obligation to report impediments to performance and any errors they have made.

An interpreter is obligated by the Oath of True Interpretation to ensure that the interpretation provided is accurate and complete. Where an interpreter recognizes that a mistake in interpretation has been made, it is incumbent upon the interpreter to stop the proceedings and to make the correction for the judge. Similarly, where an interpreter is uncertain as to how to interpret a term or phrase, or where the question or testimony has been too long for the interpreter to accurately remember what was said, the interpreter should inform the judge. The judge, in turn, should direct the witness or the questioning attorney to restate or rephrase the question or testimony to facilitate an accurate and complete interpretation.

**Preparation of Other Participants for Use of the Interpreter**

[Excerpted from A Judge's Guide to Immigration Law in Criminal Proceedings.]

At the commencement of proceedings, the judge should advise attorneys and witnesses about the role of the interpreter in order to ensure effective communication, preserve the integrity of the proceedings, and obviate the need for such an explanation at a time more likely to be distracting once the proceedings have begun. In addition, the judge should advise all persons communicating through an interpreter to avoid using complex language, or highly technical

language such as scientific, medical and legal terminology that can be expressed in simpler language. It is also useful for the court to advise parties to refrain from terms or expressions, such as slang, that may not have an equivalent in the native language of the person requiring the use of an interpreter.

***Suggested Judicial Instructions for all Individuals Who will be Communicating through a Court Interpreter***

1. The interpreter's only function is to assist the non or limited-English-speaking party to communicate effectively with the court, the attorneys, and other parties in the case.
2. The interpreter may not give legal advice, answer questions about the case, or help anyone in any other way except to facilitate communication.
3. An interpreter is not permitted to ask or answer questions, only interpret them. If a person who is using the services of an interpreter has any questions, those questions should be directed to the court, attorney, witness, or party to the case through the interpreter.
4. If someone cannot understand or communicate effectively with the interpreter, that person should tell the court or the presiding judicial officer.

[Citation from ABA publication – Excerpted from *Suggested Text for Judge's Statement in Court to Clarify the Role of the Interpreter, in Judges' Guide to Standards for Interpreted Proceedings,* in <u>Court Interpretation: Model Guidelines for Policy and Practice in State Courts</u> (1995).]

## <u>Practical Considerations for Facilitating the Interpreter's Performance of Duties</u>

[Excerpted from <u>A Judge's Guide to Immigration Law in Criminal Proceedings</u>]

1.     Interpretation equipment.

The use of wireless remote interpreting equipment, when available, can decrease the interpreter's intrusion into the proceedings. Where wireless remote interpreting equipment is not available, interpreters need to be positioned close enough to individuals requiring their services to permit clear audibility.

2.     Positioning the interpreter in the courtroom.

During trial and other judicial hearings, interpreters should be seated where they will not interfere in any way with the proceedings. For example, interpreters should not be located in the witness stand where their close proximity to the witness may increase the chances that the fact-finders will pay attention to the interpreter rather than the witness. Nor should interpreters be placed in a spot where they may block the line of sight between persons requiring their services and other courtroom participants.

3.     Audio recording of proceedings requiring an interpreter.

If errors in interpretation are made during the proceedings, a court reporter's transcript of the hearing will not be of any assistance as the court reporter is only able to record what the interpreter says, and not the actual testimony of the witness. Thus, to allow for review of any alleged errors in interpretation raised during trial or on appeal, it is of critical importance that an audio recording of all proceedings is made. This is often the only way to check the accuracy of an interpretation, even if the challenge is raised immediately following the alleged error, because it allows for the tape to be placed back at the point in time that the objection is made. It is particularly important for a tape recording to be made where a non-certified interpreter is employed.

4.      Interpreter fatigue.

Judges should be sensitive to, and make provisions for, interpreter fatigue. The task of interpreting is arduous and requires intense concentration, even more than that required of a court reporter. Where possible, two interpreters should be appointed to a trial so that the interpreters may switch off every half-hour. When this is not possible, there are other measures a judge can take to help ensure that the accuracy of the interpretation does not suffer from interpreter fatigue, such as giving regular rest-breaks and not permitting or requiring an interpreter to work more than seven hours over the course of the day.

***Recommended Practices for Facilitating Accurate Interpretation***

1.      If the interpreter cannot hear the person who is speaking, the judge may order that person to speak more audibly, either upon the judge's own request or upon the request of the interpreter.
2.      The judge can require microphones to be used whenever interpreters are utilized in the courtroom to ensure the audibility of anyone whose testimony should appear in the transcript. This practice also ensures that the court reporter will hear every word spoken in court.
3.      If the interpreter is having trouble hearing or is speaking too loudly, the judge should permit the interpreter to sit where hearing is better facilitated.
4.      If attorneys or witnesses are speaking too rapidly for the interpreter to keep up, the judge can instruct the participants to speak more slowly.
5.      When an interpreter is being used, judges and attorneys should try to avoid using complex language, and should avoid asking compound questions or using double negatives, to limit the possibility of confusion in the interpretation.
6.      When there is no equivalent translation from one language into the next, as with some idiomatic expressions, the judge can instruct the attorney to rephrase the question.
7.      The judge can instruct counsel to rephrase or ask more specific questions when there is a problem interpreting a concept or idea.

[Citation from ABA publication – Excerpted with permission from Roseann D. Gonzalez et al., Fundamentals of Court Interpretation: Theory, Policy and Practice 176, 180 (1991).]

**Modes of Interpreting** [NCSC]

The mode of interpreting to be used at any given time (consecutive and simultaneous) depends on the types of communication to be interpreted within a proceeding and not on the types of proceeding. In fact, both the simultaneous and consecutive modes will often be appropriate within a proceeding. For example, interpreting would be simultaneous when a judge is making a defendant aware of his or her rights, and consecutive when the judge begins to question the defendant. The following guidelines for modes of interpreting are suggested.

The simultaneous mode of interpreting should be used for a person who is listening only. This is the normal mode for proceedings interpreting. Accordingly an interpreter should interpret in the simultaneous mode in situations such as the following:

- for a defendant when testimony is being given by another witness,
- for a defendant or witness when the judge is in dialog with an officer of the court or any person other than the defendant or witness,
- for a defendant when the court is addressing the jury or gallery or any other persons present in the courtroom, or
- for any non-English speaking party when the judge is speaking directly to the person without interruption or regular call for responses (e.g., lengthy advisements of rights; judge's remarks to a defendant at sentencing).

The consecutive mode of interpreting should be used when a non-English speaking person is giving testimony or when the judge or an officer of the court is communicating directly with such a person and is expecting responses (e.g., taking a plea). This should be the normal mode for witness interpreting.

The summary mode of interpreting should not be used. It is most often resorted to only by unqualified interpreters who are unable to keep up in the consecutive or simultaneous modes. Qualified interpreters may report the need to use summary interpreting if they are called upon to interpret highly technical testimony of expert witnesses which they do not understand or have the vocabulary to interpret. The judge should specifically instruct all interpreters to report if it is necessary to resort to summary interpreting. In circumstances when the problem does not involve unusual and highly technical language, the preferred course of action is to dismiss and replace the interpreter if there are other interpreters available who do not need to use the summary mode. Any time the judge determines that the proceedings must continue even if summary interpreting is being used, the judge's consent should be part of the record of the proceedings.

**Use of Multiple Interpreters** [NCSC]

There are three basic functions an interpreter serves during court proceedings. In some circumstances, it is physically impossible for one interpreter to fulfill more than one of the functions at the same time.

- *Proceedings interpreting*: The most frequently encountered function an interpreter performs is to enable a non-English speaking person who is the subject of litigation understand the proceedings and communicate with the court when necessary. In short, "proceedings interpreting" makes the defendant or other litigant effectively present during the proceedings. It is conducted in the simultaneous mode.
- *Witness interpreting*: This function of the interpreter is to secure evidence from non-English speaking witnesses that is preserved for the record. It is sometimes called "record" interpreting, and it is conducted in the consecutive mode.
- *Interview interpreting*: This function of the interpreter is to facilitate communication between a non-English speaking person and her or his attorney to ensure the effective assistance of counsel, or to perform similar duties in any other interview setting associated with a court proceeding. (When an interpreter is used to assist in attorney-client consultations, the term "defense" interpreting is sometimes used.) Interviews may use both simultaneous and consecutive interpreting, depending on the circumstances.

When there is only one non-English speaking defendant and no non-English speaking witnesses, one interpreter is all that is needed. (If the hearing is lengthy, one interpreting team will be required.) If there are non-English speaking defendants and other non-English speaking witnesses, two interpreters will be needed during the witness testimony – the proceedings interpreter who is interpreting the English questions for the defendant (and who is able to assist the defendant with attorney-client communication), and the witness interpreter.

Then there are multiple non-English speaking defendants, must there be an interpreter for each person? For proceedings interpreting (making the defendants present), there need not be: one interpreter (or interpreting team) using the headset equipment can interpret at the same time for all of the defendants.

For defense interpreting, however, at least one additional interpreter needs to be available in multi-defendant cases so that defendants can communicate with counsel when necessary during the trial.

Some courts appoint an interpreter for each defendant so that each defendant's interpreter can provide proceedings interpreting and defense interpreting when necessary. As noted above, this may be an unnecessarily expensive alternative. If the parties agree, two interpreters can trade off providing proceedings interpreting for all of the defendants and the "resting" interpreter can be signaled and used by any defendant to communicate with counsel as necessary.

In cases where a trial involves more than one defendant whose interests are in conflict with each other, counsel and the parties may be uncomfortable using the same interpreter for privileged communications. If this becomes an issue, the court may have no choice but to provide interpreters for each defendant. The practice should not be presumed necessary, however, because trained and qualified interpreters are under oath to protect confidentiality of communications and to refrain from communicating directly with any court participant except when they are engaged in interpretation.

A-001208

**Handling Interpreter Error and Allegation of Interpreter Error** [New Jersey]

If an interpreter reports having made an interpreting error or someone alleges such an error, the judge or hearing officer should use the detailed procedures set forth in the "Comments" portion of this standard for dealing with such errors or allegations of error.

Comments.

Correction of errors caught by the interpreter. In order to ensure the most accurate possible interpretation on the record, judges and hearing officers should accept the correction of errors when offered by the interpreter. In a jury trial, this should generally be done during a sidebar conference. In a non-jury proceeding, this should be done by permitting the record interpreter, if still interpreting, to correct the error at once, first identifying him/herself in the third person (e.g., "The interpreter wishes to correct an error") for the record and then proceeding to make the correction. If the interpreter becomes aware of an error after the testimony has been completed, the judge or hearing officer should determine whether the error should be corrected on the record. If a jury is present, this should be done in a sidebar conference.

Handling of allegations of errors. When anyone other than the interpreter (including the team interpreter) alleges that an interpreting error has been made, the judge or hearing officer should handle resolution of the allegation outside the presence of the jury, if any. If there is a team of interpreters, the team should first confer and try to reach an agreement and the judge or hearing officer should accept any such agreed-upon correction by the team. Notwithstanding an allegation of error, the interpreter or interpreting team should be presumed to have interpreted correctly, unless the interpreter agrees that he or she made a mistake; the burden of proof in any such situation should be on the person challenging the interpretation.

If the interpreter stands by the interpretation that is alleged to have been incorrect, then the judge or hearing officer should determine whether the issue surrounding the allegedly inaccurate interpretation is so substantial or potentially prejudicial as to warrant further attention. If it is not, the allegation of error should not be pursued further. If, however, the issue is substantial or potentially prejudicial, then the judge or hearing officer should:

(1)     ask the person whose speech was allegedly misinterpreted to clarify the term or terms in question. If that does not resolve the allegation of interpreter error, the judge or hearing officer should then hear evidence as to the correct interpretation from experts submitted by attorneys for all parties if they so wish, from the interpreter who made the alleged error, and from any other linguistic expert the judge or hearing officer may select or allow. In some situations, it may be advisable or necessary to play back the recording of what a witness has said since many perceived interpreting errors are a function of what was said in a foreign language rather than its interpretation; and

(2)     make a final determination as to the correct interpretation in view of the evidence. If the determination is different from the original interpretation, then the judge or

hearing officer should amend the record accordingly and, if applicable, so advise the jury.

## Selecting and Instructing Jurors for Trials Where a Court Interpreter has been Appointed

[Excerpted from A Judge's Guide to Immigration Law in Criminal Proceedings.]

A. Question Prospective Jurors about their Attitudes Toward Interpretation.

It is recommended that the jury *voir dire* include questions to determine whether the prospective juror would be prejudiced by the use of an interpreter. The Virginia Supreme Court, for example, recommends the following inquiry to determine whether prospective jurors are affected by the presence of an interpreter: "Do they hold prejudices against people who do not speak English? Do they speak a foreign language that will be used during the proceeding? If so, will they be able to pay attention only to the English interpretation?"

B. Instruct the Jury about the Role of the Interpreter.

When an interpreter is being used for proceedings, the judge should instruct the jury on the role of the interpreter in court. The instruction should occur at the beginning of the proceedings.

### *Suggested Text for Clarifying the Role of the Interpreter for the Jury*

1. We are going to have an interpreter assist us through these proceedings, and you should know what a court interpreter can and cannot do. The interpreter's sole responsibility is to enable us to communicate with each other. The interpreter is here only to help us communicate during the proceedings. The interpreter is not a party in this case, and has no interest in this case. The interpreter works for the court and does not work for either party. Accordingly, the interpreter is completely neutral.
2. The interpreter is not an attorney, and is prohibited from giving legal advice.
3. Does anyone have any questions about the role or responsibilities of the interpreter?
4. If any of you do not understand the interpreter at any time during the proceedings, please raise your hand and let me know.

[Citation from ABA publication – Adapted from "*Suggested Text for Clarifying the Interpreter's Role to the Jury,*" figure 6.4 in *Judges' Guide to Standards for Interpreted Proceedings,* in Court Interpretation: Model guides for Policy and Practice in the State Courts (1995).]

### *Suggested Jury Instructions for Witness Testimony Through an Interpreter*

When a witness testifies through an interpreter, the judge should provide the jurors with the following instructions:

1. The interpreter is a neutral actor.

2. The interpretation of the witness's testimony should be as if the witness had spoken English and the interpreter was not present.

3. The fact that the witness's testimony is given through the assistance of an interpreter should in no way affect the jury's view of the witness's credibility.

C. Situations in which a Prospective Juror Speaks the Interpreted Language.

If the prospective juror speaks the language of the person using an interpreter, that juror need not automatically be excluded. The juror should only consider as evidence the testimony that is provided through the interpreter, which comprises the official court record of the testimony provided.

When a juror who speaks the language of the witness interprets the testimony differently from the version given by the court interpreter, it is unrealistic to expect a juror to ignore what she hears the witness say. In such cases, it may be necessary to provide the juror with a special instruction on how to handle such situations.

**Other Jury Issues** [Oregon]

1. The court should give the Uniform Criminal Jury Instruction in criminal trials in which an interpreter is being used for the parties or witnesses.

2. Instructing the Jury if a Jury Panel Member(s) Knows the Language Being Interpreted

a. Suggested Instruction - "If any of you understand the language of the witness, disregard completely what the witness says in the other language. Consider as evidence only what is provided by the court interpreter in English."

b. Sign Language - 1) When a party needs sign language interpretation and a potential juror understands sign language, it may not be appropriate for the potential juror to serve, because the juror may be able to observe and understand privileged attorney-client communications. 2) An alternative solution to removing the potential juror is to provide the hearing-impaired party "real time" interpretation (similar to closed caption television) if available and the party reads and understands English.

c. Removing a Juror—ADA Implications - Before removing a hearing-impaired juror or juror with another disability, the court should consider whether removal might violate the ADA's antidiscrimination provisions.

3. Non-English Speaking Jurors [Revise to appropriately reflect laws of individual state.]

a. Court proceedings must be conducted in English; therefore, a person who does not speak English is not qualified to serve as a juror. The court may provide an interpreter so that the court can determine a potential juror's English-speaking abilities and to interpret an explanation of this requirement to the potential juror.

b. Challenges to allow non-English speaking persons to serve as jurors have been unsuccessful in some jurisdictions. These challenges have generally been based on due process and equal protection guarantees. Oregon's appellate courts have not yet addressed this issue.

4. Disabled Jurors

a. A person with a disability is not ineligible to act as a juror and cannot be excluded from the jury list or from jury service because of his or her disability.
b. On written request of a deaf, hearing-impaired, or speech-impaired juror, and on the court's finding, the juror needs an interpreter or assistive communication device, the court must appoint a qualified interpreter or provide an assistive communication device.
c. The court must administer to the qualified interpreter an oath to communicate the proceedings accurately to the juror and to repeat the juror's statements accurately.
d. The interpreter appointed for the deaf, hearing impaired, or speech-impaired juror must be present during jury deliberations. Each party to the proceedings must stipulate to the interpreter's presence. The interpreter cannot participate in the jury deliberations "except to facilitate communication between the disabled juror and other jurors" and the court must "so instruct the jury and the interpreter."

## Other Instructions [NCSC]

### *Suggested Text for Clarifying the Interpreter's Role to the Witness*

I want you to understand the role of the interpreter. The interpreter is here only to interpret the questions that you are asked and to interpret your answers. The interpreter will say only what we or you say and will not add, omit, or summarize anything. The interpreter will say in English everything you say in your language, so do not say anything you do not want everyone to hear. If you do not understand a questions that was asked, request clarification from the person who asked it. Do not ask the interpreter. Remember that you are giving testimony to this court, not to the interpreter. Therefore, please speak directly to the attorney or me, not to the interpreter. Do not ask the interpreter for advice. Please speak in a loud, clear voice so that everyone and not just the interpreter can hear. If you do not understand the interpreter, please tell me. If you need the interpreter to repeat something you missed, you may do so, but please make your request to the person speaking, not to the interpreter. Finally, please wait until the entire question has been interpreted in your language before you answer. Do you have any questions about the role of the interpreter? Do you understand the interpreter?

### *Suggested Text for Clarifying the Interpreter's Role to the Jury*

(Proceedings Interpreting)

This court seeks a fair trial for all regardless of the language they speak and regardless of how well they may or may not speak English. Bias against or for persons who have little or no proficiency in English because they do not speak English is not allowed. Therefore, do not allow the fact that the party requires an interpreter to influence you in any way.

(Witness Interpreting)

Treat the interpretation of the witness's testimony as if the witness had spoken English and no interpreter were present. Do not allow the fact that testimony is given in a language other than English to affect your view of [her] credibility. If any of you understand the language of the witness, disregard completely what the witness says in [her] language. Consider as evidence only what is provided by the interpreter in English. Even if you think an interpreter has made a mistake, you must ignore it completely and make your deliberations on the basis of the official interpretation.

# 9. Best Practices for Working with Interpreters

## What Court Interpreters Would Tell You If They Were Here [Washington]

1.    Take some time to become familiar with my profession. I would like very much for you to understand the professional services I am responsible for rendering. When you do that, you will be more likely to respect and treat me as a professional. You will be less likely to view me as a glorified clerk of someone of dubious professional standing (certainly no equal to court reporters!). It may be a helpful guide if you would treat me the way you tend to treat your reporter or any officer of the court.

Once you understand my job better, here are some things you will no longer do. Please understand this is not just me talking. The following examples represent the best thinking of judges, lawyers, and court administrators – as well as professional interpreters, of course – who have pondered the role of the interpreter in great depth. These examples are based on the Code of Professional Responsibility I am expected to follow.

    a.    Do not ask me to explain or restate what you or anyone else says. I can only put into another language exactly what a person has said.

    b.    Do not allow attorneys appearing before you to ask me to explain or restate what someone says. When I decline to perform this task for them, please support me and do not expect me to violate the Code.

    c.    Do not ask me to take the person(s) for whom I am interpreting to an office, counter, etc.

    d.    Do not let two or more people talk at the same time. There is no way I can interpret everything that is being said!

    e.    Do not ask me not to interpret something. I am professionally bound to interpret everything that is said.

    f.    Do not forbid me to interpret simultaneously during a proceeding because it interferes with your concentration or otherwise bothers you. There are many situations in which I am professionally, ethically, and legally bound to interpret in the simultaneous mode. If my whispered simultaneous interpreting gets too loud, respectfully ask if I can speak more quietly. I will do my very best to be as unobtrusive as possible.

    g.    When an attorney or someone else alleges that I have made an error in interpretation, do not automatically assume that I have made one. Remember that the attorney is in an adversary relationship and I am not. I do make mistakes sometimes and I will be the first person to admit a mistake when I recognize one. But ask me if I agree with an attorney's allegation before

34

concluding that I have actually made a mistake. As a neutral party and a linguist, I should have more credibility before the court than virtually any attorney on such matters.

h. Do not ask me when you are really talking to a witness, defendant, or someone else. If you say "Ask him if…" or "Tell him that…," remember that I am required to say exactly that in the interpretation or to remind you to talk directly to the person you are addressing. If I do the former, the person with whom you are attempting to communicate will often be confused. If I do the latter, you may get upset.

2. Avoid rapid-fire delivery of what to you is very routine material and help attorneys avoid excessively fast speech. Understand that when we are interpreting into other languages, it is often the case that it will take more words for me to convey a message accurately and completely. Be patient and understanding if I have to keep reminding you or others to slow down so I can do my job, too.

3. I need breaks every bit as much as your reporters do, maybe even more. I am often the only person in the courtroom who is talking all of the time. While everyone else only has to understand what is being said, I have to both understand it and put it into another language. This is intensely demanding work.
Furthermore, if the proceeding I am interpreting is a proceeding which involves simultaneous interpreting for more than an hour, two interpreters should be assigned to the case. We should be able to switch off every 30 minutes or so.

4. Please make efficient use of my services. I have other commitments to attend to when I finish interpreting for the case before you for which you have summoned me. Take my case as quickly as possible in order to prevent incurring the extra costs of having me wait and inconveniencing the other courts or court support services that may be waiting for my services.

5. Understand the human limits of my job. My main interest here is that you comprehend the fact that no person knows all of the words in any one language, much less all of the words of all the dialects of that language – and, much, much less, all of the words of all the dialects of two languages (not to mention the professional and legal jargon for which there is often no equivalent at all in other languages)! Sometimes I need to obtain clarification. It is unethical for me to make up an interpretation or guess at an interpretation of something I do not understand. Instead of viewing such a request as casting doubt upon my professional credentials, consider viewing it in terms of my commitment to accuracy.

6. Many of my colleagues are not very well qualified and want very much to improve their interpreting skills. They need support for attending courses and professional seminars. Please do everything you can to enable on-the-job training, so do not hesitate to take them – and me, sometimes – under your wing when there is something we need to learn.

7.      Before you expect me to start interpreting for a given matter, give me the opportunity to find out what the nature of the proceeding is, who is involved, etc. Furthermore, let me speak to the linguistic minority person briefly to size up the person's communicative style and needs so I can make whatever adjustments may be necessary and appropriate to improve communication – or perhaps even discover that I might not be able to communicate sufficiently with the individual! Like any other professional, the better prepared I am, the better I will be able to do and the smoother the whole proceeding will flow.

## What Should I Expect from an Interpreter? [Florida]

There are a variety of actions or behaviors that will be apparent in a qualified interpreter.

1.      He or she will request clarification if a phrase or word is not understood.

2.      He or she will interpret in the first person and should address the court in the third person, in order to keep a clear record. For example:

Witness: (in native language) "I was at a party in my neighbor's house..."

Interpreter: (in English) "I was at a party in my neighbor's house...."

   **NOT:** "She said she was at a party at her neighbor's house...."

Interpreter:   (addressing the court): "Your Honor, the interpreter requests that the last question be repeated."

   **NOT:** "Your Honor, I request that the last question be repeated."

3.      He or she will have paper and pencils available at all times and may have a dictionary or other reference material with him or her.

4.      He or she will be as unobtrusive and professional as possible.

5.      He or she will not converse with the defendant or party except to interpret everything that is said in the courtroom.

He or she will not "explain" any form, document, or activity to the party or witness, nor lower the register of speech.

## What Are the "Red Flags" I Should Watch for? [Florida]

1.      Beware of the interpreter who purports to be "certified" in the State of Florida. Unless he or she is Federally certified, having passed the U.S. Administrative Office of the Court's

examination, there is no certification currently existing in Florida. He or she may be misrepresenting their qualifications.

2.      Beware if the interpreter is not interpreting everything that is being said in the courtroom. Summary and paraphrase interpreting have **no place** in the courtroom, under any circumstances.

By observation, you can determine if the interpreter is simultaneously interpreting (for instance) the testimony, both questions and answers of witnesses, the closing arguments of counsel, etc. The party is entitled to hear everything that is happening, as it is happening.

3.      Beware if you observe the interpreter engaging in conversation with the non-English speaking party or witness.

4.      Beware if the interpreter is coaching or encouraging a party to answer in a certain way (such as nodding "yes" or "no," "ssh-shing" the party, or using facial expressions to convey personal encouragement or discouragement). The interpreter should simply interpret everything that is being said in the courtroom, with no personal input whatsoever.

5.      Beware if the interpreter draws undue attention to himself or herself. A trained interpreter will be as unobtrusive as possible and professional in manner.

## What Should I Do to Assist the Interpreter? [Florida]

To best utilize the services of an interpreter in your courtroom, you should be familiar with the *Code of Professional Responsibility for Interpreters in the Judiciary in the State of Florida* which is found at the end of this guide.

1.      If more than one party needs a language interpreter in the same language,

a.      The court should afford each party a separate interpreter to avoid the appearance of a conflict of interest. Or, if equipment is available:

An interpreter can interpret for more than one party over an electronic transmission system, with each party listening by means of individual headphones. If the electronic transmission system is used, a second interpreter should be available to assist.

b.      If neither of the described situations is possible, a clear record should be established, disclosing any possible conflicts of interest and placing waivers on the record.

2.      After establishing the qualifications of the interpreter for the record, the court should:

    a.    Summarize the facts of the case for the interpreter and allow him/her to read any pertinent documents to become familiar with vocabulary, names, addresses, and so forth.

    b.    Introduce the interpreter to the party requiring the services and allow them to converse enough to determine that clear communication is possible between them.

    c.    When the interpreter is performing simultaneous interpretation, speak and read slowly and clearly enough for the interpreter to keep up.

    d.    When the interpreter is performing consecutive interpreting (during question and answer testimony), speak in logical, meaningful phrases, pausing to allow the interpreter to keep the pace. Remember that consecutive interpreting should be complete and accurate, but not verbatim or literal. For example, a "red herring" translated to Spanish verbatim is a "red fish" and has no meaning. Instead, a correct interpretation may be a "false lead."

e.  Do not allow more than one person to speak at the same time and require counsel and witnesses to speak audibly.

f.  Assure the interpreter that it is appropriate to ask for clarification or to address the court if he or she cannot interpret for any reason.

    g.    If the proceeding is longer than 30 minutes, allow the interpreter to take a break; his or her accuracy will plummet after 30 minutes. If the proceeding is longer than two hours, two interpreters should be used to relieve each other every 30 minutes.

    h.    Speak directly to the party or witness, not to the interpreter. For example, do not say, "Ask him where he was that night." The interpreter must interpret those precise words, for the non-English speaking party and it will be confusing. Instead, say, "Where were you that night?" Use the interpreter as a language source or conduit only.

    i.    Do not ask the interpreter to explain or restate anything and do not allow attorneys to ask that of an interpreter. Qualified interpreters are prohibited from explaining, giving legal advice, or changing the level, or register, of the language. They are only to interpret what is said in the way it is said.

j.  Do not ask the interpreter to refrain from interpreting any portion of the proceedings. It is unethical for him/her to do that, although he/she will if the judge orders it.

k.  If anyone challenges an interpretation, allow the interpreter the opportunity to either "stand corrected" or "stand by the interpretation." A qualified interpreter should have credibility before the court in matters of language.

**I Speak the Language.  Can't I Help?** [Florida]

1.   Judges, attorneys, and other court personnel should not function as interpreters.

2.   Judges and other court participants should speak in English at all times during proceedings.

3.   If the judge wishes to make the non-English speaking person feel at ease, he or she might address a greeting in the person's language.  In that case, an announcement should be made for the record.  For example: "Please note for the record that the court will greet the defendant in the _____ language."  The judge might then follow up, in English, with an explanation of why the court will refrain from communicating during the proceeding in that language and why the record will be in English.

# 10. Interpreters for Persons Who Are Deaf or Hard of Hearing

**Modes of Communication** [NCSC]

What people who cannot hear have in common is that they reply on "information they can see" to communicate. Beyond that, it is difficult to generalize. The preferred or most effective means of communication for deal people varies widely. The variation relates to the age at onset of hearing loss, the severity of the loss, how the person has been educated in language after the hearing loss, and, importantly, what languages or modes of communication the people in a given setting have in common.

There are several recognized methods or modes of communication used by deaf and hard of hearing individuals. These include speech reading or lip-reading; gesturing (the most primitive and limited form of communication with deaf persons); written communication, including computer-aided real-time transcription; and sign language. There are many forms of sign language, but among them, ASL appears to have the greatest inherent capacity for effective and efficient communication.

Sign language is the use of visual signs to convey information and ideas. The most advanced forms of sign language are not just manual representations of oral language; they are independent languages. When combined with facial grammar and body shifting, as in ASL, sign language conveys rich meaning, humor, pathos, and many other subtleties of communication.

Beyond the issues surrounding the complexities of any single sign language is the fact that there are many sign languages, just as there are many oral languages. The range and complexity of sign language communication make it apparent that interpreters need to be extremely knowledgeable and adept at recognizing and overcoming barriers to communication. This is what certified interpreters for deaf persons are trained to do.

ASL is a highly developed language with a structure that can be described in its own terms. The vocabulary, grammar, idioms, and syntax of ASL are completely different from English. The linguistic units and structure of ASL are comprised of facial expressions, body posture, and shapes and movements of hands, arms, eyes, and head. About 4,000 signs are used in ASL. ASL is the language of the American deaf community, and learning ASL is prerequisite for certification as an interpreter for the deaf.

Misinformation and misconceptions about ASL like the following are not uncommon among court officials who have some involvement in or knowledge of court interpretation:

> American Sign Language is not word-for-word, and should cause concern as to its use for a verbatim record [SIC].

The foregoing comment illustrates two prevalent misconceptions, the first about ASL specifically, and the second about language and interpreting generally. The first misconception is that ASL is some form of "shorthand English," rather than a language of its own. The second

is that proper interpretation between *any* two languages should always be "word for word." Despite legal language that is often phrased to the contrary, acceptable interpretation from one language to another is *often* not "word-for-word." In fact, some word-for-word translations between languages result in nonsense or, at least, in the loss or distortion of meaning. Idiomatic expressions are good examples of this. One of the specific abilities that interpreters are testing for is whether they *can conserve meaning* in such situations, rather than resorting to nonsensical or misleading word-for-word interpretations.

These misconceptions interfere with the best practices that courts should follow to facilitate communication when a deaf person is involved in court proceedings. Contrary to popular belief, a person who is fluent in ASL is more likely able to participate fully, and more efficiently, in court proceedings, than a hearing impaired person whose primary language is English and who does not also know ASL.

Several different systems of Manually Coded English (MCE) have been developed with the aim of reflecting the structure of spoken English and improving the academic achievement of deaf students in a hearing culture. MCE systems are typically used in educational settings with children rather than in social interactions among deaf adults. Other similar language systems are Seeing Essential English and Signed English.

Finger Spelling is a signing system in which each letter of the ordinary alphabet has its own sign. This principle can be applied to any language that has developed an alphabetic writing system. The main strength of finger spelling is its scope and flexibility. It is quick to learn and can then be used to sign an indefinite number of words. It is a particularly useful system for signing proper names, which are not given their own signs in other sign systems. However, it is a slow system to use, rarely exceeding 300 letters per minute (about 60 words). Moreover, it cannot be used at all unless one is able to spell (a problem for young children, who also have difficulty controlling the hand shapes required). From the receiver's point of view, it is difficult to distinguish the hand shapes at a distance. If the rate of signing speeds up in response to rapid speech, the signer will begin to omit letters, and the receiver may begin to lose comprehension. Finger Spelling is best thought of as an auxiliary signing system, a convenient bridge between spoken or written language and sign language proper.

A deaf person may or may not be able to speech read (commonly referred to as lip-reading). Under normal conditions, deaf people will be unable to comprehend most of what is being said if they rely solely on speech reading, because only 26 percent of speech is visible on the lips. Facility in speech reading also varies, as does facility in any mode of communication: given two equally intelligent people with identical training, one may be an excellent speech reader, the other poor.

Hearing impaired persons who prefer speech reading has their chosen mode of communication may require "oral interpreters." Oral interpreters are professionals who are specifically trained to present information through mouth movements only. Oral interpreters do not use sign language, instead they use clear mouth movements and rephrase words that are difficult to speech read. For example, the words "green" and "red" sound different, but they look the same on the lips. If

the words red and green appeared in the same sentence or paragraph, an oral interpreter might replace the word red with maroon, mauve, dark pink, or another synonym for red.

Written communication is a way to communicate with a deaf person, providing that the deaf person knows English (or some other oral and written language) *and can read.* (Communication by means of drawing pictures is a separate mode of communication, used most often to communicate with people who have not developed language skills.) Because English may be a second language for many deaf persons, some have limited competence in writing and reading English. Their writing style may be similar to others for whom English is a second language. In these cases, the use of concrete images and simple sentence structures is important. A deaf person will usually want important information, such as appointment dates and times, confirmed in writing.

With computer-aided transcription, a skilled court reporter keys the shorthand notes of spoken language into a stenotype machine, and the words spoken in court are concurrently translated into English text. CART systems send the shorthand output from the stenotype machine directly into a person computer that translates the shorthand instantaneously and displays it on a monitor. This makes it possible for courtroom observers to read a written version of courtroom speech while the record is being made. It also makes it possible to print the transcript at a moment's notice.

This method of communication is both efficient and effective for hearing impaired individuals who are comfortable reading English. Courts need to be vigilant, however, to avoid a misuse of CART. CART work is usually done by court reporters. If CART communicative assistance is done by the same person who is the official court reporter, special arrangements will be required for the hearing impaired person to communicate with counsel during the proceeding. The official reporter cannot both make the record and assist the deaf person. This is not a problem if a special reporter is brought in solely for the purpose of assisting the hearing impaired person.

Gesturing is far less systematic and comprehensive than is sign language. While sign language can express the same range of meaning as would be achieved by speech, gesturing is far less systematic and comprehensive. There are very few hand gestures and these are used in an ad hoc way to express a small number of basic notions.

Some deaf persons have no formalized communication system (e.g., minimally language competent individuals). They may express themselves in a variety of ways, such as gestures, pictures, pantomime, or by pointing to objects. Other deaf persons may have developed home signs to communicate with family members. These signs are generally understood only by the family members with whom the deaf person regularly interacts. When a deaf person uses home signs, a qualified family member may prove helpful, but when this is done, the family member should not be a substitute for a certified interpreter. Instead, the family member should work as part of a "relay" team under the supervision of the interpreter.

## Relay Interpreting [Oregon]

"Relay interpreting" may be needed if the disabled person has never learned standard signing or finger spelling. For example, the disabled person may communicate only with gestures. Relay interpreters have studied to become experts in communicating with gesture. If the relay interpreter is deaf or hearing- or speech-impaired, the court should appoint a second interpreter to interpret the relay interpreter's ASL into spoken English.

## Facial Grammar or Body Shifting [NCSC]

Some judges and lawyers do not understand the seemingly strange physical behavior of deaf persons as they "speak," and they restrict an interpreter's use of facial grammar or body shifting. This seriously interferes with communication during the proceeding, and facts may be lost or distorted. Such rulings limit the effectiveness of the interpreter's professional language skills, and thus limit the effectiveness of the court.

There are two categories of facial grammar (often incorrectly referred to as facial expressions). The first category refers to the messages that are conveyed by different parts of the face. The upper part of the face conveys syntax and the type of sentence that is being communicated (e.g., interrogative, declarative, imperative). The lower part of the face conveys descriptions such as adjectives and adverbs. Finally, the shifting of the head, torso, and eyes can designate subject, object, and prepositions as well as references to things present and not present. The second category of facial grammar is referred to as effective display or emotions. This is the manner in which humor, anger, sadness, or even sarcasm is communicated.

## Positioning of a Sign Language Interpreters [New Jersey]

No proceeding shall begin until the sign language interpreter has been positioned in full view of the deaf or hard of hearing person for whom he or she is interpreting.

## Certification of Interpreters for the Deaf [NCSC]

In contrast to foreign language interpretation, most states have specific laws that establish standards for qualifications of interpreters for deaf individuals. Many of these states specifically require certification of interpreters.

