## CONDITIONS OF EMPLOYMENT - CONTINUED

11. Upon being given and accepting employment with the Company, I consent and agree that all photographs, photographic negatives, prints of every kind and nature, and all illustrations, pictures, designs, paintings, drawings and other reproduction of every kind and nature in which any likeness, accurate or otherwise, of myself may appear during or after such employment, made through any media prior to or during such employment, may be published, used, copyrighted, exhibited, displayed and/or printed in advertising or otherwise in any manner, without compensation of any kind or nature to myself or others, by the Company, its agents, legal representative, successors, and assigns, and those acting for it, under its permission or upon its authority , and those for whom the Company may be acting, and I agree to indemnify and hold harmless the Company, its principals and agents, from any claim arising out of the acts of reproduction and/or publication of any likeness above mentioned.

12. Upon being given and accepting employment with the Company, I consent and agree that all inventions, discoveries, patents, copyrights, improvements, devices, and ideas which I may obtain, make, or develop during or after the period of my employment having any relation to said employment or to the business of the Company, and/or resulting in any way from said employment or business or from information obtained as a result of said employment shall be and remain the sole exclusive property of the Company, its agents, legal representatives, successors and assigns, and those acting for it, under its permission or upon its authority, without payment of any compensation whatsoever to myself, beyond my normal wage, or the payment of any costs except such disbursements as may be necessary and incidental to obtaining, making or developing the same. I further agree to do all things necessary to establish and defend good and sufficient title to same in the Company.

13. Upon being given and accepting employment with the Company, I consent and agree that all motor vehicle driving records, motor vehicle operator licensing records, and all other pertinent motor vehicle operator data and records may be released by any past employer; governmental department, agency or body; and any person or entity to the Company. I hereby release all parties from all liability for any damage which may result from releasing or furnishing this information to the Company.

14. Upon termination of employment, I authorize the Company to hold my final check until all of the Company property is returned in good condition.

15. Upon termination of my employment, I authorize the release of information by the Company to prospective employers concerning my work. I further agree that the Company may deduct from my final paycheck any outstanding debt I owe the Company or its related entities based on a statement or final accounting provided to me by the Company.

16. I understand that my employment application is not a contract for employment. If I am accepted for employment with the Company, I agree to conform to all of its rules and regulations. I understand that I am free to leave the Company's employment at any time, with or without notice, and for any reason. I understand that my employment and compensation with the Company can be terminated at any time with or without cause by the Company. I acknowledge that there has been nothing told to me which is contrary to the above statements. I understand that no Company representative other than the President has the authority to enter into any agreement for my employment for a specified period of time or to make any agreement contrary to the above, and any such agreement must be in writing.

17. I understand that I am being hired at this time for this project only. I further understand that at the completion of my phase of work, I have no expectation of continued employment.

18. I also understand that as a condition of my employment I may be required to attend a new hire safety meeting. The date and time of this meeting will be communicated to me by my supervisor.

**I have read, understood, and agree to the terms and conditions under which I will be considered for employment and under which I will be working if accepted for employment. I reaffirm that I have made no false or misleading statement or omission on the Application.**

**APPLICANT**

9-17-02

DATE

X _____
SIGNATURE OF APPLICANT

9/17/02

DATE

_____
COMPANY REPRESENTATIVE

DIVOSTA BUILDING CORPORATION
4500 PGA Boulevard
Suite 400
Palm Beach Gardens, FL 33418

(5/03-T)
15340
Deluxe

## PERSONAL

Federal and Florida law prohibit employment practice which discriminate on the basis of race, color, religion, age, national origin, sex, marital status, citizenship status, the presence of a disability, or Vietnam Era Veterans status. No question on this application is asked for the purpose of limiting or excluding any applicant because of the applicant's protected status under these laws. *

### PLEASE PRINT — ALL QUESTIONS MUST BE ANSWERED

| FIRST NAME | MIDDLE | LAST | | BER | DATE |
|---|---|---|---|---|---|
| Ricalda | JR | Sanchez | | | 6/9/03 |

PRESENT ADDRESS   STREET   CITY W.P.B   STATE FL   ZIP CODE 33413   HOW LONG 10 yrs

FORMER ADDRESS   STREET   CITY   STATE   ZIP CODE   HOW LONG

HOME PHONE NUMBER ( )   FLORIDA DRIVER'S LICENSE NUMBER S15

DO YOU NOW OR HAVE YOU EVER HAD A FRIEND OR RELATIVE WORK FOR THE COMPANY?  ☐YES  ☑NO

MILITARY SERVICE?  ☐YES  ☑NO   DATES OF SERVICE_____   · TYPE OF DISCHARGE _____

ARE YOU AT LEAST 18 YEARS OF AGE?  ☑YES  ☐NO

IN CASE OF EMERGENCY, NOTIFY (GIVE NAME, RELATIONSHIP & PHONE NUMBER) Maria Sanchez

HAVE YOU EVER BEEN CONVICTED OF ANY LAW VIOLATION (EXCEPT A MINOR TRAFFIC VIOLATION)?  ☐YES  ☑NO
EXPLAIN _____

## EDUCATION

CIRCLE HIGHEST YEAR OF EDUCATION COMPLETED

1  2  3  4  5  6  7  8  9  10  11  ⑫ / 1  2  3  4
GRADE AND HIGH SCHOOL        COLLEGE

NAME OF HIGH SCHOOL AND/OR COLLEGE

MAJOR

JOB APPLIED FOR:

DEGREE

ARE YOU EMPLOYED NOW?   (If yes, provide the name, address and telephone number of your present employer below.)
☑YES  ☐NO

HAVE YOU EVER BEEN EMPLOYED BY DIVOSTA AND/ OR AN AFFILIATED COMPANY?  ☐YES  ☐NO
IF SO WHEN?

## FORMER EMPLOYERS (LIST BELOW LAST THREE (3) EMPLOYERS, STARTING WITH THE PRESENT (OR LAST) ONE FIRST)

| MONTH & YEAR | EMPLOYER NAME & ADDRESS | SALARY | POSITION | REASON FOR LEAVING |
|---|---|---|---|---|
| FROM 7-03 TO | FL. BoLTS | 8.50 | Stock | Filing |
| FROM TO | | | | |
| FROM TO | | | | |

SPECIAL SKILLS OR LICENSES

STATE ANY ADDITIONAL INFORMATION YOU FEEL MIGHT BE HELPFUL TO US IN CONSIDERING YOUR APPLICATION:

*(You may exclude all information indicative of age, sex, race, relgion, color, national origin, marital status, citizen status, or disability)

## FOR HIRE USE ONLY

Interview by: Tim Edgerly                Date Hired:_____

Date Started:  8/13/03                   Project #:_____

Supervisor:  Sose Ramirez                Department #:_____

Rate of Pay:  $9.00                      Position Code:_____

Approved by:  Tim Edgerly                Date Approved:_____

| Form **W-4** Department of the Treasury Internal Revenue Service | **Employee's Withholding Allowance Certificate** ⤷ For Privacy Act and Paperwork Reduction Act Notice, see reverse. | OMB No. 1545-0010 **2003** |
|---|---|---|

| 1 Type or print your first name and middle initial _Ricardo_  Last name _R Sanchez_ | 2 ░ number _6903_ |
|---|---|

Home address  (number and street or rural route) ▓▓▓▓▓▓▓▓

3 ☒Single ☐Married ☐Married, but withhold at higher Single rate
Note: If married, but legally separated, or spouse is a nonresidentalien, check the Single box

City or town, state and ZIP code

4 If your last name differs from that on your social security card check here and call 1-800-772-1213 for more information  . . . . . ⤷ ☐

5 Total number of allowances you are claiming (from line G above or from the worksheets on page 2 if they apply).  . . | 5 | _11_
6 Additional amount, if any, you want withheld from each paycheck  . . . . . . . . . . . . . . . . . . . | 6 | $
7 I claim exemption from withholding for 1999 and I certify that I meet BOTH of the following conditions for exemption:
•Last year I had a right to a refund of ALL Federal income tax withheld because I had NO tax liability: AND
•This year I expect a refund of ALL Federal income tax withheld because I expect to have NO tax liability.
If you meet both conditions, enter "EXEMPT" here  . . . . . . . . . . . . . . . . . . ⤷ | 7 |

Under penalties of perjury, I certify that I am entitled to the number of withholding allowances claimed this certificate or entitled to claim exempt status.

Employee's signature _Ricardo Sanchez_    Date ⤷

8 Employer's name and address (Employer: Complete 8 and 10 only if sending to the IRS)  |  9 Office code (optional) | 10 Employers identification number

## GROUP HEALTH INSURANCE

•Group health insurance application and enrollment forms will be provided at a later date. Coverage will be effective 1st of the month following 60 days of employment.

•Employee group health insurance is OPTIONAL.  The company will pay for a portion of the cost of the employee's group health insurance and the balance is paid by the employee through payroll deduction.

•Dependent group health insurance coverage is also OPTIONAL.  The company will pay for a portion of the cost of the employee's group health insurance and the balance is paid by the employee through payroll deduction.

## MOTOR VEHICLE OPERATIONS

Please answer the following questions regarding your prior driving record.  The questions are necessary in order to process your application. An employee may be required to drive a company vehicle or his or her personal vehicle in the course of his or her duties.

1. Has your driver's license ever been suspended or revoked?   ☐Yes  ☒No
   If YES, explain:_____

2. Have you ever been arrested for driving while intoxicated or unlawful blood alcohol level?   ☐Yes  ☒No
   If YES, explain:_____

3. How many motor vehicle accidents have you been involved in, in the last five years (list dates)?_ _No_

   In which were you charged?_ _No_ _____

4. How many traffic citations have you received in the last 5 years?_ _2_ _____

A-001523

# Application For Employment

**CONDITIONS OF EMPLOYMENT** - PLEASE READ CAREFULLY PRIOR TO COMPLETING PERSONAL INFORMATION

Any false statements, omissions, or misleading information provided by me will be sufficient basis for my disqualification from further consideration for employment or termination of my services resulting in the loss of all my accumulated benefits.

1. I certify that my answers to the questions contained in this Application and other related pre-employment or employment documents are complete, true, and correct to the best of my knowledge and belief.

2. I give the Company permission to communicate with any or all of my previous employers for reference information. I understand I am required to provide the Company with complete and correct information on my former employers.

3. I authorize all past employers and the references listed on my Application to give the Company any and all information concerning my previous employment, my qualifications, and any other pertinent information they may have, personal or otherwise. I release all parties from all liability for any damage which may result from furnishing this information to the Company.

4. I understand that, after being hired, I may be required to take a physical examination, including, without limitation, a blood sample, urine sample, x-ray, and EKG, as a condition of my beginning work and for the purposes of determining my continued fitness for duty and obtaining coverage under the Company's health and hospitalization program. I understand that I may be required to take and pass a complete drug screen test as a condition of employment and for the purpose of determining my continued fitness for duty. I understand that the physical and tests will be paid for by the Company, that the results will be delivered to the Company, and that my employment is conditional on the test results. I further understand that I will be excluded from employment as a consequence of the results of a physical examination only if it is determined that I do not fulfill certain employment criteria which are job related and consistent with business necessity. I understand that any misstatement regarding past or present health conditions will be grounds for my disqualification from or termination of employment with the Company. I hereby release any provider of this information from all liabilities concerning the results of said tests and/or the procedures undertaken to obtain and evaluate the samples and/or readings.

5. As a condition of my initially beginning work and in order to determine my continued fitness for duty, I hereby authorize the Company access to any and all past medical records, any and all medical records while I am employed by the Company and any and all future medical records affecting any claim against the Company. This authorization applies to any injury, disease or condition pertaining to my physical or mental condition. A photostatic copy of this authorization shall likewise be honored. I understand that the Company may send this authorization to any treatment provider, such as a physician or hospital, to obtain my medical records and I hereby authorize the release of the information. I further release the Company and all providers of information from any liability as a result of furnishing and receiving my medical records and any information contained therein.

6. I understand that Federal law requires all employers to verify the identity and eligibility for employment in the United States of all individuals hired on or after November 7, 1986. Individuals hired by the Company shall produce for the Company's inspection and copying certain official documents designated by the Immigration and Naturalization Service ("INS") which establish both identity and employment authorization. Failure to produce the documents within the time period required by INS regulations will result in termination.

7. I understand that, upon request, I may be required to submit to a polygraph examination at any time during the term of my employment only to the extent permitted by Federal law (The Polygraph Protection Act of 1988).

8. I understand that my employment and compensation with the Company can be terminated by the Company at any time, with or without notice, and with or without cause.

9. I understand that I may be required by the Company, in its sole discretion, to work days and/or hours other than those specified at the time of hire and understand that the Company may, in its sole discretion, change my shift, or temporarily or permanently reassign me to duties other than those of the position for which I have applied or been hired. I understand that I may be required by the Company, in its sole discretion, to accept scheduled vacation time.

10. I agree to conform to the rules and regulations of the Company and acknowledge that these rules and regulations may be changed, interpreted, withdrawn, or added to by the Company at any time, at the Company's sole option and without prior notice to me.

## CONDITIONS OF EMPLOYMENT · CONTINUED

11. Upon being given and accepting employment with the Company, I consent and agree that all photographs, photographic negatives, prints of every kind and nature, and all illustrations, pictures, designs, paintings, drawings and other reproduction of every kind and nature in which any likeness, accurate or otherwise, of myself may appear during or after such employment, made through any media prior to or during such employment, may be published, used, copyrighted, exhibited, displayed and/or printed in advertising or otherwise in any manner, without compensation of any kind or nature to myself or others, by the Company, its agents, legal representative, successors, and assigns, and those acting for it, under its permission or upon its authority , and those for whom the Company may be acting, and I agree to indemnify and hold harmless the Company, its principals and agents, from any claim arising out of the acts of reproduction and/or publication of any likeness above mentioned.

12. Upon being given and accepting employment with the Company, I consent and agree that all inventions, discoveries, patents, copyrights, improvements, devices, and ideas which I may obtain, make, or develop during or after the period of my employment having any relation to said employment or to the business of the Company, and/or resulting in any way from said employment or business or from information obtained as a result of said employment shall be and remain the sole exclusive property of the Company, its agents, legal representatives, successors and assigns, and those acting for it, under its permission or upon its authority, without payment of any compensation whatsoever to myself, beyond my normal wage, or the payment of any costs except such disbursements as may be necessary and incidental to obtaining, making or developing the same. I further agree to do all things necessary to establish and defend good and sufficient title to same in the Company.

13. Upon being given and accepting employment with the Company, I consent and agree that all motor vehicle driving records, motor vehicle operator licensing records, and all other pertinent motor vehicle operator data and records may be released by any past employer; governmental department, agency or body; and any person or entity to the Company. I hereby release all parties from all liability for any damage which may result from releasing or furnishing this information to the Company.

14. Upon termination of employment, I authorize the Company to hold my final check until all of the Company property is returned in good condition.

15. Upon termination of my employment, I authorize the release of information by the Company to prospective employers concerning my work. I further agree that the Company may deduct from my final paycheck any outstanding debt I owe the Company or its related entities based on a statement or final accounting provided to me by the Company.

16. I understand that my employment application is not a contract for employment. If I am accepted for employment with the Company, I agree to conform to all of its rules and regulations. I understand that I am free to leave the Company's employment at any time, with or without notice, and for any reason. I understand that my employment and compensation with the Company can be terminated at any time with or without cause by the Company. I acknowledge that there has been nothing told to me which is contrary to the above statements. I understand that no Company representative other than the President has the authority to enter into any agreement for my employment for a specified period of time or to make any agreement contrary to the above, and any such agreement must be in writing.

17. I understand that I am being hired at this time for this project only. I further understand that at the completion of my phase of work, I have no expectation of continued employment.

18. I also understand that as a condition of my employment I may be required to attend a new hire safety meeting. The date and time of this meeting will be communicated to me by my supervisor.

**I have read, understood, and agree to the terms and conditions under which I will be considered for employment and under which I will be working if accepted for employment. I reaffirm that I have made no false or misleading statement or omission on the Application.**

**APPLICANT**

8-15-03
DATE

SIGNATURE OF APPLICANT

8-18-03
DATE

COMPANY REPRESENTATIVE

STATE OF FLORIDA
DEPARTMENT OF REVENUE
CHILD SUPPORT ENFORCEMENT
3111 S. DIXIE HWY, STE 140
WEST PALM BEACH  FL  33405

**MAILING DATE:**
07/26/2003

**CSE NUMBER:**
1174194057

**REVENUE SPECIALIST:**

MEDICAL SUPPORT ONLY
T5OCMS
(800) 622-5437

*#15340*

*■RECEIVED JUL 3 0 2003*

**MAILING ADDRESS:**

DIVOSTA BUILDING CORPORAT
4500 PGA BLVD STE 400
WEST PALM BEACH  FL  33418-3965

Dear Sir/Madam:

INCOME VERIFICATION LETTER

The Florida Department of Revenue, Child Support Enforcement Office is attempting to locate and/or verify employment and financial information regarding the below named person. Section 409.2577, Florida Statutes and the Freedom of Information Act, 5 U.S.C. 552, authorize the release of location, salary, insurance, social security, income tax, and employment history to the Department by public, private, and federal payors of income as it relates to any person obligated or allegedly obligated to provide child support.

Information currently available has been entered below. Please confirm or correct this information and complete the remaining questions. If you are no longer the payor of income to the person named below, please complete the information to the best of your ability. Your cooperation is appreciated.

Name: RICARDO SANCHEZ JR          SSN: ████-6903

Phone: ████████████          Date of Birth: ████/1983

Mailing Address:          Residential Address:
████████████

West Palm Beach, FL
33413

Employment/Entitlement Dates - From: 9.17.02  To: 5/19/03   Still Employed Y/(N) NO

Position: Laborer

Type of Work: Cleaning

Work Site: Palm Beach Gardens

Reason Terminated:

Earnings Last Six Months:

| Month Ending | Gross | Net | Month Ending | Gross | Net |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

Gross Rate: 9.50 hourly          Frequency: Weekly

Bonus/Incentives: N/A          Exemptions Claimed: 2

Continued on Page 2

000006268

A-001526

STATE OF FLORIDA
DEPARTMENT OF REVENUE
CHILD SUPPORT ENFORCEMENT
3111 S. DIXIE HWY, STE 140
WEST PALM BEACH  FL  33405

**MAILING DATE:**
09/03/2003

**CSE NUMBER:**
1174194057

REVENUE SPECIALIST:

MEDICAL SUPPORT ONLY
T50CMS
(800) 622-5437

**IRECEIVED SEP 0 5 2003**

**MAILING ADDRESS:**

DIVOSTA BUILDING CORPORAT
4500 PGA BLVD STE 400
WEST PALM BEACH  FL  33418-3965

Dear Sir/Madam:

INCOME VERIFICATION LETTER

The Florida Department of Revenue, Child Support Enforcement Office is attempting to locate and/or verify employment and financial information regarding the below named person. Section 409.2577, Florida Statutes and the Freedom of Information Act, 5 U.S.C. 552, authorize the release of location, salary, insurance, social security, income tax, and employment history to the Department by public, private, and federal payors of income as it relates to any person obligated or allegedly obligated to provide child support.

Information currently available has been entered below.  Please confirm or correct this information and complete the remaining questions.  If you are no longer the payor of income to the person named below, please complete the information to the best of your ability.  Your cooperation is appreciated.

Name: RICARDO SANCHEZ JR     SSN: ███-6903

Phone: ███ 5241                          Date of Birth: ███ 983

Mailing Address:                         Residential Address:

West Palm Bch 33413

Employment/Entitlement Dates - From: 8\13\02  To: 8\25\03  Still Employed Y/N: NO

Position: Laborer

Type of Work: Palm Bch Gardens, FL 33413

Work Site:_____

Reason Terminated:_____

Earnings Last Six Months:

| Month Ending | Gross | Net | Month Ending | Gross | Net |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Gross Rate: 9.00                     Frequency: weekly

Bonus/Incentives: N/A                 Exemptions Claimed:_____

Continued on Page 2

000017189

A-001527

TIME                                NO              9/5/03

# Payroll Change Notice

EMPLOYEE NAME: Ricardo Sanchez JR. EFFECTIVE DATE: 8/25/03

SOCIAL SECURITY NO.: _____    EMPLOYEE NO.: 15340

PROJECT NO.: 10 66 0655 _____    DEPARTMENT NO.: _____

## RATE CHANGES

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ PROMOTION | | |
| ☐ MERIT INCREASE | | |
| ☐ DEMOTION | | |
| ☐ RE-EVALUATION OF EXISTING JOB | | |
| ☐ PROBATIONARY INCREASE | | |
| ☐ TRANSFER | | |
| ☐ AUTO ALLOWANCE | | |
| ☐ OTHER: | | |

## POSITION CHANGE

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ JOB TITLE | | |
| ☐ POSITION CODE | | |

## TERMINATION

| RESIGNED (Please Check [✓] One:) | LAID OFF (Please Check [✓] One:) | DISCHARGED (Please Check [✓] One:) |
|---|---|---|
| Illness ☐ | Lack of Work ☐ | Absenteeism ☐ |
| Change of Residence ☐ | Department Discontinued ☐ | Tardiness ☑ |
| Working Conditions ☐ | Vacation Shutdown ☐ | Incompetence ☐ |
| Marital Obligations ☐ | Labor Dispute ☐ | Misconduct ☐ |
| To Accept Another Job ☐ | Other Reason ☐ | Insubordination ☐ |
| To Become Self-Employed ☐ | _____ ☐ | Violation Company Rules ☐ |
| Pregnancy ☐ | _____ ☐ | Court Conviction ☐ |
| Retired ☐ | | Falsifying Employment Application ☐ |
| Other Reason ☐ | | Other Reason ☑ |

ADDITIONAL REMARKS REQUIRED: Late every day, Not working up to Divosta's expectations.

CHANGE APPROVED BY: _____    DATE: _____

```
08:57:08     MCG908        PERSONNEL DATA MAINTENANCE       CHG        9/10/03
                                 Wage Rates
     Employee: 15340 RICARDO        SANCHEZ JR.

     Last date/job worked:  8/22/03 105209 THE RETREAT  OAKMONT   03 (A)     48 UN

     Hire date.........:  9/17/02      Exempt from overtime:  _
     Termination date..:  8/25/03      Termination code....:  E FIRED-ELIGIBLE FOR R
     Rehire date.......:  8/13/03      Rehire code.........:  R REGULAR
     Adjusted hire date:  8/13/03      Benefits package....:  _____

     Salary(info only).:  _____     Salary change date..:  1/01/03
     Wage 1............:  9.0000       Wage 2..............:  13.5000




     Union.............:   95  _       Crew................:   0
     Payroll bank......:  P1           Suppress check?.....:  _
     Cert. P/R exempt..:  _
     Employee status...:  T   TERMINATED
     Employee group....:  100 East Team 1
                                       Foreman.............:  _
     F4=List  F6=Update  F14=State/County/City information  F18=Direct deposit
```

A-001529

NO

# Payroll Change Notice

EMPLOYEE NAME: Ricardo Sanchez JR. EFFECTIVE DATE: 8/25/03

EMPLOYEE NO.: 15340

SOCIAL SECURITY NO.: _____

PROJECT NO.: _____   DEPARTMENT NO.: _____

## RATE CHANGES

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ PROMOTION | | |
| ☐ MERIT INCREASE | | |
| ☐ DEMOTION | | |
| ☐ RE-EVALUATION OF EXISTING JOB | | |
| ☐ PROBATIONARY INCREASE | | |
| ☐ TRANSFER | | |
| ☐ AUTO ALLOWANCE | | |
| ☐ OTHER: | | |

## POSITION CHANGE

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ JOB TITLE | | |
| ☐ POSITION CODE | | |

## TERMINATION

| RESIGNED (Please Check [✓] One:) | LAID OFF (Please Check [✓] One:) | DISCHARGED (Please Check [✓] One:) |
|---|---|---|
| Illness ☐ | Lack of Work ☐ | Absenteeism ☐ |
| Change of Residence ☐ | Department Discontinued ☐ | Tardiness ☑ |
| Working Conditions ☐ | Vacation Shutdown ☐ | Incompetence ☐ |
| Marital Obligations ☐ | Labor Dispute ☐ | Misconduct ☐ |
| To Accept Another Job ☐ | Other Reason ☐ | Insubordination ☐ |
| To Become Self-Employed ☐ | _____ ☐ | Violation Company Rules ☐ |
| Pregnancy ☐ | _____ ☐ | Court Conviction ☐ |
| Retired ☐ | | Falsifying Employment Application ☐ |
| Other Reason ☐ | | Other Reason ☑ |

ADDITIONAL REMARKS REQUIRED: Late every day, Not working up to Divosta's expectations.

