UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-80693-CV-SCOLA
(Case No. 06-80171-Cr-Hurley/Vitunac(s)(s)(s))

RICARDO SANCHEZ, JR.
        Movant,

vs.

UNITED STATES OF AMERICA,
        Respondent.

_____/

## UNITED STATES' RESPONSE IN OPPOSITION TO SANCHEZ MOTION FOR DISCOVERY

THE UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby files its response in opposition to Ricardo Sanchez, Jr.'s ("Sanchez"), Motion for Discovery (CV-DE 25-1).   As demonstrated below, discovery should not be ordered in this case for a variety of reasons:   (i) Sanchez fails to meet the requisite legal and factual standards justifying discovery in this collateral §2255 proceeding because his requests rest on mere speculation, not specific allegations demonstrating that discovery, if allowed, would support claims upon which Sanchez is entitled to relief; (ii) the United States already provided many of the requested items during pre-trial discovery and showed Sanchez's current counsel where and when such items were originally disclosed; and (iii) other items sought via a discovery order against the United States are obtainable from third parties by way of a duly issued subpoena.

### Legal Standard

A habeas petitioner is not automatically entitled to discovery.  *Bowers v. U.S. Parole Comm'n, Warden,* 760 F.3d 117, 1183 (11th Cir. 2014).   Discovery should be ordered only where

there is good cause shown in advance supported by specific allegations that show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief.  *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).   Good cause cannot arise from mere speculation or hypothesis, however, that some helpful information may be found if discovery is ordered.  *Id.*   The legal standard for "good cause" is a high bar.   Good cause for discovery requires a showing to be made with factual support, demonstrating that the evidence sought would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial. *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006) *citing Schlup v. Deo,* 115 S.Ct. 851 (1995).

Discovery requests based on mere speculation should be rejected because the habeas remedy was never intended to provide a means for conducting a fishing expedition for convicted defendants to explore their case in search of its existence.  *Saucedo v. Brazelton*, 2015 WL 4481795 (N.D. Cal. 2015).   Even in a death penalty case, bald assertions and conclusory allegations do not meet the "good cause" standard.  *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)); *see also Rivera v. Humphrey,* 2015 WL 3648052 (S.D. Ga. 2015) (order denying discovery in § 2254 proceeding finding mere speculative discovery request unsupported by good cause).

If allegedly undisclosed information would not have impacted the jury's verdict, then the district court may properly deny discovery.   *Smith v. United States*, 627 Fed. Appx. 852, 855 (11th Cir. 2015); *accord, Benford v. United States*, 2013 WL 6162670 (N.D. Ala. 2013*); see also, Heidler v. Chatman,* 2014 WL 725985 (S.D. Ga. 2014) (in death penalty case, court denied § 2254 discovery on basis that there was not a reasonable probability that had the sought-after evidence been disclosed to the defense the result of the proceeding would have been different).

2

Sanchez seeks discovery in the speculative hope that a broad search of the files of the United States might develop claims for which there is currently no factual basis. In each of the ten separate discovery requests, there has been no specific allegation showing, other than speculative hope, that some helpful information might be uncovered. Moreover, as to discovery requests 6, 7, and 8, the United States already provided this information during pre-trial discovery and previously has directed Sanchez to those timely disclosures.

A § 2255 proceeding is not a second opportunity to have a full-blown trial on the merits. Rather, the scope of the proceeding is really much narrower. It is designed to redress only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,* 368 U.S. 424, 428 (1962) (citing 28 U.S.C. § 2255).

Sanchez claims that discovery is required because this Court's discretion is not very broad in deciding whether to grant an evidentiary hearing on claims raised in a § 2255 petition (CV-DE 34 at p. 5). Notably however, the only case cited supporting this proposition, *Stead v. United States,* 67 F.Supp. 1064 (D. S.D. 1999), actually declined to conduct an evidentiary hearing. Sanchez also claims that as a policy matter death penalty cases are special and therefore warrant discovery. In support of this position, Sanchez cites two cases, *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976); *McFarland, v. Scott,* 512 U.S. 849, 855 (1994). Neither case stands for the proposition that discovery must be ordered. *Woodson* held only that a North Carolina state statute mandating a death sentence for all first degree convicted murderers was unconstitutional because it lacked the individualized consideration required by the Eighth Amendment. *McFarland* held only that a capital defendant is entitled to a stay of execution if he invokes his constitutional right

