**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-80693-CV-SCOLA**
**(Case No. 06 80171 Cr Hurley/Vitunac(s)(s)(s))**

**RICARDO SANCHEZ, JR.,**
        **Petitioner,**

**vs.**

**UNITED STATES OF AMERICA,**
        **Respondent.**

_____/

**GOVERNMENT RESPONSE TO SANCHEZ'S MOTION TO VACATE, SET ASIDE OR**
**CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

COMES NOW the United States of America, by and through its undersigned counsel, and

submits its response in opposition to Ricardo Sanchez Jr.'s Motion to Vacate, Set Aside or Correct

Sentence Pursuant to 28 U.S.C. § 2255.

**ISSUES RAISED BY PETITIONER**

On May 3, 2016, Ricardo Sanchez Jr., referred to herein as Sanchez or Petitioner, filed the

instant motion to vacate under Title 28, United States Code, Section 2255 with sealed entries. (CIV

DE 1[1]).  Pursuant to Court order Sanchez filed a complete, unredacted version of his § 2255

petition on May 26, 2016 (CV-DE 16-1).   On October 4, 2016, prior to expiration of the initial

---

[1] All record citations to the events in Petitioner's criminal case are denoted as "CR-DE #" and
reference the docket in Southern District of Florida Case Number 06-80171-CR-Hurley.  All
record citations to the events concerning Petitioner's instant motion to vacate, set aside, or
correct sentence are denoted as "CV-DE #" and reference the docket in Southern District of
Florida Case Number 16-80693-CV-SCOLA.

response period set for the United States, the Court issued an order partially dismissing Sanchez's claims. (CV-DE 29). In that order, the Court dismissed Sanchez claims I, II, III, VI, VII(A), IX, and X. Liberally construed, Petitioner's remaining claims raise the following issues:

A. Whether Sanchez's counsel was ineffective for failing to challenge Counts 7-10 on grounds of duplicity (Sanchez Issue VII (D));

B. Whether Sanchez's counsel was ineffective for failing to object to the charging language and jury instructions relating to Counts 7-10 (Sanchez Issue VII (D));

C. Whether Sanchez's counsel was ineffective for failing to object when the government offered the testimony of a substitute medical examiner (Sanchez Issue V);

D. Whether Sanchez's counsel was ineffective for failing to sufficiently challenge the government's "tool mark" expert testimony (Sanchez Issue VII(B));

E. Whether Sanchez's counsel was ineffective for failing to sufficiently challenge the government's evidence concerning the location cellular telephone towers (Sanchez Issues VII (C) & VIII (I));

F. Whether Sanchez's counsel was ineffective for failing to adequately challenge the Government's evidence of Sanchez's involvement in uncharged shootings (Sanchez Issue VIII (I));

G. Whether Sanchez's counsel was ineffective in his selection of and communications with the mitigation specialist (Sanchez Issues VIII(A)(2) & (F))

H. Whether Sanchez's counsel was ineffective in his investigation, preparation, and presentation of the mitigation case (Sanchez Issues VIII (A), (B), (C), (D), (F) & (G);

I. Whether Sanchez's counsel was ineffective for failing to impeach the testimony of the Government's mental health expert offered in rebuttal (Sanchez Issue VIII (H));

J. Whether Sanchez's counsel were ineffective for failing to object to jury instructions concerning non-statutory mitigating factors (Sanchez Issue VIII(K))

K. Whether Sanchez's rights to counsel and substantive due process were violated when neither trial counsel nor the Court was moved for a hearing to establish Sanchez's competency to stand trial (Sanchez Issues IV & VIII (E));

L. Whether Sanchez's counsel was ineffective for failing to object to arguments made by government counsel (Sanchez Issues VII (E) & VIII (J));

M. Whether Sanchez is entitled to relief under the cumulative effects of errors doctrine (Sanchez Issue XI).

2

Because of the wide variety of issues raised by Sanchez, the United States has organized its response by subject area, followed by a citation to the actual issue number used by Sanchez in his amended petition (CV-DE 16-1).[2]

## STATEMENT OF THE CASE

1.      Applicable Course of Proceedings.[3]

On February 14, 2008, a federal grand jury in the Southern District of Florida returned a 16-count third superseding indictment against defendants Daniel Troya and Ricardo Sanchez, Jr., and co-defendants Danny Varela and Liana Lopez (CR-DE 305).  All of the defendants were charged with non-capital drug trafficking and firearms offenses, and Troya and Sanchez were additionally charged with capital offenses involving the murders of an entire family, father mother and two little boys, ages 3 and 4.  (*Id.*).[4]

Specifically, the grand jury charged Troya and Sanchez with: conspiring to possess with intent to distribute at least 50 grams of crack cocaine and at least five kilograms of cocaine, in violation of 21 U.S.C. " 846 and 841(b)(1)(A) (Count 1); conspiring to carjack a motor vehicle, in violation of 18 U.S.C. " 371 and 2119(3) (Count 5); carjacking a motor vehicle with the intent to cause serious bodily harm and death, in violation of 18 U.S.C. " 2119(3) and 2 (Count 6); using and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime

---

[2] Page citations to the Sanchez Petition reference the ECF page number in the upper margin of the pleading, not the original page number printed at the bottom of each page.

[3] Some of the Course of Proceedings and the majority of the Statement of Facts are taken, with certain alternations, from the Response Brief of the United States in *United States v. Daniel Troya, et al.*, Case No. 09-12716-PP, filed in response to Sanchez and Troya's initial appeal explained in greater detail below.

[4] The grand jury had charged codefendants Juan C. Gutierrez and Kevin Vetere with non-capital drug trafficking offenses in earlier iterations of the indictment (CR-DE 30, 113, 170).

and causing the death of a person by murder with malice aforethought, in violation of 18 U.S.C. " 924(j)(1), 1111, and (2) (Count 7 (murder of Luis Damian Escobedo); Count 8 (murder of Luis Julian Escobedo); Count 9 (murder of Yessica Guerrero Escobedo); and Count 10 (murder of Jose Luis Escobedo)); possessing with intent to distribute at least 50 grams of crack cocaine and at least 500 grams of cocaine, in violation of 21 U.S.C. " 841(a)(1), (b)(1)(A), (B), and 18 U.S.C. ' 2 (Count 4 (Sanchez only) and Count 13); possessing firearms after previously having been convicted of a felony offense, in violation of 18 U.S.C. " 922(g)(1), 924(a)(2), and 2 (Count 3 (Troya only) and Count 14); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. ' 924(c)(1)(A)(i) (Count 15) (CR-DE 305).

With respect to Counts 6-10 of the third superseding indictment, the grand jury made the following special findings, in accordance with 18 U.S.C. " 3591(a)(2)(A)-(D) and 3592(c), as to Troya and Sanchez: (1) both were 18 years of age or older at the time of the charged offenses; (2) both intentionally killed the victims named in the charged offenses; (3) both intentionally inflicted serious bodily injury on the victims named in the charge offenses; (4) both intentionally participated in an act, contemplating that a life would be taken or intending that lethal force would be used, that resulted in the deaths of the victims named in the charged offenses; (5) both intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death and in reckless disregard for human life, that resulted in the deaths of the victims named in the charged offenses; (6) both committed the charged offenses with the expectation of pecuniary gain; (7) both committed the charged offenses after substantial planning and premeditation; and (8) both intentionally killed more than one person in a single criminal episode (CR-DE 305 at 16-21). In addition, the grand jury specially found that two of the victims, ages three and four, were particularly vulnerable due to their youth (CR-DE 305 at 20).

4

On February 20, 2008, the government filed notices of intent to seek the death penalty against Troya and Sanchez as to Counts 6-10 of the third superseding indictment (CR-DE 311, 312).

On January 6, 2009, Troya and Sanchez and codefendants Varela and Lopez proceeded to a jury trial (CR-DE 648).[5]   After two months of trial, the jury found all of the defendants guilty of all counts of the third superseding indictment, as charged (CR-DE 791-93, 796 at 7694-7703).

Between March 16 and 31, 2009, Troya and Sanchez proceeded to the penalty phase of the jury trial (CR-DE 818, 823-25, 845-48, 855-57).  At the conclusion of the penalty phase, the jury found that a sentence of death should be imposed on both defendants as to Counts 7 and 8 of the third superseding indictment, the counts charging the murders of Luis Damian Escobedo and Luis Julian Escobedo, respectively, and that a sentence of life imprisonment without the possibility of release should be imposed on both defendants as to Counts 6, 9, and 10 (CR-DE 859, 860; CR-DE 857 at 9813-42).

On May 13, 2009, the district court conducted sentencing hearings (CR-DE 895, 898-900, 955-56).  At the conclusion of the hearings, the court imposed on both Troya and Sanchez the death sentences pronounced by the jury as to Counts 7 and 8 and the life imprisonment sentences pronounced by the jury as to Counts 6, 9, and 10, with the life imprisonment sentences to run consecutively to all other sentences (CR-DE 899, 900; CR-DE 955:30-34; CR-DE 956 at 16-23). In addition, the court sentenced both defendants to concurrent terms of life imprisonment as to Counts 1 and 13 and 120 months of imprisonment as to Counts 5 and 14 and a consecutive term

---

[5] Before the trial, codefendants Vetere and Gutierrez pleaded guilty, respectively, to the drug trafficking conspiracy charged in Count 1 of the first and second superseding indictments (CR-DE 268, 291).

of 60 months of imprisonment as to Count 15 (*Id.*); Troya received a concurrent term of 120 months of imprisonment as to Count 3, and Sanchez received a concurrent term of 480 months of imprisonment as to Count 4 (*Id.*).  The court sentenced each defendant to a total term of 60 months of supervised release and a special assessment of $1,100 (*Id.*).[6]  Troya and Sanchez filed notices of appeal from the judgments against them (CR-DE 901, 907).[7]

On October 3, 2013, the Eleventh Circuit affirmed all of the convictions and sentences against both Sanchez and Troya, including the capital counts. (CR-DE 1134).  The Court's mandate was issued on January 3, 2014.  The Supreme Court denied certiorari on May 4, 2015 (CR-DE 1151).

On May 3, 2016 Sanchez filed the instant Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 (CV-DE 1) with sealed entries.  Pursuant to Court order Sanchez filed a complete unredacted version of his § 2255 petition on May 26, 2016 (CV-DE 16-1).  After the parties' submission of a Joint Status Report and Proposed Scheduling Order on June 24, 2016, (CV-DE 17), the Court held an initial status conference on July 14, 2016 to set deadlines.  After the status conference the Court issued an initial Scheduling Order directing the United States to file its initial Response to the Petition on or before October 12, 2016 (CV-DE 21).  On October 3, 2016, the United States moved for an extension of time, seeking an additional thirty-three days to file a response to the instant petition, as well as the petition filed by co-defendant Daniel Troya in

---

[6] The district court imposed sentences of imprisonment on the codefendants as follows: Vetere, 144 months (CR-DE 301), later reduced to 42 months upon the government=s motion (CR-DE 970, 1058-59); Gutierrez, 216 months (CR-DE 936); Lopez, 180 months (CR-DE 937); Varela, life (CR-DE 924).

[7] The appeals of Varela and Lopez were consolidated in a separate appeal under case number 09-12802.  On August 16, 2011, the Eleventh Circuit affirmed their convictions and sentences in *United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011).

Case No. 16-80700-CV-Scola.  (CV-DE 27).   On October 4, 2016, the United States also filed an unopposed emergency motion for extension due to an approaching hurricane, and the need for its staff to begin preparations to protect life and personal property (CR-DE 28).

On October 4, 2016, prior to expiration of the initial response period set for the United States, the Court issued an order partially dismissing Sanchez's claims.  (CV-DE 29).   In that order, the Court dismissed Sanchez claims I, II, III, VI, VII(A), IX, and X.   By paperless order also entered on October 4, 2016, the Court granted the government an extension until November 1, 2016 to respond to all of Sanchez's remaining, non-dismissed claims (CV-DE 30).   This response follows.

2.      Facts Underlying Sanchez's Conviction and Sentence.

a. The Government's Case-In-Chief At Trial

**The Murders**

On October 13, 2006, at 2:24 a.m., a couple who lived next to the Florida Turnpike, near mile marker 149 (Fort Pierce, Florida), were awakened by a series of "popping" noises that sounded like gunshots ((CR-DE 728:3099-3103, 3129-30, 3221-26).   Several hours later, an individual driving down the turnpike in the same area saw what he thought was a family sleeping on the side of the road (CR-DE 728:3112-27).   Seeing no vehicle in the area, he pulled over to offer the family a ride (*Id.*).   When he approached the individuals, about 25 feet off the road, he saw that they had been shot (*Id.*).   At first, he thought that there were three individuals, including what looked like a mother holding a child (*Id.*).   Then, he noticed a fourth individual, a small boy, who appeared to have been "hiding under his mother's legs" (*Id.*).   He called 911 (*Id.*).

The murder victims were the Escobedo family: Jose ("Lou") Escobedo, age 28; his wife, Yessica Escobedo, age 25; and their two children, Luis Julian Escobedo, age 4, and Luis Damian

7

Escobedo, age 3 (CR-DE 728:3207-08; CR-DE 729 at 3366-3466).  Each had died from multiple, close-range gunshots to the head and body (*Id.*).  Three of the Escobedos had died instantly from fatal wounds to the head; however, the youngest Escobedo, Damian, had suffered before dying. (*Id.*).[8]

### Background

In 2003, codefendant Danny Varela, also known as "D.V.," was selling marijuana, and by 2005, he had become a successful cocaine trafficker in Palm Beach County, Florida (CR-DE 751 at 4739; CR-DE 752 at 4990-99).  Varela normally delivered kilogram quantities of cocaine to customers on a weekly basis (e.g., CR-DE 752 at5005).  Frequently, Valera's cousin, Ricardo Sanchez, Jr., also known as "Rick," delivered the cocaine for Varela (CR-DE 752:4993-5001, 5133-34).  On some occasions, Varela's girlfriend, Liana Lopez, also known as "Negra," delivered the cocaine on Varela's behalf (CR-DE 738 at 4535-36; CR-DE 752 at 4998-5001).  Among Varela's other associates were Daniel Troya, also known as "Homer," whom Varela had met in jail (CR-DE 758 at 6418), codefendant Juan Gutierrez, also known as "Flaco," and codefendant Kevin Vetere (CR-DE 752 at 5128-40).

In early 2006, Jose Luis Escobedo, also known as "Lou," lived in Brownsville, Texas, where he was involved in transporting drugs from Texas and Mexico to Florida (CR-DE 752 at 4972-76; CR-DE 753 at 5711).  Escobedo lived in a house that he rented from Bonito Rodriguez, who lived in Palm Beach County, Florida (*Id.*).  Rodriguez was the uncle of both Varela and Sanchez (*Id.*).

---

[8] As set forth below, the evidence established that Troya and Sanchez murdered the Escobedos. The government argued that their motive for the murders included erasing a drug debt owed to Lou Escobedo and robbing him of 15 kilograms of cocaine (CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182).

In the summer of 2006, Rodriguez, who traveled frequently between Florida and Texas, took his nephew, Varela, to Brownsville and introduced Varela to Escobedo (CR-DE 752 at 4974-76).  Shortly thereafter, Escobedo moved to Greenacres, in Palm Beach County, Florida, with his wife, Yessica, and their two children, Luis Julian and Luis Damian (CR-DE 729 at 3468-74; CR-DE 738 at 4526-27).  At that time, Escobedo drove a black Jeep Cherokee (CR-DE 729 at 3475).

After he had moved to Palm Beach County, Escobedo visited Rodriguez often (CR-DE 752 at 4976, 4985), and Escobedo became friends with Varela and Sanchez (CR-DE 752 at 4985-86).  Escobedo and Varela were seen together often (CR-DE 730 at 3664-65; CR-DE 732 at 3969-72; CR-DE 738 at 4528-29, 6415-20).  Escobedo was one of Varela's sources for cocaine (CR-DE 754 at 5492-97).

**The Drug Life**

During the summer of 2006, Varela and his associates, including Escobedo, partied late into the early morning hours at strip clubs four or five nights a week (CR-DE 752 at 5128-38, 5142-43).  At the clubs, Lopez distributed cocaine to the strippers (CR-DE 752 at 5139-40).  When she ran out of cocaine, Varela instructed her to "go to the house" and get more (*Id.*).  The house, on Purdy Lane in West Palm Beach, Florida, was a townhouse that the defendants referred to as "Pimp Plaza" (CR-DE 752 at 5002, 5140-41, 5194-95; CR-DE753 at 5570-71).

That summer, Escobedo's cousin, Crystal Salazar, visited him in Palm Beach County (CR-DE 738 at 4525-30).  During Salazar's visit, Escobedo took his cousin and his wife and kids to Pimp Plaza (CR-DE 738 at 4530-31).  There, Salazar observed that the Escobedo children were familiar with the house and knew their way around it (CR-DE 738 at 4531-36, 4545).  Salazar met Sanchez and Lopez there, and Salazar observed Sanchez counting large stacks of money in the downstairs portion of the residence, which caused her to take the children upstairs (CR-DE 738 at

9

4537-38). Salazar quickly returned downstairs with the children after she observed a large number of firearms B possibly 50 B on a bed upstairs (CR-DE 738 at 4538-45). Sanchez told her that "they" had more guns in a closet in another room (CR-DE 738 at 4539).

On one occasion, a vehicle with a Miami Hurricanes license plate drove past Pimp Plaza and appeared to be casing the residence for a possible robbery (CR-DE 753 at 5624-28). Troya and Sanchez armed themselves with assault rifles from Pimp Plaza B Troya carried an AK-47, and Sanchez carried a smaller assault rifle B and chased after the vehicle, which sped away (*Id.*).

Sometime after the casing incident, Lopez and Escobedo were robbed at Pimp Plaza by home invaders (CR-DE 752 at 5140-42). During the robbery, Escobedo was pistol-whipped, and one of the robbers held a gun to his head until Lopez disclosed the location of cocaine (CR-DE 753 at 5569-70, 5590-95; CR-DE 756 at 5960-61). The robbers stole a kilogram of cocaine, $80,000 to $100,000 of cash, and guns (*Id.*).

Shortly after the robbery, in about August of 2006, Varela and his codefendants B Sanchez, Troya, Lopez, Gutierrez, and Vetere B moved to 6458 Garden Court, West Palm Beach, Florida, a house in a gated community (CR-DE 737 at 4297-4306; CR-DE 752 at 5143-44, 5157-66). The defendants referred to their new residence as "Thug Mansion" (CR-DE 753 at 5571). Varela instructed Troya not to tell Escobedo the address of Thug Mansion, and Troya related that instruction to the others (CR-DE 752 at 5145).

The defendants were not legitimately employed; their income came from drug dealing, and they used Thug Mansion as their base of operations for distributing drugs, primarily cocaine, crack cocaine, and Ecstasy (CR-DE 752 at 5145-72; CR-DE 753 at 5558-79, 5624; CR-DE 754 at 5429-44). Thug Mansion was also used to cook crack cocaine and to package drugs for distribution

(*Id.*). The defendants kept firearms openly in every room of the residence for easy accessibility in order to thwart any future robbery attempts (*Id.*).

Besides the threat from potential robbers, the police presented an obstacle to the defendants' drug distribution activities. On May 10, 2006, a Greenacres Police Department officer stopped Lopez in a white Cadillac and seized two kilograms of cocaine and $14,000 of cash from her; Varela's fingerprints were later lifted from the packages of cocaine (CR-DE 751 at 4886-4906, 4921-34). On June 10, 2006, a Palm Beach County Sheriff's deputy stopped Varela and Troya in a Chevy Lumina (CR-DE 754 at 5312-41). From Varela, the deputy seized $1,364 of cash; from the Lumina, the deputy seized marijuana and two pistols, a nine-millimeter and a .40 caliber, from a hidden compartment in the vehicle (*Id.*). On July 10, 2006, a Palm Beach County Sheriff's Office deputy attempted to stop Sanchez in a white Ford Taurus, which had a stolen temporary tag (CR-DE 752 at 5071-5121). Sanchez sped away, crashed the Taurus into a tree, and then fled on foot, carrying a shoe box, which he dropped (*Id.*). Sanchez was apprehended, and almost one kilogram of cocaine was seized from the shoe box that he had dropped (*Id.*).

On September 11, 2006, Sanchez, Troya, and other defendants spotted the vehicle, with the Miami Hurricanes license tag, that they believed previously had cased Pimp Plaza B the vehicle, a gold GM Park Avenue, was parked at Sugar Daddy's Strip Club in Palm Beach County (CR-DE 753 at 5628-38). The defendants went to Thug Mansion to discuss a plan of action (*Id.*). Troya dressed himself in black clothes, donned a wig, and announced that he was going to approach the vehicle and shoot whomever was sitting in the driver's seat (*Id.*). When the defendants returned to the strip club, however, it was raining, so they decided instead to follow the vehicle, "shoot the car up," then drop the shooter off at a prearranged location (CR-DE 753 at 5638-39).

The Park Avenue car left the strip club at about 3:00 a.m. (CR-DE 753 at 5639).  Driving a Toyota Camry, Sanchez followed the Park Avenue car, with Troya in the passenger seat, armed with a nine-millimeter pistol (CR-DE 753 at 5640-42).  After following the Park Avenue car for some time, Sanchez pulled next to the vehicle, and Troya leaned out of the Camry's window and fired at least 11 shots at the vehicle, causing it to swerve off the road; Sanchez sped away after the shooting, which occurred on Haverhill Road, between Summit Boulevard and Forest Hill Boulevard (CR-DE 753 at 5642-46; CR-DE 757 at 6190-6207).  The Park Avenue car returned to the strip club, where law enforcement officers observed that one of the occupants of the vehicle, a woman, was bleeding profusely from a gunshot wound to her thigh (CR-DE 758 at 6394-99).

Sanchez and Troya were no strangers to violent acts involving firearms.  On April 28, 2006, Troya had used an AK-47 assault rifle to "shoot up" a house at 1901 Mercer Avenue, West Palm Beach (CR-DE 753 at 5668-71; CR-DE 757 at 6162-89).  Troya believed that someone who had "snitched" on him was present in the house (*Id.*).  Troya fired at least 12 rounds into the house, in which a woman and her two children were present B fortunately, no one in the house was struck by the rounds (*Id.*).  On the same day, Sanchez had used the same AK-47 to fire into a house at 1305 Suwanee Drive, West Palm Beach (CR-DE 753 at 5671-73; CR-DE 757 at 6208-94; CR-DE 758 at 6391-92).  Sanchez believed that someone who had intended to rob him was present in the house (*Id.*).  A male who was present in the house was struck in the right leg by one of the rounds from the AK-47 that Sanchez fired into the house (*Id.*).

