**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CIVIL NO. 9:16-CV-80693-RNS**

| | | |
|---|---|---|
| **RICARDO SANCHEZ, JR.,** | **:** | |
| **Movant** | **:** | |
| | **:** | |
| **v.** | **:** | **THIS IS A CAPITAL CASE** |
| | **:** | |
| **UNITED STATES OF AMERICA,** | **:** | |
| **Respondent** | **:** | |

**MOVANT RICARDO SANCHEZ'S REPLY TO**
**GOVERNMENT RESPONSE TO MOTION TO VACATE, SET ASIDE OR CORRECT**
**SENTENCE PURSUANT TO 28 U.S.C. § 2255**
**AND INCORPORATED MEMORANDUM OF LAW**

Matthew C. Lawry
Aren Adjoian
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

*Counsel for Ricardo Sanchez, Jr.*

December 15, 2016

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................... iv

PRELIMINARY STATEMENT ..................................................................................................... 1

RECENT PROCEDURAL HISTORY ............................................................................................ 2

STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL ......................... 4

REPLY IN SUPPORT OF § 2255 MOTION ................................................................................ 6

CLAIM IV: MR. SANCHEZ WAS INCOMPETENT TO STAND TRIAL, TRIAL COUNSEL
WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT
EVIDENCE OF HIS INCOMPETENCE, AND THE COURT DID NOT ORDER AN
ASSESSMENT OF OR HEARING TO DETERMINE HIS COMPETENCE............................... 6

   A.   Mr. Sanchez Has Significant Impairments in Intellectual Functioning,
      Neuropsychological Impairments, and Psychiatric Symptoms. ....................................... 7

      1.   Impairments in intellectual functioning. ........................................................... 7

      2.   Neuropsychological impairments. ..................................................................... 7

      3.   Mr. Sanchez suffered debilitating psychiatric symptoms at the time of the
          preparations for trial and during trial proceedings......................................... 8

   B.   As a Result of His Impairments and Psychiatric Symptoms, Mr. Sanchez Was
      Incompetent to Stand Trial......................................................................................... 10

   C.   Trial Counsel Failed to Investigate, Prepare, and Present Evidence of Mr. Sanchez's
      Incompetence. ............................................................................................................ 12

   D.   The Commonwealth's Arguments Are Without Merit. ................................................ 15

CLAIM V: THE PROSECUTION'S PRESENTATION OF TESTIMONY OF A MEDICAL
EXAMINER WHO DID NOT CONDUCT OR OBSERVE THE AUTOPSIES OF THE
VICTIMS VIOLATED MR. SANCHEZ'S RIGHTS UNDER THE FIFTH, SIXTH, AND
EIGHTH AMENDMENTS; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO
OBJECT TO THE SUBSTITUTION OF THE MEDICAL EXAMINER. .................................. 16

   A.   Mr. Sanchez's Right to Confrontation Was Violated. .................................................. 17

   B.   Mr. Sanchez's Right to Be Free from Cruel and Unusual Punishment Was Violated. .... 20

   C.   Counsel Were Ineffective for Failing to Object to or Otherwise Challenge Dr.
      Mittleman's Testimony................................................................................................ 20

      1.   Deficient performance. .................................................................................... 21

      2.   Prejudice. ........................................................................................................ 23

CLAIM VII: MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF
COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL. ........................................... 26

   A.   Governing Legal Principles. ......................................................................................... 27

   B.   Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Properly
      Challenge the Government's Toolmark Evidence.......................................................... 29

1. The admissibility of expert testimony.................................................................. 29

2. Counsel failed to investigate, develop, and mount a *Daubert* challenge to the government's firearms and toolmark evidence........................................................... 31

3. Counsel's failure to adequately challenge the firearms and toolmark evidence prejudiced Mr. Sanchez. .................................................................................... 34

C. Trial Counsel Rendered Ineffective Assistance by Failing to Investigate and Present Testimony of a Qualified Expert in Cellular Forensics. ........................................ 37

D. Trial Counsel Unreasonably and Prejudicially Failed to Object to the Charges Contained in Counts 7 through 10, and to the Jury Instructions and Verdicts on Those Counts....... 42

E. Trial Counsel Unreasonably and Prejudicially Failed to Object to the Prosecutor's Misconduct during Guilt Phase Closing Arguments. ..................................................... 47

F. Counsel's Unreasonable Errors and Omissions Individually and Cumulatively Prejudiced the Defense at Mr. Sanchez's Capital Trial. ................................................................. 50

CLAIM VIII: MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL............................................................. 51

A. Governing Legal Principles. ................................................................................ 57

B. Failure to Investigate, Develop, and Present Evidence of Mr. Sanchez's Personal Background and Social History. ............................................................................ 57

1. Deficient performance. ................................................................................ 57

2. Prejudice. .................................................................................................. 64

C. Failure to Investigate, Develop, and Present Evidence of Mr. Sanchez's Neuropsychological and Psychiatric Impairments and Intellectual Disability and the Effects of these Impairments on His Behavior and Functioning, and Failure to Consult Effectively with the Experts Counsel Did Retain. (Claims VIII(B), VIII(C), VIII(D), VIII(F)) ............................................................................................................... 84

1. Failure to investigate and present evidence of Mr. Sanchez's neuropsychological impairments and their effects on his behavior and functioning. (Claim VIIIB)............... 86

2. Failure to investigate and present evidence of Mr. Sanchez's psychiatric disorders and their effects on Mr. Sanchez's behavior and functioning. (Claim VIIIC) ................. 89

3. Failure to investigate and present evidence that Mr. Sanchez is intellectually disabled. (Claim VIIID) ................................................................................................ 93

4. Errors and omissions in consultation with mental health experts retained by the defense. (Claim VIIIE)..................................................................................... 110

D. Failure to Investigate and Present Evidence that Mr. Sanchez Was Incompetent to Stand Trial.......................................................................................................... 114

E. Failure to Identify and Present Evidence of Mr. Sanchez's Traumatic Background and Disabilities from Documents in Counsel's Possession...................................................... 116

F. Failure to Impeach and Discredit the Testimony of Michael Brannon........................... 119

G.    Failure to Investigate, Challenge, and Mitigate the Evidence Introduced in Aggravation.................................................................................................................. 123

H.    Failure to Object to the Prosecution's Misconduct During the Penalty Phase. .............. 125

I.     Failure to Object to Penalty Phase Jury Instructions that Interfered with the Jury's Consideration of Proffered Mitigating Factors. ............................................................... 128

J.     Cumulative Prejudice from Ineffective Assistance of Counsel. ..................................... 130

CLAIM XI: MR. SANCHEZ IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL AND STATUTORY VIOLATIONS DESCRIBED IN THE MOTION. ................................................................................................................................. 130

CONCLUSION ............................................................................................................................. 133

# TABLE OF AUTHORITIES

**Federal Cases**

*Adams v. Wainwright*, 764 F.2d 1356 (11th Cir. 1985) ................................................................ 10

*Agan v. Singletary*, 12 F.3d 1012 (11th Cir. 1993) ........................................................... 6, 12, 15

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) ................................................................... 36

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................................... 94, 95

*Battle v. United States*, 419 F.3d 1292 (11th Cir. 2005) .............................................................. 56

*Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007) ................................................................................. 31

*Berger v. United States*, 295 U.S. 78 (1935) ............................................................................... 47

*Berryman v. Morton*, 100 F.3d 1089 (3d Cir. 1996) ................................................................... 32

*Bullcoming v. New Mexico*, 564 U.S. 647 (2011) ................................................................. 18, 22

*Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) ...................................................................... 126

*Byrd v. Trombley*, 580 F. Supp. 2d 542 (E.D. Mich. 2008) .................................................. 36, 41

*California v. Brown*, 479 U.S. 538 (1987) ................................................................................... 58

*Card v. Singletary*, 981 F.2d 481 (11th Cir. 1992) ................................................................ 10, 15

*Carella v. California*, 491 U.S. 263 (1989) ................................................................................. 43

*Chambers v. Mississippi*, 410 U.S. 284 (1973) .................................................................... 20, 131

*Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000) .......................................................................... 126

*Conklin v. Schofield*, 366 F.3d 1191 (11th Cir. 2004) ................................................................ 50

*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011) .......................................................................... 31

*Crawford v. Washington*, 541 U.S. 36 (2004) ..................................................................... passim

*Crotts v. Smith*, 73 F.3d 861 (9th Cir. 1996) ............................................................................ 126

*Daniel v. Comm'r*, 822 F.3d 1248 (11th Cir. 2016) .................................................................... 58

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ........................................................ passim

*Davis v. Washington*, 547 U.S. 813 (2006) ........................................................................... 18, 20

*Davis v. Zant*, 36 F.3d 1538 (11th Cir. 1994) ........................................................................... 127

*DeBruce v. Comm'r*, 758 F.3d 1263 (11th Cir. 2014) .............................................................. 5, 86

*Dickerson v. Bagley*, 453 F.3d 690 (6th Cir. 2006) ............................................................... 59, 64

*Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001) ...................................................................... 45, 97

*Dobbs v. Turpin*, 142 F.3d 1383 (11th Cir. 1998) ...................................................................... 63

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ............................................................... 50, 131

*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) ........................................................................ 48

*Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) .................................................................... 31

*Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995) ............................................................................ 32

*Drope v. Missouri*, 420 U.S. 162 (1975) ................................................................................. 6, 10

*Dugas v. Coplan*, 428 F.3d 317 (1st Cir. 2005) .......................................................................... 31

*Dusky v. United States*, 362 U.S. 402 (1960) ............................................................................. 10

*Elledge v. Dugger*, 823 F.2d 1439 (11th Cir. 1987) ................................................................... 93

*Eze v. Senkowski*, 321 F.3d 110 (2d Cir. 2003) ....................................................................... 120

*Ferrell v. Hall*, 640 F.3d 1199 (11th Cir. 2011) ................................................................. passim

*Fortenberry v. Haley*, 297 F.3d 1213 (11th Cir. 2002) ............................................................... 38

*Francis v. Franklin*, 471 U.S. 307 (1985) .................................................................................. 44

*Futch v. Dugger*, 874 F.2d 1483 (11th Cir. 1989) ................................................... 114, 115, 116

*Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005) .................................................................. 32

*Gonzalez-Lauzan v. United States*, No. 07-21144-CIV, 2008 WL 343492 (S.D. Fla. Feb. 5, 2008) ............................................................................................................................................ 46

*Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996) ......................................................................... 126

*Hall v. Florida*, 134 S. Ct. 1986 (2014) ................................................................................... 95

*Hardwick v. Crosby*, 320 F.3d 1127 (11th Cir. 2003) ............................................................... 21

*Harrington v. Richter*, 562 U.S. 86 (2011) ............................................................................... 31

*Hill v. Lockhart*, 28 F.3d 832 (8th Cir. 1994) .......................................................................... 33

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014) ....................................................................... passim

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) ................................................................. 50, 125

*Holladay v. Allen*, 555 F.3d 1346 (11th Cir. 2009) .................................................................. 94

*Holsey v. Warden, Diagnostic Prison*, 694 F.3d 1230 (11th Cir. 2012) ................................... 83

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) .......................................................... passim

*Horton v. Zant*, 941 F.2d 1449 (11th Cir. 1991) ................................................................. 45, 97

*Jackson v. Herring*, 42 F.3d 1350 (11th Cir. 1995) .................................................................. 63

*Johnson v. Nagle*, 58 F. Supp. 2d 1303 (N.D. Ala. 1999) .................................................. 28, 131

*Johnson v. Sec'y, DOC*, 643 F.3d 907 (11th Cir. 2011) ................................................ 55, 64, 83

*Johnston v. Singletary*, 162 F.3d 630 (11th Cir. 1998) ............................................................. 82

*Kimmelman v. Morrison*, 477 U.S. 365 (1986) .............................................................. 28, 33, 96

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) .......................................... 30

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................... 30

*Kyles v. Whitley*, 514 U.S. 419 (1995) ....................................................................... 25, 50, 132

*Lawrence v. Sec'y Fla. Dep't of Corr.*, 700 F.3d 464 (11th Cir. 2012) .................................... 15

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ............................................................ 84

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) ...................................................... 22, 24

*Ohio v. Roberts*, 448 U.S. 56 (1980) ........................................................................................ 22

*Paige v. Birkett*, 2006 WL 273619 (E.D. Mich. Jan. 31, 2006) ................................................... 53

*Pate v. Robinson*, 383 U.S. 375 (1966) ............................................................................... 6

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ............................................................................ 58

*Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002) ............................................................. 129

*Pope v. Sec'y for the Dep't of Corr.*, 680 F.3d 1271 (11th Cir. 2012) ....................................... 41

*Porter v. McCollum*, 558 U.S. 30 (2009) ...................................................................... passim

*Reed v. Sec'y, Dep't of Corr.*, 593 F.3d 1217 (11th Cir. 2010) ................................................ 130

*Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) .......................................................... 27, 31, 39

*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) ................................................................... 4, 39

*Rompilla v. Beard*, 545 U.S. 374 (2005) ....................................................................... passim

*Sandstrom v. Montana*, 442 U.S. 510 (1979) ................................................................... 44

*Sears v. Upton*, 561 U.S. 945 (2010) ......................................................................... passim

*Showers v. Beard*, 635 F.3d 625 (3d Cir. 2011) ................................................................ 27

*Siehl v. Grace*, 561 F.3d 289 (3d Cir. 2009) .................................................................. 27

*Soffar v. Dretke*, 368 F.3d 441 (5th Cir. 2004) ............................................................... 31

*Stanley v. Schriro*, 598 F.3d 612 (9th Cir. 2010) ............................................................ 111

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................................ passim

*Taylor v. Kentucky*, 436 U.S. 478 (1978) .................................................................... 50, 130

*Thomas v. Allen*, 607 F.3d 749 (11th Cir. 2010) ............................................................... 95

*United States ex rel. Bonner v. Warden, Stateville Corr. Center*, 422 F. Supp. 11 (N.D. Ill. 1976) ...................................................................................................... 53

*United States v. Aguiar*, 105 F. Supp. 3d 1 (D.D.C. 2015) ................................................... 53

*United States v. Bascaro*, 742 F.2d 1335 (11th Cir. 1984)..................................................... 128

*United States v. Beasley*, 2 F.3d 1551 (11th Cir. 1993) ...................................................... 128

*United States v. Booth*, 432 F.3d 542 (3d Cir. 2005) ......................................................... 53

*United States v. Burton*, 871 F.2d 1566 (11th Cir. 1989) ..................................................... 46

*United States v. Cardena*, No. 12-3680, 2016 WL 6819696 (7th Cir. Nov. 18, 2016) ............. 128

*United States v. Davis*, 611 F. Supp. 2d 472 (D. Md. 2009) ................................................... 95

*United States v. Garza*, 608 F.2d 659 (5th Cir. 1979) ....................................................... 48

*United States v. Green*, 405 F. Supp. 2d 104 (D. Mass. 2005) ............................................... 32, 35

*United States v. Hardy*, 762 F. Supp. 2d 849 (E.D. La. 2010) ................................................. 95

*United States v. Hernandez*, 921 F.2d 1569 (11th Cir. 1991) .................................................. 47

*United States v. Hughes*, 840 F.3d 1368 (11th Cir. 2016) .................................................. 128, 129

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) ................................................... 18

*United States v. Johnson*, 2003 WL 1193257 (N.D. Ill. 2003) ................................................. 95

*United States v. Lamerson*, 457 F.2d 371 (5th Cir. 1972) ........................................................... 48

*United States v. Lewis*, 2010 WL 5418901 (N.D. Ohio 2010) .................................................... 95

*United States v. Masthers*, 539 F.2d 721 (D.C. Cir. 1976) ................................................... 14, 16

*United States v. Nelson*, 419 F. Supp. 2d 891 (E.D. La. 2006) .................................................... 95

*United States v. Orr*, 636 F.3d 944 (8th Cir. 2011) .................................................... 29

*United States v. Rogers*, 94 F.3d 1519 (11th Cir. 1996) .......................................................... 44

*United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ............................................................... 21, 22

*United States v. Sablan*, 461 F. Supp. 2d 1239 (D. Colo. 2006) ................................................. 95

*United States v. Smith*, 814 F.3d 268 (5th Cir. 2016) ...................................................... 48

*United States v. Span*, 75 F.3d 1383 (9th Cir. 1996) .................................................... 129

*United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013) .......................................................... 25

*United States v. Wilk*, No. 04-60216-CR, 2005 WL 7863525 (S.D. Fla. Mar. 14, 2005) ........... 46

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007) ............................................................. 34

*United States v. Young*, 470 U.S. 1 (1985) ........................................................... 47, 49

*Walbey v. Quarterman*, 309 F. App'x 795 (5th Cir. 2009) .......................................................... 56

*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) ....................................................... 49, 50

*Wiggins v. Smith*, 539 U.S. 510 (2003) ................................................................ passim

*Williams v. Allen*, 542 F.3d 1326 (11th Cir. 2008) .............................................................. passim

*Williams v. Taylor*, 529 U.S. 362 (2000) .............................................................. passim

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) ............................................................... 27

*Wood v. Allen*, 542 F.3d 1281 (11th Cir. 2008) ......................................................... 94

*Yeck v. Goodwin*, 985 F.2d 538 (11th Cir. 1993) ................................................... 129

*Young v. Zant*, 677 F.2d 792 (11th Cir. 1982) .................................................... 45, 97

**Federal Statutes**

18 U.S.C. § 1111.................................................................................... passim

18 U.S.C. § 924(c) ............................................................................ 46

18 U.S.C. § 924(j)............................................................................... 42, 44, 45

18 U.S.C. § 2119 ............................................................................ 46

18 U.S.C. § 3596(c) ......................................................................... 95

21 U.S.C. § 841............................................................................... 46

21 U.S.C. § 846................................................................................ 46

28 U.S.C. § 455(a) ............................................................................. 3

28 U.S.C. § 2255 ...................................................................... passim

**State Cases**

*Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) ........................................................ 32, 35

**Other**

Fed. R. Civ. P. 8(b)(6) ........................................................................................................ 63, 94

Fed. R. Evid. 702 ...................................................................................................................... 29

Rules Governing Section 2255 Proceedings, Rule 5(b) ........................................................ 63, 94

## PRELIMINARY STATEMENT

Mr. Sanchez files this reply and consolidated memorandum of law in support of the claims that have not been dismissed by the Court. CV-DE 29 (Order dismissing claims). References to civil docket entries in this § 2255 litigation are cited as CV-DE ___, and citations to criminal docket entries are cited as CR-DE___. References to the consecutively numbered transcripts of the trial proceedings before this Court are cited as "Tr." followed by a page citation. Pre-trial and post-trial proceedings are cited as "Tr." followed by the date of the proceeding and page citation. References to items included in the appendix filed on October 19, 2016, and to the supplemental appendix filed contemporaneously with this reply are cited as App'x at A-___. Mr. Sanchez's § 2255 motion (CV-DE 16-1) is cited as "Motion," and the government's response in opposition (CV-DE 37) is cited as "Resp. Opp."

## RECENT PROCEDURAL HISTORY

Pending before the Court is Mr. Sanchez's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255. CV-DE 16-1 ("Motion"). On July 14, 2016, following a status conference, the Court entered a scheduling order, requiring Respondent to file a response to the Motion by October 12, 2016, and Mr. Sanchez to file a reply and memorandum of law by November 14, 2016. CV-DE 21. The scheduling order directed that deadlines for filing amended pleadings and dispositive motions would be set following a status conference scheduled for December 2, 2016. *Id.* The scheduling order also directed Mr. Sanchez to file any discovery motions by September 12, 2016, and Respondent to file a response to the discovery motion by October 12, 2016. *Id.*

Mr. Sanchez filed his discovery motion, along with a motion to interview jurors, on September 12, 2016. CV-DE 25-1, 26. On October 4, 2016, the Court sua sponte dismissed claims I, II, III, VI, VII(A), IX, and X of the Motion. CV-DE 29 (Order dismissing claims). The Court also denied the discovery requests related to those claims, and the motion for leave to interview jurors, as moot. *Id.* at 30. In separate orders, the Court ordered Respondent to respond to the remaining claims and discovery requests by November 1. CV-DE 30, 31.

On October 19, 2016, Mr. Sanchez filed a Motion to Reconsider Order Dismissing Claims and Incorporated Memorandum of Law. CV-DE 32. The Court has not yet ruled on the reconsideration motion. Also on October 19, 2016, Mr. Sanchez filed an Appendix in Support of Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 and in Support of Motion to Reconsider Order Dismissing Claims. CV-DE 33-1 through 33-16.

On November 1, 2016, Respondent filed Government Response to Sanchez's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Resp. Opp."). CV-DE 37.

2

Pursuant to the Court's October 4 Order, the response addressed only Mr. Sanchez's claims that the Court had not ordered dismissed. *See* CV-DE 30.

On November 22, 2016, the Court granted Mr. Sanchez's unopposed motion for extension of time to file his reply to December 15, 2016. CV-DE 44. Because the Court has not yet ruled on Mr. Sanchez's motion for reconsideration of the order dismissing claims, this Reply only addresses the claims not ordered dismissed. Should the Court grant reconsideration, Mr. Sanchez submits that the government should have an opportunity to respond to the dismissed claims and Mr. Sanchez an opportunity to reply.

On November 23, 2016, the Court issued an order to show cause regarding undersigned counsel's continued representation of Mr. Sanchez. CV-DE 45. The response to that order is due on December 19, 2016.

On December 12, 2016, the Court directed Mr. Sanchez's attention to docket entry 64 in *Troya v. United States*, No. 16-cv-80700-RNS. CV-DE 48. The docket entry in *Troya* is a Motion to Reassign Case Pursuant to 28 U.S.C. § 455(a). The Court ordered Mr. Sanchez to notify the Court whether he believes he may have grounds for raising a motion for disqualification or recusal on or before January 11, 2017. CV-DE 48. The order directs Mr. Sanchez to either file such a motion or instead file a notice indicating that he has diligently evaluated the issue and affirming that he has no reason to believe that disqualification or recusal is warranted. *Id.*

3

**STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL**

Mr. Sanchez's ineffective assistance of counsel claims are governed by the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. Counsel is deemed to have rendered unconstitutionally ineffective assistance where "counsel's representation fell below an objective standard of reasonableness," and there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687-88, 694.

In assessing the reasonableness of counsel's actions or omissions, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). Choices made by counsel, whether or not supported by a stated justification, were reasonable only to the extent they were informed by a reasonable investigation. *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("In assessing the reasonableness of an attorney's investigation, . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

To show prejudice at either phase of a capital trial,

> "a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693, 104 S.Ct. at 2068. The Supreme Court has explained this is so because an ineffective assistance of counsel "claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower." *Id*. at 694, 104 S.Ct. at 2068. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id*. In making the determination about whether there is a reasonable probability that [petitioner] would have received a different sentence, a reviewing court must "consider the

4

> totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter v. McCollum*, 558 U.S. 30, 41, 130 S.Ct. 447, 453-54, 175 L.Ed.2d 398 (2009) (quotation marks and alteration omitted).

*DeBruce v. Comm'r, Ala. Dep't. of Corr.*, 758 F.3d 1263, 1267 (11th Cir. 2014). "In a case challenging a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008).

## REPLY IN SUPPORT OF § 2255 MOTION

**CLAIM IV: MR. SANCHEZ WAS INCOMPETENT TO STAND TRIAL, TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF HIS INCOMPETENCE, AND THE COURT DID NOT ORDER AN ASSESSMENT OF OR HEARING TO DETERMINE HIS COMPETENCE.**

Mr. Sanchez was unable to understand the nature and consequences of the proceedings against him or rationally or properly assist counsel in the preparation and conduct of his defense leading up to and during his capital trial in 2009. At the time of his capital trial, his neuropsychological and intellectual impairments and symptoms of psychiatric disorders significantly impaired his functioning and grossly limited his ability to attend to events occurring around him, understand and engage in oral and written communication, and comprehend and follow directions.

The proceedings by which Mr. Sanchez was convicted and sentenced to death violated three related constitutional principles: (1) the defendant has a substantive due process right not to be tried while incompetent, *Drope v. Missouri,* 420 U.S. 162, 181-82 (1975); (2) the defendant has the right to effective assistance of counsel with respect to competency, *see Agan v. Singletary*, 12 F.3d 1012, 1018-19 (11th Cir. 1994); and (3) where there are indications of incompetency, a defendant has a procedural due process right to a hearing on competence, *Pate v. Robinson,* 383 U.S. 375, 378 (1966).

The Constitution requires both counsel and the trial court to be alert for signs of possible incompetency and to take measures to protect the defendant from being tried while incompetent. Here, counsel and the court breached those duties; as a result Mr. Sanchez is entitled to a new trial.

6

### A. Mr. Sanchez Has Significant Impairments in Intellectual Functioning, Neuropsychological Impairments, and Psychiatric Symptoms.

#### 1. Impairments in intellectual functioning.

We describe Mr. Sanchez's impairments in intellectual functioning in detail in Claim VIII; we do not repeat that showing here, but it is equally applicable to this claim.

#### 2. Neuropsychological impairments.

Mr. Sanchez was evaluated by a highly qualified neuropsychologist, Joette James, Ph.D. After conducting a battery of reliable tests of neuropsychological functioning, Dr. James concluded, "Mr. Sanchez's neuropsychological functioning is impaired in the domains of overall thinking and reasoning, as well in aspects of attention and executive functioning, including processing speed, working memory, cognitive flexibility, and organization." App'x at A-000772 (Joette Deanna James, Ph.D.).

Because of Mr. Sanchez's deficits in attention, working memory and processing speed, he has

> difficulty following and understanding verbal information provided to him because he is slow to process the information. Although he may appear to have a superficial understanding of verbal content . . ., his difficulty processing information results in his thinking about information he has previously heard when new information is presented, so he is unable to keep up with and understand the new information because he is distracted by the information presented previously. He also has difficulty encoding the information presented to him, due to his impairments in working memory, and thus he cannot hold the information in his attention for enough time to use the information effectively.

App'x at A-000757.

> Individuals like Mr. Sanchez who have deficits in executive functioning have difficulty adapting behavior in response to information, such as by using environmental and interpersonal feedback to change unsuccessful strategies. Impaired executive functioning also typically leads to limited ability to perceive environmental stimuli accurately, respond adaptively, anticipate and reach toward future goals, consider potential consequences, and make use of hindsight and foresight. Deficits in executive functioning also can interfere with an individual's

ability to have insight into his own behavior, thought-processes, and appearance to others.

App'x at A-000758.

Testing revealed that Mr. Sanchez's "executive functioning performance profile was consistent with those of individuals who struggle to think abstractly and demonstrate difficulty making goal-directed decisions, particularly in circumstances that are stressful or present complex cognitive or emotional stimuli." App'x at A-000758.

Test results also showed that he has a "lack of cognitive verbal flexibility," resulting in "significant difficulty focusing on more than one verbal stimulus at a time." App'x at A-000759. Moreover, the testing revealed "concrete thinking and inability to recognize and make use of contextual information to solve a problem." App'x at A-000760.

Mr. Sanchez's neurocognitive impairments prevent him from thinking efficiently and lead him to perform poorly under conditions that are stressful, novel, unfamiliar, and complex, like those of a capital trial. App'x at A-000772, A-000774-75.

### 3. Mr. Sanchez suffered debilitating psychiatric symptoms at the time of the preparations for trial and during trial proceedings.

Mr. Sanchez was also evaluated by a highly qualified psychiatrist, Louis James Kraus, M.D. Dr. Kraus conducted a clinical interview and reviewed extensive background records, including Dr. James's evaluation. App'x at A-000693 (Louis James Kraus, M.D.). Dr. Kraus concluded that Mr. Sanchez "suffered and continues to suffer from symptoms of mental illness and brain dysfunction that impair his social, psychiatric, and cognitive functioning and behavior." App'x at A-000711.

Mr. Sanchez has suffered from symptoms of depression and anxiety throughout his life. These symptoms include "disturbed sleep at least since adolescence"; "[d]ifficulty concentrating and maintaining focus" from early childhood through the present; "feelings of hopelessness and

8

helplessness throughout his life"; during adolescence and early childhood, "agitation and irritability, which are common presentations of depression in teenagers and young adults"; and suicidal ideation. App'x at A-000706-09.

Throughout his life, Mr. Sanchez has suffered symptoms of hyperactivity, hyperarousal, and inability to control impulses. His special education records show that he "exhibited hyperactivity from the time he was in kindergarten until he left school when he was almost nineteen years old." App'x at A-000709. He also "exhibited impulsivity and impaired judgment from childhood into adolescence and adulthood." App'x at A-000710. In addition to his symptoms of irritability and sleep disturbance, Mr. Sanchez reported "feelings of difficulty trusting certain other people that appeared severe enough to approach paranoia." *Id.*

Dr. Kraus concluded that there are grave doubts as to Mr. Sanchez's competence to stand trial:

> It is further my professional opinion, which I hold to a reasonable degree of medical certainty, that Mr. Sanchez's psychiatric symptoms, in concert with his cognitive and intellectual impairments, call into doubt his ability to understand the trial proceedings and to assist his appointed trial counsel in a rational manner. Mr. Sanchez would have had difficulty understanding the details of the legal process, processing the testimony and presentation of evidence in the courtroom, and comprehending his role in working meaningfully with his defense lawyers in the development and presentation of a defense.

App'x at A-000712.

Dr. James similarly found that "Mr. Sanchez has profound difficulty attending to and processing information provided to him verbally," such that "his deficits would render it difficult for him to understand trial proceedings and assist his counsel, and render it nearly impossible for him to comprehend complicated or technical testimony or evidence." App'x at A-000774 (Joette Deanna James, Ph.D.); *see also id.* at A-000775 (Mr. Sanchez's "limitations in processing speed

9

and working memory would prevent him from absorbing and following the testimony of a witness").

### B.     As a Result of His Impairments and Psychiatric Symptoms, Mr. Sanchez Was Incompetent to Stand Trial.

The Due Process Clause prohibits the government from trying and convicting a mentally incompetent defendant. *Drope*, 420 U.S. at 172. The test for determining competency to stand trial is "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). A petitioner is entitled to an evidentiary hearing on such a claim if "he presents clear and convincing evidence to create a real, substantial and legitimate doubt as to [his] mental capacity . . . to meaningfully participate and cooperate with counsel." *Adams v. Wainwright*, 764 F.2d 1356, 1360 (11th Cir. 1985) (citations and quotation marks omitted). In "assessing whether such a legitimate doubt is created," the reviewing court "must accept as true petitioner's alleged facts." *Card v. Singletary*, 981 F.2d 481, 484 (11th Cir. 1992) (citations and footnote omitted).

Here, the allegations of the original Motion and the supporting documents proffered by Mr. Sanchez raise a legitimate doubt as to his competency at trial, and he is therefore entitled to a hearing on this claim.

Mr. Sanchez was unable to understand information provided to him by his defense team, whether that information was provided orally or in written form. His lack of understanding is described in detail by the trial defense investigator, Lisa McDermott:

> I met Ricardo very soon after I started working on the case. It became clear to me during my early meetings with Ricardo that he did not understand the legal system or how to assist the legal team to challenge the evidence that the prosecution was gathering against him. He understood almost none of what Donnie [Murrell] and Mike [Cohen] told him about the evidence against him and about the criminal trial process. When I visited Ricardo with Mike, Mike rattled

10

> off legal terms and Ricardo pretended he understood what Mike was saying. Ricardo did not ask Mike to explain what he meant. Later, though, when I saw Ricardo alone, Ricardo asked me questions that made it obvious to me that he had not understood what Mike had said.
>
> Ricardo had difficulty reading, and he was unable to read law enforcement reports and other documents we brought to show him or ask him about. Sometimes I asked him to read a sentence from a document I brought, and only very rarely was he able to do this. After I had been visiting him for a while, and he became a bit more comfortable with me, he asked me to read documents to him. Even my reading the documents to him was not enough to make him understand their contents; when I asked him to tell me in his own words what I had read, he was not able to do it. He asked me questions about the documents that made it clear he had not understood them. The way in which I was able to be most successful at making him understand things was by drawing diagrams and pictures for him. His visual skills were better than his verbal skills, and he seemed to be able to follow, at least in the moment, the diagrams I drew. He asked some questions and referred back to the pictures. But Ricardo was unable to articulate very meaningful questions or have a back and forth conversation about legal strategy or other things about the case itself.

App'x at A-001709-10 (Lisa McDermott); *see also* A-001670 (Donnie Murrell) ("I had serious concerns about whether and to what extent Mr. Sanchez understood the trial process.").

As a result of his inability to understand the proceedings, respond in a meaningful way to questions his attorneys asked him, and identify important information for the attorneys to follow up on or to challenge, Mr. Sanchez was unable to properly and rationally assist his counsel in his defense, and therefore was incompetent to stand trial. App'x at A-000712 (Louis James Kraus, M.D.).

Moreover, the observations of Mr. Sanchez's defense team show that in fact he was not able to follow the proceedings or assist in his defense at trial. As investigator McDermott recalls, he did not pay attention to the proceedings in which he was on trial for his life, and was unable to assist counsel:

> Ricardo was tuned out during much of the trial. During court proceedings, he spent a lot of time drawing. We were not sure whether the jury could see what he was doing, and we worried that the jury thought he was paying careful attention and taking notes, but really he was just drawing, usually cartoon

11

characters. He asked very few questions of me or his lawyers during the trial. He spent the breaks talking with the codefendants about things totally unrelated to the trial and followed Mr. Troya's lead in his reactions to events in the courtroom.

App'x at A-001712 (Lisa McDermott).

Similarly, trial counsel Murrell recalls that Mr. Sanchez did not understand what was going on, drew pictures, and imitated the behavior of his codefendants:

I had serious concerns about whether and to what extent he understood the trial process. As an example, near the end of the formal sentencing proceeding, Judge Hurley imposed a term of supervised release on one of the convictions. Mr. Sanchez then asked me if he had received only probation. During trial proceedings, he often sat in court mimicking what his co-defendants were doing. He also drew pictures much of the time.

