# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CIVIL NO. 9:16-CV-80693-RNS

_____
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
                                                    :
                                                    :
           v.                                       :        **THIS IS A CAPITAL CASE**
                                                    :
                                                    :
                                                    :
RICARDO SANCHEZ, JR                                 :
_____           :


**SUUPLEMENTAL APPENDIX IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND IN SUPPORT OF MOTION TO RECONSIDER ORDER DISMISSING CLAIMS**

**Matthew C. Lawry**
**Aren Adjoian**
Federal Community Defender Office
for the Eastern District of Pennsylvania
Curtis Center, Suite 545-West
601 Walnut Street
Philadelphia, PA 19106
Phone: (215) 928-0520
Fax: (215) 928-0826
Matthew_Lawry@fd.org
Aren_Adjoian@fd.org

*Counsel for Ricardo Sanchez, Jr.*

Dated: December 15, 2016

## INDEX TO SUPPLEMENTALAPPENDIX

71. Janice Coe attachment-1 ....................................................................................... A-000619A

72. Janice Coe attachment-2 ....................................................................................... A-000619D

73. Wanda Lee Attachment .......................................................................................... A-000686A

74. Declaration of Michael Cohen…………………….. ........................................... A-001624

75. Declaration of Daniel Hicky Grant, Ed.D. ............................................................ A-001627

76. Transcript of Ezequiel Sanchez Palm Beach School records ................................ A-001642

77. Kaiser ACE Study ................................................................................................. A-001645

78. Declaration of Donnie Murrell ............................................................................. A-001668

79. Report of Merve Waldron, Medical Examiner ...................................................... A-001674

80. Corrected English Declaration of Aurelio Sanchez ............................................. A-001676

81. Corrected English Declaration of  Elsa Hernandez ............................................. A-001683

82. Corrected English Declaration of Juana Maria Sanchez ...................................... A-001689

83. Corrected English Declaration of Maria de la Luz Betancourt Jimenez ............... A-001702

84. Sandra Castro Declaration Certifying Aurelio Sanchez Sotelo, Elsa Hernandez, Juana
    Maria Sanchez and Maria De La Luz Betancourt translations .............................. A-001706

85. Declaration of Lisa McDermott ........................................................................... A-001708

Page: 1 Document Name: untitled

```
PANEL: ___                    A07. ASSIGNMENT HISTORY                  YEAR: 16
  T234                   Wednesday January 27, 2016 10:28 am
 STDT: 13041850    SANCHEZ, RICARDO                    SCHL: 0331  GR: 30  ST: I

 A     ENTRY          WITHDRAWAL P                                              E
 C CD   DATE   OD CD    DATE   R PF SY CL DS SCHL      DESC      GR PRS ABS UNX Y

 _ E01 082691 B  W01 061192 P _  92 01 __ 0601 BERKSHIRE ELEM 02 180 ___ ___ _
 _ E01 082790 B  W01 061391 P _  91 01 __ 0601 BERKSHIRE ELEM 01 ___ ___ ___ _
 _ E01 083089 B  W02 080390 _ _  90 01 __ 0601 BERKSHIRE ELEM 01 ___ ___ ___ _
```

PF1=HELP 3=EXIT 5=REFRESH 7=BKWD 8=FWD 9=NEXT PAGE 12=ESCAPE
NO ADDITIONAL PAGES...NEXT?                                    TERML: I072

Date: 1/27/2016 Time: 10:28:16 AM    A000619A

Page: 1 Document Name: untitled

```
PANEL: ___              A07. ASSIGNMENT HISTORY              YEAR: 16
  T234            Wednesday January 27, 2016 10:27 am
STDT: 13041850   SANCHEZ, RICARDO              SCHL: 0331  GR: 30  ST: I

A    ENTRY        WITHDRAWAL P                                          E
C CD  DATE   OD CD   DATE   R PF SY CL DS SCHL    DESC       GR PRS ABS UNX Y

_ R01 071299 __ W01 072999 N _  99 01 __ 1851 PB LAKES HIGH  09  12   1 ___ S
_ E01 081998 __ W01 060999 R _  99 01 __ 1851 PB LAKES HIGH  09 166  14 ___ Y
_ E01 082097 __ W02 061098 P _  98 01 __ 2151 OKEEHEELEE MID 08 150  30 ___ Y
_ E01 082196 __ W01 061197 P _  97 01 __ 2151 OKEEHEELEE MID 07 165  15 ___ Y
_ E01 082395 __ W02 061396 P _  96 01 __ 0541 CONNISTON MID  06 147  33 ___ Y
_ E01 082395 __ DNE 082395 N _  96 01 __ 0311 ROOSEVELT MID  06 ___ ___ ___ _
_ E01 082294 __ W02 061595 P _  95 01 __ 1441 MELALEUCA ELEM 05 160  20 ___ _
_ E01 082294 E  W01 082294 N _  95 01 __ 0601 BERKSHIRE ELEM 05 ___ ___ ___ _
_ R02 070194 E  W02 073094 _ _  94 01 __ 0621 FOREST HILL EL 04  19   1 ___ S
_ E01 082393 E  W01 061094 P _  94 01 __ 0601 BERKSHIRE ELEM 04 169  11 ___ Y
_ R01 062193 E  W01 073093 _ _  93 01 __ 0601 BERKSHIRE ELEM 03  28   1 ___ S
_ E01 082592 E  W01 061193 P _  93 01 __ 0601 BERKSHIRE ELEM 03 176   4 ___ Y
_ R01 062292 B  W01 073092 _ _  92 01 __ 0601 BERKSHIRE ELEM 02 ___ ___ ___ _


PF1=HELP 3=EXIT 5=REFRESH 7=BKWD 8=FWD 9=NEXT PAGE 12=ESCAPE
PAGE FULL...CONTINUE.                                   TERML: I072
```

Date: 1/27/2016 Time: 10:27:36 AM     A000619B

Page: 1 Document Name: untitled

```
PANEL: ___                    A07. ASSIGNMENT HISTORY                  YEAR: 16
  T234                 Wednesday January 27, 2016 10:21 am
 STDT: 13041850    SANCHEZ, RICARDO                SCHL: 0331  GR: 30  ST: I

 A    ENTRY         WITHDRAWAL P                                              E
 C CD   DATE   OD CD    DATE   R PF SY CL DS SCHL      DESC      GR PRS ABS UNX Y

 _  EA1 081303 ___ W41 081303 _ _  03 A1 ___ 0331 ADULT ED CENTE 30 ___ ___ ___ _
 _  EA1 090902 ___ W47 081203 Z _  03 A1 ___ 0331 ADULT ED CENTE 30 ___ ___ ___ Y
 _  E01 081402 ___ W02 081402 N _  03 01 ___ 2441 ROOSEVELT SERV 10 ___ ___ ___ _
 _  R02 072902 ___ W02 073002 N _  02 01 ___ 9024 FED PRGS-COAST 10  1  ___ ___ S
 _  R02 052202 X  W01 060302 R _  02 01 ___ 2441 ROOSEVELT SERV 10  7  ___ ___ Y
 _  R02 042402 ___ W02 052202 N _  02 01 ___ 1851 PB LAKES HIGH  10  8  11  ___ _
 _  R02 042202 ___ W02 042302 _ _  02 DJ ___ 3006 PB REGIONAL    10 ___ ___ ___ _
 _  E01 081401 ___ W02 042202 _ _  02 01 ___ 1851 PB LAKES HIGH  10 129 23  ___ _
 _  E02 080301 ___ W02 080401 _ _  01 01 ___ 9024 FED PRGS-COAST 10  1  ___ ___ _
 _  R01 062501 ___ W01 071301 N _  01 01 ___ 1851 PB LAKES HIGH  10 12   1  ___ S
 _  E01 081600 ___ W01 060401 R _  01 01 ___ 1851 PB LAKES HIGH  10 169 11  ___ Y
 _  R01 062000 ___ W01 072700 N _  00 01 ___ 1851 PB LAKES HIGH  09 22   4  ___ S
 _  E01 081699 ___ W01 053000 P _  00 01 ___ 1851 PB LAKES HIGH  09 158 22  ___ Y


 PF1=HELP 3=EXIT 5=REFRESH 7=BKWD 8=FWD 9=NEXT PAGE 12=ESCAPE
 PAGE FULL...CONTINUE.                                         TERML: I072
```

Date: 1/27/2016 Time: 10:22:30 AM     A000619C

# THE SCHOOL DISTRICT OF
# PALM BEACH COUNTY
### DIVISION OF INFORMATION TECHNOLOGY
### RECORDS MANAGEMENT

## FAX COVER SHEET

 

| Date: April 13, 2010 | Time: 11:20 am |
|---|---|

To: Kerry McCreight, Investigator
Attn:

From: Charmaine Hatchett, Records Coordinator
School District of Palm Beach County, Records Management

Subject: All Records Re: Ricardo Sanchez

Number of Pages (Including Cover Sheet):

Records Management: (561) 434-8029 or PX 48029
Kara Rubinson, CRM: (561) 434-8951 or PX 48951
FAX: (561) 434-8660 or PX 48660

A000619E

2010-04-13 11:26    Records Mangement    (561) 434-8660 >> 04-12-10 2159254044 P 3/14
x sent by :

*Terms*

## FEDERAL COMMUNITY DEFENDER OFFICE
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL COURT DIVISION DEFENDER ASSOCIATION OF PHILADELPHIA

*st # 13041850*
*ss # 591246903*

**SUITE 540 WEST - THE CURTIS CENTER**
**601 WALNUT STREET**
**PHILADELPHIA, PA 19106**

*dob 10-19-1983*

ELLEN T. GREENLEE,
Defender

LEIGH M. SKIPPER,
Chief Federal Defender

Phone Number (215) 928-1100
Fax Number   (215) 925-4024
Fax Number   (215) 861-3159
Fax Number   (215) 928-0822
Fax Number   (215) 928-1112 → *Fax*

### FAX MEMO

TO:          Sharmaine Hatcheet, Student Records Department

COMPANY:     Palm Beach County School District

FAX #:       561-434-8660

FROM:        Kerry McCreight, Investigator

SUBJECT:     Ricardo Sanchez

DATE:        April 12, 2010

Number of pages (including cover) __3__

☐ Hard copy will follow      ☐ Hard copy will follow      ☒ No hard copy        ☐ Call when
by regular mail              by hand delivery             will follow           received

### COMMENTS:

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission contain confidential information belonging to the sender which is legally privileged. The information is intended for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure of this telecopied information is strictly prohibited. If you have received this telecopy in error, please immediately notify us by telephone to arrange for return of the original documents to us.

A000619F

2010-04-13 11:26    Records Mangement      (561) 434-8660 >>    2159254024   P 4/14
Fax sent by :                                          04-12-10 11:30a   Pg: 2/3

# FEDERAL COMMUNITY DEFENDER OFFICE
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FEDERAL COURT DIVISION DEFENDER ASSOCIATION OF PHILADELPHIA

SUITE 540 WEST — THE CURTIS CENTER
601 WALNUT STREET
PHILADELPHIA, PA 19106

ELLEN T. GREENLEE
DEFENDER

PHONE NUMBER (215) 928-1100
FAX NUMBER     (215) 928-1112
FAX NUMBER     (215) 925-4024
FAX NUMBER     (215) 928-0922
FAX NUMBER     (215) 861-3159

LEIGH M. SKIPPER
CHIEF FEDERAL DEFENDER

April 12, 2010

VIA TELEFAX (561) 434-8660

Palm Beach County School District
Fulton-Holland Educational Services Center
3300 Forest Hill Boulevard
West Palm Beach, FL 33406

Attention: Sharmaine Hatchett, Student Records Department

## THIS IS A DEATH PENALTY CASE - IMMEDIATE RESPONSE REQUESTED

RE:    Ricardo Sanchez, 10/19/83, 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

Dear Ms. Hatchett:

Please regard this as a formal request for any and all records your school district maintains on the above-referenced individual. Ricardo Sanchez is currently under sentence of death and this office is representing him in his federal habeas corpus proceedings. The requested records are urgent for his appeal. I have enclosed a signed release authorizing your agency to release the records to us.

The requested records should include, but not be limited to, the following: report cards; progress reports; disciplinary records or reports; admission and withdrawal forms; special education files; individual education plans (IEPs) or the equivalent; aptitude, IQ and standardized testing results, tests, and records; and medical, mental health, psychological and psychiatric evaluation, treatment, and testing.

If you have any questions, please do not hesitate to call me at 215-928-0520. Thank you very much for your time and assistance.

Sincerely,

Kerry McCreight
Investigator

Enclosure

A000619G

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO - DISTRICT: 0000050 PALM BEACH          SCHOOL: 0331  DEMOGRAPHIC INFORMATION    FILE: SRTS12IS
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010  CURRENT DISTRICT: 50 PALM BEACH              PAGE: 1
FL STUDENT ID: 591246903X  SSN: 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   CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                    (561) 640-5074
MAILING    5778 COCONUT RD                   2161 N. MILITARY TRAIL
ADDRESS:   WEST PALM BEACH    FL  33413      WEST PALM BEACH    FL 334012499
DISTRICT STUDENT ID:    13041850 FL STUDENT ID-ALIAS: 591246903X
PARENT/GUARDIAN (NAME/CODE):                OLD RACIAL/ETHNIC CODE: H  SEX: M
RICARDO SANCHEZ          PARENT              BIRTH DATE: 10/19/1983  BIRTH VERIFICATION: 1
JUANA JIMENEZ            PARENT              BIRTHPLACE: WEST PALM BEACH FL
ETHNICITY: NON-HISPANIC  RACE CODES:

IMMUNIZATION STATUS: PERMANENT IMMUNIZATION CERTIFICATE
VACCINE STATUS, DATE-                      VACCINE CERTIFICATE EXPIRATION DATE:
TYPE       DOSE DATE       DOSE DATE       DOSE DATE       DOSE DATE       DOSE DATE
DTP        1    02/14/1984  2  04/16/1985  3  07/26/1985  4  08/08/1986  5  01/17/1990
POLIO      1    02/14/1984  2  01/16/1985  3  08/08/1986  4  01/17/1990
MMR        1    04/16/1985  2  11/02/1998
HEP B 3DOSE 1   10/26/1995  2  08/19/1999
(EXTRANEOUS VACCINATIONS): (A619990819)

----------------------------------- COURSE INFORMATION -----------------------------------
DISTRICT: 50 SCHOOL: 0331 NO COURSES TAKEN      DISTRICT: 50 SCHOOL: 0601 BERKSHIRE ELEMENTARY
   YEAR: 1989-1990  GRADE LEVEL: NA                YEAR: 1991-1992  GRADE LEVEL: 02
                                                            SUBJECT CRSE      CREDIT
         GPA  QTY PTS         GPA  QTY PTS  T COURSE# COURSE TITLE   AREA FLAG GRD ATT./EARN
DISTRICT-TERM: 1.2667  9.50  CUM: 1.1064  26.00  S 50 0010 ESOL              P  0.00 0.00
  STATE-TERM: 1.2667  9.50  CUM: 1.1064  26.00  S 5100080 SECOND GRADE       P  0.00 0.00
                                                 3 50 0010 ESOL              P  0.00 0.00
1989-1990 ANNUAL DAYS-PRESENT:    0  ABSENT:  0  3 5100080 SECOND GRADE       P  0.00 0.00
SUMMER TERMS DAYS-PRESENT:         0  ABSENT:  0                 CREDIT, TERM:   0.00 0.00

                                                 1991-1992 ANNUAL DAYS-PRESENT: 180  ABSENT:  0
DISTRICT: 50 SCHOOL: 0331 NO COURSES TAKEN       SUMMER TERMS DAYS-PRESENT:       0  ABSENT:  0
   YEAR: 1990-1991  GRADE LEVEL: NA              ACADEMICALLY PROMOTED

         GPA  QTY PTS         GPA  QTY PTS  DISTRICT: 50 SCHOOL: 0601 BERKSHIRE ELEMENTARY
DISTRICT-TERM: 1.2667  9.50  CUM: 1.1064  26.00    YEAR: 1992-1993  GRADE LEVEL: 03
  STATE-TERM: 1.2667  9.50  CUM: 1.1064  26.00                SUBJECT CRSE      CREDIT
                                                 T COURSE# COURSE TITLE   AREA FLAG GRD ATT./EARN
1990-1991 ANNUAL DAYS-PRESENT:    0  ABSENT:  0  S 7755010 EX ST ACAD: PK-5   P  0.00 0.00
SUMMER TERMS DAYS-PRESENT:         0  ABSENT:  0  3 7755010 EX ST ACAD: PK-5   P  0.00 0.00
ACADEMICALLY PROMOTED                                           CREDIT, TERM:   0.00 0.00

                                                 1992-1993 ANNUAL DAYS-PRESENT: 176  ABSENT:  4
                                                 SUMMER TERMS DAYS-PRESENT:       0  ABSENT:  0
                                                 ACADEMICALLY PROMOTED
```

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8020 • FAX: 561-434-8660

A000619H

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO     DISTRICT: 0000050 PALM BEACH            SCHOOL: 0331  COURSE INFORMATION        FILE: SRTS121S
GRADE LEVEL: 30   PREPARED DATE: 04/13/2010    CURRENT DISTRICT: 50 PALM BEACH          PAGE
FL STUDENT ID: 591246903X   SSN: 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   CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                              (561) 640-5074
```

```
DISTRICT: 50 SCHOOL: 0621 FORREST HILL ELEMENTARY      DISTRICT: 50 SCHOOL: 0541 CONNISTON MIDDLE
   YEAR: 1993-1994  GRADE LEVEL: 04                        YEAR: 1995-1996  GRADE LEVEL: 06
                  SUBJECT CRSE        CREDIT                              SUBJECT CRSE        CREDIT
T COURSE# COURSE TITLE     AREA FLAG GRD ATT./EARN  T COURSE# COURSE TITLE     AREA FLAG GRD ATT./EARN
S 7755010 ACAD: PK-5                 P    0.00 0.00  1 1501000 M/J PHYS FIT          F    0.00 0.00
                                                     2 1501010 M/J BODY MGMT         F    0.00 0.00
DISTRICT: 50 SCHOOL: 0601 BERKSHIRE ELEMENTARY       3 1303040 M/J CHORUS H/L I      F    0.00 0.00
   YEAR: 1993-1994  GRADE LEVEL: 04                  3 7810010 LANG ART: 6-8         D    0.00 0.00
                  SUBJECT CRSE        CREDIT          3 7810020 READ: 6-8            D    0.00 0.00
T COURSE# COURSE TITLE     AREA FLAG GRD ATT./EARN   3 7812010 MATH: 6-8            D    0.00 0.00
3 7755010 ACAD: PK-5                 P    0.00 0.00   3 7820010 SCI: 6-8             F    0.00 0.00
              CREDIT, TERM:          0.00  0.00       3 7821010 SOC STUD: 6-8        D    0.00 0.00
                                                     3 7880010 PRE-VOC: 6-8         D    0.00 0.00
1993-1994 ANNUAL DAYS-PRESENT: 169  ABSENT:  11                   CREDIT, TERM:          0.00 0.00
SUMMER TERMS DAYS-PRESENT:        0 ABSENT:   0
ACADEMICALLY PROMOTED                                1995-1996 ANNUAL DAYS-PRESENT:   0 ABSENT:   0
                                                     SUMMER TERMS DAYS-PRESENT:       0 ABSENT:   0
DISTRICT: 50 SCHOOL: 1441 MELALEUCA ELEMENTARY       NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR
   YEAR: 1994-1995  GRADE LEVEL: 05
                  SUBJECT CRSE        CREDIT          DISTRICT: 50 SCHOOL: 2151 OKEEHEELEE MIDDLE SCHOOL
T COURSE# COURSE TITLE     AREA FLAG GRD ATT./EARN      YEAR: 1996-1997  GRADE LEVEL: 07
3 5100110 FIFTH GRADE                P    0.00 0.00                  SUBJECT CRSE        CREDIT
3 7755010 ACAD: PK-5                 P    0.00 0.00   T COURSE# COURSE TITLE     AREA FLAG GRD ATT./EARN
              CREDIT, TERM:          0.00  0.00       1 8500230 PERSONAL DEV          F    0.00 0.00
                                                     2 1501020 M/J THROW/CATCH       D    0.00 0.00
1994-1995 ANNUAL DAYS-PRESENT:    0 ABSENT:   0      3 7810010 LANG ART: 6-8         D    0.00 0.00
SUMMER TERMS DAYS-PRESENT:        0 ABSENT:   0      3 7810020 READ: 6-8            C    0.00 0.00
NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR  3 7812010 MATH: 6-8            B    0.00 0.00
                                                     3 7820010 SCI: 6-8             C    0.00 0.00
                                                     3 7821010 SOC STUD: 6-8        F    0.00 0.00
                                                                  CREDIT, TERM:          0.00 0.00

                                                     1996-1997 ANNUAL DAYS-PRESENT: 165 ABSENT:  15
                                                     SUMMER TERMS DAYS-PRESENT:       0 ABSENT:   0
                                                     ACADEMICALLY PROMOTED
```

In accordance with the Family Educational Rights and Privacy Act (FERPA) you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

A000619I

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO - DISTRICT: 0000050 PALM BEACH           SCHOOL: 0331  COURSE INFORMATION        FILE: SRTS121S
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010   CURRENT DISTRICT: 50 PALM BEACH                 PAGE 3
FL STUDENT ID: 5912469903X  SSN: 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  CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                          (561) 640-5074
```

| DISTRICT: 50 SCHOOL: 2151 OKEEHEELEE MIDDLE SCHOOL | | | | | | DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR: 1997-1998  GRADE LEVEL: 08 | | | | | | YEAR: 1998-1999  GRADE LEVEL: 09 | | | | | |
| | | SUBJECT | | CREDIT | | | | SUBJECT | | CREDIT | |
| T COURSE# | COURSE TITLE | AREA | FLAG | GRD | ATT/EARN | T COURSE# | COURSE TITLE | AREA | FLAG | GRD | ATT/EARN |
| 1 1501040 | MAT STRK W/ OBC | | | F | 0.00 0.00 | 1 1503310 | BASKETBALL | PE | J | F | 0.50 0.00 |
| 2 8500240 | TEEN CHALLENGES | | | F | 0.00 0.00 | 1 7910010 | APP ENG | EL | F | 0.50 0.00 |
| 3 7810010 | LANG ART: 6-8 | | | C | 0.00 0.00 | 1 7912010 | APP MATH I | EL | D | 0.50 0.50 |
| 3 7810020 | READ: 6-8 | | | B | 0.00 0.00 | 1 7920010 | APP SCI | EL | F | 0.50 0.00 |
| 3 7812010 | MATH: 6-8 | | | D | 0.00 0.00 | 1 7921320 | FUNC COMY FM LV | EL | C | 0.50 0.50 |
| 3 7820010 | SCI: 6-8 | | | B | 0.00 0.00 | 1 7980110 | EMPLOYABILITY SK | EL | B | 0.50 0.50 |
| 3 7821010 | SOC STUD: 6-8 | | | C | 0.00 0.00 | 1 8600540 | PRODUCTION TECH 1 | VO | F | 0.50 0.00 |
| | | CREDIT, TERM: | | | 0.00 0.00 | 2 1505500 | BEG VOLLEYBALL | PE | XJ | F | 0.50 0.00 |
| | | | | | | 2 7910010 | APP ENG | EL | C | 0.50 0.50 |
| 1997-1998 ANNUAL DAYS-PRESENT: 150  ABSENT: 30 | | | | | | 2 7912010 | APP MATH I | EL | F | 0.50 0.00 |
| SUMMER TERMS DAYS-PRESENT:    0  ABSENT:   0 | | | | | | 2 7920010 | APP SCI | EL | XJ | F | 0.50 0.00 |
| ACADEMICALLY PROMOTED | | | | | | 2 7921320 | FUNC COMY FM LV | EL | D | 0.50 0.50 |
| | | | | | | 2 7980110 | EMPLOYABILITY SK | EL | A | 0.50 0.50 |
| | | | | | | 2 8600540 | PRODUCTION TECH 1 | VO | F | 0.50 0.00 |
| | | | | | | 5 7920010 | APP SCI | EL | I | C | 0.50 0.00 |
| | | | | | | | | CREDIT, TERM: | | | 6.50 3.50 |

```
                              GPA  QTY PTS                GPA  QTY PTS
                DISTRICT-TERM: 1.1538   7.50    CUM: 1.1538    7.50
                   STATE-TERM: 1.1538   7.50    CUM: 1.1538    7.50
```

```
1998-1999 ANNUAL DAYS-PRESENT: 166  ABSENT:  14
SUMMER TERMS DAYS-PRESENT:    0  ABSENT:   0
RETAINED IN SAME GRADE
```

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

A000619J

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO   DISTRICT: 0000050 PALM BEACH              SCHOOL: 0331   COURSE INFORMATION        FILE: SRTS12IS
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010    CURRENT DISTRICT: 50 PALM BEACH                 PAGE  4
FL STUDENT ID: 5912469903X   SSN: 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  CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B

LEGAL NAME: SANCHEZ, RICARDO                          (561) 640-5074
```

| DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH | | | | | | | DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| YEAR: 1999-2000   GRADE LEVEL: 09 | | | | | | | YEAR: 2000-2001   GRADE LEVEL: 10 | | | | | | |
| | | SUBJECT | CRSE | | CREDIT | | | | SUBJECT | CRSE | | CREDIT | |
| T | COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT | EARN | T | COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT | EARN |
| 1 | 0104320 DRAW/PAINT 1 | PE | XJE | F | 0.50 | 0.00 | 1 | 0104320 DRAW/PAINT 1 | PE | IJE | F | 0.50 | 0.00 |
| 1 | 1503360 TEAM SPRTS 2 | PE | XJ | F | 0.50 | 0.00 | 1 | 1503350 TEAM SPRTS 1 | PE | J | F | 0.50 | 0.00 |
| 1 | 7910110 ENG: 9-12 | EL | | D | 0.50 | 0.50 | 1 | 7910110 ENG: 9-12 | EL | | C | 0.50 | 0.50 |
| 1 | 7912050 MATH: 9-12 | EL | | D | 0.50 | 0.50 | 1 | 7912050 MATH: 9-12 | EL | | F | 0.50 | 0.00 |
| 1 | 7920050 HLTH SAF: 9-12 | EL | X | F | 0.50 | 0.00 | 1 | 7920050 HLTH SAF: 9-12 | EL | XI | F | 0.50 | 0.00 |
| 1 | 7921010 SOCIAL STUDIES | EL | X | F | 0.50 | 0.00 | 1 | 7921010 SOC STUDIES: 9-12 | EL | XI | D | 0.50 | 0.00 |
| 1 | 7980110 CAREER PREP | EL | | C | 0.50 | 0.50 | 1 | 7980110 CAREER PREP | EL | | C | 0.50 | 0.50 |
| 2 | 0104320 DRAW/PAINT 1 | PE | XJE | F | 0.50 | 0.00 | 2 | 0104320 DRAW/PAINT 1 | PE | IJE | F | 0.50 | 0.00 |
| 2 | 1502410 INDIV/DUAL SPRTS 1 | PE | J | F | 0.50 | 0.00 | 2 | 1900300 DRIVER ED CLASS | EL | | D | 0.50 | 0.50 |
| 2 | 7910110 ENG: 9-12 | EL | | F | 0.50 | 0.00 | 2 | 7910110 ENG: 9-12 | EL | | D | 0.50 | 0.50 |
| 2 | 7912050 MATH: 9-12 | EL | | F | 0.50 | 0.00 | 2 | 7912050 MATH: 9-12 | EL | | F | 0.50 | 0.00 |
| 2 | 7920050 HLTH SAF: 9-12 | EL | X | F | 0.50 | 0.00 | 2 | 7920050 HLTH SAF: 9-12 | EL | X | F | 0.50 | 0.00 |
| 2 | 7921010 SOCIAL STUDIES | EL | X | F | 0.50 | 0.00 | 2 | 7921010 SOC STUDIES: 9-12 | EL | I | C | 0.50 | 0.50 |
| 2 | 7980110 CAREER PREP | EL | | B | 0.50 | 0.50 | 2 | 7980110 CAREER PREP | EL | | C | 0.50 | 0.50 |
| 5 | 7920050 HLTH SAF: 9-12 | EL | I | D | 0.50 | 0.50 | | CREDIT, TERM: | | | | 5.50 | 3.00 |
| | CREDIT, TERM: | | | | 4.00 | 2.50 | | | | | | | |

```
            GPA   QTY PTS           GPA  QTY PTS     DISTRICT-TERM: 0.9091   5.00  CUM: 1.0303  16.50
DISTRICT-TERM: 1.0000   4.00  CUM: 1.0952  11.50    STATE-TERM:    0.9091   5.00  CUM: 1.0313  16.50
STATE-TERM:    1.0000   4.00  CUM: 1.0952  11.50
                                                    2000-2001 ANNUAL DAYS-PRESENT: 169  ABSENT:  11
1999-2000 ANNUAL DAYS-PRESENT: 158  ABSENT:  22     SUMMER TERMS DAYS-PRESENT:   0  ABSENT:   0
SUMMER TERMS DAYS-PRESENT:   0  ABSENT:   0          RETAINED IN SAME GRADE
ACADEMICALLY PROMOTED
```

| DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH | | | | | | |
|---|---|---|---|---|---|---|
| YEAR: 2001-2002   GRADE LEVEL: 10 | | | | | | |
| | | SUBJECT | CRSE | | CREDIT | |
| T | COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT | EARN |
| 1 | 1503360 TEAM SPRTS 2 | PE | IJ | F | 0.50 | 0.00 |
| 1 | 7910110 ENG: 9-12 | EL | | B | 0.50 | 0.50 |
| 1 | 7912050 MATH: 9-12 | EL | | D | 0.50 | 0.50 |
| 1 | 7920050 HLTH SAF: 9-12 | EL | I | B | 0.50 | 0.50 |
| 1 | 7921010 SOC STUDIES: 9-12 | EL | I | C | 0.50 | 0.50 |
| 1 | 7960010 LR MGT TRANS: 9-12 | EL | | C | 0.50 | 0.50 |
| 1 | 7980010 CAREER PLACE | VO | | C | 0.50 | 0.50 |
| 2 | 1505400 BEG VOLLEYBALL | PE | IJ | F | 0.50 | 0.00 |

In accordance with the Family Educational Rights and Privacy Act (FERRA) you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

A000619K

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

TO - DISTRICT: 0000050 PALM BEACH;                    SCHOOL: 0331  COURSE INFORMATION        FILE: SRTS121S
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010   CURRENT DISTRICT: 50 PALM BEACH              PAGE: 5
FL STUDENT ID: 591246903X  SSN: 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    CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B

