UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-80693-CIV-BLOOM
Capital Case – no execution date scheduled

RICARDO SANCHEZ, Jr.,

     Movant

v.

UNITED STATES OF AMERICA,

     Respondent

_____/

## MOVANT RICARDO SANCHEZ'S AMENDED MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255 AND INCORPORATED MEMORANDUM OF LAW

Stephen M. Kissinger, WY Bar No.5-2342
Asst. Federal Community Defender

Dana C. Hansen Chavis, TN Bar No.019098
Asst. Federal Community Defender

Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile: (865) 637-7999

Attorneys for Movant Ricardo Sanchez, Jr.

Dated: January 24, 2018

**TABLE OF CONTENTS**

TABLE OF CONTENTS........................................................................................................... i
PRELIMINARY STATEMENT ............................................................................................. 1
STATEMENT REGARDING INCORPORATION................................................................ 4
CITATIONS TO THE RECORD ............................................................................................ 4
PROCEDURAL HISTORY..................................................................................................... 5
TEMPORAL LIMITATIONS ON AMENDED CLAIMS ..................................................... 9
GROUNDS FOR RELIEF.................................................................................................... 10

I.   Juror misconduct deprived Sanchez of his right to a fair and impartial jury under the Fifth, Sixth and Eighth Amendments to the United States Constitution and 28 U.S.C. § 1865........................................................................................................................... 11

    A.   Diane Gooch was a convicted felon and a cooperating government witness in a prior case and failed to disclose those and other facts. ......................................... 11

    B.   Mark Sollenberger failed to disclose the full nature and extent of various family members' problems with illegal drugs.................................................................... 14

    C.   Connie Thomas failed to disclose information regarding the illegal firearms and drug problems of her family members.................................................................... 16

    D.   Dorothy Barba failed to disclose her family member's problem with illegal drugs. ................................................................................................................................. 18

    E.   Donald Little failed to disclose information regarding the illegal firearms and drug problems of his family members. .................................................................... 19

    F.   Donald G. Boser failed to disclose the illegal drug problems of his brother-in-law. ................................................................................................................................. 20

    G.   Prejudice. .............................................................................................................. 20

    H.   Conclusion. ........................................................................................................... 22

II.   Mr. Sanchez's § 924 convictions and resulting death sentences are based on an impermissibly vague statute, in violation of Due Process and the Fifth, Sixth, and Eighth Amendments. .................................................................................................... 23

    A.   *Johnson v. United States* held the ACCA residual clause is, on its face, unconstitutionally vague. ..................................................................................... 25

    B.   The relevant statutes. ........................................................................................... 27

        1.   The "crime of violence" definition in the ACCA. .................................... 27

        2.   The "crime of violence" definition in 18 U.S.C. § 16 and its residual clause is analogous to the ACCA residual clause and has widely been held unconstitutional under *Johnson*. .............................................................. 27

        3.   The "crime of violence" definition in § 924(c) is identical to that in § 16. ................................................................................................................... 28

    C.   The Seventh Circuit's analysis of the § 924(c) residual clause. .......................... 29

    D.   The Eleventh Circuit's analysis of the § 924(c) residual clause.......................... 31

        1.   The analysis in *United States v. Ovalles* fails to adhere to *Johnson*'s central holding that the categorical approach to defining a crime of violence does not comport with the Constitution's guarantee of due process........................................................................................................... 32

        2.   Any functional or textual differences between § 924(c) and (e) do not change the fact that the plain language in both residual clauses that defines "crime of violence" is unconstitutionally vague and the ordinary case

analysis of that definition layers indeterminacy upon indeterminacy, in violation of Due Process. ............................................................. 33

E.    Carjacking cannot qualify as a "crime of violence" under the residual clause because that clause is void for vagueness. ........................................... 36

F.    Carjacking does not constitute a "crime of violence" under the force clause. ..... 38

    1.    Carjacking does not always require the use or threatened use of force because it can be accomplished by intimidation. ...................................... 40

    2.    Carjacking does not always require the use or threatened use of violent physical force. .................................................................... 42

G.    Mr. Sanchez's § 924 convictions and sentences are unconstitutional because the jury instructions removed the required finding of a crime of violence from the jury, and counsel was ineffective for not raising this issue on direct appeal. ........ 44

III.    Ricardo Sanchez is ineligible for the punishment of death pursuant to the Constitution of the United States and other federal law. ...................................... 49

A.    Intellectual deficits. ............................................................................ 52

    1.    Sanchez's limited intellectual functioning. ............................... 54

        a.    Genetic and environmental risk factors for intellectual disability. ........... 55

        b.    Early childhood factors affecting Sanchez's intelligence and observed behaviors signaling low intellectual functioning. ............................... 56

        c.    Early and elementary education ................................................. 58

        d.    Middle school. .................................................................... 61

        e.    High school ....................................................................... 62

    2.    Sanchez's test scores .................................................................. 64

        a.    Academic testing. ................................................................ 65

        b.    Intelligence testing ............................................................... 66

            i.    Dr. Crosby ............................................................... 66

            ii.    Dr. McGrew ............................................................. 67

            iii.    Dr. Grant ................................................................. 69

            iv.    Dr. James ................................................................. 70

            v.    Dr. Kraus ................................................................. 73

B.    Adaptive functioning deficits. ......................................................... 73

    1.    Beginning in childhood and continuing to the present day, Sanchez has exhibited significant deficits conceptual skills. ........................................ 77

    2.    Sanchez has demonstrated significant limitations in skills in the social domain of adaptive functioning. ............................................ 79

    3.    Sanchez's practical adaptive skills are significantly limited. .................. 83

C.    Conclusion to Sanchez's intellectual disability claim. ............................ 86

D.    Sanchez is ineligible for the death penalty because his brain dysfunction, mental disorders, and mental age render the penalty unconstitutionally excessive. ......... 87

E.    This claim is properly before the Court. ............................................. 91

IV.    Mr. Sanchez was incompetent to stand trial and trial counsel was ineffective for failing to investigate, develop, and present evidence of Mr. Sanchez's incompetence and request from the Court a hearing to determine competency. ........................................ 94

A.    Mr. Sanchez has significant impairments that affected his competency to assist in his defense and to understand trial proceedings. ................................... 94

B.       Trial counsel failed to protect Mr. Sanchez's right to understand the criminal proceedings against him and to assist in his own defense. ................................... 98
        1.      Competency to stand trial. ......................................................................... 98
        2.      Counsel's failure to protect Sanchez's rights fell below professional norms......................................................................................................... 101
        3.      Sanchez was prejudiced by counsel's deficient performance................. 102

V.      The prosecution's presentation of testimony of a medical examiner who did not conduct or observe the autopsies of the victims violated Mr. Sanchez's rights under the Fifth, Sixth, and Eighth Amendments; trial counsel were ineffective for failing to object to the substitution of the medical examiner. ...................................................................... 105

VI.    The Government violated its obligations pursuant to *Brady v. Maryland* by failing to disclose exculpatory information to the defense that was material to the guilt phase of trial. ........................................................................................................................... 112
A.       The Government failed to disclose material evidence of third party guilt and/or the innocence of Ricardo Sanchez in the murder of the Escobedo family and the alleged carjacking of their vehicle. ........................................................................ 113
        1.      The Government possessed evidence demonstrating that the Escobedo family was murdered by the *Los Zetas*/Gulf cartels after Luis Escobedo failed to pay the cartel approximately $250,000.................................... 114
        2.      The Government concealed and continues to conceal exculpatory evidence. ................................................................................................. 127
        3.      The withheld evidence was material to both phases of Sanchez's capital trial ......................................................................................................... 135
            a.    Guilt Phase ............................................................................................ 135
            b.    Penalty Phase ........................................................................................ 140
B.       The Government failed to disclose material exculpatory information from the security booth at the Briar Bay neighborhood. ..................................................... 143
C.       The Government failed to disclose material exculpatory information regarding benefits provided to cooperating witness Kevin Vetere. ..................................... 145
D.       The cumulative materiality of the withheld evidence requires that Mr. Sanchez be granted a new trial and/or penalty hearing........................................................... 146

VII.   Mr. Sanchez was deprived of the effective assistance of counsel at the guilt phase of his capital trial. ................................................................................................................. 146
A.       Trial counsel failed to investigate and present available evidence supporting counsel's chosen defense. ..................................................................................... 147
        1.      Trial counsel failed to fully investigate and present exculpatory cell phone record evidence. ...................................................................................... 150
        2.      Trial counsel failed to fully investigate and challenge the Government's evidence purporting to connect spent shell casings found at the murder scene with unfired bullets recovered at the home of Danny Varela and purporting to connect spent shell casings found at other shootings with weapons recovered from the home of Danny Varela............................. 157
            a.    Trial counsel failed to properly challenge the admissibility of the testimony of the Government's toolmark "experts." ........................ 160

iii

b.   Trial counsel failed to present available expert testimony demonstrating both the lack of a scientific basis for, and the substantive unreliability of, the testimony of the Government's experts. .................................. 163

B.   Trial counsel unreasonably and prejudicially failed to object to the prosecutor's misconduct in guilt phase closing arguments. ..................................... 176

C.   Trial counsel failed to timely challenge the composition and selection of the grand and petit jury venires in violation of the Fifth, Sixth, and Eighth Amendments. 179

    1.   Trial counsel's failure to timely challenge the composition and selection of the grand and petit jury venires constituted deficient performance. ........ 179

    2.   Sanchez was prejudiced by trial counsels' failures because the process by which grand and petit juries are selected produces an unconstitutional under-representation of Hispanics and African Americans, in violation of the Fifth, Sixth, and Eighth Amendments. .............................................. 180

    3.   At an appropriately scheduled evidentiary hearing, Mr. Sanchez can present proof sufficient to establish a prima facie showing of underrepresentation. .................................................................................. 181

    4.   Hispanics and African Americans are distinct classes in the community which merit constitutional protection. .................................................. 182

    5.   Underrepresentation ................................................................................. 183

       a.   Hispanics .................................................................................. 184

       b.   African Americans .................................................................... 187

    6.   Improper exclusions based on the voter registration list ........................ 188

D.   Counsel's unreasonable errors and omissions, individually and cumulatively, prejudiced the defense at Mr. Sanchez's capital trial. ....................................... 190

VIII.   Mr. Sanchez was deprived of the effective assistance of counsel at the penalty phase of his capital trial. .................................................................................................. 192

A.   Defense counsel. ..................................................................................................... 194

B.   Counsel's pretrial investigation and penalty phase preparation. ......................... 196

    1.   Deficient mental health investigation. ..................................................... 196

    2.   Deficient investigation and utilization of Sanchez's education records. 199

    3.   Deficient investigation into classmates, friends and family. .................. 200

    4.   Deficient utilization and preparation of experts. ..................................... 202

    5.   Deficient preparation for, and cross-examination of, the prosecution's penalty phase expert. ............................................................................... 205

C.   The penalty-phase presentation. ............................................................................ 207

    1.   Family member testimony. ....................................................................... 208

    2.   A teacher's testimony. ............................................................................. 210

    3.   Expert testimony. ..................................................................................... 211

D.   The verdict. ............................................................................................................. 215

E.   Sanchez was prejudiced by counsel's failure to investigate and present evidence establishing the depth and breadth of circumstances that led to Sanchez's impaired mental state and reduced culpability and otherwise mitigating against the death penalty. ............................................................................................................ 217

    1.   Sanchez's mother and maternal relatives. .............................................. 218

    2.   Sanchez's father and paternal relatives. ................................................. 223

    3.   Ricardo Sr. and Juana marry young and begin a family. ........................ 225

        4.      Early factors contributing to Sanchez's compromised mental state. ...... 227

        5.      Sanchez's traumatic upbringing ........................................................... 229

        6.      From Head Start through a second year of tenth grade: Sanchez struggles to learn. .................................................................................................... 239

        7.      Years 18 - 22: Sanchez's attempts at independence and efforts to be a good father. ........................................................................................... 250

        8.      Domination by Varela and others. ........................................................ 253

    F.      Counsel unreasonably and prejudicially failed to adequately investigate and present evidence that Sanchez is intellectually disabled .................................. 255

    G.     Counsel unreasonably and prejudicially failed to investigate and present evidence of Sanchez's neuropsychological impairments and the resulting effect on his mental state and behavior .................................................................................. 258

    H.     Counsel unreasonably and prejudicially failed to investigate and present evidence of Sanchez's psychiatric disorders and symptoms and the resulting effects upon Sanchez's functioning. .......................................................................................... 262

    I.      Counsel rendered prejudicially ineffective assistance by failing to object to the prosecution's misconduct during penalty-phase closing argument. ................... 271

        1.      Prosecutorial vouching and reference to non-record facts. ..................... 271

        2.      Prosecutorial argument disparaged the defense, suggesting it was fabricated ........................................................................................... 276

        3.      Prosecutorial argument diluted the jurors' individual sense of responsibility and urged imposition of the death penalty for improper reasons ................................................................................................. 278

    J.      Counsel's unreasonable errors and omissions individually and cumulatively resulted in penalty-phase prejudice .................................................................. 280

IX.    Sanchez's death sentence violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishments. ............................... 283

    A.     The death penalty is a disproportionate sentence even for the gravest of offenses. ............................................................................................................................ 284

        1.      There is a national trend toward abolition. ........................................... 284

        2.      The death penalty is excessive. ........................................................... 287

        3.      The United States fails to comport with the standard of decency upon which the Founding Fathers relied in drafting the Eighth Amendment .. 287

    B.     The capital punishment schemes in the United States, including the Federal Death Penalty Act, are unconstitutional because they fail to ensure reliability, consistency, and Equal Protection of Law. ....................................................... 290

        1.      Reliability ......................................................................................... 290

        2.      Arbitrariness ..................................................................................... 291

        3.      Racial discrimination ......................................................................... 292

    C.     The conditions under which Mr. Sanchez is confined under sentence of death, and the length of time under which he will be confined prior to execution, constitute conditions of physical and psychological torture and inhumane treatment. ........ 294

    D.     Method of execution. ....................................................................................... 297

X.    The security measures used by the court during trial denied Mr. Sanchez his rights to a jury trial, to the presumption of innocence, to due process, to the effective assistance of counsel, and to be free from cruel and unusual punishment. ........................................ 299

XI.     Mr. Sanchez is entitled to relief based upon the cumulative impact of the constitutional and statutory violations described in this motion. ........................................................ 306

XII.    Erroneous jury instructions deprived Mr. Sanchez of his rights to due process, a fair trial and constitutional constraints on imposition of the death penalty guaranteed by the Fifth, Sixth, and Eighth Amendments, and counsel's failure to raise the instructional errors deprived Mr. Sanchez of his Fifth and Sixth Amendment rights to the effective assistance of counsel at trial and on direct appeal. ........................................................................ 308

    A.     Mr. Sanchez was illegally convicted of a non-existent felony murder crime and counsel were ineffective for failing to raise this meritorious issue, all in violation of the Fifth, Sixth and Eighth Amendments. ...................................................... 309

        1.     Neither carjacking nor "crimes of violence" is a predicate felony for felony murder under 18 U.S.C § 1111. .................................................... 311

        2.     Jurors could have found Sanchez guilty of either an invalid felony murder (killing in connection with a carjacking) or a premeditated murder. ....... 312

        3.     The erroneous felony murder instruction was harmful. .......................... 314

        4.     The erroneous felony murder instruction constructively amended Counts 7 through 10 by removing an element of the offense, and resulted in Sanchez being convicted of a non-existent offense. ............................... 317

        5.     Sanchez was deprived of his rights under the Fifth and Sixth Amendments when trial and appellate counsel failed to raise these issues. .................. 318

    B.     Sanchez's jurors were not instructed to make a unanimous determination of either felony murder or premeditated murder, and counsel were ineffective for failing to raise this meritorious issue, all in violation of the Fifth, Sixth and Eighth Amendments. ............................................................................................. 325

    C.     In violation of the Fifth, Sixth and Eighth Amendments, instructional error interfered with the jurors' ability to consider mitigating factors, and Sanchez's counsel rendered prejudicially deficient assistance by failing to raise this meritorious issue. ................................................................................................ 328

        1.     Counsel's failure to challenge the "three-step process" instruction was objectively unreasonable and constituted deficient performance. .......... 333

        2.     Counsel's failure to challenge these instructions was prejudicial. ......... 336

    D.     Instructional error failed to require proof beyond a reasonable doubt to impose enhanced sentences, including the death penalty, and Sanchez's trial counsel were ineffective for not raising this meritorious issue. ............................................... 344

XIII.   Sanchez's indictment contained duplicitous counts, and counsel were ineffective for failing to raise this issue in violation of the Fifth and Sixth Amendments. .................... 350

    A.     The duplicity problems. .......................................................................... 352

    B.     The ineffective assistance of trial and appellate counsel. ................................. 355

CONCLUSION ................................................................................................................. 357

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-80693-CIV-BLOOM

RICARDO SANCHEZ, Jr.,

        Movant

v.

UNITED STATES OF AMERICA,

        Respondent

_____/

**MOVANT RICARDO SANCHEZ'S AMENDED MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE
PURSUANT TO 28 U.S.C. § 2255
AND INCORPORATED MEMORANDUM OF LAW**

Petitioner, Ricardo Sanchez, Jr., pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rule 2 of the Rules Governing Section 2255 Proceedings ("2255 Rules"), requests that this Court vacate the criminal judgment entered against him, grant him a new trial and/or vacate, set aside, or correct the sentences imposed.[1] This Amended Motion is filed pursuant to the Court's order of March 23, 2017. ECF No.[69].

**PRELIMINARY STATEMENT**

From almost the moment the Escobedo family was found murdered on the side of the turnpike in West Palm Beach, Florida, law enforcement suspected the gratuitous violence and staged nature of the killings pointed to the cut-throat cocaine cartels of the Brownsville/Matamoros border country; the area from where the Escobedo family had moved only months before. Luis Escobedo was shot in the penis and between the eyes. The bodies of his wife Yessica and two dead children were found huddled on the ground, the children clinging to

_____

[1] In accordance with Rule 2 of the 2255 Rules, Sanchez sets forth the facts and claims entitling him to relief but does not provide full legal argument or citation.

their mother. Yessica Escobedo was shot four times in the face and head, and seven times in the torso; four of those were shots to her back.

Within three days, law enforcement knew that Luis Escobedo was the end point of *Los Zetas* cartel's ("*Los Zetas*") efforts to spread its reach into South Florida, and they knew that Escobedo had failed to pay *Los Zetas* for 13 kilograms ("kilos") of cocaine worth approximately $221,000. Sources in *Los Zetas* were casting blame for the Escobedo murders on a buyer who had accompanied Escobedo when he received 15 more kilos of cocaine from *Los Zetas* operatives the night of the killings. That night, two men who were employees of a known West Palm Beach cocaine dealer—Danny Varela—had travelled in Varela's vehicle and behind Escobedo as he drove up and down the Florida coast. Those men were Daniel Troya and Ricardo Sanchez, Jr..

Sanchez, the movant in this matter, was a young 22-year-old man with multiple intellectual and psychiatric impairments. His most significant prior encounter with law enforcement was an ill-fated attempt to flee a drug checkpoint. At that time, Sanchez wrecked his car, grabbed a shoebox containing his cousin Varela's cocaine, and tried to run away. But Sanchez dropped and spilled the cocaine and then became trapped by the pursuing officers when he ran into a nearby apartment complex.

With respect to the Escobedo family murder, the Government gathered evidence that Troya and Sanchez had followed or escorted Escobedo that night to obtain cocaine earmarked for distribution by Varela. Upon their return to West Palm Beach, the vehicle containing Troya and Sanchez entered the Florida Turnpike immediately behind the Jeep Escobedo was driving (and that contained his family). The duo then took possession of the Escobedo's Jeep and delivered

2

cocaine to Varela. Troya and Sanchez were charged with crimes in connection with the killings and Varela, along with two others, were charged with drug and weapons crimes.

Sanchez was tried while he was incompetent before a jury that contained jurors partial against him, on charges contained in a duplicitous indictment and one that was unconstitutionally void for vagueness. His counsel failed to present available evidence to support the guilt-phase theory of defense that Escobedo and his family were killed by a Mexican drug cartel or some other third party. Counsel failed to challenge the prosecution's evidence; most notably, to demonstrate the deliberate falsity of the only forensic evidence connecting Sanchez to the murders. Counsel also failed to object to jury instructions that stripped Sanchez of fundamental protections and left him convicted of a non-existent crime. With respect to the penalty phase of trial, counsel failed to investigate, develop and introduce evidence of Sanchez's traumatic childhood, intellectual disability, and his compromised mental health and state of mind at the time of the crime. Sanchez's life path was not one of choices but was largely predetermined by genetics, his psycho-social history, and a lifelong history of being failed by individuals and institutions which did not protect, let alone nurture him. Counsel, however, did not present this evidentiary picture of Sanchez to the jurors.

At the same time, the prosecution failed to adhere to their constitutional obligation to provide defense counsel with exculpatory evidence including: evidence of the full extent of Escobedo's relationship with *Los Zetas*; the debt Escobedo owed the cartel; the presence of cartel operatives in Florida immediately preceding and at the time the Escobedos were killed; and *Los Zetas'* attempts to conceal all of this from law enforcement. The failure to disclose this evidence favorable to the defense was compounded by, among other things, the prosecution's presentation of scientifically invalid and substantively false testimony to connect Sanchez to the murders. The

3

prosecution then exacerbated the harms by denying *Los Zetas'* known connections to the events of October 11 through October 13 of 2006, and by belittling defense counsel's arguments to the contrary. At the penalty phase, the prosecution capitalized on improper jury instructions that resulted in a mitigation-impaired jury and improperly argued, among other things, that the defense's mitigation evidence was not legitimate, and further disparaged defense counsel.

At the end of this collection of constitutional violations and resultant denial of a fair trial, Sanchez was convicted and sentenced to die for the deaths the two Escobedo children. This was a lengthy trial, joined with the drug conspiracy trial of two non-capital defendants (Varela and Liana Lopez), and involving another capital defendant, Daniel Troya. The outcome was not inevitable; the jury deliberated for days on the questions of guilt and punishment. There is a reasonable probability that any one of the constitutional violations described herein, or a combination of violations, unconstitutionally skewed the jury's ultimate decisions.

In this Motion, Mr. Sanchez demonstrates that his convictions and sentences, including each of his death sentences, were obtained in violation of the United States Constitution and federal law in multiple respects.

## STATEMENT REGARDING INCORPORATION

The facts set forth throughout this Motion are re-alleged and reincorporated into each claim for relief.

The declarations and documents contained in Appendices CV-ECF No. [33- *et. seq.*] and CV-ECF No. [52-1] are incorporated by reference in this Motion.

## CITATIONS TO THE RECORD

References to entries on the criminal trial docket, Case No. 9:06-cr-80171, are cited as "CR-ECF No.[ ]" followed by the docket entry number and page number in the header assigned by the CM-ECF system. Where the page number in the header is different from the original page

4

number of the document, the page range in the header is included; for example: "CR-ECF No.[1:10 of 100]" references docket entry 1, page 10 of 100 (as indicated in the header).

References to the 45 volumes of consecutively numbered transcripts of the trial proceedings appear as "CR-ECF No.[  ]" followed by the docket entry number and the consecutively numbered transcript page.

References to entries on the Docket in this matter, Case No. 9:16-cv-80693, are cited as "CV-ECF No.[  ]" followed by the docket entry number and page number in the header assigned by the CM-ECF system. Where the page number in the header is different from the original page number of the document, the page range in the header is included; for example: "CV-ECF No.[1:10 of 100]" references docket entry 1, page 10 of 100 (as indicated in the header).

References to the Appendix previously filed in this matter are cited as CV-ECF No.[33-*et. seq.*] and CV-ECF No.[52-1], followed by the page number appearing in the header assigned by the CM-ECF system. The Appendix is sequentially numbered with Bates Numbers (A-00000) at the bottom of the page, however, that number is obscured or illegible on some pages and those Bates Numbers are not used in this document.

An Appendix is filed with this Amended § 2255 Motion. It is sequentially numbered with Bates Numbers at the bottom right-hand corner of each page, beginning where the previous Appendix, CV-ECF No.[52-1] ended . References to this Appendix are cited Appx at A-__. All other citations are either self-explanatory or are explained herein.

## PROCEDURAL HISTORY

In October 2006, Danny Varela, Kevin Vetere, Liana Lee Lopez, Juan C. Gutierrez, Daniel Troya and Ricardo Sanchez, Jr. were arrested in connection with a narcotics-trafficking

business headed by Varela.[2] The charges centered on allegations that from May to October 2006, the defendants, led by Varela, had engaged in a conspiracy with the intent to distribute large quantities of cocaine in the months leading up to their arrests, contrary to 21 U.S.C. §§ 841(a)(1), 846 (Count 1). The defendants faced various drug and/or weapons possession offenses.[3] CR-ECF No.[305] (Counts 2-4, 11-16).

Ricardo Sanchez and Troya were also indicted on five capital counts for the killings of Jose Luis ("Luis") Escobedo, Varela's narcotics supplier,[4] Luis's wife Yessica, and their two young sons, Luis Damian and Luis Julian. Those counts included carjacking resulting in death (Count 6), 18 U.S.C. § 2119, for the killings of all four victims, and four counts (one for each victim) of using or carrying a firearm in relation to a crime of violence or drug trafficking crime, or possessing a firearm in furtherance of a crime of violence or drug trafficking crime, and in the course of the same causing death defined as murder,[5] (Counts 7-10), 18 U.S.C. § 924(c)(1), (j). CR-ECF No.[305:7-11]. In addition, Troya and Sanchez were charged with conspiracy to

---

[2] The court of appeals referred to this as "the Varela Drug Ring." *United States v. Gutierrez*, 373 F. Appx. 13, 14 (11th Cir. 2010) (characterizing facts of the case in the appeal of Gutierrez).

[3] Other drug and weapon counts involving Sanchez include possession with intent to distribute cocaine on July 10, 2006, in violation of 21 U.S.C. § 841 (Count 4), and on October 25, 2006—after the killings—possession with intent to distribute crack cocaine, in violation of 21 U.S.C. § 841 (Count 13), being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g), 924(a), and 2 (Count 14), and use of a firearm in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 15). CR-ECF No.[305].

[4] Escobedo was involved in narcotics and transported drugs from Texas and Mexico to Florida. The Escobedo family moved to Florida about three weeks after Escobedo had met Varela in Texas. The two men were seen together in Texas and in Florida on multiple occasions. *United States v. Lopez*, 649 F.3d 1222, 1227 (11th Cir. 2011) (addressing facts of the case in the appeal of Lopez and Varela).

[5] Troya and Sanchez were also charged with manslaughter under § 924(j)(2) but at trial this was not pursued by the prosecution or the defense. CR-ECF No.[305] (Counts 7-10).

commit carjacking (Count 5). CR-ECF No.[305:6]. Varela, the leader of the group, was not charged in connection with the crimes committed against the Escobedos.[6]

Sanchez pled not guilty on all counts. He did not testify at the guilt or penalty phases of trial.

After a joint jury trial that began in January 2009, Varela, Lopez, Troya and Sanchez were convicted on all counts.[7] CR-ECF No.[791]; No.[792]; No.[793]; No.[796]. At a joint sentencing hearing before the same jury in March 2009, Troya and Sanchez were each sentenced to life imprisonment on the three capital counts involving the adult victims—the carjacking count, and the two § 924 counts involving Luis Escobedo and his wife. But the jury sentenced Troya and Sanchez each to death on the two § 924 counts involving the child victims. CR-ECF No.[859:16-18]; No.[860:18-20]. The judge imposed the three life sentences consecutively to the death sentences. CR-ECF No.[899:3].[8]

Judgment was entered on May 14, 2009. CR-ECF No.[899]. A notice of appeal was timely filed. CR-ECF No.[901]. Sanchez appealed and on October 2, 2013, the Eleventh Circuit affirmed. *United States v. Troya*, 733 F.3d 1125 (11th Cir. 2013).[9]

---

[6] Cell phone records showed calls both ways between Varela's phone and Sanchez's phone on the evening of the murders as Sanchez and Troya traveled along the Florida coast, and those records showed that both Sanchez's and Troya's phones called Varela's phone less than five minutes after a couple living near the murder scene heard gunshots. The evidence at trial also pointed to Varela as the leader of the gang. *Lopez*, 649 F.3d at 1243 n.11.

[7] Vetere, in return for his cooperation, was allowed to plead guilty to drug conspiracy charges and received a sentence of 144 months (12 years); this was reduced to 42 months (3 ½ years) on a Rule 35 motion following Sanchez's trial. CR-ECF No.[752:5250]; No.[754:5422-28]; No.[753:5745-64, 5778-85]; No.CR-ECF No.[1058]. Gutierrez pled guilty to the same drug conspiracy charges and was sentenced to 216 months of imprisonment. No.[936].

[8] In addition, on the drug-related convictions Sanchez received two life sentences for Counts 1 and 13 and a concurrent term totaling 55 years on Counts 4, 5, and 14, followed by a consecutive term of 5 years on Count 15. CR-ECF No.[899:3].

[9] Appellate counsel for Sanchez raised or adopted from Troya's brief the following issues: (1) The Court's failure to identify jurors who would automatically impose the death penalty resulted in a

Sanchez's petition for writ of certiorari was denied by the United States Supreme Court on May 4, 2015. *Sanchez v. United States*, 135 S. Ct. 2048 (2015).[10] He has not filed any other motions, petitions or applications concerning this judgment of conviction in any court.

Along with Troya, Sanchez is currently incarcerated on federal death row at the United States Penitentiary in Terre Haute, Indiana.

---

jury unqualified to sit in this capital case; (2) The Court erred in denying Sanchez's *Batson* challenge; (3) The Court abused its discretion by requiring the capital and noncapital defendants to unanimously exercise twenty peremptory challenges; (4) Evidence of Sanchez's involvement in firearm incidents that were unrelated to the charged offenses was improperly admitted and exploited by the government; (5) Testimony of uncharged drug trafficking by Varela outside the time period of the drug trafficking conspiracy was improperly admitted; (6) Statements by Troya were admitted in violation of Sanchez's rights under *Bruton*; (7) Cumulative error at the guilt-phase trial; (8) The Court's evidentiary rulings and instructions to the jury regarding Sanchez's relationship with his son prevented the jury from giving effect to important mitigation about Sanchez's character; (9) The Court improperly permitted testimony based on Sanchez's compelled statements to a government psychologist; (10) Prosecutorial misconduct at penalty phase closing argument, including falsely vouching to jurors that Varela, the kingpin of the drug operation and the apparent instigator of the murders, would continue to be investigated and would ultimately be capitally prosecuted; (11) The jury instructions and the verdict sheet created the risk of a coerced, arbitrary death sentence; (12) The jury instructions improperly invited jurors to find and weigh the non-statutory aggravating factor that Sanchez had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such act; (13) The Court erred in excluding critical, reliable expert testimony regarding positive prison adjustment and safe management under a life sentence; (14) The jury's critical aggravation findings that Sanchez had substantially planned in advance the killings of the two child victims and done so to eliminate them as witnesses lacked legally sufficient supporting evidence; (15) The government failed to present legally sufficient evidence to support the statutory vulnerable-victim aggravating factor; (16) The jury wrongly weighed the aggravating factor of pecuniary-gain in sentencing Sanchez to die for the deaths of the two child victims; (17) The Court violated Sanchez's Sixth Amendment right to jury trial by refusing to instruct jurors that the aggravating factors needed to outweigh the mitigating ones "beyond a reasonable doubt" before they could vote for a death sentence; and (18) Cumulative error at penalty phase. *Troya*, 733 F.3d at 1129.

[10] The certiorari petition raised three issues: (1) Whether the prosecution's use of an "examining" expert to rebut a defense "non-examining" expert violated the Fifth Amendment; (2) Whether the Eleventh Circuit's summary denial of numerous issues in a capital direct appeal was improper; and (3) Whether the Eleventh Circuit improperly dismissed as harmless the district court's exclusion of significant, non-cumulative mitigation at a capital-sentencing hearing.

Sanchez seeks relief on the grounds set forth below, as to which he is being held in violation of the Constitution, laws, or treaties of the United States.

## TEMPORAL LIMITATIONS ON AMENDED CLAIMS

Any and all amendments to Sanchez's original § 2255 Motion are timely. *See* Motion for Leave to Amend, CV-ECF No.[77].

Timeliness can be based on any of three grounds. <u>First</u>, the one-year limitations period runs from the *latest* of four triggering events, of which the finality of conviction may be the *earliest*:

(1)      the date on which the judgment of conviction becomes final;

     (2)      the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

     (3)      the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

     (4)      the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).

A claim added by amendment is thus timely if it is filed within one year of the latest of these triggering events.

Moreover, new instances of a previously alleged violation can be considered without the need to amend, and thus without the need to consider the timeliness of such an amendment. *Wolfe v. Clarke*, 691 F.3d 410 (4th Cir. 2012). In *Wolfe*, the original habeas petition alleged a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and the Fourth Circuit held that an amendment was not necessary for the petitioner to present evidence of additional instances of such violations. *Wolfe*, 691 F.3d at 422. Leave to amend is therefore not required for the amended content presented herein which raises new or more detailed instances of claims

9

contained in the original § 2255 Motion. This rule applies to several of the amended claims including ineffective assistance of trial counsel allegations and the *Brady* claims.

Second, a claim that is added to a § 2255 motion by amendment, even after expiration of the applicable statute of limitations, will be deemed timely if it relates back to a claim that was timely presented. Fed. R. Civ. P. 15(d); Rule 12 of the § 2255 Rules. In the collateral context, a claim added by amendment relates back when it arises from the same core facts as the timely filed claims. *Mayle v. Felix*, 545 U.S. 644, 650 (2005). The relation-back rules apply to most of the amended content presented herein, as noted in the individual claims.

Third, limitations periods in collateral cases are subject to equitable tolling. *Holland v. Florida*, 560 U.S. 631 (2010). Equitable tolling applies particularly to allegations not raised previously due to prior counsel's actual conflict of interest, such as the ineffective assistance of appellate counsel.

As set forth in the Motion for Leave to Amend, and as stated herein, all added factual and legal bases for relief meet the criteria for permissible amendment and are therefore timely filed.

## GROUNDS FOR RELIEF

Sanchez alleges that his convictions and sentences, including his sentences of death, were obtained in violation of his rights under the Fifth, Sixth, and Eighth Amendments to the United States Constitution. These violations relate to ineffective assistance of counsel and violations of his rights to a fair trial, to be free of cruel and unusual punishment, and to due process of law. Sanchez moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Sanchez's claims are not cognizable under § 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241 as to any claim for which § 2255 proves to be ineffective or inadequate to test the legality of his detention and sentences.

10

I. **Juror misconduct deprived Sanchez of his right to a fair and impartial jury under the Fifth, Sixth and Eighth Amendments to the United States Constitution and 28 U.S.C. § 1865.[11]**

Mark Sollenberger, Connie Thomas, Donald E. Little, and Donald G. Boser all served on the jury that convicted Sanchez in the above-styled cause; Diane Gooch and Dorothy Barba were alternates who sat with the panel daily until excused. As in any trial, these jurors went through the *voir dire* process, including answering juror questionnaires and questioning under oath. In answering the *voir dire* questions posed to them, the listed jurors appear to have provided answers that were untrue and/or seriously misleading. Specifically, the listed jurors failed to reveal certain telling personal information that was highly relevant to matters at issue at both guilt and sentencing in Sanchez's capital case. If this critical information had been properly and truthfully disclosed, Sanchez would have challenged these jurors for cause and excluded them from jury service; at least one juror would have been statutorily disqualified.[12]

A. **Diane Gooch was a convicted felon and a cooperating government witness in a prior case and failed to disclose those and other facts.**

Diane Gooch served on the jury as an alternate, yet she was statutorily unqualified for jury service pursuant to 28 U.S.C. § 1865(b)(5), which disqualifies someone who: "has a charge pending against him for the commission of, or has been convicted in a State or Federal court of record of, a crime punishable by imprisonment for more than one year and his civil rights have not been restored." Diane Gooch had been previously convicted of a crime punishable by

---

[11] This claim has been reorganized and supplemented with additional facts and brief discussions of law in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim.

[12] Sanchez's attorneys will file a Motion to Interview Jurors to contact and interview these jurors to explore the circumstances of the misconduct further and obtain additional necessary facts to successfully present this information to this Court in a fully pled § 2255 motion.

11

imprisonment for over a year. Mrs. Gooch was engaged in the following questions and answers during voir dire:

- Jury Question #18: "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency? If YES, who, and for what agency?" Mrs. Gooch responded, "No."

- Jury Question # 20: "Have you ever been a witness to a crime? If YES, please explain the circumstances:" Mrs. Gooch checked the "No" line, avoiding further explanation.

Mrs. Gooch failed to disclose she previously worked in the Title Section of New Jersey's State Department of Motor Vehicles from approximately 1997-2003. According to public records, as a result of her employment at this agency Mrs. Gooch suffered a felony conviction for official misconduct and was sentenced to two years of probation, 30 hours of community service, and forfeit of public office position. CV-ECF No.[33-3:5 of 148]. The records show that on June 20, 1996, Ms. Gooch was originally indicted on one count of second degree felony of conspiracy to commit the crime of Official Misconduct, one count of Official Misconduct in the second degree, and one count of Tampering with Public Records, all occurring on or about November 7, 1994. CV-ECF No.[33-3:9-15 of 148]. The allegations of the indictment were Mrs. Gooch purportedly received two checks made payable to the New Jersey Division of Motor Vehicles and the Automobile Insurance Surcharge Collection Fund. These checks were prepared and backdated by a co- conspirator for the purpose of restoring that co-conspirators' driver's license prior to November 7, 1994, the date on which that co-conspirator was issued a summons for driving while license suspended. On October 15, 1996, she pled to and was adjudicated guilty of a lesser offense of third degree Official Misconduct on Count 2, and the other two counts were dismissed. CV-ECF No.[33-3:5-8 of 148].

The 1994 version of the crime to which Ms. Gooch pled is at CV-ECF No.[33-4:82 of 119]. The statutory subsection to which she pled is 2C:30-2, which provides in part: "Official misconduct is a crime of the second degree. If the benefit obtained or sought to be obtained, or of which another is deprived or sought to be deprived, is of a value of $200.00 or less, the offense of official misconduct is a crime of the third degree." *Id.* While she was ultimately sentenced to probation, the third degree crime to which Mrs. Gooch pled was a felony punishable by three to five years in prison pursuant to N.J.S. 2C:43-6(a)(3), which provides: "a. Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows: ... (3) In the case of a crime of the third degree, for a specified term of years which shall be fixed by the court and shall be between three and five years[.]" CV-ECF No.[33-4:83 of 119].

Had this felony been disclosed in response to the aforementioned question or the basic juror qualification questions, Mrs. Gooch would have been disqualified from jury service. The circumstances of the offense with which Mrs. Gooch was charged—a conspiracy—as well as the plea papers show Mrs. Gooch was also a witness to a crime. In fact, she agreed to cooperate with the Government as a witness as part of her plea. Her plea papers show a condition of the plea was that "Diane Gooch will cooperate with state in all matters pertaining to this investigation." CV-ECF No.[33-3:8 of 148]. Mrs. Gooch had obviously been a witness to a crime, as well as a government cooperator, both extremely relevant to her ability to serve fairly, and both contrary to what she swore to in her *voir dire* answers.

During the trial, the Government brought to the Court's attention that a United States Probation Officer had received information that Diane Gooch was discussing the case at work. The Court decided to not inquire into the matter because she was an alternate. CV-ECF No.[33-3:17-18 of 148].

13

**B. Mark Sollenberger failed to disclose the full nature and extent of various family members' problems with illegal drugs.**

Mark Sollenberger served on the jury at both guilt and penalty phases and was engaged in the following questions and answers during voir dire:

- Jury Question #24: "Have you or any family members or friends ever had a problem with illegal drugs?" Mr. Sollenberger stated, "Yes," "Three brother-in-law's – several convictions. DUI."

The Court only probed to the point of asking if anything about their difficulties would affect his ability to judge the evidence in this case and he stated "No." CR-ECF No.[713:2672].

Contrary to Mr. Sollenberger's sworn statements, a number of his family members in addition to his brothers-in-law appear to have had substantial problems with illegal drugs: those problems did not just include DUI's, and they were far closer to home than the juror revealed. Mr. Sollenberger failed to disclose his son, David Andrew Sollenberger, had been arrested in Florida on December 22, 2008, for drug paraphernalia—11 counts—and for possession of cannabis. CV-ECF No.[33-3:21-23 of 148]. Mr. Sollenberger initially appeared before this Court for jury selection on January 6, 2009, a mere fifteen days after his son's arrest and first appearance on December 22, 2009. CV-ECF No.[33-3:24-27 of 148]. The Information was filed in Mr. Sollenberger's son's case on January 2 and 5, 2009, right on the eve of trial. CV-ECF No.[33-3:22 of 148]. Subsequently, while the trial was in progress Mr. Sollenberger's son resolved his case with a deferred prosecution agreement on January 29, 2009. CV-ECF No.[33-3:22 of 148]. Mr. Sollenberger completely failed to disclose this information to this Court.

Mr. Sollenberger also failed to disclose that his brother, Robert Kent Sollenberger, was arrested in 1987 for possession of cocaine with intent to deliver and delivery of a controlled substance to a minor. CV-ECF No.[33-3:28-29, 32-41 of 148]. Allegedly, Robert Sollenberger

14

worked at American Prep School and was the target of an investigation about his receipt of cocaine from students in return for higher grades and extra credit. CV-ECF No.[33-3:41 of 148]. Law enforcement reportedly placed a sixteen-year-old confidential informant in the school and that informant arranged a drug deal with Mr. Sollenberger. *Id.* Mr. Sollenberger assured the confidential informant that he had taken care of the grades. Then, the sixteen-year-old confidential informant gave Mr. Sollenberger two grams of cocaine and Mr. Sollenberger gave the sixteen year old three 500 mg. Darvon tablets and told him he should take them with beer. *Id.*

Additionally, Mr. Sollenberger failed to disclose two of his brothers-in-law, Roy Livermore and Richard Livermore, had extensive criminal records which included drug charges.[13] Roy Livermore's criminal history reveals that between 1980 and 2006, he was convicted on three occasions of possession of a controlled substance, once for an aggravated assault, and once for a grand theft. These drugs reportedly include Quaaludes, Darvocet, and marijuana. CV-ECF No.[33-3:42-78 of 148].

Reportedly, during one criminal incident in March 1981, Roy Livermore was observed staggering and bumping into people at a bowling alley and generally causing a disturbance. A search incident to arrest revealed 43 Lemmon 714 Quaaludes. CV-ECF No.[33-3:69-78 of 148]. Mr. Livermore's sentence included a term of probation, a special condition of which was to attend the Spectrum Program for drug rehabilitation. CV-ECF No.[33-3:76 of 148].

Mr. Sollenberger further failed to disclose that a second brother-in-law, Richard Livermore, also has a long history of offenses between 1986 and 2006 including possession of weapons, possession of a controlled substance, obtaining a substance by fraud, assault, aggravated assault, aggravated battery and cocaine possession. CV-ECF No.[33-3:79-125 of

---

[13] Mr. Sollenberger had been married to his wife since 1981.

148]. In addition, Mr. Livermore has a 2006 felony DUI, which was generally disclosed by Mr. Sollenberger.

Richard Livermore's first criminal offense involving drugs occurred in 1986. He was convicted of obtaining a controlled substance by fraud and possession of Diazepam. CV-ECF No.[33-3:86-88, 90-94, 97 of 148]. Reportedly, a fraudulent prescription was called in for Diazepam, using someone's name other than Mr. Livermore's. CV-ECF No.[33-3:90 of 148]. When Mr. Livermore arrived at the pharmacy he was arrested, subsequently convicted, and sentenced to a term of probation. Ultimately, Mr. Livermore violated his probation and served time in prison. CV-ECF No.[33-3:89, 95-96, 98-99 of 148].

After serving his prison term, Mr. Livermore was again sentenced to eighteen months of prison on May 1, 1989, for a drug offense, possession of cocaine. CV-ECF No.[33-3:100-113 of 148]. Mr. Livermore was reportedly observed by undercover officers buying crack cocaine and attempted to flee upon detection. CV-ECF No.[33-3:113 of 148].

Shortly after his release from prison in late 1989, Mr. Livermore committed another drug offense and was convicted of possession of cocaine and possession of cannabis. CV-ECF No.[33-3:114-25 of 148]. Reportedly, Mr. Livermore was again observed by an officer buying crack cocaine. CV-ECF No.[33-3:125 of 148].

**C. Connie Thomas failed to disclose information regarding the illegal firearms and drug problems of her family members.**

Connie Thomas served on the jury and engaged in the following questions and answers during voir dire:

- Jury Question #18: "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency? If YES, who, and for what agency?" Ms. Thomas answered "No."

16

Furthermore, Teresa Thomas, believed to be Connie Thomas' sister, has worked in the State Attorney's Office, however, the dates of her service are unclear. CV-ECF No.[33-3:126 of 148].

- Jury Question #23: "Have you or any family members or friends ever had a problem involving firearms, whether used legally or illegally? If YES, please explain." Ms. Thomas answered "No."

Ms. Thomas failed to disclose her ex-husband, John Thomas Mincey, Jr., did have a substantial problem involving the illegal possession of firearms. He was convicted during their marriage of possession of firearm by a convicted felon and sentenced on that charge in 1993. CV-ECF No.[33-3:127 of 148].

Ms. Thomas also failed to disclose her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for carrying a concealed firearm. CV-ECF No.[33-3:128 of 148].

- Jury Question #24: "Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain." Ms. Thomas answered "Yes," "Possession / selling drugs. Never used."

The Court questioned her about this response. She explained it was her nephew and that she did not attend any of his court hearings. CR-ECF No.[648:238-39].

Ms. Thomas further failed to disclose that her brother, Willie James Thomas, had an extensive criminal history involving problems with illegal drugs prior to the dates of voir dire. The convictions include trafficking cocaine, multiple possession of cocaine charges, possession of marijuana, and perjury. Her brother appears to have served at least 39 months in federal prison on a perjury charge and his supervised release was violated for separate incidents involving trafficking cocaine and possession of cocaine. CV-ECF No.[33-3:130-35 of 148].

17

Ms. Thomas additionally failed to disclose that her ex-brother-in-law, John Burrows Hutchinson, Sr., served time in the Florida Department of Corrections for purchase of cocaine in 1994. CV-ECF No.[33-3:136-37 of 148].

### D. Dorothy Barba failed to disclose her family member's problem with illegal drugs.

Dorothy Barba served on the jury as an alternate and engaged in the following questions and answers during *voir dire*:

- Jury Question #24: "Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain." Mrs. Barba responded, "Yes," "My son 20 years ago for smoking pot." During voir dire she stated, "…I was glad he got caught." Accurint reveals her son, Dustin Walker, was sentenced with the Florida Department of Corrections on September 23, 1986, for constructive possession of controlled substance. Dustin Walker has not had any subsequent offenses except for one DUI.

Mrs. Barba failed to disclose her grandson, Justin Patrick Guthrie, had a problem with illegal drugs. He had three arrests and two convictions for drug possession prior to her jury service. CV-ECF No.[33-3:138-48 of 148]; No.[33-4:1-2 of 119]. It appears her grandson's drug issues were likely occurring during the time of her service as well. A mere two months after deliberations concluded, Mrs. Barba's grandson was arrested for trafficking oxycodone and obtaining drugs by fraud on June 15, 2009, obtaining drugs by fraud and marijuana possession on August 27, 2009, trafficking oxycodone and obtaining drugs by fraud on February 9, 2010, and multiple charges of possession with intent to sell on March 22, 2010. Mrs. Barba's grandson served time in the Florida Department of Corrections for these offenses. CV-ECF No.[33-3:144 of 148].

18

**E. Donald Little failed to disclose information regarding the illegal firearms and drug problems of his family members.**

Donald Little served on the jury at both guilt and sentencing phases and provided the following answers to questions during jury selection:

- Jury Questionnaire #23: "Have you or any family members or friends ever have a problem involving firearms, whether used legally or illegally? If YES, please explain." Mr. Little answered: "No."

- Jury Questionnaire #24: "Have you or any family members or friends ever had a problem with illegal drugs? If YES, please explain." Mr. Little answered: "Yes" and further stated, "A step sister who passed away." When questioned further on January 22, 2009, he explained it was "… a new step sister, new family. My mother-in-law remarried, and I didn't know them that well".[14]

Mr. Little failed to disclose that his son-in-law, Juan Francisco Gonzales, was convicted of felonies involving firearms and violence, including the Florida offenses of possession of firearm by a convicted felon, delivery of cocaine, possession with intent to sell, burglary, grand theft, and robbery. These offenses spanned the time period from 1993-2007, before jury selection in this case began. CV-ECF No.[33-4:3-45 of 119].

Records reveal that Mr. Gonzales was sentenced to four years in the Florida Department of Corrections for robbery with a firearm.[15] The armed robbery case ran concurrently with a four year sentence in the Florida Department of Corrections for burglary of a car, aiding and abetting the burglary of a conveyance, and aiding and abetting a grand theft. CV-ECF No.[33-4:5-29 of 119].

---

[14] If it was his mother-in-law, Betty Wineman Bentinoff, it would not be a step-sister; it would be a step-sister-in-law.

[15] Three years of the sentence was the mandatory minimum.

19

Subsequent to serving his prison sentence for the armed robbery and burglary of the car, Mr. Gonzales served time for delivery of cocaine. Mr. Gonzales was allegedly set up in a controlled buy of cocaine. CV-ECF No.[33-4:37-44 of 119].

Mr. Little further failed to disclose that another son-in-law, Cecil Astor Harper, was arrested for possession of cocaine with intent to sell and served time in the Florida Department of Corrections for aggravated battery with great bodily harm pursuant to a sentence imposed in 1998. Allegedly, Mr. Harper stabbed the victim with a broken bottle that caused great bodily harm. CV-ECF No.[33-4:45-62 of 119].

### F. Donald G. Boser failed to disclose the illegal drug problems of his brother-in-law.

Donald G. Boser served on the jury at both phases of the trial and was engaged in the following questions and answers during voir dire:

- Jury Question #24: "Have you or any family members or friends ever had a problem with illegal drugs?" Mr. Boser stated, "No."

Mr. Boser failed to disclose that his brother-in-law, Robert Ries, has a long criminal history that indicates a substance abuse problem. Mr. Ries' criminal history between 1999 and 2006 includes arrests for possession of heroin, possession of cocaine, and possession of a controlled substance.[16] In addition, Mr. Ries appears to have served some time in prison in New York for a drug offense. CV-ECF No.[33-4:63-81 of 119].

### G. Prejudice.

This prosecution involved both drugs and firearms (as well as Government cooperators), so the experiences of prospective jurors with these issues were at the top of the list of bases for excusal by defense counsel. Several jurors had family issues with drugs and weapons, or both,

---

[16] Mr. Boser has been married to his wife since 1999.

20

and the defense would have sought to excuse the jurors harboring such issues identified here for cause or otherwise had the jurors answered truthfully. Such an excusal motion would have been granted by this Court upon honest juror answers. Juror deceit during jury selection cannot be tolerated by the Court.

The First Circuit, while reviewing a Government appeal from a grant of a new trial in a capital § 2255 petition, aptly articulated the legal framework that governs post-conviction claims of juror dishonesty:

> It is constitutional bedrock that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend VI. An impartial jury is one "capable and willing to decide the case solely on the evidence before it." *McDonough*, 464 U.S. at 554, 104 S.Ct. 845 (internal quotation marks omitted). The right to an impartial jury is nowhere as precious as when a defendant is on trial for his life. *See Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988).

*Sampson v. United States*, 724 F.3d 150, 163 (1st Cir. 2013).

District Court Judge Sessions further observed when granting a new trial to capital § 2255 litigant, Donald Fell, that:

> The Federal Death Penalty Act ("FDPA") requires a unanimous jury to conclude that the death penalty is warranted. *See* 18 U.S.C. §§ 3593, 3594. "[E]ach juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had." *United States v. Sampson*, 820 F. Supp. 2d 151, 157 (D. Mass. 2011) ("*Sampson I*"). "'When possible juror misconduct is brought to the trial judge's attention he has a duty to investigate and to determine whether there may have been a violation of the [S]ixth [A]mendment.'" *United States v. Lloyd*, 462 F.3d 510, 518 (6th Cir. 2006) (quoting *United States v. Shackleford*, 777 F.2d 1141, 1145 (6th Cir. 1985)). "If even one [partial] juror is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992).

*United States v. Donald Fell*, No. 2:01-cr-12, 2014 WL 3697810, at *6 (D. Vt. July 24, 2014).

21

This Court should permit Sanchez's defense team to interview the identified jurors to gather sufficient evidence in support of his § 2255 petition. "To obtain a new trial for juror misconduct during *voir dire*, a party must: 1) demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then 2) show that a correct response would have provided a valid basis for a challenge for cause." *United States v. Carpa*, 271 F.3d 962, 967 (11th Cir. 2001) (citing *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984)).

First, there must be a determination of whether the juror's answer(s) were honest and then a showing of bias that would disqualify a juror. *Id.*; *see also Bank Atlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992); *United States v. Perkins*, 748 F.2d 1519, 1532 (11th Cir. 1984). If the first prong is met, the question then becomes would that juror be subject to a valid challenge for cause. Jurors are typically subject to challenges for cause if they are biased or do not meet the statutory qualifications. 2 Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 382 (4th ed. updated Apr. 2017).

## H.  Conclusion.

Without leave of Court, Sanchez's defense team was precluded from interviewing jurors to further develop this claim. *See* S.D. Fla. L.R. 11.1(e) (prohibiting attorneys from communicating with jurors after a trial in any manner without first obtaining leave of court). Here, Sanchez will pursue a motion to interview jurors as part of the discovery process. The facts set forth above certainly show good cause for juror interviews. The facts set forth above are those Sanchez's defense team were able to uncover through researching record databases, social media, and various internet sites. They indicate that jurors lied about issues that would have kept them off this jury and that were highly relevant to the allegations Sanchez was facing. These facts must be explored further in order to meet the § 2255 proof requirements and ensure a

22

constitutionally seated jury. The facts set forth above reveal that jurors were not fully forthcoming, and that some may have outright lied to this Court and counsel during *voir dire*. Juror interviews and an evidentiary hearing are required.

## II.      Mr. Sanchez's § 924 convictions and resulting death sentences are based on an impermissibly vague statute, in violation of Due Process and the Fifth, Sixth, and Eighth Amendments.[17]

Sanchez's § 924 convictions for using a firearm in relation to a "crime of violence" are void because the "crime of violence" element cannot be satisfied.[18] Sanchez was convicted of ten counts relating to Varela's drug business and the deaths of the Escobedo family. This claim alleges that the § 924 convictions should be vacated because the definition of "crime of violence"—found in § 924(c)(3)(B)—is unconstitutional. This claim is brought pursuant to the new rule announced in *Johnson v. United States*, __ U.S. __, 135 S. Ct. 2551 (2015), (issued after Sanchez's convictions became final) and made retroactive to cases on collateral review by *Welch v. United States*, __ U.S. __, 136 S. Ct. 1257, 1264 (2016).[19] *Johnson* invalidated the residual clause of the violent felony definition in the Armed Career Criminal Act (ACCA), §

---

[17] This claim's presentation is reorganized, updated discussions of law are included, citations to the record are added, and more detail to the original claim is provided. Any and all changes relate to the common core of facts and law supporting the original claim that Sanchez's convictions and sentences under § 924 (Counts 7-10) are based on an unconstitutionally vague statute and the underlying conviction is not a valid crime of violence. CV-ECF No.[16-1:21-27 of 195].

[18] The Eleventh Circuit's recent decision in *Ovalles v. United States*, 861 F.3d 1257 (11th Cir. 2017), is controlling adverse authority. Sanchez argues herein for a change of law in that *Ovalles* was incorrectly decided, *see, e.g.*, *United States v. Jackson*, 865 F.3d 946 (7th Cir. 2017), and notes that the Supreme Court will eventually decide this issue. *See* Fed. R. Civ. P. 11(b)(2) (permitting "nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law").

[19] Because the Supreme Court held in *Welch*, *supra*, that *Johnson* must be applied retroactively, the fact that counsel did not raise or preserve this issue at trial or on direct appeal does not create an obstacle to a grant of relief. Sanchez's claim was timely filed within one year after the date *Johnson* was decided (June 26, 2015), and less than one month after *Welch* was decided on April 18, 2016.

924(e), and it likewise invalidates the substantially similar residual clause in § 924(c)(3)(B).

Relevant to this claim are Sanchez's convictions on the following counts:

- Count 1 – conspiracy to possess and distribute drugs in violation of 21 U.S.C. §§ 841(a)(1) (drug crime) & 846 (conspiracy)[20]
- Count 6 – carjacking resulting in death in violation of 18 U.S.C. § 2119(3)[21]
- Counts 7-10 – using a firearm in relation to a crime of violence or a drug trafficking crime (carjacking [Count 6]) or drug conspiracy [Count 1]), in violation of 18 U.S.C. § 924(c)(1)(A), where death results and the killing is murder as defined in section 1111, in violation of 18 U.S.C. § 924(j)(1).[22]

CR-ECF No.[305:2, 7-11] (indictment) & No.[796:1, 3-5] (verdict).

The firearms crime set forth in § 924(c)(1)(A), occurs if a person "uses or carries a firearm" in relation to, or "possesses a firearm" in furtherance of, "any crime of violence or drug trafficking crime." The use of a firearm in the course of a "crime of violence" that causes the death of a person (when the killing satisfies the definition of murder in 18 U.S.C. § 1111) results in an additional punishment, the range of which is increased to include the death penalty. 18 U.S.C. § 924(j)(1). This claim centers on the definition of "crime of violence" that is set out in § 924(c)(3).

In this case, the jury was told that the carjacking alleged in Count 6 is a "crime of violence" and the drug conspiracy alleged in Count 1 is a drug trafficking crime. CR-ECF No.[771:7536-44]. The jury was then instructed to determine: (1) if Sanchez committed the carjacking crime in Count 6 or the drug conspiracy crime in Count 1; (2) whether a firearm was

---

[20] The judge imposed a life sentence for Count 1, the drug conspiracy conviction. CR-ECF No.[899:3].
[21] On Count 6 (carjacking resulting in death) the jury imposed a sentence of life imprisonment without the possibility of release. CR-ECF No.[860:18].
[22] On the two § 924 convictions related to the child victims (Counts 7 & 8), the jury sentenced Sanchez to death. The jury imposed sentences of life imprisonment without parole on the remaining two § 924 convictions for the Escobedo parents (Counts 9 & 10). CR-ECF No.[860:18-20] (verdict).

knowingly carried or used in relation to Count 6 or Count 1; (3) whether during the course of using a firearm a person died; and, (4) whether the killing was a murder, and if it was connected to the crime in Count 6 or the crime in Count 1.[23] CR-ECF No.[771:7537].

The Supreme Court's decision in *Johnson* calls into question whether the "crime of violence" element in § 924(c) and § 924(j) is unconstitutionally vague, and whether, in this case, carjacking may be relied upon to establish the "crime of violence" element. As demonstrated below, the definition of crime of violence contained in the residual clause of § 924(c)(3) is void-for-vagueness. It follows that Sanchez's § 924 convictions are unconstitutional and should be vacated.

    **A.** ***Johnson v. United States* held the ACCA residual clause is, on its face, unconstitutionally vague.**

In *Johnson*, the Supreme Court held that the definition of "violent felony" in the residual clause of the ACCA, 18 U.S.C. § 924(e)(2)(B)(ii), is facially void for vagueness. *Johnson*, 135 S. Ct. at 2557. The "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). "It is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of

---

[23] Sanchez only has to demonstrate that carjacking fails to qualify as a "crime of violence" in order to secure relief. As a matter of law, a general verdict of guilty does not reveal any unanimous finding by the jury that Sanchez was guilty of (a) either using, carrying or possessing a firearm (b) either in relation to or in furtherance of (c) a crime of violence or a drug conspiracy, or (d) both a crime of violence and a drug conspiracy. *In re Gomez*, 830 F.3d 1225, 1227-28 (11th Cir. 2016). These multiple predicates in a single § 924(c) count allowed an increased punishment without the unanimity required by the Constitution. *Id.* (citing *Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151, 2155 (2013)). Under *Stromberg v. California*, 283 U.S. 359 (1931), and its progeny, a defendant's Due Process rights are violated if a jury convicts on alternate grounds where one is valid and the other is invalid.

penal statutes.'" *United States v. Batchelder*, 442 U.S. 114, 123 (1979) (citation omitted). This principle applies to both vague criminal statutes and vague sentencing provisions. *Id.*

The *Johnson* Court held that the plain statutory language asking whether a crime "'*involves conduct*' that presents too much risk of physical injury" is unacceptably "wide ranging" and "indeterminate" and thus "denies fair notice to defendants and invites arbitrary enforcement by judges." 135 S. Ct. at 2557. In other words, that vague language creates more "unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 135 S. Ct. at 2558; *see Welch*, 136 S. Ct. at 1262. The Court explained that "[t]wo features of the residual clause conspire to make it unconstitutionally vague." *Johnson*, 135 S. Ct. at 2557. First, it "ties the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id*. A court must use a categorical approach, picturing in abstract terms whether the kind of conduct ordinarily involved in the crime presents a serious potential risk of physical injury. *Id*. The *Johnson* Court concluded that the "residual clause offers no reliable way" to determine what an ordinary crime involves. *Id.* at 2558. Second, it is unclear from the residual clause "how much risk it takes for a crime to qualify as a violent felony" and how to apply the "serious potential risk" standard to a judge-imagined abstraction. *Id.*, *see also Welch*, 136 S. Ct. at 1262.

The ACCA residual clause and the § 924(c)(3) residual clause are materially indistinguishable. Because the Supreme Court struck down the ACCA residual clause as unconstitutionally vague, it follows that the § 924(c) residual clause is also unconstitutionally vague. Therefore, Sanchez's underlying crime cannot qualify as a "crime of violence" under the residual clause of § 924(c)(3)(B). The underlying crime of carjacking also fails to qualify as a

"crime of violence" under the definition contained in the remaining "force clause" of §

924(c)(3)(A).

As a result, Sanchez's § 924(c) convictions: (1) violate due process; (2) violate the laws

of the United States (resulting in a fundamental miscarriage of justice); and, (3) were entered in

excess of this Court's jurisdiction.

### B. The relevant statutes.

Several statutes attempt to define violent criminal conduct which, when coupled with a

firearm, may support enhanced punishment.

### 1. The "crime of violence" definition in the ACCA.

The ACCA enhances punishment for defendants who commit a firearms offense and who

have three prior violent felonies, defined as an offense that:

> (i)    has as an element, the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii)    is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another.*

18 U.S.C. § 924(e)(2)(B)(i), (ii). As in § 924(c)(3), subsection (i) of § 924(e)(2)(B) is often

called the "force clause;" the second part of subsection (ii) (emphasis added above) is called the

residual clause. The residual clause was declared unconstitutionally vague under the new rule in

*Johnson*.

### 2. The "crime of violence" definition in 18 U.S.C. § 16 and its residual clause is analogous to the ACCA residual clause and has widely been held unconstitutional under *Johnson*.

In the "General Provisions" section of the criminal code, a "crime of violence" is defined

in either of two ways:

> (a)    an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

(b)      any other offense that is a felony and that, *by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*

18 U.S.C § 16(a), (b). The Eleventh Circuit has described § 16(b) as "analogous" to the ACCA residual clause. *United States v. Keelan*, 786 F.3d 865, 871 n.7 (11th Cir. 2015).[24]

In the time since *Johnson* has been decided several courts of appeals have held that § 16(b) is unconstitutional.[25] This issue is pending before the United States Supreme Court in *Sessions v. Dimaya*, No. 15-1498, where the Ninth Circuit found § 16(b) to be unconstitutionally vague.[26] *See Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015).

### 3.   The "crime of violence" definition in § 924(c) is identical to that in § 16.

The definition of crime of violence from § 16(b), verbatim, is present in § 924(c), the statute supporting Sanchez's conviction. Section 924(c)(1)(A) enhances punishment for defendants who use or carry a firearm during and in relation to, or possesses a firearm in

---

[24] *See United States v. Sanchez-Espinal*, 762 F.3d 425, 432 (5th Cir. 2014) (despite the fact that the ACCA talks of risk of injury and § 16(b) talks of risk of force, "we have previously looked to the ACCA in deciding whether offenses are crimes of violence under § 16(b)"); *Roberts v. Holder*, 745 F.3d 928, 930-31 (8th Cir. 2014) (using both ACCA cases and § 16(b) cases to define the same "ordinary case" analysis); *Jimenez-Gonzales v. Mukasey*, 548 F.3d 557, 562 (7th Cir. 2008) (noting that, "[d]espite the slightly different definitions," the Supreme Court's respective analyses of the ACCA and § 16(b) "perfectly mirrored" each other). *See also United States v. Ayala*, 601 F.3d 256, 267 (4th Cir. 2010) (relying on an ACCA case to interpret the definition of a crime of violence under § 924(c)(3)(B)).

[25] *Baptiste v. Attorney Gen.*, 841 F.3d 601, 615-21 (3d Cir. 2016); *Golicov v. Lynch*, 837 F.3d 1065, 1071-75 (10th Cir. 2016); *Shuti v. Lynch*, 828 F.3d 440, 441, 445-51 (6th Cir. 2016); *United States v. Vivas-Ceja*, 808 F.3d 719, 723 (7th Cir. 2015). *But see United States v. Gonzalez-Longoria*, 831 F.3d 670, 672-78 (5th Cir. 2016).

[26] The Immigration and Naturalization Act, 8 U.S.C. § 1101 *et seq.*, specifies classes of aliens who are removable from the United States. One such class comprises any alien convicted of an aggravated felony, including a "crime of violence" as defined in 18 U.S.C. § 16. This is the context in which the Supreme Court is analyzing § 16 under *Johnson. Dimaya, supra.*

furtherance of, a "crime of violence."[27] Section 924(c)(3) defines "crime of violence" in the same two ways as section 16:

> (3) For purposes of this subsection the term "crime of violence" means an offense that is a felony and--
> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
> (B) *that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.*

The first clause—§ 924(c)(3)(A)—is commonly referred to as the "force" or "elements" clause. The other—§ 924(c)(3)(B) (emphasis added above)—is commonly referred to as the "residual" clause. The identically worded residual clause contained in § 16 has been declared unconstitutionally vague, *see* note 26, and the same conclusion applies to the § 924(c) residual clause.

### C. The Seventh Circuit's analysis of the § 924(c) residual clause.

The Seventh Circuit has held that the residual clause in § 924(c) is unconstitutional. It arrived at this conclusion after first holding that the definition of "crime of violence" in § 16(b) is "materially indistinguishable" from the ACCA residual clause (in 18 U.S.C. § 924(e)) and therefore is void-for-vagueness pursuant to *Johnson*. *United States v. Vivas-Ceja*, 808 F.3d 719 (7th Cir. 2015); *see also Dimaya*, 803 F.3d at 1115, *cert. granted*, 137 S. Ct. 31 (2016).[28] In a subsequent case, the court of appeals then determined that the identical language in §

---

[27] Section 924(c)(1)(A) states: "Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any *crime of violence* or drug trafficking crime (including *a crime of violence* or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such *crime of violence* or drug trafficking crime--"(emphasis added).

[28] *See also* note 25, *supra*, collecting cases that hold § 16(b) is unconstitutionally vague.

924(c)(3)(B) is also unconstitutionally vague. *United States v. Cardena*, 842 F.3d 959, 995-96

(7th Cir. 2016). In *Cardena*, *supra*, the Seventh Circuit's reasoned that the three residual clauses

are vague because they can't be applied on the basis of their plain language and require a court to

engage in an ordinary-case determination and risk assessment, all of which "produces more

unpredictability and arbitrariness than the Due Process Clause tolerates." *Johnson*, 135 S. Ct. at

2558. This reasoning is constitutionally sound and should likewise be applied to Sanchez's case.

The language of the residual clauses in § 924(c) and (e) and § 16(b) are materially the same,

and both are applied after the two-step categorical approach that the *Johnson* Court held

"conspire[d]" to make the residual clause in § 924(e) unconstitutionally vague. *Vivas-Ceja*, 808

F.3d at 722; *Cardena*, 842 F.3d at 996. The Seventh Circuit explained:

> Regarding the first step of the categorical approach, § 16(b) substitutes the phrase
> "by its nature" for the residual clause's "otherwise involves conduct." That these
> two phrases are synonymous was confirmed by the Supreme Court in *Leocal v.
> Ashcroft*, 543 U.S. 1, 125 S. Ct. 377, 160 L.Ed.2d 271 (2004), decided more than a
> decade before *Johnson*. There the Court stated that § 16(b) directs courts to consider
> whether an offense would "naturally involve a person acting in disregard of the risk
> that physical force might be used against another." *Id*. at 10, 125 S. Ct. 377. This
> requires an evaluation of "the elements and the nature of the offense of conviction,"
> not "the particular facts relating to [a defendant's] crime." *Id*. at 7, 125 S. Ct. 377.
> *Leocal*'s interpretation of § 16(b) is indistinguishable from *Johnson*'s interpretation
> of the residual clause.
>
> Regarding the second step of the categorical approach—assessing the level of risk
> in the "ordinary case" of the crime— § 16(b) substitutes "substantial risk" for the
> residual clause's "serious potential risk." Any difference between these two phrases
> is superficial. Just like the residual clause, § 16(b) offers courts no guidance to
> determine when the risk involved in the ordinary case of a crime qualifies as
> "substantial."

*Vivas-Ceja*, 808 F.3d at 722. This comparison demanded the conclusion that, "[b]ecause § 16(b)

requires the identical indeterminate two-step approach, it too is unconstitutionally vague." *Id.* at

723. The residual clause in § 16(b) is the same residual clause contained in § 924(c)(3)(B) and

therefore it too is unconstitutionally vague. *Cardena*, 842 F.3d at 996.

30

### D.  The Eleventh Circuit's analysis of the § 924(c) residual clause.

In 2016, the Eleventh Circuit had not yet decided whether the residual clause of § 924(c) is unconstitutionally vague under *Johnson*, *supra*.[29] *In re: Pinder*, 824 F.3d 977, 978 (11th Cir. 2016). In *Pinder*, the Court discussed the similarities between the unconstitutionally-vague residual clause contained in § 924(e) and the residual clause at issue here in § 924(c).

> Though § 924(c) is phrased a bit differently from § 924(e), the § 924(c) language also requires courts to decide if the offense in question "naturally involve[s] a person acting in disregard of the risk that physical force might be used against another in committing an offense." *Leocal v. Ashcroft*, 543 U.S. 1, 10, 125 S. Ct. 377, 383, 160 L.Ed.2d 271 (2004).

*Pinder*, 824 F.3d at 978. *See also James v. Unites States*, No. 2:16-cv-14245-KMM, 2017 WL 1831671, at *3 (S.D. Fla. Mar. 1, 2017) (analyzing then-current cases on the issue). In addition to sharing similar language, the *Pinder* Court noted that:

> §§ 924(c) and (e) are both "penal statutes, meaning they both require higher sentences once a court decides that an offense is a 'crime of violence,'" and that "for both statutes this question is decided 'categorically'—that is, by reference to the elements of the offense, and not the actual facts of [the defendant's] conduct."

*Freeman v. United States*, No. 16-15678-C, 2017 WL 3923326, at *2 n.1 (11th Cir. Mar. 30, 2017) (quoting *Pinder*, *supra*) (assuming without deciding that *Johnson* applies to § 924(c)'s residual clause).

---

[29] It is noted that in late 2016, this Court extensively discussed the legal landscape on this issue and—absent a decision from the Eleventh Circuit—found persuasive cases from those courts of appeals that upheld the residual clause of § 924(c) against *Johnson* challenges. *Mobley v. United States*, Nos. 16-cv-61388, 15-cr-60005, 2016 WL 7188296 (S.D. Fla. Dec. 12, 2016). Other courts had reached the conclusion that *Johnson* did invalidate the § 924(c) residual clause. *See, e.g.*, *United States v. Cardena*, 842 F.3d 959, 995-99 (7th Cir. 2016); *Duhart v. United States*, Nos. 16-61499-CIV-Marra, 08-60309-CR-Marra, 2016 WL 4720424 (S.D. Fla. Sept. 9, 2016); *United States v. Lattanaphom*, 159 F. Supp. 3d 1157 (E.D. Cal. 2016); *United States v. Edmundson*, 153 F. Supp. 3d 857, 862 (D. Md. 2015).

On June 30, 2017, however, the Eleventh Circuit directly addressed the issue and concluded that "*Johnson* does not apply to or invalidate § 924(c)(3)(B)[.]" *Ovalles*, 861 F.3d at 1259. Referring to the residual clause of § 924(c) as "the 'risk-of-force'" clause, the court of appeals did not address the earlier-identified statutory similarities but distinguished the two clauses based on "function" and "textual differences." *Id.* at 1265-67. The ruling in *Ovalles* constitutes mandatory authority but Sanchez respectfully asserts it was wrongly decided and argues for the purpose of eventually persuading the court of appeals to reverse that ruling. *See* Fed. R. Civ. P. 11(b)(2) (permitting "nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law").

    **1.** **The analysis in *United States v. Ovalles* fails to adhere to *Johnson*'s central holding that the categorical approach to defining a crime of violence does not comport with the Constitution's guarantee of due process.**

The Eleventh Circuit in *Ovalles* upheld the residual clause in § 924(c) based on perceived difference in function or purpose from the ACCA residual clause (in § 924(e)). In doing so, the court strayed from the two features that the *Johnson* Court said were conclusive of vagueness: (1) the indeterminate inquiry into the ordinary case, and (2) the indeterminate measurement of risk of injury. *Welch*, 136 S. Ct. at 1262 ("The vagueness of the residual clause rests in large part on its operation under the categorical approach."). Both features are indisputably present when applying the definition of "crime of violence" in the residual clause of § 924(c). None of the ancillary observations or remarks about the residual clauses in § 924(c) and (e) are material to the same two-step analysis under both residual clauses, nor do any overcome the due process violations caused by that analysis.

32

**2.  Any functional or textual differences between § 924(c) and (e) do not change the fact that the plain language in both residual clauses that defines "crime of violence" is unconstitutionally vague and the ordinary case analysis of that definition layers indeterminacy upon indeterminacy, in violation of Due Process.**

The residual clauses of § 924(c) and (e) both require higher sentences if a gun is at issue and if the court decides under the ordinary case analysis that an offense is a "crime of violence." *Freeman*, 2017 WL 3923326, at *2 n.1. The Eleventh Circuit in *Ovalles*, however, relied upon three main points to distinguish the two residual clauses and to reach the determination that *Johnson*'s void-for-vagueness ruling does not extend to the residual clause in § 924(c)(3)(B).

First, in *Ovalles*, the court of appeals focused on the recidivism purpose of the ACCA that it alleged is not present in § 924(c). *Ovalles*, 861 F.3d at 1265 ("Notably, § 924(c) has a very different function than the ACCA.").[30] The *Ovalles* Court relied upon the notion that, unlike § 924(c), § 924(e) has "no required nexus between the conduct in the felon's prior violent felony conviction and that felon's instant firearm-possession offense." *Id.* The court attempted to distinguish § 924(c) going so far as to state: "Section 924(c) trains solely on whether the defendant herself might engage in certain type of behavior—using or threatening physical force—in the course of committing the offense, not whether her actions may produce a potential risk of physical injury in a more tangential or attenuated way." *Ovalles*, 861 F.3d at 1266. A felon's real-world conduct, however, is not at issue.

---

[30] A recidivist "function" does not change the definition of "crime of violence" in §§ 924(c) or (e). The notion that interpretation of the term "crime of violence" is made clearer or more vague if a statute involves principles of recidivism, whether or not valid, is of no moment because both §§ 924(c) and (e) address recidivism. *See* § 924(c)(1)(C) (increasing punishment for a second or subsequent conviction) and § 924(c)(1)(D) (providing for a sentence consecutive to the sentence imposed for the crime of violence, or any other term of imprisonment imposed).

33

When determining whether an offense constitutes a crime of violence a court must envision in abstract terms whether the kind of conduct *ordinarily involved* in the crime presents too much risk of injury. *Johnson*, 135 S. Ct. at 2558; *Jackson*, 865 F.3d at 952; *Pinder*, 824 F.3d at 978. In *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001), the Fifth Circuit emphasized that:

> [T]he words "by its nature" [in 18 U.S.C. § 16(b)] require us to employ a categorical approach when determining whether an offense is a crime of violence. This means that the particular facts of the defendant's prior conviction do not matter, e.g.[,] whether the defendant actually did use force against the person or property of another to commit the offense. The proper inquiry is whether a particular defined offense, in the abstract, is a crime of violence under 18 U.S.C. § 16(b).

*Id*. at 924 (internal citation omitted). The ordinary case analysis applies equally to both § 924(c) and (e) and the resulting vagueness also "applies equally whether the inquiry considers the risk of violence posed by the commission and the aftereffects of a crime, or whether it is limited to consideration of the risk of violence posed by acts necessary to satisfy the elements of the offense."[31] *Dimaya*, 803 F.3d at 1118-19 (discussing the identical residual clause in § 16).

In *Dimaya*, the Ninth Circuit doubted that the "in the course of committing the offense" language of the residual clause in § 16 (emphasized by the *Ovalles* Court) actually created a meaningful distinction from the residual clause in § 924(e). In practice, the Ninth Circuit had determined a burglary offense was a crime of violence under § 16(b) "precisely because of the risk that violence will ensue after the defendant has committed the acts necessary to constitute the offense." *Dimaya*, 803 F.3d at 1118 (citing *Lopez-Cardona v. Holder*, 662 F.3d 1110, 1112

---

[31] The court in *Dimaya* noted: "even if there were some 'straightforward cases' or categories of cases under § 16(b), *Johnson* squarely rejected the argument that 'a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp,' *id*. at 2561-62, and clearly stated that the residual clause was void for vagueness in all applications, *id*. at 2563." *Dimaya*, 803 F.3d at 1119 n.15.

34

(9th Cir. 2011)). *See also United States v. Davis*, 881 F.2d 973 (11th Cir. 1989) (holding that

burglary of a dwelling is a crime of violence under § 16(b)). More important is that, "even if

such a distinction did exist, it would not save [§ 16(b)'s] definition of a crime of violence from

unconstitutionality … because it combine[s] the indeterminate inquiry of 'how to measure the

risk posed by a crime' in the ordinary case with 'indeterminacy about how much risk it takes for

the crime to qualify as a violent felony.'" *Dimaya*, 803 F.3d at 1118 (quoting *Johnson*, 135 S. Ct.

at 2558).

Second, the Eleventh Circuit in *Ovalles* emphasized small textual distinctions between

the residual clauses in § 924(c) and (e). Although the risk at issue in § 924(e)(2)(B) is "a serious

potential risk of physical injury," and the risk at issue in § 924(c)(3)(B) is "a substantial risk that

physical force" may be used, this difference is immaterial and has no impact on *Johnson*'s

rationale. The *Johnson* Court's holding did not turn on the type of risk but rather on the

indeterminacy of assessing the risk of physical injury posed by an offense and how much risk is

required to qualify as a violent felony. *Welch*, 136 S. Ct. at 1262 ("The residual clause failed not

because it adopted a 'serious potential risk' standard but because applying that standard under

the categorical approach required courts to assess the hypothetical risk posed by an abstract

generic version of the offense."); *see also Dimaya*, 803 F.3d at 1116 n.9 ("Measuring whether an

offense poses a 'substantial' risk, however, is no less arbitrary than measuring whether it poses a

'serious potential' one[.]").

Third, the *Ovalles* Court placed great weight on the history of interpretive challenges to §

924(e) mentioned by the Supreme Court in *Johnson* when it held that residual clause void for

vagueness. *Ovalles*, 861 F.3d at 1266. Overlooked, however, is that neither the confusing list of

exemplar crimes nor the fact that the chaotic state of caselaw regarding the residual clause in §

35

924(e) were necessary conditions to the *Johnson* Court's vagueness determination. *Jackson*, 865 F.3d at 953 (citing and quoting *Vivas-Ceja*, 808 F.3d at 723). "*Johnson* ... made plain that the residual clause was void for vagueness in and of itself …, and not because of the clause's relation to the four listed offenses." *Dimaya*, 803 F.3d at 1118. And the fact that "the Supreme Court has decided more [§ 924(e)] residual clause cases than § 16(b) cases ... does not indicate that it believes the latter clause to be any more capable of consistent application." *Id.* at 1119. ("We can discern very little regarding the merits of an issue from the composition of the Supreme Court's docket.") *Id.*

The decision in *Ovalles* discerned differences between the residual clauses in § 924(c) and (e) but none undermine the applicability of *Johnson*'s fundamental holding to the residual clause in § 924(c). *Johnson* concluded that the indeterminacy of the ordinary case analysis and assessment of risk rendered the § 924(e) residual clause unconstitutionally vague. The residual clause in § 924(c) requires the identical indeterminate two-step approach and is also unconstitutionally vague.

### E. Carjacking cannot qualify as a "crime of violence" under the residual clause because that clause is void for vagueness.

As explained above, and as held by the Seventh Circuit in *Cardena*, *supra*, the residual clause of § 924(c) suffers from the identical flaws that compelled the Supreme Court to declare the ACCA residual clause unconstitutionally vague and obligated almost all courts of appeals to declare the residual clause in § 16(b) unconstitutionally vague, as well. The conclusion is inescapable that § 924(c)(3)(B) also is unconstitutional.

The residual clause in § 924(c) and the residual clause in the ACCA suffer from the same constitutional flaws; they both require an "ordinary case" analysis to assess the predicate offense, and also require the court to determine how risky that ordinary case is. This is the same defect

36

that rendered the ACCA residual clause unconstitutional, accordingly, the residual clause in §

924(c) is also unconstitutional.

Because the residual clause found in § 924(c)(3)(B) is identical to that found in 18 U.S.C.

§ 16(b), it is just as susceptible to a finding of unconstitutionality for vagueness. Under

principles of statutory construction, a term is given the same meaning "when Congress uses the

same language in two statutes having similar purposes." *Smith v. City of Jackson*, 544 U.S. 228,

233 (2005) (plurality opinion); *see also Northcross v. Board of Ed. of Memphis City Schools*, 412

U.S. 427, 428 (1973) (per curiam); *Gomez-Leon*, 545 F.3d at 788 (definitions of "crime of

violence" using the same language are subject to the same construction). The statutes at issue

here−18 U.S.C. § 924(c) and (e) and § 16−serve the same purpose of identifying violent crimes

and thereby subjecting defendants who commit them to harsher sanctions.

The Supreme Court identified two features of the ACCA's residual clause (§

924(e)(2)(B)) that "conspire[d] to make it unconstitutionally vague." *Johnson*, 135 S. Ct. at

2557. First, "the clause left 'grave uncertainty' about 'deciding what kind of conduct the

ordinary case of a crime involves,'" and thus "'denie[d] fair notice to defendants and invite[d]

arbitrary enforcement by judges' because it 'tie[d] the judicial assessment of risk to a judicially

imagined ordinary case of a crime, not to real-world facts or statutory elements.'" *Dimaya*, 803

F.3d at 1115 (quoting *Johnson*, 135 S. Ct. at 2557). Second, the "ACCA's residual clause left

'uncertainty about how much risk it takes for a crime to qualify as a violent felony.'" *Id*. (quoting

*Johnson*, 135 S. Ct. at 2558). The *Dimaya* Court held that "because of the same combination of

indeterminate inquiries, § 16(b) is subject to identical unpredictability and arbitrariness as

ACCA's residual clause" and is therefore also void for vagueness. *Id*; *see also Vivas-Ceja*,

*supra*. The Seventh Circuit likewise has held the residual clause in § 16 is void-for-vagueness

37

and in *Cardena*, *supra*, and *Jackson*, *supra*, it held that the identical residual clause in § 924(c) is also unconstitutionally vague.

Vagueness concerns rise to the level of a Due Process violation in the immigration context because of the harsh consequences of deportation. *Dimaya*, 803 F.3d at 1113. Due Process concerns, however, are even more pronounced in the context of a criminal statute like § 924(c), under which a conviction subjects the defendant to a deprivation of liberty and even—with respect to Sanchez—life. *Johnson*, 135 S. Ct. at 2557. The definition of "crime of violence" set forth in the residual clause cannot constitutionally support Sanchez's § 924 convictions or sentences.

**F.  Carjacking does not constitute a "crime of violence" under the force clause.**

Without the residual clause, Sanchez's conviction for carjacking may only qualify as a crime of violence under § 924(c)'s force clause. A carjacking occurs when an individual "with the intent to cause death or serious bodily harm[,] takes a motor vehicle ... from the person or presence of another by force and violence or by intimidation ...." 18 U.S.C. § 2119. Carjacking categorically fails to constitute a "crime of violence" under § 924(c)(3)(A) ("the force clause") because it can be accomplished by "intimidation," which does not require: (1) an intentional threat; (2) of violent physical force.

The definition of "crime of violence" under the force clause requires that a crime have "as an element the use, attempted use, or threatened use of physical force[.]" 18 U.S.C. § 924(c)(3)(A). This requires: (1) strong physical force, not unwanted touching; (2) the use of violent force, not merely the causation of physical injury; and, (3) the force must be intentional, not reckless or negligent. *Johnson v. United States*, 559 U.S. 133 (2010).

38

Whether carjacking qualifies as a "crime of violence" under the force clause is a question that must be answered categorically by reference to the elements of the offense, and not the actual facts of the defendant's conduct. *Descamps v. United States*, ___ U.S. ___, 133 S. Ct. 2276, 2283-85 (2013); *Taylor v. United States*, 495 U.S. 575, 600 (1990); *Pinder*, 824 F.3d at 978. This "categorical approach" qualifies a conviction as a crime of violence "only if the statute's elements are the same as, or narrower than, those of the generic offense." *Descamps*, 133 S. Ct. at 2281. Pursuant to this categorical approach, every carjacking under 18 U.S.C. § 2119, must be committed with "the use, attempted use, or threatened use of physical force," to qualify as a "crime of violence" under § 924(c)'s force clause. 18 U.S.C. § 924(c)(3)(A) (emphasis added).

If the statute is of such a nature that the jury is not called upon to reach a unanimous verdict on the alternate elements of the crime, the court must consider all possible ways a person could be found to have violated the statute and if any one of them does not require the use of violent physical force, employed intentionally against the person or property of another, it is not a crime of violence. *Descamps*, 133 S. Ct. at 2290. Moreover, an offense can only qualify as a "crime of violence" if the most innocent conduct penalized by a statute constitutes a "crime of violence." *United States v. Torres-Miguel*, 701 F.3d 165, 167 (4th Cir. 2012). In other words, where carjacking can be committed by force and violence *or* intimidation, it is presumed that the defendant was convicted of the least culpable act. *Moncrieffe v. Holder*, 569 U.S. 184, 190-91 (2011) (quoting *Johnson*, 559 U.S. at 137) (courts "must presume that the conviction 'rested upon [nothing] more than the least of th[e] acts' criminalized").

As explained below, because carjacking under § 2119 may be committed without the "use" of "physical force," it does not qualify as a "crime of violence" under § 924(c)'s force

39

clause. *But see Ovalles*, 861 F.3d at 1267-69 (holding in the alternative that carjacking qualifies as a crime of violence under the force clause).

### 1. Carjacking does not always require the use or threatened use of force because it can be accomplished by intimidation.

The force clause is unambiguous on its face that use of force (or threatened use of force) must be an element of the underlying crime. *Chrzanoski v. Ashcroft*, 327 F.3d 188, 196 (2d Cir. 2003) (addressing the identical force clause of § 16(a)). The force contemplated by § 924(c) is "physical force." "Physical force" means strong, violent force—that is "strong physical force," which is "capable of causing physical pain or injury to another person." *Johnson*, 559 U.S. at 140. If a crime can be accomplished without the use or threatened use of strong physical force it cannot qualify as a crime of violence under the force clause. *United States v. Palomino Garcia*, 606 F.3d 1317, 1335-36 (11th Cir. 2010). Significantly, neither actual nor threatened use of force is required for conviction under carjacking. A carjacking may be committed "by force and violence or by intimidation."[32] 18 U.S.C. § 2119.

Carjacking does not require a "threat." Under the force clause, "'threatened use of physical force' means both an intent to use force and a communication of that intent." *United States v. King*, 979 F.2d 801, 804 (10th Cir. 1992) (citing Black's Law Dictionary 1480 (6th ed. 1990)) (defining "threat" as "[a] communicated intent to inflict physical or other harm on any person or on property"). Thus, an offense can only constitute a "crime of violence" under the force clause if it has as an element the intentional employment of physical force or threat of

---

[32] A jury is not required to unanimously find beyond a reasonable doubt which of the listed alternatives—force and violence or intimidation—applied to Sanchez. This Court has no occasion to decide which statutory alternative was at issue and Sanchez is presumed to be convicted of the least culpable act; intimidation. *Moncrieffe*, 569 U.S. at 190-91.

physical force. *United States v. Palomino Garcia*, 606 F.3d 1317, 1335-36 (11th Cir. 2010) (citing *Garcia v. Gonzales*, 455 F.3d 465, 469 (4th Cir. 2006)).

Under these terms, carjacking can be accomplished without a "threat" because "intimidation" under carjacking (which means putting someone in fear of bodily harm) does not require that the defendant have any intent to put someone in fear of bodily harm, let alone any intent to communicate that threat; rather all that is required is that a reasonable person in the victim's shoes fear bodily harm from the defendant's action. Intimidation also does not require that a threat be communicated. Similarly, the separate, conditional intent to cause death or bodily injury in § 2119 does not have to be communicated or acted upon and therefore also does not constitute a "threat" under the force clause. *But see Ovalles*, 861 F.3d at 1268-69 ("conduct where the defendant must take the car by intimidation and act with intent to kill or cause serious bodily injury is unmistakably a crime of violence").

To satisfy the intimidation element of carjacking, the Government need only prove that the defendant committed an act or made a statement "that would put a reasonable person of ordinary sensibilities in fear of bodily harm." CR-ECF No.[771:7534] (jury instructions); *see also United States v. Higdon*, 832 F.3d 312, 315 (5th Cir. 1987). Intimidation could be shown by an act such as saying in a menacing voice, "Get out of the car!" even though no strong physical force was involved.

Caselaw provides many examples of an unlawful taking accomplished through intimidation and without the use or threatened use of physical force. *See United States v. Kelley*, 412 F.3d 1240, 1244-45 (11th Cir. 2005) (leaping onto a counter and causing a startling noise constitutes intimidation for the crime of bank robbery); *United States v. Kimble*, 178 F.3d 1163, 1168 (11th Cir. 1999) (carjacking established where car keys were taken from the victim's

41

pocket); *United States v. Cornillie*, 92 F.3d 1108, 1110 (11th Cir. 1996) (presenting a demand letter to a bank teller can support a conviction for bank robbery through intimidation); *see also Holloway v. United States*, 526 U.S. 1, 11 (1999) (in a carjacking case, it is possible to intend to commit death or serious bodily harm without attempting or threatening to use physical force). Therefore, by its plain terms, carjacking is not a crime of violence under the force clause because it can be accomplished through intimidation and without an intent to use force or without communicating a threat.

### 2. Carjacking does not always require the use or threatened use of violent physical force.

For a crime to qualify under the force clause, strong physical force must be used intentionally, not recklessly or negligently. *Johnson v. United States*, 559 U.S. 133 (2010); *Leocal v. Ashcroft*, 543 U.S. 1, 12-13 (2004); *United States v. Palomino Garcia*, 606 F.3d 1317, 1334-36 (11th Cir. 2010). As explained by the Fifth Circuit in the course of addressing language in U.S.S.G. § 2L1.2 that is identical to the force clause, "the phrase 'has as an element' ... means that 'the intentional use of force must be a constituent part of'" the predicate offense. *United States v. Andino-Ortega*, 608 F.3d 305, 311 (5th Cir. 2010) (quoting *United States v. Vargas-Duran*, 356 F.3d 598, 605 (5th Cir. 2004) (en banc)). Thus, if one can realistically commit a crime: (a) without using force; (b) by using force in a manner that does not require intentionality; or, (c) by intending to use *de minimis* force, it cannot constitute a crime of violence for purposes of 18 U.S.C. § 924(c). *See Johnson*, 559 U.S. at 138 (holding that a statute defining battery as "actually and intentionally" touching a person against their will does not have as an element the use of physical force because the battery could be based on "any intentional physical contact, no matter how slight.").

42

Carjacking is not a crime of violence under the force clause because it can be accomplished by intimidating a person without using or without an intent to cause injury by *strong physical force*. Carjacking in which a killing occurs, as defined by § 2119(3), requires that the perpetrator have the intent to cause death or serious bodily harm. It does not contain an element of intentional or actual use of physical violent force to take a vehicle, regardless of an intent to cause "serious bodily harm." For example, the statute authorizes a finding of guilt if the perpetrator uses intimidation to accomplish the act of taking the car. Injury or death can intentionally occur—without the intentional use of force—where a victim in a dark parking garage sees an individual approach in a menacing manner, backs away from the perpetrator, falls and sustains a physical injury (in the case of a broken neck) or dies (where the victim backs over a guardrail and falls six stories). *See also United States v. Dixon*, 805 F.3d 1193, 1197-98 (9th Cir. 2015) (describing an unintentional use of strong physical force where a defendant stole a car and, when speeding away, accidentally ran over the car's owner). This type of killing that results from a carjacking may therefore be the result of accident, negligence, or recklessness; mental states that do not require the intent to use, or the attempted use or threatened use the "force" needed to qualify under § 924(c)(3)(A).

There are many ways in which bodily injury—even death—can result without use of the level of "violent force" that is required by § 924(c)(3)(A). *Chrzanoski v. Ashcroft*, 327 F.3d 188, 195 (2d Cir. 2003) ("[T]he intentional causation of injury does not necessarily involve the use of force."). A carjacking could be accomplished, "not by physical force, but by guile, deception, or even deliberate omission" that leads to injury or death. *Id.* The Second Circuit has elaborated that "human experience suggests numerous examples of intentionally causing physical injury without the use of force[.]" *Id.* at 196. For example, a carjacking could be accomplished where a victim

43

is intimidated into exiting a car under conditions that would lead to injury or death such as leaving the victim stranded in a remote area like the middle of a desert or a treacherous mountain road during a blizzard. *See United States v. Gracia-Cantu*, 302 F.3d 308 (5th Cir. 2002) (injury could occur without the use of force where a child is left unattended near a pool); *see also Perez-Vargas*, 414 F.3d at 1286 (several examples exist of assault that would not use or threaten the use of physical force, such as, "intentionally placing a barrier in front of a car causing an accident"). Carjacking can be accomplished without strong physical force as well as without intentional strong, physical force and, therefore, it is not a crime of violence under § 924(c)(3)(A).

Carjacking does not constitute a valid "crime of violence" and therefore, Sanchez's § 924 convictions and sentences should be vacated under the retroactive rule in *Johnson*, *supra*.

### G. Mr. Sanchez's § 924 convictions and sentences are unconstitutional because the jury instructions removed the required finding of a crime of violence from the jury, and counsel was ineffective for not raising this issue on direct appeal.[33]

The trial court instructed the jury that carjacking "is in fact classified under the law as a crime of violence" for purposes of 18 U.S.C. § 924. CR-ECF No.[766:7080]; No.[771:7536]. As set forth above, that was erroneous under *Johnson*.[34] There is, however, an alternative

---

[33] As originally pled, the factual basis of this section addressed instructions to the jury that: (1) the drug conspiracy in Count 1, as a matter of law, constitutes a drug trafficking crime; (2) the carjacking in Count 6, as a matter of law, constitutes a crime of violence; and (3) the jury was to find that during either the drug trafficking crime or the crime of violence: (a) Sanchez knowingly carried or used a firearm; and (b) there was a killing with malice aforethought or premeditation. CV-ECF No.[16-1:26 of 195]. This amended subsection states a claim that is tied to this common core of operative facts and, therefore, relation back will be in order. *Mayle v. Felix*, 545 U.S. at 664. The facts about the jury instructions that were originally pled in this subsection are retained and therefore they differ in neither type nor time from the original claim, Claim II(C); indeed, they "unite the original claim and the newly asserted claim" so that relation-back is warranted. *Schirle v. Sokudo USA, L.L.C.*, 484 F. App'x 893, 901 (5th Cir. 2012) (citing *Mayle*, 545 U. S. at 659).
[34] This claim argues that the categorical approach cannot be used under § 924(c)(3), *Johnson*, *supra*, and that the determination of a "crime of violence" must be made by a jury.

44

constitutional issue presented by this jury instruction because it directed a verdict on an element of the offense. *United States v. Hastie*, 854 F.3d 1298, 1306 (11th Cir. 2017) (explaining it is the judge's duty to instruct jurors on a definition but whether that definition applies in the case is a jury question). In other words, it removed a specific finding—that Sanchez committed a crime of violence—from the jury. *Jones v. United States*, 526 U.S. 227, 232-33 (1999) (Due Process and the Sixth Amendment mandate that provisions in a criminal statute which establish higher penalties constitute additional elements of the offense that must be found, not by a judge, but by a jury); *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

In *Jones*, the Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 242-23 n.6. In this case, the elements of § 924(c) as well as the elements of murder in § 1111 were not only required for conviction but necessary to subject Sanchez to a death sentence. 18 U.S.C. § 924(j)(1). Section 924(c) requires a finding that a firearm was used or carried, or possessed in furtherance of, a crime of violence or a drug trafficking crime. Although Congress enumerated the offenses which constitute a "drug trafficking crime,"[35] the offenses which constitute a "crime of violence" are not enumerated. Instead, the definition of "crime of violence" is set out in § 924(c)(3).

Here, the trial judge determined that carjacking qualified as a crime of violence and instructed the jury no less than six times that carjacking is *as a matter of law* a crime of violence.

---

[35] Section 924(c)(2) provides that drug trafficking crimes are felonies listed under 21 U.S.C. § 801 *et. seq.* and § 951 *et. seq.*

CR-ECF No.[771:7536-44]. Regarding all the elements of Counts 7 through 10, the jury was instructed:

> Number one, that the Defendant committed the crime of violence which is set out in Count 6, or the drug trafficking crime charged in Count 1.
>
> And two, that during the commission of either or both of those offenses, that the Defendant knowingly carried or used a firearm during and in relation to the crime of violence and/or the drug trafficking crime.
>
> And three, that in the course of using the firearm, the Defendant caused the death of the person described in the particular count of the indictment.
>
> And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense or the killing resulted from the perpetration of or attempted perpetration of the crime of violence alleged in Count 6.

CR-ECF No.[771:7537]. The finding that carjacking was a crime of violence constitutes an element of the offense as well as a fact that increases the penalty for the crime and it should have been submitted to the jury and proved beyond a reasonable doubt. *Jones*, *supra*, and *Apprendi*, *supra*. This error invalidates Sanchez's § 924 convictions and also, because the crime-of-violence element was not found by a jury, the sentences are clearly unconstitutional. *See Ring v. Arizona*, 536 U.S. 584, 609 (2002); *Hurst v. Florida*, __ U.S. __, 136 S. Ct. 616, 622, 624 (2016) (the Sixth Amendment requires *all* critical findings in support of a sentence of death to be based on a jury's verdict, not a judge's finding).

At the time of Sanchez's trial and direct appeal, established law required a jury—not a judge—to find all elements of the offense and all elements necessary to impose the sentence. In addition to *Jones* and *Apprendi*, for example, the Supreme Court had held in *Blakely v. Washington*, 542 U.S. 296 (2004): "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment and the judge exceeds his proper authority." *Blakely*, 542 U.S. at 303-04 (internal

46

quotation marks and citation omitted); *see also Rita v. United States*, 551 U.S. 338, 386 (2007) (Souter, J., dissenting) ("[I]n prosecutions under these statutory schemes the most serious issue in the case might well be not guilt or innocence of the basic offense, but liability to the substantially enhanced penalty.").[36] Although trial counsel failed to object to the judge's finding that carjacking is a crime of violence and to the jury instruction that carjacking is a crime of violence, the error should have been raised on appeal because it seriously affects the fairness, integrity or public reputation of judicial proceedings.

Here, the plain error doctrine is satisfied because: (a) it was error for the judge—not the jury—to find an element (crime of violence); (b) Sanchez was prejudiced by this finding because it supported the convictions under § 924(c) and the increased sentence under § 924(j); and (c) the increased sentence was actually imposed for Counts 7 and 8.[37] *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (discussing the plain error test under Fed. R. Crim. P. 52(b)). Finally, the plain error seriously affected the fairness of judicial proceedings because counsel's failure to raise the issue on direct appeal deprived the court of appeals of the opportunity to decide the impact of the error on the fairness of the trial which, in turn, deprived Sanchez of meaningful

---

[36] Recently, in *Alleyne v. United States*, ___ U.S. ___, 133 S. Ct. 2151, 2162-63 (2013), the Supreme Court, in explaining the reasoning in *Apprendi*, stated, "the core crime and the fact triggering the mandatory minimum sentence together constitute a new, aggravated crime, each element of which must be submitted to the jury." *Id.* at 2161. The Court made it clear: "The essential point is that the aggravating fact produced a higher range, which, in turn, conclusively indicates that the fact is an element of a distinct and aggravated crime. It must, therefore, be submitted to the jury and found beyond a reasonable doubt." *Id.* at 2162-63; *see also id.* at 2162 ("[T]he essential Sixth Amendment inquiry is whether a fact is an element of the crime.").

[37] The sentencing range for Counts 9 and 10 were increased to include imprisonment for life. § 924(j)(1). No practical sentencing remedy exists for these counts because Sanchez also received consecutive life sentences for Count 1 (drug conspiracy) and Count 6 (carjacking), as well as a consecutive term of 60 years. The convictions on Counts 9 and 10, however, should be vacated.

47

appellate review. "An error of this magnitude clearly satisfies the two-part test of *Strickland*."
*Guzman*, 277 F. Supp. 2d at 264.

Trial counsel and direct appeal counsel rendered ineffective assistance for not objecting to the jury instructions at the time of trial and not raising this error before the court of appeals, respectively. *Guzman v. United States*, 277 F. Supp. 2d 255, 262- 64 (S.D.N.Y. 2003), *aff'd*, 112 F. Appx. 766 (2d Cir. 2004) (finding appellate counsel ineffective for not raising an *Apprendi* issue on direct appeal because it constitutes plain error). The presumption of effective appellate assistance generally can be overcome when ignored issues are stronger than those presented. *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Appellate counsel raised thirteen issues but the Eleventh Circuit addressed only three,[38] stating, "we find no merit to the majority of these arguments and accordingly have no need to discuss them[.]" *Troya*, 733 F.3d at 1129. The court of appeals did not dismiss the nine claims as "frivolous" but it made clear that they were so weak as to not warrant any discussion. Counsel's failure to protect Sanchez's rights by raising the *Jones/Apprendi* claim that constitutes plain error fell below an objective standard of reasonableness and, as a result, confidence in the outcome is undermined. *Strickland*, 466 U.S. at 688, 694.

Sanchez's rights to a jury and to due process were violated when the judge—not the jury—found the existence of the crime of violence element. He should, therefore, be relieved of his unconstitutional § 924 convictions and death sentences.

---

[38] The court of appeals grouped Sanchez's Claims 4 and 5, as well as, Claims 7 and 13 together as Issues 4 and 12, respectively. *Troya*, 733 F.3d at 1129. The issues discussed by the court were evidentiary rulings by the trial court regarding: (1) uncharged acts of misconduct involving firearms and drug trafficking; and (2) the admission of testimony from the Government's psychologist. *Troya*, 733 F.3d at 1130 & 1138.

48

**III.      Ricardo Sanchez is ineligible for the punishment of death pursuant to the Constitution of the United States and other federal law.**[39]

Ricardo Sanchez is intellectually disabled, making him categorically ineligible for the punishment of death pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002), *Hall v. Florida*, 134 S. Ct. 1986 (2014), *Brumfield v. Cain*, 135 S. Ct. 2269 (2015), *Moore v. Texas*, 137 S. Ct. 1039 (2017), and 18 U.S.C. § 3596(c).[40]

In *Atkins v. Virginia*, 536 U.S. 304 (2002), the Supreme Court held that the execution of a person with intellectual disability would constitute cruel and unusual punishment prohibited by the Eighth Amendment. The *Atkins* Court cited two organizations for their definitions of mental retardation—the American Association on Mental Retardation (AAMR),[41] and the American

---

[39] This claim's presentation is reorganized, brief discussions of law are included to clarify entitlement to relief, citations to the previously submitted appendices are added to existing facts, and more detail to the basic facts from the original claim is provided. Any and all changes relate to the common core of facts supporting the original claim that Sanchez, before the age of 18, exhibited significant intellectual and adaptive deficits. CV-ECF No.[16-1:27-45 of 195].

[40] In *Atkins*, the Supreme Court used the term "mental retardation," which was then in use in the clinical community to describe individuals who are now designated as "intellectually disabled." The federal statute prohibiting the execution of these individuals also uses the term "mentally retarded." 18 U.S.C. § 3596(c). Subsequent to the *Atkins* decision, the mental health community engaged in a shift of terminology away from "mental retardation" to the use of "intellectual disability." The term intellectual disability, "covers the same population of individuals who were diagnosed previously with mental retardation in number, kind, level, type, and duration of the disability and the need of people with this disability for individualized services and supports. Furthermore, every individual who is or was eligible for a diagnosis of mental retardation is eligible for a diagnosis of intellectual disability." Robert L. Schalock, *et.al.*, *The Renaming of Mental Retardation: Understanding the Change to the Term Intellectual Disability*, 45 Intell. & Dev. Disabilities 116 (April 2007); *AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support*, 11th Ed. (2010) at xvi, 3 ("AAIDD Manual"). In *Hall v. Florida*, 134 S. Ct. 1986 (2014), the Supreme Court adopted the term "intellectual disability," noting that "[t]his change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders." *Hall*, 134 S. Ct. at 1990. Accordingly, the terms "mental retardation" and "intellectual disability" are interchangeable; intellectual disability will be the preferred term used in Sanchez's pleadings.

[41] Consistent with the medical community's shift in terminology, the AAMR changed its name to the American Association on Intellectual and Developmental Disabilities (AAIDD). The AAIDD defines intellectual disability as characterized by "significant limitations both in intellectual

Psychiatric Association (APA)[42]—and noted that their definitions were "similar."[43] *Atkins*, 536

U.S. at 308 n.3. Intellectual disability is a developmental disability, meaning it manifests during

the developmental period and, by any definition, before age eighteen. Persons with intellectual

disability have significant limitations in intellectual and adaptive functioning. *Hall*, 134 S. Ct. at

1994 (discussing how to assess intellectual disability).

The Supreme Court explained in *Atkins*, *supra*, why persons with intellectual disability

have reduced personal responsibility and moral guilt, thus making death a disproportionate

punishment. *Atkins*, 536 U.S. at 312-13 (explaining why the death penalty did not further the

goal of retribution in *Enmund v. Florida*, 458 U.S. 782, 801 (1982)); *see also id.* at 319 ("If the

culpability of the average murderer is insufficient to justify the most extreme sanction available

to the State, the lesser culpability of the mentally retarded offender surely does not merit that

form of retribution."). As set forth by the *Atkins* Court:

---

functioning and in adaptive behavior as expressed in conceptual, social, and practical skills," originating before age eighteen. AAIDD Manual at 5. Under the AAIDD standard, an individual must have significant limitations in one of the three domains—conceptual skills, social skills, and practical skills—to be diagnosed as intellectually disabled. AAIDD Manual at 47.

[42] The Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (2013) (DSM-5) of the American Psychiatric Association criteria for identifying intellectual disability are: (a) deficits in intellectual functioning, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing; (b) deficits in adaptive functioning that result in failure to meet developmental and sociocultural standards for personal independence and social responsibility in at least one or more activities of daily life such as communication, social participation, and independent living, across multiple environments; and (c) onset of intellectual and adaptive deficits during the developmental period. DSM-5 at 33.

[43] Intellectual disability is a heterogeneous condition with multiple causes and may coexist in the presence of diagnosable mental illness. DSM-5 at 38. "Co-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions (*e.g.*, mental disorders, cerebral palsy, and epilepsy) three to four times higher than in the general population." DSM-5 at 40. Whether or not comorbid conditions are present, "[t]he diagnosis of intellectual disability should be made whenever Criteria A, B, and C are met." DSM-5 at 39. *See also Brumfield*, 135 S. Ct. at 2280.

> [Intellectually disabled] persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Atkins*, 536 U.S. at 318 (footnotes omitted).

Continuing, the Court explained: "it is the same cognitive and behavioral impairments that make these defendants less morally culpable," that also undermine any deterrence rationale for the death penalty. *Id.* at 320.

> [F]or example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses − … also make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Id.* at 320. This "behavior of mentally retarded offenders" places them "at the opposite end of the spectrum from behavior of" persons with the ability to coldly calculate a decision to murder. *Id.* at 319-20.

The Supreme Court also recognized that "[t]he reduced capacity of mentally retarded offenders" increases the risk "of wrongful execution." *Id.* at 320, 321. This is because "[m]entally retarded defendants may be less able to give meaningful assistance to their counsel and are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse for their crimes." *Id.* at 320-21. *See also Hall*, 134 S. Ct. at 1993 ("A further reason for not imposing the death penalty on a person who is intellectually disabled is to protect the integrity of the trial process.").

51

For these reasons, among others, the Court concluded that the death penalty is an excessive punishment for persons with intellectual disability. *Atkins*, 536 U.S. at 321. Sanchez has a proven, documented and consistent history of intellectual and adaptive functioning deficits that preceded the age of eighteen, existed at the time of the crime, continue at present, and place him within recognized norms for a diagnosis of intellectual disability.

### A. Intellectual deficits.

Mindful of the admonition in *Hall*, 134 S. Ct. at 2001, that "[i]ntellectual disability is a condition, not a number[,]" the evidence shows Sanchez has significant limitations in intellectual functioning. Sanchez's performance on intelligence testing consistently places him at or near two standard deviations below the mean.[44] A person with an IQ score above 70, however, may still qualify as intellectually disabled. *Id.* at 1998-2001. One reason is because IQ scores are, on their own terms, imprecise and should be read not as a single fixed number but as a range.[45] *Hall*, 134 S. Ct. at 1995. "[T]he assessment of intellectual functioning through the primary reliance on IQ tests must be tempered with attention to possible errors in measurement." *Brumfield*, 135 S. Ct. at 2277 (quotation and citation omitted); *Moore*, 137 S. Ct. at 1049 (where an IQ score is close to, but above, 70, courts must account for the test's standard error of measurement). In all four of its decisions applying the Eighth Amendment ban on cruel and unusual punishments to persons with intellectual disability—*Atkins*, *Hall*, *Brumfield* and *Moore*—the Supreme Court has discussed how and why "any IQ test score has a margin of error" that must be considered.

---

[44] "The standard deviation on an IQ test is approximately 15 points, and so two standard deviations is approximately 30 points. Thus a test taker who performs 'two or more standard deviations from the mean' will score approximately 30 points below the mean on an IQ test, *i.e.*, a score of approximately 70 points." *Hall*, 134 S. Ct. at 1994.

[45] The second reason is that the determination of intellectual disability is a conjunctive and interrelated assessment and it is not sound to view a single factor as dispositive. *Hall*, 134 S. Ct. at 2001.

*Brumfield*, 135 S. Ct. at 2278 (citation and quotation omitted); *Atkins*, 536 U.S. at 309 n.5; *Hall*, 134 S. Ct. at 1998-2000; *Moore*, 137 S. Ct. at 1049. Taking into account the standard error of measurement ("SEM:" the accepted 95% confidence interval, at ±5), this typically requires a full scale score at or below 75.[46] *Atkins*, 536 U.S. at 309 n.5. Illustrating these principles is the decision in *Brumfield*, 135 S. Ct. at 2277-78, where the Supreme Court determined that an IQ score of 75 was "entirely consistent with intellectual disability." *See also Hall*, *supra* (the Eighth Amendment cannot condone a strict cut-off score at 70 and, therefore, an IQ score of 71 may support an intellectual disability diagnosis).

In *Brumfield*, 135 S. Ct. at 2277, the Court warned that "an IQ test result cannot be assessed in a vacuum." Approving language from the state court's definition of intellectual disability, the Court repeated: "any IQ test score has a margin of error and is only a factor in assessing mental retardation." *Id.* at 2278 (quotation and citation omitted). Applying this rule to Brumfield the Supreme Court found significant that, along with an IQ score of 75, Brumfield had a fourth-grade reading level, had been identified as having a learning disability, and had been placed in special education classes.[47] *Id.* at 2279-80. The combination of these facts entitled the defendant to a hearing on intellectual disability and, because the state court had refused to grant one and thereafter engaged in unreasonable fact finding, the case was reversed.

Similarly, in *Moore*, 137 S. Ct. at 1047, there had been seven appraisals of the defendant's IQ, two of which—scores of 78 and 74—were considered by the courts.

---

[46] The federal statute, 18 U.S.C. § 3596(c) does not define intellectual disability. In *Atkins*, 536 U.S. at 317, the Supreme Court relied heavily upon the medical community's definition of intellectual disability but left to the States the task of developing a test for determining which offenders are intellectually disabled. In *Hall v. Florida*, 134 S. Ct. at 1993, the Court held under the Eighth Amendment that when "determining who qualifies as intellectually disabled, it is proper to consult the medical community's opinions."

[47] Also, Brumfield had been prescribed medications and treated at psychiatric hospitals as a child.

Recognizing that Moore's score of 74, when adjusted for the standard error of measurement, yields a range of 69 to 79, the Supreme Court stated: "Because the lower end of Moore's score range falls at or below 70, the [lower court] had to move on to consider Moore's adaptive functioning." *Id.* at 1049. The lower court's failure "to adequately inform" its analysis of "the 'medical community's diagnostic framework,'" required a reversal. *Id.* at 1053 (quoting *Hall*, 134 S. Ct. at 2000).

### 1.  Sanchez's limited intellectual functioning.[48]

Multiple risk factors for brain impairment are present in Sanchez's life history. "It is well established that an individual's intellectual and cognitive functioning are influenced by his or her genetic background and environment."[49] CV-ECF No.[33-8:178 of 194, ¶21] (Dr. Crosby); No.[33-8:136 of 194, ¶16] (Dr. Kraus) ("A family history of psychiatric disorders or other brain dysfunction is a risk factor that may increase the likelihood that an individual develops such a disorder."). Ricardo Sanchez, Jr. is the third of four children born to Ricardo Sanchez, Sr. and Juana Maria Jiménez. Sanchez's father has an IQ score of 67 and his mother has an IQ score of 76.[50] CR-ECF No.[824:8463-64]. Sanchez's eldest brother, Efrain, has been diagnosed with intellectual disability (IQ score of 62) as well as a severe seizure disorder that has been only poorly controlled with medication. Efrain also demonstrates bizarre behavior. CR-ECF

---

[48] The original § 2255 Motion discusses facts from Sanchez's childhood and his educational records. *See, e.g.*, CV-ECF No.[16-1:34-41 of 195]. Those records along with declarations from experts, teachers, family, and friends constitute the majority of the Appendices filed in this case. *See* CV-ECF No.[33-1 *et. seq.*]; No.[52-1] and Appx at A-001805-82. This amendment reorganizes and includes an expanded discussion of facts originally presented. It also provides record citations to those facts.

[49] "[A]n individual whose caregivers are mentally ill or cognitively impaired, or who has siblings with mental illness or brain impairment, often suffers because the parents are ill-equipped or too overwhelmed to meet the physical and emotional needs of the developing child." CV-ECF No.[33-8:136 of 194, ¶16] (Dr. Kraus).

[50] These numbers are not adjusted for testing error (SEM) or norm obsolescence.

No.[824:271] (Dr. Waddell); CV-ECF No.[33-8:137 of 194, ¶18] (Dr. Kraus); No.[33-9:10-11 of 156, ¶44]. (Dr. James). Younger brother Ezequiel has been diagnosed with a learning disability and, like Sanchez, received special education services throughout his school career.

### a. Genetic and environmental risk factors for intellectual disability.

From the time she was a young girl, Sanchez's mother Juana was shy and timid and required protection by her younger sister. CV-ECF No.[33-8:136 of 194, ¶17] (Dr. Kraus); No.[52-1:84 of 112, ¶11] (Hernandez, E). At the age of nine, Juana began working in the fields with her mother. CV-ECF No.[52-1:89 of 112, ¶4] (Sanchez, J). Juana's childhood was filled with physical, sexual and emotional abuse. CV-ECF No.[52-1:88 of 112, ¶¶3, 5] (Sanchez, J); No.[52-1:82-84 of 112, ¶¶3-5, 8-11] (Hernandez, E).

Sanchez's father, Ricardo Sr., had difficulty in school and did not attend beyond elementary school. CV-ECF No.[33-8:136 of 194, ¶17] (Dr. Kraus). As a child, Sanchez's father:

> had a quick, hot temper. He was aggressive and rebellious and did not get along with other children. As an adult, Sanchez's father engaged in violent behavior toward his family members and others in the community. He also exhibited odd, impulsive, and compulsive behaviors, including driving erratically in circles in front of his home. Sanchez's father's impairments may have been caused or exacerbated by his exposure as a child to physical contact from pesticides sprayed upon him by crop dusting planes that flew over fields near his home as well as his exposure to pesticides when he worked in the fields as an adolescent and young adult. His impairments may also have been intensified by a severe head injury he suffered in 1991, when Sanchez was eight years old. On that occasion, Sanchez's father was struck in the head with the top of a barrel that flew off when the barrel exploded; the impact drove Sanchez's father backward a number of feet. Following this accident, Sanchez's father became yet more violent.

CV-ECF No.[33-8:136 of 194, ¶17] (Dr. Kraus); *see also* No.[33-9:10-11 of 156, ¶44]. (Dr. James).

Evidence of mental illness as well as drug and alcohol abuse is also present among Sanchez's extended family members. *See* CV-ECF No.[33-8:136 of 194, ¶19] (Dr. Kraus); No.[52-1:89 of 112, ¶5] (Sanchez, J); *see also* Claim VIII(E), *infra*.

> **b. Early childhood factors affecting Sanchez's intelligence and observed behaviors signaling low intellectual functioning.**

When Sanchez's mother was pregnant, Sanchez's father did not abate the emotional and physical abuse he inflicted on his wife. This trauma likely impaired Sanchez's development, in particular, the development of the fetal brain. During Juana's pregnancy with Sanchez she did not have much prenatal care. She had an infection near the end of her pregnancy that was not properly treated. Juana—and the entire family, including Sanchez in utero, as an infant and as a small child—were exposed to neurotoxins from pesticides that were sprayed on the fields where her husband and other relatives worked. The chemical "dust" was brought into the Sanchez home on their clothing. Sanchez's birth was different from his siblings; instead of Juana's water breaking she began bleeding. CV-ECF No.[33-5:4, 36 of 107] (Juana Sanchez medical records); No.[33-8:138, 139 of 194, ¶¶22, 23] (Dr. Kraus); No.[52-1:93 of 112, ¶16]; No.[33-9:10 of 156, ¶¶43, 45, 46] (Dr. James); No.[52-1:90 of 112, ¶8] (Sanchez, J).

Sanchez was a sickly child who was hospitalized for pneumonia a few times. He was also allergic to many things. After contact with something he would break out in a rash or have breathing problems. His mother rushed him to the emergency room on occasions when he could not breathe. At 2 ½ years old, Sanchez took about 18 pills of his brother's seizure medication and was in a coma for 12 hours. One childhood head injury, occurring when Sanchez was less than five years old, was a fall where he split his head open and required several stiches or staples to

close the wound. CV-ECF No.[33-5:63 of 107] (sheriff report); No.[52-1:94-95 of 112, ¶¶21, 22].[51]

Sanchez's father inflicted physical violence on all family members. Witnessing such trauma on his family members and being the target of abuse likely changed the biology of Sanchez's brain. Such changes in the stress-response system increases the risk of negative outcomes following stressors later in life. It also causes the secretion of increased amounts of cortisol that can be neurotoxic to areas of the brain including the hippocampus (which processes memory) and the pre-frontal cortex (which processes attention and executive function). CV-ECF No.[33-8:139-41 of 194, ¶¶24-29] (Dr. Kraus).

Sanchez's mother did not attend to his needs as she was consumed with the needs of Efrain and his severe seizure disorder. The effect of neglect includes failure to thrive, physical illness, injury due to lack of supervision or guidance, low self-esteem and cognitive and psychiatric impairment. CV-ECF No.[33-8:141-42 of 194, ¶¶30-31] (Dr. Kraus).

Sanchez exhibited development delays early in childhood. He didn't talk and engage in conversational speech until much later in childhood. He was a very quiet child and rarely spoke, but smiled often. He was meek and timid and only asked "basic questions" and "was not a curious child." He did not make independent decisions but rather followed his brothers and sisters around, doing what they did and trying to do what they instructed him. Sanchez's mother observes that he seemed to be the most intellectually slow of her children. Compared to younger brother Ezequiel, who was also placed in special education classes, Sanchez was slower. Sanchez tried to obey directions at home but often had to be asked more than once. He seemed to forget

---

[51] Juana Sanchez remembers Ricardo's age as three but the date of the police report on the overdose incident indicates he was 2 ½ years old.

what he had been asked to do and then he would need help doing it. Sometimes Sanchez seemed to be in another world, did not respond immediately, and was often blank or dazed. CV-ECF No.[33-5:67, 80 of 107]; No.[52-1:95, 96-97 of 112, ¶¶24- 25, 29-31]; No.[33-9:11-12 of 156, ¶¶47-49] (Dr. James). The symptom or appearance of being "dazed" is common in individuals with very low cognitive abilities and intellectual functioning. It is also a common symptom in individuals with mild seizure activity. CV-ECF No.[33-8:177-78 of 194, ¶20]; Appx at A-001814, Hernandez Declaration p.10. [52]

When Sanchez began kindergarten, his developmental delays were obvious; he displayed "youngness in all areas of development." After an assessment for special education services Sanchez did not make meaningful progress in over ten years that followed and despite several accommodations. He did not did not graduate high school. He failed both ninth and tenth grades, and "made only very minimal progress in school" despite the fact that he had attended a Head Start program and was in full-time special education classes from the time he was in elementary school. "This lack of progress is consistent with Ricardo's very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well." CV-ECF No.[33-8:47-48 of 194, ¶11] (Wolfe); No.[33-8:67 of 194, ¶5] (Silverman); No.[33-8:110 of 194, ¶3] (Replogle); No.[33-8:145 of 194, ¶40] (Dr. Kraus); No.[33-9:12 of 156, ¶50] (Dr. James).

### c. Early and elementary education

Sanchez began kindergarten when he was six years old, making him one of the older students in his class. CV-ECF No.[33-8:46 of 194, ¶5]. Although he had attended a Head Start program, in October 1989, immediately after entering kindergarten, Sanchez's teacher observed

---

[52] The declaration of Rene Hernandez-Cardenache, Psy.D., addresses the same subject matter as the other expert declarations and expands upon Sanchez's deficiencies, including a formal assessment of Sanchez's adaptive deficits.

he had "difficulty understanding and expressing himself" and needed "a great deal of help completing his work correctly." He was described as "distractible" and "at times needs to be isolated to do his work." The kindergarten teacher attributed Sanchez's difficulties to an English/Spanish language problem and he was assigned to receive services through the English for Speakers of Other Languages (ESOL) program. CV-ECF No.[33-8:121 of 194, ¶11]; No.[52-1:96 of 112, ¶28]; No.[33-5:64 of 107]; No.[33-5:66 of 107]; No.[33-9:12 of 156, ¶50].

In November 1990, Sanchez's first-grade teacher reported: "Ricardo exhibits developmental youngness in all areas of development. He is unable to stay on task even for short periods of time. He cannot work independently and consistently disrupts the class and students around him." For example, she stated, "During reading group, Ricardo was distracted and was unable to follow directions." CV-ECF No.[33-5:65 of 107]; No.[ 33-9:13 of 156, ¶51] (James).

In October 1991, Sanchez's second-grade ESOL teacher reported that he was unable to work independently. "The only work that Ricardo completes is when somebody guides him in working the problems (math), sees that he finishes his writing assignments, and helps him with his reading workbook. When left alone, he will not do anything." She further noted his apparent inability to make progress: "Even though he has drilled the vocabulary words for levels 3-5 many times, he has not learned many of them." CV-ECF No.[33-5:66 of 107]; No.[33-9:13 of 156, ¶¶52-53] (Dr. James).

In the spring of his second-grade year Sanchez was referred for a psycho-educational evaluation because, despite interventions, "he continues to display minimal progress." He "has had difficulty with behavior and academics since kindergarten." School staff and teachers agreed that English is his predominant language. His ESOL teachers felt that Sanchez "knows English pretty well" but, after two years, he was still at the first level of the program. The second grade

59

teacher observed, "Ricardo seems to have a difficult time comprehending instructions. He seems to need constant attention while working, and is reluctant to work independently." CV-ECF No.[33-5:67, 80, 84 of 107]. Test results from the evaluation when Sanchez was eight years old are discussed below.

In third grade, the school-based speech and language pathologist determined that language competency was not the root cause of Sanchez's academic difficulties. It was determined that Sanchez has specific learning disabilities (S.L.D.) with speech and language impairments. Specifically, Sanchez "has a psychological processing disorder in visual and auditory immediate sequential memory." He also has extreme difficulty concentrating. The school dismissed Sanchez from ESOL services, placed him in E.S.E. (Exceptional Student Education) curriculum and allowed testing modifications as needed. CV-ECF No.[33-5:73-74, 85, 87, 89, 91-92, 93 of 107]. Thereafter, Sanchez spent the majority of the school day outside the regular third grade classroom receiving special education services. Only those few students with very significant needs spent that much time apart from a regular classroom. CV-ECF No.[33-8:112-13 of 194, ¶8; 125 of 194, ¶5].

In May 1994, at the end of fourth grade, an individual education plan (I.E.P.) stated: "Ricardo appears eager to learn. However he continues to experience difficulty in all academic areas." The stated goal had been to perform at a first grade level in language arts and a third grade level in math. CV-ECF No.[33-5:107 of 107].

Beginning fifth grade, his teacher noted that Sanchez "makes an effort to learn but is still having difficulties in all academic areas." He is "[c]onstantly late to school." His teacher noted that Sanchez "is frequently off-task and forgets to hand in work." One goal for the year was for Sanchez to have a homework folder, take homework assignments home nightly and bring

completed homework back to school. Education modifications still included test modifications, but added small groups and shorter assignments. Near the year's end, the ESE teacher commented: "While Ricardo['s] scores have increased, there is still a significant need for full-time SLD services this year and into middle school." His reading in class was very weak (at the middle of first grade) while his math was about 1 year behind (with assistance and modifications). A new modification was added: "All directions and non-reading items to be read aloud." CV-ECF No.[33-6:4, 6, 10, 12, 18, 19, 21, 22, 23 of 125].

### d. Middle school

In March 1996, Sanchez's sixth-grade teacher reported that he enjoys interacting with his peers but "frequently displays little or no tact while communicating … as well as using inappropriate statements about peers [with no] apparent concern of the damage it may cause him or others." Goals and objectives were to develop and use task-related skills and interpersonal skills where he exercises verbal self-control. Based on his low math, language and reading skills, modifications to his educational plan exempted him from basic skills testing. "Very few students who qualified for special education services as learning disabled were exempted from the standardized testing; only those whose intellectual and cognitive functioning was very low and those who would have experienced extreme frustration were exempted." In sixth grade he received 5 "Ds" and 4 "Fs." His grades the following year were 1 "B," 2 "Cs," 2 "Ds," and 2 "Fs." CV-ECF No.[33-6:28, 29 of 125]; No.[33-7:4 of 60]; No.[33-8:127 of 194, ¶10].

In his eighth-grade year, 1998, Sanchez was characterized as a "generally cooperative student who attempts most tasks. However, he shows difficulty in written and oral expression." Sanchez required direct, specialized instructions and curriculum as well as assistance for the majority of learning activities. He also required weekly small group training in social skills, self-regulatory behavior, self-advocacy, conflict resolution, dealing with authority and socialization.

61

He needed assistance in organizational strategies or adaptations for independent functioning. Objectives were established for Sanchez to bring necessary supplies to class, begin tasks within five minutes after the class bell, remain on task, understand and properly use vocabulary, spell, read and write complete sentences with capitalization and punctuation. "The need to set such elementary objectives with Ricardo when he was 14 years old … shows that his impairments were significant[.]" CV-ECF No.[33-8:55 of 194, ¶6]. His grades were 2 "Bs," 2 "Cs," 1 "D," and 2 "Fs." It was determined that Sanchez would "participate with disabled students" in all academic classes. CV-ECF No.[33-6:34-36, 59-63 of 125]; No.[33-7:5 of 60 of 60].

### e. High school

Sanchez attended two years of ninth grade and two years of tenth grade. He was promoted to the tenth grade even though he did not achieve the required 2.0 grade point average because of a change in Florida's education procedures in 2000. CV-ECF No.[33-8:56 of 194, ¶9]. Due to his "limited cognitive ability" he continued to participate "with disabled students" in all academic classes and some elective classes. CV-ECF No.[33-6:47, 70 of 125]. It was determined that, even with accommodations, Sanchez did not demonstrate the cognitive ability or adaptive behavior that would allow him to meet State standards and he was exempted from statewide testing. CV-ECF No.[33-6:47, 70, 89, 96 of 125]. This demonstrates that Sanchez had difficulties separate and apart from a learning disability; he had extremely limited cognitive capacity in the first instance. CV-ECF No.[33-8:177 of 194, ¶18].

He required direct, specialized instruction and curriculum, as well as assistance for the majority of learning activities, including extensive direct academic instruction. He had difficulty completing tasks and needed assistance in organizational strategies or adaptations for independent functioning and independent living skills, and monthly guidance on behavior management. CV-ECF No.[33-6:51-52, 65, 76, 90 of 125].

Over the four year period of the ninth and tenth grades, Sanchez expressed a desire to become a construction worker, to join the Marines, and to be a mechanic. It was noted that he would need services to help him find a job and to fill out applications. Educators determined that his "limited reading ability effects his ability to make realistic occupational goals." He would be "in need of transition services" after high school. CV-ECF No.[33-6:42, 44, 67, 73, 87, 91 of 125].

One high school teacher observed: "Due to Ricardo's learning disability he has trouble being organized. He is hardworking, polite and cooperative." CV-ECF No.[33-6:41 of 125]. He was described as "a pleasant young man however his inability to stay focused prohibits his success." CV-ECF No.[33-6:68 of 125]. Sanchez "was not able to understand even simple directions. Multiple-step instructions were impossible for him." He could "[f]ollow classroom and school rules when focused and with many redirections; express some concerns/problems to teachers." He "has difficulty displaying appropriate behavior across settings" and "needs to practice self-control in order to focus on his academic tasks and make progress toward a special diploma." CV-ECF No.[33-6:98 of 125]; No.[33-8:67 of 194, ¶3]. "Instructional objectives included demonstrating good decision making skills when presented with and developing strategies for resolving conflicts." CV-ECF No.[33-8:59 of 194, ¶15]. A special education teacher observed that, although Sanchez's IQ was measured at 80 when he was in second grade, "he seemed to be intellectually disabled." Several times Sanchez said, "I want to learn how to read, but I can't. Why can't I learn how to read? Can you help?" CV-ECF No.[33-8:67 of 194, ¶3].

During his tenth-grade years, Sanchez was reading at a low third grade level. He could solve simple math equations at the fourth grade level, tell time on a clock with hands, identify

63

coins and their value, make change and add the price of up to four items using a calculator. He could write some information on a personal data sheet and address an envelope. CV-ECF No.[33-6:84 of 125]. This is "a very low level of achievement[.]" Sanchez had "significant processing deficits which … resulted in his reading and performing mathematical tasks far below grade level." CV-ECF No.[33-8:58-59 of 194, ¶¶13, 15]. Sanchez left school at age 19, ranking tenth out of a class of twelve and had a cumulative GPA of 1.10. CV-ECF No.[33-7:8 of 60].

The following year, 2002-2003, Sanchez attended an Adult Education Program which was designed to assist students to prepare and take the GED test. "[T]he program was not appropriate for Ricardo because he did not have the cognitive ability or skills to pass the GED." CV-ECF No.[33-8:60 of 194, ¶17; 68-69 of 194, ¶7].

Five years later, when tested by the Government's expert, Sanchez's reading ability measured at the fourth grade level. CR-ECF No.[846:9310].

### 2. Sanchez's test scores[53]

Sanchez's performance on intelligence testing consistently places him at two standard deviations below the mean. Sanchez's four most valid IQ scores—at 95% confidence interval ranges—include scores that are within five points (plus or minus) of 70, and meet prong one of an intellectual disability diagnosis. Three IQ score ranges include scores that are within the 71-75 zone. One IQ score range includes scores within the 65-70 zone. Kevin S. McGrew, Ph.D., states, "it is my scientific and professional opinion that there is sufficient reasonable and reliable evidence that Sanchez is a person who has IQ scores that consistently fall within the range of

---

[53] The original § 2255 Motion discusses results of clinical and expert assessments of Sanchez's intellectual functioning, beginning in early childhood. *See, e.g.*, CV-ECF No.[16-1:30-34 of 195, ¶¶90-107]. Supporting records and expert declarations were filed in the Appendices, and are cited herein. *See* CV-ECF No.[33-1 *et. seq.*] No.[52-1].

scores specified for prong 1 of an intellectual disability diagnosis." Appx at A-001844, A-001856, Revised McGrew Declaration p.8 ¶23, p.20.

### a. Academic testing

In April 1991, when Sanchez was 7 years, 7 months old and in first grade, he took the Comprehensive Test of Basic Skills. Sanchez received stanine scores of 1, the lowest possible score, in all domains (comprehension, vocabulary, math, and reading). On the Test of Language Development he scored a 67, more than two standard deviations below the norm, and in the impaired range of functioning. CV-ECF No.[33-8:111 of 194, ¶3; 176 of 194, ¶16]; No.[33-5:80 of 107].

In June 1992, when he was 8 years, 9 months old and in second grade, Sanchez's teachers referred him for a psycho-educational evaluation. Despite interventions and being enrolled in the English for Speakers of Other Languages program (ESOL), he displayed "minimal" academic progress and had "extreme difficulty in reading as well as other academic areas." CV-ECF No.[33-5:67 of 107]. The examination, conducted by psychologist Francis Crosby, consisted of academic achievement testing, intelligence testing, and visual-motor skills testing. The purpose of the evaluation was to determine if Sanchez would qualify for special education services; a determination dependent upon establishing a discrepancy of at least 15 points (one standard deviation) between the full scale IQ score and scores on achievement tests. CV-ECF No.[33-8:174 of 194, ¶8].

Sanchez performed below his age group on all academic achievement and visual-motor skills testing. On eight out of ten academic achievement tests, Sanchez ranked at either the 0.1 or 0.2 percentile. In mathematics; he ranked at the second percentile and 1 year-9 months below his age. His highest score was in applied problems where he ranked at 19% and 1 year-2 months

65

below his age. CV-ECF No.[33-5:69 of 107]. Visual-motor tasks were a relative strength, but he still performed below his age group by 1 years-4 months. CV-ECF No.[33-5:71 of 107].

In sixth grade, Sanchez was exempted from basic skills testing. CV-ECF No.[33-6:27-29 of 125]. In ninth grade, he was exempted from all standardized testing in high school because of his "limited cognitive ability." CV-ECF No.[33-6:70 of 125].

### b. Intelligence testing

### i. Dr. Crosby

Sanchez's second-grade evaluation included academic, visual-motor testing and intelligence testing.[54] For intelligence testing, Dr. Crosby typically chose to administer the Stanford-Binet Fourth Edition (SB-IV) to most minority students because it had more practice items on the subtests which helped students achieve a higher score, while at the same time avoided the possibility of being stigmatized as mentally retarded. CV-ECF No.[33-8:174 of 194, ¶¶8, 9]; *see also* Appx at A-001842-43, Revised McGrew Declaration pp.6-7, ¶20. He chose the SB-IV for Sanchez. The results indicated significant processing skills deficits and particular difficulty with working memory. Working memory is required for problem solving. Those who have working memory impairments often have difficulty exercising good judgment and making reasoned decisions. CV-ECF No.[33-5:71 of 107]; No.[33-8:174-75 of 194, ¶11].

The full scale IQ test score was 80, more than one standard deviation below the mean and in the low average range of intellectual functioning. CV-ECF No.[33-8:174 of 194, ¶10]; No.[33-5:71 of 107]. Dr. Crosby cautions that an IQ score that is typically considered above the intellectual disability range when a child is 8 years-9 months old does not preclude the

---

[54] Dr. Crosby's findings and declaration were discussed in the original § 2255 Motion. *See, e.g.,* CV-ECF No.[16-1:126 of 195, ¶402; 157 of 195, ¶¶506-07] and his declaration was filed in the Appendix, CV-ECF No.[33-8:172-79 of 194].

possibility that he was and is intellectually disabled. Children who are administered an IQ test before the age of ten must be retested after three years because of changes that may occur from childhood into adolescence. CV-ECF No.[33-8:175-76 of 194, ¶14]. The school system, however, did not administer follow-up testing. CV-ECF No.[33-8:177 of 194, ¶17].

### ii.    Dr. McGrew[55]

The first intelligence testing of Sanchez at the age of 8, where he obtained a full scale IQ test score of 80 on the SB-IV, equals an IQ range of 73-83. The first intelligence test administered before trial in this case, when Sanchez was 25, revealed an IQ range of 67-77. Nine months later, a second test measured his intelligence at a range of 72-82. Within three weeks, a third test resulted in an IQ range of 80-90.[56] Eight years after trial, intelligence testing indicated an IQ range of 74-84. These five ranges equate to IQ scores of 78, 72, 77, 85 and 79. In accordance with professional norms, *see also Atkins*, *supra*, *Hall*, *supra*, and *Brumfield*, *supra*, these IQ scores are associated with confidence interval scores that have already been adjusted for testing error resulting from norm obsolescence and also account for the known level of reliability/precision inherent in IQ scores (standard error of measurement). Appx at A-001840-44, Revised McGrew Declaration pp.4-8 ¶¶16-23 & Table 1 at p.5, Figure 1 at p.6.

---

[55] Dr. McGrew's findings were discussed in the original § 2255 Motion, CV-ECF No.[16-1:42 of 195, ¶¶131-32] and his initial declaration was filed in the Appendix, CV-ECF No.[33-9:24 of 156]. Dr. McGrew's revised declaration (Appx at A-001837-65) incorporates the original content and will be cited to herein.

[56] In 2008, four Weschler intelligence tests ("WAIS") were administered to Sanchez. Only three of the test administrators reported full test scores. For this reason, three IQ test scores from 2008 will be discussed herein and described in terms of first, second, and third; although the order of test administration is first, third, and fourth. The tests and months they were administered are: WAIS-III in March 2008; WAIS-III in June 2008 (complete scoring absent); WAIS-IV on December 8th; and WAIS-III on December 28th.

The fourth IQ range of 80-90 "is most likely a significant overestimate of [Sanchez's] general intelligence due to cumulative progressive error practice effects from his [three] prior 2008 … test administrations." Appx at A001839-40, A001848-51, Revised McGrew Declaration pp.3-4, ¶14, pp.12-15, ¶¶38-49. Those results constitute "an inflated and invalid estimate of Mr. Sanchez's general intelligence … and should not be considered when determining a possible diagnosis of intellectual disability." Appx at A-001843, Revised McGrew Declaration p.7, ¶21. The second administration of intelligence testing—that revealed an IQ range of 67-77 and an IQ score of 72—represents "the most accurate estimate[.]"[57] Appx at A-001840-41, Revised McGrew Declaration pp.4-5 ¶14.

Dr. McGrew concludes:

It is my expert opinion, which I provide with a reasonable degree of scientific certainty, that consistent with prevailing standards in the scientific and clinical communities, that the collective entirety of Mr. Sanchez's most valid IQ test scores (when bounded by a 95% confidence interval and when recognizing the impact of norm obsolescence and practice effects and progressive error practice effects on his IQ test scores) include score ranges that meet or approximate the two standard deviations below the mean IQ diagnostic score range for intellectual disability, such that a complete clinical evaluation, including consideration of adaptive behavior, must be made in order to determine whether he meets criteria for a diagnosis of intellectual disability.

Appx at A-001858, Revised McGrew Declaration p.22. Other experts agree. Appx at A-001880-81, Revised Grant Declaration pp.15-16, ¶40; CV-ECF No.[33-8:153 of 194, ¶64] (Dr. Kraus); [No.33-9:20 of 156, ¶¶70-73 & n.2] (Dr. James).

---

[57] For reasons also explained by Dr. McGrew, the results of the first and third administrations of intelligence testing also overestimate Sanchez's general intellectual functioning. The first IQ test taken by Sanchez when he was eight years old (an IQ range of 73-83 and IQ score of 78), although an overestimate of his functioning, remains instructive because "the fact that Mr. Sanchez's [first] IQ score is generally convergent with three of his adult Wechsler test scores provides some degree of confidence that the [first] IQ score was an adequate, yet far from perfect, indicator of Mr. Sanchez's general intelligence while in the third grade." Appx at A-001843, Revised McGrew Declaration p.7 ¶20.

### iii.    Dr. Grant

On December 8, 2008, Daniel H. Grant, Ed.D., administered the WAIS-IV to Sanchez in what was Sanchez's third round of intelligence testing that year. He did not evaluate Sanchez's level of adaptive functioning.[58] Appx at A-001837-40, Revised Grant Declaration p. 5, ¶14. In 2009, Dr. Grant testified during the penalty phase of trial that Sanchez had several neuropsychological deficits, was at the borderline range of intelligence functioning, but was not mentally retarded since his IQ test score from the December 8, 2008 WAIS-IV was above 70. CR-ECF No.[824:8442, 8444].

> Q.    What is a normal I.Q.?
>
> A.    100 is considered average.
>
> Q.    If his I.Q. is 77, where does that place Ricardo in relation to the rest of the population?
>
> A.    It places him -- if you have a normal curve, the bell curve, somebody that is retarded would be two standard deviations, and on this test stated [sic-standard] deviation is 15 points. You need to be 30 points below 100 which would be 70 if you are retarded. There are arguments about that, but for our purposes I.Q. of 70 or below.
>
> His score of 77, places him at one and two-thirds standard deviations below the mean, or sixth percentile, which means of the people that the test was normed on, 94 percent scored better than he did.

CR-ECF No.[824:8445-46]. Dr. Grant said the full scale IQ test score of Sanchez at age eight (of "80, 81") "is right at the cut, between low average range and borderline range of intelligence."

CR-ECF No.[824:8461].

---

[58] Dr. Grant's findings and declaration were discussed in the original § 2255 Motion. *See, e.g.,* CV-ECF No.[16-1:132 of 195, ¶¶421-22; 150-54 of 195, ¶¶486-95] and his declaration was filed in the Appendix, CV-ECF No.[52-1:26-40 of 112]. Dr. Grant's updated declaration, Appx at A-001837-65, submitted with this filing, incorporates his original declaration and includes additional facts in support of his averments.

Dr. Grant has subsequently received information related to Sanchez's IQ test score when he was eight years old and information relevant to Sanchez's deficits in adaptive functioning. Appx at A-001875-76, Revised Grant Declaration, pp.10-11, ¶¶28-29. He has been provided an opportunity to explain Sanchez's IQ test score beyond the simple reporting of the full scale score at 77, and also to explain his reference at trial to the "arguments about" needing an IQ score of 70 or below for a diagnosis of intellectual disability. *See, e.g.*, Appx at A-001874-75, Revised Grant Declaration, pp. 9-10, ¶¶24-26. Dr. Grant concludes—and, if fully informed, would have concluded at the time of trial—that Sanchez has significant limitations in intellectual functioning and, therefore, meets prong one of an intellectual disability diagnosis. Appx at A-001872-73, A-001875-76, Revised Grant Declaration pp.7-8, ¶21, pp.10-11, ¶27.

### iv.    Dr. James

Joette Deanna James, Ph.D., administered neuropsychological testing and the WAIS-IV to Sanchez, then 32 years old, in January 2016.[59] CV-ECF No.[33-8:194 of 194, ¶16] - No.[33-9:1 of 156, ¶16]. She concluded, "Mr. Sanchez's full-scale IQ scores on tests administered throughout his life, both during childhood and at the time of his trial, are consistent with intellectual disability." She also found that "Mr. Sanchez's performance on a number of the neuropsychological tests [that she] administered fell significantly below the mean, and more than two standard deviations below the mean in critical areas of cognitive functioning, including working memory, processing speed, and other aspects of executive functioning." CV-ECF No.[33-9:20-21 of 156, ¶¶71-72].

---

[59] Portions of Dr. James' declaration were incorporated into Sanchez's original § 2255 Motion without attribution. *See, e.g.*, CV-ECF No.[16-1:36-41 of 195, ¶¶112-30]. Dr. James' findings were set out in the original § 2255 Motion. CV-ECF No.[16-1:42-43, ¶¶133-35]. Her declaration was filed in the Appendix. CV-ECF No.[33-8:188-94 of 194] - No.[33-9:1-23 of 156].

70

Dr. James employed a combination of testing according to the DSM-V directive that "Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score." CV-ECF No.[33-9:1 of 156, ¶16]. The WAIS-IV resulted in an IQ score range of 75-83. CV-ECF No.[33-9:2 of 156, ¶21]. Sanchez's scores demonstrated significant impairments in processing speed and in working memory; where he scored in the 8th and 9th percentiles, respectively, on the WAIS-IV and in the 2nd and 5th percentiles on additional neurological tests (CVLT-II). CV-ECF No.[33-9:3 of 156, ¶¶25, 26]. This means that his ability to take in information, make sense of it, and respond is impaired; as is his ability to retain information in order to understand environmental cues and solve problems. CV-ECF No.[33-9:2-3 of 156, ¶¶22, 23].

Sanchez exhibits significant difficulty on tests designed to assess components of executive functioning. Low scores on executive functioning tasks may be a proxy for low intelligence. CV-ECF No.[33-9:4-5 of 156, ¶29]. Impaired executive functioning typically leads to limited ability to accurately perceive environmental stimuli, change unsuccessful behavior, consider potential consequences, and make use of hindsight and foresight. *Id.*

Testing to determine how interference influences Sanchez's performance (K-KEFS) places him below the 1st percentile and in the impaired range on one test (color reading), at the 5th percentile and in the borderline impaired range on another test (word reading), and at the 9th percentile, in the low average range, on the ability to inhibit an impulse and think flexibility (inhibition/switching). His best performance at verbal fluency and switching between tasks was one standard deviation below the mean and his lowest score was two standard deviations below the mean. He has significant difficulty focusing on more than one verbal stimulus at a time. Sanchez's level of deductive reasoning and verbal abstract thinking measure at the 5th percentile,

71

nearly two standard deviations below the mean (word context). CV-ECF No.[33-9:5-7 of 156, ¶¶31-33]. He is a literal thinker and is unable to recognize and use contextual information to solve a problem. CV-ECF No.[33-9:7 of 156, ¶33].

Other testing similarly revealed executive functioning deficits in his ability to learn, degree of vulnerability to interference and response to cues which were very impaired at five standard deviations below the mean (CVLT-II, Total Intrusion Index). Sanchez's ability to reason in novel situations is impaired at the 5th percentile (Iowa Gambling Task). CV-ECF No.[33-9:7-8 of 156, ¶¶36, 38].

Academic testing showed that, at 32 years old, Sanchez reads words at the 6.9 grade level (this does not measure comprehension), spells at the 4.7 grade level and computes math at a grade level of 4.3. CV-ECF No.[33-9:9 of 156, ¶41]. In comparison purposes, in fifth grade, Sanchez was working at a fourth grade math level and a first grade level in reading. He was exempted from standardized testing in high school because "he had such significant conceptual and intellectual deficits." CV-ECF No.[33-9:14 of 156, ¶55]. In tenth grade at age 18, he was able to solve simple math equations at a fourth grade level and was able to write some information on a personal data sheet. He was reading at approximately a third grade level and comprehending at a second or third grade level. CR-ECF No.[823:8243, 8246]; CV-ECF No.[33-6:84 of 125]; No.[33-8:145 of 194, ¶40] (Dr. Kraus). Dr. James agreed with the teacher's assessment that "[t]his lack of progress is consistent with [Mr. Sanchez's] very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well." CV-ECF No.[33-9:14 of 156, ¶56]. For example, during the clinical evaluation, Sanchez reported to Dr. James that he was 33 years old because he was born on October 19, 1983, and the evaluation was occurring in 2016. Dr. James states: "It required my explaining several times that

he would not turn 33 until his birthday in October 2016 before he seemed to understand what I was telling him." CV-ECF No.[33-8:192 of 194, ¶10].

Based on the above data, Dr. James concludes that Sanchez meets prong one of an intellectual disability diagnosis. CV-ECF No.[33-9:20 of 156, ¶¶70-71].

### v.    Dr. Kraus

Louis James Kraus, M.D., evaluated Sanchez in 2016 to determine whether he suffers symptoms of mental disease or defect, and if so, what effects his condition(s) may have had on his behavior and functioning before, during, and after the capital offenses.[60] He found, among other things, that "Sanchez's intellectual functioning is extremely low and his cognition seriously impaired." He determined Sanchez's "exceedingly poor performance in school and his inability to progress beyond the fourth grade level … cannot be explained by learning disability alone." Sanchez has "very significant impairments in processing information[,]" and his "[s]ymptoms of anxiety, depression, inattention, and hyperactivity can cause or aggravate processing difficulties." Dr. Kraus also concludes that Sanchez "meets diagnostic criteria set forth in the DSM-5 for intellectual disability and mild to moderate brain impairment." CV-ECF No.[33-8:151, 153 of 194, ¶¶60, 64].

### B.  Adaptive functioning deficits.[61]

The definition of intellectual disability also includes significant limitations in adaptive functioning, *i.e.*, "the inability to learn basic skills and adjust behavior to changing

---

[60] Dr. Kraus' declaration was filed in the Appendix. CV-ECF No.[33-8:130-54 of 194]. The original § 2255 Motion discusses the psychiatric symptoms that Dr. Kraus found Sanchez has long-suffered from. *See, e.g.*, CV-ECF No.[16-1:133-35 of 195, ¶¶433-35]. It also incorporates portions of Dr. Kraus' declaration without attribution. *See, e.g.*, CV-ECF No.[16-1:135-45 of 195, ¶¶437-64].

[61] The original § 2255 Motion discusses Sanchez's long-standing deficits in adaptive skills. *See, e.g.*, CV-ECF No.[16-1:36-41 of 195, ¶¶112-30]. This amendment re-organizes those facts, provides additional details, and provides record citations for the factual allegations.

circumstances[.]" *Hall*, 134 S. Ct. at 1994. In *Atkins v. Virginia*, the Court listed such adaptive skills as "communication, self-care, and self-direction that became manifest before age 18." *Atkins*, 536 U.S. at 318; *see also id.* at 308 n.3 (quoting the adaptive skills included in the definition of mental retardation in the AAMR Manual, 9th Edition, and the DSM-IV-TR). The adaptive deficits prong is met when there are "significant limitations" in, or "ongoing support is needed in order for the person to perform adequately in" at least one of three domains: conceptual, social, or practical skills. AAIDD Manual, 11th Ed. at p.43;[62] DSM-V, pp.33 & 38. "In determining the significance of adaptive deficits, clinicians look to whether an individual's adaptive performance falls two or more standard deviations below the mean in any of the three adaptive skill sets[.]" *Moore*, 137 S. Ct. at 1046.

Here, Sanchez's adaptive performance (as assessed by standard measures) falls two or more standard deviations below the mean in two of the three adaptive skill sets.[63] Appx at A-001814, Hernandez Declaration p.10. Throughout his life, Sanchez has demonstrated significant deficits in conceptual, practical, and social skills. Appx at A-001877-80, Revised Grant Declaration pp.12-15, ¶¶32-37; CV-ECF No.[33-9:16, 20, 21 of 156, ¶¶59, 70, 73] (Dr. James).

The Supreme Court's decision in *Brumfield* illustrates the concept of adaptive deficits and the showing needed to obtain an evidentiary hearing on the issue. To begin: "The adaptive

---

[62] The AAIDD Manual strongly recommends the use of standardized measures in determining adaptive behavior deficits, with the criteria being performance that is approximately two standard deviations below the mean.

[63] Moreover, Sanchez's adaptive functioning does not rise above the skill sets of seventeen-year-olds. *Compare Roper v. Simmons*, 543 U.S. 551, 570 (2005) (exempting persons under the age of eighteen from the death penalty and explaining that the susceptibility of persons under age eighteen "to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult. Their own vulnerability and comparative lack of control over their immediate surroundings mean [they] have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment.") (quotation and citations omitted).

impairment prong of an intellectual disability diagnosis requires an evaluation of the individual's ability to function across a variety of dimensions." *Brumfield*, 135 S. Ct. at 2279. Such an evaluation is based on many sources of information "including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances." *Hall*, 134 S. Ct. at 1994.

An intellectual disability determination includes an assessment of strengths and weaknesses.[64] "But the medical community focuses the adaptive-functioning inquiry on adaptive *deficits*." *Moore*, 137 S. Ct. at 1050. Neither adaptive strengths, traumatic background, nor the existence of another mental or physical impairment counter the case for a disability determination. *Id.* In *Brumfield*, 135 S. Ct. at 2280-81, the Supreme Court emphasized that evidence tending to show certain adaptive strengths of a defendant did not diminish the evidence suggestive of intellectual disability and, thus, there remained a need for an evidentiary hearing. The Court also recounted two state court cases where hearings were granted even though in one case the defense expert testified at trial that the defendant "is not mentally retarded" and, in the other case, the defendant had never been identified as a slow learner and had received college credit for courses taken in prison. *Id.* at 2281 (quotations and citations omitted).

Summarizing the factors that established Brumfield's entitlement to an evidentiary hearing, the Court said:

> An individual who points to evidence that he was at risk of "neurological trauma" at birth, was diagnosed with a learning disability and placed in special education classes, was committed to mental health facilities and given powerful medication, reads at a fourth-grade level, and simply cannot "process information," has raised substantial reason to believe that he suffers from adaptive impairments.

---

[64] "Clinicians, however, caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is." *Moore*, 137 S. Ct. at 1050 (quoting DSM-5, at 38 and AAIDD Manual, 11th Ed. at 20).

*Brumfield*, 135 S. Ct. at 2281. Importantly, academic failure, a history of traumatic experiences, and co-occurring mental, neurodevelopmental, medical and physical conditions "count in the medical community as '*risk factors*' *for* intellectual disability." *Moore*, 137 S. Ct. at 1051 (quoting AAIDD Manual, 11th Ed. at 59-60).

The particular facts in *Brumfield* that provided substantial grounds to question the defendant's adaptive functioning were: (a) indications something had gone wrong during the mother's pregnancy; (b) the defendant had slower responses than normal babies; (c) he suffered a seizure; (d) he was placed in special education classes in fifth grade; and (e) records questioned his intellectual functions and opined that he probably had a learning disability. *Brumfield*, 135 S. Ct. at 2279-80.

There are similar facts in Sanchez's background. For example: (a) Sanchez's mother received very little prenatal care, suffered infections that were not fully treated, and she began bleedings at the beginning of labor instead of her water breaking indicating that something had gone wrong during the pregnancy; (b) Sanchez was the "slowest" of his siblings, he rarely talked until much later in childhood and he was forgetful and unable to follow directions; (c) Sanchez suffered through periods of hypoxia brought on by asthmatic symptoms and was noted to "zone out" or "seemed to be far away, absent" indicating possible seizure activity; (d) Sanchez was placed in special classes from kindergarten through high school, formally diagnosed with a specific learning disability in third grade and reduced processing speed; and, (e) school records noted Sanchez's significantly diminished intellectual functioning as well as adaptive skills deficits. In addition, as in *Moore*, 137 S. Ct. at 1051, there are clear risk factors for intellectual disability in Sanchez's background, including a history of traumatic experiences, and co-

76

occurring mental, neurodevelopmental, medical and physical conditions. Appx at A-001814-15, Hernandez Declaration pp.10-11; CV-ECF No.[33-8:152-53 of 194, ¶63] (Dr. Kraus). There is ample evidence that Sanchez's adaptive functioning in at least one skill set is more than two standard deviations below the mean, thus satisfying the second prong of an intellectual disability diagnosis.

**1. Beginning in childhood and continuing to the present day, Sanchez has exhibited significant deficits conceptual skills.**

Conceptual skills are described in the AAIDD Manual as including language, reading/writing, and money/time/number estimation. AAIDD Manual, 11th Ed. at p.43. The DSM-V as including competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations. DSM-V, pp.33 & 37.

Sanchez functions more than two standard deviations under the mean of the normative population in the Communication Domain; his functioning falls at the first percentile His scores reflect Low Adaptive levels in receptive, expressive, and written communication skills. Specifically, his receptive language abilities were Low and at a 4.7 age level; whereas, his expressive language capacities were observed to be Low and at a 3.1 age equivalent. Lastly, his written language aptitude was observed to be Moderately Low, and at an 11.9 age level. Appx at A-001812, Hernandez Declaration p.8, ¶6. Sanchez's performance in school and on psychological and neuropsychological tests demonstrates clear and significant impairments in functional academics and conceptual deficits. Appx at A-001814-15, Hernandez Declaration pp.10-11; Appx at A-001878-79, Revised Grant Declaration pp.13-14, ¶¶33-35; CV-ECF No.[33-9:11-15 of 156, ¶¶47-57] (Dr. James).

In school, Sanchez had difficulty understanding and expressing himself and needed extra assistance to complete his work correctly; he was distractible; and he needed a quiet, isolated place to do his work. CV-ECF No.[33-5:64 of 107]. He had "a difficult time comprehending instructions," to point where one teacher indicated he "was unable of following directions" and unable to work independently. CV-ECF No.[33-5:65-66, 77, 83, 84 of 107]. It was difficult, and at times impossible, for Sanchez to perform multistep tasks; he had difficulty switching from one task to another; "[h]e was not the brightest crayon in the box." CV-ECF No.[33-8:73 of 194, ¶7]. For example, his teachers consistently noted that Sanchez could not follow directions. One teacher remarked that Sanchez was unable to complete any assignment without one-to-one assistance to guide him through the steps. CV-ECF No.[33-8:110 of 194, ¶4] (Replogle); *see also* CV-ECF No.[33-5:66, 83, 73 of 107]; No.[33-9:13-14 of 156, ¶¶51 52, 54] (Dr. James). Sanchez repeated both ninth and tenth grades. He left school at age 19 without testing above a third and fourth grade level in reading, comprehension or math, and without passing the tenth grade.

One friend states:

I remember helping Rick with a movie club order. It was the kind of order from w[h]ere you picked stamps of the movies you wanted, placed them in boxes on the form then sent the form in. He had me read all the titles of the movies on the stamps because he couldn't read them himself. I had to explain a few times how the form worked and what movies was ordering before he finally understood.

CV-ECF No.[33-8:73 of 194, ¶7].

Records, testing and third-party accounts substantiate Sanchez's significant deficits:

The descriptions provided by Mr. Sanchez's teachers, friends, and family members about Mr. Sanchez's difficulty understanding and complying with directions and the challenges that he had initiating and participating in conversations are consistent with the language deficits demonstrated by his performance on the psychological and neuropsychological instruments I administered to him and those administered to him during his childhood. For example, Mr. Sanchez's grandmother recalls that, at times he "seemed to be far away, absent, as if he didn't understand what was going on around him." She described a time when Mr. Sanchez wandered too close

78

to the street where cars were driving by, and he didn't understand her warnings. She threw pebbles at him to make him move away from the street. Declaration of Maria de la Luz Betancourt Jimenez ¶17. Mr. Sanchez's mother says he was obedient at home and tried to do what was asked of him but she often had to ask him more than once to do a task. He seemed to forget what he had been asked to do and he would need help to do it. She also says that he only asked "basic questions" and "was not a curious child." Declaration of Juana Maria Jimenez Sanchez ¶25, ¶131.

Mr. Sanchez's language deficits do not arise from his being raised by Spanish-speaking parents or the fact that he may have had more exposure to Spanish than to English during his early childhood. His teachers documented he experienced difficulty learning in both English and Spanish. Mr. Sanchez has difficulty with receptive language: he has trouble with listening comprehension and encoding verbal information. These difficulties were supported by his deficits in processing skills noted on the psychological and neuropsychological tests administered to him. These impairments result in challenges to understanding concepts correctly and being limited in his ability to use language effectively as a problem-solving technique. Together these difficulties constitute significant impairments in communication and social participation.

Appx at A-001878-79, Revised Grant Declaration pp.13-14, ¶¶33-35.

### 2. Sanchez has demonstrated significant limitations in skills in the social domain of adaptive functioning.

Social skills as described in the AAIDD Manual include interpersonal skills, social responsibility, self-esteem, gullibility, naïveté/wariness, following rules/laws, avoiding victimization, and social problem solving. AAIDD Manual, 11th Ed. at p.43. The DSM-V describes awareness of others' thoughts, feelings, and experiences, empathy, interpersonal communication skills, friendship abilities and social judgment, gullibility, naïveté, avoiding victimization, social problem solving, interpersonal communication. DSM-V, pp.33 & 37.

Sanchez experiences notable difficulties with his interpersonal relationships, play and leisure time, and overall coping skills; placing him at the seventh percentile. He has limitations in socialization and in adaptively functioning in society. More specifically, the findings reflect Moderately Low abilities in relating to others and establishing reciprocal interpersonal

79

relationships (Interpersonal Relationships; Moderately Low; 14.9 Age Equivalent); moreover, Moderately Low abilities in engaging in Leisure Time and Play (Play and Leisure Time; 16.0 Age Equivalent). Most notably, Sanchez's greatest challenges with socialization were with regard to his limited coping skills which were deemed to be Moderately Low, and consistent with a person at an 11.9 age-level. Appx at A-001812, Hernandez Declaration p.8.

Deficits in processing skills impair Sanchez's ability to understand concepts correctly and to use language effectively as a problem-solving technique. Appx at A-001879, Revised Grant Declaration p.14, ¶35. Sanchez grew up not making independent decisions, rather he followed his brothers and sisters around, doing what they did and trying to do as they instructed. CV-ECF No.[52-1:86 of 112, ¶¶24-25]. His Aunt says, "[Sanchez] seemed mentally slower than his brothers and sister. He followed his siblings around and stayed close to them. They made the plans and he followed them." CV-ECF No.[52-1:86 of 112, ¶24]. Sanchez is universally described as a "follower." His family, friends, and teachers observed that Sanchez "did not have an original idea in his head," "always did whatever others wanted to do," "would go along with anything anyone told him to do and not really think about it," and "took no initiative but simply followed the will of the group." CV-ECF No.[33-8:62 of 194, ¶6; 67 of 194, ¶4]. "He would usually agree and smile when people asked him something." CV-ECF No.[33-8:128 of 194, ¶6]. Sanchez's friends note that he was not "capable of thinking too deeply about anything," he did not have "in depth conversations," and he "never really came up with thoughts of his own on any topic." CV-ECF No.[33-8:128 of 194, ¶6; 62 of 194, ¶7]. When something was complicated, Sanchez "would act like he didn't care about it." CV-ECF No.[33-8:128 of 194, ¶6].

People who know him describe Sanchez as a "clown," "goofy," "dopey," and "silly." One friend nicknamed Sanchez "goof." Sanchez liked it when people laughed and he wanted to

80

please everyone. CV-ECF No.[33-8:101 of 194, ¶3; 105 of 194, ¶6; 72 of 194, ¶5]; No.[33-9:11-12 of 156, ¶¶47-49]. At the same time, he possessed little to no insight about how his use of language and comments affected others. His teacher described Ricardo as "a carefree student" who "enjoyed interacting with his peers," but at the same time, displayed "little or no tact while communicating" with peers and teachers. CV-ECF No.[33-6:28 of 125].

Friends enjoyed Sanchez and his sweet demeanor but they also noted that often Sanchez did not engage actively with those around him. One friend recalls:

> Ricky reminded me of two cartoon characters – Eeyore and Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding contact.

CV-ECF No.[33-8:128 of 194, ¶5]. Another friend says:

> There were times, not every day but pretty often, when I noticed Rick just sat there looking like he was daydreaming, off in his own world. He seemed unfocused. I had to snap my fingers and say to him, 'Hey, Rick, snap out of it' to get him back.

CV-ECF No.[33-8:73 of 194, ¶8].

Although he had difficulty following rules, people did not perceive Sanchez as intentionally acting out but rather as unable to do what was expected. For example, a special education professional at Sanchez's high school reported:

> [Sanchez] did not intentionally misbehave, but although he wanted to please his teachers and do what he was supposed to do, he had some difficulty following rules. For example, I often found him in the hallway of the school during class time, and when I said, "Ricky, what are you doing here?" he smiled at me goofily and went immediately back to class without any complaints and without talking back.

CV-ECF No.[33-8:67 of 194, ¶3].

After another student threatened to hurt him, Sanchez responded by bringing a knife to school in order to feel "safer;" although students regularly brought weapons to school, this behavior "was extremely out of character for Ricky." CV-ECF No.[33-8:68 of 194, ¶6; 61 of

194, ¶4]. "Ricky did not understand the seriousness of having the knife at school, and [educators] determined that … his bringing the knife to school was a manifestation of his disability." CV-ECF No.[33-8:68 of 194, ¶6]. In other words, it arose from a poor coping or social problem solving response.

As a young adult, Sanchez was mistreated and taken advantage of by those with whom he felt close to. Sanchez's sister and friend recall an occasion when Maria, the mother of Sanchez's child, accosted Sanchez at a restaurant where he was eating dinner with a new girlfriend. Sanchez stood passively, without fighting back or walking away, while Maria pushed him, struck him, and yelled at him. CV-ECF No.[33-8:76 of 194, ¶6]. When his cousin screamed at him over the phone, Sanchez just stood there and listened. CV-ECF No.[33-8:108 of 194, ¶21].

Sanchez's family members, romantic partners, and others describe his gullibility. "He was easy to influence because he did not know what was happening all the time." CV-ECF No.[33-8:73 of 194, ¶7]. His cousin, Danny Varela took advantage of this and the fact that Sanchez was a follower. Varela and others Sanchez spent time with made fun of him, thought he was dumb, did not respect him, yelled at him, and ordered him around. "They often sent Sanchez on errands that they did not want to do." CV-ECF No.[33-8:65 of 194, ¶9]. Despite their treatment of him, Sanchez was very loyal and did whatever Danny told him to. CV-ECF No.[33-8:76 of 194, ¶8]. "Ricardo Jr. did not ask questions, he just did as he was told." CV-ECF No.[33-8:65 of 194, ¶9]. Sanchez seemed to have no understanding that these individuals were taking advantage of him. He believed everything they told him, in part, because Varela was a family member. CV-ECF No.[33-8:76 of 194, ¶8; 108 of 194, ¶22; 102 of 194, ¶9].

82

### 3.   Sanchez's practical adaptive skills are significantly limited.

Practical skills are described in the AAIDD Manual include activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, following schedules/routines, and use of the telephone, and the DSM-V definition includes learning and self-management across life settings, including personal care, job responsibilities, money management, recreation, self-management of behavior, and school and work task organization. AAIDD Manual, 11th Ed. at p.43; DSM-V, pp.33 & 37.

Sanchez functions more than two standard deviations under the mean of the normative population in Daily Living Skills; he is at the first percentile. Appx at A-001812-16, Hernandez Declaration pp.8-12. In particular, his personal functioning was Moderately Low and consistent with a person at a 14.0 age level; whereas, his domestic capacity was slightly lower and at a 12.0 age level (Domestic; Low; 12.0 Age Equivalent). His highest rating under the Daily Living Skills domain was observed to be in the community domain, reflecting that he was at a 17.0 age level, although continuing to function at a Low level compared to his reference peer group. Appx at A-001812, Hernandez Declaration p.8.

Sanchez's middle school records note deficits in independent functioning. CV-ECF No.[33-6:36 of 125]. Instead of recording progress from eight to ninth grade, special education providers assessed a decrease in Sanchez's independent functioning abilities, as well as a decrease in his academic skills, and ability to regulate his behavior. CV-ECF No.[33-6:50, 56, 76 of 125]. School records document Sanchez's inattention, disorganization, and disruption. CV-ECF No.[33-8:177 of 194, ¶19]. Regarding self-management skills, educators noted "Ricardo is a pleasant young man however his inability to stay focused prohibits his success." CV-ECF No.[33-6:68 of 125]. Throughout his life, Sanchez has exhibited limitations in self-direction,

home living and work skills. Appx at A-001879-80, Revised Grant Declaration pp.14-15, ¶¶36, 37.

> The declarations of family members, teachers and educational personnel, and friends also provide ample evidence of impairments in self-direction. The people who knew and observed Mr. Sanchez throughout his life knew him to be a follower, someone who did not initiate plans or come up with his own ideas and instead someone who simply did what others around him did and told him to do. When describing Mr. Sanchez, a high school teacher said he "did not have an original thought in his head." Declaration of Jeffrey Silverman ¶ 4.

Appx at A-001879, Revised Grant Declaration p.14, ¶36.

From the time of Sanchez's adolescence, when individuals typically are able to perform many tasks independently and navigate their communities with some degree of self-sufficiency, Sanchez demonstrated difficulty in these areas. Appx at A-001879-80, Revised Grant Declaration pp.14-15, ¶37. For example, when Sanchez was approximately thirteen years old, he was unable to help his sister navigate their travel on buses from Florida to Texas to visit their grandmother. His sister says: "I had to read all the signs and ask if we were on the right bus. Ricky was no help to me; he had no idea what to do." CV-ECF No.[33-8:105 of 194, ¶8]; No.[33-9:16 of 156, ¶59].

Sanchez has not been aware of dangers to his personal safety. For example, Sanchez's grandmother recalls that, at times he "seemed to be far away, absent, as if he didn't understand what was going on around him." She described a time when Sanchez wandered too close to the street where cars were driving by, and he didn't understand her warnings. She threw pebbles at him to make him move away from the street. CV-ECF No.[52-1:103 of 112, ¶17].

Sanchez never lived independently, even after he stopped attending school. He lived with his parents and with the family of his girlfriends. Even as an adult, those that he lived with took care of his finances and household responsibilities, including his mother, his girlfriend, and his

girlfriend's mother. While he and Maria, the mother of his child, were in a relationship, Maria handled his money: she took his paycheck, made sure that it was cashed, and provided money to her mother with whom they were living for rent and for the items her mother bought for their baby. CV-ECF No.[33-8:116 of 194, ¶7]. Sanchez complained that he was paying too much to cash paychecks at check cashing stores but didn't know what else to do. His sister took him to open his first bank account. She often "helped him do things he did not seem to know he should do." CV-ECF No.[33-8:108 of 194, ¶19]. She says, "Ricky needed to be told what to do." CV-ECF No.[33-8:108 of 194, ¶21].

At twenty years old, Sanchez continued to behave in the manner of a person much younger. He had difficulty comprehending and following simple directions, he needed instructions repeated and had to be reminded of the steps he was supposed to take in order to perform basic tasks, such as buying a soda for his girlfriend's mother at the store. When asked to purchase baby cereal for his son he returned with small boxes of Cheerios. He did not understand that babies eat rice cereal and not breakfast cereal in small boxes. He was unable to remember appointments and had to be reminded where he needed to go and what he was supposed to do. CV-ECF No.[33-8:115 of 194, ¶6].

Special education providers working with Sanchez while he was in high school noted that he would not be able to obtain employment independently and would require assistance to find a job. CV-ECF No.[33-6:42, 48, 91 of 125]. They reported that Sanchez required weekly personal assistance, monitoring, and intervention in the area of independent living skills functioning. CV-ECF No.[33-6:56, 73 of 125]. He was unable to "plan and make realistic occupational training and job placement decisions." CV-ECF No.[33-6:91 of 125]. After not completing the tenth grade and leaving school, Maria and Sanchez's sister helped him fill out job applications because

85

he did not read or spell well and his writing was almost unreadable. CV-ECF No.[33-8:116 of 194, ¶8; 108 of 194, ¶19]. Although Sanchez was able to obtain work and to perform some jobs, he did not keep any job for very long and at least once was let go for failing to meet expectations.

> Sanchez's brother recalls:
>
> Ricardo had a hard time keeping a job. He only ever had simple, labor jobs. Most of the jobs he got from my father or Maria's father asking their friends if he would work for them. He worked caulking windows. He dug sewer ditches and did roofing for a while. Ricardo never kept a job for long because he is forgetful and showed up late or forgot something he was supposed to do and got fired.

CV-ECF No.[33-8:18 of 194, ¶10].[65]

At the time of the crime, Sanchez was living and working for his cousin Danny Varela, or DV, who was in the drug business. His girlfriend at that time described him as "a do-boy for DV and his guys." She said that Sanchez would do anything DV asked him to do even though DV did not respect him and was not nice to him. Sanchez's girlfriend (who was a teenager) understood that DV thought Sanchez was dumb and DV was using him, but Sanchez (who was then 21 years old) didn't understand that. He thought they were friends. CV-ECF No.[33-8:76 of 194, ¶ 8].

### C. Conclusion to Sanchez's intellectual disability claim.

"Mr. Sanchez's limited intellectual functioning, and his significant limitations in adaptive functioning in the domains of cognitive, social, and practical skills, have been observed and

---

[65] The following footnote appears in the codefendants' court opinion: "Castillo later overheard Lopez tell her mother that there were very few drugs and no cash in the Thug Mansion at the time of the search because the gang had managed to clean house. But she also said that because Sanchez had dropped the ball and failed to finish his chore of getting the guns out of the garage, the officers did manage to find some of the gang's guns." *United States v. Lopez*, 649 F.3d 1222, 1231 n.5 (11th Cir. 2011).

documented through multiple and varied sources during the developmental period—well before

his eighteenth birthday—and throughout his life." CV-ECF No.[33-9:20 of 156, ¶70] (Dr.

James). Therefore, "Mr. Sanchez meets the diagnostic criteria for intellectual disability[.]" *Id.*

*See also* CV-ECF No.[33-8:153 of 194, ¶64] (Dr. Kraus) ("Mr. Sanchez meets diagnostic criteria

… for intellectual disability and mild to moderate brain impairment."); Appx at A-001880,

Revised Grant Declaration p.15, ¶38 ("Mr. Sanchez's impairments in intellectual and adaptive

functioning manifested during his childhood, prior to the age of eighteen. It is thus currently my

conclusion, held to a reasonable degree of psychological certainty, that Mr. Sanchez meets the

diagnosis for intellectual disability."); Appx at A-001817-18, Hernandez Declaration pp.13-14

("Therefore, it is my professional opinion that considering Mr. Ricardo Sanchez Jr.'s overall

history, his clinical manifestations, and his adaptive level of functioning, that he is a person that

more than likely meets criteria for Intellectual Disability as defined by the DSM-V."). The

Eighth Amendment and 18 U.S.C. § 3596(c) prohibit the execution of intellectually disabled

individuals and because Sanchez is intellectually disabled—and therefore ineligible for

execution—the death sentences should be vacated.

**D. Sanchez is ineligible for the death penalty because his brain dysfunction, mental disorders, and mental age render the penalty unconstitutionally excessive.**

When the *Atkins* Court explained why certiorari was granted in the case, it noted the shift

in evolving standards but also quoted the dissenting justices in the Virginia Supreme Court's

opinion under review who concluded that "the imposition of the sentence of death upon a

criminal defendant who has the mental age of a child between the ages of 9 and 12 is excessive,"

*Atkins*, 536 U.S. at 310 (internal quotation marks and citation omitted), and declared:

> "[I]t is indefensible to conclude that individuals who are mentally retarded are not
> to some degree less culpable for their criminal acts. By definition, such individuals
> have substantial limitations not shared by the general population. A moral and

> civilized society diminishes itself if its system of justice does not afford recognition and consideration of those limitations in a meaningful way."

*Id.* (citation omitted). In the related context of mitigation, the Supreme Court has noted the importance of mental and emotional development vis-à-vis chronological age. *Burger v. Kemp*, 483 U.S. 776, 779, 789, n.7 (1987) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 116) (1982)) (noting that petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child," and later that "[i]n light of petitioner's youth at the time of the offense, ... testimony that his 'mental and emotional development were at a level several years below his chronological age' could not have been excluded by the state court"). In 2017, legislators in at least seven states—Arkansas, Indiana, Ohio, South Dakota, Tennessee, Texas and Virginia—proposed bills to prohibit the death penalty for people who suffered from a serious mental illness at the time of their crime.

Sanchez is an individual who suffers from brain dysfunction and psychiatric impairments. Both Drs. Kraus and James conclude that Ricardo Sanchez meets diagnostic criteria for "brain impairment," otherwise stated as "neuropsychological impairment." CV-ECF No.[33-8:153 of 194, ¶64] (Dr. Kraus); No.[33-9:18-19 of 156, ¶¶67-69] (Dr. James). Sanchez also suffers from mental disorders and symptoms including those qualifying as severe mental illness, such as: anxiety, depression, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, and deficits in concentration. CV-ECF No.[33-8:135 of 194, ¶¶13-14] (Dr. Kraus). Sanchez's behavior and functioning throughout his life and at the time of the crime was that of a person significantly younger than his chronological age. *See* Appx A-001812, A-001815, Hernandez Declaration pp.8, 11. Sanchez's impairments and the fact that his mental age was comparable to that of an individual below the age of eighteen at the time of the crimes for which he was capitally charged render the death penalty grossly disproportionate to his culpability and, therefore, imposition of the death penalty in this case violates the Eighth Amendment.

Leading mental health associations in the United States recommend exempting defendants with severe mental illness from the death penalty.[66] The organizations against the execution of persons with severe mental illness include the American Psychiatric Association, the American Psychological Association, the National Alliance for the Mentally Ill, and Mental Health America.[67] All of these organizations share a common belief that the penological purposes of capital punishment are not met in the case of defendants with severe mental illness, and that these individuals' diminished personal moral culpability should preclude them from being eligible for a death sentence.

There is also a strong international consensus against the execution of individuals with mental illness.[68] Under principles of international law, the prohibition against executing persons with mental disorders and mental or intellectual disabilities qualifies as an international norm or legally binding international law. The Inter-American Commission on Human Rights (IACHR)

---

[66] The term "serious mental illness," or "severe mental illness," came from a request by Congress to the Secretary of Health and Human Services to develop a federal definition of severe mental illness. *See* Federal Definition of Severe Mental Illness, 58 Fed. Reg. 29422-29425 (May 20, 1993); *see also* Thomas Insel, *Getting Serious About Mental Illness*, National Institute of Mental Health (July 31, 2013),https://www.nimh.nih.gov/about/directors/thomas-insel/blog/2013/getting-serious-about-mental-illnesses.shtml.

[67] *Mental Disability and the Death Penalty* (2006), American Psychological Association Council Policy Manual, Chapter: IV, http://www.apa.org/about/policy/chapter-4b.aspx; *Death Penalty*, National Alliance on Mental Illness, https://www.nami.org/Learn-More/Mental-Health-Public-Policy/Death-Penalty; *Position Statement 54: Death Penalty and People with Mental Illness*, Mental Health America (June 14, 2016), http://www.mentalhealthamerica.net/positions/death-penalty.

[68] United Nations G.A. Res. 69/186, ¶ 5(d) (Feb. 4, 2015), http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186; *Commission on Human Rights Resolution 2000/65 The question of the death penalty*, UN Commission on Human Rights (Apr. 27, 2000),http://www.refworld.org/docid/3b00f29a14.html. This was reiterated in two further resolutions: *Commission on Human Rights Resolution 2004/67 The question of the death penalty*, UN Commission on Human Rights (Apr. 21, 2004) and *Human Rights Resolution 2005/59 The question of the Death Penalty*, UN Commission on Human Rights (Apr. 20, 2005). *See also* Richard J. Wilson, *The Death Penalty and Mental Illness in International Human Rights Law: Toward Abolition*, 73 Wash. & Lee L. Rev. 1469 (Summer 2016).

stated in deciding the case of *Lackey v. United States*, that "[i]t is a principle of international law that persons with mental disabilities, either at the time of the commission of the crime or during trial, cannot be sentenced to the death penalty."[69]

The European Union, which condemns the use of the death penalty in general, calls for countries that still maintain executions to comply with certain minimum standards," which include a requirement that capital punishment not be imposed on "persons suffering from any mental illness."[70] The European Court of Human Rights has made the correlation between mental illness and youth in the death penalty in the case of *Soering v. United Kingdom*, Judgment of 7 July 1989, Series A, No. 161 ¶ 108, 11 E.H.R.R. 439, 509,[71] where it stated that:

> The youth of the person concerned is a circumstance which is liable, with others, to put in question the compatibility with Article 3 [inhuman or degrading treatment] of measures connected with a death sentence.
>
> It is in line with the Court's case-law ... to treat disturbed mental health as having the same effect for the application of Article 3.

At the time of the capital crimes, Sanchez lacked the maturity and responsibility that adults typically exhibit, and as such his "irresponsible conduct [was] not as morally reprehensible as that of an adult." *Roper*, 543 U.S. at 570 (internal quotations marks and citation omitted). As set forth above, Sanchez did not achieve academically beyond an elementary school level. His reading level was so low that the government's mental health expert, Dr. Michael Brannon, was unable to administer to Sanchez the Minnesota Multiphasic Personality Inventory

---

[69] Cases 11.575, 12.333 & 12.341, Inter-Am. C.H.R., Report No. 52/13 (2013), http://www.oas.org/en/iachr/decisions/merits.asp.

[70] Council Common Guidelines on Death Penalty (EU), No.8416/13 Annex of 12 Apr. 2013 at 5, http://data.consilium.europa.eu/doc/document/ST-8416-2013-INIT/en/pdf (stating the European Union's policy on the death penalty).

[71] Available at:
http://www.kentlaw.edu/faculty/bbrown/classes/IntlLawFall2008/CourseDocs/SoeringcaseECHR.pdf

(MMPI), an instrument that requires a sixth grade reading level. CR-ECF No.[846:9310]. Sanchez's adaptive functioning in several skill-sets is not greater than those of a seventeen year old. Even after his eighteenth birthday, Sanchez's behavior and functioning was comparable to that of a minor. As a result, and for the reasons articulated by the Supreme Court and based on ever-evolving standards of decency, the imposition of the death penalty upon Sanchez constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution, and the punishment of death must be set aside.

### E. This claim is properly before the Court.[72]

This Eighth Amendment claim constitutes a unique "status" claim that cannot be waived or defaulted. *See Burgess v. Comm'r, Alabama Dep't of Corr.*, 723 F.3d 1308, 1317 (11th Cir. 2013) (describing *Atkins* as a "categorical prohibition"). The essence of *Atkins* is that a death sentenced prisoner who can establish that he is in fact intellectually disabled is constitutionally ineligible for the death penalty. *Atkins*, 536 U.S. at 321 (holding that executing an intellectually disabled person is unconstitutional). The ineligibility of an offender to be executed is not a "right" that the prisoner can waive; it is a constitutional limitation on the authority of the government. *See Montgomery v. Louisiana*, 136 S. Ct. 718, 731 (2016). Therefore, procedural barriers are inapplicable to a decision on the merit of this claim. *See Lee v. Kelley*, 854 F.3d 544, 546-51 (8th Cir. 2017) (Kelly, J., concurring) (finding that procedural barriers "should not prevent the court from determining whether he belongs to one of the three discrete classes of inmate that the Supreme Court has held the United States Constitution prohibits executing"); *Commonwealth v. Vandivner*, 130 A.3d 676, 696-97 & n.2 (Pa. 2015) (Saylor, C.J., concurring)

---

[72] This subsection has been changed from the conclusion to Claim III in the original § 2255 Motion. CV-ECF No.[16-1:45 of 195]. It now includes argument previously raised in Sanchez's Motion to Reconsider Order Dismissing Claims. *See* CV-ECF No.[32:11-12 of 22].

(finding no need to review an *Atkins* claim through the lens of counsel's ineffectiveness "[g]iven the execution-eligibility terms in which the *Atkins* restriction is phrased," because "if Appellant is determined to be intellectually disabled, the sentence of death must be vacated, irrespective of whether trial counsel can be faulted").

Alternatively, Sanchez can demonstrate that his *Atkins* claim was previously unavailable until the Supreme Court declared in *Hall v. Florida*, *supra*, that Florida's strict cut-off IQ score of 70 (in effect at the time of Sanchez's arrest, trial, and direct appeal) was incompatible with not only the clinical definition of intellectual disability but also the Eighth Amendment. *See In re: Cathey*, 857 F.3d 221, 230-33 (5th Cir. 2017) (authorizing a second-in-time habeas petition containing an *Atkins* claim that counsel believed was previously unavailable due to an IQ score that was earlier understood to be outside of the range of sub-average intellectual functioning).

Further in the alternative, Sanchez can also demonstrate that the ineffective assistance of trial counsel overcomes any asserted procedural barrier. *See also* Claim VIII, *infra*. Sanchez's Sixth Amendment right to the effective assistance of trial counsel was violated because counsel failed to conduct an adequate investigation into his intellectual disability and present proof of the same which would have, under the Eighth Amendment, excluded him from the death penalty (as demonstrated above). Such ineffective assistance of counsel of trial counsel also constitutes cause and prejudice to overcome any asserted procedural barrier to this Eighth Amendment claim. *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

Moreover, this claim is not subject to any procedural barrier based on a failure to raise the issue on direct appeal. Sanchez's Eighth Amendment claim depends on extra-record facts and could not be raised on direct appeal. As such, the claim was not waived on direct appeal because it could not have been raised on direct appeal. *Bousley v. United States*, 523 U.S. 614, 621-22

(1998) (noting there is an exception to procedural default rule "when the facts were 'dehors the record and their effect on the judgment was not open to consideration and review on appeal.'") (quoting *Waley v. Johnston*, 316 U.S. 101, 104 (1942)); *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994) (a ground is only "available" on direct appeal when "its merits can be reviewed without further factual development."). Also in the alternative, the ineffective assistance of appellate counsel for failing to raise the claim constitutes "cause" and the meritorious nature of this claim constitutes "prejudice" to overcome and asserted procedural default. *Murray v. Carrier*, 477 U.S. at 488.

Finally, proof of the Eighth Amendment claim also establishes that Sanchez is "innocent" of the death penalty and that his execution would be a fundamental miscarriage of justice. Sanchez's innocence, therefore, overcomes any asserted procedural barrier to this claim. *Sawyer v. Whitley*, 505 U.S. 333, 341 (1992).

Accordingly, the Eighth Amendment to the Constitution of the United States and 18 U.S.C. § 3596(c) prohibit the execution of intellectually disabled individuals and because Sanchez is intellectually disabled the Court should vacate Sanchez's sentences of death.

IV.     **Mr. Sanchez was incompetent to stand trial and trial counsel was ineffective for failing to investigate, develop, and present evidence of Mr. Sanchez's incompetence and request from the Court a hearing to determine competency.**[73]

Sanchez exhibited signs of intellectual disability, mental illness and incompetence and there were other red flags that specifically suggested Sanchez was unable to understand the nature and consequences of the proceedings against him or rationally or properly assist counsel in the preparation and conduct of his defense leading up to and during his capital trial and sentencing in 2009.

A.   **Mr. Sanchez has significant impairments that affected his competency to assist in his defense and to understand trial proceedings.**

Trial counsel had serious concerns about whether and to what extent Sanchez understood the trial process. CV-ECF No.[52-1:69 of 112, ¶9]. Counsel suspected Sanchez suffered from intellectual disability and it limited his understanding of the legal process. CV-ECF No.[52-1:70 of 112, ¶14]. When counsel would talk about the defense and reveal what they planned to do and Sanchez did not ask many questions or challenge any of counsel's actions. CV-ECF No.[52-1:69 of 112, ¶9] (Murrell). In truth, Sanchez pretended to understand what his attorneys said and, as soon as he and the mitigation investigator were alone, Sanchez asked her questions that made it

---

[73] This issue was presented as Claim IV in the original § 2255 Motion. The claim's presentation is reorganized, brief discussions of law are included to clarify entitlement to relief, citations to the previously submitted appendices are added to existing facts, and more detail to the basic facts from the original claim is provided. Any and all changes relate to the common core of facts supporting the original claim that: (a) Sanchez's psychiatric, neurocognitive, and intellectual impairments likely would have interfered with his understanding of trial proceedings and participation in the preparation of his defense; (b) counsel did not raise the issue, obtain adequate accommodations from the Court or otherwise work with Sanchez to maximize his understanding and participation; (c) Sanchez proceeded to trial without being competent to do so; and, (d) was deprived of his right to the effective assistance of counsel. CV-ECF No.[16-1:45-57 of 195 & ¶179]. Subpart D, *id.* at pp.56-57 of 195, ¶180 (the Court failed to *sua sponte* order a competency assessment or hearing), is hereby withdrawn. Claim VIII(E) also alleged that trial counsel unreasonably and prejudicially failed to investigate Sanchez's competence to stand trial at the penalty phase and to present evidence to the court that Sanchez was incompetent. CV-ECF No.[16-1:148-49 of 195].

obvious he had not understood what counsel told him. CV-ECF No.[52-1:108-09 of 112, ¶6]. As more fully discussed in Claim III, *supra*, Sanchez is a follower by nature and, in ordinary circumstances, tends to do what is asked of him without question. For example, his girlfriend at the time of the crime says Sanchez did anything Varela and others in the group asked of him, even at all hours of the night. CV-ECF No.[33-8:76 of 194, ¶8]. So, when listening to his attorneys, "it is common for individuals with impairments like Mr. Sanchez to fail to ask questions when they do not understand what is going on around them. This can be due to a number of factors, including a desire to mask disability, a desire to please by being compliant, and/or an inability to articulate or frame questions about what is not understood." CV-ECF No.[33-9:22-23 of 156, ¶75] (Dr. James).

Sanchez reads at the level of a young primary school student, CV-ECF No.[33-6:85 of 125]. In tenth grade, Ricardo was reading at a lower third grade level, and was unable to read many of the law enforcement reports and other documents the defense team showed him or asked him about. CV-ECF No.[52-1:109 of 112, ¶7]. Sanchez's significant reading limitations made it very difficult for him to read such reports, let alone identify information that was important from those reports. CV-ECF No.[33-9:21-22 of 156, ¶74] (Dr. James). The mitigation investigator recalls her interactions with Sanchez:

> Sometimes I asked him to read a sentence from a document I brought, and only very rarely was he able to do this. After I had been visiting him for a while, and he became a bit more comfortable with me, he asked me to read documents to him. Even my reading the documents to him was not enough to make him understand their contents; when I asked him to tell me in his own words what I had read, he often was not able to do it. He asked me questions about the documents that made it clear he had not understood them. The way in which I was able to be most successful at making him understand things was by drawing diagrams and pictures for him. His visual skills were better than his verbal skills, and he seemed to be able to follow, at least in the moment, the diagrams I drew. He asked some questions and referred back to the pictures. But Ricardo was unable to articulate very meaningful questions or have a back and forth conversation about legal strategy or

other things about the case itself, including about penalty phase issues, and his own background and history. His self-reported social and family history was difficult to obtain as his ability to understand social situations was limited.

CV-ECF No.[52-1:109 of 112, ¶7].

As an example of the difficulty Sanchez would have had communicating with trial counsel is his inability to accurately report autobiographical information, such as his age. During an evaluation in January 2016, Sanchez reported his birth date of October 1983 to an expert and stated he was 33 years old. He believed this to be his true age because it was 2016. The expert had to explain several times that he was only 32 years old and would not turn 33 until October of that year. CV-ECF No.[33-8:192 of 194, ¶10] (Dr. James). Although this type of calculation can be ascertained by counsel, much social history investigation begins with anecdotal details about the client's life. Sanchez's inability to provide personal data, among other information, was particularly detrimental in this case where a detailed psycho-social history was required for the jury to understand and assess his level of moral culpability.

At one point prior to trial, counsel considered filing a motion requesting accommodations for Sanchez during the trial, such as taking longer and more frequent breaks during the proceedings and having someone sit next to Sanchez in the courtroom to explain to him what was happening in real time during the proceedings. CV-ECF No.[52-1:69 of 112, ¶9; 110-11 of 112, ¶12]. Because it turned out that Sanchez was able to sit quietly and calmly during the proceedings, counsel did not file a motion. CV-ECF No.[52-1:69 of 112, ¶9].

During trial proceedings, Sanchez often sat in court mimicking what his codefendants were doing.[74] He was "tuned out" and drew pictures much of the time rather than confer with

---

[74] Sanchez did not appear to understand what was happening during the proceedings. Instead, he regularly looked to Daniel Troya for cues about how to behave. He imitated Troya's behavior and actions in the courtroom, smiling after Troya smiled, snickering after Troya snickered, and

counsel. CV-ECF No.[52-1:69 of 112, ¶9; 111 of 112, ¶13]. He asked very few questions of the defense team. He spent breaks talking with codefendant Troya about things unrelated to the trial. CV-ECF No.[52-1:111 of 112, ¶13]. After the judge imposed the sentence and included a term of supervised release, Sanchez asked counsel whether he had received probation. CV-ECF No.[52-1:69 of 112, ¶9].

Sanchez suffers neuropsychological and intellectual impairments, as well as symptoms of psychiatric disorders, all of which significantly impairs his functioning and grossly limits his ability to attend to events occurring around him, understand and engage in oral and written communication, and comprehend and follow directions. CV-ECF No.[33-9:21-22 of 156, ¶74] (Dr. James); No.[33-8:153 of 194, ¶65] (Dr. Kraus); No.[52-1:38-39 of 112, ¶35] (Dr. Grant). Multistep instructions are impossible for him to understand or follow. CV-ECF No.[33-9:14, 17 of 156, ¶¶54, 62] (Dr. James). He is also unable to understand when situations are risky or dangerous. CV-ECF No.[16-1:34 of 195, ¶105]. *See, e.g.*, CV-ECF No.[33-8:152, 154 of 194, ¶¶62, 66] (Dr. Kraus); CV-ECF No.[33-8:68 of 194, ¶6] (Jeffrey Silverman)

Evidence detailed in Claim III demonstrates that Sanchez is intellectually disabled and therefore ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 320 (2002). The Court's description in *Atkins* of how intellectual disability can impede a defendant's understanding of trial proceedings and interfere with the ability to contribute to the defense aptly describes Sanchez's significant limitations. As a result of Sanchez's intellectual impairments, he has "diminished capacit[y] to understand and process information, to communicate, to abstract

---

posturing when Troya postured. When the death verdict was read, Troya stood up and threw a water bottle at one of the prosecutors. Sanchez stood up after Troya did and postured. As soon as the bailiffs removed the defendants from the courtroom, Sanchez dropped his pose and resumed his respectful behavior.

from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," and he "often act[s] on impulse rather than pursuant to a premeditated plan, and that in group settings [he is a] follower[] rather than leader[]." *Atkins*, 536 U.S. at 318. Due to his intellectual disability, Sanchez was, and currently is, "less able to give meaningful assistance to [his] counsel[.]" *Atkins*, 536 U.S. at 320-21.

**B. Trial counsel failed to protect Mr. Sanchez's right to understand the criminal proceedings against him and to assist in his own defense.**

Sanchez's convictions and sentences of death were unlawfully and unconstitutionally imposed in violation of his rights to comprehend and participate in trial proceedings; not to be tried while incompetent; to a reliable determination by a tribunal of his competence to proceed to trial; to present a defense; to confrontation and compulsory process; to a trial free of materially false and misleading evidence; to an impartial and disinterested tribunal; to equal protection; and to due process of law. U.S. Const. amends. V, VI, VIII; *Dusky v. United States*, 362 U.S. 402 (1960); *Pate v. Robinson*, 383 U.S. 375 (1966); *Drope v. Missouri*, 420 U.S. 162 (1975); 18 U.S.C. §§ 4241, 4247. Sanchez was deprived of the effective assistance of counsel when counsel failed to protect these rights.

**1. Competency to stand trial.**

The Fourth Circuit has explained that § 4241 "provides a mechanism to secure a judicial determination of a criminal defendant's competency, thereby protecting the defendant's fair trial rights and the integrity of judicial proceedings." *United States v. Broncheau*, 645 F.3d 676, 682 n.8 (4th Cir. 2011). *United States v. White*, 620 F.3d 401, 404 (4th Cir. 2010) (Defendant suffered from delusional disorder, grandiose type, and not competent to stand trial); *United States v. Culp*, 930 F.2d 23 (4th Cir. 1991) (paranoid schizophrenia and delusional behavior were sufficient to establish a mental disease or defect). The Eleventh Circuit likewise explains that the

98

competency inquiry "focuses on the criminal defendant's capacity to contribute sufficiently to his own defense to allow a fair trial and, ultimately, serves to protect both the defendant and society against erroneous convictions." *Watts v. Singletary*, 87 F.3d 1282, 1286 (11th Cir. 1996). Federal law defines incompetency as follows: "[T]he defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense …." 18 U.S.C. § 4241(d).

Pursuant to 18 U.S.C. § 4241(a), the defense is entitled to "file a motion for a hearing to determine the mental competency of the defendant." Upon the filing of such motion, "[t]he court shall grant the motion … if there is a reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable … to assist properly in his defense." *Id. See also United States v. Rothman*, No. 08-20895-CR, 2009 WL 249245, at *1 (S.D. Fla. 2009) (finding facts satisfy the reasonable cause standard and ordering a competency hearing).

> A finding of mental incompetence to stand trial may arise from mental illness, physical illness, or disability; mental retardation or other developmental disability; or other etiology so long as it results in a defendant's inability to consult with defense counsel or to understand the proceedings.
>
> . . .
>
> Because the fundamental purpose of the rule [of nontriability of incompetent defendants] is to promote accurate factual determinations of guilt or innocence by enabling counsel to evaluate and present available defenses to factfinders, defendants should have at least the intellectual capacity necessary to consult with a defense attorney about factual occurrences giving rise to criminal charges. Obviously, to accomplish that, defendants require a minimal understanding of the nature of criminal proceedings, the importance of presenting available defenses, and the possible consequences of either conviction or acquittal.

*Watts*, 87 F.3d at 1286 n.4 (quoting ABA Criminal Justice Mental Health Standards § 7-4.1(c) & Commentary (2d ed. 1986)).

99

"As a matter of procedural due process, a criminal defendant is entitled to an evidentiary hearing on his claim of incompetency if he presents sufficient facts to create a 'real, substantial and legitimate doubt as to [his] mental capacity ... to meaningfully participate and cooperate with counsel....'" *United States v. Rodriguez*, 799 F.2d 649, 655 (11th Cir. 1986) (citations omitted); *United States v. Michel*, 511 F. App'x 918, 919 (11th Cir. 2013) (citing *United States v. Rahim*, 431 F.3d 753, 759 (2005)) ("A competency hearing is thereby required where a bona fide doubt exists as to whether the defendant is competent."). Several factors are considered when evaluating competency. The testimony of an expert witness recounting his observations of the defendant's behavior and mental processes along with a professional diagnoses is highly relevant. Courts also take into account the observations of lay witnesses, and particularly the observations of the defendant's counsel, with respect to the defendant's ability to reason, to remember, to cooperate, and to communicate. *Watts*, 87 F.3d at 1286.

The Supreme Court has affirmed its understanding of competency in *Godinez v. Moran*, 509 U.S. 389, 396 (1993):

> In *Dusky v. United States*, 362 U.S. 402 (1960) (*per curiam*), we held that the standard for competence to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and has "a rational as well as factual understanding" of the proceedings against him." … *Accord, Drope v. Missouri*, 420 U.S. 162, 171 (1975) ("[A] person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial").

Leading up to and throughout the trial, Sanchez was unable to rationally comprehend the proceedings. For instance, at the final sentencing hearing Sanchez believed the judge's imposition of a term of supervised release meant that he had been given a sentence of probation; he did not realize he had been sentenced to death. *See United States v. Sledge*, No. 1:08-CR-9/RS-WCS, 2011 WL 635868, at *1 (N.D. Fla Feb. 11, 2011) (defendant suffering from

100

delusional beliefs and diagnosed with a psychotic disorder not otherwise specified was found to be in incompetent at the time of trial). "[T]he conviction of an accused person while he is legally incompetent violates due process[.]" *Pate v. Robinson*, 383 U.S. at 378.

### 2. Counsel's failure to protect Sanchez's rights fell below professional norms.

Standards of practice required counsel to gather information and evidence of Sanchez's mental state and competency and raise mitigating mental health factors both pre-trial to the prosecutor and court and to the jury and court at sentencing. *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003) (citing 1 ABA Standards for Criminal Justice 4-4.1, Commentary, pp.4-55 (2d ed. 1982)); *see also* ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p.93 (1989).

Beyond the pre-existing duty to conduct a mental health investigation, in this case, "facts, which were either known or ascertainable with reasonable diligence by counsel prior to trial, provided a reasonable basis for believing th[at] defenses based on [Sanchez's] mental capacity might have been plausible." *Becton v. Barnett*, 920 F.2d 1190, 1193 (4th Cir. 1990) (citation and quotation marks omitted). Counsel should have known that, after discussing the case with Sanchez, Sanchez did not display or indicate an understanding of the subject matter discussed. Counsel suspected that Sanchez did not understand the legal proceedings and contemplated asking the court for accommodations. A simple question directed to the defense expert would have revealed a sound basis for accommodations and a competency hearing. However, counsel did not ask the defense expert, Dr. Grant, about Sanchez's ability to understand, participate in, and assist during trial proceedings.

Despite doubting Sanchez's competency, trial counsel did not request accommodations because Sanchez was able to sit quietly throughout the proceedings. CV-ECF No.[52-1:69 of

101

112, ¶9] (Murrell). The ability to sit quietly, however, did not address Sanchez's inability to understand the courtroom proceedings or assist in his defense. Counsel's failure to conduct a reasonable investigation into Sanchez's competency constitutes constitutionally deficient performance. *Wiggins v. Smith*, 539 U.S. at 527 ("[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

### 3.   Sanchez was prejudiced by counsel's deficient performance.

Sanchez likely was incompetent to stand trial. Not only was Sanchez unable to assist in his defense, if asked, Dr. Grant would have informed counsel "that without … accommodations, it would be doubtful that Mr. Sanchez would be able to understand the evidence presented." CV-ECF No.[52-1:38-39 of 112, ¶35]. Dr. James indicates that special accommodations at trial were necessary "in order to maximize Mr. Sanchez's understanding of trial proceedings and his ability to assist counsel in his defense." CV-ECF No.[33-9:22 of 156, ¶75]. This is because "due to [his] low intellectual functioning, impaired encoding of information, and his impaired language and verbal functioning, [Sanchez] experiences difficulty processing and comprehending incoming stimuli and information…." CV-ECF No.[52-1:38-39 of 112, ¶35] (Dr. Grant); *see also* CV-ECF No.[33-9:21-22 of 156, ¶74] (Dr. James).

Low intellectual functioning coupled with psychiatric symptoms of "depression, anxiety, sleep disturbance, hyperactivity, impulsivity and hyperarousal" meant that "Sanchez would have had difficulty understanding the details of the legal process, processing testimony and presentation of evidence in the courtroom, and comprehending his role in working meaningfully with his defense lawyers[.]" CV-ECF No.[33-8:152-53 of 194, ¶¶63, 65] (Dr. Kraus); CV-ECF No.[33-9:21-22 of 156, ¶74] (Dr. James). Dr. Kraus states that Sanchez's mental health "call[s]

102

into doubt his ability to understand the trial proceedings and to assist his appointed trial counsel in a rational manner." CV-ECF No.[33-8:153 of 156, ¶65]. This connection between competency at trial and Sanchez's intellectual disability and mental health raises a bona fide doubt "he lack[ed] the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[,]" and therefore he should "not [have] be[en] subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

> Dr. Grant would have advised counsel:

> [Sanchez] at a minimum, needs more time to accurately process that information in order to comprehend the meaning of what had transpired[;] … that information may need to be repeated and/or discussed with his counsel for him to comprehend the proceedings[; and,] that it was critical to take frequent breaks in the proceedings, and that these breaks should occur at least as often as after the testimony of each witness, and should last long enough for the attorneys to review the testimony with Mr. Sanchez, explain what was important in the testimony to him, and ask him questions to ensure that he understood.

CV-ECF No.[52-1:38-39 of 112, ¶35]; *see also* No.[33-9:21-22 of 156, ¶¶74-75] (Dr. James).

Counsel unreasonably failed to request accommodations in order to maximize Sanchez's understanding of the nature and consequences of the capital proceedings and his rational and proper assistance in his own defense. As a result, Sanchez understood very little about the trial proceedings.

Furthermore, Sanchez was prejudiced by counsel's failure to request a competency hearing. As set forth herein, there were facts indicating a "reasonable cause to believe" that Sanchez was "suffering from a mental disease or defect" that rendered him unable "to assist properly in his defense." 18 U.S.C. § 4241(a) (setting forth the standard under which a competency hearing shall be granted). Sanchez need only demonstrate that the Court would have held a competency hearing; he does not need to show that he would actually have been found incompetent. *Becton*, 920 F.2d at 1193 (the focus of an IAC claim is the conduct of counsel).

103

Had counsel conducted an adequate investigation and presented the above information to the Court, it is reasonably probable that a competency hearing would have been held and that Sanchez would have been found incompetent to stand trial, at least without significant accommodations for his impairments. This qualifies as ineffective assistance of counsel and resulted in the denial of his rights guaranteed by the Fifth, Sixth, and Eighth Amendments. *Strickland v. Washington*, 466 U.S. at 687 ("counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"); *Newman v. Harrington*, 726 F.3d 921 (7th Cir. 2013) (IAC for failure to raise the issue of client's competency); *Hummel v. Rosemeyer*, 564 F.3d 290 (3d Cir. 2009) (same).

Even if the hearing did not result in a finding of incompetence—if counsel had conducted an adequate investigation—there is a reasonable probability that it would have resulted in accommodations so that Sanchez would have better understood the court proceedings, and/or it would have revealed Sanchez's intellectual disability that would have exempted him from the death penalty. At a minimum, such an examination would have revealed Sanchez's intellectual disability, neuropsychological impairments and psychiatric symptoms that, in turn, would have supported an argument against death qualification and/or would have supported substantial mitigating circumstances and a probability of a life sentence. *See* Claim 3, *supra*, and Claim 8, *infra*. *See also Porter v. McCollum*, 558 U.S. 30, 40 (2009) (describing mitigation that arose from court-ordered competency evaluations); *Blanco v. Singletary*, 943 F.2d 1477, 1503 (11th Cir. 1991) ("One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury and judge should have had an opportunity to consider."); *Becton*, 920 F.2d at 1194 (the defendant suffered prejudice where no mental health defense was available to him because of counsel's failure to investigate, and no defense was offered at trial).

104

Sanchez's psychiatric, neurocognitive, and intellectual impairments likely interfered with his understanding of trial proceedings and participation in the preparation of his defense because counsel did not obtain adequate accommodations from the Court or otherwise work with Sanchez to maximize his understanding and participation. As a result, Sanchez proceeded to trial without being competent to do so and was unaware of the import of a vast majority of the court proceedings, including the immediate fact that he was *not* sentenced to probation, he was sentenced to death. These errors violated the Fifth, Sixth, and Eighth Amendments. This Court should grant relief with regard to the criminal convictions and death sentences, or, at a minimum, hold an evidentiary hearing on this claim.

**V.      The prosecution's presentation of testimony of a medical examiner who did not conduct or observe the autopsies of the victims violated Mr. Sanchez's rights under the Fifth, Sixth, and Eighth Amendments; trial counsel were ineffective for failing to object to the substitution of the medical examiner.[75]**

The autopsy of each victim in this case was conducted by Dr. Charles A. Diggs, an Associate Medical Examiner in the Office of the Medical Examiner for the Nineteenth District of Florida, which includes St. Lucie County. Dr. Diggs did not, however, testify to his findings and opinions. The Government instead moved to offer a substitute medical examiner, Dr. Roger E. Mittleman, who ultimately testified. *See* CR-ECF No.[522] (government's motion to allow for substitution of medical examiner). Defense counsel did not object to the substitution. *See* CR-

---

[75] This claim has been reorganized, supplemented with additional facts, and brief discussions of law have been added in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that the Government had violated Sanchez's rights to due process by presenting the testimony of a medical examiner who did not conduct, or participate in any way in, the autopsies of the victims, whose opinions were not based upon materials which medical examiners rely, and whose opinions were, in fact, substantively incorrect and that trial counsel was ineffective for failing to object to that testimony. Additional facts are alleged to demonstrate the prejudice suffered by Sanchez as a result of both constitutional violations, more specifically, that Sanchez's jury was presented with, and considered, materially incorrect expert opinion.

ECF No.[531] (government's amended unopposed motion to allow for substitution of medical examiner); CR-ECF No.[729:3395-96]. The magistrate court granted the motion in a one-word, handwritten order. CR-ECF No.[538].

The use of testimony by a substitute medical examiner regarding facts about the autopsies performed by a non-testifying medical examiner—including adoption of the opinions of the non-testifying doctor from the autopsy reports—violated Sanchez's rights to due process and confrontation under the Fifth and Sixth Amendments. *See Crawford v. Washington*, 541 U.S. 36 (2004). It also violated Sanchez's rights under the Eighth Amendment for failure to adhere to the heightened procedural safeguards required in capital cases. The failure to object to this clear constitutional violation violated Sanchez's right to the effective assistance of counsel under the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668 (1984).

Dr. Diggs performed the autopsies of all four victims in this case and authored all four autopsy reports. By the time of trial, however, Dr. Diggs had retired from practice. CR-ECF No.[729:3363]. In its unopposed motion to permit substitution of the testifying medical examiner, the Government represented that Dr. Diggs had moved to Tampa and that health concerns made travel for him "extremely difficult." CR-ECF No.[522:1]. The Government did not allege that Dr. Diggs was unavailable for Confrontation Clause purposes, nor did the Court so find. CR-ECF No.[522]; No.[531]; No.[538]. And Dr. Diggs was not unavailable due to chronic health concerns, as he has testified by video deposition in at least one other trial subsequent to Sanchez's trial. Shelley Rossetter, *Tampa Man Stands Trial for Decades-old Murder*, Tampa Bay Times, April 30, 2013, *available at*

http://www.tampabay.com/news/courts/criminal/tampa-man-stands-trial-for-decades-old-murder/2118253.

106

Dr. Mittleman was substituted without objection from the defense. Dr. Mittleman had not himself conducted the autopsies at issue. CR-ECF No.[729:3363]. Dr. Mittleman's name does not appear on the autopsy reports, and there is no indication that Dr. Mittleman directly observed or participated in the autopsies in any way. Dr. Mittleman was nonetheless permitted to testify to Dr. Diggs's findings and opinions without challenge. Not only was Dr. Mittleman permitted to testify to Dr. Diggs's findings and opinions, he was permitted to testify to additional conclusions that he came to on his own that were not reflected in any way in Dr. Diggs's autopsy reports. The conclusions testified to by Dr. Mittleman are particularly problematic in light of the fact that numerous complaints of incompetence and unethical behavior have been leveled against him over the course of his career. *See*, *e.g.*, Dana Calvo, *Medical Examiner Setting Standards*, South Florida Sun-Sentinel, April 19, 1998, *available at* http://articles.sun-sentinel.com/1998-04-19/news/9804180177_1_medical-examiner-mittleman-families ("'Inaccurate information or an inability to identify victims can be horrific for a grieving community, Mittleman said. 'I don't think we should be in the business of hurting people,' he said. State prosecutors are concerned he takes that philosophy too far. They are investigating charges he falsified public records.'"); Jose Luis Jimenez, *Quincy He Ain't*, Miami New Times, May 27, 1999, *available at* http://www.miaminewtimes.com/news/quincy-he-aint-6358651 (describing multiple allegations of mismanagement, incompetence, and unethical behavior).

Dr. Mittleman testified that the cause of Luis Damian Escobedo's death was "[h]emorrhage around the lungs, in the lungs, heart, blood in the air passageways, altogether." CR-ECF No.[729:3465]. Dr. Diggs's autopsy report lists Luis Damian Escobedo's cause of death simply as "multiple gunshot wounds." Even more problematic, Dr. Mittleman offered florid and gruesome details about Luis Damian Escobedo's mechanism of death that were not contained in

107

Dr. Diggs's autopsy report nor reasonably deducible from the report or any of the other materials in Dr. Mittleman's possession. Specifically, he testified that the death of Luis Damian Escobedo was "a suffocating type of death," which he equated to "drowning in one's own blood." CR-ECF No.[729:3458]. Dr. Mittleman likewise offered testimony regarding the death of Luis Julian Escobedo that is found nowhere in the autopsy report. For example, he opined that the gunshot wound to Luis Julian Escobedo's head was consistent with the shooter standing over him while he lay on the ground. CR-ECF No.[729:3451-52].

While some of Dr. Mittleman's opinions went beyond the scope of the autopsy reports, all of his testimony was dependent on the work, findings, and opinions of Dr. Diggs, who was not present for cross-examination by the defense. Dr. Diggs's autopsy reports were unquestionably testimonial in nature, as they were prepared in anticipation of use at a criminal trial. Indeed, both an investigator from the medical examiner's office and Dr. Diggs himself traveled to the crime scene where they viewed the bodies on the side of the Florida Turnpike before they were transported. The investigator and Dr. Diggs did so because they were summoned to the scene by law enforcement officials. The autopsies were thus plainly conducted in the aid of a law enforcement investigation. In view of the defense's inability to cross-examine the medical examiner who actually performed the autopsies, as well as Dr. Mittleman's unsupported embellishments to Dr. Diggs's findings, Sanchez's Fifth Amendment Due Process right, his Sixth Amendment Confrontation Clause right, and his Eighth Amendment right to be free from cruel and unusual punishment were violated.

At the time of Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant were expected to consider all legal claims potentially available, thoroughly investigate and evaluate such claims, and preserve any and all conceivable errors.

108

2003 ABA Guidelines, Guideline 10.8.A and Commentary, 31 Hofstra L. Rev. at 1028-30. Trial counsel were ineffective in failing to object to Dr. Mittleman's substituted testimony. The introduction of testimonial evidence that a criminal defendant has no opportunity to cross-examine violates the Confrontation Clause. This Confrontation Clause violation is plain and would have been evident to any attorney acting reasonably.

Counsel's failure to object was unreasonable, particularly given that the Government flagged the Confrontation Clause issue in its motion to substitute the medical examiner. *See* CR-ECF No.[522:4-5]; No.[531:4-5]. It was additionally unreasonable for counsel to fail to object given that the Government provided supplemental discovery with Dr. Mittleman's additional opinions that were not included in Dr. Diggs's autopsy reports well in advance of trial. Defense counsel had plenty of notice regarding the constitutionally problematic and inflammatory evidence the Government ultimately introduced. Counsel appeared disengaged on this issue. Not only did they fail to object to the Confrontation Clause violation in advance of trial, but they performed no questioning of Dr. Mittleman at trial. They did not *voir dire* him on his qualifications, CR-ECF No.[729:3358], and they did not ask a single question on cross-examination. CR-ECF No.[729:3466]. Nor did they engage the services of an independent forensic pathologist—either to use as a witness or to consult with—regarding the problems inherent in Dr. Mittleman's testimony.

Counsel had no reasonable basis for failing to object to Dr. Mittleman's substitution, particularly given that the issue was raised significantly in advance of trial by way of written motion. Counsel had no legitimate reason for permitting the Government to violate their client's Confrontation Clause rights. Counsel apparently failed to appreciate the meritorious Confrontation Clause objection that existed separate and apart from any issue of admissibility

109

under the Federal Rules of Evidence. Indeed, during the middle of Dr. Mittleman's testimony,

the Court *sua sponte* made a record that defense counsel were knowingly waiving objection to

the substitution of the medical examiner because the autopsy reports were admissible under the

Federal Rules of Evidence:

> THE COURT: I just want the record to be very clear in this regard, and I know the lawyers are aware of this.
>
> Dr. Mittleman was not the Medical Examiner, and obviously the doctor in a sense is providing two different types of testimony. He is repeating for us and explaining to us the information contained in medical records, the examiner's autopsy reports, and obviously independent of all that he is giving us the benefit of his opinion testimony as a forensic pathologist.
>
> I just want to be very clear, the autopsy reports are in fact, of course, admissible. I am looking at the case of United States versus Rosa, R-O-S-A, 11 Federal 3rd, page 315, and I assume it is because of a recognition that those types [of] reports would be admissible under Federal Rule of Evidence 803.8, there has been no objection to the fact that the reports were in fact not introduced and the doctor is effectively giving testimony from a document not in evidence.
>
> I simply want the record to be clear, defense counsel are aware of that and that they are purposefully not objecting.
>
> Is that my understanding? Am I correct?
>
> MR. COHEN: That is correct.
>
> THE COURT: I am not questioning it. I want the record to reflect that. Okay. That is perfectly fine.

CR-ECF No.[729:3395-96].

At no point did the Court or counsel make any reference to the Confrontation Clause. The

Court and counsel each seemed to view the issue as purely an evidentiary matter.

Sanchez was prejudiced by counsel's failure to object. Current counsel for Sanchez have

engaged a well-qualified independent forensic pathologist, Dr. David Fowler, who explains that

Dr. Diggs's autopsy reports were severely deficient and fell well below the standard of care for

minimum competence in the field of forensic pathology. Dr. Diggs would have been ripe for cross-examination if he offered any opinion beyond the basic, straightforward facts that the Escobedos died of gunshot wounds and that their manner of death was homicide. Much of Dr. Mittleman's testimony was not only unsupported by Dr. Diggs's work, it was inaccurate. Luis Damian Escobedo did not drown in his own blood; the gunshot wound to his chest caused his death within a matter of a few seconds. And Dr. Mittleman's conclusion that Luis Julian Escobedo was shot while lying on the ground with the shooter standing above him was purely speculative and lacking in reliable scientific foundation. Dr. Mittleman nonetheless was permitted to testify to these gruesome details about the deaths of each of the children that were unsupported and inaccurate without any challenge whatsoever.

The Government exploited Dr. Mittleman's testimony to inflame the passions of the jury. The prosecutor referenced the "drowning in blood" conclusion in his opening statement, and twice more in his closing argument. CR-ECF No.[728:3043]; No.[766:7161, 7164]. And the prosecutor referenced Dr. Mittleman's testimony that the gunshots were consistent with the shooter standing directly over Luis Julian Escobedo and firing directly down into his head in order to describe the killing as a "cold blooded execution." CR-ECF No.[766:7170-71]. [76] Defense counsel eventually recognized the prejudicial impact of this information. In advance of the penalty phase, counsel moved *in limine* to preclude further reference to the "drowning"

---

[76] The Eleventh Circuit specifically referenced this inflammatory information in its opinion denying relief on direct appeal, *United States v. Troya*, 733 F.3d 1125, 1136 (11th Cir. 2013), as did a juror when speaking to the press about why the jury voted to sentence Sanchez to death. Daphne Duret, *Juror cites killing of children as reason for death sentences*, Palm Beach Post, April 4, 2009, available at:
http://articles.sun-sentinel.com/2009-04-04/news/0904040002_1_jurors-daniel-troya-danny-varela (referencing speculative testimony that shooter stood over Luis Julian Escobedo while firing downwards).

comment because its prejudicial impact outweighed any probative value at the penalty phase. CR-ECF No.[773:7898]. The Government did not object. CR-ECF No.[773:7898-99]. But at that point, the damage was done. The jury had repeatedly heard the information. And press reports and the split sentencing verdict on the death penalty counts would ultimately make clear that it was the murders of the children that caused the jury to sentence Sanchez to death.

There is a reasonable probability that, had counsel objected, excluded the testimony of Dr. Mittleman, and cross-examined Dr. Diggs, the jury would not have convicted Sanchez or, at a minimum, would not have sentenced Sanchez to death.

**VI.     The Government violated its obligations pursuant to *Brady v. Maryland* by failing to disclose exculpatory information to the defense that was material to the guilt phase of trial.** [77]

Under the Due Process Clause, the Government must disclose material, exculpatory evidence to a criminal defendant. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). This includes evidence impeaching the credibility of a Government witness. *Giglio v. United States*, 405 U.S. 150, 153-56 (1972). As part of its *Brady* obligation, the Government has a duty to learn of favorable evidence from others acting on its behalf, including the police. *Kyles v. Whitley*, 514

---

[77] This claim has been reorganized and supplemented with additional facts and brief discussions of law in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim. Subsections (B), (C) and (F) have been re-designated as subsection (A) and supplemented with facts contained in, and/or reasonably inferred from the Government's July 20, 2016 disclosure of six DEA-6 forms (Appx A-001716-49) and the March 28, 2016 response of the Office of State Attorney for the 19th Judicial District of Florida by Chief Assistant State Attorney Thomas Bukkedahl (select documents found in the Appendix, Appx at A-001756-59) to Sanchez's prior counsel's public records request, as well as inferences which, in light of such disclosures, may now be drawn from evidence provided to Sanchez's counsel at the time of trial. *See United States v. Biberfeld*, 957 F.2d 98, 104 (3d Cir. 1992). Subsection (A) also provides additional discussion of prejudice resulting from the Government's *Brady* violation as to both guilt and penalty phase of Sanchez's trial. Former subsection (A) has been withdrawn. Former subsection (D) is re-designated as subsection (B). Former subsection (E) has been re-designated as subsection (C). Former subsection (G) has been re-designated as subsection (D).

U.S. 419, 437 (1995). It goes without saying that the duty to these requirements "is never more exacting than it is in a capital case." *Kyles*, 514 U.S. at 422.

The Government's failure to disclose *Brady* material requires a new trial when the exculpatory evidence would have been material to the trial. If there is any reasonable likelihood that the non-disclosure could have affected the judgment of the jury, relief must be granted. The materiality of suppressed evidence must be considered collectively, not item-by-item. *Kyles*, 514 U.S. at 436. Due process is also violated when the Government knowingly relies on false evidence and argument. *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

**A. The Government failed to disclose material evidence of third party guilt and/or the innocence of Ricardo Sanchez in the murder of the Escobedo family and the alleged carjacking of their vehicle.**

During opening argument, Sanchez's trial counsel argued to the jury that the Escobedo family had been murdered not by Sanchez and/or Troya, but rather by members of drug cartels operating, among other places, near the City of Matamoros in the Country of Mexico and the City of Brownsville in the State of Texas. As motive for the murder, counsel argued that Escobedo owed the cartels $187,000.00. CR-ECF No.[728:64-66].

At trial, however, only the scantest evidence of the involvement of Mexican drug cartels was introduced. A binder of handwritten documents—identified by the Government as a "drug ledger" (Gov't Exh. 103c) (which, on a page containing the heading "money that needs to get paid" and bore the number 187,000 and the word "Matamoros") was introduced by the Government.[78] CR-ECF No.[731:66-67, 106-07]. Defense counsel was able to elicit testimony from one Government law enforcement witness that Matamoros is a known corridor for the

---

[78] The Government, however, argued the ledger showed a debt owing from Varela to Escobedo and evidenced a motive for Varela's organization to kill the Escobedo family.

transportation of cocaine into the United States, *id.* at 105, and from another Government law enforcement witness that, <u>if</u> money were owing, yet unpaid, from an "intermediary" to people in the drug business in Matamoros, that kidnapping, carjacking, and murder could be the result. CR-ECF No.[758:148-50]. The only other evidence supporting the defense theory of the case were telephone records from a phone belonging to Yessica Escobedo bearing number 956-266-2004, which Sanchez's counsel claimed indicated that the phone was used in McAllen, Texas during the time period the Escobedo family was killed. Def. Trial Exh. 32, Appx at A-001772. With no further evidence supporting their theory of defense, trial counsel could do no more than argue that the debt <u>might</u> have been owing from Escobedo to Mexican drug cartels because Escobedo had moved to South Florida from Brownsville, Texas. CR-ECF No.[766:183-84]; No.[767:31-32, 41-42, 76-78]. Ultimately, that almost bare argument was not accepted by the jury.

### 1. The Government possessed evidence demonstrating that the Escobedo family was murdered by the *Los Zetas*/Gulf cartels after Luis Escobedo failed to pay the cartel approximately $250,000.

The failure of the prosecution to disclose evidence revealing another legitimate suspect violates *Brady*. *D'Ambrosio v. Bagley*, 527 F.3d 489 (6th Cir. 2008). Similarly, the failure to disclose that an uncharged third-party may have committed the offense is a *Brady* violation. *Smith v. Secretary of New Mexico Department of Corrections*, 50 F.3d 801, 829-35 (10th Cir. 1995). Likewise, withholding information that would suggest that another person committed the offense violates *Brady*. *Miller v. Angliker*, 848 F.2d 1312, 1321-23 (3d Cir. 1988). *See also Manning v. State*, 884 So. 2d 717, 726-27 (Miss. 2004) (granting leave to pursue post-conviction relief on claim that prosecution had violated *Brady* by failing to disclose evidence of an alternate suspect).

Here, substantial evidence existed within the Government's possession showing that the fate of the Escobedo family was sealed long before the early morning hours of October 13, 2006, and far away from the side of the Florida Turnpike. Unbeknownst to both Sanchez's counsel and his jury, prosecutors Kastrenakes and Carlton were in possession of material evidence that Luis Escobedo, working together with his brother, Manuel Escobedo (who had already been federally convicted for major drug trafficking offenses and was a Federal escapee at the time of the murders) were one of the main connections between the notorious *Los Zetas* drug cartel of northeast Mexico and the cartel's efforts to distribute cocaine throughout South Florida. More significantly, it showed not only that on October 11, 2006 (the day before he and his family were murdered), *Los Zetas* had sent men to Florida to meet with Escobedo to collect between $100,000 and $300,000 Luis had not paid, but also that two high-ranking *Los Zetas* members, Oscar Venegas and Mario Soto, told a still-unknown DEA Confidential Source that Luis Escobedo still owed them for 13 kilos of cocaine at the time of his death.

In addition, the withheld materials illuminated records already in trial counsel's possession. Consistent with Luis Escobedo meeting with *Los Zetas* members on October 11, 2006, a hotel receipt introduced by the Government at trial and telephone records from two Escobedo phones show Escobedo travelled to the Tampa/Fort Pierce area on October 11. They also show that, sometime after Escobedo returned from that meeting, one of those phones was taken from his possession by a person who returned with it to the McAllen, Texas area where *Los Zetas* was known to be actively involved in the cocaine trade. They similarly revealed that it was a second group of *Los Zetas* who provided Escobedo with 15 kilos of cocaine intended for Varela in the Daytona Beach/Ormond Beach less than three hours before his death. Finally, the withheld material not only demonstrate that the numerous, yet seemingly innocent, phone calls

115

between Luis Escobedo and his brother Manuel—phone calls which continued to within a mere hour of when the Government claimed the Escobedo family was killed—were for the purpose of advising Manuel of the progress of Luis' journey home, but also that Manuel Escobedo was passing that information over to cartel bosses Venegas and Soto. The withheld evidence, both independently and taken together with other evidence which was—or could have been— presented at trial, not only meets the *Brady* test for materiality, it is more consistent with Troya's and Sanchez's innocence than it is their guilt.

Luis Escobedo was dealing in multiple kilogram quantities of cocaine before he ever left South Texas (across from Matamoros, Mexico). After moving to South Florida in June 2006, saying he was in the business of "selling cars," [79] Luis Escobedo became one of the cartels' primary connections to the South and Central Florida cocaine markets. Each week Oscar "Muneco" (translated 'The Doll') Venegas, a cartel leader,[80] would send Luis Escobedo up to 50 kilos of cocaine, carried by *Los Zetas* cartel members loyal to Venegas' close associate, Martin Soto.[81] According to a *Los Zetas* member who also carried cocaine for Martin Soto, one method of transport was to have cartel members secure 4 kilos of cocaine to their bodies and then travel

---

[79] *See* MySA.com, 10/22/2006, *Brownsville mourns – and wonders – after family slain*, ("But Jose Luis was a small-scale used-car dealer") Appx at A-001750; *See also* DEA-6, *6/5/2007 Debriefing of Juan Carlos Santos on 05-24-2007*, p.2 ¶3, Appx at A-001740 ("Santos was "looking to purchase used cars.").

[80] *See* "Tampico violence leaves 17 dead" *Publilatin*, 4/7/2014 (Reporting Venegas as among rival Gulf cartel leaders seeking control of cartel activity in "Plaza de Tampico, and surrounding municipalities that form the so-called Southern corridor of the [Tamaulipas State of Mexico].")http://www.microsofttranslator.com/BV.aspx?ref=IE8Activity&a=http%3A%2F%2F www.publilatin.publimetro.us%2F2014%2F04%2Fviolencia-en-tampico-deja-17-muertos.html (translated link).

[81] DEA-6, *6/5/2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007*, pp.1-2 ¶¶2, 7, Appx at A-001730-31; Email, 10/16/2006, Robert T. Franklin to Armando Ramirez, Appx at A-001757-59.

by air to Florida. The next week another group[82] of *Los Zetas* would travel to Florida to collect the proceeds.[83] Escobedo would sell the cocaine for $18,000/kilo (*i.e.,* approximately $800,000 per week). In exchange, Venegas would pay Escobedo $1000 per kilo (approximately $50,000 per week) together with his rent and other bills.[84] At the time he and his family were killed, however, Escobedo had failed to pay Venegas for 13 kilos of cocaine (approximately $230,000).[85]

A day before the murders, October 11, 2006, Venegas'/Soto's men met with Escobedo in order to collect between $100,000 and $300,000.[86] The evidence introduced at trial demonstrated—and the Government argued—that Luis Escobedo and his family traveled to Ft Meyers, Florida that evening, spending the night, at the airport LaQuinta Inn in Ft. Myers.[87] A La Quinta hotel receipt in Yessica Escobedo's name introduced at trial indicates, as well as the evidence of their journey from West Palm Beach to Daytona Beach/Ormond Beach, that the Escobedo family returned the next day, October 12, 2006. The records of the Escobedo 956-266-2004 phone show that, whether by force or agreement, *Los Zetas* took possession of that phone sometime later that day.[88] Finally, the records of the 956-266-2004 phone, together with the withheld materials, establish that the *Los Zetas* member who was in possession of the second

---

[82] DEA-6, *6/6/2007 Debrief of I.C.E. Confidential Source on 05-23-2007*, p.2 ¶6, Appx at A-001734 (Two weeks before the murders cartel <u>members</u> had come to Florida to and picked up money from Luis Escobedo.).

[83] Email, 10/16/2006, Robert T. Franklin to Armando Ramirez; Appx at A-001757-59; DEA-6, *6/5/2007 Debrief of Brownsville RO CS-07-12 on 05-22-2007*, p.2 ¶7, Appx at A-001731.

[84] DEA-6, *6/5/2007 Debrief of Brownsville RO CS-07-12 on 05-22-2007*, p.2 ¶6, Appx at A-001734.

[85] Email, 10/16/2006, Robert T. Franklin to Armando Ramirez, Appx at A-001757-58.

[86] DEA-6, *6/6/2007 Debrief of I.C.E. Confidential Source on 05-23-2007*, p.2 ¶5, Appx at A-001731.

[87] *Id. See also* CR-ECF No.[731:3833-36]; Gov't Exh. 302.20.

[88] *See* Claim VII(A); *See also* DEA-6, *6/6/2007 Debriefing of I.C.E. Confidential Source on 05-23-2007*, p.2 Appx at A-001731.

Escobedo phone and who had come to Florida to collect between $100,000 and $300,000 from

Luis Escobedo, did not return the 956-266-2004 phone. Instead, he left Florida with it still in his

possession and made his way to the vicinity of McAllen, Texas, arriving sometime before

midnight. From the McAllen area, less than an hour driving time to the west of

Brownsville/Matamoros, he made three calls to a 956-742-9994 phone in Harlingen, Texas

beginning at 11:58 P.M. CST that night.[89] The last of those calls was made at 3:18 A.M. CST.[90]

Even though an innocent person would have had no way of knowing that Luis Escobedo and his

family were dead, no calls were made during that time to the phone's owners, Luis and Yessica

Escobedo, to tell them that the phone had been taken to Texas. In fact, the Government has

produced no evidence that the 956-266-2004 phone was ever used to attempt to contact

Escobedo at any time after it was taken to Texas.

As Luis Escobedo moved north, just as he was reaching the Daytona area, Escobedo

began to exchange calls with the 956-243-7313 phone later discovered to be in the possession of

Juan Santos. The last of those calls was exchanged through the furthest north cellular tower on

Luis Escobedo's journey. In other words, it was made after Escobedo had reached the delivery

point for the 15 kilos of *Los Zetas* cocaine Varela had purchased from Escobedo.[91]

The withheld materials revealed that the 956-243-7313 phone was in the possession of

Juan Santos, who had flown from Harlingen, Texas to Orlando on October 9, 2006. They also

---

[89] The Government possesses (*see* ORDER, October 16, 2006, *In Re Homicide INVESTIGATION*, Case Number 1-06-013332, Circuit Court, Fifteenth Judicial Circuit, St. Lucie County, Florida), but has not disclosed, the records of the 956-742-9994 telephone. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion. Appx at A-001765-70.

[90] The 956-266-2004 phone was in McCallen, Texas when it made three calls to 956-742-9994 in Harlingen, Texas. CR-ECF No.[765:6979]; Def. Trial Exh. 32, Bates No. 197, Appx at A-001772.

[91] CR-ECF No.[758:6503-09]; Gov't Exh. 708 (561-891-1220 phone records introduced at trial).

reveal that Santos was a drug trafficker who shared a "ranch" on the Port of Brownsville and who: (1) was interviewed by Florida law enforcement, including Assistant United States Attorney Stephen Carlton; (2) was granted immunity by Carlton for anything he revealed during that interview; (3) was believed by law enforcement to nonetheless be lying about the source of his livelihood; (4) was believed by law enforcement to nonetheless be lying about the purpose of his visit to Florida; and, (5) whose dishonesty was confirmed by his ex-wife. [92] The withheld materials further indicate that the Government is in possession of, but still has not disclosed, records from the 956-243-7313 phone revealing that, as Santos was preparing to meet Escobedo in Daytona Beach/Ormond Beach, Santos was also in contact with a prepaid phone with the number 386-785-5684 which had been bought under the fictitious name of David Blank. The Government interviewed the actual owner of that phone, Juana Beltran. In its report, the Government noted that Ms. Beltran was the sister of Jose Candelario Beltran, Cecilio Beltran, and Edgar Beltran, all of whom appear to be known to drug enforcement agents. Though Ms. Beltran denied allowing her brothers to use her phone, the agents did not believe her and she was unable to provide an alternate explanation why her phone had exchanged numerous calls with Santos on the night of the Escobedo murders.[93]

The records of Luis Escobedo's 561-891-1220 phone demonstrate that, both as he drove to Daytona Beach/Ormond Beach and as he returned home during the early morning hours of the day he and his family were killed, Luis Escobedo was also speaking by telephone to another person, his brother, Manuel. While the timing of these calls suggest that those conversations

---

[92] DEA-6, *6/5/2007 Debriefing of Juan Carlos Santos on 05-24-2007*, pp.1-2 ¶¶1-8, Appx at A-001739-40; DEA-6, *10/5/2007 Interview of Norma Guzman on 10-1-2007*, p.1 ¶¶3-7, Appx at A-001743.

[93] DEA-6, *10/5/2007 Interview of Juana Beltran on 10-2-2007*, p.2 ¶¶4-7, Appx at A-001747.

were somehow related to Luis Escobedo's ongoing drug trafficking activities,[94] the withheld

materials reveal they were not merely related to those activities, but that Luis Escobedo was

providing his brother with regular updates of his progress. In fact, Manuel Escobedo spoke to

Luis only an hour before his death, a conversation during which Luis told Manuel, "that they

(unspecified) were still behind him (Luis ESCOBEDO) but was not concerned."[95] More

importantly, the withheld materials reveal that Manuel Escobedo was providing this information

to *Los Zetas*. Only three days after the Escobedo family was murdered, Venegas and Soto passed

the substance of Luis' and Manuel's final conversation to a still-unknown DEA Confidential

Source.[96]

Together with the evidence available at the time of trial and/or actually presented at trial,

the withheld evidence clearly establishes that, at the time the maroon van driven by Troya

followed Escobedo's black Jeep onto the Florida Turnpike: (1) at least two groups of *Los Zetas*

members were in Florida, one group which was sent to collect between $100,000 and $300,000

from Luis Escobedo and one group which was sent to provide the 15 kilos of cartel cocaine sold

to Varela; (2) *Los Zetas* operatives met with Luis Escobedo at least 3 times within 24 hours of

the murders; once in the Fort Pierce area on October 11, 2006, the second sometime on October

12 as he was in route to Daytona Beach—when they took possession of his cell phone, and a

third time in the Daytona Beach area when *Los Zetas* operatives provide him with Varela's

cocaine; (3) notwithstanding the first group's purpose in coming to Florida, Escobedo still owed

---

[94] *See* Claim VII(A).
[95] Whether Luis Escobedo was referring to the two men sent to protect him (Troya and Sanchez) or to the men sent from Texas to Florida by high-ranking *Los Zetas* members Venegas and Soto— to whom he still owed over $200,000—is unknown. DEA-6, *6/5/2007 Debrief of Brownsville RO CS-07-12 on 05-22-2007*, Appx at A-001731.
[96] *Id.*

120

cartel bosses Venegas and Soto for 13 kilos of cocaine at the time he was killed; and, (4) Manuel Escobedo both knew, and informed Venegas and Soto, of the details of Luis Escobedo's return trip from Daytona Beach/Ormond Beach. Viewed in the light of the withheld evidence, the Government's remaining evidence, particularly had it been tested in the cauldron of an adversarial testing conducted by effective counsel,[97] falls far short of establishing Sanchez's connection to <u>any</u> crime perpetrated against Escobedo or any member of his family.

Turnpike surveillance videotapes, and fingerprint evidence indicated that Troya and Sanchez entered the Florida Turnpike Fort Pierce Toll Booth at 2:18 A.M. on October 13, 2006, just behind Luis Escobedo's Jeep. CR-ECF No.[728:211]. The evidence also showed that Troya and Sanchez took possession of the Escobedo vehicle and that the two vehicles left the turnpike at the Okeechobee toll booth, mile marker 99,[98] at 3:02 A.M.[99] Furthermore, the evidence showed that another vehicle entered and exited the turnpike at the same time interval as Troya and Sanchez. After identifying the Escobedo vehicle, law enforcement obtained and retained only that portion of turnpike surveillance videos. Toll tickets outside those specific entry and exit times were not obtained/retained or tested for fingerprints. No other evidence was introduced at trial from which it could be determined: (1) whether Luis Escobedo had met *Los Zetas* members shortly after entering the Turnpike—voluntarily relinquishing the Jeep at that time so Troya and Sanchez could complete the delivery of Varela's 15 kilos of cocaine; (2) whether *Los Zetas* members compelled Escobedo to relinquish the Jeep for the same purpose (and to prevent Troya and Sanchez from witnessing what was about to happen); (3) <u>or</u> whether, as the Government argued at trial, Troya and Sanchez had taken the Jeep by force. What is known is that the actions

---

[97] *See* Claim VII.
[98] CR-ECF No.[729:3288].
[99] CR-ECF No.[729:3324-25].

of Troya and Sanchez after leaving the turnpike are more consistent with the first two of these three possible scenarios than they are the last.

Upon arriving back in West Palm Beach, Troya and Sanchez drove to Varela's house and delivered 15 kilos of cocaine. Kevin Vetere, a Government witness, testified that he saw Varela, Sanchez, Troya, and another man, unload what appeared to be bags used to carry kilogram packages of cocaine at the Varela residence in the early morning hours of October 13, 2006.[100] Vetere also testified that during the early morning hours he saw the Escobedo Jeep at the home of Danny Varela's uncle, a place where Varela routinely parked vehicles because of the limited parking available at his own residence.[101] Vetere stated that, even though the Jeep was parked near the back of the small lot, it could be seen from the road and, in fact, Vetere had seen the Jeep from where he was parked in front of the uncle's home.[102] Vetere stated that Varela, Sanchez, Troya, and Gutierrez arrived at the uncle's home a few minutes later and Varela asked him to take the Jeep and park it on the street in front of Vetere's grandmother's house.[103] After doing so, Vetere joined Varela, Troya, Sanchez, and Gutierrez for breakfast at Denny's restaurant.[104] The Government offered no evidence to suggest that any attempt was made to conceal, or dispose of, the Jeep on the night the murders of the Escobedo family were carried out.

After daylight the next morning the executed bodies of the Escobedo family were found in plain view alongside the Florida Turnpike. According to the testimony of Dr. Mittleman, Luis Escobedo had 5 original entry wounds, including one in the penis. CR-ECF No.[729:3368,

---

[100] CR-ECF No.[754:5451, 5463-65].
[101] CR-ECF No.[754:5459-61].
[102] CR-ECF No.[754:5464].
[103] CR-ECF No.[754:5466-69].
[104] CR-ECF No.[754:5471].

3387]. Yessica Escobedo, with her children, lie huddled together on the ground. She had been shot 11 separate times. CR-ECF No.[729:3400]. Their two children had been shot 4 and 3 separate times respectively. CR-ECF No.[729:3432, 3234,3439, 3454-62]. After an exhaustive square foot by square foot search, only 11 spent shell casings were found at the scene. Gov't Exh. 3. CR-ECF No.[728:3218-19]. In addition, 3 projectiles were found at the scene. *Id.* Another 14 projectiles were recovered from the bodies: 3 from Luis Escobedo CR-ECF No.[729:3368]; 8 from Yessica Escobedo CR-ECF No.[729:3400]; 2 from Julian Escobedo CR-ECF No.[729:3432]; and, 1 from Damien Escobedo CR-ECF No.[729:3454]. Indeed, the Government itself argued that the scene pointed to a "triangulation of fire" by "military style operation" "thug enforcers."[105] (The Government's attempted to attribute that "military style operation" to Troya and Sanchez—as opposed to the *Los Zetas* organization which the Government knew to be in contact with Escobedo on the day he and his family were murdered— through the false and/or misleading testimony of its purported "tool mark experts," *See infra* at Claim VII.

Much like the Escobedo's Jeep, no effort was made to conceal Varela's van that night. It remained parked in the driveway in front of Varela's home for days after the murder. It was not until long after word of the Escobedo murders had become widespread, and shortly before his arrest, that Varela finally took the van to a friend and asked that it be repainted. Moreover, when the Escobedo Jeep, which had been left parked on the street in front of the home of the

---

[105] CR-ECF No.[676:7444-45]. The Government did not reveal either the involvement of the *Los Zetas* cartel in the night's events or the fact that *Los Zetas* was founded and operated by former (and sometimes current) members of Mexico's military and law enforcement. *See* Michael Ware, *Los Zetas called Mexico's Most Dangerous Drug Cartel*, CNN (Aug. 6, 2009), http://www.cnn.com/2009/WORLD/americas/08/06/mexico.drug.cartels/index.html.

grandmother of Kevin Vetere, was located near the airport three days later,[106] a full container of gasoline was found next to it. The container of gasoline had not been used to destroy the vehicle in those three days. The delay in attempting to conceal and/or destroy the Escobedo Jeep and Varela's van is inconsistent with Troya, Sanchez (or for that matter Varela) having knowledge that the vehicles were related to a quadruple murder before that information became public knowledge.[107]

According to the Government's evidence at trial, Sanchez purchased a gold chain valued at $5000 and Troya exchanged a kilo of cocaine worth approximately $20,000 for an automobile in the days following the murders.[108] Both purchases combined represented a monetary amount of less than the value of 10% of the 15 kilos of cocaine the pair had delivered to its purchaser, Varela. The Government introduced no substantial evidence that either Troya or Sanchez received any other compensation for their efforts of October 12-13, 2006, and expressly denied that Troya and Sanchez had acted at the behest of Varela. The Government introduced no evidence to explain why Troya and Sanchez would turn over to Varela the 15 kilos of cocaine they had allegedly obtained by killing four people. Troya and Sanchez's actions were consistent with doing no more than assuring the safe delivery of Varela's cocaine and being compensated for doing so. The actions of the various *Los Zetas* contingents, on the other hand, were not consistent with merely collecting money from, and delivering cocaine to, Luis Escobedo.

---

[106] CR-ECF No.[731:3888-89].

[107] The story of the Escobedo murders was hitting the press throughout the East Coast by mid-day October 13, 2006, *see* Email, 10/13/2006, Rafael X. Reyes to Armando Ramirez and Joe X. Villarreal III (Appx at A-001758-59) and was on the front page of a newspaper by the morning of October 14th. CR-ECF No.[754:5485-87].

[108] CR-ECF No.[754:5477-78]; No.[753:5652].

The *Los Zetas* who took Escobedo's 956-266-2004 phone to McAllen, Texas didn't call Escobedo when he arrived in Texas, and he never attempted to call Escobedo when they arrived back in Texas. Moreover, it is clear from the fact that the phone was used to attempt to call other persons after it arrived in Texas that the absence of any phone call to Escobedo was not because its bearer was unaware that he had accidently left Florida without returning Escobedo's phone. Rather, it shows a conscious decision not to call. In fact, even after the deaths of the Escobedo family had become national news, that phone was not used to attempt to call any member of the Escobedo family, including Luis Escobedo's brother Manuel who had been intimately involved in delivery of 15 kilos of cocaine just hours before the murders. Instead, it was used to call telephones registered in California and South Texas. Finally, it was not provided to law enforcement.

Also indicative of guilt is the dishonesty of the people whom Government agents concluded were likely directly connected to the delivery of the 15 kilos destined for Varela, attempted to deny any involvement whatsoever, even when one of them could have done so without suffering any repercussions whatsoever if, indeed, he were not involved in the murder. *See United States v. Johnson,* 64 F.3d 1120, 1128 (8th Cir. 1995) (opining that lying to law enforcement agents is circumstantial evidence of guilt); *United States v. Stanley,* 24 F.3d 1314, 1321 (11th Cir. 1994) (stating that conflicting statements and implausible stories were indicia of guilt in a conspiracy conviction); *United States v. Solis,* 841 F.2d 307, 310 (9th Cir. 1988) (ruling that "making up an implausible cover story" contributes to a finding of guilt). During her interview, Juana Beltran, in the opinion of Agent Weeks, made false statements to conceal that she knew Juan Santos and denied that her brothers had used her phone to call Santos right before

the Escobedos were killed.[109] During the debrief of Santos, after Carlton gave him immunity, Santos told an elaborate story of how he was just in Florida to visit his ex-wife and children and only called Luis Escobedo for the purpose of buying cars in South Florida to sell in South Texas. Santos' story was explicitly refuted by his ex-wife, Norma Guzman–who also stated that Santos made his living in the drug trade, even before they were divorced. It was also believed to be inconsistent with the still-undisclosed telephone records for the 956-243-7313 phone. Moreover, Santos did so despite being granted immunity by Assistant U.S. Attorney Stephen Carlton.[110] Carlton, along with lead prosecutor Kastrenakes, subsequently sought convictions for Sanchez and Troya and pursued and obtained death sentences.

Because the Government withheld evidence of the cartel's involvement with Escobedo in the months, days, and hours leading up to Escobedo's death (and, at trial actually stated that the cartels were not involved), Sanchez's jury was unable to consider whether it was more likely that the *Los Zetas* cartel, and not Troya and Sanchez, carried out the murders of the Escobedo family. More importantly, the jury was deprived of the opportunity to make the more legally salient decision of whether there remained a reasonable doubt about Troya and Sanchez's participation in the killings.

---

[109] *See infra* at fn.93.

[110] DEA-6, *6/5/2007 Debrief of Juan Carlos Santos on 05-24-2007*, p.1 ¶1, Appx at A-001739 ("SANTOS attorney, Noë Garza, who was also at the debriefing requested that a Proffer Agreement be signed before his client made any statements. AUSA Carlton agreed to this request and the agreement was signed. The following is a summary of SANTOS' immunized statements and is not purported to be a verbatim account."). The immunity agreement has not been disclosed to Sanchez's counsel.

126

**2.** **The Government concealed and continues to conceal exculpatory evidence.**

The likelihood that the story behind the Escobedo family's seemingly orchestrated dead bodies alongside the Florida Turnpike began in the Brownsville, Texas/Matamoros, Mexico drug cartels was obvious to the Government. Barely hours after the bodies were discovered, Florida DEA agents contacted their counterparts in Brownsville with their network of connections to the Gulf and *Los Zetas* drug cartels asking whether talk of the murders had surfaced. In three days, the Government's cartel sources were providing remarkably detailed accounts of Luis Escobedo's cartel connections and his activities within hours of his death. Even as AUSA's Kastrenakes and Carlton disavowed cartel involvement in the case and mocked/derided trial counsel for their inability to point to evidence in support of their claim that the Escobedos had been killed by members of Mexican drug cartels, the forgoing evidence was in the Government's possession. Indeed, counsel for the Government had assisted in gathering it.

On July 20, 2016, after Sanchez's trial, after his conviction, after his appeal, after even his initial § 2255 motion for relief, AUSA Carlton disclosed to Sanchez's prior §2255 counsel six DEA-6 forms. On or about March 28, 2016, the Office of State Attorney for the 19th Judicial District of Florida by Chief Assistant State Attorney Thomas Bukkedahl, responded to a public records request from Sanchez's prior § 2255 counsel. Included within that response were three pages of emails between DEA agents in Florida and agents in the DEA Resident Office in Brownsville, Texas. [111] Neither the six DEA-6 reports provided by counsel for the Government, nor the emails provided by the Florida State Attorneys' office were disclosed to trial counsel.

---

[111] The three pages of emails between federal DEA Agents disclosed by the Florida State Attorney's office were not included within the supplemental discovery response provided by counsel for the Government.

127

That material shows that Agent Rafael X. Reyes, the Chief of the Mexico and Central America Section of the Drug Enforcement Administration, sent an email to Armando Ramirez, Resident Agent in Charge, Brownsville Resident Office at 2:09 P.M. on October 13, 2006 (the day the bodies of the Escobedo family were discovered). [112] The email names the adult victims and asks: "wondering if information has come your way or if the names sound familiar." Three days later, Agent Robert T. Franklin sent an email to Agent Ramirez and others stating that Agent Franklin and Agent Juan Cano had talked to a confidential source on the morning of October 16, 2006. The source told them that he/she had met with Martin Soto and "Muneco" Oscar Flores-Venegas, both high-ranking members of the Gulf Cartel, who had told him that Escobedo had picked up 15 kilos of cocaine belonging to Venegas in Jacksonville, Florida, on the day he was killed. Just three days after the murder, Venegas and Soto already knew that Escobedo was being accompanied by the buyer, a fact not publicly known.[113] Venegas and Soto told the confidential source the cocaine had been transported to Jacksonville by Soto's men. He added that Escobedo owed Venegas "for 13 kilos already" at the time the Escobedos were killed.[114] The confidential source also said that Manuel Escobedo, Luis's brother, lives in

---

[112] Email, 10/13/2006, Armando Ramirez to Jose X. Villarreal, and others. Appx at A-001758-59.

[113] "The buyer" refers to Varela's men, Troya and Sanchez.

[114] The confidential source referenced in the October 16, 2006 email was/is in possession of exculpatory information identifying other suspects (*i.e.*, Venegas and Soto) in the murder of the Escobedo family with equal, if not greater, motive to carry out the murders and equal opportunity to do so. The identity of the confidential source has not been revealed by the Government. Information tending to show the nature and extent of the role, position, and activities of Venegas and Soto within the *Los Zetas* cartel, the Gulf cartel, and/or any other international criminal enterprise involved in the distribution of cocaine within the United States, is relevant to the opportunity, motive, and/or likelihood that Venegas and Soto carried out those murders. The Government did not produce such information to Sanchez's trial counsel. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion.

Matamoros, Mexico, and that the confidential source expected to see him in Matamoros that weekend and would try to find out the identity of the buyers.[115]

The Government has provided no material regarding any subsequent investigative efforts of the Brownsville DEA office, however, a DEA-6 form prepared by David Weeks on June 6, 2007,[116] reports an interview of "Brownsville RO CS-07-12" in Brownsville, Texas, on May 22, 2007, (almost 8 months later) in the presence of Agent Weeks, Agent Richard Birch, and St. Lucie County Sheriff's Office Detective Fred Wilson. Similar to the confidential source interviewed on October 16, 2006, Brownsville RO CS-07-12 stated and that he had obtained his information directly from Soto and that Escobedo was in possession of 15 kilos of Venegas' cocaine at the time of his murder. According to Weeks, Brownsville RO CS-07-12 added details about Escobedo's relationship with Venegas and Soto. He stated that Venegas charged Escobedo $17,000 per kilo of cocaine. Escobedo would sell the cocaine for $18,000 and split the $1000 difference with his brother, Manuel. Venegas paid Escobedo's rent and other bills. Escobedo was receiving between 30 and 50 kilos of cocaine per week. Also according to Brownsville RO CS-07-12, Luis Escobedo spoke to Manuel Escobedo approximately one hour prior to the homicides.

Agent Weeks's report, however, stated that Brownsville RO CS-07-12 told him that "the one with the grill" was the buyer of the cocaine, that the buyer was upset about its quality, that it was "possible" that the cocaine was being cut in Mexico prior to being shipped to the United States, and that the person buying the cocaine "already owed Luis Escobedo for 10 kilograms of

---

[115] Email, 10/16/2006, Robert T. Franklin to Armando Ramirez, Appx at A-001758-59.
[116] DEA-6, *6/5/2007 Debrief of Brownsville RO CS-07-12 on 05-22-2007*, Appx at A-001730.

cocaine."[117] Agent Weeks' Brownsville RO CS-07-12 interview was not provided to trial counsel. [118]

The next day, Agent Weeks interviewed "ICE Confidential Source." With him were Agent Richard Birch, and AUSA Carlton. Even more was learned about Escobedo and the dangerous men for whom he worked. "ICE Confidential Source" told Weeks, Carlton, and the others that in 1999 he was buying ½ to 1 kilo of cocaine per week from Luis Escobedo and that after a brief hiatus resumed buying cocaine from him in 2001. He said that Yessica Escobedo's father, Felipe Guerrero, approached him after his daughter's murder and to obtain information what had happened. For that information, ICE Confidential Source turned to his associates in the *Los Zetas* drug cartel in Matamoros, Mexico. Though the associates, like Venegas, denied responsibility, they admitted that "someone from Matamoros" had been with Escobedo the day before the murders to pick up between $100,000 and $300,000. They also told ICE Confidential Source that two weeks before the murder, the "occupants of a green Chevrolet Suburban" had picked up more money from Escobedo. According to "ICE Confidential Source," his *Los Zetas* associates stated that Escobedo obtained his cocaine from "Martin Sosa."

---

[117] *See*, however, Email, 10/16/2006, Robert T. Franklin to Armando Ramirez, Appx at A-001757. (When interviewed less than a week after speaking to Venegas and Soto, confidential source states that Escobedo owed money to Venegas for 13 kilos of cocaine).

[118] Brownsville RO CS-07-12 (RO CS-07-12 is believed to be the same person interviewed by Agents Franklin and Cano on October 16, 2006). This confidential source was/is in possession of exculpatory information identifying other suspects (*i.e.*, Venegas and Soto) in the murder of the Escobedo family with equal, if not greater, motive to carry out the murders and equal opportunity to do so. The identity of the confidential source has not been revealed by the Government. Moreover, though information tending to show the nature and extent of the role, position, and activities of Venegas and Soto within the *Los Zetas* cartel, the Gulf cartel, and/or any other international criminal enterprise involved in the distribution of cocaine within the United States is relevant to the opportunity and motive of Venegas and Soto to carry out those murders, and/or the likelihood that they did carry out those murders, the Government did not produce such information to Sanchez's trial counsel. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion.

"ICE Confidential Source," who personally transported large amounts of cocaine to South Florida for "Sosa," provided further insights into "Sosa's" methods, telling the agents and Mr. Carlton that he, together with some of "Sosa's" men, would affix 4 kilos of cocaine to their bodies and travel by air to multiple Florida cities, delivering, at times, up to 40 (*i.e.*, 4 × 10) kilos of cocaine total. [119] Agent Weeks' report of the "ICE Confidential Source" interview was not provided to trial counsel. [120]

That same day, Agent Weeks interviewed Victor Cortinas, the record owner of a cellular phone with the number 956-243-7313 which had exchanged a number of calls with the Escobedo's 561-891-1220 phone on October 12, 2006, shortly before Escobedo is believed to have received 15 kilos of cocaine destined for Danny Varela. Cortinas explained that he was indeed the owner of a cellular telephone with the number 956-243-7313, but told Weeks that the phone was in the possessions of his brother-in-law, Juan Santos, on October 12, 2006. He also told them that Mr. Santos' ex-wife, Norma Guzman, lives in Florida and provided the

---

[119] DEA-6, *6/6/2007 Debrief of I.C.E. Confidential Source on 05-23-2007*, Appx at A-001734.

[120] The "ICE Confidential Source" was/is in possession of exculpatory information identifying other another suspect, *i.e.*, "Martin Sosa" (Mr. Sosa is believed to be the same person identified as "Martin Soto" by CS-07-12) in the murder of the Escobedo family with equal, if not greater, motive to carry out the murders and equal opportunity to do so. Further, "ICE Confidential Source" had/has personal knowledge of the methods by "Sosa" to transport large quantities of cocaine to Florida which are consistent with other evidence of interactions between "Sosa" and Escobedo at the time of the murders, more specifically including, but not limited to, "Sosa's" use of aircraft <u>and</u> the simultaneous use of multiple cartel members. Such information is relevant to the opportunity and motive of "Sosa" to carry out the murders of the Escobedo family, and/or the likelihood that he did carry out those murders. The identity of the "ICE Confidential Source" has not been revealed by the Government. Moreover, though information tending to show the nature and extent of the role, position, and activities of "Sosa" within the *Los Zetas* cartel, the Gulf cartel, and/or any other international criminal enterprise involved in the distribution of cocaine within the United States is relevant to the opportunity and motive of "Sosa" to carry out those murders, and/or the likelihood that they did carry out those murders, the Government did not produce such information to Sanchez's trial counsel. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion.

131

Government with Ms. Guzman's contact information.[121] Agent Weeks' report of the Cortinas interview was not provided to trial counsel.

A day later, Agent Weeks, this time accompanied by Assistant U.S. Attorney Carlton, interviewed Santos, but first Santos was granted immunity. Even after the grant of immunity Santos told a story that Agent Weeks found unbelievable. Santos claimed that he made his living buying and selling used cars and that he met Luis Escobedo at a barbeque in Brownville, Texas in June of 2006. He claimed that at that barbeque Escobedo told him that he could help Santos find used cars in Florida. He admitted he was actually in the State of Florida on the day that Luis Escobedo was murdered, however, he insisted that he and his current wife had flown from Harlingen to Orlando to visit his four children in Bradenton and that after picking them up from Norma Guzman they had spent the night in Ocala. He admitted that he called Escobedo using the cellular phone with the number 956-243-7313 (Victor Cortinas' phone), but claimed that he did so merely to see whether Escobedo could find used cars in Florida. According to Santos, he called Escobedo at 6:00 in the evening of October 12, and again at 8:00 that night.[122] He claimed that he never spoke to Escobedo before or since, and he denied being involved in drug trafficking with Escobedo.[123] At the end of his report, Agent Weeks noted: "Believed to have been

---

[121] DEA-6, *6/5/2007 Interview of Victor Cortinas on 05-23-2007*, pp.1-2 ¶¶2, 3, 6, Appx at A-001736-37.

[122] The records from Escobedo's 561-891-1220 phone indicate that Santos and Escobedo actually exchanged, and/or attempted to exchange, calls at 9:29, 9:34, 9:46, and 9:47 the night of October 12, 2006.

[123] DEA-6, *6/5/2007 Debriefing of Juan Carlos Santos on 05-24-2007*, pp.1-2 ¶¶ 1-8, Appx at A-001739-40.

associated with the delivery of 15 Kilograms of cocaine on 10-12-06 to Jose Luis ESCOBEDO in Florida."[124] Agent Weeks' report of Santos' interview was not provided to trial counsel.[125]

Unconvinced by Santos' story, Agent Weeks interviewed Norma Guzman. Ms. Guzman stated she learned early in their relationship that Santos was involved in drug trafficking and that (other than two years ending in January of 2004 during which he worked as a mechanic) his only source of income was drug trafficking. She stated that she had learned from friends that Santos was still involved in drug trafficking and that Santos was then currently hiring individuals to transport drugs on his behalf to various locations. She added that Santos travelled via commercial airlines to various locations to pick up the drug proceeds. Regarding Santos' story regarding travelling to Bradenton in October of 2006 to visit his children, Guzman stated: (1) those events did not occur; (2) she did not trust Santos; and, (3) she had never allowed Santos to

---

[124] DEA-6, *6/5/2007 Debriefing of Juan Carlos Santos on 05-24-2007*, p.3, Appx at A-001740.

[125] Juan Carlos Santos had/has personal knowledge of the methods by Venegas and Soto to transport large quantities of cocaine to Florida which are consistent with other evidence of interactions between the associates of Venegas and Soto delivering 15 kilos of cocaine belonging to Soto and/or Venegas to Escobedo on the night of the murders, more specifically including, but not limited to, the identity of those persons. Though the Government has failed to produce a subpoena or any other request for the records of cellular telephone with the number 956-243-7313 used by Mr. Santos on and about the date of the murder of the Escobedo family, the interview of Juana Beltran demonstrates that such records were in the possession of the Government no later than October 2, 2007. Based upon the debriefs of the confidential source interviewed by Agents Franklin and Cano on October 16, 2006, CS-07-12 and "ICE Confidential Source," Santos would have also had telephonic contact persons within the *Los Zetas* and/or Gulf cartels who were involved in the delivery of 15 kilos. Such contacts are likely to lead to the discovery of relevant evidence, including, but not limited to the identity of persons having greater knowledge of the nature and extent of the role, position, and activities of Venegas and Soto within the *Los Zetas* cartel, the Gulf cartel, and/or any other international criminal enterprise involved in the distribution of cocaine within the United States is relevant to the opportunity and motive of Venegas and Soto to carry out those murders, and/or the likelihood that they did carry out those murders. The Government did not produce such information to Sanchez's trial counsel and has not produced any such information to Sanchez's current counsel. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion.

take the children without someone she knew present to supervise them.[126] Agent Weeks showed

Ms. Guzman a photograph of Gus Martin which Agent Weeks had in his possession. She

identified Martin and stated that Martin and Santos rented a ranch near the Port of

Brownsville.[127] Agent Weeks' report of the Norma Guzman interview was not provided to trial

counsel.

Continuing his investigation of Santos, Agent Weeks interviewed Juana Beltran on

October 2, 2007. In his DEA-6 report of that interview, he stated "The purpose of this interview

was to determine the owner/user of prepaid cellular telephone number 386-785-5684 during the

period of October 2006. This telephone number, subscribed in what is believed to be the

fictitious name of David Blank, was in contact with Juan Carlos SANTOS numerous times on

October 12, 2006." Weeks' report states that Juana Beltran is believed to be the sister of Jose

Candelario Beltran, Cecilio Beltran, and Edgar Beltran. During her interview, Juana Beltran

denied knowing Santos, denied allowing her brothers to use her phone, and denied any

knowledge of the numerous calls between her phone and Santos's phone on the night of the

Escobedo murders.[128] Weeks did not believe her denial. Agent Weeks' report of the Juana

Beltran interview was not provided to trial counsel. [129]

---

[126] DEA-6, *10/5/2007 Interview of Norma Guzman on 10-01-2007*, Appx at A-001742-43; DEA-6, *6/5/2007 Debriefing of Juan Carlos Santos on 05-24-2007*, pp.2-3, ¶¶ 3-11, Appx at A-001740-41.

[127] The Port of Brownsville is a deep-water port known to be an entry point for illegal drugs entering the United States by sea from Mexico.

[128] DEA-6, *10/5/2007 Interview of Juana Beltran on 10-02-2007*, p.2, ¶¶4-7, Appx at A-001747.

[129] Juana Beltran had/has personal knowledge of either the identity of *Los Zetas* members assisting Juan Santos' delivery on 15 kilos of cocaine from Venegas and Soto to Luis Escobedo only hours before his death. Though the Government has failed to produce a subpoena or any other request for the records of cellular telephone with the number 386-785-5684 called by Mr. Santos on and about the date of the murder of the Escobedo family, the interview of Juana Beltran demonstrates that such records are likely in the possession of the Government. Based upon the debriefs of the confidential source interviewed by Agents Franklin and Cano on October 16, 2006, CS-07-12 and

### 3. The withheld evidence was material to both phases of Sanchez's capital trial

When analyzing a *Brady* claim based upon withheld evidence of third party guilt, courts do not "reweigh evidence, assess the credibility of witnesses, and decide whether the [suppressed evidence] establishes the guilt of [a third party] beyond a reasonable doubt or exonerates [petitioner]." *Banks v. Reynolds*, 54 F.3d 1508, 1521 (10th Cir. 1995). The question also is not "'whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but instead must determine whether the court can be confident that the jury's verdict would have been the same.'" *Scott v. Mullin*, 303 F.3d 1222, 1232 (10th Cir. 2002) (quoting *Kyles v. Whitley*, 514 U.S. 419, 453 (1995)).

### a. Guilt Phase

Powerful in its own right, there is little doubt that a reasonable probability exists that at least one juror would have reached a different conclusion on the question of Sanchez's guilt had it heard the evidence demonstrating that Luis Escobedo had associated himself with two high-level members of the *Los Zetas* drug cartel, Oscar Venegas and Martin Soto ("Sosa"); that he had distributed up to sixteen million dollars of cocaine on their behalf since he had moved to Florida;[130] that at least two groups of cartel members had direct contact with Escobedo on the night he was

---

"ICE Confidential Source," such would have also had telephonic contact persons within the *Los Zetas* and/or Gulf cartels who were involved in the delivery of 15 kilos, including, but not limited to, Juan Santos. Such contacts are likely to lead to the discovery of relevant evidence, including, but not limited to the identity of persons with possession of the 386-785-5684 phone at those times relevant hereto and/or such persons' activities on the night of October 12, 2006. The Government did not produce such information to Sanchez's trial counsel and has not produced any such information to Sanchez's current counsel. Unless that information is voluntarily provided, Sanchez will seek discovery of such information at the appropriate time and through an appropriate motion.
[130] Escobedo had lived in South Florida for eighteen weeks. The withheld materials state that he had been receiving up to 50 kilos per week of cocaine from *Los Zetas* and had been selling the cocaine for $18,000/kilo. DEA-6, *6/5/2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007*, pp.1-2, Appx at A-001730-31.

murdered, and that Luis Escobedo had failed to pay Venegas and Soto approximately a quarter of a million dollars. In fact, dispelling even the slightest notion that such facts existed was front and center in the Government's case. The Government argued before both the Court and the jury that no evidence existed that Escobedo was in any way affiliated with the Gulf and/or *Los Zetas* cartels. Shortly before trial, Assistant United States Attorney John Kastrenakes, the Government's lead counsel, filed a "Motion *In Limine* to Exclude Testimony by Defendants Sanchez's Proposed Expert Witness on Mexican Gangs." CR-ECF No.[760]. In that motion Kastrenakes stated:

> The proffered testimony of Dr. Bagley does not appear to make any fact of consequence more or less probable. No evidence admitted at trial to date establishes that any defendant, witness or victim was a member of the Gulf Cartel, and no member of that Cartel's enforcement group the Zeta has been identified as having any connection whatsoever to this case.

CR-ECF No.[760:3].

When trial counsel attempted to raise the question of Escobedo's connection to Matamoros, Mexico before the jury in closing, Mr. Kastrenakes railed:

> Apply your common sense. If you kill Lou Escobedo and his entire family, how are you ever going to get paid $187,000.00? You don't kill the person that owes the money, makes the same sense that Lou Escobedo would kill Danny Varela and his organization, they owe him 187 plus.
>
> Makes no sense.
>
> . . .
>
> You don't kill the entire family, you don't do that. You will never get paid. Who has a motive to kill? Common sense, folks, it is the people who have the debt, they owe the money. By killing Lou Escobedo and his entire family, where does that debt go to?

CR-ECF No.[767:7430-31].

On both occasions, Mr. Kastrenakes knew his statements were false at the time he made them. The withheld materials establishing just the opposite to be true were in his possession and they were, in large part, procured by his co-counsel, AUSA Carlton, and his lead investigator,

136

Agent Weeks. This prosecution team knew that Escobedo was dealing directly with the *Los Zetas* cartel. He knew Escobedo's supplier was not merely another "middle man" looking to get paid like any other businessman, but one of the most dangerous criminal organizations in the world and one which would not hesitate to kill a man and his entire family over an unpaid debt. *See Phillips v. Ornoski*, 673 F.3d 1168, 1186 (9th Cir. 2012) ("[The prosecutor] violated *Napue* [*v. Illinois*, 360 U.S. 264, 269, (1959)] by ... deliberately and unequivocally falsely representing to the jury in his closing argument that Colman had 'never been promised anything for her testimony in this case.'"). The prosecution knew of evidence that the *Los Zetas* cartel had motive and opportunity to kill the Escobedo family. The prosecution knew cartel operatives' actions after the murders were inconsistent with innocence. This evidence – had it reached the defense – was fatal to the Government's case.

The withheld materials reveal that Luis Escobedo was a major figure in *Los Zetas'* efforts to spread their cocaine distribution network throughout south Florida, entrusted with the distribution of up to three-quarters of a million dollars-worth of cocaine every week and having access through the person of his brother Manuel to Oscar Venegas and Mario Soto, both high-ranking figures within the cartel. It shows that *Los Zetas* members came to Florida from Texas less than 36 hours prior to when Luis Escobedo and his family were murdered and that at least some of these cartel members were indisputably present in Florida three hours prior to the murders. It reveals that one of their purposes for coming to Florida was to collect between $100,000 and $300,000 that Escobedo owed the cartel and that at the time of his death, he still owed *Los Zetas* for 13 kilos (approximately $200,000) of cocaine. Together with the cell phone records introduced at trial, the withheld evidence demonstrates *Los Zetas'* movements as they crisscrossed Florida October 11-13, 2006, movements which paralleled the very paths which the

137

Government argued at trial were also taken by Luis Escobedo. Finally, they show a deliberate effort by every person within the Government's reach—because those at the top of *Los Zetas'* forays into Florida sat safely across the United States/Mexico border—to conceal the fact that they were even connected to cocaine distribution at all, much less murder, even when they could have admitted it with complete impunity.

In the face of such evidence, the Government's case would not have stood. It's very theory of the case, that Ricardo Sanchez, plagued with intellectual disabilities as he is, devised a plan to kill a major cog in the South Florida operations of one of the most violent drug cartels on the planet in exchange for a gold chain strains credulity. Furthermore, the necessary implication of that suggestion, *i.e.*, that he did so without he, his family, or the people he cares about suffering any retribution from the cartel whatsoever approaches farce. As demonstrated above, the evidence supplied by Kevin Vetere—who in return escaped a prison term that well might have been for the rest of his life—that Varela received the 15 kilos of cocaine which were his in the first place and that Troya and Sanchez received a yeoman's portion of the 15 kilos of cocaine in Escobedo's possession, is entirely consistent with the pair doing exactly what they were sent to do, to safely deliver the cocaine to its purchaser and their boss, Danny Varela. The Government's evidence purporting to show more, to directly connect the pair to the murders is, in one part demonstrably false,[131] and in the remaining part meaningless in light of the withheld evidence. The [falsely] claimed match[132] of all 11 of the spent casings found at the scene to two firearms, even if it were true, shows only that at least two guns were used, it does not show the number of men present, nor their identities. The purportedly "scientific" evidence—that a

---

[131] *See* Claim VII(A).
[132] *See* Claim VII(A).

particular magazine can be identified as the source of scratches made on the sides of two sets of two cartridges, one fired and one unfired, is wholly without a basis in science, much less so, logic.[133] Finally, neither the generalized braggadocio of two would-be characters from "Scarface," coming only after the Escobedo families' bodies had been discovered can erase Escobedo's quarter of a million dollar debt to cartel bosses Oscar Venegas and Mario Soto, or the cartel members who were in Escobedo's company on the very night he and his family were murdered.[134]

The withheld evidence demonstrates that Escobedo was distributing 50 kilos of cocaine in South Florida for the *Los Zetas* cartel every week. It shows that even though one group of *Los Zetas* had come to Florida to collect $100,000 to $300,000 from Escobedo the day before he was killed, Escobedo still owed the cartel for 13 kilos of cocaine at the time he was killed. It shows meeting after meeting (after meeting after meeting) between Escobedo and *Los Zetas* over the 36 hours prior to his execution. It shows cartel bosses Venegas and Soto with real-time knowledge of the details of Escobedo's trip both to and from the Daytona Beach area. It shows a pattern of deceit by every person identified by the Government as being involved from Brownsville, Texas to Ormond Beach, Florida. It shows motive, opportunity, and evasion by one of the deadliest drug cartels in the world.

Given that evidence, the Government's theory that they had proven beyond a reasonable doubt that Troya and Sanchez, with no guidance whatsoever from Danny Varela, killed Varela's sole supply of cocaine, Luis Escobedo, to erase a $187,000 debt allegedly owing from Varela to Escobedo would have been patently incredible to not just "a reasonable juror," but to "all

---

[133] *See* Claim VII(A).

[134] Even absent the withheld evidence, Sanchez's jury required three-and-a-half days in order to reach a unanimous determination of guilt.

reasonable jurors." Moreover, in order for the Government's theory of the case to have been accepted, 12 jurors would have had to conclude that Troya and Sanchez conspired to not merely "kill the goose that laid the golden egg," but rather conspired to kill, and in fact did kill, an integral part of the *Los Zetas* cartel's efforts to expand its reach into the state of Florida (and his entire family) and that the cartel simply turned the other cheek.

The withheld evidence was material to the guilt phase of Sanchez's capital trial.

### b. Penalty Phase

There is also a reasonable probability that at least one juror hearing the withheld evidence together with the evidence presented at trial would have also found powerful statutory and non-statutory mitigating factors sufficient to outweigh the aggravating factors, even had they concluded Sanchez was present during, and/or had participated in, the murder of the Escobedo family.

Given the evidence presented at trial, the withheld evidence would have established the 18 U.S.C. § 3592(a)(2) Duress mitigating factor. The Government introduced no evidence whatsoever that Sanchez was a member of, or regularly associated with, *Los Zetas* cartel. Because there is a reasonable probability that one or more jurors would have concluded from the withheld evidence that the Escobedo family was killed at the direction of *Los Zetas* and/or Gulf cartels, those jurors necessarily would have concluded: (1) Sanchez's participation in that act was at the direction of these cartels; and, (2) Sanchez would have been under extreme duress to carry out such directions. Sanchez would have known that his life and the innocent lives of his family, including his own young son, would be placed in danger by refusing to participate. Had Sanchez's jurors reached the conclusion that the cartel had killed the entire Escobedo family to set an example, there is a reasonable probability they would have determined that Sanchez was faced with a situation where his refusal to participate in the murder of the Escobedo family

140

would have not saved the lives of the Escobedo family, but would have caused the loss of the additional innocent lives of Sanchez's family.

In light of the evidence presented at trial, the withheld evidence would have also established the 18 U.S.C. § 3592(a)(3) Minor Participation mitigating factor. Once again, the Government introduced no evidence whatsoever that Sanchez was a member of, or regularly associated with, the *Los Zetas* cartel. Furthermore, it introduced no reliable evidence that Sanchez participated in the actual shooting of the members of the Escobedo family. There is a reasonable probability that one or more jurors would have concluded that the plan to kill the Escobedo family originated with and was led by members of *Los Zetas* cartel and that members of the cartel carried out the killings themselves. The Government's remaining proof established, if anything, only that Troya and Sanchez facilitated the meeting during which the Escobedo family was killed.

At trial, many of Sanchez's jurors found the Equally culpable defendants § 3592(a)(4) mitigating factor based upon the argument that co-defendant (on related offenses, but not the capital offense) Danny Varela had directed the murder of the Escobedo family but had not been charged. There is a reasonable probability that one or more jurors would have concluded that the plan to kill the Escobedo family originated with and was led by members of *Los Zetas* cartel. At least one juror, and in all likelihood every juror, would have found the disparity between Sanchez and the uncharged leaders of one of the most violent criminal enterprises in the world to be even greater than that between Sanchez and Varela. For those jurors, additional weight would have been assigned to the (a)(4) mitigator.

There is a reasonable probability that the withheld evidence would have established additional 18 U.S.C. § 3592(a)(8) non-statutory mitigating factors. Given the withheld evidence,

141

the circumstances of the offense jurors considered at the time of sentencing would have been substantially more mitigating.

Moreover, the withheld evidence would also have diminished the weight of the aggravating factors argued by the Government for the jurors who decided whether Sanchez should live or die, even had they concluded Sanchez was present during, and/or had participated in, the murder of the Escobedo family.

In light of the evidence presented at trial, there is also a reasonable probability that the withheld evidence would have caused one or more of Sanchez's sentencing jurors to reject the 18 U.S.C. 3592(c)(8) Pecuniary Gain aggravating factor. If the plan to kill the Escobedo family originated with and was led by members of *Los Zetas* and/or Gulf cartels for the purpose of sending a warning to other people doing business with the cartel and that members of the cartel carried out the killings themselves, any money received by Troya and Sanchez from the delivery of Varela's 15 kilos of cocaine would have been the normal proceeds of the drug transaction between Varela and Escobedo and, accordingly, unrelated to the killings. In addition, there is a reasonable probability that the withheld evidence would have caused one or more jurors to reject the 18 U.S.C. § 3592(c)(9) Substantial Planning and Premeditation aggravating factor. Because that withheld evidence shows that the cartel ordered the killing of the children and not to eliminate them as witnesses to increase the impact of their message, there is a reasonable probability that the withheld evidence would have caused one or more of Sanchez's jurors to reject the witness elimination non-statutory aggravating factors.

The Government's case for a death sentence was not overwhelming. The jury deliberated three-and-a-half days before reaching a verdict. The withheld evidence could have tipped the balance away from the death penalty. The withheld evidence adds substantial weight to the

142

mitigating factor that Escobedo's criminal conduct contributed to his family's death (Mitigator #11), found by eleven jurors. Had the jurors received specific evidence supporting the uncharged third-party defense it is likely proposed Mitigator #43 (Sanchez's exact role in the offense is not sufficient to justify the death penalty) would have been accepted (as opposed to rejected). In addition, evidence demonstrating a reasonable possibility that Sanchez was not involved in the actual killings may have undermined eligibility factors, including: (1) intentional killing; (2) intentional infliction of serious injury resulting in death. Also undermined would have been aggravating factors including: (1) substantial planning and premeditation; (2) intentional killing of multiple victims; and, (3) witness elimination.  There is a reasonable probability that such evidence would have changed the sentencing balance for at least one of Sanchez's jurors.

The withheld evidence is material as to the penalty phase of Sanchez's capital trial.

**B. The Government failed to disclose material exculpatory information from the security booth at the Briar Bay neighborhood.**

The Government presented evidence, principally through witnesses Kevin Vetere and David Doran that shortly following the murders Sanchez and Troya returned to the Garden Court house. CR-ECF No.[732:3969-70] (testimony of David Doran that he observed the burgundy van and a dark-colored vehicle that may have been a Jeep SUV (owned by the Escobedos) returning to the Garden Court house between 4:30 and 5:00 A.M. on October 13, 2006); CR-ECF No.[754:5451] (testimony of Kevin Vetere that he observed Varela, Troya, Sanchez, and Gutierrez returning to the Garden Court house in the early morning hours of October 13, 2006, carrying bags); CR-ECF No.[754:5463] (testimony of Kevin Vetere that the bags being carried by these four individuals were of the type they typically used to transport kilos of cocaine).

The Garden Court house was located in a gated community. *See*, *e.g.*, CR-ECF No.[754: 5468]. Thus, in order for the van (owned by Varela) and the Jeep to arrive at the Garden Court

143

house, they would have needed to pass through the security gate. The Government obtained, and provided in discovery, the security logs from that security gate on October 12 and 13, 2006. CR-ECF No.[765:6969-70]. Those security logs did not indicate that Sanchez or Troya entered the security gate at the time indicated by Vetere and Doran. CR-ECF No.[765:6975]. The Government, upon cross-examination of the law enforcement witness who was involved in the investigation of the logs, Special Agent Jim Matthews, elicited that there was no way to know how accurate the logs were. CR-ECF No.[765:6983-84]. Defense counsel also elicited through Special Agent David Weeks that there were surveillance cameras at the Briar Bay security gate. CR-ECF No.[765:6968]. Upon cross-examination by the Government, Agent Weeks acknowledged that he had viewed video footage from the Briar Bay surveillance cameras covering the time period from October 12 to October 14, 2006. CR-ECF No.[765:6974-75]. Agent Weeks further testified that he did not deem anything he received from Briar Bay "relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th 2006."  CR-ECF No.[765:6975].

This video footage was not turned over to the defense. Video footage, unlike a security log, is not susceptible to a charge of inaccuracy due to human error. Given that the Government did not introduce this video footage in its case, the only logical conclusion is that it did not support Kevin Vetere's and Mr. Doran's testimony. This evidence is therefore exculpatory within the meaning of *Brady*. Failure to disclose the information was also material both as to guilt and punishment for Sanchez. Even assuming the Government's theory of the case that the Escobedos were killed as part of a drug robbery were plausible in light of the withheld evidence set forth in Claim VI(A), Vetere's testimony about the bags Varela, Troya, Sanchez, and Gutierrez were carrying in the middle of the night and his speculation about what those bags may

144

have contained served as some of the only evidence that this was, in fact, a drug robbery. If the defense had been able to use this video footage to undercut Vetere's testimony, it would have dealt a severe blow to the Government's case. There is a reasonable probability that, had the information been disclosed, Sanchez would not have been convicted and/or sentenced to death.

### C.  The Government failed to disclose material exculpatory information regarding benefits provided to cooperating witness Kevin Vetere.

Cooperating witness Kevin Vetere was one of the Government's principal witnesses. Vetere was initially indicted as a co-defendant to Sanchez, but pleaded guilty to Count 1 of the Superseding Indictment (the drug conspiracy) prior to trial and was sentenced to 144 months' imprisonment. CR-ECF No.[301]. Vetere testified that no further promise of benefit was made to him, but that he hoped his sentence might be reduced as a result of his cooperation. CR-ECF No.[754:5426] (stating that a reduction in sentence was "[j]ust a hope right now."). Vetere testified on cross-examination that he had entered into a limited use immunity agreement for his testimony that he hoped that his sentence might be reduced by 40 or 50 percent due to his cooperation, and that he was told he could be prosecuted on additional gun and drug charges. CR-ECF No.[753:5793-94]; No.[756:5843-45]. Following trial, Vetere's sentence was indeed reduced at a Rule 35 hearing. The Government asked for a 40% reduction in Vetere's sentence, to 86 months. The Court went substantially further, however, and reduced Vetere's sentence to only 42 months, or three-and-a-half years. CR-ECF No.[1059]. The extreme reduction in sentence received by Vetere, on a fraction of the criminal conduct for which he could have been charged, suggests that he had more than a mere hope that his cooperation at trial might prove fruitful.

The Government had an obligation to disclose any discussions with Vetere or his attorney that made his hope for future benefit more than merely speculative and aspirational.

145

**D. The cumulative materiality of the withheld evidence requires that Mr. Sanchez be granted a new trial and/or penalty hearing.**

As discussed above, *Brady* materiality must be determined cumulatively, rather than item-by-item. The cumulative materiality of the Government's non-disclosures prejudiced Mr. Sanchez.

**VII.   Mr. Sanchez was deprived of the effective assistance of counsel at the guilt phase of his capital trial.** [135]

Under the two-prong deficient performance and prejudice test of *Strickland v. Washington,* 466 U.S. 668, 687 (1984), the proper standard for attorney performance is that of "reasonably effective assistance" *i.e.*, counsel's performance must fall within the wide "range of professionally competent assistance." *Id.* at 687, 690. Prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 690. *Fortenberry v. Haley*, 297 F.3d 1213, 1225 (11th Cir. 2002) (citation and quotation marks omitted). More specifically, in challenging the prosecution's case at trial, defense counsel exhibit deficient performance when they fail to investigate adequately the sole strategy for a defense or to prepare evidence to support that defense. *See Code v. Montgomery,* 799 F.2d 1481, 1483-84 (11th Cir. 1986). The duty to investigate requires that counsel "conduct a substantial investigation into any of his client's plausible lines of

---

[135] This claim was presented as Claim VII in the original § 2255 Motion. Here, it has been reorganized, supplemented with additional facts, and brief discussions of law have been added in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel rendered ineffective assistance at the guilt phase of trial. CV-ECF No.[16-1:80 of 195]. Original Claim VII subpart(A) regarding counsel's failure to protect Sanchez's right to a representative jury, CV-ECF No.[16-1:81-88 of 195], has been re-designated as Subpart (C). Subparts (B), CV-ECF No.[16-1:88-94 of 195]; (C), CV-ECF No.[16-1:94-98 of 195]; and, (E), CV-ECF No.[16-1:102-05 of 195] have been combined under new Subpart (A) as (1), (2), and (3), respectively. Original Claim VII, Subpart (C), is now incorporated in Subpart (A). Original Claim VII, Subpart (F), is re-designated as Subpart (E).

defense." *House v. Balkcom,* 725 F.2d 608, 617-18 (11th Cir. 1984). Indeed, the Eleventh Circuit has held assistance ineffective when counsel ignored "red flags" that any reasonable attorney would have perceived to demand further investigation. *Cunningham v. Zant,* 928 F.2d 1006, 1018 (11th Cir. 1991). *See Fortenberry*, 297 F.3d at 1226-27.

Here, trial counsel's unreasonable and prejudicial failure to conduct a timely or adequate investigation of the guilt phase issues, including the failure to investigate and challenge the Government's tool mark and cellphone evidence and failing to investigate and gather additional evidence that could have supported the claim that the Escobedos had met unknown persons involved in the cocaine trade (*i.e.*, persons who had recently travelled from South Texas to Florida) after they entered the Florida Turnpike. Trial counsel unreasonably and prejudicially failed to object to the Government's guilt phase closing arguments in which the Government repeatedly vouched for the strength of its own investigation without any foundation or connection to the evidence. Finally, counsel unreasonably and prejudicially failed to object to the racial disparity in the composition of his jury. As a result of counsel's unreasonable and prejudicial failures, Sanchez's convictions were imposed in violation of his rights to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to due process of law; and to a reliable determination of penalty. U.S. Const. amends. V, VI, VIII; *Strickland v. Washington*, 466 U.S. 668 (1984).

> **A. Trial counsel failed to investigate and present available evidence supporting counsel's chosen defense.**

The Government's failure to disclose the fact and substance of its investigations into Luis Escobedo's involvement with the *Los Zetas* cartel swept away many of the tracks leading to the conclusion that the *Los Zetas* cartel was responsible for the deaths of the Escobedo family. *See* Claim VI, *infra.* It did not, however, prevent trial counsel from conducting the constitutionally-

147

required guilt phase investigation which would have revealed other evidence supporting their chosen defense, or from presenting such evidence to Sanchez's jury.

Here, the Government presented evidence at the guilt phase of Sanchez's trial that on the evening of October 12, 2006, Troya, together with Sanchez (travelling in a maroon van belonging to co-defendant Varela) accompanied the Escobedo family (travelling in their own black Jeep) from West Palm Beach, Florida, to the Daytona Beach, Florida area. While there, the Escobedos picked up a large shipment of cocaine. The Government also presented cell phone records, turnpike surveillance videotapes, and fingerprint evidence indicating that Troya and Sanchez accompanied the Escobedo family back from Daytona Beach to the Fort Pierce Toll Booth on the Florida Turnpike. There, at 2:18 A.M. the next morning both vehicles entered the turnpike. CR-ECF No.[728:3230]. Sometime after entering the turnpike, Troya and Sanchez took possession of the Escobedo vehicle. The Government presented evidence that Troya and Sanchez then left the turnpike, drove to the home of co-defendant Varela and delivered his cocaine.[136] After daylight the next morning the bodies of the Escobedo family were found alongside the Florida Turnpike. They had been murdered sometime between the time they entered the turnpike and the time their bodies were found.

To connect Troya and Sanchez to their murders and the carjacking of the Escobedo Jeep, the Government could turn to four pieces of circumstantial evidence. First, a resident of a subdivision near the location where the Escobedo family was murdered testified that she and her husband heard 8-9 "popping noises"[137] believed to be gunfire at 2:24 A.M. on October 13, 2006.

---

[136] The defense argued at trial that Troya and Sanchez accompanied Luis Escobedo and his family to protect them during a drug delivery ultimately destined for Varela. CR-ECF No.[767:7291-92].
[137] Eleven spent shell casings and three projectiles were found at the crime scene. Gov't Exh. 3. CR-ECR No.[728:3219]. According to the medical examiner's report, however, the victims' bodies exhibited 5 (CR-ECF No.[729:3368]), +11 (CR-ECF No.[729:3400]), +4 (CR-ECF

148

Second, after the murder of the Escobedo family became public knowledge, an attempt was made to burn the Escobedo Jeep and to repaint Varela's maroon van. Third, Government "tool mark experts" testified that scratches on empty casings found at the scene of the Escobedo murders were made by the same "tool," *i.e.* the same clip, as the scratches found on unfired rounds found at the Varela home. Finally, the Government presented a "drug ledger" found in the Escobedo home reflecting a large debt owing from someone to "Matamoros," but containing names/nicknames of Sanchez and other Varela associates next to various quantities of cocaine[138] Based on that evidence, the jury convicted Sanchez and sentenced him to death for the murders of the Escobedo children.

Had trial counsel not failed to conduct a timely and adequate investigation of the guilt phase issues, Sanchez's jury would have known that the Government had failed to present them with the whole truth. Telephone records provided to trial counsel demonstrated that Luis Escobedo was in both physical and telephonic contact with persons from the Brownsville/Matamoros area during the period of time he was travelling north along Interstate 75 toward Daytona Beach to pick up Varela's cocaine. Available evidence demonstrated that the Government's claim that a semi-automatic pistol magazine that had caused scratches on the sides

---

No.[729:3432, 3439, 3446]), +4 (CR-ECF No.[729:3454, 3460) **TOTAL 23** twenty-three separate wounds. Moreover, 3 (CR-ECF No.[729:3368]), +8 (CR-ECF No.[729:3400]), + 2 (CR-ECF No.[729:3432]), + 1 (CR-ECF No.[729:3454]) **TOTAL 14** fourteen projectiles were recovered from the bodies. Those, together with the three projectiles found at the crime scene, indicate that at least twice as many shots were fired during the actual murder of the Escobedo family as the number of "popping noises" heard by the Government's witness during the incident occurring at 2:24 A.M. The witness did not contemporaneously record the time at which she heard the popping noises, nor did she immediately call law enforcement. She did not contact law enforcement until she saw their investigative activities the following morning. She testified that, at the time she did call law enforcement, her recollection was that her clock indicated the time to be 2:24 A.M.

[138] *See,* however, *infra* at Claim VI (Evidence was withheld by the Government that, at the time he was killed, a debt was owed from Luis Escobedo to the *Los Zetas* cartel.).

149

of fired shell casings found at the crime scene to the magazine had also caused scratches on unfired rounds of ammunition found at the Varela home was unsupported by admissible evidence, and was, in fact, false. None of that evidence was presented to Sanchez's jury.

### 1. Trial counsel failed to fully investigate and present exculpatory cell phone record evidence.

A qualified expert would have explained that the cell phone records of the Escobedo's phones demonstrate that Escobedo gave one of his phones, a phone bearing the number 956-266-2004, to a third person sometime after the Escobedos began their journey to Daytona Beach. The expert would have testified that the phone was taken to South Texas on the night of the murders where it made contact with cell towers located in the McAllen, Texas area three times between midnight and shortly after 3:00 AM on October 13, 2006, the time frame during which the Escobedo family was murdered, to call a telephone located in Harlingen, Texas and bearing a South Texas area code. He would have also testified that the Escobedo phone continued to be used from outside the State of Florida for almost five days after the Escobedo family had been murdered, to contact and/or attempt to contact two numbers, one number with an area code from Southern California, the second a number with an area code from South Texas.

While the records of the 956-266-2004 phone established that Escobedo met with someone from South Texas (*i.e.*, the person who took possession of one of his phones) before he received Varela's 15 kilos of cocaine, the records of Escobedo's second phone, his 561-891-1220 phone, indicated that Escobedo received Varela's cocaine from yet another person from South Texas. Finally, they show that the delivery of that cocaine was in all likelihood arranged with the assistance of Escobedo's brother, a federal fugitive who had absconded after his conviction for a major drug offense involving kilo quantities of cocaine, who was in Texas and in constant telephonic contact with his brother.

150

During trial, Special Agent David Weeks pointed to Government Exhibit 760 (a demonstrative exhibit summarizing cell phone records for Varela, Troya, Sanchez and one of phones used by Escobedo and the location of the cell phone towers through which those four phones connected between 6:00 P.M. on October 12, 2006 and 2:39 A.M. on October 13, 2006). He testified to the effect that these records established that Escobedo (and his family), Troya and Sanchez met near a Longhorn Steakhouse in West Palm Beach, Florida at approximately 6:30 P.M. on October 12 (CR-ECF No.[764:6754-57]) and that the group travelled north, and arriving in the vicinity of Port Saint Lucie, Florida at approximately 7:19 P.M.[139] (CR-ECF No.[764:6758-61]), in the vicinity of Fort Pierce, Florida at 7:37 P.M.[140] (CR-ECF No.[764:6765-69]). Officer Weeks then testified about the phone call between Escobedo and Troya/Sanchez four hours later at 11:23 P.M. in the vicinity of 1842 Tomoka Farms Road, Daytona Beach, Florida.[141] (CR-ECF No.[764:6775]). During that call, both parties connected through the same cell tower. *Id.* The next call described by Weeks, occurred at 11:29 P.M. when Sanchez called Escobedo. According to Weeks, for that call Escobedo's phone connected through the cell tower located at 1617 Martin Dairy Road, Smyrna Beach, Florida and Sanchez's phone connected through the cell tower located at 6090 S. Williamson Blvd., Port Orange Florida, indicating that the Escobedos, Troya, and Sanchez had begun their return trip. Weeks provided no testimony regarding Escobedo's location from 7:38 P.M. until 11:23 P.M.

---

[139] Port Saint Lucie, Florida is approximately 49 miles north of West Palm Beach, Florida.

[140] Fort Pierce, Florida is approximately 16 miles north of Port Saint Lucie, Florida.

[141] Officer Whitacre of the Florida Department of Transportation office, testified earlier that he had seen Troya's vehicle approximately 15 miles south of Daytona Beach, Florida at approximately 9:00 P.M. (CR-ECF No.[764:6768-69], *see also* No.[758:6406-08]). Accordingly, Troya and Sanchez had arrived in the Daytona Beach, Florida area 1 hour 40 minutes after they passed out of range of the Fort Pierce tower and had already been in the Daytona Beach area approximately 2½ hours when they were contacted by Escobedo. Daytona Beach, Florida is approximately 139 miles north of Fort Pierce.

The phone records left undiscussed by Weeks reveal a different story. According to the records of the 956-266-2004 phone, at 7:01 P.M. on the evening of October 11, 2006, that phone connected to a cell tower located 20 miles north of the toll plaza on Interstate 75 in Broward County.[142] At 8:59 that same evening, the same phone connected to the cell tower in the area of Tampa, Florida to retrieve voice mails. (Def. Trial Exh. 32, Bates No. 197, Appx at A-001772). At 12:30 P.M. the next day, the phone connected to the cell tower located at 10800 Corkscrew Road, Estero, Florida. (Fraudbuster Subscriber CDR Report, Bates No. 217, Appx at A-001920); Gov't Exh. 707.1, Bates No. 93). At 1:44 P.M., it connected to the cell tower at 3575 Brokenwoods Drive, Coral Springs, Florida, two hours away by car. (Fraudbuster Subscriber CDR Report, Bates No. 216, Appx at A-001919; Gov't Exh 707.1, Bates No. 73). At 7:47 P.M. on October 12, 2006, it connected through the cell tower located at 12400 Indrio Road, Indrio, Florida. (Fraudbuster Subscriber CDR Report, Bates No. 216, Appx at A-001919; Gov't Exh. 707.1, Bates No. 101).

To this point, the cell towers contacted by Escobedo 956-266-2004 phone align with the Escobedo trips established by the Government's evidence submitted at trial—first along the route to/from West Palm Beach to Fort Pierce and back to West Palm Beach, then along the start of the route from West Palm Beach to Daytona that Escobedo took to pick up the cocaine shipment intended for Varela. That alignment did not continue. Following its 7:47 P.M. contact with the cell tower located at Indrio Road, the Escobedo 956-266-2004 phone did not make contact with any other cell tower (*i.e.*, it neither attempted to make a phone call, nor received a phone call) until 11:58 P.M., four hours later. At 11:58 P.M. on the night of October 12, 2006, the Escobedo

---

[142] Interstate 75 provides the most direct driving route from West Palm Beach to Fort Meyers and the rest of West Florida.

956-266-2004 phone contacted a cell tower in the area of McAllen, Texas for the purpose of calling, and/or attempting to call, a phone located in nearby Harlingen, Texas with the number 956-742-9994. (Def. Trial Exh. 32, Bates No. 197, Appx at A-001772). It would do so three times, October 12, 2006 at 11:58 P.M., October 13, 2006 at 1:20 A.M., and October 13, 2006 at 3:18 A.M.. (Fraudbuster Subscriber CDR Report, Bates No. 216-17, Appx at A-001919-20).[143] It was during this period of time that the Escobedo families' murders were carried out. The Escobedo 956-266-2004 phone neither made calls to Escobedo's second phone, nor did it receive any calls from the second Escobedo phone, after it left the State of Florida.

Six hours after the Escobedo 956-266-2004 phone last called the 956-742-9994 number from the McAllen, Texas area, it began making calls to two telephones with area codes in California and South Texas. Though the Escobedo family was dead, those calls continued until at least[144] 7:24 P.M. on October 17, 2006, five days after the murder.

Despite the fact that trial counsel's guilt phase defense was that the Escobedo family had met with, and been killed by, members of Mexican drug cartels, counsel failed to present an expert witness, or any witness capable of interpreting the records of the 956-266-2004 phone, to present these facts to the jury.

Trial counsel also failed to present evidence to demonstrate that the records of 561-891-1220 phone were consistent with Luis Escobedo orchestrating the delivery of the 15 kilos of cocaine destined for Varela (by a third party using a phone with a Brownsville, Texas area code)

---

[143] Though the Government obtained a pen trace and warrant for the 956-742-9994 number (Order, IN RE: Homicide Investigation Case No. 1-06-013332, Circuit Court, Fifteenth Judicial District, St. Lucie County Florida, Appx at A-001765), the Government failed and/or refused to provide records responsive to that warrant, nor did trial counsel seek the same.

[144] The records of the Escobedo 956-266-2004 provided by the Government during trial end on October 17, 2006. Whether the phone continued to be used after that date is known only to the Government.

153

through his brother in Texas, Manuel Escobedo. The Government's affidavits for search warrants to obtain phone records and for wire taps on numerous phones, as well as the affidavits supporting the Government's request for search warrants for Varela's Garden Court residence, both of which were in trial counsel's possession, stated that Manuel Escobedo who was at the time, an escapee from federal detention, had been convicted of major cocaine distribution offenses. They also stated that Manuel Escobedo was using a cellular phone with the number 956-346-2874. [145]

Government Exhibit 760.13 shows that Luis called Manuel twice beginning at 7:49 P.M. on October 12, 2006, and that Manual called him back at 7:50 P.M..[146] After five more calls, four of which were to phones with Brownsville, Texas area codes, at 9:22 P.M., Luis received another call from his brother. Seven minutes later, at 9:29 P.M., Luis received a call from a phone with the number 956-243-7313. At the time he received that call, Luis was in range of the cellular tower located at 4750 City Center Drive, Port Orange, Florida (just south of Daytona Beach). Because of the Government's *Brady* violations, *see* Claim VI.A., trial counsel did not know that this phone belonged to the *Los Zetas* member delivering the 15 kilos of cocaine intended for Varela. However, effective counsel would have recognized that the call came soon after Luis had spoken to a convicted high-level cocaine distributor, his brother Manuel. Effective counsel would have also recognized that Luis Escobedo's subsequent contacts with the number 956-243-7313 were consistent with effectuating delivery of the 15 kilos of cocaine. At 9:46 P.M. and 9:47

---

[145] Appx at A-001897, Affidavit and Application for Search Warrant, In the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida, Case Number 06-122845, p.15.
[146] Just prior to calling his brother (in, as discussed *infra*, a phone call falling just two minutes before the time frame covered on Government Exhibit 760.13) Luis Escobedo had spoken to the third party from Texas who was in possession of Escobedo's 561-891-1220 phone and who was at that moment along the route Escobedo was taking to reach the Daytona Beach area.

154

P.M. (when Escobedo called the 956-243-7313 phone twice) he was connected through a tower located at 1687 West Granada Boulevard in Ormond Beach, Florida, the farthest north point of his journey. This fact is consistent with Ormond Beach being the point at which Escobedo met the holder of the 956-243-7313 phone and received the 15 kilos of cocaine destined for Varela. Not coincidently, it was immediately after Luis Escobedo's last call to 956-243-7313, that he called Sanchez, who was not privy to the discussions between Luis Escobedo, his brother Manuel, and the person carrying the 956-243-7313 phone.

Again, notwithstanding trial counsel's theory of the case that Escobedo had been killed by representatives of Mexican drug cartels from the Brownsville/Matamoros area who had come to Florida, trial counsel failed to demonstrate, or argue to Sanchez's jury, that Luis Escobedo's receipt of 15 kilos of cocaine was orchestrated in conjunction with his federally-convicted, cocaine-distributing, fugitive-from-justice brother, Manuel, who was at that moment in Brownsville and that the person he had physically met with to receive the cocaine was using a phone with a South Texas area code.

Trial counsel's failure to present the exculpatory aspects of the cell phone records was just that and nothing more. Trial counsel obtained the appointment of Jeffrey Fischbach as an expert in cellular forensics and submitted an expert disclosure in order to call him as a witness at trial. CR-ECF No.[515-3]. Trial counsel ultimately withdrew Mr. Fischbach as an expert witness solely because the Government did not provide notice that it would present its own expert in cellular technology. CR-ECF No.[731:2747-49]; No.[756:6014] ("My position was not having received any expert disclosure from the Government regarding cell site information, I was not in a position to go forward with my expert and I withdrew him."). Counsel also had no reasonable strategic or tactical basis for failing to investigate and gather additional evidence regarding the

155

records from the Escobedo's 561-891-1220 phone. Trial counsel introduced Ms. Escobedo's

phone records into evidence but did not present any testimony regarding the records. Def. Trial

Exh. 32; CR-ECF No.[765:6979]. On closing, trial counsel nonetheless argued:

> You will see 10/12 of 2006 at 7:47 p.m., a call was made in Melbourne, Florida, was received with respect to that phone.
>
> You will see the next call, ladies and gentlemen, on 10/12, was at 11:58 p.m. That call was in McAllen, Texas.
>
> Likewise, you will see that on 10/13/06, 12 a.m., another call was received by Yessica Escobedo's phone in McAllen, Texas.
>
> And finally, ladies and gentleman, you will see that on 10/13 at 3:18 a.m., Yessica Escobedo the Government says is dead, another call is received on that phone in McAllen, Texas.
>
> There is a mystery here which was never answered.
>
> We know someone was traveling with the Escobedos that night, and the Government knew it, too, and they ignored it and they kept this evidence out of their presentation.
>
> The second phone Mr. Carlton said was missing and which he said was searched for in the dark was that night in Texas.
>
> We provided you this information in this case, Sanchez Exhibit 32, Yessica Escobedo's phone, moves from Melbourne, Florida, the same path the Escobedos took that night, to McAllen, Texas by 12 that night.
>
> Look at its path. When they stand up here and the Government closes on rebuttal, ask them why the Government kept that information from you.

CR-ECF No.[767:7351-52].

Counsel clearly recognized that Ms. Escobedo's phone records contained critical

information that would have provided additional support for the defense theory at trial that the

murder of the Escobedo family was carried out by the cartels controlling the large scale drug

trade in the Brownsville/Matamoros area that the Escobedo family had left less than a year ago.

Counsel nonetheless failed to adequately investigate and gather additional records that would

have enabled them to establish this point.

156

Counsel's errors and omissions prejudiced Sanchez. Because trial counsel had presented no evidence to support his (factually accurate) argument that the phone was brought to Texas on the night of the murders, the Government was allowed to make the (factually inaccurate) argument in its rebuttal closing that the records did not reflect that the phone traveled from Florida to Texas on October 12, 2006, but instead merely that the service area for three calls was in McAllen, Texas because the phone had a Texas number. CR-ECF No.[767:7453] ("I don't know where Mr. Cohen got the fact that Yessica's phone was in Texas. It has a Texas number.").[147] Moreover, because trial counsel did not investigate the movement of the 956-266-2004 phone, he was unable to show that Escobedo was simultaneously meeting with then-unknown parties from the Brownsville/Matamoros area during the period of time the Government asserted Troya and Sanchez were the only persons who could have committed the murders, a claim which was critical to its case. The Government's case for a death sentence was not overwhelming. The jury deliberated three-and-a-half days before reaching a verdict.

**2. Trial counsel failed to fully investigate and challenge the Government's evidence purporting to connect spent shell casings found at the murder scene with unfired bullets recovered at the home of Danny Varela and purporting to connect spent shell casings found at other shootings with weapons recovered from the home of Danny Varela.**

At the time of Sanchez's arrest and trial, reasonably effective counsel representing a capitally charged defendant were expected to "independently investigate the circumstances of the crime and all evidence—whether testimonial, forensic, or otherwise—purporting to inculpate the client" and to "subject[] all forensic evidence to rigorous independent scrutiny." *American Bar*

---

[147] The Government forcefully repeated this argument at the Rule 29 hearing, stating, "When you look back to the records, there is no evidence at all, not one scintilla of a cell tower that carried the Yessica Escobedo number. If you look at the records, it is not there. There was no cell tower identified by the phone company for that call. To argue it is in Texas is a phantom argument unsupported by the evidence." CR-ECF No.[772:7661].

*Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases,* 31 Hofstra L. Rev. 913, 926 (2003) (Commentary to Guideline 1.1 of the 2003 ABA Guidelines); *see also id.* at 961 (Guideline 5.1.B.2.e) (capital counsel expected to demonstrate "skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence"); *id.* at 976-80 (Guideline 8.1 and Commentary ) (capital counsel is expected to keep "abreast of the field" and "must not only have mastery of current developments in law, forensics, and related areas, but also be able to anticipate future ones").

Trial counsel were, or reasonably should have been, aware that it was necessary to conduct a comprehensive investigation of the firearms identification evidence in this case. The opinion testimony of the Government's toolmark examiner Mark Chapman was the only forensic evidence connecting the crime scene to the Garden Court residence where the Government alleged Sanchez stayed. Similarly, the opinion testimony of government toolmark examiner Allison Quereau was the only forensic evidence connecting two uncharged shootings (upon which the Government relied in both guilt and penalty phase of Sanchez's trial) to the Garden Court residence. In addition, trial counsel were, or reasonably should have been, aware that it was necessary to timely challenge the admissibility of the firearms identification evidence under Federal Rules of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), or risk waiver.

Testifying as an expert, Ms. Quereau opined that eight of 11 cartridge casings found at a Mercer Avenue residence on April 28, 2006, were fired by the AK-47 rifle (Gov't. Exh. 202m) found at the Garden Court residence during the search on October 25, 2006. CR-ECF No.[757:6284, 6287, 6291]. She also opined that one other casing cycled through the rifle. CR-

158

ECF No.[757:6290]. She noted that the two remaining casings had "class characteristics" consistent with having been fired by the rifle but she made no further identification. CR-ECF No.[757:6290-91]. Regarding the Suwanee Drive shooting on April 28, 2006, Ms. Quereau testified that eight of 16 cartridge casings recovered from the scene were fired by the AK-47 rifle. In addition, six of the remaining casings cycled through the rifle at one time, and the last two casings had class characteristics consistent with the rifle. CR-ECF No.[758:6341, 6344-46]. Ms. Quereau testified that she was "100 percent sure" of her identifications. CR-ECF No.[758:6385].

The Government's second expert, Mark Chapman, testified that, based on "the sufficient quantity of the class and individual characteristics," the seven 40 caliber casings found at the murder scene were fired from the same weapon. CR-ECF No.[764:6605, 6609-10]. He similarly testified that, "based on an agreement of class and individual characteristics," the four 9 mm rounds recovered from the crime scene "were fired from the same firearm." CR-ECF No.[764:6607]. He also testified that these casings represented all of the casing recovered from the murder scene. CR-ECF No.[764:6610]. Finally, Chapman testified that scratches appearing on the side of a fired 40 caliber casing found at the murder scene were created by the same "tool," (*i.e.*, an unrecovered and therefore unidentified magazine from an unrecovered and therefore unidentified firearm) as scratches found on a live cartridge found in a completely different magazine (Magazine Number 5) during the search of the Garden Court residence of the four co-conspirators, CR-ECF No.[764:6644-47], and that scratches appearing on three of the four 9mm casings found at the murder scene were made by the same tool (again, an unrecovered and therefore unidentified magazine from an unrecovered and therefore unidentified firearm) as scratches found on 2 rounds of live 9mm ammunition recovered from a box of ammunition

159

seized during the search of Varela's Garden Court residence. CR-ECF No.[764:6650-53]. Chapman stated that his opinions were held to "a reasonable degree of scientific certainty," CR-ECF No.[764:6653, 6660], and defined the phrase "reasonable degree of scientific certainty" as meaning that it was an "impractical impossibility" that more than one tool had made the marks. CR-ECF No.[764:6666].

Though trial counsel cross-examined each expert about the reliability of toolmark identifications and the methodology used to reach their opinions. CR-ECF No.[758:6373-77] (Quereau); CR-ECF No.[764:6667-86] (Chapman), both experts remained steadfast before Sanchez's jury and trial counsel offered no expert of his own to testify otherwise.

### a. Trial counsel failed to properly challenge the admissibility of the testimony of the Government's toolmark "experts."

At the time of Sanchez's trial, the premise underlying firearms and toolmark identification—that firearms leave unique marks on ammunition components—had never been proven. Indeed, admission of the very type of testimony offered by Quereau and Chapman had been repeatedly rejected. *See, e.g.*, *United States v. Green*, 405 F. Supp. 2d 104, 107 (D. Mass. Dec. 20, 2005) (Memorandum and Order re: Motion to exclude ballistics testimony) (recounting problems inherent in firearm and tool mark identification and prohibiting firearms examiner from testifying that the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton v. State*, 93 S.W.3d 96 (Tex. Crim. App. 2002) (firearms identification testimony held inadmissible where expert testified that tool marks on shell casings had been made by the same magazine, even though, because no weapon had been recovered, expert had only compared the tool marks on the casings and had not examined the suspect magazine); *cf.* *Ramirez v. State*, 810 So. 2d 836 (Fla. 2001) (tool marks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others, was unreliable and inadmissible).

In addition, there was never a firm statistical empirical foundation for the claim that firearms leave unique toolmarks on ammunition components such that a firearms examiner can make a positive "match" based on such tool marks. *See* Adina Schwartz, *A Systemic Challenge to the Reliability and Admissibility of Firearms and Toolmarks Identification*, 6 Colum. Sci. & Tech. L. Rev. 2 (2005) (discussing lack of adequate statistical empirical foundations for firearms and tool marks identifications). Moreover, at the time of Sanchez's trial—and in the years since—the field of firearms and tool mark identification lacked national objective standards concerning how many marks must match before an examiner can make a positive identification between two pieces of evidence. *See Green*, 405 F. Supp. 2d at 114. In sum, an expert opinion that ammunition components "match" each other is not grounded in empirical science; it involves a subjective qualitative judgment by an examiner based on unarticulated standards and no statistical foundation for estimation of error rates.[148] Accordingly, there is a reasonable probability that, even absent testimony from a defense expert, Quereau's and Chapman's testimony would have been excluded on the ground that the field of firearms and toolmarks identification is not based on sufficiently reliable methods to satisfy the threshold requirements for admissibility under *Daubert/Kuhmo Tire* and Rule 702 of the Federal Rules of Evidence. *See*

---

[148] The National Academy of Sciences ("NAS") issued a report in 2009 that identified two main problems with firearms and tool marks identification: (1) the validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related tool marks had not yet been fully demonstrated; and, (2) a lack of a precisely defined process or protocol concerning the specific features to be examined and compared between tool marks, and the level of agreement that must exist in the pattern of two sets of marks before an examiner can determine with a degree of confidence that there is a correlation between the items being examined. *See* National Academy of Sciences, *Strengthening Forensic Science: A Path Forward* at 154-55 (February 2009) (available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf). Although the NAS report was published in 2009, the basis for the report's criticisms of firearms and tool marks identification existed at the time of Sanchez's trial—*i.e.*, the *lack* of any empirical foundation for the underlying premise that firearms leave unique marks, and the *lack* of any objective national standards governing the subjective determinations of firearms and tool marks examiners.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Supreme Court made clear in *Daubert* that no purportedly scientific expert testimony could be admitted unless it met certain rigorous requirements. See *Daubert*, 409 U.S. at 593-94 (directing courts to examine: (1) whether the expert's theory or technique "can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) "the known or potential rate of error" in the theory's application and "the existence and maintenance of standards controlling the technique's operation"; and (4) the "general acceptance" of the theory or technique in the relevant scientific community). Here, the Government's evidence would not have met the *Daubert* standard; as noted above, the underlying premise of firearm and toolmark identification lacks an adequate statistical empirical foundation to be considered scientifically valid. However, even if the Court had declined to reach the question of the underlying scientific validity of firearm and toolmark identification, at a minimum, there is a reasonable probability that under a *Daubert* analysis, the Government's experts would have been precluded from testifying definitively that ammunition components matched or were fired from the same weapon, and that such opinions were rendered "within a reasonable degree of scientific certainty." *See, e.g., Green*, 405 F. Supp. 2d at 107 (prohibiting firearms examiner from testifying the match he found allows for identification "to the exclusion of every firearm in the world"); *Sexton*, 93 S.W.3d at 101 (prohibiting firearms identification testimony that toolmarks on shell casings had been made by the same magazine where magazine was never recovered); *cf. Ramirez*, 810 So. 2d at 853 (prohibiting toolmarks expert's identification of the expert's knife as the murder weapon, to the exclusion of all others).

Although Quereau's and Chapman's testimony failed to meet the *Daubert* threshold, trial counsel did not challenge the admissibility of the firearms identification evidence or request a

*Daubert* hearing until the Government offered the first of its two toolmark examiners as an expert at trial. At that time, counsel argued that toolmark examiners have no way to measure the accuracy or the error rates of their determinations and that the testimony should be inadmissible under *Daubert.* CR-ECF No.[757:6258]. The Government, however, argued that defense counsel's *Daubert* motion should have been filed and heard pretrial, CR-ECF No.[757:6259], and the Court denied the defense request, specifically ruling that, since the Government had provided the expert reports pretrial, the *Daubert* motion objecting to testimony based on the reports had to be filed pretrial also. CR-ECF No.[757:6263-64].

> **b. Trial counsel failed to present available expert testimony demonstrating both the lack of a scientific basis for, and the substantive unreliability of, the testimony of the Government's experts.**

Trial counsel unreasonably failed to present available expert evidence of its own to rebut the testimony of Quereau and Chapman, despite the fact that the Court had granted trial counsel funds to retain an expert. A qualified expert could have established that forensic firearm and toolmark identification is not a science. At a minimum, a qualified expert could have provided testimony at both a *Daubert* hearing and at trial there was no scientific basis for the Government's experts' conclusions about matches between the firearms evidence, or that such conclusions could be rendered "within a reasonable degree of scientific certainty."

> 14. The guiding principle used by toolmarks examiners is the "AFTE Theory of Identification", regardless of whether or not they are AFTE members. AFTE (Association of Firearms and Toolmarks Examiners) is not a scientific body, but rather is a trade association. It should also be noted that forensic firearms/toolmarks identification practice is not a science, contrary to repetitive self-defined claims by toolmarks identification authors in numerous domain publications, claims which imply an unwarranted perception of infallibility to a trier of fact or law. Some courts have recognized this fact. There are numerous reasons why firearms identification pattern-matching practice cannot be considered a science. It has no falsifiable hypothesis (premise), no scientifically acceptable protocol articulating parameters of detection, no rules of application of such

parameters, is missing the critical cornerstones of repeatability, reproducibility, and falsifiability required of the true scientific method and, thus, is a virtually 100% subjective practice once the possible sample pool is narrowed by class characteristic elimination (*e.g.*, caliber, number of lands and grooves, direction of twist, *etc.*). There is no science that allows for 100% subjectivity or a non-falsifiable hypothesis. In fact, that is why the Scientific Method was developed: to eliminate subjectivity from the inferential process.

15. Forensic individualization, also known as specific source attribution, is the process by which a questioned item, such as a cartridge case or bullet, is purportedly associated with a specific source such as a specific firearm. Source attribution may or may not be enhanced with probabilistic language like "to the exclusion of all others," "infinitesimal chance" of a coincidental match, "unique signature," "100% certainty", "to a reasonable degree of [scientific, ballistic, practical] certainty", or even "to a reasonable degree of certainty", *inter alia*. With or without this enhancing language, however, for all worksheet observations, conclusions, reports, and testimonies of toolmarks identification examiners with claims or assumptions that striations observed are purportedly "individual," the examiner is still engaging in specific source attribution ("individualizing"). In doing so, the forensic examiner intuitively rules out - - by subjective belief as it turns out - - all other possible sources for the combination of characteristics ('striations' or 'striae', and/or 'impressions') observed in the questioned markings, including the vast universe of possible sources he or she has never examined.

16. Individualization in forensic firearms/toolmarks practice is rejected by a unanimous consensus of my colleagues and collaborators from the true (mainstream) scientific community with scientific backgrounds and/or specializing in forensic evidence.

Affidavit of William A. Tobin, *Troya v. United States*, Case No. 9:16-cv-80700-BB, ECF No.

[5-4:12-13 of 51, ¶¶14-16] (May 4, 2016) (footnotes omitted).

Furthermore:

The underlying premise of "uniqueness", required by logical necessity for conclusions rendered by the firearms examiners in this matter, has never been established to exist, as confirmed by the National Academy of Sciences. The notion that forensic toolmarks examiners are trained to recognize a phenomenon that has never been scientifically established is nonsensical. Individualization in firearms/toolmarks is without scientific basis or foundation, but rather is "based on anecdote, intuition and speculation rather than on a scientific foundation. Consequently,

164

individualizations in casework rely on a 'leap of faith'." In fact, the belief by firearms/toolmarks examiners that their practice can render specific source attributions with any scientific basis is considered a fallacy in the relevant [true] scientific community.

18. The fallacy of individualization "… arises when the forensic scientist rules out all other possible sources for the unknown marking, including the multitude he has not examined, once he has found a single object or person that matches the features of the unknown marking. The fallacy is deeply entrenched in forensic science practice, where most examiners say that their *knowledge*, *training*, and *experience* enable them to make the inferential leap from observed consistencies between markings and their putative source to a conclusion that no other object in the world could have produced those markings." [Emphasis added] Additionally, Koehler and Saks indicate, "[i]n our view, the existing and foreseeable scientific knowledge falls far short of providing criminalists with enough scientific support to claim that the objects that they study are either unique or discernibly unique. Certainly the uniqueness question cannot turn on the beliefs that forensic scientists have about this issue based on their training and experience." Yet that is exactly the *sole* basis by which firearms/toolmarks expert witnesses can realistically cite as the foundation for their proffered opinions, inasmuch as there exists no scientifically valid studies supporting claims of uniqueness, discernible uniqueness, or individualization.

. . .

20. For conclusions of individualization (specific source attribution), one of two crucial premises upon which toolmarks examiners rely is that each tool imparts individual characteristics (generally striations or striae, and impressions) to objects against which they are in contact that are purportedly unique to that tool. Scientific acceptance of the uniqueness premise is problematic.

*Id.* at 14-15, 16 of 51, ¶¶17, 18, 20 (footnotes omitted).

It follows, then, a qualified expert could have also testified before the jury that the multiple statements of certainty and probability made in Sanchez's case were without any scientific or probabilistic foundation.

54. The testimony transcripts of both **Chapman** and **Quereau** reveal repetitive claims of "same gun", "same firearm", "same rifle", "same tool", "unique", "individual", "reliable science", "scientific discipline", use of the "scientific method", and expressions of "scientific certainty" and "impractical impossibility" [sic], *inter alia*. These claims are patently unacceptable as without scientific foundation and constitute the exaggerated claims denounced by two separate National Research Council committees of the National Academy of Sciences. From

165

both probabilistic and pragmatic perspectives, these constitute statements of certainty (probability of 1) which I, the unanimous consensus of my scientific colleagues, the U.S. Department of Justice, the National Institute of Standards and Technology (NIST), and the National Academy of Sciences conclude to be objectionable as scientifically unfounded.

*Id.* at 48 of 51, ¶54 (footnotes omitted) (emphasis added).

[As] the Ballistics Imaging Committee (2008) of the NAS observed, "*Conclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis when none has been demonstrated.* Specifically, ... examiners tend to cast their assessments in bold absolutes, commonly asserting that a match can be made "to the exclusion of all other firearms in the world." Such comments cloak an inherently subjective assessment of a match with an extreme probability statement that has no firm grounding and unrealistically implies an error rate of zero." *Ballistic Imaging*, Report of the National Research Council; National Academies Press, Wash., D.C. (2008), at 82. The committee went on to note that, "It is ironic that those areas of forensic science that have real underlying data offer more modest statements of individualization, while those limited to subjective or impressionistic data make the strongest statements, sometimes of absolute certainty.

*Id.* at 48 of 51 fn.77.

As the Strengthening Forensic Science Committee (2009) of the NAS observed, "no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate a connection between evidence and a specific individual or source." *See* National Academy of Sciences, *Strengthening Forensic Science: A Path Forward* at 7 (February 2009) (available online at https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf. The recent report from the U.S. Department of Justice National Institute of Standards and Technology addressed the use of the term "reasonable scientific certainty" in testimony and stated that:

Multiple problems abound with this phrase, whether "scientific certainty" or "[discipline] certainty." These include the following:

- There is no common definition across science or within disciplines as to what threshold establishes certainty. Therefore, whether couched as "scientific certainty" or "[discipline] certainty," the term is idiosyncratic to the witness.

166

- A juxtapose to the term "beyond a reasonable doubt" is appropriate here. While not precisely quantifiable, it can be measured by comparison (it is greater than both the "preponderance" standard of 50.1% and the much higher "clear and convincing" standard) *and* has a definition as being convinced beyond having a doubt of the size that would cause a reasonable person to pause or refrain from acting in a matter of high importance.

- Use of the term "scientific" implies that the discipline is indeed a science, which in some instances may be putting the cart before the horse. As the Supreme Judicial Court of Massachusetts explained, "The phrase 'reasonable degree of scientific certainty' should also be avoided because it suggests that forensic ballistics is a science, where it is clearly as much an art as a science." *Commonwealth v. Pytou Heang*, 458 Mass. 827, 849 (Mass. 2011).

- Coupled with the term "reasonable," a juror might equate it with certainty at the level of beyond a "reasonable" doubt.

- The term invites confusion when presented with probabilistic evidence. How is a lay person, without either scientific or legal training, to understand an expert's 'reasonable scientific certainty' that evidence is 'probably' linked to a particular source?

NIST Report, "*Testimony using the term "Reasonable Scientific Certainty*," *Troya v. United States*, Case No. 9:16-cv-80700-BB, ECF Doc.[5-5:4 of 5].

The presentation of a defense firearms experts would have demonstrated the inadmissibility of Chapman's and Quereau's testimony under *Daubert*. Even if it did not, it would have established for Sanchez's jury the dubiousness of the science underlying their opinions. In addition, given the other evidence relevant to the ultimate facts to which Chapman and Quereau testified, the presentation of expert testimony would have established that Quereau's specific testimony regarding supposed connection between the casings found at the Mercer and Suwanee shootings to the AK 47 was unreliable. Most importantly, however, it would have established that Chapman's claim that the all of the spent casings found at the

murder scene were connected to just two firearms and that unfired cartridges found at the Varela

home were also connected to the same two firearms was more than unreliable, it was false.

As Tobin makes clear, not only much of the arena of firearms examination without a

scientific basis, so too were the specific opinions of Quereau and Chapman. It follows, then, a

qualified expert could have testified that the multiple statements of certainty and probability

made in Sanchez's case were without any scientific or probabilistic foundation.

> 54. The testimony transcripts of both **Chapman** and **Quereau** reveal repetitive claims of "same gun", "same firearm", "same rifle", "same tool", "unique", "individual", "reliable science", "scientific discipline", use of the "scientific method", and expressions of "scientific certainty" and "impractical impossibility" [sic], *inter alia.* These claims are patently unacceptable as without scientific foundation and constitute the exaggerated claims denounced by two separate National Research Council committees of the National Academy of Sciences. From both probabilistic and pragmatic perspectives, these constitute statements of certainty (probability of 1) which I, the unanimous consensus of my scientific colleagues, the U.S. Department of Justice, the National Institute of Standards and Technology (NIST), and the National Academy of Sciences conclude to be objectionable as scientifically unfounded.

Affidavit of William A. Tobin, *Troya v. United States*, Case No. 9:16-cv-80700-BB, ECF No.

[5-4:48 of 51, ¶54] (footnotes omitted).

Sanchez's expert, who was as available to trial counsel as he is to Sanchez's current

counsel goes into greater depth. Regarding Quereau, he states:

> 8. ... Ms. Quereau testified, consistent with her February 20, 2008 report, that she examined casings and projectiles retrieved from the Mercer Avenue address and compared them to test firings from an AK-47 rifle retrieved from the Garden Court residence. She opined that eight of the eleven casings were fired from the rifle and one casing was cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle but she did not reach any further conclusions as to those casings. Ms. Quereau also testified that she examined casings and projectiles retrieved from Suwanee Drive and compared them to the test firings from the AK-47 rifle. She opined that eight out of the sixteen casings were fired from the rifle and six casings were cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle, but she did not reach any further conclusions as to those two casings. Ms. Quereau testified that she was "100 percent" sure of her identifications.

168

. . .

10.     In my opinion, some of the identifications made by Ms. Quereau ... were reached through procedures that departed from accepted practices in the field. The discovery and testimony in this case do not indicate that Ms. Quereau . . . made any attempt to rule out the possibility of class or subclass characteristics. Drawing identification conclusions without considering class or subclass characteristics fails to comply with professional standards set forth by the Association of Firearm and Toolmark Examiners (AFTE) Theory of Identification, which states that examiners should exercise caution in distinguishing class or subclass characteristics from individual characteristics. There is little that documents or explains the processes and tests performed by Ms. Quereau that form the basis for their opinions or the process of peer review and verification. The documents reviewed fail to provide any descriptions or diagrams of the resembling striations or any explanation of the standard of comparison used in making the identifications. The comparison exemplar photographs- for just two cartridge casings out of twenty-seven - attached to Ms. Quereau's case file are unreadable ....

. . .

14.     The case records also do not indicate that either Ms. Quereau or Mr. Chapman took into account the differences in toolmarks that may result when a firearm fires different makes of ammunition. In order to account for these differences, the accepted practice of firearms and toolmarks examiners is to compare evidence toolmarks with test toolmarks made on the same brand of ammunition, whenever possible. In this case, Ms. Quereau's reports indicate that cartridge casings from the Suwanee shooting were Chinese-made, and the remaining cases are unidentified. Thus, in my opinion, there is no indication that Ms. Quereau adhered to acceptable practice by comparing evidence toolmarks with test toolmarks made on the same brand of ammunition whenever possible.

CV-ECF No.[33-8:183-86 of 194] (Gannalo).

Quereau's testimony connecting the occupants of the Garden Court home to the purported Suwanee and Mercer shootings was utilized to argue regarding Sanchez's dangerousness. The Suwanee and Mercer shootings were used in part to establish the non-statutory aggravating factor that Sanchez participated in other uncharged serious acts of violence. The jury clearly found that aggravator and just as clearly, the firearm and toolmark examiner's testimony was critical. CR-ECF No.[860:9]. Without it, the only other evidence to do so was the testimony of "Crackhead Kevin" Vetere, who was facing the possibility of life in prison, but for his cooperation, and who now walks (somewhere) as a free man. As prejudicial as it may have

169

been to fail to challenge the inflammatory evidence claiming to establish Sanchez's other bad acts, the need for a defense expert to answer the testimony of Detective Chapman was exponentially greater.

Chapman's testimony not only claimed that only two guns were used in carrying out the murder of the Escobedo family, it claimed that those two guns, which were not among the guns recovered from the Garden Court by law enforcement, could still be linked to that residence. Given the Government's weak circumstantial case connecting Troya and Sanchez to the murder of the Escobedo family, the testimony purporting to limit the active participants in the Escobedo murders to just two people and to connect fired shell casings found at the murder scene to unfired bullets found in the Varela home were essential in establishing their guilt of either the murders or the alleged carjacking of the Escobedo's Jeep. Obvious red flags alerted trial counsel to the fact that Chapman's testimony was dubious, and in all likelihood deliberately false, and required further examination by a defense firearms expert.

A Saint Lucie County Sheriff's Office (SLCSO) Report's description of the recovery of the fired shell casings were consistent with at least some of those casings be fired during at another point in time. The report states:

> Sgt. Gregg and I marked a grid on the ground in and around the area that the victims had been located. After the grid was marked the flagged areas were hand searched by myself, Det. R.T. Young, Deputy Byrnes, Deputy Gurdes and Deputy Presnell. Shell casings were observed in Grid Section I8 and two in each section of H7 and I2. The shell casings were photographed with scale by IRCSO Investigator Robb Newman.
>
> . . .
>
> I collected the five shell casings that were observed. In Grid Section I8 the shell casing was 9mm Winchester, H7 were 9mm Winchester, and in Grid I2, they were 40 Cal S&W.
>
> The grid and the surrounding area was carefully trimmed with a weed eater. The grid was re-sprayed as the grass was cut. The grid area was hand searched a second

170

time. No casings or projectiles were observed. The grid area was then re-photographed.

The grid areas that were flagged were excavated and sifted. Shell casings were located in Grid Areas I4, L2, J0, K6, J3, and projectiles were located in H4, G4, E4. The shell casings in Grid I4, L2, J0, J3, were 40 Cal S&W. The shell casing in Grid K6 was a 9mm Winchester.

SLSO Death Investigation Report, Case #1-06-013332, pp. 7-8, Appx at A-001781-82.

While the mere fact that a substantial number of casings were invisible to a hand search of the area, even after the grass had been carefully trimmed, even as others were visible even before the grass had been trimmed might have alerted effective counsel to the possibility that the two sets of casings had come to rest at this location under different circumstances (and that testimony purporting to connect all of these shells to two weapons was unreliable), the photographs taken of the recovery of the "invisible" casings would have done so for any effective attorney. Image DSC00001.JPG[149] from the files of the SLCSO shows one of those casings in as it was recovered during the excavation described in Appendix at A-001781-82, and before it was sifted from the surrounding soil. The photograph shows not only that casing was found below ground level, but also the surface above it was covered by growing vegetation.

There is no plausible explanation how a casing from a shooting allegedly occurring less than 12-24 hours earlier submerged itself more than an inch below the surface of the ground and then had vegetation grow over it in less than a day. There is also no evidence whatsoever that Troya, Varela, Sanchez, or anyone else associated with Varela, had ever been to this location in the past, much less fired a weapon there. Trial counsel knew, or should have known, that Chapman's testimony was utterly false and needed to be rebutted by testimony from a defense

---

[149] Appx at A-001783, Scene Images - Grid - Shell Casings from CD 3 provided in discovery.

expert.[150] Without such an expert, however, this false testimony was presented to the jury under the guise of scientific certainty.

The prejudice in this case validates the performance requirement that reasonably effective counsel representing a capitally charged defendant are expected to "independently investigate the circumstances of the crime and all evidence – whether testimonial, forensic, or otherwise – purporting to inculpate the client" and to "subject[] all forensic evidence to rigorous independent scrutiny." Set out in the Commentary to Guideline 1.1 of the 2003 ABA Guidelines, 31 Hofstra L. Rev. at 926; *see also* Guideline 5.1.B.2.e, 31 Hofstra L. Rev. at 961 (capital counsel expected to demonstrate "skill in the use of expert witnesses and familiarity with common areas of forensic investigation, including fingerprints, ballistics, forensic pathology, and DNA evidence"). Here, the only witness providing (allegedly) credible evidence connecting the activities of either Troya or Sanchez on October 12-13, 2006 to anything more than accompany Luis Escobedo to pick up cocaine for Danny Varela and deliver it to him was Detective Chapman. While imbued with the enhanced credibility of an expert witness, Chapman used the jargon of a false science to tell, in one portion of his testimony, a lie and, in another part of his testimony, to claim as fact what is beyond the reach of science.

All of the spent casings recovered at the murder scene did not, and could not have, come one of two weapons. In fact, they did not even come from the same shooting incident. By claiming that they did, Detective Chapman revealed: (1) the supposed "science" upon which

---

[150] Trial counsel was equally ineffective for failing to confront the Government's firearm's experts with Image DSC00001.JPG, Appx at A-001783. Not only does the image rebut their expert testimony, the Government has offered no explanation to explain how the Escobedo family came to be murdered at the same random location on the side of the Florida Turnpike location where someone had fired the same caliber weapon at a time sufficiently far in the past for one of that person's ejected casings to have been covered by more than an inch of soil and vegetation growth.

172

Chapman relied was utterly unreliable and his testimony should have been stricken in its entirety; and/or, (2) Chapman's supposedly "scientific" examination of the casings revealed that they did not all come from only two weapons and he intentionally testified falsely that they did; and/or, (3) Chapman's supposedly "scientific" examination of the casings revealed that they did all come from only two weapons but that those two weapons were carried by a person or persons other than Troya and Sanchez who had used that same location to carry out previous executions. A qualified expert would have testified, as Mr. Gannalo set out in his affidavit, that not only was Chapman's methodology outside of accepted scientific practices, *see* CV-ECF No.[33-8:183-85 of 194, ¶¶8-13] (Gannalo), but also

> Mr. Chapman's conclusion that spent 9 mm and 40 caliber cartridge casings from the crime scene and live 9 mm and 40 caliber rounds from the Garden Court address were run through the same unknown firearm in the same unknown magazine is patently unreliable and not consistent with accepted forensic standards in the field of firearm and tool mark identification currently and at the time of trial.

*Id.* at 185-86 of 194, ¶13.

A careful review of the forensic evidence by trial counsel and the retention of a qualified expert would have either prevented Chapman's testimony at all or would have revealed to Sanchez's jury that the only evidence that Sanchez was at the scene at the time the Escobedo family's murders were carried out was false and possibly intentionally so.

There is at a minimum a reasonable probability that, knowing this fact, Sanchez's jury would not have returned a guilty verdict on any of the counts related to Sanchez's actions on October 12-13, 2006. As importantly, there is a reasonable probability that an unbiased jurist, knowing that there was no evidence Sanchez had anything to do with the Escobedo family's murder, or that he had gained possession of the Escobedo Jeep in an unlawful manner, would have imposed the same sentences on the other counts of which he was convicted.

173

Concurrent with considering whether trial counsel failed to effectively challenge the Government's firearms experts, it must also be remembered that due process is not violated only when trial counsel fails to properly challenging the Government's forensic evidence. Prosecutors also violate due process by presenting material testimony that is false, by presenting material testimony that creates a false impression, or allowing such testimony to stand uncorrected. *See, e.g., Mooney v. Holohan*, 294 U.S. 103 (1935) (presenting knowingly false testimony violates due process); *Giglio v. United States*, 405 U.S. 150 (1972) (failing to correct false testimony violates due process); *Napue v. Illinois*, 360 U.S. 264 (1959) (failing to correct testimony that creates a false impression, though not perjured, violates due process). Due process is equally offended by direct statements which are untrue and the eliciting of testimony which "taken as a whole" gives the jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957). This is true even where the particular prosecutor does not know that the testimony being presented is false or misleading. *See Giglio*, 405 U.S. at 154. Indeed, the truthfulness of the process is of the utmost importance even when a specific prosecutor acts in good faith. *Id*. at 153. As the Supreme Court stated in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."

Here, Sanchez was further denied due process because the Government presented misleading, inaccurate and prejudicial testimony at his trial under the guise of forensic science. Specifically, the Government presented evidence through its expert witnesses Allison Quereau and Mark Chapman that shell casings recovered from the crime scene matched cartridges and a firearm purportedly found at the residence of Sanchez and his alleged co-conspirators. The Government then relied on this evidence throughout its closing arguments to argue that it proved

174

that Sanchez participated in the capital crime, and that this evidence established several of the aggravating factors that warranted a death sentence in this case. Under *Napue*, 360 U.S. at 270-71, and its progeny, due process is violated when: (1) the testimony in question was false; (2) the Government knew or should have known the testimony was false; and, (3) the testimony was material. Those elements are easily met here.

First, as noted above, there was no basis for the expert witnesses' testimony that the relevant firearms evidence "matched" or that such opinions could be rendered "within a reasonable degree of scientific certainty." The lack of statistical empirical evidence for the underlying premise of firearm and toolmark analysis was just as true at the time of Sanchez's trial as it is today. The same is true of the lack of objective national standards governing the subjective determination of an examiner that two pieces of firearms evidence "match."

Second, the Government knew or should have known such testimony was false, or at the very least that it was misleading; at the time of Sanchez's trial, the Government was engaged in litigation in various criminal cases where this very same *Daubert* challenge was being raised and where hearings were held documenting the significant deficiencies of firearm and toolmark analysis. *See United States v. Green*, *supra*; *United States v. Kain*, 2:03-cr-573-1 (E.D. Pa. 2004). The fact that the particular challenges were litigated by U.S. Attorney's Offices in other jurisdictions is not legally relevant under a *Napue* analysis. *See United States v. Kattar*, 840 F.2d 118, 127 (1st Cir. 1988) ("The Justice Department's various offices ordinarily should be treated as an entity, the left hand of which is presumed to know what the right hand is doing."); *United States v. Barket*, 530 F.2d 189, 195 (8th Cir. 1976) ("[O]ne office within a single federal agency must know what another office of the same agency is doing.… This is no more than to hold the

175

Government to the same standard of conduct as governs private individuals in transmitting notice from agent to principal.")

Finally, in order to establish materiality under *Napue*, one must demonstrate "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976). That standard is easily met here. As noted above, the expert testimony that the relevant firearms evidence matched was the heart of the Government's case for conviction. Moreover, the Government relied on the expert evidence to establish various aggravating factors, including evidence of other uncharged shootings. Indeed, the Government specifically invoked those uncharged shootings as a reason for why the jury should sentence Sanchez to death. *See* Claim XII (ineffectiveness for failing to challenge verdict form and instructions regarding uncharged shootings). There is a reasonable likelihood that the false expert evidence could have affected the judgment of the jury, especially considering how frequently the Government relied on these aggravating factors to argue its case for death to the jury. *See, e.g.*, *Hennon v. Cooper*, 109 F.3d 330, 333 (7th Cir. 1997) (due process precludes a prosecutor from making an argument which misleads the jury); *Bragan v. Morgan*, 791 F. Supp. 704, 714 (M.D. Tenn. 1992) (*Napue* violation found where prosecutor misled jury in argument).

### B. Trial counsel unreasonably and prejudicially failed to object to the prosecutor's misconduct in guilt phase closing arguments.

Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. ABA Guidelines, Guideline 10.8 and Commentary, 31 Hofstra L. Rev. at 930 ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." (quotations marks and citation omitted)).

176

The Government's case against Sanchez was based almost entirely on circumstantial evidence. To compensate for the lack of any direct evidence implicating Sanchez in the killings, the Government resorted to making improper arguments, including vouching for the strength of its own case and for the work of law enforcement officials. Most, if not all, of the Government's vouching was completely divorced from any meaningful attempt to discuss the facts of the case. These tactics were improper and violated Sanchez's Due Process and Eighth Amendment rights. Despite the clearly impermissible nature of the Government's commentary, trial counsel failed to object to the prosecutor's pervasive vouching and bolstering of its case, in violation of Sanchez's right to the effective assistance of counsel.

In its initial closing, for example, the prosecutor suggested that the Government had outside knowledge of Sanchez's guilt: "[t]he Government is alleging, *and we think we know*, we have proved that those murders occurred directly as a result of this carjacking." CR-ECF No.[766:7132]. In rebuttal closing, the Government argued to the jury: "Folks, the cases don't get better than this." CR-ECF No.[767:7437]. The Government further described its prosecution of the defendants as "a case worthy of this great courtroom." CR-ECF No.[767:7457]. The Government went so far as to vouch for its own honesty in its presentation of the case in its rebuttal closing. The prosecutor stated that "[t]he United States in this case honestly put this evidence before you. I submit we didn't play hide the ball." CR-ECF No.[767:7427]; *see also id.* ("We are not the enemy coming over the wall. This case was presented honestly by the United States. We didn't play hide the ball with you all.").

The Government also repeatedly vouched for the efforts of the Government agent witnesses. The prosecution's rebuttal argument included each of the following improper comments: (a) "This evidence was gathered by dedicated, hard working law enforcement." CR-

ECF No.[767:7416]; (b) "Let's stop nitpicking and let's recognize the simple truth, that a number of law enforcement agencies together and independently did a fabulous job in solving this case." CR-ECF No.[767:7425]; (c) "[T]here are a lot of good people. Detective Fred Wilson, Ms. Carmichael, Detective Parow. What a fabulous job Detective Parow did."[151] CR-ECF No.[767:7426]; (d) "The Drug Enforcement Administration should be proud of the work they did in this case, not ashamed. Agent Weeks, Agent Birch, fabulous job." *Id.*; (e) "[T]his is the kind of work that we expect and demand as a community from our law enforcement, to work together, to work incredibly long hours and solve horrible crimes like this." *Id.*; (f) "Palm Beach Sheriff's Office, Sheriff Bradshaw has a good group of people working for him, Ms. Culpepper, Deputy Halloren, Piatchek, Detective Johnson. Alcohol, Tobacco, Firearms, Barborini, Barbercheck, all these people work together. West Palm Beach Police Department, can't leave them out. Chief Bush has a good department. Mr. McCall came from that department." CR-ECF No.[767:7426-27]; (g) "The effort and dedication, they deserve praise from this community, not criticism." CR-ECF No.[767:7427]; (h) "The heroes and stars of the case are the people that marshal that evidence like Weeks, Birch, Wilson." CR-ECF No.[767:7456].

These remarks were improper personal comment by the prosecutor on the quality of the work, and thus the credibility, of the law enforcement agents involved in this case. By arguing that the law enforcement agents were good, hard-working, dedicated people who had done a "fabulous job in solving this case," the Government improperly invited jurors to judge their testimony based upon their character. Further, the argument impermissibly suggested that the prosecutor himself had a personal, extended familiarity with the agents involved in this case and

---

[151] *See also* CR-ECF No.[766:7148] (in initial closing argument, describing Detective Parow and Albeiro Munoz as "diligent"); No.[767:7426] (speaking about Parow's "dedication").

178

that he was vouching for that work based on this familiarity. This tactic is impermissible, as prosecutorial bolstering based either on the Government's reputation or on evidence not presented at trial is improper. Counsel had no reasonable basis for failing to object. Counsel emphasized throughout the case just how weak and circumstantial the Government's evidence was. Counsel therefore had no reasonable basis for allowing the Government to buttress its case with an improper appeal to the jury's views of the character, honesty, and diligence of individual law enforcement officers.

Sanchez was prejudiced by counsel's failure to object. As noted above, the Government's case was circumstantial. To find Sanchez guilty, the jury had to credit the testimony of a number of law enforcement witnesses and the physical evidence they described. Much of the Government's improper vouching dealt with law enforcement agents who offered some of the most damaging (although flawed) circumstantial evidence against Sanchez—namely, the testimony that the toolmarks left on the cartridge casings at the scene matched toolmarks left on ammunition found at the Garden Court residence and the testimony regarding cell phone evidence.

### C. Trial counsel failed to timely challenge the composition and selection of the grand and petit jury venires in violation of the Fifth, Sixth, and Eighth Amendments.

#### 1. Trial counsel's failure to timely challenge the composition and selection of the grand and petit jury venires constituted deficient performance.

Pursuant to Federal Rule of Criminal Procedure 12(b)(3), a challenge to the grand jury venire must be made before trial commences. Failure to raise such a challenge before the start of trial results in a waiver of the claim. *United States v. Ovalle*, 136 F.3d 1092, 1107 (6th Cir. 1998). Trial counsel failed to challenge the process whereby grand juries in the West Palm Beach

179

Division of the Southern District of Florida underrepresent racial and ethnic and minorities (including Hispanics and African Americans) and, thus, failed to preserve a meritorious claim.

It cannot be disputed that the defense bar recognized the ability to challenge the grand jury process, as such a challenge had been available for years prior to Sanchez's trial, *see, e.g., Castaneda v. Partida*, 430 U.S. 482 (1977) (successful challenge to grand jury system); *Rose v. Mitchell*, 443 U.S. 545 (1979) (acknowledging that discrimination in the selection of grand jury constitutes reversible error). In 2006 through 2009, at the time of Sanchez's indictment and trial, the composition of Southern District of Florida grand juries raised serious concern. Such a challenge was never investigated nor pursued before trial began. Trial counsel's failure to challenge the grand and petit jury venires deprived Sanchez of effective assistance of counsel. *See Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir. 1982) (ineffective assistance for failing to raise grand jury claim); *Hollis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (ineffective assistance in failing to challenge grand jury composition). As discussed below, a timely challenge to the grand and petit juries would have succeeded, and Sanchez's indictment would have been dismissed.[152]

> **2.   Sanchez was prejudiced by trial counsels' failures because the process by which grand and petit juries are selected produces an unconstitutional under-representation of Hispanics and African Americans, in violation of the Fifth, Sixth, and Eighth Amendments.**

Had counsel timely raised a challenge to the grand and petit jury venires, Sanchez could have established that his rights under the Fifth and Sixth Amendments to the United States Constitution were violated by the process which brought about his indictment and conviction. The Sixth Amendment guarantees criminal defendants "a speedy and public trial, by an impartial jury..." This language has been interpreted to require that the panels from which petit juries are

---

[152] A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis. *See Rose v. Mitchell*, 443 U.S. 545 (1979).

selected, be drawn from a "fair cross section" of the community in which the proceedings are held. *See, e.g., Taylor v. Louisiana*, 419 U.S. 522, 527 (1975) (citing *Brown v. Allen*, 344 U.S. 443, 474 (1953)). In jurisdictions where a grand jury system is employed, the fair cross section requirement applies to this process as well. *Alexander v. Louisiana*, 405 U.S. 625, 635-37 (1972) (Douglas, J. concurring) (relying on *Carter v. Jury Commission*, 396 U.S. 320, 330 (1970); and *Brown v. Allen*, 344 U.S. at 474); *Machetti v. Linahan*, 679 F.2d 236, 239 (11th Cir. 1982). In addition to the Sixth Amendment fair cross section requirement, the equal protection clause of the Fifth Amendment prohibits the discriminatory selection of the panel from which a grand jury is drawn if that process produces disproportionately unrepresentative results. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977).

Since a movant need not be a member of the underrepresented group in question to have standing to raise a Sixth or Fifth Amendment claim, there is no dispute that Sanchez, a Hispanic man, had standing to mount these challenges. *Campbell v. Louisiana*, 523 U.S. 392 (1998); *Taylor v. Louisiana*, 419 U.S. 522, 526 (1975) (male raising gender claim); *see also Duren v. Missouri*, 439 U.S. 357, 359 n.1 (1979); *Peters v. Kiff*, 407 U.S. 493 (1972) (white male raising claim of African Americans' absence from jury); *Powers v. Ohio*, 499 U.S. 400 (1991); *Dobbs v. Kemp*, 790 F.2d 1499, 1510-11 (11th Cir. 1986) (male defendants have standing to raise equal protection claim that women were underrepresented on grand jury).

> **3. At an appropriately scheduled evidentiary hearing, Mr. Sanchez can present proof sufficient to establish a prima facie showing of underrepresentation.**

To establish a prima facie claim that the Government has violated the fair cross section requirement, a movant must show "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of the group in venires from which juries are

181

selected is not fair and reasonable in relation to the number of such persons in the community; and, (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).[153] Proving a prima facie showing of discrimination under the equal protection clause requires similar proof. A claimant "must show the procedure employed resulted in substantial underrepresentation of his race or identifiable group," by demonstrating the group is a "recognizable, distinct class, singled out for different treatment under the laws, as written or as applied;" under-representation of the group in the grand jury process over a significant period of time; and, a selection procedure "that is susceptible of abuse or is not racially neutral." *Castaneda*, 430 U.S. at 494 (citation omitted).[154]

Sanchez can demonstrate a prima facie case of discriminatory underrepresentation, under both the Fifth and Sixth Amendments, of Hispanics and African Americans on grand jury and petit jury panels in the West Palm Beach Division of the Southern District of Florida.

> **4.   Hispanics and African Americans are distinct classes in the community which merit constitutional protection.**

It is clear Sanchez satisfies the first prong of the prima facie showing. Hispanics and African Americans have long been recognized by the courts as "distinct classes," the exclusion of whom from possible jury service and the rest of the criminal justice system is constitutionally suspect. *See Castaneda v. Partida*, 430 U.S. at 495; *Hernandez v. Texas*, 347 U.S. 475 (1954) (Hispanics are distinct class); *Batson v. Kentucky*, 476 U.S. 79 (1986) (reaffirming that African

---

[153] Under this standard, "systematic" is defined by showing that the pattern recurred over time and was "inherent in the particular jury-selection process utilized." *Id.* at 366.

[154] Under the equal protection clause, the claimant must also prove intentional discrimination, *see Duren*, 439 U.S. at 368 n.26, while the Sixth Amendment fair-cross-section requirement "forbids any substantial underrepresentation of minorities, regardless of whether the State's motive is discriminatory." *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir. 1986).

Americans are distinct class); *Smith v. Berghuis*, 559 U.S. 314, 329-30 (2010). Courts have also applied a standard deviation test. *Id.*

### 5. Underrepresentation

Although the Supreme Court has never announced mathematical standards for determining the significance of under-representations," *Alexander v. Louisiana*, 405 U.S. 625, 630 (1972), courts have recognized both an examination of absolute disparity and, where the underrepresented group is a small portion of the community, a test of comparative disparity. Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of that group on the jury wheel. In order to calculate the absolute disparity between a group's representation in the population and its representation on the jury wheel, one simply subtracts the latter percentage from the former. Peter A. Detre, Note, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1917 (1994). Thus, if a group forms 10% of the population as a whole, but accounts for only 7% of the jury wheel, the absolute disparity is three percentage points.

> Comparative disparity is calculated by dividing the absolute disparity by the percentage of the group in the overall population and then multiplying by 100%." *Id.* The comparative disparity in the above example of a group comprising 10% of the community and 7% of the jury wheel is 30% (3% divided by 10%, multiplied by 100%). Comparative disparity imagines how many members of the group in question would be on the wheel if there were full representation, and then calculates the percentage decrease from this figure due to the underrepresentation.

*Id.*

Under the standard deviation test, the court must first compare the actual number of the distinct class on the grand or petit juries with the expected number based on total population over a significant portion of time. "The measure of the predicted fluctuations from the expected value

is the standard deviation, defined … as the … square root of the product of the total number in sample … times the probability of selecting a [member of the distinct class] times the probability of selecting a non-[member of the distinct class]". *Castaneda*, 430 U.S. at 496 n.17. In instances where the "difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." *Id.* Such situations establish a *prima facie* case of discrimination.

The West Palm Beach Division of the Southern District of Florida is comprised of a single county: Palm Beach County.[155] In the period prior to Sanchez's trial, the total population of Palm Beach County was, according to the 2000 census, 1,131,186. The Hispanic population was 140,675 or 12.44% of the population. The African American population was 156,055 or 13.80% of the total population. The actual numbers of these protected classes on petit and grand jury venires does not meet constitutional muster.[156]

### a. Hispanics

Sanchez's petit jury was selected in January of 2009. That petit jury was likely drawn from the master wheel that was filled on September 7, 2007. The data concerning that wheel was reported by the district court clerk on form AO 12 on February 15, 2008. Appx at A-001714.

---

[155] *See* Plan of the United States District Court for the Southern District of Florida for the Random Selection of Grand and Petit Jurors at page 2. http://www.flsd.uscourts.gov/wp-content/uploads/2010/07/JuryPlan.pdf.

[156] In his § 2255 petition, Sanchez's co-defendant at trial, Daniel Troya, alleges he sought the forms (labelled JS 12 and AO 12) wherein a district court clerk collects data of the race of jurors each time a pool is drawn from the wheel as required by 28 U.S.C. § 1863(a). He states the clerk's office provided him with some, but not all, of the forms covering the 10-year period up to and including his trial. He further states that, although he was not provided with the AO 12 form for the relevant period in which Sanchez's and his grand jury was drawn from the wheel, based on the forms that were provided, however, a good faith basis exists for alleging that Hispanics and African Americans were underrepresented in the grand jury that indicted him. *Troya v. United States*, Case No. 9:16-cv-80700-BB, ECF No.[4:58 fn.38]. Such a basis necessarily extends to Sanchez. Like Troya, Sanchez will seek additional discovery and factual development of this claim pursuant to the applicable federal rules.

Section IV of the report contains the racial and ethnic breakdown of the jury wheel sample: the first column states the number of persons in the wheel sample, the second column states the percentage that this group represents in the wheel sample, and the third column states the percentage that this group represents in population for the jury division (Palm Beach County). According to the AO 12 report, Appx at A-001715, Hispanics made up 7.7% of the wheel, and 7.2% of the population:

| Ethnic | | | | |
|---|---|---|---|---|
| | Hispanic or Latino ..................... | 26 | 7.7 | 7.2 |
| | Non-Hispanic or Non-Latino .............. | 282 | 83.2 | 92.8 |
| | Unknown .......................... | 31 | 9.1 | 0.0 |

According to the AO 12 report, the jury wheel sample has an over-representation of Hispanics as compared to the population in the jury division. However, the third column—the reported percentage of the group in the population—appears to be inaccurate.

Census data for Palm Beach County for the years 2000 and 2010[157] establish that Hispanics made up 12.44% of the population in 2000, and 19% of the population in 2010:

| Palm Beach County, Florida - Overview | 2010 Census | | 2000 Census | | 2000-2010 Change | |
|---|---|---|---|---|---|---|
| | Counts | Percentages | Counts | Percentages | Change | Percentages |
| Total Population | 1,320,134 | 100.00% | 1,131,186 | 100.00% | 188,948 | 16.70% |
| **Population by Race** | | | | | | |
| American Indian and Alaska native alone | 6,043 | 0.46% | 2,466 | 0.22% | 3,577 | 145.05% |
| Asian alone | 31,100 | 2.36% | 17,127 | 1.51% | 13,973 | 81.58% |
| Black or African American alone | 228,690 | 17.32% | 156,055 | 13.80% | 72,635 | 46.54% |
| Native Hawaiian and Other Pacific native alone | 770 | 0.06% | 692 | 0.06% | 78 | 11.27% |
| Some other race alone | 53,138 | 4.03% | 33,709 | 2.98% | 19,429 | 57.64% |
| Two or more races | 30,272 | 2.29% | 26,928 | 2.38% | 3,344 | 12.42% |
| White alone | 970,121 | 73.49% | 894,209 | 79.05% | 75,912 | 8.49% |
| **Population by Hispanic or Latino Origin (of any race)** | | | | | | |
| Persons Not of Hispanic or Latino Origin | 1,069,311 | 81.00% | 990,511 | 87.56% | 78,800 | 7.96% |
| Persons of Hispanic or Latino Origin | 250,823 | 19.00% | 140,675 | 12.44% | 110,148 | 78.30% |

In other words, at the time that Sanchez's petit jury was drawn in 2009, Hispanics did not make up 7.2% of the population of Palm Beach County, as was reported on AO 12 form, Appx at

---

[157] http://censusviewer.com/county/FL/Palm%20Beach.

A-001715. Rather, the Hispanic population was far larger: in 2000, Hispanics already made up 12.44% of the population, and between 2000 and 2010, Hispanics had grown to 19.00% of the population. It is extremely unlikely, then, that Hispanics only made up 7.2% of the population at the time the petit jury was drawn in 2009.

Using the 2000 census data, there was an absolute disparity of 4.74%, and a comparative disparity of 38.10%. But given that the Hispanic population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparity was likely far larger. Assuming that at the time of Sanchez's trial in 2009 the Hispanic population in Palm Beach County was closer to 19.00% (per the 2010 census data), then the jury wheel sample (7.7%) represents a greater than 10% absolute disparity (11.3%), and a comparative disparity of 59.47%.[158]

---

[158] On information and belief, the Administrative Office provides clerk's offices with current census estimates when an AO 12 report is to be completed. *See* Instructions for Part IV of AO 12 ("To assist you with these comparisons, the Administrative Office will provide specially programmed Census Bureau information that show racial, ethnic, and sex data and percentages to the citizen population by county for every federal jury division in your district." It does not appear that the clerk recorded those census estimates on the AO 12 form completed on February 15, 2008. Sanchez will seek to use appropriate discovery mechanisms to obtain the relevant census estimates at the time his petit jury was drawn. Sanchez has a good faith basis for alleging that Hispanics and African Americans were underrepresented in the jury wheel that was drawn at the time of his trial.

### b. African Americans

According to the AO 12 report, Appx at A-001715, African Americans made up 12.4% of the wheel, and 10% of the population:

| This table reflects ( ) persons returning questionnaires, or ( X ) persons qualified as jurors | Number in Wheel Sample | Percent of Sample | Percent this class is found in citizen population of the: ( ) district ( X ) jury division |
|---|---|---|---|
| TOTAL | 339 | 100% | 100% |
| White | 272 | 80.2 | 86.2 |
| Black or African American | 42 | 12.4 | 10.0 |
| American Indian or Alaska Native | 0 | 0.0 | 0.2 |
| Asian | 10 | 2.9 | 0.9 |
| Native Hawaiian or Pacific Islander | 0 | 0.0 | 0.0 |
| Other | 10 | 2.9 | 1.4 |
| Multi-Racial | 1 | 0.3 | 1.3 |
| Unknown | 4 | 1.2 | 0.0 |

According to the AO 12 report, the jury wheel sample has an over-representation of African Americans as compared to the population in the jury division. However, the third column—the reported percentage of the group in the population—once again appears to be inaccurate.

At the time Sanchez's petit jury was drawn in 2009, African Americans did not make up 10% of the population of Palm Beach County, as was reported on AO 12 form. Rather, the African American population was larger: in 2000, African Americans made up 13.80% of the population, and between 2000 and 2010, that group had grown to 17.32% of the population. It is extremely unlikely, then, that African Americans only made up 10% of the population at the time the petit jury was drawn in 2009.

Using the 2000 census data, there was an absolute disparity of 1.4 %, and a comparative disparity of 10.14%. But given that the African American population was on a clear upward growth trajectory between 2000 and 2010, the absolute and comparative disparity was likely

187

larger. Assuming that at the time of Sanchez's trial in 2009 the African American population in Palm Beach County was closer to 17.32% (per the 2010 census data), then the jury wheel sample (7.7%) represents an absolute disparity of 4.92%, and a comparative disparity of 28.41%.

### 6.   Improper exclusions based on the voter registration list

The relevant AO 12 report indicates that the wheel from which the petit jury was drawn was filled with names from the voter registration list. The wheel was filled on September 7, 2007, Appx at A-001714, but it does not indicate the date of the voter registration list that was used. On information and belief, however, as well as based on the previously aforementioned analysis, the voter registration list that was used to fill the wheel for both the grand and petit juries in Sanchez's case underrepresented Hispanics and African Americans in Palm Beach County.

Additionally, on information and belief, the voter registration list that was used to fill the wheel for both the grand and petit juries in Sanchez's case improperly excluded from the wheel 18 to 21-year-olds who were otherwise eligible to serve. That is, Sanchez's trial occurred in 2009, but his wheel was filled in 2007; if the 2007 wheel was filled with a voter registration list from 2006 (or possibly even 2004), then it would have excluded a number of potential jurors that would have been old enough to serve on his jury in 2009, but who were not old enough to register to vote when the voter registration list was created. Indeed, the further the trial date is from the date the wheel was created, the greater the risk there is that potential jurors will have been excluded on the basis of age. The same is also true of the wheel that was used for the grand jury.

This under-representation is the product of an unconstitutional selection process. The underrepresentation of Hispanics and African Americans is inherent in the particular process by

188

which the petit and grand juries are selected. Additionally, an analysis of the AO 12/JS 12 forms suggest that African Americans and Hispanics have been underrepresented in the wheels in the West Palm Beach Division for a number of years. The district court clerk's office provided counsel for Daniel Troya with AO 12/JS 12 forms for the following years: 1998, 2002, 2003, 2004, 2008 and 2010. In almost every form, the citizen population data for Hispanics and African Americans—the number that is recorded in the third column of Section IV of the form— is incorrect.

First, the population data for African Americans in the jury division is reported as 10% in 1998, 11.3% in 2002, then back to 10% in 2003—and then it stays at 10% in every subsequently filed report that was provided to the undersigned, up to and including the 2010 report. Although the increase from 10% in 1998 to 11.3% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data—which suggests that the African American population dropped back to 10% in 2003 and stayed at that level through to 2010—is clearly inaccurate.

Second, the population data for Hispanics in the jury division is reported as 6.8% in 1998, 11.1% in 2002, then down to 7.2% in 2003—and then it stays at 7.2%, up to and including the 2010 report. Although the increase from 6.8% in 1998 to 11.1% in 2002 appears accurate, as it correlates with the 2000 census data showing an upward trajectory, the rest of the data—which suggests that the Hispanic population dropped back to 7.2% in 2003 and stayed at that level through to 2010—is clearly inaccurate.

The consistently inaccurate reporting of population data on the AO 12/JS 12 forms makes the process by which the grand and petit juries were selected susceptible to abuse. That is, the data reported in the AO 12/JS 12 forms as to the percentage of Hispanics and African Americans

189

in the jury division is consistently reported as much smaller than what is actually reflected in the census data; consequently, the jury wheel sample consistently appears to over-represent Hispanics and African Americans, when the reverse is actually true. And, as noted above, the underrepresentation is so stark that in some instances (*e.g.*, Hispanics), it likely exceeds a 10% absolute disparity.

### D. Counsel's unreasonable errors and omissions, individually and cumulatively, prejudiced the defense at Mr. Sanchez's capital trial.

There was no forensic evidence, no confession to police, and no eyewitness testimony that Sanchez murdered the Escobedos. Nor was there evidence that the murders had been planned in advance. The best the Government could do to link Varela's drug business to the murders was to suggest, through unreliable toolmark identification evidence, that shell casings found near the victims' bodies had toolmarks similar to those on unspent cartridge casings found at the Garden Court residence. It is clear that the jury wrestled with the verdict in this case, as evidenced by their extended deliberations. There is a reasonable probability that, had counsel conducted a constitutionally adequate investigation to develop and present readily available forensic evidence challenging the Government's circumstantial case and objected to the Government's improper vouching, the jury would have returned a different verdict.

There also is a reasonable probability that trial counsel's errors and omissions affected Sanchez's penalty phase proceedings. While the jury sentenced Sanchez to death, they again did so only after extended deliberations. Trial counsel unreasonably and prejudicially failed to present evidence to undermine the weak circumstantial evidence that placed Sanchez near the crime scene and failed to object to the Government's improper arguments that vouched for the strength of its case and the work of law enforcement officials. But for counsel's inactions, there is a reasonable probability that at least one juror would have voted to sentence Sanchez to life.

190

The Supreme Court has long recognized that constitutional claims of error are to be considered cumulatively as well as individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of the individual deficiencies warrants relief. *See, e.g.*, *Strickland*, 466 U.S. at 694 (prejudice assessed from effect of "counsel's unprofessional errors"); *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to determine whether the misconduct was sufficiently prejudicial to violate defendant's due process rights). The Eleventh Circuit has recognized the same principle. *See Conklin v. Schofield*, 366 F.3d 1191, 1210 (11th Cir. 2004) ("A piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution." (quoting *United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983) (internal quotation marks omitted).

Sanchez has identified numerous errors by trial counsel in the investigation, preparation, and presentation of the defense. There is a reasonable probability that, had counsel conducted a constitutionally adequate investigation to develop and present readily available forensic evidence challenging the Government's circumstantial case, objected to the charges and jury instructions on Counts 7 and 10, and objected to the Government's improper vouching, the jury would not have convicted Sanchez on all counts or would not have sentenced him to death. Sanchez's claim

191

of ineffective assistance of counsel at the guilt phase of his capital trial, as supported by documentary evidence, entitles him to relief, or, at the very least, an evidentiary hearing.

**VIII. Mr. Sanchez was deprived of the effective assistance of counsel at the penalty phase of his capital trial.**[159]

The essence of the Sixth Amendment right to effective counsel is counsel's role in making the adversarial testing process work so as to inspire confidence in the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (citing ABA, *Standards for Criminal Justice* 4–1.1 to 4–8.6 (2d ed. 1980)) ("The Defense Function").

To adequately fulfill the defense function and ensure that the defendant receives a fair trial, *id.* at 689, counsel must undertake a reasonable investigation and present evidence in support of mitigation, as well as, investigate and present evidence that undermines the prosecution's case in aggravation. *Id.* at 690-91; *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980) ("Unless a defendant charged with a serious offense has counsel able to invoke the procedural and substantive safeguards that distinguish our system of justice, a serious risk of injustice infects the trial itself."). This is the only way jurors will receive the information needed to render a non-arbitrary, individualized sentencing decision. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) (jurors must be able to give meaningful effect to the mitigating qualities of a troubled childhood, impaired cognitive functioning and reasoning, and mental illness); *Rompilla v. Beard*, 545 U.S. 374 (2005) (counsel must make reasonable efforts to investigate material that the

---

[159] This claim was presented as Claim VIII in the original § 2255 Motion. Here, it has been reorganized, supplemented with more facts, and brief discussions of law have been added in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel rendered ineffective assistance at the penalty phase of trial. CV-ECF No.[16-1:106 of 195]. Original Claim VIII subpart (E) regarding counsel's failure to protect Sanchez's right to be competent while tried, CV-ECF No.[16-1:148-49 of 195], is now incorporated in Claim IV. Original Claim VIII subpart (K) regarding counsel's failure to object to penalty phase instructions, CV-ECF No.[16-1:170-72 of 195], is now presented in Claim XII.

192

prosecution will probably rely on as evidence of aggravation); *Wiggins v. Smith*, 539 U.S. 510 (2003) (counsel unreasonably conducted a cursory investigation despite well-defined norms which provide that investigation into mitigating evidence should have comprised efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence); *Williams v. Taylor*, 529 U.S. 362 (2000) (petitioner was denied his constitutionally guaranteed right to effective assistance of counsel when his attorneys failed to investigate and present substantial mitigating evidence).[160] Even in cases where counsel presented *some* mitigation evidence the Supreme Court has not hesitated to find a deprivation of competent counsel if a fruitful avenue of investigation was not reasonably pursued. *See, e.g.*, *Sears v. Upton*, 561 U.S. 945, 954-55 (2010); *Rompilla*, 545 U.S. at 381-83.

In this case, trial counsel's insufficient investigation and presentation of evidence at the penalty phase failed to meet minimum standards of performance. If the jurors had been presented with available records and testimony from lay and expert witnesses, there is a likelihood of a different result which is "sufficient to undermine confidence in the outcome" actually reached at sentencing. *Strickland*, 466 U.S. at 694. In other words, there is a reasonable probability that at least one juror would have struck a different balance between the statutory aggravating and mitigating factors. *Cone v. Bell*, 535 U.S. 685, 691 (2002).

Sanchez's death sentences were imposed in violation of his rights to the effective assistance of counsel; to present a defense; to confrontation and compulsory process; to a trial free of materially false and misleading evidence; to a trial by a fair and impartial jury; to a

---

[160] *See also Sears v. Upton*, 651 U.S. 945 (2010) (counsel's facially inadequate mitigation investigation prejudiced defendant), and *Porter v. McCollum*, 558 U.S. 30 (2009) (counsel unreasonably failed to uncover and present evidence of the defendant's mental health, mental impairment and family background), where the Supreme Court applied performance standards existing at the time trial counsel represented Sanchez.

reliable, fair, non-arbitrary, and non-capricious determination of penalty; to equal protection; and to due process of law. U.S. CONST. AMENDS. V, VI, VIII. *See also* International Covenant on Civil and Political Rights art. 14, Mar. 23, 1976, 999 U.N.T.S. 171.

### A. Defense counsel.

Attorney Michael Cohen was appointed after Sanchez was arrested on a federal complaint charging conspiracy to possess with intent to distribute cocaine from May 4, 2006 through October 25, 2006. CR-ECF No.[1], No.[8]. The maximum penalty was ten years to life imprisonment. CR-ECF No.[30:5].[161]

On April 18, 2007, in a second superseding indictment, the government charged Troya and Sanchez with conspiracy to commit carjacking, carjacking resulting in death, and use of a firearm in furtherance of a crime of violence, (Counts 11 and 12, occurring October 12-13, 2006). Count 13 alleged Troya and Sanchez, on October 13, 2006, used a firearm in furtherance of a crime of violence as set forth in Counts 11 and 12. The indictment alleged statutory factors that enhanced the possible sentence to include the death penalty.[162] CR-ECF No.[170:20]. Mr. Cohen did not have experience in death penalty cases, CV-ECF No.[52-1:23 of 112, ¶¶3, 4], and on May 24, 2007, Robert Stickney was appointed as "learned counsel" to also represent Sanchez. CR-ECF No.[206]. A month later, on June 22, 2007, Mr. Stickney was relieved as

---

[161] The subsequent one-count indictment alleged a conspiracy to possess with intent to distribute crack cocaine. CR-ECF No.[30]. On February 21, 2007, a superseding indictment added cocaine to Count 1 and additionally charged Sanchez in two separate counts with conspiracy to possess with intent to distribute crack cocaine and cocaine, respectively Count 2 and Count 3, on October 25, 2006, and a count of possession with intent to distribute cocaine on July 10, 2006 (Count 8). CR-ECF No.[113-2]. The punishment range, collectively, was 5 years to life. CR ECF No.[113-2:12].

[162] A third superseding indictment was issued on February 14, 2008, and contains the counts upon which Sanchez was tried. CR-ECF No.[305]. On February 20th, the prosecution filed a formal notice of intent to seek the death penalty with respect to Counts 6 through 10 of the third superseding indictment. CR-ECF No.[312].

194

counsel and Larry D. Murrell, Jr. was appointed. CR-ECF No.[222]. Mr. Murrell had defended capital cases in state court in Florida, but had no prior experience representing individuals in federal capital proceedings. CV-ECF No.[52-1:67 of 112, ¶2]. He also did not have experience investigating or presenting evidence of a client's intellectual disability. *Id.*

Trial counsel generally divided responsibility for the development and presentation of the guilt and penalty phases, assigning responsibility for the penalty phase to Mr. Murrell. CV-ECF No.[52-1:23 of 112, ¶5]. Mr. Cohen ("guilt phase counsel") intended to integrate mitigation themes, including Sanchez's limited intellectual abilities, into his guilt phase defense (based on reasonable doubt and third-party guilt). CV-ECF No.[52-1:24 of 112, ¶¶7, 9]. Guilt phase counsel presented the idea that the murders were committed by members of a drug cartel based in Mexico to which Escobedo owed a lot of money. CV-ECF No.[52-1:24 of 112, ¶9]. Mr. Murrell ("penalty phase counsel") intended to present mitigation based on Sanchez's troubled upbringing, low functioning, limited capacity for planning, and the fact that Sanchez was easily taken advantage of and manipulated by other people. CV-ECF No.[52-1:71 of 112, ¶¶15, 16].

**B. Counsel's pretrial investigation and penalty phase preparation.**

On June 18, 2007, counsel obtained authorization to hire a mitigation expert/investigator. CR ECF No.[217]. On September 27th, counsel moved the court to amend this order to reflect the name of Lisa McDermott as the mitigation expert/investigator. CR-ECF No.[258]. Ms. McDermott conducted investigation for the guilt and penalty phases of trial. CV-ECF No.[52-1:107 of 112, ¶3]. She worked mainly with penalty phase counsel, who relied on her to identify witnesses and determine who to contact. CV-ECF No.[52-1:67 of 112, ¶4; 108 of 112, ¶5]. She also was the person who mostly searched for and interacted with penalty phase experts. CV-ECF No.[52-1:108 of 112, ¶5]. Ms. McDermott ("the investigator") worked with little guidance from the attorneys about which areas to investigate but received firm instructions about what *not* to investigate. CV-ECF No.[52-1:108 of 112, ¶5; 109-10 of 112, ¶¶8, 9].

**1. Deficient mental health investigation.**

The Sixth Amendment's commandment that counsel perform effectively requires counsel to commence investigation of penalty phase issues immediately upon appointment and adequately pursue this investigation.[163] Counsel "must compile extensive historical data as well as obtain a thorough physical and neurological examination" of their client.[164] Competent counsel also guide members of the legal team by: directing investigation to relevant areas of mitigation and aggravation; obtaining the assistance of, and communicating with, experts; and adjusting the investigation to account for new information learned. ABA Guidelines, Guideline 10.4; Guideline 10.7 & Commentary, 31 Hofstra L. Rev. at 999 & 1015.

---

[163] American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), Guideline 4.1 Commentary, 31 Hofstra L. Rev. 913, 956 (2003); ABA Guidelines 11.4.1, 11.4.1.D.2.B & C, 11.4.1.D.7.D Commentary, 11.8.3.A, 11.8.6.B Commentary (1989); ABA Guidelines, 31 Hofstra L. Rev. at 1022-25.
[164] ABA Guidelines, 31 Hofstra L. Rev. at 950.

Sanchez's penalty phase counsel hired a mental health expert who testified at trial, but he requested only an assessment of Sanchez's IQ so counsel could determine if the test score qualified for an intellectual disability diagnosis. Counsel's interactions with Sanchez had revealed Sanchez's intellectual limitations and raised serious concerns about Sanchez's comprehension level, in particular regarding the trial process. CV-ECF No.[52-1:69 of 112, ¶¶9-10; 70-71 of 112, ¶14]. The defense investigator most successfully communicated with Sanchez by drawing diagrams and pictures. CV-ECF No.[52-1:109 of 112, ¶7]. Both counsel and the investigator suspected Sanchez suffered from intellectual disability, referred to at the time as mental retardation. CV-ECF No.[52-1:70 of 112, ¶14; 108, 109 of 112, ¶¶6, 8]. They questioned Sanchez's intellectual abilities and discussed filing a motion for accommodations at trial to assist Sanchez's understanding of the process and evidence presented against him. CV-ECF No.[52-1:69 of 112, ¶9; 110-11 of 112, ¶12]. Counsel's retained expert, if consulted, would have advised that without accommodations it would be doubtful that Sanchez would be able to understand the proceedings or the evidence presented. Appx at A-001881, Revised Grant Declaration p.16, ¶42; *see also* CV-ECF No.[33-9:21-23 of 156, ¶¶74-75] (Dr. James). Counsel discovered, however, that Sanchez was able to sit quietly and calmly during pre-trial court proceedings and therefore did not file such a motion. CV-ECF No.[52-1:69 of 112, ¶9]. *See also* Claim IV (counsel failed to protect Sanchez's right to be competent while tried).

Investigation into Sanchez's intellectual disability consisted solely of obtaining IQ testing for Sanchez. The defense expert did not evaluate Sanchez's level of adaptive functioning. Appx at A-001870, Revised Grant Declaration p.5, ¶14. The IQ test results confirmed Sanchez's low intelligence but penalty phase counsel thought the scores precluded an intellectual disability defense; Florida law at that time strictly required an IQ of 70 or below in its definition of mental

197

retardation.[165] Counsel did not perform further investigation into whether Sanchez met prong one of an intellectual disability diagnosis. Counsel directed the investigator to stop exploring that defense and, therefore, a deliberate and thorough investigation into Sanchez's adaptive deficits was not pursued or performed. CV-ECF No.[52-1:70 of 112, ¶14; 109-10 of 112, ¶¶8-9]. Counsel prematurely ended the investigation due to his ignorance of intellectual disabilities and diagnostic criteria. If counsel had discussed with his retained expert what Sanchez's IQ test scores represented, the expert would have explained the concepts of practice effect and Flynn effect and the clinical understanding of the imprecision of IQ scores. Appx at A-001874-75, A-001880-81, Revised Grant Declaration pp. 9-10, 15-16, ¶¶25, 26, 40. And had counsel understood the subject matter, he would have directed a deliberate and thorough investigation into adaptive deficits and utilized the assistance of an expert to establish Sanchez's intellectual disability and present it as a defense to the death penalty. CV-ECF No.[52-1 at 70-71 of 112, ¶¶14-15].

Counsel did not otherwise direct an investigation into Sanchez's mental health and did not seek an expert evaluation for any other psychiatric impairments. CR-ECF No.[824:8488] (Dr. Grant); CV-ECF No.[52-1:71 of 112, ¶16, Appx at A-001881, Revised Grant Declaration p.16, ¶41.

---

[165] In 2009, Florida law required, as a threshold matter, an IQ test score of 70 or below before presenting any additional evidence of intellectual disability. *Hall v. Florida*, ___ U.S. ___, 134 S. Ct. 1986, 1992 (2014). A person who obtained a test score above 70 did not, as a matter of Florida law, have an intellectual disability and was barred from presenting other evidence that the medical community accepts as probative of intellectual disability, including for persons with IQ test scores above 70. *Id.* at 1994.

### 2. Deficient investigation and utilization of Sanchez's education records.[166]

Performance standards require defense counsel to obtain and review records related to the client because they "can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness, and corroborating witnesses' recollections." ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1023-25. In this case, the defense investigator collected Sanchez's school records, which were entered into evidence as Defense Sentencing Exhibit 32, and located a teacher Amy Fleming, whose testimony was presented at the penalty phase. Fleming was not qualified to discuss Sanchez's test scores, as documented in the school records. She was, therefore, limited to discussing the process for placement into special education classes, the fact that Sanchez was diagnosed with a learning disability and remarks in the records about his behavior.[167] *See, e.g.,* CR-ECF No.[823:8224].

Counsel's inadequate review of the special education records and preparation for Fleming's testimony was evident in his questioning which revealed counsel had not organized or adequately paired the records to Sanchez's age and grade level. For example, Fleming's account of Sanchez's learning deficits erroneously identified Sanchez as a second grader when such

---

[166] Information throughout original Claim VIII, subsections (A)-(D) is presented here. *See* CV-ECF No.[16-1: of 195, ¶428].

[167] Not presented to the jury was documentation in the school records that placed Sanchez within the first stanine on a test of basic skills and noted significant processing deficits. They also placed Sanchez's IQ in the range of intellectual disability. Appx at A-001842-43, Revised McGrew Declaration pp.6-7, ¶¶19-21 & Figure 1. The records also contained numerous indicators of adaptive functioning deficits that any reasonable attorney defending a client against the death penalty would have thoroughly investigated to establish intellectual disability which, in turn, would have excluded death as a possible punishment. *See Rompilla v. Beard*, 545 U.S. 374, 391 n.8 (2005) ("[O]nce counsel had an obligation to examine the file, counsel had to make reasonable efforts to learn its contents; and once having done so, they could not reasonably have ignored mitigation evidence or red flags[.]").

deficits were first noticed by Sanchez's teachers. But Sanchez's disability was observed from the time he began kindergarten. Information not brought forth from the records, *e.g.*, note 48, *supra*, demonstrates that counsel failed to review or understand the records' content. Moreover, counsel failed to interview educators listed in Sanchez's school records. In particular, Dr. Francis Crosby, the psychologist who determined Sanchez had disabilities making him eligible for special education services, was initially contacted by the investigator but counsel failed to follow up with an interview. CV-ECF No.[33-8:178-79 of 194, ¶¶22-23].[168] This constitutes deficient performance because the records contained critical evidence of the severity of Sanchez's cognitive and social deficits that had been present from kindergarten until he left school at the age of 19 and after failing his second year of tenth grade. *Wiggins*, 539 U.S. at 525 (the scope of counsel's investigation was unreasonable in light of information contained in the defendant's records).

### 3. Deficient investigation into classmates, friends and family.[169]

Performance standards require counsel to seek out and interview potential witnesses familiar with the client's life history, including family, neighbors, friends, and teachers. ABA Guideline 10.7, Commentary 31 Hofstra L. Rev. at 1015, 1019.

Counsel did not locate or interview Sanchez's classmates and childhood friends who possessed knowledge about Sanchez's kind character, knowledge that corroborated Sanchez's

---

[168] Other educators who were available to testify but not contacted by counsel include: Frances Lenore Wolfe, Sanchez's second grade teacher; Patricia Replogle, his third grade teacher; Wanda Lee, one of his special education teachers when he was in sixth grade; and Jeffrey Silverman and Janice Coe, special education administrators who knew Sanchez during his high school years.
[169] Information from original Claim VIII subsection (A) is presented here. *See* CV-ECF No.[16-1:107 of 195].

cognitive and adaptive deficits, and knowledge about violence within the Sanchez home. CV-ECF No.[52-1:110 of 112, ¶11].[170]

The investigator located and contacted Sanchez's immediate family members and the mother of Sanchez's son. Counsel, however, unreasonably failed to engage the services of a Spanish-speaking mitigation investigator and/or consistently employ a translator to communicate with and interview members of Sanchez's family. Both Sanchez's mother and father, Juana and Ricardo Sanchez, Sr., while able to speak some English, are significantly more proficient in Spanish. Counsel employed a translator in January 2008 for two group meetings totaling three hours in his office with Sanchez's immediate family members. There were two additional family gatherings—during trial—for a combined time of less than three hours. Appx at A-001785-87, CJA requests for funds.

In addition, other relatives, including maternal and paternal grandparents, aunts, and uncles, are either monolingual Spanish speakers or speak only limited English.  A Spanish-speaking interpreter was employed for some interviews, but for most interviews where a family member spoke only or primarily Spanish the investigator asked another family member to interpret. CV-ECF No.[52-1:110 of 112, ¶10].

Counsel and the investigator knew or reasonably should have known that engaging one family member to interpret an interview for another is likely to lead to the gathering of unreliable or incomplete evidence, both because it may inhibit the disclosure of information from the witness being interviewed and because it may result in the family interpreter's misinterpreting

---

[170] Friends and classmates not contacted include: Jamie Matos, CV-ECF No.[33-8:49 of 194]; Yolanda Vazquez, CV-ECF No.33-8:128 of 194]; Jason Vazquez, CV-ECF No.[33-8:61 of 194]; Kenny Velasquez, CV-ECF No.[33-8:75 of 194]; Linda Velasquez, CV-ECF No.[33-8:75 of 194]; Rosa Ponce, CV-ECF No.[33-8:119 of 194]; Michelle Sembric, CV-ECF No.[33-8:98-100 of 194, ¶¶7, 9]; and Mayra Garcia, CV-ECF No.[33-8:101-03 of 194, ¶¶7, 9, 10].

the information to comport with that family member's understanding of events.[171] The inability to communicate in a meaningful fashion with monolingual or primarily Spanish-speaking individuals, either to gather information about Sanchez's background and functioning or to explain to family members the reasons for posing intrusive questions about personal family interactions was a significant obstacle to conducting an adequate social history investigation that was not overcome.[172]

For example, counsel spoke only briefly with some family members and did not present their testimony which would have established and/or supported mitigating circumstances.[173] Other family members were not contacted although they were reasonably available and had information about Sanchez's background, experiences, and functioning that was relevant to a diagnosis of intellectual disability and/or consistent with the theory of defense.[174]

### 4.   Deficient utilization and preparation of experts.[175]

"The standard of care for lawyers in any matter that recognizes significant nonlegal expertise is to consult with experts in those subject matter areas."[176] It is "critical" for a lawyer in

---

[171] *See e.g.*, ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1024 (Counsel should bear in mind that much of the information that must be elicited for the sentencing phase investigation is very personal and may be extremely difficult for clients and witnesses to discuss).

[172] Counsel failed to elicit additional mitigating testimony from family members including: Juana Sanchez, CV-ECF No.[52-1:88 of 112]; Nydia Sanchez, No.[33-8:104 of 194]; Rachel Ramos, No.[33-8:114 of 194]; and Juan Antonio Jimenez, No.[33-8:70 of 194].

[173] These mitigation witnesses include: Sanchez's maternal aunts Lucy Jimenez Sanchez and Elsa Hernandez, CV-ECF No.[33-8:78 of 194]; No.[52-1:82 of 112]; his brother Ezequiel Sanchez, No.[33-8:16 of 194]; and his second cousin Benito Rodriguez, No.[33-7:57 of 60].

[174] Persons not contacted include: Sanchez's maternal grandmother, Maria de la Luz Betancourt, CV-ECF No.[52-1:101 of 112]; paternal Uncle Martin Sanchez, CV-ECF No.[33-8:93 of 194]; cousin Juan Gutierrez, No.[33-8:63 of 194]; Paternal grandfather, Aurelio Sanchez Sotelo No.[33-7:42 & 50 of 60].

[175] Information from original Claim VIII, subsection (F), is presented here. *See* CV-ECF No.[16-1:149 of 195].

[176] ABA Guidelines, Guideline 1.1, Commentary, 31 Hofstra L. Rev. at 919-38; Lawrence J. Fox, Capital Guidelines and Ethical duties: Mutually Reinforcing Responsibilities, 36 Hofstra L. Rev.

a capital case to associate with "someone thoroughly familiar with mental or psychological disorders[.]" Capital Guidelines, 26 Hofstra L. Rev. at 777 (citing Supplementary Guidelines, Guideline 5.1). Counsel must obtain a thorough physical and neurological examination of their client. ABA Guidelines, 31 Hofstra L. Rev. at 956. Counsel must also provide experts data necessary to reach a professionally competent conclusion, such as life history information. ABA Guidelines, Guideline 4.1 & Supplementary Guidelines, Guideline 10.11(F), 31 Hofstra L. Rev. at 952-60; 1055-56. "[A]n accurate and reliable life history investigation is the foundation for developing and presenting pivotal mental health issues." Richard G. Dudley, Jr. & Pamela Blume Leonard, *Getting It Right: Life History Investigation as the Foundation for A Reliable Mental Health Assessment*, 36 Hofstra L. Rev. 963, 975 (2008) ("*Getting It Right*"). "Only when the fruits of an accurate and reliable life history investigation are married with the knowledge and skill of competent mental health experts will defense counsel be equipped to present an effective case in mitigation and defend it against attacks from the prosecution."[177] Such a presentation, of course, requires counsel to fulfill his duty to prepare the experts for testifying. Supplementary Guidelines, Guideline 10.11(E)(1).

Sanchez's counsel failed to provide their experts with results of an adequate background investigation, including evidence of Sanchez's adaptive deficits; improperly delegated nearly full responsibility for selecting and communicating with experts to the investigator; failed to provide experts with clear and appropriate referral questions; failed to arrange for a full mental health

---

775, 777 (2008) (discussing the ABA Guidelines and Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases ("Supplementary Guidelines") through the prism of the Model Rules of Professional Conduct) ("Capital Guidelines"). The Supplementary Guidelines are reproduced at 36 Hofstra L. Rev. 677 (2008).

[177] Eric M. Freedman, *Introduction: Re-Stating the Standard of Practice for Death Penalty Counsel: The Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 663, 672 (2008) (citation, quotation & alteration omitted).

mitigation evaluation of Sanchez; permitted Sanchez to be administered psychological testing, including IQ testing, repeatedly within a period of months, resulting in the skewing of scores due to practice effects and progressive practice effects;[178] failed to ensure that the experts examined Sanchez for symptoms of psychiatric disorder; and failed to prepare their experts to testify. As a result, the opinion of the defense's testifying expert, Dr. Grant, was incomplete and misleading, and in critical respects, inaccurate. Although the jury heard some of the circumstances of Sanchez's life history through family members, counsel did not present expert testimony regarding the full effect of Sanchez's experiences and background upon his cognition, mental health and functioning.

With respect to Dr. Daniel Grant, counsel failed to provide him with sufficient background information and failed to request a full mental health mitigation evaluation, including full assessments on intellectual disability and psychiatric symptoms and disorders. CR-ECF No.[824:8488, 8442, 8469-70, 8483, 8488, 8508]. The objective of counsel's questioning of Dr. Grant was unclear and even Dr. Grant did not know the purpose of his testimony. Appx at A-001882, Revised Grant Declaration p.17, ¶43. Moreover, counsel's failure to prepare for the presentation of Dr. Grant's testimony became clear when the Government used for impeachment purposes notations contained on Dr. Grant's notes of his clinical interview with Sanchez.[179] *See*

---

[178] As explained by Dr. McGrew, "Due to his [Sanchez's] repeated exposure to the adult Wechsler scales in such a short time period (within the same year), and within the same month for his last two exams, the last two intellectual assessments are positively upward biased estimates of intelligence due to the scientifically-based and professionally recognized testing issue of practice effects and progressive error practice effects." Appx at A-001840, Revised McGrew Declaration, p.4, ¶14.

[179] Competent counsel representing a capital defendant in 2009 "investigate[d] all sources of possible impeachment of defense and prosecution witnesses." 2003 ABA Guidelines, Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1015-27; Supplementary Guidelines, Guideline 10.11(E)(1).

CR-ECF No.[824:8496-8500]. This impeachment undercut the already sparse mitigating

testimony of Dr. Grant. Competent counsel would have known the content of these notations and

prepared Dr. Grant for cross-examination.[180] Trial counsel unreasonably failed to do either, with

the result that the sole testifying defense mental health expert who had evaluated Sanchez was

discredited.

**5.  Deficient preparation for, and cross-examination of, the prosecution's penalty phase expert.[181]**

"Defense counsel must be prepared to respond to the [prosecution's] case in

aggravation." *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1273 (11th Cir. 2016);

*see also* ABA Guideline 1.1, Commentary, 31 Hofstra L. Rev. at 924 (Counsel representing a

client in a capital case "must be experienced in the utilization of expert witnesses and evidence,

such as psychiatric and forensic evidence, and must be able to challenge zealously the

prosecution's evidence and experts through effective cross-examination.").

With respect to the IQ test score obtained by prosecution expert Dr. Brannon, counsel

failed to its validity based on the Flynn Effect and practice effects. Sanchez's test score was the

highest on this administration and this evidence undermined the weight of lower IQ test scores

testified to by Dr. Grant and that were the basis for several non-statutory mitigating

circumstances pursued by defense counsel. *See, e.g.,* Mitigators #6, 24, 26 and 33, CR-ECF

No.[860].

---

[180] "Expert witnesses for the defense face an uphill battle in gaining the trust of jurors, so … [e]very document relied upon by the expert must be scrutinized by counsel[,] … [and] "counsel must consult with mental health experts regarding likely attacks the prosecution will make on the defense mental health expert through cross-examination[.]" *Getting It Right*, 36 Hofstra L. Rev. at 977.

[181] Information from original Claim VIII, subsection (H), is presented here. *See* CV-ECF No.[16-1:161 of 195].

Counsel also failed to challenge testimony from Dr. Brannon that undermined the defense theory that Sanchez had a limited capacity for planning. This was important, not only as a stated theory of defense (CV-ECF No.[52-1:71 of 112, ¶¶15, 16]), but because "substantial planning and premeditation" was an aggravating factor submitted by the prosecution. All jurors found the aggravator. CR-ECF No.[860:7]. Defense counsel did not submit a mitigator based on the stated defense theme that Sanchez had a limited ability to plan, however, not one juror found the related mitigating circumstance that Sanchez's exact role in the offense was not sufficient to justify the death penalty. CR-ECF No.[860:16] (Mitigator #43).

Competent counsel would have undercut Dr. Brannon's testimony. The testing Dr. Brannon administered did not support his testimony that Sanchez does well in being able to "plan out how events happen over time and anticipate what would happen" and "is also good at the kinds of things that require him to see something and then as a result of whatever he sees, make decisions about the right way to handle that task." CR-ECF No.[846:9296]. Counsel further failed to challenge Dr. Brannon's testimony that the Comprehension subtest on the WAIS-III "give[s] us indices or includes whether or not a person can do things like understand what happens in the world when you do certain things or know the difference between right and wrong, or know how to behave in certain situations, how you are supposed to conduct your behavior, social behavior and problem solving." CR-ECF No.[846:9298-99]. In fact, that subtest was eliminated from the WAIS-IV because research demonstrated it was not clear what it meaningfully evaluated.

Finally, counsel failed to counter Dr. Brannon's testimony that Sanchez was not adversely affected by childhood experiences as evidenced by Sanchez's denial of any family dysfunction and Sanchez's statement that his childhood was "good." CR-ECF No.[846:9319].

206

This inaccurate testimony reduced the weight of non-statutory mitigating factors related to Sanchez's family environment and experiences. *See, e.g.*, Mitigators #18, 19, 20, 23, 36, CR-ECF No.[860]. Had counsel consulted with a mental health expert about the specific effects of traumatic events in Sanchez's life, Dr. Brannon's testimony would have been negated and the jurors would have been presented with substantial mitigating evidence. *See, e.g.*, CV-ECF No.[33-8:147-54 of 194] (Dr. Kraus).

### C.  The penalty-phase presentation.

Despite red-flags signaling its presence, counsel did not pursue an adequate investigation into Sanchez's intellectual disability; a defense that, if established, would have prohibited imposition of the death penalty. Even if counsel had not successfully established Sanchez's intellectual disability, that same investigation would have uncovered a wealth of evidence providing substantial weight to the defense and mitigating circumstances counsel intended to present. Counsel's mitigation theory would have greatly benefitted from this avenue of investigation since that theory was based on Sanchez's troubled upbringing, low functioning, limited capacity for planning, and the fact that Sanchez was easily taken advantage of and manipulated by other people. CV-ECF No.[52-1:71 of 112, ¶¶15, 16]. Defense counsel submitted one statutory mitigating factor and forty-three non-statutory mitigating factors; none were found by all twelve members of the jury. Jurors rejected 14 of the 43 mitigating factors; one factor was found by only one juror; and five other factors were found by less than half the jurors. The statutory mitigator (Varela was equally culpable but not charged with murder or facing death) was found by ten jurors. CR-ECF No.[860:12-16]. During the penalty phase, counsel presented testimony from five family members, a middle school teacher, two psychologists (one who examined Sanchez and one who did not) and an expert on prison security and inmate adjustment.

207

### 1. Family member testimony.

Penalty phase counsel presented testimony from Sanchez's family members: his mother Juana, sister Nydia, maternal Uncle Juan Antonio, the mother of Sanchez's son, Maria Lopez, and his son's maternal grandmother Rachel Ramos. Jurors learned from family members that when Sanchez was a young child, the family lived in public housing surrounded by gangs and drug dealing, and the family home was broken into. CR-ECF No.[823:8160, 8272-73]. They moved to what was supposed to be a safer neighborhood when Sanchez was a pre-teen. CR-ECF No.[823:8156, 8160]. That neighborhood also suffered from poverty, crime, and other socio-economic problems. CR-ECF No.[825:8627-29].

Sanchez and his siblings grew up in a household plagued by alcohol-fueled violence and further strained by their oldest brother's mental retardation and uncontrolled seizure disorder. CR-ECF No.[823:8184-87, 8272-78, 8293-94]; No.[824:8368, 8372-73]. The children were often frightened—of the fighting between their parents, which occasioned visits either from the police, or of their brother Efrain's seizures. CR-ECF No.[823:8173, 8186-87, 8275-78]. They felt alone and unloved. Sanchez asked to move in with relatives in Texas. Later in life, brother Efrain attempted to burn down the house for attention. CR-ECF No.[823:8175-76, 8182, 8184, 8279-83, 8300-02]; No.[824:8371-72, 8381-82]. A clinical psychologist (Dr. Tomas Waddell) testified that Efrain has an IQ of 62 and was found incompetent to stand trial on arson charges. CR-ECF No.[824:8369, 8372]. Regarding mitigating factors, only four jurors found a history of mental retardation in the Sanchez family and no juror found the mitigating factor that Sanchez was exposed to his brother's violent seizures. CR-ECF No.[860] (Mitigator #10, 22).

Sanchez and Maria Lopez met as teenagers. CR-ECF No.[824:8380]. Maria testified that at school other kids made fun of Sanchez and he was embarrassed because his high school

classes were held in the building "for slow people." CR-ECF No.[824:8381]. Sanchez moved in with Maria Lopez, her younger brother, and her mother Rachel Ramos. Maria was pregnant and Sanchez worked a series of manual labor jobs to try to support his young family. CR-ECF No.[824:8383-86, 8394-96]. But Sanchez had to be treated more like another child than like a head of the household. He went to work, turned over his paycheck, and Maria and her mother Rachel Ramos ran the household. CR-ECF No.[824:8386-87]. Trial counsel's questioning on this matter, however, came across as if Sanchez was simply lazy or clueless and let others take care of him. *See, e.g.,* CR-ECF No.[824:8385-88]. Jurors were not informed that when Sanchez tried to be of any more help, his intellectual limitations got in the way. *See* CR-ECF No.[824:8391-92] (describing Sanchez buying small boxes of cereal when asked to buy baby cereal). Not one juror found the mitigating circumstance that Sanchez lacked skills to live completely independent of assistance. CR-ECF No.[860:15] (Mitigator #35). Only one juror found that Sanchez treated Rachel Ramos with respect and contributed to the household income. CR-ECF No.[860:16] (Mitigator #39).

Sanchez was dedicated to being a good father to his son, Ricardo Sanchez, III, or "Three." Three's mother Maria Lopez, Three's maternal grandmother Rachel Ramos, Three's paternal grandmother Juana Sanchez, and Three's paternal aunt Nydia Sanchez all agreed that Sanchez and Three enjoyed a strong, genuine father-son bond. CR-ECF No.[824:8406, 8434]; No.[823:8194; 8292-93]. According to Maria, Sanchez had risen above his own troubled childhood to become a better father than his own. CR-ECF No.[824:8406-07]. Although Maria testified that Sanchez provided support for Three, this non-statutory mitigating factor was found by only five jurors. CR-ECF No.[860:14] (Mitigator #17).

209

### 2.   A teacher's testimony.

Counsel presented evidence that Sanchez received special education services in school; that Sanchez's parents did not attend meetings at school relating to his special education services and did not provide him with tutoring or other supportive services outside of school; and that Sanchez did not graduate from high school. In particular, Sanchez's middle school teacher (Amy Fleming) testified and counsel introduced Sanchez's school records as an exhibit.[182] Ms. Fleming testified that when the school system tested Sanchez as a child, he showed deficits. CR-ECF No.[823:8228-30]. She said, in first or second grade, Sanchez became frustrated with reading, crawled under his desk and tore his reading text. CR-ECF No.[823:8215]. When Sanchez was nine years old, he was referred for special education placement, CR-ECF No.[823:8231-32], where he was teased and humiliated. He remained in that program until he left school in tenth grade. CR-ECF No.[823:8237-43]; No.[824:8381].

At best, Ms. Fleming's testimony established that Sanchez was diagnosed with a learning a disability, because of that disability he was exempted from standardized testing, and in tenth grade Sanchez read at a third-grade level and his math skills were assessed at a fourth-grade level. Counsel's deficient utilization of the special education records, counsel's failure to present testimony of the psychologist who assessed Sanchez and of other educators with specific knowledge of Sanchez's deficits, and counsel's deficient examination of Ms. Fleming, left the jury with the false impressions of Sanchez's functioning. The false impressions were that: Sanchez's primary difficulty in school was a learning disability; Sanchez was capable of functioning independently in the community; Sanchez did not exercise effort in school; Sanchez

---

[182] Defendant's Sentencing Exhibit 32 contains 167 pages of school records, not organized by subject matter or date.

dropped out of school after tenth grade but did not fail any grades; and Sanchez was dangerous because he brought a knife to school. No jurors found the mitigating circumstances that Sanchez can only read and do math on an elementary level or that he lacks skills necessary to live completely independent of assistance. CR-ECF No.[860:15] (Mitigators #30, 31, 35).

Although this information from family members and Ms. Fleming was truthful, it did not provide the jury an accurate picture of Sanchez's intellectual, cognitive, and adaptive functioning deficits or the traumatic events Sanchez experienced and the lifelong symptoms he exhibited as a result of traumatic events.

### 3. Expert testimony.

A former Warden and expert on prison security and inmate adjustment and assessment, James Aiken, testified that Sanchez had maintained "excellent" behavior during his two years of pre-trial detention. CR-ECF No.[825:8679]. Mr. Aiken testified that after trial Sanchez would be housed in a high security penitentiary. If Sanchez remained on good behavior he would be encouraged, and would have the opportunity, to continue his family relationships and, in particular, to be a positive influence on his son. CR-ECF No.[825:862-64]. Not one juror found the mitigating circumstance that "Ricardo Sanchez has adapted very well in a prison environment while awaiting trial" or that he "was well behaved and respectful during the trial). CR-ECF No.[860:16] (Mitigator #41, 42).

Two mental health experts testified. Counsel elicited testimony from Dr. Daniel Grant that Sanchez had an IQ over 70, he was not intellectually disabled and he had deficits in processing and auditory discrimination. CR-ECF No.[824:8442, 8445, 8448].[183] Dr. Grant

---

[183] Dr. Grant testified Sanchez suffers "significant deficits" in intellectual functioning. CR-ECF No.[824:8447]. Sanchez's IQ score of 77 places him in the sixth percentile, CR-ECF No.[824:8445], barely above the diagnostic threshold for mental retardation. CR-ECF

testified, without contradiction, that Sanchez's father has an IQ of 67 and his mother's IQ is 80.

CR-ECF No.[824:8463-64]. Only four jurors found "Ricardo Sanchez's parents had low IQs."

CR-ECF No.[860:13] (Mitigator #13). Dr. Grant's testimony was so lacking in mitigating value

in the eyes of the court of appeals that its opinion addressed the testimony of only the second

psychologist, Dr. Thomas Reidy.[184]

Dr. Reidy assessed whether events in Sanchez's life qualified as risk factors under the

Department of Justice models of "risk assessments," which Dr. Reidy had studied. CR ECF

No.[824:8520-21, 8536]. Dr. Reidy could not say for sure what effect Sanchez's upbringing had

on him. CR-ECF No.[846:9331-33]. As set forth by the appellate court:

> Dr. Reidy did not interview Sanchez personally, but based his reports on: (1) Sanchez's background reports; (2) Sanchez's self-reports; (3) the testimony of trial witnesses; and (4) [prosecution expert] Dr. Brannon's report. In Sanchez's self-reports, Sanchez denied that he had ever been abused, denied that he had ever been a victim of battery, denied that he had ever suffered from emotional problems, denied that he had ever been a victim of violence and denied that he lacked close family or friends. At sentencing, Dr. Reidy testified that he prepared a risk assessment report on Sanchez that identified risk factors related to a person's behavior. He stated that abuse in a person's childhood could be passed down to future generations. To that end, Dr. Reidy opined that Sanchez's behavior was affected by community problems, neighborhood problems, and varying academic problems. He stated "[t]he more you are exposed to risk factors, the greater the probability you will develop the problem ... [f]amily corruption is a risk factor, major risk factor[ ]." Dr. Reidy concluded that he detected "family management problems" in Sanchez's childhood home, including domestic violence and lack of familial support.

*Troya*, 733 F.3d at 1139. Dr. Reidy also indicated:

---

No.[824:8442]. Sanchez's functioning is further compromised by learning disabilities that make it difficult for him to achieve at even that low potential. CR-ECF No.[824:8455-60]. It would be possible for Sanchez to hold a job, but his options would be limited given his disabilities. CR-ECF No.[824:8466-67]. Dr. Grant did not testify to any evidence of Sanchez's traumatic life history and the effects on his mental state and conduct.

[184] This could be a result of counsel's failure to prepare for Dr. Grant's testimony and cross-examination regarding the musings Dr. Grant had scribbled on the clinical interview notes.

> Sanchez was affected by a lack of prenatal care, a family history of alcohol abuse and domestic violence, restlessness, antisocial behavior, a learning disability, living in a "bad area," academic failure, and concentration problems. Dr. Reidy specifically identified risk factors in Sanchez's background and explained that they might account for his development. In closing, Sanchez['s counsel] employed these identified risk factors to argue that they were contributing factors to which he had been exposed in his early childhood.

*Troya*, 733 F.3d at 1140.

In rebuttal, the prosecution attacked the risk factors research by pointing out that different people respond to risk and protective factors differently, and that, without having evaluated Sanchez, Dr. Reidy could not say for sure what effect Sanchez's upbringing had on him. CR-ECF No.[846:9331-33]; No.[847:9620] ("What is so curious about Dr. Reidy is he has his presentation prepared. It is canned ... [h]e wrote his report before he heard any evidence.").

The prosecution presented testimony from Dr. Brannon who agreed that Sanchez was not intellectually disabled. In addition:

> Dr. Brannon reported that Sanchez denied abuse in his childhood, denied any awareness of a family history of mental health or substance abuse, denied that any domestic violence occurred in his childhood home, denied that he was ever a victim of bullying as a child, denied any prior suicide attempts, denied anger management issues, denied substance abuse problems, and denied any exposure to traumatic events.

*Troya*, 733 F.3d at 1139. "Dr. Brannon testified that Sanchez exhibited no signs of early childhood family 'disturbances,' and that Sanchez reported a positive supportive relationship with his family and a 'good' childhood." *Id.* at 1140. Dr. Brannon's testimony "directly rebut[ted] Dr. Reidy's report and testimony on the issue of Sanchez's mental condition based on certain identified risk factors." *Id.*

The prosecution portrayed Sanchez's life as "normal," disputing certain details from the lay witness testimony to undermine the gravity of the mitigation evidence. For example, the prosecutor questioned Mrs. Sanchez's allegation that her husband had shot her, CR-ECF

213

No.[823:8204]; the number and character of Sanchez's father's prior convictions and/or arrests, CR-ECF No.[823:8194, 8203-5]; and how much abuse of the children occurred, CR-ECF No.[823:8195]. The prosecutor also questioned whether the allegations of domestic violence could be true, given that, when they grew up, Sanchez and his siblings remained in contact with their parents. CR-ECF No.[847:9514]. The prosecution relied on Sanchez's statements to Dr. Brannon to try to disprove the mitigation case. Counsel could have avoided or minimized the impact of this cross-examination by introducing records documenting Ricardo Sr.'s violence both within the home and in public, including when Ricardo Sr. admitted to law enforcement officers that he shot Juana in the face after coming home drunk.[185] *See, e.g.,* CV-ECF No.[33-9:119-21 of 156] (records regarding Ricardo Sr. shooting Juana); *see also* No.[33-9:144-156 of 156]; No.[33-10]; No.[33-11]; No.[33-12]; No.[33-13:1-17 of 130] (Ricardo Sr. police/criminal records). As it was, every juror rejected the mitigating factor that family members exposed Sanchez to criminal activity as a child. CR-ECF No.[860:14] (Mitigator #21).

---

[185] Competent counsel representing a defendant on capital charges at the time of Sanchez's trial collected, reviewed, and presented mitigating information and materials from contemporaneous records documenting the defendant's history and background. Competent counsel not only introduced the records and their contents as evidence, but also consulted with lay witnesses and experts to interpret these background records, including school records, medical and mental health records, and criminal records, and presented the testimony of these witnesses to explain the records and put the mitigating information in meaningful context before the jury. 2003 ABA Guidelines, Guideline 10.11 and Commentary thereto, 31 Hofstra L. Rev. at 1055 (counsel should consider presenting "[e]xpert and lay witnesses, along with supporting documentation (*e.g.*, school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)"); 2003 ABA Guidelines, Guideline 10.7 and Commentary thereto, 31 Hofstra L. Rev. at 1024 ("Records … can contain a wealth of mitigating evidence, documenting or providing clues to childhood abuse, retardation, brain damage, and/or mental illness."); *see also id.* at 1025 n.215 ("Contemporaneous records are more credible than witnesses sharing previously undisclosed memories or experts offering opinions that were formed only after the client faced capital charges. Records may also document events that neither the client nor family members remember.").

214

### D. The verdict.

The jury verdict form demonstrates deficiencies (and prejudice therefrom) in the mitigation presentation that prevented jurors from considering facts weighing in favor of a life sentence and thus denied Sanchez a constitutionally adequate, individualized sentencing determination. Rendering effective assistance at the penalty phase of a capital case requires more than a superficial recitation of mitigating facts, as shown here, where the jury did not find basic uncontested facts about Sanchez and his background. For example, no jurors found that "Ricardo Sanchez was 22 years old at the time of the offense." CR-ECF No.[860:16] (Mitigator #44). This fact was not only uncontested, it was included on the certified copy of a misdemeanor battery conviction the Government admitted into evidence at the penalty phase, Gov't Exh. 1204, CR-ECF No.[849:4], and Sanchez's age was recorded on dated education records admitted into evidence by defense counsel. Def. Sent. Exh. 32, CR-ECF No.[823:8210-11, 8248-49].[186]

Similarly, jurors rejected three other uncontested mitigators: that Sanchez was baptized and confirmed at the age of 17; that Sanchez can only read an on an elementary grade level; and that Sanchez can only do math on an elementary grade level. CR-ECF No.[860:13, 15]. In addition to being uncontested, these facts were documented in Sanchez's confirmation

---

[186] The Supreme Court has repeatedly held that youth is a constitutionally mitigating circumstance. *Johnson v. Texas*, 509 U.S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury…."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (capital statutory scheme that precludes effective consideration of defendant's age is unconstitutional; evidence of defendant's age is a constitutionally relevant mitigating circumstance which can serve "as a basis for a sentence less than death"); *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982) (age is a constitutionally relevant mitigating factor).

certificate, Def. Sent. Exh. 42, CR-ECF No.[823:8188], and school records, Def. Sent. Exh. 32, CR-ECF No.[823:8210-11, 8248-49].[187]

Some of Sanchez's boyhood experiences—namely, mitigating factors that he was exposed to his brother's violent seizures as a child, he looked out for his older brother and he was a loving companion to the son of Rachel Ramos—were not found by any juror. CR-ECF No.[860:14-16]. None of the mitigators relating to Sanchez's life experiences were found unanimously. CR-ECF No.[860:12-16].

As the jury verdict form proves, there is a qualitative difference between briefly placing facts before the jury and meaningfully presenting properly developed evidence that reduces a defendant's moral culpability. *Foust v. Houk*, 655 F.3d 524, 539 (6th Cir. 2011) (counsel found ineffective for presenting mitigation testimony that only scratched the surface); *Johnson v. Secretary, DOC*, 643 F.3d 907, 936 (11th Cir. 2011) (counsel found ineffective where "[t]he description, details, and depth" of the defendant's social history was not presented at trial); *Lambright v. Schriro*, 490 F.3d 1103, 1122-24 (9th Cir. 2007) (counsel found ineffective for a penalty phase presentation of limited, inaccurate, undeveloped or unsubstantiated information). On March 31, 2009, after four days of jury deliberation,[188] Troya and Sanchez were each sentenced to life imprisonment on the three capital counts involving the adult victims. But the

---

[187] The fact that a defendant has difficulty reading and writing is constitutionally recognized as mitigating, *Porter v. McCollum*, 558 U.S. 30, 41 (2009), and cannot be reduced to the status of "irrelevant" or to "inconsequential proportions." *Id.* at 42 (discussing the relevance of a defendant's life experiences and mental state to a sentence less than death). A defendant's religious activities is also a relevant mitigating factor. *See Armstrong v. Dugger*, 833 F.2d 1430, 1434 (11th Cir. 1987).

[188] The jury began deliberation on March 26 at 11:43 A.M. CR-ECF No.[848:9762]. They deliberated that afternoon, and all day March 27 and March 30. *See* CR-ECF No.[855:9776]; No.[856:9801]. It was 4:55 P.M. on the following day, March 31, when the court finished receiving the verdicts. CR-ECF No.[857:9846]. The extensive length of deliberations indicates the death

jury sentenced Troya and Sanchez each to death on the two counts involving the child victims.

CR-ECF No.[859:16-18]; No.[860:18-20].

> **E. Sanchez was prejudiced by counsel's failure to investigate and present evidence establishing the depth and breadth of circumstances that led to Sanchez's impaired mental state and reduced culpability and otherwise mitigating against the death penalty.**[189]

The Eleventh Circuit has explained *Strickland's* prejudice prong:

> As long as the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results, our confidence is undermined. Phrased another way, the result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

*Brownlee v. Haley*, 306 F.3d 1043, 1069 (11th Cir. 2002) (quotations and citations omitted).

Here, counsel's deficient performance undermines confidence in the outcome of the penalty phase of Sanchez's trial.

Members of Sanchez's jury were open to the idea of risk factors and adverse experiences, as described by Dr. Reidy. Nine jurors found that Sanchez was exposed to the DOJ risk factors and, therefore, he lacked a proper "framework" to make correct decisions. CR-ECF No.[860:16] (Mitigators #37, 38). Had counsel requested a full mental health assessment of Sanchez, an expert could have testified to two statutory mitigating circumstances not submitted to Sanchez's jury: (1) Sanchez's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct tot the requirements of the law, and (2) Sanchez's deficits are long-standing and existed at the time of the offense and constituted a severe mental

---

sentences were not inevitable and the absence of one or a combination of constitutional errors would probably have resulted in a different outcome.

[189] Information from original Claim VIII subsection (A) is presented here. *See* CV-ECF No.[16-1:107 of 195].

disturbance. 18 U.S.C. § 3592(a)(1), (a)(6). *See also* CV-ECF No.[33-8:154 of 194 ¶66] (Dr. Kraus); No.[33-9:23 of 156, ¶76] (Dr. James). Had counsel adequately presented a factual basis for each factor and expert testimony regarding how traumatic factors impacted Sanchez's development, behavior and conduct, there is a reasonable probability that at least one juror would have voted for life sentences instead of the death sentences actually imposed.

Ricardo Sanchez Jr. is descended from generations of persons with little formal education who worked hard manual labor jobs that exposed them to neurotoxic chemicals and did not pay a living wage. His great-grandparents, grandparents and parents were raised and lived in impoverished conditions and high-crime-rate environments where personal safety was threatened on a daily basis. Mental illness and disabilities as well as substance abuse are prevalent in Sanchez's lineage. So too, is domestic violence where family members either perpetrated or were victimized by emotional, physical, and sexual abuse. Ricardo Sanchez Jr. was born into this world on October 19, 1983. He was the third child of his nineteen-year-old mother Juana who, with a shy, timid personality, had borne brutal physical, psychological and sexual abuse by her father, sister and brother-in-law, and was the ongoing target of her twenty-two-year-old husband's drunken violence and manic possessiveness. These young parents were playing out the roles of their parents and grandparents. Ricardo Sanchez Jr., time would reveal, would inherit his mother's personality, both parents' significantly diminished mental abilities, and on a couple occasions mirror (on a less extreme level) Ricardo Sr.'s drunken conduct.

### 1.  Sanchez's mother and maternal relatives

At trial, defense counsel presented testimony from Sanchez's mother Juana. Regarding her background, the jurors heard that Juana was born in Matamoros, Mexico and her father died when she was nine years old. Juana's mother brought her and her siblings to the United States on

a work permit. The children worked the fields on weekends and after school. Juana's mother moved the family to West Palm Beach "[b]ecause my mother worked for a man who was a contractor. We were living in a camp, and they would give housing to the people who worked for him." Juana attended seventh and eighth grade in West Palm Beach but did not finish middle school because she got married at age 16. CR-ECF No.[823:8148-50].

This is the untold story of Juana, Sanchez's mother:

Sanchez's maternal grandmother (and Juana's mother), Maria de la Luz Betancourt Jimenez, was born in 1929 near the capital of the state of Tamaulipas, Mexico. Maria had three sisters and one brother. They grew up in a rural community; her father was a farmer. Maria was educated only through sixth grade because her family did not have the financial resources to pay for further schooling or the luxury of having her attend school rather than work in the fields along with the rest of her family. CV-ECF No.[52-1:101 of 112, ¶3].

Members of Maria's family suffered from mental illness and abused substances. Her father drank alcohol on the sly because Maria's mother did not approve of his drinking and spending the family's limited income on alcohol. He would secretly give money to Maria and send her to buy his alcohol. Maria's sister, Gregoria, committed suicide at the age of 16 by ingesting rat poison when she learned that her husband had been unfaithful to her. CV-ECF No.[52-1:101 of 112, ¶¶4-5].

Maria married Antonio Jimenez, Sanchez's maternal grandfather, when she was 15 years old and he was 17. CV-ECF No.[52-1:101 of 112, ¶6]. Antonio had grown up in a home without a father, because his father, Natividad, left his mother, Sara, for a younger woman. Sara was left alone to care for Antonio and his siblings, and went from being well-off to depending on others to survive. CV-ECF No.[52-1:82-83 of 112, ¶5].

219

Antonio was an alcoholic. He was also a womanizer, and he would return home with his underwear turned inside out. Antonio drank and beat Maria nearly daily from the time they were married until the day in 1972 that he died of liver disease brought on by years of heavy drinking. CV-ECF No.[52-1:101-02 of 112, ¶7; 82-83 of 112, ¶3; 88-89 of 112, ¶3]. Maria and Antonio separated a number of times, but each time Antonio returned to the home and continued to drink and beat Maria. CV-ECF No.[52-1:88-89 of 112, ¶3].

Antonio not only slapped and punched Maria, but also he beat their seven children (Sanchez's mother Juana and her siblings). CV-ECF No.[52-1:88-89 of 112, ¶3]. Sanchez's maternal aunt Elsa remembered one terrible incident when her father beat Sanchez's mother Juana, explaining that she started hating her father after she saw him kicking Juana "like she was a dog" when Juana was very small. CV-ECF No.[52-1:82 of 112, ¶¶3-4].

Before Antonio died, he worked in a business in Matamoros where the family lived, but did not make enough money to support the family of nine. Maria also worked to supplement the family's income by taking in other people's sewing. CV-ECF No.[52-1:82 of 112, ¶2; 88 of 112, ¶2]. The family was very poor; Maria struggled to feed her children. Juana's older siblings attended school for only a short time because they were required to work to assist the family. Juana's elder sisters moved to the United States when they were about 15 years old to live and work with families, and they sent the money they earned back to Maria and Antonio. CV-ECF No.[52-1:88 of 112, ¶2].

A few years after Juana was born, her parents Maria and Antonio moved the family to San Antonio, Texas, a few years later, after several of Juana's older siblings had already moved to the United States. Maria told Juana that life would be better in the United States because men

220

did not beat women there. Juana's two youngest siblings were born in Texas. The family continued to travel between Matamoros and Texas. CV-ECF No.[52-1:88 of 112-13, ¶3].

After Antonio died, Maria was left to support herself and their seven children—Yolanda, Natividad, Gregoria, Juana, Elsa, Juan Antonio, and Lucy—on her own. Maria worked in restaurants in San Antonio, took in sewing, and also moved around a great deal to do migrant farm work in fields in many different places in the United States, including Ohio, Indiana, Michigan, and Florida. Juana and her siblings worked in the fields picking fruit and vegetables beginning when they were very young: Juana beginning the year her father died when she was nine years old. They worked during the week after school (when they were able to enroll in school) and on weekends as well, and all of their earnings went to their mother to help them survive. No.[52-1:89-90 of 112, ¶¶4, 6-7].

Because Maria's jobs did not pay enough for her to take care of all her children, she sent Juana and Elsa to live with their older sister, Yolanda; she sent Gregoria to stay with Maria's parents in Mexico; and Juan Antonio and Lucy stayed with Maria. Juana and Elsa went to live with Yolanda when Juana was about eleven and Elsa nine years old. CV-ECF No.[52-1:89 of 112, ¶5].

Living with Yolanda was a profoundly traumatic experience for both Juana and Elsa. Yolanda was unhappy to have her sisters descend upon her and her family, and was cruel to Juana and Elsa. She treated them very differently from her own children. Yolanda restricted their diets. She also punished them in cruel ways, beating them and making them stand outside in the cold unclothed or partially clothed. Sometimes the young girls did not even know why they were being punished. As children, Juana and Elsa did not know Yolanda had mental health problems;

221

they just thought she was crazy and mean. CV-ECF No.[52-1:89 of 112, ¶5]. Elsa described their living situation as follows:

> Yolanda beat us when she felt frustrated about having to care for us. She did not want us there. She slammed our heads against the walls. We were not allowed to touch the cereal boxes or other food in the kitchen. We could only eat what Yolanda put in front of us to eat. When we ate something she did not tell us we could eat, she beat Juanita and me.

> One time when I was 10 years old, Yolanda stripped off my shirt and put me outside the house in the cold to punish me for some small mistake I had made. She left me outside for hours without my shirt on. She did this with Juanita too. We were treated like Cinderella in Yolanda's home. We had many chores to do and we rarely went to school because she made us babysit her children most of the time.

CV-ECF No.[52-1:83 of 112, ¶¶8-9].

Yolanda's husband, Amador Acevedo, physically abused Juana and Elsa, and also repeatedly sexually assaulted them. Elsa reported that Yolanda threatened to take her and Juanita's shirts off and let Amador stare at their bare chests if they did not behave. Amador touched their naked bodies and forced them to touch his genitals. Elsa states: "The worst abuse came from Amador. Juanita and I were both molested and raped by Amador. We could not escape it." CV-ECF No.[52-1:84 of 112, ¶10].

Although Juana was the elder of the two girls, she was shy and timid and did not speak or stand up to Yolanda or Amador. Elsa fought to protect herself and her sister, but was unsuccessful in curbing the abuse. CV-ECF No.[52-1:84 of 112, ¶11].

After enduring two years of physical, sexual and psychological abuse at their sister's house, Juana (about age 13) and Elsa (about 11 years old) returned to live with their mother Maria. Maria's sister Paula lived in West Palm Beach, Florida, and Maria settled there with her children Natividad, Juana, Elsa, Juan Antonio, and Lucy. Maria's children played with Paula's

222

children at family gatherings. Juana's cousin Beatriz would subsequently have a son, Danny Varela. CV-ECF No.[52-1:90 of 112, ¶10]; No.[52-1:102 of 112, ¶¶8-9; 84 of 112, ¶13].

Maria worked in the fields in and around West Palm Beach, picking oranges and vegetables, and Juana and her siblings joined her. Maria and her five children lived in housing provided for those who worked in the fields, called Campo Verde, in a dilapidated apartment with two bedrooms. There were no telephones in the apartment and the family had to place calls on one of the two pay phones used by everyone in the camp. The family continued to be very poor. They did not have a vehicle and traveled on foot or by bus. CV-ECF No.[52-1:90 of 112, ¶¶8, 10]; No.[52-1:84 of 112, ¶12].

Conditions for the day laborers where Juana and her mother and siblings worked were dangerous. Workers were brought to the fields, from the housing camp 25 minutes away, in a big bus without air conditioning. The bus smelled like dirty people and was terribly hot. Working in the South Florida fields, Juana and her family were exposed to neurotoxic chemicals. The pesticides sprayed on the crops smelled horrible and burned Juana's (and all the workers') noses and eyes. The pesticide residue got all over their clothing and stained their hands. CV-ECF No.[52-1:90 of 112, ¶¶8-9]. The workers were not provided with gloves, masks, or other protective gear, CV-ECF No.[33-7:57 of 60, ¶6], and so were exposed to the pesticides through ingestion, respiration, and skin contact.

Juana met Ricardo Sanchez, Sr., Sanchez's father, while living in Campo Verde. Ricardo Sr., along with his family, also worked in the fields. The Sanchez family was also from Matamoros, Mexico, and had lived in Brownsville, Texas. CV-ECF No.[52-1:91 of 112, ¶11].

### 2.  Sanchez's father and paternal relatives

This is the untold history of Sanchez's father:

223

Ricardo Sanchez Sr. was one of seven children born to Modesta Garcia and Aurelio Sanchez. Both his parents worked long, harsh hours in the fields, and the Sanchez family was very poor.

Growing up in Matamoros, Mexico, Aurelio Sanchez (Sanchez's paternal grandfather) and his family lived in small cardboard shacks and slept on blankets upon the dirt floor. Aurelio started working with his mother as soon as he could walk and was strong enough. They washed neighbor's clothes and worked in the fields. Like his parents, he never attended school. Aurelio's father drank alcohol all day long while his wife and children worked to earn just enough money for beans and sometimes rice. He came home sloppy drunk and beat his wife and children. Aurelio left home when he was about ten years old and lived in the barns with the cows he cared for. CV-ECF No.[52-1:75-76 of 112, ¶¶4, 6, 7, 9, 11].

Aurelio met his wife, Modesta, when he was 18. They married quickly and had four children, Ricardo Sr. was the firstborn. Modesta was a United States' citizen and the family moved to Texas and then worked all over the country picking crops. Despite working hard, the family was poor. They ate mostly beans and cactus; sometimes they had nothing to eat. Ricardo Sr. and his siblings (then numbering seven) attended some school but worked in the fields during the high seasons. When Ricardo Sr. and his family arrived in the fields each morning the plants were often still wet after being sprayed by chemicals. The chemicals got on their bodies and lingered in the air. CV-ECF No.[52-1:77-78 of 112, ¶¶14-19].

Ricardo Sr.'s mother Modesta was very controlling of her children. She was cold, distant and unaffectionate. CV-ECF No.[33-8:120 of 194, ¶7]. She was suspicious that her husband Aurelio was not faithful and she yelled at him in front of the children. CV-ECF No.[52-1:78-79

224

of 112, ¶¶23-25]. Aurelio was a heavy drinker. He treated Modesta with violence, chasing her with machetes and hitting her. CV-ECF No.[52-1:92 of 112, ¶15].

Ricardo Sr.'s father Aurelio has reflected on his treatment of the children and on Ricardo Sr.'s behavior:

> I had no patience with my children. When they did not do what I wanted, I beat them with a belt. I was very strict with my children and expected perfect behavior. When they caused trouble, I was violent with them. Looking back, I regret how hard I was on my children.
>
> My son Ricardo was different from my other children. He was aggressive even as a child and more rebellious than my other children. As early as eight years old he had problems with other children. He could not keep friends because he fought with them. He seemed to always cause problems. Ricardo went to school every once in a while we were traveling around, but he was not very good at school, and he did not graduate.

ECF-No.[52-1:79 of 112, ¶¶25, 26].

In the community, Ricardo Sr. and his brother Rolando were known as being "wild." CV-ECF No.[33-8:120 of 194, ¶7].

The Sanchez family eventually settled in West Palm Beach. They lived in Campo Verde very near where Juana lived with her family. The Sanchez and Jimenez children became friends. ECF No.[52-1:78, 79 of 112, ¶¶21, 27].

### 3.   Ricardo Sr. and Juana marry young and begin a family.

Ricardo Sr. and Juana saw each other nearly every day. Ricardo Sr. flirted with Juana, even though at 16 years old he was three years older than she and was dating others at the time. Juana danced with Ricardo Sr. at community dances, against her mother's admonitions. CV-ECF No.[52-1:91 of 112, ¶11].

Not unlike Juana's father when he was alive, Ricardo Sr. was short-tempered and he drank heavily. He often became involved in fights at dances. He became angry easily and acted

on impulse, often burning the rubber on the tires of his truck by spinning them in the dirt and making a huge cloud of dust in front of his home.

From early on in Juana's relationship with Ricardo Sr., her family advised her against dating and marrying him. Juana's family felt that Ricardo Sr. was self-involved, vain, and spoiled. Maria described him as "like a peacock; he always looked beautiful and did not care about the others around him. He was clingy and needy; he never had to lift a hand. His mother did everything for him and gave him everything." Juana's family members observed that Ricardo Sr. drank a great deal of alcohol. Juana's sister Elsa believed that Juana turned a blind eye to Ricardo Sr.'s faults and did not listen to her family's warnings about him because she wanted to leave the family home and she saw Ricardo Sr. as the way out.

Although her family warned her not to, in May 1980, Juana married Ricardo Sanchez, Sr. when she was 16 years old and he was 19 or 20. Juana moved into Ricardo Sr.'s family's apartment in Campo Verde. Juana's family knew Ricardo Sr. drank heavily but Juana did not realize how much Ricardo Sr. drank until after they were married. Ricardo Sr. drank almost every day, and while he and Juana went out together at night when they were first married, this ended soon after and Ricardo Sr. ordered Juana to stay home while he went out. He was seeing other women; some people described him as "a womanizer." Sometimes he came home with marks on his neck from other women kissing him. CV-ECF No.[52-1:91-92 of 112, ¶¶11, 13; 84, 85-86 of 112, ¶¶15, 20; 80 of 112, ¶29; CV-ECF No.[33-8:106 of 194, ¶12; 122 of 194, ¶13].

Just a few months into their marriage, Juana became pregnant. Ricardo Sr. became increasingly violent. He shot Juana in the face because he was jealous. CV-ECF No.[33-9:119-21 of 156] (police records). Juana was in the hospital for months. Family and friends did not think she would survive. CV-ECF No.[33-8:120 of 194, ¶9]. Ricardo Sr. spent 9 months in prison.

226

Juana did not return to Ricardo Sr. until after their first child, Efrain, was born. She came back because she thought Efrain needed to have his father. Ricardo Sr.'s controlling and violent behavior continued. CV-ECF No.[52-1:92 of 112, ¶14; 102 of 112, ¶11; 85 of 112, ¶16, 17; 79 of 112, ¶28]; No.[33-8:90 of 194, ¶12]; No.[33-9, 120, 119, 121 of 156].

In addition, Ricardo Sr.'s mother Modesta treated Juana poorly, spying on her and reporting her behavior back to Ricardo Sr. Modesta acted like she wanted to catch Juana cheating on Ricardo Sr. or doing something he would not approve of. She was a mean woman. On many occasions Juana saw Modesta through the window just watching her. Ricardo Sr. restricted Juana's movements, prohibiting her from leaving the house by herself even for the simplest errand. Ricardo Sr. later subjected his children to similar treatment. CV-ECF No.[52-1:92 of 112, ¶15; 80 of 112, ¶29]; No.[33-8:120, 121 of 194, ¶¶7, 13].

#### 4.   Early factors contributing to Sanchez's compromised mental state.

Juana gave birth to more children after Efrain, in short order. Her second child, Nydia, was born in August 1982. At 19 years old, Juana gave birth to her third child, Ricardo Jr. (Sanchez), on October 19, 1983. Sanchez's younger brother Ezequiel was born in April 1985. Juana had very limited prenatal care. She suffered from a urinary tract infection while pregnant with Ricardo Jr., for which she twice was prescribed antibiotics although she did not complete either course of the medication. Ricardo Sr. was still working in the fields while Juana was pregnant, and he tracked pesticides into the home at the end of each workday. As a result, Ricardo Jr. was exposed to neurotoxins in utero. When Juana went into labor, her water did not break and instead she began to bleed. CV-ECF No.[52-1:93 of 112, ¶¶16, 18]; No.[33-4:110 of 119] & No.[33-5:4, 9, 35, 36, 43 of 107] (hospital records).

Through Ricardo Jr.'s first two years his father came home from the fields covered in a yellow-green powder that smelled like poison. Although he made efforts to brush it off his clothes before he came in, he was unable to remove it all. Ricardo Sr. was able to leave work in the fields to start driving a truck but the truck he drove was for the packing company that transported the produce picked in the fields, and so he was still exposed to pesticides at that point as a result. CV-ECF No.[33-8:90 of 194, ¶8].

Juana's eldest child, Efrain, suffered from severe seizures and intellectual disability and mental problems from the time he was a small child. CV-ECF No.[33-8:121 of 194, ¶10]. Efrain required a great deal of Juana's attention, restricting the time and energy Juana had available to devote to Ricardo Jr. and his other siblings. Juana was overwhelmed with the burdens of parenting several small children. Her mother and siblings had returned to Texas shortly after Efrain was born. She could not trust her mother-in-law to help her because a neighbor reported that when Modesta was alone with the children she hit and beat them. Ricardo Sr. did not have any skills taking care of small children. Juana described one incident when she left Ricardo Jr. alone with her husband; instead of changing Ricardo Jr.'s diaper, he put a new diaper on top of the baby's clothes and dirty diaper. In addition to her four biological children, Juana was also responsible for Ricardo Sr.'s nephew Omar Diaz Sanchez, whose mother Ana died in childbirth. CV-ECF No.[52-1:93 of 112, ¶¶16, 18; 80 of 112, ¶¶30-31]; No.[33-8:104 of 194, ¶1].

Ricardo Jr. was a sickly child who was hospitalized for pneumonia a few times. He was also allergic to many things. After contact with something he would break out in a rash or have breathing problems. His mother Juana had to rush him to the emergency room on occasions when he could not breathe.

228

At trial, the jurors only heard about one medical issue concerning Ricardo Jr. At the age of three, he took about 18 pills of his brother's seizure medication; he fell into a coma and spent three or four days in the hospital. Counsel did not introduce a Sheriff's non-crime report that documented this incident. CV-ECF No.[33-5:63 of 107]. His mother testified at trial: "he didn't react the same way anymore. You could tell that he didn't have any balance in his body when he would sit up." He recovered his balance "later, little by little." CR-ECF No.[823:8176-77]. Ricardo Jr. sustained several head injuries that the jurors were unaware of. One childhood head injury, occurring when Ricardo Jr. was less than five years old, was a fall where he split his head open and required several stiches or staples to close the wound. No.[52-1:95 of 112, ¶22; 86 of 112, ¶23]. Ricardo Jr. had other bicycle accidents during his adolescence; one occurred when he was riding a bike on ramps that his neighbor had built, tried to do a flip, fell off the bicycle and hit the back of his head against the ground. CV-ECF No.[52-1:103 of 112, ¶13]; No.[33-8:105-06 of 194, ¶9].

Another example of his unawareness or inattentiveness to danger occurred when he was visiting his grandmother Maria. Ricardo Jr. walked too close to the street where cars were passing. Grandmother Maria warned him but he was in a daze and didn't understand so she threw pebbles at him to make him pay attention and move away from the street. CV-ECF No.[52-1:103 of 112, ¶16].

### 5. Sanchez's traumatic upbringing

At trial, the prosecutor cross-examined his mother Juana about how her husband Ricardo Sr. had only a sixth grade education yet "held down a job and supported" her and the children "for more than 20 years; isn't that true?" CR-ECF No.[823:8196-97]. Interrogating Juana about Ricardo Sr.'s job and the "amenities" Ricardo Sr. provided the family, the prosecutor pointed at a

childhood photograph of Ricardo Jr. near a Christmas tree and stated, "Those [presents under the tree] weren't boxes with just air in them, were they?" CR-ECF No.[823:8197]. He continued: "your husband … bought a house for his wife and his kids, he held a job and he owned his own home?" Their (intellectually disabled) son Efrain was 24 years old but, "you didn't kick him out of your house[?]" CR-ECF No.[823:8198]. "You and your husband continued to provide a roof over his head? … Food in his stomach? … You bought clothing for him when he needed it? … And if he needed to go somewhere, you provided transportation?" CR-ECF No.[823:8199]. After Juana explained she at one point had lied and said Ricardo Sr. shot her in the face by accident "because I was trying to defend my husband, but that wasn't the reality[,]" the prosecutor retorted, "The same man that provided for your three [sic-five] kids, correct? … The same man that gave you a home for over 25 years[?]" CR-ECF No.[823:8204-05].

On re-direct, defense counsel brought out Juana's prior statements to police indicating that her husband purposefully shot her. But counsel failed to introduce into evidence police records that revealed Ricardo Sr.'s graphic admissions. At first, Ricardo Sr. told police the shooting was an accident but readily admitted "he does beat her [Juana] quite often because he is jealous and [when] she does not do what he tells her to do he slaps her around." CV-ECF No.[33-7:28 of 60].

> After a while he finally broke down and admitted she (his wife) was telling the truth. He admitted on tape that he came home drunk. He found the bedroom door locked. After he beat on the door she opened it. He started yelling at her and threatening her. As she lay back down he was still yelling at her, accusing her of possibly fooling around behind his back. He then laid down beside her and tried to get her to make love but she refused. He then pulled out the 38 Smith and Wesson [sic] gun which was in his waist band and struck her in the back of the head twice. He then told her he was going to kill her and then the gun went off.

CV-ECF No.[33-9:119, 121 of 156].

Other police records document Ricardo Sr.'s violent behavior outside of the home. *See* CV-ECF No.[33-9:144-56 of 156]; No.[33-10 of 40]; No.[33-11 of 58]; No.[33-12 of 50]; No.[33-13:1-17 of 130]. Defense counsel did not expound on Juana's reference to "the reality" of life with Ricardo Sr.. Ricardo Sr. had a long history of erratic and violent behavior in addition to the physical abuse he inflicted on his wife and children, including battery on police officers.

Ricardo Sr. also "spent most of the money he earned on himself, leaving Juanita and the poor children with almost nothing. Ricardo Sr. always had nice clothes and shoes, while the children dressed in raggedly old clothes." CV-ECF No.[52-1:85 of 112, ¶20].

Sanchez's mother explains his father's behavior:

> Men in my husband's family were machista. They were hard on women and put themselves first. My husband was very much machista. The money he made went to him. He bought nice clothes and went out often. Only whatever was left over came to his family. Ricardo Sr.'s mother's uncle, Santos Garcia, was Ricardo Sr.'s role model. He was a very violent man and my husband treated his family the same way Santos did.

CV-ECF No.[52-1:96 of 112, ¶26].

Ricardo Sr. spent much of the money he earned going out to bars. When he came home drunk and started hitting Juana and pulling her hair, Ricardo Jr. and his siblings often ran to their rooms scared. They hid in the closets huddled together crying until it was over. ECF No.[33-8:104 of 194, ¶2]. Juana recalls:

> Ricardo Sr. went out almost every night and left me at home to take care of the kids while he was drinking. Often, he came home drunk and angry. Ricardo [Sr.] came home and immediately started an argument with me. He would say mean degrading things to me about my appearance or my cooking. He threw plates of food and pitchers of lemonade at me. Sometimes he threw beer bottles. He slapped and hit me when he was mad.

CV-ECF No.[52-1:93 of 112, ¶17]; *see also* No.[52-1:80, 100 of 112, ¶¶29, 43]; No.[33-8:106 of 194, ¶13].

231

> When Ricardo Sr. came home, he fought with me in front of the children, and hit the children. I hated to see him hit the children. I did not want him to hurt them. I did not like for them to see us fight, but there was no way to hide it from them. My children were scared of their father. When he came home drunk the children would scatter and hide. I remember hearing them cry but I did not leave to comfort them because it would make Ricardo Sr. furious. I tried to protect the children by calming my husband down. It usually did not work. Ricardo Sr. fought with me until he went to bed.
>
> Ricardo Sr. never had anything nice to say to any of us. My children were terrified of what their father might do to me. One time, Ricardo Sr. hit me so hard across the face that I fell to the floor. Nydia bent down to check on me and decided to call the police. By the time the police came, Ricardo Sr. was out the backdoor and across the road into the woods. He stayed there until he was sure the police were gone. He was so angry at Nydia. He screamed and threw things at her.

CV-ECF No.[52-1:94 of 112, ¶¶19-20]; No.[33-8:107 of 194, ¶15].

Ricardo Sr. hit Juana almost daily in front of the children. He also beat his children with his fists and a thick leather belt. Sanchez's grandmother Maria remembers a time when "[h]e went after Nydia and I felt powerless to do anything. I ran away like a rabbit. I called him 'The Monster.'" CV-ECF No.[52-1:103 of 112, ¶15]. Ricardo Sr. pulled the children's hair out of their heads. Although he hit them all over their bodies, Ricardo Sr. made an effort to hit them in places that would be covered by clothes so that school personnel and others outside the house would not see the physical evidence of his beatings. Juana made the children wear long sleeve shirts to hide the bruises. CV-ECF No.[52-1:97-98 of 112, ¶34]; CV-ECF No.[33-8:106, 107 of 194, ¶¶13, 18].

This nightmarish, violent environment in which Sanchez lived was unknown by the jurors. Defense counsel elicited testimony from Sanchez's mother that Ricardo Sr. only "sometimes" beat her and he hit Nydia and Ricardo Jr. "once." CR-ECF No.[823:8185-86]. On cross-examination Juana said Ricardo Sr. hit Ricardo Jr. "several times," "he was strict with him," but the prosecutor highlighted her inconsistent statement on direct. CR-ECF

232

No.[823:8195]. Juana also testified that police intervention in Ricardo Sr.'s violent episodes "affected my children a lot, because it was terrible[,]" and she agreed with counsel that Ricardo Sr. had been arrested "for a variety of offenses" including one episode where he cut his cousin with a machete during a fight. CR-ECF No.[823:8186, 8187]. The prosecutor, however, downplayed Ricardo Sr.'s violence—both inside and outside the house—by emphasizing that Ricardo Sr. had only been convicted of one crime in over 20 years. CR-ECF No.[823:8194]. Such minimization of Ricardo Sr.'s erratic and violent acts went unchecked because counsel failed to present the jury with contemporaneous police reports documenting Ricardo Sr.'s assaultive and abusive behavior toward his family members, neighbors, and bar patrons. CV-ECF No.[33-9:144-156 of 156]; No.[33-10:1-40 of 40]; No.[33-11:1-58 of 58]; No.[33-12:1-50 of 50]; No.[33-13-1-17 of 130] (police and criminal records of Ricardo Sanchez Sr.).

The jurors should have learned of Ricardo Sr.'s long history of violent and criminal behavior; a glimpse of which was documented by law enforcement from 1979-2002. In addition to instances of DUI, traffic offenses and stealing from parked cars, Ricardo Sr. had no less than ten documented assault and battery offenses (other than the attempted murder charge for shooting Juana). His victims ranged from law enforcement officers to bar employees and patrons to a coworker and friends. He fought with neighbors, threw beer bottles at them and went after one neighbor with a tire iron. CV-ECF No.[33-11:58 of 58]; *see also* No.[33-13:11 of 130]. The short police narratives describe the violence and physical injuries Ricardo Sr. brazenly inflicted on grown men.

On Christmas Day 1991, when Sanchez was eight years old, his father punched another man in the mouth and in plain view of a police officer. The officer stated: "The punch came from nowhere and without provocation." When the officer attempted to place Ricardo Sr. under arrest

233

he grabbed the officer's shirt and would not let go. The officer pulled out his baton and hit Ricardo Sr. in the knee. Ricardo Sr. kept fighting, even after he was handcuffed. While the officer had him pinned to the ground Ricardo Sr. said he would stop fighting. As the officer began to stand, Ricardo Sr. kicked the officer in the knee. Only when the backup officer arrived was Ricardo Sr. restrained. CV-ECF No.[33-10:34-35 of 40].

In April 1993, when Sanchez was nine years old, his father struck a friend in the head with a pool cue, "for reasons unknown," knocking him unconscious. The man received a three-inch gash to his skull that required 12 stitches and six steel sutures. CV-ECF No.[33-10:30-31 of 40]. In February 1999, when Sanchez was 15 years old, Ricardo Sr. was observed in the bathroom of a nightclub possibly snorting cocaine. Ricardo Sr. struck a security officer who attempted to escort him outside the club. The officer sustained a laceration to his upper and lower lip. CV-ECF No.[33-10: 26, 28 of 40]. In May 1999, police were called to the Sanchez home after Ricardo Sr. came home drunk, started a fight, threw a beer bottle against the wall, and then departed. As stated in the words of the responding officer as he neared the Sanchez house:

> I observed a huge cloud of smoke, as I got closer to the residence this smoke had an odor of burnt rubber. I noticed there was scratch marks with heavy rubber coming from the driveway of the complainant's house.

> Upon arrival, the husband, Ricardo Sanchez, was gone. I spoke with the wife Ms. Juana Sanchez, who stated he had just left and that was the smoke left from him burning the tires in the driveway. Her daughter Nydia who is 16 years of age was also up and awake. They both said Ricardo had come home drunk and started a fight and threw a beer bottle in the house hitting the wall and braking the bottle, spilling beer all over the floor. Ricardo then left. They stated he had been violent in the past and they were also afraid of him and that he would return.

> At that time I heard a vehicle coming [down] the street in a reckless manner and at a high rate of speed screeching his tires. Ricardo pulled up into the front yard burning the tires, creating more smoke and loud screeching noises in the front yard. Ricardo then pulled his pickup truck right up to the front door continuing to burn his tires creating lots of smoke.

234

I stood in the doorway to protect the wife and daughter. Ricardo began screaming and hollering in Spanish at his wife and daughter and he then told me to get off his property and out of his house. He advised me he did not call the police and did not want me there. I advised Ricardo to lean against the truck and let me see his driver license ....

Again he refused to let me see his license and reached in grabbing the beer from the truck. Ricardo then turned toward me and raised the beer bottle of his head in a threatening manner stating he was going to hit me with it. I then took my flashlight and swung it at the beer bottle, breaking the bottle so I wouldn't get hit in the head with the beer bottle. Ricardo then took the broken portion of the bottle still in his hand and raised it again in a striking position.

Backup units began to arrive Ricardo started making his way into the house towards the bedroom and at that time I attempted to stop him by grabbing his shirt. I was afraid that he would attempt to access a weapon inside the bedroom. Ricardo then became very violent striking me, and pulling me onto the couch on top of him. Ricardo attempted to bite me on several occasions on the arm and shoulder area. He as well attempted to poke out my eyes on several occasions. ... Ricardo continued aggression becoming more violent and again trying to poke out my eyes.

Ricardo was then sprayed by Lt. Etherdige with OC spray and was taken to the ground and handcuffed.

CV-ECF No.[33-11:50, 52, 54-55 of 58].

n November 2005, a confrontation ensued when Ricardo Sr. was in his truck "peeling out." The neighbors protested and Ricardo Sr. threw a beer bottle at one of them. When a man came to defense of the woman who was hit by the bottle, Ricardo Sr. took out a machete, started swinging, and cut the man's arm. CV-ECF No.[33-11:42-44 of 58].

Jurors also could have learned about Ricardo Sr.'s violent and abusive ways from persons who knew Ricardo Jr. For example, Rosa Ponce, a Family Service Specialist, knew both the Sanchez and Jimenez families. Ms. Ponce knew when Ricardo Sr. and Juana married; she was scared that Juana was not going to survive being shot by Ricardo Sr.; and she knew Ricardo Sr. was not a good father and he was mean and abusive. CV-ECF No.[33-8:119 of 194]. It was obvious how bad things were at home. Ms. Ponce and one of the Head Start teachers, Michelle Sembric, found a program that would accept Juana and her children and shelter them. They

235

devised a plan for Juana and the children to leave Ricardo Sr. but Juana was too afraid to leave. CV-ECF No.[33-8:100 of 194].

Jamie Matos, a middle-school friend of Ricardo Jr., was aware that Ricardo Sr. was very strict and Ricardo Jr. worried about getting home early so he did not get in trouble. CV-ECF No.[33-8:50 of 194, ¶8]. Another friend from middle school and high school says:

> It was clear to me, even as a kid, that Ricardo had a tough upbringing. Ricardo's family was dirt poor. Whenever I visited his house, I remember thinking that there were too many people living in such a small house. I also remember that Ricardo and his brother would never dress for gym class at school. Gym class uniforms cost money that his family did not have.
>
> Ricardo also had a really tough father. Ricardo's father was a drunk who was not a nice man. It was clear from talking to Ricardo and his brother that Ricardo would get beaten regularly.

CV-ECF No.[33-8:61 of 194, ¶¶2-3].

Sanchez's childhood was profoundly affected by his father's violent and erratic behavior. On one occasion, when Sanchez was a baby, Ricardo Sr. handed him to his maternal aunt Lucy as she was preparing to board an airplane to return to Texas from West Palm Beach. Ricardo Sr. told Lucy to take Sanchez with her. Lucy was so stunned by this bizarre request that she did so, even though she had no clothes, diapers, formula, or plane ticket. Lucy and her mother Maria cared for Ricardo Jr. in Texas until Juana came to retrieve him several months later. CV-ECF No.[52-1:103 of 112, ¶12].

Ricardo Sr. acted erratically on other occasions. Juana described him getting into his truck and spinning the wheels to stir up dust when he was angry, as well as forcing Juana to sit in the cab of the truck as he drove around and around in circles. CV-ECF No.[52-1:96 of 112, ¶27]. Ricardo Sr. was arrested numerous times for violent behavior in the community. He got into

236

fights in bars when he was drinking, and attacked people with his fists and with weapons.CV-ECF No.[33-13:12-17 of 130]; No.[52-1:80 of 112, ¶33].

Not only did Ricardo Sr. physically and emotionally abuse his wife and children, but also he controlled almost every aspect of their lives. Like his father had done, Ricardo Sr. "ran [his] house like a general and [Juana] and the children were soldiers." Ricardo Sr. "was very strict and expected that they would behave perfectly." CV-ECF No.[52-1:85-86 of 112, ¶20; 80 of 112, ¶33]. He did not like the children to leave the house except to go to school, and punished them when he learned that they had. ECF No.[33-8:104 of 194, ¶2]. He did not permit the children to participate in sports or clubs at school, or to visit friends or go to social events that were not family gatherings. Ricardo Sr.'s restrictions on his wife and children were frustrating and confusing for them given his own behavior of going out drinking almost every night. Through his draconian rules, Ricardo Sr. was able to isolate his family from those in the community who might have been able to offer them support. CV-ECF No.[33-8:106 of 194, ¶12].

Despite the fact that Ricardo Sr. kept his wife and children close to home he did not engage or interact with the children in a loving, fatherly way. Sanchez's uncle observed with regret that Ricardo Sr. did not spend much time with Sanchez and did not teach him about soccer or roller skating. CV-ECF No.[33-8:71 of 194].

Ricardo Jr. was a very quiet boy, meek and timid. He rarely spoke, but he smiled a lot and was very respectful. His grandfather Aurelio says: "Ricardo Jr. was quiet but he always had a smile for me even though I knew that [his] house was not easy to live in." He seemed mentally slower than his brothers and sister. CV-ECF No.[33-7:57 of 60, ¶4]. He followed his siblings around and stayed close to them. They made the plans and he followed them. Ricardo Jr. tried to obedient. He had to be told what to do every step of the way, but he always tried to do as he was

237

told and did not talk back. Ricardo Jr. did not remember directions that were given to him and had to repeatedly be told what to do. He was very forgetful. His sister Nydia had to remind of him things she knew he had been told several times before. Sometimes, Ricardo Jr. seemed to be in another world and he would not respond unless his name was called several times. His mother Juana explained: "He was blank and I had to bring his attention back to me from wherever he was. I recall the school mentioning this to me and suggesting that I take him to a doctor to have it checked out. I did not take Ricky to a doctor for this." CV-ECF No.[52-1:95, 96-97 of 112, ¶¶24, 29-31; 86 of 112, ¶¶24-25; 80 of 112, ¶32]; No.[33-8:105 of 194, ¶7].

Around his siblings and people he felt comfortable with, Ricardo Jr. acted goofy and clowned around. He was very smiley and wanted to please everyone. He liked to make people laugh by acting silly. He like the attention. CV-ECF No.[33-8:105 of 194, ¶6].

When Ricardo Jr. visited his family in Texas he repeatedly asked if he could stay and not return home. CV-ECF No.[52-1:103 of 112, ¶14]. Uncle Antonio testified to this at trial, without explanation. What the jurors heard was that Ricardo Jr. would "prefer" to stay "a couple days," "spend a little more time there," and "to move to San Antonio and live with [him]." Uncle Antonio's response was: "Sure, but right now wait until you get older. I am sure your mom and dad wouldn't approve at the time, but I said you are welcome whenever." CR-ECF No.[824:8300-01]. Jurors did not hear the full extent of the abuse and terror at the Sanchez house which Ricardo Jr. had tried—with his pleas to Uncle Toni—to escape.

Sometime after Ricardo Sr. began work as a truck driver, the family moved from the field-laborers' camp to a housing project on Dyson Circle which was located in a dangerous neighborhood. The project was run-down and decrepit and the Sanchez home was surrounded by drug dealers and addicts and had a frightening police presence. The area was known for being

238

overrun with drugs and violence. One of Ricardo Jr.'s brothers has vivid memories of finding guns and needles discarded in the yard around the apartment and of watching men fleeing from the police only to be caught and wrestled to the ground. CV-ECF No.[33-8:104 of 194, ¶5]. After the Sanchez family moved from Dyson Circle, the Guardian Angels came into the neighborhood clean it up. CV-ECF No.[33-8:123 of 194, ¶16].

When a small house in Coconut Grove was placed under foreclosure proceedings, the Sanchez family purchased it. The family considered it a "step up" even though it was still a low income neighborhood and posed many dangers as well. Ricardo Jr. and his family members were victims of racism and bigotry in that neighborhood, on more than one occasion being threatened to "go back where [they] came from." Efrain was sexually abused by a neighbor who took advantage of his disabilities to convince him to enter his home and then touched Efrain's penis after the boy had a seizure. Although the police were contacted, they took no action. CV-ECF No.[52-1:97 of 112, ¶¶32-33; No.[33-8:105 of 194, ¶5].

### 6. From Head Start through a second year of tenth grade: Sanchez struggles to learn.

Allegations regarding Sanchez's education and cognitive and adaptive deficits set forth in Claim III are specifically incorporated in this Claim VII. At trial, jurors heard during testimony from Sanchez's mother Juana that he and his siblings attended a Head Start program when he lived in Dyson Circle. The program helped children from homes where a language other than English was spoken. It also helped young children to socialize with other children and learn basic skills like shapes, colors and letters. The jurors did not hear that while in the program the Sanchez siblings were quiet, serious, and respectful, but Ricardo Jr. (like his mother Juana) was the most timid and shy of them all. He spoke rarely, but smiled a good deal. He stayed close to

239

the people he knew well. CV-ECF No.[33-8:121-22 of 194, ¶¶11, 13, 14]; No.[52-1:96 of 112, ¶29].

Jurors also did not hear testimony that, despite participation in the Head Start program and when Sanchez began kindergarten a year later than most of his peers, his teacher noted Sanchez's marked developmental delays in understanding and expressing himself, completing his work correctly, and concentration. CV-ECF No.[33-8:110 of 194, ¶2]. "[D]ifficulties Sanchez experienced were more extreme than those of a typical kindergartener." CV-ECF No.[33-8:110 of 194, ¶2]. In first grade, his teachers observed that he exhibited "youngness in all areas of development," he was unable to stay on task "even for short periods of time," he could not follow directions, and he was "incapable of working independently." CV-ECF No.[33-8:110 of 194, ¶3]; No.[33-5:65 of 107]. Counsel did not elicit this information from the authoring teacher, instead, asking a different teacher about behavioral symptoms that were documented after the deficits noted:

> Q.  Does this particular document also reflect some issues with Ricardo?
>
> A.  Yes.
>
> Q.  Okay. It mentions he is distracted and unable to follow directions, and he tore his reading book and crawled under the table?
>
> A.  Yes.
>
> Q.  Are those important behaviors a teacher needs to be aware of?
>
> A.  Yes.

CR-ECF No.[823:8214-15].

Instead of interviewing and/or presenting other educators who authored school records, counsel presented testimony from only one teacher, Amy Fleming, who was not qualified to interpret test results and who—under defense counsel's questioning—glanced over Sanchez's

240

deficits, incorrectly identified kindergarten records as from "approximately second grade," CR-ECF No.[823:8212], and focused on difficulties with Sanchez's behavior.

Counsel referred the teacher to test scores in Sanchez's school records when he was eight years old. Counsel did not elicit testimony that on one testing instrument administered when he was seven years old, Sanchez scored a 67 which is more than two standard deviations below the norm of 100, and in the impaired range of functioning. Sanchez scored extremely poorly on the Comprehensive Test of Basic Skills, a standardized test administered to children throughout the United States, achieving stanine scores of 1 (out of a possible 9). CV-ECF No.[33-8:111 of 194, ¶3]; No.[33-5:68, 80 of 107]. Such evidence of Sanchez's significant cognitive deficits could have been relayed to the jury through Dr. Crosby who conducted the evaluation of Sanchez. Instead, when counsel asked the teacher if she knew the meaning of test scores, she stated she was not familiar with the tests but would compare the scores to an IQ score to see if they were very high or very low. Counsel asked: "Are these very low or very high?" She answered: "I believe they would be considered average or on the low average." CR-ECF No.[823:8224-25]. Thus, counsel presented the jury with an inaccurate view of Sanchez.

Counsel also unsuccessfully attempted to address the significance of Dr. Crosby's testing when he asked:

> Q.  … On this line right here it says the child has a psychological processing disorder and visual and auditory and immediate sequential memory [sic].
>
> Could you explain to us what that means?

The prosecutor objected, asserting that the teacher was "not qualified to give that type opinion," and the trial court sustained the objection. CR-ECF No.[823:8230]; *see also* No.[823:8226] (sustaining prosecutor's objection to the question, "is this test trying to find out, to get to the bottom of those issues?"). During the teacher's testimony, the jury learned nothing

241

about Sanchez's cognitive deficits as revealed by Dr. Crosby's assessment; instead, it heard that "[t]he result of this evaluation report was that he [Sanchez] was made eligible for specific learning disabled within the School District." CR-ECF No.[823:8231]. Sanchez's learning disability is important mitigating evidence but it is not the only evidence that was available to present had counsel adequately reviewed and understood the education records and interviewed and called proper witnesses such as educators and mental health experts.[190]

Counsel's questions framed behaviors which signaled significant deficits and/or trauma-related psychiatric symptoms as poor or bad behavioral conduct. For example, when handed a document, the teacher indicated it was a checklist to look at certain behaviors of the student to determine whether they could possibly be related to a learning disability. CR-ECF No.[823:8218]. Counsel, however, did not elicit testimony as to how or why such behavior is related to a disability or cognitive deficiencies, or testimony revealing the conclusion contained within the school records that Sanchez's behavior was related to his disabilities. Instead, counsel asked the teacher:

> Q: And one of the things they said frequently happens or was a frequent problem with Ricardo Sanchez, he exhibited a slow rate of learning; is that right?
>
> A. Yes.
>
> Q. It says on behavior he almost always was impulsive, inattentive, distractible, inability to shift easily from one activity to another, appearance of being lazy, short attention span, verbally aggressive, physically aggressive. They said he seldom had tantrums or -- was hot tempered, but pointed out he was overly dependent and had daydreams.
>
> A. Yes, that is correct.
>
> Q. *Doesn't sound like very good behavior.*
>
> A. Not in my opinion, no.

---

[190] *See* footnote 168, *supra*, for a list of educators not interviewed by counsel.

CR-ECF No.[823:8220-22]. A teacher's written observation of Sanchez "coming to me continually for helping him complete his work and would not work independently," was translated as meaning either Sanchez would not or could not do the work. *See also* CR-ECF No.[823:8216-17].

At trial, jurors learned Sanchez had a learning disability and was exempt from taking standardized tests. They did not know that as early as kindergarten his teacher observed that Sanchez had difficulties that were more extreme than those of a typical kindergartner. If counsel had interviewed other educators jurors would have learned that only a very few students who qualified for special education services as learning disabled were exempted from such testing; only those whose intellectual and cognitive functioning was very low and those who would have experienced extreme frustration were exempted. CV-ECF No.[33-8:110 of 194, ¶2; 127 of 194, ¶10].

Counsel had not interviewed the psychologist who evaluated Sanchez at the age of eight and who prepared the psychological report on the basis of which Sanchez was deemed eligible for special education services. Unlike the teacher who testified at the penalty phase, Dr. Francis Crosby obviously was qualified to explain test scores in Sanchez's records and the meaning of Sanchez's cognitive deficiencies. The jury would have learned that Sanchez scored in the first stanine on a test of basic skills, the lowest possible score. Sanchez scored more two standard deviations below the mean on a language test (a 67) and within the range of intellectual disability. Sanchez was exempted from standardized testing not simply because he was diagnosed with a learning disability; Dr. Crosby found he had "significant intellectual impairment," and, "extremely limited cognitive capacity." CV-ECF No.[33-8:176 of 194, ¶¶16, 18]. The effect of Sanchez's processing deficits, or working memory impairments, is difficulty in

243

problem-solving, exercising good judgement and making reasoned decisions. CV-ECF No.[33-8:174 of 194, ¶11].

Had counsel interviewed Dr. Crosby they would have learned (and presented testimony to the jury) that Sanchez's 1992 IQ score of 80 was likely inflated. In 1999, it was very stigmatizing for a student, particularly a minority student, to be labeled as mentally retarded and, therefore, it was important to avoid that label whenever possible, while still ensuring that the student was eligible for services. Dr. Crosby chose a test instrument likely to obtain a higher IQ test score. CV-ECF No.[33-8:173-74 of 194, ¶¶8-9]. Dr. Crosby also says:

> The fact that [Sanchez] achieved a full scale IQ score that is typically considered above the mentally retarded range when he was 8 years, 9 months old does not preclude the possibility that he was and is mentally retarded (now termed intellectually disabled). As noted above, a younger child who is able to answer correctly the items that appear early in the instrument will achieve a higher IQ score than an older child, who is expected to be able to answer the more difficult questions that appear later in the instrument but who has not progressed and still is able to answer only the simpler questions toward the beginning of the instrument. In order to ensure that the IQ score accurately reflects an individual's intellectual functioning, it is important to retest the individual after several years, particularly when the first administration of an IQ instrument is completed before the age of 10, because an individual's intelligence profile may change from childhood into adolescence.

CV-ECF No.[33-8:175 of 194, ¶14]. This knowledge would have countered counsel's uniformed notion that Sanchez could not be intellectually disabled without an IQ score of 70 or lower. Having understood the incorrectness of that premise, counsel would not have shut down an investigation into Sanchez's adaptive skills and would have presented the jury with evidence of Sanchez's intellectual disability. CV-ECF NO.[52-1:70-71 of 112, ¶¶14-15] (Murrell).

In addition, Dr. Crosby also could have testified that what was characterized by trial counsel during Ms. Fleming's testimony as simply poor behavior by Sanchez—including an incident where Sanchez brought a knife to school—was actually a manifestation of Sanchez's

244

disabilities.[191] *See* CV-ECF No.[33-8:177 of 194, ¶19] (Dr. Crosby); *see also* CV-ECF No.[33-8:67, 68 of 194, ¶¶3, 6] (Silverman).

After being diagnosed, in second grade, with a learning disability Sanchez was placed in the Exceptional Student Education program and received special services full time but he did not make meaningful progress in over ten years that followed and despite several accommodations. Sanchez failed both ninth and tenth grades, and "made only very minimal progress in school" despite the fact that he had attended a Head Start program and was in full-time special education classes from the time he was in elementary school. "This lack of progress is consistent with Ricardo's very low intellectual capacity and demonstrates not simply learning disabilities but functional impairments as well." Teachers recognized that Sanchez's goal of joining the military was unattainable since he would not receive a standard high school diploma. His education ended unsuccessfully at age 19. CV-ECF No.[33-8:124 of 194, ¶4]; No.[33-8:110 of 194, ¶2]; No.[33-8:47-48 of 194, ¶11; 67 of 194, ¶5]; No.[33-8:110 of 194, ¶3] (Patricia Replogle); No.[33-8:145 of 194, ¶40] (Dr. Kraus); No.[33-9:12 Of 156, ¶50] (Dr. James).

Testimony from family members, classmates and friends could have corroborated the significant deficits recorded in the education records. Sanchez's mother Juana observed that he "seemed like the slowest of my children with learning. Ezequiel was in special classes too, but Ricky was slower than Ezequiel."[192] Sanchez's Uncle says "Ricardo Jr. seemed slow. He was low intelligence. He sometimes did not understand things that were said to him. You would have

---

[191] At trial, counsel asked the teacher about "an incident where Ricardo was found on campus with a knife in his pocket[,]" after which he was placed at an alternative education site. The jury was *not* informed that school personnel deemed his condut to be out of character for Ricardo and a manifestation of his disability. *Compare* CR-ECF No.[823:8244-45] *with* CV-ECF No.[33-8:59 of 194, ¶16; 68 of 194, ¶6; 145 of 194, ¶41.

[192] Only four jurors found the mitigating factor that there was a history of learning disabilities in the Sanchez family. CR-ECF NO.[860:13] (Mitigator #11).

to tell him things over and over. He was different from his brothers and sister in that way." CV-ECF No.[33-7:57 of 60, ¶4]. Ricardo Jr. always needed help with homework; usually his sister Nydia helped him. He read so slowly that homework took a long time and he got frustrated. Nydia tried to help her brother memorize numbers or words but he could not do it. He was forgetful and the information would not stick in his head no matter how many times he was told. Ricardo Jr. was not good at anything in school. He struggled in all of his classes. CV-ECF No.[52-1:96 of 112, ¶¶29-30]; No.[33-8:106 of 194, ¶10].

> One classmate states:

> Ricky was a sweet boy but always seemed to be low functioning. In math class, he could not answer the simplest questions. He would play it off like he did not care about it. I never saw Ricky act out in class or get angry. He was always respectful of the teacher and nice to the other students.

> Ricky reminded me of two cartoon characters - Eeyore and Mr. Magoo. Ricky was sweet and sad like Eeyore, always on the outside looking in. And he looked off into the distance like Magoo. I remember times when I couldn't get his attention because he was in a daze, doodling on paper or staring into space. It was like he lived in a dream world, keeping quiet and avoiding eye contact.

> I do not remember Ricky having in depth conversations. He would usually agree and smile when people asked him something. Or when something was complicated, he would act like he didn't care about it. I remember one time a school teacher was explaining to him why he didn't have enough credits to pass on to the next grade, and afterward he was like, whatever, that doesn't matter. But he looked confused to me.

CV-ECF No.[33-8:128 of 194, ¶¶4-6].

Another friend remembers: "Rick was always smiling. I used to call him 'goof' because he was really goofy. You could say Rick was slow. It always took him a lot to catch on as a kid." CV-ECF No[33-8:72 of 194, ¶5] (Velasquez, K.).

At trial, when the teacher could not answer defense counsel's question whether Sanchez was on track to graduate, counsel elicited general information about how a special diploma

involves a modified curriculum but students are still required to earn 24 credits and a 2.0 grade point average. CR-ECF No.[823:8239]. The jury did not learn the truth: Sanchez was not on track to graduate, even with a special diploma. Sanchez repeated ninth grade and throughout two years of tenth-grade Sanchez read at a low third grade level. He could solve simple math equations at the fourth grade level. CV-ECF No.[33-6:84 of 125]. Sanchez left school at age 19, never passing tenth grade, ranking tenth out of a class of twelve and with a cumulative GPA of 1.10. CV-ECF No.[33-7:8 of 60]; No[33-8:56 of 194, ¶¶9-10]. This information was not presented to the jury and no juror found the mitigating factors that Sanchez can only read and do math on an elementary grade level. CR-ECF No.[860:15] (Mitigators #30, 31).

On cross-examination, the prosecutor emphasized that the teacher lacked credentials to explain information in the school records related to Sanchez's cognitive ability. CR-ECF No.[823:8250-51]. The prosecutor brought out those portions of Dr. Crosby's assessment that described Sanchez's strengths. CR-ECF No.[823:8254-55]. The teacher admitted the records did not indicate Sanchez was mentally retarded, or that he was abused or traumatized; but the records did indicate Sanchez knew right from wrong. CR-ECF No.[823:8251-55]. There were no questions on re-direct even though reasonable counsel would have pointed out the complete record regarding Sanchez's ability to conceptualize "right and wrong;" it was a relative strength but Sanchez placed at only the 40th percentile. *See, e.g.*, CV-ECF No.[33-5:70 of 107]. This misinformation impacted the mitigation theory that Sanchez was low functioning. Not one juror found the mitigating factor that Sanchez's role in the offense was not sufficient to justify the death penalty. CR-ECF No.[860:16] (Mitigator #43).

The prosecutor's cross-examination also left the jury with the incorrect impression that the school records determined Sanchez was able to live and work independently in the

community. *Compare* CR-ECF No.[823:8259-62] *with* CV-ECF No.[33-8:56-59 of 194, ¶¶10-12, 14-15]. In truth, the records "did not mean that Ricardo was able to function without assistance in the community; they simply meant that the IEP team believed that he had support from family or others and that the school did not need to provide services to Ricardo for him to accomplish these goals." CV-ECF No.[33-8:58 of 194, ¶14]. Not one juror found the mitigating factor that Sanchez lacked skills to live completely independent of assistance. CR-ECF No.[860:15] (Mitigator #35).

Trial counsel elicited from the defense expert that that Ricardo's father had an IQ of 67 and his mother had an IQ of 80; the purpose of this testimony, however, was unclear. CR-ECF No.[824:8461-65]. This is because counsel, through his questioning, made clear to the jury that—even though Ricardo's father scored 67 and placed in the first percentile—he was not retarded. CR-ECF No.[824:8463]. Only four jurors found the mitigating factor that Sanchez's parents had low IQs, and less than half of the jurors found the factor that his parents were uneducated. CR-ECF No.[860:13] (Mitigators # 13, 14).

Jurors did not hear how both their impairments contributed to their difficulty functioning competently as parents, and prevented them from ensuring that Sanchez developed appropriately. Dr. Crosby, the psychologist who evaluated. Sanchez in elementary school, could have testified:

> It is well established that an individual's intellectual and cognitive functioning are influenced by his or her genetic background and environment. Because an individual needs to have all of his senses stimulated in order for his brain to develop in a healthy manner, experiential deprivation can limit the individual's brain development and thus his cognitive and intellectual functioning. The intellectual functioning skills of a child's parents can have a tremendous impact on the child's own intellectual development apart from the genetic contribution; if the child's parents are intellectually low functioning, they are less likely than typically functioning parents to provide a home environment in which the child's brain is appropriately and safely stimulated. This can lead to atypical brain development.

CV-ECF No.[33-8:179 of 194, ¶21].

The jury was not presented with this information. Trial counsel further made clear that Sanchez was not "mentally retarded" although counsel appeared to equate mental retardation with a person "walking down the street … drooling and lost." CR-ECF No.[824:8442, 8466]. Trial counsel elicited testimony about "an incident where Ricardo was found on campus with a knife in his pocket[,]" he was then placed at an alternative education site and his parents did not participate in the school proceedings. Counsel did not present evidence establishing that school personnel deemed Ricardo's conduct to be out of character for Ricardo and a manifestation of his disability. *See* CR-ECF No.[823:8244-45]; No.[823:8263-64]. The educators who knew Ricardo felt that this was uncharacteristic behavior for him, they did not believe that he posed any threat of harm, and they believed that the possession of the knife was a manifestation of his disability; the school transferred Ricardo to an alternative school placement. CV-ECF No.[33-8:67, 68-69 of 194, ¶¶3, 6-7].

Ricardo did not complete that academic year. He had often spent the day at the house of his girlfriend Maria. He told Maria's mother, Rachel Ramos, that he did not want to go to school because people teased him for having classes in the building for special classes. They called him dumb and other names. Ms. Ramos did not want Ricardo on the street so she let him stay there. CV-ECF No.[33-8:115 of 194, ¶4].

Sanchez enrolled in an adult education program that was designed to prepare students for the GED. But because he did not have the intellectual capability to take the GED, had been exempted from standardized testing for years due to his intellectual deficits, and had been preparing for a special, rather than a typical, diploma, Sanchez was unable to complete the adult education program and did not take the GED. CV-ECF No.[33-8:60 of 194, ¶17] (Coe).

### 7.  Years 18 - 22: Sanchez's attempts at independence and efforts to be a good father.

Sanchez was loyal and family oriented, but it was terrible living with his father's drunken and violent behavior. Growing up in the Sanchez house "was like a nightmare." The fighting seemed to happen every day and his father was so controlling. CV-ECF No.[33-8:16 of 194, ¶¶2, 3] (Sanchez, E.). There was no way anyone in the family could please him. His father punched and slapped the children if he thought they were not behaving perfectly. CV-ECF No.[33-8:16 of 194, ¶3]. Ricardo left the house the first chance he had; when his girlfriend Maria became pregnant he moved in with Maria and Maria's mother Rachel Ramos before the baby was born. CV-ECF No.[33-8:107 of 194, ¶18-20; 114 of 194, ¶¶2-4].

Rachel Ramos knew Sanchez's life with his father was rough because his father abused alcohol and was mean and angry when he drank. Although Ms. Ramos testified at trial, counsel did not ask her about Ricardo Sr.'s abusive behavior. One time, Maria and Ricardo took his mother Juana to the store to do some shopping. Ricardo's father did not know that Juana was with them or where they were. When they brought Juana back to the house, Ricardo's father dragged her from the car and punched her right in front of them. He screamed at her to get into the house. Before Ricardo was able to move into the Ramos house, he felt trapped at his father's house. CV-ECF No.[33-8:114 of 194, ¶¶3-4].

Shortly after Ricardo's nineteenth birthday, his son, Three, was born. Although he was "totally devoted" to parenting his son, Ricardo Jr. did not know the first thing about caring for an infant. Rachel Ramos describes Ricardo as "slow" and "like someone much younger than he was." When Maria was in labor with their son at the hospital, Sanchez left the hospital to sleep in the car, saying that Maria was too loud and he could not sleep in the hospital room. Ms. Ramos says it was "like something a child would do." She also says Ricardo had to be reminded of

things "over and over," including appointments and places he was supposed to be. CV-ECF No.[33-8:115 of 194, ¶¶5-6].

During direct examination of Maria, counsel asked about a number of household and daily living activities that Sanchez did not perform. This questioning left the impression that Sanchez was lazy or just didn't want to help. *See* CR-ECF No.[824:8385-87]. Maria's mother, however, would have testified if asked that Sanchez worked hard to do the chores asked of him. When Ms. Ramos asked Sanchez to do things for the baby or around the house, she had to give him instructions several times before he understood what she was asking. CV-ECF No.[33-8:115 of 194, ¶6].

Although Sanchez had moved away from home, Sanchez's sister Nydia continued to look after him. She helped him open his first bank account when he was about 20 years old. Both Nydia and Maria helped him fill out job applications because he could not read well, his writing was so bad and he could not spell anything. Most Sundays, Sanchez returned to visit his mother and siblings and they played Mexican bingo together. After he started hanging around with Danny Varela that changed. He only visited his parents' house once in a while. CV-ECF No.[33-8:107 of 194, ¶18-20; 114 of 194, ¶2; 116 of 194, ¶¶6-8].

While living with Maria, most of the jobs Sanchez got were through his family members or Maria's father asking their friends if he could work for them. Maria also helped Sanchez find and apply for jobs by reading the classified ads to him and filling out his job applications. Sanchez did not seem to know what to do with his money so Maria handled it. She made sure Sanchez's paycheck was cashed, and she paid her mother for rent and any baby expenses. For a short time, Sanchez and Maria moved to North Carolina, where Maria's father knew of work, and they left their baby with Maria's mother. Through family and friends Sanchez obtained

251

manual labor jobs, such as landscaping, cleaning, caulking windows, digging sewer ditches, and doing some roofing tasks. CV-ECF No.[33-15:162 of 168]; No.[33-16:6, 23 of 103]. Nine jurors found the mitigating circumstance that Sanchez's learning disabilities and low IQ limited his opportunities for career choices. CR-ECF NO.[860:15] (Mitigator #33). Jurors, however, were not presented with testimonial or documentary evidence that the reason Sanchez could not keep a job for long was due to his inability to meet even the very basic expectations of the positions he held. Because he is forgetful, Sanchez would show up late or forget something he was supposed to do. CV-ECF No.[33-8:116 of 194, ¶¶7-8] (Ramos); No.[33-8:18 of 194, ¶10] (Sanchez, E); No.[33-15:161-62, 165 of 168] (employment records); No.[33-16:8, 20 of 103] (employment records). Despite available evidence, Sanchez's jurors knew little about his inability to successfully live independently.

The prosecutor capitalized on the lack of information connecting Sanchez's disabilities and poor living skills. The prosecutor contrasted Ricardo Sr.'s long employment history as a field laborer and truck driver to Ricardo Jr.'s sporadic employment history: the prosecutor said Ricardo Jr. was able to hold a job in construction for a period of time but unlike his father he then took "the easy way out by selling drugs." CR-ECF No.[823:8197, 8199]. The prosecutor returned to this theme: "The father, not a rocket scientist, but a hardworking man[] … who raised four kids, owned his own house and held a job for 25 years. Yet the son can't do the same thing? Come on. Who are we kidding?" CR-ECF No.[847:9515]. The jury was left with the impression that Sanchez had "a series of vocations that could be available and followed by someone with a low I.Q.," and nevertheless he—along with Troya—"made a[a] conscious choice[] in this case to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they injured." CR-ECF No.[847:9507-08].

252

At trial, jurors heard testimony that when his son was 1 ½ years old Sanchez became reacquainted with his cousin, Danny Varela, who had been in prison for some time. On weekends, Sanchez spent time at his parents' house visiting his mother and siblings. Varela started coming around the house, driving a luxury car with rims to impress Sanchez and his siblings. Varela offered them rides in his car. Sanchez began to spend more and more time with Varela, and he and Maria began to have problems and grew apart. Sanchez and Maria broke up, and Sanchez moved out, but he continued to visit and spend time with his child and to contribute financially to raising him. CR-ECF No.[823:8191]; No.[824:8399-8400]; *see also* CV-ECF No.[33-8:117 of 194, ¶¶9-10].

### 8. Domination by Varela and others.

Jurors did not hear evidence that throughout his life, Sanchez followed others. He was particularly vulnerable to Varela's attention.

> Ricardo was a follower. He did whatever he was told. Danny and his friends took advantage of Ricardo. He did whatever they wanted him to and he believed anything they told him. That was valuable to them. Ricardo thought that because they were his family, he could trust them. They took advantage of that trust.

CV-ECF No.[33-8:117 of 194, ¶11] (Ramos, R.). Nine jurors, however, intuitively found the mitigating factor that Danny Varela more easily recruited Sanchez because of their family relationship. CR-ECF No.[860:13] (Mitigator #5). Eleven jurors found Varela's influence over Sanchez.[193] CR-ECF No.[860:12] (Mitigator #2). More jurors likely would have found these mitigators and those added jurors along with the existing jurors who agreed on these factors likely would have assigned significant weight to them had counsel presented the supporting evidence herein described. In particular, counsel acknowledges that expert opinion about

---

[193] A majority of jurors also found that prior to his involvement with Varela, Sanchez had legitimate jobs and no prior felony convictions. CR-ECF No.[860:12] (Mitigators #3 & 4).

Sanchez's intellectual and adaptive limitations would have enhanced the defense theories that Sanchez functioned at a low level, it was easy for others to take advantage of and manipulate him, and his capacity for planning was limited. CV-ECF No.[52-1:71 of 112, ¶15] (Murrell).

Hanging around Danny Varela, Sanchez talked differently and dressed differently. He wore many gold chains around his neck. He tried to act like a big shot. CV-ECF No.[33-8:117 of 194, ¶12] (Ramos, R.). Sanchez had begun to use alcohol and drugs when he was in high school, but his alcohol and drug use increased dramatically when he was spending time with Varela. He often smelled of alcohol and smoked pot. CV-ECF No.[33-8:75 of 194, ¶5] (Velasquez, L.).

Sanchez was wholly under Varela's thrall. He was "easy to influence because he did not know what was happening all the time." CV-ECF No.[33-8:73 of 194, ¶7] (Velasquez, K.). All his life, Sanchez did whatever others around him wanted to do. "He took no initiative but simply followed the will of the group. He was not a leader in any way." CV-ECF No.[33-8:67 of 194, ¶4] (Silverman, J.). Despite the fact that Varela and his friends did not treat Sanchez well, ridiculed him, thought he was stupid, and took advantage of him, Sanchez did whatever Varela asked him to do and naively trusted him. CV-ECF No.[33-8:109 of 194, ¶¶21, 22] (Sanchez, N.). He became "a do-boy for DV and his guys." CV-ECF No.33-8:76 of 194, ¶8] (Velasquez, L.).

When Nydia and her parents learned Ricardo Sanchez Jr. had been arrested that was the first time Nydia had ever seen her father cry. CV-ECF No.[33-8:109 of 194, ¶23].

**F.  Counsel unreasonably and prejudicially failed to adequately investigate and present evidence that Sanchez is intellectually disabled.[194]**

Ricardo Sanchez was deprived of the Sixth Amendment right to the effective assistance of trial counsel because his counsel failed to conduct an adequate investigation into intellectual disability and present proof of the same which would have, under the Eighth Amendment, excluded Sanchez from the death penalty (as demonstrated above in Claim III). *See* Appx at A-001880-81, Revised Grant Declaration p.15-16, ¶¶38-40 (defense expert at trial expressing the opinion that Sanchez is intellectually disabled); *see also* CV-ECF No.[33-9:20 of 156, ¶70] (Dr. James) ("Mr. Sanchez meets the diagnostic criteria for intellectual disability[.]"); No.[33-8:153 of 194, ¶64] (Dr. Kraus) ("Mr. Sanchez meets diagnostic criteria … for intellectual disability and mild to moderate brain impairment."); Appx at A-001817-18 (Dr. Hernandez Declaration pp.13-14) ("Therefore, it is my professional opinion that considering Mr. Ricardo Sanchez Jr.'s overall history, his clinical manifestations, and his adaptive level of functioning, that he is a person that more than likely meets criteria for Intellectual Disability as defined by the DSM-V.").

Even if counsel failed to obtain an exemption from the death penalty, evidence of Sanchez's significant intellectual and adaptive deficits constitute mitigation evidence establishing Sanchez's reduced moral culpability and therefore probably would have resulted in at least one juror voting against the death penalty. "[E]vidence of impaired intellectual functioning or adaptive functioning is inherently mitigating because our society views intellectually disabled offenders as categorically less culpable than the average criminal." *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1276 (11th Cir. 2016) (internal quotations

---

[194] Information presented here is contained in Claim VIII, subsection (D), of the original § 2255 motion. CV-ECF No.[16-1:145 of 195].

and alteration omitted); *Brownlee v. Haley*, 306 F.3d at 1070 (describing borderline mental retardation and psychiatric disorders as "powerful mitigating evidence").

Counsel "suspected that he [Sanchez] suffered from intellectual disability, or mental retardation as it was known at the time." CV-ECF No.[52-1:70 of 112, ¶14] (Murrell). Counsel's investigation began and ended with IQ testing of Sanchez. Counsel was ignorant regarding the subject of intellectual disability and believed the test scores were too high to present an intellectual disability defense.[195] *Id.* Reported IQ test results "cannot be assessed in a vacuum." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). It was, therefore, unreasonable for counsel to discount the claim that Sanchez is intellectually disabled based on his IQ scores which, in fact, are "entirely consistent with intellectual disability." *Brumfield*, 135 S. Ct. at 2277-78 (an IQ score of 75 is "squarely in the range of potential intellectual disability."). Moreover, counsel did not ask the defense expert to evaluate Sanchez's level of adaptive functioning, Appx at A-001870, Revised Grant Declaration p.5 ¶14, and directed the defense investigator to stop investigation into Sanchez's intellectual disability. CV-ECF No.[52-1:71 of 112, ¶14] (Murrell); No.[52-1:110 of 112, ¶¶8-9] (McDermott).

If counsel had asked the expert about Sanchez's IQ test scores or had he asked about the practice effect and Flynn effect he would have learned that Sanchez's scores did not preclude an intellectual disabilities diagnosis. Appx at A-001874-75, Revised Grant Declaration pp.9-10,

---

[195] Counsel unreasonably permitted Sanchez to be administered psychological testing, including IQ testing, repeatedly within a period of months, resulting in the skewing of Sanchez's scores due to practice effects and progressive practice effects. As explained by Dr. McGrew, "[d]ue to his repeated exposure to these three adult Wechsler tests in such a short time period (within the same year), and within the same month for his last two exams, the last two intellectual assessments are positively upward biased estimates of intelligence due to the scientifically-based and professionally recognized testing issue of practice effects and progressive error practice effects." Appx at A-001840, Revised McGrew Declaration p.4, ¶14.

¶¶25-26. Had counsel understood that intellectual disability could be based on IQ scores in conjunction with evidence of adaptive deficits he would have pursued this avenue of investigation and consultation with the defense expert. CV-ECF No.[52-1:71 of 112, ¶14] (Murrell). Had counsel adequately investigated and provided the defense expert with adaptive functioning information the expert would have concluded that Sanchez suffered significant limitations in adaptive functioning consistent with the second prong of the diagnosis for intellectual disability. Appx at A-001876-80, Revised Grant Declaration pp.11-15, ¶¶30, 32-37. Trial counsel states that expert opinion regarding Sanchez's intellectual disability "would have enhanced several of the defense theories ... including that Mr. Sanchez functioned at a low level, was easily taken advantage of and manipulated by other people, and had a limited capacity for planning." CV-ECF No.[52-1:71 of 112, ¶15] (Murrell); *see also* No.[52-1:24 of 112, ¶7] (Cohen).

Jurors could have placed significant weight on the evidence establishing, not only Sanchez's learning disability, but also Sanchez's low IQ. A low IQ, alone, may result in a life sentence.

> Reasonable jurists could conclude that the low IQ evidence Tennard presented was relevant mitigating evidence. Evidence of significantly impaired intellectual functioning is obviously evidence that "might serve 'as a basis for a sentence less than death,' " *Skipper*, 476 U.S., at 5, 106 S.Ct. 1669; *see also*, *e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (observing, with respect to individual with IQ of 79, that "Wiggins['] ... diminished mental capacitie[s] further augment his mitigation case"); *Burger v. Kemp*, 483 U.S. 776, 779, 789, n. 7, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (noting that petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child," and later that "[i]n light of petitioner's youth at the time of the offense, ... testimony that his 'mental and emotional development were at a level several years below his chronological age' could not have been excluded by the state court" (*quoting Eddings*, 455 U.S., at 116, 102 S.Ct. 869)).

*Tennard v. Dretke*, 542 U.S. 274, 288 (2004). *See also Williams v. Taylor*, 529 U.S. 362, 398 (2000) ("Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability") (citing *Boyde v. California*, 494 U.S. 370, 387 (1990)).

Had Sanchez's trial counsel discharged their obligation to investigate and present evidence of low IQ as mitigation, the jury's consideration of Sanchez's sentence would have been guided by readily available evidence described in this Claim and in Claim III, *supra*, along with the evidence that was presented at trial, and would probably have resulted in a life sentence for Sanchez. Trial counsel's deficient performance prejudiced Sanchez because the jury received inaccurate information regarding Sanchez's mental capacity that falsely indicated he was not intellectually disabled and that his IQ was low but otherwise unremarkable. The jurors—unaware of Sanchez's significantly reduced moral culpability—imposed a sentence based on an untrue depiction of Sanchez. Had trial counsel presented the information above, there is a reasonable probability that at least one of the jurors would have voted for life instead of death.

### G. Counsel unreasonably and prejudicially failed to investigate and present evidence of Sanchez's neuropsychological impairments and the resulting effect on his mental state and behavior.[196]

Ricardo Sanchez is an individual who suffers from brain dysfunction and impairments; he meets diagnostic criteria for "brain impairment" or "neuropsychological impairment." CV-ECF No.[33-8:153 of 194, ¶64] (Dr. Kraus); No.[33-9:18 of 156, ¶¶67-69] (Dr. James); *see also* Appx at A-001870, Revised Grant Declaration p.5, ¶15. Sanchez's behavior and functioning throughout his life and at the time of the crime was that of a person significantly younger than

---

[196] Information presented here is contained in Claim VIII subpart (B) of the original § 2255 Motion. CV-ECF No.[16-1:130 of 195].

his chronological age. *See* Appx at A-001812, A-001815, Dr. Hernandez Declaration pp.8, 11. *See also* Claim III(D), *supra*. Sanchez's impairments and the fact that his mental age was comparable to that of an individual below the age of eighteen at the time of the crimes constitutes mitigation evidence that probably would have resulted in at least one juror voting against the death penalty and for a life sentence.

Competent counsel at the time of Sanchez's capital trial engaged and presented the testimony of qualified and culturally competent experts "tailored specifically to the needs of the case" who could explain the effects of impairments on the client's judgment and impulse control. 2003 ABA Guidelines, Guideline 10.11 & Commentary, 31 Hofstra L. Rev. at 1055-70; *see also* Guideline 10.7 & Commentary, 31 Hofstra Law. Rev. at 1026 ("The circumstances of a particular case will often require specialized research and expert consultation."). For example, the Commentary to Guideline 10.7 directs that when, as here, a client grows up in a migrant farm worker community counsel should investigate what pesticides he and his family may have been exposed to and their possible effect on the client's developing brain. *Id.*. Thus, under this fact alone, counsel performing within the standards of practice would have requested a mental health assessment into possible brain damage.[197]

Counsel should have been aware of signs that Sanchez likely suffered from neuropsychological damage but they went unexplored and undeveloped. Red flags for investigation included: in utero exposure to toxins and stress-altered body chemistry due of his father's work in the fields and violence towards his mother; early childhood head injuries;

---

[197] Of course, counsel routinely "needs to explore: Medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage)." 31 Hofstra L. Rev. at 1022. Facts supporting each of these investigative areas are present in Sanchez's life history.

hospitalization when, as a toddler, Sanchez overdosed on his brother's seizure medication and lapsed into a coma; and a consistent history of appearing "dazed" or "zoned out." Furthermore, counsel possessed information showing as early as kindergarten that Sanchez: demonstrated developmental delays; had problems learning, focusing his attention, and controlling his impulses; and, at 8 years old, he exhibited "significant processing skill deficits[.]" *See, e.g.,* CV-ECF No.[33-5:71 of 107].

Defense counsel retained Dr. Grant, a neuropsychologist, to perform an evaluation of Sanchez for the limited determination of whether Sanchez's IQ met part of the criteria for an intellectual disability diagnosis. CV-ECF No.[52-1:28 of 112, ¶8] (Grant); Appx at A-001868, Revised Grant Declaration pp.3-4, ¶10. Counsel presented limited testimony from Dr. Grant that Sanchez was of borderline intelligence but not intellectually disabled. As set forth more fully in Claim III, *supra*, Dr. Grant was provided only limited background materials which resulted in an inaccurate conclusion.[198]  *See, e.g.*, Appx at A-001871-73, A-001875-77, Revised Grant Declaration pp.6-8, 10-12 of 17, ¶¶17, 21, 28-30, 32.

Although Dr. Grant administered neuropsychological tests to Sanchez and obtained evidence from this testing of Sanchez's impaired functioning, this evidence was not developed and counsel did not present much of it at trial. Counsel unreasonably and prejudicially failed to develop and present expert testimony that Sanchez suffers from organic brain impairments and the jury was unaware that Sanchez suffered significant brain dysfunction, and was unaware of the impact such deficits had on Sanchez's functioning.

---

[198] "In capital litigation, an accurate and reliable life history investigation is the foundation for developing and presenting pivotal mental health issues." *Getting It Right*, 36 Hofstra L. Rev. at 975 (expounding upon the Supplemental Guidelines). "Until the life history investigation is complete, the mental health expert can render only a preliminary diagnosis or a differential diagnosis based on the incomplete information available to him." *Id.* at 984.

For example, had trial counsel conducted a constitutionally adequate investigation and provided the results to a qualified neuropsychologist, an expert could have testified that Sanchez was exposed to risk factors for brain impairment, including lack of prenatal care, genetic predisposition for mental and developmental disorder, and head injuries and insults. *See, e.g.,* CV-ECF No.[33-9:10-11 of 156, ¶¶43-46] (Dr. James). Dr. Grant could have testified to test results which confirmed the processing deficits noted in school records and were consistent with impairments to the left hemisphere and frontal lobe of Sanchez's brain. Appx at A-001870, Revised Grant Declaration p.5, ¶15. Such damage affected Sanchez's ability to understand information and learn from experience, to engage in logical reasoning and problem solving, as well as, affected his ability to inhibit impulses. Accordingly, "[w]hen placed in a rapidly evolving situation" such as at the time of the crime "Sanchez's ability to engage in rational decision making and to determine consequences would be impaired." *Id. See also* CV-ECF No.[33-9:5 of 156, ¶30; 19 of 156, ¶68] (Dr. James). In other words, Sanchez is "unable to absorb and process in an effective and timely manner the sensory input" he receives from the world around him, and therefore is "unable to respond appropriately to that input." CV-ECF No.[33-9:3 of 156, ¶24] (Dr. James).

Counsel's failure to investigate and present evidence of Sanchez's neuropsychological impairments deprived Sanchez of his right to present mitigation evidence establishing a true picture of the young man jurors were tasked with punishing, and thereby deprived Sanchez of an individualized sentence. *Abdul-Kabir*, 550 U.S. at 262 (Jurors must be able to give meaningful effect to the mitigating qualities of evidence of childhood neglect and abandonment, possible

neurological damage, mental illness and a troubled childhood).[199] Specifically, this evidence would have supported two statutory mitigating circumstances: (1) Sanchez's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; and (2) Sanchez's deficits at the time of the crimes constitute severe mental disturbance. 18 U.S.C. § 3592(a)(1), (a)(6).

The Supreme Court has recognized that evidence of brain abnormalities and/or cognitive defects is highly relevant to the predominate issue at sentencing, which is assessing a defendant's moral culpability. *Porter v. McCollum*, 558 U.S. at 41, 43; *see also Sears v. Upton*, 561 U.S. at 949 (describing brain damage as significant mitigating evidence); *Abdul-Kabir*, 550 U.S. at 261-63 (describing "possible neurological damage" as mitigating evidence); *Rompilla*, 545 U.S. at 392 (discussing how organic brain damage is an extreme mental disturbance that significantly impairs cognitive functions and a defendant's mental capacity at the time of the crime); *Williams v. Taylor*, 529 U.S. at 398 (mitigation evidence included possible organic mental impairments). There is a reasonable probability that this unpresented evidence would have made a difference to at least one juror determining the appropriate penalty for Sanchez and at least one juror would have voted for a sentence less than death.

## H. Counsel unreasonably and prejudicially failed to investigate and present evidence of Sanchez's psychiatric disorders and symptoms and the resulting effects upon Sanchez's functioning.[200]

Ricardo Sanchez is an individual who suffers from psychiatric impairments. Sanchez suffers from mental disorders and symptoms including those qualifying as severe mental illness,

---

[199] *See also Brownlee v. Haley*, 306 F.3d at 1071, where the court found: "If counsel had exercised Brownlee's right to present all relevant and competent mitigating evidence, the jury would have heard compelling evidence addressing two statutory mitigating circumstances[.]"

[200] Information presented here is contained in Claim VIII subpart (C) of the original § 2255 Motion. CV-ECF No.[16-1:134 of 195].

262

such as: anxiety, depression, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, and deficits in concentration. CV-ECF No.[33-8:135 of 194, ¶¶13-14] (Dr. Kraus).

At the time of Sanchez's arrest and trial, competent counsel representing a capitally charged defendant engaged and presented the testimony of qualified and culturally competent experts "tailored specifically to the needs of the case" who could "explain the ... hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control." 2003 ABA Guidelines, Guideline 10.11 and Commentary, 31 Hofstra L. Rev. at 1061; *see also* Guideline 10.7 and Commentary, 31 Hofstra Law Rev. at 1026 ("The circumstances of a particular case will often require specialized research and expert consultation.").[201]

Trial counsel was, or reasonably should have been, aware that Sanchez had suffered trauma during his childhood that could lead to symptoms of psychiatric disorder.[202] Sanchez suffered abuse from his father and witnessed his father's violence toward his mother and siblings throughout his life. The Sanchez family lived in communities rife with poverty and crime, and Sanchez had been exposed to community violence from the time he was a small child. CR-ECF No.[823:8158-87] (Sanchez, J.); No.[823:8271-77] (Sanchez, N.). Counsel knew or reasonably

---

[201] "Counsel needs to explore: … (2) Family and social history (including physical, sexual, or emotional abuse; family history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment, and peer influence); other traumatic events such as exposure to criminal violence, …; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention…." ABA Guideline 10.7, Commentary, 31 Hofstra L. Rev. at 1022.

[202] Furthermore, standards of practice provide that "the prevalence of mental illness and impaired reasoning is so high in the capital defendant population that it must be assumed that the client is emotionally and intellectually impaired." ABA Guidelines, Guideline 10.5, Commentary, 31 Hofstra L. Rev. at 1007. *See also id.* at 957 ("mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine").

should have known that exposure to trauma, especially the type of severe and chronic trauma that Sanchez experienced, often leads to debilitating symptoms, including anxiety, depression, hypervigilance, sleep disturbance, low self-esteem, and self-harmful behaviors. CR-ECF No.[825:8614-31] (Dr. Reidy). Counsel also knew or reasonably should have known that Sanchez suffered from symptoms of hyperactivity and inattentiveness, because these symptoms were well-documented in school records. Def. Sent. Exh. 32.

Despite these red flags indicating the likelihood that Sanchez suffered from mental illness, trial counsel failed to investigate and consult with a mental health professional to assess Sanchez and explain the significance of mental illness and its symptoms. Counsel did not ask Dr. Grant to evaluate Sanchez for mental illness. CV-ECF No.[52-1:38 of 112, ¶34]; *see also* No.[52-1:71, ¶16] (Murrell); CR-ECF No.[824:8488] (Dr. Grant's testimony that he did not evaluate Sanchez for mental illness). Trial counsel had no strategic reason for failing to do so, and in fact, such an approach was wholly consistent with counsel's defense strategy at both the guilt and penalty phases of the trial: to present evidence of Sanchez's impairments. *See* CV-ECF No.[52-1:71 of 112, ¶16] (Murrell).

Evidence of mental illness constitutes weighty mitigation that may result in one juror voting for a life sentence. In *Rompilla v. Beard*, 545 U.S. at 390, the Supreme Court held that despite trial counsel's consultation with three mental health experts, they were ineffective where fully-informed mental health experts would have viewed evidence as pointing to schizophrenia and other disorders, and test scores showed a third grade level of cognition after nine years of schooling. *See also Porter v. McCollum*, 558 U.S. at 40 (counsel were found ineffective where they failed to investigate and present any evidence of the defendant's mental health or mental impairment).

At trial, counsel presented testimony from Dr. Reidy who had identified risk factors in Sanchez's background that related to a person's behavior. *See Troya*, 733 F.3d at 1139-40. These factors, however, can be contributors to mental illness and psychiatric symptoms that profoundly affect a person's behavior, judgment and functioning. If trial counsel had discharged their obligation to investigate Sanchez's mental health, provide a mental health expert with all relevant information and sufficient access to Sanchez, and prepare the expert to testify, jurors would have received information about the psychiatric consequences of the Sanchez family's history of mental illness, cognitive impairment and substance abuse, Sanchez's traumatic experiences and risk factors in Sanchez's background; all of which mitigate against imposition of the death penalty. *See* CV-ECF No.[33-8:138-54 of 194] (Dr. Kraus). In addition to supporting non-statutory mitigators, this evidence would have supported two statutory mitigating circumstances under 18 U.S.C. § 3592(a)(1) & (a)(6): Sanchez's deficits significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; and Sanchez's deficits at the time of the crimes constitute severe mental disturbance. CV-ECF No.[33-8:153-54 of 194, ¶66] (Dr. Kraus).

Counsel's failure to investigate and present evidence related to Sanchez's mental health resulted in prejudice because the jury did not hear or consider the following mitigation:

- Sanchez experienced traumatic events throughout his life that, along with changing his brain chemistry and development, resulted in psychiatric illness and associated symptoms.

- In utero, Sanchez was exposed to his mother's stress hormones released under the violent environment that was her daily life with Ricardo Sr.

- Sanchez's childhood exposure to violence and other, collective traumatic experiences contributed to long-term changes in the biology of his brain, making him more vulnerable to psychological disturbances, altering his stress-response system, and increasing the risk of negative outcomes following stressors later in his life.

265

- In particular, Sanchez suffered an inordinate amount of stressful events early in life that caused an increase in amounts of cortisol, a hormone that can be neurotoxic to specific brain areas, including the hippocampus (which processes memory) and the pre-frontal cortex (which processes attention and executive function).

CV-ECF No.[33-8:138 of 194, ¶¶20-22] (Dr. Kraus).

Sanchez was systematically traumatized by his father's violence. He was physically injured by his father's beatings and psychologically damaged because his father was the person he depended on for physical care, safety, and comfort. Sanchez suffered further negative psychological consequences when his mother and siblings were targets of his father's abuse. The impact upon him of watching and hearing his father beat his mother was particularly devastating, as it was confused by Sanchez's feelings of mixed loyalty. Sanchez experienced distress and confusion when his father brutally beat his mother. Sanchez was terrified that his father would seriously injure his mother and felt a strong urge to protect her, but because his siblings were all focused on taking care of their mother, he also felt that someone needed to stand up for his father. The uncertainty about what to do in these situations left him feeling even more hopeless, helpless, and confused. CV-ECF No.[33-8:139-40 of 194, ¶¶24-27] (Dr. Kraus).

That Ricardo Sr. was the primary (and for much of his childhood, the only) breadwinner for the family caused Sanchez further distress and confusion. Although on several occasions other members of his family reported Ricardo Sr.'s abuse to law enforcement authorities, the family and Ricardo Jr., himself, were concerned that if his father was arrested the family would not survive his absence. Sanchez deeply respected his father for his financial support of the family. Experiencing these contradictory emotions—feelings of admiration for as well as fear and anger toward his abuser—exacerbated the negative consequences of the abuse Sanchez suffered, because they impeded his ability to make sense of his experiences. Complicated and contradictory feelings like these are difficult for anyone to process, and much more difficult to

266

process for individuals like Sanchez whose intellectual functioning is quite limited. CV-ECF No.[33-8:140 of 194, ¶28] (Dr. Kraus).

Sanchez suffered neglect and isolation as well as abuse. "Neglect is a type of trauma: it is maltreatment of a child characterized by the failure of caregivers to provide needed, age-appropriate care that includes both physical care, emotional and psychological care, and stimulation. Neglect may have more damaging effects on the child than physical abuse, and some of the harmful effects include failure to thrive, physical illness, injury due to lack of supervision or guidance, low self-esteem, and cognitive and psychiatric impairment." CV-ECF No.[33-8:141 of 194, ¶30] (Dr. Kraus).

Neither of Sanchez's parents attended to some of Sanchez's basic needs. The family suffered from poverty. Sanchez did not have access to basic necessities and supplies that other children in his community had, including uniforms for gym class, after school activities, and tutoring. Sanchez's parents did not help him with homework, attend school meetings related to his failure to learn, and his mother was unable to pay him much attention because she was consumed with the needs of Efrain, who suffered from a seizure disorder, and had no time or resources to devote to Sanchez's needs. "Educators observed that the lack of parental involvement in and attention paid to Sanchez's significant educational needs were 'uncommon' and 'atypical.'" CV-ECF No.[33-8:141 of 194, ¶31] (Dr. Kraus).

Racism has a strong negative influence on psychological and emotional well-being because it is inherently dehumanizing and degrading and causes emotions of fear, low self-esteem, frustration, hopelessness, and anger. Sanchez experienced discrimination and racism when growing up in West Palm Beach. Particularly in the neighborhood in which he lived starting at approximately age ten, Sanchez encountered overt racism that had a profound effect

267

on his sense of self. Neighbors were hostile to Sanchez and his family members and on more than one occasion told them to "go back where [they] came from."  The subjective experience of racial discrimination, whether overt or in the form of microaggressions, causes considerable psychiatric distress and can lead to symptoms of anxiety, hyperarousal, hypervigilance, and depression. The experience of racism and discrimination can also lead to internalized racism, in which members of marginalized racial populations accept or adopt the negative societal beliefs and stereotypes about themselves. Internalized racism causes profound stress and can lead to poor psychological outcomes. CV-ECF No.[33-8:143 of 194, ¶¶36, 37] (Dr. Kraus).

In addition to these traumatic exposures, Sanchez experienced indifference from community institutions and resources that would have been expected to provide intervention and support. Although the police were called occasionally when his father brutally attacked and beat his family members, and although his father was arrested for some of these incidents, law enforcement and social services did not intervene in any meaningful way to prevent the abuse that occurred in the household on a regular basis. There is no evidence that any investigation was performed, or any action taken, by Child Protective Services or any other organization to ensure that Sanchez, his mother, and his siblings were safe.[203] CV-ECF No.[33-8:144 of 194, ¶38] (Dr. Kraus).

Additional institutional failure came from the school system. At age eight, Sanchez was psychologically evaluated, formally identified with a learning disability and deemed eligible for special education services but he did not make meaningful progress in almost eleven years. The

---

[203] During cross-examination of Sanchez's mother, the prosecutor emphasized the fact that Ricardo Sr. was convicted only one time to convey the idea that Ricardo Sr. was not really that violent or abusive. CR-ECF No.[823:8203-04]. Competent counsel would have presented the lack of community response to Ricardo Sr.'s violence as institutional indifference that contributed to Sanchez's psychiatric impairment.

school district did not follow its policy to periodically re-assess Sanchez despite the fact that his clinical profile suggested other disabilities for which he would have been eligible for services, including other health impairments (OHI) for his attention deficits and hyperactivity, and emotional disabilities. The school failed to provide an opportunity for Sanchez to achieve a better outcome. CV-ECF No.[33-8:144 of 194, ¶¶39-40] (Dr. Kraus).

Sanchez's educational experience was marked by frustration, hopelessness, embarrassment and helplessness. His teachers reported that Sanchez exerted a great deal of effort in his classes and did not understand and became frustrated by his inability to learn. "As he fell farther and farther behind his same-aged peers, he felt stupid and terrible about himself. He had no sense of what he was going to be able to achieve in the future, and indeed felt that he had no hope of any success in employment. Particularly in high school, he suffered sleep disturbance, including insomnia and nightmares. He had thoughts of suicide. He responded with agitation and irritability to disappointments." The symptoms of anxiety and depression that Sanchez experienced, along with the symptoms of attentional deficits and hyperactivity contained in his school records, exacerbated Sanchez's processing dysfunction, leading to even poorer outcomes in school. These, in turn, perpetuated increasing frustration and hopelessness that contributed to Sanchez's leaving school before completing tenth grade. CV-ECF No.[33-8:145-46 of 194, ¶¶40, 42-43] (Dr. Kraus).

It was, therefore, unsurprising that Sanchez did not progress, that he failed ninth and tenth grades, and that when he left school at age 19 and without having passed tenth grade, he was performing math at a fourth grade level and reading at approximately a third grade level. CV-ECF No.[33-8:144-45 of 194, ¶¶39-40] (Dr. Kraus).

269

Sanchez exhibited disruptive behaviors consistent with inability to focus, distractibility, hyperactivity, and frustration. "Teachers and special education personnel observed that Mr. Sanchez's disruptive behavior stemmed from his disabilities, and noted that although he was disruptive he was not aggressive or physical." Yet, when Sanchez was found with a knife in his backpack, and staff believed this behavior was a manifestation of his disability, the school system did not intervene to help; it transferred him to an alternative school, effectively ending his education. Sanchez's experiences led him to believe that no one could help him, and this belief was devastating to him. CV-ECF No.[33-8:145-46 of 194, ¶¶41, 42] (Dr. Kraus).

Over the course of his life, Sanchez exhibited debilitating symptoms of psychiatric illness and brain disorder commonly present in individuals who have chronically experienced serious trauma and that left him unable to function in a healthy and typical manner. Such psychiatric symptoms include depression, anxiety, sleep disturbance, hypervigilance, hyperarousal, avoidance, difficulty concentrating, negative alterations in cognition and mood, and substance abuse. "These symptoms exist comorbid with Sanchez's low IQ, and exacerbate his processing deficits and cognitive impairment." As a result, Sanchez approached day-to-day functioning disadvantaged by mood disturbances, cognitive disruption, decreased impulse control, impaired judgment, and lack of insight into danger. CV-ECF No.[33-8:147 of 194, ¶¶45-63] (Dr. Kraus).

Sanchez was prejudiced by trial counsel's failure to investigate his mental health and present evidence of his symptoms of mental illness and brain dysfunction that would have altered the jury's view of Sanchez's behavior and functioning. In addition to establishing statutory mitigation as stated above, an expert could have substantially supported non-statutory mitigating factors by testifying that Sanchez's psychiatric symptoms and mild to moderate brain impairment prohibited Sanchez from engaging in gainful employment, caused him to be vulnerable and

270

easily manipulated by others and interfered with his healthy development and functioning. CV-ECF No.[33-8:152-53 of 194, ¶¶63-64] (Dr. Kraus). If the jurors had heard this type of expert testimony there is a reasonable probability that at least one juror would have struck a different balance between the statutory aggravating and mitigating factors. *Strickland*, 466 U.S. at 694.

### I.   Counsel rendered prejudicially ineffective assistance by failing to object to the prosecution's misconduct during penalty-phase closing argument.[204]

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." 2003 ABA Guidelines, Guideline 10.8 and Commentary, 31 Hofstra L. Rev. at 1028-30 (quoting Stephen B. Bright, *Preserving Error at Capital Trials*, The Champion, Apr. 1997, at 42-43). Here, trial counsel failed to object to prosecutorial argument that infringed on Sanchez's Fifth Amendment right to due process, Sixth Amendment right to present a defense and Eighth Amendment right to a reliable sentencing determination. Counsel's failure to object was prejudicial because prosecutorial statements may have a "great potential for misleading the jury[.]" *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007) (quotation and citation omitted). Improper prosecutorial argument impacts jury deliberations "because a jury generally has confidence that a prosecuting attorney is faithfully observing his obligations as a representative of a sovereignty." *United States v. Carter*, 236 F.3d 777, 786 (6th Cir. 2001) (quotation and citation omitted).

### 1.   Prosecutorial vouching and reference to non-record facts.

The first mitigating circumstance asserted by Sanchez was based on the fact that Danny Varela (Sanchez's "employer") was not facing the death penalty or even murder charges. CR-

---

[204] The information presented here is contained in Claim VIII, subsection (J), of the original § 2255 Motion. CV-ECF No.[16-1:169-70 of 195].

ECF No.[860:12] (Mitigator #1). To counter this mitigator the prosecutor vouched for his office and law enforcement and to facts not in evidence, intentionally misleading the jury into believing that Varela was still being investigated and could and would in fact eventually be charged with the murders. Defense counsel failed to object to this improper argument. Given the central importance of Varela's role to the case and Sanchez's right to rely on Varela's escaping the death penalty as a reason for not imposing death in this case, *see* 18 U.S.C. § 3592(a)(4) (providing as a mitigating factor: "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death"), there is a reasonable likelihood that the prosecution's improper argument influenced the outcome of the sentencing verdict.

The Government's proof amply supported the statutory mitigator. It showed Varela employed Sanchez in his drug business and paid him to deliver drugs. CR-ECF No.[756:5972-73]. Varela owned the cocaine that was seized when Lopez and Sanchez were each arrested several months before the killings, and thus it was, according to the Government, Varela who owed a debt to Escobedo—not Troya or Sanchez. CR-ECF No.[758:6471-77].

Varela rented the Garden Court residence, in which a significant quantity of drugs and multiple weapons were stored. CR-ECF No.[732:4035-40]; No.[737:4300-01]; No.[754:5430]. Varela is the one who decided Vetere could not accompany Sanchez and Troya when they went out on the night of the killings. CR-ECF No.[754:5445-46]. Varela was in phone contact with Troya and Sanchez in the hours leading up to the killings and at the time gunshot were heard. CR-ECF No.[728:3100-01]. Varela asked the owner of a body shop to alter the appearance of his van that was used by Troya and Sanchez the night of the killings. CR-ECF No.[730:3672-74]; Gov't Exh. 706. Indeed, the Government itself would later invoke this litany of trial evidence at Varela's sentencing to argue that he was legally responsible for the deaths. CR-ECF No.[957:49-

51, 75-77]. And, in imposing the maximum available punishment, life imprisonment, this Court would find it was "absolutely satisfied far beyond a preponderance of the evidence that Danny Varela is as much responsible for the killings of the Escobedo family as Mr. Troya and Mr. Sanchez." As the court would put it, Varela "may not have been on the side of the Turnpike, he may not have had a gun in his hands, but he was calling the shots from his home base in Palm Beach County." CR-ECF No.[957:55].

But at Sanchez's sentencing hearing, the prosecutors undercut the amply proven, congressionally recognized mitigator of Varela's non-exposure to a murder charge (let alone the death penalty) despite his (at least) equal culpability, with an unsupported and misleading argument: that the Government would continue to investigate Varela and would re-prosecute him capitally as soon as it obtained enough evidence against him. This argument, which was both false and a flagrant form of vouching and reliance on non-record evidence, violated the Sixth and Eighth Amendments, and the Due Process Clause of the Fifth Amendment, as well as the FDPA, 18 U.S.C. § 3592(a).

The prosecutors planted this idea in their closing argument at the guilt trial:

Rest assured, there are no deals from the United States of America with that drug kingpin, there are no deals. And this investigation is not over, and the investigators who have dedicated the last three years to this case will continue to look for evidence and gather evidence and when and if there is sufficient evidence to charge Mr. Varela with murder, it will be brought before a jury of his peers.

CR-ECF No.[767:7414].

Jurors had further reason to trust that the investigators would doggedly continue to "gather evidence" against Varela, for, in summation, the prosecutor also improperly vouched for the "effort and dedication," as well as the skill, they had displayed thus far. The prosecutor referred to Government witnesses as "these fine agents," and noted the "evidence was gathered

273

by dedicated, hard-working law enforcement." CR-ECF No.[767:7415-16]. "The Drug Enforcement Administration should be proud of the work they did in this case .... Agent Weeks, Agent Birch, fabulous job ... Palm Beach Sheriff's Office ... has a good group of people working for him .... The effort and dedication, they deserve praise from this community." CR-ECF No.[767:7426-27 ]. "Folks, the cases don't get better than this"). CR-ECF No.[767:7437]. Anticipating the defense argument comparing Varela's culpability and the absence of any murder charge and consequent exposure to a death sentence, the government tried in its opening summation at sentencing trial to minimize Varela's role. CR-ECF No.[847:9497, 9616]. But then later, the Government unloaded its improper argument without objection:

> Danny Varela is not an equally culpable co-defendant not facing the death penalty.
>
> Have you heard any evidence that anybody from the Government's side of the table made some deal with Danny Varela? None, zero. There is no deal with Danny Varela. When the evidence is there, he will be prosecuted, and he will face another jury of his peers.

CR-ECF No.[847:9637].

On the verdict form, most of the jurors accepted the fact that Varela was equally culpable but was not presently facing the death penalty, as ten of them found the statutory mitigator. CR-ECF No.[860:12] (Mitigator #1). But they may have given the factor little or no weight. It appears from a newspaper article, published after trial, that jurors intently focused on Varela's culpability and punishment, but accepted the Government's misleading argument and used it to help justify their death verdicts for Troya and Sanchez. Juror Rick DiCresce provided evidence of the prejudice:

> There were two things ... that DiCresce said jurors spent the most time discussing before returning their verdict.
>
> The first was what they believed was the equal culpability of Danny Varela....

274

> [A]lmost all of the jurors believed that Varela was behind the murders.
>
> "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela was not sitting at that table," he said.
>
> Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that never happened, DiCresce said. Kastrenakes said authorities did not have enough evidence to charge Varela, but were still investigating....

Daphne Duret, *Brutality to Children Left Juror No Doubts*, Section A, Page 1A, Palm Beach Post (Apr. 3, 2009), available on Westlaw, 2009 WLNR 9072225.

There was no record evidence of a continuing investigation of Varela for the murders. Unsurprisingly, as of the filing of this motion, Varela has not been charged with killing the Escobedos. It is improper for a prosecutor to argue facts not in evidence or use misstatements and falsehoods to obtain a verdict in the government's favor. *Berger v. United States*, 295 U.S. 78, 86-89 (1935); *Davis v. Zant*, 36 F.3d 1538, 1548 (11th Cir. 1994).

The prosecutors' comments deliberately suggested a scenario that was unsupported by evidence at trial and urged jurors to trust the government's post- trial decision making, in violation of due process. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (due process is violated where prosecutor presents false evidence he knew or should have known was false). They also violated the Eighth Amendment's reliability requirement. *See Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (reversing death sentence where "the jury was allowed to consider evidence that has been revealed to be materially inaccurate").

In addition to its falsity, the Government's argument was a classic form of improper vouching, for it provided jurors an "assurance ... based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Lee*, 612 F.3d 170, 195 (4th Cir. 2010). The Eleventh Circuit's decisions have focused criticism on prosecutorial vouching for a particular witness's credibility, but the principle here is the same: A prosecutor

275

may not try to bolster his case before the jury by "plac[ing] the prestige of the government behind" it or by "indicating that information not presented to the jury supports" it. *United States v. Eyester*, 948 F.2d 1196, 1206 (11th Cir. 1991). Such vouching "severely impairs the likelihood of a fair trial." *Id*. This principle prohibits a prosecutor from describing or touting his office's death-penalty decision making in the case. *See Brooks v. Kemp*, 762 F.2d 1383, 1410 (11th Cir.1985) (*en banc*) (argument "improperly implied to the jury that the prosecutor's office had already made the careful judgment that this case, above most other murder cases, warranted the death penalty"), *vacated on other grounds*, 478 U.S. 1016 (1986).

These are improper arguments that would have been objected to by any competent counsel. Defense counsel here did not. Counsel's failure to object resulted in prejudice because the jury was permitted to consider the Government's improper argument as a basis for a death sentence.

### 2. Prosecutorial argument disparaged the defense, suggesting it was fabricated.

"[P]rosecutorial misconduct is least acceptable under the Constitution when aimed at the core of the defense's case." *Davis*, 36 F.3d at 1550 n.17.

Here, the prosecutor argued that Sanchez's defense was fabricated. This improper argument was designed to undermine a core theme of the penalty phase defense: that Sanchez's traumatic background mitigated his moral culpability. The prosecutor denigrated the defense by arguing that the trauma presented by defense counsel was "a figment of imagination they want you to adopt hook, line and sinker." CR-ECF No.[847:9514-15]; *see also* No.[847:9516-17] ("Those mitigators … you should not fall for it, ladies and gentleman.").[205] Much of the

---

[205] *See also* CR-ECF No.[847:9633]: The prosecutor ridiculed Troya's defense attorney for setting forth as a mitigating circumstance the fact that a BB gun, and not a real gun, was used during one

276

groundwork for this argument was laid during cross-examination of Sanchez's mother when the prosecutor challenged her testimony about the extent of Ricardo Sr.'s violence and abuse. (Defense counsel failed to conduct re-direct examination and enter hospital and police records that corroborated Juana Sanchez's testimony). Prosecutorial argument that the defense case was a sham and defense counsel was misleading the jurors, especially when the prosecutor knew the factual basis for the defense theory, violated Sanchez's fundamental due process right to a fair trial. *United States v. Kallen-Zury*, 629 F. App'x 894, (11th Cir. 2015) (citing *United States v. McLain*, 823 F.2d 1457, (11th Cir. 1987)). *See also Davis v. Zant*, 36 F.3d at 1549.

In direct contradiction of the law, the prosecutor asserted that the defense evidence was not mitigating at all: "Any suggestion that these mitigators of [Sanchez's] relatively rough childhood as argued by Mr. Murrell led to this brutal mass murder is ridiculous. We know it's ridiculous because we tested for any effect." CR-ECF No.[847:9617]. "Merely because you are required to consider something that is alleged to be mitigating does not mean that it is mitigating[.]" CR-ECF No.[847:9509]. The prosecutor exclaimed that "[e]ach [mitigating circumstance] is tiny and infinitesimal, and has nothing to do with excusing a conscious and deliberate choice to kill an entire family[.]" CR-ECF No.[847:9519]. He urged the jury to disregard evidence presented in mitigation stating, for example, "It's really disgusting for them to put up a picture of a child in a videotape and beg and in a desperate fashion ask for your mercy when they know that [Mr. Sanchez] killed a child of exactly that same age." CR-ECF No.[847:9611].

---

of the bad acts alleged by the prosecution. "[I]t is a joke." After describing details of that act and the prosecutor mocked: "Not a big deal Mr. Eisenberg." The judge interrupted and directed the prosecutor to direct comments to the jury and not opposing counsel.

This argument was prejudicial because "when the prosecutor argues that it is mercy itself that is inappropriate, the jury is told that the concept of mercy—the most significant factor which might point toward a choice of life imprisonment—is illegitimate." *Wilson v. Kemp*, 777 F.2d 621, 626 (11th Cir. 1985). Such argument unconstitutionally de-legitimizes mitigation and violates the rule reaffirmed in *Tennard v. Dretke*, 542 U.S. 274, 284-86 (2004), that evidence does not need to relate specifically to a defendant's culpability to be mitigating in the sense that it might serve as a basis for a sentence less than death. The prosecutor's argument improperly told the jury a causal connection was required, and further, it told the jury that mitigating evidence was something that could be "tested for."

Although nine jurors each found mitigating circumstances related to the DOJ risk factors, CR-ECF No.[860:16] (Mitigators #37 & 38), the prosecutor's improper argument likely diminished any weight assigned to these factors. Accordingly, counsel's failure to object resulted in prejudice.[206]

### 3. Prosecutorial argument diluted the jurors' individual sense of responsibility and urged imposition of the death penalty for improper reasons.

The Eighth Amendment prohibits mandatory imposition of the death penalty. *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976). For similar reasons, prosecutorial argument that duty or justice requires jurors to impose the death penalty violates the Eighth Amendment. *See United States v. Young*, 470 U.S. 1, 18 (1985); *Romine v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001)

---

[206] Only after closing argument did counsel assert *Tennard* as a legal basis and object to argument that mitigators must relate to the offense, but the prosecution had left jurors three times with the impression they had to. While counsel moved for a mistrial, which was denied, they did not seek a curative instruction for these improper remarks. CR-ECF No.[847:9643-45]; No.[847:9663, 9666].

278

(noting that improper prosecutorial argument indicated the prosecutor sought to overrule Supreme Court law prohibiting mandatory death sentences).

Here, the prosecutor used the imprimatur of a judge to compare the jurors' service to serving one's country in war and stressed that the jury must impose the death penalty against Sanchez "as the conscience of this community." CR-ECF No.[847:9606, 9607]. He began: "When we first started I discussed with you about Judge Bold, I won't read the quote again, he said jury service honorably performed is as important as serving your country in a time of war." CR-ECF No.[847:9605]. The prosecutor repeatedly referred to the jury's duty to impose death as "the conscience of this community." CR-ECF No.[847:9519, 9522, 9606, 9607]. He insisted: "It is your obligation to review the evidence … and come to that conclusion that the community requires and that justice demands, and that is a sentence of death[;] … Anything else would not be justice but would be avoiding your duty and passing the buck." CR-ECF No.[847:9522-23].

"Conceiving of the jurors as soldiers undermines the crucial discretionary element required by the Eighth Amendment[,]" and undermines the requirement that the sentencing consideration must be individualized. *Brooks v. Kemp*, 762 F.2d 1383, 1413 (11th Cir. 1985), *cert. granted, judgment vacated on other grounds*, 478 U.S. 1016 (1986). This argument improperly suggested that a death sentence must be imposed regardless of the mitigation evidence presented by Sanchez. Counsel's failure to object was prejudicial because the only issue properly before the jurors was whether an individualized assessment of Sanchez's moral culpability led to death or life imprisonment as the proper punishment.

Trial counsel's failure to object permitted the jury to consider constitutionally improper factors and to shift responsibility for imposing death based on "duty" or "the community." Particularly when taken together with trial counsel's numerous other errors and omissions,

279

including a failure to adequately investigate and present mitigation evidence that weighs heavily in favor of a life sentence, prosecutorial misconduct that derided and minimized Sanchez's mitigation case undermines confidence in the sentencing verdict. Thus, the death sentences should be reversed.

### J. Counsel's unreasonable errors and omissions individually and cumulatively resulted in penalty-phase prejudice.[207]

Counsel's errors, individually and cumulatively, were prejudicial. *Strickland*, 466 U.S. at 695-96 (when a court decides an ineffectiveness claim it must consider the totality of the evidence and the effects of the errors); *Kyles v. Whitley*, 514 U.S. 419-421-22 (1995) (constitutional error is to be evaluated cumulatively); *White v. Thaler*, 610 F.3d 890, 912 (5th Cir. 2010) (defense counsel's failure to preclude admission of two types of evidence had a "combined prejudicial effect"); *see also* 18 U.S.C. § 3595(c)(2) (the FDPA mandates that a death sentence shall not be imposed "under the influence of passion, prejudice, or any other arbitrary factor").

On direct appeal, the Eleventh Circuit addressed the jury's split-sentencing verdict where life sentences were imposed for the killing of Luis Escobedo and his wife but death sentences were imposed for the killing of the Escobedo children. The court stated: "We surmise that the jurors placed great weight in mitigation on Jose Luis Escobedo's contributing criminal conduct. Yet, the jury drew a line in the sand when it came to the cold-blooded murder of the Escobedo children."[208] *United States v. Troya*, 733 F.3d at 1137. The Supreme Court has consistently held, however, that a defendant's criminal acts do not excuse counsel's failure to investigate and

---

[207] The information presented here is contained in Claim VIII, subsection (L), of the original § 2255 Motion. CV-ECF No.[16-1:172 of 195].

[208] Eleven jurors found the mitigator that Escobedo's criminal conduct contributed to the circumstances leading to his family's death. CR-ECF No.[860:13 of 22] (Mitigator #7).

present mitigating evidence, nor does a defendant's conduct foreclose a life sentence. For example, in *Williams v. Taylor*, 529 U.S. 362, 398 (2000), the Supreme Court held that even where there is strong evidence supporting the future dangerousness aggravator, "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case." The Supreme Court has repeatedly found counsel's failure to investigate and present a true picture of the defendant at sentencing to be prejudicial error—even where the facts were at least as aggravated as the crime in this case.

In *Wiggins v. Smith*, 539 U.S. 510 (2003), the defendant beat, drowned, and drenched a 77-year-old victim with lye or ammonia. *Wiggins v. State*, 352 Md. 580, 585-86 (1999). In *Rompilla v. Beard*, 545 U.S. 374 (2005), the defendant, who had a prior rape conviction, stabbed and set the victim on fire. *Commonwealth v. Rompilla*, 539 Pa. 499, 505-06 (1995). In *Porter v. McCollum*, 558 U.S. 30 (2009), the defendant stalked the victim, shot her, and taunted her daughter at gunpoint. *Porter v. State*, 564 So. 2d 1060, 1061-62 (Fla. 1990). In *Sears v. Upton*, 561 U.S. 945 (2010), the defendant abducted the victim from a parking lot and beat her with brass knuckles, drove the victim to Tennessee and raped her, and then drove to Kentucky where the defendant stabbed the victim to death. *Sears v. State*, 270 Ga. 834 (1999). Despite these aggravating facts, in each case the Supreme Court found that there was a reasonable probability that the unpresented mitigating evidence—including diminished capacity and brain damage— would have caused at least one juror to vote for life. Just like those cases, Sanchez's case could have been sufficiently mitigated in order to obtain a life sentence.

281

As set forth above, jurors were particularly open to mitigating factors regarding Sanchez's low IQ, learning disability and risk factors described by Dr. Reidy.[209] Had counsel conducted a constitutionally adequate investigation and presentation of mitigating evidence to add weight to these factors, as well as factors found by only a few or no jurors, there is a reasonable probability that the weight of mitigation would have been greater than the prosecution's case in aggravation. As demonstrated, the mitigating factors, if properly supported by available evidence, spoke directly to Sanchez's moral culpability for the Escobedo children's death.

There is a reasonable probability that, but for counsel's failure to conduct a constitutionally adequate investigation and to develop and present readily available, compelling lay and expert testimony and documentary evidence in mitigation, coupled with counsel's failure to object to improper prosecutorial argument and the jury's consideration of that argument in aggravation—as well as counsel's failure to challenge penalty phase jury instructions that created mitigation-impaired jurors, as set out in Claim XII (C), *supra*—at least one juror would not have voted to impose the death penalty for the child victims.

For all these reasons, Sanchez was deprived of the effective assistance of counsel at the sentencing phase of trial and, therefore, the writ should be granted and the death sentences should be reversed.

---

[209] *See, e.g.*, Mitigators #6, 8, 18, 19, 20, 23, 24, 25, 26, 27, 28, 29, 32, 33, 36, 37, 38. CR-ECF No.[860:13-16 of 22].

**IX.     Sanchez's death sentence violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishments.** [210]

Sanchez's death sentence was obtained pursuant to an arbitrary process that failed to limit the death penalty to the worst offenders and instead operated by means of and promoted discrimination on the basis of race. *Furman v. Georgia*, 408 U.S. 238 (1972). As a result, Sanchez's death sentence and continued confinement deprive him of his rights to due process; equal protection; and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; decisional law, and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law. It is further unconstitutional because Sanchez has been and will continue to be confined for a time that is unnecessarily lengthy, and under conditions that are torturous and inhumane.

As an increasing number of justices have recognized, the delay that will transpire between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of the current standards of decency because it subjects the prisoner, in addition to and in anticipation of the forfeiture of his life, to enduring many years living under sentence of death under extraordinary psychological duress, as well as extreme physical and social conditions and restrictions. *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of the petition for writ of certiorari); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (Stevens, J., same); *Glossip v. Gross*, 135 S. Ct. 2726 (2015) (Breyer, J., dissenting). It is well-established that what is constitutionally tolerable under the Eighth Amendment is not static. "The Amendment must

---

[210] This claim has been reorganized and supplemented with additional facts and/or corrected facts and brief discussions of law in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim.

draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958). Moreover, "the Clause forbidding 'cruel and unusual' punishments 'is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice.'" *Gregg v. Georgia*, 428 U.S. 153, 171 (1976) (quoting *Weems v. United States*, 217 U.S. 349, 378 (1910)).

### A.  The death penalty is a disproportionate sentence even for the gravest of offenses.

The steady and progressive abandonment of capital punishment throughout the nation demonstrates that the death penalty, under current standards of decency, is a disproportionate punishment even for the most serious of offenses.

### 1.  There is a national trend toward abolition.

Jurisdictions throughout the country have increasingly repealed or abolished the death penalty, with greater frequency within the past few years, and thus the use of the penalty has become unusual within the meaning of the Eighth Amendment. New York's death penalty was declared unconstitutional in 2004, *People v. LaValle*, 3 N.Y. 3d 88 (2004), and no legislative or other attempt was made to reinstate it. New Jersey repealed the death penalty in 2007, and New Mexico repealed capital punishment in 2009. Following the commutation of all death sentences by the Illinois governor in 2003, the state abolished capital punishment in 2011. Connecticut repealed the death penalty in 2012, and Maryland did so in 2013. Moreover, numerous other United States jurisdictions, while retaining the death penalty on the books, either have not carried out any executions in recent years or have carried out only a handful. The federal government has not carried out any executions since 2003.[211] The military capital punishment system has not

---

[211] Death Penalty Information Center, https://deathpenaltyinfo.org/federal-death-row-prisoners#Executed.

executed anyone since 1961.[212] Seven states that legally authorize the death penalty have not carried out an execution from 2006 to 2016: California, Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming. Seven additional states have carried out only a single execution in from 2006 to 2016; these are Arkansas, Kentucky, Louisiana, Nevada, Utah, Montana, and Washington. Of these seven states, those executed in Kentucky, Louisiana, Montana, and Nevada had abandoned their appeals. In only ten states have executions averaged more than one per year from 2006 to 2016: Alabama, Arizona, Florida, Georgia, Mississippi, Missouri, Ohio, Oklahoma, Texas, and Virginia. These ten states accounted for 92% of all executions (393/428) over this time period, with a single state, Texas, responsible for over 42% (181/428). Even those states which still routinely employ the death penalty have seen a marked drop in executions, as reflected in a steady decline nationally. The high occurred in 1999, when 98 offenders were executed. Since 2006, there has been a decline in executions (2006–53; 2007–42; 2008–37; 2009–52; 2010–46; 2011–43; 2012–43; 2013–39; 2014–35; 2015–28; 2016–20; 2017−23; 2018–1 to date).[213] The decline in new death sentences is clear and stark. In 1995, 311 people were sentenced to death nationwide. In 2004, the number was less than half that, at 138. In 2008, the number was nearly halved again, with a total of 73 people sentenced to death, the lowest total since the death penalty was reintroduced in 1976. Three states accounted for half of the new death sentences in 2014: Florida with 11, Texas with 11, and California with 14.

A number of states that still authorize the death penalty have expressed reservations about its continued use. The legislatures in California, New Hampshire, Pennsylvania, and Tennessee have commissioned reports on their states' use of the death penalty, and Louisiana has

---

[212] Death Penalty Information Center, https://deathpenaltyinfo.org/us-military-death-penalty.
[213] https://deathpenaltyinfo.org/documents/FactSheet.pdf.

established a Capital Punishment Fiscal Commission to investigate the cost of the death penalty. Four states that recently abolished capital punishment—New Jersey, Illinois, Connecticut, and Maryland – all commissioned reports before enacting legislation abolishing the death penalty. In addition, the governors of Colorado, Oregon, Pennsylvania, and Washington have declared official moratoria on executions.

While not granting *certiorari* review a question challenging the *per se* constitutionality of the death penalty, the United States Supreme Court has both examined and limited the constitutionality of the death penalty for categories of offenders, as well as the constitutionality of other punishments. *See, e.g., Atkins v. Virginia*, 536 U.S. 304, 316 (2002) ("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the mentally retarded, only five have executed offenders possessing a known IQ less than 70 since we decided *Penry* [*v. Lynaugh*, 492 U.S. 302 (1989)]."); *Roper v. Simmons*, 543 U.S. 551, 564-65 (2005) (noting that although twenty states authorized capital punishment for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *see also Graham v. Florida*, 560 U.S. 48, 62 (2010) ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, these sentences are most infrequent."); *Miller v. Alabama*, 567 U.S. 460, 485 (2012) ("[S]imply counting legislative enactments can present a distorted view").

Capital punishment is infrequently practiced, other than in a very few states, and new death sentences are rapidly and consistently declining. The infrequency of the use of the death

penalty, relative to the number of death eligible offenders, renders it "truly unusual" and it can now be concluded that a "national consensus has developed against it." *Atkins*, 536 U.S. at 316.

### 2.   The death penalty is excessive.

The Eighth Amendment prohibits the imposition of excessive punishments. *Furman*, 408 U.S. at 325 (Marshall, J., concurring) (noting that the Court has concluded that "excessive punishments [are] as objectionable as those that [are] inherently cruel"). Punishments are excessive when, among other reasons, they "involve the unnecessary and wanton infliction of pain." *Gregg*, 428 U.S. at 173. The acceptable goals of punishment—deterrence, retribution, incapacitation, and rehabilitation—form the baseline for analyzing excessiveness. The death penalty fails to significantly further these goals over life imprisonment. Because the death penalty fails measurably to promote any of the permissible penological goals over life imprisonment, it is excessive. *Furman*, 408 U.S. at 279 (Brennan, J., concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive.") (internal citation omitted).

### 3.   The United States fails to comport with the standard of decency upon which the Founding Fathers relied in drafting the Eighth Amendment.

The United States executed 35 people in 2014. Only China, Iran, Saudi Arabia, and Iraq executed more. With 73 new death sentences imposed in 2014, the United States ranked behind only China, Nigeria, Egypt, Pakistan, Bangladesh, Tanzania, and Iran. Since the 1970s, 82 countries have abolished the death penalty for all crimes, bringing the total number of abolitionist countries to 98. Thirty-five additional countries are abolitionist in practice because they have not carried out any executions during the last ten years and are understood to have an established policy or practice of not carrying out executions. The General Assembly of the

287

United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."

Sanchez's prolonged confinement under sentence of death violates international human rights law. The European Court of Human Rights has held that the protracted post-conviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an accused to face such a fate. *Soering v. United Kingdom*, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989) (six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential capital defendant to that state). The Canadian Supreme Court cited such delays as a relevant consideration in deciding that extradition of a murder suspect to the United States without first obtaining assurances that the death penalty would not be imposed violated principles of fundamental justice. *United States v. Burns*, 1 S.C.R. 283, 353 (2001).

Courts in other countries, even those assuming the lawfulness of a death sentence, have held that "lengthy delay in administering a *lawful* death penalty renders ultimate execution inhuman, degrading, or unusually cruel." *Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 462 (1999) (Breyer, J., dissenting from denial of certiorari). Relying in part on international treaties and human rights law, the India Supreme Court commuted fifteen death sentences on the ground that pre-execution delays in the resolution of mercy petitions ranging from five to twelve years constituted cruel and degrading treatment and/or punishment and were inordinate, unreasonable, and amounted to torture. *Shatrughan Chauhan & Anr., v. Union of India & Ors.*, No. 55 of 2013 (India Supreme Court, filed Jan 21, 2014), slip. op. at 31-33, available at http://supremecourtofindia.nic.in/jonew/judis/41163.pdf.

Mutable though the Eighth Amendment standard may be, the Framers necessarily had some standard in mind at the time it was drafted. Without such, it would have been meaningless. The question thus becomes, to what standard did the drafters of the Eighth Amendment look? It has been held, with good reason, that the standard can be divined from the practices of so-called "advanced" societies. *See Roper v. Simmons*, 543 U.S.at 561; *Atkins v. Virginia*, 536 U.S. at 321; *Thompson v. Oklahoma*, 487 U.S. 815, 826-30 (1988). As the Court noted in *Roper*:

> The plurality opinion explained that no death penalty State that had given express consideration to a minimum age for the death penalty had set the age lower than 16. The plurality also observed that "[t]he conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo–American heritage, and by the leading members of the Western European community."

*Roper v. Simmons*, 543 U.S. at 561. (internal citation omitted).

Clearly, the standard to which the court should look includes those of the nations that share our Anglo-American heritage. In terms of determining the intent of the drafters of the Eighth Amendment, the relevance of the standards in such nations cannot be ignored. It was those nations to which the Drafters looked. As was observed almost two centuries ago, at a time nearly contemporaneous with the adoption of the Eighth Amendment, the intent of the drafters was to place this country at the head of the list of the most humane nations on earth.

> Under the [Eighth] amendment the infliction of cruel and unusual punishments, is also prohibited. The various barbarous and cruel punishments inflicted under the laws of some other countries, and which profess not to be behind the most enlightened nations on earth in civilization and refinement, furnish sufficient reasons for this express prohibition.

*Baze v. Rees*, 553 U.S. at 98 (Thomas, J., concurring) (quoting B. Oliver, *The Rights of An American Citizen* 186 (1832)) (reprint 1970).

The relevance of the standard of decency in the settling countries to the evolving standard of decency that defines the limits of the Eighth Amendment is thus beyond question.[214] Accordingly, although this Court may be bound to hold otherwise, whether capital punishment violates the Eighth Amendment and/or Article 1, Section 16 is to be determined by whether those policies violate the standard of decency in the settling countries as those standards have evolved in an advancing civilization.

**B. The capital punishment schemes in the United States, including the Federal Death Penalty Act, are unconstitutional because they fail to ensure reliability, consistency, and Equal Protection of Law.**

**1. Reliability**

The risk of wrongful execution, that is, the execution of an innocent person, attends all death penalty schemes in the United States, including capital sentences imposed pursuant to the Federal Death Penalty Act. There is evidence of at least 156 exonerations in capital cases throughout the nation. Researchers have estimated that nearly one in twenty (4.1%) of those sentenced to death are actually innocent, an unacceptably high error rate given the consequences. Because due process of law protects the innocent, as long as there remains the possibility of exoneration, this right should not be foreclosed.

---

[214] The same cannot be said for the relevance of the standard often, though not solely, relied upon for that purpose, *i.e.*, the practice in the states. With all due respect to the multitude of decisions which look to the practice in the states when determining the scope of the Eighth Amendment, Sanchez submits that they are improperly decided. If indeed the Constitution is to be interpreted consistent with the intent of the Drafters and if that intent is to be determined in the context of the historical setting in which it was drafted, as it must be, *see Powell v. McCormack*, 395 U.S. 486, 522 (1969), the practice in the states is not relevant to the line on the other side of which a punishment violates the Eighth Amendment. Stated simply, *there were no practices in the states because there were no states*. Indeed, the punishments inflicted in the colonies were those brought with the colonists from the settling countries.

## 2.   Arbitrariness

The Eighth Amendment's requirement to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements may ultimately be irreconcilable.

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Thus, to pass constitutional muster, a death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not, and suitably guide the sentencer's discretion. *See, e.g., Furman v. Georgia*, 408 U.S. 238 (1972); *Zant v. Stephens*, 462 U.S. 862, 877 (1983). In conflict with these clearly established United States Supreme Court mandates, many death penalty statutes, including the Federal Death Penalty Act, were designed to, and do, operate in the precise manner the Supreme Court found violated the Eighth Amendment in Furman. Death penalty statutes, including the Federal Death Penalty Act, fail to justify the imposition of a more severe sentence on defendants like Sanchez against whom the death penalty is sought compared to others found guilty of murder; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants such as Sanchez for capital prosecution without providing consistent guidelines to ensure reliability.

The Federal Death Penalty Act sets forth sixteen statutory aggravating factors, some of which contain multiple parts. 18 U.S.C. § 3592(c). These include, but are not limited to, felony murder; previous violent felonies involving the use of a firearm; previous conviction of an offense for which a death sentence or life without parole was authorized; previous conviction of

291

other serious offenses; grave risk of death to additional persons; heinous, cruel, or depraved manner of committing offense; financial gain from offense; conviction for two felony drug offenses; conviction for serious federal drug offenses; criminal enterprise involving drug sales to minors; offense against high public official; prior conviction for sexual assault or child molestation; and multiple killings or attempted killings. In addition to these sixteen statutory aggravating factors, the Federal Death Penalty Act permits the fact-finder to consider "any other aggravating factor for which notice has been given." 18 U.S.C. § 3592(c). As a result of the extraordinary breadth of the statute, individual federal prosecutors are afforded virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness.

### 3.   Racial discrimination

One of the fundamental goals of our criminal system is to ensure that justice is meted out fairly, in accordance with the law, and not on the basis of improper concerns such as race. Applying the death penalty in a discriminatory manner constitutes functional and structural error. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The denial of equal protection is established where a defendant demonstrates that the prosecutorial authorities' selective enforcement decision is deliberately based upon an arbitrary classification, such as race, ethnicity, national origin, or gender.

Statistical evidence shows disproportionate prosecution of people of color under the federal death penalty statute. The prosecution of and imposition of the death sentence against Sanchez violated his rights to justice without discrimination and also contributed to "the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994). Many studies

have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies consistently reveal, even after accounting for legitimate non-racial case characteristics, that offenders who kill white people have a significantly higher chance of receiving a death sentence than offenders who kill people of other races. *See, e.g.*, U.S. General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990); David C. Baldus & George Woodworth, *Race Discrimination in the Administration of the Death Penalty: An Overview of the Empirical Evidence with Special Emphasis on the Post-1990 Research*, 39 Crim. L. Bull. 194, 196, 207-08 (2003).

Some states have invoked the persistence of discrimination as a basis for eliminating or restricting the use of the death penalty. Governor Martin O'Malley of Maryland, a state that repealed the death penalty, flatly declared that the death penalty "cannot be administered without racial bias."[215] Connecticut Governor Dannel P. Mallow, signing repeal legislation, observed that he saw discrimination in the administration of the death penalty.[216] Illinois Governor Pat Quinn, signing repeal legislation, similarly commented that it is impossible to design a death penalty system that is consistent and free from discrimination on the basis of race. And New Mexico Governor Bill Richardson, on approving the abolition of capital punishment, stated, "[I]t bothers me greatly that minorities are overrepresented in the prison population and on death row."[217]

---

[215] Ian Simpson, *Maryland Becomes Latest U.S. State to Abolish Death Penalty*, Reuters, May 2, 2013, available at http://mobile.reuters.com/article/idUSBRE9410TQ20130502.

[216] Governor Dannel P. Mallow, on Signing Bill to Repeal Capital Punishment (Apr. 25, 2012), available at http://portal.ct.gov/Gov-Malloy-on-Signing-bill-to-repeal-capital-punishment/.

[217] Press Release, Governor Bill Richardson Signs Repeal of the Death Penalty (Mar. 18, 2009), *available at* https://eji.org/sites/default/files/press-release-governor-bill-richardson-signs-repeal-death-penalty-03-18-09.pdf.

In addition, the governors of Colorado, Oregon, Washington, and Pennsylvania have declared moratoria on execution in their states, and each has cited concerns about racial discrimination and equal justice in support of the moratoria.[218]

### C. The conditions under which Mr. Sanchez is confined under sentence of death, and the length of time under which he will be confined prior to execution, constitute conditions of physical and psychological torture and inhumane treatment.

The physical and psychological conditions of Sanchez's lengthy confinement are so dehumanizing, brutal, and severe as to constitute unconstitutional torture. Sanchez lives under conditions of extreme isolation in the Special Confinement Unit (SCU) at the United States Penitentiary—Terre Haute (USP-Terre Haute), where he and other federal death row inmates are confined. The amount of time Sanchez is permitted to be outside his cell is extremely limited, and when he is transported, he is handcuffed behind his back and escorted by guards. Sanchez is confined to his cell and allowed out of his cell only to go to a small exercise cage in which he exercises alone, use the computer to conduct legal research, and make telephone calls; attend medical appointments and visits, and for limited religious or educational programs. He is not permitted to work. Sanchez eats his meals in his cell. Sanchez is permitted to have only very limited personal property, including a limited number of legal materials, photographs, books, and magazines.

---

[218] http:///www.deathpenaltyinfo.org/documents/COexecutiveorder.pdf; William Yardley, Oregon Governor Says He Will Block Executions, The New York Times, Nov. 22, 2011, http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html; Governor Jay Inslee, Remarks Announcing a Capital Punishment Moratorium (Feb. 11, 2014), available at: http://www.deathpenaltyinfo.org/documents/InsleeMoratoriumRemarks.pdf; Memorandum, available at: https://www.scribd.com/doc/255669059/Governor-Tom-Wolf-Announces-a-Moratorium-on-the-Death-Penalty-in-Pa.

Sanchez's access to legal resources is restricted. SCU prisoners do not have access to hard-bound legal books or legal treatises, and are able to access only limited legal authority online, and only for a short time each day. Human contact is generally restricted to brief interactions with corrections officers and occasional meetings with attorneys, family, and friends. Sanchez and other death row prisoners at USP-Terre Haute are shackled during their visits. Inside and outside of his cell, Sanchez is under the surveillance of correctional officers.

The deplorable and inhumane physical conditions under which Sanchez has been confined are so extreme as to have generated attention and litigation. In 2007 and 2008, the National Prison Project of the American Civil Liberties Union conducted an investigation into conditions of the SCU at USP-Terre Haute and concluded that the conditions "may violate the Eighth Amendment's proscription against cruel and unusual punishment." The National Prison Project's findings included, but were not limited to:

(a) Deficiencies in the medical and psychiatric treatment exacerbated the decrepit and chaotic physical conditions. The medical, dental, and mental health treatment of death row prisoners at USP-Terre Haute was characterized by deliberate indifference to the needs of prisoners, constitutionally inadequate mental health care, denial of access to timely and adequate dental care, and exposure to incessant noise, resulting in sleep deprivation and physiological and psychological distress.

(b) The call buttons designed to alert staff to medical emergencies did not function properly, and when they did function, staff failed to respond to them in a timely manner. Prisoners suffering cardiac and diabetic emergencies were made to wait for hours after reporting symptoms to receive medical assistance. Prisoners in the SCU were provided no standardized way to make requests for medical care for acute conditions short of emergencies, and the requests they did make were frequently ignored. Prisoners who suffered serious injuries, including head injuries, were not properly assessed and the medical staff failed to comply with follow-up treatment ordered by physicians at outside hospitals. Other prisoners with diagnosed serious medical conditions were made to endure months without treatment despite the medical staff's recognition that the conditions required immediate medical attention.

(c) Preventive medical care was inadequate. Many prisoners were not administered flu shots and routine vaccinations, including measles/mumps/rubella, tetanus, and hepatitis A and B, contrary to Bureau of Prisons policy.

(d) Prisoners on death row at USP-Terre Haute lacked access to minimally adequate mental health care. "Evaluations are cursory, programming is unavailable, and the Complex lacks an on-site psychiatrist. Treatment of mentally ill prisoners is minimal." Many prisoners who require psychotropic medications are not prescribed them, and those who are receive their prescriptions following teleconferences with an off-site psychiatrist, and their follow-up care in the same manner. Psychological staff members come to prisoners' cell fronts and ask them to engage in discussions about their mental health symptoms and conditions in the presence of all other staff and prisoners on the unit, so there is no confidentiality. Many prisoners are uncomfortable describing their symptoms under these circumstances.

(e) Dental care at USP-Terre Haute was "grossly and dangerously deficient." Prisoners waited for more than 13 months for routine dental care. For those with dental problems, extraction of teeth was frequently the only treatment offered. The prison failed to provide dentures to individuals who lacked teeth or had teeth extracted and had difficulty eating.

(f) The lack of adequate medical and mental care has resulted in several inmates abandoning their death penalty appeals.

(g) A prisoner in the SCU sued medical and correctional staff at USP-Terre Haute, claiming that the staff demonstrated deliberate indifference to his medical needs when they failed to approve surgery for pterygia, a condition that adversely affected the prisoner's vision, despite his repeated requests for the surgery, for a period of five years. Following denial of relief on summary judgment by the federal district court, the Court of Appeals for the Seventh Circuit ruled that the prisoner had demonstrated a genuine issue of material fact whether the doctor who had denied the surgery was deliberately indifferent to the prisoner's medical needs. *Ortiz v. Bezy*, 281 F. App'x. 594 (2008) (unpublished).

(h) Death row at USP-Terre Haute is also an intensely loud environment, a circumstance with adverse physiological and psychological consequences. The National Prison Project found that prisoners in the SCU at USP-Terre Haute were subjected to "extreme, unbearable noise at all hours of day and night." The noise emanated from prisoners in the Secure Housing Unit (SHU) located immediately below the SCU, who screamed, banged, and pounded on walls, as well as from frequent fire alarms, which were also accompanied by strobe lights.

The psychologically torturous nature of the prolonged confinement under the conditions detailed above while under a sentence of death constitutes a violation of the Eighth Amendment ban on cruel and unusual punishment. The effect on Sanchez caused by the medieval conditions of confinement experienced by those housed at USP-Terre Haute is profoundly heightened by years of uncertainty. The United States Supreme Court has in the past recognized the cruelty of a

296

prolonged imprisonment under sentence of death and the torment suffered by those who must endure periods of uncertainty. *See In re Medley*, 134 U.S. 160, 172 (1890) (recognizing "terror" and "immense mental anxiety" of living under sentence of death as "a great increase of the offender's punishment"); *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari) (acknowledging that execution after prolonged incarceration implicates the Eighth Amendment and questioning whether state interests in deterrence and retribution are properly satisfied by such execution). The stress associated with not knowing when a prisoner will be executed exacts an immeasurable toll on that prisoner's mental health.

### D. Method of execution.

Eighth Amendment concerns about the method of execution employed by the federal government causing constitutionally unacceptable levels of suffering have prompted litigation that is still pending. In 2005, several federal death row prisoners filed a lawsuit against the federal government alleging that the federal government's lethal injection protocol violated the due process clause of the Fifth Amendment, the right to be free from cruel and unusual punishment under the Eighth Amendment, and provisions of the federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. (APA). *Roane et al. v. Gonzales et al.*, Case No. 1:05-cv-2337 (D.D.C). The case survived the defendants' motion for summary judgment. The knowledge that the three drug protocol devised and actually implemented by the government to execute prisoners demonstrated a substantial risk of extreme pain has and will continue to be a direct and proximate cause of Sanchez's extreme distress, anxiety, and fear regarding an impending execution.

Since the filing of the lethal injection lawsuit, at least one of the drugs designated to be used in the lethal injection cocktail has become unavailable, and the government has not yet

completed the process of determining what drug combination will be used instead. *Roane v. Leonhart*, 741 F.3d 147, 150 (D.C. Cir. 2014) (noting that the government "has merely suspended executions using the three-drug cocktail called for by the current protocol and has not yet issued a new protocol"). This has been the status since 2011. As a result, Sanchez has been confined under sentence of death for years without having any idea what method of execution will be imposed upon him in the event that he is actually executed.

Furthermore, Sanchez and the other prisoners under sentence of death following federal prosecutions have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the federal government will select. *See, e.g.*, The Capital Punishment Enforcement Act (to be codified as amended at Tenn. Code Ann. § 40-23-114 (May 22, 2014)) (Tennessee capital punishment statute recently amended to provide that if the correctional department commissioner certifies to the governor that "an essential ingredient" for lethal injection executions is unavailable, the mandatory method for carrying out the execution is by electrocution). Sanchez further is constantly exposed to the continuing, realistic fear that whichever method the government selects will not comport with constitutional requirements.

The arbitrariness, lack of valid penological purpose, delay, and torturous conditions of and under which Sanchez is serving a sentence of death render that sentence excessive under currently prevailing and evolving standards of decency under the federal Constitution, as well as international law. Accordingly, Sanchez's death sentence should be set aside.

**X.     The security measures used by the court during trial denied Mr. Sanchez his rights to a jury trial, to the presumption of innocence, to due process, to the effective assistance of counsel, and to be free from cruel and unusual punishment.** [219]

The Court put in place excessive security measures. These security measures interfered with Sanchez's right to counsel and to a full and fair trial. They also impacted the jury, who were led to believe that Sanchez was an extraordinarily dangerous person—without competent evidence of such and where Sanchez's alleged dangerousness was at the core of the issues the jury would resolve. This, in turn, tainted both the guilt and penalty verdicts. To the extent that counsel knew about some of these measures and failed to fully object and challenge the evidence, counsel were ineffective. Ultimately, Sanchez's right to fully confront this evidence was compromised.

It is well-settled law that a defendant's right to be presumed innocent until proven guilty is central to our system of criminal justice, and that actions that impinge upon this presumption are to be taken only when absolutely necessary. *Ruimveld v. Birkett*, 404 F. 3d 1006, 1015 (6th Cir. 2005) (citing *Estelle v. Williams*, 425 U.S. 501, 505 (1976); *Coffin v. United States*, 156 U.S. 432, 453 (1895)). In reviewing claims of excess security, the federal court must undertake to "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Holbrook v. Flynn*, 475 U.S. 560, 572 (1986). There can be little question that the holdings of the Supreme Court reflect a strong concern that unwarranted indicia of guilt "can have substantial or injurious influences on jury verdicts." *Ruimveld v. Birkett*, 404 F.3d at 1014. The Supreme Court has

---

[219] This claim has been reorganized and supplemented with additional facts and brief discussions of law in order to clarify entitlement to relief and to address the issue of procedural bar. Any and all changes relate to the common core of facts supporting the original claim that the trial court violated Sanchez's right to Fifth and Eighth Amendments by imposing unnecessary security measures.

recognized that a room full of uniformed and armed policemen may pose a threat to a defendant's chance of receiving a fair trial. In *Holbrook*, the Court analyzed the impact of uniformed security officers on a defendant's right to a fair trial and determined that the reviewing court must look at "the variety of ways in which such guards can be deployed," and do a case-by-case analysis of any prejudicial impact." *Holbrook*, 475 U.S. at 569. The *Holbrook* court went on to determine that the trial judge's "assessment of the jurors' states of mind cannot be dispositive here." *Id.* Rather, the analysis must be to consider "whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* at 570 (quoting *Williams*, 425 U.S. at 505). The Court's analysis makes clear that in conducting a case-by-case review of this type of claim, all relevant facts, such as the number and demeanor of the security personnel, must be considered.

Before trial began, the trial court *sua sponte* set in place various security measures, including partial sequestration of the jury. The jurors assembled at offsite locations each day and were then transported to the courthouse together by the United States Marshal's Service under very tight security. CR-ECF No.[1089:80-81]. Upon arrival at the courthouse, they were ushered inside—also under very tight security—and were able to see uniformed and armed law enforcement personnel in many areas in and around the courthouse. In addition to the metal detector in the lobby, there was a second metal detector placed outside the courtroom, and people coming into and out of the courtroom were required to sign in. CR-ECF No.[1089:80-81]. These unwarranted measures were put in place without the Court explaining the necessity for the additional security measures or giving Sanchez an opportunity to challenge the bases for the Court's determination at a hearing. There were no specific allegations that Sanchez, either personally or through third parties, had harmed or threatened to harm potential witnesses. Indeed,

this Court previously observed that the trial court imposed such measures based solely upon the

non-disclosed concerns of the United States Marshall's Office:

> On December 17, 2008, the trial court held a status conference. (Tr. Case No. 06-CR-80171 (Hurley, J.), ECF No 1089). At that status conference the trial judge advised counsel <u>after meeting with the United States Marshal, that the Court had established a security protocol for the jurors</u> The jurors were to park at an undisclosed location The Marshal Service would pick up the jurors at the off-sight parking location and transport them to the courthouse. During trial, the jurors would eat together and be escorted back to their automobiles at the end of the day by the Marshal Service. (*Id*. at 80). In addition, there was a second magnetometer placed directly outside the courtroom and a sign-in sheet for those persons entering and exiting. *(Id*. at 86-87). Defense counsel objected. The trial judge considered counsel's arguments but concluded that "the Court has the obligation to take appropriate steps to make sure the process is safe and secure." (*Id*. at 90). The objections were overruled and the security measures as outlined above implemented during trial.

CV-ECF No.[29:7] (emphasis added).

> Trial counsel objected to these measures.

> I appreciate The Court's concern for our clients' safety, but that concern is not going to be expressed to the jury who sees that magnetometer outside the door. They might construe it as dangerousness of the people on trial, which goes back to the anonymous jury. Both of these issues go hand in hand, and both of them implicate our clients or imply our clients are more dangerous than the run of the mill defendants, and we object to that.

CR-ECF No.[1089:88-89].

The aura of danger created by the additional security measures imposed pre-trial was heightened by the imposition of still further security measures during the trial itself. Prior to Kevin Vetere's testimony, the Court brought to counsel's attention that at least one additional Marshal would accompany Vetere into the courtroom and questioned whether a break would be needed to prevent "any extraordinary show of force … [from] happen[ing] in front of the jury." CR-ECF No.[754:5279]. During a subsequent sidebar, the Court advised counsel it had been told two Marshals would accompany Vetere when he walked in and that the Court had been asked if

301

the jury should be present. CR-ECF No.[754:5408]. The Court did not "think two Marshals walking in was such a big deal." *Id.* In addition to having at least two Marshals accompany him, Vetere also wore a jacket that looked similar to a U.S. Marshals' jacket to cover a bulletproof vest he was provided. Trial counsel, however, failed to object to these additional measures.

The prejudicial effect of the enhanced courtroom security is clear. While such measures *might* have been justified had the Government been prosecuting the leaders and members of an international drug cartel for the murders of the Escobedo family, it's theory at trial was that Troya and Sanchez acted alone in both the planning and the execution of the those murders. The overwhelming majority of the Government's Rule 404(b) evidence, *i.e.* the Haverhill Road and Suwanee Road shootings, pointed to Troya and/or Sanchez's individual capacities for violence, not the general violence of the Varela drug operation. When the trial court imposed these measure, it sent the subliminal message that Sanchez (and Troya) were so dangerous and so without moral boundaries that the two of them posed a real threat to not only the lives of witnesses, but to the lives of the jurors themselves.

Indeed the trial court specifically recognized that the additional security measures carried with them the subliminal message that Sanchez and the other defendants were more dangerous than the other violent criminals who passed through the federal courthouse doors every day.

> I understand exactly, and I am concerned about the subliminal messages that we may be sending out that we don't want to do that.
>
> We want to make sure the process is fair for everybody.
>
> At the same time The Court has the obligation to take appropriate steps to make sure the process is safe and secure.

CR-ECF No.[1089:90].

302

The Government reinforced this message throughout the trial. *See* CR-ECF No.[767:7437] (describing Sanchez as a "thug enforcer"); CR-ECF No.[766:7180] (stating that Sanchez was "willing to use weapons and reap violence"); CR-ECF No.[847:9507-08] (stating that Sanchez "made conscious choices ... to pursue a life a crime, a life of violence, unrepentant violence"). As a result, Sanchez's jury was not merely predisposed to convict him, but was implicitly informed that Sanchez and the other defendants posed an immediate threat to the jury's own safety.

The combined effect of the trial court's subliminal messages and the Government's overt ones was palpable. Throughout the trial, jurors exhibited signs that they believed their own safety was at risk. At one point the lights went out in the courtroom. By the time power was restored, the jury was visibly upset.

> 14.     At one point during the guilt phase of the trial, all of the lights in the courtroom went out and because there were no windows in the courtroom it went black. The only light in remaining on in the courtroom was a small light on the judge's desk that illuminated his face and increased the spookiness of the situation. The jury (and everyone else in the courtroom) seemed on edge. The judge had the marshals escort the jurors out of the courtroom. It turned out a transformer had blown, and the judge later explained that to the jurors, but it was clear the jurors were really on edge after that.

CV-ECF No.[52-1:111 of 112, ¶14] (McDermott).

On another occasion, the jurors found a folder containing their personal information as well as driving directions to their homes. There, the trial court noted:

> THE COURT:  I have one other problem, and I want to share it with you for a moment.
>
> I suspect that in order for the Marshal to do their work, the Marshal had jurors fill out a juror information form that lists the juror's name and their home address, and some other information, who their family doctor was, and things like that just in case there might be a problem, and a Map Quest map attached to assist the Marshal in going to their home if need be to pick them up, okay?

303

The Marshal has had a folder with that information.

Somehow, and I don't know how this happened, I think it was simply a mistake, but I suspect that the Marshal who had -- the Deputy Marshal who had possession of the folder left the folder in the jury room.

Now, the information is simply information about the jurors, okay?

The jurors discovered the folder when they arrived this morning and there was great concern. I am told by the jurors as to what this was and why it was simply available.

I would like to be able to tell the jury that having talked with the Deputy Marshal who is in charge of court security that we are well satisfied this is the Marshal's folder, and we've given it back to the Marshal, and the purpose of this information was so that the Marshal could fulfill his responsibilities in assisting the jury, whether it be in pickup or had there been a medical emergency in providing other help.

I just want to make sure the jury feels comfortable that this is not something that is in the public record.

I think that is the concern.

CR-ECF No.[825:8607-08].

Given the "seminal message" imparted by the excess security measures imposed by the trial court, the jury's concern that they were in danger as a result of being selected to decide Sanchez's fate is not surprising. These extraordinary security measures trial deprived Sanchez of the indicia of innocence.

This claim is properly before the Court. Notwithstanding the fact that Sanchez's prior §2255/appellate counsel recognized this constitutional violation (and, in fact, raised it in his initial §2255 motion for relief), they failed to raise the preserved aspect of that violation when it should have been raised, on direct appeal.

Sanchez has demonstrated he would have been entitled to relief on direct appeal based solely upon the preserved aspect of that violation. Prior 2255/appellate counsel was ineffective for omitting this claim that would have had a reasonable probability of success on appeal. *See*

304

*Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001). That is particularly true here, where the ignored issues was stronger than those presented. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000); *Heath v. Jones*, 941 F.2d at 1131 (finding "the quality of the one claim that was briefed was unreasonably deficient."). Prior 2255/appellate counsel raised thirteen issues but the Eleventh Circuit addressed only three,[220] stating, "we find no merit to the majority of these arguments and accordingly have no need to discuss them[.]" *Troya*, 733 F.3d at 1129. The court of appeals did not dismiss the nine claims as "frivolous" but it made clear that they were so weak as to not warrant any discussion. Counsel's failure to raise this stronger claim that constitutes plain error fell below an objective standard of reasonableness and, as a result, confidence in the outcome is undermined. *Strickland*, 466 U.S. at 688, 694.

By the same token trial counsel's failure to properly object to the imposition of additional security measures surrounding the testimony of Kevin Vetere constitutes ineffective assistance of trial counsel. Notwithstanding the fact that trial counsel objected to the original security measures imposed by the trial court, they failed to object as additional measures were imposed during the course of the trial and even though the effect of such measures on the jury became more and more apparent. "One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.8 (American Bar Association 2003). *See also Heath v. Jones*,

---

[220] The court of appeals grouped Sanchez's direct appeal Claims 4 and 5 as well as Claims 7 and 13 together in its opinion under Issues 4 and 12, respectively. *Troya*, 733 F.3d at 1129. The issues discussed by the court were evidentiary rulings by the trial court regarding: (1) uncharged acts of misconduct involving firearms and drug trafficking, and, (2) the admission of testimony from the Government's psychologist. *Troya*, 733 F.3d at 1130, 1138.

941 F.2d 1126, 1131 (11th Cir. 1991) ("While we are loath to encourage attorneys to file numerous claims merely for the sake of filing claims, we also realize that in a capital appeal the attorney must raise many issues in a timely fashion or else the defendant may be procedurally barred from ever raising those issues."). Here trial counsel not only knew that the trial court had placed no reasons justifying additional security measure upon the record, they knew that the trial court was aware that such measures impugned Sanchez's presumption of innocence and they knew that the jury believed it was in danger from their client. Still, and notwithstanding the Supreme Court's two-decade old decision in *Holbrook*, they failed to object. They were ineffective in failing to do so. That ineffectiveness serves as cause to excuse appellate counsel's failure to present the unpreserved portion of this claim on direct appeal and it may be considered now. *See Johnson v. Sherry*, 586 F.3d 439, 446 (6th Cir. 2009), *abrogated on other grounds by Weaver v. Massachusetts*, ___ U.S. ___, 137 S. Ct. 1899 (2017).

Both the preserved and unpreserved aspects of this claim are properly before the court.

**XI.  Mr. Sanchez is entitled to relief based upon the cumulative impact of the constitutional and statutory violations described in this motion.** [221]

Each of the claims of constitutional and statutory error set forth above stands on its own and independently requires relief. Together, the errors set forth in this Motion committed by trial counsel, the jury, state actors, and the Court, combined with the errors set forth in Sanchez's direct appeal, rendered Sanchez's trial fundamentally unfair, the resulting guilt and penalty verdicts and judgment unreliable, and his death sentences unlawful. U.S. Const. amends. V, VI, VIII, XIV. This Court is obliged under the federal constitution to conduct a cumulative error and

---

[221] This claim has been reorganized and supplemented with additional facts and brief discussions of law in order to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim. CV-ECF No.[16-1:192 of 195].

cumulative prejudice analysis. Moreover, the Eighth Amendment requirement of heightened reliability in cases in which the penalty is death imposes a special duty on the Court to examine the complete record to determine whether a capitally charged defendant received a fair trial. The Court's obligation encompasses the consideration of individual errors that the Court may deem harmless (and therefore not reversible when considered alone), and also, to assess whether the cumulative effect of those errors on the outcome of the trial is such that collectively they can no longer be regarded as harmless. *See Taylor v. Kentucky*, 436 U.S. 478, 487-88 & n.15 (1978) (cumulative effect of potentially damaging instructions and prosecution argument violated due process guarantee of fundamental fairness); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639 (1974) (considering totality of prosecutorial misconduct in context of entire trial to decide if misconduct was sufficiently prejudicial to violate defendant's due process rights); *Chambers v. Mississippi*, 410 U.S. 284, 290 n.3 (1973).

In *Strickland*, the Court consistently referred to counsel's errors in the plural, illustrating the need to assess the cumulative impact of all of counsel's errors. *See, e.g.*, *Strickland*, 466 U.S. at 687 (prejudice "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable"); *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for *counsel's unprofessional errors*, the result of the proceeding would have been different."); *id.* at 695 ("[T]he question is whether there is a reasonable probability that, *absent the errors*, the factfinder would have had a reasonable doubt respecting guilt.") (emphasis added). Subsequently, in *Williams v. Taylor*, the Court made this point even more explicitly, holding that a state court's prejudice analysis was not just erroneous but also unreasonable, where the state court "failed to evaluate the totality of the available mitigation evidence" in determining whether the petitioner had been prejudiced by counsel's

errors. *Williams v. Taylor*, 529 U.S. at 397; *accord Sears v. Upton*, 561 U.S. at 955-56; *Porter v. McCollum*, 558 U.S. at 40-41; *Wiggins v. Smith*, 539 U.S. at 536; *see also Kyles v. Whitley*, 514 U.S. 419, 434, 436-37 (1995) (noting that *Brady* materiality standard is same as *Strickland* prejudice standard, and holding that the materiality "of suppressed evidence" must be "considered collectively, not item by item").

Accordingly, this Court must consider the cumulative prejudicial effect of all constitutional and statutory violations, and it must also consider in the aggregate the prejudice flowing from all of counsel's errors and omissions.

**XII.    Erroneous jury instructions deprived Mr. Sanchez of his rights to due process, a fair trial and constitutional constraints on imposition of the death penalty guaranteed by the Fifth, Sixth, and Eighth Amendments, and counsel's failure to raise the instructional errors deprived Mr. Sanchez of his Fifth and Sixth Amendment rights to the effective assistance of counsel at trial and on direct appeal.[222]**

Instructional errors substantially affected the guilt and penalty phase verdicts and deprived Sanchez of his constitutionally-guaranteed jury trial rights, right to the effective assistance of counsel and fundamental fairness. First, instructional error resulted in convictions and enhanced sentences for a non-existent felony murder crime. Second, jurors were not instructed on unanimity as to all elements necessary to convict and sentence Sanchez. Third, instructional error impeded the jurors' ability to find and weigh non-statutory mitigating circumstances. Fourth, the jury instructions did not require imposition of enhanced sentences, including the death penalty, upon proof beyond a reasonable doubt. Sanchez's § 924(j) convictions and sentences result from the erroneous jury instructions and, individually and cumulatively, the errors require reversal.

---

[222] Claim XII is a new claim.

Sanchez's right to the effective assistance of counsel was denied when trial counsel failed to protect Sanchez's rights at trial and direct appeal counsel failed to raise these issues on appeal. Individually or in combination, such deprivations direct the conclusion that Sanchez's § 924 convictions and sentences should be vacated.

### A. Mr. Sanchez was illegally convicted of a non-existent felony murder crime and counsel were ineffective for failing to raise this meritorious issue, all in violation of the Fifth, Sixth and Eighth Amendments.[223]

Sanchez was convicted, and enhanced sentences were imposed, on four counts under § 924 without a qualifying felony to support a finding of felony murder. CR-ECF No.[305:8-11] (Counts 7-10).[224] Specifically, Sanchez was convicted and sentenced under 18 U.S.C. § 924(j) after the trial court instructed the jury that it could convict him of felony murder based on a finding that a killing occurred during a carjacking. This instruction was improper because carjacking is not a valid predicate felony for felony murder under 18 U.S.C. § 1111, the federal statute that defines murder. It is reasonably likely that that jury's general verdict was based on a non-existent felony murder crime and, therefore, the convictions are legally invalid and Sanchez must be considered innocent of any such crimes. Sanchez's § 924 convictions should be vacated.

Here, Sanchez asserts substantive claims that his rights of due process under the Fifth Amendment, a fair trial and right to the effective assistance of counsel under the Sixth Amendment, and protections against excessive and unprincipled sentences under the Eighth

---

[223] This issue was presented as Claim VII(D) in the original § 2255 Motion. It has been separated from Claim VII, reorganized, supplemented with more facts, and a brief discussion of law has been included to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel unreasonably and prejudicially failed to object to the charges contained in Counts 7–10 and to the jury instructions and verdicts on those counts. CV-ECF No.[16-1:98-101 of 195]. In particular, the original claim asserted carjacking is not an enumerated offense under § 1111 which authorizes a charge of felony murder. *See, e.g., id.* at ¶¶ 310, 312-13, 318.

[224] Counts 7-10 are identical except for the name of the victim.

309

Amendment were violated. *See United States v. Gaudin*, 515 U.S. 506, 509-10 (1995) (citing

*Sullivan v. Louisiana*, 508 U.S. 759, 770 (1988)) (The Fifth and Sixth Amendments "require

criminal convictions to rest upon a jury determination that the defendant is guilty of every

element of the crime with which he is charged, beyond a reasonable doubt."); *Apprendi v. New

Jersey*, 530 U.S. 466, 490 (2000) ("[A]ny fact that increases the penalty for a crime beyond the

prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable

doubt."). In addition, the Court lacked jurisdiction to try Sanchez for, and enter convictions and

sentences for, a non-existent crime and this jurisdictional claim can never be waived.[225] Sanchez

also asserts his Fifth and Eighth Amendment rights on the basis that, because he was charged

---

[225] Here, the Government affirmatively alleged Sanchez was guilty because: "If a murder occurs during a crime of violence, any death that results from the use of a gun in connection with a carjacking is felony murder[.]" CR-ECF No.[766:7170]. The Court instructed the jury the same way. CR-ECF No.[771:7542]. But felony murder in connection with carjacking is not a crime and Sanchez is therefore actually innocent. *See United States v. Andrade*, 83 F.3d 729, 731 (5th Cir. 1996) ("A plea of guilty typically waives all non-jurisdictional defects in the proceedings below .... Nonetheless, in this particular context, where intervening law has established that a defendant's actions do not constitute a crime and thus that the defendant is actually innocent of the charged offense, application of this rule is misplaced"); *see also United States v. Barboa*, 777 F.2d 1420, 1423 n.3 (10th Cir. 1985) ("If Barboa pled guilty to something which was not a crime, he is not now precluded from raising this jurisdictional defect, which goes 'to the very power of the State to bring the defendant into court to answer the charge brought against him.'" (quoting *Blackledge v. Perry*, 417 U.S. 21, 30 (1974)).
A court can never sentence a defendant for a charge over which it has no jurisdiction. *See United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014); *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002) ("Since jurisdictional error implicates a court's power to adjudicate the matter before it, such error can never be waived by parties to litigation."). For example, a jurisdictional defect exists "when the indictment affirmatively alleges conduct that does not constitute a crime at all because that conduct falls outside of the sweep of the charging statute." *Brown*, 752 F.3d at 1352 (citing *Peter*, 310 F.3d at 715). When such a defect exists, "proof of the alleged conduct, no matter how overwhelming, would [bring] it no closer to showing the crime charged than would ... no proof at all." *Peter*, 310 F.3d at 715. "The problem [with such defect] is not that the Government failed to allege a fact or an element that would have made the indictment's criminal charge complete. Instead, 'it is that the Government affirmatively alleged a specific course of conduct that is outside of the reach of the [statute charged].'" *Brown*, 752 F.3d at 1352 (citing *Peter*, 310 F.3d at 715).

with a crime that does not exist in law, he is actually innocent of the §924(j) crimes. It would, therefore, constitute a grave miscarriage of justice for this Court to allow these verdicts and sentences to stand.

Finally, Sanchez was deprived of his right to effective counsel when his trial and appellate attorneys failed to raise this meritorious issue.

### 1. Neither carjacking nor "crimes of violence" is a predicate felony for felony murder under 18 U.S.C § 1111.

Section 924(j)(1) authorizes a finding of guilt only if the government proves all the elements of § 924(c) <u>and</u> proves a killing constitutes murder, as murder is defined in 18 U.S.C. § 1111. Section 1111(a) defines both felony murder and premeditated murder, and it lists the felonies that qualify for felony murder:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder ... committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; ... or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being ... is murder in the first degree.

Only the commission of an enumerated crime is sufficient to satisfy the malice aforethought requirement of § 1111. *United States v. Tham*, 118 F.3d 1501, 1508 (11th Cir. 1997); *United States v. Thomas*, 34 F.3d 44, 49 (2d Cir. 1994) (citing *United States v. Browner*, 889 F.2d 549, 552 n.2 (5th Cir. 1989)). *See also* 11th Circuit Pattern Jury Instruction 45.2 (2003 ed.), Annotations and Comments.

The definition of felony murder does not include among the qualifying enumerated felonies "crime of violence" or carjacking (the crime alleged in Count 6). In other words, the carjacking crime alleged in Count 6 is an invalid basis for felony murder.

When charging the jury as to Counts 7-10, the Court instructed jurors that the carjacking charge in Count 6—as a matter of law—is a crime of violence, CR-ECF No.[771:7536], and that Sanchez could be found guilty of § 924(j) if the killing resulted from the carjacking charge in Count 6. The jury was instructed it could find Sanchez guilty upon the following facts:

> Number one, that the Defendant committed the crime of violence which is set out in Count 6, <u>or</u> the drug trafficking crime charged in Count 1.
>
> And two, that during the commission of either <u>or</u> both of those offenses, that the Defendant knowingly carried or used a firearm during and in relation to the crime of violence <u>and/or</u> the drug trafficking crime.
>
> And three, that in the course of using the firearm, the Defendant caused the death of the person described in the particular count of the indictment.
>
> And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense <u>or</u> the killing resulted from the perpetration of or attempted perpetration of *the crime of violence alleged in Count 6*.

CR-ECF No.[771:7537] (emphasis added).

Federal law does not include "crime of violence" or carjacking in the definition of felony murder, therefore, Sanchez was convicted and sentenced to death based on conduct that did not constitute a crime.

**2. Jurors could have found Sanchez guilty of either an invalid felony murder (killing in connection with a carjacking) or a premeditated murder.**

Sanchez's § 924 convictions rest on a pair of alternative crimes: first, Sanchez committed either a drug conspiracy or a carjacking; and, second, the killing was either premeditated or felony murder. The jury rendered a general verdict; it was not required to indicate (nor did it indicate) which of the alternatives it found.

With respect to carrying or using a firearm in relation to criminal conduct (§ 924(c)), the jury was instructed:

312

> So the first thing you need to decide is did the Government prove beyond a reasonable doubt that this particular Defendant committed either or both of those crimes, the drug trafficking offense contained in Count 1, and/or the crime of violence alleged in Count 6, the carjacking.

CR-ECF No.[711:7538] (emphasis added).

With respect to whether the killing constituted murder (§ 924(j)), the jury was instructed to determine if there was a killing with malice aforethought and premeditation or a killing resulting from the crime of violence alleged in Count 6 (carjacking). CR-ECF No.[771:7537]. The instructions tethered the "drug trafficking crime" to premeditated murder and the "crime of violence" to felony murder, although neither crime establishes the elements of murder. CR-ECF No.[771:7540, 7543]. After discussing premeditated murder the Court instructed the jury that the "felony murder principle only applies to carjacking." CR-ECF No.[771:7544]. The Court explained:

> If you find that the firearm was used in connection with the crime of violence as alleged in the indictment, that is if it was used *in connection with armed carjacking*, the Government can prove the fourth element of murder through what is called the concept of felony murder.

CR-ECF No.[771:7542] (emphasis added).

Because of these instructions, and the general verdict form, there is no way to definitively tell from the verdict whether the jurors found Sanchez guilty of premeditated murder or an invalid felony murder. *See Yates v. Unites States*, 354 U.S. 298 (1957) (a conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilt and may have relied on an invalid one). It is certain, however, that the jury could not have found Sanchez guilty of felony murder based on a valid predicate crime—rather than the invalid crime of carjacking—because carjacking was the only option. The jury's verdict reasonably could have

313

rested on the invalid felony murder charge, therefore, the verdicts of guilt on all four § 924(j) counts are legally invalid. *Yates*, 354 U.S. at 311.

### 3. The erroneous felony murder instruction was harmful.

It is well-settled that constitutional error occurs when a jury renders a general verdict of guilt based on multiple theories of guilt and one theory is invalid. Though the error is not structural, *Hedgpeth v. Pulido*, 555 U.S. 57 (2008), in Sanchez's case, the error had a "'substantial and injurious effect or influence in determining the jury's verdict'" and the convictions should be vacated. *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

When determining whether an error is harmful "[t]he inquiry cannot be merely whether there was enough to support the result" in the absence of the error. *Kotteakos*, 328 U.S.at 765. Rather, the proper question is "whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Ibid.*; *accord O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

> The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee.

*Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (addressing a defective reasonable doubt instruction).

Here, it is reasonably likely that one or more jurors found Sanchez guilty of Counts 7, 8, 9, and 10 based upon the jury's finding in Count 6 that Sanchez was guilty of carjacking and those guilty verdicts are attributable to the erroneous felony murder instruction stating that a violation of 18 U.S.C. §1111 could be based upon a determination that the murder had occurred

314

during the course of a carjacking. While it is <u>possible</u> that the jury found Sanchez guilty of premeditated murder, there is no way to confidently determine that they did. In fact, it is more likely that jurors found Sanchez guilty of felony murder under the erroneous instructions.

The instructions as a whole and the jury's other guilt-phase findings do not conclusively support conviction under a premeditation theory; they support a felony murder theory. *See* CR-ECF No.[796] (verdict). First, the jury's findings did not include a finding of malice or specific intent to kill. For example, § 924(c) requires general intent. It also requires a finding of *either* a drug trafficking crime *or* a crime of violence and neither finding includes malice or specific intent to kill. The carjacking charge (Count 6) poses alternatives: force and violence *or* intimidation, as well as intent to cause death *or* serious bodily harm, 18 U.S.C. § 2119, but the intent is not specific to Sanchez; it is judged objectively. CR-ECF No.[771:7534]. On the other hand, the finding of "guilty" on Count 6 satisfies <u>the Court's instruction</u> to tether Count 6 to the murder statute's felony murder component.[226]

In addition, the fact that jurors were not instructed to make a unanimous decision regarding felony murder or premeditated murder under § 924(j) compounds the effect of the erroneous felony murder instruction.[227] Jurors were only instructed to render a unanimous decision regarding whether Sanchez committed a drug trafficking crime or a crime of violence under § 924(c). Nearing the conclusion of the jury charge on Counts 7 – 10, the Court instructed:

---

[226] If jurors, following the Court's instructions, linked Count 1 (drug conspiracy) to premediated murder, the same cannot confidently be said because the elements of drug conspiracy do not satisfy the mental-state required for premeditated murder; jurors were required to make the additional findings beyond a reasonable doubt that *Sanchez* acted with malice and premeditation. Jurors also could have determined that the Government did not prove beyond a reasonable doubt that the killing was connected to the drug trafficking crime and stealing drugs from Louis Escobedo. *See* CR-ECF No.[766:7170] (government's closing).

[227] As pled, *infra* at Claim XII(B), this fact establishes a separate constitutional violation.

315

> If the jury concluded that the Government had proven one of those other crimes beyond a reasonable doubt, *I mean the crime of violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that finding.*
>
> And then depending upon that, you would have to go through on the intent issue, because you understand with respect to the drug trafficking crime, the intent is different than carjacking, the crime of violence. That felony murder principle only applies to carjacking. It does not apply to the crime of the drug trafficking offense alleged in count 1.

CR-ECF No.[771:7544].

Some jurors could have found felony murder and some jurors could have found premeditated murder. Because the jurors were not instructed to render a unanimous finding on "the intent issue" of felony murder or premeditated murder, it is reasonably likely that the guilty verdict is attributable to the erroneous felony murder instruction.

Finally, at trial, Sanchez asserted that he did not commit the killings but was following Danny Varela's instructions to escort Louis Escobedo on a drug buy for Varela's drug operation. The prosecution's theory was that Louis Escobedo was killed to erase a debt owed by Danny Varela. The killing, alleged the prosecution, was committed by Troya and Sanchez, who took Escobedo's vehicle and then delivered to Varela the drugs Escobedo had earlier acquired.[228] The prosecution, however, introduced no compelling proof on these points and the jury deliberated over a three-day period before rendering guilty verdicts. The prosecution's proof was not so overwhelming as to dispel grave doubt that the jury—or at least one of the jurors—found Sanchez guilty of felony murder. In fact, the prosecution affirmatively told the jurors they could find Sanchez guilty "[i]f a murder occurs during a crime of violence, any death that results from the use of a gun in connection with a carjacking is felony murder, and no premeditation is

---

[228] It is undisputed that Sanchez did not take money from Luis Escobedo. Money was found inside Escobedo's pocket. CR-ECF No.[728:3189-90].

required." CR-ECF No.[766:7170]. The prosecution's argument mirrored the erroneous jury instructions and the jury could not have disregarded these circumstances when deciding upon a verdict.

For these reasons, the erroneous jury instructions had a substantial effect on the four § 924(j) convictions and sentences. Counsel's failure to raise this issue, therefore, was prejudicial and constitutes a denial of the effective assistance of counsel. The convictions and sentences should be vacated.

**4. The erroneous felony murder instruction constructively amended Counts 7 through 10 by removing an element of the offense, and resulted in Sanchez being convicted of a non-existent offense.**

The Fifth Amendment states that "[n]o person shall be held to answer for a capital or otherwise infamous crime unless on …indictment of a grand jury, …." Amendment 5, United States Constitution. A trial judge is, therefore, not at liberty to change the elements of the charged crime from those presented by the Grand Jury. *Stirone v. United States*, 361 U.S. 212, 215-17 (1960).

Here, Counts 7 through 10, as returned by the Grand Jury, charged robbery. The trial court, however, did not instruct the jury that it was required to find Sanchez had committed a killing in the perpetration of a robbery. Instead, the trial court, *sua sponte*, instructed the jury it could convict on a finding that Sanchez had killed in the perpetration of a carjacking. The trial court's instructions constructively amended those counts and changed the charges the Grand Jury had returned. *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990) (A constructive amendment "occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment.").

317

The trial court's constructive amendment of Counts 7, 8, 9 and 10, allowed the jury to find only carjacking without having to find that a killing took place during the perpetration of robbery. The constructive amendment reduced the government's burden of proof by eliminating an entire element the grand jury indicted on and which the jury should have been required to find *in addition* to carjacking. It also affected Sanchez's substantial rights because he was not convicted on the charges in Counts 7–10; he was convicted of a non-existent offense. It is, therefore, self-evident that the error seriously affected the fairness, integrity and public reputation of judicial proceedings. *See United States v. Madden*, 733 F.3d 1314, 1321-23 (11th Cir. 2013).

Trial counsel did not object to the Court's constructive amendment of Counts 7 through 10, which removed an element of the offense ("robbery") from the indictment, reduced the prosecution's burden of proof, and resulted in Sanchez being convicted and sentenced for a non-existent crime. The constructive amendments were plain errors, requiring reversal on appeal, but appellate counsel failed to raise this issue. In this regard, Sanchez was deprived of the effective assistance of counsel.

> **5. Sanchez was deprived of his rights under the Fifth and Sixth Amendments when trial and appellate counsel failed to raise these issues.**

Counsel's failure to ensure that Sanchez was not convicted of a non-existent crime rendered the trial fundamentally unfair and deprived Sanchez of his constitutional right to counsel. *Strickland v. Washington*, 466 U.S. at 686 ("The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.").

318

To the extent the Court does not find a jurisdictional defect with the § 924 convictions and determines Sanchez was required to raise and preserve this claim at trial and on direct appeal, any ensuing procedural barrier should be excused by the deficient performance rendered by trial and appellate counsel, and by the prejudice that has resulted therefrom. Counsel both at trial and on direct appeal are responsible for meeting at least a minimal standard of competence which includes knowing the relevant law. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088-89 (2014) (counsel found ineffective where "he failed to make even the cursory investigation of the state statute … fundamental to his case[.]" *See also Everett v. Beard*, 290 F.3d 500, 509 (3d Cir. 2002), *abrogated on other grounds as recognized by Priester v. Vaughn*, 382 F.3d 394 (3d Cir. 2004) ("[T]he state of the law is central to an evaluation of counsel's performance at trial. A reasonably competent attorney patently is required to know the state of the applicable law, so the parties' focus upon the state of the law at the time of . . . trial is not misplaced."). Accordingly, the Supreme Court in *Hinton v. Alabama* held that an attorney's failure to act due to a mistaken or incorrect belief about the law constitutes deficient performance. *Hinton*, 134 S. Ct. at 1088. In addition, the Commentary to the 2003 ABA Guidelines notes that "[o]ne of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." Guideline 10.8, 31 Hofstra L. Rev. at 1030. *See also Heath v. Jones*, 941 F.2d 1126, 1131 (11th Cir. 1991) ("While we are loath to encourage attorneys to file numerous claims merely for the sake of filing claims, we also realize that in a capital appeal the attorney must raise many issues in a timely fashion or else the defendant may be procedurally barred from ever raising those issues.").

Reasonably effective counsel representing a defendant in a capital trial in 2009 would have known the law, objected to legal error in the jury instructions, and would have taken all steps necessary to preserve their client's objections for appellate review. Failure to object to improper jury instructions, verdict forms and/or to request proper instructions, therefore, is objectively unreasonable and constitutes deficient performance. *See also Everett v. Beard*, 290 F.3d 500, 514-15 (3d Cir. 2000); *Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989). For example, in *Reagan v. Norris*, 365 F.3d 616, 621 (8th Cir. 2004), counsel was found ineffective for not objecting to a first-degree murder instruction that lacked an essential element of the crime. In *Luchenburg v. Smith*, 79 F.3d 388, 392 (4th Cir. 1996), counsel was found ineffective for not requesting an instruction that more accurately explained to the jury that, under the law, it could not convict the defendant of a compound handgun charge unless it first found him guilty of a predicate crime of violence, and that common-law assault was not a predicate "crime of violence." In *Gray v. Lynn*, 6 F.3d 265, 271 (5th Cir. 1993), counsel was found ineffective for not objecting to instructions that allowed a conviction for attempted first degree murder upon a finding that the defendant intended to inflict great bodily harm, even if the jury had a reasonable doubt about specific intent to kill, where intent to inflict great harm was not included in the definition of first degree murder.

Here, counsel rendered deficient performance where they failed to: (1) know the composition of the statute with which Sanchez was charged and realize that carjacking was not a valid predicate offense for felony murder; (2) challenge the erroneous felony murder instructions; and (3) preserve the objection for appellate review. Counsel intended to preserve and litigate all meritorious grounds and had no strategic or tactical reason for not doing so. CV-ECF No.[52-1:68 of 112, ¶7]. A basic review of the charging statute, 18 U.S.C. § 924(j), would

320

have revealed that carjacking is not a valid predicate crime for felony murder. This ignorance of law was fundamental to the case since felony murder is the basis for enhanced sentences of life and death. *Compare* 18 U.S.C. § 924(j)(1) (punishment of death or imprisonment for any term of years or for life) *with* § 924(j)(2) (incorporating § 1112) (punishment of not more than 15 years or 8 years).

Likewise, effective appellate counsel representing a death-sentenced defendant would have raised all reasonable claims on direct appeal, including those subject to plain error review. *See Strickland*, 466 U.S. at 688 ("Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process."); *see also Molina-Martinez v. United States*, 136 S. Ct. 1338, 1346 (2016) (finding under plain error review that "[i]n most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome."); *Albrecht v. Beard*, 636 F. Supp. 2d 468, 476 (E.D. Pa. 2009) (appellate counsel found ineffective where he should have recognized and raised the unanimity issue raised by a vague jury instruction).

Sanchez was prejudiced by counsel's failure to raise this issue. Prejudice is established when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. Counsel's failure to raise the issue prejudiced Sanchez because no attorney conducted a basic review of the statute of conviction to determine whether the elements could be or were, in fact, met. *Strickland*, 466 U.S. at 694 ("An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable[.]").

321

Counsel's failure to challenge the felony murder instructions did not have just a "conceivable effect on the outcome of the proceeding[,]" the erroneous instruction had a "pervasive effect." *Strickland*, 466 U.S. at 693, 695-96. Without finding a qualifying felony for guilt under § 924(j) there was no valid basis for the jury to find felony murder and impose a conviction and enhanced sentences of death on Counts 7 and 8 and of life sentences on Counts 9 and 10. Had trial counsel objected to the felony murder instruction that allowed the jury to find Sanchez guilty of a crime under § 924(j) that is not defined as murder under § 1111, the Court would have had to narrow substantially the basis upon which the jury could have considered him guilty of a crime with enhanced punishment that included the death penalty. Had the Court done so, there is a reasonable probability that the jury would have failed to find the requisite elements for first degree murder and the accompanying enhanced sentences.[229]

Moreover, jurors could have believed Sanchez's defense that he did not kill the Escobedos but still convicted him. *See Reagan v. Norris*, 365 F.3d at 621. This is because they were instructed felony murder is sufficiently established "if the Government proves beyond a reasonable doubt that the Defendant knowingly and willfully committed … the crime of carjacking … [a]nd that the killing of the victim occurred during and in consequence of … that crime." CR-ECF No.[771:7543]. Trial counsel rendered ineffective assistance whey they did not object.

There is a reasonable probability that Sanchez would have prevailed on direct appeal had the issue been raised due to the strength of the claim, the fact that constitutional error is plain,

---

[229] The fact that Sanchez was also charged with manslaughter suggests that the Government recognized it might have difficulty convincing a jury that he had engaged in first degree murder. Manslaughter is not a lesser included offense to felony murder so the inclusion of manslaughter in the indictment can only have related to premeditated murder. As explained, it is reasonably likely that the jury imposed a conviction based on felony murder.

and the Government would have had the weighty burden to establish "beyond a reasonable doubt" that the error was harmless. *See United States v. Rogers*, 94 F.3d 1519, 1524 (11th Cir. 1996) (error occurs when a trial court "effectively omitted from the instructions an essential element of the crime charged"). In *Rogers*, the court held that when a jury instruction omits an element of the crime the error:

> may be viewed as harmless only in three rather infrequent scenarios: 1) Where the infirm instruction pertained to a charge for which the defendant was acquitted (and not affecting other charges); 2) Where the omission related to an element of the crime that the defendant in any case admitted; and 3) Where the jury has necessarily found certain other predicate facts that are so closely related to the omitted element that no rational jury could find those facts without also finding the element.

*Id.* at 1526. As explained above, none of the circumstances where the instructional error may be deemed harmless are present in Sanchez's case. Appellate counsel's failure to raise this issue, therefore, constitutes a deprivation of the right to the effective assistance of counsel.

In addition, a showing of plain error includes a reasonable probability that, but for the error, the outcome of the proceeding would have been different; the same showing that establishes prejudice under *Strickland. Griffith v. United States*, 871 F.3d 1321, 1337 (11th 2017) (quotation omitted). Not only has Sanchez demonstrated he would have been entitled to relief on direct appeal, he has shown appellate counsel was ineffective for omitting this claim that would have had a reasonable probability of success on appeal. *See Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001).

The presumption of effective appellate assistance can also be overcome when ignored issues are stronger than those presented. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000); *Heath v. Jones*, 941 F.2d at 1131 (finding "the quality of the one claim that was briefed was unreasonably deficient"). Here, appellate counsel raised thirteen issues but the Eleventh Circuit

323

addressed only three,[230] stating, "we find no merit to the majority of these arguments and accordingly have no need to discuss them[.]" *Troya*, 733 F.3d at 1129. The court of appeals did not dismiss the nine claims as "frivolous" but it made clear that they were so weak as to not warrant any discussion. Counsel's failure to raise this stronger claim that constitutes plain error fell below an objective standard of reasonableness and, as a result, confidence in the outcome is undermined. *Strickland*, 466 U.S. at 688, 694.

Moreover, the failure to raise the claim on direct appeal results in prejudice because raising the claim now—on post-conviction review—involves having to meet a higher burden, that is, showing the error had a "substantial injurious effect" on the trial. *Brecht*, 507 U.S. at 623. With respect to this particular claim, harmless error analysis on direct appeal is limited to a review of only the jury instructions, however, in this proceeding the error is viewed with respect to the trial as a whole. Specifically:

> The law of this Circuit concerning appeals involving instructions that omit an essential element of the offense was articulated in Justice Scalia's concurrence in *Carella v. California*, 491 U.S. 263, 267, 109 S. Ct. 2419, 2421–22, 105 L.Ed.2d 218 (1989) (Scalia, J., concurring). *See United States v. Rogers*, 94 F.3d 1519, 1526 (11th Cir.1996) (finding Justice Scalia's concurrence persuasive in the context of an instruction omission on direct appeal). In *Carella*, Justice Scalia reasoned that, because jury factfinding is constitutionally essential, harmless error review of instruction errors differs from the typical form of such analysis in that there should be no "expansive inquiry" into the trial record as a whole. *Carella*, 491 U.S. at 267, 109 S. Ct. at 2421–22 (Scalia, J., concurring). The implication is an instruction error can be found harmless only on the basis of the instructions as a whole, not the entire trial record. On federal habeas review, however, our harmless error analysis is not so cabined. *See McGuire*, 502 U.S. at 72, 112 S. Ct. at 482; *Agan*, 119 F.3d at 1545.

---

[230] The court of appeals grouped Sanchez's direct appeal claims 4 and 5 as well as claims 7 and 13 together in its opinion under issues 4 and 12, respectively. *Troya*, 733 F.3d at 1129. The issues discussed by the court were evidentiary rulings by the trial court regarding (1) uncharged acts of misconduct involving firearms and drug trafficking, and (2) the admission of testimony from the Government's psychologist. *Troya*, 733 F.3d at 1130, 1138.

*Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 779 n.12 (11th Cir. 2003) (on collateral review, incomplete oral jury instruction was harmless in light of the correct written instructions and the fact that the instruction was not substantively erroneous).

Sanchez has demonstrated herein that the erroneous felony murder instructions were not harmless, and he was prejudiced by counsel's failure to earlier raise this challenge under a more favorable standard and to earlier obtain relief. *See Reagan v. Norris*, 365 F.3d at 621 (counsel found ineffective for not objecting to a first-degree murder instruction that lacked an essential element of the crime). Because the jury was erroneously instructed that it could make a determination of guilt under 18 U.S.C. § 924(j) by finding him guilty of conduct that is not defined by 18 U.S.C. § 1111 as felony murder, counsel failed to perform their adversarial function to insure the process at trial worked adequately. Sanchez's convictions and sentences on Counts 7 through 10 are invalid and should be vacated.

**B. Sanchez's jurors were not instructed to make a unanimous determination of either felony murder or premeditated murder, and counsel were ineffective for failing to raise this meritorious issue, all in violation of the Fifth, Sixth and Eighth Amendments.**[231]

The jury was not instructed to reach unanimity on all elements of Counts 7 through 10 in order to convict Sanchez and impose enhanced sentences. Specifically, jurors were not instructed to make a unanimous decision regarding felony murder or premeditated murder under § 924(j). *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny mandate any element of a crime

---

[231] This issue was presented as Claim VII(D) in the original § 2255 Motion. It has been separated from Claim VII, reorganized, supplemented with more facts, and a brief discussion of law has been included to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel unreasonably and prejudicially failed to object to the charges contained in Counts 7-10 and to the jury instructions and verdicts on those counts. CV-ECF No.[16-1:100-01 of 195]. In particular, the original claim asserted the jury was not instructed it must unanimously find either premeditated or felony murder. *Id.* at ¶¶311-12, 315, 318.

must be found unanimously by a jury, and this requirement includes findings that increase the

maximum sentence or minimum mandatory sentence. *Alleyne v. United States*, 133 S. Ct. 2151,

2158 (2013). In *Apprendi*, the Court addressed "constitutional protections of surpassing

importance: the proscription of any deprivation of liberty without 'due process of law,'" and the

right to a fair trial. *Apprendi*, 530 U.S. at 476–77. The historical foundation for these

fundamental principles was explained:

> "[T]o guard against a spirit of oppression and tyranny on the part of rulers," and "as the great bulwark of [our] civil and political liberties," 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that "*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours...." 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added). *See also Duncan v. Louisiana*, 391 U.S. 145, 151-154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

*Apprendi*, 530 U.S. at 477.

Here, Sanchez was denied the fundamental protection afforded by a unanimous jury

verdict when jurors were instructed to render a unanimous decision only on whether Sanchez

committed a drug trafficking crime or a crime of violence under § 924(c). They were not

instructed to unanimously agree on whether the killing was premediated murder or felony

murder under § 924(j). Nearing the conclusion of the jury charge on Counts 7-10, the Court

mentioned unanimity twice with respect to § 924(c):

> *You will note that the indictment charges that the Defendant knowingly carried or used a firearm during an in relation to both a drug trafficking offense and a crime of violence.*

> In other words, when you look at Counts 7 through 10, they charge the Defendants violated the law in two separate ways. It is not necessary for the Government to prove that the Defendant violated the law in both of those ways. *It is sufficient if the Government proves beyond a reasonable doubt that the Defendant knowingly violated the law in either way.*

> *But in that event, you must unanimously agree upon the way in which the Defendant committed the violation.*

CR-ECF No.[771:.7543] (emphasis added).

> If the jury concluded that the Government had proven one of those other crimes beyond a reasonable doubt, *I mean the crime of violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that finding*.

CR-ECF No.[771:7544] (emphasis added).

Under these instructions, the jurors were required to be unanimous on the predicate crime under § 924(c), (*i.e.*, a crime of drug trafficking or violence), but they were not likewise told they must be unanimous regarding the predicate for murder under § 924(j), (*i.e.*, premeditated or felony murder). Accordingly, some jurors could have found felony murder and some jurors could have found premeditated murder and the conviction of murder would have not been a result of juror unanimity. This is particularly prejudicial where the charged felony murder was invalid. *See supra* Claim XII(A). Counsel's deficient performance in this regard resulted in an inadequate adversarial process.

The reasons previously set forth that establish a deprivation of the right to the effective assistance of trial and appellate counsel, *see* Claim XII(A)(3)-(5), apply equally to the failure to ensure that Sanchez was convicted upon a unanimous jury verdict. *Albrecht v. Beard*, 636 F. Supp. 2d at 476 (appellate counsel found ineffective where he should have recognized and raised the unanimity issue caused by a vague jury instruction). Since the erroneous instruction had a substantial and injurious effect on the verdict, there is also a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

327

**C. In violation of the Fifth, Sixth and Eighth Amendments, instructional error interfered with the jurors' ability to consider mitigating factors, and Sanchez's counsel rendered prejudicially deficient assistance by failing to raise this meritorious issue.**[232]

In order to satisfy the Eighth Amendment requirement that capital sentencing decisions rest upon an individualized inquiry, the jurors must be allowed a "broad inquiry" into all "constitutionally relevant mitigating evidence," *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998), and must be able to consider and give effect to a defendant's mitigating evidence in imposing sentence. *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (citation and quotation omitted). The consideration of mitigation in this case, however, was unconstitutionally circumscribed when jurors were instructed they had to first determine if a mitigating factor was valid. Trial counsel failed to object to this instruction and appellate counsel did not raise the issue as plain error. Such omissions by counsel denied Sanchez the effective assistance of counsel afforded by the Sixth Amendment.

Sanchez's jurors were told to follow a three-step process regarding nonstatutory mitigating factors: (1) decide whether a proposed mitigating factor had been proven by a preponderance of the evidence; (2) decide whether that factor was a valid mitigator; and, (3) decide what weight to give the factor if satisfied as to the first two steps. *See, e.g.*, CR-ECF No.[848:9728, 9735-37, 9742-44, 9747] (jury instructions); No.[847:9516-17, 9521, 9627-29] (prosecutor's argument). The Court had determined before charging the jury that particular evidence was relevant and constituted one or more mitigating factors, *see* CR-ECF No.[845:

---

[232] This issue was presented as Claim VIII(K) in the original § 2255 Motion. It has been separated from original Claim VIII, reorganized, supplemented with more facts, and a brief discussion of law has been included to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel unreasonably and prejudicially failed to object to penalty phase instructions that interfered with jurors' ability to consider non-statutory mitigation. CV-ECF No.[16-1:170-72 of 195].

9140]; No.[846:9369-9458], but there is a reasonable probability that step two improperly allowed one or more jurors to disregard the Court's legal determination and prevent other jurors from giving effect to evidence that they believed justified a sentence less than death. *McKoy v. North Carolina*, 494 U.S. 433, 439 (1990); *see also id.* at 441-41 & n.7 (holding unconstitutional a sentencing scheme where, for nonstatutory mitigating circumstances, the jury had to decide both whether the circumstance had been proved and whether it had mitigating value). The "step two" instruction, therefore, impermissibly limited the jurors' consideration of mitigating evidence. *Lockett v. Ohio*, 438 U.S. 586, 607 (1978) (a capital sentencing scheme is unconstitutional if it "prevent[s] the sentencer from considering any aspect of the defendant's character and record or any circumstances of his offense as an independently mitigating factor.").

As the Court's charge made clear, the jury was to independently determine whether each proffered mitigating factor was a valid mitigating factor before it could move onto the next step and consider that mitigating factor in its sentencing determination:

> If the defendant asserts something that is not set forth in the statute, well, of course, the first thing you need to decide is, A, did the Defendant prove by a preponderance of the evidence that the fact in it is true. *But you then also need to decide if it is true, does it constitute a mitigating factor under the definition of what is a mitigating factor.*

CR-ECF No.[848:9735] (emphasis added). This second step was emphasized throughout the jury instructions:

> Obviously when you are looking at something that is nonstatutory, whether it be aggravating or mitigating, *you need to decide that fact, whether it is indeed a mitigating factor*.

> I mention this because there is a reported case where in a trial one defendant listed as a mitigating factor that he was a human being. Well, of course, that is true, *but the jury needed to go to the next step and say all right, but does that constitute a mitigating factor. That is for the jury to decide*.

CR-ECF No.[848:9736] (emphasis added).

329

> In deciding whether these factors have been established and should be considered in the weighing process, each juror must determine whether the Defendant has proven by a preponderance of the evidence, number one, that the fact asserted in the mitigating factor is true, *and with respect to nonstatutory mitigating factors, you need to decide whether the fact is indeed a mitigating factor* as I have determined and defined that term on page 15 of these instructions.

CR-ECF No.[848:9737] (emphasis added).

> If you are looking at a nonstatutory aggravating fact or a nonstatutory mitigating factor, *you need to go one step further and you have to say, okay, I find that the party proved this, but is this indeed an aggravating factor. Is this indeed a mitigating factor.*

CR-ECF No.[848:9728] (emphasis added).

The Court repeated the instruction before it read Sanchez's and Troya's respective proffered mitigating factors and emphasized that just because the mitigating factors were asserted, they were not necessarily actually mitigating factors; that was for the jury to decide. *See* CR-ECF No.[848:9742-43]. During its reading of each list of mitigating factors, the Court paused to remind the jury that they must first determine that a proposed factor was actually mitigating before considering it. *See, e.g.*, CR-ECF No.[848:9743] (Sanchez mitigating factor 2 regarding the influence of Varela); CR-ECF No.[848:9744] (Sanchez mitigating factor 4 regarding no prior felony convictions); CR-ECF No.[848:9747] (Sanchez mitigating factor 16 regarding relationship with family); CR-ECF No.[848:9751-52] (Troya mitigating factor 3 regarding relationship with family).

The Government capitalized on the constitutionally erroneous instructions, further mis-informed the jurors by equating mitigation with "lessening the crime" (as opposed to reducing the defendant's moral culpability), and told the jurors they could decide for themselves what constitutes mitigating evidence. The Government addressed the three-step process for finding nonstatutory mitigation at length:

330

That involves a three step process as opposed to a two step process. The three step process, the same proof, the Government must prove beyond a reasonable doubt; the Defendant by a preponderance of the evidence.

The middle step is different, and that you must assess whether -- let's assume defense argued that the sun coming up tomorrow morning is a statutory mitigator. We know it is not on there, and it isn't. I am using that as an example. That is a step that would be proven by a preponderance of the evidence.

*The middle step is does that mitigate, lessen the crime, does it make the crime more susceptible to being life imprisonment sentence as opposed to a death sentence.*

So when we have nonstatutory mitigators and aggravators, *you have to assert a middle step in your deliberative process*, and that would be nonstatutory aggravators. *Does that aggravating circumstance tend to support the imposition of the death penalty or as a mitigator, does it tend to support the position of a lesser sentence.*

Then the third step, the same as before – I hope I am not being confusing. The third step is the weighing process. If it is a nonstatutory mitigator proven by the preponderance of the evidence, *and does tend to lessen the crime*, the third step is what weight should I give that in the scheme of things.

So with that understanding, and I know Judge Hurley will be much more artful than I was now in explaining that to you when we turn to the jury instructions, but that is basically the process and difference between statutory and nonstatutory aggravating circumstances and mitigating circumstances.

CR-ECF No.[847:9627-29] (emphasis added).

Trial counsel failed to object to this "three-step process" when the Government erroneously told the jury this was their duty, when the Government argued this process in closing, and when the Court authorized the use of this process in its charge to the jury. Specifically, counsel should have objected to the second step of the process, *i.e.*, requiring the jury to decide if the established evidence was actually mitigating. Such a requirement was improper because it limited the jurors' consideration of mitigating evidence and because the issue of whether proffered evidence constitutes relevant mitigation is a question of law, not a question of fact. *United States v. Sampson*, 335 F. Supp. 2d 166, 228-32 (D. Mass. 2004).

331

A death sentence may not be assessed by jurors who are "mitigation-impaired"—that is, jurors who do not recognize certain evidence as mitigating. *See Morgan v. Illinois*, 504 U.S. 719, 739 (1992). In *United States v. Fell*, 372 F. Supp. 2d 766, 771 (D. Vt. 2005), the court, in a related context, explained:

> Other jurors may have biases regarding particular forms of mitigating evidence. For example, some jurors may be unable to fairly consider any mitigating evidence relating to the defendant's background or upbringing. Such jurors must be excused for cause as the Supreme Court has emphasized that the sentencer may not refuse to consider evidence relating to the defendant's background or upbringing. *See Lockett v. Ohio*, 438 U.S. 586, 604-05 (1978).

Any barrier to consideration of mitigating evidence in capital cases is unconstitutional. *McKoy v. North Carolina*, 494 U.S. 433, 442 (1990). Supreme Court precedent makes clear "that the mere declaration that evidence is 'legally irrelevant' to mitigation cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death." *McKoy*, 494 U.S. at 441. The second step of the three-step process for determining mitigation in Sanchez's case violates these fundamental principles of capital sentencing by allowing juror nullification with respect to mitigation; that is, rejecting a mitigating factor established by the preponderance of the evidence solely because the juror disagreed that the particular category of evidence constituted legally-cognizable mitigation. Counsel had no strategic or tactical reason to refrain from raising this issue. Counsel's acts of omission fell below the standards of performance when they failed to object to this instruction. Counsel's deficient performance in this regard resulted in a mitigation-impaired jury and thereby prejudiced Sanchez's case for a life sentence.

332

**1. Counsel's failure to challenge the "three-step process" instruction was objectively unreasonable and constituted deficient performance.**

Trial counsel has a duty to ensure that a capital sentencing jury is instructed correctly concerning its deliberations in the penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors. This duty necessarily includes knowing relevant law and objecting to any aspects of the jury instructions or the verdict forms that are inaccurate, confusing or legally incorrect. *See* ABA Guideline 10.11(K), 31 Hofstra Law. Rev 913, 1058 (2003) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate or confusing and should offer alternative instructions.").[233]

At the time of trial, there was readily available case law that established the basis of the objection that counsel should have made. Although the Supreme Court has stated that trivial or unimportant evidence may be excluded as irrelevant to the issue of mitigation, the Court has long held the view that the standard for relevance with respect to mitigation is broad: "[T]he question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 286-87 (2004) (internal quotation marks and citation omitted). Furthermore, there are certain categories of evidence that the Court has recognized always constitute relevant mitigating evidence as a matter of law−namely,

_____

[233] *See also* Commentary to ABA Guideline 10.11(K), 31 Hofstra Law Rev. at 1068-69: "It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence. ... [C]ounsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. ... If the jury instructions are insufficient to achieve the purposes described [above] or are otherwise confusing or misleading, counsel must object, even if the instructions are the standard ones given in the jurisdiction."

information about a defendant's background and upbringing. Evidence "about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation marks and citation omitted). Here, the instruction that the jurors had to decide the validity of certain mitigating factors was an incorrect and constitutionally flawed statement of the law.

During the charge conference, the Court, Government, and trial counsel discussed each proposed mitigating factor submitted on behalf of Sanchez and Troya, and the Court made legal findings as to whether each proffered factor constituted, as a matter of law, a constitutionally relevant mitigating factor that should be presented to the jury for its sentencing deliberations. *See* CR-ECF No.[846:9369- 9458]. As the Court stated, in reviewing each proposed mitigating factor, "the issue becomes legally are they mitigating factors." CR-ECF No.[845:9140]. The Court, in fact, struck certain proffered non-statutory mitigating factors on the ground that they did not constitute legally cognizable mitigating factors. *See* CR-ECF No.[846:9409 (striking proposed mitigating factor regarding the harshness of life without parole because "as a matter of law … it is not a constitutionally relevant mitigating factor"); CR-ECF No.[846:9426] (striking proposed mitigating factor regarding execution impact evidence because "it is not a constitutionally relevant mitigating factor"); CR-ECF No.[846:9437] (striking proposed mitigating factor regarding residual doubt because it is "not an appropriate mitigator") As the Court explained, it sought to determine which proposed mitigating factors were "cognizable" and "to make judgments as a matter of law if [a proposed mitigating factor] is excludable as a matter of law." CR-ECF No.[847:9476, 9487].

334

The Court discussed the jury instructions, during which there were many opportunities for counsel to object that the second step impermissibly required the jury to make a finding of law and precluded jurors' consideration of mitigating evidence, but counsel made no such objection. For example, the Court asked: "Does defense take issue with the fact that they have an obligation to establish that the asserted ground is in fact a mitigator?" CR-ECF No.[847:9481]. Demonstrating ignorance of the law, Troya's attorney responded: "The general principle, we don't have a problem with." CR-ECF No.[847:9481-82]. Sanchez's attorney did not object. The Court continued: "[T]here is a two step process. The first is has the fact been established by a preponderance of the evidence, and, if established, is it something that mitigates. … [T]he jury has to decide is the fact true and if it is true, *is it something which constitutes a mitigating factor*." CR-ECF No.[847:9482] (emphasis added). Again, counsel did not object. Counsel repeatedly failed to object that such an instruction would impermissibly require the jury to make a legal determination about whether a proposed mitigating factors on the verdict form actually "constitutes a mitigating factor" and that this second step would interfere with the jurors' consideration of mitigating evidence. CR-ECF No.[847:9625, 9650-52, 9656, 9660, 9669, 9738, 9762].

Counsel's failure to challenge the second step of the "three-step process" jury instruction was not strategic. CV-ECV No.[52-1:68 of 112, ¶7]. Counsel intended to litigate and preserve meritorious issues, including issues regarding jury instructions. *Id.* Motions and objections during jury selection make clear that it was trial counsel's strategy to preclude venire members who could not consider or give effect to mitigating evidence put forth by the defense from the jury. CR-ECF No.[650:636-46]; No.[654, 655]. On this record, it was objectively unreasonable for counsel to waive prior objections related to a mitigation-impaired jury made during voir dire

335

and to fail to object to the jury instruction that actually impaired the sitting jurors' consideration of mitigation. Such an objection was entirely consistent with the aim of insuring that its mitigating factors would be given due consideration by the jury. *See Marshall v. Sec'y, Florida Dep't of Corr.*, 828 F.3d 1277, 1295 (11th Cir. 2016) (Rosenbaum, J., concurring) (finding counsel's performance was not strategic but deficient based on a failure to consistently follow through with a stated objective).

Considering that the law was well-settled at the time of Sanchez's trial, basic research would have revealed the constitutional problem with "step two" of the instructions on non-statutory mitigation, and any reasonably competent attorney would have objected, preserved the issue for appellate review, and raised the issue on direct appeal (even, if necessary, under the plain error doctrine). Sanchez's counsel's failure to do so was necessarily deficient performance under *Strickland*. This was especially so considering that, as a result, the jury was instructed to engage in a deliberative process that impaired the consideration of mitigation evidence and was constitutionally unlawful.

### 2.   Counsel's failure to challenge these instructions was prejudicial.

There is a reasonable probability that the three-step process, as reflected in the jury instructions, as well as the Government's closing argument, resulted in one or more jurors engaging in nullification and impermissibly refusing to consider—and persuading others not to consider—constitutionally relevant mitigating evidence. But for counsel's error, there is a reasonable probability that the outcome of the penalty phase proceeding would have been different.

Counsel's failure to properly object to the three-step process had two distinct consequences which affected the jury's deliberations regarding mitigation. First, counsel's

336

failure allowed the Government to repeatedly argue to the jury that it could simply disregard any proffered mitigating factor deemed by them to be irrelevant. Second, it resulted in an instruction to the jury that validated the Government's incorrect statement of the law, effectively encouraged jury nullification with respect to the proffered list of mitigating factors, and erected a barrier to consideration of Sanchez's mitigation evidence.

In closing argument, the Government relied heavily on the three-step process as a tactic to encourage the jurors to simply disregard the proffered mitigating factors, even if the defense had met its burden and established a given factor by a preponderance of the evidence. Indeed, the Government repeatedly emphasized that it was the jury's prerogative, under the Court's instructions, to use the second step of the three step process to disregard the defense evidence on the ground that it did not constitute legally-cognizable mitigation. The Government emphasized the erroneous instruction that it was the jury's prerogative to determine what evidence was constitutionally mitigating and essentially encouraged the jury to apply their own standards:

> Merely because you are required to consider something that is alleged to be mitigating *does not mean that it is mitigating*, that is number one. And number two, it is exclusively within your province, meaning your control and your discretion, how important those factors are. Okay?
>
> *Notwithstanding what anybody may tell you, it is your call*.

CR-ECF No.[847:9509] (emphasis added). The prosecutor compared the mitigation presentations to seeing "how much mud can be thrown against a wall and how much of it sticks." CR-ECF No.[847:9510]. He said Sanchez's lawyers "want you to adopt" his dubious mitigation "hook, line, and sinker," but urged jurors: "[D]on't fall for it." CR-ECF No.[847:9515].

> There may be a lot [of mitigators]. Each one of them . . . *has nothing to do with* excusing a conscious and deliberate choice to kill an entire family, four people, and almost kill other people in the community.

CR-ECF No.[847:9519].

337

The Government used the "second-step" instruction to argue that the mitigating factors proffered by the defense were not actually mitigating factors at all and were irrelevant to the jury's sentencing determination:

The grandmother dies. That is tragic.

Is there anybody on this jury panel that hasn't had a grandparent die? Everyone on this earth has a grandparent that dies at some point in time. It is a fact of life, *it is not a mitigator. It has nothing to do with whether or not Daniel Troya should receive the maximum punishment. It is merely a distraction.*

CR-ECF No.[847:9514] (emphasis added).

I don't care what your background is, I don't care if you have a low I.Q. or alcoholic father, or you slapped your mom when you were growing up or you had a learning disability or you saw a friend shot in seventh grade, or grandma died or next door neighbor committed suicide, or your uncle was a bad influence one summer.

*That has nothing to do with* your choice later on in life on October 13th, 2006 in the middle of nowhere in St. Lucie County to choose to wipe out an entire family and to execute in cold blood two little kids.

CR-ECF No.[847:9521] (emphasis added).

The defense will say there are many mitigators. *Those mitigators, I submit to you*, despite the attempt to [clothe] them in a different title, *are nothing more than a different translation of it's not my fault.*

To excuse a conscious choice exercised to take innocent lives, you should not fall for it, ladies and gentlemen.

CR-ECF No.[847:9516-17] (emphasis added).

The Government's argument was particularly egregious because, unbeknownst to the jury, the Government had previously been given an opportunity to object to any of the proffered mitigating factors it believed did not constitute valid mitigators, and the Court accordingly made legal findings.[234] Thus, the only mitigating factors that were actually presented to the jury were

---

[234] Counsel's prejudicial failure to object to the prosecutor's improper argument is set forth *infra*, at Claim VIII(I), as another instance of counsel's ineffectiveness.

338

those that had been argued by the parties and had already been deemed by the Court to meet the legal threshold of being constitutionally relevant mitigating factors. *See* CR-ECF No.[846:9408-58].

There is a reasonable probability that the jury instructions and subsequent argument affected the outcome of the jury's deliberations regarding the mitigating factors. Jurors may be improperly diverted from considering relevant mitigation not only by a judge's instructions, "but also as a result of prosecutorial argument." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 n.21 (2007). Accordingly, "[a] prosecutor errs by directing the jury to ignore a proposed mitigating factor." *United States v. Rodriguez*, 581 F.3d 775, 800-01 (8th Cir. 2009) (citations omitted). *See also DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002) (prosecution's comments "were designed to keep the jury from properly considering and weighing the mitigating evidence offered by the defendant"). In this case, the prosecution's argument was clear: under the law as it was given to them, the jury could disregard every piece of evidence it heard about Sanchez's background and upbringing as irrelevant to whether it mitigated Sanchez's moral culpability for the capital crime of which he had been found guilty.[235]

Prejudice is demonstrated by the verdict form which required the jury to indicate which mitigating factors were found, and by how many jurors. The verdict form shows that jurors did not find mitigating factors that were uncontested or that were clearly established by a preponderance of the evidence. For example, no jurors found mitigator number 44 which stated that "Ricardo Sanchez was 22 years old at the time of the offense." CR-ECF No.[860:16]. This

---

[235] Had any juror voiced such an opinion in *voir dire*–i.e., that he or she could not fairly consider evidence of Sanchez's background and upbringing as relevant mitigation of the crime of which he was accused–there is no question that this juror would have been validly struck for cause. Such a juror would have been "mitigation-impaired" under *Morgan v. Illinois*, 504 U.S. 719, 739 (1992), and therefore excludable for being unable to impartially consider relevant mitigation evidence.

factor was not only uncontested, it was proven by the birthdate on the certified copy of a misdemeanor battery conviction the Government admitted into evidence at the penalty phase, Gov't Exh. 1204, CR-ECF No.[849:4], and education records admitted into evidence by defense counsel, Def. Trial Ex. 32, CR-ECF No.[849:12]. The jurors are presumed to have followed the Court's instructions regarding "step two," *Penry*, 532 U.S. at 799, and the only explanation for the zero on the verdict form is that—with respect to the "step two" instruction—the jurors accepted the prosecutor's improper argument and rejected that evidence as mitigating.

The Supreme Court, however, has repeatedly held that youth is a constitutionally mitigating circumstance. *Johnson v. Texas*, 509 U.S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury…."); *Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982) (age is a constitutionally relevant mitigating factor); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (capital statutory scheme that precludes effective consideration of defendant's age is unconstitutional; evidence of defendant's age is a constitutionally relevant mitigating circumstance which can serve "as a basis for a sentence less than death"). The jury was permitted to decide that Sanchez's age had little mitigating weight but it was *not* free to reject the mitigator completely and decide that it had no constitutionally mitigating value.

Similarly, jurors wholly rejected three other uncontested mitigators: number 9, that Sanchez was baptized and confirmed at the age of 17; number 30, that Sanchez can only read an on an elementary grade level; and number 31, that Sanchez can only do math on an elementary grade level. CR-ECF No.[860:13, 15]. In addition to being uncontested, these mitigators were also proven by the introduction into evidence of Sanchez's confirmation certificate, Def. Sent. Exh. 42, CR-ECF No.[849:13], and school records, Def. Sent. Exh. 32, CR-ECF No.[849:12].

340

The fact that a defendant has difficulty reading and writing is constitutionally recognized as mitigating, *Porter v. McCollum*, 558 U.S. 30, 41 (2009), and cannot be reduced to the status of "irrelevant" or to "inconsequential proportions." *Id.* at 42 (discussing the relevance of a defendant's life experiences and mental state to a sentence less than death). A defendant's religious activities is also a relevant mitigating factor. *See Armstrong v. Dugger*, 833 F.2d 1430, 1434 (11th Cir. 1987). Here, the "step two" instruction−that jurors were required to, and could, determine whether a fact constitutes mitigation−was the only way that no jurors could find these mitigating factors. The instruction diminished constitutionally cognizable mitigation to the status of irrelevance and, therefore, is unconstitutional. *See Porter*, *supra*; *Eddings*, *supra*; *Lockett*, *supra.*

In addition, under the "step two" instruction, other non-statutory mitigating factors were rejected by all jurors and removed from the weighing calculus: number 21, that Sanchez was exposed to criminal activity by family members as a child; number 22, that Sanchez was exposed to his brother's violent seizures as a child; number 34, that Sanchez looked out for his older brother; number 40, that Sanchez was a loving companion to the son of Rachel Ramos; number 41, that Sanchez adapted well in a prison environment while awaiting trial; and, number 42, that Sanchez was well behaved and respectful during the trial. CR-ECF No.[860:14-16].

In an ultimate showing of arbitrariness, the "step two" instruction and verdict form even impaired jurors' consideration of a *statutory* mitigating factor. The verdict form separated statutory aggravators from non-statutory aggravators but failed to do the same for mitigating factors. Accordingly, jurors improperly treated the (a)(4) statutory mitigator (listed as number 1) the same as non-statutory mitigators. Two jurors rejected the uncontested fact that Danny Varela was an equally culpable co-defendant but was not charged with the murders and was not subject

341

to the death penalty. CR-ECF No.[860:12]. Again, jurors could only ignore as irrelevant the (a)(4) statutory mitigating factor because they received the "step two" instruction. The implication of this pattern on the verdict form is that even for factors which were not contested by the Government, it is quite likely that the jurors who rejected these factors did so not because the defense failed to establish the fact by a preponderance of the evidence, but rather, because the jurors simply deemed the fact to be irrelevant for purposes of mitigation.

The verdict form demonstrates that evidence regarding Sanchez's background and upbringing—that is, the kind of evidence that has been legally recognized to constitute valid, relevant mitigation which a jury is required to consider in its sentencing deliberations—was rejected on the basis of incorrect constitutionally flawed jury instructions and prosecutorial argument. There is a reasonable probability that the three-step process, as required by the jury instructions and the emphasized by the prosecutor's closing argument resulted in one or more jurors refusing to consider constitutionally relevant mitigating evidence. Even with the jurors' outright exclusion of some non-statutory mitigating factors from their consideration, and exercising influence on others to do the same or at least to significantly discount weight assigned to those factors, the sentencing decision was not a foregone conclusion. Penalty-phase deliberations lasted four days.[236] Had counsel objected to the "step two" instruction the trial court would have been presented with Supreme Court authority indicating the clear error and, in compliance with such authority, would not have included that instruction in the jury charge. In

---

[236] The jury began deliberation on March 26 at 11:43 A.M. CR-ECF No.[848:9762]. They deliberated that afternoon, and all day March 27 and March 30. *See* CR-ECF No.[855:9776], No.[856:9801]. It was 4:55 P.M. on the following day, March 31, when the Court finished receiving the verdicts. CR-ECF No.[857:9846].

other words, had counsel known the law and acted to protect Sanchez's constitutional rights, he would not have been sentenced by a mitigation-impaired jury.

In *Wiggins v. Smith*, 539 U.S. 510, 537 (2003), the Supreme Court remarked that confidence in the outcome of a capital sentencing proceeding is undermined where there is "a reasonable probability that at least one juror would have struck a different balance." The Court has stressed that "the adjective [reasonable] is important" and has equated it with "a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). As explained in *Strickland* itself: "reasonable probability" of a different result is less than a preponderance of the evidence. *Strickland*, 466 U.S. at 694. It is present when an evaluation of all of the evidence that should have been before the jury—but was not—is "sufficient to undermine confidence in the outcome." *Id.* Here, the jury's sentencing verdict is not worthy of confidence. Had jurors deliberated without the impermissible "step two" instruction−meaning, they could not determine a mitigating factor was not, in fact, mitigating and therefore even a minimal amount of weight would have been introduced into the weighing calculus−there is a reasonable probability that at least one juror would have struck a different balance.

Accordingly, Sanchez was denied the effective assistance of counsel at trial and on direct appeal to protect against, preserve, and pursue these instructional errors. Counsel should have discovered and brought to the court's attention this meritorious argument based on directly controlling precedent. *United States v. Culverhouse*, 507 F.3d 888, 897-98 (5th Cir. 2007) (quotation and citation omitted). The reasons previously set forth that establish a deprivation of the right to the effective assistance of trial and appellate counsel, *see* Claim XII(A)(3)-(5), apply equally to the failure to ensure that Sanchez was sentenced by a jury that was not mitigation-

343

impaired. Because the adversarial process did not work adequately in this case, Sanchez's

convictions and sentences on Counts 7 through 10 should therefore be vacated.

> **D.   Instructional error failed to require proof beyond a reasonable doubt to impose enhanced sentences, including the death penalty, and Sanchez's trial counsel were ineffective for not raising this meritorious issue.**[237]

In violation of the Fifth, Sixth and Eighth Amendments, jurors were instructed they could

impose a death sentence without finding that the aggravating circumstances outweighed the

mitigating circumstances beyond a reasonable doubt. Because the weighing of such

circumstances is an element that must be found before a death sentence is imposed it has to be

proved to the jury beyond a reasonable doubt. *Hurst v. Florida*, 136 U.S. 616, 621-22 (2016);

*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("any fact that increases the penalty for a

crime beyond the prescribed statutory maximum" qualifies as an element that "must be

submitted to a jury, and proved beyond a reasonable doubt.").

The Sixth Amendment in conjunction with the Due Process clause "requires that each

element of a crime be proved beyond a reasonable doubt." *Alleyne*, 133 S. Ct. at 2156 (citations

omitted). The *Apprendi* Court discussed the origin of the burden of proof required by the Sixth

Amendment, as applied to elements of conviction and elements of enhanced sentences.

*Apprendi*, 530 U.S. at 494 (sentencing factors that increase punishment are elements subject to

Sixth Amendment jury trial rights).

> Equally well founded is the companion right to have the jury verdict based on proof beyond a reasonable doubt. "The 'demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its

---

[237] This issue was presented as Claim VII(D) in the original § 2255 Motion. It has been separated from Claim VII, reorganized, supplemented with more facts, and a brief discussion of law has been included to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel unreasonably and prejudicially failed to object to the charges contained in Counts 7-10 and to the jury instructions and verdicts on those counts. CV-ECF No.[16-1:98-101 of 195].

crystallization into the formula "beyond a reasonable doubt" seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt.' C. McCormick, Evidence § 321, pp. 681-682 (1954); *see also* 9 J. Wigmore, Evidence § 2497 (3d ed.1940)." *Winship*, 397 U.S., at 361, 90 S.Ct. 1068. We went on to explain that the reliance on the "reasonable doubt" standard among common-law jurisdictions "'reflect[s] a profound judgment about the way in which law should be enforced and justice administered.'" *Id.*, at 361-362, 90 S.Ct. 1068 (quoting *Duncan*, 391 U.S., at 155, 88 S.Ct. 1444).

*Apprendi*, 530 U.S. at 478.

Where the Sixth Amendment necessitates that facts supporting a death sentence be proven to a jury, those facts must be established beyond a reasonable doubt. This requirement attaches to any factual finding necessitated by the Sixth Amendment. The Supreme Court has observed:

It is self-evident, we think, that the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. It would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine (as *Winship* requires) whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.

*Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993).

The *Apprendi* line of cases clearly incorporate this requirement. "The historic link between crime and punishment" demands the conclusion "that any fact that increase[s] the prescribed statutory maximum sentence must be an 'element' of the offense to be found by the jury." *Alleyne*, 133 S. Ct. at 2157. As the *Apprendi* Court noted time and time again that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, *and proved beyond a reasonable doubt.*" *Apprendi*, 530 U.S. at 490 (emphasis added); *United States v. Booker*, 543 U.S. 220, 244 (2005) ("Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by

345

the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."); *Cunningham v. California*, 549 U.S. 270, 292 (2007) ("Factfinding to elevate a sentence …, [this Court's] decisions make plain, falls within the province of the jury employing a beyond-a-reasonable-doubt standard….").

In *Hurst v. Florida*, the Supreme Court rejected the State's claim that the weighing process in Florida's death penalty statute did not fall within the ambit of *Ring* and *Apprendi* because the defendant was eligible for a death sentence once the jury implicitly found "at least one aggravating circumstance beyond a reasonable doubt" as a precondition to recommending the penalty. 136 S. Ct. at 621. This argument was rejected because determinations regarding the sufficiency of aggravating circumstances and the relative weight of aggravating and mitigating circumstances were also factual findings necessary to a defendant's eligibility for the death penalty. *Id*. at 622. A jury "finding" that aggravators outweigh mitigators only meets constitutional standards if it is made unanimously, based on proof beyond a reasonable doubt. *See Apprendi*, 530 U.S. at 498 (Scalia, J. concurring) (charges against the accused, and the corresponding maximum exposure he faces, must be determined "*beyond a reasonable doubt by the unanimous vote of 12 of his fellow citizens*"). The decision in *Hurst* makes clear that the federal death penalty statute, which allows a jury to authorize a death sentence by finding that aggravating factors "sufficiently outweigh" mitigating factors "to justify a sentence of death," 18 U.S.C. § 3593(e)(3), violates the central constitutional tenets of *Apprendi*, *Ring* and *Hurst* which require such findings to be established upon proof beyond a reasonable.

As occurred in this case, a jury determination of whether aggravating factors outweigh mitigating factors—without requiring the standard of proof guaranteed by the Fifth and Sixth Amendments—is insufficient to meet constitutional muster. In addition, without this

346

requirement, the federal death penalty statute fails to ensure that the death penalty is reserved for the worst offenses committed by the worst offenders. The Eighth Amendment's requirement of heightened reliability, *Caldwell v. Mississippi*, 472 U.S. 320 (1985), is turned on its head when the jury determination that aggravating circumstances outweigh mitigating circumstances may be made on a standard less than the beyond a reasonable doubt.

Although trial counsel failed to object to the lower, unconstitutional standard contained in the Federal Death Penalty Act, counsel on direct appeal did raise this issue. The court of appeals, however, summarily denied the claim. This claim is properly before the Court because the Supreme Court in *Hurst*, *supra*, expressly applied the beyond-a-reasonable-doubt standard to the weighing element of a death penalty statute. Where the controlling law changes, a prior adjudication may not be dispositive. *Davis v. United States*, 417 U.S. 333, 342 (1974) (where movant unsuccessfully raised issue on direct appeal, and where controlling law changed soon thereafter, the appeals court "erred in holding that the 'law of the case,' as determined in the earlier appeal from the … conviction, precluded him from securing relief under § 2255 on the basis of an intervening change in law"). *See also Sanders v. United States*, 373 U.S. 1, 17 (1963); *Underwood v. United States*, 15 F.3d 16, 18 (2d Cir. 1993).[238]

---

[238] Sanchez is also entitled to the benefit of this change in law because the Supreme Court has repeatedly found that new rules implicating the right to have facts determined beyond a reasonable doubt are substantive and therefore retroactive. *See, e.g., Hankerson v. North Carolina*, 432 U.S. 233, 233 (1977); *V. v. City of New York*, 407 U.S. 203, 203-04 (1972). Similarly, rules that relate to the constitutional requirements for proportionate punishment are substantive and retroactive. *Montgomery v. Louisiana*, 136 S. Ct. 718, 732-33 (2016) ("Protection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment and goes far beyond the manner of determining a defendant's sentence.").

However, even if the *Hurst* rule should be considered procedural, as opposed to substantive, its "beyond a reasonable doubt" component renders it a watershed procedural rule that courts must apply retroactively. Under *Hurst*, every finding necessary for the imposition of a death sentence now must be found solely by the jury beyond a reasonable doubt. "The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure[,]" and its use is

347

Moreover, trial counsel has a duty to ensure that a capital sentencing jury is instructed correctly concerning its deliberations in the penalty phase proceedings, especially with respect to its consideration of the proffered mitigating factors. This duty necessarily includes knowing relevant law and objecting to any aspects of the jury instructions or the verdict forms that are inaccurate, confusing or legally incorrect. *See* ABA Guideline 10.11(K), 31 Hofstra Law. Rev 913, 1058 (2003) ("Trial counsel should request jury instructions and verdict forms that ensure that jurors will be able to consider and give effect to all relevant mitigating evidence. Trial counsel should object to instructions or verdict forms that are constitutionally flawed, or are inaccurate or confusing and should offer alternative instructions.").[239]

At the time of trial, the case law above (except *Hurst*) was readily available and established the basis of the objections that counsel should have made. Counsel should have objected and brought these meritorious arguments to the trial court's attention. *Culverhouse*, 507 F.3d at 897-98 (quotation and citation omitted). Counsel's failure to object to these instructions

---

"indispensable" as a matter of due process and "to command the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 363-64 (1970). Because this proof-beyond-a-reasonable-doubt standard is central to an accurate determination that death is a legally appropriate punishment, id., the *Hurst* rule is a watershed procedural rule warranting retroactive application. *Teague v. Lane*, 489 U.S. 288, 313 (1989); *V.*, 407 U.S. at 204-205; *Winship*, 397 U.S. at 363-64.

Regardless of whether it is best described as substantive or procedural, the operation of the *Hurst* rule "places primary, private individual conduct beyond the power of the criminal law-making authority to proscribe or requires the observance of fairness safeguards that are implicit in the concept of ordered liberty." Thus, it must be applied retroactively. *Montgomery*, 136 S. Ct. at 729.

[239] *See also* Commentary to ABA Guideline 10.11(K), 31 Hofstra Law Rev. at 1068-69: "It is essential that counsel object to evidentiary rulings, instructions, or verdict forms that improperly circumscribe the scope of the mitigating evidence that can be presented or the ability of the jury to consider and give effect to such evidence. ... [C]ounsel should request instructions that will ensure that the jury understands, considers, and gives effect to all relevant mitigating evidence. ... If the jury instructions are insufficient to achieve the purposes described [above] or are otherwise confusing or misleading, counsel must object, even if the instructions are the standard ones given in the jurisdiction."

was not strategic. CV-ECV No.[52-1:68 of 112, ¶7]. Counsel intended to litigate and preserve

meritorious issues, including issues regarding jury instructions. *Id.* There is a reasonable

probability that had the jurors been instructed that aggravators had to—beyond a reasonable

doubt—outweigh mitigators at least one juror would not have made this finding. A significant

number of jurors found numerous mitigating facts. The sentencing decision was not a foregone

conclusion. Deliberations lasted over four days. Had jurors deliberated under a reasonable doubt

standard—meaning, they could not impose a death sentence upon simply finding that

aggravators "sufficiently" outweighed mitigators—there is a reasonable probability that at least

one juror would have struck a different balance.

Accordingly, Sanchez was denied the effective assistance of counsel at trial to protect

against and preserve this instructional error for subsequent review. The reasons previously set

forth that establish a deprivation of the right to the effective assistance of trial counsel, *see* Claim

XII(A)(3)-(5), apply equally to the failure to ensure that Sanchez was sentenced by a jury that

determined—beyond a reasonable doubt—that aggravating factors outweighed mitigating

factors. Sanchez's sentences on Counts 7 through 10 should therefore be vacated.

349

**XIII.   Sanchez's indictment contained duplicitous counts, and counsel were ineffective for failing to raise this issue in violation of the Fifth and Sixth Amendments.**[240]

Sanchez's convictions and sentences based on Counts 7 through 10 are so rife with duplicity that there is no possible way to determine the predicates to the crimes that the jury found and whether all necessary findings were unanimous.

When drafting a federal indictment for more than one offense, the Government is required to charge each criminal offense in a separate count. *See* Federal Rules of Criminal Procedure, Rule 8(a). The aim is to avoid duplicity, which occurs where two or more distinct and separate offenses are joined in a single count. *United States v. Schlei*, 122 F.3d 944, 977 (11th Cir. 1997); *United States v. Burton*, 871 F.2d 1566, 1573 (11th Cir. 1989) ("A duplicitous indictment charges two or more separate and distinct crimes in a single count."). The Eleventh Circuit has recognized that duplicitous counts are prohibited because they pose at least three distinct dangers:

> A duplicitous count poses three dangers: "(1) A jury may convict a defendant without unanimously agreeing on the same offense; (2) A defendant may be prejudiced in a subsequent double jeopardy defense; and (3) A court may have difficulty determining the admissibility of evidence."

*Schlei*, 122 F.3d at 977 (quoting *United States v. Wiles*, 102 F.3d 1043, 1061(10th Cir. 1996).

Other Courts of Appeal have added to the list of dangers duplicitous counts pose. These include the dangers of failing to provide adequate notice to the defendant,[241] and failing to provide a

---

[240] This issue was presented as Claim VII(D) in the original § 2255 Motion. It has been separated from original Claim VII, reorganized, supplemented with more facts, and a brief discussion of law has been included to clarify entitlement to relief. Any and all changes relate to the common core of facts supporting the original claim that counsel unreasonably and prejudicially failed to object to the charges contained in Counts 7-10 and to the jury instructions and verdicts on those counts. CV-ECF No.[16-1:98-101 of 195]. In particular, the original claim asserted the charges in the indictment were duplicitous, invited juror confusion and violated Due Process. *Id.* at 101 of 195.

[241] *See United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006); *United States v. Olmeda,* 461 F.3d 271, 281 (2nd Cir. 2006); *United States v. King*, 200 F.3d 1207, 1212 (9th Cir. 1999); *United*

basis for appropriate sentencing.[242] Courts have also recognized duplicitous counts may result in limited review on appeal.[243] Finally, and perhaps most importantly, courts have cautioned duplicitous counts may result in a general guilty verdict that might conceal a finding of guilty as to one of the crimes charged in a duplicitous count and not guilty as to other counts.[244]

In Sanchez's case however, the Government filed a superseding indictment that charged multiple different offenses in the same count. CR-ECF No.[305:8-11] (Counts 7-10). Rather than organize the charges in the indictment based on the individual criminal offenses, the Government chose to list a single count for each of the four victims and then lumped together all the offenses committed against each victim. The resulting confusion deprived Sanchez of Due Process and his Sixth Amendment jury trial rights. Neither trial nor appellate counsel raised this issue of duplicity; the failure to do so constitutes ineffective assistance of counsel and a separate violation of Sanchez's Fifth and Sixth Amendment rights.

---

States v. Sharpe, 193 F.3d 852, 870 (5th Cir. 1999); *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998); *United States v. Trammel*, 133 F.3d 1343, 1354 (10th Cir. 1998); *United States v. Blandford*, 33 F.3d 685, 699 n.17 (6th Cir. 1994); *United States v. Huguenin*, 950 F.2d 23, 26 (1st Cir. 1991).

[242] *United States v. Starks*, 472 F.3d 466, 470 (7th Cir. 2006); *Olmeda*, 461 F.3d at 281; *Haddy*, 134 F.3d at 548; *United States v. Bruce*, 89 F.3d 886, 890 D.C. Cir. 1996); *Blandford*, 33 F.3d at 699 n.17; *United States v. Correa-Ventura*, 6 F.3d 1070, 1081 (5th Cir. 1993).

[243] *Davis*, 471 F.3d at 790; *Sharpe*, 193 F.3d at 870; *Haddy*, 134 F.3d at 548; *Trammel*, 133 F.3d at 1354; *Blandford*, 33 F.3d at 699 n.17.

[244] *See Starks*, 472 F.3d at 470; *Olmeda*, 461 F.3d at 281; *Davis*, 306 F.3d at 415; *Haddy*, 134 F.3d at 548; *Correa-Ventura*, 6 F.3d at 1081; *United States v. Stanley*, 597 F.2d 866, 871 (4th Cir. 1979); *Gerberding v. United States*, 471 F.2d 55, 59 (8th Cir. 1973).

## A.  The duplicity problems.

Relevant to this claim, Count 1 of the indictment charged Sanchez with a crack cocaine drug conspiracy and a powder cocaine conspiracy for a time period that included the killings. Count 6 charged the crime of carjacking. Counts 7, 8, 9, and 10 of the Third Superseding Indictment are duplicitous as each alleged that Sanchez had committed multiple crimes, including murder:

> On or about October 13, 2006, in St. Lucie County, in the Southern District of Florida, the defendants,
>
> DANIEL TROYA
> a/k/a/ "Homer," and
> RICARDO SANCHEZ, JR.
> a/k/a "Rick,"
>
> did knowingly carry and use a firearm during, and in relation to, a crime of violence, and a drug trafficking crime, for which they may be prosecuted in a court of the United States, that is, armed carjacking, in violation of Title 18, United States Code, Section 2119, as set forth in Count Six of this Third Superseding Indictment, and conspiracy to possess with intent to distribute one or more controlled substances, in violation of Title 21, United States Code, Sections 841(a)(l) and 846, as set forth in Count One of this Third Superseding Indictment, respectively, which allegations are re-alleged and incorporated by reference herein, in violation of Title 18, United States Code, Section 924(c)(l), and in the course of this violation caused the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Luis Damian Escobedo by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation, and in the perpetration of, and attempt to perpetrate, a robbery.
>
> In violation of Title 18, United States Code, Sections 924(j)(1) and 2.

CR-ECF No.[305:8]. Counts 8 through 10 are identical except for the name of the victim. *Id*. at 9-11.

Put simply, Counts 7 through 10 each charged Sanchez with carrying and using a firearm "in relation to a crime of violence and a drug trafficking crime," and referred to two separate offenses—drug conspiracy (Count 1) and carjacking (Count 6)—as possible predicates under §

352

924(c). This is problematic because "a § 924(c) crime based on any one of these separate companion convictions would likewise be a separate offense" that should be charged in separate counts. *In re Gomez*, 830 F.3d 1225, 1227 (11th Cir. 2016). Since there was more than one predicate for the § 924(c) offense there is no way to determine if there was a unanimous finding by the jury that Sanchez was guilty of carrying a firearm at some point in the drug conspiracy but not at the time of the carjacking or in relation to the carjacking, or both. *Id.* The general verdict form provides no insight whatsoever as to the jury's findings. CR-ECF No.[796:3-5]; No.[860]. In addition, there is no way to determine the basis for an appropriate sentence, therefore, Sanchez's sentence could have been increased without the same unanimity in findings that is constitutionally required. *Id.* at 1227-28 (citing *Alleyne v. United States*, 133 S. Ct. 2151, 2155, 2158 (2013)).

Also, Counts 7 through 10 each charged Sanchez with murder as defined under § 1111 which refers to two separate offenses: felony murder and premeditated murder. The harm in this duplicity was compounded by the fact that the trial court did not instruct the jury it was required to unanimously find felony murder or premeditated murder. *See* CR-ECF No.[771:7537-44]. Again, the general verdict form provides no insight as to the jury's findings.

The verdict form on Counts 7 through 10 stated:

> As to the charge that the Defendant Ricardo Sanchez, Jr., knowingly used or carried a firearm during and in relation to a crime of violence and/or a drug trafficking crime, and in the course thereof caused the death of [name of victim], which killing is a murder defined by law, as charged in Count [7-10] of the indictment, guilty.

CR-ECF No.[774:7698-99]. The general verdicts eliminate any opportunity to ascertain whether Sanchez was found unanimously guilty of § 924(c) based on either the crime of violence or the drug trafficking crime and whether he was found unanimously guilty of felony murder (based on the invalid predicate of carjacking) or premeditated murder.

353

In addition to charging murder under 18 U.S.C. § 924(j)(1), each count also charged Sanchez with manslaughter under § 924(j)(2). While manslaughter is a lesser included offense of premeditated murder, it is a separate and distinct offense from felony murder and is not a lesser included offense.[245] *United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003); *United States v. Jose*, 425 F.3d 1237 (9th Cir. 2005); *United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000). The manslaughter jury instruction should have been read as a separate and distinct offense, as well as a lesser offense of pre-meditated murder. *See* Fed. R. Crim. P. 31(c)(1).[246] The failure to do so was plain error. However, this error was a result of the obfuscation caused by the duplicitous indictment as neither the parties nor the Court seemed to realize that manslaughter was even in play within these counts. This is another example of how the duplicity failed to give adequate notice of exactly what was charged within Counts 7 through 10 and exactly what charges Sanchez needed to defend against.

Finally, Counts 7 through 10 each included "a robbery" without reference to the criminal code, elements or any other basis. Although each count alleged Sanchez "did unlawfully kill" the victim "in the perpetration of, and attempt to perpetrate, a robbery," in accordance with felony murder under § 1111, the trial court did not instruct the jury on robbery or its elements. *See* CR-ECF No.[771:7521-76]. As a result of confusion caused by the duplicity in the counts, the jurors were erroneously instructed that they could find felony murder based on the carjacking charge in Count 6. CR-ECF No.[771:7542-43]. The jury therefore did not reach a verdict on robbery or

---

[245] The trial court did not instruct the jury on manslaughter as a separate and distinct offense or as a lesser offense of premeditated murder.
[246] Rule 31(c)(1) states that a defendant may be found guilty of any offense necessarily included in the offense charged.

any other enumerated offense upon which felony murder properly could be based. CR-ECF No.[796]. *See also* Claim XII (A), *supra*.

### B.   The ineffective assistance of trial and appellate counsel.

Trial counsel were or reasonably should have been aware that such duplicitous charges invited juror confusion and could violate Sanchez's rights to due process and to trial by jury, because a guilty verdict on such a duplicitous count invited uncertainty as to whether the jury unanimously agreed on the particular elements and/or crimes upon which the verdict was based. Reasonably effective counsel representing a defendant in a federal capital trial in 2009 objected to legal error and took all steps appropriate to preserve, on all federal grounds, any given question for review. *See* 2003 ABA Guidelines, Guideline 10.8 and Commentary, 31 Hofstra Law Rev. at 1030 ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review." (quotation marks and citation omitted)). Counsel's assistance is deficient when they do not discover and bring to the court's attention "[s]olid, meritorious arguments based on directly controlling precedent[.]" *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003) (finding trial and appellate counsel rendered deficient assistance where an indictment inadequately charged a crime with a greater penalty but the defendant received that higher sentence).

In particular, federal defense counsel were specifically required to raise before trial any objections to duplicitous charges contained in the indictment. Fed. R. Crim. P. 12(b)(3)(B)(i). Sanchez's counsel did not meet this standard of practice because they failed to recognize the duplicitous charges and the resulting consequences and argue that Sanchez was not convicted upon unanimous jury findings and, at a minimum, could not receive enhanced sentences for

355

Counts 7 through 10. Trial counsel intended to preserve and litigate all meritorious grounds and had no tactical or strategic reason for failing to move to dismiss or strike the indictment, to object to the duplicitous counts, to object to the jury instructions and the verdict sheets, or to object to the verdicts on Counts 7 through 10. CV-ECF No.[52-1:68 of 112, ¶7].

Sanchez was prejudiced by counsel's failure to object because the duplicitous counts: (1) caused confusion amongst the parties and the Court which resulted in unconstitutional jury instructions; (2) invited juror confusion that (a) resulted in non-unanimous findings and (b) an improper basis for sentencing; and (3) resulted in convictions for which the grounds are unable to be determined for double jeopardy purposes. Here, the general verdict does not reveal whether the jurors unanimously found Sanchez guilty of using a firearm during a crack cocaine drug conspiracy, a powder cocaine conspiracy or a carjacking and whether the jurors unanimously found Sanchez guilty of felony murder using an invalid felony or premeditated murder.

Where a count charges multiple violations, the jury's verdict is ambiguous as to whether it unanimously agreed on the basis for conviction, and one of the bases is invalid, the conviction must be vacated. *Schlei*, 122 F.3d at 979-80. "Where a jury verdict is ambiguous, a sentence imposed for a conviction on a count charging violations of multiple statutes or provisions of statutes may not exceed the lowest of the potentially applicable maximums." *Conley*, 349 F.3d at 840. In this case, the lowest maximum sentence is not less than 5 to not less than 10 years under § 924(c)(1)(A)(i)-(iii). But for trial counsel's failure to recognize and argue this issue, Sanchez would have−at the least−received a lesser sentence. In addition, because the error was obvious, it constituted plain error and Sanchez would have prevailed on direct appeal but for appellate counsel's failure to raise the issue.

For these reasons, the convictions on Counts 7, 8, 9 and 10 should be vacated.

356

## CONCLUSION

Movant Sanchez moves that this Court permit him to file this motion, memorandum of law in support of his motion and an appendix with documents supporting his motion; permit the Government to file an Answer; allow Movant a reasonable amount of time to file a Reply and to file such legal memoranda and briefs as may be necessary to respond or reply to any defenses raised and/or motions filed by the Government; order such discovery as Sanchez may request by separate motion; conduct an evidentiary hearing after the completion of discovery as Sanchez will request by separate motion; permit further amendment to and briefing of the motion if the fact development procedures so warrant and allow reasonable time for briefing the merits of grounds asserted in the motion and any amendments after discovery is complete and an evidentiary hearing is conducted; vacate Sanchez's convictions and death sentences and order a new trial of the guilt/innocence and penalty phases and grant such additional relief as may be necessary and to which Movant may be entitled.

Respectfully submitted,

s/Stephen M. Kissinger
Stephen M. Kissinger, WY Bar No.5-2342
Asst. Federal Community Defender
Stephen_Kissinger@fd.org
s/Dana C. Hansen Chavis
Dana C. Hansen Chavis, TN Bar No.019098
Asst. Federal Community Defender
Dana_Hansen@fd.org
Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile: (865) 637-7999

Attorneys for Movant Ricardo Sanchez, Jr.

Dated: January 24, 2017

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically by the Court's CM/ECF service on January 24, 2018, on all counsel or parties of record on the Service List below.

s/Stephen M. Kissinger
Stephen M. Kissinger

## SERVICE LIST

Stephen Carlton, Assistant United States Attorney
Stephen.Carlton@usdoj.gov
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
Attorneys for Respondent United States of America

Stephanie D. Evans, Assistant United States Attorney
Stephanie.D.Evans@usdoj.gov
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
Attorneys for Respondent United States of America