**Declaration of James Gannalo**

**Pursuant to 28 U.S.C. §1746**

I, James Gannalo, declare as follows:

1.      I am the president of Stria Consulting Group, Inc. My area of expertise is in firearms, firearms operability and identification, and shooting scene investigation.

2.      My curriculum vita is attached to this declaration and details my training and employment history. In summary, I began my firearms training with the New York Police Department Ballistics Squad in 1989. In that capacity, I worked on a number of firearms related cases and assisted local, state and federal law enforcement agencies with investigations of firearms related incidents. Since my retirement in 1998, I have worked in a private capacity as a forensic investigator, instructor, and consultant in the field of forensic firearms identification. In addition, I am certified as an assessor of accredited laboratories by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board (ASCLD/LAB), which specializes in the accreditation of public and private crime laboratories, and have conducted a number of laboratory assessments in the United States and Canada for the Forensic Quality Services Corporation. I have over twenty-five years of training and experience working for law enforcement agencies and private clients, analyzing crime and accident scenes as it pertains to firearms identification and shooting incident reconstruction.

3.      I was contacted by the Federal Community Defender Office for the Eastern District of Pennsylvania and asked to examine the evidence in the case of *United States v.*

Initials: _____      Date: 5/3/16

Attachment H to Discovery Motion

*Ricardo Sanchez*. In connection with this case, I have reviewed the notes of testimony from the crime scene technicians and firearms and toolmark experts. I also have reviewed the trial exhibits and discovery that the government provided to trial counsel pertaining to firearms and toolmark identification, including crime scene photographs, autopsy reports, ballistics analysis, and other police paperwork. My opinions below are based solely on my analysis of all of the evidence and testimony reviewed thus far, drawing on my experience as a police and private forensics examiner. I reserve the right to amend any opinions or conclusions stated within this declaration should additional information be provided.

4.      In order to perform a comprehensive evaluation, and to reach reliable forensic conclusions about the firearms and toolmark evidence in this case, it is necessary to inspect the weapons, projectiles and cartridge casings at issue. It also is necessary as part of my evaluation review the correspondence, case files, photographic records, interim reports, and bench notes relating to the forensic evaluations conducted by law enforcement personnel in this case, as well as the laboratory accreditations, protocols, examiner proficiency results, and firearms identification manuals, including but not limited to the quality, training, and technical manuals, for the Indian River Crime Lab and the Palm Beach County Sherriff's Office from 2006 to present. I have not yet been provided access to all of the physical evidence and documentation listed in this paragraph.

5.      Firearms identification is part of the forensic science discipline of toolmark identification. An underlying premise of toolmark identification is that a tool, such as a firearm barrel, leaves a unique *and* reproducible mark on an object, such as a bullet. Firearms examiners compare toolmarks on ammunition components recovered from crime scenes with test toolmarks that they produce on other ammunition components by firing or otherwise using a particular

Initials: _____                                                    Date: __5|3|16__

firearm. Toolmarks are either "striated," meaning that they consist of patterns of scratches or striae and are produced by the twisted motion of tools against objects (e.g., marks made by firearm barrels on bullets), or "impression," meaning that they are produced by the impact of tools (e.g., firing pin impressions or breech face marks). Both types of toolmarks have class, subclass, and individual characteristics.

6. Class characteristics are intentional marks that all firearms of a given make and model will share. Subclass characteristics, which are created by the manufacturing of batch lots of tools, are matching microscopic characteristics that are distinguishable from toolmarks produced by other tools of the same type but are common to toolmarks produced by tools in the same batch. These subclass characteristics are shared by a smaller more restrictive group of firearms of the same make and model. Individual characteristics are considered to be unintentional and incidental microscopic characteristics unique to the toolmarks produced by an individual firearm or other tool. For example, the rifling impressions on bullets that are classified as class characteristics that reflect the number, width and direction of twist of the lands and grooves in the types of barrels that fired them. In contrast, individual characteristics are microscopic striations or lines within the rifling impressions that correspond to imperfections or irregularities on the tool surfaces of a particular firearm that are produced by the manufacturing process and/or subsequent use, wear, or damage.

