UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 16-80693-CV-BLOOM
(Case No. 06-80171-Cr-Hurley/Vitunac(s)(s)(s))

RICARDO SANCHEZ, JR.
        Movant,

vs.

UNITED STATES OF AMERICA,
        Respondent.
_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO
SANCHEZ 'S AMENDED MOTION FOR DISCOVERY**

THE UNITED STATES OF AMERICA, by and through its undersigned counsel, hereby

files its response in opposition to Ricardo Sanchez, Jr.'s ("Sanchez"), Amended Motion for

Discovery (CV-DE 83).   As demonstrated below, discovery should not be ordered in this case.

### I.     Issues Presented

Sanchez seeks discovery on the following subject areas:

1. Documents relating to the six (6) DEA-6 reports not disclosed in pre-trial discovery concerning witnesses not called at trial by the United States, (Requests "A" through "G", and "I");

2. Interrogatories directed to the United States relating to matters or persons discussed in the six (6) DEA-6 reports (Requests "J" through"P");

3. Cellular telephone records relating to cell usage by Jose Manuel Escobedo, Martin Soto, and Oscar Venegas (Request "H");

4. New independent examination of original firearms and ballistics evidence maintained by the Indian River Crime and Palm Beach County Sheriff's Office Crime Laboratories and a review of those laboratories' correspondence, case files, photographic records, interim reports and [examiner] bench notes on this case, and in general, notes, lab

1

accreditations, protocols, examiner proficiency records, firearms identification manuals, quality training and technical manuals (Request II "A"); and

5. Documentation that Mr. Sanchez did not fire a weapon at the time of the murders of the Escobedo family and/or had a lesser role in the murders (Request II, pg. 41 of Sanchez's motion, CIV–DE 83).

## II.      Legal Standard

A habeas petitioner is not automatically entitled to discovery.  *Bowers v. U.S. Parole Comm'n, Warden,* 760 F.3d 117, 1183 (11th Cir. 2014).   Discovery should be ordered only where there is good cause shown in advance supported by specific allegations that show reason to believe that if the facts are fully developed, the petitioner may be able to demonstrate that he is entitled to relief.  *Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006).  Good cause cannot arise from mere speculation or hypothesis, that some helpful information may be found if discovery is ordered.  *Id.*  The legal standard for "good cause" is a high bar.  Good cause for discovery requires a showing to be made with factual support, demonstrating that the evidence sought would raise sufficient doubt about the defendant's guilt to undermine confidence in the result of the trial. *Arthur v. Allen*, 459 F.3d 1310 (11th Cir. 2006) *citing Schlup v. Deo,* 115 S.Ct. 851 (1995).

Discovery requests based on mere speculation should be rejected because the habeas remedy was never intended to provide a means for conducting a fishing expedition for convicted defendants to explore their case in search of its existence.  *Saucedo v. Brazelton*, 2015 WL 4481795 (N.D. Cal. 2015).   Even in a death penalty case, bald assertions and conclusory allegations do not meet the "good cause" standard.  *See Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001) (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)); *see also Rivera v. Humphrey,* 2015 WL 3648052 (S.D. Ga. 2015) (order denying discovery in § 2254

2

proceeding finding mere speculative discovery request unsupported by good cause).

If allegedly undisclosed information would not have impacted the jury's verdict, then the district court may properly deny discovery. *Smith v. United States*, 627 Fed. Appx. 852, 855 (11th Cir. 2015); *accord, Benford v. United States*, 2013 WL 6162670 (N.D. Ala. 2013*); see also, Heidler v. Chatman,* 2014 WL 725985 (S.D. Ga. 2014) (in death penalty case, court denied § 2254 discovery on basis that there was not a reasonable probability that had the sought-after evidence been disclosed to the defense the result of the proceeding would have been different).

Indeed, "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict," *Strickler v. Greene*, 527 U.S. 263, 2891(1999); that it "might" have done so is not enough, *Id.* at 289; *see also United States v. Agurs*, 427 U.S. 97, 109-110 (1976). Rather, "petitioner's burden is to establish a reasonable *probability* of a different result," *Strickler*, 527 U.S. at 291 (emphasis in original), and to establish that "'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict,'" *Id.* at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)); *Stephens v. Hall*, 407 F.3d 1195, 1203 (11th Cir. 2005). Given the plethora of evidence presented at trial concerning Sanchez's proximity (electronically and in person) to the murders, Sanchez's speculation about the supposed Mexican source of the cocaine would not likely alter the outcome of the guilty or punishment phases. As such, Sanchez has failed to meet his burden and his discovery request should be denied.

The evidence presented at trial was that Sanchez's fingerprint was identified on Turnpike ticket 5160 which had been issued to the driver of a black Jeep Cherokee (Jose Luis Escobedo) around 2:15 a.m. on October 13, 2006 southbound at the Ft. Pierce toll plaza of Florida's Turnpike.

3

*See* DE 730 at pp. 3713 – 3748 and Govt Exhs. 7 and 17 (Testimony of Jack McCall, latent print examiner), and Testimony of Albeiro Munoz who collected the toll tickets, DE 728 at pp. 3287-3332. Tickets 5160 and 5161 issued at Ft. Pierce toll plaza before the homicides to the van and the Escobedo Jeep were later retrieved at the Okeechobee Plaza in West Palm Beach, FL and reflected an exit at that location at 3:02.m. on October 13, 2006.   *Id.* at p. 3318. In addition, phone records traced to Sanchez's use the night of the homicides had the last telephone contact with Jose Luis Escobedo in St. Lucie County, south of the Ft. Pierce exit on Florida's Turnpike before the murders.   *See e.g.,* DE 764 Trial Testimony of David Weeks, at pp. 6703-6828 and Govt Exhs. 707, 707.1, 708, 760.6, 760.4; and testimony of Linda Velasquez, DE 758 at pp. 6560-6600. Troya's fingerprint was found on Turnpike toll ticket 5161.   *See* DE 729, Govt Exhs. 8 and 15; Testimony of Munoz (DE 729 at pp. 328-3332) and McCall, at DE 730 at pp. 3713-3748). That ticket also reflected a Turnpike exit at Okeechobee Road in West Palm Beach around 3:02 a.m.

Much of what Sanchez seeks would not have made a difference in the trial or penalty phases however, and for this reason discovery should not be ordered.

