**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 16-80693-CV-SCOLA**
**(Case No. 06 80171 Cr Hurley/Vitunac(s)(s)(s))**

**RICARDO SANCHEZ, JR.,**
          **Petitioner,**

**vs.**

**UNITED STATES OF AMERICA,**
          **Respondent.**

_____/

**GOVERNMENT RESPONSE TO SANCHEZ'S MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE PURSUANT TO 28 U.S.C. § 2255**

COMES NOW the United States of America, by and through its undersigned counsel, and submits its response in opposition to Ricardo Sanchez Jr.'s Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255.

**ISSUES RAISED BY PETITIONER**

On May 3, 2016, Ricardo Sanchez Jr., referred to herein as Sanchez or Petitioner, filed the instant motion to vacate under Title 28, United States Code, Section 2255 with sealed entries. (CV-DE 1).[1]  Pursuant to Court order Sanchez filed a complete, unredacted version of his § 2255 petition on May 26, 2016 (CV-DE 16-1).

_____

[1] All record citations to the events in Petitioner's criminal case are denoted as "CR-DE #" and reference the docket in Southern District of Florida Case Number 06-80171-CR-Hurley.  All record citations to the events concerning Petitioner's instant motion to vacate, set aside, or correct sentence are denoted as "CV-DE #" and reference the docket in Southern District of Florida Case Number 16-80693-CV-BLOOM.   Cites to original trial exhibits of the United States are denoted as "GX".

Prior to this case being assigned to the Honorable Beth Bloom, the previously-assigned judge, Robert Scola, had entered an Order dismissing certain claims made by Sanchez in his original filing. (CV-DE 16-1). *See, e.g.,* CV-DE 29 Order Dismissing Claims at pp. 4, 8-13. Sanchez's original 2255 counsel moved for the Court to reconsider its Order Dismissing Claims (CV-DE 32). Subsequently, this Court determined it was appropriate to relieve prior counsel and appoint the Federal Public Defender's Office from the Eastern District of Tennessee as substitute counsel (CV-DE 63). The Court also vacated Judge Scola's prior Order of Dismissal by separate order (CV-DE 64); this *vacatur* was unrelated to the substance of the Court's prior analysis, but instead rested on a prior perceived personal conflict. [2] Subsequently, Sanchez, through new 2255 counsel, filed an Amended Petition, CV-DE 80. The order of the government's response attempts to track the variety of issues raised by Sanchez from pre-trial issues such as challenges to the indictment, composition of grand jury and petit jury venires, through discovery, trial issues, argument of counsel, jury instructions in guilt and penalty phases, and finally, challenges to Sanchez's competency to stand trial and eligibility for the imposed capital sentence. Because of the wide variety of issues raised by Sanchez, the United States has organized its response by subject area, followed by a citation to the actual issue number used by Sanchez in his amended petition (CV-DE 80).[3]

---

[2] Judge Scola had noted that previously in his career he had represented the State of Florida in a capital prosecution with government trial counsel John K. Kastrenakes, who now serves as a Circuit Judge on the Fifteenth Judicial Circuit in Palm Beach County. Judges Scola and Kastrenakes had been state-court prosecutors in Dade County in the 1980s. *See* CV-DE 71.

[3] Page citations to the Sanchez Petition reference the ECF page number in the upper margin of the pleading, not the original page number printed at the bottom of each page.

Liberally construed, Sanchez's amended petition raises the following issues (numbered in accordance with the order of this response):

I.      Whether Sanchez's Motion to Vacate was timely filed.

II.     Whether Sanchez established that his counsel were constitutionally ineffective under the *Strickland* standard.

    A.   Whether Sanchez established that his counsel were ineffective for not challenging Counts 7-10 of the Third Superseding Indictment on grounds of duplicity and failure to state a crime, and for not objecting to the jury instructions for these same counts (Sanchez  Amended Issues II(G),XII(A), XII(B), and XIII);

    B.   Whether Sanchez established that his counsel were ineffective for not challenging the composition of the West Palm Beach grand and petit jury venires (Sanchez Amended Issue VII(C));

    C.   Whether Sanchez established that his counsel were ineffective for not moving for a hearing to establish Sanchez's competency to stand trial  (Sanchez Amended Issue IV);

    D.   Whether Sanchez established that his counsel were ineffective in their handling of the forensic pathology evidence (Sanchez Amended Issue V));

    E.   Whether Sanchez established that his counsel were ineffective in their handling of the government's toolmark expert witnesses (Sanchez Amended Issue VII(A)(2));

    F.   Whether Sanchez established that his counsel were ineffective for not sufficiently challenging the government's evidence concerning the location cellular telephone towers (Sanchez Amended Issue VII (A)(1));

    G.   Whether Sanchez established that his counsel were ineffective in their investigation, preparation, and presentation of the mitigation case  (Sanchez Amended Issue VIII);

    H.   Whether Sanchez established that his counsel were ineffective for not sufficiently challenging the testimony of the Government's mental health expert offered in rebuttal (Sanchez Amended Issue VIII (B)(5));

    I.   Whether Sanchez established that his counsel were ineffective for not objecting to jury instructions concerning non-statutory mitigating factors (Sanchez Amended Issue XII(C));

    J.   Whether Sanchez established that his counsel were ineffective for not objecting to portions of the penalty jury instructions which relate to the burden of proof for

3

weighing mitigating and aggravating factors (Sanchez Amended Issue XII(D));

K.   Whether Sanchez established that his counsel were ineffective for not objecting to the prosecutor's comments during guilt and penalty phase closing arguments (Sanchez Amended Issues VII(B) and VIII(I)).

III.   Whether Sanchez has established other constitutional violations that warrant vacatur of his convictions and sentences.

A.   Whether Sanchez has established that his murder convictions and resulting death sentences were based on an impermissibly vague statute and non-existent crime, Title 18, United States Code Section 924(c), in violation of the Fifth, Sixth and Eighth Amendments (Sanchez Amended Issues II(A) through (F)) and XII(A) and (B));

B.   Whether Sanchez has established the existence of petit jury misconduct which deprived Sanchez of his right to a fair and impartial jury in violation of the Fifth, Sixth, and Eighth Amendments (Sanchez Amended Issue I);

C.   Whether Sanchez has established that the United States violated its *Brady* obligations by not disclosing certain emails and investigative reports to the defense in the guilt or penalty phases of Sanchez's trial such that Sanchez's Fifth Amendment rights were violated (Sanchez Amended Issue VI);

D.   Whether Sanchez has established that the trial court's security measures denied Sanchez his right to due process and the effective assistance of counsel under the Fifth and Sixth Amendments (Sanchez Amended Issue X);

E.   Whether Sanchez has established that he is ineligible for the death penalty under the Eighth Amendment due to intellectual disability/mental retardation or other mental disorders (Sanchez Amended Issue III);

F.   Whether Sanchez has established that his capital sentences violate the prohibition against cruel and unusual punishment under the Eighth Amendment (Sanchez Amended Issue IX);

IV.   Whether Sanchez is entitled to relief under the cumulative effects of errors doctrine (Sanchez Amended Issues VII(D), VIII(J), and XI);

V.   Whether Sanchez's claims should be denied without a hearing.

**STATEMENT OF THE CASE**

1.      Applicable Course of Proceedings.[4]

On February 14, 2008, a federal grand jury in the Southern District of Florida returned a 16-count third superseding indictment against defendants Daniel Troya and Ricardo Sanchez, Jr., and co-defendants Danny Varela and Liana Lopez (CR-DE 305).  All of the defendants were charged with non-capital drug trafficking and firearms offenses, and Troya and Sanchez were additionally charged with capital offenses involving the murders of an entire family, father, mother and two little boys, ages 3 and 4.  (*Id.*).[5]

Specifically, the grand jury charged Troya and Sanchez with: conspiring to possess with intent to distribute at least 50 grams of crack cocaine and at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A) (Count 1); conspiring to carjack a motor vehicle, in violation of 18 U.S.C. § 371 and 2119(3) (Count 5); carjacking a motor vehicle with the intent to cause serious bodily harm and death, in violation of 18 U.S.C. § 2119(3) and 2 (Count 6); using and carrying a firearm during and in relation to a crime of violence and a drug trafficking crime and causing the death of a person by murder with malice aforethought, in violation of 18 U.S.C. § 924(j)(1), 1111, and (2) (Count 7 (murder of Luis Damian Escobedo); Count 8 (murder of Luis Julian Escobedo); Count 9 (murder of Yessica Guerrero Escobedo); and Count 10 (murder of Jose Luis Escobedo)); possessing with intent to distribute at least 50 grams of crack cocaine and at least 500 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), (B), and 18 U.S.C. § 2

---

[4] Some of the Course of Proceedings and the majority of the Statement of Facts are taken, with certain alterations, from the Response Brief of the United States in *United States v. Daniel Troya, et al.*, Case No. 09-12716-PP, filed in response to Sanchez and Troya's initial appeal explained in greater detail below.

[5] The grand jury had charged codefendants Juan C. Gutierrez and Kevin Vetere with non-capital drug trafficking offenses in earlier iterations of the indictment (CR-DE 30, 113, 170).

(Count 4 (Sanchez only) and Count 13); possessing firearms after previously having been convicted of a felony offense, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 2 (Count 3 (Troya only) and Count 14); and using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 15) (CR-DE 305).

With respect to Counts 6-10 of the third superseding indictment, the grand jury made the following special findings, in accordance with 18 U.S.C. §§ 3591(a)(2)(A)-(D) and 3592(c), as to Troya and Sanchez: (1) both were 18 years of age or older at the time of the charged offenses; (2) both intentionally killed the victims named in the charged offenses; (3) both intentionally inflicted serious bodily injury on the victims named in the charge offenses; (4) both intentionally participated in an act, contemplating that a life would be taken or intending that lethal force would be used, that resulted in the deaths of the victims named in the charged offenses; (5) both intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death and in reckless disregard for human life, that resulted in the deaths of the victims named in the charged offenses; (6) both committed the charged offenses with the expectation of pecuniary gain; (7) both committed the charged offenses after substantial planning and premeditation; and (8) both intentionally killed more than one person in a single criminal episode (CR-DE 305 at 16-21). In addition, the grand jury specially found that two of the victims, ages three and four, were particularly vulnerable due to their youth (CR-DE 305 at 20).

On February 20, 2008, the government filed notices of intent to seek the death penalty against Troya and Sanchez as to Counts 6-10 of the third superseding indictment (CR-DE 311, 312). On January 6, 2009, Troya and Sanchez and codefendants Varela and Lopez proceeded to

6

a jury trial (CR-DE 648).[6]   After two months of trial, the jury found all of the defendants guilty of all counts of the third superseding indictment, as charged (CR-DE 791-93, 796 at 7694-7703).

Between March 16 and 31, 2009, Troya and Sanchez proceeded to the penalty phase of the jury trial (CR-DE 818, 823-25, 845-48, 855-57).  At the conclusion of the penalty phase, the jury found that a sentence of death should be imposed on both defendants as to Counts 7 and 8 of the third superseding indictment, the counts charging the murders of Luis Damian Escobedo and Luis Julian Escobedo, respectively, and that a sentence of life imprisonment without the possibility of release should be imposed on both defendants as to Counts 6, 9, and 10 (CR-DE 859, 860; CR-DE 857 at 9813-42).

On May 13, 2009, the district court conducted sentencing hearings (CR-DE 895, 898-900, 955-56).  At the conclusion of the hearings, the court imposed on both Troya and Sanchez the death sentences pronounced by the jury as to Counts 7 and 8 and the life imprisonment sentences pronounced by the jury as to Counts 6, 9, and 10, with the life imprisonment sentences to run consecutively to all other sentences (CR-DE 899, 900; CR-DE 955:30-34; CR-DE 956 at 16-23). In addition, the court sentenced both defendants to concurrent terms of life imprisonment as to Counts 1 and 13 and 120 months of imprisonment as to Counts 5 and 14 and a consecutive term of 60 months of imprisonment as to Count 15 (*Id.*); Troya received a concurrent term of 120 months of imprisonment as to Count 3, and Sanchez received a concurrent term of 480 months of imprisonment as to Count 4 (*Id.*).  The court sentenced each defendant to a total term of 60 months

---

[6] Before the trial, codefendants Vetere and Gutierrez pleaded guilty, respectively, to the drug trafficking conspiracy charged in Count 1 of the first and second superseding indictments (CR-DE 268, 291).

of supervised release and a special assessment of $1,100 (*Id.*).[7]   Troya and Sanchez filed notices

of appeal from the judgments against them (CR-DE 901, 907).[8]

On October 3, 2013, the Eleventh Circuit affirmed all of the convictions and sentences

against both Sanchez and Troya, including the capital counts. (CR-DE 1134).  The Court issued

its mandate on January 3, 2014.  The Supreme Court denied certiorari on May 4, 2015 (CR-DE

1151).

On May 3, 2016 Sanchez filed the instant Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255 (CV-DE 1) with sealed entries.  Pursuant to Court order Sanchez

filed a complete unredacted version of his § 2255 petition on May 26, 2016 (CV-DE 16-1).  After

the parties' submission of a Joint Status Report and Proposed Scheduling Order on June 24, 2016,

(CV-DE 17), the Court held an initial status conference on July 14, 2016 to set deadlines.  After

the status conference the Court issued an initial Scheduling Order directing the United States to

file its initial Response to the Petition on or before October 12, 2016 (CV-DE 21).  On October 3,

2016, the United States moved for an extension of time, seeking an additional thirty-three days to

file a response to the instant petition, as well as the petition filed by co-defendant Daniel Troya in

Case No. 16-80700-CV-Scola.  (CV-DE 27).  On October 4, 2016, the United States also filed an

unopposed emergency motion for extension due to an approaching hurricane, and the need for its

staff to begin preparations to protect life and personal property (CR-DE 28).

---

[7] The district court imposed sentences of imprisonment on the codefendants as follows: Vetere, 144 months (CR-DE 301), later reduced to 42 months upon the government's motion (CR-DE 970, 1058-59); Gutierrez, 216 months (CR-DE 936); Lopez, 180 months (CR-DE 937); Varela, life (CR-DE 924).

[8] The appeals of Varela and Lopez were consolidated in a separate appeal under case number 09-12802.  On August 16, 2011, the Eleventh Circuit affirmed their convictions and sentences in *United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011).

Although the United States filed a response to Sanchez's initial petition on November 1, 2016, (CV-DE 37), as mentioned earlier, District Court Judge Robert Scola recused himself due to an asserted conflict, and thereafter this Court determined it was appropriate to relieve prior counsel and appoint the Federal Public Defender's Office from the Eastern District of Tennessee as substitute counsel (CV-DE 63).   The Court also vacated Judge Scola's prior partial Order of Dismissal by separate order (CV-DE 64), and directed the filing of an amended Petition by successor counsel.  Subsequently, Sanchez, through new 2255 counsel, filed an Amended Petition, CV-DE 80, and this response follows.

2.       Facts Underlying Sanchez's Conviction and Sentence.

a.  The Government's Case-In-Chief At Trial

**The Murders**

On October 13, 2006, at 2:24 a.m., a couple who lived next to the Florida Turnpike, near mile marker 149 (Fort Pierce, Florida), were awakened by a series of "popping" noises that sounded like gunshots ((CR-DE 728:3099-3103, 3129-30, 3221-26).   Several hours later, an individual driving down the turnpike in the same area saw what he thought was a family sleeping on the side of the road (CR-DE 728:3112-27).   Seeing no vehicle in the area, he pulled over to offer the family a ride (*Id.*).  When he approached the individuals, about 25 feet off the road, he saw that they had been shot (*Id.*).  At first, he thought that there were three individuals, including what looked like a mother holding a child (*Id.*).  Then, he noticed a fourth individual, a small boy, who appeared to have been "hiding under his mother's legs" (*Id.*).  He called 911 (*Id.*).

The murder victims were the Escobedo family: Jose ("Lou") Escobedo, age 28; his wife, Yessica Escobedo, age 25; and their two children, Luis Julian Escobedo, age 4, and Luis Damian Escobedo, age 3 (CR-DE 728:3207-08; CR-DE 729 at 3366-3466).  Each had died from multiple, close-range gunshots to the head and body (*Id.*).  Three of the Escobedos had died instantly from

fatal wounds to the head; however, the youngest Escobedo, Damian, had suffered before dying. (*Id.*).[9]

## Background

In 2003, codefendant Danny Varela, also known as "D.V.," was selling marijuana, and by 2005, he had become a successful cocaine trafficker in Palm Beach County, Florida (CR-DE 751 at 4739; CR-DE 752 at 4990-99). Varela normally delivered kilogram quantities of cocaine to customers on a weekly basis (e.g., CR-DE 752 at 5005). Frequently, Varela's cousin, Ricardo Sanchez, Jr., also known as "Rick," delivered the cocaine for Varela (CR-DE 752:4993-5001, 5133-34). On some occasions, Varela's girlfriend, Liana Lopez, also known as "Negra," delivered the cocaine on Varela's behalf (CR-DE 738 at 4535-36; CR-DE 752 at 4998-5001). Among Varela's other associates were Daniel Troya, also known as "Homer," whom Varela had met in jail (CR-DE 758 at 6418), codefendant Juan Gutierrez, also known as "Flaco," and codefendant Kevin Vetere (CR-DE 752 at 5128-40).

In early 2006, Jose Luis Escobedo, also known as "Lou," lived in Brownsville, Texas, where he was involved in transporting drugs from Texas and Mexico to Florida (CR-DE 752 at 4972-76; CR-DE 753 at 5711). Escobedo lived in a house that he rented from Benito Rodriguez, who lived in Palm Beach County, Florida (*Id.*). Rodriguez was the uncle of both Varela and Sanchez (*Id.*).

In the summer of 2006, Rodriguez, who traveled frequently between Florida and Texas, took his nephew, Varela, to Brownsville and introduced Varela to Escobedo (CR-DE 752 at 4974-

---

[9] As set forth below, the evidence established that Troya and Sanchez murdered the Escobedos. The government argued that their motive for the murders included erasing a drug debt owed to Lou Escobedo and robbing him of 15 kilograms of cocaine (CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182).

76).  Shortly thereafter, Escobedo moved to Greenacres, in Palm Beach County, Florida, with his wife, Yessica, and their two children, Luis Julian and Luis Damian (CR-DE 729 at 3468-74; CR-DE 738 at 4526-27).  At that time, Escobedo drove a black Jeep Cherokee (CR-DE 729 at 3475).

After he had moved to Palm Beach County, Escobedo visited Rodriguez often (CR-DE 752 at 4976, 4985), and Escobedo became friends with Varela and Sanchez (CR-DE 752 at 4985-86).  Escobedo and Varela were seen together often (CR-DE 730 at 3664-65; CR-DE 732 at 3969-72; CR-DE 738 at 4528-29, 6415-20).  Escobedo was one of Varela's sources for cocaine (CR-DE 754 at 5492-97).

### The Drug Life

During the summer of 2006, Varela and his associates, including Escobedo, partied late into the early morning hours at strip clubs four or five nights a week (CR-DE 752 at 5128-38, 5142-43).  At the clubs, Lopez distributed cocaine to the strippers (CR-DE 752 at 5139-40).  When she ran out of cocaine, Varela instructed her to "go to the house" and get more (*Id.*).  The house, on Purdy Lane in West Palm Beach, Florida, was a townhouse that the defendants referred to as "Pimp Plaza" (CR-DE 752 at 5002, 5140-41, 5194-95; CR-DE753 at 5570-71).

That summer, Escobedo's cousin, Crystal Salazar, visited him in Palm Beach County (CR-DE 738 at 4525-30).  During Salazar's visit, Escobedo took his cousin and his wife and kids to Pimp Plaza (CR-DE 738 at 4530-31).  There, Salazar observed that the Escobedo children were familiar with the house and knew their way around it (CR-DE 738 at 4531-36, 4545).  Salazar met Sanchez and Lopez there, and Salazar observed Sanchez counting large stacks of money in the downstairs portion of the residence, which caused her to take the children upstairs (CR-DE 738 at 4537-38).  Salazar quickly returned downstairs with the children after she observed a large number

of firearms, as many as "50", on a bed upstairs (CR-DE 738 at 4538-45).  Sanchez told her that "they" had more guns in a closet in another room (CR-DE 738 at 4539).

On one occasion, a vehicle with a Miami Hurricanes license plate drove past Pimp Plaza and appeared to be casing the residence for a possible robbery (CR-DE 753 at 5624-28).  Troya and Sanchez then armed themselves with assault rifles from Pimp Plaza; Troya carried an AK-47, and Sanchez carried a smaller assault rifle  and chased after the vehicle, which sped away (*Id.*).

Sometime after the casing incident, Lopez and Escobedo were robbed at Pimp Plaza by home invaders (CR-DE 752 at 5140-42).  During the robbery, Escobedo was pistol-whipped, and one of the robbers held a gun to his head until Lopez disclosed the location of cocaine (CR-DE 753 at 5569-70, 5590-95; CR-DE 756 at 5960-61).  The robbers stole a kilogram of cocaine, $80,000 to $100,000 of cash, and guns (*Id.*).

Shortly after the robbery, in about August of 2006, Varela and his codefendants  Sanchez, Troya, Lopez, Gutierrez, and Vetere  moved to 6458 Garden Court, West Palm Beach, Florida, a house in a gated community (CR-DE 737 at 4297-4306; CR-DE 752 at 5143-44, 5157-66).  The defendants referred to their new residence as "Thug Mansion" (CR-DE 753 at 5571).  Varela instructed Troya not to tell Escobedo the address of Thug Mansion, and Troya related that instruction to the others (CR-DE 752 at 5145).

The defendants were not legitimately employed; their income came from drug dealing, and they used Thug Mansion as their base of operations for distributing drugs, primarily cocaine, crack cocaine, and Ecstasy (CR-DE 752 at 5145-72; CR-DE 753 at 5558-79, 5624; CR-DE 754 at 5429-44).  Thug Mansion was also used to cook crack cocaine and to package drugs for distribution (*Id.*).  The defendants kept firearms openly in every room of the residence for easy accessibility in order to thwart any future robbery attempts (*Id.*).

Besides the threat from potential robbers, the police presented an obstacle to the defendants' drug distribution activities. On May 10, 2006, a Greenacres Police Department officer stopped Lopez in a white Cadillac and seized two kilograms of cocaine and $14,000 of cash from her; Varela's fingerprints were later lifted from the packages of cocaine (CR-DE 751 at 4886-4906, 4921-34). On June 10, 2006, a Palm Beach County Sheriff's deputy stopped Varela and Troya in a Chevy Lumina (CR-DE 754 at 5312-41). From Varela, the deputy seized $1,364 of cash; from the Lumina, the deputy seized marijuana and two pistols, a nine-millimeter and a .40 caliber, from a hidden compartment in the vehicle (*Id.*). On July 10, 2006, a Palm Beach County Sheriff's Office deputy attempted to stop Sanchez in a white Ford Taurus, which had a stolen temporary tag (CR-DE 752 at 5071-5121). Sanchez sped away, crashed the Taurus into a tree, and then fled on foot, carrying a shoe box, which he dropped (*Id.*). Sanchez was apprehended, and almost one kilogram of cocaine was seized from the shoe box that he had dropped (*Id.*).

On September 11, 2006, Sanchez, Troya, and other defendants spotted the vehicle, with the Miami Hurricanes license tag, that they believed previously had cased Pimp Plaza. The vehicle, a gold GM Park Avenue, was parked at Sugar Daddy's Strip Club in Palm Beach County (CR-DE 753 at 5628-38). The defendants went to Thug Mansion to discuss a plan of action (*Id.*). Troya dressed himself in black clothes, donned a wig, and announced that he was going to approach the vehicle and shoot whomever was sitting in the driver's seat (*Id.*). When the defendants returned to the strip club, however, it was raining, so they decided instead to follow the vehicle, "shoot the car up," then drop the shooter off at a prearranged location (CR-DE 753 at 5638-39).

The Park Avenue car left the strip club at about 3:00 a.m. (CR-DE 753 at 5639). Driving a Toyota Camry, Sanchez followed the Park Avenue car, with Troya in the passenger seat, armed

13

with a nine-millimeter pistol (CR-DE 753 at 5640-42). After following the Park Avenue car for some time, Sanchez pulled next to the vehicle, and Troya leaned out of the Camry's window and fired at least 11 shots at the vehicle, causing it to swerve off the road; Sanchez sped away after the shooting, which occurred on Haverhill Road, between Summit Boulevard and Forest Hill Boulevard (CR-DE 753 at 5642-46; CR-DE 757 at 6190-6207). The Park Avenue car returned to the strip club, where law enforcement officers observed that one of the occupants of the vehicle, a woman, was bleeding profusely from a gunshot wound to her thigh (CR-DE 758 at 6394-99).

Sanchez and Troya were no strangers to violent acts involving firearms. On April 28, 2006, Troya had used an AK-47 assault rifle to "shoot up" a house at 1901 Mercer Avenue, West Palm Beach (CR-DE 753 at 5668-71; CR-DE 757 at 6162-89). Troya believed that someone who had "snitched" on him was present in the house (*Id.*). Troya fired at least 12 rounds into the house, in which a woman and her two children were present but fortunately, no one in the house was struck by the rounds (*Id.*). On the same day, Sanchez had used the same AK-47 to fire into a house at 1305 Suwanee Drive, West Palm Beach (CR-DE 753 at 5671-73; CR-DE 757 at 6208-94; CR-DE 758 at 6391-92). Sanchez believed that someone who had intended to rob him was present in the house (*Id.*). A male who was present in the house was struck in the right leg by one of the rounds from the AK-47 that Sanchez fired into the house (*Id.*).

In early October of 2006, Sanchez, Troya, and some of the other defendants planned to obtain cocaine by stealing it, rather than by purchasing it, from someone whom Varela believed was a drug dealer (CR-DE 753 at 5653-56). In connection with the planned theft, they went to a military surplus store and purchased ski masks, gloves, and handcuffs (*Id.*). Thereafter, they drove to the victim's residence, where Sanchez, carrying a crowbar, and Troya, armed with a nine-millimeter pistol, tried to enter the back door of the residence (CR-DE 753 at 5661-66). When

14

someone inside the house began yelling, "I am going to call the police!", Sanchez and Troya ran back to their vehicle, and the defendants sped away (*Id.*).

## The Murder Investigation

The first law enforcement officer on the murder scene was a trooper with the Florida Highway Patrol; he secured the crime scene until members of the St. Lucie County Sheriff's Office arrived (CR-DE 728 at 3128-36). Thereafter, a crime scene investigator recovered a total of 13 bullet casings and projectiles from the scene; the 13 items had come from two different firearms, a .40-caliber firearm and a nine-millimeter firearm (CR-DE 728 at 3137-3215).

Later that day (October 13, 2006), law enforcement officers went to the Escobedo residence (CR-DE 730 at 3748-60; CR-DE 731 at 3817-25, 3853-88; CR-DE 737 at 4367). There, they observed that a rear sliding glass door was open, that the door to the attic was open, and that the residence appeared to have been ransacked (*Id.*). Inside the residence, the officers found drug packaging materials and traces of cocaine, a red suitcase labeled "Embark," and numerous documents (*Id.*). Among the documents was a drug ledger, in Lou Escobedo's handwriting, that contained a number of names, initials, and notations (CR-DE 731 at 3871-75; CR-DE 758 at 6449-79). The drug ledger contained several references to "D.V.," "Rick," and "Negra," adjacent to amounts such as "12 minus 3" and "12 2 minus 1" and notations such as "3 Negra first trip" and "1 Rick second trip" (*Id.*).[10] Among the documents were also two booking photographs, one for Liana Lopez ("Negra") pertaining to a narcotics offense, and the other for Ricardo Sanchez, Jr.

---

[10] An expert witness in narcotics trafficking opined that the notations involving "Negra" and "Rick" referred to a drug debt that they owed to their supplier (CR-DE 758 at 6474-77).

15

("Rick"), pertaining to traffic offenses (CR-DE 731 at 3858-61, 3912).[11]   In addition, the officers found a certificate of title for Lou Escobedo's black Jeep Cherokee (CR-DE 731 at 3883-86, 3891-92).[12]

Based on Escobedo's link to the black Jeep Cherokee, law enforcement officers began looking for that vehicle (CR-DE 728 at 3226-29).  From the Florida Department of Transportation, which had installed cameras at every toll booth on the Florida Turnpike, Detective John Parow obtained videotapes of the vehicles that had entered and exited the turnpike around the time of the murders (*Id.*).

After hours of studying the videotapes, Det. Parow observed that a black Jeep Cherokee had entered the turnpike at the Fort Pierce toll plaza (mile marker 152), approximately three miles from the murder scene, at 2:18 a.m., on October 13, 2006 (CR-DE 728 at 3230-31).  A few seconds later, a large van with scratches on its roof had followed directly behind the Jeep Cherokee onto the turnpike (CR-DE 728 at 3232-38; CR-DE 729 at 3332-45).  The Jeep Cherokee had been issued toll ticket number 5160 (GX 7); the van had been issued toll ticket number 5161 (GX8) (CR-DE 729 at 3287-3325).  At 3:02 a.m., both vehicles had exited the turnpike at the Okeechobee toll plaza in West Palm Beach (*Id.*).  The drivers of both vehicles had presented toll tickets and paid the required tolls; the driver of the van, however, had opened the vehicle's door to pay the toll rather than simply paying through the window (CR-DE 729 at 3342-44).  Det. Parow obtained the toll tickets for both vehicles from the Florida Turnpike, and law enforcement officers began

---

[11] Lopez later told a friend that Lou Escobedo had shown the booking photos to "people in Mexico" to prove that Lopez and Sanchez had been arrested and that cocaine had been seized by the police (CR-DE 752 at 5187).

[12] The black Jeep Cherokee was registered to the wife of Eric Wiksten, who had sold the vehicle to Sanchez for cash (CR-DE 754 at 5297-5305).

looking for the van with the scratches on its roof and the black Jeep Cherokee (CR-DE 729 at 3337-40).

The van with the scratches on its roof was a maroon Dodge van, which Varela had purchased for cash on June 23, 2006, and had arranged to be registered to a straw owner (CR-DE 731 at 3840-44; CR-DE 732 at 3857, 3941-56). Kevin Vetere had ridden in the van on numerous occasions with Troya, Sanchez, and Varela when they distributed narcotics (CR-DE 754 at 5421-44, 5457).

In the late afternoon of October 12, 2006, before the murders, Vetere had seen Troya and Sanchez leaving Thug Mansion in the Dodge van, and he had attempted to ride with them (CR-DE 754 at 5444-47; CR-DE 756 at 5944-46). Troya had told Vetere that he could not accompany them on that occasion (*Id.*). Because that was the first time that Vetere had ever been told he could not ride in the van, he had asked Troya to check with Varela; Troya had called Varela, who had instructed Vetere to stay at Thug Mansion (*Id.*).

Vetere did not see Troya and Sanchez again until the next day (CR-DE 754 at 5447-48). In the early morning hours of October 13, 2006, after 3:00 a.m., Vetere saw Troya and Sanchez, accompanied by Varela and Gutierrez, entered Thug Mansion; each was carrying a zippered sports bag with a handle, similar to the bags that they used for carrying kilograms of cocaine (CR-DE 754 at 5449-52, 5463; CR-DE 753 at 5697-98). Shortly thereafter, Vetere received a call from a stripper who wanted him to bring her marijuana, so Vetere retrieved the keys to the van from Sanchez's room and drove to the stripper's residence, about 10 minutes from Thug Mansion (CR-DE 754 at 5453-58).

Not long after Vetere had reached the stripper's residence, Troya called him and told him to return to Thug Mansion because Varela was angry that he had taken the van (CR-DE 754 at

5458).  Vetere complied; however, en route to Thug Mansion, Varela himself called Vetere and instructed him to take the van to Varela's uncle's house and park it (CR-DE 754 at 5459).  Vetere did so, and while he was at Varela's uncle's house, Vetere saw Lou Escobedo's black Jeep Cherokee parked behind the house (CR-DE 754 at 5460-64).

About 10 minutes after Vetere had parked the van at Varela's uncle's house, Varela, Gutierrez, Troya, and Sanchez arrived there in a white Taurus (CR-DE 754 at 5465).  Varela instructed Vetere to drive the Jeep Cherokee to his (Vetere's) grandmother's house and park it (CR-DE 754 at 5466-71).  Vetere complied, and a few minutes later, Gutierrez arrived in the van and picked Vetere up from his grandmother's house (*Id.*).  Gutierrez drove to a Denny's restaurant, where they met Varela, Troya, and Sanchez (CR-DE 754 at 5471-72).  They all ate breakfast together as the sun came up (*Id.*).[13]

Before the day was over on October 13, 2006, television and radio stations were airing news of the murders (CR-DE 729 at 3488).  The same day, Troya purchased a convertible Chevrolet Impala, which he said he had bought with "a brick," meaning a kilogram of cocaine (CR-DE 729 at 3490-92; CR-DE 756 5476-79).  Within a day or two of the murders, Troya told a friend that he had "licked somebody," meaning robbed someone, of 15 kilograms of cocaine (CR-DE 729 at 3489-90).  At the same time, Vetere observed that Sanchez had a large amount of money and was bragging that he was going to buy a $5,000 "Cuban link" gold necklace (CR-DE 753 at 5651-53).  When Vetere asked Sanchez about the money, Sanchez replied, "You going to knock off the next big timer" (*Id.*), which Vetere believed to be a reference to shooting someone (CR-DE

---

[13] After October 13, 2006, Varela told his associates that the van was "hot" and instructed them not to drive it anymore and to leave it parked at his uncle's house (CR-DE 752 at 5175-77).

756 at 5937-38).  Shortly thereafter, Sanchez purchased a gold necklace for about $2,500 (CR-DE 758 at 6573-75).

On October 14, 2006, Vetere learned of the murders from the Palm Beach Post newspaper, which carried a picture of Lou Escobedo (CR-DE 754 at 5486).  Vetere immediately asked Troya if he had moved Escobedo's Jeep Cherokee from Vetere's grandmother's house (CR-DE 754 at 5487-88).  Troya replied that he had moved the vehicle (*Id.*).

On October 16, 2006, law enforcement officers found Escobedo's Jeep Cherokee parked in an industrial area of West Palm Beach (CR-DE 731 at 3888-99).  The license tag had been removed from the vehicle, and on the ground near the vehicle were a book of matches and a five-gallon can full of gasoline (*Id.*).

When Vetere learned that the Jeep Cherokee had been found, he discussed the event with Troya (CR-DE 754 at 5488-89, 5521-25).  Troya said that he had intended to burn the vehicle but that the police had "found it too quick" (*Id.*).  Vetere expressed his concern that the police might recover fingerprints from the vehicle (*Id.*).  Troya said that he had "wiped the Jeep down real good" (*Id.*).  Vetere also asked Troya if he had been aware that the Florida Turnpike was equipped with video cameras (*Id.*).  Troya replied that he had driven the van and that when he had paid the toll, he had kept the window up, had opened the door to pay with his outstretched arm, and had not waited to receive his change from the toll booth attendant (*Id.*).

Sometime later, Vetere was with Varela, Troya, and Sanchez when Sanchez received a telephone call from his father (CR-DE 754 at 5531-35).  Sanchez's father asked, "Didn't you sell that [Jeep Cherokee] to Lou?" (*Id.*).  Something about the way that his father asked the question made Sanchez believe that the police had questioned his father (*Id.*).  When Sanchez related the incident to the others, Vetere said, "The heat is on," and Varela said that it was "time to clean the

19

house" (*Id.*).  Thereafter, Vetere, Lopez, Troya, and Sanchez tried to rid Thug Mansion of as much drug paraphernalia and ammunition as they could (CR-DE 754 at 5535-41; CR-DE 753 at 5558-79).

Besides arranging to destroy evidence at Thug Mansion, Varela also arranged for a friend of his, the owner of a body shop ("Down South Customs"), to repaint the maroon Dodge van (CR-DE 730 at 3660-75).  Gutierrez drove the van to the body shop and told the owner that Varela wanted the scratches on the roof of the van repaired and the van to be painted green (*Id.*).  The owner began to work on the van, but then he saw a television news report that law enforcement officers were looking for the van, so he called the police, who came and seized the van on October 17, 2006 (CR-DE 730 at 3675-77; CR-DE 731 at 3848-50).

Law enforcement officers searched the van (CR-DE 731 at 3825-46).  From it, they seized a red suitcase labeled "Embark" (*Id.*).  The suitcase contained some toys and a hotel receipt (*Id.*). The receipt was in the name of Yessica Escobedo and showed payment for a one-night stay, beginning on October 11, 2006, at a La Quinta Inn in Fort Meyers, Florida (*Id.*).

On October 25, 2006, after having obtained a warrant, law enforcement officers searched Thug Mansion (CR-DE 730 at 3624-46; CR-DE 731 at 3902-11, 3918-24; CR-DE 732 at 3996-4164; CR-DE 737 at 4332-65; CR-DE 754 at 5382-86).  Present during the search were Troya, Sanchez, Varela, Gutierrez, and Lopez, all of whom were arrested (*Id.*).  Despite the earlier efforts of the defendants to "clean house," the officers seized a drug ledger, bags containing cocaine and crack cocaine, drug paraphernalia, ski masks, gloves and wigs, handcuffs, body armor, a police scanner, a number of firearms, including an AK-47 assault rifle, ammunition, and ammunition clips (*Id.*).  The officers seized two cell phones and $3,327 of cash from Sanchez, and they seized

two cell phones and $593 of cash from Troya (*Id.*).  They also seized a cell phone from Varela's automobile (*Id.*).

The law enforcement officers advised Sanchez of his constitutional rights and questioned him (CR-DE 730 at 3626-46).  When he was asked whether he had any knowledge of a black Jeep Cherokee, Sanchez said that he previously had sold that vehicle to Lou Escobedo (*Id.*).  When he was asked whether he had any knowledge of "a maroon van that [Varela] drove," Sanchez answered only that he did not "hang out" with people like Varela (*Id.*).

### Corroborating Evidence

The government's forensic examination of the toll tickets established that Sanchez's fingerprints were on toll ticket number 5160 (GX 7) (CR-DE 730 at 3712-41), the ticket that had been issued to Escobedo's black Jeep Cherokee when it entered the Florida Turnpike and that had been returned to the toll booth attendant when the vehicle exited the turnpike.  In addition, Troya's fingerprints were on toll ticket number 5161 (GX 8) (*Id.*), the ticket that had been issued to the maroon Dodge van when it entered the turnpike and that had been returned to the attendant when the vehicle exited the turnpike.

The government examined the pattern of activity that occurred on the cell phones that had been seized from Troya, Sanchez, and Varela (CR-DE 764 at 6703-6824).[14]  Between 5:41 p.m. on October 12, 2006, and the time of the murders (2:24 a.m. on October 13, 2006), there were no calls between Troya's cell phone and Sanchez's cell phone, but there were numerous calls between Sanchez's cell phone and Escobedo's cell phone (CR-DE 764 at 6751-94).  During that period of

---

[14] Sanchez and Varela used cell phones with numbers that were subscribed to by others; Troya used a cell phone with a number in someone else's name as well as a cell phone with a number in his own name (CR-DE 756 at 5990-6053; CR-DE 758:6421-27, 6434-45, 6503-36, 6559-72).

21

nearly nine hours, those phone calls occurred along a northerly route from Lake Worth, Florida, to Daytona Beach, Florida, and then along a southerly route from Daytona Beach, Florida, to Fort Pierce, Florida (*Id.*).[15] After the murders, telephone activity commenced between Troya's cell phone and Sanchez's cell phone and between Troya's and Sanchez's cell phones and Varela's cell phone (CR-DE 764 at 6792-6811).[16]

Although the murder weapons were never recovered (CR-DE 738 at 4511; CR-DE 767 at 7448), the government conducted a forensic examination of the projectiles and projectile casings that had been recovered from the scene of the Escobedo murders as well as the ammunition that had been seized from Thug Mansion (CR-DE 764 at 6599-6660). Six of the seven .40-caliber projectile casings that had been recovered from the murder scene had "tool marks" on them, that is, "striated markings" on the sides of the casings (CR-DE 764 at 6643-44). Those tool marks were similar to tool marks on the casing of one of the live rounds of .40-caliber ammunition seized from Thug Mansion (*Id.*). All of the tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the government's forensic expert to opine that the live .40-caliber round seized from Thug Mansion and six of the seven .40-caliber casings recovered from the murder scene had come into contact with the same magazine (CR-DE 764 at 6645-50).

---

[15] As set forth above, Troya and Sanchez had left Thug Mansion together in the maroon Dodge van in the late afternoon of October 12, 2006. At about 9:00 p.m. that night, a police officer had seen the van heading north on I-95, about 15 miles from Daytona, Florida, and he had reported the license tag as a matter of routine road patrol (CR-DE 758 at 6405-13).

[16] After the murders, as set forth above, Troya had said that he exited the turnpike in the van, so, according to the government's theory of the evidence, Sanchez exited the turnpike in Escobedo's black Jeep Cherokee (CR-DE 766 at 7146-49).

In addition, three of the four nine-millimeter casings that had been recovered from the murder scene had tool marks on them (CR-DE 764 at 6654).  Those tool marks were similar to tool marks on the casings of two of the live rounds of nine-millimeter ammunition seized from Thug Mansion (CR-DE 764 at 6650-54).  All of those tool marks were consistent with marks that would have been left on the projectile casings by the lip of a magazine, leading the expert to opine that the two live rounds of nine-millimeter ammunition seized from Thug Mansion and three of the four nine-millimeter casings recovered from the murder scene had come into contact with the same magazine (CR-DE 764 at 6657-60).[17]

In the summer of 2007, while Troya was awaiting trial in the Federal Detention Center in Miami, Florida, he visited a friend of his, Byron Hambrick, who was also in custody (CR-DE 737 at 4404-20).  Hambrick's cellmate, Carlos Rodriguez, overheard Troya tell Hambrick that he (Troya) had done something "very wrong," that he had "killed some people," and that there had been "children involved" (*Id.*).  Hambrick asked Troya why he had done it, and Troya replied that it was something that he had to do (*Id.*).[18]

   b.  The Defense Case At Trial

---

[17] The government's forensic tool mark testimony was presented by Mark Chapman, a firearms examiner for the Indian River Crime Laboratory in Fort Pierce, Florida (CR-DE 764 at 6600). Chapman was a member of the Association of Firearms and Tool Mark Examiners (CR-DE 764 at 6633).

[18] The government's theory of the case was that Lou Escobedo had supplied Varela with cocaine, some of which had been seized by police officers from Sanchez and Lopez and some of which had been stolen from Pimp Plaza, thereby creating a debt that Varela owed to Escobedo (CR-DE 754 at 5507-10; CR-DE 766 at 7086-7182).  According to the government's theory, that debt was eliminated when Sanchez and Troya murdered Escobedo, after which they also robbed him of 15 kilograms of cocaine (*Id.*).

Sanchez did not testify in his own defense; he did, however, present the testimony of two law enforcement officers (CR-DE 765 at 6947-85). Sanchez's primary evidence was that a "silver vehicle" had entered the Florida Turnpike in Fort Pierce at 2:14 a.m. on October 13, 2006, and had exited the turnpike in West Palm Beach (Okeechobee exit) at 2:57 a.m. on the same date (*Id.*). In closing argument, his attorney conceded that Sanchez had been a member of Varela's drug organization and that Sanchez had been present on the turnpike at the time of the Escobedo murders (CR-DE 767 at 7286-7348). Counsel argued, however, that Sanchez's presence on the turnpike was only for the purpose of providing "counter-surveillance" for Lou Escobedo, whom, counsel argued, had been driving back from Daytona Beach with money after having sold drugs there (*Id.*). Counsel suggested that the silver vehicle had been involved in the murders and that the Escobedo family had been killed by a Mexican drug cartel (*Id.*).

   c. The Penalty Phase of the Trial

   (1) The Government's Case

Maria Lopez, Sanchez's ex-girlfriend and the mother of his child, testified that in October 2003, Sanchez punched her in the face with his fist (CR-DE 818 at 8070-75, 8085) and that in February 2005, he hit her again (CR-DE 818 at 8075-76). After the second assault, Lopez ended her relationship with Sanchez and started dating Jose Penaran (CR-DE 818 at 8076-80, 8088). On July 3, 2005, Sanchez broke into Lopez's residence and bashed Penaran in the head with a satellite television receiver (*Id.*). Penaran was taken to the hospital, where he was treated for deep lacerations to the back of his head (CR-DE 818 at 8087-92). Sanchez later pleaded guilty to assaulting Penaran (*Id.*).

Rita Flores testified that she was Lou Escobedo's sister (CR-DE 823 at 8100-10). She said that he had enjoyed hunting, fishing, and family gatherings (*Id.*). She said that her two nephews,

24

Luis Julian and Luis Damian, had enjoyed watching television and playing outside and that the younger boy, Luis Damian, had been very protective of his older brother (*Id.*).

Sara Guerrero, Yessica Escobedo's mother, testified that of her three children, Yessica had been "the favorite child" (CR-DE 823 at 8111-19).  Guerrero said that Yessica had been a good sister, a good daughter, an intelligent student, an athlete, and a good mother (*Id.*).  She said that Yessica's children had loved her very much and could not bear to be apart from her (*Id.*).  She said that Yessica had been "everything" to her, that Yessica's murder had "destroyed the whole family," and that Yessica's murder had caused Guerrero's husband to "los[e] his mind" (*Id.*).

Felipe Guerrero, Yessica's brother, testified that Yessica had been his "best friend" and that he had been very close to Luis Julian and Luis Damian  (CR-DE 823 at 8122-31).  He said that the two boys had loved to go fishing with their father and that the two boys had been very close to their mother (*Id.*).

Monica Moreno, Guerrero's sister and Yessica's aunt, testified that Yessica had been humble, soft-spoken, polite, and helpful (CR-DE 823 at 8131-45).  She said that Yessica had been "a great friend" and "a good listener" and that Yessica's murder had left a "hole" in her heart (*Id.*).[19]

(2) Sanchez's Case

Juanita Sanchez, Sanchez's mother, testified that he was one of her four children (CR-DE 823 at 8147-94).  She said that all four of her children had been afraid of their father, who often came home drunk and was sometimes physically abusive toward her and the children, he had slapped Sanchez "sometimes" and "hit" him "one time" (*Id.*).  She said that Sanchez was a "slow"

---

[19] Troya and Sanchez both stipulated that they had been more than 18 years old at the time of the Escobedo murders (CR-DE 818 at 8069-70).

25

learner in school (*Id.*).  She said that when Varela had first started visiting her house, he had tried to "impress" her children with his "big luxury car with rims" (*Id.*).  She said that Sanchez was a good son, a good brother, and a good father to his only son (*Id.*).

Amy Fleming, a special education coordinator, testified that Sanchez had been her student in middle school and high school and that she was familiar with his school records (CR-DE 823 at 8208-48).  She said that he had "learning issues," including behavior that she described as follows: "impulsive, inattentive, distractible [sic], inability to shift easily from one activity to another, appearance of being lazy, short attention span, verbally aggressive, physically aggressive" (*Id.*).  She said that he had an IQ of 80, which was "low average," and that he had received special education because he had a "learning disability" (*Id.*).

On cross-examination, Fleming testified that there had been no indication that Sanchez was mentally retarded, that he had been abused or traumatized at home, or that he did not know the difference between right and wrong (CR-DE 823 at 8249-65).  She conceded that at least one of his teachers had believed that his problems in school stemmed from "bad behavior" and that Sanchez preferred to "socialize" rather than to learn (*Id.*).  Fleming observed that on one occasion, Sanchez had brought a knife to school (*Id.*).  She also observed that his high school had determined that Sanchez would be able to function "on his own" in the community (*Id.*).

Nydia Sanchez, Sanchez's sister, testified that he had grown up in a "bad neighborhood" that was unsafe and where drug-dealing was prevalent and that their father had been a violent drunk (CR-DE 823 at 8271-94).  She said that Sanchez changed "a lot" after he began spending time with Varela (*Id.*).

Maria Lopez testified that she had met Sanchez in high school, that he had not appeared to have any friends or outside interests, and that he could not read or write (CR-DE 824 at 8378-

26

8409).  She said that he had worked at different jobs and had taken care of her and their son until 2004, when Sanchez began spending time with Varela (*Id.*).  She said that she broke up with Sanchez because of his relationship with Varela (*Id.*).

Daniel Grant, a psychologist, testified that he had evaluated Sanchez for mental retardation and that he had determined that Sanchez was not mentally retarded but that his "intellectual functioning" was low (CR-DE 824 at 8438-67).  Grant opined that Sanchez had a "processing disorder," that is, a learning disorder, that resulted from an inability to distinguish between certain sounds and an inability to remember "large chunks of information" (*Id.*).  On cross-examination, Grant testified that Sanchez was capable of determining between right and wrong (CR-DE 824 at 8468-8509).

Thomas Reidy, a clinical psychologist, testified that he had evaluated Sanchez for "risk factors" that had influenced the "pathway he took in life" (CR-DE 824 at 8514-61; CR-DE 825 at 8611-31).  Reidy said that Sanchez's life choices had been influenced by the following factors: lack of prenatal care; family history of domestic violence and alcohol abuse; concentration problems; restlessness; antisocial behavior; academic failure and "low bonding to school"; learning disability; low intelligence; and living in a "bad area" (*Id.*).

On cross-examination, Reidy conceded that Sanchez himself had denied the following: being physically abused or observing any domestic violence in his childhood home; lacking close friends and family; having emotional or mental problems; and being exposed to any traumatic experiences (CR-DE 825 at 8632-62).  In fact, Sanchez described his childhood as "good" (*Id.*).

James Aiken, a corrections official who was an expert in evaluating the behavior of inmates, opined that Sanchez, during his two-year incarceration awaiting trial, had "adjusted very well" to having been incarcerated (CR-DE 825 at 8671-85).

(3) The Government's Rebuttal Case

Dr. Michael Brannon, a forensic psychologist, testified that he had evaluated Sanchez in December 2008 (CR-DE 846 at 9273-9333).  He said that he had administered an IQ test to Sanchez and that Sanchez had scored 89 on the test, demonstrating that his "overall intellectual functioning" was in the "low average range" (*Id.*).  Brannon said that Sanchez had shown "strengths" in "non-verbal" areas, such as, planning and problem-solving, decision-making, and attention to detail (*Id.*).  Brannon said that Sanchez's test score had been brought down by a "verbally related reading disability" (*Id.*).  Brannon said that there was nothing to indicate that Sanchez had any problem determining right from wrong (*Id.*).

Brannon testified that Sanchez said that he had never been physically or sexually abused and that he had never observed domestic physical violence in his childhood home (*Id.*).  Brannon said that, emotionally, Sanchez showed no signs of "psychopathology," such as, depression or anxiety (*Id.*).  Brannon also said that Sanchez reported having had "a lot of friends" (*Id.*).

With respect to Reidy's testimony, Brannon said that it was impossible to weigh any factors that purported to establish a person's risk to commit violent acts (*Id.*).  Brannon said that so-called risk factors could not be quantified because one positive factor could outweigh 20 negative factors (*Id.*).  Ultimately, Brannon opined, none of Sanchez's life experiences affected his ability to plan and act, to make choices, and to understand the difference between right and wrong (*Id.*).

d.  The Sentencing Hearings

At Sanchez's sentencing hearing, the district court conducted a § 3553(a) analysis (CR-DE 956 at 2-16).  During that hearing, Sanchez claimed that he was "innocent" (CR-DE 956 at 6).  The court, however, repudiated that claim, stating, "No one who sat through that trial could give any credit to what he is saying today" (CR-DE 956 at 15).  The court found that, despite having been

raised by a loving family that had strived to impart values to him, Sanchez had "betrayed" his family's values (CR-DE 956 at 15), and the court found that the evidence had been "absolutely clear, beyond any doubt whatsoever" that Sanchez and Troya had "tracked the Escobedo family, actually spoke to them, and then murdered the entire family" (*Id.*).

At the conclusion of both sentencing hearings, the district court imposed the sentences as set forth above (CR-DE 956 at 16-23).

### E. Sanchez's Direct Appeal.

Sanchez filed a direct appeal which raised a multitude of issues. With regard to the issues raised by Sanchez, the Eleventh Circuit rejected nearly all of them summarily without comment with the exception of two issues[20] discussed in the decision: the district court's evidentiary rulings as to acts of misconduct involving firearms and drugs, and the admission of Dr. Brannon's testimony concerning Sanchez's mental state. As to the first issue, the Eleventh Circuit concluded that the uncharged shooting incidents were admitted properly either as 404(b) evidence with appropriate limiting instructions (Mercer Avenue and Suwanee Drive shootings), or as intrinsic evidence of the overall drug conspiracy (Haverhill Road shooting). *United States v. Troya*, 733 F.3d 1125, 1132-33 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 2048 (May 4, 2015). On the rebuttal issue, the appellate court found that the government's introduction of rebuttal testimony from its expert, Dr. Michael Brannon, was properly admitted to rebut evidence established by Sanchez during his penalty mitigation presentation. *Id.* at 1139-40.

---

[20] A third issue related solely to co-defendant Troya, and is not relevant to the issues raised in Sanchez's petition.

**MEMORANDUM OF LAW**

## I.      TIMELINESS

In Section 105 of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), P.L. 104-132, 110 Stat. 1214, Congress established a "1-year period of limitations" governing motions for collateral relief under § 2255.  Pursuant to 28 U.S.C. § 2255 (f)(1), Sanchez's convictions became final on May 4, 2015, when the Supreme Court denied Petitioner's writ of *certiorari*.  *See United States v. Troya*, 733 F.3d 1125, 1132-33 (11th Cir. 2013), *cert. denied*, __ U.S. __ 135 S.Ct. 2048 (2015); *See Nguyen v. United States*, 420 Fed. App'x 875, 877 (11th Cir. 2011).  Sanchez filed his original § 2255 petition (CV-DE 1) on May 3, 2016, within the one-year limitation.  Thus, the initial petition was timely filed.

On February 24, 2017, after the Government filed its response to Sanchez's initial petition, the case was reassigned to Judge Bloom, who *sua sponte* issued an order replacing court appointed defense counsel who had represented Sanchez during his direct appeal.  The Court appointed new counsel, and requested that new counsel file a proposed schedule for amended pleadings.  CV-DE 63.  The rationale for this substitution was the conflict inherent when appellate lawyers attempt to represent the same client in both direct appeals and Section 2255 petitions.  On March 23, 2017, the Court entered a scheduling order requiring Sanchez to file a motion for leave to amend on or before October 20, 2017.  CV-DE 69.  This deadline was twice extended, such that the motion for leave to amend and the amended motion were not filed until January 24, 2018, and February 13, 2018, respectively.  CV-DE 77, 80.  In the scheduling order, the Court stated that Sanchez must clearly specify how any claims in the amended petition relate back to the original pleading or the claim would be considered untimely.  CV-DE 69 at 2.

Federal Rule of Civil Procedure 15(c) provides that "[a]n amendment of a pleading relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c)(2). Interpreting this rule in the context of 2255 petitions, the Eleventh Circuit has held:

> [F]or an untimely § 2255 claim to "relate back" under Rule 15(c), the untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial and sentencing proceedings. Instead, in order to relate back, the untimely claim must have arisen from the "same set of facts" as the timely filed claim, not from separate conduct or a separate occurrence in "both time and type.

*Davenport v. United States*, 217 F.3d 1341, 1344 (11th Cir. 2000)(citations omitted)

The primary reason for ordering the substitution of counsel and new scheduling order was to remove the appearance of conflict, or actual conflict, and allow new counsel to review the case, particularly the conduct of appellate counsel, with a fresh set of eyes. A strict application of the "relate back" doctrine would not allow for such fresh review, as any ineffectiveness claims against appellate counsel would not relate back, in both time and type, to previously raised ineffectiveness claims against trial counsel or other constitutional violations. Understanding that this is a death penalty case and that it was the Court—meaning well—which appointed conflicted counsel through no fault of Sanchez, the United States will waive any timeliness defense for claims in the amended petition which directly relate to ineffective assistance of appellate counsel.

With regard to other claims—whether they relate to claims of ineffective assistance of trial counsel or to other alleged constitutional violations—the United States takes the position that these claims are untimely when Sanchez has failed to establish that these new claims directly relate—in time and place—to claims raised in the original petition. The affirmative defense of untimeliness

31

is raised in the particular sections of this response where appropriate.    The United States submits that any untimely claims should be dismissed as a matter of law.

## II.    PETITIONER'S PRIOR TRIAL AND APPELLATE COUNSEL WERE NOT CONSTITUTIONALLY INEFFECTIVE UNDER THE *STRICKLAND* STANDARD.

Claims of ineffective assistance of counsel under the Sixth Amendment are examined through the two-part test initially set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984).  In order to meet the burden of proving ineffective assistance of counsel, a movant must first show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  If this showing can be made, the movant must then demonstrate that the "deficient performance prejudiced the defense," which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*   Unless a movant can make both showings, he cannot prevail. *See Id.*   The two prongs of *Strickland* are known respectively as the "performance" and "prejudice" prongs.

When a court evaluates the first prong, "[j]udicial scrutiny of counsel's performance must be highly deferential," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy." *Id.*  at 689 (internal citations omitted).   In order to prove incompetence, "[a] petitioner must identify specific acts or omissions that were not the result of reasonable professional judgment, and a court should deem these acts or omissions deficient only if they 'were outside the wide range of professionally competent assistance.'" *Brownlee v. Haley*, 306 F.3d 1043, 1059 (11th Cir. 2002) (*quoting Strickland*, 466 U.S. at 690).   As the Eleventh Circuit has explained, "the deference

32

afforded an attorney's decision is great and the bar for proving a Sixth Amendment violation is high." *Id.*   In light of the "strong presumption in favor of competence," a petitioner seeking to prove a Sixth Amendment violation "must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1314-15 (11th Cir. 2000) (*en banc*) (emphasis added).

This presumption is even stronger where, as here, "the reviewing court is examining the performance of an experienced counsel." *Chandler*, 218 F.3d at 1316; *see also Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998) (stating that "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable).   In the instant case, Sanchez was represented by two very experienced, learned, court appointed counsel: Michael Cohen and Daniel Murrell.    *See* USA Exh. 25 (screen print from Cohen's website listing his experience); *See* USA Exh. 24 (Murrell resume from his own website).   Counsel's level of experience raises Sanchez's already high burden.

A movant can prevail under the second prong of *Strickland* only if he can "affirmatively prove prejudice" by showing that counsel's errors "actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 693.   In order to make this showing, the movant must demonstrate more than "some conceivable effect on the outcome of the proceeding." *Id.*   Although a movant need not show that the outcome of his case would more likely than not have been different absent counsel's ineffectiveness, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.   A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*   at

694. The Eleventh Circuit has cautioned that "this standard is difficult to meet." *Brownlee*, 306 F.3d at 1059. In fact, the cases in which a defendant can prove ineffectiveness are few and far between." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). When conducting the prejudice inquiry, a court must consider counsel's error in the context of "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

In the instant case, Sanchez claims that his lawyers were ineffective for not calling certain witnesses, not seeking certain testimony from witnesses that were called, and not making certain motions and objections. In addition, as to a limited number of appellate issues that were not previously raised by prior counsel, Sanchez alleges that his original appellate counsel also were ineffective. When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *See Strickland,* 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–91).

Complaints of uncalled witnesses and unoffered documents are disfavored and viewed with great caution as claims of ineffective assistance of counsel. *See Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985). "'Complaints of uncalled witnesses are not favored in federal habeas review,'" *United States ex rel. Cross v. DeRobertis*, 811 F.3d 1008, 1016 (7th Cir. 1987) (*quoting Murray v. Maggio*, 736 F.2d 279, 282 (5th Cir.1984)); *see also Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978); *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002) (allegations about possible testimony that might have been offered by a witness who was not called are viewed

34

by the courts with great caution); *Brain v. United States*, 2011 WL 1343344 (E.D. Tenn. April 8, 2011) (claims of ineffective assistance of counsel predicated upon bare allegations of uncalled witnesses are not favored in 28 U.S.C. § 2255 proceedings and mere unsupported, unsubstantiated allegations about what testimony a potential witness might have given are too speculative to justify awarding extraordinary post-conviction relief under 28 U.S.C. § 2255).

The Eleventh Circuit "has emphasized that '[w]hich witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" *Allen v. Secretary*, 611 F.3d 740, 759 (11th Cir. 2010) (*quoting Waters v. Thompson*, 46 F.3d 1506, 1512 (11th Cir. 1995). *See also Chandler*, 218 F.3d at 1314 n. 13. Furthermore, the testimony of witnesses is often speculative, so the defendant has a difficult task in showing actual prejudice that the testimony of a witness would have changed the entire outcome of a trial. *See Blackburn*, 750 F.2d at 500. A § 2255 petitioner's mere speculation that missing witnesses would have been helpful is insufficient to meet the burden of establishing ineffective assistance of counsel. *See Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

In *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001), the Eleventh Circuit commented on an argument made by petitioner's counsel asserting that the trial lawyer should have called some additional witnesses during the original trial. Habeas counsel however had only offered argument, not sworn affidavits or testimony. The Court noted that the petitioner had pointed only to unsworn statements taken from the uncalled witnesses. The witness testimony did not directly contradict any of the trial proof. The proffer only offered speculation that the missing witnesses would have been helpful. The Eleventh Circuit concluded that this kind of speculation is "insufficient to carry the burden of a habeas corpus petitioner." *Johnson*, 256 F.3d at 1187.

With regard to Sanchez's claims concerning objections and motions that Sanchez's lawyer did not make, a lawyer has no obligation to raise meritless issues. "Because a defendant's lawyer has an obligation to be truthful and forthright with the court, he has "no duty to make a frivolous argument," *United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003) (emphasis in original), and indeed is barred by the rules of professional ethics from doing so. *See Smith v. Robbins*, 528 U.S. 259, 272 (2000); *Fuller v. United States*, 398 F.3d 644, 652 (7th Cir. 2005); *see also United States v. Quarry*, 60 F. App'x. 188, 190 (10th Cir. 2003) ("[C]ounsel is not obligated to make factually or legally baseless arguments, no matter how strongly a client may regard the matter."); MODEL RULES OF PROF'L CONDUCT R. 3.1 ("A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis . . . for doing so that is not frivolous.").

The deference for acts of omission and strategic decisions is even greater where petitioners claim that appellate counsel were ineffective for failing to pursue issues on appeal. Appellate counsel are charged with reviewing the record below, including the extensive transcript record, to identify possible issues to appeal, researching those issues, and deciding which issues should be pursued on appeal. In this case, Sanchez's appellate counsel decided that, under the current state of the law, eighteen issues were worth pursuing on direct appeal. "This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 535–36 (1986)(*quoting Jones v. Barnes,* 463 U.S. 745, 751-752, 103 S.Ct. 3308, 3312-3313, 77 L.Ed.2d 987 (1983). It is also important to review the appellate record with an eye to the state of the law at the time the appellate brief was filed:

> It will often be the case that even the most informed counsel will fail to anticipate a state appellate court's willingness to reconsider a prior holding or will underestimate the likelihood that a federal habeas court will repudiate an established state rule. But, as *Strickland v.*

> *Washington* made clear, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct., at 2065.

*Smith*, 477 U.S. at 536.

In the instant motion, Sanchez has failed to meet his burden of establishing deficient performance or resulting prejudice. Sanchez has not shown that trial counsel or for that matter, appellate counsel, acted unreasonably in their representation of Sanchez in this capital case. Sanchez's claims concerning uncalled witnesses and areas of testimony that went unexplored are speculative, contradicted by the record, or cumulative of other evidence. Assuming arguendo that Sanchez was able to establish that trial counsel's performance was constitutionally deficient, he has not established that he was prejudiced thereby. To establish prejudice, Sanchez would have to establish that but for counsel's allegedly deficient action, there is a reasonable probability that the outcome of the proceeding would have been different. This, Sanchez has not and indeed cannot establish. The evidence of guilt in this case is so overwhelming that the correction of all of the alleged errors of counsel during the guilt phase would not have changed the jury's verdict. Furthermore, the horrifying facts of this case, particularly the execution-style murders of two preschool aged boys, makes it highly unlikely that Sanchez could have escaped the death penalty altogether, regardless of the quantity or quality of mitigation evidence. The fact that Sanchez was able to escape the death penalty and receive life imprisonment for three of the five death penalty eligible counts is a testament to the outstanding performances of counsel. As Sanchez has failed to meet his burden of establishing that his counsel were ineffective, the instant motion should be denied.

37

A.      <u>SANCHEZ HAS NOT ESTABLISHED THAT HIS TRIAL OR APPELLATE COUNSEL WERE INEFFECTIVE FOR NOT CHALLENGING COUNTS SEVEN, EIGHT, NINE, AND TEN OF THE INDICTMENT AND THE JURY INSTRUCTIONS REGARDING THESE SAME COUNTS (RESPONSE TO SANCHEZ AMENDED ISSUES II(G), XII(A), and XIII).</u>

Sanchez claims that Counts 7 through 10 of the indictment—and the jury instruction regarding same—were defective and that his counsel were ineffective for failing to challenge these items at trial or on appeal.  For the reasons stated herein, Sanchez's claims concerning Counts Seven through Ten lack merit and should be denied.

Counts Seven through Ten were charged identically against Troya and Sanchez, the only difference being the named victim in each count:

> On or about October 13, 2006, in St. Lucie County, in the Southern District of Florida, the defendants,
>
> DANIEL TROYA
>
> a/k/a/ "Homer," and
>
> RICARDO SANCHEZ, JR.
>
> a/k/a "Rick,"
>
> did knowingly carry and use a firearm during, and in relation to, a crime of violence, and a drug trafficking crime, for which they may be prosecuted in a Court of the United States, that is, armed carjacking, in violation of Title 18, United States Code, Section 2119, as set forth in Count Six of this Third Superseding Indictment, and conspiracy to possess with intent to distribute one or more controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846, as set forth in Count One of this Third Superseding Indictment, respectively, which allegations are re-alleged and incorporated by reference herein, in violation of Title 18, United States Code, Section 924(c)(1), and in the course of this violation caused the death of a person through the use of a firearm, which killing is a murder as defined in Title 18, United States Code, Section 1111, in that the defendants, with malice aforethought, did unlawfully kill Luis Damian Escobedo by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation, and in the perpetration of, and attempt to perpetrate, a robbery.
>
> In violation of Title 18, United States Code, Sections 924(j)(1) and

2.

(CR-DE 305 at 8 through 11).

Sanchez argues that his conviction and sentence on these counts violate his 5th Amendment right to Due Process due to a variety of defects in the indictment and jury instructions. Furthermore, Sanchez argues that as his counsel failed to raise these issues at trial or appeal, he was deprived of his 6th Amendment right of effective assistance of counsel.  First, Sanchez claims, in Section II (G) of his amended motion, that the jury instructions were defective in that the judge, and not the jury, determined that armed carjacking was a crime of violence.  Second, in Section XXII (A) of his amended motion, Sanchez claims that these counts fail to state a crime and therefore the Court lacked subject matter jurisdiction over these counts as armed carjacking is not an enumerated predicate for felony murder under the federal murder statute, Title 18, United States Code Section 1111, and when the jury instructions substituted armed carjacking as the predicate—rather than robbery as charged in the indictment—the indictment was constructively amended. Third, in Section XII (B), Sanchez claims that the jury instructions were defective for not requiring an unanimous determination as to whether the killings were premeditated or were committed in the commission of a felony offense (felony murder).  Fourth, in Section XIII of his amended motion, Sanchez claims that the counts were impermissibly duplicitous as to predicate offense (crime of violence/drug trafficking offense), murder/manslaughter, and premeditated murder/felony murder.   These claims lack both adequate factual bases as well as legal merit.  As such, they should be denied.

1. Whether a predicate offense qualifies as "crime of violence" is a legal question for the judge, not a factual question for the jury.

In Section II (G) of his amended motion, Sanchez claims that his convictions and sentences on Counts 7 through 10 should be vacated as the district court failed to provide the jury with a

definition of "crime of violence," and instead instructed the jury that armed carjacking was a "crime of violence" thereby "directing a verdict on an element of the offense" and relieving the government of its burden to prove each element of the firearm count beyond a reasonable doubt. CV-DE 80 at 52.   Sanchez also argues that his trial counsel were ineffective for not asking for such an instruction or otherwise raise this issue, and that his appellate counsel were ineffective for not raising the issue on appeal.

The Government agrees that Sanchez never asked for a jury instruction defining the term "crime of violence" or asking the jury to determine whether carjacking qualified as a "crime of violence".   In fact, during the discussion of the proposed jury instructions, the defense proposed telling the jury that carjacking was the crime of violence charged in the indictment.   The defense raised this issue on February 24, 2009, and again on February 26, 2009.   CR-DE 765 at 7067 line 25- 7081 line 5); CR-DE 767 at 7467 ln 3 – 7469 ln 20.   After some discussion, the defense requested change was adopted into the jury instructions.   Troya's counsel explained that he was concerned that if the crime of violence was not specified, the jury might think of additional crimes of violence on their own:

> THE COURT:  Okay.  Anything else from the defense that you see? Again, as we are going along and having greater opportunity to review this, we can make other changes if we have to.  I assume they will be minor, just grammatical changes and things of that nature.
>
> MR. EISENBERG:  This may be nitpicking.
>
> THE COURT:  No one has ever accused you of that.
>
> MR. EISENBERG:  Page 21.
>
> THE COURT:  All right.
>
> MR. EISENBERG:  Umm, and the way The Court has the fourth element, guilt resulting from the perpetration of or attempt -- really, the crime of violence in parenthesis, carjacking.  I thought it should read the crime of carjacking. It is sort of like you took some of the

standard and left a couple words in.

THE COURT:  You would like to put the words "the crime of"?

MR. EISENBERG:  The crime of carjacking.

 THE COURT:  Any objection to that?

 MR. KASTRENAKES:  The statute reads crime of violence.  Case law indicates whether a particular crime is a crime of violence is a matter of law for The Court.

 THE COURT:  Right.

 MR. KASTRENAKES:  You are saying crime of violence which is carjacking.  You could tell them if they find carjacking, it is a crime of violence as a matter of law.

THE COURT:  I think Mr. Eisenberg is suggesting the crime of carjacking instead of just carjacking.   Any problem with that? I don't think it makes any difference.   I would like to accede to counsel's request.  All right.  I will do that.  Okay.  Anything else?  Again –

MR. EISENBERG:  Not that I saw.

THE COURT:  This is not meant to be exhaustive. There may be stylistic changes, and we can do this as we go along, but I think rules require that counsel have the instructions substantively before them before you begin your arguments, and that is the reason they were e-mailed to everybody last night, and undoubtedly there may be other minor things. Did you have anything, Mr. Cohen?

MR. COHEN:  I'm sorry, Judge, if I could have a moment.

THE COURT:  Take your time.

MR. COHEN:  We are fine, Judge.

MR. KASTRENAKES:  Your Honor, if you are going to change, again, page 21, by doing that change, it has a ripple effect.  The first element The Court says the Defendant committed the crime of violence or drug trafficking charge in the indictment.  That is a correct statement of law.   You don't link element of one to crime of violence to your statement in element four. That can be solved in one of two ways.  Leave it as it was or just tell simply the jury as a matter of law you are instructed carjacking is a crime of violence.

41

THE COURT:   Any problem of that, carjacking is a crime of violence?

MR. EISENBERG: Leaves things open.  My concern was, they may on their own think of other crimes of violence.

THE COURT:  But it is important that we pull the jury down to what is alleged.

MR. EISENBERG:  Which is carjacking.

THE COURT:  Carjacking is a crime of violence. If the jury thinks something else happened –

MR. EISENBERG:   I think Mr. Kastrenakes has a point of consistency.  I would like you to be consistent.  That is what I am concerned about. Somebody may think it is an aggravated assault or aggravated battery. We should take the first element and say committed the crime of carjacking as charged in the indictment, which is what is charged in the indictment.

MR. KASTRENAKES:  It is all the way through, every element.

THE COURT:  Hold on a second, if you would, now. Let me make this suggestion, if I might.  After the first paragraph, wouldn't it make sense to say to the jury, as a matter of law carjacking is a crime of violence and as a matter of law -- and what is the drug trafficking crime that is referred to in the indictment?

MR. KASTRENAKES:  Count 1, Your Honor.

THE COURT:  Conspiracy to possess drugs with intent to distribute is a drug trafficking crime. Doesn't that make sense?

MR. EISENBERG:  I don't have a problem in general, but what I would ask The Court to say is carjacking is the crime of violence charged in the indictment, and conspiracy to possess with intent to distribute or conspiracy to distribute is the drug  trafficking crime. It limits it to those crimes charged.

THE COURT:   Why don't we say this.  As a matter of law, carjacking is a crime of violence.  As a matter of law, conspiracy to possess a controlled substance with intent to distribute is a drug trafficking crime. This is the crime of violence and the drug trafficking crime charged in the indictment.

MR. EISENBERG:  That is another way to do it.

42

> THE COURT:  That covers both grounds. Okay.  All set?
>
> MR. EISENBERG:  Yes.
>
> MR. KASTRENAKES:  Yes.
>
> THE COURT:  Good.

CR-DE 766 at 7076 ln 19 - 7081 ln5.  The defense raised the issue anew on the very next day:

> MR. EISENBERG:  I have a problem with one of the jury instructions.
>
> THE COURT:  Yes.
>
> MR. EISENBERG:  Page 22.
>
> THE COURT:  Just for the record, we are looking at what is marked court draft four.
>
> MR. EISENBERG:  Yes, I have draft four.
>
> THE COURT:  Okay.
>
> MR. EISENBERG:  My concern with this is the same as my concern the other day.  When we say the general, a crime of violence, that someone might think of another crime of violence such as aggravated battery or something else, and it wouldn't be limited in their mind to the carjacking, which it should be. So such as in the fourth element, if I could move up, in the fourth element The Court says, the last line, attempted perpetration of the crime of violence, parentheses, the crime of carjacking, I think it should just read or attempt perpetration of the crime of carjacking just to be clear.
>
> THE COURT:  In other words, what you are really concerned about is, you want to tie down that the crime of violence is carjacking as opposed to some other conception, a common sense conception that somebody might think of say holding a gun on somebody is a crime of violence or hitting somebody or whatever?
>
> MR. EISENBERG:  Correct.
>
> THE COURT:  Let's see if the Government disagrees.
>
> MR. EISENBERG:  If I might, before you get to it, in each one of those elements, I would like to substitute -- instead of the crime of violence, I would like to substitute the carjacking, and instead of the drug trafficking, the crime of intent to distribute controlled

substances.  To substitute those in the third and fourth elements.

THE COURT:  You are saying rather than using the statutory definition, you would like to use the specific crimes that we are talking about here, one of    which we all agree is in fact a drug trafficking offense, and the other is in fact a crime of violence? MR. EISENBERG:  Correct.  I just don't want any confusion.

THE COURT:  I understand what you are saying. Does the Government have a problem with that?

MR. KASTRENAKES:  I thought we went through this.

THE COURT:  We did.

MR. KASTRENAKES:  Your Honor, most respectfully, The Court does limit in this instruction the crime of violence to the crime of carjacking.  It is limited in the fourth paragraph.  You make no reference to any other crime.

THE COURT:  Let me think about that.  I understand what you are saying.  Let me have a chance to reflect on it.  You don't have strong objection to it?

MR. KASTRENAKES:  I don't have a strong    feeling.  I think the instruction is balanced, fair –

THE COURT:  We all agree the drug trafficking offense we are talking about is in fact the conspiracy with intent to distribute, and we all agree the crime of violence is the allegation of carjacking.

MR. KASTRENAKES:  Correct.  When The Court reads it, you reference the indictment.  The indictment isn't broader.

THE COURT:  Once again, anything we can do to clarify and simplify these instructions is a step in the right direction.

CR-DE 767 at 7467-7469.

Sanchez's counsel did not expressly opt out of this request to alter the jury instructions. Requesting the instruction was clearly a strategic decision intended to limit the jury to the four corners of the indictment.  The instruction itself was, and remains, a correct statement of the law. *See United States v. Moore*, 43 F.3d 568, 573 (1994) (citing *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994); *see also, In re Smith*, 2016 WL 3895243 (11th Cir., July 18, 2016)

(noting that regardless of the validity of § 924(c)'s residual clause, Smith's § 924(c) conviction met the requirements of that statute's force clause). *See also infra* Section III(A). Had counsel raised the issue on appeal, it would have been rejected. Sanchez has established neither deficient performance nor prejudice.

"Crime of Violence" is a legal term of art. Whether an offence qualifies as a "crime of violence" is, and always has been, a matter of statutory interpretation that is a "purely legal judgment" for the court, not the jury. *See Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015) (discussing the framework for courts to use in determining whether an offense qualifies as a "crime of violence"); *United States v. Credit*, 95 F.3d 362, 364 (5th Cir. 1996); *United States v. Evans*, 699 F.3d 858, 862 (6th Cir. 2012)(recognizing that whether an offense qualifies as a "crime of violence" is a legal determination); *United States v. Weston,* 960 F.2d 212, 217 (1st Cir.1992); *see also United States v. Moore,* 38 F.3d 977, 979 (8th Cir.1994); *United States v. Amparo,* 68 F.3d 1222, 1225-26 (9th Cir.1995), *cert. denied,* 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 200 (1996).

At the defense request, and in keeping with the language of the Indictment, the Court specifically instructed the jury that "as a matter of law, the crime of carjacking is in fact classified as a crime of violence" and noted that the crime was set forth in Count 6 of the Third Superseding Indictment. CR-DE 771 at 7536, 7538, 7542 (Court repeating to jury that carjacking is a crime of violence).[21] This was a matter of statutory interpretation as well as correct statement of law. In making this legal determination, the Court did not direct a verdict. The jury was instructed on

---

[21] To the extent that Sanchez argues that because the word "robbery" is mentioned, such an offense should have been charged and instructed he is incorrect. As noted, the two ways to commit this offense, that is, drug trafficking and carjacking were appropriately delineated.

each element of the offense:

> Each Defendant can be found guilty of this offense as charged in Counts 7 through 10 of the indictment only if all of the following facts are proven beyond a reasonable doubt:
>
> Number one -- and if I did not mention this before, let me come back for a moment.
>
> You will note that only two Defendants are charged in these counts, Mr. Troya and Mr. Sanchez. So either or both of these Defendants could be found guilty only if all of the following facts are proven beyond a reasonable doubt:
>
> Number one, that the Defendant committed the crime of violence which is set out in Count 6, or the drug trafficking crime charged in Count 1.
>
> And two, that during the commission of either or both of those offenses, that the Defendant knowingly carried or used a firearm during and in relation to the crime of violence and/or the drug trafficking crime.
>
> And three, that in the course of using the firearm, the Defendant caused the death of the person described in the particular count of the indictment.
>
> And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense or the killing resulted from the perpetration of or attempted perpetration of the crime of violence alleged in Count 6.

CR-DE 771:7536-37. Notably, while the jury was instructed, at the defense's request, that the carjacking charged in count 6 was the crime of violence, it was up to the jury to determine whether the government had proven, beyond a reasonable doubt, that the defendant committed the carjacking, carried or used a firearm in relation to the carjacking, caused the death of the victim by using that firearm, and had the requisite level of intent. In no way was this a directed verdict.

Sanchez cites to the case of *Jones v. United States,* 526 U.S. 227, 232-33 (1999), for support of his argument that the determination of whether or not carjacking was a "crime of violencewas

a factual determination for the jury." CV-DE 80 at 52. *Jones* involved the interpretation of the federal carjacking statute and whether that statute involved a single offense with multiple sentencing factors or multiple offenses with different elements that would have to be proven to a jury beyond a reasonable doubt. *Jones* did not interpret Section 924(j), the term "crime of violence", or in any way involve statutory definitions. In sum, *Jones* does not require the jury to make legal findings or to resolve issues of statutory interpretation. None of the cases cited by Sanchez requires that the jury resolve issues of statutory interpretation, such as whether a particular offense qualifies, as a matter of law, as a "crime of violence". One need only have a passing interest in federal criminal law to know that post-*Johnson*, whether a particular crime qualifies as a "crime of violence" is a hyper technical legal question, and not a factual matter for juries to determine.

Sanchez has not established that the jury instruction stating that carjacking is a crime of violence as a matter of law was unconstitutional or in any way improper. To the contrary, the instruction was a correct statement of the law and the jury was instructed on each element of the offense. Counsel's failure to object to or appeal a properly drafted jury instruction—particularly one that the defense specifically requested—does not constitute ineffective assistance of counsel. Sanchez's claims in this regard have no factual or legal merit and should be denied.

2. Sanchez has failed to establish that counsel were ineffective for not challenging counts seven though ten and the related jury instruction for failure to state a crime and constructive amendment, respectively.

Sanchez also claims, in Section XXII(A) of his amended petition, that his counsel were ineffective for failing to challenge Counts Seven through Ten of the Third Superseding Indictment as well as the jury instructions for these counts in that the counts fail to state a crime and the jury

instructions constructively amended the indictment.[22] CV-DE 80 at 325-332.  Sanchez claims that because carjacking is not an enumerated offense under the federal murder statue, 18 U.S.C. § 1111, carjacking ending in death is a legally invalid basis for a Section 924(j) conviction.  CV-DE 80 at 318.  Sanchez further argues that the enumerated offense that was charged in the indictment— robbery—was changed to carjacking in the jury instructions, thereby constructively amending the indictment. CV-DE 80 at 324-35.  Underlying these Sanchez's claims is a misunderstanding of the plain language of Section 924(j) and how this Section interplays with Sections 924(c) and 1111.

Counts 7-10 charge violations of Title 18, Section 924 (j) which statute reads:

> **(j)** A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall--
>
> **(1)** if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life

18 U.S.C.A. § 924 (j).  Section 924 (j) expressly incorporates two other sections of federal law, Section 924 (c) and Section 1111.  Specifically, Section 924 (j) incorporates the elements of Section 924(c) as well as the definition of murder contained in Section 1111.  A violation of Title 18, Section 924 (c) occurs when:

> …any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm…

18 U.S.C.A. § 924 (c).  Section 1111 defines murder as follows:

---

[22] Sanchez states, in footnote 222 of his amended motion, that "[c]laim XII is a new claim".  CV-DE 80 at 315 n.222.  The United States disagrees in part.  Claims contained in Sanchez amended sections XII (A) and XII (B) were raised in the original petition section VII (D).  Claims contained in Sanchez amended section XII(C) were raised in the original petition section VIII(K).   Claims raised in Sanchez amended section XII(D), however, are entirely new claims that do not relate back and are therefore untimely.

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

18 U.S.C.A. § 1111.

Sanchez has failed to establish that these counts were improperly drafted, or that they fail to state a crime.  Counts 7 through 10 of the Third Superseding Indictment carefully track the statutory language, weaving together Sections 924 (j), 924 (c) and 1111 to unequivocally reflect that Section 924 (j) was violated through both predicate offenses contemplated in Section 924 (c)-- a drug trafficking crime and a crime of violence—and two means of committing first degree murder as specified in Section 1111---premeditation and commission in the perpetration of a robbery.   It is this last means of committing murder—in the commission of a robbery—that Sanchez complains about here.  Specifically, Sanchez complains that robbery was never defined for the jury, that carjacking was substituted in the robbery, and therefore the Indictment was defective and constructively amended.

It is clear from a reading of the indictment, the jury instructions, and the discussions leading up to the finalization of the jury instructions, that all parties were aware that the robbery referenced in Counts 7-10 was the carjacking.  While a number of predicate offenses are defined in Section 1111 (c), robbery is not one of them.   What was meant by Congress by the use of the word "robbery" is a matter of statutory interpretation—a legal question for the court, not a factual determination for a jury.  In the context of interpreting other statutes with lists of enumerated crimes, courts have looked to the generic definition of the enumerated crime.  The Eleventh Circuit

49

has found the generic definition of robbery to be "the taking of property from another person or from the immediate presence of another person by force *or* intimidation." *United States v. Lockley*, 632 F.3d 1238, 1244 (11th Cir. 2011)(*citations omitted*).  The question now is whether the federal carjacking statute, Title 18, Section 2119 qualifies as a generic robbery.

Section 2119 provides, in relevant part:

> Whoever, with the intent to cause death or serious bodily harm **takes a motor vehicle** that has been transported, shipped, or received in interstate or foreign commerce **from the person or presence of another by force and violence or by intimidation**, or attempts to do so, shall--
>
> **(1)** be fined under this title or imprisoned not more than 15 years, or both,
>
> **(2)** if serious bodily injury (as defined in section 1365 of this title, including any conduct that, if the conduct occurred in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242 of this title) results, be fined under this title or imprisoned not more than 25 years, or both, and
>
> **(3)** if death results, be fined under this title or imprisoned for any number of years up to life, or both, or sentenced to death.

18 U.S.C. § 2119 (*emphasis added*).  There can be no question that the federal carjacking statute qualifies as generic robbery.  The question of whether the federal carjacking statute qualified as a generic robbery and thus as an enumerated crime under 1111 was a matter of statutory interpretation, a legal question for the court, and not a factual determination for the jury.  There was nothing improper in the Court making this determination, or instructing the jury in accordance thereof.

During the trial, counsel had lengthy discussions concerning the jury instructions. In the course of those discussions, the question of how to instruct the jury with regard to the element of intent on the 924 (j) counts was discussed and defense counsel agreed that the proposed instruction on felony murder and carjacking was legally correct.  CR-DE 764 at 6831 (Defense agreement);

50

CR-DE 757 at 6307 and CR-DE 764 at 6830-6837 (entire discussion).

> MR. KASTRENAKES:   We are talking about substituting the Court's instruction on page 17, 18 and part of 19, which covers Counts 7 through 10 with the substitution that I asked for. We skipped over it.
>
> THE COURT:  You are right, I have a note written we've passed that. This is the instruction that applies to Counts 7, 8, 9, 10, with respect to Mr. Troya and Mr. Sanchez, and the question is should we substitute what the Government has proposed in place of what is presently  there.
>
> MR. EISENBERG:  Well, they are legally correct.
>
> THE COURT:  The Government's is?
>
> MR. EISENBERG:   Yes.   Their instruction is legally correct, because they have added on.  The way you had it was premeditated killing, and they added the felony murder element, so I think they are legally correct.

CR-DE 764 at 6831.  The Government further clarified its justification for the instruction:

> MR. KASTRENAKES:  If you look at the indictment in conjunction with the charge, it will be pretty clear.  The indictment charges that possession of that firearm that resulted in the deaths of each of the Escobedo family members was done in furtherance of two separate things.  One is the drug trafficking charge in Count 1, secondly the crime of violence, the carjacking crime charged in Count 6.
>
> Now, you are going to give them a unanimity instruction, they can find both, one or the other, but it has to be unanimous.  If they find it is in furtherance of the crime of violence, for example, take that one first, they don't need to find premeditation or malice of forethought, because -- if they didn't find crime of violence, if they found that weapon was found in furtherance of the charge of the drug trafficking crime charged in Count 1, then we would have to prove malice of forethought *[sic.]* and premeditation as set forth in the instructions.
>
>  THE COURT:  In other words, you are saying if the scenario that might be found was that someone possessed a gun to acquire cocaine that was possessed by the Escobedos, in other words, the purpose of having the gun was to force them to submit and to hand over the cocaine, and that if in the course of that felony murder, committing robbery, death resulted, that is the felony murder aspect of it, no?

51

> MR. KASTRENAKES: Okay. You are confusing the two intents a little bit. Can you rob drugs? **You are right, in this case we are talking about robbing a car**, and in the other case is drug conspiracy to possess and distribute.
>
> United States theory is that the Escobedo vehicle traveled north to obtain 15 kilograms of cocaine escorted by Sanchez and Troya, on the way back a decision was made by Sanchez and Troya to take the 15 kilograms of cocaine contained in that car, and they did that. So that is in furtherance of the drug conspiracy, taking the drugs, and in the course of that, each of the four family members was murdered within the definition of Federal law. The applicable Federal law that applies to that murder depends on what intent was the possession of the firearm. If it was only in furtherance of the drug conspiracy, then murder as defined by Federal law would have to include malice of forethought [sic.] and premeditation. If it was because they were doing the carjacking, felony murder substitutes. The law recognizes felony murder as a substitution for malice of forethought and premeditation.
>
> THE COURT: I understand what you just said about the carjacking. So your view is if a jury concluded that the guns were possessed for the purpose of stealing the cocaine, to obtain the cocaine, the jury would have to conclude that either a Defendant had formed an intent to murder the Escobedos as the possessors of the cocaine or alternatively malice of forethought [sic.].
>
> MR. KASTRENAKES: If you link the possession of the guns on the Turnpike to the drug trafficking conspiracy, since drug trafficking conspiracy is not an enumerated offense for felony murder, United States would have to prove malice of forethought [sic.] and premeditation.

CR-DE 764 at 6833-36 (emphasis added). At the end of the discussion concerning the

Government's proposed instruction on Counts 7-10, the court once again asked if the defense had

any objection and the defense once again stated that they did not. CR-DE 764 at 6839 ln. 5-9.

The final instructions to the jury reflect the nuances of the levels of intent charged in counts

7-10 of the indictment and how they interact with the drug trafficking offense and the carjacking:

> Each Defendant can be found guilty of this offense as charged in Counts 7 through 10 of the indictment only if all of the following facts are proven beyond a reasonable doubt:

\*\*\*

> And four, that the killing was murder, that is, the unlawful killing of a human being with malice aforethought and premeditation in connection with the drug trafficking offense or the killing resulted from the perpetration of or attempted perpetration of the crime of violence alleged in Count 6.

CR-DE 771:7536-37.   The instructions on the issue of intent were correct, and Sanchez has not proven otherwise. Furthermore, Sanchez has failed to establish that his counsel were ineffective for failing to object or appeal jury instructions that were legally correct.

For all these reasons, Sanchez's claims contained in Section XII (A) should be denied.

3. <u>Sanchez has failed to establish that counsel were ineffective for not objecting to jury instructions which did not require an unanimous determination as to whether the killings were premeditated or were committed in the commission of a felony offense (felony murder)</u>

Sanchez further argues, in Section XII(B) of his amended petition,  that the jury instructions were improper in that they did not require unanimity as to whether the jury found that the murders occurred in furtherance of the carjacking charged in count 6 under the felony murder doctrine or were premeditated as part of the drug trafficking offense charged in count one.   Sanchez also claims that his counsel were ineffective for not objecting or appealing on that basis.  CV-DE 80 at 332-334.  A review of the jury instructions illustrate that Sanchez's claims lack legal and factual merit.

As discussed above, the indictment alleged alternative means of establishing first degree murder: (1) premeditated murder in relation to the drug trafficking offense charged in count one; and (2) felony murder in relation to the carjacking charged in count six.

The jury was specifically instructed on the all of the elements of the 924 (j) charges, including the fourth element—that the killing was murder.  CR-DE 771:7536-37.   The Court instructed the jury that the Government had to prove every element of the crime beyond a

53

reasonable doubt and that their decision had to be unanimous.  CR-DE 771 at 7570 ln 19 - 7571 ln

7.  The Court instructed the jury—on  more than one occasion—that they had to be unanimous

with regard to the crime of violence or the drug trafficking offense.  CR-DE 771 at 7543 (Court

instructing jury: "[b]ut you must unanimously agree upon the way in which the defendant

committed the violation"); *Id.* at 7544 (Court instructing the jury that if they "concluded that the

Government had proven one of those other crimes beyond a reasonable doubt, I mean the crime of

violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that

finding.").

The Court instructed the jury on more than one occasion, that they had to be unanimous

with regard to the crime of violence or the drug trafficking offense.  CR-DE 771 at 7543 (Court

instructing jury: "[b]ut you must unanimously agree upon the way in which the defendant

committed the violation"); *Id.* at 7544 (Court instructing the jury that if they "concluded that the

Government had proven one of those other crimes beyond a reasonable doubt, I mean the crime of

violence or the crime of the drug trafficking crime, the jury would have to be unanimous on that

finding.").  During a break in the jury instructions, outside the presence of the jury, defense counsel

asked the court to clarify the unanimity issue:

> THE COURT:  Please be seated, ladies and gentlemen.    Any
> objections or comments at this point on the  jury instructions thus
> far?
>
> MR. EISENBERG:  My only comment would be when things like
> overt act, I think you said that when there are alternative methods of
> doing things, that you just repeat that in order to find that it must be
> unanimous.
>
> THE COURT:  You want me to go back over that?
>
> MR. EISENBERG:  I think you did on the overt act, but I think that
> just bears repeating when there are alternate methods.  What I was
> thinking of, when you said it could be constructive possession or

> actual possession, I think when they are given options, to just repeat it.

CR-DE 771 at 7520. After the jury returned, the Court clarified that when a crime could be completed in alternative means (such as the alternative means of satisfying the murder element) the jury must be unanimous at to which means was proven:

> I've mentioned several times when you look at both the chart and when you look at the indictment, you will understand that Congress has allowed certain crimes to be proven sometimes in alternate ways. I want you to understand that when the Government has alleged those alternatives, the jury must be unanimous in its finding in terms of the method…

CR-DE 771 at 7559.

The unanimity instruction was legally correct, and the failure to object cannot be the basis for a claim of ineffective assistance because there can be no prejudice where the objection would have been overruled as improper under the law.

4. Sanchez has not established that counsel was ineffective for not moving to dismiss Counts 7 through 10 as duplicitous.

Sanchez claims, in Section XIII of his amended motion, that counts Seven through Ten were unconstitutionally duplicitous and that his counsel were ineffective for failing to move to dismiss the indictment, or appeal the conviction, on that basis. CV-DE 80 at 357-363. Sanchez claims that the counts were duplicitous as to the Section 924 (c) predicate offenses (drug trafficking offense / crime of violence), the Section 1111 definitions of murder (premeditation / felony murder), and whether the killings were murder or manslaughter (924 (j) (1) / 924 (j) (2)).

An indictment is duplicitous when it charges two or more separate and distinct crimes in a single count. *See United States v. Burton,* 871 F.2d 1566, 1573 (11th Cir.1989). Even when a count of an indictment is duplicitous, it is only "impermissibly duplicitous" when the manner in which the count is charged "risks unfairness to the defendant." *United States v. Margiotta*, 646

F.2d 729, 733 (2d Cir. 1981).

Sanchez's duplicity claim fails on the merits for several reasons.  First, Sanchez has not established that counts Seven, Eight, Nine and Ten charge two or more offenses in a single count. Indeed, each of these counts charge a single offense.  Second, even if Sanchez were able to establish that the Counts were duplicitous, Sanchez has not established that the manner in which the counts were charged caused unfairness to him.  Third, Sanchez has not established that his counsel were ineffective in failing to challenge properly drafted counts.

Counts Seven, Eight, Nine, and Ten charge Sanchez with using and carrying (and aiding and abetting such using and carrying) a firearm in furtherance of a crime of violence and a drug trafficking offense, and in the course of doing so causing death through the use of the firearm which death was a murder, in violation of 18 U.S.C. § 924(j) (1) and 18 U.S.C. § 2.  Each count is based on the murder of an individual member of the Escobedo family on or about October 13, 2006, and refers to the charges for the underlying crime of violence and drug trafficking offense, which are charged in Counts Six and One of the Third Superseding Indictment, respectively. The counts differ in only one respect: the identity of the murder victim.  At the conclusion of each charge, the Indictment lists the applicable statutes of violation, 18 U.S.C. § 924(j) (1) and 18 U.S.C. § 2.

Section 924 (j)(1) states: "A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall (1) if the killing is a murder (as defined in section 1111) be punished by death or by imprisonment for any term of years or for life."  To prove a violation of Section 924 (j)(1), the Government would have to plead and prove a violation of 924 (c).  To prove a violation of 924 (c), the Government would have to establish that the defendant used or carried a firearm during or in relation to a crime of violence or drug

trafficking offense.   The Indictment set forth the elements required to prove this offense which include that Sanchez violated section 924 (c) (1) by using or carrying (or aided and abetted the using or carrying) a firearm during and in relation to a crime of violence or drug trafficking offense. *See United States v. Nguyen,* 155 F.3d 1219, 1226 (10th Cir. 1999).   Of course, the indictment would need to specify what the crime of violence or drug trafficking offense was, and so it specified that these corresponded to Counts Six and One, respectively.   Section 924 (j) provides an enhanced penalty when the possession of the firearm results in a death that is a murder as defined in Section 1111.   Again, the Government would need to provide notice of this enhancement by pleading Section 1111 within the text of the count, and providing the specific definition of murder.   The Government did so.   An indictment cannot be duplicitous where, as herein, the Government carefully tracked the statutory language and charged one offense per count. *See Gonzalez-Lauzan v. United States*, No. 07-21144-CIV, 2008 WL 343492, at *13 (S.D. Fla. Feb. 5, 2008) (holding that a reference to 18 U.S.C. § 1111 within a count charging a violation of 18 U.S.C. § 924 (j) did not render the count duplicitous as the text of § 924 (j) specifically refers to § 1111 for the definition of murder).

Sanchez claims that the counts are duplicitous as to the predicate offenses (crime of violence/drug trafficking offense).   In support of this sub-claim, Sanchez cites to the case of *In re Gomez*, 830 F. 3d 1225, 1227 (11th Cir. 2016), a ruling on an ex parte, post-*Johnson* application for leave to file a successive 2255 petition.   In that case, a panel member lamented, in dicta, that because the petitioner's 924(c) count listed both crimes of violence and drug trafficking offenses as predicates, the indictment was duplicitous and required remand to determine whether the petitioner had a valid *Johnson* claim. *See In re Gomez*, 830 F.3d 1225, 1227 (11th Cir. 2016).   The Gomez case does not provide controlling precedent to the instant case.   In *In re Gomez,* the

Eleventh Circuit was not ruling on whether alleging alternative predicates in a 924 (c) count rendered the count impermissibly duplicitous.  Whether the 924(c) count in *In re Gomez* was duplicitous was not even a matter properly before the court.  Rather, the Eleventh Circuit performed its "gatekeeping function" under 28 U.S.C. § 2255(h), which required the Circuit Court to certify a second or successive habeas petition if, *inter alia*, a *habeas* motion contained "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court." 28 U.S.C. § 2255(h). In *In re Gomez,* the Eleventh Circuit restricted itself to its gatekeeping function, and determined *only* that the petitioners had established a *prima facie* case that would allow them to make their substantive arguments, in the first instance, to the district court.  *In re Gomez*, at *2-3.

The *Gomez* case cited by Sanchez does not support his claim that pleading multiple predicates in a 924 (j) count renders the count duplicative.   In truth, the undersigned could find no other case to support Sanchez's argument.  To the contrary, case law in this circuit supports the opposite conclusion.   In a case involving a charge of violating 18 U.S.C. § 641, the Eleventh Circuit squarely rejected the argument advanced by the Sanchez in the instant case, holding:

> Where a penal statute ... prescribes several alternative ways in which the statute may be violated and each is subject to the same punishment ... the indictment may charge any or all of the acts conjunctively, in a single count, as constituting the same offense, and the government may satisfy its burden by proving that the defendant, by committing any one of the acts alleged, violated the statute. The conjunctive allegations do not render the indictment duplicitous.

*Burton*, 871 F.2d at 1573 (*citations omitted*).   In the instant case, the Government plead and proved conjunctive allegations: that Sanchez used and carried the firearm in connection with a crime of violation *and* a drug trafficking offense and that Sanchez committed murder through premeditation *and* felony murder.  Under *Burton*, this does not render the Indictment duplicitous.  *See United*

*States v. Wilk*, No. 04-60216-CR, 2005 WL 7863525, at *6–7 (S.D. Fla. Mar. 14, 2005), *report and recommendation adopted*, No. 04-60216-CR, 2005 WL 7863448 (S.D. Fla. Mar. 22, 2005). Sanchez's claim in this regard lacks merit.

Sanchez further claims that the Counts are duplicitous as to the charges of murder and manslaughter. In support of this claim, Sanchez states that the charging language in each count, "[i]n violation of Title 18, United States Code, Sections 924 (j) (1) and 2" refers to 18 U.S.C. §§ 924 (j) (1) (murder) and 924 (j) (2) (manslaughter). There is absolutely no support for this claim. The body of the counts refers to murder, as defined in Section 1111, and not manslaughter, which is defined in Section 1112. On the penalty sheet of the indictment, the reference is to murder, not manslaughter. On the first page of the indictment, under the Court caption, where all statutes are listed, there is no reference to 924 (j) (2) or 1112. There is a reference to 18 U.S.C. § 2, the aiding and abetting statute, which was the statute referenced by the text "and 2" in Counts Seven, Eight, Nine and Ten. It is the common practice in this district, and indeed in every federal district, to charge 18 U.S.C. § 2 in every count where it could be applicable. Sanchez's claim that the reference to Section 2 is a reference to Section 924 (j) (2) or Section 1112 lacks a factual basis of support and reflects a gross misinterpretation of federal criminal practice. Therefore, Sanchez's claims regarding Counts Seven, Eight, Nine and Ten and the charging of manslaughter must be denied.

   5. Conclusion

In this case, the evidence established that Sanchez used and carried a firearm during and in relation to carjacking and conspiracy to possess with the intent to distribute cocaine and in so doing used, or aided and abetted the use of, the firearm to kill four members of the Escobedo family. These counts give proper notice to Sanchez of the crimes with which he is charged, and do not risk

jury confusion or other unfairness to Sanchez. Indeed, the Court submitted the charge to the jury with a clear instruction regarding the applicable law. CR-DE 769 at 22-25.  The Indictment was properly drafted and the jury was properly instructed concerning Counts Seven through Ten, and therefore no deficient performance or prejudice arose from counsel's failure to challenge either the indictment or the jury instructions on that basis.   Thus, Sanchez is entitled to no relief on this claim.

B.     SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE FOR NOT CHALLENGING THE COMPOSITION OF THE WEST PALM BEACH GRAND AND PETIT JURY VENIRES (RESPONSE TO AMENDED SANCHEZ ISSUE VII(C)).

Sanchez argues that his trial counsel were ineffective in not challenging the grand and petit jury venires for underrepresentation of Hispanics and African Americans.  He alleges that these two groups were under-represented on his juries, resulting in violations of the fair cross section requirement of the Sixth Amendment and the equal protection clause.  CV-DE 80 at 189.

The Supreme Court has set forth three requirements to establish a prima facie violation of the fair cross-section requirement.  The defendant must prove that "(1) a group qualifying as distinctive"; (2) is not fairly and reasonably represented in jury venires; and (3) 'systematic exclusion' in the jury-selection process accounts for the underrepresentation." *Berghuis v. Smith*, 559 U.S. 314, 327 (2010) (citing *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  The prima facie elements under the equal protection clause are "virtually identical" to those under Sixth Amendment fair representation claims.  *See Machetti v. Linahan*, 679 F.3d 236, 241 n.6 (11th Cir. 1982), *cert. denied*, 459 U.S. 1127 (1983).  Failure to meet any of these three elements is fatal. *See United States v. Grisham*, 63 F.3d 1074, 1079 (11th Cir. 1995).

The United States does not dispute the first prong.  Hispanics and African Americans are distinctive groups in the community.  But that is the only prima facie requirement Sanchez meets.  The reasons he cannot meet the second or third prongs are discussed in turn below.  As Sanchez cannot establish a prima facie case for his claims, he fails to show that his trial counsel was ineffective for not raising such challenges.

1.  <u>Sanchez has failed to establish either deficient performance or prejudice with regard to his counsel's lack of challenge to the grand jury venire.</u>

Sanchez presents no data supporting his claim that Hispanics and African Americans were under-represented in the grand jury that indicted him because he does not have "the AO 12 form for the relevant period in which Sanchez's . . . grand jury was drawn from the wheel." CV-DE 80 at 191, n.156.  Accordingly, he cannot establish the second element of a prima facie case, namely, that the absolute disparity between the percent of Hispanics and African Americans on the grand jury venire was substantially lower than the percent of Hispanics and African Americans eligible for jury service.  Furthermore, the posture of this claim makes the grand jury's role in finding of probable cause irrelevant.  Sanchez contends that "[a] claim of racial discrimination in the grand jury process . . . is not subject to harmless error analysis." CV-DE 80 at 187 n.152 (*citing Rose v. Mitchell*, 443 U.S. 545 (1979)).  Unlike *Rose*, however, Sanchez couches his claim in terms of ineffective assistance on the part of his trial counsel.  CV-DE 80 at 186.  Establishing ineffective assistance requires deficient performance and prejudice.  *See Strickland*, 466 U.S. at 687.  Because Sanchez has failed to establish that there was anything wrong with the racial composition of the grand jury venire, he has failed to establish that his counsel were deficient in not challenging the racial composition of the venire.  Even if Sanchez had established that his counsel were deficient for failing to challenge the grand jury venire, he has failed to establish that he was prejudiced

thereby. A petitioner shows prejudice due to ineffective assistance of counsel when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 693. As far as Sanchez's grand jury claim is concerned, he cannot establish prejudice because the evidence that came out at trial was sufficient to demonstrate probable cause, and he would likely have been re-indicted. *See Holllis v. Davis*, 912 F.2d 1343 (11th Cir. 1990) (finding "no objective reason for concluding that a grand jury containing [members of the alleged disparate group] would probably have refused to indict or have charged a lesser offense."). "[W]here the evidence was 'so overwhelming that there is no question that he would have been re-indicted,' the petitioner has suffered no prejudice." *Id*. (citations omitted).

For all of these reasons, Sanchez's claims of ineffective assistance of counsel with regard to challenges of the grand jury venire fail on the merits and must be denied.

2. <u>Sanchez has failed to establish deficient performance or prejudice with regard to his counsel's lack of challenge to the petit jury venire.</u>

    a. Sanchez cannot demonstrate that Hispanics and African Americans were unfairly represented in the pool from which his jury was chosen because he cannot show an absolute disparity exceeding 10%.

With regard to the second requirement, Sanchez's evidence falls far short of establishing that either racial or ethnic group was unfairly represented in the grand or petit jury venires. In his attempt to show that Hispanics and African Americans were under-represented in his venire, Sanchez outlines three different mathematical tests for measuring the extent of underrepresentation: absolute disparity, comparative disparity, and standard deviation. Only the first of these, however, is utilized in the Eleventh Circuit. "To determine whether the representation was fair and reasonable, we are only concerned with the 'absolute disparity' produced by the selection process." *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984).

The Eleventh Circuit has relied upon the absolute disparity test, to the exclusion of the comparative disparity or standard deviation tests, since before its inception. *See United States v. Maskeny*, 609 F.2d 183, 190 (5th Cir. 1980) ("declin[ing] appellant's invitation to focus on comparative or standard deviation disparity and find[ing] that the absolute disparities shown [in this case] do not make out a constitutional violation"); *see also United States v. Butler*, 611 F.2d 1066, 1070 (5th Cir. 1980) ("Like the *Maskeny* court, we decline to abandon the absolute disparity method for dealing with jury challenges."). In more recent years, the Eleventh Circuit continues to apply only the absolute disparity test. *See United States v. Carmichael*, 560 F.3d 1270, 1280 (11th Cir. 2009) (finding no prima facie case because the absolute disparity did not exceed 10%); *see also United States v. Pritt*, 458 F. App'x 795, 797 (11th Cir. 2012) ("To determine whether the representation of a group is fair and reasonable, we look only to the 'absolute disparity' produced in the selection process").

Absolute disparity analyzes whether distinctive groups were fairly represented in the jury pool by comparing "the difference between the percentage of [the group] in the population eligible for jury service and the percentage of [the group] in the pool." *See Carmichael*, 560 F.3d at 1280 (citation omitted). "If the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied" *Grisham*, 63 F.3d at 1078-79. The burden of showing a lack of fair representation lies squarely with the defendant. *See Carmichael*, 560 F.3d at 1281. The United States has "no obligation to rebut insufficient figures in order to prevail." *United States v. Else*, 743 F.2d 1465, 1475 (11th Cir. 1984), *overruled on other grounds by United States v. Blankenship*, 382 F.3d 1110, 1122 n.23 (11th 2004).

Sanchez's evidence does not show an absolute disparity exceeding ten percent for either Hispanics or African Americans. His argument that Hispanics and African Americans were

under-represented suffers from a major proof problem because he relies solely upon census data, which includes many individuals ineligible for jury service. Accordingly, he is unable to make the relevant comparison between the percentages of these groups in the venire to the percentages of these groups *in the population eligible for jury service* in Palm Beach County at the time. His comparison of the percentage of Hispanics and African Americans in the pool to the percentage of *all* Hispanics and African Americans in Palm Beach County in 2010 misses the point.

In a nutshell, he alleges that the West Palm Beach venire from which his jury was selected consisted of 7.7% Hispanics (CV-DE 80 at 192) and 12.4% African Americans (CV-DE 80 at 194). He then disregards the third column of Part IV of the AO 12 form, which lists numbers for the percent of these classes found in "the citizen population of the jury division," alleging that those numbers are erroneous. CV-DE 78-1 at 2. Instead, Sanchez looks to census figures to argue that the percent of Hispanics and African Americans in Palm Beach County (the area from which West Palm Beach division juries are drawn) in 2009 was actually much higher than the data recorded on the AO 12 form (7.2% for Hispanics and 10.0% for African Americans). Relying upon the 2010 census, Sanchez posits the actual percentage of these two groups in Palm Beach County was closer to 19% for Hispanics and 17.32% for African Americans. CV-DE 80 at 193, 195.

Census data, however, is inherently problematic because it is not limited to eligible jurors. As the Eleventh Circuit has observed, census figures include citizens and non-citizens, as well as others ineligible for jury service, such as minors, convicted felons, and those unable to speak or understand English. *See United States v. Rodriguez*, 776 F.2d 1509, 1512 n.6 (11th Cir. 1985) (noting one of the problems with appellants' evidence in that case regarding the under-representation of Hispanics was that while census data was adjusted for age and citizenship, it was

64

not further confined to those eligible for jury service by eliminating people without an ability to understand English); *see Else*, 743 F.2d at 1474 n.14 (determining the district court did not err in taking judicial notice under Fed. R. Evid. 201(b)(1) that "many Hispanics within the area either did not speak English, were not citizens, or lacked some other prerequisite for jury duty").

Here, Sanchez simply relies upon the 2010 census data to allege that Hispanics and African Americans made up approximately 19% and 17.32%, respectively, of the population of Palm Beach County at the time his jury was selected.  He has made no effort to narrow those figures to account for children, non-citizens, felons, or non-English speakers.  Accordingly, this Court cannot rely upon Sanchez's cited census figures because they are a woefully inaccurate reflection of the percent of Hispanics or African Americans *who were eligible for jury service* in Palm Beach County at the time.  This deficiency is fatal.  *See Else*, 743 F.2d at 1475 ("The fact that these figures were the best he could find does not mean that they automatically were sufficient to show unreasonable underrepresentation.")

Finally, even setting aside the proof problems, the claim fails with respect to African Americans because, as Sanchez concedes (CV-DE 80 at 80), the absolute disparity is only 4.92% (17.32% - 12.4%)-- well under the firmly established 10% threshold.  *See Carmichael*, 560 F.3d at 1280 ("Under black letter Eleventh Circuit precedent, '[i]f the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied") (*quoting Grisham*, 63 F.3d at 1078-79)).

Accordingly, Sanchez has not established an absolute disparity exceeding 10% with regard to either Hispanics or African Americans in the petit jury venire, and so his claim in this regard must fail.

> b. Sanchez cannot demonstrate Hispanics and African Americans were systematically  excluded from his petit jury venire.

The third element of a prima facie claim requires a showing that any disparity that exists is due to a "systematic exclusion" of the distinctive group from the jury pool.  *See Duren*, 439 U.S. at 364.  Of course, the United States agrees that "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinct groups in the community and then fail to be reasonably representative," but Hispanics and African Americans were not systematically excluded here.  *See United States v. Green*, 742 F.2d 609, 610 (11th Cir. 1984) (citing *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)) (holding that Green failed to "demonstrate that the jury wheels, pools of names, panel, or venires from which the present jury was drawn *systematically excluded* any distinct group in the community" (emphasis in original)).

The Eleventh Circuit has found systematic exclusion where a Georgia law allowed women to "opt out" of jury service "merely by sending written notice to the jury commissioners" which resulted in substantial under-representation of women on juries.  *See Machetti*, 679 F.2d at 237-41.  Similarly, our Circuit Court has found systematic exclusion where it was proven that the jury selection procedures were "'not racially [or sexually] neutral' and were 'susceptible of abuse.'"  *Gibson v. Zant*, 705 F.2d 1543, 1547 (11th Cir. 1983) (quoting *Castaneda v. Partida*, 430 U.S. 482, 494 (1977)).  In *Gibson*, venire members were chosen by jury commissioners who, aware of potential jurors' race and sex, used "their subjective judgment" to determine "which individuals were intelligent and upright."  *Id*. at 1548 (finding the third element of the prima facie case met because the process was not "facially neutral" and "easily capable of being manipulated").

On the other hand, the Eleventh Circuit rejected an under-representation claim where jury pools were selected by choosing every fifth or third name from the voter registration lists because there was no evidence that the voter list from which these jury pools were selected had been tampered with in any way, and there was no showing that the practice provided an opportunity for

66

discrimination.  *See Cunningham v. Zant*, 928 F.2d 1006, 1013 (11th Cir. 1991).  Sanchez's evidence shows that his jury venires were compiled from voter registration records.  CV-DE 78-1 at 2.  He does not argue that the venire's selection from those records was anything other than random.  Accordingly, his case bears no resemblance to *Machetti* or *Gibson*; it is like *Cunningham*, and requires the same result.

Sanchez's attempts to show systematic exclusion are unsupported and wholly misguided.  First, he makes the bald assertion that "the voter registration list that was used to fill the wheel for both the grand and petit juries in [his] case underrepresented Hispanics and African Americans in Palm Beach County."  CV-DE 80 at 195.  The sole basis for this statement is "[o]n information and belief. . . as well as based on the previously aforementioned analysis."  *Id*.  That analysis, however, was based upon census data, which we have illustrated does not accurately portray the percentage of the distinctive groups *among those eligible for jury service*.  Any other "information" upon which Sanchez relies remains a mystery, and such an unsupported allegation cannot stand.  *See United States v. Tuttle*, 729 F.2d 1325, 1327 n.4 (11th Cir. 1984) (rejecting an argument that jury lists are tainted by discrimination where "appellants do not assert that the judges . . . who adopted county voter registration lists as the sole source of names for the petit jury wheels, have themselves discriminated or that the procedures by which names on the voter registration lists are placed on jury wheels are discriminatory.").

Second, Sanchez complains that the wheel from which his jurors were obtained "excluded 18-21 year olds who were otherwise eligible to serve."  CV-DE 80 at 195.  Sanchez presents no evidence that individuals in that age bracket constitute a disparate group, and the undersigned is not aware of any.  To the extent Sanchez implies that the exclusion of this age group (a practical result of time passing between when the master wheel was created and a pool was drawn from it)

67

somehow impacted Hispanics or African Americans to a different degree than it affected other racial or ethnic groups, he provides no support for that contention.  As such, it should be summarily rejected.

Finally, Sanchez attempts to illustrate systematic exclusion by arguing that there was a pattern of underreporting the percentages of Hispanics and African Americans in the third column of Part IV of the AO 12 form.  Specifically, he asserts forms for 1998, 2002, 2003, 2004, 2008 and 2010, consistently recorded a lower percentage of Hispanics and African Americans in the West Palm Beach jury division than reflected by census statistics.  CV-DE 80 at 196.  This argument is wrought with the same proof problems discussed above.[23]

However, there is another fundamental flaw.  Even if Sanchez could prove that the clerk routinely under-reported the percentage of Hispanic and African American eligible jurors in Palm Beach County, that fact would not "make[] the process by which the grand and petit juries were selected susceptible to abuse" as he alleges. CV-DE 80 at 196.  The particular statistic he attacks as inaccurate is merely used as a check for fair representation of disparate groups throughout the community; it has nothing to do with *how* members of the venire were selected, and Sanchez does not allege the selection of venire members was anything other than random.

There can be no reasonable inference of systematic exclusion where "names from the master wheel were randomly drawn from inclusive data." *United States v. Aguero*, 248 F.Supp.2d

---

[23] Without providing documentation, Sanchez essentially asks the Court to take his word that the forms contain the data he claims they do.  Additionally, even if he has accurately reported the percentages of Hispanics and African Americans "found in the citizen population of [Palm Beach County]" (CV-DE 78-1 at 2) recorded on the forms, any comparison of these figures to census data, including unknown numbers of ineligible jurors, is futile.  Accordingly, he cannot show that the clerk erroneously underreported the total percentages of Hispanics and African Americans eligible for jury service because the census data he cites sweeps far more broadly to include children, non-citizens, felons, and non-English speakers.

1150, 1157 (S.D. Fla. 2003) (citing *United States v. Pion*, 25 F.3d 18, 23 (1st Cir. 1994)).   Sanchez

has not shown that his jury pool was generated by anything other than random selection of

inclusive voter registration data.   Accordingly, he cannot establish systematic exclusion of any

disparate group, and his claims in this regard should be denied.

   3.   Conclusion.

Sanchez has failed to establish a prima facie violation of the fair cross-section requirement

or the equal protection clause with regard to either his grand jury or trial jury venires.   As such, he

has failed to establish a problem with his jury venire of which his counsel could have meritoriously

complained.   Counsel are not required to pursue meritless challenges.   Furthermore, Sanchez's

failure to establish a prima facie violation of the fair cross section requirement or equal protection

clause also means that Sanchez has failed to establish that he was prejudiced when counsel failed

to challenge the venire.   For all these reasons, Sanchez has failed to establish that his counsel were

ineffective for not challenging his grand jury or petit jury venires.[24]

---

[24] Sanchez acknowledges that Fed. R. Crim. P. 12(b)(3) precludes an argument that Hispanics and African Americans were underrepresented in the grand jury venire and thus brings that claim only within the context of ineffective assistance of counsel for neglecting to challenge the grand jury composition.   CV-DE 80 at 186.   To the extent Sanchez may argue that the petit jury selection pool under-represented distinctive groups, irrespective of the ineffectiveness of counsel, such an argument is procedurally barred.   A careful review of the record shows that Sanchez's appellate counsel knew the race and ethnicity of every venire person and used that information to allege the improper striking of venire members based on race and gender.   *See* CR-DE 1111 at ¶ 4 (wherein co-appellant Daniel Troya, "with the consent and agreement of" Sanchez's counsel, explained that he sought such records to "consider and evaluate for possible inclusion in [his] opening brief on appeal . . . [the issue of] whether the jury-selection proceedings in this case comported with the 5th, 6th, and 14th Amendments to the United States Constitution and 28 U.S.C. §§ 1861-69. . ."); 1112 (district court order instructing the Jury Section of the Clerk's Office to release to the parties a list setting forth "(a) the name, participant number, and sequence of every individual called for service in this case, and (b) the race/ethnicity and gender of every such potential juror who completed and returned the required juror qualification form"); CR-DE 1124 (sealed documents containing the "name, participant number, sequence number, race/ethnicity, gender, and appearance date of each of the 259 potential jurors who appeared for voir dire" and "the name, participant number, sequence number, race/ethnicity, and gender for each of the 3,500 prospective

C.  SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE FOR FAILING TO MOVE FOR A COMPETENCY HEARING THAT WAS CLEARLY NOT WARRANTED. (RESPONSE TO SANCHEZ AMENDED ISSUE IV).

Sanchez, in Section IV his amended 2255 petition, alleges that his counsel were ineffective for failing to move for a competency hearing as (he now claims) he was incompetent to stand trial. CV-DE 80 at 94. Sanchez has formally withdrawn his prior claim that the Court violated his due process rights by not holding a competency hearing *sua sponte*. CV-DE 80 at 101 n.73. Sanchez's claims of incompetency are speculative and are not supported by the record or any post-trial affidavits. In fact, the record contradicts Sanchez's claims. As the Petitioner has failed to meet his burden of establishing that he was incompetent, these claims should be denied.

In support of his claim of incompetence, Sanchez cites to declarations of penalty counsel Donnie Murrell (CV-DE 52-1 at 67-72), Dr. Joette James (CV-DE 33-8 at 188-194 and CV-DE 33-9 at 1-23), Dr. Louis Kraus (CV-DE 33-8 at 130-154) as well as a revised declaration from Dr. Daniel Grant (CV-DE 78-1 at 154-170). Sanchez also points to his conduct when the penalty verdict was read—and the death sentence was announced—and his comments after sentence was imposed as evidence that his lawyer was ineffective for not moving for a competency hearing. As explained below, this evidence is either insufficient to meet Sanchez's burden of establishing deficient performance and prejudice, not credible, or both.

1. Sanchez has failed to establish deficient performance.

---

jurors summoned for service in this case"); Sanchez Initial Appellate Brief, Case No. 09-12716-P at 104 (USA Exhibit 1 hereto) (relying upon data to calculate statistics regarding the racial and gender composition of the venire to argue the government disproportionately struck women and African American potential jurors). Given his awareness of every venire person's race and ethnicity, Sanchez could have used that information to craft an argument on appeal that the venire member pool underrepresented Hispanics and African Americans. Given that record, Sanchez cannot establish cause and prejudice for not raising the under-representation argument on direct appeal. As such, the claim is now procedurally barred.

The Due Process Clause prohibits the government from trying and convicting a mentally incompetent defendant. *See Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975); *See also James v. Singletary*, 957 F.2d 1562, 1569 (11th Cir.1992) (*citing Pate v. Robinson*, 383 U.S. 375, 384–86 (1966); *Dusky v. United States*, 362 U.S. 402, (1960)). A defendant's competence to stand trial depends on whether he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Drope*, 420 U.S. at 172, 95 S.Ct. 896 (*quoting Dusky*, 362 U.S. at 402, 80 S.Ct. 788). In *Pate v. Robinson*, the Supreme Court established that due process requires a trial court to conduct a competency hearing, on its own initiative, when the objective facts known to the trial court at the time create a "bona fide doubt" as to the criminal defendant's competency. *Pate*, 383 U.S. at 385, 86 S.Ct. 836; *Wright v. Secretary for the Dep't of Corr.*, 278 F.3d 1245, 1256 (11 Cir.2002); *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987); *see also Williams v. Bordenkircher*, 696 F.2d 464, 467 (6th Cir.1983) (standard of review is "[w]hether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial"). Relevant factors to consider when assessing whether there existed a bona fide doubt regarding competency include: (1) a defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial. *See Drope*, 420 U.S. at 180, 95 S.Ct. 896; *Fallada*, 819 F.2d at 1568. Given this legal framework, it was everyone's interest—the defense, the government, and the Court's—to be on the look out for signs that a defendant is incompetent. This vigilance would be even greater in a death penalty case. And yet, no one, at any time, raised any question as to Sanchez's competency to stand trial before it was raised in Sanchez's 2255 petition.

71

Sanchez now claims that a bona fide doubt existed as to his competence to stand trial. CV-DE 80 at pp. 101-112.   Penalty counsel Donnie Murrell provided a declaration indicating that he "had serious concerns about whether and to what extent Mr. Sanchez understood the trial process," CV-DE 52-1 at ECF p. 69.  Murrrell also wrote that he considered asking for accommodations for his client—such as longer and more frequent breaks and an aide to keep Sanchez focused on the proceedings—but decided against it when Sanchez was able to sit quietly and calmly during the trial.  Sanchez now points to these statements as evidence that his counsel ignored signs that he was incompetent.  Sanchez jumps to a conclusion.    At no point in his declaration does learned counsel Murrell state that he had doubts as to Sanchez's competence, or his ability to assist in the defense, or that he did not, ultimately, understand the nature of the proceedings against him.  To the contrary, Murrell stated that he was able to discuss a potential plea with Sanchez and that he felt comfortable pleading Sanchez to a life sentence.  Sanchez's other trial attorney,  Michael Cohen, also submitted a declaration in this case.  CV-DE 52-1 at 23-25.  Although Cohen addressed Sanchez's "limited intellectual abilities", and noted that these deficits were part of their mitigation and guilt presentation, Cohen made no statement concerning competency nor did he express any concerns as to Sanchez's competency, his ability to assist in his defense, or his understanding of the nature of the proceedings against him.  The omission is notable as counsel were actively looking for mental health defenses.  To be sure, had counsel had any suspicion of a competency issue before or during the trial of this capital case, they would have moved for a competency hearing.

Even if counsel had indicated that they thought Sanchez was incompetent or pointed to behavior that would have caused competent counsel to question request a competency hearing— which they do not—their statements in this regard, at this stage of a capital proceeding, would be

highly suspect. "Statements by trial counsel in affidavits filed years after trial, where counsel in effect "fall on their swords," do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary. *Jackson v. United States*, 638 F.Supp. 2d 514, 528 (W.D.N.C. 2009). *See also, Allen v. Mullin,* 368 F.3d 1220, 1240 (10th Cir. 2004) (court relied on contemporaneous court record to discount trial counsel's testimony in competency trial) and *Newland v. Hall*, 527 F.3d 1162, 1207 (11th Cir.2008) (affidavits from trial counsel and other attorneys regarding what constitutes effective assistance in capital cases are not dispositive and have little weight). Murrell's performance must be examined by the trial record as a whole, not by his guilt over not having saved his client from the death penalty, and now trying to fall on the sword by claiming he did not do his job.

As additional support for his claim, Sanchez has submitted declarations from two new mental health experts, and revised declarations from two other mental health experts. Sanchez claims that his incompetency was caused by "neuropsychological and intellectual impairments" and "symptoms of psychiatric disorders". CV-DE 80 at 97. Petitioner provides no medical records to support this claim. The expert declarations fall short of establishing that Sanchez was incompetent to stand trial, or that his counsel should have doubted his competency. Dr. Grant, who met with Sanchez and tested him before the trial, did not testify that Sanchez was incompetent, and does not state that in his revised affidavit. CV-DE 33-8 at 26-40. In fact, Dr. Grant specifically states that he did not evaluate Sanchez for competency. CV-DE 33-8 at 38. At best, he indicates that, had he been asked, he would have recommended that Sanchez be provided accommodations—additional breaks and explanation—to help him understand each witness's testimony. CV-DE 33-8 at 38-39.

Sanchez also relies on the declaration of Dr. James to establish his claim concerning competency. CV-DE 80 at 102. The declaration of Dr. Joette James falls short of the required evidentiary showing. Dr. James evaluated Sanchez in 2016, some seven years after his capital trial, over two days for a total of 7 ½ hours with Sanchez. CV-DE 33-8 at 191. Dr. James does not opine that Sanchez is incompetent. Like Dr. Grant, she opines that she would have advised counsel or the court to make certain accommodations for Sanchez, such as explaining the day's events both before and after court, and explaining a witnesses' testimony between direct and cross. CV-DE 33-9 at 22. This is not surprising, given that Dr. James noted that Sanchez had difficulty with attention and concentration during her interaction with him. CV-DE 33-8 at 193. Her opinion, based on a day of testing in 2016, is not competent, reliable evidence to support Sanchez's claim that his lawyer should have questioned his competency at the time of his trial.

Finally, Sanchez also relied on a declaration of Dr. Krauss to establish his claim concerning competency. CV-DE 80 at 104. Dr. Krauss also did not state that Sanchez was incompetent. Dr. Krauss opined that Sanchez's psychiatric symptoms (as Sanchez self-reported in 2016 after Sanchez had been on death row for 7 years), in concert with Sanchez's intellectual impairments, would "call into doubt" his ability to understand the proceedings and assist in his defense, particularly in understanding the details of the legal process and processing testimony and evidence. CV-DE 33-8 at 153. Despite evaluating Sanchez for competency, Dr. Krauss makes no mention in her report that Sanchez did not understand the nature of the charges against him or the role played by his lawyers, the government, the court, or the jury—the typical hallmarks of a competency evaluation.

Kraus's opinion that Sanchez's impairments called into question his ability to understand the trial proceedings is belied not only by the countervailing report of the government's own expert

74

witness, Dr. Michael Brannon, but also by Sanchez's own statements at his sentencing proceeding. *See, e.g.,* CR-DE 956 (Transcript of Sanchez Sentencing Proceeding): "Umm, I just want to tell the -- Lou's family and Yessica's family, you know, sorry for a tragedy or whatever. Even though I was still found guilty, I still hold my innocence because I am innocent…." CR-DE 956 at 6.

Taken together, the three expert declarations establish that Sanchez would have benefitted from accommodations for his learning disabilities such as extra breaks and help understanding the testimony of the witnesses. This does not establish incompetency at the time of trial.

Defense counsel Murrell indicated that he told Sanchez what he planned to do during the course of the trial. CV-DE 52-1 at 69. Murrell also stated that he considered asking for special accommodations, such as taking longer and more frequent breaks and having someone sit beside Mr. Sanchez to explain what was happening in real time, but determined that this was not needed "[b]ecause it turned out that Mr. Sanchez was able to sit quietly and calmly during the proceedings." CV-DE 51-1 at 69. From counsel's explanation, it appears the more salient concern was whether Sanchez could remain calm and attentive, not whether he could understand the proceedings. This is made more clear by counsel's very next statement concerning his successful effort to understand the process well enough to accept a plea deal. CV-DE 80 at 69.

The complete record shows that Sanchez's mental health was evaluated by defense experts several times between the time of his arrest and the conclusion of this trial. CV-DE 80 at 73-83. Sanchez's mental health was also evaluated by Dr. Michael Brannon, a government expert, in preparation for the penalty phase. USA Exh. 3 and CR-DE 539, 598. At no point did any of these experts, learned counsel, the government, or the Court question Sanchez's competency to stand trial.

Finally, Sanchez points to his conduct at the end of the penalty phase and his comment during sentencing as evidence that his counsel should have moved for a competency evaluation. The transcript of the trial of this matter spans more than 9,000 pages. The Court held regular status conferences which the defendants were required to attend. The transcripts of these hearings span hundreds of pages. And yet, in all this record, Sanchez was able to allude to two specifics instances at the same hearing in which Sanchez's behavior could have called his competency into question.

Sanchez claims that after the death verdict was read, co-defendant Troya stood and threw a water bottle at the prosecutor and that, in reaction, Sanchez stood as well, mimicking the actions of co-defendant Troya. CV-DE 80 at 103-104, n. 74. First of all, Troya did not simply stand and throw a water bottle at the prosecutor after the jury left the Courtroom. Troya did these things and then ran for the judge and had to be tackled to the ground by two deputy U.S. Marshals, breaking a chair in the process. Sanchez stood not to mimic Troya, but to see what was happening to Troya on the ground. Although the trial transcript does not make clear the full extent of this outburst, Troya makes reference to his outburst during his sentencing hearing. CR-DE 955 at 17. Sanchez also points to his comment after he was sentenced, questioning whether a term of supervised release meant probation, as proof he was incompetent. By its very name, supervised release implies that a defendant is going to be released, and Sanchez's questioning of the meaning of term is not indicative of anything other than he was paying attention to the court when it announced sentence and knew to ask his attorney for clarification of a confusing term. Even if Sanchez's actions and comments during sentencing showed mimicking behavior or a lack of understanding on Sanchez's part, this action occurred at the end of the penalty phase, after the trial was concluded and competency was no longer an issue.

In fact, the record is replete with evidence of Sanchez's competency—that he was working with counsel and that he understood the nature of the proceedings, the nature of the charges against him, and the procedures to be followed in Court:

- Prior to his arrest in the instant case, Sanchez was convicted on state charges. CR-DE 97. There is no indication that Sanchez was found incompetent in that case.

- During his initial appearance of the superseding indictment before Magistrate Judge Vitunac on March 12, 2007, Sanchez appropriately addressed the Court and his counsel informed the Court that Sanchez has not been allowed normal visitation or access to legal research. CR-DE 998 at 4-5. Counsel followed up with a written motion which states, in relevant part: "[y]our undersigned was informed by Mr. Sanchez that he is presently in segregation and is not permitted to access the law library and more importantly, he is not permitted to have contact with family members and normal telephone privileges." CR-DE 142.

- During the initial appearance on the second superseding indictment before Judge Vitunac on April 27, 2007, Sanchez announces his plea of "not guilty" at the appropriate time. CR-DE 1000.

- In a motion filed on December 19, 2007, Sanchez's lawyer indicates that he and Sanchez have been meeting frequently to review discovery and discuss the case. CR-DE 285.

- During a status conference on February 20, 2008, at which time Sanchez has his initial appearance on the third superseding indictment, Sanchez has the following colloquy with the Court:

> **Magistrate Judge Vitunac**: Good afternoon, Mr. Sanchez. Have you read the third superseding indictment?
>
> **Defendant Sanchez**: Yes, we went over it.
>
> **Magistrate Judge Vitunac**: Do you understand what was charged in the indictment?
>
> **Defendant Sanchez**: Yes.
>
> Magistrate Judge Vitunac: Would you like me to read it in full at this time?
>
> **Defendant Sanchez**: No, ma'am.

CR-DE 962 at 19.

- Following his arrest on the instant charges, Sanchez was Mirandized and questioned during a recorded encounter with law enforcement.  At first, Sanchez talked and joked with the officer.  Once incriminating evidence was mentioned, Sanchez invoked.  The Court found that the Miranda waiver was knowing and voluntary and that there was no indication that Sanchez was not competent to understand his Miranda rights.  CR-DE 435.

- During the December 17, 2008, status conference, counsel indicated that he reviewed and discussed the returned juror questionnaires with Sanchez and that Sanchez assented to the agreed strikes.  CR-DE 1098 at 10.

- Throughout the proceedings, Sanchez asked counsel to ask the Court for restroom breaks. CR-DE 732 at 4146; CR-DE 752 at 5263; CR-DE 823 at 8288, CR-DE 847 at 9624; CR-DE 795 at 60.

- During the trial, Sanchez manipulated prison rules, asking staff if he could contact his attorney and instead used the opportunity to make a personal call.  CR-DE 825 at 8679.

- During his sentencing hearing, Sanchez addressed the Court, proclaimed his innocence, and hoped that his conviction would be overturned.  CR-DE 956 at 6.

In sum, the record shows that Sanchez acted rationally during the trial, and that his demeanor and interactions were appropriate.  Furthermore, prior to the filing of the instant 2255, there was never any question raised as to Sanchez's competency—not during the pendency of his prior criminal case, not during any of his pre-trial mental health evaluations, not during any of the numerous pre-trial hearings for which Sanchez was present, and not during the lengthy trial of this matter.

Sanchez has simply failed to that counsel's performance was deficient in not seeking a competency evaluation.

### 2.   Sanchez has failed to establish prejudice.

Sanchez has also failed to establish that he was prejudiced when his counsel failed to move for a competency evaluation.  Sanchez has not established that he was incompetent at the time of

his trial. At best, Sanchez has established that accommodations would have been appropriate. This is not incompetency. Sanchez has simply failed to establish that had counsel requested a competency evaluation, it would have ended with a finding that Sanchez was competent. As such, Sanchez has failed to establish that by not moving for a competency evaluation, counsel altered the outcome of the trial to Sanchez's detriment. Although Sanchez states that a competency evaluation might have resulted in finding additional mitigating evidence, Sanchez makes no specific claims as to what evidence would have been discovered. Counsel hired numerous mental health experts to evaluate Sanchez. They were actively looking for mental health issues to use in mitigation. It is unlikely that a competency evaluation would have uncovered additional, unknown evidence. Sanchez has not met his burden of establishing that if Counsel had moved for a competency hearing, the outcome of his trial would have been different.

Most of Sanchez's competency argument, and his evidence support this argument, focuses on accommodations that could have been made to assist Sanchez with his understanding of the proceedings and his involvement in his own defense. Although Sanchez has gone to great lengths to establish that he could have benefitted from accommodations during the trial, he has made no specific claims as to how these accommodations would have made a difference in the outcome of his trial. Sanchez does not indicate how the accommodations would have assisted his defense. For instance, Sanchez makes no claims that had he better understood a witness's testimony he would have suggested particular questions on cross examination. Sanchez makes no claims as to what new defenses he would have suggested had the accommodations been requested and provided. It is no surprise that Sanchez has failed to make such claims in this case, where the evidence of Sanchez's involvement in the murders was so overwhelming.

       3.     <u>Conclusion</u>

Sanchez's claim that his lawyer was ineffective for failing to move for a competency hearing should be denied without a hearing. There is no competent evidence to support Sanchez's claim that he was incompetent at the time of his trial.

Sanchez has failed to establish that his counsel's performance was deficient in not seeking a competency evaluation.  The evidence produced by Sanchez in support of his claim, mostly in the form of declarations, does not support his claim that he was incompetent.  At best, Sanchez has established that he may have needed accommodations to better understand the witness' testimony. A need for accommodations does not equal incompetence to stand trial.  None of declarants state that Sanchez lacked an understanding of the nature of the charges against him, or the role of the parties.  The record below, including numerous transcripts of hearings where Sanchez was present, indicate that he was competent.  Furthermore, Sanchez was evaluated by numerous mental health professionals during the course of the criminal case.  His lawyers were actively looking for mental health issues to use in mitigation, and yet no one raised any issue with regard to Sanchez's competency until after he was sentenced to death.

Sanchez has also failed to establish that he was prejudiced when Counsel did not move for a competency evaluation. Sanchez has failed to establish that such a motion was meritorious or would have been successful.  A lawyer cannot prejudice a defendant by not asserting the need for a competency hearing when the defendant was, in fact, competent for the pertinent period.  *See Moore v. Campbell*, 344 F.3d 1313, 1324-25 (11th Cir. 2003).  Sanchez states that his defense would have benefitted from a competency evaluation even if it did not result in a finding of incompetency, but makes no specific claims as to how the defense would have benefited from Sanchez meeting with yet another mental health professional when his defense team had already hired several.  At best, Sanchez establishes that he could have used accommodations to help in his

understanding of certain witness' testimony. Once again, Sanchez fails to make any specific claims as to how this would have made a difference. He does not indicate what he would have done differently had he received accommodations, what questions he would have suggested, what new defenses he might have raised, or how any of this would have made a difference in the outcome of his trial. He does not show that counsel was unable to discuss with him relevant evidence, documents, or his defense. Other than conclusory allegations, Sanchez fails to offer any concrete examples of defenses that were unavailable to him based upon his attorney's alleged failure to procure reasonable accommodations and the Government has found none in the record. Given the overwhelming evidence against Sanchez, it is doubtful it would have made any difference at all. Beyond the allegations, there has been no showing that Sanchez was denied access to the court, access to his attorney, or was not afforded a fair, equitable, and just trial. Consequently, Sanchez has not established that defense counsel's performance did not fall below the reasonableness standard established under *Strickland,* or that he was prejudiced by counsel's performance.

As Sanchez has failed to establish that his counsel were ineffective for not moving for a competency evaluation, his claims in this regard should be denied without a hearing.

D. SANCHEZ HAS NOT ESTABLISHED THAT COUNSEL WERE INEFFECTIVE FOR NOT OBJECTING TO THE MEDICAL EXAMINER EVIDENCE (RESPONSE TO SANCHEZ ISSUE V).

In Section V of his Amended Petition, CV-DE 80 at 57-64, Sanchez argues that his trial counsel were ineffective for allowing the testimony of a substitute medical examiner to be admitted into evidence without objection. For the reasons explained below, Sanchez is incorrect in his conclusion that the testimony was improperly admitted.

At the guilt phase in this matter, Dr. Roger E. Mittleman, testified for the United States CR-DE 729 at 3355-3466.[25]   As noted by Sanchez, at a break during Dr. Mittleman's testimony, there was discussion about the fact that he had not been the pathologist who had conducted the autopsies in question, nor had he prepared the corresponding reports.  CR-DE 729 at 3395-96.  Specifically, the Court noted that because there was binding precedent holding that the autopsy reports were business records, the defense was not objecting to Dr. Mittleman's testimony concerning those reports.  *Id.*[26]

Sanchez takes the position that his trial counsel were ineffective because they failed to object to the admission of Dr. Mittleman's testimony and should have done so because such admission violated Sanchez's Sixth and Eighth Amendment rights and he was prejudiced thereby.  Specifically, Sanchez now argues that trial counsel should have objected to the testimony on confrontation grounds based on *Crawford v. Washington*, 541 U.S. at 68.   In *Crawford v. Washington*, the Supreme Court held that the Sixth Amendment's Confrontation Clause prohibits the admission of "testimonial" statements unless the witness is unavailable and there was a prior opportunity for cross-examination.  541 U.S. 36, 68, 1374 (2004).  Sanchez also argues that because of "heightened procedural safeguards," he is also entitled to relief under the Eighth Amendment given the punishment imposed in his case.

At the time that Sanchez and Troya went to trial, an autopsy report was considered a business record, as the district judge in this case had determined, and thus those reports were exempt from the Confrontation Clause.  *See e.g., United States v. Rosa*, 11 F.3d 315, 331 (11th

---

[25] As correctly represented by Sanchez, this substitution was not opposed by his trial counsel. *See e.g.*, CR-DE 522; CR-DE 531; CR-DE 538.

[26] Citing to *United States v. Rosa*, 11 F.3d 315, 331 (2d Cir. 1993).

Cir. 1993), *accord Smith v. McDonough*, 2008 WL 2941149, *13 (S.D. Fla 2008). Although Sanchez does not reference the case, in 2012, the Eleventh Circuit decided *United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012), which held that autopsy reports constituted testimonial evidence given the particular Florida statutory framework and the related trial testimony of a medical examiner. *Id.* at 1231-32. To the extent that Sanchez would take the position that the law in this Circuit has changed and that his trial counsel should have anticipated this eventuality, he is patently incorrect.

As explained earlier, a claim of ineffective assistance of counsel has two components. "First, the defendant must show that counsel's performance was deficient," in that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. "Second, the defendant must show that the deficient performance prejudiced the defense" in the sense that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687, 694. As mentioned, the Eleventh Circuit has referred to the first element as the "performance" prong and the second element as the "prejudice" prong. *See Reece v. United States*, 119 F.3d 1462, 1464 n.4 (11th Cir. 1997) (citations omitted). A court need not address both components if the defendant makes an insufficient showing on one. *See Strickland*, 466 U.S. at 687.

"For performance to be deficient, it must be established that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence." *Putman v. Head*, 268 F.3d 1223, 1243 (11th Cir. 2001). Courts must be highly deferential in reviewing counsel's performance, and must apply the strong presumption that counsel's performance was reasonable. *See Chandler*, 218 F.3d at 1314.

With regard to issues such as the one presented by Sanchez here, a reviewing court must make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. Additionally, "as an acknowledgment that law is no exact science, the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized." *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999); *see also Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000) ("[W]e are not prepared to say categorically that counsel's failure to [preserve an argument] constituted prejudicial, ineffective nonfeasance while the law was still unsettled.").

In this case, these principles apply perforce.  When this case was being litigated, the issue of whether *Crawford* applied to autopsy reports was unsettled at best, and there was ample case law noting the reports were business records and thus exempt from the Confrontation Clause.  It is unclear what exactly Sanchez's counsel would have gained by even lodging an objection given the fact that there was case law - including one case cited by the district court here - that decided the matter against Sanchez.

Further, the fact that this issue was being contested in cases such as *Ignasiak* while Sanchez was being tried does not support Sanchez's argument that his counsel was constitutionally ineffective for failing to raise a Confrontation Clause objection.  While ignorance of well-defined legal principles is deemed inexcusable, an attorney is not liable for an error of judgment on an unsettled proposition of law.  *See Smith*, 170 F.3d at 1054-55; *see e.g., Guyton v. United States*, 447 Fed. Appx. 136 (11th Cir. 2011) (because the question of whether Florida extortion statute was non-generic was unsettled at the time of sentencing, ineffective assistance claim failed). Therefore, Sanchez's trial counsel were far from constitutionally deficient when they did not challenge the use of the autopsy reports and related testimony.

Significantly, as noted above, if a defendant fails to establish the deficient performance prong, the Court need not analyze the prejudice prong, and vice versa. *See Philmore v. McNeil*, 575 F.3d 1251, 1261 (11th Cir. 2009). However, even if Sanchez were to satisfy the first prong, which as illustrated above he cannot, it is also evident that Sanchez's prejudice argument is likewise flawed. Sanchez ostensibly complains about the fact that the Medical Examiner testified about how the murders were conducted.[27] However, he is really complaining about the fact that the Medical Examiner was allowed to testify concerning the deaths of two small children and both their parents who were then unceremoniously left on the side of a Florida public highway. It makes no difference in terms of prejudice whether the Medical Examiner was allowed to testify that the children were executed at close range. The fact remains that ample testimony was admitted concerning the fact that two small children were killed by gunfire—and left on the roadway apparently shielded, to some extent, by their mother's body.[28] The very nature of this case given the victims, and the other evidence, made this a very strong case for the United States. Although the United States wanted to make sure it met its burden, the fact remains that it was hardly an

---

[27] Apparently in an attempt to sully Dr. Mittleman before this Court, Sanchez casts various undeveloped aspersions against his reputation. CV-DE 80 at 114. But the fact remains that as explained above, none of these undeveloped arguments help Sanchez because the prejudice of which he complains is not that deaths occurred, but that amongst the four individuals killed, there were two small children who were shot and left on the side of a public road.

[28] *See e.g.*, CR-DE 728:3112-27 (eyewitness who discovered bodies on the side of the road describing what looked like a mother holding a child and a small boy who appeared to be hiding under her legs); CR-DE 728 at 3131(Florida Trooper testifying that he originally thought it was three bodies but upon closer inspection saw a small child); CR-DE 728 at 3207 (law enforcement discussing photographs taken of crime scene admitted into evidence).

ambiguity or a close question in the trial whether or not the individuals who shot these children and their parents intended to kill them.[29]

Therefore, for all of the reasons, Sanchez cannot prevail on this claim.

E.   SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE IN THEIR HANDLING OF THE GOVERNMENT'S TOOLMARK EXPERT WITNESSES (RESPONSE TO SANCHEZ AMENDED ISSUE VII(A)(2)).

Sanchez claims, in Amended Issue VII(A)(2), that his trial counsel were ineffective in the investigation and challenge of the Government's tool mark evidence. CV-DE 80 at 164-183. In detail, Sanchez complains that his trial counsel should have conducted a comprehensive investigation of the firearms evidence, and challenged the admissibility of such evidence through a pre-trial motion filed under the ruling set forth in *Daubert v. Merrill Pharmaceuticals Inc.*, 509 U.S. 579 (1993). CV-DE 80 at 164-183. Sanchez further argues that had a *Daubert* hearing failed to result in the inadmissibility of the toolmark evidence, counsel was ineffective for failing to challenge the scientific basis for the government experts' conclusions and their degree of scientific certainty.  CV-DE 80 at p. 163.   Sanchez also claims that his trial counsel were ineffective for failing to call a defense toolmark expert to testify that the government experts had expressed opinions that lacked a sound scientific basis. CV-DE 80 at 165.  Finally, Sanchez claims that the government suborned perjury by having its experts testify as to the certainty of their conclusions and by concealing evidence that the shell casings came from a prior homicide.   CV-DE 80 at 179 n. 50, 181-183.  These claims lack legal and factual merit.

---

[29] Sanchez's complaint that his trial counsel was ineffective for not challenging the medical examiner by for example, cross-examining him, is like-wise meritless.  None of the trial counsel did so.  CR-DE 729 at 3466.  One very logical reason was that they all understood that the jury would hear about these children being killed a number of times and wanted to lessen the repetition of that testimony.

86

1.  Sanchez has not shown ineffectiveness or other constitutional violations with regard to the *Daubert* issues.

Sanchez is correct that defense counsel did not move for a *Daubert* hearing in the pretrial phase.   CR-DE 757 at 6268-70. This omission, and the attempt at a belated oral *Daubert* motion, however, does not establish that defense counsel were ineffective for purposes of Sixth Amendment analysis. Even if counsel had filed a *Daubert* motion at the appropriate time, there is no guarantee that a *Daubert* hearing would have been held as a matter of right. Formal *Daubert* hearings are not required in every case. *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) ("*Daubert* hearings are not required, but may be helpful in complicated cases involving multiple expert witnesses").   Moreover, contrary to Sanchez's assumption that he would have prevailed at a *Daubert* hearing resulting in the exclusion of the firearms' testimony, the underlying methodology of tool mark identification and ballistics identification has been well established and courts have repeatedly accepted this type of expert testimony. *See United States v. Ashburn*, 88 F. Supp.3d 239 (E.D.N.Y. 2015) (*citing United States v. Otero*, 849 F. Supp.2d 425, 427 (D. N.J. 2012)); *United States v. Taylor*, 663 F.Supp.2d 1170, 1179 (D. N.M. 2009); *United States v. Diaz*, 2007 WL 485967 (N.D. Cal. 2007); *United States v. Monteiro*, 407 F. Supp. 2d 351, 365-72 (D. Mass. 2006) (Counsel does not perform deficiently when he or she fails to file motions regarding meritless issues). In sum, had a *Daubert* motion been timely filed in this case, it would have been denied. And as such motion would have been denied had it been filed, Sanchez cannot show that he was prejudiced by the lack of filing. Inasmuch as the outcome would have been the same even if trial counsel had filed a *Daubert* challenge, Sanchez's current claim must fail because of the

lack of deficient performance and prejudice. The failure to seek a *Daubert* hearing did not constitute ineffective assistance of counsel.[38]

>        2.  Sanchez has not established that his counsel were ineffective with regard to challenging the Government toolmark experts through cross examination or the testimony of an uncalled defense expert.

Sanchez claims that his counsel were ineffective by failing to adequately challenge the government toolmark experts through cross examination or, alternatively, by failing to call a defense toolmark expert.  Sanchez fails to establish either deficient performance or prejudice on either ground.

Government tool mark expert Allison Quereau testified as to her qualifications, the methodology used to reach her conclusions, the verified nature of her work through peer review, the nature of her work in general and in this case in particular, her annual proficiency testing, and the 1 – 2% error rate compiled through annual international proficiency tests. Her testimony spanned two trial days; at the end of the first day, the trial judge commented that the government had laid a sufficient foundational predicate for the admissibility of firearms' analysis as a "legitimate area of scientific inquiry", but noted that her testimony was subject to cross examination to point out any claimed deficiencies in her testimony.[30]   CR-DE 757 at pp. 6267-6280, 6298.

---

[38] No *Daubert* claims were raised on appeal, and the petition fails to assert that appellate counsel was ineffective for failing to claim that the government firearms' identification testimony was inadmissible.  As such, to the extent that Sanchez claims that the admission of the toolmark evidence was otherwise unconstitutional, those claims are procedurally barred.

[30] Contrary to the amended petition's allegations filed here, claiming that the government's firearms-related expert testimony did not meet the *Daubert* "threshold" (CV-DE 80 at p. 162), the Government did not proceed with the firearms' linkage testimony until it had established the *Daubert* foundation for admissibility.[30] CR-DE 757 at 6265 – 6270; 6295-97. *See United States v. Otero*, 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence). Importantly, the trial judge afforded defense counsel the opportunity to *voir dire* Quereau on aspects relating to her

Quereau's testimony linked an AK-47 firearm recovered during a search warrant at Garden Court (GX 202m) and eight of eleven casings recovered from a shooting on Mercer Avenue in West Palm Beach, FL (the Troya-linked shooting). GXs. 602A, 602B and 602C; CR-DE 757 at 6287. Specifically, she testified that she identified the AK-47 recovered from "Thug Mansion" as having fired eight of the cases recovered from Mercer Avenue. CR-DE 757 at 6287. The AK-47 was not a weapon used in any of the murders. Quereau also testified that with a reasonable degree of scientific certainty she linked 16 casings recovered from the Suwanne Drive shooting (GX 610A to GX 202m) with an AK-47 rifle seized from the Garden Court house known as "Thug Mansion". Quereau opined that 8 casings had been fired from that rifle and six cartridge cases had been "cycled" through the same rifle as some point in time. CR-DE 758 at pp. 6341-6346.

Mr. Murrell, penalty counsel for defendant Sanchez, conducted extensive cross-examination of government expert Allison Quereau relating to her qualifications and the science of firearms examination. *See e.g.*, CR-DE 758 at 6354-6377. Trailing defense counsel, Troya attorney Ruben Garcia, focused his questions on the terminology Quereau used, specifically the term "characteristics" and the limits of her conclusions. CR-DE 757 at 6378-6380. Those examinations brought into focus for the jury a challenge to the underlying science of tool mark identification, and the alleged uncertainty of identifying the AK-47 to the exclusion of every other AK-47 in the world.

Government expert witness Marc Chapman testified as to the long-term acceptability of the science of firearms and tool mark identification, that its known error or validation rate was 1%,

---

qualifications, and presumably the underlying science prior to the admission of her expert opinion (CR-DE 757 at 6269-70), but defense counsel opted to wait until cross-examination to make any challenges.

and that he had been trained and qualified as an expert in this field seventy times in state court and one preceding time in federal court. CR-DE 764 at 6600 - 6603. *Otero,* 557 Fed. Appx. 146 (11th Cir. 2014) (ample record evidence existed for trial court to conclude *Daubert* foundation had been laid to admit tool mark evidence). Chapman explained that the system used in toolmark identification that he used was known as ACE-V, "analyze, compare, evaluate and verify." CR-DE 764 at p. 6602. Chapman also explained that the "verify" term included peer review in every instance (CR-DE 764 at pp. 6602-6603), one of the standard features of the *Daubert* analysis. Defense counsel deferred any voir dire on Chapman's qualifications or the field of examination until cross-examination. CR-DE 764 at 6604.

Chapman testified that he examined nine millimeter casings recovered from the homicide scene and determined that they were all fired from the same (unrecovered) weapon. CR-DE 764 at 6607. He also testified that when he compared three of those casings to hundreds of live rounds found during the Garden Court search warrant, he determined that the tool marks on the casings matched the tool marks on two of the live rounds. CR-DE 764 at 6694. Chapman limited the absoluteness of his conclusion by stating that it was his opinion that within a reasonable degree of scientific certainty the same unknown tool made the tool markings on three of the .9mm casings from the homicide scene and two live rounds found at Garden Court. CR-DE 764 at 6694. Chapman also testified that he examined seven individual forty caliber casings recovered separately from the same homicide scene and determined that they were all fired from the same firearm, a second (unrecovered) weapon. CR-DE 764 at 6609. Chapman further testified that two of those homicide forty caliber casings bore tool marks that had individual characteristics that were identical to one live round found at Garden Court. CR-DE 764 at 6695. He expressed this opinion by stating that within a reasonable degree of scientific certainty it was his opinion that the tool

markings on two of the forty caliber casings and one live round recovered from Garden Court were made by the same unknown tool. CR-DE 764 at 6695.   These identifications were based on microscopic analysis and comparison of breach face marks and firing pin impressions or markings. CR-DE 764 at 6695.

Murrell, Sanchez penalty counsel, initially conducted the cross-examination of government toolmark expert Chapman. (CR-DE 764 at 6660). Murrell's cross-examination challenged Chapman's lack of accreditation, his limited experience, his laboratory's funding by law enforcement, that his professional organization does not require testing or proficiency for competence. CR-DE 764 at 6663-65. Murrell pointed out to the jury that Chapman's two published articles were unrelated to tool mark identification, that Chapman's report failed to disclose the methods he used to conduct his comparisons, and that neither his report nor his employing laboratory has any procedure for determining or disclosing known error rates or percentages of certainty for their work. CR-DE 764 at 6673-6683.  Murrell also conducted an effective cross-examination utilizing a learned journal in Chapman's field of professional work and pointed out that Chapman had not read the latest report, and that he and his laboratory were not in compliance with many of the recommended best practices published in the report. CR-DE 764 at 6675- 6680. Murrell also pointed out that all of the tool markings could have been made by a gun chamber, not just a magazine lip as raised on direct. CR-DE 764 at 6641 and 6668.[31]   Finally, Murrell pointed out that Chapman could not identify the actual tool that made the marks, nor could his analysis establish who was holding either of the two weapons that had fired the recovered casings. CR-DE 764 at 6667, 6691-92.

---

[31] The single live .40 caliber round about which Chapman testified had been located inside gun magazine #5 found during the Garden Court search. CR-DE 764 at 6641.

After Murrell's cross-examination pointed out the expert's limited experience, and the limitations of his examinations and opinion, it was up to the jury to make credibility determinations. A detailed review of the trial transcript of Murrell's examination indicates that it was thoroughly conducted and touched on areas of training, bias, expertise, and the lack of protocols to ensure accuracy. The examination raised questions for the jury concerning the credibility of the science and the certainty of the expert's opinions. After this thorough examination, no other defense attorney conducted additional cross-examination, notably because none was needed. CR-DE 764 at 6692. The substantial impeachment of Chapman's testimony by Sanchez's counsel makes any challenge of alleged ineffectiveness particularly unworthy of being sustained. *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985); *see also Card v. Dugger*, 911 F.2d 1494, 1506 (11th Cir.1990).

Sanchez also claims that his attorney should have countered the Government's tool mark evidence by presenting a defense expert who could have testified that "the multiple statements of certainty and probability [of government experts] made in Sanchez's case were without any scientific or probabilistic foundation." CV-DE 80 at p. 172.   In support of this claim, Sanchez has provided the Declaration of James Gannalo, a purported firearms expert, seeking to attack the government's trial evidence and testimony presented through the government's expert witnesses. Gannalo's criticism falls short of the required evidentiary showing . *See e.g.*, CIV-DE 33-8 at 180-187 (Gannalo Declaration).   Although Gannalo criticizes the procedures used by Quereau and Chapman to reach their conclusions, a close examination of his declaration reveals that he is ignorant and without knowledge of the procedures they actually used. He conducted no examination or comparison himself. His declaration indicates that he is not familiar with, nor does he have knowledge of, the relevant law enforcement labs' accreditations, protocols, examiner

92

proficiency results, or the technical manuals they use. CIV-DE 33-8 at para. 4. Moreover, Gannalo himself does not indicate he has read the trial transcript itself, but has only reviewed "notes of testimony" and the criminal discovery. CIV-DE 33-8 at para. 3. Although Gannalo criticizes the "procedures" used by Quereau and Chapman to reach their conclusions, his declaration makes it clear that he is ignorant of what procedures they used, or what training they have completed. Moreover, Gannalo himself has performed no analysis or comparison in this case that would directly contradict the scientific conclusions reached by the prosecution's experts. In fact, he has reached no conclusions himself and "would need to inspect and review" the items before reaching any conclusion. CIV-DE 33-8 at para. 17). This showing falls short of the high bar imposed on Sanchez to prevail on this claim. Sanchez cannot prevail on mere speculation that his new expert could contradict the government's toolmark experts. *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

Once the Court denied Sanchez's oral *Daubert* motion, counsel were faced with a choice—they could thoroughly challenge the opinions and methodologies of the government experts via a wide-ranging and detailed cross-examination or they could bolster the validity of tool marks by calling their own expert to testify. Sanchez's counsel chose the former and engaged in vigorous cross-examination of the toolmark experts.

Counsel is not ineffective for failing to call an expert witness where counsel's cross-examination of the government's expert witness covered much of the same ground the uncalled expert would have covered. *See United States v. McGill*, 11 F.3d 223, 227-228 (11th Cir. 1993). This was a strategic decision.  We know that this was a strategic decision, rather than a necessity caused by poor planning because prior to trial the United States received notification from Sanchez's trial counsel that they had retained an expert in firearms' ballistics analysis. *See* USA Exh. 15 (Reciprocal Discovery received by the prosecution concerning Dennis McGuire, ballistics expert).

When reviewing the propriety of these alleged acts or omissions, courts must give substantial deference to defense counsel's strategic judgments. *See Strickland*, 466 U.S. at 689-90. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002) (*quoting Strickland*, 466 U.S. at 690–91).  Accordingly, "[t]he relevant question is not whether counsel's choices were strategic, but whether they were reasonable…. This recognizes that "[t]o uphold a lawyer's strategy, a court 'need not attempt to divine the lawyer's mental processes underlying the strategy,'" but instead must simply determine whether the course actually taken by counsel might have been reasonable. *Crawford, supra,* 311 F.3d at 1314 (citations omitted; emphasis added).

The proper test of whether or not a movant has been denied effective representation is judged by whether or not some reasonable lawyer would have acted similarly at trial. And under this test, trial counsel's conduct was constitutionally sufficient:

> The test has nothing to do with what the best lawyers would have
> done. Nor is the test even what most good lawyers would have done.

> We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial.... We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*Johnson v. Nagle*, 58 F. Supp. 2d 1303 at 1340-41(N.D. Ala. 1999) (*quoting White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir.1992)).  Sanchez has not established that the joint cross-examination of the government experts was deficient. "[W]hen an attorney "substantially impeache[s]" the witness, no claim for ineffectiveness can succeed unless the petitioner comes forward with "specific information" which "would have added to the impeachment of the State's witnesses."*Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985); *see also Card v. Dugger*, 911 F.2d 1494, 1506 (11th Cir.1990).

Sanchez has likewise failed to establish prejudice from counsel's cross-examination or their decision not to call a defense toolmark expert.  Sanchez complains that the failure to challenge the firearms' evidence prejudiced him because, according to Sanchez, the experts' testimony was the only evidence in the trial record linking Sanchez to the Haverhill, Suwanee and Mercer Avenue shootings. CV-DE 80 at 176-177.  Sanchez prejudice claim fails on several fronts.  First, Sanchez has not established that a more vigorous cross examination or the testimony of a defense expert would have changed the outcome of the trial, or even the testimony as to whether the casings found at the murder scene related to other evidence.  Sanchez's uncalled expert expressed no opinion on this issue.  Second, the toolmark expert testimony was not the only testimony linking Sanchez to the murders or the uncharged shootings. Government witness Kevin Vetere described the involvement of Troya, Sanchez and others in the Haverhill shooting. CR-DE 753 at 5636-48. Vetere described Troya's involvement in the Mercer Avenue shooting.  CR-DE 753  at 5669-72. Vetere also described Sanchez's admitted involvement in using the AK-47 to shoot up a house in

the Westgate area.[32]  CR-DE 753 at 5672.  Finally, Maria Lopez, Sanchez's former girlfriend also testified that Sanchez had discussed with her firing a gun into a house in Westgate because he believed a friend of hers was inside the house. CR-DE 758 at 6392.   A complete negation of all the toolmark evidence would not have altered the overwhelming proof that Sanchez was one of the killers.   Trial evidence showed Sanchez's involvement with drug trafficking and affiliation with Danny Varela, Escobedo handwriting on drug ledgers showing lost cocaine and money owed to Escobedo, Sanchez's presence at the murder scene, the motive for killing the Escobedos, his telephonic contact with Jose Luis Escobedo immediately before the shots were fired, Sanchez's fingerprints on the Escobedo Turnpike toll ticket, his lie to Det. Springer about not having been on the Turnpike in a long time (CR-DE 730  3637 and GX 803) ), Vetere's testimony about the night of the homicides and their aftermath, and Sanchez's later bragging to Vetere about buying a gold chain and surmising to Vetere "you going to knock off the next big timer." (CR-DE 753 at 5653).

Sanchez's trial counsel made multiple objections to the admissibility of the government's tool mark evidence, and vigorously cross-examined the government's toolmark expert witnesses. Although Sanchez's attorneys retained and noticed a comparative witness prior to trial, they made a strategic decision not to call him and to rely on their very effective cross-examination. Their performance with regard to the tool mark evidence was not deficient and did not constitute ineffective assistance of counsel.

> 3. <u>Sanchez has failed to establish prosecutorial misconduct with regard to the toolmark evidence.</u>

---

[32] Suwanee Avenue is located near Westgate Avenue in West Palm Beach. (Testimony of Angela Culpepper, CR-DE 757 at 6210).

In addition to all of the attacks on Sanchez's trial counsel, Sanchez also claims that the government intentionally presented false testimony concerning the toolmark evidence. This claim of government misconduct is procedurally barred as it was not raised on direct appeal and Sanchez has not established cause and prejudice for this lapse. Even if this claim were not procedurally barred it would fail on the merits.

Sanchez claims that because some of the shell casing were found under grass or in the dirt at the homicide scene, the casings must have come from another homicide committed at the same location as the Escobedo murders. CV-DE 80 at 179, n. 150. Sanchez claims that Chapman knew this, but intentionally lied and covered up what happened. CV-DE 80 at 179, n. 150. Sanchez fails to cite any evidence, such as a police report, a press clipping, or an affidavit that would back up such an outlandish claim.

At the grassy murder scene alongside Florida's Turnpike, the Escobeo family members all received multiple bullets wounds from two different weapons that led to their deaths. The shooters used multiple weapons, shooting into multiple bodies that were found lying on the grassy swale next to the road. Under these circumstances, it is entirely reasonable, logical and understandable that some projectiles were found submerged beneath grass or dirt during the murder scene investigation; the "submerged" projectile was found inside the same evidence grid that had been set up at the murder site. Sanchez has failed to establish that the casings came from another murder. In fact, this claim of government misconduct is pure speculation.

Sanchez further claims that the government knew that the toolmark experts' opinions lacked a scientific basis and a reasonable degree of scientific certainty, and yet suborned perjured testimony in this regard. Just because Sanchez disagrees with the toolmark expert witness' conclusions and scientific bases, does not mean that their conclusions were false or that their

testimony was the result of some grand conspiracy to suborn perjury.  Sanchez adduces no evidence to support this claim other than rank speculation.

As Sanchez has failed to meet his burden of proof, Sanchez's claims of government misconduct concerning the toolmark evidence should be dismissed.

F.       SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE IN DECIDING NOT TO CALL A CELLULAR TELEPHONE EXPERT (RESPONSE TO SANCHEZ AMENDED ISSUE VII(A)(1)).

Sanchez complains that his trial counsel were ineffective for failing to retain and to call a cellular telephone tracking expert who could testify about the limits of the technology and the weakness of the government's summaries of cell phone tower traffic activity.[33]  CV-DE 80 at 156.

The United States in fact received pre-trial notice from Sanchez's trial attorneys that a cell phone expert had been retained by the defense.  *See e.g.*, USA Exh. 2 hereto, Jeffrey Fischbach, cellular telephone expert notice.   As acknowledged by Petitioner Sanchez (CV-DE 80 at 162), Sanchez's trial team made a strategic decision not to go forward with their cellular telephone expert when they realized that the Government had decided not to call an expert of their own.  CR-DE 713 at 2747-49; CR-DE 756 at 6014.

Instead of utilizing a cellular telephone expert, the government's trial evidence consisted of placing the cellular telephone business records, including cellular tower location data, in evidence through records custodians Larry Smith [Metro PCS] (CR-DE 756 at 5990-6053, (GXs. 701.3, 702, 705, 705.1, 70.2, 710 and 710.1) and CR-DE 757 at 6078—6091; Sue Johnson [T-

---

[33] Sanchez further argues that the government knowingly mislead the jury about the nature of its evidence.  This claim of government misconduct is procedurally barred as it was not raised on direct appeal and Sanchez has not established cause and prejudice for this lapse.  Even if this claim were not procedurally barred it would fail on the merits.  Indeed, for the reasons stated herein, the record flatly contradicts Sanchez's claim that the Government misled the jury into believing that cellular tower data could pinpoint a phone's exact location.

Mobile]) CR-DE 757 at 6118—6162) (GXs 605.1 through 605.6); Jennifer Varney [Verizon] (CR-DE 758 at 6503—6547) (GXs 706, 708, 709, 709.1, 765).   The government did not tender the records custodians as experts or argue that they were present to do anything other than explain the business records of the cellular providers.  Moreover, each of the records custodians conceded that the business records relating to cell tower activity did not pinpoint the actual location of a person placing a call. (Smith/Metro PCS at CR-DE 756 at 6011-12).  Smith even conceded that the closest tower might not be the one utilized to transmit a call if the tower was overloaded with activity, causing the call to be bumped to another nearby tower.  CR-DE 757 at 6101-04.  Sue Johnson, the T-Mobile records custodian, did not testify to anything other than identifying the tower that transmitted a call; she conceded she did not know what happened technically when a cellular tower was overloaded with cellular traffic. CR-DE 757 at 6156-6158.  The Verizon representative, Jennifer Varney, admitted that she did not know the geographical range of Verizon's cell towers (CR-DE 758 at 6529-30,6545); and that she did not know if any particular call hit the tower closest to the caller's location. *Id.*

The Government summarized this cellular tower data through summary charts, GXs 760.1 through 760.12, which were admitted during the testimony of Agent Weeks. CR-DE 764 at 6703-6824 and GXs 760.1 through 760.12.  In his testimony, Weeks admitted that the government's summary charts merely showed the general geographic location of the various cellular towers that carried calls between various parties between October 12, 2006 and October 13, 2006.  CR-DE 764 at 6703-6824.  Moreover, Sanchez's trial counsel engaged in a very extensive *voir dire* on certain charts that pointed out the limitations of what the charts did and did not summarize.  CR-DE 764 at 6740-6745.

Confrontation by Sanchez's defense counsel, either via *voir dire* or regular cross-examination, made apparent the limitations of the government's evidence, (*See* CR-DE 756 at 6007—6011; and 6094—6105), particularly that the records did not pinpoint the caller's actual location. Both the direct examination and cross-examinations made clear that the government's summary charts of the cellular tower records merely summarized the business records, that is, the cell towers and their geographical location.

The attack on counsel's alleged incompetence fails to include an offer of proof or an affidavit from Jeff Fischbach, or any other expert, showing that that the government's evidence was inaccurate, i.e., that the business records it had summarized were inaccurate in any way, or that counsel's cross-examination was insufficient in this regard. The failure to directly contradict the government's evidence on this point--not the exact location of the caller, but the geographical location of the cellular towers that carried the calls--is fatal to Sanchez's claim. A habeas petitioner who claims that his attorneys were ineffective at trial because they failed to call certain persons as witnesses must prove that the proposed witnesses would have testified favorably to his defense. *See Aldrich v. Wainwright*, 777 F.2d 630, 636-37 (11th Cir.1985). Sanchez has made no record proffer that Fischbach, or any other expert, would have contradicted the trial evidence and therefore he has failed to make a prima facie showing on this claim. Although stated in the previous section, it bears repeating that Sanchez cannot prevail simply because he now has found, or could find, new experts who have contradicted the government's evidence. *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial."); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th

100

Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant."); *Elledge v. Dugger*, 823 F.2d 1439 (11th Cir.1987).

Even assuming arguendo that Sanchez had submitted the same Fischbach affidavit as submitted by co-defendant Troya in support of his own 2255, Fischbach's purported testimony would have made no points more significant than those raised by Sanchez's counsel on cross-examination. *See generally, United States v. McGill*, 11 F.3d 223, 227-28 (1st Cir. 1993) (noting trial counsel not ineffective for failing to call rebuttal expert where skillful cross-examination established the same points the uncalled expert would have raised). Trial counsel were not ineffective in deciding not to call an expert following the cross-examinations of Agent Weeks and the records custodians. First of all, no expert was needed as the limits of the business records were pointed out to the jury during cross-examination. Second of all, any further expert testimony would have been redundant following counsel's skillful cross-examination, which effectively pointed out the limits of the cellular tower records.

Sanchez's trial counsel made multiple objections to and vigorously cross-examined the government's cellular tower location evidence. Although Sanchez's attorneys retained and noticed an expert witness in this area prior to trial, they made a strategic decision not to call him and to rely on their very effective cross-examinations. Their performance with regard to the cellular tower location evidence was not deficient. Sanchez has therefore not established that the outcome of the trial would have been different had this mystery expert been called. As such, Sanchez has failed to meet his burden of establishing constitutionally deficient representation with regard to his lawyers' handling of the cellular telephone tower location evidence.

Sanchez has likewise failed to meet the prejudice prong of *Strickland*. Sanchez claims that a defense cellular expert would have been able to establish that Yessica Escobedo's phone was

being used in Texas around the time of and after the murders were committed. This claim falls far short of establishing prejudice. First, the records cited by Sanchez do not support his factual assertions concerning the location of the phone. Second, even if Sanchez was correct concerning the location of the Yessica Escobedo's cell phone, that evidence would not negate the location of the four murdered members of the Escobedo family, or outweigh the overwhelming evidence that Sanchez's killed them.

The United States contends with respect that the amended Petition inaccurately represents the content of the T-Mobile cellular records presented at trial (Sanchez Trial Exh. 32, cited as CV-DE 78-1 at ECF pp. 59-62), and submitted in support of the present Petition. *See, e.g.*, Fraudbuster Subscriber CDR Report, CV-DE 78-1 at ECF pp. 191-210. Sanchez's trial counsel introduced an historical call record from Yessica Escobedo's T-Mobile cellular phone number (956) 266-2004, Sanchez Trial Exh. 32, *supra*, CV-DE 78-1 at ECF pp. 59-62. There is no evidence, either in the record, or from proffered defense expert Fischbach, that this record constitutes cellular tower *location* information. To make representations that these records show that Yessica Escobedo's cellular phone was physically in Harlingen, Texas is simply not true; the cited Sanchez Trial Exhibit 32 does not contain cell tower information, period. Moreover, Sanchez's claim that the United States misled the jury about the phone records is simply not true either. To determine what T-Mobile cellular tower carried a particular call requires the use of two different sets of electronic data: (i) the Fraudbuster Subscriber CDR Report, which is a T-Mobile record of cellular tower activity with numeric codes; and (ii) an internal, proprietary T-Mobile cellular cite record that

provides actual geographic cell tower locations that correspond to a five-digit code on the Fraudbuster report.[34]

Sanchez's representations concerning those records is often completely inaccurate. A review of the cell records, and how to read them, is in order to demonstrate this inaccuracy. Sanchez correctly states that on October 11, 2016, the Yessica Escobedo cell phone connected to a cell tower located 20 miles north of the toll plaza on Interstate 75 in Broward County. CV-DE 80 at 159. An excerpt of the Fraudbuster CDR Report (CV-DE 78-1 at 207) shows this call:

The arrow points to the cellular tower five-digit code corresponding to the call at 19:01 hours, or 7:01pm civilian time. To find out the location of cell tower 12802, one must refer to the master T-Mobile cell tower records, of which an excerpt is provided below:

| LAC | CELL_ID | SECTOR | LAT_DECII | LON_DECIMAL | ADDRESS | CITY | STATE | ZIP | COUNTY |
|---|---|---|---|---|---|---|---|---|---|
| 46902 | 12802 | B | 26.1475 | -80.62833333 | 20 MILES NORTH OF TOLL PLAZA ON I-75 | EVERGLADES | FL | 33341 | BROWARD |

The T-Mobile cell tower records indicates that Tower 12802, the tower used for the 7:01pm call, is in fact located in Broward County, north of the toll plaza on I-75, as accurately described in Sanchez's petition.  CV-80 at 159. *See* GX 707.1

In support of his theory that the true killers escaped back to Texas, Sanchez claims that Yessica Escobedo's phone traveled to Texas around the time of the murders. Sanchez's factual

---

[34]The T-Mobile cell tower "legend" listing the actual geographic location of cell towers was provided in pre-trial discovery and introduced at trial.  See, e.g., GX 707.1, CR-DE 757 at 6136-6137.

support is misplaced.  Sanchez claims that on October 12, 2006  at 11:58 p.m., or 23:58 military time, the Yessica Escobedo cell phone "contacted a cell tower in McAllen, Texas for the purpose of calling and/or attempting to call,  phone located in nearby Harlingen, Texas." CV-DE 80 at 160. In support of this claim, Sanchez refers the Court to Defense Exhibit 32 (located at CV-DE 78-1 at pp 59-62).  Defense Exhibit 32 is not a cellular tower location record.  The only document that recorded actual cell tower geographic location data is the Fraudbuster report coupled with the corresponding T-Mobile cell site data, GX 707.1.  Those records do not support Sanchez's argument. Rather, they establish that T-Mobile did not capture any cell tower activity on that call:

```
                5831  14044558023    10211      14044558023      0          10/12/06
16:38:15   10/12/06 16:41:53   0:03:38   9568316641
           40097   UNKNOWN         0            UNKNOWN          0          10/12/06
23:58:44   10/12/06 23:58:49   0:00:05   19567429994
           40097  14054728024      16053        14054728024     16053      10/12/06
                                    Page 17
```

CV-DE 78-1 at 207. The cell tower records do not reflect that any cell tower in Texas carried this call; the cell tower record for this call shows "0", or no value matching the requisite five-digit code used by T-Mobile.

In an attempt to lend further credence to the bogus claim that the Yessica Escobedo cell phone traveled to Texas with the "real killers", Sanchez makes more factually inaccurate claims about three cell phone calls.  Sanchez  asserts that the Yessica Escobedo phone contacted cell towers in the area of McAllen, Texas during three separate calls on the following dates and times: (1) 11:58 p.m. on October 12;  (2) 1:20 a.m. on October 13, 2006; and (3) 3:18 a.m. on October 13, 2006.[35]   Sanchez is wrong on all three accounts. In reality, the actual T-Mobile Fraudbuster

---

[35] Each of these calls, 11:58 p.m., 12:00 a.m., and 3:18 a.m. were made to (956) 742-9994 which is a T-Mobile number to access voice mail; it is not a call to a third party.

104

reports for these calls do not show a five-digit code corresponding to a tower in Texas; rather, all

three calls show that no cell tower activity was captured by T-Mobile:

CV-DE 78-1 at 207.   Sanchez misrepresented the factual record. The raw call detail record that

he cites is not a geographic cell tower record. In fact, the cell tower records for the Yessica

Escobedo phone the night of the murders do not reflect any cell tower codes that match a location

in Texas, and to argue otherwise is misleading and disingenuous.

The absurdity of Sanchez's argument is made plain simply by the known chronology of

indisputable facts.  Sanchez claims that the Yessica phone was in Texas for three calls occurring

at: (1) 11:58 p.m. on October 12, 2006; (2) 1:20 a.m. on October 13, 2006; and (3) 3:18 a.m. on

October 13, 2006.  The indisputable trial evidence established that the Escobedo vehicle entered

Florida's Turnpike at Ft. Pierce at 2:18 a.m. on October 13, 2016 (See GX 7 at CR-DE 729 pp.

3293-3300) and that the murders occurred at approximately 2:24 a.m. when the gunshots were

heard by witness Janice Rich (CR-DE 728 at 3100-3101).

Sanchez argues that the Yessica Escobedo cell phone was in Texas at 11:58 p.m. on

October 12, 2006 *before* the murders occurred, and then presumably the murders happened in

Florida.   Absurd. Additionally, whereas the murders undoubtedly happened at 2:24 a.m., it is physically impossible for the phone to have been taken to Texas for a phone call at 3:18 a.m.

Sanchez's argument that an "expert would have testified that the phone was taken to South Texas the night of the murders" CV-DE 80 at 157, is belied by the T-Mobile records, and is not supported by any sworn declaration.   Moreover, the argument defies common sense. Fischbach's declaration claiming that the "toll records" state that the handset was in the McAllen, Texas [sic.] when it placed three outgoing calls to (956) 742-9994" is plainly wrong. *Compare* CV-DE 33-8 at pp. 167-171 *with* CV-DE 78-1 at pp. 59-62.

Even if Sanchez was correct about the location of the Yessica Escobedo's phone on the night of the murders, Sanchez has not established that this evidence would have changed the outcome of the trial.   The trial was about the murder of the Escobedo family on the side of the Florida Turnpike; not the location of the victim's phones.   The trial adduced overwhelming evidence of Sanchez's guilt and involvement in the murders which would not be impacted by any imagined cellular expert testimony.   Trial evidence showed Sanchez's involvement with drug trafficking and affiliation with Danny Varela, Escobedo's handwriting on drug ledgers showed lost cocaine and money owed by Varela to Escobedo, Sanchez's presence at the murder scene, the motive for killing the Escobedos, his telephonic contact with Jose Luis Escobedo on the night of the murders and immediately before the shots were fired, Sanchez's fingerprints on the Escobedo Turnpike toll ticket, Sanchez's lie to Detective Springer about not having been on the Turnpike in a long time (CR-DE 730  3637 and GX 803) ), Vetere's testimony about the night of the homicides and their aftermath, and Sanchez's later bragging to Vetere about buying a gold chain and surmising to Vetere "you going to knock off the next big timer." (CR-DE 753 at 5653).   Sanchez has simply failed to establish prejudice in light of the trial record.

For all these reasons, Sanchez's claim on ineffective assistance with regard to his counsel's handling of the cellular testimony should be denied.

G.    SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE IN THEIR INVESTIGATION AND PRESENTATION OF MITIGATION WITNESSES (RESPONSE TO SANCHEZ AMENDED ISSUES VIII(A), (B), (C), (D), (F) & (G)).

Sanchez claims that his trial counsel were ineffective in his investigation, preparation, and presentation of the mitigation case. Specifically, Petitioner claims that his trial counsel failed to adequately investigate and offer testimony concerning Sanchez's intellectual deficits, traumatic childhood, education, cognitive and adaptive deficits, and other mental health issues. Counsel's supposed failures allegedly resulted in the omission of evidence concerning Sanchez's traumatic upbringing and how this affected his psychological development, impaired mental state and reduced culpability (Sanchez Issue VIII(E)) CV-DE 80 at pp. 224-262. Sanchez claims that trial counsel failed to adequately investigate and present evidence of Sanchez's intellectual disability (Sanchez Issue VIII(F), CV-DE 80 at pp. 262-265.   Sanchez claims he suffers from neuropsychological impairments (Sanchez Issue VIII(G), CV-DE 80 at pp. 265-269 and psychiatric disorders that Murrell failed to investigate and to present at trial (Sanchez Issue VIII(H), CV-DE 80 at pp. 269-278.

1.    Sanchez's claim that counsel failed to introduce certain lay witness evidence in mitigation is belied by the record.

Sanchez alleges that penalty counsel Murrell failed to adduce sufficient mitigation testimony from Sanchez's friends and family. (CV-DE 80  pp. 7-209, 214-216, 225-246). Specifically, Sanchez claims that his attorneys should have introduced evidence of Sanchez's family's pesticide exposure, health problems, Sanchez's family history and deficits going back several generations,  exposure to domestic violence through a violent and abusive alcoholic father,

(*Id.*), educational problems, (*Id.* at pp. 246-256),  G.E.D. program enrollment (Id. at p. 256), adaptive functioning deficits (*Id.* at pp. 257-260),  and Varela's control over Sanchez (Id. at pp. 260-261).  Most if not all of these points *were* raised during the penalty phase through witnesses and documents. Support for this conclusion rests in citations to the trial transcript, the defense-submitted mitigating factors, and the jury verdict findings indicating whether or not the mitigating factor was proved. *Id.*

Penalty counsel presented family, social, and educational background testimony and exhibits from Sanchez's mother, Juanita Sanchez (CR-DE 823 at 8148-8209, Sanchez Exhs. 1-8, 42); Sanchez's sister, Nydia Sanchez, (CR-DE 823 at 8272-8299, Sanchez Exhs. 18-22); Juan Jimenez, Sanchez's uncle (CR-DE 823 at 8299-8306); Sanchez's former teacher, Amy Fleming (CR-DE 823 at 8209-8272, Sanchez Exhs. 32, 34); Sanchez's former girlfriend and mother of his only child, Maria Lopez (CR-DE 824 at 8379-8424, Sanchez Exhs. 23-30, 31); and Lopez's mother, Rachel Ramos (CR-DE 824 at 8425-8438, Sanchez Exhs. 37, 43-45).

These witnesses established many of the subject areas that Sanchez now claims were not covered, such as: limited schooling and intellectual ability of parents (CR-DE 823 at 8148-8165), Sanchez taking prescription medicine by accident (*Id.* at 8176), his father's frequent drinking, violent outbursts, and domestic abuse (*Id.* at 8153-8188), and Sanchez's learning problems (*Id.* at 8179-8182).

Information concerning Sanchez's exposure to community violence and extreme family trauma was also presented by penalty counsel Murrell. Nydia Sanchez, Sanchez's sister confirmed that she and her siblings initially grew up in the Dyson Circle area of West Palm Beach which was a dangerous neighborhood where drugs were sold (CR-DE 823 at 8272) and that Sanchez's father often drank and got into frequent fights with his wife, Sanchez's mother (CR-DE 823 at 8275-77).

108

Nydia Sanchez also testified that her father was home most nights (CR-DE 823 at 8273), contrary to the unsworn allegations in Sanchez's original motion that Sanchez's father spent much of the money he earned going out to bars. Juanita Sanchez, Sanchez's mother, confirmed that that her husband - Sanchez's father shot her (CR-DE 823 at 8152-53) and sometimes beat her when he was drunk (CR-DE 823 at 8186). Penalty counsel also established that Sanchez's home life was so bad that as a child, Sanchez once asked an uncle in Texas if he (Sanchez) could stay with him (the uncle) instead of going back to Sanchez's family Florida.  (CR-DE 824 at 8300-01).[36]

The trial record also indicates that penalty counsel Murrell introduced evidence of Sanchez's learning disabilities and impaired intellectual function. Sanchez's school problems were spelled out in great detail by witness Amy Fleming, a special education coordinator and former teacher of Sanchez. (CR-DE 823 at 8208-8269). Fleming told the jury that the school district

---

[36] Sanchez further complains that part of his attorney's ineffectiveness was the failure to secure a Spanish-speaking mitigation specialist to aid in the investigation and preparation of the defense mitigation case. CV-DE 80 at 208. There has been no allegation or showing that the family-provided Spanish speakers did not accurately translate information being communicated during the mitigation investigation. Furthermore, the record belies Sanchez's claim that his mitigation specialist was unable to communicate with mitigation witnesses. Penalty counsel called family witnesses, and friend witnesses; many mitigating factors were found by the jury as a result of the evidence submitted through these witnesses. Moreover, there has been no substantive description as to the content of any information that could have been provided by a family member or acquaintance had counsel employed a Spanish-speaking mitigation specialist. On the record before it the Court has no basis on which to conclude that there is a reasonable probability that this unidentified information would have resulted in a different jury determination. *See, e.g., Floyd*, 638 Fed. Appx. at 915 (11th Cir. 2016) (noting that 2255 petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").   Sanchez speculates that the use of a family member to translate during interviews is likely to "to lead to the gathering of unreliable or incomplete evidence." (CV-DE 80 at 201).  He also speculates that the use of family members inhibited the disclosure of information.  This speculation does not constitute proof that inaccurate translating occurred.   Sanchez has failed to establish either deficient performance or resulting prejudice with regard to counsel's utilization of a non-Spanish speaking mitigation expert.  For all these reasons, Sanchez's claim that his lawyer was ineffective in his selection of and communications with the mitigation specialist must be denied.

identified Sanchez's learning problems early in elementary school, in second grade[37]. Documentary evidence submitted through Fleming showed that Sanchez had a learning disability, had an IQ of 80, and was not mentally retarded. (CR-DE 823 at 8208-8269). Sanchez's learning disabilities were also testified to by Sanchez's mother and sister.  Nydia Sanchez, Sanchez's sister, testified that Sanchez had learning problems in school from a young age. (CR-DE 823 at 8278-79). Juanita Sanchez, Sanchez's motion, testified as to her son's mental impairments: that Sanchez's teachers identified his learning problems early-on and indicated that Sanchez needed tutoring, a need the family never met.  *See* CR-DE 823 at 8148-8209.

Penalty Counsel Murrell augmented this lay witness testimony of Sanchez's childhood, familial experiences, and limited intellectual functioning with expert witness testimony.  Murrell presented the jury with mitigation evidence from three different mental health mitigation experts: Daniel Grant, Thomas Reidy, and Thomas Waddell.  Dr. Grant testified that Sanchez was not retarded based on testing personally conducted by Grant (CR-DE 824 at 8439-8514). Grant also testified that his testing of Sanchez led him to conclude that Sanchez's IQ was 77 (*Id.* at 8444), although he acknowledged a prior IQ test of Sanchez rendered a score of 77 (*Id.* at 8446) and that a prior school-conducted IQ test concluded his IQ was 81 (*Id.* at 8461). Grant noted that Sanchez's parents both had low IQ's—the mother 76 and the father 67 (*Id.* at 8464, 8465)—but despite all of these limitations Sanchez himself demonstrated a "concrete understanding and ability to express himself." (*Id.*  at 8498).

Attorney Murrell then presented the testimony of Dr. Thomas Reidy, a Ph.D. in forensic psychology. (CR-DE 824 at 8516-8671). Reidy testified about his work with the Department of

---

[37] Sanchez now claims that the problems were documented as early as kindergarten, but cites to no support for this claim.  Furthermore, it is doubtful that a two-year difference in when the Sanchez's learning problems were first documented would have made a difference to the jury.

Justice in identifying various sociological "risk factors" that statistically appeared to be predictors of whether a certain person would engage in criminal behavior. (*Id.* at 8532). Reidy identified risk factors in Sanchez's background based on record evidence and testimony he had observed: family problems such as spousal abuse and non-support at school functions (*Id.* at 8533); hyperactivity and restlessness, (*Id.* at 8538); academic failure and poor school bonding (*Id.* at 8540); early identity of learning problems (*Id.* at 8546); lower family IQ as a whole (*Id.* at 8558); the lack of pre-natal care obtained by Sanchez's mother (*Id.* at 8614); the drug and alcohol abuse history demonstrated by Sanchez's father (*Id.* at 8616); his father's long arrest history, (*Id.* at 8617); living in a high crime area during Sanchez's early childhood (*Id.* at 8626); and Sanchez's choice limitations imposed by this past (*Id.* at 8631).[38] Reidy opined that a lower intelligence limits a person's moral reasoning. (*Id.* at 8559).

Despite all of these observations however, Reidy had to admit that Sanchez had denied physical abuse, violent victimization or mental health concerns in his self-reporting to jail officials (*Id.* at 8637). Moreover, Reidy also acknowledged that in Sanchez's evaluation and discussion with government mental health expert, Dr. Michael Brannon, Sanchez had denied witnessing

---

[38] In Section VIII(F) of his motion, Sanchez claims that his lawyers were ineffective for failing to provide their mental health experts with adequate information concerning Sanchez's background. (CV-DE 80 at p. 211). Sanchez fails to state, with any degree of specificity, what information was withheld, and from which experts it was withheld. Even Dr. Grant, Sanchez's expert concedes that he was provided Sanchez's prior school intelligences tests, the prior 2008 tests conducted by defense experts (Katrina Hallmark and Laurence Levine), school records, information from Sanchez's family, and that he had heard the testimony of former teacher Amy Fleming during the penalty mitigation presentation. CV-DE 78-1, at p. 157, ¶¶ 11, 12; and at p. 159, ¶ 17. Moreover, to the contrary, the record, specifically Dr. Reidy's testimony, shows that information concerning Sanchez's background had been communicated to the expert witnesses. Furthermore, Sanchez provides no documentary evidence to indicate that the withheld information actually exists. He fails to establish that the withheld information would have changed trial testimony or resulted in opinions more favorable to Sanchez's mitigation case. As such, Sanchez fails to establish either cause or prejudice with regard to this sub-claim.

domestic violence in the family home and denied suffering substance abuse problems, or mental health problems.  (*Id.* at 8638-39).

Murrell also called Dr. Thomas Waddell, a retired clinical psychologist. (CR-DE 824 at 8367-8379).  Waddell was called solely to offer familial background information related to Sanchez's family situation.  Waddell had examined Sanchez's brother and confirmed that the brother, Efrain Sanchez, had an IQ of 62, and that Waddell had rendered a prior professional opinion that Efrain Sanchez was incompetent to stand trial for the crime of arson. (*Id.* at 8370-72).

The defense-submitted mitigating factors, and the jury verdict findings indicating whether or not these mitigating factors were proved, also show that penalty counsel introduced evidence in, and focused the mitigation case on, the areas that Sanchez now claims counsel ignored.  A table summarizing the penalty jury's findings illustrates this very clearly.  The below-listed chart reflects in bold font those mitigating factors which relate to the current complaints raised by Sanchez:

| # | MITIGATING FACTOR | MITIGATOR PROVED? | NUMBER JURORS FINDING |
|---|---|---|---|
| 1 | EQUALLY CULPABLE CO-DEFENDANT NOT CHARGED | YES | 10 |
| 2 | **UNDER INFLUENCE OF VARELA** | YES | 11 |
| 3 | **LEGITIMATE JOBS** | YES | 8 |
| 4 | NO FELONY CONVICTIONS PRIOR TO VARELA | YES | 7 |
| 5 | **SANCHEZ MORE EASILY RECRUITED DUE TO FAMILY RELATIONSHIP WITH VARELA** | YES | 9 |
| 6 | **SANCHEZ MORE VULNERABLE DUE TO LOW IQ** | YES | 9 |
| 7 | VICTIM ENGAGED IN CONDUCT WHICH CONTRIBUTED TO OFFENSE | YES | 11 |
| 8 | **FOLLOWER NOT LEADER** | YES | 8 |
| 9 | BAPTIZED & CONFIRMED | NO | 0 |

| # | MITIGATING FACTOR | MITIGATOR PROVED? | NUMBER JURORS FINDING |
|---|---|---|---|
| 10 | FAMILY HISTORY OF MENTAL RETARDATION | YES | 4 |
| 11 | LEARNING DISABILITIES | YES | 4 |
| 12 | SOCIALLY ISOLATED | NO | 0 |
| 13 | PARENTS LOW IQ | YES | 4 |
| 14 | PARENTS UNEDUCATED | YES | 5 |
| 15 | PARENTS SOCIALLY ISOLATED | NO | 0 |
| 16 | LOVING RELATIONSHIP WITH SON | YES | 8 |
| 17 | CONSISTENTLY PROVIDED SUPPORT FOR SON | YES | 5 |
| 18 | ALCOHOLIC FATHER | YES | 10 |
| 19 | VIOLENCE BY FATHER | YES | 10 |
| 20 | FEAR OF FATHER | YES | 9 |
| 21 | EXPOSED TO CRIMINAL ACTIVITY AS CHILD | NO | 0 |
| 22 | EXPOSED TO BROTHER VIOLENT SEIZURES | NO | 0 |
| 23 | FAMILY NORMALIZED CRIME | YES | 8 |
| 24 | SANCHEZ LOW IQ | YES | 9 |
| 25 | DIFFICULTY PROCESSING VERBAL INFORMATION | YES | 8 |
| 26 | LOW IQ AND LEARNING DISABILITIES CAUSED EMBARRASSMENT AND HUMILIATION | YES | 8 |
| 27 | LEARNING DISABILITIES DID NOT ALLOW HIM TO FUNCTION AT IQ LEVEL | YES | 9 |
| 28 | EXEMPTED FROM TAKING FCAT | YES | 8 |
| 29 | NO PARENTAL SUPPORT OVERCOMING LEARNING DISABILITIES | YES | 9 |
| 30 | READS AT ELEMENTARY GRADE LEVEL | NO | 0 |
| 31 | CAN ONLY PERFORM MATH AT ELEMENTARY GRADE LEVEL | NO | 0 |
| 32 | ACADEMIC FAILURES CONTRIBUTED TO REDUCED SELF ESTEEM | YES | 8 |

| # | MITIGATING FACTOR | MITIGATOR PROVED? | NUMBER JURORS FINDING |
|---|---|---|---|
| 33 | LIMITED OPPORTUNITIES FOR CAREER CHOICES | YES | 9 |
| 34 | LOOKED OUT FOR OLDER BROTHER | NO | 0 |
| 35 | LACKED SKILLS TO LIVE INDEPENDENTLY OF ASSISTANCE | NO | 0 |
| 36 | NO POSITIVE MALE ROLE MODEL | YES | 7 |
| 37 | RISK FACTORS GROWING UP | YES | 9 |
| 38 | FRAMEWORK TO MAKE THE RIGHT DECISION WAS FLAWED | YES | 9 |
| 39 | TREATED RACHEL RAMOS WITH RESPECT | YES | 1 |
| 40 | LOVING COMPANION OF RACHEL RAMOS | NO | 0 |
| 41 | ADAPTED WELL IN PRISON ENVIRONMENT | NO | 0 |
| 42 | WELL BEHAVED AND RESPECTFUL DURING TRIAL | NO | 0 |
| 43 | EVIDENCE OF EXACT ROLE NOT SUFFICIENT TO JUSTIFY DEATH | NO | 0 |
| 44 | 22 YEARS OLD AT TIME OF OFFENSE | NO | 0 |

(CR-DE 860 at 13-16). Sanchez's penalty counsel submitted a total of forty-four mitigating factors and established to at least one of the jurors the existence of thirty-one mitigating factors. Arguably thirty-two of the forty-four mitigating factors submitted by penalty counsel directly relate to issues that Sanchez claims his penalty counsel ignored. Twenty-seven mitigating factors relate to Sanchez's family background, social background, and learning disabilities.[39] (CR-DE 860) Sixteen mitigating factors related to the mental health history of Sanchez, including his intellectual

---

[39] Mitigators 3, 5,6, 9, 12, 14, 15, 16-24, 26, 29-32, 34-36, 39, 40, and 44. (CR-DE 860). At least some members of the jury found that sixteen of the family background mitigators had been proven by a preponderance of the evidence:  Nos. 3, 5, 6, 14, 16-20, 23, 24 26, 29, 32, 36, and 39.

shortcomings.[40]  (CR-DE 860).

The record below established that nearly all of the mitigating factors that Sanchez now complains about were submitted to the jury, and found by multiple members of the jury to have been proven by a preponderance of the evidence. As a result of Murrell's presentation, at least one member of the jury found that twenty-three different mitigating factors relating to Sanchez's family background, intellectual abilities, and other areas Sanchez now claims his attorney ignored, had been proved by a preponderance of the evidence. (*See* CR-DE 860 at 12-16, and mitigating factors # 2, 3, 5, 6, 8, 10, 11, 13, 14, 18-20, 23-29, 32, and 36-38).  Penalty counsel cannot be held to have been ineffective in failing to introduce evidence that was, actually introduced.

1. Sanchez has failed to meet his burden of establishing that counsel were ineffective for not introducing omitted lay witness testimony when the omitted evidence would have been cumulative of facts already in evidence.

To the extent that Petitioner claims that his penalty counsel was ineffective for failing to introduce evidence and testimony that was actually omitted from the penalty phase of this matter, these claims must fail either because Petitioner has failed to meet the requisite standard of proof or because the omitted evidence would have been cumulative of the evidence adduced at trial.

Although Sanchez's petition includes multiple pages of information concerning Sanchez's childhood and family history that lay witnesses purportedly could have testified to, CV-DE 80 at pp. 200-202, 208-210, 217-249, the omitted evidence would have been cumulative of the bleak and depressing story of Sanchez' childhood that was established by penalty counsel and considered by the jury during the penalty phase of the trial.  *Compare* omitted testimony cited at CV-DE 33-3 through 33-16 *with* penalty mitigation presentation involving ten (10) defense witnesses. CR-

---

[40] Mitigating factors 6, 10, 11, 13, 14, 24, 25, 26. 27, 28, 29, 30, 31, 32, 33, 35. (CR-DE 860). At least one of the jurors found that thirteen of these intelligence-related mitigators had been proven: 6, 10, 11, 13, 14, 24, 25, 26, 27, 28, 29, 32, and 33. (CR-DE 860).

DE 823 at pp. 8148-8298; and CR-DE 824 pp. 8367-8562; CR-DE 825 at pp. 8632-8693.

Most of the purportedly missing evidence related to Sanchez's low IQ and intellectual functioning, limited career choices, negative family history, and his abusive childhood. The majority of this missing evidence was not substantively different than the evidence actually presented to the jury. Counsel was able to introduce relevant facts through other witnesses so evidence was not kept from the jury. In fact, the jury found a number of mitigating factors which related to these issues in their penalty verdict. CR-DE 860. In other words, this evidence was already submitted to, and accepted by, the jury.

Sanchez argues that because certain mitigators were not accepted by the jury, or not accepted by enough members of the jury, counsel were deficient in their presentation of the evidence and failed to prove the underlying facts. Sanchez's argument ignores the mitigation jury instructions. The jury had to find not only that the mitigating fact was proven but also that it actually lessened Sanchez's culpability. That the jury failed to accept the mitigators could just as likely be a result of the jury's determination that the mitigators did not ameliorate Sanchez's execution-style killing of two pre-school age children rather than his lawyer's ineptitude. Sanchez has certainly not established that the penalty verdicts on the mitigators resulted from counsel's performance. And he has also not shown that duplicative testimony would not have tipped the balance in Sanchez's favor.

This Court's review of counsel's performance is not measured against what "some hypothetical 'best' lawyer would do." *LeCroy v. United States*, 739 F.3d 1297, 1313 (11th Cir. 2014). Instead, the Court should "reconstruct the circumstances of counsel's challenged conduct and evaluate the conduct from counsel's perspective at the time." *Id.* (internal quotation marks and citation omitted). The Eleventh Circuit has noted that "there are countless ways to provide effective

116

assistance," and "attorneys are not ineffective for making a reasonable choice to take one avenue to the exclusion of another." *Id.* (brackets omitted). *See also Chandler*, 218 F.3d at 1315 n. 16 ("If a defense lawyer pursued course A ... our inquiry is limited to whether this strategy ... might have been a reasonable one.").

Although the Petitioner challenges trial counsel's failure to call a number of witnesses in mitigation, the Supreme Court has made clear that trial counsel is not required to present all available mitigating evidence during the sentencing phase. *See Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (*citing Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Similarly, the Eleventh Circuit has stated that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Waters*, 46 F.3d at 1514 (11th Cir.1995) (*en banc*) (noting that no absolute duty exists to present all possible mitigating evidence available: "Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."); *see also Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir.2001) ("[A]t a sentencing proceeding, counsel is not required to present all mitigation evidence, even if additional mitigation evidence would have been compatible with counsel's strategy."); *Stevens v. Zant*, 968 F.2d 1076, 1082 (11th Cir.1992) ("[T]rial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.").

The decision concerning how much family testimony to present, how much school or learning problems to present, and the practical need to avoid redundancy is a classic decision that involves the experience and judgment of a skilled litigator. As the Supreme Court has recently explained, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Hunt v. Commissioner*, 666

F.3d 708, 724 (11th Cir. 2012), *citing Harrington v. Richter*, ——U.S. ——, 131 S.Ct. 770, 790, 178 L.Ed.2d 624 (2011) (*quoting Yarborough v. Gentry*, 540 U.S. 1, 8, (2003) (*per curiam*)). Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Crawford v. Head*, 311 F.3d 1288, 1298 (11th Cir.2002).

Counsel is not required to present all mitigation evidence, even if the additional mitigation evidence would have been compatible with counsel's strategy. *See Water*, 46 F.3d at 1514. "Considering the realities of the courtroom, more is not always better. Good advocacy requires 'winnowing out'" some arguments, witnesses, evidence, and so on, to stress others." *Chandler*, 218 F.3d at 1320 ("There is much wisdom for trial lawyers in the adage about leaving well enough alone.").

"The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014) (Tjoflat, J.) (death penalty case), *citing   Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir.2000) (*en banc*).   Sanchez's attack on his lawyers' choice of which mitigation witnesses to call constitutes an improper attempt to second-guess reasonable, strategic choices of trial counsel. *See  DeYoung v. Schofield*, 609 F.3d at 1289, *citing Rhode v. Hall*, 582 F.3d 1273, 1284 (11th Cir.2009) ("[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." (brackets omitted)). *See Mills v. Singletary*, 63 F.3d 999, 1024 (11th Cir.1995) ("The question is whether failing to

present certain mitigating evidence to the jury, or ending an investigation short of exhaustion, was a reasonable tactical decision. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end.") (internal quotation marks and citation omitted). Penalty counsel weighed through all of the available evidence and witnesses and made tactical decisions based on experience as to what would be most effective. Sanchez has not established deficient performance with regard to his counsel's handling of lay witnesses in mitigation.

Even assuming, arguendo, Sanchez was able to establish that counsel's performance in filtering the mitigation evidence was deficient—which he has thus far failed to do— Sanchez has not shown that he was prejudiced thereby. In order to establish prejudice, a Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Putman v. Head*, 268 F.3d 1223, 1248 (11th Cir.2001). A "reasonable probability" of a different result here, as in regard to the guilt stage, is one sufficient to undermine confidence in the outcome. *See Tompkins v. Moore*, 193 F.3d 1327, 1333 (11th Cir. 1999) (*citing Strickland*, 466 U.S. at 690); *Weeks v. Jones*, 26 F.3d 1030, 1042 (11th Cir.1994) ("[T]he petitioner must show ... there is a reasonable probability that the sentencer would have weighed the balance of aggravating and mitigating factors to find that the circumstances did not warrant the death penalty."); *accord, Horsley v. Alabama*, 45 F.3d 1486, 1493 (11th Cir.1995). In order to decide whether omitted mitigating evidence was case-changing, the Court looks at the mitigating circumstance evidence that was not presented, along with that which was presented, and considers the totality of it against the aggravating circumstances that were found. *See Tompkins*, 193 F.3d at 1333); *Callahan v. Campbell*, 427 F.3d 897, 936 (11th Cir.2005) ("When a defendant challenges a death sentence, we

119

evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.") (internal punctuation and citation omitted).

Even if the Court accepted as true all the available mitigation information listed in Sanchez's claims, the facts of the instant case, specifically the execution-style murders of the two children, are so egregious, that it is unlikely that the testimony of even a dozen extra mitigation witnesses would have made any difference in the penalty phase of this trial. At a minimum, Sanchez has not established that it would have made any difference. The type of omitted testimony proffered by Petitioner is simply not of the caliber required to meet the prejudice standard in a capital case. *See Strickland*, 466 U.S. at 700 (noting that evidence that numerous people thought defendant was a good person "would barely have altered the sentencing profile presented to the sentencing judge"); *see also DeYoung v. Schofield*, 609 F.3d 1260, 1291 (11th Cir.2010), *cert. denied*, 562 U.S. 1293 (2011) (stating "all of the family dysfunction testimony, even taken together and credited as true, is weak and a far cry from the horrific childhood circumstances that have been held sufficient to satisfy the prejudice prong in a capital case.").

The United States proved four statutory aggravating factors beyond a reasonable doubt: that Sanchez committed the murders with expectation of receipt of something of value (#1); that Sanchez committed the murders after substantial planning and premeditation to cause the death of a person (#2); that Luis Damian Escobedo and Luis Julian Escobedo were particularly vulnerable due to youth (#3); and that Sanchez intentionally killed multiple victims in a single criminal episode (#4). (CR-DE 860, Sanchez Penalty Verdict). The United States also proved three non-statutory aggravating factors beyond a reasonable doubt: that Sanchez participated in other, uncharged serious acts of violence (#1); that Sanchez killed the victims in order to eliminate them

as potential witnesses (#2); and that Sanchez caused injury, harm and loss to the murder victim families (#3). (*Id.)*

Sanchez's counsel submitted a total of forty-four mitigating factors and established to at least one of the jurors the existence of thirty-one mitigating factors. At least one member of the jury found that twenty-three different mitigating factors relating to Sanchez's family background, intellectual abilities, and other areas Sanchez now claims his attorneys ignored, had been proved by a preponderance of the evidence. (CR-DE 860 at 12-16, and mitigating factors # 2, 3, 5, 6, 8, 10, 11, 13, 14, 18-20, 23-29, 32, and 36-38). As result of counsel's preparation and presentation of the mitigation case, the jury determined that the proven mitigating factors sufficiently outweighed the proven aggravating factors to justify a life sentence on Counts Six, Nine, and Ten. Unfortunately for Sanchez, the jury found that the proven mitigating factors did not sufficiently outweigh the proven aggravating factors to justify a life sentence on Counts Seven and Eight, which counts specifically related to the murders of the Escobedo children. (*See* CR-DE 860). Merely because penalty counsel did not prevail in all his efforts does not convert his effort into a constitutionally-deficient performance.

Given the facts of this horrific case it is highly unlikely, not just improbable, that the jury would have re-weighed the balance in Sanchez's favor just because more mitigation evidence was piled on. The inherent weakness in Sanchez's argument lies in an uncomfortable and indisputable fact: despite the fact that many jurors found that Sanchez's counsel had proven thirty-one different mitigating factors, those factors did not outweigh the ugly brutality of Sanchez's execution-style murder of an entire family, including two preschool-aged boys whom he knew, and the subsequent abandonment of their bodies on the side of the Florida Turnpike. As such, this claim of ineffective assistance should be denied.

2. <u>Sanchez has failed to meet his burden of establishing that counsel were ineffective in their investigation and presentation of mental health experts.</u>

Sanchez claims that his counsel were ineffective for failing to retain and present testimony from mental health experts who could have testified to Sanchez's intellectual disabilities (Sanchez Amended Issue VIII(F)), neuropsychological impairments (Sanchez Amended Issue VIII(G)), and psychiatric disorders (Sanchez Amended Issue VIII(H). Sanchez claims that counsel's failure prejudiced him in that the omitted testimony could have caused at least one juror to vote against the death penalty on Counts 7 and 8. Sanchez has failed to establish either deficient performance or prejudice with regard to counsel's performance vis-à-vis the mental health evidence.

The United States received pre-trial reciprocal discovery from Sanchez's counsel concerning mental health experts he anticipated calling, and for whom he had received court permission to hire. These experts include Francis Crosby, psychological-educational evaluator, (USA Exh. 16); Kartina Hallmark, mental health expert (USA Exh. 17); Jose Lazano, mental health mitigation expert (USA Exh. 18); Laurence Levine, mental health mitigation expert (USA Exh. 19); Dr. Daniel Grant, mental health expert (USA Exh. 20); Theresa Parnell, mitigation mental health expert (USA Exh. 21); Thomas Reidy, mitigation mental health expert (USA Exh. 22); and Tom Waddell, mitigation mental health expert (USA Exh. 23). Only three of these witnesses—Grant, Reidy, and Waddell—were called to testify on Sanchez's behalf. The remaining experts were not called to testify and none of their opinions or bases for their opinions were ever provided to the Government. The fact that penalty counsel sought out such experts, chose them in particular, and received court approval to hire them, shows that penalty counsel was actively working on the mental health portion of the mitigation case. The fact that penalty counsel ultimately chose not to call these witnesses reflects a strategic decision, rather than a default caused by neglect.

Rather than proffer the reports authored by the above-named uncalled experts, who evaluated Sanchez at or around the time of his trial, Sanchez now provides affidavits from several new uncalled experts and an amended affidavit of Dr. Daniel Grant, who now recants significant portions of his trial testimony.   At the trial of this matter, Dr. Grant testified that Sanchez was not mentally retarded:

> Question by Mr. Murrell:.   What did we ask you to investigate?
>
> Answer by Dr. Grant:   You initially asked me to evaluate Ricardo Sanchez to determine if he may be retarded.
>
> Q.  Let's start with that.  Is he retarded?
>
> A.  No.
>
> ***
>
> Q.   You evaluated Ricardo Sanchez and determined that he is not mentally retarded?
>
> A.  He is not mentally retarded.

CR-DE 824 at 8442.

> Question by Kastrenakas: Whether it be the WAIS -- whether it be the psychological test that was administered when Sanchez was nine years old in 1992, or the test you administered in December of 2008, or the test that Dr. Brannon administered in December, 1998 -- 2008, on any of those tests, he is not retarded, correct?
>
> Answer by Dr. Grant:   Absolutely.  I don't even see that as an issue.

CR-DE 824 at 8479.

> a.  Sanchez has failed to establish deficient performance with regard intellectual disability evidence.

Sanchez claims that his counsel was ineffective in his investigation and presentation of evidence of Sanchez's intellectual disability, which at the time of the trial was referred to as mental retardation.  Sanchez claims that his counsel's ineffectiveness manifested in two distinct ways—

having Sanchez's IQ tested repeatedly, which purportedly skewed the results, and not asking for an evaluation of Sanchez's adaptive functioning. CV DE 80 at 263. Sanchez's claims are belied by the record below, and misrepresent the Supreme Court's test for establishing mental retardation.

In *Atkins v. Virginia,* 536 U.S. 304 (2002). the Supreme Court held that it was unconstitutional to execute a mentally retarded individual, but left the task of defining mental retardation to the states. As explained by *Atkins*, however, "clinical definitions of [intellectual disability] require ***not only*** subaverage intellectual functioning, ***but also*** significant limitations in adaptive skills." Atkins, 536 U.S. at 318, 122 S.Ct. 2242 (emphasis added)). At the time of the trial, subaverage intellectual functioning was defined by an IQ of 70 or below. At Sanchez's trial, two experts testified as to Sanchez's intellectual functioning: Dr. Grant and Dr. Brannon. Each expert testified that Sanchez's IQ fell well above 70, and they each concluded, independently, that Sanchez was not mentally retarded. As each expert found that Sanchez failed to meet the first prong of the *Atkins* standard, an evaluation into Sanchez's adaptive deficits—the second prong of *Atkins* was not necessary and quite frankly would have been a waste of time.

Therefore, counsel was not ineffective for not investigating or adducing testimony on adaptive deficits because such testimony would not have made a difference in whether or not Sanchez met the standard for mental retardation/intellectual disability in 2009 at the time of his trial. Certainly, Sanchez has not established that his counsel was ineffective for not investigating or offering testimony on Sanchez's adaptive deficits.

Sanchez essentially faults his counsel for failing to call the "right" expert to testify to Sanchez's level of intelligence. Sanchez concedes that penalty counsel engaged mental health experts Dr. Daniel Grant, Dr. Katrina Hallmark, and Dr. Lawrence Levine to evaluate Sanchez and that each of these experts actually administered tests to him. *See e.g.*, CV-DE 33-9, ECF p. 20, n.

124

2.  However, only Dr. Grant was called to testify.

Now, 9 1/2 years after his evaluation of Sanchez and his testimony during the penalty phase, Dr. Grant has opined that Sanchez is intellectually disabled.  While Dr. Grant claims that this change of heart is based on new information that was not previously provided by trial counsel concerning adaptive deficits CV DE 78-1 at 160-61, Grant also acknowledges that since his evaluation of Sanchez and his trial testimony, "both the clinical definition of intellectual disability and the legal landscape for considering claims of intellectual disability in capital cases has changed".  CV DE 78-1 at 160.

"Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." *Dobbert v. Wainwright,* 468 U.S. 1231, 1233–34, 105 S.Ct. 34, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting from denial of certiorari); *accord United States v. Santiago,* 837 F.2d 1545, 1550 (11th Cir.1988) (noting that "recantations are viewed with extreme suspicion by the courts"); *Ortega v. Duncan,* 333 F.3d 102, 107 (2d Cir.2003) (internal quotation omitted); *United States v. Ahern,* 612 F.2d 507, 509 (10th Cir.1980) ("downright suspicion"); *United States v. Kearney,* 682 F.2d 214, 219 (D.C.Cir.1982); *United States v. Ward,* 544 F.2d 975, 976 (8th Cir.1976); *United States v. Johnson,* 487 F.2d 1278, 1279 (4th Cir.1973); *United States v. Lewis,* 338 F.2d 137, 139 (6th Cir.1964); *Summers v. Dretke*, 431 F.3d 861 (5th Cir. 2005), 872 (5th Cir. 2005)("extreme suspicion").  These suspicions are supported by the fact that "[a]ttempts are numerous by convicted defendants to overturn their criminal convictions by presenting affidavits of recanting witnesses in support of a section 2255 motion." *Kearney,* 682 F.2d at 219.

The mere existence of a recanting affidavit is insufficient on its own to warrant post-conviction relief. As the Eighth Circuit has explained:

> It is easy to understand why this should be so. The trial is the main event in the criminal process. The witnesses are there, they are sworn, they are subject to cross-examination, and the jury determines whether to believe them. The stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.

*United States v. Grey Bear,* 116 F.3d 349, 350 (8th Cir.1997).  Dr. Grant's recantation should be accorded even greater suspicion than the average recantation for several reasons.  First, the delay in the production of the affidavit speaks to its dubious veracity.  Dr. Grant first purported to recant his testimony more than seven years after he testified in Sanchez's defense.  No explanation has been provided for this delay, even though Dr. Grant claims that he was aware of problems with the competency of defense counsel before the case went to trial and remained silent even after the death penalty was imposed.  Such a large time lag casts doubt on the veracity of his recantation. *See United States v. Provost,* 969 F.2d 617, 621 (8th Cir.1992) (district court did not err in finding recantation not credible where, among other factors, the recantation came "more than four years" after trial).  *United States v. Henry*, 821 F. Supp. 2d 249 (D.D.C. 2011), as corrected (Oct. 28, 2011), 259 (DC Cir. 2011)(four and a half year delay between trial testimony and recantation casts doubt on the veracity of the recantation).  Such a significant delay "properly puts the movant under a heavier burden for the passage of time inevitably ripens the finality of the judgment and increases the difficulties of again proving the case." *Brodie v. United States*, 295 F.2d 157 (D.C. Cir. 1961), 159-70 (DC Cir 1961).  Dr. Grant's recantation is even more suspect considering his humiliating cross-examination by then AUSA John Kastrenakas.  CR-DE 824 at 8468 et seq.  At bottom, Dr. Grant's recantation is simply not believable.

126

Sanchez is also claiming that repeated testing "skewed" his IQ scores to his detriment. This is a strange irony, as Sanchez is essentially asserting that he suffered a Sixth Amendment violation because his attorney actually conducted a mitigation examination and allowed experts to test his intelligence. The record shows that no skewing occurred. The IQ score that Dr. Grant testified to—the reported "skewed" score—was substantially similar to the IQ score reported in Sanchez's elementary records and testified to by defense witness and former teacher Amy Fleming. The score was also consistent to the 2016 testing by Dr. James, which resulted in a scaled score of 82 with a likely range of 75-83, well above the level of intellectual functioning required for the first prong of *Atkins*. CV-DE 33-9 at ¶ 21.

In fact, none of Sanchez's IQ testing has ever resulted in a score at 70 or below. The new declarations that find Sanchez to be intellectually disabled do not rely on the two-part test of *Atkins* at all. Rather, these opinions are based on the standards announced in the DSM-V, which was published in 2013, four years after Sanchez's trial.

Sanchez claims that he has found new experts who would establish a different level of intellectual functioning in 2016, yet this proffer is of no import to the analysis of whether counsel provided ineffective assistance in 2009. Whether newly-appointed 2255 movant counsel can find a new expert seven years after the original trial to establish testimony contradicting Dr. Grant, or government rebuttal expert Dr. Michael Brannon, is not controlling. Sanchez cannot prevail simply because he might now locate new experts who have come to different conclusions than their original witness, Dr. Grant, or the government's testifying expert in 2009. *See Floyd v. Secretary*, 638 Fed. Appx. 909, 920 (11th Cir. 2016)(death penalty case); *Davis v. Singletary*, 119 F.3d 1471, 1475 (11th Cir.1997) ("[T]he mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for

127

failing to produce that expert at trial.")(death penalty case); *see also Horsley v. State of Alabama*, 45 F.3d 1486, 1495 (11th Cir.1995) ( "That experts were found who would testify favorably years later is irrelevant.")(death penalty case).

Sanchez's trial attorneys cannot be held responsible for failing to anticipate that four years after the trial was concluded, the DSM-V would downplay the import of IQ testing in determining intellectual functioning and emphasize the import of adaptive deficits. Under the law at the time of the trial, as well as the mental health standard contained in the DSM-IV, adaptive deficits were only relevant to mental retardation if a defendant's IQ fell at or below 70. Every expert at trial opined that Sanchez's IQ fell well above that standard. Therefore, an investigation of adaptive deficits would have been futile. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). Further, counsel are generally entitled to rely on the opinions of mental health experts. *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002); *see also Bell v. Thompson*, 545 U.S. 794, 809-10 (2005) (suggesting defendant "would have faced an uphill battle" to convince a court the mental health investigation should have continued despite an expert opinion defendant was not mentally ill); *Clark v. Mitchell*, 425 F.3d 270, 285 (6th Cir.2005) (holding counsel "was not unreasonable" in relying on mental health professionals). Simply put, "It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir.1990). Likewise, counsel have no obligation to predict developments in science. *See Maryland v. Kulbicki*, ___ U.S. ___, 136 S. Ct. 2, 4 (2015) (per curiam) (holding the Constitution did not require counsel to foresee the subsequent scientific rejection of comparative bullet lead analysis); *see also Jones v. Stephens*, 157 F. Supp.3d 623, 651 (N.D. Tex. 2016) (holding counsel had no obligation to foresee developments in mental

128

health science). As applied to this case, Sanchez's penalty counsel should not be faulted for relying on the 2009 opinion of Dr. Daniel Grant that Sanchez was not mentally retarded, and then deciding to concentrate his efforts on showing Sanchez's educational shortcomings, family history and other mitigating factors.

Sanchez has not established that his counsel provided constitutionally ineffective assistance of counsel with regard to their investigation and presentation of Sanchez's intellectual disabilities.

                b. Sanchez has failed to establish deficient performance with regard neuropsychological impairment evidence.

Sanchez claims that his counsel were ineffective for not investigating and presenting evidence that Sanchez suffered from neuropsychological impairments—brain damage—that effected his mental state and behavior such that his mental age at the time of the offense was under the age of 18. CV DE 80 at 265-65. In support of this claim, Sanchez provides the declarations of Dr. Hernandez, Dr. James, Dr. Krauss, and a revised declaration of Dr. Grant which purportedly support the conclusion that Sanchez suffered from brain damage at the time of his offense. Sanchez further states that had counsel presented evidence concerning Sanchez's brain damage, at least one juror would have voted against the death penalty.

Sanchez claims that his counsel were ineffective for not investigating and presenting evidence that Sanchez suffered from neuropsychological impairments—brain damage—that effected his mental state and behavior such that his mental age at the time of the offense was under the age of 18. CV DE 80 at 265-65. The statements are lacking in at least two important respects: (1) the medical evidence of Sanchez's supposed brain damage is frankly unsubstantiated; and (2) no expert is able to explain how this purported brain damage effected or even related to Sanchez's conduct in the instant case.

Sanchez cites to the declaration of Dr. Hernandez alone for the claim that "Sanchez's functioning throughout his, life and at the time of the crime was that of a person significantly younger than his chronological age."  CV-DE 80 at 266.  Dr. Hernandez never met with or tested Sanchez.  His conclusion on chronological age was based on testing provided to Sanchez's mother in 2016, after Sanchez had been sentenced to death, to determine if Sanchez had adaptive deficits.  From Dr. Hernandez's declaration, there does not appear to have been any accounting for whether or not Sanchez's mother was providing credible information during this test, the purpose of which was to save her son from a death sentence.   Also, although Dr. Hernandez's declaration is cited within the section claiming Sanchez has brain damage, Dr. Hernandez's opinion is lacking in this regard.  Dr. Hernandez stated that based on his review the penalty phase testimony, declarations submitted with the 2255 petition, and Sanchez's school records,  Sanchez's "social history is consistent with a person who suffered from a childhood neurodevelopment disorder, as well as comorbid intellectual disability."  CV-DE 78-1 at 104-05.  Dr. Hernandez did not order or review any medical imaging testing to confirm this diagnosis, he did not perform any psychological testing of Sanchez himself, and he never even met with Sanchez.  Furthermore, Dr. Hernandez does not put forth any sort of opinion as to how this supposed brain defect would have effected Sanchez's conduct in the instant case.  The lack of a credibility determination for Sanchez's mother, lack of face to face meeting with Sanchez, lack of direct testing of Sanchez, and lack of any medical imaging--such as an MRI—to determine whether Sanchez was brain damaged- calls into questions any conclusions Dr. Hernandez formed[41].  And the lack of connection between Dr. Hernandez's

---

[41] The ultimate opinion of Dr. Hernandez, that Sanchez had an intellectual disability, was couched by language that Sanchez "more than likely meets the diagnostic criteria for Intellectual Disability".  CV-DE 78-1 at 106.  Given the relatively low level of confidence Dr. Hernandez has in his own conclusion, it is doubtful that the jury would have accepted Dr. Hernandez's conclusion and rejected those of Dr. Grant and Dr. Brannon, who met with and tested Sanchez personally, and

conclusion and Sanchez's conduct in the instant case, calls into question whether his conclusion was relevant to the case and how much weight the jury would have put in Dr. Hernandez's conclusion, had it been presented during the penalty phase.

Sanchez also cites to the declaration of Dr. James for support of this claim. Dr. James, a clinical psychologist with a specialty in clinical neuropsychology, met with and conducted both a clinical interview and neuropsychological assessment of Mr. Sanchez over a two day period in 2016. Dr. James opined that Sanchez exhibits mild to moderate neuropsychological impairment. CV-DE 33-9 at 18. However, Dr. James does not connect how this impairment effected Sanchez's conduct in the instant case. When Dr. James opines as to Sanchez's capacity to appreciate the wrongfulness of his conduct, how his deficits constitute severe mental disturbance, and other statutory mitigators, she connects these to Sanchez's cognitive and intellectual impairments, rather than to his mild to moderate neuropsychological impairment. CV-DE 33-9 at 23.

Sanchez also cites to the revised declaration of Dr. Grant to support the claim that Sanchez suffers from brain damage. Dr. Grant, who testified at Sanchez's capital trial, is a psychologist and board certified neuropsychologist. CV-DE 78-1 at 154. In his most recent declaration, Grant opines that Sanchez's neuropsychological deficits are consistent with "impairments to the left hemisphere of his brain". CV-DE 78-1 at 158. Once again, Dr. Grant did not order or review any medical imaging to confirm this "diagnosis". He also does not opine how this purported brain damage would have effected Sanchez's conduct in the instant case.

Sanchez also cites to the declaration of Dr. Krauss for support of his claim that Sanchez suffers from brain damage. Dr. Krauss, who met with Sanchez for one day in March 2016, opined

---

who were quite certain in their conclusion that Sanchez was not mentally retarded/intellectually disabled.

that Sanchez suffers from symptoms of mental illness and mild to moderate brain disfunction/impairment that (1) caused him to vulnerable to being taken advantage of an manipulated by others; and (2) impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. CV-DE 33-8 at 152-54. According to Dr. Krauss, the symptoms which caused these issues for Mr. Sanchez are: depression, anxiety, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, hyperactivity, impulsivity, hyperarousal, substance abuse, and cognitive disturbance and delays. CV-DE 33-8 at 135, 152-53. The issues were largely self-reported by Sanchez after he had been on death row for seven years. Dr. Krauss commented that these symptoms were likely caused by chronic exposure to traumatic experiences. CV-DE 33-8 at 135. These traumatic experiences, as reported to Dr. Krauss by Sanchez in 2016 included witnessing domestic violence between his parents and weekly beatings by his father. CV-DE 33-8 at 139-141.

Had Dr. Krauss testified to these statements and conclusions during the penalty phase of this trial, she would have been subjected to vigorous cross examination based on the record below. At the time of the trial, Sanchez denied being depressed or anxious. Dr. Brannon Report, USA Exh. 3. Sanchez denied witnessing domestic violence between his parents or being the victim of abuse at the hands of his parents. Dr. Brannon Report, USA Exh. 3. In addition, in her report, Dr. Krauss makes no consideration of the fact that Sanchez had been on death row for seven years at the time he was tested by her and self reported feeling depressed, anxious, and hopeless. Given that Sanchez denied having these problems and these traumatic experiences at the time of his trial, it is likely that a jury would have rejected Dr. Krauss' conclusions. Furthermore, Dr. Krauss did not order or review any medical imaging to confirm her suspicions that Sanchez had brain damage.

The expert declarations submitted by Sanchez fall short of establishing that Sanchez had

132

any type of brain damage now or at the time of his trial.  There is no indication that any of these experts performed any medical imaging or testing.  Indeed, none of the experts are medical doctors. Their opinions are based on psychology, not medicine.  Furthermore, none of the experts' proffered testimony explains how Sanchez's supposed brain damage actually caused any mental impairment or affected Sanchez's behavior.  CV-DE 5-21.   Without the linkage of the supposed brain injury to the criminal conduct, this Court should conclude that Sanchez has not demonstrated prejudice required for relief.  *See Lee v. Commissioner, Alabama Dept. of Corrections*, 726 F3d 1172, 1197 (11th Cir. 2013) (Court rejected habeas relief where "new" mitigating evidence failed to explain how the brain injury affected his actions at the time of the murder, and noting unlikelihood of mitigating factors newly outweighing aggravating factors).

Counsel conducted a thorough mitigation investigation—particularly focusing on mental impairments that might provide either a defense or mitigation.  Although the Government has not been privy to every finding by Sanchez's experts at the time of trial, there has been no indication that any of these experts even suspected that Sanchez suffered from brain damage.  Certainly, Sanchez has not established that counsel had reason to believe that Sanchez suffered from brain damage yet failed to pursue mitigation evidence in that regard. The fact that Sanchez has now found, nine years after his trial, additional professionals  who now opine that Sanchez had alleged brain damage, does not change this analysis.

Even if Sanchez could show deficient performance, he has not and cannot show prejudice. Had any of his new experts testified at the trial of this matter, their testimony would have been largely, if not completely, contradicted by other testimony and the lack of medical foundation for their opinions.  Given this lack of foundation, and the heinous nature of Sanchez's crimes, there is not a "reasonable probability" that the jury would have concluded that the mitigating

133

circumstances did not warrant the death penalty.  *Putman,* 268 F.3d at 1248.

Sanchez was convicted of participating in a gruesome quadruple homicide that included the slaughter of two little boys, ages three and four.  The jury found multiple statutory and non-statutory aggravating factors had been proven beyond a reasonable doubt:  statutory aggravators (a) committing the murders in the expectation of the receipt of anything of pecuniary value; (b) committing the offenses after substantial planning and premeditation to cause the death of a person; (c) that Luis Damian Escobedo and/or Luis Julian Escobedo were particularly vulnerable due to youth;  (d) Sanchez  had killed or attempted to kill multiple victims in a single criminal episode; and non-statutory aggravators:  (a) Sanchez had participated in other, uncharged serious acts of violence; (b) that Sanchez killed the victims in order to eliminate them as potential witnesses; and (c) Sanchez caused injury, harm and loss to the family of the victim(s), as evidenced by their personal characteristics as human beings and the impact of their deaths on their family members.  CR-DE 860, Penalty Verdict.

Given the seven aggravating factors, and the heinous nature of the murders it is highly unlikely that the proffered testimony of brain damage, even if it came in unchallenged, would have made a difference.  *See Rose v. McNeil*, 634 F.3d 1224 (11th Cir. 2011) (finding that new mitigation evidence of *habeas* petitioner's brain damage did not reduce the weight of the statutory aggravating factors in a case involving a brutal double murder); *Samra v. Warden, Donaldson Correctional Facility*, 626 Fed. Appx. 227 (11th Cir. 2015) (finding counsel was not ineffective for failing to introduce mitigation evidence of petitioner's brain-impairment evidence in a quadruple homicide case involving two children in that the new evidence would have been unlikely to convince a jury that the killings were any less heinous, atrocious or cruel, or that those brain impairments outweighed the heinousness, atrociousness or cruelty of the four

134

murders).[42]

As Sanchez has established neither deficient performance nor resulting prejudice, Sanchez's claim that his counsel were ineffective for not introducing evidence of brain damage must be denied.

> c. Sanchez has failed to establish deficient performance with regard to psychiatric disorders evidence.

Sanchez also claims that his counsel were ineffective for failing to have Sanchez evaluated for a psychiatric disorder. CV-DE 80 at p. 204. The record shows that counsel were actively looking for mental health issues to use in Sanchez's defense in both the guilt and penalty phases. If counsel failed to submit Sanchez to psychiatric evaluation, it is likely because their personal interactions with Sanchez over a period of many, many months between appointment in 2007 until the trial began in January 2009 did not cause them to think that Sanchez was suffering from any type of psychiatric impairment. Neither penalty counsel nor trial counsel ever voiced any concern that their client could not communicate with them, did not understand the nature of the criminal charges, nor was unable to assist them in his own defense. Trial counsel also noted during the examination of Dr. Grant that the defense had not asked Dr. Grant to evaluate Sanchez for his ability to know right from wrong. CR-DE 824 at 8574. Trial counsels' interactions with Sanchez over many months[43] led them to believe Sanchez was competent to stand trial and did not suffer from any psychiatric issues.

---

[42]   It should be noted that unlike objective indicia supporting brain dysfunction such as blackout episodes, seizures, and memory loss described by the Eleventh Circuit in discussing the case law, *Samra*, 626 Fed. Appx. at 242, Sanchez himself reported to Dr. Brannon no history of dizziness, seizures, headaches, hallucinations, and reported only recent memory loss and problems paying attention.  (USA Exh. 3).

[43] Penalty counsel, Donnie Murrell, was appointed CJA counsel on June 22, 2007 (CR-DE 221) and jury selection commenced on January 9, 2009 (CR-DE 644).

In support of his claim that he suffered from a psychiatric impairment at the time of his trial of which counsel should have been aware, Sanchez cites to the declaration of Dr. Louis Kraus. Dr. Krauss does not diagnosis Sanchez with any specific psychiatric impairment, but instead opines that Sanchez has mental deficits which "significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." CV-DE 33-8 at ECF p. 154, ¶ 66. This opinion relies on Dr. Kraus's assessment based on a single day interaction with Sanchez in 2016—after Sanchez had been on death row for 7 years—that relied on Sanchez's self-reporting that he was currently sufferering from "symptoms of mental illness including anxiety, depression, paranoia, sleep disturbance, agitation and irritability, hypervigilance, hopelessness, deficits in concentration, and substance abuse. CV-DE 33-8 at 135. Dr. Kraus makes no accommodation or accounting for the fact that these symptoms were reported years after the trial, after the Sanchez had been on death row for 7 years.

The psychiatric symptoms Sanchez now complains of—and upon which Dr. Kraus relied-- are completely belied by the record below. Dr. Michael Brannon evaluated Sanchez in December 2008, just prior to his trial. (*See, e.g.*, Report of Dr. Michael Brannon, January 1, 2009)(USA Exh. 3); CR DE 846 at 9283.   At that time, Sanchez reported and Dr. Brannon testified that Sanchez stated he did not suffer from anxiety or depression:

> Q.  During your clinical interview did you see anything about the emotional behavior that gave you a clue that he was overly depressed or anxious about anything?
>
> A.  No.  The opposite.
>
> Q.  The testing, Personality Assessment Inventory Test, PAI Test, does it have a scale that measures for depression?
>
> A.   It does.
>
> Q.  Did he have depression?

A.   No.  He did not score in a manner similar to other people that report depression.

Q.   Does it have a scale that measures anxiety?

MR. MURRELL:  I want to renew my objection. This is far afield.

THE COURT:  Legal objection?

MR. MURRELL:  Irrelevant.

THE COURT:  I will overrule that objection.

THE WITNESS:  He did not score in any way that would be consistent with other individuals who took that test who reported being anxious.

BY MR. KASTRENAKES:

Q.   Based on his performance on the PAI Test, what would  you describe as the Defendant's behavior based on the scoring of that test as he presents himself to society?

A.   It is consistent with an individual who has a positive self concept, an individual who, you know, interacts or connects well with other people.  It is consistent with someone who is described as friendly, outgoing, no signs of what we call psychopathology, depression, anxiety, hearing voices, seeing things, none  of those kinds of vestiges you would expect to see if there were disturbances early on.

Q.   Did the Defendant report depression to you?

A.   No.

Q.   Did he deny being depressed?

A.   Yes.

Q.   Did he deny being anxious?

A.   Yes.

Q.   In the same records in the Palm Beach County Jail that they assess him on a monthly basis, did he consistently deny depression?

A.   Yes.

Q.   You were present when Dr. Grant testified, correct?

A.   Yes, I was.

137

Q.  Dr. Grant had in his notes the Defendant denied being depressed before he was arrested; is that right?

A.  Yes.

CR-DE 846 at 9326-28.  Sanchez's pretrial statements that he did not suffer from anxiety or depression were also addressed during the cross examination of defense expert Dr. Reidy:

Q.  Now, in preparing for your testimony here today, or in general to talk about this area that you have been  speaking about, is it fair to say that you would rely in part on the evaluations conducted by other medical professionals, people who have met with the Defendant?

A.  It provided input to what I had to say, yes.

Q.  Did you consider the evaluation of Dr. Michael Brannon who did evaluate the Defendant Sanchez?

A.  I did read that.

Q.  And in that report, again, we are talking about these are things that the Defendant has himself said about his own background, his own life. He told Dr. Brannon again that -- he denied ever being physically or sexually abused during his formative  years?

A.  Yes.

Q.  He denied ever observing domestic violence in his childhood home?

A.  Yes.

Q.  That he was not aware of any family history of mental health or substance abuse problems?

A.  Yes.

Q.  That he described his own childhood as good?

A.  Yes, I saw that.

Q.  He denied ever being bullied in school?

A.  Yes.

Q.  He denied ever attempting suicide?

A.  Yes.

Q. Denied anger control problems?

A. Yes.

Q. He did not report any symptoms of depression, anxiety, or mania?

A. Yes.

Q. He denied exposure to any traumatic events?

A. Yes.

Q. Denied having a substance abuse problem saying that he could stop at any time?

A. Yes.

Q. And those are all factors that he has self reported about his own life?

A. To Dr. Brannon, yes.

Q. As well as in the evaluations while he was incarcerated?

A. Oh, yes.

Q. So we have his self reports, we have the fact that there was no evaluation, personality testing done by you, correct?

A. Correct.

CR-DE 825 at 8638-8640. The evidence adduced at trial showed that Sanchez denied being anxious or depressed, and personality testing confirmed his self-report. Now Sanchez claims that his counsel was ineffective for not ignoring Sanchez's own statements and the results of his personality testing, and finding someone to testify contrary to this evidence. Sanchez has not established that his counsel's performance was deficient in this regard. Counsel actually objected to the admission of the statements and testing, but was not successful as the law was not on his side. CR-DE 822; CR DE 845 at 9173-76; CR-DE 846 at 9267-9273. Sanchez is essentially complaining about the impact of his own statements, and the results of his personality testing. He has not established counsel's deficient performance in not pursuing a psychiatric evaluation.

Furthermore, Sanchez has not established that he was prejudiced when counsel did not put forth evidence that Sanchez suffered from these purported psychiatric symptoms.  Had counsel adduced such expert testimony, that expert would have been cross-examined and impeached by Sanchez's own denials that he suffered from such ailments, as well as the results of the personality testing done by Dr. Brannon.  Furthermore, Sanchez has not shown that such testimony would have been accepted by the jury as a mitigating factor. Sanchez was convicted of murdering an entire family—including two preschool aged boys—and leaving their bodies on the side of the Florida Turnpike.  Sanchez has not shown that evidence that he is anxious, depressed, or has trouble sleeping, would have caused the jury not to impose the death penalty.  For all these reasons, Sanchez has failed to show that his counsel was ineffective in his investigation and presentation of Sanchez's purported psychiatric disorders.

### d.   Conclusion

Sanchez's showing on this issue falls far short of the required showing mandating relief. Sanchez complains that more should have been done, but it cannot be concluded that the trial attorney efforts were constitutionally deficient. The defense mitigation case may not have been perfect, nor did it convince the jury to vote against the death penalty on all counts, but it was constitutionally sufficient.

> With unlimited time and resources, there is always something more that might have been done in a capital case—such allegations "prove[ ] at most the wholly unremarkable fact that with the luxury of time and the opportunity to focus resources on specific parts of a made record, post-conviction counsel will inevitably identify shortcomings in the performance of prior counsel."

*See Waters*, 46 F.3d at 1514.

The evidence presented by counsel was sufficient to save Sanchez from the death penalty

on three of the five counts for which it was available; it was just not enough to overcome the brutal, execution style murder of two preschool-aged boys. Sanchez has failed to establish either deficient performance or resulting prejudice.    For all the foregoing reasons, Sanchez's claims that penalty counsel was ineffective if the investigation, preparation, and presentation of the mitigation case must be denied.

      H.      SANCHEZ HAS NOT ESTABLISHED THAT HIS TRIAL COUNSEL WERE INEFFECTIVE IN THEIR HANDLING OF GOVERNMENT MENTAL HEALTH EXPERT DR. MICHAEL BRANNON (RESPONSE TO SANCHEZ AMENDED ISSUE VIII(B)(5).

Sanchez complains that his counsel were ineffective for not challenging or successfully impeaching government mental health expert Dr. Michael Brannon. Brannon testified that he had interviewed Sanchez personally, conducted an intelligence test of him, and engaged him in conversation about various topics including his family background. Notably, Brannon concluded that Sanchez had a low average IQ of 89, that Sanchez was not retarded, that he understood right from wrong, and that Sanchez was friendly, outgoing, and interacted and connected well with others. CR-DE 846 at 9290, 9301, and 9327.

The trial record does not support Sanchez's claim the trial counsel failed to challenge Dr. Brannon's testimony. Prior to Dr. Brannon testifying, penalty counsel filed a motion *in limine* to limit Dr. Brannon's testimony, (CR-DE 822), and then voiced multiple objections during the trial to the exact content of Dr. Brannon's testimony. *See, e.g.,* CR-DE 845 at 9173-9176; CR-DE 846 at 9267-9272, 9293, and 9324.

The record also belies Sanchez's claim that his counsel did not attempt to impeach or otherwise discredit Dr. Brannon. Penalty counsel Murrell conducted a detailed cross-examination of Dr. Brannon in which he brought out favorable concessions from Dr. Brannon to show agreements with the defense experts, and challenged Dr. Brannon on other conclusions that were

141

harmful to the defense. CR-DE 846 at 9334-9351. Sanchez complains his trial attorneys should have attacked or undercut Dr. Brannon's testimony as it related to his ability to plan out events over time and anticipate what would happen. See CV-DE 80 at p. 213. This is a *new* claim not previously contained in the original 2255 petition, that is, claiming ineffective assistance of counsel for counsel's failure to attack Brannon for facts supporting the penalty aggravator for "substantial planning and premeditation." As such, this argument is untimely and should be dismissed. Regardless, as Sanchez fails to establish either deficient performance or resulting prejudice, the claim fails on the merits.

Sanchez complains that his trial counsel was ineffective for not establishing the following points during the cross examination of Dr. Brannon: (i) Brannon's testing of Sanchez did not support his conclusions concerning Sanchez's IQ and ability to plan; and (ii) Brannon should not have relied on Sanchez's own assessment that his childhood was "good" to determine that Sanchez was not adversely effected by this childhood experiences. CV-DE 80 at 213.

Although counsel did not contradict that Sanchez indicated that his childhood was "good", he certainly did cross examine Dr. Brannon on whether Sanchez's own assessment of his childhood could be trusted. CR-DE 846 at 9334-9341. Counsel's cross examination was successful in that he was able to adduce testimony that Sanchez may not have realized that his childhood was abnormal if he was exposed to domestic violence or other traumas so often that he did not perceive it to be a problem. CR-DE 846 at 9341.

The petition fails to point out specifically what more counsel could have done to challenge Dr. Brannon's conclusions concerning Sanchez's IQ. Sanchez and his experts claim that Brannon's IQ testing was unreliable because of the "Flynn" and practice effects (*see, e.g.*, McGrew Declaration, CV-DE 33-8 at pp. 24-27; and James Declaration, CV-DE 33-8 at ECF p.188, and

142

CV-DE 33-9 at ECF p. 2, ¶ 21).    "[T]he Flynn Effect is a statistically-proven phenomenon, although no medical association recognizes its validity." *Thomas v. Allen,* 607 F.3d 749, 757 (11th Cir. 2010).   At the heart of the "Flynn" effect is the belief that IQ tests across populations rise 9 points for every generation, or 30 years after an intelligence test is normed.  The test administered by Dr. Brannon in 2008, the WAIS III was normed in 1995—a 13 year difference, resulting in a possible Flynn effect of 3.9 points, hardly significant to Sanchez's test score.   To the extent that the practice effect was a ripe area for cross examination, this area was already addressed during Dr. Brannon's testimony.  Brannon specifically testified the he had taken into account any possible "practice" effect that might artificially inflate an IQ test score.   CV-DE 846 at 9299-9300. Brannon also testified that his administration of a different IQ test than that given most recently by Dr. Grant (WAIS-IV-Grant vs. WAIS-III-Brannon) would have minimized any inflationary practice effect because the questions were different.   CV-DE 846 at 9299-9300.   In light of Brannon's testimony as to how he took steps to negate the practice effect, it is unclear what more counsel could have done to highlight this issue, or how additional highlighting would have affected the penalty verdict.

The petition fails to point out what more counsel could have done at the time of the trial to challenge Dr. Brannon's conclusions concerning Sanchez's ability to plan.  Counsel spent a considerable amount of time in this cross examination questioning Dr. Brannon about how Sanchez's learning disability and family history might have impacted his ability to plan.  CR-DE 846 at 9344-9350.   Sanchez now claims that his lawyer should have questioned Brannon about a subtest he used from the WAIS-III that was subsequently dropped from the WAIS-IV. CV-DE 80 at 213.   Sanchez cites to no proof that this subtest was dropped because it was not effective. Regardless, Sanchez fails to establish that any questions concerning this subtest would have altered

the outcome of the penalty phase when Brannon's conclusion concerning Sanchez's ability to plan was based on more than just one subtest.  Brannon testified he spent three days with Sanchez, over twelve hours, conducting tests and clinical interviews.  CR-DE 846 at pp. 9274 – 9354.   As to his ultimate upon on Sanchez's ability to plan, Brannon testified as follows:

> QUESTION BY MR. KASTRENAKES:    Based on all of your testing, and all of your review  of the records of Defendant Sanchez, including your clinical interview of him, your review of school records and jail records, is there any data that you can point to to suggest that the Defendant's life experiences, whether they be positive or negative, affected his ability to plan and act?
>
> ANSWER BY DR. BRANNON:  No.
>
> Q.  Did they affect his ability to make choices?
>
> A.  No.
>
> Q.  Did they affect his ability to understand the difference between what is wrong and what is right?
>
> A.  No.

CR-DE 846 at 9333:2-14.

Sanchez has failed to establish that his counsel's cross of Dr. Brannon was in any way deficient.  Several of his claims in this regard are belied by the record below.  Furthermore, Sanchez has failed to establish that additional cross would have had any impact on the penalty verdict, given the egregious facts of this case and the numerous aggravating factors in play.  For all these reasons, Sanchez's claim that counsel were ineffective in their cross examination of Government witness Dr. Brannon should be denied.

I.  <u>SANCHEZ HAS FAILED TO ESTABLISH THAT TRIAL COUNSEL WERE INEFFECTIVE FOR NOT OBJECTING TO JURY INSTRUCTIONS CONCERNING NON-STATUTORY MITIGATING FACTORS BECAUSE COUNSEL DID, IN FACT, OBJECT TO THESE INSTRUCTIONS (RESPONSE TO SANCHEZ AMENDED ISSUE XII(C) & (D))</u>.

Sanchez complains that his counsel were ineffective for failing to object to allegedly erroneous jury instructions and government arguments relating to non-statutory mitigating factors

and the jury's role in determining whether the factor was actually mitigating in nature. CV-DE 80 at 336-337. Sanchez's claim is belied by the record. Counsel did in fact object to the allegedly erroneous instruction. (CR-DE 847 at 9479-83). The court overruled the objection and the Eleventh Circuit later held that the instructions were legally correct.[44] There was no ineffectiveness here.

The Federal Death Penalty Act, ("FDPA") provides a list of seven factors, which, if established, must be considered as mitigating factors. 18 U.S.C. § 3592(a)(1)-(7).[45] The FDPA also provides for the consideration of "other factors" under the catch-all provision. 18 U.S.C. § 3592(a)(8) ("Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against the imposition of the death sentence."). In the instant case, in accordance with the FDPA, the Court and all of the parties agreed that, apart from the seven statutory mitigating factors that the jury was required to consider, if established, the jury also was required to consider any other factors in the defendant's background, record, or character, or any other circumstance of the offense that mitigated against the imposition of the death penalty (CR-DE 818 at 7862-66, 7901-16). *See* 18 U.S.C. § 3592(a)(8) ("Other factors"). The parties did not agree as to how the jury would determine whether "other," i.e., non-statutory, factors proposed by the defendants were, in fact, mitigating factors (CR-DE 845 at 9139-42; CR-DE 846 at 9369-71, 9405-61).

In discussing the issue of how the jury was to consider a proposed non-statutory mitigating factor, the Court framed the issue thusly: "[I]f someone came in and said Joe Smith is a human being, or if someone came in and said it was raining on the day of the murders, we would all say,

---

[44] *Troya*, 733 F.3d at 1129.

[45] The seven statutory mitigating factors, generally, are: (1) impaired capacity; (2) duress; (3) minor participation; (4) equally culpable defendant; (5) no prior criminal record; (6) disturbance; and (7) victim's consent. 18 U.S.C. §§ 3592(a)(1)-(7).

okay, you can establish that, but the question is, is that a mitigating factor" (CR-DE 847 at 9473-75). Thereafter, the Court adopted the two-pronged approach set forth in *United States v. Lawrence*, 555 F.3d 254 (6th Cir. 2009) and informed the parties that it intended to instruct the jury that Congress had set out statutory mitigating factors, that those were presumed to have "some merit," but that a defendant was free to propose other factors as long as the defendant satisfied the burden of (1) establishing the facts underlying a proposed factor and (2) establishing that a proposed factor constituted a mitigating factor (CR-DE 847 at 9478).

Sanchez's counsel objected to the district court's approach on the ground that it would improperly imply to the jury that there was a "qualitative difference" between statutory and non-statutory mitigating factors (CR-DE 847 at 9479). Although defense counsel agreed with the "general principle" that the defense had the burden of establishing that a proposed non-statutory factor, if established, constituted a mitigating factor, counsel essentially argued that the jury should make that determination without any reference to the presumptive merits of statutory mitigating factors (CR-DE 847 at 9479-83).

The district court opined that the jury, in determining whether a proposed non-statutory factor constituted a mitigating factor, had "a right to consider the similarity between" the proposed non-statutory factor and the statutory mitigating factors (CR-DE 848 at 9680-81). In that regard, the district judge stated, "I would think that the closer you get to the language of a statutory mitigating factor, the easier it probably would be for the jury to come to the conclusion, yes, this is a mitigating factor" because [i]t's very close to what Congress has said or close to the category of things that Congress has determined are mitigating factors" (CR-DE 848 at 9681-82). Accordingly, the court advised the parties that it intended to inform the jury of the seven statutory mitigating factors so that the jury could compare those factors with the non-statutory factors

146

proposed by the defense (*Id.*). The court emphasized, however, that it would instruct the jury that the statutory mitigating factors were not entitled to any greater weight, simply by virtue of their designation by Congress, than a non-statutory mitigating factor (CR-DE 848 at 9682).

Thereafter, the district judge instructed the jury, in pertinent part:

> Now, you know that there are things called statutory aggravating factors and there are things called nonstatutory aggravating factors.
>
> . . .
>
> Just like the government regarding statutory and nonstatutory, well, the same thing is true for the defense. The Federal Death Penalty Act actually lists some statutory mitigating factors, but a defendant has an absolute right to allege anything that [the] defendant feels constitutes a mitigating factor that the jury should consider.
>
> . . .
>
> Congress has listed an aggravating factor in the statute, or listed a mitigating factor, Congress has made the judgment that if the facts underlying that particular factor are established, that they do constitute an aggravating factor or a mitigating factor, and they must be considered by the jury.
>
> Now, please understand, Congress has not in any way suggested what weight or value the jury should attach to it. That is up to the jury. But the Congress has said if the Government proves a statutory aggravating factor beyond a reasonable doubt, or if a Defendant proves a statutory mitigating factor by a preponderance of the evidence, it must be considered.
>
> . . .
>
> Well, in any of these, the first thing you do, of course, you have to look and say did the party offering that, did they prove it. If it is an aggravating factor, you have to say did the Government prove this to me beyond a reasonable doubt.  And as I mentioned, it has to be unanimous.
>
> For a Defendant, you have to say did the Defendant prove this [by] a preponderance of the evidence, and [it] doesn't have to be unanimous.
>
> If you are looking at a nonstatutory aggravating factor or a nonstatutory mitigating factor, you need to go one step further

and you have to say, okay, I find that the party proved this, but is this indeed an aggravating factor. Is this indeed a mitigating factor.

. . .

Now, in these instructions I've laid out for you seven of the mitigating factors that Congress set out in the statute . . . and I have done it for a particular reason and I will explain it to you in more detail as we go along.

Let me lay out what the statute lists as seven statutory mitigating factors.

The first would be that the Defendant's capacity to appreciate the wrongfulness of the Defendant's conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge.

Two, the Defendant was under unusual or substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.

Three, the Defendant is punishable as a principal in the offense, which was committed by another, but the Defendant's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.

Four, another Defendant or Defendants, equally culpable in the crime, will not be punished by death.

Five, the Defendant did not have significant prior history of other criminal conduct.

Six, the [Defendant] committed the offense under severe mental or emotional disturbance.

Seven, the victim consented to the criminal conduct that resulted in the victim's death.

. . .

If the defendant asserts one of the statutory mitigating factors, and if they prove it, Congress says you must consider that.

148

> If the defendant asserts something that is not set forth in the statute, well, of course, the first thing you need to decide is, A, did the defendant prove by a preponderance of the evidence that the fact in it is true. But you then also need to decide if it is true, does it constitute a mitigating factor under the definition of what is a mitigating factor.

> And by the way, and I will talk about this in a moment, when you look at what the Defendant -- a particular defendant has pled, I think you can also compare that to the statutory mitigating factor, and if you see that there is a close relationship between the two, I think that is a factor that you can consider in determining whether the nonstatutory assertion is in fact a mitigating factor.

> And please understand, there is -- Congress does not in any way say what weight that you should apply to either a statutory or a nonstatutory factor. That is for you, the jury, to decide.

CR-DE 848 at 9705, 9727-28, 9730-31, 9733-36. These instructions were not erroneous.[46]

---

[46] Sanchez's argument begs the question of how a jury must go about determining whether a proposed non-statutory mitigating factor is, in fact, a mitigating factor. His essential, but unspoken, argument is that the jury is entitled to consider in mitigation anything that the defense proposes and that anything that the defense proposes is a mitigating factor by virtue of the fact that the defense proposed it. That argument, however, ignores the fact that proposed non-statutory mitigating factors are nothing more than alleged mitigating factors, and, as the district court aptly held, they are subject to a two-pronged approach: the jury must determine not just (1) whether the facts alleged to be mitigating were sufficiently proven, the jury must also determine (2) whether those alleged facts are properly considered as mitigating the defendant's culpability. *See United States v. Lawrence*, 555 F.3d 254, 267 (6th Cir. 2009); *see also Rogers v. Secretary, Department of Corrections*, 2010 WL 668261, *27 (M.D. Fla. Feb. 19, 2010) (unpublished) (holding that sentencing courts must apply two-pronged approach in addressing non-statutory mitigating factors). A jury is entitled to reject a submitted mitigator. *See, e.g., United States v. Paul*, 217 F.3d 989, 1000 (8th Cir. 2000) (finding no error in the failure of six jurors to find the defendant's age (which was not disputed) at the time of the offense as mitigating, because a juror is not required to give mitigating effect to any factor). *See also, United States v. Bernard*, 299 F.3d 467, 485-86 (5th Cir. 2002). Several Supreme Court cases hold that the jury is not required to have given that undisputed factor any weight. *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), address mitigating factors, but impose no requirement on a capital sentencing jury to give mitigating effect or weight to any particular evidence. Rather, *Lockett* and *Eddings* merely stand for the principle that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370 at 377-78 (1990). Thus, a sentencer's decision not to give weight to proffered non-statutory mitigating factors on the ground that the factors are not mitigating does not violate the

At the conclusion of the court's instructions, Sanchez's counsel renewed his objection to the instruction concerning the non-statutory mitigating factors (CR-DE 848 at 9763). Counsel stated that the court's instruction was "misleading" because it "tied the value" of the non-statutory mitigating factors to their "similarity" with the statutory mitigating factors (*Id.*).

The backbone of the instant claim is Petitioner's allegation that counsel failed to object to the jury instruction concerning the proposed non-statutory mitigating factors and the jury's obligation to determine whether the proposed factor was, in fact, mitigating. The record conclusively establishes that counsel objected to this instruction not once, but twice. Counsel's objection was overruled as the law was not on his side. Counsel cannot be found to be ineffective for failing to do something that he actually *did*. As the record does not support Sanchez's claim that his lawyer failed to object to this portion of the jury instructions, this claim should be denied.

Additionally, Sanchez claims that his counsel were ineffective for failing to object when the prosecutor made remarks indicating that the proposed non-statutory mitigating factors were entitled to little or no weight. These remarks were consistent with the district court's instructions that the weight to be attached to any mitigating factor was "up to the jury" (CR-DE 848 at 9727). As such, the comments were proper and any objection to them would have been overruled.

As Sanchez has failed to establish that his counsel's performances with regard to the jury instructions for the non-statutory mitigating factors, and the prosecutor's comments regarding the same, were deficient, Sanchez has failed to establish this claim of ineffective assistance. This claim should be denied.

J.   SANCHEZ HAS NOT ESTABLISHED THAT HIS COUNSEL WERE INEFFECTIVE FOR NOT OBJECTING TO THE PORTIONS OF THE PENALTY

---

rule of *Lockett* and *Eddings*. *Johnson v. Wainwright*, 778 F.2d 623, 629 (11th Cir. 1985); *accord Graham v. Collins*, 506 U.S. 461, 490 (1993)

JURY INSTRUCTIONS WHICH RELATE TO THE BURDEN OF PROOF FOR
WEIGHING MITIGATING AND AGGRAVATING FACTORS (SANCHEZ
AMENDED ISSUE VII(D)).

Sanchez implicitly contends that the FDPA is facially unconstitutional because it does not require the weighing of aggravating factors and mitigating factors to be found by the jury beyond a reasonable doubt[47]. Sanchez therefore postulates that the FDPA runs afoul of *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428 (2002), *Apprendi v, New Jersey*, 530 U.S. 46, 490 (2000), and *Hurst v. Florida*, ___U.S. ___, 136 S. Ct. 616, 622 (2016). Sanchez further claims that the penalty jury instructions concerning the weighing of the aggravating and mitigating factors run afoul of *Hurst*, and therefore *Ring* and *Apprendi*. Finally, Sanchez claims that he was deprived of the effective assistance of counsel because his trial attorneys did not to object to the FDPA or the jury instructions. Sanchez's claims are new to his amended petition, and do not relate back to any claims raised in his initial 2255. As such, the claims are untimely. Furthermore, Sanchez's claims fail on the merits.

To the extent that Sanchez claims his counsel were ineffective for failing to object or raise this issue on appeal, his claim fails on both the facts and the law. The record shows that trial counsel made such an objection. Sanchez adopted Troya's pre-trial motion to dismiss the indictment premised on the alleged unconstitutionality of the FDPA. *See, e.g.*, CR-DE 375. The Magistrate judge recommended that the motion be denied in a detailed discussion of this issue,

---

[47] The FDPA sets forth the weighing standard in 18 U.S.C. § 3593(e): "the jury . . . shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death . . ." Absent from the definition is any reference to the "beyond a reasonable doubt" standard. Compare 18 U.S.C. §3593(c) (the government bears "[t]he burden of establishing the existence of any aggravating factor … beyond a reasonable doubt").

151

and rejection of the current argument. CR-DE 474. The District Court adopted the Report and Recommendation by order dated November 21, 2008. CR-DE 535.  In addition, Sanchez notes that this same FDPA challenge was raised by appellate counsel on direct appeal as issue "(17)". *See* CV-DE 80 at pp. 14-15, n. 9.    The Eleventh Circuit implicitly rejected this issue in affirming Sanchez's convictions and sentences.  Trial, penalty and appellate counsel cannot be ineffective for not raising issues that they did, in fact raise, even though the challenges were rejected on the merits.

Contrary to Sanchez's assertion, *Hurst* – as the progeny of *Apprendi* – does not require any particular standard of proof with regard to weighing factors.  *Hurst* quite specifically turns on the fact that Florida's capital sentencing scheme required independent factual findings by the judge, without the jury: "As described above and by the Florida Supreme Court, the Florida sentencing statute does not make a defendant eligible for death until 'findings by the court that such person shall be punished by death.'"  *Hurst v. Florida*, ___U.S. ___, 136 S. Ct. 616, 622 (2016) (citing Fla. Stat. § 775.082(1)).  Furthermore, "No Supreme Court decision holds that its *Hurst* decision is retroactively applicable." *Lambrix v. Secretary*, 872 F.3d 1170, (11th Cir. 2017)  In *Lambrix V*, the Eleventh Circuit already indicated that *Hurst* is not retroactively applicable on collateral review under federal law, and that no reasonable jurist would find that issue debatable   *Lambrix V*, *supra*, 851 F.3d at 1165 n.2.   As such, even if *Hurst* were helpful to Sanchez, he would be barred from raising the issue herein.

Furthermore, Sanchez's argument concerning the unconstitutionality of the FDPA has been rejected by numerous federal circuit courts of appeal.  *See, e.g., United States v. Samson*, 486 F.3d 13 (1st Cir. 2007); *United States v. Fell*, 360 F.3d 135 (2nd Cir. 2004).   The United States notes that the FDPA is silent on what standard of proof a jury must apply in the weighing process during

152

the penalty phase, that is, whether or not the jury is required to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating ones before recommending a death sentence. Sanchez implicitly asserts that this statutory silence makes the FDPA unconstitutional on its face, and faults trial counsel for not making this same claim. Courts that have reviewed this issue have rejected this argument.

While it is true that the government must prove at least one statutory aggravating factor beyond a reasonable doubt, once that threshold is reached the defendant then becomes statutorily eligible for the death penalty, and since the maximum penalty cannot then be raised any higher, *Apprendi* does not apply. Contrary to Petitioner's assertion, the jury's consideration of whether the aggravating factors outweigh the mitigating factors is not a determination that increases the defendant's maximum sentence – *he is then already eligible for imposition of a death sentence* – and therefore the jury's weighing of aggravating factors, both statutory and non-statutory versus mitigating factors is not subject to *Apprendi* or the reasonable doubt standard. *United States v. Talik*, 2007 WL 4570704 (N.D.W.Va. 2007); *See also United States v. Gooch*, 2006 WL 3780781 (D.D.C. 2006); *United States v. Diaz*, 2007 U.S. Slip Copy, 2007 WL 656831 (N.D.Cal. 2007); *United States v. Natson*, 444 F.Supp.2d 1296, 1304 (M.D.Ga. 2006); *United States v. Henderson*, 461 F.Supp.2d 133, 135 (S.D.N.Y. 2006); *United States v. Haynes*, 269 F.Supp.2d 970, 980 (W.D.Tenn. 2003); *see also, Zant v. Stephens*, 462 U.S. 862, 878-9, 103 S.Ct. 2733 (1983) and *Tuilaepa v. California*, 512 U.S. 967, 979, 114 S.Ct. 2630 (1994)(Supreme Court upheld constitutionality of statutes like FDPA which fail to enunciate specific standards for the jury's weighing of factors). Sanchez's complaint that the FDPA is unconstitutional because the jury was not instructed that it must find that the aggravators outweighed the mitigators beyond a reasonable doubt was raised on direct appeal and rejected by the Eleventh Circuit.

The federal courts of appeals have consistently and repeatedly held that the weighing of aggravators and mitigators does not constitute a factual finding within the meaning of the *Ring/Apprendi* line of authority; every circuit that has considered Sanchez's argument has rejected it. *See United States v. Gabrion*, 719 F.3d 511, 533 (6th Cir.2013) (*en banc*) (joining six other federal circuits in concluding that decision weighing aggravating and mitigating did not have to be proven beyond a reasonable doubt); *Lockett v. Trammel*, 711 F.3d 1218, 1253 (10th Cir.2013); *see also United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013); *United States v. Fields*, 516 F.3d 923, 950 (10th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 993–94 (9th Cir. 2007); *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007); *United States v. Fields*, 483 F.3d 313, 345–46 (5th Cir. 2007); *United States v. Purkey*, 428 F.3d 738, 749 (8th Cir. 2005). Indeed, the Supreme Court has indicated that the reasonable doubt standard is unnecessary in weighing factors. *See Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (noting that state could place burden on defendant to prove mitigating circumstances outweighed aggravating circumstances); *id*. at 174, (noting that states have "a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed").

In short, *Hurst* does not support Sanchez's argument, and seven circuit courts have rejected essentially the same position. The court did not err in its instruction, and Sanchez's attorneys did not act ineffectively in failing to make an objection that they actually did make. And, to the extent that their objections may not have encompassed the precise holding of *Hurst*, counsel is not expected to predict future changes to the law. See *United States v. LeCroy*, 739 F.3d 1297 (11th Cir. 2014). As Sanchez has failed to meet his burden of proof, this claim should be denied.

K.      SANCHEZ HAS FAILED TO ESTABLISH THAT HIS ATTORNEYS WERE CONSITUTIONALLY INEFFECTIVE FOR FAILING TO OBJECT TO THE PROSECUTOR'S ARGUMENTS DURING THE GUILT AND PENALTY PHASES (SANCHEZ AMENDED ISSUES VII(B) AND VIII(I)).

154

Sanchez claims that his attorneys were constitutionally ineffective for failing to object to allegedly improper and prejudicial prosecution argument during the guilt and penalty phases. CV-DE 80 at 183-86; 278-287. To prevail on these claims, Sanchez must establish that no competent counsel would have failed to make the omitted objections. As counsel is not required to raise meritless issues, Sanchez must establish a proper legal basis for each of the objections he claims should have been made. Sanchez fails to make this showing. Even if Sanchez was able to establish a legal basis for objection, it is not unusual for counsel to make a strategic decision not to object during argument to avoid highlighting the prosecutor's comments for the jury. Sanchez cannot establish deficient performance. And even if he had met his burden, which he has not, Sanchez cannot and has not established that he was prejudiced thereby. Sanchez must make a particularly high showing with regard to the impact of his counsels' collective failure to make objections to allegedly improper prosecutorial arguments:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Strickland*, 466 U.S. at 694. Stated differently, the question as applied to these issues becomes whether in the absence of the attorneys' failures to object to the prosecutors' arguments the factfinder would have had a reasonable doubt about guilt, or punishment. Given the overwhelming evidence of guilt and the heinous nature of his crime, Sanchez cannot show that the allegedly improper comments tilted the balance against him. In addition, comments made by the lawyers are not evidence. The jury instruction to this effect cured any possible prejudice. For all the reasons stated herein, Sanchez's claims that his counsel were ineffective for failing to objection to closing arguments must fail. We address the claims in the order raised.

1.        Guilt Phase Complaints

Sanchez initially complains that his counsel were ineffective for failing to object when the prosecutor argued: "[t]he Government is alleging, and we think, we know, we have proved that those murders occurred directly as a result of this carjacking." (CR-DE 766 at 7132). Sanchez claims that this argument was improper because it hints that the prosecutor had outside knowledge of Sanchez's guilt.  Sanchez completely misinterprets this argument. The prosecutor corrected himself by changing the word "think" to "know" in order to make his argument more persuasive to the jury as an advocate for the United States.  There is no support in the record for concluding that the prosecutor was trying to inject his personal knowledge of non-record evidence into the jury's decision-making process. Nothing improper occurred here and counsel was not deficient for failing to object.

Sanchez complains that his counsel were ineffective for failing to object when the prosecutor allegedly vouched for the credibility of government witnesses and stated that "cases don't get better than this" (CV-DE 80 at 281).   To prevail on this claim, Sanchez would have to demonstrate that the failure to object was outside the wide range of professional conduct, and that failure had an impact on the verdict and sentence.  The failure to object to prosecutorial comments about witness reliability did not fall outside the wide range of professional conduct here because the prosecutor's comments constituted invited reply to defense arguments concerning the purported weakness of the government's case.   The prosecutor's comment in rebuttal closing about cases "not getting any better than this", (CR-DE 766 at 7438), referred to the mountain of circumstantial evidence pointing to Sanchez's guilt and was a proper invited reply to the defense arguments concerning the supposed weakness of the prosecution's case.  *See e.g.*, CR-DE 767 at pp. 7279 – 82 (Troya counsel Ruben Garcia suggesting that the government's case was based

solely on circumstantial evidence and supposition); and CR-DE 767 at p. 7290-91 (Sanchez counsel Cohen suggesting that the prosecution's entire murder case against Sanchez rested on four bullets, and jury could take all the other evidence and throw it out). *See also United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir.2009) (recognizing, as an exception to the prohibition against vouching for a witness, that "a prosecutor [is entitled] to respond to arguments advanced by defense counsel in his or her statement to the jury'"). As such, Sanchez cannot establish that any legal basis for an objection to such comments let alone that such an objection would have been sustained by the Court.

2.      Penalty Phase Complaints

Sanchez complains that counsel were ineffective for failing to object when the prosecutor allegedly denigrated defense counsel and misrepresented facts during penalty phase closing arguments (CV-DE 80 at 276, citing CR-DE 847 at 9515). Viewed in its entire context the prosecutor's summation properly argued to the jury the lack of weight the jury should attach to the submitted defense mitigating factor concerning the alleged domestic abuse trauma suffered by Sanchez. In support of this argument, the prosecutor properly pointed out evidence in the record for the jury, that is, despite claims of "trauma", Sanchez himself had denied any domestic abuse in describing his adolescent home life, and admitted that he returned to the family home regularly to play bingo. It was altogether fitting that the prosecutor argued that the allegations of abuse had been greatly overblown. Nothing improper was stated, therefore counsel was not deficient in failing to object because any objection would have been overruled. Sanchez complains that his counsel were ineffective for failing to object when the government argued:

> A line was crossed that cannot be excused. It cannot be excused
> with life in prison that this is just like any other murder, just drug
> dealers. Two little kids murdered brutally, an entire family

157

> slaughtered.  If this case doesn't qualify, I don't know what will, ever.

(CR-DE 847 at 9522).   The prosecutor's comments were directed to the statutory and non-statutory aggravators submitted by the government, that is, (i) that the defendant murdered two little boys who were "particularly vulnerable due to youth" (CR-DE 860 at 8, ¶3); (ii) that the offense involved intentionally killing "multiple victims in a single criminal episode" (*Id.*  at 8, ¶4); and (iii) that the victims were killed in order to eliminate them as potential witnesses (*Id.*  at 10, ¶2). The argument was not improper and therefore counsel was not deficient for failing to object to it.

Sanchez further complains that his counsel were ineffective for failing to object when the prosecutor argued, during the penalty phase rebuttal closing that the jurors needed to act as the "conscience of the community":

> Whatever your verdict is after this phase, if you follow the law, and you discussed legal things, and you rendered a verdict that spoke the truth based on the evidence and the law, hold your head high, whatever your verdict, because you have discharged your duty…

> So as the *conscience of this community*, you need to speak with one voice as to the appropriateness of the penalty here.  It is the verdict of you each individually and it is the verdict of you as 12 jurors, as a voice of this community to tell us what the appropriate penalty is…

> It is that process, sharing viewpoints, re-examining what we actually originally may have thought, and coming to a conclusion that speaks the truth.  That is the hallmark of our justice system. Do it, talk, exchange your ideas, and reach a consensus.  Speak together with your unanimous verdict as the *conscience of this community*.

(CR-DE 847 at 9606-07) (italics supplied).  These comments were not improper and in fact echoed the Court's instruction to the jury on this same issue: "Your role is to be the conscience of the community in making a moral judgment about the worth of an individual life balanced against the

158

societal value of what the Government contends is deserved punishment for the Defendant's offense." (CR-DE at 9756).   Any objection as to the prosecutor's comment that the jury was the "conscience of the community" would have been overruled.  Counsel were not deficient for failing to make this objection.

Sanchez further complains that his counsel were ineffective for failing to object when the prosecutor referred to certain evidence offered in mitigation as "disgusting":

> On the one hand, you weigh Sanchez's learning disability, domestic abuse at home against the execution of two children.  Children that played with his child.  Children he knew.  He wasn't killing strangers.  Not that that is any mitigation, but it is even more despicable when you think about it, when you are putting a gun to the head of a child that has played with your child,[48] that is the same age as your child.
>
> He killed those children because they would know that he killed their daddy.  That's it.  In the middle of the night on the dark side of a road a three and four-year-old child would never be able to pick out of a lineup any stranger, but they knew that they were following their daddy and mommy for eight hours.  They knew who was in the van.  They knew who was there.
>
> It's really disgusting for them to put up a picture of a child in a videotape and beg and in a desperate fashion ask for your mercy when they know that he killed a child of exactly that same age.

(*Id.* at 9610-11).   The prosecutor's statement was a proper comment on Sanchez's use of a videotape of his young son during the mitigation case.   Nothing improper occurred, therefore counsel was not deficient in failing to object.

Sanchez complains that his counsel were ineffective for failing to object to when the prosecutor allegedly minimized the abuse Sanchez had suffered at his father's hands in penalty

---

[48] *See* Testimony of Crystal Salazar (CR-DE 738 at 4532-45) indicating Escobedo children knew Sanchez; *see also* Testimony of Maria Lopez (CR-DE 758 at 6390-92) indicating her son came back from defendant Sanchez's home with a Batman book bag containing the name of "Julian Escobedo" [subsequently-murdered child] written in it.

phase rebuttal closing. (CV-DE 16-1 at 170, second bullet issue). Once again, it is important to read the prosecutor's actual comments in context:

> Mr. Murrell spent some time with you in discussing the evidence that was presented during their phase of the trial. And you know he spent a lot of time being very harsh on Mr. Sanchez's dad and very harsh on that family.
>
> You know, I comment to you about this, maybe his father wasn't a perfect father, but this man had a third grade education, and an I.Q. below 70. He comes to this country, becomes a citizen, he holds down a steady job for 25 years, he provides for a family. He buys a house, pays mortgage payments on a house, takes his family on trips, he feeds them, buys clothes for them. That is a remarkable achievement for a man who came from another country with very little education.
>
> Prime minister of India Nehru back in the 1940's said, life is like a game of cards, the hand you are dealt is determinism, the way you play it is free will.
>
> That was a tough hand dealt to Ricardo Sanchez, Sr. And his mom who worked in the field and worked with the crops, no education, they played it the best they could. They did it the best they could.

(CR-DE 847 at 9612-13).

The above argument was entirely proper given the record evidence in the case concerning just how bad, or not so bad, the Sanchez household was during the defendant's formative years (*See* Testimony of Maria Sanchez, CR-DE 823 at 8148-8209, Testimony of Nydia Sanchez, (*Id.* at 8272-8299), and rebuttal Testimony of Dr. Michael Brannon, CR-DE 846 at 9319, indicating Sanchez denied he had seen adults fighting at his home when growing up). Nothing improper occurred, therefore counsel was not deficient in failing to object.

Finally, Sanchez argues his counsel were ineffective for failing to object when the prosecutor argued, during the penalty phase rebuttal closing, that Varela was not an equally culpable co-defendant, and there had been no deals with Varela (CV-DE 80 at 278-283). There was nothing improper about this statement. Varela went to trial with Sanchez and Troya. This

same jury found Varela guilty.  It was apparent to everyone that no deals had been made between the government and Varela.  Sanchez cannot show that he was prejudiced by the government's commentary on Varela's culpability for the murders as the great majority of the jurors rejected the prosecutor's argument that Varela was not an equally culpable codefendant.  Ten of the twelve jurors found that "[a]n equally culpable co-defendant, Danny Varela, was not charged in these murders and will not be facing death" (CR-DE 859 at 12; CR-DE 860 at 12).

### 3.    Prejudice

Sanchez has simply not established that he would have been acquitted or escaped the death penalty had counsel objected to the prosecutor's comments.  The recently proposed objections lack merit and would have been overruled, for the reasons stated above.  Furthermore, the government's case was strong.  In fact, on direct review, the Eleventh Circuit described the evidence of guilt as "overwhelming".  *United States v. Troya*, 733 F.3d 1125, 1138 (11th Cir. 2013), *cert. denied*, 135 S.Ct. 2048 (2015).     The absence of the complained of arguments would not have made any difference in the outcome. At the very least, Sanchez has not established that it would.

When viewed in the context of a lengthy and convoluted trial, the prosecution comments were not so pervasive that they permeated the entire trial. The United States called its first of seventy-two guilt phase witnesses on January 27, 2009 (CR-DE 728 at 3099).  Guilt phase closing arguments were completed on February 26, 2009 (CR-DE 767 at 7457).  The penalty phase began on March 16, 2009 (CR-DE 818 at 7918), and ended with final arguments on March 25, 2009 (CR-DE 847 at 9640).  The three hours or so of government closing arguments were relatively isolated and did not permeate the atmosphere of the trial.  The comments did not affect the atmosphere of the long trial, nor were they made repeatedly over the course of the trial. For this reason, amongst others, this claim should be rejected.  *See, e.g., United States v. Mueller*, 74 F.3d 1152 (11th Cir.

1996) and *United States v. Kallen-Zury*, 629 Fed. Appx. 894 (11th Cir. 2015) (both cases upholding convictions despite prosecutorial comment error).

While the United States does not concede that its prosecutors erred in the closing penalty arguments, and indeed the record shows that they did not so err, any error was cured by the court's repeated instructions to the jury that the lawyers' comments were not evidence (CR-DE 728 at 3024, 3036, 3037; CR-DE 767 at 7275; CR-DE 771 at 7490-91). These instructions cured any alleged error from the prosecution's statements. *See Smith v. United States*, 379 Fed. Appx. 811 (11th Cir. 2010) (affirming district court habeas finding of no prejudice where trial court instructed jury that counsel arguments were not evidence after prosecutor vouched for witness's credibility in response to defense closings); *see also Sims v. Singletary*, 155 F.3d 1297, 1309 (11th Cir. 1998) (no prejudice for failure to object where conviction supported by substantial independent evidence). *See United States v. Gainey*, 111 F.3d 834, 836-37 (11th Cir.1997) (prosecutor's inappropriate comment not prejudicial where it "was mitigated by the district court's curative instructions"); *United States v. Barshov*, 733 F.2d 842, 846-47 (11th Cir.1984) (same).

The jury is presumed to have followed the court's instructions in this regard, therefore there was no prejudice, and counsel was not ineffective for failing to object.

4.     Conclusion

Sanchez has not met his burden of establishing that his trial counsel's failures to object to prosecution arguments constituted representation that was outside the wide range of reasonable professional conduct. Sanchez also has failed to demonstrate prejudice inasmuch as any prejudice during argument was cured by the court's repeated instructions that the lawyers' comments did not constitute evidence. Finally, the failures to object did not have an outcome on the ultimate verdicts in the case, and therefore Sanchez suffered no prejudice. For all these reasons, Sanchez's

162

claims concerning counsel's failure to object to statements made during government argument should be denied.

### III. SANCHEZ HAS FAILED TO ESTABLISH OTHER CONSTITUTIONAL VIOLATIONS THAT WARRANT VACATUR OF HIS CONVICTIONS AND SENTENCES.

#### A. SANCHEZ'S MURDER CONVICTIONS AND RESULTING DEATH SENTENCES WERE BASED ON A VALID STATUTE, TITLE 18, UNITED STATES CODE SECTION 924(c), THAT IS NOT IMPERMISSIBLY VAGUE (RESPONSE TO SANCHEZ ISSUE II).

In Claim II, Sanchez argues that his "[18 U.S.C.] § 924(c) convictions and resulting death sentences" were "based on an impermissibly vague statute, in violation of Due Process and the Fifth, Sixth and Eighth Amendments." CV-DE 80 at 30. Sanchez attempts to argue that this claim "update[s]" the arguments made in his earlier petition, and specifically challenges his convictions on Counts 7 through 10. CV-DE 80 at 30 n.17. Sanchez's main support for this proposition is the case of *Johnson v. United States*, ___ U.S. ___, 135 S.Ct. 2551 (2015). In *Johnson*, the United States Supreme Court held that the so-called "residual clause" of 18 U.S.C. § 924(e)(2(B) of the Armed Career Criminal Act ("ACCA") was unconstitutionally vague. Essentially, the Court concluded that the phrase "or otherwise involves conduct that presents a serious potential risk of physical injury to another," was constitutionally flawed. 18 U.S.C. § 924(e)(2)(B)(ii); *Johnson*, 135 S.Ct. at 2557-63. Differentiating itself from the Armed Career Criminal Act, the statutory section under which Sanchez was convicted, that is, section 924(c), specified that he could be found guilty of a crime of violence premised on either a drug trafficking offense, or a carjacking in which a killing occurred, under 18 U.S.C. § 2119(3). Sanchez contends that carjacking does not qualify as a crime of violence. For a number of reasons Sanchez is mistaken.

1. Sanchez Procedurally Defaulted His Claim

163

As a threshold matter, it is firmly established that a defendant must raise a claim on direct appeal or the claim will be subject to the procedural default rule. *See Massaro v. United States*, 538 U.S. 500, 504 (2003); *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986). In this case, Sanchez did not raise a constitutional challenge to the residual clause of § 924(c), nor argue that statute was vague, as part of his direct appeal. Accordingly, that claim is procedurally barred. In order to overcome this default, Sanchez must demonstrate both cause for his failure to raise the claim earlier and prejudice from the alleged error. *See United States v. Frady*, 456 U.S. 152, 167-68 (1982). The "cause and prejudice" standard requires a prisoner to show not only that "some objective factor external to the defense impeded" his efforts to raise the issue earlier, *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (*quoting Murray*, 477 U.S. at 488), but also that the error he alleges "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Frady*, 456 U.S. at 170 (emphasis in original). Thus, "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal" under the plain error standard of review.

### 2.   Sanchez Cannot Establish Cause

Sanchez has not and cannot demonstrate any cause for failing to assert Claim II on direct appeal. Sanchez presumably would argue that his *Johnson*-based claim was likely to have been rejected had he raised it before the trial court or on direct appeal and that it was therefore futile. But the perceived futility of raising an objection, even when existing precedent has already rejected such a claim, does not constitute "cause" excusing a default. *See Bousley v. United States*, 523 U.S. 614, 623 (1998).

Although the novelty of a claim can in some circumstances constitute "cause" to excuse a procedural default, *see Reed v. Ross*, 468 U.S. 1, 16 (1984), the tools necessary to construct the vagueness argument that ultimately carried the day in *Johnson* existed long before the *Johnson*

164

decision was issued. *See Howard v. United States*, 374 F.3d 1068, 1073 (11th Cir. 2004) (where the "legal basis" for a claim existed, the claim was "not sufficiently unheard of to be novel for cause purposes"). On multiple occasions, the Supreme Court wrestled with the parameters of the ACCA's residual clause, indicating unresolved and "pervasive disagreement about the nature of the inquiry." *Johnson*, 135 S. Ct. at 2560. *See also, e.g., Sykes v. United States*, 564 U.S. 1 (2011); *Chambers v. United States*, 555 U.S. 122 (2009); *Begay v. United States*, 553 U.S. 137 (2008); *James v. United States*, 550 U.S. 192 (2007). Indeed, this continuing dispute over the ACCA's residual clause led the petitioner in *Johnson* to conclude that a claim of unconstitutional vagueness was viable and to raise it. This history makes clear that Sanchez's § 924(c) vagueness claim was not so "novel" as to support a claim of "cause" excusing his procedural default.

        3.   Sanchez cannot establish prejudice**.**

Nor can Sanchez establish prejudice. First, as explained below, as determined by binding Eleventh Circuit precedent, the armed carjacking offenses of which Sanchez was convicted under section 924(c), clearly constitute crimes of violence under the force clause of that statute. Second, and as further delineated herein, the *Johnson* decision is not applicable to section 924(c) for a host of reasons. Therefore, Sanchez cannot establish the requisite prejudice.

        4.   Sanchez Cannot Show Actual Innocence**.**

To the extent that Sanchez attempts to argue that he is exempted from the cause and prejudice requirements because he is actually innocent of the section 924(c) offenses, he is again mistaken. *See e.g.*, CV-DE 80 at 317 n.225; CV-DE 80 at 318. It is true that a defendant who cannot demonstrate both cause and prejudice may still obtain relief on collateral review if he can show that he is "actually innocent." *Bousley*, 523 U.S. at 623. To establish the requisite probability of actual innocence, a defendant must show that it is "'more likely than not that no reasonable

165

juror would have convicted him.'"  *Id.* (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).  Where a defendant has been convicted under a constitutionally invalid provision of a statute, the defendant is actually innocent of the offense because his conduct was not a crime.  However, Sanchez cannot satisfy the "actual innocence" exception to the procedural default rule because, as discussed below, *Johnson* cannot be extended to the residual clause of § 924(c), and because even if it could, Sanchez's predicate carjacking convictions are crimes of violence under the force clause of § 924(c)(3)(A).  In other words, the conclusion that Sanchez's claims fail on their merits necessarily leads to the conclusion that those claims have been procedurally defaulted.  Here, Sanchez cannot circumvent the procedural bar because he is not actually innocent of violating § 924(c).  Sanchez has not satisfied his burden to proceed on his claims.

For some time, it has been axiomatic in this Circuit that in a § 2255 proceeding, the burden is on the movant to show that he is entitled to relief.  *See Rivers v. United States*, 777 F.3d 1306, 1316 (11th Cir. 2015) ("In making [the] determination [whether the district court correctly denied the § 2255 motion], we note that [the movant] bears the burden to prove the claims in his § 2255 motion."); *LeCroy v. United States*, 739 F.3d 1297, 1321 (11th Cir. 2014) ("[O]n a § 2255 [motion, the burden of proof] belongs to the [movant].");  *see also United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010) ("[T]he district court must determine whether the [§ 2255 movant] has met his burden of showing that his sentence is unlawful on one of the specified grounds.");  *United States v. Trumblay*, 234 F.2d 273, 273 (7th Cir. 1956) ("On a motion to vacate, set aside or correct a sentence, a movant has the burden of proof.").  The law to be applied to a § 2255 motion is the law that existed at the time of the conviction, plus any new substantive rules of law or "watershed rules of criminal procedure."  *See Teague v. Lane*, 489 U.S. 288, 311 (1989).

166

Recently that point has been further unambiguously settled by the Eleventh Circuit, in the context of *Johnson* claims. In *Beeman v. United States*, 871 F.3d 1215 (11th 2017), the Court made clear that the burden is not on the United States, but on the movant, in this case, Sanchez. *Beeman*, 871 F.3d at 122 (*citing Rivers*, 777 F.3d at 1316; *LeCroy*, 739 F.3d at 1321; *Barnes v. United States*, 579 F.2d 364, 366 (5th Cir. 1978); *Coon v. United States*, 441 F.2d 279, 280 (5th Cir. 1971) [internal parentheticals omitted). In *Beeman*, 871 F.3d at 1221-22, the Court declared that:

> To prove a Johnson claim, the movant must show that -- more likely than not -- it was the use of the residual clause that led to the sentencing court's enhancement of his sentence. If it is just as likely that the sentencing court relied on the elements or enumerated offenses clause, solely or as an alternative basis for the enhancement, then the movant has failed to show that this enhancement was due to use of the residual clause.

In conjunction with that, the Court noted "[O]ne of the principal functions of [the Antiterrorism and Effective Death Penalty Act] was to ensure a greater degree of finality to convictions." *Beeman*, 871 F.3d at 1223 (internal citations omitted).

In other words, unless a movant proves that his sentence actually "turned on the validity of the residual clause," he cannot satisfy his burden of proof, and his claim must be dismissed. *Id.* at Beeman, 871 F.3d at 1221 (internal quotations and citation omitted); *see id.* at 1225 ("Having failed to prove that but for the residual clause he would have received a different sentence, he cannot prevail."); *id.* at 1221 ("Only if the movant would not have been sentenced as an armed career criminal absent the existence of the residual clause is there a *Johnson* violation.").

The Eleventh Circuit rejected the notion, previously expressed in dicta, that it is sufficient merely to show the "possibility that the court relied on the residual clause to enhance the sentence." *Beeman*, 871 F.3d at 1221 & n.3 (rejecting *In re Chance*, 831 F.3d 1335, 1338–42 (11th Cir. 2016)); *Beeman*, 871 F3d at 1225 ("Where … the evidence does not clearly explain what happened[,] the party with the burden loses." (internal quotation marks and ellipses omitted)). In the course of so

167

doing, the Eleventh Circuit recognized that "[P]utting the burden of proof and persuasion on the Government in a § 2255 proceeding to show the absence of a constitutional violation or that an error had no effect on the judgment would undermine the presumption of finality that attaches at the end of the direct appeal process," and thus "would go a long way toward creating a presumption of non-finality and undermine the important interests that finality protects." *Beeman*, 871 F.3d at 1223.

*Beeman* therefore clearly establishes that, to prove his *Johnson* claim, Sanchez must meet his burden to show that his convictions and sentence were actually effected by the residual clause of Section 924(c). *See e.g., Carlos Granda v. United States*, Case No. 16-23426-CV-DMM (S.D. Fla October 1, 2017) (Middlebrooks, J. Order dismissing § 2255 challenging section 924(c) conviction, in part based on *Beeman*).

Accordingly, as evidenced above, in the context of a *Johnson* claim, the movant's burden is to show that his convictions and sentence were, in fact, affected by the challenged residual clause. The mere potential that the district court may have relied on the residual clause of § 924(c) is insufficient to satisfy Sanchez's burden. Rather, to meet his burden, Sanchez must show that the district court necessarily relied on the residual clause. In the absence of explicit record evidence of the district court's reliance on the residual clause, Sanchez could satisfy this burden by showing that under the then-existing law, the district court must have relied on the residual clause (*i.e.*, then-existing law clearly precluded reliance on the force clause). In the instant case, however, there was no law precluding the district court's reliance on the force clause of § 924(c) to find carjacking to be a crime of violence and Sanchez's convictions fall within the scope of that

168

clause. Therefore, Sanchez cannot meet his burden to show that his convictions and sentence were actually impacted by the residual clause of § 924(c).[49]

> 5. Movant's Carjacking Convictions Qualify as Crimes of Violence under 18 U.S.C. § 924(c)(3)(A).

Although Sanchez expends much effort arguing that *Johnson's* holding as to ACCA's residual clause applies to section 924(c), the Court may refrain from addressing that issue because Sanchez's carjacking convictions in Counts 7 through 10, qualify as crimes of violence under 18 U.S.C. § 924(c)(3)(A), referred to as the force clause. *United States v. Albertini*, 472 U.S. 675, 680 (1985) (noting that courts should generally exercise judicial restraint and construe statutes in a fashion that avoids constitutional questions). Therefore, even if *Johnson*, and its progeny were extended to the residual clause of § 924(c)(3)(B), Sanchez's convictions would still stand because his predicate carjacking convictions nevertheless qualify as crimes of violence under the force clause of § 924(c)(3)(A).

---

[49] In this Amended Petition, Sanchez noted that in *Ovalles v. United States*, 861 F.3d 1247 (11th Cir. 2017), the Eleventh Circuit held that *Johnson* did not invalidate the residual clause in § 924(c)(3)(B). Since Sanchez filed his Amended Petition, the 11th Circuit has *sua sponte* vacated *Ovalles* and set it for *en banc* rehearing. The oral argument is scheduled for July 9, 2018. *Ovalles v. United States*, Case No. 17-10172 (11th Cir. May 15, 2018) (Order requiring *en banc* briefing and setting argument date). Sanchez also argues that a case that was pending *certiorari* when his Amended Petition was filed, *Sessions v. Dimaya*, Case No. 15-1498 (U.S. argued Oct. 2, 2018), undermined the holding in *Ovalles*. Since Sanchez filed his § 2255 petition, the U.S. Supreme Court has decided *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018). *Dimaya* involved an Immigration provision, 8 U.S.C. § 16(b), which operated to render an alien deportable if previously convicted of an aggravated felony. Within its definitions, the statute referred to its own residual clause defining a crime of violence. *Dimaya*, 138 S.Ct. at 1210-11. In *Dimaya*, the Court determined that as in *Johnson*, the residual clause which subjected the aliens to deportation was in fact unconstitutionally vague. *Id.* at 1210. But *Dimaya's* holding has no impact at the moment on this case in light of the Eleventh Circuit's binding precedent. The Eleventh Circuit is correct that certain crimes, such as the Hobbs Act Robbery, and the crime at issue here, that is, carjacking, remain valid convictions and not impacted by either *Johnson* or *Dimaya* because of § 924(c)'s force clause. *See also United States v. Wiles*, ___ F. App'x ___, 2018 WL 2189455 *1 (11th Cir. May 14, 2018) (determining that even following U.S. Supreme Court decision in *Dimaya*, the force clause of section 924(c) is not invalidated).

The § 924(c) counts in the Third Superseding indictment charged that Sanchez committed the crime of using or carrying a firearm during the commission of a crime of violence, which in this case was carjacking.  CR-DE 305 at 8-9.  The jury was charged in accordance with that offense.  CR-DE 771 at 7536-43.  And, as fully explained below, Sanchez's carjacking offenses still qualify as "crimes of violence" post-*Johnson*.

To determine whether an offense constitutes a "crime of violence" as defined in 18 U.S.C. § 924(c), courts employ the "categorical approach."  *See Leocal v. Ashcroft*, 543 U.S. 1, 7 (2004); *United States v. Chitwood*, 676 F.3d 971, 976-77 (11th Cir. 2012) (quoting *James v. United States*, 550 U.S. 192, 202 (2007), *overruled on other grounds by Johnson*, 135 S. Ct. at 2551).  "[T]he proper inquiry is whether the conduct encompassed by the elements of the offense, in the ordinary case," falls within the definition of a crime of violence, not whether "every conceivable factual offense covered by a statute" meets the statutory definition.  *James*, 550 U.S. at 208.

Subsection 924(c)(3)(A) includes in § 924(c)(3)'s definition of a "crime of violence" any felony offense that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). "[I]n the context of a statutory definition of [crime of violence], the phrase 'physical force' means *violent* force - that is, force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010) (construing "physical force" contained in elements clause of ACCA's violent felony definition); *United States v. Owens*, 672 F.3d 966, 971 (11th Cir. 2012) (observing that in accordance with *Johnson*, "physical force" under ACCA's elements clause means "strong physical force or a substantial degree of force").

The federal carjacking statute prohibits the taking of a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce, with the intent to cause death

170

or serious bodily harm, from the person or presence of another, by force and violence or by intimidation, as well as attempts to accomplish the same. 18 U.S.C. § 2119. Sanchez argues that because the taking of the vehicle may be accomplished by "intimidation," it does not necessarily involve the use, attempted use, or threatened use of violent force, as required for the offense to be considered a "crime of violence." CV-DE 80 at 45-49.

The argument fails because, as the plain language of the statute makes clear, an element of the offense is the defendant's "intent to cause either death or serious bodily harm." *See, e.g., United States v. Diaz*, 248 F.3d 1065, 1096 (11th Cir. 2001). Thus, regardless of whether a carjacking is accomplished "by force and violence" or by "intimidation," each and every conviction under § 2119 necessarily requires evidence proving an intent "to seriously harm or kill." *See, e.g., United States v. LeCroy*, 441 F.3d 914, 923 (11th Cir. 2006) ("The carjacking statute requires, for any carjacking at all, a taking of a motor vehicle, with intent to cause serious bodily harm or injury . . . ."); *United States v. Fulford*, 267 F.3d 1241, 1244 (11th Cir. 2001) ("To constitute carjacking under § 2119, the taking of a motor vehicle must be committed with the intent to cause death or serious bodily harm.") (internal quotation omitted); *Diaz*, 248 F.3d at 1096 (citing *Holloway v. United States*, 526 U.S. 1, 12 (1999)); *United States v. Kimble*, 178 F.3d 1163, 1166 (11th Cir. 1999). The Eleventh Circuit has acknowledged, after the Supreme Court's decision in *Holloway*, 526 U.S. at 12, that the requisite "intent to cause death or serious bodily harm" is sufficiently established if proof is adduced demonstrating that the defendant intended to cause the death or serious bodily harm only in the event that the victim refuses to relinquish control of the car. *See, e.g., Diaz*, 248 F.3d at 1096. This possibility does not take carjacking outside the scope of § 924(c)(3)(A), which expressly includes offenses involving the "threatened use of physical force." *See United States v. Davis*, 2015 WL 8311538, at *3 (E.D. Mich. 2015 Dec. 9, 2015) ("At the very

171

least, then, carjacking by intimidation -which requires the defendant to demonstrate a willingness 'to seriously harm or kill the victim if necessary to steal the car' - involves the threatened use of physical force.") (quoting *Holloway*, 526 U.S. at 12) (internal alteration omitted).

It is not logically possible for death or serious bodily harm to result from the use of force unless that force is "violent force." If a particular type or amount of force is capable of causing "death or serious bodily harm," it is resultantly "force capable of causing physical pain or injury to another person" as contemplated by the Supreme Court in *Johnson*. Because every § 2119 offense involves the use, attempted use, or threatened use of such force, carjacking qualifies as a "crime of violence" pursuant to § 924(c)(3)(A).

Indeed, even prior to revision of the statute to require "intent to cause serious bodily harm or injury," the Eleventh Circuit held that carjacking qualified as a "crime of violence" pursuant to 18 U.S.C. § 924(c)(3)(A). *See United States v. Moore*, 43 F.3d 568, 572-73 (11th Cir. 1994). Relying on *Moore*, the Eleventh Circuit has held - when confronted with a *Johnson*-based claim identical to Sanchez's - that carjacking still qualifies a crime of violence under § 924(c)(3)(A). *In re: Jeffrey Smith*, 829 F.3d 1276 (11th Cir. 2016). There, the defendant petitioned the Eleventh Circuit for an order allowing him to file a second or successive § 2255 motion, arguing that his carjacking conviction no longer qualified as a crime of violence post-*Johnson*. *Id.* at 1277. The Eleventh Circuit denied the application, reasoning that even if *Johnson* invalidated § 924(c)(3)(B)'s residual clause, the elements of the defendant's underlying carjacking conviction qualified under § 924(c)(3)(A)'s force clause. *Id.* at 1280. The Court reasoned that "an element requiring that one take or attempt to take by force or violence or intimidation, which is what the federal carjacking statute does, satisfies the force clause of § 924(c), which requires the use, attempted use, or threatened use of physical force. In short, our precedent holds that carjacking in

172

violation of § 2119 satisfies § 924(c)'s force clause, and that ends the discussion." *Id.* 1280-81 (citing *Moore*).

Other courts have overwhelmingly concluded that carjacking is a "crime of violence" under § 924(c)(3)(A). *See, e.g., Moberg v. United States*, 2016 WL 6156215, *3 (S.D. Ala. Sept. 29, 2016) ("The carjacking statute includes the element 'with the intent to cause death or serious bodily harm.' . . . The undersigned finds that this . . . element falls with the definition of physical force - or violent force - as contemplated by the [*Johnson*] court, a finding consistent with other district court holdings throughout the country.") (internal and other citations omitted); *Gray v. United States*, 2016 WL 4507118, *2 (E.D. Va. July 25, 2016); *Johnson v. United States*, 2016 WL 3200292, *4 (W.D. Mo. June 8, 2016); *United States v. Sandoval*, 2016 WL 632212, *3-*4 (D. Nev. Feb. 17, 2016); *Davis*, 2015 WL 8311538, at *3; *United States v. Mills*, 2015 WL 6672537, *3 (W.D.N.C. Oct. 30, 2015); *United States v. Cruz-Rivera*, 2015 WL 6394416, *3 (D. P.R. Oct. 21, 2015) ("[T]he court finds that carjacking under 18 U.S.C. § 2119 categorically fulfills the requirements of a crime violence under 18 U.S.C. § 924(c)(3)(A)."); *United States v. Evans*, 2015 WL 6673182, *8 (E.D.N.C. Oct. 20, 2015) (holding that carjacking "is a crime of violence under the force clause set forth in 18 U.S.C. § 924(c) (3)(A) because it has an element the 'use, attempted use, or threatened use of physical force'").

Based on the weight of this authority - both binding and persuasive – Sanchez is not entitled to § 2255 relief because his underlying carjacking convictions qualified as crimes of violence under § 924(c)(3)(A)'s force clause. *United States v. Wiles*, ___ F. App'x ___, 2018 WL 2189455 *1 (11th Cir. May 14, 2018).

Therefore, for these reasons, Sanchez's claim II should be denied.

B. <u>SANCHEZ'S CLAIM THAT PETIT JURY CONDUCT DURING *VOIR DIRE* DEPRIVED HIM OF HIS RIGHT TO A FAIR AND IMPARTIAL TRIAL IN</u>

173

VIOLATION OF HIS FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS IS PROCEDURALLY BARRED AND FAILS ON THE MERITS (RESPONSE TO SANCHEZ ISSUE I).

Sanchez claims he is entitled to a new trial based upon allegedly "untrue and/or seriously misleading" *voir dire* responses from four jurors who deliberated in his case and two alternates who were excused without ever deliberating (CV-DE 80 at 18).  This claim is procedurally barred as it could have been, but was not raised on direct appeal. Even if it was not procedurally barred, the claim fails on the merits because Sanchez does not show that jurors intentionally lied during *voir dire* or were biased against him.

1.   Sanchez's claims concerning jury misconduct are procedurally barred.

A petitioner is procedurally barred from raising, for the first time in a collateral attack on his conviction, issues that were capable of being raised on direct appeal, unless the petitioner can demonstrate both: "(1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982); *see also Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1719 (1992) (cause and prejudice standard applicable to failure to take an appeal); *accord Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 2565 (1991); *United States v. DeBernardo*, 880 F.2d 1216, 1227 (11th Cir. 1989) (failure to take an appeal may be raised as a bar to collateral relief). Where a defendant makes no showing of cause and prejudice regarding the failure to raise issues on direct appeal that are raised for the first time in a Section 2255 motion, summary dismissal of those claims is warranted. *See Parks v. United States*, 832 F.2d 1244, 1246 (11th Cir. 1987).

A careful review of the record shows that appellate counsel obtained the questionnaires completed by the venire members[50]. *See* CR-DE 1115 (former co-defendant Troya's "Agreed-Upon Motion to Unseal and Release Juror Questionnaires"); CR-DE 1118 (Order directing the Jury Section of the Clerk's Office to provide the parties with questionnaires completed by the venire members who were brought into the courtroom for *voir dire*). Armed with the juror's questionnaires, Sanchez could have raised the claim of alleged juror misconduct on appeal. Having not raised the claim on direct appeal, it is now procedurally barred unless he establishes cause and prejudice.   Sanchez has made no attempt to show cause or prejudice with regard to his juror misconduct claim.   As such, pursuant to Eleventh Circuit precedent, the claim is procedurally barred.

2.   Sanchez fails to show jurors were deliberately dishonest or biased against him.

Even if Sanchez's claim of juror misconduct was not procedurally barred, it would fail on the merits.  It is well-established that a new trial is not warranted unless Sanchez can demonstrate that: 1) a juror failed to honestly answer a material question on *voir dire*, and 2) a correct response would have provided a valid basis for a challenge for cause. *McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 556 (1984). For the first prong, it is not enough that a juror neglect to share something in response to a *voir dire* question that he knew at some point in time. Rather, there must be a determination that the juror "was aware of the fact that his answers were false." *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 955 F.2d 1467, 1473 (11th Cir. 1992) (quoting *United States v. Perkins*, 748 F2d 1519, 1532 (11th Cir. 1984)). The second prong requires a showing of actual bias. *Id*. (citing *Perkins*, 748 F2d at 1532; *United States v. Casamayor*, 827 F.2d

---

[50] Before bringing venire persons to the courthouse for the oral *voir dire* process, the Court asked them to complete written questionnaires to "save us time so we can talk about issues that we really think we need to talk about in greater detail" (CR-DE 648 at pp. 34).

1509, 1515 (11th Cir. 1988)). Actual bias can be established by "express admission" or through "specific facts showing such a close connection to the circumstances at hand that bias must be presumed." *Perkins*, 748 F2d 1519, 1532 (11th Cir. 1984) (citing *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976)).   In other words, in order to prevail on his juror dishonesty claim, Sanchez must show that a juror "deliberately failed to disclose relevant information" and was actually biased against him.  *See United States v. Tutt*, 704 F.2d 1567, 1569 (11th Cir. 1983) (requiring a showing of "an actual, identifiable prejudice on the part of the juror").

Sanchez's claim fails because he has not shown that any of the twelve jurors who returned guilty and death penalty verdicts against him deliberately concealed information during *voir dire* or were biased against him, both of which he would need to establish to be entitled to a new trial. The accusations Sanchez makes regarding the jurors' honesty are purely speculative.  Sanchez presents no evidence that any of the jurors at issue were aware of their alleged family members' troubles.  Moreover, Sanchez does not show how that led to prejudice against him.  Most of the alleged omissions concern family members' troubles relating to drugs or firearms. This lack of evidence of intentional concealment, bias, or prejudice is particularly problematic given that all of the accused jurors responded in their written questionnaires that there is nothing "about the subject matter of this case, or the points covered in this questionnaire, which creates a question in your mind as to whether you could be a fair, objective and impartial juror in this case."  (USA Exhs. 4-9  at 10) (juror questionnaires of Donald Little, Mark Sollenberger, Donald Boser, Connie Thomas, Dorothy Barba and Diane Gooch).[51]

---

[51] The written juror questionnaires (USA Exh. 4 through 9) are not identified by the juror's name, but rather by the juror's participant number. These participant numbers were cross-referenced with the trial court's CRD list (USA Exh. 10) (CRD list linking juror names to numbers) to identify the juror questionnaires authored by the jurors Sanchez has challenged.

To the extent Sanchez claims that drug and firearm "issues were at the top of the list of bases for excusal by defense counsel" and that he would have challenged any juror who disclosed a family members' drug problems (DE-CV 80 at 18, 27-28), the record belies such claim. Melissa Scibilia (CR-DE 687 at 1116), Joseph Morrison (CR-DE 712 at 2450), Mariam Boneta-Betancur (CR-DE 712 at 2576), Peggy Gandiaga (CR-DE 712 at 2588), and Daisy Phillips (CR-DE 713 at 2678-79) all disclosed family members' drug-related problems, and the defense did not challenge any of these venire persons for cause. Furthermore, the defense did not challenge Ms. Marye Allen for cause despite her sharing that she had extended family with drug problems (CR-DE 713 at 2669), and Ms. Allen was selected and served as a juror in the guilt and penalty phases. Sanchez's failure to raise cause challenges for any of these jurors severely undercuts his claim that he would have challenged the jurors he now alleges failed to report their family member's drug or firearm related problems. Furthermore, Sanchez's claim that family troubles relating to drugs or firearms would lead to prejudice against him is wholly unsupported. Indeed, the contrary is more likely. In *United States v. Quilca-Carpio*, the Eleventh Circuit noted "it would be speculative to assume" a juror had been dishonest during *voir dire*, even where the juror explained after trial that his friends' arrests might make him biased in a drug case. 118 F.3d 719, 722 (11th Cir. 1997). Addressing the prejudice prong, the court reasoned, "if there was any potential bias on [the jurors'] part, it likely would have inured to the benefit of the defendant rather than the prosecution." *Id*. The same logic applies here. Simply put, Sanchez presents no specific facts showing actual bias or how jurors' relatives' drug or firearms convictions are so closely connected to the circumstances of this capital murder case that bias must be presumed. *Perkins*, 748 F2d at 1532.

177

With that background, the United States will address Sanchez's allegations about each of the jurors in order of their seating on the jury or as alternates.[52]

    i.  Donald Little

Sanchez alleges that Mr. Little was dishonest during the *voir dire* because he did not disclose firearm and drug convictions of his two sons-in-law (CV-DE 80 at 26-27). This claim fails for multiple reasons. Before even considering whether Sanchez has established both of the *McDonough* prongs above, he has presented no evidence showing that Juan Francisco Gonzales and Cecil Astor Harper are Mr. Little's sons-in-law. Nor has Sanchez shown, even if Mr. Little's sons-in-law did sustain convictions for firearm and drug offenses as alleged, that Mr. Little had any knowledge of that criminal history. On those bases alone, Sanchez's claim must fail.

Moreover, even if Mr. Little was aware of the alleged convictions of his sons-in-law, there is no evidence that he intentionally concealed this information during the *voir dire*. To the contrary, the record shows that Mr. Little was forthcoming with the Court about his family's drug history.

---

[52] The court announced the twelve selected jurors in order: "Donald Little, Alan Creswick, Marye Allen, Robyn Keys, Benamin Yelverton, Mark Sollenberger, Jeffrey Manning, Donald Boser, Connie Thomas, Consuelo Minutoli, Esther Pearl, and Amerigo Dicreasce." (CR-DE 727 at 2930). The court also announced the six selected alternates, "Now, the first alternate is Mr. Lawrence Uline. The second alternate would be Mr. Richard Frisby. The third alternate would be Dorothy Barba. The fourth is Gilbert Lanham. The fifth would be Diane Gooch. And the sixth would be Mr. Steven Haskins" (CR-DE 727 at 2944). The twelve initially selected jurors were the same twelve jurors who deliberated in the guilt phase and returned the guilty verdict (CR-DE 774 at 7705-06). Only the first three of the six alternates, Mr. Uline, Mr. Frisby, and Ms. Barba, were retained to observe the penalty phase trial (CR-DE 774 at 7722-23). Mr. Uline was excused for illness during the penalty phase trial, and the parties agreed to proceed with the two remaining alternates, Mr. Frisby and Ms. Barba (CR-DE 825 at 8605-07). No alternate was ever needed, and the same initially selected twelve jurors who returned the guilty verdict deliberated in the penalty phase (CR-DE 848 at 9761-62) and returned the death sentence verdict (CR-DE 857 at 9842-43).

Mr. Little responded affirmatively on his juror questionnaire in response to Question 24 ("Have you or any family members or friends ever had a problem with illegal drugs?") and noted he had, "a step sister who passed away." (USA Exhibit 4 at 7) (juror questionnaire of Donald Little).  During *voir dire*, the Court inquired further, asking, "Also, and I want to thank you for being so candid, but you mentioned you had a stepsister who had problems with drug use, and I wondered, was there anything about that that you thought would affect your ability to evaluate the evidence in this case?"  (CR-DE 713 at 2666).  Mr. Little responded, "Not at all."  *Id*. at 2667.  The fact that Mr. Little disclosed a drug problem and subsequent death of a distant relative that he "didn't know . . . that well" indicates he was not attempting to hide his family's drug-related troubles.  Similarly, there is no indication Mr. Little intentionally tried to conceal his son-in-law's alleged firearms conviction.

Finally, even if this Court were to find that Mr. Little failed to honestly answer a material question during *voir dire*, Sanchez has made no showing that a correct response would have provided a valid basis for a challenge for cause, the second required *McDonough* prong.  Instead, the record shows Mr. Little firmly believed he was unbiased.  During *voir dire,* the Court asked him, "[D]o you think you could be a fair and impartial juror to all parties in the case?" and he responded, "Yes, I do." (CR-DE 648 at 51).  And the record is devoid of any evidence to the contrary.  In fact, if Mr. Little bore some ill will toward Sanchez, he likely would not have disclosed having been the victim of an assault. (USA Exhibit 4 at 6) (juror questionnaire of Donald Little).  Rather, Mr. Little was forthcoming about having been assaulted, and explained it would "not at all" "affect [his] ability to judge the evidence in this case." (CR-DE 713 at 2666).  Despite Mr. Little's prior personal victimization, neither Sanchez nor his co-defendants challenged Mr. Little for cause.  There is no reason to believe, therefore, that Mr. Little's sons-in-laws' alleged

179

drug or firearms convictions would have even prompted a challenge for cause, let alone resulted in the Court's finding that Mr. Little could not be fair.

In sum, there is no evidence that Mr. Little was deliberately dishonest or should have been excused for cause.

ii. Mark Sollenberger

Sanchez claims that Mr. Sollenberger was dishonest during the *voir dire* for not disclosing his brother's alleged drug-related conviction, his son's arrest for marijuana and drug paraphernalia that was ultimately nolle prossed, and the criminal history of his brothers-in-law (CV-DE 80 at 21-23). Like the claim related to Mr. Little, this claim fails because Sanchez has presented no evidence showing that David Andrew Sollenberger, Robert Kent Sollenberger, Roy Livermore, and Richard Livermore are the juror's son, brother, and brothers-in-law respectively. Nor has Sanchez shown, even if Mr. Sollenberger's family members were involved in the alleged drug offenses, that Mr. Sollenberger had any knowledge of it. On those bases alone, Sanchez's claim must fail.

Even if Mr. Sollenberger knew about his son's and brother's alleged drug offenses, Sanchez does not show that Mr. Sollenberger deliberately withheld this information. Indeed, Mr. Sollenberger disclosed, contrary to Sanchez's claim (CV-DE 80 at 22), that he had brothers-in-law with criminal histories. He reported on his juror questionnaire that he had "Three Brother In Laws" who had a problem with illegal drugs and then listed "several convictions" and "DUI" (USA Exhibit 5 at 7) (juror questionnaire of Mark Sollenberger). During *voir dire* the Court addressed Mr. Sollenberger, "You told us that you've had some brothers-in-laws that had some problems" and asked, "Was there anything about their difficulties that you think would affect your ability to judge the evidence in this case?" (CR-DE 713 at 2672). Mr. Sollenberger unequivocally replied,

"No, sir."  *Id.*  Accordingly, the record indicates Mr. Sollenberger was candid that his family had some drug problems, but clarified that those issues would not prevent him from being fair in this case.  Sanchez has given no reason to doubt the validity of his response.

Finally, even if the Court were to find Mr. Sollenberger intentionally concealed his brother's and son's alleged drug-related offenses, Sanchez fails to show Mr. Sollenberger was biased against him, forming a basis for a dismissal for cause.  "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial."  *McDonough*, 464 U.S. 556.  Simply put, Sanchez fails to meet his burden establishing that Mr. Sollenberger should have been dismissed for cause.

### iii.   Donald Boser

Sanchez next accuses Mr. Boser of being dishonest during the *voir dire* for not disclosing his brother-in-law's alleged drug convictions (CV-DE 80 at 27).  Yet, as with Mr. Little and Mr. Sollenberger, Sanchez does not show that the Robert Ries involved in drug-related crimes is Mr. Boser's brother-in-law or that Mr. Boser had any knowledge of Mr. Ries's criminal history.  That lack of evidence is fatal to Sanchez's claim.

Furthermore, even if Mr. Boser was aware of the alleged convictions of his brother-in-law, there is no evidence that he intentionally concealed this information during the *voir dire*.  Indeed, it is entirely possible that Mr. Boser's notion of "family" did not include siblings-in-law or that Mr. Boser was simply not close enough to this brother-in-law that Mr. Boser thought to mention his brother-in-law's alleged drug-related past.  USA Exh. 6 (juror questionnaire of Donald Boser).  In *McDonough*, the United States Supreme Court recognized that jurors are called "from all walks of life" and may interpret the same question differently.  464 U.S. at 554 (finding that a juror "apparently believed that his son's broken leg sustained as a result of an exploding tire" was not

181

the sort of injury asked about during *voir dire* and that "a juror's mistaken, through honest response to a question" will not warrant a new trial). Similarly, District Court Judge Cohn found a juror's failure to disclose the extent of his past civil litigation, though "troubling," to be "innocent omissions, due to his not remembering or not understanding the full scope of the question." *Suppa v. Costa Crociere*, 2008 WL 3926446 at *4 (S.D. Fla. 2008). Sanchez presents no evidence suggesting that Mr. Boser intentionally withheld his brother-in-law's criminal history. To the contrary, the record shows that Mr. Boser, far from trying to hide relevant information during *voir dire*, was careful to supplement his responses to the Juror Questionnaire. He explained, "I remember one of the questions being do you know anyone who owns a handgun. I wrote no, and my father-in-law owns one, just recently" (CR-DE 648 at 198). Mr. Boser then confirmed that nothing about that would affect his ability to fairly evaluate the case. *Id.*

Just as Sanchez provides no evidence that Mr. Boser deliberately gave false answers, he makes no showing that Mr. Boser exhibited actual bias toward him. Even if he purposely failed to disclose his brother-in-law's issues with drugs, nothing beyond pure speculation bridges the gap between that and actual bias against Sanchez. This is especially true considering Mr. Boser's affirmative response that "[w]hen all is said and done" he could be "a fair and impartial juror in the case" (CR-DE 648 at 233). Sanchez has not satisfied either prong of the *McDonough* test with regard to Mr. Boser.

iv. Connie Thomas

Sanchez next alleges that Connie Thomas withheld during *voir dire* that her ex-husband had alleged problems with firearms, that her brother had alleged problems with drugs, and that her ex-brother-in-law had alleged problems with both (CV-DE 80 at 24-25). Additionally, Sanchez contends Ms. Thomas did not disclose that her alleged sister Teresa Thomas had worked for a

182

State Attorney's Office.  As with Sanchez's claims against the other jurors, these attacks are wholly unsupported by any showing that John Thomas Mincey, Willie James Thomas, or John Burrows Hutchinson, Sr., are Ms. Thomas's ex-husband, brother, and ex-brother-in-law, respectively. Similarly, even if these individuals are Ms. Thomas's relatives, and they did have the alleged problems with firearms and drugs, Sanchez has presented no evidence that Ms. Thomas was aware of that.  Nor does Sanchez provide a shred of evidence that Teresa Thomas is the juror's sister or that the juror was aware of that employment.  Accordingly, Sanchez's claim fails.

Even in the event Ms. Thomas was aware of her ex-husband's and ex-brother-in-law's alleged firearms convictions, Sanchez has not established that Ms. Thomas intentionally concealed such information during the *voir dire*.  While the Juror Questionnaire inquired whether "you or any family members or friends ever had a problem involving firearms, whether used legally or illegally," it is entirely conceivable that she consciously no longer considered her ex-husband or ex-brother-in-law to be "family" (USA Exhibit 7 at 6) (juror questionnaire of Connie Thomas).  It is equally possible that she simply did not recall their alleged firearms convictions.  Certainly, Sanchez falls far short of showing that Ms. Thomas deliberately withheld firearms-related information.

As for the question asking whether "you or any family members or friends ever had a problem with illegal drugs," Ms. Thomas candidly responded, "Yes," and wrote "Possession/selling drugs" and "never used them" (USA Exhibit 7 at 7) (juror questionnaire of Connie Thomas).  When asked follow-up questions during *voir dire*, Ms. Thomas explained she was referring to her nephew and clarified that there was nothing about that would affect her "ability to judge any of the issues in this case." (CR-DE 638 at 239).  Indeed, the Court pressed the matter with Ms. Thomas, "Let me put this to you.  I think you understand there are drug charges in this

183

case.  I want to make sure, you know, when something happens to somebody close to use, we can't forget about that, we know it." *Id*.  The Court then said, "I want to make sure you feel comfortable that you could isolate that and your nephew's situation would not affect how you evaluated the evidence in this case." *Id*.  Ms. Thomas remained steadfast that she could be fair.  Accordingly, the record indicates Ms. Thomas did not intend to hide relevant information about her family's problems with drugs or have any sort of bias because of them.

As for Sanchez's claim that Ms. Thomas failed to disclose her sister's alleged former employment with a State Attorney's Office, the juror questionnaire asked "Have you or any family members or friends ever worked for, or applied to work for, any state attorney's office, United States Attorney's Office, or any other city, county, state or federal office or agency." (USA Exhibit 7 at 5) (juror questionnaire of Connie Thomas).  Ms. Thomas checked "No," which seems inconsistent with her previous disclosure that she, herself, was currently employed as a Court Program Specialist with the Palm Beach County Courthouse (USA Exhibit 7 at 1). Perhaps she misunderstood the question. Regardless, there is nothing in the record to indicate that she intentionally hid her sister's alleged former employment with a State Attorney's Office.

Finally, even if Ms. Thomas, for some reason, chose to purposefully conceal her ex-husband's alleged firearm problem, her brother's alleged drug problem, her ex-brother-in-law's alleged drug and firearms problems, or her sister's alleged former employment with a State Attorney's Office, there is no indication that she was biased against Sanchez.  Without such demonstrated bias, a cause challenge would not have been founded, especially in light of Ms. Thomas's continued assurances to the Court that she would evaluate the evidence in the case without outside influence.

> v.  Dorothy Barba and Diane Gooch

184

Additionally, Sanchez accuses Dorothy Barba of failing to disclose her grandson's alleged drug-related arrests and convictions and Diane Gooch of being ineligible for jury service because of an alleged felony conviction (CV-DE 80 at 18-20, 25); *see also* USA Ex. 8 (juror questionnaire of Dorothy Barba) and USA Exh. 9 (juror questionnaire of Diane Gooch).  Both Ms. Barba and Ms. Gooch were selected as alternate jurors (CR-DE 727 at 2944).  While they both observed the guilt phase, neither deliberated or returned the guilty verdict (CR-DE 774 at 7705-06).  Ms. Gooch did not even observe the penalty phase (CR-DE 774 at 7722-23), and although Ms. Barba did (CR-DE 825 at 8605-07), she did not deliberate or (CR-DE 848 at 9761-62) return the death sentence verdict (CR-DE 857 at 9842-43).  Accordingly, any claims that either Ms. Barba or Ms. Gooch were untruthful during *voir dire* or were ineligible to serve are simply irrelevant.

Binding precedent makes clear that claims of unfair or improper jury selection do not extend to nonparticipating alternate jurors.  *See Smith v. Whisman*, 431 F.2d 1051 (5th Cir. 1970).[53] There, the Court considered allegations in a death penalty habeas case that venire persons were improperly excluded even though the record was allegedly unclear that they were unwilling to apply the death penalty under any circumstances.  *Id*. at 1054.  The parties did not dispute that the person ultimately selected as the alternate juror did not participate in deliberations.  *Id*.  The Court cited to a federal district court that faced a similar problem.  *Id*. (quoting *Woodards v. Maxwell*, 303 F.Supp. 690, 693 (S.D. Ohio 1969) ("[B]ecause none of the alternate jurors participated in the deliberations or verdict at the conclusion of petitioners' trial, the Court will not consider their examination relevant in the discussion of the *Witherspoon* issue.")).  Adopting that reasoning, the Fifth Circuit held a death sentence is not voided for error related to jury selection of an alternate

---

[53] Decisions of the United States Court of Appeals for the Fifth Circuit on or prior to September 30, 1981, are binding precedent for the Eleventh Circuit.  *Bonner v. City of Prichard, Alabama*, 661 F.2d 1206 (11th Cir. 1981).

"as long as the alternate juror selected is not needed, does not sit in on the deliberation or participate in the verdict, and provided that there is no indication that he influenced the regular jurors or prejudiced the rights of defendant." *Id.* at 1055.  In other words, "Ultimately, the Constitution is concerned only that the jury which decides the defendant's fate be 'impartial and indifferent to the extent commanded by the Sixth Amendment.'" *Waldrop v. Thomas*, 2014 WL 1328138 at *95 (M.D. Ala. March 31, 2014) (quoting *Morgan v. Illinois*, 504 U.S. 719 (1992)).

Here, it is undisputed that Ms. Barba and Ms. Gooch did not deliberate or participate in either the guilt phase or penalty phase verdicts.  Indeed, Ms. Gooch did not even participate in the penalty phase trial.  There is also no indication that either Ms. Barba or Ms. Gooch "influenced the regular jurors or prejudiced the rights of defendant."  *Smith*, 431 F.2d at 1055.  At the conclusion of *voir dire* for the panel that included Ms. Barba and Ms. Gooch, the Court instructed the venire persons not to discuss the case (CR-DE 687 at 1152) ("Now, what I would like to ask each one of you to do is, first, please don't talk to anybody about the case.").  Then, again, immediately prior to opening statements in the guilt phase, the Court emphasized the importance of "not discuss[ing] the case in any manner among yourselves or with anybody else. . ." (CR-DE 728 at 3025).

To the extent Sanchez may suggest that Ms. Gooch tainted other jurors based upon some indication that she may have discussed the case at work (CV-DE 80 at 20), the allegation is meritless.  During trial, the United States raised the matter that one of Ms. Gooch's co-workers told a third party (Mr. Fazio) who told a fourth party (Probation Officer Goldberg) that she "was speaking either about the case or jury service with other employees of Arigo Dodge" (CR-DE 771 at 7477).  After confirming that Ms. Gooch was an alternate, and one of the last alternates, the

Court proposed to postpone an evidentiary hearing until such time as she might be required to be substituted in as a deliberating juror (CR-DE 771 at 7479). The parties agreed. *Id.*

It is critical to recognize the allegation was not of premature deliberations or any other improper communications between Ms. Gooch and other members of the jury. Rather, there was a concern that she might have discussed "the case or jury service" with her co-workers. Accordingly, there was no concern then that Ms. Gooch somehow improperly influenced other jurors, and there should be no concern now that either Ms. Gooch or Ms. Barba somehow prejudiced Sanchez "based on a mere theoretical fear that the alternate juror[s] disobeyed the judge's instructions and tried to pressure the other jurors." *Smith*, 431 F.2d at 1055.

### 3. Conclusion

The United States appreciates defendant's right to a trial by a fair and impartial jury, but Sanchez has made no showing that he received anything less. His unsubstantiated allegations are a far cry from the cases to which he refers in his amended petition (CV-DE 80 at 28).

In *Sampson v. United States*, 724 F.3d 150 (1st Cir. 2013), during the trial *voir dire*, a juror omitted having been the victim of an abusive ex-husband and lied, saying she had only two sons, when she also had a daughter who had a drug problem. Ultimately, the court found that the juror intentionally withheld the information because she could not accept that such problems could exist in her family and concluded that lying because of a "magnitude of . . . emotional distress" and "intense feelings about her own life experiences" "impaired her ability to decide the case solely on the evidence." *Sampson*, 724 F.3d at 162, 167.

None of the allegedly withheld information from Mr. Little, Mr. Sollenberger, Mr. Boser, or Ms. Thomas approaches the sort of trauma the juror in *Sampson* apparently suffered. The denial of the existence of a child because of drug-related shame is on a completely different level than

187

the alleged omissions here. Mr. Little, Mr. Sollenberger, and Ms. Thomas each shared some family drug-related problems, and each assured the Court that they could nonetheless be fair and impartial. Nothing in the record indicates any of these jurors were emotionally influenced at all by any of their family members' issues, let alone to the degree of the juror in *Sampson*. While Mr. Boser did not bring up any family drug-related problems, his efforts to supplement his questionnaire with his father-in-law's recent firearm acquisition shows his attempt to fully disclose anything that conceivably could be of interest to the court and parties. In that light, his lack of mentioning his brother-in-law's drug problems (if he even has such a relative) suggests that it had no impact on him.

Sanchez also cites a case where the District of Vermont ultimately granted a habeas petition for a new trial based on allegations of juror misconduct. *United States v. Donald Fell*, case no. 01-CR-00012-GWC, DE 514, 2014 WL 3697810 (D. Vt. July 24, 2014). However, the *Fell* court dismissed allegations of *voir dire* failures to disclose as unfounded. The court considered how Juror 162 "seriously under-reported" her son's criminal history, but found this was not the result of dishonesty and did not establish bias. *Id.* at 30-31, 44. Similarly, the court found insufficient evidence that Juror 26 "intentionally withheld information, or that his responses were evidence of bias." *Id.* at 86. Indeed, the reason the court granted Fell a new trial had nothing to do with alleged *voir dire* non-disclosures, but rather Juror 143's "deliberately undertaking an independent investigation" by traveling "over two hours to view the crime scenes in knowing violation of the Court's order" and viewing "extra-record information that was highly relevant to the aggravating and mitigating factors presented at trial." *Id.* at 91. Here, because there is no genuine assertion of extraneous influence on the jury and the *voir dire* allegations were unfounded in *Fell*, the case does not support Sanchez's plea for a new trial.

188

For all the foregoing reasons, Sanchez's claim concerning juror misconduct during *voir dire* should be denied without a hearing[54].

C.      SANCHEZ HAS NOT ESTABLISHED ANY *BRADY* OR *GIGLIO* VIOLATIONS (RESPONSE TO SANCHEZ AMENDED ISSUE VI).

Sanchez claims that the United States engaged in misconduct by failing to disclose and withholding *Brady* and *Giglio.* Specifically, Sanchez claims that the United States failed to disclose material exculpatory information relating to: (1) the Briar Bay security booth; (2) promises made or benefits provided to prosecution cooperator Kevin Vetere; (3) the movement of Yessica Escobedo'a cell phone around the time of the murders; and (4) evidence of third party guilt, namely that the Zetas cartel actually killed the Escobedos rather than Sanchez and Troya. Finally, Sanchez argues that the cumulative effect of these items of withheld evidence require the

---

[54] Sanchez seeks to interview the jurors and an evidentiary hearing related to his allegations of juror dishonesty (CV-DE 80 at 29-30). Sanchez does not have a pending motion to interview jurors, but even assuming he properly filed such a motion with this Court, the request should be denied for all the reasons cited in this Court's Order denying such a motion filed by his former co-defendant Daniel Troya. *See Daniel Troya v. United States*, case no. 16-CV-80700-BB, DE 124 at 8-13 (S.D. Fla. July 26, 2017).

Similarly, an evidentiary hearing on this issue is not warranted. To justify a post-trial hearing on juror misconduct, Sanchez "must do more than speculate' he must show 'clear, strong, substantial and incontrovertible evidence . . . that a specific nonspeculative impropriety has occurred.'" *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (quoting *United States v. Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983))). "The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." Id. (quoting *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir. 1985)). This standard applies equally in cases alleging lack of juror candor during *voir dire. See Quilca-Carpio*, 118 F.3d 719 (11th Cir. 1997) (finding no abuse of discretion where the trial court denied an evidentiary hearing where a juror later indicated he might have a drug-related bias).

Here, Sanchez has done nothing more than speculate. He has not presented any evidence, let alone "clear, strong, substantial and incontrovertible evidence" that any of the jurors were deliberately dishonest during *voir dire* or would have been excused for cause if they had been completely forthcoming. *Cuthel*, 903 F.2d 1381, 1383.

granting of a new trial and/or penalty hearing.  Several of Sanchez's claims of prosecutorial misconduct are procedurally barred; all fail on the merits.

A petitioner is procedurally barred from raising, for the first time in a collateral attack on his conviction, issues that were capable of being raised on direct appeal, unless the petitioner can demonstrate both: "(1) 'cause' excusing his . . . procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 168 (1982); *see also Keeney v. Tamayo-Reyes*, 112 S. Ct. 1715, 1719 (1992) (cause and prejudice standard applicable to failure to take an appeal); *accord Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546, 2565 (1991); *United States v. DeBernardo*, 880 F.2d 1216, 1227 (11th Cir. 1989) (failure to take an appeal may be raised as a bar to collateral relief).   Where a defendant makes no showing of cause and prejudice regarding the failure to raise issues on direct appeal that are raised for the first time in a Section 2255 motion, summary dismissal of those claims is warranted. *See Parks v. United States*, 832 F.2d 1244, 1246 (11th Cir. 1987).  Sanchez's claims of *Brady* and *Giglio* violations concerning the Briar Bay security booth and government witness Kevin Vetere could have been raised by Sanchez on direct appeal but they were not.   As such, they are procedurally barred unless Sanchez can demonstrate how his claims of prosecutorial misconduct would qualify under an exception to the procedural bar rule.  Sanchez has failed to make this showing.

Moreover, Sanchez has not established that any *Brady* violations actually occurred.  The *Brady* legal framework is well settled.   "There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

190

To demonstrate prejudice, the petitioner must "convince us that there is a reasonable probability that the result of the trial would have been different if the [allegedly suppressed items] had been disclosed to the defense. In other words, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *High v. Head,* 209 F.3d 1257, 1267 (11th Cir.2000) (citations and internal quotation marks omitted*); see also Strickler*, 527 U.S. at 289-90, 119 S.Ct. at 1952 ("the question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence' ") (citation omitted*) Johnson v. Alabama*, 256 F.3d 1156, 1188-89 (11th Cir. 2001).

Sanchez's *Brady* and *Giglio* claims have been procedurally defaulted, fail on the merits, and should be summarily denied.  Sanchez has failed to establish that the undisclosed reports were material and exculpatory, and therefore do not undermine confidence in the correctness of the jury's verdicts on guilt or punishment.

1.   Sanchez has failed to establish that the United States failed to disclose *Giglio* information concerning government cooperator  Kevin Vetere (Sanchez Amended Issue VI(C).

Sanchez alleges that the United States shirked its *Giglio* obligations by failing to turn over all documents in its possession concerning promises made to Kevin Vetere.  CV-DE 80 at 152.  In support thereof, Sanchez cites to Vetere's post-trial reduction in sentence from 144 months to only forty-two (42) months. *Id*.  Sanchez speculates that Vetere had more than just "a mere hope that his cooperation might prove fruitful." *Id.*   The United States made all disclosures required under *Giglio* concerning Kevin Vetere's treatment, and Sanchez has failed to specify what records he

seeks that would not be publicly available, as all motions, judgments and conviction orders, and hearing transcripts are publicly available.

Sanchez has failed to establish a *Giglio* violation and indeed, the United States submits that no *Giglio* violation occurred. The prosecution provided *Giglio* information on Vetere in advance of trial on December 22, 2008, in accordance with the timing provisions of a Protective Order entered earlier in the case. USA Exh. 13. To the extent that Sanchez complains of the security enacted in the Courtroom relating to the testimony of witness Kevin Vetere in response to threats made by Troya, those facts were completely known to all of the attorneys by virtue of the December 22, 2008 delayed *Giglio* response, and the government's in-trial notice at sidebar.[55] Immediately thereafter trial counsel was able to cross-examine Vetere as to his hope of receiving a Rule 35 reduction of sentence and related possible bias towards the government. CR-DE 754 at 5735 ln 22 - 5737 ln 6; CR-DE 754 at 5738 ln 22 – 5739 ln 22; CR-DE 754 at 5778 ln 10 – 5781 ln 18; CR-DE 756 at 5823 ln 15- 5824 ln 12; CR-DE 756 p. 5842 ln 24 – 5845 ln 7. The Court also instructed the jury with regard to Vetere's hopes of receiving a sentence reduction as a result of his testimony. CR-DE 754 at 5421 ln 3-9. Not only has Sanchez failed to establish a *Giglio* violation with regard to Vetere and his hopes of a sentence reduction, the record indicates that counsel, the Court, and the jury were all made aware of his hopes of receiving such a reduction.

The fact that Vetere subsequently received a reduction in his sentence does not mean that there were extraordinary, undisclosed promises of leniency. The grant of a reduction in sentence, and the extent of any reduction, lies wholly within the discretion of the District Court. The United

---

[55] Troya had been subjected to Special Administrative Measures ("SAM") of pre-trial detention due to Troya's proclivity to commit violence. USA Exh. 14. Prior to cross examination of Vetere it also was disclosed that the family had incurred moving expenses borne by the United States, and that Vetere was under the prospective protection of the Marshals Service. CR-DE 754 at p. 5403-12; and USA Exh. 13.

States—in open, public hearings—advised the respective judge as to the extent of the cooperation provided, how the cooperation fit into the larger trial, and recommended a percentage reduction in the cooperator's sentence. Thereafter, the District Court, specifically United States District Judge Daniel T.K. Hurley, who had presided over the joint trial of Sanchez, Troya, Varela and Lopez, decided to reduce the sentence of Vetere as he saw just. The District Court granted a reduction as a matter of discretion by the Court not fiat by the Executive Branch. [56]   Counsel is mistaken concerning the existence of, and failure to disclose, hidden promises of extraordinary leniency, and has cited no basis other than pure supposition. The fact that the amount of reduction far exceeded that which the Government requested or advocated undercuts Sanchez's claim that the final sentence reductions were the result of undisclosed Government promises of extraordinary leniency. Sanchez's mere speculation is insufficient to meet this burden.

Furthermore, as stated *supra*, Sanchez has procedurally defaulted on these *Giglio* claims by failing to raise them on direct appeal. The defense knew of Vetere's reduction as of the date of his resentencing on October 8, 2009. CR-DE 1059. Sanchez's appellate brief was filed in the Eleventh Circuit on April 3, 2012, several years after all the facts giving rise to the instant claim were known to the defense. (USA Exh. 1 hereto) Sanchez waited to raise any claim related to these facts for nearly seven years after the facts were known to him. He has offered no explanation as to this cause for this delay as required by law. As this claim is procedurally defaulted, and as Sanchez has failed to meet his burden of proof on the merits of this issue, it should be summarily denied.

---

[56] The comments of the presiding judge made clear that the reduction ultimately imposed was the Court's decision, and the reduction was above that recommended by the United States, in recognition of the personal and familial safety risks undertaken by Vetere in choosing to cooperate. CR-DE 1066

In sum, all required *Giglio* disclosures were made in advance of trial, and information was provided in time to utilize it for effective cross-examination.  Sanchez's unsupported suppositions concerning *Giglio* violations lack any factual support.  Furthermore, Sanchez failed to raise this claim in his appellate brief and has offered no explanation as to why he waited nearly seven years after the salient facts were known to him to raise the instant claim.  As this claim is procedurally defaulted, and as Sanchez has failed to meet his burden of proof on the merits of this issue, it should be summarily denied.

2, Sanchez has failed to establish that the Government withheld material, exculpatory information concerning the guard gate video surveillance at the Briar Bay development, where "Thug Mansion" was located, and furthermore, this issued is procedurally barred (Response to Sanchez Amended Issue VI(B)).

Sanchez alleges that the United States committed a *Brady* violation by failing to turn over visitor logs and security gate videos from the Briar Bay development, where "Thug Mansion" was located. No violation occurred. The United States produced all evidence in its possession relating to the security gate and the time period related to the homicides, including a clone copy of the hard drive from the computer located at the guard gate. However, there was no video recording contained on the data received from the security officials at Briar Bay.  This discovery was provided by the United States to the defense in its Eighth Supplemental SDO Response filed on August 6, 2007.  CR-DE 231, para. 6b therein.  Sanchez's counsel obviously had this information because it was listed on his trial exhibit list.  CR-DE 815, Sanchez Exh. 40.  Moreover, Sanchez's defense case included two Government agents (DEA Special Agents Weeks and Matthews) who testified for the defense concerning the lack of relevant evidence from the logs and video cameras in use at the Briar Bay guard gate.  CR-DE 765 at  6967 ln 23- 6970 ln 2, 6976 ln 9 – 6978 ln 12,  6980 ln 7 – 6984 ln 24.  The lack of corroborating evidence from the Briar Bay logs and cameras was also used by Sanchez's counsel during closing to argue that there was no

corroboration for Vetere's testimony concerning the defendants' whereabouts on the night of the murders.  CR-DE 767 at 7332 ln 19 –7333 ln 22.  Not only has Sanchez failed to establish the existence of the *Brady* violation, but also the record clearly shows that the exculpatory nature of the Briar Bay logs and entry camera evidence was known to the defense.

Sanchez claims that DEA Special Agent David Weeks testified that he had viewed video footage from the Briar Bay security cameras covering the time period October 12 through October 14, 2006, which would include the night of the murders.  The transcript citation provided by Sanchez is misleading at best.  In fact, agent Weeks never testified that he viewed video footage from the night of the murders.  CR-DE 765 at 6975-6979.  The relevant exchange occurred as follows:

> Q. With regard to the Briar Bay and security cameras, you don't even know if the cameras were working in October, 2006, do you?
>
> A. I have seen some video footage from that location, but --
>
> Q. In fact --
>
> THE COURT: Wait a minute.
>
> MR. CARLTON: I'm sorry.
>
> THE COURT: Let the witness finish answering the question.
>
> THE WITNESS: I have seen some footage from that location. I don't know which cameras were working and which weren't.
>
> BY MR. CARLTON:
>
> Q. The video turned over from Briar Bay was from the time period October 12th to October 14th?
>
> A. Yes.
>
> Q. Isn't it true law enforcement determined after viewing that electronic whatever saved by Briar Bay was of no help whatsoever identifying anything?
>
> MR. COHEN: Hearsay.
>
> THE COURT: Sustained.
>
> MR. EISENBERG: Move to strike.
>
> THE COURT: Grant the motion to strike.

BY MR. CARLTON:

Q. Was there any evidence you received from Briar Bay that you determined relevant to the investigation concerning the entry or exit of the vehicles concerning that development after 3:02 a.m. October 13th, 2006?

A. No, sir.

CR-DE 765 at 6974 ln 15 – 6975 ln 19.  Sanchez has cited to this exchange in an effort to establish that the Government was in possession of a video showing ingress and egress from the Briar Bay guard date on the night of the murders.  This exchange does not establish the government's possession of such a tape, which could potentially corroborate or fail to corroborate Kevin Vetere's testimony concerning the actions of the defendants on the night of the murders.  If the existence of such a video had become known at the end of such a lengthy and important trial, the defense would have shouted for a mistrial, which they did not do.  The defense did not move for a mistrial at this juncture because they understood the context of Agent Weeks testimony and also understood that there was no video from the Briar Bay security gate relevant to the night of the murders.

To put it bluntly, the video footage cited by the defense does not exist and was certainly never in the Government's possession.  The United States endeavored to recover information believed to have been recorded on the hard drive of the security gate computer at Briar Bay, however no video recordings were recovered despite a forensic examination to uncover them.  The results of that forensic examination and the CD containing a clone copy of the Briar Bay hard drive were produced to the defense in discovery.  The allegation that the United States failed to produce a videotape in its possession is not true; the United States did not possess such a piece of evidence.  The video tape evidence described by the defense did not exist.  Defense counsel were well aware of this, as evidenced by the lack of calls for a mistrial following Agent Weeks' testimony and also

considering the arguments made by counsel in closing. Sanchez has simply failed to meet his burden of establishing that the Government had in its possession, and yet withheld, potentially exculpatory information: to wit, the video showing movement into and out of the Briar Bay development, where Thug Mansion was located, at the time of the murders. The government cannot violate a requirement to provide exculpatory materials if the government does not possess those materials. *See United States v. Meros*, 866 F.2nd 1304, 1308 (11th Cir. 1989).

Furthermore, assuming that Weeks' testimony establishes the government's possession of a video tape relevant to the defendants' movements on the night of the murders, Weeks testified on February 24, 2009, more than three years before Sanchez's appellate brief was filed. Sanchez's prior counsel was aware of all the facts giving rise to this claim prior to the filing of his appeal and could have, but did not raise this issue therein. Sanchez provides no explanation for the failure to pursue this issue in a timely manner. A review of Sanchez's amended Petition indicates that Sanchez makes no claim that his appellate attorneys were ineffective for failing to raise this claim in the direct appeal. As such, the issue is procedurally barred and should be summarily denied.

3. Sanchez has failed to establish that the United States failed to disclose material exculpatory information concerning third party guilt relating to the location of murder victim Yessica Escobedo's cell phone, and this claim is procedurally barred (Response to Sanchez Amended Issue VI(A)).

At the trial of this matter, defense counsel argued that cell phone records showed that victim Yessica Escobedo's cellular telephone was in Texas within hours after her death and suggested that these records were an indication of the involvement and guilt of a third party who caused the phone to travel from Florida to Texas. CR-DE 767 at 7350 ln 19 – 7352 ln 7; CR-DE 772 at 7654-61, 7682-85. Sanchez now alleges that the Government failed to produce material information in its possession concerning a third party's involvement in the movement of the cell phone owned or used by Yessica Escobedo. Sanchez provides no proof of this allegation, only speculation that the

government must have such information. "[M]ere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" *Jordan*, 316 F.3d at 1252 n. 81. Sanchez has failed to meet his burden of proof on this issue.

Furthermore, the record flatly contradicts Sanchez's claim that the government withheld material, exculpatory information. The United States produced a multitude of cellular telephone evidence in the case, both forensically-derived data and subpoenaed records. As relates to Yessica Escobedo, the United States produced cellular telephone records in its Sixth Supplemental SDO Response filed on or about May 18, 2007. (USA Exh. 12). Some of those records pertained to Yessica Escobedo's cell phone assigned phone number 956-266-2004. Disclosed records relating to this cellular telephone number consisted of: a T-Mobile subscriber report (Bates 196); call detail records for the time period September 22, 2006 through October 13, 2006 (Bates 197-199); and switch data (cell cite data) for the time period September 9, 2006 through October 17, 2006 (Bates 200-219)(Id.).

Additional cell telephone records for the cellular phone assigned number 561-891-1220 were also disclosed to the defense. The "1220" number also was opened in the name of Yessica Escobedo, but was believed to have been actually used by her husband, Jose Luis Escobedo. As to the "1220" number, the United States produced cellular telephone records in the Sixth Supplemental SDO Response filed on or about May 18, 2007. These records consisted of records produced by Verizon as follows: (a) cell site data from October 1, 2006 through October 14, 2006; and (b) toll records from October 1, 2006 through October 14, 2006. (*Id.*)

Sanchez claims that the purportedly withheld materials show that Yessica Escobedo's cellular phone traveled from south Florida to McAllen, Texas area immediately after the killings. Sanchez claims that these "records" show that Los Zetas members actually took Yessica

198

Escobedo's phone with telephone number (956) 266-2004 to Texas after they murdered the Escobedo family.   To the extent Sanchez argues that the Government withheld evidence establishing this movement, he is mistaken on two fronts.  First, Sanchez's counsel was able to use the previously disclosed phone records to make a similar argument at trial.  CR-DE 767 at 7350 ln 19 – 7352 ln 7.  Second, the previously described disclosed phone records do not support Sanchez's claim that the phone traveled to Texas.  *See* Section II(F), supra, at pp. 97-106 (discussing phone records.

The United States had no information about the location of the actual telephones other than the cellular carrier records described above and other cell site tower location exhibits or summaries admitted into evidence during the trial.  To the prosecution's knowledge, the actual cellular telephones used by Jose Luis Escobedo and Yessica Escobedo were never found.  No *Brady* violation occurred here; the United States did not possess additional information concerning the location of the phones and it certainly did not withhold any such information from the defense.

Furthermore, as counsel was able to make a similar argument at trial, the record contradicts any claim of prejudice on this issue.  The record shows that Sanchez's trial counsel, Michael Cohen, not only received the records but used them to argue the exact point Sanchez makes here: that Yessica's phone travelled to Texas after the murders in an effort to create a reasonable doubt in the case:

> Ladies and gentlemen, I am going to direct your attention to Exhibit Sanchez Exhibit 32.  You will see from the first page of that account that the name on the cell phone account was that of Yessica Escobedo.  That was her phone.
>
> Mr. Gershman, if you could turn the page, please.
>
> You will see 10/12 of 2006 at 7:47 p.m., a call was made in Melbourne, Florida, was received with respect to that phone.

You will see the next call, ladies and gentlemen, on 10/12, was at 11:58 p.m.  That call was in  McAllen, Texas.

Likewise, you will see that on 10/13/06, 12 a.m., another call was received by Yessica Escobedo's phone in McAllen, Texas.

And finally, ladies and gentlemen, you will see that on 10/13 at 3:18 a.m., Yessica Escobedo the Government says is dead, another call is received on  that phone in McAllen, Texas.

There is a mystery here which was never answered.

We know someone was traveling with the Escobedos that night, and the Government knew it, too, and they ignored it and they kept this evidence out of their presentation.

The second phone Mr. Carlton said was missing and which he said was searched for in the dark was that night in Texas.

We provided you this information in this case,  Sanchez Exhibit 32, Yessica Escobedo's phone, moves from Melbourne, Florida, the same path the Escobedos took that night, to McAllen, Texas by 12 that night.

Look at its path.  When they stand up here and the Government closes on rebuttal, ask them why the  Government kept that information from you.

I am going to ask you now to return a verdict based on this and the other evidence in this case, ask you to return a verdict of not guilty.

CR-DE 767 at 7350 ln 19 – 7352 ln 7, referencing Sanchez Trial Exhibit 32; see Sanchez Trial Exh. List, CR-DE 815 p. 5, clearly listing as Sanchez Exh. 32, "T-Mobile Phone Records (956) 266-2004"; CR-DE 772 at 7654-61, 7682-85.  This evidence and these arguments did not help the defendants, however, given the overwhelming evidence of Sanchez's involvement in the murders. This claim is procedurally barred as it could and should have been raised earlier.

As Sanchez has failed to establish that the government possessed but failed to disclose any material, exculpatory information concerning the movement of Yessica Escobedo's cell phone by a third party, or that Sanchez was prejudiced thereby, this claim should be denied.

4.  Sanchez has failed to establish that the United States failed to disclose material, exculpatory information concerning a drug deal involving Jose Luis Escobedo

<u>in Daytona Beach on the days before his murder and, in any event, this claim is
procedurally barred (Response to Sanchez Amended Issue VI(A)).</u>

In Section VI(A) of his amended petition, Sanchez claims that the Government possessed information of third party guilty, withheld this information from the defense, and made misrepresentations to the court and the jury concerning the paucity of evidence pointing to the guilt of third parties. Sanchez points to an email between DEA agents in Texas, a handful of DEA interview reports, and phone records to support his claim that there were several "teams" from the Zetas cartel in Florida at the time of the murders who had contact with or knew where the Escobedos were located and had a motive to kill them. Sanchez's claim is procedurally barred and also fails on the merits. The email, DEA reports, and phone records do not support Sanchez's version of events and, in fact, support the Government's theory of prosecution. Even if Sanchez had used these documents in the manner he now suggests, they would have been dwarfed by the evidence linking Sanchez to the murders. Furthermore, Sanchez's counsel was able to, and did argue that the cartel killed the Escobedos as payment for a drug debt, but the jury rejected that defense.

At trial, the Government's theory of the murders was that victim Luis Escobedo was in possession of a multi-kilogram quantity of cocaine obtained from some unidentified source in the Daytona area, and that he and his family were murdered to steal the drugs and erase a pre-existing drug debt owed by Varela to Escobedo.   As part of its investigation, the Government attempted to identify the source of the cocaine that was stolen from the Escobedos at the time of the murders. The United States contacted confidential sources in the Browsville, Texas / Matamoros area, where Escobedo had lived before moving to Florida. The government also tracked down calls made to and from Escobedo's phone around the time of the murders in an attempt to identify the source of supply. These same records of calls—and the towers Escobedo's phone were hitting—were used

201

to approximate the location of the deal.  All toll records for Escobedo's phones were timely disclosed to the defense pre-trial.  The investigation of the toll records and confidential sources led to the interview of several individuals and the creation of DEA interview reports (DEA 6s) that memorialized these interviews.   The previously undisclosed DEA reports memorialize the interviews of the following individuals: (i) a DEA informant; (ii) an ICE informant; (iii) Victor Cortinas; (iv) Juan Carlos Santos; (v) Norma Guzman; (vi) Juana Beltran, and (vii) Juana Caro. The interviews led nowhere, the source of supply was never positively identified, and the reports were deemed irrelevant, immaterial, and not exculpatory—as such they were not disclosed prior to the trial of this matter.[57]

Through a request to the Florida State Attorney's Office for the 19th Judicial Circuit (where the murders occurred), Sanchez was able to obtain emails between law enforcement officials in Texas in the days following the murders.  CV-DE 78-1 at 44-47.  One email indicated that a confidential source in Texas heard some discussions concerning the murders and Escobedo's source of supply within a day or two of the murders.  CV-DE 78-1 at 45.   Before defense counsel made the United States aware of these emails, the undersigned Assistant United States Attorney was personally unaware of the contents or existence of these emails.  Therefore, the Government would have been unable to disclose this email at the time of the trial.  The DEA was a part of the prosecution team, and under current law and interpretation of the Government's *Brady* obligations, the existence of this email between agents at a Texas DEA office would be imputed to the Government now.   Sanchez suggests that the CS mentioned in the email and report are the same person.  The undersigned Assistant United States has recently confirmed that the CS referenced in

---

[57] The DEA reports were disclosed during the pendency of this 2255.  CV-DE 49-2 at 5, 17-36. These reports are the same items of which Sanchez has sought discovery in this proceeding.

the email (CV-DE 78-1 at 45) and the DEA 6 prepared June 4, 2007 (CV-DE 78-1 at 18-19) is the same person.

The United States never learned the identities of the person from whom Escobedo obtained the cocaine before he was killed further south in St. Lucie County by Sanchez and Troya. The information contained in the previously undisclosed reports and email was largely second and third hand, and the government was not able to verify the source of supply or the exact location for Escobedo's last drug deal. This was not surprising given the publicity surrounding the murders and the fact that an acknowledgement of involvement in the sale would have resulted in likely criminal liability for the narcotics transaction. However, the Government never hid the fact that Escobedo was a drug dealer, that he was from the Brownsville/Matamoros area, or that he owed money to his source of supply in Matamoros. These were key features of the government's case. Frankly, nothing in the reports or email undercuts the Government's theory or supports a finding that a third party was involved in the killings. Sanchez's argument concerning the evidentiary strength of information discussed in the investigative reports vastly overstates what little substance exists to his support his theory of third-party guilt, and completely disregards portions of the reports and email which indicate the killer was not from Mexico, but that the murders were part of a drug rip perpetrated by persons from Florida.

Sanchez asserts that the DEA reports established that Jose Luis Escobedo was one of the main connections between the Los Zetas drug cartel and its efforts to distribute cocaine throughout south Florida. CV-DE 80 at 122. Neither the email nor the reports establish a connection with the Los Zetas cartel, or that Jose Luis Escobedo was a main connection for the cartel. In fact, there is no agreement between the reports as to who was the source of supply for Escobedo. The email and report of the DEA CS states that Oscar Flores Venegas' was the source for Escobedo's last

203

drug deal. CV-DE 78-1 at 45; CV-DE 78-1 at 18. The CS also indicated that the weekly shipments of 30-50 kilograms of cocaine were actually shipped to Escobedo by his brother, Manuel. CV-DE 78-1 at 19. The email indicated that the shipments were coordinated by Martin Soto's people, and that Soto was an associate of Venegas. CV-DE 78-1 at 45. The report of the ICE CS indicates that Martin Sosa[58] was a source for Escobedo, but does not specify that Sosa was the source on the day of the murders. CV-DE 78-1 at 22. In fact, that report contains no information as to whether Escobedo was involved in a deal on the day of the murders.    Neither the reports nor the email indicate that the cocaine was provided by the Las Zetas cartel, or that Venegas, Soto, or Manuel Escobedo were associated with Las Zetas at the time of the murders. Indeed, the government is not aware of any information linking Venegas, Soto, or Manuel Escobedo to the Zetas cartel at the time of the murders. Sanchez's claim that the reports establish a connection between Escobedo's source of supply and the Zetas is pure fantasy. Furthermore, Sanchez also argues that the drugs could have come from Juan Carlos Santos (CV-DE 80 at 125-26), who had telephonic contact with Escobedo on the day of the murders and who was interviewed by the government pursuant to a proffer agreement.    CV-DE 78-1 at 27-28.    Santos repeatedly denied being involved in drug trafficking activities with Escobedo. CV-DE 78-1 at 28. In sum, the reports and email, taken as a whole, do not definitely establish the source of cocaine, or that the source was the Zetas cartel.

Sanchez claims that the Zetas sent men to Florida on October 11, 2006 to collect between $100,000 - $300,000 from Escobedo. CV-DE 80 at 122-124-45. The DEA 6 report concerning the interview of the ICE CS stated that a member of the Zetas told the CS that someone from Matamoros picked up $100,000-$300,000 from Escobedo on the day before the murders. CV-DE 78-1 at 22. While the information purportedly came to the CS from a member of the Los Zetas,

---

[58] This was likely a reference to "Martin Soto", and not "Martin Sosa".

there is no indication that the person who collected the money was with the Zetas—only that they were from Matamoros. Also, there is no indication at all that more than one person collected the money from Escobedo. Sanchez also claims that this collection happened when Escobedo was on the West coast of Florida on October 11. Sanchez is making an assumption about the date as well as the location. There is no indication of the location of the collection. As the murders occurred in the early morning hours of October 13, "the day before" could be a reference to October 11 or 12, and it is possible that the collection of money—if it occurred at all-- occurred at the same time and place as the delivery of the cocaine to Escobedo. In fact, the DEA report of interview with the DEA CS indicates that money was paid when the next shipment was received. CR-DE 78-1 at 19. In sum, the reports and email do not support Sanchez's claim that a team of Zeta cartel members met with Escobedo on the day before the murders.

Sanchez also claims that previously withheld phone records show that Yessica's phone travelled from Florida to Texas on the night of the murders, that it was transported to Texas by the same Zetas members who collected the money from Escobedo. Trial counsel was able to argue—from records received in pretrial discovery--that Yessica's phone travelled to Texas around the time of the murders. CR-DE 767 at 7351 (Cohen closing on behalf of Sanchez). However, neither the record cited by the defense or any other phone record shows that Yessica's phone was in Texas around the time of the murders. The phone was never recovered and no cell tower record shows the phone interacting with a tower in Texas around the time of the murders. The calls after the murder show that the phone did not interact with any tower—so the location would be unknown. In sum, the phone records were disclosed pre-trial and do not establish that anyone—let alone the Zetas cartel—took the phone to Texas.

Sanchez also claims even after the payment of the $100,000-$300,000, Escobedo still owed

205

money to the Zetas for 13 kilograms of cocaine. CV-DE 80 at 122.  Of the previously undisclosed documents, only the email on October 16 references a debt between Escobedo and his source of supply.  The CS did not report this information during his May 2007 interview.  Whether the agent recounting the information in the email was incorrect or the CS omitted the information from his interview is anyone's guess at this point.  Regardless, the fact that Escobedo owed money to his supplier was not contested at trial.  The Government introduced a drug ledger from Escobedo's house that indicated significant monies were owed to "Matamoros".  GX 103C, CR-DE 731 at pp. 3853-391.  The government's theory, supported by the evidence at trial was this debt was incurred when Varela's organization lost cocaine as a result of various robberies and law enforcement seizures, creating a debt Varela owed to Escobedo, and Escobedo—in turn—owed to his supplier in Matamoros.  *See e.g.,* Lopez seizure, (CR-DE 751 at  4886 – 4927), Sanchez seizure, (CR-DE 752 at  5072 -  5254) and prior home invasion theft of cocaine from Lopez and Escobedo (CR-DE 752 at p. 5140-5142) (witness Elvia Castillo) and CR-DE 753 at  5569-5571 (witness Kevin Vetere); CR-DE 731 at  3853 – 3918 (ledger seizure);  CR-DE 758 at  6450 – 6503 (handwriting identification of Escobedo authorship of drug ledgers); s*ee also* GX 103c *and* Testimony of Rita Flores, (sister of Jose Louis Escobedo) CR-DE 758  6459—6463.  In sum, the email and reports do not establish anything not already known at the time of the trial concerning the drug debts stemming from the Varela seizures.

Sanchez further speculates as to the content of phone conversations between Luis Escobedo and his brother Manuel, "Manny", on the night of the murders, and argues that Manuel was providing the cartel with real time location information on his brother—giving the cartel the information necessary to ambush Escobedo and murder him.  The email concerning the DEA CS's conversation with Soto and Venegas indicates that Escobedo was being followed by the buyer of

cocaine, but does not indicate when or from where Soto and Venegas learned this information. CV-DE 78-1 at 45. The DEA report of the interview with the DEA CS indicates that Soto told the CS that Manuel spoke with his brother about an hour before the murders and that Escobedo stated he was being followed but was not concerned. CV-DE 78-1 at 19. Once again, there is no indication of when Soto obtained this information, or from whom he obtained it. It is possible that Soto learned this through gossip after the murders, and not through Manuel directly. There is certainly no information in the records that Manuel gave his brother's location to the cartel so they could kill him. Sanchez's claim that Manuel reported on his brother's location in real time is pure fantasy.

Sanchez claims that the email and DEA reports undercut the United States's theory of the case; that simply is not true. No information contained in any of the DEA 6 reports establish, or even suggest, that Escobedo was murdered by someone other than Sanchez and Troya. Similarly, none of the reports definitely establish the source of the cocaine or the exact location of Escobedo's last drug deal.

At bottom, the undisclosed reports and email tend to establish that Escobedo was a drug dealer—a fact previously disclosed to the defense. They tend to establish that Escobedo had just obtained 15 kilograms of cocaine and was on his way home with that cocaine when he was killed— facts also previously disclosed to the defense. They establish that someone from the Matamoros area had supplied the cocaine—which was also not hidden and was known to the defense. They also tend to support a theory that Escobedo owed money to someone in Matamoros. This was also known and argued by the defense. In sum, the email and reports do not add anything that the defense did not already know and were able to argue to the jury.

The nature of the reports and emails were either hearsay (in the case of the CS DEA 6s) or

denials of wrongdoing (in the case of the Santos DEA 6) or of little help at all (the remaining undisclosed DEA 6s). Even if the reports and email had been disclosed, and even if counsel were able to offer them into evidence or have a witness testify to their contents, it would not have resulted in evidence not already known and submitted to the jury. They certainly would not have helped Sanchez. And if the reports and email were somehow admitted into evidence, their contents which indicated that the murders were done by persons in Florida as part of a drug rip, would also have come in to the detriment of Sanchez. In sum, neither the reports nor the email would have made a material difference to Sanchez in the guilt phase of the trial.

The evidence of Sanchez's involvement in the murder was overwhelming. Kevin Vetere testified to Sanchez's role in accompanying Troya in a van early on October 12, 2006. (CR-DE 754 at 5445, 5447, 5451, 5457, 5461, 5463-5465). Using cell phone records and cell tower data, the prosecution also circumstantially showed the van in which Sanchez and Troya were driving/riding following Escobedo from Palm Beach County north along I-95 all the way to the Daytona Beach area on the evening of October 12, 2006. The van had been seen moving north on I-95 in Brevard County by a law enforcement officer who had made a note of it. (CR-DE 758 at 6405-6416). The United States also showed that a cell phone connected to Sanchez was used on the evening of, and in the vicinity of, the murders to communicate with Escobedo. (*Compare* Linda Velasquez testimony CR-DE 758 at 6560-6600 *with* Testimony of David Weeks tracking cell tower activity, CR-DE 764 at 6735-6824 and GXs 707, 707.1, 707.2, 707.3). Escobedo's Jeep and the van carrying Sanchez and Troya were seen entering Florida's Turnpike around 2:17 a.m. on October 13, 2006. The phone used by Sanchez contacted Escobedo's cell phone at 2:19 a.m (*Id.* at p. 6789). Just five minutes later neighbor Janice Rich recalled being startled from her sleep by popping sounds at 2:24 a.m. (*See* CR-DE 728 at 3099-3103). It was undisputed that

208

Sanchez's fingerprints were located on Turnpike ticket 5160, which had been issued to the Escobedo's car as they entered the turnpike in Fort Pierce (the Escobedo ticket)(GX 7), and Troya's prints were found on the ticket issued to the van following Escobedo's jeep entering the Turnpike, ticket 5161 (GX 8).  (*Compare* Parow testimony locating the tickets (CR-DE 728 at 3321-3287 *and* Albeiro Munoz testimony locating the toll plaza photos (CR-DE 729 at 3287-3332 *with* Jack McCall fingerprint expert identifying the latent prints (CR-DE 737 at  4370-4405)). Kevin Vetere also testified that  in the early morning hours following the murders, Sanchez was in the company of Troya and Varela as Varela asked Vetere to move the Escobedo's Jeep Cherokee vehicle (CR-DE 754 at 5445, 5447, 5451, 5457, 5461, 5463-5465). Prosecution  witness Melvyn Fernandez, who testified that after the murders his friend, Daniel Troya, told him [Fernandez] that he had done a "lick" (robbery) for fifteen kilograms of cocaine. (CR-DE 729 at  3487-3490). Vetere also testified that after the homicides, Sanchez bragged to Vetere about buying a gold chain and surmising to Vetere "you going to knock off the next big timer." (CR-DE 753 at 5653).

The undisclosed DEA reports and emails would not contradict or offset the admitted trial evidence that showed a documentary foundation for the prosecution's argument that Escobedo was the source of cocaine for Varela and that prior drug seizures from Sanchez and Lopez resulted in cocaine profits being lost by Varela and being owed to Escobedo. *See* Testimony of Rob Barton on recovery of drug ledgers at Escobedo home CR-DE 731 at  3853-3918, GX 103c, identification of Escobedo writing on the ledgers (Rita Flores), CR-DE 758 at  6450-6466 and expert testimony identifying the content as drug ledgers (Stephen Hills), *Id.,* at  6466-6503.  None of the undisclosed reports would have changed that conclusion.

The undisclosed DEA reports and emails would not contradict or offset the admitted trial evidence that circumstantially showed that Escobedo was carrying fifteen kilograms of cocaine at

the time of his and his family's murders and that this cocaine was stolen by Troya and Sanchez. In fact, the email and CS reports credit that the murders were part of a drug rip by the Florida buyers, and not anyone in Mexico.  Furthermore, the undisclosed DEA reports and emails would not contradict or offset the trial testimony of Kevin Vetere that after the theft of the cocaine and the murder of Escobedo, Sanchez stated he had plans to buy a large gold necklace called a "Cuban link", and that after bragging he was going to buy the gold chain for $5,000 he told Vetere "you going to knock off the next big timer."  CR-DE 753 at  5651-5654.

The undisclosed DEA reports and emails would not contradict or offset the admitted trial evidence that a Sanchez-linked phone was the last communication with the Escobedos before they were murdered.   They would also not contradict or offset the evidence that Sanchez's fingerprint was found on the turnpike ticket submitted when the Escobedo's jeep exited the Turnpike, when the entire Escobedo family was left behind, dead on the side of the road.

The undisclosed DEA reports and emails would not contradict or offset the admitted trial evidence that a casing found at the murder scene bore the same toolmarks found on casings found at "Thug Mansion", where Troya and Sanchez lived at the time of the murders.  Nor would they undercut or alter Sanchez's false exculpatory statement to law enforcement after the murders that he (Sanchez) had not been on the turnpike in some time.   CR-DE 730 at 3637 and GX 803.

Furthermore, non-disclosure of the email and  report did not prevent Sanchez from building a theory of defense that the Escobedos were murdered by cartel members over a drug debt.   The Matamoros issue was first raised at the pre-trial status conference held on June 12, 2008:

> Mr. Murrell: The other problem, I think, as the Court may be aware, a lot of the background material in this case emanates from Brownsville, Texas and Matamoros area.   There is a State Department travel warning as to Matamoros.  We are reluctant to take the defense team down there.

210

The Court: I understand what you are saying.

CR-DE 963, p. 20, lines 17-23.   All defendants and all of defendants' counsel were present at this hearing.

The Matamoros issue was also raised before the jury at trial, in opening, in direct examination, during cross-examination, and in each defendant's closing arguments.  In opening, Sanchez's counsel identified the connection between Matamoros cartels and the killing of the Escobedo family:

> You are going to learn October 13, 2006, after the bodies of the Escobedo family was found, that a search warrant was executed at 1244 Olympic Circle, right here in Greenacres, Florida, not too far away from the courthouse.
>
> When Federal and State authorities executed that search warrant it became apparent that the Escobedos were involved in the drug business.
>
> And among the papers found along -- among Jose Escobedo's papers was a drug ledger.
>
> In that drug ledger under the heading written in his own hand, money that needs to be paid, were the words Matamoros, and $187,000.00.
>
> Now, I want to tell you a little bit about Matamoros. Matamoros is in Mexico. It is a border town between U.S. Texas border and Mexico. It is a short distance away from Brownsville, Texas where the Escobedos lived before they came to Florida.
>
> Jose Escobedo traveled back to Brownsville frequently, and in fact he was scheduled to return with his family back to Brownsville the day he died.
>
> I want to also tell you that Brownsville is a major cocaine cartel for smuggling cocaine into the United States. That is fairly recent vintage. For years cocaine traffic came from Colombia through South Florida and was the major source of supply for cocaine.  Now it changed in recent years. In recent years the cocaine traffic through cartels, just like Colombian cartels started coming into the United States through Matamoros, Brownsville and into South Florida.
>
> The violence associated with the Mexican   cartels spilled over into the United States, and in this case the night of October 13, 2006, that

211

> same violence spilled over to Central Florida where the Escobedo family was killed along with his wife and children.
>
> You see, on the night of October 13, 2006, someone from Matamoros, Mexico sent a message to Louis Escobedo and his extended family.
>
> As evidence of the 187,000 that I mentioned will show that 187,000 debt proved, if nothing else, that Jose Escobedo was a bad businessman. He made little money himself, he owed a large amount of money to the people in Matamoros, drugs had been stolen and Yessica Escobedo and Jose Escobedo were at risk.
>
> The saddest part of this, is that knowing this, they put the children in harms way that night and the unfortunate and tragic death of that family including their children ensued.
>
> But you must understand that the tragic deaths of those children and of those two people was not the result of anything that Ricardo Sanchez will be responsible for. The evidence will fail to show that he was responsible in any way for the murder of that family.

CR-DE 728 at 3083 line15 - 3084 line 13.

During the cross of Detective John Parow, the defense was able to establish that there was an additional vehicle, a silver car, on the same section of the Turnpike as the victim and defendants, at around the same time as the victims and defendants.   CR-DE 729 at 3345-51.  Testimony that a ledger found in the Escobedo's home contained a reference to Matamoros and 187,000 came out on the direct examination of Detective Robert Barton, who participated in the search of the Escobedo's residence.  *Id.* at 3872, 3875.  During the cross of Crystal Salazar, Sanchez's counsel established that Brownsville, Texas and Matamoros are about ten to fifteen minutes apart by car. CR-DE 738, p. 4554.

During the cross of Government cooperator Kevin Vetere, Troya's Counsel elicited testimony of Escobedo's connection to Matamoros and the safety concerns that raised:

> Q.   And you were concerned, were you not, not only with law enforcement's interest in this case, you were also concerned about

> the repercussions from people in Brownsville, Texas or Matamoros, Mexico?
>
> A. Yes.
>
> Q. And what was your concern about that?
>
> A. My safety.
>
> Q. Would you be a little more specific? What do you mean?
>
> A. My safety from being killed, my safety from being in jail.
>
> Q. And you were concerned about that because you knew that Lou Escobedo, Jos, Luis Escobedo, sometimes referred to here as Lou, was involved in Texas and Matamoros, Mexico, right?
>
> A. Yes.
>
> Q. And you knew that Lou Jos, Escobedo was bringing drugs from Brownsville and Matamoros, Mexico; is that right?
>
> A. Yes.

CR-DE 753 at 5710 line 15 - 5711 line 9. In that same cross-examination, Troya's counsel elicited testimony that Vetere had heard that Escobedo had come to Florida because someone in Mexico wanted to kill Escobedo. *Id.* at 5725, lines 7-16.

Government expert witness Steven Hills testified as to Escobedo's drug ledger, and the reference to Matamoros. On cross, counsel for co-defendant Varela elicited testimony that Matamoros was a popular place for drugs. CR-DE 758 at 6483, lines 13-18. In this same cross-examination, defense counsel elicited the expert's opinion that violent retribution can occur when drugs are not paid for:

> Q. So going off on a different tangent for a moment, let's assume trust is established, cocaine fronted without payment being made for however many kilograms, ten or 11, let's say. Payment from intermediary is not given to the supplier from Matamoros. Let's assume those facts for a moment.
>
> A. All right
>
> Q. What is that person in Matamoros going to do to the intermediary or intermediary's family?

MR. CARLTON:  Objection; calls for speculation.

THE COURT:  If that is within your range of experience, you can answer, but we don't want you to guess.

THE WITNESS:  Right.  They would want to make contact with the person to collect money.

BY MR. GERSHMAN:

Q.  That comment is sort of gentle as to what they really want to do. They want to make contact and get paid.  If not get paid, cause harm to that intermediary or intermediary's loved ones?

A.  That is possible.

Q.  That is reality, isn't it?

A.  That is a little beyond my expertise, but I know there is the threat of some kind of retribution if the money is not paid based on witnesses that I have interviewed and things like that.

Q.  So based on what you just touched on, what does that mean there is this possibility of threat to the intermediary?  Just as specific as you can, what does that mean?

A.  As far as what people do in the drug business?

Q.  Yes, sure, of course.

A.  They do all kinds of things, kidnappings, all kind of violence to people.

Q.  Carjacking?

A.  Yes, sir.

Q.  Murders?

A.  Yes, sir.

*Id.* at 6486, line 19 - 6488, line 6.    In this same cross-examination, defense counsel obtained an

expert opinion concerning the likelihood that Varela, who Escobedo was supplying with cocaine,

would kill his supplier:

Q.  If the local, let's say South Florida group of people are making their livelihood off of the intermediary obtaining cocaine from Matamoros, let's assume that for a second, let's assume the following:

214

> There is a person that supposedly doesn't have legitimate work, supposedly hasn't paid employee withholding or taxes of any sort, people have testified the person doesn't have a legitimate job and pays cash for everything, okay?   Using that as a base line briefly.
>
> A.   These are the customers of the intermediary?
>
> Q.   Just one.  Make it singular for our purposes.  One customer of the intermediary.
>
> A.   Okay.
>
> Q.   And that person, that customer has been living that lifestyle for a period of time, months or years, however long it is.
>
> A.   Yes, sir.
>
> Q.   Can you think of, based on your training and experience, why that person who is making that lucrative living from the intermediary, from the cocaine in Matamoros would want the intermediary dead?
>
> A.   No, sir, I have no idea.

*Id.,* at 6494, line 25 – 6495, line 22. (2/19/2009)

Sanchez's trial counsel noticed an expert on the issue of Mexican cartels and their attendant violence.  CR-DE 515, 527, 571, 597.  So, clearly, the defense had considered the import of the violence of the Mexican drug cartels.  However, after the cross of Government expert Steven Hills and just prior to the Government resting its case in chief in the guilt phase, the defense team announced that it had decided that it no longer needed to call the expert on Mexican cartels.  CR-DE 758, at 6875.

Matamoros was also featured in the closing of Varela's counsel:

> There is also another saying that says we should not bite the hand that feeds us.
>
> According to the Government that hand feeding Varela was Escobedo.
>
> Crunching numbers briefly, if Varela is in fact dealing hundreds of kilos a month out of his home over the duration of the conspiracy --

let's say it is a six month conspiracy.  Let's say it is 100 kilos a month, 600 kilos, however much higher you wish to go.

He is going to send his people to kill others in public on the side of the road for 15 kilos?  And that is a fraction of a percent.  That doesn't make sense.  Common sense or business sense.

Besides it not making common sense, we must remember Government expert witness Steven Hills.

Mr. Hills was honest and straightforward, knock on wood.

You could see when he sat in that chair he was going to answer the questions truthfully and to the best of his knowledge no matter if it is they or I asking the questions.

Mr. Hills tells you about his 20 plus years experience investigating drug trafficking, drug ledgers, interviewing, traveling the globe to gain his experience.  He tells you in his expert opinion a gentleman like Varela would not reasonably or realistically want to harm Escobedo, the intermediary.

On the contrary, Matamoros and the Mexican suppliers therein want revenge and will exact that revenge against Escobedo and his family.

CR-DE 766, at 7198 line 14 - 7199 line 17.   Matamoros was also featured in closing by Troya's

counsel:

We then have Ms. Flores.

She identified her brother's handwriting, and that handwriting was in the form of what has been described to you by an I.R.S. agent as a ledger, an accounting of who owed what money to who.

 Now, when you looked at that ledger, and please remember that Ms. Flores identified her brother's handwriting on that ledger, there is the figure of  $187,000.00.  That is a lot of money.

And as the Government has said, in the drug business, when you owe that kind of money, it is serious if it isn't being paid.

Ledger said to be paid.

Now, why is that important?  It is important because Mr. Vetere testified that Jose Luis Escobedo, known as Lou, had left Brownsville, Texas because he was he owed money.    That is the

216

same Kevin Vetere who told you that because he owed $3,000.00 in drug money. 3,000 versus 187.

Now, if you are afraid that something is going to happen to you that you get so paranoid that you won't go out of your house -- and by the way, he may have been paranoid just because he used crack. If you are so scared and you think somebody is going to kill you over $3,000.00, then I think it is safe to assume that Jose Luis Escobedo had a big problem if he owed 187 large, as they say in the trade. $187,000.00, and he leaves Brownsville because he is afraid.

Did somebody come to collect? I don't know. But since we are operating here on assumptions based on circumstantial evidence, then I think I am free to question did something else happen?

***

He was an independent agent who I think if we are going to use circumstantial assumptions, had contacts in Texas, Brownsville, right across the border from Matamoros, Mexico and those people don't play.

You don't owe those people money and just move out of town.

*Id.,* at 7251, line 23 – 7254, line 7.

In Sanchez's closing argument, counsel argued that the brutal manner in which the Escobedo family was killed and Escobedo's $187,000 drug debt to folks in Matamoros, "the home of violent Mexican cartels" (CR-DE 767, at 7304, line 6), indicated that the Escobedos were murdered by the cartel, and not the defendants:

When he [Escobedo] goes up the Florida peninsula, he is selling cocaine to someone in Daytona Beach. When he comes back down to Fort Pierce, he has money, not drugs." ... [I]f Escobedo was the source of supply, if he bought the cocaine from Matamoros and went up the Florida peninsula to sell the cocaine, Daytona, he would have sold it, come back. And Ricardo Sanchez providing surveillance. And there would be no cocaine for anyone to take…Mexican cartel comes in when they…when he shot Mr. Escobedo in his penis, if you don't pay us for the cocaine, we shoot you and your children,…. [T]his drug ledger…which says …Escobedo under a description money that has to be paid, owed $187,000 to Matamoros. We know through other testimony Matamoros is the home of violent cartels, and that is the connection…Louis Escobedo owed $187,000 to people down in Mexico."

217

CR-DE 767 at  7293-7294, 7304, 7313.

The defense team's efforts to pin the Escobedo murders on a Mexican cartel member in Matamoros could not and did not create doubt in the minds of the jurors, who found that Sanchez murdered the four members of the Escobedo family beyond a reasonable doubt.  The effort was not wasted, as eleven of the jurors found that the defense had proven the mitigating factor that Escobedo "engaged in criminal conduct that contributed to the circumstances leading to his family's death".  CR-DE 859, at 14.  This was the most agreed to mitigating factor; no mitigating factor received twelve votes.   Nothing in the undisclosed reports would have added to what the defense was already able to argue.  Defense counsel was able to argue to the jury that murder victim Escobedo was a drug dealer involved with violent Mexican cartels and could have been killed by other individuals.  *See generally* Defense Opening and Closing Arguments, CR-DE 727 at 3074-3086 and CR-DE 767 at 7286-7348.  Sanchez has not established that he was prejudiced, in any way, by the previously undisclosed reports and emails.

Sanchez also argues that the undisclosed reports and email would have made a difference in the penalty verdict.  Specifically, Sanchez argues that the reports and email, if originally disclosed, would have undercut the penalty aggravators of "intentional killing of multiple victims" and "witness elimination".  *See e.g.,* CV-DE 860 at p. 8, Statutory Aggravator #4, *and* at p. 10, Non-Statutory Aggravator #2.  The United States disagrees with these arguments for the same reasons stated above--the email and reports do not tend to establish that someone else committed the murders.

Sanchez further claims that the undisclosed items which identify or hint at the alleged Mexican source of Escobedo's cocaine would have helped him establish the mitigator of "duress" in the penalty phase.   There is no real evidence that Sanchez committed the instant offense under

218

duress.  Certainly, the undisclosed reports do not establish a duress defense.  Furthermore, to avail oneself of a duress defense, a defendant must admit to the underlying conduct, which Sanchez never did.  In fact, Sanchez denied his involvement at sentencing.  CR-DE 956 at 6 (Sentencing Transcript, May 13, 2009) .  Moreover, the reports do not provide any help to Sanchez on a "minor participant" claim.

Sanchez further claims that undisclosed items would have caused jurors to reject the statutory aggravator of committing the murders for pecuniary gain. The United States disagrees: the reports do not negate other evidence establishing pecuniary gain that still would have been heard during the trial.  None of the information contained in the DEA reports support the allegation that Sanchez was not involved in murderous criminal activity related to narcotics.  To the contrary, some of the reports confirm the evidence presented at trial, that is, that the murders were committed as part of an internal drug rip off by persons in Florida who were buying cocaine from Escobedo.

Finally, Sanchez asserts that the reports would have aided him by helping establish a mitigator of an equally-culpable defendant.  Sanchez also argues that the undisclosed reports would have aided his uncharged third-party defense. CR-DE 847 at  9532, 9539 (penalty closing blaming Varela); and guilt phase, CR-DE 818 at  7946, 7947 (blaming Varela). The United States disagrees; the jury already found that Varela's uncharged status and the fact that Sanchez acted under Varela's influence were mitigators in his favor, yet death verdicts were still rendered for the murder of the little boys. *See e.g.,* CR-DE 860 at p. 12, mitigating factors #1 and #13.  But frankly speaking, although the jury clearly found mitigation to prevent the death penalty on the adult murders, the undeserved murder of two little boys was, and would continue to be, too much to overcome in this case. Blaming another phantom uncharged third-party for the child  murders would not change the outcome of the penalty phase, and Sanchez's claims that someone else

219

committed the murders after the guilt verdict was returned would more than likely have inflamed the jurors during the penalty phase.

In summary, examination of the recently disclosed DEA reports compels the conclusion that there is no likelihood that disclosure of the materials would have had any significant impact on the trial. Neither Sanchez's counsel nor Troya's were prevented from presenting evidence and arguing to the jury that people other than Sanchez and Troya—specifically Mexican cartel members-- had a motive and opportunity to murder the Escobedos.  CR-DE 765 at 6931-6979 and Sanchez Trial Exhs. 1, 3-9, 32, 49, and 50; CR-DE 767 at 7310.  To the extent that the undisclosed reports and emails contained admissible evidence, or facts that could have been produced to a jury, they would not have added anything to the presentation defense counsel was already able to, and did, make.  Sanchez's interpretation of the reports and email into a tale of multiple Zeta cartel teams with motive and opportunity to kill the Escobedo family is not supported by the documents, and is pure fantasy.

Furthermore, all the facts relevant to this issue were known at the time of the trial.  The government's theory was made clear from at least the start of the trial, and numerous witnesses testified to the Escobedos' and the defendants' travel to the Daytona area on the day of the murders and subsequent robbery and possession of cocaine by the defendants and their co-conspirators. Defense counsel knew of Escobedo's involvement in drug trafficking as early as August 18, 2007, when he read about it in the Palm Beach Post, and asked the Government for materials relevant to Escobedo's drug trafficking shortly thereafter.  CR-DE 260 at 2-3.  In fact, Troya filed a motion to compel discovery on this issue on October 2, 2007.  CR-DE 260.  Sanchez did not "opt out" of this motion.  In support of the motion to compel discovery, the defense submitted a letter from the Government in which it acknowledged that Escobedo supplied cocaine to Valera's organization,

but maintained that whether Escobedo was a drug trafficker or not was not *Brady* with regard to the guilt phase of the trial.  CR-DE 260-1.  The Court denied the defendant's motion on November 19, 2007, because it found that "the defendant's request, as asserted is 'mere speculation' and lacks the indicia of materiality required under *Brady*".  CR-DE 274 at 5.

If Sanchez continued to have concerns regarding the Government's viewpoint on disclosure of information concerning Escobedo's drug trafficking, he could have pursued the issue at trial or on appeal.  Instead, Sanchez chose to wait more than eight years after his co-defendant's initial concerns to raise the issue in this 2255, and his claims are no less speculative than they were in 2007.  Sanchez has provided no cause for this delay, nor has he established resulting prejudice.  As such, the claim is procedurally barred.  Even if the claim were not barred, given the overwhelming amount of evidence against Sanchez there is no reasonable probability of a different result here.  Furthermore, a review of the record indicates that counsel were able to argue reasonable doubt based on Escobedo's drug dealing and use this as a mitigating factor during the penalty phase.

Sanchez has simply failed to establish that the facts contained in the undisclosed DEA reports and emails were material or exculpatory, or that he was prejudiced by their lack of disclosure.  As such, Sanchez has failed to meet his burden on this issue.  For all the foregoing reasons, Sanchez's claim that the government violated its Brady obligations with regard to the undisclosed DEA emails and reports should be denied.

> 5. <u>Sanchez has failed to establish that the cumulative effect of Brady omissions entitle him to either a new trial or new sentencing (Sanchez Amended Petition Issue VI(D).</u>

Sanchez claims that the cumulative effect of not disclosing certain information entitled him to a new trial and/or a new sentencing.  The DEA-6 reports did not contain information that would

have made a difference in the outcome of the case.   The unconfirmed, third-hand information relating to the purported source of cocaine obtained by Jose Luis Escobedo in the Daytona Beach, Florida area would not have altered the outcome of the trial, nor does its disclosure in this proceeding result in a criminal trial verdict against Sanchez that is not worthy of confidence in its outcome.   The United States did not fail to disclose security video footage from Briar Bay; the evidence obtained by law enforcement was not viewable. No *Giglio* or *Brady* violation occurred concerning the benefits provided to government witness Kevin Vetere.   The United States disclosed in pre-trial discovery all telephone records in its possession pertaining to a cellular telephone linked to Yessica Escobedo, (956) 266-2004.

The United States acknowledges that the Court's consideration of alleged *Brady* violations must be considered in a cumulative manner. *See Kyles v. Whitly*, 514 U.S. 419 (1995). The cumulative consideration in this case however does not change the outcome here. As stated in *Kyles*,

> the touchstone of materiality is a "reasonable probability" of a different result…The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial.

*Kyles,* 514 U.S. at 435.

The undisclosed DEA reports and emails, taken as a whole, would not have altered the overwhelming proof that Sanchez was one of the killers.   Trial evidence showed Sanchez's involvement with drug trafficking and affiliation with Danny Varela, a debt owed by Varela to Escobedo which provided a motivation for the murders, Sanchez's presence at the murder scene, his telephonic contact between Sanchez and Jose Luis Escobedo the night of the murders and

immediately before the shots were fired, toolmark evidence connecting rounds found at Sanchez's residence to casings found at the murder scene, Sanchez's fingerprints on the Escobedo Turnpike toll ticket, his lie to Det. Springer about not having been on the Turnpike in a long time, (GX 803; CR-DE 730), Vetere's testimony about the night of the homicides and their aftermath, and Sanchez's later bragging to Vetere about buying a gold chain and surmising to Vetere "you going to knock off the next big timer." (CR-DE 753 at 5653).

Even if the cumulative effect of all the alleged *Brady* material is considered, Sanchez has not met his burden of establishing a reasonable probability that the result would have been different or that he did not receive a fair trial resulting in a verdict worthy of confidence. *See Stricker,* 527 U.S. at 289-90. Considering the entire trial record, Sanchez received a fair trial resulting in a verdict worthy of confidence. For all these reasons, Sanchez's *Brady* and *Giglio* claims should be denied.

D. <u>SANCHEZ HAS NOT ESTABLISHED THAT THE TRIAL COURT'S SECURITY MEASURES DEPRIVED SANCHEZ OF HIS RIGHT TO A FAIR TRIAL (SANCHEZ AMENDED ISSUE X)</u>.

Petitioner Sanchez claims that three extra measures of security during the trial interfered with his right to a fair trial, and that to the extent his lawyers failed to object to them that this failure deprived him of his right to counsel. DE 77-1, Petition, at pp. 299-306. As explained below, these measures were warranted, were thoughtfully considered and carried out, and contributed to Sanchez's receipt of a fair trial rather than depriving him of one. Moreover, his

223

counsel lodged objections to two of the measures, preserving his right to argue these issues on appeal, a right he chose to abandon when he failed to raise them there.[59]

1. <u>Assembling the jurors offsite and transporting them together, and installing a magnetometer outside the courtroom were appropriate, reasonable security measures.</u>

During the pre-trial conference held on December 17, 2008, the Court explained that there would "be a magnetometer outside the courtroom," and that the jury panel would "not be sequestered, but the jurors will be picked up by the Marshals, brought to the courthouse, will eat together as a group and leave together as a group." (CR-DE 584 at pp. 80-81.)  Counsel for Petitioner Sanchez objected to the magnetometer, "particularly if the jury is going to be brought in and out through that." *Id*. at 86.  The Court explained the reasons for its rulings, including the need for making adjustments because the courthouse used to be an office building:

> Let me tell you what is the concern, and not a concern with the Defendants at all. It is a concern with the observers at the trial, there have been family members of the Defendants here, and presumably wanting to come to the trial, something they have a vital interest in.  I think it is equally reasonable to assume there is going to be family members from the family who died and others, and so my concern is not at all with the Defendants.  I want the Defendants to be safe, but I want to make sure we don't have problems brought on by other people in the courtroom.

CR-DE 584 at p. 88.

Counsel for Sanchez objected, claiming that the magnetometer would "imply our clients are more dangerous than the run of the mill defendants, and we object to that." *Id.* at 89.

---

[59] In his Petition, rather than refer to the trial record's lengthy discussion of these issues in the transcript, Sanchez instead chose to quote from Judge Scola's Order in Case No. 16-80693-Civ-Scola, where the court had summarized the underlying discussion.  CIV-DE 29 at pp. 7-8.

Before the trial began, the Court again noted that the jurors would be transported by the Marshals and that the "jury will stay together at lunch as opposed to being wandering around the courthouse." CR-DE 727 at p. 3015. Petitioner Sanchez's lawyer again voiced his objections, stating:

> Judge, it seems to me the jury will infer from those arrangements that there is a problem. And on top of the additional security we have with the metal detector at the doorway, which many of them saw this morning when they were brought in, this additional layer of security causes us a great deal of concern.

*Id.* at 3016. In its opening instructions to the jury, the Court explained the need for the jury to meet offsite and then come into the courthouse as a group:

> You know, I remember coming to the dedication of this building when it was first opened. When this building was opened, virtually every single Federal agency in town was housed in this building. This was an office building, Social Security and all kinds of Federal agencies were in the building.
>
> As the court system has grown, I am afraid we muscled other people out of the building, and it is essentially only the courthouse today. When you look at courthouse east and the way it is in structured today, and our county courthouse, which is such a beautiful building, one of the things that is done and carefully done is to arrange so jurors have an area that is for themselves, the public is in another area, and we try it carefully. We don't have it in this courthouse, and sometimes we are bumping into each other.
>
> And I want you to know it is because of considerations like that that I made some arrangements so the Marshals will transport the jurors to the courthouse in the morning. When we break for lunch, we are going to make arrangements so the jury as a group can go to lunch, and the Marshals will transport you away from the courthouse in the evening. And the whole purpose of that is so we can make sure that we don't have these mistaken confrontations or meetings, and I think that that will help everybody in this regard.
>
> Now, let me go and say with respect to the lawyers, and, for instance, other people that you may come to realize having some connection with the case, I want to instruct you that in order to avoid even the appearance of impropriety, you should have no conversations with these people at all while you are serving on the jury.

(CR-DE 728 at pp. 3027-3029.)

In reviewing a court's imposition of enhanced security measures during trial, the standard is abuse of discretion. *United States v. Baker*, 432 F.3d 1189, 1245 (11th Cir. 2005). District judges are ultimately responsible for "ensuring the safe, reasonable and orderly progress of trial." *United States v. Durham*, 287 F.3d 1297, 1303 (11th Cir. 2002)(quoting *United States v. Theriault*, 531 F.2d 281, 284 (5th Cir. 1976). Accordingly, a district judge must be afforded reasonable discretion to balance the interests involved and to determine the measures necessary to guarantee the security of the courtroom. *Id. citing Theriault*, 531 F.2d at 284; *United States v. Mayes*, 158 F.3d 1215, 1219 (11th Cir. 1998).

The Supreme Court discussed the delicate balance that must be struck to preserve both the courtroom security and the defendant's right to a fair trial in *Holbrook v. Flynn*, 475 U.S. 560, 567-68 (1986) (assessing the impact of four uniformed law enforcement officers seated in the first spectator's row behind the six criminal defendants):

> Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978). This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

Here, transporting the jurors to and from the courthouse as a group was exactly the type of trial procedure that is reasonable to ensure the safe and orderly progress of the trial.  In the Sanchez trial, one juror reported being approached by someone who recognized him as a juror, causing the Court to remind those in the courtroom not to speak to jurors.  CR-DE 727 at p. 5547-48.  The person reportedly was a friend of co-defendant Troya's family, and she made contact with the juror again during the penalty phase, prompting the Court to question and admonish her about the encounter on the record.  CR-DE 845 at pp. 8887, 8889-8891.  The enhanced security measures were designed to prevent incidents just such as that, and were not an abuse of the discretion of the Court.

Similarly, the addition of a second metal detector for the courtroom was reasonable given the circumstances described by the trial judge at length before and after jury selection.  In *United States v. Wilson*, 634 Fed. Appx. 718 (11th Cir. 2015)(unpublished), *cert. denied* 138 S.Ct. 199 (2017), the Court considered the trial judge's imposition of additional law enforcement officers and an additional metal detector for the courtroom.   In finding that the additional security measures did not pose any risk that an impermissible factor would affect the jury's decision-making, the Court observed:

> Significantly, the record lacks any evidence that the jurors were aware that the spectators were subject to this screening, or, even if they were, that they would have known that the second metal detector was anything out of the ordinary. *See United States v. Howell*, 514 F.2d 710, 715 (5th Cir. 1975) (no prejudice where all persons entering courtroom, *including jurors*, were required to pass through two metal detectors).

634 Fed. Appx. at 734 (emphasis and citation in original).

As in the *Wilson* case, here there is no record evidence that any juror considered the metal detector or other security measures to be out of the ordinary.   Counsel for Sanchez lodged objections to these measures at trial, as detailed above, and the issue was not raised on appeal,

227

likely due to the substantial case law against Sanchez's current argument. *See Holladay v. Haley,* 209 F.3d 1243, 1254-1256 (11th Cir. 2000) (failure to object to extra security measures, including *inter alia*, additional state troopers in the courtroom and metal detectors for screening all who entered the courtroom, did not constitute ineffective assistance of counsel since "counsel need not raise every possible nonfrivolous issue on appeal"). This claim has no merit.

2. <u>The escort of witness Kevin Vetere by two Deputy Marshals in plain clothes did not violate Sanchez's right to a fair trial.</u>

Before Kevin Vetere was called as a witness by the government, the prosecutor informed the Court that Vetere had been placed in the Witness Protection Program operated by the U. S. Marshals due to a credible threat against himself and his family. CR-DE 754 at p. 5403. The trial judge invited argument from counsel prior to witness Vetere entering the courtroom, and a discussion ensued regarding the desirability of having him brought in and seated outside of the jury's presence. Mr. Eisenberg was the singular attorney to respond, stating that he did not feel any differently than the trial judge – that two marshals was not a big deal. Sanchez has argued that Vetere's having one extra deputy Marshal in the courtroom, plus his wearing a bulletproof vest under his suit jacket, were measures that unreasonably heightened the perception Mr. Vetere was in danger from Mr. Sanchez and the other defendants. CV-DE 80 at 309-310.

The Supreme Court has considered whether the presence of identifiable security officers at trial created inherent prejudice to a criminal defendant, and in holding that it did not, stated as follows:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a

> defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Holbrook, supra, at* 569. The Court considered the scene presented to jurors to determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to the defendant's right to a fair trial. *Id*. The Court went on to hold that, ". . . if the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id*. at 572.

That Mr. Vetere was escorted by two deputy Marshals rather than one, as were other incarcerated witnesses, hardly rises to the level of an inherently prejudicial show of security such that it violated Sanchez's constitutional rights. Because the law in *Holbrook* and other cases was so clear on this, it is not surprising that Sanchez's attorney did not object, and no prejudice attached to that failure to object. This argument is meritless.

Finally, Sanchez points to an incident where the lights in the courtroom briefly went out to argue dramatically that "jurors exhibited signs that they believed their own safety was at risk" without citing any evidence to support that claim. Rather than citing to the record, Sanchez relies on a declaration of his investigator, Lisa McDermott, and her personal opinion that because the lights accidentally went out, the "jury (and everyone else in the courtroom) seemed on edge." CIV-DE 52-1 at 112. The trial transcript, by contrast, reveals the trial judge calmly directing the

jury out of the courtroom, as well as making other arrangements for people to leave the dark courtroom, pointing out that the jurors and others from the courtroom could step out into the hallway where there was emergency lighting if they felt the need. CR-DE 730 at pp. 3606-7.

After a brief recess, the trial resumed and the judge explained what had happened on the record:

> Ladies and gentlemen, please be seated.
>
> Well, that was an exciting mid-morning recess we hadn't planned. It certainly has disclosed to us, though, when the building was remodeled, clearly, working emergency lighting is in place in the entire rest of the building, but as we look around this room, we really don't have any. And I have been in touch with the folks in Miami so we could get an assessment.
>
> Apparently there was a power outage over several blocks, I am told, involving a transformer. I want to explain to counsel I went to the jury and explained that it was a power outage and we would be gathering shortly. We had an area in the courthouse that had window light.
>
> As the lawyers are aware and people in the courtroom, the emergency power was not working. Everybody needs to be aware where the stairways are, and I am sorry about that situation, but we will work immediately to get that looked at and taken care of.
>
> Now, when we stopped, I think we were in cross examination, and I think Mr. Gershman was in his cross examination. So let me turn back to see if there are other questions he might have.
> MR. GERSHMAN: Thank you, Judge.

*Id.* at 3607-8.

After the court discussed the power outage, the trial resumed without incident. Sanchez has failed to demonstrate any prejudice resulting from the additional security measures, and the "lights out" episode does not change that result.

E.   SANCHEZ HAS NOT ESTABLISHED THAT HE IS INELIGIBLE FOR THE DEATH PENALTY AND FURTHERMORE HIS CLAIM IS PROCEDURALLY BARRED (Sanchez Amended Issue III)[60]

During the trial of this matter, Sanchez made no claim that he is mentally retarded or intellectually disabled, as is the current terminology.  Sanchez's IQ was the subject of several witnesses' testimony, but all the witness and experts agreed that Sanchez was not mentally retarded.  Evidence that Sanchez was slow, and had difficulties learning, was used by his counsel during the penalty phase to support defense submitted mitigating factors.  The jury did not find that these mitigators outweighed the aggravating factors with regard to the murders of the two little boys, and Sanchez was sentenced to death on those counts.  For the parents' deaths, the jury recommended life sentences.  Now, for the first time, Sanchez claims that he is mentally retarded and ineligible for the death penalty.  Sanchez also claims that he suffers from other mental health issues that, although not rising to the level of intellectual disability or insanity, nonetheless make him ineligible for the death penalty.

1.   Sanchez's Claims of Intellectual Disability are Procedurally Barred or Not Yet Ripe for Review, and Fail on the Merits.

After careful readings of Sanchez's Amended Issue III, it is difficult to discern whether Sanchez's claim is based on an alleged eighth amendment violation at the trial court level when Sanchez was sentenced to death, or an allegation of a prospective violation that may occur when the sentence is carried out.  This is an important distinction that impacts not only the standard for review but also the ripeness, proper venue, and proper vehicle for Sanchez's claim.

---

[60] This issue was not raised in Sanchez's initial 2255 and does not relate back to any claims raised therein.  As such, the Government submits that this claim is untimely and should be dismissed.

Although the FDPA does not specify the governing standard of proof, federal courts have consistently found that defendants carry the burden of proving intellectual disability by a preponderance of the evidence. See, *e.g.*, *United States v. Umana*, 750 F.3d 320, 358 (4th Cir. 2014); *United States v. Sablan*, 461 F. Supp. 2d 1239, 1243 (D. Colo. 2006); *United States v. Davis*, 611 F. Supp. 2d 472, 474 (D. Md. 2009).

To obtain an evidentiary hearing, a defendant must allege facts that, if taken as true, establish "reason to believe" that he meets the criteria of intellectual disability. *Brumfield v. Cain*, 135 S. Ct. 2269, 2281 (2015); *accord Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) (evidentiary hearing required where habeas petitioner "has alleged that he is mentally retarded as *Atkins* defines that condition" and the "'facts are in dispute'"); *Sasser v. Norris*, 553 F.3d 1121, 1126 (8th Cir. 2009) (evidentiary hearing not required "in every conceivable set of circumstances"), *abrogated on other grounds, Wood v. Milyard*, 566 U.S. 463 (2012); *Jackson v. Norris*, 615 F.3d 959, 960 (8th Cir. 2010) (evidentiary hearing warranted where habeas petitioner alleged facts in support of each element of intellectual disability claim). That standard is consistent with the standard governing competency hearings. See 18 U.S.C. 4241(a) (requiring "reasonable cause to believe" that the defendant is incompetent).

On appeal, "[t]he legal standard applicable to an *Atkins* claim presents a pure question of law, which [this Court] review[s] de novo." *Sasser v. Hobbs*, 735 F.3d 833, 841-842 (8th Cir. 2013). The "ultimate determination" whether an individual is intellectually disabled is a factual question subject to clear error review. *Ortiz*, 664 F.3d at 1164 (citing *Walker v. Kelly*, 593 F.3d 319, 323 (4th Cir. 2010); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010)); *see also Sasser*, 735 F.3d at 842.

Under the FDPA, errors that were "properly preserved" in the district court are not reversible where the government shows that they were harmless beyond a reasonable doubt. 18 U.S.C. 3595(c)(2)(C). Unpreserved errors are reviewed for plain error only. *See Jones v. United States*, 527 U.S. 373, 388-389 (1999) (plain-error review applies under the FDPA). Under plain error review, "relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights." *Id.* at 389 (citing *Johnson v. United States*, 520 U.S. 461, 467 (1997); *United States v. Olano*, 507 U.S. 725, 732 (1993)). In addition, "[a]n appellate court should exercise its discretion to correct plain error only if it 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Ibid.* (quoting *Olano*, 507 U.S. at 732) (alterations omitted).

Sanchez did not preserve this claim on the trial court level. As such, Sanchez's claim that he is ineligible for a death sentence under the FDPA is subject to plain error review[61]. At trial, every expert agreed that Sanchez was not mentally retarded. Under the law and clinical standards in effect at 2009, Sanchez was not mentally retarded. The trial record casts no doubt on this conclusion. As such, Sanchez's claim that he was ineligible for the death penalty due to intellectual disability cannot survive plain error analysis.

To the extent Sanchez claims a prospective Eighth Amendment violation, to occur when the sentence is to be carried out, the Government submits that the claim is not yet ripe for review. Under the FDPA, a sentence of death cannot be implemented "until exhaustion of the procedures for appeal of the judgement of conviction and for review of the sentence". 18 U.S.C. § 3596(a). As these conditions precedent have yet to occur, Sanchez's prospective challenge is not yet ripe. Furthermore, such a claim should be brought under Title 28, United States Code 2241, in the

---

[61] The Government also asserts that Sanchez's claim is procedurally barred as he did not raise it on appeal and has not established excuse for the default.

district in which the petitioner is incarcerated or in which the sentence is to be executed.  Should

the court decide that Sanchez's claim is ripe, and that this is the proper vehicle and venue for such

a claim, the Government submits that Sanchez's claim fails on the merits.

Sanchez claims he is intellectually disabled and, therefore, ineligible for execution under

*Atkins v. Virginia*, 536 U.S. 304 (2002), *Hall v. Florida*, 134 S. Ct. 1986 (2014), *Brumfield v. Cain*,

135 S. Ct. 2269 (2015), *Moore v. Texas*, 137 S. Ct. 1039 (2017), and 18 U.S.C. § 3596(c).  CV-

DE 80 at 56-100.  The United States disagrees.  To the extent that Sanchez contends the trial court

should have applied legal standards that were only subsequently recognized by the Supreme Court

under *Hall*, *Brumfield* and *Moore*, he has defaulted the issue by failing to assert it on appeal.  *See*

*Lynn v. United States*, 365 F.3d 1225, 1234 (11th Cir. 2004).  Furthermore, Sanchez's attempt to

rely on *Hall, Brumfield* or *Moore* in this proceeding is barred by the non-retroactivity doctrine as

Sanchez's argument seeks the retroactive application of a rule announced after the finality of

Sanchez's appeal.  *See  Teague v. Lane*, 489 U.S. 288 (1989).  As to the remainder of Sanchez's

claim, the record demonstrates he is not intellectually disabled, regardless of whether the court

applies the procedural rules applicable in 2009 or recently announced by the Supreme Court.

Sanchez's Amended Issue III asserts that he is "ineligible for the punishment of death

pursuant to the Constitution of the United States and other Federal law" because he is

"intellectually disabled."[62] CV-DE 80 at 56.  He argues that he has demonstrated intellectual

deficits and adaptive deficits involving in intellectual functions including reasoning, problem

solving, planning, abstract thinking, judgment, academic learning, and learning from experience,

---

[62] The term "intellectually disabled" was adopted by the United States Supreme Court in *Hall v. Florida*, 134 S.Ct. 1986 (2014) to replace the prior clinical terminology - "mentally retarded." 18 U.S.C. §3596(c) has not been amended to reflect this change.

throughout his life beginning in early childhood and continuing into adulthood. CV-DE 80 at 61-101.

To be sure, persons who are intellectually disabled are ineligible for the death penalty. Indeed, well before the United States Supreme Court recognized a constitutional prohibition against the execution of an intellectually disabled person, the Federal Death Penalty Act prohibited such an execution:

> (c) Mental capacity.--A sentence of death shall not be carried out upon a person who is mentally retarded. A sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person.

18 U.S.C.A. § 3596 (c).[63]

In 2002, the Supreme Court found that the execution of an intellectually disabled person constitutes cruel and unusual punishment in violation of the Eighth Amendment. *See Atkins v. Virginia,* 536 U.S. 304 (2002). In *Atkins*, the United States Supreme Court held that the execution of mentally-retarded offenders is categorically prohibited by the Eighth Amendment to the U.S. Constitution. *Atkins*, 536 U.S. at 321. *Atkins* did not define mental retardation, leaving it to the states to develop appropriate ways to prohibit the execution of the mentally retarded. However, the Court did provide some guidance to the states regarding the definition of mental retardation by citing two clinical definitions of mental retardation that it noted were consistent with many state statutory definitions. As explained by *Atkins*, "clinical definitions of [intellectual disability] require ***not only*** subaverage intellectual functioning, ***but also*** significant limitations in adaptive skills" with onset before the age of majority. *Atkins*, 536 U.S. at 318, 122 S.Ct. 2242 (emphasis added)).

---

[63] It is important to note that the statute prohibits the execution of the mentally retarded, and not sentencing the mentally retarded to death. For purposes of ripeness, this is an important distinction.

At the time of the trial, subaverage intellectual functioning was generally defined by an IQ of 70 or below, although the federal death penalty act required no such bright line cut off.

After the trial of this matter, the Supreme Court provided further guidance at to the procedure to be applied in determining whether a defendant has subaverage intellectual functioning. In *Hall*, the Court determined that the standard error measurement (SEM) for intelligence tests should be considered in determining whether the first prong of *Atkins* was established. *See Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).

Although the Court has recently reiterated the importance of relying on professional clinical standards to create the framework for analysis, *see Moore v. Texas*, 137 S. Ct. 1039 (2017), federal courts have consistently held that in determining whether a defendant is intellectually disabled within the meaning of *Atkins,* the court is making a *legal* (not a medical or psychological) determination. *See, e.g., Ortiz v. United States,* 664 F.3d 1151, 1168 (8th Cir.2011) (rejecting an argument that "established science ... dictates a mental retardation diagnosis" because it "incorrectly assumes the *Atkins* decision delegates to the scientific community the finding of whether an individual is mentally retarded"); *Hooks v. Workman,* 689 F.3d 1148, 1172 (10th Cir.2012) (emphasizing that "a clinical standard is not a constitutional command"). "*Atkins* 'did not delegate to psychologists the determination of whether an inmate should not face execution.' " *United States v. Wilson,* 922 F. Supp. 2d 334, 339 (E.D.N.Y. 2013), *on reconsideration,* 170 F. Supp. 3d 347 (E.D.N.Y. 2016), 922 F.Supp.2d at (*quoting United States v. Bourgeois,* 2011 WL 1930684, at *24 (S.D.Tex. May 19, 2011)). Rather, " 'psychology informs, but does not determinatively decide, whether an inmate is exempt from execution,' leaving the 'contours of the constitutional protection to the courts.' " *Ortiz,* 664 F.3d at 1168 (quoting *Bourgeois,* 2011 WL 1930684, at *24). The court ultimately must "apply its own judgment as to the "appropriate ways"

to enforce the ultimately *legal* prohibition on executing [intellectually disabled] offenders," *Wilson,* 922 F.Supp.2d at 339 (quoting *Atkins,* 536 U.S. at 317, 122 S.Ct. 2242), particularly when facing ambiguous or conflicting definitions and testimony. *United States v. Williams*, 1 F. Supp. 3d 1124, 1136–37 (D. Haw. 2014).

It is commonly understood that—excepting for traumatic brain injuries or other serious illnesses—a person's IQ generally remains constant throughout his life. Sanchez makes no claim that he was been seriously injured since his trial. Indeed, *Atkins* requires that both the first and second prongs—subaverage intellectual functioning and adaptive deficits, must have had onset before adulthood. Thus, the answer to the question of whether Sanchez is intellectually disabled should be the same now as it was in 2009 at the time of his trial. At the time of his trial, all experts agreed that Sanchez was not mentally retarded.

Now, Sanchez has found several experts willing to opine that Sanchez is intellectually disabled. In fact, to meet the *Atkins* requirement that the intellectual disability manifest before age 18, Sanchez claims that he has been intellectually disabled throughout his life – from early childhood to the present day. *See generally* CV-DE 80 at 61-80. However, the trial testimony presented by Sanchez's own expert witnesses belies this assertion.

During the penalty phase of trial, Sanchez's counsel argued to the jury that he had learning disabilities and was an impressionable young man who had been manipulated by Danny Varela. CR-DE 818 at 7947. In support of this mitigation, penalty counsel presented the testimony of Amy Fleming. CR-DE 823 at 8209-8249. Ms. Fleming was a Special Education Coordinator at Palm Beach County Schools. She testified that Sanchez's educational file did not indicate that he was intellectually disabled. (*Id*. at 8251-8252). According to her testimony, Sanchez had a full scale

IQ score of 80. *Id*. at 8228. Ms. Fleming testified that an IQ score of 80 is "not retarded." *Id*. at 8267.

Next, penalty counsel presented the testimony of Dr. Daniel Grant, a clinical psychologist. CR-DE 824 at 8439. In advance of the penalty phase, Dr. Grant was retained to evaluate Sanchez and determine if he was intellectually disabled. Dr. Grant testified unequivocally.

> Q. You evaluated Ricardo Sanchez and determined that he is not mentally retarded?
> A. He is not mentally retarded.

*Id*. at 8442.

Grant determined that the Movant's full scale IQ was 77 and when also considering a general ability index, his IQ score was 81. (*Id*. at 8444). In fact, when questioned regarding the Sanchez's IQ scores and an intellectual disability determination, Dr. Grant responded that "absolutely" Sanchez was not intellectually disabled and that he did not "even see it as an issue." *Id*. at 8475.

Following Dr. Grant, penalty counsel called Dr. Thomas Reidy, a clinical psychologist, to testify. Dr. Reidy testified primarily about the familial relationships in Sanchez's family and how they shaped his personality. However, Dr. Reidy also testified that Sanchez was "not retarded" and his intellectual testing results correlated with someone who was of low average intelligence. *Id*. at 8642.

In rebuttal, the United States called Dr. Michael Brannon, a licensed psychologist. Dr. Brannon testified that nothing about Sanchez's performance on educational tests or his IQ scores would lead to the conclusion that Sanchez was intellectually disabled. CR-DE 846 at 9308. In closing argument, the Government argued that "all the medical experts, psychologists agreed that Ricardo Sanchez is not retarded." CR-DE 847 at 9515. Sanchez did not dispute this argument or challenge the accuracy of the statement. Perhaps, the most clear and concise statement made

during the trial regarding Sanchez's intellectual abilities was defense counsel's closing argument to the jury. Counsel pointedly argued that "[w]e are not claiming that he is mentally retarded, he is not." (*Id*. at 9543)(emphasis added). Yet, nine years later in arguing that the Court should vacate, set aside, or correct his death sentence, this is exactly what Sanchez is claiming.

Sanchez's current argument that he meets the clinical criteria for an intellectually disabled diagnosis is based  primarily on the 2016 expert opinions of Dr. Kevin McGrew, CV-DE 33-9 at 24-156, CV-DE 78-1 (revised declaration)); *see also* Dr. Joette James, CV-DE 33-8 at 188-194, CV-DE 33-9 at 1-23; Dr. Louis James Kraus, CV-DE 33-8 at 130-154; Dr. Daniel Grant , CV-DE 52-1 at 26-40 and CV-DE 78-1 at 154-170 (revised declaration), and Dr. Rene Hernandez-Cardenache, CV-DE 78-1 at 93-124.  It is important to note that these are not independent expert opinions. Rather, Dr. Grant admits that his opinion is based on the opinions and reports of Drs. James, McGrew, and Kraus.  CV-DE 78-1 at 169.  Dr. McGrew admits that his opinion is based on the declaration of Dr. James.  CV-DE 78-1 at 125 ¶2.  Dr. Kraus likeswise admits that his opinion is based, in part, on the declaration of Dr. James.  CV-DE 33-8 at 153.

Dr. James determined that Sanchez's full-scale IQ score, considering the "Flynn" effect[64] as well as the SEM was between 75 and 83.  CV-DE 33-9 at 2.  Even with the application of the

---

[64] The "Flynn Effect" refers to the nine point increase in IQ scores across a generation—reflecting a belief that human society, on the whole,  is slowly becoming more intelligent. Although real life experience tends to disprove this theory on a daily basis, the Flynn effect is a "statistically-proven phenomenon, although no medical association recognizes its validity." *Thomas v. Allen,* 607 F.3d 749, 757 (11th Cir.2010) *Atkins* does not mandate an adjustment for the Flynn Effect. Moreover, there is no scientific consensus on its validity. Frank M. Gresham & Daniel J. Reschly, *Standard of Practice and Flynn Effect Testimony in Death Penalty Cases,* 49 Intell. & Developmental Disabilities 131, 131, 136–37 (2011) (arguing that the Flynn Effect is "a well-established psychometric fact" that should be accounted for in IQ testing, but noting the lack of a consensus in the clinical community on its use). In addition, federal and state courts are divided over the use of the Flynn Effect, and "there is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning." *Thomas,* 607 F.3d at 757–58 (collecting cases); *see also Maldonado v. Thaler,* 625 F.3d 229, 238

Flynn effect, this is well above the standard of the 1st *Atkins* prong.   Dr. James nevertheless opined that Sanchez is intellectually disabled.   In so doing, Dr. James claimed to rely on the DSM-V, stating, "as the DSM-V explains, individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score."  CV-DE 33-9 at 20. The problem with this reasoning, which was also adopted by Sanchez other experts, is that they are discounting not a "single IQ score", but at least six measures of IQ taken by different experts, at different points in Sanchez's life.   Five of these six testings, even accounting for the SEM and Flynn effect, indicate that Sanchez's IQ range is above 70.   In addition, Dr. James conflates the intellectual functioning and adaptive deficit prongs, using unchallenged claims of adaptive deficits made by Sanchez and his family and friends, in order to establish subaverage intellectual functioning.   This is a direct contradiction to the holding in *Atkins* requiring both subaverge intellectual functioning and adaptive deficits.

Dr. McGrew evaluated each of Sanchez's IQ tests but failed to conduct any testing of his own.   In fact, Dr. McGrew has never met Sanchez.   Yet, McGrew opined that all but one of Sanchez's IQ tests—the only test where the lower part of the range fell below 70-- should be discounted as over-stating Sanchez's intellectual  functioning.   CV-DE 78-1 at 127.   McGrew declares that Brannon's report of a Sanchez IQ of 89 should be ignored because it is inflated due

---

(5th Cir.2010) ("[N]either this court nor the [Texas Court of Criminal Appeals] has recognized the Flynn Effect as scientifically valid."). the Eleventh Circuit has held that a federal habeas court has discretion to consider the standard error of measurement and the Flynn effect. (Doc. 59, p. 61, citing *Thomas v. Allen,* 607 F.3d 749, 753 (11th Cir.2010)). Thus, when there is evidence to suggest a petitioner's IQ should be adjusted downward, a court may consider applying the Flynn effect. However, where, there is little or no evidence to point towards a downward adjustment, the could refuse to apply the Flynn effect to adjust the defendant's IQ downward. *See Smith v. Thomas*, No. CIV.A. 05-0474-CG-M, 2014 WL 217771, at *4 (S.D. Ala. Jan. 21, 2014)

to practice effect. However, McGrew's declaration conspicuously ignores Brannon's trial testimony that he conducted the WAIS-III intelligence test knowing that he would have to account for any inflation due to practice effects of prior testing using the WAIS-IV. (CR-DE 846 at 9299-9302). Furthermore, if the Brannon IQ test result was inflated due to practice effect, one would expect the 2016 Dr. James test result to revert back to the prior, unpracticed test result. But it does not. In fact, the 2016 result is more in line with the Dr. Brannon test result. Curiously, when Dr. McGrew had difficulty explaining why the preferred test was so much lower than other, similar tests, McGrew questioned whether the preferred test's score was the result of "testing error". CV-DE 78-1 at 144 ¶49. And yet, Dr. McGrew maintained that the other tests, which contained consistently higher scores, "significantly overestimate [Sanchez's] general intellectual functioning". CV-DE 78-1 at 127. Dr. McGrew makes this conclusion despite crediting Sanchez's original 1992 SB-IV result of 80 (CV-DE 78-1 at p. 131, n. 20; CV-DE 33-9 at p. 26; *see also Id*., at p. 30, n. 5) and the 2016 Dr. James WAIS-IV test which concluded that Sanchez's IQ was 82. Dr. McGrew discounts these results *in toto* to embrace the flawed, but lowest score, even though he never met Sanchez.

Dr. McGrew also engages in creative math to arrive at his conclusion, adjusting scores for the SEM and then placing them on a graph where the SEM is applied again to make it appear as if the scores fall within the range of intellectual disability, when they do not. CV-DE 78-1 at 130, figure 1.

Furthermore, Dr. McGrew's decision to discount Dr. Brannon's test result due to practice effect, is not supported by sound scientific theory. Practice effect can occur when a subject takes the same test within a short period of time. Gain scores, also called "practice effects," can be caused by repeated administrations of the **same intelligence test** in a short period of time. *Atkins v.*

*Virginia: Implications and recommendations for forensic practice,* Gilbert S. Macvaugh III, Psy.D. and Mark D. Cunningham, Ph.D., ABPP, The Journal of Psychiatry & Law 37/Summer-Fall 2009. "As noted in the WAIS-III and WMS-III Technical Manual (The Psychological Corporation, 1997), in one study involving 394 subjects in the standardization sample of the WAIS-III who were tested and retested at a mean interval of 34.6 days, mean test scores were two to three points higher on Verbal IQ scores, three to eight points higher on Performance IQ scores, and two to three points higher on Full Scale IQ scores; this was attributable 'mainly to practice' (p. 57)". *Id.* If a retest of the same test within 34.6 days results in an average increase in full scale IQ of 2 to 3 points, then the fact that Sanchez took two different tests within months should have virtually no impact—certainly not an impact great enough to justify discarding the Dr. Brannon IQ score. Sanchez's evidence of adaptive deficits is likewise lacking. For support of his claim that he suffers from adaptive deficits, Sanchez cites to the declaration of Dr. Rene Hernandez-Cardenache. Dr. Hernandez did not examine Sanchez, conduct any clinical tests on Sanchez, or even meet with Sanchez CV-DE 78-1 at 93-124. Rather, Dr. Hernandez-Cardenache's opinions are based on interviews he conducted of Sanchez's mother and sister, and testing he conducted solely of petitioner's mother in 2016, after Sanchez had been sentenced to death, to determine if Sanchez had adaptive deficits. Notably, from Dr. Hernandez's declaration, there does not appear to have been any accounting for whether or not Sanchez's mother was providing credible information during this test, the purpose of which was to save her son from a death sentence.

Furthermore, Dr. Hernandez-Cardenache was not provided, and therefore did not review Dr. Michael Brannon's report which concluded Sanchez had an IQ of 89 and noted that Sanchez had denied many of the family impairments or trauma that Sanchez's family, and his experts, claimed caused intellectual dysfunction. *See* CV-DE 78-1 at 122 for list of materials submitted

242

to Dr. Hernandez-Cardenache.   This is a common refrain among Sanchez's experts.  Not only do their examples of adaptive deficits conflict with the trial testimony, they also conflict with details published in Sanchez's prisoner pen pal registry, where Sanchez describes himself as a lover of literature, whose favorite novel is Charles Dickens' *Great Expectations*, and who is seeking female pen pals to correspond with and make donations to him.  *See* Prison Inmate Profile for Ricardo Sanchez, USA Exh. 27 at https://www.prisoninmates.com/RicardoSanchez75820-004 (May 17, 2018).   Even with this glaringly one-sided basis, Dr. Hernandez does not base his conclusion on a finding that Sanchez's adaptive deficits are two standard deviations below the mean in any domain, but instead focuses his opinion on singular subsets within the domain.  This is an insufficient finding of adaptive deficits under *Atkins*.

In sum, Sanchez's newly discovered evidence of intellectual disability is not credible, and not consistent with the *Atkins* decision.   As such, Sanchez has failed to establish the he is intellectually disabled and ineligible for the death penalty.

1.   Sanchez has not established that he is ineligible for the death penalty dues to other purported mental health issues

Sanchez also claims that he is ineligible for the death penalty because he suffers from "brain disfunction and psychiatric impairments" CV-DE 80 at 95 and, as a result, his "irresponsible conduct was not as morally reprehensible as that of an adult".  CV-DE 80 at 97 (citations omitted). Sanchez cites to no case law or statute that supports this 8th Amendment claim.

The federal statute governing exceptions to the death penalty provides that, "[a] sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person".  18 U.S.C. § 3596(c). Sanchez fails to establish that he falls within this exception.  Sanchez has made no claim of substantial disability.  Furthermore, he has made no claim, let alone established, that he does

not understand that he has been sentenced to death or that he does not know why the death penalty was imposed.  Sanchez himself acknowledges his understanding of his situation.  *See, e.g.*, USA Exh. 27, "I have made many mistakes in my past, but nothing to deserve the penalty I am striven [sic.] against."   As such, Sanchez fails to meet the mental disability exception of Section 3596.

The Supreme Court has also found an exception to the death penalty when a defendant establishes that he is incompetent/insane[65] such that he fails to understand the causal connection between his crime and the death penalty.  S*ee Ford v. Wainwright*, 477 U.S. 399 (1986); *see Panetti v. Quarterman,* 551 U.S. 930, 949, 957, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007).  Sanchez is not claiming that he is insane/incompetent.  He has likewise neither alleged nor established that he does not understand that he has been convicted of a crime and as a result has been sentenced to death.

Rather than establish a exemption under Section 3596(c) or under *Ford/Panetti*, Sanchez is advocating that this court expand the types of mental conditions warranting exemption from the death penalty.  Such an expansion is entirely unwarranted.  Sanchez claims that his mental age at the time of the offense was under 18, and therefore he should be exempted from the death penalty.  Although the Supreme Court has held that it is unconstitutional to impose capital punishment for crimes committed while under the age of 18 (*see Roper v. Simmons*, 543 U.S. 551 (2005)), the Court has never expanded this protection to those whose mental age was under 18.  Furthermore, Sanchez has not established that his mental age at the time of the offense was that of a person under the age of 18.  Sanchez also claims that he is ineligible for the death penalty as he suffered from a severe mental illness.  Sanchez's supposed mental illness is undefined, and not severe.

---

[65] While the Court used the term "insane" in *Ford*, post-*Ford* decisions identify the issue as "competency to be executed." *E.g., Herrera v. Collins*, 506 U.S. 390, 439, 113 S.Ct. 853, 881, 122 L.Ed.2d 203 (1993).

Sanchez does not allege that he suffers from schizophrenia, hallucinations, or paranoid delusions. Taking Sanchez's claim at face value, Sanchez suffers from anxiety, depression, and hopelessness—feelings he no doubt shares with any number of prisoners on death row.

Sanchez fails to meet any established exemption to the death penalty. His claims do not warrant further expansion of the areas of ineligibility. His claims are nothing more than an attempt to circumvent the jury's rejection of the defense submitted mitigators. For these reasons, his current claim should be denied.

F. SANCHEZ'S CLAIMS THAT HIS DEATH SENTENCES VIOLATE THE EIGHTH AMENDMENT'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT ARE PROCEDURALLY BARRED AND FAIL ON THE MERITS (SANCHEZ AMENDED ISSUE IX).

In his Motion, Sanchez says his sentence of death violates the Eighth Amendment's prohibition against cruel and unusual punishments for four reasons: (A) the death penalty is disproportionate to Sanchez's crimes (CV-DE 80 at 291), (B) the death penalty fails to ensure reliability, consistency, and equal protection (*Id*. at 297), (C) the conditions of Sanchez's confinement constitute physical and psychological torture and inhumane treatment (*Id*. at 301), and (D) the method of execution is unconstitutional. (*Id*. at 304-305). Sanchez failed to raise any of these claim in his direct appeal. *See generally United States v. Sanchez*, 733 F.3d 1125 (11th Cir. 2013), *cert. denied*, ___ U.S. ___, 135 S.Ct. 2048 (2015). As a result, these claims are procedurally defaulted and are barred.

A collateral attack is more limited than an appeal, and the doctrine of procedural default generally bars consideration of any claim that the movant failed to appropriately raise on appeal. *See United States v. Frady*, 456 U.S. 152, 165 (1982). The procedural default doctrine is adhered to by the courts to conserve judicial resources and respect the law's important interest in the finality of judgments. *See Massaro v. United States*, 538 U.S. 500, 504 (2003). This doctrine

245

applies even in death penalty cases. *See Battle v. United States*, 419 F.3d 1292, 1298 (11th Cir. 2005). Because these claims are procedurally barred, the Court should dismiss these claims without further consideration.

Notwithstanding the procedural bar which is fatal to Sanchez's claims, we will examine and respond *seriatim* to the substance of Sanchez's claims, each of which is without merit.[66]

   1. Sanchez has not established that the death penalty is disproportionate to his crimes. CV-DE 80 at 291-294.

      a. There is no national trend toward abolition.

Sanchez claims there is a "steady and progressive abandonment of capital punishment throughout the nation" and that therefore it has become a "disproportionate punishment even for

---

[66] To the extent Sanchez intended to claim that the death penalty is unconstitutional as cruel and unusual punishment and a *per se* denial of due process, it should be noted that three separate phrases in the Fifth Amendment, including the Due Process Clause, specifically contemplate capital punishment:

> No person shall be held to answer for a **capital**, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...; nor shall any person be subject for the same offense to be twice put in jeopardy of **life** or limb; ... nor be deprived of **life**, liberty, or property, without due process of law....

U.S. Const. Amend. V (emphasis added). This text plainly refutes any claim that due process requires a categorical ban on capital punishment. *See Gregg v. Georgia*, 428 U.S. at 177 ("[i]t is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers.") (joint opinion of Stewart, Powell, and Stevens, JJ.). "To the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder." *Id.*, at 186. Moreover, it has repeatedly been held that the death penalty is not cruel and unusual and does not offend the requirements of due process. *See, e.g., United States v. Sampson*, 486 F.3d. 13, 29 (1st Cir. 2007), *cert. denied*, 553 U.S. 1035 (2008) ("Because *Gregg, Roberts [v Louisiana*, 428 U.S. 325, 331 (1976)]*, and *Chapman [v. United States*, 500 U.S. 453, 465 (1991)] are binding upon us, we reject Sampson's bedrock claim and hold that the death penalty itself is not unconstitutional.") As a result, to the extent Sanchez might be seeking to advance such arguments, they are without merit, in any event.

the most serious of offenses."  CV-DE 80 at 291.  Sanchez says there is a "national trend toward abolition" and he points to New York, New Jersey, New Mexico, Illinois, Connecticut, Maryland, and Nebraska.  *Id.*  Moreover, Sanchez says a group of states (California, Colorado, Kansas, New Hampshire, Oregon, Pennsylvania, and Wyoming) have not carried out an execution in the past decade, and several other states (Arkansas, Kentucky, Louisiana, Nevada, Utah, Montana, and Washington) have only carried out one execution in the past decade.  *Id*.  Sanchez claims that ten states account for 92% of all executions in the past decade, and there has allegedly been a "clear and stark" decline in the executions in those states.  CV-DE 80 at 292.  A number of states (California, New Hampshire, Pennsylvania, and Tennessee) have commissioned reports on their use of capital punishment; and Louisiana has begun to investigate the *financial cost* of capital punishment.  *Id.*  Governors of Colorado, Oregon, Pennsylvania, and Washington have allegedly declared a moratorium on executions.  *Id.* at 293.  Sanchez correctly notes the Supreme Court has banned the execution of persons who are mentally retarded/intellectually disabled as well as those who were not 18 years old at the time of the capital murder.  *Id.*  Sanchez claims there is now a "national consensus" against the death penalty.  CV-DE 80 at 294.

Sanchez's arguments are self-defeating.  Even under Sanchez's arguments, 31 states continue to support capital punishment.  *See* www.deathpenaltyinfo.org/states-and-without-death-penalty.  Additionally, despite the fact that virtually every year bills are introduced in Congress to abolish the FDPA, Congress has never embraced such bills.  *See, e.g.*, 113 H.R. 3741, Federal Death Penalty Abolition Act of 2013; 112 H.R. 3051, Federal Death Penalty Abolition Act of 2011; 111 S. 650, Federal Death Penalty Abolition Act of 2009; 110 H.R. 6875, Federal Death Penalty Abolition Act of 2008; 110 S. 447, Federal Death Penalty Abolition Act of 2007; 109 H. R. 4923, "A bill to abolish the death penalty under Federal law" (2006); 109 S. 122, "A bill to

abolish the death penalty under Federal law" (2006); 109 H. R. 379, "A bill to ensure equal protection and due process of law in capital punishment cases by imposing a moratorium on the imposition and carrying out of the death penalty in certain States" (2006).

Recent electoral activity in several states also runs counter to Sanchez's claim. For example, on November 8, 2016, the citizens of Nebraska voted in a referendum, by a 61-39 margin, to reinstate the death penalty following 2015 legislation abolishing capital punishment.[67] Further, in 2012, there was a general referendum (Proposition 34) in California on whether to abolish the death penalty. Despite the fact that anti-death penalty special interests spent $7,000,000 in their partisan effort to convince voters to abolish the death penalty, the California electorate rejected Proposition 34 by some 6 percentage points. *See* www.mercurynews.com/ci_21943752/california-proposition-34-voters-decide-whether-keep-states.

In 2006, the state legislature in Wisconsin – which abolished the death penalty approximately 150 years earlier -- authorized a statewide referendum on whether its voters desired the reinstatement of capital punishment. In the July 2006 referendum, a majority of the Wisconsin electorate voted in favor of the reinstatement of capital punishment in Wisconsin. *See* www.ipsnews.net/2006/07/death-penalty-wisconsin-to-vote-on-reinstatement. The history of capital punishment in Oregon is particularly instructive. Prior to 1864, Oregon did not have capital punishment. In 1864, Oregon first introduced capital punishment by statute. In 1914, by

---

[67] *See*, last year's referendum in Nebraska, in which the electorate (by a 61.2% to 38.8% vote) overrode legislation repealing the state's capital punishment law. https://ballotpedia.org/Nebraska_Death_Penalty_Repeal,_Referendum_426_(2016)

Constitutional Amendment, Oregon voters repealed capital punishment with 50.4% of the popular vote. However, in 1920, Oregon voters reinstated capital punishment with 56% of the popular vote. In 1964, Oregon voters repealed capital punishment with 60% of the popular vote. Thereafter, in 1978, Oregon voters reinstated capital punishment. However, in 1981, the Oregon Supreme Court struck down Oregon's death penalty statute because it directed the trial judge – not the jury – to determine whether the defendant was sentenced to death or life imprisonment. Thereafter, in 1984, 75% of the Oregon electorate voted in favor of Ballot Measure 7, which reinstated capital punishment – where it remains the law in Oregon to this day. *See* www.oregon.gov/doc/OC/Pages/cap_punishment/history.aspx. In 2012, despite well-organized and funded opposition to capital punishment in Oregon, 57% of Oregonians continued to support capital punishment (39% oppose capital punishment, and 4% are uncertain). *See* www.deathpenaltyinfo.org/documents/opbpoll.pdf.

On January 12, 2016, in *Hurst v. Florida*, 577 U.S. ___, 136 S.Ct. 616 (2016), the Supreme Court struck down Florida's death penalty statute (because the judge, rather than the jury, made the final decision on a sentence of death). However, by March 7, 2016, the Florida legislature had passed legislation, and the Florida Governor had signed into law, a measure reinstating capital punishment in and for Florida. *See* www.wlrn.org/post/death-penalty-back-books-florida.

Moreover, as confirmed by Gallop polling -- going back from 2015 to 1936 – in all but four years (1971, 1966, 1965, 1957) *more than* 50% of the American public have been "in favor of the death penalty for a person convicted of murder." USA Exh. 26 ("Death Penalty/Gallup Historical Trends" www.gallup.com/poll/1606/death-penalty.aspx?version=print (7/2/2015)).[68]

---

[68] Note: The question repeatedly asked by Gallup for nearly 80 years did not include the limiting factors: (1) *premediated or felony* murder, or (2) *involving Special Aggravating Factors/Circumstances*. If the Gallup question was further refined – to comport with modern law

From 1976 to 2015, the percentage of Americans who are "in favor of the death penalty for a person convicted of murder" has **never been below 60%**, and it was at or above 70% in 1985 (x2), 1986, 1988 (x2), 1991, 1994 (80%), 1995, 1999, 2002, and 2003.  *Id.*  Conversely, going back to 1936, there were only four years (1972, 1971, 1969, 1966) when 40% or more of the American public was <u>not</u> "in favor of the death penalty for a person convicted of murder."  *Id.*  Indeed, between 1972-2015, the <u>highest</u> percentage of Americans who were <u>not</u> "in favor of the death penalty for a person convicted of murder" was 37% (2015), and they were generally within the twentieth percentiles (1976, 1978, 1985, 1986, 1999, 2000 (x3), 2001 (x2), 2002, 2003, 2006 (x2), 2007, 2010)  or in the teens (1985, 1988 (x2), 1991, 1994, 1995 (13%)).  [*Id.*]

Moreover, to the extent Sanchez is arguing for "proportionality review," the Supreme Court and the various Circuits have consistently rejected such a claim as being neither necessary nor appropriate.  *See, e.g., Pulley v. Harris*, 465 U.S. 37, 43-45, 50-51 (1984); *United States v. Mitchell*, 502 F.3d 931, 980-81 (9th Cir. 2007); *United States v. Higgs*, 353 F.3d 281, 320-21 (4th Cir. 2003); *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1998).

Thus, Sanchez's claims that there is "steady and progressive abandonment of capital punishment throughout the nation" and that there is currently a "national consensus" against the death penalty are simply untrue.

b.   The death penalty is not excessive.

Sanchez claims the death penalty is "excessive" because it allegedly involves "the unnecessary and wanton infliction of pain."  CV-DE 80 at 294.   Sanchez also says that capital punishment fails to significantly further what he says are the "baseline" goals for analyzing

---

– the results would, no doubt, show an even greater support for capital punishment among the American public.

excessiveness:  "deterrence, retribution, incapacitation, and rehabilitation" and because (he claims) the death penalty does not measurably" promote any of the permissible penological goals over life imprisonment," Sanchez claims it is excessive.  *Id.*

In advancing his claim, Sanchez fails to properly acknowledge, much less forthrightly address, binding Supreme Court authority (including *Baze v Rees*, 553 U.S. 35, 47 (2008)) that forecloses his claim.  *See, e.g.*, *Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726 (2015) ("[W]e have time and again reaffirmed that capital punishment is not *per se* unconstitutional," *Id.*, 2739; "because it is settled that capital punishment is constitutional, '[i]t necessarily follows that there must be a [constitutional] means of carrying it out.'"  *Id.* at 2732-33 (quoting *Baze*, 553 U.S. at 47 (2008)).  Nor does Sanchez attempt to grapple with the fatal tautological fact that "[i]t is impossible to hold unconstitutional that which the Constitution explicitly *contemplates*."  *Glossip*, 135 S.Ct. at 2747 (Scalia, concurring).  For each of these reasons, Sanchez's arguments are without merit.

> c.  Sanchez's claim that the Court should consider international consensus against the death penalty as part of its Eighth Amendment analysis has no support in American law.

Sanchez says only China, Iran, Saudi Arabia, and Iraq have recently executed more people than the United States; and in 2014 only China, Nigeria, Egypt, Pakistan, Bangladesh, Tanzania, and Iran imposed more death sentences than did the United States.  CV-DE 80 at 294.   In the past 50 years, Sanchez says, 82 countries have abolished the death penalty for all crimes and an additional 35 are "abolitionist in practice;" and the General Assembly of the United Nations "has repeatedly adopted resolutions calling for countries that still maintain the death penalty 'to establish a moratorium on executions with a view to abolishing it."  CV-DE 80 at 295.  Sanchez claims that his "prolonged confinement under sentence of death violates international human rights law" [*Id.*], and that other countries have held that "lengthy delay in administering a *lawful* death penalty

251

renders ultimate execution inhuman, degrading, or unusually cruel" and thus  a violation of the Eighth Amendment. *Id*. at 296.

Sanchez is unable to cite a single decision in the United States that supports his claim.  The Supreme Court has repeatedly held that capital punishment is constitutional and proper.  *See, e.g., Glossip v. Gross,* ___ U.S. ___, 135 S.Ct. 2726 (2015); *Kansas v. Marsh,* 548 U.S. 163 (2006); *McCleskey v. Kemp*, 481 U.S. 279, 302 (1987); *United States v. Gregg*, 428 U.S. 153, 189 (1976).

As a result, Sanchez's claims are without merit and should be denied.

2.  <u>Sanchez has failed to establish that the death penalty fails to ensure reliability, consistency, and equal protection.  CV-DE 80 at 297-301</u>.

a.  <u>Reliability</u>.

Sanchez claims that the death penalty violates the Eighth Amendment because there is a "risk of wrongful execution, that is, execution of an innocent person" under the FDPA.  Sanchez claims there is evidence of "at least 156 exonerations in capital cases throughout the nation.  Researchers have estimated that nearly one in twenty (4.1%) of <u>those</u> sentenced to death are actually innocent, an unacceptably high rate given the consequences."   [CV-DE 80 at 297 (emphasis provided)]

Putting aside that Sanchez's claims are enormously exaggerated and misleading with regard to <u>state</u> executions, there has never been a claim (much less a *credible* claim) that anyone executed pursuant to the FPDA was actually innocent.  Moreover, the Supreme Court and various Circuit Courts have unanimously rejected Sanchez's claim, in any event.  *See Herrera v. Collins*, 506 U.S. 390 (1993); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2009); *United States v. Sampson*, 486 F.3d 13, 27-29 (1st Cir. 2007); *United States Quinones*, 313 F.3d 49, 60-69 (2d Cir. 2002); *accord United States v. Briseno*, 2015 WL 163526 (N.D. Ind. 2015).  As a result, Sanchez's claims are without merit and should be denied.

b.   Arbitrariness.

Without citation or support, Sanchez claims that the "Eighth Amendment's requirement to eliminate arbitrariness in capital cases is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing.  These requirements are ultimately irreconcilable."   CV-DE 80 at 298 (emphasis provided).   Sanchez says the "death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which is not, and suitably guide the sentencer's discretion."  *Id.* He says because the FDPA "fail[s] to justify the imposition of a more severe sentence on defendants like Sanchez against whom the death penalty is sought compared to others found guilty of murder; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants such as Sanchez for capital prosecution without providing consistent guidelines to ensure reliability."  *Id.*  Sanchez  acknowledges, as he must, that the FDPA sets forth sixteen statutory aggravating factors (some containing multiple sub-parts), *see* 18 U.S.C. § 3592(c), and additionally permits consideration of specified non-statutory aggravating factors "for which notice has been given," *see* 18 U.S.C § 3592, which he claims results in "extraordinary breadth of the statute, [affording] individual prosecutors … virtually unfettered discretion to determine whether to seek death, thereby creating a substantial risk of arbitrariness."  CV-DE 80 at 299.

Sanchez's amended Petition essentially asserts that because the death penalty is sought and imposed in *few* cases, the FDPA operates arbitrarily and capriciously in violation of the Eight Amendment in *all* cases.  Given the boldness of his opening claim, Sanchez's Petition turns surprisingly bashful when it fails to apprise the Court that his argument has been routinely rejected

by every other federal court before which it has been presented.  *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 306-07 (1987) (absent showing that death penalty operates arbitrarily and capriciously, defendant can't prove constitutional violation by showing similarly situated defendants did *not* receive death penalty); *United States v. Sampson*, 486 F.3d 13, 23-26 (1st Cir. 2007) (death penalty discretion must be directed so verdicts are reasoned and individualized; government process for seeking death penalty has numerous procedural safeguards; case summaries can't capture the factors unique to each case that lead to verdict; to prevail under Equal Protection Clause defendant must prove purposeful discriminatory in his own case); *United States v. Mitchell*, 502 F.3d 931, 981-83 (9th Cir. 2007) (no right to "inter-case proportionality review"; statistical data about disproportionate impact of death penalty is  insufficient to prove unconstitutionality; rarity of federal executions doesn't render FDPA unconstitutional); *United States v. Briseno,* 2015 WL 163526, \*3-4 (N.D. Ind. 2015); *United States v. Taylor*, 648 F. Supp.2d 1237, 1239-41 (D.N.M. 2008) (and authorities cited therein).

Indeed, in *Kansas v. Carr*, 577 U.S. ___, 136 S.Ct. 633 (2016), the Supreme Court resolved that in death penalty cases, "[i]n the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not, *which is what our case law is designed to achieve*." Slip op. at 10-11 (emphasis provided).  Thus, in essence, Sanchez's Motion attempts to cast as a vice precisely that which the Supreme Court embraces as a virtue.

To be sure, *Furman* was a *per curiam* decision in which the Supreme Court struck down state death penalty statutes that offered no guidance to the sentencing body and were, therefore, unconstitutional.  According to the Supreme Court, it was this lack of guidance that created the possibility that the penalty of death would be imposed capriciously or, even worse, in a

254

discriminatory manner – a possibility that appears to have undermined confidence in the entire system. *See Furman*, 408 U.S. at 309-10 (Stewart, J., concurring).

However, in its post-*Furman* death penalty jurisprudence, the Supreme Court has made clear that its decision in *Furman* was not based on the frequency with which the death penalty was sought or imposed, but rather with the *manner* in which it was imposed. *See, e.g., Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006); *United States v. Gregg*, 428 U.S. 153, 189 (1976); *and see United States v. Sampson*, 486 F.3d 12, 23 (1st Cir. 2007); *United States v. Taylor*, 648 F. Supp.2d at 1240. In so doing, the Supreme Court has explained, as a fundamental matter, that where discretion is afforded to the sentencing body that discretion must be suitably directed and limited to satisfy the Eighth Amendment. *See McCleskey v. Kemp*, 481 U.S. 279, 302 (1987) (*citing Gregg v. Georgia*, 428 U.S. 153, 189 (1976)); *see also United States v. Sampson*, 486 F.3d at 23 (explaining that "the primary emphasis of the Supreme Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness.")

Subsequent to its decision in *Furman*, the Supreme Court clarified that a properly drawn death penalty statute "must (1) rationally narrow the class of death-eligible defendants, and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006). In *Gregg v. Georgia*, the Supreme Court explained, "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195.

Plainly, the FDPA does not lack the guidance or share the other flaws of the statutes at issue in *Furman* and it is the kind of "carefully drafted statute" contemplated by *Gregg* and the Supreme Court's other post-*Furman* death penalty decisions.  To the contrary, under the FDPA, the jury is carefully focused on the defendant and his crime and whether it should impose the death penalty.  The sequence and method with which the jury must determine punishment under the FDPA is well defined and clearly provides for necessary narrowing of the class of death-eligible defendants and an individualized sentencing determination.  *See* 18 U.S.C. §§ 3591-3593; *see also Jones v. United States*, 527 U.S. 373, 376-79 (1999) (detailing the FDPA's sentencing process); *United States v. Nguyen*, 928 F. Supp. 1525, 1532 (D. Kan. 1996) (same).  Accordingly,      the FDPA fully meets the requirements of guided discretion, suitably directing and limiting the leeway afforded to the decision-makers.  *United States v. Sampson*, 486 F.3d at 24; *see also United States v. Taylor*, 648 F. Supp.2d at 1240 ("[T]he FDPA sufficiently guides and limits the jury's discretion to make it constitutional under the Supreme Court's jurisprudence."); *see also United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007) ("That federal executions are rare . . . does not render the FDPA unconstitutional.").[69]

Hence, other than Sanchez's misguided reliance on *Furman*, he offers no other authority for his claim that the FDPA is unconstitutional on the bases of infrequent application or broad

---

[69]  To the extent that Sanchez is claiming that the FDPA runs awry of *Furman* because it grants the Government unguided prosecutorial discretion to seek the death penalty and because the Government rarely seeks the death penalty, these claims must also be rejected.  This is so, because such claims grossly misconstrue *Furman*, which was not concerned with discretion afforded to the charging body, but rather, only to the sentencing body.  *See United States v. Sampson*, 486 F.3d 13, 23 (1st Cir. 2007) (holding that this same argument "mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence" since *Furman*).  The fractured opinions of *Furman* limit only the authority of the sentencing body in imposing a death sentence, not the Government in seeking one.  *See McCleskey v. Kemp*, 481 U.S. 279, 307 (1987).

prosecutorial discretion.  This is not surprising, because no such authority exists.  In fact, numerous courts have explicitly rejected Sanchez's argument for the reasons cited by the Government herein. *See, e.g., United States v. Sampson*, 486 F.3d at 23-24; *United States v. Mitchell*, 502 F.3d at 983 (9th Cir. 2007); *United States v. Briseno,* 2015 WL 163526, *3-4 (N.D. Ind. 2015); *United States v. Jacques*, 2011 WL 1675417, *2-3 (D. Vt. 2011), *vacated on other grounds*, 684 F.2d 324 (2d Cir. 2012); *United States v. Basciano*, 763 F. Supp.2d 303, 340 (E.D.N.Y 2011); *United States v. Aquart*, 2010 WL 4363414, *2-4 (D. Conn. 2010); *United States v. Cruz-Ramirez*, 2010 WL 1459446, *4-6 (N.D. Cal. 2010); *United States v. Johnson*, 2009 WL 1856240, *2-3 (E.D. Mich. 2009); *United States v. Barnes*, 532 F. Supp.2d 625, 633 (S.D.N.Y. 2008); *United States v. Taylor*, 2008 WL 217115, *4 (E.D. Tenn. 2008); *United States v. Green*, 2008 WL 4000943, *2 (W.D. Ky. 2008); *United States v. Sablan*, 2006 WL 1028780, *11 (D. Colo. 2006); *United States v. O'Driscoll*, 203 F. Supp.2d 334, 341 (M.D. Pa. 2002); *United States v. Hammer*, 25 F. Supp.2d 518, 546-47 (M.D. Pa. 1998).

In the face of this overwhelming authority, Sanchez reiterates a handful of selected statistics – regularly rejected by other courts – that at best suggest that the death penalty is rarely sought and obtained in federal courts.  Yet, as Sanchez well knows, this type of outcome-analysis was explicitly rejected by the Supreme Court in *Gregg v. Georgia*, 428 U.S. at 199 ("The existence of these discretionary stages [of prosecutions of capital cases] is not determinative of the issues before us.")  Moreover, in *McCleskey v. Kemp*, the Supreme Court pronounced that "[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime."  481 U.S. at 307 n. 28.  Indeed, as noted above, in its January 20, 2016, decision in *Kansas v. Carr*, the Supreme Court embraced that fact that in death penalty cases "[i]n the last analysis, jurors will accord mercy if they deem it appropriate, and withhold mercy if they do not,

*which is what our case law is designed to achieve*.”  *Carr*, 136 S.Ct. at 633 (emphasis provided).

Sanchez's amended Petition has no response to these controlling precedents, nor could it.

For each of these reasons, Sanchez's claims that the FDPA imposes the death penalty in an arbitrary and capricious manner are without merit and should be denied.

c.   Racial Discrimination.

Sanchez says Congress enacted 21 U.S.C. § 848(o) for the express purpose of granting "capital defendants the 'right … to justice without discrimination,' requiring juries to certify that racial discrimination played no role in the imposition of the death penalty in specific cases."  CV-DE 80 at 299.  Sanchez claims that "[s]tatistical evidence shows disproportionate prosecution of people of color under the [FDPA]," which he alleges violated his rights pursuant to Section 848(o).  CV-DE 25 at 277.   Ignoring the one comprehensive study – the 2006 RAND Corporation's $1.6 million "triple-blind" study -- that specifically investigated whether or not race played any role whatsoever in prosecutions under the FDPA (and found definitively it did not), Sanchez claims that "[m]any studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular.  These studies reveal … that offenders who kill white people have a significantly higher chance of receiving a death sentence than offenders who kill people of other races."  *Id.*[70]  Finally, Sanchez then says that the Governors of Maryland, Illinois, and New Mexico signed legislation in their states abolishing their state death penalties claiming, in their view, that some form of bias existed in their state systems,

---

[70]   Sanchez ignores the concurring opinion of Judge Reena Raggi in *United States v. Fell*, 571 F.3d 264, 276-78 (2d Cir. 2009), in which she analyzes the state and federal capital experience and identifies as the most likely factor in juries' decisions to impose, or not impose, the death penalty is whether or not the victim of the capital murder is (or is not) an "innocent" victim; meaning was not himself/herself involved in criminal conduct, *Id.* at 276-78, which is a logical explanation of the jury's capital determinations in Sanchez's case.   Moreover, Sanchez is Hispanic as were his and Troya's murder victims.

and that the Governors of Colorado, Oregon, Washington, and Pennsylvania have declared moratoria on execution[s] in their states . [based on] concerns about racial discrimination and equal justice in support of the moratoria." CV-DE 80 at 301.

Sanchez is unable to provide the citation to any case that directly supports his conclusion while seeking to avoid the fact that his argument has routinely been rejected by other courts. Inevitably, Sanchez's claim must fail for the simple reason that the studies and reports he cites do not – and cannot – begin to meet the burden established by the Supreme Court in *McCleskey v. Kemp*, 481 U.S. 279 (1987), necessary to support either a Fifth Amendment or an Eight Amendment race-based or geography-based claim. Yet, Sanchez advances the same discredited reasoning – statistical disparity – that has repeatedly been rejected by the federal courts in virtually identical claims. *See e.g., United States v. Sampson*, 486 F.3d at 26-27; *United States v. Jacques*, 2011 WL 1675417, *5 (D. Vt. 2011), *vacated on other grounds*, 684 F.2d 324 (2d Cir. 2012); *United States v. Aquart*, 2010 WL 4363414, *4-*5 (D. Conn. 2010); *United States v. Johnson*, 2009 WL 1856240, *5-*6 (E.D. Mich. 2009); *United States v. Barnes*, 532 F. Supp.2d 625, 635-36 (S.D.N.Y. 2008); *United States v. Taylor*, 2008 WL 217115, *5-6 (E.D. Tenn. 2008); *United States v. Sablan*, 2006 WL 1028780, *12 (D. Colo. 2006); *United States v. Llera Plaza*, 179 F. Supp.2d 444, 456 (E.D. Pa. 2001); *United States v. Edelin*, 134 F. Supp.2d 59, 89 (D.D.C. 2001). Each of these courts correctly recognized that generalized showings of statistical disparity -- without evidence of its applicability to the specific defendant – was foreclosed by the Supreme Court in *McCleskey v. Kemp*.

Because Sanchez does not, and cannot, identify any evidence demonstrating that unlawful discrimination was applied to him, Sanchez's claim is without merit and should be denied.

3. <u>The Court lacks jurisdiction to entertain Sanchez's claims concerning the conditions of his confinement. CV-DE 80 at 301.</u>

Sanchez claims that the physical and psychological conditions of his confinement in the Special Confinement Unit (SCU) at the United States Penitentiary – Terre Haute (USP-Terre Haute), where he and other federal death row inmates are confined, "are so dehumanizing, brutal, and severe as to constitute unconstitutional torture" (CV-DE 80 at 301) which has been "profoundly heightened by years of uncertainty" (CV-DE 80 at 303). There is no jurisdiction over these claims in this case, because they are asserted using the wrong vehicle, and in the wrong forum. The proper vehicle for these claims is a petition for habeas corpus under § 2241(a), and the proper forum for these claims is the judicial district where Sanchez is confined. It is well established that the execution of a sentence is not cognizable in a motion to vacate under 28 U.S.C. § 2255. "Challenges to the execution of a federal sentence are properly brought under 28 U.S.C.A. § 2241." *United States v. Little*, 392 F.3d 671, 679 (4th Cir. 2004). Challenging the execution of a sentence on the basis of an alleged constitutional violation does not remove it from the ambit of § 2241. *Id.* As an alternative to a properly filed § 2241 petition, it appears that Sanchez could also file a *Bivens* action in his district of confinement challenging the specifics of his execution. *See Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 415 (1971); *see also Hill v. McDonough*, 547 U.S. 573, 582 (2006) (permitting a suit under 42 U.S.C. § 1983 to challenge method of execution).

District courts can grant § 2241 habeas relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a). That statute requires "nothing more than that the court issuing the writ have jurisdiction over the custodian." *Braden v. 30th Judicial Circuit Court*, 410 U.S. 484, 495 (1973). Thus, "[w]henever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement." *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004).

260

Sanchez is domiciled in the United States Penitentiary at Terre Haute, Indiana. Accordingly, this Court is not the proper venue for a § 2241 petition filed by Sanchez; the Southern District of Indiana appears to have jurisdiction over this question. Moreover, Sanchez has made no attempt to name his custodian, though the denomination of his pleading invokes both § 2241 and § 2255. In light of these two flaws, this Court should dismiss that aspect of the Petition that seeks the granting of habeas relief – specifically, Sanchez's challenge to the method of execution. *See United States v. Little*, 392 F.3d at 680; *see also Stanley v. California Supreme Court*, 21 F.3d 359, 360 (9th Cir. 1994) (holding that the failure to name the custodian as a respondent deprived the federal court of personal jurisdiction).

Furthermore, to the extent that Sanchez's Petition attacks the promulgation of the federal execution protocols, his claim appears to have fallen far afield of the limitations on § 2255 litigation. The statute provides jurisdiction to consider flaws in a criminal judgment, not in the legality of rules for implementing that judgment. *See United States v. Addonizio*, 442 U.S. 178, 185 (1979) (limiting the scope of § 2255 motions and holding that they do not encompass all claimed errors in conviction and sentencing); *see also Brown v. United States*, 610 F.2d 672 (9th Cir. 1980) (holding the motion can test only the sentence imposed and not the sentence as it is being executed). Even if Sanchez filed his claims concerning his conditions of confinement in the appropriate forum, using the appropriate vehicle, Sanchez's claims would still fail on the merits.

Sanchez's claims related to the conditions of his confinement and alleged psychological harm from such confinement are *Lackey* claims,[71] which are regularly rejected. *Lackey* claims are grounded in the constitutional principles that constrain the death penalty. While the death penalty can be justified by "retribution and deterrence of capital crimes by prospective offenders," an

---

[71] *Lackey v. Texas*, 514 U.S. 1045 (1995).

execution "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." *Gregg v. Georgia,* 428 U.S. 153, 183 (1976) (plurality opinion); *Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010).  As noted by the Ninth Circuit in *Allen v. Ornoski,* 435 F.3d 946 (9th Cir. 2006), "[t]he Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Id.* at 958; *see also Knight v. Florida,* 528 U.S. 990 (1999) (Thomas, J., concurring in denial of *certiorari*) ("I am unaware of any support in the American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.")

4. The Court lacks jurisdiction to entertain Sanchez's claim that the method of his execution violates the eight amendment and the claim is not yet ripe for review. CV-DE 80 at 304.

Sanchez claims the method of execution under the FDPA might cause "constitutionally unacceptable levels of suffering." CV-DE 80 at 304.  Sanchez claims that the three-drug protocol previously used by the Government to execute prisoners "demonstrated a substantial risk of extreme pain" and will cause Sanchez "extreme distress, anxiety, and fear regarding [his] impending execution." *Id.*  Sanchez avers that at least one of the drugs in the three-drug protocol "has become unavailable" and that, since 2011, the "government has not yet completed the process of determining what drug combination will be used instead." *Id.*  Thus, Sanchez complains, he has been "confined under a sentence of death for years without having any idea what method of execution will be imposed upon him…." *Id.*  Further, Sanchez says, he and the other prisoners under sentences of death "have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the federal government

262

will select," which exposes Sanchez to the "continuing, realistic fear that whichever method the government selects will not comport with constitutional requirements." *Id.*

Sanchez anticipates that the government will use the predominant method of execution by lethal injection to execute him. As fully set forth above, the government submits that Sanchez fails properly to present this claim concerning his conditions of confinement or to bring it in the appropriate forum. Accordingly, this Court should summarily dismiss this claim.

In addition to the 2241 issue, Sanchez cannot challenge his prospective execution because the issue is not yet ripe. Article III of the Constitution extends the judicial power of the United States only to real cases or controversies. *See* U.S. Const. art. III, § 1; *see Kennedy v. Block*, 784 F.2d 1220, 1222 (4th Cir. 1986). Thus, federal courts cannot give advisory opinions in hypothetical cases. *See Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806). Among other issues, the question of ripeness bears on a federal court's subject matter jurisdiction under Article III. *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1498-99 (10th Cir.1995). Before a plaintiff may obtain an injunction against future enforcement of a law he must show some substantial hardship – the enforcement must be certain and the only impediment to the case's ripeness is delay before eventual prosecution. *See Steffel v. Thompson*, 415 U.S. 452, 462 (1974) (allowing an injunction against police when the plaintiff or his friends had twice before been arrested for distributing the same handbills at the same shopping center); *see Crosetto v. State Bar of Wisconsin*, 12 F.3d 1396, 1403 (7th Cir. 1993). The plaintiff bears the burden of alleging facts sufficient to demonstrate the appropriateness of a judicial resolution. *See Renne v. Geary*, 501 U.S. 312, 316 (1991).

In this case, Sanchez has made no effort to demonstrate ripeness of his complaints about the federal lethal injection protocol. Quite the opposite, he has premised the balance of this § 2255

motion on claims designed to avoid execution of his death sentence.  Furthermore, he agrees that the execution protocol will be subject to amendment prior to his actual execution. Not only does Sanchez fail to allege facts sufficient to demonstrate ripeness, he affirmatively recognizes that this Court may decline to consider the case on ripeness grounds.  Because Sanchez has failed to undertake any effort to demonstrate the justiciability of this Eighth Amendment claim, this Court should dismiss this claim.

In all, Sanchez's § 2255 Petition represents an inappropriate mechanism for considering potential problems with an execution that is not slated to occur in this District and might not occur for years to come.  This Court should therefore dismiss this claim.[72]

Even if Sanchez had a ripe claim, had named the correct respondent, and filed his suit in the appropriate venue, he could not obtain relief.  *Baze v. Rees*, 553 U.S. 35, 48-49, 61 (2008), is the standard by which Eight Amendment method of execution claims are governed.  In *Baze*, the Supreme Court noted that it has never invalidated a state's chosen procedure for carrying out a sentence of death.  553 U.S. at 48; a*ccord Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726, 2737 (2015).  As reiterated by the Supreme Court in *Glossip*:

> The controlling opinion in *Baze* first concluded that prisoners cannot successfully challenge a method of execution unless they establish that the method presents a risk that is "'*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.' *Id.,* at 50 (quoting *Helling v. McKinney,* 509 U.S. 25, 33, 34–35 (1993)[emphasis in original]).  To prevail on such a claim, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" 553 U.S., at 50 (quoting *Farmer v. Brennan,* 511 U.S. 825, 846, and n. 9, (1994)).  The controlling

---

[72]   The government interprets Sanchez's claim as a narrowly focused challenge to the federal method of execution.  To the extent that Sanchez claims a broader challenge to the categorical use of a lethal injection as a method of execution, such a challenge would be based on a new rule that is *Teague* barred.

opinion also stated that prisoners: Cannot successfully challenge a State's method of execution merely by showing a slightly or marginally safer alternative." 553 U.S., at 51. Instead, prisoners must identify an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain. *Id.,* at 52. The controlling opinion [in *Baze*] summarized the requirements of an Eighth Amendment method-of-execution claim as follows: A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain. [And] [h]e must show that the risk is substantial when compared to the known and available alternatives *Id.,* at 61. The preliminary injunction posture of the present case thus requires petitioners to establish a likelihood that they can establish both that Oklahoma's lethal injection protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives. The challenge in *Baze* failed both because the Kentucky inmates did not show that the risks they identified were substantial and imminent, *Id.,* at 56, and because they did not establish the existence of a known and available alternative method of execution that would entail a significantly less severe risk, *id.,* at 57–60. Petitioners' arguments here fail for similar reasons. First, petitioners have not proved that any risk posed by midazolam is substantial when compared to known and available alternative methods of execution. Second, they have failed to establish that the District Court committed clear error when it found that the use of midazolam will not result in severe pain and suffering.

*Glossip v. Gross*, 135 S.Ct. at 2737-38.

For all of his machinations, Sanchez has not, and cannot, establish that a *future* lethal injection protocol will "create[] a demonstrated risk of <u>severe</u> pain," nor can he establish that such risk is *substantial when compared to the known <u>and available</u> alternatives*." *See, e.g., Glossip*, 135 S.Ct. at 2738 ("Petitioners do not seriously contest this factual finding [no alternative drugs are available], and they have not identified any available drug or drugs that could be used in place of those that Oklahoma is now unable to obtain. Nor have they shown a risk of pain so great that other acceptable, available methods must be used.")

Any execution will cause the condemned some pain. *See Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 464 (1947). Thus, there is no requirement that the pain of death be totally averted by any method of execution, and this Court lacks jurisdiction to dictate that method unless there is a "substantial risk of serious harm," an "objectively intolerable risk of harm 'that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment," and Sanchez has not identified an alternative that is "feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip*, 135 S.Ct. at 2737 (*quoting Baze*, 553 U.S. at 52).

For each of these independent reasons, Sanchez's claims concerning the constitutionality and methods of enforcement of the death penalty are without merit and should be denied.

## IV.   SANCHEZ IS NOT ENTITLED TO RELIEF UNDER THE CUMULATIVE ERROR DOCTRINE (SANCHEZ AMENDED ISSUES VI(D), VIII(J) and XI).

Sanchez asserts that he is entitled to have his convictions and sentences vacated due to "cumulative errors" in his trial and appeal. Sanchez has cited the Court several decisions that merit a response. Sanchez cites *Taylor v. Kentucky*, 436 U.S. 478, (1978) for the proposition that this Court should review the record below for the cumulative errors of defense counsel relating to the ineffectiveness of counsel claim. This citation is somewhat misleading in that the *Taylor* decision actually involved federal habeas review of a state court prosecution. The Supreme Court overturned a state criminal conviction based on the trial court's refusal, over objection, to provide a presumption of innocence instruction to the jury. Compounding the trial court's initial jury instruction error, the Supreme Court noted that the conviction also could be overturned for the additional court error of refusing to tell the jury that the indictment as merely an allegation and was entitled to no evidentiary weight. The Supreme Court commented that the cumulative effect of the trial court's dual errors could be considered, but that the single error was significant enough

266

to invalidate the conviction under due process grounds. The case really does not deal with analyzing an ineffectiveness of counsel claim. Sanchez also cites *Donnelly v. DeChristofaro*, 416 U.S. 637 (174) for the proposition that the prosecution's alleged misconduct must be viewed over the context of the entire trial. We agree with this assertion in general. However, we note that the actual holding of *Donnelly* was not cited to the Court, yet we find the holding instructive. The Supreme Court held that in viewing the lengthy trial record as a whole, including the trial court's near immediate corrective instruction to the jury, that the prosecution's isolated comment, did not make the trial so fundamentally unfair as to deprive the defendant of due process of law.

Under the cumulative error doctrine, even if individual judicial errors or prosecutorial misconduct would not suffice to warrant reversal, their effect may be evaluated cumulatively to determine if they denied the defendant a fair trial. *See United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009). "In addressing a claim of cumulative error, [the Court] must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Id.* (quotation omitted). However, where there is no error or a single error, there cannot be any cumulative error. *See United States v. Waldon*, 363 F.3d 1103, 1110 (11th Cir. 2004).

Here, the United States has demonstrated how each of Sanchez's individual claims of error have failed. The evidence against him was overwhelming. Regardless of the alleged errors discussed above, no reasonable jury could have acquitted Sanchez on this record, which established unquestionably that Sanchez had participated in a horrific act of wanton violence that resulted in the multiple members of an entire family, including two innocent little boys. No additional mitigation evidence would have changed the penalty verdict either. His own experts and evidence indicated that he was not intellectually disabled, and the jury rejected a multitude of submitted mitigating factors supported by evidence that did not outweigh the prosecution- submitted

267

aggravators. Under this record as a whole, Sanchez was afforded a fair trial, and his attorneys rendered constitutionally-sufficient representation.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Morris v. Secretary, Dept. of Corrections*, 677 F.33d 1117, 1132 (11th Cir. 2012) (*citing United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir.2005)) (internal quotation marks omitted). This Court should address claims of cumulative error by first considering the validity of each claim individually, and then examining any established errors in the aggregate and in light of the trial as a whole to determine whether Sanchez was afforded a fundamentally fair trial. *See United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir.1997).

Sanchez's argument, without elaboration, appears to advance a volume discount theory, bundling all of trial counsel's alleged perceived errors, big and small, into one great mass with a Sixth Amendment denial of counsel label.  This approach is not approved by *Strickland*.[73] Sanchez does not point to any Eleventh Circuit case recognizing the "cumulative error" claim as a basis for relief.  In fact, at least one district court has noted that the Eleventh Circuit has declined to adopt a "cumulative error" theory as an independent basis for habeas relief.  *See, e.g., Peterka v. McDonough, Sec'y Dept. of Corrections*, 2007 WL 1030078 (N.D. Fla. 2007); *see also Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997); *see generally, Jones v. McNeil*, 776 F.Supp. 2d 1323,

---

[73] The United States does not concede that the cumulative error doctrine even survives the *Strickland* decision which set out the limited avenues available for 2255 relief.  *See generally, Johnson v. Nagle,* 58 F. Supp. 2d 1303 at 1352 (N.D. Ala. 1999).

1369 (S.D. Fla. 2011) (indicating that unless the trial was rendered fundamentally unfair, the Eleventh Circuit Court of Appeals has declined to entertain "cumulative error" claims).

Trial counsel here, in both the guilt and penalty phases, vigorously contested the government's case, suggested alternative theories of the murders exonerating Sanchez, and presented a detailed presentation of Sanchez's background through family, third party and expert witnesses in mitigation. Counsel's alleged mistakes were not the sort of conduct that creates a presumption of harm under *United States v. Cronic*, 466 U.S. 684 (1984) (noting that if defense counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable). A denial of the Sixth Amendment right to counsel as envisioned in *Cronic* occurs where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Cronic*, 466 U.S. at 659. In such cases, the adversary process itself becomes presumptively unreliable and there is no requirement to show any specific prejudice. That is simply not what happened here. The entire trial record here, as demonstrated by the United States in this response, amply establishes that Sanchez's attorneys did not sit idle or fail to subject the prosecution's case to meaningful testing. Sanchez received a fair trial, and his attorneys rendered constitutionally sufficient representation. Merely lumping all of the allegations into the kitchen sink does not entitle him to relief where no single error has been established on its own merits.

## III.    IN CONCLUSION, PETITIONER'S MOTION SHOULD BE DENIED WITHOUT A HEARING

In his motion pursuant to Title 28, United States Code Section 2255, Petitioner claims that his conviction and sentence was unconstitutional because his learned and experienced court lawyers were ineffective. Petitioner's claims of ineffective assistance, though numerous and

verbose, are either completely contradicted by the record below or are not substantiated by the required sworn affidavits or other documentary proof, or both, and otherwise lack merit.

It is well settled that the simple filing of a Section 2255 motion does not establish any right to a hearing. *See Newfield v. United States*, 565 F.2d 203, 207 (2d Cir. 1977). A petitioner must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact which, if proved at a hearing, would entitle him to relief. *See United States v. Aiello*, 900 F.2d 528, 534 (2d Cir. 1990); *Newfield*, 565 F.2d at 207. Where a defendant's claims, even if true, fail to state a claim upon which habeas relief can be granted, the claims are subject to dismissal without a hearing. *See Machibroda v. United States*, 368 U.S. 487, 495, 82 S. Ct. 510, 514 (1962); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991), *cert. denied*, 502 U.S. 1105 (1992). Thus, no evidentiary hearing is required where, as here, the Petitioner has failed to set forth specific facts supported by competent evidence and the written record conclusively shows that even if every allegation were accepted as true, the Petitioner is still not entitled to relief. *See Anderson v. United States*, 948 F.2d 704, 706 (11th Cir. 1991); *Tejada*, 941 F.2d at 1559; *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (petitioner not entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible.").

For the foregoing reasons, the United States requests that Sanchez's Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 should be denied in all respects without an evidentiary hearing.

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

By:    /s Stephen Carlton
STEPHEN CARLTON
ASSISTANT UNITED STATES ATTORNEY
500 S. Australian Ave., Suite 400
West Palm Beach, Florida 33401-6235
Admin. No. A5500011
Tel. (561) 209-1053
Telefax (561) 659-4526
E-mail: Stephen.Carlton@USDOJ.GOV
*Attorney for the United States*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 21, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   /s/  Stephen Carlton
Stephen Carlton
Assistant United States Attorney

## SERVICE LIST

**Ricardo Sanchez, Jr.  v. United States
Case No. 16-80693-CV-SCOLA
United States District Court, Southern District of Florida**

**Stephen Carlton
Brandy Galler
Stephanie Evans**
Assistant U.S. Attorneys
Stephen.Carlton@usdoj.gov
Brandy.Galler@usdoj.gov
U.S. Attorney's Office
500 S. Australian Ave, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526
Attorney for United States
[Service via CM/ECF]

**Stephen M. Kissinger
Dana Hansen
Counsel for Ricardo Sanchez, Jr.**
Stephen_kissinger@fd.org
Dana_hansen@fd.org
Asst. Federal Community Defenders
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile:  (865) 637-7999
[Service via CM/ECF]