*USA Response to Amended Sanchez Petition*

# USA Exh. 1

# Sanchez Initial Appellate Brief

Appeal No. 09-12716-P
*United States of America v. Troya, et al., Defendants-Appellants*

## CERTIFICATE OF INTERESTED PERSONS

Bolser, Sean J., appellate counsel for Appellant Troya;

Carlton, Stephen, trial counsel for Appellee;

Cohen, Michael B., former counsel for Appellant Sanchez;

DiRosa, Phillip, appellate counsel for Appellee;

Eisenberg, James L., former counsel for Appellant Troya;

Escobedo, Jose Luis, victim;

Escobedo, Luis Damian, victim;

Escobedo, Luis Julian, victim;

Escobedo, Yessica Guerrero, victim;

Fisher, Barry J., counsel for Appellant Troya;

Gannett, Sarah S., appellate counsel for Appellant Sanchez;

Garcia, Ruben M., former counsel for Appellant Troya;

Hurley, Hon. Daniel T. K., United States District Judge;

McClain, Martin J., appellate counsel for Appellant Sanchez;

McGlasson, Robert L., counsel for Appellant Troya;

1

Murrell, Jr., Larry Donald, former counsel for Appellant Sanchez;

Sanchez, Jr., Ricardo, Appellant;

Schultz, Anne R., counsel for Appellee;

Troya, Daniel, Appellant;

Vitunac, Hon. Ann E., United States Magistrate Judge;

Yera, Evelio, J., counsel for Appellee.

## PRELIMINARY STATEMENT

This is an appeal from Sanchez's conviction and death sentences in a case involving the murders of four members of the Escobedo family: Jose Luis Escobedo, his wife Yessica, and their sons, Luis Julian and Luis Damian. Sanchez was sentenced to death in relation to the deaths of Julian and Damian Escobedo. This was a lengthy trial, joined with the trial of two non-capital defendants in a related drug conspiracy, and involving another capital defendant, Daniel Troya, whose case is also on appeal.

For ease of understanding, the arguments in this brief are presented chronologically, beginning with jury selection, proceeding to the guilt/innocence trial, and concluding with penalty phase challenges. Although serious errors were made during each segment of the case, the penalty phase errors presented here — particularly the district court's treatment of the mitigation regarding Sanchez's relationship with his son and its handling of the government's mental health expert — were especially grave.

To assist the Court, we have included with this brief an Addendum containing a summary of the indictment, delineating the charges and which defendants were charged in each count (Addendum at 6-7); a list of people, places, and vehicles involved in the case, with brief descriptions of their roles (Addendum

i

at 1-5); and a summary of the jury's mitigation findings regarding Sanchez (Addendum at 8-10).

All transcripts and court filings are referred to by their district court docket number ("DE") and page number, *e.g.*, DE1:1. "GX" and "DX" refer to government and defense trial exhibits, respectively, *e.g.*, GX-1, DX-1. In the penalty phase, "PP" is added, and defense exhibits are identified by the first initial of the defendant's last name, *e.g.*, GX-PP-1, SX-PP-1. Parallel citations to cases are omitted. Full citations are given at the beginning of each argument, even if the case is repeated in more than one argument. Emphasis is indicated where supplied.

## STATEMENT REGARDING ORAL ARGUMENT

Sanchez requests oral argument because of the substantial questions of fact and law presented by this appeal, some of which are issues of first impression in this Circuit, and because of the severity of the penalty at issue. *See* 11th Cir. R. 28-1(c) & 34-3(c).

## TABLE OF CONTENTS

**PAGE**

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Statement Regarding Oral Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xv

Statement of Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Regarding Adoption of Briefs of Other Parties. . . . . . . . . . . . . . . . . . . 1

Statement of the Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of the Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      Course of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      A.    The Guilt-Innocence Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         1.    Sanchez worked for Varela in a drug conspiracy supplied by Luis Escobedo.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         2.    The Escobedos were murdered on the side of the Florida Turnpike... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         3.    The government could prove only that Sanchez was present near the scene... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

         4.    The evidence showed no clear motive for the murders.. . . . . 19

## TABLE OF CONTENTS CONTINUED

**PAGE**

5. The Varela conspiracy may have been providing counter-surveillance for Escobedo.. . . . . . . . . . . . . . . . . . . . . . . . . . . 21

6. The government relied on "Crackhead Kevin" Vetere to fill in some of the gaps in its case.. . . . . . . . . . . . . . . . . . . . . . . . 23

7. A "wheelbarrow" of "other highly prejudicial evidence" was admitted during the trial.. . . . . . . . . . . . . . . . . . . . . . . . . . 27

  a. The Shooting Evidence. . . . . . . . . . . . . . . . . . . . . . . . . 27

  b. The Drug-Trafficking Evidence.  . . . . . . . . . . . . . . . . . . . 30

  c. Troya's Confessions. . . . . . . . . . . . . . . . . . . . . . . . . . . 31

8. The government portrayed Sanchez as a "Thug Enforcer," based on the "other evidence.". . . . . . . . . . . . . . . . . . . . . . . 32

9. The government vouched for its case and promised to prosecute Varela for murder.. . . . . . . . . . . . . . . . . . . . . . . . 33

10. The jury deliberated several days and asked to see the AK-47, before returning guilty verdicts.. . . . . . . . . . . . . . . . . . . . . . 34

B. The Penalty Phase. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

 The Government's Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

 The Defense Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1. Sanchez suffers low intellectual functioning and severe learning disabilities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

## TABLE OF CONTENTS CONTINUED

**PAGE**

2.   Sanchez's home life was unsupportive, turbulent and violent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

3.   Sanchez became a father and temporarily settled down at age 19.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

4.   "Hurricane Varela" disrupted the fragile family life Sanchez and Ms. Lopez had built.. . . . . . . . . . . . . . . . . . . . . . . 41

5.   Sanchez remained devoted to parenting his son, Three. . . . . . 42

6.   Government research explained that multiple circumstances in Sanchez's life made him vulnerable.. . . . . . . . . . . . . . . . . . 43

7.   Sanchez adjusted well to pretrial detention.. . . . . . . . . . . . . 44

8.   The district court's rulings undermined the jury's ability to consider Sanchez's mitigation... . . . . . . . . . . . . . . . . . . . . 46

     a.  Evidence About Sanchez's Relationship With Three. . . . . 47

     b.  Dr. Brannon's Testimony. . . . . . . . . . . . . . . . . . . . . . 49

9.   The government improperly told the jury Sanchez's mitigation didn't matter... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

10.  The jury imposed split verdicts: Life for killing the parents and the whole family, death for killing the children.. . . . . . . . . . 53

Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## TABLE OF CONTENTS CONTINUED

**PAGE**

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

I.
[Adequacy of Voir Dire]
The district court's failure to identify jurors who would automatically impose the death penalty resulted in a jury unqualified to sit in this capital case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A.      The court's process for "life"-qualification did not directly address the key issues in the case, employed primarily "follow the law"-type questions, and elicited almost no information from jurors.. . . . . . . . . . . . . . . . . . . . . . 75

B.      The voir dire was insufficient to identify jurors whose pro-death-penalty biases disqualified them from serving. . . . . . . . . . . . . . . . . . . . . . . . . . . 84

  1.      The court refused to ask the simple, basic question required by *Morgan* — whether each juror would always vote for the death penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

  2.      The court improperly refused to explore whether prospective jurors held any opinions that would prevent them from following the statutory requirement to consider mitigating factors involving Sanchez's "background, record, or character.". . . . . . . . . . . . . . . . 88

  3.      Given the facts of this case, *Morgan* also required that the district court inquire whether jurors would impose the death penalty for someone who had killed two small children. . . . . . . . . . . . . . . . . 93

  4.      The court refused to say that Sanchez was charged with committing an "intentional killing," *i.e.*, "murder," preventing the court from identifying prospective jurors who would automatically vote for death on conviction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

## TABLE OF CONTENTS CONTINUED

**PAGE**

C.      The serious deficiencies in the court's capital voir dire require a new sentencing hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

II.
[*Batson*/*J.E.B.*]
In denying Sanchez's *Batson* challenge to the government's use of peremptory strikes against black and female jurors, the court erred by failing to consider the factors the Supreme Court has recognized are probative of discrimination.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

A.      When Sanchez complained about the government's pattern of striking veniremembers based on race and gender, the court simply accepted prosecution's race-neutral reasons at face value.. . . . . . . . . . . . . . . . . . . 104

B.      The government's reasons for the contested strikes are not supported by the record, and are belied by its lack of questioning about the supposed areas of concern and by its acceptance of closely similar white or male jurors.. . . 107

    1.      Daisy Phillips. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

    2.      Melissa Silva.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    3.      Genevieve Meckes, Yanick Rankine, and Sally Perez.. . . . . . . . . . . 111

C.      This Court should consider Sanchez's comparative-juror arguments and other factors probative of discrimination apparent from the record, even though they were cited to the district court.. . . . . . . . . . . . . . . . . . . . . . 114

D.      Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

## TABLE OF CONTENTS CONTINUED

**PAGE**

### III.

[Unanimous Exercise of Peremptory Challenges]
The district court abused its discretion by requiring the capital and noncapital defendants to unanimously exercise twenty peremptory challenges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

A.    The district court's unanimity requirement impaired Sanchez's ability to select an impartial jury because of the conflict of interest between capital and noncapital defendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

B.    Sanchez was prejudiced by his inability to strike jurors Manning and Minutoli during the penalty phase.. . . . . . . . . . . . . . . . . . . . . . . . . . 125

### IV.

[404(b) Evidence of Shootings]
Evidence of Sanchez's involvement in several shooting and firearm incidents that were unrelated to the charged offenses unfairly prejudiced Sanchez by strongly suggesting a propensity to engage in violence and to shoot at innocent victims, and was exploited during the government's summation to support conviction on the capital charges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

A.    The evidence of the Suwanee Drive shooting in April 2006 should have been excluded under Rule 404(b) because it was at best only marginally probative of Sanchez's uncontested intent to possess guns six months later, and any probative value was outweighed by unfair prejudicial effect under Rule 403.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

B.    The government engaged in misconduct in closing argument by improperly using the Suwanee Shooting incident along with the other shooting and firearms incidents as evidence that Sanchez had a propensity for violence and shooting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

## TABLE OF CONTENTS CONTINUED

**PAGE**

C.      The erroneous admission of evidence showing a propensity for violence and shooting, and the government's exploitation of this evidence in summation, unfairly prejudiced the jury's consideration of the capital charges... . . . . 142

V.
[Other-drug-crimes evidence]
Testimony of uncharged drug trafficking by Varela outside the time period of the drug trafficking conspiracy was not admissible as "intrinsic evidence" or as other crimes evidence under Fed. R. Evid. 404(b), and prejudiced Sanchez by portraying him as involved with a major drug dealer.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

A.      The testimony of Malik Mullino.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

B.      The testimony of Mario Calderon. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

C.      The other-drug-crimes evidence was not admissible either as intrinsic evidence or as evidence of intent under Fed. R. Evid. 404(b).. . . . . . . . . 152

D.      The other-drug-crimes evidence was also inadmissible under Fed. R. Evid. 403 because it was unfairly prejudicial.. . . . . . . . . . . . . . . . . . . . . . . . . . 156

E.      The erroneous admission of the prejudicial other-drug-crimes evidence cannot be deemed harmless.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

VI.
[*Bruton* Error]
The introduction of Troya's statements admitting to the murder of children and attempts to cover-up the crime violated Sanchez's Sixth Amendment and Due Process rights under *Bruton,* because these statements, seen in light of the government's whole case, compelled the inference of Sanchez's guilt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

## TABLE OF CONTENTS CONTINUED

**PAGE**

A.      Troya's confessions to involvement in the murders and the coverup.. . . . 162

B.      The introduction of Troya's confessions violated *Bruton* because, in light of the government's whole case, they incriminated Sanchez.. . . . . . . . . . . 165

C.      The prosecutor in rebuttal made explicit the prejudicial inference that Troya's confessions incriminated Sanchez.. . . . . . . . . . . . . . . . . . . . . 171

D.      *Bruton* applies to nontestimonial as well as testimonial statements of codefendants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

E.      The *Bruton* error was not harmless beyond a reasonable doubt.. . . . . . . 176

VII.
[Guilt-Innocence Phase Cumulative Error]
The district court's multiple evidentiary errors in the guilt phase rendered Sanchez's guilt-phase trial unfair and require reversal of his convictions under the cumulative error doctrine.. . . . . . . . . . . . . . . . . . . 178

VIII.
["Execution Impact" Testimony and Instructions]
The court's evidentiary rulings and instructions to the jury regarding Sanchez's relationship with his son prevented the jury from giving effect to important mitigation about Sanchez's character, in violation of the Eighth Amendment and the Federal Death Penalty Act.. . . . . . . . . 182

A.      The defense carefully tailored the mitigation presentation regarding Sanchez's relationship with Three to comply with the court's (incorrect) ruling that "execution impact" evidence is inadmissible.. . . . . . . . . . . . . 184

## TABLE OF CONTENTS CONTINUED

**PAGE**

B.    The court prevented the jury from considering much of Sanchez's evidence by refusing to submit proposed mitigators about Sanchez's relationship with his son and by instructing the jury to give limited consideration to Sanchez's role as a father... . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

      1.    The court rejected proposed mitigating factors regarding Sanchez's relationships with Three and other family members... . . . . . . . . . . 188

      2.    The court's instructions diluted the sole mitigating factor that addressed Sanchez's relationship with Three.. . . . . . . . . . . . . . . . . 192

C.    The testimony offered by Sanchez was relevant mitigation concerning his character.  Under the Eighth Amendment and the FDPA, Sanchez was entitled to have the jury consider this evidence as a basis for a sentence less than death.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

D.    Under the Eighth Amendment and the FDPA, Sanchez was entitled both to present and to have the jury consider as a mitigating factor execution impact evidence about the grief and loss his family would suffer if he were executed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

E.    The court's exclusion of relevant character evidence and execution impact evidence, its refusal to permit the jury to consider mitigation related to Sanchez's future contributions as a father, co-parent and inmate, and its instruction that jurors ignore such mitigation, prejudiced Sanchez.. . . . . 204

**TABLE OF CONTENTS CONTINUED**

**PAGE**

IX.

[Fifth & Sixth Amendments - Statements to Government Expert]
The district court improperly permitted testimony based on Sanchez's
compelled statements to a government psychologist that went beyond
the scope of the defense intellectual functioning evaluation, in
violation of the Fifth and Sixth Amendments and Federal Rule of
Criminal Procedure 12.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

A.      Sanchez's statements to a government psychologist about his life
history and mental health status were not proper rebuttal of the
defense expert's intelligence testing or the lay and expert witness
testimony about Sanchez's history and resulting risk factors.. . . . . . . . . . 209

   1.      Sanchez presented limited evidence of his learning disabilities, lay
witness testimony about his turbulent childhood, and sociological
data about risk factors for criminal behavior... . . . . . . . . . . . . . . . 209

      a.      Dr. Grant's testimony about intellectual functioning.. . . . . . 209

      b.      Lay witness testimony about Sanchez's childhood... . . . . . . 211

      c.      Dr. Reidy's general testimony about social science research on
"risk factors.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

   2.      The district court improperly refused to limit the prosecution's expert
to testing and testimony about Sanchez's intellectual functioning,
violating the Fifth Amendment and Federal Rule of Criminal
Procedure 12.2.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

   3.      Sanchez was prejudiced by the introduction of the clinical interview
and personality testing, which effectively made him a witness against
himself in the penalty phase of his capital trial.. . . . . . . . . . . . . . 227

## TABLE OF CONTENTS CONTINUED

**PAGE**

B.      Admission of Sanchez's PAI Test Results was improper because the test was administered in violation of his Sixth Amendment right to assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

X.
[Improper Closing Argument]
The government violated Sanchez's rights under the Due Process Clause, the Sixth Amendment, and the Eighth Amendment, by making improper closing arguments, which effectively nullified Sanchez's case in mitigation.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

A.      The government's unfounded suggestion that Varela would face future capital prosecution was prejudicial. . . . . . . . . . . . . . . . . . . . . . . . . . . 238

B.      The government's attempt to cast Sanchez's mitigation as an "excuse" was prejudicial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 240

XI.
[Consequences of Deadlock]
The court's instructions and the verdict sheet created the risk of a coerced, arbitrary death sentence by neglecting to explain that even if jurors deadlocked and Sanchez received a "lesser sentence" of a "term of years," the result still would be a *de facto* sentence of life imprisonment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241

XII.
[Other Uncharged Serious Acts of Violence]
The court's instructions improperly invited jurors to find and weigh the non-statutory aggravating factor that Sanchez had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 246

## TABLE OF CONTENTS CONTINUED

**PAGE**

XIII.
[Penalty Phase Cumulative Error]
Multiple errors in the penalty phase rendered Sanchez's sentencing hearing unfair and require reversal of his death sentences under the cumulative error doctrine and 18 U.S.C. § 3595.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 253

Certificate of Compliance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 254

Certificate of Service.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 255

Addendum

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                       **PAGE**

*Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 96

*Batson v. Kentucky*, 476 U.S. 79 (1986). . . . . . . . . . . . . . . . . . . . . . . . . 102, 124

*Battie v. Estelle*, 655 F.2d 692 (5th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . 222

*Berger v. United States*, 295 U.S. 78 (1935). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Boyde v. California*, 494 U.S. 370 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . 244

*Brown v. Sanders*, 546 U.S. 212 (2006).  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

*Brown v. United States*, 356 U.S. 148 (1958). . . . . . . . . . . . . . . . . . . . . . . . . 222

*Bruton v. United States*, 391 U.S. 123 (1968). . . . . . . . . . . . . . . . . . . . . . *Passim*

*Buchanan v. Kentucky*, 483 U.S. 402 (1987). . . . . . . . . . . . . . . . . . . . . . 221, 231

*Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997).  . . . . . . . . . . . . . . . . . . . . . 115

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . 251

*Chambers v. Mississippi*, 410 U.S. 284 (1973). . . . . . . . . . . . . . . . . . . . . 178, 250

*Chapman v. California*, 386 U.S. 18 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 251

*Crawford v. Washington*, 541 U.S. 36 (2004). . . . . . . . . . . . . . . . . . . . . . 173, 174

*Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007).  . . . . . . . . . . . . . . . . . . . . . . . 204

*Davis v. Washington*, 547 U.S. 813 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 174

*Delguidice v. Singletary*, 84 F.3d 1359 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . 233

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*Eddings v. Oklahoma*, 455 U.S. 104 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . 196

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991).. . . . . . . . . . . . . . . 103

*Estelle v. Smith*, 451 U.S. 454 (1981). . . . . . . . . . . . . . . . . . . 208, 221, 222, 229

*Ford v. Wainwright*, 477 U.S. 399 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 118

*Gaines v. Kelly*, 202 F.3d 598 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 244

*Graham v. Collins*, 506 U.S. 461 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 201

*Gray v. Maryland*, 523 U.S. 185 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 166

*Green v. Johnson*, 160 F.3d 1029 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . 100

*J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). . . . . . . . . . . . . . . . . 102, 113

*Jones v. Dugger*, 839 F.2d 1441 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . 221

*Jordan v. Lippman*, 763 F.2d 1265 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . 95

*Lambright v. Schriro*, 490 F.3d 1103 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . 89

*Lockett v. Ohio*, 438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

*Lowenfield v. Phelps*, 484 U.S. 231 (1988). . . . . . . . . . . . . . . . . . . . . . . . . 245

*McGahee v. Alabama Department of Corrections*, 560 F.3d 1252
  (11th Cir. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106, 110

*Michigan v. Bryant*, 131 S. Ct. 1143 (2011). . . . . . . . . . . . . . . . . . . . . . . . 175

*Miller-El v. Dretke*, 545 U.S. 231 (2005). . . . . . . . . . . . . . . . . . . . . . . . *Passim*

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*Mitchell v. United States*, 526 U.S. 314 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . 222

*Monachelli v. Warden, SCI Graterford*, 884 F.2d 749 (3d Cir. 1989). . . . . . . . . 176

*Montana v. Egelhoff*, 518 U.S. 37 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*Morgan v. Illinois*, 504 U.S. 719 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Morris v. Woodford*, 273 F.3d 826 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . 243

*Nelson v. Quarterman*, 472 F.3d 287 (5th Cir. 2006). . . . . . . . . . . . . . . . . . 204, 205

*Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005). . . . . . . . . . . . . . . . . . 229

*Old Chief v. United States*, 519 U.S. 172 (1997). . . . . . . . . . . . . . . . . . . . . 134, 152

*Osborne v. Ohio*, 495 U.S. 103 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

*Parker v. Allen*, 565 F.3d 1258 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 108, 109

*Parker v. Randolph*, 442 U.S. 62 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . 229

*Payne v. Arkansas*, 356 U.S. 560 (1958). . . . . . . . . . . . . . . . . . . . . . . . . . . . 231

*Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . 88, 201

*Pointer v. Texas*, 380 U.S. 400 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175

*Pointer v. United States*, 151 U.S. 396 (1894). . . . . . . . . . . . . . . . . . . . . . . . 124

*Porter v. McCollum*, 130 S. Ct. 447 (2009). . . . . . . . . . . . . . . . . . . . . . . . 205, 230

*Powell v. Texas*, 492 U.S. 680 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . *Passim*

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*Powers v. Ohio*, 499 U.S. 400 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . 115

*Richardson v. Marsh*, 481 U.S. 200 (1987). . . . . . . . . . . . . . . . . . . . . 166, 169, 172

*Richardson v. United States*, 526 U.S. 813 (1999). . . . . . . . . . . . . . . . . . . . . . 247

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981). . . . . . . . . . . . . . . . 54, 85, 123

*Ross v. Oklahoma*, 487 U.S. 81 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

*Satterwhite v. Texas*, 486 U.S. 249 (1988). . . . . . . . . . . . . . . . . . 229, 231, 232, 235

*Skilling v. United States*, 130 S. Ct. 2896 (2010). . . . . . . . . . . . . . . . . . . . . . 78, 229

*Skipper v. South Carolina*, 476 U.S. 1 (1986). . . . . . . . . . . . . . . . . . . . . . . . *Passim*

*Smith v. Estelle*, 602 F.2d 694 (5th Cir. 1979), *aff'd*, 451 U.S. 454 (1981). . . . . 233

*Smith v. Texas*, 543 U.S. 37 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*Snyder v. Louisiana*, 552 U.S. 472 (2008). . . . . . . . . . . . . . . . . . . . 105, 110, 115

*Stenson v. Lambert*, 504 F.3d 873 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . 197, 199

*Stringer v. Black*, 503 U.S. 222 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

*Swain v. Alabama*, 380 U.S. 202 (1965). . . . . . . . . . . . . . . . . . . . . . . . . 123, 124

*Taylor v. Kentucky*, 436 U.S. 478 (1978). . . . . . . . . . . . . . . . . . . . . . . . 178, 250

*Tennard v. Dretke*, 542 U.S. 274 (2004). . . . . . . . . . . . . . 69, 88, 196, 204, 205, 237

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*Turner v. Murray*, 476 U.S. 28 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*United States v. Al-Moayad*, 545 F.3d 139 (2d Cir. 2008). . . . . . . . . . . . . . 178, 251

*United States v. Ash*, 413 U.S. 300 (1973). . . . . . . . . . . . . . . . . . . . . . . . . 234

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005). . . . . . . . . . . . . . . . . *Passim*

*United States v. Battle*, 173 F.3d 1343 (11th Cir. 1999). . . . . . . . . . . . . . . . . 184

*United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997). . . . . . . . . . . . . . . 224

*United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978). . . . . . . . . . . . . . . 152, 156

*United States v. Bledsoe*, 531 F.2d 888 (8th Cir. 1976). . . . . . . . . . . . . . . . . 181

*United States v. Brokemond*, 959 F.2d 206 (11th Cir. 1992). . . . . . . . . . . . . . . . 56

*United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006). . . . . . . . . . . . . . . . . . 86

*United States v. Byers*, 740 F.2d 1104 (D.C. Cir. 1984). . . . . . . . . . . . . . . 215, 222

*United States v. Calderon*, 127 F.3d 1314 (11th Cir. 1997). . . . . . . . . . . . . . . . 141

*United States v. Cameron*, 907 F.2d 1051 (11th Cir. 1990). . . . . . . . . . . . . . . . 55

*United States v. Cardenas*, 895 F.2d 1338 (11th Cir. 1990). . . . . . . . . . . . . . . . 154

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . 100

*United States v. Chandler*, 996 F.2d 1073 (11th Cir. 1993). . . . . . . . . . . . . . 92, 99

*United States v. Church*, 955 F.2d 688 (11th Cir. 1992). . . . . . . . . . . . . . 137, 153

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*United States v. Dale*, 614 F.3d 942 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . 175

*United States v. Dohan*, 508 F.3d 989 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . 56

*United States v. Doherty*, 233 F.3d 1275 (11th Cir. 2000). . . . . . . . . . . . . . 55, 177

*United States v. Edelin*, 134 F. Supp. 2d 45 (D.D.C. 2001). . . . . . . . . . . . . . . . 225

*United States v. Edouard*, 485 F.3d 1324 (11th Cir. 2007). . . . . . . . . . 133, 153, 248

*United States v. Fell*, 372 F. Supp. 2d 766 (D. Vt. 2005). . . . . . . . . . . . . . . . . . 90

*United States v. Fell*, 531 F.3d 197 (2d Cir. 2008). . . . . . . . . . . . . . . . . . 88, 100

*United States v. Felts*, 579 F.3d 1341 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . 56

*United States v. Fernandez*, 496 F.2d 1294 (5th Cir. 1974). . . . . . . . . . . . . . . . 141

*United States v. Fields*, 516 F.3d 923 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . 95

*United States v. Figueroa-Cartagena*, 612 F.3d 69 (1st Cir. 2010). . . . . . . . . . . 175

*United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995). . . . . . . . . . . . . 92, 93, 96, 100

*United States v. Foster*, 889 F.2d 1049 (11th Cir. 1989). . . . . . . . . . . . . . . . . . 153

*United States v. Fulks*, 454 F.3d 410 (4th Cir. 2006). . . . . . . . . . . . . . . . . . . . 100

*United States v. Garber*, 471 F.2d 212 (5th Cir. 1972). . . . . . . . . . . . . . . . 141, 144

*United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999). . . . . . . . . . . . . . . . . . . . 122

*United States v. Hall*, 152 F.3d 381 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . 92

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*United States v. Hands*, 184 F.3d 1322 (11th Cir. 1999).. . . . . . . . . . . . . . 136, 143

*United States v. Hansen*, 262 F.3d 1217 (11th Cir. 2001). . . . . . . . . . . . . . . . . 55

*United States v. Harris*, 542 F.2d 1283 (7th Cir. 1976).. . . . . . . . . . . . . . . . 121

*United States v. Haworth*, 942 F. Supp. 1406 (D.N.M. 1996).. . . . . . . . . . . . . 224

*United States v. Honken*, 381 F. Supp. 2d 936 (N.D. Iowa 2005). . . . . . . . . . . . . 94

*United States v. Hooper*, 575 F.2d 496 (5th Cir. 1978). . . . . . . . . . . . . . . . . 122

*United States v. Houston*, 456 F.3d 1328 (11th Cir. 2006). . . . . . . . . . 114, 115, 116

*United States v. Jiminez*, 224 F.3d 1243 (11th Cir. 2000). . . . . . . . . . . . . . . . 55

*United States v. Johnson*, 362 F. Supp. 2d 1043 (N.D. Iowa 2005). . . . . . . . . . . 233

*United States v. Johnson*, 366 F. Supp. 2d 822 (N.D. Iowa 2005). . . . . . . . . . . . 92

*United States v. Johnson*, 495 F.3d 951 (8th Cir. 2007). . . . . . . . . . . . . . . . . 87

*United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009). . . . . . . . . . . . . . . . . 175

*United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011). . . . . . . . . . . . . . 9, 122, 174

*United States v. Marshall*, 173 F.3d 1312 (11th Cir. 1999).. . . . . . . . . . . . . . . 143

*United States v. Martinez-Salazar*, 528 U.S. 304 (2000).. . . . . . . . . . . . . . . 124

*United States v. McSherry*, 226 F.3d 153 (2d Cir. 2000).. . . . . . . . . . . . . . . 222

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998).. . . . . . . . . . . . . 56, 158

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*United States v. Moore*, 174 Fed. Appx. 540 (11th Cir. 2006). . . . . . . . . . . . . . 135

*United States v. Moss*, 290 Fed. Appx. 234 (11th Cir. 2008). . . . . . . . . . . . . . . 136

*United States v. Nell*, 526 F.2d 1223 (5th Cir. 1976).. . . . . . . . . . . . . . 54, 118, 125

*United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001). . . . . . . . . . . . . . . . . . 55

*United States v. O'Reilly*, 2010 WL 653188 (E.D. Mich. Feb. 19, 2010). . . . . . . 224

*United States v. Paul*, 217 F.3d 989 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . 100

*United States v. Peoples*, 74 F. Supp. 2d 930 (W.D. Mo. 1999). . . . . . . . . . . . . . 90

*United States v. Quinones*, 511 F.3d 289 (2d Cir. 2007). . . . . . . . . . . . . . . . . . . 91

*United States v. Rowe*, 437 Fed. Appx. 800 (11th Cir. Aug. 11, 2011). . . . . . . . . 114

*United States v. Ruff*, 717 F.2d 855 (3d Cir. 1983). . . . . . . . . . . . . . . . . . . . . 176

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004). . . . . 224, 225, 233

*United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007). . . . . . . . . . . . . . . . . . . . 91

*United States v. Schwartz*, 541 F.3d 1331 (11th Cir. 2008).. . . . . . . . . . . . . *Passim*

*United States v. Smalls*, 605 F.3d 765 (10th Cir. 2010).. . . . . . . . . . . . . . . . . . 175

*United States v. Sriyuth*, 98 F.3d 739 (3d Cir. 1996).. . . . . . . . . . . . . . . . . . . . 157

*United States v. Taylor*, 320 F. Supp. 2d 790 (N.D. Ind. 2004).  . . . . . 208, 217, 224

*United States v. Turner*, 474 F.3d 1265 (11th Cir. 2007). . . . . . . . . . . . . . . . . . 55

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*United States v. Utter*, 97 F.3d 509 (11th Cir. 1996).. . . . . . . . . . . . . . . . . . . . 137

*United States v. Veltman*, 6 F.3d 1483 (11th Cir. 1993). . . . . . . . . . . . . . . . . . . 136

*United States v. Wade*, 388 U.S. 218 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . 232

*United States v. Whitten*, 610 F.3d 168 (2d Cir. 2010). . . . . . . . . . . . . . . . . . 92, 99

*United States v. Williams*, 731 F. Supp. 2d 1012 (D. Haw. 2010).. . . . . . 218, 224-26

*United States v. Wood*, 207 F.3d 1222 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . 252

*Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . 172

*Vincent v. Parke*, 942 F.2d 989 (6th Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . 176

*Whorton v. Bockting*, 549 U.S. 406 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 174

*Wiggins v. Smith*, 539 U.S. 510 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230

*Woodson v. North Carolina*, 428 U.S. 280 (1976). . . . . . . . . . . . . . . . . . . . . . 123

**STATE CASES**                                                                **PAGE**

*Fuller v. State*, 827 S.W.2d 919 (Tex.Cr.App. 1992). . . . . . . . . . . . . . . . . . . . 205

*People v. Bennett*, 199 P.3d 535 (Cal. 2009).. . . . . . . . . . . . . . . . . . . . . . . . . 199

*People v. Ervin*, 990 P.2d 506 (Cal. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004).. . . . . . . . . . . . . . . . . . . . . . . 243

*Sexton v. State of Texas*, 93 S.W.3d 96 (Tex.Crim.App. 2002).. . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

*State v. Stenson*, 940 P.2d 1239 (Wash. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . 205

**DOCKETED CASES**                                                    **PAGE**

*United States v. Bourgeois*, No. CR-C-02-216 (S.D. Tex. Apr. 20, 2002). . . . . . . 94

*United States v. Mitchell*, No. CR-01-01062-PCT-MHM
   (D. Ariz. Apr. 1, 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**FEDERAL STATUTES**                                                  **PAGE**

18 U.S.C. § 924(c)(1)(A)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

18 U.S.C. § 924(c)(1)(C)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 244

18 U.S.C. § 2119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 98, 243

18 U.S.C. § 2119(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3592(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237, 239

18 U.S.C. § 3592(a)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73, 88, 236

18 U.S.C. § 3593(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

18 U.S.C. § 3595. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 250

18 U.S.C. § 3595(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 251, 252

18 U.S.C. § 3595(c)(2)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245

# TABLE OF AUTHORITIES CONTINUED

**PAGE**

18 U.S.C. § 924(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 97, 243

18 U.S.C. §1111(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

21 U.S.C. § 841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 244

21 U.S.C. § 841(a)(1), (b)(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

21 U.S.C. § 841(b)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 244

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243

21 U.S.C. § 851. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 243, 244

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**OTHER AUTHORITIES**                                                    **PAGE**

11th Cir. R. 28-1(c) & 34-3(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

11th Cir. R. 28-1(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 28(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 12.2. . . . . . . . . . . . . . . . . . . . . . . . . . 205, 208, 216, 223, 232

Fed. R. Crim. P. 12.2(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208, 216, 223

Fed. R. Crim. P. 12.2(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 216, 232

Fed. R. Crim. P. 24(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Fed. R. Crim. P. 24(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

Fed. R. Crim. P. 24(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

Fed. R. Evid. 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 196

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 144, 145, 152

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text revision 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Daphne Duret, *Brutality to Children in Turnpike Killings Left Juror No Doubts*, Palm Beach Post, at A1A (Apr. 3, 2009). . . . . . . . . . . . . . . . . . 10, 96, 240, 245

Declaration of Kevin J. McNally, Director, Federal Death Penalty Resource Counsel Project (Sept. 18, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

Declaration of Kevin McNally Regarding Execution Impact Testimony (Jan. 25, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202

Gary Groth-Marnat, *Handbook of Psychological Assessment* 75 (4th ed. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

John Blume et al., *"Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209 (Summer 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Marla Sandys & Adam Trahan, *Life Qualification: Automatic Death Penalty Voter Status and Juror Decision Making in Capital Cases*, 29 Just. Sys. J. 385 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

Scott E. Sundby, *The Capital Jury and Empathy: The Problem of Worthy and Unworthy Victims*, 88 Cornell L. Rev. 343 (2003). . . . . . . . . . . . . . . . . . . . . . 95

## TABLE OF AUTHORITIES CONTINUED

**PAGE**

Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?,* 98 Colum. L. Rev.1538 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 250

Susannah Sheffer & Renny Cushing, *Creating More Victims: How Executions Hurt the Families Left Behind:  A Report by Murder Victims' Families for Human Rights* (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

Ursula Bentele & William J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse,* 66 Brook. L. Rev. 1011 (Summer 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

## STATEMENT OF JURISDICTION

Sanchez appeals from the judgment of conviction and death sentence entered on May 13, 2009, by the United States District Court for the Southern District of Florida (Hurley, J.).  (DE899).  Sanchez timely filed his notice of appeal on May 15, 2009.  (DE901).  Jurisdiction in the district court was conferred by 18 U.S.C. § 3231.  Appellate jurisdiction is invoked pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3595.

## STATEMENT REGARDING ADOPTION OF BRIEFS OF OTHER PARTIES

Pursuant to Federal Rule of Appellate Procedure 28(I) and 11th Cir. R. 28-1(f), Sanchez hereby adopts in full the following portions of the brief filed on behalf of Appellant Daniel Troya in *United States of America v. Daniel Troya*, No. 09-12716P:[1]

3.      The court erred in excluding critical, reliable expert testimony that Troya would make a positive adjustment to prison and could safely be managed if sentenced to life.  This testimony, which is routinely admitted in other federal capital cases, was directly relevant to rebut extensive government evidence and argument implying that Troya would be violent or present an escape risk while incarcerated, and was also independently admissible as mitigation.

---

[1] Although the headings in Troya's brief use his name, the issues apply equally to Sanchez.  The headings are stated here as they are stated in his brief simply to avoid confusion as to which issues are being adopted.

1

5.      The jury's critical aggravation findings that Troya had substantially planned in advance the killings of the two child victims and done so to eliminate them as witnesses lacked legally sufficient supporting evidence.  There was no proof that he even knew the children were in the car with their parents, and the government itself acknowledged that they may even have been collateral casualties, killed by bullets intended for their parents.

6.      The government failed to present legally sufficient evidence to support the statutory vulnerable-victim aggravating factor as to the two counts for which Troya was sentenced to die, because there was no proof that the youth of the child victims facilitated their shooting deaths, which courts have consistently required before applying this factor.

7.      The jury wrongly weighed the aggravating factor of pecuniary-gain in sentencing Troya to die for the deaths of the two child victims, since the government did not prove, or even allege that they were murdered to effectuate the theft of their father's jeep or the drugs it contained, a well-established prerequisite for applying this factor.

11.     The court violated Troya's Sixth Amendment right to jury trial by refusing to instruct jurors that the aggravating factors needed to outweigh the mitigating ones "beyond a reasonable doubt" before they could vote for a death sentence, since the weighing determination constituted a factual finding essential to his eligibility for a death sentence.

Sanchez also adopts Troya's Issues 8, 9, 10 & 12, but, because these issues

involve facts specific to Sanchez's case and distinct from Troya's, Sanchez has

also submitted limited argument on these points (*see* Points XII, X, XI):

8.      The court's instructions invited the jury to find and weigh the non-statutory aggravating factor that Troya had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such crime, or, indeed, any particular one.  This improperly circumvented the reasonable-doubt and unanimity requirements of the Federal Death Penalty Act and the Constitution.

2

9.       The prosecutors engaged in serious misconduct by falsely vouching to jurors that Daniel Varela, the kingpin of the drug operation and the apparent instigator of the murders, would continue to be investigated and would ultimately be capitally prosecuted, and, thus, that they should disregard the mitigating factor, explicitly recognized by Congress in the Federal Death Penalty Act, that an equally culpable co-defendant is not facing the death penalty.

10.       The court's instructions, as amplified by the government's summation, wrongly conveyed to jurors that a mitigating factor unconnected to the crime presumptively carried no significance.  This prejudiced the jury's consideration of Troya's central mitigating factors.

12.       The verdict sheet licensed jurors to return a not-unanimous verdict, but left them free to speculate about its consequences.  This, and the court's misleading instructions that a "lesser sentence" than life was possible — Troya actually could not have received less than 115 years, *de facto* life, even on a not-unanimous verdict — created the risk of a coerced, arbitrary death sentence.

In addition, Sanchez's Issues IV (404(b) Evidence of Shootings) and VIII

("Execution Impact" Testimony and Instructions), briefed herein, adopt portions of

Troya's Issues 1 & 8, on those same topics, to avoid duplication of argument.  *See*

Point IV, pp. 128-29 & n.63; Point VIII, pp. 203-04.

## STATEMENT OF THE ISSUES

### Jury Selection Issues

I.       The district court's failure to identify jurors who would automatically impose the death penalty resulted in a jury unqualified to sit in this capital case.

II.       In denying Sanchez's *Batson* challenge to the government's use of peremptory strikes against black and female jurors, the court erred by failing to consider the factors the Supreme Court has recognized are probative of

discrimination.

III.    The district court abused its discretion by requiring the capital and noncapital defendants to unanimously exercise twenty peremptory challenges.

## Guilt-Innocence Phase Issues

IV.    Evidence of Sanchez's involvement in several shooting and firearm incidents that were unrelated to the charged offenses unfairly prejudiced Sanchez by strongly suggesting a propensity to engage in violence and to shoot at innocent victims, and was exploited during the government's summation to support conviction on the capital charges.

V.    Testimony of uncharged drug trafficking by Varela outside the time period of the drug trafficking conspiracy was not admissible as "intrinsic evidence" or as other crimes evidence under Fed. R. Evid. 404(b), and prejudiced Sanchez by portraying him as involved with a major drug dealer.

VI.    The introduction of Troya's statements admitting to the murder of children and attempts to cover-up the crime violated Sanchez's Sixth Amendment and Due Process rights under *Bruton*, because these statements, seen in light of the government's whole case, compelled the inference of Sanchez's guilt.

VII.    The district court's multiple evidentiary errors in the guilt phase rendered Sanchez's guilt-phase trial unfair and require reversal of his convictions under the cumulative error doctrine.

## Penalty Phase Issues

VIII.    The court's evidentiary rulings and instructions to the jury regarding Sanchez's relationship with his son prevented the jury from giving effect to important mitigation about Sanchez's character, in violation of the Eighth Amendment and the Federal Death Penalty Act.

IX.    The district court improperly permitted testimony based on Sanchez's compelled statements to a government psychologist that went beyond the

4

scope of the defense intellectual functioning evaluation, in violation of the Fifth and Sixth Amendments and Federal Rule of Criminal Procedure 12.2.

X.     The government violated Sanchez's rights under the Due Process Clause, the Sixth Amendment, and the Eighth Amendment, by making improper closing arguments, which effectively nullified Sanchez's case in mitigation.

XI.    The court's instructions and the verdict sheet created the risk of a coerced, arbitrary death sentence by neglecting to explain that even if jurors deadlocked and Sanchez received a "lesser sentence" of a "term of years," the result still would be a *de facto* sentence of life imprisonment.

XII.   The court's instructions improperly invited jurors to find and weigh the non-statutory aggravating factor that Sanchez had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such act.

XIII.  Multiple errors in the penalty phase rendered Sanchez's sentencing hearing unfair and require reversal of his death sentences under the cumulative error doctrine and 18 U.S.C. § 3595.

## STATEMENT OF THE CASE

## COURSE OF PROCEEDINGS

In October 2006, Danny Varela, Daniel Troya, Ricardo Sanchez, Jr., and Liana Lopez were arrested in connection with a narcotics conspiracy, led by Varela.  (DE1, 2, 3, 4, 6).  The government later indicted them for multiple narcotics and weapons offenses.  (DE30, 113, 170, 305).  Troya and Sanchez were also indicted for the murders of another alleged drug dealer, Jose Luis Escobedo, his wife, Yessica Escobedo, and their sons, Luis Julian and Luis Damian

5

Escobedo.  (DE170, 305).  As noted, for the Court's convenience, a summary of the indictment is included in the Addendum to this brief at pp. 6-7.  The Addendum also contains a list of people, places, and vehicles referenced in the brief, at pp. 1-5, since the record in this case is so voluminous.

The final indictment contained five capital counts.  Count Six charged Troya and Sanchez with carjacking resulting in the deaths of all four Escobedos, in violation of 18 U.S.C. § 2119(3).  Counts Seven, Eight, Nine, and Ten charged them with using a firearm in connection with a crime of violence or drug trafficking crime, causing the deaths of Damian, Julian, Yessica, and Jose Luis Escobedo, respectively, in violation of 18 U.S.C. § 924(j).  (DE305:7-11).  The notice of special findings alleged as aggravating factors that Troya and Sanchez committed the killings for pecuniary gain and after substantial planning and premeditation, and that there were multiple victims, including two who were especially vulnerable by virtue of their youth.  (DE305:19-21).

After a jury trial, Sanchez was convicted of all the counts charged (as were all the other defendants).  At a sentencing hearing before the same jury, he was sentenced to death, even though the jury made significant mitigation findings related to his loving relationship with his son, limited intellectual functioning, troubled family background, and vulnerability to Varela.  (DE860).  A summary of

6

the mitigation findings made by the jury is contained in the Addendum at pp. 8-10.

Sanchez is currently incarcerated on the federal death row at the United States Penitentiary, Terre Haute, Indiana.

This appeal raises claims relating to all three stages of the trial: jury selection, the guilt-innocence phase, and the penalty phase.  The district court entertained many motions, objections, and requests for jury instructions, which are too numerous to catalog here, but which are identified in connection with the point(s) to which they are relevant.

Throughout the proceedings, by agreement, an objection for one defendant constituted an objection for all, sufficient to preserve the issue for appellate review.  (DE732:4052; *see also* DE254).

## STATEMENT OF FACTS

In 2006, Danny Varela was the leader of a cocaine-dealing operation in West Palm Beach, Florida.  Ricardo Sanchez, Jr. was one of several younger men and women who worked for Varela, preparing, packaging, and delivering drugs, and collecting money from customers.  (DE957:49, 54).  Sanchez was twenty-two years old and the father of a three year-old son.  He had dropped out of high school in tenth grade, having struggled since first grade in special education classes due to his low IQ and profound learning disabilities, which placed him

close to the diagnostic cut-off for mental retardation. *See post* Section B.1 at 36-37. After attempting to support his young family for several years in a series of menial jobs, Sanchez fell in with Varela, his older, flashier cousin, who paid him a modest weekly sum for his services to the drug operation. (DE824:8384-85, 8399; DE823:8190-91; DE847:9530-31).

The government's case against Sanchez for the murders could theorize possible motives, it could place him near (though not at) the scene of the crime, but it could not put a gun in his hand or prove that he fired a single shot, even through the testimony of its cooperating witnesses. Nor could the government account for evidence suggesting there were other people on the road with the Escobedos that night who could have been responsible for the murders. The government succeeded, however, in presenting the jury with irrelevant and highly prejudicial evidence of unrelated violent acts and prior drug dealing. On that basis, the government argued that Sanchez was the kind of person who would commit the killings charged here. The jury convicted him.

At Sanchez's penalty phase, his lawyers argued that the humiliation and social isolation engendered by his "borderline" intelligence (DE824:8461), along with the abuse he witnessed and suffered as a child, combined to make Sanchez uniquely susceptible to the influence of his cousin, Varela, who must have called

8

the shots on the killings, if the Varela organization was responsible.[2]  Many jurors shared this view.  In fact, a majority found that Sanchez was a "follower," not a leader, who was recruited by Varela due to their family relationship, and who was more vulnerable to Varela because of his low IQ.  *See* DE860:12-13.[3]

Among the most powerful arguments for life, the defense argued, was that an equally or more culpable co-defendant — the conspiracy's mastermind, Varela — had not been charged with the murders.  In fact, in both the guilt and penalty phase closing arguments, the government felt obliged to pledge to the jury that it would someday prosecute Varela for the murders and that he would face his own sentencing jury when that time came.  (DE767:7414; DE847:9637-38).  This never happened.  While Sanchez stands convicted of capital murder and faces execution, Varela is serving a life sentence on his drug and weapons convictions.[4]  Although jurors appeared to see the inequity in this — ten found the statutory mitigator that

---

[2] At Varela's sentencing, the district court found him "as much responsible for the killings of the Escobedo family as Mr. Troya and Mr. Sanchez[,] . . . calling the shots from his home base in Palm Beach County."  (DE957:55).

[3] Jurors also made a multitude of other mitigation findings in favor of Sanchez — 30 in total — mostly related to his background and characteristics.  *See* DE860:12-16.  None of these were found unanimously, however.  *Id.*

[4] This Court's opinion in Varela's case (and Lopez's) is found at *United States v. Lopez*, 649 F.3d 1222 (11th Cir. 2011).

an equally culpable co-defendant would not face the death penalty — the press reported that they were swayed by the government's pledge. *See* Daphne Duret, *Brutality to Children Left Juror No Doubts*, Palm Beach Post at A1A (Apr. 3, 2009) (quoting juror who commented that "the biggest travesty in this case is that Danny Varela wasn't sitting at that table," but also pointed out prosecutor's statement that authorities were still investigating).

This appeal addresses the evidentiary and other errors that led the jury to convict and impose the death penalty on Sanchez, despite the powerful mitigation findings many jurors made in his favor. As outlined in the Summary of Argument, *post,* pp. 57-71, these errors included: voir dire inadequate to identify unqualified jurors; admission of irrelevant and prejudicial evidence about other shootings and drug crimes; exclusion of important mitigation regarding Sanchez's role as a father; attacks on Sanchez's other mitigation that violated the Fifth and Sixth amendments; and improper argument by the prosecutors at both the guilt and penalty phases.[5] These errors culminated in split verdicts: death for the counts charging the murders of the two children, and life for the counts charging the

---

[5] Other important errors presented in Troya's brief included insufficient proof of four significant aggravating factors central to the death sentences (Points V-VII), exclusion of critical rebuttal on future danger (Point III), and various instructional errors (Points VIII, X, XI, XII).

murders of the parents and the entire family.

This statement of facts aims to give the Court an overview of the evidence in this lengthy trial. Additional facts pertinent to the individual claims are further developed in connection with those points later in the brief.

## A.      The Guilt-Innocence Trial

### 1.      Sanchez worked for Varela in a drug conspiracy supplied by Luis Escobedo.

The indictment alleged a drug conspiracy dating from approximately May through October 2006. Escobedo, who transported drugs from Texas and Mexico to Florida (DE753:5711), supplied Varela. Escobedo and Varela were seen together both in Texas and in Florida on more than one occasion (DE:730:3664-65; DE:738:4528-29, 4592), and the names of Varela and his subordinates appeared in Escobedo's drug ledger (DE:731:3872-74; DE:758:6475-77). On the night he was killed, Escobedo allegedly was transporting 15 kilograms of cocaine in his Jeep. (DE754:5510; DE764:6834; DE766:7088; DE767:7437).

The conspiracy involved the four named co-defendants (Varela, Daniel Troya — who was also accused of the murders — Sanchez, and Liana Lopez), as well as cooperating witness Kevin Vetere and Juan Gutierrez, who pled guilty but did not cooperate. Although Varela and Lopez contested the government's case

11

on the drug charges, Sanchez did not deny that he worked for Varela dealing drugs.  In fact, counsel acknowledged in opening statement and closing argument that Sanchez was a "delivery boy" for Varela's drug organization.  (DE728:3079; DE767:7295).

According to Vetere, Sanchez earned $500 per week working for Varela, along with other "workers" in Varela's drug operation, including Gutierrez and Lopez.  (DE756:5972-75; DE753:5582-90).  Indeed, Count Four involved Sanchez's arrest on July 10, 2006, apparently en route to a delivery, with a shoe box containing nearly a kilogram of cocaine powder.  (DE3052).

Varela ran his drug operation first from a townhouse on Purdy Lane, moving it to 6458 Garden Court, West Palm Beach, in the summer of 2006.[6] Some of his workers, including Sanchez, lived with him at the Garden Court residence, but Varela paid the rent — always in cash.  (DE737:4302, 4305). Varela's workers also prepared and packaged drugs there.  (DE752:5147, 5149-51; DE754:5536-41).[7]  Varela supplied them vehicles and temporary tags to use when

---

[6] The Purdy Lane house was sometimes referred to as "Pimp Plaza," and the Garden Court house was sometimes referred to as "Thug Mansion." (DE752:5140-41, 5144).

[7] When police executed a search warrant at the Garden Court residence, they found materials used to cook powder cocaine into crack, scales for weighing product, and packaging materials.  (DE732:4054-4104).

delivering the drugs.  (DE753:5597-98).  He provided them cell phones.

(DE758:6421-23, 6425-26).  And Varela purchased and provided firearms for the

protection of his stash and his cash.  Varela and Troya were charged in Count

Three with possession of two of those guns, based on a car stop on June 10, 2006.

(DE728:3055; DE766:7107-08).  Many more guns were discovered in the Garden

Court garage and in Varela's room there when police executed a search warrant on

the residence after the murders.  (DE732:4086-4133).

At trial, the government presented evidence of four drug transactions as

proof of the six-month-long Varela conspiracy.  Count Two charged Liana Lopez

and Danny Varela with possession with intent to distribute cocaine, based on

Lopez's arrest on May 10, 2006, with one kilogram of cocaine and $14,000 in the

car she was driving.  (DE751:4886-4910).  Varela's fingerprint was lifted from the

temporary tag on the car.  (GX-514b.1).  Count Four charged Sanchez with

possession with intent to distribute cocaine, based on his arrest on July 10, 2006,

for the shoe box-full of cocaine, described above.  Count Eleven charged Varela

with distribution of cocaine, based on his sale of half a kilogram of cocaine to a

confidential informant at the Garden Court residence on October 21, 2006.  And

Count Thirteen charged all four defendants with possession with intent to

distribute at least fifty grams of crack cocaine and 500 grams of powder cocaine

discovered at the Garden Court residence when they were arrested on October 25, 2006, and police executed the search warrant.  (DE305).

### 2.   The Escobedos were murdered on the side of the Florida Turnpike.

Luis Escobedo moved his family and his drug dealing operation from Texas to South Florida in the spring of 2006, after receiving death threats from other drug dealers.  (DE732:3972; DE753:5710-11, 5725).  Six months later, in the early morning hours of October 13, 2006, the family — Jose Luis (28), Yessica (25), Luis Julian (4), and Luis Damian (3) — was shot to death on the side of the Florida Turnpike, near Port St. Lucie, Florida.

Their bodies were left in a grassy area on the side of the road near mile-marker 149 (DE728:3130-32), and were discovered by a passing driver several hours later (DE728:3114-15).  Investigation revealed that all four family members, including the children, had been shot multiple times at close range.  (DE729:3392-94, 3428-29).  Luis, Yessica, and Julian appeared to have died instantly from head wounds (DE729:3374, 3407, 3436), but Damian, who was shot in the heart and lungs, might have survived for up to a minute (DE729:3458).  It appears that the children may have been shot by bullets intended for their parents.  (DE729:3447-49, 3459-63; DE767:7445).  Indeed, crime scene photographs depicting the

14

position of the victims' bodies suggest that Yessica Escobedo may have been holding her children when the shots were fired.  (GX-1.1, 1.2, 1.5, 1.7; DE766:7172).

When police executed a search warrant at the Escobedo home, they immediately discovered that Luis Escobedo was a drug dealer.  From his ledger, and with the help of an informant, they decided that a local drug ring operated by Danny Varela owed Escobedo money and may therefore have had a motive for his murder.  (GX-103c).  The government subsequently charged Varela and his subordinates, Troya, Sanchez, and Lopez, in a sixteen-count indictment alleging a drug conspiracy and various substantive drug and weapons offenses.[8]  But because police could place only Troya and Sanchez on the Turnpike on the night of the murders, they alone were charged with conspiracy to carjack the Escobedos, carjacking resulting in the deaths of all four family members, and carrying and using a firearm in relation to a crime of violence and a drug trafficking crime resulting in the death of each individual victim.  Varela, the undisputed leader of the organization, escaped the more serious charges.  (DE305).

---

[8] Vetere and Gutierrez were also charged, but pled guilty to the second superseding indictment.  (DE268; 291).  Sanchez and the other defendants went to trial on the third superseding indictment.

### 3. The government could prove only that Sanchez was present near the scene.

The government placed Sanchez and Troya near the scene of the crime in two ways: using Turnpike toll video and tickets, and using cell phone records.

Police knew from paperwork seized at the Escobedo home and from their neighbors that the family owned a black Jeep Cherokee. (DE729:3475; DE731:3883). Since witnesses had heard gunshots near the crime scene at approximately 2:24 a.m. on October 13, 2006 (DE728:3100-01; DE728:3225-27), police reviewed Turnpike toll video from around that time period, searching for the Jeep. (DE728:3227-29). They located it entering the Turnpike near Fort Pierce at about 2:18 a.m., about three miles north of the crime scene and exiting at 3:01 a.m., 53 miles south at the Okeechobee Blvd. exit in West Palm Beach. (DE729:3333, 3340; GX-9A, 9A.1-11). Traveling in close proximity to the Jeep was a burgundy Dodge Ram conversion van that was later tied to Varela.[9] The toll tickets turned in by the drivers of these vehicles in West Palm Beach bore fingerprints that matched those of Sanchez (in the Jeep) and Troya (in the van).

---

[9] The van entered the Turnpike just after the Jeep, at 2:19 a.m. It left the Turnpike just before the Jeep, at 3:01 a.m. (DE729: 3335, 3341).

16

(GX-7, 8; DE730; 737-38, 729-31).[10]  A third car — a silver sedan — entered and left the Turnpike at the exact same locations about four minutes before the Jeep and the van, but police never identified it or its owner.  (DE729:3349-50; SX-PP 1, 5-9).[11]

Cell phone records established that Escobedo and Sanchez placed a series of short calls to each other from just before 6 p.m. on the evening of October 12, 2006, until 2:21 a.m. on October 13, 2006.  By mapping the cell phone towers that received these calls, the government showed that Sanchez and Escobedo traveled in tandem north from West Palm Beach to Daytona Beach (a distance of about 200 miles), and then back south to Fort Pierce, where they got onto the Florida Turnpike heading south to West Palm Beach.  (GX760.1-15; DE764:6750-6821).  No calls occurred between Troya's and Sanchez's phones during that time, which the government explained by suggesting that the two were riding together in

---

[10] It is not possible to identify the drivers of the Jeep and the van from the tapes (DE729:3343; DE754:5521-22), nor is it possible to tell how many people were in each vehicle.  (DE729:3350).  Later, police recovered property of the Escobedos — a red suitcase — in the van, which Troya had apparently been driving.  (DE731:3833-35).

[11] This was highly suspicious.  If the silver car was unconnected with the Jeep and the van, it should have exited sooner, since the Jeep and the van stopped off the road.  Instead, the three vehicles appear to have traveled apace with each other.

17

Varela's van.  Troya did make several other calls, which were received by cell towers in the same vicinity in which Escobedo and Sanchez were traveling. (GX760.4, 760.8).  After 2:25 a.m., by which point the murders had occurred, multiple calls between Troya and Sanchez showed their phones to be traveling back to West Palm Beach.  (GX760.6, 760.9).  Both Sanchez and Troya appear to have spoken with Varela at various times on October 12 and October 13, 2006, both before and after the murders.  (GX760.1-15).[12]

Although this evidence appeared to place Sanchez and Troya near the scene, the government's proof that Sanchez committed the murders contained significant "gaps."  (DE766:7218; DE767:7284).  There was no forensic evidence, no confession to police, and no eyewitness testimony that Sanchez actually murdered or helped Troya or anyone else murder the Escobedos.  Nor was there evidence that the murders — especially the murders of the children — had been planned in advance.  The best the government could do to link the Varela conspiracy to the murders was to suggest that shell casings found near the victims' bodies had

---

[12] According to these cell tower records, at least one of Varela's phones remained in West Palm Beach; however there was testimony that Varela had more than one phone (DE754:5527).

18

markings ("toolmarks") similar to those found at the Garden Court residence.[13]

### 4.      The evidence showed no clear motive for the murders.

The government never settled on one motive for the murders.  It theorized two: that the Varela conspiracy had killed Escobedo to erase a drug debt to him (DE766:7134-35) or that it had killed him to steal the drugs he allegedly was carrying (DE766:7135-36).  (DE305:5-11).  Either way, the government posited, the rest of the family had been killed to eliminate them as witnesses.[14] (DE766:7131-32; DE847:9508).  The defense offered a third motive: that unknown other drug dealers had killed Escobedo because he owed a debt to them, and that Escobedo's family had been killed to send a message.  (DE767:7291-94).

In support of the first motive — erasing the drug debt — the government noted that Escobedo's drug ledger recorded drug debts owed by members of the Varela conspiracy, including Varela, Sanchez, and Lopez.  (GX-103c).  But the

---

[13] Although not raised at trial, the ballistics evidence linking the casings from the scene to the casings from Garden Court was suspect, because the government never recovered the tool that purportedly made the marks.  *See Sexton v. State of Texas*, 93 S.W.3d 96, 98-99 (Tex. Crim. App. 2002).

[14] The government alleged that Sanchez felt compelled to kill the Escobedo children because they would recognize him from having met him and his son. (DE766:4531, 7132, 7137; DE847:9498, 9610).  Of course, an equally plausible inference was that Sanchez would have been reluctant to harm children with whom he and his family were familiar.

19

government failed to explain why the Varela conspiracy would execute its own supplier.  The government's narcotics trafficking expert, Stephen Hill, conceded that this would make little sense.  (DE758:6495-97).

Moreover, Escobedo's ledger also recorded a much larger drug debt — $187,000 — owed by Escobedo to "Matamoros."  (GX-103c).  The defense suggested that this entry provided the more intelligible motive for killing Escobedo.  On cross-examination, Hill testified that Matamoros, Mexico is an area well-known for drug activity.  He explained that the ledger appeared to reflect that Escobedo owed payment for 11 kilograms of cocaine — at $17,000 each — to someone in Matamoros.  Hill acknowledged that when such debts go unpaid, the supplier may do harm to the buyer's family, including "all kind[s] of violence," even murder.  (DE758:6481-88).

Other evidence, beyond the death threats Escobedo received in Texas, showed that people outside the Varela conspiracy had a motive to harm Escobedo. He and Lopez were together the victims of a home invasion robbery — during which Escobedo was pistol whipped and one of the robbers held a gun to his head until Lopez disclosed the location of cocaine and money.  (DE752:5142; DE753:5569-70, 5590-95; DE756:5960).

20

In support of the second motive — theft of the cocaine that Escobedo was transporting in the Jeep — the government offered evidence that Troya and Sanchez appeared to have access to drugs and money after the murders. Witnesses testified that, shortly after the murders, Troya traded a "brick" of cocaine for a used car (DE754:5478) and Sanchez bought an expensive gold necklace (DE753:5651-53; DE758:6574-75). Melvin Fernandez testified that a few days after the murders, Troya said he had robbed ("licked") someone for fifteen kilos of cocaine. (DE729:3489-90). But there was also testimony that the Varela organization had regular access to kilogram quantities of cocaine and "stacks" of money. (DE738:4538; DE752:5170; DE753:5558-68).

### 5. The Varela conspiracy may have been providing counter-surveillance for Escobedo.

Based on the Varela organization's past practices, the defense argued that Sanchez and Troya were on the Turnpike providing counter-surveillance for Escobedo, not setting him up. (DE767:7291-92). Lopez appeared to have been providing counter-surveillance for Sanchez when he was delivering cocaine on the charges that became Count Four of the indictment. Indeed, when Sanchez was arrested, Lopez immediately notified the others about what had occurred. (DE738:4547-50). The defense argued that Sanchez and Troya were doing the

21

same for Escobedo. (DE767:7291-92, 7317).

The counter-surveillance defense was consistent with evidence that others involved with Escobedo may have been on the Turnpike on the night of the murders. As noted, although little traffic was on the road in the early morning hours when the van and the Jeep passed through the tolls, the video recording showed the silver car entering and exiting the Turnpike at the same points and almost the same time as both the Jeep and the van. And although Yessica Escobedo's body was discovered on the side of the Turnpike on October 13, 2006, sometime between October 12, 2006 and October 13, 2006, her cell phone appeared to have traveled from Florida to Texas, according to the cell phone records. (DX-32).

Yessica Escobedo's curious cell phone records were never explained by the government. They show her phone apparently receiving a call in the Melbourne (FL) service area at 7:48 p.m., when the cell phone records relied upon by the government show the Jeep and the van close to that area. *Compare* DX-32 with GX-760.2. Hours later, at 11:58 p.m. and 12:00 a.m., however, when the cell phone records relied upon by the government show the Jeep and the van still in Florida (GX-760.3), Yessica Escobedo's cell phone records show her phone operating in the McAllen (TX) service area (DX-32). Of course, Yessica

22

Escobedo herself remained in Florida.  This suggests that others may have been traveling with the Escobedos that night, or may have met them along the way, perhaps in the silver car.[15]

If Troya and Sanchez were conducting counter-surveillance, the real murderers may have been associated with those who returned to Texas with Yessica Escobedo's cell phone or with those who were driving the silver car. (DE767:7291, 7350-52).  In fact, Yessica Escobedo's cell phone records show a call at 3:18 a.m., after her death.  (DX-32).

### 6.     The government relied on "Crackhead Kevin" Vetere to fill in some of the gaps in its case.

"Crackhead Kevin" Vetere[16] was the government's star witness.  After announcing to Troya not long after the murders that "when they come handing out life sentences, I am not going to get one," (DE754:5524), Vetere first gave two statements denying any knowledge of what happened before finally deciding to cooperate.  (DE753:5765-68) (Vetere told police:  "It took me a while to put all

---

[15] The government also never explained a hotel receipt in Yessica Escobedo's name, dated the day before the murder, from a La Quinta at the Ft. Myers, FL airport, found in the red suitcase in the van, which the government said Troya drove back to West Palm Beach from the scene of the murders. (DE731:3833-35).

[16] Vetere was known as "Crackhead Kevin" because of his serious drug addiction.  (DE752:5250; DE753:5745-48).

23

this together.  Like I have been putting this together knowing I am going to talk to you all.").  Even then, he never provided details about what happened out on the Turnpike.  At most, his testimony suggested that Sanchez and especially Troya were in a position to know.

Vetere testified that he saw Sanchez and Troya leave Garden Court together in the late afternoon of October 12, 2006.  When he asked Troya if he could accompany them, Troya called Varela to ask permission.  Varela said no.  (DE754: 5446-47).  Vetere did not see Sanchez or Troya again until early in the morning on October 13, 2006, when he testified he awoke to see them with Varela and Gutierrez, carrying bags he suspected contained cocaine through the house to Varela's bedroom.  (DE754:5451-53, 5463; DE753: 5697-98).

A short time later, Vetere took the van to visit a stripper, but Troya called him and told him to return the van.  While Vetere was en route, Varela called, telling Vetere to take the van instead to Varela's uncle's house.  When Vetere arrived there, he saw the Escobedos's Jeep.  (DE754:5453-72; DE753:5697-5701).  At Varela's direction, Vetere moved the Jeep to Vetere's grandmother's house, where Gutierrez later picked him  up.  (DE754:5466, 68).  Vetere then helped Gutierrez drop the burgundy van off at a gas station near a detail shop.

24

(DE754:5474-75).[17]

Later (still October 13, 2006 — the day of the murders), Troya bought a 1973 Chevrolet convertible.  He told Vetere that he paid for the car with a kilo of cocaine.  Vetere testified that he had never known Troya to have access to that amount of drugs or to the kind of cash needed to buy such a car without financing. (DE754:5477-78; *see also* GE211).  Vetere also testified that Sanchez bragged not long after October 13, 2006, that he planned to buy a new necklace for $5000. Vetere claimed that he commented, "you have a lot of money," and Sanchez responded, "you going to knock off the next big timer?"  (DE753:5651-53). Sanchez later purchased a necklace for approximately $2500.  (DE756:5937; DE758:6574-75).

The day after the murders, Vetere and Troya went out in Troya's new car. At a gas station, Vetere noticed Luis Escobedo's picture on the front page of the newspaper.  When he asked Troya about it, Troya responded that Escobedo was dead.  Vetere then asked whether the Jeep had been moved from Vetere's grandmother's house.  Troya said he had moved it.  (DE754:5485-91).  When the Jeep was discovered by police, abandoned near the airport, Vetere again asked

---

[17] The owner of the detail shop saw the van on a "Crime Stoppers" television program and called police.  (DE730:3676).  The van was recovered. (DE730:3677).

Troya about it. Troya explained that he had intended to burn the Jeep, but the police found it first. Vetere was concerned that, since he had driven the Jeep to his grandmother's house, it might contain his (Vetere's) fingerprints. Troya assured Vetere that he had wiped the Jeep clean of fingerprints. When Vetere worried that he'd had to fiddle with a loose door panel, Troya admitted that he had been in a hurry, and wasn't sure he'd cleaned the door panel. (DE754:5521-24). Vetere was right to worry; police found Vetere's fingerprints in the Jeep. (DE753:5779).

Finally, Vetere testified that he was present when Sanchez received a call from his father, asking about the Escobedos's Jeep.[18] Vetere said that Sanchez took the call to mean that the police had been to his parents' house. Believing that "the heat [was] on," the Varela group tried to purge the Garden Court residence of evidence of their drug trafficking. (DE754:5535-40, DE7535558-70). Of course, they were unsuccessful.

The only thing Vetere could tell the jury about what happened on the Turnpike was that Troya admitted driving the van, that he opened the door to pay the toll, and that he didn't wait for his change — all of which was already known

---

[18] Sanchez had previously owned the Jeep, but had sold it to Escobedo. (DE730:3644, DE731:3885-86; DE754:5301-04).

26

from the fingerprint and toll video evidence.  (DE754:5521-25; *see* DE729:3343).

Still, in exchange for his testimony, Vetere's sentence was reduced from a potential range of 168-210 months' imprisonment to just forty-two months. (DE887:25; DE1066:12).

### 7.   A "wheelbarrow" of "other highly prejudicial evidence" was admitted during the trial.

The government bolstered its case against Sanchez with what the district court called a "wheelbarrow" of "highly prejudicial" evidence; indeed according to the court, "its prejudicial impact" was "candidly overwhelming." (DE738:4711).  This evidence included uncharged, serious shootings, other drug trafficking, and statements by Troya that implicated both men in the Escobedo murders.[19]  This evidence allowed the government to portray Sanchez as a major drug dealer who was the kind of person who could have killed the Escobedos and their children, and who must have been involved, since his co-defendant Troya had confessed.

**a.  The Shooting Evidence.**  Over repeated defense objections, the government introduced extensive and bloody evidence of shooting and firearms incidents involving Sanchez and Troya that were unrelated to the Escobedo

---

[19]  The district court made the "wheelbarrow" comment with respect to the uncharged drug trafficking evidence.  (DE738:4711).

27

murders.  The district court permitted introduction of this evidence under Federal Rule of Evidence 404(b), as proof of the defendants' intent to possess weapons — including an AK-47 — found at the Garden Court residence.  (DE756:5820-21).  The defense objected that the evidence was unnecessary, as neither defendant contested the government's evidence of constructive possession of the firearms.  But the shooting evidence would severely prejudice Sanchez and Troya on the capital charges, by improperly suggesting their propensity to shoot at innocent victims.  (DE361; DE756:5814-17).

Without addressing the defense objection to the marginal probative value of the evidence, the district court ruled that "the Government has an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes."  (DE757:6218).  It did not explain how this destruction and danger related to the defendants' intent to commit the charged gun possession crimes.  (DE771:7501-02).  But it gave a limiting instruction, advising the jury to consider the evidence only in determining Sanchez and Troya's intent to possess the weapons.  (DE771:7501-02).[20]

---

[20] As discussed below, this instruction was undermined by the government's closing argument, which intertwined discussion of the weapons charges, the shooting evidence, and the murder charges, and by the court's failure to sustain defense objections to that argument.

The shooting evidence consisted of three discrete incidents, wholly unrelated to the Escobedo murders: (1) evidence that Sanchez used an AK-47 to shoot at a house on Suwanee Drive on April 28, 2006, leaving numerous bullet holes in the house and injuring one person inside;[21] (2) evidence that Sanchez was the driver of a car from which Troya shot at another car on Haverhill Road on September 11, 2006, leaving numerous bullet holes in the car and injuring the driver; and (3) evidence that Sanchez, Troya and others on some unidentified date attempted an armed home invasion of a rapper they knew as "B Real."  The evidence of these incidents was presented through eight witnesses, consumed at least 195 pages of transcripts, and involved at least 66 exhibits.  (DE753:5625-48, 5653-73; DE757:6190-6207, 6208-6294; DE758:6341-89, 6392).  It was also detailed, including photographs of bullet holes, bloodstains, and victim injuries.  (GX-612.1, 612.2, 612.3, 612.4, 612.14, 612.15, 612.20, 621.21, 612.25, 612.26, 612.28, 612.31, 612.33, 612.34, 612.36, 612.37, 612.39, 612.40, 613.1, 613.2, 613.3, 613.4, 613.5, 613.6; DE757:6191-6203, 6204-07, 6221-45, 6248-49, 6254; DE758:6395-6402).

---

[21] The government also alleged that Troya used the same AK-47 rifle on that same date to shoot up a house on Mercer Avenue.  (DE753:5670).  This incident, which did not involve Sanchez, involved additional testimony and exhibits.  *See* Troya's brief (Point I, pp. 58-61).

29

**b.  The Drug-Trafficking Evidence.**  Also over repeated defense objections, the government introduced testimony from two cooperating witnesses — Malik Mullino and Mario Calderon — that Varela involved Sanchez in dealing over 150 kilograms of cocaine, most of it outside of the time period of the drug conspiracy alleged in the indictment.  (DE751:473; DE752:5005).  The court's initial assessment was that this "wheelbarrow" of "other highly prejudicial evidence" was unnecessary to the government's case.  (DE738:4711).  The court also observed that, "its prejudicial impact is candidly overwhelming," and concluded that, "the prejudicial impact of [the other crimes evidence] significantly overweighs any probative value."  (DE738:4711).

Ultimately, however, the district court permitted introduction of this testimony as "intrinsic evidence," because it viewed the prior drug dealing as inextricably intertwined with the evidence of the charged offenses — in particular, with Varela's sale on October 21, 2006, of a kilogram of cocaine to Mullino just prior to the defendants' arrest.  (DE751:4720-21).  In the alternative, the court ruled that the evidence was admissible under Federal Rule of Evidence 404(b), as proof of intent to engage in drug trafficking during the period of the conspiracy.  (DE751:4728).

The defense objected that Sanchez was not charged with participating in the Varela-Mullino transaction, and that, in any case, Sanchez had not challenged the government's evidence of drug trafficking, so his intent was not in issue. (DE738:4688, 4701-03; DE728:3078).  The district court did not address Sanchez's arguments, but ruled that the evidence was admissible with respect to Varela.  (DE751:4728-29).

> c.  **Troya's Confessions**.  According to Vetere, in the days after the murders, Troya made inculpatory statements about covering up the Escobedo murders.  (DE754:5521-24).  Carlos Rodriguez, a boat captain convicted of drug smuggling who was incarcerated with Troya, also testified to a Troya confession. During Troya's pretrial confinement, Rodriguez overheard Troya tell another inmate, "I have done something very wrong.  There is some people involved.  I have killed some people.  And those people were children involved." (DE737:4416-17).  According to Rodriguez, Troya admitted that it was "something [I] ha[d] to do."  (DE737:4416-17).[22]

Sanchez moved for severance, both before and during trial, arguing that the statements' admission violated the *Bruton* rule prohibiting admission of the

---

[22] On cross-examination by Troya's counsel, Rodriguez said Troya admitted being "involved in killing some people, some of them children," (DE738:4461-62) (emphasis added), which suggested he committed the crime with someone else.

confession of one defendant implicating another defendant also on trial in the same case. *Bruton v. United States*, 391 U.S. 123 (1968). (DE368; DE7387:4380-82; DE738:4431-32). Sanchez argued that because the fingerprint and cell phone evidence placed him with Troya on the night of the murders, Troya's statements necessarily implicated him, as well. (DE368; DE737:4379-83). The court denied Sanchez's motion. (DE393; DE737:4383-96; DE738:4431-32). Although the court instructed the jury to consider the statements only as to Troya (DE738:4540-41), the defense maintained "a severance would have to be necessary." (DE738:4540-41; DE754:5526; DE771:7499-7500).

8.    **The government portrayed Sanchez as a "Thug Enforcer," based on the "other evidence."**

In closing argument, the government emphasized the other drug crimes and other shooting evidence in urging the jury to convict Troya and Sanchez for the Escobedo murders. It portrayed the two as "thug enforcers" (DE767:7437) for the Varela conspiracy, "willing to carry guns, wear disguises and shoot." (DE766:7180-81).

The government displayed the AK-47 to jurors during closing argument, and invited them to examine it during deliberations. It reminded the jury that Sanchez and Troya had both admitted to committing shootings with this weapon.

32

(DE766:7119-21).  These were the sort of people, the government argued, whom the jury should believe capable of killing the Escobedos.  (DE767:7448-49).  According to the government, the Escobedo murders were merely the culmination of a series of wanton, violent acts by Troya and Sanchez on behalf of the Varela conspiracy.  (DE767:7444-45) ("This is a military style operation and execution by the thug enforcers.").

The government also used Troya's purported confession to inculpate Sanchez, in violation of the court's order redacting the statement and limiting its use.  (DE767:7455) ("As Troya told Carlos Rodriguez, "he had to do it, they had to do it because it was business . . . . They had to kill these little kids because they knew them, and for no other reason.  It is really cold.").

9. **The government vouched for its case and promised to prosecute Varela for murder.**

The government told the jurors not to be concerned that there were gaps in the government's case against Sanchez and Troya for the Escobedo murders: "Let's stop nitpicking . . . ."  (DE767:7425).  It assured the jury, "Folks, the cases don't get any better than this."  (DE767:7437).

The government also told the jurors not to be concerned about convicting Troya and Sanchez for the murders, but not Varela — the man the government

33

called "a professional drug trafficker" who would do anything "to protect his

operation and commit murder if necessary." (DE766:7116).  The government

pledged to pursue Varela for the murders.  (DE767:7414) ("Rest assured, there are

no deals . . . . and when and if there is sufficient evidence to charge Mr. Varela

with murder, it will be brought before a jury of his peers.").

### 10.    The jury deliberated several days and asked to see the AK-47, before returning guilty verdicts.

The jury retired to deliberate at 12:30 p.m. on March 2, 2009, deliberated

throughout the day on March 3 and 4, 2009, and returned guilty verdicts on all

counts against all defendants at 1:30 p.m. on March 5, 2009.  (DE771:7577;

DE774:7693-706).  During several days of deliberations, the only evidence that

the jury asked to see was the AK-47 that was allegedly used in the Suwanee and

Mercer shootings, and one other firearm.  (DE789; DE772:7594).

## B.    The Penalty Phase

**The Government's Case.**  In seeking the death penalty against Sanchez, the

government primarily emphasized the evidence about the Escobedo murders and

the other shootings offered in the guilt phase.  It also presented evidence that

Sanchez once committed an act of domestic violence against his girlfriend, Maria

Lopez (DE:818:8074-77) and that he was convicted of battery and served 15 days

in prison for beating her subsequent boyfriend, Jose Penaran, in the head with a satellite television box (DE818:8077-80, 8087-93).  The most powerful government penalty phase evidence was victim impact testimony by Luis Escobedo's sister and Yessica Escobedo's mother, aunt and brother, about the devastating loss the families had experienced in the wake of Luis, Yessica, Julian, and Damian's deaths.  (DE823:8100-45).

**The Defense Case.**  In response, Sanchez's counsel sought to explain how and why Sanchez became involved with the Varela conspiracy, and to show that if sentenced to life in prison without the possibility of release, Sanchez could contribute something positive to his family and society.  Witnesses reported on Sanchez's limited intelligence, profound learning disabilities and the social isolation and humiliation he faced as a result.  They described the alcohol-fueled rages of Sanchez's father, which terrorized the family.  And they pointed out the lack of nurturing and support he received from his cognitively-limited parents. They also shared impressions of Sanchez's relationship with his young son, Ricardo Sanchez, III (whom the family calls "Three," because he is the third Ricardo Sanchez, after his grandfather and his father), which remained close and positive, even during Sanchez's more than two years of pretrial detention.

Although the jury found much of this evidence mitigating,[23] erroneous court rulings unfairly limited its reach, compromising Sanchez's case for life.

### 1. Sanchez suffers low intellectual functioning and severe learning disabilities.

Dr. Daniel Grant, a neuropsychologist with twenty-five years' experience (DE824:8440), found that Sanchez had a full scale IQ of 77 (DE824:8444), in the sixth percentile (DE824:8445-46) — just two points above the diagnostic cut-off for mental retardatio*n, see* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. text revision 2000) ("DSM-IV-TR") at 41-42, 48, 49 (noting that mental retardation may be diagnosed in individuals with IQs ranging up to 75). In addition to his low IQ, Sanchez suffered severe learning disabilities. As a result, Sanchez functioned at a level even lower than would be expected of a person with his limited IQ. (DE824:8455-60).

Sanchez struggled in school from the outset (DE823:8215-21) and was finally placed in a full-time, segregated special education program when he was nine. (DE823:8229-32). His learning disabilities were so severe that he was not

---

[23] In total, jurors found 30 mitigating factors on behalf of Sanchez. (DE860:12-16). In contrast, it found only 8 mitigating factors for Troya. (DE:859:12-14).

required to take the statewide proficiency tests that other students took each year. (DE823:8239-40).  He was not eligible to earn a full high school diploma, only a so-called "special diploma," due to his modified curriculum.  (DE823:8239).  This dashed his hopes of joining the marines upon graduation, since the military would not accept a "special diploma."  (DE823:8240-41).  When Sanchez left high school in tenth grade, he was reading at only a third grade level and doing math at a fourth grade level.  (DE823:8243).

The results of the government expert's testing were similar to the defense expert's findings, and he arrived at a similar interpretation of the historical records about Sanchez's IQ and learning disabilities.  (DE846:9294-9311).

### 2. Sanchez's home life was unsupportive, turbulent and violent.

At home, Sanchez found no refuge from his academic struggles.  The Sanchez household was crowded, controlling, and sometimes violent, and Sanchez received little nurturing to compensate for the frustration and humiliation he experienced at school.

Sanchez's parents, Juana Sanchez and Ricardo Sanchez, Sr., both moved from Mexico to the United States as children, working as migrant farmers. Neither finished junior high school — Sanchez, Sr. dropped out in elementary school, and Mrs. Sanchez dropped out in eighth grade, at age 16.  (DE823:8147-

37

51).  Testing revealed that Sanchez Sr.'s IQ was 67, lower than Sanchez's, and below the threshold for mental retardation.  (DE824:8463).  His math skills were similar to those of a third-grader.  (DE824:8464).  Mrs. Sanchez's IQ was 76, and her math skills hovered between those of a fourth- and fifth-grader. (DE824:8464).

Sanchez's parents married as teenagers, and Mrs. Sanchez immediately became pregnant with their first child, Efrain.  Efrain was born when Mrs. Sanchez was barely 17, Nydia when she was 18, Ricardo when she was 19, and Ezekiel when she was 21.  Later, the family adopted Omar, when his mother, Sanchez Sr.'s sister, passed away.  (DE823:8151-57).  Sanchez, Sr. worked full time as a truck driver.  (DE823:8196-97, 8273).  Mrs. Sanchez worked intermittently, but was largely consumed with childcare, and especially by the need to attend to Efrain, who was mentally retarded and suffered uncontrolled seizures.  (DE 823:8273-74; DE824:8368, 8372-73).

The family struggled financially, living in subsidized housing in an impoverished neighborhood (Dyson Circle, West Palm Beach), where their home was broken into and where drug dealers ruled the corners.  (DE823:8158-61).  The children attended the Head Start pre-kindergarten program, designed to help disadvantaged kids from such neighborhoods keep up with those from more

38

privileged backgrounds.  (DE823:8162; SX-PP 3,4).  When Sanchez was 10, the family was able to move to a more stable neighborhood (Cocoanut Drive, West Palm Beach).  Over time, though, that neighborhood too began to suffer from crime and urban blight.  (SX-PP 34; DE825:8626-29).

Although the family home remained intact, it was emotionally crippled by domestic violence, disability, and extreme discipline.  The violence began before the children were born.  Early in Mrs. Sanchez's pregnancy with Efrain, Sanchez, Sr. came home drunk one night and shot her in the face.[24]  Her injuries were so severe that she was hospitalized for a month and had to take medicine that doctors warned her might harm her unborn child.  Sanchez, Sr. was arrested and prosecuted for the shooting and was in jail when Efrain was born.  When he was released from jail, however, the family reunited.  (DE823:8152-55).  Thus began a cycle of abuse that terrorized Mrs. Sanchez and her children for years to come and repeatedly required intervention by the police.  (DE823:8276; DE823:8184-88, 8275-77, 8293-94).[25]

---

[24] At the time of the shooting, Mrs. Sanchez told police that the gun discharged accidentally.  At trial in this case, she explained that she had not told the truth to police, in order to protect her husband.  (DE823:8206-07).

[25] Sanchez and his sister moved out of the family home at ages 19 and 20, respectively.  (DE818:8073;DE823:8297).  As Nydia put it, "I didn't want to live there anymore because of my parents, them arguing all the time."  (DE823:8297).

Sanchez's father was very strict with the children and kept them isolated. They were subject to severe discipline and beatings. Their time was consumed by chores, and they were not permitted to play with friends or participate in extracurricular activities. (DE823:8184-87, 8280-81). When the family visited relatives in Texas when he was six, ten, fourteen, and seventeen years-old (DE823:8300), Sanchez asked each time if he could stay, instead of returning to Florida (DE823:8304). But his uncle, Antonio Jimenez, "didn't want to break the family" and refused. (DE823:8300-02). Sanchez went home with his parents. The next time Jimenez saw Sanchez was when Jimenez testified at the trial.

### 3.    Sanchez became a father and temporarily settled down at age 19.

At age 16, Sanchez met Maria Lopez. She was then 15. (DE824:8380). When Maria Lopez became pregnant with their son, two years later, Sanchez moved in with her, her mother, Rachel Ramos, and her younger brother, Julio. Sanchez and Maria Lopez lived a quiet life that centered around the Ramos household. Sanchez also worked a series of menial jobs to try to support himself, his baby's mother, and soon, his son (DE824:8384-86, 8394-96), but — due to his limited intellectual capacity — he needed help managing his daily activities. He

---

In the years that followed, however, they returned regularly to the only social network they knew. (DE823:8290).

went to work, turned over his paycheck to Maria Lopez and Ms. Ramos, and they ran the household.  (DE824:8386-88, 8428).  This simple life lasted only a short time, however.

### 4. "Hurricane Varela" disrupted the fragile family life Sanchez and Ms. Lopez had built.

In 2004, Sanchez and Maria Lopez ran into Danny Varela at a local flea market.  Varela was Sanchez's second cousin, but the two hadn't been close as children.  (DE823:8190).  Varela had just been released from prison (DE823:8291), and after they met at the flea market, he began coming around to see Sanchez frequently.  He drove fancy cars and wore nice clothes.  He impressed Sanchez, and his invitations to hang out and go to clubs made Sanchez feel special.  (DE823:8190-91; DE824:8399-400).  Until that point, Sanchez had not had much of a social life.  He had few friends (DE824:8382) and spent most of his time with Maria Lopez or his family (DE823:8191, 8289-90; DE824:8395-96).  Now, Sanchez began spending more time with Varela and less time at home, which caused friction between him and Maria Lopez.  They began to fight, and Sanchez eventually moved out of the Ramos home and into Varela's.  (DE824:8400-01).  Before long, he became ensnared in Varela's conspiracy and earned his first drug arrest.

As defense counsel explained in closing argument, Varela "played on Ricardo's sense of inadequacy and low self-esteem to recruit him into this world of crime." (DE847:9531). Counsel compared Varela to a hurricane, which "instead of rain and wind, . . . brought manipulation and deceit." With his intellectual impairments and his painful social history, "Ricardo Sanchez as a person could not stand up to the force, the pressure of Hurricane Varela." Eventually, Sanchez "collapsed in the onslaught of the storm," and the hurricane "raged out of control, bringing death, destruction and heartache" with the murders of the Escobedos. (DE847:9531).

**5.      Sanchez remained devoted to parenting his son, Three.**

Even as he fell in with Varela, Sanchez continued to try to be a good father to his son, Three. Family members described Sanchez's relationship with Three as close and authentically loving — very different from the one Sanchez had with his own father. (DE823:8195, 8292-93; DE824:8406-07, 8434). Even after he and Maria Lopez split up, Sanchez was a doting father, whom Maria Lopez trusted to care for their son and provide for him financially. (DE824:8402-03, 8405).

After Sanchez was arrested in this case, family members — including Juana Sanchez, Rachel Ramos, and Maria Lopez — regularly took Three to visit Sanchez

42

in jail during his pretrial detention.  (DE824:8405; DE823:8194; DE24:8435).[26]

The two also spoke often on the phone.  (SX-PP 37).  In a brief video-taped

interview that was played for the jury, Three confirmed the strength of his

relationship with his father and the significance of these visits.  (SX-PP 37).

According to Maria Lopez, in their visits and phone calls, Sanchez was able to

help discipline Three and keep him focused on school.  (DE824:8407).

James Aiken, a former state death-row warden and corrections official, and

an expert on prisons, testified that Sanchez would be able to maintain this

relationship with Three if he were sentenced to life in prison without release.  Just

as he was during his pretrial detention, Sanchez would be permitted phone calls

and visitation with Three.  (DE825:8683-84).  Aiken explained that such

interaction between inmates and their children is very meaningful to both parent

and child, and can make a difference in a child's life.  (DE825:8684-85).

### 6. Government research explained that multiple circumstances in Sanchez's life made him vulnerable.

Sanchez's final witness was Dr. Thomas Reidy, a psychologist, who

testified about research sponsored by the Department of Justice on the factors that

make a young person vulnerable to bad influences.  According to the Department

---

[26] Three was just three years old when his father was arrested, but was six by the time he was convicted.

43

of Justice research, the "risk factors" include poverty, exposure to domestic violence, low intellectual functioning, family history of substance abuse, exposure to crime, difficulty in school, and social isolation.  (DE824:8526-30).  *See* Office of Juvenile Justice and Delinquency Prevention, Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders (May 1995).  Dr. Reidy explained that Sanchez's life experiences, as described in the records and testimony, would qualify as risk factors under the DOJ models. (DE824:8520, 8536; DE825:8629-31).

The government's primary attack on the risk factors research was that different people respond to risk differently, and that, without having evaluated Sanchez, Dr. Reidy could not say for sure what effect Sanchez's upbringing had on him.  Dr. Reidy agreed that the research was only predictive.  (DE825:8647-51, 8654-56, 8658-60).

### 7.    Sanchez adjusted well to pretrial detention.

Prior to his pretrial detention in this case, Sanchez had never been incarcerated for more than a few weeks at a time, and then only in local jails.  *See, e.g.*, SX-PP 46.  He spent more than two years in federal pretrial detention awaiting trial in this case.  (DE825:8678).

Prison expert Aiken reviewed Sanchez's pretrial detention record and characterized it as "excellent." (DE825:8679). Sanchez committed only two infractions in all the time that he was awaiting trial — one for refusing to stand for count, and one for making an unauthorized telephone call. (DE825:8678-79). Aiken concluded that "he . . . adjusted very well to . . . jail or incarceration." (DE825:8678). Aiken explained that pretrial detention is a very stressful environment for inmates. The population is "transient," and inmates must be constantly alert for new detainees who might present a danger. (DE825:8680). Inmates are also "pumped up," because they don't know what is going to happen in their cases. (DE825:8680). Aiken explained that it is a "myth" that inmates do their best to stay out of trouble during pretrial detention. The worry and uncertainty more typically leads to "disruptive" behavior. (DE825:8681). These problems are especially prevalent with young inmates, like Sanchez, who may lack the maturity to manage the stress. (DE825:8681-82). As a result, prison staff often see "fighting . . . , trying to get weapons, sexual assault, all types of adverse behavior patterns . . . " among pretrial detainees. (DE825:8681).

Aiken testified that he would have expected to see Sanchez "fighting, talking back to staff, having bad days." Although Aiken would have considered that behavior "relatively normal," Sanchez did not engage in it. (DE825:8682).

45

Sanchez sought to have Aiken testify that, if sentenced to serve life in prison without the possibility of release, he would continue to show a positive adjustment to incarceration and would not present a future danger. (DE795:7812-13).[27] The district court excluded that testimony, however, ruling that because the government was not alleging a "future dangerousness" aggravator, Sanchez was not entitled to address the issue. (DE 823:8337-39; 824:8354). Although it did not allege the aggravator, the government pursued a future dangerousness theme, nonetheless, cross-examining Aiken extensively about other inmates for whom he had testified, including one who "released from Florida State Prison and went to Clemson University and strangled a young girl" (DE825:8685-90),[28] and emphasizing what it characterized as Sanchez and Troya's "unrepentant . . . unremorseful violence" (DE847:9507).

### 8. The district court's rulings undermined the jury's ability to consider Sanchez's mitigation.

A series of court rulings interfered with the jury's ability to consider Sanchez's life history mitigation. The first set of rulings related to what the court

---

[27] The defense's proposed testimony on this issue is discussed in more detail in Troya's brief (Point III, pp.115-21). *See* DE795:7822 (prosecutor, comparing Aiken and Troya's expert, Cunningham, calls them "two peas in a pod").

[28] The court overruled Sanchez's objection to this questioning. (DE825:8686).

termed "execution impact" testimony. The court prohibited Sanchez's family from telling the jury what effect a death sentence for Sanchez would have upon them. It also prevented the jury from considering as part of its sentencing decision whether Sanchez could continue to parent his son from prison. The second set of rulings related to the government psychologist's testimony. The court permitted the government's expert to testify about his personality testing and mental health interview of Sanchez, even though the defense presented no statements by Sanchez through its experts, and offered expert testimony only about Sanchez's intellectual functioning. Individually and together, the court's rulings severely undercut Sanchez's mitigation case.

**a. Evidence About Sanchez's Relationship With Three.** Sanchez presented compelling evidence about his relationship with his son, Three, and the potential for that relationship to continue if the jury sentenced him to life without the possibility of release. Although the trial court permitted the jury to consider the mitigating factor that Sanchez had a "loving relationship" with his son, it expressly prohibited mitigating factors related to how Sanchez might be able to foster that relationship from prison. It held that because those proposed mitigating factors focused attention on the effect Sanchez's execution could have on his son, they constituted impermissible "execution impact evidence." According to the

47

court, only <u>backward</u>-looking evidence about Sanchez's role as a father before his trial bore on his character and constituted relevant mitigation, and <u>forward</u>-looking evidence was, by definition, beyond the jury's purview. (DE846:9428-29).

As a result, the court instructed the jury — three separate times — that it was not to consider "execution impact," which the court had specifically "excluded . . . as a factor in the case." (DE848:9747). The court defined execution impact broadly to include any harm the defendant's execution might cause his family as a result of the loss of their relationship with him. (DE848:9746-47, 9751-52, 9754-55). Although it allowed the defense to submit to the jury the mitigating factor regarding Sanchez's loving relationship with his son, when it instructed on this mitigator, the court devoted a full page and one-half to warning the jury that it should "not . . . consider . . . any loss that the son would suffer if the father were not there to continue in that relationship." (DE848:9746-47. *See also* DE848:9751-52; DE848:9754-55). The defense objected that the instructions prevented the jury from giving full consideration even to the mitigating factor the court had approved — Sanchez's loving relationship with his son. (DE848:9690). Although it was uncontested, only eight jurors found this mitigating factor. (DE860:14).

48

   **b. Dr. Brannon's Testimony.**  The government sought a rebuttal

mental state examination of Sanchez under Federal Rule of Criminal Procedure

12.2, based on the defense proffer that it would present expert testimony of

Sanchez's low intellectual functioning.  (DE524:590).  The court granted this

request.  (DE525:598).  The court refused, however, to limit the scope of the

government exam to that necessary to rebut the defense exam, as contemplated by

Rule 12.2.  (DE965:22).  Thus, although the defense gave notice of, and

conducted, only a neuropsychological evaluation of Sanchez's intellectual

functioning, the government's expert — Dr. Michael Brannon — conducted a

broad-based psychological examination, including a clinical interview and

personality testing.  (DE965:7, 22).

   At trial, the defense moved *in limine* to prevent Dr. Brannon from testifying

about his clinical interview or the results of the personality testing, since neither

would rebut Dr. Grant's testimony about Sanchez's impaired intellectual

functioning.  (DE822).  The defense also objected to testimony about Sanchez's

statements to Dr. Brannon, because Dr. Grant had not relied on statements by

Sanchez.  Counsel cited the Fifth and Sixth Amendments to the U.S. Constitution

and Federal Rule of Criminal Procedure 12.2(c)(4), which prohibits the

prosecution from using the defendant's statements during a government

49

examination against him, except when the defendant offers like evidence.  The

government did not contend that Brannon's testimony would rebut anything Dr.

Grant said, nor did it argue that the defense had introduced testimonial statements

by Sanchez.  Rather, it maintained that its expert's clinical interview and other

personality testing would rebut Dr. Reidy's risk factor testimony.  (DE845:9176).

Despite the fact that Reidy never examined Sanchez and that the defense

offered no statements by or test results about Sanchez on the topics covered by Dr.

Reidy or Dr. Brannon, the court accepted this reasoning.  Since Dr. Reidy "talked

about risk factors and other factors, protective factors that might explain how a

person developed the way they are" (DE846:9270-71), the court permitted Dr.

Brannon to testify that Sanchez had denied exposure to most of the risk factors

during their interview, and to opine that if Sanchez had been exposed to the risk

factors, his personality testing would have revealed depression, anxiety or other

symptoms that were not indicated in the results.  (DE846:9319-28).

In closing argument, the government used Dr. Brannon's testimony to rebut

Sanchez's lay witnesses, rather than the experts, arguing that Sanchez's statements

proved that his mitigation case was made up.  (DE847:9514-15).  To the extent the

jury believed Sanchez's witnesses, the government argued that the PAI disproved

the risk factor research suggesting that Sanchez's experiences might affect his

behavior later in life. (DE847:9617, 9620-21).

Despite the strength of the defense witnesses' testimony, and testimony by Dr. Grant and Dr. Reidy that self-reporting is notoriously unreliable because people tend to try to minimize their own problems (DE824:8465-66; DE825:8663; DE846:9341),[29] Brannon's testimony apparently caused some jurors to question Sanchez's mitigation. None of the mitigators relating to his life experience were found unanimously. (DE860:12-16).

**9. The government improperly told the jury Sanchez's mitigation didn't matter.**

One of the primary defense themes in the penalty phase was that Sanchez was uniquely vulnerable to the profound negative influence of his cousin, Varela, due to his limited intellectual functioning, troubled upbringing, and social isolation. As a result, Sanchez did not deserve a death sentence, particularly when Varela had not even faced murder charges for his role in the Escobedos' deaths, let alone a potential death sentence. With the exception of the mitigating factor about Sanchez's relationship with his son, virtually all of his proposed mitigators addressed this theme. (DE860:12-16).

---

[29] *See* Gary Groth-Marnat, *Handbook of Psychological Assessment* 75 (4th ed. 2003).

The government's main approach to defeating the defense plea for life was to suggest that Sanchez's mitigating evidence amounted to little more than excuses, which the jury should disregard because they were unrelated to the crimes at issue in the case. This line of argument was pervasive. The government repeatedly argued that Sanchez's mitigation was "no excuse" and "had nothing to do" with the Escobedo murders. (DE847:9516-17, 9519, 9521-22).

In rebuttal, the government went so far as to suggest that the statutory mitigating factor that an equally culpable co-defendant — here, Varela — was not facing the death penalty, should be rejected because it did not excuse the killings. (DE847:9637-38).[30]

At the conclusion of the government's rebuttal closing, defense counsel moved for a mistrial based on the government's suggestion that the mitigation should be disregarded because it did not relate to the offense, since Supreme Court precedent does not require such a relationship. (DE847:9643). The court denied the motion. (DE847:9645; DE848:9679). As noted, jurors found none of the mitigating factors relating to Sanchez's background or his relationship with Varela unanimously. (DE860:12-16).

---

[30] This argument echoed the that from the guilt phase: the jury could be comfortable convicting Sanchez because the government promised to go after Varela for the murders. *See ante*, p. 34.

**10.     The jury imposed split verdicts: Life for killing the parents and the whole family, death for killing the children.**

The jury deliberated for more than three days before returning its penalty phase verdict.  (DE848:9762; DE855:9776; DE856:9801; DE857:8746).

Ultimately, the jury imposed life sentences for three of the capital counts, and death sentences for two: on Count Six, which charged the carjacking resulting in the death of the entire Escobedo family, the jury imposed a life sentence; on Counts Nine and Ten, which charged the use of a firearm resulting in the deaths of Yessica Escobedo and Luis Escobedo, the jury also imposed life sentences; but on Counts Seven and Eight, which involved the deaths of the children, Damian and Julian, the jury imposed death sentences.  (DE860:18-20).

Jurors found the government to have established four statutory aggravating factors: that Sanchez committed the offense after substantial planning and premeditation, that he killed multiple victims in a single criminal episode, that he committed the offense for pecuniary gain, and that Damian and Julian were particularly vulnerable victims due to their youth.  The jury also found three nonstatutory aggravating factors:  that Sanchez caused harm and loss to the family of the victims, that he killed the victims in order to eliminate them as potential witnesses, and that he had participated in other, uncharged serious acts of

53

violence.  (DE860:7-12).

It found the defense to have established thirty mitigating factors, the majority of which related either to the equal culpability of Varela or to Sanchez's prior life experiences.  *See* DE860:12-17.  Jurors appeared particularly moved by Sanchez's susceptibility to Varela's influence.  *See* DE860:12-13.[31]  But although many of the mitigating factors were found by a majority of the jurors, none were found unanimously.  (DE860:12-16).  Eleven jurors found as a mitigating factor that "Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death."  (DE860:13).

## STANDARDS OF REVIEW

The Court reviews decisions regarding voir dire and peremptory challenges (Points I & III) for abuse of discretion; however, the Court will intervene when the questioning or manner of questioning violates constitutional principles.  *See Morgan v. Illinois*, 504 U.S. 719, 730 (1992) (*citing Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)); *United States v. Nell*, 526 F.2d 1223, 1229 (5th

---

[31] *E.g.*, eleven jurors find that Sanchez "acted under the influence of Danny Varela;" eight jurors find that, "[p]rior to his involvement with Danny Varela, Ricardo Sanchez had several legitimate jobs;" seven jurors find that "[p]rior to his involvement with Danny Varela, Ricardo Sanchez had no felony convictions;" nine jurors find that "[b]ecause of their family relationship, Ricardo Sanchez was more easily recruited by Danny Varela;" nine jurors find that "Ricardo Sanchez was more vulnerable to Danny Varela because of his low IQ." *Id.*

Cir. 1976).  The Court reviews a district court's acceptance of the prosecution's *Batson* or *J.E.B.* explanations (Point II) for clear error.  *See United States v. Novaton*, 271 F.3d 968, 1001(11th Cir. 2001).

Evidentiary rulings — such as those challenged in Point IV (404(b) Evidence of Shootings), Point V (Other-drug-crimes Evidence), and Point VI (*Bruton* Error) — are also reviewed for abuse of discretion.  *See United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005); *United States v. Hansen*, 262 F.3d 1217, 1233 (11th Cir. 2001); *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000).  When evidentiary rulings implicate a constitutional right, as with *Bruton* error (Point VII), the Court subjects the improperly admitted evidence to review for harmlessness beyond a reasonable doubt.  *See United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007) (*quoting United States v. Doherty*, 233 F.3d 1275, 1282 (11th Cir. 2000)).

Questions of law — such as whether a set of facts may be considered a mitigating factor (Point VIII, "Execution Impact" Testimony and Instructions), the correct interpretation of  Federal Rule of Criminal Procedure 12.2, or whether the admission of Sanchez's statements violated his 5th and 6th Amendment rights (Point IX, "Fifth & Sixth Amendments – Statements to Government Expert) — are reviewed *de novo*.  *See United States v. Cameron*, 907 F.2d 1051, 1061 (11th Cir.

1990); *United States v. McVeigh*, 153 F.3d 1166, 1211 (10th Cir. 1998).  Whether particular evidence is relevant to a proffered mitigating factor (Point VIII, "Execution Impact" Testimony and Instructions) is reviewed for abuse of discretion.  *See McVeigh*, 153 F.3d at 1211.

In reviewing whether a prosecutor's closing argument was improper (Point X, Improper Closing Argument),  the Court considers whether the argument, in the context of the case as a whole, substantially prejudiced the defendant.  *See Berger v. United States*, 295 U.S. 78, 89 (1935).

The Court also reviews erroneous jury instructions (Point XI, Failure to Instruct on Consequences of Deadlock) by evaluating whether "the instruction by itself so infected the entire [proceeding] that the resulting [verdict] violated due process."  *United States v. Brokemond*, 959 F.2d 206, 208 (11th Cir. 1992).  Jury instructions that are challenged for the first time on appeal (Point XII, Other Uncharged Serious Acts of Violence) are reviewed for plain error.  *See United States v. Felts*, 579 F.3d 1341, 1343 (11th Cir. 2009).

The cumulative impact of multiple errors (Points VII & XIII) is reviewed de novo, even though some of the individual errors might be reviewed for plain error. *See United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007).

## SUMMARY OF ARGUMENT

This appeal presents three categories of claims:[32]  First, it challenges the jury selection process, which failed to adequately identify jurors who would automatically impose the death penalty, because the court refused to ask the questions or provide the information necessary to that inquiry, and because the court permitted discriminatory and one-sided jury selection practices.  Second, it challenges the court's guilt-innocence phase evidentiary rulings, which permitted the government to introduce highly inflammatory, but marginally relevant, evidence, and then argue that the evidence showed Sanchez's propensity for wanton violence, including murder.  Third, this appeal challenges the court's penalty phase rulings, which unfairly constrained the jury's consideration of Sanchez's mitigation, while permitting the government unduly free rein to counter it.  All these claims, individually and cumulatively, require reversal.

---

[32] The brief is therefore organized into three sections: jury selection, guilt-innocence, and penalty phase.  These are presented in chronological order, for the Court's convenience.  The organization of the brief is not intended to convey anything about the relative merits of the claims.

57

**The voir dire process was inadequate to identify jurors who would automatically impose the death penalty in the case of the death of a child, and skewed to prevent fair selection of jurors.**

### Point I: Adequacy of Voir Dire

In a capital case, voir dire must be adequate to identify jurors who are unqualified because they would automatically impose the death penalty in every case or would be otherwise unable to fairly consider a life sentence. *Morgan v. Illinois*, 504 U.S. 719 (1992). Here, the district court refused repeated defense requests that it ask simple, direct questions of jurors on these critical qualifying characteristics.

Despite *Morgan*, the district court failed to ask jurors the essential question whether they would automatically impose the death penalty if Sanchez were convicted. The court also refused to inquire whether jurors could consider mitigating factors having to do with the defendant's life history, as opposed to circumstances of the crime, and whether they could consider a life sentence when two of the decedents were young children. The court even refused to say that the crime charged was intentional murder, instead describing it in a manner that left open the possibility of lesser crimes. The resulting confusion likely prevented identification of those veniremembers who would always vote for the death penalty.

58

This incomplete, imprecise, and one-sided questioning created an unacceptable risk that jurors biased against Sanchez on the central issues at sentencing — and therefore unqualified to serve in this case — may have been allowed to decide his fate.

### Points II & III: *J.E.B./Batson* & Unanimous Exercise of Peremptory Challenges

The voir dire was also flawed because the court permitted discriminatory jury selection by the government and required the defendants to exercise their peremptory challenges unanimously.  This further skewed the jury empaneled from those qualified through the inadequate questioning already discussed.

The government disproportionately struck black and female jurors from the venire.  In evaluating the explanations offered for these strikes, the court was supposed to analyze all relevant circumstances, *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005), including various factors that the Supreme Court has recognized as probative of discrimination.  Instead, the court accepted the government's explanations at face value.  Had it considered all relevant factors — and particularly, compared the stricken jurors to seated jurors — it would have found that the government's reasons were pretextual, and that the government discriminated against black and women jurors, in violation of the Fifth

59

Amendment's Due Process Clause, under *Batson* and *J.E.B.*

But the court did not afford the same deference to the defense in the exercise of peremptory challenges.  In fact, it required that all defendants — capital and non-capital — agree on the exercise of a peremptory strike, before it would dismiss a juror.  This created a conundrum, because the interests of the capital defendants, including Sanchez, diverged from those of the non-capital defendants.  Although this Court held in the non-capital defendants' appeals that requiring unanimous exercise of peremptories was not error, different considerations arise in a capital case.  To satisfy the heightened reliability requirement of the Eighth Amendment, defendants' exercise of peremptory challenges must be unconstrained.  In requiring Sanchez to accept jurors he did not wish to accept — jurors who had expressed opinions that indicated a predisposition to death in his case — the district court erred.

**The admission of highly prejudicial, marginally relevant evidence at the guilt phase distracted the jury from the lack of any evidence proving Sanchez murdered the Escobedos.**

As even the district court acknowledged, a "wheelbarrow" of "other highly prejudicial evidence," unrelated to the Escobedos's deaths, was admitted during the trial.  This included evidence of other shootings (Point IV), massive drug trafficking by Danny Varela outside of this conspiracy (Point V), and confessions

60

by Daniel Troya (Point VI), which unfairly implicated Sanchez, who was unable to effectively challenge the statements, since Troya did not testify.  The district court erred in admitting all this evidence, which enabled the government improperly to argue that Sanchez had a propensity to commit murder.

### Point IV: 404(b) Evidence of Shootings

The government, over repeated defense objections, introduced extensive and bloody evidence of other shooting incidents involving Sanchez and Troya that were unrelated to the offenses charged, including (1) evidence that Sanchez used an AK-47 to shoot at a house on Suwanee Drive on April 28, 2006, leaving numerous bullet holes in the house and injuring one person inside; (2) evidence that Sanchez was the driver of a car from which Troya shot at another car on Haverhill Road on September 11, 2006, leaving numerous bullet holes in the car and injuring a female driver; and (3) evidence that Sanchez, Troya and others on some unidentified date attempted a home invasion of a rapper they knew as "B Real."  This evidence should have been excluded under Rule 404(b)'s prohibition on propensity evidence, and under Rule 403 on the ground that any probative value was substantially outweighed by prejudicial effect.

The government claimed that the evidence was introduced under Rule 404(b) to show Sanchez's intent to possess the weapons found on October 25,

61

2006, during the search of the Garden Court residence.  But Sanchez did not mount a defense against the gun possession counts, and the government's evidence on those counts went completely unchallenged.  Because the evidence had at most minimal probative value, but was highly prejudicial, it should not have been admitted.  But the court inexplicably admitted it, ruling that the government had "an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes."  Once the evidence was admitted, the government exploited it to argue Sanchez's propensity for violence in summation, suggesting that the shootings gave the jury a reason to believe that Sanchez "could execute an entire family."  The erroneous admission of this evidence — and its use in this manner — was highly prejudicial.

### Point V: Other-drug-crimes Evidence

The district court also allowed the government to introduce unfairly prejudicial testimony from cooperating witnesses about Varela's involvement in extensive, multi-kilogram drug dealing outside of the time period of the conspiracy alleged in the indictment, and Sanchez's association with Varela during that time.  The court failed to address Sanchez's objections that the evidence should not have been admitted against him, because it was not related to any charge against him and because he did not contest the drug trafficking

charges.  Once admitted, this evidence was used against Sanchez as improper character evidence, unfairly (and inaccurately) portraying him as a major drug dealer, and thus as someone more likely to commit acts of violence to further the drug dealing — a "thug enforcer," as the government referred to him.

### Point VI:  *Bruton* Error

Troya made statements to a cell-mate and a cooperating witness inculpating himself in the murders.  This was the only direct evidence that either defendant participated in the shootings.  The introduction of these statements violated Sanchez's rights under *Bruton v. United States*, 391 U.S. 123 (1968), because, in light of the government's whole case, they compelled the inference of Sanchez's guilt, since there was evidence that Troya and Sanchez were together on the night of the murders and that two guns were used in the shootings.  *United States v. Schwartz*, 541 F.3d 1331, 1351 (11th Cir. 2008).  The error in admitting Troya's statements was compounded when, during closing argument, the government relied on Troya's statements as direct evidence that Sanchez was a shooter.

### Point VII: Guilt-Innocence Phase Cumulative Error

Individually and cumulatively, the district court's errors prejudiced Sanchez because they likely influenced jurors to convict Sanchez based on marginally relevant, but highly inflammatory, evidence.

63

The government presented circumstantial evidence — including fingerprints on the toll tickets for the van and the Jeep, pictures of the van and the Jeep entering the Turnpike together, and cell phone records showing that Sanchez and Troya followed the Escobedos north on the Turnpike and then south on the return trip — that Sanchez and Troya were on the Turnpike at or near the scene of the murders. But that evidence did not prove they committed the murders. Rather, it was entirely consistent with the defense that Sanchez and Troya were engaged in counter-surveillance to protect Escobedo during a drug delivery and sale, but that someone intercepted the Escobedos and killed them before Sanchez and Troya had a chance to offer any protection. This defense was supported by significant record evidence.

The counter-surveillance defense was severely undercut, however, by the court's multiple evidentiary errors in the guilt-innocence trial. Together, these errors permitted the government to portray Sanchez as a major drug dealer, with a propensity for violence, and whose co-defendant had confessed to the killings. Indeed, in closing argument, the government relied on the erroneously admitted evidence to characterize Sanchez and Troya as "thug enforcers" who "take it upon themselves to take proactive action . . . in the form of violence to protect their ongoing narcotics activity." The cumulative effect of the errors was therefore

64

prejudicial, even if each individual error was harmless.

**Penalty phase errors prevented the jury from considering Sanchez's mitigation and otherwise fairly deciding his penalty.**

In the penalty phase, Sanchez's counsel sought to explain how and why Sanchez became involved with the Varela conspiracy, and to show that, if sentenced life in prison without the possibility of release, Sanchez could contribute something positive to his family and society. The central themes of Sanchez's mitigation were his strong relationship with his son, Three, and his vulnerability to the influence of his older cousin, Varela, due to Sanchez's impaired intellectual functioning and troubled upbringing. Erroneous court rulings unfairly limited the impact of this evidence, compromising Sanchez's case for life. Other court rulings interfered with the accuracy and fairness of the jury's decision-making process, drawing into question the reliability of Sanchez's death sentences.

### Point VIII: "Execution Impact" Testimony and Instructions

Sanchez presented strong mitigating evidence concerning his demonstrated capacity for love, ability as a parent, and opportunity for redemption as a role model and father figure for his son, Three. This evidence should have formed the foundation for his strongest mitigating factors, but the court's rulings and

65

instructions prevented jurors from giving effect to it.  The court mistakenly believed that it would be improper for jurors to consider Sanchez's future relationship with his son.  It therefore precluded Sanchez from introducing evidence of that future relationship and submitting to the jury several mitigating factors, including that "[i]f sentenced to life in prison, without the possibility of release, Ricardo Sanchez can continue to be a father to his son Ricardo III."  The court further instructed jurors not to consider "execution impact," which it defined as "any loss that the son would suffer if the father were not there to continue in that relationship."

The court's approach, which appears to be unprecedented in federal death penalty cases, was error.  First, the evidence Sanchez offered was not "execution impact" evidence, but instead proper mitigation regarding Sanchez's character.  The value of Sanchez's character traits to others does not, as the district court believed, convert them into inadmissible execution impact evidence.  Indeed, the Supreme Court has held that evidence about a defendant's character and future conduct if spared the death penalty is relevant mitigation.  *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986).  Second, even if regarded as execution impact evidence, numerous other courts have recognized such evidence as relevant and mitigating under the Eighth Amendment and the Federal Death Penalty Act.  The

66

district court therefore improperly excluded an important category of relevant mitigation from the jury's consideration, in violation of the Eighth Amendment and the Federal Death Penalty Act.

**Point IX: Fifth & Sixth Amendments - Statements to Government Expert**

Prior to trial, the defense advised that it planned to present expert testimony in mitigation regarding Sanchez's limited intellectual functioning. Under Federal Rule of Criminal Procedure 12.2, the government had a right to examine Sanchez for purposes of rebuttal of the defense expert. Sanchez had a Fifth Amendment right to remain silent when questioned by the Government and a Sixth Amendment right to advice by counsel concerning the examination. The district court's rulings violated those rights.

The district court refused to properly limit the scope of that examination to correspond to the defense examination, to require the government to provide notice of the tests its expert proposed to administer, or to permit defense counsel to be present during the examination. These errors enabled the government's expert to conduct a broad psychological examination of Sanchez, including personality testing, that exceeded its right to rebuttal of the defense intellectual functioning exam, in violation of the Sixth Amendment and Rule 12.2.

67

Then, the court permitted the government's expert to testify not just about Sanchez's intellectual functioning, but about the full examination, including Sanchez's statements during a clinical interview and the personality testing. This was not rebuttal to the intellectual functioning mitigation, but was used to suggest that lay witness testimony about Sanchez's traumatic childhood was exaggerated or manufactured, in violation both of his Fifth Amendment right against self-incrimination and the fair rebuttal principles embodied in Rule 12.2.

These errors skewed the aggravation-mitigation balance in favor of death. Because the penalty phase was so close, the government cannot prove beyond a reasonable doubt that the court's Fifth Amendment and Rule 12.2 errors had no effect on the outcome at trial. And, but for the Sixth Amendment and Rule 12.2 errors before trial, counsel could have prevented the improper testing — and the government's improper use of it at trial — altogether.

### Point X: Improper Closing Argument

The government's closing arguments unconstitutionally interfered with the jury's consideration of Sanchez's case for life in two ways. First, the government improperly argued facts not in evidence in both phases of the case when it stated it would continue to investigate the case against Varela and would seek the death penalty in a subsequent prosecution as soon as it obtained enough evidence to do

68

so.  This undermined Sanchez's sole statutory mitigator that an equally culpable co-defendant was not facing capital punishment, and several related mitigating factors.  Second, the government repeatedly argued in the penalty phase that Sanchez's mitigating evidence amounted to nothing but "excuses" that had nothing to do with the crimes at issue.  This argument violated clear Supreme Court precedent that mitigating evidence need not have a nexus to the underlying crime in order to be considered by the jury.  *See Tennard v. Dretke*, 542 U.S. 274 (2004).[33]  These two lines of improper argument served effectively to nullify Sanchez's case in mitigation, denying his fundamental rights to due process under the Fifth Amendment, to present a defense under the Sixth Amendment, to be free from cruel and unusual punishment under the Eighth Amendment, as well as his rights under the Federal Death Penalty Act to present and have the jury consider mitigating factors.

### Point XI: Consequences of Deadlock

At the sentencing hearing, the court provided jurors with a verdict form on the capital counts that permitted them to render a verdict of not-unanimous as to all three options — death, life imprisonment, or a "lesser sentence."  But the court

---

[33]  The court's erroneous instructions regarding statutory and non-statutory mitigators exacerbated this error.  As noted, Sanchez has adopted the argument on that issue from Troya's brief (Point X, pp. 200-205).

refused to tell jurors the legally-mandated consequence of a not-unanimous verdict:  that Sanchez's noncapital convictions and laws requiring consecutive sentences meant that he faced a minimum 125 years' imprisonment — an effective life sentence.  The court's charge thereby introduced an arbitrary factor into the jury's sentencing deliberations and risked coercing a death verdict because life-leaning jurors may have been pressured into switching their votes to death simply to avoid what they feared might be a lesser sentence.  This violated due process and the prohibition on cruel and unusual punishment, under the Fifth and Eighth Amendments.

### Point XII: Other Uncharged Serious Acts of Violence

The first non-statutory aggravator asked the jury to determine beyond a reasonable doubt whether Sanchez "participated in other, uncharged serious acts of violence."  In its penalty phase closing arguments, the government argued that both the Suwanee shooting and Sanchez's battery conviction supported the aggravator and justified a death sentence.  But neither the jury instructions nor the verdict form required the jury unanimously to identify which act or acts it had found beyond a reasonable doubt.  By allowing jurors to consider these uncharged and unrelated acts of violence collectively, the aggravator as submitted undermined juror unanimity in the penalty phase, in violation of the Due Process

70

Clause and the FDPA.

## Point XIII: Penalty Phase Cumulative Error

Reversal of Sanchez's sentences is required because the district court's rulings at the penalty phase of the trial resulted in a one-sided proceeding, at which the defense was prevented from presenting critical mitigation,[34] jurors were admonished not to consider certain evidence and argument in support of the case for life, and the prosecution was permitted to urge jurors to sentence Sanchez to death based on inflammatory, inadequately proven,[35] or incomplete information. Collectively, these penalty phase errors cannot be deemed harmless beyond a reasonable doubt, as required by the Constitution and the FDPA, if this Court is to affirm.

---

[34] This includes the "execution impact" mitigation addressed herein (Point VIII) and in Troya's brief (Point IV), as well as the testimony proposed to rebut the government's allegations of future dangerousness, *see* Troya brief (Point III).

[35] The FDPA mandates review of whether each aggravation finding was supported by the evidence. As discussed in Troya's brief (Points V-VII), and adopted herein, the evidence was legally insufficient to support four aggravating factors — substantial planning, witness elimination, vulnerable victim, and pecuniary gain.

## ARGUMENT

### I.

### [Adequacy of Voir Dire]

**The district court's failure to identify jurors who would automatically impose the death penalty resulted in a jury unqualified to sit in this capital case.**

The Constitution guarantees a capital defendant the right to an impartial jury that is capable of making a reliable sentencing determination.  *See Morgan v. Illinois*, 504 U.S. 719, 729-30, 736-38 (1992); *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988).  Part of this guarantee is the right to an "adequate voir dire to identify unqualified jurors." *Morgan*, 504 U.S. at 729.

To be qualified to serve in a capital case, jurors must:

- Not be so in favor of the death penalty that they would automatically impose it in every murder case.

- Be able to consider a sentence other than death regardless of the circumstances of the defendant's particular crime.

- Be able to consider mitigating factors involving the defendant's background, record or character.

*See Morgan*, 504 U.S. at 719, 736-39.  Here, the district court refused repeated defense requests that it ask simple, direct questions of jurors on these critical, qualifying characteristics.  As a result, this Court cannot be confident that the

72

jurors who decided Sanchez's fate were in fact qualified to serve in a capital case.

First, the court refused to ask prospective jurors the essential *Morgan* question: whether they would automatically impose the death penalty if Sanchez was convicted. Instead, the court merely asked whether jurors would vote for death without first <u>considering</u> aggravating and mitigating factors. This question failed to satisfy *Morga*n, because jurors could have truthfully answered "no," while still harboring fixed opinions that such consideration would invariably yield a death verdict.

Second, while the court noted that the sentencing process would require consideration of "mitigating factors," it never said what this meant, and refused to tell veniremembers that it included "factors in the defendant's background, record, or character." 18 U.S.C. § 3592(a)(8). Veniremembers thus had no way of knowing that mitigating factors embraced anything beyond the circumstances of the crime, and could have answered that they were able to consider mitigating factors, while firmly believing that any evidence about the defendant's history should be rejected as a version of the "abuse excuse." This is particularly disturbing since Sanchez's mitigation case focused almost exclusively on his background and character.

Third, the court also refused to ask potential jurors whether the fact that two of the victims were very young children would interfere with their ability to consider mitigating factors. Instead, it merely mentioned these victims' youth, along with a slew of other facts, in its introductory remarks to each panel — and then declined to ask any question that would have drawn jurors' attention to the issue. The jury, which may have included jurors who would automatically impose death on a child killer, ultimately imposed death only for the capital counts involving exclusively the child victims.

Finally, the court refused to say that the indictment charged Sanchez with an intentional killing. Instead, it told veniremembers only that they were to be tried for a carjacking that "resulted in" the victims' deaths. This statement was not an adequate substitute; if anything, it suggested that the deaths may have been accidental or that Sanchez's responsibility for them may have been indirect. The resulting confusion likely prevented identification of those veniremembers who would always vote the death penalty for someone who committed murder.

As a whole, this incomplete and imprecise questioning created an unacceptable risk that jurors biased against Sanchez on the central issues at sentencing — and therefore unqualified to serve in this case — may have been allowed to decide his fate. In the face of this uncertainty, his death sentences must

74

be vacated. *See Morgan*, 504 U.S. at 739 ("Because the inadequacy of voir dire leads us to doubt that petitioner was sentenced to death by a jury empaneled in compliance with [the Constitution], his sentence cannot stand") (citation omitted).

**A.      The court's process for "life"-qualification did not directly address the key issues in the case, employed primarily "follow the law"-type questions, and elicited almost no information from jurors.**

Before voir dire began, the defense submitted lists of proposed death-penalty questions, urging they be asked of jurors in the written questionnaire and in voir dire. (DE436-2:35-44; DE637-2:5-10, 18).

These included inquiries that plainly and directly asked if a prospective juror would automatically impose the death penalty. For example, whether the juror:

- believed that "anyone" who "commits a murder should get the death penalty" or would "always vote for a verdict of death as punishment for someone convicted of murder";

- believed that "the death penalty is always justified" when "one person intentionally kills another person"; and

- could give "consideration to a sentence of life imprisonment . . . for someone who commits a murder."

(DE436-2:37-39; DE637-2:7-8).

The defense also requested that, before questioning veniremembers about whether they could consider mitigating factors, the court explain that, under the

Federal Death Penalty Act, such factors may include "information about the life, background, or character of the defendant," such as the defendant's "history of physical, mental, or emotional problems."  (DE436-2:36, 44; DE637-2:6, 9-10).

The defense further proposed that the court inquire whether the fact that two of the victims were young children would prevent any jurors from following the law at a sentencing hearing or being fair and impartial. This included asking each prospective juror;

- if the juror could give "consideration to and weigh any mitigating evidence . . . for someone convicted of the intentional murder of two small children";

- if he or she would "always vote for a verdict of death as punishment for someone convicted of the intentional murder of two small children"; and

- what "impact . . . the age of the victim(s)" would have on the juror's "ability to sit and listen to the evidence in this case."

(DE436-2:42; DE637-2:9, 18).

Finally, several of these questions incorporated the fact that Sanchez was charged with "murder," in other words, "intentional killing."  (DE436-2:35, 37-42; DE637-2:5, 7-10).  *See also* DE633:4-5 (jurors must be asked whether they could consider mitigating factors and life sentence after having been convicted of "murder," not just of a "death eligible 'offense'").

76

Although the government made some limited objections, it did not seek to prevent these inquiries altogether.  (DE438:25-26; DE439:8-9; DE964:15-16).  In fact, the government itself proposed that the court inform jurors the victims had been "found shot to death" by the side of the Florida Turnpike, and then ask whether any "would automatically vote in favor of the death penalty" or "would automatically vote against the death penalty" if seated in this case and Sanchez were convicted.  (DE438:18, 20).  *See also* DE439:7-8.

Though both sides had requested questions about the death penalty, the court refused to include any in the written questionnaire, instead promising to address this area in voir dire.  (DE965:43).  The questionnaire also said nothing at all about the charged crimes.

Before voir dire, all veniremembers watched a 34-minute video, titled "Jury Instructions by Judge Hurley," which featured the trial judge speaking from behind his desk.  The video, specially produced for this case, focused largely on the importance of the jury system and general principles governing criminal trials. It said little about the capital crimes charged against Sanchez, describing them as involving "the deaths of four people off the Florida Turnpike" and "carjacking resulting in death."  It never mentioned the word "murder" or otherwise conveyed that Sanchez was charged with intentional killing.  As for the death penalty, the

77

video said that a sentencing decision would be made at a separate phase, that other options would include life imprisonment, that the jury would decide whether aggravating factors significantly outweighed "any mitigating issues," and that the court "intend[ed] to talk to [veniremembers]. . . on a one-to-one basis" about it. (DE643).

The court began voir dire with lengthy remarks focusing on the sentencing process.  (DE648:18-42, 151-75; DE649:455-476; DE650:590-613).[36]  The court explained that, if Sanchez was convicted, there would be a second, sentencing proceeding.  The government would have to prove "a mental intent or mental culpability factor, . . . An intent to commit a killing or an <u>intent to do something of that serious nature</u>, and there are other examples."  (DE648:162 (emphasis added). *See also* DE648:27).  For Sanchez to be eligible for the death penalty, the government would also have to prove a statutory aggravating factor, and could then prove additional aggravating factors.  These would have to be found unanimously and beyond a reasonable doubt.  (DE648:28, 163).  The defense

---

[36] On the first day of voir dire, the court questioned two panels of potential jurors, including nine who were eventually seated on Sanchez's jury.  Because the adequacy of voir dire is assessed by focusing on the jurors who were later seated, *see Skilling v. United States*, 130 S. Ct. 2896, 2920 n.24 (2010), we focus here on the voir dire of those jurors, noting those areas in which the court later made changes as voir dire progressed.

would have a chance to demonstrate mitigating factors, which would need to be proven by a preponderance, and which jurors could find individually. (DE648:29, 163-64). Jurors would weigh these factors to determine whether the aggravating factors significantly outweighed the mitigating ones, and thus whether Sanchez should be sentenced to death, or receive life imprisonment without release. (DE648:29-30, 164-65).

Nothing in the court's instructions communicated that mitigating factors included not just circumstances of the crime, but also Sanchez's record, character, and background. On the contrary, the court told one panel that aggravating factors were ones that "make the crime more serious" and mitigating factors were ones that "lessen the seriousness — and maybe that is not the right word, nothing lessens the seriousness if a human life is taken, but they are factors that ought to be considered in determining what would be the appropriate punishment." (DE648:29).[37] Other panels were told simply they were "something that the jury should know and take into consideration" in deciding punishment. (DE648:163).

The court then told each panel there were two kinds of jurors who could not serve in a case like this. The first were jurors who say "under no circumstances

---

[37] Five jurors were seated from this panel (Little, Creswick, Allen, Keys, and Yelverton). (DE648:49-51, 68-69, 73-75, 77-78, 78-79; DE727:2944).

79

could I ever impose the death penalty." (DE648:166. *See also id.* at 31-32, 39.)

The second were ones who would "vote for the death penalty <u>without engaging in this weighing process that I have been talking about</u>." (DE648:167 (emphasis added); s*ee also id.* at 32, 39).

The court never told jurors the capital charges against Sanchez involved "murder" or an "intentional killing." Instead, it described the charges in vague terms, suggesting the possibility that the deaths were accidental or Sanchez's responsibility for them indirect, because this was a carjacking that "resulted in" death. (DE648:160-61; DE648:25).

Unlike in the vast majority of federal capital trials, voir dire here was conducted exclusively by the court; the lawyers were not allowed to inquire of any jurors directly.[38] Also quite unusually, the court refused to allow any individual sequestered voir dire on death-penalty attitudes.[39] (DE436:3; DE1089:30, 32-34, 36-37). Virtually all the questioning (except for that about publicity) was

---

[38] Lawyers were permitted to write follow-up questions on pieces of paper and hand them up to the court. (DE652:6).

[39] Courts have allowed attorney-conducted voir dire in about 80 percent of federal cases, and conducted individual, sequestered voir dire on jurors' views about capital punishment in about 85 percent of cases. *See* Declaration of Kevin J. McNally, Director, Federal Death Penalty Resource Counsel Project (Sept. 18, 2008), available at www.capdefnet.org (click through to "Declarations" and then "Jury Selection").

80

conducted in a group setting, among panels of approximately fifteen.

The court had each venireperson read silently a list of ten questions, two of which pertained to the death penalty. One of these two (number seven) aimed at identifying venirepersons whose *anti*-death penalty opinions would disqualify them. It asked if any had "views that would prevent [them] from considering the imposition of the death penalty." (DE1123-1-4).

A parallel question for jurors biased in the opposite direction would have asked if any held "views that would lead them to always vote for imposition of the death penalty," "views that would prevent them from considering a sentence less than the death penalty," or something to that effect. Instead, tracking the preliminary remarks, the court's only other capital question, number eight, inquired: "If the jury were to consider the imposition of the death penalty . . . do you have . . . views that would compel you to vote for the death penalty *without* considering and weighing the aggravating and mitigating factors." (DE1123-1-2) (emphasis in original).[40]

The next part of voir dire, in which jurors actually spoke, was remarkably brief. Some of the nine seated jurors questioned on the first day of voir dire

---

[40] The phrasing of the question later changed slightly to read "evaluating and weighing." (DE1123-3-4).

literally just noted the questions by number, gave a yes-or-no answer to each (*e.g.*, "seven is no,"), and then were done. For example, the complete voir dire of Mr. Yelverton was: "Answer to one is yes. Two, no. Three, yes. Four is no. Five is yes. Six is yes. Seven is no. Eight is no. Nine is yes. And ten is yes." (DE648:79).[41] For other venirepersons, the court interjected during this litany and had them also confirm they could "engage in that weighing process" it had described in its preliminary instructions. (DE648:69).[42]

In response to defense counsel's objection that this process was not adequately identifying pro-death penalty biases, the court promised to "look at [the defense's proposed questions]" and consider adjusting its questioning. (DE648:265-66).[43] However, as it qualified the venirepersons from among whom the remaining jurors were selected, the court continued to use a set of instructions and questions that was essentially the same.

---

[41] The inquiries of other jurors were similar. (DE648:180; DE648:198-99, 203-04).

[42] *See also id.* at 50-51, 74, 78, 177.

[43] The next morning, counsel submitted an additional list of questions, including whether jurors believed in the death penalty as punishment for "intentional murders," and how they felt about the death penalty for killing children. (DE645-2:2).

The court added to the original list two more questions about capital punishment, but neither was a sufficient *Morgan* question.  One asked each veniremember: "Do you have an opinion about the death penalty and, if so, what is it?"  The other asked a question similar to the one the court had posed orally to some of the seated jurors from the first day: in considering the death penalty, "would you be able to follow and apply the law including the evaluating and weighing process as instructed by the court."  (DE1123-3-4).[44]

The defense again challenged the adequacy of the court's questioning.  It also asked to "strike the 'qualified' panels and recommence voir dire."  (DE654; DE652).  The court refused.  It did agree, "as a remedial measure," to call back those from the first day — when voir dire was most limited — for additional questioning about the death penalty.  (DE688:1421-22; DE690:1698, 1700; DE712:2604).  But it indicated it that the scope of that inquiry would be narrow: "I may need to simply go over the death penalty aspect again to make sure I properly explained that to everybody."  (DE712:2601).

---

[44] The court also slightly improved the preliminary remarks it delivered to one subsequent panel: It made clear that the capital charges against Sanchez, for which veniremembers might have to sentence him, involved the "murder" of the Escobedo family.  (DE649:311; DE649:319).  No seated jurors were qualified from this panel, however.  The government objected to the improved preliminary instructions, and by the time the next seated jurors were questioned, the court had returned to its previous script.  (DE650:591-93, 596-602, 609-10).

When those jurors returned for final jury selection, the court delivered another explanation of the sentencing process.  (DE713:2622-31).  The explanation never defined "mitigating factors;" never mentioned the child-status of two of the victims; and it never mentioned that Sanchez was charged with an intentional killing, or used the word "murder," instead referring only to "armed carjacking" that "resulted in the loss of human life."  (DE713:2622-23).

Having talked about the capital-sentencing process (the mental-state factors, the statutory aggravating factors, the non-statutory aggravating ones, the mitigating ones, the various burdens and standards of persuasion, etc.), the court said it needed "to know can someone follow and apply the law," (DE713:2629), and what opinion each juror had about the death penalty.  The nine venirepersons from this group who later served all promised to abide by the law.  And most of them said they supported or had no problems with the death penalty — if guilt was strongly established.  The additional questioning yielded little more. (DE713:2631-32, 40-46, 48-50, 57-58, 68-70).

**B.     The voir dire was insufficient to identify jurors whose pro-death-penalty biases disqualified them from serving.**

"'Voir dire plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate

voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Morgan*, 504 U.S. at 729-30, (*quoting Rosales-Lopez v. United States*, 451 U.S. 182 (1981) (plurality opinion)).

Here, the court gave short shrift to the most critical component of capital voir dire: the inquiry into whether prospective jurors harbor biases that would prevent or impair them from considering mitigating factors and a life sentence. Individually and cumulatively, the court's four significant failings in questioning Sanchez's jurors violated the Sixth Amendment's guarantee of an impartial jury and the Due Process Clause's guarantee of fundamental fairness.  These errors require a new capital sentencing hearing.

> **1.      The court refused to ask the simple, basic question required by *Morgan* — whether each juror would always vote for the death penalty.**

To identify "those prospective jurors who would always impose death following conviction," the Court in *Morgan* held that the trial judge should at least have asked the simple, direct question proposed by defense counsel: "If you found [defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts were?"  504 U.S. at 723.  As the Court observed, this question mirrored the one it had approved to determine whether anti-death-penalty

jurors are unqualified to serve, a version of which the prosecution was allowed to pose in *Morgan*: Would you automatically vote against capital punishment no matter what the trial might reveal?  *See id.* at 731, 733-34.

Here too, the court asked every potential juror if he or she held any "views that would prevent them from considering the imposition of the death penalty." The converse of this question, aimed at identifying jurors with *pro*-death penalty biases, would have inquired whether each veniremember held any "views that would prevent them from considering a sentence less than the death penalty," or something to that effect.  (And, indeed, the defense proposed questions similar to this.)  *See United States v. Brown*, 441 F.3d 1330, 1354 (11th Cir. 2006) (voir dire held adequate where district court "particularly" identified and excused "those who had predetermined their death penalty vote").

Instead, the court posed a quite different question:  whether the potential juror had " . . . views that would compel you to vote for the death penalty *without* considering and weighing the aggravating and mitigating factors."  (DE1123-1-2 (emphasis in original)).  By appending the "without considering" phrase, the court dramatically altered the meaning of the question.  Some jurors could have been willing to consider and weigh all the factors, but might still have held a strong, definite opinion that such a process would invariably yield a death verdict.

86

Despite such prejudgment, jurors could truthfully have answered "no" to the question. This "engage in the process" question suffers the same deficiency as the "could you follow the law?" inquiry the Supreme Court rejected as inadequate in *Morgan*: Jurors "could in all truth and candor respond affirmatively," to such questions, "personally confident that [their] dogmatic views" are not disqualifying, "while leaving the specific concern unprobed." 504 U.S. at 735.

Here, as in *Morgan*, Sanchez's challenge draws strong support from the pointed, straightforward death-penalty questions allowed the government. 504 U.S. at 734 (government's "own request" for more pointed questioning of jurors about bias against the death penalty "of course belies th[e] argument" that questions allowed the defense were adequate). *See also United States v. Johnson*, 495 F.3d 951, 963 (8th Cir. 2007) (government and defendant have "equal interest in exploring" veniremembers' attitudes about the death penalty). The court did not conduct a *Witherspoon* inquiry that asked only whether jurors held "views that would compel you to vote against the death penalty *without* considering and weighing the aggravating and mitigating factors." Such a question would have risked missing some veniremembers who would consider all the factors, but for whom such consideration would always yield a verdict against death.

87

Sanchez was entitled, at minimum, to the converse of the question the government was able to ask, a version of the simple, straightforward one approved in *Morgan*.

>**2. The court improperly refused to explore whether prospective jurors held any opinions that would prevent them from following the statutory requirement to consider mitigating factors involving Sanchez's "background, record, or character."**

The Federal Death Penalty Act obligates capital sentencing jurors to consider, as "mitigating factors," "factors in the defendant's background, record, or character," as well as "circumstance[s]" of the offense." 18 U.S.C. § 3592(a)(8). The Eighth Amendment mandate of individualized sentencing also makes such life-history factors pertinent. *See Penry v. Lynaugh*, 492 U.S. 302, 328 (1989) (death sentence reversed where instructions failed to permit jury to consider evidence of defendant's abuse as a child), *abrogated in part on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

The Supreme Court has further recognized that such life-history mitigation need not relate at all to the defendant's culpability for the crime. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004). *See Smith v. Texas*, 543 U.S. 37, 45 (2004) (defendant's troubled childhood need not have "nexus" to the capital murder in order to be considered mitigating). *See also United States v. Fell*, 531 F.3d 197,

88

222 (2d Cir. 2008); *Lambright v. Schriro*, 490 F.3d 1103, 1114 (9th Cir. 2007).

This case primarily involved mitigation regarding the defendant's life and experiences. *See* DE860:12-16 (listing Sanchez's proposed mitigators). To be qualified to serve on Sanchez's jury, the law required that jurors be willing to consider that type of mitigation. *See Morgan*, 504 U.S. at 736. Here, the court refused the defense request that it alert jurors, before voir dire, that mitigating factors may include "information about the life, background, or character of the defendant." Instead, the court either said nothing about what "mitigating factors" meant, or worse, suggested to one panel (which contained six of the seated jurors) that these were factors that "lessen the seriousness" of the crime (just as aggravating factors were ones that "make the crime more serious"). *See ante,* p. 79.

When the court later asked veniremembers if they could "engage in the process" it had described, which included weighing mitigation and aggravation, all the seated jurors said yes. But it cannot be assumed that they knew that mitigating factors embraced the defendant's background or character. On the contrary, several of the seated jurors appeared to focus exclusively on the crime in their promises to "engage in the process." *See* DE648:51 ("if I were sure"); DE650:629 ("if the evidence was so strong that I had no doubt that they were truly guilty");

DE713:2641-2 ("I also think that the punishment fits the crime, but I have to be totally convinced"); DE713:2644 ("it has to be 100 percent proven by the government"); DE713:2649 ("The prosecution would have to really show me that . . . the Defendants were guilty of that crime").

Had potential jurors understood that they would be called on to consider mitigating factors involving the defendant's life, and not just the crime, a significant number might well have balked.  Capital trial judges have recognized that such attitudes are prevalent.  *See*, *e.g.*, *United States v. Fell*, 372 F. Supp. 2d 766, 771 n.2 (D. Vt. 2005) ("voir dire in this case has confirmed that some prospective jurors will categorically refuse to consider" mitigating evidence about defendant's "background"); *United States v. Peoples*, 74 F. Supp. 2d 930, 932 (W.D. Mo. 1999) ("I am mindful that defendants are allowed to offer what many would consider frivolous issues in mitigation.  When empaneling the jury it was clear that some members of the public are put off by so-called mitigators that offend the sense of moral responsibility for a grave crime.").

Empirical studies of actual capital jurors have revealed that a substantial number dismiss such evidence out of hand.  *See*, *e.g.*, Ursula Bentele & William J. Bowers, *How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires Death; and Mitigation is No Excuse*, 66 Brook. L. Rev. 1011, 1042-53

90

(Summer 2001) (interviews with more than 200 capital jurors from more than 50 cases in six states indicated a significant number summarily rejected mitigation such as childhood abuse because it did not excuse the crime).

Here, in fact, the only time that the court did explain mitigating factors, during a rare, sequestered follow-up, the veniremember revealed precisely such a bias: When the juror asked what mitigating evidence she would be weighing, the court responded:  "Anything, childhood background or anything else, would you consider that . . .?"  (DE648:100).  The juror said no, explaining, "If so, you could blame every action anybody has on some previous experience."  (DE648:101)[45]

Since a defendant is entitled under *Morgan* to voir dire sufficient to identify jurors who cannot follow the statutory instruction to consider "factors in the defendant's background, record, or character," jurors have routinely been asked just such questions.  *See, e.g., United States v. Quinones*, 511 F.3d 289, 298 (2d Cir. 2007) (jurors were asked if they would support a life sentence for person who "had an abusive, neglectful or chaotic childhood" or "has below normal intelligence"); *United States v. Sampson*, 486 F.3d 13, 40 (1st Cir. 2007) (juror was questioned about ability to balance mitigating evidence of defendant's "severe

---

[45] Since this exchange took place in the presence of just the juror, counsel, and the court, others did not have the benefit of the court's single attempt to give meaning to the term "mitigating factor."  (DE648:95, 101).

91

emotional disturbance"); *United States v. Hall*, 152 F.3d 381, 408, 412 (5th Cir. 1998) (jurors were asked whether they "could consider the fact that a defendant grew up in a dysfunctional, abusive family as a mitigating factor"); *United States v. Flores*, 63 F.3d 1342, 1354 (5th Cir. 1995) ("Both the government and Garza asked the venire about their feelings toward specific aggravating and mitigating factors."); *United States v. Chandler*, 996 F.2d 1073, 1103 (11th Cir. 1993) (defense permitted to question juror about her ability to consider mitigating factor of defendant's youth). *See also United States v. Johnson*, 366 F. Supp. 2d 822, 847-49 (N.D. Iowa 2005) (recognizing that abstract inquiries will miss biases involving certain kinds of mitigation).

Sanchez does not argue that the court was required to preview any particular mitigating factor for jurors. Rather, he maintains that the court at least needed to let jurors know that mitigation involves not just the crime, but the defendant's life. It is entirely appropriate to provide such information. *See United States v. Whitten*, 610 F.3d 168, 183-84, 186 (2d Cir. 2010) (jurors asked if they would "be willing to consider evidence about the convicted individual's character and background").

The failure to ask such questions was particularly damaging here, since the focus of Sanchez's case against the death penalty at sentencing was his character,

92

record and background.  *See* Statement of Facts, Section B.1-7.  The prosecutor appeared to capitalize on the hope that jurors, thus selected, would dismiss such mitigation out of hand:  He repeatedly argued in summation that Sanchez's mitigating factors were "tiny and infinitesimal" because they had "nothing to do with" and therefore could not "excuse[]" the murders.  (DE847:9519).  *See also post*, Point X.B.

This improper argument may well have hit home with at least some of the jurors who sentenced Sanchez to die: On the verdict sheets the jury filled out for both Sanchez and Troya, no mitigating factor involving either defendant's character, background, or record was found unanimously, and many were found by none, or by only a handful, of the jurors.  (DE859:12-14; DE860:12-17).

3.   **Given the facts of this case, *Morgan* also required that the district court inquire whether jurors would impose the death penalty for someone who had killed two small children.**

Someone who would automatically impose the death penalty for the murder of a child, just like someone who would never impose the death penalty for the murder of some category of victims, should not have been qualified to sit in Sanchez's case.  *See United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995) (court properly excused juror who could never vote for the death penalty where victim was coconspirator in a drug-trafficking case).  But the court refused to

93

undertake the questioning needed to identify such jurors. *Cf., e.g., United States v. Honken*, 381 F. Supp. 2d 936, 993 (N.D. Iowa 2005) ("voir dire of Juror 902 demonstrated that she would weigh the aggravating and mitigating factors, with an open mind to both possible sentences, even if the evidence proved the murder of children . . . . Thus, this juror was both life- and death-qualified as required by *Morgan*.").[46]

Although the court initially mentioned the youth of the victims in its lengthy preliminary remarks to each panel, it never asked potential jurors, including any of the 12 seated ones, a single question on this subject. The defense had proposed several, including whether jurors could consider and weigh mitigating evidence for someone convicted of killing two small children, whether they would always vote for the death penalty in such a case, and what impact the victims' youth would have on their ability to listen to the evidence. *See ante*, Section I.A.

---

[46] As in *Honken*, other federal courts have allowed such questioning in death-penalty trials involving young child victims. *See, e.g., United States v. Mitchell*, No. CR-01-01062-PCT-MHM, Transcript at 131 (D. Ariz. Apr. 1, 2003) (court asks one juror, as it did others, "what if the victim is a child, would that affect your decision on the . . . death penalty?" and "would you be able to listen to all the facts and the law and consider a sentence of life imprisonment if the defendant was convicted of murdering or killing a child?"); *United States v. Bourgeois*, No. CR-C-02-216, Transcript at 1-7 (S.D. Tex. Apr. 20, 2002) (court overrules government objection to asking jurors if they would automatically impose death for "murder of a two-year old child").

A disqualifying bias for death in cases involving the murder of young children was likely common in the community.  Such biases must be the subject of questioning.  *See Morgan*, 504 U.S. at 723 n.2, 735 n.9 (noting that refusal to consider mitigation is not uncommon).  *Cf. Turner v. Murray*, 476 U.S. 28, 35 n.7 (1986) ("It remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would influence the jury].") (internal quotation marks and citation omitted).  This Court has similarly recognized that "relief is required where there is a significant possibility of prejudice plus inadequate voir dire to unearth such potential prejudice in the jury pool." *Jordan v. Lippman*, 763 F.2d 1265, 1275 (11th Cir. 1985).

That standard is amply satisfied here.  It is well known that prospective jurors are often particularly inflamed by the murders of children and may be prone to impose the death penalty in such cases.  A study of actual capital jurors revealed that "the child victim had a pronounced effect" on capital jurors.  "This strong reaction in cases in which the victim is a child is unsurprising, as the child victim touches practically every rational and emotional chord calling for the severest punishment possible . . . ."  Scott E. Sundby, *The Capital Jury and Empathy: The*

95

*Problem of Worthy and Unworthy Victims*, 88 Cornell L. Rev. 343, 346 (2003).[47]

Here, the youth of the two child victims, Damian, age 3, and Julian, age 4, proved central to the jurors' death verdicts. They imposed death sentences only for the two counts limited to the killings of the boys, and life sentences on all the counts involving adult victims. And one press account of a juror interview suggested that at least some jurors felt the death penalty should be automatic for killing such young children: "[I]n the end, there was no other aspect of the case of the case . . . that could erase the line . . . the killers crossed. 'The children were sacronsanct,'" said the juror. Daphne Duret, *Brutality to Children in Turnpike Killings Left Juror No Doubts*, Palm Beach Post, at A1A (Apr. 3, 2009).

In voir dire, it did not suffice for the court to briefly mention the child victims in its extensive, complex introductory remarks and then later ask potential jurors generally whether they could "engage in the process." True, a few veniremembers did take note of the victims' youth and volunteered that this would

---

[47] Even jurors generally opposed to capital punishment often make an exception for crimes against children. Jurors who would only impose death in such cases are subject to removal for cause. *See, e.g., United States v. Fields*, 516 F.3d 923, 937-38 (10th Cir. 2008) (affirming removal for cause of juror who would only support the death penalty for narrow category of cases, including willful killing of children); *United States v. Flores*, 63 F.3d 1342, 1355 n.10 (5th Cir. 1995) (same, murder of a small child); *Antwine v. Delo*, 54 F.3d 1357, 1369 (8th Cir. 1995) (same, brutal murder of small child). The same is true for juror who would always impose death in such cases.

make it difficult for them to serve.  (*E.g.*, DE648:56).  But the absence of any questioning on the subject makes it impossible to know whether other jurors held such views when they gave qualifying answers to those generalized questions.

> **4.       The court refused to say that Sanchez was charged with committing an "intentional killing," *i.e.*, "murder," preventing the court from identifying prospective jurors who would automatically vote for death on conviction.**

The trial indictment included five capital counts, each of which accused Sanchez of committing an intentional killing.  Count 6 charged that he and Troya acted "with the intent to cause death and serious bodily harm" in committing the crime of carjacking.  Counts 7-10 each charged that he and Troya "caused the death of a person through the use of a firearm, which killing is a murder . . . in that" he and Troya "with malice aforethought, did unlawfully kill" each of the four victims "by shooting him with the firearm willfully, deliberately, and maliciously, and with premeditation."  (DE305:7-11).  These allegations were not surplusage; rather, they constituted elements from the statutes Sanchez was charged with violating.  *See* 18 U.S.C. §§ 924(j), 1111(a), 2119.

Yet neither in the questionnaire, the videotaped instructions, the oral preliminary remarks, nor the voir dire did the court convey to the seated jurors that Sanchez stood charged with an "intentional killing."  Nor, indeed, did it use the

shorthand term "murder" to describe the charges.  On the contrary, by describing the victim's deaths in vague, passive terms, as having "resulted from" the carjacking in which Sanchez conspired or participated,[48] the court's language conjured a possible scenario in which they had perished by accident, or in which Sanchez  may have been only indirectly involved.

That this case involved an intentional killing, a "murder" was neither a collateral detail nor some sentencing fact the defense was improperly seeking to preview.  Rather, it rested at the heart of any meaningful effort to identify jurors who harbored disqualifying, fixed pro-death-penalty opinions.[49]

This follows from the basic logic of *Morgan*'s holding that a capital defendant is entitled to "voir dire" adequate "to lay bare the foundation of [a]

---

[48] "If death results" is also statutory language, 18 U.S.C. § 2119, but using that language alone does not convey the full meaning of the charges.

[49] It is not merely a remote or abstract possibility that, because of the court's failure to explain the basic nature of the charges, some of the jurors who sentenced Sanchez to die harbored automatic death-penalty views about intentional killings. Empirical studies of actual capital jurors have shown that many such persons find their way on to capital juries. *See* Marla Sandys & Adam Trahan, *Life Qualification: Automatic Death Penalty Voter Status and Juror Decision Making in Capital Cases*, 29 Just. Sys. J. 385, 393 (2008); John Blume et al., *"Life Qualification" Through Expanded Voir Dire*, 29 Hofstra L. Rev. 1209, 1244-45 (Summer 2001) ("all too often . . . the potential jurors are . . . thinking of circumstances that would make the crime not a murder at all, let alone a capital murder").

challenge for cause against those prospective jurors who would always impose death <u>following conviction</u>," 504 U.S. at 733 (emphasis added).  For that holding to be meaningful, the court must identify that the defendant is charged with an intentional murder.  "Following conviction" must refer to the crime charged — here, intentional murder.

Although, in *Morgan*, the question the defense unsuccessfully sought to ask did not specify the crime charged, *id.* at 723, all the prospective jurors had previously been told that the charge was "murder."  And the trial court had also instructed most of the panels that Morgan was accused of having "without lawful justification, intentionally and knowingly shot and killed" the victim.  Joint Appendix, *Morgan v. Illinois*, 1991 WL 11009384 *8a, 77a, 89a (filed in the United States Supreme Court, Dec. 3, 1991).  Accordingly, the Supreme Court assumed that the basic fact that a capital case involves a "murder" will be understood by jurors when they are subjected to the questioning required by *Morgan*.

That assumption appears to have been borne out in federal death penalty cases.  *See*, *e.g.*, *United States v. Chandler*, 996 F.2d 1073, 1103 (11th Cir. 1993) (two jurors said in voir dire "they would not automatically vote for the death penalty if they found Chandler guilty of murder"); *United States v. Whitten*, 610

99

F.3d 168, 185-86 (2d Cir. 2010) (potential jurors told, before questioning, that indictment charged defendant had "murdered two undercover police officers"); *United States v. Caro*, 597 F.3d 608, 613-14 (4th Cir. 2010) (potential jurors told, before questioning, that defendant was "charged with the first degree murder of [victim] while both of them were inmates"); *United States v. Fulks*, 454 F.3d 410, 428-30 & n.7 (4th Cir. 2006) (potential jurors asked whether they would always impose the death penalty for "intentional murder"); *United States v. Paul*, 217 F.3d 989, 1003-04 (8th Cir. 2000) (potential jurors asked whether they could consider non-death sentence for "intentional killing").

Indeed, in other capital cases, the government asks prospective jurors whether they would refuse to consider the death penalty for the particular kind of crime or defendant at hand — *e.g.*, a victim involved in drug crimes, a defendant who was the non-triggerperson accomplice, or the hirer in a contract-killing case — and successfully excuses jurors who say they could not. *See, e.g., United States v. Flores*, 63 F.3d 1342, 1356 (5th Cir. 1995); *Green v. Johnson*, 160 F.3d 1029, 1036-37 (5th Cir. 1998); *People v. Ervin*, 990 P.2d 506, 515 (Cal. 2000). In one recent federal capital case, the government used voir dire to identify and eliminate jurors who could not consider the death penalty for a reckless killing that was not murder. *See United States v. Fell*, 531 F.3d 197, 214 (2d Cir. 2008). If that is

100

permissible, then surely a capital defendant is entitled to ask veniremembers whether they would consider a life sentence for an intentional killing.

Here, because jurors were not told that the charged crimes involved intentional killing, but rather were led to think they could involve something less, the voir dire would have fallen short even if the court's questioning had otherwise been exemplary.

## C.    The serious deficiencies in the court's capital voir dire require a new sentencing hearing.

The truncated and skewed questioning of jurors that resulted from the court's multiple voir-dire errors requires reversal of Sanchez's sentences, for it created an unacceptable risk that jurors with disqualifying biases on the key death-penalty issues of non-crime mitigation, child victims and intentional killing were allowed to decide his fate.  That risk is especially intolerable given "the ease with which [it] could have been minimized." *Morgan*, 504 U.S. at 736 (internal quotation marks and citation omitted).  The deficiencies complained of here could have been avoided just by modifying or adding a few questions to the voir dire and words to the court's preliminary remarks.

Sanchez cannot and need not prove that any of the seated jurors were actually biased, since it was the court's erroneous restraints on questioning that

101

prevented his counsel from obtaining that information.  Under *Morgan*, he is

entitled to reversal of his death sentences, based on any one of the errors alone.

504 U.S. at 739 ("Because the 'inadequacy of voir dire' leads us to doubt that

petitioner was sentenced to death by a jury empaneled in compliance with"

constitutional requirements, "his sentence cannot stand") (internal quotation marks

and citation omitted).

## II.

### [*Batson*/*J.E.B.*]

**In denying Sanchez's *Batson* challenge to the government's use of peremptory strikes against black and female jurors, the court erred by failing to consider the factors the Supreme Court has recognized are probative of discrimination.**

Sanchez had "the right to be tried by a jury whose members are selected

pursuant to nondiscriminatory criteria."  *Batson v. Kentucky*, 476 U.S. 79, 85-86

(1986).  "[G]ender, like race, is an unconstitutional proxy for juror competence

and impartiality."  *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).  And

potential jurors have an equal protection right — enforceable by the defendant —

"to jury selection procedures that are free from state-sponsored group stereotypes

rooted in, and reflective of, historical prejudice."  *Id.* at 128.  *Accord Powers v.*

102

*Ohio*, 499 U.S. 400 (1991).[50]

Here, the government disproportionately struck black and female jurors. It peremptorily challenged black jurors at four times the rate of white ones, eliminating two of the three black veniremembers. And, although women were slightly more than half the venire, the government used all but one of its eight strikes against them.

In evaluating the explanations the prosecutor offered for these challenges, the court was supposed to analyze "all relevant circumstances." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). These include various factors that the Supreme Court and this Court have recognized are probative of discrimination. In Sanchez's case, however, the court appears to have accepted the government's facially race-neutral explanations without considering those factors. Had it considered them, it would have found that the government's reasons were pretextual, and therefore that the strikes of black and women jurors violated the Fifth Amendment's Due Process Clause under *Batson* and *J.E.B.*

---

[50] These protections apply to federal proceedings through the Due Process Clause of the Fifth Amendment. *See Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 616 (1991).

**A.    When Sanchez complained about the government's pattern of striking veniremembers based on race and gender, the court simply accepted prosecution's race-neutral reasons at face value.**

The government exercised seven of its eight peremptory challenges to remove women from the venire.  After the government used its second peremptory strike to remove Yanick Rankine, defense counsel challenged the strike as gender-motivated.  Defense counsel subsequently protested, on the same grounds, the government's strikes of four other women: Daisy Phillips, Melissa Silva, Genevieve Meckes, and Sally Perez.[51]  Rankine and Phillips were both black, and the defense contested their strikes as racially motivated too.  (DE727:2898-2928).

These government challenges displayed a skewed pattern.  (*Id*. at 2903, 2914).  Although women constituted 56 percent of the qualified group from which the jury was composed (19 of 34), the government used 88 percent of its strikes (7 of 8) against them.  (DE1124-2, Ex. A; DE727:2929-30).  And while only 9 percent of the group was black (3 of 34), a quarter of the government's peremptories (2 of 8) were employed to eliminate all but one of them.  (DE727:2898-2928).

---

[51] Defense counsel did not challenge the government's first strike of Lynn Hugo, nor its seventh strike of Jeanne Vandermolen.  (DE727:2898, 2921-22).

104

In short, the prosecutors went just about as far as they could go to rid the jury of blacks and women, with a single, token exception in each category: they exercised one strike against a man, and they left one black juror. (DE727:2930; DE1124-2, Ex. A). As a result of the prosecution's tactics, Sanchez was tried by a jury composed of seven men and five women. All the jurors were white, except for one black woman.[52]

The district court expressly found a prima facie case of discrimination for jurors Rankine, Phillips and Silva. It required the government to tender race-neutral reasons for all strikes to which defense counsel objected. (DE727:2902, 2908, 2914-15, 2919, 2927).

Once such reasons were offered, the court had to decide whether Sanchez had established purposeful discrimination. *See Miller-El*, 545 U.S. at 239. To do so, it needed to consider "all relevant circumstances" probative of discrimination. *Id.* at 240. *See also Snyder v. Louisiana*, 552 U.S. 472, 478 (2005) ("all of the circumstances that bear upon the issue of racial animosity must be consulted").

These circumstances include, for example, a skewed pattern of strikes, a close similarity between stricken minority jurors and seated ones the government

---

[52] Striking even one juror for an impermissible reason is sufficient to require reversal. *See Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

accepted, the government's failure to question stricken jurors on matters of supposed concern, and the implausibility that the cited attribute would have inclined the jurors against the prosecution. *See Miller-El*, 545 U.S. at 240-66 (finding that such factors established discrimination by clear and convincing evidence).

Instead, for each contested juror, the court accepted the reasons offered by the prosecutor, essentially at face value, and sustained the strike. While the court went through the motions of abstractly discussing case law and the different steps in the *Batson* analysis, its actual assessment involved simply saying that the proffered reason was, for example, "correct" (DE727:2906), "credible" (DE727:2927), "true" (DE727:2911), or "permissible." (DE727:2916). It never mentioned, and presumably did not consider, any of the various factors that bear on whether a *Batson* explanation should be accepted.[53]

A review of these factors and their application to the strikes in Sanchez's case demonstrates that the prosecutor's explanations were pretextual.

---

[53] Indeed, the court specifically disavowed the relevance of the prosecutor's disproportionate pattern of strikes when it was cited by Troya's counsel. (DE727:2903, 2914). That was erroneous. *See McGahee v. Alabama Dept. of Corrections*, 560 F.3d 1252, 1267 (11th Cir. 2009) ("disproportionate exclusion" is relevant to help show intentional discrimination under *Batson*) (*citing Miller-El*, 545 U.S. at 241).

106

**B.      The government's reasons for the contested strikes are not supported by the record, and are belied by its lack of questioning about the supposed areas of concern and by its acceptance of closely similar white or male jurors.**

**1.      Daisy Phillips**

The prosecution claimed that it struck Phillips, a black woman, because she had medical problems; because one of the answers on her questionnaire was difficult to read and understand; and because her son had been in jail on a drug charge.  (DE727:2907-09).

The court appears to have laid aside the government's first two explanations, saying it did not "ascribe . . . weight" to them, and finding that she was able to "express herself and discuss the case with her fellow jurors" and physically able to serve.[54]  (DE727:2910-11).  But, the court said, the government "may be justifiably concerned" that she had a son who had been incarcerated for a crime similar to the one charged.  Thus, the court sustained the strike.  (*Id*. at 2911).

---

[54] The court correctly viewed the first two explanations as makeweight. Phillips had no difficulty understanding or answering questions during voir dire. (DE648:193-97, 226-31).  She told the court she had suffered a stroke a year before, "but now I am better," and would be comfortable sitting as a juror. (DE648:226, 230, 258; DE713:2677-78.  *See also* DE727:2907).

107

This explanation was pretextual. Toward the end of her voir dire, Phillips — having not been asked about the subject — volunteered that "my son was in jail for drugs." It was apparently a minor charge, since she noted "[h]e wasn't there selling drugs on the street," and that, while he had gone to court, he was home now. (DE713:2678). Questioned briefly by the court, she said she did not know how he had been treated. She assured the court that there was nothing about her son's experience that would affect her ability to judge the evidence in Sanchez's case. (DE727:2678-79).

The government made absolutely no effort to ask Phillips about this subject, to fill in her vague statements and determine, for example, what crime her son had been charged with, the nature of the alleged incident, what court he had been prosecuted in, what attorneys or judge handled the case, or how it had ended. If the prosecutors had truly been focused on the issue of Phillips's son, rather than just her race and gender, they would have pursued such questions. *See Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009) (credibility of explanation is undermined "when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned [about]") (*citing Miller-El*, 545 U.S. at 246).

Further discrediting this explanation was the prosecution's acceptance of white or male jurors with relatives who had been prosecuted for a crime or had drug problems. *See Miller-El*, 545 U.S. at 241; *Parker*, 565 F.3d at 1271 ("prosecutor's explanation" is undermined when it is "equally applicable to jurors of a different race who have not been stricken").

Mark Sollenberger, a while male, wrote on his questionnaire that he had three brothers-in-law who had "several convictions DUI." (Jury Questionnaire, at 7).[55] The prosecution also accepted a white woman, Marye Allen, who stated that several members of her extended family had problems with drugs. (DE713:2669). In addition, Donald Little had a stepsister with drug problems, but the government did not strike him. (DE713:2666-67). Sollenberger, Allen, and Little were all seated as jurors.

In light of the prosecution's complete lack of interest in questioning Phillips about her son's drug case, and its failure to strike similar white or male jurors, this explanation cannot be accepted.

---

[55] The jury questionnaires are maintained by the Jury Section of the Clerk of Court and were unsealed and released to counsel by court order for purposes of this appeal. (DE508; DE 1118). Should the Court wish, counsel will provide copies to the Court.

109

### 2.   Melissa Silva

The prosecution claimed to have struck Melissa Silva, another female veniremember, because she had a long drive to the courthouse, was "nervous" in rush-hour traffic, "and we don't want a juror to be substituted."  (DE727:2915).

While Silva had expressed surprise at the traffic during her first day commuting from Belle Glade to the courthouse in West Palm Beach, and said it was "hectic" and "strained," she never sought to be excused on this basis; on the contrary, she told the court she could still serve.  (DE713:2663-64).

The government's purported reliance on these responses was highly implausible.  A hectic, unfamiliar commute hardly suggested that Silva would ultimately be unable or unwilling to continue as a juror and have to be excused. Indeed, such a concern, in the face of her assurance to the Court that she could handle the driving, smacks of sexism.  *See McGahee*, 560 F.3d at 1265 ("the State's claim that several African-Americans were of 'low intelligence' is a particularly suspicious explanation given the role that the claim . . . has played in the history of racial discrimination from juries").

Where the government's proffered reasons are not supported by the record, the court may properly conclude that the strike was impermissibly motivated by race or gender.  *See Snyder*, 552 U.S. at 479-486 (prosecutor's assertion he struck

110

black juror because of juror's conflicting obligations was pretextual where the juror discounted the conflict and the prosecutor accepted white jurors with equally or more serious conflicts); *Miller-El*, 545 U.S. at 252 ("If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.").

### 3.    Genevieve Meckes, Yanick Rankine, and Sally Perez

The prosecution sought to justify his strikes of potential jurors Meckes, Rankine, and Perez by claiming that their attitudes about the death penalty specifically, or punishment generally, rendered them unsuitable.  However, the record suggests that these explanations were pretextual because white male jurors accepted by the prosecutor also expressed ambivalence about capital punishment.

Genevieve Meckes worked for the federal government as a postal employee and was a victim of a drug-related robbery, attributes that presumably would tend to make her more prosecution-oriented.  (DE727:2919).  Nonetheless, the prosecution used its sixth peremptory challenge to remove her.  It claimed that her voir-dire references to God deciding "fate" and weighing each "cherishe[d] soul and life" in a death-penalty decision might incline her to a "subjective evaluation" of aggravating and mitigating factors.  This, the prosecution, added, was the sort of "touchy feely type stuff the Government did not want in a juror."  Defense

111

counsel objected, arguing that "touchy feely" was not a gender-neutral reason. (DE727:2919-20).  The court found that the prosecutor's reason was "credible" because the juror's "subjective feelings have[] nothing to do with her gender." (DE727:2921).

These explanations, though, distorted the record.  *See Miller-El*, 545 U.S. at 244 (rejecting *Batson* explanations that "mischaracterized" voir dire).  Meckes referred to everyone having a life and soul in the context of discussing her own special attachment to children through volunteer work and how she would consider a case involving child victims.[56]  Thus, it appeared she was focusing on the "soul and life" of each victim, not each defendant.  (DE649:341-43). Moreover, she mentioned letting God "handle the situation" and leaving things in "God's hands" in the context of saying how she drew guidance from her religious faith.  She never suggested she would have difficulty judging people or reaching decisions as a juror, even on the death penalty.  (DE649:399-401).

The prosecution's remaining two contested challenges of women cannot withstand close scrutiny.  Yanick Rankine, a nurse at the Veteran's Administration, had said she could impose the death penalty but would need

---

[56] Meckes shared that "what upset me was, two small children and the family.  I felt if they were going to murder someone why didn't they take the children away from the people and just kill the adults . . . ."  (DE649:399).

"strong evidence" because, as another veniremember had noted, "there are so many people who are found guilty and they are not guilty." (DE713:2652; DE727:2902). Sally Perez, a high school bus driver (DE727:2926-27), stated that, while she personally felt it was God's prerogative to take a life, she could vote for the death penalty if the evidence was strong and could follow the court's instructions on weighing aggravating and mitigating circumstances. (DE650:629-32). The prosecution explained that it struck her because it thought she was a person who made decisions based on subjective qualities; she was a "heart person" and had expressed some concern about judging others. (DE727:2927).

But by summarily excluding women — and women only — on the purported basis that they would have inordinate difficulty in making the sentencing decision between life and death (even though every one of them indicated on the record that they ultimately could), the prosecution essentially adopted the view that women are the weaker sex who cannot be trusted to make judgments of this magnitude. These are precisely the type of "stereotypical presumptions that reflect and reinforce patterns of historical discrimination" against women, which the Constitution prohibits as a basis to exercise peremptory strikes. *J.E.B.*, 511 U.S. at 141.

113

As compared to the white male jurors whom the government accepted, Meckes, Rankine and Perez were ultimately no more hesitant in their support for the death penalty.  Donald Boser stated he "would prefer life imprisonment over the death penalty" if the charges were proven beyond a reasonable doubt. (DE713:2657).  Similarly, Benjamin Yelverton, another seated juror, stated that he thought "[l]ife without possibility is a much more punitive action."  (*Id*. at 2645). And Amerigo Dicresce, the final juror empaneled, said that he thought that the death penalty was "vastly overused."  (DE650:635).  The prosecution did not strike any of them.

In this context, and given the disproportionate pattern of strikes against women, the government's assertions that it struck women because they were "nervous," "in a rush-hour traffic," and a "heart person" were pretextual.

**C.     This Court should consider Sanchez's comparative-juror arguments and other factors probative of discrimination apparent from the record, even though they were not cited to the district court.**

Sanchez acknowledges that his trial counsel did not specifically mention the similarities between particular stricken black or female jurors and unstricken white or male ones.  He also acknowledges that, in *United States v. Houston*, 456 F.3d 1328, 1338-40 (11th Cir. 2006), this Court declined to consider comparative-juror arguments that had not specifically been presented to the district court.

114

But Sanchez respectfully submits that this portion of *Houston* conflicts with the Supreme Court's subsequent analysis in *Snyder* and should not be followed. *See Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) (Court not bound by circuit law in conflict with subsequent Supreme Court decision).  While the *Snyder* Court recognized the difficulty in conducting "a retrospective comparison of jurors based on a cold appellate record," it nonetheless examined the state court record, which it found sufficient to evaluate the claim, and held that *Batson* had been violated.  *Snyder*, 522 U.S. at 483.  This Circuit has not squarely addressed the apparent conflict between *Snyder* and *Houston*.  *See United States v. Rowe*, 437 Fed. Appx. 800, 802 n.3 (11th Cir. Aug. 11, 2011) (reserving judgment on whether *Snyder* overrules *Houston*).  However, *Snyder* is clear that a failure to raise comparative-juror arguments in the lower court is not fatal to a *Batson* claim.

This is the same position the Supreme Court took in *Miller-El*.  In *Houston*, this Court erroneously distinguished the Supreme Court's consideration of comparative-juror analysis in *Miller-El* based on the fact that the trial in *Miller-El* occurred before *Batson*.  *See Houston*, 456 F.3d at 1338-39 & n.8.  But, as the Fifth Circuit observed, *Miller-El* reached the Supreme Court following a post-*Batson* remand hearing in the trial court, at which Miller-El had again failed to advance any comparative-juror arguments.  *See Reed v. Quarterman*, 555 F.3d

115

364, 371-73 (5th Cir. 2009). Nevertheless, the Supreme Court considered those arguments on federal habeas appeal, as it subsequently did in *Snyder*.

Indeed, the dissent in *Miller-El* expressed the same view as this Court in *Houston*, arguing that the Supreme Court could not consider the comparative analysis because Miller-El had not presented it at his *Batson* hearing. *Id.* at 283 (Thomas, J., dissenting). The majority soundly rejected that argument:

> The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El's arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been "put before the Texas courts." . . . But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence . . . . There can be no question that the transcript of *voir dire*, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not "fairly presen[t]" his *Batson* claim to the state courts.

*Id.* at 241 n.2 (internal citations omitted).[57]

If comparative-juror arguments not raised in a state trial court must be considered in a federal habeas appeal, certainly the same kind of arguments not raised in a federal trial court must be considered in a federal direct appeal.

---

[57] *Houston* relied on footnote 2 from *Miller-El*, but mistakenly turned it on its head, saying: "*Miller-El* recognizes that . . . 'theories about'" the *Batson* evidence "will only be considered by a court of appeals if they were offered at the trial court level." 456 F.3d at 1339 (*quoting Miller-El*, 545 U.S. at 241 n.2).

116

**D.     Conclusion**

A careful review of facially neutral explanations based on relevant record factors is a critical element of a *Batson* or *J.E.B.* analysis.  Without such review, the prohibition on discrimination in jury selection would be reduced to an empty promise.  *See Miller-El*, 545 U.S. at 239-40.  Here, the district court did not evaluate "the totality of the relevant facts," as it was required to do.  The court did not take account of any of the indicia of improper motivation identified by the Supreme Court and this Court.  Taken together in this case, these indicia constitute strong evidence of discriminatory intent.  Sanchez's convictions should be reversed, and he should be granted a new trial.

## III.

### [Unanimous Exercise of Peremptory Challenges]

**The district court abused its discretion by requiring the capital and noncapital defendants to unanimously exercise twenty peremptory challenges.**

The district court ordered all defendants — capital and noncapital alike — to share twenty peremptory challenges and ordered the challenges to be exercised unanimously.  If the defendants could not agree whether to accept or reject a potential juror, that person was seated on the jury.  (DE708).  As a result of the district court's rulings, the venire contained two jurors — Jeffrey Manning and

117

Consuelo Minutoli — that Sanchez and Troya wished to strike but could not. The district court's unanimity requirement was error because it forced the capital defendants to accept jurors whom they believed could not fairly adjudicate the penalty phase, in violation of the Sixth and Eighth Amendments.

**A.      The district court's unanimity requirement impaired Sanchez's ability to select an impartial jury because of the conflict of interest between capital and noncapital defendants.**

The number of peremptory challenges in a federal trial is governed by Rule 24 of the Federal Rules of Criminal Procedure, which prescribes that, for offenses "punishable by death, each side is entitled to 20 peremptory challenges." Fed. R. Crim. P. 24(b)(1). Although the district court is given latitude in determining how peremptory challenges are distributed, that latitude is limited by the Sixth Amendment's guarantee of an impartial jury and the "essential demands of fairness[,]" *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976) (internal quotation marks and citations omitted), and, in a capital case, the Eighth Amendment's requirement of "a heightened standard of reliability," *Ford v. Wainwright*, 477 U.S. 399, 411, (1986).

When the district court first proposed the plan to require capital defendants to unanimously exercise peremptory challenges, counsel for Varela objected, stating, "I am going to have a different motivation in picking jurors than Sanchez

118

and Troya." (DE688:1433). Counsel for Sanchez likewise objected, arguing that the unanimity requirement was unduly prejudicial to the capital defendants. As counsel explained, the capital defendants were more concerned with the penalty phase:

> [T]he defense for the capital defendants have a different concern, and we are picking a penalty phase jury, that is where our whole focus is. Those are quite different jurors . . . and I am afraid we are going to have serious disagreements on who we want on this panel . . . .

(DE688:1434-35).

Balancing these competing interests was further complicated by the equal split between capital and noncapital defendants. The court's initial inclination was to resolve disagreements between defendants by majority vote. (DE688:1435) ("If need be I would insist you take a vote and I will honor the majority of the defense."). Since the equal split could (and did) lead to tie votes, defense counsel proposed a solution based on Rule 24 in which the capital defendants would receive twenty peremptory challenges, the noncapital defendants would receive ten peremptory challenges, and the government would receive twenty-six peremptory challenges. (DE690:1703-04).[58] The court rejected this proposal as too time-consuming. (DE690:1705).

---

[58] In noncapital felony cases, defendants receive ten peremptory challenges, and the government receives six. Fed. R. Crim. P. 24(b)(2).

119

A number of other possible resolutions were discussed. (DE690:1709-10; DE689:1855, 1859-60). The court's final proposal was that it would grant each defendant one additional peremptory challenge that could be exercised against any one juror over the objection of his or her co-defendants. (DE711:2171-72). In return, the government would receive four additional peremptory challenges for a total of twenty-four. (*Id.*) Counsel for Sanchez and Troya objected, observing that while each defendant would receive one challenge, the government would receive four even though it had no conflicts of interest. (DE711:2174; DE712:2610). Because all defendants could not agree to accept the additional peremptory challenge, the court ruled that the defendants would share twenty peremptory challenges to be exercised unanimously. (DE708; DE727:2876).

The court's main concern was that no defendant be permitted to remove a juror from the venire when another defendant, especially one of the capital defendants, wanted that person to remain on the jury. "I am deeply concerned that somebody … [would] have a unilateral right to exercise a challenge without consulting anybody else and may ultimately say, I want this person off. I don't think that should happen if Mr. Sanchez or Mr. Troya says, I want that person." (DE689:1863-64, 1853). But no defendant had expressed that concern. In fact, that "concern" merely reflects how peremptory challenges operate. The "solution"

120

the court adopted created the opposite problem, forcing the capital defendants to accept jurors they felt could not fairly serve.

There were alternatives available to the court that would have balanced the parties' interests without disadvantaging the capital defendants.  The court could have granted defense counsel's request and allocated a set number of peremptory challenges to the capital defendants and a set number to the noncapital defendants, with each group to exercise their peremptory challenges jointly.  Or, the court could have ruled that if the defendants could not agree on whether or not to exercise a peremptory challenge, the prospective juror would be removed from the venire.[59]  Or, the court could have given each defendant an additional peremptory challenge without conditioning the grant on the government receiving four additional challenges.[60]  Under any of these approaches, no matter how the government chose to exercise its peremptory challenges, the capital defendants could have prevented jurors whom they believed had a predisposition to vote for the death penalty from serving on the jury.  Instead, the district court unfairly

---

[59] Had the court excused all persons on which the defendants could not agree, the defense would have used nineteen peremptory challenges to select the petit and alternate jurors – within the limit set by Rule 24(b).

[60] *E.g.*, *United States v. Harris*, 542 F.2d 1283, 1294 (7th Cir. 1976) (granting each defendant an additional challenge to be exercised separately without providing the government an additional challenge).

required the capital defendants to accept jurors whom they wished to strike simply because the noncapital defendants wished to retain them, even though the capital and noncapital defendants had competing interests and the stakes for the capital defendants were much higher.

In *United States v. Lopez*, this Circuit denied a challenge by Sanchez's co-defendants to the jury selection process, relying on *United States v. Hooper*, 575 F.2d 496 (5th Cir. 1978), which "approved the requirement of unanimous consent for the exercise of peremptory challenges." *United States v. Lopez*, 649 F.3d 1222, 1244 (11th Cir. 2011) (*citing Hooper*, 575 F.2d at 498). However, neither the Supreme Court nor any lower court has squarely addressed the issue raised here: whether <u>capital</u> defendants should be required to <u>jointly</u> exercise peremptory challenges with <u>noncapital</u> defendants given the unique nature of the capital sentencing phase.[61]

---

[61] In a noncapital case, *United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999), the district court granted eight co-defendants sixteen peremptory challenges and required that they exercise them jointly. When the defendants could not agree whether to challenge two particular jurors, the district court held a vote. The resulting four-four split meant that both jurors were seated on the jury. The Sixth Circuit held that the district court did not abuse its discretion because each defendant failed to describe "how his case [was] sufficiently different in nature from his co-defendants' cases to render the district court's joint-challenge, majority-rule system an abuse of discretion under the circumstances." *Id*. at 436. Here, the interests of the capital defendants in finding jurors who could also consider a life sentence at penalty clearly conflicted with the noncapital

The Supreme Court has repeatedly recognized that because of the death penalty's unparalleled severity and irreversibility, the Eighth Amendment imposes a heightened requirement for reliability "in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). *See also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (death is qualitatively different from all other forms of punishment, and this difference "calls for a greater degree of reliability when the death sentence is imposed"). A critical component of heightened reliability is the selection of an impartial jury that can properly find facts and apply law at both the guilt and sentencing phases. The heightened constitutional need for reliability in capital cases requires that potential jurors are adequately questioned during voir dire about any potential biases so that they can be excused for cause or peremptorily challenged. *See e.g.*, *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) ("lack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges").

By enabling each side to exclude those jurors it believes will be the most partial toward the other side, peremptory challenges are a means of "eliminat[ing] extremes of partiality on both sides," *Swain v. Alabama*, 380 U.S. 202, 219 (1965),

---

defendants and their interests in only guilt phase jurors.

123

thereby "assuring the selection of a qualified and unbiased jury," *Batson v. Kentucky*, 476 U.S. 79, 91 (1986). In this way, while "peremptory challenges are not of federal constitutional dimension," *see United States v. Martinez-Salazar*, 528 U.S. 304, 311 (2000), they are "one of the most important of the rights secured to the accused," *Pointer v. United States*, 151 U.S. 396, 408 (1894). *See Swain*, 380 U.S. at 219 ("The persistence of peremptories and their extensive use demonstrate the long and widely held belief that the peremptory challenge is a necessary part of trial by jury."). In a capital case, the exercise of peremptory challenges is even more critical because the jury is not only responsible for deciding guilt or innocence, but also life or death. The statute itself recognizes the difference between capital and noncapital cases, granting capital defendants ten additional peremptory challenges. *See* Fed. R. Crim. P. 24(b).

The Supreme Court's analysis of a related issue makes clear that Rule 24(b) was meant to ensure that defendants have a choice over who the jurors are. In *Martinez-Salazar*, the Supreme Court held that a defendant's right under the rules governing the exercise of peremptory strikes is not violated when that defendant exercises a challenge to remove a potential juror after the court erroneously refuses to dismiss a juror for cause. "A hard choice is not the same as no choice." *Martinez-Salazar*, 528 U.S. at 315. Here, and in contrast to *Martinez-Salazar*, the

124

capital defendants had no choice but to accept Manning and Minutoli on the jury.

The district court recognized that there "may not be commonality of concerns" where some of the defendants face death penalty charges. (DE688:1436). But it failed to consider that its approach to peremptory challenges meant that the capital defendants would have the question of life or death decided by persons who they believed could not fairly decide those questions, but whom they could not strike from the jury. Rather than provide heightened safeguards to capital defendants, the district court curtailed the protections provided to them by requiring them to jointly exercise peremptory challenges with their noncapital co-defendants.

Because counsel could not exercise a peremptory challenge to strike Manning and Minutoli, the capital defendants were deprived of an opportunity to remove otherwise qualified jurors whom they believed had a predisposition to vote for the death penalty, in violation of Rule 24(b) and the right to an impartial jury.

**B.      Sanchez was prejudiced by his inability to strike jurors Manning and Minutoli during the penalty phase.**

The district court's ruling lessened the reliability of the jury's verdict and prejudiced Sanchez at sentencing. While "peremptory challenges can be exercised for any reason or for no reason at all[,]" *Nell*, 526 F.2d at 1229 n.8, counsel's

125

reasons for seeking to remove both jurors in this case are apparent from the record.

Minutoli was present when venire members made prejudicial statements about their views on the death penalty during group voir dire.  On the fourth juror panel, potential juror Sarah Valencia commented that, "if the Government established an exceptionally strong case, I would not have a problem with [the death penalty]."  She continued, "In certain cases particularly dealing with minor children, I might – you know, I have more strong feelings in that area." (DE649:524).  Although defense counsel did not move to strike this panel, Sanchez's counsel recognized a potential taint problem and requested in writing that the court inquire as to whether "the comments that any of your fellow jurors made today clarified or changed the way you feel about any of the issues discussed.  In what way[?]  Which issues[?]"  (DE644:52).  The court did not pose these questions to the panel.

Further, Minutoli was exposed to pre-trial publicity of the homicides and admitted to having a vocal negative reaction upon learning that two children were among those killed.  (DE649:561).  Similarly, while Manning asserted that the fact that he had young grandchildren would not affect his evaluation of the evidence at penalty, it is entirely possible that counsel for the capital defendants did not find

126

his conclusory statements credible.  (DE713:2673).[62]

This was a close case, and the jury struggled to determine the appropriate penalty.  After deliberating over the course of four days, the jury unanimously voted for life on three of the five capital counts, which included all the counts that involved the two adult victims.  Further, while the aggravating factors were without question serious, jurors found substantial mitigating factors involving Sanchez's childhood and youth, his prior criminal record, his limited intellectual functioning, and an equally culpable co-defendant who was not facing the death penalty.  Had counsel been able to strike those jurors perceived to be more likely to vote for death, the verdict on the other two capital counts may well have been different.  Sanchez's death sentences therefore must be reversed.

## IV.

### [404(b) Evidence of Shootings]

**Evidence of Sanchez's involvement in several shooting and firearm incidents that were unrelated to the charged offenses unfairly prejudiced Sanchez by strongly suggesting a propensity to engage in violence and to shoot at innocent victims, and was exploited during the government's summation to support conviction on the capital charges.**

---

[62] As described in more detail in Point I, *ante*, the court conducted limited voir dire in groups of fifteen of the death penalty views of potential jurors, which restricted defense counsel's ability to identify jurors more likely to vote for death and further impeded counsel's ability to exercise peremptory challenges.

127

At the guilt-innocence phase, the government, over repeated defense objections, introduced extensive and bloody evidence of other shooting incidents involving Sanchez and Troya that were unrelated to the offenses charged. Although the evidence was allowed as "intrinsic evidence" and under Federal Rule of Evidence 404(b), as evidence supposedly relevant to the drug and gun possession charges, it in fact was unnecessary for those uncontested charges and was at most of marginal relevance. It served primarily as improper evidence of a propensity to shoot at innocent victims, and it prejudiced Sanchez on the capital charges. This evidence should have been excluded under Rule 404(b)'s prohibition on propensity evidence, and under Rule 403 on the ground that any probative value was substantially outweighed by prejudicial effect.

The government compounded the unfair prejudice in closing arguments by folding the discussion of these other shooting incidents into its discussion of the homicides, thereby suggesting guilt based on a propensity to commit acts of violence with guns. The court erred by not sustaining defense counsel's objection to this improper argument.

The evidence of other shooting and firearms incidents consisted of three discrete incidents, none of which was related to the homicides charged in the indictment: (1) evidence that Sanchez used an AK-47 to shoot at a house on

128

Suwanee Drive on April 28, 2006,[63] leaving numerous bullet holes in the house and injuring one person inside; (2) evidence that Sanchez was the driver of a car from which Troya shot at a car on Haverhill Road on September 11, 2006, leaving numerous bullet holes in the car and injuring a female driver; and (3) evidence that Sanchez, Troya and others on some unidentified date attempted a home invasion of a "rapper" they knew as "B Real."  The second and third incidents — the Haverhill shooting and the attempted home invasion — are fully addressed in Troya's brief (Point I, pp. 50-57, 65-68).  Sanchez does not repeat those arguments here, but instead focuses on the Suwanee Drive shooting evidence.

**A.    The evidence of the Suwanee Drive shooting in April 2006 should have been excluded under Rule 404(b) because it was at best only marginally probative of Sanchez's uncontested intent to possess guns six months later, and any probative value was outweighed by unfair prejudicial effect under Rule 403.**

The government claimed that the evidence of the Suwanee Drive shooting was admissible under Rule 404(b) to show Sanchez's intent to possess the weapons found six months later during the search of the Garden Court residence. But the extensive detail of blood and bullet holes that the government introduced

---

[63] The government also alleged that Troya used the same AK-47 rifle on that same date to shoot up a house on Mercer Avenue.  (DE753:5670).  This incident, which did not involve Sanchez, is addressed in Troya's Brief.  *See* Troya's brief (Point I, pp. 58-65).

belied the purported rationale and made clear the true purpose of this evidence —

to show that Sanchez was a violent person who would readily shoot innocent

victims such as the Escobedo children.  In light of the marginal probative value of

the evidence on the uncontested gun possession charge, this evidence should have

been excluded as propensity evidence under Rule 404(b), and as unduly

prejudicial under Rule 403.

The government called five witnesses to testify regarding the Suwanee

Drive shooting.  Kevin Vetere testified, over objection, that Sanchez told him he

had used an AK-47 rifle to shoot up a house on Suwanee Drive in the West Gate

neighborhood of West Palm Beach.  (DE753:5657, 5671; DE361).  Vetere said

Sanchez told him it was the house of someone who was going to rob him, and that

one bullet hit the person in the buttocks while he slept.  (DE753:5672).  Maria

Lopez (Sanchez's former girlfriend) also testified that Sanchez told her about the

shooting, but she said Sanchez told her he fired at the house because a friend of

hers lived there.  (DE758:6392).

The government also introduced extensive evidence about the Suwanee

shooting from a tool mark expert and two crime scene investigators.  The tool

mark expert testified regarding 16 casings and 7 projectiles found at the scene, and

opined that eight of the casings could be identified as having been fired from the

130

same AK-47 rifle found at the Garden Court residence during the search on October 25, 2010. (DE758:6344-46). The government introduced a total of 17 photographs showing the house and a neighboring house hit by the bullets, plus six diagrams showing where in the houses the bullets hit.[64] The two crime scene investigators testified in detail regarding the strike marks caused by the shooting, going through the photographs and diagrams one by one.

The government dwelt on the fact that an occupant of one house was shot, introducing two separate photographs, shot from different angles, of the same pool of blood on the floor. (GX-612.33, 612.34). One investigator testified to seeing bullet strikes on the exterior of the building, the front door, inside the stove in the kitchen, the walls of the kitchen and the back bedroom. (DE757:6221-45). The other investigator testified to seeing the shooting victim with a wound in the right leg. (DE757:6250-55). The government also elicited testimony from both crime scene investigators regarding the pool of blood. (DE757:6239-40; DE757:6248-

---

[64] Responding to the court's concern that the evidence regarding this shooting be limited so as not to "distort" the trial and "magnif[y]" the incident, the prosecutor represented that he had only "ten pictures for two homes and four diagrams." (DE757:6218). Despite this representation, the prosecutor introduced (over defense counsel's repeated objections) 17 photographs and six diagrams. (Photographs: GX-612.1, 612.2, 612.3, 612.4, 612.15, 612.20, 621.21, 612.25, 612.26, 612.28, 612.31, 612.33, 612.14, 612.36, 612.37, 612.39, 612.40, at Tr. 6210-43, Feb. 18, 2009; Diagrams: GX-613.1, 613.2, 613.3, 613.4, 613.5, 613.6). (DE757:6211-32).

49).

When the government first mentioned its intent to introduce the Suwanee shooting evidence, defense counsel objected that it had no or little probative value and was extremely prejudicial.  Counsel argued that even limiting instructions would be insufficient to cure the unfair prejudice of such inflammatory evidence. (DE756:5814-18; DE361).  The district court ultimately ruled that although the shooting evidence was not intrinsic evidence, it was admissible under Rule 404(b) as evidence of Sanchez's knowledge of the AK-47 rifle and his intent to possess it along with the other guns found in the Garden Court residence, as charged in Counts 14 and 15.  (DE756:5820-21).  The court also ruled that the probative value would not be outweighed by the unfair prejudicial effect.  In doing so, however, the court did not consider the abundance of uncontested evidence the government had introduced regarding the gun possession charges.  *Id.*  The court gave a limiting instruction stating that the Suwanee evidence could only be considered to determine whether Sanchez had the "state of mind or the intentness" to commit the crimes of gun possession charged in Counts 14 and 15. (DE771:7500-03).[65]

---

[65] The court gave a similar instruction after Vetere testified regarding the incident.  (DE756:5982-85).

The court abused its discretion in admitting the shooting evidence because it was of marginal probative value, it amounted to evidence of a propensity to commit acts of violence with guns, and it was so inflammatory that limiting instructions could not cure the prejudice. *See United States v. Baker*, 432 F.3d 1189, 1202 (11th Cir. 2005) (evidentiary rulings are reviewed for abuse of discretion). As Rule 404(b) makes plain, evidence of other crimes or acts (also called "extrinsic evidence") may not be admitted "to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Such evidence may be admissible only for very limited purposes, such as proof of intent and knowledge. *Id.* Under Rule 403, evidence that is relevant to such a purpose should still be excluded if the probative value is substantially outweighed by prejudicial effect. As this Court has made clear, "the stronger the government's case on intent, the less the extrinsic evidence will add." *Baker*, 432 F.3d at 1205. And when intent is undisputed by the defendant, "the evidence is of negligible probative weight compared to its inherent prejudice and is therefore uniformly inadmissible." *Id.*

Here, although Sanchez pleaded not guilty to the gun possession charges and thereby put in issue all elements including intent, *United States v. Edouard*, 485 F.3d 1324, 1345 (11th Cir. 2007), he did not launch any defense against these

133

charges at trial, and the government's evidence on them was undisputed. The government established that Sanchez was present and living in the Garden Court residence on October 25, 2006, the date of the search in which the 14 weapons charged in Counts 14 and 15 were found. Vetere testified without contradiction that the guns had been in plain view around the house, including in Sanchez's room, and that he, Troya and Sanchez had put all the guns in a bag several days before the search. (DE753:5575-76). Sanchez never contested the evidence that he was living at that residence at the time of the search, nor that the guns were present in the house, nor that he had access to the guns. Accordingly, the probative value of the Suwanee shooting, which occurred six months before the search, was minimal. The district court entirely failed to consider that the evidence had such negligible probative value in ruling that the evidence was admissible. *See Old Chief v. United States*, 519 U.S. 172, 184-85 (1997) (Rule 403 requires court to determine probative value of extrinsic evidence relative to other available evidence).

The unfair prejudicial effect of the evidence was substantial, especially since the court permitted the government not just to show that Sanchez possessed the AK-47 on April 28, 2006, but also to present bloody and inflammatory details that were both irrelevant to the intent issue, and powerfully and unfairly

134

prejudicial on the homicide charges.  Indeed, the court expressly ruled that "the Government has an absolute right to show the kind of destruction, the danger that was occasioned by shooting into homes."  (DE757:6218).  But the court never explained how evidence of the "kind of destruction" and "the danger" was relevant to the intent issue.  It was not.  Its only conceivable relevance was improper:  to establish a propensity to commit acts of wanton violence with weapons and endanger the lives of others.[66]

The government took full advantage of the court's ruling, presenting detailed and repetitive testimony and photographic evidence of the bullet marks in the houses and the pool of blood, as well as testimony regarding the bullet wound in the leg of the man who had been inside.  None of this evidence of injury or violence was probative of whether Sanchez had an intent to possess any of the guns found on October 25, 2006.  It served only to portray Sanchez as a dangerous gun-slinger willing to shoot up houses and people, and thus by inference also

---

[66]  The government at trial relied on this Court's not precedential opinion in *United States v. Moore*, 174 Fed. Appx. 540 (11th Cir. 2006), which held that evidence of the defendant's possession of a firearm seven months before the charged offense of unlawful possession of a firearm was admissible as evidence of intent under Rule 404(b), even though the defendant did not affirmatively contest intent.  But *Moore* is inapposite because, unlike the Suwanee shooting evidence here, the extrinsic evidence there did not involve any violence or shooting and thus it did not present the same substantial risk of unfair prejudice.

willing to kill a family on the side of the Florida Turnpike.  Even if the evidence

that Sanchez possessed and used the AK-47 on April 28, 2006, was technically

relevant to the knowledge and intent issues, the detailed evidence regarding the

bloody and violent nature of the shooting was entirely irrelevant and, at the very

least, these inflammatory details should have been excluded.  *See United States v.*

*Moss*, 290 Fed. Appx. 234, 245 (11th Cir. 2008) (although evidence that defendant

fired gun at officer was relevant, testimony and photos of bullet holes in walls of

bedroom of neighbor's daughter should have been excluded as unfairly

prejudicial: "Because this evidence did not tend to make the fact of [the defendant]

shooting [the officer] more or less probable, and likely put in the jury's minds an

idea that [defendant] could have killed [the neighbor's daughter] had [the

neighbor] and her daughters been home, it is arguable that the probative value of

the evidence was outweighed by its prejudicial effect.").

This was a case where evidence "of scant or cumulative probative force was

dragged in by the heels for the sake of its prejudicial effect."  *United States v.*

*Veltman*, 6 F.3d 1483, 1500 (11th Cir. 1993) (internal quotation marks and citation

omitted).  Given the graphic and violent nature of the extrinsic evidence, it "had

great potential to incite unfair prejudice."  *United States v. Hands*, 184 F.3d 1322,

1328 (11th Cir. 1999).  As this Court noted in *Hands*, "some types of extrinsic acts

136

are particularly 'likely to incite a jury to an irrational decision.'" *Id.* (*quoting United States v. Church*, 955 F.2d 688, 702 (11th Cir. 1992)).  In *Hands*, this Court found that violent spousal abuse fell in that category, and it reversed the defendant's conviction because the inflammatory nature of such evidence outweighed the minimal probative value it had regarding the charged drug conspiracy.  The extrinsic evidence here — that Sanchez shot up two houses with an AK-47 and wounded one person inside — was even more likely to "incite a jury to an irrational decision" than the spousal abuse in *Hands*.  *See also United States v. Utter*, 97 F.3d 509, 514-15 (11th Cir. 1996) (extrinsic evidence of prior fire in case involving arson charge "involved a high risk of prejudice" and should have been excluded in view of scant probative value).  The Suwanee shooting evidence therefore should have been excluded on the ground that any minimal probative value it may have had was substantially outweighed by its inflammatory prejudicial effect.

**B.     The government engaged in misconduct in closing argument by improperly using the Suwanee Shooting incident along with the other shooting and firearms incidents as evidence that Sanchez had a propensity for violence and shooting.**

In closing argument, the government used the Suwanee shooting evidence together with the other shooting and firearms evidence to portray Sanchez as a

137

violent person fully capable of murder.  This encouraged the jury to treat the extrinsic shooting evidence as propensity evidence that made his participation in the alleged murders seem more likely.  Defense counsel's objections to this argument should have been sustained.

Having only a circumstantial case regarding the homicide counts, the government employed a strategy of portraying Sanchez and Troya as "thug enforcers" in a violent drug trafficking organization who were willing to use weapons and violence without regard to who they were shooting.  In closing argument, the prosecutor argued that Sanchez and Troya

> are not innocent law abiding citizens, they are members of a violent drug trafficking organization headed by Danny Varela who were willing to use weapons and reap violence when required to protect the ongoing activities of that group, and it didn't matter if they knew the person or if it was a stranger.  If it threatened them, they were willing to carry guns, wear disguises and shoot, and they did that in this case. Sanchez and Troya.

(DE766:7180-81).  In rebuttal, the second prosecutor returned to this theme, describing Sanchez and Troya as the "thug enforcers from the Thug Mansion." (DE767:7437).  Turning to "the murder, Counts 7 through 10," the prosecutor argued that Sanchez and Troya were the shooters.  (DE767:7443).  "They agreed to perpetrate violence, one of them had one gun, Troya had one, Sanchez had the other."  (DE 767:7444).  The number of shots fired and the locations of the casings

138

established premeditation, the prosecutor said.  "[T]his is a military style operation

and execution by the thug enforcers.  They get them out of the car, it is a

triangulation of fire."  (DE767:7444-45).

After four pages of transcript discussing the bullet entry and exit wounds

and the ballistics evidence (DE767:7445-48), the prosecutor then folded into the

argument a discussion of the Haverhill shooting to suggest that Troya and, by

implication and association, Sanchez, were the sort of people who could execute a

family:

> Is it really pushing credulity to believe that a killer like Daniel Troya
> could execute an entire family?  All you have to look at is the
> Haverhill shooting, . . .
>
> [Defense counsel object.  Court overrules objection.]
>
> The Haverhill shooting, they believed that was involved in casing
> Pimp Plaza, and they were going to identify that car.  All three of the
> Defendants [including Sanchez, who was driving] were in that car.
> Troya sprayed a car, not seeing anybody inside that car, not knowing
> who it was, and he strikes a young black lady in the leg.  But for the
> Grace of God, she is alive.  She could have been killed.

(DE767:7448-49).  Continuing the same train of thought, the prosecutor brought

in the Suwanee and Mercer shootings on April 28, 2006, arguing that

> Sanchez and Troya possessed that AK-47 on October 25th, and you
> can use as evidence their prior use of this same weapon on April 28th
> to prove to you . . .

139

> [Defense counsel objects.  Court defers ruling.]
>
> [T]his evidence is admissible April 28th to prove knowledge and intent . . . to possess this weapon October 25th as either convicted felons or as in furtherance of their drug possession with intent to distribute that day.

(DE767:7450).  Although this argument ostensibly related to the two firearms possession counts, the prosecutor again tied these shootings to the homicides by immediately returning to the events of October 12, 2006 on the Turnpike.  The prosecutor argued that Escobedo thought Sanchez and Troya were providing counter-surveillance, but unbeknownst to him, "Troya and Sanchez were not there to insure anybody's safety, but insure their deaths. . . . [T]his would be a drug rip-off and murder resulting in a huge pay day for Sanchez and Troya . . . ." (DE767:7451).

Defense counsel objected and moved for a mistrial, arguing that the prosecutor's reference to the Suwanee shooting "in the context" of the carjacking and murder counts "left the jury with the unmistakable inference that that incident was tied to the murder."  (DE767:7459).  The court overruled counsel's objection and denied the mistrial motion, ruling that the prosecutor had raised the Suwanee shooting properly as evidence of intent to possess the weapons found during the search of the Garden Court residence on October 25, 2006.  (DE767:7460-62;

140

DE771:7481).

The district court erred. The prosecutor, by placing his discussion of the other shooting evidence in the midst of his argument regarding the murder counts, made plain that the violence of the shooting incidents, including the Suwanee shooting, established a propensity of these two "thug enforcers" to commit acts of violence, such as the murder of the Escobedo family. This placement made the inference inescapable, in spite of the prosecutor's obligatory reference to the Suwanee evidence as proof of knowledge and intent to possess the weapons seized from the Garden Court residence.

Such an argument based on propensity violates Rule 404(b) and constitutes misconduct. Even where extrinsic evidence is admissible for some other purpose, this Court has ruled that it is error for the government to use it in a manner that suggests a propensity to commit the crime. *See United States v. Calderon*, 127 F.3d 1314, 1337 (11th Cir. 1997) (error for prosecutor to use evidence of defendant's prior conviction, which was properly admitted on issue of intent under Rule 404(b), to show propensity to break the law); *United States v. Garber*, 471 F.2d 212, 217 (5th Cir. 1972) (plain error requiring reversal where prosecutor argued that evidence of prior convictions showed defendant's "disposition to commit this act"); *United States v. Fernandez*, 496 F.2d 1294, 1302 (5th Cir.

141

1974) (reversal required where prosecutor argued that evidence of defendant's prior convictions showed a propensity to commit the offense charged).  Counsel's objections here to the government's use of the shooting evidence as propensity evidence should have been sustained.

**C.      The erroneous admission of evidence showing a propensity for violence and shooting, and the government's exploitation of this evidence in summation, unfairly prejudiced the jury's consideration of the capital charges.**

As this Court has observed, "Extrinsic evidence of other crimes, wrongs or acts is inherently prejudicial to the defendant." *United States v. Baker*, 432 F.3d 1189, 1205 (11th Cir. 2005).  Here, the erroneous admission of the Suwanee shooting evidence and the government's use of this evidence in summation severely prejudiced Sanchez and cannot be deemed harmless.  The limiting instructions the judge gave were inadequate, in light of the bloody and graphic nature of the evidence regarding the shooting.  It is unlikely that these instructions could have kept the jurors from viewing this evidence as proof that Sanchez had a propensity to engage in violent shooting rampages, and thus was likely guilty, along with Troya, of murdering the Escobedo family.

As discussed above, the government introduced extensive, detailed testimony from five witnesses regarding the Suwanee shooting, along with 17

142

photographs and six diagrams.  The government dwelt on the violent nature of the shooting, with redundant photographs and testimony regarding a pool of blood on the floor and testimony about the person wounded by one of the bullets.  *See Hands*, 184 F.3d at 1329 (domestic violence evidence "particularly likely to incite the jury to irrational decision because it was graphic and arresting.").  In spite of instructions that this evidence was to be used only as evidence of intent to possess the guns charged in Counts 14 and 15, no juror could reasonably be expected to ignore the implication that Sanchez was a dangerous gun-slinger fully capable of killing an entire family.

This inflammatory message was made clear in the government's summation, which incorporated the shooting evidence into the argument regarding the homicide counts.  *Hands*, 184 F.3d at 1332 (prejudice of domestic violence evidence exacerbated by prosecutor's closing, which reminded jury that defendant had beaten his wife "severely"); *United States v. Marshall*, 173 F.3d 1312, 1318 (11th Cir. 1999) (prejudice of prior arrest evidence exacerbated by government's use of prior arrest in closing).  Moreover, by overruling defense counsel's objections to the improper use of the shooting evidence in closing, the court effectively put its imprimatur on this improper use, and gave the jury permission to consider the shooting evidence in determining guilt on the homicide charges.

143

Taken in this context, the limiting instructions the court gave were "at best too little and too late." *Garber*, 471 F.2d at 217 (prejudice of government's improper propensity argument in closing not cured by limiting instructions).

The jurors evidently gave great significance to the shooting evidence, as shown by the fact that they requested, and were permitted to see during deliberations, the AK-47 used at the Suwanee and Mercer shootings.  (DE789; DE772:7594).  In light of the weakness of the government's circumstantial case, fully discussed in Point VII, the erroneous admission of this evidence and its use in closing arguments by the government cannot be dismissed as harmless.

**V.**

**[Other-drug-crimes evidence]**

**Testimony of uncharged drug trafficking by Varela outside the time period of the drug trafficking conspiracy was not admissible as "intrinsic evidence" or as other crimes evidence under Fed. R. Evid. 404(b), and prejudiced Sanchez by portraying him as involved with a major drug dealer.**

Over defense counsel's repeated objections, the court allowed the government to introduce unfairly prejudicial testimony from two cooperating witnesses – Malik Mullino and Mario Calderon – that Varela involved Sanchez in extensive multi-kilo drug dealing outside of the time period of the drug conspiracy

alleged in the indictment.[67]  The government had provided no pre-trial notice that it intended to introduce such evidence.[68]  The Court should have excluded the other crimes testimony regarding Sanchez, because the evidence was not intrinsic to the charges against him, was not admissible as evidence of intent, and was substantially more prejudicial than probative.

Although the evidence regarding Varela's prior dealings with these two cooperating witnesses was arguably relevant to show Varela's relationship with them, their testimony regarding Sanchez was not "intrinsic evidence" because it was not inextricably intertwined with the evidence of the charged offenses.  It also was not admissible to prove intent under Fed. R. Evid. 404(b) because Sanchez, unlike Varela, did not contest the drug trafficking charges, and thus under Rule 403, the minimal probative value of the evidence was substantially outweighed by its prejudicial effect.  Indeed, counsel during his opening statement affirmatively

---

[67] The drug trafficking charges against Sanchez comprised three counts in the indictment: Count One, charging a conspiracy to possess with intent to distribute cocaine powder and crack cocaine from May 2006 through October 25, 2006; Count Four, charging possession with intent to distribute cocaine powder on July 10, 2006; and Count Thirteen, charging possession with intent to distribute cocaine powder and crack cocaine on October 25, 2006.  (DE305).

[68] The standing discovery order in this case required the government to notify the defense of its intention to introduce extrinsic act evidence pursuant to Fed. R. Evid. 404(b).  (DE42, ¶ H).

removed from the case any challenge to the drug trafficking charges by acknowledging that Sanchez worked for Varela, delivering drugs. (Calderon confirmed that Sanchez merely delivered the drugs, *see* DE752:4990-5005.)

Mullino's and Calderon's testimony regarding Sanchez's involvement in these uncharged crimes was extrinsic evidence that should have been excluded as unnoticed and unduly prejudicial under a proper Rule 404(b) analysis. The district court's erroneous ruling admitting it constituted an abuse of discretion requiring reversal.

Ultimately, the government used the evidence of other drug trafficking crimes to portray Sanchez — like Varela — as someone with a propensity to be a major drug dealer, and thus as someone more likely to commit acts of violence to further the drug dealing, such as the murders charged in counts six through ten of the indictment. In fact, the evidence actually showed — and the jury later found in the penalty phase — that, far from being a major drug dealer, Sanchez was merely recruited to work for Varela by virtue of their family relationship. By then it was too late: Sanchez stood convicted of capital murder.

## A.     The testimony of Malik Mullino.

The government called cooperating witness Malik Mullino to testify regarding Count Eleven, which charged Varela with the distribution of cocaine on

146

October 21, 2006. Mullino testified that he made a "controlled buy" — wearing a recording device and with DEA surveillance — of one kilogram of cocaine from Varela on this date at the Garden Court house. Mullino saw Sanchez at the house, and after the sale he drove Varela and Sanchez to a Wal-Mart in his truck. (DE751:4777-97). Sanchez was not charged in this count.

In addition to the testimony relating directly to Count Eleven, the government moved to introduce Mullino's testimony about his history of buying cocaine from Varela from March 2004 to early 2005. (DE738:4692-98). This period pre-dated the period of the drug conspiracy alleged in the indictment — May 2006 to October 25, 2006.

Mullino testified he first met Varela at a work-release camp in 2003, and began buying cocaine from him in March or April, 2004, switching to a different supplier in early 2005. At first Mullino would pay for a half kilogram, and Varela would "front" (advance) him another half kilogram. He later progressed to paying for one kilogram, and being fronted a second kilogram. *Id.* Mullino estimated that he bought a total of about 70 kilograms of cocaine from Varela from March 2004 until early 2005. (DE751:4732-39).

147

Whenever Mullino met Varela to buy the cocaine, Sanchez would come with Varela.  Mullino described Sanchez as Varela's "enforcer."  (DE751:4736).[69] But the role he described was less dramatic: "Whenever I meet with Danny Varela, to purchase coke, Richard, Ricardo [Sanchez] would show up with him.  If there is a balancing question, if moneys come up short, he would maybe come back and collect it later, something like that."  (DE751:4736-37; *see also id.* (Sanchez's role was to "[w]atch Danny Varela's back, sometimes count money, things like that.")).

The government argued that the evidence of the prior drug dealing was necessary to explain the relationship of trust that Mullino had with Varela, and with Sanchez who was working for Varela.  This evidence of other drug dealing, the government claimed, was inextricably intertwined with the evidence of the drug deal on October 21, 2006, charged in Count Eleven.  (DE738:4685, 4692-98).

Defense counsel objected to any evidence suggesting that Sanchez was involved in the prior drug dealing.  (DE738:4699; DE736).  Counsel argued that Sanchez was not even charged in Count Eleven, that the evidence was too far

---

[69] The district court later sustained defense counsel's objection to the use of the word "enforcer," but did not strike the reference from the record. (DE751:4774).  The government used this term in its rebuttal argument, describing both Troya and Sanchez as "thug enforcers from Thug Mansion."  (DE767:7437).

148

outside the period of the conspiracy to be admissible as intertwined, and that the prejudice would outweigh any probative value. (DE738:4701-4702; 4709). As counsel observed, "We know there is a drug conspiracy. I conceded on opening my client worked for Danny Varela, but then you get to the bigger issue of the capital counts." (DE738:4709). This evidence, counsel argued, would unfairly "overcom[e the] presumption of innocence on the carjacking counts." *Id.* Counsel for Troya likewise objected that the evidence "prejudices Troya in the homicide case because now the jury is going to think that he is working for a guy who is just a huge drug dealer over a bigger period of time, which is more likely . . . to do violent acts. . . ." (DE738:4703).

The court's own initial assessment was that this "wheelbarrow" of "other highly prejudicial evidence" was unnecessary just to "explain this link of trust." (DE738:4711). The court accurately observed that "its prejudicial impact is candidly overwhelming," and concluded that "the prejudicial impact of [the other crimes evidence] significantly overweighs [sic] any probative value." *Id.* The court was especially concerned about the "extraordinary quantity" of drugs Mullino alleged — "that Mr. Varela became a source to Mr. Mullino of ten kilograms a month, two to three per week, all total 50 to 70 kilograms. That is a lot." (DE738:4712-13).

149

The court later reversed itself, however, ruling that Mullino's other-crimes testimony was admissible. But the court's ruling focused entirely on the relevance of the evidence in the case against Varela, and did not address Sanchez at all. The court ruled the evidence was "intextricably intertwined" with the charged offense. (DE751:4720). "It is necessary . . . to explain why Mr. Mullino would have been able to call Mr. Varela out of the blue in October 2006 and arrange to purchase cocaine, why he would have thought that Mr. Varela was willing to sell cocaine to him. It is also necessary to some degree to explain the price differential and why Mr. Varela would be willing to sell cocaine at a price that is below the street value for a kilogram of cocaine." (DE751:4720-21). In the alternative, the court ruled that the evidence was admissible under Rule 404(b) because Varela, by pleading not guilty, had placed his intent in issue. Although the court recognized it was also required to determine under Rule 403 whether the unfair prejudicial effect would substantially outweigh the probative value, it failed to conduct this analysis, and simply overruled the objection and admitted the evidence. (DE751:4727-29).

The court did not address the relevance and admissibility of the evidence in regard to Sanchez, and it entirely failed to engage in the weighing analysis required by Rule 403. It also failed to give any instruction to limit the prejudice to Sanchez from admitting the evidence.

150

**B.** **The testimony of Mario Calderon.**

The same issue arose with regard to cooperating witness Mario Calderon. Calderon testified that from September 2005 until July 2006 he was buying 3 kilograms of cocaine per week from Varela, for a total of "80 or more" kilograms, and that Sanchez and Lopez delivered it. (DE752:4990-5005). Again, most of this time period — the eight months from September 2005 until April 2006 — was outside the period of time alleged in the indictment.

When the government proffered this testimony, defense counsel objected on the same grounds as it had to Mullino's testimony: the sheer quantity of cocaine dealing outside the alleged conspiracy prejudiced the defense regarding the homicide charges. (DE751:4959-60). The court ruled the testimony admissible to prove the conspiracy because the government should not be held to the precise dates alleged in the indictment. The court also ruled that the evidence was inextricably intertwined with the charged drug-trafficking conspiracy because it "completes the story of the transaction." (DE751:4962). In the alternative, the court held that the testimony was admissible as evidence of intent under Rule 404(b), and that it did not violate Rule 403, but the court again failed to articulate any weighing analysis. *Id.*

151

**C.**     **The other-drug-crimes evidence was not admissible either as intrinsic evidence or as evidence of intent under Fed. R. Evid. 404(b).**

The district court should have excluded the evidence of Sanchez's involvement in the other drug crimes as improper extrinsic evidence tending only to establish a propensity to commit crimes.  As this Court has repeatedly emphasized, "[e]xtrinsic evidence of other crimes, wrongs, or acts is inherently prejudicial to the defendant." *See United States v. Baker*, 432 F.3d 1189, 1205 (11th Cir. 2005) (*citing United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978) (en banc)).  The danger inherent in the admission of such evidence "'is that the jury may convict the defendant not for the offense charged but for the extrinsic offense.'" *Id*. (*quoting Beechum*, 582 F.2d at 914).  The jury is tempted to generalize the defendant's "earlier bad act into bad character" and thus improperly treat the evidence as establishing a propensity to commit the crime.  *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997).  Here, the other-drug-crimes evidence cast Sanchez as being the "enforcer" for a drug trafficking organization that was dealing in such large quantities that it would have seemed fully capable of violence and murder.

Federal Rule of Evidence 404(b) expressly bars such propensity evidence, but this Rule only applies to "extrinsic" evidence.  The government here attempted

152

to avoid the limitations of Rule 404(b) by characterizing the other-drug-crimes evidence as intrinsic evidence. Evidence is intrinsic to the offense charged, and thus is not covered by Rule 404(b), if it is "'(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.'" *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (*quoting Baker*, 432 F.3d at 1205 n.9). Evidence is "inextricably intertwined" with the evidence of the charged offense "if it forms an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted.'" *Id.* (*quoting United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989)).

Regardless of whether the evidence of other crimes is extrinsic or intrinsic, it still must satisfy Rule 403 of the Federal Rules of Evidence — the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice. *Id.*; *Baker*, 432 F.3d at 1219 n.36; *United States v. Church*, 955 F.2d 688, 700 (11th Cir. 1992). Probative value depends in part on the strength of the government's case on the element for which the evidence is offered. *Baker*, 432 F.3d at 1205. For example, "[t]he stronger the government's case on intent, the less the extrinsic evidence will add. . . . It follows that if intent is undisputed by

153

the defendant, the evidence is of negligible probative weight compared to its inherent prejudice and is therefore uniformly inadmissible." *Id.* (citations omitted). Thus, although a defendant such as Sanchez who is charged with conspiracy makes intent an issue by entering a not guilty plea, if the defendant "'takes affirmative steps to remove the issue of intent from the case'" the evidence must be excluded. *Id.* at 1221 (*quoting United States v. Cardenas*, 895 F.2d 1338, 1342 (11th Cir. 1990)).

Here, the court was arguably correct in concluding that Mullino's testimony regarding his relationship with Varela was necessary to explain why Varela would trust him sufficiently to give him a kilogram of cocaine while receiving payment for only a half kilogram. But the same was not true of Mullino's testimony regarding Sanchez. Sanchez was not charged with participating in the sale alleged in Count Eleven. Thus, there was nothing to explain about Mullino's history with Sanchez. Far from being intrinsically intertwined evidence, Mullino's testimony about Sanchez amounted to gratuitous other-crimes evidence.

The district court, however, appears to have entirely missed this distinction, focusing in its ruling only on the relevance of the testimony to the charge against Varela. (DE751:4721: "It is necessary . . . to explain why Mr. Mullino would have been able to call Mr. Varela out of the blue in October 2006 . . . ."). The court

154

erred in failing to address the admissibility of the evidence as to Sanchez, and in admitting it in his trial.

The court likewise erred regarding Calderon's testimony of pre-indictment drug dealing from September 2005 to April 2006. While this testimony was arguably relevant to explain his history of dealing with Varela, there was no need for him to mention any role Sanchez played before May 2006 — the beginning date of the conspiracy alleged in the indictment. The evidence, moreover, was not intrinsic merely because it was part of a continuous period of drug dealing, since Calderon could have just as coherently testified to his pre-indictment history with Varela without any mention of Sanchez. Sanchez's involvement in the prior uncharged drug crimes therefore was not necessary to complete the story Calderon was telling.

The other-drug-crimes testimony of Mullino and Calderon could not be admitted under Rule 404(b) for two reasons. First, there was no notice provided as required by Rule 404(b). Second, counsel for Sanchez had removed the issue of his intent from the case. Counsel made clear in his opening that Sanchez was not contesting the drug conspiracy charges, and thus his intent to participate in the conspiracy was not at issue. (DE728:3078). As counsel candidly explained, "Ricardo Sanchez was involved in a drug dealing business headed by Varela but

155

only in the sense that he was a delivery boy for him." (DE728:3079). Neither the evidence at trial, nor the cross-examination, suggested otherwise. Instead, counsel contested only the homicide charges, arguing that the government's evidence would fail to prove Sanchez was involved. (DE728:3080-83). Although the government has the right to prove its case on each element, since counsel had affirmatively removed the issue of intent to distribute drugs from the case, the evidence of other drug crimes was of "negligible probative weight compared to its inherent prejudice," and inadmissible under Rule 404(b). *Baker*, 432 F.3d at 1205; *Beechum*, 582 F.2d at 914 ("If the defendant's intent is not contested, then the incremental probative value of the extrinsic offense is inconsequential when compared to its prejudice; therefore, in this circumstance the evidence is uniformly excluded.").

Accordingly, Mulino's and Calderon's testimony regarding Sanchez's involvement in other uncharged drug crimes was not admissible either as intrinsic evidence or as evidence of intent under Rule 404(b). The district court erred in failing to exclude it.

**D.    The other-drug-crimes evidence was also inadmissible under Fed. R. Evid. 403 because it was unfairly prejudicial.**

Even if the other-drug-crimes evidence were properly viewed as intrinsic

156

evidence or 404(b) evidence of intent, it was still inadmissible because its unfair prejudicial effect substantially outweighed its probative value. When combined, Mullino's and Calderon's testimony asserted that Sanchez assisted Varela in delivering over 150 kilograms of cocaine, the vast majority of it outside of the time period alleged in the indictment. This amount was far greater than the total of seven kilograms alleged in the indictment. As the district court accurately concluded when it first examined the issue, "its prejudicial impact is candidly overwhelming." (DE738:4711). An organization capable of supplying ten kilograms of cocaine per month to just one buyer would be seen by the jury as much more likely to engage in acts of violence and murder. The court was thus correct in its original assessment that "the prejudicial impact significantly [out]weighs the probative value." *Id*.

When the court reversed itself on this ruling, moreover, the court erred by not engaging in the weighing process required by Rule 403, and by not explaining on the record how it now reached the exact opposite conclusion — that the prejudicial impact did <u>not</u> substantially outweigh the probative value. In the absence of any such on-the-record weighing, the court's ruling is not entitled to any deference. *See United States v. Sriyuth*, 98 F.3d 739, 745 n.9 (3d Cir. 1996) (where court fails to explain its reasons for denying Rule 403 objection and its

reasons are not apparent on record, circuit court will conduct weighing itself);

*United States v. McVeigh*, 153 F.3d 1166, 1189 n.10 (10th Cir. 1998) (on-the-record findings required for trial court's balancing under Rule 403).

**E.     The erroneous admission of the prejudicial other-drug-crimes evidence cannot be deemed harmless.**

The court's error requires reversal because of the unfair prejudicial effect of the other-crimes evidence on the jury's consideration of the homicide charges. Although Mullino's and Calderon's testimony about Sanchez comprised only a handful of pages from the transcript, the government used it to paint a picture of Sanchez's drug trafficking activity that was far bigger, and therefore far more likely to be violent, than the drug trafficking actually charged or Sanchez's role in it. Indeed, both prosecutors used the other-crimes evidence for precisely this purpose in their opening and closings, expressly linking the "large scale drug trafficking" with the homicides and labeling Sanchez a drug trafficker.

In the opening, the prosecutor described the "shocking and horrifying" nature of the homicides, dwelling on the death of the "three year old" who "was basically drowning in his own blood." (DE728:3042-43). He then asked rhetorically, "Who would do such a despicable, cowardly act? . . . . That is the story of this trial. It begins and ends with the nasty and dangerous business of

158

drug trafficking.  Drugs, guns, <u>large scale drug trafficking</u>, and four dead bodies."
(DE728:3043 (emphasis added)).

In closing the prosecutor returned to this theme, reminding the jury that he had promised "we would show you that this is a case about <u>large scale drug trafficking</u>, guns, and violence.  And my prediction has born true."  (DE766:7087) (emphasis added)).  He continued "this expressway to murder was caused by <u>large scale drug trafficking</u>, a drug debt, and then the opportunity to erase that drug debt and the opportunity to gain 15 kilograms of cocaine for free by robbery, a carjacking and murder."  (DE766:7088 (emphasis added)).

The prosecutor recalled that Calderon "testified about the history that he had buying kilogram quantities of cocaine from Danny Varela, and the persons that assisted Varela during the time period of September 2005 through July of '06 included Sanchez and Lopez."  (DE766:7091).  The prosecutor left out, however, that Sanchez mainly served as Varela's lackey, earning only $500/week during the period of the conspiracy for his "assistance"  (DE756:5971), which amounted mostly to dropping off drugs or picking up money (DE 751:4736-37; DE752:4998-5005).[70]  The prosecutor then linked the large-scale drug dealing

---

[70] In fact, after hearing the evidence at the penalty phase, a majority of jurors found that Sanchez was recruited by Varela due to their family relationship; that he was more vulnerable to Varela because of his low IQ; that he was a "follower,"

with the murder charges, arguing, "These Defendants are not innocent law abiding citizens, they are members of a violent drug trafficking organization headed by Danny Varela who were willing to use weapons and reap violence when required to protect the ongoing activities of that group, and it did not matter if they knew the person or if it was a stranger."  (DE766:7180).

On rebuttal, the second prosecutor returned to this theme, picking up on Mullino's improper description of Sanchez during the pre-conspiracy drug dealing as Varela's "enforcer."  The prosecutor argued that Sanchez and Troya were the "thug enforcers from the Thug Mansion who that night were going to rip-off 15 kilos of coke."  (DE767:7437).  The prosecutor made this argument in spite of the district court having sustained defense counsel's objection to the use of the term "enforcer"  (DE751:4774), and despite the fact that neither Mullino nor Calderon testified to any "enforcer" activities by Sanchez.

The prosecutors thus took full and unfair advantage of the other-drug-crimes evidence, using it to establish both a propensity to engage in large-scale drug trafficking and a propensity to engage in the violence that is associated with such activity.  They transformed Sanchez from a delivery boy for a small-time

---

not a leader; that prior to meeting Varela, he had no felony convictions; and that he had worked a number of legitimate jobs before falling in with Varela. *See* DE860:12-13.

drug ring to the "enforcer" for a large-scale drug-trafficking organization.  In light

of the weaknesses in the government's case discussed in Point VII, *post*, the

court's error in admitting the other-crimes evidence cannot be deemed harmless.

Reversal and a new trial are required.

## VI.

## [*Bruton* Error]

**The introduction of Troya's statements admitting to the murder of children and attempts to cover-up the crime violated Sanchez's Sixth Amendment and Due Process rights under *Bruton,* because these statements, seen in light of the government's whole case, compelled the inference of Sanchez's guilt.**

The introduction of co-defendant Troya's statements inculpating himself in

the murders of the Escobedos violated Sanchez's rights under *Bruton v. United*

*States*, 391 U.S. 123 (1968), because the statements necessarily inculpated

Sanchez as well.  As this Court has made clear, the introduction of a non-testifying

codefendant's statement violates *Bruton* when that statement, "in light of the

Government's whole case, compels a reasonable person to infer the defendant's

guilt." *United States v. Schwartz*, 541 F.3d 1331, 1351 (11th Cir. 2008) (emphasis

added).  Troya's statements, even though redacted to eliminate any reference to

Sanchez, easily met this test in light of the evidence that Sanchez was with Troya

on the night of the murders.  In closing argument, moreover, the prosecutor

effectively un-redacted Troya's statements to make clear that they directly inculpated Sanchez, thereby severely compounding the *Bruton* violation.

The introduction of these powerfully inculpatory co-defendant statements was not harmless beyond a reasonable doubt. In what was otherwise an entirely circumstantial case, Troya's statements, although inherently unreliable as the statements of an alleged accomplice, became powerful evidence of Sanchez's guilt since Sanchez had no opportunity to challenge them through cross-examination. As *Bruton* held, no limiting instructions can cure such constitutional error. 391 U.S. at 137.

**A. Troya's confessions to involvement in the murders and the coverup.**

The government first sought to introduce Troya's confessions through Carlos Rodriguez, a cooperating witness who overheard a conversation between Troya and Rodriguez's cell mate (Byron Hambrick) in which Troya, after his arrest on these charges, talked about being involved in killing some children. Troya had told the cell mate, "I had to do it." (DE737:4379). The prosecutor explained to the court that Rodriguez had actually overheard Troya use the word "we," but the prosecutor had instructed Rodriguez not to use that word so as not to implicate any defendant other than Troya. (DE737:4378).

162

Defense counsel, who previously had filed a motion for severance under *Bruton*, which the district court had denied (DE368), objected under *Bruton* on the ground that even the redacted statement would implicate Sanchez in view of the government's other evidence.  As counsel explained,

> There are only two people on the Turnpike and two people charged for this murder. . . . Mr. Troya and Mr. Sanchez are so tied together in the facts of this case because of the alleged fact that the Jeep Cherokee is following the maroon van, the fact that the sequence of the toll tickets, and fingerprints on the toll tickets, and all the facts and circumstances of the allegations, any confession elicited from Mr. Troya in this case because of the facts and circumstances of the particular way the Government has alleged this crime occurred necessarily implicates Mr. Sanchez.

(DE737:4380-82).  The district court overruled the *Bruton* objection and permitted Rodriguez to testify to Troya's statements as redacted, using the singular "I" or "he" in place of "we" or "they."  (DE737:4383-4396).  Defense counsel later moved for a mistrial.  (DE738:4431-32).

In front of the jury, Rodriguez testified that he overheard Troya talking with his cell mate about the cell mate's experiences fighting and killing people in Iraq.  Troya then said he had killed people too:

> "I have done something very wrong. . .  There is some people involved. . . . I have killed some people . . . and those people were children . . . ."

(DE737:4416-17).  Rodriguez recounted that when his cell mate asked Troya why

163

he killed the people, "He say that is something he have to do." (DE737:4417).

Before his arrest on these charges, Troya also made inculpatory statements to Vetere regarding his efforts to cover-up the crime by moving the Jeep and wiping it for prints. Defense counsel again objected on *Bruton* grounds prior to the testimony, arguing that Troya's statements would have a prejudicial "spillover effect" and that limiting instructions would not be enough. (DE754:5410, 5520). The district court overruled the objection, but ordered that the statements be redacted to take out the word "they" and any mention of Sanchez or his fingerprints. (DE754:5519).[71]

Vetere testified before the jury that on October 16, 2006, after police had discovered the Jeep, he spoke with Troya in Troya's bedroom about Vetere's concerns that the police might be able to trace the Jeep back to them through the cameras at the toll booths and through fingerprints. Troya tried to reassure Vetere,

---

[71] The government moved to introduce Troya's statements about the coverup as direct evidence against Sanchez, arguing that they were co-conspirator statements made in furtherance of the conspiracy. But the court sustained defense counsel's objection, ruling that since these statements were made after the date of the carjacking and murders, October 13, 2006, they were not in furtherance of the conspiracy, and therefore could only be used against Troya. (DE754:5517-19). The court gave limiting instructions to this effect following Vetere's testimony. (DE754:5526). But as noted below, such limiting instructions do not cure *Bruton* error. The government did not move to introduce Troya's statements as direct evidence against Sanchez on any other ground.

explaining that, when he went through the toll plaza in the van, he opened the door

and paid with cash, keeping the window up.  (DE754:5522, 5525).  Vetere told

Troya he was worried his and Troya's prints would be found in the Jeep, since

Vetere had moved the Jeep after the murders to his grandmother's house, and

Troya had later moved it from there to the location where it was found by the

police.  (DE754:5521-22).  Troya tried to reassure him that he "wiped the Jeep

down real good."  (DE754:5523).  Vetere asked why Troya had not burned the

Jeep, and Troya replied that "he was going to burn it the next day, but [the police]

found it."  (DE754:5523).  Vetere testified that in response, "I told them [sic]

when they come handing out life sentences, I am not going to get one."

(DE754:5524).  Troya then asked, "What are you going to tell on me?"  (*Id.*).

## B.     The introduction of Troya's confessions violated *Bruton* because, in light of the government's whole case, they incriminated Sanchez.

Although Troya's statements were redacted to avoid mention of anyone

other than Troya himself, that redaction was insufficient to avoid the *Bruton*

violation in light of the government's whole case.  Both this Court and the

Supreme Court have made clear that a proper *Bruton* analysis, because of the

important fair trial interests at stake, requires more than just looking at the

redacted statement in isolation.

165

*Bruton* held that the admission of "powerfully incriminating extrajudicial statements of a [non-testifying] codefendant" violates the Confrontation Clause as well as due process since the defendant has no opportunity to cross-examine and test the credibility of the co-defendant. 391 U.S. at 131 n.5, 135. The Court refined the *Bruton* rule in *Richardson v. Marsh*, 481 U.S. 200 (1987), holding that a codefendant's statement that was redacted to eliminate any reference to the defendant was admissible since it only became incriminating "inferential[ly]" when linked with the defendant's own testimony later in the trial. *Id*. at 208. In doing so, as this Circuit explained, "the Court examined the totality of the Government's case against Richardson and the precise nature of the codefendant statement allegedly inculpating her." *Schwartz*, 541 F.3d at 1349. As the Supreme Court later explained in *Gray v. Maryland*, 523 U.S. 185 (1998), the "'kind'" of inference is critical, and a co-defendant's confession which involves incriminating "'inferences that a jury ordinarily could make immediately'" is still within the rule of *Bruton*. *Schwartz*, 541 F.3d at 1350 (*quoting Gray*, 523 U.S. at 196 (redaction that replaces defendant's name with blank space or word "deleted" violates *Bruton*)). The *Bruton* analysis thus requires an examination of the entire Government case to determine whether the incriminating inference in a redacted statement is compelling.

166

In *Schwartz*, this Court succinctly articulated the standard as follows:

> We think the proper *Bruton* standard is clear from a close reading of *Bruton*, *Richardson*, *Gray*, and our subsequent *Bruton* decisions: a defendant's confrontation right is violated when the court admits a codefendant statement that, in light of the Government's whole case,[fn 62] compels a reasonable person to infer the defendant's guilt.

*Schwartz*, 541 F.3d at 1351 (explaining further in footnote 62 that "[w]e look at everything the Government presented to the jury, not just admissible evidence, because a statement violating *Bruton* by definition is inadmissible as evidence, and a limiting instruction does not cure it.").

Here, the government's whole case rendered Troya's redacted statements compellingly incriminating for Sanchez.  Vetere testified that Troya and Sanchez left from the Garden Court house together in the van in the late afternoon on October 12, 2006 (DE754:5444-47), and the forensic evidence suggested that they were together on the Turnpike.  Troya's palm print was found on the toll ticket for the van, which entered the Turnpike at Fort Pierce just behind the Escobedo's van at 2:18 a.m.  (DE729:3302; 730:3729-41; GX-8).  The murders evidently occurred at 2:24 a.m., when a neighbor living near the scene next to the Turnpike awoke to the sound of gun shots.  (DE728:3100).  The van exited the Turnpike at West Palm Beach at 3:01 a.m., immediately ahead of the Escobedos's Jeep.  (DE729:3317).

167

Sanchez's palm print was on the toll ticket for the Jeep.  (DE730:3729-41).

Cell phone records and cell tower data likewise showed that Troya and Sanchez were together on the Turnpike, both before the murders on the way up the Turnpike as they followed the Escobedos, and on the way back down the Turnpike, after the murders, when the government alleged Sanchez was in the Escobedos's Jeep.  (DE757:6081-91).

In addition, ballistics evidence from the scene suggested that two different caliber bullets — 9 mm and .45 caliber — were shot from two different guns at the Escobedos.  (DE764:6632-33; GE3).  Based on the ballistics evidence, the government argued that the murders were committed by two different shooters. (DE766:7172).

Against this backdrop of undisputed forensic evidence placing Troya and Sanchez together on the Turnpike, and suggesting that two guns were used to murder the Escobedos, the introduction of any confession by Troya that he was involved in the murders compelled the inference that Sanchez was also involved. As defense counsel argued when he made his *Bruton* objection, no evidence placed anyone else with Troya.  In light of the forensic evidence, these confessions, although redacted to remove any direct reference to Sanchez, were equally incriminating for Sanchez.

168

This Court's decision in *Schwartz* involved analogous facts and shows that the introduction of Troya's confessions here violated *Bruton*.  In *Schwartz*, defendant Schwartz was charged with a fraudulent scheme to sell high-yield promissory notes, issued by companies that Schwartz and a co-defendant owned, to individual investors.  541 F.3d at 1332.  The prosecutor introduced a co-defendant's affidavit that was redacted to eliminate any reference to Schwartz.  Instead, it named corporations he owned or controlled.  The affidavit on its face did not incriminate Schwartz — just as Troya's redacted statements on their face did not incriminate Sanchez.

As the Court in *Schwartz* explained, however, in evaluating the *Bruton* claim, "we examine the whole record to determine whether a reasonable juror was compelled to draw an inference of Schwartz's guilt from the codefendant's statements." *Id.* at 1340.  After a thorough review of the government's case, the Court concluded that the codefendant's affidavit "'powerfully incriminat[ed]' Schwartz by summarizing the loans FCS [controlled by Schwartz] made to other companies Schwartz controlled." *Id.* at 1351 (*quoting Bruton*, 391 U.S. at 135). Thus, even though the codefendant's affidavit "'was not incriminating on its face, and became so only when linked' with other evidence, *Richardson*, 481 U.S. at 208, we think that the statement compelled an inference that Schwartz directed

169

FCS to use investor monies to line the coffers of his personal business enterprises." *Id.* at 1351.  Introduction of the affidavit therefore violated *Bruton*. *Id.*

Troya's statements, likewise, when taken together with the other government evidence, compelled an inference that Sanchez was involved in the murders.  Indeed, the inference here is just like the inference in *Schwartz*.  The government's evidence here linked Troya with Sanchez, just like the government's evidence in *Schwartz* linked FCS with Schwartz.  Troya's redacted confessions to the murders, taken together with the government's forensic evidence, compellingly incriminated Sanchez, just like the redacted affidavit in *Schwartz* laying out the fraudulent dealings of FCS, taken together with the government's whole case, compellingly incriminated Schwartz.  Accordingly, in light of *Schwartz*, the introduction of Troya's statements violated *Bruton*.

Although the district court here, as in *Schwartz*, instructed the jury not to use these statements against Sanchez, *Bruton* and *Schwartz* hold that such limiting instructions do not cure this violation of the right to cross-examine one's accusers.[72]  *Bruton*, 391 U.S. at 137 ("[W]e cannot accept limiting instructions as

---

[72] The district court instructed the jury following Rodriguez's and Vetere's testimony and in the charge to the jury not to use Troya's statements against any other defendant.  (DE738:4540-41; DE754:5526; DE771:7499-7500).

an adequate substitute for petitioner's constitutional right of cross-examination.");

*Schwartz*, 541 F.3d at 1351 n.62 ("[A] statement violating *Bruton* by definition is

inadmissible as evidence, and a limiting instructions does not cure it.").  The

limiting instructions, therefore, did not cure the *Bruton* error.

**C.     The prosecutor in rebuttal made explicit the prejudicial inference that Troya's confessions incriminated Sanchez.**

The prosecutor capitalized on the *Bruton* error in rebuttal by using Troya's

confessions explicitly to incriminate Sanchez.  The prosecutor, having redacted

Troya's statements to change "they" to "he" in order to get the statements

admitted, sought to undo the redaction by switching "he" back to "they" and

arguing that the confessions applied to *both* of them:

> As Troya told Carlos Rodriguez, <u>he</u> had to do it, <u>they</u> had to do it because it was business.  <u>They</u> needed to get elimination of a drug debt and <u>they</u> wanted a pay day.  <u>They</u> wanted the Dunk, <u>they</u> wanted the gold chain, <u>they</u> wanted the kilos, and <u>they</u> had to kill that entire family.  <u>They</u> had to kill these little kids because <u>they</u> knew them, and for no other reason.  It is really cold.

(DE767:7455) (emphasis added).

"They" plainly referred to Troya and Sanchez — the only two people on

trial for the murders.  Indeed, the "gold chain" referred to the $2,500 chain the

government contended Sanchez bought with the drugs or money stolen from the

Escobedos shortly after the murders.  (DE758:6574-75) (The "Dunk" referred to

171

the early model Chevy convertible Troya bought after the murders, also allegedly with the stolen drugs or money.  (DE729:3490-91)).  The prosecutor thus told the jury what was already obvious from the government's evidence — that Troya's confessions were equally incriminating for Sanchez.

Here again, *Schwartz* is strikingly on point.  In *Schwartz,* the prosecutor in summation expressly linked the defendant to the companies named in the co-defendant's affidavit, thereby making the incriminating nature of the affidavit even more obvious than it already was in light of the government's whole case and exacerbating the prejudice of the *Bruton* error.  541 F.3d at 1353 ("If the affidavit was insufficient to compel an inference of guilt based on the trial testimony alone, the inference was made inevitable – and therefore 'devastating' – when the prosecutor expressly made that connection for the jury in his closing argument.").  *See also Richardson v. Marsh*, 481 U.S. at 211 (remanding to determine whether writ should be granted because "the prosecutor sought to undo the effect of the limiting instruction by urging the jury to use Williams' confession in evaluating respondent's case"); *Vazquez v. Wilson*, 550 F.3d 270, 283 n.14 (3d Cir. 2008) (granting habeas petition based on *Bruton* violation where prosecutor's closing argument implicitly identified defendant as the shooter mentioned in co-defendant's redacted statement).

172

Defense counsel repeatedly objected to the introduction of Troya's confessions on *Bruton* grounds.  Although he did not lodge a separate objection to the prosecutor's rebuttal argument, he did not need to do so.  Defense counsel's original *Bruton* objections were sufficient to preserve the issue for review since they gave the prosecutor and the court ample notice of the issue.  Indeed, the prosecutor responded to the *Bruton* objection by redacting Troya's confession, switching "they" to "he."  The prosecutor was thus on notice that he could not properly argue the very incriminating inference that his own redaction, made in response to the *Bruton* objection, was meant to preclude.  The prosecutor's rebuttal argument therefore constituted error that compounded the *Bruton* violation.

**D.**     ***Bruton* applies to nontestimonial as well as testimonial statements of codefendants.**

Although the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 51 (2004), has limited the Sixth Amendment to testimonial statements, *Bruton* is not so limited since it is based not only on the Sixth Amendment, but also on the Due Process Clause.  391 U.S. at 131 n.5.  The reasoning of *Bruton*, which rests on the due process concern for a fair trial and the inherent unreliability of accomplice statements, applies regardless of whether the statements are testimonial or

173

nontestimonial.  Thus, although Troya's confessions were nontestimonial statements to a cell mate and an acquaintance, they were, as all parties below agreed, still subject to *Bruton*.

In *Crawford*, the Supreme Court ruled that regardless of their reliability, testimonial out-of-court statements are barred by the Sixth Amendment Confrontation Clause.  541 U.S. at 68.  The Court in later decisions made clear that the Sixth Amendment extends only to testimonial statements and does not cover nontestimonial statements.  *Whorton v. Bockting*, 549 U.S. 406, 420 (2007); *Davis v. Washington*, 547 U.S. 813, 824 (2006).  *See also United States v. Lopez*, 649 F.3d 1222, 1237 (11th Cir. 2011).  Troya's statements to Rodriguez and Vetere were plainly nontestimonial.  *Davis*, 547 U.S. at 825 (statements from one prisoner to another are nontestimonial); *Lopez*, 649 F.3d at 1238 ("bragging to a friend about the fruits of a robbery is not testimonial").

Even assuming that the Sixth Amendment does not apply to Troya's statements because they were nontestimonial, *Bruton* still does apply.  *Bruton* makes clear that the exclusion of codefendant statements is based not only on the Sixth Amendment, but also on the fair trial principles embedded in the Due Process Clause: "'Indeed, we have expressly declared that to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth

174

Amendment's guarantee of due process of law.'"  391 U.S. at 131 n.5 (*quoting*

*Pointer v. Texas*, 380 U.S. 400, 405 (1965)).  More recently, the Supreme Court

similarly noted in *Michigan v. Bryant*, 131 S. Ct. 1143 (2011), that "the

Confrontation Clause is not the only bar to admissibility of hearsay statements at

trial" and that "the Due Process Clauses of the Fifth and Fourteenth Amendments

may constitute a further bar to the admission of, for example, unreliable evidence."

*Id.* at 1162 n.13.[73]

The ruling in *Bruton* was based on the inherent unreliability of accomplice

statements.  As the Court explained, the

> extrajudicial statements of a codefendant . . . are . . . devastating to
> the defendant [and] their credibility is inevitably suspect, a fact
> recognized when accomplices do take the stand and the jury is
> instructed to weigh their testimony carefully given the recognized
> motivation to shift blame onto others.  The unreliability of such
> evidence is intolerably compounded when the alleged accomplice, as
> here, does not testify and cannot be tested by cross-examination.

391 U.S. at 135-36.

---

[73] The Eleventh Circuit has not yet addressed whether *Bruton* applies to nontestimonial statements.  Although several other circuits have held that *Bruton* does not apply, none of these decisions addresses the due process aspect of *Bruton* discussed here.  *See United States v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (*Bruton* does not apply to nontestimonial statements because such statements are outside the scope of the Sixth Amendment); *United States v. Dale*, 614 F.3d 942, 956 (8th Cir. 2010) (same); *United States v. Figueroa-Cartagena*, 612 F.3d 69, 85 (1st Cir. 2010) (same); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) (same).

This concern for the inherent unreliability of codefendants' statements is a due process and fair trial concern that applies equally to testimonial and nontestimonial statements.  Just as a codefendant during a police interrogation may have a suspect motivation — to shift blame or curry favor with the police — so too a codefendant talking with a cell mate may have multiple motivations to lie.  The codefendant may be motivated to shift blame, or conversely he may be motivated to brag and claim participation in crimes so as to increase his credibility in the prison.  *See Vincent v. Parke*, 942 F.2d 989, 992 (6th Cir. 1991) (*Bruton* applies to statement by codefendant to sister confessing guilt and implicating defendant); *Monachelli v. Warden, SCI Graterford*, 884 F.2d 749, 753 (3d Cir. 1989) (*Bruton* applies to codefendant's noncustodial statement to acquaintance); *United States v. Ruff*, 717 F.2d 855, 857 (3d Cir. 1983) (*Bruton* applies to codefendant's statements to relatives).  *Bruton*, grounded as it is on the due process concern with admission of inherently unreliable evidence "that cannot be tested," therefore applies here to Troya's statements to a cell mate and to Vetere.  Under *Bruton*, these statements should not have been admitted.

## E.    The *Bruton* error was not harmless beyond a reasonable doubt.

A *Bruton* error requires a new trial unless the government can establish that the error was harmless beyond a reasonable doubt.  *Schwartz*, 541 F.3d at 1353.

176

This Court has articulated the standard as follows: "'[A] *Bruton* error is harmless only if the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the co-defendant's statement so insignificant, that beyond any reasonable doubt the improper use of the statement was harmless.'" *Id.* (*quoting United States v. Doherty*, 233 F.3d 1275, 1282 (11th Cir. 2000)). The *Bruton* error here plainly does not meet this standard of harmlessness.

Without Troya's confessions to the murders, the government had no direct evidence of who committed them. The government's case was built on circumstantial evidence placing Troya and Sanchez at the scene, evidence that, as argued in Point VII, was consistent with the defense that Troya and Sanchez were only engaged in counter-surveillance for Escobedo and were not the murderers. The government's case was therefore not overwhelming. Against this backdrop, Troya's confessions incriminating Sanchez cannot be dismissed as "insignificant." Instead, they were critical to the government's case. Troya's confessions provided the only direct evidence that Troya and Sanchez committed the murders.

The importance of these confessions to the government's case against Sanchez was made clear by the government's rebuttal, which explicitly relied on them to incriminate Sanchez, and thus exacerbated the prejudice of the *Bruton* error. The rebuttal made certain that the jury understood that Troya's confessions

177

were equally incriminating for Sanchez.  Accordingly, the improper admission of these statements, in violation of Sanchez's rights under *Bruton*, was not harmless beyond a reasonable doubt, and reversal is required.

## VII.

### [Guilt-Innocence Phase Cumulative Error]

**The district court's multiple evidentiary errors in the guilt phase rendered Sanchez's guilt-phase trial unfair and require reversal of his convictions under the cumulative error doctrine.**

The cumulative effect of a district court's errors — even if those errors are harmless individually — may create sufficient prejudice to require reversal. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978) ("the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness"); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) ("exclusion of . . . critical evidence, coupled with the State's refusal to permit cross-examination" denied defendant "a trial in accord with traditional and fundamental standards of due process.").  Here, reversal of Sanchez's convictions is required because the district court's rulings at the guilt-innocence phase of the trial resulted in a one-sided proceeding, at which the prosecution was permitted to urge jurors to convict Sanchez based on marginally relevant but highly inflammatory factors.  *See United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir.

178

2008) (reversing conviction based on cumulative effect of multiple evidentiary errors).

As discussed at greater length in the Statement of Facts, *ante* A.3, while the government's forensic evidence placed Sanchez and Troya on the Turnpike at or near the scene of the murders, that evidence did not prove they committed the murders.  To the contrary, this evidence — including fingerprints on the toll tickets for the van and the Jeep, pictures of the van and the Jeep entering the Turnpike together, and cell phone records suggesting that Sanchez and Troya followed the Escobedos north on the Turnpike and then south on the return trip — was entirely consistent with the defense that Sanchez and Troya were engaged in counter-surveillance to protect Escobedo during a drug transaction.  Someone else could have intercepted the Escobedos and killed them before Sanchez and Troya had a chance to offer any protection.

The defense argument that others committed the murders was supported by the fact that a third car, a silver sedan, entered and left the Turnpike within minutes of the Jeep and van.  (DE729:3348-50).  Police never identified the owner or occupants of this car.  (DE729:3350).  But the evidence established that others certainly had a motive and the means to kill Escobedo, who had just abruptly moved his drug supply operation from Brownsville, Texas to Florida.  Escobedo

179

made the move to Florida because, as Kevin Vetere explained, "he was going to get killed in Mexico." (DE754:5874).

Perhaps the murderers were hit-men for Mexican drug dealers from Brownsville or the Mexican border town of Matamoros to whom Escobedo owed $187,000. (GX-103c). Or perhaps they were the violent robbers who just months earlier had pistol-whipped Escobedo during a home invasion, threatened to kill him, and stolen money and drugs from him and Liana Lopez. (DE753:5590-95). There was no shortage of people who had reasons for wanting to murder Escobedo. Regardless who was responsible, however, once Sanchez and Troya came upon the scene of the murders, they felt compelled to drive the Jeep off the Turnpike and attempt to conceal it. Since Sanchez had sold the Jeep to Escobedo (DE730:3644), and it could be traced to him, Sanchez and Troya — correctly, it turns out — presumably feared that the murders would be attributed to them.

The counter-surveillance defense was severely undercut, however, by the court's multiple evidentiary errors: admitting marginally relevant and highly prejudicial evidence of shootings and uncharged drug trafficking, and permitting testimony about Troya's statements admitting to the murders and cover-up attempts. Together, these errors permitted the government to portray Sanchez as a major drug dealer with a propensity for violence, whose co-defendant had

180

confessed to the killings.  Indeed, in closing argument, the government relied on the erroneously admitted evidence to characterize Sanchez and Troya as "thug enforcers" who "take it upon themselves to take proactive action . . . in the form of violence to protect their ongoing narcotics activity."  (DE766:71101-02).[74]  The cumulative effect of the errors was therefore prejudicial, even if the prejudice from each individual error was harmless.  *See United States v. Baker*, 432 F.3d 1189, 1203, 1229-30 (11th Cir. 2005).

Given the "relatively thin evidence of [Sanchez's] participation" in the murders, and the inflammatory nature of the erroneously admitted evidence, the Court should reverse Sanchez's convictions.  *Baker*, 432 F.3d at 1220.  *See also Montana v. Egelhoff*, 518 U.S. 37, 53 (1996) (plurality opinion) ("[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation."); *United States v. Bledsoe*, 531 F.2d 888, 892 (8th Cir. 1976) (in close case, "the cumulative effect of these errors cannot be considered harmless and could easily have been the difference between conviction and acquittal.").

---

[74] *See also* DE766:7180 ("[T]hey are members of a violent drug trafficking organization . . . who were willing to use weapons and reap violence when required . . . and it didn't matter if they knew the person . . . . If it threatened them, they were willing to carry guns, wear disguises and shoot, and they did that in this case."); DE767:7457 ("This is a major narcotics operation involved in untold violence . . . .").

181

## VIII.

### ["Execution Impact" Testimony and Instructions]

**The court's evidentiary rulings and instructions to the jury regarding Sanchez's relationship with his son prevented the jury from giving effect to important mitigation about Sanchez's character, in violation of the Eighth Amendment and the Federal Death Penalty Act.**

At the sentencing phase, Sanchez's family offered compelling testimony about the close bond between Sanchez and his then six year-old son, Three.[75]  In addition to recounting stories of Three's early childhood, Sanchez's family conveyed to the jury how Sanchez parented his son from jail while in pretrial detention, both nurturing and providing guidance to Three during visits and phone calls.  Sanchez's prison expert, James Aiken, explained that Sanchez would be able to continue his relationship with Three during a sentence of life without the possibility of release.  This demonstrated capacity for love, ability to parent, and opportunity for redemption should have been among the strongest mitigating factors in this case, in which two young lives had already been destroyed.

But the court's rulings and instructions prevented jurors from giving consideration and effect to this evidence.  Because the court mistakenly believed

---

[75] As noted, Sanchez's son's full name is Ricardo Sanchez, III, after his father and grandfather — hence, the nickname "Three."

182

that it would be improper for jurors to consider any relationship that Sanchez might have with his son in the future, it prevented Sanchez from submitting to the jury several mitigating factors, including that "[i]f sentenced to life in prison, without the possibility of release, Ricardo Sanchez can continue to be a father to his son Ricardo III." (DE830:2; DE846:9428).  The court further instructed jurors that it would be improper to consider "any loss that the son would suffer if the father were not there to continue in that relationship.  That is sometimes referred to in the law as execution impact testimony, and I have excluded that as a factor in the case . . . ." (DE848:9747).  In fact, only eight jurors found the sole, undisputed mitigating factor submitted regarding Three: that "Ricardo Sanchez has a loving relationship with his son, Ricardo III." (DE860:14).

The court's approach, which appears to be unprecedented in federal death penalty cases, was error.  First, the evidence Sanchez offered was not "execution impact" evidence — that is, evidence focused on the emotional harm and distress that third parties would experience if the jury imposed a death sentence — but instead proper mitigation regarding Sanchez's character and therefore admissible. *See Skipper v. South Carolina*, 476 U.S. 1, 7 (1986) (approving testimony in mitigation demonstrating that defendant "could lead a useful life behind bars if sentenced to life imprisonment").  In fact, the government had not even objected to

183

some of the mitigation excluded by the court.  (DE846:9427) (government agrees to submission of proposed mitigator #23, ultimately denied by the court, that, if sentenced to life in prison, Sanchez can continue to provide support to Maria Lopez in raising Ricardo III).  The court failed to recognize, however, the degree to which the evidence about Sanchez's potential future relationship with Three reflected on Sanchez as well as his son.

Second, even if regarded as execution impact evidence, numerous other courts have recognized such evidence as relevant and mitigating under the Eighth Amendment and the Federal Death Penalty Act.  Indeed, third-party impact evidence should be admissible in its own right.  *Cf. United States v. Battle*, 173 F.3d 1343, 1348-49 (11th Cir. 1999) (rejecting challenge to government evidence about how life sentence for prison killer would affect inmates and guards).

Given the court's mishandling of this critical aspect of Sanchez's mitigation case, a new sentencing hearing is required.

**A.**     **The defense carefully tailored the mitigation presentation regarding Sanchez's relationship with Three to comply with the court's (incorrect) ruling that "execution impact" evidence is inadmissible.**

During opening statement at the penalty phase, Sanchez's counsel emphasized Sanchez's role as a father, and how important he was in that role to both his son and his son's mother, even though he had been in jail for a substantial

184

period of time pretrial.  (DE818:7945).  The government did not object to this

preview of the mitigation case.[76]

The next day, however, the court announced that "testimony regarding the

impact of a sentence upon the Defendant's family" was inadmissible.  In its ruling,

the court singled out Sanchez's relationship with his son:

> And to some degree, there is a slight flavor of [the impact of a
> sentence on the Defendant's family] in the suggestion that a sentence
> of life imprisonment without the possibility of release would allow
> Mr. Sanchez's son to continue to visit with his father, and, if you will,
> the unarticulated but I think inevitable other side of that is that the
> son would be devastated by the loss of his father. . . .  I don't think
> that type of testimony is admissible in these hearings.

(DE823:8338).  Sanchez's counsel protested that they had planned to make "the

mitigating argument . . . that he has a relationship with his son, and life in prison

would allow him to function as a father," which would have "an impact on the

son."  (DE823:8344).  Both the prosecutor and the court responded that such

testimony was inadmissible.  (DE823:8344-45).

When counsel renewed Sanchez's objection to the court's ruling the next

day (DE824:8356), the court explained that, in its view, Sanchez's prospects for a

future relationship with his son did not relate to the defendant's background or

---

[76] The government had previously objected to defense witnesses testifying as
to the appropriate punishment or to the "negative impact" the defendant's death
would have upon them.  (DE795:7849-50, DE1113:15-16).

185

character, and thus did not qualify as admissible mitigation. (DE824:8358-60). While maintaining his objection, counsel adhered to the court's ruling in presenting Sanchez's mitigation case, emphasizing not the potential impact of Sanchez's execution on his family, but his "role and relationships with other people," particularly his son. (DE846:9438).[77]

Four fact witnesses testified about Sanchez's relationship with Three: Three's mother, Maria Lopez; Three's maternal grandmother, Rachel Ramos; Three's paternal grandmother, Juana Sanchez; and Three's paternal aunt, Nydia Sanchez. All agreed that Sanchez and Three enjoyed a strong, genuine father-son bond. (DE824:8406; 8434; DE823:8194; 8292-93). In fact, according to Maria Lopez, Sanchez had risen above his own troubled childhood to become a better father than his own. (DE824:8406-07).

Maria Lopez, Ramos, and Juana Sanchez described taking Three to visit Sanchez during Sanchez's pretrial detention. Maria Lopez explained that she (and Three's grandmothers) took Three to the jail "often" because "[m]y son asks to go see his dad" (DE824:8405-06; *see also* DE823:8193-94 (Juana Sanchez);

---

[77] Sanchez's witnesses also testified to their own relationships with him. *See* DE824:8436 (Ramos) ("Q: You heard the evidence against Ricardo? A: Yes . . . . Q: You still love Ricardo Sanchez? A: Yes."); DE823:8194 (Juana Sanchez) ("Yes [I love Ricardo]. He was a good son."); DE823:8293 (Nydia Sanchez) ("Of course I love my brother").

DE824:8435 (Ramos)).  Ramos expressed her support for the jail visits because they strengthened the relationship between Three and his father.  (DE824:8435-36).  Maria Lopez offered an example of how Sanchez helped her keep their son focused on school, even from jail, just by talking to Three over the phone. (DE824:8407).

In a brief video-taped interview that was played for the jury, Three confirmed the strength of his relationship with his father and described the nature of their contact.  In the interview, Three calls Sanchez "the best dad" and describes how they talk and play during visits.  He explains how hard it is for both of them when the visits end and that it makes both of them cry because they love each other.  Three says that he talks to his dad about school and about his upcoming birthday.[78]  And, he describes how his father calls him from jail to wish him goodnight.  *See* Sanchez SX-PP 37; DE824:8424.

Sanchez expert witness James Aiken, a former state death-row warden and corrections official, testified that Sanchez would be able to maintain his relationship with Three, if he were sentenced to life in prison without release. (DE825:8683-84).  Aiken explained that interaction between inmates and their

---

[78]  Three was born on January 3, 2003, so he was five years old when the video was made on December 31, 2008, but six years old by the time the trial started in January 2009.

187

children is very meaningful to both parent and child, and can make a difference in

a child's life.  (DE825:8684-85 ("I have seen inmates on the phone fussing at their

children about studying and staying out of trouble, and don't follow the way of

your father, let me be a living example for you not to do the things [I did].")).  The

government did not object to any of this testimony.

**B.**    **The court prevented the jury from considering much of Sanchez's evidence by refusing to submit proposed mitigators about Sanchez's relationship with his son and by instructing the jury to give limited consideration to Sanchez's role as a father.**

      **1.**    **The court rejected proposed mitigating factors regarding Sanchez's relationships with Three and other family members.**

As the penalty phase concluded, Sanchez's counsel submitted proposed

mitigating factors to the court.  Among these were four that implicated Sanchez's

ongoing relationships with his family:

> Ricardo Sanchez has a loving relationship with his son, Ricardo III. [referred to as mitigator #20][79]
>
> Ricardo Sanchez can continue to provide support to Maria Lopez in raising Ricardo III. [referred to as mitigator #23]
>
> If sentenced to life in prison, without the possibility of release, Ricardo Sanchez can continue to be a father to his son Ricardo III.

---

[79] The proposed mitigators filed by Sanchez (DE830) were not numbered; however, they were incorporated into a draft verdict form, *see* DE846:9405-06, which is not a part of the record, but apparently was numbered.  The transcript therefore refers to the mitigators by number.

[referred to as mitigator #24]

> There is value in the remainder of Ricardo Sanchez's life in the context of life in prison without the possibility of release. [referred to as mitigator #57]

(DE830:2, 5).  Each of these was consistent with Supreme Court authority establishing a defendant's right to present mitigation about his character, including his ability to "lead a useful life behind bars if sentenced to life imprisonment." *Skipper*, 476 U.S. at 7.

The court allowed the noncontroversial mitigating factor that Sanchez has a loving relationship with his son.  *See* DE846:9424.  The court refused, however, to give the forward-looking mitigating factors, which addressed Sanchez's likely future contributions as a co-parent, father, and inmate.

Notably, the government did not object to the proposed mitigating factor that, if sentenced to life in prison without possibility of release, Sanchez could continue to provide support to Maria Lopez in raising Ricardo III (referred to as proposed mitigator #23).  *See* DE:846:9427 ("[W]e are okay with the mitigator as it is phrased.").  Sanchez's counsel explained that the mitigator was intended to address Sanchez's ability to help Three's mother:

> [W]e are talking about his ability to help Maria Lopez with the son, and Ms. Lopez testified about how he was having trouble acting out in school, and he was able to make the phone call and talk to him, and

189

he straightened out, and hasn't had any trouble since.  She is a single mother, and any help she can get is a help to her.

(DE846:9427-28).  The ability to help raise his son, counsel argued, was an "aspect[] of Sanchez's character."  (DE846:9428).

The government did object to the proposed mitigating factor that, if sentenced to life in prison without the possibility of release, Sanchez could continue to be a father to his son (referred to as proposed mitigator #24). (DE846:9427).  Sanchez's counsel explained that the mitigator was intended to address Sanchez's "ability to be a father figure and [be involved] with [his son]." Again, counsel argued, this was an aspect of Sanchez's character.  (DE846:9428).

The court struck both mitigators, finding they constituted execution impact, not aspects of Sanchez's "character and record that he has with respect to his son. That is, that he presently has a loving relationship with his son."  (DE846:9428) (emphasis added).  According to the court, only backward-looking evidence bore on Sanchez's character and constituted relevant mitigation.  Forward-looking evidence — that Sanchez "would not be able to continue his relationship with his son" or "could no longer provide support to [Three's] mother" — was, by definition, inadmissible.  (DE846:9428).

190

Thus, when the government objected to the mitigating factor that there is value in the remainder of Ricardo Sanchez's life in the context of life in prison without the possibility of release, the court struck that mitigator, as well. (DE846:9438, 9439).  But, as Sanchez's counsel explained, this was not inadmissible execution impact mitigation.  "It means that people will care when he dies, but that is not [execution] impact as much as it is a comment on his ability to maintain relationships."

> I can't think of much of anything that is more personal and directed at the characteristics of Ricardo Sanchez as an individual than the value of his life and whether it has any meaning within the context of life in prison.  And we have demonstrated that it does in his role and relationships with other people.
>
> I know earlier you said that was [execution] impact evidence, but there is a fine line between his role as an individual and his ability to establish relationships with others and [execution] impact evidence.
>
> It is almost looking through the same telescope through different ends.  If he didn't have an ability to establish relationships, no one would care about him.  If he didn't have the ability to maintain relationships, no one would care about him.
>
> That is not necessarily [execution] impact.

(DE846:9438-39).  However, the court heard in this argument the implication that "an execution would preclude him from making those [contributions]."  It therefore ruled, "I do think this is execution impact, so I will disallow that."

191

(DE846:9439).[80]

Sanchez also submitted two other mitigating factors to preserve the court's earlier rulings excluding evidence of "execution impact":

> The execution of Ricardo Sanchez will cause trauma to his son, Ricardo III. [referred to as mitigator #21]

> The execution of Ricardo Sanchez will cause trauma to his mother and loved ones. [referred to as mitigator #22]

*See* DE830; DE846:9424.  Consistent with its evidentiary ruling, the court refused to give them.  (DE846:9427).[81]

### 2. The court's instructions diluted the sole mitigating factor that addressed Sanchez's relationship with Three.

In closing argument, Sanchez's counsel continued to focus on what role Sanchez could play in the lives of his son and co-parent, Maria Lopez, avoiding any discussion of the impact of his execution on his loved ones:

> All that will be accomplished [by executing Sanchez] is that another life will be snuffed out, a life that can still be of some use to others.

> You've heard that Ricardo Sanchez has a loving relationship with his son, Three.

---

[80] Counsel filed a memorandum in support of the admissibility of this evidence and the submission of the mitigators.  *See* DE836.

[81] As discussed below, the court did not impose similar limitations on victim impact testimony, permitting the victims' family members to testify about how the victims' deaths were affecting them and would continue to affect them.

You've heard by all accounts it is a genuine love.  Maria Lopez has told  you she sees it.  Maria Lopez has told you that even while incarcerated and awaiting trial, Ricardo has helped her with Three. Ricardo helped her[] with his behavior at school and Maria told you Three shaped up and started behaving again.

Three told you in a video he loves his father.

You heard from Jim Aiken, a man with a lifetime of experience dealing with prisoners and prisoners' families, he sees the influence a man behind bars could have on his family.  He has told you a piece of advice over the telephone spoken at the right time might keep a child from becoming a criminal and instead becoming a lawyer.  A piece of advice that might turn a child from a life of drug addiction to being a doctor.  It is as simple as that.

There is no doubt that little Three is going to be exposed to many of those risk factors Dr. Reidy told us about.  There is no doubt having a father in prison is not good, it may be a risk factor itself.  But if that father loves you, and if that father shows that love, isn't that a protective factor?

Think about it.  Ricardo Sanchez quit school in the tenth grade, and still went further than either his mother or father.  How sad is it that he can spend the rest of his life in prison and still be a better father to Three than his father was to him?

Ricardo Sanchez has a learning disorder.  His brother apparently has the same problem.  Science tells us it is genetic and runs in families. We don't yet know if Three has that disorder or not.  But imagine the good Ricardo can do from prison by telling his son, I understand what you are going through, I know how frustrated you are, I am proud of you, don't give up.  You are special to me.

He can do that if you give him the chance.  It is an opportunity at redemption.  You may not think he deserves it, but it is something he can contribute.

193

Ricardo Sanchez cannot provide a roof over Three's head or put clothes on his back or food in his belly. By his conduct, Ricardo forfeited his ability and right to do those things. But Ricardo can put love in Three's heart. He has done so in the past and will continue to do so in the future if you allow him to. Isn't love the most important thing a parent can offer their children?

Allow Ricardo to do that for his son, allow him to live.

(DE847:9546-48) (emphasis added). The government did not object to this argument.

Nonetheless, the following morning, the court announced *sua sponte* that it would be adding a cautionary instruction against considering execution impact, singling out the issue in its final charge. (DE848:9679).[82] Sanchez objected to the instruction, emphasizing that he had argued Sanchez's characteristics, not execution impact. (DE848:9689-90). Counsel noted his concern that the instruction would make it difficult for the jury to give full consideration and effect to Sanchez's abilities in his role as a father. (DE848:9690) ("I think it is asking too much of this jury to understand execution impact evidence and specific characteristics of the role he plays as a father."). The court maintained its position but acknowledged that the law was not conclusively established. The court stated:

---

[82] The court stated: "The reason I am doing that, both of the arguments came very, very close to the line, and I know neither lawyer did not [sic] want to mislead the jury, but I do think I have an obligation to do that, and so I will, just for clarification purposes. . . ." (DE848:9683).

194

"if I am in error . . . I know the appellate court would speak to that, and certainly it would be useful to have a clear ruling on this." (DE848:9691).  The court cited no precedent for its instruction and failed to acknowledge the Supreme Court's holding in *Skipper*.

In its final instructions later that day, the court admonished the jury three times not to consider execution impact, which it defined broadly to include any harm the defendant's execution might cause his family as a result of the loss of their relationship with him.  (DE848:9746-47, 9751-52, 9754-55).  When it instructed on the mitigating factor about Sanchez's loving relationship with his son, the court devoted a full page and one-half to this warning:

> Let me stop for a moment and just talk about this, and I wanted to tell you about a ruling I made in the case.
>
> If the jury found that a Defendant in the case had a loving relationship with a family member, that is a characteristic about that person that certainly the jury would be able to consider . . . . But I made a ruling in the case . . . and here is the ruling that I made.
>
> The jury, if it finds this to be true, absolutely is entitled to consider a relationship that a person had with their family members.  That is perfectly permissible.  But what the jury cannot consider and what would not be a legitimate mitigating factor would be the loss that the family member might suffer because of the execution of the Defendant.
>
> So the jury in this case has an absolute right to consider whether Mr. Sanchez has established that indeed he has a loving relationship with

195

his son and that he is a person capable of having those kinds of loving relationships.  But what would not be appropriate to consider would be any loss that the son would suffer if the father were not there to continue in that relationship.

That sometimes is referred to in the law as execution impact testimony, and I have excluded that as a factor in the case . . . .

(DE848:9746-47).  The court gave similar, though less extensive versions of this instruction when it charged the jury on a similar mitigating factor involving Troya's relationship with his family (DE848:9751-52), and then again, for a third time, at the close of its discussion of the mitigating factors (DE848:9754-55).

**C.      The testimony offered by Sanchez was relevant mitigation concerning his character.  Under the Eighth Amendment and the FDPA, Sanchez was entitled to have the jury consider this evidence as a basis for a sentence less than death.**

Under the Eighth Amendment, a capital sentencing jury "may not . . . be precluded from considering 'any relevant mitigating evidence.'"  *Skipper*, 476 U.S. at 6 (*quoting Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).  Here, as elsewhere, relevant means having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable."  *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quotation omitted).  *See also* Fed. R. Evid. 401.  In a capital case, a fact of consequence is simply one the jury "could reasonably deem to have mitigating value."  *Tennard*, 542 U.S. at 284.

196

This "low threshold," *id.* at 285, licenses evidence from which the jury "could . . . draw[] . . . inferences" about "any aspect of a defendant's character or record" that "might serve as a basis for a sentence less than death," *Skipper*, 476 U.S. at 6 (internal quotation marks and citations omitted).[83]

Mitigating factors 23, 24, and 57, which addressed Sanchez's potential future impact on society as a father, co-parent and inmate, were proper under the Supreme Court's jurisprudence. In refusing to permit the jury to consider these mitigating factors, the court confused forward-looking evidence about the contributions a defendant may make in the future with execution impact evidence.[84] Execution impact evidence focuses on the emotional harm and distress that third parties would experience if the jury imposed a death sentence. *Cf. Stenson v. Lambert*, 504 F.3d 873, 880, 892 (9th Cir. 2007) (considering what effect execution would have on defendant's three young children and father, who suffered from heart condition). *Cf. also* Susannah Sheffer & Renny Cushing,

---

[83] The Federal Death Penalty Act tracks this expansive standard. *See* 18 U.S.C. § 3593(c) ("The defendant may present any information relevant to a mitigating factor . . .").

[84] The "execution impact" in this case was captured by mitigators 21 and 22, which were rejected by the court: that the execution of Ricardo Sanchez will cause trauma to his son, Ricardo III, and that it will cause trauma to his mother and loved ones.

197

*Creating More Victims: How Executions Hurt the Families Left Behind:  A Report by Murder Victims' Families for Human Rights* (2006) (describing violent, traumatic loss and accompanying mental health problems experienced by families of the condemned).  In contrast, the testimony recounted above portrayed Sanchez in his role as a father — someone who played with Three, tucked him in at night (at least by phone), and counseled him about how to behave, even from pretrial confinement.

Sanchez's ability to parent from prison demonstrated something far more powerful than the mere father-son bond conveyed in the "loving relationship" mitigator.  It showed dedication, devotion and fortitude in the face of challenges that cause other inmate parents to withdraw and turn disablingly bitter.  It required him to set aside his own anxiety and pain to nurture his son.  Such character evidence is classic, relevant mitigation, because it reveals an "aspect of [Sanchez's] character . . . that might serve as a basis for a sentence less than death."  *Skipper*, 476 U.S. at 4-5 (internal quotation marks and citations omitted). Jurors could reasonably have decided that Sanchez's effort on behalf of his son, and the effort he would choose to expend over the course of a lifetime in prison, counseled against a death sentence.  Yet the jury was barred from considering this evidence as mitigation by the court's failure to submit for the jury's consideration

198

mitigators 23, 24 and 57. The court exacerbated the harm from its refusal to submit the mitigators when it gave a limiting instruction that seriously diluted the only mitigator relating to Sanchez's parenting ability: the "loving relationship" mitigator.

The court seemed to believe that the value of Sanchez's character traits to others converts them into inadmissible or improper execution impact mitigation. It does not. It simply helps describe those traits, showing how Sanchez's character and likely future behavior may be viewed from more than one perspective — for example, the father's, the mother's or the child's. (DE846:9438) ("It is almost looking through the same telescope through different ends."). Thus, even courts that approve the exclusion of traditional execution impact mitigation permit the forward-looking character evidence that was offered here. *See Stenson*, 504 F.3d at 892 ("[T]he trial court did permit extensive testimony from Stenson's family members and friends about their relationships with Stenson and whether they would continue those relationships while Stenson was in prison.") (emphasis added); *People v. Bennett*, 199 P.3d 535, 552-53 & n.10 (Cal. 2009) (while court kept expert from opining that defendant's execution would cause children to feel abandoned and require therapy, it "permitted the expert to testify about the children's bond with defendant, their love for him, and how they would benefit

199

from a continuing relationship if he were allowed to live").

A sentencing jury may not be precluded from considering concrete contributions a defendant can make in the future in deciding whether to impose a death or life sentence. To the contrary, in *Skipper*, the Supreme Court held that it was appropriate to inquire into the behavior of a defendant in prison because a jury could be convinced that he should be spared the death penalty if he "could lead a useful life behind bars if sentenced to life imprisonment." 476 U.S. at 7. Yet the court here struck mitigating factors that bore directly on the question whether Sanchez could lead a "useful life behind bars," (DE846:9428, 9439),[85] and explicitly forbade the jury from considering how Sanchez might parent Three during a life sentence (DE848:9746-47) ("what would not be appropriate to consider would be any loss that the son would suffer if the father were not there to continue in that relationship").[86]

---

[85] The court explained, "What you are really saying is, you are talking about Mr. Sanchez as a person and you are saying he can make contributions to society in the future . . . . I suppose the counter argument is that you are suggesting an execution would preclude him from making those. I do think this is execution impact, so I will disallow that." (DE846:9439).

[86] As the Supreme Court noted in Skipper, the distinction between past, present, and future, as it bears on a defendant's character, "is elusive. As we have explained . . . a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper*, 476 U.S. at 7. Similarly,

The "loving relationship" mitigator did not, on its face, fully account for Sanchez's contributions to parenting Three, either in the past or in the future. It merely described their mutual affection in the present. Thus, in striking the other mitigators and instructing the jurors not to consider Sanchez's role vis-a-vis Three, the court improperly excised an important category of relevant mitigation from Sanchez's case. Since the jury never heard any execution impact testimony — *e.g.*, executing Sanchez will traumatize his son — it can only have understood the jury instructions about the "loss that the son would suffer" as prohibiting consideration of what Sanchez could offer Three as a parent during a sentence of life imprisonment without the possibility of release when evaluating the "loving relationship mitigator."

The Supreme Court has acknowledged that a "constitutional defect" occurs not only when a jury is precluded from hearing certain types of mitigating evidence, but also when "the defendant's evidence [i]s placed before the sentencer but the sentencer ha[s] no reliable means of giving mitigating effect to that evidence." *See Graham v. Collins*, 506 U.S. 461, 475 (1993). *See also Penry v. Lynaugh*, 492 U.S. 302, 321, 323 (1989) (requiring that juries be given

---

Sanchez's disposition to effectively parent his son from prison is an aspect of his character that was relevant to the sentencing determination in his case.

201

instructions allowing them to give effect to a defendant's mitigating evidence and express their reasoned moral response to that evidence in determining sentence). Because the court's actions in striking the proposed mitigators and giving an instruction that diluted the mitigating factor about Sanchez's relationship with his son prevented Sanchez's jury from giving full consideration and effect to his mitigation, his death sentences must be reversed.

**D.    Under the Eighth Amendment and the FDPA, Sanchez was entitled both to present and to have the jury consider as a mitigating factor execution impact evidence about the grief and loss his family would suffer if he were executed.**

In its evidentiary and instructional rulings excluding all execution impact mitigation, the court exceeded even those authorities that have frowned on such evidence, since most forbid only explicit pleas by relatives to spare the defendant's life.  In fact, the prevailing practice in federal district courts is to permit execution impact mitigation.  According to data maintained by the Federal Death Penalty Resource Counsel Project, federal capital juries have found "execution impact" as a mitigating factor in at least 61 cases, including four in this Circuit.  *See* Declaration of Kevin McNally Regarding Execution Impact Testimony (Jan. 25, 2010), *available at* http://www.capdefnet.org/FDPRC/WorkArea/DownloadAsset.aspx?id=3728.

Excluding such evidence here was error for at least three reasons, which are developed in more detail in Troya's brief (Point IV, pp. 139-57).

First, execution impact was circumstantial proof of Sanchez's character. *See Skipper*, 476 U.S. at 6 (defining mitigation as any evidence from which the jury "could . . . draw[] . . . inferences" about the defendant's character). The grief and loss his family would suffer if he were executed would have helped the defense establish that Sanchez was a person who had formed close, emotional bonds with others and had a life worth saving.

Second, even to the extent that such future-oriented grief or loss was a factor that had to do with Sanchez's family, rather than his own character or background, it still constituted relevant mitigation under the expansive language of the Federal Death Penalty Act, and by analogy with other well-recognized aggravating and mitigating factors, such as future dangerousness and victim impact evidence.

And third, excluding the evidence was particularly unfair in light of the extensive and emotional forward-looking victim-impact evidence the court permitted the government to introduce about the loss and grief the victims' relatives would continue to suffer in the future as a result of the victims' deaths, and in light of the government's argument that it would continue to investigate

Danny Varela's role in the murders, and try him on capital charges one day, *see post*, Point X.A.

**E.     The court's exclusion of relevant character evidence and execution impact evidence, its refusal to permit the jury to consider mitigation related to Sanchez's future contributions as a father, co-parent and inmate, and its instruction that jurors ignore such mitigation, prejudiced Sanchez.**

Errors that affect the jury's consideration of relevant mitigation are structural, as the Fifth and Sixth Circuits have held, and thus not subject to harmless-error analysis. *See Nelson v. Quarterman*, 472 F.3d 287, 314-15 (5th Cir. 2006); *Davis v. Coyle*, 475 F.3d 761, 774-75 (6th Cir. 2007). Indeed, "the Supreme Court has *never* . . . given any indication that harmless error might apply in its long line of post-*Furman* cases addressing the jury's ability to give full effect to a capital defendant's mitigating evidence." *Nelson*, 472 F.3d at 314-15 (citing cases). To the contrary, the Court has suggested that reviewing courts may not substitute their judgment for the jury's, except "insofar as evidence of a trivial feature of the defendant's character . . . is unlikely to have any tendency to mitigate the defendant's culpability." *Tennard*, 542 U.S. at 286. Sanchez's role as a father, son and brother can hardly be characterized as "trivial features" of his character without any mitigating value. It would therefore be "wholly inappropriate" for the Court "to substitute its own moral judgment for the jury's."

204

*Nelson,* 472 F.3d at 315 (*citing Tennard*, 542 U.S. at 286-87).  Instead, the death sentences must be reversed and the case remanded for a new sentencing hearing.

Even under a harmless error standard, reversal is clearly required.  This was not a case in which counsel was prevented from asking just "one very particular question" of the mitigation witnesses.  *Cf. Fuller v. State*, 827 S.W.2d 919, 936 (Tex.Cr.App. 1992) (no error in prohibiting "one very particular question of whether a witness felt that appellant should live or die").  Nor was it one in which, notwithstanding any restriction, the defendant's family members still were allowed to convey that they would "continue to have a relationship with him if he were in prison."  *State v. Stenson*, 940 P.2d 1239, 1279 (Wash. 1997).  Here, the court's evidentiary and instructional rulings combined to place the entire future-oriented subject of Sanchez's relationships with his relatives — and particularly his ability to parent his son from prison — out of bounds.  The court's instructions forbade the jury from considering the limited evidence on this subject that was admitted.

The jury clearly struggled in determining the appropriate penalty in this case.  *See Porter v. McCollum*, 130 S. Ct. 447, 454 (2009) (citing similar split verdicts on multiple capital counts as indicator that sentencing case was close one and that omitted mitigation might have influenced outcome).  The jury unanimously voted for life on three of the five capital counts, which included one

205

count that involved the two child victims. (*See* Statement of Facts, Section B.10, *ante*). Under these circumstances, the government cannot prove beyond a reasonable doubt that the court's erroneous rulings had no effect on the outcome.

Indeed, had the jury been able to give full consideration and effect to the mitigation involving Sanchez's relationship with the only other young child in the case — his son, Three — the verdicts on the remaining counts might well have been different.[87] Although the aggravating factors for Sanchez were undoubtedly serious, jurors found substantial mitigating factors involving his childhood and youth, his prior criminal record, his limited intellectual functioning, an equally culpable co-defendant who was not facing the death penalty, and one of the victims having contributed indirectly to the crime. (*See* DE860:12-16). And the jury deliberated over the course of four days before reaching a death verdict.[88] The court's errors limiting mitigation likely tipped the balance toward death here, for a man whom jurors found was a follower, with limited cognitive skills and

---

[87] As it was, eight jurors found Sanchez's "loving relationship" with Three factor. (DE860:14). In contrast, no jurors found the loving relationship factor for Troya vis-a-vis his family. (DE859:12).

[88] The jury began deliberation on March 26 at 11:43 a.m. (DE848:9762). They deliberated that afternoon, and all day March 27 and March 30. *See* DE855:9776, DE856:9801. It was 4:55 p.m. on the following day, March 31, when the court finished receiving the verdicts. (DE857:9846).

flawed decision-making, who was subject to undue influence by his co-defendant cousin, and who — despite a childhood scarred with neglect and exposure to violence — had forged a loving, supportive relationship with his son.

Sanchez's death sentences therefore must be reversed.

## IX.

### [Fifth & Sixth Amendments - Statements to Government Expert]

**The district court improperly permitted testimony based on Sanchez's compelled statements to a government psychologist that went beyond the scope of the defense intellectual functioning evaluation, in violation of the Fifth and Sixth Amendments and Federal Rule of Criminal Procedure 12.2.**

In anticipation of the penalty phase, pursuant to Federal Rule of Criminal Procedure 12.2, defense counsel advised that Sanchez planned to present expert testimony in mitigation regarding his limited intellectual functioning. The government requested and received court permission to conduct a "rebuttal" expert examination of Sanchez. But the district court refused to properly limit the scope of that examination to correspond to the defense examination, to require the government to provide notice of the tests its expert proposed to administer, or to permit defense counsel to be present during the examination. These errors enabled the government's expert to conduct a broad psychological examination of Sanchez, including personality testing, that exceeded its right to rebuttal of the

207

defense intellectual functioning exam.

During the penalty phase, over defense objection, the court permitted the government's expert to testify not just about Sanchez's intellectual functioning, but about the full examination, including Sanchez's statements during a clinical interview and the personality testing. This was not rebuttal to the intellectual functioning mitigation, but was used to suggest that lay witness testimony about Sanchez's traumatic childhood was exaggerated or manufactured.

The use of Sanchez's statements in this manner violated both his Fifth Amendment right against self-incrimination and the fair rebuttal principles embodied in Federal Rule of Criminal Procedure 12.2. Sanchez did not rely on statements to his own expert or on any testing other than for intellectual functioning; therefore, the government should not have been permitted to do so either. *See Estelle v. Smith*, 451 U.S. 454, 467-68 (1981); Fed. R. Crim. P. 12.2(c)(4); *United States v. Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004) (defendant's intent to introduce evidence on mental condition does not "open the door for any type of mental testing" by the government). In addition, because the court's pretrial rulings prevented Sanchez's counsel from providing him meaningful guidance in deciding whether to submit to the government exam, the use of the personality testing violated the Sixth Amendment. *See Powell v. Texas*,

208

492 U.S. 680, 686 (1989).

**A.      Sanchez's statements to a government psychologist about his life history and mental health status were not proper rebuttal of the defense expert's intelligence testing or the lay and expert witness testimony about Sanchez's history and resulting risk factors.**

**1.      Sanchez presented limited evidence of his learning disabilities, lay witness testimony about his turbulent childhood, and sociological data about risk factors for criminal behavior.**

Sanchez presented three types of evidence in his mitigation case: expert testimony regarding his limited intellectual capacity, lay testimony about his stressful childhood, and expert testimony about social science research indicating that certain life experiences increase the risk that people will make poor decisions in young adulthood.  None of this evidence triggered a government right to introduce Sanchez's statements against him.

**a.      Dr. Grant's testimony about intellectual functioning.**

The defense made clear well before trial that its "mental condition" testimony under Rule 12.2 would be very circumscribed: "[t]he only testing that we intend to introduce . . . bears on our client's I.Q." (DE965:22).  As a result, counsel submitted that the government's expert would require "simply I.Q. testing to rebut or [corroborate] our testing, not a broad psychological investigation." *Id.* At trial, Sanchez's expert, Dr. Daniel Grant, a neuropsychologist (DE824:8440),

adhered to the defense's pretrial pledge, presenting only testing and testimony relating to Sanchez's intellectual functioning.  (DE824:8442-3).

Grant testified that Sanchez suffers "significant deficits" in intellectual functioning. (DE824:8447).  His I.Q. score of 77 places him in just the sixth percentile (DE824:8445), barely above the diagnostic threshold for mental retardation (DE824:8442).[89]  His functioning is further compromised by learning disabilities that make it difficult for him to achieve at even that low potential. (DE824:8455-60).  Grant noted that it would be possible for Sanchez to hold a job, but that his options would be limited given his disabilities.  (DE824:8466-67).  Grant's testing also revealed that other members of Sanchez's family have similar deficits.  (DE824:8463-65).[90]  Grant did not testify to any statements by Sanchez, or to any evidence of Sanchez's traumatic life history.

The government's expert generally did not contest Dr. Grant's findings, although he did note some areas in which Sanchez's performance was better than others.  (DE846:9294-99).

---

[89] *See* DSM-IV-TR at 41-42, 48, 49 (noting that mental retardation may be diagnosed in individuals with IQs up to 75).

[90] As noted in the Statement of Facts, Section B.2, *ante*, Sanchez's father's score meets the diagnostic criteria for mental retardation.  Sanchez's mother's score, like Sanchez's own, comes close.  *Id.*

210

### b. Lay witness testimony about Sanchez's childhood.

The defense also presented lay witness testimony about Sanchez's childhood, some of which supported Dr. Grant's testimony about his low intellectual functioning, and much of which described his traumatic childhood.[91]

Sanchez's special education teacher, Amy Fleming, told the jury that when the school system tested Sanchez as a child, he showed deficits consistent with those revealed in Dr. Grant's testing. (DE823:8228-30). In first or second grade, his frustration with reading was so severe that, one teacher noted, he crawled under his desk and tore his reading text. (DE823:8215). When he was just nine years old, he was referred for special education placement, in a self-contained, full-time program (DE823:8231-32), where he was teased, humiliated, and had few friends. He remained in such a program until he left school in tenth grade. (DE823:8237-43; DE824:8381).

While he struggled at school, Sanchez was also under stress at home. When he was a young child, the family lived in public housing in Dyson Circle, West Palm Beach, where there were gangs and drug dealing, and their home was broken into. (DE823:8160, 8272-73). They moved to what was supposed to be a

---

[91] This testimony is described in more detail in the Statement of Facts at B.1-4.

safer neighborhood when Sanchez was a pre-teen.  (DE823:8156, 8160).  But even that neighborhood suffered from poverty, crime, and other socio-economic problems.  (DE825:8627-29).

Sanchez and his siblings grew up in a household plagued by alcohol-fueled violence and further strained by their oldest brother's mental retardation and medical problems.  (DE823:8276; DE823:8184-87, 8272-78, 8293-94; DE824:8368, 8372-73).  The children were often frightened — either of the fighting between their parents, which occasioned multiple visits from the police, or of their brother's uncontrolled seizures. (DE823:8173, 8186-87, 8275-78).  They felt so alone and unloved that Sanchez begged permission to move in with relatives in Texas and his brother attempted to burn down the house for attention. (DE823:8175-76, 8182, 8184, 8279-83, 8300-02; DE824:8371-72, 8381-82).

Sanchez and Maria Lopez met as teenagers.  (DE824:8380).  Within two years, their son, Three, was born.  Sanchez moved in with Maria Lopez, her mother, Rachel Ramos, her younger brother, Julio, and baby Three, and he worked a series of menial jobs to try to support his young family.  (DE824:8384-86, 8394-96).  But he was treated more like another child than like the head of the household.  He went to work, turned over his paycheck to one of them, and they ran the household.  (DE824:8386-87).  When he tried to be of any more help, his

212

intellectual limitations got in the way.  (DE824:8391-92).

The government attempted to portray Sanchez's life as "normal," disputing certain details from the lay witness testimony.  For example, the prosecutor questioned Mrs. Sanchez's allegation that her husband had shot her (DE823:8204);[92] the number and character of Sanchez's father's prior convictions and/or arrests (DE823:8194, 8203-5); and how much abuse of the children occurred (DE823:8195).  The prosecutor also questioned whether the allegations of domestic violence could be true, given that the family remained in contact when the children grew up.  (DE847:9514).  The government did not, however, call any lay witnesses or present any records that contradicted the thrust of the defense evidence.  Instead, as discussed below, it relied on Sanchez's statements to its expert to try to disprove his mitigation case.

> **c.    Dr. Reidy's general testimony about social science research on "risk factors."**

Sanchez called a second expert, Dr. Tom Reidy, to explain social science research about how life experiences can shape an individual's future behavior. According to studies by the U.S. Surgeon General, funded by the U.S. Department of Justice, the common-sense notion that our experiences shape our futures proves

---

[92] In her statement to police at the time she was shot, Mrs. Sanchez stated that the gun had fired by accident.  *Id.*

true: exposure to certain "risk factors" increases the probability that a child may make bad choices and be involved in criminal activity later in life. (DE824:8526-33).

Dr. Reidy did not opine as to whether Sanchez had in fact been exposed to or shaped by such "risk factors," because he never interviewed Sanchez and had no personal knowledge of Sanchez's life. (DE824:8549).[93] Dr. Reidy merely assessed whether the life events described in the records and lay testimony would qualify as risk factors under the DOJ models, which he had studied. (DE824:8520-21, 8536). For example, according to the Department of Justice, the domestic violence in the Sanchez home qualified as a risk factor. (DE824:8547). In fact, the records and lay witnesses established that Sanchez experienced many risk factors, including low intellectual functioning, a family history of substance abuse, domestic violence, poverty, exposure to crime, difficulty in school, and social isolation. (DE825:8629-31). Dr. Reidy therefore testified that, assuming this evidence was true, the DOJ models would predict that Sanchez was at risk for future criminal behavior. (DE825:8629-31).

---

[93] Dr. Reidy had reviewed some social history records, which were equally available to the government expert. (DE825:8614).

The government's only attack on the risk factors research itself was that different people respond to risk and protective factors differently, and that, without having evaluated Sanchez, Dr. Reidy could not say for sure what effect Sanchez's upbringing had on him. (DE846:9331-33). *See* DE847:9620 ("What is so curious about Dr. Reidy is he has his presentation prepared. It is canned . . . He wrote his report before he heard any evidence.").

### 2. The district court improperly refused to limit the prosecution's expert to testing and testimony about Sanchez's intellectual functioning, violating the Fifth Amendment and Federal Rule of Criminal Procedure 12.2.

The defense had informed the court prior to trial that it would not present evidence of Sanchez's general mental health during the penalty phase, but rather would confine its evidence to the narrow issue of Sanchez's intellectual functioning. (DE965:22). It had also requested that the court likewise limit the government testing of, and expert testimony about, Sanchez. The court refused. (DE965:22).

The government's expert proceeded to conduct "a typical battery of psychological exam," including tests for substance abuse and personality disorders. (DE965:7; *see also* DE822:2). Given the court's ruling, Sanchez had little choice but to submit to this examination. *Cf. United States v. Byers*, 740

215

F.2d 1104, 1113 (D.C. Cir. 1984) (Scalia, J.) ("it is doubtful whether" submission to government exam "could meet the high standard required for a voluntary, free and unconstrained relinquishment of the Fifth Amendment privilege," due to legal consequences of refusal).[94] *See also* Fed. R. Crim P. 12.2(d) ("If the defendant . . . does not submit to an examination when ordered . . . the court may exclude any expert evidence from the defendant.").

As the government prepared to present its penalty phase rebuttal case, the defense filed a motion to limit testimony by the government's expert to the subject of Sanchez's intellectual functioning and to preclude introduction of any statement made by Sanchez during the exam "unless it relates to low intelligence." (DE822: 3).[95] Under the Fifth Amendment and Rule 12.2, the defense argued, the government's need for parallel access to Sanchez to rebut his mental health mitigation was fulfilled without the broader psychological testimony and test

---

[94] Brannon testified that he told Sanchez "I was hired by the U.S. Government . . . to do a psychological evaluation" and "the results would not be confidential" and "[i]f there was a conviction they would be revealed, there would be a hearing like this." (DE846:9341-42). There is no evidence that Sanchez waived or was even informed of his right to remain silent with respect to the examination. *Cf. Powell*, 492 U.S. at 681-82.

[95] The motion also sought to preclude introduction of "any matter 'based on the statement[s]'" or "any matter which constitutes 'fruits of the statement . . . .'" (DE822:3) (*citing* Fed R. Crim. P. 12.2(c)(4)).

216

results, since Sanchez had not submitted to such testing by the defense and would not present such expert testimony on his own behalf.  (DE822:3.  *See also* DE846:9293).  *Cf. Taylor*, 320 F. Supp. 2d at 794.

The government agreed not to introduce evidence of polysubstance abuse or personality disorders, and effectively conceded that evidence of the clinical interview and other personality testing would not rebut Dr. Grant's testimony.  But the government maintained that it would rebut Dr. Reidy's risk factor testimony.  (DE845:9176).  As the government acknowledged, however, Dr. Reidy never interviewed Sanchez, much less conducted the tests that Dr. Brannon did, and never relayed to the jury any of Sanchez's statements.  (DE825:8635; DE846:9333-36).

Nonetheless, the court permitted introduction of both Sanchez's statements from the clinical interview and the results of the Personality Assessment Inventory ("PAI"), a psychological test based on self-reporting by the subject.  In so doing, the court accepted the government's bait and switch that the statements were proper rebuttal, not to Dr. Grant's testimony, but to Dr. Reidy's.  Since Dr. Reidy "talked about risk factors and other factors, protective factors that might explain how a person developed the way they are," the court held that Sanchez's statements and test results in the government examination were "relevant to the

217

issues that were raised by the defense experts." (DE846:9270-71).[96]

But the government did not even use Sanchez's statements for the purpose it proffered. *See* DE845:9175-76 (government states its intent, through Brannon, to rebut the alleged risk factors). Instead of attacking the validity of the risk factor research, it attempted to use Sanchez's own words to undermine the historical accuracy, and the significance to Sanchez, of the accounts of his lay witnesses — to suggest that Sanchez's father was not an alcoholic, that there was no domestic violence in the home, and that Sanchez had healthy relationships with friends and family. That is, the government used information gathered in its mental health exam to suggest that Sanchez's witnesses had lied on his behalf (and, perhaps, at his behest). This use of Sanchez's statements to Dr. Brannon was in no way "similar" to Dr. Grant's testing or testimony or even to Dr. Reidy's testimony. *United States v. Williams*, 731 F. Supp. 2d 1012, 1017 (D. Haw. 2010)

---

[96] The government also suggested that the substance of Sanchez's statements to Dr. Brannon was already before the jury from its cross-examination of Dr. Reidy (DE825:8636-40), during which it inquired whether Reidy was aware that Sanchez had denied exposure to various risk factors. (DE846:9269). The defense did not object to the cross-examination, in which Sanchez's statements were not offered for their truth, but to test Reidy's knowledge of the record. To the extent an objection was theoretically warranted, it would have been futile, given the court's prior rulings refusing to limit the government's expert examination or testimony. *See Osborne v. Ohio*, 495 U.S. 103, 124-25 (1990). In any event, the court did not rely on the Reidy cross-examination in allowing Dr. Brannon's testimony. (DE846:9270-71).

(government's rebuttal limited to "expert examinations that parallel the . . . examinations conducted by defense experts.").  It therefore violated Sanchez's Fifth Amendment right against self-incrimination and Federal Rule of Criminal Procedure 12.2.

Dr. Brannon told the jury that he had conducted a clinical interview of Sanchez, to understand his life history and how that history had affected him. (DE846:9286).[97]  He also relied on the PAI, which he said could reveal a pattern indicating that a subject was depressed or anxious or suffering some other disorder brought on by prior life experience.  (DE846:9312-13).  Like the clinical interview, the PAI accomplishes this by asking the subject questions about himself.[98]

In his testimony, Dr. Brannon relayed what Sanchez had said during the clinical interview about his upbringing.[99]  According to Dr. Brannon, Sanchez said

---

[97] Dr. Brannon also testified about intelligence testing.  (DE846:9285-9311).

[98] Some of the questions on the PAI — which the subject rates on a scale of very true to false — include: 1. My friends are available if I need them; 41. I like being around my family; 46. I've forgotten what it's like to be happy; 215. Some people around me think I drink too much alcohol; 289. I don't have any good memories from my childhood; 301. I have a lot to live for.

[99] The court granted the defense a standing objection to this line of questioning.  (DE846:9317).  Dr. Brannon also referred to records of monthly assessments by the Palm Beach County Jail (and other sources), which asked

that he never observed domestic violence in his home and was never abused himself.  He also said he was not aware of mental health or substance abuse issues in the home.  He described his relationship with his family growing up as "good." (DE846:9319).  Dr. Brannon also explained that if Sanchez had been exposed to the "risk factors" testified to by his lay witnesses, his personality testing would have revealed this by showing "elevations in areas like depression, like anxiety." Sanchez's did not, nor did he report those feelings.  (DE846:9324-27).[100]

None of this evidence rebutted the substance of Dr. Reidy's testimony about the Department of Justice "risk factors."[101]  Dr. Reidy's testimony did not purport to evaluate the veracity of the lay witness testimony or offer an opinion about Sanchez's reaction to any risk factors to which he may have been exposed.  But Dr. Brannon's testimony about Sanchez's statements did both.  It was presented as

_____

similar questions of Sanchez.  *See, e.g.*, DE846:9319-20.  The court should have excluded these records for the same reasons that it should have excluded Sanchez's statements to Dr. Brannon.

[100] The defense objections to the PAI testimony were overruled. (DE846:9323-24, 9326).

[101] The government had already addressed Dr. Reidy's testimony, through its cross-examination of Dr. Reidy about the limits of the risk-factor research and testimony on that subject by Dr. Brannon.  Ultimately, however, even Dr. Brannon was forced to agree that the risk factors research has some validity. (DE846:9335).

substantive evidence from Sanchez himself, with the imprimatur of a trained expert, to contradict the lay witness testimony about Sanchez's experiences as a child and young adult.  This violated the Fifth Amendment and Rule 12.2(c)(4). *Cf. Jones v. Dugger*, 839 F.2d 1441, 1444 n.7 (11th Cir. 1988) (noting that statements to mental health professionals, including "[a] defendant's discussion of his past life," when offered for the truth of the matter asserted, may implicate the Fifth Amendment).[102]

The Fifth Amendment limits government mental health examinations and testimony to those issues on which the defendant presents expert evidence at trial. *See Buchanan v. Kentucky*, 483 U.S. 402, 423-24 (1987) (permitting government expert testimony on mental status to rebut defendant's expert testimony); *Smith*, 451 U.S. at 468 (precluding testimony on future dangerousness, when defendant consented only to competency evaluation).  The Supreme Court has held, for instance, that when the defendant presents only expert evidence of insanity, the government has no right to examine him and present testimony about his future dangerousness.  *See Powell*, 492 U.S. at 684-85.  Here, where Sanchez was examined and presented testimony only about his intellectual functioning, the

---

[102] As the Court noted in *Smith*, a government mental health examination like the one conducted here is akin to custodial interrogation, and equally subject to Fifth Amendment protections.  451 U.S. at 466-67.

government had no right to present his statements to the government expert about his life history.

This principle parallels the law governing cross-examination of a testifying defendant, which limits questioning to those topics addressed in direct examination. *See Brown v. United States*, 356 U.S. 148, 155-56 (1958) (a defendant "determines the area of disclosure and therefore of inquiry"). Put simply, because the defendant has not waived his Fifth Amendment privilege on matters about which he has not adduced evidence, the government may not inquire about them. *Id.* at 154-155. *Cf. Mitchell v. United States*, 526 U.S. 314, 325 (1999) (noting, in holding that Fifth Amendment privilege persists at sentencing, that "criminal proceedings rely on accusations proved by the Government, not on inquisitions conducted to enhance its own prosecutorial power."). When the defendant constructively testifies, by granting a diagnostic interview to his own expert about which the expert then testifies, the government is entitled only to similar access and testimony. *See Smith*, 451 U.S. at 468-469; *Battie v. Estelle*, 655 F.2d 692, 702 & n.22 (5th Cir. 1981); *see also United States v. McSherry*, 226 F.3d 153, 156 (2d Cir. 2000); *United States v. Byers*, 740 F.2d 1104, 1113-14 (D.C. Cir. 1984).

222

Rule 12.2 codifies this reciprocal approach and is designed with a defendant's Fifth Amendment rights in mind.  *See* Fed. R. Crim. P. 12.2 advisory committee's note (1983, 2002).  It provides that:

> No statement made by a defendant in the course of any examination conducted under this rule . . . , no testimony by the expert based on the statement, and no other fruits of the statement may be admitted into evidence against the defendant in any criminal proceeding except on an issue regarding mental condition on which the defendant: . . .
>
> (B) has introduced expert evidence in a capital sentencing proceeding . . . .

Fed. R. Crim. P. 12.2(c)(4).  This language, adopted by amendment in 2002, was specifically intended to govern situations like the one in this case.  The Advisory Committee sought to clarify that Rule 12.2 did not provide access to the defendant for general rebuttal purposes, but only to rebut the results of a defense mental examination:

> As amended, Rule 12.2(c)(4) provides that the admissibility of such evidence in a capital sentencing proceeding is triggered only by the defendant's introduction of expert evidence.  The Committee believed that, in this context, <u>it was appropriate to limit the government's ability to use the results of its expert mental examination to instances in which the defendant has first introduced expert evidence on the issue</u>.

Fed. R. Crim. P. 12.2 advisory committee's note (2002) (emphasis added).

Here, the district court's ruling permitting the government's expert to testify about Sanchez's statements during the psychological examination violated Rule

223

12.2(c)(4) and the Fifth Amendment principles on which it is grounded. It also resulted in substantial prejudice, because it allowed the government to unfairly capitalize on Sanchez's attempts to mask his own limitations and those of his family, thereby creating the mistaken impression that Sanchez either did not experience — or was not affected by — the events described by his witnesses.

The district court's rationale for admitting the testimony — that it was "relevant to issues raised by the defense experts [Reidy]," (DE846:9270-71) — misses the point. Under the Fifth Amendment and Rule 12.2, the question is not whether the government expert's proffered evidence is "relevant," or even whether it generally rebuts a mitigation theme. The question is whether the evidence being offered by the government is "similar," *Williams*, 731 F. Supp. 2d at 1017 (government entitled only to "a similar examination" for the purpose of "rebutting" the defense), or "parallel," *Taylor*, 320 F. Supp. 2d at 794 (limiting government testing to "parallel testing of substance abuse"), to the evidence that was offered by the defense. *See Powell*, 492 U.S. at 685.[103] Here, it was not. Dr.

_____

[103] "The Government's rebuttal expert testimony must be limited in scope to that . . . which is based upon expert examinations that <u>parallel</u> the exploration of the examinations conducted by defense experts." *Williams*, 731 F. Supp. 2d at 1020 (emphasis added). *See also United States v. O'Reilly*, 2010 WL 653188, at *5 (E.D. Mich. Feb. 19, 2010); *United States v. Sampson,* 335 F. Supp. 2d 166, 243 (D. Mass. 2004); *United States v. Beckford*, 962 F. Supp. 748, 758 (E.D. Va. 1997) (*quoting United States v. Haworth*, 942 F. Supp. 1406, 1407-08 (D.N.M.

Reidy never interviewed Sanchez, nor did his testimony rely on any statements by Sanchez. He merely offered the weight of social science to the common-sense proposition that childhood challenges can lead to bad life outcomes. Dr. Brannon's testimony was not of the same "type." *United States v. Sampson*, 335 F. Supp. 2d 166, 243 (D. Mass. 2004).[104]

The district court's decision in *Williams* is illustrative. In *Williams*, the defense proposed to offer evidence of the defendant's borderline intellectual functioning ("BIF"). The government then requested permission not only to determine whether the defendant suffered from BIF, but to conduct a full mental status exam. 731 F. Supp. 2d 1017. The district court held that this would "exceed[] the scope of the Government expert's role in this case." It limited the

---

1996)).

[104] Prior to the 2002 amendments to Rule 12.2, one court suggested that the government is entitled to conduct an examination of the defendant any time the defense presents evidence of mental condition, regardless whether the defense has conducted its own examination. *See United States v. Edelin*, 134 F. Supp. 2d 45, 51-53, 58-59 (D.D.C. 2001). This reasoning is inconsistent with *Smith*'s likening a government examination to a custodial interrogation: the fact that the defendant alone possessed information related to his defense would not require his waiver of his right to remain silent. In any event, even if *Edelin* were correct under the Fifth Amendment and Rule 12.2, it is distinguishable, because there the defense expert relied on materials to which the government did not have access. 134 F. Supp. 2d at 52 & n.11. Here, the district court and the parties took care to assure that the testimony related only to materials to which all parties had access. (DE824:8512-13).

government's expert to "what an examination for BIF would entail," because that was all that was required to " rebut[] Defendant's mental status evidence." *Id.* at 1017, 1018.

As in *Williams*, proper rebuttal under the Fifth Amendment and Rule 12.2 in this case should have been limited to addressing Dr. Grant's testing and testimony regarding Sanchez's intellectual functioning.[105]  But the government used its psychological examination of the low-intelligence and learning-disabled defendant, who Dr. Brannon conceded was "minimizing" the trauma in his background,[106] to attack the evidence and lay witness testimony about Sanchez's background.  This shortcut was improper.

The government conducted little cross-examination of Sanchez's lay witnesses.  Nor did it present its own records or lay witnesses to contradict the facts to which Sanchez's witnesses testified.  Its inability to assail the mitigation facts presented by Sanchez, however, did not authorize the government to use statements made during mental health testing in an effort to suggest that Sanchez

---

[105] And, arguably, the validity of the risk factors research itself.

[106] Brannon testified that the PAI results indicated that Sanchez was "minimizing" on the PAI.  (DE846:9341).  Nonetheless, Dr. Brannon believed that the results of the testing were valid, based on the overall results.  (DE846:9312-14, 9351-54).

either did not experience, or was not affected by, the events the records and witnesses described.

> **3. Sanchez was prejudiced by the introduction of the clinical interview and personality testing, which effectively made him a witness against himself in the penalty phase of his capital trial.**

Mitigation relating to Sanchez's upbringing was central to his defense at the penalty phase. In fact, close to a third of the mitigating factors submitted to the jury were based on Sanchez's upbringing and the lay witness testimony about it. (DE860:13-16) (thirteen mitigators covering Sanchez's social isolation, alcoholic father, exposure to criminal activity, low IQ and learning disabilities, academic failures, lack of parental support and role models, and disabled brother). Two mitigators directly referenced the risk factors identified by Reidy, and Sanchez's inability to make the right decisions as a result of his exposure to those influences. (DE860:16). Although the lay witness testimony provided ample factual support for most of these mitigators, none were found unanimously by the jury. The government's use of Sanchez's statements may well have persuaded some jurors that the lay witness testimony was inaccurate or that the mitigating factors deserved little weight in light of the results of Dr. Brannon's testing.

In fact, the government explicitly argued to the jury, based on Sanchez's statements to Dr. Brannon, that the defense fabricated the mitigation case:

227

> Sanchez claims domestic abuse and violence, yet he tells Dr. Brannon, never abused, never hit, never saw anything.  And the house that is -- supposedly was the sight of all of the fear and humiliation and violence, is it avoided after he leaves?  No.  Goes back every weekend to play bingo.
>
> Some trauma.  It is a figment of imagination they want you to adopt hook, line and sinker, and don't fall for it.

(DE847:9514-15).

To the extent the jury believed the witnesses, the government argued that — based on the PAI — the jury should not credit the defense argument that Sanchez's experiences might have affected his behavior later in life:

> Any suggestion that these mitigators of having a relatively rough childhood as argued by Mr. Murrell led to this brutal mass murder is ridiculous.  We know it is ridiculous <u>because we tested for any effect</u>.

(DE847:9617) (emphasis added).[107]

Both arguments were improper, because they relied on statements by Sanchez in the clinical interview and/or the PAI, which the government should never have been able to take or present under Fifth Amendment or Rule 12.2 principles of fair rebuttal:

> In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist.  Just as the Fifth Amendment prevents a criminal defendant from being made "the

---

[107] *See also* DE847:9621 (describing Reidy's report as "shoddy" and asserting, based on PAI, that the risk factors "did not affect" Sanchez).

228

> deluded instrument of his own conviction," it protects him as well
> from being made the "deluded instrument" of his own execution.

*Smith*, 451 U.S. at 462 (internal quotation marks and citations omitted).

A defendant's statements are "'probably the most probative and damaging evidence that can be admitted against him.'" *Skilling v. United States*, 130 S. Ct. 2896, 2916 (2010) (*quoting Parker v. Randolph*, 442 U.S. 62, 72 (1979) (plurality opinion)). Moreover, the statements were conveyed in a uniquely powerful manner: through the government's last witness on rebuttal, an expert who purported to have tested Sanchez's veracity, and whose testimony became a focal point of the government's closing argument. *See Satterwhite v. Texas*, 486 U.S. 249, 259 (1988) (finding Sixth Amendment error harmful under similar circumstances).[108] As a result, this evidence may well have tipped the balance in Sanchez's case from life to death. *See Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (noting "the unique weight" expert testimony "may have in a jury's deliberations").

This was a close case at sentencing. Although some jurors were persuaded not to find the mitigators relating to Sanchez's upbringing, many jurors did,

---

[108] As the Supreme Court stated in *Satterwhite*: "Dr. Grigson was the State's final witness. His testimony stands out both because of his qualifications as a medical doctor specializing in psychiatry and because of the powerful content of his message." *Id.*

despite the government's improper evidence and argument.  *See* DE860:14-16

(recording mitigation findings).  Absent the improper evidence and argument

based on Sanchez's statements, more jurors may have been persuaded to find these

mitigators, or to find the other life experience mitigators, which were not found by

the jury,[109] altering the way jurors weighed the government's case in aggravation

and the defense case in mitigation.  *Cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003)

(potential impact on even one juror's vote is sufficient to establish harm).

In addition to the numerous mitigating factors found by the jury, the split

verdict imposing life on counts six, nine, and ten, and death on counts seven and

eight indicates that the case was close, so that the exclusion of Sanchez's

statements might have made a difference.  *See Porter v. McCollum*, 130 S. Ct. 447,

454 (2009) (citing similar split verdicts on multiple capital counts as indicator that

sentencing case was close and that omitted mitigation might have influenced

outcome).

Given the centrality of the life experience mitigators to Sanchez's penalty

phase case, the government's use of Sanchez's own statements to undercut them,

and the closeness of the verdict, the government cannot prove "beyond a

---

[109] No jurors found that Sanchez was exposed to criminal activity by his family, was exposed to his brother's violent seizures, was humiliated by his learning disabilities, or looked out for his older brother.  (DE860:14-15).

reasonable doubt" that the court's Fifth Amendment and evidentiary errors had no effect on the outcome here.  *See Satterwhite*, 486 U.S. at 260 ("[T]he prosecution placed significant weight on [the expert's] powerful and unequivocal testimony. . . . [W]e find it impossible to say beyond a reasonable doubt that [the] testimony . . . did not influence the sentencing jury.").  *See also Payne v. Arkansas*, 356 U.S. 560, 567 (1958) ("no one can say what credit and weight the jury gave to the confession").  As a result, Sanchez's death sentences must be reversed.

**B.      Admission of Sanchez's PAI Test Results was improper because the test was administered in violation of his Sixth Amendment right to assistance of counsel.**

The Sixth Amendment requires that the government provide notice to the defense of the scope of any proposed examination of the defendant.  *Powell v. Texas*, 492 U.S. 680, 686 (1989) (holding that petitioner's Sixth Amendment right to counsel was violated by government examination on future dangerousness during court-ordered examination regarding competency and insanity); *cf. Buchanan*, 483 U.S. at 424 (noting that petitioner "undoubtedly" had Sixth Amendment right to consultation with counsel about psychiatric exam).  Such notice is required so that counsel may advise the defendant whether to submit to testing.  *Powell*, 492 U.S. at 681 (*citing Satterwhite*, 486 U.S. at 254).  Because mental health test results can be "literally a life or death matter" in a capital case, a

231

defendant is not required to undergo a government examination "without the guiding hand of counsel." *Satterwhite*, 486 U.S. at 254.

In this case, as discussed in Point IX.A, *ante*, the district court refused to set any limits on the government's examination, or to require any notice of the scope of proposed testing. (DE965:22). The court simply authorized the government expert to examine Sanchez. (DE525). The court also denied the defense motion to attend or observe the examination (DE544), so counsel was not present to advise Sanchez about any objectionable testing that arose. (DE545).[110] This left counsel in the untenable position of choosing to allow all testing to proceed or advising Sanchez to refuse all testing, which, under Federal Rule of Criminal Procedure 12.2 would have risked forfeiting his own intellectual functioning mitigation. *See* Fed. R. Crim. P. 12.2(d) ("If the defendant . . . does not submit to an examination when ordered . . . the court may exclude any expert evidence from the defendant."). Under these circumstances, defense counsel could not provide the sort of meaningful advice contemplated by the Sixth Amendment. *Cf. Powell*,

---

[110] The defense motion, while emphasizing the need to preserve the defendant's ability to meaningfully cross-examine the government expert at trial, properly cited the Sixth Amendment and case law identifying the critical question to be "whether potential substantial prejudice to the defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." *See* DE544:2-3 (*citing United States v. Wade*, 388 U.S. 218, 227 (1967)).

492 U.S. at 686 (holding that counsel must be able to advise client about submitting to future dangerousness testing as part of psychiatric exam); *Delguidice v. Singletary*, 84 F.3d 1359, 1362 (11th Cir. 1996) ("[T]he Sixth Amendment right to counsel requires that counsel be given advance notice of the scope and nature of a psychological examination so that counsel can discuss with the client the advisability of undergoing the examination and give other appropriate advice.").

In other cases, district courts have required that the government provide notice under Rule 12.2 of proposed testing, recognizing the Sixth Amendment need for assistance of counsel in deciding whether a defendant should submit to an exam or to particular tests in an exam. *See, e.g., United States v. Johnson*, 362 F. Supp. 2d 1043, 1085 (N.D. Iowa 2005); *Sampson*, 335 F. Supp. 2d at 246 ("a defendant, with or without his lawyer's advice, might refuse to participate in certain tests or to answer certain questions"). When a court provides for such notice, it may be unnecessary for counsel to attend or observe the exam, because the notice of testing offers defense counsel the information needed to meaningfully advise his client. *See Johnson*, 362 F. Supp. 2d at 1091.[111] When no

---

[111] *See also Smith v. Estelle*, 602 F.2d 694, 708 (5th Cir. 1979), *aff'd*, 451 U.S. 454 (1981), in which the former Fifth Circuit found no right to have counsel present for a government examination when notice of the scope of the exam has

notice is afforded, however, counsel should be permitted to attend or observe the exam to advise the defendant as it progresses. *Cf. United States v. Ash*, 413 U.S. 300, 313 (1973) (Sixth Amendment right to counsel implicated when "the accused required aid in coping with legal problems or assistance in meeting his adversary"). Here, without notice or permission to be present, counsel was unable to prevent Sanchez from submitting to testing beyond the scope of the defense examination, since counsel did not know in advance what tests would be administered.

In particular, if given notice or if present for the exam, counsel could have advised Sanchez not to submit to the PAI, since the defense had not conducted any personality testing and since the PAI does not bear on intellectual functioning. Because no notice was provided, and because counsel was not permitted to be present, Sanchez submitted to the PAI, and those results were available for the government to present through Dr. Brannon.

When the government offered Dr. Brannon as a witness, the defense objected, citing, among other grounds, the Sixth Amendment. (DE846:9293). The court failed to recognize that Sanchez was denied the assistance of counsel in deciding whether to submit to the PAI, in violation of the Sixth Amendment, and

been provided.

234

that Brannon's testimony should therefore be excluded.  Indeed, the court failed to address the defense Sixth Amendment objection at all.  (DE846:9292).  The court overruled the objection and permitted Dr. Brannon's testimony about the PAI. The admission of the tainted testimony, the failure to require notice, and the denial of the right to be present were all error in the context of this case.

As discussed above, *see* Point IX, *ante*, p. 228, the testimony about the PAI results was especially prejudicial because Dr. Brannon and the prosecution suggested that the absence of elevated anxiety or depression scales proved either that Sanchez did not suffer a turbulent childhood, contrary to the testimony of his lay witnesses, or that those experiences had no impact upon him.  (DE846:9324-27; DE847:9617).  This testimony undercut a primary theme of Sanchez's mitigation case, and likely influenced how jurors saw the fourteen mitigators related to that theme.  *See* Point IX, *ante*, pp. 229-30.  As a result, Sanchez's death sentences must be reversed, just as the death sentences were reversed in *Powell* and *Satterwhite* for similar violations of the Sixth Amendment right to assistance of counsel in connection with government mental health examinations.  *See Satterwhite*, 486 U.S. at 260 (reversing death sentence because admission of future dangerousness evidence obtained through government exam without notice to counsel was not harmless beyond a reasonable doubt); *Powell*, 492 U.S. at 686

235

(reversing death sentence because evidence of future dangerousness was obtained through government exam in violation of right to assistance of counsel).

## X.

### [Improper Closing Argument]

**The government violated Sanchez's rights under the Due Process Clause, the Sixth Amendment, and the Eighth Amendment, by making improper closing arguments, which effectively nullified Sanchez's case in mitigation.**

One of the primary themes of the defense case in mitigation was that Sanchez should not be sentenced to death because, due to his intellectual impairments, troubled upbringing, and social isolation, he was uniquely susceptible to the profound negative influence of his cousin, Varela.  The defense argued that this susceptibility diminished Sanchez's moral culpability and counseled against imposition of the death penalty, particularly in light of the fact that Varela did not even face murder charges for his role in the Escobedos's deaths, let alone a potential capital sentence.  Virtually all of Sanchez's proposed mitigators addressed this theme in some fashion, including the sole statutory mitigator, 18 U.S.C. § 3592(a)(8), that an equally culpable co-defendant was not facing the death penalty.  (DE860:12-16).

236

The government's closing arguments in the guilt and penalty phases unconstitutionally interfered with the jury's consideration of Sanchez's case for life in two ways.  First, the government improperly argued facts not in evidence in both phases when it stated it would continue to investigate the case against Varela and would seek the death penalty in a subsequent prosecution as soon as it obtained enough evidence to do so.  Second, the government repeatedly argued in the penalty phase that Sanchez's mitigating evidence amounted to nothing but excuses that were unrelated to the crimes at issue, in violation of Supreme Court precedent that mitigating evidence need not have a nexus to the underlying crime in order to be considered by the jury.  *See Tennard v. Dretke*, 542 U.S. 274 (2004). The government's two lines of improper argument served effectively to nullify Sanchez's case in mitigation, denying his rights to due process under the Fifth Amendment, to present a defense under the Sixth Amendment, to be free from cruel and unusual punishment under the Eighth Amendment, as well as his right under the Federal Death Penalty Act (18 U.S.C. § 3592(a)) to present and have the jury consider mitigating factors.[112]

---

[112] These errors were compounded by the district court's erroneous instruction that jurors should give greater weight to statutory mitigating factors than to non-statutory mitigating factors, like those presented by Sanchez.  *See* Troya's Brief (Point X, pp. 200-205).

The facts and legal arguments supporting these claims are developed in more detail in Troya's brief (Points IX & X).  But the errors were particularly prejudicial for Sanchez, because of the content of his mitigation case and in light of the jury's findings on his mitigating factors.

### A. The government's unfounded suggestion that Varela would face future capital prosecution was prejudicial.

At the penalty phase, Sanchez emphasized that Varela, the kingpin who allegedly "call[ed] the shots" on the murders (DE957:55), was not facing the death penalty on homicide charges.  This inequity formed the basis for Sanchez's sole statutory mitigator: that an equally culpable co-defendant was not facing the death penalty.  (DE860:12).  But Varela was central to a majority of Sanchez's argument for a life sentence.  Indeed, five more mitigating circumstances proposed by Sanchez dealt directly with his Varela's responsibility for Sanchez's involvement in the crime:

- Ricardo Sanchez acted under the influence of Danny Varela (found by 11 jurors).

- Prior to becoming involved with Danny Varela, Ricardo Sanchez had several legitimate jobs (found by 8 jurors).

- Prior to his involvement with Danny Varela, Ricardo Sanchez had no felony convictions (found by 7 jurors).

238

- Because of their family relationship, Ricardo Sanchez was more easily recruited by Danny Varela (found by 9 jurors).

- Ricardo Sanchez was more vulnerable to Danny Varela because of his low IQ (found by 9 jurors).

(*Id.* at 12-13). Still others were related, and explained why Sanchez would have followed Varela's lead. *See id.* at 14-16 (describing Sanchez's troubled childhood, social isolation, and cognitive impairment).

The jury obviously was receptive to this line of mitigation, as ten jurors found the statutory mitigator, more than half of the jurors found each of the mitigators having to do with Sanchez's susceptibility to Varela, and many found related mitigators.[113] It is also clear from a newspaper article published post-trial that jurors relied on the government's improper argument about Varela to justify their death verdict, despite that mitigation. Juror Rick DiCresce provided powerful evidence of the prejudice in an interview:

> "I'll say this, and I said this several times while we were back there, the biggest travesty in this case is that Danny Varela wasn't sitting at that table," he said.
>
> Assistant U.S. Attorney John Kastrenakes provided the only explanation as to why that didn't happen, DiCresce said. Kastrenakes

---

[113] *E.g.*, eight jurors found that Sanchez was a "follower" and not a leader, eight jurors found that his learning disabilities caused him embarrassment and humiliation and reduced self-esteem, and nine found that risk factors in his childhood contributed to flawed decision-making later in his life. (DE860:13-16).

said authorities didn't have enough evidence to charge Varela, but
were still investigating.

Daphne Duret, *Brutality to Children Left Juror No Doubts*, Palm Beach Post at

A1A (Apr. 3, 2009).

The government's pledge to prosecute Varela was so patently improper and

resulted in such severe prejudice, that it violated Sanchez's substantial rights and

constituted plain error requiring reversal.

**B.    The government's attempt to cast Sanchez's mitigation as an "excuse" was prejudicial.**

As detailed in Troya's brief (Point X, pp. 206-07), the prosecution

repeatedly told the jurors to disregard the remainder of Sanchez's mitigation

because it consisted only of "excuses" that had no nexus to the murders.  *See, e.g.*,

DE847:9519-21 ("Are four murders and three attempted murders really excused

by domestic abuse, retarded brother, a low I.Q. . . .?  A line was crossed that

cannot be excused.  It cannot be excused with life in prison . . . .")).  Apparently,

the jury listened: Jurors either failed to find or accorded no weight to

unquestionably true facts that fit squarely within the definitions of "mitigation" in

the case law and under the FDPA.  *See, e.g.*, DE860: 14-16 (jurors write "no"

beside mitigators relating to Sanchez's difficult upbringing, learning disabilities,

and behavior during pretrial detention).  And, even though some jurors found

certain mitigators, no mitigator was found unanimously. *See* DE860:12-16.

Given the prosecution's improper argument, there is an unacceptable risk that

other jurors failed to accord any weight to those mitigators because they did not

"justify" Sanchez's conduct.[114]

The government cannot establish that these errors were harmless beyond a

reasonable doubt. To the contrary, since the jury appears to have considered

Sanchez's a close case at sentencing, *see* Point VIII.E, *ante*, he likely was

prejudiced. A new sentencing hearing is therefore required.

## XI.

### [Consequences of Deadlock]

**The court's instructions and the verdict sheet created the risk of a coerced, arbitrary death sentence by neglecting to explain that even if jurors deadlocked and Sanchez received a "lesser sentence" of a "term of years," the result still would be a *de facto* sentence of life imprisonment.**

At the sentencing hearing, the court provided jurors with a verdict form on

the capital counts that permitted them to render a verdict of not-unanimous as to

all three options — death, life imprisonment, or a "lesser sentence." But the court

refused to tell jurors the legally-mandated consequence of a not-unanimous

---

[114] The court's erroneous instructions regarding statutory and non-statutory mitigators exacerbated this error. As noted, Sanchez has adopted the argument on that issue from Troya's brief (Point X, pp. 200-205).

241

verdict.  Instead, the court left jurors free to wonder about those consequences, charging that Sanchez was eligible to receive a "lesser sentence" of a "term of years" on each capital count, but refusing to explain that his noncapital convictions and laws requiring consecutive sentences meant that, even if the jury reached a not-unanimous verdict, Sanchez still faced, at a minimum, 125 years' imprisonment — an effective life sentence.

Reasonable jurors might have assumed that a not-unanimous verdict would allow the court to impose a sentence that would allow Sanchez (whom the government had cast as a quadruple murderer and a dangerous predator) to return to society some day.  In truth, however, the same 125-year minimum would have bound the court, whether the jurors voted unanimously for a "lesser sentence" or if they deadlocked completely.  The court's charge thereby introduced an arbitrary factor into the jury's sentencing deliberations and risked coercing a death verdict.

This argument is developed in more detail in Troya's brief (Point XII, pp. 220-232), but is discussed briefly here because Sanchez's sentencing exposure was slightly different than Troya's.  The bottom line is that life-leaning jurors who feared that a not-unanimous verdict may have led to a sentence <u>less than</u> life could have been pressured into switching their votes to death, simply to avoid that

242

result.[115] By creating such a risk, a court violates due process and the prohibition on cruel and unusual punishment, under the Fifth and Eighth Amendments. *See Morris v. Woodford*, 273 F.3d 826, 841-43 (9th Cir. 2001); *People v. LaValle*, 817 N.E.2d 341, 365 (N.Y. 2004).

Like Troya, Sanchez was found guilty on five capital counts. Four were for use of a firearm during a crime of violence resulting in death, one count for each victim. 18 U.S.C. § 924(j). The fifth was for carjacking resulting in death, for all four victims. 18 U.S.C. § 2119. Under both of these statutes, a sentence less than life imprisonment — any "term of years" — was authorized.

Even if he received a "lesser" punishment, however, Sanchez was guaranteed a sentence of *de facto* life imprisonment, because of statutory mandatory minimums and consecutive sentencing requirements. At this capital trial, Sanchez faced the following mandatory-minimum sentences:

| Count | Statute | Mandatory Minimum |
|-------|---------|-------------------|
| Count 1 | 21 U.S.C. §§ 846, 841(b)(1)(A), 851 | 20 years |
| Count 4 | 21 U.S.C. § 841(a)(1), (b)(1)(B), | 5 years |
| Count 7 | 18 U.S.C. § 924(c)(1)(A)(I), (j) | 5 years, consecutive |
| Count 8 | 18 U.S.C. § 924(c)(1)(C)(I), (j) | 25 years, consecutive |

---

[115] As discussed *post*, n.117, this was more than a theoretical possibility here, where three jurors voted for life in the first poll.

| Count 9 | 18 U.S.C. § 924(c)(1)(C)(I), (j) | 25 years, consecutive |
| Count 10 | 18 U.S.C. § 924(c)(1)(C)(I), (j) | 25 years, consecutive |
| Count 13 | 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 851 | 20 years |
| Count 15 | 18 U.S.C. § 924(c)(1)(C)(I), (j) | 25 years, consecutive |

*See* DE305.[116]  Thus, even had the jury opted for a "lesser sentence" on each of the

five capital counts, Sanchez still would have faced a minimum aggregate sentence

of 125 years imprisonment (*i.e.*, 20+ 5 +25 + 25 + 25 + 25 years) — the functional

equivalent of life imprisonment.

As in Troya's case, the combination of instructions and verdict-form

language here created the impression that a not-unanimous verdict might mean a

sentence less than life and Sanchez's subsequent release back into the community.

*See Gaines v. Kelly*, 202 F.3d 598, 606 (2d Cir. 2000) ("we must determine

'whether there is a reasonable likelihood that the jury has applied the challenged

instruction in a way' that violates the constitution") (*quoting Boyde v. California*,

494 U.S. 370, 380 (1990)).  It is reasonable to think that some jurors would have

found that prospect unpalatable, since Sanchez was a convicted quadruple-

murderer whom the government had earnestly suggested posed a significant

---

[116] The drug sentences do not have to run consecutively to each other.  If run concurrently, as the court did here, the mandatory minimums on each count — 20 + 5 +20 — would amount to a total of 20.  (DE956:17).

244

danger of future violence.  (Though much of that presentation was itself plagued by other errors.  *See* Points IV, V, X, *ante*; *see also* Troya's brief (Points III, V-X).  Such an alarming prospect might well have coerced one or more life-leaning jurors into switching their votes to death just to avoid it.[117]  This unacceptable and unnecessary risk violated the Fifth and Eighth Amendments.  *See Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988) ("Any criminal defendant, and especially any capital defendant, being tried by a jury is entitled to the uncoerced verdict of that body.").

To establish that this error was harmless beyond a reasonable doubt, *see* 18 U.S.C. § 3595(c)(2)(c), the government would have to show that not a single juror could have entered into deliberations believing that life was the appropriate sentence for Sanchez, so that the Court need not concern itself with the risk of pressured vote-switching.  Given the significant mitigation findings on behalf of Sanchez, the government cannot meet that burden.  Accordingly, the Court should order a new capital sentencing hearing.

---

[117] It should be noted that, after the sentencing verdicts, a newspaper interview with one jurors revealed that "[i]n the initial votes during deliberations, nine jurors voted for death and three weren't sure . . . After a weekend break," the jurors reached unanimous verdicts.  Daphne Duret, *Brutality to Children Left Juror No Doubts*, Palm Beach Post at A1A (Apr. 3, 2009).

## XII.

### [Other Uncharged Serious Acts of Violence]

**The court's instructions improperly invited jurors to find and weigh the non-statutory aggravating factor that Sanchez had engaged in other "uncharged serious acts of violence" even if jurors did not unanimously agree or find proof beyond a reasonable doubt as to each such act.**

The first non-statutory aggravator asked the jury to determine beyond a reasonable doubt whether Sanchez "participated in other, uncharged serious acts of violence." (DE860:9; DE848:9728). During the guilt phase of the trial, the government had presented evidence of three uncharged serious acts of violence — the Mercer and Suwanee shootings and the attempted "B Real" home invasion, which are the subject of Point IV. During the penalty phase, the government also presented evidence that Sanchez beat his son's mother's boyfriend, Jose Penaran, in the head. (DE818:8077, 8087-94). In its penalty phase closing arguments, the government argued that both the Suwanee shooting and the Penaran beating supported the aggravator and justified a death sentence. (DE847:9505-07). But neither the jury instructions nor the verdict form required the jury unanimously to identify which act or acts it had found beyond a reasonable doubt. By allowing jurors to consider these uncharged and unrelated acts of violence collectively, the aggravator as submitted undermined juror unanimity in the penalty phase, in

246

violation of the Due Process Clause and the FDPA. Sanchez's death sentence must therefore be reversed.

The legal challenge to the aggravator is developed in detail in Troya's brief (Point VIII, pp. 180-99). Because the "other uncharged prior acts of violence" alleged against each defendant were different, however, Sanchez provides the following discussion of those facts applicable in his case that are not discussed in Troya's brief.

In Sanchez's case, the aggravator charged that Sanchez either committed the Suwanee shooting on April 24, 2006, or the Penaran beating on July 22, 2006. It required the jury to consider these two completely separate, unrelated acts as part of a single allegation that Sanchez committed other serious acts of violence. Sanchez was prejudiced by the submission of this aggravator, which plainly violated both the FDPA's procedural protections and the Due Process Clause. *See* Troya's brief (Point VIII, pp. 181-85).

The manner of proof of the two acts here, the Suwanee shooting and the Penaran beating, enhanced the risk of prejudice in the jury's decisionmaking in Sanchez's case. *See Richardson v. United States*, 526 U.S. 813, 819 (1999) (recognizing that using broad allegations to adjudicate individual acts risks compromising fair evaluation of the facts).

247

Because the Suwanee incident was introduced as 404(b) evidence in the guilt phase of the trial, the jury was not initially instructed that the government had the burden of proving Sanchez's participation beyond a reasonable doubt.  In fact, although 404(b) evidence is normally evaluated under a preponderance standard, *see United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (reciting standard of proof for 404(b) acts), the district court never required the jury to hold the government to any standard of proof as to the 404(b) evidence.  *See* DE756: 5982-85; DE769:8.  Given that the jury had already accepted the Suwanee evidence at the guilt phase, without the requirement of proof beyond a reasonable doubt, it could not fairly be expected to reevaluate that evidence at the penalty phase by the higher standard required by the FDPA.

With respect to the Penaran incident, the jury learned that Sanchez pled guilty to the offense of simple battery.  (GX-PP 1204; DE818:8092).  The government evidently sought to prove that he had committed "much more serious crimes" in the attack.  (DE818:8093) (government question to testifying agent).  In fact, a Palm Beach County Sheriff's Office deputy who investigated the incident was permitted to testify that officials had prosecuted Sanchez for other charges in addition to battery.  (DE818:8093 ("Q:  You had gotten a warrant for other crimes other than the crime of battery? A:  Correct.")).  But the jury was never given any

248

framework for evaluating Sanchez's conduct in this incident, other than the officer's word. Was his conduct adequately accounted for by his guilty plea to battery, or did it in fact amount to another uncharged, serious act of violence on top of the battery?

The government's reliance on the other, uncharged serious acts of violence aggravator in its penalty phase closing argument compounded the risk of prejudice. Predictably, the government highlighted the prior acts, suggesting to the jury that Sanchez narrowly, and only accidentally, avoided amassing even more victims:

> What is the appropriate punishment in this case? Not one murder, not two, not three, not – it is four, and more attempted murders. Haverhill, if Troya had been a good aim, would have been five. Mercer, if Troya had seen somebody, had a good aim, would have been at least six. Suwanee, if Sanchez was a good aim and seen anybody, would have been seven. If the cable box hit a different spot, it would have been eight.

(DE847:9516. *See also* DE847:9505 (discussing Suwanee incident)).

The government also encouraged the jury to look at the defendants' bad acts collectively, urging jurors to find, for example, that "Sanchez and Troya both made conscious choices in this case to pursue a life of crime, a life of violence, unrepentant violence, unremorseful violence without regard to the consequences, and without caring who they injured." (DE847:9507-08). The prejudice from

249

these argument is manifest.  *See* Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev.1538, 1559 (1998) (citing studies showing that jurors are more likely to impose the death penalty if the defendant has a history of violent crime).

Given that the jurors found both multiple aggravating factors and multiple mitigating factors , the jury's weighing of the others serious acts of violence factor "skewed the weighing process," putting a "thumb . . . on death's side of the scale," and invalidating the death sentence.  *Stringer v. Black*, 503 U.S. 222, 232 (1992). Moreover, none of the "other sentencing factors enable[d] the [jury] to give aggravating weight to the same facts and circumstances."  *Brown v. Sanders*, 546 U.S. 212, 220 (2006).  Sanchez's death sentences therefore must be reversed.

## XIII.

### [Penalty Phase Cumulative Error]

**Multiple errors in the penalty phase rendered Sanchez's sentencing hearing unfair and require reversal of his death sentences under the cumulative error doctrine and 18 U.S.C. § 3595.**

As discussed *ante*, Point VII, the cumulative effect of a district court's errors — even if those errors are harmless individually — may create sufficient prejudice to require reversal. *See Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).  Here, reversal of

Sanchez's sentences is required because the district court's rulings at the penalty phase of the trial resulted in a one-sided proceeding, at which the defense was prevented from presenting critical mitigation, jurors were admonished not to consider certain evidence and argument in support of the case for life, and the prosecution was permitted to urge jurors to convict Sanchez and sentence him to death based on marginally relevant but highly inflammatory factors, some of which were entirely unsupported by the record. *See Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003) (finding cumulative error requiring reversal of death sentence in combination of improper victim impact evidence, failure to present mitigation and prosecutorial misconduct).[118]

Collectively, these penalty phase errors cannot be deemed harmless beyond a reasonable doubt, as required by the FDPA and the Constitution if this Court is to affirm. *See* 18 U.S.C. § 3595(c)(2); *Chapman v. California*, 386 U.S. 18, 24 (1967). As a result, Sanchez's death sentences must be reversed. *Cf. United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008) (reversing conviction based on

---

[118] Here, the government's utter failure to prove four of the aggravators relied upon by the jury, as discussed in Troya's brief (Points V-VII) and adopted herein, is critically important, especially when considered together with the court's erroneous rulings with regard to Sanchez's mitigation case, *see* Points VIII, IX, and the government's improper argument, *see* Point X; *see also* Troya's brief (Points IX, X).

251

cumulative effect of multiple evidentiary errors); *United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000) (reversing conviction based on cumulative effect of evidentiary errors and error in denial of motion for judgment of acquittal). *See also* 18 U.S.C. § 3595(c)(2) (death sentence may not be imposed "under the influence of passion, prejudice, or any other arbitrary factor."). In fact, the split verdicts and the jury's significant mitigation findings suggest that the cumulative impact of the penalty phase errors may well have influenced the verdicts. Had the jury been protected from prejudicial aggravating evidence and free to fairly consider Sanchez's mitigation, the split verdicts here would instead have been life verdicts across all counts. Sanchez's death sentences must therefore be reversed.

## CONCLUSION

For the foregoing reasons, Sanchez respectfully requests that his convictions

and sentences be reversed.

Respectfully submitted this 26th day of March, 2012.


/s/ Sarah S. Gannett
SARAH S. GANNETT, Esq.
Assistant Federal Defender
Federal Community Defender Office
Suite 540 West - Curtis Center
601 Walnut Street
Philadelphia, PA  19106
(215) 928-1100
sarah_gannett@fd.org

MARTIN J. McCLAIN, Esq.
Attorney at Law
141 NE 30th Street
Wilton Manors, FL  33334
(305) 984-8344
martymcclain@earthlink.net

*Attorneys for Defendant-Appellant*
*Ricardo Sanchez*

253

## CERTIFICATE OF COMPLIANCE

I, Sarah S. Gannett, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that the foregoing brief[119] contains 57,141 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in a proportionately spaced typeface using WordPerfect X5 for Windows 7 word count software in font size 14, type style Times New Roman.

/s/ Sarah S. Gannett
SARAH S. GANNETT
*Attorney for Ricardo Sanchez, Jr.*

Dated:   March 26, 2012

---

[119] On March 14, 2012, Appellant Sanchez filed a Motion to File Brief Exceeding the Ordinary Word Limit and to Electronically File Brief on CD-ROM, which is currently pending disposition before this Court.

## CERTIFICATE OF SERVICE

I, Sarah S. Gannett, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I have filed this same day, both in electronic and paper form, the *Brief for Appellant Sanchez* and served hard copies by Federal Express upon Assistant United States Attorney Stephen Carlton at 500 South Australian Avenue, Suite 400, West Palm Beach, FL  33401, upon Assistant United States Attorney Phillip DiRosa, at 500 East Broward Boulevard, 7th Floor, Ft. Lauderdale, FL 33394, upon Assistant United States Attorneys Anne R. Schultz and Kathleen M. Salyer, 99 N.E. 4th Street, Miami, FL  33132, and upon the following:

Martin J. McClain, Esq.
141 NE 30th Street
Wilton Manors, FL  33334
*Counsel for Ricardo Sanchez, Jr.*

Robert L. McGlasson, II, Esq.
1024 Clairemont Avenue
Decatur, GA  30030
*Counsel for Daniel Troya*

Sean J. Bolser, Esq.
Federal Defenders of New York
One Pierrepont Plaza - 16th Floor
Brooklyn, NY  11201
*Counsel for Daniel Troya*

Barry J. Fisher, Esq.
Federal Capital Appellate Resource Counsel
39 N. Pearl Street, 5th Floor
Albany, NY  12207
*Counsel for Daniel Troya*.

/s/ Sarah S. Gannett
SARAH S. GANNETT

Dated:   March 26, 2012

255

# ADDENDUM

# INDEX OF PEOPLE, PLACES AND VEHICLES

## INDEX OF PEOPLE, PLACES AND VEHICLES
### referred to in Appellant's Brief

**A.     People**

| | |
|---|---|
| Aiken, James | former prison warden who testified on behalf of Sanchez at penalty phase, but whose testimony on future dangerousness was excluded by the district court |
| Brannon, Michael | forensic psychologist who examined appellant on behalf of the government and testified at the penalty phase |
| Calderon, Mario | testified about Varela's drug dealing |
| Chapman, Mark | government tool examiner, who linked cartridge casings from murder scene to cartridge casings from Garden Court residence |
| Cunningham, Mark | psychologist and expert on prison violence whose testimony on future dangerousness was excluded by the district court |
| Escobedo, Jose Luis | victim – drug trafficker who moved his family from Texas to South Florida in the spring of 2006; cocaine supplier to the Varela organization. |
| Escobedo, Luis Damian | victim – the three year old son of Jose Luis Escobedo. |
| Escobedo, Luis Julian | victim  – the four year old son of Jose Luis Escobedo. |
| Escobedo, Yessica | victim  – the wife of Jose Luis Escobedo. |
| Fernandez, Melvin | testified about Troya statement that he "licked someone for 15 kilos" |
| Fleming, Amy | appellant's teacher who testified about his school records during the penalty phase |

1

| | |
|---|---|
| Grant, Dr. Daniel | neuro-psychologist who examined appellant for the defense and testified at the penalty phase. |
| Gutierrez, Juan | co-defendant – pled to being an operative for the Varela organization, but was not a cooperating witness. |
| Hambrick, Byron | Carlos Rodriguez's cellmate, to whom Rodriguez heard Troya confess |
| Hill, Stephen | government's narcotics trafficking expert |
| Jimenez, Juan Antonio | appellant's uncle, who testified at the penalty pahse |
| Lopez, Liana | co-defendant – charged as an operative of the Varela drug organization and tried with defendant |
| Lopez, Maria | appellant's girlfriend and mother of his son, Ricardo Sanchez, III, AKA "Three" |
| Mullino, Malik | testified about Varela's drug dealing, including purchase of a kilogram of cocaine from Varela shortly before arrests |
| Jose Penaran | Maria Lopez's boyfriend after breaking up with appellant; victim of battery by appellant |
| Quereau, Allison | government toolmark examiner, who linked cartridge cases from Mercer and Suwanee to AK-47 |
| Ramos, Julio | Maria Lopez's younger brother |
| Ramos, Rachel | mother of Maria Lopez; testified at penalty phase |
| B Real | rapper whose home a witness testified was the target of an attempted armed home invasion |

2

| | |
|---|---|
| Reidy, Dr. Thomas | psychologist who testified for appellant at penalty phase about Department of Justice "risk factors" research |
| Rodriguez, Carlos | testified to statements made by Troya while they were incarcerated together |
| Sanchez, Efrain | appellant's mentally-retarded older brother |
| Sanchez, Ezekiel | appellant's younger biological brother |
| Sanchez, Juana | appellant's mother |
| Sanchez, Nydia | appellant's sister |
| Sanchez, Omar | appellant's adoptive youngest brother |
| Sanchez, Sr., Ricardo | appellant's father |
| Sanchez, Jr., Ricardo | appellant – charged as an operative of the Varela drug organization and as one of two individuals who murdered the Escobedo family |
| Sanchez, III, Ricardo | appellant's young son, generally referred to as Three by his family since he bore his father's and his grandfather's name |
| Troya, Daniel | co-defendant – charged as an operative of the Varela drug organization and as one of two individuals who murdered the Escobedo family |
| Varela, Danny | co-defendant – charged as the leader of a cocaine-running operation centered in West Palm Beach, Florida |
| Vetere, Kevin | co-defendant – AKA "Crackhead Kevin," pled to being an operative for the Varela drug organization and testified for the Government as part of plea agreement |

3

**B.     Places**

| | |
|---|---|
| Brownsville, TX | border town in Texas where the Escobedo family moved from in 2006 |
| Cocoanut Drive | West Palm Beach neighborhood where appellant's family moved and continues to live |
| Daytona Beach, FL | Northern-most point of travel for Escobedos, Sanchez & Troya on night of murders |
| Dyson Circle | West Palm Beach neighborhood where appellant spent his early childhood |
| Fort Pierce, FL | Location on the Florida Turn pike where vehicles entered turnpike after the murders |
| Garden Court residence | 6458 Garden Court, West Palm Beach (AKA "Thug Mansion") – home base for Varela organization starting in the summer of 2006 |
| Haverhill Road | location of shooting on September 11, 2006, in which Troya shot out of moving car at another vehicle, injuring the driver |
| Matamoros, Mexico | border town in Mexico known for drug trafficking and drug-related violence, which appears in Escobedo's drug ledger |
| Mercer Avenue | location of shooting on April 28, 2006, in which Troya fired into house |
| Mile-marker 149 | location of murders on the Turnpike |
| Port St. Lucie, FL | closest city to site of murders on the Turnpike |

4

| | |
|---|---|
| Purdy Lane residence | townhouse (AKA "Pimp Plaza") in West Palm Beach that served as home base for Varela organization prior to Garden Court residence; location of robbery and beating of Escobedo and Liana Lopez |
| Suwanee Drive | location of shooting on April 28, 2006, in which Sanchez fired into a house and a person inside was injured |
| West Palm Beach, FL | Where the defendants and victims were living at the time of the events in this case |

## C.   Vehicles

| | |
|---|---|
| Jeep Cherokee | (black) vehicle owned by Escobedo, sold to him by Sanchez; driven on Turnpike on night of murders; abandoned after murders |
| Dodge Ram Van | (burgundy) vehicle used by Varela organization; driven on Turnpike on night of murders; recovered from auto body shop during investigation |
| Silver sedan | unidentified vehicle traveling on Turnpike at same time as Jeep and van on night of murders |
| the "Dunk" | 1973 Chevrolet convertible purchased by Troya after the murders, allegedly with stolen money or drugs |

# SUMMARY OF THIRD SUPERSEDING INDICTMENT (DE 305)

## SUMMARY OF THIRD SUPERSEDING INDICTMENT (DE 305)

| COUNT | CHARGE | DEFENDANTS CHARGED |
|---|---|---|
| COUNT ONE | DRUG CONSPIRACY<br>21 U.S.C. § 841(b)(1)(A)<br>(May 2006-October 2006) | VARELA<br>TROYA<br>SANCHEZ<br>LOPEZ |
| COUNT TWO | PWID COCAINE<br>21 U.S.C. § 841(b)(1)(B)<br>(May 10, 2006) | VARELA<br>LOPEZ |
| COUNT THREE | FELON IN POSSESSION<br>18 U.S.C. § 922(g)(1)<br>(June 10, 2006) | VARELA<br>TROYA |
| COUNT FOUR | PWID COCAINE<br>21 U.S.C. § 841(b)(1)(B)<br>(July 10, 2006) | SANCHEZ |
| COUNT FIVE | CARJACKING CONSPIRACY<br>18 U.S.C. § 2119(3)<br>(October 12-13, 2006) | TROYA<br>SANCHEZ |
| COUNT SIX | CARJACKING RESULTING IN DEATH ESCOBEDO FAMILY<br>18 U.S.C. § 2119(3) & (2)<br>(October 13, 2006) | TROYA<br>SANCHEZ |
| COUNT SEVEN | USE/CARRY FIREARM RESULTING IN DEATH LUIS DAMIAN ESCOBEDO<br>18 U.S.C. § 924(j)(1) &( 2)<br>(October 13, 2006) | TROYA<br>SANCHEZ |
| COUNT EIGHT | USE/CARRY FIREARM RESULTING IN DEATH LUIS JULIAN ESCOBEDO<br>18 U.S.C. § 924(j)(1) &( 2)<br>(October 13, 2006) | TROYA<br>SANCHEZ |

6

| COUNT NINE | USE/CARRY FIREARM RESULTING IN DEATH YESSICA ESCOBEDO (October 13, 2006) 18 U.S.C. § 924(j)(1) &( 2) | TROYA SANCHEZ |
|---|---|---|
| COUNT TEN | USE/CARRY FIREARM RESULTING IN DEATH JOSE LUIS ESCOBEDO 18 U.S.C. § 924(j)(1) &( 2) (October 13, 2006) | TROYA SANCHEZ |
| COUNT ELEVEN | DISTRIBUTION COCAINE 21 U.S.C. § 841(a)(1) (October 21, 2006) | VARELA |
| COUNT TWELVE | CARRY FIREARM IN RELATION TO DRUG TRAFFICKING 18 U.S.C. § 924(c)(1)(A)(i) (October 21, 2006) | VARELA |
| COUNT THIRTEEN | PWID COCAINE BASE PWID CRACK 21 U.S.C. § 841(b)(1)(A) & (B) (October 25, 2006) | VARELA TROYA SANCHEZ LOPEZ |
| COUNT FOURTEEN | FELON IN POSSESSION 18 U.S.C. § 922(g)(1), 924(a)(2) (October 25, 2006) | VARELA TROYA SANCHEZ |
| COUNT FIFTEEN | CARRY FIREARM IN RELATION TO DRUG TRAFFICKING 18 U.S.C. § 924(c)(1)(A)(i) (October 25, 2006) | VARELA TROYA SANCHEZ LOPEZ |
| COUNT SIXTEEN | UNREGISTERED FIREARM 26 U.S.C. § 5861(d) & 5871 (October 25, 2006) | VARELA |

7

# SUMMARY OF MITIGATING FACTORS FOUND FOR SANCHEZ
## (Based on Verdict Sheet, DE 860)

## SUMMARY OF MITIGATING FACTORS FOUND FOR SANCHEZ
### (Based on Verdict Sheet, DE 860)

| Mitigating Factor | | Number of jurors who found the factor |
|---|---|---|
| 1. | An equally culpable co-defendant, Danny Varela, was not charged in these murders and will not be facing death. | 10 |
| 2. | Ricardo Sanchez acted under the influence of Danny Varela. | 11 |
| 3. | Prior to becoming involved with Danny Varela, Ricardo Sanchez had several legitimate jobs. | 8 |
| 4. | Prior to his involvement with Danny Varela, Ricardo Sanchez had no felony convictions. | 7 |
| 5. | Because of their family relationship, Ricardo Sanchez was more easily recruited by Danny Varela. | 9 |
| 6. | Ricardo Sanchez was more vulnerable to Danny Varela because of his low IQ. | 9 |
| 7. | Jose Luis Escobedo engaged in criminal conduct that contributed to the circumstances leading to his family's death. | 11 |
| 8. | Ricardo Sanchez is a follower and not a leader. | 8 |
| 9. | Ricardo Sanchez was voluntarily baptized and confirmed at the age of seventeen. | 0 |
| 10. | There is a history of mental retardation in the Sanchez family. | 4 |
| 11. | There is a history of learning disabilities in the Sanchez family. | 4 |
| 12. | Ricardo Sanchez was socially isolated from the community. | 0 |
| 13. | Ricardo Sanchez's parents had low IQs. | 4 |
| 14. | Ricardo Sanchez's parents were uneducated. | 5 |
| 15. | Ricardo Sanchez's parents were socially isolated from the community. | 0 |

8

| 16. | Ricardo Sanchez has a loving relationship with his son, Ricardo III. | 8 |
|-----|---|---|
| 17. | Ricardo Sanchez has consistently provided support to Ricardo III since his birth. | 5 |
| 18. | Ricardo Sanchez grew up in a home with an alcoholic father. | 10 |
| 19. | Ricardo Sanchez and his family were subjected to violence by Ricardo Sanchez, Sr. as a result of his drinking. | 10 |
| 20. | Ricardo Sanchez and his siblings grew up in fear of their father because of his drinking. | 9 |
| 21. | Ricardo Sanchez was exposed to criminal activity by family members as a child. | 0 |
| 22. | Ricardo Sanchez was exposed to his brother's violent seizures as a child. | 0 |
| 23. | Ricardo Sanchez's family system normalized crime, violence and substance abuse. | 8 |
| 24. | Ricardo Sanchez has a low IQ. | 9 |
| 25. | Ricardo Sanchez has difficulty in processing verbal information. | 8 |
| 26. | His low IQ and learning disabilities caused Ricardo Sanchez embarrassment and humiliation. | 8 |
| 27. | Ricardo Sanchez suffered from learning disabilities and cognitive deficiencies which did not allow him to function at the level of his already low IQ. | 9 |
| 28. | Ricardo Sanchez's cognitive deficiencies and limited IQ were so severe that he was exempted from taking the FCAT (Florida Comprehensive Achievement Test). | 8 |
| 29. | As a child, Ricardo Sanchez had no parental support in overcoming his learning disabilities. | 9 |
| 30. | Ricardo Sanchez can only read on an elementary grade level. | 0 |
| 31. | Ricardo Sanchez can only do math on an elementary grade level. | 0 |

9

| 32. | Ricardo Sanchez's academic failures contributed to reduced self-esteem and low bonding to school. | 8 |
|---|---|---|
| 33. | Ricardo Sanchez's learning disabilities and low IQ limited his opportunities for career choices. | 9 |
| 34. | Ricardo Sanchez looked out for his older brother inside and outside the home. | 0 |
| 35. | Ricardo Sanchez lacked the skills to live completely independent of assistance. | 0 |
| 36. | As a child, Ricardo Sanchez had no positive male role models in his life other than limited exposure to his Uncle Tony. | 7 |
| 37. | While growing up Ricardo Sanchez was exposed to many of the risk factors identified by the Department of Justice. | 9 |
| 38. | Because of his exposure to the Department of Justice identified risk factors, Ricardo Sanchez's "framework" to make the right decisions was flawed. | 9 |
| 39. | During the time Rachel Ramos knew Ricardo Sanchez, he treated her with respect, contributed to the household income and assisted her in caring for her son, Julio. | 1 |
| 40. | Ricardo Sanchez was a loving companion to the son of Rachel Ramos. | 0 |
| 41. | Ricardo Sanchez behaved very well in a prison environment while awaiting trial. | 0 |
| 42. | Ricardo Sanchez was well behaved and respectful during the trial. | 0 |
| 43. | The evidence of Ricardo Sanchez's exact role in the offense is not sufficient to justify a sentence of death. | 0 |
| 44. | Ricardo Sanchez was 22 years old at the time of the offense. | 0 |
| 45. | Findings regarding additional mitigating factors. | 0 |