UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-80693-CIV-BLOOM

RICARDO SANCHEZ, Jr.,

        Movant

v.

UNITED STATES OF AMERICA,

        Respondent

_____/

**REPLY TO THE UNITED STATES' RESPONSE IN OPPOSITION TO
SANCHEZ'S AMENDED MOTION FOR DISCOVERY**

Stephen M. Kissinger, WY Bar No.5-2342
Asst. Federal Community Defender

Dana C. Hansen Chavis, TN Bar No.019098
Asst. Federal Community Defender

Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile: (865) 637-7999

Attorneys for Movant Ricardo Sanchez, Jr.

Dated: June 1, 2018

## TABLE OF CONTENTS

I.     The "good cause" standard under Habeas Rule 6. ............................................. 3

II.    The proof of Sanchez's involvement in the murders of the Escobedo
       family is not overwhelming ................................................................. 8

III.   Sanchez had pleaded facts which are both disputed by the Government
       and establish a reasonable probability of a different outcome. ...................... 12

   A.  Evidence contained in law enforcement reports withheld by the
       Government creates a reasonable probability of a different outcome ......... 13
       1.    October 16, 2006, 2:11 PM email from Agent Robert T. Franklin to
             Maurice Dowdy and Armando Ramirez, ECF No. [78-1], Appx. at A-
             001757-59 (withheld from trial counsel). ............................... 14
       2.    DEA-6, 06-04-2007 Debriefing of Brownsville RO CS-07-12 on 05-22-
             2007, ECF No. [78-1], Appx at A-001730-32 (withheld from trial
             counsel). Request Exhibit A. ................................................ 15
       3.    DEA-6, 06-06-2007 Debrief of I.C.E. Confidential Source on 05-23-
             2007, ECF No. [78-1], Appx. at A-001733-35 (withheld from trial
             counsel). Request Exhibit B. ................................................ 17
       4.    DEA-6, 06-05-2007 Interview of Victor Cortinas on 05-23-2007, ECF
             No. [78-1], Appx. at A-001736-38 (withheld from trial counsel). Request
             Exhibit C. .......................................................................... 19
       5.    DEA-6, 06-05-2007 Debriefing of Juan Carlos Santos on 05-24-2007,
             ECF No. [78-1], Appx. at A-001739 (not revealed to trial counsel).
             Request Exhibit D. ............................................................. 20
       6.    DEA-6, 10-05-2007 Interview of Norma Guzman on 10-01-2007, Appx.
             at A-001742-45 (withheld from trial counsel). Request Exhibit E. ...... 22
       7.    DEA-6, 10-05-2007 Interview of Juana Beltran on 10-2-2007, ECF No.
             [78-1], Appx. at A-001746-47 (withheld from trial counsel). Request
             Exhibit F. .......................................................................... 24
   B.  Evidence impeaching the Government's case which went unpresented due
       to trial counsel's ineffectiveness creates a reasonable probability of a
       different outcome. ............................................................................. 25

IV.    Sanchez is entitled to discovery ..................................................... 26

i

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 16-80693-CIV-BLOOM

RICARDO SANCHEZ, Jr.,

        Movant

v.

UNITED STATES OF AMERICA,

        Respondent

_____/

**REPLY TO THE UNITED STATES' RESPONSE IN OPPOSITION TO
SANCHEZ'S AMENDED MOTION FOR DISCOVERY**

Movant Sanchez has requested discovery documents and information related to his *Brady* claim (Claim VI) and trial counsel's failure to present available evidence supporting the theory of defense (Claim VII & Claim VIII).[1]

The Government admits that the newly discovered information set forth in the *Brady* claim and motion for discovery was not disclosed to Sanchez's trial counsel. *See, e.g.*, ECF No. [91] at 6, 7, 21, 24. It opposes, however, Sanchez's discovery of additional documents and information related to that new information. Traditional objections to discovery are not raised in the Government's Response, *e.g.*, that the request is burdensome or overbroad; that the materials sought are privileged or confidential; or that the discovery sought is not relevant to the

---

[1] Sanchez also claimed, as an alternative to the *Brady* claim, that—if counsel should have discovered such evidence—then they rendered ineffective assistance in the guilt phase (Claim VII) and penalty phase (Claim VIII) of trial. ECF No. [83] at 12 of 47 n.2. The Government, however, does not allege that the new facts were discoverable by trial counsel.

substance of the claims presented.[2] The Government's opposition is premised instead entirely on the assertion that not one juror would have altered their guilt or penalty phase verdicts had they known of the evidence in the Government's possession pointing to the *Zetas* drug cartel's responsibility for the Escobedo murders and of the fact that the Government's toolmark evidence tying the crime scene evidence to Danny Varela's home was both scientifically unsound and patently false.

The Government begins its argument with a lofty assessment of the strength of the circumstantial evidence case it presented at trial and repeats that assessment throughout its Response. Simultaneously, it fails to acknowledge the mountain of circumstantial evidence pointing to *Los Zetas* and dismisses the logical inferences raised by that evidence as mere "speculation."[3] In fact, law enforcement reports withheld from Sanchez's trial counsel provide substantial evidence that, no later than two days after the Escobedo murders, two cartel bosses knew: (1) Luis Escobedo was indebted to the cartel for almost $250,000; (2) Escobedo and his brother were cutting (diluting) the cartel's cocaine before shipping it from Mexico to Texas; and, (3) one of their buyers, Danny Varela, had complained about the quality

---

[2] The Government briefly alludes to "Sanchez's overly broad requests," ECF No. [91] at 7, but Sanchez's requests specifically identify a set category of information and, where possible, specific documents. Undersigned counsel remain willing to meet and confer with counsel for the Government to address concerns regarding any perceived overbreadth.

[3] In a more recent filing, the Government now concedes that at least some of what it brands here as "speculation" are actually undisputed facts. ECF No. [102] at 202-03, 204 fn.58

of the cut cocaine Luis Escobedo was providing *and* that he had not paid for the last 10 kilos of cocaine he had received. These reports also provided evidence that: (1) showed cartel members were in Florida when the Escobedo family was killed; (2) identified one cartel associate who arrived in Florida three days before the murders and did not leave until after the Escobedo family was dead; and, (3) revealed that, despite being granted immunity, this associate lied to conceal his drug trafficking activities, to conceal his interactions with Escobedo, and to distance himself from a cellular telephone connecting him to Escobedo. These facts, as well as the additional facts alleged in Sanchez's § 2255 motion, supported the theory of defense at trial. Sanchez was denied a fair trial when trial counsel was deprived of their use.