Standards for certification of interpreters for deaf individuals in all of the language modalities used by deaf persons are set by the National Registry of Interpreters for the Deaf (NRID). NRID certification is based on a rigorous evaluation of the candidate's interpretation skills and knowledge of the NRID Code of Ethics by a group of professional peers. The NRID certification system establishes minimum levels of achievement, representing a starting point for interpreters, varying according to certification area and level of competence. Certified interpreters are expected to continue to improve their skills by attending workshops and training seminars and through frequent use of sign language.

[Current information on NRID certification can be found at www.rid.org.]

# 11. Definitions and Terminology

[NCSC]

**Consecutive Interpreting** - is rendering statements made in a source language into statements in the target language intermittently after a pause between each completed statement in the source language. In other words, the interpreter renders an interpretation after the speaker has stopped speaking. When using this mode of interpreting, it may be necessary for the interpreter to signal a speaker to pause to permit a consecutive interpretation when the length of the utterance approaches the outer limits of the interpreter's capacity for recall. During consecutive interpreting, the interpreter should take notes to assist him/her in rendering the interpretation.

**Functions of Interpreting** - relate to the purpose or the setting in which interpreting occurs. It is important to understand the functions of interpreting because in some settings more than one interpreter will be required, depending on how many interpreting functions need to be carried out during the same proceeding. In some circumstances, two or more interpreters might be required during one trial in order to perform all of the required interpreting functions.

**Intermediary Interpreting** - involves more than one interpreter to reach people who have idiosyncratic speech characteristics or (in the case of deaf people) who employ gestures or other signing varieties beyond the understanding of the primary interpreter. Intermediary interpreting should be undertaken with a trained primary interpreter, assisted by the secondary interpreter. Secondary interpreters may be deaf people holding the Reverse Skills Certificate (RSC) awarded by the National Registry of Interpreters for the Deaf, family members or friends of the person needing special communicative assistance, and professional service providers. Intermediary interpreters must work with a primary interpreter who is a professional.

**Interpretation** - means the unrehearsed transmitting of a spoken or signed message from one language to another. Interpretation is distinguished from "translation," which relates to written language. Two modes of interpreting are used in court by qualified interpreters -- "simultaneous" and "consecutive." A third common mode is "summary" interpreting, which should not be used in court settings.

**Interview Interpreting** - is interpreting to facilitate communication in interview or consultation settings. Interview interpreting may occur in conjunction with court proceedings or before or after court proceedings. Foremost among these are interviews or consultations that take place between attorney and client (sometimes referred to as "defense" interpreting) and between a non-English speaking person and bail screening or probation personnel. Interview interpreting may be performed in either or both the simultaneous and consecutive modes during an interview, depending on the circumstances.

**Non-English Speaking Person** - Refers to any person who is unable to communicate in English or who has a limited ability to communicate in English. The term also applies when the language limitation arises due to deafness or being hard of hearing. The term generally refers to a principal party in interest or a witness in the case.

**Proceedings Interpretation** - is for a non-English speaking litigant in order to make the litigant "present" and able to participate effectively during the proceeding. This interpreting function is ordinarily performed in the simultaneous mode. The interpreter's speech is always in the foreign language, and is not part of the record of proceedings.

**Sight Interpreting** - is more commonly referred to as "sight translation".

**Sight Translation** - is a hybrid type of interpreting/translating whereby the interpreter reads a document written in one language while translating it orally into another language. It is sometimes called sight interpreting. In this mode of interpreting a written text must be rendered orally without advance notice and on sight.

**Simultaneous Interpreting** - is rendering an interpretation continuously at the same time someone is speaking. Simultaneous interpreting is intended to be heard only by the person receiving the interpretation and is usually accomplished by speaking in whispered tones or using equipment specially designed for the purpose in order to be as unobtrusive as possible.

**Source Language** - is the language of the original speaker. "Source language" is thus always a relative term, depending on who has spoken last.

**Summary Interpreting** - is paraphrasing and condensing the speaker's statement. Unlike simultaneous and consecutive interpreting, this method does not provide a precise rendering of everything that is said into the target language. This is a mode of interpreting that should not be used in court settings.

**Target Language** - is the language of the listener, the language into which the interpreter is communicating the meaning of the words spoken in the source language.

**Translation** - is converting a written text from one language into written text in another language. The source of the message being converted is always a written language.

**Witness Interpretation** - is interpretation during witness testimony for the purpose of presenting evidence to the court. This interpreting function is performed in the consecutive mode; the English language portions of the interpretation are part of the record of the proceeding. A variant of "witness" interpreting is assistance provided by the interpreter during communications between the judge or other English-speaking official on the case and a non-English-speaking defendant or civil litigant. Typical examples are communications who occur during arraignments, plea or sentencing hearings.

A-001226

## 12. Resources

[This section may be used to include state contact information, helpful websites, journal articles, and other documents.]

# 13. References

The text in this document was excerpted from the following sources:

Campbell, Hon. Nancy and Cathy Rhodes, Chapter 20: Interpreters, Oregon Revised Statutes (February 1999).

Court Interpreter Workgroup, Committee on Trial Court Performance and Accountability, Florida Judicial Management Council, A Judge's Guide to Language Interpretation in the Courts (Draft Report dated May 2001).

Goldberg, Pamela and Carol Leslie Wolchok, A Judge's Guide to Immigration Law in Criminal Proceedings, by the American Bar Association Commission on Immigration. © 2004 by the American Bar Association, and "Reprinted with permission."

Gonzalez, Roseann D., et al., Fundamentals of Court Interpretation: Theory, Policy and Practice (University of Arizona Press 1992). Excerpt reprinted with permission.

Hewitt, William E., Court Interpretation: Model Guides for Policy and Practice in the State Courts (National Center for State Courts 1995).

Minnesota Supreme Court Interpreter Advisory Committee, Best Practices Manual on Interpreters in the Minnesota State Court System (May 1999).

New Jersey Judiciary, Standards for Delivering Interpreting Services in the New Jersey Judiciary (March 2004).

Washington Judiciary, Washington Judges' Bench Book.

A-001227

## 14. Appendix A

[Insert Supreme Court Order establishing the Code of Professional Responsibility in the Judiciary.]

A-001228

**ATTACHMENT I0.2**

**Standards for Performance and Professional Responsibility for Contract Court Interpreters in the Federal Courts**

**Preamble**

> Federally certified court interpreters are highly skilled professionals who bring to the judicial process specialized language skills, impartiality, and propriety in dealing with parties, counsel, the court, and the jury. All contract court interpreters, regardless of certification, are appointed to serve the court pursuant to 28 U.S.C. § 1827. When interpreters are sworn in they become, for the duration of the assignment, officers of the court with the specific duty and responsibility of interpreting between English and the language specified. In their capacity as officers of the court, contract court interpreters are expected to follow the Standards for Performance and Professional Responsibility for Contract Court Interpreters in the Federal Courts.

**1: Accuracy and Completeness**

Interpreters shall render a complete and accurate interpretation or sight translation that preserves the level of language used without altering, omitting, or adding anything to what is stated or written, and without explanation. The obligation to preserve accuracy includes the interpreter's duty to correct any error of interpretation discovered by the interpreter during the proceeding.

**2: Representation of Qualifications**

Interpreters shall accurately and completely represent their certifications, training, and pertinent experience.

**3: Impartiality, Conflicts of Interest, and Remuneration and Gifts**

*Impartiality.* Interpreters shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias. During the course of the proceedings, interpreters shall not converse with parties, witnesses, jurors, attorneys, or with friends or relatives of any party, except in the discharge of their official functions.

*Conflicts of Interest.* Interpreters shall disclose any real or perceived conflict of interest, including any prior involvement with the case, parties, witnesses or attorneys, and shall not serve in any matter in which they have a conflict of interest.

A-001229

*Remuneration and Gifts.* Court interpreters shall accept remuneration for their service to the court only from the court. Court interpreters shall not accept any gifts, gratuities, or valuable consideration from any litigant, witness, or attorney in a case in which the interpreter is serving the court, provided, however, that when no other court interpreters are available, the court may authorize court interpreters working for the court to provide interpreting services to, and receive compensation for such services from, an attorney in the case.

### 4. Professional Demeanor

In the course of their service to the court, interpreters shall conduct themselves in a manner consistent with the dignity of the court and shall be as unobtrusive as possible.

### 5: Confidentiality

Interpreters shall protect the confidentiality of all privileged and other confidential information.

### 6: Restriction of Public Comment

Interpreters shall not publicly discuss, report, or offer an opinion concerning a matter in which they are or have been engaged, even when that information is not privileged or required by law to be confidential.

### 7: Scope of Practice

Interpreters shall limit themselves to interpreting or translating, and shall not give legal advice, express personal opinions to individuals for whom they are interpreting, or engage in any other activities which may be construed to constitute a service other than interpreting or translating while serving as an interpreter.

### 8: Assessing and Reporting Impediments to Performance

Interpreters shall assess at all times their ability to deliver their services. When interpreters have any reservation about their ability to satisfy an assignment competently, they shall immediately convey that reservation to the appropriate judicial authority.

### 9: Duty to Report Ethical Violations

Interpreters shall report to the proper judicial authority any effort to impede their compliance with any law, any provision of these Standards, or any other official policy governing court interpreting and legal translating.

A-001230

# Christopher J. Fichera, Ph.D., Sharon M. Theroux, Ph.D. & Associates, PA

Clinical Psychology      Forensic Psychology      Neuropsychology

**DEFENDANT:**      EFRAIN SANCHEZ
**D.O.B.:**      ███ 1981
**DATE OF EVALUATION:** October 20, 2004

**CASE NO:**    04-MM022384 A02

**REFERRAL:** Efrain Sanchez is a 22-year-old, Hispanic male, who is currently charged with Stalking. The Defendant was referred by the Office of the Public Defender for a confidential evaluation of his Competency to Stand Trial, and his Sanity at the Time of his Alleged Offense. The Defendant was seen for evaluation at my offices in Boca Raton, Florida.

**NOTIFICATION:** Prior to the evaluation, Mr. Sanchez was advised of the purpose of the evaluation, this examiner's status as an expert witness, the probable evaluation procedures, the limits on confidentiality, and the potential uses of the evaluation at subsequent stages of his case, including possible outcomes that might be influenced by the outcome of this evaluation. Mr. Sanchez indicated that he understood the purpose and conditions of the evaluation and agreed to participate in the evaluation.

**EVALUATION PROCEDURES:** In conducting the evaluation, the undersigned had available to him the following sources of information:

A. Criminal Justice Records/Documents Reviewed
     1. Palm Beach County Sheriff's Office Probable Cause Affidavit, August 28, 2004.
     2. Palm Beach County Sheriff's Office Witness Statement, August 28, 2004.
     3. Palm Beach County Sheriff's Office Victim Statement, August 28, 2004.

B. Records of Psychiatric Treatment/Evaluation Reviewed
     1. Defendant's Prison Health Services Mental Health Assessment, August 30, 2004.

C. Third-Party Interviews
     1. Defendant's biological mother, Juana Sanchez, October 20, 2004.
     2. Defendant's sister, Nydia Sanchez, October 25, 2004, by phone.

7100 W. Camino Real, Suite 123      Boca Raton, FL 33433      Telephone: 561-395-0243      Fax: 561-391-5054

D. Clinical Procedures
   1. Face-to-face clinical interview of Mr. Sanchez at my offices in Boca Raton, Florida, October 20, 2004.

## CLINICAL INTERVIEW SUMMARY:

*Brief Background Obtained from the Defendant:*   Efrain Sanchez is a 22-year-old, Hispanic male who was born in West Palm Beach, Florida, and who was raised by his biological parents. He is a high school graduate who is single, never married, and who has no children. He reports that he has been receiving Social Security disability benefits "since I was three years old." When asked why he was receiving benefits, he stated, "I have seizures." He presently lives in West Palm Beach, Florida with his parents, his two brothers, ages 17 and 14, and his 22-year-old sister. The Defendant had difficulty providing much additional background information, due to what appears to be limited intellectual abilities, and related verbal limitations.

*Psychiatric/Substance Abuse History:*   The Defendant reports that he has been under the care of a doctor "for seizures." He denies any history of psychiatric treatment. He also denies any history of substance abuse.

During her interview with the undersigned, the Defendant's mother, Ms. Juana Sanchez, confirmed that the Defendant has no history of psychiatric treatment. She reports that he has suffered from seizures since age 3, and has been treated by a Miami physician for this disorder at Jackson Memorial Hospital since that time.

*Circumstances of the Offense:*   According to the Probable Cause Affidavit, witness statements, and victim's statement, on August 28, 2004, the Palm Beach County Sheriff's Office responded in reference to a stalking report. The police report indicates that the responding deputy met with the alleged victim in this case, who reported that a Hispanic male, identified as the Defendant, had attempted to make contact with her at her home on that day, in spite of requests on her part that he not do so. Further, the responding deputy was informed that the Defendant had been making numerous phone calls to the house, and that for this reason the alleged victim had previously made a formal complaint requesting that the Defendant cease his activity. The Probable Cause Affidavit also indicated that the Defendant had in his possession letters written to the alleged victim that were not threatening in nature; however, they suggested an infatuation toward the alleged victim, and indicated that, "she was going to be his girlfriend in the near future." The Defendant was charged with stalking, placed under arrest, and taken into custody.

A witness statement, completed by the alleged victim's mother, indicated that the Defendant had made a number of phone calls to their house of a non-threatening nature. Further, the statement stated that the Defendant "doesn't want to hurt her. He just wants her to be his girlfriend. He calls stating that my daughter doesn't know how much he loves her."

EFRAIN SANCHEZ, Page 3 of 6

When asked about the allegations against him contained in the police report, the Defendant stated, "I don't remember." He spoke of how he and the alleged victim met at a wedding, after which they had spoken by phone several times. His elaboration of these events is somewhat confused, owing to what is believed to be limited intellectual abilities on his part. When asked if the alleged victim is his girlfriend, he responded, "If she wants to be." When asked if she wants to be his girlfriend, he responded, "Maybe." When told by this examiner that she does not want to be his girlfriend, he seemed somewhat surprised and stated, "Oh! She doesn't?"

The Defendant's mother, Juana Sanchez, was interviewed by the undersigned as part of the present evaluation. She confirmed the Defendant's report that he met the alleged victim at a wedding they attended approximately one year ago. She states that the Defendant "is slow" and has been "in slow grades at school." She states that. "When someone talks to him, he thinks they are his friend." She also stated that the Defendant told her that he went to the alleged victim's house just to see her, and that he "didn't do anything wrong."

The Defendant's sister, Nydia Sanchez, was interviewed by phone by the undersigned. Nydia, who unlike her mother speaks perfect English, reported that she is unaware of any formal IQ testing that has been completed on her brother. She confirmed that he had been in special education classes throughout his school years, and added that he needs to have things explained to him, "Because he doesn't understand a lot of the times." She states that the family told him that the alleged victim did not want him to call her, but that he did not seem to understand this. "He kept saying 'She likes me...She'll like me one day.'"

The Defendant was seen for psychiatric screening at the Palm Beach County Jail. A review of the Mental Health Assessment report from that screening indicated that the Defendant was alert, oriented to all spheres, denied auditory and visual hallucinations, and exhibited euthymic (normal) mood. The possibility of an erotomanic delusion was raised, given the Defendant's preoccupation with the alleged victim.

*Current Mental Status:* The Defendant was seen for evaluation at my offices in Boca Raton, Florida, where he presented dressed casually, but appropriately for the situation, while exhibiting average range hygiene and grooming. He was alert, coherent, and oriented to person, place, time, and situation. He appeared to have significantly limited verbal skills, and his overall presentation was consistent with an individual of below average intelligence. He correctly identified the current president as President Bush, but when asked who the president was prior to Mr. Bush, he responded "George Washington?" He could not correctly perform any portion of the Serial 7's task, was unable to calculate any of 4 simple arithmetic equations, performed poorly on 4 of 4 gross measures of abstract thinking, and was able to recall 0 of 3 items after approximately 1 ½ hours. He denied any feelings of depression, as well as denying both suicidal and homicidal thinking. He denied any recent episodes of crying, and described his sleep and appetite as being non-problematic. He denied any history, past or present, of auditory or visual hallucinations, as well as denying any history, past or present, of

A-001233

delusional thinking. No overt evidence of psychotic thinking was elicited throughout the evaluation session. He remained calm and cooperative throughout the evaluation process. Although no formal measure of intellectual functioning was administered as part of the present evaluation, it is estimated that the Defendant's intellectual ability falls within the mentally retarded range of functioning.

## COMPETENCY CRITERIA:

Mr. Sanchez was evaluated on the Competency Criteria listed in the Florida Rules of Criminal Procedure. My assessment on each factor contained within the Competency Criteria is as follows:

1. *Capacity to appreciate the charges and allegations.* Mr. Sanchez evidenced a poor understanding of the charges and allegations that he is presently facing.

2. *Capacity to appreciate the range and nature of possible penalties.* The Defendant did not appear to be able to grasp the range and nature of possible penalties in his current case, after they were explained to him by the undersigned.

3. *Capacity to understand the adversary nature of the legal process.* The Defendant demonstrated a poor understanding of the various elements that comprise the criminal legal process. He appears to have a less than adequate understanding of both the roles played by the major players in a courtroom, as well as the major concepts one needs to grasp in order to participate in the criminal process.

4. *Capacity to disclose to counsel facts pertinent to the proceedings at issue.* Due to his limited intellectual ability and corresponding limited verbal skills, the Defendant's capacity to disclose to counsel facts pertinent to the proceedings at issue is somewhat compromised. He does not appear to have the capacity to adequately monitor courtroom proceedings, challenge witnesses, and otherwise make a meaningful contribution to his own defense.

5. *Capacity to manifest appropriate courtroom behavior.* It is believed that the Defendant will most likely present in a calm and cooperative manner in any courtroom setting where he is required to appear.

6. *Capacity to testify relevantly.* The Defendant has the capacity to provide the Court with limited relevant testimony.

7. *Other relevant factors.* The Defendant does not appear to fully understand that he will lose his right to a trial and to face his accusers, if he should enter a plea of guilty, in spite of several attempts to explain this to him during the course of the evaluation.

## CONCLUSIONS REGARDING COMPETENCY

### Competency to Proceed

The Defendant performed poorly on the Competency Criteria listed in the Florida Rules of Criminal Procedure. It is the opinion of this examiner that Mr. Sanchez is **INCOMPETENT** to proceed at this time.

### Sanity at the Time of the Alleged Offense

It is believed that Mr. Sanchez has limited intellectual abilities, which may very well fall within the mentally retarded range of functioning. His capacity to fully understand the complexity of situations that he finds himself in, especially interpersonal relationships, appears to be directly compromised as a result of these intellectual limitations. Further, the question of an erotomanic delusion has been raised by a clinician who evaluated the Defendant at the Palm Beach County Jail. This is a subtype of a delusional disorder where the central theme of the delusion involves a belief that another person is in love with the individual. Although most individuals with this subtype of delusion in a clinical sample are females, it has been reported that most individuals with this subtype of delusion in forensic samples are males. Mr. Sanchez appears to have the characteristics consistent with erotomanic delusion, as it applies to the alleged victim in this case. Whether this belief on his part is the directly the result of a psychiatric problem, and/or the result of limited intellectual abilities and a corresponding tendency to misinterpret the motives and intentions of those around him, is somewhat unclear. Either way, it appears that the Defendant, for the reasons outlined above, was of the belief that his contacting the alleged victim was not something that constituted wrong or illegal behavior at the time of his alleged offense. Therefore, based on all information available for review, the sources of which are listed above, it is believed that the Defendant was **INSANE** at the time of his alleged offense.

## RECOMMENDATIONS:

Regarding the issue of competency restoration, the Defendant was not administered a formal intelligence test as part of the current evaluation. It is estimated, however, that Mr. Sanchez is likely in the mentally retarded range of functioning. To what extent he has the ability to grasp the various concepts contained within the competency criteria, is unknown at this time. If the Court so wishes, he may undergo a course of competency restoration designed to educate him on the various factors contained within the Competency Criteria, although it should be said that, based on observations made by this examiner, as well as his reported history of low intellectual functioning, it does not appear likely that he will be able to grasp some of the higher order concepts. Also, the Defendant may benefit from a short course of supportive counseling designed to

A-001235

EFRAIN SANCHEZ, Page 6 of 6

assist him in understanding the impropriety of those actions that are at the center of his current charges.

Christopher J. Fichera, Ph.D.
Licensed Psychologist
CJF/vp

Sanchez-34918-922.CF.vp

A-001236

# James D. Barnard Ph.D. P.A.
Licensed Psychologist PY0002033

P.O. Box 14246
North Palm Beach, Fl. 33408

561 625 0350

**CONFIDENTIAL**

Psychological Evaluation

| | | |
|---|---|---|
| Client | : | Efrain Sanchez |
| Date of Birth | : | ███████ |
| Date of Assessment | : | 04-04; 04-11; 04-30-2006 |
| Chronological Age | : | 25 years 07 months |
| Parents | : | Ms. Juana Sanchez |
| Address | : | ████████████ |
| Grade | : | Twelfth( ESE classes) |
| School | : | Palm Beach Lakes High |
| Referred by | : | Honorable Stephen Rapp |
| Examiner | : | James D. Barnard Ph.D. |
| Case No. | : | 06CF002827A99; 06CF000016A02 |

Background Information: This twenty-five year old male client was referred by the Honorable Stephen Rapp , Fifteenth Judicial Circuit Court, for assessment of competency to proceed with trial. The client has recently been charged with the offenses of : felony battery and battery offense dates 02-28-06). Per client report, he has an additional charge of arson which occurred in December 2005. Probable cause affidavit or Court petition delimiting that charge was not available at time of assessment.

No historical records accompanied the client at referral. Information was provided by the client. Multiple attempts to contact the client's mother were not successful. Reliability of client self-reports could not be determined. According to the client, he was born in West Palm Beach, Fl.. He has been observed to exhibit developmental delays historically, however, estimates regarding intelligence were not available at time of assessment. The client reportedly attended ESE programs and was placed in classes for pupils exhibiting learning disability. He reportedly graduated from High School with a special diploma in 2003. The client has been thought to be a client with the Agency for Persons with Disabilities.

Significant early health and developmental history has been present. The client has diagnosis of seizure disorder and is treated with anticonvulsant medications. Onset of seizure disorder was during the early childhood period. Seizures have been partially controlled. Other significant health history was not described. The client speaks English as a primary language.

The client has never been legally married and has no children. The client has not been gainfully employed on a full time basis.

The client does not have documented history of mental health evaluation and treatment. Client legal history was not known to the examiner at time of assessment.

Assessment Tools:

Wechsler Adult Intelligence Scale III
Vinéland II ( Adaptive Behavior Scales)( attempted)
Structured Interview regarding Competency Matters
Competency Assessment for Standing Trial with the Mentally Retarded
( CAST MR)
Mini Mental Status Exam
SCL 90 R ( attempted)
Client Interview


Results of evaluation:

Behavior during testing: The client was evaluated at the Palm Beach
County jail on three occasions. He approached the testing situation in a
cooperative and friendly manner. No problem behavior was exhibited.
Attention to task materials was satisfactory. It is assumed that a valid
and reliable sample of the client's true ability and performance was
obtained during assessment. The client was examined on the Medical Ward
during evaluation session two as he had experienced a seizure several
days prior to that session and was being observed and treated.


Wechsler Adult Intelligence Scale III

|  | IQ Scale Score | Confidence Interval (95%) | Interpretation |
|---|---|---|---|
| Verbal Scale Intelligence Quotient | 52 | 49-58 | Moderate Retardation Range |
| Performance Scale Intelligence Quotient | 70 | 65-79 | Borderline Range |
| Full Scale Intelligence | 56 | 53-61 | Mild Retardation Range |

Test scores change over time due to chance, error, and many other
factors. The confidence interval indicates the probable range of client
scores which can be expected when the client is retested.

Verbal IQ - Moderate Retardation Range
Performance IQ- Borderline Range
Full Scale IQ.- Mild Retardation Range


| National Percentile Rank | 0 | 25 | 50 | 75 | 100 |
|---|---|---|---|---|---|
| Verbal IQ | .1 * | | | | |
| Performance IQ | 2 * | | | | |
| Full Scale IQ | .1 * | | | | |

A-001238

| WAIS III Sub-test | Standard Score | Difference from Mean | Strength/Weakness |
|---|---|---|---|
| **Verbal sub-tests** | | | |
| Vocabulary | 1 | .67 | non-significant |
| Similarities | 1 | .67 | non-significant |
| Arithmetic | 1 | .67 | non-significant |
| Digit Span | 1 | .67 | non-significant |
| Information | 4 | 2.33 | Strength |
| Comprehension | 2 | .33 | non-significant |
| **Performance Sub-tests** | | | |
| Picture Completion | 6 | .8 | non-significant |
| Digit Symbol | 4 | 1.2 | non-significant |
| Block Design | 5 | .2 | non-significant |
| Matrix Reasoning | 5 | .2 | non-significant |
| Picture Arrangement | 6 | .8 | non-significant |

Obtained scores fall within the range of significant delay.

Below is a brief description of each subtest and abilities thought measured by the subtest.

Information: general factual knowledge and long term memory.
Digit Span: short-term auditory memory and concentration.
Vocabulary: word knowledge, verbal fluency.
Arithmetic: attention and concentration, numerical reasoning.
Comprehension: Social judgment, common sense reasoning.
Similarities: abstract reasoning, categories and relationships.

Picture Completion: alertness to essential details.
Picture Arrangement: sequential, logical thinking.
Block Design: spatial, abstract, visual problem solving.
Object Assembly: visual analysis and construction of objects
Digit Symbol: visual motor coordination, speed and concentration.
Matrix Reasoning: visual information processing and abstract reasoning.

---

WAIS III Interpretation: These scores may be interpreted as follows. The WAIS III is comprised of six subtests measuring language and verbal skills ( the Verbal Scale IQ) and five subtests measuring perceptual-motor or non-verbal problem solving ability ( the Performance Scale IQ). Individual subtest scores are interpreted using a mean of 10 and standard deviation of 3.

The Full Scale IQ may be interpreted using a mean of 100 and standard deviation of 15. Scores within the range of 90-110 are considered average. Scores more than two standard deviations below the mean ( below 70) are utilized to indicate significant delay/mental retardation.

Intelligence test scores reflect prior learning in several areas including acquired factual knowledge, on the spot problem solving, memory and attention. The obtained scores are generally good predictors of future learning and performance, however, many factors are not measured by this or other tests including motivation, curiosity, work habits, creative talents, etc..

The obtained Full Scale IQ of 56 was observed to fall within the Mild Retardation range. The obtained score falls at below the 1st. percentile rank when compared to individuals in the standardization sample and suggests that the client scored as high or higher than 1 percent of individuals in that sample. It is thought that the client's Full scale IQ might fall within the range of 53-61 in 9.5 out of ten future re-evaluations. The obtained score falls within the range of significant delay.

Analysis of sub-test scatter revealed the presence of one individual strength and no weaknesses. The Verbal Scale IQ did differ significantly from the Performance Scale IQ ( V <P )suggesting that both sets of abilities are not equally well developed. The obtained Full Scale IQ score is likely not representative of the client's actual level of functioning. The Performance Scale IQ is, perhaps, the best estimate of client functioning. The client reported not having been evaluated with the Wechsler scales recently. A test-retest or practice effect may be present on re-administrations.

---

James D. Barnard Ph.D. P.A., Evaluation - Efrain Sanchez-                    4

James D. Barnard Ph.D. Licensed Psychologist

███████████ █████████ ██ ██

Competency Assessment-   Efrain Sanchez-

Competency to Proceed: Administration of structured interview with the client suggests that he exhibits incomplete and unsatisfactory knowledge of basic legal matters and/or knowledge of skills to assist defense counsel. The client responded only partially to instruction during competency evaluation thus demonstrating limited capacity to understand and appreciate new knowledge and concepts. It is the examiner's opinion that the client is not competent to proceed with trial.

The Competency Assessment for Standing Trial with the Mentally Retarded ( CAST MR ) multiple choice screening test was administered with the client. He achieved a score of 20% on this instrument, a score comparable to samples of individuals in the standardization sample with developmental disability judged not competent to proceed with trial. The obtained score suggests limited knowledge of basic legal matters.

Client responses to structured interview questions regarding competency were as follows.

Criteria One:  Appreciation of charges: Examiner rating- Acceptable. The client was familiar with the term charge ( " you getting charged with something.. like a battery") and is aware that he had been accused of committing multiple crimes. While unable to report the proper names for many of his charges, he was able to describe the behaviors which led to his arrest and detention. For example, the client reported he faces charges including : ". trespassing, shoplifting.. caught with some tools.. fighting here.. one for burning a house". He could not define terms including felony and misdemeanor, guilt or innocence. He was not certain as to whether his charges are felony or misdemeanor charges. He was familiar with the term rights and of his important right to legal counsel during a proceeding. He could not define the term trial. The client demonstrated difficulty defining hypothetical charges and selecting the more serious of charges presented to him in pairs ( accuracy rate only 67%). He could not differentiate between armed robbery and robbery and could not define the charges of burglary , grand or petit theft, battery, etc..

Criterion Two: Appreciation of the range and nature of possible penalties: Examiner rating- Unacceptable . The client demonstrates limited awareness of the conditions and restrictions which might be imposed upon him if convicted. He was observed to overstate possible sanctions if convicted of his charges . He stated " locked up for the rest of my life". He was reassured regarding the nature of probable sanctions and advised to discuss such with his attorney as soon as possible. He was observed to be unable to provide possible sanctions for hypothetical crimes presented to him. His responses did not suggest an appreciation of the relationship between offense and penalty severity. The client was observed to be unable to define terms such as fine, appeal, bail, probation or sentence. The client does appear aware of the negative conditions associated with incarceration.

Criterion Three:  Appreciation of the adversary nature of the legal process: Examiner rating- Unacceptable . The client is aware that he is represented by legal counsel, however, he otherwise demonstrated incomplete knowledge of the roles of Court officers. He was partially aware of the advocacy role played by his attorney ( " take care of all the cases for me.. tell you the truth.. I'm not sure"}. Similarly he was unable to describe the roles of State Attorney, Judge or Jury. The client demonstrated poor retention of information presented regarding

Evaluation - EA-00124 Sanchez-

James D. Barnard Ph.D. Licensed Psychologist

the roles of Court officials. He remained unable to define the roles of State Attorney, Judge or Jury following instruction. The client did appear aware of the terms evidence and witness. He was unable to describe evidence which might exist and could be used to convict him of his charges. The client was unable to describe the process of a plea agreement or to appreciate advantages and disadvantages of a plea agreement. He demonstrated poor response to instruction in this area.

Criterion Four : Capacity to disclose to attorney pertinent facts associated with the alleged offense. Examiner rating- Questionable. The client demonstrated difficulty providing case-specific information regarding his charges. He demonstrated partial recall for several offenses in question but frequently commented " they didn't tell me that" when asked case-specific information. For example, it was initially difficult to have the client report the location of the residence he allegedly set on fire. After initial questioning , the examiner was not certain whether the client attempted to start fire to his or another individual's house. He described the date of the arson offense as " before Christmas". As regards the shoplifting charge, he reported the location as " a Goodwill store", and described merchandise allegedly taken as " clothes and stuff… TV.. it wasn't big stuff". He reported that the proprietor " caught me on camera". The client reported that one of his trespass charges occurred " at Lyons Road and Banquet Way" and that this was his " girlfriend's house". He was able to provide the name of his girlfriend ( " Vanessa Perez"). He reported being arrested at his girlfriend's house while he was attempting to knock on her door. The client appears able to recall historical information and to share ( with prompting) case-specific information.

Criterion Five : Capacity to manifest appropriate courtroom behavior. Examiner rating- Acceptable . The client appears at little or no risk for problem behavior during a legal proceeding. He was cooperative and socially appropriate during the current four hour assessment. He was not observed to exhibit problems with irritability or anger control. The client appears aware of behavioral expectations during a legal proceeding and is also aware that sanctions exist for problem behavior. He reported that he should " dress nice with tie.. behave real good" while in Court. He stated that one might get "arrested" for exhibiting inappropriate behavior in the Courtroom. He demonstrated an awareness that he should turn to his attorney for assistance if he has difficulty understanding terms, questions or events during a proceeding.

Criterion Six- Capacity to testify relevantly: Examiner rating- Questionable . The client's intellectual abilities were observed to fall within the Mild range of mental retardation. He demonstrated some difficulty with receptive and expressive language skills. Functional communication skills do appear delayed. The client does not have history of mental health evaluation and treatment. There were no problems with voice tone, eye contact, or attention. The client exhibited no signs of formal thought disorder during the evaluation ( e.g. disturbance in the form of thought or content of thought). The client would , in all probability, require assistance in the form of rehearsal, coaching and supervision in order to testify during a trial. He did not demonstrate difficulty communicating in a coherent and relevant manner.

Evaluation – Efrain Sanchez–     A-001242                      6

James D. Barnard Ph.D. Licensed Psychologist

Summary : Assessment of intelligence suggested the presence of significant delays. Adaptive behavior assessment should be performed with a knowledgeable informant. This examiner was unable to make telephone contact with the client's mother on five different occasions. Adaptive behavior skills are clearly delayed based upon preliminary client assessment, interview and observation. The client's knowledge of basic legal matters appears unsatisfactory. While ultimately a legal decision , it is the examiner's advisory opinion that the client does not appear competent to proceed with trial at present.

Mental Status Assessment- Current Mental Status

The Symptom Checklist 90- Revised was attempted with the client, however, it could not be successfully completed due to client inability to respond to items when read to him. His responses were ambiguous and tentative and frequent definition of terms was required. It did not appear that a valid profile could be obtained with the client.

Interview with the client revealed the following. He presented as an appropriately groomed male client with thin physical features. No unusual motor behavior was noted. The client was oriented as to person, place and partially to time. Store of general information appeared below average and consistent with estimated intelligence. The client's speech was soft and unelaborated but coherent, relevant and goal- directed. No looseness of association ( e.g. fragmented or disjointed speech) was apparent. The client exhibited no signs of response to hallucinations, however he did report these. Delusional thinking was observed on one occasion. He reported hearing tones( " deee") bilaterally. He reported that these tones are a " sign somebody talking about you". He further reported that the directionality of the tone ( left or right ear) indicates good or bad luck. The client reported that these experiences have occurred recently, but that they are infrequent. As this client exhibits neurological problems ( seizure disorder), more in depth assessment of reported perceptual disturbances is indicated. The client denied hearing voices. Command hallucinations were denied. When asked about visual hallucinations, the client reported he can visualize his grandmother and " see things". He stated " I thank God for all these things.. I can see everything coming to me". The client's mood was anxious and depressed and affect restricted. Mood symptoms have been present including sleep difficulty , daytime fatigue, sad or dysphoric mood and difficulty concentrating. Decreased appetite was also self-reported. The client denied suicidal ideation or overtures, past or present. The client denied violent or homicidal ideation or paranoid ideation. He did report fear for his safety while incarcerated.

The client denied anxiety symptoms. Unusual fears were not reported. Obsessive thoughts or compulsive behaviors were denied. Feelings of de-realization or de-personalization were denied. Somatic concerns have been present due to the presence of seizure disorder. Use or abuse of alcohol or controlled substances was denied.

The client reported problems with anger control and also alleged history of family dysfunction. He alleged prior exposure to domestic violence, and also alleged having been abused/neglected during the childhood period. He reported that family stressors have oftentimes been triggers for problem behavior in the home. The client further reported association with deviant peers and possible exposure to gang-related activity in the community. He expressed concern regarding his being easily influenced by peers.

Evaluation – Efrain Sanchez-      A-001243                                  7

James D. Barnard Ph.D. Licensed Psychologist

████████████    ████████████  ██ ██████

Diagnostic Impressions:

Axis I      Major Depression, Recurrent with Psychotic Features
Axis II     Rule out Mild Mental Retardation
Axis III    Seizure disorder
Axis IV     Stressors- Unemployment, current legal difficulty
            support
Axis V      GAF  35

Mental Status at the time of the offense:  An opinion as to the client's mental status at the time of an alleged offense was not requested.

Summary and Recommendations:

Based upon all of the above information it is the examiner's advisory opinion that the client is not competent to proceed with trial. The client appears to exhibit dual disability ( developmental disability and mental illness). His behavior while incarcerated in 2003 was described in jail records as " very strange and very afraid". The client appears a candidate for further mental health evaluation and treatment as well as competency restoration services ( intense instruction ). He appears restorable given appropriate training and treatment. Incompetence appears due to mental retardation and mental illness. The client-has been charged with the offenses of arson ( probable cause affidavit not available) and felony battery within the past five months. The client has thus exhibited recent violent/dangerous behavior. While competency restoration services may be available for the client in the Community ( e.g. out-patient mental health services and competency instruction), it may be more appropriate to refer the client for services via the Mentally Retarded Defendant's Program at Florida State Hospital. He could receive more comprehensive mental health evaluation while hospitalized as well as receiving competency training and instruction.