CHANGE APPROVED BY: _____   DATE: _____

A-001530

```
11:37:46     MCG908       PERSONNEL DATA MAINTENANCE       CHG        9/02/03
                                   Wage Rates
   Employee: 15340 RICARDO            SANCHEZ JR.
```

Last date/job worked:  8/22/03 105209 THE RETREAT  OAKMONT    03 (A)        48 UN

```
Hire date.........:  9/17/02     Exempt from overtime:  _
Termination date..:  8/25/03     Termination code....: E FIRED-ELIGIBLE FOR R
Rehire date.......:  8/13/03     Rehire code.........: R REGULAR
Adjusted hire date:  8/13/03     Benefits package....:  ____

Salary(info only).:  _____    Salary change date..:  1/01/03
Wage 1............:  9.0000      Wage 2..............:  13.5000



Union.............:   95 _       Crew................:   0
Payroll bank......: P1           Suppress check?.....: _
Cert. P/R exempt..: _
Employee status...: T   TERMINATED
Employee group....: 100 East Team 1
                                 Foreman.............: _
F4=List  F6=Update  F14=State/County/City information  F18=Direct deposit
```

A-001531

```
10:48:50      MCG908        PERSONNEL DATA MAINTENANCE        CHG        8/19/03
                                  Wage Rates
   Employee: 15340 RICARDO          SANCHEZ JR.
```

Last date/job worked:  5/16/03 105001 THE RETREAT JOB GENERAL          560 UN

```
   Hire date.........: 9/17/02    Exempt from overtime:
   Termination date..: 5/19/03    Termination code...: Q QUIT
   Rehire date.......: 0/00/00    Rehire code........: R REGULAR
   Adjusted hire date: 9/17/02    Benefits package...:

   Salary(info only).:            Salary change date..: 1/01/03
   Wage 1............: 9.0000      Wage 2.............: 13.5000




   Union.............: 95         Crew...............:  0
   Payroll bank......: P1         Suppress check?....:
   Cert. P/R exempt..:
   Employee status...: T   TERMINATED
   Employee group....: 100 East Team 1
                                  Foreman............:
   F4=List  F6=Update  F14=State/County/City information  F18=Direct deposit
```

A-001532

**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of form. ANTI-DISCRIMINATION NOTICE. It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Sanchez | Ricardo | J. | |

| Address (Street Name and Number) | Apt. # | Date ██████ |
|---|---|---|
| ████████████ | | |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| W.P.B. | FL | 33413 | ██████ -6903 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
- ☑ A citizen or national of the United States
- ☐ A Lawful Permanent Resident (Alien # A_____)
- ☐ An alien authorized to work until ___/___/___ (Alien # or Admission #_____)

| Employee's Signature | Date (month/day/year) |
|---|---|
| Ricardo Ricart | 2-15-02 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name Ricardo Sanchez |
|---|---|
| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B and one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: Florida License | | Florida License | | Social Security |
| Issuing authority: _____ | | ████████████ | | ████████ 6903 |
| Document #: _____ | | Birthdate ████ -83 | | _____ |
| Expiration Date (if any): ___/___/___ | | 10/19/07 | | ___/___/___ |
| Document #: _____ | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Tim Edgerly Jim Edgerly | Tim DIVOSTA BUILDING CORPORATION | Landscape Supervisor |
| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) 4500 PGA Blvd. Suite 400 Palm Beach Gardens, FL 33418 | Date (month/day/year) 8/18/03 |

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____ Document #: _____ Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| | |

Form I-9 (Rev. 11-21-91) N

A-001533





Operation of a motor vehicle constitutes consent to any sobriety test required by law.

# NEW EMPLOYEE CHECKLIST

Employee Name: _Ricoma Sanchez_ Title: _____

**Discuss & Distribute:**

[✓] Position Responsibilities/Job Description

[✓] Pay Rate, Deductions, Pay Days, Status (Hourly, Salaried, Overtime Policy)

[✓] Time Cards (if applicable)

[✓] Work Rules, Reporting Time, Work Hours, Etc.

[✓] Person to Call if Sick or Late

[✓] Employee Handbook

[✓] Dress Code Policy

[✓] New Employee Site Safety Training Checklist (Employee to Keep Employee Safety Manual)

[✓] Employee Acknowledgement Worker's Comp. Managed Care Information (Employee to Keep ESIS Q&A Guide)

[✓] Holiday Schedule

[✓] Phone Lists, Maps, Other Orientation Material

**Forward to Payroll Department:**

[✓] Application for Employment Form (W-4 and Motor Vehicle Operations Sections Complete)

[✓] Form I-9 Employment Eligibility Verification (with appropriate copies- Driver License, SS card or INS card)

[✓] Employee Data Record

[✓] Post Job Offer Health Questionnaire

[ ] Form 8850 – Welfare-to-Work Form

[✓] Signed Receipt for Employee Handbook

[✓] Signed Receipt for Employee Dress Code

[✓] Signed New Employee Site Safety Training Checklist (White Copy)

[✓] Signed Employee Acknowledgement Workers' Compensation

[✓] Signed Business Practice Policy (Office Staff and Supervisors - Occupation Codes 1-5 and 10-20 Only)

[✓] Employment References, Resume, Offer Letter (if available)

[✓] New Employee Checklist

I confirm that I have received the information listed above and have discussed it with my supervisor or other company representative. I also agree to read and review the material on my own.

Employee Signature _____ Date _8-15-03_

Supervisor Signature _____ A-001535 Date _____

RECEIPT FOR EMPLOYEE DRESS CODE

EMPLOYEE NAME _____*Ricardo Sanchez*_____ DATE_____

I have received a copy of the DiVosta Building Corporation's Dress and Appearance Standards (effective October 2001).

_____
Employee Signature

_____
Supervisor

A-001536

RECEIPT FOR EMPLOYEE HANDBOOK


EMPLOYEE NAME _Ricardo  Sanchez_ DATE_____

I have received a copy of the "DiVosta Building Corporation Employee Handbook" (revised January, 2001).


_____
Employee Signature


_Tim Edgerly_____
Supervisor

A-001537

## EMPLOYEE DATA RECORD

Applicants are considered for all positions, and employees are treated during employment without regard to race, color, religion, sex, national origin, age, marital or veteran status, medical condition or handicap.

As employers, we comply with government regulations and affirmative action responsiblites.

Soley to help us comply with government record keeping, reporting and other legal requirements, please fill out this Employee Data Record. We appreciate your cooperation.

*(PLEASE PRINT)*

Name _Sanchez_ _Ricardo_ _JR_ Phone ( ███ ███████
      LAST          FIRST          MIDDLE

Address _____████████████ ███ WPB FL 33415
                                      CITY      STATE   ZIP CODE

## AFFIRMATIVE ACTION SURVEY

Government agencies require periodic reports on the sex, ethnicity, handicapped and veteran status of applicants. This data is for analysis and affirmative action only Submission of information is voluntary.

Check One:

☑ Male   ☐ Female        Date of Birth: ___███████_____

Check one of the following:

Race/Ethnic Group: ☐ White   ☐ Black   ☑ Hispanic   ☐ Carribean Islander

☐ American Indian/Alaskan Native   ☐ Asian/Pacific Islander

Check if any of the following are applicable:

☐ Vietnam Era Veteran   ☐ Disabled Veteran   ☐ Handicapped Individual

A-001538

# DiVOSTA
## BUILDING CORP.

### Employee Acknowledgement

**YOUR EMPLOYER** has agreed to provide workers' compensation coverage for Work related injuries and illnesses through a Managed Care Arrangement (MCA) pursuant to Section 440.134, Florida Statutes.

As an employee of <u>DiVosta Building Corporation</u> you must follow the
(Employer/Company Name)
procedures and guidelines of your workers' compensation MCA.

The attached employee brochure entitled, "ESIS/Intracorp Florida Managed Care Employee Q & A Guide" sets forth your rights and responsibilities under your employer's workers' compensation MCA.

**<u>BE ADVISED</u>:**
Your failure to comply with the procedures, terms and conditions of the MCA could result in loss of benefits, and personal responsibility for the payment of medical and hospital charges.

**ACKNOWLEDGEMENT OF EMPLOYEE:**
I, _____*Ricardo S.*_____ an employee of <u>DiVosta Building Corporation</u>
(Employee Name) (Employer Name)
do hereby agree to comply with the procedures, terms and conditions of my employer's Worker's Compensation MCA. I acknowledge and understand that my failure or refusal to comply with the procedures, terms and conditions of this MCA could result in the loss of benefits to me and the responsibility for the payment of medical and hospital charges.

☐ Si Usted no comprende Ingles, Por favor dirijase a su supervisor quien le proveera estos documentos en Espanol.
☐ Anglè pa lang matènèl mwen. Silvouplè voye yon tradiksyon an Kreyòl pou mwen. (Tcheke bwat sa a, epi voye fòm nan tounen bay sipèvizè w).

_____                      _____
(Employee Signature)                                              (Date)

_____                      _____
(Supervisor Signature)                                            (Date)

4500 PGA Blvd., Suite 400                          Executive Offices: (561) 627-2112
Palm Beach Gardens, FL 33418                            Fax: (561) 775-9121

A-001539

# Payroll Change Notice

EMPLOYEE NAME: Ricardo Sanchez Jr.    EFFECTIVE DATE: 5-19-03

SOCIAL SECURITY NO.: _____    EMPLOYEE NO.: 15340

PROJECT NO.: _____    DEPARTMENT NO.: 62-0395-001

## RATE CHANGES

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ PROMOTION | | |
| ☐ MERIT INCREASE | | |
| ☐ DEMOTION | | |
| ☐ RE-EVALUATION OF EXISTING JOB | | |
| ☐ PROBATIONARY INCREASE | | |
| ☐ TRANSFER | | |
| ☐ AUTO ALLOWANCE | | |
| ☐ OTHER: | | |

## POSITION CHANGE

| DESCRIPTION (Please check applicable box) | FROM | TO |
|---|---|---|
| ☐ JOB TITLE | | |
| ☐ POSITION CODE | | |

## TERMINATION

| RESIGNED (Please Check [✓] One:) | LAID OFF (Please Check [✓] One:) | DISCHARGED (Please Check [✓] One:) |
|---|---|---|
| Illness ☐ | Lack of Work ☐ | Absenteeism ☐ |
| Change of Residence ☐ | Department Discontinued ☐ | Tardiness ☑ |
| Working Conditions ☐ | Vacation Shutdown ☐ | Incompetence ☐ |
| Marital Obligations ☐ | Labor Dispute ☐ | Misconduct ☐ |
| To Accept Another Job ☐ | Other Reason ☐ | Insubordination ☐ |
| To Become Self-Employed ☐ | _____ ☐ | Violation Company Rules ☐ |
| Pregnancy ☐ | _____ ☐ | Court Conviction ☐ |
| Retired ☐ | | Falsifying Employment Application ☐ |
| Other Reason ☐ | | Other Reason ☐ |

ADDITIONAL REMARKS REQUIRED: He was warned 3 times of Tardiness

CHANGE APPROVED BY: Jerry Wms -001540    DATE: 5-19-03

```
08:15:17     MCG908          PERSONNEL DATA MAINTENANCE        CHG        5/28/03
                                    Wage Rates
    Employee: 15340 RICARDO          SANCHEZ JR.
─────────────────────────────────────────────────────────────────────────────────
    Last date/job worked:  5/16/03 105001 THE RETREAT JOB GENERAL          560 UN

    Hire date.........:  9/17/02    Exempt from overtime:  _
    Termination date..:  5/19/03    Termination code....:  Q QUIT
    Rehire date.......:  0/00/00    Rehire code.........:  R REGULAR
    Adjusted hire date:  9/17/02    Benefits package....:  _____

    Salary(info only).:  _____    Salary change date..:  1/01/03
    Wage 1...........:   9.0000     Wage 2.............:   13.5000


    Union............:   95  _      Crew...............:   0
    Payroll bank......:  P1         Suppress check?.....:  _
    Cert. P/R exempt..:  _
    Employee status...:  T    TERMINATED
    Employee group....:  100 East Team 1
                                    Foreman............:  _
    F4=List   F6=Update   F14=State/County/City information   F18=Direct deposit
```

A-001541



May 28, 2003

RICARDO SANCHEZ JR. *AND FAMILY*

█████████████

WEST PALM BEACH FL 33413

RE:     RIGHT TO CONTINUE GROUP HEALTH PLAN COVERAGE

Dear RICARDO,

As a result of your recent termination of employment, your coverage under the DiVosta and Company group health plan will terminate on 05/31/03. If any of your dependents are covered under the plan their coverage will terminate on the same day. This letter is to notify you and all of your eligible dependents of your right to continue coverage under the group health plan for up to 18 months from the date of your qualifying event (the last day of the month in which your termination or reduction in working hours occurred). A description of your rights and responsibilities under this continuation provision is provided in this package. PLEASE READ IT CAREFULLY.

If you wish to continue coverage, you must complete the enclosed election form and return it to the address indicated on the form by 07/31/03. If you decline continuation coverage at this time, you may change your decision during the 60-day election period. However, the plan will not provide coverage during the time your declination was in effect. Further, if you allow your continuation coverage to lapse, you may not reinstate it. The cost for continuation coverage is listed on the enclosed election form. (The cost for coverage is subject to change, no more frequently than once in 12 months, as the cost of the Plan's coverage to DiVosta changes.)

You may continue coverage until the earlier of 18 months after 05/31/03, the date after the date you elect continuation coverage on which you first become covered under another group health plan (unless there are coverage limitations due to pre-existing conditions), the date after the date you elect continuation coverage on which you first become entitled to Medicare, the date DiVosta terminates all of its group health plans, or the first day on which timely premium payment is not made.

You and each of your family members who were covered at the time of your qualifying event have the right to continue combined medical/dental coverage or no coverage at all. You may continue only the level of coverage that was in effect on the date of your qualifying event as indicated on your election form. You may elect another level of coverage, if you are still eligible, effective January 1 of each year during the open enrollment period. If you are still eligible, you will be provided at the time of open enrollment, with the information necessary to make a change in your level of coverage. If your loss of coverage is due to you being disabled, you may be eligible for extended benefits. Please contact Human Resources/Insurance Department at (561) 627-2112 if this applies to you. If you need additional election forms to accommodate differing needs among you and your family members, please contact the Human Resources/ Insurance Department.

If you choose to continue medical/dental coverage you can wait for your premium bill to send your first monthly payment, but to ensure continued coverage we strongly recommend you send your first payment when you return your election form. (Note: Claims may not be paid nor services approved for coverage until your account is paid to date.) Monthly premium bills are provided to you as a courtesy. Premium payment due dates are described in the enclosed statement of Continuation Coverage Rights and are in no way affected by a failure to receive premium bills.

Sincerely,

DiVosta Human Resources/Insurance Department
Enclosure

*TERM 2001*

**DiVOSTA**
AND COMPANY

Notice/Election of
Health Care Coverage Continuation - 2002

**Section A - To be completed by Employer**

| Employee Name: RICARDO SANCHEZ Jr | Location Code: Palm Bch | SSN: 0903 | Date of Birth: 83 | Sex: M | Marital Status: S |
|---|---|---|---|---|---|
| Participant Name (if not same as employee): | | SSN: | Date of Birth: | Sex: | Marital Status: |

City, State, Zip: West Palm Bch, FL 33413

Qualifying Event (Select One):

☑ TERMINATION
☐ Death
☐ Retirement
☐ Divorce/Legal Separation

☐ Child Loses Dependent Status
☐ Work Hour Reduction
☐ Bankruptcy
☐ Other _____

Qualifying Event Date: 5-31 03

Current Coverage for Medical/Dental: Nmo— Standard ee only

| Employer Representative: Michelle Ally ← LYNDA Presser | Telephone #: 561-207-2002 | Date of Notice: 5-30-2003 |
|---|---|---|

**Section B - To be completed by Employee (individual electing coverage continuance)**

You may only elect to cover yourself and those dependents, or any combination of persons who were covered as of the time of the qualifying event.

Monthly Medical/Dental Premiums (please circle one of the coverage option pricetags below):

**Medical & Dental**

| Medical | Single Only | & Code | Single + 1 | & Code | Single + 2 or More | & Code |
|---|---|---|---|---|---|---|
| CIGNA HMO (EPP) | ☐ 242.07 | | ☐ 532.53 | | ☐ 762.51 | |
| CIGNA PPO | ☐ 260.40 | | ☐ 599.86 | | ☐ 781.20 | |
| No Coverage | ☐ I decline medical coverage for the plan year. I understand that I cannot change this election until the next Open Enrollment period, unless I have an eligible status change. | | | | | |

| Dental | Single Only | & Code | Single + 1 | & Code | Single + 2 or More | & Code |
|---|---|---|---|---|---|---|
| MetLife Standard | ☐ 16.92 | | ☐ 31.41 | | ☐ 51.72 | |
| MetLife Enhanced | ☐ 29.30 | | ☐ 56.34 | | ☐ 91.55 | |
| No Coverage | ☐ I decline dental coverage for the plan year. I understand that I cannot change this election until the next Open Enrollment period, unless I have an eligible status change. | | | | | |

I certify that I have read all the information contained in this statement of continuation of coverage rights & understand the conditions required for continuation of coverage under COBRA

| Signature | Date |
|---|---|
| | |

| Make check payable to: | DiVosta Building Corporation | |
|---|---|---|
| Send to: | DiVosta and Company Attn: Human Resources/Insurance - COBRA 4500 PGA Blvd. Suite 400 Palm Beach Gardens, FL 33418 1-561-207-2002 | Revised 1/02 |

**DiVOSTA**
AND COMPANY
**BUILT-SOLID**

4500 PGA Boulevard, Suite 400
Palm Beach Gardens, FL 33418



RICARDO SANCHEZ JR. *AND FAMILY*

WEST PALM BEACH FL 33413

A-001544

# Payroll Change Notice

EMPLOYEE NAME: _Ricardo Sanchez Jr._   EFFECTIVE DATE: _5/8/03_

SOCIAL SECURITY NO.: _____   EMPLOYEE NO.: _#15340_

PROJECT NO.: _#182212 Capri's Isle's_   DEPARTMENT NO.: _#67-0825-001 Cault_

| RATE CHANGES | | |
|---|---|---|
| DESCRIPTION (Please check applicable box) | FROM | TO |
| ☐ PROMOTION | | |
| ☐ MERIT INCREASE | | |
| ☐ DEMOTION | | |
| ☐ RE-EVALUATION OF EXISTING JOB | | |
| ☐ PROBATIONARY INCREASE | | |
| ☑ TRANSFER | # Cault 67-0825-001 | # Sto Team #1 62-0395-001 |
| ☐ AUTO ALLOWANCE | | |
| ☐ OTHER: | | |

| POSITION CHANGE | | |
|---|---|---|
| DESCRIPTION (Please check applicable box) | FROM | TO |
| ☐ JOB TITLE | | |
| ☐ POSITION CODE | | |
| ☐ LIFE INSURANCE CODE | | |

## TERMINATION

**RESIGNED** (Please Check [✓] One:)

Illness ☐
Change of Residence ☐
Working Conditions ☐
Marital Obligations ☐
To Accept Another Job ☐
To Become Self-Employed ☐
Pregnancy ☐
Retired ☐
Other Reason ☐

**LAID OFF** (Please Check [✓] One:)

Lack of Work ☐
Department Discontinued ☐
Vacation Shutdown ☐
Labor Dispute ☐
Other Reason ☐
_____ ☐
_____ ☐

**DISCHARGED** (Please Check [✓] One:)

Absenteeism ☐
Tardiness ☐
Incompetence ☐
Misconduct ☐
Insubordination ☐
Violation Company Rules ☐
Court Conviction ☐
Falsifying Employment Application ☐
Other Reason ☐

ADDITIONAL REMARKS: _____

CHANGE AUTHORIZED BY: _Mark A. Dee_   DATE: _5/8/03_

CHANGE APPROVED BY: _Clark A. Dee_   DATE: _5/8/03_



**DiVOSTA**
BUILDING CORP.

September 30, 2002

To whom it may concern:

This letter is in reference to Ricardo Sanchez Jr. whose social security number is ████-6903. Ricardo Sanchez Jr. has been an employee of DiVosta Building Corporation since September 17, 2002 and works for the Caulking department. He is scheduled 40 hours per week and his current hourly rate of pay is $8.50.

If you have any further questions, please do not hesitate to contact me at (561) 207-2034.

Sincerely,

Michelle E. Ally
Payroll/Benefits Manager

4500 PGA Blvd., Suite 400
Palm Beach Gardens, FL 33418

A-001546

Executive Offices: (561) 627-2112
Fax: (561) 775-9121

RECEIPT FOR EMPLOYEE DRESS CODE

EMPLOYEE NAME X / Ricardo Sanchez    DATE 9/4/08

I have received a copy of the DiVosta Building Corporation's Dress and Appearance Standards (effective October 2001).

_____

Employee Signature

_____

Supervisor

FILE:P:ADMIN\PAYROLL\WORD\DRESSCODERECEIPT

A-001547

RECEIPT FOR EMPLOYEE HANDBOOK

EMPLOYEE NAME _X Ricardo Sanchez_     DATE _9-14-02_

I have received a copy of the "DiVosta Building Corporation Employee Handbook" (revised January, 2001).

X _Ricardo Sanchez_
Employee Signature

_Mark Deel_
Supervisor

A-001548





**U.S. Department of Justice**
Immigration and Naturalization Service

OMB No. 1115-0136
**Employment Eligibility Verification**

Please read instructions carefully before completing this form. The instructions must be available during completion of this form. **ANTI-DISCRIMINATION NOTICE.** It is illegal to discriminate against work eligible individuals. Employers CANNOT specify which document(s) they will accept from an employee. The refusal to hire an individual because of a future expiration date may also constitute illegal discrimination.

**Section 1. Employee Information and Verification.** To be completed and signed by employee at the time employment begins

| Print Name: Last | First | Middle Initial | Maiden Name |
|---|---|---|---|
| Sanchez | Ricardo | JR | JR or Rick |

| Address | Apt. # | Date of Birth (month/day/year) |
|---|---|---|
| ████████ | | ██ 83 |

| City | State | Zip Code | Social Security # |
|---|---|---|---|
| West-Palm-Beach | FL | 33415 | ████ -6903 |

I am aware that federal law provides for imprisonment and/or fines for false statements or use of false documents in connection with the completion of this form.

I attest, under penalty of perjury, that I am (check one of the following):
☑ A citizen or national of the United States
☐ A Lawful Permanent Resident (Alien # A _____)
☐ An alien authorized to work until ___/___/___
(Alien # or Admission # _____)

| Employee's Signature | Date (month/day/year) |
|---|---|
| X Ricardo Sanchez | 9/17/02 |

**Preparer and/or Translator Certification.** (To be completed and signed if Section 1 is prepared by a person other than the employee.) I attest, under penalty of perjury, that I have assisted in the completion of this form and that to the best of my knowledge the information is true and correct.

| Preparer's/Translator's Signature | Print Name |
|---|---|
| | |

| Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|
| | |

**Section 2. Employer Review and Verification.** To be completed and signed by employer. Examine one document from List A OR examine one document from List B **and** one from List C as listed on the reverse of this form and record the title, number and expiration date, if any, of the document(s)

| List A | OR | List B | AND | List C |
|---|---|---|---|---|
| Document title: FL. ID Card | | Soc Sec. | | |
| Issuing authority: Division of Drlv. Lic. | | ████ -6903 | | |
| Document #: ████ | | | | |
| Expiration Date (if any): 10/19/04 | | ___/___/___ | | ___/___/___ |
| Document #: DoB ████ 83 | | | | |
| Expiration Date (if any): ___/___/___ | | | | |

**CERTIFICATION** - I attest, under penalty of perjury, that I have examined the document(s) presented by the above-named employee, that the above-listed document(s) appear to be genuine and to relate to the employee named, that the employee began employment on (month/day/year) ___/___/___ and that to the best of my knowledge the employee is eligible to work in the United States. (State employment agencies may omit the date the employee began employment).

| Signature of Employer or Authorized Representative | Print Name | Title |
|---|---|---|
| Mark C. Deal DIVOSTA HOLDING CORPORATION | Mark A. Deal | Supervisor |

| Business or Organization Name | Address (Street Name and Number, City, State, Zip Code) | Date (month/day/year) |
|---|---|---|
| DIVOSTA HOLDING CORPORATION | 4500 ABBA Boulevard Suite 400 Palm Beach Gardens, FL 33418 | |

**Section 3. Updating and Reverification.** To be completed and signed by employer

| A. New Name (if applicable) | B. Date of rehire (month/day/year) (if applicable) |
|---|---|
| | |

C. If employee's previous grant of work authorization has expired, provide the information below for the document that establishes current employment eligibility.

Document Title: _____   Document #: _____   Expiration Date (if any): ___/___/___

I attest, under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States, and if the employee presented document(s), the document(s) I have examined appear to be genuine and to relate to the individual.

| Signature of Employer or Authorized Representative | Date (month/day/year) |
|---|---|
| Mark C. Deal | 9/17/02 |

Form I-9 (Rev. 11-21-91) N

A-001550

## EMPLOYEE DATA RECORD

Applicants are considered for all positions, and employees are treated during employment without regard to race, color, religion, sex, national origin, age, marital or veteran status, medical condition or handicap.

As employers, we comply with government regulations and affirmative action responsibilites.

Soley to help us comply with government record keeping, reporting and other legal requirements, please fill out this Employee Data Record. We appreciate your cooperation.

*(PLEASE PRINT)*

Name __X Sanchez   Ricaldo   J.R.__   Phone ( ███  █ ████ ) ____
   LAST   FIRST   MIDDLE   Area Code

Address ___███___ ███___ W.P.B___ FL___ 33413___
   NUMBER  STREET  CITY  STATE  ZIP CODE

## AFFIRMATIVE ACTION SURVEY

Government agencies require periodic reports on the sex, ethnicity, handicapped and veteran status of applicants. This data is for analysis and affirmative action only. Submission of information is voluntary.

Check One:

☑ Male   ☐ Female  Date of Birth: ___████___ 02 83

Check one of the following:

Race/Ethnic Group: ☐ White ☐ Black ☑ Hispanic ☐ Carribean Islander

   ☐ American Indian/Alaskan Native ☐ Asian/Pacific Islander

Check if any of the following are applicable:

   ☐ Vietnam Era Veteran ☐ Disabled Veteran ☐ Handicapped Individual

A-001551

# Post Job Offer Health Questionnaire

This questionnaire is to be completed only after an applicant has been hired and should be forwarded to the administration office upon completion.

Name _X_ _Ricardo Sanchez_

Do you have now, or have you ever had? Respond below to each "yes" answer. Use as many sheets as necessary.

| | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Pain or pressure in Chest | ☐ | ☐ | Lower Back Trouble | ☐ | ☐ | Difficulty Bending/Stooping | ☐ | ☐ |
| Skin Trouble or Dermatitus | ☐ | ☐ | High or low Blood Presure | ☐ | ☐ | Broken or Fractured Bones | ☐ | ☐ |
| Any Alcohol/Drug Medicine Habit | ☐ | ☐ | Convulsions, Spells or Epilepsy | ☐ | ☐ | Rupture or Hernia | ☐ | ☐ |
| Rheumatism or Arthritis | ☐ | ☐ | Silicosis or Tuberculosis | ☐ | ☐ | Lead Poisoning | ☐ | ☐ |
| Hearing Problems | ☐ | ☐ | Illness Due to Working with Chemicals | ☐ | ☐ | Paralysis/Numbness | ☐ | ☐ |
| Diabetes | ☐ | ☐ | Breathing Problems | ☐ | ☐ | Sports Injuries | ☐ | ☐ |
| Heart Trouble | ☐ | ☐ | Trick Joints | ☐ | ☐ | Car Accidents | ☐ | ☐ |
| Nervous Disorders | ☐ | ☐ | Eye Problems | ☐ | ☐ | Other | ☐ | ☐ |
| Neck Trouble | ☐ | ☐ | Fainting or Dizzines | ☐ | ☐ | | | |

Respond to each yes answer:_____

Do you have any physical or mental condition which will prevent or impair your performance of any essential job function which may be required in the position(s) for which you are applying?_____
If yes, describe such defects and specific work limitations_____ _N/O_

How many days were you absent during each of the last five years of your previous employment due to illness? (List each year). _1 day_

Have you received workers compensation for injuries? ☐YES ☒NO If yes, describe_____

Do you use alcohol?: ☐No ☐Sociably

Do you use any form of drugs?: ☐Yes ☒No If yes, type: ☐Prescription ☐Non-Prescription
Name _____

Have you received medical or dental treatment within the past 90 days? (Give details. Use as many sheets as necessary.) _N/O_

Any defects in hearing, vision or speech? (Give details.) _____

Have you ever been treated by an orthopedic surgeon; chiropractor, psychologist or psychiatrist. If so, please list the dates and specific nature of the treatment _____

Employee Signature: _X Ricardo Sanchez_ Date: _9-17-07_

Supervisor Signature: _Mark Deal_ Date: _9/17/02_

| Form **8850** | Pre-Screening Notice and Certification Request for | |
|---|---|---|
| (Rev. November 1998) | the Work Opportunity and Welfare-to-Work Credits | OMB No. 1545-1500 |
| Department of the Treasury Internal Revenue Service | ► See separate instructions. | |

Job applicant: Fill in the lines below and check any boxes that apply. Complete only this side.