3

to assistance of counsel to initiate a habeas challenge to his conviction.   Neither of these cases has anything to do with ordering discovery in every § 2255 case, especially, as is the case here, where good cause has not been demonstrated.   The United States agrees that this case concerns serious matters, amongst other things, the murder of two children and their parents.   Nevertheless, following a meticulous trial at both the guilt and penalty stage, and an extensive appellate process, Sanchez must now meet the requisite legal standards when seeking discovery.   A review of his discovery motion evidences that he fails to meet those standards.

### Discovery Is Not Warranted Given the Vast Amount of Information Disclosed in the Original Discovery Process

The grand jury initially indicted Sanchez on November 3, 2006 (CR-DE 30).   Discovery commenced immediately.   The United States continued to provide pre-trial discovery in this matter after the return of the third superseding indictment adding capital counts in February, 2008 (CR-DE 305).   Discovery continued through trial of this matter as information was received by the United States.   Prosecutors kept meticulous records concerning the dates and substance of what was disclosed to defense counsel.   Between the beginning of the case all the way up until the eve of trial, the United States provided more than *fifty* discovery-related responses to defense counsel in this case, covering most but not all of the current discovery requests.   *See* Appendix A, (Index of USA Discovery Responses).[1]

Moreover, since the filing of the § 2255 petition in this matter, the United States received an informal discovery request.   The United States responded, providing detailed notice

---

1 Four appendices are attached to this pleading.   They are titled A, C, D and E for consistency with the United States' response to discovery motion in United States v. Troya, 16-CV-80700-Scola.   The records that would have been the United States' Appendix B are already part of the record in this case, attached to Sanchez's motion for discovery (CV-DE 25-1 at pp. 28-41).

4

concerning information it already had disclosed in pre-trial discovery.   In fact, the United States utilized its Index, Appendix A, *supra*, in preparing its response to the informal discovery requests (CV-DE 25-1 at pp. 28-42).   Since providing that detailed explanation as to pre-trial discovery items already provided, the United States – with one exception – has received no communication from the defense concerning their collective inability to find documents previously disclosed to predecessor counsel, or concerning the documents they now request in the discovery motion. Rather, Sanchez has merely ignored the overture for the most part and continued to demand a detailed response to a boundless fishing expedition without initially making the requisite showing of good cause.

### Each of Sanchez's Ten Discovery Requests Should be Denied.

Sanchez seeks discovery in ten (10) separate requests, to which the United States hereby responds *ad seriatim*.   On some, but not all of the requests, the Court already has issued an Order Dismissing Claims (CV-DE 29).   When dismissing such claims, the Court also denied related pending discovery requests (Requests 1, 2, 4, 5, 9, and 10).   Those are noted below, and the United States will not file a substantive response related to those already-denied discovery requests.

1. Documents pertaining to Claim I.   Documents about the alleged government investigation of prospective jurors (without any specific allegation of bias or extraneous influence on the selected jury);

(Claim dismissed and discovery request denied; *see* CV-29 at pp. 5-6).

2. Documents pertaining to Claim III, Sanchez's ineligibility for the death penalty. Documents in the possession of the United States, or its mental health expert, Dr. Michael Brannon, relating to Sanchez's mental health or ineligibility for the death penalty (without any specific allegation that such records exist or how they would establish ineligibility for the death penalty);

(Claim dismissed and discovery request denied; *see id*. at pp. 8-13).

5

3. Documents pertaining to Claim IV, Sanchez incompetent to stand trial.   Documents in the possession of the prosecution team, or the *records of court proceedings,* or in the possession of *the pre-trial detention custody officials* (without any specific allegation as to how or what these records would establish for Sanchez to be incompetent to stand trial);

On this request, Sanchez's motion for discovery is premised entirely on speculation -- not specific factual allegations.   For example, Sanchez seeks this discovery so that it "will enable him to *develop the facts* in support of his claim that he was incompetent to stand trial" (CV-DE25-1 at pp. 7-8) (emphasis supplied).