In early October of 2006, Sanchez, Troya, and some of the other defendants planned to obtain cocaine by stealing it, rather than by purchasing it, from someone whom Varela believed was a drug dealer (CR-DE 753 at 5653-56).  In connection with the planned theft, they went to a military surplus store and purchased ski masks, gloves, and handcuffs (*Id.*).  Thereafter, they drove

to the victim's residence, where Sanchez, carrying a crowbar, and Troya, armed with a nine-millimeter pistol, tried to enter the back door of the residence (CR-DE 753 at 5661-66). When someone inside the house began yelling, "I am going to call the police!", Sanchez and Troya ran back to their vehicle, and the defendants sped away (*Id.*).

### The Murder Investigation

The first law enforcement officer on the murder scene was a trooper with the Florida Highway Patrol; he "secured" the crime scene until members of the St. Lucie County Sheriff's Office arrived (CR-DE 728 at 3128-36). Thereafter, a crime scene investigator recovered a total of 13 bullet casings and projectiles from the scene; the 13 items had come from two different firearms B a .40-caliber firearm and a nine-millimeter firearm (CR-DE 728 at 3137-3215).

Later that day (October 13, 2006), law enforcement officers went to the Escobedo residence (CR-DE 730 at 3748-60; CR-DE 731 at 3817-25, 3853-88; CR-DE 737 at 4367). There, they observed that a rear sliding glass door was open, that the door to the attic was open, and that the residence appeared to have been ransacked (*Id.*). Inside the residence, the officers found drug packaging materials and traces of cocaine, a red suitcase labeled "Embark," and numerous documents (*Id.*). Among the documents was a drug ledger, in Lou Escobedo's handwriting, that contained a number of names, initials, and notations (CR-DE 731 at 3871-75; CR-DE 758 at 6449-79). The drug ledger contained several references to "D.V.," "Rick," and "Negra," adjacent to amounts such as "12 minus 3" and "12 2 minus 1" and notations such as "3 Negra first trip" and "1 Rick second trip" (*Id.*).[9] Among the documents were also two booking photographs, one for

---

[9] An expert witness in narcotics trafficking opined that the notations involving "Negra" and "Rick" referred to a drug debt that they owed to their supplier (CR-DE 758 at 6474-77).

13

Liana Lopez ("Negra") pertaining to a narcotics offense, and the other for Ricardo Sanchez, Jr. ("Rick"), pertaining to traffic offenses (CR-DE 731 at 3858-61, 3912).[10]  In addition, the officers found a certificate of title for Lou Escobedo's black Jeep Cherokee (CR-DE 731 at 3883-86, 3891-92).[11]

Based on Escobedo's link to the black Jeep Cherokee, law enforcement officers began looking for that vehicle (CR-DE 728 at 3226-29).  From the Florida Department of Transportation, which had installed cameras at every toll booth on the Florida Turnpike, Detective John Parow obtained videotapes of the vehicles that had entered and exited the turnpike around the time of the murders (*Id.*).

After hours of studying the videotapes, Det. Parow observed that a black Jeep Cherokee had entered the turnpike at the Fort Pierce toll plaza (mile marker 152), approximately three miles from the murder scene, at 2:18 a.m., on October 13, 2006 (CR-DE 728 at 3230-31).  A few seconds later, a large van with scratches on its roof had followed directly behind the Jeep Cherokee onto the turnpike (CR-DE 728 at 3232-38; CR-DE 729 at 3332-45).  The Jeep Cherokee had been issued toll ticket number 5160 (GX7)[12]; the van had been issued toll ticket number 5161 (GX8) (CR-DE 729 at 3287-3325).  At 3:02 a.m., both vehicles had exited the turnpike at the Okeechobee toll plaza in West Palm Beach (*Id.*).  The drivers of both vehicles had presented toll tickets and paid the required tolls; the driver of the van, however, had opened the vehicle's door to pay the toll

---

[10] Lopez later told a friend that Lou Escobedo had shown the booking photos to "people in Mexico" to prove that Lopez and Sanchez had been arrested and that cocaine had been seized by the police (CR-DE 752 at 5187).

[11] The black Jeep Cherokee was registered to the wife of Eric Wiksten, who had sold the vehicle to Sanchez for cash (CR-DE 754 at 5297-5305).

[12] References to GX refer to original trial exhibits introduced by the United States during the guilt and penalty phases.

rather than simply paying through the window (CR-DE 729 at 3342-44).  Det. Parow obtained the toll tickets from both vehicles, and law enforcement officers began looking for the van with the scratches on its roof in addition to the black Jeep Cherokee (CR-DE 729 at 3337-40).

The van with the scratches on its roof was a maroon Dodge van, which Varela had purchased for cash on June 23, 2006, and had arranged to be registered to a straw owner (CR-DE 731 at 3840-44; CR-DE 732 at 3857, 3941-56).  Kevin Vetere had ridden in the van on numerous occasions with Troya, Sanchez, and Varela when they distributed narcotics (CR-DE 754 at 5421-44, 5457).

In the late afternoon of October 12, 2006, before the murders, Vetere had seen Troya and Sanchez leaving Thug Mansion in the Dodge van, and he had attempted to ride with them (CR-DE 754 at 5444-47; CR-DE 756 at 5944-46).  Troya had told Vetere that he could not accompany them on that occasion (*Id.*).  Because that was the first time that Vetere had ever been told he could not ride in the van, he had asked Troya to check with Varela; Troya had called Varela, who had instructed Vetere to stay at Thug Mansion (*Id.*).

Vetere did not see Troya and Sanchez again until the next day (CR-DE 754 at 5447-48).  In the early morning hours of October 13, 2006, after 3:00 a.m., Vetere saw Troya and Sanchez, accompanied by Varela and Gutierrez, enter Thug Mansion; each was carrying a zippered sports bag with a handle, similar to the bags that they used for carrying kilograms of cocaine (CR-DE 754 at 5449-52, 5463; CR-DE 753 at 5697-98).  Shortly thereafter, Vetere received a call from a stripper who wanted him to bring her marijuana, so Vetere retrieved the keys to the van from Sanchez's room and drove to the stripper's residence, about 10 minutes from Thug Mansion (CR-DE 754 at 5453-58).

15

Not long after Vetere had reached the stripper's residence, Troya called him and told him to return to Thug Mansion because Varela was angry that he had taken the van (CR-DE 754 at 5458). Vetere complied; however, en route to Thug Mansion, Varela himself called Vetere and instructed him to take the van to Varela's uncle's house and park it (CR-DE 754 at 5459). Vetere did so, and while he was at Varela's uncle's house, Vetere saw Lou Escobedo's black Jeep Cherokee parked behind the house (CR-DE 754 at 5460-64).

About 10 minutes after Vetere had parked the van at Varela's uncle's house, Varela, Gutierrez, Troya, and Sanchez arrived there in a white Taurus (CR-DE 754 at 5465). Varela instructed Vetere to drive the Jeep Cherokee to his (Vetere's) grandmother's house and park it (CR-DE 754 at 5466-71). Vetere complied, and a few minutes later, Gutierrez arrived in the van and picked Vetere up from his grandmother's house (*Id.*). Gutierrez drove to a Denny's restaurant, where they met Varela, Troya, and Sanchez (CR-DE 754 at 5471-72). They all ate breakfast together as the sun came up (*Id.*).[13]

Before the day was over on October 13, 2006, television and radio stations were airing news of the murders (CR-DE 729 at 3488). The same day, Troya purchased a convertible Chevrolet Impala, which he said he had bought with "a brick," meaning a kilogram of cocaine (CR-DE 729 at 3490-92; CR-DE 756 5476-79). Within a day or two of the murders, Troya told a friend that he had "licked somebody," meaning robbed someone, of 15 kilograms of cocaine (CR-DE 729 at 3489-90). At the same time, Vetere observed that Sanchez had a large amount of money and was bragging that he was going to buy a $5,000 "Cuban link" gold necklace (CR-DE 753 at 5651-53). When Vetere asked Sanchez about the money, Sanchez replied, "You going to knock

---

[13] After October 13, 2006, Varela told his associates that the van was "hot" and instructed them not to drive it anymore and to leave it parked at his uncle=s house (CR-DE 752 at 5175-77).

off the next big timer" (*Id.*), which Vetere believed to be a reference to shooting someone (CR-DE 756 at 5937-38).  Shortly thereafter, Sanchez purchased a gold necklace for about $2,500 (CR-DE 758 at 6573-75).

On October 14, 2006, Vetere learned of the murders from the Palm Beach Post newspaper, which carried a picture of Lou Escobedo (CR-DE 754 at 5486).  Vetere immediately asked Troya if he had moved Escobedo's Jeep Cherokee from Vetere's grandmother's house (CR-DE 754 at 5487-88).  Troya replied that he had moved the vehicle (*Id.*).

On October 16, 2006, law enforcement officers found Escobedo's Jeep Cherokee parked in an industrial area of West Palm Beach (CR-DE 731 at 3888-99).  The license tag had been removed from the vehicle, and on the ground near the vehicle were a book of matches and a five-gallon can full of gasoline (*Id.*).

When Vetere learned that the Jeep Cherokee had been found, he discussed the event with Troya (CR-DE 754 at 5488-89, 5521-25).  Troya said that he had intended to burn the vehicle but that the police had "found it too quick" (*Id.*).  Vetere expressed his concern that the police might recover fingerprints from the vehicle (*Id.*).  Troya said that he had "wiped the Jeep down real good" (*Id.*).  Vetere also asked Troya if he had been aware that the Florida Turnpike was equipped with video cameras (*Id.*).  Troya replied that he had driven the van and that when he had paid the toll, he had kept the window up, had opened the door to pay with his outstretched arm, and had not waited to receive his change from the toll booth attendant (*Id.*).

Sometime later, Vetere was with Varela, Troya, and Sanchez when Sanchez received a telephone call from his father (CR-DE 754 at 5531-35).  Sanchez's father asked, "Didn't you sell that [Jeep Cherokee] to Lou?" (*Id.*).  Something about the way that his father asked the question made Sanchez believe that the police had questioned his father (*Id.*).  When Sanchez related the

17

incident to the others, Vetere said, "The heat is on," and Varela said that it was "time to clean the house" (*Id.*).  Thereafter, Vetere, Lopez, Troya, and Sanchez tried to rid Thug Mansion of as much drug paraphernalia and ammunition as they could (CR-DE 754 at 5535-41; CR-DE 753 at 5558-79).

Besides arranging to destroy evidence at Thug Mansion, Varela also arranged for a friend of his, the owner of a body shop ("Down South Customs"), to repaint the maroon Dodge van (CR-DE 730 at 3660-75).  Gutierrez drove the van to the body shop and told the owner that Varela wanted the scratches on the roof of the van repaired and the van to be painted green (*Id.*).  The owner began to work on the van, but then he saw a television news report that law enforcement officers were looking for the van, so he called the police, who came and seized the van on October 17, 2006 (CR-DE 730 at 3675-77; CR-DE 731 at 3848-50).

Law enforcement officers searched the van (CR-DE 731 at 3825-46).  From it, they seized a suitcase labeled "Embark" (*Id.*).  The suitcase contained some toys and a hotel receipt (*Id.*).  The receipt was in the name of Yessica Escobedo and showed payment for a one-night stay, beginning on October 11, 2006, at a La Quinta Inn in Fort Meyers, Florida (*Id.*).

On October 25, 2006, after having obtained a warrant, law enforcement officers searched Thug Mansion (CR-DE 730 at 3624-46; CR-DE 731 at 3902-11, 3918-24; CR-DE 732 at 3996-4164; CR-DE 737 at 4332-65; CR-DE 754 at 5382-86).  Present during the search were Troya, Sanchez, Varela, Gutierrez, and Lopez, all of whom were arrested (*Id.*).  Despite the earlier efforts of the defendants to "clean house," the officers seized a drug ledger, bags containing cocaine and crack cocaine, drug paraphernalia, ski masks, gloves and wigs, handcuffs, body armor, a police scanner, a number of firearms, including an AK-47 assault rifle, ammunition, and ammunition clips (*Id.*).  The officers seized two cell phones and $3,327 of cash from Sanchez, and they seized

two cell phones and $593 of cash from Troya (*Id.*).  They also seized a cell phone from Varela's automobile (*Id.*).

The law enforcement officers advised Sanchez of his constitutional rights and questioned him (CR-DE 730 at 3626-46).  When he was asked whether he had any knowledge of a black Jeep Cherokee, Sanchez said that he previously had sold that vehicle to Lou Escobedo (*Id.*).  When he was asked whether he had any knowledge of "a maroon van that [Varela] drove," Sanchez answered only that he did not "hang out" with people like Varela (*Id.*).

### Corroborating Evidence

The government's forensic examination of the toll tickets established that Sanchez's fingerprints were on toll ticket number 5160 (GX7) (CR-DE 730 at 3712-41), the ticket that had been issued to Escobedo's black Jeep Cherokee when it entered the Florida Turnpike and that had been returned to the toll booth attendant when the vehicle exited the turnpike.  In addition, Troya's fingerprints were on toll ticket number 5161 (GX8) (*Id.*), the ticket that had been issued to the maroon Dodge van when it entered the turnpike and that had been returned to the attendant when the vehicle exited the turnpike.

The government examined the pattern of activity that occurred on the cell phones that had been seized from Troya, Sanchez, and Varela (CR-DE 764 at 6703-6824).[14]  Between 5:41 p.m. on October 12, 2006, and the time of the murders (2:24 a.m. on October 13, 2006), there were no calls between Troya's cell phone and Sanchez's cell phone, but there were numerous calls between Sanchez's cell phone and Escobedo's cell phone (CR-DE 764 at 6751-94).  During that period of

---

[14] Sanchez and Varela used cell phones with numbers that were subscribed to by others; Troya used a cell phone with a number in someone else's name as well as a cell phone with a number in his own name (CR-DE 756 at 5990-6053; CR-DE 758:6421-27, 6434-45, 6503-36, 6559-72).

nearly nine hours, those phone calls occurred along a northerly route from Lake Worth, Florida, to Daytona Beach, Florida, and then along a southerly route from Daytona Beach, Florida, to Fort Pierce, Florida (*Id.*).[15]   After the murders, telephone activity commenced between Troya's cell phone and Sanchez's cell phone and between Troya's and Sanchez's cell phones and Varela's cell phone (CR-DE 764 at 6792-6811).[16]

Although the murder weapons were never recovered (CR-DE 738 at 4511; CR-DE 767 at 7448), the government conducted a forensic examination of the projectiles and projectile casings that had been recovered from the scene of the Escobedo murders as well as the ammunition that had been seized from Thug Mansion (CR-DE 764 at 6599-6660).  Six of the seven .40-caliber projectile casings that had been recovered from the murder scene had "tool marks" on them, that is, "striated markings" on the sides of the casings (CR-DE 764 at 6643-44).  Those tool marks were similar to tool marks on the casing of one of the live rounds of .40-caliber ammunition seized from Thug Mansion (*Id.*).  All of the tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the government's forensic expert to opine that the live .40-caliber round seized from Thug Mansion and six of the seven .40-caliber casings recovered from the murder scene had come into contact with the same magazine (CR-DE 764 at 6645-50).

---

[15] As set forth above, Troya and Sanchez had left Thug Mansion together in the maroon Dodge van in the late afternoon of October 12, 2006.  At about 9:00 p.m. that night, a police officer had seen the van heading north on I-95, about 15 miles from Daytona, Florida, and he had reported the license tag as a matter of routine road patrol (CR-DE 758 at 6405-13).

[16] After the murders, as set forth above, Troya had said that he exited the turnpike in the van, so, according to the government's theory of the evidence, Sanchez exited the turnpike in Escobedo's black Jeep Cherokee (CR-DE 766 at 7146-49).

In addition, three of the four nine-millimeter casings that had been recovered from the murder scene had tool marks on them (CR-DE 764 at 6654).  Those tool marks were similar to tool marks on the casings of two of the live rounds of nine-millimeter ammunition seized from Thug Mansion (CR-DE 764 at 6650-54).  All of those tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the expert to opine that the two live rounds of nine-millimeter ammunition seized from Thug Mansion and three of the four nine-millimeter casings recovered from the murder scene had come into contact with the same magazine (CR-DE 764 at 6657-60).[17]

In the summer of 2007, while Troya was awaiting trial in the Federal Detention Center in Miami, Florida, he visited a friend of his, Byron Hambrick, who was also in custody (CR-DE 737 at 4404-20).  Hambrick's cellmate, Carlos Rodriguez, overheard Troya tell Hambrick that he (Troya) had done something "very wrong," that he had "killed some people," and that there had been "children involved" (*Id.*).  Hambrick asked Troya why he had done it, and Troya replied that it was something that he had to do (*Id.*).[18]

      b.  The Defense Case At Trial

---

[17] The governments forensic tool mark testimony was presented by Mark Chapman, a firearms examiner for the Indian River Crime Laboratory in Fort Pierce, Florida (CR-DE 764 at 6600). Chapman was a member of the Association of Firearms and Tool Mark Examiners (AAFTE) (CR-DE 764 at 6633).

[18] The government's theory of the case was that Lou Escobedo had supplied Varela with cocaine, some of which had been seized by police officers from Sanchez and Lopez and some of which had been stolen from Pimp Plaza, thereby creating a debt that Varela owed to Escobedo (CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182).  According to the government's theory, that debt was eliminated when Sanchez and Troya murdered Escobedo, after which they also robbed him of 15 kilograms of cocaine (*Id.*).

Sanchez did not testify in his own defense; he did, however, present the testimony of two law enforcement officers (CR-DE 765 at 6947-85). Sanchez's primary evidence was that a "silver vehicle" had entered the Florida Turnpike in Fort Pierce at 2:14 a.m. on October 13, 2006, and had exited the turnpike in West Palm Beach (Okeechobee exit) at 2:57 a.m. on the same date (*Id.*). In closing argument, his attorney conceded that Sanchez had been a member of Varela's drug organization and that Sanchez had been present on the turnpike at the time of the Escobedo murders (CR-DE 767 at 7286-7348). Counsel argued, however, that Sanchez's presence on the turnpike was only for the purpose of providing "counter-surveillance" for Lou Escobedo, whom, counsel argued, had been driving back from Daytona Beach with money after having sold drugs there (*Id.*). Counsel suggested that the silver vehicle had been involved in the murders and that the Escobedo family had been killed by a Mexican drug cartel (*Id.*).

c. The Penalty Phase of the Trial

(1) The Government's Case

Maria Lopez, Sanchez's ex-girlfriend and the mother of his child, testified that in October 2003, Sanchez punched her in the face with his fist (CR-DE 818 at 8070-75, 8085) and that in February 2005, he hit her again (CR-DE 818 at 8075-76). After the second assault, Lopez ended her relationship with Sanchez and started dating Jose Penaran (CR-DE 818 at 8076-80, 8088). On July 3, 2005, Sanchez broke into Lopez's residence and bashed Penaran in the head with a satellite television receiver (*Id.*). Penaran was taken to the hospital, where he was treated for deep lacerations to the back of his head (CR-DE 818 at 8087-92). Sanchez later pleaded guilty to assaulting Penaran (*Id.*).

Rita Flores testified that she was Lou Escobedo's sister (CR-DE 823 at 8100-10). She said that he had enjoyed hunting, fishing, and family gatherings (*Id.*). She said that her two nephews, Luis Julian and Luis Damian, had enjoyed watching television and playing outside and that the younger boy, Luis Damian, had been very protective of his older brother (*Id.*).

Sara Guerrero, Yessica Escobedo's mother, testified that of her three children, Yessica had been "the favorite child" (CR-DE 823 at 8111-19). Guerrero said that Yessica had been a good sister, a good daughter, an intelligent student, an athlete, and a good mother (*Id.*). She said that Yessica's children had loved her very much and could not bear to be apart from her (*Id.*). She said that Yessica had been "everything" to her, that Yessica's murder had "destroyed the whole family," and that Yessica's murder had caused Guerrero's husband to "los[e] his mind" (*Id.*).

Felipe Guerrero, Yessica's brother, testified that Yessica had been his "best friend" and that he had been very close to Luis Julian and Luis Damian  (CR-DE 823 at 8122-31). He said that the two boys had loved to go fishing with their father and that the two boys had been very close to their mother (*Id.*).

Monica Moreno, Guerrero's sister and Yessica's aunt, testified that Yessica had been humble, soft-spoken, polite, and helpful (CR-DE 823 at 8131-45). She said that Yessica had been "a great friend" and "a good listener" and that Yessica's murder had left a "hole" in her heart (*Id.*).[19]

(2) Sanchez's Case

---

[19] Troya and Sanchez both stipulated that they had been more than 18 years old at the time of the Escobedo murders (CR-DE 818 at 8069-70).

Juanita Sanchez, Sanchez's mother, testified that he was one of her four children (CR-DE 823 at 8147-94).  She said that all four of her children had been afraid of their father, who often came home drunk and was sometimes physically abusive toward her and the children B he had slapped Sanchez "sometimes" and "hit" him "one time" (*Id.*).  She said that Sanchez was a "slow" learner in school (*Id.*).  She said that when Varela had first started visiting her house, he had tried to "impress" her children with his "big luxury car with rims" (*Id.*).  She said that Sanchez was a good son, a good brother, and a good father to his only son (*Id.*).

Amy Fleming, a special education coordinator, testified that Sanchez had been her student in middle school and high school and that she was familiar with his school records (CR-DE 823 at 8208-48).  She said that he had "learning issues," including behavior that she described as follows: "impulsive, inattentive, distractible [sic], inability to shift easily from one activity to another, appearance of being lazy, short attention span, verbally aggressive, physically aggressive" (*Id.*). She said that he had an IQ of 80, which was "low average," and that he had received special education because he had a "learning disability" (*Id.*).

On cross-examination, Fleming testified that there had been no indication that Sanchez was mentally retarded, that he had been abused or traumatized at home, or that he did not know the difference between right and wrong (CR-DE 823 at 8249-65).  She conceded that at least one of his teachers had believed that his problems in school stemmed from "bad behavior" and that Sanchez preferred to "socialize" rather than to learn (*Id.*).  Fleming observed that on one occasion, Sanchez had brought a knife to school (*Id.*).  She also observed that his high school had determined that Sanchez would be able to function "on his own" in the community (*Id.*).

Nydia Sanchez, Sanchez's sister, testified that he had grown up in a "bad neighborhood" that was unsafe and where drug-dealing was prevalent and that their father had been a violent

drunk (CR-DE 823 at 8271-94).  She said that Sanchez changed "a lot" after he began spending time with Varela (*Id.*).