App'x at A-001670 (Donnie Murrell).

The observations of Ms. McDermott and Mr. Murrell, together with the findings of Drs. Kraus and James, show that Mr. Sanchez was incompetent to stand trial. At a minimum, the evidence proffered by Mr. Sanchez is sufficient to require a hearing on his competence.

### C.    Trial Counsel Failed to Investigate, Prepare, and Present Evidence of Mr. Sanchez's Incompetence.

Trial counsel failed to investigate, prepare, and present evidence of Mr. Sanchez's incompetence. When there is an issue as to competence, "counsel has a duty to investigate a client's competency to stand trial." *Agan*, 12 F.3d at 1018. Here, counsel were aware that there was a competency issue, but made at best nominal efforts to investigate the issue, and did not insist on a competency evaluation or request accommodations for Mr. Sanchez that could have enabled him to understand the proceedings and assist counsel. Counsel's performance was deficient, and Mr. Sanchez was prejudiced.

The members of the defense team were well aware that Mr. Sanchez had at best a very limited understanding of the proceedings, and that he had little or no ability to properly and rationally assist counsel in their defense of him. App'x at A-001709-10 (Lisa McDermott); *see*

12

*also id.* at A-001670 (Donnie Murrell). Despite that knowledge, counsel failed to undertake a competency investigation or to request accommodations for Mr. Sanchez.

Although counsel obtained court approval for Dr. Grant, a neuropsychologist, to evaluate Mr. Sanchez, counsel did not ask Dr. Grant to evaluate his competency to stand trial. App'x at A-001638 (Daniel Hicky Grant, Ed.D.). Moreover, counsel had identified seeking accommodations from the court for Mr. Sanchez's impairments as one possible measure for dealing with the competency issue, but failed to pursue that avenue either.

Investigator McDermott recalls that she raised this issue with Attorney Murrell, who agreed that it was a good idea, but that it ultimately was never pursued:

> Given how much trouble Ricardo had following and understanding the discussions his lawyers and I had with him while preparing for trial, I knew that Ricardo was going to have a lot of difficulty understanding the court proceedings themselves. I suggested to Donnie that the team request accommodations for him under the American Disabilities Act to try to maximize his comprehension of the trial. Donnie agreed this was a good idea. The accommodations we considered included taking frequent breaks during the proceedings so that we could recap for Ricardo what had just happened, encourage him to ask questions about evidence he did not understand and answer those questions for him, and provide an overview of what we expected a witness to say prior to the witness taking the stand. . . . To my knowledge, no one followed up on the pursuit of accommodations, however.

App'x at A-001712 (Lisa McDermott).

Attorney Murrell acknowledges that he considered making such a request, but decided not to do so when it "turned out that Mr. Sanchez was able to sit quietly and calmly during the proceedings." App'x at A-001670 (Donnie Murrell).

Counsel's failure to investigate further was deficient. Counsel knew that Mr. Sanchez's ability to understand the proceedings and properly and rationally assist counsel was at best minimal. Despite that knowledge, counsel neither requested that counsel's own expert evaluate Mr. Sanchez's competence, nor sought accommodations from the court that might have enabled

13

Mr. Sanchez to understand the proceedings and assist counsel. Counsel decided not to pursue the issue based on Mr. Sanchez's ability to "sit quietly and calmly" in court. That was not reasonable, because the ability to "sit quietly and calmly" in court does not equate to competency to stand trial. *See United States v. Masthers*, 539 F.2d 721, 727-28 (D.C. Cir. 1976), *overruled on other grounds by Godinez v. Moran*, 509 U.S. 389 (1993) (neither defendant's "apparent acquiescence" to a plea nor the trial court's "observation of a defendant's apparent rationality and comprehension" were basis for concluding that possibly intellectually disabled defendant was competent).

Mr. Sanchez was prejudiced by counsel's deficient performance. Drs. James, Kraus and Grant all agree that there were serious questions about Mr. Sanchez's competence, that these questions would at least have supported a request for accommodations, and that without such accommodations Mr. Sanchez was likely tried while incompetent. Dr. James explained her findings on these matters in detail:

> Had I been consulted by the court or counsel representing Mr. Sanchez at the time of his capital trial, I would have advised them that his deficits would render it difficult to understand trial proceedings and assist his counsel, and render it nearly impossible for him to comprehend complicated or technical testimony or evidence. I would have advised counsel and the court that Mr. Sanchez's significant reading limitations would have made it very difficult for him to read law enforcement reports, let alone identify information that was important from those reports. I also would have advised counsel and the court that Mr. Sanchez would have had significant trouble following and participating meaningfully in the legal proceedings. His limitations in processing speed and working memory would prevent him from absorbing and following the testimony of a witness, particularly when the content of the testimony was complicated or technical. I would have advised counsel and the court that Mr. Sanchez's disabilities were likely to be exacerbated under the stress of a capital trial, especially one involving multiple defendants and attorneys, and thereby increasing distracting stimuli.
>
> Although Mr. Sanchez's very low intellectual functioning would have interfered with his understanding of trial proceedings and participation in preparation of his defense under any circumstances, I would have informed counsel and the court that special accommodations must be made in order to

14

maximize Mr. Sanchez's understanding of trial proceedings and his ability to assist counsel in his defense. I would have advised them that counsel must prepare Mr. Sanchez at the beginning of each court day by informing him what witnesses would testify that day, and provide him with an overview of the content of their testimony. I further would have advised them that a break should be taken between the presentation of the direct testimony and cross-examination of each witness so that Mr. Sanchez's lawyers would have an opportunity to review the testimony with Mr. Sanchez to maximize his understanding prior to the presentation of the next witness. In addition, I would have advised them that at the close of each court day, counsel should review the proceedings with Mr. Sanchez again. I would have informed counsel that it is common for individuals with impairments like Mr. Sanchez to fail to ask questions when they do not understand what is going on around them. This can be due to a number of factors, including a desire to mask disability, a desire to please by being compliant, and/or an inability to articulate or frame questions about what is not understood.

App'x at A-000774-76 (Joette Deanna James, Ph.D.) (footnote omitted); *accord* App'x at A-000712 (Louis James Kraus, M.D.); App'x at A-001638 (Daniel Hickey Grant, Ed.D.).

The evidence in this record undermines confidence in Mr. Sanchez's competence and thus establishes prejudice. *See Agan*, 12 F.3d at 1018 (prejudice inquiry asks whether there is a reasonable probability that the result of the proceeding would have been different); *Lawrence v. Sec'y, Fla. Dept. of Corr.*, 700 F.3d 464, 479 (11th Cir. 2012) (reasonable probability that defendant would have received a competency hearing and been found incompetent). Based on the proffered evidence, there is at least a reasonable probability that Mr. Sanchez would have been found incompetent in the absence of accommodations for his impairments.

### D.     The Commonwealth's Arguments Are Without Merit.

The Commonwealth argues that Mr. Sanchez has failed to offer factual support for this claim. Resp. Opp. at 90-94. The government errs. As set forth above, Mr. Sanchez has proffered detailed factual support for his claim. Furthermore, in assessing whether Mr. Sanchez has met his burden, the reviewing court "must accept as true petitioner's alleged facts." *Card*, 981 F.2d at 484. Mr. Sanchez's allegations and supporting materials meet his burden and can only be resolved by holding an evidentiary hearing.

The government also argues that the claim is rebutted by evidence of Mr. Sanchez's conduct during the proceedings. Resp. Opp. at 92-94. The actions cited by the government – *e.g.*, telling counsel that he had not received contact visits from family, and announcing his plea of not guilty at the appropriate time – fall far short of establishing competency to stand trial, and do nothing to rebut the showing made above. The expert declarations proffered by Mr. Sanchez make clear that the ability to answer "yes" or "no" to questions is not the same thing as competency. Indeed, that was also recognized by the court in *Masthers*, *supra*, some forty years ago. The government's argument is meritless.

**CLAIM V: THE PROSECUTION'S PRESENTATION OF TESTIMONY OF A MEDICAL EXAMINER WHO DID NOT CONDUCT OR OBSERVE THE AUTOPSIES OF THE VICTIMS VIOLATED MR. SANCHEZ'S RIGHTS UNDER THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS; TRIAL COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE SUBSTITUTION OF THE MEDICAL EXAMINER.**

As set forth in the Motion, the autopsy of each victim in this case was conducted by Dr. Charles A. Diggs, but Dr. Diggs did not testify to his findings and opinions. Motion at 50-57; App'x at A-000826 (autopsy reports). The government instead moved pre-trial to offer a substitute medical examiner, Dr. Roger E. Mittleman, who ultimately testified. *See* CR-DE 522 (government's motion to allow for substitution of medical examiner).

Although this substitute testimony violated the Confrontation Clause, defense counsel did not object to the substitution. *See* CR-DE 531 (government's amended unopposed motion to allow for substitution of medical examiner); Tr. 3395-96.

The use of testimony by a substitute medical examiner regarding facts about the autopsies performed by a non-testifying medical examiner – including adoption of the opinions of the non-testifying doctor from the autopsy reports – violated Mr. Sanchez's rights to due process and confrontation under the Fifth and Sixth Amendments. It also violated Mr. Sanchez's rights under

16

the Eighth Amendment for failure to adhere to the heightened procedural safeguards required in capital cases. The failure to object to this clear constitutional violation violated Mr. Sanchez's right to the effective assistance of counsel under the Sixth Amendment. Moreover, defense counsel further provided ineffective assistance by failing to investigate or effectively challenge Dr. Mittleman's testimony when he did testify.

In its response, the government effectively acknowledges that permitting Dr. Mittleman to testify in Dr. Diggs's stead violated the Confrontation Clause. *See* Resp. Opp. at 40. The government nonetheless argues that Mr. Sanchez's right to the effective assistance of counsel was not violated because 1) raising a Confrontation Clause objection would have required the anticipation of future legal developments; thus, counsel did not provide deficient performance; and 2) Mr. Sanchez was not prejudiced by counsel's failure. *Id.* at 40-43. The government is mistaken on both counts.

The government further argues that defense counsel could not have been ineffective for failing to cross-examine Dr. Mittleman or otherwise challenge his testimony because they logically would have wished to avoid focusing the jury's attention on this issue. Resp. Opp. at 43 n.27. But this argument ignores the fact that counsel performed no investigation into Dr. Mittleman's testimony; thus, any decision made by counsel was not informed by investigation and was necessarily unreasonable.

### A.     Mr. Sanchez's Right to Confrontation Was Violated.

In *Crawford v. Washington*, 541 U.S. 36, (2004), the Supreme Court ruled that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. The prosecution therefore may not introduce "testimonial" hearsay against a criminal defendant, regardless of whether such statements are deemed reliable, absent the opportunity to

17

cross-examine the declarant at trial or in a previous proceeding, if the declarant is unavailable at

trial. *Id.* at 53-43, 68. The Court described the class of testimonial statements covered by the

Confrontation Clause as follows:

> Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*United States v. Ignasiak*, 667 F.3d 1217, 1230 (11th Cir. 2012) (quoting *Crawford*, 541 U.S. at

51-52) (quotation marks and citations omitted); *see also Davis v. Washington*, 547 U.S. 813, 822

(2006) (defining "testimonial" statements as having a "primary purpose" of "establish[ing] or

prov[ing] past events potentially relevant to later criminal prosecution").

As the government acknowledges, Resp. Opp. at 40, the Eleventh Circuit has made clear

that autopsy reports fall squarely within the category of testimonial evidence *Crawford*

describes; thus, the testimony of a substitute medical examiner regarding an autopsy he did not

conduct does not satisfy the Confrontation Clause. *Ignasiak*, 667 F.3d at 1233 ("Admission of

the autopsy reports on solely this [replacement medical examiner] testimony—absent evidence

that the actual medical examiners who performed the autopsy were unavailable and the accused

had a prior opportunity to cross examine them—thus violated Ignasiak's Sixth Amendment

rights under the Confrontation Clause."); *see also Bullcoming v. New Mexico*, 564 U.S. 647, 652

(2011) (testimony of substitute forensic scientist does not satisfy the Confrontation Clause absent

unavailability of original scientist and a prior opportunity to cross-examine him).

18

The government largely does not respond to any of the allegations made by Mr. Sanchez that establish this Confrontation Clause violation. As Mr. Sanchez discussed in the Motion, Dr. Diggs performed the autopsies of all four victims and authored all four autopsy reports. App'x at A-000826 (autopsy reports). Dr. Diggs did not testify, nor was he available for cross-examination during a prior proceeding. Dr. Mittleman, who had neither participated in nor observed the autopsies, testified in his place. Although the government argued in its motion to permit substitution of the medical examiner that Dr. Diggs had chronic health concerns, it did not argue that Dr. Diggs was unavailable for Confrontation Clause purposes, nor did the Court so find. CR-DE 522, 531, 538. And Dr. Diggs testified at an unrelated trial that post-dated Mr. Sanchez's trial, so he was not, in fact, unavailable. Motion at 51-52.

The government likewise does not challenge Mr. Sanchez's contention that not only was Dr. Mittleman permitted to testify to Dr. Diggs's findings and opinions, he was permitted to testify to additional conclusions that he came to on his own that were not reflected in any way in Dr. Diggs's autopsy reports. Dr. Mittleman testified to multiple damaging opinions that were not contained in Dr. Diggs's reports nor reasonably deducible therefrom. *Id.* at 52-53.

And the government does not dispute that Dr. Diggs's reports were plainly testimonial in nature. As Mr. Sanchez noted in his 2255 Motion, Dr. Diggs (along with an investigator from his office) personally traveled to the crime scene where he viewed the bodies of the victims on the side of the Florida Turnpike before they were transported. App'x at A-001674 (Report of Merv Waldron). The investigator and Dr. Diggs did so because they were summoned to the scene by law enforcement officials. *Id.* There can be no question that the out-of-court statements made by Dr. Diggs in his autopsy reports served the "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution," when they were made directly in

19

response to a law enforcement request to participate in an active homicide investigation and after Dr. Diggs personally visited the crime scene. *Davis*, 547 U.S. at 822; *see also Crawford*, 541 U.S. at 51.

### B.    Mr. Sanchez's Right to Be Free from Cruel and Unusual Punishment Was Violated.

As Mr. Sanchez alleged in the Motion, his right to be free from cruel and unusual punishment pursuant to the Eighth Amendment was likewise violated. The Eighth Amendment demands a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Chambers v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). A process whereby the medical examiner who performed the autopsies in a murder investigation is not made available for cross-examination does not satisfy this heightened need for reliability. This is particularly so where, as set forth more fully below and in the 2255 Motion, the testifying medical examiner made numerous damaging assertions and embellishments that were not accurate and not supportable based upon Dr. Diggs's work.[1] Again, the government does not meaningfully respond to Mr. Sanchez's Eighth Amendment claim.

### C.    Counsel Were Ineffective for Failing to Object to or Otherwise Challenge Dr. Mittleman's Testimony.

The government's primary response to this claim is that, notwithstanding the error, trial counsel were not ineffective for failing to object on Sixth or Eighth Amendment grounds to the substitution of the medical examiner or to otherwise challenge his testimony. Resp. Opp. at 40-43. The government suggests both that counsel did not provide deficient performance and that

---

[1] Also significant is the fact that, as discussed in numerous published media accounts, Dr. Mittleman has been accused of improprieties in his work on numerous occasions, including allegations that he falsified records. Motion at 52. While the government writes this information off as an attempt to "sully" Dr. Mittleman's reputation, Resp. Opp. at 42 n.25, it is hardly irrelevant given the nature of his testimony.

Mr. Sanchez was not prejudiced by his attorneys' failure to object. *Id.* The government is mistaken on both counts.

### 1.      Deficient performance.

A criminal defense attorney provides constitutionally deficient performance where his performance falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88. As Mr. Sanchez stated in the Motion, at the time of Mr. Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant were expected to consider all legal claims potentially available, thoroughly investigate and evaluate such claims, and preserve any and all conceivable errors. 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("2003 ABA Guidelines"), Guideline 10.8.A and commentary. An "attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014); *see also Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("[A] tactical or strategic decision is unreasonable if it is based on a failure to understand the law."). Counsel rendered deficient performance for failing to recognize and raise a Confrontation Clause objection to Dr. Mittleman's testimony.

The essence of the government's response is that counsel cannot be faulted for failing to anticipate future legal developments where the "binding precedent" at the time of trial held that autopsy reports were admissible as business records. Resp. Opp. at 39, 40. The government's response is mistaken for two reasons.

First, no binding precedent established that autopsy reports were immune from Confrontation Clause challenges at the time of Mr. Sanchez's trial. The only case cited by the government is the same case cited by the trial court—*United States v. Rosa*, 11 F.3d 315, 331 (2d

21

Cir. 1993). *Rosa*'s Confrontation Clause analysis relied on *Ohio v. Roberts*, 448 U.S. 56, 65-66 (1980), which was overruled by *Crawford* five years *before* Mr. Sanchez's trial. *Rosa*, 11 F.3d at 333. *Rosa* simply was no longer good law on the Confrontation Clause issue at the time the Court relied on it.

Second, *Ignasiak* did not constitute a change in the law; thus, there was nothing for counsel to anticipate. *Crawford* provided a sufficient basis upon which defense counsel could and should have made their challenge at trial, as subsequent Supreme Court cases make clear. In 2009, the Court ruled in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 311 (2009), that under a straightforward application of *Crawford*, out-of-court statements made by prosecution forensic analysts are testimonial. And in *Bullcoming v. New Mexico*, the Court made clear that *Melendez-Diaz* merely "refused to create a 'forensic evidence' exception" to the *Crawford* rule. *Bullcoming*, 564 U.S. at 658. The fact that the Court described *Melendez-Diaz* as a refusal to carve out an exception to *Crawford* means that *Crawford* provided all the support that counsel needed to make a Confrontation Clause challenge at trial.

Counsel's failure to object was unreasonable, particularly given that the government flagged the Confrontation Clause issue in its motion to substitute the medical examiner. *See* CR-DE 522, 531. It was additionally unreasonable for counsel to fail to object given that the government provided supplemental discovery with Dr. Mittleman's additional opinions that were not included in Dr. Diggs's autopsy reports well in advance of trial. App'x at A-000823 (supplemental discovery letter dated 11/21/08); App'x at A-000825 (supplemental discovery letter dated 1/13/09). Defense counsel had plenty of notice regarding the constitutionally problematic and inflammatory evidence the government ultimately introduced.

22

Not only did counsel fail to object to the Confrontation Clause violation in advance of trial, but they also did nothing to challenge Dr. Mittleman's testimony. Counsel asked no questions of Dr. Mittleman at trial. They did not voir dire him on his qualifications, Tr. 3358, and they did not ask a single question on cross-examination. Tr. 3466. Nor did they engage the services of an independent forensic pathologist—either to use as a witness or to consult with regarding the problems inherent in Dr. Mittleman's testimony. Their failure to challenge this testimony was therefore unreasonable. *Strickland*, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); *accord Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

The government responds to this failure to challenge the substance of Dr. Mittleman's testimony by hypothesizing that counsel may have wished to lessen the repetition of such testimony. Resp. Opp. at 43 n.27. But such a decision, even assuming it accurately reflects counsel's thought process, cannot be viewed as reasonable in the absence of adequate investigation.

### 2. Prejudice.

Mr. Sanchez was prejudiced by counsel's failure to object. Prejudice accrues where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Id.*

Current counsel for Mr. Sanchez have engaged a well-qualified independent forensic pathologist, Dr. David Fowler, who explains that Dr. Diggs's autopsy reports fell far below the standard of care and did not comport with fundamental standards of the discipline of forensic pathology as they existed at the time of trial. App'x at A-000721 (David Fowler, M.D.) ("The

23

autopsy reports prepared in this case are noteworthy for their brevity and for their lack of detail. They fall far short of the required standards necessary for minimal competence in the performance of the duties of a forensic pathologist. Critically, the autopsy reports do not sufficiently document the results of Dr. Diggs's examinations so as to permit subsequent forensic pathologists to draw reliable independent conclusions about the cause and manner of the Escobedos' deaths, except in the most rudimentary way."). As such, Dr. Diggs would have been ripe for cross-examination if he offered any opinion beyond the basic, straightforward facts that the Escobedos died of gunshot wounds and that their manner of death was homicide. *See Melendez-Diaz*, 557 U.S. at 321 ("[T]esting analysts' honesty, proficiency, and methodology" are "the features that are commonly the focus in the cross-examination of experts.").

Much of Dr. Mittleman's testimony was not only unsupported by Dr. Diggs's work, but it was also inaccurate. For example, Luis Damian Escobedo did not drown in his own blood; the gunshot wound to his chest was "very rapidly fatal" and caused his death within a matter of "a few seconds." App'x at A-000723, A-000724. And Dr. Mittleman's conclusion that Luis Julian Escobedo was shot while lying on the ground with the shooter standing above him was "purely speculative" and lacking in reliable scientific foundation due to the lack of appropriate documentation in Dr. Diggs's autopsy report. App'x at A-000724.

Dr. Mittleman nonetheless was permitted to testify to these gruesome but unsupported and inaccurate details about the deaths of each of the children, without any challenge whatsoever from counsel.

The government exploited Dr. Mittleman's testimony to inflame the passions of the jury. The prosecutor referenced the "drowning in blood" conclusion in his opening statement, and twice more in his closing argument. Tr. 3043, 7161, 7164. And the prosecutor referenced Dr.

24

Mittleman's testimony that the gunshots were consistent with the shooter standing directly over Luis Julian Escobedo and firing directly down into his head in order to describe the killing as a "cold blooded execution." Tr. 7170-71. The prejudice to Mr. Sanchez "is best understood by taking the word of the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 444 (1995).

The Eleventh Circuit also specifically referenced this inflammatory information in its opinion denying relief on direct appeal, *United States v. Troya*, 733 F.3d 1125, 1136 (11th Cir. 2013), as did a juror when speaking to the press about why the jury voted to sentence Mr. Sanchez to death. Daphne Duret, *Juror cites killing of children as reason for death sentences*, Palm Beach Post, Apr. 4, 2009 *available at* http://articles.sun-sentinel.com/2009-04-04/news/0904040002_1_jurors-daniel-troya-danny-varela (referencing speculative testimony that shooter stood over Luis Julian Escobedo while firing downwards).

Defense counsel eventually recognized the prejudicial impact of this information. In advance of the penalty phase, counsel moved in limine to preclude further reference to the "drowning" comment because its prejudicial impact outweighed any probative value at the penalty phase. Tr. 7898. The government did not object. *Id.*

But at that point, the damage was done. The jury had repeatedly heard the information. And press reports and the split sentencing verdict on the death penalty counts would ultimately make clear that it was the murders of the children that caused the jury to sentence Mr. Sanchez to death. There is a reasonable probability that, had counsel objected, excluded the testimony of Dr. Mittleman, and cross-examined Dr. Diggs, the jury would not have convicted Mr. Sanchez or, at a minimum, would not have sentenced Mr. Sanchez to death.

The government's response argues that Mr. Sanchez's claim of prejudice is irrelevant. Resp. Opp. at 42-43. According to the government's reasoning, the mere facts of the deaths of

25

the Escobedo family are sufficient to overcome any prejudice argument that Mr. Sanchez might make about the impropriety of the medical examiner's testimony. *Id.* This argument cannot be reconciled with the prosecution's repeated focus on the gruesome nature of Dr. Mittleman's testimony at trial and the fact that the Eleventh Circuit and a trial juror elected to single out Dr. Mittleman's testimony when discussing the case. Clearly, the testimony had an impact. Mr. Sanchez was prejudiced.

### CLAIM VII: MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT PHASE OF HIS CAPITAL TRIAL.

The government presented circumstantial evidence – including a palm print on a turnpike toll ticket, photographs of the van and the Jeep entering the turnpike together, and cellular phone records – that placed Mr. Sanchez on the turnpike at or near the scene of the murders. This evidence was consistent with the defense theory at trial that Mr. Sanchez was engaged in counter-surveillance to protect Jose Escobedo during a drug delivery and sale. Tr. 7291-92. The defense theory was undercut by trial counsel's unreasonable and prejudicial failure to conduct a timely or adequate investigation of the guilt phase issues, including failing to investigate and challenge the government's toolmark and cellphone evidence and failing to investigate and gather additional evidence that could have supported the defense that other unidentified persons were traveling with the Escobedos or met them along the way. Trial counsel unreasonably and prejudicially failed to object to the duplicitous charges contained in Counts 7 through 10, and to the jury instructions and verdicts on those counts. Trial counsel also unreasonably and prejudicially failed to object during guilt phase closing arguments when the government repeatedly vouched for the strength of its own investigation without any foundation or connection to the evidence. As a result of counsel's unreasonable and prejudicial failures, Mr. Sanchez's convictions were imposed in violation of his rights to the effective assistance of

26

counsel, to present a defense, to confrontation and compulsory process, to due process of law, and to a reliable determination of penalty. U.S. Const. amends. V, VI, VIII; *Strickland v. Washington*, 466 U.S. 668 (1984).

### A. Governing Legal Principles.

Under *Strickland*, a defendant establishes a deprivation of the Sixth Amendment right to the effective assistance of counsel by showing that counsel's performance was constitutionally deficient, and that the defendant was prejudiced. With respect to deficient performance, the duty to investigate is paramount; counsel has a duty to undertake a "thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690; *accord Williams v. Taylor*, 529 U.S. 362, 396 (2000) (capital defense counsel have an "obligation to conduct a thorough investigation").

Counsel's duty to investigate is especially weighty in a capital case, where counsel has a duty to thoroughly investigate and prepare for both the guilt and penalty phases of trial. *E.g.*, *Williamson v. Ward*, 110 F.3d 1508, 1514 (10th Cir. 1997) ("[I]n a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed."). This duty to investigate extends to the professionally reasonable investigation and presentation of relevant expert testimony. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014); *Showers v. Beard*, 635 F.3d 625, 632 (3d Cir. 2011) (counsel ineffective for failing to present expert testimony); *Siehl v. Grace*, 561 F.3d 289 (3d Cir. 2009) (counsel ineffective for failing to properly consult with expert witness that trial counsel retained). This duty also includes "work[ing] with the expert to understand the basics of the science involved." *Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007). Under these precedents, counsel's failure to conduct an adequate investigation at the guilt phase constitutes deficient performance.

27

Throughout the Response, the government argues that counsel could not have been ineffective in failing to present expert testimony because counsel were able to elicit similar testimony on cross-examination. Resp. Opp. at 46-47, 48-49, 54-55. However, the "principal concern" in deciding whether Mr. Sanchez's counsel were ineffective for failing to present an appropriate expert is not whether counsel should have presented expert testimony; rather, it is "whether the investigation supporting counsel's decision not to introduce [expert testimony] was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Johnson v. Nagle*, 58 F. Supp. 2d 1303, 1341 (N.D. Ala. 1999) (same). Strategic choices made by counsel in the absence of a thorough investigation do not meet *Strickland*'s objective standard of reasonableness. *See Wiggins*, 539 at 527-28 (2003) ("Counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to [trial] strategy impossible."); *id.* at 536 ("[C]ounsel were not in a position to make a reasonable strategic choice . . . because the investigation supporting their choice was unreasonable."). Strategic choices made on the basis of misunderstanding of the applicable law also are unreasonable, and thus constitute deficient performance. *Hinton*, 134 S. Ct. at 1088; *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986).

Prejudice is established where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. This does not require a showing that the outcome would have been different – a reasonable probability of a different outcome suffices to undermine confidence in the result. At the guilt phase, prejudice is established where, but for counsel's errors, there is a reasonable probability that the fact finder would have had a reasonable doubt with respect to the defendant's guilt. *Strickland*, 466 U.S. at 695; *see Hinton*, 134 S. Ct. at 1089-90 (prejudice shown where there is a reasonable probability that the evidence that trial counsel failed to produce would have created a

28

reasonable doubt about defendant's guilt); *United States v. Orr*, 636 F.3d 944 (8th Cir. 2011) (prejudice shown from counsel's failure to impeach witness where, absent counsel's errors, there was a reasonable probability that jury would have a reasonable doubt about defendant's guilt).

> **B.      Trial Counsel Unreasonably and Prejudicially Failed to Investigate and Properly Challenge the Government's Toolmark Evidence.**

Mr. Sanchez's jury was presented with unreliable scientific evidence. The government's toolmark experts, Alison Quereau and Mark Chapman, testified that an AK-47 firearm and cartridge casings collected from the Garden Court residence matched projectiles and casings collected from the crime scene and from Mercer Avenue and Suwanee Drive. Motion at 82-83. Based on these conclusions, the government displayed the AK-47 to jurors during closing argument and argued that Mr. Sanchez was a "thug enforcer" for the Varela conspiracy, "willing to carry guns, wear disguises and shoot." Tr. 7180, 7437. However, the general premise underlying firearms and toolmark identification – that firearms leave unique marks – has never been proven, and the government's experts' conclusions about "matches" were unsupported and inaccurate. Despite the significance of this testimony and its lack of scientific basis, trial counsel did nothing to preclude its admission by filing a pretrial motion, or to rebut it once it was admitted by presenting expert testimony. Mr. Sanchez was prejudiced and a new trial is warranted.

> **1.      The admissibility of expert testimony.**

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the trial court is required to act as a gatekeeper, excluding scientific and non-scientific opinions or methods that lack sufficient reliability or relevance.[2] In performing this

---

[2] Federal Rule of Evidence 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto

gatekeeper function, a trial court should consider: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation"; and (4) the "general acceptance" of the theory or technique in the relevant scientific community. *Daubert*, 509 U.S. at 593-94. An expert's testimony "must be reliable at each and every step or else it is inadmissible. 'The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.'" *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 354-55 (5th Cir. 2007) (quoting *Heller v. Shaw*, 167 F.3d 146, 166 (3d Cir. 1999)).

The party proffering the expert testimony must establish that the proffered evidence is both "relevant" and "reliable." Relevance depends upon "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 593. Reliability is determined by assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Id*. at 592-93. In making the reliability inquiry, it is the district court's responsibility "to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Counsel plays a critical role in triggering the court's gatekeeping function. Absent an application from counsel calling into question the admissibility of the particular evidence, the court cannot necessarily be expected to know that the evidence is of questionable validity. In this

---

in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court held that the gatekeeper protections of *Daubert* apply to scientific as well as non-scientific expert opinions.

case, the government's expert firearms and toolmark evidence failed to meet the reliability prong of *Daubert*. This evidence was admitted, however, because Mr. Sanchez's counsel failed to investigate and challenge this evidence by way of a pretrial *Daubert* motion.

### 2. Counsel failed to investigate, develop, and mount a *Daubert* challenge to the government's firearms and toolmark evidence.

The Supreme Court has recognized that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). This is because "[p]rosecution experts, of course, can sometimes make mistakes. Indeed, we have recognized the threat to fair criminal trials posed by the potential for incompetent or fraudulent prosecution forensics experts. . . . This threat is minimized when the defense retains a competent expert to counter the testimony of the prosecution's expert witnesses[.]" *Hinton*, 134 S. Ct. at 1090.

Thus, trial counsel have a critical duty to conduct an adequate pretrial investigation of the government's scientific evidence. *See Draughon v. Dretke*, 427 F.3d 286, 296 (5th Cir. 2006) (counsel deficient for failure to investigate ballistics evidence or consult expert where the "centrality [of the ballistics evidence] is plain"); *Soffar v. Dretke*, 368 F.3d 441, 476 (5th Cir. 2004) (counsel deficient for failure to consult or present ballistics expert where prosecution's theory "relied heavily" on ballistics evidence").[3] In addition to preparing and investigating the

---

[3] *See also Richey*, 498 F.3d at 362 (counsel's performance deficient where "counsel did not conduct the investigation that a reasonably competent lawyer would have conducted into an available defense – that the fire was not caused by arson" – even where counsel consulted a fire science expert); *Couch v. Booker*, 632 F.3d 241, 246-47 (6th Cir. 2011) (counsel ineffective for failing to investigate and present evidence casting doubt on prosecution theory that, as a result of a beating, deceased drowned in his own blood); *Bell v. Miller*, 500 F.3d 149, 156-57 (2d Cir. 2007) (counsel deficient for failing to consult and present medical expert testimony to contest only evidence that defendant was perpetrator); *Dugas v. Coplan*, 428 F.3d 317, 328-32 (1st Cir. 2005) (finding counsel's performance deficient where counsel presented "no arson" defense and

case, counsel has a duty to conduct adequate cross-examination of the government's witnesses and/or present contrary evidence to support his defense. *See, e.g.*, *Berryman v. Morton*, 100 F.3d 1089, 1097-99 (3d Cir. 1996) (counsel's failure to conduct adequate cross-examination ineffective). This includes expert witnesses, as "[v]igorous cross-examination [and] presentation of contrary evidence . . . are the traditional and appropriate means of attacking shaky but admissible expert testimony." *Daubert*, 509 U.S. at 596.

At the time of Mr. Sanchez's trial, the premise underlying firearms and toolmark identification – that a firearm leaves unique and reproducible marks on an object – had never been proven and was being successfully challenged in courts across the country. *See, e.g.*, *United States v. Green*, 405 F. Supp. 2d 104, 110-14, 124 (D. Mass. 2005) (describing the issues inherent in firearms and toolmark identification and precluding the firearms examiner from testifying that the identification was "to the exclusion of every other firearm in the world"); *Sexton v. State*, 93 S.W.3d 96, 101 (Tex. Crim. App. 2002) (firearms identification testimony inadmissible where expert testified that toolmarks on shell casings had been made by the same magazine where no weapon or magazine had been recovered); *see also* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing the lack of statistical empirical foundations for firearms and toolmark identification).[4]

---

failed to consult or present fire science expert or do necessary research for counsel to understand fire science evidence); *Gersten v. Senkowski*, 426 F.3d 588, 608 (2d Cir. 2005) (finding counsel deficient for failing to consult or present medical expert); *Driscoll v. Delo*, 71 F.3d 701, 707-08 (8th Cir. 1996) (defense counsel has the duty to study and understand lab results and scientific aspects of case).