LEGAL NAME: SANCHEZ, RICARDO                                    (561) 640-5174

DISTRICT: 50 SCHOOL: 2441 LIFE SKILLS NORTH (RFSC)      DISTRICT: 50 SCHOOL: 0331 NO COURSES TAKEN
   YEAR: 2001-2002   GRADE LEVEL: 10                        YEAR: 2002-2003   GRADE LEVEL: NA

|   | SUBJECT | CRSE | | CREDIT | | | | | |
|---|---------|------|--|--------|--|--|--|--|--|
| T COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT./EARN | | | | GPA QTY PTS | GPA QTY PTS |
| 2 7910110 ENG: 9-12 | EL | | F | 0.50 0.00 | DISTRICT-TERM: 1.2667 | 9.50 | CUM: 1.1064 | 26.00 | |
| 2 7912050 MATH: 9-12 | EL | | D | 0.50 0.50 | STATE-TERM: 1.2667 | 9.50 | CUM: 1.1064 | 26.00 | |
| 2 7920010 SCI: 9-12 | EL | | D | 0.50 0.50 | | | | | |

2002-2003 ANNUAL DAYS-PRESENT:    0    ABSENT:    0
SUMMER TERMS DAYS-PRESENT:    0    ABSENT:    0
NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR

DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH
   YEAR: 2001-2002   GRADE LEVEL: 10

|   | SUBJECT | CRSE | | CREDIT |
|---|---------|------|--|--------|
| T COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT./EARN |
| 2 7920050 HLTH SAF: 9-12 | EL | X | F | 0.50 0.00 |

DISTRICT: 50 SCHOOL: 2441 LIFE SKILLS NORTH (RFSC)
   YEAR: 2001-2002   GRADE LEVEL: 10

|   | SUBJECT | CRSE | | CREDIT |
|---|---------|------|--|--------|
| T COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT./EARN |
| 2 7921010 SOC STUDIES: 9-12 | EL | | D | 0.50 0.50 |

DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH
   YEAR: 2001-2002   GRADE LEVEL: 10

|   | SUBJECT | CRSE | | CREDIT |
|---|---------|------|--|--------|
| T COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT./EARN |
| 2 7960010 LF MGT TRANS: 9-12 | EL | | F | 0.50 0.00 |

DISTRICT: 50 SCHOOL: 2441 LIFE SKILLS NORTH (RFSC)
   YEAR: 2001-2002   GRADE LEVEL: 10

|   | SUBJECT | CRSE | | CREDIT |
|---|---------|------|--|--------|
| T COURSE# COURSE TITLE | AREA | FLAG | GRD | ATT./EARN |
| 2 7963070 SOC PSNL SK | EL | | D | 0.50 0.50 |
| 2 7980110 CAREER PREP | EL | | C | 0.50 0.50 |
| CREDIT, TERM: | | | | 7.50 5.50 |

|   | GPA | QTY PTS | | GPA | QTY PTS |
|---|-----|---------|--|-----|---------|
| DISTRICT-TERM: | 1.2667 | 9.50 | CUM: | 1.1064 | 26.00 |
| STATE-TERM: | 1.2667 | 9.50 | CUM: | 1.1064 | 26.00 |

2001-2002 ANNUAL DAYS-PRESENT: 129  ABSENT:  23
SUMMER TERMS DAYS-PRESENT:    0  ABSENT:   0

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8020 • FAX: 561-434-8660

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO : DISTRICT: 0000050 PALM BEACH           SCHOOL: 0331  GRADUATION SUMMARY        FILE: SRT5121S
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010   CURRENT DISTRICT: 50 PALM BEACH                PAGE  6
FL STUDENT ID: 591246903X  SSN: 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  CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                           (561) 640-5074
```

```
****** C U M U L A T I V E   S U M M A R Y ******   VOCATIONAL PROGRAM COMPLETION STATUS-
*          AS OF: 04/13/2010                    *      NUMBER: 8500240   TEEN CHALLENGES
*                                               *      TERMINATION:            COMPLETED:
* GRADUATION OPTION: 4-YR STANDARD              *   VOCATIONAL PROGRAM COMPLETION STATUS-
* YEAR ENTERED NINTH GRADE: 2098/2099           *      NUMBER: 8600540  PRODUCTION TECH 1
*          - - - CREDITS - - -                  *      TERMINATION:            COMPLETED:
*          SUBJECT  TOTAL   TOTAL   TOTAL        *
*           AREA   TO DATE  NEEDED REMAINING *     DISTRICT CLASS RANK- EFFECTIVE DATE: 08/01/2002
*    ENGLISH   (EN)   0.00   4.00   4.00    *        CLASS RANK, NUMERICAL POSITION:     10
*    MATHEMATICS (MA) 0.00   3.00   3.00    *          CLASS RANK, PERCENTILE:           17
*    SCIENCE   (SC)   0.00   3.00   3.00    *      CLASS RANK, TOTAL NUMBER IN CLASS:    12
*    AMER HISTORY (AH) 0.00  1.00   1.00    *
*    WORLD HISTORY (WH) 0.00 1.00   1.00    *   COMMUNITY SERVICE HOURS:  0  REQUIREMENT MET: N
*    ECONOMICS  (EC)  0.00   0.50   0.50    *
*    AMER GOVERNMENT (AG) 0.00 0.50  0.50   *
*    VOCATIONAL/ (VO/ 0.50               *
*  PERFORM FINE ART  PF) 0.00  1.00*  0.50* *
* LIFE MGMT SKILLS (LM) 0.00   0.50   0.50  *
*    PHYSICAL ED (PE) 0.00     1.00   1.00  *
* FOREIGN LANGUAGE (FL) 0.00          0.00  *
* ..LANGUAGE ARTS (LA) 0.00                 *
*  SOCIAL STUDIES (SS) 0.00                 *
*    ELECTIVE  (EL)  14.00   8.50     0.00  *
*    ESE     (EX)     0.00                  *
* COMPUTER ED (CE)    0.00                  *
* CREDITS, CUMULATIVE: 14.50  24.00  15.00  *
* * TOTALS INCLUDE VOCATIONAL & PERFORM FINE ARTS*
*          GPA QTY PTS          GPA QTY PTS *
* DISTRICT: 1.1064  26.00 STATE: 1.1064  26.00 *
*************************************************
+++++++++++++++++++++++++++++++++++++++++++++++++
+CERTIFIED BY:                                  +
+                                               +
+                                               +
+SIGNATURE: _____            +
+                                               +
+DATE: _____                           +
+++++++++++++++++++++++++++++++++++++++++++++++++
```

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

A000619M

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO    DISTRICT: 0000050 PALM BEACH           SCHOOL: 0331  COMMENTS              FILE: SRTS12IS
GRADE LEVEL: 30   PREPARED DATE: 04/13/2010   CURRENT DISTRICT: 50 PALM BEACH     PAGE
FL STUDENT ID: 591246903X   SSN: 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  CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                  (561) 640-5074
```

---------------------------- DEFINITION OF TERM CODES ------------------------------------

```
CODE DEFINITION         CODE DEFINITION         CODE DEFINITION         CODE DEFINITION         CODE DEFINITION
 1  SEMESTER 1           S  COMBINED SUMMER      B  TRIMESTER 1          E  QUINMESTER 1         J  SIX WEEKS 1
 2  SEMESTER 2              SESSION              C  TRIMESTER 2          F  QUINMESTER 2         K  SIX WEEKS 2
 3  ANNUAL               T  INTERSESSION 1*      D  TRIMESTER 3          G  QUINMESTER 3         L  SIX WEEKS 3
 4  SUMMER SESSION 1     U  INTERSESSION 2*      6  QUARTER 1           H  QUINMESTER 4         M  SIX WEEKS 4
 5  SUMMER SESSION 2     V  INTERSESSION 3*      7  QUARTER 2           I  QUINMESTER 5         N  SIX WEEKS 5
 R  SHORT COURSE**       W  INTERSESSION 4*      8  QUARTER 3           Y  YEAR OF              O  SIX WEEKS 6
                         X  INTERSESSION 5*      9  QUARTER 4              NONENROLLMENT***
```

```
   *   USED (INSTEAD OF SUMMER SCHOOL SESSIONS) WITH YEAR-ROUND SCHOOL RECORDKEEPING
  **   USED ONLY FOR WORKFORCE DEVELOPMENT EDUCATION (ADULT GENERAL AND POSTSECONDARY VOCATIONAL EDUCATION)
 ***   USED ONLY FOR REPORTING STUDENTS WHO HAVE WITHDRAWN BETWEEN SCHOOL YEARS
```

STATE GRADING SCALE FOR HIGH SCHOOL STUDENTS (REGARDLESS OF ENTRY DATE) EFFECTIVE SCHOOL YEAR 1997-1998

GRADING SCALE, EFFECTIVE 07/01/2001

```
            GRADE   QUALITY                   GRADE   QUALITY                   GRADE   QUALITY
GRADE   EQUIVALENT   POINTS        GRADE   EQUIVALENT   POINTS        GRADE   EQUIVALENT   POINTS
  A  =   90 - 100    4.00            B  =   80 - 89     3.00            C  =   70 - 79     2.00
  D  =   60 - 69     1.00            F  =    0 - 59     0.00
```

GRADING SCALE, PRIOR TO 07/01/2001

```
            GRADE   QUALITY                   GRADE   QUALITY                   GRADE   QUALITY
GRADE   EQUIVALENT   POINTS        GRADE   EQUIVALENT   POINTS        GRADE   EQUIVALENT   POINTS
  A  =   94 - 100    4.00            B  =   85 - 93     3.00            C  =   77 - 84     2.00
  D  =   70 - 76     1.00            F  =    0 - 69     0.00
```

```
NOTE:  FROM THE 1987-1988 THROUGH THE 1996-1997 SCHOOL YEARS FOR STUDENTS ENTERING
       HIGH SCHOOL DURING THESE YEARS, THE GRADE EQUIVALENTS FOR C, D, AND F WERE:
       C = 75-84, D = 65-74, AND F = 0-64. QUALITY POINTS AND ALL OTHER GRADES WERE
       THE SAME AS THOSE SHOWN IN THE IMMEDIATELY PRECEDING STATE GRADING SCALE.
```

In accordance with the Family Educational Rights and Privacy Act (FERPA) you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561 434 8029 • FAX: 561 434 8660

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO:   DISTRICT: 0000050 PALM BEACH              SCHOOL: 0331   COMMENTS                    FILE: SRTS12KS
GRADE LEVEL: 30   PREPARED DATE: 04/13/2010    CURRENT DISTRICT: 50 PALM BEACH                    PAGE: 3
FL STUDENT ID: 59126903X   SSN: 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    CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
LEGAL NAME: SANCHEZ, RICARDO                              (561) 640-5074
```

```
------------------------------ STATE DEFINED COURSE FLAGS -----------------------------------
E=ACADEMIC SCHOLAR-ELECTIVE        R=ACADEMIC SCHOLAR-REQUIREMENT      9=NINTH GRADER
G=GIFTED                           H=HONORS                           N=NO CREDIT
I=INCLUDE IN GPA                   X=EXCLUDE FROM GPA                  N=EXCLUDE FROM STATE GPA
P=COURSE IS IN PROGRESS            S=CREDIT AWARDED BY SLEP EXAM       T=TRANSFERRED COURSE

VOCATIONAL SUBSTITUTION COURSES-                                      Z=JROTC AIR FC SUB FOR LIFE MGMT
$=JOURNALISM SUB FOR PRAC ARTS     0=JROTC SUB FOR PRACTICAL ARTS     1=COMP ED SUB FOR PRACTICAL ARTS
2=SUB FOR BUS EN I 1001440         3=SUB FOR BUS EN I 1001440/II 1001450  4=SUB FOR MA I 1205540
5=SUB FOR MA I 1205380/II 1205390  6=SUB FOR GEN SCI 2002310          7=SUB FOR ANAT PHYSIO 2000350
8=SUB FOR PRE ALGEBRA 1200300      A=JROTC CST GD SUB FOR SCIENCE     F=JROTC AIR FC SUB FOR SCIENCE
K=JROTC NAVY SUB FOR SCIENCE       O=JROTC ARMY SUB FOR LIFE MGMT     Q=JROTC MARINE SUB FOR LIFE MGMT
@=SUB FOR BIO TECH 2000430         #=SUB FOR ENV SCI 2001340          %=SUB FOR PHY SCI 2003310
*=SUBSTITUTE FOR COURSE SPECIFIED ON FOLLOWING LINE ON COURSE LIST
+=CREDIT IS ALSO AWARDED FOR AN ASSOCIATED SECOND COURSE
```

```
ELL INSTRUCTION-
M=HOME LANGUAGE INSTRUCTION        B=HOME LANGUAGE &/OR ESOL INSTRUCTION (ELEMENTARY SELF-CONTAINED)
D=ESOL INSTRUCTION
```

```
----------------------------------- FY 1991-1992 COMMENTS -----------------------------------
THE PALM BEACH COUNTY SCHOOL DISTRICT AWARDS THE HIGH SCHOOL VALIDICTORIAN
AND SALUTATORIAN USING A WEIGHTED GPA AVERAGE THAT IS BASED ON COURSES TAKEN
IN GRADES 9 - 12.  HOWEVER, THE DISTRICT GPA INCLUDES ALL CREDIT COURSES.
```



In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO: - DISTRICT: 0000050 PALM BEACH          SCHOOL: 0331  CATEGORY B INFORMATION     FILE: SRTS121S
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010   CURRENT DISTRICT: 50 PALM BEACH                 PAGE  9
FL STUDENT ID: 591246903X   SSN: 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  CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B
```

LEGAL NAME: SANCHEZ, RICARDO                         (561) 640-5074

WITHDRAWAL-DATE: 08/13/2003   CODE: W41

HOME LANGUAGE SURVEY DATE: 10/09/1991         COUNTRY OF BIRTH: US UNITED STATES
NATIVE LANGUAGE: SP SPANISH                   PRIMARY HOME LANGUAGE: SP SPANISH

HEALTH EXAMINATION - SCHOOL ENTRY: Y SCHOOL ENTRY HEALTH EXAMINATION CERTIFIED
SCREENINGS - HEARING: HY STUDENT TOOK AND PASSED TEST       VISION: VY STUDENT TOOK AND PASSED TEST

```
------------------------------------- EXCEPTIONAL STUDENT INFORMATION ------------------------------------
STUDENT PLAN DATE: 04/30/2002   CURRENT EVALUATION/RE-EVALUATION DATE: 02/22/2005
PRIMARY EXCEPTIONALITY: K SPECIFIC LEARNING DISABLED      FEFP PROGRAM:
```

```
---------------------------- EXCEPTIONAL STUDENT PROGRAM INFORMATION -----------------------
                                                    EVALUATION    ELGB    PLACE   DISMIS-
                               PLACEMENT           REFERRAL  COMPLETE  DETERM   MENT    SAL
EXCEPTIONALITY                 STATUS              DATE      DATE      DATE     DATE    DATE
SPECIFIC LEARNING DISABLED     ELIGIBLE AND PLACED 04/06/92  07/09/92  12/03/92 12/10/92
```

```
----------------------- DROPOUT PREVENTION PROGRAM INFORMATION ------------------------------
DROPOUT PREVENTION PROGRAM      PLACEMENT REASONS              OUTCOMES
EDUCATION SERVICES IN DJJ PGMS  NOT APPLICABLE                RECEIVED ACADEMIC&VOCATIONAL SERVCS
                                NOT APPLICABLE
                                NOT APPLICABLE
                                NOT APPLICABLE
                                NOT APPLICABLE
```

```
------------------------------------------ TEST INFORMATION ----------------------------------
TEST INFORMATION:
      TEST         TEST  LEVEL  SUBJECT      SCORE  SCORE  SUBJECT     SCORE  SCORE  SUBJECT     SCORE  SCORE
GRD   DATE         NAME  FORM   CONTENT TYPE  TYPE  CONTENT  TYPE  TYPE  CONTENT  TYPE  TYPE
```

| GRD | DATE | TEST NAME | LEVEL FORM | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 30 | 09/17/2002 | TAB | 7 E | READ(T) | SS 0000 | | READ(T) | GE 0000 | | MATH(T) | SS 0000 | |
| | | | | MATH(T) | GE 0029 | | LANGUAGE | SS 0000 | | LANGUAGE | GE 0000 | |
| | | | | TOTBAT | SS 0000 | | TOTBAT | GE 0000 | | | | |
| 30 | 09/17/2002 | TAB | 7 M | READ(T) | SS 0000 | | READ(T) | GE 0000 | | MATH(T) | SS 0000 | |
| | | | | MATH(T) | GE 0000 | | LANGUAGE | SS 0000 | | LANGUAGE | GE 0024 | |
| | | | | TOTBAT | SS 0000 | | TOTBAT | GE 0000 | | | | |
| 30 | 09/04/2002 | TAB | 7 E | READ(T) | SS 0000 | | READ(T) | GE 0036 | | MATH(T) | SS 0000 | |
| | | | | MATH(T) | GE 0000 | | LANGUAGE | SS 0000 | | LANGUAGE | GE 0000 | |
| | | | | TOTBAT | SS 0000 | | TOTBAT | GE 0000 | | | | |

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO  DISTRICT: 0000050 PALM BEACH           SCHOOL: 0331  TEST INFORMATION          FILE: SRTS121S
GRADE LEVEL: 30  PREPARED DATE: 04/13/2010  CURRENT DISTRICT: 50 PALM BEACH         PAGE 10 OF 10
FL STUDENT ID: 5912469403X   SSN: 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   CURRENT SCHOOL: 0331 ADULT ED CENTER OF PALM B.

LEGAL NAME: SANCHEZ, RICARDO                        (561) 640-5074
```

TEST INFORMATION:

| TEST GRD DATE | TEST NAME | LEVEL FORM | SUBJECT CONTENT | TYPE | SCORE TYPE | SCORE | SUBJECT CONTENT | TYPE | SCORE TYPE | SCORE | SUBJECT CONTENT | TYPE | SCORE TYPE | SCORE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 08 02/10/1998 | WAP | 08 | WR EXPOS | SS | 0000 | | WR PERSO | SS | 0010 | | WRITING | SS | 0000 | |
| 08 01/27/1998 | FCA | 08 | READ(T) | SS | 0126 | | MATH(T) | SS | 0194 | | | | | |
| 05 04/18/1995 | CTB | B 15 | COMPREHE | SS | 0553 | | COMPREHE | NP | 0001 | | PROB/SLV | SS | 0667 | |
| | | | PROB/SLV | NP | 0010 | | LANGUAGE | SS | 0000 | | LANGUAGE | NP | 0000 | |
| | | | CAP/MECH | SS | 0000 | | CAP/MECH | NP | 0000 | | USAGE/EX | SS | 0000 | |
| 05 04/18/1995 | CTB | B 15 | USAGE/EX | NP | 0000 | | | | | | | | | |
| 02 04/08/1992 | CTB | A 12 | READ(T) | SS | 0463 | | READ(T) | NP | 0001 | | MATH(T) | SS | 0421 | |
| | | | MATH(T) | NP | 0001 | | COMPREHE | SS | 0486 | | COMPREHE | NP | 0003 | |
| | | | COMPUTAT | SS | 0411 | | COMPUTAT | NP | 0001 | | VOCAB | SS | 0440 | |
| 02 04/08/1992 | CTB | A 12 | VOCAB | NP | 0001 | | PROB/SLV | SS | 0430 | | PROB/SLV | NP | 0001 | |
| 01 04/16/1991 | CTB | A 11 | READ(T) | SS | 0411 | | READ(T) | NP | 0002 | | MATH(T) | SS | 0000 | |
| | | | MATH(T) | NP | 0000 | | COMPREHE | SS | 0386 | | COMPREHE | NP | 0002 | |
| | | | COMPUTAT | SS | 0334 | | COMPUTAT | NP | 0003 | | VOCAB | SS | 0445 | |
| 01 04/16/1991 | CTB | A 11 | VOCAB | NP | 0002 | | PROB/SLV | SS | 0000 | | PROB/SLV | NP | 0000 | |
| | | | WORD | SS | 0000 | | WORD | NP | 0000 | | SCIENCE | SS | 0000 | |
| | | | SCIENCE | NP | 0000 | | LANGUAGE | SS | 0000 | | LANGUAGE | NP | 0000 | |
| 01 04/16/1991 | CTB | A 11 | CAP/MECH | SS | 0000 | | CAP/MECH | NP | 0000 | | SS/ENVIR | SS | 0000 | |
| | | | SS/ENVIR | NP | 0000 | | USAGE/EX | SS | 0000 | | USAGE/EX | NP | 0000 | |