7. If the same class characteristics are found on the evidence collected and test samples, a firearms and toolmark examiner uses a comparison microscope to determine whether that they share subclass and individual characteristics that are similar and unique. While wear and tear on some tools may cause the subclass characteristics to be completely replaced by

Initials: _____    Date: 5|3|16

Page 4 of 8

individual characteristics, in other tools, subclass and individual characteristics may exist alongside each other.

8.      In this case, Allison Quereau and Mark Chapman testified that they were able to identify toolmarks based on class and individual characteristics. Ms. Quereau testified, consistent with her February 20, 2008 report, that she examined casings and projectiles retrieved from the Mercer Avenue address and compared them to test firings from an AK-47 rifle retrieved from the Garden Court residence. She opined that eight of the eleven casings were fired from the rifle and one casing was cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle but she did not reach any further conclusions as to those casings. Ms. Quereau also testified that she examined casings and projectiles retrieved from Suwanee Drive and compared them to the test firings from the AK-47 rifle. She opined that eight out of the sixteen casings were fired from the rifle and six casings were cycled through the rifle. The remaining two casings had class characteristics consistent with having been fired by the rifle, but she did not reach any further conclusions as to those two casings. Ms. Quereau testified that she was "100 percent" sure of her identifications.

9.      Mr. Chapman also relied on class and individual characteristics to compare 9 mm and 40 caliber casings retrieved from the crime scene to live 9 mm and 40 caliber cartridges retrieved from the Garden Court residence. In his May 29, 2008 report, Mr. Chapman stated that six of the seven 40 caliber casings from the crime scene and one cartridge from Garden Court "were identified as having individual characteristics of an unknown origin but a common source typical of magazine lip marks or chamber marks." Mr. Chapman also stated in his report that three of the four 9 mm caliber casings from the crime scene and two cartridges out of a box of forty-one cartridges found at the Garden Court residence "were identified as having individual

Initials: _____                                                    Date: __5|3|16__

characteristics of an unknown origin but a common source typical of magazine lip marks or chamber marks." Mr. Chapman provided slightly more detail in his testimony, stating that, based on a comparison viewing of two evenly spaced scratches that ran the length of the cartridge casings, the casings came in contact with the same tool at some time. Although he could not identify the tool used, he opined that the marks were consistent with the lip of a magazine and that it was "practically impossible" that a different tool made the marks.

10.     In my opinion, some of the identifications made by Ms. Quereau and Mr. Chapman were reached through procedures that departed from accepted practices in the field. The discovery and testimony in this case do not indicate that Ms. Quereau or Mr. Chapman made any attempt to rule out the possibility of class or subclass characteristics. Drawing identification conclusions without considering class or subclass characteristics fails to comply with professional standards set forth by the Association of Firearm and Toolmark Examiners (AFTE) Theory of Identification, which states that examiners should exercise caution in distinguishing class or subclass characteristics from individual characteristics. There is little that documents or explains the processes and tests performed by Ms. Quereau and Mr. Chapman that form the basis for their opinions or the process of peer review and verification. The documents reviewed fail to provide any descriptions or diagrams of the resembling striations or any explanation of the standard of comparison used in making the identifications. The comparison exemplar photographs – for just two cartridge casings out of twenty-seven – attached to Ms. Quereau's case file are unreadable, and there are no comparison photographs for Mr. Chapman at all.

11.     Mr. Chapman's identifications are further called into question by the fact that no firearm or magazine was recovered in this case and, consequently, no exemplars or standards could be obtained. Therefore, Mr. Chapman's opinions were all reached without being able to

Initials: _____                                    Date: __5\3\16__

test the actual firearm or magazine used during the incident and without additional tests to determine shared class and/or subclass characteristics from similar firearms or magazines. According to his reports and testimony, Mr. Chapman could not determine if the toolmarks were made by a magazine or by a firearm chamber. Exemplars could have been examined to determine if the toolmarks were reproducible (a basic principal of firearms identification) and to determine if similar firearms or magazines made comparable marks. Although it might be the case that the spent cartridge casings and the unspent cartridge casings shared similar markings, in my opinion, it is not possible – and it was not possible in 2009 – to state within a reasonable degree of scientific certainty, let alone a "practical impossibility," that the casings came in contact with the "same" weapon based on the limited toolmarks alone.