Sanchez seeks discovery in the speculative hope that a broad search of the files of the United States might develop claims for which there is currently no factual basis.   In each of the ten separate discovery requests, there has been no specific allegation showing, other than speculative hope, that some helpful information might be uncovered.

A § 2255 proceeding is not a second opportunity to have a full-blown trial on the merits. Rather, the scope of the proceeding is really much narrower.   It is designed to redress only "fundamental defect[s] which inherently [result] in a complete miscarriage of justice" and "omission[s] inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,*

4

368 U.S. 424, 428 (1962) (citing 28 U.S.C. § 2255).

Sanchez claims that discovery is required because this Court's discretion is not very broad in deciding whether to grant an evidentiary hearing on claims raised in a § 2255 petition (CV-DE 83 at pp. 6-7).   The United States agrees that this case concerns serious matters, including the murder of two children and their parents.   The United States disagrees with the assertion that discovery is automatic in § 2255 proceedings. In support of his argument, Sanchez has cited *Harris v. Nelson*, 394 U.S. 286 (1969) for the proposition that the Supreme Court has mandated that district courts set out procedures for developing facts relevant to disposition of a § 2255 petition. The actual holding of *Harris* however makes clear that the Supreme Court did not mandate district courts to conduct full-blown discovery in every case:

> We do not assume that courts in the exercise of their discretion will pursue or authorize pursuit of all allegations presented to them. We are aware that confinement sometimes induces fantasy which has its basis in the paranoia of prison rather than in fact.

*Harris v. Nelson*, 394 U.S. 286, 299 (1969).

Sanchez also cites *Bowers v. United States Parole Comm'n, Warden*, 760 F.3d 1177 (11th Cir. 2014) for the proposition that discovery must be ordered when the movant's allegations go beyond mere speculation.   The United States submits that this is not the holding of *Bowers*. *Bowers* involved an appeal from a denial of mandatory parole by the U.S. Parole Commission. The defendant sought discovery on the issue of whether or not improper political pressure was put on the Parole Commission members during the pendency of the defendant's parole matter.   The District Court, in denying discovery, failed to even consider whether or not the defendant had established good cause for ordering discovery in connection with the movant's claim.   The Supreme Court did not hold that discovery had to be ordered, it merely indicated that a *per se* rule

5

that discovery was not provided for, ever, was in error; the appellate court remanded the case back to the district court for a factual determination. The case also did not involve potential discovery into the Sixth Amendment claims concerning trial counsel's alleged ineffectiveness.

Sanchez also cites *Quisenberry v. Taylor*, 162 F.3d 273 (4th Cir. 1998) for the proposition that discovery should be granted whenever specific facts are shown that may demonstrate a petitioner is entitled to relief if allowed the opportunity to conduct discovery. Actually, *Quisenberry's* holding provided that the district court did <u>not</u> abuse its discretion in denying discovery because "good cause" had not been demonstrated by the movant. Any claim that *Quisenberry* provided for a different principle involves dicta, and not the holding of *Quisenberry*.

## III.   Argument

### A.  Discovery Is Not Warranted On The Undisclosed DEA-6 Reports Because There Was No Violation of Brady (Requests "A" – "G", "I")

Sanchez asserts that he was entitled to pre-trial disclosure of the information contained in the six omitted DEA reports under the <u>*Brady*</u> doctrine and that he now is entitled to documents and follow-up interrogatories relating to those reports. The United States concedes that it did not turn over the reports in pre-trial discovery, however it asserts that the information contained in those reports was not exculpatory to Sanchez's guilt during the guilt phase, nor were the documents exculpatory or mitigating in the penalty phase.

Sanchez's discovery requests are based on the following reports now in his possession, CIV-DE 83-1 (DEA Brownsville CS**)** (Sanchez Exh. A)**,** CIV DE 83-2 (ICE Confidential Source) (Sanchez Exh. B), CIV-DE 3 (Report on Victor Cortinas) (Sanchez Exh. C), CIV-DE 83-4, (Report on Juan Carlos Santos) (Sanchez Exh. D), CIV DE 83-5, (Report on Norma Guzman) (Sanchez Exh. E), CIV-De 83-6, (Report on Juana Beltran) (Sanchez Exh. F), and CIV-DE 83-7,

6

(Report on Juana Caro) (Sanchez Exh. G).   Each of these discovery requests have many, many subparts.   Prior to ordering any discovery on any of these subparts, it is crucial to analyze what impact, if any, the information sought by those requests is likely to have on issues raised in the 2255 proceeding. The United States submits that Sanchez's overly broad requests which would extend necessarily to Texas and/or Mexico are speculative and do not establish sufficient doubt as to the defendant's guilt.   Thus the United States submits that good cause has not been demonstrated by Sanchez because the undisclosed DEA reports do not constitute *Brady* information; the contents of the reports were not exculpatory to Sanchez in either guilt or punishment phases.   As Sanchez has not met his burden on this issue discovery should be denied.

The United States does not contest that certain DEA-6 reports were not turned over during pre-trial discovery (Civ-DE 83-1 through 83-7); they were provided as part of the 2255 process. The grand jury initially indicted Sanchez on November 3, 2006 (DE 30).   Discovery commenced immediately.   The United States continued to provide pre-trial discovery in this matter after the return of the third superseding indictment adding capital counts in February 2008 (DE 305). Discovery continued through the trial of this matter as information was received by the United States.   Prosecutors kept meticulous records concerning the dates and substance of what was disclosed to defense counsel.   Between the beginning of the case all the way up until the eve of trial, the United States provided more than *fifty* discovery-related responses to defense counsel in this case, covering most but not all of the current discovery requests.   *See* Appendix A, (Index of USA Discovery Responses). Moreover, since the filing of the § 2255 petition in this matter, the United States received an informal discovery request by electronic mail in approximately June 2016 (attached), and responded by letter dated July 16, 2016 (attached).   In that letter, on page 5,

7

the United States alerted Sanchez's prior 2255 counsel that it was disclosing certain investigative reports -the DEA-6 reports at issue here- but communicated that the investigation failed to develop information sufficient to charge anyone else, or any information materially favorable to the defendants.