## I.     The "good cause" standard under Habeas Rule 6.

Sanchez need not first prove the merit of his claims to be entitled to discovery. Sanchez's motion asserts—and the Government's Response overlooks—that "good cause" for discovery exists when the allegations set forth in his habeas petition establish a prima facie case for relief.[4] That standard does not set a high hurdle. As the Court explained in *Johnson v. California*, 545 U.S. 162, 170 (2005), a

---

[4] The Government's Response mischaracterizes Sanchez's discovery motion as asserting that discovery is "automatic," "required," or "must" be ordered in this case. ECF No. [91] at 5. Sanchez's motion consistently states that "good cause" is required for habeas discovery and explains why he has met that standard. For example, after discussing how the "good cause" standard is met, the motion states: "When good cause is established, discovery must be allowed. *Harris*, 394 U.S. at 299-300; *see also id.* at 291 ('It is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing.'); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991) ('A court should grant discovery in its discretion where there is 'good cause' why discovery should be allowed.')." ECF No. [83] at 7 of 47.

party makes a prima facie case when he produces evidence "sufficient to permit the trial judge to draw an inference" that a violation occurred. Each of the claims for which Sanchez seeks discovery satisfies that standard. Sanchez's § 2255 pleadings contain specific allegations, identify documents, and point to exculpatory information withheld from Sanchez's counsel. Sanchez's § 2255 allegations establish a prima facie *Brady* violation and denial of the right to counsel, and will demonstrate, if the facts are fully developed, that he is entitled to relief. *Bracy v. Gramley*, 520 U.S. 899, 908-08 (1997).

The Government, in opposition, asserts that the "good cause" standard is a high bar that requires Sanchez to prove his claims are meritorious. *See, e.g.*, ECF No. [91] at 2. As a consequence, the Government does not dispute that Sanchez has set forth prima facie claims for relief; it asserts Sanchez has not proven his claims.

The assertion that Sanchez must prove his claims is based on a sentence from an Eleventh Circuit case that imported into a discussion on discovery under § 2254 the "cause" standard for overcoming procedural default. *See Arthur v. Allen*, 459 F.3d 1310, 1311 (11th Cir. 2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 317 (1995) (discussing the proof required to satisfy the threshold showing for actual innocence and, therefore, "cause" for a procedural default). The Eleventh Circuit, however, has not subsequently relied on *Arthur*, *supra*, to apply the *Schlup* actual innocence standard to a habeas discovery issue. The cited standard for discovery set forth in *Arthur* provides: "Good cause is demonstrated where specific allegations show reason to believe that the petitioner may, if the facts are fully developed, be able to

4

demonstrate that he is entitled to relief."[5] *See, e.g., Bowers v. U.S. Parole Comm'n, Warden,* 760 F.3d 1177, 1183 (11th Cir. 2014) (quoting *Arthur,* 459 F.3d at 1310-11 (internal quotation marks and alterations omitted)).[6] The Government's argument against discovery would require the Court to render a merits determination of Sanchez's claims as opposed to analyzing whether "good cause" exists.

The Government thus begins with the erroneous and circuitous assertion that Sanchez must demonstrate the merit of his claims (*e.g.,* the "materiality" of the evidence supporting his *Brady* claim) before he is allowed discovery in order to develop evidence to demonstrate that merit. It then compounds that error by suggesting that Sanchez cannot make that showing because the evidence of guilt presented at trial is sufficient to support his murder convictions.[7] *See, e.g.* ECF No.

---

[5] Undersigned counsel's research has not located a case that utilizes for discovery purposes the *Schlup* language from *Arthur, supra,* which is proposed by the Government in this case.

[6] The Government's Response disputes the holding of *Bowers.* ECF No. [91] at 5. The *Bowers* Court stated: "we hold that the district court abused its discretion by denying Bowers's motions for discovery and leave to amend." 760 F.3d at 1183. It specifically held: "Therefore, Bowers should be granted discovery on the impact that post-October 2005 political pressure may have had on the Parole Commission's 2011 decision. However, Bowers should not be granted discovery on [a second issue]." *Id.* at 1185 & n.10.

The Response also derides as dicta (ECF No. [91] at 6) Sanchez's parenthetical to *Quesinberry v. Taylor,* 162 F.3d 273, 279 (4th Cir. 1998): "(finding discovery should be granted when a movant 'makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief.')" ECF No. [83] at 6 of 47.  The quoted language from *Quesinberry* is a restatement of the discovery standard set forth in *Harris v. Nelson,* 394 U.S. 286, 300 (1969).

[7] Cases cited in support of this merits-based approach are distinguishable. The court affirmed the denial of an evidentiary hearing and discovery in *Smith v. United States,* 627 Fed. Appx. 852, 855-56 (11th Cir. 2015), where the defendant alleged a *Brady* claim involving criminal activity of a testifying co-defendant. The court determined a hearing on the claim was not warranted because it was based on criminal activity by

[91] at 3. Sufficiency of the evidence, however, is not determinative of the "good cause" inquiry, let alone the materiality requirement under *Brady*. *Guzman v. Secretary, Dep't of Corrections*, 663 F.3d 1336, 1355 (11th Cir. 2011) ("[T]he fact that there may have been sufficient evidence to convict is not the relevant materiality question."); *United States v. Scheer*, 168 F.3d 445, 452 (11th Cir. 1999) ("[T]he Supreme Court expressly has disavowed a simple 'sufficiency of the evidence' test in the *Brady/Bagley* context[.]") Directly applicable to Sanchez's motion is the Supreme Court's explanation of the "good cause" standard in the context of discovery for a *Brady* claim:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995).

---

the co-defendant that took place after the defendant's trial; in other words, it would not have impacted the jury verdict. In *Benford v. United States*, Nos. 5:12-cv-8021, 5:09-cr-441, 2013 WL 6162670, at *7 (N.D. Ala. Nov. 22, 2013), the district court denied a pro se petitioner's discovery request because his claim was based on "unsupported generalizations." Finally, in *Heidler v. Chatman*, No. CV 611-109, 2014 WL 725985, at *6 (S.D. Ga. Feb. 24, 2014), the court denied a discovery request made in support of a *Brady* claim alleging that the prosecution withheld evidence about past sexual abuse of the victim. The district court also noted that the records which were being sought in federal habeas discovery had been reviewed in camera by the state court post-conviction judge and found to be irrelevant to the defense.

The Government's Response, therefore, misses the mark when it opposes Sanchez's discovery motion by asserting that the *requested* documents and information "do not negate other evidence" from the prosecution's case, ECF No. [91] at 9, that "some of the reports confirm the [prosecution's] evidence presented at trial," *id.* at 10, that "[e]ven if Sanchez could negate the toolmark evidence, it would not have changed the verdict," or that "[t]he undisclosed DEA reports would not alter that reality [facts asserted by the prosecution at trial]." ECF No. [91] at 12, 28.[8] "A federal habeas court must allow discovery and an evidentiary hearing … where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief[.]" *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994). Put another way, "Good cause is demonstrated 'where specific allegations ... show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief.'" *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d 1248, 1281 (11th Cir. 2016) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)).