Thank you for the opportunity to see this client.

*[signature]*

James D. Barnard Ph.D.
Licensed Psychologist  PY2033

Evaluation - Efrain Sanchez-        A-001244                        8

# Thomas R. Waddell, Ph.D.
**Diplomate in Clinical Psychology**
**American Board of Professional Psychology**

### REPORT OF PSYCHOLOGICAL EVALUATION OF

Efrain Sanchez, D.O.B. 3/30█

Case No.  06-CF002827 A99
06-CF000016 A02

Criminal Division "X"

**DATE OF EVALUATION:** May 1, 2006

**PLACE OF EVALUATION:** Palm Beach County Jail, 3228 Gun Club Road, West Palm Beach, FL 33406

**DATE OF REPORT:** May 4, 2006

**REASON FOR EVALUATION:** The examiner was selected by the Agency for Persons with Disabilities to perform an evaluation to determine if Efrain Sanchez's intellectual abilities and adaptive behaviors meet the statutory definition of mental retardation. If his abilities and behaviors were found to meet that definition, a court ordered evaluation was to be performed and an expert opinion was to be rendered regarding his competency to proceed.

**IDENTIFYING AND BACKGROUND INFORMATION:** Efrain Sanchez is a 25 year old, single Hispanic man from West Palm Beach who is charged with committing arson and who is believed to also face charges for aggravated battery as a result of an incident on 2/2206 (no charging information was available to the examiner regarding the more recent charges).

**PROCEDURES EMPLOYED:**

April 25, 2006 6:05 - 6:25 PM          Telephonically interviewed Juana Sanchez and completed the majority of the Vineland Adaptive Behavior Scales, Second Edition (Vineland-II) with her serving as informant for her son, Efrain.

April 26, 2006 4:30 - 4:50 PM          Prior to the face-to-face evaluation of Mr. Sanchez, reviewed the following documents: Order appointing the Agency for Persons with Disabilities to perform this evaluation; Palm Beach County Sheriff's Office arrest/notice to appear, probable cause affidavit, supplementary investigation documents and charging information for the alleged arson offense; Palm Beach County Sheriff's Office arrest/notice to appear, and probable cause affidavit for the offenses of aggravated battery and simple battery on 2/22/06; West Palm Beach Police Department arrest/notice to appear and

Licensed Psychologist #PY4725          6502 Winding Lake Drive, Jupiter, FL 33458-3788          (561) 741-0654   Fax 741-0650

**Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30▮**
**May 1, 2006**

probable cause affidavit for the offenses of loitering and prowling, carrying a concealed weapon, possession of burglary tools and "criminal attempt/burglary" (those charges are believed no longer to exist); A follow-up evaluation document from neurologist Merredith R. Lowe, M.D. dated 3/22/04; two pages of Palm Beach County School records; Report of an evaluation by Timothy Tavis, Ph.D. dated 5/24/05; Report of an evaluation by Christopher Fichera, Ph.D. dated 10/20/04.

May 1, 2006 9:35 AM - 3:50 PM          Interviewed Efrain Sanchez and administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III) and completed administration of the Vineland-II; Accomplished preliminary scoring of the WAIS-III and the Vineland-II; Conducted additional interview of Mr. Sanchez and administered the Revised - Competence To Stand Trial Assessment Instrument; Reviewed Mr. Sanchez's jail medical records.

May 4, 2006 12:30 - 3:45 PM          Completed test scoring and prepared the evaluation report.

**BEHAVIORAL OBSERVATIONS DURING INTERVIEW AND TESTING:** Mr. Sanchez was seen in the interview room on unit West 4 of the main jail. He responded to the examiner's greeting in a cooperative and socially appropriate manner. His mood appeared free from significant distress. His affect was slightly blunted but most of the time was congruent with his mood and the content of his speech. Toward the conclusion of the evaluation, Mr. Sanchez exhibited some smiling that did not really fit the situation. That "inappropriate affect" most likely reflected "nervous grinning" due to difficulty he experienced communicating with the examiner and did not truly resemble a symptom of severe mental illness. While his thinking did not appear disorganized in a manner similar to a formal thought disorder (like that observed among schizophrenics), he did exhibit awkward and disjointed communication which is likely to result from weak language skills. He also exhibited weak concentration and memory ability. Mr. Sanchez denied any unusual beliefs or experiences. He never showed any sign of responding to internal stimulation (i.e. auditory hallucinations).

At the beginning of the evaluation, a notification form for the evaluation of competency to proceed was reviewed with Mr. Sanchez by reading it to him and periodically pausing to invite questions. He appeared to understand and cooperatively signed the notification form to document that the notification had been performed.

Intermittently throughout the evaluation the examiner entertained questions about the adequacy of Mr. Sanchez's motivation. He exhibited unusually long latencies before responding to questions or tasks. His participating in most of the evaluation with his arms at least partially pulled into his blue uniform might have been a response an expression of a passively non-cooperative attitude but more likely was a response to the objectively cool temperature of the interview room. Ultimately, the poor quality of his performance seemed to reflect limitations in his abilities, rather than inadequate effort. The longer than usual time required to complete the evaluation was a direct product of the slowness of his thought processes.

P.03          15:53          May 4 '06          Fax:561-741-0650          Thomas R Waddell,PhD

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30█
May 1, 2006

**ADDITIONAL HISTORY AND INTERVIEW:** Mr. Sanchez reported that he is a native of West Palm Beach. When telephonically interviewed, Juana Sanchez reported that her son had been in "SLD" classes in school (which she believed referred to his exhibiting a "slow learning disability"). Documents cited in the evaluation performed by Dr. Timothy Tavis in May, 2005 (a 1995 psycho-educational evaluation and a 2002 Individual Education Plan), indicated that Mr. Sanchez was in Educable Mentally Handicapped special education classes. Those documents indicate that instead of exhibiting a specific leaning disability, the defendant had been determined to be mentally retarded. A Palm Beach County School District computer printout document which was among the records provided to the examiner indicated that Mr. Sanchez received a "special diploma" on 6/03/03 (when he would have been 22 years of age).

Juana Sanchez reported that her son has exhibited a seizure disorder since the age of three or four. A record of a "follow-up evaluation" by neurologist Merredith R. Lowe, M.D. Dated 3/22/04 reported that he was discontinued from participation in a medical trial of an anticonvulsant drug called Talampanel in February, 2004, and was placed on a regimen of Keppra, 2000 mg/day and Topamax, 200 mg/day (both are anticonvulsants). Although Mr. Sanchez reported that he felt "well" on the latter medication, he experienced seizures both before and following the change in medication. Records reviewed in Mr. Sanchez's jail medical file, including reports of an MRI and EEG, consistently showed abnormal brain findings and are consistent with his exhibiting a "focal left temporal seizure disorder". The report of a consultation with neurologist Allen Bezner, M.D. noted the poor quality of the historical information provided by the defendant and his exhibiting "some difficulty communicating, even in Spanish".

While incarcerated in August, 2004, Mr. Sanchez was unable to report the medication he was taking and stated that "his mother takes care of this". In December, 2004 and again in February 2005, he experienced seizures in the jail. He was found in his cell on 2/24/05, slumped forward. When aroused, he initially spoke only in Spanish but after five minutes or so was able to converse in English. That account is consistent with the "post-ictal confusion" that is typically observed immediately following a convulsive or gran-mal seizure.

Records indicated that Mr. Sanchez's being placed on a mental health observation unit when he was incarcerated last December was the result of a court order requiring that he undergo a mental health assessment (apparently in response to the nature of the offense for which he was arrested, his history of impaired mental ability and emotional distress which he exhibited at the time of his arrest). The evaluation performed by jail psychologist Michael Purcell, Ph.D. failed to elicit any history or symptoms of mental illness but found "probable presence of mental retardation". Mr. Sanchez was transferred from the more acute mental health observation unit (South 3D) to a less acute unit (South 2A) and remained there until 2/23/06 when the incident occurred leading to his recent battery charges. Since he never exhibited any signs of mental illness throughout the two months of observation, he was then transferred back to a general population unit. At the time of this evaluation Mr. Sanchez continued to receive treatment with anticonvulsant medication.

Thomas R Waddell, PhD    Fax:561-741-0650                May 4 '06    15:54    P.04

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30/█
May 1, 2006

**Defendant's Experience in Legal Matters:** In addition to his present charges, records shared with the examiner included the report of an arrest on 11/27/04 for loitering and prowling, carrying a concealed weapon, possession of burglary tools and criminal attempt/burglary. The resolution of those charges is not known.

## RESULTS OF FORMAL ASSESSMENT:

Part of the assessment of Mr. Sanchez's competency to proceed involved direct questioning regarding the criteria for competence to proceed employing the Revised - Competence To Stand Trial Assessment Instrument. This is a revised version of a semi-structured interview which was created by A. L. McGarry and Associates at the Laboratory of Community Psychiatry, Harvard Medical School under the auspices of a grant from the National Institute of Mental Health. The results of that interview will be discussed, as appropriate, when reviewing the evaluation conclusions.

In the reporting of the assessment of the factors related to competency to proceed, the rating of "clearly competent" means that no obvious deficits were found to exist. "Borderline competent" means that the defendant lacks some knowledge or skills. "Borderline incompetent" means that the defendant lacks significant knowledge or skills. "Clearly incompetent" means that the defendant's mental disability greatly or severely impairs his capacity.

**Summary of the Results of Psycho-diagnostic Assessment:**

WAIS-III IQs

|  | Score | Category | %-tile |
|---|---|---|---|
| Verbal IQ | 59 | Extremely Low | <1 |
| Performance IQ | 74 | Borderline | 4 |
| Full Scale IQ | 62 | Extremely Low | 1 |

WAIS-III Subtest Scaled Scores*

| | | | |
|---|---|---|---|
| Vocabulary | 2 | Picture Completion | 8 |
| Similarities | 3 | Digit Symbol-Coding | 4 |
| Arithmetic | 3 | Block Design | 6 |
| Digit Span | 2 | Matrix Reasoning | 5 |
| Information | 4 | Picture Arrangement | 6 |
| Comprehension | 3 | | |

*Scaled Scores have a mean of 10 and a standard deviation of 3

Mr. Sanchez earned a Full Scale WAIS-III IQ of 62 which places his intelligence in the Extremely Low range and at about the 1st percentile. Although there is a significant discrepancy between Mr. Sanchez's Verbal and Performance (i.e. non-verbal) IQs, the subtest scores which contribute to each of those IQs are normally similar. That consistency supports

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30/█
May 1, 2006

the conclusion that this is a long-standing pattern of abilities and is unlikely to reflect a recent decline in abilities from a previously higher level due to some form of pathology. Potential explanations for Mr. Sanchez's comparatively weak language skills include the fact of English being a second language for him, his family's being immigrants and the family's socioeconomic/educational background. The fact that the neurological site from which Mr. Sanchez's seizures arise is the area which mediates language abilities may also be a contributing issue.

Mr. Sanchez earned a Vineland-II Adaptive Behavior Composite score of 44, which implies overall adaptive behaviors even lower than would have been predicted from his IQ scores. He obtained standard scores of 29, 57 and 48 in the domains of communication, daily living skills and socialization, respectively. The weak communication domain scores once again reflects his weak verbal ability in both the oral and visual communication channels and in both receptive and expressive modalities. His daily living skills are comparable to his overall IQ and reflect his reasonably competent personal hygiene and domestic behaviors. His weak socialization domain score reflects significant social isolation. This is largely the result of his disinclination to venture out of the home by himself for fear that he may have a seizure in a public situation when no one is there to help him.

Because of concerns about the adequacy of Mr. Sanchez's motivation (particularly during the early stages of the evaluation), the examiner elected to administer the Dot Counting Test. The Dot Counting Test consists of measuring the time that it takes the subject to count the number of grouped or ungrouped dots on cards which are placed in front of him. Especially when embedded in the administration of a procedure such as the WAIS-III (as was the case during this evaluation), that task is intended to be seen by the subject as one more measure of his mental ability. In fact, the task is so simple that it is comparatively insensitive to strength or weakness of mental ability, even among persons whose abilities are moderately impaired by mental illness or brain disorder. Slower than usual performance, especially when counting dots which are in grouped formations which renders the task even easier, is indicative of low motivation or an attempt to appear disabled. An Error-Score is computed which reflects a summation of the average number of seconds to count the groups of grouped and ungrouped dots, plus the number of incorrect responses. Adequately-motivated, non-clinical subjects should earn an E-score of less than 14. Adequately motivated subjects who exhibit a learning disability are expected to earn a score of less than 15. Adequately-motivated schizophrenic and head-injured subjects should earn an E-score below 20. Adequately motivated subjects who have suffered a stroke or who exhibit mild dementia should obtain an E-score below 22.

The populations on which the Dot Counting Test was standardized did not include subjects who are mentally retarded. Extrapolating from the "cut-offs" for the populations cited above, the examiner interprets Mr. Sanchez's score of 15 as indicative of adequate motivation.

EVALUATION CONCLUSIONS: The levels of ability and functioning documented in the scores above meet the definition of mental retardation as defined in Florida

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30█
May 1, 2006

Statutes Sections 393.063(41) and 916.106(8).

Before reviewing Mr. Sanchez's capacities in the specific areas which contribute to competency to proceed, the following more general conclusions are provided: Mr. Sanchez exhibits weakness in his communication skills that are felt to be even more severe than is implied by his IQ scores. The neurological condition which is responsible for his convulsive seizure disorder is understood to largely, if not entirely, reside in the area of the brain which mediates verbal functioning. The ability impairment which results from a convulsive seizure disorder is not confined to the discrete episodes in which seizures occur. There are additional, less obvious episodes of compromised ability which particularly include loss of ability to maintain mental focus. All of these factors are believed to have contributed to Mr. Sanchez's limited retention of the examiner's instruction regarding competency issues.

In addition to the effects of neuropsychological symptoms on Mr. Sanchez's competency to proceed, the court's attention is called to the phenomena of "temporal lobe epilepsy" and "psychomotor seizures". Although this is a matter that is controversial (which some might attribute to its abuse by defense attorneys), a significant scientific literature exists concerning the commission of antisocial and illegal acts which are the product of a seizure disorder arising from the anterior temporal lobe of the brain. These acts tend to be more spontaneous than planned and to be simple and brief, rather than complex and extended in duration. The examiner has no specific information on which to base an assertion that either of the alleged acts leading to Mr. Sanchez's charges are the product of temporal lobe epilepsy. Nevertheless, the focus (or neurological point of origin) of his seizures (which is well documented in his medical records) coincides with the brain region that is associated with so called psychomotor seizures. To the degree that either of those behavioral episodes "came out of left field" or seem otherwise difficult to explain, resemblance to this neurological pathology would be increased.

Regarding the capacities which contribute to competency to proceed:

(a)     From his responses on the Revised - Competence To Stand Trial Assessment Instrument, Mr. Sanchez's capacity to understand the meaning of the charges against him is rated as borderline competent, at best. He understands that he is charged with "burning the inside of a house". When asked about additional charges, he answered "for stealing". When asked if he has charges from something that happened at the jail, he replied "for fighting". He appropriately described his charges as serious. His dependably understanding or using terms including arson, aggravated battery, felony and misdemeanor is uncertain.

(b)     Based upon his responses to interview questioning, Mr. Sanchez's capacity to understand the range and nature of possible penalties that may be imposed in the proceedings against him is rated as borderline incompetent. Although he showed a marginal and simplistic understanding of some sanctions that are associated with being on probation, that understanding was imperfect (e.g. he expressed the belief that cutting grass at his parents' home might constitute community service). Were he to be placed on probation, the examiner concludes that he would be at risk for violating its terms due to failure to

**Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30/█**
**May 1, 2006**

adequately grasp and retain the meaning of those sanctions. Neither before or following instruction was he able to adequately state the more severe penalties which could be imposed.

(c) Assessment of capacity to understand the adversary nature of the legal process includes rating of understanding of the roles of court participants and understanding of court procedures. Based upon his structured interview responses, Mr. Sanchez's capacity is rated as clearly incompetent. Although occasionally he provided adequate responses to questions on this topic, more frequently (both before and following instruction by the examiner) his responses were pathetically inadequate. When re-questioned about the meaning of a plea of Not Guilty, he answered "You're guilty". When re-questioned about the role of the jury, he answered "What's a jury?" When re-questioned about what a witness does, he said "Gives you advice". A strong case can be made for concluding that adequately understanding legal processes and procedures is beyond Mr. Sanchez's capacity.

(d) Based upon the account provided by the defendant of the events leading to the charges against him and the examiner's understanding of the quality of his psychological functioning, Mr. Sanchez's capacity to disclose to counsel facts pertinent to the proceedings at issue is rated as borderline incompetent. While some of the accounts provided by Mr. Sanchez suggests that he recalls the events leading to his charges, there were significant elements of those accounts which were implausible and/or irrelevant. The examiner is left with doubts about both the adequacy of Mr. Sanchez's recall and the adequacy of his ability to express what he recalls. The weakness of his intelligence and memory ability contribute to this conclusion.

(e) From his behavior during this evaluation and his responses to questioning about the requirements of courtroom decorum, Mr. Sanchez's capacity to manifest appropriate courtroom behavior is rated as borderline competent. Mr. Sanchez never behaved in an overtly improper manner during more than five hours of face-to-face evaluation, nor does the examiner foresee significant risk of his deliberately behaving disruptively. Nevertheless, his capacity is rated as less than clearly competent due to doubt about his ability to adequately monitor and control his behavior during a trial. While it would not be a matter for which he would truly be responsible and while the likelihood is statistically remote, his having a seizure in court is a remote possibility (because that problem has never been well controlled by his medication). If Mr. Sanchez had a seizure in court, the affect would be highly disruptive.

(f) From the nature of his responses to all kinds of questions which were presented during this evaluation, Mr. Sanchez's capacity to testify relevantly is rated as borderline incompetent. Mr. Sanchez's responses during this evaluation were so slow, so labored and so variable in their quality that it is difficult to imagine him being able to adequately testify in his own behalf.

The following additional factors are deemed relevant by the examiner to determination of Mr. Sanchez's competency to proceed:

A-001251

7

**Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30█**
**May 1, 2006**

(g)    From his responses to structured interview and the manner in which he related to the examiner, Mr. Sanchez's capacity to sufficiently trust, and rationally cooperate with, his attorney is rated as clearly competent. The manner in which Mr. Sanchez related to the examiner and all of his statements about his attorney (to whom he referred as "Jennifer") implied adequate capacity to trust and cooperate with defense counsel.

(h)    A defendant's capacity to assist his attorney in planning a defense includes the capacities to appreciate available defenses, to appraise likely outcome and to participate in planning of legal strategy (including consideration of any potential plea agreement). From his responses to the Revised - Competence To Stand Trial Assessment Instrument and the examiner's assessment of his mental abilities, Mr. Sanchez's capacity is rated as clearly incompetent. When first asked to explain the meaning of a plea bargain or plea agreement, Mr. Sanchez replied "I've heard of it". When re-questioned about half an hour following instruction by the examiner, he failed to utter a response at all. His mental abilities, especially his weak verbal skills are regarded as thoroughly insufficient to enable him to rationally weigh the merits of defense alternatives.

(i)    From his responses to structured interview and the cognitive capacities demonstrated throughout this evaluation, Mr. Sanchez's capacity to realistically challenge prosecution witnesses is rated as clearly incompetent. His weak verbal abilities and limited capacity to sustain concentration are likely to prevent him from adequately monitoring prosecution witness testimony. Even if he could learn and remember the role he should play in advising defense counsel, should false or biased testimony be given, the trustworthiness of his promptly speaking to defense counsel is limited.

(j)    From his responses to structured interview and the attitude and manner exhibited during this evaluation, Mr. Sanchez's motivation to help himself in the legal process is rated as borderline competent. Rating Mr. Sanchez's capacity in this area is very difficult because of his apparent passivity and the limited degree to which he has exercised any significant control over the course of his life. His attempts to defend himself against his alleged charges during conversations with the examiner imply motivation to minimize the imposition of sanctions by the court. Nevertheless, his thinking and judgement is of such poor quality that his motivation to actively contribute to his legal defense cannot be rated as high as clearly competent.

(k)    Mr. Sanchez's capacity to cope with the stress of incarceration prior to trial is rated as clearly competent. The examiner found no basis for concluding that the integrity of Mr. Sanchez's psychological functioning has been eroded or threatened by the effects of his confinement.

In summary, Mr. Sanchez's capacity is rated as clearly competent in the areas of:

- Quality of relating to defense counsel
- Capacity to cope with the stress of incarceration while awaiting trial

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30█
May 1, 2006

Mr. Sanchez's capacity is rated as borderline competent in the areas of:

- Appreciation of charges
- Capacity to manifest appropriate courtroom behavior
- Motivation to help self in the legal process

Mr. Sanchez's capacity is rated as borderline incompetent in the areas of:

- Appreciation of range and nature of possible penalties
- Capacity to disclose to counsel pertinent facts
- Capacity to testify relevantly

Mr. Sanchez's capacity is rated as clearly incompetent in the areas of:

- Understanding of the legal process
- Capacity to assist in planning legal defense
- Capacity to realistically challenge prosecution witnesses

## OPINION REGARDING COMPETENCY TO PROCEED:

Competency to proceed is a legal concept with legal definitions. Some courts, however, desire that an opinion be expressed on this issue by the expert. If this is the case, it is the examiner's opinion that Mr. Sanchez is not competent to proceed. It is the examiner's opinion that Mr. Sanchez's incompetence is primarily the product of his mental retardation.

## OPINION REGARDING RESTORABILITY:

Mr. Sanchez's abilities are not so weak that the examiner would conclude that he cannot attain competence, but his abilities are sufficiently weak that the likelihood of success is low. Any potential for success will require competency training that is extended (perhaps a year in duration) and intensive (in residential placement).

## OPINION REGARDING CRITERIA FOR INVOLUNTARY PLACEMENT:

Concluding whether the criteria for involuntary placement in a hospital or residential facility for treatment or training is met is a close or difficult call for two reasons. First, the examiner is unaware of how available Mr. Sanchez's family may be to resume supporting him. If they are not, the examiner confidently concludes that he would be at risk for suffering from neglect which threatens harm to his well-being, were he to be released from custody.

Even if the Sanchez family is prepared to resume caring from their son, the nature of the act of which he is accused (his arson charge) implies that he poses a threat to himself or others. While it is not concluded that he presently harbors suicidal or homicidal motivation or intent, his judgement and impulse control appear so faulty that his causing seriously

Thomas R Waddell ,PhD    Fax:561-741-0650    May 4 '06    15:58    P.10

Mental Retardation and Competency Evaluation of Efrain Sanchez, D.O.B. 3/30/█
May 1, 2006

bodily harm to himself or others in an impulsive act is foreseeable and consistent with his behavior when most recently at liberty.  His alleged behavior while incarcerated (leading to the apparent aggravated battery charge) and even his prior behavior (leading to allegations of stalking associated with a possible erotomanic delusion) further contribute bases for this conclusion.

Thomas R. Waddell, Ph.D.
Licensed Psychologist
Diplomate in Clinical Psychology
American Board of Professional Psychology

Report Distribution:

Original        Ms. Wyllner, Agency for Persons with Disabilities

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT,
IN AND FOR PALM BEACH COUNTY, FLORIDA.
CRIMINAL DIVISION "X"

CASE NO. 06CF002827A09,
06CF000016A02
04CF014555A02

STATE OF FLORIDA,

VS.

EFRAIN SANCHEZ,

_____ Defendant/

### ORDER ADJUDGING DEFENDANT INCOMPETENT
### TO PROCEED  (DUE TO RETARDATION) AND
### COMMITMENT TO DEPARTMENT OF CHILDREN AND FAMILIES

THIS CAUSE having come to be heard before the Court, and the question of the competency of the Defendant in this case to proceed having been raised in accordance with the provisions of Rule 3.210(b), Fla. R. Crim. P. and §916.3012(1), Fla. Stat., the Court appointed doctors james d. barnard to examine the Defendant and to report to the Court on whether the Defendant's mental condition is mental retardation or autism, and whether the Defendant is competent to proceed and, if not, report on any recommended training for the Defendant to attain competence to proceed.  The Court having received:

_____ the written reports

_____ the oral testimony

in relation to the issue of the Defendant's competency to proceed and need for training, it is

ORDERED AND ADJUDGED that

1.    The Defendant is mentally retarded or autistic.

2.    Because of the mental retardation or autism, the Defendant is incompetent to proceed with the trial of the case, pre-trial hearings, entry of a plea, violation of probation or community

A-001255

ORDER ADJUDGING DEFENDANT INCOMPETENT TO PROCEED (RETARDATION)
Page 2

control proceedings, sentencing, hearings on issues regarding a defendant's failure to comply with court orders or conditions, or other matters where the mental competence of the defendant is necessary.

3. The Defendant meets the criteria for involuntary commitment to a treatment facility of the Department of Children and Families as provided in §916.302, Fla. Stat. in that:

    a. the defendant is retarded or autistic;

    b. there is a substantial likelihood that in the near future the defendant will inflict serious bodily harm on himself or herself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm;

    c. all available, less restrictive alternatives, including services provided in the community residential facilities or other community settings, which would offer an opportunity for improvement of the condition have been judged inappropriate; and

    d. there is a substantial probability that the retardation or autism causing the defendant's incompetence will respond to training and the defendant will regain competency in the reasonably foreseeable future.

4. The defendant is hereby committed to the Department of Children and Families to be placed in a forensic facility for those with retardation with the goal of attaining competency to proceed.

5. The Clerk of the Court is directed to forthwith forward a certified copy of this order along with copies of any written reports submitted to this Court by experts appointed by the Court relating to the issues of competency and need for training; copies of any other psychiatric, psychological or social work reports submitted to the court relative to the mental state of the

A-001256

ORDER ADJUDGING DEFENDANT INCOMPETENT TO PROCEED (RETARDATION)
Page 3

defendant; and a copy of the charging instrument and all supporting affidavits or other documents

used in the determination of probable case to:

> The Mentally Retarded Defendant Program
> Florida State Hospital
> Attention: Residential Services Director
> P. O. Box 1000
> Chattahoochee, Florida 32324

5.      Upon notification of an available bed space by the Department of Children and

Families, the Sheriff of Palm Beach County shall, on the date specified, forthwith transport and

deliver the Defendant to a treatment facility designated by the Department, together with a certified

copy of this Order and the other documentation outlined in Paragraph 4 above.  The defendant shall

be transported to the designated treatment facility within 15 days from the date that the Department

receives the completed copy of the commitment order containing the documentation required by

Rule 3.212, Fla. R. Crim. P.

6.      The Department, through the Administrator of the facility to which the Defendant is

admitted, shall report directly to this Court, initially within six (6) months of the date of admission

(or commitment) with copies to the attorneys for the State and Defense on the issues of competency

to proceed and the need for continued commitment as provided in Rules 3.202(2)(a) and 3.212, Fla.

R. Crim. P.  After the initial report, reports shall be submitted on a yearly basis.

7.      If the Department believes that the Defendant no longer meets the criteria for

commitment, it shall, through the Administrator of the facility, report directly to this Court with

copies to the attorneys for the State and Defense on the issues of discontinuing involuntary

commitment. The Department shall provide a release plan to the Court within twenty-one (21) days.

The Court will set a status check within thirty (30) days of the filling of this report.

8.      Should the facility need to take the Defendant off of the hospital grounds, the

defendant must be accompanied at all times by facility staff as approved by DCF.

A-001257

ORDER ADJUDGING DEFENDANT INCOMPETENT TO PROCEED (RETARDATION)
Page 4

9.     In the event the Defendant's presence is required at any hearings in this cause, this Court shall issue an Order to Transport, directing the Sheriff of Palm Beach County, or his designee to resume custody of and transport the Defendant back to the jurisdiction of this Court.

10.    This Court retains jurisdiction in this cause, and the Defendant shall not be released from commitment without further Order of this Court, as provided in §916.3025, Fla. Stat. The defendant may not be transferred from a secure facility except as provided in §916.302(2)(c) & (d), Fla. Stat.

DONE AND ORDERED at Palm Beach County, Florida, this 11 day of April, 2006.

_____
STEPHEN A. RAPP
CIRCUIT COURT JUDGE

Copies furnished to:
    STEPHEN P. SMITH, Office of the State Attorney, Division "X"
    JENNIFER MARSHALL, Office of the Public Defender, Division "X"

    Developmental Services Program
    William Shea, Administrator
    111 S. Sapodilla Ave.
    West Palm Beach, FL 33401

    Office of the Palm Beach County Sheriff

A-001258



**University of Miami**
**Health Services**

Date: _5/18/05_

Attached please find the records requested on _Efrain Sanchez_.

Fee for requesting records is as follow: $1.00 per page up to 25 pages; thereafter it is $0.25 per page.

No. of pages $1.00 ea:      _25_
No. of pages $0.25 ea:      _52_
Total Amount:               _$38.00_

Make checks payable to UMDC-Neurology:
International Center for Epilepsy
University of Miami
Professional Arts Center
1150 N.W. 14th Street Suite #410
Miami, Fl. 33136-2115

If fee has already been submitted, please disregard this notice.

If you need additional information, please feel free to contact us at (305)243-5944.

International Center For Epilepsy
Department of Neurology (D4-5)
1150 N.W. 14th St., Suite 410
Miami, Florida 33136
A-001259
305-243-5944

# iCON
### ON Laboratories, Inc.

Printe: Mar 31, 2004 09:38:50

☐ 123 Sm.. Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business :
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE: 1**

**PROTOCOL #:** IXL-201F-14-187

**SUBJECT VISIT #:** FOLLOW-UP

| SITE # | | INVESTIGATOR | | | COLLECTION DATE/TIME | RECEIVED DATE/TIME | REPORT DATE/TIME |
|---|---|---|---|---|---|---|---|
| 334 | # 334 | TEL (305) 243-5944 | FAX (305) 243-7648 | | 23-Mar-2004 10:27:30 | 25-Mar-2004 07:35:03 | 29-Mar-2004 10:24:00 |

**SUBJECT**

| # | INITIALS | SEX | BIRTHDATE |
|---|---|---|---|
| 0102 | E-S | M | 1981 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannea McJulton
University Of Miami School Of Medicine

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| R354242 | 40021508 | |

**LAB USE ONLY**

PB: 102737.187

COMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ADDITIONAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

**ADDITIONAL VISIT INFORMATION**

Last Study Med: 20:00
Time of AED #1: 08:15
Time of AED #2: 08:15

--- HEMATOLOGY ---

| | | | | |
|---|---|---|---|---|
| HB | 15.4 | | g/dL | 13.2-17.0 |
| HT | 46.0 | | % | 40.0-54.0 |
| RC | 5.13 | | x10^12/L | 4.20-5.80 |
| MV | 89.6 | | fL | 80.0-98.0 |
| CH | 29.7 | | pg | 27.0-33.0 |
| CHC | 33.4 | | g/dL | 32.0-36.0 |
| WC | 4.72 | | x10^9/L | 3.50-11.10 |
| PLATELETS | 226 | | x10^9/L | 150-400 |
| NEUTROPHILS | 44.9 | | % | 40.0-74.0 |
| LYMPHOCYTES | 39.7 | | % | 19.0-48.0 |
| MONOCYTES | 6.6 | | % | 3.4-9.0 |
| EOSINOPHILS | | 7.7 | % | .0-7.0 |
| BASOPHILS | 1.1 | | % | .0-1.5 |
| ABS NEUTROPHILS | 2 12 | | x10^9/L | 1.80-7.00 |
| ABS LYMPHOCYTES | 1.88 | | x10^9/L | 1.20-4.00 |
| ABS MONOCYTES | 0.31 | | x10^9/L | .00-.80 |
| ABS EOSINOPHILS | 0.36 | | x10^9/L | .00-.50 |
| ABS BASOPHILS | 0.05 | | x10^9/L | .00-.20 |

--- CHEMISTRY ---

| | | | | |
|---|---|---|---|---|
| SODIUM | 141 | | mEq/L | 134-146 |
| POTASSIUM | | 3.5 | mEq/L | 3.6-5.2 |
| BICARBONATE | 31 | | mEq/L | 20-31 |
| CHLORIDE | 106 | | mEq/L | 95-112 |
| TOTAL BILIRUBIN | 0.4 | | mg/dL | .0-1.1 |
| TOTAL PROTEIN | 7.0 | | g/dL | 6.1-7.9 |
| ALKALINE PHOSPHATASE | 111 | | U/L | 40-135 |
| Gamma GT | 13 | | U/L | 0-51 |
| ALT | 34 | | U/L | 0-47 |
| AST | 24 | | U/L | 0-37 |

A-001260

Jak Albukerk, MD FCAP
Laboratory Director

**icon**

**ON Laboratories, Inc.**

Prints  her 31. 2004 09:22:50

☐ 123 Sm.. .treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ,
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE:   2

| PROTOCOL # | IXL-201F-14-189 |
| --- | --- |
| SUBJECT VISIT # | FOLLOW-UP |

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
| --- | --- | --- | --- | --- | --- | --- |
| 3346 | # 3346 | TEL (305) 243-5744 | FAX (305) 243-7688 | 22-MAR-2004  10 22 UP | 23-MAR-2004 07:35:03 | 29-MAR-2004  10:24:00 |

| | | S U B J E C T | | |
| --- | --- | --- | --- | --- |
| # | INITIALS | SEX | | BIRTHDATE |
| 6182 | E-S | M | | |

| ACCESSION # | LABORATORY # | SCREEN # |
| --- | --- | --- |
| B354242 | 40021508 | |

| LAB USE ONLY |
| --- |
| PB: 102737.188 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannae McJilton
University Of Miami School Of Medicine
1150 NW 14 Street, Suite 410
Miami, FL 32136

COMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
| --- | --- | --- | --- | --- | --- |
| CREATININE | 0.8 | | mg/dL | .6- | 1.4 |
| URIC ACID | 4.2 | | mg/dL | 3.1- | 8.8 |
| PHOSPHATE | 3 0 | | mg/dL | 2.4- | 4.9 |
| CALCIUM | 9.0 | | mg/dL | 8.4- | 10.2 |
| GLUCOSE, RANDOM, SERUM | 74 | | mg/dL | 70- | 141 |
| PROTEIN | 4.6 | | g/dL | 3.7- | 4.9 |
| CHOLESTEROL, TOTAL | 100 | | mg/dL | LESS THAN 200 | |
| UREA (BUN) | 9 | | mg/dL | 9- | 24 |

--- URINALYSIS ---

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| SPECIFIC GRAVITY | 1.005 | | | 1.005- | 1.030 |
| pH | 7.0 | | | 5.0- | 8.0 |
| PROTEIN URINE | NEGATIVE | | mg/dL | NEGATIVE | |
| GLUCOSE URINE | NORMAL | | mg/dL | NORMAL | |
| KETONES | NEGATIVE | | | NEGATIVE | |
| BILIRUBIN | NEGATIVE | | | NEGATIVE | |
| UROBILINOGEN | NORMAL | | mg/dL | NORMAL | |
| BLOOD | NEGATIVE | | | NEGATIVE | |
| NITRITE | NEGATIVE | | | NEGATIVE | |

--- AED SAMPLES ---

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| Levetiracetam [1] | | | 47 ug/mL | 3- | 37 |
| Zonisamide [1] | 6.9 | | ug/mL | Peak: 4.4 - 9.2 | |
| | | | | Trough: 4.4 - 6.6 | |
| ( | 171 | | U/L | 24- | 195 |

REFERRAL LABORATORIES

[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY          CLINICALLY SIG. ETIOL.   COMMENT

--HEMATOLOGY
EOSINOPHILS          7.7          ___ YES   / NO   _____
--CHEMISTRY
POTASSIUM            3.5          ___ YES   / NO   _____
--AED SAMPLES
Levetiracetam [1]    47           ___ YES   / NO   _____

A-001261

Jak Albukerk, MD FCAP
Laboratory Director

Printe   Mar 31, 2004 07:39:50          PAGE:   3

☐ 123 Sm.  Street            ☐ South County Business
Farmingdale, NY 11735           Leopardstown, Dublin 18      PROTOCOL #    IXL-201F-14-189
Tel: 631 777 8833                Tel: 353 1 216 1100
ON Laboratories, Inc.      Fax: 631 777 8842           Fax: 353 1 216 1201      SUBJECT VISIT #    FOLLOW-UP

| SITE # | INVESTIGATOR | | | COLLECTION DATE/TIME | RECEIVED DATE/TIME | REPORT DATE/TIME |
|---|---|---|---|---|---|---|
| 4-4 | # 394 | TEL (305) 243-6944 | FAX (305) 243-7060 | 23-MAR-2004  19:27:00 | 25-MAR-2004 07:35:03 | 29-MAR-2004 10:24:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannes McJilton
University Of Miami School Of Medicine
1150 NW 14 Street, Suite 410
Miami, FL 33136

| # | SUBJECT | | |
|---|---|---|---|
| | INITIALS | SEX | BIRTHDATE |
| 4102 | E-S | M | |
| ACCESSION # | LABORATORY # | | SCREEN # |
| 235-4242 | 40021606 | | |

LAB USE ONLY

PB:  102737.169                           N

COMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES   ***
1. No change or change not clinically significant.  No follow-up required
2. Change clinically significant and attributable to disease or disease management.  No follow-up required.
3. Change clinically significant and possibly attributable to study medication. No follow-up required.
4. Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
5. Apparent Laboratory Error.
6. Unevaluable.