Your name __X Ricardo Jr Sanchez__     Social security number ► ██████

Street address where you live ██████

City or town, state, and ZIP code __W.P.B   FL   33415__

Telephone no. __(561) 471-5241__

If you are under age 25, enter your date of birth (month, day, year ██████ 83

### Work Opportunity Credit

1  ☐ Check here if you received a conditional certification from the state employment security agency (SESA) or a participating local agency for the work opportunity credit.

2  ☐ Check here if any of the following statements apply to you.

  • I am a member of a family that has received assistance from Aid to Families with Dependent Children (AFDC) or its successor program, Temporary Assistance for Needy Families (TANF), for any 9 months during the last 18 months.

  • I am a veteran and a member of a family that received food stamps for at least a 3-month period within the last 15 months.

  • I was referred here by a rehabilitation agency approved by the state or the Department of Veterans Affairs.

  • I am at least age 18 but not over age 24 and I am a member of a family that:
    a Received food stamps for the last 6 months, OR
    b Received food stamps for at least 3 of the last 5 months, BUT is no longer eligible to receive them.

  • Within the past year, I was convicted of a felony or released from prison for a felony AND during the last 6 months I was a member of a low-income family.

  • I received supplemental security income (SSI) benefits for any month ending within the last 60 days.

### Welfare-to-Work Credit

3  ☐ Check here if you received a conditional certification from the SESA or a participating local agency for the welfare-to-work credit.

4  ☐ Check here if you are a member of a family that:
  • Received AFDC or TANF payments for at least the last 18 months, OR
  • Received AFDC or TANF payments for any 18 months beginning after August 5, 1997, OR
  • Stopped being eligible for AFDC or TANF payments after August 5, 1997, because Federal or state law limited the maximum time those payments could be made.

### All Applicants

Under penalties of perjury, I declare that I gave the above information to the employer on or before the day I was offered a job, and it is, to the best of my knowledge, true, correct, and complete.

Job applicant's signature ► __X Ricardo Sanchez Sanchez__     Date __9/1/05__

For Privacy Act and Paperwork Reduction Act Notice, see page 2.     Cat. No. 22851L     Form **8850** (Rev. 11-98)

A-001553

Form 8850 (Rev. 11-98)                                                                 Page 2

## For Employer's Use Only

Employer's name _____  Telephone no. ( ) - ____ EIN ► ___

Street address _____

City or town, state, and ZIP code _____

Person to contact, if different from above _____ Telephone no. ( ) -

Street address _____

City or town, state, and ZIP code _____

If, based on the individual's age and home address, he or she is a member of group 4 or 6 (as described under Members of Targeted Groups in the separate instructions), enter that group number (4 or 6) . . . . . . . . . . . . . ► ___

| DATE APPLICANT: | Gave information / / | Was offered job / / | Was hired / / | Started job / / |

Under penalties of perjury, I declare that I completed this form on or before the day a job was offered to the applicant and that the information I have furnished is, to the best of my knowledge, true, correct, and complete. Based on the information the job applicant furnished on page 1, I believe the individual is a member of a targeted group or a long-term family assistance recipient. I hereby request a certification that the individual is a member of a targeted group or a long-term family assistance recipient.

Employer's signature ► _Mark Deel_  Title _Supervisor_  Date 9/17/02

## Privacy Act and Paperwork Reduction Act Notice

*Section references are to the Internal Revenue Code.*

Section 51(d)(12) permits a prospective employer to request the applicant to complete this form and give it to the prospective employer. The information will be used by the employer to complete the employer's Federal tax return. Completion of this form is voluntary and may assist members of targeted groups and long-term family assistance recipients in securing employment. Routine uses of this form include giving it to the state employment security agency (SESA), which will contact appropriate sources to confirm that the applicant is a member of a targeted group or a long-term family

assistance recipient. This form may also be given to the Internal Revenue Service for administration of the Internal Revenue laws, to the Department of Justice for civil and criminal litigation, to the Department of Labor for oversight of the certifications performed by the SESA, and to cities, states, and the District of Columbia for use in administering their tax laws.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by section 6103.

The time needed to complete and file this form will vary depending on individual circumstances. The estimated average time is:

Recordkeeping . . . . 2 hr., 47 min.
Learning about the law or the form . . . . . . . . 28 min.
Preparing and sending this form to the SESA. . . . . . . .36 min.

If you have comments concerning the accuracy of these time estimates or suggestions for making this form simpler, we would be happy to hear from you. You can write to the Tax Forms Committee, Western Area Distribution Center, Rancho Cordova, CA 95743-0001.

DO NOT send this form to this address. Instead, see When and Where To File in the separate instructions.

⊛

A-001554

## DiVOSTA BUILDING CORPORATION
### NEW EMPLOYEE SITE SAFETY TRAINING

Employee Name X *Ricardo Sanchez*   Job Title *Laborer*   Supervisor *Mark Deal*

### GENERAL INFORMATION
1. Inform employee of work hours.
2. Inform employee of break and lunch schedules.
3. Inform employee where drinking water is located on jobsite.
4. Inform employee where tools are located and where they need to be returned.
5. Inform employee that if they are injured on the job they must report the injury to their supervisor immediately. Also, explain briefly, how Workers Compensation works if they are injured.
6. Inform the employee that they are to immediately notify their supervisor of any unsafe conditions.
7. Inform employee where restrooms are located.
8. Inform employee that intoxicants and nonprescription drugs are NOT PERMITTED on the jobsite at any time, and are cause for IMMEDIATE DISMISSAL.

***Ask employee if they have any questions regarding the job or jobsite. On the back of this page, please make note of any questions.

### SAFETY INFORMATION
1. Employee safety is a top priority. Your Safety depends mainly on you.
2. It is the employees Right to Know about the chemicals they may be exposed to on the job. Describe to employee any chemical materials they may be using in their job. Inform them of the proper way to use them and that they should wash their hands before eating or drinking.
3. Explain the Material Safety Data Sheet and that they can be found in a binder located in the Jobsite Trailer.
4. Gloves should be worn whenever working with chemical materials.
5. Hard Hats are required AT ALL TIMES while on Jobsite.
6. Safety Glasses or Goggles must be used if exposed to flying debris, chemicals, wood, metal, nails, dust, harmful rays, cutting or welding operations.
7. Safety equipment is for employee protection and the employee must make sure that it is in good condition and replaced when it is worn.
8. Wear clothing suitable for the weather. Torn or loose clothing should not be worn.
9. Jewelry (rings, bracelets, necklaces) should not be worn.
10. Wear shoes suitable for the job you perform.
11. Be aware whenever you are around cranes. Do not walk under or near lifted loads.
12. Be cautious when walking into streets or traffic areas, watch for vehicles and equipment.
13. Be aware of the work going on around you.
14. Horseplay is not permitted. It leads to accidents and injuries.
15. Only qualified personnel are approved to operate vehicles and equipment.
16. Always read and follow any warning signs. This includes warning labels on materials, jobsite signs warning of danger, caution or instructions.
17. Always know the correct way to use tools prior to use. Always use the proper tool for the job. If you do not know how to use a tool or what tool to use, ask for assistance prior to use.
18. Always report any broken or defective tools or machinery to their supervisor immediately.
19. Always place all tools, materials, cords, and hoses so they avoid causing a tripping hazard and prevent damage.
20. Explain housekeeping and that every crew must clean up after themselves.
21. Consider all electrical wires as "live" until checked by an electrician and locked out. Always keep a safe distance from "live" electricity.
22. EXPLAIN ANY DETAILS REGARDING THE SPECIFIC JOB THEY WILL BE PERFORMING WITH REGARD TO THEIR SAFETY...

### EMPLOYEE STATEMENT:
1. On the Job Safety Instructions have been given to me by my foreman to provide an understanding and awareness of the safety rules in the construction working environment.
2. I am fully aware that each employee is responsible for his/her own safety in the observance of these rules of conduct.
3. I understand and will comply with the contents of the DiVosta Building Corporation Safety Rules and Regulations.

X *[signature]* 9-17-02
Employee Signature        Date

*Mark Deal* 9/17/02
Supervisor Signature        Date

Revision A – April, 2001

A-001555

# NEW EMPLOYEE CHECKLIST

Employee Name: X _Ricardo Sanchez_ Title: _Laborer_

**Discuss & Distribute:**

[√] Position Responsibilities/Job Description

[√] Pay Rate, Deductions, Pay Days, Status (Hourly, Salaried, Overtime Policy)

[√] Time Cards (if applicable)

[√] Work Rules, Reporting Time, Work Hours, Etc.

[√] Person to Call if Sick or Late

[√] Employee Handbook

[√] Dress Code Policy

[√] New Employee Site Safety Training Checklist (Employee to Keep Employee Safety Manual)

[√] Employee Acknowledgement Worker's Comp. Managed Care Information (Employee to Keep ESIS Q&A Guide)

[√] Holiday Schedule

[√] Phone Lists, Maps, Other Orientation Material

**Forward to Payroll Department:**

[√] Application for Employment Form (W-4 and Motor Vehicle Operations Sections Complete)

[√] Form I-9 Employment Eligibility Verification (with appropriate copies- Driver License, SS card or INS card)

[√] Employee Data Record

[√] Post Job Offer Health Questionnaire

[√] Form 8850 – Welfare-to-Work Form

[√] Signed Receipt for Employee Handbook

[√] Signed Receipt for Employee Dress Code

[√] Signed New Employee Site Safety Training Checklist (White Copy)

[√] Signed Employee Acknowledgement Workers' Compensation

[√] Signed Business Practice Policy (Office Staff and Supervisors - Occupation Codes 1-5 and 10-20 Only)

[√] Employment References, Resume, Offer Letter (if available)

[√] New Employee Checklist

I confirm that I have received the information listed above and have discussed it with my supervisor or other company representative. I also agree to read and review the material on my own.

Employee Signature X _Ricardo Sanchez_ Date _9-17-02_

Supervisor Signature _Clark Deal_ Date _9/17/02_

A-001556

# DIVOSTA BUILDING CORP. SAFETY RULES & REGULATIONS

## PERSONAL SAFETY

- Wear clothing suitable for weather and your work. Torn or loose clothing, cuffs, neckwear are hazardous.
- Wear sturdy shoes suitable for your trade...in good condition.
- Use gloves, aprons, or other suitable skin protection when handling rough aterials, chemicals, hot or cold objects. Replace if worn.
- Jewelry (rings, bracelets, neck chains, etc.) should not be worn.
- Have safe access to work areas- the safe way is the right way. Have enough light on stairs, aisles, and work area- to prevent falls.
- Avoid shortcuts- use ramps, stairs, walkways, ladders, etc.
- Be sure of your footing. Watch out for overhanging or broken planks, slippery spots, loose objects, etc.
- Be aware of work going on around you. Keep clear of suspended loads, traffic areas, etc.
- Bend knees, keep back nearly straight when lifting. Leg muscles, not your back, should do the work.
- Get help with heavy or bulky materials to avoid dropping load or getting thrown off-balance.
- Have just one person give commands when team-lifting big loads. Before lift, check for clear path.
- Check for clear path first. Then have clear view while carrying load.
- Be sure you have clear area behind you before swinging sledgehammer, other tools or materials.
- In/or near old construction, locate gas, power and water sources before starting work. Contact utility companies.
- Keep "horseplay" and roughhousing away from the job. Practical jokes often become painful injuries.
- Keep your mind on your job- and temper under control- always!
- Intoxicants and nonprescribed drugs are NOT PERMITTED- cause for immediate dismissal.
- Give your wholehearted support to safety activities. Preventing your accident depends mostly on YOU!

## FIRE PREVENTION

- Flammable liquid containers shall be clearly labeled and stored in a protected, separate area.
- Flammable liquids shall be used only in small amounts and in approved, self-closing containers.
- Do not refuel a hot or running engine. Clean up spills before starting. Never use gasoline as a cleaner.
- Store oily wiping rags in covered metal containers or dispose of them safely.
- Never use an air hose for pressure to empty gasoline drums.
- Welding, cutting work should be closely supervised. Remove or shield nearby combustibles.
- Keep a fire watch with adequate fire extinguishers during and after "hot work" as job location requires.
- Keep salamanders or other portable heating equipment away from combustible materials.
- Make sure engines in buildings are away from combustibles- and exhaust is properly ventilated.
- After work, check clothing for hidden hot slag or molten metal. Do not wear oil-soaked clothes.
- Keep oily clothes away from oxygen (explosion danger!)
- Always light torch with a "torch lighter" (never use a match or cigarette- and never in a keg or drum).
- "No Smoking" signs stand guard near fire dangers. Obey them- always!
- Know location and use of fire extinguishing equipment and how to give fire alarm.

## VEHICLES AND MACHINERY

- Only qualified personnel should operate or service power tools, vehicles and other machinery.
- Before starting machinery, opening valves, switches, etc., check safety of workmen. Have safety guards in place.
- Do not ride on vehicles or mobile equipment unless specifically authorized. Do not ride on hook, ball, rigging or load.
- Always be seated when riding authorized vehicles (unless designed for standing).
- Never adjust or repair machinery while in motion. Lock out, block, bleed air as required to prevent movement.
- Operate machinery and vehicles within rated capacity and at safe speeds.
- Operate forklift only when instructed to do so by foreman.
- Do not permit vehicles too close to edge of cut.

## HAZARDOUS CHEMICALS

- Information on hazardous chemicals used on our job site is outlined on material safety data sheets (MSDS's).
- MSDS's are located in the job site trailer or at our warehouse complex.
- Laborers and cleaning department personnel are required to use gloves in handling all liquid hazardous products.

## REPORTS

- Report any injuries immediately. Even small cuts can become seriously infected. Get First Aid!
- Report any unsafe conditions or equipment to supervisor to prevent a loss.

## TOOLS

- Know correct use of hand and power tools before using. Use the right tool for the job.
- Do not use tools with split, broken or loose handles.
- Have tools with burred or mushroomed heads dressed. Keep cutting tools sharp and carry in a container (not in your pocket).
- Report defective power tools or machinery to supervisor immediately.
- Never point an air hose at anyone or use it to clean clothing- extremely dangerous!
- Do not use electrical power tools or equipment while standing in water. Keep cords out of puddles.
- Keep all tools and materials away from edge of scaffolds, platforms, shaft openings, etc.
- Have cords, leads, hoses, etc. placed to avoid tripping hazards and getting damaged. Keep away from oil, heat, and chemicals.
- Keep check on load lines, slings, blocks, clamps or other tackle. Repair/replace defects. Hang up slings if not in use.
- Check hose, fittings, valves for leaks (use soapy water). Cylinders shall be kept upright and secured.
- Open cylinder valves slowly to prevent damage to regulator. Close valves if work is finished, moving cylinders, in storage or empty.
- Use only sturdy ladders on firm base. Where possible angle out base ¼ of ladder working length. Keep area clear of scrap, tools, hose.
- Have ladder reach at least 3 feet above landing for easy access. Tie off ladder at top (secure bottom and brace long ladders).
- Face ladder when climbing. Use both hands. Use hand line or material hoist to lift loads. Don't lift electrical tools by cord.
- Use scaffold made of straight-grained lumber, free of defects and knots if solid footing or safe ladder access is not possible. Test plank strength.
- Platform planks should overlap supports not less than 6" or more than 12", be secured from shifting. Minimum width: Two 12" planks or three 10" planks.
- Handle scaffold parts carefully where erecting or dismantling.

## CONSTRUCTION MATERIALS

- Keep materials orderly. Prevent piles from falling or shifting (tie down or support, if necessary).
- Do not block aisles, traffic lanes, fire exits with equipment or materials. Keep loose materials off stairs, walkways, ramps, platforms, etc.
- Guard protruding ends of rebar where there is a danger of impalement.
- Shavings, dust, scraps, oil or grease must not accumulate. Make good housekeeping part of the job. Remove trash piles as soon as they build up. Pull nails from used forms.
- Oil, grease and water spills must be cleaned up right away. Delay can cause an accident.
- Place excavation spoil far enough away to avoid load strain on walls. Remove surface rocks that may fall in.

## ELECTRICAL

- Consider all wires "live" until checked and locked out. Keep safe distance from "live" electricity.
- Have electrical equipment properly grounded. Also use 3-wire grounded receptacles and extension cords.
- Cord splices or repairs shall be electrical/mechanical equal to that cord's quality (no substandard patching).
- Only qualified personnel should make electrical repairs or installations. Do not use metal ladders and hats near high-powered electricity.

## PERSONAL EQUIPMENT

- Special safety equipment is provided for your protection. Use when required. Keep in good condition.
- Hard hats must be worn at all times- Visitors included.
- Wear proper eye protection if exposed to flying objects, wood or metal shavings, dust, hot splashing metal, harmful rays, chemicals, welding or cutting operations.
- Wear proper respirator when spray painting, burning, exposed to dust or other toxic hazards. If entering, manhole, tank, etc., air must be checked. If air checked is not acceptable, ventilation or supplied air is required.
- Use body harness and tie off if other fall protection is not available.

## WARNINGS AND BARRICADES

- Read danger warnings on container labels. Follow any health/safety precautions.
- Know...before you use it.
- Place barricades and signs to warn of overhead danger, traffic, excavation, etc. Have warning lights, flagman or watchman, if necessary.
- Don't leave floor openings unprotected. Use strong cover, or 42" high guardrail (with midrail and toeboard).
- Properly brace or shore up excavation side wall if not sloped.

## EMPLOYEE STATEMENT

On the job safety instructions were given by my foreman in providing an understanding and awareness of the safety rules in the construction/shop working environment.

I am fully aware that each employee is responsible for his/her own safety in the observance of these rules of conduct.

I have read, understand, and will comply with the contents of the Divosta Building Corp. Safety Rules and Regulations.

| COMPANY SIGNATURE | X _Ricardo Sanchez_ EMPLOYEE SIGNATURE | 9/7/0? DATE |
| --- | --- | --- |

A-001557

WHITE: Payroll Department          CANARY: Employee Copy



BUILDING CORP.

## Employee Acknowledgement

**YOUR EMPLOYER** has agreed to provide workers' compensation coverage for Work related injuries and illnesses through a Managed Care Arrangement (MCA) pursuant to Section 440.134, Florida Statutes.

As an employee of **DiVosta Building Corporation** you must follow the
(Employer/Company Name)
procedures and guidelines of your workers' compensation MCA.

The attached employee brochure entitled, "ESIS/Intracorp Florida Managed Care Employee Q & A Guide" sets forth your rights and responsibilities under your employer's workers' compensation MCA.

**BE ADVISED:**
Your failure to comply with the procedures, terms and conditions of the MCA could result in loss of benefits, and personal responsibility for the payment of medical and hospital charges.

**ACKNOWLEDGEMENT OF EMPLOYEE:**
I, ___X _Ricardo_____ an employee of **DiVosta Building Corporation**
(Employee Name)                                      (Employer Name)
do hereby agree to comply with the procedures, terms and conditions of my employer's Worker's Compensation MCA. I acknowledge and understand that my failure or refusal to comply with the procedures, terms and conditions of this MCA could result in the loss of benefits to me and the responsibility for the payment of medical and hospital charges.

- ☐ Si Usted no comprende Ingles, Por favor dirijase a su supervisor quien le proveera estos documentos en Espanol.
- ☐ Anglè pa lang matènèl mwen. Silvouplè voye yon tradiksyon an Kreyòl pou mwen. (Tcheke bwat sa a, epi voye fòm nan tounen bay sipèvizè w).

X _Ricardo Sanchez_                         _9-17-0?_
(Employee Signature)                         (Date)

_Mark Deal_                                  _9/17/02_
(Supervisor Signature)                       (Date)

4500 PGA Blvd., Suite 400
Palm Beach Gardens, FL 33418              A-001558

Executive Offices: (561) 627-2112
Fax: (561) 775-9121



# Post Job Offer Health Questionnaire

This questionnaire is to be completed only after an applicant has been hired and should be forwarded to the administration office upon completion.

Name _____ Ricaldo Sanchez _____

Do you have now, or have you ever had? Respond below to each "yes" answer. Use as many sheets as necessary.

|  | YES | NO |  | YES | NO |  | YES | NO |
|---|---|---|---|---|---|---|---|---|
| Pain or pressure in Chest | ☐ | ☑ | Lower Back Trouble | ☐ | ☑ | Difficulty Bending/Stooping | ☐ | ☑ |
| Skin Trouble or Dermatitus | ☐ | ☑ | High or low Blood Presure | ☐ | ☑ | Broken or Fractured Bones | ☐ | ☑ |
| Any Alcohol/Drug Medicine Habit | ☐ | ☑ | Convulsions, Spells or Epilepsy | ☐ | ☑ | Rupture or Hernia | ☐ | ☑ |
| Rheumatism or Arthritis | ☐ | ☑ | Silicosis or Tuberculosis | ☐ | ☑ | Lead Poisoning | ☐ | ☑ |
| Hearing Problems | ☐ | ☑ | Illness Due to Working with Chemicals | ☐ | ☑ | Paralysis/Numbness | ☐ | ☑ |
| Diabetes | ☐ | ☑ | Breathing Problems | ☐ | ☑ | Sports Injuries | ☐ | ☑ |
| Heart Trouble | ☐ | ☑ | Trick Joints | ☐ | ☑ | Car Accidents | ☐ | ☑ |
| Nervous Disorders | ☐ | ☑ | Eye Problems | ☐ | ☑ | Other | ☐ | ☑ |
| Neck Trouble | ☐ | ☑ | Fainting or Dizzines | ☐ | ☑ |  |  |  |

Respond to each yes answer:_____ No _____

Do you have any physical or mental condition which will prevent or impair your performance of any essential job function which may be required in the position(s) for which you are applying?____ No _____
If yes, describe such defects and specific work limitations_____

How many days were you absent during each of the last five years of your previous employment due to illness? (List each year). _ Non _____

Have you received workers compensation for injuries? ☑YES ☐NO If yes, describe_____

Do you use alcohol?: ☑No ☐Sociably
Do you use any form of drugs?: ☐Yes ☑No If yes, type: ☐Prescription ☐Non-Prescription
Name _____
Have you received medical or dental treatment within the past 90 days? (Give details. Use as many sheets as necessary.) No
Any defects in hearing, vision or speech? (Give details.) ____ No _____

Have you ever been treated by an orthopedic surgeon, chiropractor, psychologist or psychiatrist. If so, please list the dates and specific nature of the treatment _____ No _____

| Employee Signature: _Ricardo Sanchez_ | Date: _____ |
|---|---|
| Supervisor Signature: _Jim Edgerly_ | Date: _____ |

A-001559



## WORK OPPORTUNITY TAX CREDIT/WTW ELIGIBILITY QUESTIONNAIRE

Our company is participating in a Federal jobs tax credit program. The information requested below is strictly confidential and will only be used for the purpose of securing WOTC/WTW tax credits.

In compliance with company procedures, completed questionnaires, along with the IRS 8850 forms, should be forwarded to Walton Management Services, Inc. 3321 Doris Avenue, Ocean, New Jersey 07712.

**EMPLOYEE PLEASE COMPLETE:**

NAME _Ricardo Sanchez_

ADDRESS_____

CITY_____ STATE_____ ZIP_____

PHONE # _____

SOCIAL SECURITY # _____

DATE OF BIRTH:_____ AGE:_____

| TO BE COMPLETED BY MANAGER: |
| --- |
| Company: DiVosta & Company, Inc. |
| Loc #:_____ |
| Start Date:_____ |
| Job Title:_____ |

Please check only one answer for each of the following questions:

1. A. Have you or any member of your household received Aid to Families with Dependent Children (AFDC/TANF) any time during the last 18 months?    YES___ NO___
   Recipient's Name _____Case #_____
   Relationship_____ City & State Where Received_____

   B. Are you a Veteran who is presently receiving food stamps?    YES___ NO___

   C. Have you been convicted of a felony in the last 12 months?    YES___ NO___
   If yes, estimate your income during the past *6 months*: $_____
   Date of Conviction: _____ Date of Release: _____

   D. Are you 16 but not 25 years of age?    YES___ NO___

   E. Are you currently participating in or have you recently completed a State or Veteran approved vocational rehabilitation agency?    YES___ NO___
   Name of Agency _____ Tel#: ( ) _____
   Address of Agency _____ Counselor's Name_____

   F. Have you or any family member living with you received Welfare payments or General Assistance during the last year? If yes, please provide:    YES___ NO___
   Recipient's Name _____ Case # _____
   Relationship _____ City & State Where Received_____

   G. Have you or any member of your household received Food Stamps at any time during the last year? If yes, please provide:    YES___ NO___
   Recipient's Name _____ Case # _____
   Relationship _____ City & State Where Received_____

2. Have you or any family member living with you received AFDC/Welfare payments of General Assistance for at least 18 consecutive months?    YES___ NO___

3. Have you received Supplemental Security Income (SSI) within the last 60 days?    YES___ NO___

> **If you have answered "Yes" to any of the above questions (except 1D), please enclose a copy of the document showing proof if immediately available.**



**The**
**INSTITUTE**
for Behavioral Sciences
and the Law

**Office  (954) 766-8826**
**Fax  (954) 764-3486**

**750 SE 3rd Avenue, Suite 204**
**Fort Lauderdale, FL  33316**

## Psychological Evaluation
## (Sentencing)

| | |
|---|---|
| **Defendant's Name:** | Ricardo Sanchez, Jr. |
| **Case #:** | 06-80171-Cr-Hurley |
| **Evaluation Date:** | 12-26-08; 12-27-08; 12-28-08 |
| **Report Date:** | 01-01-09 |
| **Assistant U.S. Attorney:** | John S. Kastrenakes, Esquire |
| **Examiner:** | Michael P. Brannon, Psy.D. |

**Referral Information:** Mr. Ricardo Sanchez was evaluated pursuant to a request from Assistant United States Attorney John S. Kastrenakes for a psychological assessment for possible use in the penalty phase. He was interviewed at the Palm Beach County Jail in West Palm Beach, Florida. He has been incarcerated since 10-25-06. *It should be noted that the following conclusions are limited to the information available at the time of this assessment. Additional information and documentation was requested by this examiner prior to the completion of this report. However, that information was not received as of the date of this report. Therefore, the following conclusions are subject to change or modification based upon the possible future receipt of additional relevant information including but not limited to medical records, academic records, mental health records, occupational records, and contact information for collateral sources of data such as relatives, friends, or treating professionals.*

**Sources of Information:** Clinical Interview; Mental Status Examination; Personality Assessment Inventory (PAI); Wechsler Adult Intelligence Scale – III, (WAIS-III); Wide Range Achievement Test (WRAT); Test of Memory Malingering (TOMM); Speech and Language Evaluation Department of Exceptional Student Education Palm Beach County Schools Records; Arrest Records from FCIC/NCIC Database; and Transcripts from Palm Beach County Schools. In addition, various records including police statements, Probable Cause Affidavits, and Incident Reports were reviewed from prior offenses as well as the current allegations. Several attempts were made to contact the defendant's parents; however, the telephone number provided by Mr. Sanchez was reported as disconnected by a recorded message.