Moreover, he seeks information that is already available to him, specifically information about discussions to provide accommodations to Sanchez in custodial or courtroom settings.   *Id.* Arguably, the best records of that would be the court transcripts, which have been available to Sanchez for years.   Sanchez's suggestion that there are some other records documenting his behavior in custody or the courtroom is pure speculation.   He has not made the required factual showing demonstrating that any records actually exist, or that such records, if they do exist, would establish that he was, in fact, incompetent to stand trial.

Sanchez's own pleading reveals the fatal defect in his request, that is, he admits that he does not have *facts* to support his assertion that he was incompetent to stand trial; he is seeking speculatively *to develop facts*.   This falls short of good cause.   Good cause for discovery requires a showing to be made with factual support, not hypothesis or speculation, demonstrating that the evidence sought would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial.   *Arthur v. Allen*, 459 F.3d 1310, *supra*.   The Court should not authorize Sanchez to conduct a fishing expedition to explore this claim for which he has provided no factual support that such records to bolster his claim even exist.

6

4. Documents pertaining to Claim VI, *Brady* violations relating to:

    a. Danny Varela's guilt in the murder conspiracy, and failure to be charged therein;

    b. Evidence that Yessica Escobedo's phone traveled to Texas after the murders;

    c. Evidence about a drug deal in Daytona Beach, FL before the murders was withheld from pre-trial discovery;

    d. Evidence that video surveillance from the Briar Bay security booth was withheld from the defense;

    e. *Giglio* information about witness Kevin Vetere was withheld from the defense; and

    f. Evidence that Sanchez was less culpable for the murders.

(Claims dismissed and discovery request denied; *see* CV-DE 29 at pp. 13-16).

5. Documents Pertaining to Claim VII (A), Failure to Challenge Jury Venires. Information from the Clerk, United States District Court, Southern District of Florida concerning jury venires and composition (without citing specific allegations for Palm Beach County).

(Claim dismissed and discovery request denied; *see* CV-29 at pp. 5-6).

6. Documents Pertaining to Claim VII (B), Failure to Challenge Firearms and Tool Mark Experts.

As to the firearms and tool mark requested discovery, the request is quite detailed:

> [1] Documents including opinions, reports (including interim or amended reports), memoranda, testing results, bench notes, and correspondence concerning the examination of the casings and projectiles collected from the crime scene, the casings and projectiles collected at Suwanee Drive and Mercer Avenue, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court;

The United States informed Sanchez that information related to firearms and tool mark

experts was previously provided in pre-trial discovery as follows, *see* CV-DE 25-1 at pp. 33-37:

7

[1] *Discovery related to tool mark evidence was provided in pre-trial discovery as follows:*

*1st Discovery Response, [DE 39, Sanchez (11/20/2006); DE 58, Troya (11/27/2006)] included inventory of search warrant, items take from search of Garden Court residence on October 25, 2006;*

*5th Supplemental SDO Response, [DE #176, April 24, 2007]:*
> *m. ATF reported dated February 7, 2007 concerning testing of certain firearms by ATF Special Agent Steve Barborini, (copy attached to defense counsel copy of this response);*

> *n. additional ATF Exhibits as follows: Exhibits 7, 8, 11, 12, 13, 18, 19, 20, 21, 25, 26, 27 and 29, all of which relate to firearms and violations of federal firearms laws, (copies were attached to defense counsel copy of that response);*

*Please note that paragraphs "m" and "n" cited above relate to firearms but are not believed to related to tool mark evidence, but only operability.*

> *Paragraph A. 6. of this same supplemental response also included the following information:*

>> *a. firearms testing: see response listed under paragraph "A.5n", supra;*

>> *b. ballistics results: Indian River Crime Lab, ("IRCL"), two reports, (2), each dated October 25, 2006 from Mark A. Chapman, 4 pages and 1 page, respectively, (copies attached to defense counsel copy of this response);.*

>> *c. attached to defense counsel's copy of this response are the curriculum vitae of IRCL employees Mark A. Chapman and Earl Ritzline, PBSO employee Beth Rosenthal, chemist, ATF Special Agents Steve Barborini and Jeff Kunz.* ***[only Chapman testified about tool mark evidence]***

*6th Supplemental SDO Response, [Docket Entry #, filed 5/18/2007]:*
> *k. Chain of custody form for projectile recovery reports from St. Lucie County medical examiner.*