Maria Lopez testified that she had met Sanchez in high school, that he had not appeared to have any friends or outside interests, and that he could not read or write (CR-DE 824 at 8378-8409).  She said that he had worked at different jobs and had taken care of her and their son until 2004, when Sanchez began spending time with Varela (*Id.*).  She said that she broke up with Sanchez because of his relationship with Varela (*Id.*).

Daniel Grant, a psychologist, testified that he had evaluated Sanchez for mental retardation and that he had determined that Sanchez was not mentally retarded but that his "intellectual functioning" was low (CR-DE 824 at 8438-67).  Grant opined that Sanchez had a "processing disorder," that is, a learning disorder, that resulted from an inability to distinguish between certain sounds and an inability to remember "large chunks of information" (*Id.*).  On cross-examination, Grant testified that Sanchez was capable of determining between right and wrong (CR-DE 824 at 8468-8509).

Thomas Reidy, a clinical psychologist, testified that he had evaluated Sanchez for "risk factors" that had influenced the "pathway he took in life" (CR-DE 824 at 8514-61; CR-DE 825 at 8611-31).  Reidy said that Sanchez's life choices had been influenced by the following factors: lack of prenatal care; family history of domestic violence and alcohol abuse; concentration problems; restlessness; antisocial behavior; academic failure and "low bonding to school"; learning disability; low intelligence; and living in a "bad area" (*Id.*).

On cross-examination, Reidy conceded that Sanchez himself had denied the following: being physically abused or observing any domestic violence in his childhood home; lacking close

friends and family; having emotional or mental problems; and being exposed to any traumatic experiences (CR-DE 825 at 8632-62).  In fact, Sanchez described his childhood as "good" (*Id.*).

James Aiken, a corrections official who was an expert in evaluating the behavior of inmates, opined that Sanchez, during his two-year incarceration awaiting trial, had "adjusted very well" to having been incarcerated (CR-DE 825 at 8671-85).

(3) The Government's Rebuttal Case

Michael Brannon, a forensic psychologist, testified that he had evaluated Sanchez in December 2008 (CR-DE 846 at 9273-9333).  He said that he had administered an IQ test to Sanchez and that Sanchez had scored 89 on the test, demonstrating that his "overall intellectual functioning" was in the "low average range" (*Id.*).  Brannon said that Sanchez had shown "strengths" in "non-verbal" areas, such as, planning and problem-solving, decision-making, and attention to detail (*Id.*).  Brannon said that Sanchez's test score had been brought down by a "verbally related reading disability" (*Id.*).  Brannon said that there was nothing to indicate that Sanchez had any problem determining right from wrong (*Id.*).

Brannon testified that Sanchez said that he had never been physically or sexually abused and that he had never observed domestic physical violence in his childhood home (*Id.*).  Brannon said that, emotionally, Sanchez showed no signs of "psychopathology," such as, depression or anxiety (*Id.*).  Brannon also said that Sanchez reported having had "a lot of friends" (*Id.*).

With respect to Reidy's testimony, Brannon said that it was impossible to weigh any factors that purported to establish a person's risk to commit violent acts (*Id.*).  Brannon said that so-called risk factors could not be quantified because one positive factor could outweigh 20 negative factors (*Id.*).  Ultimately, Brannon opined, none of Sanchez's life experiences affected his ability to plan and act, to make choices, and to understand the difference between right and wrong (*Id.*).

26

d.  The Sentencing Hearings

At Sanchez's sentencing hearing, the district court conducted a § 3553(a) analysis (CR-DE 956 at 2-16).  During that hearing, Sanchez claimed that he was "innocent" (CR-DE 956 at 6).  The court, however, repudiated that claim, stating, "No one who sat through that trial could give any credit to what he is saying today" (CR-DE 956 at 15).  The court found that, despite having been raised by a loving family that had strived to impart values to him, Sanchez had "betrayed" his family's values (CR-DE 956 at 15), and the court found that the evidence had been "absolutely clear, beyond any doubt whatsoever" that Sanchez and Troya had "tracked the Escobedo family, actually spoke to them, and then murdered the entire family" (*Id.*).

At the conclusion of both sentencing hearings, the district court imposed the sentences as set forth above (CR-DE 956 at 16-23).

E.  Sanchez's Direct Appeal.

Sanchez filed a direct appeal which raised a multitude of issues.  With regard to the issues raised by Sanchez, the Eleventh Circuit rejected nearly all of them summarily without comment with the exception of two issues[20] discussed in the decision:  the district court's evidentiary rulings as to acts of misconduct involving firearms and drugs, and the admission of Dr. Brannon's testimony concerning Sanchez's mental state.  As to the first issue, the Eleventh Circuit concluded that the uncharged shooting incidents were admitted properly as either as 404(b) evidence with appropriate limiting instructions (Mercer Avenue and Suwanee Drive shootings), or as intrinsic evidence of the overall drug conspiracy (Haverhill Road shooting).  *United States v. Troya*, 733

---

[20] A third issue related solely to co-defendant Troya, and is not relevant to the issues raised in Sanchez's petition.

27

F.3d 1125, 1132-33 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 2048 (May 4, 2015). On the rebuttal issue, the appellate court found that the government's introduction of rebuttal testimony from its expert, Dr. Michael Brannon, was properly admitted to rebut evidence established by Sanchez during his penalty mitigation presentation. *Id.* at 1139-40.

## MEMORANDUM OF LAW

### I. PETITIONER'S MOTION WAS TIMELY FILED.

As a preliminary matter, the Government acknowledges that Petitioner's initial motion was filed within the time limit provisions set forth in Title 28, United States Code Section 2255. In Section 105 of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), P.L. 104 132, 110 Stat. 1214, Congress established a "1-year period of limitations" governing motions for collateral relief under § 2255. Pursuant to 28 U.S.C. § 2255 (f)(1), Petitioner's convictions became final on May 4, 2015, when the Supreme Court denied Petitioner's writ of certiorari. *See United States v. Troya*, 733 F.3d 1125, 1132-33 (11th Cir. 2013), *cert. denied*, __ U.S. __ 135 S.Ct. 2048 (2015); *See Nguyen v. United States*, 420 Fed. App'x 875, 877 (11th Cir. 2011). Petitioner filed this § 2255 petition on May 3, 2016, within the one-year limitation. Thus, the initial petition was timely filed. To the extent that Sanchez has attempted to expand or alter the legal issues raised in his May 3, 2016, motion, the Government takes the position that these belated filings should be disregarded as untimely.

### II. PETITIONER'S COUNSEL WAS NOT CONSTITUTIONALLY INEFFECTIVE UNDER THE *STRICKLAND* STANDARD.

Claims of ineffective assistance of counsel under the Sixth Amendment are examined through the two-part test initially set forth by the U.S. Supreme Court in *Strickland v. Washington*,

466 U.S. 668 (1984).  In order to meet the burden of proving ineffective assistance, a movant must first show that "counsel made errors so serious that counsel was not functioning as the >counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  If this showing can be made, the movant must then demonstrate that the "deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*   Unless a movant can make both showings, he cannot prevail.  *See Id.*   The two prongs of *Strickland* are known respectively as the "performance" and "prejudice" prongs.

When a court evaluates the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Id.* at 689 (internal citations omitted).   In order to prove incompetence, "[a] petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment, and a court should deem these acts or omissions deficient only if they 'were outside the wide range of professionally competent assistance.'" *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002) (*quoting Strickland*, 466 U.S. at 690).  As the Eleventh Circuit has explained, "the deference afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high." *Id.*   In light of the "strong presumption in favor of competence," a petitioner seeking to prove a Sixth Amendment violation "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler*, 218 F.3d at 1314-15 (emphasis added).

This presumption is even stronger where, as here, "the reviewing court is examining the performance of an experienced counsel." *Chandler v. United States*, 218 F.3d 1305, 1316 (11th

Cir. 2000) (*en banc*); *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998) (stating that "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable).   In the instant case, Petitioner was represented by two very experienced, learned, court appointed counsel: Michael Cohen and Daniel Murrell.   *See* USA Exh. 1 (screen print from Cohen's website listing his experience); *See* USA Exh. 2 (Murrell resume from his own website).   Counsel's level of experience raises Petitioner's already high burden.

A movant can prevail under the second prong of *Strickland* only if he can "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." 466 U.S. at 693.  In order to make this showing, the movant must demonstrate more than "some conceivable effect on the outcome of the proceeding." *Id.*  Although a movant need not show that the outcome of his case would more likely than not have been different absent counsel's ineffectiveness, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  at 694.  The Eleventh Circuit has cautioned that "this standard is difficult to meet."  *Brownlee*, 306 F.3d at 1059.  In fact, the cases in which a defendant can prove ineffectiveness Aare few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).  When conducting the prejudice inquiry, a court must consider counsel's error in the context of "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

In the instant case, Sanchez claims that his lawyer was ineffective for not calling certain witnesses, not seeking certain testimony from witnesses that were called, and not making certain

motions and objections.  When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *Strickland, Supra*, 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066).

Complaints of uncalled witnesses and unoffered documents are disfavored and viewed with great caution as claims of ineffective assistance of counsel.  *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985).   "'Complaints of uncalled witnesses are not favored in federal habeas review,'" *United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1016 (7th Cir. 1987) (*quoting Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)); *see also Buckelew v. U.S.*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (allegations about possible testimony that might have been offered by a witness who was not called are viewed by the courts with great caution); *Brain v. United States*, 2011 WL 1343344 (E.D. Tenn. April 8, 2011) (claims of ineffective assistance of counsel predicated upon bare allegations of uncalled witnesses are not favored in 28 U.S.C. § 2255 proceedings and mere unsupported, unsubstantiated allegations about what testimony a potential witness might have given are too speculative to justify awarding extraordinary post-conviction relief under 28 U.S.C. § 2255).

The Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters v. Thompson*, 46 F.3d 1506, 1512 (11th Cir. 1995).  *See also Chandler*, 218 F.3d at 1314 n. 13.  Furthermore, the testimony of

witnesses is often speculative, so the defendant has a difficult task in showing actual prejudice that the testimony of a witness would have changed the entire outcome of a trial. *See Blackburn*, 750 F.2d at 500. A § 2255 petitioner's mere speculation that missing witnesses would have been helpful is insufficient to meet the burden of establishing ineffective assistance of counsel. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

In *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) the Eleventh Circuit commented on an argument made by petitioner's counsel asserting that the trial lawyer should have called some additional witnesses during the original trial. Habeas counsel however had only offered argument, not sworn affidavits or testimony. The Court noted that the petitioner had pointed only to unsworn statements taken from the uncalled witnesses. The witness testimony did not directly contradict any of the trial proof. The proffer only offered speculation that the missing witnesses would have been helpful. The Eleventh Circuit concluded that this kind of speculation is "insufficient to carry the burden of a habeas corpus petitioner." *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

In the instant petitioner, Sanchez has failed to provide any affidavits from any witnesses concerning the purportedly new testimony. The only proffer of how these witnesses might have testified comes from the petitioner's own self-serving allegations. Such speculation that these individuals would have provided exculpatory testimony is insufficient to establish that counsel were ineffective. *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir. 1985) (speculation that witnesses would have been helpful insufficient to carry petitioner's burden).

With regard to Sanchez's claims concerning objections and motions that Sanchez's lawyer did not make, a lawyer has no obligation to raise meritless issues. "Because a defendant's lawyer has an obligation to be truthful and forthright with the court, he has "no duty to make a frivolous

32

argument," *United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) (emphasis in original), and indeed is barred by the rules of professional ethics from doing so.  *See Smith v. Robbins*, 528 U.S. 259, 272 (2000); *Fuller v. United States*, 398 F.3d 644, 652 (7th Cir. 2005); *see also United States v. Q. uarry*, 60 F. App'x. 188, 190 (10th Cir. 2003) ("[C]counsel is not obligated to make factually or legally baseless arguments, no matter how strongly a client may regard the matter."); MODEL RULES OF PROF'L CONDUCT R. 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis . . . for doing so that is not frivolous.").

In the instant motion, Sanchez has failed to meet his burden of establishing deficient performance or resulting prejudice.  Sanchez has not shown that trial counsel acted unreasonably in their representation of Sanchez in this capital case.  Sanchez's claims concerning uncalled witness, or areas of testimony that went unexplored are speculative and unsubstantiated or completely contradicted by the record.  Assuming arguendo that Sanchez was able to establish that trial counsel's performance was constitutionally deficient, he has not established that he was prejudiced thereby.  To establish prejudice, Sanchez would have to establish that but for counsel's allegedly deficient action, the outcome of the proceeding would have been different.  This, Sanchez has not and indeed cannot establish.  The evidence of guilt in this case is so overwhelming that the correction of all of the alleged errors of counsel during the guilt phase would not have changed the jury's verdict.   Furthermore, the horrifying facts of this case, particularly the execution-style murders of two preschool aged boys, makes it highly unlikely Sanchez could have escaped the death penalty altogether, regardless of the quantity or quality of mitigation evidence.   The fact that Sanchez was able to escape the death penalty and receive life imprisonment for three of the five death penalty eligible counts is a testament to the outstanding performances of counsel.  As

Sanchez has failed to meet his burden of establishing that his counsel were ineffective, the instant motion should be denied.

A. <u>COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO ARGUE THAT COUNTS 7, 8, 9, AND 10 ARE DUPLICITOUS BECAUSE THESE COUNTS CHARGE A SINGLE OFFENSE AND ARE NOT DUPLICITOUS; COUNSEL CANNOT BE EXPECTED TO RAISE MERITLESS CHALLENGES TO A PROPERLY DRAFTED INDICTMENT (RESPONSE TO SANCHEZ ISSUE VII(D))</u>.

Petitioner claims that Counts Seven, Eight, Nine, and Ten of the Third Superseding Indictment are duplicitous and that counsel were ineffective in failing to challenge this duplicity. This claim is factually baseless and legally without merit.

An indictment is duplicitous when it charges two or more separate and distinct crimes in a single count. *See United States v. Burton*, 871 F.2d 1566, 1573 (11 Cir.1989). Even when a count of an indictment is duplicitous, it is only "impermissibly duplicitous" when the manner in which the count is charged "risks unfairness to the defendant." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981). Petitioner's duplicity claim fails on the merits because counts 7, 8, 9, and 10 do not charge two or more offenses in a single count.

Counts Seven, Eight, Nine, and Ten charge Petitioner Sanchez with using and carrying (and aiding and abetting such using and carrying) a firearm in furtherance of a crime of violence and a drug trafficking offense, and in the course of doing so causing death through the use of the firearm which death was a murder, in violation of 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2. Each count is based on the murder of an individual member of the Escobedo family on or about October 13, 2006, and refers to the charges for the underlying crime of violence and drug trafficking offense, which are charged in Counts Six and One of the Third Superseding Indictment, respectively. The counts differ in only one respect: the identity of the murder victim. At the

conclusion of each charge, the Indictment lists the applicable statutes of violation, 18 U.S.C. § 924(j)(1) and 18 U.S.C. § 2.

Section 924(j)(1) states: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life." To prove a violation of Section 924(j)(1), the Government would have to plead and prove a violation of 924(c). To prove a violation of 924(c), the Government would have to establish that the defendant used or carried a firearm during or in relation to a crime of violence or drug trafficking offense. The Indictment set forth the elements required to prove this offense which includes that the Petitioner violated section 924(c)(1) by using or carrying (or aided and abetted the using or carrying) a firearm during and in relation to a crime of violence or drug trafficking offense. *See United States v. Nguyen*, 155 F.3d 1219, 1226 (10th Cir. 1999). Of course the indictment would need to specify what the crime of violence or drug trafficking offense was, and so it specified that these corresponded to Counts Six and One, respectively. Section 924(j) provides an enhanced penalty when the possession of the firearm results in a death that is a murder as defined in Section 1111. Again, the Government would need to provide notice of this enhancement by pleading Section 1111 within the text of the count, and providing the specific definition of murder. The Government did so. An indictment cannot be duplicitous where, as herein, the Government carefully tracked the statutory language and charged one offense per count. *See Gonzalez-Lauzan v. United States*, No. 07-21144-CIV, 2008 WL 343492, at *13 (S.D. Fla. Feb. 5, 2008) (holding that a reference to 18 U.S.C. § 1111 within a count charging a violation of 18 U.S.C. § 924(j) did not render the count duplicitous as the text of § 924(j) specifically refers to § 1111 for the definition of murder).

Petitioner Sanchez claims that the counts are duplicitous as to the predicate offenses (crime of violence/drug trafficking offense).  Petitioner cites to no case in support of this sub-claim.   In truth, the undersigned could find no case to support their argument.  To the contrary, case law in this circuit supports the opposite conclusion.   In a case involving a charge of violating 18 U.S.C. § 641, the Eleventh Circuit squarely rejected the argument advanced by the Petitioner in the instant case, holding:

> Where a penal statute ... prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment ... the indictment may charge any or all of the acts conjunctively, in a single count, as constituting the same offense, and the government may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute. The conjunctive allegations do not render the indictment duplicitous.

*United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir.1989) (citations omitted).   In the instant case, the Government pled and proved conjunctive allegations, that the Petitioner used and carried the firearm in connection with a crime of violation and a drug trafficking offense.  Under Burton, this does not render the Indictment duplicitous. *See United States v. Wilk*, No. 04-60216-CR, 2005 WL 7863525, at *6–7 (S.D. Fla. Mar. 14, 2005), report and recommendation adopted, No. 04-60216-CR, 2005 WL 7863448 (S.D. Fla. Mar. 22, 2005).  The Petitioner's claim in this regard lacks merit.

In this case, the evidence established that the Petitioner used and carried a firearm during and in relation to carjacking and conspiracy to possess with the intent to distribute cocaine and in so doing used, or aided and abetted the use of, the firearm to kill four members of the Escobedo family.  These counts gave proper notice to the Petitioner of the crimes with which he was charged, and do not risk jury confusion or other unfairness to Petitioner. Indeed, the Court submitted the charge to the jury with a clear instruction regarding the applicable law. CR-DE 769 at 22-25.  The

36

Indictment was not duplicitous, and therefore no deficient performance or prejudice has been established arising from counsel's failure to challenge the indictment on that basis.   The Petitioner is thus entitled to no relief on this claim.

> B.      COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO OBJECT TO THE JURY INSTRUCTIONS REGARDING CERTAIN ELEMENTS OF COUNTS 7, 8, 9, AND 10 AS THE JURY WAS PROPERLY CHARGED AND COUNSEL CANNOT BE EXPECTED TO RAISE MERITLESS CHALLENGES TO PROPERLY DRAFTED JURY INSTRUCTIONS (RESPONSE TO SANCHEZ, ISSUE VII(D)).

Sanchez argues that the jury was not properly charged as to Counts Seven through Ten of the Third Superseding Indictment.  CR-DE 16-1 at 100.  Sanchez argues that the instruction to the jury that it could find murder based on the carjacking charge was improper because the indictment charged that murder occurred in furtherance of a robbery and neither carjacking nor drug trafficking are enumerated offenses under the federal murder statue, 18 U.S.C. § 1111.  CR-DE 16-1 at ¶310.      Sanchez further argues that the jury instructions were improper in that they did not require unanimity as to whether the jury found that the murders occurred in furtherance of a carjacking or a drug trafficking offense.  A review of the Third Superseding Indictment and the jury instructions illustrate that Sanchez is incorrect.

As Sanchez notes, in pertinent part, the Third Superseding Indictment charged that Sanchez and Troya:

> did knowingly carry and use a firearm during, and in relation to, a crime of violence, and a drug trafficking crime, for which they may be prosecuted in a Court of the United States, that is, armed carjacking, in violation of Title 18, United States Code, Section 2119, as set forth in Count Six of this Third Superseding Indictment, and conspiracy to possess with intent to distribute one or more controlled substances, in violation of Title 21, United States Code, Sections 841(a)(l) and 846, as set forth in Count One of this Third Superseding Indictment, respectively, which allegations are realleged and incorporated by reference herein, in violation of Title 18, United States Code, Section 924(c)(l), and in the course of this violation caused the death

of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Luis Damian Escobedo by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation, and in the perpetration of, and attempt to perpetrate, a robbery.

In violation of Title 18, United States Code, Sections 924(j)(1) and 2.

CR-DE 305 at 8 through 11.[21]  Thus, the Third Superseding Indictment unequivocally reflects that the law was violated in two different ways, by either committing a drug trafficking crime or a crime of violence.  Section 1111 is referenced for the definition of "murder" only.  Section 1111 is not charged in any of Counts Seven through Ten, and thus whether carjacking or drug trafficking crimes are predicate offenses of this statute is of no moment.

In keeping with the language of the Indictment, the Court specifically instructed the jury that "as a matter of law, the crime of carjacking is in fact classified as a crime of violence" and noted that the crime was set forth in Count 6 of the Third Superseding Indictment.  CR-DE 771 at 7538; *Id.* at 7542 (Court repeating to jury that carjacking is a crime of violence).[22]  Further, the Court instructed the jury on more than one occasion, that they had to be unanimous with regard to the crime of violence or the drug trafficking offense.  CR-DE 771 at 7543 (Court instructing jury: "[b]ut you must unanimously agree upon the way in which the defendant committed the violation"); *Id.* at 7544 (Court instructing the jury that if they "concluded that the Government had proven one of those other crimes beyond a reasonable doubt, I mean the crime of violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that finding."). The manner in which this case was charged and instructed was appropriate and proper.  *See e.g.,*

---

[21] As noted above, this was charged as to each victim.

[22] To the extent that Sanchez seems to be saying that because the word "robbery" is mentioned, such an offense should have been charged and instructed he is incorrect.  As noted, the two ways to commit this offense, that is, drug trafficking and carjacking were appropriately delineated.

*United States v. Young*, 248 F.3d 260, 274-75 (4th Cir. 2001). Counsel's failure to object to properly drafted jury instructions does not constitute ineffective assistance of counsel.

      C.      COUNSEL WAS NOT INEFFECTIVE FOR NOT OBJECTING TO THE MEDICAL EXAMINER EVIDENCE (RESPONSE TO SANCHEZ ISSUE V).

In Section V of his Motion, Sanchez essentially makes the argument that the testimony of a substitute medical examiner was inappropriately admitted into evidence without objection, and that his trial counsel were therefore ineffective. CV-DE 16-1 at 50-57. For the reasons explained below, however, Sanchez is incorrect.