[4] The National Research Council of the National Academies (NRC) also released two reports calling into question the "validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related toolmarks." NRC, *Ballistic Imaging, Committee to Assess the*

Trial counsel, however, failed to raise a *Daubert* challenge to exclude the toolmark and firearms evidence until the government offered the first of its two toolmark examiners as an expert at trial. Tr. 6258. This was too late. The trial court denied the defense's request for a *Daubert* hearing, ruling that any *Daubert* motion needed to be filed pretrial. Tr. 6263-64.

Counsel knew that the government intended to introduce firearms and toolmark evidence purporting to link Mr. Sanchez to the crime scene and to uncharged shootings, having received proper notice from the government identifying their experts and their qualifications and anticipated testimony. *See* Tr. 6264-65. Counsel lacked a reasonable basis for not filing the *Daubert* motion pretrial. Counsel mistakenly "believed that [he] would be able to challenge the admissibility of the government's expert ballistics testimony during trial." App'x at A-001669 (Donnie Murrell). Counsel also failed to investigate and obtain comparison photographs from the government's firearms experts until the experts were present and testifying in court. *Id.* Although counsel had retained a ballistics expert, because counsel had not investigated, counsel could not provide the materials to the expert to determine if expert testimony was needed or if other lines of cross-examination challenging the reliability of the government's experts were available.

Counsel's performance was deficient. *See Kimmelman*, 477 U.S. at 385 (finding counsel's failure to file timely suppression motion was deficient performance in part because counsel's failure "was not based on 'strategy,' but on counsel's mistaken beliefs. . ."); *Hill v. Lockhart*, 28 F.3d 832, 845 (8th Cir. 1994) ("[C]ounsel's 'strategy' not to use [certain witnesses] was not so much trial strategy as it was an accommodation to his own inadequate trial

---

*Feasibility Accuracy, and Technical Capability of National Ballistics Database*, 80-81 (2008); NRC, *Strengthening Forensic Science in the United States: A Path Forward*, 155 (2009) ("[T]he scientific knowledge base for toolmark and firearms analysis is fairly limited," and the studies that have been performed place a "heavy reliance on the subjective findings of examiners rather than on the rigorous quantification and analysis of sources of variability.").

preparation. . . . [A]lthough it may have been a trial decision of counsel not to pursue [certain] testimony it was counsel's lack of preparation which went a long way in inducing him to make it" (quoting *Eldridge v. Atkins*, 665 F.2d 228, 237 N.5 (8th Cir. 1981) (citation omitted) (some alterations in original)).

### 3.   Counsel's failure to adequately challenge the firearms and toolmark evidence prejudiced Mr. Sanchez.

As a result of trial counsel's failure to raise a pretrial *Daubert* challenge, Mr. Sanchez lost the opportunity to exclude toolmark evidence linking him to the murders and to two uncharged shootings. While courts have accepted this type of firearms and toolmark identification testimony in other cases, *see* Resp. Opp. at 44, the admissibility of the toolmark and firearms evidence depends on the facts of the particular case. In *United States v. Williams*, 506 F.3d 151 (2d Cir. 2007), the Second Circuit cautioned that its opinion admitting the government's firearms identification expert should not "be taken as saying that any proffered ballistic expert should be routinely admitted." *Id.* at 161. It noted that *Daubert* did not protect from "scrutiny evidence that had previously been admitted under *Frye* [*v. United States*, 293 F. 1013 (D.C. Cir. 1923)]." Rather, "expert testimony long assumed reliable before Rule 702 must nonetheless be subject to the careful examination that *Daubert* and *Kumho Tire* require." *Id.*

Had trial counsel timely sought a *Daubert* hearing, counsel could have presented testimony that the methods and techniques used by Ms. Quereau and Mr. Chapman to reach identifications were scientifically and technically flawed. Contrary to the government's assertions, Resp. Opp. at 50-51, Mr. Sanchez set forth specific factual allegations about the evidence and testimony that counsel could have presented had an adequate investigation been conducted, including the following:

- Ms. Quereau and Mr. Chapman did not make any attempt to rule out the possibility of class or subclass characteristics.

34

- Ms. Quereau and Mr. Chapman did not adequately document or explain the processes and tests performed, including providing descriptions, diagrams, or exemplar photographs for each identification.

- Ms. Quereau and Mr. Chapman did not take into account the differences in toolmarks that may result when a firearm fires different makes of ammunition.

- Mr. Chapman's opinions were reached without being able to test the actual firearm or magazine used, and Mr. Chapman could not determine whether the toolmarks were made by a magazine or firearm chamber.

- Mr. Chapman's report does not indicate that he made any attempt to determine the makes and models of firearms or magazines that the ammunition could have been worked through or fired by, and thus could not determine whether the marks were individual, class, or subclass characteristics.

- To the extent that the unidentified tool was a magazine, Mr. Chapman's identification was patently unreliable in part because the limited quantity of markings makes identification error highly likely.

- The techniques and procedures used by Ms. Quereau and Mr. Chapman did not conform to accepted standards within the field.

Motion at 85-86; App'x at A-000743-46 (James Gannalo).

Moreover, even if the court declined to exclude the firearms and toolmark entirely, there is a reasonable probability that under a *Daubert* analysis, the government's experts would have been precluded from testifying that the components "matched" or were fired from the same weapon and that such opinions were rendered "within a reasonable degree of scientific certainty." *See, e.g.*, *Green*, 405 F. Supp. 2d at 104 (prohibiting firearms examiner from testifying the match he found allowed for identification "to the exclusion of every other firearm in the world"); *Sexton*, 93 S.W.3d at 101 (prohibiting firearms identification testimony that toolmarks on shell casings had been made by the same magazine where magazine was never recovered).

The government contends that Mr. Sanchez was not prejudiced by counsel's failure to raise a *Daubert* challenge pretrial because counsel conducted an "effective" cross-examination of

35

the government's experts. Resp. Opp. at 48-49. However, "[t]he few begrudging concessions which counsel was able to elicit from the prosecution's [witnesses] was no substitute for contradictory, scientifically grounded evidence which wholly contradicted their testimony." *Byrd v. Trombley*, 580 F. Supp. 2d 542, 559 (E.D. Mich. 2008); *see also Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) ("The fact that trial counsel was marginally successful in some respects does not excuse his complete failure to investigate and prepare *before* trial.").

Further, the cross-examination demonstrates the prejudicial effect of counsel's failure to adequately investigate the firearms and toolmark evidence and challenge it pretrial. As the government concedes, counsel elicited testimony on cross-examination about Mr. Chapman's lack of accreditation, his limited experience and lack of qualifications, and the limitations of his opinion – all of which would have supported counsel's efforts to preclude the toolmark evidence under *Daubert*. Resp. Opp. at 48-49. Moreover, had counsel investigated, counsel would have been in a position to cross-examine the government's experts on the additional grounds set forth above, present the testimony of an independent expert, and provide the jury with a compelling basis on which to reject the government's testimony – even if counsel had not prevailed on the *Daubert* challenge.

The firearms and toolmark evidence was devastating to the defense at both the guilt and the penalty stages of trial. Ms. Quereau's toolmark testimony regarding the Suwanee and Mercer shootings was the basis for introducing inflammatory evidence of shootings not connected to the offense. In closing argument, the government emphasized the other drug crimes and other shootings evidence in urging the jury to convict Mr. Sanchez for the Escobedo murders. The government displayed the AK-47 to jurors during closing argument and invited them to examine

36

it during deliberations. Tr. 7119-21, 7594.[5] The government portrayed Mr. Sanchez as a "thug enforcer" for the Varela conspiracy, "willing to carry guns, wear disguises and shoot." Tr. 7180, 7437. Mr. Sanchez, the government argued, was the sort of person whom the jury should believe capable of killing the Escobedos. Tr. 7448-49.

Mr. Chapman's toolmark testimony likewise was prejudicial, as it was the only forensic evidence purporting to tie Mr. Sanchez to the Escobedo murders. While other forensic evidence placed Mr. Sanchez on the turnpike, that evidence did not connect him to the murders themselves. As trial counsel made clear in closing, "[f]our bullets that Mark Chapman says connect [Ricardo] Sanchez to the murder scene. That's the Government's case. That's it." Tr. 7290.

The admission of the unreliable toolmark testimony linking Mr. Sanchez to the Suwanee and Mercer shootings and linking the murder weapons to the residence where Mr. Sanchez was alleged to have stayed, and the failure to pose an adequate challenge to the evidence that was introduced, were prejudicial. Relief is warranted.

**C.     Trial Counsel Rendered Ineffective Assistance by Failing to Investigate and Present Testimony of a Qualified Expert in Cellular Forensics.**

Prior to trial, the government produced discovery indicating that it would use cell site data in an effort to "map" the movement of the defendants and the Escobedos on October 12 and October 13, 2006, through the use of cellular phones. Members of the defense team were aware that the government intended to use the cellular phone records to establish that Mr. Sanchez was near the crime scene. In turn, the defense sought to use the records to raise reasonable doubt that third parties were involved in the conspiracy and murders because the records showed that Yessica Escobedo's phone traveled to the vicinity of McAllen, Texas, on October 12, 2006.

---

[5] During several days of deliberations, the only evidence the jury asked to see was the AK-47 and one other firearm. CR-DE No. 789; Tr. 7594.

App'x at A-001625-26 (Michael Cohen). Mr. Sanchez's counsel obtained the appointment of Jeff Fischbach as an expert witness in cellular forensics and submitted an expert disclosure in order to call him as a witness. CR-DE 515-3. Counsel, however, removed Mr. Fischbach's name from the witness list after the government represented that it would not present an expert witness. Tr. 2747-49, 6014.

Counsel's handling of the cellular evidence was deficient. At the time of Mr. Sanchez's trial, it was understood that counsel's "duty to investigate require[d] that counsel conduct a substantial investigation into any of his client's plausible lines of defense." *Fortenberry v. Haley*, 297 F.3d 1213, 1226 (11th Cir. 2002) (quotations and citations omitted). Here, although counsel retained an expert in cellular forensics, counsel failed to adequately investigate the cellular phone evidence and consult with Mr. Fischbach prior to trial. Counsel did not ask Mr. Fischbach to review and provide a general analysis of the cellular tower data until immediately prior to trial. App'x at A-000726 (Jeff M. Fischbach). By that point, Mr. Fischbach was operating under time constraints and could only provide a limited declaration to counsel. App'x at A-000726-27.

Counsel's lack of preparation is clear from the record. Counsel prematurely withdrew Mr. Fischbach as an expert witness without having consulted with him and were caught flat-footed when the government sought to introduce testimony and exhibits purporting to map the cellular calls. *See* Tr. 6015, 6020. Had counsel consulted with Mr. Fischbach in a timely manner, counsel could have presented expert testimony to explain the deficiencies in the cellular phone evidence and more effectively cross-examined the government's witnesses on these issues. Similarly, counsel introduced Yessica Escobedo's phone records into evidence to argue that the records showed the phone traveled from Melbourne, Florida, to McAllen, Texas, on the night of the crime – thus supporting the defense theory that other persons were involved in and responsible

for the crime. Tr. 7351-52. Counsel, however, failed to investigate and gather additional records that would have enabled them to definitely establish and present expert testimony in support of this theory and to forestall the government's argument in rebuttal.

The government would excuse counsel's lack of preparation by claiming that counsel's decision to not present expert testimony was "strategic." Resp. Opp. at 52. However, choices made in the absence of appropriate investigation are not entitled to deference; indeed, they are not "strategic" choices at all. *Porter v. McCollum*, 558 U.S. 30, 40 (2009); *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). Moreover, "the mere hiring of an expert is meaningless if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." *Richey*, 498 F.3d at 362.

At trial, the government relied heavily on cell site data through testimony of witnesses who were not qualified as experts. In the Response, the government claims that these records custodians did not do "anything other than explain the business records of the cellular providers." Resp. Opp. at 52. This is incorrect. Larry Smith, a records custodian for Metro PCS, testified on direct examination that he could "narrow down [the location of a handset] to a specific area one and half to two miles where a call occurred from." Tr. 6011, 6114. Moreover, the testimony from Special Agent Weeks about the summary map created from the cellular tower data, Govt. Ex. 760.1-760.15, suggested that the two vehicles traveled in tandem, sending and receiving calls that bounced off the same or nearby cell towers. Tr. 6705-6821.

Had counsel adequately prepared and consulted with Mr. Fischbach, counsel could have presented compelling expert testimony that the records produced at trial were insufficient to substantiate the whereabouts of an individual handset with the degree of accuracy and precision suggested by the government's witnesses.

39

In this case, the testimony at trial suggested that the cellular tower data could narrow the origination point of a call to a specific area one and a half to two miles from the location of the cellular tower that processed the call. Based on my examination of the records, the discovery produced at trial was patently insufficient to substantiate the whereabouts of an individual handset on a given date and time with such accuracy or precision. The records are only sufficient to determine the location and engineered capabilities of the particular cellular tower that provided cellular service.

The various factors that affect cellular tower range and coverage area – such as geography, cell site design and engineering, network integrity, obstructions, density, and congestion – are not predictable or constant. Though a tower may have been engineered to provide a certain range of coverage, there is no guarantee that the entire coverage area will receive the same quality of service or any service at all.

Each major cellular network provider maintains standard business records that could substantiate the approximate range and operating conditions of their cellular towers, including records that describe the towers' operational behavior, engineered capabilities, tuning and alignment, maintenance, and service history. Such records, which do not appear to have been provided in this case, dictate the actual range of service and would provide a more accurate estimation of an individual's location within the provider network.

App'x at A-000728-29.

Counsel also could have obtained the additional records needed to definitely establish that Yessica Escobedo's handset traveled from Florida to the vicinity of McAllen, Texas, on October 12, 2006, and thus further support the defense theory that others were involved in the conspiracy and murders.

I also reviewed the toll records, CDRs, and subscriber information for (956) 266-2004. The number was assigned to Yessica Escobedo by T-Mobile in May 2006. The toll records state that the handset was in the McAllen, Texas when it placed three outgoing calls to (956) 742-9994 at 11:58 PM on October 12, 2006, 12:00 AM on October 13, 2006, and 3:18 AM on October 13, 2006. The CDRs, which provide the cell site and switch data needed to identify the specific cellular towers responsible for providing cellular service, are incomplete for these calls.

The toll records, CDRs, and subscriber information provided by T-Mobile for (786) 853-8416, which the government alleged was used by Ricardo Sanchez, are similarly incomplete. There are calls in early October where the toll records show that the service area is Rio Grande, Texas or Houston, Texas. The CDRs

40

provided by T-Mobile only cover October 12-14, 2006. As a result, the specific towers that processed those calls cannot be identified.

Because these records are incomplete, it is not possible to definitely determine whether the ([9]56) 266-2004 handset traveled to Texas at some point on October 12, 2006. In order to perform a more comprehensive forensic evaluation, I would need to review system information, cell site, and switch data for relevant T-Mobile cellular towers in Florida and Texas during October 2006. Because network providers continuously update their cell site and switch center data, the data provided from 2007 and 2008 is not historically accurate. Historically accurate data is particularly important in this case because T-Mobile acquired wireless spectrum from the FCC in September 2006 and was in the process of upgrading its equipment and network capabilities during this time. I also would need to review the CDRs for (786) 853-8416 and (956) 266-2004 for the entire month of October 2006. As noted above, the CDRs for (786) 583-8416 only covered two days, and the CDRs produced by T-Mobile for (956) 266-2004 were generated by a third party subsidiary – Fraudbusters.

App'x at A-000729-30.

The government contends Mr. Sanchez was not harmed by counsel's failure to present expert testimony from Mr. Fischbach because (1) Mr. Sanchez failed to offer factual support for this claim; and (2) "Fischback's [sic] purported testimony would have made no points more significant than those raised by Sanchez's counsel on cross-examination." Resp. Opp. at 53-55. The government errs. Mr. Sanchez has proffered detailed factual support for this claim in the § 2255 motion and herein, which the reviewing court must accept as true and which entitles him to an evidentiary hearing. *See Pope v. Sec'y for the Dep't of Corr.*, 680 F.3d 1271, 1291-92 (11th Cir. 2012). Furthermore, cross-examination is an inadequate substitute for the testimony of a well-qualified expert. *See Byrd*, 580 F. Supp. 2d at 559.

The government capitalized on trial counsel's deficient performance, relying heavily on the misleading cellular testimony in its closing arguments to the jury. Using the map purporting to track the locations of the cellular phones, the prosecutor argued that that the evidence pointed to Mr. Sanchez being on the turnpike and at the scene of the crime when the murders occurred. Tr. 7140-53, 7149-50 (describing the circumstantial cellular evidence as "powerful . . . proof of a

41

chain of facts and circumstances"). The prosecutor also undermined the defense's argument that other parties were involved in the crime. Tr. 7453 ("I don't know where Mr. Cohen got the fact that Yessica's phone was in Texas."). Counsel's failure to challenge this evidence was prejudicial.

> **D.      Trial Counsel Unreasonably and Prejudicially Failed to Object to the Charges Contained in Counts 7 through 10, and to the Jury Instructions and Verdicts on Those Counts.**

The § 2255 motion alleged that counsel were ineffective in failing to object to the indictment, jury instructions, and verdicts on Counts 7 through 10. Motion at 91-94. Each of the four counts charged two different predicate offenses – drug trafficking and carjacking – for a crime of violence under 18 U.S.C. § 924(j)(1), and each count charged a killing that violated 18 U.S.C. § 1111 as premeditated murder and as felony murder committed during robbery. *Id*. at 92.

The Court's jury instructions, however, omitted any mention of felony murder during a robbery and instead authorized the jury to convict Mr. Sanchez of felony murder based only on the carjacking charge *even though § 1111 does not authorize felony murder based on carjacking*. *Id*. at 93. The Court failed to instruct the jury that each charge required it to unanimously find that each killing was committed willfully, deliberately, and maliciously, and with premeditation, or to unanimously find that each killing occurred in the course of an enumerated felony under § 1111. *Id*. at 93-94.

The jury's verdicts on Counts 7 to 10 did not indicate whether Mr. Sanchez had been unanimously found guilty of premediated murder and/or of felony murder in the course of carjacking. *Id*. The jury did not reach a verdict on robbery or any other enumerated § 1111 offense upon which felony murder properly could be based. *Id*. Accordingly, Mr. Sanchez's convictions on Counts 7 to 10 may well have been based on erroneous instructions that charged a nonexistent crime—felony murder in the course of carjacking. *See id*.

42

Despite these significant errors of which counsel were or should have been aware, trial counsel failed to object. *Id*. Counsel had no strategic reason for these omissions. *See* App'x at A-001669 (Donnie Murrell). Mr. Sanchez was prejudiced because the jury did not unanimously find all of the statutorily required elements for conviction in Counts 7 through 10. Had counsel properly objected to the indictment, instructions, and verdicts, there is a reasonable probability of a different outcome. *See* Motion at 94.

Respondent's opposition fails to dispute a fundamental defect in these counts, namely that:

> Despite the allegations in Counts 7 to 10 that Mr. Sanchez did unlawfully kill each victim in the perpetration of, and attempt to perpetrate, a robbery, pursuant to § 1111's felony murder clause, the Court did not instruct the jury on the elements of robbery, [but instead. . . ] erroneously instructed the jury that it could find felony murder based on the carjacking charge.

Motion at 93 (internal quotations omitted).[6] In light of this defect, the jury may well have convicted Mr. Sanchez based on its determination that each "killing resulted from the perpetration of, or attempted perpetration of, . . . carjacking." CR-DE 769 at 22. Because such a crime is neither authorized by statute nor charged in the indictment, Mr. Sanchez's convictions on Counts 7 to 10 were erroneous.

Indeed, jury instructions that relieve the government of its obligation to prove every element of the offense beyond a reasonable doubt violate due process. *Carella v. California*, 491

---

[6] *See* Tr. 7543 (instructing the jury that "[i]t is sufficient if the Government proves beyond a reasonable doubt that the Defendant knowingly and willfully committed and attempted to commit the crime of carjacking as charged in the indictment[, a]nd that the killing of the victim occurred during and in consequence of the Defendant's commission of or attempt to commit that crime"); CR-DE 769 at 22 (instructing the jury that a guilty verdict on counts 7 through 10 could be reached where the jury found "[t]hat the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense, *or*, the killing resulted from the perpetration of, or attempted perpetration of, the crime of violence (the crime of carjacking)") (emphasis in original).

U.S. 263, 265 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979); *see also United States v. Rogers*, 94 F.3d 1519, 1524 (11th Cir. 1994) (error where the district court "effectively omitted from the instructions an essential element of the crime charged"). Counts 7 through 10 here charged violations of § 924(j)(1), the elements of which included that "the killing is a murder (as defined in section 1111)." 18 U.S.C. § 924(j)(1). In the indictment, the government alleged that each killing was a murder as defined in § 1111; to wit, it was either "willful, deliberate, malicious, and premeditated," or was committed "in the perpetration of, or attempt to perpetrate, . . . robbery." 18 U.S.C. § 1111(a); *see* CR-DE 305 at 8-11. But the jury instructions relieved the government of its obligation to prove every element of § 924(j)(1) by authorizing conviction on Counts 7 through 10, where the killing was neither premeditated nor committed during robbery, but where the killing resulted from carjacking. *See* Tr. 7543; CR-DE 769 at 22. The instructions were therefore erroneous and violated due process, and counsel should have objected.

Instead of addressing this error, Respondent asserts:

Section 1111 is referenced for the definition of "murder" only. Section 1111 is not charged in any of Counts Seven through Ten, and thus whether carjacking or drug trafficking crimes are predicate offenses of this statute is of no moment.

Resp. Opp. 38. Although it is true that § 1111 was not separately charged, that is irrelevant. Congress expressly incorporated § 1111's definition of murder as an element of § 924(j)(1), and the government was accordingly required to prove § 1111's definition of murder in Counts 7 through 10. The Court's jury instructions, however, plainly authorized conviction for murder that does *not* meet § 1111's definition, i.e., murder resulting from carjacking.

44

Counsel were deficient in failing to object to this error.[7] As the Supreme Court has stated, "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton*, 134 S. Ct. at 1089. Here, § 1111's definition of murder applied, as was plain from the indictment and from the statutory language of § 924(j). Yet counsel failed to object when the court instructed the jury that it could convict based on a definition of murder that was inconsistent with § 1111. This failure was not the result of a strategic or tactical decision. *See* App'x at A-001669 (Donnie Murrell). Where Mr. Sanchez's life depended on the jury's resolution of Counts 7 through 10, and where any objections could have been made outside the jury's hearing, no such strategy or tactic can even be envisioned. *See Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[T]actical decision was unreasonable" where it was "based upon a misinterpretation of the law[.]"); *see also Young v. Zant*, 677 F.2d 792, 798 (11th Cir. 1982) ("Where defense counsel is so ill prepared that he fails to understand his client's factual claims or the legal significance of those claims . . ., we have held that counsel fails to provide service within the range of competency expected of members of the criminal defense bar."); *Dixon v. Snyder*, 266 F.3d 693, 703 (7th Cir. 2001) (when counsel makes a decision that an awareness of the governing law would foreclose, that decision "cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a 'startling ignorance of the law'" (quoting *Kimmelman*, 477 U.S. at 385 (1986))).

---

[7] Respondent does not address Movant's allegations of ineffective assistance of counsel except by contending that there were no underlying errors in the indictment or instructions and thus no reason for counsel to object. *See* Resp. Opp. at 37, 39. Because its premise is wrong, the government's defense of counsel's performance is likewise misplaced.

45

Prejudice is established because it cannot be determined from the verdict sheets – or from any other part of the record – whether the jury found the fourth element of Counts 7 through 10 based on its finding of "the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense, *or*, the killing resulted from the perpetration of, or attempted perpetration of, the crime of violence (the crime of carjacking)." CR-DE 769 at 22 (emphasis in original). As either basis is plausible, there is a reasonable probability of a different result if counsel had objected.

Rather than addressing the above errors, which themselves warrant relief, Respondent's opposition focuses on defending the inclusion of the two predicate offenses – drug trafficking and carjacking/crime of violence – in the indictment and instructions on these counts. *See* Resp. Opp. at 34-38. Respondent argues that "counts 7, 8, 9, and 10 do not charge two or more offenses in a single count." *Id*. at 34. But this is incorrect. Obviously, "armed carjacking, in violation of Title 18, United States Code, Section 2119," and "conspiracy to possess with intent to distribute one or more controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846," are two separate offenses, as the record in this case makes clear. CR-DE 305 at 3-4, 7-11. Under Eleventh Circuit precedent, "[a] duplicitous indictment charges two or more separate and distinct crimes in a single count." *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989). The indictment here did precisely what *Burton* prohibits.[8] And

---

[8] The government also cites *Gonzalez-Lauzan v. United States*, No. 07-21144-CIV, 2008 WL 343492 (S.D. Fla. Feb. 5, 2008), and *United States v. Wilk*, No. 04-60216-CR, 2005 WL 7863525 (S.D. Fla. Mar. 14, 2005), *report and recommendation adopted*, 2005 WL 7863448 (S.D. Fla. Mar. 22, 2005), in support of its position. *See* Resp. Opp. at 35-36. In *Wilk* and *Gonzalez-Lauzan*, however, the government charged only one underlying crime – a crime of violence – and did not charge an alternate drug crime. *See Gonzalez-Lauzan*, 2008 WL 343492, at *5 ("Count 5 of the Indictment charged the Movant with only one offense: knowingly using and carrying a firearm during and in relation to a crime of violence resulting in death . . . ."); *Wilk*, 2005 WL 7863525, at *3 ("Count 3 tracks the statutory language of 18 U.S.C. § 924,

46

while Mr. Sanchez acknowledges that the Court instructed the jury to decide on the predicate offenses unanimously, *see* Resp. Opp. at 38, the verdict sheets did not require such unanimity and did not indicate which predicate(s) were found. *See* Motion at 93. Under these circumstances, counsel was deficient for failing to object, and Movant was prejudiced as a result of all of these errors.

> **E.      Trial Counsel Unreasonably and Prejudicially Failed to Object to the Prosecutor's Misconduct during Guilt Phase Closing Arguments.**

The prosecutor has a special obligation to avoid "improper suggestions, insinuations, and especially, assertions of personal knowledge." *Berger v. United States*, 295 U.S. 78, 88 (1935). Such conduct is prohibited because these "comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried based solely on the evidence presented to the jury." *United States v. Young*, 470 U.S. 1, 18-19 (1985).

While a prosecutor may state his views of what the evidence shows and the inferences and conclusions that the evidence supports, it is clearly improper for a prosecutor to bolster a witness's testimony by arguing credibility based on the reputation of the government office or on evidence not before the jury. *See United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991). This is because jurors tend to give great deference to the prosecutor, and improper prosecutorial arguments "are apt to carry much weight against the accused when they should properly carry none." *Berger*, 295 U.S. at 88; s*ee also Young*, 470 U.S. at 18 ("[T]he prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to

---

which states, in pertinent part: '(c) . . . any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm [shall be subject to punishment in addition to the penalty for the crime of violence].'") (ellipses and alteration by the court).

trust the Government's judgment rather than its own view of the evidence."); *Drake v. Kemp*, 762 F.2d 1449, 1459 (11th Cir. 1985) ("Arguments delivered while wrapped in the cloak of state authority have a heightened impact on the jury."). Thus, the prosecutor's argument "must be scrutinized carefully," *Drake*, 762 F.2d at 1459, and arguments that invite the jury to convict based on the government's reputation or on evidence not presented at trial violate a defendant's due process and Eighth Amendment rights.

In the guilt phase closing arguments, the prosecutors vouched for the strength of their case, the honesty of its presentation, and the dedication of law enforcement based on evidence outside the record. *See* Motion at 95-96. Assistant United States Attorney Kastrenakes argued that the law enforcement agents were "dedicated, hard working" individuals, Tr. 7416, who had done "a fabulous job in solving this case." Tr. 7425. He also lauded the law enforcement agents as "heroes" and "stars" who were worthy of "praise from this community, not criticism" or "nitpicking." Tr. 7425, 7427, 7456. Assistant United States Attorney Carlton suggested outside knowledge of Mr. Sanchez's guilt: "[t]he Government is alleging, *and we think we know*, we have proved that those murders occurred directly as a result of this carjacking." Tr. 7132.

The prosecutors' comments and arguments clearly were improper and fell under the umbrella of similar remarks that have been held to be error. *See, e.g.*, *United States v. Smith*, 814 F.3d 268, 274-77 (5th Cir. 2016) (reversible error where the prosecutor made repeated arguments that witnesses were "truthful" and "worthy of believing"); *United States v. Garza*, 608 F.2d 659, 664-65 (5th Cir. 1979) (error when the prosecutor argued "those people [the government agents] and the Government has [sic] no interest whatsoever in convicting the wrong person"); *United States v. Lamerson*, 457 F.2d 371, 372 (5th Cir. 1972) (error for the prosecutor to state that he would not be prosecuting the defendant "had [he] not committed a crime"). Yet trial counsel

48

stood silent and failed to object. Given that counsel emphasized the weakness of the government's evidence, counsel had no reasonable basis for failing to object to the government's attempts to buttress its case with improper appeals to the jury based on the character, honesty, and diligence of individual law enforcement agents. *See Washington v. Hofbauer*, 228 F.3d 689, 703 (6th Cir. 2000) ("The prosecution's tactics and challenged statements amounted to unfair and prejudicial misconduct plainly meriting an objection and curative instruction, yet [trial counsel] sat silent. At the most pivotal moments, we conclude, his silence was due to incompetence and ignorance of the law rather than as a part of a reasonable trial strategy.").

The government argues that counsel had no reason to object because the prosecutors' comments were not impermissible vouching but instead invited replies to the defense arguments concerning the weaknesses of the prosecution's case. Resp. Opp. at 95-96. However, the "invited response" doctrine was developed to address prosecutorial responses to *improper* defense arguments, which may be considered in determining whether the "prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant." *Young*, 470 U.S. at 12. Under the "invited response" doctrine, "if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,'" they ordinarily will not violate due process. *Id.* at 12. The "invited response" doctrine does not apply here because: (1) defense counsel's argument that the government's case was based almost entirely on circumstantial evidence was not improper; and (2) the prosecutor did not limit his response to an attempt to "right the scale," but instead launched a wide-ranging, personal appeal to the jury based on the purported quality of the work, and thus the credibility, of law enforcement agents.

Because the prosecutor did far more than "right the scale," an objection would have been valid, and trial counsel's failure to raise such an objection prejudiced Mr. Sanchez. *See, e.g.*,

49

*Hodge v. Hurley*, 426 F.3d 368, 378-79 (6th Cir. 2005) (reversing denial of habeas relief where counsel failed to object to prosecutor's vouching for the credibility of a witness and her family); *Washington*, 228 F.3d at 699-706 (reversing denial of habeas relief where counsel failed to object to repeated instances of misconduct during closing argument).

**F.      Counsel's Unreasonable Errors and Omissions Individually and Cumulatively Prejudiced the Defense at Mr. Sanchez's Capital Trial.**

The Supreme Court has long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of the individual deficiencies warrants relief. *See, e.g.*, *Strickland*, 466 U.S. at 694 (prejudice assessed from effect of "counsel's unprofessional errors"); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to determine whether the misconduct was sufficiently prejudicial to violate defendant's due process rights). The Eleventh Circuit has recognized the same principle. *See Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004) ("A piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." (quoting *United States v. Blasco*, 702 F.2d 1315 (11th Cir. 1983))).

Mr. Sanchez has identified numerous errors by trial counsel in the investigation, preparation, and presentation of the defense. There is a reasonable probability that, had counsel

50

conducted a constitutionally adequate investigation to develop and present readily available forensic evidence challenging the government's circumstantial case, objected to the charges and jury instructions on Counts 7 and 10, and objected to the government's improper vouching, the jury would not have convicted Mr. Sanchez on all counts or would not have sentenced him to death. Mr. Sanchez's claim of ineffective assistance of counsel at the guilt phase of his capital trial, as supported by documentary evidence, entitles him to relief, or, at the very least, an evidentiary hearing.

### CLAIM VIII: MR. SANCHEZ WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE OF HIS TRIAL.

As a result of trial counsel's errors and omissions at the penalty phase of Mr. Sanchez's trial, the jury was presented with an impression of Mr. Sanchez that was incomplete and misleading. Counsel's ineffective performance provided the prosecution with an opening to convince the jury to accept a false and distorted portrayal of Mr. Sanchez's background, character, and functioning. *See, e.g.*, Tr. 9514-15 (prosecutor arguing that Mr. Sanchez did not suffer abuse at the hands of his father and was not exposed to domestic violence); *id.* (government arguing that Mr. Sanchez was not traumatized by domestic abuse and violence because when he was an adult he returned home each weekend to play bingo: "Some trauma. It is a figment of imagination they want you to adopt hook, line and sinker, and don't fall for it."); *id.* at 9515 (government arguing that Mr. Sanchez's father was "a hard working man who raised four kids"); *id.* at 9515 (Mr. Sanchez's intellectual functioning was in the low average range rather than in the range of intellectual disability). Counsel's failures also facilitated the jury's consideration – and acceptance – of evidence of other violent behavior by Mr. Sanchez that lacked indicia of reliability. *See, e.g.*, Tr. 5642-46, 6190-6207 (testimony by Kevin Vetere that Mr. Sanchez was involved in a shooting on Haverhill Road); *id.* at 5671-73, 6208-94, 6391-92

51

(testimony by Mr. Vetere that Mr. Sanchez used an AK-47 to fire into a house on Suwanee Road).