```
----------------------------MAJOR AREA OF INTEREST INFORMATION--------------------------

                                         COURSE   CREDIT   MAI   MAI
           DISTRICT SCHOOL   YEAR   TERM  NUMBER   EARNED   CODE  PROGRAM

                             NO MAI INFORMATION TO PRINT
*****************************  END OF TRANSCRIPT  **************************************
```

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

A000619Q

THE SCHOOL DISTRICT OF PALM BEACH COUNTY
# Individual Educational Plan

Initial: ____
Review: Annual ✓ Other ____
Post 3 yr. Re-eval ____

CURRENT DEMOGRAPHIC INFORMATION

PAGE 1 of 3

Student Name: Sanchez, Ricardo
LAST        FIRST        MIDDLE

Student ID #: 1304 1850    DOB: ____

Current School: Conniston

Assigned Grade Level: 6

| | MONTH | DAY | YEAR |
|---|---|---|---|
| Current Date: | 3 | 26 | 96 |

IEP Reviewed on: ____

Three Year Re-eval due: (School Year) 3-23-98

## In Attendance at the IEP Meeting and Participating in the Development of the IEP:

| Signature | Date | Comments | Signature | Date | Comments |
|---|---|---|---|---|---|
| PARENT/GUARDIAN | | | Lynn Rotten — LEA REPRESENTATIVE/ESE DESIGNEE | 3/26/96 | |
| PARENT/GUARDIAN | | | DISTRICT ESE REPRESENTATIVE | | |
| STUDENT | | | Evaluators/Others: | | |
| Clarice Sherman — TEACHER | 3/26/96 | | TITLE | | |
| Wanda SEE — TEACHER | 3/26/96 | | TITLE | | |
| TEACHER/SPEECH-LANGUAGE PATHOLOGIST | | | TITLE | | |

Procedural Safeguards have been explained. ☐ YES ☒ NO    Explain: Sent home

| Attempts to Notify | Date | Results | Signature |
|---|---|---|---|
| letter | 3/8/96 | Parent will attend | L. Rotten |
| telephone | 3/26/96 | unable to attend - permission to proceed | L. Rotten |

IEP read by mainstream teachers (Signature/Date): ____

White Copy: School File    Yellow Copy: ESE Coordinator    Pink Copy: Parents    Goldenrod Copy: Working Folder

PBSD 0659A ( . 11/91)

A-000686A

**Student Name:** Ricardo Sanchez   **ID#:** 13041850   **Date:** 3/26/96   **PAGE**

**DOMAIN:** _____   **Present Level of Performance:** Ricardo is a carefree student who enjoys interacting w/his peers. Due to his socializing, he has trouble beginning tasks; staying on tasks; and completing tasks. Ricardo frequently displays little or no tact while communicating w/peers and teachers alike, as well as using inappropriate statements about peers w/no apparent concern of the damage it may cause him or others. He has poor sentence structure usage and handwriting skills that need to be developed through practice and/or drill.

**Annual Goal:** Ricardo will develop and use task-related skills and interpersonal skills to enable him to perform classroom tasks and have successful classroom experiences. He will develop knowledge of and use written expression for academic improvement.

| SHORT-TERM INSTRUCTIONAL OBJECTIVES | | EVALUATION OF SHORT-TERM INSTRUCTIONAL OBJECTIVES | | |
|---|---|---|---|---|
| Ricardo _____ will: | PERSONS RESPONSIBLE (TITLE) | CRITERION FOR MASTERY | EVALUATION PROCEDURES AND SCHEDULE | DATE/RESULTS |
| 1) write his daily class assignments on paper, with teacher review of task | ESE student and teachers | 90% mastery, as observed by the classrm. teacher throughout remainder of IEP | | |
| 2) begin a task within 10 min. after written assignment has been reviewed | | 80% mastery, as observed and recorded by classrm. teacher on student's progress reports, throughout remainder of IEP | | |
| 3) work independently and remain on task for a min. of 15-20 min. | | | | |
| 4) use tact when communicating w/peers (verbal self-control) | | | | |
| 5) use functional written expression skills in sentence writing and and handwriting material | | 75% mastery, as observed by the classrm. teacher on quizzes, daily work, tests throughout the remainder of IEP | | |
| 6) verbalize his thoughts to his teacher for appropriateness to a given task prior to writing a response | | 80% mastery, as observed and recorded by classroom teacher on progress students' progress reports, throughout remainder of IEP | | |
| | | | | |
| | | | | |

PBSD 0659B (W 11/91)   White Copy:  School File       Yellow Copy:  ESE Coordinator       Pink Copy:  Parents       Goldenrod Copy:  Working Folder

WN 01-9971

**Student Name:** Ricardo Sanchez   **ID#:** 13041850   **Date:** 3/26/96   **PAGE** 3 of 3

**EXCEPTIONAL STUDENT EDUCATION ASSIGNMENT(S):**

| PROGRAM(S) | TIME | DELIVERY MODEL | ANTICIPATED INITIATION DATE | DURATION |
|---|---|---|---|---|
| Specific Learning Disabilities | 6 classes | E.I./S.C. | 3/26/96 | 6/12/96 |
| | | | 8/96 | 3/25/97 |

**ESE Instructional Area(s)/Class(es):**

Math, Science, Soc. Sts, Lang. Arts, Reading, Pre-Vocational

**RELATED SERVICES:**

**Diploma Option:** not at this time

**Transition Services:** not at this time

The student's program is determined to provide the least restrictive environment ☒ Yes ☐ No

The student has Limited English Proficiency ☒ Yes ☐ No. The student's needs are being met through ☒ ESE ☐ Other _____

**The IEP reflects**
**ITP goals:** ☐ YES ☐ NO ☒ N/A

**Modifications:** Exempt from CTBS testing – Student's math & language/reading skills would make it frustrating for student.

**PARTICIPATION IN REGULAR OR VOCATIONAL PROGRAM(S):**

| AREA(S) | EXTENT OF PARTICIPATION | SPECIAL AIDS, SERVICES OR EQUIPMENT | QUALIFIES FOR MAINSTREAM COST FACTOR |
|---|---|---|---|
| Electives | 1-3 classes | none | no |
| | | | |
| | | | |

**Physical Education:** ☒ Regular ☐ Adaptive ☐ Modified (Specify): _____

**COMMENTS:** Classes meet per block schedule. – Behavior Management form attached –

**Declaration of Michael Cohen, Esq.**
**Pursuant to 28 U.S.C. § 1746**

1.      I am an attorney admitted to practice in the States of Florida and New York. My primary office is in Fort Lauderdale.

2.      In 2009, Donnie Murrell, Esq., and I represented Ricardo Sanchez, Jr., in his federal capital murder trial. I have been asked by Mr. Sanchez's current counsel to provide information with regard to specific aspects of our representation.

3.      I first became involved in the case as appointed CJA counsel before Mr. Sanchez was charged with murder and before the case was charged capitally. I had not represented Mr. Sanchez previously and was not familiar with him or his family. I was chosen to represent Mr. Sanchez pursuant to the standard CJA appointment process, as in any other federal drug case.

4.      As the case proceeded, it turned into a murder case and was charged capitally. I had no prior experience in death penalty cases in either federal or state court. Mr. Murrell, who had tried capital cases in state court, was appointed as co-counsel and served as "learned counsel" with respect to the unique concerns and procedures that death penalty prosecutions entail.

5.      Given my lack of experience in capital cases and Mr. Murrell's role as learned counsel, we divided responsibilities between the guilt and penalty phases. With a few exceptions explained below, I was primarily responsible for presenting the guilt phase defense, and Mr. Murrell was primarily responsible for preparing and presenting the penalty phase case. Lisa McDermott, a mitigation specialist who investigated penalty phase issues, worked closely with Mr. Murrell.

6.      Despite our guilt/penalty division of labor, we did delegate to Mr. Murrell responsibility for challenging the government's ballistics evidence at the guilt phase. Mr. Murrell had more

1

A-001624

experience than I did with ballistics evidence, and we decided that he would handle that aspect of the case. He was responsible for questioning government witnesses, presenting evidence, and filing any motions related to ballistics.

7. I also deferred to Mr. Murrell with respect to investigating and presenting mental health evidence that could implicate guilt phase issues. I was well aware of Mr. Sanchez's limited intellectual abilities, and his impairments were part of the mitigation case at penalty phase. I attempted to integrate those themes into my guilt phase presentation by describing Mr. Sanchez as a follower and as a person with low intelligence. Had Mr. Murrell and Ms. McDermott developed other psychiatric defenses or competency issues, I would have deferred to their expertise in such matters and tried to incorporate that evidence into the guilt phase to the extent appropriate.

8. During its case-in-chief, the government introduced evidence of cell phone calls in an effort to establish that Mr. Sanchez and Daniel Troya were present at the scene of the murders. The government also argued that, immediately before the murders, the victims had traveled to near Daytona Beach, where Jose Escobedo consummated a large drug deal.

9. In Mr. Sanchez's defense, I sought to raise reasonable doubt as to whether he had committed any act of violence on the night of the shooting or whether the murders were in fact committed by others in the drug trade, potentially including members of the drug cartel based in Matamoros, Mexico, to which Mr. Escobedo owed large sums of money. As part of this defense, we introduced as an exhibit Yessica Escobedo's cell phone records. These records indicated that her cell phone traveled to the vicinity of McAllen, Texas – across the border from Matamoros – on the night of the murders. These records also contradicted the argument by the government that Mr. Sanchez and Mr. Troya had taken the phone after the murders. In its closing argument,

2

the government disputed that the cell phone records reflected that Mrs. Escobedo's phone had traveled to Texas on the night of the murders.

10.     Our defense suggesting third party participation in the murders was hamstrung by a dearth of information about the drug deal that Mr. Escobedo consummated shortly before the murders and about the person or persons who took possession of Mrs. Escobedo's phone and traveled to Texas on the night of the crime.  Had the government disclosed more information about these issues, we would have sought to further investigate and present such evidence to the jury.  We did not have a tactical or strategic reason for limiting our investigation and presentation of this evidence.

I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge, information, and belief, subject to the penalty of perjury, pursuant to 28 U.S.C. § 1746.

_Michael Cohen_

Michael Cohen, Esq.

Date: 4/11/2016

Gabriela Suarez
Commission # FF164906
Expires: OCT 01, 2018
BONDED THRU
1ST FLORIDA NOTARY, LLC

_Gabriela Suarez_
—personally known

3

Page **1** of **15**

## Declaration of Daniel Hicky Grant, ED.D.

### Pursuant to 28 U.S.C. §1746

I, Daniel Hicky Grant, ED.D., declare as follows:

1.      I am a psychologist licensed in Georgia, and a board certified neuropsychologist. In 2008, counsel representing Ricardo Sanchez, Jr., in federal capital trial proceedings in the Southern District of Florida hired me to conduct a neuropsychological evaluation of Mr. Sanchez and testify at the penalty phase of his trial.

2.      I earned a Masters in Psychology from West Georgia College in 1971. I completed post-Masters training in school psychology at Georgia Southern College in 1972 and 1973. I received training in clinical neuropsychology at the Department of Neurology, Medical College of Georgia, and I earned a Doctorate in Educational Psychology from the University of Georgia in 1981.

3.      I am board certified in clinical neuropsychology by the American Board of Professional Neuropsychology. I am also board certified as a forensic examiner by the American Board of Forensic Examiners. I am a fellow of the American College of Forensic Examiners, and I am certified by the American Academy of Experts in Traumatic Stress and Crisis Management.

4.      I am a member in good standing of a number of professional organizations, including the American Psychological Association, the American Academy of Experts in Traumatic Stress, the American Academy of Pain Management, the American Association on Intellectual and Developmental Disabilities, the American Board of Forensic Examiners, the Georgia Association of School Psychologists, the Georgia Psychological Association, the International Neuropsychological Society, the National Academy of Neuropsychologists, and the National Center for Crisis Management.

Page **2** of **15**

5.      My professional experience includes work as a school psychologist, evaluation and treatment for juveniles in detention centers, evaluation and treatment of adults in military settings, and private clinical and forensic practice.  That experience includes the following: Between 1972 and 1974, I was the Clinical Director for the Department of the Army (Civilian) Alcohol and Drug Abuse Center at Fort Stewart, Georgia.  In 1975 and 1976, I worked as an instructional assistant for Dr. Alan Kaufman, the author of several measures of intelligence for both children and adults, in an intelligence testing course at the University of Georgia's Department of School Psychology.  From 1977 to 1982, I served as a school psychologist for the Hall County Board of Education in Gainesville, Georgia.  I was a consulting psychologist at the Coastal Correctional Institution Diagnostic Unit in Garden City, Georgia between 1982 and 1997. In that position I evaluated inmates who were functioning within the borderline and intellectually disabled range.  I maintained a private practice in psychology and neuropsychology in Brunswick and Savannah, Georgia.  From 1995 to 2002, I served as a neuropsychologist with the Outpatient Psychiatric Service at Winn Army Hospital in Fort Stewart.  Between 1998 and 2011, I worked as a psychologist with the Savannah Regional Youth Detention Center in Savannah.  Between 2002 and 2011, I worked as a psychologist for the Claxton Regional Youth Detention Center in Claxton, Georgia.  In 2011 and 2012, I worked as a counseling psychologist in the Army Substance Abuse Program in Fort Stewart.  From 1995 to the present, I have maintained a private practice in neuropsychology and forensic psychology in Richmond Hill, Georgia.

6.      I have experience and expertise in administering psychodiagnostic tests and conducting educational, neuropsychological, rehabilitation, and vocational evaluations with

Page **3** of **15**

preschool children, school children, adolescents, and adults in outpatient and inpatient institutions and in correctional facilities.

7.      I have been qualified to testify as an expert in neuropsychological evaluations in criminal and personal injury cases in state courts in Tennessee, Georgia, Louisiana, Mississippi, Florida, Alabama and Ohio.  I also have been qualified to testify in Social Security cases.  Mr. Sanchez's case was the second federal capital case on which I worked and in which I testified. The first federal capital case was one in Mississippi in which I testified that the defendant was mentally retarded.  The jury rejected the death penalty for that defendant.

8.      Mr. Sanchez's legal team contacted me in the fall of 2008.  I communicated with Donnie Murrell, one of Mr. Sanchez's lawyers, and with Lisa McDermott, the mitigation specialist working on Mr. Sanchez's behalf.  My understanding was that their primary goal was for me to render an opinion as to whether or not Mr. Sanchez was mentally retarded.  (Because the current terminology to describe this condition is "intellectually disabled," I will use that terminology for the remainder of this declaration.)

9.      Mr. Sanchez's team provided me with results of psychological and neuropsychological tests administered to Mr. Sanchez earlier that year and in his childhood. They also provided some of Mr. Sanchez's school records and a few other background materials, including information about the crimes with which Mr. Sanchez was charged.

10.      Initially, I reviewed the results of the prior testing of Mr. Sanchez.  Among the results that I reviewed were percentile scores of two administrations of a Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III"), administered to Mr. Sanchez in February or March 2008 and in June 2008.  I also reviewed Mr. Sanchez's special education records, which included the results of psychological testing administered to him in June 1992, when Mr.

Page **4** of **15**

Sanchez was eight years old. The results indicated that Mr. Sanchez had obtained a full scale IQ score of 80 on the Stanford-Binet, Fourth Edition ("SB-4").

11. After I reviewed these results, I determined that I needed to administer testing to Mr. Sanchez myself. In part, this was because the results of the testing were reported as percentiles rather than as standard scores, which was atypical, and I believed it would have drawn criticism if presented at trial. I also felt more comfortable relying on the results of my own assessment when rendering an opinion and testifying in court. On December 8 and 9, 2008, I administered neuropsychological tests to Mr. Sanchez. These included, among other tests, the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"); the Peabody Picture Vocabulary Test; the Wide Range Achievement Test, Fourth Edition ("WRAT-4"); the Denman Neurological Memory Scale; the Rey Auditory Verbal Learning Scale; the Reitan Story Memory Test; the Rey Complex Figure Test and Recognition Trial; the Category Test; the Comprehensive Trail Making Test; and the Visual Search and Attention Test.

12. I concluded, based on the results of the testing I administered and my review of Mr. Sanchez's special education records, that Mr. Sanchez had a number of neuropsychological deficits. These included deficits in processing, particularly in verbal processing and processing speed. He also demonstrated auditory discrimination issues. In addition, Mr. Sanchez had significant difficulty encoding verbal information. He had problems with attention and focus. Mr. Sanchez exhibited difficulty with language acquisition. These problems are consistent with impairments to the left hemisphere of his brain. Mr. Sanchez also demonstrated impairments in executive functioning skills, such as impulsivity and marked difficulty inhibiting actions, which are associated with the frontal lobes of the brain. Mr. Sanchez's relative strengths were in non-

Page **5** of **15**

verbal, visuospatial skills.  Based upon the information I had at that time, I concluded that Mr.

Sanchez's intellectual functioning was at the borderline level.

13.     As I noted above, I was provided with only limited background materials relating

to Mr. Sanchez and his behavior and functioning over time.  Mr. Sanchez's trial defense team

gave me some records of prior testing of Mr. Sanchez, his special education records, some

information related to the investigation of the capital crimes, and some records relating to Mr.

Sanchez and his family members.  Neither Mr. Murrell nor Ms. McDermott provided me with

any information about Mr. Sanchez's adaptive or behavioral functioning in the community, other

than the limited information contained in his special education records.  I spoke very briefly with

Mr. Sanchez's sister Nydia, and through an interpreter also very briefly to Mr. Sanchez's parents.

I did not speak with any other of Mr. Sanchez's family members, friends, or teachers about Mr.

Sanchez's functioning, nor did the trial team provide me with any information from these

individuals.  I was present during the testimony of Mr. Sanchez's teacher, Amy Fleming, the day

before I testified, but I was not given an opportunity to talk to her or learn any additional

information about Mr. Sanchez's functioning from her.

14.     Since my work in Mr. Sanchez's case in 2008-2009, both the clinical definition of

intellectual disability and the legal landscape for considering claims of intellectual disability in

capital cases have changed.  In 2013, the American Psychiatric Association ("APA") published

the fifth edition of its Diagnostic and Statistical Manual of Mental Disorders (the "DSM-5").

Although a diagnosis of intellectual disability continues to require deficits in intellectual

functioning and deficits in adaptive functioning that manifest during the developmental period,

as it did during the time of Mr. Sanchez's trial, in the DSM-5 the APA refined the diagnosis to

deemphasize IQ scores and place greater focus on the individual's adaptive functioning.  There is

A-001631

Page **6** of **15**

no longer a threshold score per se for establishing a diagnosis of intellectual disability, and instead scaled IQ scores are evaluated in context of individual's entire "clinical picture."

15.     In making this change, the APA recognized that while

> IQ test scores represent approximations of conceptual functioning, [they] may be insufficient to assess reasoning in real-life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is required to interpret the results of IQ tests.[1]

16.     In May 2014, the United States Supreme Court ruled in *Hall v. Florida* that a bright-line cut-off IQ score of 70 for diagnosing intellectual disability was unconstitutional.  The Supreme Court ruled that the federal Constitution does not permit a legal definition of intellectual disability that requires that an individual's IQ score be 70 or below.

17.     Based on the information I have been provided by counsel representing Mr. Sanchez in habeas proceedings in federal court, I now conclude that Mr. Sanchez has significant limitations in intellectual functioning and adaptive functioning that manifested during the developmental period and thus that he is intellectually disabled.  Mr. Sanchez meets the criteria for intellectual disability as currently defined by clinical and legal standards.  Furthermore, had I had at trial the information about Mr. Sanchez's intellectual and adaptive deficits that I currently have, I would have concluded and testified then that Mr. Sanchez functioned at the level of an individual with intellectual disability.

18.     Mr. Sanchez was administered a Wechsler intelligence test four times in 2008. Dr. Katrina Hallmark administered the WAIS-III in March 2008, Dr. Laurence Levine

---

[1] *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition*, American Psychiatric Association (2013), at page 37.

Page 7 of **15**

administered the WAIS-III in June 2008, I administered the WAIS-IV in early December 2008, and Dr. Michael Brannon, the prosecution's expert, administered the WAIS-III in late December. Research has demonstrated that upon repeated administrations of a Wechsler instrument, an individual's scores typically rise because of increased familiarity with the test.[2] In particular, an individual's scores on the non-verbal, primarily performance-based portions of the instrument typically rise because over repeated administrations those portions lose their novelty, which means that the individual has already had practice figuring out strategies for solving the problems they pose. These improvements are due to practice effects rather than true change in intellectual functioning. The practice effect is observed both in people with typical neurological functioning as well as in people with impaired functioning and neurological disease.

19.     When the Wechsler is administered repeatedly over a relatively short period of time, as it was in Mr. Sanchez's case, this practice effect is exacerbated. In addition, because Mr. Sanchez's relative strengths are in non-verbal skills, the practice effect was further intensified.

20.     Mr. Sanchez's scores on both my administration of the WAIS-IV and Dr. Brannon's administration of the WAIS-III are likely to reflect practice effect, that is, a score that reflects an artificially inflated IQ. The score of 77 that Mr. Sanchez obtained on my administration of the WAIS-IV demonstrates a less extreme practice effect than the score of 89 that he obtained on Dr. Brannon's administration of the WAIS-III. There are several reasons for this difference: first, I administered the WAIS-IV over five months after Mr. Sanchez had last

---

[2] For example, a study conducted in 2012 demonstrated that Full Scale IQ scores on the WAIS-IV improved approximately 7 points upon retest three to six months following the first administration of the test. Eduardo Estevis, Michael R. Basso, and Dennis Combs, "Effects of Practice on the Wechsler Adult Intelligence Scale-IV Across 3- and 6-Month Intervals," *The Clinical Neuropsychologist*, 2012, 26 (2), 239–254.

Page **8** of **15**

taken a Wechsler test, while Dr. Brannon administered the WAIS-III approximately three weeks after I administered the WAIS-IV, so many items on the test as well as the test format itself were fresh in Mr. Sanchez's mind when Dr. Brannon tested him.  Second, the WAIS-IV, although similar in many ways to the WAIS-III, was nonetheless a somewhat different test with approximately 40 percent different items and a few different subtests, and Mr. Sanchez had not been exposed to the exact same test previously.  Third, Dr. Brannon's administration of the WAIS-III to Mr. Sanchez was the third time in nine months that Mr. Sanchez encountered the same test items.  If Mr. Murrell had asked me about the practice effect, I would have provided him with this explanation and would have testified to this before the penalty phase jury.

21.     The scores that Mr. Sanchez achieved on the three administrations of the WAIS-III in 2008 also reflect inflation as a result of the fact that the norms to which Mr. Sanchez was compared were outdated.  This outdating of norms as an IQ test instrument ages is commonly known as the Flynn effect, named after the psychologist whose research first documented this phenomenon.  Dr. Flynn's research indicates that scores on the Wechsler scales increase by three points over the course of a decade, or by approximately 0.33 points each year.  The WAIS-III was normed in 1995.  Thus, by the time of its administration to Mr. Sanchez in March 2008, June 2008, and December 2008, it inflated Mr. Sanchez's scores by approximately 3.9 (13 years x 0.33/year) points.[3]  If Mr. Murrell had asked me about the Flynn effect, I would have provided him with this explanation and would have testified to this before the penalty phase jury.

22.     As I noted in cross-examination during my testimony, taking into account the standard error of measurement, the range within which Mr. Sanchez's IQ falls given his score of

_____

[3] The WAIS-IV was normed in 2007, and I administered it in December 2008.  As a result, Mr. Sanchez's score on my administration of the WAIS-IV was not significantly inflated as a result of norm obsolescence.

Page **9** of **15**

77 on the WAIS-IV is between 73 and 82, without accounting for the inflation due to the practice effect. This range of scores meets the first prong of the definition of intellectual disability as defined by the DSM-5 and *Hall*.[4] Recognizing that the score he obtained is likely an overestimate of his intellectual functioning due to the practice effect further reinforces my conclusion that Mr. Sanchez satisfies the first prong of the intellectual disability diagnosis.

23.    Current counsel representing Mr. Sanchez recently provided me with the declaration of Dr. Francis Crosby, the educational psychologist who tested Mr. Sanchez when he was eight years, nine months old. This declaration puts into context the significance of the full scale IQ score of 80 that Mr. Sanchez obtained on the SB-4 at that time. Dr. Crosby explained that his practice in assessing minority students at the time he evaluated Mr. Sanchez was to try to ensure that these students received special educational services without being labeled "mentally retarded," because that diagnosis was stigmatizing. For that reason, Dr. Crosby selected test instruments that were most likely to demonstrate a significant discrepancy between the student's IQ and the student's achievement, which would allow the student to be qualified for special education as learning disabled. Dr. Crosby noted that minority students tended to obtain higher scores on the SB-4 than on other IQ tests, which helped to accomplish his goal of demonstrating a larger gap between IQ and achievement.

24.    Dr. Crosby also stated that the fact that at age eight Mr. Sanchez achieved a score that is typically considered above the range of performance for an intellectually disabled person does not rule out the possibility that he was and continues to be intellectually disabled. He

---

[4] Although at one point I testified that a diagnosis of intellectual disability requires an IQ measuring at three standard deviations below the norm, taking into account standard error of measurement,[4] that testimony in error; the correct statement, which I provided earlier in my testimony,[4] is that the IQ must fall approximately *two* standard deviations below the mean, considering the standard error of measurement. I testified correctly to this effect earlier in my testimony.

Page **10** of **15**

observed that it is important to reevaluate a child after several years to determine whether the initial evaluation accurately reflects his functioning, particularly when the first evaluation was conducted when the child is younger than ten years old. Dr. Crosby also noted that Mr. Sanchez was not reevaluated by the administration of psychological testing by the school district at any time following his first evaluation, despite the fact that he made very minimal progress with the educational accommodations and services that were put in place for him. If I had had this information at the time that I rendered my opinions and testified in Mr. Sanchez's case, I would have questioned whether the IQ score of 80 accurately reflected Mr. Sanchez's intellectual functioning when he was a child and I would not have relied upon it as an indication that Mr. Sanchez functioned above the intellectually disabled level.

25.    Current counsel for Mr. Sanchez have also recently provided me with declarations from Mr. Sanchez's family members, friends, teachers, and other educational personnel. The information in those declarations indicates that Mr. Sanchez suffered significant limitations in adaptive behavior throughout his life, consistent with the second prong of the diagnosis of intellectual disability.

26.    The Fourth Edition of *The Diagnostic and Statistical Manual of Mental Disorders*, and the *Intellectual Disability: Definition, Classification, and Systems of Supports, Tenth Edition*, published by the American Association on Intellectual and Developmental Disabilities ("AAIDD"), both of which were used to diagnose intellectual disability at the time of Mr. Sanchez's trial in 2009, required impairment in two or more of the following adaptive functioning areas to satisfy that prong of the diagnosis: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The current editions of both the DSM and the AAIDD Manuals

Page **11** of **15**

require impairment in one or more activities of daily life, categorized into conceptual, practical, and social domains. Although the framework has changed slightly, the skills examined are generally consistent between 2009 and now.

27.     The information that Mr. Sanchez's current lawyers have provided indicates that Mr. Sanchez's adaptive functioning falls at the level of an intellectually disabled person. If I had had this information at the time of his trial, I would have concluded that Mr. Sanchez had impairments in the domains of communication, functional academics, and self-direction. The new information demonstrates that Mr. Sanchez has significant difficulty with independent functioning. Today, I conclude that Mr. Sanchez has significant impairments in conceptual and social domains (under the AAIDD rubric), or in communication and social participation domains (under the DSM rubric). The information from Mr. Sanchez's teachers that Mr. Sanchez's thinking was inflexible; that it was extremely difficult, and at times impossible, for Mr. Sanchez to perform multistep tasks; that he had difficulty switching from one task to another; that he was "not the brightest crayon in the box," and that he was a follower support these conclusions. Mr. Sanchez's performance in school and on psychological and neuropsychological tests demonstrates clear and significant impairments in functional academics and conceptual deficits.

28.     The descriptions provided by Mr. Sanchez's teachers, friends, and family members about Mr. Sanchez's difficulty understanding and complying with directions and the challenges that he had initiating and participating in conversations are consistent with the language deficits demonstrated by his performance on the psychological and neuropsychological instruments I administered to him and those administered to him during his childhood. Mr. Sanchez's language deficits do not arise from his being raised by Spanish-speaking parents or the fact that he may have had more exposure to Spanish than to English during his early childhood.

A-001637

Page **12** of **15**

Mr. Sanchez has difficulty with receptive language: he has trouble with listening comprehension and encoding verbal information. These difficulties were supported by his deficits in processing skills noted on the psychological and neuropsychological tests administered to him. These impairments result in challenges to understanding concepts correctly and being limited in his ability to use language effectively as a problem-solving technique. Together these difficulties constitute significant impairments in communication and social participation.

29.     The declarations of family members, teachers and educational personnel, and friends also provide ample evidence of impairments in self-direction. The people who knew and observed Mr. Sanchez throughout his life knew him to be a follower, someone who did not initiate plans or come up with his own ideas and instead someone who simply did what others around him did and told him to do.

30.     There is also evidence that Mr. Sanchez had limitations in other domains, including home living and work. Mr. Sanchez never lived independently; even as an adult he lived with others who took care of his finances and household responsibilities, including his mother, his girlfriend, and his girlfriend's mother. Although Mr. Sanchez was able to obtain work and to perform some jobs, he did not keep any job for very long and at least once was let go for failing to meet expectations.

31.     Mr. Sanchez's impairments in intellectual and adaptive functioning manifested during his childhood, prior to the age of eighteen. It is thus currently my conclusion, held to a reasonable degree of psychological certainty, that Mr. Sanchez meets the diagnosis for intellectual disability.

32.     Mr. Sanchez's trial defense team did not provide me with much of the information that Mr. Sanchez's current counsel have provided. As a result, I had insufficient information at

that time from which to determine that Mr. Sanchez exhibited deficits in adaptive skills domains. If I had been provided at the time of trial with the more thorough information about Mr. Sanchez's adaptive functioning deficits over the course of his life, I would have considered it important to a determination of intellectual disability.  Evidence of Mr. Sanchez's deficits in functioning also would have informed and supported my opinions about Mr. Sanchez's additional impairments, and if that information had been provided to me I would have considered it carefully in rendering all of my opinions.

33.     I also recently reviewed the expert declarations of Dr. Joette James and Dr. Kevin McGrew, which were obtained by Mr. Sanchez's current counsel.  These doctors' conclusions about Mr. Sanchez's intellectual and adaptive functioning are consistent with the clinical definitions of intellectual disability as set forth in the DSM-5.  They are based upon a clinical understanding of the imprecision of IQ scores.  Dr. James' declaration also places appropriate emphasis under DSM-5 upon the significant deficits in adaptive functioning that Mr. Sanchez has exhibited throughout his life.

34.     In addition, I recently reviewed the declaration of psychiatrist Louis Kraus, who evaluated Mr. Sanchez for psychiatric symptoms at habeas counsel's request.  Dr. Kraus concluded that Mr. Sanchez suffers from symptoms of mental illness, including anxiety, depression, hyperactivity, and sequelae of trauma.  At no time during my consultation with Mr. Sanchez's defense team did any member of the team ask me to assess Mr. Sanchez for mental illness.

35.     Mr. Sanchez's trial team also did not ask me about Mr. Sanchez's ability to understand, participate in, and assist counsel during trial proceedings.  If they had asked me, I would have advised them that due to Mr. Sanchez's low intellectual functioning, impaired

Page **14** of **15**

encoding of information, and his impaired language and verbal functioning, he experiences difficulty processing and comprehending incoming stimuli and information and, at a minimum, needs more time to accurately process that information in order to comprehend the meaning of what had transpired. I also would have advised them that information may need to be repeated and/or discussed with his counsel for him to comprehend the proceedings. I would have advised them that it was critical to take frequent breaks in the proceedings, and that these breaks should occur at least as often as after the testimony of each witness, and should last long enough for the attorneys to review the testimony with Mr. Sanchez, explain what was important in the testimony to him, and ask him questions to ensure that he understood. I would have told them that without these accommodations, it would be doubtful that Mr. Sanchez would be able to understand the evidence presented. In other cases, I have assisted the trial team by preparing an affidavit in support of a motion for accommodations in the court room, and I would have done this in Mr. Sanchez's case had I been asked to do so.

36.     I did not feel prepared to testify when I took the stand in Mr. Sanchez's case. It was unclear to me what Mr. Murrell's purpose was in presenting my testimony. The defense team had not explained to me what the penalty phase defense theory was or how my testimony fit into it. And I was perturbed when I took the stand because it was my impression that Mr. Murrell did not really understand the neuropsychological tests and what the results meant and was unprepared to handle testimony about psychological functioning. Although it appeared that Mr. Murrell understood that some issues were important – for example, he knew that it was important that Mr. Sanchez's brother was mentally retarded and that Mr. Sanchez's parents both exhibited low intellectual functioning – Mr. Murrell did not seem to understand why these issues were important. He asked me about Mr. Sanchez's parents' intellectual functioning during my

Page **15** of **15**

testimony, but he did not ask questions that permitted me to explain that an individual who has a

family history of impaired cognitive abilities is at much greater risk for the development of

cognitive and intellectual impairment himself.

I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.

Signed on _1 December 2016_

Name _Daniel H. Brant_

A-001641

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921 DEMOGRAPHIC INFORMATION        FILE: SRTS12IS
GRADE LEVEL: 12   PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL            PAGE 1
FL STUDENT ID: 595324176X   SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                         (000) 000-0000
MAILING    5778 COCONUT RD                            1325 GATEWAY BLVD
ADDRESS:   WEST PALM BEACH    FL  33413               BOYNTON BEACH      FL 33426
DISTRICT STUDENT ID:  18024299 FL STUDENT ID-ALIAS: 595324176X
PARENT/GUARDIAN (NAME/CODE):                          OLD RACIAL/ETHNIC CODE: H  SEX: M
JUANA SANCHEZ            PARENT                        BIRTH DATE: 04/17/1985  BIRTH VERIFICATION: 1
RICARDO SANCHEZ         PARENT                         BIRTHPLACE: PALM BEACH CO  FL
ETHNICITY: NON-HISPANIC  RACE CODES:
RESIDENCY FOR TUITION PURPOSES: NOT REQUIRED

IMMUNIZATION STATUS: PERMANENT IMMUNIZATION CERTIFICATE
VACCINE STATUS, DATE-                            VACCINE CERTIFICATE EXPIRATION DATE:
TYPE        DOSE DATE      DOSE DATE      DOSE DATE      DOSE DATE      DOSE DATE
DTP          1  07/10/1985  2  11/20/1985  3  08/08/1986  4  02/04/1987  5  08/08/1989
POLIO        1  07/10/1985  2  11/20/1985  3  08/08/1986  4  08/08/1989
MMR          1  08/08/1986  2  04/19/1996
MEASLES      1  08/08/1986
HEP B 3DOSE  1  09/08/1997  2  04/23/1998  3  09/29/1998
(EXTRANEOUS VACCINATIONS): (A619970908)
------------------------------------- COURSE INFORMATION -------------------------------------
DISTRICT: 50 SCHOOL: 2921 NO COURSES TAKEN       DISTRICT: 50 SCHOOL: 1531 C O TAYLOR/KIRKLANE ELEME
   YEAR: 1990-1991  GRADE LEVEL: NA                  YEAR: 1992-1993  GRADE LEVEL: 02
                                                              SUBJECT CRSE G    A O   CREDIT
                GPA QTY PTS        GPA QTY PTS      T COURSE# COURSE TITLE    AREA FLAG R   C N ATT./EARN
DISTRICT-TERM: 2.0000   14.00  CUM: 1.6271   48.00  S 5100080 SECOND GRADE            P   Z N 0.00 0.00
    STATE-TERM: 2.0000   14.00  CUM: 1.6271   48.00
                                                   DISTRICT: 50 SCHOOL: 1441 MELALEUCA ELEMENTARY
1990-1991 ANNUAL DAYS-PRESENT:    0  ABSENT:    0      YEAR: 1992-1993  GRADE LEVEL: 02
SUMMER TERMS DAYS-PRESENT:    0  ABSENT:    0                  SUBJECT CRSE G    A O   CREDIT
NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR T COURSE# COURSE TITLE    AREA FLAG R   C N ATT./EARN
                                                   2 5100080 SECOND GRADE            F   Z N 0.00 0.00
DISTRICT: 50 SCHOOL: 1441 MELALEUCA ELEMENTARY            CREDIT, TERM:       0.00 0.00
   YEAR: 1991-1992  GRADE LEVEL: 01
                SUBJECT CRSE G    A O   CREDIT  1992-1993 ANNUAL DAYS-PRESENT: 168  ABSENT: 12
T COURSE# COURSE TITLE    AREA FLAG R   C N ATT./EARN SUMMER TERMS DAYS-PRESENT:    27  ABSENT:  2
3 5100070 FIRST GRADE            P   Z N 0.00 0.00 ACADEMICALLY PROMOTED
5 5100070 FIRST GRADE            P   Z N 0.00 0.00
          CREDIT, TERM:       0.00 0.00

1991-1992 ANNUAL DAYS-PRESENT: 180  ABSENT:    0
SUMMER TERMS DAYS-PRESENT:    0  ABSENT:    0
```

A-001642

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

Case 9:16-cv-80698-BB   Document 52-1   Entered on FLSD Docket 12/15/2016   Page 42 of 112

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921   COURSE INFORMATION              FILE: SRTS12IS
GRADE LEVEL: 12   PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL              PAGE 2
FL STUDENT ID: 595324176X   SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                               (000) 000-0000
```

THE SCHOOL DISTRICT — REACH FOR EXCELLENCE — PALM BEACH COUNTY

```
DISTRICT: 50 SCHOOL: 1441 MELALEUCA ELEMENTARY        DISTRICT: 50 SCHOOL: 0351 WESTWARD ELEMENTARY
   YEAR: 1993-1994  GRADE LEVEL: 03                      YEAR: 1995-1996  GRADE LEVEL: 05
                    SUBJECT CRSE G   A O   CREDIT                        SUBJECT CRSE G   A O   CREDIT
T COURSE# COURSE TITLE   AREA FLAG R   C N ATT./EARN   T COURSE# COURSE TITLE   AREA FLAG R   C N ATT./EARN
S 5100090 THIRD GRADE         P       Z N 0.00 0.00    3 5100110 FIFTH GRADE         P       Z N 0.00 0.00
3 5100090 THIRD GRADE         F       Z N 0.00 0.00    3 5100110 FIFTH GRADE         P       Z N 0.00 0.00
            CREDIT, TERM:       0.00  0.00             3 7763040 LANG THRPY: PK-5    P       Z N 0.00 0.00
                                                                   CREDIT, TERM:       0.00  0.00
1993-1994 ANNUAL DAYS-PRESENT: 170  ABSENT:  10
SUMMER TERMS DAYS-PRESENT:       18  ABSENT:   2       1995-1996 ANNUAL DAYS-PRESENT: 178  ABSENT:   2
ACADEMICALLY PROMOTED                                 SUMMER TERMS DAYS-PRESENT:       20  ABSENT:   0
                                                      ACADEMICALLY PROMOTED
DISTRICT: 50 SCHOOL: 1441 MELALEUCA ELEMENTARY
   YEAR: 1994-1995  GRADE LEVEL: 04                   DISTRICT: 50 SCHOOL: 2151 OKEEHEELEE MIDDLE SCHOOL
                    SUBJECT CRSE G   A O   CREDIT         YEAR: 1996-1997  GRADE LEVEL: 06
T COURSE# COURSE TITLE   AREA FLAG R   C N ATT./EARN                     SUBJECT CRSE G   A O   CREDIT
3 5100100 FOURTH GRADE        P       Z N 0.00 0.00   T COURSE# COURSE TITLE   AREA FLAG R   C N ATT./EARN
3 5100100 FOURTH GRADE        P       Z N 0.00 0.00   3 7810010 LANG ART: 6-8       C       Z N 0.00 0.00
3 7763040 LANG THRPY: PK-5    P       Z N 0.00 0.00   3 7810020 READ: 6-8           C       Z N 0.00 0.00
            CREDIT, TERM:       0.00  0.00             3 7812010 MATH: 6-8           D       Z N 0.00 0.00
                                                      3 7820010 SCI: 6-8            D       Z N 0.00 0.00
1994-1995 ANNUAL DAYS-PRESENT: 175  ABSENT:   5       3 7821010 SOC STUD: 6-8       D       Z N 0.00 0.00
SUMMER TERMS DAYS-PRESENT:        0  ABSENT:   0       6 8500130 LIFE CHOICES        F       Z N 0.00 0.00
ACADEMICALLY PROMOTED                                 7 8200110 BUS KEYBOARDING     D       Z N 0.00 0.00
                                                      8 1501000 M/J PHYS FITNESS    B       Z N 0.00 0.00
DISTRICT: 50 SCHOOL: 0291 NORTHBORO ELEMENTARY        9 0100000 M/J ART/ART APPREC  C       Z N 0.00 0.00
   YEAR: 1995-1996  GRADE LEVEL: 05                                 CREDIT, TERM:       0.00  0.00
                    SUBJECT CRSE G   A O   CREDIT
T COURSE# COURSE TITLE   AREA FLAG R   C N ATT./EARN  1996-1997 ANNUAL DAYS-PRESENT: 174  ABSENT:   6
S 5010010 ESOL E              P       Z N 0.00 0.00   SUMMER TERMS DAYS-PRESENT:       20  ABSENT:   0
                                                      ACADEMICALLY PROMOTED
```

A-001643

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  COURSE INFORMATION              FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL              PAGE 3
FL STUDENT ID: 595324176X  SSN: 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    CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                            (000) 000-0000
```