12. Moreover, the discovery does not provide any information regarding the methodology Mr. Chapman used to reach his identifications. Magazines can be interchangeable between different makes and models of firearms. Mr. Chapman's report does not indicate that he made any attempt to determine the makes and models of firearms or magazines that the ammunition could have been worked through or fired. Therefore, he could not have used knowledge of how various types of firearms and magazines are manufactured to determine whether the marks were individual, class, or subclass characteristics. In my opinion, this leaves open the possibility that any markings assumed to be unique may in fact have been class or subclass characteristics.

13. To the extent that the unidentified tool was a magazine, the reliability of the magazine mark identification that Mr. Chapman made in the absence of the magazine is also called into question because of the limited information that magazines provide for evaluation. The edges of magazine lips are narrow and contain few characteristics to make striated markings.

Initials: _____  Date: _5\3\16_

Because magazine marks on cartridges have a limited quantity of striated markings for comparison, there is a greater likelihood of identification error. In my opinion, magazine mark identifications should not be made without directly examining the magazine lips under magnification, which Mr. Chapman could not do in this case. For that reason, Mr. Chapman's conclusion that spent 9 mm and 40 caliber cartridge casings from the crime scene and live 9 mm and 40 caliber rounds from the Garden Court address were run through the same unknown firearm in the same unknown magazine is patently unreliable and not consistent with accepted forensic standards in the field of firearm and toolmark identification currently and at the time of trial.

14.     The case records also do not indicate that either Ms. Quereau or Mr. Chapman took into account the differences in toolmarks that may result when a firearm fires different makes of ammunition. In order to account for these differences, the accepted practice of firearms and toolmarks examiners is to compare evidence toolmarks with test toolmarks made on the same brand of ammunition, whenever possible. In this case, Ms. Quereau's reports indicate that cartridge casings from the Suwanee shooting were Chinese-made, and the remaining cases are unidentified. Thus, in my opinion, there is no indication that Ms. Quereau adhered to acceptable practice by comparing evidence toolmarks with test toolmarks made on the same brand of ammunition whenever possible.

15.     In the May 2, 2007 Amended Report, Mr. Chapman indicates that the 40 caliber cartridge casings retrieved from the crime scene, where identifiable, were manufactured by several companies – Federal, Winchester, Remington, Companhia Brasileria de Cartuchos (CBC), Arms Corporation of the Philippines (ACP), and PMC. The report identifies the manufacturer of only one 9 mm cartridge casing and describes the 9 mm jackets as being made

Initials: _____     Date: _5_3_16_

Attachment H to Discovery Motion

Page **8** of **8**

of brass, copper, or nickel. The case records and testimony reviewed do not identify the manufacturer of the 40 caliber round, but the magazine from which it was retrieved contained rounds from seven different manufacturers. The 9 mm live rounds were manufactured by Winchester. The case records contain no explanation of why, despite the differences in the makes of the ammunition, Mr. Chapman concluded that the live rounds and the spent casings were cycled through the same magazine.

16.     Based on the foregoing, it is my expert opinion that the procedures used by Ms. Quereau and Mr. Chapman to reach the identifications in this case were unreliable and did not conform to established standards within the field. If I had been called to testify at a pretrial *Daubert* hearing or at trial, I would have testified to the same regarding the unreliability of the toolmark identifications in this case.

17.     In order to reach reliable forensic conclusions about the firearms and toolmark evidence in this case, I would need to inspect and review the items and records identified in paragraph 4, above.

**I declare under penalty of perjury and pursuant to 28 U.S.C. §1746 that the forgoing is true and correct.**

Signed on ___5/3/16___

Name _____

Initials: _____

Date: ___5/3/16___

Attachment H to Discovery Motion