Counsel's argument concerning the evidentiary strength of information discussed in the investigative reports vastly overstates what little substance exists. Sanchez argues that the undisclosed DEA reports were material to his theory of defense at the guilt and penalty phases. The government submits that the reports would not have made a material difference to Sanchez in either the guilt or penalty phases of the trial. Sanchez claims that the DEA reports undercut the United States's theory of the case; that simply is not true. No information contained in any of the DEA 6 reports established, or even suggested, that Escobedo was murdered by someone other than Sanchez and Troya. Similarly, none of the reports establish that Escobedo picked up money or drugs from anyone in the Daytona Beach area around midnight before he and his family were murdered. Sanchez also argues that if originally disclosed the reports would have undercut the penalty aggravators of "intentional killing of multiple victims" and "witness elimination". *See e.g.,* DE 860 at p. 8, Statutory Aggravator #4, *and* at p. 10, Non-Statutory Aggravator #2. The United States disagrees with these arguments for the same reasons; the reports do not establish that someone else committed the murders.

The primary evidence of why the Escobedo family was murdered came from government trial witness Melvyn Fernandez, who testified that after the murders his friend, Daniel Troya. told him [Fernandez] that he had done a "lick" (robbery) for fifteen kilograms of cocaine. (DE 729 at pp. 3487-3490). Circumstantially, the United States established that Sanchez accompanied Troya

8

in a van following Escobedo from Palm Beach County north along I-95 all the way to the Daytona Beach on the evening of October 12, 2006. The van had been seen moving north on I-95 in Brevard County by a law enforcement officer who had made a note of it. (DE 758 at pp. 6405-6416).   The United States showed that a cell phone connected to Sanchez was used on the evening of, and in the vicinity of, the murders to communicate with Escobedo.   (*Compare* Linda Velasquez testimony DE 758 at pp. 6560-6600 *with* Testimony of David Weeks tracking cell tower activity, DE 764 at pp. 6735-6824 and GX 707, 707.1, 707.2, 707.3).   Escobedo's Jeep was seen entering Florida's Turnpike around 2:17 a.m. on October 13, 2006, the phone used by Sanchez contacted Escobedo's cell phone (*Id.* at p. 6789). This call occurred at 2:19 a.m.; and just five minutes later neighbor Janice Rich recalled being startled from her sleep by popping sounds at 2:24 a.m. (*See* DE 728 at pp. 3099-3103). It was undisputed that Sanchez's fingerprints were located on Turnpike ticket 5160 (the Escobedo ticket), and Troya's prints were found on the ticket issued to the van following Escobedo's jeep entering the Turnpike, ticket 5161.   (*Compare* Parow testimony locating the tickets (DE 728 at pp. 3321-3287 *and* Albeiro Munoz testimony locating the toll plaza photos (DE 729 at pp. 3287-3332 *with* Jack McCall fingerprint expert identifying the latent prints (DE 737 at pp. 4370-4405).

Sanchez claims that the omitted reports which identify or hint at the alleged Mexican source of Escobedo's cocaine would have helped him establish "duress" in the penalty phase, and would have caused jurors to reject the statutory aggravator of committing the murders for pecuniary gain. The United States disagrees:   the reports do not negate other evidence establishing pecuniary gain that still would have been heard during the trial.   (*See* Testimony of Kevin Vetere about socializing with Sanchez after the murders and asking Sanchez about a "Cuban link" gold

9

necklace, and Sanchez responding "you going to knock off the next big timer."(DE 753 at pp. 5651-5654); *see also* other testimony about seized drugs and the Escobedo drug ledgers showing a debt owed to Escobedo related to those seized drugs.

None of the information contained in the DEA reports support the allegation that Sanchez was not involved in murderous criminal activity related to narcotics; to the contrary some of the reports confirm the evidence presented at trial, that is, that the murders were committed as part of an internal drug rip off by persons in Florida who were buying cocaine from Escobedo. Similarly, although Sanchez claims that the omitted reports would have established the mitigating factor of duress, there is no real evidence of that at all. Moreover the reports do not provide any help to Sanchez on a "minor participant" claim.

Finally, Sanchez asserts that the reports would have aided him by helping establish a mitigator of an equally-culpable defendant.  Sanchez also argues that the undisclosed reports would have aided his uncharged third-party defense. DE 847 at pp. 9532, 9539 (penalty closing blaming Varela); and guilt phase, DE 818 at pp. 7946, 7947 (blaming Varela). The government disagrees; the jury already found that Varela's uncharged status and the fact that Sanchez acted under Varela's influence were mitigators in his favor, yet death verdicts were still rendered for the murder of the little boys.  *See e.g.,* DE 860 at p. 12, mitigating factors #1 and #13.  But frankly speaking, although the jury clearly found that mitigation might prevent the death penalty on the adult murders, the undeserved murder of two little boys was, and would continue to be, too much to overcome in this case. Blaming another phantom uncharged third-party for the child murders (beyond Varela) would not change the outcome in this case.

The United States never received additional information corroborating any of the

information concerning the source of the cocaine or what monies, if any, were actually owed by Escobedo to anyone.   The information that was obtained was presented at trial; that evidence showed that there were prior seizures of cocaine by law enforcement from the Varela gang.   *See e.g.,* Lopez seizure, (DE 751 at pp. 4886 – 4927), Sanchez seizure, (DE 752 at pp. 5072 -   5254) and prior home invasion theft of cocaine from Lopez and Escobedo (DE 752 at p. 5140-5142) (witness Elvia Castillo) and DE 753 at pp. 5569-5571 (witness Kevin Vetere).   In addition, after those seizures and during the post-homicide search of the Escobedo home, drug ledgers were found in Jose Luis Escobedo's handwriting that dove-tailed with the prior cocaine seizures, thus establishing an evidentiary linkage between the seized cocaine and a murder motive of an unpaid debt owed to Escobedo. (Compare ledger seizure DE 731 at pp. 3853 – 3918 *with* handwriting identification of Escobedo authorship of drug ledgers, DE 758 at pp. 6450 – 6503).   The ledgers indisputedly established that Escobedo was owed money from the prior cocaine seizures involving members of the Varela gang.   *See also* GX 103c *and* Testimony of Rita Flores, (sister of Jose Louis Escobedo) (DE 758 pp. 6459—6463).