---

[8] As importantly, the Response incorrectly argues that Sanchez's sentences of death were a foregone conclusion because the case involves "[t]he murder of two little boys under the age of five." ECF No. [91] at 29. The notion of an automatic death penalty offends evolving standards of decency and contemporary values. *Woodson v. North Carolina*, 428 U.S. 280, 292-98 (1976); *see also Williams v. Taylor*, 529 U.S. 362, 398 (2000) (Finding counsel was ineffective for failing to investigate and present mitigating evidence because it "may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case."); *Sears v. Upton*, 561 U.S. 945, 951 (2010) ("This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears[.]").

II.     **The proof of Sanchez's involvement in the murders of the Escobedo family is not overwhelming**

The Government's circumstantial case against Sanchez is not nearly so conclusive as to his participation in the murders of the Escobedo family to demonstrate that not one juror – taking each of the allegations contained in Sanchez's § 2255 motion as true, and drawing all reasonable inferences in Sanchez's favor, *see Johnson v. California*, 545 U.S. at 170 – would have voted to acquit him of those crimes. *See Guzman v. Secretary, Dep't. of Corrections*, 663 F.3d at 1355; *United States v. Scheer*, 168 F.3d at 452. *See* ECF No. [91] at 3-4. Because that is the standard by which "good cause" for discovery as to Sanchez's *Brady* and ineffective assistance of counsel claims is to be determined, discovery is warranted here.

The bulk of the evidence introduced against Mr. Sanchez at trial went to establish his involvement in Danny Varela's drug trafficking scheme and the fact that he and Troya escorted Escobedo to the Daytona Beach area on the night of the murders where Escobedo picked up 13 kilos of cocaine destined for Mr. Varela. The Government introduced cellular phone records to infer the paths of the Troya/Sanchez vehicle and the Escobedo vehicle from West Palm Beach to just north of Daytona Beach and then back to the Fort Pierce entrance to the Florida Turnpike. There, during the early morning hours of October 13, 2006, both vehicles entered the turnpike. Fingerprint evidence was introduced which the Government suggests were consistent with the two vehicles leaving the turnpike 45 minutes later, one driven by Sanchez, the other by Troya. Another member of Varela's drug

8

trafficking scheme, Kevin Vetere, testified that he saw the two men, together with Varela and other of his compatriots, unloading what appeared to him to be bags containing a large quantity of cocaine. Packaging consistent with a large amount of cocaine was later recovered from Mr. Varela's home. A ledger listing quantities of cocaine next to the names of Sanchez (one kilo) and other Varela associates and indicating a $186,000 debt to be paid to "Matamoros" was recovered from Escobedo's home. Indeed, this is the very evidence the Government points to in its Response to support its claim that the *Brady* materials described in Sanchez's § 2255 motion would not have made a difference to his jury. ECF No. [91] at 3-4, 8-9, 28-29.[9]

Regardless of what may be said about this evidence insofar as whether Sanchez participated in Varela's cocaine distribution scheme, the Government's case is not nearly as impenetrable as its Response suggests with regard to Sanchez's involvement in the execution of the Escobedo family. The evidence placing Troya and Sanchez near the scene around the time of the murders (*i.e.*, the popping noises heard relatively soon after the Troya/Sanchez and Escobedo vehicles entered the Florida Turnpike; the fingerprint evidence that Sanchez was driving the Escobedo vehicle when it left the turnpike; and the cell phone contact between Sanchez and Escobedo near that point in time) may well be consistent with the Government's theory of the case. However, the evidence is *also* consistent with Luis

---

[9] The Government asserts "Given the plethora of evidence presented at trial concerning Sanchez's proximity (electronically and in person) to the murders, Sanchez's speculation about the supposed Mexican source of the cocaine would not likely alter the outcome of the guilty [sic] or punishment phases." ECF No. [91] at 3.

Escobedo informing Troya and Sanchez during that final phone call that he was pulling over to join a third party, turning his vehicle over to Troya and Sanchez so the pair could complete the delivery of the cocaine shipment they had been sent to protect, and the Escobedo family then being murdered by the third party. So too, evidence of Varela's attempt to repaint the van used by Troya and Sanchez to escort and/or someone's attempt to destroy the Escobedo Jeep could be consistent with the Government's theory at trial, but were equally consistent with Varela seeking to protect his ongoing criminal enterprise after learning that the two vehicles in his possession were being sought by law enforcement.

Accordingly, *absent evidence that Escobedo was dealing face to face with third parties who had both the motive and moral flexibility to murder him and his family* (such as was still being concealed at the time of trial), one can understand why the jury would accept the Government's theory (*i.e.*, Troya and Sanchez killed Luis Escobedo during a botched attempt to relieve him of 15 kilos of cocaine and to eliminate a prior drug debt—then thereafter killed his family in order to eliminate witnesses).[10] Here, however, the salient question is not whether the jury could find Sanchez guilty based upon the trial evidence. It is whether there is a reasonable probability that, upon considering trial evidence and the evidence previously undisclosed by the Government (as well as the evidence Sanchez develops based

---

[10] In this regard, it must be noted that, even at the time of trial, the Government's case was not without some areas of weakness.

upon the discovery allowed during these proceedings), a reasonable juror would conclude otherwise. *Guzman*, 663 F.3d at 1355; *Scheer*, 168 F.3d at 452.

Moreover, other evidence presented at trial does not support the Government's murder case. First, the nature of the wounds suffered by Luis Escobedo and his wife point to something more purposeful than a robbery gone bad, as does the arrangement of the bodies at the crime scene. Second, the idea that Sanchez and Troya were liable to *Escobedo* for the value of cocaine that had been seized from them by law enforcement after it had already been delivered from Escobedo to Varela may pass for credible in the mind of the law enforcement witness who testified that such was the case. Past that, however, it begs the question why the debt would be owing from Troya and Sanchez as opposed to from Varela, the person who was in an (albeit illegal) contractual relationship with Escobedo. *See* ECF No. [91] at 10, 11. Third, the fact that Troya and Sanchez ultimately delivered the October 14th cocaine shipment to Varela—who the Government still contends cannot be connected to Troya's and Sanchez's supposed robbery scheme—as opposed to retaining it for themselves undercuts the Government's argument that Troya's Chevrolet convertible and Sanchez's gold chain represent anything more than compensation for their efforts in getting the October 14th delivery to its *real* beneficiary, Varela. Fourth, even assuming Sanchez's richly rewarded roommate, Kevin Vetere, is to be believed, his statement that Sanchez stated, "you going to knock off the next big timer," *see* ECF No. [91] at

11

10, with no reference to the execution of Escobedo's wife and children, falls far short of a confession. Indeed, it fails even as the braggadocio of an unremorseful killer.