Signature: _____          Date: 4/2/04
Eugene E Ramsay, MD

REPORT   COMPLETE

A-001262
Jak Albukerk, MD FCAP
Laboratory Director

Print   Feb. 2, 2004 09:07:59                                  PAGE:  1

☐ 260 Sm. street                 ☐ South County Business         **PROTOCOL #:**  IXL-201F-14-19?
Farmingdale, NY 11735            Leopardstown, Dublin 18

ICON Laboratories, Inc.
Tel: 631 777 8833                Tel: 353 1 216 1100             **SUBJECT VISIT #:**  EARLY DISC
Fax: 631 777 8842                Fax: 353 1 216 1201

| ITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL (305) 243-5744  FAX (305) 243-7668 | 26-JAN-2004 10:35:00 | 27-JAN-2004 08:53:13 | 30-JAN-2004 10:35:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| | SUBJECT | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE | |
| 01102 | E-S | M | | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B328764 | 40021506 | |

LAB USE ONLY

PB:  100477.188

N

COMMENTS  *NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| | | ADDITIONAL VISIT INFORMATION | | | ...] |
| [ | | | | | .[ |
| [  Last Study Med: 07:00 | | | | | .[ |
| [  Time of AED #1: 07:00 | | | | | .[ |
| [...Time of AED #2: 07:00 | | | | | ...] |
| ---- HEMATOLOGY ---- | | | | | |
| HGB | 15.8 | | g/dL | 13.2- | 17.0 |
| HCT | 46.9 | | % | 40.0- | 54.0 |
| RBC | 5.19 | | x10^12/L | 4.20- | 5.60 |
| MCV | 90.4 | | FL | 80.0- | 98.0 |
| MCH | 30.4 | | PG | 27.0- | 33.0 |
| MCHC | 33.7 | | g/dL | 32.0- | 34.0 |
| WBC | 5.83 | | x10^9/L | 3.50- | 11.30 |
| PLATELETS | 272 | | x10^9/L | 150- | 400 |
| NEUTROPHILS | 52.5 | | % | 40.0- | 74.0 |
| LYMPHOCYTES | 33.4 | | % | 19.0- | 48.0 |
| MONOCYTES | 6.3 | | % | 3.4- | 9.0 |
| EOSINOPHILS | 6.6 | | % | .0- | 7.0 |
| BASOPHILS | 1.3 | | % | .0- | 1.5 |
| ABS NEUTROPHILS | 3.06 | | x10^9/L | 1.80- | 7.00 |
| ABS LYMPHOCYTES | 1.95 | | x10^9/L | 1.20- | 4.00 |
| ABS MONOCYTES | 0.36 | | x10^9/L | .00- | .80 |
| ABS EOSINOPHILS | 0.38 | | x10^9/L | .00- | .50 |
| ABS BASOPHILS | 0.08 | | x10^9/L | .00- | .20 |
| ---- CHEMISTRY ---- | | | | | |
| SODIUM | 139 | | mEq/L | 134- | 146 |
| POTASSIUM | 4.1 | | mEq/L | 3.6- | 5.2 |
| BICARBONATE | 24 | | mEq/L | 20- | 31 |
| CHLORIDE | 102 | | mEq/L | 95- | 113 |
| TOTAL BILIRUBIN | 0.3 | | mg/dL | .0- | 1.1 |
| TOTAL PROTEIN | | 8.1 | g/dL | 6.1- | 7.9 |
| ALKALINE PHOSPHATASE | 113 | | U/L | 40- | 135 |
| Plasma GT | 16 | | U/L | 0- | 51 |
| ALT | 11 | | U/L | 0- | 47 |
| AST | 21 | | U/L | 0- | 37 |

A-001263

Jak Albukerk, MD FCAP
Laboratory Director

**)CON** Laboratories, Inc.

Print   Feb  2, 2004 09:07:59
☐ 260 Sm. Street          ☐ South County Business
Farmingdale, NY 11735         Leopardstown, Dublin 18
Tel: 631 777 8833              Tel: 353 1 216 1100
Fax: 631 777 8842              Fax: 353 1 216 1201

**PAGE:  2**

**PROTOCOL #:** IXL-201F-14-18?

**SUBJECT VISIT #:** EARLY DISC

| ITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 334A | # 334A TEL FAX (305) 243-7668 | 26-JAN-2004 18:35:00 | 27-JAN-2004 08:53:10 | 30-JAN-2004 18:35:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
████  ██  ███████  ████  ████
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ████ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B328764 | 4002150b | |

LAB USE ONLY
PB: 100477.189
N

COMMENTS   *NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| CREATININE | 0.9 | | mg/dL | .6- | 1.4 |
| URIC ACID | 4.1 | | mg/dL | 3.1- | 8.8 |
| PHOSPHATE | 3.0 | | mg/dL | 2.4- | 4.9 |
| CALCIUM | 9.1 | | mg/dL | 8.4- | 10.2 |
| GLUCOSE, RANDOM, SERUM | 71 | | mg/dL | 70- | 141 |
| ALBUMIN | 4.5 | | g/dL | 3.7- | 4.9 |
| CHOLESTEROL, TOTAL | 118 | | mg/dL | LESS THAN 200 | |
| UREA (BUN) | 13 | | mg/dL | 9- | 24 |
| —— AED SAMPLES —— | | | | | |
| Levetiracetam [1] | 30 | | ug/mL | 3- | 37 |
| Topiramate [1] | | 2.8 ug/mL | | Peak: 6.4 - 9.2 | |
| | | | | Trough: 4.4 - 6.4 | |
| K | 142 | | U/L | 24- | 195 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc., Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY            CLINICALLY SIG. ETIOL   COMMENT

--CHEMISTRY
TOTAL PROTEIN          0.1          ___YES  ✓ NO  _____
--AED SAMPLES
Topiramate [1]         2.8          ___YES  ✓ NO  _____

A-001264
Jak Albukerk, MD FCAP
Laboratory Director

**iCON**

ON Laboratories, Inc.

Print    Feb  2, 2004  09:07:59

☐ 260 Sm.  .treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business .
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE:  3**

PROTOCOL #:   IXL-201F-14-16?

SUBJECT VISIT #:   EARLY DISC

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | 3346 | TEL | FAX (305) 243-7668 | 26-JAN-2004  10:35:00 | 27-JAN-2004 00:53:13 | 30-JAN-2004  10:35:00 |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▆ ▆ ▆ ▆
Miami, FL 33136

| | S U B J E C T | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01182 | E-S | M | ▆ |
| ACCESSION # | LABORATORY # | | SCREEN # |
| 8328764 | 40021506 | | |

LAB USE ONLY

PB:  100477.190

N

OMMENTS    *NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES  ***
1.  No change or change not clinically significant.  No follow-up required
2.  Change clinically significant and attributable to disease or disease
    management.  No follow-up required.
3.  Change clinically significant and possibly attributable to study medication.
    No follow-up required.
4.  Change clinically significant and attributable to study medication.
    FOLLOW-UP REQUIRED.
5.  Apparent Laboratory Error.
6.  Unevaluable.

Signature: _____                    Date: 2/3/04
            Eugene E Ramsay, MD

REPORT COMPLETE

Jak Albukerk, MD FCAP
Laboratory Director

Printed: Nov 13, 2003 09:14:59

**PAGE: 1**

☐ 260 Sm   Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

ON Laboratories, Inc.

**PROTOCOL #:** IXL-201F-14-189

**SUBJECT VISIT #:** VISIT 6

| SITE # | | INVESTIGATOR | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 5146 | # TEL ▮▮▮ | F A X (302) 243-7560 | 03-NOV-2003 11:18:00 | 04-NOV-2003 07:32:26 | 12-NOV-2003 14:56:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮▮▮▮▮▮▮▮
Miami, FL 33136

| | SUBJECT | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 51182 | E-C | M | | ▮▮▮ |
| ACCESSION # | | LABORATORY # | | SCREEN # |
| B296989 | | 32811343 | | |
| | LAB USE ONLY | | | |
| PB: 97386.54 | | | N | |

COMMENTS *NO FROZEN FKB RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| ADDITIONAL VISIT INFORMATION | | | | ...] |
| Time Study Med: 13:00 | | | | .] |
| Time of AED #1: 06:00 | | | | .] |
| Time of AED #2: 06:00 | | | | ...] |
| ---- AED SAMPLES ---- | | | | |
| carbazepine [1] | | (0.5) g/mL | 10.0- | 35.0 |
| vetiracetam [1] | 29 | ug/mL | 3- | 37 |
| piramate [1] | | (2.0) g/mL | Peak: 6.4 - 9.2 | |
| | | | Trough: 4.4 - 6.6 | |

### REFERRAL LABORATORIES

[1] National Medical Svcs Inc., Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY          CLINICALLY SIG. ETIOL   COMMENT

| --AED SAMPLES | | | | | |
|---|---|---|---|---|---|
| xcarbazepine [1] | (0.5 | ___ YES ✓ NO | | *Pt. is not taking OXC* |
| opiramate [1] | (2.0 | ___ YES ✓ NO | | |

*** ETIOLOGY CODES ***

1. No change or change not clinically significant. No follow-up required
2. Change clinically significant and attributable to disease or disease management. No follow-up required.
3. Change clinically significant and possibly attributable to study medication. No follow-up required.
4. Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
5. Apparent Laboratory Error.
6. Unevaluable.

Signature: _____    Date: 11/12/03
              Eugene E Ramsay, MD

### REPORT COMPLETE

A-001266
Jak Albukerk, MD FCAP
Laboratory Director

Print Oct 3, 2003 09:09:06

260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

South County Business Park
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**ICON Laboratories, Inc.**

| PAGE | 1 |
| PROTOCOL # | IXL-201F-14-189 |
| SUBJECT VISIT # | VISIT 5 |

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | TEL ▆ | FAX (305) 243-7668 | 29-SEP-2003 10:20:00 | 30-SEP-2003 12:52:41 | 02-OCT-2003 18:21:00 |

| | SUBJECT | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ▆ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B286058 | 32380530 | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

| LAB USE ONLY |
|---|
| PB: 95991.93 |

COMMENTS   *NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [... ADDITIONAL VISIT INFORMATION | | | | | ...] |
| Time Study Med: 19:00 | | | | | . |
| Time of AED #1: 06:40 | | | | | . |
| [...Time of AED #2: 06:40 | | | | | ...] |
| ---- HEMATOLOGY ---- | | | | | |
| HGB | 15.6 | | g/dL | 13.2- | 17.0 |
| HCT | 48.9 | | % | 40.0- | 54.0 |
| RBC | 5.06 | | x10^12/L | 4.20- | 5.80 |
| MCV | 96.6 | | fL | 80.0- | 98.0 |
| MCH | 30.9 | | pg | 27.0- | 33.0 |
| MCHC | 32.0 | | g/dL | 32.0- | 36.0 |
| WBC | 6.24 | | x10^9/L | 3.50- | 11.10 |
| PLATELETS | 247 | | x10^9/L | 150- | 400 |
| NEUTROPHILS | 53.6 | | % | 40.0- | 74.0 |
| LYMPHOCYTES | 30.2 | | % | 19.0- | 48.0 |
| MONOCYTES | 7.2 | | % | 3.4- | 9.0 |
| EOSINOPHILS | | 8.1 | % | .0- | 7.0 |
| BASOPHILS | 1.0 | | % | .0- | 1.5 |
| ABS NEUTROPHILS | 3.34 | | x10^9/L | 1.80- | 7.00 |
| ABS LYMPHOCYTES | 1.89 | | x10^9/L | 1.20- | 4.00 |
| ABS MONOCYTES | 0.45 | | x10^9/L | .00- | .80 |
| ABS EOSINOPHILS | 0.50 | | x10^9/L | .00- | .50 |
| ABS BASOPHILS | 0.06 | | x10^9/L | .00- | .20 |
| ---- CHEMISTRY ---- | | | | | |
| SODIUM | 138 | | mEq/L | 134- | 146 |
| POTASSIUM | 3.9 | | mEq/L | 3.6- | 5.2 |
| BICARBONATE | 25 | | mEq/L | 20- | 31 |
| CHLORIDE | 101 | | mEq/L | 95- | 113 |
| TOTAL BILIRUBIN | 0.3 | | mg/dL | .0- | 1.1 |
| TOTAL PROTEIN | 7.8 | | g/dL | 6.1- | 7.9 |
| ALKALINE PHOSPHATASE | 123 | | U/L | 40- | 135 |
| Gamma GT | 30 | | U/L | 0- | 51 |
| ALT | 7 | | U/L | 0- | 47 |
| AST | 22 | | U/L | | |

A-001267

Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

ENTERED

**icon**

ON Laboratories, Inc.

☐ Print   Oct  3,  2003  09:08:06
☐ 260 Smit Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business P.
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE** 2

| PROTOCOL # | IXL-201F-14-189 |
| SUBJECT VISIT # | VISIT 5 |

| SITE # | # | INVESTIGATOR | | COLLECTION DATE/TIME | RECEIVED DATE/TIME | REPORT DATE/TIME |
|---|---|---|---|---|---|---|
| 3346 | 3346 | T E L (305) 243-5944 | F A X (305) 243-7669 | 29-SEP-2003  10:20:00 | 30-SEP-2003 12:52:41 | 02-OCT-2003  18:21:00 |

| | # | INITIALS | SEX | BIRTHDATE |
|---|---|---|---|---|
| SUBJECT | 01102 | E-S | M | ▓ |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▓
Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B286058 | 32380530 | |

LAB USE ONLY

PB: 95991.94

OMMENTS      *NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| CREATININE | 0.7 | | mg/dL | .6- | 1.4 |
| URIC ACID | 3.7 | | mg/dL | 3.1- | 8.8 |
| PHOSPHATE | 3.7 | | mg/dL | 2.4- | 4.9 |
| CALCIUM | 9.0 | | mg/dL | 8.4- | 10.2 |
| GLUCOSE, RANDOM, SERUM | 76 | | mg/dL | 70- | 141 |
| ALBUMIN | 4.4 | | g/dL | 3.7- | 4.9 |
| CHOLESTEROL, TOTAL | 120 | | mg/dL | LESS THAN 200 | |
| UREA (BUN) | 8 | | mg/dL | 9- | 24 |

   --- COMMENTS    Serum is Slightly Hemolyzed.
       ---- AED SAMPLES ----

| CARBAMAZEPINE | 7.3 | | ug/mL | 4.0- | 10.0 |
|---|---|---|---|---|---|
| Levetiracetam [1] | 39 ug/mL | | | 3- | 37 |

| CK | 149 | | U/L | 24- | 195 |

### REFERRAL LABORATORIES

[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | CLINICALLY SIG. | ETIOL | COMMENT |
|---|---|---|---|---|
| --HEMATOLOGY | | | | |
| EOSINOPHILS | 8.1 | __YES   /NO | | |
| --CHEMISTRY | | | | |
| UREA (BUN) | 8 | __YES   /NO | | |
| --AED SAMPLES | | | | |
| Levetiracetam [1] | 39 | __YES   /NO | | |

A-001268

Dieter Schapfel, MD, FCAP



**ON Laboratories, Inc.**

Print   Oct  3, 2003 09:08:06

☐ 260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business P.
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PROTOCOL #   IXL-201F-14-15

SUBJECT VISIT #   VISIT 5

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3348  3348 TEL ▓ FAX (305) 243-7660 | 29-SEP-2003  10:20:00 | 30-SEP-2003 12:52:40 | 02-OCT-2003 16:21:00 |

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ▓ |
| ACCESSION # | LABORATORY # | | |
| B286058 | 32380530 | | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▓  ▓  ▓  ▓
Miami, FL 33136

LAB USE ONLY

PB: 95991.95

COMMENTS

*NO URINE RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES ***

1. No change or change not clinically significant.  No follow-up required
2. Change clinically significant and attributable to disease or disease
   management.  No follow-up required.
3. Change clinically significant and possibly attributable to study medication.
   No follow-up required.
4. Change clinically significant and attributable to study medication.
   FOLLOW-UP REQUIRED.
5. Apparent Laboratory Error.
6. Unevaluable.

Signature: _____   Date: __10/22/03__
Eugene E Ramsay, MD

REPORT  COMPLETE



A-001269
Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

**ICON**

ON Laboratories, Inc.

Printed: Sep 9, 2003 09:14:48
☐ 260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business P.
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE: 1**

PROTOCOL #: IXL-201F-14-189

SUBJECT VISIT #: VISIT 4

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346 TEL (305) 243-5944 FAX (305) 243-7660 | 02-SEP-2003 09:25:00 | 03-SEP-2003 11:46:36 | 08-SEP-2003 14:12:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
1150 NW 14 Street, Suite 410
Miami, FL 33136

| # | SUBJECT | | | |
|---|---|---|---|---|
| | INITIALS | SEX | BIRTHDATE | |
| 91162 | E-S | M | ▮▮▮▮ | |
| ACCESSION # | | LABORATORY # | | |
| B277662 | | 32380529 | | |

| LAB USE ONLY |
|---|
| PB: 95048.86 |
| AI |

COMMENTS *NO FROZEN PREDOS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| ADDITIONAL VISIT INFORMATION | | | | [ | ] |
| Time Study Med: 19:00 | | | | | ] |
| Time of AED #1: 06:45 | | | | | ] |
| Time of AED #2: 06:45 | | | | [ | ] |
| --- AED SAMPLES --- | | | | | |
| CARBAMAZEPINE | | 10.1 | ug/mL | 4.0- | 10.0 |
| levetiracetam [1] | 25 | | ug/mL | 3- | 37 |

REFERRAL LABORATORIES

[1] National Medical Svs, Inc. , Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY         CLINICALLY SIG. ETIOL  COMMENT

---AED SAMPLES
CARBAMAZEPINE        10.1              ___YES ✓NO

*** ETIOLOGY CODES ***
1. No change or change not clinically significant. No follow-up required
2. Change clinically significant and attributable to disease or disease management. No follow-up required.
3. Change clinically significant and possibly attributable to study medication. No follow-up required.
4. Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
5. Apparent Laboratory Error.
6. Unevaluable.

Signature: _____ Date: 10/14/03
Eugene E Ramsay, MD

### REPORT COMPLETE

A-001270
Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

ICE9-18-03
JSM

Printed: Aug 11, 2003 09:20:10

**PAGE: 1**

☐ 260 Smith    eet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business P
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**dcon**
ON Laboratories, Inc.

| PROTOCOL #: | IXL-201F-14-189 |
|---|---|
| SUBJECT VISIT #: | VISIT 3 |

| ITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL ▮▮▮  FAX (305) 243-7668 | 04-AUG-2003 09:50:00 | 06-AUG-2003 09:49:52 | 08-AUG-2003 17:41:00 |

| | | S U B J E C T | | |
|---|---|---|---|---|
| | # | INITIALS | SEX | BIRTHDATE |
| | 61102 | E-S | M | ▮▮▮ |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮  ▮▮▮  ▮▮▮  ▮▮▮
Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B268974 | 23290741 | |

| LAB USE ONLY |
|---|
| PB: 93955.218          N |

MMENTS *NO FROZEN PK'S RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | ...] |
| Time Study Med: 10:30 | | | | .] |
| Time of AED #1: 06:30 | | | | .] |
| [...Time of AED #2: 06:30 | | | | ...] |
| —— AED SAMPLES —— | | | | |
| ARBAMAZEPINE | | 11.5 ✓ | ug/mL | 4.0- 10.0 |
| evetiracetam [1] | 22 | | ug/mL | 3- 37 |
| REFERRAL LABORATORIES | | | | |

[1] National Medical Svs, Inc., Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | CLINICALLY SIG. | ETIOL | COMMENT |
|---|---|---|---|---|
| --AED SAMPLES | | | | |
| CARBAMAZEPINE | 11.5 | ___YES ✓NO | | _____ |

*** ETIOLOGY CODES ***

1.  No change or change not clinically significant. No follow-up required
2.  Change clinically significant and attributable to disease or disease management. No follow-up required.
3.  Change clinically significant and possibly attributable to study medication. No follow-up required.
4.  Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
5.  Apparent Laboratory Error.
6.  Unevaluable.

Signature: _____     Date: 8/12/03
              Eugene E Ramsay, MD

REPORT COMPLETE

A-001271
Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

Printed: Aug 5, 2003 14:10:19          **PAGE:  1**

☐ 260 Smit  reet          ☐ South County Business F     **PROTOCOL #:**   IXL-201F-14-189
Farmingdale, NY 11735       Leopardstown, Dublin 18
Tel: 631 777 8833          Tel: 353 1 216 1100
Fax: 631 777 8842          Fax: 353 1 216 1201          **SUBJECT VISIT #:**   VISIT 2

ON Laboratories, Inc.

| ITE # | INVESTIGATOR | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|
| 3346 | # 3346 | TEL ▮▮▮ FAX (305) 243-7668 | 21-JUL-2003  09:15:00 | 22-JUL-2003 07:30:00 | 25-JUL-2003  12:46:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮ ▮▮ ▮ ▮▮▮ ▮▮ ▮▮▮
Miami, FL 33136

| # | S U B J E C T INITIALS | SEX | BIRTHDATE |
|---|---|---|---|
| 01102 | E-S | M | ▮▮▮ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B264089 | 23290735 | |

LAB USE ONLY

PB:  93767.52                       N

MMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | ...] |
| ] Time Study Med: 10:25 | | | | .] |
| ] Time of AED #1: 06:45 | | | | .] |
| [...Time of AED #2: 06:45 | | | | ...] |
| --- AED SAMPLES --- | | | | |
| CARBAMAZEPINE | 9.2 | | ug/mL | 4.0- 10.0 |
| Levetiracetam [1] | 28 | | ug/mL | 3- 37 |
| REFERRAL LABORATORIES | | | | |

[1]  National Medical Svs. Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES ***
1. No change or change not clinically significant.  No follow-up required
2. Change clinically significant and attributable to disease or disease management.  No follow-up required.
3. Change clinically significant and possibly attributable to study medication. No follow-up required.
4. Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
5. Apparent Laboratory Error.
6. Unevaluable.

Signature: _____          Date: _____
Eugene E Ramsay, MD

REPORT  COMPLETE

Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

A 001272

Printed  Jul 12, 2003 09:04:26                    PAGE:  1

**ⴑcon**
☐ 260 Sm.  reet          ☐ South County Business       PROTOCOL #    IXL20114189
ON Laboratories, Inc.   Farmingdale, NY 11735          Leopardstown, Dublin 18
                        Tel: 631 777 8833              Tel: 353 1 216 1100     SUBJECT VISIT #   VISIT 12
                        Fax: 631 777 8842              Fax: 353 1 216 1201

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | TEL (305) 243-5944 | FAX (305) 243-7648 | 07-JUL-2003  09:10:00 | 08-JUL-2003 07:34:47 | 11-JUL-2003  11:02:00 |

| | S U B J E C T | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01182 | E-S | M | ▮▮▮▮ |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B259335 | 30351172 | |

Miami, FL 33136

LAB USE ONLY

PB:  92790.183

N

OMMENTS  *NO FROZEN PK9 RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| ADDITIONAL VISIT INFORMATION | | | | ...] |
| Time Study Med: 09:15 | | | | .| |
| Time of AED #1: 06:45 | | | | .| |
| Time of AED #2: 06:45 | | | | ...] |
| ---- AED SAMPLES ---- | | | | |
| ARBAMAZEPINE | 7.4 | | ug/mL | 4.0-   10.0 |
| evetiracetam [1] | 27 | | ug/mL | 3-   37 |
| REFERRAL LABORATORIES | | | | |

[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES  ***
  No change or change not clinically significant.  No follow-up required.
  Change clinically significant and attributable to disease or disease
    management. No follow-up required.
  Change clinically significant and possibly attributable to study medication.
    No follow-up required.
  Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
  Apparent Laboratory Error.
  Unevaluable.

Signature: _____                    Date: 7/26/03
              Eugene E Ramsay, MD

REPORT  COMPLETE

Dieter Schapfel, MD, FCAP        A-001272
LABORATORY DIRECTOR

Printed: Jul 8, 2003 09:14:39                                    PAGE:   1

☐ 260 Street          ☐ South County Business     PROTOCOL #:   IXL20114189
**con**       Farmington, NY 11735        Leopardstown, Dublin 1
                  Tel: 631 777 8833          Tel: 353 1 216 1100
ON Laboratories, Inc.   Fax: 631 777 8842      Fax: 353 1 216 1201     SUBJECT VISIT:   VISIT 11

| TE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | T E L (305) 243-5944 | F A X (305) 243-7668 | 30-JUN-2003  09:00:00 | 02-JUL-2003 07:04:12 | 07-JUL-2003  11:54:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
████-█-█-███████   ██████   ██████
Miami, FL 33136

| S U B J E C T | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ███████ |
| ACCESSION # | LABORATORY # | | SCREEN # |
| B257882 | 23101394 | | |

| LAB USE ONLY |
|---|
| PB: 92571.140 |
| N |

MMENTS *NO FROZEN PK RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | | ...] |
| I   Time Study Med: 09:30 | | | | | .I |
| I   Time of AED #1: 06:45 | | | | | .I |
| [...Time of AED #2: 06:45 | | | | | ...] |
| ---- AED SAMPLES ---- | | | | | |
| RBAMAZEPINE | 8.5 | | ug/mL | 4.0- | 10.0 |
| vetiracetam [1] | 23 | | ug/mL | 3- | 37 |
| REFERRAL LABORATORIES | | | | | |

[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES  ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _E Ramsay_____          Date: _7/18/03_
            Eugene E Ramsay, MD

REPORT  COMPLETE

Dieter Schapfel, MD
LABORATORY DIRECTOR



**ON Laboratories, Inc.**

Printed: Jun 27, 2003 09:10:26

☐ 260 Smit    eet
Farmingda__, NY 11735
Tel:  631 777 8833
Fax: 631 777 8842

☐ South County Business P
Leopardstown, Dublin 18
Tel:  353 1 216 1100
Fax: 353 1 216 1201

PAGE:   1

PROTOCOL #:  IXL20114199

SUBJECT VISIT #:  VISIT 10

| ITE # | # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|---|
| 3346 | 3546 | T E L (305) 243-5999 | F A X (305) 243-7666 | | 23-JUN-2003 16:25:00 | 24-JUN-2003 07:16:52 | 26-JUN-2003 16:52:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| S U B J E C T | | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 01102 | E-S | M | | |
| ACCESSION # | LABORATORY # | | | SCREEN # |
| 8255270 | 23101398 | | | |

**LAB USE ONLY**

PB:  98293.155

N

COMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| C... | ADDITIONAL VISIT INFORMATION | | | ...] | |
| Time Study Med: 06:00 | | | | .] | |
| C...Time of AED #1: 04:00 | | | | ...] | |
| --- AED SAMPLES --- | | | | | |
| CARBAMAZEPINE | 8.7 | | ug/mL | 4.0- | 10.0 |
| Levetiracetam [1] | 20 | | ug/mL | 3- | 37 |
| REFERRAL LABORATORIES | | | | | |
| [1]  National Medical Svs, Inc. , Willow Grove, PA 17090 | | | | | |

*** ETIOLOGY CODES ***
    No change or change not clinically significant.  No follow-up required.
    Change clinically significant and attributable to disease or disease
        management. No follow-up required.
    Change clinically significant and possibly attributable to study medication.
        No follow-up required.
    Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
    Apparent Laboratory Error.
    Unevaluable.

Signature: _____                    Date: 7/28/03
                Eugene E Ramsay, MD

REPORT COMPLETE

A 001275

Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR

**iCON**
**ON Laboratories, inc.**

Printed un. 3, 2003 09:41:42
☐ 260 Smit. reet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business F
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE: 1**

PROTOCOL #: IXL20114189
SUBJECT VISIT #: VISIT 9

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 # 3346 | T E (305) 243-5944 F A (305) 243-7668 X | 27-MAY-2003 10:00:00 | 28-MAY-2003 13:22:29 | 02-JUN-2003 12:56:00 |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B247070 | 30351158 | |

LAB USE ONLY
PB: 91341.166
N

COMMENTS *NO FROZEN PK'S RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| | ADDITIONAL VISIT INFORMATION | | | [ | ] |
| Time Study Med: 19:30 | | | | | |
| Time of AED #1: 06:45 | | | | | |
| Time of AED #2: 06:45 | | | | | |
| ---- HEMATOLOGY ---- | | | | | |
| GB | 15.5 | | g/dL | 13.2- | 17.0 |
| CT | 47.9 | | % | 40.0- | 54.0 |
| BC | 4.92 | | x10^12/L | 4.20- | 5.80 |
| CV | 97.2 | | fL | 80.0- | 98.0 |
| CH | 31.4 | | pg | 27.0- | 33.0 |
| CHC | 32.3 | | g/dL | 32.0- | 36.0 |
| BC | 6.14 | | x10^9/L | 3.50- | 11.10 |
| LATELETS | 264 | | x10^9/L | 150- | 400 |
| EUTROPHILS | 46.1 | | % | 40.0- | 74.0 |
| YMPHOCYTES | 37.3 | | % | 19.0- | 48.0 |
| ONOCYTES | 7.2 | | % | 3.4- | 9.0 |
| OSINOPHILS | | 8.6 | % | .0- | 7.0 |
| ASOPHILS | 0.8 | | % | .0- | 1.5 |
| BS NEUTROPHILS | 2.83 | | x10^9/L | 1.80- | 7.00 |
| BS LYMPHOCYTES | 2.29 | | x10^9/L | 1.20- | 4.00 |
| BS MONOCYTES | 0.44 | | x10^9/L | .00- | .80 |
| BS EOSINOPHILS | | 0.53 | x10^9/L | .00- | .50 |
| BS BASOPHILS | 0.05 | | x10^9/L | .00- | .20 |
| ---- CHEMISTRY ---- | | | | | |
| ODIUM | 142 | | mEq/L | 134- | 146 |
| OTASSIUM | 3.8 | | mEq/L | 3.6- | 5.2 |
| ICARBONATE | 29 | | mEq/L | 20- | 31 |
| HLORIDE | 103 | | mEq/L | 95- | 113 |
| OTAL BILIRUBIN | 0.3 | | mg/dL | .0- | 1.1 |
| OTAL PROTEIN | 7.8 | | g/dL | 6.1- | 7.9 |
| LKALINE PHOSPHATASE | 106 | | U/L | 40- | 135 |
| amma GT | 32 | | U/L | 0- | 51 |
| T | 9 | | U/L | 0- | 47 |
| ST | 22 | | U/L | 0- | 37 |

A-001276

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

**iCON**

CON Laboratories, Inc.

Printed: 'un 3, 2003 09:41:42

☐ 260 Smi.   .eet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business I
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE:  2**

PROTOCOL #: IXL20114189

SUBJECT VISIT #: VISIT 9

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|--------|-------------|---|---|----------------------|---------------------|-------------------|
| 3346 | # 3346 | TEL ▉▉▉ | FAX (305) 243-7668 | 27-MAY-2003  10:00:00 | 28-MAY-2003 13:22:29 | 02-JUN-2003  12:58:00 |

**SUBJECT**

| # | INITIALS | SEX | BIRTHDATE |
|---|----------|-----|-----------|
| 81162 | E-S | M | ▉▉▉ |

| ACCESSION # | LABORATORY # | SCREEN # |
|-------------|--------------|----------|
| B247070 | 30351158 | |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▉▉▉ ▉▉▉ ▉▉▉
Miami, FL 33136

LAB USE ONLY

PB: 91341.167                    N

OMMENTS  *NO FROZEN PK'S RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|-----------|---------|----------|-------|-----------------|---|
| REATININE | 0.8 | | mg/dL | .6- | 1.4 |
| RIC ACID | 3.4 | | mg/dL | 3.1- | 8.8 |
| HOSPHATE | 3.3 | | mg/dL | 2.4- | 4.9 |
| ALCIUM | 9.4 | | mg/dL | 8.4- | 10:2 |
| LUCOSE, RANDOM, SERUM | | 69 | mg/dL | 70- | 141 |
| LBUMIN | 4.4 | | g/dL | 3.7- | 4.9 |
| HOLESTEROL, TOTAL | 136 | | mg/dL | LESS THAN 200 | |
| REA (BUN) | 10 | | mg/dL | 9- | 24 |
| ---- AED SAMPLES ---- | | | | | |
| ARBAMAZEPINE | 9.6 | | ug/mL | 4.0- | 10.0 |
| evetiracetam [1] | 25 | | ug/mL | 3- | 37 |
| ---- MISC. ---- | | | | | |
| ( | 107 | | U/L | 24- | 195 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY                CLINICALLY SIG. ETIOL    COMMENT

| ---HEMATOLOGY | | | |
|---------------|---|---|---|
| EOSINOPHILS | 8.6 | ___YES ✓NO | |
| ABS EOSINOPHILS | 0.53 | ___YES ✓NO | |
| --CHEMISTRY | | | |
| GLUCOSE, RANDOM, SERU | 69 | ___YES ✓NO | |

A-001277

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printed' 'un  3, 2003 09:41:42                    **PAGE:  3**

icon

ON Laboratories, Inc.

☐ 260 Smit  reet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business F
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PROTOCOL #:** IXL20114189

**SUBJECT VISIT #:** VISIT 9

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  T E L  F A (305) 243-7668 X | 27-MAY-2003  10:00:00 | 28-MAY-2003 13:22:29 | 02-JUN-2003  12:58:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| # | SUBJECT |  |  |  |
|---|---|---|---|---|
|  | INITIALS | SEX |  | BIRTHDATE |
| 01102 | E-S | M |  |  |
| ACCESSION # | LABORATORY # |  | SCREEN # |  |
| B247070 | 30351158 |  |  |  |

| LAB USE ONLY |
|---|
| PB: 91341.168 |
| N |

COMMENTS *NO FROZEN PK'S RECEIVED*

---

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES  ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____          Date: 6/3/03
              Eugene E Ramsay, MD

REPORT  COMPLETE

A-001278

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printe  May 2, 2003 09:18:09

**PAGE: 1**

☐ 260 Sm.. Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business Park
Leopardstown, Dublin 18
Tel:. 353 1 216 1100
Fax: 353 1 216 1201

CON Laboratories, Inc.

| PROTOCOL #: | IXL20114189 |
|---|---|
| SUBJECT VISIT #: | VISIT 8 |

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | TEL (305) 243-5744 | FAX (305) 243-7668 | 28-APR-2003  08:55:00 | 29-APR-2003 07:24:13 | 01-MAY-2003  18:09:00 |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮▮▮   ▮▮▮▮   ▮▮▮▮
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ▮▮▮▮ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B236598 | 30351151 | |

LAB USE ONLY

PB: 90397.182

N

COMMENTS *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | | ...] |
| ! Time Study Med: 19:00 | | | | | .! |
| ! Time of AED #1: 07:00 | | | | | .! |
| [...Time of AED #2: 07:00 | | | | | ...] |
| --- HEMATOLOGY --- | | | | | |
| GB | 15.5 | | g/dL | 13.2- | 17.0 |
| CT | 46.0 | | % | 40.0- | 54.0 |
| BC | 5.01 | | x10^12/L | 4.20- | 5.80 |
| CV | 91.8 | | fL | 80.0- | 98.0 |
| CH | 30.8 | | pg | 27.0- | 33.0 |
| CHC | 33.6 | | g/dL | 32.0- | 36.0 |
| BC | 5.52 | | x10^9/L | 3.50- | 11.10 |
| LATELETS | 285 | | x10^9/L | 150- | 400 |
| EUTROPHILS | 44.3 | | % | 40.0- | 74.0 |
| YMPHOCYTES | 37.9 | | % | 19.0- | 48.0 |
| ONOCYTES | 6.1 | | % | 3.4- | 9.0 |
| OSINOPHILS | | 10.6 % | | .0- | 7.0 |
| ASOPHILS | 1.1 | | % | .0- | 1.5 |
| OS NEUTROPHILS | 2.44 | | x10^9/L | 1.80- | 7.00 |
| OS LYMPHOCYTES | 2.09 | | x10^9/L | 1.20- | 4.00 |
| OS MONOCYTES | 0.34 | | x10^9/L | .00- | .80 |
| OS EOSINOPHILS | | 0.58 x10^9/L | | .00- | .50 |
| OS BASOPHILS | 0.06 | | x10^9/L | .00- | .20 |
| --- CHEMISTRY --- | | | | | |
| ODIUM | 140 | | mEq/L | 134- | 146 |
| OTASSIUM | 4.0 | | mEq/L | 3.6- | 5.2 |
| CARBONATE | 26 | | mEq/L | 20- | 31 |
| HLORIDE | 100 | | mEq/L | 95- | 113 |
| OTAL BILIRUBIN | 0.2 | | mg/dL | .0- | 1.1 |
| OTAL PROTEIN | 7.6 | | g/dL | 6.1- | 7.9 |
| LKALINE PHOSPHATASE | 108 | | U/L | 40- | 135 |
| amma GT | 28 | | U/L | 0- | 51 |
| T | 9 | | U/L | 0- | 47 |
| T | 18 | | U/L | 0- | 37 |

A-001279

Ron Gambardella, PHD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR OF PATH/MEDICAL AFFAIRS

## iCON

CON Laboratories, Inc.