**Notification of Confidentiality Limitations:** The defendant was informed of the purpose of the evaluation and the limits to its confidentiality and he agreed to participate in the interview.

**Relevant Historical Information:** Mr. Sanchez is a 25 year-old, single, Hispanic male who was born in West Palm Beach, Florida. He reported that he was raised by his parents along with two brothers, one sister, and one stepbrother. He denied that he was ever physically or sexually abused during his formative years. In addition, he denied that he ever observed domestic violence in his childhood home. He was not aware of any family history of mental health or substance abuse problems. The defendant described his childhood as "good."

1

The defendant denied that he has ever been married. He reported that his longest exclusive relationship was for approximately five years. He denied the occurrence of domestic violence in any of his relationships. He reported that he is the father of one child, a five year old son. He denied that he has ever been homeless. He reported that he was residing with his mother and father in West Palm Beach at the time of arrest.

Academically, the defendant reported he completed 9th grade in special education classes. He reported he earned below average grades in school, and he displayed ongoing behavioral problems in that setting including several suspensions. He reported that he was eventually expelled from school due to "skipping class" and "fighting in school." He denied that he was ever bullied in school, or that he ever bullied others in that setting. He attended adult education classes for a brief period of time, although he did not obtain his high school diploma or General Equivalency Diploma (GED).

Educational testing of the defendant by Palm Beach County Schools on 07-07-92, 07-09-92, and 09-30-92 revealed that the defendant was functioning intellectually in the Low Average range. In addition, he was noted to have "significant processing skill deficits in the immediate sequential, visual and auditory, memory task, which seems to have contributed to the presence of a significant aptitude/academic achievement discrepancy." He was noted to have a relative strength in the "perception of detail and social understanding as well as conceptualization of right and wrong." He was noted to have a relative weakness on a task measuring "short-term memory for visual stimuli" and "attention and concentration." Achievement testing with the Woodcock-Johnson Psycho-Educational Battery – Revised from the 3rd grade revealed the following test scores: Broad Reading – K.9, Broad Mathematics – 1.5, Broad Written Language – K.7. It was concluded that the results of the testing were "consistent with other children who are considered to manifest a learning disability."

Transcripts from Palm Beach County revealed the defendant received passing grades in elementary school while enrolled in ESOL and Specific Learning Disabled classes. However, those same records revealed poor academic performance (4 Fs, 5 Ds) in the 6th grade with an improvements in his grades (2 Fs, 2 Ds, 2 Cs, 1 B) in 7th grade. Academic performance in 8th grade revealed a similar range of grades (2 Fs, 1 D, 2 Cs, 2 Bs) and 9th grade revealed a wide range of grades with most of his academic difficulty occurring in academic subjects (8 Fs, 2 Ds, 3 Cs, 1 B, 1 A). The defendant was noted to have been retained in 9th grade and his academic performance worsened in the following year (10 Fs, 3 Ds, 1 C, 1 B). The same pattern occurred in 10th grade with his first year producing poor grades (7 Fs, 3 Ds, 4 Cs) resulting in retention, although there was a slight improvement in grades during the following year (3 Fs, 3 Ds, 3 Cs, 1 B). It also should be noted that the defendant's school records revealed a patterns of excessive absences beginning in 7th grade. The defendant appeared to have terminated from school prior to the completion of 10th grade.

Occupationally, the defendant reported he was employed part-time as a lawn maintenance worker at the time of his arrest. He reported that he has been fired from several jobs, mostly due to attendance problems. He denied that he ever received Social Security disability benefits. He denied that he has ever served in the United Stated military. The defendant expressed that he "was planning on joining the Army but I didn't graduate high school."

Socially, the defendant reported that he has "a lot of friends" and he indicated that he "gets together with them a lot when I am on the outside." Recreationally, he reported that he mostly enjoyed "going to strip clubs with my friends and spending time with my girl(friend)."

Legally, the defendant reported he has been arrested in the past as a juvenile on status offenses (truancy) and several traffic tickets. He reported that he was incarcerated in Juvenile Detention Center on one occasion for "not paying tickets." He denied that he was ever a member of a youth gang. As an adult, he reported that he was previously arrested on charges including Possession of Drug Paraphernalia and Possession of Cocaine with Intent to Deliver. He denied that he has ever been sentenced to prison.

Correctional records from FCIC/NCIC revealed the defendant has been previously charged with the following offenses: Criminal Mischief (juvenile), Battery (two counts as a juvenile), Failure to Appear, Possession of a Weapon on School Grounds, Carrying a Concealed Weapon, Domestic Battery, Disorderly Conduct, Resisting Officer without Violence, Battery, Possession of Cocaine, Trafficking in Cocaine, Fleeing or Attempting to Elude, and Resisting Officer without Violence. In addition, the defendant was noted to have received 20 separate traffic offenses.

In regard to his mental health history, the defendant reported he "saw the school counselor a few times for problems in school." He denied that he has ever received psychiatric or psychological treatment services in the community. For example, he denied that he has ever been psychiatrically hospitalized, received outpatient counseling, or been prescribed psychotropic medication. He denied that he has ever attempted suicide. He denied that he has ever experienced auditory or visual hallucinations. He denied anger control problems. He did not report any symptoms of depression, anxiety, or mania. He denied exposure to any traumatic events.

The defendant acknowledged the use of cocaine, alcohol, marijuana, Xanax, and MDMA. He reported he initially abused substances when he was 17 years of age. He reported he was using alcohol and marijuana on a daily basis, and cocaine 3-4 times per week at the time of this arrest. The defendant reported that he used MDMA approximately 10 times and Xanax on one occasion. He reported that he has abused substances when he was alone and while in the company of his peers. He reported his longest period of abstinence from substances while residing in the community was for approximately two months. He identified his mother and father as his primary sources of emotional support. The defendant denied that he has ever received substance rehabilitation treatment. When asked if he believed that he had a substance abuse "problem," the defendant stated, "No, because I could stop any time I wanted."

Medical health was reported as remarkable due to several head injuries. For example, the defendant reported that he fell from his bicycle and hit his head on a rock when he was "5 or 6 years of age." The defendant further indicated that he was hospitalized at that time and "a couple of staples were put in my head." On another occasion, Mr. Sanchez reported that "a basketball backboard came down on top of my head when I was about 14 years of age." Mr. Sanchez reported an additional medical problem during childhood when he accidentally overdosed on his brother's anticonvulsant medication. He reported that he suffered a seizure time and was hospitalized for a brief period of time. The defendant reported recent memory loss and problems "paying attention." He denied the occurrence of seizures, dizziness, or headaches.

**Mental Status Examination:** The defendant was appropriately groomed and attired in the standard uniform of Federal inmates. He was of average height and weight with a goatee and close-cropped hair. Eye contact was direct. His general attitude was cooperative and his demeanor was pleasant. He responded appropriately to humor and sarcasm. Motoric responses were within normal limits. Attention span was mildly impaired as he was occasionally distracted by extraneous stimuli. Memory functions were intact on brief measures of those cognitive skills. He was oriented to time, place, person, and situation. Speech content was appropriate in volume, pacing, and word production. Thought content was rational and relevant. He did not display any behaviors that were suggestive of imaginary internal stimuli (hallucinations). He did not verbalize any statements that were consistent with the presence of an active delusional belief system. Affect was expressed in a full range and mood was congruent with the content of the interview. He denied suicidal or homicidal ideations or plans.

**Intelligence Testing:** The Wechsler Adult Intelligence Scale – Third Edition (WAIS-III) yields an objective estimate of an individual's present level of intellectual functioning. The WAIS-III is composed of various subtests that measure different aspects of general intellectual performance. The scores of the subtests are converted to scaled scores and index scores which allow for comparisons in performance between the examinee and a normative group. In addition, the scaled scores are summarized into various indices including Verbal, Performance, and Full Scale Intelligence Quotients (IQ) estimates. Mr. Sanchez earned the following scores:

| Scale | Sum of SS | IQ Score | 95% Confidence Interval | Percentile Rank | Qualitative Description |
|---|---|---|---|---|---|
| Verbal | 40 | **80** | 76-86 | 9 | Low Average |
| Performance | 52 | **102** | 95-109 | 55 | Average |
| Full Scale | 92 | **89** | 85-93 | 23 | Low Average |

| Verbal Subtests | Scales Scores | Percentile Rank | Performance Subtests | Scaled Scores | Percentile Rank |
|---|---|---|---|---|---|
| Vocabulary | 5 | 5 | Picture Completion | 12 | 75 |
| Similarities | 6 | 9 | Digit Symbol - Coding | 6 | 9 |
| Arithmetic | 7 | 16 | Block Design | 11 | 63 |
| Digit Span | 8 | 25 | Matrix Reasoning | 11 | 63 |
| Information | 5 | 5 | Picture Arrangement | 12 | 75 |
| Comprehension | 9 | 37 | Symbol Search | 7 | 16 |
| Letter-Number Sequencing | 11 | 63 | Object Assembly | 10 | 50 |

**Personality Testing:** The Personality Assessment Inventory (PAI) is one of the most frequently administered tests in forensic settings due to its multiple clinical and validity scales. The PAI Professional Manual 2nd Edition reported that the PAI requires a 4th grade reading levels (see WRAT scores above). Validity Scales revealed a tendency towards defensive responding (elevated PIM) to test items. Individuals who score in a similar manner are often attempting to deny or minimize common shortcomings that most other individuals readily endorse. As a result, it is possible that scores on the Clinical Scales may underestimate the actual severity of any problems areas. Clinical Scales did not reveal any significant elevations that would be suggestive of a major mental disorder. Individuals who score in a similar manner often report a consistent and positive self-concept. Interpersonally, they are often described as friendly and outgoing. However, they may report heightened levels of stress due to a major event occurring in their lives. Social support is often perceived as an effective buffer for stress in their lives. Treatment receptiveness was noted to be below average when compared to other adults not currently receiving treatment services.

**Malingering Testing:** The Test of Memory Malingering (TOMM) is one of the most frequently utilized instruments in discriminating between genuine memory loss and individuals feigning memory loss. The test involves the presentation of 50 line drawings on two separate occasions with opportunities to recognize the previous designs from 50 cards containing two drawings (one correct response, one incorrect response). In addition, corrective feedback is provided in the first two of three trials in order to further expedite accurate responding on successive trials. Individuals who respond to the TOMM in a purely random manner without regard to item content, generally score in the approximate range of chance (25). However, all groups studied in the standardization research for this test discovered most individuals were able to score above 40 on each of the clinical trials, with scores above 45 on the last two trials. This includes individuals diagnosed with Dementia, Alzheimer's Disease, and Traumatic Brain Injury (TBI). The defendant's scores on the TOMM (49, 50, 50) are reflective of an adequate effort on this test. Individuals who score in a similar manner are rarely diagnosed with Malingering.

**DSM-IV-TR Diagnoses:**

| | |
|---|---|
| **Axis I:** | Polysubstance Dependence Disorder |
| | Learning Disorder NOS |
| **Axis II:** | R/O Antisocial Personality Disorder |
| **Axis III:** | No medical problems reported |
| **Axis IV:** | Legal |
| **Axis V:** | 80 |

Thank you for the opportunity to participate in this interesting case and please feel free to telephone me if you require additional information in this matter.

Michael P. Brannon, Psy.D.
Licensed Psychologist
PY0004289

6

## Controversial execution in Ohio uses new drug combination

*By Dana Ford and Ashley Fantz , CNN*
*updated 1:01 PM EST, Fri January 17, 2014*                                          CNN.com

**(CNN)** -- Ohio inmate Dennis McGuire appeared to gasp and convulse for roughly 10 minutes before he died Thursday by lethal injection using a new combination of drugs, reporters who witnessed it said.

McGuire was convicted in 1994 of the rape and murder of 22-year-old Joy Stewart, who was seven months pregnant. Her relatives were at Southern Ohio Correctional Facility in Lucasville to witness his death, according to tweets from television reporter Sheila Gray.

McGuire's "children and daughter-in-law were crying and visibly upset," Gray tweeted.

She said McGuire, before the drugs took effect, thanked Stewart's family for a letter he apparently received.

"To my children, I'm sorry. I love you. I'm going to heaven and I'll see you there when you come," McGuire reportedly said, according to CNN affiliate WDTN.

Columbus Dispatch reporter Alan Johnson said that the whole execution process took 24 minutes, and that McGuire appeared to be gasping for air for 10 to 13 minutes.

"He gasped deeply. It was kind of a rattling, guttural sound. There was kind of a snorting through his nose. A couple of times, he definitely appeared to be choking," WDTN quoted Johnson as saying.

The convicted murderer was pronounced dead at 10:53 a.m. ET.

The execution generated controversy because, like many states, Ohio has been forced to find new drug protocols after European-based manufacturers banned U.S. prisons from using their drugs in executions -- among them, Danish-based Lundbeck, which manufactures pentobarbital.

According to Ohio's corrections department, the state used a combination of the drugs midazolam, a sedative; and the painkiller hydromorphone.

Both the length of time it took for McGuire to die and his gasping are not typical for an execution, said Howard Nearman, an anesthesiologist at University Hospitals Case Medical Center in Cleveland.

"Why it took 24 minutes, I really can't tell you," he said. "It just makes you wonder -- what was given? What was the timing, and what were the doses?"

In an opinion piece written for CNN this week, a law professor noted that McGuire's attorneys argued he would "suffocate to death in agony and terror."

"The state disagrees. But the truth is that no one knows exactly how McGuire will die, how long it will take or what he will experience in the process," wrote Elisabeth A. Semel, clinic professor of law and director of the Death Penalty Clinic at U.C. Berkeley School of Law.

Speaking on behalf of McGuire's legal team, attorney Allen Bohnert called on the governor to impose a moratorium on future executions because of what took place Thursday.

"At this point, it is entirely premature to consider this execution protocol to be anything other than a failed, agonizing experiment," he said in a statement.

"The people of the State of Ohio should be appalled at what was done here today in all of our names. Ohio, like its citizens, must follow the law. The state has failed."

CNN's Sonny Hostin said that McGuire's execution will likely spark debate over whether how inmates react to the use of the drugs constitutes cruel and unusual punishment prohibited by the U.S. Constitution.

"Whenever there's a change in the lethal injection process clearly it's subject to legal proceedings and perhaps we will see those," Hostin said.

Ohio ran out of pentobarbital, which is a narcotic and sedative barbiturate, in September, according to JoEllen Smith, spokeswoman for the Ohio Department of Rehabilitation and Correction.

In response to that shortage, the department amended its execution policy to allow for the use of midazolam and hydromorphone.

Stewart's body was discovered by hikers near a creek in southwestern Ohio in February of 1989. Her throat was cut and she had been sodomized.

Death penalty states scramble for lethal injection drugs

There are currently 138 men and one woman on death row in Ohio.

The state was set to execute death row inmate Ron Phillips using the new drug combination last year, but Gov. John Kasich granted the convicted killer a stay of execution pending a review of a possible organ donation to his family members.

CNN's Joe Sutton, Ross Levitt and Deborah Feyerick contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

# Botched Oklahoma execution comes as alternatives emerge from shadows

Wed, Apr 30 2014

By Jon Herskovitz

AUSTIN, Texas (Reuters) - Firing squads, electric chairs and other methods of execution seen as cruel or antiquated could be getting a fresh look after Oklahoma botched a lethal injection, leaving the condemned inmate withering in apparent pain on its death chamber gurney.

Lawmakers in several states this year have put forward legislation to revise alternative methods of capital punishment in the face of a shortage of drugs once used for executions as well as legal challenges to new lethal "cocktails."

Oklahoma was among those states, and it had faced lawsuits to stop the execution of convicted rapist and murderer Clayton Lockett, who died on Tuesday night of an apparent heart attack minutes after a medical official on the scene called a halt to the botched process, saying something had gone wrong with the lethal injection.

"As long as there are problems with lethal injection, and there have been and there will be, there will always be legislators determined to kill people with some other method," said Rick Halperin, director of the Embrey Human Rights Program at Southern Methodist University in Dallas.

So far this year, lawmakers in Tennessee have passed a measure to allow the state to electrocute death row inmates if it could not obtain drugs for lethal injections.

A Missouri lawmaker introduced a bill to set up firing squads and a gas chamber should there be problems with lethal injections. In Wyoming, lawmakers were also considering firing squads.

The Virginia House in January passed a measure to make electrocution the default death penalty method if lethal injection drugs cannot be procured, but the bill was halted in the state Senate.

The electric chair was used for years after the U.S. Supreme Court reinstated capital punishment in 1976, but it has also produced some horrific results.

There were reports in both Virginia and Alabama of an inmate being set on fire in the early 1980s, with the smell of charred flesh wafting through the death chambers.

In response, several states led by Texas began using lethal injections in the early 1980s, with the method of execution seen as more humane.

It is now the primary method of execution in all of the 32 U.S. states that use the death penalty as well as for federal death row convicts.

Since 1976, just over 1,200 inmates have been executed by lethal injection while 158 were electrocuted, 11 put to death in a gas chamber, three hanged and three killed by firing squad, according to the Death Penalty Information Center, a capital punishment monitoring agency.

CRUEL AND UNUSUAL

Eight states still have electrocution on their books as an alternative method of execution, but with caveats. For example, Oklahoma can use the electric chair if its lethal injection protocol is found to be unconstitutional.

Virginia allows some inmates to die in the electric chair if they chose to do so. Its last electrocution using the chair was in 2013 when it put inmate Robert Gleason to death.

Larry Fitzgerald, a former spokesman for the Texas Department of Criminal Justice who has witnessed scores of executions, said the results of the state's lethal injections were always the same - with the inmate being rendered unconscious and then dying from drugs designed to stop breathing and stop the heart.

About five minutes after all the drugs of a three-drug cocktail were administered, a physician would be called in to pronounce death.

However, there were a few rare times when inmates blurted "I can feel it," or "I can taste it," after the injection, Fitzgerald said.

The U.S. Supreme Court has ruled that executions do not need to be painless. In a pair of cases out of Kentucky, the court in 2008 dismissed the idea that the potential for pain made the three-drug cocktail method of execution unlawful.

"Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual," Chief Justice John Roberts wrote then.

The Eighth Amendment to the U.S. Constitution bans cruel and unusual punishment.

Megan McCracken a lawyer at the University of California, Berkeley School of Law's Death Penalty Clinic said that although lethal injections appear serene, the inmate can be suffering greatly.

"The prisoner could be conscious and in extraordinary agony, but once that paralytic is administered, we would never see it," McCracken said.

The lethal injection process in the United States underwent a fundamental change in 2011, when drug company Hospira stopped making sodium thiopental, due to concerns about its widespread use in executions. It was the lone U.S. manufacturer of the drug.

The drug was an anesthetic that would render a person unconscious before the other drugs that would cause death were administered.

Texas changed to a single drug while other states scrambled to develop new lethal injection protocols.

The botched execution in Oklahoma has raised questions on whether these new protocols could be ruled as cruel and unusual punishment by the courts.

"This is really going to make the courts demand a whole lot more and they are not going to be as quick to allow executions to go forward unless the state can prove it knows what it is doing," said Richard Dieter, executive director of the Death Penalty Information Center.

(Additional reporting Bredan O Brien in Milwaukee, Wisconsin and David Ingram in New York; editing by G Crosse)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

## Oklahoma's botched lethal injection marks new front in battle over executions

*By Josh Levs, Ed Payne, and Greg Botelho , CNN*
*updated 3:32 PM EDT, Thu May 1, 2014*

CNN.com

**(CNN)** -- A botched lethal injection in Oklahoma has catapulted the issue of U.S. capital punishment back into the international spotlight, raising new questions about the drugs being used and the constitutional protection against cruel and unusual punishment.

"We have a fundamental standard in this country that even when the death penalty is justified, it must be carried out humanely -- and I think everyone would recognize that this case fell short of that standard," White House spokesman Jay Carney said Wednesday.

What went wrong Tuesday in Oklahoma "will not only cause officials in that state to review carefully their execution procedures and methods," said Richard W. Garnett, a former Supreme Court law clerk who now teaches criminal and constitutional law at the University of Notre Dame, "it will also almost prompt many Americans across the country to rethink the wisdom, and the morality, of capital punishment."

"The Constitution allows capital punishment in some cases, and so the decision whether to use it or abandon it, and the moral responsibility for its use and misuse, are in our hands," he said.

Precisely what happened during the execution of convicted murderer and rapist Clayton Lockett remains unclear. Witnesses described the man convulsing and writhing on the gurney, as well as struggling to speak, before officials blocked the witnesses' view.

It was the state's first time using a new, three-drug cocktail for an execution.

Oklahoma halted the execution of another convicted murderer and rapist, Charles Warner, which was scheduled for later in the day.

Thirty-two U.S. states have the death penalty, as does the U.S. government and the U.S. military. Since 2009, three states -- New Mexico, Connecticut, and Maryland -- have voted to abolish it.

States that have capital punishment have been forced to find new drugs to use since European-based manufacturers banned U.S. prisons from using theirs for executions. One of those manufacturers is the Danish company Lundbeck, maker of pentobarbital.

Carney, speaking to reporters at a daily briefing, said he had not discussed the Oklahoma case with President Barack Obama.

"He has long said that while the evidence suggests that the death penalty does little to deter crime, he believes there are some crimes that are so heinous that the death penalty is merited." The crimes committed by the two men in Oklahoma "are indisputably horrific and heinous," Carney said.

**'There was chaos'**

Lockett lived for 43 minutes after being administered the first drug, CNN affiliate KFOR reported. He got out the words "Man," "I'm not," and "something's wrong," reporter Courtney Francisco of KFOR said. Then the blinds were closed.

Other reporters, including Cary Aspinwall of the Tulsa World newspaper, also said Lockett was still alive and lifted his head while prison officials lowered the blinds so onlookers couldn't see what was going on.

Dean Sanderford, Lockett's attorney, said his client's body "started to twitch," and then "the convulsing got worse. It looked like his whole upper body was trying to lift off the gurney. For a minute, there was chaos."

Sanderford said guards ordered him out of the witness area, and he was never told what had happened to Lockett, who was convicted in 2000 of first-degree murder, rape, kidnapping and robbery.

After administering the first drug, "We began pushing the second and third drugs in the protocol," said Oklahoma Department of Corrections Director Robert Patton. "There was some concern at that time that the drugs were not having the effect. So the doctor observed the line and determined that the line had blown." He said that Lockett's vein had "exploded."

The execution process was halted, but Lockett died of a heart attack, Patton said.

"I notified the attorney general's office, the governor's office of my intent to stop the execution and requested a stay for 14 days," said Patton.

Gov. Mary Fallin issued a statement saying that "execution officials said Lockett remained unconscious after the lethal injection drugs were administered."

## Another state, another botched execution

Earlier this year, a convicted murderer and rapist in Ohio, Dennis McGuire, appeared to gasp and convulse for at least 10 minutes before dying from the drug cocktail used in his execution.

Ohio used the sedative midazolam and the painkiller hydromorphone in McGuire's January execution, the state said.

Louisiana announced later that month that it would use the same two-drug cocktail.

Oklahoma had announced the drugs it planned to use: midazolam; vecuronium bromide to stop respiration; and potassium chloride to stop the heart. "Two intravenous lines are inserted, one in each arm. The drugs are injected by hand-held syringes simultaneously into the two intravenous lines. The sequence is in the order that the drugs are listed above. Three executioners are utilized, with each one injecting one of the drugs."

The execution was the first time Oklahoma had used midazolam as the first element in its three-drug cocktail. The drug is generally used for children "before medical procedures or before anesthesia for surgery to cause drowsiness, relieve anxiety, and prevent any memory of the event," the U.S. National Library of Medicine says. "It works by slowing activity in the brain to allow relaxation and sleep."

The drug "may cause serious or life-threatening breathing problems," so a child should only receive it "in a

hospital or doctor's office that has the equipment that is needed to monitor his or her heart and lungs and to provide life-saving medical treatment quickly if his or her breathing slows or stops."

**Cruel and unusual?**

The question for courts is whether using such drugs in executions constitutes "cruel and unusual" punishment, in violation of the Eighth Amendment to the U.S. Constitution.

After his execution, McGuire's family filed a lawsuit seeking an injunction of the execution protocol the state used.

"The lawsuit alleges that when Mr. McGuire's Ohio execution was carried out on January 16th, he did endure frequent episodes of air hunger and suffocation, as predicted," the office of the family's attorney Richard Schulte said in a statement. "Following administration of the execution protocol, the decedent experienced 'repeated cycles of snorting, gurgling and arching his back, appearing to writhe in pain,' and 'looked and sounded as though he was suffocating.' This continued for 19 minutes."