> *lab results & CV's:*

8

a.   *amended ballistics report from Indian River Crime Lab, ("IRCL"), Mark A. Chapman; (copy attached to defense counsel copy of that response);*

*March 7, 2008, letter noting additional evidence:*

a. 404(b) notice on Suwanee & Mercer Avenue shootings;
b. PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]
c.   Haverhill shootings by Troya and Sanchez;

*March 27, 2008 Fed. Exp. packets, Index, papers, CD's, photos, etc., [post-SLSO & DEA review]:*
a. packets mailed only to: Ruben Garcia **[Troya]** , Michael Cohen **[Sanchez],** Greg Lerman **[Lopez],** Robert Gershman **[Varela]**
b. contents included:
d.   CD which consists of photographs of loaded magazines from Garden Court firearms (SLSO CD#72);

*April 24, 2008 letter enclosing the following:*
b.   CD labeled 06-110508 containing digital photos of Haverhill shooting;

*May 8, 2008 letter enclosing the following:*
a.   PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]

*June 23, 2008 letter enclosing the following:*
IRCL ballistics report comparing homicide casings w/ Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings]

*June 26, 2008 letter enclosing the following:*
IRCL ballistics report comparing homicide casings with Garden Ct. casings, [both .40 and 9 mm casings have consistent magazine markings] & c.v. of Jimmie D. Thompson, IRCL adopting same report

*August 12, 2008 letter with attachments:*
i. curriculum vitae of Omar Felix;
iii. curriculum vitae of Alison Quereau

*October 17, 2008 discovery letter with attachments:*
i. lab report of Jay Mullins, PBSO prelim. ballistics; [note: not

*believed to be related to tool mark evidence]*

*October 22, 2008 discovery letter with attachments:*
  *i. CD-ROM, Suwanee shooting photos;*
  *ii. CD-ROM, Mercer Ave., shooting photos;*
  *iii. CD-ROM w/ following attachments:*
    *a. (a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files];*
    *(b) crime scene diagram of Mercer Avenue shooting scene;*
    *(c) curriculum vitae of Karin A. Crenshaw;*
    *(d) curriculum vitae of Vonda Bray;*
    *(e) photocopy of handwritten note intercepted on October 6, 2008 from Daniel Troya;*
    *(f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*

*November 21, 2008 supplemental discovery letter with enclosures:*
  *(c) Chapman chart on research on .40 caliber projectiles & potential weapons;[2]*

Sanchez seeks additional discovery beyond that initially noted above to include:

[b] Documents relating to the manufacturer and model of the microscopes used for comparison purposes, and any manuals describing proper uses and maintenance of the instrument;

[c] Documents containing internal written policies and standards for tool mark comparisons and guidelines for rendering an opinion;

[d] Any and all photomicrographs of the comparison subjects;

[e] Diagrams and/or photographs of subject evidence at all stages of collection and testing;

[f] Results of all test-firings of the recovered weapon, including notes, reports, opinions and photomicrographs of the test-firing subjects;

[g] Copies of written procedures (often called Standard Operating Procedures (SOPs)) for evidence testing, including procedures for

---

2 This was set forth in the letter exchange between counsel, CV-DE 25-1 pp. 28-42, *supra*. *See also* Appendix C, which contains the referenced supplemental discovery letters the United States provided during pre-trial discovery related to firearm and tool mark evidence.

preparation, instrument analysis, instrument calibration, and all required quality control practices;

[h] Laboratory quality manuals (however named) in effect at the time the subject work was performed;

[i] Laboratory quality procedures (however named), including internal audit procedures, training and qualification procedures, and document control procedures, in effect at the time the subject work was performed;

[j] Internal and external audit reports generated or received by the laboratories;

[k] For the analysts involved in the subject casework, a copy of the personnel file and all internal and external proficiency testing results for tool mark identification (including sponsoring agency, date(s) performed, responsible analyst, true values, reported results, raw data, scores, related correspondence, and corrective action records, as appropriate); and

[l] Access by defense experts to the casings and projectiles collected from the crime scene, the casings and projectiles collected from Mercer Avenue and Suwanee Drive, the projectiles collected from Garden Court, and the AK-47 rifle collected from Garden Court

As illustrated above, comprehensive and highly detailed tool mark and firearms evidence already was disclosed by the United States during pre-trial discovery. *See* CR-DE 58, 176, 202, and Appendix C (ten separate letters of supplemental discovery provided on various dates between March 7, 2008 and November 21, 2008). The United States did not disclose, nor does it possess, information about the firearms laboratory itself, or the personnel files of any employee of the Indian River Crime Laboratory.