At the guilt phase in this matter, Dr. Roger E. Mittleman, testified for the United States CR-DE 729 at 3355-3466.[23]  As noted by Sanchez, at a break during Dr. Mittleman's testimony, there was discussion about the fact that he had not been the pathologist who had conducted the autopsies in question, nor had he prepared the corresponding reports. (CR-DE 729 at 3395-96). Specifically, the Court noted that because there was binding precedent holding that the autopsy reports were business records, the defense was not objecting to Dr. Mittleman's testimony concerning those reports. (*Id.*).[24]

Sanchez takes the position that his trial counsel were ineffective because they failed to object to the admission of Dr. Mittleman's testimony and should have done so because such admission violated Sanchez's Sixth and Eighth Amendment rights and he was prejudiced by the testimony. Specifically, Sanchez now argues that trial counsel should have objected to the testimony on confrontation grounds based on *See Crawford v. Washington*, 541 U.S. at 68. In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment's Confrontation

---

[23] As correctly represented by Sanchez, this substitution was not opposed by his trial counsel. *See e.g.*, CR-DE 522; CR-DE 531; CR-DE 538.

[24] Citing to *United States v. Rosa*, 11 F.3d 315, 331 (2d Cir. 1993).

Clause prohibits the admission of "testimonial" statements unless the witness is unavailable and there was a prior opportunity for cross-examination. 541 U.S. 36, 68, 1374 (2004). Sanchez also argues that because of "heightened procedural safeguards," he is also entitled to relief under the Eighth Amendment given the punishment imposed in his case.

At the time that Sanchez and Troya went to trial, an autopsy report was considered a business record, as the district judge in this case had determined, and thus those reports were exempt from the Confrontation Clause. *See e.g., United States v. Rosa*, 11 F.3d 315, 331 (11th Cir. 1993), *accord Smith v. McDonough*, 2008 WL 2941149, *13 (S.D. Fla 2008). Although Sanchez does not reference the case, in 2012, the Eleventh Circuit decided *United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012), which held that autopsy reports constituted testimonial evidence given the particular Florida statutory framework and the related trial testimony of a medical examiner. *Id.* at 1231-32. To the extent that Sanchez would take the position that the law in this Circuit has changed and that his trial counsel should have anticipated this eventuality, he is patently incorrect.

As explained earlier, a claim of ineffective assistance of counsel has two components. "First, the defendant must show that counsel's performance was deficient," in that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense" in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 694. As mentioned, the Eleventh Circuit has referred to the first element as the "performance" prong and the second element as the "prejudice" prong. *See Reece v. United States*, 119 F.3d 1462, 1464 n.4 (11th Cir. 1997) (citations omitted). A court need not address both

40

components if the defendant makes an insufficient showing on one. *See Strickland*, 466 U.S. at 687.

"For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." *Putman v. Head*, 268 F.3d 1223, 1243 (11th Cir. 2001). Courts must be highly deferential in reviewing counsel's performance, and must apply the strong presumption that counsel's performance was reasonable. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (*en banc*).

With regard to issues such as the one presented by Sanchez here, a reviewing court must make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Additionally, "as an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999); *see also Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000) ("[W]e are not prepared to say categorically that counsel's failure to [preserve an argument] constituted prejudicial, ineffective nonfeasance while the law was still unsettled.").

In this case, these principles apply perforce. When this case was being litigated, the issue of whether *Crawford* applied to autopsy reports was unsettled at best, and there was ample case law noting the reports were business records and thus exempt from the Confrontation Clause. It is unclear what exactly Sanchez's counsel would have gained by even lodging an objection given the fact that there was case law - including one case cited by the district court here - that decided the matter against Sanchez.

41

Further, the fact that this issue was being contested in cases such as *Ignasiak* while Sanchez was being tried does not support Sanchez's argument that his counsel was constitutionally ineffective for failing to raise a Confrontation Clause objection.  While ignorance of well-defined legal principles is deemed inexcusable, an attorney is not liable for an error of judgment on an unsettled proposition of law.  *See Smith*, 170 F.3d at 1054-55; *see e.g., Guyton v. United States*, 447 Fed. Appx. 136 (11th Cir. 2011) (because the question of whether Florida extortion statute was non-generic was unsettled at the time of sentencing, ineffective assistance claim failed). Therefore, Sanchez's trial counsel were far from constitutionally deficient when they did not challenge the use of the autopsy reports and related testimony.

Significantly, as noted above, if a defendant fails to establish the deficient performance prong, the Court need not analyze the prejudice prong, and vice versa.  *See Philmore v. McNeil*, 575 F.3d 1251, 1261 (11th Cir. 2009).  However, even if Sanchez were to satisfy the first prong, which as illustrated above he cannot, it is also evident that Sanchez's prejudice argument is likewise flawed.  Sanchez ostensibly complains about the fact that the Medical Examiner testified about how the murders were conducted.[25]   However, he is really complaining about the fact that the Medical Examiner was allowed to testify concerning the deaths of two small children and both their parents who were then unceremoniously left on the side of a Florida public highway.  It makes no difference in terms of prejudice whether the Medical Examiner was allowed to testify that the children were executed at close range.  The fact remains that ample testimony was admitted

---

[25] Apparently in an attempt to sully Dr. Mittleman before this Court, Sanchez casts various undeveloped aspersions against his reputation.  CV-DE 16-1 at 52.  But the fact remains that as explained above, none of these undeveloped arguments help Sanchez because the prejudice of which he complains is not that deaths occurred, but that amongst the four individuals killed, there were two small children who were shot and left on the side of a public road.

concerning the fact that two small children were killed by gunfire—and left on the roadway apparently shielded, to some extent, by their mother's body.[26]  The very nature of this case given the victims, and the other evidence, made this a very strong case for the United States.  Although the United States wanted to make sure it met its burden, the fact remains that it was hardly an ambiguity or a close question in the trial whether or not the individuals who shot these children and their parents intended to kill them.[27]

Therefore, for all of the reasons, Sanchez cannot prevail on this claim.

D.    COUNSEL WAS NOT INEFFECTIVE IN HIS HANDLING OF THE GOVERNMENT'S TOOLMARK EXPERT WITNESSES (RESPONSE TO SANCHEZ ISSUE VII(B)).

Sanchez claims in Issue VII(B) that his trial counsel were ineffective in the investigation and challenge of the Government's tool mark evidence (CV-DE 16-1 at 88-94). In detail, Sanchez complains that his trial counsel should have conducted a comprehensive investigation of the firearms evidence, and challenged the admissibility of such evidence through a pre-trial motion filed under *Daubert v. Merrill Pharmaceuticals Inc.*, 509 U.S. 579 (1993).  (*Id.*). Sanchez further argues that had a *Daubert* hearing failed to result in the inadmissibility of the tool mark evidence, counsel could have challenged the government's evidence "by presenting an expert who could

---

[26] *See e.g.*, CR-DE 728:3112-27 (eyewitness who discovered bodies on the side of the road describing what looked like a mother holding a child and a small boy who appeared to be hiding under her legs); CR-DE 728 at 3131(Florida Trooper testifying that he originally thought it was three bodies but upon closer inspection saw a small child); CR-DE 728 at 3207 (law enforcement discussing photographs taken of crime scene admitted into evidence).

[27] Sanchez's complaint that his trial counsel was ineffective for not challenging the medical examiner by for example, cross-examining him, is like-wise meritless.  None of the trial counsel did so.  CR-DE 729 at 3466.  One very logical reason was that they all understood that the jury would hear about these children being killed a number of times and wanted to lessen the repetition of that testimony.

explain the inadequacies of the tool mark identifications in this case and by thoroughly cross-examining the government's experts on these grounds." (CV-DE 16-1 at 91).

With regard to the unheld *Daubert* hearing, Petitioner is correct that no *Daubert* motion was filed pre-trial by any defense attorney as to the opinions cited by any of the government's firearms experts. (CR-DE 757 at 6268-70). This omission, and the attempt at a belated oral *Daubert* motion, however, does not establish that the defense attorney efforts were ineffective for purposes of Sixth Amendment analysis. Even if counsel had filed a *Daubert* motion at the appropriate time, there is no guarantee that a *Daubert* hearing would have been held as a matter of right. Formal *Daubert* hearings are not required in every case. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) ("*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses"). Moreover, contrary to Petitioner's assumption that he would have prevailed at a *Daubert* hearing resulting in the exclusion of the firearms' testimony, the underlying methodology of tool mark identification and ballistics identification has been well established and courts have repeatedly accepted this type of expert testimony. *See United States v. Ashburn*, 88 F. Supp.3d 239 (E.D.N.Y. 2015) (citing *United States v. Otero*, 849 F. Supp.2d 425, 427 (D. N.J. 2012)); *United States v. Taylor*, 663 F.Supp.2d 1170, 1179 (D. N.M. 2009); *United States v. Diaz*, 2007 WL 485967 (N.D. Cal. 2007); *United States v. Montiero*, 407 F. Supp. 2d 351, 365-72 (D. Mass. 2006) (Counsel does not perform deficiently when he or she fails to file motions regarding meritless issues). In sum, had a *Daubert* motion been timely filed in this case, it would have been denied. And as such motion would have been denied had it been filed, Petitioner cannot show that he was prejudiced by the lack of filing. Inasmuch as the outcome would have been the same even if trial counsel had filed a *Daubert*

44

challenge, Sanchez's current claim must fail because of the lack of deficient performance and prejudice. The failure to seek a *Daubert* hearing did not constitute ineffectiveness.[28]

Once the Court denied Petitioner's oral *Daubert* motion, counsel was faced with a choice—they could thoroughly challenge the opinions and methodologies of the government experts via a wide-ranging and detailed cross-examination or they could bolster the validity of tool marks by calling their own expert to testify. Sanchez's counsel chose the former and engaged in a challenge to the firearms' evidence.

As a preliminary matter, counsel is not ineffective for failing to call an expert witness where counsel's cross-examination of the government's expert witness covered much of the same ground the uncalled expert would have covered. *See United States v. McGill*, 11 F.3d 223, 227-228 (11th Cir. 1993). This was a strategic decision. We know that this was a strategic decision, rather than a necessity caused by poor planning because prior to trial the United States received notification from Sanchez's trial counsel that they had retained an expert in firearms' ballistics analysis. See USA Exh. 3, Reciprocal Discovery received by the prosecution concerning Dennis McGuire, ballistics expert.

When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *Strickland*, *Supra*, 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support

---

[28] The failure to hold a *Daubert* hearing was not asserted as an issue on appeal, and the petition fails to assert that appellate counsel was ineffective for failing to claim that the government firearms' identification testimony was inadmissible.

the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–91).

Accordingly, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable…. This recognizes that "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine the lawyer's mental processes underlying the strategy,'" but instead must simply determine whether the course actually taken by counsel might have been reasonable. *Crawford*, *Supra*, 311 F.3d at 1314 (citations omitted; emphasis added).

Government tool mark expert Allison Quereau linked an AK-47 firearm recovered during a search warrant at Garden Court (GX 202m) and eight of eleven casings recovered from a shooting on Mercer Avenue in West Palm Beach, FL (GXs. 602A, 602B and 602C) (CR-DE 757 at 6287). Specifically, she testified that she identified the AK-47 recovered from "Thug Mansion" as having fired eight of the cases recovered from Mercer Avenue. (*Id.*). The AK-47 was not a weapon used in any of the murders. Contrary to the petition filed here, the Government did not proceed with the firearms' linkage testimony until it had established the *Daubert* foundation for admissibility.[29] (CR-DE 757 at 6265 – 6270; 6295-97). *See United States v. Otero*, 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence). Importantly, the trial judge afforded defense counsel the opportunity to *voir dire* Quereau on aspects relating to her qualifications, and presumably the underlying science prior to the admission of her expert opinion (*Id.* at 6269-70), but defense counsel opted to wait until cross-examination to make any challenges.

---

[29] *See* Allison Quereau predicate questions for admissibility of expert opinion, CR-DE 757 at 6256-6270; *and see* Marc Chapman predications questions for admissibility, CR-DE 764 at 6599-6604.

Mr. Murrell, penalty counsel for defendant Sanchez, conducted extensive cross-examination of government expert Allison Quereau relating to her qualifications and the science of firearms examination. See e.g., CR-DE 60 at 6354-6377. Trailing defense counsel, Troya attorney Ruben Garcia, focused his questions on the terminology Quereau used, specifically the term "characteristics" and the limits of her conclusions. CR-DE 757 at 6378-6380. Those examinations brought into focus for the jury a challenge to the underlying science of tool mark identification, and the alleged uncertainty of identifying the AK-47 to the exclusion of every other AK-47 in the world.

This joint cross-examination was not constitutionally ineffective. "[W]hen an attorney "substantially impeache[s]" the witness, no claim for ineffectiveness can succeed unless the petitioner comes forward with "specific information" which "would have added to the impeachment of the State's witnesses." *Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985); *see also Card v. Dugger*, 911 F.2d 1494, 1506 (11th Cir.1990).

Government expert witness Marc Chapman testified as to the long-term acceptability of the science of firearms and tool mark identification, that its known error or validation rate was 1%, and that he had been trained and qualified as an expert in this field seventy times in state court and one preceding time in federal court. (CR-DE 764 at 6600--6603). *See United States v. Otero*, 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence). Defense counsel deferred any *voir dire* on the witness's qualifications or the field of examination until cross-examination. (*Id.* at 6604). Chapman testified that he examined nine millimeter casings recovered from the homicide scene and determined that they were all fired from the same (unrecovered) weapon (CR-DE 764 at 6607). He also testified that when he compared three of those casings to hundreds of live rounds found in

the Garden Court search warrant, he determined that the tool marks on the casings matched the tool marks on two of the live rounds. (*Id.* at 6694). Chapman voiced this conclusion by stating that it was his opinion that within a reasonable degree of scientific certainty the same unknown tool made the tool markings on three of the .9mm casings from the homicide scene and two live rounds found at Garden Court (*Id.*).   Chapman also testified that he examined seven individual forty caliber casings recovered separately from the same homicide scene and determined that they were all fired from the same firearm, a second (unrecovered) weapon.  (CR-DE 764 at 6609). Chapman further testified that two of those homicide forty caliber casings bore tool marks that had individual characteristics that were identical to one live round found at Garden Court. (*Id.* at 6695) He expressed this opinion by stating that within a reasonable degree of scientific certainty it was his opinion that the tool markings on two of the forty caliber casings and one live round recovered from garden Court were made by the same unknown tool (*Id.*)   These identifications were based on microscopic analysis and comparison of breach face marks and firing pin impressions or markings. (*Id.*).

Murrell, Sanchez penalty counsel, initially conducted the cross-examination of government tool mark expert Chapman. (CR-DE 764 at 6660).  Murrell's cross-examination challenged Chapman's lack of accreditation, his limited experience, his laboratory's funding by law enforcement, that his professional organization does not require testing or proficiency for competence, (CR-DE 764 at 6663-65). Murrell pointed out to the jury that Chapman's two published articles were unrelated to tool mark identification, that Chapman's report failed to disclose the methods he used to conduct his comparisons, and that neither his report nor his employing laboratory has any procedure for determining or disclosing known error rates or percentages of certainty for their work. (*Id.* at 6673-6683).  Murrell also conducted an effective

48

cross-examination utilizing a learned journal in Chapman's field of professional work and pointed out that Chapman had not read the latest report, and that he and his laboratory were not in compliance with many of the recommended best practices published in the report (*Id.* at 6675-6680). Murrell also pointed out that all of the tool markings could have been made by a gun chamber, not just a magazine lip as raised on direct. (*Id.* , compare 6641 with 6668)[30] Finally, Murrell pointed out that Chapman could not identify the actual tool that made the marks, nor could his analysis establish who was holding either of the two weapons that had fired the recovered casings (*Id.* at 6667, 6691-92).

After Murrell's cross-examination pointed out the expert's limited experience, and the limitations of his examinations and opinion, it was up to the jury to make credibility determinations. A detailed review of the trial transcript of Murrell's examination indicates that it was thoroughly conducted and touched on areas of training, bias, expertise, and the lack of protocols to ensure accuracy. The examination raised questions for the jury concerning the credibility of the science and the certainty of the expert's opinions. After this thorough examination, no other defense attorney conducted additional cross-examination, notably because none was needed. (CR-DE 764 at 6692). The substantial impeachment of Chapman's testimony by Sanchez's counsel makes any challenge of alleged ineffectiveness particularly unworthy of being sustained. *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985); *see also Card v. Dugger*, 911 F.2d 1494, 1506 (11th Cir.1990).

The proper test of whether or not a movant has been denied effective representation is judged by whether or not some reasonable lawyer would have acted similarly at trial. And under

---

[30] The single live .40 caliber round about which Chapman testified had been located inside gun magazine #5 found during the Garden Court search (CR-DE 764 at 6641).

this test, trial counsel's conduct was constitutionally sufficient.  "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." *Johnson v. Nagle*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999), *quoting White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir.1992).

Sanchez also complains that the failure to challenge the firearms' evidence was magnified because ostensibly, the experts' testimony was the only evidence in the trial record linking Sanchez to the Haverhill, Suwanee and Mercer Avenue shootings. (CV-DE 16-1 at 167, ¶ 532.  This is not accurate. Government witness Kevin Vetere described the involvement of Troya, Sanchez and others in the Haverhill shooting.  (CR-DE 753 at 5636-48).  Vetere described Troya's involvement in the Mercer Avenue shooting (*Id.*  at 5669-72).   Vetere also described Sanchez's admitted involvement in using the AK-47 to shoot up a house in the Westgate area. (*Id.*  at 5672)[31]  Finally, Maria Lopez, Sanchez's former girlfriend also testified that Sanchez had discussed with her firing a gun into a house in Westgate because he believed a friend of hers was inside the house (CR-DE 758 at 6392).

Finally, Sanchez claims that his attorney should have countered the Government's tool mark evidence by presenting a defense expert "who could explain the inadequacies of the tool mark identifications in this case". (CV-DE 16-1 at 91).  Even now, seven years after the trial of this matter, Sanchez is unable to name an expert who would testify in such a manner or to provide

---

[31] Suwanee Avenue is located near Westgate Avenue in West Palm Beach.  (Testimony of Angela Culpepper, CR-DE 757 at 6210).

affidavits or an expert's report which would counter the Government's tool mark evidence.  Even assuming arguendo that Sanchez now has found a particular firearms' expert to counter the government's evidence is of no moment.  Sanchez cannot prevail simply because he now has found, or could find, new experts who have come to different conclusions than the government's firearms experts.  *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

Sanchez's trial counsel made multiple objections to the admissibility of the government's tool mark evidence, and vigorously cross-examined the government's tool mark expert witnesses. Although Sanchez's attorneys retained and noticed a comparative witness prior to trial, they made a strategic decision not to call him and to rely on their very effective cross-examination.  Their performance with regard to the tool mark evidence was not deficient and did not constitute ineffective assistance of counsel.

    E.    <u>COUNSEL WAS NOT INEFFECTIVE IN DECIDING NOT TO CALL A CELLULAR TELEPHONE EXPERT (RESPONSE TO SANCHEZ ISSUE VII(C))</u>.

Petitioner complains that his trial counsel were ineffective for failing to retain and to call a cellular telephone tracking expert who could testify about the limits of the technology and the weakness of the government's summaries of cell phone tower traffic activity.[32]  (CV-DE 16-1 at

---

[32] Sanchez further argues that the government knowingly mislead the jury about the nature of its evidence.  This claim of government misconduct is procedurally barred as it was not raised on direct appeal and Sanchez has not established cause and prejudice for this lapse.  Even if this claim

94-98).    The United States in fact received pre-trial notice from Sanchez's trial attorneys that a cell phone expert had been retained by the defense.  *See e.g.*, USA Exh. 4 hereto, Jeffrey Fischback, cellular telephone expert notice.   As acknowledged by Petitioner Sanchez (CV-DE 16-1 at 96), Sanchez's trial team made a strategic decision not to go forward with their cellular telephone expert when they realized that the Government had decided not to call an expert of their own.  (CR-DE 713 at 2747-49; CR-DE 756 at 6014).

Instead of utilizing a cellular telephone expert, the government's trial evidence consisted of placing the cellular telephone business records, including cellular tower location data, in evidence through records custodians Larry Smith [Metro PCS] (CR-DE 756 at 5990-6053, (GXs. 701.3, 702, 705, 705.1, 70.2, 710 and 710.1) and CR-DE 757 at 6078—6091; Sue Johnson [T-Mobile]) CR-DE 757 at 6118—6162) (GXs 605.1 through 605.6); Jennifer Varney [Verizon] (CR-DE 758 at 6503—6547) (GXs 706, 708, 709, 709.1, 765).   The government did not tender the records custodians as experts or argue that they were present to do anything other than explain the business records of the cellular providers.  Moreover, each of the records custodians conceded that the business records relating to cell tower activity did not pinpoint the actual location of a person placing a call. (Smith/Metro PCS at CR-DE 756 at 6011-12).  Smith even conceded that the closest tower might not be the one utilized to transmit a call if the tower was overloaded with activity, causing the call to be bumped to another nearby tower.  (*Id.*  at 6101-04).  Sue Johnson, the T-Mobile records custodian, did not testify to anything other than identifying the tower that transmitted a call; she conceded she did not know what happened technically when a cellular tower

---

were not procedurally barred it would fail on the merits.  Sanchez provides no record citations in support of this claim.  Indeed, for the reasons stated herein, the record flatly contradicts Sanchez's claim that the Government misled the jury into believing that cellular tower data could pinpoint a phone's exact location.

was overloaded with cellular traffic. (CR-DE 757 at 6156-6158).  The Verizon representative, Jennifer Varney, admitted that she did not know the geographical range of Verizon's cell towers (CR-DE 758 at 6529-30,6545); and that she did not know if any particular call hit the tower closest to the caller's location. (*Id.*).

The Government summarized this cellular tower data through summary charts, GXs 760.1 through 760.12, which were admitted during the testimony of Agent Weeks. (CR-DE 764 at 6703-6824 and GXs 760.1 through 760.12).  In his testimony, Weeks admitted that the government's summary charts merely showed the general geographic location of the various cellular towers that carried calls between various parties between October 12, 2006 and October 13, 2006.  (CR-DE 764 at 6703-6824).  Moreover, Sanchez trial counsel engaged in a very extensive *voir dire* on certain charts that pointed out the limitations of what the charts did and did not summarize.  (CR-DE 764 at 6740-6745).

Confrontation by Sanchez's defense counsel, either via *voir dire* or regular cross-examination, made apparent the limitations of the government's evidence, (*See* CR-DE 756 at 6007—6011; and 6094—6105), particularly that the records did not pinpoint the caller's actual location.  Both the direct examination and cross-examinations made clear that the government's summary charts of the cellular tower records merely summarized the business records, that is, the cell towers and their geographical location.