In support of its argument that Mr. Sanchez has not established that his trial counsel rendered prejudicially deficient performance at the penalty phase of his trial, Respondent relies heavily and repeatedly on the false contention that Mr. Sanchez has not provided any supporting documentation such as affidavits or other records to support his claim. *See, e.g.*, Resp. Opp. at 61 ("Sanchez provides no evidence—no evidence or cites to the record—to support this claim."); *id.* at 67 n.33 ("Sanchez provides no documentary evidence to indicate that the withheld information actually exists."); *id.* at 71 ("Although Sanchez's petition includes sixteen pages of information concerning Sanchez's childhood and family history that lay witnesses purportedly could have testified to, Sanchez provided no affidavits to indicate what witnesses would have testified and what information they would have testified to."); *id.* at 72 ("Sanchez has failed to establish through affidavit, expert report or any other evidence, that any expert witness would have testified that Sanchez suffers from a psychological disorder (Sanchez Issue IV(A), (B)), that Sanchez suffered from neuropsychological impairments that affected his behavior and brain functioning (Sanchez Issue VIII(B)); or that Sanchez's IQ was overrepresented at trial (Sanchez Issue VIII(B) and (D))."); *id.* at 73 ("Sanchez further claims that his counsel failed to investigate and present evidence of Sanchez's adaptive functioning deficits but does not indicate what this evidence entails, such as an affidavit or report from an appropriate mental health expert."); *id.* at 90 ("Sanchez [sic] claims of incompetency are speculative and are not supported by the record or any post-trial affidavits"); *id.* at 91 ("In support of these allegations [of incompetence], Sanchez provides no evidence: no cites to the record and no post-trial affidavits."); *id.* at 92 (Sanchez "provides no affidavits or medical records to support [his] claim" that his incompetence was

52

caused by neuropsychological and intellectual impairments and symptoms of psychiatric disorder).

Mr. Sanchez set forth detailed factual allegations in the Motion, and these facts must be taken as true and entitle him to an evidentiary hearing. Rule 2(b), Rules Governing Section § 2255 Proceedings, sets forth exactly what a § 2255 motion must include: specification of all of the moving party's "grounds for relief," and a statement of "the facts supporting each ground." It says nothing about filing "documentation" supporting the properly pled grounds for relief. Courts have repeatedly made clear that, as long as a motion states the relevant facts, it need not contain supporting documents. *See, e.g.*, *Paige v. Birkett*, 2006 WL 273619, at *6 (E.D. Mich. Jan. 31, 2006) (nothing in habeas statute or rules "requires a habeas petitioner to attach . . . evidentiary material to his petition for writ of habeas corpus"); *United States ex rel. Bonner v. Warden, Statesville Corr. Ctr.*, 422 F. Supp. 11, 14 (N.D. Ill. 1976) (habeas petition "need not contain evidentiary material"). Mr. Sanchez's Motion complied with these requirements.

In determining whether an evidentiary hearing is warranted, the Court must accept the truth of the factual allegations in the § 2255 motion unless they are clearly frivolous. *See, e.g.*, Rules Governing § 2255 Cases, R. 4(b) (providing that the district court is required to hold an evidentiary hearing "unless the motion and files and records of the case show conclusively that the movant is not entitled to relief"); *United States v. Booth*, 432 F.3d 542, 545 (3d Cir. 2005) ("In considering a motion to vacate a defendant's sentence, 'the court must accept the truth of the movant's factual allegations unless they are clearly frivolous on the basis of the existing record.'") (internal citation omitted); *United States v. Aguiar*, 105 F. Supp. 3d 1 (D.D.C. 2015) (noting with approval that "[i]n addressing [petitioner's] § 2255 motion, the Court did accept all of [his] factual assertions as true for the purposes of its analysis"). Mr. Sanchez has set forth

53

detailed allegations, and supported them with documentary evidence, entitling him to a hearing on this claim.

Furthermore, Mr. Sanchez filed and served upon the government an Appendix containing numerous sworn declarations of family members, friends, teachers and other educational personnel, trial counsel, and mental health experts, as well as other documentary exhibits, on October 19, 2016,[9] two weeks prior to the government's filing of its Opposition on December 1, 2016. These materials provide extensive additional factual support for the allegations in Mr. Sanchez's § 2255 motion.

The government disregards the materials in the Appendix in its attempt to convince the Court that a § 2255 motion itself must "contain all . . . supporting evidence . . . including any supporting documentation." Gov't Resp. Mot. Recon., CV-DE 40 at 4-5. As set forth in Mr. Sanchez's Reply Memorandum in Support of Motion to Reconsider Order Dismissing Claims, the government's position is contrary to existing law and procedure. *See* CV-DE 42 at 2-4. The claims in Mr. Sanchez's § 2255 motion were properly pled and timely, and supplemental filing of documentation in support of those claims is customary and permissible. *Id*. at 4, citing *Vasquez v. Hillery*, 474 U.S. 254, 250 (1986).

Respondent insists that any deficient performance by trial counsel could not have been prejudicial to Mr. Sanchez because "the facts of the instant case . . . are so egregious, that it is unlikely that the testimony of a dozen extra mitigation witnesses would have made any difference in the penalty phase of this trial." Resp. Opp. at 79-80. Respondent acknowledges that "at least one member of the jury found that twenty-three different mitigating factors relating to Sanchez's family background, intellectual abilities, and other areas . . . had been proved by a

---

[9] Mr. Sanchez has supplemented the Appendix filed on October 19, 2016, with additional declarations and documents filed in conjunction with this Reply and Memorandum of Law.

preponderance of the evidence" and that the jury voted not to impose a death sentence on two of the murder counts. *Id*. at 80-81. The government argues, however, that because "the jury found that the proven mitigating factors did not sufficiently outweigh the proven aggravating factors to justify a life sentence" on the counts related to the murders of the Escobedo children, "more mitigation evidence"[10] could not have caused the jury to "re-weigh[] the balance" in favor of Mr. Sanchez. *Id*. at 81-82. As set forth in more detail below, this conclusion is illogical; the fact that some members of the jury found some of the presented mitigating factors to be true and still voted to impose a sentence of death in no way precludes the probability that if more members of the jury had found more (or more compelling) mitigating factors to be true, the jury would have imposed a sentence less than death for those two counts.

The government further asserts that "[t]he type of omitted testimony proffered by Petitioner is simply not of the caliber required to meet the prejudice standard in a capital case." *Id*. at 80. Perhaps the new information is not compelling to counsel for Respondent, but that is not the standard that Mr. Sanchez must meet in order to obtain relief. This Court must consider whether the newly presented information is reasonably likely to have changed the vote of even

---

[10] Throughout the Opposition, Respondent argues that the information set forth in the Motion and the supporting documentation is simply more of the same type that was presented at trial and therefore would not have influenced or changed the vote of any of the penalty phase jurors. *See, e.g.*, Resp. Opp. at 81 ("Given the facts of this horrific case it is highly unlikely, not just improbable, that the sentence would have re-weighed the balance in Sanchez's favor just because more mitigation evidence was piled on."). But Respondent is incorrect; the newly presented information is not only of a different quantity but also of a different quality than that presented at trial. *See, e.g.*, *Johnson v. Sec'y, Dept. of Corr.*, 643 F.3d 907, 936 (11th Cir. 2011) ("The description, details, and depth of abuse in Johnson's background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told. The picture Jones painted for the jury was of Johnson having cold and uncaring parents, something in the nature of the 'American Gothic' couple. With a reasonable investigation, though, he could have painted for the jury the picture of a young man who resembled the tormented soul in 'The Scream.' There is nothing wrong with a Grant Wood approach, if that is all one has to use, but an Edvard Munch approach would have been far more likely to sway the jury to sympathy for Johnson.").

*one* of the capital jurors; if the answer is yes, relief is required. *Strickland*, 466 U.S. at 695 ("the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.") (internal quotation omitted); *Battle v. United States*, 419 F.3d 1292, 1302 (11th Cir. 2005) ("[I]n federal capital penalty-phase deliberations, a single juror has the power to thwart a death sentence without persuading anyone: he simply needs to vote against the death penalty and the defendant will then be sentenced to life in prison.").[11]

Mr. Sanchez's claim of ineffective assistance of counsel at the penalty phase of his capital trial sets forth allegations, supported by documentary evidence, that entitle him to relief or, at the very least, an evidentiary hearing.

---

[11] In effect, the government appears to contend that no matter what mitigating evidence the defense presented at the penalty phase, the jury still would have imposed death sentences for the killing of the two children. Resp. Opp. at 81 ("The inherent weakness in Sanchez's argument lies in an uncomfortable and indisputable fact: despite the fact that many jurors found that Sanchez's counsel had proven thirty-one different mitigating factors, those factors did not outweigh the ugly brutality of Sanchez's execution-style murder of an entire family, including a [sic] two preschool aged boys whom he knew, and the subsequent abandonment of their bodies on the side of the Florida Turnpike."). But this argument holds no water. Although the killing of two small children is an undeniably terrible crime, prejudice has repeatedly been found in cases with devastating facts. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 378, 383 (2005) (defendant stabbed victim repeatedly and set body on fire; history of violent felony convictions, including convictions for rape and assault); *Wiggins v. Smith*, 539 U.S. 510, 514-15 (2003) (defendant drowned seven-year-old child in bathtub); *Williams v. Taylor*, 529 U.S. 362, 367-68 (2000) (defendant robbed an elderly man and beat him to death with a mattock; prior convictions for armed robbery, burglary, and assaults on elderly people); *Walbey v. Quarterman*, 2009 WL 113778, *8, 309 F. App'x 795 (5th Cir. 2009) (unpublished) ("Texas's next argument – that Walbey suffered no prejudice because the brutality of his crime eclipses any mitigating evidence – is a non-starter. . . . To permit a jury to impose the death sentence solely because the facts are heinous and egregious would be to return to the days of inflicting capital punishment based on emotion and revenge. . . . Almost without exception, the cases we see in which conviction of a capital crime has produced a death sentence arise from extremely egregious, heinous, and shocking facts. But, if that were all that is required to offset prejudicial legal error and convert it to harmless error, habeas relief . . . would virtually never be available, so testing for it would amount to a hollow judicial act.").

A.      **Governing Legal Principles.**

As set forth earlier in this Reply, Mr. Sanchez's ineffective assistance of counsel claims are governed by the well-established standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. The argument and authorities set forth above are incorporated by this reference as though fully set forth here.

There need be no causal relationship between the mitigating evidence and the crime, or between the mitigating evidence and the aggravating evidence, in order for the evidence to be presented and the jury required to consider it. *Williams v. Taylor*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Williams v. Allen*, 542 F.3d 1326, 1343-44 (11th Cir. 2008) (reversing district court's denial of relief because of lack of causal relationship between mitigating evidence and crime, citing *Williams v. Taylor*).

B.      **Failure to Investigate, Develop, and Present Evidence of Mr. Sanchez's Personal Background and Social History.**

1.      **Deficient performance.**

"It is unquestioned that under the prevailing professional norms at the time of [Mr. Sanchez's 2009] trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Porter v. McCollum*, 558 U.S. 30, 38-39 (2009) (citing *Williams v. Taylor*, 529 U.S. at 396, and holding that counsel's failure as long ago as 1988 to conduct a thorough investigation of the defendant's background did not satisfy prevailing professional norms); *Rompilla v. Beard*, 545 U.S. 374, 387 (2005) (holding that counsel's failure in 1988 to conduct a thorough investigation of the defendant's background did not satisfy prevailing professional norms); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) ("[I]nvestigations into mitigating evidence should comprise efforts to discover all reasonably available mitigating

57

evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.") (internal quotations omitted); *Strickland*, 466 U.S. at 690-91 (holding, in 1984, that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary"); *Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1262 (11th Cir. 2016) (same; citing *Wiggins* and quoting *Porter*). The Supreme Court has explained that "evidence about [a capital] defendant's background and character is relevant because of the belief, long held by society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 544 (1987) (O'Connor, J., concurring); *accord Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

Sources of prevailing norms of practice may establish the prevailing professional standards in place at the time of trial. *See, e.g.*, *Wiggins*, 539 U.S. at 524 (evaluating the performance of counsel using both the American Bar Association's Guidelines and testimony regarding the professional standards that prevailed in the state at the time of petitioner's trial); *Daniel*, 822 F.3d at 1262-63 ("When assessing the reasonableness of an attorney's performance, the Supreme Court has looked to standards promulgated by the American Bar Association (ABA) as appropriate guides."); *id.* at 1263 ("[I]n 1985, the ABA standards . . . provided that '[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant [to a mitigation investigation], as will mitigating circumstances surrounding the commission of the offense itself'") (citing *Wiggins* and quoting *Bobby v. Van Hook*, 558 U.S. 4, 7-8 (2009)).

58

The government contends that Mr. Sanchez's claim that his trial counsel failed to investigate, develop, and present compelling mitigating information about Mr. Sanchez's background and social history fails because Mr. "Sanchez's claims in this regard are speculative and are not supported by the record or any post-trial affidavits or expert reports." Resp. Opp. at 63. As explained above, the government's contention is erroneous. *See* App'x filed on October 19, 2016, and App'x filed concurrently with this Reply.

The government further argues that Mr. Sanchez's claim fails because the witnesses called by the defense at the penalty phase "established many of the subject areas that Sanchez now claims were not covered." Resp. Opp. at 64. This argument, too, has no merit. Respondent assumes that counsel's performance cannot be constitutionally deficient if counsel conducted some investigation, or presented some mitigating evidence, but the law holds otherwise. *See, e.g.*, *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) ("a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements" for effective counsel). Although counsel's duty to investigate mitigating evidence "does not necessarily require counsel to investigate every evidentiary lead, . . . the decision to limit an investigation 'must flow from an informed judgment.'" *Williams v. Allen*, 542 F.3d at 1336, 1339 (quoting *Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989)).

Counsel entirely failed to locate, interview, and present the testimony of teachers and educational personnel who could and would have provided detailed testimony about Mr. Sanchez's cognitive, academic, and social impairments during his childhood. Although counsel presented the testimony of one of Mr. Sanchez's teachers, Amy Fleming, counsel did not elicit meaningful testimony about her personal experiences with or her own observations of Mr. Sanchez, and instead used her as a vehicle to authenticate and introduce Mr. Sanchez's special

59

education records and information from those records into evidence. Tr. 8208-70. Counsel failed

to locate and interview additional teachers and special education personnel who remembered Mr.

Sanchez personally, could attest to his significant lifelong deficits, and could explain their own

records of Mr. Sanchez's impaired performance, including but not limited to Frances Lenore

Wolfe, Janice Coe, Jeffrey Silverman, Patricia Replogle, Wanda Lee, and Dr. Francis Crosby.[12]

App'x at A-000604 (Frances Lenore Wolfe), A-000612 (Janice Coe), A-000625 (Jeffrey

Silverman), A-000669 (Patricia Replogle), A-000683 (Wanda Lee), A-000739 (Francis Crosby,

Psy.D.). Counsel's failure to do so when these teachers were local, available, and willing to

testify was unreasonable.

Respondent informs the Court, incorrectly, that trial counsel interviewed and presented

the testimony of "friend witnesses" at the penalty phase. Resp. Opp. at 62. Counsel did not

interview or present the testimony of friends of Mr. Sanchez. Counsel's presentation at the

penalty phase was limited to the testimony of the following people: Juana Sanchez, Mr.

Sanchez's mother; Amy Fleming, one of Mr. Sanchez's middle school teachers; Nydia Sanchez,

Mr. Sanchez's sister; Juan Antonio Jimenez, Mr. Sanchez's maternal uncle; Thomas Waddell, a

psychologist who had evaluated Mr. Sanchez's older brother, Efrain Sanchez; Maria Lopez, the

mother of Mr. Sanchez's child; Rachel Ramos, Maria Lopez's mother; Dr. Daniel Grant, a

neuropsychologist; and Thomas Reidy, a psychologist. Counsel did not present the testimony of

Mr. Sanchez's friends and girlfriends, nor of friends of Mr. Sanchez's mother Juana, who had

information about his father's alcoholism and abusive treatment of Mr. Sanchez and his mother;

his academic, behavioral, and social impairments; and his traumatic life experiences. App'x at A-

---

[12] As set forth in the § 2255 motion at 104, the mitigation specialist contacted Dr. Crosby once but failed to interview him despite his availability and willingness to testify. App'x at A-000737-38 (Francis Crosby, Psy.D.).

000608 (Jamie Matos), A-000620 (Jason Vazquez), A-000631 (Kenny Velasquez), A-000634 (Linda Velasquez), A-000657 (Michelle Sembric), A-000660 (Mayra Garcia), A-000678 (Rosa Ponce), and A-000687 (Yolanda Vazquez). *See Williams v. Allen*, 542 F.3d at 1337-39 (holding that capital defense counsel in 1990 had a duty to "obtain names of collateral persons or sources to verify, corroborate, explain and expand upon [the] information obtained") (quoting 1989 ABA Guidelines, Guideline 11.4.1(D)).

Although counsel spoke with some family witnesses and presented the testimony of three of them at trial (Juana Sanchez, his mother; Nydia Sanchez, his sister; and Juan Antonio Jimenez, his maternal uncle), counsel failed to investigate and present testimony from numerous other family members, including paternal and maternal grandparents, aunts and uncles, siblings, and cousins, who possessed critical information about Mr. Sanchez's family history and Mr. Sanchez's experiences, behavior, and functioning that the jury never heard. *See, e.g.*, App'x at A-001676-82 (Aurelio Sanchez Sotelo),[13] A-000575 (Ezequiel Sanchez), A-000622 (Juan Gutierrez), A-000637 (Lucy Jimenez Sanchez), A-000652 (Martin Sanchez).

Because no member of the defense team spoke Spanish, including the mitigation investigator, counsel failed to communicate effectively and meaningfully with the important family witnesses whom counsel did contact, thereby precluding the development of thorough and reliable information from these witnesses. *See, e.g.*, A-001683-88 (Elsa Hernandez), App'x at A-001689-1701 (Juana Maria Sanchez), A-001702-05 (Maria de la Luz Betancourt). Respondent's contention that Mr. Sanchez has not established deficient performance with regard to counsel's

---

[13] In drafting this Reply, counsel for Mr. Sanchez noted some errors in the English translations of the Spanish declarations of Aurelio Sotelo Sanchez, Elsa Hernandez, Juana Maria Sanchez, and Maria de la Luz Betancourt that were filed with the Appendix on October 19, 2016. As a result, Mr. Sanchez has filed along with this Reply corrected English translations of those declarations, and cites to those here.

failure to ensure that the defense team included a competent Spanish-speaker, Resp. Opp. at 62, requires this Court to ignore the fact that this failure precluded the presentation of testimony from numerous witnesses, including but not limited to Aurelio Sanchez Sotelo, Mr. Sanchez's paternal grandfather; Maria de la Luz Betancourt, Mr. Sanchez's maternal grandmother; and Elsa Hernandez, Mr. Sanchez's maternal aunt; as well as the fact that it precluded the presentation of complete and reliable testimony of Juana Maria Sanchez, Mr. Sanchez's mother. *See, e.g.*, App'x at A-000668 (Nydia Sanchez) ("My mother does not speak English well and she was very confused by everything that was going on. [The mitigation specialist] used me to interpret from English to Spanish most of the time. I tried to help explain things to my mother but the process was very complicated."); *id*. at A-001700 (Juana Sanchez) (stating because the mitigation specialist "did not speak Spanish, . . . I relied on my children to explain to me all that was happening" and noting "[b]ecause I did not exactly understand what was going on, I was afraid to trust Ricky's attorneys. If I had understood what was going on, I could have given them more information.").

Failing to elicit compelling mitigation information from witnesses who were called to testify constitutes deficient performance. *See, e.g.*, *Ferrell v. Hall*, 640 F.3d 1199, 1230 (11th Cir. 2011) (finding deficient performance where "the very witnesses who were called by the defense to testify at [defendant's] trial . . . could have provided detailed information about his deeply troubled mental health and his childhood if they had ever been asked").

In short, trial counsel unreasonably cut short the background history/mitigation investigation after interviewing some of Mr. Sanchez's family members and a teacher. Despite the fact that trial counsel's penalty phase theory was that Mr. Sanchez was intellectually low functioning and suffered from impairments throughout his life, *see, e.g.*, App'x at A-001671-73

(Donnie Murrell), counsel failed to interview and develop this information from individuals – additional teachers, family friends, neighbors, and peers – who were readily available and willing to provide it. Trial counsel had no strategic reason for failing to interview and present the testimony of any of these witnesses and indeed, if counsel had had the information these witnesses have provided to post-conviction counsel, trial counsel would have presented it at the penalty phase. *Id*.

"[W]e have found deficient performance in cases where an attorney's efforts to speak with available witnesses were insufficient 'to formulate an accurate life profile of [the] defendant.'" *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995); *see also Dobbs v. Turpin*, 142 F.3d 1383, 1388 (11th Cir. 1998) (finding deficient performance where counsel failed to interview potential witnesses who could have testified regarding defendant's unfortunate childhood); *Williams v. Allen*, 542 F.3d at 1339-40 (same); *Ferrell*, 640 F.3d at 1230 (finding deficient performance where counsel "could have elicited significant, and powerful, additional mitigating evidence from the witnesses who were willing to testify, and did testify on [defendant's] behalf, if counsel had only asked these witnesses about the defendant's background and childhood").

Respondent does not deny Mr. Sanchez's allegation that his trial counsel failed to investigate and present evidence of Mr. Sanchez's adaptive functioning deficits throughout his childhood and adulthood. Motion at 105. Respondent's failure to deny this allegation constitutes an admission of the truth of the allegations. Rules Governing Section 2255 Proceedings, Rule 5(b) ("The answer must address the allegations in the motion."); Federal Rules of Civil Procedure, Rule 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied.").

63

Trial counsel had no reasonable basis for failing to investigate and present readily available evidence of Mr. Sanchez's deficits in adaptive functioning throughout his life. Counsel were aware that it was important to investigate, develop, and present to the jury information that Mr. Sanchez "suffered from serious impairments throughout his life," and if counsel had had that information, counsel would have presented it at trial. App'x at A-001673 (Donnie Murrell).

Because trial counsel limited the mitigation investigation to a short list of family witnesses and a teacher, and failed to elicit critical, available information about Mr. Sanchez's background and functioning from available witnesses, counsel's performance was unconstitutionally deficient.

> The question under *Strickland* is not whether [Mr. Sanchez's] trial counsel's overall performance at the sentence stage was exemplary or even average, but whether he conducted an adequate background investigation or reasonably decided to end the background investigation when he did. *See Ferrell*, 640 F.3d at 1226 ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,' but those made after 'less than complete investigation' are reasonable only to the extent that reasonable professional judgment supports the limitations on investigation.") (quoting *Strickland*, 466 U.S. at 690–691, 104 S.Ct. at 2066).

*Johnson v. Sec'y, DOC*, 643 F.3d 907, 931-32 (11th Cir. 2011); *see also Dickerson*, 453 F.3d at 696 (citing *Strickland*, *Wiggins*, and *Rompilla*, and holding, "strategic choices made after less than complete investigation will not pass muster as an excuse when a full investigation would have revealed a large body of mitigating evidence").

### 2.    Prejudice.

Respondent avers that "most if not all" of the facts about Mr. Sanchez's background and functioning set out in the § 2255 motion "were raised during the penalty phase through witnesses and documents." Resp. Opp. at 64. This is erroneous. Although counsel presented some testimony that Mr. Sanchez was abused and witnessed abuse of his family members by an alcoholic father; that he received special education in school; that his parents did not attend

64

meetings related to his special education and did not provide him with other supportive services;

and that he was dedicated to parenting his son, this presentation paled in comparison to the

robust presentation that was readily available had counsel looked for it and that is detailed in the

Motion and supporting documentation. Some examples of information counsel failed to uncover

and present to the jury that would have had a fundamental impact on how the jury perceived Mr.

Sanchez are the following:

- Several of Mr. Sanchez's maternal family members suffered from mental illness; a genetic history of mental illness rendered Mr. Sanchez more likely to suffer mental illness himself. Motion at 106; App'x at A-001690 (Juana Maria Sanchez), A-001702 (Maria de la Luz Betancourt; *see also* App'x at A-000695 (Louis James Kraus, M.D.).

- Addiction to intoxicating substances ran on both sides of Mr. Sanchez's family, and therefore, Mr. Sanchez was at heightened risk of addiction and substance dependence himself. Motion at 106-07, 110-11; App'x at A-001676-82 (Aurelio Sotelo), A-001683-88 (Elsa Hernandez), A-001689-1701 (Juana Maria Sanchez), A-001702-05 (Maria de la Luz Betancourt), A-000679 (Rosa Ponce); *see also* App'x at A-000696 (Louis James Kraus, M.D.).

- Multiple members of Mr. Sanchez's family, including but not limited to his parents and his brother Efrain, suffered from cognitive deficits, and as a result, Mr. Sanchez was genetically predisposed to these deficits as well. Motion at 122; App'x at A-001694 (Juana Maria Sanchez) ("My husband had no idea how to care for children. . . . One night I left Ricardo Sr. with Ricky when he was a baby while I ran to the store for milk. I came home and instead of changing the baby's diaper, he had just slapped another on top of the baby's clothes and dirty diaper."); *see also id*. at A-001680-81 (Aurelio Sotelo); *id*. at A-000695-96 (Louis James Kraus, M.D.).

- Domestic violence, including physical, sexual, and emotional abuse, was prevalent on both sides of Mr. Sanchez's family. *See* Motion at 106-07, 108-09, 111-12; App'x at A-001676-82 (Aurelio Sotelo), A-001683-87 (Elsa Hernandez), A-001690-95 (Juana Maria Sanchez).

- Mr. Sanchez and his family suffered from extreme poverty. Motion at 106-10, 113-14; App'x at A-001676-82 (Aurelio Sotelo), A-001685 (Elsa Hernandez), A-001690, A-001698 (Juana Maria Sanchez), A-000620 (Jason Vazquez), A-000629 (Juan Antonio Jimenez), A-000637 (Lucy Jimenez Sanchez), A-001702-03 (Maria de la Luz Betancourt), A-000652 (Martin Sanchez), A-000663-64 (Nydia Sanchez); *see also* App'x at A-000701 (Louis James Kraus, M.D.).

65

- Mr. Sanchez was exposed to neurotoxins in utero and as a small child, during critical developmental periods for his body and brain. Motion at 109-10, 113; App'x at A-000654-55 (Martin Sanchez) (describing Mr. Sanchez's father's working in the fields and "[l]ike my parents he brought the residual chemicals into his house where he had four young children"; these chemicals were "a yellow green powder that smelled like poison" and "fell off all over the place" in the apartment); *see also* App'x at A-000697-98 (Louis James Kraus, M.D.).

- Mr. Sanchez's mother had minimal prenatal care and suffered from complications during her pregnancy with him and during his birth, a risk factor for developmental delays. Motion at 112; App'x at A-001694 (Juana Maria Sanchez); *id*. at A-000697 (Louis James Kraus, M.D.).

- Mr. Sanchez's father exhibited violent behavior from an early age and inflicted violence upon members of the community as well as his own family members. Motion at 115; App'x at A-001680 (Aurelio Sotelo); *id*. at A-001069-74 (Ricardo Sanchez Sr. Criminal Records).

- Mr. Sanchez's father's violence escalated after he suffered a head injury when a tank exploded alongside him. App'x at A-001682 (Aurelio Sotelo); *id*. at A-001700 (Juana Maria Sanchez).

- In addition to violence and alcohol abuse, Mr. Sanchez's father demonstrated symptoms of mental illness that created an unpredictable and frightening home for Mr. Sanchez and the rest of his immediate family. Motion at 111-12, 115-17; App'x at A-001697 (Juana Maria Sanchez) ("My husband did some crazy things when he was mad. Not only did he argue and fight with me, but sometimes he would get in his big truck and spin the wheels creating all kinds of dust and smoke. He would drive around in circles with me in the cab of the truck just because he was mad. It scared me and I did not understand this behavior."); *id*. at A-000654 (Martin Sanchez) (same); *id*. at A-000637-38 (Lucy Jimenez Sanchez) (describing an incident when Mr. Sanchez was a baby when Mr. Sanchez's father handed Mr. Sanchez to her at the airport and told her to take Mr. Sanchez with her to Texas, without having discussed this with her before or packing any diapers, clothes, or formula for him); *id*. at A-001704 (Maria de la Luz Betancourt) (same).

- Mr. Sanchez's father exercised coercive control over Mr. Sanchez and the rest of the immediate family, directing nearly every aspect of their lives and isolating them from others outside the community who might otherwise have served as supports to ameliorate the damage he caused them. Motion at 117-18; App'x at A-001681 (Aurelio Sotelo), A-001686 (Elsa Hernandez), A-001698-99 (Juana Maria Sanchez), A-000660 (Mayra Garcia), A-000663, A-000665-66 (Nydia Sanchez), A-000673-74 (Rachel Ramos), A-000680-81 (Rosa Ponce); *see also* App'x at A-000700-01 (Louis James Kraus, M.D.).

- Mr. Sanchez was a sickly child, suffering from pneumonia, respiratory problems, and allergies. Medical problems in early childhood may contribute to

66

developmental delays. Motion at 114; App'x at A-001696 (Juana Maria Sanchez), A-000663 (Nydia Sanchez).

- Mr. Sanchez suffered numerous head injuries over the course of his childhood. Head injuries can lead to brain damage and impaired functioning. Motion at 115; App'x at A-000664-65 (Nydia Sanchez) (describing two occasions during Mr. Sanchez's teenage years upon which he hit his face and head after falling off a bicycle); *see also id.* at A-001687 (Elsa Hernandez), A-001696 (Juana Maria Sanchez), A-000630 (Juan Antonio Jimenez), A-000638 (Lucy Jimenez Sanchez); *see also* App'x at A-000764 (Joette Deanna James, Ph.D.)

- Mr. Sanchez was a sweet and loving child who exhibited impairments from the time he was very small, including difficulty with communication, inability understanding things that were said to him, difficulty following instructions that involved more than a single step, and memory impairments. Motion at 114-15, 119-20; App'x at A-001681 (Aurelio Sotelo), A-000556 (Benito Rodriguez), A-001687 (Elsa Hernandez), A-000609 (Jamie Matos), A-000630 (Juan Antonio Jimenez), A-000638 (Lucy Jimenez Sanchez), A-001704 (Maria de la Luz Betancourt), A-000655-56 (Martin Sanchez), A-000658 (Michelle Sembric), A-000681 (Rosa Ponce), A-000687 (Yolanda Vazquez).

- Mr. Sanchez had regular and constant exposure to dangerous and criminal activity from the time he was a small child. Motion at 114; App'x A-000575 (Ezequiel Sanchez) (describing drug addicts, drug paraphernalia, and weapons in the neighborhood); *id.* at A-000664 (Nydia Sanchez) (same); *id.* at A-000657-58 (Michelle Sembric) (describing the neighborhood in which Mr. Sanchez lived as a small child as "known for violence and drugs" and recounting an incident in which Mr. Sanchez found a gun in the grass near his house); *id.* at A-000681 (Rosa Ponce); *id.* at A-001698 (Juana Maria Sanchez) (describing molestation of Mr. Sanchez's elder disabled brother Efrain by a male neighbor); *id.* at A-000620 (Jason Vazquez) (describing how dangerous the high school Mr. Sanchez attended was, and noting, "Pretty much everyone I knew brought a knife, brass knuckles, a chain, or some other weapon to school at some point or another for protection. You could get ganged up on by several kids at any time and having a weapon was just a matter of protecting yourself and surviving."); *id.* at A-000701-02 (Louis James Kraus, M.D.).

- Racism and bigotry characterized the communities in which Mr. Sanchez was raised and was directed at him and his family personally. Motion at 114; App'x at A-001698 (Juana Maria Sanchez) ("Some of our neighbors were racist. They yelled things like, 'go back where you came from!'"); *id.* at A-000664 (Nydia Sanchez) ("[W]e had some neighbors that said racist things after we moved in. One of our neighbors yelled things at my father and they got into an argument. My mother was scared and called the police."); *id.* at A-000702-03 (Louis James Kraus, M.D.).

- People and institutions that were tasked with protecting and supporting Mr. Sanchez, including his parents, other extended family members, the police, social

67

services, and the school district, repeatedly failed him.[14] Motion at 118-20; App'x at A-000607 (Frances Lenore Wolfe); *id*. at A-000666 (Nydia Sanchez) (describing an occasion upon which Mr. Sanchez's sister called the police in response to her father's abuse, and the police sprayed her father with a hose and then left him home to resume his beating of the family); *id*. at A-000736 (Francis Crosby, Psy.D.); *id*. at A-000703-06 (Louis James Kraus, M.D.).

- Mr. Sanchez often had difficulty understanding outside of the classroom as well as inside the class. *See, e.g.*, App'x at A-000608 (Jamie Matos) ("I knew that he did not get things outside of school. A lot of times when we were talking he said, 'huh?' I had to explain what I meant or repeat what I said. I often did this a couple of times before he said he understood."); *id*. at A-000630 (Juan Antonio Jimenez) ("It was hard to have a conversation with him. He was slow and did not seem like a boy who played outside much. . . . He sometimes asked questions but did not seem to understand the answers."); *id*. at A-000631-32 (Kenny Velasquez) ("I used to call him 'goof' because he was really goofy. You could say Rick was slow. It always took him a lot to catch on as a kid. . . . He was not the brightest crayon in the box."); *id*. at A-000664 (Nydia Sanchez) ("He was kind of goofy. . . . He was forgetful. I had to remind him of things I knew I told him several times before.").