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

DISTRICT: 50 SCHOOL: 2151 OKEEHEELEE MIDDLE SCHOOL      DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH
  YEAR: 1997-1998  GRADE LEVEL: 07                       YEAR: 1999-2000  GRADE LEVEL: 09

```
                    SUBJECT CRSE G   A O   CREDIT                      SUBJECT CRSE G   A O   CREDIT
T COURSE# COURSE TITLE  AREA FLAG R   C N ATT./EARN   T COURSE# COURSE TITLE  AREA FLAG R   C N ATT./EARN
1 0100010 M/J ART/ART APPREC       A   Z N 0.00 0.00  1 0200310 COMPU APPLI I     EL      D   Z N 0.50 0.50
2 1501040 M/J STRIKING OBJECT      D   Z N 0.00 0.00  1 1001310 ENG 1             EN  J   C   Z N 0.50 0.50
3 7810010 LANG ART: 6-8            C   Z N 0.00 0.00  1 1205500 EXPLOR IN MATH I  MA  C   C   Z N 0.50 0.50
3 7810020 READ: 6-8                A   Z N 0.00 0.00  1 2001310 ERTH/SPA SCI      SC  J   D   Z N 0.50 0.50
3 7812010 MATH: 6-8                C   Z N 0.00 0.00  1 7963080 LRNG STRATEGIES   EL      B   Z N 0.50 0.50
3 7820010 SCI: 6-8                 A   Z N 0.00 0.00  1 8502000 LIFE MANAGEMENT SKI LM    D   Z N 0.50 0.50
3 7821010 SOC STUD: 6-8            C   Z N 0.00 0.00  1 8600540 PRODUCTION TECH I VO      D   Z N 0.50 0.50
                CREDIT, TERM:        0.00 0.00         2 0200330 COMPU APPLI II    EL      D   Z N 0.50 0.50
                                                       2 1001310 ENG 1             EN  J   C   Z N 0.50 0.50
1997-1998 ANNUAL DAYS-PRESENT: 150  ABSENT:   30       2 1205500 EXPLOR IN MATH I  MA  XC  F   Z N 0.50 0.00
SUMMER TERMS DAYS-PRESENT:       0  ABSENT:    0       2 1501300 PERS FIT          PE  XRJ F   Z N 0.50 0.00
ACADEMICALLY PROMOTED                                  2 2001310 ERTH/SPA SCI      SC  J   D   Z N 0.50 0.50
                                                       2 7963080 LRNG STRATEGIES   EL      A   Z N 0.50 0.50
DISTRICT: 50 SCHOOL: 2151 OKEEHEELEE MIDDLE SCHOOL      2 8600540 PRODUCTION TECH I VO      D   Z N 0.50 0.50
  YEAR: 1998-1999  GRADE LEVEL: 08                      5 1205500 EXPLOR IN MATH I  MA  IC  B   Z N 0.50 0.50
                    SUBJECT CRSE G   A O   CREDIT                     CREDIT, TERM:        6.50 6.50
T COURSE# COURSE TITLE  AREA FLAG R   C N ATT./EARN
1 0100040 M/J ART/ART APPREC       C   Z N 0.00 0.00                  GPA QTY PTS              GPA QTY PTS
1 8200210 COMP APP IN BUS 2        C   Z N 0.00 0.00  DISTRICT-TERM: 1.7692   11.50   CUM: 1.7692   11.50
2 1501040 M/J STRIKING OBJECT      F   Z N 0.00 0.00     STATE-TERM: 1.7692   11.50   CUM: 1.7692   11.50
2 8500240 TEEN CHALLENGES          C   Z N 0.00 0.00
3 2002100 M/J COMPRE SCI 3         F   Z N 0.00 0.00  1999-2000 ANNUAL DAYS-PRESENT: 165  ABSENT:   15
3 2100010 M/J US HIST              F   Z N 0.00 0.00  SUMMER TERMS DAYS-PRESENT:       13  ABSENT:    0
3 7810010 LANG ART: 6-8            D   Z N 0.00 0.00  ACADEMICALLY PROMOTED
3 7812010 MATH: 6-8                C   Z N 0.00 0.00
                CREDIT, TERM:        0.00 0.00

1998-1999 ANNUAL DAYS-PRESENT: 154  ABSENT:   26
SUMMER TERMS DAYS-PRESENT:       0  ABSENT:    0
ACADEMICALLY PROMOTED
```

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

A-001644

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

THE SCHOOL DISTRICT PALM BEACH COUNTY REACH FOR EXCELLENCE

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  COURSE INFORMATION          FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL         PAGE 4
FL STUDENT ID: 595324176X  SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC
```

LEGAL NAME: SANCHEZ, EZEQUIEL                                    (000) 000-0000

| | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH

YEAR: 2000-2001  GRADE LEVEL: 09

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | G R | A C | O N | CREDIT ATT./EARN |
|---|---|---|---|---|---|---|---|---|
| 1 | 1001340 | ENG 2 | EN | J | C | Z | N | 0.50 0.50 |
| 1 | 1200370 | ALG 1-A | MA | XJR | F | Z | N | 0.50 0.00 |
| 1 | 1503360 | TEAM SPRTS 2 | PE | J | A | Z | N | 0.50 0.50 |
| 1 | 1900300 | DRIVER ED CLASS | EL | | C | Z | N | 0.50 0.50 |
| 1 | 2000310 | BIO 1 | SC | XRJ | F | Z | N | 0.50 0.00 |
| 1 | 2109310 | WORLD HIST | WH | XRJ | F | Z | N | 0.50 0.00 |
| 1 | 7963080 | LRNG STRATEGIES | EL | | C | Z | N | 0.50 0.50 |
| 2 | 1001340 | ENG 2 | EN | J | C | Z | N | 0.50 0.50 |
| 2 | 1200370 | ALG 1-A | MA | XJR | F | Z | N | 0.50 0.00 |
| 2 | 1502410 | INDIV/DUAL SPRTS 1 | PE | J | C | Z | N | 0.50 0.50 |
| 2 | 2000310 | BIO 1 | SC | RJ | F | Z | N | 0.50 0.00 |
| 2 | 2109310 | WORLD HIST | WH | RJ | F | Z | N | 0.50 0.00 |
| 2 | 7963080 | LRNG STRATEGIES | EL | | F | Z | N | 0.50 0.00 |
| 2 | 8500390 | PRINC FOOD PREP | VO | | C | Z | N | 0.50 0.50 |
| 4 | 1200370 | ALG 1-A | MA | IJR | B | Z | N | 0.50 0.50 |
| 5 | 1200370 | ALG 1-A | MA | IJR | B | Z | N | 0.50 0.50 |

```
                         CREDIT, TERM:           6.00  4.50

                  GPA QTY PTS                 GPA QTY PTS
DISTRICT-TERM: 1.8333   11.00    CUM: 1.8000  22.50
   STATE-TERM: 1.8333   11.00    CUM: 1.8000  22.50

2000-2001 ANNUAL DAYS-PRESENT: 179  ABSENT:    2
SUMMER TERMS DAYS-PRESENT:        26  ABSENT:   0
RETAINED IN SAME GRADE
```

DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH

YEAR: 2001-2002  GRADE LEVEL: 09

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | G R | A C | O N | CREDIT ATT./EARN |
|---|---|---|---|---|---|---|---|---|
| 1 | 1001370 | ENG 3 | EN | J | C | Z | N | 0.50 0.50 |
| 1 | 1200310 | ALG 1 | MA | J | C | Z | N | 0.50 0.50 |
| 1 | 1501340 | WEIGHT TRAIN 1 | PE | J | C | Z | N | 0.50 0.50 |
| 1 | 2001340 | ENV SCI | SC | X J | F | Z | N | 0.50 0.00 |
| 1 | 2100310 | US HIST | AH | XRJ | F | Z | N | 0.50 0.00 |
| 1 | 7963080 | LRNG STRATEGIES | EL | D | | Z | N | 0.50 0.50 |
| 1 | 8601010 | COMMUNICATION TECH | VO | B | | Z | N | 0.50 0.50 |
| 2 | 1001370 | ENG 3 | EN | J | C | Z | N | 0.50 0.50 |
| 2 | 1200310 | ALG 1 | MA | XJ | F | Z | N | 0.50 0.00 |
| 2 | 1501300 | PERS FIT | PE | IRJ | F | Z | N | 0.50 0.00 |
| 2 | 2001340 | ENV SCI | SC | J | F | Z | N | 0.50 0.00 |
| 2 | 2100310 | US HIST | AH | RJ | F | Z | N | 0.50 0.00 |
| 2 | 7963080 | LRNG STRATEGIES | EL | | F | Z | N | 0.50 0.00 |
| 2 | 8601010 | COMMUNICATION TECH | VO | B | | Z | N | 0.50 0.50 |
| 5 | 1200310 | ALG 1 | MA | IJ | C | Z | N | 0.50 0.50 |

```
                         CREDIT, TERM:           6.00  4.00

                  GPA QTY PTS                 GPA QTY PTS
DISTRICT-TERM: 1.4167    8.50    CUM: 1.6757  31.00
   STATE-TERM: 1.4167    8.50    CUM: 1.6757  31.00

2001-2002 ANNUAL DAYS-PRESENT: 175  ABSENT:    5
SUMMER TERMS DAYS-PRESENT:         1  ABSENT:   0
ACADEMICALLY PROMOTED
```

DISTRICT: 50 SCHOOL: 1852 PB LAKES ADULT ED CENTER

YEAR: 2002-2003  GRADE LEVEL: 10

| T | COURSE# | COURSE TITLE | SUBJECT AREA | CRSE FLAG | G R | A C | O N | CREDIT ATT./EARN |
|---|---|---|---|---|---|---|---|---|
| 1 | 1000410 | INTENS READ | EL | B | | Z | N | 0.50 0.50 |

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

A-001645

THE SCHOOL DISTRICT · REACH FOR EXCELLENCE · PALM BEACH COUNTY

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

UNOFFICIAL

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  COURSE INFORMATION                FILE: SRTS12IS
GRADE LEVEL: 12   PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL               PAGE  5
FL STUDENT ID: 595324176X  SSN: 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        CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                                   (000) 000-0000
```

```
DISTRICT: 50 SCHOOL: 1851 PALM BEACH LAKES HIGH        DISTRICT: 50 SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC
 YEAR: 2002-2003  GRADE LEVEL: 10                       YEAR: 2003-2004  GRADE LEVEL: 10
                  SUBJECT CRSE G  A O    CREDIT                          SUBJECT CRSE G  A O    CREDIT
T COURSE# COURSE TITLE    AREA FLAG R  C N ATT./EARN    T COURSE# COURSE TITLE    AREA FLAG R  C N ATT./EARN
1 1001400 ENG 4           EN   J    F  Z N 0.50 0.00    1 1001460 APPL COMMUNICATION EN RJ  D  Z N 0.50 0.50
1 2000310 BIO 1           SC   IRJ  F  Z N 0.50 0.00    1 1205370 CONSUMER MATH      MA C    C  Z N 0.50 0.50
1 2001340 ENV SCI         SC   I J  F  Z N 0.50 0.00    1 2002520 MARINE SCI 2       SC J    C  Z N 0.50 0.50
1 2100310 US HIST         AH   IRJ  F  Z N 0.50 0.00    1 7963130 UNIQUE SK          EL      A  Z N 0.50 0.50
1 2106450 AMER POLITICAL SYST AG JR F  Z N 0.50 0.00    1 8301610 WORK EXP 1         VO      C  Z N 0.50 0.50
1 2109310 WORLD HIST      WH   IRJ  B  Z N 0.50 0.50    1 8301650 WORK EXP-OJT       VO      F  Z N 1.00 0.00
1 7963080 LRNG STRATEGIES EL        F  Z N 0.50 0.00    2 1001460 APPL COMMUNICATION EN RJ  B  Z N 0.50 0.50
              CREDIT, TERM:            4.00 1.00         2 1205370 CONSUMER MATH      MA C    C  Z N 0.50 0.50
                                                        2 2106350 LAW STUDIES        SS J    C  Z N 0.50 0.50
            GPA QTY PTS          GPA QTY PTS            2 7963130 UNIQUE SK          EL      B  Z N 0.50 0.50
DISTRICT-TERM: 0.7500   3.00  CUM: 1.5111  34.00        2 8301610 WORK EXP 1         VO      B  Z N 0.50 0.50
   STATE-TERM: 0.7500   3.00  CUM: 1.5111  34.00        2 8301650 WORK EXP-OJT       VO      C  Z N 1.00 1.00
                                                                      CREDIT, TERM:           7.00 6.00
2002-2003 ANNUAL DAYS-PRESENT: 127  ABSENT:  30
SUMMER TERMS DAYS-PRESENT:        0  ABSENT:   0                     GPA QTY PTS         GPA QTY PTS
NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR    DISTRICT-TERM: 2.0000  14.00  CUM: 1.6271  48.00
                                                         STATE-TERM: 2.0000  14.00  CUM: 1.6271  48.00

                                                      2003-2004 ANNUAL DAYS-PRESENT:  59  ABSENT:   0
                                                      SUMMER TERMS DAYS-PRESENT:        0  ABSENT:   0
                                                      NOT ENROLLED IN DISTRICT K-12 AT END OF SCHOOL YEAR
```

A-001646

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  GRADUATION SUMMARY        FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL       PAGE  6
FL STUDENT ID: 595324176X  SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                         (000) 000-0000

****** C U M U L A T I V E   S U M M A R Y ******       DIPLOMA DATE: 05/28/2004
*           AS OF: 04/26/2016                    *       TYPE: W10-FL HS PERF-BASED (GED/APPRVD GRAD TEST
* GRADUATION OPTION: GED EXIT OPTION MODEL       *     CAREER & TECH PRGM COMPLETION STATUS:
* YEAR ENTERED NINTH GRADE: 19992000             *       NUMBER: 8600500  UNKNOWN
*          - - - - CREDITS - - - -               *
*         SUBJECT  TOTAL   TOTAL   TOTAL          *     DISTRICT CLASS RANK- EFFECTIVE DATE: 07/28/2004
*           AREA  TO DATE  NEEDED REMAINING *          CLASS RANK, NUMERICAL POSITION:    110
*      ENGLISH (EN)  4.00   4.00    0.00     *              CLASS RANK, PERCENTILE:         36
*     ALGEBRA1 (A1)  0.00   0.00    0.00     *          CLASS RANK, TOTAL NUMBER IN CLASS:  173
*     ALGEBRA2 (A2)  0.00                    *
*     GEOMETRY (GE)  0.00   0.00    0.00     *     DATE PASSED ASSESSMENT TEST FOR GRADUATION PURPOSES
*   MATHEMATICS (MA) 4.00   3.00    0.00     *       ENGLISH/LANGUAGE ARTS:   10/2002
*      BIOLOGY (BI)  0.00   0.00    0.00     *       MATHEMATICS/ALGEBRA 1:   10/2002
* EQ RIG SCIENCE(EQ/SC) 1.50 3.00   1.50     *     ONLINE COURSE EXEMPT:     T
*   U.S. HISTORY (AH) 0.00  1.00    1.00     *     COMMUNITY SERVICE HOURS:    0  REQUIREMENT MET: N
*  WORLD HISTORY (WH) 0.50  1.00    0.50     *
*     ECONOMICS (EC)  0.00  0.50    0.50     *
* U.S. GOVERNMENT (AG) 0.00 0.50    0.50     *
*     VOCATIONAL/ (VO) 4.50                  *
* PERFORM FINE ART PF)* 0.00 1.00            *
* LIFE MGMT SKILLS (LM) 0.50 0.50   0.00     *
*    PHYSICAL ED (PE)  1.50  1.00   0.00     *
*   SOCIAL STUDIES (SS) 0.50                 *
*      ELECTIVE (EL)   5.00  8.50   0.00     *
* CREDITS, CUMULATIVE: 22.00 24.00  4.00     *
*- - - - - - - - - - - - - - - - - - - - - - *
* * TOTALS INCLUDE VOCATIONAL & PERFORM FINE ARTS*
*        GPA QTY PTS        GPA QTY PTS      *
* DISTRICT: 1.6271  48.00 STATE: 1.6271  48.00 *
****************************************************
+++++++++++++++++++++++++++++++++++++++++++++++++
+CERTIFIED BY:                                  +
+SIGNATURE:                                     +
+DATE:                                          +
+++++++++++++++++++++++++++++++++++++++++++++++++
```

OFFICIAL TRANSCRIPT
THE SCHOOL DISTRICT OF
PALM BEACH COUNTY FLORIDA

APR 26 2016

RECORDS CUSTODIAN

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

A-001647

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  COMMENTS              FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL        PAGE 7
FL STUDENT ID: 595324176X  SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                         (000) 000-0000

------------------------------------ DEFINITION OF TERM CODES ------------------------------------
CODE DEFINITION       CODE DEFINITION       CODE DEFINITION       CODE DEFINITION       CODE DEFINITION
  1  SEMESTER 1         S  COMBINED SUMMER    B  TRIMESTER 1        E  QUINMESTER 1       J  SIX WEEKS 1
  2  SEMESTER 2            SESSION            C  TRIMESTER 2        F  QUINMESTER 2       K  SIX WEEKS 2
  3  ANNUAL             T  INTERSESSION 1*    D  TRIMESTER 3        G  QUINMESTER 3       L  SIX WEEKS 3
  4  SUMMER SESSION 1   U  INTERSESSION 2*    6  QUARTER 1          H  QUINMESTER 4       M  SIX WEEKS 4
  5  SUMMER SESSION 2   V  INTERSESSION 3*    7  QUARTER 2          I  QUINMESTER 5       N  SIX WEEKS 5
  R  SHORT COURSE**     W  INTERSESSION 4*    8  QUARTER 3          Y  YEAR OF           O  SIX WEEKS 6
                        X  INTERSESSION 5*    9  QUARTER 4             NONENROLLMENT***

  *   USED (INSTEAD OF SUMMER SCHOOL SESSIONS) WITH YEAR-ROUND SCHOOL RECORDKEEPING
  **  USED ONLY FOR WORKFORCE DEVELOPMENT EDUCATION (ADULT GENERAL AND POSTSECONDARY CAREER & TECHNICL ED)
  *** USED ONLY FOR REPORTING STUDENTS WHO HAVE WITHDRAWN BETWEEN SCHOOL YEARS

STATE GRADING SCALE FOR HIGH SCHOOL STUDENTS (REGARDLESS OF ENTRY DATE) EFFECTIVE SCHOOL YEAR 1997-1998

                                  GRADING SCALE, EFFECTIVE 07/01/2001
           GRADE   QUALITY                  GRADE   QUALITY                  GRADE   QUALITY
  GRADE  EQUIVALENT  POINTS        GRADE  EQUIVALENT  POINTS        GRADE  EQUIVALENT  POINTS
   A  =   90 - 100    4.00          B  =   80 - 89    3.00          C  =   70 - 79    2.00
   D  =   60 - 69     1.00          F  =    0 - 59    0.00

                                  GRADING SCALE, PRIOR TO 07/01/2001
           GRADE   QUALITY                  GRADE   QUALITY                  GRADE   QUALITY
  GRADE  EQUIVALENT  POINTS        GRADE  EQUIVALENT  POINTS        GRADE  EQUIVALENT  POINTS
   A  =   94 - 100    4.00          B  =   85 - 93    3.00          C  =   77 - 84    2.00
   D  =   70 - 76     1.00          F  =    0 - 69    0.00

  NOTE:  FROM THE 1987-1988 THROUGH THE 1996-1997 SCHOOL YEARS, FOR STUDENTS ENTERING
         HIGH SCHOOL DURING THESE YEARS, THE GRADE EQUIVALENTS FOR C, D, AND F WERE:
         C = 75-84, D = 65-74, AND F = 0-64; QUALITY POINTS AND ALL OTHER GRADES WERE
         THE SAME AS THOSE SHOWN IN THE IMMEDIATELY PRECEDING STATE GRADING SCALE.
```

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

A-001648

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

Case 9:16-cv-80655-BB   Document 32-1   Entered on FLSD Docket 12/15/2016   Page 48 of 112

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  COMMENTS                    FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016     CURRENT DISTRICT: 50 PALM BEACH SCHOOL             PAGE 8
FL STUDENT ID: 595324176X  SSN: 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     CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                               (000) 000-0000

------------------------------ STATE DEFINED COURSE FLAGS -----------------------------------
E=ACADEMIC SCHOLAR-ELECTIVE     R=ACADEMIC SCHOLAR-REQUIREMENT      9=NINTH GRADER
G=GIFTED                        H=HONORS                           N=NO CREDIT
I=INCLUDE IN GPA                X=EXCLUDE FROM GPA                  W=EXCLUDE FROM STATE GPA
P=COURSE IS IN PROGRESS         S=CREDIT AWARDED BY SLEP EXAM       T=TRANSFERRED COURSE

CAREER & TECH SUBSTITUTION CRSES-                          &=JROTC AIR FC SUB FOR LIFE MGMT
$=JOURNALISM SUB FOR PRAC ARTS  0=JROTC SUB FOR PRACTICAL ARTS     1=COMP ED SUB FOR PRACTICAL ARTS
2=SUB FOR BUS EN I 1001440      3=SUB FOR BUS EN I 1001440/II 1001450 4=SUB FOR MA I 1205540
5=SUB FOR MA I 1205380/II 1205390 6=SUB FOR GEN SCI 2002310, 8427100 7=SUB FOR ANAT PHYSIO 2000350
8=SUB FOR PRE ALGEBRA 1200300   A=JROTC CST GD SUB FOR SCIENCE     F=JROTC AIR FC SUB FOR SCIENCE
K=JROTC NAVY SUB FOR SCIENCE    O=JROTC ARMY SUB FOR LIFE MGMT     Q=JROTC MARINE SUB FOR LIFE MGMT
@=SUB FOR BIO TECH 2000430      #=SUB FOR ENV SCI 2001340          %=SUB FOR PHY SCI 2003310
*=SUBSTITUTE FOR COURSE SPECIFIED ON FOLLOWING LINE ON COURSE LIST

ELL INSTRUCTION-
M=HOME LANGUAGE INSTRUCTION      B=HOME LANGUAGE &/OR ESOL INSTRUCTION (ELEMENTARY SELF-CONTAINED)
D=ESOL INSTRUCTION

------------------- SCHOOL YEAR 1991-1992 COMMENTS ------------------------
     THE PALM BEACH COUNTY SCHOOL DISTRICT AWARDS THE HIGH SCHOOL VALEDICTORIAN
     AND SALUTATORIAN USING A WEIGHTED GPA AVERAGE THAT IS BASED ON COURSES TAKEN
     IN GRADES 9 - 12.  HOWEVER, THE DISTRICT GPA INCLUDES ALL CREDIT COURSES.
     ---------------------------------------------------------------------
     **FLORIDA LAW STATES THAT BEGINNING WITH STUDENTS ENTERING GRADE 9 IN THE
     2011-2012 SCHOOL YEAR AND BEGINNING THAT YEAR FOR MIDDLE SCHOOL STUDENTS,
     ABSENT A WAIVER AUTHORIZED BY STATUTE, THE FOLLOWING COURSES ARE NOT AWARDED
     HIGH SCHOOL CREDIT, UNLESS AN END-OF-COURSE (EOC) EXAM IS TAKEN AND PASSED OR
     AN EQUIVALENT SCORE IS EARNED:
     ALGEBRA 1 (OR AN EQUIVALENT COURSE), ALGEBRA 1 HONORS
```

THE SCHOOL DISTRICT
REACH FOR EXCELLENCE
PALM BEACH COUNTY

A-001649

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921 CATEGORY B INFORMATION      FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016  CURRENT DISTRICT: 50 PALM BEACH SCHOOL         PAGE  9
FL STUDENT ID: 595324176X  SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                          (000) 000-0000

WITHDRAWAL-DATE: 05/28/2004  CODE: W10

HOME LANGUAGE SURVEY DATE: 08/27/1991        COUNTRY OF BIRTH: US UNITED STATES
NATIVE LANGUAGE: SP SPANISH                  PRIMARY HOME LANGUAGE: SP SPANISH

HEALTH EXAMINATION, SCHOOL ENTRY: Y SCHOOL ENTRY HEALTH EXAMINATION CERTIFIED.
SCREENINGS - HEARING: HY STUDENT TOOK AND PASSED TEST     VISION: VY STUDENT TOOK AND PASSED TEST

------------------------------- EXCEPTIONAL STUDENT INFORMATION ------------------------------------
STUDENT PLAN DATE: 11/20/2003  CURRENT EVALUATION/RE-EVALUATION DATE: 02/14/2005
PRIMARY EXCEPTIONALITY: K SPECIFIC LEARNING DISABILITY   FEFP PROGRAM: 251 INVALID CODE

---------------------------- EXCEPTIONAL STUDENT PROGRAM INFORMATION --------------------------------
                                            EVALUATION    ELGB     PLACE-   DISMIS-
                        PLACEMENT           RESULTANT COMPLETE DETERM   MENT     SAL
EXCEPTIONALITY          STATUS              DATE     DATE     DATE     DATE     DATE
LANGUAGE IMPAIRED       ELIGIBLE AND PLACED 10/05/94 02/07/95 02/14/95 03/23/95
SPECIFIC LEARNING DISABILITY ELIGIBLE AND PLACED 10/05/94 02/07/95 02/14/95 03/23/95

---------------------------- DROPOUT PREVENTION PROGRAM INFORMATION ---------------------------------
DROPOUT PREVENTION PROGRAM      PLACEMENT REASONS           OUTCOMES
EDUCATIONAL ALTERNATIVE PROGRMS ACADEMICALLY UNSUCCESSFUL
EDUCATIONAL ALTERNATIVE PROGRMS ACADEMICALLY UNSUCCESSFUL  NO PERFORMNCE/ATTENDNCE IMPROVEMNT
EDUCATIONAL ALTERNATIVE PROGRMS RETAINED IN GRADE          DOCUMNTD IMPRVD ACADMC PERFORMANCE

--------------------------- ENGLISH LANGUAGE LEARNERS (ELL) INFORMATION -----------------------------
ENGLISH LANGUAGE LEARNERS:   LZ STUDENT FOR WHOM 2-YEAR FOLLOW-UP PERIOD IS COMPLETE AFTER EXITING ESOL
BASIS OF ENTRY: A AURAL/ORAL
BASIS OF EXIT:  R READING AND WRITING (EXIT PRIOR TO 7/1/08)

ENTRY DATE:            09/06/1991    POST RECLASSIFICATION DATES-
CLASSIFICATION DATE:   09/06/1991    1ST REPORT CARD:        11/12/1997
PLAN DATE:             09/25/1997    1ST SEMIANNUAL REVIEW:  01/31/1998
REEVALUATION DATE:     09/25/1997    2ND SEMIANNUAL REVIEW:  10/31/1998
EXTENSION OF INSTRUCTION: YES        END OF THE 2ND YEAR:    06/10/1999
EXIT DATE:             09/30/1997
RECLASSIFICATION DATE:
RECLASSIFICATION EXIT DATE:
```

A-001650

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.