The undisclosed DEA reports would not contradict or offset the admitted trial evidence that showed a documentary foundation for the prosecution's argument that Escobedo was the source of cocaine for Varela and that prior drug seizures from Sanchez and Lopez resulted in cocaine profits being lost by Varela and being owed to Escobedo. *See* Testimony of Rob Barton on recovery of drug ledgers at Escobedo home (DE 731 at pp. 3853-3918, GX 103c, identification of Escobedo writing on the ledgers (Rita Flores, DE 758 at pp. 6450-6466) and expert testimony identifying the content as drug ledgers (Stephen Hills, *Id.,* at pp. 6466-6503).   None of the undisclosed reports would have changed that conclusion.

11

The United States established at trial circumstantially that Escobedo was carrying fifteen kilograms of cocaine at the time of his and his family's murders.   This circumstantial conclusion would not have been affected by the introduction of any information contained in those same reports. The jury found that the United States established Sanchez committed the murders for pecuniary gain, Aggravator #1 (Penalty Verdict, ECF 860 at p. 6); this factor would have applied whether the killers took cocaine or money from Escobedo.   An indisputable fact that cannot be ignored is that the Sanchez-linked phone was the last communication with the Escobedos before they were murdered. The undisclosed DEA reports would not alter that reality.

Despite Sanchez's broad unsupported statements to the contrary, the jury's determination would not have been affected by any information in these reports.   None of the reports purport to establish that someone other than Sanchez and Troya obtained the fifteen kilograms of cocaine. In this regard, the United States did establish through Kevin Vetere that after the theft of the cocaine and the murder of Escobedo, Sanchez stated he had plans to buy a large gold necklace called a "Cuban link", and that after bragging he was going to buy the gold chain for $5,000 he told Vetere "you going to knock off the next big timer."   (DE 753 at pp. 5651-5654). None of the information in the reports would have affected or changed this testimony.   We now address these requests in the order raised by Sanchez.

### 1.   Sanchez's Request "A"

A close reading of the DEA informant report, (CIV-DE 83-1), demonstrates that the report is not actually exculpatory to Sanchez. DEA Brownsville CS-02-12 informed law enforcement that he/she allegedly spoke to a "Martin Soto" in Mexico about a week after the Escobedo murders. Soto allegedly claimed to the CS that Escobedo was in possession of fifteen kilograms of cocaine

owned by Oscar Venegas at the time of Ecobedo's murder. DE 83-1, p.1. The CS stated that the cocaine buyer, the one with the "grill" (Danny Varela) who was buying the cocaine from Escobedo in Florida was upset about the poor quality of cocaine he was receiving. Varela was the planned buyer of the fifteen kilograms of cocaine stolen from Escobedo on the night of the murders.

The CS stated that the person buying the cocaine from Escobedo (Varela) already owed Escobedo for ten kilograms that previously had been delivered. None of this information is exculpatory as to Sanchez or Troya. Rather, the report corroborates the United States; theory of prosecution, that: (1) Escobedo was the source of cocaine for the Varela organization; (2) Varela's organization owed a significant drug debt to Escobedo; and (3) the theft of fifteen kilograms of cocaine from Escobedo and his murder resulted in the gain of cocaine for free and the elimination of a drug debt.

The DEA report found at CIV-DE 83-1 does not in any way undermine the verdict as to Sanchez. To the contrary, this report validates the theory of prosecution. As Sanchez has failed to meet his burden, the Court should deny is discovery request "A".

### 2. Sanchez's Request "B"

Information provided by an ICE confidential source on May 23, 2007 (DE 83-2) also would not affect either the guilt or penalty verdicts. This report also does not contain information that is exculpatory to Sanchez. An ICE informant told law enforcement that he/she in 1999 bought one half to a whole kilogram of cocaine from Jose Luis Escobedo, and marijuana at times. In 2001, the CI began buying cocaine directly from Jose Luis Escobedo, but that he/she had not seen Escobedo in "the past five years". The CS further stated that an unidentified person in Matamoros, Mexico told the CI that the Escobedo murders were *not* committed by anyone in Mexico. This associate

13

who provided this information to the CS supposedly was a member of the Los Zetas cartel.   (*Id.*). Importantly however, the CS stated that the associate had indicated that the Escobedo murders were actually a drug "rip" (robbery) committed by someone in Florida. Again, this information was not exculpatory to Sanchez or Troya; rather, the information corroborated the trial evidence that Sanchez and Troya had performed the drug rip in Florida of fifteen kilograms of cocaine from Escobedo and then murdered him and his family.

The CS also told law enforcement that approximately two weeks before the murders Escobedo had met with unnamed occupants of a green Chevrolet Suburban. The location of this supposed meeting was not revealed; the participants to this meeting were not named. No further detail was provided. The CI did not state that the occupants were even known to him/her, nor that they had anything to do with the Escobedo murders two weeks later. The CI provided no information about the occupant(s) of the Suburban nor any indication that such person(s) were even in Florida at the time of the murders. This information was not exculpatory to Sanchez. The CS identified a "Martin Sosa" as a source of cocaine to Escobedo; however no other details of any type were provided, including any allegation that this same person has supplied cocaine to Escobedo immediately before the murders.

The CS provided information to law enforcement identifying other methods by which he/she had delivered cocaine to persons in Tampa, Bonita Springs, and Naples; none of those deliveries were claimed to have any connection whatsoever to Escobedo.   The CS also stated that Sosa would deliver cocaine to a person name "Adolfo" LNU (last name unknown) in Naples, Florida, and that he/she (the CI) and others would fly into Naples with four kilograms of cocaine strapped to their bodies. No connection to Escobedo was alleged on these deliveries; this material

14

was not exculpatory as to Sanchez. The CS also claimed that he/she also delivered cocaine separately to a FNU Cisneros in a trailer park in Bonita Springs; no further detail was provided. This information was not exculpatory to Sanchez. The CI stated that in addition to cocaine deliveries he/she had made to Adolfo, the CI had made deliveries to a male, Cesar LNU.   The CI did not state that either recipient had any connection to Escobedo. This information was not exculpatory as to Sanchez.