### III. Sanchez had pleaded facts which are both disputed by the Government and establish a reasonable probability of a different outcome.

The Government's attempt to characterize the evidence (it admits it concealed from trial counsel) as merely "Sanchez's speculation about the supposed Mexican source of the cocaine," *see* Response, ECF No. [91] at 3, can neither serve as grounds for denying Sanchez the discovery he seeks, nor for questioning the sufficiency of his *Brady* and/or ineffective assistance of counsel claims. Even more so, the Government cannot simply ignore the evidence the Government concealed when it interferes with the Government's narrative. The factual allegations contained in Sanchez's *Brady* and/or ineffective assistance of counsel claims, together with the reasonable inferences which may be drawn from them, create a reasonable probability that at least one juror would have come to a different conclusion than the jurors did at trial. They undermine confidence in the outcome. Presented together with the evidence presented at trial there is a reasonable probability that one or more jurors would have harbored a reasonable doubt whether the Escobedo family was actually killed because Luis Escobedo had failed to pay the *Zetas* Cartel almost a quarter of a million dollars and because he had diluted (*i.e.*, stolen) cartel cocaine destined for South Florida. There is a reasonable probability that this doubt would not have been dispelled by the Government's scientifically unsound and patently incorrect claim that the empty shell casings found at the crime scene, including one inexplicably buried beneath the ground, had

12

all been scientifically matched to whole bullets recovered from Danny Varela's home. There is a reasonable probability that jurors would not be persuaded to ignore the evidence of third-party guilt of the Escobedo murders by a Government case pointing no further than a drug conspiracy which pales in comparison to the one to which it turned a blind eye in order to protect the murder charges against Mr. Sanchez.

Sanchez will address the trial evidence, the withheld information, the information which would have been presented by effective counsel, and the reasonable inferences which, taken as true, set forth this probability. Because the Government raises only the lack of materiality and/or prejudice as grounds for denying the same, Sanchez is entitled to the discovery he seeks.

### A. Evidence contained in law enforcement reports withheld by the Government creates a reasonable probability of a different outcome.

According to the evidence introduced at trial, Luis Escobedo's body displayed wounds far beyond those necessary to kill and rob a man of the 15 kilos of cocaine. In addition to a fatal head wound, it was riddled with bullet wounds, punctuated by one from a bullet placed through his penis. Rather than reflect a chaotic and unplanned elimination of witnesses, his wife and children were forced to lie on the ground and summarily executed. Like Luis, his wife Yessica's body showed far more wounds than would have been necessary to eliminate her as a witness. Had trial counsel possessed the evidence of Luis Escobedo's betrayal of *Los Zetas* (which was revealed, and then only partially, for the first time to Sanchez's § 2255 counsel) there is a reasonable probability one or more members of his jury would have

13

concluded their deaths were intended to send a message, a message the *Zetas* are still known for.

> **1.   October 16, 2006, 2:11 PM email from Agent Robert T. Franklin to Maurice Dowdy and Armando Ramirez, ECF No. [78-1], Appx. at A-001757-59 (withheld from trial counsel).**

Beginning less than 72 hours after the Escobedo murders, confidential sources from the Matamoros/Brownsville area—whose accurate information regarding details of the events surrounding them—verify their claim to have spoken to persons with actual knowledge, began to explain the nature of Luis Escobedo's association with the deadly *Zetas* Cartel.[11] Within a day or two following the murders, *Zetas'* bosses Martin Soto and Oscar "Muneco" Flores-Venegas displayed knowledge of events about which they could have only known so quickly by learning of those events as they happened. The pair told the confidential source that Luis Escobedo had been distributing cocaine for them and that he had received 15 kilos of their cocaine just before he was killed.[12] They told the source that this cocaine had been taken from Mexico to Texas by persons the source described as "Soto's people."[13] Finally, they told the source the buyer of their 15 kilos had accompanied Escobedo to pick it up.[14] Importantly, however, they also told the source that Luis

---

[11] ECF No. [78-1], Appx. at A-001757, 10-16-2006, 2:11 PM email from Agent Robert T. Franklin to Maurice Dowdy and Armando Ramirez ("Juan and I talked to a CS this morning who met with Martin SOTO and 'Muneco', Oscar Flores-VENEGAS, over the weekend at a house of SOTO's in Matamoros.").

[12] *Id.* ("The CS said Luis ESCOBEDO supposedly picked up 15 kilos of cocaine in Jacksonville, FL (Muneco's dope) and was possibly being followed by the buyer[.]").

[13] *Id.* ("transported by SOTO's people")

[14] *See infra* at fn.12.

Escobedo had failed to pay them for 13 kilos of cocaine, an amount of cocaine which Escobedo would have sold for just short of a quarter of a million dollars.[15]

As his interview ended, Agent Franklin's source added that he was going to speak to Luis Escobedo's brother, Manuel, the next weekend and would try to get more information about the buyer.[16]

> **2.  DEA-6, 06-04-2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007, ECF No. [78-1], Appx at A-001730-32 (withheld from trial counsel). Request Exhibit A.**

The Government never revealed to trial counsel what the confidential source told Agent Franklin during that first interview. Long after Sanchez's trial, after his direct appeal, and after he had filed a motion for relief under 28 U.S.C § 2255, however, AUSA Carlton did reveal that he (and his lead agent on Sanchez's case, Agent Weeks) personally met with the same confidential informant in Brownsville months after that initial meeting for another interview.[17] The report of that interview, which was also only revealed for the first time during § 2255 proceedings, showed that the confidential source provided Carlton and Weeks with greater detail about what the source had learned from Venegas and Soto about the Escobedo/*Los Zetas* relationship and further information about the buyer.

---

[15] *Id.* at A-001757 ("The CS said ESCOBEDO owed Muneco for 13 kilos already and they were talking about not being able to get the money from them.").

[16] *Id.* ("Luis ESCOBEDO's brother, is residing in Matamoros. The CS is expecting to see Manuel ESCOBEDO this weekend at a Bar-B-Que in Matamoros and might be able to find out who the Florida buyer is.").

[17] *Compare* ECF No. [78-1], Appx. at A-001757, 10-16-2006, 2:11 PM email from Agent Robert T. Franklin to Maurice Dowdy and Armando Ramirez, *with* ECF No. [78-1], Appx. at A-001730-32, DEA-6, 06-04-2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007.