Printed May 2, 2003 09:18:10
☐ 260 Smi    treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business F...
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE: 2

PROTOCOL #: IXL201141B9

SUBJECT VISIT #: VISIT 8

| SITE # | INVESTIGATOR | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|
| 3346 | # 3346 | F A (305) 243-7668 | 28-APR-2003  00:55:00 | 29-APR-2003 07:24:13 | 01-MAY-2003  18:09:00 |

**INVESTIGATOR**

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| | SUBJECT | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01182 | E-S | M | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B236598 | 30351151 | |

| LAB USE ONLY |
|---|
| PB:  90397.183 |
| N |

COMMENTS *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| REATININE | 0.8 | | mg/dL | .6- | 1.4 |
| RIC ACID | 3.1 | | mg/dL | 3.1- | 8.8 |
| HOSPHATE | 4.3 | | mg/dL | 2.4- | 4.9 |
| ALCIUM | 9.0 | | mg/dL | 8.4- | 10.2 |
| LUCOSE, RANDOM, SERUM | | 65 | mg/dL | 70- | 141 |
| LBUMIN | 4.4 | | g/dL | 3.7- | 4.9 |
| HOLESTEROL, TOTAL | 138 | | mg/dL | LESS THAN 200 | |
| REA (BUN) | 12 | | mg/dL | 9- | 24 |
| ---- AED SAMPLES --- | | | | | |
| ARBAMAZEPINE | 8.3 | | ug/mL | 4.0- | 10.0 |
| evetiracetam [1] | 27 | | ug/mL | 3- | 37 |
| --- MISC. --- | | | | | |
| ( | 114 | | U/L | 24- | 195 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | CLINICALLY SIG. | ETIOL | COMMENT |
|---|---|---|---|---|
| --HEMATOLOGY | | | | |
| EOSINOPHILS | 10.6 | __YES  / NO | | |
| ABS EOSINOPHILS | 0.58 | __YES  / NO | | |
| --CHEMISTRY | | | | |
| GLUCOSE, RANDOM, SERU | 65 | __YES  / NO | | |



A-001280

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

**iCON**
CON Laboratories, Inc.

Printed May 2, 2003 09:18:10
☐ 260 Smi .treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business F...
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE: 3**

PROTOCOL #: IXL20114189

SUBJECT VISIT #: VISIT 8

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | T E L (305) 243-5944 | F A X (305) 243-7668 | 28-APR-2003 08:55:00 | 29-APR-2003 07:24:13 | 01-MAY-2003 18:07:00 |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮ ▮ ▮▮
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01182 | E-S | M | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B236598 | 30351151 | |

LAB USE ONLY

PB: 90397.184

N

COMMENTS *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____   Date: 5/31/03
                Eugene E Ramsay, MD

REPORT COMPLETE

Ron Gambardella, PhD, DABCC        Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR               DIR. OF PATH/MEDICAL AFFAIRS

A-001281

A-001282

**iCON Laboratories, Inc.**

Printed Apr 9, 2003 09:31:45

☐ 260 Sm. Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ...s
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE: 1

PROTOCOL #: IXL20114189

SUBJECT VISIT #: VISIT 7

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346  # 3346 | TEL ▒  FAX (305) 243-7668 | 31-MAR-2003  09:10:00 | 01-APR-2003 11:35:59 | 07-APR-2003 12:40:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▒ ▒ ▒ ▒
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01182 | E-S | M | ▒ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B226869 | 30351148 | |

LAB USE ONLY

PB: 69546.213       N

COMMENTS *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [...ADDITIONAL VISIT INFORMATION | | | | | ...] |
| [ Time Study Med: 09:14 | | | | | ] |
| [ Time of AED #1: 07:00 | | | | | ] |
| [...Time of AED #2: 07:00 | | | | | ] |
| —— HEMATOLOGY —— | | | | | |
| HGB | 15.5 | | g/dL | 13.2– | 17.0 |
| HCT | 46.1 | | % | 40.0– | 54.0 |
| RBC | 4.99 | | x10^12/L | 4.20– | 5.80 |
| MCV | 92.4 | | FL | 80.0– | 98.0 |
| MCH | 31.1 | | pg | 27.0– | 33.0 |
| MCHC | 33.7 | | g/dL | 32.0– | 36.0 |
| WBC | 5.21 | | x10^9/L | 3.50– | 11.10 |
| PLATELETS | 260 | | x10^9/L | 150– | 400 |
| NEUTROPHILS | 47.9 | | % | 40.0– | 74.0 |
| LYMPHOCYTES | 36.8 | | % | 19.0– | 48.0 |
| MONOCYTES | 7.0 | | % | 3.4– | 9.0 |
| EOSINOPHILS | | 7.5 | % | .0– | 7.0 |
| BASOPHILS | 0.8 | | % | .0– | 1.5 |
| 'S NEUTROPHILS | 2.50 | | x10^9/L | 1.80– | 7.00 |
| 'S LYMPHOCYTES | 1.92 | | x10^9/L | 1.20– | 4.00 |
| 'S MONOCYTES | 0.36 | | x10^9/L | .00– | .80 |
| 'S EOSINOPHILS | 0.39 | | x10^9/L | .00– | .50 |
| 'S BASOPHILS | 0.04 | | x10^9/L | .00– | .20 |
| —— CHEMISTRY —— | | | | | |
| SODIUM | 140 | | mEq/L | 134– | 146 |
| POTASSIUM | 4.1 | | mEq/L | 3.6– | 5.2 |
| CARBONATE | 29 | | mEq/L | 20– | 31 |
| CHLORIDE | 102 | | mEq/L | 95– | 113 |
| TOTAL BILIRUBIN | 0.3 | | mg/dL | .0– | 1.1 |
| TOTAL PROTEIN | 7.9 | | g/dL | 6.1– | 7.9 |
| ALKALINE PHOSPHATASE | 108 | | U/L | 40– | 135 |
| Gamma GT | 30 | | U/L | 0– | 51 |
| T | 7 | | U/L | 0– | 47 |
| F | 22 | | U/L | 0– | 37 |

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printed Apr 9, 2003 09:31:46

PAGE: 2

☐ 260 Sm.  .treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ,
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PROTOCOL #:** IXL20114189

**SUBJECT VISIT #:** VISIT 7

/CON
/N Laboratories, Inc.

| /TE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | T E L (305) 243-5944 | F A X (305) 243-7660 | 31-MAR-2003  09:10:00 | 01-APR-2003 11:35:59 | 07-APR-2003 12:46:00 |

| SUBJECT | | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 01102 | E-S | M | | ▮▮▮▮ |
| ACCESSION # | | LABORATORY # | | SCREEN # |
| B226869 | | 30351148 | | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▮▮▮ ▮ ▮▮▮ ▮▮ ▮
Miami, FL 33136

LAB USE ONLY

FB: 89546.214

N

OMMENTS  *NO FROZEN PAS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| REATININE | 0.7 | | mg/dL | .6- | 1.4 |
| RIC ACID | | 2.8 | mg/dL | 3.1- | 8.8 |
| HOSPHATE | 3.8 | | mg/dL | 2.4- | 4.9 |
| ALCIUM | 9.5 | | mg/dL | 8.4- | 10.2 |
| LUCOSE, RANDOM, SERUM | 78 | | mg/dL | 70- | 141 |
| LBUMIN | 4.6 | | g/dL | 3.7- | 4.9 |
| HOLESTEROL, TOTAL | 133 | | mg/dL | LESS THAN 200 | |
| REA (BUN) | 11 | | mg/dL | 9- | 24 |
| —— AED SAMPLES —— | | | | | |
| ARBAMAZEPINE | 9.0 | | ug/mL | 4.0- | 19.0 |
| evetiracetam [1] | 26 | | ug/mL | 3- | 37 |
| —— MISC. —— | | | | | |
| K | 124 | | U/L | 24- | 195 |

REFERRAL LABORATORIES

[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY          CLINICALLY SIG. ETIOL   COMMENT

| --HEMATOLOGY | | | | |
|---|---|---|---|---|
| EOSINOPHILS | 7.5 | __YES  ✓NO | | |
| --CHEMISTRY | | | | |
| URIC ACID | 2.8 | __YES  ✓NO | | |

A-001283

Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR                   DIR. OF PATH/MEDICAL AFFAIRS

Printed  Apr  9, 2003 09:31:46                          PAGE:  3

**CON Laboratories, Inc.**

☐ 260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business Park
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

| PROTOCOL # | IXL20114189 |
|---|---|
| SUBJECT VISIT # | VISIT 7 |

| # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 348 | 1348  TEL (305) 243-5944  FAX (305) 243-7660 | 31-MAR-2003  09:10:00 | 01-APR-2003 11:35:59 | 07-APR-2003  12:48:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
Miami, FL 33136

| | # | INITIALS | SEX | BIRTHDATE |
|---|---|---|---|---|
| SUBJECT | 81182 | E-S | M | |
| | ACCESSION # | LABORATORY # | | SCREEN # |
| | B226869 | 30351148 | | |

LAB USE ONLY

PB:  69546.215

N

COMMENTS  *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

**\*\*\* ETIOLOGY CODES \*\*\***

No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____          Date:  4/18/03
           Eugene E Ramsay, MD

REPORT  COMPLETE

A-001284

Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR                  DIR. OF PATH/MEDICAL AFFAIRS

Printe    Mar 29, 2003 08:49:56                    PAGE:    1

**ICON Laboratories, inc.**

☐ 260 Sm.  street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

| PROTOCOL #: | IXL26114189 |
|---|---|
| SUBJECT VISIT #: | VISIT 6 |

| ITE # | INVESTIGATOR | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|
| 3346 | # 3346 | TEL (305) 243-5944  FAX (305) 243-7468 | 24-MAR-2003 08:50:00 | 26-MAR-2003 07:42:45 | 28-MAR-2003 18:12:00 |

| | S U B J E C T | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01162 | E-S | M | ▒▒▒▒ |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▒▒▒ ▒ ▒ ▒▒▒▒ ▒▒▒ ▒▒▒
Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B224824 | 30351142 | |

| LAB USE ONLY |
|---|
| PB:  89112.144 ~ |

MMENTS  *NO FROZEN PK6 RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [ ADDITIONAL VISIT INFORMATION | | | | ...] |
| Time Study Med: 08:55 | | | | .] |
| Time of AED #1: 06:00 | | | | .[ |
| [...Time of AED #2: 06:00 | | | | ...] |
| ---- AED SAMPLES ---- | | | | |
| CARBAMAZEPINE | 9.6 | | ug/mL | 4.0- 10.0 |
| Levetiracetam [1] | 23 | | ug/mL | 3- 37 |
| REFERRAL LABORATORIES | | | | |
| [1] National Medical Svs, Inc. , Willow Grove, PA 19090 | | | | |

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
   management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
   No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____                Date: 4/18/03
           Eugene E Ramsay, MD

### REPORT COMPLETE

A-001285

Ron Gamberdella, PhD, DABCC           Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR                   DIR. OF PATH/MEDICAL AFFAIRS

```
                          Printer  Mar 21, 2003 07:10:32          PAGE:    1
icon         □ 260 Sm  treet        □ South County Business ,    PROTOCOL #:   IXL20114189
              Farmingdale, NY 11735    Leopardstown, Dublin 18
              Tel: 631 777 8833        Tel: 353 1 216 1100       SUBJECT VISIT #:  VISIT 5
ON Laboratories, Inc.  Fax: 631 777 8842   Fax: 353 1 216 1201
```

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL ▉▉▉  FAX (305) 243-7668 | 17-MAR-2003  08:50:00 | 18-MAR-2003 07:54:42 | 20-MAR-2003  18:01:00 |

| | SUBJECT | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 0102 | E-S | M | | ▉▉▉▉ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B221689 | 30351137 | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▉▉▉    ▉▉▉▉    ▉▉▉
Miami, FL 33136

LAB USE ONLY
PB: 88855.101
N

COMMENTS *NO FROZEN PKS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [...          ADDITIONAL VISIT INFORMATION | | | | | ...] |
|  Time Study Med: 06:30 | | | | | . ] |
|  Time of AED #1: 06:30 | | | | | . ] |
| [...Time of AED #2: 06:30 | | | | | ...] |
| ---- AED SAMPLES ---- | | | | | |
| CARBAMAZEPINE | 8.6 | | ug/mL | 4.0- | 10.0 |
| Levetiracetam [1] | 33 | | ug/mL | 3- | 37 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

---

*** ETIOLOGY CODES  ***
    No change or change not clinically significant.  No follow-up required.
    Change clinically significant and attributable to disease or disease
       management. No follow-up required.
    Change clinically significant and possibly attributable to study medication.
       No follow-up required.
    Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
    Apparent Laboratory Error.
    Unevaluable.

---

Signature: _____   Date: 4/18/03
              Eugene E Ramsay, MD

                  REPORT  COMPLETE

A-001286
Ron Gambardella, PhD, DABCC        Dieter Schapfel, MD, FCAP
    LABORATORY DIRECTOR             DIR. OF PATH/MEDICAL AFFAIRS

Printed Mar 14, 2003 07:54:58                    **PAGE: 1**

☐ 260 Sm  treet          ☐ South County Business
   Farmingdale, NY 11735        Leopardstown, Dublin 18
   Tel: 631 777 8833           Tel: 353 1 216 1100
   Fax: 631 777 8842           Fax: 353 1 216 1201

**ICON** Laboratories, Inc.

PROTOCOL: IXL20114189
SUBJECT VISIT: VISIT 4

| SITE # | INVESTIGATOR | COLLECTION DATE/TIME | RECEIVED DATE/TIME | REPORT DATE/TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL ▓▓▓▓  FAX (305) 243-7668 | 10-MAR-2003  00:00:00 | 11-MAR-2003 12:05:26 | 13-MAR-2003 16:10:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▓▓▓▓▓▓▓
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | ▓▓▓ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B219099 | 30351134 | |

| LAB USE ONLY |
|---|
| PB: 08494.267        N |

COMMENTS *NO FROZEN PK'S RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [...                    ADDITIONAL VISIT INFORMATION | | | | ...] |
| ]  Time Study Med: 13:43 | | | | .] |
| ]  Time of AED #1: 08:15 | | | | .] |
| [...Time of AED #2: 08:15 | | | | ...] |
| --- AED SAMPLES --- | | | | |
| CARBAMAZEPINE | 11.7 | | ug/mL | 4.0-   10.0 |
| Levetiracetam [1] | 40 | | ug/mL | 3-   37 |
| REFERRAL LABORATORIES | | | | |
| [1]  National Medical Svs, Inc. , Willow Grove, PA 19090 | | | | |

OUT OF RANGE ANALYTES SUMMARY           CLINICALLY SIG. ETIOL.   COMMENT

| --AED SAMPLES | | | | |
|---|---|---|---|---|
| CARBAMAZEPINE | 11.7 | __YES  ✓NO | _____ | _____ |
| Levetiracetam [1] | 40 | __YES  ✓NO | _____ | _____ |

*** ETIOLOGY CODES ***
   No change or change not clinically significant.  No follow-up required.
   Change clinically significant and attributable to disease or disease
      management. No follow-up required.
   Change clinically significant and possibly attributable to study medication.
      No follow-up required.
   Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
   Apparent Laboratory Error.
   Unevaluable.

Signature: _____          Date: 7/28/03
           Eugene E Ramsay, MD

## REPORT COMPLETE

A-001287
Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP           ENTERED
LABORATORY DIRECTOR                  DIR. OF PATH/MEDICAL AFFAIRS

Printed  Mar  7, 2003 09:19:46

**PAGE:  1**

| | |
|---|---|
| ☐ 260 Sm.  treet<br>Farmingdale, NY 11735<br>Tel: 631 777 8833<br>Fax: 631 777 8842 | ☐ South County Business<br>Leopardstown, Dublin 18<br>Tel: 353 1 216 1100<br>Fax: 353 1 216 1201 |

**DCON**
ON Laboratories, Inc.

PROTOCOL: IXL20114189

SUBJECT VISIT: VISIT 3

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL (305) 243-5944  FAX (305) 243-7668 | 03-MAR-2003  10:30:00 | 04-MAR-2003 13:04:30 | 06-MAR-2003  16:00:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B216464 | 23600011 | |

LAB USE ONLY

PB: 88266.170

N

COMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | ...] | |
| ]  Time OF AED #1: 06:00 | | | | | .] |
| [...Time of AED #2: 06:00 | | | | ...] | |
| --- HEMATOLOGY --- | | | | | |
| GB | 15.1 | | g/dL | 13.2- | 17.0 |
| CT | 46.0 | | % | 40.0- | 54.0 |
| BC | 4.91 | | x10^12/L | 4.20- | 5.80 |
| CV | 93.7 | | fL | 80.0- | 98.0 |
| CH | 30.8 | | pg | 27.0- | 33.0 |
| CHC | 32.9 | | g/dL | 32.0- | 36.0 |
| BC | 5.22 | | x10^9/L | 3.50- | 11.10 |
| LATELETS | 254 | | x10^9/L | 150- | 400 |
| EUTROPHILS | 41.8 | | % | 40.0- | 74.0 |
| YMPHOCYTES | 40.8 | | % | 19.0- | 48.0 |
| ONOCYTES | 7.4 | | % | 3.4- | 9.0 |
| OSINOPHILS | | 8.8 | % | .0- | 7.0 |
| ASOPHILS | 1.1 | | % | .0- | 1.5 |
| BS NEUTROPHILS | 2.18 | | x10^9/L | 1.80- | 7.09 |
| BS LYMPHOCYTES | 2.13 | | x10^9/L | 1.20- | 4.00 |
| BS MONOCYTES | 0.39 | | x10^9/L | .00- | .80 |
| BS EOSINOPHILS | 0.46 | | x10^9/L | .00- | .50 |
| BS BASOPHILS | 0.06 | | x10^9/L | .00- | .20 |
| --- CHEMISTRY --- | | | | | |
| ODIUM | 141 | | mEq/L | 134- | 146 |
| OTASSIUM | 5.2 | | mEq/L | 3.6- | 5.2 |
| ICARBONATE | 27 | | mEq/L | 20- | 31 |
| HLORIDE | 99 | | mEq/L | 95- | 113 |
| OTAL BILIRUBIN | 0.3 | | mg/dL | .0- | 1.1 |
| OTAL PROTEIN | 7.7 | | g/dL | 6.1- | 7.9 |
| LKALINE PHOSPHATASE | 109 | | U/L | 40- | 135 |
| amma GT | 27 | | U/L | 0- | 51 |
| LT | 19 | | U/L | 0- | 47 |
| ST | 22 | | U/L | 0- | 37 |
| REATININE | 0.8 | | mg/dL | .6- | 1.4 |

A-001288

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printer Mar 7, 2003 09:19:46    **PAGE: 2**

**ICON**
ON Laboratories, Inc.

☐ 260 Smi. reet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ,
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

| PROTOCOL # | IXL20114189 |
| SUBJECT VISIT # | VISIT 3 |

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  T E L (305) 243-5744  F A X (305) 243-7668 | 03-MAR-2003  10:30:00 | 04-MAR-2003 13:04:30 | 04-MAR-2003 16:00:00 |

Eugene E Ramsey, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 01102 | E-S | M | |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B216444 | 23600011 | |

LAB USE ONLY

PB: 80266.191

N

OMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| RIC ACID | 3.1 | | mg/dL | 3.1- | 8.8 |
| HOSPHATE | 4.3 | | mg/dL | 2.4- | 4.9 |
| ALCIUM | 9.4 | | mg/dL | 8.4- | 10.2 |
| LUCOSE, RANDOM, SERUM | 93 | | mg/dL | 70- | 141 |
| LBUMIN | 4.5 | | g/dL | 3.7- | 4.9 |
| HOLESTEROL, TOTAL | 135 | | mg/dL | LESS THAN 200 | |
| REA (BUN) | 10 | | mg/dL | 9- | 24 |
| --- AED SAMPLES --- | | | | | |
| ARBAMAZEPINE | | 10.8 | ug/mL | 4.0- | 10.0 |
| evetiracetam [1] | 22 | | ug/mL | 3- | 37 |
| --- MISC. --- | | | | | |
| K | 115 | | U/L | 24- | 195 |

REFERRAL LABORATORIES
[1] National Medical Svs, Inc. , Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | CLINICALLY SIG. | ETIOL | COMMENT |
|---|---|---|---|---|
| --HEMATOLOGY | | | | |
| EOSINOPHILS | 8.8 | ___YES  ✓NO | | _____ |
| ---AED SAMPLES | | | | |
| CARBAMAZEPINE | 10.8 | ___YES  ✓NO | | _____ |

A-001289

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printer  Mar  7, 2003 09:19:46

**ICON**
ON Laboratories, Inc.

☐ 260 Smi  reet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

**PAGE:  3**

| PROTOCOL | IXL20114189 |
| SUBJECT VISIT | VISIT 3 |

| SITE # | | INVESTIGATOR | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | TEL | FAX (305) 243-7668 | 03-MAR-2003  10:30:00 | 04-MAR-2003 13:04:30 | 06-MAR-2003  16:00:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| | SUBJECT | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 01102 | E-S | M | | |
| ACCESSION # | LABORATORY # | | SCREEN # | |
| B216464 | 23600011 | | | |

LAB USE ONLY

PB:  88266.192

N

OMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
     management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
     No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____     Date: 3/12/03
          Eugene E Ramsay, MD

REPORT COMPLETE

A-001290

Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP
     LABORATORY DIRECTOR              DIR. OF PATH/MEDICAL AFFAIRS

Printer  Feb 28, 2003 08:16:42

PAGE

**ON** Laboratories, Inc.

☐ 260 Sm:  treet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ,
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PROTOCO

SUBJECT V

| ;ITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME |
|---|---|---|---|---|---|
| 3346 | # 3346 | TEL | F A X (305) 243-7668 | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:0 |

|  | # | SUB. INITIALS | S |
|---|---|---|---|
|  | 334602 | E-S |  |

| ACCESSION # | LABORATOR |
|---|---|
| B213690 | 30351 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

LAB US

PB: 87919.132

MMENTS *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REI |
|---|---|---|---|---|

C...                    ADDITIONAL VISIT INFORMATION
]   Visit Type: RETEST OF BASELINE
]   Time Study Med: 19.00
C...Time of AED #1: 19:00
        --- AED SAMPLES ---
RBAMAZEPINE                    6.7                        ug/mL
avetiracetam [1]                6                          ug/mL
        REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES  ***
    No change or change not clinically significant.  No follow-up required.
    Change clinically significant and attributable to disease.or disease
        management. No follow-up required.
    Change clinically significant and possibly attributable to study medical
        No follow-up required.
    Change clinically significant and attributable to study medication. FOLL
    Apparent Laboratory Error.
    Unevaluable.

Signature: _____                    Date: 3/15/
            Eugene E Ramsay, MD

                    REPORT  COMPLETE

A-001291

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR OF PATH/MEDICAL AFFAIR

inter' Feb 28, 2003 08:16:42

| | | | **PAGE:** | **1** |
|---|---|---|---|---|

i0 Sm.  treet     ☐ South County Business .     **PROTOCOL #:**   IXL20114189
rmingdale, NY 11735    Leopardstown, Dublin 18
Tel: 631 777 8833    Tel: 353 1 216 1100    **SUBJECT VISIT #**   UNSCHED
Fax: 631 777 8842    Fax: 353 1 216 1201

| TOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|
| F A (305) 243-7668 X | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | 27-FEB-2003  17:54:00 |

| | | SUBJECT | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 334682 | E-S | M | | 5-1981 |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B213690 | 30351120 | |

a/Jeannee McJilton
 School Of Medicine
Suite 410

LAB-USE ONLY

PB: 87919.132

N

ATION*

## LABORATORY REPORT

| RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|
| **ADDITIONAL VISIT INFORMATION** | | | ...] |
| BASELINE | | | .¦ |
| | | | .¦ |
| | | | ...] |
| B ——— | | | |
| 4.7 | | ug/mL | 4.0-    10.0 |
| 6 | | ug/mL | 3-    37 |

ATORIES
 Inc. , Willow Grove, PA 19090

t clinically significant.  No follow-up required.
ificant and attributable to disease or disease
ow-up required.
ificant and possibly attributable to study medication.
ed.
ificant and attributable to study medication. FOLLOW-UP REQUIRED.
ror.

Date: 3/10/03

nsay, MD

REPORT  COMPLETE

A-001292

.1a, PhD, DABCC    . Dieter Schapfel, MD, FCAP
Y DIRECTOR     DIR OF PATH/MEDICAL AFFAIRS


ENTERED

Printer   Feb 28, 2003 08:16:42                                    PAGE:   1

| | | |
|---|---|---|
| ☐ 260 Smi   treet | ☐ South County Business | PROTOCOL #:  IXL20114189 |
| Farmingdale, NY 11735 | Leopardstown, Dublin 18 | |
| Tel: 631 777 8833 | Tel: 353 1 216 1100 | |
| Fax: 631 777 8842 | Fax: 353 1 216 1201 | SUBJECT VISIT #:  UNSCHED |

**dCON**
ON Laboratories, Inc.

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3346 | # 3346 | TEL (305) 243-5944 | FAX (305) 243-7668 | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | 27-FEB-2003  17:54:00 |

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B213690 | 30351120 | |

| LAB USE ONLY |
|---|
| PB: 87919.132     N |

COMMENTS  *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| [...        ADDITIONAL VISIT INFORMATION | | | | | ...] |
| \|   Visit Type: RETEST OF BASELINE | | | | | .\| |
| \|   Time Study Med: 19.00 | | | | | .\| |
| [...Time of AED #1: 19:00 | | | | | ...] |
| ---- AED SAMPLES ---- | | | | | |
| ARBAMAZEPINE | 6.7 | | ug/mL | 4.0- | 10.0 |
| evetiracetam [1] | 6 | | ug/mL | 3- | 37 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

---

*** ETIOLOGY CODES   ***
   No change or change not clinically significant.  No follow-up required.
   Change clinically significant and attributable to disease or disease
      management. No follow-up required.
   Change clinically significant and possibly attributable to study medication.
      No follow-up required.
   Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
   Apparent Laboratory Error.
   Unevaluable.

Signature: _____              Date: 3/10/03
            Eugene E Ramsay, MD

REPORT   COMPLETE

A-001293

Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP
      LABORATORY DIRECTOR           DIR OF PATH/MEDICAL AFFAIRS

ENTERED

ICON Laboratories-(New York)  02/27/2003

# ICON | LABORATORIES

260 SMITH STREET, FARMINGDALE, NY 11735 · (631)-77

Print: Feb 27, 2003 18:02:16

| PROTOCOL #: TXL20114189 | | | | | | SUBJECT VISIT #: |
|---|---|---|---|---|---|---|
| SITE # | | INVESTIGATOR | | COLLECTION DATE/TIME | RECEIVED DATE/TIME | |
| 3346 | 3346 | TEL (305) 243-5944 | FAX (305) 243-7668 | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | 27 |

| # | SUBJE |
|---|---|
| | INITIALS    SEX |
| 334602 | E-S    M |

| ACCESSION # | LABORATORY # |
|---|---|
| B213690 | 30351120 |

LAB USE ON

N

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
1150 NW 14 Street, Suite 410
Miami, FL 33136

COMMENTS      *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMALS | UNITS | RI |
|---|---|---|---|---|
| ADDITIONAL VISIT INFORMATION | | | | |
| Visit Type: RETEST OF BASELINE | | | | |
| Time Study Med: 19.00 | | | | |
| Time of AED #1: 19:00 | | | | |
| --- AED SAMPLES --- | | | | |
| Levetiracetam [1] | 6 | | ug/mL | |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES  ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
   management. No follow-up required.
Change clinically significant and possibly attributable to study medicati
   No follow-up required.
Change clinically significant and attributable to study medication. FOLLO
Apparent Laboratory Error.
Unevaluable.

Signature: _____          Date: _____
              Eugene E Ramsay, MD

REPORT COMPLETE

RONALD GAMBARDELLA, Ph.D.          A-001294 ALBUKERK, M.D., F.A.S.C.P., F.C.A.P.

ICON Laboratories-(New York)   02/27/2003   19:47:00

# ICON | LABORATORIES

260 SMITH STREET, FARMINGE, NY 11735 -(631)-777-8833

Print: Feb 27, 2003 18:02:16

| PROTOCOL #: | TXL20114189 | | | | SUBJECT VISIT #: | UN |
|---|---|---|---|---|---|---|
| SITE # | | INVESTIGATOR | | COLLECTION DATE/TIME | RECEIVED DATE/TIME | RE |
| 3346 | 3346 | ▓▓▓ FAX (305) 243-7668 | | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | 27-FEB- |

| # | INITIALS | SEX | |
|---|---|---|---|
| 334602 | E-S | M | ▓ |

| ACCESSION # | LABORATORY # |
|---|---|
| B213690 | 30351120 |

INVESTIGATOR

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
▓▓▓▓▓▓▓▓
Miami, FL 33136

LAB USE ONLY

N

COMMENTS       *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMALS | UNITS | REFERE |
|---|---|---|---|---|
| ADDITIONAL VISIT INFORMATION | | | | |

Visit Type: RETEST OF BASELINE
Time Study Med: 19.00
Time of AED #1: 19:00
--- AED SAMPLES ---

| Levetiracetam [1] | 6 | | ug/mL | 3- |
|---|---|---|---|---|

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES   ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
   management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
   No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP
Apparent Laboratory Error.
Unevaluable.

Signature: _____   Date: _____
            Eugene E Ramsay, MD

REPORT COMPLETE

RONALD GAMBARDELLA, Ph.D.          A-001295 ALBUKERK, M.D., F.A.S.C.P., F.C.A.P.

ICON Laboratories-(New York)   02/27/2003            19:47:00

# ICON | LABORATORIES

260 SMITH STREET, FARMING    E, NY 11735 · (631)-777-8833 · FAX (631)-777-3904

Print: Feb 27, 2003 18:02:16                    PAGE: 1

| PROTOCOL #: IXL20114189 | | | | | SUBJECT VISIT #: UNSCHED | |
|---|---|---|---|---|---|---|
| SITE # | | INVESTIGATOR | COLLECTION DATE/TIME | RECEIVED DATE/TIME | | REPORT DATE/TIME |
| 3346   3346 | X(305) 243-5944  FA(305) 243-7668 | | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | | 27-FEB-2003  17:54:00 |

| S U B J E C T | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | ▮▮▮ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B213690 | 30351120 | |

**INVESTIGATOR**

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
1▮▮▮▮
Miami, FL 33136

| LAB USE ONLY |
|---|
| N |

**COMMENTS**     *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMALS | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [...                    ADDITIONAL VISIT INFORMATION | | | | ...] |
| Visit Type: RETEST OF BASELINE | | | | |
| Time Study Med: 19.00 | | | | |
| [...Time of AED #1: 19:00 | | | | ...] |
| --- AED SAMPLES --- | | | | |
| Levetiracetam [1] | 6 | | ug/mL | 3 -       37 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

---

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
   management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
   No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

---

Signature: _____    Date: _____
              Eugene E Ramsay, MD

                    REPORT COMPLETE

RONALD GAMBARDELLA, Ph.D.        A-001290LBUKERK, M.D., F.A.S.C.P., F.C.A.P.

ICON Laboratories–(New York)  02/27/2003                17:25

# ICON | LABORATORIES

260 SMITH STREET, FARMING  .E, NY 11735 ·(631)-777-8833 · FAX (631)-777-3904

Print: Feb 27, 2003 16:30:46                              PAGE: 1

| PROTOCOL #: IXL20114189 | | | | SUBJECT VISIT #: | UNSCHED |
|---|---|---|---|---|---|
| SITE # | INVESTIGATOR | COLLECTION DATE/TIME | RECEIVED DATE/TIME | | REPORT DATE/TIME |
| 3346  3346 | (305) 243-7668 | 24-FEB-2003  09:55:00 | 25-FEB-2003 13:11:00 | | 25-FEB-2003  18:20:00 |

| | # | SUBJECT INITIALS | SEX | BIRTHDATE |
|---|---|---|---|---|
| | 334602 | E-S | M | |

| | ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|---|
| INVESTIGATOR | B213690 | 30351120 | |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine

Miami, FL 33136

LAB USE ONLY

N

COMMENTS    *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMALS | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

```
[...              ADDITIONAL VISIT INFORMATION              ...]
|    Visit Type: RETEST OF BASELINE                           .|
|    Time Study Med: 19.00                                     |
[...Time of AED #1: 19:00                                   ...]
          --- AED SAMPLES ---
CARBAMAZEPINE                   6.7                ug/mL      4.0-      10.0
Levetiracetam [1]             *PEND*               ug/mL      3-          37
          REFERRAL LABORATORIES
  [1]  National Medical Svs, Inc. , Willow Grove, PA 19090
```

*** ETIOLOGY CODES  ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____    Date: _____
              Eugene E Ramsay, MD

REPORTED RESULTS ARE CONSIDERED COMPLETE
PENDING TESTS WILL FOLLOW ON SEPARATE REPORT

RONALD GAMBARDELLA, Ph.D.        A-00129 J ALBUKERK, M.D., F.A.S.C.P., F.C.A.P.

Printed Jan 31, 2003 08:47:07    PAGE: 1

☐ 260 Sm_ street    ☐ South County Business ...
Farmingdale, NY 11735        Leopardstown, Dublin 18
Tel: 631 777 8833              Tel: 353 1 216 1100
Fax: 631 777 8842             Fax: 353 1 216 1201

**ON Laboratories, Inc.**

PROTOCOL   IXL20114189

SUBJECT VISIT   UNSCHED

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3246 | # 3246   T/E (305) 243-5944   F/A/X (305) 243-7648 | 27-JAN-2003 10:00:00 | 28-JAN-2003 09:13:34 | 30-JAN-2003 18:12:00 |

**SUBJECT**

| # | INITIALS | SEX | BIRTHDATE |
|---|---|---|---|
| 334002 | E-S | M | ▮▮▮ |

Eugene E Ramsey, MD
ATT: Marinellie Vega/Jeannee McWilton
University Of Miami School Of Medicine
▮▮ ▮▮▮ ▮▮▮▮: ▮▮▮ ▮▮
Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B282084 | 23460007 | |

**LAB USE ONLY**
PB: S6720.140    N

OMMENTS

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [...                    ADDITIONAL VISIT INFORMATION | | | | ...] |
| │  Visit Type: RETEST OF BASELINE | | | | .│ |
| │  Time Study Med: 07.00 | | | | .│ |
| [...Time of AED #1: 07:00 | | | | ...] |
| ---- AED SAMPLES ---- | | | | |
| CARBAMAZEPINE | 9.1 | | ug/mL | 4.0-   10.0 |
| evetiracetam [1] | | 2 | ug/mL | 0-   37 |

REFERRAL LABORATORIES
[1]  National Medical Svs, Inc. , Willow Grove, PA 19090

OUT OF RANGE ANALYTES SUMMARY          CLINICALLY SIG. ETIOL   COMMENT

--AED SAMPLES
Levetiracetam [1]          2                    __YES ✓ NO   *NCS Report level*

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____          Date: 2/14/03
        Eugene E Ramsey, MD

REPORT COMPLETE

A-001298

Ron Gambardella, PhD, DABCC        Dieter Schapfel, MD, FCAP
    LABORATORY DIRECTOR              DIR. OF PATH/MEDICAL AFFAIRS

ICON Laboratories, Inc.