In Oklahoma, attorneys for both Lockett and Warner have been engaged in a court fight over the drugs used in the state's executions.

They'd initially challenged the state Department of Corrections' unwillingness to divulge which drugs would be used. The department finally disclosed the substances.

Lockett and Warner also took issue with the state's so-called secrecy provision forbidding it from disclosing the identities of anyone involved in the execution process or suppliers of any drugs or medical equipment. The Oklahoma Supreme Court rejected that complaint, saying such secrecy does not prevent the prisoners from challenging their executions as unconstitutional.

After Lockett's execution, Adam Leathers, co-chairman of the Oklahoma Coalition to Abolish the Death Penalty, accused the state of having "tortured a human being in an unconstitutional experimental act of evil."

"Medical and legal experts from around the country had repeatedly warned Oklahoma's governor, courts and Department of Corrections about the likelihood that the protocol intended for use ... would be highly problematic," said Deborah Denno, death penalty expert at Fordham Law School.

"This botch was foreseeable and the state (was) ill prepared to deal with the circumstances despite knowing that the entire world was watching. Lethal injection botches have existed for decades but never have they been riskier or more irresponsible than they are in 2014. This outcome is a disgrace," Denno said.

Amnesty International USA called the botched execution "one of the starkest examples yet of why the death penalty must be abolished."w

"Last night the state of Oklahoma proved that justice can never be carried out from a death chamber," Executive Director Steven W. Hawkins said in a statement.

**Investigation**

The Oklahoma attorney general's office is "gathering information on what happened in order to evaluate," said spokeswoman Dianne Clay.

Fallin ordered an independent review of the state's execution procedures and issued an executive order granting a two-week delay in executions.

"I believe the legal process worked. I believe the death penalty is an appropriate response and punishment to those who commit heinous crimes against their fellow men and women. However, I also believe the state needs to be certain of its protocols and its procedures for executions and that they work," she told reporters Wednesday.

Fallin gave no deadline for the review, which will be led by Department of Public Safety Commissioner Michael Thompson. If it is not done within the 14-day period, the governor said she would issue an additional stay for Warner.

Lockett's attorney slammed the announcement and called for a "truly" independent investigation.

"The DPS is a state agency, and its Commissioner reports to the Governor. As such, the review proposed by Governor Fallin would not be conducted by a neutral, independent entity.

"In order to understand exactly what went wrong in last night's horrific execution, and restore any confidence in the execution process, the death of Clayton Lockett must be investigated by a truly independent organization, not a state employee or agency," Dean Sanderford said in a statement.

Lockett was convicted in 2000 of a bevy of crimes that left Stephanie Nieman dead and two people injured.

Nieman's parents released a statement Tuesday prior to Lockett's scheduled execution.

"God blessed us with our precious daughter, Stephanie for 19 years," it read. "She was the joy of our life. We are thankful this day has finally arrived and justice will finally be served."

Warner, who now awaits execution, was convicted in 2003 for the first-degree rape and murder six years earlier of his then-girlfriend's 11-month-old daughter, Adrianna Waller.

His attorney, Madeline Cohen, said further legal action can be expected given that "something went horribly awry" in Lockett's execution Tuesday.

"Oklahoma cannot carry out further executions until there's transparency in this process," Cohen said. "... Oklahoma needs to take a step back."

In a CNN/ORC poll earlier this year, 50% of Americans said the penalty for murder in general should be death, while 45% said it should be a life sentence. The survey's sampling error made that a statistical tie. Fifty-six percent of men supported the death penalty for murder in general, while 45% of women did.

A Gallup poll last year found 62% of Americans believe the death penalty is morally acceptable, while half as many, 31%, consider it morally wrong.

CNN's Dana Ford, Eliott C. McLaughlin and Ross Levitt contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

AP / May 22, 2014, 8:30 AM

# Will Wyoming turn to firing squads for executions?



The execution chamber at the Utah State Prison after an execution by firing squad June 18, 2010; the bullet holes are visible in the wood panel behind the chair. / TRENT NELSON, AP

17 Comments / 34 Shares / Tweets / Stumble / Email        More+

**CHEYENNE, Wyo.**     Prompted by the shortages of available drugs for lethal injections, Wyoming lawmakers are considering changing state law to permit the execution of condemned inmates by firing squad.

A Wyoming legislative committee has directed its staff to draft a firing squad bill for consideration ahead of next year's legislative session starting in January.

Lawmakers in Utah also may consider a return to firing squads for civilian executions. A Republican state lawmaker there recently announced that he intends to introduce firing squad legislation in his state's next legislative session in January as well.

Utah outlawed execution by firing squad in 2004 but kept it as an option for inmates convicted before that time. It last executed an inmate by firing squad in 2010.



Play VIDEO
**British woman's efforts stopped supply of execution drug to U.S.**

Bob Lampert, director of the Wyoming Department of Corrections, told members of the Wyoming Legislature's Joint Interim Judiciary Committee last week in Rawlins that drugs for lethal injection have become increasingly difficult to obtain.

"In the event that we had an execution scheduled and we couldn't carry it out as a result of lack of substances, I suggested to the Joint Judiciary that we may want to consider having an alternate means of execution, such as the firing squad," Lampert said Wednesday.

Current state law specifies Wyoming would execute condemned inmates in a gas chamber, which the state doesn't currently have, as a backup to lethal injection only if lethal injection were found to be unconstitutional. Existing state law doesn't address how the state should proceed in response to a drug shortage.

Lethal injection is becoming increasingly difficult for states to perform as pharmaceutical companies withhold drug compounds that states traditionally have used. Some inmates have raised constitutional challenges as states have

turned to untried compounds.

Wyoming has no execution drugs on hand, Lampert said.



*Play* VIDEO

**Okla. executions on hold after lethal injection goes wrong**

Last month, Oklahoma inmate Clayton Lockett died of a heart attack more than 40 minutes after corrections officials there started trying to administer drugs at his execution. President Obama called the Lockett incident deeply troubling and said he had asked his attorney general to review the application of the death penalty.

Sen. Bruce Burns, R Sheridan, had proposed a bill in the state's legislative session earlier this year to change state law to allow the use of firing squads. He's a member of the judiciary committee.

Burns said Wednesday the committee intends to consider the firing squad approach at its next meeting in July. He floated a bill in the legislative session early this year calling for allowing use of the firing squad, but it failed an introductory vote.

Burns said his fellow lawmakers increasingly seem to recognize that the state needs to act.

Burns said he believes using the firing squad would be a preferable means of execution to lethal injection, in which inmates feel the needle and then have to wait for drugs to take effect.

Wyoming has only one inmate on death row: Dale Wayne Eaton, 69, is pressing a federal appeal of the state court death penalty he received in 2004 for the murder of Lisa Marie Kimmell, 18, of Billings, Montana.

Cheyenne lawyer Terry Harris represents Eaton in his federal appeal. An attempt to reach Harris for comment Wednesday wasn't immediately successful.

Rep. Stephen Watt, R Rock Springs, serves on the Joint Interim Judiciary Committee. He said he intends to sponsor a bill in the state's coming legislative session to do away with the death penalty entirely but doesn't expect it will get much support.

Watt is a former Wyoming Highway Patrol trooper who was severely injured in a gunfight on the job years ago.

"The biggest and probably the most important one is probably my Christian beliefs that it's wrong for man to kill man," Watt said Wednesday of his opposition to the death penalty. "The second one is because of technology. All the time, we're coming up with more and more technology, and we're finding innocent people that have been wrongly convicted and sentenced to die. It would be a tragedy for one innocent person to die."

Watt said he doesn't consider the firing squad to be a more humane alternative to lethal injection.

"I've been shot," he said. "And I don't care how quickly death comes from firing squad. It still hurts and it's still terrifying. And I think it's cruel and unusual."

© 2014 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.

*17* Comments / *34* Shares / Tweets / Stumble / Email      More +

## Tennessee to use electric chair when lethal drugs unavailable

*By Ed Payne and Mariano Castillo , CNN*
*updated 11:14 AM EDT, Fri May 23, 2014*                              CNN.com

**(CNN)** -- As controversies over lethal injection drugs surge, Tennessee has found a way around the issue: It is bringing back the electric chair.

Eight states authorize electrocution as a method of execution but only at the inmate's discretion.

Now Tennessee is the first state to make use of the electric chair mandatory when lethal injection drugs are unavailable.

Tennessee Gov. Bill Haslam signed the measure into law Thursday.

"This is unusual and might be both cruel and unusual punishment," said Richard Dieter, president of the Death Penalty Information Center.

"No state says what Tennessee says. This is forcing the inmate to use electrocution," according to Dieter, who believes "the inmate would have an automatic Eighth Amendment challenge."

The amendment protects against cruel and unusual punishment.

"The electric chair is clearly a brutal alternative," Dieter said.

Controversy over lethal injections has been brewing in recent years after European manufacturers, including the Denmark-based manufacturer of pentobarbital, banned U.S. prisons from using their drugs in executions.

In April, a botched lethal injection in Oklahoma catapulted the issue back into the international spotlight. It was the state's first time using a new, three-drug cocktail for an execution. Execution witnesses said convicted murderer and rapist Clayton Lockett convulsed and writhed on the execution gurney and struggled to speak, before officials blocked the witnesses' view. Lockett died 43 minutes after being administered the first drug, CNN affiliate KFOR-TV in Oklahoma City reported.

Earlier this year, a convicted murderer and rapist in Ohio, Dennis McGuire, appeared to gasp and convulse for at least 10 minutes before dying from the drug cocktail used in his execution.

In 2009, the U.S.-based manufacturer of sodium thiopental, a drug also commonly used in executions, stopped making the painkiller.

Many states have scrambled to find products from overseas or have used American-based compounding pharmacies to create substitutes.

This month, a group of criminal justice experts recommended that federal and state governments move to a single lethal drug for executions instead of complex cocktails that can be botched.

The controversy over legal injection drugs raises the question of when a case will arise to test the new

SEH121884

law.

The last death penalty by electrocution in Tennessee was that of Daryl Holton in 2007.

Holton -- a convicted murderer who killed his three young sons and his ex-wife's daughter -- elected to be killed by the electric chair.

Before Holton's execution, Tennessee had not used the electric chair in 47 years.

CNN's Dave Alsup contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

SEH121885

**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.



# Arizona inmate takes nearly two hours to die in botched execution

Thu, Jul 24 2014

By David Schwartz



PHOENIX (Reuters) - An Arizona inmate took almost two hours to die by lethal injection on Wednesday and his lawyers said he "gasped and snorted" before succumbing in the latest botched execution to raise questions about the death penalty in the United States.

The execution of convicted double murderer Joseph Wood began at 1:52 p.m. at a state prison complex, and the 55-year-old was pronounced dead just shy of two hours later at 3:49 p.m., the Arizona attorney general's office said.

During that time, his lawyers filed an unsuccessful emergency appeal to multiple federal courts that sought to have the execution halted and their client given life-saving medical treatment.

The appeal, which said the procedure violated his constitutional right to be executed without suffering cruel and unusual punishment, was denied by Justice Anthony Kennedy of the U.S. Supreme Court.

"He gasped and struggled to breathe for about an hour and 40 minutes," said one of Wood's attorneys, Dale Baich.

"Arizona appears to have joined several other states who have been responsible for an entirely preventable horror: a bungled execution. The public should hold its officials responsible."

Arizona Governor Jan Brewer expressed concern over how long the procedure took and ordered the state's Department of Corrections to conduct a full review, but said justice had been done and that the execution was lawful.

"One thing is certain, however, inmate Wood died in a lawful manner and by eyewitness and medical accounts he did not suffer," the Republican governor said in a statement.

"This is in stark comparison to the gruesome, vicious suffering that he inflicted on his two victims, and the lifetime of suffering he has caused their family."

An Arizona Republic journalist who witnessed the execution said he counted the inmate gasping for breath about 660 times.

"I just know it was not efficient," said the reporter, Michael Kiefer. "It took a long time."

DRAWN-OUT DEATH

Charles Ryan, director of Arizona's Department of Corrections, said protocol was followed and that the execution was monitored by a team of licensed medical professionals.

He said Wood was "fully and deeply sedated" five minutes after the drugs began to be administered, and that the medical team reaffirmed that he remained deeply sedated seven more times before he was pronounced dead.

Ryan said in a statement that apart from snoring, Wood "did not grimace or make any further movement."

The Pima County Medical Examiner will conduct an independent autopsy, he said, and a toxicology study was requested too.

Wood had been one of six death row prisoners who sued Arizona last month arguing that secrecy surrounding the drugs used in other botched executions in Ohio and Oklahoma violated their rights.

But he exhausted his appeals on Wednesday when the Arizona Supreme Court lifted a hold after reviewing a last-minute appeal that involved demands for more information about the lethal drug cocktail to be used in the execution.

Wood's lawyers had also wanted to know the qualifications of the medical staff conducting the execution.

Anti-death penalty campaigners expressed horror over the drawn-out death. Cassandra Stubbs, director of the American

A-001578
**1912**

Civil Liberties Union's Capital Punishment Project, said Arizona had broken constitutional rights, and the bounds of basic decency.

"It's time for Arizona and the other states still using lethal injection to admit that this experiment with unreliable drugs is a failure," she said in a statement.

Diann Rust-Tierney, executive director of the National Coalition to Abolish the Death Penalty, said Wood's execution had been shocking, cruel and entirely predictable.

"Americans have had enough of the barbarism," she said.

In January, convicted rapist and murderer Dennis McGuire was put to death in Ohio using a sedative-painkiller mix of midazolam and hydromorphone, the first such combination administered for a lethal injection in the United States. The execution took about 25 minutes to complete, with McGuire reportedly convulsing and gasping for breath.

In Oklahoma in April, convicted killer Clayton Lockett writhed in pain and a needle became dislodged during his lethal injection at a state prison. The execution was halted, but Lockett died about 30 minutes later of a heart attack.

(Writing by Daniel Wallis; Editing by Cynthia Johnston, Eric Walsh, Robert Birsel)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

A-001579
1913

# A DEATH
# BEFORE DYING

Solitary Confinement on Death Row

July 2013



AMERICAN CIVIL LIBERTIES UNION

# A Death Before Dying:
## Solitary Confinement on Death Row

July 2013



American Civil Liberties Union
125 Broad Street
New York, NY 10004
www.aclu.org

Cover Photo: Texas Department of Corrections

A-001581

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................................ 2

TRAPPED IN A BROKEN SYSTEM .................................................................................................. 2

PUNISHMENT ON TOP OF PUNISHMENT ..................................................................................... 3

SURVEY REVEALS MAJORITY OF DEATH ROWS HOLD PRISONERS IN SOLITARY CONFINEMENT ...... 4

    Cramped and Bare Cells Are the Norm ......................................................................................... 4

    Most on Death Row Experience Extreme Isolation and Inactivity ................................................ 5

    Too Many on Death Row Are Denied Religious Services .............................................................. 5

THE DEVASTATING EFFECTS OF PROLONGED SOLITARY CONFINEMENT ARE WELL KNOWN .......... 6

"DEATH ROW PHENOMENON" AND STAGGERING DELAYS EXACERBATE DAMAGE ....................... 8

CONCLUSION ................................................................................................................................. 11

A-001582

## INTRODUCTION

Most death row prisoners in the United States are locked alone in small cells for 22 to 24 hours a day with little human contact or interaction; reduced or no natural light; and severe constraints on visitation, including the inability to ever touch friends or loved ones.



Texas' death row, where prisoners have spent an average of nearly 11 years before execution.
Photo Credit: Texas Department of Corrections, 2008

This stark reality endures at a time when the United States' experiment with the death penalty is at a crossroads. On one hand, in 2013, another state repealed the death penalty – Maryland. That makes six states in the last six years – Maryland, Connecticut, Illinois, New Mexico, New Jersey, and New York – that have repealed the death penalty, bringing the number of states without it to 18. Today, more than half of the states have either eliminated the death penalty completely or have not executed anyone for at least 10 years. Thirty states, plus federal and military jurisdictions, have not executed anyone in at least 5 years. This steady march toward repeal seems to indicate that it is only a matter of time before the Supreme Court will declare the death penalty cruel and unusual punishment and bar its use nationwide.

But until that time, many states will continue efforts to execute, often after death-sentenced prisoners have languished in solitary confinement on death row for years and even decades. Death row prisoners are subjected to these harsh conditions not because of their conduct in prison or any demonstrated dangerousness to staff or other prisoners.  They are subjected to extreme isolation due to their sentences alone.

## TRAPPED IN A BROKEN SYSTEM

While many in the United States understand that part of the horror of the death penalty is living day in and day out with the threat of execution, most are unaware that the vast majority of death row prisoners also suffer under conditions of extreme isolation that compromise their physical and mental health and needlessly inflict pain and suffering.  Indeed, researchers have found that the clinical effects of extreme isolation can actually be similar to those of physical torture.[1] For this reason, the European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment found that solitary confinement conditions can amount to "inhuman and degrading treatment"[2] and the United Nations Special Rapporteur on Torture has called for a global ban on solitary confinement in excess of 15 days.[3]

Death row prisoners spend years and years on death row for a number of reasons. The length of time is often needed for lawful appeals, but these processes are too often extended by serious breakdowns in our legal system; inadequate counsel for the poor; prosecutors' suppression of evidence favorable to defendants; ill-advised and illegal execution protocols; and the appeals, legal

A Death Before Dying | 2

A-001583

challenges, and stresses on judicial resources related to these problems. All of these factors contribute to the time spent on death row.

The injustice of the death penalty system and its lack of fairness have been proven again and again as shown by the dozens of individuals – 142 as of July 2013 – found innocent after years on death row. Scores of other defendants have been found to be illegally sentenced to death and have had their sentences, and often even their convictions, reversed by the courts.   For example, in Pennsylvania, where 202 prisoners are currently imprisoned on death row, a recent study documented 142 cases in which a jury handed down a murder conviction and death sentence but where an appellate court, finding serious legal error, later threw out the murder conviction, the death sentence, or both.[4]

**A VIEW FROM THE ROW:**

"I saw guys who dropped their appeals because of the intolerable conditions. Before his execution, one inmate told me he would rather die than continue existing under these inhumane conditions. I saw guys come to prison sane, and leave this world insane, talking nonsense on the execution gurney. One guy suffered some of his last days smearing feces, lying naked in the recreation yard, and urinating on himself."

-Anthony Graves, who spent years on Texas' death row in solitary confinement for a crime he did not commit.

# PUNISHMENT ON TOP OF PUNISHMENT

While death row prisoners fight for their lives in these failed and failing systems, they spend years and years subjected to the devastating effects of solitary confinement.   Ultimately, some will "volunteer" to die rather than continue to live under such conditions. Many will be broken beyond repair – their minds gone before the state ever executes them. All will suffer needlessly.

As policy leaders, lawyers, judges, advocates and the public struggle with how to "fix" or end the death penalty, they must also recognize that the current system inflicts a double punishment on death-sentenced prisoners which is neither required by law nor in any way mandated by the sentence imposed by the judge or jury. This punishment is years and years spent in agonizing solitary confinement while pursuing lawful appeals.



A solitary confinement cell on Texas' death row.
Photo Credit: Texas Department of Corrections, 2008

Regardless of their stance on the death penalty, the people of the United States understand that a fair justice system must be a humane justice system. And by this measure, we are currently failing. It is time for reformers on both sides of the death penalty debate to recognize the hidden harms of solitary confinement inflicted on death row prisoners across the country. Solitary confinement is not part of the sentence. In order to build a criminal justice system that accurately reflects our values, we must end the routine use of solitary confinement of death row prisoners.

A Death Before Dying | 3

This briefing paper offers a first critical overview of solitary confinement on death row. It explores the results of an ACLU survey of death row conditions nationwide and the legal and human implications of the death row prisoners locked in solitary confinement for years and even decades.

The data that follow are the result of a survey completed by advocates for death row prisoners and others knowledgeable about death row conditions. Adequate and reliable responses were received from 26 states.[5]

# SURVEY REVEALS MAJORITY OF DEATH ROWS HOLD PRISONERS IN SOLITARY CONFINEMENT

Nationally, more than 3,000 prisoners are confined on death rows in 35 states (including two that have repealed the death penalty, but so far have allowed pre-existing death sentences to stand). According to the *American Bar Association's Standards for the Treatment of Prisoners*, death row prisoners, while permissibly separated from other prisoners, should be housed in conditions comparable to those in general population. Administrative segregation or solitary confinement should only be used for brief periods for reasons related to discipline, security, or crime.[6] Despite this clear best practice standard, the overwhelming majority of death-penalty states house death row prisoners in solitary confinement. Our survey revealed that the vast majority of these states confine death row prisoners in segregation or solitary-type conditions based *solely* on their death sentences. Contrary to the American Bar Association standards, most death row prisoners cannot be moved to less restrictive conditions based on good conduct. Simply put, they are condemned to solitary for life, a kind of death before dying.

## Cramped and Bare Cells Are the Norm

Death row prisoners are housed alone in tiny cells, ranging from just 36 square feet to little more than 100 square feet. Most are the size of an average bathroom. Most cells generally contain a steel bed or concrete slab, steel toilet, and small writing table. The majority of death row prisoners eat alone in their cells, fed on trays inserted through a slot in the door. They also receive the majority of their medical and mental health care through these slots. Face-to-face contact with another human being is rare.

**A VIEW FROM AN ACTIVIST:**
"Folks can disagree about the death penalty, but can anyone disagree that the warden is responsible for the prisoner's welfare until his execution? Many guys are released from death row because they are proven innocent – shouldn't a prisoner be allowed to prove his innocence while he awaits execution? Shouldn't he be allowed to prove his death sentence was wrongly handed down? Shouldn't he be allowed to try to get right with God, or to make apologies to his victims? Shouldn't he be allowed to spend time with his family before he goes? Solitary is crazy making. And it makes it impossible for the prisoner to do what society thinks he should be able to do before he is sent to his maker. He's still a person while he's here on earth; his punishment is supposed to be death, not day-by-day torture leading up to his execution."

A Death Before Dying | 4

-Steve Earle, singer, song-writer, and social activist

## Most on Death Row Experience Extreme Isolation and Inactivity

Always sleeping alone locked in a tiny cell is one thing. But more damage is caused when prisoners are locked in these bathroom-sized cells for hours on end for months, years, and even decades – when their *whole life* exists in the cell. The survey revealed that 93 percent of states lock up their death row prisoners for 22 or more hours per day. Most of these prisoners live under conditions of extreme social isolation and enforced idleness.

Death Rows across the U.S. make their beds from:

- Steel: 60%
- Concrete: 13%
- Steel with mattress: 9%
- Concrete with pad: 6%
- Metal: 6%

For many death row prisoners, human contact is generally restricted to brief interactions with corrections officers and, for some prisoners, occasional encounters with healthcare providers or attorneys. An overwhelming majority of states do not allow death row prisoners to have access to work or employment opportunities, or provide access to educational or vocational programming of any kind.

The social isolation and forced idleness experienced by most on death row are exacerbated by extreme limits on visitation with loved ones. Most death row prisoners will never be able to touch or hug family members or loved ones, as 67 percent of states mandate no-contact visitation for death row prisoners. This means that all human interactions during family visits occur while the prisoner is behind some sort of barrier. Frequently, prisoners will also be in arm and leg restraints during visits.

Enforced idleness for most death row prisoners also takes the form of an extreme lack of the exercise and movement human beings need to maintain physical and mental health. In fact, 81 percent of states allow only one hour or less of exercise daily for death row prisoners. And nearly half provide only a cage, pen, or cell in which to exercise. Access to exercise equipment, or even a simple ball to bounce up and down, is extremely rare on death row. Many prisoners will go years without access to fresh air or sunshine.



Average size of death row cells (in feet)

## Too Many on Death Row Are Denied Religious Services

While prisoners' rights are limited in many ways, the right to free exercise of religion is protected under the First Amendment as well as two federal statutes providing heightened protection for

A Death Before Dying | 5

religious exercise in prison: the Religious Freedom Restoration Act (RFRA), which applies to federal and District of Columbia prisoners, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), which applies to state and local institutions that receive money from the federal government (i.e., most local jails and every single state prison system).

Despite the fact that Congress and the courts have recognized the importance of religious freedom in prison, death row prisoners are afforded little to no access to religious services. Indeed, 62 percent of states offer no religious services to death row prisoners and access to chaplains or other religious advisors is sporadic at best. This denial of such an important right enshrined in our Constitution and federal laws for condemned men and women raises troubling questions about capital punishment regimes nationwide. It is also likely to exacerbate the devastating effects of solitary confinement to which so many death row prisoners are subjected.



A solitary confinement cell on Texas' death row.
Photo Credit: Texas Department of Corrections, 2008

**A VIEW FROM THE WARDEN:**
"As a former warden at San Quentin and life-long corrections professional, I know that safety for staff, prisoners, and the public is the utmost concern. But I also know we can do this in a humane way. Death rows should be designed to allow prisoners to leave their cells, participate in programs, and spend time on the yard without coming into physical contact with staff, but where they can be observed by staff visually, such as through screen or glass. Where prisoners are well-behaved, 23/1 solitary is ridiculous. Conditions of confinement should be responsive to behavior – prisoners should be able to earn their way into the least restrictive conditions consistent with meeting safety concerns. Privileges and incentives, like educational programs, contact visits, and phone calls, should be used to achieve the best security. The damage done to people through solitary confinement on death row is unnecessary and avoidable; fixing this problem is consistent with my number one concern, which is our overall public safety."