Sanchez has failed to establish good cause on any of his requests concerning tool marks because he does not allege specific facts that, if disclosed, would demonstrate he is entitled to relief on this claim. In fact, his request is devoid of any factual allegations that would establish "good cause." Rather, it is based on pure speculation that if discovery were allowed concerning these

11

items, something will turn up allowing him to craft a claim.

The trial already has occurred, and the § 2255 attack is limited to whether trial counsel was ineffective in this subject area.   Sanchez's recent retention of another tool mark expert to merely review the findings of the experts who already testified and were subject to cross-examination at trial does not create a cognizable claim under 28 U.S.C. § 2255 (CV-DE 25-1 at pp 12).   Even if Sanchez had found a new expert to contradict the trial testimony, such a finding seven years after the original trial is irrelevant.   New experts who have come to different conclusions, or who *might* in the future come to different conclusions than the United States' firearms experts, is insufficient to support an ineffective assistance claim.   *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016) (death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably years later is irrelevant.") (death penalty case).

Rather, the proper test of whether Sanchez has been denied effective representation is judged by whether a reasonable lawyer would have acted similarly at trial.   And under this test, trial counsel's conduct was constitutionally sufficient for all the reasons discussed in the United States' Response to Sanchez's § 2255 motion, including vigorous cross examination of the government's tool mark expert witnesses.   *See Johnson v. Nagle, supra*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999), *quoting White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Allowing discovery into all of the minutia of the firearms laboratory, its policies and procedures,

12

its manuals, audit reports, and personnel files -- without specific factual allegations -- would not be based on "good cause," but unfounded speculation, which is contrary to the prevailing case law. *See, e.g. Arthur v. Allen, supra*, 459 F.3d 1310.

7. Discovery Pertaining to Claim VII (C), Cellular Telephone Records. Documents relating to Yessica Escobedo's cellular phone, and evidence that it traveled to Texas after she was murdered.

This request seeks the following discovery:

a. Any and all notes, documents, manuals, memoranda, reports, or other information concerning or referencing the operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history for cellular towers maintained by Verizon Wireless, T-Mobile, and MetroPCS in Florida;

b. System information, cell site, and switch data for T-Mobile cellular towers in Florida and Texas for October 2006; and

c. Call detail reports (CDRs) for (786) 853-8416 and (956) 266-2004 for October 2006.

As to this information, the United States previously informed Sanchez:

*[1] USAO does not have this information; if it exists it could be obtained from the cell carriers via subpoena from any party.*

*[2-3] all records in the possession of the government relating to the evidence presented at trial was disclosed pre-trial in discovery; see our detailed response, supra, wherein we described all evidence related to Yessica Escobedo's cell phone that we possessed.*

(CV-DE 25-1 at p. 37).

More specifically, the United States informed Sanchez:

*USAO provided discovery of Yessica Escobedo's cell phone records [(956) 266-2004] and other persons' cell phone records at various stages of pre-trial preparation. See responses provided on the following dates: (i) 6th Supplemental SDO Response filed May18, 2007, sections (e) and (f) of that response; 8th Supplemental SDO Response filed August 6, 2007, section (vii) of that response; January 28, 2008, Supplemental Discovery response; November 17, 2008 Supplemental discovery letter from AUSA enclosing*

13

> *CDROM with T-Mobile cell site data; and November 25, 2008,*
> *supplemental discovery letter enclosing cell phone subscriber, tolls and cell*
> *sight records for Troya, and T-Mobile cell site data (Sanchez, 786-853-*
> *8416), all on CDR #1; see also supplemental letter response of December*
> *22, 2008, enclosing a CD-ROM containing: two sets of T-Mobile business*
> *records recently received by the United States: (1) an Excel spreadsheet*
> *entitledVLR_List.xls which contains a list of telephone switches; and (2) an*
> *Excel spreadsheet entitled florida_041907(1) - T-Mobile Cell Site*
> *Locationsl.xls which contains a listing of cellular tower site locations;*
>
> *Note also, albeit unrelated to Yessica Escobedo's cell phone, that in the*
> *same December 22, 2008 supplemental response additional disclosure was*
> *provided concerning Sanchez cell phone records: "another copy of the*
> *subscriber and cell site location records for (786) 853-8416. We sent these*
> *out earlier but one or more photocopies may have been blocked when*
> *copying due to a post-it pad not being removed."*

(CV-DE 25-1 at pp. 31-32).