The attack on counsel's alleged incompetence fails to include an offer of proof or an affidavit from Jeff Fischback, or any other expert, showing that that the government's evidence was inaccurate, i.e., that the business records it had summarized were inaccurate in any way, or that counsel's cross-examination was insufficient in this regard.  The failure to directly contradict the government's evidence on this point--not the exact location of the caller, but the geographical

location of the cellular towers that carried the calls--is fatal to Sanchez's claim. A habeas petitioner who claims that his attorneys were ineffective at trial because they failed to call certain persons as witnesses must prove that the proposed witnesses would have testified favorably to his defense. *Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985).   Sanchez has made no record proffer that Fischback, or any other expert, would have contradicted the trial evidence and therefore he has failed to make a prima facie showing on this claim.   Although stated in the previous section, it bears repeating that Sanchez cannot prevail simply because he now has found, or could find, new experts who have contradicted the government's evidence.  *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

Even assuming arguendo that Sanchez had submitted the same Fischback affidavit as submitted by co-defendant Troya in support of his own 2255, Fischback's purported testimony would have made no points more significant than those raised by Sanchez's counsel on cross-examination.  *See generally, United States v. McGill*, 11 F.3d 223, 227-28 (1st Cir. 1993) (noting trial counsel not ineffective for failing to call rebuttal expert where skillful cross-examination established the same points the uncalled expert would have raised).   Trial counsel were not ineffective in deciding not to call an expert following the cross-examinations of Agent Weeks and the records custodians.  First of all, no expert was needed as the limits of the business records were pointed out to the jury during cross-examination.   Second of all, any further expert testimony

would have been redundant following counsel's skillful cross-examination, which effectively pointed out the limits of the cellular tower records.

Sanchez's trial counsel made multiple objections to and vigorously cross-examined the government's cellular tower location evidence. Although Sanchez's attorneys retained and noticed an expert witness in this area prior to trial, they made a strategic decision not to call him and to rely on their very effective cross-examinations. Their performance with regard to the cellular tower location evidence was not deficient. Sanchez has therefore not established that the outcome of the trial would have been different had this mystery expert been called. As such, Sanchez has failed to meet his burden of establishing constitutionally deficient representation with regard to his lawyers' handling of the cellular telephone tower location evidence.

F. PETITIONER HAS NOT ESTABLISHED THAT HIS COUNSEL WAS INEFFECTIVE WITH REGARD TO THE INVESTIGATION OF THE UNCHARGED SHOOTINGS (RESPONSE TO SANCHEZ ISSUE VIIII(I)).

Petitioner Sanchez, in Section VIII (I) of his 2255 motion, alleges that his counsel was ineffective for failing to investigate, challenge, and mitigate evidence offered in aggravation namely, the uncharged shootings on Suwannee Drive, Mercer Avenue, and Haverhill Road. See CV-DE 16-1 at 164-69. Specifically, Petitioner Sanchez argues that had counsel investigated the circumstances of these events, counsel could have established that Sanchez "was not involved or that he was acting under the control of others if he was involved." CV-DE 16-1 at 167. Sanchez also claims that his lawyer was ineffective for failing to introduce evidence that Sanchez's intellectual functioning impeded him "from coming up with and planning acts on his own, causing him to act without considering the consequences of his behavior." CV-DE 16-168.

Within the context of defense strategies at the trial level, it has been recognized that "an attorney has the duty to consult with his client on important decisions." *Lewis v. Alexander*, 11

F.3d 1349, 1353 (6th Cir. 1993).  Counsel, however, "may exercise his professional judgment with respect to the viability of certain defenses and evidentiary matters without running afoul of the Sixth Amendment."  *Id.*  at 1343 54.  Additionally, "[a] petitioner cannot succeed on a § 2255 motion by simply making the bare allegation that her attorney should have done more."  *Anderson v. United States*, 468 F.Supp.2d 780, 786 (D. Md. 2007).  In *Streeter v. United States*, 335 Fed. Appx. 859, at 863 864 (11th Cir. 2009) the Court explained that "[W]here the record is incomplete or unclear about [counsel]'s actions, we will presume that [s]he did what [s]he should have done, and that [s]he exercised reasonable professional judgment." (internal citations and quotation marks omitted).  To overcome that presumption, Petitioner must demonstrate that "no competent counsel would have taken the action that his counsel did take."  *Id.*   While it is true that trial counsel "has a duty to conduct reasonable investigations or to make a reasonable decision that renders a particular investigation unnecessary," there exists "no absolute duty to investigate particular facts or a certain line of defense."  *See Id.*  (*citing Strickland*, 466 U.S. at 691).  However, a complete failure to investigate may constitute deficient performance of counsel in certain circumstances. *See Fugate v. Head*, 261 F.3d 1206, 1217 (11th Cir. 2001).

Complaints of uncalled witnesses are disfavored and viewed with great caution as claims of ineffective assistance of counsel.  *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985).   "'Complaints of uncalled witnesses are not favored in federal habeas review,'" *United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1016 (7th Cir. 1987) (*quoting Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)); *see also Buckelew v. U.S.*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (allegations about possible testimony that might have been offered by a witness who was not called are viewed by the courts with great caution); *Brain v. United States*, 2011 WL 1343344 (E.D. Tenn. April 8, 2011) (claims of

ineffective assistance of counsel predicated upon bare allegations of uncalled witnesses are not favored in 28 U.S.C. § 2255 proceedings and mere unsupported, unsubstantiated allegations about what testimony a potential witness might have given are too speculative to justify awarding extraordinary post-conviction relief under 28 U.S.C. § 2255).  In addition, the Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters*, 46 F.3d at 1512); *see also, Chandler*, 218 F.3d at 1314 n. 13. Furthermore, the testimony of witnesses is often speculative, so the defendant has a difficult task in showing actual prejudice that the testimony of a witness would have changed the entire outcome of a trial. *See Blackburn*, 750 F.2d at 500.

Sanchez has produced no affidavits or expert reports to support his specific claim of intellectual impairment.  Thus, his claim that his lawyer was ineffective for failing to introduce such evidence is speculative, at best.  Furthermore, Sanchez has offered no affidavits from witnesses who could contradict the overwhelming evidence of Sanchez's involvement in the uncharged shootings.

During the guilt phase of the trial, Government witness Kevin Vetere testified that he had a conversation with Sanchez about a shooting involving the AK 47.  (CR-DE 753 at 5671, line 14-5672, line 11).  Vetere testified that he and Sanchez had been walking in the Westgate area of West Palm Beach when Sanchez began acting parano*Id.*  *Id.*  at 5672, lines 12-19. Vetere testified that when he asked Sanchez why he was acting so paranoid, Sanchez told him that he (Sanchez) had used an AK 47 to shoot up a house in the West Gate area and a man was shot as a result.  *Id.*  at 5672, line 19 –5673, line 19.  Vetere's testimony concerning the Westgate shooting was corroborated by the testimony of law enforcement officers who responded to a shooting at 1305

57

Suwannee Drive, in the West Gate Area on April 28, 2006.  Angela Culpepper, a crime scene specialist with the Palm Beach County Sheriff's office, testified that in the early morning hours of April 28, 2006, she responded to a call of shots fired at 1305 Suwannee Drive, in the Westgate area.  CR-DE 757 at 6208, line 3 –6209, line 21.  Culpepper testified that two residences were affected by the shooting, and that she found 16 bullet casings in front of the residence on Suwannee Drive.  *Id.* at 6209, line 11 –6212, line 22.  Neil Sielinski, a crime scene investigator with the Palm Beach County Sheriff's Office, also responded to the shooting at Suwannee, and testified as to the bullet holes in the residences, bullets that were recovered from the residence, and blood on the floor of one of the residences.  *Id.* at 6219- 6245.  Brandon Orr, who was working at the time as an officer with the Palm Beach County Sheriff's Office, testified that a man had been shot in the leg during the shooting at Suwanee on April 28, 2006, and that he had arranged for emergency transport for the shooting victim.  *Id.* at 6246-6255.

Maria Lopez, the mother of Sanchez's child, testified during the guilt phase that Sanchez had confessed to a shooting in the Westgate area, indicating that he had shot at a house because he (Sanchez) believed that a friend of Lopez's was inside.  CR-DE 758 at 6389, line 20 – 6392, line 12.

Vetere also testified that Troya had spoken about using an AK 47 to shoot up a house on Mercer Avenue after Troya was released from prison.  Vetere testified that Troya believed that a co-defendant who had cooperated against Troya lived in that house.  CR-DE 753 at 5669, line 23 –5671, line 3.  Vetere's testimony was also corroborated by several additional witness and items of evidence.

Officer Khaled Ghumrawi, of the West Palm Beach Police Department, testified that on April 28,2006, he responded to a call indicating shots fired at a house located at 1901 Mercer

58

Avenue.  CR-DE 757 at 6162, line 3 –6163, line 23.  This is the same date as the Suwannee shooting.  Officer Ghumrawi testified that a mother and two children were in the home at the time of the shooting.  *Id.*  at 6164, lines 9 – 12.  Officer Ghumrawi testified that he saw firearm casings in the street near the home and called a crime scene investigator.  *Id.*  at 6163, line 24 –6164, line 6.

Tracy Haynes, a crime scene investigator with the West Palm Beach police also responded to the shooting at 1901 Mercer Avenue.  *Id.*  at 6169, line 4 –6170, line 16.  Haynes testified that she collected 11 casings, 2 projectiles, and took photos of 12 projectile strikes in and around the home.  *Id.*  at 6171, line 1 –6172, line 23.  Haynes testified that there were three bullet holes in the door of the residence and 7 bullet holes in the stucco exterior of the home.  *Id.*  at 6180, lines 1- 19.  Haynes further testified that three of the bullets went into the interior of the home.  *Id.*  at 6186, lines 1- 22.  Two of these bullets were recovered—on from the kitchen and one from the living room near the couch.  *Id.*  at 6187, line 10 – 6189, line 4.

The government recovered an AK 47 firearm from the execution of the search warrant on "Thug Mansion", the residence shared by Varela, Troya, Sanchez, and Vetere.   This firearm was introduced as evidence during the guilt phase of the trial, and was one of the firearms listed in Count 14 of the Third Superseding Indictment, which Count charged the Petitioners Troya and Sanchez with possession of a firearm subsequent to a felony conviction. CR-DE 305.

During the guilt phase of the trial, the Government called firearms and tool mark expert Allison Quereau, who testified that she had examined the AK 47 recovered from "Thug Mansion", as well as bullet and casings recovered from the Mercer and Suwanee crime scenes.  Quereau testified that she was able to identify eight of the cartridges from the Mercer Avenue crime scene as having been fired from the AK 47 recovered from thug mansion.  CR-DE 758 at 6286-87.

Quereau testified that she was able to identify eight of the cartridges from the Suwannee Drive crime scene as having been fired from the AK 47 recovered from thug mansion. *Id.* at 6341, line 18 –6344, line 21. Quereau testified that she six additional cartridges from the Suwannee Drive crime scene were at least cycled through the AK 47 recovered from "Thug Mansion". *Id.* at 6346, lines 3-7.

During the guilt phase, government witness Kevin Vetere testified that he witnessed Troya, who was wearing a distinctive wig with long, black dreadlocks, use a 9 mm handgun to shoot from a moving vehicle into another moving vehicle, gold in color with a Hurricane license plate, on Haverhill Road. CR-DE 753 at 5625, line 4 – 5630, Line 3; 5634, line 12- 5645, line 6. Vetere, Varela, Sanchez, and Troya were all present in the vehicle when this shooting occurred, and believed the car they were shooting at had been used to case "Pimp Plaza", a townhouse where Varela and Troya lived and stored narcotics. Vetere identified the wig worn by Troya as the same wig found during the search of the residence shared by Varela, Troya, and Sanchez. *Id.* at 5641, lines 8-20.

Inspector Rodon of the Palm Beach County Sheriff's Office testified that on September 11, 2006, she had responded to a call concerning a drive by shooting on Haverhill Road. CR-DE 757 at 6190, lines 8 – 6191, line 8. Rodon observed the car that had been shot at and identified bullet holes in the vehicle, the description of which matched the description given by Kevin Vetere. Rodon then collected eleven casings from the scene and identified them as 9mm caliber casings. *Id.* at 6203, line 21 –6204, line 14. Deputy Jeff Cunningham of the Palm Beach County Sheriff's Office testified that the woman who was driving the other vehicle had been shot in the thigh. CR-DE 758 at 6395-6397.

The evidence of Sanchez's involvement in these shootings is very strong. Although Sanchez claims that his lawyer failed to investigate these shootings, he has submitted no evidence, no cites to the record, in support of his allegation that his counsel's investigation was ineffective or non-existent. Sanchez fails to establish what additional investigation might have accomplished. He has submitted no affidavits from witnesses or scientific tests which contradict the evidence at trial. Sanchez's claim of deficient performance with regard to the uncharged shootings is speculative, at best.

Even if Petitioner was able to establish that counsel's investigation of the shootings was constitutionally deficient, Petitioner has not established that he was prejudiced thereby. Given the strength of the government's case for aggravation and the brutal nature of Sanchez's crimes, Sanchez has not and indeed cannot establish that additional investigation concerning the uncharged shootings would have resulted in a lesser sentence. *See Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1252 (11th Cir. 2009).

As Petitioner has established neither deficient performance nor resulting prejudice, Petitioner's claim concerning ineffective assistance of counsel and the investigation of the uncharged shootings should be denied.

G. PETITIONER HAS NOT ESTABLISHED THAT HIS TRIAL COUNSEL WERE CONSTITUTIONALLY INEFFECTIVE IN THEIR SELECTION AND COMMUNICATION WITH THEIR MITIGATION SPECIALIST (RESPONSE TO SANCHEZ ISSUES VIII(A)(2) & VIII (F)).

Sanchez claims that his trial counsel "failed to provide the mitigation specialist with adequate guidance about which witnesses she should contact, what subjects she should explore with these witnesses, and what themes and topics were critical to develop for presentation to the penalty phase jury". CR-DE 16-1 at 109. Sanchez provides no evidence—no affidavits or cites to the record—to support this claim.

Sanchez further claims that his lawyer was ineffective for delegating "nearly all responsibility" for the selection of and communications with experts to the mitigation specialist. (CV-DE 16-1 at 150). Again, Sanchez provides no support for this allegation. Sanchez provides no proof that such a delegation occurred and does not establish that he was negatively affected, in any way, by this purported delegation.

Sanchez further complains that part of his attorney's ineffectiveness was the failure to secure a Spanish-speaking mitigation specialist to aid in the investigation and preparation of the defense mitigation case. There has been no allegation or showing that the family-provided Spanish speakers did not accurately translate information being communicated during the mitigation investigation. Furthermore, the record belies Sanchez's claim that his mitigation specialist was unable to communicate with mitigation witnesses. Penalty counsel called family witnesses, and friend witnesses; many mitigating factors were found by the jury as a result of the evidence submitted through these witnesses. Moreover, there has been no substantive description as to the content of any information that could have been provided by a family member or acquaintance had counsel employed a Spanish-speaking mitigation specialist. On the record before it the Court has no basis on which to conclude that there is a reasonable probability that this unidentified information would have resulted in a different jury determination. *See, e.g., Floyd*, 638 Fed. Appx. at 915 (11th Cir. 2016) (noting that 2255 petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."). Sanchez has failed to establish either deficient performance or resulting prejudice with regard to counsel's utilization of a non-Spanish speaking mitigation expert.

For all these reasons, Sanchez's claim that his lawyer was ineffective in his selection of and communications with the mitigation specialist must be denied.

H.   COUNSEL WAS NOT INEFFECTIVE IN HIS INVESTIGATION AND PRESENTATION OF MITIGATION WITNESSES (RESPONSE TO SANCHEZ ISSUE VIII(A), (B), (C), (D), (F) & (G)).

Sanchez claims that his attorneys were ineffective in their investigation, preparation, and presentation of the mitigation case.  Specifically, Petitioner claims that his penalty counsel Murrell's deficiency resulted in the omission of evidence concerning Sanchez's upbringing and how this affected his psychological development (Sanchez Issue VIII(A)) (CV-DE 16-1 at 107-128 (¶¶ 332-410)); Sanchez's childhood experiences--including a tricycle accident, taking his brother's seizure medications, and exposure to pesticides--"might" have resulted in neuropsychological impairments that effected his behavior and brain functioning (Sanchez Issue VIII (B) (CV-DE 16-1 at 131); Sanchez's childhood exposure to community violence and extreme family trauma and how this resulted in psychiatric disorders including depression, anxiety, hyperactivity and substance abuse (Sanchez Issue VIII (C)) (CV-DE 16-1at 134, ¶ 433); Sanchez's intellectual disability and its effect on Sanchez's behavior (Sanchez Issue VIII (D)) (*See* CV-DE 16-1 at 145); and Sanchez's traumatic background and disabilities (Sanchez Issue VIII(G)). Sanchez's claims in this regard are speculative and are not supported by the record or any post-trial affidavits or expert reports.

1.   Sanchez's claim that penalty counsel failed to introduce certain evidence in mitigation is belied by the record.

Sanchez alleges that penalty counsel Murrell failed to adduce sufficient mitigation testimony from Sanchez's friends and family. (CV-DE 16-1 at 112-28).  Specifically, Sanchez claims that his attorneys should have introduced evidence of Sanchez's pesticide exposure (CV-DE 16-1 at ¶¶ 341-45, 350-362, 365, 368, 377, 380),  health problems (CV-DE 16-1 at ¶ 385), Sanchez's family history and deficits going back several generations ((CV-DE 16-1 at ¶ 348-379), exposure to domestic violence through a violent and abusive alcoholic father, (CV-DE 16-1 at

¶390-399), G.E.D. program enrollment (CV-DE 16-1 at ¶ 405), drug use (CV-DE 16-1 at ¶ 409), adaptive functioning deficits and learning disabilities (CV-DE 16-1 at ¶ 344-46, 401-404), employment history (CV-DE 16-1 at ¶ 401, 511), and Varela's control over Sanchez (CV-DE 16-1 at ¶ 408, 410). Most if not all of these points were raised during the penalty phase through witnesses and documents. Support for this conclusion rests in citations to the trial transcript, the defense-submitted mitigating factors, and the jury verdict findings indicating whether or not the mitigating factor was proved. *Id.*

Penalty counsel presented family, social, and educational background testimony and exhibits from Sanchez's mother, Juanita Sanchez (CR-DE 823 at 8148-8209, Sanchez Exhs. 1-8, 42); Sanchez's sister, Nydia Sanchez, (CR-DE 823 at 8272-8299, Sanchez Exhs. 18-22); Juan Jimenez, Sanchez's uncle (CR-DE 823 at 8299-8306); Sanchez's former teacher, Amy Fleming (CR-DE 823 at 8209-8272, Sanchez Exhs. 32, 34); Sanchez's former girlfriend and mother of his only child, Maria Lopez (CR-DE 824 at 8379-8424, Sanchez Exhs. 23-30, 31); Lopez's mother, Rachel Ramos (CR-DE 824 at 8425-8438, Sanchez Exhs. 37, 43-45).

These witnesses established many of the subject areas that Sanchez now claims were not covered, such as: limited schooling and intellectual ability of parents (CR-De 823 at 8148-8165), Sanchez taking prescription medicine by accident (*Id.* at 8176), his father's frequent drinking, violent outbursts, and domestic abuse (*Id.* at 8153-8188), and Sanchez's learning problems (*Id.* at 8179-8182).

Information concerning Sanchez's exposure to community violence and extreme family trauma was presented by penalty counsel Murrell. Nydia Sanchez, Sanchez's sister confirmed that she and her siblings initially grew up in the Dyson Circle area of West Palm Beach which was a dangerous neighborhood where drugs were sold (CR-DE 823 at 8272) and that Sanchez's father

often drank and got into frequent fights with his wife, Sanchez's mother (CR-DE 823 at 8275-77). Nydia Sanchez also testified that her father was home most nights (CR-DE 823 at 8273), contrary to the unsworn allegations in Sanchez's motion that Sanchez's father spent much of the money he earned going out to bars.   Juanita Sanchez, Sanchez's mother, confirmed that that her husband - Sanchez's father shot her (CR-DE 823 at 8152-53) and sometimes beat her when he was drunk (CR-DE 823 at 8186).  Penalty counsel also established that Sanchez's home life was so bad that as a child, Sanchez once asked an uncle in Texas if he (Sanchez) could stay with him (the uncle) instead of going back to Sanchez's family Florida.  (CR-DE 824 at 8300-01).

The trial record also indicates that penalty counsel Murrell introduced evidence of Sanchez's learning disabilities and impaired intellectual function.  Sanchez's school problems were spelled out in great detail by witness Amy Fleming, a special education coordinator and former teacher of Sanchez. (CR-DE 823 at 8208-8269).  Fleming told the jury that the school district identified Sanchez's learning problems early in elementary school.  Documentary evidence submitted through Fleming showed that Sanchez had a learning disability, had an IQ of 80, and was not mentally retarded.  (CR-DE 823 at 8208-8269).  Sanchez's learning disabilities were also testified to by Sanchez's mother and sister.  Nydia Sanchez, Sanchez's sister, testified that Sanchez had learning problems in school from a young age. (CR-DE 823 at 8278-79).  Juanita Sanchez, Sanchez's motion, testified as to her son's mental impairments: that Sanchez's teachers identified his learning problems early-on and indicated that Sanchez needed tutoring, a need the family never met.  *See* CR-DE 823 at 8148-8209.

Penalty Counsel Murrell augmented this lay witness testimony of Sanchez's childhood, familial experiences, and limited intellectual functioning with expert witness testimony. Murrell

65

presented the jury with mitigation evidence from three different mental health mitigation experts: Daniel Grant, Thomas Reidy, and Thomas Waddell.

Dr. Grant testified that Sanchez was not retarded based on testing personally conducted by Grant (CR-DE 824 at 8439-8514).  Grant also testified that his testing of Sanchez led him to conclude that Sanchez's IQ was 77 (*Id.*  at 8444), although he acknowledged a prior IQ test of Sanchez rendered a score of 77 (*Id.*  at 8446) and that a prior school-conducted IQ test concluded his IQ was 81 (*Id.*  at 8461).  Grant noted that Sanchez's parents both had low IQ's—the mother 76 and the father 67 (*Id.*  at 8464, 8465)—but despite all of these limitations Sanchez himself demonstrated a "concrete understanding and ability to express himself." (*Id.*  at 8498).