- Beginning when he was a child, Mr. Sanchez had frequent episodes when he appeared to be mentally absent. Motion at 118; App'x at A-000576 (Ezequiel Sanchez) ("It seemed like he was lost or blank."); *see also id.* at A-001696 (Juana Maria Sanchez) ("Ricky sometimes seemed to be in another world. He did not respond unless I called his name several times when this happened. He was blank and I had to bring his attention back to me from wherever he was."); *id*. at A-000605 (Frances Lenore Wolfe) ("Ricardo often appeared to be in a daze."); *id*. at A-000609 (Jamie Matos) ("Ricardo had periods of time where he zoned out. He seemed to be somewhere else. In class, I had to poke him and call his name a couple of times to get him to come back. The teachers had to pound or slap on his desk several times before he came back. I noticed that he did this outside of school, too. He seemed to go blank. We had to snap our fingers or tap him on the arm and call his name loudly to get him back."); *id*. at A-000613 (Janice Coe) ("He often had a blank, or absent expression, as if he were not all there."); *id*. at A-000632 (Kenny Velasquez) ("There were times, not every day but pretty often, when I noticed Rick just sat there looking like he was daydreaming, off in his own world. He seemed unfocused. I had to snap my fingers and say to him, 'Hey, Rick, snap out of it' to get him back."); *id*. at A-000664 (Nydia Sanchez) (describing Mr. Sanchez "star[ing] off into space"); *id*. at A-000687 (Yolanda Vazquez) ("Ricky reminded me of two cartoon characters – Eeyore and Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he

---

[14] By the time of Mr. Sanchez's penalty retrial, it was well-known that "institutional failure is a[] theme that is prominent in the lives of capital defendants." Craig Haney, *The Social Context of Capital Murder: Social Histories and the Logic of Mitigation*, 35 Santa Clara L. Rev. 547, 575 (1995).

looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding eye contact.").

Furthermore, Mr. Sanchez's difficulties in school were much more profound and he demonstrated greater disability there than the information presented at trial indicated. As noted above, trial counsel presented the testimony of a single teacher, Amy Fleming, regarding Mr. Sanchez's experiences with special education. Ms. Fleming's testimony was incomplete and unreliable both because her personal experience with Mr. Sanchez was limited to contact with him when he was in middle school and because her understanding of the meaning and significance of portions of the records counsel asked her to interpret was flawed. As a result, the jury heard only partial, and in some respects very misleading, information about Mr. Sanchez's school performance.

For example, Ms. Fleming testified that a note by his second grade teacher stating that Mr. Sanchez would not work independently could be construed either as "would not" or as "could not," but that "it would depend on the perspective of the person who wrote the statement." Tr. 8216-17. The jury was thus left to speculate that Mr. Sanchez may simply have been a lazy or willful, rather than an impaired, student. If trial counsel had presented the testimony of the teacher who wrote that note, the jury would have learned that Mr. Sanchez in fact "was unable to work independently." App'x at A-000605 (Frances Lenore Wolfe).

As another example, Ms. Fleming testified very briefly on direct examination about an incident in which Mr. Sanchez was disciplined for having a knife at school. Tr. 8244-45. Her brief testimony, elicited without elaboration by trial counsel, permitted the prosecutor to cross-examine her about that incident and elicit misleading testimony that the incident indicated that Mr. Sanchez had a proclivity for violence. Tr. 8262-65 (testifying that there were findings that Mr. Sanchez knew the difference between right and wrong, knew it was wrong to bring a knife to

69

school, chose to bring the knife to school anyway, and threatened the general welfare of others). In fact, the truth was just the opposite. Had counsel called to testify Mr. Sanchez's schoolmate Jason Vazquez, and/or the educational personnel familiar with the incident, the jury would have learned that (1) the high school that Mr. Sanchez attended was dangerous and that many students brought a knife or another weapon to school "just [as] a matter of protecting yourself and surviving," App'x at A-000620 (Jason Vazquez); (2) Mr. Sanchez did not take the knife out of his backpack or threaten anyone with it, *id*. at A-000618 (Janice Coe); (3) Mr. Sanchez had the knife because another student had threatened to hurt him so he felt safer with it in his backpack, *id*. at A-000618 (Janice Coe), A-000627 (Jeffrey Silverman) (same); and (4) Mr. Sanchez "did not understand the seriousness of having the knife at school" and "his bringing the knife to school was a manifestation of his disability," *id*. at A-000627 (Jeffrey Silverman).

Ms. Fleming testified on cross-examination that notes by Mr. Sanchez's teacher when he was twelve years old indicated that Mr. Sanchez's difficulty in school was due to "socializing." She also agreed with the prosecution's characterization of the notes that the teacher who prepared them believed that Mr. Sanchez "displayed little or no tact in interacting with classmates, teachers and the like." Tr. 8255-57. This testimony was inaccurate. Had counsel interviewed the teacher who prepared these notes, they would have learned and could have presented evidence that the teacher instead concluded that Mr. Sanchez "had significantly limited social skills," that he "spoke impulsively without being able to exert control over his speech," and that he was unable to start or stay on task not simply because he was "socializing" but rather because he "had difficulty focusing on and understanding directions for class assignments and was unable to exert control to attend to and complete assignments." App'x at A-000684-85

70

(Wanda Lee).[15] The jury also would have heard that the teacher saw Mr. Sanchez's lack of tact

not as willful, but rather as evidence that Mr. Sanchez "was unable to understand that some of

the things he said were offensive or insulting, that he spoke impulsively without being able to

exert control over his speech, and that he was unable to understand the consequences of saying

hurtful things – both for himself and for others." *Id*. at A-000685.

Ms. Fleming also testified on cross-examination from her review of the records that in

second grade and at other times during his schooling, Mr. Sanchez "was physically and verbally

aggressive with his peers." Tr. 8257, 8262. If trial counsel had interviewed Mr. Sanchez's second

grade teacher, he would have learned and could have presented to the jury that Mr. Sanchez's

teacher and the IEP team that relied upon this teacher's input concluded that, although Mr.

Sanchez was impulsive, "his impulsivity [did] not reflect aggression or serious behavioral

problems but rather puerility and attention-seeking conduct." App'x at A-000605-06 (Frances

Lenore Wolfe); *id.* at A-000670 (Patricia Replogle) ("[N]either the psychologist who evaluated

him nor the team who deemed him eligible for special education felt that he exhibited aggression

or demonstrated emotional disturbance that required a separate eligibility determination. We felt

that Ricardo's behavior stemmed from his cognitive and academic difficulties and the frustration

he experienced as a result of his academic failure.").

If counsel had interviewed other teachers who worked directly with Mr. Sanchez, counsel

could have presented to the jury information that although Mr. Sanchez exhibited some

behavioral dysregulation in high school, he did not exhibit physical aggression or violence,

---

[15] Both Wanda Lee's and Janice Coe's declarations, included as part of the Appendix filed with this Court on October 19, 2016, reference attachments drawn from Mr. Sanchez's school records. Those attachments inadvertently were omitted from the October 19, 2016, filing. They are included with the supplemental materials in the Appendix filed in conjunction with this Reply, at pages A-000619A-Q (Janice Coe) and A-000686A-C.

71

including on the occasion upon which he was arrested for having a butterfly knife in his backpack. Motion at 119; App'x at A-000618 (Janice Coe); *id.* at A-000626-28 (Jeffrey Silverman) ("Ricky did not intentionally misbehave, but although he wanted to please his teachers and do what he was supposed to do, he had some difficulty following rules.").

Ms. Fleming's testimony on cross-examination that the IEP records from Mr. Sanchez's high school years indicated that he functioned independently in the community and was able to live in an apartment on his own, Tr. 8260, was inaccurate and misleading. In fact, those records "did not mean that Ricardo was able to function without assistance in the community; they simply meant that the IEP team believed that he had support from family or others and that the school did not need to provide services to Ricardo for him to accomplish these goals." App'x at A-000617 (Janice Coe). Similarly, Ms. Fleming's testimony that Mr. Sanchez was capable of obtaining employment and living independently, Tr. 8261, was incorrect. Instead, "[t]hat notation does not mean that Ricardo was independent in these areas; it simply means that because Ricardo came to school appropriately groomed and dressed and appeared well-nourished, did not pose a behavioral problem at school, and appeared to make himself understood, the school did not need to provide services or interventions in these areas." *Id.* at A-000616 (Janice Coe).

If trial counsel had interviewed additional educational personnel whose names were in Mr. Sanchez's special education records and who were available and willing to speak with counsel and testify, in addition to clarifying the errors in Ms. Fleming's testimony counsel would and could have presented the following compelling information:

- As early as the fall of his kindergarten year, school personnel observed that Mr. Sanchez had difficulty understanding and expressing himself, needed help completing his work, and was distractible. "Although most kindergarteners have some difficulty focusing in class for extended periods of time due to their youth

and unfamiliarity with a classroom setting, the fact that Ricardo's teacher filled out an assessment observation form to describe Ricardo's behavior demonstrates that his difficulties were more extreme than those of a typical kindergartener." App'x at A-000669 (Patricia Replogle).

- During Mr. Sanchez's first grade year, he "continued to demonstrate developmental delay, academic difficulty, and atypical behavior." App'x at A-000669 (Patricia Replogle). He "was distractible and unable to stay on task even for short periods of time, as most first graders are able to do," "he was incapable of working independently," and "he could not follow directions." *Id*. at A-000669-70. He scored more than two standard deviations below the norm on one standardized test, and achieved the lowest possible stanine score on another. *Id*. at A-000670.

- Mr. Sanchez exhibited "serious academic difficulties" in second grade. Mr. Sanchez was developmentally behind many of the students in his second grade class, despite the fact that he was older than most of them. App'x at A-000605-06 (Frances Lenore Wolfe).

- Mr. Sanchez's lack of progress in school, including the fact that both when he was in fifth grade and when he was in tenth grade he was achieving only at a fourth grade level in math and a first grade level in reading, "is consistent with Ricardo's very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well." *See* Motion at 119; App'x at A-000607 (Frances Lenore Wolfe).

- Mr. Sanchez "made only very minimal progress in school despite the many interventions offered to him. This lack of progress [was] not surprising . . . ; children and teenagers with low intellectual functioning like Ricky rarely exhibited much academic improvement." App'x at A-000626 (Jeffrey Silverman).

- In middle school, as throughout the rest of his schooling, Mr. Sanchez was assigned to a full-time special education program because he had "intensive," "significant academic needs that could not be addressed adequately . . . in a regular classroom with additional services." His subjects "were adapted and designed to impart functional skills rather than academic skills." App'x at A-000684 (Wanda Lee).

- Mr. Sanchez exhibited significant impairments in goal-orientation, organization, and self-direction in middle school. App'x at A-000685 (Wanda Lee). He was also "unable to recognize when he was on the wrong track, when he did not understand directions, or when his answers were incorrect." *Id*. at A-000686.

- In middle school "Ricardo had significantly limited social skills and task-related and organization skills in addition to difficulties in academic skills." App'x at A-000684 (Wanda Lee). He "had difficulty focusing on and understanding directions for class assignments, and was unable to exert control to attend to and complete assignments." *Id*. at A-000685.

73

- The fact that when Mr. Sanchez was fourteen years old and in eighth grade, the special education team set extremely elementary objectives for his learning, including teaching him to understand and properly use vocabulary, spell, and read and write complete sentences with appropriate capitalization and punctuation, demonstrates that his impairments were very significant. App'x at A-000614 (Janice Coe).

- In high school, Mr. Sanchez's "need for services was extensive." App'x at A-000613 (Janice Coe). His "intellectual functioning was quite low. He had difficulty understanding, remembering, and following directions provided to him. When there was more than one step involved in a task or project, his teachers could not give him all of the steps at once because he was unable to follow them under those conditions. He needed to have tasks broken up into small pieces, with instructions given at the beginning of each piece, in order for him to make progress with the task." *Id.*; *see also* A-000626 (Jeffrey Silverman) (same).

- In high school, Mr. Sanchez "seemed to be intellectually disabled. He acted goofy and smiled shyly often, but there was a sadness and seriousness about him, too. Several times he came up to me and asked me why he was not able to read. He said, 'I want to learn how to read, but I can't. Why can't I learn how to read? Can you help?'" App'x at A-000626 (Jeffrey Silverman).

- Nearly all of his teachers believed that Mr. Sanchez's difficulties in school were not due to poor effort; they perceived him to exert a great deal of effort in his classes. App'x at A-000615 (Janice Coe); *id.* at A-000626 (Jeffrey Silverman) ("It was obvious to me that Ricky wanted to perform well and generally tried his best, and that his inability to make progress was upsetting and frustrating to him.").

- Mr. Sanchez was unable to focus his attention and required one-on-one instruction to begin, make progress on, and complete assignments. App'x at A-000626 (Jeffrey Silverman).

- Mr. Sanchez was in high school for nearly four years, from fall 1998 through April 2002, and repeated both ninth and tenth grades. He was promoted to tenth grade even though he did not meet the GPA required for promotion. He left high school after nearly four years without having passed ninth grade or completed tenth grade. App'x at A-000615 (Janice Coe).

- The team completing Mr. Sanchez's Individualized Education Plan (IEP) during his first year of high school worked on a plan to qualify Mr. Sanchez for vocational employment but determined that he would not be able to obtain employment independently. App'x at A-000615-16 (Janice Coe).

- Mr. Sanchez's IEPs from March 2000, March 2001, and March 2002 report that Mr. Sanchez "needed daily assistance for all learning activities and direct specialized instruction and curriculum for the majority of learning activities" and that he "require[d] additional help with development of independent living skills." App'x at A-000616-17 (Janice Coe).

74

- When Mr. Sanchez was seventeen years old and in the tenth grade (for the first time), his math skills were so impaired that he was able only to solve simple equations, tell time on an analog clock, identify coins and their values and count them, and make change using coins. His math skills, however, were more advanced than his reading level and comprehension, and his writing skills were limited to writing some information on a personal data sheet and addressing an envelope. App'x at A-000617 (Janice Coe).

Respondent further argues that because some of the jurors found a number of the mitigating factors that trial counsel set before them to be true (and provides a chart to illustrate this point), Mr. Sanchez can demonstrate no prejudice arising from counsel's deficient performance. But this argument misses the boat. Counsel were constrained by the inadequate investigation they conducted and their inadequate presentation at the penalty phase in their submission of factors in mitigation to the jury, because they could only argue factors as to which they had presented evidence. *See, e.g.*, Tr. 9356 (court informing counsel, "[O]n a mitigator there has to be proof. The first thing I am going to look for you is, are [sic] there proof, have you set an objective fact."); *id*. at 9357 (court stating to counsel, with regard to the proposed mitigating factors, "We have a major redrafting effort that we need to go through today. You have things in there that is absolutely no proof in this court on several of these things, and so we are going to have to go through them one by one.").

The fact that some of the jurors found some of the mitigating factors proposed by trial counsel does not rebut Mr. Sanchez's showing that trial counsel's deficient performance resulted in prejudice to Mr. Sanchez. Had trial counsel not performed ineffectively, the jurors would have been presented with, and been required to consider, not simply the mitigating factors that were presented, but also (or instead) the mitigating factors that they were precluded from considering due to counsel's errors and omissions.

In addition, had counsel performed effectively and discovered and presented the information set forth in the § 2255 motion and supporting documents, additional jurors may have

75

found true the mitigating factors that only some of the jurors found, and jurors might have found

true other mitigators presented to them. For example, if counsel had presented the more robust

information from numerous witnesses (not simply from Mr. Sanchez's mother and sister)

regarding Mr. Sanchez's father's abuse of Mr. Sanchez and his family members, it is likely that

all twelve rather than just ten of the jurors would have found the mitigating factor presented that

Mr. Sanchez was subjected to violence by his father as a result of Mr. Sanchez's father's

drinking, and all twelve would have accorded this factor more weight. This new evidence

includes the following:

- Mr. Sanchez's father hit Mr. Sanchez with his fists and thick leather belts multiple times a week. He slapped them and yanked their hair. Motion at 116; App'x at A-001681 (Aurelio Sotelo), A-000575 (Ezequiel Sanchez), A-001698-99 (Juana Maria Sanchez), A-001704 (Maria de la Luz Betancourt), A-000665-66 (Nydia Sanchez).

- Mr. Sanchez's father threw heavy objects at his wife and children. App'x at A-001694 (Juana Maria Sanchez) ("He threw plates of food and pitchers of lemonade at me. Sometimes he threw beer bottles."); *id.* at A-000665 (Nydia Sanchez) ("He threw things like plates of food at us."); *id.* at A-000658 (Michelle Sembric).

- Mr. Sanchez attempted to protect his mother and sister from his father's beatings, but his efforts were unsuccessful. *See, e.g.*, App'x at A-000666 (Nydia Sanchez) ("Sometimes Ricky put himself between my father and me when he thought my father was going to hit me. Ricky got slapped across the face instead and usually my beating was worse when he interfered.").

- Mr. Sanchez's father hit Mr. Sanchez's mother so hard across the face that she fell to the floor. Motion at 116; App'x at A-000666 (Nydia Sanchez) ("When I was about 15 years old my father came home completely drunk and hit my mother so hard she fell to the floor. . . . I screamed at my father and then called the police. The police came to our house and pulled my father in the front yard and sprayed him with the hose to calm him down. After they left, my father slapped me hard across the face."); *id.* at A-001695 (Juana Maria Sanchez); *id.* at A-000695 (Louis James Kraus, M.D.).

- As well as administering physical abuse, Mr. Sanchez's father psychologically abused Mr. Sanchez's mother. App'x at A-001694, A-001697, A-001699 (Juana Maria Sanchez).

76

- Mr. Sanchez's mother failed to protect Mr. Sanchez from his father's abuse and occasionally physically beat him as well. App'x at A-000666 (Nydia Sanchez).

- Mr. Sanchez's brother Ezequiel moved out of the house and lived with a paternal aunt and cousins during his teenage years, in order to avoid the violence and abuse in his own home. App'x at A-000576 (Ezequiel Sanchez), A-000623 (Juan Gutierrez).

- Mr. Sanchez "moved out of his father's house as soon as he could. He wanted to leave his family's home and get away from the fighting and his father's mean, angry outbursts." App'x at A-000623 (Juan Gutierrez); *see also id.* at A-000673 (Rachel Ramos) (when Mr. Sanchez moved in with his pregnant girlfriend, he "seemed happy to be out of his father's home"); *id.* at A-000666-67 (Nydia Sanchez) ("[I]t was terrible living with my father. . . . Ricky, Ezequiel, and Omar all moved out of the house the first chance they had. . . . I did not want to get married at a young age. I thought I would get married when I was 26 or older, but I could not stay in the house with my father. I got married at 19 years old and moved out with my husband.").[16]

Trial counsel's unreasonable omissions also permitted the prosecutor to question whether the accounts of physical abuse by Mr. Sanchez's father were exaggerated or fabricated. *See, e.g.*, Tr. 9514-15 ("Some trauma. It is a figment of imagination they want you to adopt hook, line and sinker, and don't fall for it."). Effective performance by trial counsel would have foreclosed the counterfactual arguments the prosecutor made in favor of the imposition of the death penalty; thus, but for trial counsel's failures, the result of the proceeding likely would have been different. *See Sears v. Upton*, 561 U.S. 945, 955-56 (2010) (per curiam); *Williams v. Taylor*, 529 U.S. at 396-97.

---

[16] Trial counsel presented some evidence of the abuse, as well as evidence that Mr. Sanchez moved out of his house when his girlfriend Maria became pregnant with their child in order to escape his father's abuse. The prosecution, however, denigrated the defense for presenting this evidence, arguing that Mr. Sanchez could not have been badly abused or trying to escape abuse because he returned home on the weekends to play bingo. Tr. 9514-15. This argument may well have been persuasive to some of the jurors. Had trial counsel presented the additional information about Mr. Sanchez's father's abuse, from a wider range of readily available witnesses, the prosecution would not have been able to make this argument to the jury.

More jurors would have found true, and accorded more weight to, the mitigating factors

presented that Mr. Sanchez is a follower and not a leader and that he acted under the influence of

Danny Varela had they been provided the following information:

- As a child, Mr. Sanchez was mentally slower than his brothers and sister and followed his siblings around and stayed close to them. "They made the plans and he followed them." App'x at A-001687 (Elsa Hernandez); *see also id*. at A-000576 (Ezequiel Sanchez) ("Ricardo was not one to make a plan; he just followed along with what we were doing."); *id*. at A-000622 (Juan Gutierrez) ("He played anything the rest of us came up with."); *id*. at A-001704 (Maria de la Luz Betancourt) (Mr. Sanchez "always wanted to do everything the other children were doing. He seemed slower than his brothers and sisters").

- Mr. Sanchez was "meek and timid" as a child. He stayed close to his mother and followed her around the house. App'x at A-001696 (Juana Maria Sanchez); *id*. at A-000655-56 (Martin Sanchez).

- When Mr. Sanchez was playing with other children, he "played whatever the group wanted to play." App'x at A-000609 (Jamie Matos).

- In high school, Mr. Sanchez "did not plan or initiate activity and instead he just followed other students around." App'x at A-000613 (Janice Coe); *see also id*. at A-000621 (Jason Vazquez) ("Ricardo was never one to start trouble. I would describe him as a follower. He would go along with anything anyone told him to do and not really think about it."); *id*. at A-000626 (Jeffrey Silverman) ("[H]e always did whatever others wanted to do. He took no initiative but simply followed the will of the group. He was not a leader in any way.").

- Mr. Sanchez "was easy to influence because he did not know what was happening all the time." App'x at A-000632 (Kenny Velasquez).

- Mr. Sanchez "copied everything that Danny [Varela] did. He even started talking like Danny. Ricardo did anything that Danny asked him to do." App'x at A-000577 (Ezequiel Sanchez); *see also id*. at A-000624 (Juan Gutierrez) ("He seemed to do whatever Danny [Varela] and Daniel [Troya] wanted him to. They often sent him on errands that they did not want to do. Ricardo Jr. did not ask questions, he just did as he was told."); *id*. at A-000635 (Linda Velasquez) ("Rick seemed to be a do-boy for DV [Danny Varela] and his guys. . . . He was very loyal to them, even though they were not nice to him. He thought they were his friends but really they were just using him. He did anything they told him to do. I could tell they thought he was dumb."); *id*. at A-000662 (Mayra Garcia) ("Ricardo did whatever Danny [Varela] told him to do"); *id*. at A-000667 (Nydia Sanchez) ("Ricky needed to be told what to do. He was a follower and did anything he was told. Danny [Varela] took advantage of this. I was with Ricky when he took a phone call from Danny. He just stood there while Danny

78

screamed at him over the phone. Danny was so mean to him, and I could not believe that Ricky just did whatever Danny told him to."); *id.* at A-000676 (Rachel Ramos) ("Ricardo was a follower. He did whatever he was told. Danny [Varela] and his friends took advantage of Ricardo. He did whatever they wanted him to and he believed anything they told him. That was valuable to them.").

Not only would more than nine jurors have found true, and accorded more weight to, the mitigating factor that Mr. Sanchez has a low IQ, but they also would have understood the significance of suffering a low IQ to his functioning and behavior, had the jurors been presented with the following:

- Mr. Sanchez's younger sister helped him with his homework but was unable to get him to be able to memorize numbers or words despite her efforts. *See* Motion at 119; App'x at A-001697-98 (Juana Maria Sanchez); A-000665 (Nydia Sanchez).

- Mr. Sanchez was unable to absorb information. Motion at 119; App'x at A-001698 (Juana Maria Sanchez) ("He was forgetful and the information would not stick in his head no matter how many times you told him. . . . I often had to ask Ricky more than once to do something. He seemed to forget what I had asked him to do and needed help to do it.").

- Mr. Sanchez did not appear to be able to think independently. App'x at A-000621 (Jason Vazquez) ("Even though we were good friends, I never remember having a deep conversation with him. He was able to answer simple questions, but he never really came up with thoughts of his own on any topic. He was basically just kind of a dopey guy."); *see also id.* at A-000626 (Jeffrey Silverman) ("Ricky did not have an original idea in his head.").

- Mr. Sanchez had a difficult time understanding even simple video games. "When we were kids, we were just playing the simple games that were out at the time like Super Mario Brothers or Sonic the Hedgehog, but Ricardo did not really seem to be able to get the hang of them. I always had the sense that something was not quite right with Ricardo, but I could never put my finger on exactly what." App'x at A-000621 (Jason Vazquez).

- Mr. Sanchez's friends had to help him complete simple tasks. For example, one of his friends had to help him with a movie club order because he was unable to do it himself. "It was the kind of order form were [sic] you picked stamps of the movies you wanted, placed them in boxes on the form then sent the form in. He had me read all the titles of the movies on the stamps because he couldn't read them himself. I had to explain a few times how the form worked and what movies he was ordering before he finally understood." App'x at A-000632 (Kenny Velasquez).

79

- Although Mr. Sanchez often tried to mask his lack of understanding and confusion, his problems were apparent nonetheless. *See, e.g.*, App'x at A-000687-88 (Yolanda Vazquez) ("He would usually agree and smile when people asked him something. Or when something was complicated, he would act like he didn't care about it. I remember one time a school teacher was explaining to him why he didn't have enough credits to pass on to the next grade, and afterward he was like, whatever, that doesn't matter. But he looked confused to me.").

- Mr. Sanchez's sister took care of him even though he was older than she was: "Where I went he went. When I was 14 years old, my mother gave me some money and put Ricky and me on a bus from Florida to Texas to visit my grandmother and her family. We had to change buses in a strange city and we almost got lost. I had to read all the signs and ask if we were on the right bus. Ricky was no help to me; he had no idea what to do. Eventually, we ended up on the right bus and made it to Texas. Taking care of Ricky was a big responsibility." App'x at A-000664 (Nydia Sanchez).

- After leaving school at age 18, prior to finishing tenth grade, Mr. Sanchez attempted to earn his GED but was not able to do so. App'x at A-001699 (Juana Maria Sanchez); A-000619 (Janice Coe).

- "Ricardo was slow. He behaved like someone much younger than he was. When Maria was in labor with [their son] at the hospital, he decided to leave the room and go sleep in the car for a few hours. He said that Maria was too loud and he could not sleep in the hospital room. It seemed so silly, like something a child would do. He was also forgetful and I had to remind him of things over and over. . . . I also had to remind him of important appointments or places he was supposed to be. When I asked him to do things for the baby or around the house, I had to give him instructions several times before he understood what I was asking." App'x at A-000674 (Rachel Ramos).

- Even after Mr. Sanchez moved out of his family home and had his own child, his younger sister helped to take care of him, including taking him to a bank to open his first account and filling out his job applications, leaving him only to sign the completed applications. App'x at A-000667 (Nydia Sanchez); *id*. at A-000675 (Rachel Ramos).

- Mr. Sanchez's girlfriend handled Mr. Sanchez's money. "She took his paycheck and made sure that it was cashed. Then she made sure I got money for rent and anything that I purchased for the baby. Ricardo did not seem to know what to do with his money." App'x at A-000675 (Rachel Ramos). Mr. Sanchez's girlfriend also helped him find and apply for jobs; she read the classified ads to him. *Id*. She also helped him take his first driving test; "[h]e read very slowly and did not understand what most of the words meant." *Id*.

Similarly, not only would more jurors have found, and accorded more weight to, the

mitigating factor that Mr. Sanchez had legitimate jobs prior to becoming involved with Danny

80

Varela, but also the jurors would have understood that these jobs were basic and menial and that even so, Mr. Sanchez had difficulty performing them. Motion at 120-21; App'x at A-000577 (Ezequiel Sanchez) (Mr. Sanchez "never kept a job for long because he is forgetful and showed up late or forgot something he was supposed to do and go fired"); *see also id*. at A-001699 (Juana Maria Sanchez) ("Maria's father got him a job with a friend that ran a construction crew. He did not keep any job for long.").

At least some jurors would have found true the mitigating factor that Mr. Sanchez was socially isolated from the community had they learned that Mr. Sanchez's father did not permit Mr. Sanchez and his siblings to "participate in sports or clubs at school" and rarely allowed them "to visit friends or go to social events that were not family gatherings." App'x at A-000665 (Nydia Sanchez); *see also id*. at A-000666 (Nydia Sanchez) ("My father did not allow me to date or even talk to boys."); *id*. at A-000673 (Rachel Ramos) ("Before Ricardo moved in with me and Maria, he felt trapped at his father's house. Ricardo's father was strict and did not like for his children to be away from home."); *id*. at A-000660 (Mayra Garcia) (same); *id*. at A-000701 (Louis James Kraus, M.D.).

In addition, at least some of the jurors would have found true the mitigating factor that Mr. Sanchez lacked the skills to live independently if they had been provided the information described above that Mr. Sanchez's IEP and other education records did not mean that Mr. Sanchez was capable of this, as well as readily available information that Mr. Sanchez never lived alone, but instead always with his own family, a girlfriend and her family, or other individuals who provided for his basic needs, managed his money, and completed his employment applications. *See, e.g.*, App'x at A-000667 (Nydia Sanchez); *id*. at A-000675 (Rachel Ramos).

81

Some jurors also would have found true the mitigating factor that Mr. Sanchez looked out for his older brother Efrain inside and outside the home if they had been presented with information that Mr. Sanchez knew that Efrain was "not the strongest in the head" and "was very protective of him even though he was younger than Efrain." App'x at A-000632 (Kenny Velasquez); *see also id.* at A-000625 (Jeffrey Silverman).

Respondent's assertion, Resp. Opp. at 72, that "the omitted evidence [set forth in the Motion and above and in the supporting documents] would have been cumulative" of the evidence presented at trial is erroneous.[17] The additional information from Mr. Sanchez's teachers, classmates, friends, and family members described in detail above is not only of a quantity but also a quality very different from that presented at Mr. Sanchez's trial. The information presented at trial regarding Mr. Sanchez's difficulties in school was incomplete and inaccurate, grossly mischaracterizing the extent and nature of Mr. Sanchez's disabilities and falsely indicating that he was aggressive and dangerous in childhood. Furthermore, much of the additional information about Mr. Sanchez's experiences and functioning comes from witnesses outside of Mr. Sanchez's family, and therefore may have been more credible to the jury than, or at least corroborating of, the testimony provided at trial by his mother, sister, and uncle.

This additional evidence, whether in persuading more jurors to find true more of the mitigating factors presented to them, in forming the basis for additional mitigating factors the jurors could have found true, or in causing the jury to accord more weight to the mitigating factors found, is reasonably likely to have persuaded at least one juror to vote for a sentence

---

[17] Even assuming this Court determines that some of the newly presented evidence is cumulative of that presented at trial, the Eleventh Circuit has indicated that cumulative evidence may have value at the penalty phase of a capital trial. *Johnston v. Singletary*, 162 F.3d 630, 639 (11th Cir. 1998) ("[W]e do not discount the value of cumulative testimony in the penalty phase of a capital trial . . . .").

other than death. The compelling details of the domestic, physical, and sexual abuse; poverty; alcohol and drug addiction; and exposure to neurotoxins, community violence and crime, and bigotry that plagued Mr. Sanchez and his forebears illuminated by the information set forth above and in the Motion and supporting documentation does more than simply eclipse the anemic testimony at trial about Mr. Sanchez's family life (a presentation so anemic that it permitted the prosecution to argue that the adversity Mr. Sanchez faced was "a figment of the imagination"). *See, e.g.*, *Johnson*, 643 F.3d at 936 ("The description, details, and depth of abuse in Johnson's background that were brought to light in the evidentiary hearing in the state collateral proceeding far exceeded what the jury was told. The picture Jones painted for the jury was of Johnson having cold and uncaring parents, something in the nature of the 'American Gothic' couple. With a reasonable investigation, though, he could have painted for the jury the picture of a young man who resembled the tormented soul in 'The Scream.' There is nothing wrong with a Grant Wood approach, if that is all one has to use, but an Edvard Munch approach would have been far more likely to sway the jury to sympathy for Johnson."); *cf. Holsey v. Warden*, 694 F.3d 1230, 1260-61 (11th Cir. 2012) (noting that courts of appeals "generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or 'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples of amplifies the themes presented to the jury") (quoting *Cullen v. Pinholster*, 563 U.S. 170, 200 (2011)). Instead, it presents a picture of an individual so devastated by innate impairments, external hardship, and neglect that he was starved for affection and unable to recognize when he was being exploited by those who pretended to care for him.

83

**C.**      **Failure to Investigate, Develop, and Present Evidence of Mr. Sanchez's Neuropsychological and Psychiatric Impairments and Intellectual Disability and the Effects of these Impairments on His Behavior and Functioning, and Failure to Consult Effectively with the Experts Counsel Did Retain. (Claims VIII(B), VIII(C), VIII(D), VIII(F))**

"Because of the crucial mitigating role that evidence of a poor upbringing or mental health problems can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence." *Littlejohn v. Trammell*, 704 F.3d 817, 860 (10th Cir. 2013).

Respondent contends that Mr. Sanchez's claim that his trial counsel were ineffective in the investigation, development, and presentation of evidence regarding Mr. Sanchez's mental functioning fails because counsel "actually conducted a mitigation examination and allowed experts to test his intelligence in an effort to present a positive mitigation presentation." Resp. Opp. at 74. Respondent errs. Whether or not counsel investigated and presented at trial *some* information about a defendant's mental impairments is not the operative question. *See, e.g.*, *Sears*, 561 U.S. at 954 ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented."). In fact, where the evidence presented by trial counsel misleads the jury to conclude that although the defendant may have suffered some impairments, those impairments did not significantly affect his functioning and behavior, the prejudice stemming therefrom may be greater. *See, e.g.*, *Ferrell*, 640 F.3d at 1228 (concluding that "trial counsel's mental health investigation was unjustifiably and unreasonably circumscribed" where "the mental health evaluation they requested from [their expert] was limited to answering only two questions: whether Ferrell was mentally retarded and whether he suffered from any problems that may have affected his waiver of rights for the statements he gave to the police" and where in fact the defendant had suffered head injuries, exhibited symptoms of psychiatric disorder, and had seizures); *see also Hooks v. Workman*, 689 F.3d 1148, 1207 (10th Cir. 2012) (granting relief where some mental health information was presented at

84

trial because "the mental-health evidence that was presented was inadequate, unsympathetic, and even counterproductive at times").