# THE SCHOOL DISTRICT OF PALM BEACH COUNTY

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  TEST INFORMATION            FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL          PAGE 10
FL STUDENT ID: 595324176X   SSN: 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   CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                            (000) 000-0000

TEST INFORMATION:
```

| GRD | TEST DATE | TEST NAME | LEVEL FORM | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE | SUBJECT CONTENT | SCORE TYPE | SCORE TYPE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 10 | 02/11/2003 | WAP | 10 | WR EXPOS | SS 0000 | | WR PERSU | SS 0025 | | WRITING | SS 0000 | |
| 10 | 10/11/2002 | FCA | 10 | READ(T) | SS 0299 | | READ(T) | DS 1921 | | MATH(T) | SS 0300 | |
|    |            |     |    | MATH(T) | DS 1889 | | SCIENCE | SS 0000 | | SCIENCE | DS 0000 | |
| 09 | 03/12/2002 | FCA | 09 | READ(T) | SS 0231 | | READ(T) | DS 1483 | | MATH(T) | SS 0199 | |
|    |            |     |    | MATH(T) | DS 1574 | | | | | | | |
| 09 | 03/05/2001 | FCA | 09 | READ(T) | SS 0270 | | READ(T) | DS 1695 | | MATH(T) | SS 0268 | |
|    |            |     |    | MATH(T) | DS 1808 | | | | | | | |
| 09 | 03/05/2001 | FCA | N 09 | COMPREHE | NP 0040 | | COMPREHE | NS 0005 | | COMPREHE | SS 0687 | |
|    |            |     |    | PROB/SLV | NP 0039 | | PROB/SLV | NS 0004 | | PROB/SLV | SS 0678 | |
| 08 | 02/02/1999 | FCA | 08 | READ(T) | SS 0236 | | READ(T) | DS 1534 | | MATH(T) | SS 0000 | |
|    |            |     |    | MATH(T) | DS 0000 | | SCIENCE | SS 0000 | | SCIENCE | DS 0000 | |
| 08 | 01/26/1999 | WAP | 08 | WR EXPOS | SS 0000 | | WR PERSU | SS 0000 | | WRITING | SS 0000 | |
| 05 | 04/17/1996 | CTB | B 15 | COMPREHE | SS 0553 | | COMPREHE | NP 0001 | | PROB/SLV | SS 0623 | |
|    |            |     |    | PROB/SLV | NP 0002 | | LANGUAGE | SS 0000 | | LANGUAGE | NP 0000 | |
|    |            |     |    | CAP/MECH | SS 0000 | | CAP/MECH | NP 0000 | | USAGE/EX | SS 0000 | |
| 05 | 04/17/1996 | CTB | B 15 | USAGE/EX | NP 0000 | | | | | | | |
| 04 | 04/18/1995 | CTB | A 14 | READ(T) | SS 0000 | | READ(T) | NP 0000 | | MATH(T) | SS 0000 | |
|    |            |     |    | MATH(T) | NP 0000 | | COMPREHE | SS 0528 | | COMPREHE | NP 0001 | |
|    |            |     |    | COMPUTAT | SS 0000 | | COMPUTAT | NP 0000 | | VOCAB | SS 0000 | |
| 04 | 04/18/1995 | CTB | A 14 | VOCAB | NP 0000 | | PROB/SLV | SS 0623 | | PROB/SLV | NP 0007 | |
|    |            |     |    | SCIENCE | SS 0000 | | SCIENCE | NP 0000 | | SS/ENVIR | SS 0000 | |
|    |            |     |    | SS/ENVIR | NP 0000 | | | | | | | |
| 04 | 02/08/1995 | WAP | 04 | WR NARRA | SS 0000 | | WR EXPOS | SS 0000 | | WRITING | SS 0000 | |
| 03 | 04/22/1994 | CTB | A 13 | COMPREHE | SS 0530 | | COMPREHE | NP 0002 | | PROB/SLV | SS 0643 | |
|    |            |     |    | PROB/SLV | NP 0023 | | LANGUAGE | SS 0637 | | LANGUAGE | NP 0011 | |
|    |            |     |    | CAP/MECH | SS 0647 | | CAP/MECH | NP 0019 | | USAGE/EX | SS 0627 | |

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

V-001651

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660

```
TO - DISTRICT: 0000050 PALM BEACH SCHOOL DISTRICT SCHOOL: 2921  TEST INFORMATION          FILE: SRTS12IS
GRADE LEVEL: 12  PREPARED DATE: 04/26/2016   CURRENT DISTRICT: 50 PALM BEACH SCHOOL        PAGE 11 OF 11
FL STUDENT ID: 595324176X  SSN: 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  CURRENT SCHOOL: 2921 SURVIVORS OF BOYNTON BEAC

LEGAL NAME: SANCHEZ, EZEQUIEL                          (000) 000-0000

TEST INFORMATION:
     TEST        TEST  LEVEL  SUBJECT      SCORE   SCORE   SUBJECT      SCORE   SCORE   SUBJECT      SCORE   SCORE
GRD  DATE        NAME  FORM   CONTENT TYPE  TYPE    TYPE   CONTENT TYPE  TYPE    TYPE   CONTENT TYPE  TYPE    TYPE
03  04/22/1994   CTB   A 13   USAGE/EX NP 0008

02  03/29/1993   CTB   A 12   READ(T)  SS 0485          READ(T)  NP 0002          MATH(T)  SS 0494
                             MATH(T)  NP 0003          COMPREHE NP 0401          COMPREHE NP 0001
                             COMPUTAT SS 0475          COMPUTAT NP 0004          VOCAB    SS 0569

02  03/29/1993   CTB   A 12   VOCAB    NP 0010          PROB/SLV SS 0513          PROB/SLV NP 0003

01  04/08/1992   CTB   A 11   READ(T)  SS 0493          READ(T)  NP 0011          MATH(T)  SS 0468
                             MATH(T)  NP 0014          COMPREHE SS 0495          COMPREHE NP 0012
                             COMPUTAT SS 0430          COMPUTAT NP 0011          VOCAB    SS 0490

01  04/08/1992   CTB   A 11   VOCAB    NP 0009          PROB/SLV SS 0505          PROB/SLV NP 0019
                             WORD     SS 0000          WORD     NP 0000          SCIENCE  SS 0000
                             SCIENCE  NP 0000          LANGUAGE SS 0000          LANGUAGE NP 0000

01  04/08/1992   CTB   A 11   CAP/MECH SS 0000          CAP/MECH NP 0000          SS/ENVIR SS 0000
                             SS/ENVIR NP 0000          USAGE/EX SS 0000          USAGE/EX NP 0000

01  10/08/1991   CTB   A 10   READ(T)  SS 0425          READ(T)  NP 0019          COMPREHE SS 0424
                             COMPREHE NP 0023          VOCAB    SS 0425          VOCAB    NP 0016
                             PROB/SLV SS 0288          PROB/SLV NP 0002