While Sanchez presently argues that the report established an undisclosed motive for the Zetas cartel to have committed the murders, this report directly refutes that claim.   The ICE informant told law enforcement that rather than not paying his up-line drug supplier, Escobedo had given someone from Matamoros between $100,000 to $300,000 the day before the murders. This was never corroborated by law enforcement.   However, this payment information –even if true- certainly does not support an argument that Escobedo was murdered by someone other than Sanchez and Troya because he was *not* paying his suppliers. The information is not exculpatory to Sanchez.

Furthermore, non-disclosure of this report did not prevent Sanchez from making this exact same argument during the trial:

> When he [Escobedo] goes up the Florida peninsula, he is selling cocaine to someone in Daytona Beach. When he comes back down to Fort Pierce, he has money, not drugs."   (Michael Cohen closing argument for Sanchez, DE 767 at pp. 7293-94).   "[I]f Escobedo was the source of supply, if he bought the cocaine from Matamoros and went up the Florida peninsula to sell the cocaine, Daytona, he would have sold it, come back. And Ricardo Sanchez providing surveillance. And there would be no cocaine for anyone to take…Mexican cartel comes in when they…when he shot Mr. Escobedo in his penis, if you don't pay us for the cocaine, we shoot you and your children,…." (*Id*.) "[T]his drug ledger…which says …Escobedo under a description money that has to be paid, owed $187,000 to Matamoros. We know through other testimony Matamoros is the home of violent cartels, and

that is the connection…Louis Escobedo owed $187,000 to people down in Mexico."

(*Id.* at p. 7304)

In those same drug ledgers however, the United States established that much of the debt owed related to cocaine that had been seized from the Varela people, specifically Liana Lopez and Ricardo Sanchez during other cocaine seizures. *See* Testimony about Lopez stop of May 10, 2006, (DE 751 at pp. 4886 through 4940), *and* separately, Sanchez stop of July 10, 2006 (DE 752 at pp. 5072 -5129). One of the DEA reports related that Escobedo had paid someone between $100,000 to $300,000 the day before the murders.   The information contained in DE 83-2 is either unrelated to the crime in question or supports the government's theory.   As the report does not in any way undermine confidence in the verdict against Sanchez, Sanchez can not and has not met his burden.   Accordingly, the Court should deny his discovery request as to this report.

### 3.   Sanchez's Request "C"

The next report involves an interview of Victor Cortinas that also was not disclosed during pre-trial discovery.   Cortinas was the subscriber to telephone number (956) 243-7313. (DE 83-3) Sanchez claims that the United States never disclosed this telephone number in pre-trial discovery; this is *not* true. The subscriber data for (956) 243-7313 was disclosed by the United States in the United States's Sixth Supplemental Discovery Response, (Bates numbers 610,611; his Cingular Wireless subscriber records). Cortinas told law enforcement that he had given the phone to his brother-in-law, Juan Carlos Santos; that Santos drove a box truck and re-sold Walmart-returned merchandise at flea markets. Cortinas also identified Santos' ex-wife as Norma Guzman.   No other information was provided.   The report of this interview contains an agent opinion set out at the end of the report under the name Juan Carlos Santos: "[b]elieved to have been associated with

16

the delivery of 15 kilograms of cocaine on 1012-06 to Jose Luis ESCOBEDO in Florida." Cortinas did not provide this information.   The agent placed that information in the "Indexing" portion of the report that is part of the underlying NADDIS system; this information was not an investigative finding, but merely an identifier for any future law enforcement agent who researched the proprietary and confidential internal database system, and attempted to determine in the future if Juan Carlos Santos ever had any connection to suspected narcotics trafficking.   NADDIS indexing information is not discoverable, and the failure to redact the indexing section of any DEA report constitutes a mistaken oversight by the prosecutor. Sanchez's claims regarding the agent's indexing comment are speculative at best. The agent's opinion and supposition did not constitute information exculpatory to Sanchez. The United States never corroborated any information showing a narcotics link between Juan Carlos Santos and Jose Luis Escobedo.   The agent's opinion and supposition did not constitute information exculpatory to Sanchez.   As Sanchez has failed to establish that the Cortinas interview report casts doubt on the Sanchez verdict, he has failed to meet his burden with regard to this claim.   Sanchez's discovery request on this item, Request "C" also should be denied.

### 4.  Sanchez's Request "D"

Agents and an AUSA interviewed Juan Carlos Santos under a use immunity proffer. (DE 83-4). Santos admitted that he knew Escobedo from the car re-sale business; he admitted he (Santos) had been in Florida on October 12, 2006 but claimed that his phone calls with Escobedo were about buying cars and had nothing to do with drug trafficking. Santos claimed that he flew to Orlando from Harlingen, Texas; and according to Santos a neighbor of his ex-wife, Norma Guzman, dropped off his four kids with Santos. Santos claimed that he then drove the kids, himself and his

current wife to Ocala in a rented PT Cruiser. Just like the Cortinas report, the end of the Santos report contains an identifying comment at the end of the report in the Indexing section under the name Juan Carlos Santos: "[b]elieved to have been associated with the delivery of 15 kilograms of cocaine on 10-12-06 to Jose Luis ESCOBEDO in Florida."  Santos did not provide this information.  In fact, he denied seeing Escobedo during that trip. The agent's opinion and supposition did not constitute information exculpatory to Sanchez, but merely an identifier in NADDIS regarding Santos and a prior interview of him. As Sanchez has failed to establish that the Santos interview report casts doubt on the Sanchez verdict, he has failed to meet his burden with regard to this claim.   Sanchez's discovery request on this item, Request "D" also should be denied.

### 5.   Sanchez's Request "E"

In October, 2007, agents interviewed the ex-wife of Juan Carlos Santos, Norma Guzman (DE 83-5).   Guzman told the agents that she learned in 1990 that Santos was involved in shipping marijuana from Texas to Florida; Guzman claimed that Santos had taken her to a house filled with marijuana from which females would drive the marijuana in separate cars with hidden compartments.  (*Id.*).  Guzman separated from Santos in 2004 and moved to Florida. Guzman said unidentified friends in Brownsville, TX told her that Santos was once again involved in drug trafficking. She claimed that she saw Santos exchange suitcases with some females at a Wal-Mart in Bradenton, FL, and that he was driving a black Lincoln at the time. Guzman did not link Santos to Escobedo or his family. Guzman related that on separate trips, she or another person had taken her children to meet their father, Santos, at Bradenton (thrice), Palmetto, and Tampa. She denied that she or her neighbor ever took the children to meet their father who then took the children to

Ocala.   Guzman did admit that she knew a person by the name of Gus Martin who shared a rental ranch with Santos in the Brownsville area, but that she did not know of Martin being involved in any illegal activity.   Guzman stated that the men had cows and horses on the ranch.   Guzman did not mention any connection to Escobedo or the east coast of Florida. Nothing she told law enforcement constituted exculpatory information for Sanchez.   Sanchez's claims with regard to the Guzman interview are speculative.   Furthermore, Sanchez has not established that the Guzman interview would have affected the jury's verdicts against him.   For these reasons, the Court should deny discovery on this Request "E".