The report showed Luis Escobedo, who had been living in Florida for about 18 weeks, had been receiving between 30 and 50 kilos of cocaine a week from Venegas/Soto and had been selling that cocaine for $18,000/kilo.[18] The source explained that, among the people he had described earlier only as "Soto's people," the individual who was arranging the shipment of the cocaine from Mexico to Florida was Manuel Escobedo—Luis Escobedo's brother.[19] (The source stated during his first interview that he was going to meet with Manuel on the weekend following his first interview.) Under the Escobedo brothers' arrangement with Venegas/Soto, Luis and Manuel would split $1000 equally, the rest would be remitted to the cartel. (Stated in terms of weekly incomes, Luis would receive between $15,000 and $25,000/week and the cartel would receive between $510,000 and $850,000/week) In addition, Venegas paid the Escobedo family's living expenses.[20] Over the 18 weeks Escobedo had been in Florida, the *Zetas* would have received between and $9,180,000 and $15,300,000.

The report, however, also indicates that this arrangement was not working out as planned for either the *Zetas* or Escobedo's buyers. The confidential source stated that a buyer, whom he described as "the one with the grill," was upset with the quality of the cocaine Escobedo was providing. (Given photographs that law enforcement retrieved from a disposable camera seized at Varela's residence, there

---

[18] ECF No. [78-1], Appx. at A-001730, ¶2, DEA-6, 06-04-2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007.

[19] *Id.* at A-001731, ¶7 ("According to the CS, Manuel ESCOBEDO was shipping Luis ESCOBEDO 30 - 50 kilograms of cocaine a week.")

[20] *Id.* at A-001731, ¶6.

appears little doubt but that "the one with the grill" was Danny Varela.) The source

explained that the reason Varela was upset about the quality of the cocaine was

because it was being cut before leaving Mexico.[21] Immediately after describing

Varela's dissatisfaction with the cocaine he was buying from Escobedo, the report

noted that Varela had not paid for 10 kilos of the cocaine he had received from

Escobedo.[22] As noted, the "Soto person" shipping the cartel's cocaine from Mexico to

Florida, *i.e.*, the last person having control of it before it left Mexico, was Manuel

Escobedo. Manuel Escobedo's father-in-law, however, was a homicide detective in

Mexico.[23]

The Government has refused to identify Brownsville RO CS-07-12 or to

provide any additional information regarding him.

> **3.      DEA-6, 06-06-2007 Debrief of I.C.E. Confidential
> Source on 05-23-2007, ECF No. [78-1], Appx. at A-
> 001733-35 (withheld from trial counsel). Request
> Exhibit B.**

The next day, AUSA Carlton and Agent Weeks attended the Brownsville

interview of a second confidential source.[24] This informant told them that seven

years earlier he had been a one-half-to-a-whole-kilo customer of Luis Escobedo. He

stated that Yessica Escobedo's father, Felipe Guerrero, asked him to find out what

he could about the murders.[25] To get the information, this confidential source went

---

[21] *Id.* at A-001731, ¶4.

[22] *Id.* at A-001731, ¶5.

[23] *Id.* at A-001731, ¶9.

[24] DEA-6, 06-06-2007 Debrief of I.C.E. Confidential Source on 05-23-2007, ECF No. [78-1], Appx. at A-001733-35.

[25] *Id.* at A-001734, ¶4.

to associates of his who were members of *Los Zetas*.[26] The *Zetas* members told him details of two incidents that only people with direct knowledge could have provided. The earliest was that occupants of a Chevrolet Suburban had met with Escobedo in Florida two weeks before the murders to pick up money. The two were concerned because they had met at a location with video surveillance and might have been exposed as a result of the murder investigation.[27] The more recent was that "someone from Matamoros" had picked up between $100,000 and $300,000 the day before the murder.[28] (The Government's Response, ECF No. [91] at 15, submits this "directly refutes" Venegas'/Soto's claim Escobedo owed them for 13 kilos of cocaine at the time he was killed. This submission overlooks that $100,000 and $300,000 would represent at most two-thirds, and as little as one-ninth, of what Escobedo would owe to the cartel for the weekly cocaine shipments described by CS RO CS-07-12 in Request Exhibit A.)

The *Zetas* members confirmed it was Martin Soto who had been supplying Escobedo with cocaine.[29] Because the I.C.E. source was also personally involved in transporting cocaine from Mexico to Florida for Soto, he was able to provide details of Soto's south Florida operations.[30] He stated that Soto would ship 20 to 30 kilos of cocaine to an individual named "Adolfo" in Naples by strapping 4 kilos of cocaine per person to men travelling to Florida on commercial airlines. This was an amount

---

[26] *Id.* at A-001734, ¶5.
[27] *Id.* at A-001734, ¶6.
[28] *Id.* at A-001734, ¶5.
[29] *Id.* at A-001734, ¶7. This DEA-6 identifies Martin "Sosa" who is likely Martin Soto.
[30] *Id.* at A-001734, ¶8.

18

similar, but yet significantly smaller, to that Soto was shipping to Escobedo.[31] The

I.C.E source also informed Carlton and Weeks that Adolfo was formerly a customer

of the rival Gulf Cartel. [32]

The Government has refused to identify I.C.E. Confidential Source or to

provide any additional information regarding him.[33]

4.      **DEA-6, 06-05-2007 Interview of Victor Cortinas on 05-23-2007, ECF No. [78-1], Appx. at A-001736-38 (withheld from trial counsel). Request Exhibit C.**

On the same day Agent Weeks and AUSA Carlton attended the interview of

I.C.E. Confidential Source, they met with Victor Cortinas. Cortinas had come to the

Government's attention because a cell phone (phone number 956-243-7313) he had

purchased had connected to an Escobedo phone multiple times on the night of

---

[31] *Compare id.* at ¶8, *with,* DEA-6, 06-04-2007 Debriefing of Brownsville RO CS-07-12 on 05-22-2007, ECF No. [78-1], Appx. at A-001731, ¶7.

[32] *Id.* at A-001734, ¶8.

[33] In its Response, ECF No. [91] at 14, the Government claims that the information provided by I.C.E. Confidential Source is not exculpatory because I.C.E. Confidential Source *also* stated that the murders were committed in connection with a drug robbery in Florida (*i.e.*, the Government's theory of the case). Even setting aside the legal error underlying that statement, *see DiSimone v. Phillips*, 461 F.3d 181, 195 (2d Cir. 2006) (internal quotation marks and citation omitted) (evidence "having both an inculpatory and exculpatory effect" must be turned over to the defense counsel as *Brady* material"), the Government's claim exaggerates the inculpatory nature of this statement. The *Zetas* members' statements describing the inner workings of the Escobedo/*Los Zetas* relationship necessarily came from someone within either *Los Zetas* or someone close to Luis Escobedo. No one else would have such information. The same is not true for statements blaming someone else for the murder. The Government claims there is no connection between the Escobedo's killers and *Los Zetas*. The *Zetas* members who spoke to I.C.E. Confidential Source (and/or I.C.E. Confidential Source himself) therefore had no source for these claims other than what was publicly available at the time, to wit, the Government's pending accusations against Sanchez and Troya.