Printed an 17, 2003 14:12:04
☐ 260 Sml .eet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE: 1

| PROTOCOL | IXL20114189 |
| SUBJECT VISIT | UNSCHED |

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL (305) 243-5944  FAX (305) 243-7660 | 13-JAN-2003  11:00:00 | 14-JAN-2003 13:05:13 | 17-JAN-2003  12:53:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
████ ██ ████████ ██████
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | ███████ |
| ACCESSION # | LABORATORY # | | SCREEN # |
| B197081 | 23600010 | | |

LAB USE ONLY
PB: 86113.10
N

OMMENTS  *HELD FOR VERIFICATION*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [... | ADDITIONAL VISIT INFORMATION | | | ...] |
| | Visit Type: RETEST OF BASELINE | | | |
| | Time Study Med: N/A | | | |
| | Time of AED #1: 08:30 | | | |
| [...Time of AED #2: 08:30 | | | ...] |
| --- AED SAMPLES --- | | | | |
| ARBAMAZEPINE | 6.8 | | ug/mL | 4.0- 10.0 |
| evetiracetam [1] | 29 | | ug/mL | 3- 37 |
| REFERRAL LABORATORIES | | | | |

[1] National Medical Svs. Inc. , Willow Grove, PA 19090

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
   management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
   No follow-up required.
Change clinically significant and attributable to study medication. FOLLOW-UP REQUIRED.
Apparent Laboratory Error.
Unevaluable.

Signature: _____        Date: 1/29/03
           Eugene E Ramsay, MD

### REPORT COMPLETE

A-001299

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

ENTERED

Print: Oct 11, 2002 16:58:02   PAGE: 1

# ICON Laboratories, Inc.

☐ 260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business P...
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PROTOCOL # : IXL20114189

SUBJECT VISIT : BASELINE

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 334 | # 334 TEL (305) 243-5944 FAX (305) 243-7668 | 07-OCT-2002 09:50:00 | 08-OCT-2002 10:23:30 | 11-OCT-2002 13:25:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
Miami, FL 33136

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | |
| ACCESSION # | LABORATORY # | | SCREEN # |
| B160670 | 13580751 | | |

LAB USE ONLY

PB: 82174.134    N

COMMENTS  *NO REFNMS RECEIVED*

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| E... | ADDITIONAL VISIT INFORMATION | | | ...] | |
| E...Time Of Dose: 08:00 | | | | ...] | |
| ---- AED SAMPLES ---- | | | | | |
| CARBAMAZEPINE | | | 10.3  ug/mL | 4.0- | 10.0 |
| Levetiracetam [1] | 23 | | ug/mL | 3- | 37 |

REFERRAL LABORATORIES

[1] National Medical Svs, Inc., Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | CLINICALLY SIG. | ETIOL | COMMENT |
|---|---|---|---|---|
| ---AED SAMPLES | | | | |
| CARBAMAZEPINE | 10.3 | YES ___ / NO ✓ | | |

*** ETIOLOGY CODES ***

No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication.         FOLLOW-UP RE
Apparent Laboratory Error.
Unevaluable.

Signature: _Eugene E Ramsay MD_          Date: 10-31-02

REPORT COMPLETE

A-001300

Ron Gambardella, PhD, DABCC          Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR                   DIR. OF PATH/MEDICAL AFFAIRS

ICON Laboratories, Inc.

Printed Sep 28, 2002 09:37:25

☐ 260 Smi... Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE: 1

PROTOCOL: IXL20114189

SUBJ/CRT/VISIT: SCREENING

| SITE # | INVESTIGATOR | | | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|---|---|
| 3348 | # 3346 | TEL (305) 243-5944 | FAX (305) 243-7668 | 09-SEP-2002 09:50:00 | 10-SEP-2002 08:04:06 | 13-SEP-2002 18:12:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannes McJilton
University Of Miami School Of Medicine
████ ██  ████████ ████████
Miami, FL 33136

| | SUBJECT | | | |
|---|---|---|---|---|
| # | INITIALS | SEX | | BIRTHDATE |
| 334002 | E-S | M | | ██████ |
| ACCESSION # | | LABORATORY # | | SCREEN # |
| B147336 | | 13580746 | | |

LAB USE ONLY

PB: 81592.239

N

COMMENTS  **NO SLIDE RECEIVED**

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|
| [...] | ADDITIONAL VISIT INFORMATION | | | [...] |
| [...Time Of Dose: 07:20 | | | | [...] |
| —— HEMATOLOGY —— | | | | |
| HGB | 15.2 | | g/dL | 13.2– 17.0 |
| HCT | 48.4 | | % | 40.0– 54.0 |
| RBC | 5.00 | | x10^12/L | 4.20– 5.80 |
| MCV | 96.9 | | fL | 80.0– 98.0 |
| MCH | 30.4 | | pg | 27.0– 33.0 |
| MCHC | | 31.4 | g/dL | 32.0– 36.0 |
| WBC | 6.03 | | x10^9/L | 3.50– 11.10 |
| PLATELETS | 235 | | x10^9/L | 150– 400 |
| NEUTROPHILS | 47.4 | | % | 40.0– 74.0 |
| LYMPHOCYTES | 34.0 | | % | 19.0– 48.0 |
| MONOCYTES | 7.9 | | % | 3.4– 9.0 |
| EOSINOPHILS | | 10.1 | % | .0– 7.0 |
| BASOPHILS | 0.5 | | % | .0– 1.5 |
| ABS NEUTROPHILS | 2.86 | | x10^9/L | 1.80– 7.00 |
| ABS LYMPHOCYTES | 2.06 | | x10^9/L | 1.20– 4.00 |
| ABS MONOCYTES | 0.48 | | x10^9/L | .00– .80 |
| ABS EOSINOPHILS | | 0.61 | x10^9/L | .00– .50 |
| ABS BASOPHILS | 0.03 | | x10^9/L | .00– .20 |
| —— CHEMISTRY —— | | | | |
| SODIUM | 139 | | mEq/L | 134– 146 |
| POTASSIUM | 5.0 | | mEq/L | 3.6– 5.2 |
| BICARBONATE | 26 | | mEq/L | 20– 31 |
| CHLORIDE | 101 | | mEq/L | 95– 113 |
| TOTAL BILIRUBIN | 0.4 | | mg/dL | .0– 1.1 |
| TOTAL PROTEIN | | 8.5 | g/dL | 6.1– 7.9 |
| ALKALINE PHOSPHATASE | 92 | | U/L | 40– 135 |
| Gamma GT | 26 | | U/L | 0– 51 |
| ALT | 17 | | U/L | 0– 47 |
| AST | 20 | | U/L | 0– 37 |
| CREATININE | 0.8 | | mg/dL | .4– 1.4 |
| URIC ACID | 3.5 | | mg/dL | 3.1– 8.8 |

A-001301

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapfel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

Printed Sep 28, 2002 08:37:25  PAGE: 2

**ICON**
ON Laboratories, Inc.

☐ 260 Smith Street
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PROTOCOL: IXL2011418?

SUBJECT VISIT: SCREENING

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  TEL (305) 243-5944  FAX (305) 243-7668 | 09-SEP-2002 09:50:00 | 10-SEP-2002 00:04:08 | 13-SEP-2002 18:12:00 |

| SUBJECT | | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | ███ |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
██████ ████ ███ █
Miami, FL 33136

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B147336 | 13580748 | |

| LAB USE ONLY |
|---|
| PB: 81592.240    N |

COMMENTS  **NO SLIDE RECEIVED**

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE | |
|---|---|---|---|---|---|
| PHOSPHATE | 3.3 | | mg/dL | 2.4- | 4.9 |
| CALCIUM | 9.9 | | mg/dL | 8.4- | 10.2 |
| GLUCOSE, RANDOM, SERUM | 86 | | mg/dL | 70- | 141 |
| ALBUMIN | 4.7 | | g/dL | 3.7- | 4.9 |
| CHOLESTEROL, TOTAL | 148 | | mg/dL | LESS THAN 200 | |
| UREA (BUN) | 13 | | mg/dL | 9- | 24 |
| —— URINALYSIS —— | | | | | |
| SPECIFIC GRAVITY | 1.015 | | | 1.005- | 1.030 |
| PH | 7.0 | | | 5.0- | 8.0 |
| PROTEIN URINE | NEGATIVE | | mg/dL | NEGATIVE | |
| GLUCOSE URINE | NORMAL | | mg/dL | NORMAL | |
| KETONES | NEGATIVE | | | NEGATIVE | |
| BILIRUBIN | NEGATIVE | | | NEGATIVE | |
| UROBILINOGEN | NORMAL | | mg/dL | NORMAL | |
| BLOOD | NEGATIVE | | | NEGATIVE | |
| NITRITE | NEGATIVE | | | NEGATIVE | |
| MUCOUS | | 3+ | | NONE FOUND TO 1+ | |
| —— AED SAMPLES —— | | | | | |
| CARBAMAZEPINE | 9.2 | | ug/mL | 4.0- | 10.0 |
| Levetiracetam [1] | 28 | | ug/mL | 3- | 37 |
| —— MISC. —— | | | | | |
| CK | 133 | | U/L | 24- | 195 |

REFERRAL LABORATORIES
[1] National Medical Svs, Inc. , Willow Grove, PA 19090

| OUT OF RANGE ANALYTES SUMMARY | | | CLINICALLY SIG. ETIOL | COMMENT |
|---|---|---|---|---|
| --HEMATOLOGY | | | | |
| MCHC | 31.4 | | __YES ✓NO | NCS |
| EOSINOPHILS | 10.1 | | __YES ✓NO | NCS |
| ABS EOSINOPHILS | 0.61 | | __YES ✓NO | NCS |
| ---CHEMISTRY | | | | |
| TOTAL PROTEIN | 8.5 | | __YES __NO | NCS |
| --URINALYSIS | | | | |
| MUCOUS | 3+ | | __YES ✓NO | NCS |

A-001302

Ron Gambardella, PhD, DABCC
LABORATORY DIRECTOR

Dieter Schapel, MD, FCAP
DIR. OF PATH/MEDICAL AFFAIRS

**DCON**
**ON Laboratories, Inc.**

Printe  Sep 28, 2002 08:37:25

☐ 260 Smi   reet
Farmingdale, NY 11735
Tel: 631 777 8833
Fax: 631 777 8842

☐ South County Business ,
Leopardstown, Dublin 18
Tel: 353 1 216 1100
Fax: 353 1 216 1201

PAGE:  3

PROTOCOL   IXL20114189

SUBJECT VISIT   SCREENING

| SITE # | INVESTIGATOR | COLLECTION DATE /TIME | RECEIVED DATE /TIME | REPORT DATE /TIME |
|---|---|---|---|---|
| 3346 | # 3346  T E L (305) 243-5944  F A X (305) 243-7668 | 09-SEP-2002  09:50:00 | 10-SEP-2002 08:04:04 | 13-SEP-2002  10:12:00 |

Eugene E Ramsay, MD
ATT: Marinellie Vega/Jeannee McJilton
University Of Miami School Of Medicine
██ █ █ ██ █
Miami, FL 33136

| | SUBJECT | | |
|---|---|---|---|
| # | INITIALS | SEX | BIRTHDATE |
| 334602 | E-S | M | ██████ |

| ACCESSION # | LABORATORY # | SCREEN # |
|---|---|---|
| B147336 | 13580748 | |

LAB USE ONLY

PB: 81592.241                     N

COMMENTS   **NO SLIDE RECEIVED**

## LABORATORY REPORT

| TEST NAME | RESULTS | ABNORMAL | UNITS | REFERENCE RANGE |
|---|---|---|---|---|

*** ETIOLOGY CODES ***
No change or change not clinically significant.  No follow-up required.
Change clinically significant and attributable to disease or disease
    management. No follow-up required.
Change clinically significant and possibly attributable to study medication.
    No follow-up required.
Change clinically significant and attributable to study medication.          FOLLOW-UP RE
Apparent Laboratory Error.
Unevaluable.

Signature: _____          Date: 10/16/02
Eugene E Ramsay, MD

REPORT  COMPLETE

A-001303

Ron Bamberdella, PhD, DABCC          Dieter Schapfel, MD, FCAP
LABORATORY DIRECTOR                  DIR. OF PATH/MEDICAL AFFAIRS

FAXSR: QUEST DIAGNOSTICS At 11--N-2002 15:45 Page 1



**FAX LABORATORY REPORT**

**Quest Diagnostics**

```
8200018  AREA/ROUTE/STOP: 6800000
WELLINGTON-PSC
10397 SOUTHERN BL (KMART PLAZA)
ROYAL PALM BEACH, FL 33411
```

| PATIENT NAME | PATIENT ID | ROOM NO. | AGE | SEX | PHYSICIAN |
|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | 21 | | BEZNER, ALLEN H |

| PAGE | REQUISITION NO. | ACCESSION NO. | LAB REF.# | COLLECTION DATE & TIME | LOG-IN-DATE | FAX DATE | & TIME |
|---|---|---|---|---|---|---|---|
| 1 | 7990716 | MI305176G | | 06062002  4:30  PM | 06072002 | 06112002 | 4:43PM |

REMARKS

FASTING: U

| REPORT STATUS | TEST | RESULT IN RANGE | RESULT OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| FINAL | | | | | | |

Date of Birth: ████ 1981
A COPY OF THIS REPORT HAS BEEN SENT TO: ALLEN BEZNER,
116 JFK CIRCLE BLDG STE 110
LAKE WORTH, FL
33462

| | | IN RANGE | OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| ALT | | 13 | | U/L | 2-60 | MI |
| CBC (INCLUDES DIFF/PLT) | | | | | | MI |
| WHITE BLOOD CELL COUNT | | 5.3 | | THOUS/MCL | 3.8-10.8 | |
| RED BLOOD CELL COUNT | | 4.45 | | MILL/MCL | 4.20-5.10 | |
| HEMOGLOBIN | | 13.9 | | G/DL | 13.2-15.5 | |
| HEMATOCRIT | | 41.1 | | % | 38.5-45.0 | |
| MCV | | 92.4 | | FL | 80.0-100.0 | |
| MCH | | 31.2 | | PG | 27.0-33.0 | |
| MCHC | | 33.8 | | G/DL | 32.0-36.0 | |
| RDW | | 12.3 | | % | 11.0-15.0 | |
| PLATELET COUNT | | 199 | | THOUS/MCL | 140-400 | |
| ABSOLUTE NEUTROPHILS | | 2094 | | CELLS/MCL | 1500-7800 | |
| ABSOLUTE LYMPHOCYTES | | 1924 | | CELLS/MCL | 850-3900 | |
| ABSOLUTE MONOCYTES | | 456 | | CELLS/MCL | 200-950 | |
| ABSOLUTE EOSINOPHILS | | | 795 H | CELLS/MCL | 50-550 | |
| ABSOLUTE BASOPHILS | | 32 | | CELLS/MCL | 0-200 | |
| NEUTROPHILS | | 39.5 | | % | | |
| LYMPHOCYTES | | 36.3 | | % | | |
| MONOCYTES | | 8.6 | | % | | |
| EOSINOPHILS | | 15.0 | | % | | |
| BASOPHILS | | 0.6 | | % | | |
| CARBAMAZEPINE, TOTAL | | 6.2 | | MG/L | 4.0-12.0 | MI |
| VALPROIC ACID | | 93 | | MG/L | 50-100 | MI |

```
  ** IF AGE AND/OR SEX ARE NOT GIVEN, REFERENCE INTERVALS SHOWN
     ARE THE NARROWEST APPLICABLE ADULT MALE AND/OR FEMALE RANGES **
        Hard Copy with additional information to follow


        >> END OF REPORT - SANCHEZ, EFRAIN MI305176G <<
                                        A-001304
```

FAXER: QUEST DIAGNOSTICS At 6-MAY-2002 05:20 Page 5

## FAX
## LABORATORY REPORT



**Quest Diagnostics**

57009    AREA/ROUTE/STOP: 56W8999
BEZNER, ALLEN H, MD
116 JFK DR
ATLANTIS, FL 33462-6606

| ATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | |
|---|---|---|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | | | 21 | M | BEZNER, ALLEN H | |

| GE | REQUISITION NO. | ACCESSION NO. | LAB REF.# | COLLECTION DATE & TIME | LOG-IN-DATE | FAX DATE | & TIME |
|---|---|---|---|---|---|---|---|
| 1 | 7375205 | MI890578F | | 05032002 4:10 PM | 05042002 | 05062002 | 6:07AM |

REMARKS

SS#: ████████                                            FASTING: N

| REPORT STATUS | FINAL | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|---|
| | | | IN RANGE | OUT OF RANGE | | | |
| Date of Birth: ████/1981 | | | | | | | |
| CARBAMAZEPINE, TOTAL | | | 7.1 | | MG/L | 4.0-12.0 | MI |
| VALPROIC ACID | | | 54 | | MG/L | 50-100 | MI |

Hard Copy with additional information to follow


>> END OF REPORT - SANCHEZ, EFRAIN MI890578F <<

*[Handwritten notes:]*

-6-02 9:03 Am rc from case worker stating pt had a Sz this morning lasting approx 30 seconds. Advised pt has an appt this Wed. 5/8/02. Case work states pt is back to normal now and was advised to keep him under supervision & to call office if there are further episodes okay to stay @ rehab. Jr.

6-01 11:10 PM H had another Sz this am. Per Dr Bezner ↑ Depakote 500 to TID. Pt's mother advised. Jr. Vm Jr Doreen

A-001305

FAXER: QUEST DIAGNOSTICS At 3-APR-2002 02:28 Page 1



FAX
LABORATORY REPORT
Quest
Diagnostics

8200018   AREA/ROUTE/STOP: 6800000
WELLINGTON-PSC
10397 SOUTHERN BL(KMART PLAZA)
ROYAL PALM BEACH, FL 33411

MICROFILM# -

| PATIENT NAME | | PATIENT ID | | | ROOM NO. | AGE | SEX | PHYSICIAN |
|---|---|---|---|---|---|---|---|---|
| EFRAIN, SANCHEZ | | | | | | 21 | | ALLEN BEZNER |

| PAGE | REQUISITION NO. | ACCESSION NO. | LAB REF.# | | COLLECTION DATE & TIME | LOG-IN-DATE | FAX DATE | & TIME |
|---|---|---|---|---|---|---|---|---|
| 1 | 6920539 | MI466452F | . | | 04022002 11:00 AM | 04032002 | 04032002 | 3:29AM |

REMARKS

SS#: ███████           FASTING: N

| REPORT STATUS | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| FINAL | | IN RANGE | OUT OF RANGE | | | |

Date of Birth: ███ /1981
A COPY OF THIS ███ T HAS BEEN SENT TO: ALLEN BEZNER
                                       116 JFK CIR
                                       BUILDING 110
                                       ATLANTIS, FL
                                       33462

| | | IN RANGE | OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| CARBAMAZEPINE, TOTAL | | 7.2 | | MG/L | 4.0-12.0 | QDB |
| VALPROIC ACID | | | 122 H | MG/L | 50-100 | QDB |

```
 **  IF AGE AND/OR SEX ARE NOT GIVEN, REFERENCE INTERVALS SHOWN
     ARE THE NARROWEST APPLICABLE ADULT MALE AND/OR FEMALE RANGES **
        Hard Copy with additional information to follow


     >> END OF REPORT - EFRAIN, SANCHEZ MI466452F <<
```

4-3-02 called pt's mother and gave her new instructions
for Depakote 500mg A.M
500mg afternoon
250 mg P.M
Called in Keppra 250mg 1 BID for 1 wk. then
500 mg BID thereafter.
MT.

fax': 683-3042

702 9:44am TC from Case Mgr @ Goodwill, Daneen
Vatley, to confirm pt's medications. JK.

A-001306

FAXSR: QUEST DIAGNOSTICS At 1F MAP-2002 07:44 Page 1



**FAX
LABORATORY REPORT
Quest
Diagnostics**

MICROFILM# -

```
8200018   AREA/ROUTE/STOP: 6800000
WELLINGTON-PSC
+++PSC
10397 SOUTHERN BL(KMART PLAZA)
ROYAL PALM BEACH, FL 33411
```

| ATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | | |
|---|---|---|---|---|---|---|---|---|---|
| SANCHEZ, ERRAIN | | | | | 20 | M | | | |

| GE | REQUISITION NO. | ACCESSION NO. | LAB REF.# | COLLECTION DATE & TIME | LOG-IN-DATE | FAX DATE | & TIME |
|---|---|---|---|---|---|---|---|
| L | 6272599 | MI238599F | | 03142002 3:10 PM | 03152002 | 03152002 | 8:45AM |

REMARKS

SS#: █████████                                                    FASTING: U

| REPORT STATUS | | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|---|
| | FINAL | | IN RANGE | OUT OF RANGE | | | |

Date of Birth: ████/1981
A COPY OF THIS REPORT HAS BEEN SENT TO: ALLEN, BEZNER
116 JFK CIRCLE
ATLANTIS, FL
33462

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ALT | | 18 | | U/L | 2-60 | QDB |
| CARBAMAZEPINE, TOTAL | | 7.7 | | MG/L | 4.0-12.0 | QDB |
| VALPROIC ACID | | 76 | | MG/L | 50-100 | QDB |

Hard Copy with additional information to follow

>> END OF REPORT - SANCHEZ, ERRAIN MI238599F <<

A-001307

FAXSR: QUEST DIAGNOSTICS At 1 MAR-2002 16:25 Page 1



FAX
LABORATORY REPORT
Quest
Diagnostics

8200018  AREA/ROUTE/STOP: 6800000
WELLINGTON-PSC
+++PSC
10397 SOUTHERN BL (KMART PLAZA)
ROYAL PALM BEACH, FL 33411

MICROFILM# -

| PATIENT NAME | | PATIENT ID | | | ROOM NO. | AGE | SEX | PHYSICIAN | | |
|---|---|---|---|---|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | | | | 20 | M | BEZNER ALLEN | | |
| SE | REQUISITION NO. | ACCESSION NO. | LAB REF.# | | COLLECTION DATE & TIME | | LOG-IN-DATE | FAX DATE | | & TIME |
| | 6087940 | MI056128F | | | 02282002  4:00 PM | | 03012002 | 03012002 | | 5:27PM |

REMARKS

SS#: █████████                                          FASTING: U

| EPORT STATUS | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| | | IN RANGE | OUT OF RANGE | | | |
| PARTIAL | | | | | | |

Date of Birth: ███/1981
A COPY OF THIS REPORT HAS BEEN SENT TO: ALLEN BEZNER
116 JFK BLDG 110
ATLANTIS, FL
33462

| Test | IN RANGE | OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|
| CARBAMAZEPINE, FREE & TOTAL | | | | | EY |
| | | ************************************ * TEST CANCELLED PER CLIENT REQUEST * ************************************ | | | |
| CBC (INCLUDES DIFF/PLT) | | | | | QDB |
| WHITE BLOOD CELL COUNT | 5.8 | | THOUS/MCL | 3.8-10.8 | |
| RED BLOOD CELL COUNT | 4.71 | | MILL/MCL | 4.20-5.80 | |
| HEMOGLOBIN | 14.6 | | G/DL | 13.2-17.1 | |
| HEMATOCRIT | 43.8 | | % | 38.5-50.0 | |
| MCV | 92.8 | | FL | 80.0-100.0 | |
| MCH | 30.9 | | PG | 27.0-33.0 | |
| MCHC | 33.3 | | G/DL | 32.0-36.0 | |
| RDW | 12.4 | | % | 11.0-15.0 | |
| PLATELET COUNT | 275 | | THOUS/MCL | 140-400 | |
| ABSOLUTE NEUTROPHILS | 2993 | | CELLS/MCL | 1500-7800 | |
| ABSOLUTE LYMPHOCYTES | 2036 | | CELLS/MCL | 850-3900 | |
| ABSOLUTE MONOCYTES | 302 | | CELLS/MCL | 200-950 | |
| ABSOLUTE EOSINOPHILS | 418 | | CELLS/MCL | 50-550 | |
| ABSOLUTE BASOPHILS | 58 | | CELLS/MCL | 0-200 | |
| NEUTROPHILS | 51.6 | | % | | |
| LYMPHOCYTES | 35.1 | | % | | |
| MONOCYTES | 5.2 | | % | | |
| EOSINOPHILS | 7.2 | | % | | |
| BASOPHILS | 1.0 | | % | | |
| CARBAMAZEPINE, TOTAL | 9.9 | | MG/L | 4.0-12.0 | QDB |

Hard Copy with additional information to follow

>> REPORT CONTINUED ON NEXT PAGE - SANCHEZ,EFRAIN MI056128F <<

A-001308

**3ORATORY REPORT**



Quest
Diagnostics

```
15856    AREA/ROUTE/STOP: 56W6090
THOMPSON,ISSAC MD
2601 S MILITARY TRL STE 32
WEST PALM BEACH, FL 33415-7512
```

MICROFILM# 02050215371

| PATIENT NAME | | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | |
|---|---|---|---|---|---|---|---|---|---|
| SANCHAZ, EFRAIN | | | | | | 20 | M | THOMPSON, ISAAC K | |
| PAGE | REQUISITION NO. | ACCESSION NO. | LAB REF. # | COLLECTION DATE & TIME | | LOG-IN-DATE | | REPORT DATE | & TIME |
| 1 | 5293726 | MI747122E | | 02052002 | | 02062002 | | 02062002 | 8:23AM |

REMARKS

ATTN DR·Bezner  439-0506

SS#: ███████████                                         FASTING: U

| REPORT STATUS | TEST | RESULT | | UNITS | REFERENCE | SITE |
|---|---|---|---|---|---|---|
| FINAL | | IN RANGE | OUT OF RANGE | | RANGE | CODE |
| Date of Birth: ███/1981 | | | | | | |
| CARBAMAZEPINE, TOTAL | | 5.7 | | MG/L | 4.0-12.0 | QDI |

```
        >> END OF REPORT -- SANCHAZ,EFRAIN MI747122E <<
```

## LABORATORY REPORT



Quest
Diagnostics

```
15A56     AREA/ROUTE/STOP: 56W6030
THOMPSON, ISSAC MD
2601 S MILITARY TRL STE 32
WEST PALM BEACH, FL 33415-7912
```

MICROFILM# —

| PATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | | |
|---|---|---|---|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | | | 20 | M | THOMPSON, ISAAC K | | |
| AGE | REQUISITION NO. | ACCESSION NO. | LAB REF. # | COLLECTION DATE & TIME | | LOG-IN-DATE | REPORT DATE | & TIME |
| 1 | 5293702 | MI651588E | | 01292002 | | 01292002 | 01302002 | 7:56AM |

REMARKS

ATTN DR. Bezner 439-0506

SSN: ███-2247                                                    FASTING: U

| REPORT STA | FINAL | TEST | RESULT IN RANGE | OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|---|
| Date of Birth: ██/1981 | | | | | | | |
| GOT | | | 55 | | U/L | 2-90 | QD) |
| ALT | | | 17 | | U/L | 2-60 | QD) |
| CBC (INCLUDES DIFF/PLT) | | | | | | | QD) |
| WHITE BLOOD CELL COUNT | | | 5.4 | | THOUS/MCL | 3.8-10.8 | |
| RED BLOOD CELL COUNT | | | 4.39 | | MILL/MCL | 4.20-5.80 | |
| HEMOGLOBIN | | | 13.8 | | G/DL | 13.2-17.1 | |
| HEMATOCRIT | | | 40.5 | | % | 38.5-50.0 | |
| MCV | | | 92.2 | | FL | 80.0-100.0 | |
| MCH | | | 31.5 | | PG | 27.0-33.0 | |
| MCHC | | | 34.2 | | G/DL | 32.0-36.0 | |
| RDW | | | 12.6 | | % | 11.0-15.0 | |
| PLATELET COUNT | | | 287 | | THOUS/MCL | 140-400 | |
| ABSOLUTE NEUTROPHILS | | | 2986 | | CELLS/MCL | 1500-7800 | |
| ABSOLUTE LYMPHOCYTES | | | 1469 | | CELLS/MCL | 850-3900 | |
| ABSOLUTE MONOCYTES | | | 459 | | CELLS/MCL | 200-950 | |
| ABSOLUTE EOSINOPHILS | | | 421 | | CELLS/MCL | 50-550 | |
| ABSOLUTE BASOPHILS | | | 65 | | CELLS/MCL | 0-200 | |
| NEUTROPHILS | | | 55.3 | | % | | |
| LYMPHOCYTES | | | 27.2 | | % | | |
| MONOCYTES | | | 8.5 | | % | | |
| EOSINOPHILS | | | 7.8 | | % | | |
| BASOPHILS | | | 1.2 | | % | | |
| CARBAMAZEPINE, TOTAL | | | | 2.7 L | MG/L | 4.0-12.0 | QDI |
| PHENYTOIN | | | | 38.9 H | MG/L | 10.0-20.0 | QDI |

VERIFIED BY REPEAT ANALYSIS

>> END OF REPORT - SANCHEZ, EFRAIN MI651588E <<

1-31-02 Instructed pt's mother: Stop Dilantin until 2/4/02.
↑ Tegutol 200mg ↑ q am, ↑ q lunch, ↑ q dinner; ↑ q hs
Check level mon. 2/4/02. ℞

LABORATORY REPORT

Quest Diagnostics

```
15856      AREA/ROUTE/STOP: 56W6090
THOMPSON, ISSAC MD
2601 S MILITARY TRL STE 32
WEST PALM BEACH, FL 33415-7512
```

MICROFILM# 02050215371

| PATIENT NAME | PATIENT ID | | | ROOM NO. | AGE | SEX | PHYSICIAN | |
|---|---|---|---|---|---|---|---|---|
| SANCHAZ, EFRAIN | | | | | 20 | M | THOMPSON, ISAAC K | |

| GRP | REQUISITION NO. | ACCESSION NO | LAB REF # | COLLECTION DATE & TIME | LOG-IN-DATE | REPORT DATE | & TIME |
|---|---|---|---|---|---|---|---|
| 1 | 5293726 | MI747122E | | 02052002 | 02062002 | 02062002 | 8:23AM |

REMARKS

ATTN DR Bezner 439-0506

SSN: 2747                                                              FASTING: U

| REPORT | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| FINAL | | IN RANGE | OUT OF RANGE | | | |

```
Date of Birth:    /1981
CARBAMAZEPINE, TOTAL          5.7              MG/L        4.0-12.0        QDB

          >> END OF REPORT - SANCHAZ, EFRAIN MI747122E <<
```

okay fax
to Dr Bezner
2/8/02

A-001311

**ABORATORY REPORT**



Quest
Diagnostics

```
15856     AREA/ROUTE/S JP: 56W6090
THOMPSON, ISSAC MD
2601 S MILITARY TRL STE 32
WEST PALM BEACH, FL 33415-7512
```

MICROFILM# -

| PATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | |
|---|---|---|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | | | 20 | M | THOMPSON, ISSAC K | |

| PAGE | REQUISITION NO. | ACCESSION NO. | LAB REF. # | COLLECTION DATE & TIME | LOG-IN-DATE | REPORT DATE | & TIME |
|---|---|---|---|---|---|---|---|
| 1 | 5293702 | MI651508E | | 01292002 | 01292002 | 01302002 | 7:56 |

REMARKS

ATN DR·Bezner 439-0500

SS#: ████████

FASTING: |

| REPORT STATUS | FINAL | TEST | RESULT IN RANGE | RESULT OUT OF RANGE | UNITS | REFFRENCE RANGE | S CO |
|---|---|---|---|---|---|---|---|
| Date of Birth: ███/1981 | | | | | | | |
| GGT | | | 55 | | U/L | 2-30 | G |
| ALT | | | 17 | | U/L | 2-60 | G |
| | | | | | | | |
| CBC (INCLUDES DIFF/PLT) | | | | | | | G |
| WHITE BLOOD CELL COUNT | | | 5.4 | | THOUS/MCL | 3.8-10.8 | |
| RED BLOOD CELL COUNT | | | 4.39 | | MILL/MCL | 4.20-5.80 | |
| HEMOGLOBIN | | | 13.8 | | G/DL | 13.2-17.1 | |
| HEMATOCRIT | | | 40.5 | | % | 38.5 50.0 | |
| MCV | | | 92.2 | | FL | 80.0-100.0 | |
| MCH | | | 31.5 | | PG | 27.0-33.0 | |
| MCHC | | | 34.2 | | G/DL | 32.0-36.0 | |
| RDW | | | 12.6 | | % | 11.0-15.0 | |
| PLATELET COUNT | | | 257 | | THOUS/MCL | 140-400 | |
| ABSOLUTE NEUTROPHILS | | | 2986 | | CELLS/MCL | 1500-7800 | |
| ABSOLUTE LYMPHOCYTES | | | 1469 | | CELLS/MCL | 850-3900 | |
| ABSOLUTE MONOCYTES | | | 459 | | CELLS/MCL | 200-950 | |
| ABSOLUTE EOSINOPHILS | | | 421 | | CELLS/MCL | 50-550 | |
| ABSOLUTE BASOPHILS | | | 65 | | CELLS/MCL | 0-200 | |
| NEUTROPHILS | | | 53.3 | | % | | |
| LYMPHOCYTES | | | 27.2 | | % | | |
| MONOCYTES | | | 8.5 | | % | | |
| EOSINOPHILS | | | 7.8 | | % | | |
| BASOPHILS | | | 1.2 | | % | | |
| CARBAMAZEPINE, TOTAL | | | | 2.7 L | MG/L | 4.0-12.0 | QD |
| PHENYTOIN | | | | 30.9 H | MG/L | 10.0-20.0 | QD |

VERIFIED BY REPEAT ANALYSIS

>> END OF REPORT - SANCHEZ, EFRAIN MI651508E <<

A-001312

LABORATORY REPORT

15856 : AREA/ROUTE/S..P  56W5350
THOMPSON, ISSAC MD
2601 S. MILITARY TRAIL S-32
WEST PALM BEACH, FL 33415
+++CRE

**SB SmithKline Beecham**
Clinical Laboratories

MICROFILM# 02180041041

| PATIENT NAME | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN |
|---|---|---|---|---|---|---|
| SANCHEZ, ETRAIN | | | | 18 | M | THOMPSON, ISAAC K |

| PAGE | REQUISITION NO. | ACCESSION NO. | LAB REF. # | COLLECTION DATE & TIME | LOG-IN-DATE | REPORT DATE | A TIME |
|---|---|---|---|---|---|---|---|
| 1 | 3865129 | TP711662X | | 02172000  900AM | 02182000 | 02182000 | 8:09AM |

REMARKS  FASTING

SS#:

| REPORT STATUS FINAL | TEST | RESULT IN RANGE | RESULT OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| Date of Birth: /1981 | | | | | | |
| COMPREHENSIVE METABOLIC | | | | | | MI |
| PANEL WITHOUT CO2 | | | | | | |
| | GLUCOSE | 73 | | MG/DL | 70-115 | |
| | UREA NITROGEN (BUN) | 10 | | MG/DL | 7-25 | |
| | CREATININE | 0.8 | | MG/DL | 0.5-1.4 | |
| | BUN/CREATININE RATIO | 13 | | (CALC) | 6-29 | |
| | SODIUM | 142 | | MEQ/L | 135-146 | |
| | POTASSIUM | 4.3 | | MEQ/L | 3.5-5.3 | |
| | CHLORIDE | 103 | | MEQ/L | 95-108 | |
| | CALCIUM | 9.1 | | MG/DL | 8.5-10.3 | |
| | PROTEIN, TOTAL | 7.7 | | G/DL | 6.0-8.5 | |
| | ALBUMIN | 4.3 | | G/DL | 3.2-5.0 | |
| | GLOBULIN | 3.4 | | G/DL (CALC) | 2.2-4.2 | |
| | ALBUMIN/GLOBULIN RATIO | 1.3 | | (CALC) | 0.8-2.0 | |
| | BILIRUBIN, TOTAL | 0.4 | | MG/DL | 0.0-1.3 | |
| | ALKALINE PHOSPHATASE | 103 | | U/L | 30-225 | |
| | AST (SGOT) | 21 | | U/L | 0-42 | |

* Reference footnote #1

| CBC (INCLUDES DIFF/PLT) | | | | | | MI |
|---|---|---|---|---|---|---|
| | WHITE BLOOD CELL COUNT | | 4.2 L | THOUS/MCL | 4.5-13.0 | |
| | RED BLOOD CELL COUNT | 4.65 | | MILL/MCL | 4.10-5.30 | |
| | HEMOGLOBIN | 14.3 | | G/DL | 12.0-16.0 | |
| | HEMATOCRIT | 42.8 | | % | 36.0-49.0 | |
| | MCV | 92.0 | | FL | 78.0-102.0 | |
| | MCH | 30.7 | | PG | 25.0-35.0 | |
| | MCHC | 33.3 | | G/DL | 31.0-37.0 | |
| | RDW | 13.2 | | % | 9.0-15.0 | |
| | PLATELET COUNT | 260 | | THOUS/MCL | 130-400 | |
| | ABSOLUTE NEUTROPHILS | | 1701 L | CELLS/MCL | 1800-8000 | |
| | NEUTROPHILS | 40.5 | | % | | |
| | ABSOLUTE LYMPHOCYTES | 1709 | | CELLS/MCL | 1200-5200 | |
| | LYMPHOCYTES | 40.7 | | % | | |
| | ABSOLUTE MONOCYTES | | 155 L | CELLS/MCL | 200-1100 | |
| | MONOCYTES | 3.7 | | % | | |
| | ABSOLUTE EOSINOPHILS | | 613 H | CELLS/MCL | 50-500 | |
| | EOSINOPHILS | 14.6 | | % | | |
| | ABSOLUTE BASOPHILS | 21 | | CELLS/MCL | 0-200 | |
| | BASOPHILS | 0.5 | | % | | |

2-22-00

>> REPORT CONTINUED ON NEXT PAGE - SANCHEZ, ETRAIN TP711662X <<

A-001313

CONTINUED REPORT

15856     AREA/ROUTE/S__P: 56W5350
THOMPSON, ISSAC MD
2601 S. MILITARY TRAIL S-32
WEST PALM BEACH, FL 33415
+++CRE



**SB SmithKline Beecham**
Clinical Laboratories

MICROFILM# 02180041041

| PATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN |
|---|---|---|---|---|---|---|---|
| SANCHEZ, ETRAIN | | | | | 18 | M | THOMPSON, ISAAC K |

| AGE | ACQUISITION NO. | ACCESSION NO. | LAB REF. # | | COLLECTION DATE & TIME | LOG-IN-DATE | REPORT DATE | & TIME |
|---|---|---|---|---|---|---|---|---|
| 2 | 3885129 | TP711662X | | | 02172000  900AM | 02162000 | 02182000 | 8:09AM |

REMARKS    FASTING

SS#:

| REPORT STATUS  FINAL | TEST | RESULT | | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| | | IN RANGE | OUT OF RANGE | | | |

Date of Birth: /1981
CARBAMAZEPINE, TOTAL       11.2            MG/L       4.0-12.0      MI
                                           POTENTIALLY TOXIC: > 12.0

Footnote 1

BECAUSE YOUR ORDER FOR A CHEMISTRY PANEL DID NOT
CONTAIN SBCL SPECIFIC TERMINOLOGY, BUT INDICATED
12 OR MORE ANALYTES AND WE WERE UNABLE TO OBTAIN
A CLARIFICATION FROM YOUR OFFICE, WE PERFORMED
A COMPREHENSIVE METABOLIC PANEL WITHOUT CO2
(NA, K, CL, GLU, BUN, CR, CA, TP, ALB, TBILI, AP, AST).  IF
YOU DID NOT INTEND TO ORDER A COMPREHENSIVE
METABOLIC PANEL WITHOUT CO2, PLEASE CONTACT US
IMMEDIATELY SO THAT WE CAN ADJUST OUR BILLING
APPROPRIATELY.  THE USE OF SBCL SPECIFIC
TERMINOLOGY AND/OR SBCL SELECTEST REQUISITIONS
WILL HELP ENSURE APPROPRIATE TEST ORDERING
PRACTICES.  IF YOU REQUIRE ADDITIONAL OR
ALTERNATIVE TESTING OR ADDITIONAL INFORMATION,
PLEASE PHONE YOUR LOCAL CLIENT RESPONSE CENTER.