-Jeanne Woodford, former warden, San Quentin State Prison, California

# THE DEVASTATING EFFECTS OF PROLONGED SOLITARY CONFINEMENT ARE WELL KNOWN

Empirical research consistently demonstrates that prisoners subjected to isolation suffer many of the same symptoms caused by physical torture.[7]

Research shows that people subjected to solitary confinement exhibit a variety of negative physiological and psychological reactions, including:

- Hypersensitivity to external stimuli;[8]
- Perceptual distortions and hallucinations;[9]

A Death Before Dying | 6

A-001587

- Increased anxiety and nervousness;[10]
- Fears of persecution;[11]
- Lack of impulse control;[12]
- Severe and chronic depression;[13]
- Appetite loss and weight loss;[14]
- Heart palpitations;[15]
- Withdrawal;[16]
- Blunting of affect and apathy;[17]
- Talking to oneself;[18]
- Headaches;[19]
- Problems sleeping;[20]
- Confused thought processes;[21]
- Nightmares;[22]
- Dizziness;[23]
- Self-mutilation;[24] and
- Lower levels of brain function, including a decline in EEG activity after only seven days in solitary confinement.[25]

As one prison psychiatrist has noted, "It's a standard psychiatric concept, if you put people in isolation, they will go insane. … Most people in isolation will fall apart."[26]

In addition to increased psychiatric symptoms generally, suicide rates and incidents of self-harm are much higher for prisoners in solitary confinement.[27] It is not unusual for prisoners in solitary to compulsively cut their flesh, repeatedly smash their heads against walls, swallow razors and other harmful objects, or attempt to hang themselves.[28] Although national data are not available for suicide rates of death row prisoners in solitary confinement, we know that approximately 50 percent of all prisoner suicides take place in isolation cells.[29] In California, for example, although less than 10 percent of the state's prison population was held in isolation units in 2004, those units accounted for 73 percent of all suicides.[30] The psychologically-shattering effects of solitary confinement on those with mental illness are so well documented that every federal court to consider the question of whether placing the severely mentally ill in such conditions is cruel and unusual punishment has found a constitutional violation.[31] The leading psychiatrists' professional organization in the United States, the American Psychiatric Association, recently issued a formal position statement that prisoners with serious mental illness should almost never be subjected to such treatment and in the rare event that isolation is necessary, they must be given extra clinical supports.[32]

Despite the legal and medical consensus on the harms produced by solitary confinement for persons with mental illness, no exceptions are generally made for the many men and women with serious mental illness confined in solitary on death rows around the country.  The counter-therapeutic conditions imposed on seriously mentally ill death row prisoners are further exacerbated by the fact that access to mental health treatment is often perfunctory, irregular, and typically occurs "cell-side" through the bars or mesh of the prisoner's cell door.

**"VOLUNTEERS" AND SUICIDES:**
Facing isolated conditions, helplessness, despair, and the anxiety and anguish of waiting to die for years on end, many death row prisoners take control in the only way they know: they drop their legal appeals and "volunteer" for execution.

To date, more than 10 percent of the 1,323 executions since 1976 were of those who dropped their appeals and sought execution.  Death-row suicides are also common. Texas has seen 10, including six since 2004.

The prospect of executing the third "volunteer" in Oregon was a specific reason for Governor Kitzhaber to announce an execution moratorium. As he observed, only those who "volunteer" are executed, making a mockery of the idea that justice is "swift and certain."

# "DEATH ROW PHENOMENON" AND STAGGERING DELAYS EXACERBATE DAMAGE

Michael Selsor spent over 36 years on Oklahoma's death row prior to his execution in 2012. Manuel Valle spent 33 years on Florida's death row before his 2011 execution.  According to the Bureau of Justice Statistics, the average time spent on death row by prisoners executed in 2010 was 14.8 years.[33] From 2000 to present, the average time from sentence to execution in Texas, one of the country's most active death rows, has been nearly 11 years.[34] Several states have death row prisoners who have served more than three decades on death row; two decades on the row is not uncommon.

Death row prisoners spend long periods of time on death row while pursuing their legal appeals, which is a time-consuming process. For all death row prisoners, these years in solitary confinement take their toll on the mind, on the ability to pursue appeals, and on the will to live. The impact of solitary confinement adds to questions already raised at the local, state, and national level over the fairness of the death penalty in both its conception and its implementation.

**SUFFERING OF INNOCENTS:**
The devastating impact of solitary confinement on death row is not suffered only by the guilty or those correctly sentenced to death. Nationally, 142 death row prisoners have been freed from death rows after they were proven innocent – that's more than one innocent person released for every 10 executions since 1976.[35] The average time between conviction and exoneration was nearly 10 years.[36] Until they win relief, all innocent prisoners are subjected to the same inhumane conditions as their guilty counterparts.

The Supreme Court has never addressed whether prolonged confinement on death row before execution violates the Eighth Amendment. Some members of the court, however, have engaged in a discussion on the issue in opinions attached to the court's brief orders declining to decide this issue.

A Death Before Dying | 8

Justices Stephen Breyer and John Paul Stevens have written opinions addressing this issue. The international community has been uniform in finding that it is "an inhuman act to keep a man facing the agony of execution over a long extended period of time."[37] Courts in Canada, India, Zimbabwe, the Bahamas, Uganda, and Guyana have adopted this principle.[38] So too have human rights courts. Most famously, the European Court of Human Rights, in *Soering v. United Kingdom*, specifically recognized "death row phenomenon" and found that the United Kingdom could not extradite a potential capital defendant to Virginia because the delay between his sentence and execution (there, estimated to be a relatively brief 6- to 8-year period) would amount to "cruel, inhuman, [or] degrading treatment or punishment" forbidden by the European Convention on Human Rights.[39] The Inter-American Court of Human Rights has held likewise.[40]

Answering the argument that the delay between sentence and execution is caused by the condemned person's appeals, the court in *Soering* noted that "just as some lapse of time between sentence and execution is inevitable if appeal safeguards are to be provided to the condemned person, so it is equally part of human nature that the person will cling to life by exploiting those safeguards to the full. However well-intentioned and even potentially beneficial is the provision of the complex of post-sentence procedures in Virginia, the consequence is that the condemned prisoner has to endure for many years the conditions on death row and the anguish and mounting tension of living in the ever-present shadow of death."[41]

On this issue, Justice Stevens was blunter, stating that "[j]udicial process takes time, but the error rate in capital cases illustrates its necessity. We are duty bound to insure that every safeguard is observed when a defendant's life is at stake." [42]

**A VIEW FROM THE BENCH:**
Building on the opinion he penned in 1995 in *Lackey v. Texas*, involving a man imprisoned for 17 years before execution, now retired Supreme Court Justice John Paul Stevens wrote in 2009 of a Florida man who had spent 32 years on death row before his execution:

"As he awaits execution, petitioner has endured especially cruel conditions of confinement, spending up to 23 hours per day in isolation in a 6- by 9-foot cell. Two death warrants have been signed against him and stayed only shortly before he was scheduled to be put to death. The dehumanizing effects of such treatment are undeniable. Moreover, as I explained in *Lackey*, delaying an execution does not further public purposes of retribution and deterrence but only diminishes whatever possible benefit society might receive from petitioner's death. It would therefore be appropriate to conclude that a punishment of death after significant delay is "so totally without penological justification that it results in the gratuitous infliction of suffering."

# CONCLUSION

While the courts determine whether states are entitled to execute our fellow human beings, some prisoners will endure conditions of solitary confinement for years and decades on end, followed, for some, by a long-delayed execution. Especially as we move toward becoming a country without capital punishment, this human rights violation requires immediate attention.

A Death Before Dying | 9

[1] Hernán Reyes, *The Worst Scars Are In The Mind: Psychological Torture*, 89 INT. REV. OF THE RED CROSS 591 (2007); Metin Basoglu, et al., *Torture vs. Other Cruel, Inhuman and Degrading Treatment: Is the Distinction Real or Apparent?*, 64 ARCHIVES GEN. PSYCHIATRY 277 (2007).

[2] EUROPEAN COMMITTEE FOR THE PREVENTION OF TORTURE AND INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT, 21ST GENERAL REPORT OF THE CPT 76 (2011), *available at* http://www.cpt.coe.int/en/annual/rep-21.pdf.

[3] Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *Interim Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, ¶ 77, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Mendez) *available at* http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf.

[4] R. Dunham, THE FIRST 100 RE-SENTENCINGS: SUBSEQUENT DISPOSITIONS OF PENNSYLVANIA CAPITAL CASES REVERSED IN POST-CONVICTION, Villanova Law School, Jan. 28, 2013, available at http://www.deathpenaltyinfo.org/arbitrariness-pennsylvanias-costly-and-broken-death-penalty-system (as visited on April 30, 2013).

[5] Surveys were completed by capital defense attorneys who regularly visit prisoners on death rows and, in some limited cases, other persons with direct knowledge of death row conditions.

[6] ABA Crim. Just. Standards on the Treatment of Prisoners, Standard 23-2.6.(a) (2010), *available at* http://www.abanet.org/crimjust/policy/midyear2010/102i.pdf.

[7] Reyes, *supra* note 1; Basoglu, *supra* note 1.

[8] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*, 140 AM. J. PSYCHIATRY 1450, 1452 (1983).

[9] *Id.*; Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130, 134 (2003); *see generally* R. Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 SOC. JUST. 8 (1988).

[10] Grassian, *supra* note 8, at 1452-53; Haney, *supra* note 9, at 130, 133; Holly A. Miller, *Reexamining Psychological Distress in the Current Conditions of Segregation*, 1 J. CORRECTIONAL HEALTH CARE 39, 48 (1994); *see generally* S.L. Brodsky & F.R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 FORENSIC REP. 267 (1988).

[11] Grassian, *supra* note 8, at 1453.

[12] *Id.*; Holly A. Miller & G. Young, *Prison Segregation: Administrative Detention Remedy or Mental Health Problem?*, 7 CRIMINAL BEHAV. AND MENTAL HEALTH 85, 92 (1997).

[13] Grassian, *supra* note 8, at 1453; Miller & Young, *supra* note 12, at 92; Haney, *supra* note 9, at 131.

[14] Haney, *supra* note 9, at 130; *see generally* Korn, *supra* note 9.

[15] Haney, *supra* note 9, at 131.

[16] Miller & Young, *supra* note 12, at 91; *see generally* Korn, *supra* note 9.

[17] *Id.*

[18] Haney, *supra* note 9, at 134; *see generally* Brodsky & Scogin, *supra* note 10.

A Death Before Dying | 10

[19] Haney, *supra* note 9, at 133.

[20] *Id.*

[21] Haney, *supra* note 9, at 137; *see generally* Brodsky & Scogin, *supra* note 10.

[22] Haney, *supra* note 9, at 133.

[23] *Id.*

[24] Grassian, *supra* note 8, at 1453; Eric Lanes, *The Association of Administrative Segregation Placement and Other Risk Factors with the Self-Injury-Free Time of Male Prisoners*, 48 J. OFFENDER REHABILITATION 529, 539-40 (2009).

[25] Paul Gendreau, N.L. Freedman, & G.J.S. Wilde, *Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement*, 79 J. ABNORMAL PSYCH. 54, 57-58 (1972).

[26] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 149 n. 513 (2003).

[27] Expert Report of Professor Craig Haney at 45-46, n. 119, *Coleman v. Schwarzenegger/Plata v. Schwarzenegger*, No: Civ S 90-0520 LKK-JFM P, C01-1351 THE (E.D. Cal/N.D. Cal. Aug. 15, 2008).

[28] *See generally* J. Metzner & J. Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY LAW 104-108 (2010).

[29] *Reassessing Solitary Confinement: The Human Rights, Fiscal and Public Safety Consequences: Hearing Before the Subcommittee on the Constitution, Civil Rights and Human Rights of the Senate Judiciary Committee*, 112th Cong. 8 (2012) (written testimony of Professor Craig Haney) (footnote omitted), *available at* http://www.durbin.senate.gov/public/index.cfm/files/serve?File_id=60d33684-06d6-4cf1-bd95-58564e9dc8e8.

[30] Expert Report of Professor Craig Haney *supra* note 29.

[31] *See, e.g., Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) ("Conditions in TDCJ-ID's administrative segregation units clearly violate constitutional standards when imposed on the subgroup of the plaintiffs' class made up of mentally-ill prisoners"); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995); *Casey v. Lewis*, 834 F. Supp. 1477, 1549-50 (D. Ariz. 1993); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1988) (holding that evidence of prison officials' failure to screen out from SHU "those individuals who, by virtue of their mental condition, are likely to be severely and adversely affected by placement there" states an Eighth Amendment claim).

[32] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--newsroom/position-statements.

[33] *See* Bureau of Justice Statistics, *Capital Punishment, 2010 - Statistical Tables* (December 20, 2011), available at http://bjs.gov/index.cfm?ty=pbdetail&iid=2236.

[34] *See* Texas Department of Criminal Justice, *Death Row Facts*, available at http://www.tdcj.state.tx.us/stat/dr_facts.html.

[35] Death Penalty Information Center, *Innocence and the Death Penalty*, available at http://www.deathpenaltyinfo.org/innocence-and-death-penalty (stating current number of exonerations); Death Penalty Information Center, *Executions by Year Since 1976*, available at http://www.deathpenaltyinfo.org/executions-year

A Death Before Dying | 11

(stating current number of executions).

[36] Death Penalty Information Center, *The Innocence List*, available at http://www.deathpenaltyinfo.org/innocence-list-those-freed-death-row.

[37] *Pratt v. The Attorney General for Jamaica*, Privy Council Appeal No. 10, 22 (1993).

[38] *Cox v. Canada*, Comm. No. 539/1993, U.N. Doc. CCPR/C/52/D/539 (1993); *T.V. Vaitheeswaran v. State of Tamil Nadu*, 2 SCR 348 (1983); *Catholic Commission v. Attorney General*, 2 Z.L.R. 306, (Zimbabwee 1993)' *Henfield v Attorney-General of The Bahamas*, AC 413 (PC 1997); *Susan Kigula and 417 Others*, No. 03 of 2006 (Uganda: Supreme Court 2009).

[39] *Soering v United Kingdom,* 14038/88, 07/07/1989

[40] *Hilaire, Constantine and Benjamin et al. v. Trinidad and Tobago.* Judgment of June 21, 2002. Series C No. 94.

[41] *See supra* note 39.

[42] *Thompson v. Mcneil,* 129 S.Ct. 1299, 1300 (2009).

A-001593

**LEGAL DEPARTMENT**
**NATIONAL PRISON**
**PROJECT**



**VIA FEDERAL EXPRESS**

October 15, 2008

Mr. Harley Lappin
Director
Bureau of Prisons
320 First St. NW
Washington, DC 20534

Dear Director Lappin:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

ELIZABETH ALEXANDER
DIRECTOR
ATTORNEY AT LAW

NATIONAL OFFICE
125 BROAD STREET, 18TH FL.
NEW YORK, NY 10004-2400
T/212.549.2500

OFFICERS AND DIRECTORS
NADINE STROSSEN
PRESIDENT

ANTHONY D. ROMERO
EXECUTIVE DIRECTOR

RICHARD ZACKS
TREASURER

As you are aware, the National Prison Project of the American Civil Liberties Union Foundation continues to investigate conditions in the Special Confinement Unit (SCU) at USP-Terre Haute. In August 2007, my colleague, David Fathi, sent you a detailed letter outlining serious deficiencies in medical, dental and mental health care, environmental conditions, and several other civil liberties issues. Regrettably, we received no response from your office; rather, in October 2007, we received a reply from Warden R.V. Veach, who dismissed many of our most serious concerns. For your convenience, copies of both letters are attached.

Based on a considerable body of evidence gathered in the months since Warden Veach's reply,[1] I agree with Mr. Fathi's conclusion that many of the conditions endured by men housed in the SCU may violate the Eighth Amendment's proscription against cruel and unusual punishment.[2] I further echo Mr. Fathi's desire to engage in a meaningful discussion with the Bureau in an effort to avoid litigation.

Now is a particularly difficult time for the men in the SCU. In May, the government sought judicial permission to lift the stays of execution previously granted to James Roane, Richard Tipton, Cory Johnson, Bruce Webster, Orlando Hall, and Anthony Battle.[3] The men in the SCU are fully aware of this fact and the resulting stress makes the issues discussed below even more urgent and

---

[1] I have spoken with prisoners in person in addition to written and telephone correspondence. In addition, I have reviewed hundreds of pages of documents and have been in contact with counsel for several prisoners. Many of these attorneys share the concerns discussed herein.

[2] I also echo Mr. Fathi's recognition of the courtesy displayed by the SCU staff during my visits. Kindly convey my gratitude to them.

[3] Defendants' Renewed Motion for Judgment on the Pleadings & Renewed Motion to Lift the Stay of the Plaintiffs' & Plaintiff-Intervenors' Executions, *Roane v. Mukasey*, No. 05-2337 (D.D.C. May 16, 2008).

1

salient. The Bureau's systematic denial of adequate medical, mental health, and dental care causes inordinate fear, pain, and suffering among men facing the prospect of a trip across the FCC campus to the death chamber.

Many of the men know you personally from your tenure as warden and many continue to communicate their respect for the leadership you demonstrated while at USP-Terre Haute. I ask that you consider seriously this letter's discussion of the dangerous deficiencies in the medical, mental health, and dental care provided to SCU prisoners. Each of these deficiencies is grave, and all have the capacity to kill, cause permanent harm, or cause the suffering of needless pain. This letter's conclusions may be summarized as follows:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

I.  The Bureau of Prisons fails to provide constitutionally acceptable medical care to SCU prisoners.  Specifically:

- Current policies and practices result in dangerously delayed responses to medical emergencies;
- SCU prisoners lack adequate access to sick call and acute medical care;
- Medical staff fail to make timely and necessary referrals to specialists;
- Care for prisoners with diabetes is medically and constitutionally deficient;
- Prisoners needing medications face substantial obstacles;
- Preventive health care is poor; and
- Signs of potentially serious health conditions are ignored.

II.  Constitutionally adequate mental health care services are not available to SCU prisoners.

III.  SCU prisoners are denied access to timely, adequate dental care.

IV.  Prisoners continue to endure incessant noise, resulting in sleep deprivation and psychological and physiological stress.

* * *

2

## I. Evidence of Deliberate Indifference to Serious Medical Needs – Provision of Health Care

### A. Response to Medical Emergencies

Several prisoners[4] report dangerous problems with staff's delayed response to medical emergencies. They report that the audio alarm that is supposed to sound when a prisoner presses his emergency call button has been either disabled or attenuated. According to the prisoners, the disabling or attenuation of the audio alarm is a relatively recent event. They further report that, although the call button may activate some form of alarm in the control "bubble," the bubble is often unmanned. Given the number of hours per day that SCU prisoners are locked down, a properly functioning emergency call button system is their only means of alerting staff to a life-threatening incident.[5]

In multiple recent incidents, the emergency call button system, to the degree it even functioned as intended, failed to timely summon help. It was only the screams of inmates and banging on cell doors that ultimately attracted staff attention. Failing to timely respond to an emergency call button may constitute actionable deliberate indifference. *Velez v. Johnson*, 395 F.3d 732, 736 (7th Cir. 2005). Officials who knowingly fail to maintain a working call button system may also be held individually liable. *Felton v. Godinez*, No. 93-C-4584, 1996 WL 137645, at *5 (N.D. Ill. March 25, 1996). Below are descriptions of several recent medical emergencies. While individual witnesses may offer slightly differing accounts, each of these incidents was urgent, had the capacity to cause serious harm or death, and failed to receive a timely response by staff.

<div style="margin-left:2em">AMERICAN CIVIL LIBERTIES<br>UNION FOUNDATION</div>

---

[4] To protect their privacy, prisoners will be referred to by numbers. An identification key is attached to this letter. Kindly consider the prisoners' privacy when you share this letter with others both inside and outside of your office.

[5] Prisoner 2 submitted a BP-8 on this very issue. In response, he was told that, on March 18, 2008, "maintenance staff checked the control panel in the SCU control room and made necessary adjustments to the auditory speaker of the panel." March 19, 2008 Response to Informal Resolution submitted by Prisoner 2.

That the speaker required "necessary adjustments" supports Prisoner 2's assertion that the audio alarm was either disabled or turned down. However, according to Prisoner 2, the audio alarm was disabled or turned down once again shortly after the March 18th maintenance. Although Warden Marberry claims that a backup system is in place "[i]f the alarm is not acknowledged in a timely manner," this backup system seems to do little to reduce the institution's dangerously slow response to medical emergencies. Response to Request for Administrative Remedy No. 487815-F1, dated April 24, 2008. Regardless, even if the system is currently operating as intended, measures to ensure future operability are required.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### 1. Prisoner 1

On June 7, 2008, Prisoner 1 reports pressing his emergency call button at approximately 6:34 p.m. Prisoner 1, a type-1 diabetic with a known history of diabetic emergencies, had requested his insulin two hours earlier but had yet to receive it. He felt very sick with the symptoms of hyperglycemia. Nobody responded to his distress call. He pushed the emergency button again twice. Instead of receiving a response by medical staff, the officer in charge sent an inmate orderly to tell Prisoner 1 that the nurse was too busy passing out medications elsewhere on the compound to deliver his insulin. Prisoner 1 waited and pressed the button yet again. He reports that an officer passed by his cell and said that he knew that the emergency could not be too serious because he had heard Prisoner 1 yelling for help. Sometime after 7:41 p.m., a nurse finally arrived at Prisoner 1's cell. His blood sugar was at 395 even though he had not had anything to eat prior to the reading.[6] According to the American Diabetes Association, pre-prandial (pre-meal) capillary plasma glucose should range between 70 and 130mg/dl.[7] Prisoner 1 had a similar experience on April 26, 2008. This casualness in responding to medical emergencies may one day cost the lives of Prisoner 1 and those similarly situated.

### 2. Prisoner 2

On February 24, 2008, Prisoner 2 suffered a cardiac emergency. He pressed his emergency call button but reports that he received no response for over forty-five minutes. Prisoner 2 sought assistance from the prisoner in the cell across from him, who began yelling for help. After 10 minutes of yelling, an officer finally responded. Prisoner 2 describes the situation in a BP-9:

> There was approximately one hour that passed between the time I pressed the emergency distress button in my cell and when the staff removed me from that cell. I suffered severe pain during this time (and afterwards). No officer responded to my request for assistance by way of the emergency signaling device because it was deactivated and they were not

---

[6] According the American Diabetes Association, peak post-prandial (post-meal) capillary plasma glucose should not exceed 180mg/dl, measured one to two hours after the start of a meal. American Diabetes Association, *Standards of Medical Care in Diabetes*, 31 Diabetes Care S12, S18 (Jan. 2008). Glucose levels may be measured using either whole blood or plasma. Glucose levels in blood are generally 10-15% lower than levels measured in plasma. Robyn Graham, *Self-Monitoring of Blood Glucose (SMBG): Considerations for Intensive Diabetes Management*, 30 Pharmacy & Therapeutics 1, 8-9 (2005). It is unclear whether the glucometer used to measure Prisoner 1's glucose reported his blood sugar level or whether the device converted the reading to a plasma level. Regardless, Prisoner 1's glucose level indicates severe hyperglycemia.

[7] American Diabetes Association, *Standards of Medical Care in Diabetes, supra*, at S18.

aware of my situation because they weren't in the SCU Control Room. The range doors are kept shut and locked so even once [another prisoner] began to holler for a staff member that a man was down it took another ten minutes for the staff to respond.[8]

According to Prisoner 2 and other prisoners, the arrival of the correctional officer did little to provide the emergency care needed. After a lieutenant arrived, Prisoner 2 was placed in a wheelchair and taken to the day room. The lieutenant contacted the on-call physician, who was more than an hour and a half away. The lieutenant told Prisoner 2 that, per policy, she could not call for an ambulance unless she received prior physician approval. According to Prisoner 2, the physician arrived approximately three hours after he first pressed his call button. Only then was he transported to the emergency room via ambulance to be treated for a critical cardiac incident involving, among other things, his left anterior descending artery.[9]

Prisoner 2 could have died as a result of the BOP's inexplicable delay in providing him with emergency care. Indeed, the left anterior descending artery is commonly known as the "widow-maker artery." The Bureau's own Clinical Guideline states that "[m]ortality from [myocardial infarction] increases from 1%, when thrombolytic therapy is given immediately, to 10% when thrombolytic therapy is given after 6 hours from the onset of symptoms. Therefore inmates with clinical syndromes consistent with acute MI should be immediately transferred to a community hospital for evaluation and treatment."[10]  BOP's policy of requiring physician approval of emergency room visits when the on-call physician is located an hour and a half away speaks of a reckless disregard for the medical needs of the prisoners in its care. Indeed, the policy is so reckless that I had difficulty believing that it existed until it was confirmed by Warden Marberry, who offered this explanation:

> Due to increased security concerns of inmates housed in the Special Confinement Unit (SCU), it is necessary for a physician to make a medical determination as to whether a SCU inmate is sent to the local hospital. Upon arrival at the institution, the on call physician evaluated your condition and determined it was medically necessary for you to be sent to the local hospital for further evaluation and testing... There is no evidence

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[8] Request for Administrative Remedy (BP-9) No. 487815-F1 dated March 24, 2008.

[9] Request for Administrative Remedy (BP-9) No. 487815-F1 dated March 24, 2008 and hospitalization records.

[10] BOP Clinical Practice Guidelines for the Management of Coronary Artery Disease (2001) § 3.

to suggest that there were unreasonable delays in evaluating you or having you transported to a local hospital.[11]

While there may or may not be "increased security concerns" for death row prisoners, none of these concerns justify the denial of prompt medical care for a prisoner with a life-threatening emergency. Indeed, Bureau policies already contain procedures for authorizing emergency medical trips for high-security prisoners. According to the policy, during non-duty hours, the Administrative Duty Officer or on-duty Lieutenant may authorize such trips.[12] The current policy for SCU prisoners deviates from the Bureau's own rules and the consequences may very well prove deadly.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

3. Prisoner 3

In February 2008, over the course of several days, Prisoner 3 experienced fever, bloody vomiting, dizziness, and sweating. At one point, he passed out in the shower. Prisoner 3 reports pressing the emergency call button on multiple occasions but failed to receive any response. According to Prisoner 3, officers were unaware of his emergency because the audio alarm connected to the call button had been deactivated. Ultimately, it was the yelling of his fellow prisoners that attracted the attention of security staff. When personnel finally arrived, Prisoner 3 was unable to stand upright. An officer told him to crawl to the door so that he could be restrained. Prisoner 3 received no meaningful treatment and never saw a physician. He is unsure of his diagnosis or whether his condition required any follow-up. Prisoner 3's symptoms called for immediate, emergency attention. He received none and, as a result, he suffered needlessly. It is my understanding that counsel for Prisoner 3 has attempted to contact the warden about her client's medical situation but has yet to receive a satisfactory response.

BOP's own policy notes that "ACA standards require a four minute response to life or limb threatening medical emergencies."[13] Clearly, staff at USP-TH has not complied with the standard and, it seems, may be unable to do so.

B.      Access to Acute Care and Sick Call

Access to acute health care is woefully deficient. The current system of

---

[11] Response to Request for Administrative Remedy No. 487814-F1, April 25, 2008.