All records in the possession of the United States relating to cellular telephones, including search warrants, were already disclosed during pre-trial discovery. *See, e.g.*, CR-DE 176, 202, 231; Appendix A at numbered paragraphs 8q, 9e, 9f, 11(i), 11(vii), 15, 17, 47, 49, 51, and 52; and Appendix D (five separate letters of supplemental discovery provided on various dates between January 25, 2008 and December 22, 2008).[3/]   The documented discovery the United States provided included whatever information it possessed related to Sanchez's requests described above in subparagraphs 7b and 7c.

More specifically, with regard to Sanchez's request in subparagraph 7c for CDRs for (786) 853-8416 and (956) 266-2004 for October 2006, the United States disclosed the CDRs (also known as toll records) for both of those phone numbers in its Sixth Supplemental Response to the Standing Discovery Order.  *See* Attachment E.[4/]   The first table in Attachment E reflects that the United

---

3 Appendix D consists of supplemental discovery letters the United States provided pre-trial related to cellular telephones.

4 Attachment E consists of CR-DE 202 and tables of phone record information disclosed as part

States provided toll records for (786) 853-8416 from October 1 through October 14 of 2006 and toll records for (956) 266-2004 from September 9 through October 17 of 2006.   That time period includes days after the murders.   At no time has the United States possessed additional toll records (or cell site records) that it did not disclose.

As to Sanchez's request in subparagraph 7a, which seeks operational data relating to the capabilities of the various systems operated by private carriers, i.e., Verizon Wireless, T-Mobile, and MetroPCS in Florida, the United States does not have this private, proprietary information. To the extent it exists, it could have been subpoenaed from those third parties in preparation for Sanchez's filing his § 2255 motion.   However, Sanchez still fails to make a sufficient factual showing to establish that there is reason to believe that the information sought from these third parties would allow him to prevail on a claim of ineffective assistance.   He alleges that his "trial counsel was ineffective for failing to challenge the accuracy of these cellular records" (CV-DE 25-1 at pp. 15), but he presents no factual basis that the records were inaccurate.   This request is another speculative fishing expedition in search of a claim that falls short of the "good cause" standard warranting discovery, even a court-authorized subpoena to a third party.

8.  Documents Pertaining to Claim VIII, Failure to Conduct Adequate Background Investigation.   Documents relating to Sanchez's alleged mental health impairments, specifically:

   a.  documents relating to any police contact with, or arrest, guilty pleas, trial, conviction, and sentence incurred by Ricardo Sanchez, Sr., Mr. Sanchez's father, between January 1980 and October 2006;

   b.  documents relating to the investigation of crimes occurring in Dyson Circle, West Palm Beach, between 1983 and 1994,

---

of the United States' Sixth Supplemental Response to the Standing Discovery Order.

when Mr. Sanchez lived there as a child;

c.   documents relating to investigations of charges of sexual abuse of Mr. Sanchez's brother Efrain Sanchez by a neighbor on Coconut Grove, West Palm Beach;

d.   documents relating to investigations of racially motivated disturbances or hate crimes in the Fruity Acres neighborhood of West Palm Beach, between 1993 and 2003, when Mr. Sanchez was living there;

e.   Documents relating to the investigation of a shooting on April 28, 2006, at 1305 Suwanee Drive, Apartment B, West Palm Beach; the investigation of a shooting on April 28, 2006 at 1901 Mercer Avenue, West Palm Beach; and the investigation of a shooting on September 11, 2006, on the 1300 block of Haverhill Road in West Palm Beach.