Attorney Murrell then presented the testimony of Dr. Thomas Reidy, a Ph.D. in forensic psychology. (CR-DE 824 at 8516-8671).  Reidy testified about his work with the Department of Justice in identifying various sociological "risk factors" that statistically appeared to be predictors of whether a certain person would engage in criminal behavior. (*Id.*  at 8532).  Reidy identified risk factors in Sanchez's background based on record evidence and testimony he had observed: family problems such as spousal abuse and non-support at school functions (*Id.*  at 8533); hyperactivity and restlessness, (*Id.*  at 8538); academic failure and poor school bonding (*Id.*  at 8540); early identity of learning problems (*Id.*  at 8546); lower family IQ as a whole (*Id.*  at 8558); the lack of pre-natal care obtained by Sanchez's mother (*Id.*  at 8614); the drug and alcohol abuse history demonstrated by Sanchez's father (*Id.*  at 8616); his father's long arrest history, (*Id.*  at 8617); living in a high crime area during Sanchez's early childhood (*Id.*  at 8626); and Sanchez's

choice limitations imposed by this past (*Id.* at 8631).[33]   Reidy opined that a lower intelligence limits a person's moral reasoning. (*Id.* at 8559).

Despite all of these observations however, Reidy had to admit that Sanchez had denied physical abuse, violent victimization or mental health concerns in his self-reporting to jail officials (*Id.* at 8637).   Moreover, Reidy also acknowledged that in Sanchez's evaluation and discussion with government mental health expert, Dr. Michael Brannon, Sanchez had denied witnessing domestic violence in the family home and denied suffering substance abuse problems, or mental health problems.  (*Id.* at 8638-39).

Murrell also called Dr. Thomas Waddell, a retired clinical psychologist.  (CR-DE 824 at 8367-8379).   Waddell was called solely to offer familial background information related to Sanchez's family situation.   Waddell had examined Sanchez's brother and confirmed that the brother, Efrain Sanchez had an IQ of 62, and that he had rendered a prior professional opinion that Efrain Sanchez was incompetent to stand trial for the crime of arson. (*Id.* at 8370-72).

The defense-submitted mitigating factors, and the jury verdict findings indicating whether or not these mitigating factors were proved, also show that penalty counsel introduced evidence in, and focused the mitigation case on, the areas that Sanchez now claims counsel ignored.  A table

---

[33] In Section VIII(F) of his motion, Sanchez claims that his lawyers were ineffective for failing to provide their mental health experts with adequate information concerning Sanchez's background. (CV-DE 16-1 at 150). Sanchez fails to state, with any degree of specificity, what information was withheld, and from which experts it was withheld. (To the contrary, the record, specifically Dr. Reidy's testimony, shows that information concerning Sanchez's background had been communicated to the expert witnesses.)  Furthermore, Sanchez provides no documentary evidence to indicate that the withheld information actually exists.  He fails to establish that the withheld information would have changed trial testimony or resulted in opinions more favorable to Sanchez's mitigation case.  As such, Sanchez fails to establish either cause or prejudice with regard to this sub-claim.

summarizing the penalty jury's findings illustrates this very clearly. The below-listed chart reflects

in bold font those mitigating factors which relate to the current complaints raised by Sanchez:

| # | MITIGATING FACTOR | MITIGATOR PROVED? | NUMBER JURORS FINDING |
|---|---|---|---|
| 1 | EQUALLY CULPABLE CO-DEFENDANT NOT CHARGED | YES | 10 |
| 2 | **UNDER INFLUENCE OF VARELA** | YES | 11 |
| 3 | **LEGITIMATE JOBS** | YES | 8 |
| 4 | NO FELONY CONVICTIONS PRIOR TO VARELA | YES | 7 |
| 5 | **SANCHEZ MORE EASILY RECRUITED DUE TO FAMILY RELATIONSHIP WITH VARELA** | YES | 9 |
| 6 | **SANCHEZ MORE VULNERABLE DUE TO LOW IQ** | YES | 9 |
| 7 | VICTIM ENGAGED IN CONDUCT WHICH CONTRIBUTED TO OFFENSE | YES | 11 |
| 8 | **FOLLOWER NOT LEADER** | YES | 8 |
| 9 | BAPTIZED & CONFIRMED | NO | 0 |
| 10 | **FAMILY HISTORY OF MENTAL RETARDATION** | YES | 4 |
| 11 | **LEARNING DISABILITIES** | YES | 4 |
| 12 | **SOCIALLY ISOLATED** | NO | 0 |
| 13 | **PARENTS LOW IQ** | YES | 4 |
| 14 | **PARENTS UNEDUCATED** | YES | 5 |
| 15 | **PARENTS SOCIALLY ISOLATED** | NO | 0 |
| 16 | LOVING RELATIONSHIP WITH SON | YES | 8 |
| 17 | CONSISTENTLY PROVIDED SUPPORT FOR SON | YES | 5 |
| 18 | **ALCOHOLIC FATHER** | YES | 10 |
| 19 | **VIOLENCE BY FATHER** | YES | 10 |
| 20 | **FEAR OF FATHER** | YES | 9 |
| 21 | **EXPOSED TO CRIMINAL ACTIVITY AS CHILD** | NO | 0 |
| 22 | **EXPOSED TO BROTHER VIOLENT SEIZURES** | NO | 0 |
| 23 | **FAMILY NORMALIZED CRIME** | YES | 8 |
| 24 | **SANCHEZ LOW IQ** | YES | 9 |

| # | MITIGATING FACTOR | MITIGATOR PROVED? | NUMBER JURORS FINDING |
|---|---|---|---|
| 25 | **DIFFICULTY PROCESSING VERBAL INFORMATION** | YES | 8 |
| 26 | **LOW IQ AND LEARNING DISABILITIES CAUSED EMBARRASSMENT AND HUMILIATION** | YES | 8 |
| 27 | **LEARNING DISABILITIES DID NOT ALLOW HIM TO FUNCTION AT IQ LEVEL** | YES | 9 |
| 28 | **EXEMPTED FROM TAKING FCAT** | YES | 8 |
| 29 | **NO PARENTAL SUPPORT OVERCOMING LEARNING DISABILITIES** | YES | 9 |
| 30 | **READS AT ELEMENTARY GRADE LEVEL** | NO | 0 |
| 31 | **CAN ONLY PERFORM MATH AT ELEMENTARY GRADE LEVEL** | NO | 0 |
| 32 | **ACADEMIC FAILURES CONTRIBUTED TO REDUCED SELF ESTEEM** | YES | 8 |
| 33 | **LIMITED OPPORTUNITIES FOR CAREER CHOICES** | YES | 0 |
| 34 | **LOOKED OUT FOR OLDER BROTHER** | NO | 0 |
| 35 | **LACKED SKILLS TO LIVE INDEPENDENTLY OF ASSISTANCE** | NO | 0 |
| 36 | **NO POSITIVE MALE ROLE MODEL** | YES | 7 |
| 37 | **RISK FACTORS GROWING UP** | YES | 9 |
| 38 | **FRAMEWORK TO MAKE THE RIGHT DECISION WAS FLAWED** | YES | 9 |
| 39 | TREATED RACHEL RAMOS WITH RESPECT | YES | 1 |
| 40 | LOVING COMPANION OF RACHEL RAMOS | NO | 0 |
| 41 | ADAPTED WELL IN PRISION ENVIRONMENT | NO | 0 |
| 42 | WELL BEHAVED AND RESPECTFUL DURING TRIAL | NO | 0 |
| 43 | EVIDENCE OF EXACT ROLE NOT SUFFICIENT TO JUSTIFY DEATH | NO | 0 |
| 44 | 22 YEARS OLD AT TIME OF OFFENSE | NO | 0 |

(CR-DE 860 at 13-16).   Sanchez's penalty counsel submitted a total of forty-four mitigating factors and established to at least one of the jurors the existence of thirty-one mitigating factors. Arguably thirty-two of the forty-four mitigating factors submitted by penalty counsel directly relate to issues that Sanchez claims his penalty counsel ignored.   Twenty-seven mitigating factors relate to Sanchez's family background, social background, and learning disabilities.[34] (CR-DE 860)  Sixteen mitigating factors related to the mental health history of Sanchez, including his intellectual shortcomings.[35]  (CR-DE 860).

The record below established that nearly all of the mitigating factors that Sanchez now complains about were submitted to the jury, and found by multiple members of the jury to have been proven by a preponderance of the evidence.  As a result of Murrell's presentation, at least one member of the jury found that twenty-three different mitigating factors relating to Sanchez's family background, intellectual abilities, and other areas Sanchez now claims his attorney ignored, had been proved by a preponderance of the evidence. (*See* CR-DE 860 at 12-16, and mitigating factors # 2, 3, 5, 6, 8, 10, 11, 13, 14, 18-20, 23-29, 32, and 36-38).   Penalty counsel cannot be held to have been ineffective in failing to introduce evidence that was, actually introduced.

> 2.  <u>Sanchez has failed to meet his burden of establishing that penalty counsel was ineffective for failing to introduce omitted evidence where he has introduced no evidence to substantiate the existence of the purportedly omitted evidence and</u>

---

[34] Mitigators 3, 5,6, 9, 12, 14, 15, 16-24, 26, 29-32, 34-36, 39, 40, and 44. (CR-DE 860). At least some members of the jury found that sixteen of the family background mitigators had been proven by a preponderance of the evidence:  Nos. 3, 5, 6, 14, 16-20, 23, 24 26, 29, 32, 36, and 39.

[35] Mitigating factors 6, 10, 11, 13, 14, 24, 25, 26. 27, 28, 29, 30, 31, 32, 33, 35. (CR-DE 860).  At least one of the jurors found that thirteen of these intelligence-related mitigators had been proven: 6, 10, 11, 13, 14, 24, 25, 26, 27, 28, 29, 32, and 33. (CR-DE 860).

> where the omitted evidence would have been cumulative of facts already in evidence.

To the extent that Petitioner claims that his penalty counsel was ineffective for failing to introduce evidence and testimony that was actually omitted from the penalty phase of this matter, these claims must fail either because Petitioner has failed to meet the requisite standard of proof or because the omitted evidence would have been cumulative of the evidence adduced at trial.

### i.    Omitted lay witness testimony

Although Sanchez's petition includes sixteen pages of information concerning Sanchez's childhood and family history that lay witnesses purportedly could have testified to, Sanchez provided no affidavits to indicate what witnesses would have testified and what information they would have testified to.  Sanchez claims that his lawyer was ineffective for failing to introduce documentary evidence concerning Sanchez's family, educational, medical, and employment histories that was in his lawyers' possession.  (CR-DE 16-1 at 154-161.)  Although Sanchez cursorily describes some of the information contained in these documents, he does not exhibit them to his motion and therefore fails to substantiate that these documents exists or that they contain the information that Sanchez now claims they contain.  Instead of providing supporting evidence (as required by law) Sanchez provides only conclusory allegations and arguments through his attorneys.  This falls short of the showing required under *Johnson v. Nagle*, 58 F. Supp. 2d 1303, 1357 (N.D. Ala. 1999) and *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001). As such, Petitioner's claims that his lawyers were ineffective for failing to offers this "new" evidence are purely speculative and should be dismissed.

Assuming, arguendo, that Sanchez had provided the necessary proof concerning the uncalled lay witnesses and unoffered testimony of called lay witnesses, the omitted evidence would have been cumulative of the bleak and depressing story of Sanchez' childhood that was

established by penalty counsel and considered by the jury during the penalty phase of the trial. Most of the purportedly missing evidence related to Sanchez's low IQ and intellectual functioning, limited career choices, negative family history, and his abusive childhood.   The majority of this missing evidence was not substantively different than the evidence actually presented to the jury. Counsel was able to introduce relevant facts through other witnesses so evidence was not kept from the jury.   In fact, the jury found a number of mitigating factors which related to these issues in their penalty verdict.    CR-DE 860.   In other words, this evidence was already submitted to, and accepted by, the jury.   Duplicative testimony would not have tipped the balance in Sanchez's favor.

### ii.      Omitted Expert Testimony

A habeas petitioner who claims that his attorneys were ineffective at trial because they failed to call certain persons as witnesses must prove that the proposed witnesses would have testified favorably to his defense. *See Johnson v. Nagle*. 58 F. Supp. 2d 1303, 1358 (citing *Aldrich*, 777 F.2d at 636).   Sanchez has failed to establish through affidavit, expert report or any other evidence, that any expert witness would have testified that Sanchez suffers from a psychological disorder (Sanchez Issue IV(A), (B)), that Sanchez suffered from neuropsychological impairments that affected his behavior and brain functioning (Sanchez Issue VIII(B)); or that Sanchez's IQ was overrepresented at trial (Sanchez Issue VIII(B) and (D)).

Sanchez also claims that his counsel were ineffective for failing to have Sanchez evaluated for a psychiatric disorder. (CV-DE 16-1, 151-52).   Counsel did not submit Sanchez to psychiatric counseling presumably because their personal interactions with Sanchez over a period of many,

many months,[36] led them to believe Sanchez was competent to stand trial and did not suffer from any psychiatric issues. Interestingly, although Sanchez complains that his penalty counsel was ineffective for not obtaining a psychiatric examination of Sanchez, he has failed to proffer or provide any evidence of psychiatric problems from any medical witness.

Sanchez further claims that his counsel failed to investigate and present evidence of Sanchez's adaptive functioning deficits but does not indicate what this evidence entails, such as an affidavit or report from an appropriate mental health expert. CR-DE 16-1 at 112, 128-29. (Sanchez Issue VIII (A)). Furthermore, Sanchez fails to describe how this testimony would have differed from the IQ and learning disability testimony offered during Sanchez's case-in-chief during the penalty phase.

Sanchez also claims that his counsel were was ineffective for failing to call the "right" expert to testify to Sanchez's level of intelligence. Sanchez concedes that penalty counsel engaged mental health experts Dr. Daniel Grant, Dr. Katrina Hallmark, and Dr. Lawrence Levine to evaluate Sanchez and that each of these experts actually administered assessments to him. (*Id.* at 132 and note 19 therein). However, only Dr. Grant was called to testify. Sanchez now complains that his counsel were ineffective because Dr. Grant's testimony concerning Sanchez's IQ was "wrong", Dr. Grant failed to testify about certain unspecified documents he purportedly had in his possession, and that repeated assessments by the many mental health experts hired by the defense resulted in the skewing of Sanchez's IQ score.[37] (CV-DE 16-1151).

---

[36] Penalty counsel, Donnie Murrell, was appointed CJA counsel on June 22, 2007 (CR-DE 221) and jury selection commenced on January 9, 2009 (CR-DE 644).

[37] Sanchez further claims that counsel were ineffective because the Government was able to effectively cross-examine Dr. Grant concerning handwritten notations Dr. Grant had made during his evaluation of Mr. Sanchez. (CV-DE 16-1 at 152-53). Once again, Sanchez provides no record citations concerning this claim. The perceived unreliability of the testimony of Dr. Grant does not

In a strange irony, Sanchez asserts that he suffered a Sixth Amendment violation because his attorney actually conducted a mitigation examination and allowed experts to test his intelligence in an effort to present a positive mitigation presentation, presumably premised on Sanchez's intellectual deficits. The record shows that no skewing occurred. The IQ score that Dr. Grant testified to—the reported "skewed" score—was substantially similar to the IQ score reported in Sanchez's elementary records and testified to by defense witness and former teacher Amy Fleming. Furthermore, Sanchez has not provided any evidence of what a different expert would have established under sworn testimony that would have contradicted Dr. Grant's testimony. Neither Dr. Hallmark nor Dr. Levine testified at the trial, and the content of the uncalled expert's testimony has not been proffered to this Court. Without this evidence, Sanchez has failed to meet his burden of establishing that his counsel was ineffective in how he handled the intelligence testing.

Even if Sanchez were to find and cite a new expert who would establish a different IQ in 2016, that proffer would be of no significance. Whether newly-appointed 2255 movant counsel can find a new expert seven years after the original trial to establish testimony contradicting Dr. Grant, or government rebuttal expert Dr. Michael Brannon, is not controlling. Sanchez cannot prevail simply because he might now locate new experts who have come to different conclusions than their original witness, Dr. Grant, or government's testifying expert in 2009. *See Floyd v.*

---

establish that penalty counsel was ineffective. The value and weight of a witness' testimony consists of a full glass of words, phrases, opinions and observations. The glass may be filled during direct examination, emptied during cross-examination, and re-filled during re-direct. Penalty counsel performed competently in filling the glass during direct; he did not somehow become incompetent when he turned over the glass to government counsel whereupon the glass of Dr. Grant's testimony was emptied by a piercing and illuminating cross-examination conducted by Assistant United States Attorney John S. Kastrenakes. Penalty counsel's professional acumen should not be measured by how one witness responds to cross-examination.

*Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016)(death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.")(death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant.")(death penalty case).

The United States received pre-trial reciprocal discovery from Sanchez's counsel concerning mental health experts he anticipated calling, and for whom he had received court permission to hire.   These experts include Francis Crosby, psychological-educational evaluator, (USA Exh. 5); Kartina Hallmark, mental health expert (USA Exh. 6); Jose Lazano, mental health mitigation expert (USA Exh. 7); Laurence Levine, mental health mitigation expert (USA Exh. 8); Dr. Daniel Grant, mental health expert (USA Exh. 9); Theresa Parnell, mitigation mental health expert (USA Exh. 10); Thomas Reidy, mitigation mental health expert (USA Exh. 11); and Tom Waddell, mitigation mental health expert (USA Exh. 12).   Only three of these witnesses—Grant, Reidy, and Waddell—were called to testify on Sanchez's behalf.   The remaining experts were not called to testify and none of their opinions or bases for their opinions were ever provided to the Government.   The fact that penalty counsel sought out such experts, chose them in particular, and received court approval to hire them, shows that penalty counsel was actively working on the mental health portion of the mitigation case.   The fact that penalty counsel ultimately chose not to call these witnesses reflects a strategic decision, rather than a default caused by neglect.

3.    <u>Sanchez has not established that Penalty counsel's performance *vis a vis* the mitigation case was constitutionally deficient.</u>

This Court's review of penalty counsel Murrell's performance is not measured against what "some hypothetical 'best' lawyer would do." *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th

Cir.2014). Instead, the Court should "reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time." *Id.* (internal quotation marks and citation omitted). The Eleventh Circuit has noted that "there are countless ways to provide effective assistance," and "attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another." *Id.* (brackets omitted). *See also Chandler*, 218 F.3d at 1315 n. 16 ("If a defense lawyer pursued course A ... our inquiry is limited to whether this strategy ... might have been a reasonable one.").

Although the Petitioner challenges trial counsel's failure to call a number of witnesses in mitigation, the Supreme Court has made clear that trial counsel is not required to present all available mitigating evidence during the sentencing phase. *See Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (*citing Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Similarly, the Eleventh Circuit has stated that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514 (11th Cir.1995) (*en banc*) (noting that no absolute duty exists to present all possible mitigating evidence available: "Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."); *see also Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir.2001) ("[A]t a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy."); *Stevens v. Zant*, 968 F.2d 1076, 1082 (11th Cir.1992) ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.").

The decision concerning how much family testimony to present, how much school or learning problems to present, and the practical need to avoid redundancy is a classic decision that

involves the experience and judgment of a skilled litigator.   As the Supreme Court has recently explained, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' *Hunt v. Commissioner*, 666 F.3d 708, 724 (11th Cir. 2012), *citing Harrington v. Richter*, ——U.S. ——, 131 S.Ct. 770, 790, 178 L.Ed.2d 624 (2011) (*quoting Yarborough v. Gentry*, 540 U.S. 1, 8, (2003) (*per curiam*)). Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002).

Sanchez's current complaint that counsel's failure to call all of the engaged experts to testify at trial also must fail.  Counsel is not required to present all mitigation evidence, even if the additional mitigation evidence would have been compatible with counsel's strategy. *See Water*, 46 F.3d at 1514.  "Considering the realities of the courtroom, more is not always better. Good advocacy requires 'winnowing out'" some arguments, witnesses, evidence, and so on, to stress others."  *Chandler*, 218 F.3d at 1320 ("There is much wisdom for trial lawyers in the adage about leaving well enough alone.").

Where experts' findings are a mixed bag and contain evidence or opinions both helpful and harmful to the defense, the decision on whether to call such an expert should and must rest within the discretion of an experienced trial counsel.  "The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) (Tjoflat, J.) (death penalty case), *citing Chandler*

*v. United States*, 218 F.3d 1305, 1315 (11th Cir.2000) (*en banc*). In *Hittson*, the Eleventh Circuit found that a lawyer's decision not to put on testimony of retained mental health experts was reasonable because their opinions were a mixed bag, and "[t]he defense team's judgment that the findings were more aggravating than mitigating [was] precisely the type of game-time decision that *Strickland* insulate[d] from Monday-morning quarterbacking". *Hittson*, 218 F.3d at 1248-49 (*citing Waters*, 46 F.3d at 1512).

Sanchez's attack on his lawyers' choice of which mitigation witnesses to call constitutes an improper attempt to second-guess reasonable, strategic choices of trial counsel. *See DeYoung v. Schofield*, 609 F.3d at 1289, *citing Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir.2009) ("[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." (brackets omitted)). *See Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir.1995) ("The question is whether failing to present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (internal quotation marks and citation omitted). Penalty counsel weighed through all of the available evidence and witnesses and made tactical decisions based on experience as to what would be most effective. Sanchez has not established deficient performance with regard to his counsel's handling of witnesses in mitigation.

4. <u>Sanchez has not established that he was prejudiced by Penalty counsel's performance *vis a vis* the mitigation case</u>

Even assuming, arguendo, Sanchez was able to establish that counsel's performance in filtering the mitigation evidence was deficient—which he has thus far failed to do— Sanchez has not shown that he was prejudiced thereby. In order to establish prejudice, a Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded

that the balance of aggravating and mitigating circumstances did not warrant death." *Putman v. Head*, 268 F.3d 1223, 1248 (11th Cir.2001). A "reasonable probability" of a different result here, as in regard to the guilt stage, is one sufficient to undermine confidence in the outcome. *See Tompkins v. Moore*, 193 F.3d 1327, 1333 (11th Cir. 1999) (*citing Strickland*, 466 U.S. at 690); *Weeks v. Jones*, 26 F.3d 1030, 1042 (11th Cir.1994) ("[T]he petitioner must show ... there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty."); *accord, Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir.1995). In order to decide whether omitted mitigating evidence was case-changing, the Court looks at the mitigating circumstance evidence that was not presented, along with that which was presented, and considers the totality of it against the aggravating circumstances that were found. *See Tompkins*, 193 F.3d at 1333); *Callahan v. Campbell*, 427 F.3d 897, 936 (11th Cir.2005) ("When a defendant challenges a death sentence, we evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.") (internal punctuation and citation omitted). Sanchez's bald assertions and unsubstantiated claims make this task impossible as the Court is left in the dark as to what the missing evidence entails or how it might add or subtract from the evidence adduced at trial. Absent documentation as to just what the omitted evidence entails, the Court is unable to attempt the re-weighing process and make its own determination as to whether the omitted testimony would have made a difference.