Trial counsel understood that evidence of mental impairments was mitigating and should be presented to the jury. Presentation of evidence of Mr. Sanchez's mental impairments was wholly consistent with trial counsel's strategy at the penalty phase of demonstrating to the jury that Mr. Sanchez "functioned at a low level, was easily taken advantage of and manipulated by other people, and had a limited capacity for planning," and that "Mr. Sanchez suffered from serious impairments throughout his life." App'x at A-001672-73 (Donnie Murrell). Nevertheless, counsel failed to ensure that the investigation elicited the information that was readily available about the severity of Mr. Sanchez's deficits, to present this information to experts, and to consult with experts who were qualified to assess the significance of the information. Furthermore, although trial counsel presented some information about Mr. Sanchez's low intelligence and poor performance in school, counsel did not explain the significance of even these deficits and how they shaped Mr. Sanchez's behavior and inhibited productive and normal functioning. *See, e.g.*, App'x at A-001640-41 (Daniel Hicky Grant, Ed.D.) ("Although it appeared that Mr. Murrell understood that some issues were important – for example, he knew that it was important that Mr. Sanchez's brother was mentally retarded and that Mr. Sanchez's parents both exhibited low intellectual functioning – Mr. Murrell did not seem to understand why these issues were important. He asked me about Mr. Sanchez's parents' intellectual functioning during my testimony, but he did not ask questions that permitted me to explain that an individual who has a family history of impaired cognitive abilities is at much greater risk for the development of cognitive and intellectual impairment himself."). "[H]ad counsel presented and explained the significance of [Mr. Sanchez's] . . . limited mental capacity, there would have been a compelling

85

basis on which to argue for clemency in light of [Mr. Sanchez's] age and life experiences."

*Debruce*, 758 F.3d at 1278.

### 1.   Failure to investigate and present evidence of Mr. Sanchez's neuropsychological impairments and their effects on his behavior and functioning. (Claim VIIIB)

#### a.   Deficient performance.

Respondent's sole challenge to Mr. Sanchez's allegations that his trial counsel failed to present evidence of Mr. Sanchez's significant neuropsychological impairments is that Mr. Sanchez "failed to establish through affidavit, expert report or any other evidence, that any expert witness would have testified . . . that Sanchez suffered from neuropsychological impairments that affected his behavior and brain functioning." Resp. Opp. at 72. Mr. Sanchez has explained above that this assertion is legally unsupported and factually incorrect. Mr. Sanchez presented detailed allegations regarding his neuropsychological deficits in the Motion at pages 123-27 and submitted the declaration of Joette Deanna James, Ph.D., a neuropsychologist who evaluated Mr. Sanchez at the request of post-conviction counsel, App'x at A-000747-76, in support of those allegations.

Although trial counsel did consult with neuropsychologists and called one of them, Dr. Daniel Grant, to testify, counsel failed to recognize the significance of the data the neuropsychologists obtained from their testing and to present this information at Mr. Sanchez's trial. Instead, counsel limited the inquiry and testimony of Dr. Grant to information derived almost exclusively from the tests of intellectual functioning he administered, unreasonably failing to elicit information about Mr. Sanchez's cognitive impairments in working memory and executive functioning, both of which had profound effects upon Mr. Sanchez's behavior and ability to operate productively in his community. As set forth in more detail *infra*, counsel also failed to provide Dr. Grant with information from those who observed Mr. Sanchez over the

86

course of his lifetime that would have informed his evaluation of Mr. Sanchez and the conclusions he drew therefrom.

Counsel had no reason for failing to develop and present the evidence of Mr. Sanchez's neuropsychological dysfunction that post-conviction counsel has developed. App'x at A-001672-73 (Donnie Murrell). If trial counsel had developed this information, counsel would have presented it to the penalty phase jury. *Id.*

### b.   Prejudice.

Mr. Sanchez suffered prejudice as the result of his counsel's failure to present evidence about neuropsychological damage. *See, e.g.*, *Porter*, 558 U.S. at 43 (finding deficient performance where trial counsel failed to present evidence of brain damage); *Hooks*, 689 F.3d at 1205 (explaining that "the involuntary physical alteration of brain structures, with its attendant effects on behavior, tends to diminish moral culpability, altering the causal relationship between impulse and action," and for this reason, courts have deemed evidence of organic brain damage as mitigating). Had trial counsel performed effectively, the jury would have learned the following information about Mr. Sanchez's neuropsychological deficits and their effects upon his everyday functioning:

- Mr. Sanchez's neuropsychological deficits "include[] deficits in processing, particularly in verbal processing and processing speed[;] . . . auditory discrimination issues[;] . . . significant difficulty encoding verbal information; . . . problems with attention and focus[;] . . . [and] difficulty with language acquisition[, all of which] . . . are consistent with impairments to the left hemisphere of his brain." App'x at A-001630 (Daniel Hicky Grant, Ed.D.).

- On neuropsychological tests, "Mr. Sanchez performed the most poorly on instruments measuring aspects of attention and executive functioning, including sustained attention, organized retrieval, processing speed, working memory, decision-making, and fluid reasoning. He also demonstrated significant academic deficits. He exhibited relative strengths in motor skills and visual memory. These results are consistent with significant cognitive deficits that are neurodevelopmental in nature (that is, they are more likely to have developed prenatally or early in life than to have been caused by a specific head injury).

87

These neurocognitive impairments prevent him from thinking efficiently and lead him to perform very poorly under conditions that are stressful, novel, unfamiliar, and complex." App'x at A-000752-53 (Joette Deanna James, Ph.D.).

- Mr. Sanchez demonstrates impairments in both processing speed and working memory. "Individuals who demonstrate difficulty with both working memory and processing speed are at risk for poor decision-making and judgment because they are unable to absorb and process in an effective and timely manner the sensory input they receive from the world around them, and so are unable to respond appropriately to that input." App'x at A-000755-56 (Joette Deanna James, Ph.D.).

- "Mr. Sanchez's impairments in working memory and processing speed result in his having difficulty following and understanding verbal information provided to him because he is slow to process the information. Although he may appear to have a superficial understanding of verbal content (hence his higher score on the Verbal Comprehension Index), his difficulty processing information results in his thinking about information he has previously heard when new information is presented, so he is unable to keep up with and understand the new information because he is distracted by the information presented previously. He also has difficulty encoding the information presented to him, due to his impairments in working memory, and thus he cannot hold the information in his attention for enough time to use the information effectively." App'x at A-000757 (Joette Deanna James, Ph.D.).

- "Executive functions control skill sets including problem-solving; abstract reasoning; learning from experience; applying previously acquired knowledge to novel situations; organization; cognitive flexibility; planning; engaging in goal-directed thinking, speech, and behavior; controlling impulses and inhibiting behavior; and understanding and responding appropriately to social cues. Individuals with impairment in executive functioning have difficulty adapting behavior in response to information, such as by using environmental and interpersonal feedback to change unsuccessful strategies. Impaired executive functioning also typically leads to limited ability to perceive environmental stimuli accurately, respond adaptively, anticipate and reach toward future goals, consider potential consequences, and make use of hindsight and foresight. Deficits in executive functioning also can interfere with an individual's ability to have insight into his own behavior, thought processes, and appearance to others. Research has demonstrated that low scores on executive functioning tasks may be a proxy for low intelligence." App'x at A-000757-58 (Joette Deanna James, Ph.D.).

- Mr. Sanchez also has "impairments in executive functioning skills, such as impulsivity and marked difficulty inhibiting actions, which are associated with the frontal lobes of the brain." App'x at A-001630 (Daniel Hicky Grant, Ed.D.).

- "Mr. Sanchez's executive functioning performance profile was consistent with those of individuals who struggle to think abstractly and demonstrate difficulty making goal-directed decisions, particularly in circumstances that are stressful or

present complex cognitive or emotional stimuli." App'x at A-000758 (Joette Deanna James, Ph.D.).

If counsel had performed in a reasonably effective manner, the jury also would have been presented with evidence about possible causes of Mr. Sanchez's brain impairments that were mitigating both because they demonstrated that Mr. Sanchez's deficits arose from circumstances beyond his control and because they likely would have elicited feelings of sympathy and mercy for Mr. Sanchez in their own right. The jury was deprived of readily available information that possible etiologies for Mr. Sanchez's brain dysfunction include exposure to neurotoxins and trauma while in utero as well as during infancy and toddlerhood; birth complications; genetic predisposition to cognitive disorder; ill health as a developing infant and child; overdose on his brother's seizure medication as a toddler; head injuries during childhood; and exposure to traumatic experiences throughout his life. App'x at A-000763-64 (Joette Deanna James, Ph.D.).

### 2. Failure to investigate and present evidence of Mr. Sanchez's psychiatric disorders and their effects on Mr. Sanchez's behavior and functioning. (Claim VIIIC)

Respondent offers only a weak challenge to Mr. Sanchez's allegations that trial counsel performed ineffectively by failing to investigate, develop, and present evidence that Mr. Sanchez suffered from psychiatric impairments that shaped his behavior and functioning. First, Respondent asserts, incorrectly, that Mr. Sanchez has failed to present an affidavit or expert report that any expert witness that Mr. Sanchez "suffers from a psychological disorder." Resp. Opp. at 72, 73. Mr. Sanchez set forth detailed allegations in the Motion of Mr. Sanchez's psychiatric symptoms including sequelae of trauma, inability to focus, distractibility, hyperactivity, sleep disturbance, depression and suicidal ideation, anxiety, irritability, hyperarousal, impulsivity, impaired judgment, and substance abuse. Motion at 127-38. These

allegations are supported by the declaration of Louis James Kraus, a psychiatrist. App'x at A-000689-713.

Second, Respondent speculates that trial "counsel did not submit Sanchez to psychiatric counseling presumably because their personal interactions with Sanchez over a period of many, many months, led them to believe Sanchez was competent to stand trial and did not suffer from any psychiatric issues." *Id*. Respondent's conjecture has no basis in fact and is incorrect. Trial counsel unreasonably failed to investigate Mr. Sanchez's psychiatric functioning despite the fact that they were aware that Mr. Sanchez had suffered numerous traumatic events and abused alcohol and drugs, largely because they focused their attention on developing information about Mr. Sanchez's limited intelligence. Their failure to investigate and develop his symptoms of psychiatric disorder was not the product of a reasonable strategic decision but rather was oversight. *See* App'x at A-001672 (Donnie Murrell). If counsel had developed the information about Mr. Sanchez's psychiatric impairments that was readily available at the time of trial and that post-conviction counsel have developed and presented to the Court in the Motion and the Declaration of Louis James Kraus, M.D., counsel would have presented it to the jury at the penalty phase. *Id*.

Among the evidence of Mr. Sanchez's psychiatric impairments that the jury would have considered had trial counsel performed effectively is the following:

- Mr. Sanchez suffers symptoms of mental illness including anxiety, depression, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, deficits in concentration, and substance abuse. Many of these symptoms are likely sequelae of chronic exposure to traumatic experiences. App'x at A-000694 (Louis James Kraus, M.D.).

- Mr. Sanchez's symptoms are of long-standing duration. His "impairments originated at or shortly after his birth, and his symptoms were exacerbated by events and environmental factors that affected him throughout his infancy, childhood, adolescence, and young adulthood." App'x at A-000694 (Louis James Kraus, M.D.).

90

- Mr. Sanchez demonstrates blunted affect as well as emotional flooding when describing traumatic events in his life, including experiencing and witnessing the abuse by his father. "Both these reactions—flat affect and emotional flooding—are symptoms that arise from exposure to chronic traumatic experiences." App'x at A-000695 (Louis James Kraus, M.D.).

- Mr. Sanchez has a family history of psychiatric disorders and other brain dysfunction, risk factors that may increase the likelihood that he developed such a disorder. Mr. Sanchez also had caregivers who were mentally ill and/or cognitively impaired, and had at least one sibling with mental illness and brain impairment, and as a result, he suffered "because [his] parents [were] ill-equipped or too overwhelmed to meet [his] physical and emotional needs. App'x at A-000695 (Louis James Kraus, M.D.); *see also id.* at A-000695-96.

- Mr. Sanchez experienced tremendous stress upon witnessing his father physically attack other members of his family. The impact upon him of witnessing his father beat his mother was particularly devastating, as it was confused by Mr. Sanchez's feelings of mixed loyalty. Mr. Sanchez experienced distress and confusion when his father brutally beat his mother. Mr. Sanchez was terrified that his father would seriously injure his mother, and felt a strong urge to protect her, but because his siblings were all focused on taking care of their mother – he described this as their all being "on her side" – he also felt that someone needed to stand up for his father. The uncertainty about what to do in these situations left him feeling even more hopeless, helpless, and confused by the experience. App'x at A-000699 (Louis James Kraus, M.D.).

- Mr. Sanchez experienced contradictory emotions toward his father—feelings of admiration as well as fear and anger toward his abuser—and these exacerbated the negative consequences of the abuse Mr. Sanchez suffered, because they impeded his ability to make sense of his experiences. These complicated and contradictory feelings are difficult to process for individuals like Mr. Sanchez whose intellectual functioning is quite limited. App'x at A-000699-700 (Louis James Kraus, M.D.).

- "Mr. Sanchez experienced frustration, hopelessness, and helplessness throughout his school career. He could not understand why he was unable to learn to read proficiently, despite great effort. As he fell farther and farther behind his same-aged peers, he felt stupid and terrible about himself. He had no sense of what he was going to be able to achieve in the future, and indeed felt that he had no hope of any success in employment. Particularly in high school, he suffered sleep disturbance, including insomnia and nightmares. He had thoughts of suicide. He responded with agitation and irritability to disappointments. Mr. Sanchez also reported to me that his experiences led him to believe that no one could help him, and this belief was devastating to him." App'x at A-000705 (Louis James Kraus, M.D.).

91

- Mr. Sanchez's symptoms of anxiety and depression, along with the symptoms of attentional deficits and hyperactivity, likely exacerbated Mr. Sanchez's processing dysfunction, leading to even poorer outcomes in school. These, in turn, perpetuated increasing frustration and hopelessness that contributed to Mr. Sanchez's leaving school before completing tenth grade. App'x at A-000705 (Louis James Kraus, M.D.).

- "Mr. Sanchez had limited or no access to protective factors and community supports to enable him to develop resilience to overcome or minimize the effects of the trauma he experienced." App'x at A-000705-06 (Louis James Kraus, M.D.).

- Mr. Sanchez suffers symptoms of depression, including disturbed sleep (nightmares and insomnia), difficulty concentrating and maintaining focus, feelings of helplessness and hopelessness, feelings of worthlessness and low self-esteem, agitation and irritability, and suicidal ideation, and has suffered these symptoms at least since adolescence. App'x at A-000706-08 (Louis James Kraus, M.D.).

- Mr. Sanchez suffers symptoms of anxiety, including agitation, irritability, and sleep disturbance. App'x at A-000708 (Louis James Kraus, M.D.).

- Mr. Sanchez experienced sleep disturbances for much of his life. By the time he was in high school, Mr. Sanchez was suffering significant sleep difficulties, including increased sleep latency and waking up at night, which intensified his difficulties with concentration and further impaired his functioning. He had nightmares that influenced his waking thought processes and his inability to fall asleep and maintain sleep led to exhaustion and the keeping of odd hours during the day. App'x at A-000708-09 (Louis James Kraus, M.D.).

- Mr. Sanchez exhibited symptoms of impulsivity, impaired judgment, hyperactivity, and hyperarousal throughout his life. App'x at A-000709-10 (Louis James Kraus, M.D.).

- Mr. Sanchez has difficulty trusting certain other people that is severe enough to approach paranoia. He believed that most people wanted to harm him, very few wanted to help him, and he could turn only to a few people, primarily members of his family, for help. App'x at A-000710 (Louis James Kraus, M.D.).

- Mr. Sanchez's significant impairments in processing information are caused or exacerbated by his symptoms of anxiety, depression, inattention, and hyperactivity. App'x at A-000710-11 (Louis James Kraus, M.D.).

- "Because Mr. Sanchez did not receive mental health treatment for his psychiatric conditions, including anxiety, depression, and trauma, he took the quite typical and predictable track of using alcohol and drugs to avoid his symptoms and dissociate from his experiences. The substances he used [including alcohol, marijuana, cocaine, and MDMA (Ecstasy)] blunted the impact of the emotions

92

and the effects of the trauma that affected him." App'x at A-000711 (Louis James Kraus, M.D.).

- "Mr. Sanchez's psychiatric symptoms have contributed to his deficits in intellectual functioning, precluded his academic achievement, prohibited him from engaging in gainful employment, resulted in behavioral dysfunction, caused him to be vulnerable to being taken advantage of and manipulated by others, and otherwise interfered with healthy development and functioning throughout Mr. Sanchez's life." App'x at A-000711-12 (Louis James Kraus, M.D.).

- "Mr. Sanchez's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; his deficits, which are long-standing and existed at the time of the offenses for which he was charged, constituted severe mental disturbance; and his impairments are factors in his background, record, or character that mitigate against imposition of the death sentence." App'x at A-000713 (Louis James Kraus, M.D.).

None of this readily available evidence (*see* App'x at A-000713 (Louis James Kraus, M.D.)) was presented at the penalty phase. This evidence would have served not only as mitigating in its own right, but also "it also could [have] significantly weaken[ed] the aggravating factors" presented against Mr. Sanchez. *Elledge v. Dugger*, 823 F.2d 1439, 1447 (11th Cir.), *withdrawn in part on denial of rehearing en banc*, 833 F.2d 250 (11th Cir. 1987) (withdrawing only unrelated Part III of the opinion).

### 3. Failure to investigate and present evidence that Mr. Sanchez is intellectually disabled. (Claim VIIID)

Respondent does not directly address Mr. Sanchez's allegations that his trial counsel rendered prejudicially deficient performance in failing to investigate and present evidence that Mr. Sanchez is intellectually disabled. Instead, Respondent states, incorrectly, that Mr. Sanchez "claims that his counsel were was [sic] ineffective for failing to call the 'right' expert to testify to Sanchez's level of intelligence." Resp. Opp. at 73. Mr. Sanchez has made no such claim. As noted above, Respondent also offers no denial to Mr. Sanchez's allegations that his counsel rendered ineffective assistance by failing to investigate and present evidence of Mr. Sanchez's

93

adaptive deficits. The failure to deny these allegations constitutes an admission of their truth. Rules Governing Section 2255 Proceedings, Rule 5(b) ("The answer must address the allegations in the motion."); Federal Rules of Civil Procedure, Rule 8(b)(6) ("An allegation . . . is admitted if a responsive pleading is required and the allegation is not denied.").

Mr. Sanchez's claim is that although his trial counsel wanted to present a defense of intellectual disability, and initiated an investigation intended to gather evidence to support that defense, counsel's misunderstanding of the legal and clinical standards for proving intellectual disability and counsel's errors and omissions in the investigation to support the defense resulted in the failure to obtain the information necessary to prove that Mr. Sanchez was and is intellectually disabled, even though such information was readily available at the time of trial. Motion at 138-41; *see* App'x at A-001625 (Michael Cohen); *id*. at A-001671-72 (Donnie Murrell).

### a.    Deficient performance.

Trial counsel were aware at the time of Mr. Sanchez's trial that individuals with intellectual disability were constitutionally ineligible for the death penalty because the execution of such individuals violates the Cruel and Unusual Punishment Clause of the Eighth Amendment. *Atkins v. Virginia*, 536 U.S. 304 (2002); *Holladay v. Allen*, 555 F.3d 1346 (11th Cir. 2009); *Wood v. Allen*, 542 F.3d 1281 (11th Cir. 2008); App'x at A-001671-72 (Donnie Murrell). Counsel were aware that presenting evidence that Mr. Sanchez was intellectually disabled could be the most effective way to ensure that he was not sentenced to death. Counsel also understood that a diagnosis of intellectual disability required a showing of deficits in intellectual functioning. App'x at A-001671-72 (Donnie Murrell). But counsel unreasonably believed, contrary to federal legal standards at the time of the trial, that Mr. Sanchez's IQ scores were "too high" for him to be intellectually disabled. *Id*. Counsel also discounted the importance

94

of adaptive deficits for establishing a diagnosis of intellectual disability, and thus failed to direct the mitigation specialist to conduct an investigation into Mr. Sanchez's adaptive functioning. *Id*.

At the time of Mr. Sanchez's trial, as today, courts conducting hearings pursuant to *Atkins* to determine whether or not a defendant was intellectually disabled required the defendant to make such a showing by a preponderance of the evidence. *See, e.g.*, *United States v. Hardy*, 762 F. Supp. 2d 849, 852 (E.D. La. 2010); *United States v. Davis*, 611 F. Supp. 2d 472, 474 (D. Md. 2009); *United States v. Sablan*, 461 F. Supp. 2d 1239, 1242-43 (D. Colo. 2006); *United States v. Nelson*, 419 F. Supp. 2d 891, 894 (E.D. La. 2006).

Also at the time of Mr. Sanchez's trial, as today, federal law set no bright-line IQ score as a cut-off above which a capital defendant cannot be deemed intellectually disabled and ineligible for the death penalty. *See* 18 U.S.C. § 3596(c) (stating only "[a] sentence of death shall not be carried out upon a person who is mentally retarded"); *see also, e.g.*, *Thomas v. Allen*, 607 F.3d 749, 757 (11th Cir. 2010) (federal case describing Alabama law: "There is no Alabama case law stating that a single IQ raw score, or even multiple IQ raw scores, above 70 automatically defeats an *Atkins* claim when the totality of the evidence (scores) indicates that a capital offender suffers subaverage intellectual functioning."); *United States v. Lewis*, 2010 WL 5418901, at \*8 (N.D. Ohio 2010) (unpublished) ("[T]here is no specific cutoff score required to make a diagnosis of mental retardation or intellectual disability."); *United States v. Johnson*, 2003 WL 1193257, at \*11 (N.D. Ill. 2003) (unpublished order denying petitioner's request for discovery but noting that IQ scores of 79, 74, and 76 constitute evidence of significant limitations in intellectual functioning).

Although the Supreme Court decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014), made explicit that the federal constitution does not permit a legal definition of intellectual disability

95

that requires that the defendant's IQ be 70 or below, and thus ruled unconstitutional the Florida system employing that definition, federal law had never instituted such a rigid standard. Thus, trial counsel's conclusion that Mr. Sanchez's IQ scores were "too high" for him to be intellectually disabled was unreasonable because it was based on a misunderstanding of the law. *See Hinton v. Alabama*, 134 S. Ct. 1081 (2014); *Kimmelman v. Morrison,* 477 U.S. 365 (1986).

Trial counsel were or should have been aware that medical definitions of intellectual disability used by clinicians did not recognize bright-line cut-off IQ scores as necessary to a diagnosis. At the time of trial, the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text-Revised (DSM-IV-TR), set forth the criteria for identifying intellectual disability (at that time called mental retardation in the DSM-IV-TR). The diagnostic criteria in the DSM-IV-TR required "[s]ignificantly subaverage intellectual functioning: an IQ of approximately 70 or below on an individually administered IQ test." DSM-IV-TR at 49.[18] Similarly, at the time of trial, the American Association on Intellectual and Developmental Disabilities (AAIDD) defined intellectual disability as: "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18."[19] Neither of these primary authorities on

---

[18] The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) (DSM-5) of the American Psychiatric Association sets forth the current criteria for identifying intellectual disability. The DSM-5 diagnostic criteria for intellectual disability are: (a) deficits in intellectual functioning, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing; (b) deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility in at least one or more activities of daily life such as communication, social participation, and independent living, across multiple environments; and (c) onset of intellectual and adaptive deficits during the developmental period. DSM-5 at 33.

[19] The AAIDD currently defines intellectual disability as characterized by "significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical skills," originating before age eighteen. AAIDD Ad Hoc Committee on Terminology

96

intellectual disability established a bright-line cut-off IQ score. Furthermore, trial counsel had

consulted with an expert in the diagnosis of intellectual disability who informed him that no

bright line cut-off existed. App'x at A-001711 (Lisa McDermott).

Respondent contends that Mr. Sanchez "asserts that he suffered a Sixth Amendment

violation because his attorney . . . allowed experts to test his intelligence." Resp. Opp. at 74. This

is not so. Mr. Sanchez actually alleges that counsel erred by, inter alia, failing to understand and

inform their experts about the clinical and federal legal standards for proving significant deficits

in intellectual functioning. A tactical or strategic decision is unreasonable if it is based on a

failure to understand the law. *Hinton*, 134 S. Ct. at 1088; *see also Horton v. Zant*, 941 F.2d 1449,

1462 (11th Cir. 1991); *Young v. Zant*, 677 F.2d 792, 798 (11th Cir. 1982) ("Where defense

counsel is so ill prepared that he fails to understand his client's factual claims or the legal

significance of those claims . . . , we have held that counsel fails to provide service within the

range of competency expected of members of the criminal defense bar."); *Dixon v. Snyder*, 266

F.3d 693, 703 (7th Cir. 2001) ("When counsel makes a decision that an awareness of the

governing law would foreclose, that decision "cannot be accorded the same presumption of

reasonableness as is accorded most strategic decisions because it was not based on strategy but

rather on a 'startling ignorance of the law'." (quoting *Kimmelman*, 477 U.S. at 385)). Counsel

also erred by failing to inquire of his experts how the effects of obsolete and aging norms as well

as repeated administration of the same or similar IQ tests skewed the interpretation of IQ scores

obtained on those tests. *See, e.g.*, App'x at A-001632-34 (Daniel Hicky Grant, Ed.D.); *id*. at A-

000755, A-000773-74 (Joette Deanna James, Ph.D.); *id*. at A-000772-99 (Kevin S. McGrew,

---

and Classification, *Intellectual Disability: Definition, Classification, and System of Supports*
(11th ed. 2010) (Green Book) at 5. Under the AAIDD standard, an individual must have
significant limitations in one of the three domains – conceptual skills, social skills, and practical
skills – to be diagnosed as intellectually disabled. Green Book at 47.

Ph.D.). Counsel's errors and omissions resulted in counsel's reaching the false conclusion that Mr. Sanchez's IQ scores did not satisfy the first prong of the intellectual disability diagnosis. App'x at A-000772-99 (Kevin McGrew, Ph.D.).

Trial counsel additionally rendered deficient performance by failing to conduct a thorough investigation into Mr. Sanchez's adaptive deficits. Although counsel and the mitigation specialist interviewed some members of Mr. Sanchez's family, omitted from their interviews were questions about Mr. Sanchez's functioning in the domains relevant to a diagnosis of intellectual disability at that time: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *See* App'x at A-001671-73 (Donnie Murrell); *id.* at A-001711 (Lisa McDermott). Furthermore, counsel did not interview friends and teachers who could have provided such information. *Id.* Although counsel elicited some information about Mr. Sanchez's impairments in functional academics from the single teacher they contacted, this information was based entirely on that teacher's interpretation of Mr. Sanchez's school records, which, as explained above, was incomplete at best and faulty at worst. Counsel had no *reasonable* strategy for failing to conduct such an investigation; counsel's explanation for failing to do this was simply counsel's *unreasonable* conclusion that Mr. Sanchez's IQ scores were too high to merit such an investigation. App'x at A-001671-72 (Donnie Murrell); *id.* at A-000795 (Kevin S. McGrew, Ph.D.) (finding that Mr. Sanchez's IQ scores available to trial counsel at the time of trial satisfied the first prong of intellectual disability and that a full evaluation of adaptive functioning was necessary to determine whether Mr. Sanchez was intellectually disabled).

### b. Prejudice.

Mr. Sanchez was prejudiced by trial counsel's deficient performance regarding the investigation and presentation of evidence of Mr. Sanchez's intellectual disability. Qualified

mental health professionals, including Joette James, Ph.D., Louis Kraus, M.D., Kevin McGrew, Ph.D., and Daniel Grant, Ed.D.,[20] have concluded, based on information developed by current counsel but which was available at the time of Mr. Sanchez's trial, that Mr. Sanchez met the criteria for intellectual disability at the time of his trial and continues to meet them now. App'x at A-000773-74 (Joette Deanna James, Ph.D.); *id.* at A-000712 (Louis James Kraus, M.D.); *id.* at A-001635-39 (Daniel Hicky Grant, Ed.D.); *id.* at A-000795 (Kevin S. McGrew, Ph.D.) (finding that Mr. Sanchez's IQ scores available to trial counsel at the time of trial satisfied the first prong of intellectual disability and that a full evaluation of adaptive functioning was necessary to determine whether Mr. Sanchez was intellectually disabled). If counsel had performed effectively, the court and/or the jury would have been presented with this information and these conclusions, and Mr. Sanchez would have been deemed ineligible for the death penalty.

As set forth in the Motion, Mr. Sanchez demonstrates significant deficits in intellectual functioning that manifested in childhood and continue into his adulthood. Reasonably effective counsel would have presented the following information to the court and jury:

- The results of the administration of reliable intelligence, cognitive, and neuropsychological assessment instruments establish Mr. Sanchez's significantly limited general intellectual functioning. App'x at A-000795 (Kevin S. McGrew, Ph.D.); *id.* at A-000753-56, A-000773-74 (Joette Deanna James, Ph.D.); *id.* at A-

---

[20] Respondent argues that "Sanchez has not provided any evidence of what a different expert would have established under sworn testimony that would have contradicted Dr. Grant's testimony," and that "[e]ven if Sanchez were to find and cite a new expert who would establish a different IQ in 2016, that proffer would be of no significance." Resp. Opp. at 74. But Mr. Sanchez is not alleging that a "different IQ" is what establishes that his intellectual functioning is significantly impaired. Rather, Mr. Sanchez alleges that counsel unreasonably failed to understand the scores Mr. Sanchez did achieve and to elicit information from the experts with whom counsel consulted to interpret them accurately. Furthermore, Mr. Sanchez does not merely present information and conclusions from new experts who contradict Dr. Grant's conclusions, but instead presents new, consistent conclusions from Dr. Grant himself, which are based upon the new information provided to him that counsel unreasonably failed to give him and which are rendered in response to questions counsel unreasonably failed to ask him.

> 000732-35 (Francis Crosby, Psy.D.); *id*. at A-001634-35, A-001639 (Daniel Hicky Grant, Ed.D.).

- Mr. Sanchez has achieved scores within the range of mild intellectual disability on instruments designed to measure intellectual functioning that were administered while he was a child and while he was pending capital trial. App'x at A-000795 (Kevin S. McGrew, Ph.D.); *id*. at A-000753-56, A-000773-74 (Joette Deanna James, Ph.D.); *id*. at A-000732-35 (Francis Crosby, Psy.D.); *id*. at A-001634-35, A-001639 (Daniel Hicky Grant, Ed.D.).

- Mr. Sanchez was administered the Stanford-Binet Fourth Edition (SB-IV) in June 1992, when he was 8 years, 9 months old. App'x at A-000732 (Francis Crosby, Psy.D.). He achieved a full scale intelligence quotient (IQ) score that was reported as 80 on this test. *Id*. at A-000733 (Francis Crosby, Psy.D.). Mr. Sanchez's true IQ score on this instrument, when it is adjusted for norm obsolescence and standard error of measurement, falls between 73 and 83, approximately two standard deviations below the norm, and within the range of scores of mild intellectual disability.[21]

- Dr. Francis Crosby, the psychologist who administered the SB-IV to Mr. Sanchez, reported that students tended to achieve higher scores on this instrument than on the other instrument used regularly in 1992 to evaluate students' IQs, the Wechsler Intelligence Scale for Children, Revised Edition (WISC-R). He further reported that he administered the SB-IV rather than the WISC-R to Mr. Sanchez purposely to ensure that Mr. Sanchez met the criteria for eligibility for special education services as learning disabled rather than as intellectually disabled, at the time considered a stigmatizing diagnosis better avoided. App'x at A-000732-33 (Francis Crosby, Psy.D.). If Dr. Grant had had this information at the time he rendered his opinions, he "would have questioned whether the IQ score of 80 accurately reflected Mr. Sanchez's intellectual functioning when he was a child and I would not have relied upon it as an indication that Mr. Sanchez functioned above the intellectually disabled level." App'x at A-001635-36 (Daniel Hicky Grant, Ed.D.).

- Psychological studies have demonstrated that the SB-IV has been observed to inflate the score for individuals with intellectual disability. *Id*. at A-000782 (Kevin S. McGrew, Ph.D.).

- Mr. Sanchez was administered the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), in March 2008, pending his capital trial. App'x at A-000780-81 (Kevin S. McGrew, Ph.D.). He achieved a full scale IQ score that was reported at 76. *Id*. Mr. Sanchez's true IQ score on this instrument, when it is adjusted for

---

[21] When adjusted for norm obsolescence, the score itself is 78. However, psychological and psychometric consensus is that "a person does not obtain a specific IQ score when tested: they obtain a range of possible IQ test scores with a certain degree of confidence." App'x at A-000781 (Kevin S. McGrew , Ph.D.).

norm obsolescence and standard error of measurement, falls between 67 and 77[22], two standard deviations below the norm, and within the range of scores of mild intellectual disability. *Id*. at A-000780-83. Of Mr. Sanchez's convergent IQ scores, Mr. Sanchez's score on the WAIS-III administered to him in March 2008 is the score with the least amount of score bias; that is, it is the score that is most accurate and reliable of the scores of tests administered to him prior to trial. *Id*. at A-000783.