*********************************** END OF TRANSCRIPT ***********************************
```

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby
notified that this information is provided upon the condition that you, your agents or employees,
will not permit any other party access to this record without the consent of the student.
Alteration of this transcript may be a criminal offense.

3300 FOREST HILL BOULEVARD • WEST PALM BEACH, FL 33406 • TEL: 561-434-8029 • FAX: 561-434-8660





THE WORD "UNOFFICIAL" APPEARS ON ALTERNATE ROWS WHEN PHOTOCOPIED

THE OFFICIAL TRANSCRIPT WILL BE STAMPED, DATED AND SIGNED BY THE RECORDS CUSTODIAN

A-001653

In accordance with the Family Educational Rights and Privacy Act (FERPA), you are hereby notified that this information is provided upon the condition that you, your agents or employees, will not permit any other party access to this record without the consent of the student. Alteration of this transcript may be a criminal offense.

**Research Article**

# Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults

## The Adverse Childhood Experiences (ACE) Study

Vincent J. Felitti, MD, FACP, Robert F. Anda, MD, MS, Dale Nordenberg, MD, David F. Williamson, MS, PhD, Alison M. Spitz, MS, MPH, Valerie Edwards, BA, Mary P. Koss, PhD, James S. Marks, MD, MPH

**Background:** The relationship of health risk behavior and disease in adulthood to the breadth of exposure to childhood emotional, physical, or sexual abuse, and household dysfunction during childhood has not previously been described.

**Methods:** A questionnaire about adverse childhood experiences was mailed to 13,494 adults who had completed a standardized medical evaluation at a large HMO; 9,508 (70.5%) responded. Seven categories of adverse childhood experiences were studied: psychological, physical, or sexual abuse; violence against mother; or living with household members who were substance abusers, mentally ill or suicidal, or ever imprisoned. The number of categories of these adverse childhood experiences was then compared to measures of adult risk behavior, health status, and disease. Logistic regression was used to adjust for effects of demographic factors on the association between the cumulative number of categories of childhood exposures (range: 0–7) and risk factors for the leading causes of death in adult life.

**Results:** More than half of respondents reported at least one, and one-fourth reported $\geq 2$ categories of childhood exposures. We found a graded relationship between the number of categories of childhood exposure and each of the adult health risk behaviors and diseases that were studied ($P < .001$). Persons who had experienced four or more categories of childhood exposure, compared to those who had experienced none, had 4- to 12-fold increased health risks for alcoholism, drug abuse, depression, and suicide attempt; a 2- to 4-fold increase in smoking, poor self-rated health, $\geq 50$ sexual intercourse partners, and sexually transmitted disease; and a 1.4- to 1.6-fold increase in physical inactivity and severe obesity. The number of categories of adverse childhood exposures showed a graded relationship to the presence of adult diseases including ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease. The seven categories of adverse childhood experiences were strongly interrelated and persons with multiple categories of childhood exposure were likely to have multiple health risk factors later in life.

**Conclusions:** We found a strong graded relationship between the breadth of exposure to abuse or household dysfunction during childhood and multiple risk factors for several of the leading causes of death in adults.

**Medical Subject Headings (MeSH):** child abuse, sexual, domestic violence, spouse abuse, children of impaired parents, substance abuse, alcoholism, smoking, obesity, physical activity, depression, suicide, sexual behavior, sexually transmitted diseases, chronic obstructive pulmonary disease, ischemic heart disease. (Am J Prev Med 1998;14:245–258) © 1998 American Journal of Preventive Medicine

Department of Preventive Medicine, Southern California Permanente Medical Group (Kaiser Permanente), (Felitti) San Diego, California 92111. National Center for Chronic Disease Prevention and Health Promotion, Centers for Disease Control and Prevention, (Anda, Williamson, Spitz, Edwards, Marks) Atlanta, Georgia 30333. Department of Pediatrics, Emory University School Medicine, (Nor–denberg) Atlanta, Georgia 30333. Department of Family and Community Medicine, University of Arizona Health Sciences Center, (Koss) Tucson, Arizona 85727.

Address correspondence to: Vincent J. Felitti, MD, Kaiser Permanente, Department of Preventive Medicine, 7060 Clairemont Mesa Boulevard, San Diego, California 92111.

A-001654

## Introduction

Only recently have medical investigators in primary care settings begun to examine associations between childhood abuse and adult health risk behaviors and disease.[1–5] These associations are important because it is now clear that the leading causes of morbidity and mortality in the United States[6] are related to health behaviors and lifestyle factors; these factors have been called the "actual" causes of death.[7] Insofar as abuse and other potentially damaging childhood experiences contribute to the development of these risk factors, then these childhood exposures should be recognized as the basic causes of morbidity and mortality in adult life.

Although sociologists and psychologists have published numerous articles about the frequency[8–12] and long-term consequences[13–15] of childhood abuse, understanding their relevance to adult medical problems is rudimentary. Furthermore, medical research in this field has limited relevance to most primary care physicians because it is focused on adolescent health,[16–20] mental health in adults,[20] or on symptoms among patients in specialty clinics.[22,23] Studies of the long-term effects of childhood abuse have usually examined single types of abuse, particularly sexual abuse, and few have assessed the impact of more than one type of abuse.[5,24–28] Conditions such as drug abuse, spousal violence, and criminal activity in the household may co-occur with specific forms of abuse that involve children. Without measuring these household factors as well, long-term influence might be wrongly attributed solely to single types of abuse and the cumulative influence of multiple categories of adverse childhood experiences would not be assessed. To our knowledge, the relationship of adult health risk behaviors, health status, and disease states to childhood abuse and household dysfunction[29–35] has not been described.

We undertook the Adverse Childhood Experiences (ACE) Study in a primary care setting to describe the long-term relationship of childhood experiences to important medical and public health problems. The ACE Study is assessing, retrospectively and prospectively, the long-term impact of abuse and household dysfunction during childhood on the following outcomes in adults: disease risk factors and incidence, quality of life, health care utilization, and mortality. In this initial paper we use baseline data from the study to provide an overview of the prevalence and interrelation of exposures to childhood abuse and household dysfunction. We then describe the relationship between the number of categories of these deleterious childhood exposures and risk factors and those diseases that

**See related Commentary on pages 354, 356, 361.**

underlie many of the leading causes of death in adults.[6,7,36,37]

## Methods
### Study Setting

The ACE Study is based at Kaiser Permanente's San Diego Health Appraisal Clinic. More than 45,000 adults undergo standardized examinations there each year, making this clinic one of the nation's largest freestanding medical evaluation centers. All enrollees in the Kaiser Health Plan in San Diego are advised through sales literature about the services (free for members) at the clinic; after enrollment, members are advised again of its availability through new-member literature. Most members obtain appointments by self-referral; 20% are referred by their health care provider. A recent review of membership and utilization records among Kaiser members in San Diego continuously enrolled between 1992 and 1995 showed that 81% of those 25 years and older had been evaluated in the Health Appraisal Clinic.

Health appraisals include completion of a standardized medical questionnaire that requests demographic and biopsychosocial information, review of organ systems, previous medical diagnoses, and family medical history. A health care provider completes the medical history, performs a physical examination, and reviews the results of laboratory tests with the patient.

### Survey Methods

The ACE Study protocol was approved by the Institutional Review Boards of the Southern California Permanente Medical Group (Kaiser Permanente), the Emory University School of Medicine, and the Office of Protection from Research Risks, National Institutes of Health. All 13,494 Kaiser Health Plan members who completed standardized medical evaluations at the Health Appraisal Clinic between August–November of 1995 and January–March of 1996 were eligible to participate in the ACE Study. Those seen at the clinic during December were not included because survey response rates are known to be lower during the holiday period.[38]

In the week after visiting the clinic, and hence having their standardized medical history already completed, members were mailed the ACE Study questionnaire that included questions about childhood abuse and exposure to forms of household dysfunction while growing up. After second mailings of the questionnaire to persons who did not respond to the first mailing, the response rate for the survey was 70.5% (9,508/13,494).

A-001655



**Survey Wave I--complete**
**71% response (9,508/13,494)***

*All medical evaluations abstracted*

Follow-up

(Cohort  n=19,000)

**Mortality**
**National Death Index**
**Morbidity**
**Hospital Discharge**
**Outpatient Visits**
**Emergency Room Visits**
**Pharmacy Utilization**

**Survey Wave II--completed, n=15,000   under evaluation**

*All medical evaluations abstracted*

**Figure 1.** ACE Study design. *After exclusions, 59.7% of the original wave I sample (8,056/13,494) were included in this analysis.

A second survey wave of approximately the same number of patients as the first wave was conducted between June and October of 1997. The data for the second survey wave is currently being compiled for analysis. The methods for the second mail survey wave were identical to the first survey wave as described above. The second wave was done to enhance the precision of future detailed analyses on special topics and to reduce the time necessary to obtain precise statistics on follow-up health events. An overview of the total ACE Study design is provided in Figure 1.

**Comparison of Respondents and Nonrespondents**

We abstracted the completed medical evaluation for every person eligible for the study; this included their medical history, laboratory results, and physical findings. Respondent ($n = 9,508$) and nonrespondent ($n = 3,986$) groups were similar in their percentages of women (53.7% and 51.0%, respectively) and in their mean years of education (14.0 years and 13.6 years, respectively). Respondents were older than nonrespondents (means 56.1 years and 49.3 years) and more likely to be white (83.9% vs. 75.3%) although the actual magnitude of the differences was small.

Respondents and nonrespondents did not differ with regard to their self-rated health, smoking, other substance abuse, or the presence of common medical conditions such as a history of heart attack or stroke, chronic obstructive lung disease, hypertension, or diabetes, or with regard to marital status or current family, marital, or job-related problems (data not shown). The health appraisal questionnaire used in the clinic contains a single question about childhood sexual abuse that reads "As a child were you ever raped or sexually molested?" Respondents were slightly more likely to answer affirmatively than nonrespondents (6.1% vs. 5.4%, respectively).

**Questionnaire Design**

We used questions from published surveys to construct the ACE Study questionnaire. Questions from the Conflicts Tactics Scale[39] were used to define psychological and physical abuse during childhood and to define violence against the respondent's mother. We adapted four questions from Wyatt[40] to define contact sexual abuse during childhood. Questions about exposure to alcohol or drug abuse during childhood were adapted from the 1988 National Health Interview Survey.[41] All of the questions we used in this study to determine childhood experiences were introduced with the phrase "While you were growing up during your first 18 years of life . . ."

Questions about health-related behaviors and health problems were taken from health surveys such as the Behavioral Risk Factor Surveys[42] and the Third National Health and Nutrition Examination Survey,[43] both of which are directed by the Centers for Disease Control and Prevention. Questions about depression came from the Diagnostic Interview Schedule of the National Institute of Mental Health (NIMH).[44] Other information for this analysis such as disease history was obtained from the standardized questionnaire used in the Health Appraisal Clinic. (A copy of the questionnaires used in this study may be found at *www.elsevier.com/locate/amepre.*)

A-001656

**Table 1.** Prevalence of childhood exposure to abuse and household dysfunction

| Category of childhood exposure[a] | Prevalence (%) | Prevalence (%) |
|---|---|---|
| **Abuse by category** | | |
| **Psychological** | | **11.1** |
| *(Did a parent or other adult in the household . . .)* | | |
| Often or very often swear at, insult, or put you down? | 10.0 | |
| Often or very often act in a way that made you afraid that you would be physically hurt? | 4.8 | |
| **Physical** | | **10.8** |
| *(Did a parent or other adult in the household . . .)* | | |
| Often or very often push, grab, shove, or slap you? | 4.9 | |
| Often or very often hit you so hard that you had marks or were injured? | 9.6 | |
| **Sexual** | | **22.0** |
| *(Did an adult or person at least 5 years older ever . . .)* | | |
| Touch or fondle you in a sexual way? | 19.3 | |
| Have you touch their body in a sexual way? | 8.7 | |
| Attempt oral, anal, or vaginal intercourse with you? | 8.9 | |
| Actually have oral, anal, or vaginal intercourse with you? | 6.9 | |
| **Household dysfunction by category** | | |
| **Substance abuse** | | **25.6** |
| Live with anyone who was a problem drinker or alcoholic? | 23.5 | |
| Live with anyone who used street drugs? | 4.9 | |
| **Mental illness** | | **18.8** |
| Was a household member depressed or mentally ill? | 17.5 | |
| Did a household member attempt suicide? | 4.0 | |
| **Mother treated violently** | | **12.5** |
| *Was your mother (or stepmother)* | | |
| Sometimes, often, or very often pushed, grabbed, slapped, or had something thrown at her? | 11.9 | |
| Sometimes, often, or very often kicked, bitten, hit with a fist, or hit with something hard? | 6.3 | |
| Ever repeatedly hit over at least a few minutes? | 6.6 | |
| Ever threatened with, or hurt by, a knife or gun? | 3.0 | |
| **Criminal behavior in household** | | |
| Did a household member go to prison? | 3.4 | **3.4** |
| | **Any category reported** | **52.1%** |

[a]An exposure to one or more items listed under the set of questions for each category.

## Defining Childhood Exposures

We used three categories of childhood abuse: psychological abuse (2 questions), physical abuse (2 questions), or contact sexual abuse (4 questions). There were four categories of exposure to household dysfunction during childhood: exposure to substance abuse (defined by 2 questions), mental illness (2 questions), violent treatment of mother or stepmother (4 questions), and criminal behavior (1 question) in the household. Respondents were defined as exposed to a category if they responded "yes" to 1 or more of the questions in that category. The prevalence of positive responses to the individual questions and the category prevalences are shown in Table 1.

We used these 7 categories of childhood exposures to abuse and household dysfunction for our analysis. The measure of childhood exposure that we used was simply the sum of the categories with an exposure; thus the possible number of exposures ranged from 0 (unexposed) to 7 (exposed to all categories).

## Risk Factors and Disease Conditions Assessed

Using information from both the study questionnaire and the Health Appraisal Clinic's questionnaire, we chose 10 risk factors that contribute to the leading causes of morbidity and mortality in the United States.[6,7,36,37] The risk factors included smoking, severe obesity, physical inactivity, depressed mood, suicide attempts, alcoholism, any drug abuse, parenteral drug abuse, a high lifetime number of sexual partners ($\geq$50), and a history of having a sexually transmitted disease.

We also assessed the relationship between childhood exposures and disease conditions that are among the leading causes of mortality in the United States.[6] The presence of these disease conditions was based upon medical histories that patients provided in response to the clinic questionnaire. We included a history of ischemic heart disease (including heart attack or use of nitroglycerin for exertional chest pain), any cancer, stroke, chronic bronchitis, or emphysema (COPD),

A-001657

diabetes, hepatitis or jaundice, and any skeletal fractures (as a proxy for risk of unintentional injuries). We also included responses to the following question about self-rated health: "Do you consider your physical health to be excellent, very good, good, fair, or poor?" because it is strongly predictive of mortality.[45]

### Definition of Risk Factors

We defined severe obesity as a body mass index (kg/meter$^2$) $\geq$35 based on measured height and weight; physical inactivity as no participation in recreational physical activity in the past month; and alcoholism as a "Yes" response to the question "Have you ever considered yourself to be an alcoholic?" The other risk factors that we assessed are self-explanatory.

### Exclusions from Analysis

Of the 9,508 survey respondents, we excluded 51 (0.5%) whose race was unstated and 34 (0.4%) whose educational attainment was not reported. We also excluded persons who did not respond to certain questions about adverse childhood experiences. This involved the following exclusions: 125 (1.3%) for household substance abuse, 181 (1.9%) for mental illness in the home, 148 (1.6%) for violence against mother, 7 (0.1%) for imprisonment of a household member, 109 (1.1%) for childhood psychological abuse, 44 (0.5%) for childhood physical abuse, and 753 (7.9%) for childhood sexual abuse. After these exclusions, 8,056 of the original 9,508 survey respondents (59.7% of the original sample of 13,494) remained and were included in the analysis. Procedures for insuring that the findings based on complete data were generalizable to the entire sample are described below.

The mean age of the 8,506 persons included in this analysis was 56.1 years (range: 19–92 years); 52.1% were women; 79.4% were white. Forty-three percent had graduated from college; only 6.0% had not graduated from high school.

### Statistical Analysis

We used the Statistical Analysis System (SAS)[46] for our analyses. We used the direct method to age-adjust the prevalence estimates. Logistic regression analysis was employed to adjust for the potential confounding effects of age, sex, race, and educational attainment on the relationship between the number of childhood exposures and health problems.

To test for a dose-response relationship to health problems, we entered the number of childhood exposures as a single ordinal variable (0, 1, 2, 3, 4, 5, 6, 7) into a separate logistic regression model for each risk factor or disease condition.

### Assessing the Possible Influence of Exclusions

To determine whether our results were influenced by excluding persons with incomplete information on any of the categories of childhood exposure, we performed a separate sensitivity analysis in which we included all persons with complete demographic information but assumed that persons with missing information for a category of childhood exposure did not have an exposure in that category.

## Results
### Adverse Childhood Exposures

The level of positive responses for the 17 questions included in the seven categories of childhood exposure ranged from 3.0% for a respondent's mother (or stepmother) having been threatened with or hurt by a gun or knife to 23.5% for having lived with a problem drinker or alcoholic (Table 1). The most prevalent of the 7 categories of childhood exposure was substance abuse in the household (25.6%); the least prevalent exposure category was evidence of criminal behavior in the household (3.4%). More than half of respondents (52%) experienced $\geq$1 category of adverse childhood exposure; 6.2% reported $\geq$4 exposures.

### Relationships between Categories of Childhood Exposure

The probability that persons who were exposed to any single category of exposure were also exposed to another category is shown in Table 2. The relationship between single categories of exposure was significant for all comparisons ($P < .001$; chi-square). For persons reporting any single category of exposure, the probability of exposure to any additional category ranged from 65%–93% (median: 80%); similarly, the probability of $\geq$2 additional exposures ranged from 40%–74% (median: 54.5%).

The number of categories of childhood exposures by demographic characteristics is shown in Table 3. Statistically, significantly fewer categories of exposure were found among older persons, white or Asian persons, and college graduates ($P < .001$). Because age is associated with both the childhood exposures as well as many of the health risk factors and disease outcomes, all prevalence estimates in the tables are adjusted for age.

### Relationship between Childhood Exposures and Health Risk Factors

Both the prevalence and risk (adjusted odds ratio) increased for smoking, severe obesity, physical inactivity, depressed mood, and suicide attempts as the number of childhood exposures increased (Table 4). When

**Table 2.** Relationships between categories of adverse childhood exposure

| First Category of Childhood Exposure | Sample Size* | Percent (%) Exposed to Another Category | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Psychological Abuse | Physical Abuse | Sexual Abuse | Substance Abuse | Mental Illness | Treated Violently | Imprisoned Member | Any One Additional Category | Any Two Additional Categories |
| Childhood Abuse: | | | | | | | | | | |
| Psychological | 898 | — | 52* | 47 | 51 | 50 | 39 | 9 | 93 | 74 |
| Physical abuse | 874 | 54 | — | 44 | 45 | 38 | 35 | 9 | 86 | 64 |
| Sexual abuse | 1770 | 24 | 22 | — | 39 | 31 | 23 | 6 | 65 | 41 |
| Household dysfunction: | | | | | | | | | | |
| Substance abuse | 2064 | 22 | 19 | 34 | — | 34 | 29 | 8 | 69 | 40 |
| Mental illness | 1512 | 30 | 22 | 37 | 46 | — | 26 | 7 | 74 | 47 |
| Mother treated violently | 1010 | 34 | 31 | 41 | 59 | 38 | — | 10 | 86 | 62 |
| Member imprisoned | 271 | 29 | 29 | 40 | 62 | 42 | 37 | — | 86 | 64 |
| median | | 29.5 | 25.4 | 40.5 | 48.5 | 38 | 32 | 8.5 | 80 | 54.5 |
| range | | (22–54) | (19–52) | (34–47) | (39–62) | (31–50) | (23–39) | (6–10) | (65–93) | (40–74) |

*Number exposed to first category. For example, among persons who were psychologically abused, 52% were also physically abused. More persons were a second category than would be expected by chance (P < .001; chi-square).

persons with 4 categories of exposure were compared to those with none, the odds ratios ranged from 1.3 for physical inactivity to 12.2 for suicide attempts (Table 4).

Similarly, the prevalence and risk (adjusted odds ratio) of alcoholism, use of illicit drugs, injection of illicit drugs, ≥50 intercourse partners, and history of a sexually transmitted disease increased as the number of childhood exposures increased (Table 5). In comparing persons with ≥4 childhood exposures to those with none, odds ratios ranged from 2.5 for sexually transmitted diseases to 7.4 for alcoholism and 10.3 for injected drug use.

## Childhood Exposures and Clustering of Health Risk Factors

We found a strong relationship between the number of childhood exposures and the number of health risk factors for leading causes of death in adults (Table 6). For example, among persons with no childhood exposures, 56% had none of the 10 risk factors whereas only 14% of persons with ≥4 categories of childhood exposure had no risk factors. By contrast, only 1% of persons with no childhood exposures had four or more risk factors, whereas 7% of persons with ≥4 childhood exposures had four or more risk factors (Table 6).

## Relationship between Childhood Exposures and Disease Conditions

When persons with 4 or more categories of childhood exposure were compared to those with none, the odds ratios for the presence of studied disease conditions ranged from 1.6 for diabetes to 3.9 for chronic bronchitis or emphysema (Table 7). Similarly, the odds ratios for skeletal fractures, hepatitis or jaundice, and poor self-rated health were 1.6, 2.3, and 2.2, respectively (Table 8).

## Significance of Dose-Response Relationships

In logistic regression models (which included age, gender, race, and educational attainment as covariates) we found a strong, dose-response relationship between the number of childhood exposures and each of the 10 risk factors for the leading causes of death that we studied ($P < .001$). We also found a significant ($P < .05$) dose-response relationship between the number of childhood exposures and the following disease conditions: ischemic heart disease, cancer, chronic bronchitis or emphysema, history of hepatitis or jaundice, skeletal fractures, and poor self-rated health. There was no statistically significant dose-response relationship for a history of stroke or diabetes.

A-001659

**Table 3.** Prevalence of categories of adverse childhood exposures by demographic characteristics

| Characteristic | Sample size (N) | Number of categories (%)[a] | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 3 | 4 |
| Age group (years) | | | | | | |
| 19–34 | 807 | 35.4 | 25.4 | 17.2 | 11.0 | 10.9 |
| 35–49 | 2,063 | 39.3 | 25.1 | 15.6 | 9.1 | 10.9 |
| 50–64 | 2,577 | 46.5 | 25.2 | 13.9 | 7.9 | 6.6 |
| ≥65 | 2,610 | 60.0 | 24.5 | 8.9 | 4.2 | 2.4 |
| Gender[b] | | | | | | |
| Women | 4,197 | 45.4 | 24.0 | 13.4 | 8.7 | 8.5 |
| Men | 3,859 | 53.7 | 25.8 | 11.6 | 5.0 | 3.9 |
| Race[b] | | | | | | |
| White | 6,432 | 49.7 | 25.3 | 12.4 | 6.7 | 6.0 |
| Black | 385 | 38.8 | 25.7 | 16.3 | 12.3 | 7.0 |
| Hispanic | 431 | 42.9 | 24.9 | 13.7 | 7.4 | 11.2 |
| Asian | 508 | 66.0 | 19.0 | 9.9 | 3.4 | 1.7 |
| Other | 300 | 41.0 | 23.5 | 13.9 | 9.5 | 12.1 |
| Education[b] | | | | | | |
| No HS diploma | 480 | 56.5 | 21.5 | 8.4 | 6.5 | 7.2 |
| HS graduate | 1,536 | 51.6 | 24.5 | 11.3 | 7.4 | 5.2 |
| Any college | 2,541 | 44.1 | 25.5 | 14.8 | 7.8 | 7.8 |
| College graduate | 3,499 | 51.4 | 25.1 | 12.1 | 6.1 | 5.3 |
| **All participants** | **8,056** | **49.5** | **24.9** | **12.5** | **6.9** | **6.2** |

[a]The number of categories of exposure was simply the sum of each of the seven individual categories that were assessed (see Table 1).
[b]Prevalence estimates adjusted for age.

## Assessment of the Influence of Exclusions

In the sensitivity analysis where missing information for a category of childhood exposure was considered as no exposure, the direction and strength of the associations between the number of childhood exposures and the risk factors and disease conditions were nearly identical (data not shown). Thus, the results we present appear to be unaffected by our decision to exclude persons for whom information on any category of childhood exposure was incomplete.

## Discussion

We found a strong dose response relationship between the breadth of exposure to abuse or household dysfunction during childhood and multiple risk factors for several of the leading causes of death in adults. Disease conditions including ischemic heart disease, cancer, chronic lung disease, skeletal fractures, and liver disease, as well as poor self-rated health also showed a graded relationship to the breadth of childhood exposures. The findings suggest that the impact of these adverse childhood experiences on adult health status is strong and cumulative.

The clear majority of patients in our study who were exposed to one category of childhood abuse or household dysfunction were also exposed to at least one other. Therefore, researchers trying to understand the long-term health implications of childhood abuse may benefit from considering a wide range of related adverse childhood exposures. Certain adult health outcomes may be more strongly related to unique combinations or the intensity of adverse childhood exposures than to the total breadth of exposure that we used for our analysis. However, the analysis we present illustrates the need for an overview of the net effects of a *group* of complex interactions on a wide range of health risk behaviors and diseases.

Several potential limitations need to be considered when interpreting the results of this study. The data about adverse childhood experiences are based on self-report, retrospective, and can only demonstrate associations between childhood exposures and health risk behaviors, health status, and diseases in adulthood. Second, some persons with health risk behaviors or diseases may have been either more, or less, likely to report adverse childhood experiences. Each of these issues potentially limits inferences about causality. Furthermore, disease conditions could be either over- or under-reported by patients when they complete the medical questionnaire. In addition, there may be mediators of the relationship between childhood experiences and adult health status other than the risk factors we examined. For example, adverse childhood experiences may affect attitudes and behaviors toward health and health care, sensitivity to internal sensations, or physiologic functioning in brain centers and neurotransmitter systems. A more complete understanding of these issues is likely to lead to more effective ways to address the long-term health problems associated with childhood abuse and household dysfunction.

However, our estimates of the prevalence of child-

A-001660

**Table 4.** Number of categories of adverse childhood exposure and the adjusted odds of risk factors including current smoking, severe obesity, physical inactivity, depressed mood, and suicide attempt

| Health problem | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Current smoker[d] | 0 | 3,836 | 6.8 | 1.0 | Referent |
| | 1 | 2,005 | 7.9 | 1.1 | ( 0.9–1.4) |
| | 2 | 1,046 | 10.3 | 1.5 | ( 1.1–1.8) |
| | 3 | 587 | 13.9 | 2.0 | ( 1.5–2.6) |
| | 4 or more | 544 | 16.5 | 2.2 | ( 1.7–2.9) |
| | Total | 8,018 | 8.6 | — | — |
| Severe obesity[d] (BMI ≥ 35) | 0 | 3,850 | 5.4 | 1.0 | Referent |
| | 1 | 2,004 | 7.0 | 1.1 | ( 0.9–1.4) |
| | 2 | 1,041 | 9.5 | 1.4 | ( 1.1–1.9) |
| | 3 | 590 | 10.3 | 1.4 | ( 1.0–1.9) |
| | 4 or more | 543 | 12.0 | 1.6 | ( 1.2–2.1) |
| | Total | 8,028 | 7.1 | — | — |
| No leisure-time physical activity | 0 | 3,634 | 18.4 | 1.0 | Referent |
| | 1 | 1,917 | 22.8 | 1.2 | ( 1.1–1.4) |
| | 2 | 1,006 | 22.0 | 1.2 | ( 1.0–1.4) |
| | 3 | 559 | 26.6 | 1.4 | ( 1.1–1.7) |
| | 4 or more | 523 | 26.6 | 1.3 | ( 1.1–1.6) |
| | Total | 7,639 | 21.0 | — | — |
| Two or more weeks of depressed mood in the past year | 0 | 3,799 | 14.2 | 1.0 | Referent |
| | 1 | 1,984 | 21.4 | 1.5 | ( 1.3–1.7) |
| | 2 | 1,036 | 31.5 | 2.4 | ( 2.0–2.8) |
| | 3 | 584 | 36.2 | 2.6 | ( 2.1–3.2) |
| | 4 or more | 542 | 50.7 | 4.6 | ( 3.8–5.6) |
| | Total | 7,945 | 22.0 | — | — |
| Ever attempted suicide | 0 | 3,852 | 1.2 | 1.0 | Referent |
| | 1 | 1,997 | 2.4 | 1.8 | ( 1.2–2.6) |
| | 2 | 1,048 | 4.3 | 3.0 | ( 2.0–4.6) |
| | 3 | 587 | 9.5 | 6.6 | ( 4.5–9.8) |
| | 4 or more | 544 | 18.3 | 12.2 | (8.5–17.5) |
| | Total | 8,028 | 3.5 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

hood exposures are similar to estimates from nationally representative surveys, indicating that the experiences of our study participants are comparable to the larger population of U.S. adults. In our study, 23.5% of participants reported having grown up with an alcohol abuser; the 1988 National Health Interview Survey estimated that 18.1% of adults had lived with an alcohol abuser during childhood.[41] Contact sexual abuse was reported by 22% of respondents (28% of women and 16% of men) in our study. A national telephone survey of adults in 1990 using similar criteria for sexual abuse estimated that 27% of women and 16% of men had been sexually abused.[12]

There are several reasons to believe that our estimates of the long-term relationship between adverse childhood experiences and adult health are conservative. Longitudinal follow-up of adults whose childhood abuse was well documented has shown that their retrospective reports of childhood abuse are likely to underestimate actual occurrence.[47,48] Underestimates of childhood exposures would result in downwardly biased estimates of the relationships between childhood exposures and adult health risk behaviors and diseases. Another potential source of underestimation of the strength of these relationships is the lower number of childhood exposures reported by older persons in our study. This may be an artifact caused by premature mortality in persons with multiple adverse childhood exposures; the clustering of multiple risk factors among persons with multiple childhood exposures is consistent with this hypothesis. Thus, the true relationships between adverse childhood exposures and adult health risk behaviors, health status, and diseases may be even stronger than those we report.

An essential question posed by our observations is, "Exactly how are adverse childhood experiences linked to health risk behaviors and adult diseases?" The link-

A-001661

**Table 5.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of health risk factors including alcohol or drug abuse, high lifetime number of sexual partners, or history of sexually transmitted disease

| Health problem | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Considers self an | 0 | 3,841 | 2.9 | 1.0 | Referent |
| alcoholic | 1 | 1,993 | 5.7 | 2.0 | (1.6–2.7) |
| | 2 | 1,042 | 10.3 | 4.0 | (3.0–5.3) |
| | 3 | 586 | 11.3 | 4.9 | (3.5–6.8) |
| | 4 or more | 540 | 16.1 | 7.4 | (5.4–10.2) |
| | Total | 8,002 | 5.9 | — | — |
| Ever used illicit drugs | 0 | 3,856 | 6.4 | 1.0 | Referent |
| | 1 | 1,998 | 11.4 | 1.7 | (1.4–2.0) |
| | 2 | 1,045 | 19.2 | 2.9 | (2.4–3.6) |
| | 3 | 589 | 21.5 | 3.6 | (2.8–4.6) |
| | 4 or more | 541 | 28.4 | 4.7 | (3.7–6.0) |
| | Total | 8,029 | 11.6 | — | — |
| Ever injected drugs | 0 | 3,855 | 0.3 | 1.0 | Referent |
| | 1 | 1,996 | 0.5 | 1.3 | (0.6–3.1) |
| | 2 | 1,044 | 1.4 | 3.8 | (1.8–8.2) |
| | 3 | 587 | 2.3 | 7.1 | (3.3–15.5) |
| | 4 or more | 540 | 3.4 | 10.3 | (4.9–21.4) |
| | Total | 8,022 | 0.8 | — | — |
| Had 50 or more | 0 | 3,400 | 3.0 | 1.0 | Referent |
| intercourse partners | 1 | 1,812 | 5.1 | 1.7 | (1.3–2.3) |
| | 2 | 926 | 6.1 | 2.3 | (1.6–3.2) |
| | 3 | 526 | 6.3 | 3.1 | (2.0–4.7) |
| | 4 or more | 474 | 6.8 | 3.2 | (2.1–5.1) |
| | Total | 7,138 | 4.4 | — | — |
| Ever had a sexually | 0 | 3,848 | 5.6 | 1.0 | Referent |
| transmitted disease[d] | 1 | 2,001 | 8.6 | 1.4 | (1.1–1.7) |
| | 2 | 1,044 | 10.4 | 1.5 | (1.2–1.9) |
| | 3 | 588 | 13.1 | 1.9 | (1.4–2.5) |
| | 4 or more | 542 | 16.7 | 2.5 | (1.9–3.2) |
| | Total | 8023 | 8.2 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

ing mechanisms appear to center on behaviors such as smoking, alcohol or drug abuse, overeating, or sexual behaviors that may be consciously or unconsciously used because they have immediate pharmacological or psychological benefit as coping devices in the face of the stress of abuse, domestic violence, or other forms of family and household dysfunction. High levels of exposure to adverse childhood experiences would expectedly produce anxiety, anger, and depression in children. To the degree that behaviors such as smoking, alcohol, or drug use are found to be effective as coping devices, they would tend to be used chronically. For

**Table 6.** Relationship between number of categories of childhood exposure and number of risk factors for the leading causes of death[a]

| Number of categories | Sample size | % with number of risk factors | | | | |
|---|---|---|---|---|---|---|
| | | 0 | 1 | 2 | 3 | 4 |
| 0 | 3,861 | 56 | 29 | 10 | 4 | 1 |
| 1 | 2,009 | 42 | 33 | 16 | 6 | 2 |
| 2 | 1,051 | 31 | 33 | 20 | 10 | 4 |
| 3 | 590 | 24 | 33 | 20 | 13 | 7 |
| ≥4 | 545 | 14 | 26 | 28 | 17 | 7 |
| Total | 8,056 | 44 | 31 | 15 | 7 | 3 |

[a]Risk factors include: smoking, severe obesity, physical inactivity, depressed mood, suicide attempt, alcoholism, any drug use, injected drug use, ≥50 lifetime sexual partners, and history of a sexually transmitted disease.

A-001662

**Table 7.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of heart attack, cancer, stroke, COPD, and diabetes

| Disease condition[d] | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Ischemic heart disease | 0 | 3,859 | 3.7 | 1.0 | Referent |
| | 1 | 2,009 | 3.5 | 0.9 | (0.7–1.3) |
| | 2 | 1,050 | 3.4 | 0.9 | (0.6–1.4) |
| | 3 | 590 | 4.6 | 1.4 | (0.8–2.4) |
| | 4 or more | 545 | 5.6 | 2.2 | (1.3–3.7) |
| | Total | 8,022 | 3.8 | — | — |
| Any cancer | 0 | 3,842 | 1.9 | 1.0 | Referent |
| | 1 | 1,995 | 1.9 | 1.2 | (1.0–1.5) |
| | 2 | 1,043 | 1.9 | 1.2 | (1.0–1.5) |
| | 3 | 588 | 1.9 | 1.0 | (0.7–1.5) |
| | 4 or more | 543 | 1.9 | 1.9 | (1.3–2.7) |
| | Total | 8,011 | 1.9 | — | — |
| Stroke | 0 | 3,832 | 2.6 | 1.0 | Referent |
| | 1 | 1,993 | 2.4 | 0.9 | (0.7–1.3) |
| | 2 | 1,042 | 2.0 | 0.7 | (0.4–1.3) |
| | 3 | 588 | 2.9 | 1.3 | (0.7–2.4) |
| | 4 or more | 543 | 4.1 | 2.4 | (1.3–4.3) |
| | Total | 7,998 | 2.6 | — | — |
| Chronic bronchitis or emphysema | 0 | 3,758 | 2.8 | 1.0 | Referent |
| | 1 | 1,939 | 4.4 | 1.6 | (1.2–2.1) |
| | 2 | 1,009 | 4.4 | 1.6 | (1.1–2.3) |
| | 3 | 565 | 5.7 | 2.2 | (1.4–3.3) |
| | 4 or more | 512 | 8.7 | 3.9 | (2.6–5.8) |
| | Total | 7,783 | 4.0 | — | — |
| Diabetes | 0 | 3,850 | 4.3 | 1.0 | Referent |
| | 1 | 2,002 | 4.1 | 1.0 | (0.7–1.3) |
| | 2 | 1,046 | 3.9 | 0.9 | (0.6–1.3) |
| | 3 | 587 | 5.0 | 1.2 | (0.8–1.9) |
| | 4 or more | 542 | 5.8 | 1.6 | (1.0–2.5) |
| | Total | 8,027 | 4.3 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

example, nicotine is recognized as having beneficial psychoactive effects in terms of regulating affect[49] and persons who are depressed are more likely to smoke.[50,51] Thus, persons exposed to adverse childhood experiences may benefit from using drugs such as nicotine to regulate their mood.[49,52]

Consideration of the positive neuroregulatory effects of health-risk behaviors such as smoking may provide biobehavioral explanations[53] for the link between adverse childhood experiences and health risk behaviors and diseases in adults. In fact, we found that exposure to higher numbers of categories of adverse childhood experiences increased the likelihood of smoking by the age of 14, chronic smoking as adults, and the presence of smoking-related diseases. Thus, smoking, which is medically and socially viewed as a "problem" may, from the perspective of the user, represent an effective immediate solution that leads to chronic use. Decades later, when this "solution" manifests as emphysema, cardiovascular disease, or malignancy, time and the tendency to ignore psychological issues in the management of organic disease make improbable any full understanding of the original causes of adult disease (Figure 2). Thus, incomplete understanding of the possible benefits of health risk behaviors leads them to be viewed as irrational and having solely negative consequences.

Because adverse childhood experiences are common and they have strong long-term associations with adult health risk behaviors, health status, and diseases, increased attention to primary, secondary, and tertiary prevention strategies is needed. These strategies include prevention of the occurrence of adverse childhood experiences, preventing the adoption of health risk behaviors as responses to adverse experiences during childhood and adolescence, and, finally, helping change the health risk behaviors and ameliorating the disease burden among adults whose health problems may represent a long-term consequence of adverse childhood experiences.

A-001663

**Table 8.** Number of categories of adverse childhood exposure and the prevalence and risk (adjusted odds ratio) of skeletal fracture, hepatitis or jaundice, and poor self-rated health

| Disease condition | Number of categories | Sample size (N)[a] | Prevalence (%)[b] | Adjusted odds ratio[c] | 95% confidence interval |
|---|---|---|---|---|---|
| Ever had a skeletal fracture | 0 | 3,843 | 3.6 | 1.0 | Referent |
| | 1 | 1,998 | 4.0 | 1.1 | (1.0–1.2) |
| | 2 | 1,048 | 4.5 | 1.4 | (1.2–1.6) |
| | 3 | 587 | 4.0 | 1.2 | (1.0–1.4) |
| | 4 or more | 544 | 4.8 | 1.6 | (1.3–2.0) |
| | Total | 8,020 | 3.9 | — | — |
| Ever had hepatitis or jaundice | 0 | 3,846 | 5.3 | 1.0 | Referent |
| | 1 | 2,006 | 5.5 | 1.1 | (0.9–1.4) |
| | 2 | 1,045 | 7.7 | 1.8 | (1.4–2.3) |
| | 3 | 590 | 10.2 | 1.6 | (1.2–2.3) |
| | 4 or more | 543 | 10.7 | 2.4 | (1.8–3.3) |
| | Total | 8,030 | 6.5 | — | — |
| Fair or poor self-rated health | 0 | 3,762 | 16.3 | 1.0 | Referent |
| | 1 | 1,957 | 17.8 | 1.2 | (1.0–1.4) |
| | 2 | 1,029 | 19.9 | 1.4 | (1.2–1.7) |
| | 3 | 584 | 20.3 | 1.4 | (1.1–1.7) |
| | 4 or more | 527 | 28.7 | 2.2 | (1.8–2.7) |
| | Total | 7,859 | 18.2 | — | — |

[a]Sample sizes will vary due to incomplete or missing information about health problems.
[b]Prevalence estimates are adjusted for age and gender.
[c]Odds ratios adjusted for age, gender, race, and educational attainment.
[d]Indicates information recorded in the patient's chart before the study questionnaire was mailed.

Primary prevention of adverse childhood experiences has proven difficult[54,55] and will ultimately require societal changes that improve the quality of family and household environments during childhood. Recent research on the long-term benefit of early home visitation on reducing the prevalence of adverse childhood experiences is promising.[56] In fact, preliminary data from the ACE Study provided the impetus for the Kaiser Health Plan to provide funding to participate at 4 locations (including San Diego County, California) in the Commonwealth Fund's "Healthy Steps" program. This program extends the traditional practice of pediatrics by adding one or more specialists in the developmental and psychosocial dimensions of both childhood and parenthood. Through a series of office visits, home visits, and a telephone advice line for parents, these specialists develop close relationships between children and their families from birth to 3 years of age. This approach is consistent with the recommendation of the U.S. Advisory Board on Child Abuse and Neglect that a universal home visitation program for new parents be developed[57,58] and provides an example of a family-based primary prevention effort that is being explored in a managed care setting. If these types of approaches can be replicated and implemented on a large scale, the long-term benefits may include, somewhat unexpectedly, substantial improvements in overall adult health.

Secondary prevention of the effects of adverse childhood experiences will first require increased recognition of their occurrence and second, an effective understanding of the behavioral coping devices that commonly are adopted to reduce the emotional impact of these experiences. The improbability of giving up an immediate "solution" in return for a nebulous long-term health benefit has thwarted many well-intended preventive efforts. Although articles in the general medical literature are alerting the medical community to the fact that childhood abuse is common,[59] adolescent health care is often inadequate in terms of psychosocial assessment and anticipatory guidance.[60] Clearly, comprehensive strategies are needed to identify and intervene with children and families who are at risk for these adverse experiences and their related outcomes.[61] Such strategies should include increased communication between and among those involved in family practice, internal medicine, nursing, social work, pediatrics, emergency medicine, and preventive medicine and public health. Improved understanding is also needed of the effects of childhood exposure to domestic violence.[19,62] Additionally, increased physician training[63] is needed to recognize and coordinate the management of all persons affected by child abuse, domestic violence, and other forms of family adversity such as alcohol abuse or mental illness.

In the meantime, tertiary care of adults whose health problems are related to experiences such as childhood abuse[5] will continue to be a difficult challenge. The relationship between childhood experiences and adult health status is likely to be overlooked in medical practice because the time delay between exposure



**Figure 2.**  Potential influences throughout the lifespan of adverse childhood experiences.

during childhood and recognition of health problems in adult medical practice is lengthy. Moreover, these childhood exposures include emotionally sensitive topics such as family alcoholism[29,30] and sexual abuse.[64] Many physicians may fear that discussions of sexual violence and other sensitive issues are too personal even for the doctor-patient relationship.[65] For example, the American Medical Association recommends screening of women for exposure to violence at every entrance to the health system;[66] however, such screening appears to be rare.[67] By contrast, women who are asked about exposure to sexual violence say they consider such questions to be welcome and germane to routine medical care,[68] which suggests that physicians' fears about patient reactions are largely unfounded.