### 6.   Sanchez's Request "F"

In October, 2007, agents interviewed Juana Beltran in an effort to find out why a cell phone believed to have been in her possession had been communicating with a telephone linked to Juan Carlos Santos on the night of October 12, 2006 before the Escobedo murders. This cellular phone bearing telephone number 386-785-5684 (DE 83-6) had been in touch with the Santos-linked phone on October 12, 2006.     Beltran admitted this was her prior telephone number from a prepaid cellular telephone purchase in Deland, FL in which the store clerk created the subscriber information.   Beltran also claimed that she had given this phone to Juana Caro sometime in 2007. Beltran denied knowing Juan Carlos Santos, and denied any knowledge of any phone calls between her former telephone number and that of the Santos-linked cell phone on October 12, 2006. This report contained no exculpatory information about Sanchez. Sanchez's claims with regard to the Beltran interview are speculative.   Furthermore, Sanchez has not established that the Beltran interview would have affected the jury's verdicts against him.   For these reasons, the Court should deny discovery on this Request "F".

19

### 7.  Sanchez's Request "G"

In October, 2007, agents interviewed Juana Caro in order to find out information about the user of a cellular phone bearing telephone number 386-785-5684 (DE 83-7).   Caro claimed that she had bought the phone about six months ago from a friend of hers, Juana Beltran; (this would place the purchase time to around March 2007, some five months after the Escobedo murders). She identified Beltran from a photograph shown to her, but claimed that she threw the phone away after dropping in it water around one month earlier. Caro provided no information that was exculpatory to Sanchez.   Sanchez's claims with regard to the Caro interview are speculative. Furthermore, Sanchez has not established that the Caro interview would have affected the jury's verdicts against him.   For these reasons, the Court should deny discovery on this Request "G".

### 8.  Conclusion

Sanchez also argues that the DEA reports would have helped him establish more weight to a defense mitigator during the penalty phase, specifically, that Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death. However, as noted by Sanchez, even without the DEA reports, the United States conceded this point at trial, and eleven (11) jurors found this to be true. *See* DE 860 at p. 13.   Accordingly, the United States submits that the DEA report information would not have materially altered the jury's conclusions on this already-established mitigator.   Contrary to Sanchez's speculation, the DEA reports do not establish nor even hint about Sanchez's minor participation in the murders; there simply is no suggestion of this at all, and frankly the opposite is true.   In his final claim on the effect of the non-disclosure of the DEA , Sanchez argues that the reports would have aided him in showing his

20

lack of substantial planning and premeditation, statutory aggravators. *See* DE 860 at p.7, statutory aggravator #2. Again, as with other arguments Sanchez has made, there is simply no support for this conclusion. The reports are not exculpatory, they do not purport to demonstrate that someone other than the Florida cocaine buyer performed a drug ripoff. To the contrary, the information contained in the DEA reports are either irrelevant or support the government's theory of prosecution. Furthermore, the reports do not contradict the overwhelming evidence of Sanchez's guilt. As Sanchez has failed to establish good cause, his discovery requests "A" through "G" should be denied.

### B. Requests for Documents and Interrogatories Relating to Cell Phones, Sanchez Request "H" & "I"

In Requests "H", and "I", Sanchez seeks discovery of three items: (1) documents showing cell phone use by Manny Escobedo relevant to his brother Jose Luis Escobedo's drug trafficking, and/or his murder; (2) documents showing cell phone use by Martin Soto relating to Escobedo's drug trafficking and/or the Escobedo murders; and (3) documents tending to show cell phone use by Oscar Venegas at all times relating to Escobedo's drug trafficking and/or the Escobedo murders.

As to this request, the United States admits that it possessed but did not disclose an Excel spreadsheet that we believe relates to a number used by Manny Escobedo, that is, (956) 346-2874. (We believe the spreadsheet was actually produced by the service provider). However, the United States did disclose the toll records of Jose Luis Escobedo which demonstrated contacts with (956) 346-2874. The records, even if obtained however were not exculpatory to Sanchez or Troya, and Sanchez has not established how contact between the Escobedo brothers was exculpatory. The records demonstrated that on the night of the homicides the user of this cellular telephone number was hitting cell towers located near Brownsville, TX. The requested records will not alter the

21

demonstrable trial facts established below that unquestionably led to the jury convictions against Sanchez and Troya.

As to the request for cell phone records relating to Martin Soto and OscarVenegas, there has been no showing that either person was connected to the Escobedo murders, was in Florida during that time period, or had any personal contact with Escobedo the night of the homicides. To the contrary the only DEA reports that mention Soto or Venegas do not establish anything exculpatory to Sanchez.  (CIV-E 83-1. 83-2). Moreover, neither report indicates that Escobedo owed a drug debt to either Soto or Venegas; instead, the reports provide information that dovetails with the government's trial evidence, that is, the murders were committed as part of a drug rip off in Florida and that the murders were not committed by someone in Mexico.

As to the requested telephone records, Sanchez has failed to establish that the information was material to either guilt or punishment, that is, that there is a reasonable probability that the result of the proceeding would have been different if the allegedly suppressed information[1] had been disclosed to the defense.   As such, Sanchez has failed to meet his burden and his discovery request should be denied.

### C.   Requests for Interrogatories Directed to the United States, (Requests "J" – "P")

In Request "J", Sanchez desires to engage in an unwarranted fishing expedition for additional information concerning the Brownsville DEA informant, Martin Soto, and Oscar Venegas. None of the pre-trial undisclosed DEA reports, which Sanchez's counsel now possesses, purport to establish that any of those persons had anything to do with the Escobedo murders. To the contrary,

---

[1] As to Martin Soto and Oscar Venegas, the undersigned prosecutor has no knowledge that the United States ever obtained telephone records subscribed in their names or traceable to them.

the reports support the prosecution's theory that the murders were part of a drug rip by persons in Florida, specifically, the person purchasing cocaine from Escobedo.