19

October 12, 2006.[34] The last of these was at a time when Escobedo was at or near the location where he met with *Zetas* Cartel members.[35]

Cortinas told Agent Weeks that the phone was in the possession of his brother-in-law, Juan Santos, during the time the Escobedo family was murdered. Santos had the phone for 10 months, but sometime before January 10, 2007, Cortinas took it back because Santos was not paying the bill, changed its number, and then gave the phone to his brother.[36] Cortinas provided contact information for Santos and said that Santos' ex-wife, Norma Guzman, lived in Florida with Santos' four children.[37]

The Government has refused to provide any further information regarding Victor Cortinas and/or his interview.

> **5.   DEA-6, 06-05-2007 Debriefing of Juan Carlos Santos on 05-24-2007, ECF No. [78-1], Appx. at A-001739 (not revealed to trial counsel). Request Exhibit D.**

The following day, AUSA Carlton and Agent Weeks interviewed Santos. At that meeting, Carlton agreed to grant Santos immunity.[38] After receiving immunity, Santos claimed that he and his current wife had travelled to Florida on October 9, 2006, to visit his children and to buy used cars in Florida to take back to

---

[34] DEA-6, 06-05-2007 Interview of Victor Cortinas on 05-23-2007, ECF No. [78-1], Appx. at A-001736, Synopsis.

[35] GX 760.13 - 760.14.

[36] ECF No. [78-1], Appx. at A-001737, ¶3.

[37] *Id.* at ¶6.

[38] DEA-6, 06-05-2007 Debriefing of Juan Carlos Santos on 05-24-2007, ECF No. [78-1], Appx. at A-001739, ¶1. Because the Government has refused to voluntarily produce documents related to this debriefing, it is unknown whether immunity extended to the murders of the Escobedo family.

Brownsville to sell. He said that his ex-wife's neighbor turned the children over to him and that they all stayed at a hotel in Ocala for the remainder of the trip.[39] Santos admitted that he had Cortinas' phone at the time. He claimed, however, that he had called Escobedo around 6:00 in the evening looking for cars to purchase and again about two hours later and was told by Escobedo that he (Escobedo) did not have time to talk. Santos claimed that he never spoke to Escobedo again and that he never met with him.[40] Finally, Santos claimed that after speaking to Escobedo, but before returning to Brownsville, he lost Cortinas' phone.[41]

Santos, despite his agreement with AUSA Carlton, had lied at every turn. Santos' attempt to distance himself from Cortinas' 956-243-7313 phone by claiming that he lost it after speaking to Escobedo at approximately 8:00 PM was false. In fact, Cortinas told Carlton and Weeks just a day earlier how Santos had returned the phone to him some time prior to January of 2007, and how that phone was now in the possession of Cortinas' brother.[42] More importantly, however, just five months later his ex-wife Norma Guzman would expose the fact that Santos had lied not only about the purpose of his trip to Florida, but about what he did while he was there. Santos was not a divorced used car broker who travelled to Florida to take his children for a three-plus day excursion at a hotel in Ocala. He was a cocaine

---

[39] *Id.* Appx. at A-001740, ¶¶3-4.
[40] *Id.* at ¶¶5-6.
[41] *Id.* at ¶8.
[42] *Infra* at fn.37.

trafficker who had come to Florida for business and who had never spent more than just a handful of hours alone with his children.

> **6. DEA-6, 10-05-2007 Interview of Norma Guzman on 10-01-2007, Appx. at A-001742-45 (withheld from trial counsel). Request Exhibit E.**

On October 1, 2007, Agent Weeks interviewed Norma Guzman.[43] Guzman told Weeks that Juan Santos had held only three jobs. He worked as a mechanic for two years ending when he got fired in January of 2004. He had a paper route in the early 1990's. His remaining job was that of a drug trafficker.[44] Guzman told Weeks about one occasion when her brother dropped off the children for a five hour visit, her brother saw Santos exchanging suitcases with an unknown number of females.[45] Guzman also told Weeks that Santos had never been alone with her children overnight and that most visits lasted only a few hours.

Regarding Santos' explanation for his presence in Florida when the Escobedo family was murdered, Guzman stated that Santos' story never happened. In fact, she would never have allowed the children to travel to Ocala with Santos.[46]

Request Exhibit E also recounts an incident which not only connects Santos to major figures associated with the illegal distribution of cocaine, but calls into question the Government's protestations that it has no information connecting

---

[43] ECF No. [78-1], Appx. at A-001742-45. DEA-6, 10-05-2007 Interview of Norma Guzman on 10-01-2007. Notably, though they were unmentioned by Cortinas, and denied by Santos, Request Exhibit E begins by stating in its "Synopsis" that Ms. Guzman was being interviewed about Santos' "drug trafficking activities."

[44] *Id.* Appx. at A-001742-43, ¶¶3, 4.

[45] *Id.* Appx. at A-001743, ¶6.

[46] *Id.* Appx. at A-001744, ¶10.

Santos to the large scale cocaine operations in which Escobedo played a major role.[47] In fact, it demonstrates that the Government had conducted an additional, and still undisclosed, investigation into Santos' drug trafficking before Weeks ever interviewed Ms. Guzman.

Agent Weeks came to the interview of Norma Guzman with a photograph of an individual named "Gus Martin." Sanchez is informed, and therefore believes, Martin is known by the Government to be involved in large-scale cocaine trafficking. Because the Government has refused to voluntarily produce documents related to the interviews of Ms. Guzman or Mr. Santos, the specific information which caused Weeks to believe Santos knew Martin is currently unknown. However, the reliability of that information is beyond question. When Weeks showed Ms. Guzman a picture of Mr. Martin, she identified him immediately. She told Weeks that Martin and Guzman rented a ranch together near the Port of Brownsville, a known arrival point for cocaine being shipped from Mexico to the United States.[48]

---

[47] *See* Response, ECF No. [91] at 17 ("[T]his information [that Santos was believed to have delivered 15 kilos of Venegas/Soto's cocaine to Escobedo] was not an investigative finding, but merely an identifier for any future law enforcement agent ... attempt[ing] to determine in the future if Juan Carlos Santos ever had any connection to suspected narcotics trafficking."); *id.* at 18 ("Santos did not provide this information. In fact, he denied seeing Escobedo during that trip. The agent's opinion and supposition [that Santos was believed to have delivered 15 kilos of Venegas/Soto's cocaine to Escobedo] did not constitute information exculpatory to Sanchez, but merely an identifier[.]").