        >> END OF REPORT - SANCHEZ, ETRAIN TP711662X <<

A-001314

FAXER: QUEST DIAGNOSTICS At 11-JUN-2002 15:45 Page 1

8200018 AREA/ROUTE/STOP: 6800000
WELLINGTON-PSC
10397 SOUTHERN BL (KMART PLAZA)
ROYAL PALM BEACH, FL 33411



**FAX
LABORATORY REPORT
Quest Diagnostics**

| PATIENT NAME | | PATIENT ID | | ROOM NO. | AGE | SEX | PHYSICIAN | | |
|---|---|---|---|---|---|---|---|---|---|
| SANCHEZ, EFRAIN | | | | | 21 | | BEZNER, ALLEN H | | |

| AGE | REQUISITION NO. | ACCESSION NO. | LAB REF # | | COLLECTION DATE & TIME | LOG-IN-DATE | FAX DATE | & TIME |
|---|---|---|---|---|---|---|---|---|
| 1 | 7990716 | MI305176G | | | 06062002 4:30 PM | 06072002 | 06112002 | 4:43PM |

REMARKS

FASTING: U

| REPORT STATUS: FINAL | TEST | RESULT IN RANGE | RESULT OUT OF RANGE | UNITS | REFERENCE RANGE | SITE CODE |
|---|---|---|---|---|---|---|
| Date of Birth: ████ 981 | | | | | | |
| A COPY OF THIS REPORT HAS BEEN SENT TO: ALLEN BEZNER, | | | | | | |
| | | | | 116 XX CIRCLE BLDG STE 110 | | |
| | | | | LAKE WORTH, FL | | |
| | | | | 33462 | | |
| ALT | | 13 | | U/L | 2-60 | MI |
| | | | | | | MI |
| CBC (INCLUDES DIFF/PLT) | | | | | | |
| WHITE BLOOD CELL COUNT | | 5.3 | | THOUS/MCL | 3.8-10.8 | |
| RED BLOOD CELL COUNT | | 4.45 | | MILL/MCL | 4.20-5.10 | |
| HEMOGLOBIN | | 13.9 | | G/DL | 13.2-15.5 | |
| HEMATOCRIT | | 41.1 | | % | 38.5-45.0 | |
| MCV | | 92.4 | | FL | 80.0-100.0 | |
| MCH | | 31.2 | | PG | 27.0-33.0 | |
| MCHC | | 33.8 | | G/DL | 32.0-36.0 | |
| RDW | | 12.3 | | % | 11.0-15.0 | |
| PLATELET COUNT | | 129 | | THOUS/MCL | 140-400 | |
| ABSOLUTE NEUTROPHILS | | 2094 | | CELLS/MCL | 1500-7800 | |
| ABSOLUTE LYMPHOCYTES | | 1924 | | CELLS/MCL | 850-3900 | |
| ABSOLUTE MONOCYTES | | 456 | | CELLS/MCL | 200-950 | |
| ABSOLUTE EOSINOPHILS | | | 795 H | CELLS/MCL | 50-550 | |
| ABSOLUTE BASOPHILS | | 32 | | CELLS/MCL | 0-200 | |
| NEUTROPHILS | | 39.5 | | % | | |
| LYMPHOCYTES | | 36.3 | | % | | |
| MONOCYTES | | 8.6 | | % | | |
| EOSINOPHILS | | 15.0 | | % | | |
| BASOPHILS | | 0.6 | | % | | |
| CARBAMAZEPINE, TOTAL | | 6.2 | | MG/L | 4.0-12.0 | MI |
| VALPROIC ACID | | 93 | | MG/L | 50-100 | MI |

** IF AGE AND/OR SEX ARE NOT GIVEN, REFERENCE INTERVALS SHOWN
ARE THE NARROWEST APPLICABLE ADULT MALE AND/OR FEMALE RANGES **
Hard Copy with additional information to follow

>> END OF REPORT - SANCHEZ, EFRAIN MI305176G <<

Jun. 12 2002 10:43AM P2     FAX NO. :5614398506     FROM :ALLEN BEZNER MD

**PATIENT NAME:** SANCHEZ, EFRAIN      **DATE SEEN:** 3/22/04
**SS#:**
**PHYSICIAN:** Merredith R. Lowe, M.D.

## FOLLOW-UP EVALUATION

### History:

The patient returns for follow-up visit. The patient was on the Talampanel study. The patient was discontinued from Talampanel on February 2, 2004. The patient continues to take Keppra 2000 mg per day and Topamax 200 mg per day. The patient is reported to have 14 seizures since the last visit January 26, 2004. The patient states that he feels well on the current regimen, however, he continues to have seizures.

### Examination:

Neurologic exam is stable.

### Impression:

Seizures, not controlled on the current regimen.

### Plan:

I recommend increasing the dose of Topamax to 300 mg per day, while continuing the current regimen of Keppra 2000 mg per day. The patient will return for follow-up visit in one month.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.97155

A-001316

**PATIENT NAME:**   **SANCHEZ, EFRAIN**                **DATE SEEN:**   **1/26/04**
**SS#:**                               ███████
**PHYSICIAN:**        **Merredith R. Lowe, M.D.**

## FOLLOW-UP EVALUATION

**History:**

The patient returns for follow-up visit. The patient is in the Talampanel study, the open label portion. The patient is currently taking Talampanel 225 mg per day in three divided doses. The patient also takes Keppra 3000 mg per day in two divided doses and Topamax 100 mg per day in two divided doses. The patient is accompanied to today's visit by his mother. The patient's mother reports that since December, the patient, in her opinion, has had behavioral difficulties. Specifically, the patient has become obsessed with a girl that he met and has tattooed the name of the girl to his neck. According to the patient's mother, the patient was told by the person doing the tattoos not to have the tattoos done, but the patient insisted. According to the patient's mother, the patient also told this tattoo artist that if this girl did not agree to be his girlfriend, he was going to kidnap her. The patient's mother said she was told that he was going to buy a stun gun. The patient's mother said that this behavior is not characteristic of her son. The patient's mother also reports that there have been times since December where the patient has come home and his gait has been unsteady and his behavior has been hyperactive. The patient denies drug use or alcohol use. The patient denies making any threats against anyone.

**Examination:**

The patient is alert and oriented to person and place but not time. The patient does not know what the date is. He does not know the day, month, or year. The patient's mother states that the patient has always had difficulty with dates and always needs to refer to the calendar. Cranial nerves II through XII are intact. No visual field cuts present. Examination of the fundi reveals the disks to be sharp. Motor function is intact. Sensory function is intact to all modalities. Deep tendon reflexes are symmetric. No Babinski sign present. Gait is steady. The patient is able to tandem walk without difficulty. No Romberg sign present.

**Impression:**

According to the patient's mother, the patient continues to have generalized seizures and simple partial seizures. The patient's mother states that she has not noticed any difference since the patient started Talampanel and has reached the current dose. The patient's mother states that she has not noticed any behavioral difficulties since the patient was started on Keppra and the dose was increased to the current dose of 3000 mg per day.

A-001317

**Plan:**

Based on the above circumstances since the patient has not had any better seizure control on the current regimen of Talampanel and the patient's mother reports behavioral difficulties, I recommend decreasing the dose of Talampanel and taking the patient off the Talampanel eventually, while continuing the current dose of Keppra and Topamax. I am requesting that the patient be seen at the crisis center at Jackson Memorial Hospital for psychiatric evaluation and to assess whether or not the patient is a risk of harming himself or anyone else. The patient will return for follow-up visit as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.86109

**INTERNATIONAL CENTER FOR EPILEPSY**　　　　**UNIVERSITY OF MIAMI**

SANCHEZ, EFRAIN　　　　　　　Page 2 of 2　　　　　　　JANUARY 26, 2004

**PATIENT NAME:** SANCHEZ, EFRAIN      **DATE SEEN:** 11/3/03
**SS#:** ▮▮▮▮▮▮▮
**PHYSICIAN:** Merredith R. Lowe, M.D.

## FOLLOW-UP EVALUATION

**History:**

The patient returns for follow-up visit. The patient reports that he has had six seizures since the last visit, which was September 29, 2003. The patient takes Keppra 3000 mg per day, Talampanel 225 mg per day in three divided doses, and Topamax 50 mg per day in two divided doses. The patient states that since starting Topamax, he has noticed that he often feels tired, however, the patient also reports that there are times where he goes to bed very late at night. The patient feels he is tolerating the current regimen and does not wish to make any changes at this time.

**Examination:**

Neurologic exam is stable and unchanged. No clinical sign of toxicity on the current regimen.

**Impression:**

Seizures, not controlled on the current regimen.

**Plan:**

Continue current regimen of Keppra 3000 mg per day and Talampanel 225 mg per day. I recommend increasing the dose of Topamax to 100 mg per day in two divided doses because the patient continues to report recurrence of seizures. The patient will return for follow-up visit as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.73972

A-001319

PATIENT NAME:   SANCHEZ, EFRAIN                    DATE SEEN:   9/29/03
SS#:
PHYSICIAN:      Merredith R. Lowe, M.D.

## FOLLOW-UP EVALUATION

**History:**

The patient returns for follow-up visit.  The patient is in the Talampanel study.  The patient and the patient's mother report that the patient has had six generalized seizures since the last visit, with the last seizure occurring September 26, 2003.  The patient takes Tegretol 200 mg p.o. b.i.d., Keppra 3000 mg per day in two divided doses, and Talampanel 225 mg per day in three divided doses.

The patient states that he feels well on the current regimen, however, he continues to have generalized seizures.  The addition of Keppra has not improved seizure frequency.  The patient is on the maximum amount of study medication.

**Examination:**

The patient is alert and oriented.  Speech is fluent.  Comprehension is intact.  No facial asymmetry is noted.  Ocular movements are intact.  No nystagmus present.  No visual field cuts present.  No motor weakness present.  No pronator drift.  Coordination is intact to finger-to-nose.  Gait is steady.

**Impression:**

Seizures, not controlled on the current regimen.  The patient is tolerating the current regimen without difficulty.

**Plan:**

I reviewed in detail the side effect profile of Topamax.  The patient is willing to start Topamax to try and achieve better seizure control.  The patient will start at a dose of 25 mg p.o. b.i.d. and increase the dose by 25 mg per week until he is taking 50 mg p.o. b.i.d.  At that time, the patient will return for follow-up visit.  At that time, I will consider decreasing the dose of Keppra, while continuing Tegretol and Talampanel study medication.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.68651

A-001320

**PATIENT NAME:**  **SANCHEZ, EFRAIN**            **DATE SEEN:  8/4/03**
**SS #:**
**PHYSICIAN:**   **R. Eugene Ramsay, M.D.**

## FOLLOW-UP EVALUATION

**History:**

This young man is in the Talampanel study.  He came in on 25 mg t.i.d., along with Tegretol 400 mg b.i.d. and Keppra 1000 mg b.i.d.  He has had four generalized seizures.  He reports that the seizures have not really changed in character since he was here last.  He does feel, however, that the generalized seizures are less frequent.

**Examination:**

Weight 145 pounds.  Blood pressure 124/84.  Pulse 62.  Respirations 16.  Neurological exam was completed normal.

**Disposition:**

He will continue on the protocol and increase the dose to 50 mg b.i.d. of Talampanel. We will see him back as per protocol.

R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/njw.60567

A-001321

PATIENT NAME:   **SANCHEZ, EFRAIN**        **DATE SEEN:   7/21/03**
SS#:
PHYSICIAN:        **Merredith R. Lowe, M.D.**

## FOLLOW-UP EVALUATION

### History:

The patient is on the Talampanel study. The patient is currently taking Talampanel 25 mg p.o. t.i.d. In addition, the patient takes carbamazepine 800 mg a day in two divided doses and Keppra 2000 mg per day in two divided doses.

Since the last visit, the patient has had four seizures. With these events, the patient apparently has alteration of awareness. The patient reports that he recently had an event reported as a seizure in which he was hearing voices from the television. According to the patient and the patient's mother, the patient has not experienced this specific symptom before and at this time the patient states that he does not hear voices.

According to the patient and the patient's mother, the patient does not have any psychiatric history. The patient reports that with his events, he often gets the feeling of fear and he experienced it with this last event.

### Examination:

The patient is alert and oriented x 3. Speech is fluent. Comprehension is intact. Mood and affect are appropriate. The patient denies hearing voices. Neurologic exam is stable and unchanged. No signs of incoordination. Gait is stable. No sign of nystagmus. Motor function is intact. Ocular movements are intact. Pupils equal, regular, and reactive. Gait is steady.

### Impression:

The patient continues to have seizures despite the current regimen. The report of the patient hearing voices from the television set are, in my opinion, most likely related to a seizure event.

### Plan:

Increase dose of Talampanel as per study protocol, while continuing the current regimen of Tegretol and Keppra. The patient and the patient's mother have been instructed that if the patient has any difficulty with the increased dose of Talampanel, he should reduce the dose back to what it was prior to the most recent increase.

A-001322

The patient will return for follow-up visit as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.58551

---

**INTERNATIONAL CENTER FOR EPILEPSY**          **UNIVERSITY OF MIAMI**

SANCHEZ, EFRAIN                    Page 2 of 2                    JULY 21, 2003

A-001323

**PATIENT NAME:** **SANCHEZ, EFRAIN**            **DATE SEEN: 7/7/03**
**SS #:**                    ███████
**PHYSICIAN:**     **R. Eugene Ramsay, M.D.**

## FOLLOW-UP EVALUATION

### History:

The patient is at the end of the blinded treatment phase for Talampanel. He is also on Tegretol 800 and Keppra 2000 mg per day. He has had no interim medical problems.

He does describe a new phenomenon. He is feeling a buzzing sensation in his left foot which began about five weeks ago. This lasts up to three to four minutes. This is not painful and it does not radiate, but it tends to occur in the foot up to about the ankle. He also has had an occasional time where he noted a similar type of buzzing in both hands, and this perception is not necessarily linked between the upper and lower extremity. There has been no trauma and he is on no other medications.

He has no bowel or bladder symptoms. He does describe, however, some pressure sensation in his left flank. He has not fallen, so there is no injury. There is no relationship between the pressure sensation in the flank and the buzzing feeling that he has in his foot.

### Examination:

Weight 143 pounds. Blood pressure 123/79. Pulse 57. Temperature 96.0. Neurological exam was normal, including a careful assessment of his peripheral sensory exam.

### Disposition:

I am not sure of the etiology of his "buzzing" sensation in his left foot and separately in his hands. I find nothing on his examination to indicate the presence of a neurological problem. We will continue to taper him over to the target open Talampanel dose and see how he responds. I suppose the buzzing sensation could be secondary to the medication, however, I would not expect this occurring asymmetrically in the limbs. He will return as per protocol and stay on his present dose of Tegretol and Keppra.

*R. Eugene Ramsay*

R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/njw.56458

A-001324

PATIENT NAME:   SANCHEZ, EFRAIN          DATE SEEN:   6/23/03

PHYSICIAN:      John De Toledo, M.D.

## FOLLOW-UP EVALUATION

### History:

The patient returns for follow-up.  He is part of the Talampanel drug study.  He continues taking Tegretol 800, Keppra 2000, and either the drug or placebo.  His condition is essentially unchanged.  Although the frequency of seizures has increased somewhat, it does not seem to have changed a whole lot from earlier months.  The severity of the seizures is also unchanged, as is the timing.  As with his previous seizures, no specific triggers are indicated.  He is taking no other medications other than albuterol on an as-needed basis.  He denies other interval changes.  He reports some difficulty with hemorrhoids, but that is also long-standing.

### Examination:

Examination today shows him to be alert, oriented, and cooperative.  He has no ataxia, incoordination, or nystagmus.

### Disposition:

Seizure disorder, clinically unchanged.  The patient is finishing the double-blind portion of the study.  We will continue into the open label.  We are making no specific changes in his drugs at this point.  Disposition will be done according to the protocol.

John DeToledo, M.D.
Associate Professor of Neurology
Chief, EEG Lab Jackson Memorial Hospital
Co-Director, International Center for Epilepsy
University of Miami

JD/COMP/njw.54061

A-001325

**PATIENT NAME:**  SANCHEZ, EFRAIN          **DATE SEEN:**  5/26/03

**SS#:** ████████

**PHYSICIAN:**  Merredith R. Lowe, M.D.

## FOLLOW-UP EVALUATION

### History:

The patient is participating in the Talampanel.  The patient is in the placebo phase of the study.  The patient reports that he has had nine complex partial seizures since the last visit.  In addition to the study medication placebo phase, the patient is taking carbamazepine 800 mg per day and Keppra 2000 mg per day in two divided doses.

### Examination:

The patient is alert and oriented x 3.  Speech is fluent.  Comprehension is intact. Mood and affect are appropriate.  Cranial nerves II through XII are intact.  Examination of the fundi reveals the disks to be sharp.  No visual field cuts present.  Motor function is intact.  Sensory function is intact to all modalities.  Deep tendon reflexes are symmetric. No Babinski sign present.  Coordination is intact to finger-to-nose test.  Gait is steady. Patient is able to tandem walk without difficulty.  No Romberg sign present.

### Impression:

The patient reports that he continues to have seizures, but he is tolerating the current regimen without difficulty.

### Plan:

The patient will continue on the current regimen.  The patient will return for follow-up visit as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.48229

A-001326

**PATIENT NAME:**   **SANCHEZ, EFRAIN**         **DATE SEEN:**   **4/28/03**

**PHYSICIAN:**          **John De Toledo, M.D.**

## FOLLOW-UP EVALUATION

### History:

The patient returns for follow-up. He is part of the Talampanel study. He is in the double blind phase. He is taking Tegretol 800 and Keppra 2000. The patient and the mother indicate that the frequency of the major seizures has decreased. All in all, they feel that he is doing somewhat better, although he has had an increase in the number of these smaller episodes. He describes these episodes as thoughts or sensations that may linger for many seconds at a time, and he feels very anxious about them. The mother believes that his awareness is not much affected during that time. He denies side effects from any of the medications and denies other interval changes.

### Examination:

Examination today shows no signs or symptoms of drug toxicity.

### Disposition:

Seizure disorder, presently undergoing a trial of Talampanel. No significant side effects are reported.

We are keeping him on the present combination of medications. We will see him in follow-up according to the protocol.

John DeToledo, M.D.
Associate Professor of Neurology
Chief, EEG Lab Jackson Memorial Hospital
Co-Director, International Center for Epilepsy
University of Miami

JD/COMP/njw.42977

A-001327

PATIENT NAME:    SANCHEZ, EFRAIN                    DATE SEEN:    3/24/03
SS#:
PHYSICIAN:       Merredith R. Lowe, M.D.

## FOLLOW-UP EVALUATION

**History:**

The patient returns for follow-up visit. The patient is on the Talampanel study. The patient is on the Talampanel/placebo stage of the study. The patient also takes Tegretol 800 mg per day in two divided doses and Keppra 2000 mg per day in two divided doses. The patient reports that he has had two seizures since the last visit, both involving alterations of consciousness. The patient states that he feels well on the current regimen and does not report any difficulties.

**Examination:**

Neurologic exam is stable and unchanged.

**Impression:**

Seizures, not controlled on the current regimen. The patient is the Talampanel/placebo stage of the study. We do not know if the patient is receiving Talampanel or placebo.

**Plan:**

Continue current study protocol since the patient is feeling well on the current regimen and is not reporting any difficulties. The patient will return for follow-up visit as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami

MRL/COMP/njw.36752

A-001328

**PATIENT NAME:**   **SANCHEZ, EFRAIN**          **DATE SEEN:  03/17/03**
**SS #:**
**PHYSICIAN:**      **R. Eugene Ramsay, M.D.**

## FOLLOW-UP EVALUATION

### History:

This patient is on the Talampanel study.  He is on carbamazepine 800, Keppra 2000, and is in the blinded phase of Talampanel.  He has had one generalized seizure and three simple partial seizures.  The last visit was on March 10.  He is feeling well and has done fine from the last visit.  He has had no interim medical problems.

### Examination:

Weight:  136 pounds.   Blood pressure:  148/97.  Neurological exam was normal.

### Disposition:

The medications were left at the present dose, and he will return as per protocol.

R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/cac.37876

A-001329

**PATIENT NAME:** SANCHEZ, EFRAIN      **DATE SEEN: 03/10/03**

**PHYSICIAN:** John De Toledo, M.D.

## FOLLOW-UP EVALUATION

### History:

The patient returns for a followup. He is part of the Talampanel drug study. He was started on the drug approximately seven days ago and is doing well. He denies side effects from the drug since its initiation.

### Examination:

Examination today shows him to be alert, oriented, and cooperative. He has no ataxia, incoordination, or nystagmus. There are no signs of drug toxicity at this point.

### Disposition:

Seizure disorder, undergoing a trial of Talampanel. Today we are starting to increase the dose to two pills three times a day and keeping the dose of Keppra and Tegretol unchanged for now. We will see him in followup according to the protocol.

John De Toledo, M.D.
Associate Professor of Neurology
Chief, EEG Lab Jackson Memorial Hospital
Co-Director, International Center for Epilepsy
University of Miami

JD/COMP/cac.34498

**PATIENT NAME:**   **SANCHEZ, EFRAIN**         **DATE SEEN:  03/03/03**

**PHYSICIAN:**       **John De Toledo, M.D.**

## FOLLOW-UP EVALUATION

**History:**

The patient returns for a followup.  He is being enrolled in the Talampanel study.  He is taking Tegretol 800 and Keppra 2000 mg a day.  The patient is alert, oriented, and cooperative.  Cranial nerves II-XII are normal with no nystagmus.  Visual fields are full to confrontation.  Muscular strength is 5/5.  He has no drifting, posturing, or fixation.  Rapid repetitive movements are slightly sluggish bilaterally.  He has normal performance on finger-to-nose and he has no resting tremor. The patient is able to walk on tiptoes and tandem without difficulty.

Baseline neurological exam prior to entering drug study shows a nonfocal neurological exam.

John De Toledo, M.D.
Associate Professor of Neurology
Chief, EEG Lab Jackson Memorial Hospital
Co-Director, International Center for Epilepsy
University of Miami

JD/COMP/cac.33520

A-001331

PATIENT NAME:    SANCHEZ, EFRAIN                DATE SEEN:  1/27/03

PHYSICIAN:       John De Toledo, M.D.

## FOLLOW-UP EVALUATION

### History:

The patient returns for a followup.  He is now doing the baseline for the Talampanel study.

### Examination:

Examination today shows him to be alert, oriented, and cooperative.  Weight:  135. Blood pressure:  120/83.  Mental status exam is noted for some hesitation in speech, but he is able to comprehend and follow complex commands.  He reads at an elementary school level.  Cranial nerves II-XII are normal.  Visual fields are full to confrontation, and he has no nystagmus.  Muscular strength is 5/5 with no drifting or posturing.  He does not have myoclonus, other involuntary movements, or tremor. Deep tendon reflexes are symmetrical.  Plantar responses are downgoing.  Sensory and cerebellar exams are normal.  The patient is able to walk on tiptoes, tandem, and heels.   General examination is also noted for problems with acne but no other abnormalities are noted.

### Disposition:

Baseline neurologic exam for the Talampanel study shows no focal neurologic deficits.

John De Toledo, M.D.
Associate Professor of Neurology
Chief, EEG Lab Jackson Memorial Hospital
Co-Director, International Center for Epilepsy
University of Miami

JD/COMP/cac.28178

A-001332

**PATIENT NAME:**    **SANCHEZ, EFRAIN**       **DATE SEEN: 1/13/03**

**SS #:**          █████████

**PHYSICIAN:**      R. Eugene Ramsay, M.D.

## FOLLOW-UP EVALUATION

### History:

This young man has had five seizures since he was here last. They are again similar to what he has had in the past. He has a perception of a feeling of fear. He then loses consciousness. He has flexion of his arms and crosses his legs and then he will usually fall. His eyes roll up and he will have arching of his back, and he will salivate and often have urinary incontinence. The last one occurred this morning. The seizures are stereotyped. He is presently on carbamazepine 800 mg and Keppra 2000 mg a day. He has been compliant with his medications although he did run out of the 400 mg extended release carbamazepine, and it was refilled with 200 mg standard Tegretol. For one day, he was taking one 200 mg b.i.d. which was just for yesterday. I have instructed them to increase that to two pills b.i.d. as of today. There have been no interim medical problems.

### Examination:

Weight: 135 pounds. Blood pressure: 129/61. Pulse: 63 and regular. Respirations: 16. Neurological exam was normal.

### Disposition:

There have been some mixed visits, and we talked with the sponsoring company and they have agreed as long as the rest of the visits are met that he can still remain in the study. This will be a 2# visit. We will draw blood levels, and he will return in four weeks, at which time Talampanel will be started.

R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/cac.26546

A-001333

**PATIENT NAME:**   **SANCHEZ, EFRAIN**     **DATE SEEN:  10/22/02**
**SS #:**
**PHYSICIAN:**     **R. Eugene Ramsay, M.D.**

## FOLLOW-UP EVALUATION

### History:

The patient has had 3 ~~10~~ complex partial seizures since he was here last on 09/09/02 *10/07/02*... He is presently on carbamazepine 800 and Keppra 2000 mg a day. He is tolerating this dose well but unfortunately continues to have frequent seizures. He has had a history of asthma but has had no exacerbations in the interim. He is here as part of the Talampanel study.

### Examination:

Weight: 136 pounds. Blood pressure: 124/73. Pulse: 50 and regular. Respirations: 16. Temperature: 97. 5. Neurological examination was completely normal.

### Disposition:

He will stay on his present medications and return as per protocol to be started on Talampanel.


R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/cac.18580

A-001334

**PATIENT NAME:**   **SANCHEZ, EFRAIN**          **DATE SEEN:**   **10/07/02**
**PHYSICIAN:**        **Merredith R. Lowe, M.D.**

## FOLLOW-UP EVALUATION

### History:

The patient returns for a follow-up visit.  The patient is being screened for the Talampanel Study.  The patient reports that since the last visit on September 9, 2002, the patient has had eight secondary generalized seizures.  The patient states that he gets a warning prior to these events which he describes as a feeling of fear.  The patient is taking carbamazepine 400 mg p.o. b.i.d. and Keppra 1000 mg p.o. b.i.d.  The patient states that he feels well on the current regimen, however, continues to have seizures. Since the last visit, patient had an asthma attack on October 5, 2002.  The patient was started on prednisone 50 mg tablets 1 tablet per day for four days and an albuterol inhaler.  The albuterol inhaler is used p.r.n.   The patient was also started on erythromycin 500 mg p.o. q.i.d. for seven days for bronchitis.

### Examination:

The patient is alert and oriented x 3.  Speech is fluent.  Comprehension is intact.  Mood and affect are appropriate.  The patient is in no acute distress.  Cranial nerves II-XII are intact.  Examination of the fundi reveal the discs to be sharp.  No visual field cuts present.   Motor function is intact.   Sensory function is intact to all modalities. Coordination is intact.  Deep tendon reflexes are symmetric.  No Babinski sign is present.  Gait is steady.  No Romberg sign present.

### Impression:

The patient with secondary generalized seizures being screened for the Talampanel Study.   The patient has had eight seizures since the last visit.

### Plan:

The patient will continue on the current regimen and will continue screening for the Talampanel Study.  The patient will return as per study protocol.

Merredith R. Lowe, M.D.
Assistant Professor of Neurology
International Center for Epilepsy
University of Miami
MRL/COMP/cac.16431

A-001335

**PATIENT NAME:** SANCHEZ, EFRAIN     **DATE SEEN: 09/09/02**
**SS #:**
**PHYSICIAN:** R. Eugene Ramsay, M.D.

## FOLLOW-UP EVALUATION

**History:**

This gentleman is here as a screening visit for a Talampanel study. He was here last on 08/20/02 and subsequently has had four secondary generalized seizures. He is on Keppra 2000 mg and Tegretol XR 800 mg a day. Documented seizures occurred on 08/20, 09/03, 09/05, and 09/08. He has had no interim medical problems and is not reporting any complaints about the medication. Four months ago, he had an infected left ear and was in the hospital for 14 days. That has cleared.

**Examination:**

Weight 137 lbs. Blood pressure 124/81. Pulse 85 and regular. Neurological examination was normal.

**Disposition:**

He will stay on the same dose of medication and return as per protocol.

R. Eugene Ramsay, M.D.
Professor of Neurology
Director, International Center for Epilepsy
University of Miami

RER/COMP/cac.14028

A-001336

07/16/2005  16:08    5616154170                    PALM BEACH LAKES ESE                          PAGE  02

**THE SCHOOL DISTRICT OF PALM BEACH COUNTY**
**EXCEPTIONAL STUDENT EDUCATION (ESE)**
**Individual Education Plan (IEP)**

| STUDENT NUMBER: | 1 3 0 3 3 1 7 | PAGE NO. 1 of 7 |
|---|---|---|
| CURRENT DATE: 11/26/2002 | IEP DUE DATE: 11/25/2003 | |

| STUDENT NAME: (last) Sanchez | (first) Efrain | (MI) | DATE OF BIRTH: | SEX: |
|---|---|---|---|---|
| SAC SCHOOL: Palm Beach Lakes High School | CURRENT SCHOOL: Palm Beach Lakes High School | GRADE 12 | REEVA | |

## 1. PROCEDURAL SAFEGUARDS

☐ **SUMMARY OF PROCEDURAL SAFEGUARDS** (PBSD 1025) (in the home language) has been received by and an explanation was given to the parent(s) or guardian(s) of the student.  Parent/Guardian Initials: _____

☐ Parent received *Summary of Procedural Safeguards* and waived rights for explanation.  Parent/Guardian initials: _____

☐ Parent was not in attendance. Copy of *Summary of Procedural Safeguards* (PBSD 1025) was sent home on: ___/___/___

Primary language or mode of communication of parent/guardian if other than English: _____

Interpreter/translator provided: ☐ N/A ☐ Yes ☐ No  If no, explain: _____

## 2. IEP CONFERENCE(S) Conference Type (Check all that apply):

☐ Initial   ☑ Annual review   ☐ Temporary assignment   ☐ Alternative Education consideration   ☐ Reevaluation

☐ Extended School Year (ESY)   ☐ Preschool transition   ☐ Interim review (date) ___/___/___

## 3. AREAS OF ELIGIBILITY /A/ Primary Exceptionality

☑ A. Educable Mentally Handicapped
☐ B. Trainable Mentally Handicapped
☐ C. Orthopedically Impaired
☐ D. Occupational Therapy
☐ E. Physical Therapy
☐ F. Speech Impaired  F  V  A
☑ G. Language Impaired  (circle)

☐ H. Deaf or Hard of Hearing
☐ I. Visually Impaired
☐ J. Emotionally Handicapped
☐ K. Specific Learning Disabled
☐ L. Gifted
☐ M. Hospital/Homebound
☐ N. Profoundly Mentally Handicapped

☐ O. Dual-Sensory Impaired
☐ P. Autistic
☐ Q. Severely Emotionally Disturbed
☐ S. Traumatic Brain Injured
☐ T. Developmentally Delayed (age: 0-5)
☐ V. Other Health Impaired

## 4. SIGNATURES  The following individuals were in attendance at the IEP meeting and participated in the development of the IEP. Marked (*) signatures indicate individuals who must be in attendance:

| PARENT/GUARDIAN | GENERAL EDUCATION TEACHER * | NAME/TITLE |
|---|---|---|
| PARENT | ESOL TEACHER | NAME/TITLE |
| LEA REPRESENTATIVE * | STUDENT | NAME/TITLE |
| ESE TEACHER / ESE SERVICE PROVIDER * | NAME/TITLE | NAME/TITLE |
| EVALUATION SPECIALIST * | NAME/TITLE | NAME/TITLE |

Complete for the students in 9th grade or turning 16 years of age during the IEP year:
Responsibilities and/or Linkages for Transition Services:  How were agency representative(s) invited? (check below)

☑ Written (date) ___/___/___   ☐ Phone (date) ___/___/___   ☐ Other_____ (date) ___/___/___

| AGENCY REPRESENTED | RESPONSIBILITIES | AGENCY REPRESENTATIVE SIGNATURE | DATE |
|---|---|---|---|

If agency representative(s) were not in attendance, describe the method(s) of obtaining input:
M. O'Meare will send information to school for student

PBSD 0659 (REV. 7/6/2001)  ORIGINAL - ESE Confidential File    COPY - Parent/Guardian    COPY - Staff Responsible for Implementing IEP

A-001337

07/16/2005 16:08 5516154170 PALM BEACH LAKES ESE PAGE 03

| STUDENT NAME: (last) | (first) | (MI) | STUDENT NUMBER: | PAGE NO. |
|---|---|---|---|---|
| Sanchez | Efrain | | 1 3 0 3 3 1 7 | 2 of 7 |

## 5. LIMITED ENGLISH PROFICIENCY (LEP)
Student has Limited English Proficiency. ☐ Yes ☐ No  If Yes, student's LEP needs are met through: ☐ ESE ☐ ESE/ESOL ☐ Other
If other, explain:

## 6. IEP CONSIDERATIONS
The student's disability affects his/her involvement and progress in the general education curriculum, or for preschool students, participation in appropriate activities, in the following way(s):
Due to Efrain's low cognitive ability and his problems with reading and math, Efrain is unable to successfully complete the general curriculum.