[12] Program Statement 5538.04 (Escorted Trips) §§ 6(c)(1), 6(d)(2), 8. *See also* USP-TH Institution Supplement THX-6400.02D (Urgent Medical and Dental Care) (Feb. 2007) § 5(b) ("the Operations Lieutenant may initiate procedures for outside emergency medical care.")

[13] Program Statement P6031.01 (Patient Care) § 9.

6

triage, referral to providers, and follow-up fails to meet even the basic health care needs of SCU prisoners. While lockdown units such as the SCU may present special challenges, prisoners are entitled to timely, unimpeded access to acute health care. Changes to the current system are needed immediately.

### 1. Requests for Care & Availability of Sick Call

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Prisoners seeking medical attention report scribbling their complaints on pieces of notebook paper. If there is a special form for requesting sick call, it is not in regular use. As a result, there is no meaningful record of a prisoner's request for health care unless the prisoner writes a duplicate copy of his handwritten slip. Requests for care frequently seem to disappear into a "black hole." This practice is at odds with ACA standard 4-4346, which requires sick call request forms. It is also at odds with BOP's own policy, which contemplates an "Inmate Request for Triage Services form."[14] According to multiple prisoners, sick call is held only on weekdays, meaning that prisoners are unable to submit sick call requests on weekends and holidays, a practice inconsistent with the Institutional Supplement governing the SCU. Recently, Prisoner 4 submitted a Request for Administrative Remedy challenging the adequacy of this policy. He received the following quizzical response from the warden:

> An investigation into your request was completed and reveals that we are currently providing sick call 7 days a week, per policy. However, based on your concerns, medical staff has since been instructed to take sick call forms to include weekends and holidays.[15]

As an initial matter, if the policy is to provide sick call seven days per week, then, according to multiple prisoners, the policy was being ignored. Second, if sick call actually was being conducted seven days per week as claimed by the warden, then why would the warden need to instruct medical staff to take sick call forms on weekends and holidays? An adequate correctional health care system requires a suitable mechanism for prisoners to request care and receive a timely response. Current practices in the SCU fall far short of this standard.

### 2. Timely and Appropriate Referrals to Providers

Prisoners report that they lack timely access to physicians and physicians' assistants for non-emergency care. Once triaged, prisoners must wait, at a minimum, until the following Wednesday before seeing a PA. Frequently, they must wait until the Wednesday after that. Thus, prisoners needing health care

---

[14] Program Statement P6031.01 (Patient Care) § 17.

[15] Response to Request for Administrative Remedy No. 484367-F1, March 31, 2008.

deemed to be non-urgent must wait one or two weeks before receiving medical attention. This is an unacceptable delay, particularly for painful conditions. Further, in the event that the triage nurse mistakenly overlooks the seriousness of a prisoner's symptoms, the prisoner is put at extreme risk. The health services department is very open about its delays. In a response to a BP-8, health services responded that "[o]nce you are evaluated on sick call, you should be scheduled within two weeks to be evaluated by the PA."[16]

### 3. Prisoner 5

The case of Prisoner 5 illustrates some of the significant barriers faced by prisoners needing acute medical care. On May 5, 2006, Prisoner 5, who has a history of neck and back trauma, slipped and fell while stepping out of the shower, hitting his head and injuring his back. That evening, a health care provider inserted staples in Prisoner 5's head to treat his wounds but provided no additional care for his injuries, let alone screening for neurological damage. The next morning, Prisoner 5 awoke in severe pain and unable to move his head. He experienced shooting, electric-like sensations up and down his spinal column. Despite his pleas to nursing and correctional staff, he reports receiving no additional meaningful medical attention until May 10th — five days after his fall — when health staff realized his condition warranted immediate evaluation at the emergency department of the local hospital, where it was determined that Prisoner 5 had suffered a concussion and other injuries. Upon return to the SCU, staff failed to provide him with the pain medications prescribed by the hospital physician at discharge. Instead, after he had suffered excruciating pain for several days, staff told him that he could purchase the medication from the commissary if he had sufficient funds to do so. Ultimately, Prisoner 5 reports that he went without pain medication for approximately two weeks.

Prisoner 5's care did not improve. Staff ignored multiple sick call requests and failed to remove the staples from his head within the time frame originally intended, placing him at risk of complications to his wounds. Prisoner 5 reports never seeing a physician and continued through the summer to experience a combination of pain, immobility, and multiple unanswered requests for sick call. As the Seventh Circuit noted in overturning the dismissal of a deliberate indifference claim, "[a]ny injury to the head unless obviously superficial should ordinarily be considered serious and merits attention until properly diagnosed as to severity." *Murphy v. Walker*, 51 F.3d 714, 719 (7th Cir. 1995).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[16] Memorandum to Prisoner 4 regarding Informal Resolution, March 13, 2008.

8

Prisoner 5 reports spending several painful months in a wheelchair. He received no physical therapy and only the most cursory of medical supervision. It was during this period that he filed a motion to drop his appeals and volunteer for execution. In his motion, he requested death within 60 days, adding that "I no longer wish to live like this just to be put to death anyway." [17] Quite simply, the Bureau appears to have cared little for Prisoner 5's welfare and exhibited recklessness consistent with deliberate indifference to a serious medical need.

Taken together, it is clear that providing timely access to health care services simply is not a priority. The men awaiting execution in the SCU deserve better – much better.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

#### 4. Failure to Address Symptoms of Serious Illness

Prisoner 6 has suffered from painful swelling in his legs and feet for over a year but has received little treatment. He also reports suffering from chest pain, labored breathing, and fatigue. This cluster of symptoms could indicate a serious, life-threatening cardiovascular condition. BOP medical staff issued him T.E.D. hose, which are frequently used to prevent blood clots or other vascular problems. This suggests that medical staff is on notice of Prisoner 6's problem. Nevertheless, Prisoner 6 reports that the clinical director curtly dismissed his complaints after the most cursory of visual examinations. Proper diagnosis requires prompt evaluation. It is my understanding that counsel for Prisoner 6 have received copies of his medical records through a Freedom of Information Act request and will take appropriate action to ensure that their client receives the care he needs.

### C.    Referrals to Specialists

With regard to specialty medical care, multiple prisoners report significant delays – and seemingly unwarranted denials.   Trips to off-site providers are rare, leaving prisoners without timely access to orthopedists, gastroenterologists, ophthalmologists, endocrinologists, and other providers. When combined with the lack of access to on-site health care, prisoners needing consultations with outside specialists are left to suffer.

#### 1. The *Ortiz* Litigation: An Indication of a Serious Systemic Problem

The ongoing litigation on behalf of Arboleda Ortiz provides a typical

---

[17] Prisoner 5 later withdrew this motion.

example of the Bureau's failure to provide proper, timely specialty care.[18]  In 2001, an ophthalmologist diagnosed Mr. Ortiz with pterygia (masses of thickened conjunctiva that cover part of the eyeball).  The doctor recommended surgical removal but this recommendation was denied.  During the next five years, Ortiz continued to suffer eye problems and his doctors continued to recommend surgical intervention.  They noted that Ortiz had "difficulty seeing" and that the pterygia impaired his vision.  Each recommendation for surgery was met with a denial with no further explanation.   On June 13, 2008, the United States Court of Appeals for the Seventh Circuit reversed the district court's ruling with respect to claims against Dr. Thomas Webster, the current Clinical Director at USP-TH.  The Court of Appeals was clearly disturbed by Webster's conduct:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> Dr. Webster, the only medical defendant, denied Ortiz surgery after eye specialists had recommended it, and although he belatedly provided an explanation for the denials – that the eye specialists found that the pterygia did not affect Ortiz's vision – the explanation does not square with the record.  Instead, the records show that his vision worsened from 20/80 to 20/100 between 2001 and 2003, that he had "difficulty seeing," and that the pterygia were causing "visual distortion."  And, contrary to the district court's recitation of the facts, Ortiz did not receive surgery within 75 days of when it was first recommended; instead, his surgery to remove only one of the pterygia occurred in 2006, over 5 years after the initial recommendation and only after Ortiz filed this lawsuit.[19]

The Seventh Circuit's indictment of the poor care afforded to Mr. Ortiz should serve as a wake-up call for the Bureau.  Mr. Ortiz's ordeal is hardly unique.  Several other prisoners continue to suffer similarly.

### 2. Prisoner 3

Prisoner 3 has a history of severe chest and abdominal pain.  This problem appears in his medical records as early as August 8, 2007, when he was prescribed ranitidine for what was assumed to be heartburn.  More than two months later, medical records indicate that Prisoner 3 reported that "[i]t still feels like my chest is going to explode."  A BP-S622.060 (Radiologic Consultation Request/Report) indicates that x-rays had been ordered for Prisoner 3 on October 4, 2007 to help diagnose "chest pain."  However, despite the severity of his pain, the Bureau failed to perform the x-rays until December 28, 2007.  The results were not reviewed and signed off on until January 14, 2008.  Two and a half pain-filled

---

[18] *Ortiz v. Bezy, et al.*, No. 2:05-CV-246-LJM-WTL (S.D. Ind.).  SCU prisoner-paralegals prepared the legal documents for this litigation as Mr. Ortiz is unable to do so himself.

[19] *Ortiz v. Bezy, et al.*, No. 07-3807, 2008 WL 2415857, at *3 (7th Cir. June 13, 2008).

months elapsed while he awaited the most simple of radiologic procedures. By the time the x-rays were taken, Prisoner 3 was complaining of vomiting at every meal.

The Utilization Review Committee met on January 17, 2008 to consider Prisoner 3's case. Although Health Services had already had five months to determine an effective course of treatment, the URC deferred action until yet an additional medication regimen was tried. On February 13, 2008, Prisoner 3 complained of a squeezing pain in his abdomen and of spitting up blood. Finally, on February 14, the URC approved him for an esophagogastroduodenoscopy (EGD). The URC classified his need as "Level 2" and "Priority 2," meaning that the procedure "…cannot be reasonably delayed *without the risk of further complication*, serious complication, significant pain or discomfort…" (emphasis in original) and that the exam should occur within 30 days. Prisoner 3 did not have his EGD until late June 2008. This delay is unacceptable. Chest and abdominal pain are serious matters that require urgent attention and prompt diagnosis. The care provided to Prisoner 3 falls short of the standards set forth in the Bureau's own Clinical Practice Guidelines, which call for ambulatory pH monitoring, upper endoscopy, or both if the patient fails to improve after eight weeks of $H_2$ antagonist therapy (e.g., ranitidine) and four weeks of proton pump inhibiter treatment (e.g., omeprazole).[20]    Medical staff was clearly aware of Prisoner 3's pain; the decision to ignore it for so long demonstrates deliberate indifference, particularly if staff fails to provide proper follow-up based on Prisoner 3's EGD results.

### 3. Prisoner 7

Prisoner 7 suffers from a chronic, painful skin condition. For several years, much of his body has been covered with bright red sores. In 2000, while still in state custody, a board-certified dermatologist wrote that this condition may be the result of an allergic reaction to a metal bullet lodged in Prisoner 7's right hip. In the resulting progress note, the doctor's recommendation is underlined: "Needs to have the bullet removed." In 2001, a state court judge ordered that Prisoner 7 be taken to a doctor for evaluation and possible removal of the bullet. Later that year, the Director of Emergency Medicine at Sequoyah Memorial Hospital (Oklahoma) wrote that "I feel that there certainly can exist in a high probability a causal relationship between the persistent rash on his lower extremities and the existing bullet fragment… without removing the bullet fragment, there may exist a potential for further progression of the rash, which may in turn become more serious and/or disfiguring." It is my understanding that

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[20] Clinical Practice Guidelines for Gastroesophageal Reflux Disease (GERD) Dyspepsia, and Peptic Ulcer Disease, Appendix 1 (November 2001).

BOP staff have been made aware of these state medical records. On November 9, 2006, after Prisoner 7's arrival at USP-TH, an orthopedic surgeon wrote that "It is the consensus of the doctors who have seen him that [the bullet] is what is causing the sores." As of my most recent contact with Prisoner 7, the bullet remains in his hip, his sores persist, and he still awaits medically adequate treatment.

Official responses to Prisoner 7's grievances suggest a medical system that fails to meet the needs of the population it is meant to serve. In a response to his BP-11 Central Office Administrative Remedy Appeal, a BOP official wrote that:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> [r]elevant portions of your medical record have been reviewed which reveal that you were evaluated by the staff physician on October 18, 2006, for your complaint of skin rash due to a bullet being lodged in your right hip. During the evaluation, the staff physician evaluated you and determined that you did not suffer from any erosion of the bullet through the skin nor was there any skin irritation at the site of the healed bullet wound. As such, your request to have the bullet removed is not clinically indicated and will not be performed.[21]

This response – and the doctor's evaluation cited therein – do not address Prisoner 7's request that his allergic skin reaction be treated. He did not complain of the bullet protruding through the skin or of irritation limited to the wound site. After waiting over six months for a final reply, the Central Office upheld the denial of treatment for symptoms other than the ones actually suffered by Prisoner 7. In February 2007, he raised the issue again in a Request for Informal Resolution. In response, he was told that the records of his previous consultation could not be located, that no orthopedic specialist was available to see him due to contract issues, and that he should sign up for sick call if he still had problems.[22] On May 23, 2007, Warden Veach informed him that USP-TH had finally retained a new orthopedic surgeon. Four months later, Prisoner 7 submitted a "cop-out" stating that "[t]he sores are getting worse and spreading to my arms and head…" and asking when he would be seen by the new orthopedic surgeon. The Medical Secretary replied that Prisoner 7 hadn't been referred for a consult until September 12, 2007 and that he would "be evaluated once [his] name reaches the top of the list."

Prisoner 7 did not see the specialist until November 2007 and has yet to receive adequate treatment for his condition. As Prisoner 7 wrote in a BP-11, "[i]f you don't know what's wrong then send me somewhere w[h]ere they can

---

[21] Response to Central Office Administrative Remedy Appeal (BP-11) No. 418953-A1, dated January 26, 2007.

[22] Undated Response to Request for Informal Resolution (BP-8) submitted on February 21, 2007.

12

find out... I bleed all over my clothes, bed[d]ing, and the sores are spreading. I need to know what's wrong."[23] Regardless of what the specialist found, Prisoner 7 still suffers and BOP is responsible for diagnosing, treating, and monitoring his serious medical need. Unlike many medical conditions, his skin affliction is readily visible to even a lay observer. He needs immediate care. Further, it is unacceptable to deny care simply because the patient is not at "the top of the list."

### 4. Prisoner 8

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Prisoner 8 has a long history of knee problems which, in the past, required two surgical interventions. He still experiences significant, chronic pain. Beginning in the fall of 2006, he began asking to see an orthopedist. He waited over a year before seeing the orthopedic specialist in November 2007. After the visit, BOP refused to approve the medication prescribed by the specialist. Prisoner 8 continues to suffer even as he awaits a ruling on the government's motion to vacate his stay of execution.

### 5. Prisoner 4

Prisoner 4 has a history of retinal detachments and other serious eye problems, all of which were documented in his records from MCC-Chicago. In a consultation notes dated February 8, 2006, Prisoner 4's eye care provider wrote that Prisoner 4 should have cataract surgery within 6 to 12 months. In July 2006, after arriving at the SCU, an optometrist likewise noted that Prisoner 4 should be considered for cataract surgery. Nothing happened. In March 2007, the same optometrist noted an advanced, hypermature cataract in Prisoner 4's left eye. Yet again, he wrote that Prisoner 4 needed an evaluation for cataract surgery by an ophthalmologist. Fifteen months passed before he finally saw an ophthalmologist in June 2008. According to Prisoner 4, the ophthalmologist recommended a consultation with a retinal specialist and that Prisoner 4 be cleared for cataract surgery. Given the state of his vision, per BOP guidelines, he is a candidate for surgery.[24] It appears that Dr. Webster signed off on the ophthalmologist's consultation report. Prisoner 4's optometrist recently told him that his cataract was getting worse and that the surgery could trigger another retinal detachment. Given the dangerously slow response time to medical emergencies at the SCU, Prisoner 4 is terrified that he will suffer a post-surgical retinal detachment in his cell with no one to seek emergency care on his behalf.

As noted above, the *Ortiz* litigation should serve to remind the Bureau that constitutionally acceptable health care requires the provision of prompt specialty

---

[23] Central Office Administrative Remedy Appeal (BP-11) No. 475571-A1, March 4, 2008.

[24] BOP Ophthalmology Guidance (February 2008) at 5.

care. Mr. Ortiz will continue to vigorously litigate his deliberate indifference claims against the Clinical Director at USP-TH. A delay of six months before referral to a specialist may constitute deliberate indifference to a serious medical need. *Jones v. Simek,* 193 F.3d 485, 490 (7th Cir. 1999). Mr. Ortiz waited five years, and others continue to wait. Failing to follow a specialist's sound recommendation may also constitute deliberate indifference. *Gil v. Reed,* 381 F.3d 649, 663 (7th Cir. 2004); *Jones,* 193 F.3d at 490.

I am told that multiple prisoners were recently sent off-site to see specialists. This is a welcome development and, I hope, the recommendations of the specialists will be heeded and prisoners will receive proper follow-up. Proactive medical care could have averted Mr. Ortiz's need to litigate. By this letter, I hope that we can work together to avoid the need for additional litigation.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### D. Care for Prisoners with Diabetes

The American Diabetes Association (ADA) holds that "[p]eople with diabetes in correctional facilities should receive care that meets national standards."[25] Care at Terre Haute falls woefully and dangerously short of these standards. At least two SCU prisoners suffer from diabetes serious enough to jeopardize their daily wellbeing, organ function and, ultimately, their lives. Proper care for these prisoners includes frequent, routine monitoring of glucose and hemoglobin A1C levels, appropriate diet and exercise opportunities, and care for life-threatening complications such as hypertension, dyslipidemia, kidney disease, retinopathy, and neuropathy.[26] Failure to timely diagnose and treat these complications may cost a diabetic prisoner his eyesight, limbs, and kidney function. There are major deficiencies in the care provided to diabetic SCU prisoners.

#### 1. Failure to Provide a Medically Appropriate Diet

BOP inexplicably fails to provide a diabetic diet to prisoners with diabetes. Prisoner 1, for example, does not receive a diabetic diet even though his intake assessment, signed by the USP-TH Clinical Director, clearly calls for such a diet. For Prisoner 1 and other diabetics, the only alternative to the standard fare diet is to apply to receive the common fare diet, which is designed to accommodate the dietary needs of religious prisoners.

---

[25] American Diabetes Association, *Diabetes Management in Correctional Institutions,* 31 Diabetes Care S87, S87 (Jan. 2008).

[26] *Id.* at S87, S90.

14

Prisoners report that, in order to receive common fare, they must apply through the chaplain and answer a series of questions related to religion. It is unclear whether this diet is actually more appropriate for diabetic prisoners than the standard meals. It is well-established that proper nutrition is critical to the care of persons with diabetes,[27] and diabetic diets are commonplace in jails and prisons throughout the country. That BOP fails to provide such a diet is disturbing and incomprehensible, especially when BOP's own Patient Care Program Statement specifically authorizes medical staff to offer such diets if clinically indicated. Further, BOP's *Food Service Technical Reference Manual* clearly states that "[a] diabetic meal plan is indicated for any person with diabetes or documented glucose intolerance and for weight management."[28] Indeed, the *Manual* dedicates over 30 pages to the preparation of diabetic diets.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

In less secure settings, nutritional counseling and education may help prisoners select a proper diabetic diet from the choices available in the institution's cafeteria. But this approach is unworkable in secure units in which prisoners have few, if any, opportunities to select menu items.[29] Because SCU prisoners do not eat from the mainline, they are unable to self-select healthy options. Given this circumstance, the *Manual* requires the Bureau to provide a medically appropriate diet.[30] The repercussions of failing to do so may be life-threatening, as outlined below.

## 2. Poor Management of Prisoners with Diabetes – Glycemic Control

Prisoner 1 and Prisoner 2 are type-1 and type-2 diabetics, respectively. During their incarceration in the SCU, both have had "severely uncontrolled diabetes" as defined by BOP criteria.[31] Prior to mid-2007, health staff provided dangerously infrequent blood glucose monitoring. Prisoner 2's medical records indicate that, between February 2005 and May 2007, staff checked his blood glucose fewer than 50 times. The checks that did occur were hardly regular; rather, they occurred at seemingly random intervals, suggesting the lack of a treatment plan. In mid-2007, Bureau officials increased the frequency of blood glucose checks for SCU prisoners. This was a welcome and necessary step, and all parties involved are grateful.

---

[27] American Diabetes Association, *Standards of Medical Care in Diabetes, supra,* at S20-22.

[28] Food Service Technical Reference Manual TRM 4701.02 at 62.

[29] American Diabetes Association, *Diabetes Management in Correctional Institutions, supra,* at S89.

[30] Food Service Technical Reference Manual at 45.

[31] BOP Clinical Practice Guideline: Management of Diabetes (2008) at 10.

15

A-001608

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

But increasing the frequency of checks, while a positive development, appears to have gone only so far in helping Prisoner 1, a type-1 diabetic, control his condition. Prisoner 1's blood sugar continues to reach levels in the 400s. During the course of his incarceration in the SCU, Prisoner 1 has had multiple life-threatening diabetic emergencies. Typical of such emergencies is the incident documented in his BOP medical file on December 17, 2006: "Inmate was found to be lying in his bed. Inmate is a known diabetic. Extremely diaphoretic. Was not alert or oriented but was moving about bed and moaning. Noted to have saliva pouring out of mouth. Blood sugar noted to be 34." Three weeks *before* this incident, the warden, in a BP-9 response, informed Prisoner 1 that he was "receiving proper medical treatment for the aforementioned [diabetic] issues."[32] And four weeks *after* the emergency, the Regional Director assured Prisoner 1 that health staff were "aware of your concerns and have been responsive to your requests."[33] Similarly, on October 26, 2007, Prisoner 1 was "found in his bed non-responsive with clonic/tonic movements systemically. the prisoner was extremely diaphoretic." Prisoner 1 was taken to an exam room and given intravenous fluids. Six minutes elapsed before he regained consciousness. Despite the graveness of this emergency,[34] the nurse felt that no follow-up medical care needed to be scheduled. Rather, health staff would follow-up only as needed. Prisoner 1 did not see a physician until November 7th.

Prisoners 1 and 2 report that their life-saving medications are delivered at inconsistent times. For proper control of diabetes, insulin delivery should be coordinated with meal service. The BOP's Clinical Practice Guideline unequivocally echoes this principle: "The consequences of insulin/food mismatch are, at best, suboptimal control of hyperglycemia; at worst, the result is frequent and potentially severe hypoglycemic episodes." The American Diabetes Association concurs: "[t]iming of meals and snacks must be coordinated with medication administration as needed to minimize the risk of hypoglycemia..." The Bureau has consistently flouted these bedrock principles of diabetic care. When prisoners seek redress, they are brushed off with bureaucratic indifference. Typical of the boilerplate responses received by prisoners is this example:

> FCC Terre Haute medical staff acknowledge that you may not have received your insulin injection at exactly the same time as normal on May 27, 28, 29, 30, and 31, 2007, however, you did receive the injection,

---

[32] Response to Request for Administrative Remedy No. 430701-F1, dated November 27, 2006.

[33] Response to Regional Administrative Remedy Appeal No. 430701-R1, dated January 17, 2007.

[34] Altered mental status, diaphoresis, and seizures are symptoms of "severe hypoglycemia" which is a "medical emergency." American Diabetes Association, *Diabetes Management in Correctional Institutions, supra*, at S89.

16

without suffering from any medical complications.[35]

Not only are the responses to the prisoners' BP-11s grossly inadequate, it should be noted that the responses were generally written six months or more after the underlying events occurred. A patient asking for the care to which he is entitled should not have to wait six months to receive a conclusive reply. Further, on multiple occasions, health services fails to provide even a boilerplate response to properlfdy submitted Informal Resolution requests (BP-8s). When unit staff admirably attempt to follow up on the prisoners' BP-8 requests, they are often met with the same response that the prisoners receive: silence.[36]

### 3. Improper Management of Diabetic Complications

It appears that Prisoner 2's diabetic complications are being neglected. Prisoner 2's attempts to be vigilant about his insulin have been met by apathy. In response to a BP-11 dated September 25, 2007, a BOP official acknowledged that Prisoner 2's laboratory results "remain at high levels."[37] However, a few sentences later, the official concludes that "[t]he record reflects you are receiving appropriate medical care and treatment for your diabetes condition." When Prisoner 2 raised similar concerns about his disease control a few months later, the same BOP official replied that these concerns had previously been addressed and that the Bureau would provide no further response.

Patients with diabetes are at increased risk of cardiovascular disease. Accordingly, the BOP Clinical Guideline asserts that "[l]ipid disorders should be managed aggressively in diabetic patients to reduce the risk of serious cardiovascular events." Although Prisoner 1's cholesterol levels have improved, his triglycerides remain unacceptably high. Prisoner 2 is in a similar situation. In a BP-10 dated June 19, 2007, Prisoner 2 cited the BOP Clinical Guideline and attached copies of laboratory results indicating triglyceride levels of 450 and 511 mg/dL (the BOP treatment goal for diabetics is 150 mg/dL or less) and HDL levels of 29 and 28 mg/dL (the BOP treatment goal for diabetics is 40 mg/dL or

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[35] Request for Administrative Remedy (BP-9) No. 456291-A1. For nearly identical responses, see Nos. 455064-A1, 455068-A1, 455061-F1, 455070-A1, 456287-A1, 456290-A1, 456721-A1, and 456471-A2.

[36] For example, in a memorandum dated July 2, 2007 from the SCU Unit Counselor to Prisoner 1, the Counselor writes "This memorandum is in reference to the informal resolution that you filed in reference to the Health Services Department concerning your diabetes. The Health Services Department was contacted in reference to this issue and asked to assist me with providing you with a response in an effort to informally resolve this matter. They failed to reply to my requests timely."

[37] Response to Central Office Administrative Remedy Appeal No. 453503-A1, dated September 25, 2007.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

greater).[38] Notwithstanding that Prisoner 2's lipid levels were dangerously out of line with BOP's Clinical Practice Guideline, the Regional Director replied that "[w]e have reviewed the documentation related to your appeal. We have determined the HSD staff members are aware of your medical status. They are providing ongoing assessment and treatment per the BOP's Patient Care Policy, Program Statement 6031.01, and the BOP's Clinical Practice Guidelines for Diabetes."[39] Within a few months of that response, Prisoner 2 suffered a serious cardiovascular event that could have cost him his life.