The United States does not possess information related to Sanchez's requests in subparagraphs 8a-8d.   Moreover, Sanchez has failed to make any specific allegation or showing concerning how such information would entitle him to relief, that is, show how his attorneys were ineffective.   This failure to set forth specific factual allegations demonstrates that Sanchez has not established good cause that he would be entitled to relief if discovery was ordered.

As for Sanchez's request in subparagraph 8e, the United States already specifically informed Sanchez that it provided this information during the pre-trial discovery and where to find it, *see e.g.,* CV-DE 25-1 at pp. 39-40:

*Suwanee:*

*3/07/2008 letter of additional evidence:*

   *a. 404(b) notice on Suwanee & Mercer Avenue shootings;*

   *b. PBSO ballistics analysis by Quereau linking weapons for Suwanee & ballistics analysis for Mercer Ave shootings [Quereau]*

*10/22/08 discovery letter w/ attachments:*
   *i. CD-ROM, Suwanee shooting photos;*

16

> iii. *CD-ROM w/ following attachments:*
> > a. *(a) crime scene diagram of Suwanee Drive shooting scene, [2 "pdf" files]; (c) curriculum vitae of Karin A. Crenshaw; (f) property receipts relating to various items of evidence [mostly spent casings] at each of the three separate shooting locations:*

**Mercer Ave.:**

*3/07/2008 letter of additional evidence:*
> a. *404(b) notice on Mercer Avenue shooting;*
> b. *PBSO ballistics analysis by Quereau for Mercer Ave shootings [Quereau]*

*10/22/08 discovery letter w/ attachments:*
> ii. *CD-ROM, Mercer Ave., shooting photos;*
> iii. *CD-ROM w/ following attachments:*
> > *(b) crime scene diagram of Mercer Avenue shooting scene; (f) property receipts relating to various items of evidence [mostly spent bullets and casings] at each of the three separate shooting locations:*

**Haverhill:**

*3/07/2008 letter of additional evidence:*
> c. *Haverhill shootings by Troya and Sanchez;*

*4/24/08 letter enclosing the following:*
> b. *CD labeled 06-110508 containing digital photos of Haverhill shooting;*

*5/8/08 letter enclosing the following:*
> a. *PBSO ballistics lab report, negative match on Haverhill [PBSO Omar Felix]*

S*ee also* Appendix A, containing the master discovery index.

To the extent that Sanchez requests additional records in subparagraph 8e, aside from what the United States has already disclosed, he makes no showing how such records would support his claim or that such records even exist.   Accordingly, he fails to establish good cause, and additional discovery related to this claim should be denied.

17

9.   Documents Pertaining to Claim IX, Death Sentence Violates Eighth Amendment.

(Claim dismissed and discovery request denied; *see* CV-DE 29 at pp. 16-17).

10. Discovery Related to Claim X, Trial Security Measures

(Claim dismissed and discovery request denied; *see* CV-DE 29 at pp. 7-8).

## Conclusion

Sanchez asks this Court to allow for discovery in a boundless fishing expedition in the speculative hope that a broad search of the government's files might develop claims for which there is no established or proffered factual basis.   The Court has already denied discovery requests 1, 2, 4, 5, 9 and 10 based on dismissal of the underlying claims.   On the remaining requests, that is, 3, 6, 7 and 8, the United States either has provided the information already or is not in possession of the information sought.

Now, after an appeal rejected on its merits, Sanchez seeks additional discovery without demonstrating the legally-required factual support.   His claims are not based on the requisite showing of good cause.   Sanchez has not provided specific factual support demonstrating that the evidence sought via discovery would raise sufficient doubt about his guilt to undermine confidence in the result of the trial.   For this reason, his discovery requests should be denied.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY


By:   */s Stephen Carlton*
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV
*Attorney for the United States*

19

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: /s/   *Stephen Carlton*
          Stephen Carlton
          Assistant United States Attorney

## SERVICE LIST

**Ricardo Sanchez, Jr. v. United States**
**Case No. 16-80693-CV-SCOLA**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Brandy Galler**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Brandy.Galler@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
**Attorney for United States**
[Service via CM/ECF]


**Matthew C. Lawry**
**Aren Adjoian**
Federal Community Defender Office for the Eastern District of Pennsylvania Curtis
Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone:   (215) 928-0520
Fax:   (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org
[Service via CM/ECF]

21