Even if Sanchez had sufficiently detailed the allegedly omitted evidence to enable the Court to attempt the re-weighing process, and even if the Court accepted as true all the available mitigation information listed in Sanchez's remaining claims, the facts of the instant case, specifically the execution-style murders of the two children, are so egregious, that it is unlikely

79

that the testimony of a dozen extra mitigation witnesses would have made any difference in the penalty phase of this trial. At a minimum, Sanchez has not established that it would have made any difference. The type of omitted testimony proffered by Petitioner is simply not of the caliber required to meet the prejudice standard in a capital case. *See Strickland*, 466 U.S. at 700 (noting that evidence that numerous people thought defendant was a good person "would barely have altered the sentencing profile presented to the sentencing judge"); *see also DeYoung v. Schofield*, 609 F.3d 1260, 1291 (11th Cir.2010), *cert. denied*, 562 U.S. 1293 (2011) (stating "all of the family dysfunction testimony, even taken together and credited as true, is weak and a far cry from the horrific childhood circumstances that have been held sufficient to satisfy the prejudice prong in a capital case.").

The United States proved four statutory aggravating factors beyond a reasonable doubt: that Sanchez committed the murders with expectation of receipt of something of value (#1); that Sanchez committed the murders after substantial planning and premeditation to cause the death of a person (#2); that Luis Damian Escobedo and Luis Julian Escobedo were particularly vulnerable due to youth (#3); and that Sanchez intentionally killed multiple victims in a single criminal episode (#4). (CR-DE 860, Sanchez Penalty Verdict). The United States also proved three non-statutory aggravating factors beyond a reasonable doubt: that Sanchez participated in other, uncharged serious acts of violence (#1); that Sanchez killed the victims in order to eliminate them as potential witnesses (#2); and that Sanchez caused injury, harm and loss to the murder victim families (#3). (*Id.)*

Sanchez's counsel submitted a total of forty-four mitigating factors and established to at least one of the jurors the existence of thirty-one mitigating factors. At least one member of the jury found that twenty-three different mitigating factors relating to Sanchez's family background,

intellectual abilities, and other areas Sanchez now claims his attorneys ignored, had been proved by a preponderance of the evidence. (CR-DE 860 at 12-16, and mitigating factors # 2, 3, 5, 6, 8, 10, 11, 13, 14, 18-20, 23-29, 32, and 36-38).   As result of counsel's preparation and presentation of the mitigation case, the jury determined that the proven mitigating factors sufficiently outweighed the proven aggravating factors to justify a life sentence on Counts Six, Nine, and Ten. Unfortunately for Sanchez, the jury found that the proven mitigating factors did not sufficiently outweigh the proven aggravating factors to justify a life sentence on Counts Seven and Eight, which counts specifically related to the murders of the Escobedo children. (*See* CR-DE 860). Merely because penalty counsel did not prevail in all his efforts does not convert his effort into a constitutionally-deficient performance.

Given the facts of this horrific case it is highly unlikely, not just improbable, that the sentencer would have re-weighed the balance in Sanchez's favor just because more mitigation evidence was piled on.  The inherent weakness in Sanchez's argument lies in an uncomfortable and indisputable fact:  despite the fact that many jurors found that Sanchez's counsel had proven thirty-one different mitigating factors, those factors did not outweigh the ugly brutality of Sanchez's execution-style murder of an entire family, including a two preschool aged boys whom he knew, and the subsequent abandonment of their bodies on the side of the Florida Turnpike.

Sanchez's showing on this issue falls far short of the required showing mandating relief. Sanchez complains that more should have been done, but fails to provide the requisite proof[38] establishing what favorable evidence was available to and should have been elicited by counsel.

---

[38] Sanchez cited references to a Kevin McGrew in his petition, (CV-DE 16-1 at 30), but the United States has been unable to locate in Sanchez's Petition filing any Appendix or Exhibit referencing an affidavit or expert report establishing what McGrew's testimony would have been.

The evidence presented by Murrell was sufficient to save Sanchez from the death penalty on three of the five counts for which it was available; it was just not enough to overcome the brutal, execution style murder of two preschool-aged boys.

For all the foregoing reasons, Sanchez's claims that penalty counsel was ineffective if the investigation, preparation, and presentation of the mitigation case must be denied.

I.     <u>TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO IMPEACH AND DISCREDIT GOVERNMENT MENTAL HEALTH EXPERT DR. MICHAEL BRANNON (RESPONSE TO SANCHEZ ISSUE VIII(H))</u>.

Sanchez complains that his counsel were ineffective for not challenging or successfully impeaching government mental health expert Dr. Michael Brannon. Brannon testified that he had interviewed Sanchez personally, conducted an intelligence test of him, and engaged him in conversation about various topics including his family background. Notably, Brannon concluded that Sanchez had a low average IQ of 89, that Sanchez was not retarded, that he understood right from wrong, and that Sanchez was friendly, outgoing, and interacted and connected well with others. (CR-DE 846 at 9290, 9301, and 9327). The trial record does not support Sanchez's claim the trial counsel failed to challenge Dr. Brannon's testimony. Prior to Dr. Brannon testifying, penalty counsel filed a motion *in limine* to limit Dr. Brannon's testimony, (CR-DE 822), and then voiced multiple objections during the trial to the exact content of Dr. Brannon's testimony. *See, e.g.,* CR-DE 845 at 9173-9176; CR-DE 846 at 9267-9272, 9293, and 9324.

The record also belies Sanchez's claim that his counsel did not attempt to impeach or otherwise discredit Dr. Brannon. Penalty counsel Murrell conducted a detailed cross-examination of Dr. Brannon in which he brought out favorable concessions from Dr. Brannon to show agreements with the defense experts, and challenged Dr. Brannon on other conclusions that were harmful to the defense. (CR-DE 846 at 9334-9351).

Sanchez complains that counsel should have engaged yet another mitigation expert to conduct another intelligence test of Sanchez, that is, to conduct a sort of *sur-rebuttal* investigation to contradict Dr. Brannon's testimony. This sub-claim of ineffectiveness fails for at least three reasons. First, the instant motion fails to point out specifically what information was wrong about the IQ test conducted by Brannon. Second, Sanchez fails to establish that new IQ evidence would have contradicted Dr. Brannon's testimony or any other IQ evidence adduced at trial, especially considering that counsel retained additional metal health experts but chose not to call them after they evaluated Sanchez's intelligence. Third, Sanchez cannot show that additional evidence of his low intelligence would have changed the outcome of the trial given the egregious facts of this case and the numerous aggravating factors in play. *See Supra*, Section H.

The defense mitigation case may not have been perfect, nor did it convince the jury to vote against the death penalty on all counts, but it was constitutionally sufficient.

> With unlimited time and resources, there is always something more that might have been done in a capital case—such allegations "prove[ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel."

*See Waters*, 46 F.3d at 1514 (11th Cir.1995). Sanchez has failed to establish either deficient performance or resulting prejudice with regard to counsel's challenges to Dr. Brannon's testimony. As such, this claim of ineffective assistance should be denied.

J. TRIAL COUNSEL WERE NOT INEFFECTIVE FOR FAILING TO OBJECT TO JURY INSTRUCTIONS CONCERNING NON-STATUTORY MITIGATING FACTORS BECAUSE COUNSEL DID, IN FACT, OBJECT TO THESE INSTRUCTIONS (RESPONSE TO SANCHEZ ISSUE VIII(K)).

Sanchez complains that his counsel were ineffective for failing to object to allegedly erroneous jury instructions and government arguments relating to non-statutory mitigating factors

and the jury's role in determining whether the factor was actually mitigating in nature.  CV-DE 16-1 at 170-72.     Sanchez's claim is belied by the record.   Counsel did in fact object to the allegedly erroneous instruction.  (CR-DE 847 at 9479-83).  The court overruled the objection and the Eleventh Circuit later held that the instructions were legally correct.[39]   There was no ineffectiveness here.

The Federal Death Penalty Act, ("FDPA") provides a list of seven factors, which, if established, must be considered as mitigating factors.  18 U.S.C. § 3592(a)(1)-(7).[40]   The FDPA also provides for the consideration of "other factors" under the catch-all provision.  18 U.S.C. § 3592(a)(8) ("Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence.").   In the instant case, in accordance with the FDPA, the Court and all of the parties agreed that, apart from the seven statutory mitigating factors that the jury was required to consider, if established, the jury also was required to consider any other factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigated against the imposition of the death penalty (CR-DE 818 at 7862-66, 7901-16).  *See* 18 U.S.C. § 3592(a)(8) ("Other factors").  The parties did not agree as to how the jury would determine whether "other," i.e., non-statutory, factors proposed by the defendants were, in fact, mitigating factors (CR-DE 845 at 9139-42; CR-DE 846 at 9369-71, 9405-61).

In discussing the issue of how the jury was to consider a proposed non-statutory mitigating factor, the Court framed the issue thusly: "[I]f someone came in and said Joe Smith is a human

---

[39] *Troya*, 733 F.3d at 1129.

[40] The seven statutory mitigating factors, generally, are: (1) impaired capacity; (2) duress; (3) minor participation; (4) equally culpable defendant; (5) no prior criminal record; (6) disturbance; and (7) victim=s consent.  18 U.S.C. §§  3592(a)(1)-(7).

84

being, or if someone came in and said it was raining on the day of the murders, we would all say, okay, you can establish that, but the question is, is that a mitigating factor" (CR-DE 847 at 9473-75). Thereafter, the Court adopted the two-pronged approach set forth in *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) and informed the parties that it intended to instruct the jury that Congress had set out statutory mitigating factors, that those were presumed to have "some merit," but that a defendant was free to propose other factors as long as the defendant satisfied the burden of (1) establishing the facts underlying a proposed factor and (2) establishing that a proposed factor constituted a mitigating factor (CR-DE 847 at 9478).

Sanchez's counsel objected to the district court's approach on the ground that it would improperly imply to the jury that there was a "qualitative difference" between statutory and non-statutory mitigating factors (CR-DE 847 at 9479). Although defense counsel agreed with the "general principle" that the defense had the burden of establishing that a proposed non-statutory factor, if established, constituted a mitigating factor, counsel essentially argued that the jury should make that determination without any reference to the presumptive merits of statutory mitigating factors (CR-DE 847 at 9479-83).

The district court opined that the jury, in determining whether a proposed non-statutory factor constituted a mitigating factor, had "a right to consider the similarity between" the proposed non-statutory factor and the statutory mitigating factors (CR-DE 848 at 9680-81). In that regard, the district judge stated, "I would think that the closer you get to the language of a statutory mitigating factor, the easier it probably would be for the jury to come to the conclusion, yes, this is a mitigating factor" because [i]t's very close to what Congress has said or close to the category of things that Congress has determined are mitigating factors" (CR-DE 848 at 9681-82). Accordingly, the court advised the parties that it intended to inform the jury of the seven statutory

85

mitigating factors so that the jury could compare those factors with the non-statutory factors proposed by the defense (*Id.*). The court emphasized, however, that it would instruct the jury that the statutory mitigating factors were not entitled to any greater weight, simply by virtue of their designation by Congress, than a non-statutory mitigating factor (CR-DE 848 at 9682).

Thereafter, the district judge instructed the jury, in pertinent part:

> Now, you know that there are things called statutory aggravating factors and there are things called nonstatutory aggravating factors.
>
> . . .
>
> Just like the government regarding statutory and nonstatutory, well, the same thing is true for the defense. The Federal Death Penalty Act actually lists some statutory mitigating factors, but a defendant has an absolute right to allege anything that [the] defendant feels constitutes a mitigating factor that the jury should consider.
>
> . . .
>
> Congress has listed an aggravating factor in the statute, or listed a mitigating factor, Congress has made the judgment that if the facts underlying that particular factor are established, that they do constitute an aggravating factor or a mitigating factor, and they must be considered by the jury.
>
> Now, please understand, Congress has not in any way suggested what weight or value the jury should attach to it. That is up to the jury. But the Congress has said if the Government proves a statutory aggravating factor beyond a reasonable doubt, or if a Defendant proves a statutory mitigating factor by a preponderance of the evidence, it must be considered.
>
> . . .
>
> Well, in any of these, the first thing you do, of course, you have to look and say did the party offering that, did they prove it. If it is an aggravating factor, you have to say did the Government prove this to me beyond a reasonable doubt. And as I mentioned, it has to be unanimous.
>
> For a Defendant, you have to say did the Defendant prove this [by] a preponderance of the evidence, and [it] doesn't have to be unanimous.
>
> If you are looking at a nonstatutory aggravating factor or a nonstatutory mitigating factor, you need to go one step further and you have to say, okay, I find that the party proved this, but is this indeed an aggravating factor. Is this indeed a mitigating factor.
>
> . . .

Now, in these instructions I've laid out for you seven of the mitigating factors that Congress set out in the statute . . . and I have done it for a particular reason and I will explain it to you in more detail as we go along.

Let me lay out what the statute lists as seven statutory mitigating factors.

The first would be that the Defendant's capacity to appreciate the wrongfulness of the Defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Two, the Defendant was under unusual or substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Three, the Defendant is punishable as a principal in the offense, which was committed by another, but the Defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

Four, another Defendant or Defendants, equally culpable in the crime, will not be punished by death.

Five, the Defendant did not have significant prior history of other criminal conduct.

Six, the [Defendant] committed the offense under severe mental or emotional disturbance.

Seven, the victim consented to the criminal conduct that resulted in the victim's death.

> . . .

If the defendant asserts one of the statutory mitigating factors, and if they prove it, Congress says you must consider that.

If the defendant asserts something that is not set forth in the statute, well, of course, the first thing you need to decide is, A, did the defendant prove by a preponderance of the evidence that the fact in it is true.  But you then also need to decide if it is true, does it constitute a mitigating factor under the definition of what is a mitigating factor.

And by the way, and I will talk about this in a moment, when you look at what the Defendant -- a particular defendant has pled, I think you can also compare that to the statutory mitigating factor, and if you see that there is a close relationship between the two, I think that is a factor that you can consider in determining whether the nonstatutory assertion is in fact a mitigating factor.

And please understand, there is -- Congress does not in any way say what weight that you should apply to either a statutory or a nonstatutory factor. That is for you, the jury, to decide.

(CR-DE 848 at 9705, 9727-28, 9730-31, 9733-36).[41]  These instructions were not erroneous.[42]

---

[41] In a related instruction, the district court defined "mitigating factors" generally as "considerations that suggest that a sentence of death should not be imposed" and stated that mitigating factors "need not justify or excuse the Defendant's conduct, but they do suggest that a punishment less than death may be sufficient to do justice in the case" (CR-DE 848 at 9720-21).

[42] Sanchez's argument begs the question of how a jury must go about determining whether a proposed non-statutory mitigating factor is, in fact, a mitigating factor.  His essential, but unspoken, argument is that the jury is entitled to consider in mitigation *anything* that the defense proposes and that anything that the defense proposes is a mitigating factor by virtue of the fact that the defense proposed it.  That argument, however, ignores the fact that proposed non-statutory mitigating factors are nothing more than alleged mitigating factors, and, as the district court aptly held, they are subject to a two-pronged approach:  the jury must determine not just (1) whether the facts alleged to be mitigating were sufficiently proven, the jury must also determine (2) whether those alleged facts are properly considered as mitigating the defendant's culpability.  *See. Lawrence*, 555 F.3d at 267; *see also Rogers v. Secretary*, *Department of Corrections*, 2010 WL 668261, *27 (M.D. Fla. Feb. 19, 2010) (unpublished) (holding that sentencing courts must apply two-pronged approach in addressing non-statutory mitigating factors).  A jury is entitled to reject a submitted mitigator.  *See, e.g., United States v. Paul*, 217 F.3d 989, 1000 (8th Cir. 2000) (finding no error in the failure of six jurors to find the defendant's age (which was not disputed) at the time of the offense as mitigating, because a juror is not required to give mitigating effect to any factor).  *See also, United States v. Bernard*, 299 F.3d 467, 485-86 (5th Cir. 2002).  Several Supreme Court cases hold that the jury is not required to have given that undisputed factor any weight.  *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), address mitigating factors, but impose no requirement on a capital sentencing jury to give mitigating effect or weight to any particular evidence. Rather, *Lockett* and *Eddings* merely stand for the principle that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370 at 377-78 (1990). Thus, a sentencer's decision not to give weight to proffered non-statutory mitigating factors on the ground that the factors are not mitigating does not violate the rule of *Lockett* and *Eddings*.  *Johnson v. Wainwright*, 778 F.2d 623, 629 (11th Cir. 1985); *accord Graham v. Collins*, 506 U.S. 461, 490 (1993).

At the conclusion of the court's instructions, Sanchez's counsel renewed his objection to the instruction concerning the non-statutory mitigating factors (CR-DE 848 at 9763).   Counsel stated that the court's instruction was "misleading" because it "tied the value" of the non-statutory mitigating factors to their "similarity" with the statutory mitigating factors (*Id.*).

The backbone of the instant claim is Petitioner's allegation that counsel failed to object to the jury instruction concerning the proposed non-statutory mitigating factors and the jury's obligation to determine whether the proposed factor was, in fact, mitigating.   The record conclusively establishes that counsel objected to this instruction not once, but twice.   Counsel's objection was overruled as the law was not on his side.   Counsel cannot be found to be ineffective for failing to do something that he actually *did*.   As the record does not support Sanchez's claim that his lawyer failed to object to this portion of the jury instructions, this claim should be denied.

Additionally, Sanchez claims that his counsel were ineffective for failing to object when the prosecutor made remarks indicating that the proposed non-statutory mitigating factors were entitled to little or no weight.   These remarks were consistent with the district court's instructions that the weight to be attached to any mitigating factor was "up to the jury" (CR-DE 848 at 9727).   As such, the comments were proper and any objection to them would have been overruled.

As Sanchez has failed to establish that his counsel's performances with regard to the jury instructions for the non-statutory mitigating factors, and the prosecutor's comments regarding the same, were deficient, Sanchez has failed to establish this claim of ineffective assistance.   This claim should be denied.

K.     PETITIONER SANCHEZ HAS NOT ESTABLISHED THAT HE WAS INCOMPETENT AT THE TIME OF HIS TRIAL AND THEREFORE HAS NOT ESTABLISHED THAT HIS DUE PROCESS RIGHTS WERE VIOLATED WHEN THE COURT ALLOWED THE TRIAL TO PROCEED WITHOUT A COMPETENCY HEARING OR THAT HIS COUNSEL WAS INEFFECTIVE

FOR FAILING TO MOVE FOR A COMPETENCY HEARING THAT WAS
CLEARLY NOT WARRANTED.  (RESPONSE TO SANCHEZ ISSUE IV).

Petitioner Sanchez, in Sections IV and VIII(E) of his 2255 motion, alleges that he was incompetent to stand trial (guilt and penalty phases), that his lawyer was ineffective for failing to move for a competency hearing, and that the Court violated his due process rights for failing to hold a competency hearing *sua sponte*.  CV-DE 16-1 at 45-57; 148-49.   Sanchez claims of incompetency are speculative and are not supported by the record or any post-trial affidavits.  In fact, the record contradicts Sanchez's claims.  As the Petitioner has failed to meet his burden of establishing that he was incompetent, these claims should be denied.

The Due Process Clause prohibits the government from trying and convicting a mentally incompetent defendant. *See Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *See also James v. Singletary*, 957 F.2d 1562, 1569 (11th Cir.1992) (*citing Pate v. Robinson*, 383 U.S. 375, 384–86 (1966); *Dusky v. United States*, 362 U.S. 402, (1960)). A defendant's competence to stand trial depends on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Drope*, 420 U.S. at 172, 95 S.Ct. 896 (*quoting Dusky*, 362 U.S. at 402, 80 S.Ct. 788). In *Pate v. Robinson*, the Supreme Court established that due process requires a trial court to conduct a competency hearing, on its own initiative, when the objective facts known to the trial court at the time create a "bona fide doubt" as to the criminal defendant's competency. *Pate*, 383 U.S. at 385, 86 S.Ct. 836; *Wright v. Secretary for the Dep't of Corr.*, 278 F.3d 1245, 1256 (11 Cir.2002); *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987); *see also Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir.1983) (standard of review is "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with

90

respect to competency to stand trial"). Relevant factors to consider when assessing whether there existed a bona fide doubt regarding competency include: (1) a defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial. *Drope*, 420 U.S. at 180, 95 S.Ct. 896; *Fallada*, 819 F.2d at 1568.

A petitioner in a collateral proceeding may allege that he was tried and convicted while incompetent -- a substantive due process violation -- even if he failed to raise the issue on direct appeal; the procedural default rule does not apply to such claims. *See Adams v. Wainwright*, 764 F.2d 1356, 1359 (11th Cir. 1985); *see also Medina v. Singletary*, 59 F.3d 1095, 1107 ("The Sykes procedural default rule does not … preclude review on the merits of a post-conviction incompetency claim, even if the claim was not raised on direct appeal"). To receive an evidentiary hearing on a substantive due process competency claim, a petitioner must present "clear and convincing evidence creating a real, substantial and legitimate doubt as to his competence to stand trial." *Medina*, 59 F.3d at 1106 (internal quotation marks and citations omitted). To prevail at the evidentiary hearing, the petitioner must establish his incompetence at the time of his trial by a preponderance of the evidence. *See James v. Singletary*, 957 F.2d 1562, 1571 (11th Cir. 1992).

Sanchez argues that a bona fide doubt as to his competence to stand trial arose out of his behavior at trial: "Mr. Sanchez did not attend to the proceedings, drew and doodled rather than conferring with counsel during proceedings, and rather than acting organically and naturally to the proceedings imitated the reacted and behaviors of his codefendants.". CV-DE 16-1 at 57. In support of these allegations, Sanchez provides no evidence: no cites to the record and no post-trial affidavits. The transcript of the trial of this matter spans more than 9,000 pages. The Court held regular status conferences which the defendants were required to attend. The transcripts of these hearings span hundreds of pages. In all this record, Sanchez was able to allude to only one specific

instance in the record in which behavior could have called his competency into question. Sanchez claims that after the death verdict was read, co-defendant Troya stood and threw a water bottle at the prosecutor and that, in reaction, Sanchez stood as well, mimicking the actions of co-defendant Troya. First of all, Troya did not simply stand and throw a water bottle at the prosecutor after the jury left the Courtroom. Troya did these things and then ran for the judge and had to be tackled to the ground by two deputy U.S. Marshals, breaking a chair in the process. Sanchez stood not to mimic Troya, but to see what was happening to Troya on the ground. Although the trial transcript does not make clear the full extent of this outburst, Troya makes reference to his outburst during his sentencing hearing. CR-DE 955 at 17. Secondly, even if this was mimicking behavior on Sanchez's part, this action occurred at the end of the penalty phase, after the trial was concluded and competency was no longer an issue.