- Mr. Sanchez was administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) in December 2008, shortly before his capital trial. App'x at A-000783, A-000790 (Kevin S. McGrew, Ph.D.); *id*. at A-001632-33 (Daniel Hicky Grant, Ed.D.). He obtained a full scale IQ score of 77. The range of scores within which Mr. Sanchez's IQ falls on this instrument to a 95 percent degree of confidence is 72-82. App'x at A-000780-81 (Kevin S. McGrew, Ph.D.). Scores in this range occur within the mildly intellectually disabled range. *Id*. at A-000780. The score of 77 is likely inflated due to a practice effect, because Mr. Sanchez had been administered a WAIS-III, a similar test, twice prior in 2008. App'x at A-001633-34 (Daniel Hicky Grant, Ed.D.).

- The scores that Mr. Sanchez achieved on these three instruments are convergent. "[A] reasonable degree of score convergence is present when the 95% confidence bands from the different IQ test scores 'overlap or are not far apart.'" App'x at A-000782 (Kevin S. McGrew, Ph.D.). This means that these three test scores, obtained over a sixteen-year period, provide the same approximate estimate of general intelligence for Mr. Sanchez, within the mildly intellectually disabled range. "Given that Mr. Sanchez's first three IQ score ranges include scores within the zone of scores that meet prong 1 of an intellectual disability diagnosis, . . . there is sufficient reasonable and reliable evidence that Mr. Sanchez is a person who has IQ scores that fall within the range of scores specified for prong 1 of an intellectual disability diagnosis. This conclusion is consistent with the 'unanimous professional consensus that the diagnosis of intellectual disability requires comprehensive assessment and the application of clinical judgment.'" *Id*. at A-000783 (citation omitted).

- Congruent data from numerous sources establish and confirm Mr. Sanchez's significant limitations in intellectual functioning. Mr. Sanchez was described by family members as mentally slow. App'x at A-001687 (Elsa Hernandez); *id*. at A-000630 (Juan Antonio Jimenez); *id*. at A-001697 (Juana Maria Sanchez); *id*. at A-000674-76 (Rachel Ramos); *id*. at A-001704 (Maria de la Luz Betancourt); *id*. at A-000556 (Benito Rodriguez). A girlfriend reported that Mr. Sanchez's friends thought he was dumb. *Id*. at A-000635 (Linda Velasquez). Friends described him as sweet but low functioning, dopey, goofy, and unable to understand even basic

---

[22] When adjusted for norm obsolescence, the score itself is 72. But "[w]hen interpreting Mr. Sanchez's IQ test scores, professional standards and clinical accuracy requires utilizing the 95% confidence interval band from each assessment and not the point-specific IQ score obtained." App'x at A-000782 (Kevin S. McGrew, Ph.D.).

games. *Id*. at A-000608-09 (Jamie Matos); *id*. at A-000621 (Jason Vazquez); *id*. at A-000631-32 (Kenny Velasquez); *id*. at A-000687-88 (Yolanda Vazquez).

- Mr. Sanchez was not able to understand even simple directions; multiple-step instructions were impossible for him to understand or follow. App'x at A-000626 (Jeffrey Silverman). Very basic instructions had to be repeated to him several times before he understood them. *Id*. at A-000674 (Rachel Ramos).

- Mr. Sanchez's mother noted that Mr. Sanchez seemed to be the most intellectually slow of her children. App'x at A-001697 (Juana Maria Sanchez). Mr. Sanchez's mother described: "He only asked basic questions like where we are going, or what time is it. He was not a curious child." *Id*. at A-001696.

- Educators noted that Mr. Sanchez "seemed to be intellectually disabled." App'x at A-000626 (Jeffrey Silverman). Mr. Sanchez had extreme difficulty reading, and was reading at only a third grade level when he stopped attending high school prior to finishing tenth grade at the age of nineteen. Mr. Sanchez was identified as having problems learning when he was in kindergarten, and he was assessed and deemed eligible for special education when he was in third grade. App'x at A-00331-512 (Education Records); *id*. at A-000606 (Frances Lenore Wolfe); *id*. at A-000669-70 (Patricia Replogle); *id*. at A-000733 (Francis Crosby, Psy.D.).

- Mr. Sanchez failed both ninth and tenth grades, "made only very minimal progress in school" despite the fact that he was in full-time special education classes from the time he was in elementary school, and did not graduate from high school. App'x at A-000626-27 (Jeffrey Silverman); *id*. at A-000615, A-000618-19 (Janice Coe).

- Mr. Sanchez's genetic history includes factors associated with elevated risk for impairments in intellectual functioning. Underlying causes of intellectual disability are varied, but can include genetic abnormalities and genetic syndromes, environmental causes, and other conditions. The fact that multiple individuals in Mr. Sanchez's family exhibited signs of intellectual disability and other developmental disabilities demonstrates that Mr. Sanchez was predisposed to intellectual impairment. App'x at A-000695-96 (Louis James Kraus, M.D.); *id*. at A-000737 (Francis Crosby, Psy.D.); *id*. at A-000763 (Joette Deanna James, Ph.D.); *id*. at A-001640-41 (Daniel Hicky Grant, Ed.D.).

- Both of Mr. Sanchez's parents have very limited cognitive functioning, as measured by tests of nonverbal intelligence: his mother achieved scores in the range of borderline intellectual functioning and his father achieved scores in the range of intellectual disability. App'x at A-000763 (Joette Deanna James, Ph.D.); *id*. at A-001640-41 (Daniel Hicky Grant, Ed.D.). Mr. Sanchez's father has exhibited erratic behavior, including numerous episodes of violence, particularly when under the influence of alcohol. App'x at A-000513-40 (Ricardo Sanchez, Sr.'s arrest records). Mr. Sanchez's eldest brother, Efrain, has been diagnosed with intellectual disability as well as a severe seizure disorder that has been only poorly controlled with medication. Tr. 8369, 8372 (Thomas Waddell testimony).

102

- Mr. Sanchez was exposed to environmental factors associated with elevated risk for impairments in intellectual functioning. He may have suffered from birth complications; his mother reported that unlike with her labor with her other children, when she went into labor with Mr. Sanchez, her water did not break but she started to bleed. App'x at A-001694 (Juana Maria Sanchez). Mr. Sanchez was a sickly child who contracted pneumonia and suffered from allergies. *Id.* at A-001696 (Juana Maria Sanchez); *id.* at A-000663 (Nydia Sanchez). He was exposed to neurotoxins in the form of pesticides from the farms on which he and his relatives worked and which were brought into the home on clothing following days in the fields. *Id.* at A-000654-55 (Martin Sanchez); *see also id.* at A-000556 (Benito Rodriguez).

- Mr. Sanchez suffered head injuries and insults as a child that can negatively affect neurodevelopment. App'x at A-000764 (Joette Deanna James, Ph.D.). When he was two years old, Mr. Sanchez ingested a large quantity of his brother's anti-seizure medication, *id.* at A-000329-30 (Palm Beach Non Crime Offense Report), after which he exhibited symptoms including lethargy and lack of coordination and was taken to the hospital by ambulance. His mother and sister indicated that he went into a coma and took some time to recover. *Id.* at A-001695-96 (Juana Maria Sanchez); *id.* at A-000663 (Nydia Sanchez). When Mr. Sanchez was three or four years old, he fell off a tricycle and hit his head, requiring treatment of staples to his scalp. Mr. Sanchez sustained blows to the head on several other occasions when riding his bicycle: when he was about fourteen years old he tried to do a back flip on his bicycle and struck the back of his head on the ground when he landed. On another occasion he fell and struck his face on the ground. *Id.* at A-000664-65 (Nydia Sanchez) (describing two occasions during Mr. Sanchez's teenage years upon which he hit his face and head after falling off a bicycle); *see also id.* at A-001687 (Elsa Hernandez), A-001696 (Juana Maria Sanchez), A-000630 (Juan Antonio Jimenez), A-000638 (Lucy Jimenez Sanchez).

Also as set forth in the Motion, Mr. Sanchez demonstrates significant deficits in adaptive functioning in conceptual skills, social skills, and practical skills[23] that manifested in childhood

---

[23] As stated above, at the time of Mr. Sanchez's trial, adaptive functioning skills were categorized into the following categories: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. Since Mr. Sanchez's trial, the clinical community has changed the categories to conceptual, social, and practical skills. However, the skills falling into these categories are the same. *See* AAIDD Green Book at 44 (explaining that conceptual skills encompass language and literacy; money, time, and number concepts; and self-direction; social skills encompass interpersonal skills, social responsibility, self-esteem, gullibility, naïveté (i.e., wariness), social problem solving, and the ability to follow rules/obey laws and to avoid being victimized; and practical skills encompass activities of daily living (personal care), occupational skills, healthcare, travel/transportation, schedules/routines, safety, use of money, and use of the telephone.). Under the rubric in place at the time of Mr. Sanchez's trial, deficits in at least two of

103

and continue into his adulthood. Reasonably effective counsel would have presented the

following information to the court and jury:

From the time he was a child, Mr. Sanchez has exhibited deficits in conceptual skills.

Those include but are not limited to the following:

- Mr. Sanchez exhibited developmental delays beginning in early childhood. Family members noted that he was a very quiet child; he rarely spoke but he smiled often. It was difficult to have a conversation with him. App'x at A-001681 (Aurelio Sotelo), A-000556 (Benito Rodriguez), A-001687 (Elsa Hernandez), A-000609 (Jamie Matos), A-000630 (Juan Antonio Jimenez), A-000638 (Lucy Jimenez Sanchez), A-001704 (Maria de la Luz Betancourt), A-000655-56 (Martin Sanchez), A-000658 (Michelle Sembric), A-000681 (Rosa Ponce), A-000687 (Yolanda Vazquez). These qualities are characteristic of communication and conceptual deficits. *Id.* at A-000764 (Joette Deanna James, Ph.D.); *id.* at A-001637-38 (Daniel Hicky Grant, Ed.D.).

- He appeared mentally slower than his brothers and sister, despite their own significant impairments. Mr. Sanchez did not make decisions independently, but rather simply followed his brothers and sister around, doing what they did and trying to do what they told him to do. He had difficulty remembering instructions and "had to be told what to do every step of the way." App'x at A-001687 (Elsa Hernandez); *see also id.* at A-000576 (Ezequiel Sanchez) ("Ricardo was not one to make a plan; he just followed along with what we were doing."); *id.* at A-000622 (Juan Gutierrez) ("He played anything the rest of us came up with."); *id.* at A-001704 (Maria de la Luz Betancourt) (Mr. Sanchez "always wanted to do everything the other children were doing. He seemed slower than his brothers and sisters").

- Beginning when he was a child, Mr. Sanchez had frequent episodes during which he appeared to be mentally absent. Motion at 118-19; App'x at A-000576 (Ezequiel Sanchez) ("It seemed like he was lost or blank."); *see also id.* at A-001696 (Juana Maria Sanchez) ("Ricky sometimes seemed to be in another world. He did not respond unless I called his name several times when this happened. He was blank and I had to bring his attention back to me from wherever he was."); *id.* at A-000605 (Frances Lenore Wolfe) ("Ricardo often appeared to be in a daze."); *id.* at A-000609 (Jamie Matos) ("Ricardo had periods of time where he zoned out. He seemed to be somewhere else. In class, I had to poke him and call his name a couple of times to get him to come back. The teachers had to pound or slap on his desk several times before he came back. I noticed that he did this outside of

---

the eleven categories were required for a diagnosis of intellectual disability; under the current rubric, deficits in at least one of the three categories is required. Because Mr. Sanchez meets the criteria under either rubric, for the purposes of simplicity, Mr. Sanchez will set forth his impairments under the three current criteria.

school, too. He seemed to go blank. We had to snap our fingers or tap him on the arm and call his name loudly to get him back."); *id*. at A-000613 (Janice Coe) ("He often had a blank, or absent expression, as if he were not all there."); *id*. at A-000632 (Kenny Velasquez) ("There were times, not every day but pretty often, when I noticed Rick just sat there looking like he was daydreaming, off in his own world. He seemed unfocused. I had to snap my fingers and say to him, 'Hey, Rick, snap out of it' to get him back."); *id*. at A-000664 (Nydia Sanchez) (describing Mr. Sanchez "star[ing] off into space"); *id*. at A-000687 (Yolanda Vazquez) ("[H]e looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding eye contact.").

- Mr. Sanchez's friends noted that he was not "capable of thinking too deeply about anything" and "never really came up with thoughts of his own on any topic." They reported that he "could not answer the simplest questions in math class," and did not have "in depth conversations." App'x at A-000621 (Jason Vazquez) ("Even though we were good friends, I never remember having a deep conversation with him."); *see also id*. at A-000626 (Jeffrey Silverman) ("Ricky did not have an original idea in his head.").

- Mr. Sanchez's friends had to help him complete simple tasks. For example, one of his friends had to help him with a movie club order because he was unable to do it himself. "It was the kind of order form were [sic] you picked stamps of the movies you wanted, placed them in boxes on the form then sent the form in. He had me read all the titles of the movies on the stamps because he couldn't read them himself. I had to explain a few times how the form worked and what movies he was ordering before he finally understood." App'x at A-000632 (Kenny Velasquez).

- Although Mr. Sanchez often tried to mask his lack of understanding and confusion, his problems were apparent nonetheless. *See, e.g.*, App'x at A-000687-88 (Yolanda Vazquez) ("He would usually agree and smile when people asked him something. Or when something was complicated, he would act like he didn't care about it. I remember one time a school teacher was explaining to him why he didn't have enough credits to pass on to the next grade, and afterward he was like, whatever, that doesn't matter. But he looked confused to me.").

- Very shortly after Mr. Sanchez entered public school, his teachers recognized that he had disabilities that required specialized attention. The factual allegations and the documents offered in support thereof above in section (B) of this claim, *supra*, relating to Mr. Sanchez's functional academic deficits are incorporated by this reference as though fully set forth here.

From the time he was a child, Mr. Sanchez has exhibited deficits in social skills. Those deficits include but are not limited to the following:

105

- People who observed Mr. Sanchez when he was a child described him as a "clown," "goofy," "dopey," and "silly." He liked it when people laughed and wanted to please everyone. App'x at A-000660 (Mayra Garcia); *id*. at A-000664 (Nydia Sanchez); *id*. at A-000613 (Janice Coe); *id*. at A-000621 (Jason Vazquez); *id*. at A-000626 (Jeffrey Silverman); *id*. at A-000631-32 (Kenny Velasquez).

- Mr. Sanchez is universally described as a "follower." App'x at A-000621 (Jason Vazquez); *id*. at A-000667 (Nydia Sanchez); *id*. at A-000676 (Rachel Ramos); *id*. at A-000626 (Jeffrey Silverman); *see also id*. at A-001687 (Elsa Hernandez); *id*. at A-000576 (Ezequiel Sanchez); *id*. at A-000609 (Jamie Matos); *id*. at A-000613 (Janice Coe). His friends and teachers observed that Mr. Sanchez "did not have an original idea in his head," *id*. at A-000626 (Jeffrey Silverman), "always did whatever others wanted to do," *id*., "took no initiative but simply followed the will of the group," *id*., and "would go along with anything anyone told him to do and not really think about it," *id*. at A-000621 (Jason Vazquez). Although he had difficulty following rules, people did not perceive him as intentionally acting out but rather as unable to do what was expected. *Id*. at A-000626 (Jeffrey Silverman); *id*. at A-001698 (Juana Maria Sanchez); *id*. at A-000576 (Ezequiel Sanchez).

- Although friends liked him and thought he was sweet, they noted that often he did not engage actively with those around him. One friend described him as follows: "Ricky reminded me of two cartoon characters—Eeyore and Mr. Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding contact." App'x at A-000687 (Yolanda Vazquez).

- Mr. Sanchez's family members, romantic partners, and others described his gullibility in other situations as well. They note that Mr. Sanchez regularly was taken advantage of by his cousin, Danny Varela. Danny Varela and others Mr. Sanchez spent time with made fun of him, thought he was stupid, did not respect him, yelled at him, and ordered him around. Despite their treatment of him, Mr. Sanchez "did whatever Danny told him to." App'x at A-000577 (Ezequiel Sanchez). Family members perceived Mr. Sanchez as having no understanding that these individuals were taking advantage of him, and noted that he believed everything they told him and that they were trustworthy because Danny and others involved with him were family members. *Id*. at A-000624 (Juan Gutierrez) ("He seemed to do whatever Danny [Varela] and Daniel [Troya] wanted him to. They often sent him on errands that they did not want to do. Ricardo Jr. did not ask questions, he just did as he was told."); *id*. at A-000635 (Linda Velasquez) ("Rick seemed to be a do-boy for DV [Danny Varela] and his guys. . . . He was very loyal to them, even though they were not nice to him. He thought they were his friends but really they were just using him. He did anything they told him to do. I could tell they thought he was dumb."); *id*. at A-000662 (Mayra Garcia) ("Ricardo did whatever Danny [Varela] told him to do"); *id*. at A-000667 (Nydia

106

Sanchez) ("Ricky needed to be told what to do. He was a follower and did anything he was told. Danny [Varela] took advantage of this. I was with Ricky when he took a phone call from Danny. He just stood there while Danny screamed at him over the phone. Danny was so mean to him, and I could not believe that Ricky just did whatever Danny told him to."); *id.* at A-000676 (Rachel Ramos) ("Ricardo was a follower. He did whatever he was told. Danny [Varela] and his friends took advantage of Ricardo. He did whatever they wanted him to and he believed anything they told him. That was valuable to them.").

Mr. Sanchez has also exhibited deficits in practical skills beginning during the developmental period. These include but are not limited to the following:

- When Mr. Sanchez was approximately thirteen years old, he was unable to help his sister navigate their travel on buses from Florida to Texas to visit their grandmother. App'x at A-000664 (Nydia Sanchez).

- Special education providers working with Mr. Sanchez while he was in high school noted that he would not be able to obtain employment independently and would require assistance to find a job. They also reported that he required specialized instruction and curriculum and direct assistance for the majority of learning activities and weekly personal assistance, monitoring, and intervention in the area of independent functioning. He was "unable to plan and make realistic occupational training and job placement decisions." App'x at A-000616-17 (Janice Coe).

- After leaving school at age eighteen, prior to finishing tenth grade, Mr. Sanchez attempted to earn his GED but was not able to do so. App'x at A-000601 (Juana Maria Sanchez), A-000619 (Janice Coe).

- "Ricardo was slow. He behaved like someone much younger than he was. When Maria was in labor with [their son] at the hospital, he decided to leave the room and go sleep in the car for a few hours. He said that Maria was too loud and he could not sleep in the hospital room. It seemed so silly, like something a child would do. He was also forgetful and I had to remind him of things over and over . . . . I also had to remind him of important appointments or places he was supposed to be. When I asked him to do things for the baby or around the house, I had to give him instructions several times before he understood what I was asking." App'x at A-000674 (Rachel Ramos).

- Even after Mr. Sanchez moved out of his family home and had his own child, his younger sister helped to take care of him, including taking him to a bank to open his first account and filling out his job applications, leaving him only to sign the completed applications. App'x at A-000667 (Nydia Sanchez); *id.* at A-000675 (Rachel Ramos).

- Mr. Sanchez's girlfriend handled Mr. Sanchez's money. "She took his paycheck and made sure that it was cashed. Then she made sure I got money for rent and

107

anything that I purchased for the baby. Ricardo did not seem to know what to do with his money." App'x at A-000675 (Rachel Ramos). Mr. Sanchez's girlfriend also helped him find and apply for jobs; she read the classified ads to him. *Id*. She also helped him take his first driving test; "[h]e read very slowly and did not understand what most of the words meant." *Id*.

- Mr. Sanchez never lived independently, even after he stopped attending school; he lived with his family and with the family of his girlfriends or with other friends. App'x at A-000667 (Nydia Sanchez); *id*. at A-000673-74 (Rachel Ramos); *id*. at A-000634-35 (Linda Velasquez).

Had trial counsel provided the information of Mr. Sanchez's adaptive functioning deficits to Dr. Daniel Grant, the neuropsychologist he hired to evaluate Mr. Sanchez's intellectual and neuropsychological functioning and to testify to the jury, Dr. Grant "would have considered it important to a determination of intellectual disability." App'x at A-001639 (Daniel Hicky Grant, Ed.D.). Dr. Grant would have reached the following conclusions had he been given this information, nearly none of which he had at the time of Mr. Sanchez's trial:

> The information that Mr. Sanchez's current lawyers have provided indicates that Mr. Sanchez's adaptive functioning falls at the level of an intellectually disabled person. If I had had this information at the time of his trial, I would have concluded that Mr. Sanchez had impairments in the domains of communication, functional academics, and self-direction. The new information demonstrates that Mr. Sanchez has significant difficulty with independent functioning. Today, I conclude that Mr. Sanchez has significant impairments in conceptual and social domains (under the AAIDD rubric), or in communication and social participation domains (under the DSM rubric). The information from Mr. Sanchez's teachers that Mr. Sanchez's thinking was inflexible; that it was extremely difficult, and at times impossible, for Mr. Sanchez to perform multistep tasks; that he had difficulty switching from one task to another; that he was "not the brightest crayon in the box," and that he was a follower support these conclusions. Mr. Sanchez's performance in school and on psychological and neuropsychological tests demonstrates clear and significant impairments in functional academics and conceptual deficits.

> The descriptions provided by Mr. Sanchez's teachers, friends, and family members about Mr. Sanchez's difficulty understanding and complying with directions and the challenges that he had initiating and participating in conversations are consistent with the language deficits demonstrated by his performance on the psychological and neuropsychological instruments I administered to him and those administered to him during his childhood. Mr. Sanchez's language deficits do not arise from his being raised by Spanish-

108

speaking parents or the fact that he may have had more exposure to Spanish than to English during his early childhood. Mr. Sanchez has difficulty with receptive language: he has trouble with listening comprehension and encoding verbal information. These difficulties were supported by his deficits in processing skills noted on the psychological and neuropsychological tests administered to him. These impairments result in challenges to understanding concepts correctly and being limited in his ability to use language effectively as a problem-solving technique. Together these difficulties constitute significant impairments in communication and social participation.

The declarations of family members, teachers and educational personnel, and friends also provide ample evidence of impairments in self-direction. The people who knew and observed Mr. Sanchez throughout his life knew him to be a follower, someone who did not initiate plans or come up with his own ideas and instead someone who simply did what others around him did and told him to do.

There is also evidence that Mr. Sanchez had limitations in other domains, including home living and work. Mr. Sanchez never lived independently; even as an adult he lived with others who took care of his finances and household responsibilities, including his mother, his girlfriend, and his girlfriend's mother. Although Mr. Sanchez was able to obtain work and to perform some jobs, he did not keep any job for very long and at least once was let go for failing to meet expectations.

App'x at A-001637-38 (Daniel Hicky Grant, Ed.D.).

Mr. Sanchez alleged in the Motion that qualified mental health professionals have concluded, based on the information that current counsel has provided and that was available but not developed at the time of trial, that Mr. Sanchez is intellectually disabled. Dr. Grant, the trial expert, is one of those experts. App'x at A-001638 (Daniel Hicky Grant, Ed.D.). Mr. Sanchez is thus ineligible for the death penalty. Trial counsel's failure to develop and present this information to consulting experts, the court, and the jury was prejudicial.[24]

---

[24] Respondent states, "Where experts' findings are a mixed bag and contain evidence or opinions both helpful and harmful to the defense, the decision on whether to call such an expert should and must rest within the discretion of an experienced trial counsel." Resp. Opp. at 77. Respondent also asserts, "Sanchez's current complaint that counsel's failure to call all of the engaged experts to testify at trial also must fail." *Id*. Respondent misrepresents Mr. Sanchez's claim. Mr. Sanchez has alleged not that his counsel failed to call particular experts, but that counsel failed to develop and present particular mitigating mental health evidence, none of which was harmful to the defense.

#### 4.    Errors and omissions in consultation with mental health experts retained by the defense. (Claim VIIIE)

Mr. Sanchez alleged in his Motion that his counsel rendered prejudicially deficient performance in the consultation with the mental health experts retained during trial. He alleged that counsel failed to provide retained experts, including those who testified – Dr. Daniel Grant and Dr. Thomas Reidy – information about Mr. Sanchez's background and adaptive functioning adequate to enable them to reach reliable conclusions. Mr. Sanchez further alleged that counsel failed to ask any of the retained experts to assess Mr. Sanchez for psychiatric impairments, which was unreasonable given that counsel were aware of red flags for psychiatric problems, including that Mr. Sanchez had experienced chronic trauma throughout his life. In addition, Mr. Sanchez alleged that counsel were ineffective for permitting Mr. Sanchez to be administered tests of intellectual functioning on a repeated basis, resulting in artificially inflated IQ scores, and for then failing to understand the effect of the inflation and its implication for diagnosis. Mr. Sanchez also alleged that counsel unreasonably asked Dr. Reidy to explain to the jury how Mr. Sanchez's adverse life experiences led him to criminal behavior (an aggravating presentation) rather than to psychiatric illness and cognitive dysfunction (a mitigating presentation). Mr. Sanchez alleged that counsel failed to prepare Dr. Grant to testify. *See* Motion at 100-37, 142-56.

Respondent challenges very few of these allegations. Resp. Opp. at 73-74 & n.37 (arguing only that Mr. Sanchez's complaint that "the Government was able to effectively cross-examine Dr. Grant concerning handwritten notations Dr. Grant had made during his evaluation of Mr. Sanchez" does not require relief,[25] and that Mr. Sanchez's IQ scores were not skewed). The remainder of Mr. Sanchez's allegations are uncontested.

---

[25] In making this argument, counsel for Respondent commends the performance of his co-counsel in the prosecution of Mr. Sanchez, Assistant United States Attorney Kastrenakes. Counsel argues that Mr. Sanchez's counsel "did not somehow become incompetent when he

Respondent does not challenge Mr. Sanchez's allegation that counsel failed to provide the mental health experts they consulted with readily available information about Mr. Sanchez's background and functioning except to complain that Mr. Sanchez "fails to state, with any degree of specificity, what information was withheld, and from which experts it was withheld" and that he "provides no documentary evidence to indicate that the withheld information actually exists." Resp. Opp. at 67 n.33. Again, this argument asks the Court to ignore the detailed allegations and supporting documents Mr. Sanchez has filed. Respondent argues that trial counsel must have given information to their retained experts because Dr. Reidy testified about Mr. Sanchez's background. *Id.* But Mr. Sanchez alleged not that counsel gave no information to their experts but that counsel failed to provide critical information that would have changed those experts' conclusions.

Failure to provide readily available background information to retained mental health experts constitutes deficient performance. *Rompilla*, 545 U.S. at 392 (concluding that counsel's failure to present mitigating background information from the defendant's prior criminal file to their mental health experts was deficient because it resulted in the experts finding "nothing helpful to [his] case"); *see also Stanley v. Schriro*, 598 F.3d 612, 624 (9th Cir. 2010) ("Trial counsel has an affirmative duty to provide mental health experts with all information relevant to the formulation of their conclusions."). As set forth above, Mr. Sanchez's counsel did not provide Dr. Grant with critical information about Mr. Sanchez's background and adaptive functioning and the context in which Mr. Sanchez was evaluated and made eligible for special

---

turned over the glass to government counsel whereupon the glass of Dr. Grant's testimony was emptied by a piercing and illuminating cross-examination conducted by Assistant United States Attorney John S. Kastrenakes." Resp. Opp. at 73-74 n. 37. The argument does not address or refute Mr. Sanchez's allegation that his trial counsel failed to prepare Dr. Grant to testify. App'x at A-001640-41 (Daniel Hicky Grant, Ed.D.).

111

education as a child. App'x at A-001629, A-001631, A-001635-36 (Daniel Hicky Grant, Ed.D.).

Mr. Sanchez was prejudiced by this error because, had counsel provided Dr. Grant with

information and materials about these issues, Dr. Grant "would not have relied upon [the

childhood IQ score of 80] as an indication that Mr. Sanchez functioned above the intellectually

disabled level" and would have concluded "that Mr. Sanchez suffered significant limitations in

adaptive behavior throughout his life, consistent with the second prong of the diagnosis of

intellectual disability." *Id*. at A-001635-36 (Daniel Hicky Grant, Ed.D.).

Respondent does not contest Mr. Sanchez's allegation that counsel failed to provide their

retained experts with clear and appropriate referral questions. App'x at A-001640 (Daniel Hicky

Grant, Ed.D.) ("It was unclear to me what Mr. Murrell's purpose was in presenting my

testimony. The defense team had not explained to me what the penalty phase defense theory was

or how my testimony fit into it."). Dr. Grant had the distinct impression that "Mr. Murrell did not

really understand the neuropsychological tests and what the results meant and was unprepared to

handle testimony about psychological functioning." *Id*.

As described above, Respondent offers only a very weak response to Mr. Sanchez's

allegation that counsel erred by failing to direct any of the retained experts (or any other expert)

to evaluate Mr. Sanchez for psychiatric illness. The discussion above about the deficient

performance and prejudice arising therefrom is incorporated by this reference as though fully set

forth here.

Respondent does not address Mr. Sanchez's allegations that the questions counsel asked

Dr. Reidy unreasonably focused the jury's attention upon Mr. Sanchez's criminal behavior rather

than upon Mr. Sanchez's mental disorders and dysfunction, and that as a result the jury learned,

not that Mr. Sanchez's exposure to multiple risk factors led to psychiatric and cognitive

112

impairment that affected his behaviors in ways that he was not able to control, but instead that the risk factors simply led Mr. Sanchez to commit criminal acts. There was no reasonable basis for this decision.

Despite the fact that trial counsel was or reasonably should have been aware that repeated administrations of intelligence tests can result in the subject obtaining artificially inflated scores upon the later-administered tests, that tests normed many years prior to administration also produce artificially elevated scores, and that therefore the scores that Mr. Sanchez obtained on the IQ tests administered in December 2008 did not accurately represent his true IQ, counsel failed to present this information to the jury. Counsel failed to question Dr. Grant about the manner in which the practice effect may have affected Mr. Sanchez's score on the WAIS-IV in early December 2008 and his score on the WAIS-III later that month. If counsel had asked this question of Dr. Grant, the jury would have heard the following information:

> Research has demonstrated that upon repeated administrations of a Wechsler instrument, an individual's scores typically rise because of increased familiarity with the test. In particular, an individual's scores on the non-verbal, primarily performance-based portions of the instrument typically rise because over repeated administrations those portions lose their novelty, which means that the individual has already had practice figuring out strategies for solving the problems they pose. These improvements are due to practice effects rather than true change in intellectual functioning. The practice effect is observed both in people with typical neurological functioning as well as in people with impaired functioning and neurological disease.
>
> When the Wechsler is administered repeatedly over a relatively short period of time, as it was in Mr. Sanchez's case, this practice effect is exacerbated. In addition, because Mr. Sanchez's relative strengths are in non-verbal skills, the practice effect was further intensified.
>
> Mr. Sanchez's scores on both my administration of the WAIS-IV and Dr. Brannon's administration of the WAIS-III are likely to reflect practice effect, that is, a score that reflects an artificially inflated IQ. The score of 77 that Mr. Sanchez obtained on my administration of the WAIS-IV demonstrates a less extreme practice effect than the score of 89 that he obtained on Dr. Brannon's administration of the WAIS-III. There are several reasons for this difference: first, I administered the WAIS-IV over five months after Mr. Sanchez had last taken a

> Wechsler test, while Dr. Brannon administered the WAIS-III approximately three weeks after I administered the WAIS-IV, so many items on the test as well as the test format itself were fresh in Mr. Sanchez's mind when Dr. Brannon tested him. Second, the WAIS-IV, although similar in many ways to the WAIS-III, was nonetheless a different test with different items and a few different subtests, and Mr. Sanchez had not been exposed to the exact same test previously. Third, Dr. Brannon's administration of the WAIS-III to Mr. Sanchez was the third time in nine months that Mr. Sanchez encountered the same test items.

App'x at A-001633-34 (Daniel Hicky Grant, Ed.D.).

Counsel also knew or reasonably should have known that when outdated IQ tests with outdated norms are administered, scores overestimate the subject's true IQ. Mr. Sanchez was administered the WAIS-III three times in 2008. This test was normed in 1995, and was thirteen years old at the time it was administered. Thus, the scores that Mr. Sanchez obtained on these tests overestimated his true IQ. Nevertheless, counsel failed to present this information to the jury. Counsel could have, but did not, elicit the following information about the effect of outdated test norms from Dr. Grant:

> The scores that Mr. Sanchez achieved on the three administrations of the WAIS-III in 2008 also reflect inflation as a result of the fact that the norms to which Mr. Sanchez was compared were outdated. This outdating of norms as an IQ test instrument ages is commonly known as the Flynn effect, named after the psychologist whose research documents this phenomenon. Dr. Flynn's research indicates that scores on the Wechsler scales increase by three points over the course of a decade, or by approximately 0.33 points each year. The WAIS-III was normed in 1995. Thus, by the time of its administration to Mr. Sanchez in March 2008, June 2008, and December 2008, it inflated Mr. Sanchez's scores by approximately 3.9 (13 years x 0.33/year) points. If Mr. Murrell had asked me about the practice effect, I would have provided him with this explanation and would have testified to this before the penalty phase jury.

App'x at A-001634 (Daniel Hicky Grant, Ed.D.).

**D.      Failure to Investigate and Present Evidence that Mr. Sanchez Was Incompetent to Stand Trial.**

Counsel have a duty to ensure that their clients are not tried while incompetent. *Futch v. Dugger*, 874 F.2d 1483, 1486-87 (11th Cir. 1989). "Counsel could have been ineffective either

by failing to make reasonable investigation into [Mr. Sanchez's] competency or by failing to make a reasonable decision that such investigation was unnecessary." *Id*. at 1487. Here, counsel did neither.