Clearly, further research and training are needed to help medical and public health practitioners understand how social, emotional, and medical problems are linked throughout the lifespan (Figure 2). Such research and training would provide physicians with the confidence and skills to inquire and respond to patients who acknowledge these types of childhood exposures. Increased awareness of the frequency and long-term consequences of adverse childhood experiences may also lead to improvements in health promotion and disease prevention programs. The magnitude of the difficulty of introducing the requisite changes into medical and public health research, education, and practice can be offset only by the magnitude of the implications that these changes have for improving the health of the nation.

We thank Naomi Howard for her dedication to the ACE Study. This research is supported by the Centers for Disease Control and Prevention via cooperative agreement TS-44-10/12 with the Association of Teachers of Preventive Medicine.

## References

1. Springs F, Friedrich WN. Health risk behaviors and medical sequelae of childhood sexual abuse. Mayo Clin Proc 1992;67:527–32.

2. Felitti VJ. Long-term medical consequences of incest, rape, and molestation. South Med J 1991;84:328–31.

3. Felitti VJ. Childhood sexual abuse, depression and family dysfunction in adult obese patients: a case control study. South Med J 1993;86:732–6.

4. Gould DA, Stevens NG, Ward NG, Carlin AS, Sowell HE, Gustafson B. Self-reported childhood abuse in an adult population in a primary care setting. Arch Fam Med 1994;3:252–6.

5. McCauley J, Kern DE, Kolodner K, Schroeder AF, et al. Clinical characteristics of women with a history of childhood abuse. JAMA 1997;277:1362–8.

A-001665

6. Mortality patterns: United States, 1993. Morb Mortal Wkly Rep 1996;45:161–4.

7. McGinnis JM, Foege WH. Actual causes of death in the United States. JAMA 1993;270:2207–12.

8. Landis J. Experiences of 500 children with adult sexual deviation. Psychiatr Q 1956;30(Suppl):91–109.

9. Straus MA, Gelles RJ. Societal change and change in family violence from 1975 to 1985 as revealed by two national surveys. J Marriage Family 1986;48:465–79.

10. Wyatt GE, Peters SD. Methodological considerations in research on the prevalence of child sexual abuse. Child Abuse Negl 1986;10:241–51.

11. Berger AM, Knutson JF, Mehm JG, Perkins KA. The self-report of punitive childhood experiences of young adults and adolescents. Child Abuse Negl 1988;12:251–62.

12. Finkelhor D, Hotaling G, Lewis IA, Smith C. Sexual abuse in a national survey of adult men and women: prevalence, characteristics, and risk factors. Child Abuse Negl 1990;14:19–28.

13. Egelend B, Sroufe LA, Erickson M. The developmental consequence of different patterns of maltreatment. Child Abuse Negl 1983;7:459–69.

14. Finkelhor D, Browne A. The traumatic impact of child sexual abuse Am J Orthopsychiatry. 1985;55:530–41.

15. Beitchman JH, Zucker KJ, Hood JE, DaCosta GA, Akman D, Cassavia E. A review of the long-term effects of sexual abuse. Child Abuse Negl 1992;16:101–18.

16. Hibbard RA, Ingersoll GM, Orr DP. Behavioral risk, emotional risk, and child abuse among adolescents in a nonclinical setting. Pediatrics 1990;86:896–901.

17. Nagy S, Adcock AG, Nagy MC. A comparison of risky health behaviors of sexually active, sexually abused, and abstaining adolescents. Pediatrics 1994;93:570–5.

18. Cunningham RM, Stiffman AR, Dore P. The association of physical and sexual abuse with HIV risk behaviors in adolescence and young adulthood: implications for public health. Child Abuse Negl 1994;18:233–45.

19. Council on Scientific Affairs. Adolescents as victims of family violence. JAMA 1993;270:1850–6.

20. Nelson DE, Higginson GK, Grant-Worley JA. Physical abuse among high school students. Prevalence and correlation with other health behaviors. Arch Pediatr Adolesc Med 1995;149:1254–8.

21. Mullen PE, Roman-Clarkson SE, Walton VA, Herbison GP. Impact of sexual and physical abuse on women's mental health. Lancet 1988;1:841–5.

22. Drossman DA, Leserman J, Nachman G, Li Z, et al. Sexual and physical abuse in women with functional or organic gastrointestinal disorders. Ann Intern Med 1990;113:828–33.

23. Harrop-Griffiths J, Katon W, Walker E, Holm L, Russo J, Hickok L. The association between chronic pelvic pain, psychiatric diagnoses, and childhood sexual abuse. Obstet Gynecol 1988;71:589–94.

24. Briere J, Runtz M. Multivariate correlates of childhood psychological and physical maltreatment among university women. Child Abuse Negl 1988;12:331–41.

25. Briere J, Runtz M. Differential adult symptomatology associated with three types of child abuse histories. Child Abuse Negl 1990;14:357–64.

26. Claussen AH, Crittenden PM. Physical and psychological maltreatment: relations among types of maltreatment. Child Abuse Negl 1991;15:5–18.

27. Moeller TP, Bachman GA, Moeller JR. The combined effects of physical, sexual, and emotional abuse during childhood: long-term health consequences for women. Child Abuse Negl 1993;17:623–40.

28. Bryant SL, Range LM. Suicidality in college women who were sexually and physically punished by parents. Violence Vict 1995;10:195–201.

29. Zeitlen H. Children with alcohol misusing parents. Br Med Bull 1994;50:139–51.

30. Dore MM, Doris JM, Wright P. Identifying substance abuse in maltreating families: a child welfare challenge. Child Abuse Negl 1995;19:531–43.

31. Ethier LS, Lacharite C, Couture G. Childhood adversity, parental stress, and depression of negligent mothers. Child Abuse Negl 1995;19:619–32.

32. Spaccarelli S, Coatsworth JD, Bowden BS. Exposure to family violence among incarcerated boys; its association with violent offending and potential mediating variables. Violence Vict 1995;10:163–82.

33. McCloskey LA, Figueredo AJ, Koss MP. The effects of systemic family violence on children's mental health. Child Dev 1995;66:1239–61.

34. Brent DA, Perper JA, Moritz G, Schweers J, Balach L, Roth C. Familial risk factors for adolescent suicide: a case-control study. Acta Psychiatr Scand 1994;89:52–8.

35. Shaw DS, Vondra JI, Hommerding KD, Keenan K, Dunn M. Chronic family adversity and early child behavior problems: a longitudinal study of low income families. J Child Psychol Psychiatry 1994;35:1109–22.

36. U.S. Department of Health and Human Services. Physical activity and health: A report of the Surgeon General. Atlanta, Georgia. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Chronic Disease Prevention and Health Promotion; 1996.

37. Rivara FP, Mueller BA, Somes G, Mendoza CT, Rushforth NB, Kellerman AL. Alcohol and illicit drug abuse and the risk of violent death in the home. JAMA 1997;278:569–75.

38. Dillman DA. Mail and telephone surveys: the total design method. New York: John Wiley & Sons; 1978.

39. Straus M, Gelles RJ. Physical violence in American families: risk factors and adaptations to violence in 8,145 families. New Brunswick: Transaction Press; 1990.

40. Wyatt GE. The sexual abuse of Afro-American and White-American women in childhood. Child Abuse Negl 1985;9:507–19.

41. National Center for Health Statistics. Exposure to alcoholism in the family: United States, 1988. Advance Data, No. 205. U.S. Department of Health and Human Services, Washington, DC; September 30, 1991.

42. Siegel PZ, Frazier EL, Mariolis P, et al. Behaviorial risk factor surveillance, 1991; Monitoring progress toward the Nation's Year 2000 Health Objectives. Morb Mortal Wkly Rep 1992;42(SS-4).1–15.

43. Crespo CJ, Keteyian SJ, Heath GW, Sempos CT. Leisure-time physical activity among US adults: Results from the

A-001666

Third National Health and Nutrition Examination Survey. Arch Intern Med 1996;156:93–8.

44. Robins LN, Helzer JE, Groughan J, Ratliff K. National Institute of Mental Health Diagnostic Interview Schedule: its history, characteristics, and validity. Arch Gen Psychiatry 1981;38:381–9.

45. Idler E, Angel RJ. Self-rated health and mortality in the NHANES I Epidemiologic Follow-up Study. Am J Pub Health 1990;80:446–52.

46. SAS Procedures Guide. SAS Institute Inc. Version 6, 3rd edition, Cary, NC: SAS Institute; 1990.

47. Femina DD, Yeager CA, Lewis DO. Child abuse: adolescent records vs. adult recall. Child Abuse Negl 1990;14:227–31.

48. Williams LM. Recovered memories of abuse in women with documented child sexual victimization histories. J Traumatic Stress 1995;8:649–73.

49. Carmody TP. Affect regulation, nicotine addiction, and smoking cessation. J Psychoactive Drugs 1989;21:331–42.

50. Anda RF, Williamson DF, Escobedo LG, Mast EE, Giovino GA, Remington PL. Depression and the dynamics of smoking. A national perspective. JAMA 1990;264:1541–5.

51. Glassman AH, Helzer JE, Covey LS, Cottler LB, Stetner F, Tipp JE, Johnson J. Smoking, smoking cessation, and major depression. JAMA 1990;264:1546–9.

52. Hughes JR. Clonidine, depression, and smoking cessation. JAMA 1988;259:2901–2.

53. Pomerlau OF, Pomerlau CS. Neuroregulators and the reinforcement of smoking: towards a biobehavioral explanation. Neurosci Biobehav Rev 1984;8:503–13.

54. Hardy JB, Street R. Family support and parenting education in the home: an effective extension of clinic-based preventive health care services for poor children. J Pediatr 1989;115:927–31.

55. Olds DL, Henderson CR, Chamberlin R, Tatelbaum R. Preventing child abuse and neglect: a randomized trial of nurse home visitation. Pediatrics 1986;78:65–78.

56. Olds DL, Eckenrode J, Henderson CR, Kitzman H, et al. Long-term effects of home visitation on maternal life course and child abuse and neglect: Fifteen-year follow-up of a randomized trial. JAMA 1997;278:637–43.

57. U.S. Advisory Board on Child Abuse and Neglect. Child abuse and neglect: critical first steps in response to a national emergency. Washington, DC: U.S. Government Printing Office; August 1990; publication no. 017-092-00104-5.

58. U.S. Advisory Board on Child Abuse and Neglect. Creating caring communities: blueprint for an effective federal policy on child abuse and neglect. Washington, DC: U.S. Government Printing Office; September 1991.

59. MacMillan HL, Fleming JE, Trocme N, Boyle MH, et al. Prevalence of child physical and sexual abuse in the community. Results from the Ontario Health Supplement. JAMA 1997;278:131–5.

60. Rixey S. Family violence and the adolescent. Maryland Med J 1994;43:351–3.

61. Chamberlin RW. Preventing low birth weight, child abuse, and school failure: the need for comprehensive, community-wide approaches. Pediatr Rev 1992;13:64–71.

62. Kashani JH, Daniel AE, Dandoy AC, Holcomb WR. Family violence: impact on children. J Am Acad Child Adolesc Psychiatry 1992;31:181–9.

63. Dubowitz H. Child abuse programs and pediatric residency training. Pediatrics 1988;82:477–80.

64. Tabachnick J, Henry F, Denny L. Perceptions of child sexual abuse as a public health problem. Vermont, September 1995. Morb Mortal Wkly Rep 1997;46:801–3.

65. Sugg NK, Inui T. Primary care physicians' response to domestic violence. Opening Pandora's box. JAMA 1992;267:3157–60.

66. Council on Scientific Affairs. American Medical Association Diagnostic and Treatment Guidelines on Domestic Violence. Arch Fam Med 1992;1:38–47.

67. Hamberger LK, Saunders DG, Hovey M. Prevalence of domestic violence in community practice and rate of physician inquiry. Fam Med 1992;24:283–7.

68. Friedman LS, Samet JH, Roberts MS, Hans P. Inquiry about victimization experiences. A survey of patient preferences and physician practices. Arch Int Med 1992;152:1186–90.

A-001667

Page **1** of **6**

**Declaration of Donnie Murrell**
**Pursuant to 28 U.S.C. §1746**

I, Donnie Murrell, declare as follows:

1.      I am an attorney licensed to practice in Florida since 1981. I represented Ricardo Sanchez, Jr., at his capital trial in the United States District Court for the Southern District of Florida in 2009. I was appointed to represent Mr. Sanchez in June 2007 and continued to represent him through his formal sentencing in May 2009.

2.      Prior to representing Mr. Sanchez, I had been defense counsel in three capital trials in the Florida state courts in the 1990s. I also represented some capital defendants whose cases were resolved by plea deals before trial. None of my prior capital defense experience involved defendants for whom we investigated or presented mental retardation or intellectual disability as a penalty phase defense. Although I had represented defendants in criminal cases in federal court prior to Mr. Sanchez's case, Mr. Sanchez's case was my first and last federal capital case.

3.      Michael Cohen was my co-counsel on Mr. Sanchez's case. Mr. Cohen had been appointed soon after Mr. Sanchez's arrest in October 2006, and I was appointed as "learned counsel" at the time the government was formally considering whether to seek the death penalty against Mr. Sanchez. I did not know Mr. Cohen before our appointments to represent Mr. Sanchez, and Mr. Cohen did not have any capital defense experience at the time.

4.      Lisa McDermott was appointed as the mitigation investigator in our case. I had not worked with her before on a capital case. Ms. McDermott worked closely with me in preparing for the penalty phase and on other aspects of the case. I deferred to her in identifying many of the specific witnesses who would be contacted and in deciding how and when to approach those witnesses.

Page **2** of **6**

5.      We decided before trial that I would handle the ballistics/firearms portion of the guilt phase.  However, I did not raise a *Daubert* motion prior to trial to exclude the ballistics and firearms evidence.  I believed that I would be able to challenge the admissibility of the government's expert ballistics testimony during trial based on the absence of an error rate in the ballistics field.  It was not until the prosecution's firearms experts were present and testifying in court that I saw their photographs of the evidence.  I reviewed the materials at that time in order to conduct my cross-examination.

6.      Before trial, the government moved for leave to present the testimony of a substitute medical examiner, Dr. Mittleman, in lieu of the testimony of the medical examiner, Dr. Diggs, who had conducted all of the autopsies in this case.  We did not object to the motion.  We also did not object when Dr. Mittleman offered additional opinions and conclusions that were not included in the autopsy reports completed by Dr. Diggs.  These additional opinions included his conclusion that one of the child victims experienced significant suffering by essentially drowning in his own blood.

7.      We had no strategic or tactical reason for not objecting to the indictment and jury instructions on the ground that the charges in counts 7 to 10 were duplicitous, or that they were not authorized by § 1111, or on related legal grounds.  We intended to preserve and litigate all meritorious grounds, particularly given that this was a capital case.

8.      I met Mr. Sanchez not long after I was appointed to represent him.  Mr. Cohen had visited Mr. Sanchez very infrequently prior to my appointment to the case, and it appeared he had not developed any meaningful relationship with Mr. Sanchez or his family at the time I came on the case.  After I was appointed, I tried to visit Mr. Sanchez regularly.

Page **3** of **6**

9.    I had serious concerns about whether and to what extent Mr. Sanchez understood the trial process.  As an example, near the end of the formal sentencing proceeding, Judge Hurley imposed a term of supervised release on one of the convictions.  Mr. Sanchez then asked me if he had received probation.  During trial proceedings, he often sat in court mimicking what his co-defendants were doing.  He also drew pictures much of the time.  I would tell him what I planned to do and he did not argue with me or challenge me on any decisions I made.  At one point prior to trial, I considered filing a motion requesting accommodations for Mr. Sanchez during the trial, such as taking longer and more frequent breaks during the proceedings and having someone sit next to Mr. Sanchez in the courtroom to explain to him what was happening in real time during the proceedings.  Because it turned out that Mr. Sanchez was able to sit quietly and calmly during the proceedings, we did not file a motion.

10.    Although Mr. Sanchez did not seem to have a complete understanding of the process, I was able to get him to agree to a plea deal.  Mr. Sanchez agreed to plead guilty in exchange for a sentence of life in prison.  John Kastrenakes and Steve Carlton, the Assistant U.S. Attorneys assigned to prosecute the case against Mr. Sanchez, Daniel Troya, Danny Varela, Juan Gutierrez, and Liana Lopez, were amenable to pleading the case against Mr. Sanchez and Mr. Troya.  However, the Attorney General refused to approve the plea and insisted that the case be tried.  This occurred during the closing days of the Bush administration.

11.    In preparing for trial, a jury consultant, Rebecca Lynn, was appointed to assist the defense team.  Ms. Lynn advised us, among other things, that potential jurors who had negative experiences with crime, firearms or illegal drugs would tend to be less receptive of mitigating evidence and more likely to give weight to aggravating evidence in light of the nature of the charges in this case.  This was also something I understood as an experienced attorney.  We

Page **4** of **6**

therefore sought to identify and exclude jurors who had, or whose family members had, such experiences. In identifying those jurors, we relied primarily on the truthfulness of the jurors' self-reporting, which was given under oath in their questionnaires and voir dire testimony. We did not independently conduct criminal background checks of the venirepersons, or of their family members, to confirm the veracity of their statements.

12. At some point during voir dire, we became aware that the government was conducting criminal background checks through the National Crime Information Center of some potential jurors. We did not have access to the NCIC database, and we sought and received an order from the Court that the government would share with the defense the results of those background checks. We assumed that they would provide anything that they had. We did not have any strategic or tactical reason for not investigating the crime-related experiences of the jurors, and in fact, we believed that such information was important in conducting voir dire and seating a fair and impartial jury.

13. At trial, we did not raise a challenge to the racial composition of the grand jury or petit jury venires. I do not recall a tactical or strategic reason for not doing so. We were of the opinion that minority jurors might be more favorable at the guilt and penalty phases and more sympathetic to Mr. Sanchez. Had I understood that the jury venires systematically underrepresented minority persons, I would have raised a challenge before trial.

14. Mr. Sanchez's limited understanding of the legal process appeared rooted in his obvious intellectual limitations. Ms. McDermott and I both suspected that he suffered from intellectual disability, or mental retardation as it was known at the time. We obtained IQ testing of Mr. Sanchez, and the test results confirmed that he had low intelligence, but I thought the scores were too high for us to present a defense of mental retardation. Despite the scores, Ms.

Page **5** of **6**

McDermott continued to advocate for further investigating and presenting a defense of mental retardation; however, I decided that we would not do so. Had I understood that a mental retardation defense could be presented based on the IQ scores in conjunction with available evidence of Mr. Sanchez's adaptive deficits, Ms. McDermott and I would have focused on completing a thorough adaptive deficits investigation, would have provided the results of the investigation to the appropriate expert, and would have obtained an expert opinion regarding Mr. Sanchez's intellectual impairment in light of that investigation.

15.     I recently reviewed the declarations that Mr. Sanchez's current counsel obtained from Dr. Joette James, Dr. Kevin McGrew, and Dr. Louis Kraus.  The opinions these doctors provided about Mr. Sanchez's intellectual impairments are the types of mental health evidence that the defense team was seeking to develop and present to the jury on Mr. Sanchez's behalf. The doctors' conclusions about Mr. Sanchez's intellectual and adaptive limitations would have provided a basis for a penalty phase defense of intellectual disability and would have enhanced several of the defense theories we did present at the guilt and penalty phases, including that Mr. Sanchez functioned at a low level, was easily taken advantage of and manipulated by other people, and had a limited capacity for planning.

16.     We did not focus on investigating whether Mr. Sanchez suffered from psychiatric impairments.  Dr. Kraus's conclusions about Mr. Sanchez's psychiatric impairments, particularly his psychiatric symptoms from trauma, are the type that we would have wanted to present to the jury and would have supported our mitigation evidence of Mr. Sanchez's troubled upbringing.

17.     I also reviewed the recent declarations from several of Mr. Sanchez's friends, teachers, and other educational personnel.  The information in those declarations describes adaptive impairments that Mr. Sanchez dealt with.  If we had that information at Mr. Sanchez's

Page **6** of **6**

trial, I would have provided it to our mental health experts and presented it at penalty phase –

both to support a defense of intellectual disability and as compelling mitigating evidence that Mr.

Sanchez suffered from serious impairments throughout his life.

18.     Although Ms. McDermott identified many of the witnesses to be contacted as part

of the overall mitigation investigation into Mr. Sanchez's life history, it was my responsibility to

ensure that all important witnesses were interviewed.  From my review of the recent declarations

of friends, teachers, and educational personnel, it is apparent that some education witnesses like

Dr. Francis Crosby and Janice Coe were either not contacted at all or were contacted

preliminarily but then never followed up with.  It is also seems that we did not interview some

lay witnesses who witnessed Mr. Sanchez's traumatic childhood and lifelong mental health

deficits, and who therefore could have provided support for our penalty phase case.

I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and
correct.

_____

Donnie Murrell

Signed on: __12/9/16__

A-001673

Medical Examiner's Office
District Nineteen, Florida

Homicide Investigation (Escobedo Family, [4 Members] )
MEO Case #06-19-(594, 595, 596, 597) 10-13-06, St. Lucie County

On 10-13-06 at 8:20 AM I received a call from the answering service to call Sgt. Grant
King of the St. Lucie County Sheriff's Department.  Sgt. King advised they where
currently at the scene of a multiple murder on the Turnpike approximately three miles
south of Ft. Pierce along the southbound lanes.  He advised it appears they had been shot
multiple times.

I arrived at the scene at 8:57 AM to find numerous Law Enforcement Officers and
Investigators at the scene and was briefed as to what was known at the time.  What was
known was that a passing motorist at 7:45 AM saw the bodies and while stopped and
attempting to call 911 a State Trooper stopped to assist him and called 911.

 I observed a blue tent covering the immediate area of four bodies lying on the grassy
area of the shoulder and all four were partially on top of each other.  I took several
photographs to clearly indicate the position of each body, their proximity to each other,
their clothing, some but not all bullet wounds and related body fluid flow.

The SLSO CSI's were currently searching the immediate area for the presence of any
evidence, particularly cartridge casings or projectiles.  Several were located and flagged
so as to protect them while the rest of the investigation surrounding the bodies could be
continued.

Cursory examination of the bodies determined each was cold to the touch and each was
in full rigor mortis: (Jaw, Neck, Arms, Finger, and Knees), and areas I could observe for
lividity were also consistent with current posture.  Clothing and other personal items were
observed as:

Dr. Diggs arrived and assisted with the on-scene exam of the bodies.

Older Male:
 Black Hair and several days to a week of beard growth, light colored slip-on short sleeve
shirt with shoulder area having darker areas, dungaree shorts that came half way between
knees and ankles, black belt, white underwear, brown flip-flops, wedding band on left
finger.  A search of the clothing produced a large amount of cash in the left front pocket
which was placed in an evidence bag.

Older Female:
Black hair, slender build, appeared to be in her early 20's, wearing a yellow slip-on short
sleeve shirt with two buttons at the top and horizontal blue, white and orange stripes.  She
wore full length dungarees, with brown flip-flops, blue bikini panties, and a white bra.
She had a brown plastic bracelet on her right wrist, a watch on her left, a double wedding
band on her left hand, and round white plastic earrings.

A-001674

Oldest Child:
Was clad only in dungaree shorts and white underwear.

Youngest Child
Clad only in a pair of whitish colored shorts and a diaper.

The older male was lying on his back, arms extended, left leg mostly straight, right leg partially bent at the knee. He had sustained a gunshot in the face between the eyes, flow of body fluids was consistent with position of the head, and his flip-flops were still on both feet. The older female was laying face down with her neck and head between the knee areas of the older man, she appeared to have sustained several gunshot wounds of the upper body and her head. The oldest child was partially under her right side with his legs straddling her and her right arm around him as if she had been holding him on her right hip and fell face down in the same general position. He appeared to have sustained at least one gunshot wound in the abdominal area. The youngest child was partially under her left side with his feet towards her head and his head near her left hip. He had obviously sustained at least one gunshot would in the top of his head as well as his left forearm. (See Photographs for more details)

Upon completion of the photographs, cursory examination, and search of the clothing the temperatures were taken as follows:

Ambient temperature in the shade was 80 Degrees at 9:25 AM
Core temperature of the older male was (rectally) 96 degrees at 9:35 AM
Core temperature of the female was (Rectally) 92 degrees at 9:40 AM

The bodies were then placed in individual body bag and awaited transport to the Medical Examiner's Office for further study and examination.

I left the scene at the same time as Dr. Diggs, 10:40 AM.

Merv Waldron, Forensic Investigator
Medical Examiner's Office
District Nineteen, Florida

A-001675

**Declaration of AURELIO SANCHEZ SOTELO**

**Pursuant to 28 U.S.C. §1746**

I, AURELIO SANCHEZ SOTELO, declare as follows:

1.      I am Ricardo Sanchez Jr.'s paternal grandfather. His father Ricardo Sanchez Sr. is my oldest son.

2.      I was married to Modesta Garcia for 42 years. We had seven children together. They are Ricardo, Rolando, Nora, Martin, Ana, Sergio, and Aurelio Jr.

3.      I was born in Matamoros, Mexico in 1935.  My parents were German Sanchez and Guadalupe Sotelo. I have 8 brothers and sisters. They are Armando, Felipa, Guadalupe (we call her Lupita), Esteban, Emilio, German Jr., Marta and Maria. My sister Lupita lives near me in Texas.

4.      I grew up in Matamoros. My family was poor. My family lived in shacks and worked in the fields nearby.  Our shacks were made of cardboard with dirt floors. There were no windows, no bathroom, no electricity and no running water. We slept on the dirt floor with just blankets laid down. We all lived on top of each other. There was no space.  My grandfather and father built the shacks. We moved to a different area of Matamoros at least four times because the hurricanes tore down our humble houses.

5.      My maternal grandfather, Esteban Sotelo Calderon, also lived in Matamoros. He had three houses in the area where we lived. One was wood, one was cardboard and one was concrete. He and my grandmother, Manuela Marroquin, had ten children, five girls and five boys. My grandfather drank beer every day in cantinas and did not have a job. He was very hard on his children, especially my mother. My grandfather had a whistle and he watched his children work and when they did something wrong he blew the whistle and beat them.

Initials: _AS_____                                           Date: _8/1/2016_____

6.      I started working with my mother when I could walk and was strong enough to help her. We walked house to house washing our neighbor's clothes for them. All of my siblings and I also worked in the fields from the time we were young children. We gave the money to my mother. My mother worked hard so that we could eat. My father rarely had a job.

7.      It felt like we had almost nothing to eat. We were hungry. Sometimes we only had beans. Once in a while we had some rice. Rarely did we have meat. We brought water to the house from a nearby canal for drinking and cooking. We bathed in that same canal.

8.      We dressed in hand-me down clothes. We did not have anything new. I did not have shoes at all when I was a child.

9.      My mother and father never went to school. I did not attend school either. When I was about seven years old, I started helping take care of cows on the farm. I fed them and helped to clean the barn.

10.      My parents were not affectionate people. They did not hug or kiss us often. It was customary when I was growing up to kiss the hand of my elders, but that was the only affection we showed.

11.      My father drank alcohol heavily. He went to the cantina every day and drank beer all day long. He came home sloppy drunk and everything my mother said made him angry. They fought all the time. He was violent with her and us children. I could not stand to watch my father hurt my mother, so I stepped in and defended her to make him stop. My father punished us by beating us with a belt. He yelled at us and made us feel bad.

12.      I never knew how old I was. We did not celebrate birthdays in my family. My sisters used to joke that by the time we moved to Texas they were twins. They are about a year apart. My family did not celebrate Christmas or celebrate with gifts. It was a hard life. We were

Initials: _AS_____                                              Date: _8/1/2016_____

very, very poor; although everyone but my father worked hard we never had anything to show for it.

13.   When I was about ten years old I left home and started staying where I worked. I started staying on cots in the barns with the cows I cared for. I moved from place to place and always stayed where I worked. It was nice to be away from the crowding and the fighting at my home. I only made one Mexican dollar a day. It was enough to take care of myself. I lived this way until I was 18 years old.

14.   I met Modesta Garcia when I was 18 years old. We met in Matamoros and were married quickly. Our children Ricardo, Rolando, Nora and Martin were born in Matamoros. We lived in a one-room house and I continued to work on farms and in the fields. I went across the border to Brownsville, Texas to work in the fields and came back to Mexico. I had a special work pass.

15.   My wife's mother, Guadalupe Reyes Radules, was born in the United States. Because her mother was a citizen, Modesta was a citizen. My children and I were able to be citizens because of my wife. In 1973 we decided to move our family across the border to live in Texas. We entered the United States in Hidalgo, Texas.

16.   Modesta and I worked hard in the fields. It was still very hard to feed our family. My children went to school for a little while, but when they were as young as seven I sent them to work in the fields after school or on the weekends. Sometimes I took them out of school altogether to help in the high seasons.

17.   We worked all over the United States picking crops on farms in Indiana, Idaho, Michigan and Florida. We followed the growing seasons. Wherever there was work, we went.

Initials: _AS_____                                          Date: _8/1/2016_____

18. The fields were sprayed and were still wet with chemicals when we started working. The chemicals lingered in the air and got all over us. There was a strong smell all day long. I was not given any mask or gloves to wear when I was picking.

19. We remained poor. There were times when we had nothing to eat but we kept having babies so we had to keep working. When there was food it was simple. We ate mostly beans and cactus. After my wife and I had a baby, she went back to work again. The children at home had to take care of the babies and each other because Modesta and I were out in the fields. My children Ana, Aurelio Jr. and Sergio were all born in the United States while we were moving around working in the fields.

20. My father died in Matamoros, Mexico in 1975. He left my mother penniless after drinking his whole life. There is a lot of heart disease in my family and my mother died in 1985 from a heart attack.

21. Modesta and I settled in West Palm Beach, Florida with my family. We lived in a housing development where mostly people working in the fields lived. We called it "Campo Verde." My wife and kids and I lived in a two story apartment. We lived there for many years.

22. After we had been in West Palm Beach for a while I started working in construction. Modesta got up very early and cooked breakfast and lunch for me before I left for work. She also made very little money by making breakfast and lunch for many of the single men who worked in the fields. She worked in the fields during the day and in the plant where they packaged the produce to be shipped at night.

23. My wife loved our children very much. However, she was very controlling and did not let the children be away from home or have many friends. She did not let anyone touch her children. She was cold, distant and unaffectionate. She did not kiss me because she was

Initials: _AS_____                                                    Date: _8/1/2016_____

suspicious that I was not faithful, even though I was always faithful. She told me that she would not kiss me because she did not know how many others had kissed me.

24.     My wife and I argued about many things. She yelled at me in front of the children and I got mad.

25.     I had no patience with my children. When they did not do what I wanted, I beat them with a belt. I was very strict with my children and expected perfect behavior. When they caused trouble, I was violent with them. Looking back, I regret how hard I was on my children.

26.     My son Ricardo was different from my other children. He was aggressive even as a child and more rebellious than my other children. As early as eight years old he had problems with other children. He could not keep friends because he fought with them. He seemed to always cause problems. Ricardo went to school every once in a while we were traveling around, but he was not very good at school, and he did not graduate.

27.     Juana Jimenez and her siblings lived with their mother, Maria Jimenez, in the same neighborhood just a few doors down from us. My children and Juana and her siblings were friends. I was happy when Juana and Ricardo got married. I liked Juana and her family and was glad to see my son settled. They lived with us in our apartment after they were married. It was cramped in our house with all the children and Juana and Ricardo. My wife and I slept in the living room so they could have their own bedroom.

28.     Shortly after we learned that Juana was pregnant with their first child, there was a terrible incident. Ricardo shot Juana in the face in their bedroom. I did not know what happened. I did not even know Ricardo had a gun. After that Juana's family blamed me and did not want to talk to me anymore. I was hurt that they blamed me for this.

Initials: _AS_____                                        Date: _8/1/2016_____

A-001680

29.     The relationship between Juana and my wife was not very good. Modesta thought Juana was unfaithful to Ricardo. Even so, my wife tried to defend Juana because Ricardo was so violent towards Juana. Of all my children, Ricardo was the most violent. He hit Juana and threw things at her. He constantly yelled mean things at her. My wife made life harder for Juana sometimes, but she also knew that Ricardo was unfaithful to Juana. He had many other women. She often scolded Ricardo, saying, 'why are you chasing other women if you have yours?'

30.     Juana's and Ricardo's first son, their son Efrain, had seizures from the time he was born and is different from the other children. He thinks slower than the others and he sometimes behaves strangely. I think that Efrain's seizures and strange behavior were caused by the beatings Ricardo gave Juana as well as the shooting while Juana was pregnant.  She had such a fright and it made Efrain the way he is.

31.     Ricardo and Juana eventually had three other children: Nydia, Ricardo Jr. and Ezequiel. When my daughter, Ana, died after having her youngest child, they also adopted her oldest son, Omar.

32.     My grandchildren have always been respectful to me and Modesta. They were loving and affectionate and I enjoyed them. My grandson Ricardo Jr. was quiet but he always had a smile for me even though I knew that house was not easy to live in.

33.     Even after he had children, my son Ricardo drank alcohol and went out to bars almost every night. He got into fights a lot when he drank. He was almost always very violent with his children and Juana. He beat Juana and the children in front of me regularly. He hit the children with belts and was very harsh with them. He commanded his children and Juana like he was a soldier. He was very strict and expected that they would behave perfectly.

Initials: _AS_____                                    Date: _8/1/2016_____

A-001681

34.     Sometime after Juana and Ricardo were married a gas tank exploded right near Ricardo's head. He has a hard time hearing now.

35.     My wife died in 2003 from complications from diabetes. Shortly after she died I moved back to Donna, Texas to live near my sister. I have not seen my grandson Ricardo Jr. in about ten years. I have gone back to Florida a couple of times to visit saw him one of those times.

36.     When my grandson Ricardo Jr. was arrested my daughter Nora called and told me. I also saw him on the news in Texas. I was so heartbroken for my son and his family. There was nothing about my grandson that ever gave me the impression that he was a person who could do this type of crime.

37.     I have lived in Donna, Texas for 12 years. I was not contacted by lawyers or anyone else working on Ricardo Jr.'s trial. I would have talked to them and testified to all I say here if I had been asked.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


**Signed on _8/1/2016_____**

**Name _Aurelio Sotelo_____**


Initials: _AS_____                                     Date: _8/1/2016_____


A-001682

**Declaration of Elsa Hernandez**

**Pursuant to 28 U.S.C. §1746**

I, ELSA HERNANDEZ, declare as follows:

1.      I am the maternal aunt of Ricardo Sanchez, Jr. Ricardo is the son of my older sister Juanita Sanchez. Juanita and I have five siblings. In order, we are: Yolanda, Natividad, Gregoria, Juanita, me, Juan Antonio, and Lucy. Our parents were Antonio Jimenez and Maria de la Luz Betancourt Jimenez.

2.      Both of my parents came to the United States from Matamoros, Mexico. All of my brothers and sisters were born in Mexico except for Juan Antonio and Lucy. When we lived in Mexico my father and I went back and forth to Brownsville, Texas for work. My mother stayed at home and took in sewing to make extra money for us.

3.      After my father died my mother moved to San Antonio, Texas. She continued to take in sewing and worked in restaurants to provide for us. My father was a drunk. I remember my mother telling me that my father was a bad man. When he drank he treated her badly and I saw him slapping and punching my mother. My father was an angry man and he had many other women while he was married to my mother.

4.      My father, Antonio, beat my brothers and sisters and me as well as my mother. I started hating my father after I saw him kick my sister Juanita. She was so small. At the time, we lived in Mexico and Juanita had been playing with a little girl in the neighborhood. The little girl had done something bad and my father just walked straight over to the neighbor's house and kicked Juanita like she was a dog.

5.      My mother told me that my paternal grandfather, Natividad Jimenez, left my grandmother, Sara, for a younger woman who cleaned his house. Natividad had his new family

Initials: _EH_                                                          Date: __4/7/2016__

and left Sara to fend for herself and care for all of her children. As a result my father's family went from being well-off to depending on others to survive.

6.      The alcohol finally killed my father in 1972. My mother could not afford to take care of all of the children still living at home on her own. My older sister Gregoria stayed with my mother's parents in Mexico. The rest of us moved to San Antonio where my mother worked in restaurants and continued to take in sewing to provide for us. We moved around quite a bit when we were growing up because my mother also worked as a migrant farmworker. My mother took us to Ohio and Indiana depending on the time of year.

7.      When I was about nine years old, my mother sent Juanita, and me to live with my older sister, Yolanda. Yolanda was about 24 years old and married to Amador Acevedo when Juanita and I went to live with her. Juanita was 11years old. Yolanda worked for a family in San Antonio, Texas and had 3 children of her own. Juanita and I shared a bedroom in Yolanda's house.

8.      Yolanda and her husband were both very tough on us. Yolanda beat us when she felt frustrated when she had to care for us. She did not want us there. She slammed our heads against the walls. We were not allowed to touch the cereal boxes or other food in the kitchen. We could only eat what Yolanda put in front of us to eat. When we ate something she did not tell us we could eat, she beat Juanita and me.

9.      One time when I was 10 years old, Yolanda stripped off my shirt and put me outside the house in the cold to punish me for some small mistake I had made. She left me outside for hours without my shirt on.  She did this with Juanita too. We were treated like Cinderella in Yolanda's home. We had many chores to do and we rarely went to school because we had to babysit her children most of the time.

Initials: _EH_                                                   Date: __4/7/2016__

10.     Amador was not a nice man. Yolanda threatened to take my or Juanita's shirts off and let Amador stare at our bare chests if we did not behave. The worst abuse came from Amador. Juanita and I were both molested and raped by Amador. We could not escape it.

11.     Juanita was very timid. She did not speak to Yolanda or Amador. I stood up against them and fought to protect both of us, even though I was two years younger than Juanita.

12.     When I was about 11 years old and Juanita was about 13 years old, we moved from Yolanda's home in San Antonio, Texas to West Palm Beach, Florida to live with my mother again. We were very poor. We had no car and took the bus everywhere. We worked on the farms picking oranges and vegetables where my mother and her sister worked. We lived in the neighborhood of migrant farm workers.  Ricardo Sanchez lived with his family in the same neighborhood when they moved from Brownsville, Texas. Juanita met Ricardo because he lived across the street from us.

13.     My mother's sister Paula and her family lived in West Palm Beach, Florida and did migrant farm work. Paula had three daughters: Beatriz, Graciela, and Minerva. Beatriz is Daniel Varela's mother.

14.     I did not graduate from high school, nor do I have my GED. I worked in the fields picking vegetables when I was a teenager. I worked instead of finishing school to help my mother earn enough money to feed our family.

15.     No one in my family thought it was a good idea for Juanita to marry Ricardo Sanchez, Sr. We told her not to marry him. He was very full of himself and not a kind man. But Juanita did not listen to us.  She wanted to get out of her house and she saw Ricardo Sr. as the way out. She was married when Juanita was 17 and Ricardo Sr. was 20 years old.

Initials: _EH_                                                    Date: __4/7/2016__

16.     Ricardo Sr. went out often and drank large amounts of alcohol. He came home after drinking all night and started arguments with Juanita. He smacked her around and beat her. When she was three months pregnant with her son, Efrain, Ricardo Sr. shot her in the face in a drunken rage. Ricardo Sr. was arrested and Juanita had to go to the hospital.

17.     When Juanita was discharged she came and stayed with my mother and me. We pleaded with her not to talk to Ricardo Sr. or go back to him. Ricardo sent his sister, Nora, to talk to Juanita and encourage her to go back to Ricardo Sr. Juanita stayed with us for a while and then went to Houston, Texas to stay with her sister Gregoria after Efrain was born.  She called Ricardo Sr. and went back to him after Efrain's birth. We could not convince her to leave Ricardo Sr. I thought Juanita was crazy to go back to Ricardo Sr. and to stay with him for all these years.

18.     After Efrain was born, my mother, Juan Antonio, Lucy, and I moved back to San Antonio, Texas. I was 17 years old. I started working in a factory called American Lantern where I made and assembled light fixtures. I worked there for a long time. I have worked in factories since that time. I still work in a cornmeal factory.

19.     I married Hector Hernandez in 1984 in San Antonio. Juanita brought Efrain and Nydia to my wedding because she did not want to leave them alone with their father. My children, Hector, Alex, and Deyaneris, are all much younger than Juanita's children.