In Request "K" Sanchez seeks information concerning an ICE Confidential Source as well as Carlos Garcia, Felipe Guerrero, Martin Sosa, Adolfo LNU, Robert LNU, and FNU Cisneros. No undisclosed United States report remotely mentions, suggests, or implies that any of those persons were in Florida the night of the murders, involved in the murders, or that any of them even knew Escobedo.

In Request "L" Sanchez seeks information concerning Victor Cortinas. The undisclosed DEA reports do not establish any linkage between Cortinas and the Escobedos; no one has suggested that Cortinas was in Florida at the time of the homicides, nor does any information exist known to the government that Cortinas had any connection at all to Escobedo.

In Request "M", Sanchez wants the United States to explain Agent Week's basis for his unsupported opinion that Santos was believed to have been associated with the delivery of cocaine to Escobedo before the murders. This issue already has been addressed earlier this memorandum and will not be repeated; we adopt the same argument here.

Moreover, the request also seeks the identity of persons who have interacted with Santos regarding illegal drug activity in Florida, including gang or cartel affiliations.  No DEA report established that Santos had any contact with Escobedo after the cell tower traffic indicated that phones carried by Escobedo, Sanchez and Troya began a trip south from the Daytona Beach area back to Ft. Pierce and then West Palm Beach.

In Request "N" Sanchez seeks information about Norma Guzman. The DEA reports do not purport to establish that she knew Escobedo or that she herself was involved in drug trafficking.

The most that could be said about Norma Guzman is that she denied that her children had been taken to Ocala, Florida by her ex-husband, Santos around the time of the murders. Moreover, Guzman never provided any information to law enforcement in the single interview that Santos was involved in cocaine trafficking; the only thing she ever mentioned was marijuana being smuggled in cars; and suitcases being exchanged on the west coast of Florida.

In Requests "O" and "P" Sanchez seeks a host of information relating to the alleged drug trafficking activity of Juana Beltran, Juana Caro, Jose Candelario Beltran, Edgar Beltran, Cecilio Beltran; and Juana Caro ("P"). There is no stated connection by any of these persons to any Escobedo family member or to Juan Carlos Santos. The United States submits that their names were included in the report merely as family members identified by Juana Beltran; and the agents merely confirmed with Beltran that none of those persons (Jose Candelario Beltran, Edgar Beltran, Cecilio Beltran) ever used her phone. (CV-DE 83-6 at ¶5). The reports do not mention or even hint that any of those siblings know Escobedo or were involved in drug trafficking. There has been no showing as to how any of these people are connected to the Escobedo murders. The late disclosure of DEA reports mentioning those persons names did not remotely hint or suggest that any of them were present at the murder scene. For all of these reasons discovery on phone evidence should be denied.

As Sanchez has failed to establish that the requested information would undermine confidence in the verdicts, they should be denied by the court for lack of good cause.

24

**Third Party Discovery**

**D.  Request for Inspection of Physical Evidence and Information Regarding Ballistics and Toolmark Evidence**

Sanchez seeks third party discovery to re-litigate the toolmark and ballistics part of the guilt–phase trial.  He seeks an order allowing a newly-hired expert, James Gannalo, to personally examine original evidence. Sanchez's showing falls short. His declaration is filled with speculation, and Sanchez's argument far surpasses the Gannalo declaration. For instance, Sanchez claims that the ballistic/toolmark evidence collected at the crime scene tended to demonstrate that someone other than Sanchez was responsible for these murders. Nowhere in Gannalo's declaration does he make that claim.   A current review of original evidence by Sanchez's newly-hired expert is not warranted.

There is no explanation as to how the sought after information would bolster his arguments that the trial expert testimony should have been challenged under *Daubert v. Merrill Pharmaceuticals, Inc*., 509 U.S. 579 (1993), that the experts should have been restricted from determining ballistic "matches," that Sanchez's counsel (and Troya's counsel in a joint defense strategy) conducted ineffective cross examination and should have called a defense expert on rebuttal, or that the United States engaged in misconduct by presenting misleading testimony. Here, Sanchez seeks a new examination of items that he already had an opportunity to review during the pre-trial phase.

Significantly, the United States earlier informed Sanchez that information related to firearms and tool mark experts was previously provided in pre-trial discovery as follows, *see*

25

*generally* CV-DE 78-1 at ECF pp. 10-13. [2/] As illustrated in the voluminous discovery already cited, comprehensive and highly detailed tool mark and firearms evidence already was disclosed by the United States during pre-trial discovery.   *See* DE 58, 176, 202, and Appendix B (ten separate letters of supplemental discovery provided on various dates between March 7, 2008 and November 21, 2008).

The instant discovery request is based on pure speculation that the requested items will produce a different expert opinion nine years after the trial.   To the extent this new expert challenges or contradicts the trial testimony, such a finding nine years after the original trial is irrelevant.   New experts who have come to different conclusions, or who might in the future come to different conclusions than the United States' firearms experts, is insufficient to support an ineffective assistance claim.   *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016) (death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir. 1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial.") (death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir. 1995) ("That experts were found who would testify favorably years later is irrelevant.") (death penalty case).

The trial already has occurred, followed by an appeal, and the § 2255 attack is limited to whether trial counsel was ineffective in this subject area.   Sanchez's recent retention of another

---

2 This was set forth in the letter exchange between counsel, CV-DE 78-1 at pp. 4-14, *supra*. *See also* Appendix B, which contains the referenced supplemental discovery letters the United States provided during pre-trial discovery related to firearm and tool mark evidence. The preceding discovery responses have ECF citations from the underlying original criminal case.

tool mark expert to merely review the findings of the experts who already testified and were subject to cross-examination at trial does not create a cognizable claim under 28 U.S.C. § 2255. Even if Sanchez nine years later has found a new expert to contradict the trial testimony, such a finding nine years after the original trial is irrelevant.   This Court should deny discovery on the toolmark area for precisely the same reason discussed in the Troya matter:

> When considering an ineffective assistance of counsel claim for a failure based on information that is contained in a[n] undiscoverable document, the Court must consider what was available to counsel at the time of trial. In other words, if the information sought now through Rule 6 discovery requests are documents that would have been precluded from discovery at trial by either Rule 16 or Rule 17, the Movant has not shown good cause. The Movant is unable to demonstrate an entitlement to relief on an ineffective assistance of counsel claim for failing to retain, consult, or cross-examine experts using documents that were unavailable to them at trial. Accordingly, the Movant has failed to show good cause for discovery.