[48] ECF No. [78-1], Appx. at A-001744, ¶11, DEA-6, 10-05-2007 Interview of Norma Guzman on 10-01-2007.

The Government had reason to believe then, and it has proffered no evidence to demonstrate it does not *still* have reason to believe, that Santos did not come to Florida to engage with Escobedo in business associated with the South Florida and South Texas used car markets. Rather it had, and has, reason to believe he came to Florida to engage with Escobedo in the business surrounding the distribution of cocaine for the drug cartels of northeast Mexico.

> **7.    DEA-6, 10-05-2007 Interview of Juana Beltran on 10-2-2007, ECF No. [78-1], Appx. at A-001746-47 (withheld from trial counsel). Request Exhibit F.**

It was because of the Government's knowledge (and not speculation, supposition, or guesswork) that Santos was in Florida to engage in activities related to the large-scale trafficking of cocaine that the day after speaking to Ms. Guzman, Agent Weeks interviewed Juana Beltran. The stated purpose of the interview was to determine the owner/user of a prepaid phone[49] which, just like the Escobedo phone, had been contacted by Santos numerous times on the night of the Escobedo family's murders.[50] Despite these numerous calls, Beltran claimed she was the only person who possessed the phone on the night of the Escobedo murders and she neither knew Santos, nor had ever seen him. Not surprisingly, Agent Weeks did not believe her.[51]

---

[49] Request Exhibit F confirms that the Government continues to conceal its investigation of Santos' drug trafficking activities, activities which also involved Luis Escobedo. The prepaid phone could not be connected to Ms. Beltran simply by tracing its number back to the purchaser of the phone because the phone was purchased under the false name of David Blank.

[50] ECF No. [78-1], Appx. at A-001746, Synopsis. DEA-6, 10-05-2007 Interview of Juana Beltran on 10-02-2007.

[51] *Id.* at A-001747, ¶¶5-6.

24

### B.   Evidence impeaching the Government's case which went unpresented due to trial counsel's ineffectiveness creates a reasonable probability of a different outcome.

Sanchez claims that trial counsel was ineffective for failing to retain a toolmark expert to rebut Government witnesses who testified that empty shell casings found at the scene of the Escobedo murders could be scientifically-connected to whole bullets recovered from Varela's home. That claim also sets forth facts which, together with the reasonable inferences to which Sanchez is entitled at this point, create a reasonable probability of a different outcome.

The Government insists otherwise, pointing to the fact that the declaration of Sanchez's expert, James Gannalo, does not state that the toolmark evidence points to the guilt of a third party. What the Government ignores is that evidence undercutting the prosecution's proof is every bit as material as proof establishing the defendant's case in chief. *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989). Here, Gannalo's declaration states that the Government witnesses' testimony that they had matched empty casings at the crime scene to whole bullets found at the Varela residence was without a basis in fact. Accordingly, the only issues raised by the Government's Response regarding whether Sanchez is entitled to the discovery he seeks are whether the trial counsel's failure to present evidence of the unreliability of the Government's testimony prejudiced Mr. Sanchez and whether the Government disputes Gannalo's conclusions. The answer to the latter question is clearly "yes." ECF No. [91] at 25-26. The question thus becomes: If trial counsel had demonstrated the unreliability of the Government's toolmark experts, is there a

reasonable probability of a different result. *See Strickland v. Washington,* 466 U.S. 668, 690 (1984); *Fortenberry v. Haley*, 297 F.3d 1213, 1225 (11th Cir. 2002).

On this point, the Government once again claims its case demonstrating Troya's and Sanchez's guilt is "overwhelming." ECF No. [91] at 29. As explained above, *see infra* at 8-11, it is not. Moreover, it is even less so in light of the evidence of third-party guilt which the Government concealed. Contrary to the Government's assertion that the toolmark evidence is "merely additional evidence of guilt," ECF No. [91] at 28, it is the *only* evidence presented at trial which is inconsistent with the available evidence of third-party guilt.

## IV.    Sanchez is entitled to discovery.

Rather than address the facts alleged in Sanchez's § 2255 motion and/or attempt to explain how they are not supported by the ample record citations which Sanchez provides, the Government inaccurately characterizes them as mere speculation and/or proceeds as if they do not exist. In fact, it is not until page 12 of its Response that the Government even reaches the substance of Sanchez's allegations. Even then, it feigns ignorance of facts in its possession.

For example, at page 12, the Government purports to describe the contents of Request Exhibit A:

> DEA Brownsville CS-02-12 informed law enforcement that he/she allegedly spoke to a "Martin Soto" in Mexico about a week after the Escobedo murders. Soto allegedly claimed to the CS that Escobedo was in possession of fifteen kilograms of cocaine owned by Oscar Venegas at the time of Ecobedo's (sic) murder. DE 83-1, p.1.

> The CS stated that the cocaine buyer, the one with the "grill" (Danny Varela) who was buying the cocaine from Escobedo in Florida was upset about the poor quality of cocaine he was receiving. Varela

26

was the planned buyer of the fifteen kilograms of cocaine stolen from Escobedo on the night of the murders.

The CS stated that the person buying the cocaine from Escobedo (Varela) already owed Escobedo for ten kilograms that previously had been delivered.

ECF No. [91] at 12-13.

The Government points to a debt owing from Varela to Escobedo, *yet fails to mention* that the October 16, 2006 email from DEA Agent Robert T. Franklin to Maurice Dowdy and Armando Ramirez (also withheld from trial counsel), ECF No. [78-1], Appx. at A-001757-59 (describing an interview of the same confidential source conducted only three days after the murders) reports an unpaid debt owing from Escobedo to cartel bosses Venegas and Soto. Even as to the Varela debt, the Government notes Varela's displeasure with the quality of the cocaine, *yet fails to mention* that their confidential source told them, not only that Escobedo's brother Manuel was the person who shipped the cocaine to Escobedo for Venegas and Soto in Mexico, but also that the cocaine was being diluted before it left Mexico. When forced to confront the fact that their source identified who had provided the cocaine being sent to Varela, the information becomes nothing more than "allegations." Even then, the Government *fails to mention* that, not only did the cocaine being trafficked by the Escobedo brothers belong to Soto and Venegas, the *Zetas* bosses had been sending as much as almost $900,000 dollars of cocaine through the

27

brothers to Florida *every week*. Similarly,[52] the Government *fails to mention* Soto's description of actions taken by Escobedo, actions about which he necessarily could learn only from someone with first-hand knowledge. Finally, the Government *fails to mention* that their source told them that Manuel Escobedo had a close familial relationship with a homicide detective in Mexico.

The Government thus elides: (1) every statement pointing to the cartel's obvious motives for executing the Escobedo family; (2) every statement demonstrating the cartel's intimate knowledge of Escobedo's activities on the night he was murdered; and, (3) every statement revealing that the murder of Escobedo would not, as the Government claimed at trial, have erased anyone's debt. Having done so, it then declares that Request Exhibit A is not exculpatory.