Prior to developing IEP goals and objectives, the team has considered:
☑ Previous Goals and Objectives  ☑ Informal Assessments
☐ Evaluation/Reevaluation Results  ☐ Results of Performance on Statewide Assessment(s) (as appropriate):

☑ Strengths of Student demonstrates effort when self motivated

☐ Parent Input

In addition to the previous information, the committee assures that the following have been considered or are not appropriate:

| CONSIDERED | N/A | |
|---|---|---|
| ☑ | ■ | The assistive technology or equipment needs for the student. |
| ☑ | ■ | The communication and language needs for the student. |
| ☐ | ☑ | Positive behavior interventions, strategies, and supports for students whose behavior impedes learning. |
| ☐ | ☑ | The need for Braille instruction for students who are blind or visually impaired. |
| ☐ | ☑ | For students who are deaf or hard of hearing, opportunities for direct communication in the student's language and communication mode. |

## 7. OTHER PERTINENT INFORMATION
Diploma Option ☐ N/A Student not age appropriate. ☐ Standard Diploma ☑ Special Diploma (check one option)    ☐ Option 1    ☑ Option 2

YES  N/A
☑  ☐  Medical Information: seizures

☐  ☐  Other (e.g., allergies, restrictions):

## 8. TRANSITION STATEMENT ☐ N/A  Student not age appropriate.
☐ 14-15 years old or will turn 14 during the current IEP duration. Transition service needs may be addressed through components of the IEP that focus on the student's course of study. Provide a brief description of the student's course of study.
Student will take _____ course of study, leading to (desired Postschool outcome)

☑ Ninth grade or 16 years old or will turn 16 during the current IEP duration (complete IEP Transition Plan (PBSD 1779)
The following is an outcome statement that describes a direction and vision of the student's post-high school plans from the perspective of the student, parent, and team members.
Student will take _____ course of study, leading to (desired Postschool outcome) _____

Transfer of Rights  Check (4) if the student has been informed of transfer of rights at least one year prior to reaching the age of majority (18). Indicate the date when this occurred.
☐ Student was informed.  Date of notification: ___/___/___    How was the student notified? _____
☐ Parent was informed.  Date of notification: ___/___/___    How was the parent notified? _____

## 9. LONG-TERM GOALS AND SHORT-TERM OBJECTIVES/TRANSITION PLAN
The committee has determined that, based upon all available information, the attached long-term goals and short-term objectives are necessary to provide an appropriate education. See Long-term Goals and Short-term Objectives (PBSD 0559C) or Transition Plan (PBSD 1779).

PBSD 0559 (REV. 7/6/2001) ORIGINAL – ESE Confidential File    COPY – Parent/Guardian    COPY – Staff Responsible for Implementing IEP

A-001338

07/16/2005 16:08 5516154170 PALM BEACH LAKES ESE PAGE 04

| STUDENT NAME: (last) | (first) | (MI) | STUDENT NUMBER: | PAGE NO. |
|---|---|---|---|---|
| Sanchez | Efrain | | 1 3 0 3 3 1 7 | 3 of |

## 10. SPECIAL EDUCATION SERVICES

| Areas of instruction (e.g., electives, math, etc.) | Location REG. ESE BOTH | | | Service Provider REG. ESE BOTH | | | Special Education Service | Frequency/Time (e.g. daily, weekly, monthly/minutes) |
|---|---|---|---|---|---|---|---|---|
| 1. Vocational electives | | ✓ | | | ✓ | | time sheets | weekly |
| 2. | | | | | | | | |
| 3. | | | | | | | | |
| 4. | | | | | | | | |
| 5. | | | | | | | | |
| 6. | | | | | | | | |
| 7. | | | | | | | | |

## 11. ACCOMMODATIONS / PROGRAM MODIFICATIONS / SUPPLEMENTAL AIDS AND SERVICES

| What | How Often | Where | By Whom |
|---|---|---|---|
| job performance evaluations | monthly | ESE/JOB | transition specialist |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## 12. RELATED SERVICES

| What | How Often | Where | By Whom |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Assistive Technology ☐ Yes ☑ Assistive technology is not required at this time.
If yes, explain:

Special Transportation (Check (4) all that apply.) ☑ No special services needed
☐ (A) Medical equipment (child safety restraint system included) ☐ (B) Medical condition ☐ (C) Aide/monitor required
☐ (D) Shortened school day ☐ Other:

Physical Education (Check (4) only the one program that applies.) ☑ NA (not required at this time)
☐ Regular ☐ Adaptive regular ☐ Specially designed physical education

PBSD 0659 (REV. 7/6/2001) ORIGINAL - ESE Confidential File   COPY - Parent/Guardian   COPY - Staff Responsible for Implementing IEP

A-001339

07/16/2005 16:08 5616154170     PALM BEACH LAKES ESE     PAGE 05

| STUDENT NAME: (last) | (first) | (MI) | STUDENT NUMBER: | PAGE NO. |
|---|---|---|---|---|
| Sanchez | Efrain | | 1 3 0 3 3 1 7 | 4 of 7 |

## 13. SUPPORT NEEDED FOR SCHOOL PERSONNEL    ☑ No Support Services required at this time.

*(The IEP team recommends the following training/support be provided to personnel listed below to assist with implementing the student's IEP.)*

| School Personnel | Needs | Who is Responsible | Projected Date |
|---|---|---|---|
| | | | |
| | | | |

## 14. STATE OR DISTRICTWIDE ASSESSMENT PARTICIPATION   ☑ Student not age appropriate

If the answer to any of the following questions is checked "Yes", the IEP team can anticipate that the student may be included in the administration of Statewide Testing.

YES  NO

☐ ☐   Is the student working on the Sunshine State Standards (SSS)?

☐ ☐   Is the student expected to progress toward a standard high school diploma?

☐ ☐   Does the student demonstrate cognitive ability and adaptive behavior that allow for completion of SSS with appropriate accommodations?

☐ ☐   Can allowable accommodations be made to statewide testing so that the student can complete the test without changing the validity of the test?

Will the student participate in State and District assessments? ☐ Yes, standard administration

☐ Yes, with accommodations    ☐ Partial (explain) _____    ☐ No, exempt from all portions

Accommodations required for participation in the assessment (if permitted by the test publisher) may include:
*(Any accommodations which are checked must also be implemented in the classroom for the student)*

A. Presentation _____     B. Responding _____

C. Scheduling _____     D. Setting _____

E. Assistive Devices _____     F. Other _____

If the student meets exemption criteria, the following alternate assessment will be completed
*(If student is exempted this section must be completed)*

☐ Brigance _____     ☐ Assessment and Learning Profile ☐ Other _____

## 15. EXTENDED SCHOOL YEAR

Extended School Year program has been considered. Does the student require an ESY program to obtain benefit from his/her educational program? ☐ Yes ☐ No ☑ Insufficient information available to determine ESY services. If yes, see ESY Interim form.

## 16. IEP IMPLEMENTATION

Person(s) responsible for the implementation of this IEP include:

☐ Regular Education Teacher(s)   ☑ ESE Teacher(s)    ☐ Speech/Language Pathologist    ☐ Psychologist

☐ Orientation and Mobility Specialist ☐ Occupational Therapy Staff   ☐ Physical Therapy Staff   ☐ Guidance Counselor

☑ Student   ☑ Other(s): transition specialist

How will the IEP be made available to the persons implementing it?
Copy given to all committee members at IEP meeting ☑ Yes ☐ No

If no, how will the IEP be provided? _____

All persons responsible were notified of their IEP implementation responsibilities during the IEP committee meeting. ☐ Yes ☑ No

If no, how will the IEP team members be notified? Copy will be provided

Services delineated on the IEP, unless otherwise indicated,

    will initiate 11/27/2002 and have an anticipated duration through 06/01/2003 and

    will initiate 08/14/2003 and have an anticipated duration through 11/25/2003.

PBSD 0659 (REV. 7/6/2001) ORIGINAL - ESE Confidential File    COPY - Parent/Guardian    COPY - Staff Responsible for Implementing IEP

A-001340

07/16/2005 16:08 5616154170 PALM BEACH LAKES ESE PAGE 06

| STUDENT NAME (last) | (first) | (MI) | STUDENT NUMBER | PAGE NO. |
|---|---|---|---|---|
| Sanchez | Efrain | | 1 3 0 3 3 1 7 0 | 5 of 7 |

## 17. LEAST RESTRICTIVE ENVIRONMENT (LRE)

**Considerations:** Factors considered in selecting the student's placement and ensuring that it is in the least restrictive environment include parent/committee input, current educational performance levels, goals and objectives, as well as: *(Check all that apply)*

- ☑ Student frustration and stress
- ☑ Student self-esteem and worth
- ☐ Student requires extensive adaptive equipment
- ☑ Student requires extensive direct academic instruction
- ☐ Distractibility
- ☑ Need for lower pupil-to-teacher ratio
- ☐ Student requires extensive instruction in organizational strategies

- ☐ Mobility access in a large school setting
- ☐ Need for increased supervision for safety
- ☐ Health and safety concerns requiring adaptive equipment
- ☐ Difficulty with emotional control
- ☐ Need for social skill development
- ☑ Difficulty completing tasks
- ☐ Health/medical services required
- ☐ Need for communication development

☐ Other(s): _____

Educational alternatives / placements / accommodations / modifications, previously considered or attempted. The Team must always consider the regular classroom *(Check (4) all that apply.)*

| | | | |
|---|---|---|---|
| ☑ Regular Class | ☐ Special School | ☐ Drop out Prevention Program | ☑ Accommodations |
| ☑ Resource Class | ☐ Hospital/Homebound | ☐ Counseling Services | ☐ Behavioral Intervention |
| ☑ Special Class | ☐ Title I Program | ☐ Peer Tutoring | ☐ Other: _____ |

Considering the continuum of placement options, the students placement is determined by checking one of the following below. The students IEP goals will be achieved appropriately in:

- ☐ Regular Class *(0-315 mins. per week)*
- ☐ Resource Room *(315 - 900 mins. per week)*
- ☑ Special Class *(900+ mins. per week)*
- ☐ Special School
- ☐ Residential School
- ☐ Hospital/Homebound

Indicate participation in non-academic activities with regular education students: *(Check (4) all that apply.)*

☐ Special Areas/Electives ☑ Clubs ☐ Lunch ☑ Field Trips ☐ Recess ☑ Community Experience ☐ Other

An explanation of the extent, if any, to which the student will not participate with non-disabled students in the regular classroom. Due to Efrain's low cognitive ability and his problems with reading and math, Efrain needs the support of ESE classes

Will the student be educated in the school he or she would attend if non-disabled? ☑ Yes ☐ No

If no, will the student be attending the school closest to his/her home where the IEP can be implemented? ☐ Yes ☐ No

Will the student be removed from the regular education program for more than fifty percent of the school day because this is the least restrictive environment? ☑ Yes ☐ No

## 18. PRIOR WRITTEN NOTICE

A. Does this IEP include a change of placement or change in the provision of a Free Appropriate Public Education (FAPE) from the previous IEP? ☐ No ☐ Yes

B. Is it anticipated that the student will graduate at the end of the current school year? ☐ Yes ☐ No

If yes to A and/or B, attach *Prior Written Notice (PBSD 1723).*

## 19. PARENT(S)/GUARDIAN(S) COMMENTS

Parent(s)/guardian(s) if present, please initial: _____ agreement or _____ disagreement.

Comments: _____

_____

_____

_____

_____

PBSD 0659 (REV. 7/6/2001) ORIGINAL - ESE Confidential File COPY - Parent/Guardian COPY - Staff Responsible for Implementing IEP

A-001341

THE SCHOOL DISTRICT OF PALM BEACH
## Individual Education Plan (IEP)
## Post Secondary Transition Plan

| STUDENT NUMBER | PAGE NUMBER | |
|---|---|---|
| 13033170 | of | 7 |
| DATE OF BIRTH | CURRENT DATE | |
| ████████ | 11/25/2003 | |

| STUDENT NAME (last) | (first) | (MI) | ASSIGNED SCHOOL |
|---|---|---|---|
| Sanchez | Efrain | | Palm Beach Lakes High School |

**Domain:** *(check (4) each domain area to be addressed through an annual goal)*   ☐ Instruction   ☑ Employment   ☐ Community Experience
☐ Post Secondary Adult Living   ☐ Daily Living Skills   ☐ Other _____

**Present Levels of Educational Performance:** Based upon: job performance evaluations, consultation with transitions specialist and Goodwill

Efrain _____ *(student name)*, is currently able to: follow one and two step verbal directions, and communicate appropriately with both peers and supervisors/adults. Efrain's attitude has greatly improved.

**Effects of disability:** Efrain is unable to follow multi directions or multi-task. He is easily distracted and often forgets directions after a short period. He is unable to demonstrate consistent work behaviors in order to maintain employment.

**Priority educational need:** to demonstrate behaviors needed to maintain employment with as little intervention as possible

**Measurable Annual Goal:** The student will: demonstrate correct behaviors needed to maintain employment as independently as possible..

by *(date or time line):* the duration of the IEP

with *(criterion for mastery):* 85%

as measured by *(evaluation):* job performance evaluations, consultation with transitions specialist and Goodwill

Persons responsible job performance evaluations, consultation with transitions specialist and Goodwill

### Short Term Objectives/Benchmarks

1.) ask questions when unsure of multiple step tasks.

2.) maintain regular attendance and be on time.

3.) maintain attention to task for 85% of the class period or job assignment

4.) demonstrate initiative on the job

The Transition IEP Team believes that no services are needed at this time in the following activity area(s) because:

Instruction _____

Community Experiences  Efrain's family help Efrain utilize community resources

Employment _____

Postschool Adult Living  Efrain functions in this area.

Parents will be notified of their child's progress toward the annual goal at least as often as parents of nondisabled students. Parents will receive progress updates toward annual goals ___4___ times per year

| KEY: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NA = Not Attempted<br>NP = No Progress<br>SP = Some Progress<br>AM = Almost Mastered<br>M = Mastered | Is student likely to meet the goal at end of IEP year? YES  NO | | | | Is student likely to meet the goal at end of IEP year?  YES  NO | | | |
| | 1.) Date | / / | NA NP SP AM M ☐ ☐ | | 5.) Date | / / | NA NP SP AM M ☐ ☐ | |
| | 2.) Date | / / | NA NP SP AM M ☐ ☐ | | 6.) Date | / / | NA NP SP AM M ☐ ☐ | |
| | 3.) Date | / / | NA NP SP AM M ☐ ☐ | | 7.) Date | / / | NA NP SP AM M ☐ ☐ | |
| | 4.) Date | / / | NA NP SP AM M ☐ ☐ | | 8.) Date | / / | NA NP SP AM M ☐ ☐ | |

A-001342

07/16/2005  16:08    561615417 79          PALM BEACH LAKES FSE                    PAGE  08

| STUDENT NAME: (last) | (first) | (MI) STUDENT NUMBER: | PAGE NO. |
|---|---|---|---|
| Sanchez | Efrain | 1 3 0 3 3 1 7 0 | 7 of 7 |

## IEP NOTES

Date: ___ / ___ / _____

Date: ___ / ___ / _____

Date: ___ / ___ / _____

PBSD 0659 (REV. 7/6/2001)  ORIGINAL - ESE Confidential File     COPY - Parent/Guardian     COPY - Staff Responsible for Implementing IEP

A-001343

07/16/2005 16:08 5616154170 PALM BEACH LAKES FSE PAGE 09

THE SCHOOL DISTRICT OF P/ BEACH COUNTY
DEPARTMENT OF EXCEPTIONAL STUDENT EDUCATION (ESE)
## Parent Participation Notification

STUDENT NUMBER
1 3 0 3 3 1 7 0

### I. To the Parent(s)/Guardian(s) of

| STUDENT NAME (last) | (first) | (MI) | DATE OF BIRTH | SEX |
|---|---|---|---|---|
| Sanchez | Efrain | | | M |

| SCHOOL | GRADE | CURRENT DATE |
|---|---|---|
| Palm Beach Lakes High School-Room 102 | 11 | 10/16/2002 |

You are being invited to attend a meeting regarding the educational program for your child. We welcome your input or ideas and encourage you to attend.

### II. A meeting has been scheduled at Palm Beach Lakes High School-Room 102 on 11-04-02 at 8:30 AM

### III. The purposes of this meeting is
1. ☐ Parent Conference
2. ☐ The opportunity to review evaluation results
3. ☐ The opportunity to determine eligibility/ineligibility
4. ☒ The opportunity to review and/or develop the Individual Educational Plan (IEP) for your child
5. ☐ The opportunity to develop an Educational Plan (EP) for your child

6. ☐ The opportunity to determine the appropriate educational program/placement for your child
7. ☒ The identification of post-school outcomes and transition services your child may need
8. ☐ The opportunity to review reevaluation needs
9. ☐ The opportunity to discuss continuation or discontinuation of your child's current program(s) or services
10. ☐ Other

### IV. The following people* have been invited to participate in this meeting

Name and Position: Efrain Sanchez, student
R. KREIDER, General Education Teacher
Mrs. Parson-Coe/Mrs. Fleming, LEA Representative
K. COOK, TRANSITION SPECIALIST

Name and Position: L. MARSHALL, Special Education Teacher (Case Mgr.)
Mrs. Fleming, Evaluator
L. Browning, Transition Specialist

*Note: When school to post-school transition services are being considered, your child will be invited.

### V. For further information about the meeting or to reschedule, please call

Mrs. Parson-Coe/Mrs. Fleming at ( 561 ) 615 - 4170 between the hours of 07:30 and 02:4 .

As a parent of a child with a disability, you have rights under federal and state laws. These rights are described in detail for you in the Summary of Procedural Safeguards (PBSD 1025) provided with this document. Please read it carefully. You have the right to have it fully explained to you in your native language or primary mode of communication. If you have any questions regarding these recommendations or the Procedural Safeguards Notice, please contact the school center or Area ESE designee indicated below.

| SCHOOL CENTER ESE DESIGNEE: | TELEPHONE NUMBER: | AREA ESE DESIGNEE: | TELEPHONE NUMBER: |
|---|---|---|---|
| Janice Parson-Coe | ( ) | Jeff Silverman | |

### VI. Parent section (KEEP A COPY FOR YOUR RECORDS)
Please check one of the following and return this form to: Mrs. Parson-Coe/Mrs. Fleming
1. ☐ I will attend the meeting on the date and time shown above.
2. ☐ I would like to attend, but need to reschedule for the following date/time: __ / __ at __ : __
3. ☐ I am unable to attend, but give my permission for the meeting to take place without me.
4. If you are unable to attend, let us know your concern. We welcome your input.

5. As a parent of a child with a disability, you have the right to bring to the IEP meeting, individuals who have knowledge or special expertise regarding your child, including related services personnel.

CHECK ONE: I plan to bring (name optional) _____ to the meeting with me.

☐ I have received a copy of Summary of Procedural Safeguards, and was given the opportunity to ask questions. I understand

THE SCHOOL DISTRICT OF PALM BEACH COUNTY
EXCEPTIONAL STUDENT EDUCATION (ESE)
## Individual Education Plan (IEP)

| STUDENT NUMBER: | PAGE NO. |
|---|---|
| 1 3 0 3 3 1 7 0 | 1 of 8 |

| CURRENT DATE: | IEP DUE DATE: |
|---|---|
| 11/07/2001 | 11/06/2002 |

| STUDENT NAME: (last) | (first) | (MI) | DATE OF BIRTH: | SEX: |
|---|---|---|---|---|
| Sanchez | Efrain A-001344 | | 03/30/ | M |

| SAC SCHOOL: | CURRENT SCHOOL: | GRADE: | REEVALUATION DATE: |
|---|---|---|---|
| | Palm Beach Lakes High School | 14 | |

07/16/2005 16:19 5616154170 PALM BEACH LAKES FSE PAGE 07

## PSYCHO-EDUCATIONAL REEVALUATION

Area 3 - Psychological Services
School District of Palm Beach County, Florida

COPY

| | | | |
|---|---|---|---|
| STUDENT'S NAME: | Efrain Sanchez | STUDENT NUMBER: | 1303370 |
| SEX: | Male | AGE: | 14 years 1 month |
| SCHOOL: | Conniston Middle | GRADE: | 7 |
| BIRTHDATE: | ████-81 | DATE REFERRAL REC'D: | 3-15-95 |
| REFERRED BY: | Child Study Team | DATE(S) EVALUATED: | 4-25-95 |
| SCHOOL PSYCHOLOGIST: | Dr. Len Laakso | | |

### REASON FOR REFERRAL:

This student was referred for a three-year reevaluation in accordance with the Palm Beach County Special Procedures and Placement guidelines. Efrain is presently in an EMH program.

### BACKGROUND INFORMATION:

Efrain Sanchez recently relocated to Conniston Middle School from Jefferson Davis Middle School where he reportedly had been placed in the EMH program due to his low functioning. He had been in a combination of ESOL and EMH programs in the past; Child Study Teams have had frequent discussions about him and his learning disabilities, seeking the most appropriate program. He reportedly is on seizure medication three times a day.

Efrain has a history of poor attendance at school and frequently arrives at school tardy.

### TESTS ADMINISTERED:

Woodcock-Johnson Psycho-Educational Battery-Revised (Tests of Achievement)

House-Tree-Person Developmental Drawings (HTPDD)

Clinical Interview

Bender Visual-Motor Gestalt Test

### TEST RESULTS AND INTERPRETATION:

Woodcock-Johnson Psycho-Educational Battery-Revised: (Tests of Achievement)

| Subtests | Age Equivs. | Grade Equivs. | Standard Scores | %ile Ranks |
|---|---|---|---|---|
| Letter-Word Identification | 7-0 | 1.4 | 50 | .1 |
| Passage Comprehension | 7-2 | 1.6 | 52 | .1 |
| Broad Reading | 7-1 | 1.6 | 37 | .1 |

A-001345

07/16/2005  16:19   56161541 79 PALM BEACH LAKES FSE  PAGE  08

EFRAIN SANCHEZ  PAGE 2  PSYCHO-EDUCATIONAL REEVALUATION

TEST RESULTS AND INTERPRETATION:  (Continued)

Woodcock-Johnson Psycho-Educational Battery-Revised: (Tests of Achievement)
  (Continued)

| Subtests | Age Equivs. | Grade Equivs. | Standard Scores | %ile Ranks |
|---|---|---|---|---|
| Calculation | 8-3 | 2.8 | 54 | .1 |
| Applied Problems | 6-9 | 1.4 | 58 | .3 |
| Broad Mathematics | 7-7 | 2.1 | 52 | .1 |
| Dictation | 7-2 | 1.6 | 47 | .1 |
| Writing Samples | 7-6 | 2.2 | 66 | .1 |
| Broad Written Language | 7-6 | 2.0 | 57 | .2 |
| Skills | 7-2 | 1.6 | 49 | .1 |

Efrain's achievement is consistently and significantly low.  Although he is
relatively better in his writing skills and math performance, these are still
significantly problematic.

The House-Tree-Person drawings viewed developmentally appeared to indicate a
developmental level higher than the achievement indicated on the Woodcock-
Johnson.

Interpretation of these drawings as projectives yield greatly expansive emotional
identifications in the world such that his "boundaries" are uncertain.  He is
highly positive, idealistic and appears happy.  However, there appears to be
significant concern for his "reality orientation."

Bender Visual-Motor Gestalt Test:

Errors:  0  (Koppitz Scoring Criteria)
Visual-Motor Perceptual Age Range:  At ceiling of the instrument
Standard Score:  At ceiling of the instrument

SUMMARY AND RECOMMENDATIONS:

Efrain Sanchez appears to require continued placement in the Educable Mentally
Handicapped program based on poor academic progress.  His progress is also
related to poor habits of attention; therefore, the Child Study Team should
consider referral to the resource attendance officer to explore the prospects of
better reinforcement for school attendance provided through the home.

The Child Study Team should invite the parent to a meeting to review all aspects
of Efrain's development; an update of the social history might be appropriate at
that time.

A-001346

07/16/2005  16:19    5616154170              PALM BEACH LAKES ESE                    PAGE  09

EFRAIN SANCHEZ                       PAGE  3      PSYCHO-EDUCATIONAL REEVALUATION

SUMMARY AND RECOMMENDATIONS:    (Continued)

A concern for Efrain's emotional/social development is raised by this examiner and recommended to the Child Study Team to continue review of Efrain's development to answer questions regarding his emotional/social progress.

Consideration must be given to possible referral for mental health services (evaluation/treatment).

LL/10
6/23/95
tnd10/PSP/3FM.1-3

Dr. Len Laakso
School Psychologist

A-001347

07/16/2005 16:19    5616154170    PALM BEACH LAKES ESE    PAGE 06

| STUDENT NAME: (last) Sanchez | (first) Efrain | (MI) | STUDENT NUMBER: 130313170 | PAGE NO. 7 of 7 |

### IEP NOTES

Date: 11 / 08 / 2000

Efrain's IEP was reviewed and rewritten today due to a change of placement. He is going on an option 2 diploma. We met with Efrain, his mother, Mrs. Sanchez, and Ms Cook, the transition specialist on 11/7/00 Efrain is currently working at Walmart. Mom said to go ahead with IEP —

Date: ___ / ___ / ___

Date: ___ / ___ / ___

PBSD 0659 (REV. 3/1/2000)  ORIGINAL - ESE Confidential File   COPY - Parent/Guardian   COPY - Staff Responsible for Implementing IEP

A-001348

07/16/2005 16:19    5616154170             PALM BEACH LAKES ESE              PAGE  05

# THE SCHOOL DISTRICT OF PALM BEACH
## Individual Education Plan (IEP)
## Post Secondary Transition Plan

STUDENT NUMBER: 1 3 1 0 3 1 3 1 1 7 0
PAGE NUMBER: 6 of 7
CURRENT DATE: 11 / 08 / 2000

STUDENT NAME: (last)          (first)          (MI)   ASSIGNED SCHOOL: Palm Bch Lakes High

**Domain:** (check (✓) each domain area to be addressed through an annual goal)  ☐ Instruction  ☑ Employment  ☐ Community Experience
☐ Post Secondary Adult Living  ☐ Daily Living Skills  ☐ Functional Vocational Evaluation  ☐ Other _____

**Present Levels of Educational Performance:** Based upon: job performance evaluators, observation Efram (student name), is currently able to: ~~~~ apply for and interview for a job with some assistance

**Effects of disability:** Efraine is unable to demonstrate correct job skills to maintain employment

**Priority educational need:** develop skills needed to maintain employment for future independence.

**Measurable Annual Goal:** The student will: develop and maintain proper work skills and behaviors in order to maintain employment

by (date or time line): the duration of the IEP
with (criterion for mastery): 90%
as measured by (evaluation): job performance evaluations, time sheets, observation
Persons responsible: teacher, transition specialist

### Short Term Objectives/Benchmarks

1.) Maintain good attendance and punctuality.

2.) exhibit a initiative on the job

3.) turn in necessary documents (time sheets, pay stubs) to teacher on time

4.) ask for assistance from supervisor when needed

5.) follow 2 step verbal directions from supervisor

The Transition IEP Team believes that no services are needed at this time in the following activity area(s) because:

Instruction _____

Community Experiences: Efrain receives community experiences through his friends and family.

Employment _____

Postschool Adult Living: Efrain functions appropriately in this area.

Parents will be notified of their child's progress toward the annual goal at least as often as parents of nondisabled students. Parents will receive progress updates toward annual goals  8  times per year.

| KEY:<br>NA = Not Attempted<br>NP = No Progress<br>SP = Some Progress<br>AM = Almost Mastered<br>M = Mastered | Is student likely to meet the goal at end of IEP year? YES NO | | Is student likely to meet the goal at end of IEP year? YES NO | |
|---|---|---|---|---|
| | 1.) Date  /  /  NA NP SP AM M ☐ ☐ | | 5.) Date  /  /  NA NP SP AM M ☐ ☐ | |
| | 2.) Date  /  /  NA NP SP AM M ☐ ☐ | | 6.) Date  /  /  NA NP SP AM M ☐ ☐ | |
| | 3.) Date  /  /  NA NP SP AM M ☐ ☐ | | 7.) Date  /  /  NA NP SP AM M ☐ ☐ | |
| | 4.) Date  /  /  NA NP SP AM M ☐ ☐ | | 8.) Date  /  /  NA NP SP AM M ☐ ☐ | |

PBSD 1779 (REV. 3/1/2000)     ORIGINAL - ESE Confidential File     COPY - Parent/Guardian     COPY - Staff Responsible for Implementing IEP

A-001349

| STUDENT NAME: (last) Sanchez | (first) Efrain | (M) | STUDENT NUMBER: 1 3 0 3 3 1 70 | PAGE NO. 5 of 7 |
|---|---|---|---|---|

## 17. LEAST RESTRICTIVE ENVIRONMENT (LRE)

**Considerations:** Factors considered in selecting the student's placement and ensuring that it is in the least restrictive environment include parent/committee input, current educational performance levels, goals and objectives, as well as: (Check all that apply)

☑ Student frustration and stress
☑ Student self-esteem and worth
☐ Student requires extensive adaptive equipment
☐ Student requires extensive direct academic instruction
☐ Distractibility
☐ Need for lower pupil-to-teacher ratio
☐ Student requires extensive instruction in organizational strategies
☐ Other(s): _____

☐ Mobility access in a large school setting
☐ Need for increased supervision for safety
☐ Health and safety concerns requiring adaptive equipment
☐ Difficulty with emotional control
☐ Need for social skill development
☑ Difficulty completing tasks
☐ Health/medical services required

Educational alternatives / placements / accommodations / modifications, previously considered or attempted. The Team must always consider the regular classroom (Check (✓) all that apply.)

☑ Regular Class ☐ Special School ☐ Drop out Prevention Program ☐ Use of Instructional Aid
☑ Resource Class ☐ Hospital/Homebound ☐ Counseling Services ☐ Residential School
☑ Special Class ☐ Title I Program ☐ Peer Tutoring ☑ Other: ____ OTT

Considering the continuum of placement options, the students placement is determined by checking one of the following below. The students IEP goals will be achieved appropriately in:

☐ Regular Class (0-5.25 hrs. per week) ☑ Special Class (greater than 15 hrs. per week) ☐ Residential School
☐ Resource Room (greater than 5.25 to 15 per week) ☐ Special School ☐ Hospital/Homebound

Indicate participation in non-academic activities with regular education students: (Check (✓) all that apply.)

☐ Special Areas/Electives ☐ Clubs ☐ Lunch ☐ Field Trips ☐ Recess ☑ Community Service ☑ Other Job

An explanation of the extent, if any, to which the student will not participate with non-disabled students in the regular classroom.

_Efrain is participating in the Option 2 diploma program He will be with non disabled peers at his job on a daily basis._

Will the student be educated in the school he or she would attend if non-disabled? ☑ Yes ☐ No

If no, will the student be attending the school closest to his/her home where the IEP can be implemented? ☐ Yes ☐ No

Will the student be removed from the regular education program for more than fifty percent of the school day because this is the least restrictive environment? ☑ Yes ☐ No

## 18. PRIOR WRITTEN NOTICE

Does this IEP include a change of placement or change in the provision of a Free Appropriate Public Education (FAPE) from the previous IEP? ☐ No ☑ Yes If yes, attach *Prior Written Notice* (PBSD 1723).

## 19. PARENT(S)/GUARDIAN(S) COMMENTS

Parent(s)/guardian(s) if present, please initial: _____ agreement or _____ disagreement.
Comments: _____

A-001350

07/16/2005 16:19 5616154170      PALM BEACH LAKES ESE      PAGE 03

| STUDENT NAME: (last) Sanchez | (first) Efrain | (MI) | STUDENT NUMBER: 130313170 | PAGE NO: 4 of 7 |
|---|---|---|---|---|

## 13. MODIFICATIONS / SUPPORT NEEDED FOR SCHOOL PERSONNEL ☑ No Support Services required at this time.

*(The IEP team recommends the following training/support be provided to personnel listed below to assist with implementing the student's IEP.)*

| School Personnel | Needs | Who is Responsible | Projected Date |
|---|---|---|---|
| | | | |
| | | | |

## 14. STATE OR DISTRICTWIDE ASSESSMENT PARTICIPATION ☐ Student not age appropriate

If the answer to any of the following questions are checked "Yes", the IEP team can anticipate that the student may be included in the administration of Statewide Testing.

YES NO
- ☐ ☑ Is the student currently working on the Sunshine State Standards (SSS) curriculum?
- ☐ ☑ Is the student expected to progress toward a standard high school diploma?
- ☐ ☑ Can the student progress in the SSS curriculum with only accommodations?
- ☐ ☑ Can remediation toward SSS skills maintain the student in the general curriculum?
- ☐ ☑ Does the student demonstrate cognitive ability and adaptive behavior that allow for completion of SSS with appropriate accommodations?
- ☐ ☑ Can allowable accommodations be made to Statewide Testing so that the student can access the test without changing the validity of the test?

Will the student participate in State and District assessments? ☐ Yes, standard administration

☐ Yes, with accommodations     ☐ Partial (explain) _____     ☑ No, exempt from all portions.

Accommodations required for participation in the assessment (if permitted by the test publisher) may include: *(Any accommodations which are checked must also be implemented in the classroom for the student)*

☐ Flexible Scheduling   ☐ Flexible Setting   ☐ Flexible Responding   ☐ Flexible Presentation   ☐ Revised Format   ☐ Other

If they are NOT checked, the following alternate assessment will be completed *(If student is exempted this section must be completed)*
☑ Brigance Life Skills _____ ☐ Academic Learning Profile ☐ Other _____

## 15. EXTENDED SCHOOL YEAR

Extended School Year program has been considered. Does the student require an ESY program to obtain benefit from his/her educational program? ☐ Yes ☐ No ☑ Insufficient information available (if student's progress indicates a need for additional services, the team will reconvene to reconsider ESY needs by: __/__/__ )

If yes, what service(s) is (are) required? _____

If yes, when is (are) the service(s) required? _____

## 16. IEP IMPLEMENTATION

Person(s) responsible for the implementation of this IEP include:

☐ Regular Education Teacher(s)   ☑ ESE Teacher(s)   ☐ Speech/Language Pathologist   ☐ Psychologist

☐ Orientation and Mobility Specialist   ☐ Occupational Therapy Staff   ☐ Physical Therapy Staff   ☐ Guidance Counselor

☐ Parent   ☑ Student   ☐ Other(s): transition specialist

How will the IEP be made available to the persons implementing it?
Copy given to all committee members at IEP meeting ☑ Yes ☐ No
If no, how will the IEP be provided? _____

All persons responsible were notified of their IEP implementation responsibilities during the IEP committee meeting. ☐ Yes ☑ No
If no, how will the IEP team members be notified? Copy will be provided

Services delineated on the IEP, unless otherwise indicated,
will initiate 11/08/2000 and have an anticipated duration through 05/31/2001 and
will initiate 08/14/2001 and have an anticipated duration through 11/07/2001.

PBSD 0069 (REV. 3/1/2000)   ORIGINAL - ESE Confidential File    COPY - Parent/Guardian   COPY - Staff Responsible for Implementing IEP

A-001351

.07/16/2005 16:19 5616154170 PALM BEACH LAKES ESE PAGE 02

| STUDENT NAME: (last) Sanchez | (first) Efrain | (MI) | STUDENT NUMBER: 130303170 | PAGE NO. 3 of 7 |

## 10. SPECIAL EDUCATION SERVICES

| Areas of Instruction (e.g., electives, math, etc.) | Location REG. ESE BOTH | Service Provider REG. ESE BOTH | Special Education Service | * Frequency/Time (e.g. daily, weekly, monthly/minutes) |
|---|---|---|---|---|
| 1. Career Placement | ✓ | ✓ ✓ | job evaluations, performance monitor on the job | weekly, monthly |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |

## 11. ACCOMMODATIONS / MODIFICATIONS / SUPPLEMENTAL AIDS AND SERVICES

| What | How Often | Where | By Whom |
|---|---|---|---|
| check of time sheets | weekly | ESE/job | ESE |
| Job performance evaluations | monthly | job | Transition specialist |
| the utilize job coach | as needed | job | ESE job coach |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## 12. RELATED SERVICES

| What | How Often | Where | By Whom |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

Assistive Technology ☐ Yes ☑ No
Explain: _____

Special Transportation (Check (✓) all that apply.) ☑ No special services needed
☐ (A) Medical equipment (child safety restraint system included) ☐ (B) Medical condition ☐ (C) Aide/monitor required
☐ (D) Shortened school day ☐ Other: _____

Physical Education (Check (✓) only the one program that applies.) ☑ N/A (Not required at this time)
☐ Regular ☐ Adaptive regular ☐ Specially designed physical education

PBSD 0659 (REV. 3/1/2000) ORIGINAL - ESE Confidential File COPY - Parent/Guardian COPY - Staff Responsible for implementing IEP

A-001352