Prisoner 2 also suffers from a diabetic-related retinopathy, an eye condition that, according to the Clinical Guideline, "can lead to retinal detachment and irreversible vision loss." It is unclear whether Prisoner 2's vision has already suffered irreparable damage. Regardless of the harm already done, he requires medical intervention by specialists to treat this serious and potentially disabling condition.

Further, it is well-established that diabetic patients are prone to kidney disease. Prisoner 1's lab results, dated January 29, 2008, show a significantly elevated blood creatinine level. These results appear to be initialed and acknowledged by the FCC-TH Clinical Director. Prisoner 1 must be monitored for possible chronic kidney disease.

BOP has been on notice of the grave deficiencies in its care of diabetic SCU prisoners for some time. My office expressed serious concerns to you directly last year, as have other counsel. I urge you to take immediate steps to improve care before a diabetic emergency or complication proves fatal.

### E. Medications

SCU prisoners seeking effective, clinically appropriate medications face an uphill battle. Indeed, clinical staff seem to expend more effort denying medications than they do prescribing and dispensing them. The medications sought by SCU prisoners are not "lifestyle" drugs or medically optional. Rather, they are important treatments for serious medical conditions.

1. Prisoner 7

Prisoner 7 has a documented history of stomach ulcers and related

---

[38] Regional Administrative Remedy Appeal (BP-10) No. 452452-R1. BOP's lipid goals for diabetics are set forth in the BOP Clinical Practice Guideline: Management of Diabetes (2008) at 36.

[39] Response to Regional Administrative Remedy Appeal No. 452452-R1 dated July 23, 2007.

18

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

problems dating back at least eight years. His BOP medical records indicate a diagnosis of gastroesophageal reflux disease (GERD) as early as October 18, 2006. When untreated, he vomits up his food, experiences acid reflux, and passes bloody stools. Although BOP's Clinical Practice Guideline emphasizes the value of upper endoscopy and other diagnostic tests, Prisoner 7 has never received these procedures. Instead, medical staff has subjected him to extended medication outages and the arbitrary discontinuation of treatment with omeprazole, a medication that provides relief of Prisoner 7's symptoms. At times, they have refused to prescribe omeprazole and, instead, prescribed ranitidine – a medication that has been ineffective for Prisoner 7's condition. At other times, staff has instructed him that he must purchase his omeprazole from the commissary (at a cost of over $17.00 per box).

As an initial matter, knowingly continuing to treat Prisoner 7 with an ineffective medication states an Eighth Amendment claim for deliberate indifference to a serious medical need. On two occasions, the Seventh Circuit has addressed this very issue. In *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), the court reversed the dismissal of claims against a defendant who had failed to prescribe omeprazole and, instead, continued the prisoner-patient on an ineffective course of treatment. In *McCarty v. Pitzer*, No. 96-2301, 1997 WL 2225869 (7th Cir. April 20, 1997), the court allowed claims to proceed when a prison doctor insisted on prescribing ranitidine instead of omeprazole when the former had proven ineffective and no justification for the substitution had been offered.

Second, Program Statement P6541.02 (Over-the-Counter Medications) authorizes medical staff to refer prisoners to the commissary to purchase over-the-counter medications "in response to complaints related to cosmetic and general hygiene issues or symptoms of minor medical ailments." Prisoner 7's documented history of gastrointestinal disease is hardly a matter of cosmetics, general hygiene, or a minor medical ailment. And, while it is true that the Bureau's National Formulary (2007) and the Clinical Guideline for the treatment of GERD place certain conditions on the prescription of omeprazole, it appears that Prisoner 7 satisfies the conditions and should be eligible to receive this vital medication by prescription.

2. Prisoner 2

Prisoner 2, discussed above, was discharged from a local hospital in February 2008 after suffering a cardiac emergency. He reports that he waited five days before receiving the first dose of a critical medication prescribed by the hospital cardiologist. My office will be looking at Prisoner 2's records to determine the risk at which he was placed by this inexplicable delay. It should

19

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

also be noted that he received little if any physician follow up upon returning to the SCU, and that he was denied a diabetic diet.

### 3. Prisoner 8

Prisoner 8 saw an orthopedic specialist for chronic, excruciating knee pain. Prisoner 8 has a history of not tolerating several standard pain medications, which cause him gastrointestinal bleeding, vomiting, diarrhea, and abdominal cramps. Given this history, the specialist prescribed the pain medication Celebrex. After a substantial delay, medical staff refused to grant non-formulary approval for this medication. While it is true that Celebrex is a non-formulary drug,[40] this fact does not absolve BOP from its obligation to provide proper pain relief to Prisoner 8. Whether with Celebrex or a suitable substitute, Prisoner 8 has the constitutional right to receive safe and effective treatment for his serious knee pain. He continues to suffer as a result of BOP's conduct.

### F. Infectious Disease, Preventive Health Care, and Documentation

The failure to identify, treat, and prevent infectious diseases creates needless suffering for individual prisoner-patients and substantial dangers for staff and the entire prison population.

### 1. Management of a MRSA Case

Prisoner 7's medical records indicate a diagnosis of methicillin-resistant *staphylococcus aureus* (MRSA) based on laboratory tests performed on January 3, 2008 and reported five days later. However, nobody informed him of the results – and treatment was not started – until early February. Aside from any prejudice to Prisoner 7's health, a four-week delay in treating an infectious disease puts other prisoners at risk.

### 2. Preventive Health Care

This disregard for basic principles of public health extends to the institution's gross failure to implement the vaccination protocols mandated by the Bureau's own policies.[41] In a recent Department of Justice Inspector General's report, auditors reviewed compliance with various health care-related performance measures by institutions. USP-TH performed poorly in several

---

[40] BOP Health Services National Formulary (2007) at 21.

[41] Vaccination protocols are set forth in the BOP Preventive Health Care Clinical Practice Guidelines (April 2007).

20

areas, but the most serious deficiencies were found to be in the institution's vaccination program. Only *one percent* of eligible prisoners had received a measles/mumps/rubella vaccine, only *forty percent* had received a tetanus vaccine within the past ten years, and only *forty-eight percent* of eligible prisoners had received vaccination against hepatitis A. Nine percent of prisoners had not received hepatitis B testing or vaccination and fourteen percent had not received an annual influenza vaccine.[42]

Compliance with several other measures of preventive health care performance was equally poor. Only *eighteen percent* of prisoners had received a cardiovascular risk calculation in the last five years. Given the significant number of SCU prisoners with risk factors for cardiovascular disease, it is likely that prisoners will suffer death or injury before health staff assess their risk and take prophylactic measures. Similarly, only *thirty-six percent* of prisoners had received a current body mass index calculation. A full twenty percent had not received a fecal occult blood test, which is used to screen for colorectal cancer and other serious diseases. And twenty-two percent had not received a hearing screening test – an unfortunate statistic given the level of noise to which SCU prisoners are subject (see Section IV, below).

When asked why vaccination rates were so low, USP-TH health staff responded that "they did not provide routine tests and vaccines because of staffing inadequacies and scheduling constraints."[43] This response is no more acceptable than the underlying gross failure to provide vaccines and other preventative health care.

### 3. Non-Compliance with BOP Documentation Protocols

Finally, it appears that USP-TH health services staff fail to document key health care data as specifically required by BOP policy. The Bureau requires that the institutional Health Services Administrator (HSA) prepare quarterly reports "to help monitor the health care services provided."[44] Among other things, in her quarterly report, the HSA must document (1) the use of health care services by category; (2) referrals to specialists; (3) the number of medication, laboratory, and radiology orders filled; (4) hospital admissions; and (5) serious injuries, illnesses, deaths, or offsite transports. On May 19, 2008, my office submitted a Freedom of Information Act request asking for copies of these quarterly reports. On August 25, 2008, BOP Regional Counsel informed me that "[i]nstitution staff conducted a

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[42] U.S. Department of Justice Office of the Inspector General, Audit Division, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care,* Audit Report 08-08 (February 2008) at 93-94.

[43] *Id.* at 31.

[44] Program Statement P6010.02 (Health Services Administration) § 7(b).

thorough search for the records responsive to your request." However, institution staff were unable to locate any of the quarterly reports required by BOP policy. Similarly, BOP requires the HSA to "maintain a Consultant Log Book reflecting times and dates of all consultant visits."[45] No such log book could be found in response to my FOIA request. Given the seriousness of the deficiencies found in medical care at USP-TH, the absence of these documents is alarming.

## II.    Failure to Provide Mental Health Care

Prisoners uniformly report that they lack meaningful access to even the most basic level of mental health care. Evaluations are cursory, programming is unavailable, and the Complex lacks an on-site psychiatrist. Treatment of mentally ill prisoners is minimal.

### 1. Lack of Meaningful Evaluation

A mental health care provider tours the unit periodically, accompanied by security staff. The provider stops at each cell and, through the cell door, asks the prisoner if he is doing okay. Quite literally, prisoners are asked if they are "all right" and the "clinical" encounter ends just seconds after it began. Frequently, these conversations occur within listening distance of security staff and other prisoners, making confidential communication impossible. Prisoners express serious concerns about whether these conversations could be used as evidence in their post-conviction proceedings and, understandably, are extremely hesitant to participate. Even if they chose to participate, the value of a "drive-by" mental health consult would be limited. Minute-long cell-front consultations do not satisfy the Bureau's legal duty to provide mental health care to prisoners. Further, the notes written by clinical staff are often boilerplate, even when the subject is a prisoner with serious, documented mental illness. In one instance, it appears that a prisoner's periodic mental health evaluation was based on observations made while the prisoner was having his teeth cleaned. Based on this observation, the Ph.D. psychologist concluded that the prisoner "does not appear to be a danger to self or others at this time."

### 2. Insufficient Staffing and Treatment

Prisoners who receive care beyond these cursory screenings are seen by a provider in Springfield, Missouri via a tele-psychiatry consult. It is my understanding that these consultations are solely for the purpose of prescribing psychotropic medications. Putting aside the question of whether a condemned prisoner's mental health needs can be adequately met by an unfamiliar provider

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[45] Program Statement P6010.02 (Health Services Administration) § 7(j).

22

located hundreds of miles away, the therapeutic value of these interactions is questionable. It appears that prisoners do not receive psychotherapy or counseling of any sort, and it is unclear whether prisoners receive the kind of medication monitoring that should accompany all courses of psychotropic medications. Further, prisoners report that there is no on-site psychiatrist at FCC-TH, despite a population of approximately 3,500 prisoners. The Seventh Circuit has characterized the lack of an on-site psychiatrist as a "serious system deficiency" contributing to a finding of deliberate indifference to a serious medical need. *Wellman v. Faulkner*, 715 F.2d 269, 272-73 (7th Cir. 1983). Indeed, so little mental health care is provided that a systemic evaluation is difficult. The Bureau's own policy speaks of "an overall effective, integrated mental health program for the institution."[46] Nothing of the sort exists for prisoners confined in the SCU, many of whom require both acute and chronic psychiatric care.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### 3. Prisoner 9

Prisoner 9 suffers from severe, debilitating mental illness. Both his counsel and fellow prisoners paint a sad portrait of his symptoms. He rarely leaves his cell and, when he does, he frequently dresses in just his underwear. He showers only when forced to do so by staff. His cell is filthy; he urinates in the corners and ejaculates on the walls, often without regard as to who may be watching. His pathology is evident to even the most casual observer; he screams at the television and will stare at a blank screen, listening to the static. He has attacked a microwave oven with a broom and complains of implanted devices controlling his thoughts and actions. In July 2006, for several days in a row, Prisoner 9 jettisoned urine and feces from his cell, believing that BOP had rendered his toilet inoperable. Recently, he flooded his cell for no apparent reason. But more shocking than his behavior is the Bureau's response. Counsel for Prisoner 9 informs me that, in her client's nearly nine years at USP-TH, he has received no meaningful mental health treatment.

### 4. Prisoner 10

Equally disturbing as the BOP's failures to treat mental illness are the lengths to which the Bureau has gone to affirmatively prevent prisoners from receiving adequate mental health care. Multiple SCU prisoners report that BOP staff discontinued their psychotropic medications upon arrival at USP-TH. This is a dangerous practice.

---

[46] Program Statement 5310.12 (Psychology Services Manual) § 3.2(A). It should be noted that this document is dated August 30, 1993 and references American Correctional Association Standards that have since been superseded.

23

Prisoner 10 has a long history of symptoms of mental illness. In the past, a regimen of psychotropic medications helped Prisoner 10 keep his symptoms under control. However, it appears that BOP abruptly discontinued these medications after he arrived at USP-TH. On February 14, 2007, Prisoner 10 filed papers dropping his *habeas* proceedings and volunteering for execution. Among his reasons for doing so, Prisoner 10 cited BOP's denial of mental health treatment. Prisoner 10's volunteering for execution should have, at a minimum, alerted Bureau staff that he needed psychiatric assessment and treatment. Instead, the Bureau focused its resources on opposing a motion by his counsel seeking treatment for their client. Prisoner 10 withdrew his motion to be executed but the court denied the motion for psychiatric treatment, and he continues to suffer needlessly.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### 5. Increased Attention Is Needed to the Mental Health Needs of Condemned Prisoners

As the former warden at USP-TH, I am sure that you have a keen appreciation for the special mental health issues confronted by prisoners awaiting execution. These men are locked down in supermax-style cells for most of the day. Hundreds or thousands of miles separate them from their families and attorneys. Many may have organic brain disorders, histories of substance abuse and trauma, and suffer from serious (and often poorly treated) medical conditions. Some of these men arrived with diagnosed mental disorders and had their treatment plans abruptly interrupted and discontinued. Others may have developed disorders while incarcerated. And all must cope with the nagging, chronic stress of awaiting their trip to the death chamber.[47]

In 1972, the California Supreme Court noted that "Penologists and medical experts agree that the process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."[48] And psychologists have recognized that "...the incidence of

---

[47] *See* American Bar Association, *ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases* (rev. ed. 2003), 31 Hofstra L. Rev. 913, 1082 (2003) ("Even if their executions have been safely stayed, however, the mental condition of many capital clients will deteriorate the longer they remain on death row. This may result in suicidal tendencies and/or impairments in realistic perception and rational decisionmaking."). *See also* Mark E. Olive & Russell Stetler, *Using the Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases to Change the Picture in Post-Conviction*, 36 Hofstra L. Rev. 1067, 1086 (2008) ("conditions of confinement on death row often exacerbate preexisting disorders or give rise to new ones.")

[48] *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972) *recognized as superseded by state constitutional amendment, People v. Hill*, 3 Cal.4th 959, 1017 (1992).

24

psychological symptoms and mental health problems among death row inmates calls for comprehensive mental health services. Effective treatment of psychological symptoms and disorders among death row inmates is not only humane, but likely to facilitate institutional management and reduce disciplinary misconduct."[49]

As the Bureau's Clinical Guideline points out, simple screening methods have a high sensitivity for detecting depressive disorders.[50] And there are myriad cost-effective treatment options available to clinicians for depression and other mental disorders suffered by SCU prisoners. There is no defensible reason why any prisoner in need of mental health care should go untreated.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## III.    Dental Care

Dental care for SCU prisoners is grossly and dangerously deficient. SCU prisoners wait and wait in considerable pain while their requests for care are routinely ignored. Care is so poor that some prisoners have chosen to have all of their teeth extracted rather than suffer any further.[51]

### 1. An Ongoing Lack of Staffing and Resources

In an Inmate Request to Staff dated February 12, 2008, a SCU prisoner inquired about the waiting time to receive routine dental care. He was told that *there were 281 prisoners ahead of him on the routine care waiting list.* He was further told that he could expect to wait *a minimum of 13 months* before being seen and that only *3 hours of dentist time* per week were set aside for SCU prisoners. And, most shockingly, only *one dentist provided routine care to the approximately 4,000 inmates at the FCC at the time.* The same prisoner asked the same questions of the warden. A month later, he was told that nothing had changed since the original response.[52] The same prisoner brought these numbers to the attention of the Regional Office. In a stunning example of bureaucratic indifference, he received this response: "Although we respect your concerns, we have determined the FCC Terre Haute Dental Department operates in accordance with the BOP's Program Statement 6400.02, Dental Services. Sick call is the

---

[49] Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, & Confinement: A Critical Review of the Literature*, 20 Behav. Sci. & L. 191, 207 (2002).

[50] BOP Clinical Practice Guidelines: Management of Major Depressive Disorder (2001) at 9.

[51] However, even this "solution" fails to guarantee a dentally adequate outcome. After waiting over a year to have his remaining teeth pulled, Prisoner 2 received a pair of dentures that do not fit his mouth. He now is unable to eat with his dentures.

[52] Response by Warden Marberry to Inmate Request to Staff Member dated March 11, 2008.

appropriate avenue to advise staff of symptomatic concerns with your teeth and gums. The subsequent assessment will guide your course of dental care."[53]

These statistics are startling and suggest that problems with dental care are endemic to the entire FCC. They should have triggered an urgent response by the Bureau. Instead, nothing was done. As openly acknowledged by BOP administrators, the dental department at USP-TH remains understaffed.[54]

### 2. Long Delays and Limited Care

The lack of access to routine care is particularly troublesome given the institution's emergency dental care policy. Prisoners report that, should they require a filling before their turn on the routine care list, they receive only a temporary filling, which is subject to crumbling.[55] Further, during emergency care visits, prisoners report that the dentist will treat only one tooth at a time, even if multiple teeth require attention.

Prisoners further report that generally, when they finally do get to see the dentist, extraction is the only treatment offered. This restriction, even if exceptions are occasionally made, is at odds with BOP policy, which authorizes a wider array of treatment options.[56]

Even simple extractions are handled poorly. After approximately six weeks of pain, Prisoner 7 finally saw the dentist, who extracted the wrong tooth. Fifteen minutes later, he was returned to the dentist and the correct tooth was pulled. Subsequently, he developed an abscess. Three weeks passed before he was seen for this serious medical condition. Such a three-week delay may constitute deliberate indifference to a serious medical need. *Fields v. Gander*, 734 F.2d 1313, 1314 (8th Cir. 1984) (three-week delay before treating painful dental condition). His abscess returned in January 2008 and, once again, his pleas for care were ignored even though the pain kept him awake at night. Prisoner 7 continues to have significant dental problems and inadequate treatment. His "cop-outs" continue to elicit silence from dental staff.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

[53] Response to Regional Administrative Remedy Appeal No. 487816-R1, dated May 27, 2008.

[54] Response to Central Office Administrative Remedy Appeal No. 487816-A, dated July 17, 2008.

[55] This policy is confirmed in the former warden's July 28, 2006 response to Prisoner 7's Request for Administrative Remedy (BP-9) No. 418950-F1.

[56] Program Statement P6400.02 (Dental Services) § 8(d).

### 3. Dental Care for Patients with Special Needs

Dental care for prisoners with diabetes is poor. The Bureau's Clinical Guideline aptly recognizes the special dental needs of diabetic patients. Diabetics are subject to "an increase in the incidence and severity of dental caries, gingival inflammation, periodontal abscesses, and chronic periodontal disease."[57] Yet diabetic Prisoners 1 and 2 continue to receive substandard care that not only causes them pain and impairment, but also increases their risk of serious health consequences. Prisoner 2 has had all of his teeth pulled. However, his dentures do not fit properly and he cannot eat with them in place. Failure to provide Prisoner 2 with a soft diet or other relief until new dentures are fitted may constitute an Eighth Amendment violation. *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).

Until a few weeks ago, Prisoner 1 had only six teeth left in his mouth, making it difficult to eat the few foods he receives that are appropriate for a diabetic patient. His remaining teeth were loose and painful and he had requested that the remaining teeth be extracted and that he be fitted with dentures. His multiple requests and efforts at informal remedies were routinely met with boilerplate and often contradictory responses. For example, on August 21, 2007, Prisoner 1 wrote to Dr. Cooper, a dentist, complaining of dental pain. In response, he was told "[f]or dental pain sign up for dental sick call with the nurse."[58] Despite the inappropriateness of this response, Prisoner 1 complied and submitted a dental sick call request. Sixteen days later, he submitted a second request. Seventeen days later, he submitted a third request, emphasizing that "I have severe pain from my teeth when I eat and when I brush..." Finally, fifteen days after his third request, Prisoner 1 was seen by a hygienist who did nothing to address Prisoner 1's pain other than to tell him that "if he has any pain or problems to fill out [a] sick call slip."

Prisoner 1 made every effort to follow the instructions of BOP staff. In a letter to Prisoner 1's counsel, Warden Marberry advised that he must submit a sick call request if he has additional pain issues.[59] Prisoner 1 complied. But, once again, his efforts were ignored. He submitted three sick call requests over seventeen days before being seen by the dentist.

It is my understanding that Prisoner 1 has finally had his remaining teeth pulled in June or July of this year. Accordingly, it is imperative that he receive

<div style="margin-left:2em;">
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
</div>

---

[57] BOP Clinical Practice Guideline: Management of Diabetes (2008) at 24.

[58] Inmate Request to Staff dated August 31, 2007.

[59] Letter to David C. Hemingway, Esq. from Warden H.J. Marberry, May 15, 2008.

dentures as soon as possible as he has no teeth with which to chew his food. Prisoner 1 has already filed a BP-9 on this issue. The warden's boilerplate response glaringly failed to address Prisoner 1's urgent needs: "You are currently on the list to be evaluated for dentures. If you are in pain caused by your teeth, submit a sick call request for dental during sick call rounds."[60] However, as Prisoner 1 aptly points out, "[j]ust because my name may be on some list for dentures [] does not address the emergency situation created because of my immediate need..."[61] Failure to provide dentures to a prisoner having difficulty eating may constitute deliberate indifference to a serious medical need. *Wynn v. Southward*, 251 F.3d 588, 593-94 (7th Cir. 2001).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Dental care at USP-TH is in crisis. The Bureau has allowed months to pass with no effort to remedy the lack of staff, intolerable waits, and the excruciating pain endured by many prisoners. Immediate action is necessary.

## IV.   Noise

Prisoners continue to report extreme, unbearable noise at all hours of day and night. Prisoner 10 cited "constant bombardment" with "incessant noise and pounding" as a reason for dropping his *habeas* petition and volunteering for execution.[62] Noise emanates from two sources. First, since the SCU sits atop the SHU, the constant screaming, banging, and pounding of prisoners in the SHU is easily audible in the SCU. Second, prisoners report frequent fire alarms. While some number of fire alarms is to be expected, prisoners report several deafening fire alarms each week that last between 10 and 90 minutes with the strobe light lasting even longer. The alarm is deafening and the flashing strobe light causes significant psychological distress. The alarms are so loud that correctional officers wear over-the-ear hearing protection, suggesting that the frequency and volume of the alarms may place prisoners at risk of irreversible hearing loss. One prisoner reports that he was given yellow ear plugs, but these were insufficient. As a result of the constant alarms, screaming, and banging, prisoners are sleep deprived, unable to get a healthy night's sleep, and suffer daytime fatigue.

The American Correctional Association has issued a standard concerning daytime and nighttime noise levels in housing units.[63] At a very minimum, BOP

---

[60] Response to Request for Administrative Remedy No. 498862-F1, dated August 11, 2008.

[61] Regional Administrative Remedy Appeal No. 498862, dated August 14, 2008.

[62] This motion was subsequently withdrawn.

[63] "Noise levels in inmate housing units do not exceed 70 dBA (A Scale) in daytime and 45 dBA (A Scale) at night." American Correctional Association, *Standards for Adult Correctional Institutions* § 4-4150 (4th ed. 2003).

should ensure compliance with this standard. Seventh Circuit case law holds that complaints of excessive noise state a claim under the Eighth Amendment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (nightly noise interrupted and prevented prisoner from sleeping); *Lucien v. Peters*, No. 95-2778, 1997 WL 58812, at *1-2 (7th Cir. Dec. 17, 1996). Sadly, given the paucity of medical and mental health care available to prisoners, it is likely that any physical or psychological harm resulting from the noise will go undiagnosed and/or untreated. However, as the Seventh Circuit noted, incessant noise "may cause agony" and "the state is not free to inflict such pains without cause just so long as it is careful to leave no marks." *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988).

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

\* \* \*

The above examples are not isolated incidents. Rather, they represent a pattern of deliberate indifference to serious medical needs, including dental and mental health needs. The Seventh Circuit holds that plaintiffs may demonstrate deliberate indifference by *either* showing "'repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff'" *or* by "'proving there are such systemic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care.'" *Wellman*, 715 F.2d at 272 (quoting *Ramos v. Lamm,* 639 F.2d 559, 575 (10th Cir. 1980)). The Bureau's failure to provide adequate medical care to SCU prisoners satisfies both tests. BOP has been on notice of this pattern for some time. Rather than working to resolve these concerns, the Bureau seems to have chosen a course of willful blindness. The problems with medical, mental health, and dental care at USP-TH are patent. Yet despite the obviousness of these deficiencies, BOP continues to ignore "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

While all prisoners are entitled to the rights guaranteed by the United States Constitution, death row prisoners have unique needs, many of which are outlined in this letter. Proper correctional leadership demands sensitivity to these special needs and circumstances. Based on my investigation, such leadership is currently lacking. Indeed, one of the men in the SCU recently related that some USP-TH and SCU staff members, including high-ranking officials, were completely unaware of the government's pending efforts to proceed with the executions of six prisoners. However, it is not the responsibility of SCU staff to monitor the court dockets of the prisoners in their charge. Rather, ultimate responsibility for the health and well-being of SCU prisoners lies with those BOP

officials empowered with the statutory duty,[64] oversight authority, technical expertise, and leadership ability to effect real, meaningful change. Responsibility for addressing the concerns raised in this letter should not rest with unit staff or even the warden; your direct involvement is both requested and required.

I suspect that the serious deficiencies in medical, mental health, and dental care may extend beyond the SCU to other components of the FCC. But the express purpose of this letter is to yet again alert you to the plight of the federally death-sentenced prisoners in the SCU. These men will continue to suffer needlessly until you make substantial, immediate changes to the quantity and quality of health services provided to SCU prisoners. The concerns raised in this letter are neither minor nor abstract; rather, they speak to fundamental issues of human dignity.

My office — and all other concerned parties — sincerely hope that we can work together to ensure that the condemned prisoners in your charge receive the care constitutionally guaranteed to them. We look forward to your response.

Very truly yours,

Gabriel B. Eber

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Enclosures

---

[64] 18 U.S.C. § 4042(a).

30