Sanchez also claims that his incompetency was caused by "neuropsychological and intellectual impairments" and "symptoms of psychiatric disorders". CV-DE 16-1 at 45. Petitioner provides no affidavits or medical records to support this claim. The complete record shows that Sanchez's mental health was evaluated by defense experts several times between the time of his arrest and the conclusion of this trial. *See* Section H, *infra*. Sanchez's mental health was also evaluated by a government expert in preparation for the penalty phase. CR-DE 539, 598. At no point did any of these experts, learned counsel, or the Court question Sanchez's competency to stand trial.

In fact, the record is replete with evidence of Sanchez's competency—that he was working with counsel and that he understood the nature of the proceedings, the nature of the charges against him, and the procedures to be followed in Court:

- Prior to his arrest in the instant case, Sanchez was convicted on state charges. CR-DE 97. There is no indication that Sanchez was found incompetent in that case.

92

- During his initial appearance of the superseding indictment before Magistrate Judge Vitunac on March 12, 2007, Sanchez appropriately addressed the Court and his counsel informed the Court that Sanchez has not been allowed normal visitation or access to legal research. CR-DE 998 at 4-5. Counsel followed up with a written motion which states, in relevant part: "[y]our undersigned was informed by Mr. Sanchez that his is presently in segregation and is not permitted to access the law library and more importantly, his is not permitted to have contact with family members and normal telephone privileges." CR-DE 142.

- During the initial appearance on the second superseding indictment before Judge Vitunac on April 27, 2007, Sanchez announces his plea of "not guilty" at the appropriate time. CR-DE 1000.

- In a motion filed on December 19, 2007, Sanchez's lawyer indicates that he and Sanchez have been meeting frequently to review discovery and discuss the case. CR-DE 285.

- During a status conference on February 20, 2008, at which time Sanchez has his initial appearance on the third superseding indictment, Sanchez has the following colloquy with the Court:

> **Magistrate Judge Vitunac**:  Good afternoon, Mr. Sanchez.  Have you read the third superseding indictment?
>
> **Defendant Sanchez**:  Yes, we went over it.
>
> **Magistrate Judge Vitunac**:  Do you understand what was charged in the indictment?
>
> **Defendant Sanchez**:  Yes.
>
> Magistrate Judge Vitunac: Would you like me to read it in full at this time?
>
> **Defendant Sanchez**:  No, ma'am.

CR-DE 962 at 19.

- Following his arrest on the instant charges, Sanchez was Mirandized and questioned during a recorded encounter with law enforcement. At first, Sanchez talked and joked with the officer. Once incriminating evidence was mentioned, Sanchez invoked. The Court found that the Miranda waiver was knowingly and voluntary and that there was no indication that Sanchez was not competent to understand his Miranda rights. CR-DE 435.

- During the December 17, 2008, status conference, counsel indicated that he reviewed and discussed the returned juror questionnaires with Sanchez and that Sanchez assented to the agreed strikes.  CR-DE 1098 at 10.

- Throughout the proceedings, Sanchez asked counsel to ask the Court for restroom breaks. CR-DE 732 at 4146; CR-DE 752 at 5263; CR-DE 823 at 8288, CR-DE 847 at 9624; CR-DE 795 at 60.

- During the trial, Sanchez manipulated prison rules, asking staff if he could contact his attorney and instead used the opportunity to make a personal call.  CR-DE 825 at 8679.

- During his sentencing hearing, Sanchez addressed the Court, proclaimed his innocence, and hoped that his conviction would be overturned.  CR-DE 956 at 6.

In sum, the record shows that Sanchez acted rationally during the trial, and that his demeanor and interactions were appropriate.  Furthermore, prior to the filing of the instant 2255, there was never any question raised as to Sanchez's competency—not during the pendency of his prior criminal case, not during any of his pre-trial mental health evaluations, not during any of the numerous pre-trial hearings for which Sanchez was present, and not during the lengthy trial of this matter.

As Petitioner has not alleged any competent, reliable evidence to support his claim of incompetency --let alone clear and convincing evidence-- his claim that the Court violated his substantive due process rights by failing to hold a competency hearing should be denied without a hearing.  Sanchez's related claim—that his lawyer was ineffective for failing to move for a competency hearing—should likewise be denied. There is no competent evidence to support Sanchez's claim that he was incompetent at the time of his trial.  A lawyer cannot prejudice a defendant by not asserting the need for a competency hearing when the defendant was, in fact, competent for the pertinent period.  *See Moore v. Campbell*, 344 F.3d 1313, 1324-25 (11th Cir. 2003).  For all the foregoing reasons, Sanchez's claims concerning competency should be denied without a hearing.

94

L.     SANCHEZ HAS FAILED TO ESTABLISH THAT HIS ATTORNEYS WERE CONSITUTIONALLY INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S ARGUMENTS DURING THE GUILT AND PENALTY PHASES (SANCHEZ ISSUES VII(E) AND VIII(J)).

Sanchez claims that his attorneys were constitutionally ineffective for failing to object to improper and prejudicial prosecution argument during the guilt and penalty phases (CV-DE 16-1 at 102-105; 169-70).

1.    Guilt Phase Complaints

Sanchez initially complains that his counsel were ineffective for failing to object when the prosecutor argued: "[t]he Government is alleging, and we think, we know, we have proved that those murders occurred directly as a result of this carjacking." (CR-DE 766 at 7132). Sanchez claims that this argument was improper because it hints that the prosecutor had outside knowledge of Sanchez's guilt.  Sanchez completely misinterprets this argument. The prosecutor corrected himself by changing the word "think" to "know" in order to make his argument more persuasive to the jury as an advocate for the United States.  There is no support in the record for concluding that the prosecutor was trying to inject his personal knowledge of non-record evidence into the jury's decision-making process. Nothing improper occurred here and counsel was not deficient for failing to object.

Sanchez complains that his counsel were ineffective for failing to object when the prosecutor allegedly vouched for the credibility of government witnesses and stated that "cases don't get better than this" (CV-DE 16-1 at 102-04).    To prevail on this claim, Sanchez would have to demonstrate that the failure to object was outside the wide range of professional conduct, and that failure had an impact on the verdict and sentence.  The failure to object to prosecutorial comments about witness reliability did not fall outside the wide range of professional conduct here because the prosecutor's comments constituted invited reply to defense arguments concerning the

95

purported weakness of the government's case.   The prosecutor's comment in rebuttal closing about cases "not getting any better than this", (CR-DE 766 at 7438), referred to the mountain of circumstantial evidence pointing to Sanchez's guilt and was a proper invited reply to the defense arguments concerning the supposed weakness of the prosecution's case. *See e.g.*, CR-DE 767 at pp. 7279 – 82 (Troya counsel Ruben Garcia suggesting that the government's case was based solely on circumstantial evidence and supposition); and CR-DE 767 at p. 7290-91 (Sanchez counsel Cohen suggesting that the prosecution's entire murder case against Sanchez rested on four bullets, and jury could take all the other evidence and throw it out). *See also United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir.2009) (recognizing, as an exception to the prohibition against vouching for a witness, that "a prosecutor [is entitled] to respond to arguments advanced by defense counsel in his or her statement to the jury'"). As such, Sanchez cannot establish that any legal basis for an objection to such comments let alone that such an objection would have been sustained by the Court.

2.      Penalty Phase Complaints

Sanchez complains that counsel were ineffective for failing to object when the prosecutor allegedly denigrated defense counsel and misrepresented facts during penalty phase closing arguments (CV-DE 16-1 at 169, citing CR-DE 847 at 9515). Viewed in its entire context the prosecutor's summation properly argued to the jury the lack of weight the jury should attach to the submitted defense mitigating factor concerning the alleged domestic abuse trauma suffered by Sanchez. In support of this argument, the prosecutor properly pointed out evidence in the record for the jury, that is, despite claims of "trauma", Sanchez himself had denied any domestic abuse in describing his adolescent home life, and admitted that he returned to the family home regularly to play bingo.  It was altogether fitting that the prosecutor argued that the allegations of abuse had

been greatly overblown. Nothing improper was stated, therefore counsel was not deficient in failing to object because any objection would have been overruled.

Sanchez complains that his counsel were ineffective for failing to object when the government argued:

> A line was crossed that cannot be excused.  It cannot be excused with life in prison that this is just like any other murder, just drug dealers.  Two little kids murdered brutally, an entire family slaughtered.  If this case doesn't qualify, I don't know what will, ever.

(CR-DE 847 at 9522).  The prosecutor's comments were directed to the statutory and non-statutory aggravators submitted by the government, that is, (i) that the defendant murdered two little boys who were "particularly vulnerable due to youth" (CR-DE 860 at 8, ¶3); (ii) that the offense involved intentionally killing "multiple victims in a single criminal episode" (*Id.* at 8, ¶4); and (iii) that the victims were killed in order to eliminate them as potential witnesses (*Id.* at 10, ¶2). The argument was not improper and therefore counsel was not deficient for failing to object to it.

Sanchez further complains that his counsel were ineffective for failing to object when the prosecutor argued, during the penalty phase rebuttal closing that the jurors needed to act as the "conscience of the community":

> Whatever your verdict is after this phase, if you follow the law, and you discussed legal things, and you rendered a verdict that spoke the truth based on the evidence and the law, hold your head high, whatever your verdict, because you have discharged your duty…

> So as the conscience of this community, you need to speak with one voice as to the appropriateness of the penalty here.  It is the verdict of you each individually and it is the verdict of you as 12 jurors, as a voice of this community to tell us what the appropriate penalty is…

> It is that process, sharing viewpoints, re-examining what we actually originally may have thought, and coming to a conclusion that speaks the truth. That is the hallmark of our justice system. Do it, talk, exchange your ideas, and reach a consensus. Speak together with your unanimous verdict as the conscience of this community.

(CR-DE 847 at 9606-07) (italics supplied). These comments were not improper and in fact echoed the Court's instruction to the jury on this same issue: "Your role is to be the conscience of the community in making a moral judgment about the worth of an individual life balanced against the societal value of what the Government contends is deserved punishment for the Defendant's offense." (CR-DE at 9756). Any objection as to the prosecutor's comment that the jury was the "conscience of the community" would have been overruled. Counsel were not deficient for failing to make this objection.

Sanchez further complains that his counsel were ineffective for failing to object when the prosecutor referred to certain evidence offered in mitigation as "disgusting":

> On the one hand, you weigh Sanchez's learning disability, domestic abuse at home against the execution of two children. Children that played with his child. Children he knew. He wasn't killing strangers. Not that that is any mitigation, but it is even more despicable when you think about it, when you are putting a gun to the head of a child that has played with your child,[43] that is the same age as your child.

> He killed those children because they would know that he killed their daddy. That's it. In the middle of the night on the dark side of a road a three and four-year-old child would never be able to pick out of a lineup any stranger, but they knew that they were following their daddy and mommy for eight hours. They knew who was in the van. They knew who was there.

---

[43] *See* Testimony of Crystal Salazar (CR-DE 738 at 4532-45) indicating Escobedo children knew Sanchez; *see also* Testimony of Maria Lopez (CR-DE 758 at 6390-92) indicating her son came back from defendant Sanchez's home with a Batman book bag containing the name of "Julian Escobedo" [subsequently-murdered child] written in it.

> It's really disgusting for them to put up a picture of a child in a videotape and beg and in a desperate fashion ask for your mercy when they know that he killed a child of exactly that same age.

(*Id.* at 9610-11).   The prosecutor's statement was a proper comment on Sanchez's use of a videotape of his young son during the mitigation case.   Nothing improper occurred, therefore counsel was not deficient in failing to object.

Sanchez complains that his counsel were ineffective for failing to object to when the prosecutor allegedly minimized the abuse Sanchez had suffered at his father's hands in penalty phase rebuttal closing.   (CV-DE 16-1 at 170, second bullet issue).   Once again, it is important to read the prosecutor's actual comments in context:

> Mr. Murrell spent some time with you in discussing the evidence that was presented during their phase of the trial.  And you know he spent a lot of time being very harsh on Mr. Sanchez's dad and very harsh on that family.
>
> You know, I comment to you about this, maybe his father wasn't a perfect father, but this man had a third grade education, and an I.Q. below 70.  He comes to this country, becomes a citizen, he holds down a steady job for 25 years, he provides for a family.  He buys a house, pays mortgage payments on a house, takes his family on trips, he feeds them, buys clothes for them.   That is a remarkable achievement for a man who came from another country with very little education.
>
> Prime minister of India Nehru back in the 1940's said, life is like a game of cards, the hand you are dealt is determinism, the way you play it is free will.
>
> That was a tough hand dealt to Ricardo Sanchez, Sr.  And his mom who worked in the field and worked with the crops, no education, they played it the best they could.  They did it the best they could.

(CR-DE 847 at 9612-13).

The above argument was entirely proper given the record evidence in the case concerning just how bad, or not so bad, the Sanchez household was during the defendant's formative years (*See* Testimony of Maria Sanchez, CR-DE 823 at 8148-8209, Testimony of Nydia Sanchez, (*Id.*

at 8272-8299), and rebuttal Testimony of Dr. Michael Brannon, CR-DE 846 at 9319, indicating Sanchez denied he had seen adults fighting at his home when growing up). Nothing improper occurred, therefore counsel was not deficient in failing to object.

Finally, Sanchez argues his counsel were ineffective for failing to object when the prosecutor argued, during the penalty phase rebuttal closing, that Varela was not an equally culpable co-defendant, and there had been no deals with Varela (CV-DE 16-1 at 170, third bullet issue). There was nothing improper about this statement. Varela went to trial with Sanchez and Troya. This same jury found Varela guilty. It was apparent to everyone that no deals had been made between government and Varela. Sanchez cannot show that he was prejudiced by the government's commentary on Varela's culpability for the murders as the great majority of the jurors rejected the prosecutor's argument that Varela was not an equally culpable codefendant. Ten of the twelve jurors found that "[a]n equally culpable co-defendant, Danny Varela, was not charged in these murders and will not be facing death" (CR-DE 859 at 12; CR-DE 860 at 12).

    3.    <u>Prejudice</u>

Sanchez has simply not established that he would have been acquitted or escaped the death penalty had counsel objected to the prosecutor's comments. The recently proposed objections lack merit and would have been overruled, for the reasons stated above. Furthermore, the government's case was strong. In fact, on direct review, the Eleventh Circuit described the evidence of guilt as "overwhelming". *United States v. Troya*, 733 F.3d 1125, 1138 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 2048 (2015). The absence of the complained of arguments would not have made any difference in the outcome. At the very least, Sanchez has not established that it would.

When viewed in the context of a lengthy and convoluted trial, the prosecution comments were not so pervasive that they permeated the entire trial. The United States called its first of

seventy-two guilt phase witnesses on January 27, 2009 (CR-DE 728 at 3099). Guilt phase closing arguments were completed on February 26, 2009 (CR-DE 767 at 7457). The penalty phase began on March 16, 2009 (CR-DE 818 at 7918), and ended with final arguments on March 25, 2009 (CR-DE 847 at 9640). The three hours or so of government closing arguments were relatively isolated and did not permeate the atmosphere of the trial. The comments did not affect the atmosphere of the long trial, nor were they made repeatedly over the course of the trial. For this reason, amongst others, this claim should be rejected. *See, e.g., United States v. Mueller*, 74 F.3d 1152 (11th Cir. 1996) and *United States v. Kallen-Zury*, 629 Fed. Appx. 894 (11th Cir. 2015) (both cases upholding convictions despite prosecutorial comment error).

While the United States does not concede that its prosecutors erred in the closing penalty arguments, and indeed the record shows that they did not so err, any error was cured by the court's repeated instructions to the jury that the lawyers' comments were not evidence (CR-DE 728 at 3024, 3036, 3037; CR-DE 767 at 7275; CR-DE 771 at 7490-91). These instructions cured any alleged error from the prosecution's statements. *See Smith v. United States*, 379 Fed. Appx. 811 (11th Cir. 2010) (affirming district court habeas finding of no prejudice where trial court instructed jury that counsel arguments were not evidence after prosecutor vouched for witness's credibility in response to defense closings); *see also Sims v. Singletary*, 155 F.3d 1297, 1309 (11th Cir. 1998) (no prejudice for failure to object where conviction supported by substantial independent evidence). *See United States v. Gainey*, 111 F.3d 834, 836-37 (11th Cir.1997) (prosecutor's inappropriate comment not prejudicial where it "was mitigated by the district court's curative instructions"); *United States v. Barshov*, 733 F.2d 842, 846-47 (11th Cir.1984) (same).

The jury is presumed to have followed the court's instructions in this regard, therefore there was no prejudice, and counsel was not ineffective for failing to object.

4.      Conclusion

Sanchez has not met his burden of establishing that his trial counsel's failures to object to prosecution arguments constituted representation that was outside the wide range of reasonable professional conduct.  Sanchez also has failed to demonstrate prejudice inasmuch as any prejudice during argument was cured by the court's repeated instructions that the lawyers' comments did not constitute evidence.  Finally, the failures to object did not have an outcome on the ultimate verdicts in the case, and therefore Sanchez suffered no prejudice.  For all these reasons, Sanchez's claims concerning counsel's failure to object to statements made during government argument should be denied.

M.      SANCHEZ IS NOT ENTITLED TO RELIEF UNDER THE CUMULATIVE ERROR DOCTRINE (SANCHEZ ISSUE XI).

Sanchez's last claim for relief asserts that he is entitled to have his convictions and sentences vacated due to "cumulative errors" in his trial and appeal.  Sanchez fails to cite any case law in support of this claim.  Under the cumulative error doctrine, even if individual judicial errors or prosecutorial misconduct would not suffice to warrant reversal, their effect may be evaluated cumulatively to determine if they denied the defendant a fair trial.  *See United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009).  "In addressing a claim of cumulative error, [the Court] must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."  *Id.*  (quotation omitted).  However, where there is no error or a single error, there cannot be any cumulative error.  *See United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004).

Here, the United States has demonstrated how each of Sanchez's individual claims of error have failed.  The evidence against him was overwhelming.  Regardless of the alleged errors discussed above, no reasonable jury could have acquitted Sanchez on this record, which established unquestionably that Sanchez had participated in a horrific act of wanton violence that

resulted in the multiple members of an entire family, including two innocent little boys.  No additional mitigation evidence would have changed the penalty verdict either.  His own experts and evidence indicated that he was not intellectually disabled, and the jury rejected a multitude of submitted mitigating factors supported by evidence that did not outweigh the prosecution-submitted aggravators.   Under this record as a whole, Sanchez was afforded a fair trial, and his attorneys rendered constitutionally-sufficient representation.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal."   *Morris v. Secretary, Dept. of Corrections*, 677 F.33d 1117, 1132 (11th Cir. 2012) (*citing United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir.2005)) (internal quotation marks omitted).  This Court should address claims of cumulative error by first considering the validity of each claim individually, and then examining any established errors in the aggregate and in light of the trial as a whole to determine whether Sanchez was afforded a fundamentally fair trial. *See United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir.1997).

Sanchez's argument, without elaboration, appears to advance a volume discount theory, bundling all of trial counsel's alleged perceived errors, big and small, into one great mass with a Sixth Amendment denial of counsel label. This approach is not approved in *Strickland*,[44] which set out the available avenues for relief in an ineffective assistance of counsel claim.

---

[44] The United States does not concede that the cumulative error doctrine even survives the *Strickland* decision, which set out the limited avenues available for 2255 relief.  *See generally, Johnson v. Nagle*, 58 F. Supp. 2d 1303 at 1352 (N.D. Ala. 1999).

Trial counsel here, during both the guilt and penalty phases, vigorously contested the government's case, suggested alternative theories of the murders exonerating Sanchez, and presented a detailed presentation of Sanchez's socio-economic and low-intellectual background through family, third party and expert witnesses in mitigation.  Counsel's alleged mistakes were not the sort of conduct that creates a presumption of harm under *United States v. Cronic*, 466 U.S. 684 (1984) (noting that if defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable).   A denial of the Sixth Amendment right to counsel as envisioned in *Cronic* occurs where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. In such cases, the adversary process itself becomes presumptively unreliable and there is no requirement to show any specific prejudice. That is simply not what happened here. The entire trial record here, as demonstrated by the United States in this response, amply establishes that Sanchez's attorneys did not sit as idle as passive observers but were, instead, passionate and involved zealous advocates who subjected the government's case to meaningful testing.   Sanchez received a fair trial, and his attorneys rendered constitutionally-sufficient representation.  Merely lumping all of the allegations into the kitchen sink does not entitle him to relief where no single error has been established on its own merits.

## III.   IN CONCLUSION, PETITIONER'S MOTION SHOULD BE DENIED WITHOUT A HEARING

In his motion pursuant to Title 28, United States Code Section 2255, Petitioner claims that his conviction and sentence was unconstitutional because his learned and experienced court lawyers were ineffective.  Petitioner's claims of ineffective assistance, though numerous and verbose, are either completely contradicted by the record below or are not substantiated by the required sworn affidavits or other documentary proof, or both, and otherwise lack merit.

It is well settled that the simple filing of a Section 2255 motion does not establish any right to a hearing.  *See Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977).  A petitioner must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief.  *See United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990); *Newfield*, 565 F.2d at 207.  Where a defendant's claims, even if true, fail to state a claim upon which habeas relief can be granted, the claims are subject to dismissal without a hearing.  *See Machibroda v. United States*, 368 U.S. 487, 495, 82 S. Ct. 510, 514 (1962); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992).  Thus, no evidentiary hearing is required where, as here, the Petitioner has failed to set forth specific facts supported by competent evidence and the written record conclusively shows that even if every allegation were accepted as true, the Petitioner is still not entitled to relief.  *See Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991); *Tejada*, 941 F.2d at 1559; *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (petitioner not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible.").

For the foregoing reasons, the United States requests that Sanchez's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 should be denied in all respects without an evidentiary hearing.

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By:      */s Stephen Carlton*
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV
*Attorney for the United States*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 1, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     /s/ Stephen Carlton
                Stephen Carlton
                Assistant United States Attorney

## SERVICE LIST

**Ricardo Sanchez, Jr.  v. United States**
**Case No. 16-80693-CV-SCOLA**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Brandy Galler**
**Stephanie Evans**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Brandy.Galler@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
Attorney for United States
[Service via CM/ECF]


**Matthew C. Lawry**
**Aren Adjoian**
Federal Community Defender Office for the Eastern District of Pennsylvania Curtis Center
Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone:  (215) 928-0520
Fax:  (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org
[Service via CM/ECF]