Trial counsel were aware that Mr. Sanchez had significant difficulty understanding the significance of the charges against him, the strength of the evidence the prosecution had marshalled against him, and the legal proceedings. *See, e.g.*, App'x at A-001670 (Donnie Murrell) ("I had serious concerns about whether and to what extent Mr. Sanchez understood the trial process. . . . During trial proceedings, he often sat in court mimicking what his co-defendants were doing. He also drew pictures much of the time. I would tell him what I planned to do and he did not argue with me or challenge me on any decisions I made.").

Counsel's observations of and contact with Mr. Sanchez led them to consider moving the trial court to make accommodations for Mr. Sanchez in the courtroom to maximize his understanding of the proceedings. App'x at A-001670 (Donnie Murrell). Counsel unreasonably and prejudicially abandoned pursuing this motion not because they concluded that Mr. Sanchez could understand the proceedings after all, but simply because they determined that Mr. Sanchez would not disrupt the proceedings. *See id*.

Counsel also failed to inquire of the mental health experts they retained about the effects of Mr. Sanchez's impairments upon his comprehension of the trial proceedings. Had counsel asked Dr. Grant, he would have advised them of the following:

> [D]ue to Mr. Sanchez's low intellectual functioning and his impaired language
> and verbal functioning, he experiences difficulty processing and comprehending
> incoming stimuli and information and needs more time to accurately process that
> information in order to comprehend the meaning of what had transpired. . . .
> [I]nformation may need to be repeated and/or discussed with his counsel for him
> to fully comprehend the proceedings. . . . [I]t was critical to take frequent breaks
> in the proceedings, and that these breaks should occur at least as often as after the
> testimony of each witness, and should last long enough for the attorneys to review

115

> the testimony with Mr. Sanchez, explain what was important in the testimony to him, and ask him questions to ensure that he understood what had happened. . . . [W]ithout these accommodations, Mr. Sanchez would not be able to understand the evidence presented.

App'x at A-001639-40 (Daniel Hicky Grant, Ed.D.). Dr. Grant also would have prepared an affidavit to the court in support of a motion for accommodations in the courtroom had counsel asked him to do so. *Id.*

As a result of counsel's unreasonable decisions, Mr. Sanchez's inability to understand the nature and consequences of the proceedings against him or rationally or properly assist counsel in the preparation and conduct of his defense was never communicated to the trial court, and Mr. Sanchez was tried while incompetent. In order to avoid unnecessary duplication, the factual allegations and supporting documents and legal authorities set forth in Claim Four of this Reply are hereby incorporated by this reference.

Despite having sat through an entire trial following which the jury found him guilty of four counts of first degree murder in addition to other charges, and a penalty phase following which the jury handed down death verdicts on two of the murder counts, Mr. Sanchez still did not understand what was happening during the sentencing proceedings. As counsel explained, "[N]ear the end of the formal sentencing proceeding, Judge Hurley imposed a term of supervised release on one of the convictions. Mr. Sanchez then asked me if he had received probation." App'x at A-001670 (Donnie Murrell).

### E. Failure to Identify and Present Evidence of Mr. Sanchez's Traumatic Background and Disabilities from Documents in Counsel's Possession.

Mr. Sanchez has alleged that his counsel unreasonably and prejudicially failed to introduce into evidence documentary records in their possession and to present testimony explaining accurately the contents thereof. Motion at 147-54. The Constitution requires counsel to review "readily available file[s]," *Rompilla*, 545 U.S. at 385, and conduct a reasonable

investigation based on the contents thereof. *Wiggins*, 539 U.S. at 527-28 (holding that counsel's failure to conduct an investigation "[i]n light of what . . . records actually revealed" prior to resolving upon a penalty phase theory constituted deficient performance).

The government responds that Mr. Sanchez has not "exhibit[ed these documents] to his motion and therefore fails to substantiate that these documents exists [sic] or that they contain the information that Sanchez now claims they contain." Resp. Opp. at 71. Mr. Sanchez, however, filed an Appendix with documents including Mr. Sanchez's employment records, his father's criminal records, a record of Mr. Sanchez's treatment for an overdose of seizure medication ingested as a toddler, records of Mr. Sanchez's birth and his mother's limited prenatal care while pregnant with him, and declarations explaining in detail the contents of Mr. Sanchez's special education records. App'x at A-000233-328 (Bethesda Memorial Hospital Records); *id*. at A-000329-30 (Palm Beach Non Crime Offense Report); *id*. at A-000896-1068 (Ricardo Sanchez, Sr., Comprehensive Criminal Records); *id*. at A-001509-60 (Divosta Homes Records on Ricardo Sanchez, Jr.); *id*. at A-000604-07 (Frances Lenore Wolfe); *id*. at A-000612-19 (Janice Coe); *id*. at A-000625-28 (Jeffrey Silverman); *id*. at A-000669-72 (Patricia Replogle); *id*. at A-000683-86 (Wanda Lee); *id*. at A-000731-38 (Francis Crosby, Psy.D.). These documents, with the exception of the declarations explaining the special education records, were in trial counsel's possession at the time of trial and they "substantiate" the detailed allegations in the Motion.

Respondent also contends that the information contained in the documents "would have been cumulative of the bleak and depressing story of Sanchez' [sic] childhood that was established by penalty counsel." Resp. Opp. at 71-72. This is not so. The documents that were not introduced contained information that was different from the information provided to the jury, and the declarations explaining the meaning and significance of Mr. Sanchez's school

117

records provided information that was different from, and much more mitigating than, that

"submitted to, and accepted by, the jury." *Id*. at 72.

Had trial counsel introduced these documents and their contents at the penalty phase, and

conducted an investigation based upon the information in these documents, the jury would have

learned the following mitigating facts:

- Mr. Sanchez's mother received no prenatal care while pregnant with Mr. Sanchez. App'x at A-000272 (Bethesda Memorial Hospital Records).

- Mr. Sanchez's mother suffered from two urinary tract infections while pregnant with Mr. Sanchez, did not complete her course of antibiotics for the first of these infections, and was hospitalized for the second when she was approximately thirty-eight weeks pregnant. App'x at A-000272, A-000303, A-000310 (Bethesda Memorial Hospital Records).

- Mr. Sanchez's mother bled abnormally while in labor with Mr. Sanchez. App'x at A-000272 (Bethesda Memorial Hospital Records); *id*. at A-001694 (Juana Maria Sanchez).

- When he was approximately thirty months old, Mr. Sanchez ingested eighteen of his elder brother's seizure pills and had to be taken by ambulance to the emergency room and treated. App'x at A-000330 (Palm Beach Non Crime Offense Report); *id*. at A-001695-96 (Juana Maria Sanchez). Mr. Sanchez lost consciousness and was in a coma for several hours. *Id*. at A-001695-96 (Juana Maria Sanchez); *id*. at A-000663 (Nydia Sanchez).

- Mr. Sanchez's father was arrested for an assault on a police officer in June 1994, when Mr. Sanchez was ten years old. App'x at A-000515-16 (Ricardo Sanchez, Sr. Arrest Record).

- Mr. Sanchez's father was arrested for shooting Mr. Sanchez's mother in the face when Mr. Sanchez's mother was sixteen years old and pregnant with their first child. App'x at A-000517-40 (Ricardo Sanchez, Sr. Arrest Record).

- Mr. Sanchez was terminated from his job at Divosta Homes *twice* because he did not arrive to work on time and did "not work[] up to Divosta expectations." App'x at A-001540 (Divosta Homes Records). After he was rehired following his first termination, Mr. Sanchez continued to be unable to arrive to work in a timely fashion and was discharged again for the same reason. *Id*. at A-001528.

- Mr. Sanchez's difficulties in school were much more profound and he demonstrated greater disability there than the information presented at trial indicated. To avoid unnecessary duplication, the factual allegations and

118

supporting documents set forth in section (B), *supra*, are incorporated as though fully set forth here.

**F.         Failure to Impeach and Discredit the Testimony of Michael Brannon.**

As set forth in the Motion, trial counsel failed to discredit the testimony of prosecution expert Michael Brannon on critical points and as a result left his erroneous and prejudicial testimony uncontested. Clearly established federal law requires trial counsel to make "'efforts to discover evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guidelines, Guideline 11.4.1.C).

Respondent's response to Mr. Sanchez's allegations is simply that counsel did challenge Dr. Brannon's testimony by seeking to limit it through a motion in limine and by conducting some cross-examination. Mr. Sanchez acknowledges that counsel sought to limit Dr. Brannon's testimony and conducted some cross-examination of him (and Mr. Sanchez set those facts out in the Motion). He alleges not that trial counsel did nothing, but rather that counsel failed to act as an effective advocate by failing to take other action that any reasonably effective attorney would have taken to discredit Dr. Brannon's extremely damaging rebuttal testimony. *See Sears*, 561 U.S. at 954 ("We have never limited the prejudice inquiry under *Strickland* to cases in which there was only 'little or no mitigation evidence' presented.").

Trial counsel failed to elicit from Dr. Brannon any information about the disclaimer in his report that his conclusions were limited by the fact that he lacked critical background information about Mr. Sanchez, including "medical records, academic records, mental health records, occupational records, and contact information for collateral sources of data such as relatives, friends, or treating professionals." App'x at A-001561 (Report of Michael P. Brannon, Psy.D.). This failure was prejudicial because Dr. Brannon testified that because Mr. Sanchez reported to him that he was not subject to abuse or violence at home and that his relationship

119

with his parents was "good," Dr. Brannon concluded that Mr. Sanchez was not adversely affected by his childhood experiences. Motion at 157; Tr. 9319-20, 9324-26. Had counsel addressed the disclaimer in Dr. Brannon's report during cross-examination, and confronted Dr. Brannon with the information about the abuse Mr. Sanchez suffered available from "collateral sources of data such as relatives, friends, or treating professionals," counsel would have been able either to alter Dr. Brannon's conclusion with regard to Mr. Sanchez's childhood experiences or to reveal his conclusions as lacking in credibility. Furthermore, counsel were aware from Dr. Brannon's report, which they had prior to the presentation of their defense case at the penalty phase, that Mr. Sanchez had not described his father's abuse of him and his family members to Dr. Brannon. Reasonably effective counsel therefore would have anticipated testimony consistent with Dr. Brannon's report and taken steps to ensure that their own experts addressed the impact of this abuse on Mr. Sanchez's psychiatric functioning.

Respondent misrepresents Mr. Sanchez's Motion, stating that "Sanchez complains that counsel should have engaged yet another mitigation expert to conduct another intelligence test of Sanchez, that is, to conduct a sort of sur-rebuttal investigation to contradict Dr. Brannon's testimony." Resp. Opp. at 83. Mr. Sanchez made no such allegation; instead, Mr. Sanchez alleged that reasonably effective counsel would have asked the experts with whom counsel did consult, or another expert who simply reviewed the testing, to present testimony explaining the invalidity of the IQ score of 89 that Dr. Brannon had obtained. "[I]n the absence of a defense expert to challenge his findings [and testimony], it was all but assured that Dr. [Brannon]'s testimony would carry great weight with the jury." *Eze v. Senkowski*, 321 F.3d 110, 130 (2d Cir. 2003).

120

Counsel could and should have presented a challenge to this IQ score through the testimony of Dr. Grant as well as through testimony of an expert in psychological testing such as Dr. Kevin McGrew. Counsel were aware of the score that Dr. Brannon had obtained prior to putting on the defense case at the penalty phase, and therefore could and reasonably should have presented testimony during the defense case-in-chief to establish the invalidity of Dr. Brannon's IQ score.

The conclusions Dr. McGrew would have testified to are set forth in the Motion at page 26 n.8, and in the Appendix at pages A-000778-79, A-000785, and A-000791-94. With regard to the score of 89 obtained on Dr. Brannon's administration of the WAIS-III, Dr. McGrew concluded that it "is an invalid score and should not be considered when formulating a clinical determination of whether Mr. Sanchez is, or is not, intellectually disabled." *Id*. at A-000794.

Dr. Grant would have testified that (1) Dr. Brannon's administration of the WAIS-III was likely to have reflected practice effect, i.e., a score that reflects an artificially inflated IQ, because (a) Dr. Brannon administered the WAIS-III approximately three weeks after Dr. Grant administered the WAIS-IV, and many items on the test as well as the test format itself were fresh in Mr. Sanchez's mind when Dr. Brannon tested him; (b) Dr. Brannon's administration of the WAIS-III to Mr. Sanchez was the third time in nine months that Mr. Sanchez encountered the same test items; and (2) the score Dr. Brannon obtained reflected inflation because the norms to which Mr. Sanchez was compared were outdated. App'x at A-001633-35 (Daniel Hicky Grant, Ed.D.).

Counsel also could have and reasonably should have consulted with experts to evaluate Dr. Brannon's testimony, in order to prepare adequately to cross-examine Dr. Brannon about the false and unreliable testimony he rendered on direct examination. If counsel had done so, counsel

121

would have been able to undermine the validity of Dr. Brannon's testimony in the following

respects:

- Dr. Brannon's testimony that Mr. Sanchez could "plan out how events happen over time and anticipate what would happen" (Tr. 9296) could have been refuted by testimony by Dr. Grant that "Mr. Sanchez also demonstrated impairments in executive functioning skills, such as impulsivity and inability to inhibit actions, which are associated with the frontal lobes of the brain." App'x at A-001630 (Daniel Hicky Grant, Ed.D.); *id.* at A-001637 ("[I]t was extremely difficult, and at times impossible, for Mr. Sanchez to perform multistep tasks; that he had difficulty switching from one task to another."); *id.* at A-001638 (he was unable to "initiate plans or come up with his own ideas and instead [was] someone who simply did what others around him did and told him to do"); *see also id.* at A-000757-62 (Joette Deanna James, Ph.D.) (reporting that neuropsychological testing indicated that Mr. Sanchez has impairments in executive functioning that prevent him from "think[ing] abstractly" and contribute to his having "difficulty making goal-directed decisions, particularly in circumstances that are stressful or present complex cognitive or emotional stimuli").

- Dr. Brannon's testimony that Mr. Sanchez "is also good at the kinds of things that require him to see something and then as a result of whatever he sees, make decisions about the right way to handle that task," Tr. 9296, could and should have been explained and tempered by testimony of Dr. Grant that although Mr. Sanchez's strengths rest in his visual skills, the difficulties he experiences with verbal information prevent him from making effective decisions in most contexts because they "result in challenges to understanding concepts correctly and being limited in his ability to use language effectively as a problem-solving technique." App'x at A-001638 (Daniel Hicky Grant, Ed.D.); *see also id.* at A-000772 (Joette Deanna James, Ph.D.) (reporting that Mr. Sanchez's deficits prevent him from processing information from the environment and using that information immediately or at later times).

- Dr. Brannon's testimony that there is no statistical way to determine/quantify adverse outcomes for negative childhood experiences, Tr. 9332-33, could and should have been refuted by multiple sources. *See, e.g.*, App'x at A-001654 (Kaiser ACE Study) ("Persons who had experienced four or more categories of childhood exposure, compared to those who had experienced none, had 4- to 12-fold increased health risks for alcoholism, drug abuse, depression, and suicide attempt; a 2- to 4-fold increase in smoking, poor self-rated health, ≥ 50 sexual intercourse partners, and sexually transmitted disease; and a 1.4- to 1.6 fold increase in physical inactivity and severe obesity. . . . The seven categories of adverse childhood experiences were strongly interrelated and persons with multiple categories of childhood exposure were likely to have multiple health risk factors later in life."); *id.* at A-000697 (Louis James Kraus, M.D.) ("Most individuals exposed to [traumatic] events suffer immediate overwhelming psychological or physical symptoms. The extent to which a person suffers long

122

term effects of the trauma depends upon factors including the chronicity and intensity of the experiences, the age at which they occur, and the presence or absence of other stressors or protective factors.").

**G.     Failure to Investigate, Challenge, and Mitigate the Evidence Introduced in Aggravation.**

At the time of Mr. Sanchez's penalty trial, it was widely understood that, as part of counsel's general duty to investigate, trial counsel must make "'efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting 1989 ABA Guidelines, Guideline 11.4.1.C); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299, 337 (1983) ("[D]efense counsel must investigate and prepare a rebuttal case against any evidence of other crimes or circumstances in the defendant's background which the prosecution may be permitted to introduce in aggravation at the penalty phase."). Counsel's duty to investigate included a duty "to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Rompilla*, 545 U.S. at 377.

Mr. Sanchez alleged in the Motion that his counsel were ineffective for failing to investigate the circumstances surrounding the events presented by the prosecution in aggravation at the penalty phase, particularly the uncharged Haverhill, Suwanee, and Mercer shootings. Motion at 159-62. Counsel failed to investigate the possibility that Mr. Sanchez may not have participated in these events at all, and failed to investigate and present evidence that if he was involved, he played a minor role and that his culpability was diminished by his intellectual, neuropsychological, and psychiatric impairments. *Id*.

Respondent does not refute Mr. Sanchez's allegations that his counsel rendered deficient performance by failing to investigate Mr. Sanchez's role in these shootings. Instead, Respondent

123

sets forth numerous citations standing for irrelevant premises, such as that "[c]omplaints of uncalled witnesses are disfavored" and that "there exists 'no absolute duty to investigate particular facts or a certain line of defense.'" Resp. Opp. at 56 (citations omitted). Respondent also challenges the allegations of prejudice by arguing that (1) Mr. Sanchez offered no affidavits of witnesses who contradicted the testimony of Kevin Vetere that Mr. Sanchez was involved in these shootings; (2) Mr. Sanchez has produced no expert reports to support his claim of intellectual impairment; and (3) the government introduced evidence to establish that casings found at the Haverhill Road shooting were 9 millimeter casings and therefore could have come from a 9 millimeter weapon found at Garden Court. Resp. Opp. at 57-59.

None of Respondent's challenges has merit. Mr. Sanchez has submitted several expert declarations describing Mr. Sanchez's intellectual, neuropsychological, and psychiatric impairments. App'x at A-000689-713 (Louis James Kraus, M.D.); *id*. at A-000731-38 (Francis Crosby, Psy.D.); *id*. at A-000747-76 (Joette Deanna James, Ph.D.); *id*. at A-000777-820 (Kevin McGrew, Ph.D.); *id*. at A-001627-41 (Daniel Hicky Grant, Ed.D.).

Mr. Sanchez also set forth in detail in the Motion facts in the law enforcement records of the investigation of the Haverhill Road shooting that contradict Mr. Vetere's testimony and strongly suggest that perpetrators other than Mr. Sanchez were responsible for this shooting. Motion at 160-61; *see also* App'x at A-000875-95. Counsel had this information and yet failed to use it to cross-examine Mr. Vetere, or present it through testimony of investigating officers or other witnesses. Mr. Vetere's testimony should have been viewed with great skepticism: he pled guilty to charges stemming from his relationship with and participation in Mr. Varela's drug dealing business and received protection as well as leniency for testifying against Mr. Sanchez.

124

The failure to use the materials in counsel's possession to impeach Mr. Vetere's damaging testimony was unreasonable and prejudicial to Mr. Sanchez.

Although Respondent argues that Mr. Sanchez "submitted no . . . scientific test which contradict[s] the evidence at trial," Resp. Opp. at 61, this is untrue. Mr. Sanchez alleged in Claim VII of the Motion that trial counsel unreasonably and prejudicially failed to challenge the toolmark evidence presented at trial. Motion at 81-87. He also submitted a supporting declaration by James Gannalo, a criminalist with expertise in firearms, firearms operability and identification, and shooting scene investigation, opining that the conclusions and testimony rendered by the prosecution toolmark experts at trial "were unreliable and did not conform to established standards within the field." App'x at A-000746.

The government ultimately relies, as it does throughout the Opposition, on the argument that given "the brutal nature of Sanchez's crimes, Sanchez has not and indeed cannot establish that additional investigation concerning the uncharged shootings would have resulted in a lesser sentence." Resp. Opp. at 61. To the contrary, evidence that Mr. Sanchez was involved in additional shootings was particularly prejudicial here, where Mr. Sanchez's personal role in the homicides of the Escobedos was far from clear because the prosecution presented no eyewitnesses to what had occurred. The evidence was designed to, and did, persuade the jury that Mr. Sanchez had fired weapons and injured people on numerous occasions in addition to the homicide of the Escobedos. The failure to challenge this evidence was clearly prejudicial.

**H.      Failure to Object to the Prosecution's Misconduct During the Penalty Phase.**

Counsel's failure to object to improper evidence or argument may constitute ineffective assistance just as any abrogation of counsel's duty of competence and responsibility to his or her client may constitute ineffective assistance of counsel. *See, e.g.*, *Hodge v. Hurley*, 426 F.3d 368, 371-72 (6th Cir. 2005) (reversing denial of habeas relief where counsel failed to object to

prosecutor's misconduct during closing argument); *Burns v. Gammon*, 260 F.3d 892, 894 (8th

Cir. 2001) (reversing denial of habeas relief where counsel failed to object to prosecutor's

argument condemning petitioner for exercise of Sixth Amendment right); *Combs v. Coyle*, 205

F.3d 269, 272-73 (6th Cir. 2000) (reversing denial of habeas relief where counsel failed to object

to violation of client's Fifth Amendment right); *Gravley v. Mills*, 87 F.3d 779, 782 (6th Cir.

1996) (reversing denial of habeas relief for failure to object to prosecutorial misconduct); *Crotts*

*v. Smith*, 73 F.3d 861, 866-67 (9th Cir. 1996) (holding that trial counsel's failure to object to

prejudicial testimony introduced by the prosecutor constituted ineffective assistance), *superseded*

*by statute on other grounds, as stated in Van Tran v. Lindsay*, 212 F.3d 1148 (9th Cir. 2000).

Trial counsel rendered ineffective assistance by failing to object to the prosecution's

misconduct during the penalty phase. Motion at 162-63. The government responds that the

prosecution did not commit misconduct, and in the alternative, that even if the prosecution did

commit misconduct, that misconduct and counsel's failure to object to it were not prejudicial

because the trial court instructed the jury that "the lawyers' comments were not evidence." Resp.

Opp. at 101. This argument is unavailing. In evaluating whether a prosecutor's conduct is

unconstitutional, the Eleventh Circuit

> generally do[es] not analyze whether a particular comment or action is
> unconstitutional, unless the conduct violates an expressly enumerated right. *See*
> *Donnelly v. DeChristoforo*, 416 U.S. at 643, 94 S.Ct. at 1871; *Brooks*, 762 F.2d at
> 1400. Instead, [the Court] determine[s] whether a remark or a series of remarks, in
> the context of that trial, rendered the entire trial unfair. *Id*. Therefore, the essence
> of such a claim is that the prosecutor's conduct as a whole violated the Fourteenth
> Amendment due process right to a fair trial. Different factors have been utilized
> by various courts in order to decide whether or not the cumulative errors at trial
> could be said to have, in reasonable probability, changed the result at trial
> including: 1) the degree to which the challenged remarks have a tendency to
> mislead the jury and to prejudice the accused; 2) whether they are isolated or
> extensive; 3) whether they were deliberately or accidentally placed before the
> jury; and 4) the strength of the competent proof to establish the guilt of the
> accused. *Id*. at 1402, *Walker v. Davis*, 840 F.2d 834, 838 (11th Cir. 1988).

126

*Davis v. Zant*, 36 F.3d 1538, 1546 (11th Cir. 1994).

Respondent's approach is directly contrary to Eleventh Circuit law; Respondent looks at the prosecutor's improper comments and actions and urges the Court to determine that each individually did not establish a constitutional violation. This Court should instead do what the Eleventh Circuit requires: "determine whether [the] series of remarks [that Mr. Sanchez has alleged constituted misconduct], in the context of that trial, rendered the entire trial unfair." *Id.*

Mr. Sanchez alleged that the prosecution's misconduct to which counsel did not object included the following improper acts: misrepresenting facts and denigrating the defense by contending that the trauma the defense had presented was "a figment of the imagination," Tr. 9515; misrepresenting law and facts when telling the jury that a sentence of life in prison would make this crime "just like any other murder, just drug dealers," Tr. 9522; mispresenting the law by stating that the jury was required to impose the death penalty in order to represent "the conscience of this community," Tr. 9606; denigrating the defense and urging the jury to disregard evidence in mitigation by arguing that it was "disgusting" for the defense to present photographs of Mr. Sanchez's child and "beg . . . for mercy when they know that [Mr. Sanchez] killed a child of exactly that same age," Tr. 9611; misrepresenting the facts by minimizing Mr. Sanchez's father's abuse of his family, Tr. 9612; and misrepresenting the facts and law by arguing that Mr. Varela was not "an equally culpable co-defendant," Tr. 9636-37.[26]

As a result of the unchallenged misconduct, the jurors were left with the understanding that counsel representing Mr. Sanchez had lied to them about Mr. Sanchez's traumatic upbringing and that counsel had engaged in dishonest and contemptible behavior by presenting

---

[26] Assistant United States Attorney Carlton delivered the prosecution's closing argument after all parties rested, and Assistant United States Attorney Kastrenakes delivered the prosecution's argument in rebuttal following the presentation of arguments by Mr. Murrell for Mr. Sanchez and Mr. Eisenberg for Daniel Troya. Most of the misconduct alleged in the Motion occurred during Mr. Kastrenakes's rebuttal argument, which begins at page 9604 of the trial transcript.

127

evidence about Mr. Sanchez's close relationship with his child. The jurors also were left to speculate about the government's special, undisclosed information that Mr. Varela had nothing to do with the Escobedo homicides. The prosecution's appeal to the jury during its rebuttal argument that imposing a death sentence on Mr. Sanchez was the only way to properly act as the "conscience of the community" was calculated to, and did, inflame the jury to reject a lesser sentence. *See United States v. Beasley*, 2 F.3d 1551, 1560 (11th Cir. 1993); *United States v. Bascaro*, 742 F.2d 1335, 1354 (11th Cir. 1984). Counsel's failure to object to the prosecutors' misconduct and its cumulative effect rendered the trial unfair and requires the grant of relief.

## I.       Failure to Object to Penalty Phase Jury Instructions that Interfered with the Jury's Consideration of Proffered Mitigating Factors.

Mr. Sanchez alleged in the Motion that his trial counsel rendered ineffective assistance by failing to advance important objections to jury instructions regarding the jury's consideration of proffered factors in mitigation. Motion at 163-64. Respondent misconstrues these allegations, contending that counsel cannot have been ineffective because counsel objected to these jury instructions. Resp. Opp. at 83-89. Although Respondent says that counsel objected to the instruction "not once, but twice" and that the objection was overruled "as the law was not on his side," Resp. Opp. at 89, counsel did not make the objection that they should have made – that the jurors should not be instructed that it was up to them to decide whether the factors proffered in mitigation were in fact mitigating. It is simply untrue that because counsel objected to the instructions on other bases, counsel cannot be found ineffective for failing to object on other, meritorious legal grounds. *See, e.g.*, *United States v. Hughes*, 840 F.3d 1368 (11th Cir. 2016) (holding that jury instruction would be reviewed only for plain error with respect to claim that there was no basis under circuit precedent to instruct the jury to draw negative inferences when defendant had objected to the instruction on a different ground at trial); *United States v.*

128

*Cardena*, No. 12-3680, 2016 WL 6819696 (7th Cir. Nov. 18, 2016) (holding that defendant had waived argument on appeal that photo array was unduly suggestive when defendant had objected to the array only on the ground that there was a lack of foundation to admit it).

Trial counsel has a duty to request that the jury be instructed in accordance with the law and consistent with the defense theory of the case. *See Pirtle v. Morgan*, 313 F.3d 1160, 1169 (9th Cir. 2002) (finding trial counsel's performance deficient where trial counsel failed to request an instruction that was supported by the evidence and was consistent with the defense's theory of the case); *United States v. Span*, 75 F.3d 1383, 1389 (9th Cir. 1996) (holding that trial counsel's failure to request an instruction relevant to a particular defense "inadvertently lost" their client that defense). Where trial counsel objects to jury instructions on one ground, but fails to raise other objections to those instructions, claims that the instructions were erroneous are waived unless raised as a claim of ineffective assistance. *See, e.g.*, *Hughes*, 840 F.3d 1368; *Yeck v. Goodwin*, 985 F.2d 538, 542 (11th Cir. 1993) (holding that although defendant objected to the admissibility of evidence, because he failed to request a limiting instruction on the admissibility of the evidence and failed to request a charge to the jury on mistake of fact, those claims were procedurally defaulted).

Counsel proposed a number of mitigating factors that the trial court prohibited to be submitted to the jury on the grounds that they were not constitutionally relevant, e.g., that the execution of Mr. Sanchez would cause trauma to his son and his mother, Tr. 9424-27; that if Mr. Sanchez were not executed he could continue to be a father to his son and provide support to his son's mother, Tr. 9427-28; that residual doubt regarding Mr. Sanchez's guilt made a death sentence unjustified, Tr. 9436-37; and that Mr. Sanchez is an individual with the ability to establish and maintain relationships and his life has value, Tr. 9439-40. The trial court

129

determined as a matter of law whether proposed factors were not mitigating, and excluded those factors from the jury's consideration. Respondent cites a number of cases for the premise that jurors are entitled to give mitigating factors little or no weight, Resp. Opp. at 88 n.42, but those cases are inapposite. While the jurors were legally permitted to find true or not true the mitigating factors, and after they found mitigating factors true they were permitted to accord much or little weight to those factors, they were not permitted by law to determine whether the factors submitted to them were in fact mitigating, because the court had already made that determination as a matter of law.

J.      **Cumulative Prejudice from Ineffective Assistance of Counsel.**

Supreme Court precedent demands that in assessing prejudice, this Court evaluate the totality of the available mitigation evidence – that adduced at trial and that adduced in post-conviction – and reweigh it against the evidence in aggravation. *Williams*, 529 U.S. at 397-98. "In that process, what matters is not merely the number of aggravating or mitigating factors, but their weight." *Reed v. Sec'y, Fla. Dep't of Corr.*, 593 F.3d 1217, 1240-41 (11th Cir. 2010). Relief is required where, in considering the evidence presented in post-conviction along with the evidence presented at trial, "at least one juror would have struck a different balance" in weighing the aggravation against the mitigation. *Wiggins*, 539 U.S. at 537. That threshold is met here for all of the reasons set forth above and in Mr. Sanchez's prior submissions.

**CLAIM XI: MR. SANCHEZ IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL AND STATUTORY VIOLATIONS DESCRIBED IN THE MOTION.**

In the Motion, Mr. Sanchez alleged that he is entitled to relief based on the well-recognized doctrine of cumulative error or prejudice flowing from multiple constitutional violations. Motion at 185-86; *see Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due

130

process guarantee of fundamental fairness); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

The government appears to accept that cumulative error is an accepted legal principle, but argues that there are no errors to cumulate. Resp. Opp. at 102-03. Mr. Sanchez submits that he has in fact demonstrated numerous errors that should be cumulated, as shown here and in his prior submissions.

Confusingly, the government then asserts that cumulative prejudice analysis "is not approved in *Strickland*," and suggests that the "cumulative error doctrine [does not] even survive[] the *Strickland* decision." Resp. Opp. at 103 & n.44 (citing *Johnson v. Nagle*, 58 F. Supp. 2d 1303, 1352 (N.D. Ala. 1999)). This assertion is inconsistent with *Strickland* itself, with subsequent Supreme Court decisions, and with the numerous Eleventh Circuit post-*Johnson* decisions applying the cumulative error doctrine cited by the government. *See* Resp. Opp. at 102-03.

The government appears to be asserting that each individual error or omission of counsel should be examined to determine whether it is prejudicial, thus ignoring the cumulative impact of all of counsel's errors or omissions. *Strickland* and its progeny are to the contrary.

In *Strickland*, the Court consistently referred to counsel's errors in the plural, illustrating the need to assess the cumulative impact of all of counsel's errors. *See, e.g.*, *Strickland*, 466 U.S. at 687 (prejudice "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"); *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for *counsel's unprofessional errors*, the result of

131

the proceeding would have been different."); *id.* at 695 ("[T]he question is whether there is a reasonable probability that, *absent the errors*, the factfinder would have had a reasonable doubt respecting guilt.") (emphases added). Subsequently, in *Williams v. Taylor*, the Court made this point even more explicitly, holding that a state court's prejudice analysis was not just erroneous but also unreasonable, where the state court "failed to evaluate the totality of the available mitigation evidence" in determining whether the petitioner had been prejudiced by counsel's errors. *Williams v. Taylor*, 529 U.S. at 397; *accord Sears*, 561 U.S. at 955-56; *Porter*, 558 U.S. at 40-41; *Wiggins*, 539 U.S. at 536; *see also Kyles v. Whitley*, 514 U.S. 419, 434, 436-37 (1995) (noting that *Brady* materiality standard is same as *Strickland* prejudice standard, and holding that the materiality "of suppressed evidence" must be "considered collectively, not item by item").

Accordingly, this Court must consider the cumulative prejudicial effect of all constitutional and statutory violations, and it must also consider in the aggregate the prejudice flowing from all of counsel's errors and omissions.

132

## CONCLUSION

For all of the foregoing reasons, and for those stated in Mr. Sanchez's prior pleadings,

Mr. Sanchez respectfully requests that the Court schedule an evidentiary hearing on his claims

and grant relief from his convictions and sentences.


Respectfully submitted,


/s/ Matthew C. Lawry
Matthew C. Lawry
Aren Adjoian
Federal Community Defender Office
  for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
(215) 928-0520
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

*Counsel for Ricardo Sanchez, Jr.*


133

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served electronically by

the Court's CM/ECF service on this 15th day of December, 2016, on the following individuals:


Stephen Carlton
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 820-8711
Fax: (561) 659-4526
stephen.carlton@usdoj.gov
Counsel for the United States

Brandy Galler
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Phone: (561) 820-8711
Fax: (561) 659-4526
brandy.galler@usdoj.gov
Counsel for the United States


/s/ Matthew C. Lawry
Matthew C. Lawry