20.     Ricardo was mean and angry, controlling and manipulative. Juanita told me that Ricardo Sr. ran their house like a general and she and the children were the soldiers. Ricardo Sr. demanded to know everything that went on when he was away from home. Everything was always for Ricardo Sr. He spent most of the money he earned on himself, leaving Juanita and the poor children with almost nothing. Ricardo Sr. always had nice clothes and shoes, while the

Initials: _EH_                                            Date: __4/7/2016__

children dressed in raggedy old clothes. He went out to bars at night and was almost always with other women. Juanita told me that sometimes he came home with marks on his neck from other women kissing him. He rarely let Juanita and the children leave the house.

21.     Ricardo Sr. beat the children as well as Juanita. Ricardo Sr. beat his daughter Nydia so hard she had bruises all over her body. It was hot in Florida, but she had to wear long sleeves to cover the bruises.

22.     My brother, Natividad, was shot and killed in May 1989. He had always been my mother's favorite child, and she was heartbroken.

23.     When Ricardo Jr., or as our family calls him, Ricardín, was a small boy, he went to visit our family in San Antonio. Ricardín came to stay with us when he was little. Ricardín fell off a tricycle and hit his head while he was with us. My brother, Juan Antonio, took him to the hospital. He had to have many staples put into his head.

24.     Ricardín came again to visit us a few years later, this time with more of his family. Ricardín was a very quiet boy. He rarely spoke, but he smiled a lot and was very respectful. He seemed mentally slower than his brothers and sister. He followed his siblings around and stayed close to them. They made the plans and he followed them.

25.     Ricardín was very obedient. He had to be told what to do every step of the way, but he always tried to do as he was told and did not talk back. He did not remember directions that were given to him. We told him repeatedly what to do. He was very forgetful.

26.     Juanita and I have a close relationship. We speak on the phone often and I usually know what is going on with her and the kids. She told me when Ricardín was arrested that she was terrified for him and could not believe it. It was definitely a shock to us. This does not seem like something Ricardín could be capable of doing.

Initials: _EH_                                                              Date: __4/7/2016__

27.     Before Ricardín went to trial, Lisa McDermott, his investigator, and a young man went to visit me. They asked me how Ricardin was as a child. They wanted to know if he was a good boy. They did not ask me much of anything else. We had a nice talk but I did not hear anything else from them. I wanted to testify at trial, and I did not attend trial. If I had been asked, I would have testified to all I say here.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


**Signed on _Elsa Hernandez [sic]_**

**Name _Elsa Hernandez_____**

Initials: _EH_                                                                 Date: __4/7/2016__

## Declaration of Juana Maria Sanchez

## Pursuant to 28 U.S.C. §1746

I, Juana Maria Jiménez Sanchez, declare as follows:

1.      I am Ricardo Sanchez, Jr.'s mother. I call him Ricky. Ricky is the third child born to my husband, Ricardo Sanchez, Sr. and me. We have four children together: Efrain, Nydia, Ricardo Jr. and Ezequiel. We also adopted the son of my husband's sister, who had a heart problem and died in childbirth. His name is Omar Diaz Sanchez.

2.      I was born in Matamoros, Mexico in 1963. My parents are Maria de la Luz Betancourt and Antonio Jiménez. I was the fourth child born and I have six siblings. They are Yolanda, Natividad, Gregoria, Elsa, Juan Antonio and Lucy. When I was young my family lived in Matamoros in a house near the city. My father worked in a business that made very little money. My mother took in other people's sewing to help my father provide for us. We were poor. My parents struggled to care for and feed seven children. My older siblings were not able to finish school in Mexico because you had to pay tuition for high school. My sisters went to work outside the house with families in the United States when they were about 15 years old. My sister, Yolanda, would bring us boots and clothing from the United States because my mother could not afford to buy them in Mexico. All of my older siblings gave my parents money to help them keep the house.

3.      My father was a severe alcoholic. He beat my mother frequently. He beat us kids too. After I was born my mother and father separated for a time because the abuse of my mother continued. He was also cheating on her with other women. My mother threw my father out many times. He always came back and continued to drink and beat her. My parents' last four children were born after they got back together. My mother used to tell me that when we moved to the

Initials:  __JS___                                                        Date:__8/4/16__

A-001689

United States life would be better because men did not beat women there. My mother and father moved us to San Antonio, Texas.

4.      When I was nine years old, my father died from liver disease. He left my mother to take care of seven children alone. She started working outside the home doing prep work in restaurants and she continued to take in sewing. We also started working on farms picking fruit. I began working around 12 years old picking apples in Michigan. My older siblings worked and also sent my mother money to help support us.

5.      When I was 10-11 years old, my mother sent me and my sister Elsa to live with my older sister Yolanda. Yolanda was upset that she had to take care of us. She was not kind to Elsa and me. She gave her children whatever they wanted to eat and Elsa and I had to eat whatever was put in front of us. She hit us and punished us. Yolanda made us do strange things like take our clothes off and stand outside in the cold. Sometimes we did not even know what we were being punished for. Yolanda has mental health problems. We did not know this as children, we just thought she was very crazy and mean.

6.       After my father died, my mother had to work outside the home to support us. We traveled to farms in Michigan to pick apples. In Indiana, we picked strawberries. We picked tomatoes in Ohio and in Florida vegetables like peppers and cucumbers.  She took her younger children with her so they all worked in the fields. We worked during the week after school, when we went. We also worked on Saturday and Sunday if there was work. Our income went to my mother to survive.

7.      Occasionally, we were able to go to school when we were in other states. I remember going to school in Toledo, Ohio and Michigan. Eventually, my mother decided to stay

Initials:  __JS___                                                      Date:__8/4/16__

in West Palm Beach, Florida. We worked in the fields there and it was close to my [sic] sister, Paula Rodriguez and her children.

8.      My mother brought my brother Natividad, me, Elsa, and Juan Antonio and Lucy with her to West Palm Beach. My older brother got a job and moved out of my mother's home. We lived in housing provided for those who worked in the fields. It was called Campo Verde. There was a large group of two story buildings, like apartments. Ours had two bedrooms and a bathroom. It was rundown and in disrepair. It was Elsa's and my job to keep the apartment clean. I cleaned the upstairs and Elsa cleaned the downstairs. There was no telephone in the apartments. The camp had two pay phones and you had to walk to them and wait your turn to make a call.  I worked on farms until I was 15 years old.  The chemicals they sprayedsmelled horrible and hurt my nose with the strong chemical smell. The plants were covered with white powder and we got it all over our hands and clothes. We did not have gloves or masks.

9.      We were day laborers on agricultural farms. The man who paid us came to pick us up from the housing camp in a big bus. It smelled like dirty people and was terribly hot. There was no air conditioning and we had to ride 25 minutes each way.

10.      My aunt Paula had five children. They are Armando, Beatriz, Benito, Graciela and Minerva. We spent time with them when we were children at family gatherings. My cousin Benito Rodriguez took an interest in my family and tried to help us when he could. He used to drive us to the store to buy food. We did not have a car. My cousin Beatriz is Danny Varela's mother. My cousin Minerva was killed in a home invasion in 2001. She had two children, Jessenia and Fermin, and they went to live with Paula when she died.  My cousin Armando was deported back to Mexico. He was an addict and smoked crack cocaine and got into trouble.

Initials:  __JS___                                                                                   Date:__8/4/16__

11.     Close to the camp for workers lived the Sanchez family. The Sanchez family had several things in common with our family. Their family came from Matamoros, Mexico and lived in Brownsville, Texas for a time. My mother knew them before we moved to Florida. Also, the entire Sanchez family worked on the farms in Florida. They had traveled around to many of the same states that my family did to work on farms. The Sanchez family also had several children who were around the same age as me and my younger brother and sisters. This is how I knew Ricardo Sr. I saw him nearly every day. We were friends. He teased me that I was too young for him to talk to. I went to dances in the community and danced with Ricardo. I was not supposed to dance with Ricardo. My sister, Elsa, would tattle on me to my mother every time she saw me dance with him. Even though my family warned me not to, I married Ricardo Sanchez, Sr. when I was 16 and Ricardo Sr. was 20 years old. My family did not want me to marry Ricardo because they knew he drank heavily. However, they did not tell me this before we married. My mother kept telling me that I was too young to marry and to wait for another man. I did not know how much Ricardo drank until after we were married. I left my house on April 17 and we got married on May 10, 1980.

12.     Ricardo's parents were Modesta Garcia and Aurelio Sanchez. They had seven children. They are Ricardo, Rolando, Martin, Ana, Nora Ellian, Sergio, and Aurelio Jr.  All but the youngest two children were born in Matamoros, Mexico. My sister Elsa and I were good friends with Nora and Ana. Ricardo and I married on May 10, 1980. We moved into his parents' apartment in the workers camp.

13.     Shortly after Ricardo and I married, I discovered he was an alcoholic. He drank what seemed like every day. We went out together sometimes when we were first married, but

Initials:  __JS___                                                                                      Date:__8/4/16__

soon he wanted me to stay home while he went out. I was sure that he was seeing other women. I became pregnant with my first son in 1980.

14.     Ricardo Sr. became increasingly violent in the months before and after I got pregnant. In September of 1980, Ricardo Sr. shot me in the face because he was jealous. I was one month pregnant with Efrain. I had to go to the hospital and be treated for the gunshot wound. I was in the hospital for two months. They arrested Ricardo and he was in prison for 9 months. After I was released from the hospital, I could not go back and live with Ricardo Sr., because I was too scared and angry. I went to live with my mother until the baby was born, then to Houston, Texas to stay with my sister Gregoria. Ricardo Sr.'s sister Nora called and visited me, asking me to talk to Ricardo Sr. She wanted us to reunite. I did not want to speak to him. However, after Efrain was born, I called Ricardo Sr. and asked him to come get me. I wanted him to pay for his mistake and be made to support Efrain and me. I went back to live with him and his controlling and violent behavior continued. I came back because I thought Efrain needed to have his father.

15.     Ricardo Sr.'s family, like mine, was violent. I liked Ricardo Sr.'s father but he was a heavy drinker. He was nicer than Ricardo Sr.'s mother, but he was violent with Modesta. Ricardo's father went after Modesta with a machete and also hit her. Modesta followed me around and came to my house to spy on me. She wanted to catch me doing something wrong. I saw her through the window on many occasions just watching me. She thought she might catch me cheating on Ricardo or doing something he would not approve of. He was driving a truck on long hauls and was often not home for days at a time. She kept an eye on me for him. Also, Ricardo Sr. would not allow me to leave the house by myself even for the simplest errand. He would call his mother to come and watch me so that she could report back to him. It upset me.

Initials:  __JS___                                                                 Date:__8/4/16__

Even today Ricardo Sr. does not like me to leave the house by myself. He often makes Efrain go with me even if it is only for a walk or to go to the park.

16.     Efrain has mental problems, is slow in intelligence and suffered from epileptic attacks since he was small. He has been on medicine to control the seizures for many years. I think that being shot so early in my pregnancy with Efrain caused these problems. Within two years, Nydia and Ricky were born. I did not have much prenatal care. I went to the doctor for an infection while I was pregnant with Ricky. Ricky's birth was different than my previous two. Instead of my water breaking I started bleeding. I was afraid something was wrong. I rushed to the hospital and had Ricky. I did not know why that happened.

17.     It was a lot of work to take care of three small children. Ricardo Sr. went out almost every night and left me at home to take care of the kids while he was drinking. Often, he came home drunk and angry. Ricardo came home and immediately started an argument with me. He would say mean degrading things to me about my appearance or my cooking. He threw plates of food and pitchers of lemonade at me. Sometimes he threw beer bottles. He slapped and hit me when he was mad.

18.     In April of 1985, my youngest son Ezequiel was born. My other three children were under the age of 5 years old. I was overwhelmed with taking care of them. I was on my own. I could not depend on my mother in law because one of her neighbors told me that anytime I left the children at her house she hit and beat them. My husband had no idea how to care for children. He would not change a diaper or feed the children. One night I left Ricardo Sr. with Ricky when he was a baby while I ran to the store for milk. I came home and instead of changing the baby's diaper, he had just slapped another on top of the baby's clothes and dirty diaper. I could not imagine what he was thinking.

Initials:  __JS___                                                          Date:__8/4/16__

19.     My husband was arrested several times in the years that I was pregnant with the children. We had very little money and lived in the projects. The neighborhood was full of drugs and fighting. Most of the time, I was home alone taking care of the children. My mother and siblings except for Natividad moved back to San Antonio, Texas around 1982. I had no help from them to care for my children. When Ricardo Sr. came home, he fought with me in front of the children, and hit the children. I hated to see him hit the children. I did not want him to hurt them. I did not like for them to see us fight, but there was no way to hide it from them. My children were scared of their father. When he came home drunk the children would scatter and hide. I remember hearing them cry but I did not leave to comfort them because it would make Ricardo Sr. furious. I tried to protect the children by calming my husband down. It usually did not work. Ricardo Sr. fought with me until he went to bed.

20.     Ricardo Sr. never had anything nice to say to any of us. My children were terrified of what their father might do to me. One time, Ricardo Sr. hit me so hard across the face that I fell to the floor. Nydia bent down to check on me and decided to call the police. By the time the police came, Ricardo Sr. was out the backdoor and across the road into the woods. He stayed there until he was sure the police were gone. He was so angry at Nydia. He screamed and threw things at her.

21.     When Ricky was three years old, we lived in an apartment in Dyson Circle in West Palm Beach. One day my husband and I noticed that Ricky was falling asleep. He was wobbly and swaying from side to side. The apartment had two floors and I took Ricky upstairs to put him in bed. I noticed an open pill bottle of Efrain's seizure medication. I counted 18 pills missing. I made Ricardo Sr. call an ambulance and I ran to the pharmacy to see what I should

Initials:  __JS___                                                                                          Date:__8/4/16__

give to Ricky. The ambulance took Ricky to the hospital and he was in a coma for 12 hours. I was very scared.

22.      Ricky had another accident when he was less than five years old. He was visiting my mother in San Antonio. He was there for about a month when my mother called and told me that Ricky was playing and fell and split open his head. My brother Juan Antonio rushed him to the hospital where they had to put a bunch of stitches into his head. I went and brought him home after that.

23.      Ricky seemed to be sick a lot when he was a child. He was hospitalized for pneumonia a few times. He was also allergic to many things when he was a child. He would rub up against something and have an allergic reaction, like a rash or breathing problems. When he could not breathe I rushed him to the emergency room at the hospital where they gave him medicine.

24.      Ricky sometimes seemed to be in another world. He did not respond unless I called his name several times when this happened. He was blank and I had to bring his attention back to me from wherever he was. I recall the school mentioning this to me and suggesting that I take him to a doctor to have it checked out. I did not take Ricky to a doctor for this. I misunderstood what the school was saying. I thought they meant that Ricky was distracted or not paying attention to the teacher. He was often distracted at home and I did not think it was a severe problem. Looking back I wish I had paid more attention to this.

25.      To me, Ricky seemed meek and timid. He was always waiting for something bad to happen. He only asked basic questions like where we are going, or what time is it. He was not a curious child. Ricky was clingy and affectionate. He was always close to me when he was small. He liked to watch me cook in the kitchen or followed me when I cleaned the house.

Initials:  __JS___                                                                                        Date:__8/4/16__

26.     Men in my husband's family were machista. They were hard on women and put themselves first. My husband was very much machista. The money he made went to him. He bought nice clothes and went out often. Only whatever was left over came to his family. Ricardo Sr.'s mother's uncle, Santos Garcia, was Ricardo Sr.'s role model. He was a very violent man and my husband treated his family the same way Santos did.

27.     My husband did some crazy things when he was mad. Not only did he argue and fight with me, but sometimes he would get in his big truck and spin the wheels creating all kinds of dust and smoke. He would drive around in circles with me in the cab of the truck just because he was mad. It scared me and I did not understand this behavior. I thought all the drinking must have damaged his brain for him to act this way.

28.     All of my children attended the Head Start program before they started school. Ricky liked going and learned a few basic things before he started school.

29.     In 1989, Ricky started school at Berkshire Elementary School in Palm Beach County.  Efrain and Nydia were already attending school. I spoke Spanish to my children at home, but they all learned English too. They placed Ricky in classes for English as a second language. I thought these were special classes to help Ricky in school. When Ricky was in second grade the school told me that they tested Ricky and he had problems learning. Ricky seemed like the slowest of my children with learning. Ezequiel was in special classes too, but Ricky was slower than Ezequiel. Neither my husband nor I attended meetings at school for Ricky. I went to a couple of meet the teacher meetings when Ricky was in elementary school, but my husband was usually working and I was taking care of the house.

30.     Ricky always needed help with his homework. Usually, Nydia helped him. They were close in age and sometimes had similar work. Ricky was not a good reader. He had trouble

Initials:  __JS___                                                                                    Date:__8/4/16__

studying for tests. Nydia tried to help him memorize numbers or words but he could not do it. It was hard for me to help Ricky. I only finished the sixth grade and I do not read English.  He was forgetful and the information would not stick in his head no matter how many times you told him. Ricky stopped going to school in 10th grade.

31.      Ricky was obedient at home and tried to do what I asked him. I often had to ask Ricky more than once to do something. He seemed to forget what I had asked him to do and needed help to do it.

32.      In 1995, my husband and I bought a small house off Southern Boulevard in West Palm Beach. We were able to get the house because it was going to be foreclosed on. The new neighborhood was still low income, but the new neighborhood was not overrun with drugs and fighting. The majority of the neighborhood was White and Spanish when we moved in. Some of our neighbors were racist. They yelled things like, "go back where you came from!" This problem went on for some time and the police were called more than once.

33.      I also called the police after I found out that a man down the street from us had molested Efrain. Efrain rode his bike to visit a friend who lived near the man. Efrain called me from this man's house and said he needed help fixing his antennae. The man got on the phone and told me that he was safe and Efrain would be home soon. Efrain did come home and told her [sic] that he had a seizure at the man's house. When he came out of the seizure the man pulled his pants down and touched his penis. I called the police and they said they would talk to the man, but I never heard anything else about it.

34.      As my children got older, the violence in my house got worse. My husband hit the kids. He yelled at them and punched or slapped them if he thought they were not behaving. It seemed like every time my husband was hitting or fighting with someone in our house. Nydia

Initials:  __JS___                                                                                      Date:__8/4/16__

had her hair yanked when Ricardo Sr. did not like something she did. He punched her and left bruises all down her arms. I made her wear long sleeve shirts to hide the bruises. My husband did not like for the children to go out of the house except for school. He was extremely controlling of us all. A few times Ricky or Efrain tried to protect me from Ricardo Sr's abuse. Ricky would stand up to Ricardo, but it only made him angrier.

35. I did work out of the home from 1996 to 2001 at Publix grocery store. I enjoyed working out of the home, but I had to quit when Efrain was in high school. His seizures came more frequently and I had to be able to pick him up at a moment's notice. I regularly felt overwhelmed by my responsibilities to my family. Nothing I did was good enough for Ricardo Sr. He was always humiliating me and putting me down. Sometimes I did not know where my head was. Ricky was about 13 and I took all the kids to the store with me. I went and did my shopping and returned home to find Omar sitting on the front lawn eating an orange. I left him there. He never made it into the car with the rest of the kids. I could not believe that I was so careless to leave him behind.

36. Ricky was in high school when he met Maria Lopez. After they dated for a while, she got pregnant with my grandson, Ricardo Sanchez, III. The family calls him Three. I thought Ricky was too young to be a father, but he seemed like he wanted to be involved. Shortly after his 19th birthday, Ricky moved in with Maria and her mother, Rachel Ramos. I was sad to have Ricky leave the house. Ricky wanted to be with his son, but also to be away from his father and all of the fighting in the house. I tried to get Ricky to get his GED, but he could never do it.

37. Ricky tried to find work so that he could support Maria and Three. He worked in construction. Maria's father got him a job with a friend that ran a construction crew. He did not keep any job for long. They were struggling to make ends meet and they moved to North

Initials: __JS___                                              Date:__8/4/16__

Carolina for a while to look for better jobs. Ricky came by my house a couple times a week. Usually I saw him on Sundays.

38.     After Ricky and Maria split up, he did not come around to my house much. He started hanging out with my Cousin Beatriz's son, Danny Varela. I did not know Danny very well, but I did not like the influence he had on Ricky. Ricky changed. He dressed differently and wore more jewelry like Danny. He started getting into trouble with the police and I was very worried for him. I knew that Danny was trouble and I was scared he would get Ricky into a bunch of trouble. I told Ricky what I thought, but he felt like Danny was like family and his friend. Ricky trusted Danny.

39.     When Ricky was arrested, I was horrified. I was scared and I did not really understand what was going on. They put Ricky in jail and he had attorneys and an investigator. The investigator, Lisa, came to talk to me on many occasions. She did not speak Spanish, so I relied on my children to explain to me all that was happening.

40.      I visited Ricky in the prison as often as I could before his trial. Ricky was scared and really sad. I know it comforted him for me to visit, but he seemed very confused about what was going on with his case. I was not able to calm his fears. During trial I was sitting behind Ricky. I could not see his face, but he was so quiet and still. He did not talk much to the attorneys.

41.     Because I did not exactly understand what was going on, I was afraid to trust Ricky's attorneys. If I had understood what was going on, I could have given them more information.

42.     In 1991 my husband had an accident. A barrel exploded and the lid hit his face and head. The impact sent him flying 14-20 feet. He became more violent after that accident.

Initials:  __JS___                                                      Date:__8/4/16__

43.      Ricardo would throw plates and cups when I would serve him; food saying "this needs salt". He would humiliate me and throw the cups of ice tea in front of the children.  Ricky saw and heard everything and that would happen frequently because Ricardo would come home drunk.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


**Name:**          _Juana M. Sanchez  8/4/16_____

**Witness:**        _Alba S. Johnson 8/4/16_____
                Alba S. Johnson

Initials:  __JS___                                                              Date:__8/4/16__

**Declaration of Maria de la Luz Betancourt Jimenez**

**Pursuant to 28 U.S.C. §1746**

I, MARIA DE LA LUZ BETANCOURT JIMENEZ, declare as follows:

1.      I am Juanita Jimenez Sanchez's mother. Ricardo Sanchez, Jr. is my grandson.

2.      I am 87 years old and I am blind.

3.      I was born in Padilla, nearby Ciudad Victoria, the capital of Tamaulipas, Mexico, in 1929. I am one of five children. My sisters are Gregoria, Paula, and Oralia. I have one brother, Abel. We grew up on a farm on which my father, Abel Betancourt, farmed corn, beans, and chile. My mother was Maria Trujillo Jimenez. I went to a rural school only through the sixth grade. After that my parents had to pay to send me to school and they did not have the means to send me or my siblings to school. I worked in the fields helping my parents when I was not in school.

4.      My father liked to drink alcohol. He gave me money and sent me to buy him alcohol so my mother would not know.

5.      My sister Gregoria got married when she was 15 years old. Gregoria found out that her husband was cheating on her and she confronted him. We kept rat poison to kill the vermin so they would not eat the crops. My sister Gregoria took the rat poison and killed herself when she was 16 years old.

6.      I married Antonio Jimenez when I was 15 years old. He was two years older than me. We had seven children together; Yolanda, Natividad, Gregoria, Juanita, Elsa, Juan Antonio, and Lucy. We moved to San Antonio, Texas when Elsa was a baby.

7.      My life with Antonio was filled with violence, alcohol, and other women. Antonio came home with his underwear turned inside out, so I knew he had been with other

Initials:_MJ_____                                                          Date:_4/7/16_

A-001702

women. He drank and beat me on a daily basis until he died in 1972, in Matamoros, Mexico when he was middle aged from liver disease brought on by his years of drinking.

8.    After Antonio died, I never remarried. I worked hard cleaning, cooking, and sewing while I was raising my children. I had to support the children alone. I sent my daughter Gregoria to live with my parents in Mexico. I sent Juanita, Elsa, and Juan Antonio to live with my oldest daughter, Yolanda. She was married, working, and had a home of her own. I took in sewing for people and worked in restaurants in San Antonio. I moved around, following the crops, and worked as a cook for migrant workers in the fields in Ohio, Michigan, and finally in Florida. My sister Paula was living in West Palm Beach, Florida and I took my eldest son, Natividad and my youngest daughter, Lucy to live with me while I worked picking oranges.

9.    Juanita, Elsa, and Juan Antonio eventually came to join me in Florida. They all worked in the fields, too. Juanita met Ricardo Sanchez, Sr., where his parents worked in the fields picking oranges with Paula and me. We lived in a group of trailers that the field bosses provided for the workers.

10.    I never wanted Juanita to marry Ricardo Sr. He was always all about himself. He was like a peacock; he always looked beautiful and did not care about the others around him. He was clingy and needy; he never had to lift a hand. His mother did everything for him and gave him everything.

11.    When Juanita was pregnant with her first child, Efrain, Ricardo Sr. shot her in the face in a drunken rage. My family believes that this is why Efrain was born with epilepsy and mental health problems. After he shot her, Juanita left Ricardo Sr. and stayed with us for about six months. Although her sisters and I warned her not to, she returned to Ricardo Sr. Shortly after Juanita went back to Ricardo Sr., I moved with Juan Antonio and Lucy back to San Antonio.

Initials:_MJ____                                                                                          Date:_4/7/16_

12.    The first time Juanita's son, Ricardo, whom I call Ricardín, came to Texas to visit he was seven months old. My daughter Lucy and I had been visiting in Florida and as we were returning to Texas, Ricardo Sr. handed Ricardín to Lucy and told her to take him. Lucy took Ricardín on the plane even though he had no clothes, diapers, formula, or plane ticket. Juanita came months later to take Ricardín home.

13.    The second time Ricardín came to visit me he was about 3 years old. He had a terrible fall and split his scalp open. My son rushed him to the hospital where they had to put staples in his head.

14.    When Juanita's children came to visit us, they wanted to stay and not to return home. They said their parents fought a lot in their home. Ricardín asked Juan Antonio if he could stay with him and Nydia asked Elsa if she could stay with her. Both Ricardín and Nydia said that their father hit them and their mother all the time.

15.    Ricardo Sr. drank often. He went out almost every night to drink and hang out with his friends. I once saw Ricardo Sr. take off his thick, leather belt and beat the children with it. He went after Nydia and I felt powerless to do anything. I ran away like a rabbit. Ricardo Sr. hit Juanita almost daily in front of the children. I called him "The Monster."

16.    Ricardín was a very good boy. He was always kind and affectionate. He did not talk much and always wanted to do everything the other children were doing. He seemed slower than his brothers and sisters. He was very respectful and always wanted to please me. *Ricardín at times seemed to be far away, absent, as if he didn't understand what was going on around him.*

17.    Ricardín only visited a few times when he was a child. I went to Florida to see the family for vacations. I never liked to stay with Juanita because of Ricardo Sr., and I have not traveled to see them in a long time. I find traveling difficult because I have Parkinson's disease and arthritis that causes severe pain in my knees. I have to use a walker to move around. *once, when he was visiting at my house, Ricardín got too close to the street where cars were passing, and he didn't understand my warnings so I threw pebbles at him to make him pay attention. I got him to move away.*

Initials: MJ____                                                      Date: 4/7/16_

A-001704

18.      I was shocked and heartbroken when I found out that Ricardín had been arrested.

19.      Alba Johnson read this declaration to me and I confirm that it is accurate.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**


**Signed on \_Maria  4/7/2016_____**

**Name \_Maria Jimenez_____**


I certify that I read this declaration in full to Maria de la Luz Betancourt Jimenez. She confirmed

its accuracy and I witnessed her signature.

                                           \_Alba S. Johnson_____

                                           Alba S. Johnson

Initials:\_MJ\_\_\_\_                                                        Date:\_4/7/16\_

### AFFIDAVIT/DECLARATION OF SANDRA CASTRO
### PURSUANT TO 28 U.S.C. § 1746

I, Sandra Castro, hereby declare and verify as follows:

1. My name is Sandra Castro. I am employed with the Capital Habeas Unit of the Federal Community Defender Office for the Eastern District of Pennsylvania as a bilingual paralegal.

2. In 1989, I received a Bachelor of Arts degree in Business-Spanish from Holy Family University.

3. From 1989 to 2005, I was employed as the official Spanish Interpreter for the Defender Association of Philadelphia. My duties included serving as the Spanish interpreter for defense counsel in hundreds of criminal jury trials, bench trials, proffer sessions, guilty pleas and sentencings.

4. I have served as a Spanish interpreter in civil arbitration hearings and have done translations for private counsel in both civil and criminal proceedings.

5. I translated into English the Spanish-language affidavits of Aurelio Sanchez Sotelo, Elsa Hernandez, Juana Maria Sanchez and Maria De la Luz Betancourt Jimenez and filed with the Appendix at A-000541-48, A-000563-68, A-000578-90 and A-000639-42.

6. I hereby certify that the attached English translations filed concurrently with the Appendix at A-001676-82, A-001683-88, A-001689-1701 and A-001702-05 are true and correct translations of the corresponding Spanish language declarations of Aurelio Sanchez Sotelo, Elsa Hernandez, Juana Maria Sanchez and Maria De la Luz Betancourt Jimenez, respectively.

I hereby certify that the facts set forth above are true and correct to the best of my knowledge and belief, subject to 28 U.S.C. § 1746.

Philadelphia, PA

Sandra Castro, Paralegal
Federal Community Defender Office
For The Eastern District of Pennsylvania
Capital Habeas Unit

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
KATHLEEN KAIB, Notary Public
City of Philadelphia, Phila. County
My Commission Expires November 17, 2017

Sworn to and subscribed before me
this 13 day of Dec 20 16.

A-001707

Page **1** of **6**

## Declaration of Lisa McDermott
## Pursuant to 28 U.S.C. §1746

I, Lisa McDermott, declare as follows:

1. I worked as a mitigation specialist and investigator with the defense team representing Ricardo Sanchez, Jr., against capital charges in federal court in West Palm Beach Florida between 2007 and 2009.

2. I am a mental health counselor licensed in the State of Florida. I am also a Florida Supreme Court Certified Mediator. In 1994, I founded McDermott & Associates, a full-service firm offering private investigations as well as criminal, civil, and family case support services. I have been hired and appointed to work as an investigator and a mitigation specialist on numerous capital cases in state and federal courts in Florida.

3. In July 2007, defense attorney Larry Donnie Murrell called me to ask me to work with Ricardo's defense team and to conduct a mitigation investigation to uncover information that could be presented on Ricardo's behalf at the guilt and penalty phases of his capital trial. Upon motion of counsel, the federal district court appointed me to serve as the mitigation specialist for Ricardo. My role in that capacity was to work closely with counsel, Ricardo, and social history witnesses through all phases of the case. Although I was appointed as the mitigation specialist, as case preparations progressed I became involved in investigating some aspects related to the guilt/innocence phase of the case as well.

4. Donnie and Mike Cohen were the two lawyers appointed to represent Ricardo. Donnie had some experience representing defendants in capital cases in state court in Florida prior to his appointment to Ricardo's case. Ricardo's was Mike's first capital case. He had been appointed to represent Ricardo before the government added the homicide charges against Ricardo. When the homicide charges were added, and it was possible that the government would

Page **2** of **6**

seek the death penalty against Ricardo, Donnie was appointed as learned counsel because Mike

was not qualified on his own to represent a defendant in federal capital proceedings.  Although

Donnie and Mike loosely split responsibility for the case such that Mike did much of the

presentation in court at the guilt phase and Donnie did the penalty phase presentation, Donnie

assumed primary responsibility for developing the theories of the case at both phases.  I had

much more contact with Donnie than I did with Mike regarding my work on the case.

5.      Although most of my communication about my work on the case was with

Donnie, I did a great deal of my work without direction or guidance from either Donnie or Mike.

For example, I selected which witnesses to meet and interview and which background records to

request.  I discussed the information I learned with Donnie, and sometimes also with Mike, but

even so I made most of the decisions about what leads to pursue, which witnesses to follow up

with, and what questions to ask them on my own.  This was true about family and other social

history witnesses as well as about guilt phase witnesses, including friends and family members

of the Escobedo family.  I also did much of the work to identify experts with whom the defense

team consulted on guilt and penalty phase issues, and I had much of the contact with these

experts.

6.      I met Ricardo very soon after I started working on the case.  It became clear to me

during my early meetings with Ricardo that he did not understand the legal system or how to

assist the legal team to challenge the evidence that the prosecution was gathering against him.

He understood almost none of what Donnie and Mike told him about the evidence against him

and about the criminal trial process.  When I visited Ricardo with Mike, Mike rattled off legal

terms and Ricardo pretended he understood what Mike was saying.  Ricardo did not ask Mike to

Page **3** of **6**

explain what he meant. Later, though, when I saw Ricardo alone, Ricardo asked me questions that made it obvious to me that he had not understood what Mike had said.

7.      Ricardo had difficulty reading, and he was unable to read many of the law enforcement reports and other documents we brought to show him or ask him about. Sometimes I asked him to read a sentence from a document I brought, and only very rarely was he able to do this. After I had been visiting him for a while, and he became a bit more comfortable with me, he asked me to read documents to him. Even my reading the documents to him was not enough to make him understand their contents; when I asked him to tell me in his own words what I had read, he often was not able to do it. He asked me questions about the documents that made it clear he had not understood them. The way in which I was able to be most successful at making him understand things was by drawing diagrams and pictures for him. His visual skills were better than his verbal skills, and he seemed to be able to follow, at least in the moment, the diagrams I drew. He asked some questions and referred back to the pictures. But Ricardo was unable to articulate very meaningful questions or have a back and forth conversation about legal strategy or other things about the case itself, including about penalty phase issues, and his own background and history. His self-reported social and family history was difficult to obtain as his ability to understand social situations was limited.

8.      Based on our interactions with and observations of Ricardo, Donnie and I agreed that we should pursue an argument that Ricardo was intellectually disabled and therefore ineligible for the death penalty. We hired experts to administer tests of intellectual functioning and other neuropsychological tests to Ricardo. Ricardo had an IQ score of 80 from his childhood, and the experts we hired obtained scores in the mid-70s. A couple of months prior to trial, we hired Dr. Daniel Grant, and he reviewed the prior testing and Ricardo's school records

Page **4** of **6**

and administered his own testing to Ricardo. Based on the information he had, Dr. Grant decided that Ricardo was not intellectually disabled but instead was in the borderline range of intelligence. I had spoken with a few experts in intellectual disability who told me that Ricardo's scores were not preclusive of a diagnosis of intellectual disability. I gave Donnie materials that Dr. Harvey Switzky had provided me and I put Donnie in touch with Dr. Switzky. Donnie did not speak with Dr. Switzky until after trial had already begun. I was frustrated because I knew that Ricardo functioned at the level of an intellectually disabled person, but Donnie told me to stop pursuing the issue.

9. Donnie did not direct me to conduct an investigation into Ricardo's adaptive functioning. Although I conducted interviews of some of Ricardo's family members, I did not do much investigation into Ricardo's adaptive deficits over the course of his life, an investigation that might have made a difference in the defense team's ability to present a defense that Ricardo was intellectually disabled.

10. I was hindered in conducting a thorough investigation with Ricardo's family members in part by the fact that Ricardo's parents spoke limited English. There were a few times that I used the services of a Spanish-speaking interpreter to help me interview some of the family members, but most of the time I either interviewed the family as best as I could in English or had Ricardo's sister Nydia help to interpret.

11. I collected Ricardo's special education records and interviewed one of his teachers, Amy Fleming, whose testimony Donnie presented at the penalty phase of Ricardo's trial. I did not locate or interview Ricardo's classmates.

12. Given how much trouble Ricardo had following and understanding the discussions his lawyers and I had with him while preparing for trial, I knew that Ricardo was

Page **5** of **6**

going to have a lot of difficulty understanding the court proceedings themselves.  I suggested to Donnie that the team request accommodations for him under the American Disabilities Act to try to maximize his comprehension of the trial.  Donnie agreed this was a good idea.  The accommodations we considered included taking frequent breaks during the proceedings so that we could recap for Ricardo what had just happened, encourage him to ask questions about evidence he did not understand and answer those questions for him, and provide an overview of what we expected a witness to say prior to the witness taking the stand.  We also considered ways to minimize the distractions that were inherent in a courtroom with four defendants, eight lawyers (six for the various defendants and two for the government), and various support staff.  To my knowledge, no one followed up on the pursuit of accommodations, however.

13.     Ricardo was tuned out during much of the trial.  During court proceedings, he spent a lot of time drawing.  We were not sure whether the jury could see what he was doing, and we worried that the jury thought he was paying careful attention and taking notes, but really he was just drawing, usually cartoon characters.  He asked very few questions of me or his lawyers during the trial.  He spent the breaks talking with the codefendants about things totally unrelated to the trial and followed Mr. Troya's lead in his reactions to events in the courtroom.

14.     At one point during the guilt phase of the trial, all of the lights in the courtroom went out and because there were no windows in the courtroom it went black.  The only light in remaining on in the courtroom was a small light on the judge's desk that illuminated his face and increased the spookiness of the situation.  The jury (and everyone else in the courtroom) seemed on edge.  The judge had the marshals escort the jurors out of the courtroom.  It turned out a transformer had blown, and the judge later explained that to the jurors, but it was clear the jurors were really on edge after that.

Page **6** of **6**

      I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.

Signed on         12/14/16

Name