Case No. 16-CIV-80700-BB, (S.D. Fla.), DE 124 at p. 23.

The proper test of whether Sanchez has been denied effective representation is judged by whether a reasonable lawyer would have acted similarly at trial.   And under this test, trial counsel's conduct was constitutionally sufficient for all the reasons discussed in the United States' Response to Sanchez's *original* § 2255 motion.   *See, e.g.,* CIV-DE 37 at pp. 43-51, including vigorous cross examination of the United States's tool mark expert witnesses focusing on qualifications, the science of firearms examination, the limits of their conclusions or terminology, lack of accreditation, bias (lab's funding by law enforcement), lack of proficiency testing, lack of publishing history, lack of error rate determination, lack of familiarity with recent filed publication, etc.   (DE 758 at pp. 6355-6380; DE 764 at pp. 6660-6692) (cross examinations).   *See Johnson v.*

27

*Nagle, supra*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999), *quoting White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).   Allowing discovery by means of a new independent examination which is not guaranteed to show that someone other than Sanchez committed the murders would not be based on "good cause," but unfounded speculation, which is contrary to the prevailing case law.   *See, e.g. Arthur v. Allen, supra*, 459 F.3d 1310 (11th Cir. 2006).   Even if Sanchez could negate the toolmark evidence, it would not have changed the verdict.

The firearms evidence in this case is merely additional evidence of guilt.   The key evidence was the Turnpike photographs and the fingerprints of Sanchez and Troya on the toll tickets.   The photographs depicted the Escobedo black Jeep entering the Florida Turnpike at the Ft. Pierce toll booth, immediately followed by the Varela-linked van. Turnpike toll tickets 5160 and 5161 were issued to those vehicles.

After Escobedo's Jeep was seen entering Florida's Turnpike around 2:17 a.m. on October 13, 2006, the phone used by Sanchez contacted Escobedo's cell phone (CR-DE 765 at p. 6789). This call occurred at 2:19 a.m.; and just five minutes later neighbor Janice Rich recalled being startled from her sleep by popping sounds at 2:24 a.m. (See DE 728 at pp. 3099-3103). It was undisputed that Sanchez's fingerprints were located on Turnpike ticket 5160 (the Escobedo ticket), and Troya's prints were found on the ticket issued to the van following Escobedo's jeep entering the Turnpike, ticket 5161.   (*Compare* Parow testimony locating the tickets (DE 728 at pp. 3321-3287 *and* Albeiro Munoz testimony locating the toll plaza photos (DE 729 at pp. 3287-3332) with Jack McCall fingerprint expert identifying the latent prints (DE 737 at pp. 4370-4405)).   Troya and Sanchez exited the Turnpike on Okeechobee Road in West Palm Beach at approximately 3:10 a.m.; the van followed by the Escbedo black Jeep. Troya later admitted to Vetere that he had driven

28

the van and did not roll his window down but reached around the opened car door to hand his ticket to the attendant. All of this in total amounted to the crucial evidence.   The firearms evidence does not alter the overwhelming evidence of Sanchez's guilt.   Sanchez asserts that the firearms evidence was the only evidence indicating that he was an active shooter. This is not true. The United States established with other evidence that Sanchez and Troya had followed Escobedo on I-95 from Palm Beach County to Daytona and back during the early and late evening hours of October 12, 2006. Then as they approached Ft. Pierce, the evidence showed that both vehicles entered the Florida Turnpike southbound, taking numbered toll tickets 5160 and 5161. Sanchez and Troya's fingerprints were later found on those tickets. Sanchez called Escobedo after they were on the Turnpike, and shortly thereafter the murders occurred at 2:24 a.m.   Thereafter Sanchez and Troya then exited the Turnpike in West Palm Beach at 3:10 a.m. at the Okeechobee Boulevard exit, as evidenced by the Turnpike toll records.

To the extent that Sanchez argues that discovery in this area might help him in the penalty phase, such argument should be rejected. Sanchez already received the benefit of mitigating findings evidence as it related to the murders of the Escobedo parents: life sentences were returned there. The murder of two little boys under the age of five caused the jury to return the death sentences for Sannchez's convictions, the sought-after evidence (evidence review) would not change that reality.

29

**Third Party Discovery**

**E.  Request for Production of Documents Relating
to Claims VI and VII and whether Sanchez
was an active shooter**

Here Sanchez seeks all documents containing information that Mr. Sanchez did not fire a weapon at the time of the murders of the Escobedo family and/or had a lesser role in the murders. To the United States's knowledge no such documents exist.

**Conclusion**

After a trial that was meticulous at very stage, a fully-briefed and unsuccessful appeal, Sanchez seeks additional discovery without demonstrating the legally-required factual and legal support. His claims are not based on the requisite showing of good cause.  Sanchez has not provided specific factual support demonstrating that the evidence sought via discovery would raise sufficient doubt so as to undermine confidence in the result of the trial as to guilt or punishment phases.   For this reason, his discovery requests should be denied.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY


By:    */s Stephen Carlton*
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV
*Attorney for the United States*

30

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on March __ 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


By: /s/   *Stephen Carlton*
Stephen Carlton
Assistant United States Attorney

31

## SERVICE LIST

**Ricardo Sanchez, Jr. v. United States**
**Case No. 16-80693-CV-SCOLA**
**United States District Court, Southern District of Florida**

**Stephen Carlton**
**Stephanie Evans**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Stephanie.Evans@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
**Attorney for United States**
[Service via CM/ECF]

**Stephen M. Kissinger**
**Dana Hansen**
**Counsel for Ricardo Sanchez, Jr.**
**Stephen_kissinger@fd.org**
**Dana_hansen@fd.org**
**Counsel for Ricardo Sanchez, Jr.**
Asst. Federal Community Defenders
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile:   (865) 637-7999
[Service via CM/ECF]