This is the tactic employed by the Government throughout its Response. As to each Request Exhibit, it offers an inaccurate summary of their content, a summary which omits the portions of those exhibits supporting Sanchez's claims. The Government's denial of the existence of Sanchez's well-pled facts is no less a factual dispute than would be their denial of the truth of those facts.

If that dispute is resolved in Sanchez's favor, he is clearly entitled to relief. Sanchez's jurors would have known that Luis Escobedo and his brother Manuel were associates of the *Zetas* Cartel, *e.g.*, Martin Soto and Oscar Flores Venegas, and were a major cog in the cartel's expansion into the south Florida market. They

---

[52] *Compare infra* at 17-19 with ECF No. [91] at 13-16; *infra* at 19-20 with ECF No. [91] at 16-17; *infra* at 20-21 with ECF No. [91] at 17-18; *infra* at 22-24 with ECF No. [91] at 18-19; *infra* at 24 with ECF No. [91] at 19.

would have known Escobedo owed the cartel almost a quarter of a million dollars. They would have known Luis and his brother Manuel had been cutting (diluting) the cartel's cocaine to increase their profits and that one of the cartel's major south Florida customers, Danny Varela, had complained about receiving diluted cocaine and had failed and/or refused to pay Escobedo for 10 kilos.

The jurors would have also known that cartel associates were in Florida at the time the Escobedo family was murdered and that cartel associates (*i.e.*, Soto's people) were the ones who provided Escobedo with 15 kilos for delivery to Mr. Varela. They would have known cell phone records, the very type of evidence the Government claimed was proof beyond a reasonable doubt of Sanchez's opportunity to commit murder, showed near-constant communications between Luis Escobedo and his brother Manuel on the night Luis and his family were killed. So too, they would have known that the cartel's contemporaneous knowledge of the substance of those communications showed Manuel was sharing them with cartel bosses Soto and Venegas. Further, Sanchez's jurors would have known that Juan Santos, a known trafficker in large quantities of cocaine was contacting Luis Escobedo as he approached, and as he arrived at, the location where he was to meet "Soto's people."

The jurors would have learned that Juan Santos could have told the Government the truth about not only his lifetime of drug trafficking, but also about any drug trafficking activities from the time he arrived in Florida three days before the murders of the Escobedo family until he left sometime after they had been killed. He would not serve even a minute in prison for any of it because AUSA

29

Carlton had agreed to give him immunity. Still, Santos found a reason to lie to Carlton, to Agent Weeks, and to the other law enforcement agents who attended his debriefing. They would have known Santos lied about why he came to Florida shortly before the Escobedo murders and lied about what he did when he was there. The jurors would have known he lied when he said he quit having contact with Luis Escobedo. Finally, they would have known he lied about losing the Cortinas cell phone which indisputably tied Santos to Escobedo late on the night of the murders.

Sanchez's jurors would have also known about how the other people working with Santos on the night Escobedo was murdered lied once to anonymously purchase a prepaid (burner) phone and then lied again to law enforcement about having anything to do with Santos on the night of the Escobedo murders.

Finally, they would have known that the *only* testimony connecting Sanchez to the crime scene was both scientifically unreliable and patently false.

Put simply, Sanchez's jurors would have known about suspects with far greater reasons to execute a family of four than two underlings allegedly hoping to profit from the extinguishment of a debt they did not personally owe and to provide their boss, Danny Varela, with cocaine he was going to receive regardless of whether the Escobedo family lived or died. They would have known that those suspects' associates were in Florida at the time of the murders, had just met with Escobedo, and that those suspects were keeping tabs on Escobedo as he drove home.

Sanchez has stated a cause of action.

30

For the purposes of determining whether discovery should be granted, however, the Court does not look merely to whether the facts alleged in a movants' § 2255 motion would entitle him to relief, but also to whether the additional facts might be developed which would entitle him to relief. *Daniel v. Comm'r, Alabama Dep't of Corr.*, 822 F.3d at 1281.

The Government has not denied that it possesses additional facts regarding Luis Escobedo's association with the cartels. For example, DEA Brownsville CS-02-12 (Request Exhibit A) did not appear out of thin air, but was the product of an investigation into the Escobedo/cartel relationship. The same can be said for the I.C.E. Confidential Source. Moreover, it is clear an undisclosed investigation was undertaken to determine Juan Santos' involvement in large-scale cocaine trafficking as Agent Weeks was able to connect Santos not only to the delivery of cocaine to Escobedo, but to identify another major cocaine trafficker, Gus Martin, as one of Santos' associates without getting that information directly from Santos. Finally, the Government has not denied and has partially admitted (*see* ECF No. [91] at 21) it possesses telephone records for the persons who are alleged by Sanchez to have the motive and opportunity to have killed the Escobedo family for the periods of time surrounding the murders. As the Government continues to deny that Venegas, Soto, Santos, Manuel Escobedo, and other unidentified persons had the motive and opportunity to (directly or through their agents) kill the Escobedo family, all information tending to establish the allegations contained in Sanchez's § 2255 motion is subject to discovery.

WHEREFORE Mr. Sanchez renews his requests for leave of the Court to request the production of documents, to propound interrogatories, to inspect physical evidence, to conduct depositions of any party identified in the Government's written answers to interrogatories, and to issue subpoenas to third parties.

Respectfully submitted,

s/Stephen M. Kissinger
Stephen M. Kissinger, WY Bar No.5-2342
Asst. Federal Community Defender
Stephen_Kissinger@fd.org

s/Dana C. Hansen Chavis
Dana C. Hansen Chavis, TN Bar No.019098
Asst. Federal Community Defender
Dana_Hansen@fd.org

Federal Defender Services
 of Eastern Tennessee, Inc.
800 S. Gay Street, Suite 2400
Knoxville, TN 37929
Telephone: (865) 637-7979
Facsimile: (865) 637-7999

Attorneys for Movant Ricardo Sanchez, Jr.

Dated: June 1, 2018

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically by the Court's CM/ECF service on June 1, 2018, on all counsel or parties of record on the Service List below.

<u>s/Stephen M. Kissinger</u>
Stephen M. Kissinger

## SERVICE LIST

Stephen Carlton, Assistant United States Attorney
Stephen.Carlton@usdoj.gov
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526

Stephanie D. Evans, Assistant United States Attorney
Stephanie.D.Evans@usdoj.gov
United States Attorney's Office
500 South Australian Avenue, Suite 400
West Palm Beach, FL 33401
Telephone: (561) 820-8711
Facsimile: (561) 659-4526

Attorneys for Respondent United States of America

33